**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | **MDL No. 3060** <br><br> Master Docket Case No. 1:23-cv-00818 <br><br> Honorable Mary M. Rowland |

<u>**MASTER LONG FORM COMPLAINT**</u>

Now comes the Plaintiffs in MDL No. 3060, through the appointed leadership committee, and bring their Master Long Form Complaint ("Master Complaint") against John Paul Mitchell Systems ("Defendant") and allege on personal knowledge as to themselves, and on information and belief as to all matters as follows:

## NATURE OF THIS MASTER COMPLAINT

1.      This Master Complaint sets forth allegations of fact and law common to those claims within this multidistrict proceeding relating to hair relaxer products. It includes allegations that the Defendant manufactured, sold, distributed, advertised, and promoted toxic hair relaxer products that caused Plaintiffs to develop cancers and other injuries, although not all Plaintiffs in these proceedings have claims against Defendant John Paul Mitchell Systems and other products and defendants are at issue in these proceedings. Plaintiffs seek compensatory and punitive damages, monetary restitution, medical monitoring and equitable relief, and all other available remedies as a result of injuries incurred by Defendant John Paul Mitchell Systems's defective products and other wrongful practices.

2.      This Master Complaint will address the claims arising as the direct and proximate result of the conduct of the Defendant, its directors, agents, heirs and assigns, and/or its corporate predecessors, and its hair relaxer products, which include but are not limited to The Relaxer-Regular Strength by John Paul Mitchell, and The Relaxer - Super Strength by John Paul Mitchell.

3.      This Master Complaint does not necessarily include all claims asserted in all of the transferred actions to this Court, nor is it intended to consolidate for any purpose the separate claims of the Plaintiffs herein. It is anticipated that individual plaintiffs may adopt this Master Complaint and the causes of action herein through use of a separate Master Short Form Complaint for Individual Claims, which will specify the particular products and defendants against whom claims are asserted by each individual plaintiff.

4.      This Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in any individual actions, nor does any Plaintiff relinquish the right to move to amend their individual claims to seek any additional claims as discovery proceeds. As set forth herein, each Plaintiff maintains that hair relaxers are defective, dangerous to human health, unfit

and unsuitable to be advertised, marketed, and sold in the United States, and have lacked proper warnings of the dangers associated with their use. Any separate facts and additional claims of individual plaintiffs are set forth in those actions filed by the respective plaintiffs.

<u>**NATURE OF THIS ACTION**</u>

5.      Plaintiffs in this action seek compensation, and justice, for injuries resulting from use of defective hair relaxers designed, manufactured, sold, distributed, and marketed by the Defendant.

6.      Plaintiffs' use of toxic chemical straightening products designed or manufactured by the Defendant was a direct result of Defendant's wrongful marketing practices. The Defendant systematically misrepresented and continues to misrepresent the significant health impacts of hair relaxer use, all while targeting women of color and taking advantage of centuries of racial discrimination and cultural coercion which emphasized—both socially and professionally—the necessity of maintaining straight hair.

7.      Rather than disclosing the risks and warning women and children, the Defendant exploited for profit this deep-rooted connection between hair and identity in how Defendant chose to market its hair relaxer products. Defendant's advertising and marketing of its hair relaxer products, and Defendant's failures to take reasonable and necessary steps to protect Plaintiffs from harm, (1) exposed Plaintiffs to brutally toxic products without warning; and (2) amplified institutionalized systems of discrimination that have minimized the cultural identity and heritage of women of African descent. The Defendant advertised its hair relaxer products as, *inter alia*, "organic," "safe," "botanicals," "natural," and "ultra nourishing" in newspapers, magazines, and media predominantly consumed by Black and Brown women. The advertisements, commercials, and packaging for the Defendant's hair relaxer products feature almost exclusively women of color with smooth hair texture.

- 2 -

8.     Indeed, the Defendant purposely sought to increase sales and ensure generations of dedicated consumers—all while having knowledge that the hair relaxer products it designed, manufactured, advertised, and sold contained toxic carcinogens.

9.     Consumers of hair relaxer products relied on the Defendant's misrepresentations and were misled as to the products' safety, and as a result have suffered brutal injuries including uterine and ovarian cancer. Many Plaintiffs have also suffered the inability to have children – a tremendous blow to their life goals and legacies.

## I.     PARTIES

10.     This Master Complaint is filed on behalf of all Plaintiffs whose claims are subsumed within MDL 3060. Plaintiffs in these individual actions have suffered personal injuries and death as a result of their use of the Defendant's various hair relaxer products.

11.     Plaintiffs have suffered personal injuries as a direct and proximate result of Defendant's conduct and misconduct as described herein in connection with the design, development, manufacture, testing, packaging, promotion, advertising, marketing, distribution, labeling, warning, and sale of Defendant's respective hair relaxer products.

12.     Defendant John Paul Mitchell Systems is a California corporation with its principal place of business at 20705 Centre Pointe Parkway, Santa Clarita, CA 91350.

13.     John Paul Mitchell Systems registered 1505 Agents are Amanda Garcia, Daisey Montenegro, Beatrice Casarez-Barrientez, Jessie Gastelum and John Montijo and can be served at 330 N Brand Blvd, Glendale CA 91203.

## II.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over each of the constituent cases in this litigation for one or more of the following reasons:

a.      Under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs and Defendant are residents of different states;

b.      Under 28 U.S.C. § 1331 because they involve questions of federal law arising under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et. seq.*, and the amount in controversy exceeds $50,000. 15 U.S.C. § 2310.

c.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state law claims because all claims alleged herein form part of the same case or controversy.

15.     This Court has personal jurisdiction over the Defendant in accordance with the allegations asserted here and in each Plaintiff's Short Form Complaint.

## III.     FACTS COMMON TO ALL COUNTS[1]

### A.     Market for Hair Relaxer Products

16.     Black people make up about 13 percent of the U.S. population, but by one estimate, Black spending accounts for as much as 22 percent of the $42 billion-a-year personal care products market, suggesting that Black people buy and use more of such products—including those with potentially harmful ingredients—than Americans as a whole.[2]

17.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black and Brown women, about one in twelve was ranked highly hazardous on the scoring

---

[1] Plaintiffs adopt and incorporate by reference the Facts Common To All Counts contained in paragraphs 33—114 of the Master Long Form Complaint filed on May 15, 2023. (*See* Dkt. 106, PageID # 1037—1071).

[2] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

system of EWG's Skin Deep® Cosmetics Database, an online resource for finding less-hazardous alternatives to personal care products. The worst-scoring products marketed to Black and Brown women were hair relaxers (along with hair colors and bleaching products). Each of these categories had an average product score indicating high potential hazard.

18.     In the U.S. alone, Black and Brown consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

19.     In 2020, the global black hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

20.     The Defendant, aware of the unique history of its target consumers, developed and has long deployed a marketing framework based on misrepresentations that exploit its consumers' social and economic need to maintain straight hair.

### 1.     History of Afro-Textured Hair and Hair Relaxers—The Framework for Defendant's Wrongful Marketing Practices

21.     Dating back to 1619, Black and Brown women have been degraded based upon the texture of their hair and compelled to conform to the Eurocentric beauty standard that furthers the notion that "straight" hair is an indicator of social status, moral virtue, and professional competence. By contrast, hair texture of African heritage ("afro-textured hair") has been characterized as unattractive, unprofessional, and inferior. [3]

22.     In its natural state, afro-textured hair is characterized by coily, springing, zigzag, and s-curve curl patterns, as well as its density, fullness, texture, and feel.[4]

---

[3] Shelby Smith, The Evolution of Black Hair in America, Imani Hair Care (Aug. 6, 2020), https://imanihaircare.com/blogs/news/the-evolution-of-black-hair-in-america
[4] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application*, 26, 14 (2018).

23.     Certain African hairstyles can be traced back thousands of years, when they often indicated tribe membership and stature,[5] slave masters commonly forced enslaved Black and Brown people to cut their hair. This was a way to "break their spirit and make slaves easier to control."[6] What was once a symbol of pride and symbolism became a tool for subordination and degradation. Hair cutting was also a common form of punishment during slavery and during Jim Crow.

24.     The very nature of slavery involved working long hours in dire conditions. "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangled tresses and shield them from hours spent toiling under the sun."[7] The hair that was once an important spiritual and cultural symbol became framed and viewed as tangled, matted, and unseemly.

25.     Because afro-textured hair reflected African heritage rather than European ancestry, afro-textured hair was considered a symbol of low social status.[8]

26.     In 1786, the Governor of Louisiana, Don Esteban Miro, passed the "Tignon Law" requiring women of African descent to wear a tignon (scarf) over their hair as a way of signifying they were members of the slave class, *even if they were free.* This law sent a direct signal to Black and Brown people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

27.     Texturism—the idea that "good hair" is equated with a straighter hair texture—was cemented into American culture during slavery. "Eurocentric beauty standards dictated that coily

[5]     *History of Braids: More Than Just a Hairstyle*, Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/.

[6] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

[8] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).

hair and dark skin were unattractive and inferior"; "lighter skinned and straighter haired slaves were favored and selected for more desirable positions in the house" as opposed to the fields.[9] Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom[.]"[10]

28.     Early American culture impressed on Black and Brown men and women that the straighter and less kinky their hair was, the better a life they could have. This stigma fueled the desire for tools and products that could straighten Black and Brown hair texture.

29.     In slavery and post-slavery America, Black and Brown women found a need to morph their hairstyles "from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black and Brown kinks and curls."[11]

30.     In an effort to obtain a better life, many enslaved people, and later their progeny, would go to "dangerous lengths to straighten their hair."[12]

31.     Afro-textured hair can be manipulated into a straightened state with the use of hair tools and non-chemical hair products. Prior to the invention of the chemical relaxer in 1900s individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated in a stove or ceramic heater, then pressed into hair strands to temporarily straighten them.[13]

---

[9] *Id.*
[10] *Id.*
[11] Brenda A. Randle, *I Am Not My Hair*, Race, Gender and Class, Volume 22, Number 1-2, 114 – 121 (2015).
[12] Nikki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://odelebeauty.com/blogs/the-rinse/black-hair-history-facts
[13] Jaclyn Peterson, *The Price of Beauty*, CTI Charlotte Teachers Institute Curriculum (2021).

### 2. The Invention of the Chemical Relaxer

32.     Black inventor Garrett Augustus Morgan discovered and created a system that would permanently straighten afro-textured hair, eliminating the issue of "shrinkage," where the curl pattern results in hair appearing to be shorter than it actually is.

33.     In addition to being an inventor, Morgan was a tailor. In the early 1900s, Morgan was repairing his sewing machines and creating a way to polish the needles to stitch fabrics more smoothly.[14] He applied a chemical solution to the needles and wiped the solution off with a rag and later noticed that the "curly" fibers in the rag were straightened after exposure to the chemical.[15]

34.     Morgan turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream that was marketed in 1913.



---

[14] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).
[15] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen 28 (2008).



35. Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical-based permanent hair relaxing products in the Black and Brown hair care market, also known as hair relaxers.[16]

36. Over the next 40-plus years, these products dominated the market for relaxing afro-textured hair until the emergence of new technology involving lye-based formulas.

### 3. Defendant's Marketing Efforts[17]

37. John Paul Mitchell Systems is a closely held private company still controlled by its original co-founders John Paul DeJoria and Angus Mitchell. Upon information and belief, the products referenced herein that are sold by John Paul Mitchell Systems including "The Relaxer" are manufactured, owned, controlled, designed, marketed and sold by Defendant John Paul Mitchell Systems. Upon information and belief, John Paul Mitchell Systems has been selling "The Relaxer" since at least 2009.

---

[16] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

[17] The following discussion of various Defendant manufacturers and/or products is not an exhaustive list of all hair relaxer manufacturers and/or products that have been marketed to consumers, nor is it an exhaustive list of all manufacturers and/or products currently on the market. Rather, it is a representative sample of how Defendant manufacturers advertised their products throughout the years.

38.     Upon information and belief , "The Relaxer" has caused the same health issues and concerns as all of the other hair relaxer products alleged within the original Master Long Form Complaint in the Hair Relaxer Litigation, specifically uterine and ovarian cancer (*See* Dkt. 106).

39.     John Paul Mitchell Systems has been advertising "The Relaxer," as having an innovative formula to reduce damage, having a rich cream base that is easy to apply, easy to rinse, and gives a fresh, clean fragrance for beautiful, conditioned results, continually implying their products are safe for use. They have been making these claims since at least 2009 and have never warned of any potential dangers that may exist from using its relaxers as directed.



**The Relaxer**
Regular and Super Strength Formulas
**What it does:** Two strengths address all hair types and textures and achieve just the right amount of curl reduction.
- Regular: Ideal for fine to medium texture, wavy or curly hair.
- Super: Ideal for medium to coarse texture, curly to extra-curly hair.

**How it works:** Innovative formula reduces damage, penetrates quickly and greatly reduces reversion.
**Added bonus:** Rich cream base is easy to apply, easy to rinse and has a fresh, clean fragrance for beautiful, conditioned results and a pleasant service experience.
**SIZES (OZ): 30**



40.     Defendant's marketing efforts, all have a common theme; they are filled with representations and insinuations that their hair relaxing products are safe and beneficial to the user. The use of words such as "professional," "fresh," "clean," "beautiful" and "pleasant service experience" in their marketing can lead a consumer to believe Defendant's hair relaxer products are safe when in fact they are not.

41.     The Defendant made these affirmative statements and/or omissions all while it knew or should have known of the true danger of its hair relaxer products when used by a plaintiff.

42.     Despite this knowledge, the Defendant continued their marketing efforts without ever attempting to correct the misconceptions they were creating.

### 4.    Chemical Relaxer Use: From Adolescence into Adulthood

43.    Hair relaxers are applied to the base of the hair shaft and left in place for a cooking interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage is to straighten and smooth the hair.

44.    After a period of weeks or months, depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots. Maintaining the relaxed hairstyle requires on-going application of hair relaxer to the new growth, a process colloquially referred to in the community as "re-touches," resulting in users relaxing their new growth every four to eight weeks on average.

45.    Hair relaxing is highly prevalent among Black and Brown women.  In some studies, up to 90% of Black women have used hair relaxers and straighteners, which is more commonplace for these women than women of any other race.

46.    The reasons for Black women's use and dependence upon hair straightening products are multi-faceted.[18] There are superficial reasons such as maintenance and personal choice. Yet, in addition to aesthetic aspirations, based upon the historical framework set forth above, maintaining straight hair was and is a means of integrating.

47.    The failure to maintain an appearance with straightened hair has and does impact the lives of Black women in the educational, social, and in the professional spheres.

---

[18] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/

48.     For example, Black and Brown girls and women are often victims of hair discrimination. According to the Dove CROWN[19] Research Study for Girls (2021)[20] conducted by JOY Collective, two-thirds (66%) of Black and Brown girls in White-majority schools who were surveyed reported they have experienced hair discrimination. Further, 45% of Black and Brown girls in all school environments reported hair discrimination, and nearly half (47%) of the Black mothers surveyed reported experiencing hair discrimination themselves.

49.     Moreover, hair discrimination is not only pervasive, it also often starts at an early age for young Black girls:

a.     100% of Black elementary school girls in majority-White schools who report experiencing hair discrimination state they experience the discrimination by the age of 10.[21]

b.     86% of Black teens who experience discrimination state they have experienced discrimination based on their hair by the age of 12.[22]

50.     In adulthood, hair discrimination impacts Black women's economic security. In the professional world, Black women with natural and unstraightened hair are "often deemed unkempt and unemployable."[23]

---

[19] The CROWN Act of 2021 was intended to address discrimination against protective hairstyles worn predominantly by women of color. H.R. 2116, 117th Cong (enacted); S. 888, 117th Cong. The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then California State Senator Holly J. Mitchell, to ensure protection against discrimination based on race-based hairstyles. The CROWN Act extended statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com/. While the bill did not pass the Senate in 2022, eighteen states have signed a version of the bill into state law.

[20] JOY Collective, *Dove CROWN Research Study for Girls* (2021), https://static1.squarespace.com/static/5edc69fd622c36173f56651f/t/623369f7477914438ee18c9b/164753 6634602/2021_DOVE_CROWN_girls_study.pdf

[21] *Id.*

[22] *Id.*

[23] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus, https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/

51.     Black women are one-and-a-half times more likely to be sent home from the workplace because of their hair.[24] Black women are 89% more likely than White women to agree with the statement, "I have to change my hair from its natural state to fit in at the office."[25]

52.     Many Black women succumb to these professional pressures and are compelled to use hair relaxers to both straighten and maintain their straight hair with routine re-touches.

53.     The Defendant was aware of, and marketed to, the above-detailed stereotypes and history concerning natural Black and Brown hair.

### 5.     Defendant's Hair Relaxer Products Contain Harmful, Toxic and Carcinogenic Ingredients

54.     The Defendant was aware or should have been aware of both the potential for harm and the increased risk of developing uterine and ovarian cancer from the use of the hair relaxer products based on evolving scientific studies, on-going research, and various government standards and regulations.

55.     This potential for harm to human health is due to the harmful, toxic, and carcinogenic ingredients in Defendant's hair relaxer products that are known to disrupt and/or harm a woman's endocrine system. Such harmful, toxic and carcinogenic ingredients have included over time, but are not limited to, phthalates, parabens, cyclosiloxanes, di-(2-ethylhexyl), octamethylcyclotetrasiloxane, lye, formaldehyde, and other toxic chemicals which can affect the endocrine system.

56.     The endocrine system is indispensable for life and influences nearly every cell, organ, and process within the body.[26] The endocrine system regulates all biological processes in

---

[24] CROWN study, *supra* note 23.
[25] *Id.*
[26] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[27]

57.     The precise functioning of the endocrine system is vital to maintaining hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[28]

58.     Endocrine-disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

59.     EDCs can block hormone stimulus by inducing epigenetic changes, (modifications to DNA that regulate whether genes are turned on or off) or altering the structure of target cells' receptors.[29]

60.     Natural and synthetic EDCs are present in some of Defendant's hair relaxer products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are applied to the hair and scalp.

61.     One of the EDCs, Phthalates are known to interfere with natural hormone production and degradation and are harmful to human health.[30]

---

[27] *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system

[28] *Id.*; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8

[29] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

[30] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

62.     They were developed in the last century and are used to make plastics more durable. These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

63.     Chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs. Several countries have established restrictions and regulations on some types of phthalates. [31]

64.     Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

65.     However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates and other EDCs evade listing when combined with a fragrance. As a result, consumers are not able to determine from the ingredient declaration on the label if phthalates or other toxic chemicals are present in a fragrance used in the hair relaxer products used by the Plaintiffs and placed into the stream of commerce by the Defendant.

**B.      Scientific Studies Confirm – Hair Relaxer Products Cause Uterine and Ovarian Cancer**

**1.      Uterine Cancer**

66.     Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[32]

---

[31] *Id.*
[32] Linda Duska, et al., *Treatment of Older Women With Endometrial Cancer: Improving Outcomes With Personalized Care*, American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/

67.     Uterine cancer is the fourth most common cancer for women in the United States, and the most commonly diagnosed gynecological cancer.[33] An estimated 66,570 new cases of uterine cancer are diagnosed each year, and around 12,940 women will die every year from the condition.[34]

68.     Uterine cancer has a hormonally driven etiology, and an imbalance of estrogen and progesterone can lead to the development of uterine cancers.[35]

69.     In October 2022, the National Institutes of Health released a study of approximately 34,000 women, aged 35-74, which was conducted over approximately 11 years.[36]

70.     The study revealed that there were significantly higher rates of uterine cancer in women who had used hair relaxers.

71.     Specifically, the study found that an estimated 1.64% of women who never used chemical hair relaxers would go on to develop uterine cancer by the age of 70. However, frequent users of hair relaxers (four or more times per year) were nearly three times more likely to develop uterine cancer than women who never used hair relaxers.[37]

72.     The study found that women who had ever used hair relaxers had an approximately doubled risk of developing uterine cancers as compared to women who did not use hair relaxers.

---

[33]     National Foundation for Cancer Research. https://www.nfcr.org/cancer-types/uterine-cancer/?gad=1&gclid=Cj0KCQjwsIejBhDOARIsANYqkD31b2Q0YCsXxx2UoDUEG2PYN4qKdyO36skCGpuZYh4dFf_Y--c5KJMaAleuEALw_wcB
[34] *Id.*
[35] https://www.cancer.org/cancer/types/endometrial-cancer/causes-risks-prevention/risk-factors.html
[36] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, Journal of the National Cancer Institute, Oct. 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087
[37] *Id.*

2.     **Ovarian Cancer**

73.     In a 2021 study funded by NIH and the National Institute on Minority Health Sciences, frequent use of hair relaxers was strongly associated with ovarian cancer.[38]

74.     In fact, the study revealed that those who frequently (four or more times per year) used hair relaxers were more than twice as likely to develop ovarian cancer.[39]

75.     It is estimated that 19,880 women in the United States will be diagnosed with ovarian cancer in 2022, with an estimated 12,810 of those diagnoses resulting in death.[40]

76.     Like uterine cancer, ovarian cancer is also believed to have a hormonally driven etiology, meaning that the insertion of hormonal disrupting compounds and the subsequent disruption of a woman's hormonal balance could lead to ovarian cancer.[41]

77.     Products that are used to relax hair texture have been found to contain an array of endocrine disrupting compounds including, but not limited to, phthalates, parabens, cyclosiloxanes, and metals, in addition to formaldehyde.[42] These chemicals can alter the body's delicate hormonal balance, and cause spikes or drops in levels of estrogens and progesterone (as well as other hormones).

78.     Recent studies have found an association between personal hair care products, including products that contain endocrine disrupting compounds, and ovarian cancer.[43]

---

[38] White, AJ, Sandler DP, Gaston SA, Jackson CL, O'Brien KM, *Use of hair products in relation to ovarian cancer risk*. Carcinogenesis. 2021 Oct 5; 42(9):1189-1195. doi: 10.1093/carcin/bgab056. PMID: 34173819; PMCID: PMC8561257, https://pubmed.ncbi.nlm.nih.gov/34173819.

[39] *Id.*

[40] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[41] White, Alexandra J., et al., Use of Hair Products in Relation to Ovarian Cancer Risk, Carcinogeneisi Vol. 42, No. 9, 1189-1195, 1189 (2021).

[42] *Id.*

[43] *Id.*

79.     Widely used chemical hair products, such as hair relaxers, are a source of exposure to carcinogens and these endocrine disrupters alike.[44]

80.     Other studies have found a positive correlation between the use of hair relaxers and incidents of ovarian cancer. Self-reported frequent use of hair relaxers has been associated with a higher risk of ovarian cancer.[45]

81.     Black and Brown women, the overwhelming majority of consumers of hair relaxer products, are more susceptible to the risk of ovarian cancer associated with the use and distribution of Defendant's products.

### C.     Regulatory Framework

82.     The law does not require cosmetic products or ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States are the Federal Food Drug and Cosmetic Act[46] ("FD&C Act") and the Fair Packaging and Labeling Act[47] ("FPLA").

83.     The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.[48]

84.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping, or handling.[49]

85.     Under the FD&C Act, a cosmetic is adulterated if, *inter alia*: (1) it bears or contains any poisonous or deleterious substance causing injury to the product user, or (2) if its container is

---

[44] *Id.*
[45] *Id.* at 1192.
[46] 21 U.S.C. § 361 *et. seq.*
[47] 15 U.S.C. § 1451 *et. seq*.
[48] 21 U.S.C. § 361
[49] *Id.*

composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.[50]

86.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.[51]

87.     Under the FD&C Act, a cosmetic is misbranded if: (1) labeling is false or misleading, (2) the label does not include all required information, (3) required information is not prominent and conspicuous, or (4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[52]

88.     Under federal law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[53] An example of such an ingredient is methylene chloride because it causes cancer in animals and is likely harmful to humans.[54]

89.     Companies and individuals who manufacture and/or market cosmetics have a legal responsibility and duty to ensure the safety of their own products.

90.     The FDA has consistently advised cosmetics manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through: (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic, and (b) performance of any

---

[50] *Id.*
[51] 21 U.S.C. § 362.
[52] *See id.*
[53] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics
[54] 21 C.F.R. § 700.19.

additional toxicological and other tests that are appropriate in light of such existing data and information.[55]

91.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that: (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[56]

92.     With respect to whether the product is properly labeled, 21 CFR § 740.1 defines the establishment of warning statements related to cosmetic products. § 740.1 states, "The label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." (emphasis added). This warning directive directly correlates with the broad authority and responsibility of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

93.     When a manufacturer is unable to adequately substantiate the safety of their product before marketing, the product is considered to be misbranded if the principal display panel does not include the required, "conspicuous statement" from 21 CFR § 740.10: "*Warning* – The safety of this product has not been determined."

94.     In short, under the current regulatory framework the Defendant was and is required to assess the safety of its hair relaxer products and warn consumers of any and all health hazards.

95.     Having this duty, the Defendant failed to:

---

[55] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar., 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated
[56] *Id.*

a.     Disclose the high risk of unreasonable, dangerous adverse side effects of its hair relaxer products when used as intended; and/or

b.     Disclose that the hair relaxer products contained potential or known toxic chemicals and carcinogens; and/or

c.     Disclose it had not properly tested the safety of its hair relaxer products; and/or

d.     Disclose that it did not research the safety of its hair relaxer products.

96.     Defendant had the capacity to design hair relaxer products that were safer than the hair relaxer products it sold to Plaintiffs and that caused Plaintiffs' injuries alleged herein.

97.     It was economically possible for the Defendant to manufacture hair relaxer products that were safer than the hair relaxer products it sold to Plaintiffs, and that caused Plaintiffs' injuries alleged herein.

98.     The alternative hair relaxer product designs that the Defendant could have utilized would not have changed the intended purpose of the hair relaxer products—to straighten otherwise curly and/or kinky hair.

99.     Such alternative safer designs include, but are not limited to:

a.     Replacing toxic chemicals with readily available natural ingredients;

b.     Oil treatments (such as olive, coconut, and/or avocado oils);

c.     Hot combs and other methods of heat styling; and

d.     Blow drying.

## CAUSES OF ACTION

**First Cause of Action**
**Negligence and/or Gross Negligence**

100.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

101.    At all relevant times, the Defendant had a duty to exercise reasonable care in the manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, labeling, packaging, selling, and distributing of its hair relaxer products.

102.    Defendant's duty to exercise reasonable care in the advertising and sale of its hair relaxer products included a duty to warn Plaintiffs and other consumers of the risks and dangers associated with its hair relaxer products that were known or should have been known to the Defendant at the time of the sale of its hair relaxer products to the Plaintiffs.

103.    The Defendant also owed a continuing duty to Plaintiffs to remove, recall, or retrofit the unsafe and/or defective hair relaxer products across the United States and Territories (including in each Plaintiff's state or territory).

104.    At all relevant times, the Defendant knew or should have known through the exercise of reasonable care of the dangers associated with the normal and/or intended use of its hair relaxer products. In particular, the Defendant knew or should have known that phthalates and other EDCs in its hair relaxer products significantly increase the risk of cancers and other negative health conditions.

105.    At all relevant times, the Defendant knew, or should have known through the exercise of reasonable care, that ordinary consumers such as Plaintiffs would not realize the potential risks and dangers of Defendant's hair relaxer products.

106.    The Defendant breached its duty of care by manufacturing, designing, researching, testing, producing, supplying, inspecting, marketing, selling, and/or distributing of its hair relaxer products negligently, recklessly, and/or with extreme carelessness and by failing to adequately warn of the risks and dangers of its hair relaxer products as described in the allegations above. Such breaches include but are not limited to:

a.    Failing to warn Plaintiffs and other consumers of the risks and dangers associated with the use of its hair relaxer products;

b.    Failing to properly test its hair relaxer products to determine the adequacy or effectiveness of safety measures, if any, prior to releasing its hair relaxer products for consumer use;

c.    Failing to properly test its hair relaxer products to determine the increased risk of harm to the endocrine system including, uterine, ovarian, and/or endometrial cancers during the normal and/or intended use of its hair relaxer products;

d.    Designing its hair relaxer products defectively such that it caused serious injuries or death when used in its intended and reasonably foreseeable manner;

e.    Failing to inform Plaintiffs and other consumers as to the safe and proper methods of handling and using its hair relaxer products;

f.    Failing to remove or recall its hair relaxer products from the market when the Defendant knew or should have known its hair relaxer products were defective and/or dangerous;

g.    Failing to instruct the Plaintiffs and other consumers as to the methods for reducing the type of exposure to its hair relaxer products which caused increased risk of cancer, including, but not limited to, uterine, ovarian, and/or endometrial cancer;

h.      Marketing and labeling its hair relaxer products as safe when the Defendant knew or should have known its hair relaxer products were defective and/or dangerous;

i.      Claiming in labeling and marketing that its hair relaxer products are safe, healthy, protective, and/or natural, including but not limited to the marketing assertions quoted and displayed in the facts alleged above; and

j.      Failing to act like a reasonably prudent company under similar circumstances. Each of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiffs.

107.    The Defendant knew or should have known that consumers such as Plaintiffs would foreseeably suffer injuries as a result of the Defendant's failure to exercise ordinary care as described above.

108.    Due to the Defendant's failure to exercise ordinary care or comply with its duties of selling cosmetic products, Plaintiffs were not able to discover the dangerous nature of Defendant's hair relaxer products.

109.    The Defendant's acts and/or omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiffs and other consumers.

110.    The Defendant acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiffs and other consumers, Defendant's acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiffs.

111.     The Defendant's negligence and/or gross negligence was a direct and proximate cause of the injuries, harm, and economic losses that Plaintiffs have suffered, and will continue to suffer, as described herein.

112.     The Defendant's negligence and/or gross negligence were a substantial factor in causing and/or contributing to Plaintiffs' harms.

113.     As a direct and proximate result of Plaintiffs' reasonably anticipated use of the Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

114.     The Defendant's conduct with respect to its design and sale of its hair relaxer products, including its negligent marketing, to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**Second Cause of Action**
**Negligence *Per Se***

115.     Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

116.     The Food, Drug, and Cosmetic Act, 21 U.S.C. ch. 9 § 301 *et seq.*, and its accompanying regulations, are implemented to regulate and promote safety in the design, manufacturing, marketing, branding, labeling, and sale of food, drugs, and cosmetics, including Defendant's hair relaxer products.

117.     Upon information and belief, the Defendant's conduct violated one or more statutes or related regulations, including but not limited to the following:

     a.      21 U.S.C. § 331;

     b.      21 U.S.C. § 361;

     c.      21 U.S. Code § 362; and

     d.      21 CFR Part 740, including but not limited to 21 CFR § 740.1 and 21 CFR § 740.10.

118.    Plaintiffs are currently unadvised of the full extent of the federal or state safety laws and regulations that the Defendant or its agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery.

119.    The Defendant's violation of such safety laws and regulations constitutes negligence *per se*.

120.    As a direct and proximate result of Plaintiffs' reasonably anticipated use of the Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

121.    The Defendant's conduct with respect to its design and sale of its hair relaxer products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**Third Cause of Action**
**Strict Liability: Design Defect**

122.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

123. The Defendant designed, manufactured, marketed, and sold its hair relaxer products that were used by Plaintiffs, and the Defendant was in the business of selling its hair relaxer products.

124. The Defendant's hair relaxer products were in an unsafe, defective, and unreasonably dangerous condition at the time they left the Defendant's possession because of their design.

125. In particular, the Defendant's hair relaxer products were defectively designed because they caused serious injuries and death, including but not limited to uterine cancer and ovarian cancer.

126. The Defendant's hair relaxer products are unreasonably dangerous as designed because they do not perform as safely as an ordinary consumer, including Plaintiffs, would expect when used in an intended or reasonably foreseeable manner.

127. The Defendant's hair relaxer products are unreasonably dangerous as designed because the danger inherent in their design outweighs the benefits of that design.

128. The Defendant caused its hair relaxer products to enter the stream of commerce and to be sold to consumers, including Plaintiffs, through a variety of channels, including through sales to hair salons for use with its customers as well as direct sale to consumers through retail stores.

129. The Defendant's hair relaxer products were expected to, and did, reach consumers, including Plaintiffs, without substantial change in the condition in which those products were manufactured and sold or otherwise released into the stream of commerce by the Defendant.

130. Plaintiffs used the Defendant's hair relaxer products for the purposes and in a manner normally intended, recommended, promoted, and marketed by the Defendant.

131.     The Defendant knew or should have known that its products were in a defective condition as a result of their design and were unreasonably dangerous when used in an intended or reasonably foreseeable manner.

132.     At all times material to Plaintiffs' claims, there were technologically and economically feasible safer alternative designs that would have prevented or substantially reduced the risk to Plaintiffs without substantially impairing the utility of Defendant's hair relaxer products.

133.     As a direct and proximate result of Plaintiffs' reasonably anticipated use of Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses in the future.

134.     Defendant's conduct with respect to its design and sale of its hair relaxer products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

135.     Plaintiffs plead this claim for relief in the broadest sense and seek the full measure of damages allowed under the applicable governing law, including the common law and, where and to the extent applicable, all product liability acts, statutes, and laws.

**Fourth Cause of Action**
**<u>Strict Liability: Failure to Warn</u>**

136.     Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

137.     The Defendant designed, manufactured, marketed, and sold its hair relaxer products that were used by Plaintiffs, and Defendant was in the business of selling hair relaxer products.

138.    The Defendant's hair relaxer products were in an unsafe, defective, and unreasonably dangerous condition at the time they left Defendant's possession because they were not accompanied by adequate warnings.

139.    In particular, the Defendant knew or should have known that its hair relaxer products could cause serious injuries and death when used in an intended or reasonably foreseeable manner, including but not limited to uterine cancer, ovarian cancer, and endometrial cancer. Defendant failed to give appropriate and adequate warning of such risks.

140.    If the Defendant had warned Plaintiffs that use of its hair relaxer products in an intended or reasonably foreseeable manner would increase their risk of being seriously injured, including but not limited to developing uterine cancer, ovarian cancer, or endometrial cancer, Plaintiffs would not have used Defendant's hair relaxer products.

141.    The Defendant caused its hair relaxer products to enter the stream of commerce and to be sold to consumers, including Plaintiffs, through a variety of channels, including through sales to hair salons for use with Defendant's customers and directly to consumers through retail stores.

142.    The Defendant's hair relaxer products were expected to, and did, reach consumers, including Plaintiffs, without substantial change in the condition in which Defendant's hair relaxer products were manufactured and sold or otherwise released into the stream of commerce by the Defendant.

143.    Plaintiffs used the Defendant's hair relaxer products for the purposes and in a manner normally intended, recommended, promoted, and marketed by the Defendant.

144.    As a direct and proximate result of Plaintiffs' reasonably anticipated use of Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Plaintiffs suffered serious injury, harm,

damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses in the future.

145.    Defendant's conduct with respect to its design and sale of its Hair Relaxer Products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**Fifth Cause of Action**
**Breach of Implied Warranty of Merchantability/Fitness for Particular Use**

146.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

147.    The Defendant is in the business of manufacturing, supplying, marketing, advertising, warranting, and/or selling hair relaxer products.

148.    Prior to the time that the Plaintiffs purchased and/or used Defendant's hair relaxer products, the Defendant knew of the uses for which its hair relaxer products were intended and impliedly warranted to Plaintiffs that Defendant's hair relaxer products were of merchantable quality and safe and fit for such intended and ordinary uses. The Defendant also impliedly warranted to Plaintiffs that Defendant's hair relaxer products were of a certain quality.

149.    Defendant's warranties included but are not limited to the warranties that its hair relaxer products are safe, healthy, protective, and/or natural, including but not limited to the marketing assertions quoted and displayed in the facts alleged above.

150.    The Defendant breached its implied warranties of Defendant's hair relaxer products sold to Plaintiffs because they were not fit for their ordinary purposes and intended and reasonably foreseeable uses. Nor were Defendant's hair relaxer products minimally safe for their expected purpose.

151. Defendant's hair relaxer products were neither safe for their intended use nor of merchantable quality, as warranted by the Defendant, because its hair relaxer products have dangerous propensities when used as intended and cause severe injuries to users including Plaintiffs.

152. Similarly, Defendant's hair relaxer products were unfit for their particular purpose—safely straightening hair. Defendant's hair relaxer products could not and do not safely straighten hair, and never could at any point after leaving the Defendant's control.

153. Defendant's hair relaxer products were unfit for their ordinary use, were not of merchantable quality, did not conform to the representations made by Defendant, and/or were unfit for their particular purpose when they left the Defendant's control.

154. At the time Plaintiffs purchased or used Defendant's hair relaxer products, the Defendant knew or should have known that Plaintiffs would detrimentally rely on Defendant's misrepresentations regarding safety.

155. Plaintiffs purchased or used Defendant's hair relaxer products reasonably relying upon Defendant's warranties.

156. Plaintiffs used Defendant's hair relaxer products for the purpose and in the manner intended by the Defendant.

157. Plaintiffs could not have discovered the breached warranties or realized Defendant's hair relaxer products' danger through the use of reasonable care.

158. Plaintiffs would not have purchased or used Defendant's hair relaxer products if they had known the truth about the misrepresentations described above, or that Defendant's hair relaxer products were unfit for ordinary use or their particular purpose.

159. The Defendant's conduct described in this Complaint constitutes a breach of implied warranties under the following statutes:

  a.  Ala. Code § 7-2-314, *et seq.*;

  b.  Alaska Stat. § 45.02.314, *et seq.*;

  c.  Ariz. Rev. Stat. § 47-2314, *et seq.*;

  d.  Ark. Code § 4-2-314, *et seq.*;

  e.  Cal. Com. Code § 2314, *et seq.*;

  f.  Cal. Civ. Code § 1790, *et seq.*;

  g.  Colo. Rev. Stat. § 4-2-314, *et seq.*;

  h.  Conn. Gen. Stat. § 42a-2-314, *et seq.*;

  i.  6 Del. C. § 2-314, *et seq.*;

  j.  D.C. Code § 28:2-314, *et seq.*;

  k.  Fla. Code § 672.314, *et seq.*;

  l.  O.C.G.A. § 11-2-314, *et seq.*;

  m.  Haw. Rev. Stat. § 490:2-314, *et seq.*;

  n.  Idaho Code § 28-2-314, *et seq.*;

  o.  810 Ill. Comp. Stat. 5/2-314, *et seq.*;

  p.  Ind. Code § 26-1-2-314, *et seq.*;

  q.  Iowa Code § 554.2314, *et seq.*;

  r.  Kan. Stat. § 84-2-314, *et seq.*;

  s.  Ky. Rev. Stat. § 355.2-314, *et seq.*;

  t.  La. Rev. Stat § 9:2800.53(6) , *et seq.*;

  u.  11 M.R.S.A. § 2-314, *et seq.*;

v.      Md. Code Ann., Com. Law § 2-314, *et seq.*;

w.      Mass. Code 106, § 2-314, *et seq.*;

x.      Mich. Comp. Laws 440.2314, *et seq.*;

y.      Minn. Stat. § 336.2-314, *et seq.*;

z.      Miss. Code § 75-2-314, *et seq.*;

aa.     Mo. Rev. Stat. § 400.2-314, *et seq.*;

bb.     Mont. Code § 30-2-314, *et seq.*;

cc.     Neb. U.C.C. § 2-314, *et seq.*;

dd.     Nev. Rev. Stat. § 104.2314, *et seq.*;

ee.     N.H. Rev. Stat. § 382-A:2-314, *et seq.*;

ff.     N.J. Stat. § 12A:2-314, *et seq.*;

gg.     N.M. Stat. § 55-2-314, *et seq.*;

hh.     N.Y. U.C.C. § 2-314, *et seq.*;

ii.     N.C. Gen. Stat. § 25-2-314, *et seq.*;

jj.     N.D. Cent. Code § 41-02-30, *et seq.*;

kk.     Ohio Rev. Code § 1302.26, *et seq.*;

ll.     Okla. Stat. Tit. 12A, § 2-314, *et seq.*;

mm.     Or. Rev. Stat. § 72.3130, *et seq.*;

nn.     13 Pa. Cons. Stat. § 2314, *et seq.*;

oo.     R.I. Gen. Laws § 6A-2-314, *et seq.*;

pp.     S.C. Code § 36-2-313, *et seq.*;

qq.     S.D. Codified Laws § 57A-2-313, *et seq.*;

rr.     Tenn. Code § 47-2- 314, *et seq.*;

ss.   V.T.C.A., Bus. & C. § 2.314, *et seq.*;

tt.   Utah Code § 70A-2-314, *et seq.*;

uu.   Vt. Stat. Tit. 9A, § 2-314, *et seq.*;

vv.   Va. Code § 8.2-314, *et seq.*;

ww.   Wash. Rev. Code § 62A.2-314, *et seq.*;

xx.   W. Va. Code § 46-2-314, *et seq.*;

yy.   Wis. Stat. § 402.314, *et seq.*;

zz.   Wyo. Stat. § 34.1-2-314, *et seq.*;

aaa.   American Samoa Code Ann. § 27.0701, *et seq.*;

bbb.   13 Guam Code Ann. §§ 2314 and 2315, *et seq.*;

ccc.   5 C.M.C. §§ 2314 and 2315, *et seq.*; and

ddd.   11A Virgin Is. Code §§ 2-214 and 2-215, *et seq.*

160.   Defendant's conduct described in this Complaint also constitutes a breach of implied warranties under the common law of Puerto Rico.

161.   Defendant's conduct described in this Complaint also constitutes a breach of implied warranties under the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.*).

162.   Defendant's hair relaxer products are consumer products, Plaintiffs are consumers, Defendant is a supplier and/or warrantor of the defective hair relaxer products, and Defendant breached its implied warranties as described above.

163.   The breach of warranties was a substantial factor in bringing about Plaintiffs' injuries.

164.   As a direct and proximate result of Plaintiffs' reasonably anticipated use of Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or

introduced into the stream of commerce by Defendant, Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

165. Defendant's conduct with respect to its design and sale of its hair relaxer products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

166. Plaintiffs did not need to send (additional) notice to the Defendant of its breaches of warranty because the Defendant was already on notice of the defects alleged herein and Defendant's related violations, including already facing similar lawsuits for the same conduct.

**Sixth Cause of Action**
**Breach of Express Warranty under state law and the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2301 *et. seq.***

167. Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

168. The Defendant, at all relevant times, was in the business of manufacturing, supplying, marketing, advertising, warranting, and/or selling hair relaxer products.

169. The Defendant expressly represented and warranted to Plaintiffs, through statements made by the Defendant or its authorized agents in direct-to-consumer marketing, advertisements, and labels, that Defendant's hair relaxer products were safe and effective for their reasonably expected and intended use—straightening hair.

170. Defendant's warranties included but are not limited to the warranties that its hair relaxer products are safe, healthy, protective, and/or natural, including but not limited to the marketing assertions quoted and displayed in the facts alleged above.

171.     These and other (mis)representations were made directly by the manufacturer or seller to consumers and end users of Defendant's hair relaxer products, constitute express warranties, and became part of the basis of the bargain between the parties and created a collective express warranty that its hair relaxer products would conform to Defendant's affirmations and promises.

172.     The Defendant breached its express warranties about its hair relaxer products and their qualities because Defendant's statements about its hair relaxer products' safety were false and its hair relaxer products did not conform to those affirmations and promises.

173.     Defendant's hair relaxer products were not safe, but rather exposed Plaintiffs and other consumers to unreasonable risks of adverse health effects including cancer.

174.     At the time Plaintiffs purchased or used Defendant's hair relaxer products, the Defendant knew or should have known that Plaintiffs would detrimentally rely on Defendant's misrepresentations regarding safety.

175.     Plaintiffs purchased or used Defendant's hair relaxer products reasonably relying upon Defendant's warranties.

176.     Plaintiffs used Defendant's hair relaxer products for the purpose and in the manner intended by Defendant.

177.     Plaintiffs could not have discovered the breached warranties or realized Defendant's hair relaxer products' danger through the use of reasonable care.

178.     Plaintiffs would not have purchased or used Defendant's hair relaxer products if they had known the truth about the misrepresentations described above, or that Defendant's hair relaxer products were unfit for ordinary use or their particular purpose.

179.    The breach of the warranties was a substantial factor in bringing about Plaintiffs' injuries.

180.    Defendant's conduct described in this Complaint constitutes a breach of express warranties under the following statutes:

a.      Ala. Code § 7-2-313, *et seq.*;

b.      Alaska Stat. § 45.02.313, *et seq.*;

c.      Ariz. Rev. Stat. § 47-2313, *et seq.*;

d.      Ark. Code § 4-2-313, *et seq.*;

e.      Cal. Com. Code § 2313, *et seq.*;

f.      Cal. Civ. Code § 1790, *et seq.*;

g.      Colo. Rev. Stat. § 4-2-313, *et seq.*;

h.      Conn. Gen. Stat. § 42a-2-313, *et seq.*;

i.      6 Del. C. § 2-313, *et seq.*;

j.      D.C. Code § 28:2-313, *et seq.*;

k.      Fla. Code § 672.313, *et seq.*;

l.      O.C.G.A. § 11-2-313, *et seq.*;

m.      Haw. Rev. Stat. § 490:2-313, *et seq.*;

n.      Idaho Code § 28-2-313, *et seq.*;

o.      810 Ill. Comp. Stat. 5/2-313, *et seq.*;

p.      Ind. Code § 26-1-2-313, *et seq.*;

q.      Iowa Code § 554.2313, *et seq.*;

r.      Kan. Stat. § 84-2-313, *et seq.*;

s.      Ky. Rev. Stat. § 355.2-313, *et seq.*;

t.  La. Rev. Stat § 9:2800.53(6) , *et seq.*;

u.  11 M.R.S.A. § 2-313, *et seq.*;

v.  Md. Code Ann., Com. Law § 2-313, *et seq.*;

w.  Mass. Code 106, § 2-313, *et seq.*;

x.  Mich. Comp. Laws 440.2313, *et seq.*;

y.  Minn. Stat. § 336.2-313, *et seq.*;

z.  Miss. Code § 75-2-313, *et seq.*;

aa.  Mo. Rev. Stat. § 400.2-313, *et seq.*;

bb.  Mont. Code § 30-2-313, *et seq.*;

cc.  Neb. U.C.C. § 2-313, *et seq.*;

dd.  Nev. Rev. Stat. § 104.2313, *et seq.*;

ee.  N.H. Rev. Stat. § 382-A:2-313, *et seq.*;

ff.  N.J. Stat. § 12A:2-313, *et seq.*;

gg.  N.M. Stat. § 55-2-313, *et seq.*;

hh.  N.Y. U.C.C. § 2-313, *et seq.*;

ii.  N.C. Gen. Stat. § 25-2-313, *et seq.*;

jj.  N.D. Cent. Code § 41-02-30, *et seq.*;

kk.  Ohio Rev. Code § 1302.26, *et seq.*;

ll.  Okla. Stat. Tit. 12A, § 2-313, *et seq.*;

mm.  Or. Rev. Stat. § 72.3130, *et seq.*;

nn.  13 Pa. Cons. Stat. § 2313, *et seq.*;

oo.  R.I. Gen. Laws § 6A-2-313, *et seq.*;

pp.  S.C. Code § 36-2-313, *et seq.*;

qq. S.D. Codified Laws § 57A-2-313, *et seq.*;

rr. Tenn. Code § 47-2- 313, *et seq.*;

ss. V.T.C.A., Bus. & C. § 2.313, *et seq.*;

tt. Utah Code § 70A-2-313, *et seq.*;

uu. Vt. Stat. Tit. 9A, § 2-313, *et seq.*;

vv. Va. Code § 8.2-313, *et seq.*;

ww. Wash. Rev. Code § 62A.2-313, *et seq.*;

xx. W. Va. Code § 46-2-313, *et seq.*;

yy. Wis. Stat. § 402.313, *et seq.*;

zz. Wyo. Stat. § 34.1-2-314, *et seq.*;

aaa. American Samoa Code Ann. § 27.0701, *et seq.*;

bbb. 13 Guam Code Ann. § 2313, *et seq.*;

ccc. 5 C.M.C. § 2313, *et seq.*; and

ddd. 11A Virgin Is. Code § 2-213, *et seq.*

181. Defendant's conduct described in this Complaint also constitutes a breach of express warranties under the common law of Puerto Rico.

182. Defendant's conduct described in this Complaint also constitutes a breach of express warranties under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* Defendant's hair relaxer products are "consumer products" because they are normally used for personal purposes and were, in fact, purchased primarily for personal use. *Id.* at § 2301(1). Plaintiffs are "consumers" as that term is defined in § 2301(3). Defendant is a "supplier" and "warrantor." *Id.* at § 2301(4)-(5). Defendant's hair relaxer products' express warranties constitute a "written warranty" 15 U.S.C. § 2301(6).

- 40 -

183.    Defendant's failure to tender its hair relaxer products to Plaintiffs free of defects constitutes a breach of the written warranties covering Defendant's hair relaxer products, in violation of the Magnuson Moss Warranty Act. Defendant is on notice of its defective hair relaxer products, yet Defendant has failed to cure the damage resulting therefrom within a reasonable time.

184.    Defendant's breach of warranties was a substantial factor in bringing about Plaintiffs' injuries.

185.    As a direct and proximate result of Plaintiffs' reasonably anticipated use of Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses in the future.

186.    The Defendant's conduct with respect to its design and sale of its hair relaxer products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**Seventh Cause of Action**
**U.S. State and Territory Statutory Consumer Protection and**
**Unfair or Deceptive Trade Practices Claims**

187.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

188.    The Defendant engaged in unfair competition or unfair, unconscionable, and/or deceptive acts or practices in violation of the state and territory consumer protection statutes listed below when it misled consumers regarding the safety risks associated with use of its hair relaxer products.

189. As a direct result of Defendant's deceptive, unfair, and/or unconscionable conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, personal injury, loss of companionship and society, mental anguish and/or other compensable injuries.

190. Defendant has engaged in unfair competition and/or unfair, deceptive, and/or unconscionable acts or practices in violation of:

    a.    Ala. Code § 8-19-1 *et seq.*;

    b.    Alaska Stat. § 45.50.471 *et seq.*;

    c.    Ariz. Rev. Stat. Ann. § 44-1521 *et seq.*;

    d.    Ark. Code Ann. § 4-88-101 *et seq.*;

    e.    Cal. Civil Code § 1750 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq.*;

    f.    Colo. Rev. Stat. § 6-1-101 *et seq.*;

    g.    Conn. Gen. Stat. Ann. § 42-110a *et seq.*;

    h.    Del. Code Ann. tit. 6 § 2511 *et seq.*;

    i.    D.C. Code Ann. § 28-3901 *et seq.*;

    j.    Fla. Stat. Ann. § 501.201 *et seq.*;

    k.    Ga. Code Ann. § 10-1-370 *et seq.*;

    l.    Haw. Rev. Stat. § 480-1 *et seq.* and 481A-1 *et seq.*;

    m.    Idaho Code § 48-601 *et seq.*;

    n.    815 Ill. Comp. Stat. 505/1 *et seq.*;

    o.    Ind. Code Ann. § 24-5-0.5-1 *et seq.*;

    p.    Iowa Code § 714.16 *et seq.*;

    q.    Kan. Stat. Ann. § 50-623 *et seq.*;

    r.    Ky. Rev. Stat. Ann. § 367.170 *et seq.*;

s.      La. Rev. Stat. Ann. § 51:1401 *et seq.*;

t.      Me. Rev. Stat. Ann. tit. 5, § 205-A *et seq.*;

u.      Md. Code Ann., Com. Law § 13-301 *et seq.*;

v.      Mass. Gen. Laws ch. 93A, § 1 *et seq.*;

w.      Mich. Comp. Laws Ann. § 445.901 *et seq.*;

x.      Minn. Stat. §§ 325D.09 *et seq.*, 325D.43 *et seq.*, 325F.67, 325F.68 *et seq.*, and § 8.31;

y.      Miss. Code Ann. § 75-24-5 *et seq.*;

z.      Mo. Ann. Stat. § 407.010 *et seq.*;

aa.     Mont. Code Aim. § 30-14-101 *et seq.*;

bb.     Neb. Rev. Stat. § 87-301 *et seq.*;

cc.     Nev. Rev. Stat. Ann. §§ 598.0903 *et seq.* and 41.600;

dd.     N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*;

ee.     N.J. Stat. Ann. § 56:8-1 *et seq.*;

ff.     N.M. Stat. Ann. § 57-12-1 *et seq.*;

gg.     N.Y. Gen. Bus. Law §§ 349 *et seq.*, 350, 350-a and 350-e *et seq.*;

hh.     N.C. Gen. Stat. § 75-1 *et seq.*;

ii.     N.D. Cent. Code §§ 51-12-01 *et seq.* and 51-15-01 *et seq.*;

jj.     Ohio Rev. Code Ann. § 1345.01 *et seq.*;

kk.     Okla. Stat. Ann. tit. 15, § 751 *et seq.*;

ll.     Or. Rev. Stat. § 646.605 *et seq.*;

mm.     73 Pa. Cons. Stat. § 201-1 *et seq.*;

nn.     R.I. Gen. Laws § 6-13.1-1 *et seq.*;

oo.     S.C. Code Ann. § 39-5-10 *et seq.*;

pp.    S.D. Codified Laws § 37-24-1 *et seq.*;

qq.    Tenn. Code Ann. § 47-18-101 *et seq.*;

rr.    Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*;

ss.    Utah Code Ann. § 13-11-1 *et seq.*;

tt.    Vt. Stat. Ann. tit. 9, § 2451 *et seq.*;

uu.    Va. Code Ann. § 59.1-196 *et seq.*;

vv.    Wash. Rev. Code Ann. § 19.86.010 *et seq.*;

ww.    W.Va. Code § 46A-6-101 *et seq.*;

xx.    Wis. Stat. Ann. §§ 100.18 and 421.101 *et seq.*;

yy.    Wyo. Stat. Ann. § 40-12-101 *et seq.*;

zz.    American Samoa Code Ann. § 27.0401 *et seq.*;

aaa.   4 CMC § 5101 *et seq.*;

bbb.   5 Guam Code Ann. § 32102 *et seq.*; and

ccc.   12A Virgin Is. Code § 301 *et seq.*

191.    Defendant's deceptive, unfair, unlawful, and unconscionable practices included but were not limited to the following practices, done knowingly:

a.    Representing that goods have characteristics, ingredients, uses, or benefits that they do not have;

b.    Representing that goods are of a particular standard, quality, or grade if they are of another; and

c.    Advertising goods with the intent not to sell them as advertised.

192.    The Defendant's actions and failure to act, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of its hair

relaxer products constitute acts, uses or employment by Defendant of unconscionable commercial practices, deception, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that Plaintiffs and others rely upon such concealment, suppression or omission of material facts in connection with the sale of merchandise of the Defendant in violation of the consumer protection statutes listed above.

193.    Defendant's unfair and deceptive trade practices have caused injuries to consumers, and the public will benefit from a cessation of these unlawful actions through this litigation.

194.    By reason of the unlawful acts engaged in by the Defendant, Plaintiffs have suffered ascertainable loss and damages.

195.    As a direct and proximate result of Plaintiffs' reasonably anticipated use of Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

196.    Defendant's conduct with respect to its design and sale of its hair relaxer products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

197.    Due to the above, the Defendant is liable to Plaintiffs for compensatory, as well as exemplary, multiple, and/or punitive damages to the extent available and as applicable, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

198.    Plaintiffs did not need to send (additional) notice to the Defendant of its violations of the consumer protection statutes pled in this Complaint because the Defendant was already on notice of the defects alleged herein and Defendant's related violations, including already facing similar lawsuits for the same conduct.

**Eighth Cause of Action**
**Unjust Enrichment**

199.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

200.    As an intended and expected result of Defendant's conscious wrongdoing as set forth in this Complaint, the Defendant profited and benefited from payments Plaintiffs and other consumers made for Defendant's hair relaxer products.

201.    In exchange for the payments made for Defendant's hair relaxer products, at the time payments were made, Plaintiffs expected that Defendant's hair relaxer products were safe and effective in the ways the Defendant represented and for the purposes the Defendant advertised its hair relaxer products. In exchange for their payments, Plaintiffs believed they were receiving a safe method for straightening hair that did not involve the risk of serious adverse health effects.

202.    The Defendant has voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of its wrongdoing, Plaintiffs paid for Defendant's hair relaxer products when they otherwise would not have done so.

203.    The failure of the Defendant to provide Plaintiffs with the remuneration expected enriched the Defendant unjustly.

204.    It is unjust to allow the Defendant to earn and retain revenues, profits, and benefits from its hair relaxer products while Plaintiffs suffered and are suffering serious illnesses, including but not limited to uterine, ovarian, and/or endometrial cancer.

205.    Plaintiffs are entitled to equity to seek restitution of Defendant's wrongful revenues, profits, and benefits to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

**Ninth Cause of Action**
**Wrongful Death**

206.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

207.    Decedent Plaintiffs died as a result of the defects in and undisclosed risks of Defendant's hair relaxer products and are survived by various family members, named and unnamed.

208.    The representatives/administrators of Decedent Plaintiffs' estates and/or Decedent Plaintiffs' surviving heirs bring this claim on behalf of the Decedent Plaintiffs' lawful heirs.

209.    Defendant's wrongful conduct, as described in this Complaint, has foreseeably, directly, and proximately caused Decedent Plaintiffs' heirs to suffer the loss of Decedents' companionship, services, society, marital association, love, consortium, and/or all other damages allowed under state statutes and laws.

210.    Decedent Plaintiffs' estate representatives and/or Decedent Plaintiffs' surviving heirs bring this claim on behalf of Decedent Plaintiffs' lawful heirs for these damages and for all pecuniary losses sustained by the heirs.

211.    Decedent Plaintiffs' estate representatives and/or Decedent Plaintiffs' surviving heirs further plead all wrongful death damages allowed by statue in the state/territory or states/territories in which the causes of action accrued.

212.    Defendant's conduct with respect to its design and sale of its hair relaxer products to Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly

negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

### Tenth Cause of Action
#### Survival Action

213.     Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

214.     Certain Plaintiffs ("Decedent Plaintiffs") have passed away after suffering injuries and losses as a result of Defendant's hair relaxer products and conduct described in this Complaint.

215.     As a direct and proximate result of Decedent Plaintiffs' reasonably anticipated use of Defendant's hair relaxer products as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendant, Decedent Plaintiffs suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses prior to Decedent Plaintiffs' deaths.

216.     The representative/administrators of Decedent Plaintiffs' estates bring this claim on behalf of Decedent Plaintiffs' estates and Decedent Plaintiffs' beneficiaries for damages.

217.     The representative/administrators of Decedent Plaintiffs' estates further plead all survival damages allowed by statute and law in the state/territory or states/territories in which the causes of action accrued.

218.     Defendant's conduct with respect to its design and sale of its products to Decedent Plaintiffs and the public was fraudulent, malicious, oppressive, willful, reckless, and/or grossly negligent, and indicates a wanton disregard of the rights of others, justifying an award of punitive or exemplary damages.

**Eleventh Cause of Action**
**Loss of Consortium**

219.    Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

220.    Certain Plaintiffs were married to spouses (hereinafter referred to as "Spouse Plaintiffs") and/or have family members (hereinafter referred to as "Family Member Plaintiffs") who have suffered injuries and losses as a result of such Plaintiffs' injuries.

221.    As a foreseeable, direct, and proximate result of Defendant's unlawful conduct as described in this Complaint, Spouse Plaintiffs and/or Family Member Plaintiffs have paid and have become liable to pay for medical aid, treatment and for medications, and will incur further expenses of a similar nature in the future.

222.    As a foreseeable, direct, and proximate result of Defendant's unlawful conduct as described in this Complaint, Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's care, comfort, support, companionship, services, society, love, and affection.

223.    Spouse Plaintiffs allege their marital relationships have been impaired and depreciated, and the marital associations between spouses have been altered.

224.    Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

225.    As a foreseeable, direct, and proximate result of Defendant's unlawful conduct, Spouse Plaintiffs and/or Family Member Plaintiffs have sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses, and other damages.

226.    Due to the above, the Defendant is liable to Spouse Plaintiffs and/or Family Member Plaintiffs for compensatory, equitable, and punitive damages, to the extent permitted by

applicable law, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## Twelfth Cause of Action
## Punitive Damages

227. Plaintiffs incorporate by reference paragraphs 1 through 99 as if fully set forth herein and further allege as follows.

228. The acts and omissions of the Defendant as alleged throughout this Complaint were willful, wanton, and malicious. The Defendant committed these acts with a conscious disregard for the rights, health, and safety of Plaintiffs and other consumers/users of Defendant's hair relaxer products, for the primary purpose of increasing Defendant's profits from the sale and distribution of its hair relaxer products.

229. Defendant's outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against the Defendant in an amount appropriate to punish and make an example of the Defendant.

230. Defendant's willful, wanton, malicious, and/or reckless acts include the following (as detailed throughout this Complaint):

a. Failing to disclose or warn of, concealing, and/or suppressing material facts regarding the dangers and serious safety concerns of Defendant's hair relaxer products to Plaintiffs, other consumers, and the public;

b. Making false and deceptive representations that Defendant's hair relaxer products could be used safely for their ordinary and intended purposes, for the purpose of deceiving and lulling Plaintiffs and other consumers into purchasing and using Defendant's hair relaxer products without knowledge of their risks;

c.    Falsely representing the qualities and characteristics of Defendant's hair relaxer products and their safety to Plaintiffs, other consumers, and the public;

d.    Knowingly subjecting Plaintiffs and all purchasers and users of Defendant's hair relaxer products to a substantial and unreasonable risk of harm, including the risk of serious illness and death, for the purpose of enhancing Defendant's profits; and

e.    Intentionally targeting Black and Brown women, including Black and Brown teenaged girls and children, as customers to purchase and use Defendant's unsafe hair relaxer products and doing so without warning of their dangers, including by relying on and invoking anti-Black stereotypes and anti-Black history against natural Black and Brown hair and features.

f.    To the extent that punitive damages are an available remedy but not considered an independent cause of action in any Plaintiffs state, the allegations in this section are pled in support of punitive damages being an appropriate remedy for that Plaintiffs' other causes of action.

## JURY TRIAL DEMAND

231.    Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiffs hereby demand a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendant on each of the above-referenced.

A.    Awarding compensatory damages, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

C.    Awarding damages and/or equitable relief to provide medical monitoring for the early detection, diagnosis, and treatment of injuries related to the Products and prevention of exacerbation of such injuries;

D.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendant which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff in an amount sufficient to punish the Defendant and deter future similar conduct;

E.    Statutory damages including treble damages;

F.    Prejudgment interest;

G.    Post judgment interest;

H.    Awarding Plaintiffs reasonable attorneys' fees;

I.    Awarding Plaintiffs the costs of these proceedings; and

J.    Such other and further relief as this Court deems just and proper.

Dated: May 28, 2024                    Respectfully submitted,

                                       */s/ Edward A. Wallace*
                                       Edward A. Wallace
                                       **WALLACE MILLER**
                                       150 N. Wacker Dr., Suite 1100
                                       Chicago, Illinois 60606
                                       Tel.: 312-261-6193
                                       Email: eaw@wallacemiller.com

                                       *Plaintiffs' Liaison Counsel*

                                       Diandra "Fu" Debrosse Zimmermann
                                       **DICELLO LEVITT LLCP**

505 20th Street North - Suite 1500
Birmingham, Alabama 35203
Tel.: 205-855-5700
Email: fu@dicellolevitt.com

*Plaintiffs' Co-Lead Counsel*

Fidelma L. Fitzpatrick
**MOTLEY RICE LLC**
40 Westminster Street, Fifth Floor
Providence, Rhode Island 02903
Tel.: 401-457-7700
Email: ffitzpatrick@motleyrice.com

*Plaintiffs' Co-Lead Counsel*

Michael A. London
**DOUGLAS & LONDON, P.C.**
59 Maiden Lane, Sixth Floor
New York, New York 10038
Tel.:212-566-7500
Email: mlondon@douglasandlondon.com

*Plaintiffs' Co-Lead Counsel*

Benjamin L. Crump
**BEN CRUMP LAW FIRM**
122 South Calhoun Street
Tallahassee, Florida 32301
Tel.: 850-224-2020
Email: ben@bencrump.com

*Plaintiffs' Co-Lead Counsel*

and

*On behalf of Plaintiffs' Executive Committee:*

Brian Barr
**LEVIN PAPANTONIO RAFFERTY**
316 South Baylen St.
Pensacola, FL 32502
Tel.: (850) 435-7044
Email: bbarr@levinlaw.com

Tim Becker
**JOHNSON BECKER**
444 Cedar St., Suite 1800
St. Paul, MN 55101
Tel.: (612) 436-1804
Email: tbecker@johnsonbecker.com

Jayne Conroy
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: (212) 257-8482
Email: jconroy@simmonsfirm.com

Jennifer Hoekstra
**AYLSTOCK, WITKIN, KREIS &**
**OVERHOLTZ, PLLC**
17 E. Main St.
Pensacola, FL 32502
Tel.: (850) 202-1010
Email: jhoekstra@awkolaw.com

Rene F. Rocha
**MORGAN & MORGAN**
400 Poydras St., Suite 1515
New Orleans, LA 70130
Tel.: (954) 318-0268
Email: rrocha@forthepeople.com

Navan Ward
**BEASLEY ALLEN**
2839 Paces Ferry Rd SE, Suite 400
Atlanta, GA 30339
Tel.: (404) 751-1162
Email: navan.ward@beasleyallen.com

Kelly M. Dermody
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN**
275 Battery Street, Suite 2900
San Francisco, CA 94111
Tel.: (415) 956-1000
Email: kdermody@lchb.com

LaRuby May
**MAY JUNG**
3216 11th Place SE
Washington, DC 20032
Tel.: (202) 869-3735
Email: laruby@mayjung.com

Larry Taylor
**THE COCHRAN FIRM**
1825 Market Center Blvd #500
Dallas, TX 75207
Tel.: (214) 466-7620
Email: ltaylor@cochrantexas.com

and

*On behalf of Plaintiffs' Steering Committee:*

Anne Andrews
**ANDREWS & THORNTON**
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Tel.: (949) 748-1000
Email: aa@andrewsthornton.com

Thomas P. Cartmell
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel.: (816) 701-1100
Email: tcartmell@wcllp.com

Greg Cade
**ENVIRONMENTAL LAW GROUP**
2160 Highland Ave.
Birmingham, AL 35205
Tel.: (205) 328-9200
Email: GregC@elglaw.com

C. Andrew Childers
**CHILDERS, SCHLEUTER & SMITH**
1932 North Druid Hills Road, Suite 100
Atlanta, GA 30319
Tel.: (404) 419-9500
Email: achilders@cssfirm.com

Erin Copeland
**FIBICH LEEBRON COPELAND
BRIGGS**
1150 Bissonnet
Houston, TX 77005
Tel.: (713) 751-0025
Email: ecopeland@fibichlaw.com

Lee Floyd
**BREIT BINIAZAN**
2100 East Cary Street, Suite 310
Richmond, VA 23223
Tel.: (804) 351-9040
Email: lee@bbtrial.com

Kristine Kraft
**SCHLICHTER BOGARD & DENTON**
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Tel.: (314) 884-7706
Email: kkraft@uselaws.com

Melanie Muhlstock
**PARKER WAICHMAN**
6 Harbor Park Dr.
Port Washington, NY 11050
Tel.: (516) 466-6500
Email: mmuhlstock@yourlawyer.com

Michelle Parfitt
**ASHCRAFT & GEREL, LLP**
1825 K Street NW, Suite 700
Washington, DC 20006
Tel.: (703) 824-4772
Email: mparfitt@ashcraftlaw.com

EricaRae Garcia
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Tel.: (212) 558-5825
Email: egarcia@weitzlux.com

Richard W. Schulte
**WRIGHT & SCHULTE LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
Tel.: (937) 435-7500
Email: rschulte@yourlegalhelp.com

Maria Fleming
**NAPOLI SHKOLNIK**
1500 West 3rd Street
Cleveland, OH 44113
Tel.: (844) 230-7676
Email: mfleming@napolilaw.com

Kendra Y. Goldhirsch
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Tel.: (888) 480-1123
Email: goldhirsch@chaffinluhana.com

Buffy Martines
**LAMINACK, PIRTLE & MARTINES**
5020 Montrose Blvd., 9th Floor
Houston, TX 770606
Tel.: (713) 292-2750
Email: buffym@lpm-triallaw.com

David A. Neiman
**ROMANUCCI & BLANDIN, LLC**
321 N Clark St. #900
Chicago, Illinois 60654
Tel.: (312) 253-8810
Email: dneiman@rblaw.net

Syreeta Poindexter
**BABIN LAW**
65 E. State St., Suite 1300
Columbus, OH 43215
Tel.: (614) 412-0877
Email: syreeta.poindexter@babinlaws.com

Steve Rotman
**HAUSFELD**
One Marina Park Dr., Suite 1410
Boston, MA 02210
Tel.: (617) 207-0602
Email: srotman@hausfeld.com

Ashlie Case Sletvold
**PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP**
6370 SOM Center Road, Suite 108
Cleveland, OH 44139
Tel.: (216) 260-0808
Email: asletvold@peifferwolf.com

L. Chris Stewart
**STEWART MILLE SIMMON**S
55 Ivan Allen Jr. Blvd NW, Suite 700
Atlanta, GA 30308
Tel.: (404) 589-3476
Email: cstewart@smstrial.com

Mikal Watts
**WATTS GUERRA**
4 Dominion Dr., Bld 3, Suite 100
San Antonio, TX 78257
Tel.: (210) 447-0500
Email: mcwatts@wattsguerra.com

Aimee Wagstaff
**WAGSTAFF LAW FIRM**
940 N. Lincoln St.
Denver, CO 80203
Tel.: (720) 208-9414
Email: awagstaff@wagstafflawfirm.com