**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION**<br><br>**This document relates to:**<br>*All Cases* | Case No. 23 C 818<br><br>MDL No. 3060<br><br>Judge Mary M. Rowland |

**PLAINTIFFS' SUPPLEMENTAL BELLWETHER PROTOCOL SUBMISSION**

**I.      INTRODUCTION**

The Plaintiffs' Co-Lead Counsel Executive Committee, and Steering Committee ("Plaintiffs" or "PSC") respectfully submit their bellwether protocol attached as Exhibit A pursuant to the Court's December 13, 2024 minute entry (ECF 986). Like Plaintiffs' prior submission[1] (Plaintiffs' Proposed Case Management Order re. Bellwether Selection Schedule and Procedure ("Pltfs' Proposed Bellwether CMO") [ECF 396-1]), this updated proposal governs the eligibility, selection, workup, and schedule of bellwether cases, and ultimately the winnowing down of those case for trial. Plaintiffs' proposal is consistent with bellwether protocols entered in many other similar product liability MDL proceedings, will appropriately advance the interest of the parties in this MDL, and also remains consistent to their prior proposal. On the other hand, as noted from the Joint Status Report dated December 9, 2024 [ECF 981], Defendants' position has morphed into a proposal that adds complexity, hurdles, more time, and guarantees that bellwether trials in this MDL will not happen in a timely fashion. Furthermore, instead of modifying their position in an attempt to reach common ground with the Plaintiffs, Defendants have deviated from common MDL practice and have failed to even finalize their position for Plaintiffs as of the date of this filing.

Notwithstanding the infirmities of the Defendants' positions to date, Plaintiffs herein address the two issues[2] identified by the Court for supplemental briefing: (1) the process whereby the parties will select 16 cases for bellwether discovery; and (2) the timing by which the parties will conduct such bellwether discovery [ECF 986].

---

[1] Plaintiffs incorporate their prior briefing on the bellwether protocol (Plaintiffs' Bellwether Protocol Submission ("Pltfs' Bellwether Protocol Submission") [ECF 396]).
[2] To the extent Defendants seek to brief additional issues, beyond the two identified for supplemental briefing in the Court's December 14, 2024 Order, Plaintiffs believe those arguments should be stricken or, in the alternative, Plaintiffs should be permitted to respond to those arguments in writing.

*First*, Plaintiffs submit that the initial 16 bellwether cases should be selected from the pool of cases filed and served as of February 1, 2024, as previously ordered in the Court's minute entry dated January 25, 2024 [ECF 415], and, by way of compromise with Defendants' previous proposal,[3] the pool be narrowed to those with Plaintiff Fact Sheets ("PFSs") deemed substantially complete, in compliance with Case Management Order No. 9, by December 31, 2024.[4] Furthermore, and consistent with prior briefing by both parties, Plaintiffs propose the parties each select eight (8) cases from the pool. Finally, the Plaintiffs propose that these 16 cases (8 picked by the PSC and 8 picked by the defense) be comprised of plaintiffs alleging uterine, endometrial, and/or ovarian cancer and said selections occur by February 28, 2025. As such, the parties will each have the ability to select eight cases from potentially 2,000 cases.

*Second*, Plaintiffs propose that Core Discovery in the initial 16 bellwether cases, the scope of which was previously agreed upon by the parties[5], be completed within seven (7) months after bellwether selection; namely: by September 30, 2025. Plaintiffs suggest this seven (7) month period as a reasonable compromise between Plaintiffs' original proposal of four (4) months (Pltfs.' Proposed Bellwether CMO [ECF 396-1] at 4) and Defendants' *original* proposal of eight (8) months (Defs' Proposed CMO [ECF 395-1] at 3).[6] Plaintiffs oppose two of what we believe are Defendants' newly stated positions. First that nine (9) months is needed to complete this Core Discovery (up from their prior request for eight (8) months). And second, that that an additional

---

[3] *See* (Defendants' Proposed Case Management Order re. Bellwether Selection Schedule and Procedure ("Defs' Proposed Bellwether CMO") [ECF 395-1] at 2).
[4] According to MDL Centrality, there will be approximately 2,000 eligible cases with substantially complete PFSs as of December 31, 2024.
[5] As the Court is aware, the parties previously agreed that Core Discovery in the initial 16 bellwethers would consist of four (4) depositions per side and additional case-specific written discovery. Pltfs.' Bellwether Protocol Submission [ECF 396] at 5.
[6] Plaintiffs understand that Defendants may now be proposing that nine (9) months of case-specific discovery is needed (despite having the additional time to focus on minutia in PFSs).

2

90 days of "Phase II" discovery should take place—on a randomly-selected subset of cases—*prior to* selecting the initial 16 bellwether cases and before Core Discovery.

## II. THE BELLWETHER PROCESS BACKGROUND AND LEGAL STANDARD

"The term bellwether [or early trial case] is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, Case No. 00-1898, 2007 WL 1791258, at *1 (S.D.N.Y. June 15, 2007). The goal is to select cases and conduct trials in a manner that will inform and be beneficial to the many thousands of plaintiffs (and their counsel) in this MDL proceeding.

The information gleaned from bellwether trials can enhance and accelerate the process of the MDL itself and often results in well-informed global resolutions. "If bellwether trials are to serve their twin goals as informative indicators of future trends and catalysts for an ultimate resolution, the transferee court and the attorneys must carefully construct the trial-selection process." Fallon, Grabill & Wynne, *Bellwether Trials in Multidistrict Litig.*, 82 TUL. L. REV. 2323, 2343 (2008). The Court has broad discretion in the management of its trials and in fashioning a trial plan that best serves the interests of all parties and the Court. *See, e.g.*, FED. R. CIV. P. 42(a) ("If actions before the court involve a common question of law or fact, the court may (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay."). The Manual for Complex Litigation supports the use of bellwether cases to "determine the nature and strength of the claims." *See Manual for Complex Litigation, Fourth* §22.315. Moreover, significant MDL jurisprudence, including but not limited to orders from this district and other federal courts in Illinois, confirms

that Plaintiffs' proposed bellwether process is preferred over the convoluted process Defendants have submitted. *See, e.g.*, *In re Testosterone Replacement Therapy Prods. Liab. Litig. ("TRT")*, No. 1:14-cv-01748, MDL No. 2545 (N.D. Ill. Nov. 6, 2014), ECF 467; *In re Yasmin and Yaz (Drosprirenone) Mktg. Sales Practices, and Prod. Liab. Litig.* ("Yaz"), MDL No 2100 (S.D. Ill), ECF 1329.[7]

## III. ARGUMENT

Plaintiffs respectfully submit that their proposed bellwether protocol, as compared to both Defendants' original and (what we believe to be their) revised proposal, is consistent with the spirit of those adopted in numerous other MDLs and will more appropriately advance the interests of the parties in this MDL by focusing the efforts of the parties and the Court on truly representative cases in an efficient manner.

### A. The Eligible Pool and Bellwether Selection Process (*i.e.* "the process whereby the parties will select 16 cases for bellwether discovery" [ECF 986])

In short, Plaintiffs stand by their previous submission proposing that the 16 bellwether cases be chosen from the pool of cases filed and served by February 1, 2024 (as later ordered by the Court, ECF 415) alleging a primary injury of uterine, endometrial, and/or ovarian cancer (Pltfs' Bellwether Protocol Submission [ECF 396] at 6). Further, as previously touched upon in the Parties' Status Report for the January 9, 2025 Case Management Conference ("Parties' Bellwether Status Report" [ECF 981]) and as a compromise with Defendants' previously stated position (Defendants' Joint Submission Regarding Bellwether Selection ("Defs.' Joint Bellwether Submission" [ECF 395] at 2), Plaintiffs propose that the pool be additionally narrowed to include only those cases with PFSs deemed "substantially complete" as of a date certain, which the Plaintiffs submit should be December 31, 2024, and which will include approximately 2,000 cases

---

[7] Plaintiffs can provide courtesy copies of these orders, and any other cited orders, at the Court's request.

4

that would be considered as eligible.

As discussed below, Plaintiffs reject Defendants' newest suggestion that the pool of cases eligible for bellwether selection be arbitrarily limited to a few hundred cases through a (yet to be explained) *random selection* process. In addition, Plaintiffs submit that—as was previously negotiated and agreed to by the parties[8]—each party should select eight (8) cases from the eligible pool to make up the initial 16 bellwether cases. While Plaintiffs believe the 16 cases can be selected sooner, in an effort at compromise with allowing the defense more time, Plaintiffs propose that those selections should be made by February 28, 2025.

### 1. The Eligible Pool of Bellwether Cases

In addition to requiring bellwether cases to have been filed and served by February 1, 2024 and have a PFS deemed "substantially complete" by December 31, 2024, Plaintiffs continue to maintain that the bellwether process should be laser-focused on the injury types that exist in the vast majority of cases in this MDL; namely: uterine, endometrial, and/or ovarian cancer.[9] Defendants, however, continue to seek to include cases in the bellwether process that allege "other injuries" beyond the cancer cases at the core of this litigation, whether purposefully or by their inclusion in a randomized pool of cases. Parties' Bellwether Status Report [ECF 981] at 8. There is simply no reason to include outlier injury cases in the 16 bellwether cases. There is nothing "representative" about them, and therefore, they do not serve as a "bellwether" to the thousands of cancer cases. Working up those cases for trial creates an unnecessary burden on the litigants and

---

[8] *See* Pltfs.' Bellwether Protocol Submission [ECF 396] at 10, 13.
[9] Of the cases filed and served by February 1, 2024, at least 5,100 of the nearly 6,000 cases allege uterine, endometrial, and/or ovarian cancer. Further, Plaintiffs have already sought to differentiate cases from this MDL that do not allege uterine, endometrial and/or ovarian cancer as a primary injury and will continue to promote this practice in an effort to maintain a more manageable and definable docket. See ECF 650. Indeed, differentiating and compartmentalizing disparate injuries is common place in MDLs and where one injury type is the overwhelmingly predominate injury (here uterine, endometrial and/or ovarian cancer) those cases should more forward first.

the Court.

This litigation is not unique because it includes several different injury types. Many other product liability MDLs similarly involved plaintiffs with multiple injuries, including: *In re: Testosterone Replacement Therapy Prod. Liab. Litig.*, *In re: Yasmin and Yaz (Drospirenone) Mktg., Sales Practices, and Prod. Liab. Litig.*, *In re: E.I. du Pont de Nemours and Company C-8 Pers. Inj. Litig.*, *In re: Xarelto (Rivaroxaban) Prod. Liab. Litig.*, *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, and *In re: Zimmer Nexgen Knee Implant Prod. Liab. Litig.*[10] MDL courts such as those noted above have repeatedly chosen an injury-specific approach as a means of efficiently structuring bellwether discovery and trial—with expert discovery particularly benefiting from such an approach. Indeed, a bellwether plan incorporating a tiered approach based on injury is essential to an effective bellwether process. Since the majority of cases in the proposed pool involve uterine, endometrial, and/or ovarian cancer injuries, Plaintiffs propose it is prudent and "representative" to limit the initial bellwether selections to cases alleging those injuries.

Plaintiffs agree that there could be some threshold for inclusion of non-cancer cases in the bellwether pool—*i.e.* if there are a significant percentage of cases involving only a specific (non-cancer) injury type (meaning a non-cancer injury without an accompanying cancer injury[11]), then

---

[10] *See In re: Testosterone Replacement Therapy Prod. Liab. Litig.* (MDL 2545), Case No. 1:14-cv-01748, CMO 14 (AbbVie bellwether process) (ECF 1588); *In re: Testosterone Replacement Therapy Prod. Liab. Litig.* (MDL 2545), Case No. 1:14-cv-01748, CMO 31 (Auxilium bellwether trials) (ECF 1547); *In re: Yasmin and Yaz (Drospirenone) Mktg., Sales Practices, and Prod. Liab. Litig.* (MDL 2100), Case No. 3:09-md-02100, CMO 24 (ECF 1329); *In re: Zimmer Nexgen Knee Implant Prod. Liab. Litig.* (MDL 2272), Case No. 1:11-cv-05468, CMO 12 (ECF 2341); *In re: E.I. du Pont de Nemours and Company C-8 Pers. Inj. Litig.* (MDL 2433), Case No. 2:13-md-02433, CMO 6 (ECF 194); *In re: Xarelto (Rivaroxaban) Prod. Liab. Litig.* (MDL 2592), Case No. 2:14-md-02592, CMO 4 (ECF 1785); *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.* (MDL 2873), Case No. 2:18-mn-02873, CMO 26 (ECF 3080). Plaintiffs can provide courtesy copies of these orders at the Court's request.

[11] This distinction is critical to the process. Many of the cancer injury cases may also allege other non-cancer injuries, such as uterine fibroids. Those cases, given the cancer diagnosis, would be included in the pool. Cases where Plaintiffs have only identified non-cancer injuries would not be included in the bellwether discovery pool.

that *could* be considered. But it must be a substantial number; not simply a one-off case that happens to fall in the random selection of cases Defendants propose.

In fact, Defendants previously represented to the Court that they would not argue that a (non-cancer) injury case would qualify as a bellwether case unless more than 10% of the cases filed had that same specific injury in the absence of an accompanying cancer diagnosis.[12] Tr. of 1/25/24 at 46:3-23 (MR. GOODMAN: "If there are no injuries that meet that threshold of 10 percent other -- then the cancers will be the only cases that qualify for the 16."). Defendants should, at the very least, be held to their promise to adhere to a threshold; and should not be permitted to select non-representative, outlier injuries for bellwether treatment.

Again, non-cancer cases should be assessed and, if needed, a bellwether process can be developed for specific non-cancer injury types at a later date. It has been long established practice in MDLs to address outlier injuries via other case management tools following the advancement of a bellwether process on the primary or most common injuries.[13] It belies common sense to focus this bellwether process—intended to address the most representative cases—on a *de minimis* group of cases representing a small fraction of the thousands of bellwether eligible cases.

Finally, Plaintiffs propose that in order for a case to be deemed eligible for inclusion in the bellwether pool, the individual Plaintiff's counsel who filed or handles the case must have signed the Participation Agreement entered in conjunction with CMO 14. [ECF 967]. Such a requirement is necessary to protect the work product of the PSC and to ensure efficient prosecution of the bellwether and trial cases.

---

[12] Defendants also agreed that this threshold is for a "particular injury"—not just that 10% of the total cases are non-cancer cases. Tr. of 1/25/24 at 49:5-19.
[13] *See e.g., In Re: Aqueous Film-Forming Foam Products Liability Litigation*, MDL No. 2:18-mn-2873, Second Amended Case Management Order No. 28 [ECF No. 4985]; *In re Yaz*, MDL No 2100 (S.D. Ill), CMO 24, 10/13/10; *In re: E.I. du Pont de Nemours and Company C-8 Pers. Inj. Litig.* (MDL 2433), Case No. 2:13-md-02433, CMO 6 (ECF 194).

## 2. The Bellwether Selection Process.

As briefly addressed in the Parties' Bellwether Status Report [ECF 981 at 8], and contrary to previous discussions with the Court, Defendants now propose further limiting the cases eligible for bellwether selection to a pool of 320 cases *that are randomly selected* following the February 28, 2025, written discovery close date. Defendants' new proposal for an initial, random selection of bellwether eligible cases should be rejected out-of-hand.

Defendants previously agreed that random case selection would not be advanced by the parties by virtue of their agreement that the parties should each select eight (8) cases once a threshold of "substantially complete" PFSs were received. [ECF 395 at 2]; *see also* Tr. of 1/25/24 at 36:11-14.[14] Yet now, in another change of position, Defendants suggest such a pool would be too large, and that some random selection process should be used to winnow thousands of cases down to a few hundred cases. The PSC rejects this, as should the Court.

Numerous courts have held that this sort of random selection results in cases that are *not* representative of the litigation as a whole. *E.g.*, *In re: Testosterone Replacement Therapy Prod. Liab. Litig.* ("TRT") (MDL 2545) (Tr. of 11/30/2017 case management conference) (where Judge Kennelly recognized: "Random doesn't mean representative. Random means random. Coin can come up heads six times in a row. That's random. It's not representative.").[15] In this MDL, a

---

[14] Defense counsel suggested that threshold might be 75%—but that suggestion was never reasonable, and it was never accepted or ordered by the Court. And given Defendants' failure to timely review PFSs [ECFs 961, 979], the suggested pool of 2,000 eligible cases is more than sufficient.

[15] There is a significant body of caselaw from judges presiding over MDLs (past and present) about the fallacy and flaws of using any random nature towards the selection of cases into a bellwether process. *E.g. In Re: Aqueous Film-Forming Foam Products Liability Litigation*, MDL No. 2:18-mn-2873 (District of SC, Charleston Div), Aug. 7, 2020 status conference (rejecting the idea that "somehow randomness really produces the best results."); *In re Yaz*, MDL No 2100 (S.D. Ill), CMO 24, 10/13/10 ("the Court will not take a chance with random selection"); *In Re: Risperdal/Seroquel/Zyprexa Lit.*, Case Code 274 (N.J. Super. Ct. Law Div.), 11/10/09 hearing at 43:2-3 ("none of [the random selections] would be my pick for a bellwether; that would be for sure."). Following these rulings most product liability MDL bellwether processes do *not* utilize any form of random selections; which can be established by scores of bellwether

random selection of eligible cases is even more inappropriate because it could include cases with only outlier injuries, or cases that do not sufficiently represent or include the various Defendants.

Moreover, Defendants' proposal to limit the bellwether eligibility pool to 320[16] randomly selected cases is contrary to many prior representations about needing a large pool. It could and would only undermine the Court's efforts to have representative bellwether trials. As noted above, the Court has already acknowledged that the bellwether eligible cases would be chosen from the entire pool of Plaintiffs who filed and served before February 1, 2024—and specifically warned against the parties trying to artificially limit which cases were eligible for selection. Tr. of 3/7/24 at 53:5-11 ("THE COURT: Let me just say this. I started off by saying we are going to have plenty of cases in the bellwether. This is -- they're not trying to manipulate who is in the bellwether; you're not trying to manipulate who is in the bellwether. We're going to have plenty. We're going to have riches. *We're going to have 7,000 cases in the bellwether*.") (emphasis added).

Defendants themselves have repeatedly agreed that the pool of cases eligible for bellwether selection is comprised of *all cases* filed prior to February 1, 2024, where a substantially complete PFS has been provided—and prior to this most recent round of discussions never suggested any sort of random selection of cases within that pool. *E.g.* Tr. of 1/25/24 at 27:3-22 (MR. GOODMAN: "We're willing to give on that. We can do filed and served by February 1. . .); [ECF 415] ("The parties agree that only cases filed and served by 2/1/24 will be eligible as bellwether cases.").

Defendants' new proposal—to limit the eligible pool to 320 randomly-selected cases—is also contrary to Defendants' (often-repeated) argument that bellwether selection should be delayed

---

orders the PSC will not burden the Court with that do not have a random process being used.

[16] During the parties' meet-and-confer process, Defendants proposed a random selection of 320 bellwether eligible cases. Their only explanation for why they proposed that number—as opposed to a different amount—is that 320 is divisible by 16.

9

because Defendants needed to first receive and review "substantially complete" PFSs. Tr. of 1/25/24 at 27:14-22 ("MR. GOODMAN: So we need these plaintiff facts sheets . . . And we need a substantial number of them substantially complete so we can figure out what is truly a representative case to get down to the -- to our eight and their eight for what will really cut the greatest swath across all these cases for your Honor's ruling."); *see also*, Tr. of 4/11/2024, (53:9-17) (MS. LEVINE: "That is the only source of discovery we have of the plaintiffs right now. The only source is the fact sheets. And to the extent that your Honor talks about trial dates and bellwethers, we cannot get there until we have information from the plaintiffs that we don't yet have."); Tr. of 10/10/2024 (42:23-43:3; 43:15-19); Tr. of 11/14/2024 (42:10-21). After months of insisting that their selection of bellwether cases depended upon receiving substantially complete PFSs, Defendants now propose a completely random selection of only 320 cases from which the parties must select their eight bellwether pool cases. Of course, as argued in Plaintiffs' prior briefing on this issue, Defendants' attempts to link their selection of bellwether cases to an arbitrary percentage of "substantially complete" PFSs was always an effort to cause delay, create a moving target, and result in "litigation within litigation." *See* Pltfs' Bellwether Protocol Submission [ECF 396] at 10. And this is precisely what Defendants accomplished here.

The PFSs completed for the cases filed and served before February 1, 2024, provide Defendants with ample information for selecting their eight (8) bellwether cases. Moreover, limiting the eligible cases to just those with "substantially complete" PFS' as of December 31, 2024 (approximately 2,000 cases) was an offer the PSC made in response to Defendants' statement that they no longer wanted to look at the approximately 6,000+ eligible cases using simply the filed and served date of February 1, 2024.

As such, Defendants will have approximately two thousand cases with "substantially

completed" PFSs to choose from even if it is only limited to cases substantially complete by December 31, 2024. *Defendants* are free to *choose* to limit the number of cases that they consider for bellwether selection; but there is no reason to arbitrarily—and randomly—limit the *Plaintiffs' ability* to select their own eight (8) bellwether cases. But if Defendants now seek to have a smaller pool, why then did they argue a few months ago they need 75% of the cases to have substantially complete PFSs? Why not at the outset of this process suggest randomization and a date by which *those cases* would need to provide a substantially complete PFS? But whatever their motives, and new arguments they will come up with, Defendants can select their eight (8) cases and the PSC select their eight (8) from a set corpus of cases, which the PSC submits should be those cases that are substantially complete by a date certain – which the PSC maintains should be December 31, 2024

Finally, Defendants also appear to recant their prior agreement that the parties each select eight (8) of the 16 bellwether cases; instead, they now appear to propose that each side should select twelve (12) cases so the other side can strike four (4) of the twelve (12) before arriving at eight (8) cases per side. *See* Parties' Bellwether Status Report [ECF 981] at 8. Plaintiffs and Defendants previously discussed this issue, and Plaintiffs thought there was agreement that each side would select its own eight (8) cases. (Defs.' Joint Bellwether Submission [ECF 395] at 2).[17] Nevertheless, if Defendants have changed this position too, Plaintiffs submit the parties should not be permitted to strike the other side's bellwether picks. Simply put, the parties select cases that they believe are most representative of the thousands of other cases in this MDL. Allowing the opposing party to strike picks does nothing but take representative cases out of consideration. If a party selects a case that has no right to be in the bellwether pool, opposing counsel is free to raise

---

[17] The potential for striking cases was never raised by Defendants or addressed by the parties in the previous briefing or arguments; instead, Defendants were content with each side picking its own representative cases.

11

that case's selection with the Court (or it runs the very real risk of said case(s) not becoming a finalist among the final five (5) cases selected for trial). Indeed, the likely process for selecting the final five (5) cases (to be set for trial) is for the parties to agree to the selection of the five (5) cases or for the Court to select them based upon arguments/briefing by the parties. As such, if a party includes a non-representative case in its group of eight (8), they do so at their own peril.

### B. The Bellwether Discovery Schedule (*i.e.* "the timing in which the parties will conduct such bellwether discovery." [ECF 986])

As previously noted in Plaintiffs' submission (Pltfs' Bellwether Protocol Submission [ECF 396] at 12), the parties agree that the initial 16 bellwether cases shall undergo Core Discovery, which shall include four (4) depositions per side and additional case specific written discovery. However, the parties have still not reached an agreement on the specified time period for conducting this Core Discovery. Further, Defendants also now appear to raise a new, additional issue of conducting Phase II discovery prior to even selecting the initial 16 bellwether cases (Parties' Bellwether Status Report [ECF 981] at 7). Plaintiffs first address this most recent issue.

The PFS allows "Phase II" discovery only "if [a plaintiff's] case has been designated for Phase II Discovery (e.g., [the plaintiff's] case is included in a bellwether selection pool)." In other words, "Phase II Discovery" is the case-specific discovery that takes place on cases that have *already* been chosen for bellwether treatment. However, under the guise that it constitutes permissible "Phase II" discovery, Defendants now propose that they be given 90 days to take "additional discovery" on the (proposed) 320 randomly selected cases *before* bellwether selection. The record is clear, however, that no case-specific discovery—beyond what is required by the PFS—should be taken prior to bellwether selection.

Defendants have previously, and repeatedly, acknowledged that pre-bellwether selection discovery is limited to the PFS. *E.g.* Tr. of 11/13/24 at 84:25-85:10 (MS. LEVINE: "[Non-

12

bellwether cases] are never going to likely have discovery at all beyond the plaintiff fact sheets."). And it was previously agreed that "Phase II" discovery does not occur until bellwether cases have already been selected by the parties. Tr. of 11/17/23 at 10:9-12 (MS. LEVINE: "And there will be a Phase II that will be part of the bellwether process where additional discovery, typically including depositions and potentially other documents and issues, will come up. And that was negotiated."). In fact, Defendants admitted that the entire purpose of the PFS was to be "in lieu of" other case-specific discovery. Tr. of 1/25/24 at 43:7-12 ("MR. GOODMAN: This is in lieu of our interrogatories are these plaintiff fact sheets."). But now Defendants claim they get a second layer of discovery before the bellwether cases are even selected. Plaintiffs submit that Defendants' proposal is not only duplicative of Core Discovery, but also would result in unnecessary delay in beginning the bellwether discovery process.

In yet another change of position, based on recent meet-and-confers, Defendants now ask for a full nine (9) months *after* bellwether selection to take case-specific discovery on the 16 bellwether cases, in addition to their requested 90-day "additional discovery period" before bellwether selection, bringing the full "bellwether discovery period" to at least one year before the parties even discuss final trial case selection. Plaintiffs had previously proposed a four (4)-month period to complete that case-specific discovery. *See* Plntfs' Bellwether Submission [ECF 396] at 14). Defendants previously proposed eight (8) months. *See* Defs' Joint Bellwether Submission [ECF 395] at 2. So again, like many other things, Defendants have changed their position since their prior submission and representations to the Court. However, as a compromise on the parties' original positions, Plaintiffs submit that seven (7) months from the date of the initial bellwether selection (*i.e.*, assuming selections occur on February 28, 2025, by September 30, 2025) should be a reasonable time period to conduct Core Discovery and is yet another instance of an effort at

13

compromise the PSC is seeking in favor of having a Case Management Order and plan for moving forward with a bellwether selection process.[18]

### C. Defendants' "Additional" Argument on PFSs and the Selection Process

In the parties' discussions relating to the parties' January 2025 Joint Status Report, Defendants have argued that because the PFSs in some cases filed and served prior to February 1, 2024—and therefore eligible for bellwether selection—may be amended to add additional information prior to February 28, 2025, the entire bellwether process should be extended to wait for any such amendments to the PFSs in those cases. Plaintiffs oppose any further extension of the selection process based upon this relatively small number of cases—especially given the thousands of eligible cases that the parties would already have to choose from.

The solution to Defendants' purported problem is to only include in the eligible pool cases those cases where Defendants have already determined the PFS to be "substantially complete." The PSC's proposal does exactly this. Namely, bellwether cases be selected by February 28, 2025 from a pool of eligible cases fitting the following criteria: (1) filed and served by February 1, 2024; (2) having a PFS deemed "substantially complete" by Defendants by December 31, 2024; and (3) involving an above-identified cancer injury. According to MDL Centrality, that is approximately 2,000 eligible cases where, by Defendants' own admission, the Plaintiffs have provided sufficient information to deem their PFSs "substantially complete." Moreover, to the extent additional

---

[18] There have been many other bellwether case management orders that have had more cases selected for inclusion as Initial Bellwether Discovery Cases and afforded less time in which to complete Core Discovery. *See In re Testosterone Replacement Therapy Prod. Liab. Litig.* No. 14-cv-07148, MDL No. 2545 (N.D. Ill), CMO 14 (selecting 16 cases as Initial Bellwether Cases and setting the deadline for core discovery at 2 ½ months); *In re Yaz*, MDL No 2100 (S.D. Ill), CMO 24 (selecting 24 cases as Initial Bellwether Cases and setting the deadline for core discovery at 4 ½ months); *In re: E.I. du Pont de Nemours and Company C-8 Pers. Inj. Litig.* (MDL 2433), CMO 6 (selecting 20 cases as Initial Bellwether Cases and setting the deadline for core discovery at 4 months); *In re: Elmiron (Pentosan Polysulfate Sodium) Prod. Liab. Litig.* (MDL 2973), CMO 17 (selecting 20 cases as Initial Bellwether Cases and setting the deadline for core discovery at 4 months)).

14

information is provided about those cases through amendments to their PFSs, it should be inconsequential to bellwether selection. In fact, Defendants previously represented to the Court that they would not base arguments on such minor issues with the PFSs. Tr. of 1/25/24 at 43:7-17 (MR. GOODMAN: It's not in our interest. This ambush game is not what we're looking to do, right? … This is not a situation where we're going to sit here and argue in front of you whether [the PFSs are] substantially complete or not. It's really an objective test: Did they sign it? Did they fill out? Did they provide the authorizations? And did they give us the documents?"). And to the extent Defendants have delayed in reviewing PFSs in eligible cases—as recognized by the Court [ECFs 961, 979]—that is no excuse to delay bellwether selection. The bellwether process cannot wait until every PFS is perfect in Defendants' eyes.

## IV. CONCLUSION

Plaintiffs' bellwether proposal, as slightly revised herein in the spirit of compromise with some of Defendants' new positions regarding PFS substantial completeness and timing of bellwether discovery, continues to follow the general structure most commonly used in MDLs and provides the most reasonable and traditional path forward to appropriately advancing the litigation and conserving judicial resources. Accordingly, the Court should approve the PSC's proposal attached as Exhibit A, deny Defendants requests in there entirety, and grant such other and further relief as the Court deems just and appropriate under the circumstances.[19]

Dated: January 3, 2025	Respectfully Submitted,

s/ *Edward A. Wallace*
Edward A. Wallace

---

[19] As discussed in Plaintiffs' prior submission (Pltfs.' Bellwether Protocol Submission [ECF 396] at 15), and as a means of alternative and/or further relief in addition to the above proposed bellwether plan, Plaintiffs again respectfully suggest the Court consider a track for Settlement Evaluation Cases of varying injury types and damages for limited core discovery. This parallel track, meant to aid the parties in case valuation, would begin to inform settlement negotiations as recently suggested by the Court (Tr. of 11/14/2024 at 9:15-10:12) and help guide the parties in the bellwether process.

**WALLACE MILLER**
150 N. Wacker Dr., Suite 1100
Chicago, Illinois 60606
Tel.: 312-261-6193
Email: eaw@wallacemiller.com

*Plaintiffs' Liaison Counsel*

Diandra "Fu" Debrosse Zimmermann
**DICELLO LEVITT LLC**
505 20th Street North - Suite 1500
Birmingham, Alabama 35203
Tel.: 312-214-7900
Email: fu@dicellolevitt.com

*Plaintiffs' Co-Lead Counsel*

Fidelma L. Fitzpatrick
**MOTLEY RICE LLC**
40 Westminster Street, Fifth Floor
Providence, Rhode Island 02903
Tel.: 401-457-7700
Email: ffitzpatrick@motleyrice.com

*Plaintiffs' Co-Lead Counsel*

Michael A. London
**DOUGLAS & LONDON, P.C.**
59 Maiden Lane, Sixth Floor
New York, New York 10038
Tel.:212-566-7500
Email: mlondon@douglasandlondon.com

*Plaintiffs' Co-Lead Counsel*

Benjamin L. Crump
**BEN CRUMP LAW FIRM**
122 South Calhoun Street
Tallahassee, Florida 32301
Tel.: 850-224-2020
Email: ben@bencrump.com

*Plaintiffs' Co-Lead Counsel*