**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | **MDL No. 3060**<br>Case No. 23 C 818<br>Judge Mary M. Rowland<br><br>**This document relates to:**<br>All Cases |

**DEFENDANTS' BRIEF IN SUPPORT OF**
**BELLWETHER SELECTION AND SCHEDULE**

## I.    INTRODUCTION AND SUMMARY OF DEFENDANTS' PROPOSAL

Defendants' proposed bellwether process is guided by concepts of fairness, parity of information, and the timely and well-ordered selection and work-up of cases for trial eligibility. Indeed, the proposed process will permit an orderly selection of ***representative cases*** for discovery on a schedule consistent with the one previously discussed with the Court.[1]    Importantly, Defendants' proposal will allow the parties to work from a pool of "Candidate Cases" (*i.e.*, those filed and served by February 1, 2024) with facts that are sufficiently well-established based on the February 28, 2025 Plaintiff Fact Sheet ("PFS") amendment deadline.  The proposal also grants the parties sufficient time to analyze the information from the pool of Candidate Cases before identifying 16 "Bellwether Discovery Cases" via a selection-and-strike process.  It then gives the

---

[1] Defendants submit as Exhibit A to this Brief a revised Proposed Case Management Order regarding Bellwether Selection and Schedule.  In its December 13, 2024 Minute Order, the Court, "order[ed] supplemental briefing regarding (A) the process to select the 16 cases subject to bellwether discovery; and (B) the timing to conduct bellwether discovery" and invited the parties to "submit revised proposed CMOs with their briefs," adding that the Court would "issue a comprehensive bellwether protocol that addresses issues beyond bellwether selection."  (ECF No. 986.)  Based on this guidance from the Court, Defendants' proposed Case Management Order addresses bellwether selection and discovery and other important issues, including expert discovery in 2025 and Rule 702 (*Daubert*) briefing/hearings in 2026 and having the first bellwether case ready for trial in early 2027.  (*Accord* ECF No. 892 at 47).

parties adequate time to work up those 16 cases in discovery and to agree on a process to further narrow those cases down to five "Bellwether Trial Pool Cases."

The parties and the Court have done a tremendous amount of work over the past year to gather complete and usable information about the plaintiffs in this MDL. To that end, the parties and the Court have worked through the PFS deficiency process, built a platform to house and view the PFS data, weeded out more than 1,000 cases from the docket, and are about to lock in a huge amount of PFS data on February 28, 2025, for those cases filed and served by February 1, 2024. The Candidate Cases total approximately 6,700 cases and have always been recognized as the most appropriate pool for bellwether selection.

Having put in all of this work, it only makes sense that the bellwether process should start after the February 28 discovery deadline so that the case-specific facts for the selection pool are well-established and the parties can rely on those facts equally. Plaintiffs' proposal, on the other hand, would have the parties selecting bellwether cases now, at a time when any selected plaintiff could still change her PFS response. This approach would create the wrong incentive; all plaintiffs (not just bellwether-selected plaintiffs) should be inspecting and amending their PFS responses to insure that complete and accurate responses have been provided. But more importantly, it would deprive Defendants of the benefit of the complete set of information to which this Court has repeatedly recognized they are entitled to have before making their bellwether selections.

In an effort to reduce the number of issues for the Court to decide, Defendants have engaged in multiple meet and confers with the plaintiffs with respect to the timing and process for selecting bellwether cases and for scheduling discovery. While the parties have been able to reach general agreement as to some issues, they unfortunately have not been able to reach agreement on all critical process and scheduling issues. In sum, Defendants submit that:

1) Bellwether selection should take place after February 28, 2025 (*i.e.*, the Court-ordered deadline for completion of PFS discovery in the Candidate Cases);

2) The pool for bellwether selection should be the Candidate Cases, namely, those filed and served by February 1, 2024 – not just cases where the plaintiffs chose to comply with their discovery obligations and submitted a "substantially complete" PFS – so that the parties can select truly representative cases from the pool of Candidate Cases;

3) A random sample of 300 cases should be drawn from the approximately 6,700 Candidate Cases; this would be a statistically significant sample that would not only increase efficiency and consistency in finding representative cases but also allow the selection process to begin earlier (*i.e.*, an initial down-selection to 300 on or about March 7, 2025);

4) The 16 Bellwether Discovery Cases should be selected by allowing each side to choose 12 cases from the random, down-selected pool of 300 by May 1, 2025 (*i.e.*, 55 days after the down-selection) and then permitting the other side to strike four of those cases five days later on May 6, 2025, yielding eight cases per side; this process will further eliminate non-representative outlier cases;

5) The selection of the 16 Bellwether Discovery Cases should occur 60 days after the down-selection to 300 cases, or by May 6, 2025, to allow the parties sufficient time to assess the 300 cases for representativeness; and

6) A sufficient period for core discovery of the 16 Bellwether Discovery Cases should be provided such that written discovery and up to eight depositions can be conducted as to each of those 16 cases; Defendants suggest this core discovery period be eight months in length.

Given the evolution of this litigation and the meet and confers undertaken, Defendants have made significant modifications and concessions from their initial proposal submitted in January 2024 (ECF No. 395-1). First, the current proposal allows the plaintiffs to complete any updates to their PFS by February 28, 2025 for cases filed and served by February 1, 2024, as ordered by the Court. (*See* ECF No. 961.) Second, the proposal provides for a reduced pool of 300 cases, drawn from the Candidate Cases, with the process of reduction happening within one week of the close of PFS discovery, *i.e.*, by March 7, 2025. This will allow the parties to choose their 16 Bellwether Discovery Cases 60 days later on May 6, 2025. The down-selection to 300 cases eliminates the many months that would otherwise be required to review the potentially thousands of amended

PFSs likely to be submitted at the end of February.[2] Third, the proposal increases the likelihood that only representative cases are selected as the 16 Bellwether Discovery Cases, by allowing each side to strike four of the other side's selections. Typically, this "strike" process serves to eliminate the most favorable cases (generally, outliers) from the other side's selections, making the ultimate pool more neutral and representative of the entire docket. Finally, in an attempt at compromise, Defendants have agreed to limit this first round of bellwether cases to those alleging a Reproductive Cancer (*i.e.*, uterine, endometrial, or ovarian cancer), deferring a schedule for the non-Reproductive Cancer cases to a later time that will be separately negotiated.[3]

## II. DISCUSSION

### A. The Fact Discovery Deadlines Set by the Court Are Important and Those Deadlines Should Be Met Before Bellwether Case Selection Begins

In an effort to reach a compromise with the plaintiffs, Defendants agreed to limit the first round of 16 Bellwether Discovery Cases and five Bellwether Trial Pool Cases to the plaintiffs who allege a Reproductive Cancer. After the recent wave of dismissals and based on the available PFS data, approximately 5,500 such cases remain that were filed and served by February 1, 2024. As the Court is well aware, the parties have for nearly a year worked very hard to collect complete information relating to those plaintiffs, and numerous cases initially filed by February 1, 2024 have already been dismissed. Because that process is continuing and needs to come to an end in order to move on to the bellwether process, the Court recently entered an order setting a February 28 deadline for PFS discovery for these cases. (ECF No. 961.) For the same reason, Defendants are

---

[2] Should the Court decline to include the randomization to a small, more manageable pool, Defendants reluctantly must ask for more time to review the complete set of final information for the 5,500 eligible cases.

[3] For the Court's convenience, Defendants attach as Exhibit B a chart outlining the key stages of Defendants' proposed bellwether selection process.

seeking a court order in the January 2025 Joint Status Report to set the same February 28 deadline for any defendants to be added to the Short Form Complaints ("SFCs") for any case filed and served by February 1, 2024. Respectfully, those processes must be allowed to run their course and conclude before the parties can fairly, rationally, and with adequate information select bellwether cases.

There currently is no deadline for the plaintiffs to add defendants to their SFCs. At a minimum, for the bellwether Candidate Cases – those filed and served before February 1, 2024 – Defendants must know if they are in or out of the cases that can be selected. Moreover, it would be highly prejudicial if a plaintiff was allowed to *add* defendants to one of the 16 Bellwether Discovery Cases *after* the bellwether selection process has taken place. This is due in part to the fact that the defendants named in a particular case will be important in helping the parties achieve the representativeness goal of the bellwether process.[4] For example, Revlon-only bankruptcy plaintiffs may or may not be representative of the MDL case inventory as a whole. Some defendants are named in thousands of cases and others in far fewer. In addition, some manufacturers may be positioned differently from others because of product dissimilarities that may impact representativeness (*e.g.*, professional-only products versus consumer-only products). Unless the defendants named in a given SFC are locked in, the parties will not be able to ascertain whether eligibility criteria have been met or whether the 16 Bellwether Discovery Cases

---

[4] Judge Kennelly and the parties in TRT understood that the defendant pool impacted representativeness and, on that basis, created defendant- and injury-specific bellwether waves. *See In Re: Testosterone Replacement Therapy Products Liability Litigation*, No. 1:14-cv-01748 (MFK) (N.D. Ill.), Case Management Order 14 and subsequent amendments (ECF Nos. 467, 793, 1089, 1287, 1588). While Defendants are not advocating for defendant-specific bellwether processes here, each defendant should know if it is in or out of a case – and accordingly whether it will bear any disproportionate share of the defense - as the joint defense group are advocating for certain cases as bellwether selections.

accurately represent the litigation docket as a whole. Moreover, the ability of one of the 16 Bellwether Discovery Case plaintiffs to add additional defendants ***after*** the cases are selected by the parties would render Defendants' careful selection process meaningless.

Second, the Court ordered that "Plaintiff fact discovery [will] close on 2/28/25 for any Plaintiffs who filed and served their SFC by 2/1/24." (ECF No. 961.) Thus, February 28 is the "final deadline for Plaintiffs to submit completed PFS." (*Id.*) To be clear, February 28 will be the first date by which Defendants will have all information available to assess these cases. As of December 27, 2024, at least 2,222 plaintiffs who filed and served cases by February 1, 2024 still have outstanding, noticed deficiencies and delinquencies that remain uncured. Indeed, 555 of these plaintiffs have not submitted a PFS at all. Even where a PFS is considered "substantially complete" under Case Management Order No. 9 because ***some*** response has been provided, the PFS may still offer substantively meaningless answers like "Don't remember" or "Don't know" on key PFS queries like the names of treating oncologists. These deficiencies thus pose significant limitations on key information available to the parties. The Court has repeatedly recognized this distinction and for that reason established the February 28, 2025 PFS discovery deadline. Defendants reasonably anticipate hundreds, perhaps thousands, of amendments to the PFSs. In other words, there will potentially be thousands of cases undergoing changes to their most fundamental information in the coming weeks.

In spite of these issues, the plaintiffs would have the parties selecting cases prior to the PFS discovery deadline. But the parties cannot realistically evaluate a case until there is finality and certainty as to the key case-related information the plaintiffs are providing,[5] and as the plaintiffs

---

[5] Moreover, the rest of the plaintiffs would know they were not selected for further work-up and, therefore, may not do the work that needs to be done by the February 28 deadline. The parties should not take steps that disincentivize full compliance with discovery obligations.

themselves have recognized, there is a need to "truly be done with this" so that "the plaintiff fact sheets are what the plaintiff fact sheets are, the answers are what the answers are." (ECF No. 966 at 10.)

The key to conducting the bellwether selection process appropriately is getting to representative cases accurately and efficiently. But allowing the plaintiffs to add additional defendants, change the injuries alleged, disclose different products, produce new medical records, and/or change the facts and nature of the cases *after* a plaintiff is selected as one of the 16 Bellwether Discovery Cases or one of the five Bellwether Trial Pool Cases would not further those goals and would be patently unfair and one-sided.

### B. Bellwether Cases Should Be Selected from a Narrowed Pool of Candidate Cases

Once the Court-imposed pleadings and discovery deadlines have passed and the information relating to the approximately 6,700 Candidate Cases is set, that pool should be reduced by a reasonable number using random selection. Defendants propose reducing the candidate cases from 6,700 to 300 – approximately 4.5% of the pool – and the parties make their bellwether selections from those 300 cases. This proposed down-selection process is prudent from a cost and efficiency perspective as well as from a time-to-completion standpoint. Without reducing the cases in this fashion, Defendants would need extensive time to evaluate the information for the 6,700 cases, including analyzing any new and/or amended information via the PFS update-and-lock process of February 28. They must then engage in extensive discussions among the joint defense group ("JDG") and each defendant on its own to select representative cases, including those defendants that will be included in the 12 cases to be put forward by the JDG as the potential 16 Bellwether Discovery Cases. Plaintiffs, via their leadership committee, arguably will have a much easier time making those selections.

To avoid the need for such an extensive and lengthy selection period – which likely would take many months given the amount of information that exists for each of the more than 6,700 cases, the large number of updates expected at the February 28 PFS deadline, and the large number of Defendants involved in the process – Defendants propose randomly down-selecting from the Candidate Cases with an alleged Reproductive Cancer to 300 cases. This smaller number of cases to work from would dramatically reduce the amount of information and time that would be needed for the identification, selection, and consensus-building process to get to 16 Bellwether Discovery Cases. Unlike other single defendant or single ingredient MDLs, the complexities in this litigation (*e.g.*, differently situated defendants, disparate product formulations and ingredients, lack of consumer product verification, unknown and untested scientific theories of causation, etc.) make it far more challenging to define what representativeness is or should be. The Court and the parties have yet to tackle those characteristics that truly define a representative case in MDL 3060. As a result, Defendants' proposal of a random down-selection to 300 cases ensures that every combination has a chance equal to its proportion in the population of being in the pool. Courts routinely deploy random sampling as a useful and cost-effective method to gather information about large groups where it would be impractical or burdensome to examine each case individually.[6]

---

[6] *See Federal Judicial Center's Reference Manual on Scientific Evidence: Reference Guide on Statistics, Third Edition,* p. 555 ("Randomization minimizes the likelihood that there are differences in relevant characteristics between those exposed to the agent and those not exposed."); *see also* William G. Cochran, *Sampling Techniques*, (1977, 2nd Ed. Wiley) ("Sampling is used widely in industrial quality control, in forecasting elections, and, of course, throughout the sciences."); *see also infra* Part II.B (describing instances where courts have adopted a random sampling approach). Cherry-picked cases and underlying data will not result in representative cases for trial and will likely underscore prejudice by creating spurious correlations. A spurious correlation is a statistical relationship between two variables that appears to be causal but is not. For example, cherry picked data can illustrate that ice cream consumption and violent crime rates are correlated. *See* Vigen, Tyler, *Spurious Correlations*, *available at*

One might say "why don't we just let the plaintiffs pick from the entire pool of cases and Defendants can pick from whatever reduced pool they wish?" The answer is that the plaintiffs should select cases from the ***same pool*** as Defendants in order for consistency and fundamental fairness to be met; it would simply be untenable for the plaintiffs to pick from over 6,700 cases about which they have the best and complete knowledge while Defendants are selecting from a reduced pool or are attempting to assess each Candidate Case. However, if both sides are ordered to pick from a randomly reduced pool, no plaintiff or defendant could be heard to complain. This alternative process permits the parties to make their selections on a more even-playing field, ensuring a bellwether process that is efficient and productive, and bellwether cases that are more representative of the entire docket filed in this litigation. Finally, the down-selection process could be completed quickly and efficiently within a week of the February 28 PFS discovery deadline, helping to provide the plaintiffs with a faster timeline, as requested.

For all of these reasons, Defendants propose that in early March 2025 the parties and the Court, as has occurred in other MDLs, use computer tools to identify 300 cases from the 5,500 Candidate Cases that allege a Reproductive Cancer, using randomizing software such as Microsoft Randomizer that can ensure that the 300-case subset is statistically likely to be representative of the entire MDL 3060 docket.[7] With the pool of eligible bellwether cases reduced to 300 cases, the parties can then focus their attention on assessing 300 current PFSs and related materials to identify the 16 Bellwether Discovery Cases.

---

https://www.tylervigen.com/spurious/correlation/9632_ice-cream-consumption_correlates-with_violent-crime-rates (last visited Jan. 3, 2025).

[7] Review of PFSs for deficiencies in the non-pooled cases would continue under CMO 9.

In their December 9, 2024 submission to the Court, the plaintiffs mischaracterize Defendants' bellwether proposal. As noted *supra*, Defendants agree that the "bellwether-eligible" pool of cases would be populated by only those cases that meet the Court-ordered criteria. The purpose of reducing the pool to a 300-case random sample, statistically similar to and representative of the full inventory of MDL 3060 cases, is not to artificially constrain the parties' bellwether selections but to ensure that the parties have the time to meaningfully review those cases to identify truly representative cases. In other words, this will remain fundamentally a ***party-driven*** selection process. Defendants are not proposing, and have never proposed, randomly selecting the case(s) to be tried. Rather, by narrowing the initial universe of 5,500 cases using a method that ensures statistical consistency with the whole, the ability of one side to artificially skew the ultimate bellwether process is reduced.[8]

The purpose of this bellwether process is and should be to provide valuable information about the strengths and weaknesses of the cases in this MDL, information that could be used to guide motion practice and the resolution of the litigation on a large scale, or even a global scale. For that to be possible, ***all parties must have confidence that the limited number of cases ultimately tried are representative of the numerous non-tried cases***. Plaintiffs' proposal will not accomplish this goal, as they would have each side select just eight cases from those cases where the plaintiffs had the commitment and where-with-all to substantially complete the PFS process. Yet, while the plaintiffs' counsel have full access to their clients, the information about their claims and the injuries alleged, including having vetted their clients and on that basis agreed to represent them, Defendants do not have such unfettered access. The disparity of available information gives

---

[8] For example, the narrower pool will retain approximately the same proportion of defendants, plaintiffs' firms, and injuries that exists in the overall case docket.

the plaintiffs a significant advantage in the bellwether selection process and allows them to hand-pick the most likable and compelling plaintiffs with cases that match their causation theories. Any result in such a case would not yield valuable information for Defendants to allow for resolution; it would just fan the flames of the underlying information disparity. *See, e.g.*, *Guidelines and Best Practices for Large and Mass-Tort MDLs,* Bolch Judicial Institute, Duke Law School (2d ed.) September 2018 ("Usually a judge should be skeptical of the value provided by trying one side's 'strong' cases that may not be representative of the broader claims").

Defendants' proposed down-selection to 300 cases will allow some of this "information gap" to be narrowed. Using a randomizing tool to reduce over 5,500 cases to a 300-case sample would preserve the characteristics of the total pool while making it possible for Defendants to focus and finalize their assessment efforts for those 300 cases that would permit them to make their picks based on better-quality, more-detailed information and in a far shorter timeframe.

Contrary to the plaintiffs' characterizations, Defendants' proposal is consistent with bellwether-selection approaches used by other MDL courts, including in this District.

- In *In re Testosterone Replacement Therapy Products Liability Litigation*, Judge Kennelly used a similar hybrid approach early in the litigation, using a randomized sample of 100 cases from which the plaintiff and relevant defendants would each make selections, an approach commentators suggest allowed the "parties to participate in the selection process . . . while yielding what could be a representative stable of cases." *See Guidelines and Best Practices for Large and Mass-Tort MDLs*, *supra*.[9]

- In the Zantac MDL, Judge Rosenberg ordered the parties to use the Microsoft Randomizer tool to identify 8% of cases within eight different cancer types at issue there, resulting in a total pool of 200 cases from which to select bellwether cases. *In*

---

[9] While the plaintiffs point to later statements from Judge Kennelly rejecting the use of randomization for subsequent trial case selection of later wave defendants, those statements were based on the recognition that random is not necessarily representative. As discussed *supra*, Defendants are not advocating for a strict random selection of cases to choose the final bellwether cases but, rather, a random selection of a statistically consistent pool of cases from which the parties will choose the bellwether cases.

*re: Zantac (Ranitidine) Products Liab. Litig.*, MDL No. 2924 (S.D. Fla.), PTO 69, (Nov. 19, 2021).

- In *In re 3M Combat Arms Earplugs Prods. Liab. Litig.*, the court first ordered a random down-selection to approximately 1,400 cases to serve as a potential bellwether pool, from which the parties identified 175 cases that met agreed criteria for a bellwether pool from which the court and the parties selected a "discovery pool." MDL No. 2885 (N.D. Fla. Jan. 21, 2020).

- In *In re J&J Talc*, the court employed a process in which a 1,000-case subset was chosen at random so the parties could focus discovery efforts on those cases before selecting representative bellwether cases. MDL No. 2738 (May 2020).

Defendants acknowledge that courts have cautioned that using random selection *alone* runs a risk of including outlier cases in a bellwether pool and skewing the bellwether process, just as a party's selection of "best" or "worst" cases skews the process. But there is no prohibition against using randomization to *reduce the size of the pool* for ultimate bellwether selection, and courts have not hesitated to incorporate elements of random selection into efficient hybrid approaches that facilitate the parties' selection of representative bellwether cases. That is all Defendants' proposal would do here.

### C. All Cases That Meet The Criteria Should Be Eligible For Bellwether Selection

For months now, the Court and the parties have contemplated that the Candidate Cases would be those cases filed and served by February 1, 2024. That is why the plaintiffs insisted a year ago that the eligible cases be *served* and not merely filed by that date, and that is why the Court ordered the PFS discovery deadline to apply *only* to those cases. The plaintiffs who comprise the Candidate Cases were never in doubt until recently when, presumably, the plaintiffs realized that they could argue for selections to be made now (from cases with "substantially complete" PFSs), rather than waiting until after the February 28, 2025 PFS discovery deadline.

Contrary to the plaintiffs' assertions, Defendants' proposal does not "contradict[] [Defendants'] prior agreements with the PLC and representations to the Court." (*See* ECF No.

981 at 6.)  Rather, Defendants' proposal is entirely consistent with their statements to the Court and is simply a further concession by Defendants to attempt to reach agreement on a bellwether selection process.  It is also a recognition that the litigation has evolved tremendously since the parties first briefed the bellwether issues a year ago.  Indeed, since their initial briefing, Defendants have offered significant modifications to their proposal in an effort to reach a compromise, including agreeing that the Candidate Cases for bellwether selection would be those filed ***and served*** before February 1, 2024.  (*See, e.g.*, January 25, 2024 Hearing Tr. at 27:3-22 (MR. GOODMAN: "We're willing to give on that.  We can do filed and served by February 1"); ECF No. 415 at 1 ("The parties agree that only cases filed and served by 2/1/24 will be eligible as bellwether cases").)  In addition, Defendants have agreed to select from the Candidate Cases that allege Reproductive Cancers and to place other injuries on a separate bellwether track (as the plaintiffs themselves have repeatedly proposed to the Court), despite Defendants' well-known desire to test such cases for lack of causation as soon as possible.  Also, Defendants have agreed to waive, for the time being, their proposed requirement that the plaintiffs reach substantial completion for 75% of PFSs submitted in Candidate Cases before starting the bellwether case selection process, given the Court's subsequent setting of a PFS discovery deadline that supersedes the need to have a percentage of substantially complete PFSs.

In an unfortunate attempt to miscast Defendants' current proposal as a "substantial departure" from their prior proposal, the plaintiffs have mischaracterized Defendants' prior comments on the PFS "substantially complete" issue.  (*See* ECF No. 981 at 7 ("Defendants themselves have repeatedly agreed that the pool of cases eligible for bellwether selection is comprised of all cases filed prior to February 1, 2024, *where a substantially complete PFS has been provided*").)  The truth is, Defendants ***never*** agreed to limit the pool of Candidate Cases to

those for which a substantially complete PFS had been provided (much less before the deadline to complete PFS discovery has passed, as the plaintiffs now claim). Indeed, doing so would make no sense, given the paucity of information required to constitute a "substantially complete" PFS. Defendants have only ever suggested that the *timing* of bellwether selection should depend on the plaintiffs achieving a certain percentage of "substantially complete" PFSs – initially proposed by Defendants at 75% substantial completion. This was always a *timing* issue – without PFS information from a substantial portion of the Candidate Cases, the parties and Court would not have enough information to determine whether a case is representative for bellwether selection. (*See, e.g.*, ECF No. 395 at 3; ECF No. 395-1 at 4; ECF No. 395-2 at 4.)[10]

During the parties' negotiations, the plaintiffs insisted that the pool of initial bellwether cases be limited to those where the PFSs are *currently* – *i.e.*, more than two months before the PFS discovery deadline – "substantially complete." This both ignores the Court's order setting a PFS discovery deadline and needlessly narrows the Candidate Case pool, potentially excluding highly representative cases that the plaintiffs have yet to supplement. In direct contrast to Defendants' proposal to narrow the Candidate Case pool through randomization (which attempts to preserve the overall representativeness of the narrowed pool), Plaintiffs proposal narrows the available cases to those hand-selected by them. Plaintiffs should not be afforded the power to unilaterally control the pool of bellwether-eligible cases, as doing so would be unfair, and in contravention of the goal of finding representative cases that will help the parties understand the merits and value of the claims, if any.[11]

---

[10] Notably, the plaintiffs still have not reached the 75% substantially complete threshold.

[11] *Accord* MANUAL FOR COMPLEX LITIGATION (Fourth) § 22.315 (2004), *available at* https://www.uscourts.gov/sites/default/files/mcl4.pdf (last visited December 26, 2024) (for bellwether trials to fulfill their purpose, the selected claims and injuries tried "should be representative of the range of cases" in the MDL as a whole); MELISSA J. WHITNEY,

Contrary to the plaintiffs' assertions, and as discussed *supra*, the selection of bellwether cases cannot fairly and rationally occur until some reasonable time after the February 28 PFS discovery deadline has passed. Once the plaintiffs have cured all of the Rule 26(g) compliance issues, as ordered by the Court, Defendants will have a full opportunity to review and synthesize the hundreds of updated and/or amended PFSs and will be in the optimal position to select the 16 Bellwether Discovery Cases.

### D. Schedule For Bellwether Discovery Case Work-Up

Following selection of the 16 Bellwether Discovery Cases, Defendants propose that the parties have eight months for discovery relating to those 16 cases. Eight months is an ambitious, arguably aggressive, timetable given the need for case-specific written discovery and the parties' prior agreement to permit up to eight depositions for each of the 16 cases (up to 128 depositions).

The parties do not dispute that additional case-specific written discovery of the initial 16 Bellwether Discovery Cases is required, as prior case management orders anticipated the service of answers and affirmative defenses by each defendant to each bellwether SFC as well as the completion of Phase II PFSs and Defendant Fact Sheets, including discovery of the particular plaintiffs' social media. (*See* ECF No. 249; ECF No. 343.) All of this case-specific discovery will need to be coordinated while general discovery is occurring at the same time, including the numerous depositions of Defendants' company witnesses and third-parties that the plaintiffs have stated they intend to take in the litigation as a whole.[12] Given the number of depositions, the

---

BELLWETHER TRIALS IN MDL PROCEEDINGS: A GUIDE FOR TRANSFEREE JUDGES 3 (Fed. Jud. Ctr. 2019) at 3-4 ("If bellwether cases are representative of the broader range of cases in the … proceeding, they can provide the parties and [the] court with information on the strengths and weaknesses of various claims and defenses and the settlement").

[12] Plaintiffs informed Magistrate Jantz that they estimate more than 100 general discovery depositions will need to be taken of Defendants.

number of parties' and counsels' schedules to be coordinated and the intervening holidays, and mindful of the Court's stated desire to provide realistic deadlines for the parties, Defendants contend that eight months is the minimum amount of time necessary to complete this discovery, which should allow the parties and the Court to assess dispositive and/or evidentiary motions.

Defendants' proposed schedule would complete core discovery for the 16 Bellwether Discovery Cases by February 2026, which should allow sufficient time for the parties to select the five Bellwether Trial Pool Cases, complete any additional fact and expert discovery with respect to those five cases, permit resolution of any remaining motions, and have an initial case ready for trial in early 2027, which is all consistent with the schedule articulated by the Court.[13]

## III.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court adopt their Bellwether Proposal, enter the appended Proposed Case Management Order, and reject the plaintiffs' competing proposal.

Dated: January 3, 2025     Respectfully submitted by,

            */s/Mark C. Goodman*

            Mark C. Goodman
            **BAKER & MCKENZIE LLP**
            Two Embarcadero Center, Suite 1100
            San Francisco, California 94111
            T: (415) 576-3080
            mark.goodman@bakermckenzie.com

            *Defense Liaison Counsel and Counsel for Defendant*
            *Namasté Laboratories, LLC*

---

[13] The Court stated its intention to have the first cases ready for trial in 2027, with expert discovery starting in 2025 and Rule 702 (*Daubert*) hearings taking place in 2026. (ECF No. 892 at 46-47.) As noted, Defendants' proposed Case Management Order is consistent with and reflects this scheduling.

Mark D. Taylor
**BAKER & MCKENZIE LLP**
1900 North Pearl Street, Suite 1500
Dallas, Texas 75201
T: (214) 978-3000
mark.taylor@bakermckenzie.com

Maurice Bellan
Teisha C. Johnson
**BAKER & MCKENZIE LLP**
815 Connecticut Avenue, NW
Washington DC 20006
T: (202) 452-7057
maurice.bellan@bakermckenzie.com
teisha.johnson@bakermckenzie.com

Barry Thompson
**BAKER & MCKENZIE LLP**
10250 Constellation Boulevard, Suite 1850
Los Angeles, CA 90067
T: (310) 201-4703
barry.thompson@bakermckenzie.com

Colleen Baime
Laura Kelly
**Baker & McKenzie LLP**
300 East Randolph Street, Suite 5000
Chicago, Illinois 60601
T: (312) 861-2510
colleen.baime@bakermckenzie.com
laura.kelly@bakermckenzie.com

*Counsel for Defendant Namasté Laboratories, LLC*

Seth A. Litman
Irvin Hernandez
**THOMPSON HINE LLP**
Two Alliance Center
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
T: (404) 541-2900
Seth.Litman@ThompsonHine.com
Irvin.Hernandez@ThompsonHine.com

*Counsel for Keratin Defendants Keratin Complex and Keratin Holdings, LLC*

17

Dennis S. Ellis
Katherine F. Murray
Serli Polatoglu
**ELLIS GEORGE CIPOLLONE O'BRIEN LLP**
2121 Avenue of the Stars
Suite 3000, 30th Floor
Los Angeles, CA 90067
T: (310) 274-7100
F: (310) 275-5697
dellis@egcfirm.com
kmurray@egcfirm.com
spolatoglu@egcfirm.com

Jonathan Blakley
**GORDON REES SCULLY MANSUKHANI LLP**
1 N. Franklin St., Suite 800
Chicago, IL 60606
T: (312) 565-1400
F: (312) 565-6511
jblakley@grsm.com

Peter Siachos
**GORDON REES SCULLY MANSUKHANI LLP**
18 Columbia Turnpike, Suite 220
Florham Park, NJ 07932
T: (973) 549-2500
F: (973) 377-1911
psiachos@grsm.com

*Counsel for Defendants L'Oréal USA, Inc., L'Oréal
USA Products, Inc. and SoftSheenCarson LLC*

Lori B. Leskin
**ARNOLD & PORTER KAYE SCHOLER, LLP**
250 West 55th Street
New York, NY 10019
T: (212) 836-8641
F: (212) 836-8689
Lori.leskin@arnoldporter.com

Rhonda R. Trotter
**ARNOLD & PORTER KAYE SCHOLER, LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
T: (213) 243-4000
F: (213) 243-4199

18

*Counsel for Defendants Strength of Nature LLC; Strength of Nature Global LLC; and Godrej SON Holdings*

R. Trent Taylor
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
T: (804) 775-1182
F: (804) 225-5409
rtaylor@mcguirewoods.com

Patrick P. Clyder
Royce B. DuBiner
**MCGUIREWOODS LLP**
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
T: (312) 849-8100
F: (312) 849-3690
pclyder@mcguirewoods.com
rdubiner@mcguirewoods.com

*Counsel for Defendant House of Cheatham LLC*

Joseph P. Sullivan
Kevin A. Titus
Bryan E. Curry
**LITCHFIELD CAVO LLP**
303 W. Madison, Suite 300
Chicago, IL 60606
T: 312-781-6677
F: 312-781-6630
sullivanj@litchfieldcavo.com
titus@litchfieldcavo.com
curry@litchfieldcavo.com

*Counsel for Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc.*

Richard J. Leamy, Jr.
Kristen A. Schank
Anna Morrison Ricordati
**WIEDNER & MCAULIFFE, LTD.**
1 N. Franklin St., Suite 1900

19

Chicago, Illinois 60606
T: (312) 855-1105
rjleamy@wmlaw.com
kaschank@wmlaw.com
amricordati@wmlaw.com

*Counsel for Defendant Avlon Industries, Inc.*

Melissa Fallah
Robert W. Petti
Alyssa P. Fleischman
**MARON MARVEL**
191 N. Wacker Drive – Suite 2950
Chicago, Illinois 60606
T: (312) 579-2018 (ofc)
mfallah@maronmarvel.com
rpetti@maronmarvel.com
afleischman@maronmarvel.com

*Counsel for Defendant Luster Products, Inc.*

Robert A. Atkins
Daniel H. Levi
Shimeng (Simona) Xu
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
T: (212) 373-3000
ratkins@paulweiss.com
dlevi@paulweiss.com
sxu@paulweiss.com

Randy S. Luskey
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
T: (628) 432-5112
rluskey@paulweiss.com

David E. Cole
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC 20006

T: (202) 223-7348
dcole@paulweiss.com

Abbot P. Edward
Erich J. Gleber
**HAWKINS PARNELL & YOUNG LLP**
275 Madison Avenue, 10th Floor
New York, NY 10016
eabbot@hpylaw.com
egleber@hpylaw.com

*Counsel for Defendants Revlon, Inc., Revlon Consumer Products Corporation, and Revlon Group Holdings LLC*

Heidi Levine
**SIDLEY AUSTIN LLP**
787 7th Ave
New York, NY 10019
T: (212) 839-5300
hlevine@sidley.com

Lisa M. Gilford
**SIDLEY AUSTIN LLP**
555 W 5th St,
Los Angeles, CA 90013
T: (213) 896-6000
lgilford@sidley.com

Colleen M. Kenney
Kara L. McCall
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
T: (312) 853-2666
ckenney@sidley.com
kmccall@sidley.com

Amanda Crawford-Steger
**SIDLEY AUSTIN LLP**
2021 McKinney Ave., Suite 2000
Dallas, TX 75201
T: (214) 981-3496
asteger@sidley.com

*Counsel for Sally Beauty Supply LLC*

Joseph J. Welter
Ryan M. Frierott
**GOLDBERG SEGALLIA**
665 Main Street
Buffalo, NY 14203
T: (716) 566-5457
jwelter@goldbergsegalla.com
rfrierott@goldbergsegalla.com

*Counsel for AFAM Concept, Inc.*