IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 3060 <br><br> Master Docket No. 23-cv-0818 <br><br> Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiffs' and Defendants' proposed case management orders regarding the Bellwether Selection Schedule and Procedures. [289, 290, 395, 396, 981, 1005, 1006]. The Court has considered these filings, and the extensive arguments held on January 10, 2025 and January 31, 2025. For the reasons stated herein, the Court adopts certain proposals of each party, rejects others and adopts some of its own.

**I.  Background**

From the early stages of this litigation, the parties have agreed on the utility of bellwether trials to evaluate the thousands of cases in this MDL and to drive global resolution. *See* [168] at 3–4. The aim of the bellwether process is to garner information useful for the parties to evaluate the strengths and weaknesses of their arguments and evidence as well as to assess the risks and costs of litigation. To achieve these goals, the results of the bellwether trials must be reasonably representative of all the cases in the MDL. Unable to reach agreement on a bellwether

1

plan despite months of meeting and conferring, the parties each submitted proposed case management orders setting forth their bellwether plans on November 20, 2023. [289, 290]. The parties submitted revised competing proposed bellwether plans on January 16, 2024. [395, 396]. On December 9, 2024, the parties identified remaining disputes regarding the bellwether procedure [981] and the Court permitted additional briefing on (a) the process to select the cases subject to bellwether discovery; and (b) the timing to conduct bellwether discovery [986]. The Court now considers the parties' revised proposed plans. [1005, 1006].

Two initial points. First, the parties have always agreed that sixteen (16) cases would be selected for bellwether discovery (each party selecting eight (8)) with five (5) cases selected for trial. After much consideration, the Court has determined that these numbers are far too low. Preparing only five cases for trial runs the risk of these cases resolving short of trial or being subject to a dispositive motion and, thus, not being available to serve as representative bellwether cases. This is not an opportunity for one side's advocacy to win the day and put forward their strongest cases, instead the parties should aim to select and try representative cases. MANUAL FOR COMPLEX LITIGATION (Fourth) § 22.315 (2004) ("The more representative the test cases, the more reliable the information about similar cases will be."). Thus, the parties are required to each select twenty (20) case for bellwether discovery with up to twelve (12) total cases ultimately selected for the trial pool.

Second, the parties diverged on the appropriate scope of this Order. Defendants contend "no one aspect of the bellwether process can be decided in

2

isolation" as the "timing and substance of the selection process and any subsequent discovery are intertwined." [931] at 2. In contrast, Plaintiffs urge the Court to decide issues relevant to bellwether selection first and defer decision on other matters related to the bellwether procedure, such as expert reports. This Order addresses disputes regarding the entire bellwether process, including issues beyond bellwether selection.

## II. Analysis

### a. Bellwether Eligibility

The parties agree that all cases in which Short Form Complaints were filed and served by February 1, 2024 will be presumptively eligible for inclusion in the bellwether trial pool ("Eligible Cases").[1] [421] at 27. Based on these deadlines, over 6,500 cases are presumptively eligible. The Court addresses limiting the pool of Eligible Cases based on: (i) designated injuries, (ii) execution of a Participation Agreement, and (iii) PFS status and/or random selection.

#### i. Designated Injuries

The parties now agree as to the scope of injuries to be included in the bellwether pool ("Designated Injuries"). The parties agree plaintiffs who allege injuries of uterine, endometrial, or ovarian cancer (collectively "reproductive cancer") have qualifying Designated Injures and are eligible. [1005-1] at 3; [1006-1] at 2–3. In the past, however, the parties differed on the treatment of cases claiming non-cancer

---

[1] In their January 2025 proposed Case Management Order, Defendants refer to this category of member cases as "Candidate Cases." [1006-1] at 2. Throughout this opinion, the Court continues to refer to these cases as "Eligible Cases."

3

injuries. *Compare* [395-1] at 2 *with* [396-1] at 3; *see also* [1005] at 5–7. The Court notes that non-cancer injuries may be included in the bellwether process because individual plaintiffs who claimed reproductive cancer injuries also pleaded non-cancer injuries and are eligible for bellwether selection. [1005] at 7 n.11. Limiting the bellwether pool to plaintiffs who alleged uterine, endometrial, or ovarian cancer narrows the number of Eligible Cases to approximately 5,230.[2]

### ii. Participation Agreement

Plaintiffs seek to limit Eligible Cases to those where individual plaintiffs' counsel of record have executed the Participation Agreement entered in conjunction with CMO 14 Establishing Common Benefit Fee and Expense Protocols [967]. [1005] at 8; [1005-1] at 2. They contend such a requirement is necessary to protect the work product of the Plaintiff Steering Committee and to ensure the efficient prosecution of the bellwether cases. [1005] at 8. This contradicts the express terms of CMO 14. *See* [967] at 5 n.1. In CMO 14, the PLC agreed they "will make common benefit work product available to [counsel who have declined to sign the Participation Agreement] to the extent necessary, and at the time appropriate, for the limited purpose of preparing the case for trial" if such a case is selected for trial—either as a bellwether or otherwise. *Id.* The Court denies Plaintiffs' proposal to limit Eligible Cases to those where counsel of record have signed the Participation Agreement. However, the Court

---

[2] The pool of Eligible Cases continues to shrink as cases are dismissed for deficiencies in the Plaintiff Fact Sheet process or other reasons. As of January 31, 2025, Defendants report there are approximately 5,230 Eligible Cases with Designated Injuries.

4

will consider this factor when deciding appropriate bellwether cases to set for trial.

### iii. Cases Available for Selecting Bellwether Discovery Cases

As stated, the Court is increasing the number of cases that comprise the bellwether selection pool ("Initial Bellwether Discovery Cases"), from the agreed 16 to 40 (and potentially fewer if strikes are permitted). These cases will undergo case specific discovery and will be the pool from which the parties and the Court will select the bellwether trial cases. The parties' initial and first revised proposed bellwether procedures and discussions at prior case management conferences contemplated selecting the pool of bellwether discovery cases from all presumptively Eligible Cases with Designated Injuries, *i.e.*, the pool of approximately 5,230 cases. *See, e.g.*, [289-1]; [291-1]; [395-1]; [396-1].

Defendants recently proposed randomly selecting 300 cases (approximately 4.5 percent of the pool of Eligible Cases, or 5.7 percent of Eligible Cases with Designated Injuries) and then selecting the Initial Bellwether Discovery Cases from this limited pool. [1006] at 7. Plaintiffs object to this plan. [1005] at 9–12. Defendants contend this proposed process is cost and time effective as counsel otherwise would require extensive time to evaluate all Eligible Cases and build consensus among the joint defense group regarding selection. *Id.* at 7–10. They stress the complexity of defining representativeness in this MDL featuring many Defendants who produced different products with varying active chemicals and formulations as opposed to a single-defendant or single-ingredient MDL. *Id.* at 8. They suggest a random "down-selection to 300 cases ensures that every combination has a chance equal to its proportion in the population of being in the pool." *Id.* Finally, Defendants contend there is an

5

"information gap" between Plaintiffs and Defendants because Plaintiffs have full access to their clients, which gives them a significant advantage in the bellwether selection process. *Id.* at 10–11.

As the Plaintiffs note, the disparity in information is present in every MDL. Down-selection does not remedy this alleged disparity of available information. It simply reduces the pool of cases from which to select representative samples. In addition, as the Court noted at the January hearing, this randomized selection from the full 5,230 is an idea being raised *late* in the process. The Court has been operating, and spending time assisting the parties to create a pool of cases with substantially complete PFSs. The Court is concerned that to require the parties to agree on 300 cases selected at random as a predicate to selecting the Initial Bellwether Discovery Cases, some percentage of which will not have substantially completed PFSs, is a waste of time and resources.

For their part, Plaintiffs propose the pool of Eligible Cases be narrowed to those with PFSs deemed substantially complete as of December 31, 2024. *Id.* at 11. They offer that restriction provides Defendant with ample information for selecting Initial Bellwether Discovery Cases while also narrowing the pool to approximately 2,000 cases. *Id.* Defendants reject this counterproposal and argue they cannot evaluate a case until after the close of Plaintiff fact discovery. [1006] at 6–7. According to Defendants, at least 2,222 of the plaintiffs who are presumptively eligible for bellwether selection have PFSs with outstanding deficiencies and 555 of those plaintiffs have not submitted a PFS at all as of December 27, 2024. [1006] at 6.

Defendants argue adopting Plaintiffs' plan permits Plaintiffs to hand select and unilaterally control the narrowed pool because Plaintiffs had a role in completing some PFSs and not others by December 31, 2024.[3] *Id.* at 14.

At the hearing on January 10, 2025, the Court explored the possibility of allowing the Defendants to narrow the pool of Eligible Cases with the use of randomization while the Plaintiffs would rely on the pool of Plaintiffs with sufficiently complete PFSs. Both parties agreed that method would be acceptable to them. [1117] 1/10/25 Tr. 69:14–71:6.

The pool will be limited to those Plaintiffs who have submitted PFSs. Defendants are free to use randomization in selecting their Initial Bellwether Discovery Cases, but it must be limited to cases with submitted PFSs. As stated at the January 10, 2025 hearing, by February 28, 2025 all PFSs must be substantially complete and all final amendments to the SFCs must be filed.[4]

### b. Deadline to Select Initial Bellwether Discovery Cases

By April 30, 2025, the parties are to identify and exchange their Initial Bellwether Discovery Cases. Given the extensive time the parties had over the past year to review PFSs, this deadline is firm—no extensions will be granted.

---

[3] Defendants have raised this concern previously, that Plaintiffs may manipulate the pool of Eligible Cases by frontloading PFSs or the filing of SFCs. The Court has been presented no evidence of this inappropriate conduct. Indeed, the Court has conducted regular hearings attempting to assure compliance with PFS deadlines and has dismissed several hundred cases based on the failure of individual plaintiffs to fulfill their obligations to complete PFSs. The Court has not observed any indication that the PSC is manipulating the pool of available Eligible Cases.

[4] Prior to February 28, 2025, amendments to SFCs may be made as of right without moving for leave to file.

### c. Process to Select Initial Bellwether Discovery Cases

In prior proposals, the parties agreed each side would select 8 Initial Bellwether Discovery Cases without input from the other side. [395-1] at 4; [396-1] at 3. Defendants now propose each party select 12 Initial Bellwether Discovery Cases and the opposing party may strike 4 of the other side's cases. [1006-1] at 3. Plaintiffs oppose strikes and respond this plan removes representative cases from consideration that the parties may have selected to test specific theories or issues. [1005] at 12–13.

The Court reserves ruling on the question of strikes until after the parties submit briefing or a stipulation related to *Lexecon* waiver. The Court will defer ruling.

### d. General Causation

The parties continue to disagree on when general causation should be addressed. Defendants propose a "dual-tracked" schedule that proceeds with initial bellwether fact-discovery in parallel with general causation expert discovery and expert centered motion practice to test the scientific evidence. [395] at 3. Defendants plan to challenge Plaintiffs' general causation experts pursuant to FRE 702 and assert that their proposed sequencing promotes efficiency because scientific issues are central to the case and admissibility of expert testimony may be dispositive. *Id.* at 3, 9. Consequently, Defendants posit addressing general causation before bellwether trial selection will ensure cases selected for trial will be capable of being tried. *Id.* at 11. Plaintiffs oppose Defendants' proposal and consider this a foreclosed matter based on prior rulings. [396] at 4–5; *see also* [116] (Plaintiffs' Submission Opposing Bifurcation of General Causation Discovery).

The Court previously declined to adopt similar proposals from Defendants to

8

initiate expert discovery on general causation before the close of fact discovery, but invited the Defendants to re-raise the issue at a later stage. [146]. Defendants distinguish this proposal from their earlier attempts to bifurcate general causation by emphasizing the current ongoing status of discovery and arguing the proposal does not interfere with fact discovery that will continue the same schedule as it would otherwise even if general causation was not addressed in tandem. [395] at 8. More than a year and a half has passed since the Court considered bifurcation of general causation expert discovery, the close of document fact discovery is less than one month away, and the close of oral fact discovery is just over half a year away. Thus, Plaintiffs' objections that prioritizing general causation deviates from traditional discovery plans, is premature, or would prejudice Plaintiffs because they would lack access to Defendants' document discovery are no longer persuasive. *See* [396] at 3, 9–10; *see generally* [116].

The Court recognizes the importance of scheduling potentially dispositive *Daubert* motions to maximize efficiency but will not deprive any party (or the Court) of the full discovery and record necessary to fairly adjudicate the scientific issues. While some MDL courts decline to prioritize challenging general causation, many other courts permit similar plans. *Compare* [395] at 10 *with* [116] at 8–9. Over Plaintiffs' objections, the Court grants Defendants' request to conduct expert discovery on general causation in parallel with case-specific discovery in the Initial Bellwether Discovery Cases.[5]

---

[5] The Court recognizes the need to understand the science supporting the parties' claims and defenses and intends to host Science Day at which the parties may present their core medical

9

### e. Timeline for Bellwether Discovery and Trial

The parties dispute the timeline for selection of Initial Bellwether Discovery Cases, case-specific fact discovery ("Core Discovery"), case specific expert discovery, selection of trial cases, and other deadlines. The Court sets the following deadlines:

- <u>April 30, 2025</u>: Parties identify and exchange 20 Initial Bellwether Discovery Cases.

- <u>May 9, 2025</u>: Parties to file joint status report identifying Initial Bellwether Discovery Cases.

- <u>June 9, 2025</u>: Each Defendant shall serve its Answer and Affirmative Defenses to each of the Initial Bellwether Discovery Cases.

- <u>September 30, 2025</u>: Close of oral fact discovery in the MDL.

- <u>October 31, 2025</u>: Plaintiffs to disclose general causation expert reports.

- <u>December 1, 2025</u>: Defendants to disclose general causation expert reports.

- <u>December 15, 2025</u>: Plaintiffs to disclose general causation expert reports.

- <u>February 16, 2026</u>: Close of case-specific fact discovery in the Initial Bellwether Discovery Case. Deadline for the parties to file simultaneous submissions with the Court of position papers on the 5 to 12 cases that should be selected for trial ("Bellwether Trial Cases"). Submissions limited to 2 pages per case.

- <u>March 2, 2026</u>: Close of general causation expert discovery. Court to rule on Bellwether Trial Case selection.

- <u>April 1, 2026</u>: Last day to file general causation *Daubert* motions.

- <u>May 1, 2026</u>: Close of additional case-specific fact discovery, if any, for Bellwether Trial Cases. Responses to general causation *Daubert* motions due.

---

and scientific theories. However, the Court will address the scheduling and scope of Science Day separately from the bellwether procedure. As of December 9, 2024, Plaintiffs report they do not object to Science Day and anticipate the parties can reach an agreed schedule. [981] at 9.

- <u>May 15, 2026</u>: Replies in support of general causation *Daubert* motions due.

- <u>June 30, 2026</u>: Plaintiffs to disclose case-specific and all other expert disclosures (*i.e.*, non-general causation expert reports).

- <u>August 3, 2026</u>: Defendants to disclose case-specific and all other expert disclosures (*i.e.*, non-general causation expert reports).

- <u>August 17, 2026</u>: Plaintiffs to disclose case-specific and all other rebuttal expert disclosures (*i.e.*, non-general causation rebuttal expert reports).

- <u>October 16, 2026</u>: Close of case-specific and all other expert discovery (*i.e.*, non-general causation rebuttal expert discovery).

- <u>November 16, 2026</u>: Last day to file summary judgment and any non-general causation *Daubert* motions.

- <u>December 16, 2026</u>: Responses to summary judgment and any non-general causation *Daubert* motions due.

- <u>January 6, 2027</u>: Replies in support of summary judgment and non-general causation *Daubert* motions due.

### f. Substitution of Settled Initial Bellwether Discovery Cases

The parties disagree as to how Initial Bellwether Discovery Cases will be substituted if any are settled before selecting cases for trial.[6] Under Plaintiffs' proposed plan, Plaintiffs select the substitute case without conferring with Defendants. [1005-1] at 4. Under Defendants' proposal, the parties are to mutually agree on the substitute case, or, if the parties cannot agree, the Court will select the substitute following briefing. [1006-1] at 4.

Defendants are concerned Plaintiffs' proposal grants Plaintiffs unilateral power over substitution in a manner that will negatively influence resolution

---

[6] The parties agree that if any plaintiff voluntarily dismisses her claim, Defendants may unilaterally designate a replacement case of the same injury type. *Compare* [1005-1] at 4 *with* [1006-1] at 4.

11

incentives and erode the purpose of the bellwethers to address representative claims and to evaluate global resolution. [395] at 3, 15. But Defendants' objections ignore their role and power in settlement—for instance, Defendants may offer to settle cases perceived as stronger for Plaintiffs. Consistent with the practice in other MDLs, the Court adopts Plaintiffs' proposed plan for substitution of Initial Bellwether Discovery Cases settled before trial selection. *See* Bolch Judicial Institute & Duke Law School, *Standards and Best Practices for Large and Mass-Tort MDLs*, at 26–27 (Sept. 2018) (recommending the same approach).

### g. Selection of Bellwether Trial Cases

The Court has modified the bellwether trial pool ("Bellwether Trial Cases") to include up to 12 cases. The parties disagree as to how (and as discussed above, when) to select the cases. Plaintiffs propose the parties jointly identify the cases from among the bellwether discovery cases, or, if the parties fail to reach agreement, the Court will select the cases following simultaneous briefing. [1005-1] at 4–5. Defendants now propose submitting a plan to address trial selection prior to the close of core discovery for the Initial Bellwether Discovery Cases ([1006-1] at 4), but previously proposed each party unilaterally select 1 case and the parties select the remaining 3 cases by agreement, [395-1] at 5. As with Plaintiffs' plan, Defendants proposed any disputes regarding selection to be briefed and presented to the Court. *Id.*

MDL courts employ a variety of methods to select cases for bellwether trials, including random selection, selection by the court, selection by the parties, and combinations of the aforementioned. *See* Fallon *et al.*, *Bellwether Trials in*

*Multidistrict Litigation, supra,* at 2360–65. A hybrid approach will assist to achieve representation on the docket of Bellwether Trial Cases in an efficient manner. The first three trials will be selected by the Court following simultaneous briefing by the parties.[7] The Plaintiffs will then be permitted to select a case, and the Defendants will select a case. We will then repeat the process.

## CONCLUSION

Within 21 days after entry of this Order, the parties shall file a joint proposed case management order on Bellwether Selection and Procedure that incorporates the Court's rulings. Parties are to file a status report on the dispute regarding the use of strikes and the *Lexecon* waiver issue by noon on February 7, 2025.

E N T E R:

Dated: January 31, 2025

MARY M. ROWLAND
United States District Judge

---

[7] At an appropriate time, the Court will consider Plaintiffs' suggestion for multi-plaintiff trials. *See* [396] at 16; [396-1] at 5. Plaintiffs contend a decision is not ripe and Defendants do not address this issue.