**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | **MDL No. 3060**<br>Case No. 23 C 818<br>Judge Mary M. Rowland<br><br>**This document relates to:**<br>All Cases |

**JOINT STATUS REPORT FOR THE SEPTEMBER 4, 2025**
**DISCOVERY STATUS CONFERENCE**

Co-Lead Counsel for Plaintiffs and counsel for Defendants provide this Joint Status Report in advance of the discovery status conference scheduled for September 4, 2025 before the Honorable Magistrate Judge Beth W. Jantz.

I.      **Global Issues:**

a.   **Tabitha O'Dell Documents and Deposition**

**Plaintiffs' Position:**
On May 13, 2025, Plaintiffs issued two third-party subpoenas for documents; one to Tabitha O'Dell, a consultant to Namaste, Strength of Nature, and House of Cheatham, and a second to her consulting company, Consumer Relations Group, LLC d/b/a Cosmetic Answers. Initially, it appeared that counsel for Strength of Nature, Namaste and House of Cheatham would be coordinating on behalf of Ms. O'Dell to facilitate collection, review, and production of her discovery response. Further, after counsel for Strength of Nature and House of Cheatham refused to produce Tabitha O'Dell for a deposition asserting that she was not a company employee and was outside their custody and control, on August 1, 2025, Plaintiffs issued a Third-Party subpoena for her deposition with a placeholder date of September 3, 2025. After significant time passed without any movement on document production, Plaintiffs were informed on August 22, 2025 that Consumer Relations Group, LLC d/b/a Cosmetic Answers and Ms. Odell retained their own counsel [Swanson, Martin & Bell, LLP] to address the subpoenas. It is unclear at this time if that counsel was retained solely for purposes of their depositions or if that counsel will also be coordinating document production separately from Namaste, Strength of Nature, and House of Cheatham. As this witness and her consulting company are related to multiple Defendants, Plaintiffs request that a meet and confer be scheduled with her counsel, Plaintiffs, and counsel for the interested Defendants, and that a confirmed production timeline be enforced.

**Defendants' Position:**
Tabitha Odell and Consumer Relations Group have retained independent counsel, Anthony Monaco at Swanson Martin & Bell, LLP, who Defendants understand is coordinating Ms. Odell and Consumer Relations Group's responses to the subpoena

1

duces tecum and availability for a deposition. Defendants understand that Mr. Monaco has already made contact with Plaintiffs and is available for a meet and confer to timelines for Ms. Odell/Consumer Relations Group's subpoena response and deposition.

II.    ***Defendant Specific Discovery Status***

    **Avlon Industries, Inc.:**

    **a.  Document Production**

      **Plaintiffs' Position:**

        **i.  Relevancy Review based on an incomplete and inaccurate "secondary checklist" has resulted in improper removal of relevant documents from the rolling productions**

Avlon has been conducting a "relevancy review" after running search terms to withhold additional documents from production. Specifically, with respect to ingredient related documents, Avlon reviewers have been using an incomplete set of "secondary checklists" to cross-check ingredients in order to determine whether documents are responsive. Avlon has marked items as non-responsive if the ingredients do not appear on those "secondary checklists." However, those "secondary checklists" are incomplete and, therefore, have resulted in exclusion of documents that should have been produced.

Plaintiffs only learned about this checklist after contacting Avlon's counsel to inquire about important Safety Data Sheets ("SDS") which should exist in Avlon's files yet have not been produced. On August 15, 2025, Avlon's counsel located and produced the highly relevant, missing SDSs. In the cover email sent concurrently with the production of the SDSs, Avlon's counsel explained "it appears that MSDS sheets for those two ingredients were inadvertently marked not responsive."

In a follow-up meet –and confer, Avlon's counsel explained that the failure to provide the SDSs stemmed from a relevancy review using a "secondary checklist" to evaluate whether certain chemicals were in those products. Plaintiffs therefore requested that Avlon identify the secondary checklists.

Upon review of these "secondary checklists," it is clear that they lack sufficient information to perform an adequate review. For example, these "secondary checklists" do not contain the following alternative names/terms that may be used to describe a chemical:

1. INCI Name ("International Nomenclature Cosmetic Ingredient name")
2. AS Material Code (Avlon's old internal code)
3. CAS number (the numerical identifier of a chemical assigned by the Chemical Abstracts service)

Thus, if an email simply referred to an AS Material Code or a memo discussed a chemical by its INCI name, it may have been removed by the reviewer.

Likewise, these "secondary checklists" contain only the fragrance <u>names</u>, but do not contain all of the <u>ingredients for the fragrances</u>. A relevant document regarding a chemical that is in the fragrance would therefore have been marked non-responsive and withheld from production.

Avlon's counsel has offered to run a "quality control check on the universe of documents." However, Avlon still does not have a comprehensive list of all ingredient naming conventions and raw material codes for each ingredient, and therefore, any secondary relevancy review will simply result in exclusion of relevant documents. Ultimately, Avlon should have produced documents after running search terms and the fact that reviewers are working on incomplete "secondary checklists" to exclude documents from production is improper and has resulted in further delays by still withholding responsive documents from production months after their deadline for production.

**Avlon's Position:**
Plaintiff's counsel has raised the issue of possible gaps in discovery and/or documents. Avlon's counsel promptly reviewed the concerns, identified where any errors were made, and made the necessary corrections. Plaintiffs' concerns regarding missing or incomplete documents were forwarded to the vendor to have the issues corrected. Subsequently, counsel participated in a meet and confer to discuss the issues further. During this meeting, in response to missing documents, Avlon explained how some documents could have inadvertently been marked non-responsive during the document review process. As a part of the process to correct this, Avlon completed a secondary review of the list of ingredients to ensure that it produced responsive documents related to ingredients in relaxers and component parts only. Plaintiffs misunderstood this secondary review as Avlon's using a "secondary checklist" to determine relevancy and demanded the production of such list. Avlon explained the error in the use of terms relevancy and responsiveness and maintains that its document production has been fulsome in responsiveness, and no relevant documents or secondary checklists have been withheld.

Plaintiffs are making a mountain out of a molehill. Avlon, as per the federal rules and the ESI orders entered in this case, has conducted a responsiveness review of its materials hitting upon the agreed search terms and producing those documents responsive to the discovery requests and topics in this litigation. Avlon's counsel inartfully interchanged relevancy and responsiveness during a recent exchange with the Plaintiffs regarding questions about MSDS/SDS for two ingredients used in the hair relaxers it manufactures. Avlon investigated Plaintiffs' queries and discovered that the two ingredients were either miss-spelled or accidentally left off the check list provided to reviewers to aid in the determination of responsiveness for the more than one hundred different ingredients included in the more than twenty different Avlon hair relaxer products and non-hair relaxer system products at issue in the

case. Moreover, one of the ingredients was from a product sold by Avlon for less than a year in 2002. Avlon corrected the issue by producing the missing documents by "go-gets" and reviewing the responsiveness of documents hitting upon the related terms and ingredients and produced those documents on August 22, 2025. Avlon apologized for the interchange of words and assured Plaintiffs that it has been reviewing materials for responsiveness and not relevancy. Plaintiffs' dispersions are unhelpful when Avlon has been more than forthcoming about its production responses.

### ii. Jafar Syed emails and text messages

#### (a) Emails withheld from production

**Plaintiffs' Position:**
Avlon's relevancy review appears to have resulted in improperly low production of other types of documents as well. For example, Avlon produced only 89 emails authored by Jafar Syed—Avlon's co-owner and VP of Operations that has worked for Avlon for 17 years. Mr. Syed testified that this email account is his primary means of communication for work. (Jafar Syed, Rough Dep. Tr. at 94:23-95:3).

When asked whether it sounded accurate that his custodial file had only 89 sent emails, Mr. Syed responded "[t]hat sounds strange…very low." When asked why there would only be 89 sent emails after 17 years, Mr. Syed suggested that perhaps the other emails were not relevant stating that "there could be so many more related to something you have no interest in…" (Jafar Syed, Rough Dep. Tr. at 103:15-104:9).

It is inconceivable that as Avlon's co-owner and VP of Operations, Mr. Syed, has authored only 89 emails during his 17 years working for Avlon. Instead, it seems more likely that Avlon's relevancy review is excluding large swaths of relevant documents.

**Avlon's Position:**
Plaintiffs' discussion of emails is misleading and disjointed. In the days before Mr. Syed's deposition, Plaintiffs complained to Avlon that only 89 sent emails were included in productions from Jafar's custodial materials, citing to this as definitive evidence that Avlon's collection is somehow flawed. However, Plaintiffs refer to this number without considering the number of emails upon which Jafar Syed is otherwise copied or included. The total production from Jafar Syed, VP of Operations, includes a total of 5,324 documents, a number that is comparative to that of other Avlon employees when one examines his time at the company and his overall limited involvement with Avlon's hair relaxers.

Avlon investigated further into Jafar's custodial emails and determined that 101,442 were eligible based on time scope to be searched with the hit and only 8,635 were sent by Jafar. The remaining were either received by, cc'd, or bcc'd to

Jafar. 1,046 had hits from the search term list (1932 with families) and 89 (276 with families) were produced. Ultimately, the comparable percentages were fairly consistent given the smaller number of sent emails by Jafar overall.

To put this number in perspective, production relating to Hasan Syed, who is acknowledged as having a much larger involvement in hair relaxer products, was included on approximately 8,000 documents. Further, Zohaira Rizvi, Avlon's 30-year brand manager for Affirm Hair Relaxers, and Dr. Syed, the founder of Avlon, were included on approximately 14,000 documents and 21,000 documents, respectively. Thus, with just a little context, the document production relating to Jafar Syed reveals itself to be entirely proportional with his role and time at Avlon when comparing him to similarly situated employees. Plaintiffs may wish that Mr. Syed sent more emails relating to hair relaxers during his time managing operational aspects of Avlon, but their unwillingness to accept a very obvious explanation cannot serve as a basis for further delaying depositions.

### (b) General Email Accounts at Avlon

**Plaintiffs' Position:**
At deposition, Jafar Syed testified that Avlon has several email accounts (warehouse@avlon.com; regulatory@avlon.com; filling@avlon.com; qualitycontrol@avlon.com; crelations@avlon.com; and ownerans@avlon.com) that were set up, to assist with continuity if someone leaves their role at Avlon.

Following Jafar Syed's deposition, Plaintiffs asked for clarification about whether the email addresses above[1] were searched and produced. Based on the JSR submission, Plaintiffs are now aware that the emails were not searched and they should have been. These are newly discovered emails that Plaintiffs were unaware of until Mr. Syed's deposition. Defendant's assertion that Plaintiffs have been "on notice" of these accounts is misleading. For example, Anna Brosko's custodial file was produced by Avlon however, the alternate company email she used (based on deposition testimony) was not produced. Furthermore, the email address "regulatory@avlon.com" has only 34 emails in Avlon's entire production. This certainly does not meet the requirements for "notice" despite Defendants attempts to suggest otherwise. Instead, this holds Plaintiffs to an improper and unfair standard that requires them to search for and find Defendant's failure to comply with their discovery obligations by sifting through documents to find a needle in a haystack. Thus, Plaintiffs request that these emails be searched and produced in accordance with Avlon's discovery obligations.

**Avlon's Position:**
The above emails have not been searched, and the request to search these accounts is simply tardy. Plaintiffs have been on notice of these accounts since as early as

---

[1] In addition, Plaintiffs included the following three types of general emails as a question to Avlon's counsel: (7) An email address that deals with customer complaints; (8) a general email address for Research and Development; and (9) any other general email addresses used for Hair Relaxer products.

February 2024. Avlon has produced hundreds of emails from these various general accounts as the contents have been automatically forwarded to many of the previously named custodians. Plaintiffs received the bulk of general email account information in Avlon's rolling productions by December 11, 2024.[2] Plaintiffs were on notice well before then to request clarification of and/or request that Avlon consider these sources as additional custodians. Again, Plaintiffs have sat on their hands and failed to act. Plaintiffs should not be rewarded for not taking action and demanding that Avlon spend more time and resources to collect, process, store, and review these new custodial accounts when they have received responsive information from these accounts through other custodians. The information produced through other custodians has shown that the information collected, if any, will not be different than what has been previously produced.

Avlon has previously responded in its answers to the ESI Interrogatories that it does not have an email address devoted specifically to customer complaints and that customer complaints were collected and dealt with through a variety of sources and individuals at Avlon. Avlon does not have a general email address for Research and Development, and Avlon does not have a general email address for hair relaxers.

### (c) Text Messages Not Produced

**Plaintiffs' Position:**
Jafar Syed also testified that he used text messaging to communicate in his role as VP of Operations. Yet, Avlon has not produced any text messages in this litigation.

In the Court's 8/11/2025 Order, a similar issue was addressed as it relates to HOC and WhatsApp communications. That Order instructed HOC to produce its current employees responsive WhatsApp communications. Considering Avlon's employees used text messages to conduct their work, Avlon should have also investigated the use of text messages and produced any that were responsive. Accordingly, Plaintiffs request the Court to urge Avlon to collect and produce text messages and/or messages exchanged on other platforms as well.

**Avlon's Position:**
As a cursory matter, Avlon notes that Plaintiffs have not previously requested the production of text messages. Because of this, Avlon is only now exploring this issue, and can offer that Avlon does not issue cellphones to its employees such that the devices would fall under its control. Thus, Plaintiffs' new discovery requests would require employees (both current and former) to turnover their personal devices, and it is unclear at this time whether employees will consent to such invasive searches at this stage in the litigation. To extent that the Court would mandate such a production at this late stage, Avlon does not yet have information to report on the costs of collecting text messages from one- let alone all- current

---

[2] Avlon is prepared to present the court with metrics for each of these accounts through each of its rolling production batches throughout this case upon request.

and former employees as demanded by the Plaintiffs on August 22, 2025, and as such cannot measure the proportionality of such a request. Moreover, it is Avlon's understanding that bellwether Plaintiffs have objected to the production of their own text messages.

Avlon further notes that, based on preliminary discussions with Mr. Syed on this issue, his testimony regarding the use of his personal cell phone for Avlon affairs would be limited to correspondence relating to housekeeping activities such as ensuring that the alarm for the facility was set at the end of each day. There is no reason to believe that any substantive information relating to hair relaxer products would be contained in text messages on Mr. Syed's personal device, particularly where his deposition testimony otherwise indicated that he did incredibly limited work relating to hair relaxer products. Plaintiffs are now attempting to use a clearly limited statement from one deponent as the basis for requesting the personal cell phones of all employees nearly 7 months after the close of written discovery, something which Avlon reiterates it has no authority to do. This is simply another baseless tactic Plaintiffs are utilizing to delay this proceeding even further.

Avlon notes that collection of Mr. Mensah's text messages falls outside of the scope of this litigation because Mr. Mensah was hired in February 2023, one month after Avlon was first named in this litigation on January 12, 2023.

### iii. Basecamp Document Production

**Plaintiffs' Position:**

Avlon was instructed to produce Basecamp communications. The actual production, despite Avlon's previous representations to the Court, still has not taken place.

In June 2025, Avlon's counsel represented to the Court that "[they] did speak with [their] vendor regarding the alternate sources. They anticipate finishing collection by next Tuesday, June 3rd." (05/29/2025 Jantz Hr'g Tr. at p56). On July 30, 2025, Avlon's counsel further represented to Plaintiffs that "the production batch that went out [on that same day] is the last of our responsive documents based on the ordered custodians." And yet, not a single Basecamp document was produced during that timeframe.

Plaintiffs have repeatedly asked Avlon to confirm whether the complete Basecamp chats and related documents have been collected, why these chats/documents have not been produced, how many chats/documents included hits on the search terms, and when Plaintiffs can expect the complete production of these chats/documents. During a Meet-and-Confer held on August 20, 2025, Avlon's counsel indicated that there may not be any Basecamp materials that are accessible or relevant. The following day, Avlon's counsel followed up on the meet and confer, informing Plaintiffs that producing the Basecamp materials through Avlon's vendor would cost an estimated $50,000.00. Avlon asserts that this cost is

not proportional to the needs of the litigation and states it will not proceed with collecting, reviewing, or producing Basecamp materials without a court order. Plaintiffs seek a court order consistent with Professor Grossman's instruction, requiring Avlon to produce Basecamp materials.

**Avlon's Position:**

In response to Plaintiffs' request for a separate search of Basecamp, a project management software and online collaboration tool, Avlon's ESI provider, FTI Consulting Technology, LLC, provided a more thorough analysis of Avlon's Basecamp platform.

Doing so revealed a number of extraction limitations existing within the Basecamp platform. In particular, the export functionality available does not provide structured load files or metadata necessary to link or map underlying content across each project. The native export is primarily intended for offline viewing or backup purposes, rather than for structured data extraction and review.

From an eDiscovery standpoint, the format lacks the metadata and field-level structure required for direct ingestion into review platforms. Specifically, it does not support linking of messages, attachments, to-do lists, and other elements in a way that preserves their relationships or context.

To enable functionality, Avlon would need a custom scripted workflow to parse the HTML files contained within the Basecamp export. This workflow would aim to reconstruct logical relationships between the various content elements within each project (e.g., messages, attachments, and tasks).

This approach involves parsing and extracting available metadata fields embedded within the HTML files, which may include, but are not limited to, participants, timestamps, file path references, and attachment names. Custom fields would need to be created within the Relativity workspace to appropriately organize and accommodate this metadata. Even if the data could be structured in a way that supports review and analysis, threading and native linkage of content would still be limited due to the constraints of the original export. The cost of doing this, including custom programming, database loading, indexing, searching and production, is anticipated at upwards of $56,000.00.

In essence, Avlon would be required to reconstruct this platform to enable Plaintiffs to view what is likely duplicative materials. Avlon does not believe that Plaintiffs' request is proportionate to the needs of this litigation, which already includes [EXACT # of documents], and [EXACT # of pages] of Avlon production materials.

**Avlon's Position:**

In response to Plaintiffs' request for a separate search of Basecamp, a project management software and online collaboration tool, Avlon's ESI provider, FTI Consulting Technology, LLC, provided a more thorough analysis of Avlon's Basecamp platform.

Doing so revealed a number of extraction limitations existing within the Basecamp platform. In particular, the export functionality available does not provide structured load files or metadata necessary to link or map underlying content across each project. The

native export is primarily intended for offline viewing or backup purposes, rather than for structured data extraction and review.

From an eDiscovery standpoint, the format lacks the metadata and field-level structure required for direct ingestion into review platforms. Specifically, it does not support linking of messages, attachments, to-do lists, and other elements in a way that preserves their relationships or context.

To enable functionality, Avlon would need a custom scripted workflow to parse the HTML files contained within the Basecamp export. This workflow would aim to reconstruct logical relationships between the various content elements within each project (e.g., messages, attachments, and tasks).

This approach involves parsing and extracting available metadata fields embedded within the HTML files, which may include, but are not limited to, participants, timestamps, file path references, and attachment names. Custom fields would need to be created within the Relativity workspace to appropriately organize and accommodate this metadata. Even if the data could be structured in a way that supports review and analysis, threading and native linkage of content would still be limited due to the constraints of the original export. The cost of doing this, including custom programming, database loading, indexing, searching and production, is anticipated at upwards of $56,000.00.

In essence, Avlon would be required to reconstruct this platform to enable Plaintiffs to view what is likely duplicative materials. Avlon does not believe that Plaintiffs' request is proportionate to the needs of this litigation, which already includes [158,387 documents], and [690,000+ pages] of Avlon production materials.

### b. Deposition Update

**Plaintiffs' Position:**

Below chart depicts the currently scheduled depositions as well as those anticipated to be scheduled. As anticipated, with the production of additional, late produced, documents, a well as deposition testimony, additional, potential deponents are coming to light.

**Currently Confirmed Avlon Depositions**

| | |
|---|---|
| **Jafar Syed (Fact Witness)** | COMPLETED ON Tuesday August 19 |
| **Hasan Syed (Fact Witness)** | COMPLETED ON Thursday August 21 |
| **Ned Washington (Fact Witness)** | COMPLETED ONAugust 26 |
| **Karyla Klimkiewicz (Fact Witness)** | COMPLETED ONAugust 29 |
| **Karyla K. (30b6 on Corporate Structure)** | COMPLETED ON August 29 |
| **Anna Brosko (Fact Witness)** | Friday September 12 |
| **Rounaq Khan (30b6 on Product ID Ingredients/ Formulas)** | Tuesday September 16 (Chicago) |
| **Timakai Evans (Fact Witness)\*** | Tuesday September 16 (New Jersey) |
| **Zohaira Rizvi (Fact Witness)** | Wednesday September 17 |

| Natalie McDaniel Hicks (Fact Witness) | Friday September 19 |
|---|---|
| Jasmine Mathews (Fact Witness) | Wednesday September 24 |
| Ali Zaidi (Fact Witness) | Friday September 26 |
| Rounaq Khan (Fact Witness) | Monday September 29 |
| Ali Syed (Fact Witness) | Tuesday September 30 |

**Avlon Depositions Pending Scheduling**

| Robert Brown (Current employee) | Subpoena outstanding for personal emails<br>Avlon has offered: September 5, 8, 11 |
|---|---|
| Lina Zayed | Avlon has offered: The Week of September 8 |
| Keith Wells | Avlon has offered: September 9, 10 |
| Stacy Womack | Avlon has offered: September 17, 22, 23 |
| Maliha Syed | Awaiting dates |
| Narjis Askar | Subpoena has been issued |
| Akbar Hussain | Subpoena has been issued |
| Mukhtar Hussain | Subpoena has been issued |
| Michael Utech | Recently requested that he be served with a subpoena |
| Dr. Kazim Ali Raza Naqvi | Avlon reports he has some physical limitations and cannot sit for deposition. This will need to be evaluated and discussed further |
| Khadijeh Saad | Currently on medical leave |
| 30b6 on Product ID Artwork, Marketing Names, etc. | Date to be scheduled |
| 30b6 on Naming Conventions | Date to be scheduled |
| 30b6 on Sales/Marketing | Date to be scheduled |
| 30b6 on Distributors/Salons | Date to be scheduled |
| 30b6 on Regulatory | Date to be scheduled. May be broken into depositions across more than one witness. |
| 30b6 on Science | Date to be scheduled. May be broken into depositions across more than one witness. |
| Deborah Redbourn | Resides in the UK. Contact has not yet been made with this witness. |
| Potential Additional Deponents as a result of deposition testimony or further document production | Joseph Mensah<br>Dante Albano<br>Tom Bingham<br>Others To Be Determined |

**Avlon's Position:**

At the date of the hearing, the parties will have completed four fact depositions and one 30(b)(6) deposition. The below chart outlines the upcoming depositions and the deposition about which Avlon has not heard from the Plaintiffs.

| Avlon Deponent | Dep Date | Role/Position |
|---|---|---|
| Jafar Syed | 8/19/2025 | VP of Operations |
| Hasan Syed | 8/21/2025 | President/Marketing |
| Ned Washington | 8/26/2025 | VP International Sales (former/retired) |
| Karyla Klimkiewicz (also Corporate Structure 30(b)(6) | 8/29/2025 | Office of the president |
| Anna Brosko | 9/12/2025 | Outside Regulatory |
| Timakai Evans | 9/16/2025 | Regional Sales |
| Product ID 30(b)(6) -- Dr. Rounaq Khan on topics 2, 3, and 4. | 9/16/2025 | |
| Zohaira Rizvi (also Product ID 30(b)(6) topics 1, 5, 6, and 7) | 9/17/2025 | Affirm Brand Manager |
| Natalie Hicks | 9/19/2025 | Chain Sales Manager (former/retired) |
| | | |
| Ali Zaidi | 9/24/2025 | Operations/Production (former Syntonics Relaxer Brand Manager) |
| Jasmin Mathew | 9/26/2025 | Fiber Physics Lab Manager |
| Dr. Rounaq | 9/29/2025 | Sr. Chemist |
| Dr. Syed | 9/30/2025 | President/Chief Chemist |

11

Depositions which Plaintiffs have yet to schedule are identified below. As noted, of those medically able to sit for a deposition, dates have been offered for these individuals, and no response has been received from Plaintiffs. Avlon is more than willing to work with Plaintiffs on scheduling these depositions should they respond.

| Requested Avlon Deponent | Offered Dates or Reason for Lack of Availability | Role/Position |
|---|---|---|
| Keith Wells | 8-11-25 Offered 3 dates and no response | Sales (Current) |
| Robert Brown | 8-11-25 Offered 3 dates and no response | Sales (Current) |
| Stacy Womack | 8-21-25 Offered 3 dates and no response | QC/QA (former) |
| Lina Zayed | 8-18-2025 Offered 3 dates and no response | QC/QA (former) |
| Khadijeah Saad | Notified that she is on medical leave | R&D (current) |
| Dr. Ali Raza Naqvi | Notified that he is retired and not physically able to sit for a deposition | R&D (former -- left 20 years ago) |
| Mukhtar Hussain | Notified that he is medically unable to testify. | Retired |

1. **Pressure to proceed with depositions, even while awaiting document production**

   a. <u>Ned Washington</u>

**Plaintiffs' Position:**

Ned Washington served as Avlon's Worldwide Director of Sales for 26 years. His deposition took place Tuesday, August 26, 2025. Six days prior, Avlon notified Plaintiffs it had obtained and was reviewing emails from his personal email account. Avlon insisted on moving forward with the deposition, without knowledge of when the additional production would be available, because Mr. Washington would be leaving the country for an extended period of time. Four days before the deposition, Avlon produced

over 650 documents (over 2000 images) from Mr. Washington's personal email account.

Plaintiffs were required to proceed with Mr. Washington's deposition on August 26 because of the threats that there would not be an additional opportunity to depose him. Therefore, Plaintiffs were required to perform a cursory review of the over 2000 images and attempt to identify the most important documents. Plaintiffs were provided insufficient time to truly review and analyze the documents from this important witness.

**Avlon's Position:**
Ned Washington is an agreed upon custodian who retired from Avlon in 2020. Avlon has produced what custodial files remained relating to Ned Washinton as of 2023 per the preservation order. Avlon acknowledged that Mr. Washington utilized his personal email account for business communications but had no authority to demand and collect the personal email account of a former employee. Magistrate Jantz acknowledged this in her July 2, 2025 order, in which she explicitly stated that "[t]he court declines to order Avlon to produce its former employees' personal emails, as the proper way for Plaintiffs to have obtained those emails was by subpoena." [ECF____]. Still, Plaintiffs claim their failure to do so as a basis for delaying or otherwise continuing Ned Washington's deposition is without merit.

Plaintiffs' prickliness about being urged to proceed with Mr. Washington's deposition is just that – irritation that they actually had to take action. The deposition was completed on August 26, 2025, with Plaintiffs in possession of a few hundred documents from Mr. Washington's personal email account – many of which were used as exhibits at his deposition. Avlon urged Plaintiffs to proceed with the deposition on that date because Mr. Washington agreed to sit for the deposition without a subpoena and was leaving the country for an extended period of time. Moreover, after lengthy discussion, Mr. Washington agreed to give access to Avlon to search and produce responsive emails from his personal account without the need for an out of jurisdiction subpoena. Avlon only obtained Mr. Washington's agreement to access his emails on August 18, 2025, but managed to search the 6,000 documents and families and produce responsive materials by August 22, 2025 – four days before the deposition. As Avlon had been urged to do in the past, Plaintiffs could have hired more paralegals to help with the review.

### b. Timakai Evans

**Plaintiffs' Position:**

Timakai Evans is a current employee at Avlon who works in the sales department and used a personal email account to conduct Avlon-related business. Professor Grossman directed Avlon to attempt to recover his personal email account. Avlon's vendor has successfully determined a way to access Mr. Evans' email but is still awaiting information from Mr. Evans to collect. Avlon has indicated they are still attempting to obtain that information from him and have not provided the PSC with a definitive timeline as to when this information will available.

Mr. Evans's deposition currently is scheduled for September 16. Even if the documents are produced before the hearing, Plaintiffs are prejudiced by having to rush to review documents while preparing for his deposition. The production deadlines were set to allow Plaintiffs reasonable time to review documents. Plaintiffs are now presumably left with an insufficient period of time to review and unknown number of documents.

**Avlon's Position:**

Mr. Evans is a regional salesperson with Avlon. Despite incredibly limited use of his personal email being found, Plaintiffs requested production from Mr. Evans' personal email account in June 2025. Avlon objected to this, noting that Plaintiffs had never requested the custodial files of Mr. Evans, but nonetheless undertook efforts to provide Plaintiffs with those documents. In doing so, Avlon learned that Mr. Evans had abandoned the personal account cited by Plaintiffs several years before and could no longer access it. Under direction from Special Master Grossman, Avlon went to extraordinary lengths with Mr. Evans and its production vendor to reactivate the account only to be denied access and reactivation by Microsoft on August 25, 2025. Plaintiffs being notified of this should proceed with Mr. Evans' deposition on September 16, 2025. Avlon believes that, at this time, Mr. Evans and Avlon's production vendor have expended sufficient time and energy to reactivate the account. Any further efforts to reactivate the account are not proportionate to the needs of this litigation.

### c. Robert Brown

**Plaintiffs' Position:**

Robert Brown is a current employee at Avlon who works in the sales department and used a personal email account to conduct Avlon-related business. As this Court is aware, Mr. Brown refused to allow Avlon access to his personal emails. The PSC issued a third-party subpoena seeking responsive emails from Mr. Brown's personal email account. Initially, Mr.

Brown refused the subpoena. Service ultimately was effectuated on 8/21/25.

Meanwhile, although Avlon's counsel has informed the PSC that she cannot speak with Mr. Brown regarding production of documents from his personal email account, Avlon's counsel has indicated that she will be presenting him for deposition.

Plaintiffs informed Avlon's counsel that they wish to schedule his deposition after the production of his email. Avlon's counsel has responded that, because Mr. Brown "is willing to sit for his deposition, though not provide his personal email account, we should proceed nonetheless." The PSC believes that once Mr. Brown has complied with the subpoena, the Plaintiffs should be afforded the opportunity to review those documents and then schedule the deposition.

**Avlon's Position:**

Robert Brown, like Mr. Evans, is a member of the Avlon sales team. Plaintiffs did not request Mr. Brown's custodial file but instead requested Avlon to produce documents from his personal email account in June 2025. Mr. Brown refused and referenced Avlon to his personal counsel on this issue in July 2025. Mr. Brown has nonetheless agreed to sit for his deposition without intervention of personal counsel, and Plaintiffs have subpoenaed Mr. Brown's personal email directly. Plaintiffs should proceed with the deposition.

### c. 30(b)(6) Depositions

**Plaintiffs' Position:**

During meet & confers Avlon's counsel explained that a handful of fact witnesses also would serve as the 30(b)(6) witnesses and that both the fact witness deposition and a 30(b)(6) deposition would take place upon swearing in the witness one time, and then after each answer, a witness could be asked to clarify whether that answer also is an answer on behalf of the company. That simply is not feasible. As this Court stated in the February 2025 hearing, "the rule is they are separate." (See Feb. 13, 2025 Tr. at 103:5-6).

Plaintiffs have agreed, for efficiency and due to time constraints, to attempt to conduct Ms. Karyla Klimkiewicz's fact witness deposition and her 30b6 deposition on corporate structure on the same date. To be clear, however, Plaintiffs expect those to be two separate depositions and for Ms. Klimkiewciz to be sworn in on two separate occasions, once as a fact witness and once as a 30(b)(6). To the extent those two depositions cannot be completed in one day, Plaintiffs should not be prejudiced for attempting to complete two depositions in one day.

15

Avlon's counsel previously expressed producing fact witnesses first and once the fact witness depositions have concluded, the scope of the 30(b)(6) depositions could be narrowed. Although Plaintiffs believe certain 30(b)(6) depositions that will cover foundational testimony may be needed earlier in the deposition process, Plaintiffs generally are agreeable to the concept of proceeding with several fact witness depositions and then evaluating whether they can narrow the scope of certain 30(b)(6) depositions. However, Plaintiffs need a sufficient opportunity to conduct those depositions, evaluate the testimony, and then prepare for the 30(b)(6) depositions.

**Avlon's Position**:

Plaintiffs have sent seven (30)(6) deposition notices since July 14, 2025. Avlon has served objections to all of them including document riders within the proscribed timeframe. Avlon and the Plaintiffs met and conferred several times regarding the notices. Avlon has suggested that Plaintiffs complete the fact witness depositions of Dr. Rounaq Khan, Zohaira Rizvi, Dr. Ali Syed, Karyla Klimkiewicz, Anna Brosko, and Keith Wells as some of these individuals would be those selected for the various 30(b)(6) subject matters and see if further 30(b)(6) testimony would be required. The parties have reached some compromises on the following:

    a.    **<u>Karyla Klimkiewicz</u>**: 8.29.25 – She will sit for both her fact witness deposition and the 30(b)(6) on corporate structure.

    b.    **9.16.25 –** Dr. Rounaq Khan will sit for topics 2, 3, and 4 of the Product Identification 30(b)(6)

    c.    **9.17.25 –** Zohaira Rizvi will sit for her fact witness deposition as well as answer as Avlon's 30(b)(6) on topics 1, 5, 6, and 7 of the Product Identification 30(b)(6). Avlon has also notified Plaintiffs that Ms. Rizvi will offer testimony consistent with the topics outlined in the Marketing and Sales 30(b)(6).

In addition, Avlon has proposed an additional 3.5 hours for a total of 10.5 hours for the deposition of Dr. Ali Syed, the founder and chief scientist at Avlon that begins on September 30, 2025, and continues to October 2, 2025. Dr. Syed will offer much of Avlon's testimony on science and regulation that can be transitioned into a 30(b)(6) on those topics if necessary. Avlon has also notified Plaintiff's that Dr. Syed is 80 years old and will not be able to sit for more than 4 to 5 hours at a time for a deposition. Avlon is also presenting Dr. Rounaq Khan on September 29, 2025, and he will be able offer Avlon's testimony on Regulatory issues and Science laid out in the 30(b)(6) notices of the same.

Avlon in the process of preparing a written response for the Product Naming Convention 30(b)(6). Avlon also believes that Regulatory topics and distribution and sales topics will be covered through the depositions of those individuals already scheduled. Avlon is willing to formalize outstanding 30(b)(6) deposition topics not covered by the already scheduled witnesses within the first two weeks of October.

### d. Avlon witnesses resisting authentication of documents

**Plaintiffs' Position:**

At the time of the drafting of this JSR, two Avlon depositions have taken place. Both witnesses have fought against simple authentication of basic documents, such as emails produced by Avlon from their own custodial files which includes those witnesses as senders and/or receivers of those emails. The PSC will have to take additional 30b6 depositions for the sole purpose of authenticating documents produced by Avlon and Bates stamped by Avlon in this litigation. These additional depositions will further prevent plaintiffs from meeting the discovery deadline.

**Avlon's Position:**

Avlon disputes Plaintiff's interpretation of the authentication of documents by Avlon's witnesses. In many cases, the witnesses were presented with emails and documents in which they were copied on rather being the direct recipient of the emails and documents. Witnesses answered honestly that they did not remember receiving the documents or reading the documents. Avlon has discussed and will continue to discuss the presentation of exhibits to Avlon's upcoming witnesses. Plaintiffs veiled threats of more depositions is absolutely unnecessary.

### e. Third Party Subpoenas — MNJ (Keracare)

**Plaintiffs' Position:**

Avlon believes that marketing products related to KeraCare are not relevant and have indicated they will object to a third-party subpoena issued to MNJ. The KeraCare documents are relevant because this product was intended for sale within the United States, but ultimately was not sold in the United States based on feedback from its distributors. When ruling on products sold outside the United States as it pertains to L'Oreal, this Court ruled that products sold "outside the United States can shed light on [defendant's] knowledge and notice of safety risks." See ECF No. 1322 p. 2 citing ECF No. 1261 at 2-3. Plaintiffs are issuing the third-party subpoenas to MNJ next week, over Avlon's objections.

**Avlon's Position:**

Avlon and Plaintiffs have met and conferred regarding the MNJ subpoena. First, Avlon has repeated that while it had a proposed contract with MNJ in 2010, the contract was never executed, and Avlon does not have control such that it can order and/or compel MNJ to produce documents. Second, Avlon does not object to Plaintiffs subpoenaing documents from MNJ regarding the Affirm, FiberGuard, and Syntonics Hair Relaxers. Avlon objects to Plaintiffs subpoenaing information from MNJ regarding the insular KeraCare Hair Relaxer. This hair relaxer was sold exclusively outside of the United States for a very short period of time. Avlon has produced the labels, ingredients, formulas, and regulatory materials as required by the Court for this product sold outside of the United States. However, MNJ is a marketing firm, and if, MNJ had marketing materials related to the KeraCare Hair Relaxer, which Avlon does not believe it has

given the 6 year gap between the explored relationship between Avlon and MNJ and the release of the KeraCare Hair Relaxer outside of the United States, are not within the scope of discovery determined by this Court [EFC #353] regarding foreign sold hair relaxers.

Avlon also has concerns with Plaintiffs' inability and unwillingness to be specific when issuing their subpoenas to third parties. Avlon has had to have several meet and confers with Plaintiffs regarding their subpoenas as they include broad brand names and/or brands and products not at issue in this litigation. While Plaintiffs have generally been willing to correct their very obvious mistakes regarding the products at issue in this litigation, Avlon is doubtful that Plaintiffs are willing and able to correctly distinguish products and brands not at issue in this litigation, including the KeraCare hair relaxer. KeraCare is another brand family for Avlon that includes many products not at issue in this litigation. The KeraCare brand only had one hair relaxer in 2017-2018; however, it has been selling dozens of other products not at issue in this litigation for decades. Plaintiffs must demonstrate more precision and care when issuing any subpoena in this litigation.

With respect to other third parties, Avlon has met and conferred with the Plaintiffs regarding their list of vendors over which Avlon has "presumptive control." Avlon identified one party over which it agreed that it had control – Anna Brosko/Amber Consulting – and confirmed that Avlon has produced the responsive materials in its possession and assisted Amber Consulting in producing the responsive materials in its control.

Avlon also pointed out to the Plaintiffs where they had already received a subpoena response from particular vendors and where they withdrew subpoenas from other vendors. Avlon requested that Plaintiffs identify what their basis for Avlon's control was when there was no contract supporting that control and the only relationships appear to be purchase orders or conversations with that third party.

### Beauty Bell Enterprises and House of Cheatham, LLC:

#### a. Third-Party Subpoenas – Segmentation America/Mario de la Guardia

**Plaintiffs' Position:**

Plaintiffs maintain that documents in the possession of Segmentation America and/or Mario de la Guardia concerning House of Cheatham are within House of Cheatham's care, custody, and control. House of Cheatham disputes this assertion but did not produce any contracts in response to Plaintiffs' Second Set of Requests for Production, Request 2, which would allow Plaintiffs to understand the nature of the relationship between House of Cheatham and Segmentation America. Plaintiffs specifically requested production of these contracts on August 5, 2025. House of Cheatham has not produced the contracts to date. Plaintiffs request the Court order production of any Segmentation America and/or Mario de la Guardia contracts within 2 days.

**HOC/Beauty Bell's Position:**

House of Cheatham, LLC has unable to find any such contracts. It is House of Cheatham, LLC's understanding that Mr. de la Guardia has or is the process of responding to a subpoena through counsel and will be presented for deposition on September 11, 2025.

**b. Dwanyetta White Deposition materials**

**Plaintiffs' Position:**

During the deposition of Dwanyetta White, the former VP of Global Marketing for House of Cheatham, Ms. White identified categories of House of Cheatham documents that may be in her personal possession and thus documents that were not searched or produced. Those categories of documents include brochures, product catalogs, brand strategies, PowerPoint presentations, marketing material, and/or employee evaluations.

**HOC/Beauty Bell's Position:**

These items have been requested and Ms. White is searching for them.

**c. Deposition Update**

**Plaintiffs' Position:**

Plaintiffs requested the depositions of 12 current and former employees of House of Cheatham on July 14 & 21, 2025. As of date, House of Cheatham has still not provided dates for the following 3 witnesses: Danielle Beckford (requested July 14, 2025), Crystal Styles (requested July 21, 2025), and Frank Auman (requested July 21, 2025).

**HOC/Beauty Bell's Position:**

These are former employees and HOC anticipates circulating dates prior to the status conference.


**L'Oréal USA:**

**a. Requests for Production**

**Plaintiffs' Position:**

Disputes remain as to Plaintiffs Requests for Production Set 4, Nos 6 and 11. After numerous meet and confers, L'Oréal indicated it would assess whether they would search and produce documents in response to the deficiencies identified by Plaintiffs. Following the Court's direction during the last status hearing to confer on final positions, L'Oréal indicated no intent to supplement its production. Plaintiffs thus alert the Court to these discrete issues for resolution.

- Requests for Production, Set 4, No. 6
  - "ALL DOCUMENTS and COMMUNICATIONS relating or referring to drafts and final versions of advertisements for use in all platforms (e.g., billboards, online, print, radio, social media, and television) related to YOUR HAIR RELAXER PRODUCT(S)."

At the time Plaintiffs initially raised this dispute, Plaintiffs had received zero production from any of L'Oréal's social media platforms. However, both L'Oréal's

professional and consumer brand portfolios, of which chemical hair relaxers are a part of, have various social media platforms. We requested from counsel, in accordance with CMO 4, to inform Plaintiffs of which social media platforms L'Oreal intended to search and produce from prior to production so that Plaintiffs could assess the sufficiency of collection and avoid any downstream issues, but unfortunately L'Oreal produced without doing so. Upon reviewing the production, it is devoid of Facebook and Instagram communications and advertisements related to L'Oreal's hair relaxer products. However, Erica Culpepper (General Manager for Softsheen Carson) testified that content and information was posted on social media (Facebook and Instagram) related to hair relaxers and that each brand under the Softsheen Carson portfolio had a brand-specific handle. A review of social media today, reflects posts on L'Oreal's Dark and Lovely Facebook and Instagram pages related to L'Oreal's promotion of direct to consumer hair relaxers (including from 2017 – 2019), yet to date, such information has not been provided. With respect to L'Oreal's professional product lines (e.g. Mizani), L'Oreal has produced certain videos and some social media posts related to the Mizani brand, however, these do not include a number of videos or posts that are currently posted on YouTube and other social media platforms.

- Requests for Production, Set 4, No. 11
  - "ALL DOCUMENTS and COMMUNICATIONS with YOU and any cosmetology school or cosmetic group relating or referring to any HAIR RELAXER PRODUCT(s) and/or the haircare or cosmetics market."

As part of L'Oreal's marketing efforts for chemical hair relaxers sold under their professional product division, L'Oreal engages with cosmetology schools and groups concerning their hair relaxer products. Yet, such communications (postings on the SalonCentric website) are lacking in their productions. By way of exemplar, L'Oreal's affiliate, SalonCentric provides and has provided digital education to cosmetology students, the cosmetic market at large and salons specifically about relaxing hair and featuring chemical hair relaxer products L'Oreal manufactures, markets and sells. These communications are clearly relevant, yet despite specifically and repeatedly requesting, Plaintiffs have received no such production. Plaintiffs request production of this belated, responsive information.

**L'Oreal USA's Position:**

L'Oréal USA has sufficiently responded to Plaintiffs' requests for production. To the extent that Plaintiffs contend any of L'Oréal USA's responses and/or document productions are inadequate, such complaints are both unfounded and untimely.

As to Set 4, Request No. 6, L'Oréal USA has produced all the final and draft advertisements regarding hair relaxer products it has been able to locate, including from social media. In addition, as Plaintiffs are aware, L'Oréal USA worked with its outside advertising agency, Publicis, to ensure that responsive documents in the possession of Publicis were also produced to Plaintiffs. Plaintiffs' submission makes reference to certain recent social media posts to complain that documents relating to these recent posts have not been produced. Any documents relating to recent posts are, of course,

well after the date of filing of this lawsuit and therefore not within the scope of discovery.

On Set 4, Request No. 11, once again, L'Oréal USA has produced what it has been able to locate after a reasonable and diligent search. In response to Plaintiffs' requests, L'Oréal USA has searched for all educational materials that might be responsive to this request. L'Oréal USA is not withholding responsive documents.

**b. Le Care Consumer Complaints**

**Plaintiffs' Position:**

Plaintiffs have consistently sought and requested noted concerns and consumer complaints regarding L'Oréal's chemical hair relaxer products. During the recent deposition of Anne Garrison, former Vice President of Marketing for Softsheen Carson, she testified that she was familiar with a department called "Le Care," as a department within L'Oreal which tracks incoming calls and consumer reviews. (*See* Garrison Rough Tr. At 137:13-17 "Q. Are you familiar with Le Care? A. Yes. Q. What's Le Care? A. It's a department within L'Oreal that tracks incoming calls and consumer reviews). Additionally, another witness, Jennifer Jose, deposed on August 27, 2025, affirmed that Le Care is a consumer complaint division at L'Oreal. Plaintiffs do not appear to have such information from Le Care in production and have asked counsel to specifically confirm this information has been produced. To date, L'Oreal has refused to provide the answer as to whether they have searched and produced information from Le Care.

**L'Oreal USA's Position:**

Contrary to Plaintiffs' suggestion, L'Oréal USA has produced significant materials regarding customer complaints received regarding relevant products. Plaintiffs' suggestion that the testimony of Anne Garrison demonstrates the existence of particular responsive documents that have not yet been produced is a misstatement of her testimony. Ms. Garrison testified that she did not receive information from Le Care and that she did not know where Le Care information was stored. (*See* Garrison Rough Tr. at 137:18-25 " Q. Okay. And do you -- did you, while in your position as vice president of marketing for SoftSheen-Carson, receive information with respect to your Le Care department? A. No."; 139:18-20 "Q. Okay. Do you know where the Le Care consumer complaints and incoming calls are stored? A. No.") Nothing in that testimony suggests any gaps or shortcomings in L'Oréal USA's production. Responsive consumer complaint documents have been produced to Plaintiffs.

**c. Deposition Update**

**Plaintiffs' Position:**

Plaintiffs have received over 57,000 pages of documents since June of 2025. Despite the prejudice resulting from the compressed timeline caused by Defendants' insufficient productions ( Plaintiffs received custodial productions of approximately 30,000 pages for 10 additional custodians on July 28, 2025), re-litigation of issues decided by the Court (L'Oréal SA product information file issue wherein Plaintiffs still await full production by mid-September, 2025), related delayed meetings on privilege challenges and delayed production of documents and information clearly sought in discovery (e.g.

21

safety data sheets for raw materials in May of 2025, teams chats, incomplete social media production produced mid-August, 2025), Plaintiffs have agreed to proceed with depositions as expeditiously and efficiently as possible. To date, Plaintiffs have taken about 13 depositions and have pulled down 3. Plaintiffs continue to await L'Oreal's full production of product information files which are anticipated to be produced by September 12, 2025. Plaintiffs have requested a 30-day extension to complete depositions which include several fact witnesses to be subpoenaed as well as 30b6 witnesses and are awaiting L'Oreal's response.

Contrary to L'Oréal's representation below, Plaintiffs initiated the meet and confer process on L'Oréal's objections to the 30(b)(6) deposition notices, and met with L'Oréal on those topics on August 15, 2025. During that meeting, L'Oréal also proposed that some as yet-unknown number of currently scheduled depositions of fact witnesses could also become 30(b)(6) depositions and those combined fact and 30(b)(6) depositions could just "flow" between corporate representative and fact witness testimony. Plaintiffs declined the "flow" proposal although they indicated they could try to accommodate consecutive dates for witnesses also designated as 30(b)(6) witnesses, if schedules permitted, in an already compressed schedule. Plaintiffs also asked L'Oréal to advise Plaintiffs which of its fact witnesses would also be designated for which 30(b)(6) topics, but L'Oréal has not responded. On August 24, 2025 and again on August 27, 2025, Plaintiffs' counsel reached out to defense counsel to schedule a meet and confer regarding 30(b)(6) depositions for Thursday, August 28, 2025 and have not obtained a response. On August 27, 2025, Plaintiffs received a response, and the Parties are now working to schedule a meet and confer for Friday, August 29. 2025.

**L'Oreal USA's Position:**

L'Oréal USA has, in accordance with the Deposition Protocol, made the witnesses requested by Plaintiffs available for deposition in a timely manner, and depositions of L'Oréal USA witnesses are proceeding at a rapid pace. With respect to the 30(b)(6) witnesses/topics requested by Plaintiffs, L'Oréal USA has served objections and has been attempting to schedule a substantive meet and confer with Plaintiffs.

Plaintiffs' supposed complaints about L'Oréal USA document production timing do not remotely justify their requested change in schedule, which in any event must be decided by Judge Rowland. The documents from 10 additional custodians were produced *at Plaintiffs' request* and under the supervision of Special Master Grossman, and this production accounts for the vast majority of anything that L'Oréal USA has produced since February 2025. There have been no delayed meeting on privilege challenges; that is simply false. What Plaintiffs characterize in this submission as "delays" by L'Oréal USA are, in reality, reflective of L'Oréal USA's attempts to resolve disputes with Plaintiffs in response to Plaintiffs' ever-growing and ever-shifting list of demands.

As to Plaintiffs' request for additional time to complete depositions, L'Oréal USA joins in the joint defense position outlined in the Status Report submitted to Judge Rowland.

**Luster Products, Inc.:**

**a. Document Recollection and Production**

**Plaintiff's Position:**

The parties have met and conferred extensively following the July 2025 status conference to discuss Luster's re-collection and reproduction efforts. Those efforts were as follows:

- As of February 28, 2025 Luster had produced a total of 12, 077 documents.

- Between July 3, 2025 to August 16, 2025, Luster produced a total of 158,031 documents.

Put simply, Luster produced ten times as many documents after the close of discovery as they did during discovery. Moreover, the backloaded and late productions contain highly relevant documents that should have been produced at the onset of this litigation, as well as all of the custodial files for deponents whose depositions are scheduled for September.

These documents were produced late because Luster failed to appropriately collect and review documents at the outset of the litigation two years ago:

| Date of Doc Production | Number of Docs Produced | Days Since RFP01 Served | Days Since RFP02-RFP07 Served | Days Until First Deposition |
|---|---|---|---|---|
| 6/9/2025 | 10,680 | 620 | 556 | **98** |
| 6/24/2025 | 8,410 | 635 | 571 | **83** |
| 7/3/2025 | 4,789 | 644 | 580 | **74** |
| 7/21/2025 | 9,689 | 662 | 598 | **56** |
| 7/29/2025 | 40,501 | 670 | 606 | **48** |
| 8/8/2025 | 27,316 | 680 | 616 | **38** |
| 8/16/2025 | 53,831 | 688 | 623 | **30** |
| **TOTAL FROM JUNE TO AUGUST 2025: 155,276** | | | | |

**Luster's Position:**

Plaintiff's counsel made several additional requests on Luster Products, Inc. for additional collection of documents including, new custodians, additional search terms, personal email accounts, and text messages off personal devices after the close of written discovery, including requests as late as July 2025. Luster always agreed to provide additional information that Plaintiff's counsel requested, which therefore led to collection, review, and production of additional documents. The production of these documents was completed August 16, 2025. There are no additional requests from Plaintiff's counsel and this phase of document production is complete. We understand that plaintiff's counsel may need additional time to review these documents in order to depose witnesses. However, we presently agreed upon six, and potentially eight, fact witnesses to proceed by the September 30, 2025 deadline and believe that both sides are ready to proceed with those depositions.

### b. Custodial Files

**Plaintiff's Position:**

The production of critical custodial files continued to lag well beyond the court-ordered close of discovery in February 2025. On January 27, 2025, Plaintiffs requested, and Luster agreed, to provide custodial files for certain witnesses then known to Plaintiffs. This list included Freddie Luster II (Vice President), Jory Luster (President and CEO), and two sales representatives, Randy Lee and Carmen Martinez. All of the depositions for these witnesses were confirmed to go forward in September 2025. Yet, between June 2025 and present date, Luster produced custodial files for these witnesses with the following totals:

- Jory Luster: 17,960
- Randy Lee: 27,191
- Carmen Martinez: 20,365

The parties agree that these key witnesses were known to both parties from the onset of the litigation three years ago. Producing large custodial files six months after the close of discovery and only weeks before the depositions renders it nearly impossible for plaintiffs to adequately prepare for these depositions.

Moreover, the late production of documents has not only prejudiced Plaintiffs ability to take fact and corporate witness depositions, but also to appropriately prepare expert reports.

Separately, it appears that additional key witnesses were never disclosed to plaintiffs during the litigation. For example, Mohan Rao was Luster's project manager of R&D, Quality Assurance, and Regulatory from 2005-2012. Mr. Rao's name does not appear on any Luster organizational chart and therefore his custodial file was not requested, nor was his name included in any discovery response.

Plaintiffs were notified by the Namaste Discovery Team two days before Mr. Rao's scheduled deposition that he was a former Luster employee. A detailed search of the Luster documents, which could only be completed by searching Mr. Rao's first and last name, separately, revealed he was the custodian of 229 responsive documents. However, none of the produced information would lead Plaintiffs to understand the scope and breadth of his position at Luster, much less indicate that the deposition should be simultaneously conducted by the Namaste and Luster teams.

**Luster's Position:**

The parties are willing to work together to ensure Plaintiffs have adequate time to prepare for the depositions. As mentioned above, Plaintiff's issued additional requests after the close of discovery for additional documents, custodians, search terms, personal email addresses, and text messages after the close of written discovery. This led to the production of these large custodial files by Luster after the close of discovery. The individuals outlined in Plaintiff's Position, Jory Luster, Randy Lee, and Carmen Martinez were all part of that additional request of information, including personal email accounts request in July 2025. Luster is working with plaintiff's counsel on scheduling the depositions of Jory Luster, Randy Lee, and Carmen Martinez. We

have agreed to have Jory Luster's proceed towards to end of September to allow plaintiff's adequate time to prepare for the deposition. Further, parties agreed that if the court extends the deadline that Randy Lee and Carmen Martinez's deposition may proceed in October to allow plaintiff's adequate time to prepare for their depositions.

Further, the deposition of Mohan Rao, a current Namaste employee, proceeded on August 14, 2025. At his deposition, he clearly testified that he never worked on hair relaxers while employed at Luster Products, Inc.

| | |
|---|---|
| 17 | Q. Okay. What did you do for Luster |
| 18 | Products? |
| 19 | A. I'm the project manager for R & D. I |
| 20 | work on the lotions, creams and all pomade and all |
| 21 | kind of things. But nothing related to relaxer. |

Rao Dep., Page 33:17-21, August 14, 2025.

Plaintiff's suggestion that Mr. Rao's is a key witness in this litigation is not accurate

### c. Metadata Compliance

**Joint Position:**

The parties have met and conferred on the metadata issues raised by the Plaintiffs in July 2025. The parties have worked cooperatively and in conjunction with their eDiscovery vendors to resolve any unpopulated date related metadata issues. This includes Luster's eDiscovery vendor writing a script to extract additional metadata from documents and an agreement to provide native documents where the missing date related metadata remains an issue for Plaintiff's eDiscovery vendor to attempt additional extraction of date related metadata. By agreement, these files will be provided by August 29, 2025.

### d. Deposition Update

**Plaintiffs' Position:**

Despite ongoing production issues, the parties have confirmed 6 depositions for the month of September and are in the process of confirming an additional 4 depositions to take place before September 30, 2025, in compliance with the Court's order. In light of the large number of documents that were produced seven months after the close of discovery, the plaintiffs request a 90-day extension to continue depositions.

**Luster's Position:**

Plaintiffs requested forty-two fact witnesses of Luster's present and former employees on July 21, 2025. Luster has approximately 100 employees, including warehouse workers and administrative staff. Luster responded with three dates for the requested deponents on July 28, 2025. On August 13, 2025, the parties agreed to dates for ten deponents to proceed in September and two would proceed in October with the court's

permission. On August 26, 2025, Plaintiffs requested multiple changes to the agreed upon deposition schedule. The agreed-on schedule currently is:

Deposition Dates Agreed upon by the Parties as of August 26, 2025:

- September 15: Herbert Luster
- September 16: Ricky Luster
- September 17: Kalaam Steward
- September 22: Kevin Gonzalez
- September 23: Sonja Luster Munis
- September 24: Jory Luster

Parties are working together to try and finalize the schedule for a total of eight depositions to proceed in September and four depositions to proceed in October, if the court allows an extension.

**McBride Research Laboratories, Inc.:**

**a. 30(b)(6) Deposition**

**Plaintiffs' Position:**

On August 28, the PSC and McBride met and conferred regarding the various 30(b)(6) topics and the dates. The PSC has agreed to amend specific topics and McBride has agreed to provide a corporate designee for all topics. The PSC and McBride are confirming dates for depositions that have not been scheduled.

**McBride's position:**

McBride has met and conferred with Plaintiffs regarding its objections to Plaintiffs' 30(b)(6) notices. McBride has provided dates for all requested 30(b)(6) depositions, which have been scheduled, apart from one. McBride is waiting for confirmation from Plaintiffs on one remaining 30(b)(6) date.

**b. Deposition Update**

**Plaintiffs' Position:**

Plaintiffs will need additional time to complete fact discovery of McBride witnesses. Plaintiffs have served two subpoenas on former employees of McBride. One deponent, Noureddine Mriouah, has retained separate counsel and counsel has requested that Plaintiffs withdraw the subpoena. Plaintiffs have a call scheduled with Mr. Mriouah's counsel to discuss the subpoena. The other former McBride employee that was subpoenaed, Courtney Jenkins, has been served but has not responded to the subpoena. To the extent Mr. Jenkins refuses to comply with the subpoena, Plaintiffs will likely require additional time to enforce compliance. Thus far, Plaintiffs have taken five depositions and have an additional 10 depositions scheduled in September.

**McBride's Position:**

McBride has provided deposition dates for all requested fact witnesses and 30(b)(6) depositions. McBride is waiting on confirmation from Plaintiffs for one final 30(b)(6)

date. McBride does not believe Plaintiffs need any additional time to complete fact discovery of McBride, as all depositions have been completed or are scheduled to be completed by September 30, 2025.

Further, McBride has been in communication with former McBride employee, Noureddine Mriouah's, counsel. Mr. Mriourah's counsel served responses and objections to Plaintiffs' subpoena duces tecum on August 12, 2025. Mr. Mriouah's counsel has indicated he has been attempting to confer with plaintiffs for over two weeks on Mr. Mriouah's scheduled deposition date. Mr. Mriouah's counsel has also represented to McBride that while Mr. Mriouah lacks knowledge of the pertinent subject matter in this lawsuit, they have agreed to attend the scheduled deposition of Mr. Mriouah on September 11, 2025, as noticed by Plaintiffs. Thus, there are no issues with the scheduling or coordination of this witness.

Plaintiffs also claim difficulty serving a subpoena to one other former McBride employee – Courtney Jenkins. Plaintiffs served their subpoena duces tecum on Mr. Jenkins on August 1, 2025, providing them with 2 full months to locate and schedule Mr. Jenkins' deposition before the close of fact discovery on September 30, 2025.

To date, Plaintiffs have taken five depositions (three fact witnesses and two 30(b)(6) depositions) and have an additional 10 depositions (five fact witness depositions and five 30(b)(6) depositions) scheduled in September. As a result, there is no reason why fact discovery should be extended as to McBride.

### Namasté Laboratories, LLC:

#### a. Foreign Regulatory Documents:

**Plaintiffs' Position:**

Plaintiffs are currently awaiting confirmation from Namaste that The Regulatory Company has produced all requested documents which are in its control.

**Namaste's Position:**

Namasté continues to work with The Regulatory Company to ensure that, consistent with the Court orders addressing discovery of both foreign markets and documents in the possession of third parties, all responsive documents have been produced. Namasté has already coordinated with The Regulatory Company on one production and is now confirming whether any additional documents are in its possession. Namasté is not aware of any issues for the Court to address on this topic.

#### b. Deposition Update:

**Plaintiffs' Position:**

Plaintiffs have yet to receive deposition dates for 17 corporate witnesses that they have requested. Namaste reports that scheduling each of these requested depositions is problematic because they are former employees—something that was not apparent to Plaintiffs at the beginning of the deposition scheduling process and is not necessarily common, even in mass torts where the conduct spans decades.

On August 7, 2025, counsel for Namaste *first* advised Plaintiffs that they were not able to secure deposition dates for a large majority of the requested witnesses because they

were former employees. On August 8, 2025, (less than 24 hours later) Plaintiffs requested last known addresses for all former employees.

Three days later, counsel for Namaste stated that she would "provide last known address information as soon as I have it." When asked how much longer it would be before the information would be provided, Namaste's counsel replied, "Unfortunately it won't be today as the individual who gathers that information is out. We will endeavor to get that information to you tomorrow." The next day, Namaste provided last known addresses for *only* 6 of these witnesses and stated that one witness was deceased. And the following day, Namaste provided contact information for one additional former employee.

On August 14th, during a short in-person meeting at Baker McKenzie's office in Chicago, counsel for both parties had a discussion on how best to deal with the delays in getting depositions scheduled and generally agreed that a short extension would be needed. Tan email later that evening confirmed, "In general, I agreed with the idea of setting depositions after the deadline." That same email also stated that counsel for Namaste continued to "search for contact information for other former employees."

On August 22, 2025, Namaste advised--for the first time--that it had produced all the information that it planned to produce as to the remaining witnesses requested by Plaintiffs. The next day, Plaintiffs attempted to confirm with Namaste that is was making no further attempts to locate witnesses. On August 25th, Namaste stated that it was unable to locate any additional witnesses.

To date, Plaintiffs have issued subpoenas for every witness where Namaste has provided a last known address and continue to search for remaining witnesses. Based on the representations of counsel, Plaintiffs content that, generally, the parties ***have already agreed*** that Plaintiffs are entitled to additional time to locate, subpoena, and depose the remaining witnesses. Where there is disagreement is as to how long Plaintiffs should have to complete this process. Under the circumstances, Plaintiffs believe that an additional 90 days past the September deadline may be required.

**Namaste's Position:**

At the July 31, 2025 Case Management Conference (CMC) before Judge Rowland, Plaintiffs' entire premise for extending the September 30, 2025 deposition deadline focused on alleged document production delays. At the CMC, Plaintiffs' counsel represented to the Court that "the scheduling of depositions" required that she "go back to the doc productions" because "the order that [the Court] put in place anticipated that [Plaintiffs would] have all documents by February 28th, and then [Plaintiffs] should have seven months till September 30th to actually take those depositions." Dkt. 1364, p.42, line 16; p. 43, line 1; and p. 43, lines 7-10. Plaintiffs' counsel reiterated Plaintiffs' concern with the current September 30, 2025 deadline as follows: "[Y]our Honor told us we had seven months to take depositions, that we were getting the documents by February 28th and we had seven months to review those documents and take depositions. In a case of very many of these defendants, we do not have the time to do that. The time that you gave us is not the time that we are actually getting *because of these delays in document production*." Dkt. 1356, p. 50, lines 12-18 (emphasis added). In response, the Court noted "I understand there's been further production. We all

anticipated that, frankly, that there would be further production. It sounds like some defendants haven't had to do supplemental production, so you should be able to get those deps done." Dkt. 1356, p. 53, lines 21-25.

At no point during the July 31, 2025 CMC did Plaintiffs represent that Namasté's document productions in any way impacted the seven (7) months allowed for depositions. Nor could they do so. As to Namasté, Plaintiffs **have** had the promised seven (7) months to conduct depositions: Namasté completed 99.93% of its document production in compliance with the February 28, 2025 deadline. Namasté produced 460,763 documents on or before February 28, 2025 and only produced 302 documents since that date. To the extent Plaintiffs offer the Court a different number on Namasté's productions after Februray 28, 2025, Namasté has confirmed with Plaintiffs' counsel and their vendor that any difference in those numbers is due to Namasté's "re-production" of documents produced in less-redacted or unredacted form following privilege log adjustments. Plaintiffs should be able "get [Namasté's] deps done" within the September 30, 2025 deadline set by the Court.

Plaintiffs' sole--and last minute--complaint as to Namasté is as to the number of outstanding depositions. On that point, Plaintiffs noticed six (6) depositions of Namasté witnesses on April 18 (even before the deposition protocol in this matter was entered). None of those depositions are at issue: three (3) witnesses have been deposed; two (2) notices were withdrawn; and one (1) witness has been subpoenaed. Thereafter, plaintiffs waited almost three (3) months until July 14, 2025 to request an additional 12 depositions before then following up on July 21, 2025 with a request for eight (8) additional depositions. Of the 20 depositions Plaintiffs requested in July 2025--over four (4) months after the close of written discovery--18 of the requested witnesses were former Namasté employees. On August 7, 2025, Namasté notified Plaintiffs of the two (2) former employees it could produce for deposition, identified two (2) former employees who were attorneys in the Namasté legal department who Namasté opposed having sit for deposition, and expressly notified Plaintiffs that Namasté had been unable to contact the remaining former employees and that those individuals "may require subpoenas to appear for deposition." Namasté followed up with Plaintiffs providing them with the seven (7) last known addresses it was able to locate for former employees; only six (6) of those individuals have been subpoenaed for deposition. Despite knowing of the impending deposition deadline, Plaintiffs have, since August 7, 2025, neither located addresses for nor subpoenaed any of the remaining witnesses for deposition.

Beyond that, Plaintiffs' assertion that they "have yet to receive deposition dates for 17 corporate witnesses" is incorrect. As reflected on the deposition table submitted to the Court contemporaneously with this JSR, there are only 12 Namasté depositions to be scheduled. Of those 12, one (1) individual is deceased, two (2) individuals were legal counsel in Namaste's legal department, and one (1) individual was never a Namasté employee. Moreover, Namasté is currently working with Plaintiffs to schedule three (3) of the listed depositions within the current September 30, 2025 deadline. Therefore, consistent with the chart that the parties submitted to the Court, there are only five (5)

outstanding depositions requiring subpoenas and Plaintiffs have known that subpoenas may be required for those individuals since August 7, 2025.

As counsel experienced in this type of litigation, which involves over 20 years of alleged misconduct as to Namasté, Plaintiffs should have and could have fully anticipated that a significant number of requested deponents would be former employees for whom subpoenas would be required for deposition. Plaintiffs nonetheless chose to wait four (4) of the seven (7) months allotted for depositions before requesting 75% of the depositions they seek from Namasté. Given these facts, Namasté is not a Defendant for whom additional time for depositions (beyond anything the Court may allow as to all Defendants) should be granted.

Plaintiffs are incorrect in their assertion that the parties have agreed that Plaintiffs will need additional time." Rather, during a meet and confer, Plaintiffs suggested that additional time was necessary to complete the depositions and Namasté noted it was willing to entertain a proposal setting depositions in October on the condition that no other deadlines would be impacted and no argument would be made to the Court that any such agreement necessitated the movement of additional deadlines. Plaintiffs' counsel promised to provide Namasté with a written proposal but failed to do so.

Finally, to the extent Plaintiffs contend that they did not have a full understanding of the number of subpoenas that would be required in connection with former Namasté employees at the time of the July 2025 CMC, Plaintiffs clearly understood that issue by August 18, 2025 when Plaintiffs first proposed extending the deposition deadline by thirty (30) days as to all Defendants other than than two, **not including Namasté**. Plaintiffs' request for additional time to conduct Namasté depositions (beyond anything the Court grants as to all Defendants) should be denied.

### c. Privilege log issues

#### 1. The Non-Compliant Log

**Plaintiffs' Position:**

Pursuant to the Court's June 18, 2025 Order (Dkt. 1266), Namaste was required to serve a privilege log by July 18, 2025, in compliance with CMO 5 (Dkt. 112). The log Namaste produced on July 18, was not compliant, however, omitting fundamental information required by CMO 5, including authors, recipients, and accurate dates, for thousands of entries, thereby making it impossible to assess the validity of their privilege claims. Following a meet and confer, Namaste advised it would need until August 28, 2025, to provide a compliant privilege log. Thus, as of date, Namaste has yet to comply with the Court's Order denying Plaintiffs the ability to assess privilege assertions and secure the production of wrongfully withheld documents. For example, Namaste's July 18, 2025 privilege log includes 3,443 claims which fail to provide any authors or recipients. Further, the date for each such privilege claim is either missing or appears on its face to be inaccurate. This basic information is necessary and required by CMO 5, even for hard-copy documents. *See* CMO 5 (Dkt. 112) at 17, ¶ 12. Moreover, these deficiencies mirror

the same prior deficiencies over these very exact privilege claims, which prompted the Court's June 18 Order (Dkt. 1266) in the first place requiring Namaste to bring these privilege claims into compliance. But again, Namaste failed to do so.

On the evening of August 27, Namaste served an amended privilege log. Plaintiffs have not been able to fully analyze this updated privilege log, but at least some previous deficiencies appear to be addressed by Namaste. Plaintiffs will update the Court during the upcoming JSR hearing.

**Namaste's Position:**

On August 9, 2025, Plaintiffs advised Namasté that it was challenging Namaste's July 18, 2025 privilege log. Of those challenges, approximately 3,400 entries were hard copy documents that had to be manually updated, where possible. Therefore, when the parties met and conferred, Namasté advised it would need until August 28, 2025 to produce a revised log. Namasté will produce the revised log on or before August 28, 2025 and will produce downgraded documents by September 3, 2025.

**Revlon:**

    **a. Limited Personnel Files:**

**Plaintiffs' Position:**

Revlon is significantly redacting personnel files on the mistaken notion that only the sentences that reference hair relaxers within a performance evaluation are relevant. Plaintiffs have received only a single year's performance evaluation of a long-time Revlon Multi-Cultural Group manager and vice president, Jolorie Williams. That evaluation was heavily redacted to only expose sentences that contained the word relaxer, despite the fact that Ms. Williams held marketing responsibilities for all multi-cultural hair products and her performance evaluations took into consideration all of her work on all products..

**Revlon's Position:**

Consistent with the Court's June 26th Order, Revlon has undertaken a search of the deponents' personnel files for "compensation, bonus, or performance review information *related to the [hair relaxer] products at issue* in this litigation." ECF No. 1287 at 2 (emphasis added). Of the depositions that have occurred following that Order, Revlon has produced portions of a deponents' performance review that specifically related to hair relaxer products; an in-depth review of the other employees' or former employees' personnel files—the depositions of which occurred after the Court's June 26th Order—has not revealed any information that references or is specifically related to hair relaxer products and Plaintiffs have been advised accordingly.[3] The lack of specific references to hair relaxer products in these personnel files should come as no

---

[3] Revlon is currently reviewing the personnel files for those deponents whose depositions took place prior to the Court's June 26th Order and will provide responsive materials, to the extent in existence, immediately upon completion of said review.

surprise, for several deponents have testified that hair relaxers comprised a minor percentage of their duties and responsibilities. It is Revlon's position that defendants are required to produce only those portions of a deponents' personnel file that reference the specific hair relaxer products at issue. *See* ECF No. 1287 at 3-4; ECF No. 1371 at 3. Such an interpretation is consistent with the Court's prior orders and relevant cases cited in support thereof that limit production to only personnel file information that "mention[s] or refer[s]" to the product(s) at issue. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2019 WL 5787747, at *2-3 (N.D. Fla. Nov. 6, 2019).

### b. Custodial Files:

**Plaintiffs' Position:**

Plaintiffs note ongoing deficiencies in Revlon's custodial file productions. For instance, long-term employees have limited or incomplete document production, and many documents lack complete or accurate custodial metadata, often being generically listed as "Revlon." This indicates either incomplete collection or improper metadata tagging in violation of CMO 4, and further hampers Plaintiffs ability to identify relevant custodial documents tied to specific employees for use during depositions.

**Revlon's Position:**

Revlon has produced custodial ESI and hard copy files to the extent they can be located and is in the process of working with its ESI vendor to respond to Plaintiffs' latest request. Revlon requests a meet and confer with Plaintiffs on this issue. In the event the parties are unable to reach an agreement, Revlon respectfully requests that the issue be referred to Special Master Grossman.

### c. Professor Grossman Topics:

#### i. Bill of Materials

**Plaintiffs' Position:**

The parties have submitted their letter briefs regarding an updated "Bill of Materials" and are pending Special Master Grossman's ruling on this matter.

**Revlon's Position:**

Special Master Grossman has requested an early September conference on the updated Bill of Materials letter briefs; a date and time is currently being worked out between the parties.

#### ii. Third Party Subpoenas

**Plaintiffs' Position:**

Plaintiffs are awaiting the Domain/Email List per Special Master Grossman's ruling and request that Revlon provide known third-party information no later than September 1, 2025. The parties have agreed that, because this matter is ongoing, subpoenas may be issued after the deadline once the necessary third-party information is provided.

**Revlon's Position:**

Revlon has requested documents from the 21 third parties identified in Plaintiffs' chart dated August 26, 2025 using the template letter agreed upon by the Special Master and Plaintiffs. Given the upcoming holiday, Revlon agrees to provide Plaintiffs with the Domain / Email list as to those entities Revlon has requested documents from no later than September 2, 2025.

### iii. Responses to Interrogatories

**Plaintiffs' Position:**

While Special Master Grossman previously ruled that Revlon may update third-party interrogatory responses after depositions are complete, since Revlon is still gathering this information, new information arising at each deposition continues to reveal inaccuracies in Revlon's other interrogatory responses. Plaintiffs request that Revlon update its interrogatory responses with known information within the next 30 days and continue to update on a rolling basis as additional information is discovered. Revlon's assertion that the parties have agreed to update responses within a reasonable time after depositions only applies to third-party discovery.

**Revlon's Position:**

The parties previously agreed that Revlon would update its interrogatory responses within a reasonable time following the completion of depositions. Revlon sees no reason why the Special Master's ruling and the parties' prior agreement on this issue should be disturbed.

### d. Specific Privilege Challenges

**Plaintiffs' Position:**

The parties have significantly narrowed the scope of the privilege claims in dispute. Revlon has withdrawn a number of its privilege claims, and Plaintiffs have withdrawn a number of challenges. As of this report, eight (8) privilege claims remain in dispute. The parties are continuing their efforts to narrow/resolve these outstanding challenges. Should the parties be unable to reach an agreement by the date of the hearing, Plaintiffs will seek *in-camera* review from the Court.

**Revlon's Position:**

The parties continue to meet and confer regarding Plaintiffs' ongoing privilege challenges. Revlon agrees that an in-camera review by Special Master Grossman may be necessary in the event the parties are unable to reach an agreement.

### e. Deposition Update

**Plaintiffs' Position:**

Plaintiffs are working diligently to complete depositions but face ongoing challenges due to Revlon's failure to comply with the deposition protocol, including but not limited to, incomplete document production, failure to adhere to the three-date requirement, and unreasonably stacking dates. Additionally, Plaintiffs have the challenge of Revlon's ongoing layoffs, summer holidays, foreign travel, and burdensome translation requirements. Accordingly, Plaintiffs requested that Revlon

agree to a 30-day extension in order to complete depositions, with the understanding that no other deadlines will be affected. As of date, Plaintiffs are still awaiting a response from Revlon.

**Revlon's Position:**

Revlon has produced six fact witnesses and one Rule 30(b)(6) witness for depositions thus far, and the parties have currently scheduled six additional fact witness depositions for September. The parties have started the meet and confer process regarding Revlon's objections to Plaintiffs' six Rule 30(b)(6) notices, which contain an approximate total of 58 topics and 90 subtopics; however, pursuant to discussions held with Special Master Grossman, Revlon has provided the list of Rule 30(b)(6) topics Bryan Shelley will testify regarding, which is scheduled to take place, if possible, immediately following Mr. Shelley's fact witness deposition. In regard to the remaining deposition notices Plaintiffs served on July 21, 2025, Revlon has advised which of the requested deponents are former employees and provided their last known address and has further agreed to provide the former employees' last date of employment per Plaintiffs' request.

Revlon joins in the joint defense position as to Plaintiffs' request for extension of the deposition deadline.

### f. Deposition Questions Regarding Deponents Salary

**Plaintiffs' Position:**

Plaintiffs' questioning regarding deponents' compensation, bonuses, and performance reviews tied to hair relaxer products is squarely within the scope of permissible discovery under this Court's ruling. The Court has recognized that such information is relevant because it may demonstrate employee motivation or bias, both during their employment and in connection with the allegations at issue. Judge Jantz confirmed on July 31, 2025, that this includes situations where employees split their time across product categories: if a deponent spent part of their time on relaxers, then performance or bonus information reflecting that work must be disclosed. Accordingly, Plaintiffs are entitled to pursue questioning on these subjects at deposition. Defendants' efforts to restrict or limit this line of inquiry are inconsistent with the Court's ruling, and Plaintiffs intend to ask such questions fully to develop the record.

**Revlon's Position:**

Though the Court's June 26th and August 11th Orders only explicitly concerned the *production* of certain information from a deponents' personnel file, it is Revlon's position that, consistent with those orders, a witness should not be required to divulge their current or former salary when it is not specifically tied to the performance of hair relaxer products. Indeed, several deponents were or are salary-based and did not receive a bonus, and simply because hair relaxers comprised a small percentage of their employment should not justify disclosure of their salary amount because such compensation was merely tied to the company's overall general performance. *See* ECF No. 1371 at 3 ("But if a deponent's compensation, bonus, or performance information is tied to the company's general performance, . . . that information is not subject to production under the order."); *see also* Transcript of July 31, 2025 Status Hearing with

M.J. Jantz at 63:14-17 (stating that, in the context of personnel files, "if it's based on sales of the company generally, it's not fair game to turn over."). Revlon maintains that such lines of questioning are extremely intrusive for the deponents, many of whom worked on hair relaxers in a very limited capacity, and sees this as nothing more than Plaintiffs' backdoor attempt to circumvent the Court's prior limitations on production of employees' personnel files, specifically bonus and compensation information.

### Sally Beauty Supply LLC:

#### a. 30(b)(6) Deposition

**Plaintiffs' Position:**

Plaintiffs served 30(b)(6) notices on Sally Beauty on August 1, 2025. Sally Beauty served their objections in response to the 30(b)(6) notices on August 11, 2025. The parties engaged in a meet and confer to discuss the objections. As a result of the meet and confer, Plaintiffs served amended 30(b)(6) notices on August 20, 2025 and Sally Beauty served objections to the notices on August 25, 2025.

**Sally Beauty's position:**

Plaintiffs served four 30(b)(6) notices on Sally Beauty on August 1, 2025. The parties resolved their disputes regarding those notices on August 25, 2025. Sally Beauty is working to identify dates for those depositions.

#### b. Third Party Subpoenas

**Plaintiffs' Position:**

The parties held a meet and confer on August 26, 2025, regarding third-party vendors. While the discussion did not fully resolve the issue of Rule 34 control, Plaintiffs promptly followed up the same day with a written breakdown of the contractual provisions that demonstrate Sally Beauty's ability to obtain documents from third party vendors FTI Consulting, Alliant Manufacturing, LLC and Dhaliwal Labs.

Sally Beauty's characterization of the sequence of events and control of the documents is inaccurate. Plaintiffs first requested a meet and confer regarding Rule 34 control on April 16, 2025. The parties exchanged correspondence, and only after extended back-and-forth and Defendants' delay in offering dates did the parties agree to meet on May 1, 2025, the final day permitted under the Court's order. It is, therefore, misleading for Sally Beauty to suggest that Plaintiffs failed to timely request or conduct a meet and confer. Equally incorrect is Sally Beauty's assertion that Plaintiffs "waived" pursuit of these documents. Plaintiffs have consistently sought discovery from Sally Beauty's third-party vendors and affiliates and have never abandoned those efforts.

Defendants further misstate the scope of Plaintiffs' waiver. Plaintiffs agreed not to pursue further discovery from Raani Corporation only because Raani itself represented that it had no documents. That limited waiver does not extend to Raani's successors, Alliant Manufacturing, LLC and Dhaliwal Labs, which are separate entities with their own contractual and operational ties to Sally Beauty. Defendants' effort to treat the Raani waiver as applying to its successors is improper and inconsistent with both the

record and Plaintiffs' longstanding position that successor entities remain subject to discovery obligations where Rule 34 control exists.

Defendants rely on *Boyd Group v. D'Orazio* to argue that control requires only a "legal right" and that contracts must expressly reference document release or retention. That is an incomplete and misleading characterization of the law in this District.

First, while *Boyd Group* uses the phrase "legal right," the Northern District of Illinois has explained that control is not limited to contracts with magic-word clauses about document "release" or "retention." In *Dexia Crédit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004), the court held that a party need not have actual possession of the records; the test is whether it has a legal right to obtain them. That right may arise from contractual oversight provisions, quality-control requirements, or other enforceable obligations, not only from explicit "document release" clauses.

Second, Defendants' reliance on cases from outside the Seventh Circuit (e.g., *Micron, U.S. Auto Parts, Cryptography Research, Lofton*) is misplaced. Those decisions apply varying standards, many embracing the broader "practical ability" test rejected by the Seventh Circuit. But they do not reflect controlling law in this jurisdiction. In the Seventh Circuit, courts assess the substance of the contractual and operational relationship, including obligations relating to formulas, testing, audits, and confidentiality, to determine whether a responding party has the right to obtain documents.

Third, Plaintiffs have already identified specific provisions in the Alliant and Dhaliwal contracts that give Sally Beauty such rights. These provisions include:

- Formula Ownership – "all Sally Formulas developed or commercialized during the Term of this Agreement will be assigned to and owned free and clear by Beauty Holdings," giving Sally Beauty ownership rights that necessarily include access to supporting documentation.

- Approval Rights – vendor specifications are not binding until accepted by Sally Beauty, establishing its control over the development process and the underlying data needed to exercise that authority.

- Quality-Control/Audit Rights – Sally Beauty retains the ability to test and police vendor products, a hallmark of Rule 34 control.

- Indemnity Obligations – vendors are required to indemnify Sally Beauty against product-related claims, which by necessity requires vendors to provide documents relevant to product safety and compliance.

Taken together, these contractual provisions establish that Sally Beauty holds enforceable rights to access and obtain vendor records. Defendants' argument that only an explicit 'document release' clause creates control misstates the law and is inconsistent with Boyd and Dexia, both decided in the Northern District of Illinois and directly controlling here.

Accordingly, Plaintiffs respectfully request that the Court order Sally Beauty to exercise its Rule 34 control to obtain and produce responsive documents from FTI Consultants, Alliant Manufacturing, LLC and Dhaliwal Labs.

**Sally Beauty's Position:**

Sally Beauty denies that it has control over any of the third parties that Plaintiffs raised. Sally Beauty disclosed the existence of those third parties more than a year ago, in interrogatory responses and document production. Sally Beauty also produced its contracts with those third parties, to the extent a contract existed. When Plaintiffs previously raised this issue months ago, the Court ordered the parties to "meet and confer in advance of next status hearing in late June to attempt to resolve any remaining issues" with respect to control of third-party documents. ECF No. 1261 at 4. Plaintiffs did not ask to meet and confer with Sally Beauty by the Court's deadline, and Sally Beauty understands these issues to be resolved. Plaintiffs waived any further pursuit of these documents from Sally Beauty.

Nevertheless, on August 15, Plaintiffs first requested a meet and confer with Sally Beauty to discuss third parties, including a third party who is already a Defendant (RNA), third parties for whom Plaintiffs previously waived any further pursuit of Sally Beauty, May 29, 2025 Hr'g Tr. At 45:14-17, and third parties that the parties previously discussed and resolved.

Sally Beauty asked Plaintiffs to identify the basis for their contention that Sally Beauty controls these third parties, as this Court has recognized that it is Plaintiffs' burden to demonstrate control. ECF No. 353 at 5. Plaintiffs refused to provide that information in advance of a meet and confer for Sally Beauty to review. The parties met and conferred on August 26, but much of that meet and confer was spent waiting for Plaintiffs to read the relevant contracts (which should have been done in advance of the call and is why Sally Beauty requested Plaintiffs' support for their position in advance).

Hours after the call and for the very first time, Plaintiffs identified four contractual provisions they contend establish control over Alliant Manufacturing and Dhaliwal Labs. Without identifying specific contractual provisions, Plaintiffs summarily contended that Sally Beauty also has control over FTI. Both of Plaintiffs' contentions are baseless for the reasons set forth below.

"[T]he Seventh Circuit is very clear that the issue of control turns on the legal right of the party *to demand document production* from a third party." *Boyd Grp. (U.S.), Inc. v. D'Orazio*, 2015 WL 5321262, at *3 (N.D. Ill. Sept. 11, 2015) (emphasis added). A "legal right" to demand document production means a binding contract, a fiduciary duty, or some other legally enforceable arrangement. *Micron Technology, Inc. v. Tessera, Inc*., 2006 WL 1646133, at *1 (N.D.Cal.,2006) (citing *United States v. Intern. Union of Petro. & Indus. Wkrs.*, 870 F.2d 1450, 1452 (9th Cir.1989)).

To find control, courts require the contract to specifically reference the release, retention, or access to documents. S*ee e.g., U.S. Auto Parts Network, Inc. v. Parts Geek*, LLC, 2010 WL11597461, at *1–2 (C.D. Cal. May 18, 2010) (finding control existed because the agreement expressly provided that the non-moving party was entitled to a copy of the software program "which may be retained in perpetuity" and "all system updates in perpetuity"); *Cryptography Research, Inc. v. Visa Intern. Service Ass'n*, 2005 WL 1787421, at *3–4 (N.D. Cal. July 27, 2005) (finding that control existed because the contracts expressly required that "all vendors and manufacturers must

agree to allow the laboratory to release the information" to the [non-moving party]); *Lofton v. Verizon Wireless (Vaw) LLC*, 2014 WL 10965261, at *1 (N.D. Cal. Nov. 25, 2014) (finding control existed because the contract provided a right to access documents— "[non-moving party], through its authorized representatives, shall have the right, at all times, to examine and audit records..." and that "[non-moving party's] access to all information in [the vendors']possession or control regarding [non-moving party] accounts ... is to be completely unrestricted.").

Plaintiffs' assertion that certain contractual provisions establish control over Alliant Manufacturing , Dhaliwal Labs, and FTI is unfounded. The only provisions identified by Plaintiffs relate to formula ownership, the definition of "Merchandise," quality control mechanisms, the confidential nature of the relationship, and reimbursement for laboratory testing costs. None of these provisions address the production, retention, or release of documents, nor do they create any obligation for Alliant Manufacturing, Dhaliwal Labs, FTI or any third party to provide documents to Sally Beauty

**Deposition Update**

**Plaintiffs' Position:**

The parties have been working to schedule all depositions by the September 30th deadline and have been largely successful in doing so. The parties are still working to schedule 30(b)(6) depositions. However, Sally Beauty's characterization of Plaintiffs' deposition practice is inaccurate. Plaintiffs served notices within the timeline set by the Deposition Protocol and have worked cooperatively to streamline requests, including withdrawing 10 individual requests for depositions.

Defendants contend that Plaintiffs' deposition requests are duplicative because several current and former employees worked in regulatory roles. That is incorrect. Each of these witnesses held different positions at different times and may have unique knowledge relevant to Plaintiffs' claims. Defendants do not get to dictate which depositions are necessary for Plaintiffs to prove their case. Plaintiffs are entitled to determine which individual employees with first-hand knowledge should be deposed, even if their job titles fall within the same general department.

Defendants mischaracterize the state of the 30(b)(6) notices. Plaintiffs served four notices on August 1, 2025, within the deadline set by the Deposition Protocol, and have since acted in good faith to streamline them. Through the meet and confer process, Plaintiffs reduced the scope from 96 topics to 56. Defendants are also incorrect in asserting that document requests seeking "all documents in the deponent's possession related to all deposition topics" remain at issue. On August 25, 2025, Plaintiffs expressly withdrew those requests, further narrowing the scope of the Plaintiff's request.

Defendants' remaining objection, that certain topics are "duplicative" of written discovery, misstates the law. Rule 30(b)(6) depositions are not barred simply because they overlap with interrogatories or document productions; they serve the distinct

purpose of obtaining binding corporate testimony. Plaintiffs have complied fully with the Federal Rules and the Court's Protocol, while Defendants continue to resist producing corporate representatives by recasting standard discovery as improper.

**Sally Beauty's Position:**

Plaintiffs' leadership issued notices of deposition for 27 individual current and former Sally Beauty employees, 17 of which were not issued until July 21, 2025, the last day to issue notices and complete the requirements in the Deposition Protocol for depositions of individuals. Of these 27 depositions, and after significant negotiations, Plaintiffs agreed to withdraw requests for ten (10) individual depositions, leaving 17 depositions to be taken, not including corporate designee depositions. This late onslaught of requests means Plaintiffs have taken only seven (7) of the requested depositions to date and six (6) additional depositions are scheduled in September. Of these requested depositions, many current and former employees are overlapping and duplicative. For example, seven witnesses are current or former regulatory personnel, including one who has been the Senior Director of Product Safety and Regulatory Affairs for most of the time that Sally Beauty has sold relaxers. Despite having multiple depositions taken of Sally Beauty regulatory personnel, Plaintiffs demand a corporate representative deposition for regulatory and product safety, covering dozens of topics.

As another example, Sally Beauty disclosed to Plaintiffs that at least two of the witnesses have no decision-making authority or direct knowledge of issues relevant to this litigation, as well as scheduling hardships, but Plaintiffs refused to withdraw their requests.

In addition, Plaintiffs served Sally Beauty with four Rule 30(b)(6) corporate representative deposition notices on August 1, 2025—the last day allowed under the deposition protocol. These notices cover 96 total topics—not including subparts—on the broad subjects of distribution, marketing, advertising, sale practices, regulatory, and foreign regulatory. Each notice also included document requests. In accordance with the Deposition Protocol, Sally Beauty served objections to the notices on August 11, 2025. Following meet and confers about these objections, the Parties reached agreement and limited the deposition(s) to 56 topics.

### Strength of Nature LLC:

#### a. Joint Statement: Tony Adair Deposition

On May 30, 2025, Plaintiffs issued a 3rd Party subpoena for documents to Tony Adair, a consultant to Strength of Nature and House of Cheatham. Counsel for Strength of Nature interceded on behalf of Mr. Adair, indicating that they would coordinate a discovery response on Mr. Adair's behalf with House of Cheatham. On August 1, 2025, Tony Adair's deposition was noticed to Strength of Nature, and on August 4, Strength of Nature exchanged three dates of availability for Mr. Adair's deposition: September 4, 5, and 8. On August 10 and 11, Tony Adair – through counsel for Strength of Nature – made two productions of documents in response to the subpoena. On August 14, Mr. Adair made a third production in response to the subpoena, through counsel for House of Cheatham. Upon receipt of Mr. Adair's documents, Plaintiffs requested that his deposition be moved later into September to give Plaintiffs additional time to review

the documents produced. The Parties were unable to find an alternative date for Mr. Adair's deposition in September within the witness and counsel's availability but compromised on a date after the September 30th close of deposition discovery by agreeing to move Mr. Adair's deposition to October 14, 2025, in Savannah, Georgia.

**b. Deposition Update**

**Joint Statement:**

As of September 4, 2025, Plaintiffs will have completed 10 depositions with another 10 depositions anticipated. Plaintiffs have also noticed a 30(b)(6) deposition for Sales and Marketing which is scheduled to occur with two designees on September 15 & 19, 2025. The depositions to date include: Kim Davis (Supply Chain), Lindsey Strickland (Supply Chain), Cheryl Davis (Procurement), Deborah Disher (Regulatory), Terry Delandis (Marketing), John Grippi (Supply Chain), Javier Fernandez Aravena (Regulatory), Latasha Russell (Regulatory), Linda Johnson (R&D), and Tiffany White (Complaints). Upcoming depositions include: Rob Comber (Technical/Regulatory), Mario de la Guardia (CEO), Karan Sood (CEO/Management), Morrishane Collins (Marketing), Tiffany Hill (Marketing), and Kimberly Rowe (Marketing), as well as certain third parties with some affiliation to SON like Tabitha O'Dell (Consulting) and Tony Adair (R&D Consultant).

**II.     _Second-wave Defendant Specific Discovery Status_**

**RNA:**

**a. Document Collection and Search Methodology**

**Plaintiffs' Position:**

Plaintiffs report that the parties are engaged in ongoing discussions regarding search methodologies, including potential use of Technology Assisted Review ("TAR") under CMO 4. On April 8, 2025, Plaintiffs proposed search terms and on August 18, 2025, Plaintiffs provided a sample TAR protocol to facilitate those discussions. Plaintiffs maintain that discussions surrounding search terms, search methodology, and protocols should proceed in conjunction with custodian identification, ESI and paper document collection to avoid unnecessary delay.

RNA has stated that due to resource limitations and its focus on collecting ESI from custodial hard drives and ShareFile repositories to meet the parties agreed upon mid-September collection deadline, it is not presently addressing hard copy or RNA database collections, citing the need to handle one discovery issue at a time. Plaintiffs have emphasized the importance of resolving outstanding issues concerning batch records and other hard copy documents. Despite having first raised the issue in May 2025, little progress has been made, with RNA continuing to cite burden, disorganized storage, and resistance to full production.

The identification of custodians remains ongoing. To date, RNA has produced fewer than 100 documents, underscoring that its production is substantially incomplete. Plaintiffs anticipate that additional custodians will be identified in document discovery. Additionally, new custodians may be necessary to ensure coverage of all relevant subject areas and time periods, where additional employees or former employees should be added to capture responsive information. For former employees where RNA no longer maintains a custodial file, we have requested that RNA confirm whether a custodial file can be created from sourcing documents form other available sources.

**RNA's Position:**

The parties are continuing to meet and confer on document collection and search methodology under CMO 4. Through combined efforts of RNA's counsel and Plaintiffs' counsel, the parties have identified a list of 44 custodians from whom RNA is currently in the process of collecting ESI. RNA has also informed Plaintiffs' counsel that it is in the process of collecting documents from non-custodial sources of ESI. RNA has informed Plaintiffs that its e-discovery vendor expects to complete ESI collection sometime in September, absent a few data storage programs which may need separately negotiated search methodologies, and then RNA will proceed with ESI review and production. With respect to the data storage programs, RNA has been working diligently with its vendor to explore all possible methods of collecting relevant information from those programs so that the production format of such data will be readable.

Regarding search methodology, the parties held a meet and confer on August 15, 2025, where RNA's counsel informed Plaintiffs that RNA did not believe search terms would be a workable search methodology and RNA intended to use TAR to locate responsive documents. At that time, Plaintiffs' counsel informed RNA that they did not object to the use of TAR and, in fact, agreed that this was a good case for TAR, but also wanted to discuss an agreed-upon TAR protocol. On August 18, 2025, Plaintiffs' counsel sent RNA's counsel an example TAR protocol that Plaintiffs had entered with another defendant in this case. RNA has since discussed that protocol with its e-discovery vendor and sent Plaintiffs a draft protocol based on RNA's ESI collection and its vendor's e-discovery platform and capabilities. RNA has informed Plaintiffs' counsel that certain aspects or limitations of the protocol will not be able to be finalized until RNA has completed its ESI collection and its vendor can evaluate the volume of documents that are "unsuitable" for TAR. RNA is optimistic that the parties will be able to enter an agreed-upon TAR protocol soon after RNA completes its ESI collection so RNA can promptly begin reviewing and producing its responsive ESI.

On August 27, 2025, RNA also informed Plaintiffs that RNA was in the process of collecting all batch records that RNA maintained in hard copy so they could be scanned by RNA's copy vendor and then reviewed to identify responsive batch records for production. At this time, RNA does not have an estimate from its copy vendor of how long it will take to scan and process the thousands of batch records that RNA is collecting, but RNA's counsel will provide that estimate to Plaintiffs when available.

**Bronner Bros., Inc.:**

    **a. Document Production**

**Plaintiffs' Position:**

To date, Bronner Bros. has produced 0 documents. In fact, the only responses Bronner Bros. has provided is in response to Plaintiffs' ESI Interrogatories (Second Set).

**Bronner Bros' Position:**

Bronner Bros. and its IT specialist recently participated in a productive meet & confer with Plaintiffs to discuss ESI, Manual Document Review, search terms and vendor selection, and have agreed to a follow-up meet and confer on September 8, 2025, to discuss developments. Hard drives are currently being assessed and document production on a rolling basis will begin in short order. Answers to Interrogatories will be provided contemporaneously and will be updated as additional information becomes available.

    **b. Interrogatories**

**Plaintiffs' Position:**

Plaintiffs are still waiting for discovery responses from Bronner Bros. with respect to interrogatory sets 7, 3, and 4 (due May 30, June 21, and July 21, 2025) and RFP sets 7, 2, and 3 (due on the same dates). As of date, Bronner Bros. has not provided any responses or productions in response to these requests for discovery nor has Bronner Bros. supplemented its initial disclosures. Plaintiffs request the Court set a deadline by which Bronner Bros will respond to discovery.

**Bronner Bros' Position:**

Bronner Bros. and its IT specialist recently participated in a productive meet & confer with Plaintiffs to discuss ESI, Manual Document Review, search terms and vendor selection, and have agreed to a follow-up meet and confer on September 8, 2025, to discuss developments. Hard drives are currently being assessed and document production on a rolling basis will begin in short order. Answers to Interrogatories will be provided contemporaneously and will be updated as additional information becomes available.

**Murray's Worldwide:**

    **a. Insurance**

**Plaintiffs' Position:**

Murray's has not updated its initial disclosures or provided insurance information after previously indicating that they had liability insurance coverage at various times with multiple insurance carriers. In their initial disclosures, Murray's stated "[d]ue to the fact that discovery is incomplete and further due to the fact that Murray's Worldwide is still in the process of identifying all possible sources of insurance coverage, it is not possible to specify all the applicable policies. Such policies, once identified, will be available for inspection and copying upon request." Plaintiffs believe the request for insurance information has already been submitted and that these disclosures should be

updated with the insurance information at this time. Plaintiffs request Murray's supplement its initial disclosures by September 18, 2025.

**Murray's Worldwide Position:**

The inclusion of this topic, as to Murray's Worldwide, is premature for the August JSR, as Murray's Worldwide was unaware of this topic being at issue. Murray's Worldwide will review its disclosures and discovery responses and determine if supplementation is necessary. The topic of insurance can be addressed between the parties during the next meet and confer on September 10, 2025.

Nonetheless, since this issue is being prematurely addressed before the Court, Plaintiffs' Counsel has only reached out two (2) times for a meet and confer with Murray's Worldwide: September 5, 2024, for a preemptive meet and confer "regarding Murray's planned use of search methodologies"; and again nearly a year later on August 7, 2025, regarding Plaintiffs' concern they have "only received three documents (172 pages)." Both requests for meet and confers were timely responded to and promptly handled in good faith by Murray's. The topic of insurance has not been addressed by Counsel until initial exchange of the Discovery JSR topics.

Dated: August 28, 2025

**FOR PLAINTIFFS:**

Respectfully Submitted,

*/s/Edward A. Wallace*
Edward A. Wallace
Edward A. Wallace
**WALLACE MILLER**
150 N. Wacker Dr., Suite 1100
Chicago, Illinois 60606
T: (312) 261-6193
Email: eaw@wallacemiller.com

*Plaintiffs' Liaison Counsel*

Diandra "Fu" Debrosse Zimmermann
**DICELLO LEVITT LLC**
505 20th Street North, Suite 1500
Birmingham, Alabama 35203
T: (312) 214-7900
Email: fu@dicellolevitt.com

*Plaintiffs' Co-Lead Counsel*

**FOR DEFENDANTS:**

Respectfully Submitted,

*/s/Mark C. Goodman*
Mark C. Goodman
**BAKER & MCKENZIE LLP**
101 California Street, Ste 4100
San Francisco, California 94111
T: (415) 576-3080
mark.goodman@bakermckenzie.com

*Defense Liaison Counsel and Counsel for Defendant Namasté Laboratories, LLC*

Mark D. Taylor
**BAKER & MCKENZIE LLP**
1900 North Pearl Street, Suite 1500
Dallas, Texas 75201
T: (214) 978-3000
mark.taylor@bakermckenzie.com

Fidelma L. Fitzpatrick
**MOTLEY RICE LLC**
40 Westminster Street, Fifth Floor
Providence, Rhode Island 02903
T: (401) 457-7700
Email: ffitzpatrick@motleyrice.com

*Plaintiffs' Co-Lead Counsel*

Michael A. London
**DOUGLAS & LONDON, P.C.**
59 Maiden Lane, Sixth Floor
New York, New York 10038
T: (212) 566-7500
Email: mlondon@douglasandlondon.com

*Plaintiffs' Co-Lead Counsel*

Benjamin L. Crump
**BEN CRUMP LAW FIRM**
122 South Calhoun Street
Tallahassee, Florida 32301
T: (850) 224-2020
Email: ben@bencrump.com

*Plaintiffs' Co-Lead Counsel*

Colleen Baime
Laura Kelly
**BAKER & MCKENZIE LLP**
300 East Randolph Street, Suite 5000
Chicago, Illinois 60601
T: (312) 861-2510
colleen.baime@bakermckenzie.com
laura.kelly@bakermckenzie.com

Maurice Bellan
Teisha C. Johnson
**BAKER & MCKENZIE LLP**
815 Connecticut Avenue, NW
Washington DC 20006
T: (202) 452-7057
maurice.bellan@bakermckenzie.com
teisha.johnson@bakermckenzie.com

Barry Thompson
**BAKER & MCKENZIE LLP**
10250 Constellation Boulevard, Suite 1850
Los Angeles, CA 90067
T: (310) 201-4703
barry.thompson@bakermckenzie.com

*Counsel for Defendant Namasté Laboratories, LLC*

Dennis S. Ellis
Katherine F. Murray
Serli Polatoglu
**ELLIS GEORGE LLP**
2121 Avenue of the Stars
Suite 3000, 30th Floor
Los Angeles, CA 90067
T: (310) 274-7100
F: (310) 275-5697
dellis@egcfirm.com
kmurray@egcfirm.com
spolatoglu@egcfirm.com

Jonathan Blakley
**GORDON REES SCULLY MANSUKHANI LLP**
1 N. Franklin St., Suite 800
Chicago, IL 60606
T: (312) 565-1400
F: (312) 565-6511
jblakley@grsm.com

Peter Siachos
**GORDON REES SCULLY
MANSUKHANI LLP**
18 Columbia Turnpike, Suite 220
Florham Park, NJ 07932
T: (973) 549-2500
F: (973) 377-1911
psiachos@grsm.com

*Counsel for Defendants L'Oréal USA, Inc.,
L'Oréal USA Products, Inc. and SoftSheen-
Carson LLC*

Lori B. Leskin
E. Dean Harris Porter
**ARNOLD & PORTER KAYE
SCHOLER, LLP**
250 West 55th Street
New York, NY 10019
T: (212) 836-8641
F: (212) 836-8689
Lori.leskin@arnoldporter.com
Dean.Porter@arnoldporter.com

Rhonda R. Trotter
**ARNOLD & PORTER KAYE
SCHOLER, LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
T: (213) 243-4000
F: (213) 243-4199
rhonda.trotter@arnoldporter.com

*Counsel for Defendants Strength of Nature
LLC; Strength of Nature Global LLC; and
Godrej SON Holdings*

R. Trent Taylor
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
T: (804) 775-1182
F: (804) 225-5409
rtaylor@mcguirewoods.com

Patrick P. Clyder
Royce B. DuBiner
**MCGUIREWOODS LLP**
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
T: (312) 849-8100
F: (312) 849-3690
pclyder@mcguirewoods.com
rdubiner@mcguirewoods.com

*Counsel for Defendant House of
Cheatham LLC*

Joseph P. Sullivan
Kevin A. Titus
Bryan E. Curry
**LITCHFIELD CAVO LLP**
303 W. Madison, Suite 300
Chicago, IL 60606
T: (312) 781-6677
F: (312) 781-6630
sullivanj@litchfieldcavo.com
titus@litchfieldcavo.com
curry@litchfieldcavo.com

*Counsel for Defendant Beauty Bell
Enterprises, LLC f/k/a House of
Cheatham, Inc.*

Richard J. Leamy, Jr.
Kristen A. Schank
Anna Morrison Ricordati
**WIEDNER & MCAULIFFE, LTD.**
1 N. Franklin St., Suite 1900
Chicago, Illinois 60606
T: (312) 855-1105
rjleamy@wmlaw.com
kaschank@wmlaw.com
amricordati@wmlaw.com

*Counsel for Defendant Avlon Industries,
Inc.*

Melissa Fallah
Robert W. Petti
Alyssa P. Fleischman
**MARON MARVEL**
191 N. Wacker Drive, Suite 2950
Chicago, Illinois 60606
T: (312) 579-2018 (ofc)
mfallah@maronmarvel.com
rpetti@maronmarvel.com
afleischman@maronmarvel.com

*Counsel for Defendant Luster Products,
Inc.*

Robert A. Atkins
Daniel H. Levi
Shimeng (Simona) Xu
**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
T: (212) 373-3000
ratkins@paulweiss.com
dlevi@paulweiss.com
sxu@paulweiss.com

Randy S. Luskey
**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
T: (628) 432-5112
rluskey@paulweiss.com

David E. Cole
**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
2001 K Street, NW
Washington, DC 20006
T: (202) 223-7348
dcole@paulweiss.com

Edward P. Abbot
**ECKERT SEAMANS CHERIN &
MELLOT, LLC**
275 Madison Avenue 10th Floor
New York, NY  10016
T: (646) 513-2358
eabbot@eckertseamans.com

*Counsel for Defendants Revlon, Inc.,
Revlon Consumer Products Corporation,
and Revlon Group Holdings LLC*

47

Heidi Levine
**SIDLEY AUSTIN LLP**
787 7th Ave
New York, NY 10019
T: (212) 839-5300
hlevine@sidley.com

Lisa M. Gilford
**SIDLEY AUSTIN LLP**
555 W 5th St,
Los Angeles, CA 90013
T: (213) 896-6000
lgilford@sidley.com

Colleen M. Kenney
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
T: (312) 853-2666
ckenney@sidley.com

Yvette Ostolaza
Amanda Crawford-Steger
Imani Maatuka
**SIDLEY AUSTIN LLP**
2021 McKinney Ave., Ste. 2000
Dallas, TX 75201
T: (214)981-3496
yostolaza@sidley.com
asteger@sidley.com
imaatuka@sidley.com

*Counsel for Defendant Sally Beauty Supply LLC*

Joseph J. Welter
Ryan M. Frierott
**GOLDBERG SEGALLIA**
665 Main Street
Buffalo, NY 14203
T: (716) 566-5457
jwelter@goldbergsegalla.com
rfrierott@goldbergsegalla.com

*Counsel for AFAM Concept, Inc.*

48

Seth V. Alhadeff
Ravika Rameshwar
Matthew C. Wasserman
**DINSMORE & SHOHL LLP**
Southeast Financial Center
200 S. Biscayne Blvd.
Miami, FL 33131
T: (786) 957-1157
Seth.Alhadeff@dinsmore.com
Ravika.Rameshwar@dinsmore.com
Matthew.Wasserman@dinsmore.com

Matthew C. Wasserman
**DINSMORE & SHOHL LLP**
222 W. Adams Street
Suite 3400
Chicago, IL 60606
Matthew.Wasserman@dinsmore.com

Ashley C. Webber
Emily D. Robinson
**MARSH ATKINSON & BRANTLEY, LLC**
271 17th Street NW
Suite 1600
Atlanta, GA 30363
ashley.webber@mablawfirm.com
emily.robinson@mablawfirm.com

*Counsel for Defendant, Dudley Beauty Corp, LLC*

Daniel L. Stanner
Ashley Crettol Insalaco
Megan E. Ryan
**TABET DIVITO & ROTHSTEIN LLC**
209 S. LaSalle Street, 7th floor
Chicago, IL 60604
Tel: (312) 762-9450
dstanner@tdrlaw.com
ainsalaco@tdrlaw.com
mryan@tdrlaw.com

*Counsel for Defendant RNA Corporation*

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street
Suite 4000
Houston, TX  77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
nancy.patterson@morganlewis.com

Mark A. Fiore
**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
Princeton, NJ 08540-6241
Telephone: (609) 919-6600
Facsimile: (877) 432-9652
mark.fiore@morganlewis.com

*Counsel for Defendant John Paul Mitchell Systems, Inc.*

Leslie A. Federer, ARDC #6325614
**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**
191 N. Wacker Drive, Suite 2950
Chicago, Illinois 60606
(312) 767-1314
lfederer@maronmarvel.com

Robert E. Dille (*pro hac vice*)
**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**
201 St. Charles Ave., Suite 2411
New Orleans, Louisiana 70170
(504) 321-9331

*Counsel for Defendant Murray's Worldwide, Inc.*