**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | **MDL No. 3060**<br>Case No. 23 C 818<br>Judge Mary M. Rowland<br><br>**This document relates to:**<br>All Cases |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' COMBINED MOTION TO EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERTS UNDER FEDERAL RULE OF EVIDENCE 702

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

BACKGROUND ....... 3

I. CHEMICAL HAIR RELAXERS ....... 3

II. CHEMICALS ALLEGEDLY CONTAINED IN HAIR RELAXERS ....... 4

III. THE EPIDEMIOLOGICAL RECORD ....... 6

A. The Sister Study ....... 7

B. The Black Women's Health Study ....... 11

IV. PLAINTIFFS' GENERAL CAUSATION EXPERTS ....... 13

LEGAL STANDARD ....... 16

I. RULE 702 AND THE COURT'S GATEKEEPING OBLIGATION ....... 16

II. GENERAL CAUSATION ....... 19

ARGUMENT ....... 20

I. PLAINTIFFS' EXPERTS' THEORIES LACK A RELIABLE FOUNDATION ....... 20

A. Plaintiffs' Experts Do Not Identify Any Particular Chemical Allegedly Present Across Defendants' Chemical Hair Relaxer Products ....... 21

B. Plaintiffs' Experts Have Not Shown that Any Identified Chemicals or Chemical Classes Can Cause Uterine or Ovarian Cancer ....... 23

C. Plaintiffs' Experts Fail to Establish Dose or Exposure ....... 25

D. Plaintiffs Lack Evidence That Chemicals in Hair Relaxers Act Together to Cause Uterine or Ovarian Cancer ....... 29

E. Plaintiffs' Experts Fail to Establish that Any Identified Chemical Can Be Absorbed at a Rate to Meet Any Dose Threshold ....... 31

II. PLAINTIFFS' EXPERTS CANNOT RELIABLY OPINE THAT THERE IS A VALID ASSOCIATION BETWEEN HAIR RELAXER USE AND EITHER UTERINE OR OVARIAN CANCER ....... 33

A. The Sister Study Papers (*Chang* and *White*) Do Not Provide Any Findings Specific to Hair Relaxers and Therefore Cannot Establish Valid Associations ....34

B. Plaintiffs' Experts Concede that None of the Relevant Epidemiological Studies Exclude Chance ....36

1. The Sole Ovarian Cancer Study (*White*) Does Not Support A Valid Association ....38

2. The Two Uterine Cancer Studies (*Chang* and *Bertrand*) Do Not Show a Valid Association ....40

C. Plaintiffs' Experts Go Beyond the Conclusions of the Studies on Which They Rely ....41

III. EVEN ASSUMING A VALID ASSOCIATION, PLAINTIFFS' EXPERTS MISAPPLY BRADFORD HILL ....43

A. Strength of Association ....45

B. Consistency ....47

C. Specificity ....49

D. Temporality ....50

E. Biological Gradient (Dose–Response) ....51

F. Biological Plausibility and Mechanism ....53

G. Experimental Evidence ....54

IV. EACH OF PLAINTIFFS' GENERAL CAUSATION EXPERTS' OPINIONS FAIL FOR A MULTITUDE OF METHODOLOGICAL FLAWS ....56

A. Dr. Cote's Opinions Are Unreliable, Litigation-Driven, and Premised on Insufficient Facts ....57

B. Plaintiffs' Dermatology Experts' Limited Opinions on Biological Plausibility Are Untested, Unsupported and Inadmissible ....61

1. Clarence Brown ....61

2. Silvina Pugliese ....64

a) Dr. Pugliese is Not Qualified to Opine on Uterine and Ovarian Cancer Causation ....65

b) Dr. Pugliese's "Weight of the Evidence" Review Is Methodologically Unreliable ....66

C. Plaintiffs' Gynecology Experts Are Unqualified to Offer Causation Opinions, and Utilize Unreliable Methodologies ....68

1. Dr. Jeffrey Chang ....68

a) Dr. Chang is Not Qualified to Offer a Causation Opinion ....68

b) Dr. Chang's Unidentifiable and Unreliable Methodology Favors Exclusion ....69

2. Dr. Dario Roque ....70

a) Dr. Roque Is Not Qualified to Opine on Causation ....71

b) Dr. Roque Did Not Apply a Transparent or Replicable Methodology ....72

3. Dr. Sameer Sharma ....72

D. Plaintiffs' Biological Mechanism/Toxicology Experts Offer Unreliable Opinions Based on Inadequate Facts or Data ....75

1. Stanley Atwood ....75

a) Mr. Atwood's Opinions Are Not Based On Sufficient Data Regarding Any Chemicals Purportedly At Issue ....76

b) Mr. Atwood Does Not Assess the Dose of Any Chemicals in Hair Relaxer Products ....79

c) Mr. Atwood's Opinions Are Not Supported By Any Exposure Pathway Analysis ....80

d) Mr. Atwood Fails to Reliably Apply the National Toxicology Program's Report on Carcinogens Handbook Methods for Conducting Cancer Hazard Evaluations ....82

e) Mr. Atwood's Purported General Causation Opinions Are Untimely, Scientifically Unreliable And Unsupported ....83

(1) Mr. Atwood's Causation Opinions Are Untimely .83

(2) Mr. Atwood's Bradford Hill Analysis is Skeletal and Unreliable ....................................................83

2. Dr. Michael Crowley ....................................................................84

a) Dr. Crowley's Opinions Are Not Based On Sufficient Facts Or Data....................................................84

b) Dr. Crowley Cannot Offer Incomplete Causation Opinions ..........................................................................87

3. Dr. Dipak Panigrahy ....................................................................89

a) Dr. Panigrahy's Opinions Are Not Supported by Sufficient Facts or Data ....................................................89

b) Dr. Panigrahy Does Not Reliably Apply The Bradford Hill Framework .................................................91

4. R. Thomas Zoeller .........................................................................93

CONCLUSION: The Analytical Gap Requires Exclusion ...............................................97

**Exhibits Attached to Accompanying Declaration of L. Leskin:**

1. Bertrand, et al., *Hair relaxer use and risk of uterine cancer in the Black Women's Health Study*, 239 Env't Rsch. 117228 (2023).
2. Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, 114 J. Nat'l Cancer Inst. 1636 (2022)
3. Hernandez, et al., *Systematic Review of the Epidemiology of Hair Relaxer Use and Hormone-Sensitive Reproductive Outcomes Among Black Adult Women in the United States*, Journal of Applied Toxicology (2025)
4. White et al., *Use of Hair Products in Relation to Ovarian Cancer Risk*, 42 Carcinogenesis 1191 (2021)
5. Akonde, et al., *Cigarette Smoking in Relation to Survival in Black Women with Ovarian Cancer: Evidence from the African American Cancer Epidemiology Study (AACES)*, 104 Annals of Epidemiology 48, 53 (2025)
6. Pierce, et al., *Evaluation of Dermal Exposure to Phthalates and Parabens Resulting from the Use of Hair Relaxers*, 35 Intl. J. Env. Health Res. 1707-1726 (2025)
7. Schildroth, et al., *Hair Product Use and Urinary Biomarker Concentrations of Non-Persistent Endocrine Disrupting Chemicals Among Reproductive-Aged Black Women*, 361 Chemosphere 142442 (2024)
8. Helm, J.S., et al., *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*, 165 Environ. Res. 448 (2018)

9. Stanley Atwood Deposition Transcript (March 6, 2026)
10. Dr. Clarence Brown Deposition Transcript (February 17, 2026)
11. Dr. Jeffrey Chang Deposition Transcript (February 19, 2026)
12. Dr. Michelle Cote Deposition Transcript (February 12, 2026)
13. Dr. Michael Crowley Deposition Transcript (March 12, 2026)
14. Dr. Dipak Panigrahy Deposition Transcript (February 6, 2026)
15. Dr. Silvina Pugliese Deposition Transcript (March 11, 2026)
16. Dr. Dario Roque Deposition Transcript (January 28, 2026)
17. Dr. Sameer Sharma Deposition Transcript (February 19, 2026)
18. Dr. R. Thomas Zoeller Deposition Transcript (February 24, 2026)
19. Stanley Atwood Expert Report
20. Dr. Clarence Brown Expert Report
21. Dr. Jeffrey Chang Expert Report
22. Dr. Michelle Cote Expert Report
23. Dr. Michael Crowley Expert Report
24. Dr. Dipak Panigrahy Expert Report
25. Dr. Silvina Pugliese Expert Report
26. Dr. Dario Roque Expert Report
27. Dr. Sameer Sharma Expert Report
28. Dr. Thomas Zoeller Expert Report
29. Dr. Lucile Adams-Campbell Expert Report
30. Dr. Lewis Chodosh Expert Report
31. Dr. Julie Goodman Expert Report (Filed under seal)
32. Dr. Douglas Weed Expert Report
33. Dr. Douglas Weed Deposition Transcript (April 8, 2026)

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams v. BRG Sports, Inc.*,
2021 WL 1517881 (N.D. Ill. Apr. 17, 2021) ....................19

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....................97

*Brooks v. Ingram Barge Co.*,
2008 WL 5070243 (N.D. Miss. Nov. 21, 2008) ....................31

*Brown v. Burlington N. Santa Fe Ry. Co.*,
765 F.3d 765 (7th Cir. 2014) ....................17

*Burst v. Shell Oil Co.*,
2015 WL 3755953 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016)....................35

*C.W. v. Textron*,
2014 WL 1047940 (N.D. Ind. 2014) *aff'd sub nom. C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015) ....................25

*C.W. v. Textron, Inc.*,
807 F.3d 827 (7th Cir. 2015) ....................3, 16, 18, 41

*Caraker v. Sandoz Pharmaceuticals Corp.*,
188 F. Supp. 2d 1026 (S.D. Ill. 2001)....................38, 47, 60, 65, 70

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ....................17

*Cunningham v. Masterwear, Inc.*,
2007 WL 1164832 (S.D. Ind. Apr. 19, 2017)....................27, 65

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................... *passim*

*Daubert v. Merrell Dow Pharms, Inc. (Daubert II)*,
43 F.3d 1311 (9th Cir. 1995) ....................45

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ....................17

*Ervin v. Johnson & Johnson, Inc.*,
492 F.3d 901 (7th Cir. 2007) ....................17, 19

*Gayton v. McCoy*,
593 F.3d 610 (7th Cir. 2010) ....................................................................................65

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)........................................................................................... *passim*

*Gilbert v. Lands' End Inc.*,
158 F. 4th 839 (7th Cir. 2025) ..................................................................6, 33, 36, 40

*Glastetter v. Novartis Pharms. Corp.*,
252 F.3d 986 (8th Cir. 2001) ...........................................................................17, 22

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) ...................................................................................17

*Hall v. Baxter Healthcare Corp.*,
947 F. Supp. 1387 (D. Or. 1996) .............................................................................46

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021)..........................................................................19, 27

*Heller v. Shaw Indus., Inc.*,
167 F.3d 146 (3d Cir. 1999).....................................................................................97

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009).................................................................28

*Hostetler v. Johnson Controls, Inc.*,
2020 WL 5543081 (N.D. Ind. Sept. 16, 2020) ..........................................................28

*In re Abbott Lab'ys*,
2025 WL 1282749 (N.D. Ill. May 2, 2025)...............................................................52

*In re Acetaminophen*,
707 F. Supp. 3d 309 (S.D.N.Y. 2023)..............................................................47, 49

*In re Acetaminophen ASD-ADHD Prods. Liab. Litig.*,
2024 WL 3357608 (S.D.N.Y. July 10, 2024) ............................................................34

*In re Baby Food Prods. Liab. Litig.*,
2026 WL 559857 (N.D. Cal. Feb. 27, 2026) ..................................................... *passim*

*In re Bextra and Celebrex Mktg Sales Pracs. and Prod. Liab. Litig.*,
524 F.Supp.2d 1166 (N.D. Cal. 2007) ......................................................................25

*In re Deepwater Horizon Belo Cases*,
2022 WL 17721595 (N.D. Fla. Dec. 15, 2022), *aff'd*, 119 F.4th 937
(11th Cir. 2024)..........................................................................................................36

*In re Deepwater Horizon Belo Cases*,
2024 WL 4349466 (N.D. Fla. Sept. 30, 2024)....................45

*In re Denture Cream Products Liability Litigation*,
795 F. Supp. 2d 1345 (S.D. Fla. 2011)....................27

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
337 F. Supp. 3d 728 (S.D. Ohio 2015)....................31

*In re Flint Water Cases*,
2024 WL 21786 (E.D. Mich. Jan. 2, 2024)....................48

*In re Hanford Nuclear Rsrv. Litig.*,
292 F.3d 1124 (9th Cir. 2002)....................19

*In re In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018)....................19, 44, 45, 48, 55

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
982 F.3d 113 (2d Cir. 2020)....................16

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir.1994)....................97

*In re Paraquat Prods. Liab. Litig.*,
730 F. Supp. 3d 793 (S.D. Ill. 2024).................... *passim*

*In re Roundup Prods. Liab. Litig.*,
390 F. Supp. 3d 1102 (N.D. Cal. 2018)....................19

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*,
2017 WL 1833173 (N.D. Ill. May 8, 2017)....................38

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
644 F. Supp. 3d 1075 (S.D. Fla. 2022)....................16, 18, 35, 67

*In re Zoloft Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017).................... *passim*

*Johnson v. Edward Orton, Jr. Ceramic Found.*,
2021 WL 5493231 (N.D. Ill. Nov. 23, 2021) (Rowland, J.), *rev'd on other grounds*, 71 F.4th 601 (7th Cir. 2023)....................28

*Kaoui v. BP Expl. & Prod., Inc.*,
2023 WL 330510 (E.D. La. Jan. 12, 2023)....................33

*Krik v. Exxon Mobil Corp.*,
870 F.3d 669 (7th Cir. 2017) ....................17, 28, 60, 90

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................16, 58

*Lapsley v. Xtek, Inc.*,
689 F.3d 802 (7th Cir. 2012) ....................17

*Lucido v. Nestle Purina Petcare Company*,
217 F. Supp. 3d 1098 (N.D. Cal. 2016)....................30

*Lust v. Merrell Dow Pharmaceuticals, Inc.*,
89 F.3d 594 (9th Cir. 1996) ....................56

*Mahler v. Vitamin Shoppe Indus., Inc.*,
2023 WL 6141369 (N.D. Ill. September 20, 2023) ....................27

*Mason v. Texaco, Inc.*,
741 F. Supp. 1472 (D. Kan. 1990) ....................65

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005)....................22, 27, 30

*Mid-State Fertilizer v. Exchange Nat'l Bank*,
877 F.2d 1333 (7th Cir. 1989)....................67

*Myers v. Ill. Cent. R.R. Co.*,
629 F.3d 639 (7th Cir. 2010) ....................17

*Rains v. PPG Indus.*,
361 F. Supp. 2d 829 (S.D. Ill. 2004)....................53

*Rider v. Sandoz Pharm. Corp.*,
295 F.3d 1194 (11th Cir. 2002)....................22, 41

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996)....................1, 43, 67

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ....................65

*Solaia Technology LLC v. ArwinMeritor, Inc.*,
361 F.Supp.2d 797 (N.D. Ill. 2005) ....................69

*Sutera v. Perrier Grp. of Am. Inc.*,
986 F. Supp. 655 (D. Mass. 1997) ....................65

*Timm v. Goodyear Dunlop Tires N. Am., Ltd.*,
932 F.3d 986 (7th Cir. 2019)....................66, 74

*Varlen Corp. v. Liberty Mut. Ins. Co.*,
924 F.3d 456 (7th Cir. 2019)....................18

*Wintz by & Through Wintz v. Northrop Corp.*,
110 F.3d 508 (7th Cir. 1997)....................27

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
636 F.3d 874 (7th Cir. 2011....................48

*Zenith Elec. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005)....................58

*Zurbriggen v. Twin Hill Acquisition Co.*,
2025 WL 1092973 (N.D. Ill. April 11, 2025).................... *passim*

**Statutes**

Fed. R. Civ. P. 26....................56

Fed. R. Evid. 702.................... *passim*

**Other Authorities**

Maxwell Akonde et al., *Cigarette Smoking in Relation to Survival in Black Women with Ovarian Cancer: Evidence from the African American Cancer Epidemiology Study (AACES)*,
104 Annals of Epidemiology 48, 53 (2025)....................37, 57

Bertrand, et al., *Hair relaxer use and risk of uterine cancer in the Black Women's Health Study*,
239 Env't Rsch. 117228 (2023).................... *passim*

Boston University Slone Epidemiology Center, *Black Women's Health Study: History*, https://www.bu.edu/bwhs/history/ (last visited May 3, 2026)....................11

Boston University Slone Epidemiology Center, *Black Women's Health Study*, https://www.bu.edu/bwhs/ (last visited May 3, 2026)....................11

Boston University Slone Epidemiology Center, *Black Women's Health Study: Publications*, https://www.bu.edu/bwhs/research/publications (last visited May 3, 2026)....................12

Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, 114 J. Nat'l Cancer Inst. 1636 (2022) ............................................................. *passim*

Corey, et al., *Impact of Positive Cytology in Uterine Serous Carcinoma: A Reassessment*, 37 Gynecologic Oncology Reps. 1, 3-5 (2021) ........................................................57

Eaton, 12 J.L. & Pol'y 1 (2003) ..........................................................................51, 52

EPA, *Cancer Human Health Hazard Assessment for Di(2-ethylhexyl) Phthalate (DEHP), Dibutyl Phthalate (DBP), Butyl Benzyl Phthalate (BBP), DiisobutylPhthalate (DIPB), and DicyclohexylPhthalate (DCHP)*, EPA-740-R-25-029 (2025) ..................................................................................93

Green, *et al*., Reference Guide on Epidemiology, in *Reference Manual on Scientific Evidence* 551 (Fed. Jud. Ctr. 3d ed. 2011) ....................................................................... *passim*

Helm, J.S., et al., *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*, 165 Environ. Res. 448 (2018) ........................................................................76

Hernandez, et al., *Systematic Review of the Epidemiology of Hair Relaxer Use and Hormone-Sensitive Reproductive Outcomes Among Black Adult Women in the United States*, Journal of Applied Toxicology (2025) ............................................................. *passim*

Lee, H, Park, J, Park K., *Effects of consumer products chemicals ingredients and their mixtures on the estrogen receptor/androgen receptor transcriptional activation*, 302 Cheosphere 134866 (2022) .........................94

Nat'l Inst. of Env't Health Sci., *The Sister Study: About the Study*, https://sisterstudy.niehs.nih.gov/English/about.htm (last visited May 3, 2026) ..........................................................................................................7

Nat'l Toxicology Program, U.S. Dept. of Health & Hum. Servs., Handbook on Methods for Conducting Cancer Hazard Evaluations: NTP Report on Carcinogens (June 2025), https://ntp.niehs.nih.gov/sites/default/files/2025-05/handbook_roc_508.pdf ...........................................................................82

Hyo K. Park et al., *Benign Gynecologic Conditions Are Associated With Ovarian Cancer Risk In African-American Women: A Case-Control Study*, 29 Cancer Causes & Control 1081 (2018) .....................................................58

Pierce, et al., *Evaluation of Dermal Exposure to Phthalates and Parabens Resulting from the Use of Hair Relaxers*, 35 Intl. J. Env. Health Res. 1707-1726 (2025) ..........62

Reeves, et al., *Urinary Phthalate Biomarker Concentrations and Postmenopausal Breast Cancer Risk*, 111 J. Nat'l Cancer Inst. 1059, 1059 (2019)..........58

Schildroth, et al., *Hair Product Use and Urinary Biomarker Concentrations of Non-Persistent Endocrine Disrupting Chemicals Among Reproductive-Aged Black Women*, 361 Chemosphere 142442 (2024)..........63

Gold, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence*, 897 (Fed. Jud. Ctr. 4th ed. 2025)..........33

Tarney, et al., *Impact of Age at Diagnosis on Racial Disparities in Endometrial Cancer Patients*, 149 Gynecol. Oncol. 12 (2018)..........59

White, et al., *Use of Hair Products in Relation to Ovarian Cancer Risk*, 42 Carcinogenesis 1191 (2021) .......... *passim*

## INTRODUCTION

"[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it."

*Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

Judge Posner's instruction is particularly apt in this case. Plaintiffs' general causation experts have expressed a wide range of hypothetical theories to support the ultimate general causation opinion that use of chemical hair relaxers can cause ovarian or uterine cancer. This opinion, however, rests on a multi-layered inferential chain: weak and inconsistent epidemiologic associations, mechanistic hypotheses concerning endocrine disruption and carcinogenesis, theoretical dermal absorption pathways, and speculative ingredient and "mixture" effects. What is noticeably absent is what Federal Rule of Evidence 702 requires—a reliable, scientifically grounded methodology rigorously applied to sufficient facts and data. Instead, the proffered opinions reflect a results-oriented exercise in assembling litigation-driven narratives from weak and inconclusive science. That failure permeates each of Plaintiffs' ten general causation experts' opinions, and is dispositive of this motion.

***First***, Plaintiffs' experts cannot identify the foundational facts necessary to support a general causation opinion. *See* Fed. R. Evid. 702(b). Their theories are just that—theories. They have hypothesized potential mechanisms but have done nothing to test them and have no data to support them. Despite opining that chemical hair relaxers cause uterine and ovarian cancer, they point to no specific chemical or set of chemicals present in chemical hair relaxer products that are actually capable of causing uterine or ovarian cancer, no threshold dose at which those chemicals allegedly cause uterine or ovarian cancer, no evidence of supposedly "combined" effects of multiple chemicals, and no mechanism

operating at human-relevant exposure levels. Nor do Plaintiffs' experts account for the variability in ingredients across hundreds of different chemical hair relaxer products sold by dozens of Defendants over the course of nearly half a century. Without those fundamentals, their theory fails at the outset.

***Second***, the limited epidemiology on which Plaintiffs' experts rely does not support a valid association (let alone causation) between chemical hair relaxers and either uterine or ovarian cancer. There are only *two* epidemiological studies addressing chemical hair relaxers and uterine cancer (*Chang* and *Bertrand*)[1] and only *one* addressing ovarian cancer (*White*)[2], which even the studies' own authors do not assert establish causation; rather, they characterize their findings as novel and warranting further research. And for good reason: at most, these studies report modest, inconsistent associations, insufficient to rule out chance. Two of the three studies (*Chang* and *White*) do not even isolate or distinguish chemical hair relaxers from unrelated hair treatment products, making it impossible to attribute any observed association to chemical hair relaxers alone. Such tenuous associations cannot support a causal analysis. Yet Plaintiffs' experts cherry-pick limited favorable findings while ignoring the vast majority of non-statistically significant results and use them as a springboard for increasingly attenuated inferences.

---

[1] *See* Bertrand, et al., *Hair relaxer use and risk of uterine cancer in the Black Women's Health Study*, 239 Env't Rsch. 117228 (2023) (Ex. 1); Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, 114 J. Nat'l Cancer Inst. 1636 (2022) (Ex. 2).

[2] White et al., *Use of Hair Products in Relation to Ovarian Cancer Risk*, 42 Carcinogenesis 1191 (2021) (Ex. 4).

***Third***, Plaintiffs' experts' attempt to move from mere *association* to *causation*—for which they purport to utilize the Bradford Hill criteria—is not a disciplined application of a causal analysis, but a results-driven exercise built on data too weak to support it.

Rule 702 demands proof of sufficient facts or data and a reliable causal methodology, not a chain of speculation, hypotheticals and possibilities. Where, as here, experts stack one inference atop another to bridge evidentiary gaps, in an effort to support a predetermined outcome, exclusion is required because "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also C.W. v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015). The chasm here between Plaintiffs' experts' theories and the science is simply too great; their general causation experts' opinions should be excluded.

## BACKGROUND

## I. CHEMICAL HAIR RELAXERS

"Hair relaxers" are not a single product. They are a broad category of cosmetic products designed to break the chemical bonds within the hair shaft to permanently alter the structure so that it appears straighter, or less tightly curled. The category has included different formulations over time, including lye and no-lye products, sold by many different manufacturers and brands. That heterogeneity matters: different products are packaged and sold differently, ingredients vary significantly across product lines and have changed over time, and many manufacturers not named in this litigation have sold chemical hair relaxers over the years.

The published literature recognizes that hair relaxer products may contain differing ingredients, that specific formulations are proprietary and that they are not uniform across products or over time. *See, e.g.*, Hernandez, et al., *Systematic Review of the Epidemiology*

*of Hair Relaxer Use and Hormone-Sensitive Reproductive Outcomes Among Black Adult Women in the United States*, Journal of Applied Toxicology (2025) (Ex. 3) at 2; *see also* Cote Rep. (Ex. 22) at 12 (acknowledging that chemical hair relaxers are "complex . . . mixtures of various chemicals").

Just as importantly, hair relaxers are not the only hair care products used to straighten hair. Numerous products can be used for a more temporary straightening – products ranging from flat irons and hot combs to "smoothing" methods known as Brazilian or Japanese straightening. Unlike chemical hair relaxers, heat is an essential component of these processes. *See* Cote Tr. (Ex. 8) at 135; *see also Hernandez* at 2. As distinguished from these other straightening products, the vast majority of chemical hair relaxer users are Black/African American women. *E.g.*, Cote Tr. at 66-68. Understanding the differing products and the populations who use them is a critical datapoint necessary to the evaluation of any studies at issue in this case, as the breadth of products and lack of uniformity makes broad generalities about their ingredients, their usage patterns and thus their impact impossible.

## II. CHEMICALS ALLEGEDLY CONTAINED IN HAIR RELAXERS

Nowhere do Plaintiffs' experts identify any specific chemicals, or defined set of chemicals, much less concentrations, across *all* of the products named in this litigation that are allegedly responsible for causing Plaintiffs' injuries. Instead, some of their experts identify myriad chemicals that *might* be present in *some* hair relaxer products, and assume they may be involved (either alone or in combination) in causing uterine or ovarian cancer. This failure is not surprising since, as noted above, there is no singular formula.

Though different Plaintiffs' experts refer to different groups or classes of chemicals, they generally include the following: parabens, phthalates, phenols,

formaldehyde, ethylene oxide, 1,4-dioxane, nitrosamines, NDMA, benzophenones, cyclic siloxanes, and diethanolamine.[3] Yet, Plaintiffs' experts do not identify *which* (putting aside how much) of these chemicals are present in *which* hair relaxer product(s) or whether they appear in any Defendants' products at all.[4] Importantly, each of these chemicals or chemical classes have been extensively studied, and none has been shown to cause uterine or ovarian cancer in humans (let alone at doses present in hair relaxers). *See* Chodosh Rep. at ¶¶ 199-337 (summarizing the extensive body of experimental evidence on these ingredients); Goodman Rep. (Ex. 31) at 48-71 (same). Indeed, Plaintiffs' experts readily concede that studies of these ingredients do not demonstrate they can cause uterine or ovarian cancer.[5]

---

[3] *See, e.g.,* Chang Rep. (Ex. 21) at 8 (discussing phthalates, parabens, and phenols); Atwood Rep. (Ex. 19) at 4 (referring to formaldehyde, parabens, phthalates, ethylene oxide, 1,4-dioxane, diethanolamine, and nitrosamines); Cote Rep. at 12 (referring to formaldehyde, parabens, phenols, and phthalates); Zoeller Rep. (Ex. 28) at 42 (discussing benzophenones, phthalates, parabens, siloxanes, formaldehyde, 1,4-dioxane, ethylene oxide, and nitrosamines); Panigrahy Rep. (Ex. 24) at 25-26 (discussing formaldehyde, ethylene oxide, 1,4-dioxane, acrylamide, parabens, phthalates, benzophenones, N-Nitrosodiethanolamine, NDMA, Polycyclic aromatic hydrocarbons, and arsenic); Crowley Rep. (Ex. 23) at 27 (similar). Plaintiffs' experts also refer generically to "endocrine disrupting chemicals" (EDCs), a broad category of hundreds or thousands of chemicals that have the potential to interfere with some element of endocrine function (*i.e.* hormones), but which do not have uniform effects, if any, on human health outcomes. *See* Chodosh Rep. (Ex. 30) at 42-43.

[4] *E.g.,* Chang Tr. (Ex. 11) at 106-07 (Dr. Chang "tried" to review ingredient lists for a "couple" of products, and "assumed" substances were present); Cote Tr. (Ex. 12) at 364-65 ("I do not know which specific products contain which specific chemicals now or in the past. . . . I don't know what the specific components are."); Crowley Tr. (Ex. 13) at 82-83, 121-123, 171-72 (Dr. Crowley did not confirm that each chemical he identified was present in each defendant's products, and he does not know how many of a specific defendant's products contained a particular chemical); Atwood Tr. (Ex. 9) at 265, 268-78 (Mr. Atwood could not identify any authority supporting that cyclosiloxanes, ethylene oxide, 1,4 dioxane, or nitrosamines are present in hair relaxers).

[5] *E.g.*, Atwood Tr. at 158, 168, 170-171, 185, 262-263, 278-279 (admitting that no studies report a causal association between exposure to formaldehyde, parabens, phthalates,

## III. THE EPIDEMIOLOGICAL RECORD

Epidemiology is the study of the "incidence, distribution, and etiology of disease in human populations." Michael D. Green *et al*., Reference Guide on Epidemiology, in *Reference Manual on Scientific Evidence* 551 (Fed. Jud. Ctr. 3d ed. 2011) (hereinafter cited as "*RMSE*").[6] "Epidemiologic evidence identifies agents that are associated with an increased risk of disease," but, importantly, "*an association is not equivalent to causation.*" *Id.* at 552 (emphasis in original). An epidemiological causation analysis follows a disciplined two-step sequence. First, it asks whether there is an association between an agent and a disease—*i.e.*, whether they occur more frequently together than would be expected by chance. Only then, if an association is established, does it ask whether that association is causal. *Id.* at 566, 597.[7]

Only three published epidemiological articles form the foundation of Plaintiffs' experts' opinions: *Bertrand, Chang*, and *White*. These three articles analyze data collected

nitrosamines, or diethanolamine and either uterine or ovarian cancer in humans); Panigrahy Tr. (Ex. 14) at 124 (conceding that neither the International Agency for Research on Cancer (IARC) nor the National Toxicology Program (NTP) has concluded that *any* of the eleven chemicals he identifies causes uterine or ovarian cancer in humans).

[6] The RMSE is recognized by the Seventh Circuit as an authoritative text in Rule 702 challenges. *See, e.g.*, *Gilbert v. Lands' End Inc.*, 158 F. 4th 839, 850 (7th Cir. 2025).

[7] Animal studies and other experimental evidence can serve a different, but limited, role. While animal studies allow "controlled and measured" exposures and conditions, their relevance in toxic tort cases is constrained by fundamental limitations. *Id.* at 563. Most notably, to be relevant, animal findings must be extrapolated across species despite "differences in absorption, metabolism, and other factors, [which] may result in interspecies variation in response," *id.*, and typically utilize "high doses" which may far exceed real-world human exposures. *Id.* For those reasons, animal studies do not establish human causation on their own. Instead, at best, they "play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiological studies." *Id.*

from two cohort studies—the Sister Study and the Black Women's Health Study ("BWHS")—that followed large groups of women to help generate hypotheses for further, more focused study. In a cohort study, researchers "define a study population without regard to the participants' disease status" and subsequently "classify the study participants into groups based on whether they were exposed to the agent of interest." *RMSE* at 557.

Neither the Sister Study nor the BWHS was designed to study the association between chemical hair relaxer use and ovarian or uterine cancer. And neither study collected data on, and thus no article reports data on, any particular Defendant's products, formulation, or ingredient. Cote Tr. at 156, 256.

**A. The Sister Study**

The Sister Study is a nationwide, prospective cohort created to study environmental and lifestyle risk factors for breast cancer and other health outcomes in women.[8] Women were enrolled from 2003 to 2009 based on specific criteria, including having a sister with breast cancer, rendering the cohort a "higher-risk cohort" than the general population.[9] Critical here, the cohort includes only a small proportion of Black participants: just 3,418 (8%) of the 50,884 total women enrolled.[10] Over 300 research papers examining a broad range of health conditions and exposures have been published using data from the Sister Study cohort.[11]

---

[8] Nat'l Inst. of Env't Health Sci., *The Sister Study: About the Study*, https://sisterstudy.niehs.nih.gov/English/about.htm (last visited May 3, 2026).

[9] *Hernandez* at 20. *See also Bertrand* at 6.

[10] *See White* at 1191.

[11] Nat'l Inst. of Env't Health Sci., *The Sister Study: Articles*, https://sisterstudy.niehs.nih.gov/English/articles.htm (last visited May 3, 2026).

At enrollment, Sister Study participants completed a baseline questionnaire covering a wide range of topics. Additional participant information, including health and lifestyle information, was collected through regular follow-up questionnaires. The initial questionnaire (and only the initial questionnaire) asked participants about use in the prior 12 months of "straighteners, relaxers, or pressing products," a broad, undifferentiated category encompassing numerous and materially different products beyond hair relaxers. *Chang* at 1637. Participants were never asked to specify use of chemical hair relaxer products or identify any particular hair product used. *Id.* at 1641 ("Brands or ingredients of hair products were not collected"). Thus, for any given participant in the Sister Study who self-reported as a product user, "we do not know whether or not they have ever used a chemical hair relaxer product." Cote Tr. at 155-56. Compounding these limitations, the initial questionnaire's "exposure" assessment relies entirely on participants' self-reported product use during *only* the prior 12 months and therefore could not evaluate "product use behaviors and product formulations" that "may vary over time." *Chang* at 1642.

Two of the hundreds of papers published out of the Sister Study have been cited by Plaintiffs' experts as central to this litigation: *White's* "*Use of hair products in relation to ovarian cancer risk"* and *Chang's "Use of Straighteners and Other Hair Products and Incident Uterine Cancer."*

- ***White, et al.*** **– Ovarian Cancer**

*White.* analyzed data from the Sister Study to "evaluate the association between use of specific hair products during adulthood in relation to incident ovarian cancer." *White* at 1189. After exclusions, the analysis included 40,559 women, among whom 241 ovarian-cancer cases were identified over a mean follow-up period of approximately 10 years. The authors reported that "ever" use of straighteners/relaxers or pressing products in the prior

12 months did **not** result in a statistically significant increase in the risk of ovarian cancer, with a hazard ratio ("HR") of 1.29 (95% confidence interval or "CI": 0.70-2.38). *White* at 1192 (Table 2).[12] "Frequent use" of "straighteners/relaxers or pressing products" (>4 times/year in prior 12 months) was associated with an increased ovarian cancer HR of 2.19 (95% CI: 1.12–4.27). *White* at 1193 (Table 3). As discussed above, however, that result is based on a broad, undifferentiated exposure category and does not isolate hair relaxers, much less any particular formulation or ingredient. Tellingly, the association between product use and ovarian cancer for Black women—the population most likely to have used hair relaxers as opposed to the straightener and pressing products included in the study—was not statistically significant. *Id.* at 1194 (Table 5).[13] At bottom, the study does not establish that chemical hair relaxers, much less any particular hair relaxer product, ingredient, formulation, or manufacturer, are capable of causing ovarian cancer. Indeed, given these limitations, the study authors recognized their results may generate no more than a preliminary hypothesis about a broad category of self-reported product use in this selected cohort, explicitly referring to the "novelty" of their findings and the need for "more research." *Id.* at 1195.

[12] A hazard ratio (or risk estimate) above 1.0 represents a positive association between an exposure and outcome, and a hazard ratio below 1.0 represents a negative association between an exposure and an outcome. A "confidence interval provides a range of values around the reported risk estimate that are consistent with the data." Adams-Campbell Rep. (Ex. 29) at 12. A "confidence interval" that includes 1.0 "is, by definition, not statistically significant," Cote Tr. at 109, such that chance cannot be excluded as an explanation for the result, *id*. at 115. *See also* RMSE at 621.

[13] Unlike straighteners or pressing products, Black women are far more likely than women of other races to use chemical hair relaxers. *See* Cote Tr. at 66; Cote Rep. at 12.

Notably, *White* is the ***only*** epidemiological publication in which the outcome measured is ovarian cancer and the exposure in question potentially includes chemical hair relaxers —meaning there is no published study reporting on the incidence of ovarian cancer specifically among users of chemical hair relaxers. Cote Tr. at 198.

- ***Chang, et al.*** **– Uterine Cancer**

*Chang* (2022) evaluated 33,947 Sister Study participants, among whom 378 incident uterine cancer cases were identified over a 10.9-year follow-up. As in *White*, the relevant exposure (for purposes of this litigation) was defined broadly as self-reported use of "straighteners, relaxers, or pressing products" in the prior 12 months. Most participants (90.9%) reported no use during that period, while 9.1% were classified as "ever users." *Chang* at 1640 (Table 2).

The study reported that uterine cancer was statistically significantly associated with "ever use" of the combined "straighteners, relaxers, or pressing products" exposure category (HR 1.80; 95% CI 1.12–2.88) and with "frequent use" (>4 times/year) (HR 2.55; 95% CI 1.46–4.45), while there was no statistically significant association between "infrequent use" (≤4 times/year) and uterine cancer (HR 1.20; 95% CI 0.63–2.29). *Id.* at 1640 (Table 2), 1641 (Table 3). Further, the association was observed among postmenopausal women ("ever use": HR 1.90; 95% CI 1.16–3.13; "frequent use": HR 2.52; 95% CI 1.39-4.55) but not premenopausal women ("ever use": HR 1.56; 95% CI 0.26–9.29; "frequent use": HR 1.56; 95% CI 0.26-9.29). *Id.* at 1642 (Table 4). Notably, no statistically significant associations were reported among Black women, including for "ever use" (HR 1.66; 95% CI 0.67–4.09) *or* "frequent use" (HR 2.12; 95% CI 0.83–5.39), despite this group having the highest prevalence of hair relaxer use. *See Id.* at 1643 (Table 5). On the other hand, the reported associations between "ever" and "frequent" product use

and uterine cancer remained statistically significant among non-Hispanic White women, *id.*, a subgroup in which only 5% of women report regular use of hair relaxers. *See* Cote Rep. at 12.

Again like *White*, the *Chang* authors characterize their analysis as novel, stating: "To our knowledge, this is **the *first* epidemiologic study investigating the relationship between straightener use and uterine cancer.**" *Chang* at 1639 (emphasis added). They further acknowledged key limitations, including the failure to collect information on specific brands and ingredients, which meant the authors could not identify any specific chemicals potentially associated with the observed findings, and emphasized that additional research is needed, particularly in Black women. *Id.* at 1642-43.

**B. The Black Women's Health Study**

The BWHS is an ongoing observational cohort begun in 1995 to examine risk factors for a range of conditions, including "hypertension, breast cancer at young ages, diabetes, stroke and lupus" among Black women in the United States.[14] The study has followed more than 59,000 Black women through periodic questionnaires and follow-up. "When the participants entered the study, they provided information on factors that might influence health and disease, such as contraceptive use, cigarette smoking, and diet. At regular intervals, participants provide updated information on these factors and on any illnesses they develop."[15] Information on participant hair relaxer use was collected *only once*, in 1997, and was not updated in any subsequent follow-up. More than 350 papers

[14] Boston University Slone Epidemiology Center, *Black Women's Health Study*, https://www.bu.edu/bwhs/ (last visited May 3, 2026).

[15] Boston University Slone Epidemiology Center, *Black Women's Health Study: History*, https://www.bu.edu/bwhs/history/ (last visited May 3, 2026).

have been published based on data from the BWHS, examining potential relationships between a range of exposures, including diet, environmental and social factors, and a range of health outcomes.[16] Only one of those, *Bertrand*, is relevant to this litigation and Plaintiffs' experts' general causation opinions.

- ***Bertrand, et al.* – Uterine Cancer**

*Bertrand*, is the *only* epidemiological publication to evaluate the effect of chemical hair relaxers in isolation—rather than as part of the broader, undifferentiated product category used in *White* and *Chang*—on the incidence of uterine cancer. Using BWHS data, *Bertrand* analyzed data from the 44,798 Black women followed through 2019, identifying 347 incidents of uterine cancer. Most notably, *Bertrand* found no statistically significant association in the primary analysis: between hair relaxer use and uterine cancer in the cohort overall. Among "heavy" ($\geq$15 years use and used at least 5 times/year) and "moderate" users, the hazard ratios were not statistically significant (HR: 1.18 (95% CI 0.81-1.71) and HR: 1.23 (95% CI 0.86-1.76), respectively) as compared to never/light users. *Bertrand* at 3 (Table 2). Chemical hair relaxer use likewise was not associated with a statistically significant increase in the incidence of uterine cancer, regardless of duration of hair relaxer use (measured in years), frequency of use (measured in number of uses per year), or age at first use. *Id.* A statistically significant increased risk appeared *only* in a single subgroup: postmenopausal women. Even there, however, a longer duration or greater frequency of hair relaxer use did not result in an increased incidence of uterine cancer (*i.e.*, there was no "dose-response"). *Id.* at 4 (Table 4).

[16] Boston University Slone Epidemiology Center, *Black Women's Health Study: Publications*, https://www.bu.edu/bwhs/research/publications (last visited May 3, 2026).

The *Bertrand* authors explicitly state, "Our findings highlight the importance of *continued research* regarding potential adverse health effects of exposure to chemical hair relaxers and their constituents." *Id.* at 5 (emphasis added). And as in *White* and *Chang*, *Bertrand* does not and cannot identify the specific hair relaxer products participants used, their chemical composition, the dose absorbed, or whether any particular brand or formulation (including any at issue in this litigation) was involved.

## IV. PLAINTIFFS' GENERAL CAUSATION EXPERTS

Plaintiffs offer ten general causation experts from multiple disciplines—epidemiology, dermatology, toxicology, cancer biology, gynecology/oncology, and organic chemistry. They offer building blocks of opinions, but ultimately they converge on a single conclusion: that use of chemical hair relaxers can cause uterine and/or ovarian cancer. Plaintiffs' ten general causation experts are:

- **Dr. Michelle Cote:** Dr. Cote, Plaintiffs' sole epidemiology expert,[17] opines that chemical hair relaxers can cause uterine and ovarian cancer based primarily on the limited observational data available from the three cohort papers described above, despite their largely non-statistically significant results and methodological constraints. Although she then invokes the Bradford Hill framework to reach her causation opinion,[18] she does not apply it reliably or in accordance with accepted practices. Rather, she cherry-picks data and selectively emphasizes certain criteria while improperly discounting or ignoring others.
- **Dr. Silvina Pugliese:** Dr. Pugliese, a dermatologist, offers opinions regarding dermal absorption. She opines that chemical hair relaxers can damage the scalp and compromise the skin barrier, thereby permitting chemical absorption into systemic circulation and rendering development of uterine or ovarian cancers "biologically plausible." Dr. Pugliese does not offer an opinion that hair relaxers cause cancer, nor does she quantify exposure, systemic dose, or the biological effect of any absorbed chemical. Instead, her analysis is limited to general concepts of skin permeability and

[17] Plaintiffs initially designated B. Burt Gerstman as an epidemiology expert as well, but withdrew him prior to his deposition.

[18] *See infra* at § III, describing the "Bradford Hill" framework, a causal analysis utilized by epidemiologists and recognized by courts.

theoretical absorption pathways, supplemented by analogies to unrelated topical medications. Her opinions thus address only the *possibility* of absorption in the abstract, without any product-specific, chemical-specific, or dose-related analysis connecting those concepts to carcinogenesis (let alone uterine or ovarian cancer development) in humans.

- **Dr. Clarence W. Brown, Jr.:** Dr. Brown, also a dermatologist, similarly addresses dermal absorption and does not offer an overall general causation opinion. He opines that the high pH of chemical hair relaxers can disrupt the scalp barrier, increase permeability, and allow chemicals to enter systemic circulation, which he contends provides a biologically plausible pathway for hair relaxers to cause uterine and ovarian cancer. Like Dr. Pugliese, Dr. Brown has not tested his theory and does not quantify exposure, measure systemic concentrations, or assess whether any absorbed chemicals cause ovarian or uterine cancer, let alone at the levels of absorption from use of chemical hair relaxers. His analysis extrapolates from general dermatologic principles and transdermal absorption concepts without any product-specific testing or dose evaluation. His opinions therefore assume, rather than demonstrate, that theoretical absorption could result in biologically meaningful exposure.

- **Dr. R. Jeffrey Chang:** Dr. Chang, a reproductive endocrinologist, opines that long-term chemical hair relaxer use can cause uterine and ovarian cancer, relying on epidemiologic studies, mechanistic literature involving endocrine-disrupting chemicals, and clinical analogies involving estrogen exposure. Like Drs. Pugliese and Brown, Dr. Chang does not identify specific chemicals present in Defendants' hair relaxer products that are capable of causing uterine or ovarian cancer, nor does he assess the dose, dermal absorption level, or binding affinity of the chemicals in hair relaxer products despite acknowledging these are critical measures for assessing causation. Rather, Dr. Chang extrapolates from *in vitro* and animal studies of EDCs as a class to human causation without addressing the specific chemicals at issue, their dose, exposure levels, or the relevance of those studies to real-world use. His analysis combines concepts from multiple disciplines—including epidemiology, toxicology, and exposure science—but he never articulates a coherent, reproducible methodology for synthesizing them into a valid causal determination.

- **Dr. Dario Roque:** Dr. Roque, a gynecologic oncologist, likewise concludes that chemical hair relaxers can cause uterine and ovarian cancer, applying a Bradford Hill framework despite never having utilized that methodology outside of this litigation. Nor does he apply it reliably: Dr. Roque admits that he assigned certain studies greater weight than others without articulating objective or reproducible criteria for doing so. He also concedes that certain Bradford Hill factors are not satisfied, yet dismisses those limitations while emphasizing factors that purportedly support his conclusion. His analysis thus lacks a transparent or systematic methodology capable of reliably establishing causation.

- **Dr. Sameer Sharma:** Dr. Sharma, also a gynecologic oncologist, opines that exposure to chemicals in hair relaxers can cause uterine and ovarian cancer. He relies primarily on the same three cohort studies above, purports to apply the Bradford Hill criteria, and supplements his analysis with mechanistic theories involving EDCs and estrogen

signaling. He assigns "great weight" to selected epidemiologic findings while discounting contrary evidence, including multiple systematic reviews that reached contrary conclusions. His application of the Bradford Hill criteria is selective and outcome-driven, and his opinions rely on generalized mechanistic concepts rather than a disciplined assessment of causation specific to the chemicals (which he cannot identify) present in hair relaxers.

- **Stanley T. Atwood, MS:** Mr. Atwood, a toxicologist, identifies a collection of chemicals he believes *may* be present in chemical hair relaxers—or potentially generated during use—and characterizes them as a "complex mixture" capable of contributing to carcinogenesis. Mr. Atwood's analysis is not tied to any specific chemical, product-specific testing, or exposure assessment. He does not identify the chemicals present in the particular chemical hair relaxer products at issue, specify which chemicals are necessary to produce any effect, quantify exposure levels, or evaluate whether real-world use results in doses sufficient to cause the effects he describes.

- **Dr. Dipak Panigrahy:** Dr. Panigrahy, a cancer biologist, opines that it is more likely than not that chemical hair relaxers can cause uterine and ovarian cancer. He relies on mechanistic literature, the "key characteristics of carcinogens" framework, and a synthesis of epidemiologic and experimental studies to conclude that chemicals in hair relaxers act as tumor initiators and promoters, particularly when considered as mixtures. Dr. Panigrahy's analysis focuses on the theoretical properties of individual chemicals and general mechanisms of carcinogenesis, rather than product-specific exposure or human-relevant dose. He extrapolates from in vitro and animal studies—often conducted at high doses—to draw conclusions about real-world human exposure without accounting for dose, duration, or route. His approach conflates the existence of theoretical carcinogenic mechanisms with proof of causation under conditions of actual use.

- **Dr. Thomas Zoeller:** Dr. Zoeller, an endocrinologist, opines that it is biologically plausible that chemical hair relaxers cause uterine and ovarian cancer through endocrine-disrupting mechanisms. He focuses on estrogenic chemicals in these products, their interaction with estrogen receptors, and their purported potential to produce additive effects that promote carcinogenesis. Dr. Zoeller's framework rests on general principles of endocrine disruption and mixture effects rather than on evidence that the specific chemicals he identifies can cause uterine or ovarian cancer, or are present in the relevant chemical hair relaxer products at levels sufficient to produce those effects in humans. Notably, he disregards contrary available animal and human carcinogenicity data, focusing instead on the estrogenicity of EDCs in hair relaxer products, albeit recognizing that this does not establish carcinogenicity.

- **Dr. Michael M. Crowley:** Dr. Crowley, an organic chemist, analyzes the chemical composition of hair relaxers and identifies potential impurities, degradants, and reaction pathways. He opines that certain conditions—such as high pH and heat—could *theoretically* lead to the formation of reactive species, including formaldehyde and nitrosamines, and that these reactions *may* occur during product use. Dr. Crowley does not offer an opinion on causation, exposure, or dose. His analysis is limited to

theoretical chemical reactions and potential pathways, without testing actual products, demonstrating that such reactions occur at levels relevant to human health, or showing that the chemicals present or created can cause uterine or ovarian cancer in humans. His opinions therefore address chemical possibility rather than real-world risk or causation.

## LEGAL STANDARD

### I. RULE 702 AND THE COURT'S GATEKEEPING OBLIGATION

Because expert opinions "can be both powerful and quite misleading," the Supreme Court has directed that district courts must serve as gatekeepers to ensure expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 595 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). That gatekeeping function requires more than accepting an expert's conclusion at face value; rather, Rule 702 "requires" courts "to take a hard look at plaintiffs' experts' reports . . . to ensure reliability" and exclude those opinions connected to the data only by the expert's *ipse dixit* or an unsupported inferential leap. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II),* 982 F.3d 113, 123 (2d Cir. 2020); *see also Fed. R. Evid. 702 Advisory Committee's note to 2000 amendments* (recognizing court must "scrutinize" proposed expert testimony to ensure it meets requirements of Rule 702); *Joiner*, 522 U.S. at 146. This includes, *inter alia*, assessing whether the opinion is grounded in sufficient facts and data, whether it is the product of reliable principles and methods, and whether those principles and methods have been reliably applied to the facts of the case. Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 593–94; *C.W.,* 807 F.3d at 834 (the Court must examine "the soundness and care with which the expert arrived at her opinion"); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1102 (S.D. Fla. 2022) (in evaluating expert evidence, the Court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation by a genuine scientist") (*citing*

*Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014)); *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). The burden always rests on the party seeking to admit the expert to establish their admissibility by a preponderance of the evidence. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017); *see also Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

In the Seventh Circuit, the district court "must engage in a three-step analysis before admitting expert testimony": it must determine whether the witness is qualified, whether the expert's methodology is scientifically reliable, and whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue.[19] *Gopalratnam*, 877 F.3d at 779. In assessing reliability, the Seventh Circuit has emphasized that "the courtroom is not the place for scientific guesswork, even of the inspired sort," and excluded experts whose opinions were "properly characterized as a hunch or an informed guess." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010). Thus, Rule 702 requires courts to examine the inferential path from data to conclusion, not merely the expert's credentials or bottom-line assurance. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904–05 (7th Cir. 2007); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772–73 (7th Cir. 2014) (an "expert must do more than just state that she is applying a respected methodology; she must follow through with it,"; affirming exclusion of expert where "factual deficiencies or discrepancies" were "the result of [the expert's] faulty methods"); *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 675 (7th Cir. 2017) (affirming exclusion of

---

[19] Courts must also consider whether: (1) the testimony grows naturally out of research independent of litigation: (2) whether the expert has accounted for obvious alternative explanations; and (3) whether the expert applies the same level of intellectual rigor as in professional practice. Fed. R. Evid. 702 advisory committee's note (2000 amendments); *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).

experts who offered causation opinion "with little to no evaluation of the actual facts of this case"); *C.W.*, 807 F.3d at 837 (affirming exclusion of experts based on the "failure of the experts to connect the dots from the studies to the illnesses endured" by plaintiffs); *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 460 (7th Cir. 2019) (affirming exclusion of expert who "failed to demonstrate that his conclusions were anything more than guesses"). As *Varlen* held, an expert must "provide an explanation of how the evidence led to his conclusions"; otherwise, the opinion is no more than inadmissible speculation. *Id*.

Where an expert's opinions are "based on the data from . . . unreliable and unhelpful studies" and the experts do "nothing to verify the validity of [those] studies or results," their opinions are inadmissible. *In re Zantac*, 644 F. Supp. 3d at 1160. An expert must also offer a reliable methodology connecting any underlying studies to the specific harm at issue in the litigation. When "there is simply too great an analytical gap between the data and the opinion proffered," the expert's testimony must be excluded. *Joiner*, 522 U.S. at 146.

Those principles have particular force here. Plaintiffs must show, by a preponderance of the evidence, that each of their experts' challenged opinions rests on sufficient facts and data, reliable methods, and a rigorous application of those methods to the issue. Where, as here, the opinions rests on a chain of inferences stretching from inadequate ingredient and dose data to limited and inconsistent epidemiology to sweeping causal conclusions across hundreds of products that have changed over decades of alleged use, Rule 702 requires careful scrutiny and exclusion of the expert if any link in that chain breaks.

## II. <u>GENERAL CAUSATION</u>

Pursuant to Case Management Order 15, Plaintiffs' experts' opinions, and the Court's assessment, are limited to general causation, *i.e.*, "whether a substance is capable of causing a particular injury or condition in the general population." *Adams v. BRG Sports, Inc.*, 2021 WL 1517881, at *4 (N.D. Ill. Apr. 17, 2021); *see also Ervin*, 492 F.3d at 904. More precisely, general causation asks "whether exposure to a substance for which a defendant is responsible . . . at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in the general population." *In re Baby Food Prods. Liab. Litig.*, 2026 WL 559857, at *3 (N.D. Cal. Feb. 27, 2026) (citing *In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002)); *see also Hardeman v. Monsanto Co.*, 997 F.3d 941, 963 (9th Cir. 2021); *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115 (N.D. Cal. 2018) (noting it was not sufficient to show the pesticide at issue caused cancer generally, but that plaintiffs must show it caused the specific type of cancer alleged). If Plaintiffs' experts cannot reliably opine that the alleged chemicals in chemical hair relaxer products, when used in real world conditions, are capable of causing ovarian or uterine cancers, their opinions cannot proceed as a matter of law.

This requirement is especially critical in MDLs where general causation is often case-dispositive. For example, in *In re In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II)*, 341 F. Supp. 3d 213, 238 (S.D.N.Y. 2018), the court confronted a similarly sparse epidemiological record: before litigation, only two epidemiological studies examined whether the Mirena intrauterine device was associated with development of idiopathic intracranial hypertension ("IIH"). One study had been partially retracted and the other had "found a correlation between Mirena use and IIH, but it found only that." *Id.* at 238. Against that backdrop, "with no medical organization or

regulator or peer-reviewed scientific literature having found that Mirena or any contraceptive product using LNG is a cause of IIH, an expert witness who would so opine as to Mirena necessarily would break new ground in this litigation." *Id.* at 238-39. Such suspect conclusions—like those facing the Court here—warrant careful scrutiny before allowing them to proceed. The Court must therefore assess not only whether Plaintiffs' experts' say their methods and opinions are valid, but must look behind the curtain and examine whether they are.

## ARGUMENT

### I. PLAINTIFFS' EXPERTS' THEORIES LACK A RELIABLE FOUNDATION

Plaintiffs' experts assert, at bottom, that exposure to chemical hair relaxers causes uterine and ovarian cancer. When assessing similar claims, courts routinely hold that the claimants' experts must identify the allegedly harmful ingredient, whether the dose used is capable of causing the specifically alleged harm, and whether the necessary dose could be administered through product use. *E.g., In re Baby Food,* at *8, *24 (analyzing—and rejecting—experts' opinions because they failed to identify the "quantity of lead and arsenic consumed"; how much "is absorbed by the body"; and whether that level can cause the injury at issue). Yet Plaintiffs' experts here do not (i) identify any specific chemical allegedly present in each Defendant's chemical hair relaxer products or that the formulations are consistent across their products, (ii) show that any particular chemical allegedly present in hair relaxers is actually is capable of causing Plaintiffs' alleged injuries, (iii) identify a threshold dose at which any allegedly present chemical causes Plaintiffs' alleged injuries, or (iv) analyze whether or how any such substances reach the uterus or ovaries at any such dose. Instead, they invoke an amorphous "toxic mixture"

theory that dispenses with core principles of chemical identity, dose, and exposure while simultaneously asserting—without testing or other scientific support—that causation depends on the "combined" action of unidentified chemicals. Indeed, Dr. Panigrahy testified that the specific concentrations or percentages of ingredients in any particular product was "not relevant to [the] question that [he] was asked." Panigrahy Tr. at 138. Similarly, Dr. Chang testified that his "mandate" was only to opine on "the composite" and "not a singular class of compounds nor a singular compound in any of the classes," and that he simply "assumed" the chemicals he cited "had to be in" the hair relaxer products. Chang Tr. at 107, 394-95. [20] The results-driven nature of Plaintiffs' experts' approach is not science, and Rule 702 requires their exclusion. *In re Baby Food*, at *10 (excluding general causation experts relying on a hypothetical baby food menu that reflected a "lack of realism" to what children may actually have eaten).

### A. Plaintiffs' Experts Do Not Identify Any Particular Chemical Allegedly Present Across Defendants' Chemical Hair Relaxer Products

Plaintiffs' general causation theory fails because after nearly four years of litigation and extensive discovery of Defendants' formulas, Plaintiffs' experts still do not identify a specific chemical—or even a defined set of chemicals—present in Defendants' chemical hair relaxer products. They do not attempt to determine what chemicals are in the hundreds

[20] Similarly, Dr. Roque testified that he "had no reason to suspect that these products are any different as a class of products" but did not conduct his own analysis of specific products to determine what endocrine disrupting chemicals (EDCs) are (or are not) present. Roque Tr. at 360, 714-15. Dr. Zoeller testified that he did not "break the mixture down into individual units" to determine whether any individual chemical could cause cancer, but rather opines that it is the "combination" of some undefined set of chemicals that does so. Zoeller Tr. at 358. Yet, he also acknowledges that he "didn't quantitate" that effect. *Id.* at 371.

of products at issue, which products contain which chemicals, or whether any common set of chemicals exists across those products that could support a coherent causation theory.

Instead, Plaintiffs' experts refer generally to broad *classes* of chemicals (*e.g.*, parabens, phthalates, or phenols) among many that *may* be present in certain hair relaxers, without establishing that any such substances are in fact in any, let alone all, Defendants' hair relaxers. That level of generality is insufficient as a matter of law and science. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) (rejecting expert who "presumes the same effect" in different chemicals because "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced") (citing *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002) and *Glastetter*, 252 F.3d at 990).

Courts routinely exclude expert opinions that fail to identify the specific defect in the product at issue. In *Zurbriggen v. Twin Hill Acquisition Co*., 2025 WL 1092973 (N.D. Ill. April 11, 2025), current and former airline personnel sued American Airlines and clothing manufacturer Twin Hill for personal injuries allegedly caused by harmful chemicals in uniforms. The court excluded plaintiffs' experts because they did not identify a ***distinct chemical or chemicals*** responsible for plaintiffs' symptoms, finding the experts "did not purport to identify a chemical capable of triggering the reported symptoms in any environment, in any dosage, at any distance." *Id.* at 20.

The same deficiency pervades Plaintiffs' experts' opinions here. Dr. Chang could not identify the universe of chemicals he could have considered, and instead "tried" to review ingredient lists for a "couple" of products despite the hundreds of hair relaxer products at issue here. Chang Tr. at 106. Ultimately, he limited his analysis to parabens,

phthalates and phenols ("3Ps") as supposedly "representative" of an entire class of chemicals in hair relaxer products. *Id.* at 188. Instead of looking at company documents or formulation records, however, he ***assumed*** that all hair relaxers at issue contained one or more of the "3Ps" without taking any steps to verify his conclusory leap or identify specific chemicals within these broad classes. *Id.* at 42, 107-09. *See also, e.g.,* Cote Tr. at 357 ("I do not know the specific components and chemicals included in any specific hair product manufactured now, manufactured 20 years ago."); *id.* at 364-65 ("I do not know which specific products contain which specific chemicals now or in the past. . . . I don't know what the specific components are. It's really just this mixture of multiple chemicals."); Atwood Rep. ¶3.1 ("it was not necessary to identify which chemicals were the most responsible for the observed effects"); Atwood Tr. at 265, 268-69, 274-78 (unable to identify authority supporting that chemicals he references, including cyclosiloxanes, ethylene oxide, 1,4 dioxane, or nitrosamines, are present in any hair relaxers); Crowley Tr. at 82-83, 121-23, 171-72 (did not confirm that each chemical he identified was present in each Defendant's products, how many of a specific Defendant's products contained a particular chemical, or which component of a hair relaxer kit contained certain chemicals). Because Plaintiffs' experts lack even these basic facts and data, their causation opinions should be excluded under Rule 702.

### B. Plaintiffs' Experts Have Not Shown that Any Identified Chemicals or Chemical Classes Can Cause Uterine or Ovarian Cancer

The failure to point to any specific chemical (or defined set of chemicals) present across the Defendants' products is even more significant here because Plaintiffs' experts do not establish that any of the chemicals or chemical classes they generally reference can cause uterine or ovarian cancer. Indeed, they did not even try. For example, Dr. Cote "did

not review single chemicals, heavy metals, formaldehyde, single types of chemicals that are included in these chemical hair products and the risk of ovarian or the risk of uterine cancer." Cote Tr. at 375.

Mr. Atwood admitted that many of the individual chemicals he identified had "not been evaluated or identified as a carcinogen." Atwood Tr. at 169. But even that does not answer the ultimate question, because the injuries alleged here are ovarian or uterine cancer, not cancer generally. *In re Baby Food*, at *4 ("it is not enough to say the baby food can cause generalized neurological injury; rather, it must be the specific neurological injury alleged here."). And as Dr. Zoeller acknowledged, there is no single carcinogen that causes all known human cancers. Zoeller Tr. (Ex. 18) at 51.

Nor *could* Plaintiffs' experts establish a link between the chemicals they identify and either uterine or ovarian cancer because no study has demonstrated that. For example, Mr. Atwood concedes that exposure to formaldehyde has not been shown to be associated with, or cause, uterine or ovarian cancer, he is not aware of "any scientific studies reporting a causal association between parabens and uterine cancer," and there are no studies reporting a causal association between DEP or DEHP (phthalates), nitrosamines, or diethanolamine and uterine or ovarian cancer in humans. *Id.* at 158, 168, 170-71, 185, 262-63, 278-79. Dr. Panigrahy admits that neither IARC nor the NTP has concluded that *any* of the chemicals he identifies causes uterine or ovarian cancer in humans. [21] Panigrahy Tr.

[21] IARC is "the specialized cancer agency of the World Health Organization. . . . The objective of IARC is to promote international collaboration in cancer research. The Agency is interdisciplinary, bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer . . . ." *International Agency for Research on Cancer*, https://www.iarc.who.int/about-iarc-mission/. NTP, part of the U.S. Department of Health and Human Services, works to "identify potentially hazardous substances and

at 124. Dr. Zoeller identifies a "mixture" of eight chemicals that "create the highly plausible biological basis for the increased risk of uterine and ovarian cancer," but he readily acknowledges that looking for whether any of them had been shown to cause uterine or ovarian cancers "wasn't part of his opinion." Zoeller Rep. at 42; Zoeller Tr. at 313-14; *see also* Zoeller Tr. at 359 ("I didn't look to see whether this chemical produced that cancer.").[22]

Plaintiffs' experts' inability to identify any chemicals in hair relaxers that purportedly cause uterine or ovarian cancer is fatal to their causation opinions under Rule 702. *Zurbriggen*, 2025 WL 1092973, at *24 (excluding experts who did not identify distinct chemical(s) responsible for injuries).

**C. Plaintiffs' Experts Fail to Establish Dose or Exposure**

Plaintiffs' experts' causation theory independently fails because they do not address the most fundamental principle of toxicology: dose. It is axiomatic that "the dose makes the poison." *RMSE* at 636; *see also C.W. v. Textron*, 2014 WL 1047940, *6-7 (N.D. Ind. 2014) *aff'd sub nom.* 807 F.3d 827 (7th Cir. 2015) (rejecting expert who failed to present evidence that "the dosage of the substance the plaintiffs were exposed to is capable of causing the harms suffered," because "the dose makes the poison – i.e., a substance cannot be capable of causing the harms alleged if it's not present in sufficient quantities"); *In re Bextra and Celebrex Mktg Sales Pracs. and Prod. Liab. Litig.*, 524 F.Supp.2d 1166, 1174-

---

evaluate their effects for human health." *National Toxicology Program*, https://ntp.niehs.nih.gov/.

[22] Dr. Zoeller's opinion "as a scientist" as to "biological plausibility" admittedly concerns only "biological insights" into the issue. (Zoeller Rep. at 42). But the law requires more than just speculative ideas of what could be, it requires testing to support it.

75 (N.D. Cal. 2007) (collecting cases). The relevant inquiry is thus not only whether chemicals present in hair relaxers can cause uterine or ovarian cancer (which they do not, *supra* § I.B), but also whether use of any Defendant's chemical hair relaxer products under real-world conditions can deliver a *dose* of those chemicals sufficient to cause uterine and/or ovarian cancer. Even Dr. Chang acknowledges that dose can dictate the level of a hormonal change that, under Plaintiffs' experts' theory, is the mechanism for causing the alleged harm. Chang Tr. at 161, 210-11.

But Plaintiffs' experts offer no such analysis and provide no such data. Not one of Plaintiffs' experts attempted to quantify chemical exposure from hair relaxer products or identify any dose capable of causing uterine or ovarian cancer. Instead, they rely exclusively on impermissible "any exposure" and cumulative risk theories divorced from dose. Indeed, Dr. Panigrahy testified that *none* of the eleven chemicals require a threshold dose to be carcinogenic. *See* Panigrahy Tr. at 232 (there is "no threshold in this case" for any of the chemicals he identified). But he does not cite a single study supporting that conclusion. Dr. Cote similarly testified that there is no safe dose of chemical hair relaxer products, but she does not know the amount of any chemical contained in any hair relaxer product. Cote Tr. 344-45, 347. Dr. Zoeller likewise testified—without citation—that EDCs do not have a threshold for an adverse effect. Zoeller Tr. 225-29. And Mr. Atwood admitted that he "was not looking at any particular chemical" to establish required exposure levels. Atwood Tr. at 141.[23]

[23] Drs. Crowley and Chang also acknowledged that they did not perform any dose analysis. Crowley Tr. at 157, 166, 172; Chang Tr. at 165-68.

Their failure is dispositive. Courts routinely exclude causation opinions where experts do not identify the level of exposure necessary to cause the alleged harm. *See In re Denture Cream Products Liability Litigation*, 795 F. Supp. 2d 1345, 1352-53 (S.D. Fla. 2011) (excluding expert who failed to determine "how much Fixodent must be used for how long to increase the risk" of injury); *In re Baby Food*, at *10 (citing *Hardeman*, 997 F.3d at 963 (failure to identify realistic exposure to product or harmful ingredient rendered opinions unreliable). Indeed, courts have long held that "[s]cientific knowledge of the harmful level of exposure to a chemical" is a "minimal fact[] necessary to sustain the plaintiff's burden." *McClain*, 401 F.3d at 1241 (excluding expert who "offered no testimony about the dose of Metabolite required to injure Plaintiffs or anyone else. He could not say how much is too much.").[24]

Consistent with that requirement, the Seventh Circuit has rejected the kind of "any exposure" and cumulative theories advanced here because they ignore the dose-dependent nature of disease. In *Krik*, the Seventh Circuit affirmed the exclusion of expert testimony based on "each and every exposure" and "cumulative exposure" theories of causation in an asbestos case because the "any exposure theory ignored fundamental principles of toxicology that illnesses like cancer are dose dependent," and the expert's theory lacked

[24] Of course, if Plaintiffs' experts are not able to ascertain how much is required to cause injury, it is questionable how an expert could ever determine whether any individual plaintiff was exposed to a sufficient dose to cause her injury. *See, e.g., Wintz by & Through Wintz v. Northrop Corp.*, 110 F.3d 508, 514 (7th Cir. 1997) (affirming exclusion of plaintiff's toxicologist who gathered no information regarding the exposure to the chemical that allegedly caused plaintiff's birth defects); *Mahler v. Vitamin Shoppe Indus., Inc.*, 2023 WL 6141369, at *7 (N.D. Ill. September 20, 2023) (excluding expert who did not determine dose and duration of exposure to the chemicals at issue to which plaintiff was allegedly exposed by use of defendant's product); *Cunningham v. Masterwear, Inc.*, 007 WL 1164832, at *8 (S.D. Ind. Apr. 19, 2017) (causation expert excluded for failure to examine level of exposure to perchloroethylene because exposure may be medically insignificant).

any analysis of the amount, duration, or intensity of the plaintiff's exposure. 870 F.3d at 675-78 (internal quotations omitted).[25] Without such an analysis, the court held, causation becomes an inference untethered to evidence linking any particular exposure to the disease. *Id*. at 677; *see also, e.g.*, *Johnson v. Edward Orton, Jr. Ceramic Found.*, 2021 WL 5493231, at *2-3 (N.D. Ill. Nov. 23, 2021) (Rowland, J.), *rev'd on other grounds*, 71 F.4th 601 (7th Cir. 2023) (excluding expert testimony based on a "cumulative exposure" theory that failed to consider dose or the amount and duration of exposure, consistent with *Krik*); *Hostetler v. Johnson Controls, Inc.*, 2020 WL 5543081, at *5-6 (N.D. Ind. Sept. 16, 2020) (rejecting expert who failed to calculate exposure dose, recognizing that "an expert cannot avoid that problem [of determining dose] by asserting that there is no safe level of exposure" as that theory is not reliable).

In the absence of data demonstrating otherwise, Plaintiffs' experts' "no safe level" theory is fatally deficient. None of Plaintiffs' experts identifies a threshold dose for any alleged chemical, quantifies exposure from the products at issue, or demonstrates that real-world use of the products could result in a harmful dose. Without those essential showings, their general causation opinions are speculative, unreliable and must be excluded. *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1165-66 (E.D. Wash. 2009)) ("The use of the no safe level or linear 'no threshold' model for showing unreasonable risk flies in the face of the toxicological law of dose-response," and "cannot be falsified, nor can it be validated.").

---

[25] The court further explained the District Court's reasoning: "The law of causation, however, required the plaintiff to prove that the *defendants'* acts or products were a '*substantial* contributing factor' to Krik's illness. De minimis exposure is not sufficient . . . . And substantial exposure that cannot be attributed to a particular defendant is likewise insufficient." 870 F.3d at 675.

### D. Plaintiffs Lack Evidence That Chemicals in Hair Relaxers Act Together to Cause Uterine or Ovarian Cancer

Unable to show that any identified chemical (or class of chemicals) causes uterine or ovarian cancer and is present in all Defendants' hair relaxer products at a dose sufficient to cause uterine or ovarian cancer, Plaintiffs' experts pivot to the unsupported assertion that the chemicals in hair relaxers behave differently when used in combination, without alleging, much less substantiating, any "synergistic," cumulative or additive effect. The experts offer no cohesive theory or reliable scientific evidence demonstrating that any such interaction occurs and, instead, assume the very interaction they must prove.

Importantly, Plaintiff's experts make no attempt to identify the precise combination of chemicals necessary to create this combined impact. *See, e.g.,* Atwood Tr. at 193 ("Q: So as you sit here today, can you identify any single chemical that is a necessary component to create this mixture of chemicals that supports your biological plausibility opinions? A: No, I could not do that."); *see also* Cote Tr. at 364-65 ("I do not know which specific products contain which specific chemicals now or in the past. . . . I don't know what the specific components are. It's really just this mixture of multiple chemicals.").

Nor does any expert identify a study demonstrating a combined effect of any such mixture. When asked about the potency of the individual EDC chemicals discussed in his report, Dr. Zoeller testified that he was "really looking at the combination," while recognizing that "all of the [] studies are talking about individual chemicals." Zoeller Tr. at 370. Thus, he could offer no evidence of testing establishing the potency of the (ill-defined) combination of chemicals:

> Q: So just to make sure I'm clear, your theory is that although the individual EDCs might be weakly estrogenic, when combined in the mixture, they become potent?
> A: That it is a potent mixture. And I wasn't . . .
> Q: But you don't have any empirical or quantitative evidence for that?

A: I didn't quantitate . . .

*Id.* Dr. Panigrahy similarly admitted there is no publication examining the synergistic effect of all of the relevant chemicals he identifies in his report. Panigrahy Tr. at 270 (". . .we don't have a publication thankfully of all these carcinogens and human exposure."). Instead, he cites only to an article recognizing a "hypothesis" that "low-dose exposures to [mixtures of] disruptive chemicals that are not individually carcinogenic may be capable of instigating and/or enabling carcinogenesis." *Id.* at 280. But, as *Joiner* observed, where study authors are unwilling to conclude that an exposure caused the disease at issue, their study cannot support an expert's opinion to the contrary. 522 U.S. at 145. And no other expert identified studies demonstrating such an additive or synergistic effect. *See* Atwood Tr. at 348 (acknowledging he had "no data to specifically answer" whether there was a synergistic effect among EDCs in chemical hair relaxers); Chang Tr. at 482 ("Q: Is it your opinion that the chemicals in chemical hair relaxers, in that mixture . . . act in a cumulative/additive fashion or in a synergistic fashion or both? A: I can't say that because I don't know.").

Courts regularly reject such baseless, speculative reasoning. For example, the Eleventh Circuit in *McClain* excluded a combined-effects theory, holding the expert's failure to offer testing to support the theory was fatal: "There is no doubt that [the expert's] theory of the toxicity of the ephedrine/caffeine combination can be tested, as can most theories; but, he has offered no evidence of any testing of his theory, and therefore, he has shown no proof for support of his opinions by the scientific community." *McClain*, 401 F.3d at 1251. Similarly, in *Lucido v. Nestle Purina Petcare Company*, 217 F. Supp. 3d 1098, 1112 (N.D. Cal. 2016), the court excluded expert opinions that multiple contaminants

in dog food could produce adverse health effects through a synergistic interaction because the scientific literature cited by the expert did not actually study or support the claimed combined effects. 217 F. Supp. 3d at 1110; *see also Brooks v. Ingram Barge Co.*, 2008 WL 5070243, at *4 (N.D. Miss. Nov. 21, 2008) (excluding expert's proposed synergy theory as speculative and not grounded in rigorous scientific methodology); *In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 337 F. Supp. 3d 728 (S.D. Ohio 2015) (rejecting as speculative an expert's untested theory that obesity acted synergistically with C-8 to contribute to kidney cancer).

Here too, Plaintiffs' experts provide no support that any mixture of the chemicals they identify causes an effect that none of those chemicals have been shown to cause individually. Their speculative "mixture" theory is unreliable and should be excluded.

### E. Plaintiffs' Experts Fail to Establish that Any Identified Chemical Can Be Absorbed at a Rate to Meet Any Dose Threshold

The next link in Plaintiffs' experts' causal chain fails as well: their experts offer no evidence demonstrating that *any* chemical (or combination of chemicals) is ever *absorbed* into the body through hair relaxer use at a dose capable of causing some harm, much less ovarian or uterine cancer. In addition to failing to address *exposure* volume (*supra* § I.C), Plaintiffs' dermatology experts, Dr. Brown and Dr. Pugliese, provide no facts or data regarding realistic dermal absorption rates of chemical hair relaxers or any ingredient in any relaxer, systematic distribution, or target-organ dose. Brown Tr. (Ex. 10) 195-96, 299-300; Pugliese Tr. (Ex. 15) at 104-07, 171-73. Instead, they offer only hypothetical theories (including absorption through an "injured" scalp or persistence in the follicle sac) untethered to any empirical evidence. Yet these hypotheses have not been tested on any of the chemicals even alleged to be in chemical hair relaxers, despite their recognition that

dermal absorption differs depending on the size of the molecule. *See, e.g.,* Pugliese Tr. 212. A "plausible" theory is not one that can simply be imagined. "Scientific methodology," rather, requires "generating hypotheses *and testing them to see if they can be falsified.*" *Daubert*, 509 U.S. at 593 ("a key question to be answered [is] whether a theory . . . can be (and has been) tested") (emphasis added). Plaintiffs' experts fall well short of this requirement.

Beyond the speculative chain as to whether any chemicals could even penetrate the scalp, Dr. Brown concedes that he has not quantified a systemic dose of any chemicals from hair relaxer use, identified a uterine tissue concentration after application, calculated carcinogenic threshold exceedance, compared estimated exposure to animal tumor doses, or performed any ingredient-specific causal analysis. *See* Brown Tr. at 299-302. Indeed, he acknowledged that assessing whether the hair relaxer chemicals "must reach a sufficient concentration in the uterus to produce biological meaningful effects" was not even "part of the issues [he] was tasked to answer." *Id.* at 167-68. *See also, infra,* at § VI.B.1.

Dr. Pugliese likewise offers no information on realistic dermal exposure volume during normal chemical hair relaxer use, rate of absorption of a chemical hair relaxer or any ingredient, or systemic exposure following absorption. *See* Pugliese Rep. (Ex. 25), generally; Pugliese Tr. at 126–27; 146–47. She "did not find any papers that looked specifically at chemical hair relaxers as they're present in the mixture" and measured their absorption rates. Pugliese Tr. at 104; *see also id.* at 107 ("there was nothing that I found that looked at commercial available chemical hair relaxers and measured any absorption"); *id.* at 171-72 (agreeing that she did not find any evidence in the literature looking at exposure to chemical hair relaxers and paraben or phthalate absorption specifically). In

fact, like Dr. Brown, Dr. Pugliese testified that she did not believe a dose or amount of exposure to chemical hair relaxer was "pertinent" to formulating her opinion at all. *Id.* at 104, 127. No other expert provided any evidence supporting dermal absorption or the resulting levels in the ovaries or uterus.[26] *See also, infra,* at § VI.B.2.

Courts regularly exclude such theoretical but scientifically baseless opinions. In *Kaoui v. BP Expl. & Prod., Inc.*, the court excluded a general causation expert who, despite at least presenting some threshold dose data, nonetheless failed to provide minimal risk levels for dermal exposure. 2023 WL 330510, *7 (E.D. La. Jan. 12, 2023) (holding that "[t]he lack of any data demonstrating the minimum level of exposure to chemicals found within crude oil necessary to cause adverse health effects via dermal exposure . . . render[ed] these figures unhelpful, unreliable, and irrelevant."). Here, Plaintiffs' experts offer even less, requiring exclusion of their unreliable opinions.

## II. PLAINTIFFS' EXPERTS CANNOT RELIABLY OPINE THAT THERE IS A VALID ASSOCIATION BETWEEN HAIR RELAXER USE AND EITHER UTERINE OR OVARIAN CANCER

"Before epidemiologists can draw conclusions about causation, they must assess whether there is an *association* between an exposure to the agent and the disease in question." *In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 810 (S.D. Ill. 2024) (emphasis in original); *see also Gilbert*, 158 F. 4th at 850 ("Before conducting a Bradford Hill analysis, an expert must first conduct an associational analysis"); Steve C. Gold et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 897, 973

[26] For example, Dr. Chang failed to consider the level of dermal absorption of chemicals from hair relaxer use, systemic levels achieved through that use, or the binding affinity of those chemicals in the human body, despite conceding that these factors are fundamental to assessing whether the purported effects of chemical in hair relaxers (*i.e.* hormonal changes) can cause harm. Chang Tr. at 160-166, 209-11, 227-28, 341-42.

(Fed. Jud. Ctr. 4th ed. 2025) ("[I]t is imperative to note that epidemiologists employ [the Bradford Hill framework] only after a study finds an association, to determine whether that association reflects a true causal relationship.").

An observed association, "without more," must be treated "with caution" and rigorously evaluated for chance, confounding, or bias before any causal inference is made. *In re Acetaminophen ASD-ADHD Prods. Liab. Litig.*, 2024 WL 3357608, at * 5 (S.D.N.Y. July 10, 2024) (*citing RMSE* at 567-68). Plaintiffs' experts gloss over this threshold requirement, sidestepping the most consequential limitations in the three published articles on which they rely and overreading the limited findings to reach conclusions the articles' own authors expressly decline to draw. Plaintiffs' experts substitute advocacy for methodology, elevating tentative or inconclusive findings to support a flawed causation analysis.

### A. The Sister Study Papers (*Chang* and *White*) Do Not Provide Any Findings Specific to Hair Relaxers and Therefore Cannot Establish Valid Associations

As discussed *supra*, at § II.A, both *Chang* and *White* rely on an overly broad exposure definition that does not isolate hair relaxers and therefore cannot support a valid association between hair relaxers and uterine or ovarian cancer. Both rely on data from the Sister Study, which captures participants' self-reported use of "***straighteners, relaxers, or pressing products***"—an undifferentiated category encompassing materially different products other than chemical hair relaxers. Plaintiffs' experts admit that, as a result of this broad definition, "we do not know whether or not [participants] have ever used a chemical hair relaxer product." Cote Tr. at 152–57 (emphasis added). The issue is underscored by the limited participation in the Sister Study by the very population most likely to use chemical hair relaxers. The Sister Study cohort is predominantly Non-Hispanic White

women, among whom only 5% report regular use of chemical hair relaxer products, as Plaintiffs' experts also acknowledge. *Id*. at 66–68, 214; Cote Rep. at 12 ("88% of African American women reported regular use of chemical relaxers/straighteners, while only 5% of white women reported regular use"). Dr. Cote also acknowledged the limited nature of the data from the Sister Study because participants were only asked "to recall [product] use in the last 12 months" prior to completing the questionnaire. *Id.* at p. 153.

These are not minor caveats—they are fundamental issues that render the *Chang* and *White* studies unreliable for the purpose of drawing *any* conclusions specific to hair relaxers. Plaintiffs' experts' effort to attribute results in these articles to chemical hair relaxers is impossible and speculative at best. As the authors themselves noted, before any conclusion could be drawn, "more research is needed," particularly "in racially/ethnically diverse populations and inclusive of a wider variety of hair care products to help us better understand their role in determining ovarian cancer risk." *White*, at 1195; *see also Chang*, at 1642 ("More research is warranted to confirm our novel findings in different populations, *particularly in African American and/or Black women*. . . .") (emphasis added).

Because Plaintiffs' experts' opinions depend on those studies, the same limitations infect and undermine their conclusions. There is "simply too great an analytical gap between the data and opinion proffered." *Joiner*, 522 U.S. at 146; *see also In re Zantac*, 644 F. Supp. 3d at 1160, 1217–18 (excluding general causation opinions based on "unhelpful" and "attenuated" studies that did not focus on the specific product or chemical at issue); *Burst v. Shell Oil Co.*, 2015 WL 3755953, at *11 (E.D. La. June 16, 2015), *aff'd*, 650 F. App'x 170 (5th Cir. 2016) ("unless a study isolates exposure to gasoline from other

products containing benzene, it cannot support the conclusion that the benzene in gasoline is the causative agent"); *In re Deepwater Horizon Belo Cases*, 2022 WL 17721595, at *9 (N.D. Fla. Dec. 15, 2022), *aff'd*, 119 F.4th 937 (11th Cir. 2024) ("Courts have excluded expert opinions on causation based on epidemiological and other scientific studies for several reasons, including … the studies note 'that the *subjects were exposed to a range of substances* and then nonspecifically notes increases in disease incidence'") (*quoting* Burst, 2015 WL 3755953, at *6–7) (emphasis added).

Plaintiffs' experts, however, downplay this limitation and assume the modest, and often non-statistically significant, associations reported in *White* and *Chang* reflect the effects of only chemical hair relaxers in the relevant population. That approach impermissibly substitutes inference for evidence. Without evidence isolating hair relaxer use, *Chang* and *White* cannot establish a valid association between hair relaxer use and the cancers at issue or, in turn, support any subsequent causation analysis.

### B. Plaintiffs' Experts Concede that None of the Relevant Epidemiological Studies Exclude Chance

A valid association requires that the stimulus and health response "'occur together more frequently than one would expect by chance.'" *Gilbert*, 158 F. 4th at 850 (quoting *RMSE* at 556). Statistical significance provides a standardized method to make such a foundational assessment. *See RMSE* at 676 (defining statistical significance as the "test used to evaluate the degree of association"); *id.* at 930 ("A result that is statistically significant is generally considered unlikely to be the result of chance."). Indeed, Plaintiffs' experts concede that "if a point estimate [i.e. a hazard ratio] is not statistically significant," *i.e.*, when the confidence interval includes 1.0, then "chance cannot be ruled out." Cote Tr. at 115, 192.

Outside this courtroom, Plaintiffs' experts have recognized the central role of statistical significance in evaluating epidemiological associations. As recently as 2025, Dr. Cote co-authored a publication explicitly stating that "the observed association was ***not statistically significant***, ***emphasizing the continued need for evidence*** on this topic ***to better clarify the presence and magnitude of this association***, thereby ***permitting more definitive inferences to be drawn***." Maxwell Akonde et al., *Cigarette Smoking in Relation to Survival in Black Women with Ovarian Cancer: Evidence from the African American Cancer Epidemiology Study (AACES)*, 104 Annals of Epidemiology 48, 53 (2025) (emphasis added) (Ex. 5); *see also* Cote Tr. at 117–23.

Likewise, Dr. Chang, while minimizing statistical significance in reaching his opinion here, acknowledged that it remains a critical benchmark for evaluating epidemiologic evidence—going so far as to describe it as the "ultimate proof." Chang Tr. at 294–95. He admitted that his own research was rejected for publication based on a non-statistically significant p-value of 0.06, underscoring the prevailing scientific standard that even *marginally* non-significant results cannot support reliable conclusions. *Id.* at 294-95.[27] Dr. Sharma likewise confirmed the conventional framework, explaining that the "null" represents the "cutoff" at which "hypotheses [are] valid or invalid." Sharma Tr. (Ex. 17) at 303. Dr. Panigrahy similarly conceded that statistically significant associations are important to his causation methodology. Panigrahy Tr. at 103.

And while statistical significance is not an absolute prerequisite to admissibility of a causation opinion, it "remains an important metric to distinguish between results

[27] A p-value above .05 (which corresponds to a 95% confidence interval) is generally considered not to be statistically significant. *See* RMSE at 87-88.

supporting a true association and those resulting from mere chance"—particularly where, as here, the epidemiological research is limited. *See In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 793 (3d Cir. 2017). Accordingly, courts in this Circuit reject reliance on non-statistically significant epidemiological data when there is only a small body of research analyzing a potential association. *Compare Caraker v. Sandoz Pharmaceuticals Corp.*, 188 F. Supp. 2d 1026, 1032–34 (S.D. Ill. 2001) (rejecting selective reliance on statistically insignificant findings where there were only *seven* relevant epidemiological studies), *with In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, 2017 WL 1833173, at *3, *11 (N.D. Ill. May 8, 2017) (permitting reliance on some statistically insignificant findings where "[t]he existing medical literature contain[ed] at least thirty peer-reviewed epidemiological studies that assess[ed] the potential association"). Likewise, courts exclude expert opinions that rely on epidemiological data to opine on the existence of a valid association where "the lack of statistical significance is not only evident in one study; it is prevalent throughout the epidemiological literature." *In re Paraquat*, 730 F. Supp. 3d at 846.

Here, where the number of studies is minimal, the lack of statistically significant associations reflected in the three published articles is not "sufficiently strong" to support any subsequent causal conclusions. *In re Paraquat*, 730 F. Supp. 3d at 810; *see also Zurbriggen*, 2025 WL 1092973, at *15.

#### 1. The Sole Ovarian Cancer Study (*White*) Does Not Support A Valid Association

As set forth above, *White* is the *only* epidemiological publication that has ever addressed the potential association between chemical hair relaxers (together with straightening and/or pressing products) and ovarian cancer. Setting aside other dispositive

limitations of that sole publication, including those noted above, on its face the article cannot establish a valid association between product use and ovarian cancer. Indeed, in its primary analysis, *White* reports a non-statistically significant association between "ever" use of straighteners, relaxers, or pressing products and ovarian cancer, with an adjusted HR of 1.29 (95% CI 0.70-2.38).[28] *White* at 1192 (Table 2).

And while Plaintiffs' experts cherry-pick one statistically significant finding reported between use of these products more than 4 times per year in the last 12 months and ovarian cancer (*id.* at 1193 (Table 3)), a similar analysis limited to Black women was not statistically significant.[29] This absence of statistically significant findings in Black women is particularly telling because Plaintiffs' experts acknowledge that the "vast majority" of chemical hair relaxer users are Black women. Cote Tr. at 66:8–68:1; Cote Rep. at 12.

The only relevant study addressing ovarian cancer thus fails to detect a reliable association, including among Black women, the group in which one would most expect to find an association if one existed. On this record—one study with no statistically significant results in the relevant population and a broad exposure definition—Plaintiffs' experts cannot establish a valid association between ovarian cancer and chemical hair relaxers.[30]

---

[28] Because the confidence interval ("CI") crosses 1.0, the reported result is not statistically significant. Cote Tr. 192:10-13.

[29] *White* reported hazard ratios of 1.28 (95% CI: 0.46–3.52) for "ever" use and 1.82 (95% CI: 0.64–5.18) for "frequent" use among Black women. *White* at 1194 (Table 5).

[30] At a *minimum*, Plaintiffs' experts should be precluded from opining that a valid association (let alone causation) exists between chemical hair relaxer use and ovarian cancer.

### 2. The Two Uterine Cancer Studies (*Chang* and *Bertrand*) Do Not Show a Valid Association

The uterine cancer evidence is no stronger. Plaintiffs' experts rely on two studies, *Chang* and *Bertrand*, neither of which reports statistically significant findings in the population most relevant here.

*Chang*, like *White*, relies on Sister Study data that neither isolates chemical hair relaxer uses nor captures participant product use beyond the prior 12 months. Although it reports a 1.80 HR (95% CI 1.12-2.88) for uterine cancer among "ever" users of hair relaxers, straighteners, or pressing products, that result does not hold for Black women, again, the population most likely to have actually used hair relaxers rather than the other straightening and pressing products included in the analysis. *Compare Chang* at 1640 (Table 2) *with* 1643 (Table 5) (for Black women, reporting a HR of 1.66 (95% CI: 0.67–4.09) for "ever" use and 2.12 (95% CI: 0.83–5.39) for "frequent" use, both of which include 1.0 and therefore cannot rule out chance).

And *Bertrand*—the *only* epidemiological study that isolates hair relaxer use and studies Black women exclusively—fares no better, reporting uniformly non-statistically significant associations between hair relaxer use and uterine cancer across every exposure metric examined, including frequency of product use, duration of product use, age at first use, and burn history. *Bertrand* at 3 (Table 2).[31]

Taken together, these studies do not show that hair relaxer use and uterine cancer "occur together more frequently than one would expect by chance." *Gilbert*, 158 F. 4th at

---

[31] *See also Hernandez* at 1413, 1414 (reviewing *Chang* and *Bertrand* and finding "no statistically significant increases in gynecological cancers (i.e., uterine, endometrial, or ovarian cancer)").

850 (quoting *RMSE* at 556). The threshold requirement of a valid association thus has not been met, eliminating any need for a Bradford Hill analysis and precluding any reliable causation opinion under Rule 702.

### C. Plaintiffs' Experts Go Beyond the Conclusions of the Studies on Which They Rely

Courts applying Rule 702 routinely exclude expert opinions that overstate or mischaracterize the conclusions of the underlying scientific literature—particularly where "[a] consensus exists in the scientific community that the available evidence does not warrant a claim that [an exposure] causes [a] disease." *In re Paraquat*, 730 F. Supp. 3d at 49–50 (excluding expert opinion where "[n]o author of any published review stated that it ha[d] been established that exposure to paraquat causes Parkinson's disease"). Where the authors of the relied-upon studies characterize their findings as preliminary, hypothesis-generating, or in need of further research, an expert's contrary assertion that a valid association is established reflects the type of litigation-driven overreach Rule 702 is designed to prevent. *Id.* at 850 ("This type of isolation from the scientific community triggers significant reliability concerns because 'courts may only admit the state of science *as it is*.'") (quoting *Rider*, 295 F.3d at 1202) (emphasis in original); *C.W.*, 807 F.3d at 832 (holding that an expert may not bridge an "analytical gap between the data and the opinion proffered" with her own subjective interpretation) (quoting *Joiner*, 522 U.S. at 146).

Here, each of the authors of *Chang*, *Bertrand*, and *White*—collectively, 14 epidemiologists—expressly characterize their findings as novel, preliminary, and/or in need of confirmation and call for additional research before any conclusions can be drawn:

- **Chang**: "***More research is warranted*** to confirm ***our novel findings*** in different populations, particularly in African American and/or Black women because of the high prevalence of straightener use, and to evaluate the potential contribution of hair products to health disparities in uterine

cancer." *Chang* at 1642–43 (emphasis added). The authors also called for future analyses to identify specific chemical ingredients and their potential effects. *Id.* at 1643.

- **Bertrand**: "Our findings highlight the ***importance of continued research*** regarding potential adverse health effects of exposure to chemical hair relaxers and their constituents." *Bertrand* at 5 (emphasis added). "[I]t is ***not known whether these results are generalizable to chemical hair relaxers*** on the market today or to contemporary patterns of use." *Id.* (emphasis added). "If the present results are confirmed…" *Id.*

- **White**: This study "provide[s] the ***first evidence*** of a ***possible relationship*** between frequent adult use of straightener/relaxers or pressing products and ovarian cancer risk." White at 1195 (emphasis added). "***Given the novelty of these findings, more research is needed to confirm our results*** and identify constituents of these products that may be driving risk." *Id.* (emphasis added). "It is particularly important for future studies to be conducted in racially/ethnically diverse populations[.]" *Id.*[32]

Plaintiffs' experts do not dispute that *White* is the first (and only) epidemiological study to evaluate the use of hair relaxers, straighteners, or pressing products and ovarian cancer risk. *See* Cote Tr. at 198. Dr. Cote similarly characterizes *Chang* and *Bertrand* as "present[ing] ***novel*** data examining the association between chemical hair relaxer use and risk of uterine cancer." Cote Rep. at 15 (emphasis added). Yet, Dr. Cote stands alone among epidemiologists when she concludes that these "novel association[s]" are "established" with "moderate to strong weight." *Id.* at 17–18, 24. Even Plaintiffs' expert, Dr. Brown, disagrees with Dr. Cote on this point, recognizing that the existing epidemiological data provides no more than a "signal that is worthy of further investigation" to "further elucidate the relationship between chemical hair relaxer products and uterine and ovarian cancer." Brown Rep. (Ex. 20) at 9; *see also* Brown Tr. at 155-57. "The Seventh Circuit and courts

[32] *See also Hernandez* at 1414 (concluding based on the epidemiological data that "Black women likely do not experience increased risk of . . . ovarian cancer [] or uterine cancer due to hair relaxers").

around the country view such scientific isolation as an evidentiary red flag" because "[l]aw lags science; it does not lead it." *Rosen*, 78 F.3d at 319.[33] Plaintiffs' experts cannot elevate preliminary, hypothesis-generating findings into proof of an established association consistent with Rule 702.

## III. EVEN ASSUMING A VALID ASSOCIATION, PLAINTIFFS' EXPERTS MISAPPLY BRADFORD HILL

Only after establishing that a valid *association* exists may an expert proceed to assessing whether that association is *causal*. *See In re Paraquat*, 730 F. Supp. 3d at 810 ("Once a sufficiently strong association between an agent and a disease is found, epidemiologists consider whether the association could be the product of a cause-and-effect relationship."). Plaintiffs' expert universally ignore this requirement, and jump into a causation analysis. Several of Plaintiffs' experts purport to apply a "Bradford Hill" analysis, a methodology first published in 1965 by Sir Austin Bradford Hill, and under which nine distinct factors are considered to determine whether an "association reflects a true causal relationship." *RMSE* at 973; *In re Paraquat*, 730 F. Supp. 3d at 810.[34] The nine Bradford Hill factors are:

1. **Strength of Association** (the magnitude of the observed association between the exposure and outcome);
2. **Consistency** (replication of the observed association across studies and populations);

---

[33] Significantly, no medical association, governmental entity, or peer-reviewed publication has concluded that hair relaxers cause either uterine or ovarian cancer. Weed Tr. (Ex. 33) at 129:15-130:6. At most, the American Cancer Society has listed hair relaxers as a factor that "*might* increase the risk of endometrial cancer." https://www.cancer.org/cancer/types/endometrial-cancer/causes-risks-prevention/risk-factors.html (emphasis added).

[34] The following Plaintiffs' experts purport to apply a Bradford Hill analysis: Dr. Cote, Mr. Atwood, Dr. Panigrahy, Dr. Roque, and Dr. Sharma.

3. **Specificity** (whether the association is limited to a particular exposure-outcome relationship, *i.e.,* the exposure only causes one disease, or the disease only has one cause);
4. **Temporality** (whether the exposure precedes the disease);
5. **Dose Response / Biologic Gradient** (whether greater exposure results in greater incidence of the outcome);
6. **Biological Plausibility** (whether the association can be explained through a proposed and demonstrated mechanism of action, *e.g.*, based on toxicological studies);
7. **Coherence** (whether the hypothesized causal relationship fits with the existing body of scientific knowledge);
8. **Experimental Evidence** (whether interventions or natural experiments (*e.g.*, randomized clinical trials or intervention studies) have been undertaken and support causation); and
9. **Analogy** (whether similar bodies of evidence have been used to deem other relationships causal).

*See* Cote Rep. at 6; Weed Rep. (Ex. 32) at 33-36.

While Bradford Hill can be a generally accepted methodology, Rule 702 requires that an "expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FRE 702; *see also In re Zoloft*, 858 F.3d at 795 ("each application [of Bradford Hill] is distinct and should be analyzed for reliability"). While experts need not mechanically apply each of the nine factors, they must grapple with the full body of evidence, explain how each factor was evaluated, and articulate a scientifically grounded method for weighing the factors relative to one another. *See id.* at 796 ("To ensure that the Bradford Hill/weight of the evidence criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process . . . there must be a scientific method of weighting that is used and explained.'") (citation omitted). Otherwise, the analysis becomes "standardless," "unacceptably manipulable," and "serve[s] as [a] vehicle[] to support a desired conclusion." *In re Mirena*, 341 F. Supp. 3d at 247; *see also In re Paraquat*, 730 F.Supp.3d at 841 (excluding expert whose "weight of the evidence/Bradford Hill analysis

is a textbook example of the type of standardless presentation of evidence that courts have cautioned against").

Rather than applying the Bradford Hill methodology as a disciplined evaluation of the available evidence, Plaintiffs' experts use it to paper over deficiencies that doom, and render unreliable, their resulting causation opinions. For example, Plaintiffs' experts make no meaningful effort to reconcile the substantial evidence that undermines or directly contradicts the conclusion that a Bradford Hill factor is satisfied or their ultimate causation opinions. What remains is not a reliable methodology, but a conclusion-driven exercise. Ultimately, admitting such opinions "would invite the jury to guess as to the validity of a novel and untested theory based essentially on [Plaintiffs' experts'] say-so." *In re Mirena*, 341 F. Supp. 3d at 270. Plaintiffs' experts' assessment of these criteria, and their resulting causation opinions, should be excluded.

### A. Strength of Association

The first Bradford Hill factor requires rigorous assessment of both the magnitude and statistical significance of the association. "The consideration of the strength of the association is the 'cornerstone for causal inferences' because '[t]he higher the relative risk, the stronger the association and the lower the chance that the effect is spurious.'" *In re Paraquat*, 730 F. Supp. 3d at 846; *see also RMSE* at 977. Consistent with that principle, federal courts have recognized that hazard ratios below 2.0 are inherently suspect. *See Daubert v. Merrell Dow Pharms, Inc. (Daubert II)*, 43 F.3d 1311, 1321 (9th Cir. 1995) (epidemiological studies with a relative risk of less than two "would not be helpful, and indeed would only serve to confuse the jury" because such a low relative risk "actually tends to *dis*prove legal causation") (emphasis in original); *see also In re Deepwater Horizon Belo Cases*, 2024 WL 4349466 at *5 (N.D. Fla. Sept. 30, 2024) (recognizing that

"the threshold for concluding that an agent more likely than not caused a disease is 2.0"); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1405 (D. Or. 1996) (where "none of the 16 epidemiological studies" showed a relative risk "of anywhere near 2.0," expert's opinion that silicone "'more likely than not' causes disease or signs and symptoms of disease in women" held unreliable). Indeed, Dr. Cote acknowledged that, although she has "not looked," she is unaware of any literature that assesses a hazard ratio of less than 2.0 "as showing a strong association." Cote Tr. at 319.[35]

Here, the sole epidemiological study regarding ovarian cancer (*White*), and the two epidemiological studies regarding uterine cancer (*Chang, Bertrand*) report (largely non-significant) hazard ratios clustered between 1.0 and 2.0. *See supra* § II.B. Plaintiffs' experts' conclusion that this factor supports causation, *e.g.* Cote Rep. at 23–24, is therefore fundamentally flawed. More specifically, *Bertrand* found no statistically significant association between either "moderate" or "heavy" use of chemical hair relaxers and uterine cancer, with hazard ratios of 1.23 and 1.18, respectively. *Bertrand* at 3 (Table 2). *Chang* identified a 1.80 hazard ratio associated with "ever" use of straighteners, relaxers, or pressing products and uterine cancer in the previous 12 months. *Chang* at 1640 (Table 2). And *White* identified a non-statistically significant hazard ratio of 1.29 among straighteners, relaxers, or pressing product "ever" users. *White* at 1192 (Table 2). These are, at most, *weak* associations that weigh against a causal relationship under sound scientific principles and existing caselaw. While Plaintiffs' experts point to a handful of

[35] *See also RMSE* at 977 ("For cigarette smoking, for example, the estimated relative risk for lung cancer is very high, about 10. . . . Although smaller relative risks can also reflect causality, epidemiologists scrutinize such associations more closely because weaker biases (which may have been ignored or are unknown) or smaller random error could account for them.").

individual results, an expert's "selective reliance on favorable evidence" is the definition of cherry-picking, making the expert's "examination of the strength of association . . . methodologically unsound." *In re Paraquat*, 730 F. Supp. 3d at 846; *see also In re Acetaminophen*, 707 F. Supp. 3d 309, 357–58 (finding expert's methodology "per se not reliable" where he concluded the strength of association criterion was met despite predominantly "low" odds ratios ("between 1 and 2") and relied on conclusory, "ipse dixit" reasoning).

Dr. Cote attempts to overcome these weak findings by asserting that any increased risk is "unacceptable," declining to identify any objective threshold for a "strong" association. Indeed, Dr. Cote goes so far as to suggest that a hazard ratio as low as 1.10 could satisfy this criteria. But Dr. Cote does not (and cannot) identify any literature or accepted methodology supporting her view that such values constitute a "strong" association. Cote Tr. at 314 ("I'm not going to put a label of 'strong' associated with a single number, even an imaginary hypothetical number from thousands of studies"); 315–16 (declining to define a "strong" association, and suggesting that odds ratios of 1.1, 1.3, or 1.4 can meet this criteria); 318–24 (similar). And, of course, "unacceptable" does not equate to "causal." *See, e.g.*, *Caraker*, 188 F. Supp. 2d at 1031 (excluding expert opinion where the expert's conclusions amounted to "personal opinions [rather] than products of any scientific methodology rigorously applied.")

**B. Consistency**

Consistency requires reproducible findings across multiple epidemiologic studies. *See Zurbriggen*, 2025 WL 1092973, at *16 (explaining that "proper inputs for the consistency criterion are the results of controlled epidemiological studies"). Indeed, the Reference Manual on Scientific Evidence states:

> Rarely, if ever, does a single study persuasively demonstrate a cause/effect relationship. It is important that a study be repeated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists.

*RMSE* at 981.

For ovarian cancer, the epidemiological evidence consists of a single study (*White*), which its own authors describe as presenting "novel" findings for which "more research is needed to confirm our results." Cote Tr. at 196; *White* at 1195. Yet, Dr. Cote deems the consistency factor satisfied, despite her concession in another litigation that "[o]ne cannot assess consistency for a single study." Cote Tr. at 327–31. Even Plaintiffs' other experts disagree with Dr. Cote on this point. Atwood Tr. at 242; Chang Tr. at 96–97, 100.

This Court is not bound to accept her unsupported conclusion—which is belied by Plaintiffs' other experts, Dr. Cote's own prior statements, and multiple decisions across courts—that the consistency factor is satisfied when there is, in fact, only a single unreplicated study. *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a 'hint of an inferential process,' are useless to the court."); *In re Flint Water Cases*, 2024 WL 21786, at *5 (E.D. Mich. Jan. 2, 2024) ("A single study of a single incident is by definition insufficient to establish consistency."); *In re Mirena*, 341 F. Supp. 3d at 250 (consistency generally requires "'similar findings . . . generated by *several epidemiological studies* involving various investigators.'") (citation omitted) (emphasis added).

For uterine cancer, only two epidemiological studies exist (*Chang* and *Bertrand*). But those studies reach *inconsistent* results with regard to critical findings, including the primary point of analysis: "ever" product users. *Compare, Bertrand* at 3 (Table 2) (finding no statistically significant association between chemical hair relaxer use and uterine cancer

among "ever" users), *with Chang* at 1640 (Table 2) (finding a statistically significant association between "ever" relaxer/straightener/pressing product use and uterine cancer).

Dr. Cote attempts to sidestep these deficiencies by collapsing uterine and ovarian cancers into a single Bradford Hill analysis. Cote Rep. at 23–24. That approach is methodologically improper, particularly where, as here, Dr. Cote admits that the uterus and the ovaries are different organs with distinct cancers and risk factors. Cote Tr. at 74-75, 77–78. Courts have rejected similar "transdiagnostic" analyses as unreliable because they can "obscure[] limitations in the scientific literature." *In re Acetaminophen*, 707 F. Supp. 3d 309, 339 (S.D.N.Y. 2023) (finding that expert's "use of a transdiagnostic Bradford Hill analysis fails to meet the requirements for admissibility on the issue of causation for either ASD or ADHD" because it improperly combined the two even though they were distinct conditions with distinct diagnostic criteria). Likewise here, combining the distinct conditions of ovarian and uterine cancer obscures a central defect in the evidence upon which Plaintiffs' experts rely: for ovarian cancer, there is only one study; for uterine cancer, the only two studies have largely non-statistically significant, and inconsistent findings.

Ultimately, Plaintiffs' experts' conclusions that consistency is satisfied and assigned "moderate to strong" weight in favor of a causal finding, Cote Rep. at 23–24, is not grounded in a reliable methodology, and is precisely the type of "standardless" and results-driven analysis that courts reject under Rule 702. *See In re Acetaminophen*, 707 F. Supp. 3d at 339, 342 (finding an expert's analysis of the consistency factor unreliable where it "fails to engage meaningfully with the inconsistencies among the studies").

**C. Specificity**

If no specific causal link can be identified—meaning the outcome of interest is not uniquely attributable to a specific causal agent—the specificity factor weighs against a

finding of causation. *E.g., In re Zoloft Prods. Liab. Litig.*, 26. F. Supp. 3d 449, 455 (E.D. Pa. 2014) (well-established Bradford Hill factors include "specificity of the association (i.e., does an outcome have only one cause or several?")). Both Drs. Roque and Cote concede that specificity does not support causation here, because cancer is "multifactorial," driven by genetics, hormones, diet, lifestyle, environmental exposures, and a host of other variables. Roque Rep. (Ex. 26) at 58; Roque Tr. (Ex. 16) at 346; Cote Rep. at 24; Cote Tr. at 339. Thus, the "specificity" consideration cannot form a basis for Plaintiffs' experts' ultimate conclusions that a causal relationship has been established. *See Zurbriggen*, 2025 WL 1092973, at *17 (finding the specificity factor undercut the expert's causal conclusions because "the observed symptoms . . . could have resulted from a wide suite of" other exposures).[36]

### D. Temporality

Temporality is a "*necessary* Bradford Hill factor": the exposure must precede the disease. *In re Paraquat*, 730 F. Supp. 3d at 811 n.17 (emphasis in original). Without reliable evidence establishing that sequence, a causal inference cannot be drawn.

As Dr. Cote acknowledges, temporality "can be more difficult to determine in diseases where there is a long latency period between the exposure and the onset of

[36] "Specificity" also refers to whether the available epidemiological evidence evaluates the "specific" exposure in question and the "specific" outcome in question, considerations that similarly are absent here. *See* Weed Rep. at 46; Adams-Campbell Rep. at 17 ("The exposure of interest (e.g., chemical hair relaxers) and the outcome of interest (e.g., ovarian cancer) should be evaluated specifically"); *id.* at 31 ("[A]s the Sister Study did not specifically assess chemical hair relaxer and determined chemical hair relaxer use in the same aggregated category with other hair straightening and pressing products, there is no specificity between the findings of *White* and plaintiffs' allegation that chemical hair relaxer use causes ovarian cancer."), 34 (similar, with regard to *Chang* and uterine cancer). *c.f.* Cote Tr. at 339-40 (testifying that she is not familiar with that formulation of the "specificity" criteria).

clinically apparent disease." Cote Rep. at 24. But she fails to consider the Sister Study's exposure limitations (measuring straightening, relaxer, or pressing product use *only* in the 12 months prior to the enrollment questionnaire) as compared to the well-established and lengthy latency periods associated with both uterine and ovarian cancers. Indeed, a single, recent 12-month snapshot of product use cannot reliably establish whether any relevant exposure occurred during the etiologically meaningful window of time (*i.e.*, potentially years earlier) when development of uterine or ovarian cancer may have begun.

In fact, none of Plaintiffs' experts attempt to determine when a study participant's cancer development actually began, as compared to when it was diagnosed and reported, or determine its impact on their own causation analysis. Dr. Roque, for instance, admitted he conducted no "research into the latency of uterine or ovarian cancer and how long it takes to develop," Roque Tr. at 350, yet nevertheless concluded that the temporality factor was satisfied. An expert who has not evaluated timing of disease development cannot reliably opine on whether exposure preceded it. *See Zurbriggen*, 2025 WL 1092973, at *17 (the lack of data reliably recording onset dates precludes any expert from determining whether the temporality criterion is met).

**E. Biological Gradient (Dose–Response)**

Biological gradient, or dose-response, asks whether increased exposure is associated with an increased risk of an outcome. *See In re Paraquat*, 730 F. Supp. 3d at 843. Dose-response is "the hallmark of basic toxicology," and "the single most important factor" in determining whether an exposure can cause an adverse effect. Eaton, 12 J.L. & Pol'y 1 at 15 (2003).[37]

[37] The absence of a dose-response relationship is particularly telling here where plaintiffs cannot identify either a dose threshold or a dose-response relationship. *See In re Abbott*

The scant epidemiological record in this litigation does not demonstrate a dose-response relationship. *Bertrand*—the only study to isolate chemical hair relaxer use (and to do so in Black women)—found no evidence of a dose-response, *i.e.*, no consistent increase of uterine cancer incidence with corresponding increases in duration of hair relaxer use, increases in frequency of hair relaxer use, or decreases in age at first use. *Bertrand* at 3 (Table 2); Cote Tr. at 270:17–23; 267:25–268:9 (conceding that "[t]here is no clear linear trend that as the years of use increase, the rate of uterine cancer increases," and no statistically significant difference in the rate of uterine cancer as between "Never/Light" users of hair relaxers and women who used hair relaxer products for more than 20 years).

Against this backdrop, each of Plaintiffs' experts employs a variation of the same flawed approach: abandoning long-held dose-response principles, while selectively relying on favorable data and dismissing more robust unfavorable findings as "underpowered" or flawed. For example, rather than grappling with this evidence that undercuts their causation opinions, Plaintiffs' experts postulate, without supporting evidence, that the chemicals in hair relaxers may have "non-monotonic" effects that do not exhibit the type of dose-response that is "the hallmark of basic toxicology." *See* Eaton, 12 J.L. & Pol'y 1 at 15 (2003). Plaintiffs' experts do not test this hypothesis nor do they provide data that would support this leap. *See, e.g.,* Zoeller Tr. at 220–28; Atwood Tr. at 312–16, 315; Cote Tr. at 344–47. This is not a scientific weighing of the evidence; it is cherry-picking and selective reasoning and should be excluded. *See In re Paraquat*, 730 F. Supp. 3d at 844–45

---

*Lab'ys*, 2025 WL 1282749, at *37-38 (N.D. Ill. May 2, 2025) (excusing failure of expert to identify "*precise* triggering exposure" where he established that "a dose-response relationship likely exists.")

(excluding expert who relied on favorable dose-response data while disregarding contrary evidence).[38]

### F. Biological Plausibility and Mechanism

The biological plausibility factor asks whether the asserted association is "consistent with current biological knowledge about the disease." *In re Paraquat*, 730 F. Supp. 3d at 811. That requires more than theoretical possibility. A reliable opinion must identify a concrete, evidence-based mechanistic pathway from exposure to disease and demonstrate that the pathway operates at real-world exposure levels. *See Zurbriggen*, 2025 WL 1092973, at *14 (rejecting biological plausibility where the expert failed to identify a specific toxic chemical or dose).

Plaintiffs' experts offer no such evidence. As discussed in detail in Section I, their experts have developed a string of hypothetical and speculative theories about how certain chemicals that *might* be in hair relaxers *might* react to *possibly* cause ovarian or uterine cancer. But they do not reliably identify which specific chemicals in which products allegedly cause uterine or ovarian cancer, do not quantify exposure or absorption, do not demonstrate that any proposed mechanism operates at doses relevant to real-world use, and do not point to any testing showing that it does. Instead, they rely on generalized theories about endocrine disruption untethered to specific chemicals, product-specific data, human exposure levels, or disease-specific pathways. *Supra* §§ I.C–I.E. These opinions are inadmissible, and cannot support Plaintiffs' experts' ultimate causation opinions. *E.g., Rains v. PPG Indus.*, 361 F. Supp. 2d 829, 836 (S.D. Ill. 2004) (excluding expert who failed

---

[38] Each of Plaintiffs' experts' flawed analyses of the dose-response consideration is described further in Section IV.

to articulate a biological mechanism by which perchloroethylene triggered multiple sclerosis).

### G. Experimental Evidence

The "experimental evidence" factor asks whether experiments showing a change in the incidence of disease following the removal or reduction of the suspected causal agent provide support for a causal inference. *See* Weed Rep. at 36; Adams-Campbell Rep. at 32. Because there are no controlled human studies, no animal studies, and no interventional data of any kind demonstrating that chemical hair relaxer use causes uterine or ovarian cancer, Plaintiffs' experts—correctly—acknowledge that this factor cannot support causation. Dr. Cote admitted that "experimental evidence is not available here as that term is defined in Bradford Hill's framework," and assigned this factor "no weight" in her overall analysis. Cote Tr. at 383; Cote Rep. at 26 ("This factor is not considered in the overall analysis to determine causality"). Drs. Roque and Sharma likewise "did not consider experimental evidence" in their overall causation analyses. Roque Tr. at 387; Sharma Rep. (Ex. 27) at 43.

While experimental evidence is not required in every case, its absence here—particularly in light of the limitations in the other Bradford Hill factors—does not support a reliable inference of causation.[39]

[39] Any reliance by Plaintiffs' experts on the Bradford Hill "coherence" and "analogy" considerations to support causation is similarly flawed. *See, e.g.,* Cote Rep. at 26 (claiming "coherence" and "analogy" support causation). "Coherence" refers to whether the hypothesized causal relationship fits with the existing body of scientific knowledge. Here, it plainly does not. *See, e.g.,* Weed Rep. at 47, 51, 72-74 (noting that a published study (*Sarink*) found no statistically significant associations between chemicals identified by plaintiffs' experts—including parabens and phthalates—and uterine cancer, such that "[a] clearer example of *incoherence* would be hard to imagine") (emphasis added). "Analogy" refers to whether similar bodies of evidence have been used to deem other relationships causal. *Id.* at 36. No peer-reviewed publications, governmental agency or scientific

*　　*　　*

At bottom, none of Plaintiffs' experts reliably apply the Bradford Hill framework to reach their causation conclusions. Plaintiffs' experts agree that at least two of the nine factors are not met in this case: specificity and experimental evidence. But their analysis of the remaining seven factors is cursory, conclusory, outcome determinative and fails to meaningfully engage with conflicting evidence. Where, as here, an expert's application of the Bradford Hill factors is riddled with conflated analyses, selective reliance on cherry-picked data, disregard of contrary evidence, and a conclusion-driven approach devoid of objective, scientific methodologies, courts routinely reject such analyses—and the resulting causation opinions—as inadmissible under Federal Rule 702. *See, e.g.*, *In re Paraquat*, 730 F. Supp. 3d at 841 (excluding expert's opinion and characterizing his Bradford Hill analysis as "a textbook example of the type of standardless presentation of evidence that courts have cautioned against"); *In re Mirena*, 341 F. Supp. 3d at 247 (excluding expert's opinion because "his analysis [wa]s flawed by serious methodological deficiencies[,] . . . includ[ing] an . . . unmoored application of the nine Bradford Hill factors, a failure to consider known contrary evidence, a contravention of principles [that] … should guide an epidemiologist's inquiry, [and] a selective use of case report data"); *In re Zoloft*, 858 F.3d at 800 (affirming district court's exclusion of expert's opinion where he

organization has concluded "that a causal relationship has been established between an exposure and an outcome based on the level of available evidence we have here pertaining to a potential relationship between chemical hair relaxers and [either] ovarian cancer [or] uterine cancer." Weed Tr. at 259:9-260:19. Assertions that these factors nevertheless *support* causal conclusions are neither based on sufficient facts nor reliable.

failed to "consistently assess the evidence supporting each [Bradford Hill] criterion or explain his method for doing so," rendering his opinion "unreliable").[40]

## IV. EACH OF PLAINTIFFS' GENERAL CAUSATION EXPERTS' OPINIONS FAIL FOR A MULTITUDE OF METHODOLOGICAL FLAWS

In the sections below, Defendants apply the above overarching deficiencies in Plaintiffs' experts' theories to the opinions proffered by each individual expert and demonstrate why each expert fails to meet the requirements of Rule 702.[41] Significantly, none of the experts have published their opinions or otherwise subjected them to peer review, nor have they demonstrated that their opinions are generally accepted among any medical or regulatory body. *Daubert*, 509 U.S. at 593-594. "When an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

[40] Again, given the scant record of a single epidemiological study with weak and largely non-statistically significant findings, Plaintiffs' experts should be precluded, *at a minimum*, from opining that chemical hair relaxers cause ovarian cancer.

[41] Plaintiffs' initial Rule 26 designation identified B. Burt Gerstman as an additional expert in the field of epidemiology. On February 18, 2026, Plaintiffs' withdrew Dr. Gerstman as a designated expert. Defendants reserve all rights to challenge Dr. Gerstman's opinions should he be redesignated in the future. To the extent Plaintiffs' other experts rely on the opinions of Dr. Gerstman, those opinions should be excluded given Defendants' inability to explore and challenge Dr. Gerstman's opinions.

### A. Dr. Cote's Opinions Are Unreliable, Litigation-Driven, and Premised on Insufficient Facts

Dr. Cote's opinion that chemical hair relaxers cause uterine and ovarian cancer fails at every critical step, and should be excluded for the reasons set forth in Sections I, II, and III. She cannot reliably opine that chemicals in hair relaxers cause uterine or ovarian cancer, or that a valid association exists between chemical hair relaxer products and either ovarian or uterine cancer, and her subsequent application of the Bradford Hill criteria is independently unreliable. *Supra* §§ I-III.

*First*, Dr. Cote lacks knowledge regarding specific chemicals or doses contained in any hair relaxer products: She cannot identify evidence connecting specific chemicals to uterine or ovarian cancer, let alone identify any dose or exposure level required to have any such effect. *Supra* §§ I.A–I.C. Accordingly, her opinions are not connected to the underlying facts of this litigation, creating "too great an analytical gap" to be reliable. *Joiner*, 522 U.S. at 146.

*Second*, Dr. Cote's made-for-litigation methodology—asserting a "valid association" between chemical hair relaxer use and both uterine and ovarian cancer despite limited epidemiological studies, as well as non-statistically significant and inconsistent data—likewise warrants exclusion. As recently as last year, in her peer-reviewed work, Dr. Cote treated the absence of statistical significance as a meaningful limitation requiring caution and further study. *Supra* at § II.B (quoting *Akonde* at 53); *see also* Cote Tr. at 117–23.[42] Yet, here, she abandons that standard, calling statistical significance "antiquated" and

[42] Dr. Cote has likewise relied on statistical significance to interpret results in numerous other recent publications. *E.g.,* Logan Corey et al., *Impact of Positive Cytology in Uterine Serous Carcinoma: A Reassessment*, 37 Gynecologic Oncology Reps. 1, 3–5 (2021) (Dr. Cote and co-authors describe results in terms of statistical significance and conclude that although many findings were statistically significant and "provide[d] compelling data,"

not "the standard way of thinking anymore," because it "oftentimes misses the point." *Id.* at 420–21; *see also, e.g.*, *id.* at 307–08 ("I have not hung my hat on a single number, one number, one estimate, one statistically significant finding throughout my entire report because I no longer think that that constitutes good science."). When confronted with her prior calls for further research in the absence of statistically significant findings, Dr. Cote offered no explanation reconciling her vastly different approaches inside and outside the courtroom. *Id.* at 117–23.

Rule 702 does not permit such inconsistency. An expert must "employ[] in the courtroom the same level of intellectual rigor that" she applies in her "relevant field." *Kumho*, 526 U.S. at 152; *see also In re Paraquat*, 730 F. Supp. 3d at 818 ("In the Seventh Circuit, this means that experts are required to 'follow scientific approaches normal to their disciplines.'") (quoting *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005)). Dr. Cote's unexplained departure from her own standards is "an evidentiary red flag," *In re Paraquat*, 730 F. Supp. 3d at 849, and warrants exclusion.

*Third*, the same lack of rigor permeates Dr. Cote's Bradford Hill analysis, on which she bases her causation opinions. As explained above:

- Dr. Cote defines no objective criteria for assessing the "strength of association" between chemical hair relaxers and uterine or ovarian cancer, and ignores contrary data. *Supra* § III.A.

---

future studies "should be designed" to "further refine our understanding of the implication[s]"); Katherine W. Reeves et al., *Urinary Phthalate Biomarker Concentrations and Postmenopausal Breast Cancer Risk*, 111 J. Nat'l Cancer Inst. 1059, 1059 (2019) (Dr. Cote and co-authors conclude that because they "did not observe statistically significant positive associations between phthalate biomarkers and breast cancer risk," the results did not support "an increased risk of developing breast cancer"); Hyo K. Park et al., *Benign Gynecologic Conditions Are Associated With Ovarian Cancer Risk In African-American Women: A Case-Control Study*, 29 Cancer Causes & Control 1081 (2018) (Dr. Cote and co-authors note that "[o]bserved associations were not consistently significant," and therefore "[t]hese results must be interpreted with caution and await further confirmation").

- Dr. Cote impermissibly conflates uterine and ovarian cancer to manufacture "consistency," while disregarding *inconsistent* findings. *Supra* §III.B
- Dr. Cote assumes "temporality,", despite the Sister Study lacking any data on when participants began using chemical hair relaxer products (or straighteners or pressing products), and the uncertain latency period for development of uterine or ovarian cancer. *Supra* § III.D.
- She e lacks knowledge to support ***"biological plausibility,"*** including *inter alia*, specific hair relaxer product ingredients, dose, or peer-reviewed publications concluding that those ingredients cause uterine or ovarian cancer. *Supra* § III.F; Cote Tr. at 357, 360, 364, 367, 373, 376.
- Dr. Cote cherry-picks data on "dose-response," and then asserts (without support) that "there is no safe dose" of chemical hair relaxer products. *Supra* § III.E.
- Dr. Cote concedes "specificity" and "experimental evidence" do not support causation. *Supra* §§ III.C, III.G.

Her handling of *Bertrand*'s lack of dose-response is particularly telling. She speculates (without support) that the lack of dose-response *may* result because "the main effects of exposure happen during critical developmental periods," Cote Rep. at 25, even though (and without addressing that) *Bertrand* also finds no statistically significant association between hair relaxer use and uterine cancer regardless of age at first use. *Bertrand* at 3 (Table 2).[43] At deposition, Dr. Cote criticized *Bertrand* for not using a *combined* measure of frequency, duration, and age at first use, Cote Tr. at 347-49 (*Bertrand* "wasn't looking at kind of the *combined* age at first use and . . . number of doses and all that") (emphasis added); 272-73, 276-77 (similar), yet she relies on far weaker measures of "dose-response" in *White* and *Chang*, which similarly do not use a combined measure and which classify use based solely on whether participants used straighteners, relaxers, or

[43] Dr. Cote similarly states that "low levels of exposure to EDC" can increase the risk of cancer "depending on the timing of the exposure." Cote Rep. at 25. But she cites only to an article focused on differences in age of *diagnosis*, not exposure, that does not mention "exposure" or "EDC." *Id.* (citing Tarney et al., *Impact of Age at Diagnosis on Racial Disparities in Endometrial Cancer Patients*, 149 Gynecol. Oncol. 12 (2018)).

pressing products more or less than 4 times *in the last 12 months*. *See White* at 1193 (Table 3); *Chang* at 1641 (Table 3).

Dr. Cote ultimately concedes the data in *Bertrand* shows no clear dose-response trend, *see supra* at § III.E, and acknowledges key limitations in the Sister Study that undermine any reliable dose assessment. Cote Tr. at 153 (admitting *White* "just asked women to recall use in the last 12 months"); 156 (admitting "we do not have full information about what types of products were used [in the Sister Study]"). Still, she opines that "there is no safe dose," *id*. at 344-47, an impermissible "any exposure" opinion that courts reject. *See supra* at § I.C (discussing *Krik*, 870 F.3d at 674–75).

At bottom, Dr. Cote's analysis reflects a precautionary public-health perspective, not a disciplined scientific evaluation. Her causation opinions are evidently influenced by her belief that these products have "no medicinal value," are "for cosmetic use only," and provide "no direct benefit" to users. Cote Tr. at 347; 386–87. Rule 702 does not allow an expert to relax methodological standards in order to advocate policy judgments and personal beliefs, and courts routinely exclude opinions that reflect these types of analytical leaps and conclusion-driven reasoning. *See, e.g.*, *Caraker*, 188 F. Supp. 2d at 1031 (excluding expert opinion where the expert's conclusions reflected "too many analytical leaps," and amounted to "personal opinions [rather] than products of any scientific methodology rigorously applied."); *In re Zoloft*, 858 F.3d at 796 (Bradford Hill analysis must employ a "scientific method of weighting" rather than "a mere conclusion-oriented selection process.") (citation omitted). Dr. Cote's causation opinions, therefore, should be excluded pursuant to Rule 702.[44]

---

[44] Dr. Cote is Plaintiffs' only expert epidemiologist, and the only Plaintiffs' expert with any remote experience analyzing general causation between an exposure and a disease. *See*

### B. Plaintiffs' Dermatology Experts' Limited Opinions on Biological Plausibility Are Untested, Unsupported and Inadmissible

#### 1. Clarence Brown

Dr. Brown unequivocally confirmed that he had no opinions regarding the causal connection between chemical hair relaxer use and uterine or ovarian cancer. Brown Tr. at 152-55. He conceded that any epidemiological statements in his report are background statements rather than opinions he intends to offer at trial. *Id.* Notably, the *only* comment he was able to offer as to Plaintiffs' theory of causation is that **further investigation is necessary**. *Id.* at 155-56.

The only opinion Dr. Brown offers in this case is that there is a biologically plausible mechanism via which hair relaxers can be dermally absorbed through the scalp, enter systemic circulation, and eventually make their way to a woman's reproductive organs. *Id.* at 158, 166-67. This hypothesized mechanism rests on a chain of speculative assumptions, including but not limited to that: (1) the hair relaxer must come in contact with the scalp, (2) the ingredients then penetrate the epidermal barrier or through the "transappendageal process," and (3) the chemicals[45] then enter the bloodstream and reach the uterine or ovarian tissue. *Id.* at 166-67.

---

*RMSE* at 971–75 (explaining that *epidemiologists* apply Bradford Hill to assess general causation). To the extent Plaintiffs' other experts' rely on Dr. Cote's flawed epidemiological analyses or opinions, their opinions should be excluded for the same reasons.

[45] Dr. Brown identifies the following chemicals as potential constituents in chemical hair relaxers: Sodium hydroxide, potassium hydroxide, lithium hydroxide, guanidine hydroxide, guanidine carbonate, phthalates, parabens, and derivatives of benzophenone. Brown Rep. at 20-21.

But Dr. Brown has no evidence that any of these steps actually occur. As set forth in Section I, he did not conduct any independent tests or toxicological analyses on hair relaxer ingredients, dose calculations, absorption, dose and exposure rates, or chemical thresholds within organ tissues. *Id.* at 81-83, 112-13, 193, 291-96, 299-300. He cites no article examining dermal absorption of chemicals from hair relaxers. *Id.* at 191, 197. And he was not even asked to determine whether his theory of absorption could lead to "sufficient concentration in the uterus to produce biological meaningful effects." *Id.* at 167-68.

But there is a study directly on point: Pierce, et al., *Evaluation of Dermal Exposure to Phthalates and Parabens Resulting from the Use of Hair Relaxers*, 35 Intl. J. Env. Health Res. 1707-1726 (2025) (Ex. 6). Dr. Brown admits *Pierce* is the "first published study to assess dermal absorption and the resultant internal dose of phthalates, parabens, and phthalate substitutes from the use of hair relaxers" —in other words, the exact topic of his opinions. Brown Tr. at 204-05. Using a "well-accepted dermal modeling tool," *Pierce* concludes that "modeled absorbed doses for each chemical were below estimated internal daily doses associated with the most relevant health-based guidance values, indicating consumer exposure from product use is not expected to pose a health risk." *Pierce* at 1720. Yet Dr. Brown ignores the Pierce findings simply because they were the result of a mathematical/computer equation that he questioned. Brown Tr. at 204-05. Dr. Brown testified that he disagrees with Pierce's conclusion that the absorbed doses would not surpass guidance levels, but does not have any numerical basis to justify the disagreement, has done nothing to determine absorbed doses, and has not conducted any investigation of his own to corroborate his disagreement. *Id.* at 206-17.

On the other hand, the only article Dr. Brown could invoke to support his dermal absorption opinion—*Schildroth, et. al.*[46]—measured urinary metabolites without determining how any chemicals at issue in fact penetrated the body. Brown Tr. at 196-97 ("Q: You didn't perform any tests, there's no studies you relied upon that talk about the level of exposure of the chemicals in hair relaxers in the bloodstream once dermal absorption has happened, right? A: Measuring the bloodstream levels of these chemicals following exposure, I do not recall specific publication on that subject"). Importantly, *Schildroth* examined a wide variety of hair products, including "relaxer/straighteners/perms, styling products, moisturizers, oils and hair food," and in a combined analysis regarding users of relaxers, straighteners, and perms, found almost exclusively no statistically significant effects on urinary biomarkers for various phenols, phthalate metabolites, or parabens. *See Schildroth* at 2. Similarly, Dr. Brown identified no study that measured "the bloodstream levels of these chemicals following exposure." Brown Tr. at 196. Dr. Brown's failure to grapple with the findings in *Pierce* or the shortcomings in *Schildroth* is fatal. *In re Paraquat*, 730 F. Supp. 3d at 846 (expert's "selective reliance on favorable evidence" is "the definition of cherry-picking").[47]

[46] Schildroth, et al., *Hair Product Use and Urinary Biomarker Concentrations of Non-Persistent Endocrine Disrupting Chemicals Among Reproductive-Aged Black Women*, 361 Chemosphere 142442 (2024) (Ex 7).

[47] Dr. Brown also acknowledges that dermal absorption requires scalp contact, yet admits hair relaxers are not intended to come in contact with the skin. *Id.* at 166. Hair relaxer product instructions direct users to apply a protective barrier of petroleum jelly prior to applying the hair relaxers and to rinse immediately if hair relaxer contact with the skin occurs. *Id.* at 287-90. Dr. Brown admits that if these instructions were followed, dermal absorption would not occur or would be significantly impeded. *Id.* at 287, 290-91. The rank speculation underlying Dr. Brown's opinion mandates exclusion.

At bottom, Dr. Brown cannot point to ***any*** data or scientific testing —his own or others'—that substantiates his opinion. Dr. Brown's failure to consider sufficient facts or data, and his unsupported rejection of contrary study findings, warrants exclusion of his opinions.

**2. Silvina Pugliese**

Dr. Pugliese offers two conclusions: 1) chemical hair relaxers increase the risk of dermal absorption of chemicals[48] into the skin (dermal absorption opinion); and 2) it is biologically plausible that such products are absorbed systematically and can cause cancers such as uterine and ovarian cancers. Pugliese Rep. at 13.

***First***, for the reasons set forth in Section I, Dr. Pugliese's "biological plausibility" opinions are not supported by sufficient facts. She relies on no facts or data regarding the dose of any chemicals purportedly contained in hair relaxers, the level of dermal exposure to such chemicals from hair relaxer use, the systemic exposure or distribution of chemicals that purportedly results from hair relaxer use, or organ-specific dose from hair relaxer use. *Supra* § I.

***Second***, Dr. Pugliese is not qualified to offer causation opinions (including biological plausibility) regarding uterine or ovarian cancers. Third, Dr. Pugliese's purported "weight of the evidence" methodology, as applied to both her absorption opinion and causation opinion, is not reliable under Rule 702. Indeed, Dr. Pugliese did not apply a

---

[48] Dr. Pugliese identifies the following chemicals as potential constituents of chemical hair relaxers: Sodium hydroxide, potassium hydroxide, guanidine hydroxide, calcium hydroxide, lithium hydroxide, fragrances (linalool, limonene), phthalates (bis(2-ethylhexyl) phthalate, diethyl phthalate), parabens (methyl paraben), UV filers (octinoxate, benzophenone-1), preservatives (formaldehyde, phenoxyethanol), and antioxidants (butylated hydroxytoluene, BHT). Pugliese Rep. at 4.

defined or reproducible methodology, rendering her opinions an impermissible analytic leap under Rule 702. *See, e.g., Caraker*, 188 F. Supp. 2d at 1031 (excluding experts whose methodology "involve[d] a loose application of purportedly objective scientific causation standards").

#### a) Dr. Pugliese is Not Qualified to Opine on Uterine and Ovarian Cancer Causation

To assess an expert's qualifications under Rule 702, the Court must examine an expert's "full range of practical experience as well as academic or technical training" against the *specific* opinions she intends to offer. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010).

Defendants do not dispute that Dr. Pugliese is a qualified oncodermatologist, or challenge her dermal absorption opinions on qualification grounds. But, with no practical experience related to epidemiology, toxicology, or reproductive cancers, she is not qualified to render her broader causation opinions, including whether it is biologically plausible for hair relaxer exposure to cause uterine or ovarian cancer. *Cunningham v. Masterwear, Inc.*, 2007 WL 1164832, at *10 (S.D. Ind. Apr. 19, 2007) (excluding medical doctors as general causation experts where both had "no professional experience or training in toxicology or epidemiology"); *Sutera v. Perrier Grp. of Am. Inc.*, 986 F. Supp. 655, 667 (D. Mass. 1997) ("Simply having a medical degree or training is insufficient expertise to establish causation which hinges on factors such as 'dosage, duration of dosage and latency periods'"; diagnosing and treating a disease "is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty"); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1497 (D. Kan. 1990) (noting that epidemiologists are

"uniquely suited" to assess general causation as opposed to medical doctors who rely on epidemiological studies to give the same opinions).

In particular, Dr. Pugliese is a board certified oncodermatologist focused on skin cancers and the management of the cutaneous toxicity *to the skin* of various cancer therapies. *See* Pugliese Tr. at 22–25. Dr. Pugliese does not treat patients for uterine or ovarian cancers, does not diagnose such cancers in her practice, and has never researched or written on uterine or ovarian cancers prior to this litigation. *Id*. at 32, 57. Dr. Pugliese has never drafted any epidemiologic studies at all and has never testified as an expert witness on cancer epidemiology. *Id*. at 58–59.

In sum, Dr. Pugliese's testimony, CV, and bibliography provide no foundation for her to opine on the toxicology, epidemiology, or causation of uterine or ovarian cancers. *See* Pugliese Rep. at Exhibit A (curriculum vitae). The court should therefore exclude Dr. Pugliese's opinion that it is "biologically plausible for chemical hair relaxers to […] cause cancers such as uterine and ovarian cancer." Pugliese Rep. at 13.

**b) Dr. Pugliese's "Weight of the Evidence" Review Is Methodologically Unreliable**

Dr. Pugliese claims to have performed a comprehensive literature search and to have undertaken a "weight of the evidence" analysis in formulating her dermal absorption and causation conclusions. Pugliese Rep. at 3-4, 13.

Courts recognize that while a weight of the evidence "methodology offers the benefit of flexibility, it is vulnerable to results-driven analysis, which, of course, raises significant reliability concerns." *In re Paraquat*, 730 F. Supp. 3d at 840 (citing *In re Zoloft*, 858 F.3d at 795-97) (internal citations omitted). Accordingly, at minimum, an expert using a weight-of-the-evidence approach is required to provide "a scientific method of weighting

that is used and explained." *Zantac* at 1236, *citing In re Zoloft*, at 795. Dr. Pugliese does not.

Dr. Pugliese admits she "did not use any kind of formalized weight of the evidence analysis." Pugliese Tr. at 136. Nor does she have a weight of the evidence methodology that she teaches or employs in her clinical practice. *Id*. at 141–42. Her report contains no literature search protocols or inclusion/exclusion criteria and no method of weighing any of the literary evidence considered. *See Pugliese Rep.* generally. She did not retain any search terms she utilized, making it impossible to replicate her work or identify any potential errors. *Id.* at 98-99. And although she was aware of available scoring criteria for publications she identified, she did not employ any type of scoring methodology to the materials she reviewed. *Id*. at 137.

Similarly, Dr. Pugliese claims that her absorption conclusions were based on a "holistic approach," but offers no explanation as to whether or how she considered the particle size of relevant chemicals, despite acknowledging that such data is important for understanding her absorption opinion. *See* Pugliese Rep. at 7; Pugliese Tr. at 260. An "expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Rosen*, 78 F.3d at 319, *citing Mid-State Fertilizer v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).

Absent defined search methods, reproducible criteria, any explanation for how articles were scored or weighted, or how conclusions were drawn, and given her admission that no formal weight of the evidence methodology was employed, Dr. Pugliese's conclusions on both dermal absorption and cancer causation are a "text book example of the type of standardless presentation of evidence" that courts deem unreliable. *See*

*Paraquat*, 730 F. Supp. at 841; *see also Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) (expert opinions that cannot be objectively replicated are subject to exclusion).

### C. Plaintiffs' Gynecology Experts Are Unqualified to Offer Causation Opinions, and Utilize Unreliable Methodologies

#### 1. Dr. Jeffrey Chang

Dr. Chang is a reproductive endocrinologist who opines that long-term chemical hair relaxer use can cause uterine and ovarian cancer. His opinion should be excluded for the reasons set forth in Section I, above. Specifically, Dr. Chang (1) *assumes* that the chemicals he evaluated are contained in, and are "representative" of, the ingredients in Defendants' chemical hair relaxer products, (2) did not analyze the dose of any chemicals contained in hair relaxer products, and (3) fails to consider the level of dermal absorption of chemicals from hair relaxers, the systemic levels of chemicals resulting from hair relaxer use, or the binding affinity of those chemicals in the human body, despite admitting that that those considerations are fundamental to his causation opinions. *Supra* § I.

In addition, Dr. Chang is not qualified to offer his causation opinion. His training and background are limited to obstetrics, gynecology and reproductive endocrinology. Chang Tr. at 16, 54, 56. Nor does he utilize a reliable methodology to reach his opinions. For these additional reasons, Dr. Chang's opinions should be excluded.

##### a) Dr. Chang is Not Qualified to Offer a Causation Opinion

Dr. Chang admits that he is not an expert in and holds no degrees in gynecologic oncology, toxicology, cancer biology, medical genetics, epidemiology or pathology and, notably, has not researched carcinogenesis or mechanisms of cancer causation, the very topics on which he offers opinions in this litigation. Chang Tr. at 71-79. Until this

litigation—his first as an expert —Dr. Chang's work focused on fertility hormones, ovulatory disorders and disorders of the hypothalamic-pituitary-ovarian axis, not ovarian or uterine cancer. *Id.* at 56, 60. He has never conducted a Bradford Hill analysis, yet purports to do so here for the first time on subjects he admits are beyond his expertise. *Id.* at 74

Further, Dr. Chang's clinical experience with cancer patients is limited to oncofertility—preserving the fertility of cancer patients—not diagnosing, determining the cause of, or treating cancer. He refers such patients to oncology. He admits his lack of expertise in the diagnosis or causation of cancers, including the potential impact of EDCs, parabens, phthalates, or phenols on cancer development. *Id.* at 60-61, 63-69. He likewise lacks training or specialized knowledge in dermatology, including chemical absorption, aside from a peripheral awareness of polycystic ovarian syndrome patients for whom Dr. Chang typically makes a dermatology referral. *Id.* at 75-77. Dr. Chang admitted he had not previously examined dermatological issues and was "totally ignorant" of the hair relaxer application process. *Id.* at 77, 112-15.

Dr. Chang's admitted lack of expertise precludes him from offering any opinions on causation, and these opinions should be excluded. *See Solaia Technology LLC v. ArwinMeritor, Inc.*, 361 F.Supp.2d 797, 812-13 (N.D. Ill. 2005). The Seventh Circuit does not allow experts to adopt litigation-driven positions untethered to their expertise or practice. *See In re Paraquat*, 730 F. Supp. 3d at 1818 (internal citations omitted).

**b) Dr. Chang's Unidentifiable and Unreliable Methodology Favors Exclusion**

Dr. Chang purports to use a "weight of the evidence" methodology but cannot define it or identify criteria for weighting studies, rendering his opinions unreliable. Chang

Tr. at 94-95. As discussed, *supra* at § IV.B.2 in connection with Dr. Pugliese, a "weight of the evidence" approach requires a clear and careful explanation of how evidence is weighted; otherwise the factfinder cannot evaluate it. *In re Paraquat,* 730 F. Supp. 3d 793, 841-42. But Dr. Chang provides no explanation. While calling his review a "weight of the evidence approach" (Chang Rep. at 3), he does no more than describe the general areas of interest he reviewed throughout the published literature. Dr. Chang admits that his report does not show how he weighted studies, and he did not test whether different weightings would have altered his conclusions. Chang Tr. at 95-96. This lack of transparency warrants exclusion. S*ee e.g., Zurbriggen*, 2025 WL 1092973, at *18 (deeming an expert's testimony inadmissible in part because of his failure to explain the weight he assigned to each Bradford Hill criteria).

As explained, *supra* at § II, the epidemiological studies on which Dr. Chang relies have significant limitations—limitations he acknowledges. Chang Tr. at 96 (acknowledging his report does not explain how his conclusions account for the limitations in the studies he cites). But he fails to discuss or explain how he accounted for those limitations in his analysis. *Id.* Dr. Chang's attempt to expand these studies beyond their intended scope ultimately substitutes personal opinion and advocacy for scientific analysis in contravention of Rule 702, and must therefore be excluded. *See e.g., Caraker*, 188 F. Supp. 2d at 1026 (excluding an expert's opinion that was akin to "personal opinions" rather than a scientific conclusion).

**2. Dr. Dario Roque**

Dr. Roque was retained to opine "as to whether chemical hair relaxer use can cause uterine cancer or ovarian cancer in the women who use these products." Roque Rep. at 4; Roque Tr. at 61. His opinions suffer from the same flaws that pervade all of Plaintiffs'

experts' opinions and should be excluded for the reasons set forth in Sections I-III, above. Moreover, in this, his maiden attempt at applying the Bradford Hill criteria, Dr. Roque has assumed causation and worked backwards to "paper over" his pre-determined conclusion. He is utterly lacking in relevant training, experience and familiarity with the epidemiological analysis he purports to undertake. Additionally, he conducts an unreliable analysis lacking in transparency and replicability. For these two additional and independent reasons, his opinions should be excluded.

**a) Dr. Roque Is Not Qualified to Opine on Causation**

His report in this case is the "first time" Dr. Roque has conducted a Bradford Hill analysis "for the purpose of causality." Roque Tr. at 345. He claims he "independently reviewed" literature on hair products and EDCs, along with "certain" carcinogens and cancers, after which he applied the Bradford Hill framework. Roque Rep. at 6. Dr. Roque has never used the Bradford Hill criteria in his clinical practice, research, or publications. Roque Tr. at 198-99. Nor has he applied the Bradford Hill framework as a published author or peer-reviewer. *Id.* While he is a gynecologic oncologist, the epidemiological analysis he undertakes here falls outside his expertise. He also lacks training and holds no degrees in epidemiology, biostatistics, neuroendocrinology, dermatology, endocrinology, environmental exposures, genetics, occupational medicine, pathology, pathology of cancer, public health, or toxicology. *Id.* at 102-07.[49]

---

[49] His clinical practice underscores the same limitations. He admitted he does not inquire about chemical hair relaxer use as part of a patient's social history and admits that to this day, he has never advised his patients to avoid or discontinue using chemical hair relaxers. Roque Tr. at 74-77, 83-84. In fact, although in his report he claims to be following the methodology he "routinely use[s] in [his] clinical practice" (Roque Rep. at 5), Dr. Roque does not even consider addressing *specific* causation in an individual patient to be part of his role outside of litigation. Roque Tr. at 74 ("I don't really have the time in my current

In short, Dr. Roque's use of the Bradford Hill framework is a litigation-driven exercise applied outside his expertise. His causation opinions should be excluded.

#### b) Dr. Roque Did Not Apply a Transparent or Replicable Methodology

Dr. Roque's analysis is devoid of any transparency or replicability, rendering it unreliable. For instance, in his report, Dr. Roque claimed to have "methodically and systematically searched and reviewed the medical literature" (Roque Rep. at 5), yet he could not testify as to the specific material he reviewed or considered in performing his analysis, and expressly declined to state that his disclosures were complete, acknowledging "there might be other sources that I considered." Roque Tr. at 18-30. Dr. Roque likewise could not define the scope of his literature review or even recall the universe of literature he reviewed in performing his causal assessment. *Id.* at 23-24. Without a defined and disclosed body of evidence, there can be no reliable weighing of that evidence. *See, e.g.*, *In re Paraquat*, 730 F.Supp.3d at 831 ("The search for relevant literature should be clearly documented and be 'as comprehensive as possible,' to ensure that the relevant studies are identified and to allow other researchers to validate the process."). This lack of transparency precludes meaningful evaluation or replication of his analysis. *See supra* at § I.B. His opinions are therefore unreliable and should be excluded.

### 3. Dr. Sameer Sharma

Dr. Sharma purports to have reviewed the "totality of the data" to conduct a causation analysis under Bradford Hill. His analysis suffers from the same flaws discussed above, and for the same reasons, those opinions warrant exclusion. *See supra* at § III.

---

practice when I'm just like seeing these patients, treating them, to go down this causal analysis for each individual patient.").

Like Dr. Roque, Dr. Sharma is board-certified in gynecologic oncology and gynecology attempting—apparently for the first time—to perform an epidemiological causation analysis. Sharma Tr. at 45. Before this litigation, Dr. Sharma had never examined whether exposure to chemical hair relaxers could cause uterine or ovarian cancer, nor had he researched or published on the potential impact of parabens, phthalates, phenols, or any other chemicals on uterine or ovarian cancer. *Id.* at 38, 44-45. In fact, his professional work has never considered chemical hair relaxers or EDCs. *Id.* at 53.

Like Drs. Chang and Roque, Dr. Sharma's literature review—the foundation of his opinions—lacks a defined, reproducible methodology. He testified that his process involved a "PubMed search, and looking at hair relaxers in a variety of exposures and outcomes in terms of associations with endometrial cancer, uterine cancer, other outcomes such as breast cancer, fibroids," as well as a Google search in which he "basically tried to put together a combination between EDCs and some of these other outcomes, focusing mostly on uterine and ovarian" but could not identify a full set of search terms, inclusion criteria, or materials considered. *Id.* at 55-56, 59-60, 62-63. He relied not only on peer-reviewed studies but also on unspecified secondary materials without "original data." *Id.* at 55-56. His report similarly provides no insight into his search criteria or which papers he relied upon and which he disregarded.

Dr. Sharma relied on three epidemiological studies to form his opinion: Studies by Chang and Bertrand, which look at the potential link between the use of chemical hair relaxers and uterine cancer, and a study by White, which looks at the potential link between the use of chemical hair relaxers and ovarian cancer. *Id.* at 56-57. He could not find any other epidemiological studies other than these three. *Id.* at 56. All three studies utilize the

cohorts and data from the Sister Study and Black Women's Health Study. *Id.* at 58. Dr. Sharma acknowledged that the Sister Study and Black Women's Health Study cohorts were not designed specifically to investigate the relationship between chemical hair relaxers and uterine or ovarian cancer. *Id.* at 58. Dr. Sharma chose to downplay the significance of a study's design and purpose and declared it "reasonable" to extrapolate a study's conclusions to situations which a study did not investigate. *Id.* at 57.

Dr. Sharma also agreed that the Chang study evaluated more straightening methods than just chemical hair relaxers, yet he refused to agree that it would be a misrepresentation to state that Chang investigated the potential association between the use of chemical hair relaxers and the risk of developing uterine cancer. *Id.* at 266. With respect to the Bertrand study, Dr. Sharma agreed that the study's findings were ungeneralizable to current hair relaxers or contemporary use behavior, and that no subsequent study or data has been published that would resolve that issue. *Id.* at 278-81. When questioned about the fact that the White study did not differentiate between methods of straightening or question its sample about specific formulations or brands used, Dr. Sharma resolved that the majority used chemical hair relaxers without providing any evidence for that conclusion. *Id.* at 283-85.

Throughout his deposition, Dr. Sharma displayed an inclination to stretch studies' findings to fit his and Plaintiffs' desired conclusions. This is neither reasonable, nor scientific, and more closely mirrors conjecture than expert opinion. The only way to replicate Dr. Sharma's opinions is to start with Plaintiffs' causal theory and reason backwards, an approach the Seventh Circuit has deemed inherently unreliable and subject to exclusion. *In re Paraquat,* 730 F. Supp. 3d at 833 (*citing Timm*, 932 F.3d at 994). This

selective and undefined approach to the literature, as well as Dr. Sharma's lack of reasoned interpretation of the findings set forth in the epidemiological literature, undermines any claim of a reliable methodology.

### D. Plaintiffs' Biological Mechanism/Toxicology Experts Offer Unreliable Opinions Based on Inadequate Facts or Data

#### 1. Stanley Atwood

Mr. Atwood, a toxicologist, opines that biologically plausible mechanisms link exposure to chemicals in chemical hair relaxers with ovarian and uterine cancers. *See* Atwood Rep. at 1. His opinions should be excluded on numerous grounds. First and foremost, as discussed at length above, Mr. Atwood does not identify the chemicals present in different chemical hair relaxers, identify any chemicals (or particular combinations thereof) that are linked to uterine or ovarian cancer, assess the dose of any such chemicals resulting from chemical hair relaxer use, or assess any exposure pathway whereby those chemicals could cause uterine or ovarian cancer. These deficiencies are emblematic of those facing each of Plaintiffs' experts, *see supra* § I, but are particularly notable since Mr. Atwood, a toxicologist, chose not to perform the foundational toxicological analyses necessary to assess causation, such as evaluating absorption, dose, toxicokinetics, or dose-response relationships for any chemical at issue.

Beyond this, Mr. Atwood misapplies the NTP Report on Carcinogens Handbook Methods for Conducting Cancer Hazard Evaluations ("Handbook"). And, finally, Mr. Atwood purported—for this first time at his deposition—to offer untimely *causation* opinions that stretch beyond the "biological plausibility" opinions disclosed in his expert report.

#### a) Mr. Atwood's Opinions Are Not Based On Sufficient Data Regarding Any Chemicals Purportedly At Issue

Mr. Atwood cannot: (1) identify which chemicals are present in the chemical hair relaxers at issue in this litigation, or (2) identify any constituent ingredients that are associated with uterine or ovarian cancer or otherwise support his opinions. *Supra* § I. Indeed, despite access to Defendants' chemical hair relaxer formulation data, Mr. Atwood did not review or rely on the ingredient lists of a single product in this litigation, conceding he simply lacked time and did not consider this vital information relevant to his analysis. Atwood Tr. at 59, 64.

Instead, Mr. Atwood relies on a single study from 2018, analyzing the chemicals contained in **three** hair relaxers (and several other products across six hair care categories) purchased in 2008. *Helm et al.*[50] The authors of *Helm* expressly acknowledged that the sample size was too small for statistical comparisons. Even more problematic, the formulations of the three products tested do not contain many of the chemicals Mr. Atwood identified in his report, and he can point to no other source from which he gleaned ingredient information. Atwood Tr. at 153-54. There is no reliable basis for Mr. Atwood to generalize across the hundreds of chemical hair relaxer products produced over decades at issue here.

Mr. Atwood additionally opines that individual chemicals in hair relaxer products make up a "complex mixture" that supports his biological plausibility opinion, but cannot identify any chemical or chemicals that must be present to support his opinions:

---

[50] Helm, J.S., et al., *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*, 165 Environ. Res. 448 (2018) (Ex. 8). *Helm* does not name the brands or products tested.

Q. . . . Are you able to give me a list of the chemicals that are actually in chemical hair relaxers that are necessary that have to be in the chemical hair relaxer in order to support your claim and opinion on biological plausibility?

A. No.

* * *

Q. So as you sit here today, can you identify any single chemical that is a necessary component to create this mixture of chemicals that supports your biological plausibility opinion?

* * *

THE WITNESS:
No, I could not do that.

Atwood Tr. at 46, 193.

When asked whether the absence of specific chemicals change his biological plausibility opinion, he responded "no." *Id.* at 51. Confusingly, his opinion is the same whether or not *any* chemical class he analyzed is present in the chemical hair relaxer (e.g. formaldehyde, parabens, and DEP/DEHP). *Id.* at 150, 175, 185-86. With respect to specific chemicals Mr. Atwood addresses, he further acknowledged the following:

**Formaldehyde**: Mr. Atwood does not opine that exposure to formaldehyde has been shown to be associated with, or cause, uterine or ovarian cancer. *Id.* at 158. Moreover, he only identifies formaldehyde as a carcinogen—for other types of cancer not at issue here—when released through the application of heat and inhaled (Atwood Rep. at 9), without actually considering whether heat was generated during the hair relaxer application process. Atwood Tr. at 142-45. [51]

[51] "Q: Can you point to any authority that says that the chemicals in a chemical hair relaxer product releases formaldehyde into the atmosphere as a result of it being applied? A: . . . that's not something that I looked at specifically." *Id.* at 144-45.

**Parabens:** Mr. Atwood readily admits that parabens[52] have not been identified as carcinogens or evaluated for carcinogenic effects by health organizations, including IARC, the NTP, or the U.S. Environmental Protection Agency ("EPA"). *Id.* at 168. He concedes there are no human or animal studies related to the carcinogenicity of parabens, and admits that there are no studies reporting a causal association between parabens and uterine or ovarian cancer. *Id.* at 168-71.

**Phthalates (DDEP and DEHP):** Mr. Atwood identifies two phthalates, DEP and DEHP, but does not know whether they are present in all Defendants' chemical hair relaxer products. *Id.* at 186. He further acknowledges that the presence or absence of DEP or DEHP is irrelevant to his biological plausibility opinion. *Id.*. Nevertheless, he concedes that there are no studies reporting a causal association between phthalates and uterine or ovarian cancer in humans. *Id.* at 184-85.

**Cyclosiloxanes, Ethylene Oxide, 1,4 Dioxane, Nitrosamines:** Mr. Atwood could provide no authority that these chemicals are present in chemical hair relaxers, let alone at doses relevant to uterine or ovarian cancer. *Id.* at 265, 268-276, 278.[53]

---

[52] Parabens are a class of chemicals. Individual parabens, such as methylparaben have been separately analyzed by many regulatory and health organizations, finding that they each have different potential adverse health effects (none related to cancer). Atwood made no effort to consider the actual paraben in CHRs but generically referred to the class as a whole. *Id.* at 172.

[53] *See also id*. at 278 (Mr. Atwood is not "aware of any scientific studies that report a causal association between nitrosamines in uterine or ovarian cancer"). Mr. Atwood refers to many other chemicals that he generically associates with personal care products, but which he cannot show are present in chemical hair relaxers and/or which no studies link to uterine or ovarian cancer. Moreover, like the chemicals discussed above, these not associated with uterine or ovarian cancer, and Mr. Atwood has not explained or assessed their relevance to his biological plausibility opinions. *See, e.g., id*. at 279 (Mr. Atwood is not "aware of any studies reporting a causal association between diethanolamine and uterine or ovarian cancer").

These factual shortcomings are fatal to Mr. Atwood's opinions for the reasons set forth in Section I.

**b) Mr. Atwood Does Not Assess the Dose of Any Chemicals in Hair Relaxer Products**

Like Plaintiffs' other experts, Mr. Atwood cannot provide any dose levels for any chemicals in hair relaxer products because "conducting a dose response analysis was not part of [his] mandate." Atwood Tr. at 314-15. Instead he relies on non-monotonic dose response, Atwood Tr. at 312-313, 315, and he postulates that undetectable doses of certain EDCs could lead to some adverse effects. *Id.* at 320-22. Mr. Atwood concedes that this approach has not been generally accepted and is sharply debated in the scientific community, and he offers no evidence that any such effect may occur from the chemicals in hair relaxer products. *Id.* at 318-19. "A known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 595.

Likewise, although Mr. Atwood surmises that chemicals in hair relaxers may have additive, synergistic and cumulative effects, he concedes he never analyzed chemical hair relaxers or their constituent chemicals to determine whether such effects actually occur from use of chemical hair relaxer products. Atwood Tr. at 344-45, 347-49. Mr. Atwood's failure to test his theory, similarly, undermines its reliability. *Daubert*, 509 U.S. at 593 ("a key question to be answered . . .will be whether it can be (and has been) tested").

Finally, in an attempt to explain away the lack of a dose-response evident in the existing research (*see supra at* § III.E*),* Mr. Atwood asserts that chemical hair relaxers may have a "non-monotonic" effect. But, again, Mr. Atwood offers no evidence to support this hypothesis. While he acknowledges his theory can be tested and describes how to conduct

a nonmonotonic assessment, he did not do so in this case. Atwood Tr. at 315-16; *see also Daubert* at 593 (the "key question" is whether a theory "can be (and has been) tested").

**c) Mr. Atwood's Opinions Are Not Supported By Any Exposure Pathway Analysis**

Mr. Atwood has not conducted an assessment of the exposure pathway(s) for the various chemicals he identified. For example, Mr. Atwood speculates that "all" of the chemicals in hair relaxer products can be vaporized and inhaled, with no testing, analysis or authority to support that position. Atwood Tr. at 71. Mr. Atwood's failure to support these basic facts further undermines the admissibility of his opinions.[54]

Mr. Atwood also claims that "endocrine disruptors" present in hair relaxers are absorbed into the body, make their way to the uterus and the ovaries, and bind with receptors in these locations in a manner that may develop cancer. However, even if he could establish the chemicals could be absorbed and travel to the uterus (for which he offers no support), Mr. Atwood concedes that a disruption of the endocrine system does not necessarily lead to adverse health effects, let alone cancer. Atwood Tr. at 121. Indeed, he recognizes that the endocrine system is intentionally disrupted both naturally and through medication such as birth control with no ill health effects and provides no support as to why or how a different result would occur in the alleged presence of hair relaxers. Mr. Atwood offers no explanation of what happens in the uterus or ovaries on a biological,

[54] Mr. Atwood also claims that scalp burns when applying hair relaxer products provide an exposure pathway for dermal absorption. However, if his biological plausibility opinion is based on compromising the scalp to permit absorption, then every application of every hair relaxer product would have to burn or damage the scalp to create that environment, a premise for which Mr. Atwood does not and cannot provide any support. Notably, an increased number of burns during hair relaxer application is not associated with a higher rate of uterine cancer. *See supra* § II.B.2 (citing *Bertrand*).

cellular or genetic level that could plausibly result in cancer. In fact, he concedes that there are absolutely no scientific studies supporting the hypothesis that the disruption of the endocrine system has been causally associated with uterine or ovarian cancer. *Id.* at 129-30. This is a glaring analytical gap that breaks the chain of any biological plausibility analysis. *Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only the *ipse dixit* of the expert").

To fill this gap, Mr. Atwood relies on a study regarding breast cancer, a so-called "transdiagnostic" analyses that courts have rejected as unreliable. Atwood Tr. at 178-79, 346-47; *supra* § III.B. But Mr. Atwood concedes that if something causes cancer in one location, that is not evidence that it causes cancer in another location. *Id.* at 200. That is because different tissues in different parts of the body have different sensitivities and react differently to chemicals or agents, *id.* at 130-31, and Mr. Atwood provides no support for his conclusion that a breast cancer study can support a conclusion regarding uterine or ovarian cancer.

At bottom, Mr. Atwood's claims regarding a biologically plausible pathway for hair relaxer products to cause uterine or ovarian cancer is unsupported, directly contradicted by the current scientific literature, and inadmissible.

#### d) Mr. Atwood Fails to Reliably Apply the National Toxicology Program's Report on Carcinogens Handbook Methods for Conducting Cancer Hazard Evaluations

Mr. Atwood claims to have applied the NTP Report on Carcinogens Handbook Methods for Conducting Cancer Hazard Evaluations ("Handbook"). Atwood Rep. at 21,[55] However, even a cursory comparison of Mr. Atwood's report to the Handbook demonstrates that he failed to properly apply this methodology.

For example, the Handbook requires evaluation of the mechanistic and other data relevant to the potential carcinogenicity, including evidence of absorption, distribution, metabolism, and excretion ("ADME") and toxicokinetics.[56] But Mr. Atwood admitted that he did not conduct "a methodologically reliable ADME assessment" as he was "not tasked with conducting a…formal ADME analysis." Atwood Tr. at 293.[57]

Mr. Atwood's failure to follow the very methodology he purports to apply renders his opinion methodologically flawed and scientifically unreliable.

---

[55] Mr. Atwood admitted he applied an outdated methodology to form his opinions, relying on the 2015 version of the Handbook even though the NTP released a new version in June 2025 (with Mr. Atwood listed as a contributor). Mr. Atwood knew about the 2025 Handbook but simply chose not to use it in this litigation and could not say whether there were methodological differences between the two versions. Atwood Tr. at 103-04.

[56] *See* Nat'l Toxicology Program, U.S. Depot of Health & Hum. Servs., Handbook on Methods for Conducting Cancer Hazard Evaluations: NTP Report on Carcinogens (June 2025), https://ntp.niehs.nih.gov/sites/default/files/2025-05/handbook_roc_508.pdf.

[57] For example, on absorption, Mr. Atwood was asked "how chemicals from a chemical hair relaxer are absorbed into the body"; Mr. Atwood provided no analysis but generically stated "that he would just follow the general principles, the absorption through the skin," later contradicting himself by testifying that all chemicals from hair relaxers could be vaporized and inhaled. Atwood Tr. at 67, 71. He never considered the issue of distribution; for example, when asked how long parabens "have to be present in the body to actually disrupt the endocrine system," Mr. Atwood admits "that's something that I did not specifically investigate." *Id.* at 181.

#### e) Mr. Atwood's Purported General Causation Opinions Are Untimely, Scientifically Unreliable And Unsupported

##### (1) Mr. Atwood's Causation Opinions Are Untimely

Mr. Atwood consistently represented—both in his report and at deposition—that his mandate was limited to assessing biological plausibility. Atwood Rep. at 1, 4, 75. Only at the close of his deposition did Plaintiffs' counsel elicit, for the first time, a *general causation* opinion beyond biological plausibility. Atwood Tr. at 350-51. This newly-offered opinion was not disclosed by the Court-ordered deadline of December 1, 2025 and should be precluded as untimely.

##### (2) Mr. Atwood's Bradford Hill Analysis is Skeletal and Unreliable

Because Mr. Atwood represented that he was not providing a causation opinion, it is not surprising that his report includes only a cursory discussion of Bradford Hill. He provides no underlying analysis or substantive explanation of the evidence. However, if Mr. Atwood now seeks to offer an opinion on causation (and the Court permits him to do so given its untimeliness), his treatment of the individual Bradford Hill factors is unsupported and unreliable (*see also* § III*, supra)*:

- ***Strength of Association.*** Mr. Atwood offers only conclusory statements that the *Chang* and *White* studies report an association. His reference to ranges for "HRs" does not cure that deficiency as he does not identify their source, significance, or whether they relate to uterine or ovarian cancer. Atwood Rep. at 75**.** As discussed, this factor does not support a causal finding for either uterine or ovarian cancer. *Supra* § III.A.

- ***Consistency.*** Mr. Atwood maintains there were "[c]onsistent results among five uterine cancer studies and one ovarian cancer study." Atwood Rep. at 75. He repeats this statement as one of the key points on which he formed his opinions in this litigation: "At least six epidemiology studies have reported that chemical hair relaxer use, particularly long-term use, is associated with an increased risk of developing ovarian and uterine cancer" *Id.* at 49. This is blatantly false. Three of the studies he cites address uterine fibroids (a benign condition), not cancer, and do

not mention cancer at all. This mischaracterization materially inflates his evidence base and undermines the reliability of his conclusions. Additionally, Mr. Atwood impermissibly conflates uterine and ovarian cancer in one Bradford Hill analysis. Atwood Tr. at 208-09; Atwood Rep. at 75; *supra* § III.B.

- ***Specificity***. Mr. Atwood offers only the generalized assertion that "[m]ultiple epidemiology studies showed associations with endocrine-related cancer among women that used chemical hair relaxers. Other studies (human and *in vitro*) identified endocrine disrupting effects consistent with cancer." *Id.* at 76. This statement is not even relevant to Bradford Hill's "specificity" factor, *see supra* § III.C, nor is it specific to uterine or ovarian cancer, and instead relies on broad, non-specific references to "cancer" and "endocrine-related" cancer.

- ***Temporality***. Atwood states only that "[d]isease outcome was related to prior use of hair relaxers," Atwood Rep. at 76, without consideration of the long latency period for cancer development or the Sister Study's prior 12-months exposure measurement limitations. *See supra* § III.D.

### 2. Dr. Michael Crowley

Dr. Crowley, an organic chemist, analyzes the chemical composition of hair relaxers and purports to identify potential impurities, degradants, and reaction pathways. His opinions should be excluded because his opinions are not based on sufficient facts or data, *supra* § I, and, to the extent he purports to opine on causation or health effects of hair relaxers or the chemicals he identifies, his opinion lacks any reliable methodology.

#### a) Dr. Crowley's Opinions Are Not Based On Sufficient Facts Or Data

Dr. Crowley identifies chemicals purportedly present in hair relaxer products, but his opinions lack sufficient facts or data regarding (i) the chemical hair relaxer products in which those chemicals were present, (ii) the purported degradation of ingredients he identifies, or (iii) dermal absorption of chemicals from hair relaxer use. *Supra* § I.

*First,* Dr. Crowley admits that he did not conduct a systematic review to confirm that each chemical he identified was present in each Defendant's products, some chemicals appeared in certain Defendants' products but not necessarily in all, he did not know how

many of a specific Defendant's products contained a particular chemical, and he could not identify which component of a hair relaxer kit (e.g., the relaxer cream, the neutralizing shampoo, the conditioner, the protective base) contained certain chemicals. Crowley Tr. at 83, 122, 171-172; *see supra* at § I.A.

Dr. Crowley also conceded that he did not examine how chemical formulations changed over time. He searched the "Everlaw" database[58] for chemical names and verified "hits," but did not build any timeline of ingredients for specific products. He was "just identifying whether [an ingredient] was ever in the product" at some unspecified point between 1990 and 2023, a period spanning over three decades. *Id.* at 89-91, 95, 104. Dr. Crowley did not test any chemical hair relaxer for the presence of impurities, contaminants, degradants, or nitrosamines. Crowley Tr. at 102-03.

Table 1 in Dr. Crowley's Report, titled "Impurities and Contaminants in Cosmetics," relates to cosmetics *generally*—not chemical hair relaxers specifically. Dr. Crowley admitted that he did not verify that each substance listed in Table 1 is present in a chemical hair relaxer product (let alone Defendants' chemical hair relaxer products).[59] Table 1 therefore functions only as a general cosmetics reference that was not independently validated for the products at issue. Crowley Tr. at 150-153.

*Second*, Dr. Crowley's core opinions rest on the premise that certain chemicals in chemical hair relaxers can degrade under conditions of high alkaline pH, elevated temperature, or oxidation to form harmful reactive species, including formaldehyde and

[58] Everlaw is a cloud-based e-discovery platform used by the parties in this litigation to host, search, and review documents produced during discovery.

[59] By contrast, Table 2 in his Report purports to identify chemicals that Dr. Crowley verified were in Defendants' product formulations.

nitrosamines. Yet Dr. Crowley did not conduct or identify any testing to determine whether these degradation reactions actually occur in chemical hair relaxer products, at what rate, or to what extent. *Id.* at 128, 178-179. Nor did he conduct any stability testing on any chemical hair relaxer product or its components. Despite acknowledging that such testing "would be a good practice to examine potential chemical reactions from one component to the other," Dr. Crowley simply stated he "was not asked to" do any of it. *Id.* at 103, 109, 128, 179, 185-186, 190-194. Similarly, Dr. Crowley acknowledged that, in the pharmaceutical space, force degradation studies, involving acid and base catalyzed hydrolysis, photolysis, oxidation, and thermal exposure, are standard practice, and that conducting such studies on chemical hair relaxer products would also be "a good practice." Yet he performed none. Crowley Tr. at 108-109, 192-98.

With respect to nitrosamines, Dr. Crowley opined that chemical hair relaxers contain the necessary "ingredients to bake the cake," including amines, nitrosating agents, and conditions favorable to nitrosamine formation, but Dr. Crowley did not determine whether the "cake gets baked" in reality. That is, he did not measure the amount of formaldehyde formation in chemical hair relaxers, did not assess whether any such formation was sufficient to catalyze nitrosamine formation, and did not measure how much nitrosamine, if any, would actually form during typical product use. Dr. Crowley ultimately conceded he "did not do any measurements" and that the dose-response component was "unnecessary" for his opinions. Crowley Tr. at 50, 178-179, 201. That is speculation masquerading as analysis.

Despite being "very curious" about conducting testing on chemical hair relaxers, Dr. Crowley's universal response to every question about the absence of testing was the

same: "It wasn't necessary to come to my opinions." *Id.* at 134, 152-53. This reflexive answer, repeated dozens of times throughout his deposition, highlights this methodological deficiency in his opinions. A pharmaceutical chemist who identifies random chemicals from certain Defendants' documents and then concludes that harmful reactive species "can" be formed, without ever testing whether they actually are formed, at what levels, and under what real-world conditions, is offering speculation, not a reliable expert analysis. *Id.* at 131, 185-186. *Daubert* at 593.

*Third*, the same flaw pervades Dr. Crowley's dermal absorption opinions. While he cites literature on the general permeability of scalp skin and the effects of damaged skin on absorption, he conducted no studies measuring actual dermal absorption of any specific chemical from any chemical hair relaxer product. He conceded he is "not offering an opinion on how much" chemical is absorbed. Crowley Tr. at 185-86. He also acknowledged he is not providing measurements of the duration of exposure. In other words, Dr. Crowley asserts only that absorption "does happen" but cannot say how much, how fast, at what concentration, or for how long—parameters essential to any scientifically grounded health risk assessment. Crowley Tr. at 185-186. *See also supra,* ¶I.E.

These factual shortcomings render Dr. Crowley's opinions inadmissible, as set forth in Section I.

**b) Dr. Crowley Cannot Offer Incomplete Causation Opinions**

Throughout his deposition, Dr. Crowley unequivocally and repeatedly confirmed that he is "not offering causation opinions." *Id.* at 135, 144, 146, 158. He was not asked to determine whether use of chemical hair relaxers causes uterine cancer or ovarian cancer, whether it is biologically plausible that chemical hair relaxers cause these cancers, or

analyze dose-response or duration of use. *Id.* at 111-12, 134-36, 156, 204-205. Despite his academic focus on ADME, Dr. Crowley conducted no ADME analysis of any chemical in chemical hair relaxers. He did not evaluate any epidemiological evidence or apply any recognized scientific analysis use to assess health effects of chemical exposures. *Id.* at 138, 140, 154-157. Rather, he characterized his role as limited to verifying the presence of certain chemicals in chemical hair relaxer products, describing their known chemical, physical, and biological properties, and explaining how they *might* interact or degrade. *Id.* at 109. He consistently deferred all dose-response, toxicological causation, and epidemiological questions to "other experts." *Id.* at 145, 154-156.

But that self-imposed limitation does not insulate his opinions from scrutiny; it exposes their incompleteness and tendency to mislead. His report repeatedly identifies the presence or potential formation of chemicals of "known carcinogens" (such as formaldehyde) in chemical hair relaxer products, creating the unmistakable implication that chemical hair relaxers contain cancer-causing chemicals, while disclaiming the very analyses necessary to support that inference. The mere identification of a known carcinogen in a product, without analyzing whether it is linked to uterine or ovarian cancer, the dose at which it is present, the route and extent of human exposure, or the biological plausibility of harm at those levels, is not a scientifically reliable opinion. *See supra,* § I. At best, it is an incomplete building block; at worst, it is a rhetorical device designed to suggest causation without undertaking the rigorous analysis required to establish it. *Id.* at 174-178.

If Dr. Crowley is not offering causation opinions, then his testimony that chemical hair relaxer ingredients are "known carcinogens" or "hazardous to human health" serves

no admissible purpose independent of the causation opinions he disclaims. His opinions should be precluded because they are either (1) impermissible causation opinions masquerading as chemistry opinions, or (2) scientifically incomplete opinions that will mislead the jury into drawing causal inferences that are unsupported by the analyses Dr. Crowley was required, but ultimately failed, to perform.

Indeed, in the *Johnson & Johnson MDL*, the only other case in which Dr. Crowley has testified regarding cancer of the female reproductive system, the Special Master recommended narrowing Dr. Crowley's testimony, specifically with respect to cancer causation. Dr. Crowley understands that the special master "recommended that I not give opinions on the cancer causation of those specific chemicals." *Id.* at 14-16, 63. This judicial limitation on Dr. Crowley's testimony underscores the precise overreach at issue here.

**3. Dr. Dipak Panigrahy**

**a) Dr. Panigrahy's Opinions Are Not Supported by Sufficient Facts or Data**

As discussed, *supra* § I, Dr. Panigrahy did not conduct a product-specific analysis of Defendants' hair relaxers, or determine which chemicals are present in which products, in what concentrations, or during what time periods. Instead, he identified eleven chemicals[60] based on their appearance in certain company witness depositions and the literature, rather than through any systematic or product-specific evaluation. Panigrahy Tr. at 123.

[60] Dr. Panigrahy identifies formaldehyde, parabens, phthalates, NDELA, NDMA, ethylene oxide, 1,4-dioxane, acrylamide, benzophenones, polycyclic aromatic hydrocarbons (PAHs), and arsenic.

Nor did he consider the dose of any such chemicals in hair relaxer products, or a minimum exposure level required for causation. *Supra* § I.C. In fact, Dr. Panigrahy disclaims the need to assess *any* threshold, dose, or duration, or frequency of exposure. Panigrahy Tr. at 116-18, 132-34 Dr. Panigrahy's general causation opinion ultimately reduces to the uniformly rejected "any exposure" theory—that any combination at any level of the eleven chemicals he identified causes ovarian and/or endometrial cancer. He testified that "these compounds don't have a threshold" and that chemical concentration "is not relevant." Panigrahy Tr. at 132, 138. Dr. Panigrahy offered no opinion as to the minimum frequency or duration of use of hair relaxer products required to increase the risk of ovarian or uterine cancer. *Id.* at 73. In effect, Dr. Panigrahy's opinion is that any exposure, regardless of dose, duration, or frequency of exposure, is sufficient to cause cancer. As discussed *supra* at § I, courts have consistently rejected such theories as unreliable. *See Krik*, 870 F.3d at 677 ("more than thirty other federal and state courts have held that this cumulative/"any exposure" theory is not reliable.")

Moreover, as discussed above, Dr. Panigrahy's causation opinion rests primarily on the premise that certain chemicals are capable of causing cancer under some conditions and that certain biological mechanisms (*e.g.*, inflammation, genotoxicity, oxidative stress) are associated with carcinogenesis. Panigrahy Tr. at 130-31; 137-38. But Rule 702 requires more than identifying general potential hazards; it requires a reliable methodology demonstrating that the exposures at issue are capable of causing the specific diseases alleged. Dr. Panigrahy never performs that analysis. He does not identify any human data establishing that the chemicals he identified cause uterine or ovarian cancer at real-world exposure levels. *Id.* at 142-44; 256-57. Nor does he demonstrate that the mechanisms he

invokes operate at those exposure levels in humans. *Id.* at 131-32. Instead, he aggregates general propositions about carcinogenesis and treats them as sufficient to establish causation. Panigrahy Tr. at 146-47; 152; 167-69.

This shortcoming is particularly problematic here, where Dr. Panigrahy acknowledges that neither IARC nor the NTP has concluded that any chemicals he identifies cause uterine or ovarian cancer in humans. *Id.* at 124. In fact, he testified that removing any one of the identified chemicals or classes of chemicals from hair relaxers would not change his causation opinion because "any combination" of those chemicals can cause uterine or ovarian cancer. *Id.* at 156, 168; *supra* §§ I(B) and III(E)(iv). This disconnect underscores the absence of adequate facts or data to support his opinions, and the lack of a reliable methodological bridge between the data and the causation opinions he offers. A causation opinion that does not depend on the identity, amount, or combination of chemicals—and that remains unchanged regardless of actual product composition—cannot be grounded in a reliable scientific methodology and must be excluded as a litigation-driven conclusion.

**b) Dr. Panigrahy Does Not Reliably Apply The Bradford Hill Framework**

Although Dr. Panigrahy invokes Bradford Hill and a "totality of the evidence" approach, his deposition testimony shows that he does not apply those principles consistently or in a scientifically reliable manner. *See supra* § III. Rather, he describes any supporting evidence as meaningful while dismissing all contrary evidence as flawed or "underpowered" with little explanation. Panigrahy Tr. at 105-106, 164. For instance, he acknowledged that the *White* and *Chang* publications (based on data from the Sister Study) found no statistically significant increased risk of either ovarian or uterine cancer for Black

women regardless of how frequently they used straighteners, relaxers, or pressing products, yet he relied on a single subgroup result (post-menopausal women) and baselessly insisted the studies underestimated the risk of uterine or ovarian cancer by conflating hair relaxers with other products not at issue in this litigation. *Id.* at 91-93, 109-10. Likewise, he conceded the absence of a biological gradient (*i.e.* dose-response) in *Bertrand*, but discounted that finding by asserting the study design was inherently underpowered and "underrepresent[s]" the risk unless it follows women for 20 to 30 years. *Id.* at 164.

His treatment of the Sister Study data further illustrates Dr. Panigrahy's biased, unreliable methodology. Dr. Panigrahy admitted that many data points did not show a dose-response relationship, yet dismissed those findings as flawed while elevating a single data point he deemed "meaningful." *Id.* at 117-118. ("Q: And there is no dose response, correct? A: … correct. But this goes back to a lower number"; "Q: And under 'frequency of use,' there is no dose response, correct? A: Correct. Again, we have to go to Table 4 for menopausal women." "Q: … Table 2 does not show a dose response, correct? A: Correct… because of the reasons I mentioned with the lower numbers"). Curiously, when discussing this single data point, Dr. Panigrahy no longer asserted that the study was flawed.

This selective treatment of the evidence—crediting supportive findings while dismissing contrary data as evidence that the same study was "flawed" and "underpowered"— confirms that Dr. Panigrahy's opinions are driven by conclusion rather than scientific analysis. Coupled with his assertion that any and all exposure, regardless of dose, frequency, duration, or even specific chemicals can cause cancer, Dr. Panigrahy's methodology amounts to subjective belief rather than scientific reasoning. *See discussion* § IV.D.3, *supra.*

#### 4. R. Thomas Zoeller

Dr. Zoeller, an endocrinologist, focuses on eight chemicals or chemical classes—four EDCs (benzophenones, phthalates, parabens, and siloxanes) and four "carcinogens" (formaldehyde, 1,4-dioxane, ethylene oxide, and N-Nitrosamines)—and claims that they create a "perfect storm" of carcinogenicity in the uterus and the ovaries. Zoeller Tr. at 202-206. According to Dr. Zoeller, the four carcinogens create a "carcinogenic environment" in which the four EDCs combine to activate a "proliferative signal" in the endometrium and the ovaries that "amplifies" the signal activated by the body's own estrogen, thereby contributing to "excess estrogen," and in turn uterine and ovarian carcinogenesis. His opinions are inconsistent with a wealth of scientific data, and unreliable under Rule 702.

*First*, Dr. Zoeller's theory is directly contradicted by the relevant scientific evidence regarding carcinogenicity. Dr. Zoeller's eight "perfect storm" chemicals have been studied for carcinogenicity in animals, and none has been found to cause uterine or ovarian cancer, even at exceedingly high lifetime doses.[61] Likewise, the available epidemiological data for these chemicals shows no consistent valid association with uterine or ovarian cancer in humans. Adams-Campbell Rep. at 28-29; Weed Rep. at 8-12. In other words, there is not simply a lack of evidence that these chemicals can cause uterine or ovarian cancer; *there is robust scientific evidence that these chemicals cannot cause those cancers*. Astonishingly, Dr. Zoeller completely ignored the relevant, contradictory animal

[61] One study of ethylene oxide in mice showed an increase in uterine tumors at exceedingly high doses through chronic inhalation, but that finding was not replicated in rats. Chodosh Rep. at ¶¶ 300-305. Studies of DEHP in rats showed an increase in uterine tumors, but those results are not considered relevant to humans. *Id.* at ¶¶ 222-224, discussing EPA. *Cancer Human Health Hazard Assessment for Di(2-ethylhexyl) Phthalate (DEHP), Dibutyl Phthalate (DBP), Butyl Benzyl Phthalate (BBP), DiisobutylPhthalate (DIPB), and DicyclohexylPhthalate (DCHP)*. EPA-740-R-25-029 (2025).

and human carcinogenicity data, because he "did not consider it relevant" in conducting his literature search. Zoeller Tr. at 83-85, 101. Instead, he limited his inquiry to whether the EDCs in hair relaxer products are "estrogenic" (*i.e.*, that they bind and activate ER-alpha). *Id*. But estrogenicity is not synonymous with carcinogenicity (let alone uterine or ovarian cancer). Genistein, for example, which is a natural, estrogenic chemical in soy, is not considered carcinogenic and might even protect against uterine (endometrial) cancer. Chodosh Rep. at ¶ 164. As Dr. Zoeller admitted at his deposition, "there is more to the relationship between chemical interference with estrogen action and estrogen-sensitive cancers than ER-alpha binding" and "activation of proliferative signaling." Zoeller Tr. at 104. Dr. Zoeller's failure to consider (let alone address) directly contrary scientific data is alone grounds to exclude his opinions.

*Second*, even setting aside Dr. Zoeller's blatant failure to consider data on carcinogenicity, Dr. Zoeller's opinions are not even consistent with the data he does cite. In particular, Dr. Zoeller relied exclusively on mechanistic studies, most of which were *in vitro*, as purported evidence that the four identified EDCs are estrogenic. Those same studies, however, included findings that certain of those chemicals were not estrogenic or did not stimulate ER-alpha proliferative signaling. For example, in one study he relied on, methylparaben and the five tested phthalates were *negative* for estrogenicity (ER-alpha activation).[62] When confronted with these contrary findings, Dr. Zoeller resorted to generalized assertions of "confidence" that the mixture of his four "perfect storm" EDCs *as a whole* is estrogenic. *Id.* at 352-353. Likewise, when confronted with literature

---

[62] Lee, H, Park, J, Park K. 2022. Effects of consumer products chemicals ingredients and their mixtures on the estrogen receptor/androgen receptor transcriptional activation. Chemosphere, 302:134866.

describing of the four EDCs as "weak" estrogenic chemicals (if estrogenic at all), he retreated from characterizing the individual chemicals as "potent" and instead attributed that label only to the entire mixture of EDCs in his "perfect storm" theory. *Id*. at 205 (characterizing his theory as the combination of potent EDCs and other carcinogens), 369-370 (conceding that the EDCs at issue are weak estrogens, but the combination of these weak estrogens is potent). He made no attempt, however, to quantify the mixture's "potency." *Id*. at 370-371. Critically, he also admitted that "it remains to be seen whether a mixture of estrogenic EDCs could act together to impact the actions of endogenous estrogens in a way that is physiologically relevant." *Id*. at 118.

Dr. Zoeller's biological plausibility theory ultimately rests on the premise that the "**entire mixture**" of eight "perfect storm" EDCs and carcinogens in hair relaxer products can cause uterine and ovarian cancer. He offers no scientific support for this proposition. When asked to identify any evidence demonstrating such an effect, his only answer was that he "did not look at that for [his] report." *Id*. at 298-299. Moreover, he admitted he did not perform any mixture risk assessment, which would involve determining the potency of the individual chemicals in the mixture and then analyzing their combined potency with respect to a particular defined endpoint. *Id*. at 263-265. Nor did he perform any exposure analysis, admitting that he had no idea what dose of any chemical would reach the uterus or ovaries from hair relaxer use. *Id*. at 252. At the same time, he acknowledged that the same mixture of chemicals are ubiquitous in the environment and/or produced naturally in the body, such that individuals are routinely exposed to them from multiple sources other than hair relaxers, making it impossible to avoid them in "normal life." *Id*. at 255-256.

Dr. Zoeller attempts to justify his "mixture effects" conclusions by invoking various "Key Characteristics of Carcinogens" ("KCCs") and "Key Characteristics of Endocrine Disruptors" ("KCs of EDCs"), asserting that the chemicals in his proposed mixture collectively exhibit these characteristics. But, as he admitted at his deposition, the KCCs and KCs of EDCs are not meant to function as "checklists" to determine whether a particular chemical—or, here, a mixture—is a carcinogen or an EDC. *Id*. at 302, 305. When pressed on whether it was his understanding that any chemical possessing some number of KCCs is carcinogenic, he admitted that, "since it's not a checklist, I don't think that you can look at it like that." *Id.* at 304.

Finally, although Dr. Zoeller claims to have conducted a "weight of evidence" analysis to reach his general causation opinions, he admitted that he did not perform such an analysis in a scientifically recognized manner, as he "did not keep track of the various categories." *Id*. at 135-137. He further "assumed," without support, that data regarding certain chemicals in a chemical class (*e.g.*, a certain type of phthalate) could be extrapolated or "read over" to different chemicals in that class, because he was dealing with "limited information" regarding the specific chemicals in hair relaxer products. *Id*. at 89-94. He made this assumption notwithstanding his acknowledgement that the "read across" method cannot be used without scientific justification, which he admittedly did not provide. *Id*. When asked whether he was aware that Defendants in the litigation had produced their product formulas, he answered, "I haven't seen those." *Id.* at 91. Had he seen them, he would have known, among other things, that many of the products at issue in this litigation do not even contain the "entire mixture" of chemicals on which his "perfect storm" theory depends.

In short, Dr. Zoeller's opinions are not based on sufficient facts or data and are not the product a reliable principle or method. They should be excluded under Rule 702.

## CONCLUSION: The Analytical Gap Requires Exclusion

Under Rule 702, *Daubert, Joiner*, *Varlen*, and related authority from courts throughout the country, testimony must be excluded where there is too great an inferential leap between data and conclusion. That is precisely the issue here. Plaintiffs' experts have built their opinions on a series of untested and unverified assumptions and hypotheses. Yet, they have done nothing to confirm which chemicals are in any of Defendants' hair relaxer products or at what level, whether any of the myriad chemicals they point to are even capable of causing ovarian or uterine cancer or, if they can, what dose is required to do so, or determine whether any of the chemicals are capable of absorption into the body, of reaching the uterus or ovaries or of reaching levels sufficient to cause cancer in those tissues.

"To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Rule 702 and the caselaw under *Daubert* requires an expert's conclusions be "supported by good grounds for each step in the analysis," meaning "that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994). "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). For the reasons discussed above, Plaintiffs' experts' opinions fail at every step, and Rule 702 requires their exclusion.

Dated: May 5, 2026

By: /s/ Lori B. Leskin
Lori B. Leskin
E. Dean Harris Porter
**ARNOLD & PORTER KAYE SCHOLER, LLP**
250 West 55th Street
New York, NY 10019
T: (212) 836-8641
F: (212) 836-8689
Lori.leskin@arnoldporter.com
Dean.Porter@arnoldporter.com

Rhonda R. Trotter
**ARNOLD & PORTER KAYE SCHOLER, LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
T: (213) 243-4000
F: (213) 243-4199
Rhonda.trotter@arnoldporter.com
*Counsel for Defendants Strength of Nature LLC; Strength of Nature Global LLC; and Godrej SON Holdings*

Heidi Levine
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York 10019
T: (212) 839-5300
hlevine@sidley.com
*Defense Liaison Counsel and Counsel for Defendant Namasté Laboratories, LLC*

Daniel A. Spira
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, Illinois 60603
T: (312) 853-7274
dspira@sidley.com

Amanda M. Blau
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York 10019
T: (212) 839-5441
ablau@sidley.com

Caitlin P. Strauss
**SAUL EWING LLP**

1735 Market Street
Suite 3400
Philadelphia, PA 19103-7504
T: (215) 972-7153
caitlin.strauss@saul.com

Michael A. Jacobson
**SAUL EWING LLP**
161 North Clark Street
Suite 4200
Chicago, IL 60601
T: (312) 876-7121
michael.jacobson@saul.com
*Counsel for Defendant Namasté Laboratories, LLC*

Dennis S. Ellis
Katherine F. Murray
Serli Polatoglu
**ELLIS GEORGE LLP**
2121 Avenue of the Stars
Suite 3000, 30th Floor
Los Angeles, CA 90067
T: (310) 274-7100
F: (310) 275-5967
dellis@ellisgeorge.com
kmurray@ellisgeorge.com
spolatoglu@ellisgeorge.com

Jonathan Blakley
**GORDON REES SCULLY MANSUKHANI LLP**
1 N. Franklin St., Suite 800
Chicago, IL 60606
T: (312) 565-1400
F: (312) 565-6511
jblakley@grsm.com

Peter Siachos
**GORDON REES SCULLY MANSUKHANI LLP**
18 Columbia Turnpike, Suite 220
Florham Park, NJ 07932
T: (973) 549-2500
F: (973) 377-1911
psiachos@grsm.com

*Counsel for Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc. and SoftSheen-Carson LLC*

Patrick P. Clyder
**MCGUIREWOODS LLP**
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
T: (312) 849-8100
F: (312) 849-3690
pclyder@mcguirewoods.com
*Counsel for Defendant House of Cheatham LLC*

Mack H. Shultz
**MCGUIREWOODS LLP**
Safeco Plaza
1001 Fourth Ave.
Suite 4368
Seattle, WA 98154-1123
T: (206) 336 5181
F: (206) 336 5791
mshultz@mcguirewoods.com
*Counsel for Defendant House of Cheatham LLC*

Kevin A. Titus (6217520)
Sherita Glover (6319197)
**LITCHFIELD CAVO, LLP**
303 West Madison Street, Suite 300
Chicago, Illinois 60606
Telephone: (312) 781-6668
Facsimile: (312) 781-6630
Titus@litchfieldcavo.com
Glover@litchfieldcavo.com

Daniel P. Costello (6274746)
Michael P. Turiello (6238272)
Shipra S. Mehta (6321116)
**COSTELLO GINEX & WIDEIKIS, P.C.**
150 N. Wacker Drive, Suite 1400
Chicago, IL 60606
T: 312-850-2651
F: 312-893-7395
dcostello@cgw-legal.com
mturiello@cgw-legal.com
smehta@cgw-legal.com

*Counsel for Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc.*

Richard J. Leamy, Jr.
Kristen A. Schank
Anna Morrison Ricordati
**WIEDNER & MCAULIFFE, LTD.**
1 N. Franklin St., Suite 1900
Chicago, Illinois 60606
T: (312) 855-1105
rjleamy@wmlaw.com
kaschank@wmlaw.com
amricordati@wmlaw.com
*Counsel for Defendant Avlon Industries, Inc.*

Melissa Fallah
Robert W. Petti
Alyssa P. Fleischman
**MARON MARVEL**
191 N. Wacker Drive, Suite 2950
Chicago, Illinois 60606
T: (312) 579-2018
mfallah@maronmarvel.com
rpetti@maronmarvel.com
afleischman@maronmarvel.com
*Counsel for Defendant Luster Products, Inc.*

Robert A. Atkins
Daniel H. Levi
Shimeng (Simona) Xu
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
T: (212) 373-3000
ratkins@paulweiss.com
dlevi@paulweiss.com
sxu@paulweiss.com

Randy S. Luskey
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
T: (628) 432-5112
rluskey@paulweiss.com

David E. Cole
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006
T: (202) 223-7348
dcole@paulweiss.com

Edward P. Abbot
**ECKERT SEAMANS CHERIN & MELLOT, LLC**
275 Madison Avenue, 10th Floor
New York, NY 10016
T: (646) 513-2358
eabbot@eckertseamans.com
*Counsel for Defendants Revlon, Inc., Revlon Consumer Products Corporation, and Revlon Group Holdings LLC*

Heidi Levine
**SIDLEY AUSTIN LLP**
787 7th Ave
New York, NY 10019
T: (212) 839-5300
hlevine@sidley.com

Lisa M. Gilford
**SIDLEY AUSTIN LLP**
555 W 5th St.
Los Angeles, CA 90013
T: (213) 896-6000
lgilford@sidley.com

Colleen M. Kenney
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
T: (312) 853-2666
ckenney@sidley.com

Yvette Ostolaza
Amanda Crawford-Steger
**SIDLEY AUSTIN LLP**
2021 McKinney Ave., Ste. 2000
Dallas, TX 75201

T: (214)981-3496
yostolaza@sidley.com
asteger@sidley.com
*Counsel for Defendant Sally Beauty Supply LLC*

Joseph J. Welter
Ryan M. Frierott
**GOLDBERG SEGALLIA**
665 Main Street
Buffalo, NY 14203
T: (716) 566-5457
jwelter@goldbergsegalla.com
rfrierott@goldbergsegalla.com
*Counsel for AFAM Concept, Inc.*

Seth V. Alhadeff
Ravika Rameshwar
Matthew C. Wasserman
**DINSMORE & SHOHL LLP**
Southeast Financial Center
200 S. Biscayne Blvd.
Miami, FL 33131
T: (786) 957-1157
Seth.Alhadeff@dinsmore.com
Ravika.Rameshwar@dinsmore.com
Matthew.Wasserman@dinsmore.com

Matthew C. Wasserman
**DINSMORE & SHOHL LLP**
222 W. Adams Street, Suite 3400
Chicago, IL 60606
T: (312) 837-4316
Matthew.Wasserman@dinsmore.com

Adam Fox
**DINSMORE & SHOHL LLP**
801 Pennsylvania Avenue N.W., Suite 610
Washington, D.C. 20004 T: (202) 559-3615 F: (202) 372-9141
Adam.Fox@dinsmore.com

*Counsel for Defendant, McBride Research Laboratories, Inc.*

Ashley C. Webber
Emily D. Robinson
**MARSH ATKINSON & BRANTLEY, LLC**

271 17th Street NW, Suite 1600
Atlanta, GA 30363
T: (404) 282-5050
ashley.webber@mablawfirm.com
emily.robinson@mablawfirm.com
*Counsel for Defendant, Dudley Beauty Corp, LLC*

Daniel L. Stanner
Ashley Crettol Insalaco
Megan E. Ryan
**TABET DIVITO & ROTHSTEIN LLC**
209 S. LaSalle Street, 7th floor
Chicago, IL 60604
T: (312) 762-9450
dstanner@tdrlaw.com
ainsalaco@tdrlaw.com
mryan@tdrlaw.com
*Counsel for Defendant RNA Corporation*

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street
Suite 4000
Houston, TX 77002
T: (713) 890-5000
F: (713) 890-5001
nancy.patterson@morganlewis.com

Mark A. Fiore
**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
Princeton, NJ 08540-6241
T: (609) 919-6600
F: (877) 432-9652
mark.fiore@morganlewis.com
*Counsel for Defendant John Paul Mitchell Systems, Inc.*

Ann C. Barron
Sara Peal
**HEYL, ROYSTER, VOELKER & ALLEN, P.C.**
Suite 100, Mark Twain Plaza III
105 West Vandalia
Edwardsville, Illinois 62025
Telephone 618.656.4646
abarron@heylroyster.com
speal@heylroyster.com

*Counsel for Advanced Beauty, Inc.*

Leslie A. Federer, ARDC #6325614
**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**
191 N. Wacker Drive, Suite 2950
Chicago, Illinois 60606
T: (312) 767-1314
lfederer@maronmarvel.com
Robert E. Dille (*pro hac vice*)
**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**
201 St. Charles Ave., Suite 2411
New Orleans, Louisiana 70170
T: (504) 321-9331
rdille@maronmarvel.com
*Counsel for Defendant Murray's Worldwide, Inc.*