# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION, | ) Case No. 1:23-cv-00818 |
| | ) MDL No. 3060 |

VIDEOTAPED DEPOSITION

OF

STANLEY T. ATWOOD, MS

Friday, March 6, 2026

Raleigh, North Carolina

Reported by: Christine A. Taylor, RPR

Job No.: 7935153

On March 6, 2026, commencing at 9:00 a.m., the videotaped deposition of STANLEY T. ATWOOD, MS, was taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure, on behalf of the Defendant AFAM Concept, Inc., at Poyner Spruill LLP, 301 Fayetteville Street, Suite 1900, Raleigh, North Carolina.

* * *

APPEARANCES:

Representing the Plaintiffs:

SHIPMAN WRIGHT & MOORE LLP
BY: GARY K. SHIPMAN, ESQ.
575 Military Cutoff Road, Suite 106
Wilmington, North Carolina 28405
910.762.1990
gshipman@shipmanlaw.com

and

ASHCRAFT GEREL
BY: MICHELLE PARFITT, ESQ.
1825 K Street NW, Suite 700
Washington, D.C. 20036
202.335.2600
mparfitt@ashcraftlaw.com

Representing the Defendant AFAM Concept, Inc.:

GOLDBERG SEGALLA LLP
BY: JOSEPH J. WELTER, ESQ.
HARDIP B. PASSANANTI, ESQ. (Zoom)
LYNN LEHNERT, ESQ. (Zoom)
665 Main Street
Buffalo, New York 14203
716.566.5400
jwelter@goldbergsegalla.com
hpassananti@goldbergsegalla.com
llehnert@goldbergsegalla.com

Representing the Defendants Strength of Nature LLC; Strength of Nature Global LLC; and Godrej SON Holdings:

SHOOK, HARDY & BACON
BY: PEIYUAN GUO, PH.D., ESQ. (Zoom)
1 Rockefeller Plaza, Suite 2801
New York, New York 10020
212.989.8844
pguo@shb.com

(continued)

Representing the Defendant Avlon Industries, Inc.:

WIEDNER & McAULIFFE, LTD.
BY: ETHAN S. DILLON, ESQ. (Zoom)
One North Franklin Street, Suite 1900
Chicago, Illinois 60606
312.855.1105
esdillon@wmlaw.com

For the Defendant Beauty Bell Enterprises, LLC f/k/a House of Cheatham, Inc.:

SEGAL MCCAMBRIDGE
BY: CHRIS MALON, ESQ. (Zoom)
100 Congress Avenue, Suite 800
Austin, Texas 78701
512.476.7834
cmalon@smsm.com

and

LITCHFIELD CAVO, LLP
BY: KEVIN A. TITUS, ESQ. (Zoom)
303 West Madison, Suite 300
Chicago, Illinois 60606
312.752.5241
titus@litchfieldcavo.com

and

MCGUIREWOODS LLP
BY: CHRISTIAN E. HENNEKE, ESQ. (Zoom)
800 East Canal Street
Richmond, Virginia 23219
804.775.1050
chenneke@mcguirewoods.com

Representing the Defendant Murray's Worldwide:

MARON MARVEL BRADLEY ANDERSON & TARDY LLC
BY: LESLIE A. FEDERER, ESQ. (Zoom)
191 North Wacker Drive, Suite 2950
Chicago, Illinois 60606
312.767.1314
lfederer@maronmarvel.com

(continued)

Representing the Defendant Beauty Bell Enterprises:

COSTELLO GINEX & WIDEIKIS, P.C.
BY: SAMANTHA SANGHERA, ESQ. (Zoom)
141 West Jackson Boulevard
Suite 1400
Chicago, Illinois 60604
312.850.2651
ssanghera@cgw-legal.com

Representing the Defendant JPMS:
CLAUSEN MILLER, P.C.
BY: BRIAN J. RIORDAN, ESQ. (Zoom)
225 West Randolph Street, Suite 700
Chicago, Illinois 60606
312.6066.7805
briordan@clausen.com

Representing the Defendant Advanced Beauty Systems, Inc.:

HEYL ROYSTER VOELKER & ALLEN
BY: SARA J. PEAL, ESQ. (Zoom)
701 Market Street, Suite 1505
St. Louis, Missouri 63101
314.241.2018
speal@heylroyster.com

Also Present:
Corey Parker, Videographer
Frederick Longer, Esq. (Zoom)
Levin Sedran & Berman, LLP

Alyssa Chayban, Paralegal (Zoom)
Goldberg Segalla
Dustin Crawford (Zoom)
Emily Robinson (Zoom)
James Moore (Zoom)
Kelbey Deck (Zoom)
Laila Razzaghi (Zoom)
Mona Sedky (Zoom)
Ravika Marcadis (Zoom)

C O N T E N T S


| | PAGE |
|---|---|
| EXAMINATION BY MR. WELTER | 8 |
| EXAMINATION BY MR. SHIPMAN | 350 |


* * *

E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Videotaped Deposition of Stanley T. Atwood, MD | 13 |
| Exhibit 2 | Statement of Compensation | 14 |
| Exhibit 3 | Expert Report of Stanley T. Atwood, M.S. | 16 |
| Exhibit 4 | Atwood Final Report - Errata | 195 |
| Exhibit 5 | Post-Report References Considered by Stanley T. Atwood, M.S., DABT | 34 |
| Exhibit 6 | Article: Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women | 80 |
| Exhibit 7 | Article: Use of Hair Straighteners/Chemical Relaxers and Incidence of Non-Reproductive Cancers | 115 |

| | | |
|---|---|---|
| Exhibit 8 | Chemicals in Hair Straightening Products Background Document | 146 |
| Exhibit 9 | Bradford Hill article: The Environment and Disease: Association or Causation? | 214 |
| Exhibit 10 | Chang article: Use of Straighteners and Other Hair Products and Incident Uterine Cancer | 237 |
| Exhibit 11 | Bertrand article: Hair relaxer use and risk of uterine cancer in the Black Women's Health Study | 237 |
| Exhibit 12 | White article: Use of hair products in relation to ovarian cancer risk | 248 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We're now on the record. Today's date is Friday, March 6, 2026. The time is 9:01 a.m. Eastern.

This is case of all MDL Hair Relaxer cases versus Hair Relaxer. The deponent is Stanley Atwood.

Counsel, please introduce yourselves, after which our court reporter will swear in our witness.

MR. WELTER: Joseph Welter with Goldberg Segalla.

MR. SHIPMAN: Gary Shipman and Michelle Parfitt for the plaintiffs.

THE WITNESS: Stanley Atwood.

* * *

STANLEY ATWOOD,

having first been duly sworn, was examined and testified as follows:

* * *

EXAMINATION

BY MR. WELTER:

Q. Good morning, Mr. Atwood.

A. Good morning.

Q. We met off the record, but I'll introduce myself again. My name is Joe Welter. I'm an attorney with Goldberg Segalla, and I'll be asking you probably most, if not all, of the questions today.

I understand from some discussions off the record this is the first time that you've given a deposition?

A. Well, I -- early in my career when I was working for the state, it's been close to 40 years ago now, I was called to give a deposition. I don't even remember what it was about, but I was working for the state regulatory agency. And so it was about probably some decision I'd made about a imminent hazard or health threat from a hazardous waste site.

Q. Okay.

A. And so it was brief -- well, the deposition, I don't remember how long it lasted, probably a couple of hours or so.

Q. Okay. I appreciate that.

THE VIDEOGRAPHER: Excuse me. Can you clamp the microphone on there?

MR. WELTER: Do you need a microphone on me?

THE VIDEOGRAPHER: Yeah, there's one there. Just clamp it on there.

THE WITNESS: Help me out here.

BY MR. WELTER:

Q. All right. Well, Mr. Atwood, since it's been a while since you had given that one deposition, let's -- let's just go over some of the rules for today so that we have a smooth day ahead of us and we get a clear record, and we give you a fair -- full and fair opportunity to give your -- your testimony here.

First, we have Christine, the court reporter, taking down everything you and I say. So, logistically, it's important that we -- that we do a couple of things to make sure that she's able to take down the full record.

The first thing is, if you can be kind enough to wait until I complete my entire question before you begin to give your answer.

A. Sure.

Q. This way we have a -- we're not talking over each other. And I'll try to extend the same courtesy and wait until you complete your answer before I ask my next question. I'm telling you right now, I'm not going to be

perfect with that. But if I ever cut you off during the day before you've completed your answer, please let me know that; fair?

A. Okay. Sure.

Q. Okay. The second thing is you do have to speak your answers and verbally respond. Shaking your head or gesturing with your hands, while we're videotaping this and that may come up on the videotape, it's not going to come up on the stenographic record. So if you mean yes, you have to say "yes." If you mean no, "no," "I don't know," whatever the response would be, you have to verbalize that; fair?

A. Understood.

Q. Okay. Any time you want to take a break, and we've talked a little bit about that before we went on the record, happy to accommodate you. The only caveat is that if there's a question pending, that you respond to that question before we take the break; fair?

A. Fair.

Q. Okay. I'm going to ask you questions today. If you don't understand any of the questions that I'm asking you, please let me know that, and I'd be happy to ask it in a different

way and rephrase it. Sometimes I -- I'm not as clear as I think I am when I'm asking questions; fair?

A. Sure, yes.

Q. And if you -- if I ask you a question and you respond, I'm going to assume that you understood the question; fair?

A. Fair.

Q. I understand this morning that you have in front of you a copy of your report in a binder, that you also have a second binder that contains select references of -- we'll call them papers for now, from your report; correct?

A. That's correct.

Q. You also have in front of you a laptop computer that your counsel has represented contains a complete list of the references for your report?

A. That's correct.

Q. And -- and then we'll talk in a second about a one-page sheet of paper that contains some corrections to your initial report; correct?

A. Correct.

Q. Those all -- those are all the

document -- aside from the exhibits I -- I've already handed that you, which we'll talk about, that's all that you have with you today; correct?
A. That's correct.
(Exhibit 1 marked for identification.)
BY MR. WELTER:
Q. Let's -- if you could take a look at Exhibit 1, and that is an amended deposition notice that the defendants have provided in this case, and we've requested that certain documents be produced. Have you seen this document before?
A. Yes.
Q. Did you conduct any searches for records in response to this request?
A. The only -- the only thing that I brought that I understood that required would be a copy of my report and CV, and -- and I believe a statement of my compensation was provided as well.
Q. It was. So other -- other than that, anything else?
A. No.
Q. Okay. Last thing that I wanted to remind you in terms of the rules, I will be

asking you a lot of questions today. If you could focus on the question that I'm asking and respond to that question. I know you have a lot of information in your head, and I have a lot of questions in my head. The tendency is for us to become conversational as the day goes along. And we're going to do our best not to drift into that space.

But -- but I -- I do have specific questions, and if you could focus on the questions that I'm asking and try to respond to those, I would appreciate that; fair?

A. Okay. Yes.

Q. Thank you so much.

(Exhibit 2 marked for identification.)

BY MR. WELTER:

Okay. You can put Exhibit 1 aside. If you could take a look at Exhibit 2, and I understand that is your compensation statement that you mentioned a minute ago?

A. Yes.

Q. Does this -- does this document reflect the hours you have spent on this litigation from July 2023 to January 31st, 2026?

A. Yes, it does.
Q. And were you first retained in July 2023?
A. Yes.
Q. Okay. Do you know how -- approximately how many hours you spent working on this case in February of this year, 2026?
A. 51 hours.
Q. And do you have -- okay. And how many hours in March?
A. Probably --
Q. If you know.
A. -- maybe 8 or 10, something like that.
Q. Okay. Have you been retained in any other hair relaxer cases other than the MDL?
A. No.
Q. Have you been retained by any of -- any other plaintiff attorney in connection with the hair relaxer litigation?
A. No.
Q. Other than issuing your report in this case, have you issued any other reports in the hair relaxer litigation?
A. No.

(Exhibit 3 marked for identification.)

Q. Now, if you could turn to Exhibit 3, and I -- I appreciate that you have your own copy of the -- of your report, but we've marked as Exhibit 3 a full copy of the report that has been provided to us. And so I don't -- I don't care which version you work from to make it more efficient.

A. Okay.

Q. But just so you know, Exhibit 3 is a full copy with the exhibits. Understood?

A. Okay. Yes.

Q. Okay. So if you can go to exhibit -- you don't have to go to Exhibit A, but is Exhibit A to your report your CV?

A. Yes.

Q. Does your -- is that a current CV, to the best of your knowledge?

A. Yes.

Q. Are there any additions from December 1st to the present?

A. No.

Q. Does this CV reflect all of your past employment?

A. Yes.
Q. Does this CV contain all of the papers and publications that you authored, coauthored, or contributed to in some way in your professional career?
A. Yes.
Q. Are you currently working on any papers?
A. No.
Q. You have a Master's of Science in toxicology; correct?
A. Yes.
Q. And a certificate Level 1 as a clinical trials research associate from Durham Technical Community College; correct?
A. Yeah.
Q. Are you board-certified in toxicology?
A. I was. But as my -- I was board-certified for 30 years from 1993 to 2023, and after I retired, I did not recertify.
Q. And you retired in 2023; right?
A. Well, I retired in 2022.
Q. Okay. You do not have a doctorate in toxicology or any other discipline; correct?

A. That is correct.
Q. Okay. You don't have a degree in epidemiology?
A. That is correct.
Q. You don't have a degree in chemistry?
A. No.
Q. You are not a medical doctor; correct?
A. Correct.
Q. You are not a cancer biologist; correct?
A. Correct.
Q. You are not an endo -- endocrinologist; correct?
A. Correct.
Q. You are not a geneticist?
A. Correct.
Q. You are not a dermatologist?
A. That is correct.
Q. Would it be fair to say that your opinions in this case are limited to your toxicological expertise?
MR. SHIPMAN: Objection to form.
THE WITNESS: My -- well, I've worked for many years in cancer hazard

evaluation. And so during that process, I had to evaluate epidemiology data as well as data from other disciplines. And so I was hired as a toxicologist, but I am familiar with certainly epidemiology principles and -- and other scientific input into the evaluation of -- of data that's relevant to hazard evaluation.

BY MR. WELTER:

Q. Okay. You have some professional affiliations in your CV. You state you were a member of the Society of Toxicology from 2007 to 2021. What were the requirements to join that organization?

A. I don't remember any specific requirements other than, you know, as a -- as an -- if you had an interest in toxicology, I think any -- you didn't have to be a toxicologist, as far as I know, to join those organizations. But as a toxicologist, I was certainly interested, and so I was a member of both the -- we had a state chapter of the Society of Toxicology as well as national chapters.

Q. So you just -- you paid your dues and you were a member?

A. Correct.
Q. Okay. And it also -- your CV also says you're affiliated with North Carolina Society of Toxicology for the same period of time. Same thing, pay your dues, and you're a member?
A. Correct.
Q. You also state you -- state you were affiliated with the Genetic and Environmental Mutagenesis Society. Is that the same thing, pay your dues, you're a member?
A. Yes.
Q. Okay. You discontinued your affiliation with these organizations in 2021. Why?
A. Primarily because I was -- knew I would be retiring soon. I retired at the end of March in 2022, so...
Q. Do you currently have any professional affiliations?
A. No.
Q. You state that you were certified as a diplomat of the American Board of Toxicology. What were the requirements to obtain and maintain that certification?

A. Well, that was a rather rigorous process. Having a master's degree, I had to wait a minimum of seven years after completing the master's degree and before I qualified to take the examination. An examination was offered here in Raleigh. And so in '93, which is actually eight years after I received my degree in toxicology, I took the examination.

And it was a day and a half examination consisting of various aspects of toxicology. It is -- and I was able to pass that on the first attempt, which I was very happy of that because about one-third of even PhDs that take it fail to pass it on the first attempt.

Q. Okay. And you -- you maintained that certification until 2023 after you retired?

A. Yes. Every five years, there was a recertification process, and also there were continuing education requirements to maintain the certification as well.

Q. Okay. Now, you also stated in your CV and in your report that you -- you have -- you spent 20-plus years with the National Toxicology Program; correct?

A. That's correct.

Q. And I'm going to refer to that probably at times at NTP. Is that okay?
A. NTP, that's the way --
Q. That's --
A. -- we all refer to it.
Q. Okay. Great.
Can you just brief -- give me a brief general overview of the work that you did when you were with the NTP?
A. Well, the NTP was -- it is working with a Report on Carcinogens group, and the Report on Carcinogens is a congressionally mandated report that is to evaluate cancer hazard and to identify substances or exposure circumstances that may be contributing to cancer in the US population.
And so the process of that, there's a nomination process, and then a review process of gathering the information. And so it's preparing the report that basically summarizes the available data that's relevant to the evaluation of -- of that substance.
And I was hired originally as a staff toxicologist to -- to evaluate data for the animal cancer data, the mechanistic data, as well

as data on absorption and distribution, metabolism, and excretion. And so those were the parts of the report that I focused on, and so it was much -- what -- what I did for this report.

It's to evaluate data, conduct literature searches, identify, and evaluate the studies, and report the information. And over the course of the 22 years, obviously, the methods and -- that we followed changed as we developed our own specific protocols and a handbook to guide the procedures that we used to evaluate the data. And --

Q. Okay.

A. -- so during the course of those 22 years, I estimate we probably -- that I was involved with approximately 50 evaluations that covered a broad range of, you know, just environment -- exposures to specific chemicals; in some cases, mixed -- complex mixtures; other cases, things like radiation. Everything from ionizing radiation, gamma rays, X-rays, ultraviolet rays.

We looked at other -- some products like mineral oils, soots, and then we even did an -- did an evaluation of shift work and

exposure to light at night. So it covered a broad range, viruses, bacterial agents as well.

Q. Okay. Let's talk a little bit about your publications and -- and that. Does your CV contain all of your professional publications?

A. Yes.

Q. Have you ever published a peer-reviewed dissertation?

MR. SHIPMAN: Objection to form.

THE WITNESS: My master's degree in wildlife biology, my -- you know, the -- my master's thesis was published.

BY MR. WELTER:

Q. And what was the -- what was the topic of the thesis?

A. That was -- I'll have to --

Q. Is it in your -- is it in your CV somewhere?

A. It is. It is in the -- it would probably be the first one at the end.

Q. Okay. And I'll -- I'll find it. I just -- if it's in your information, we'll get that. No issue there.

A. Yes.

Q. So, now, you list a bunch of report

on carcinogens --
A. Yes.
Q. -- reports on carcinogens --
A. Right.
Q. -- that you have been involved with in some way over the years. And I did see in some of them, you were listed as a field investigator; correct? At least some of them.
A. Well, I'm not sure what you are referring to there. Not -- now, my original -- my first job out at school was with the state Superfund group where we evaluated hazardous waste sites, and then we had --
Q. Mr. Atwood, if I could respectfully interrupt you.
A. Yeah.
Q. My focus is simply on the reports --
A. Yeah.
Q. -- that you were involved in or contributing to in some way that are listed in your CV.
A. Yes.
Q. If -- I'm just trying to understand what your role was in connection -- in other words, there were a lot of people who contributed

to creating these reports; correct?

A. Right.

Q. And I'm just trying to understand what your title or job -- or job was, not in a particular report, but over the years, in what different roles did you serve?

A. Okay. So if you're looking at my entire career, the roles that I served, I did -- there was a time early in my career when I was primarily doing risk assessment work where I did -- was part of a team that conducted field investigations, collect -- collecting soil and water samples and sediment samples that were used then to evaluate as part of the report.

Most of my career, though, has been involved in -- in literature searches and -- and evaluating hazards. And, like I said, most of the career was either conducting risk assessment reports for industry. My -- I had eight -- eight and a half years working as a risk assessor where we had primary industrial clients, so evaluating and preparing risk assessment reports.

There were a few times where I actually did go to -- into the field to inspect sites or collect samples. But, again, it was

preparing risk assessment reports, and -- which were to guide any remedial action that was needed at the site.

And then, as we discussed, with NTP, the -- which was the majority of my career was conducting cancer hazard evaluations and evaluating literature and writing reports.

Q. No, I understand the path -- the reports that eventually were issued that you include in your CV. They were all subject to a peer-review panel?

A. Yes. They went through -- the process changed over time, but it was always a peer-reviewed, first beginning with internal review at NIHS, and then other agents or reviews, EPA, and then -- and then a final review, and then public meetings were also involved later on.

Q. Did you ever serve on the peer-review panel for any of these reports?

A. No.

Q. Were you ever a lead field investigator in connection with any of these reports?

A. No.

Q. Do you know a -- a person by the name

of either Dr. or Mr. Garner?
A. Sandy Garner?
Q. Yes.
A. Yes, yes. He was my boss for about 20 years.
Q. Okay. And so in some of these reports, maybe all of them, that he's listed as the lead investigator and you were one of the people who worked for him; correct?
A. That's correct.
Q. Did you ever attend any of the peer-review panels that -- that preceded the issuance of any of the reports?
A. Early on, it was a different process, but there was a time in the early 2000s or -- or the mid 2000s, I guess, 2005 probably to 2010, where we did have a process where we would identify experts for various aspects of the report.
They would come to Raleigh. We would have an all-day meeting, sometimes a day-and-a-half meeting, where we would split off into work groups. And I was generally the one that -- with the mechanistic group, and so would participate in that, in discussions with that.

They would have comments on the report. I would take notes and have discussions with them.

Q. Let's talk about your publications outside of the NTP, and you do -- do a list of number of those on your CV; correct?

A. Yes.

Q. And it -- it appears to me that there's only -- you've only published one paper since 1999?

A. Yes. One, that would probably be correct. Let me -- outside -- yes, that was -- that would be correct, yes.

Q. Okay. Have you ever authored a peer-reviewed epidemiological study? Again, we're talking about outside of the NTP.

A. No.

Q. Have you ever attempted to publish any papers that did not pass peer review?

A. No.

Q. Have you ever published in the peer-reviewed literature any papers applying the Bradford Hill criteria?

A. No.

Q. Have you ever published in the peer-reviewed literature on any biological

plausibility analysis as part of the Hill criteria?

A. No.

Q. Have you ever published anything on how scientists assess causality between exposure to chemicals and cancer in humans?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, my last publication while I was with NTP, we did publish a paper on, I think, a novel approach in our use of -- of a read-across method to evaluate and list. In this case, it was drinking water disinfectant products that we're looking at the -- at chemicals that are common disinfectant byproducts, and were able to -- to use methods there to list a couple of products that there was no animal cancer data for.

But based on the -- the read-across from other members of that that were listed as the haloacetic acids, the brominade of chloroethyl and so forth.

BY MR. WELTER:

Q. Okay. Any other studies beyond that?

A. No.

Q. Or papers beyond that?
A. No.
Q. Okay. Have you ever published anything in the peer-reviewed literature about the endocrine system or endocrine-disrupting chemicals?
A. No.
Q. How about while with -- and I'm just looking for a yes or no at this point. While you were with the NP -- NTP, did you do any research or investigation or write anything about the endocrine system or endocrine-disrupting chemicals?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Where we did certainly during that time evaluate a number of agents that were endocrine disruptors, I guess steroidal estrogens would be one of the ones that come to mind, and the light at night was involved also in -- in disrupting a number of the end -- neuroendocrine systems as well, so --
BY MR. WELTER:
Q. Now, in response to that, you said "we." And so I appreciate sometimes you work in

a team setting.
A. Right.
Q. Were you personally involved in conducting that research or investigation?
A. Yes, because it involved the mechanisms, and so I was principally responsible.
Q. And you were one of several team members?
A. Yes. We had other -- we had one other toxicologist on the -- the time, but he was focused more on the animal data and I was focused on the mechanistic data, so...
Q. If you could -- we're going to go back to your report for a second. Page 81, there's a list of -- there's a references section that goes on for some time. I'm not going to ask you details about it.
A. Okay.
Q. Does this reference section list all of the scientific studies and papers you cite in your report?
A. Yes.
Q. And is this reference list a complete list of all the scientific studies and papers you relied on in forming your opinions in this

litigation?
A. Yes.
Q. And now Exhibit B to your report contains a list of materials considered; correct?
A. Yes.
Q. What is the difference between the reference list and the materials listed on Exhibit B?
A. I'm not sure if I can answer that. I think the -- what -- what this would be that I was asked after I submitted my report, and so the period from December -- I submitted the report, I think, at the end of November. So from December to now, there were other references that I looked at and considered, and so I'd expect those are maybe added to that.
Q. Okay. So were the references on Exhibit B things that you considered but ultimately did not rely on in forming your opinions, if you know?
A. I -- I do not know. There were --
Q. Okay.
A. I do know that there were certainly other references that I identified but did not get around to using. At some point, I just had

to stop.
Q. Fair enough.
(Exhibit 5 marked for identification.)
BY MR. WELTER:
Q. So if you could turn to -- I believe you have before you Exhibit 5, which would be the post-report references.
A. Okay. So that's -- okay. Yes.
Q. So we were provided this list a couple of days ago. And have you seen this document before?
A. Yes.
Q. And would these be references you considered after you issued your December 1st, 2025, report?
A. Yes.
Q. And, again, to the best of your recollection, did you read any of these papers before you issued your report?
A. No, I do not believe I did.
Q. Okay. What -- what, if anything, precipitated your continuing this research and reviewing these papers?
MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, I mean, it was just -- again, after I had issued my report and looking back over the report and, you know, just continuing to have interest in -- in other studies that might be relevant to that, and so it was just addressing other various issues to help my understanding of -- of some issues that could possibly come up, I suppose, in depositions. So --

BY MR. WELTER:

Q. Okay. With respect to your reference materials, the materials considering Exhibit B in Exhibit 5, were all of these papers discovered by you through the research you conducted, or were some of them provided to you to consider?

A. All of these were papers that -- that I discovered, I think, generally going back and looking at -- either through additional lit searches and just other ideas that I had, and just wanted to make sure I clarify my understanding on some issues.

Q. Okay. Fair enough.

Have you seen any other plaintiff expert reports in this litigation?

A. Yes.
Q. Did you see those before or after you issued your December 1st, 2025, report?
A. That would have been after.
Q. And which reports from the plaintiff's side did you see? Just the names of the people at this point.
A. Okay. Dr. Cote; Dr., I think it was, Gerstman, I think; Dr. Pugliese; Panigrahy; Dr. Roque. And -- and there may have been one or two others that I can't recall the names at this time, but -- but I was focusing mainly on the report from the epidemiologist and the cancer biologist that were on the team.
Q. Okay. Fair enough.
And I'm just looking for a yes or no at this point. After reviewing those reports, was there anything in any of those reports that you disagreed with?
MR. SHIPMAN: Objection to the form. Counsel, you've got to do better than that.
BY MR. WELTER:
Q. You may answer.
A. I do not recall that there was.

Q. Okay. Have you seen any of the defense reports -- expert reports in this case?
A. Yes.
Q. Which ones?
A. There was -- I don't remember the -- Dr. Barlow, Dr. Weed, Dr. Goodman were the primary ones I focused on. I think Dr. Hoyt as well. And so those -- but particularly, I guess, mainly on Dr. Goodman and Dr. Barlow.
Q. Do you know approximately when you received those reports and reviewed them?
A. I can't remember if I received those in December, or it may have been in January, early January before I received them.
Q. Were you ever asked to prepare a rebuttal report addressing these defense expert opinions?
A. No. Not a rebuttal report, but I certainly was interested in reviewing them to see --
Q. Were you aware that the plaintiffs --
MR. SHIPMAN: Counsel, let him finish. Let him finish his answer.
MR. WELTER: Sure. Absolutely.
MR. SHIPMAN: Stan, go ahead, finish

your answer.
THE WITNESS: Well, I -- I was certainly interested in looking and -- and seeing what their comments were. I did not -- one, I did not realize I would have access to them, and, two, I did not realize that -- that their expert reports looked like -- to be primarily response to the plaintiffs' expert reports, so...
BY MR. WELTER:
Q. Mr. Atwood, the only -- my question simply was whether you were asked to prepare a rebuttal report.
A. No.
Q. And the answer is no, and I'd appreciate if you focus on the question and respond just to the question.
A. Okay.
Q. All right. Let's -- let's --
MR. SHIPMAN: Counsel, let -- let me make clear, he can answer the question any way he wishes to answer the question. I appreciate your efforts to keep him to yes or no.
But, Stan, you answer the question --

any question that you're asked, you answer it any way you want to.

THE WITNESS: Okay.

MR. SHIPMAN: Go ahead.

BY MR. WELTER:

Q. Let's -- yeah. Let's shift topics, Mr. Atwood, just so you get a sense as to where I'm heading today. I'm going to go over a couple of kind of high-view, basic questions to set the stage --

A. Okay. Sure.

Q. -- for -- for the discussion throughout the rest of the day. So let's start with this: What is a chemical hair relaxer product?

A. Well, it is a product that is used to straighten curly or coiled hair. The chemical reaction there breaks the disulfide bonds and rearranges those to -- to form straighter hair.

Q. Is there a difference between a chemical hair relaxer and a hair straightening product?

A. Well, certainly. And I've not spent a lot of time looking at that, but certainly I know straightening chemical -- or hair

straightening products can just be something like a flat iron or -- and so rather than a chemical product.

Q. What are the component parts of a chemical hair relaxer?

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. If you know?

A. Well, I did not know much about that before I started working on this, but looking at that, I know that they come in kits, that they have various components, that there's some type of gel that's applied to the scalp, and then a chemical treatment to relax the hair. And then there's neutralizing shampoos and various other conditioners that are involved in the process.

Q. Okay. And to just to make sure we're on the same page as we go forward, is it your understanding that -- with respect to these kits, that the -- the gel is first applied to the scalp?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, I don't recall seeing anything that talked about the sequence, but -- but certainly given the

nature of the product, that I would assume that a -- some type of gel would be applied first.

BY MR. WELTER:

Q. Okay. So let's -- since -- since you don't know the actual sequence, would it be fair to say that the gel, the chemical treatment, the neutralizing shampoo, and the conditioners at some point are all used in the chemical hair relaxing process?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, I would -- no. They come in a kit. There's a number of products in the kit, and I would assume that you're supposed to use all of them in some sequence.

BY MR. WELTER:

Q. Well, have you ever -- have you ever seen any chemical hair relaxer products?

A. I don't recall that I have.

Q. Have you ever examined any of the specific products at issue in this litigation?

A. No.

Q. Have you ever seen a chemical hair relaxer applied?

A. Only in the movies.
Q. When you say "in the movies," what are you referring to?
A. Well, what -- I specifically remember I saw a movie on the -- the singing group "The Temptations" one time, and one of the lead there, I remember going into the barber shop, and he wanted the Tony Curtis hairdo. So I remember that.
Q. Okay. Other -- and the reason why I ask where you saw it is, look, there are some videos out there in the public realm that actually demonstrate how a chemical hair relaxer is applied. You've never seen anything like that?
A. No, I have not.
Q. Okay. If I ask you to describe how the different chemicals and -- and component parts in a chemical hair relaxer are applied, do you have any knowledge on that?
A. No.
Q. For how long do these products stay on the hair, if you know?
A. I don't recall exactly, but I know it's maybe 10 to 15 minutes or so.

Q. How frequently do women use these chemical hair relaxer products?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, the only information I have on that is just a number of studies that -- that I reviewed and discussed the -- the use of that, and that some women may use them as often as every couple of months, eight weeks or so.

That -- I know that -- that frequent use and lifetime use and beginning at early ages, you know, sometimes as early as four years old are things that I remember from the studies I reviewed.

BY MR. WELTER:

Q. Okay. Over what time of period do women have to use chemical hair relaxers in order for you to support your biological plausibility opinion?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, the only way I could answer that is just back, again, to the results of that epidemiology studies and how they reported -- reported that.

And so some of the studies show an

effect with ever versus never use. And they -- the reports were consistent in showing that frequent use increased -- increased the risk, and that, I think, was defined as four to five times a year.

BY MR. WELTER:

Q. Sure. And I appreciate that answer. My question was slightly different.

Because we talked about how often. My focus is, is there some minimum period over which these women have to use the chemical hair relaxers in order to support your opinion on biological plausibility?

MR. SHIPMAN: Objection to form.

THE WITNESS: No. I was not asked to address that specifically. I just know that from -- based on the epidemiology studies and what they report. So that was not part of my -- any efforts that I made to determine what a minimum amount would be to -- to pose a risk.

BY MR. WELTER:

Q. Okay. Thank you.

Shift topics a little bit here. What are the specific chemicals or classes of

chemicals in chemical hair relaxer products that are necessary to support your opinion on biological plausibility? I'm simply looking for a list of those chemicals at this point.

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, I discussed that in my report. Again, I'm looking at this more as a chemical mixture, what the specific chemicals are, and all the hair relaxer products over the past 20 or 30 years. I could not answer that.

The studies that I did find that did do a chemical analysis or reported on that were primarily just the Helm study in 2018, and then the California EPA study, which, as I recall, looked back over a database for a number of years.

I can't remember the specific year range that they investigated, but it was -- seems like, you know, somewhere around 100 to 200 different products. And so both of those reports did report -- identify, you know, the -- what I call chemicals of concern in my report. And so --

BY MR. WELTER:

Q. Sure. And I appreciate that answer.

A. Yeah.

Q. My question was simply for a list of chemicals at this point.

A. Yeah.

Q. And so are you able to give me a list of the chemicals in -- that are actually in chemical hair relaxers that are necessary that have to be in the chemical hair relaxer in order to support your claim and opinion on biological plausibility?

A. No.

MR. SHIPMAN: Objection to the form.

THE WITNESS: No, I could not. And I think I state -- I do state this in my report, that I could not identify a specific chemical and point to that and say, this is the reason that chemical hair relaxer are causing cancer in these women.

Again, my conclusion and opinion is that it is a mixture effect, but the extent that chemicals were identified, and that helped, you know, focus additional literature searches to look at the

properties of what chemicals are known there.

BY MR. WELTER:

Q. Sure. And I appreciate that answer, and I appreciate -- we're going to get to the mixture discussion, that's fine. But in order to get to the mixture discussion, I'm trying to understand which chemicals are in play, in your view, that when they in some way interact or mix together lead to a biological plausibility conclusion.

MR. SHIPMAN: Objection --

BY MR. WELTER:

Q. Are you able to identify any -- any chemicals --

MR. SHIPMAN: -- to the form.

BY MR. WELTER:

Q. -- as you sit here today?

A. No, I -- I cannot answer that question.

Q. Okay. So let's set that question aside.

Regardless of which chemicals they are -- well, let -- let me do it this way: There are certain chemicals that you specifically

discuss in your report; correct?
A. Yes.
Q. And there are some we're going to -- let's, for our discussion purposes, call them either endocrine disrupting chemicals or suspected endocrine disrupting chemicals; fair?
A. Fair.
Q. And I'm going to refer to that as EDCs --
A. Okay.
Q. -- if that's okay with you.
A. Yes.
Q. From reading your report, my understanding is that parabens are -- fall into that category; correct?
A. Yes.
Q. And phthalates?
A. Yes.
Q. What other EDCs or potential EDCs did you conclude were chemicals of concern in chemical hair relaxer products?
A. Cyclosiloxane would be one other category there, and benzophenones. Those are the ones that -- at one time I was looking at a few others that Helm reported, but did not -- did not

follow through with those.

Q. Now, with respect to -- you also have a carcinogen section?

A. Yes.

Q. And you identify some carcinogens or suspected carcinogens; right?

A. Yes.

Q. And one of those was formaldehyde?

A. Yes.

Q. And I believe you also identified ethylene oxide?

A. Yes.

Q. And identified 1,4-Dioxane?

A. Yes.

Q. What other chemicals would fall into just the carcinogen chemicals of concern category?

A. Well, some others that -- again, it's in my report. I created a table based on the agency evaluations from NTP, EPA, and the IARC, the International Agency for Research on Cancer. And so the diethanolamine, there's some evidence there for the phthalates. The diethylhexyl phthalate was one. And I think another possible contaminant or byproduct would be nitrosamines.

Q. As you sit here today, are there any other chemicals that either fall into the EDC category or the possible carcinogen category that you deem to be relevant to your analysis?

MR. SHIPMAN: Other than what's contained in his report or --

MR. WELTER: In addition -- in addition to what's he testified to today.

MR. SHIPMAN: Okay.

THE WITNESS: Well, the -- the only thing that I thought about throughout as I was working on this report that I know that -- that there are a number of other -- or likely a number of other phenolic compounds that are contained that could possibly be contributed to endocrine-disrupting effects, and possibly some -- some metals.

But I did not have a lot of data on those specifically, or did not have the time to investigate all that either.

BY MR. WELTER:

Q. Fair. With respect to the four EDCs that you identified, are all of these chemicals present in chemical hair relaxer products?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Based on the data I reviewed, that is my understanding, yes.

BY MR. WELTER:

Q. Okay. Do you know which particular component parts of a chemical hair relaxer these different EDCs are located?

A. No.

Q. Did all four of -- well, strike that.

Do -- do all four of these EDCs necessarily have to be included in a chemical hair relaxer product to support your opinion on biological plausibility?

MR. SHIPMAN: Objection. Form.

THE WITNESS: No.

BY MR. WELTER:

Q. Okay. Do -- can it be any one of them --

MR. SHIPMAN: Objection --

MR. WELTER: Well, let me finish the question, Gary.

BY MR. WELTER:

Q. You know, does -- does there have to be at least one of these four identified EDCs present in a chemical hair relaxer product to

support your opinion on biological plausibility?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I do not think so. I would -- because, again, I did not try to identify any particular chemical in saying, okay, if this one was eliminated, everything would be fine.

I was looking -- when I was doing my literature searches, was thinking that there possibly might be some data that are published, you know, looking at the safety assessment of these products by the manufacturers, but did not find anything along those lines where they had conducted toxicology studies to investigate long-term effects.

BY MR. WELTER:

Q. Assuming a chemical hair relaxer does not contain any of the four EDCs that you identified in your testimony here today, is it still biologically plausible that use of that chemical hair relaxer product can cause uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, I considered a

number of lines of evidence, and so, no, my -- my opinion on biological plausibility is not just limited to those specific chemicals.

BY MR. WELTER:

Q. No, and I appreciate that.

My hypothetical that I'm posing to you is, if there's a chemical hair relaxer product that does not contain the four EDCs that you identified, do you still hold the opinion that use of chem -- that is biologically plausible that use of chem -- that chemical hair relaxer product without an EDC can cause uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, that is something that I was -- not really part of my mandate, so I have not really researched that or thought about that. Certainly the presence of EDCs is a contributing factor.

Whether or not that's a -- but, again, getting back, it is the product as a whole, and whatever else could be in there that's possibly contributing to that, I do not know. So --

BY MR. WELTER:

Q. And we're going to get to your mandate in a second, but let's kind of --

A. Okay.

Q. -- fast-forward a little bit.

My understanding of your mandate was to assess the biological plausibility of the use of chemical hair relaxer products and uterine or ovarian cancer; fair?

A. Yes.

Q. Okay. That mandate was not focused on EDCs; correct? In particular?

A. No, it was not.

Q. Okay. So then coming back to my initial question, if a chemical hair relaxer product does not contain any of the EDCs at all, then is it still biologically plausible that use of that chemical hair relaxer product can cause uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, when I -- when I think about it, I go back to the epidemiology data. And so, as you know, the epidemiology reports did not report on specific chemicals that were present in

those products. And so what they had, I do not know.

And so, again, I looked at a lot of evidence, and so with focusing particularly on hair relaxer studies, and I identified over 100 studies of chemical hair relaxers. Most of them were dealing with just effects on the scalp, so I did not consider them.

But there were a number of other studies that were just looking at the product that were reporting effects that I felt relevant and supported biological plausibility in -- in addition to just the specific chemicals.

BY MR. WELTER:

Q. Is it your understanding that chemical hair relaxers all contain EDCs as ingredients?

MR. SHIPMAN: Objection. Form.

THE WITNESS: I can't answer that. I -- I do not know.

BY MR. WELTER:

Q. Okay. Let's talk about the carcinogens. Again, you -- you identified, I

think, six in your testimony today. Do -- do all of those chemicals have to necessarily be present in a chemical hair relaxer product to support your biological plausibility opinion?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No. Those are just -- again, as part of the mandate, that is obviously something that I would look at, what is in the products and what is known about the hazardous properties of those chemicals.

The other side is that I also realize that there are a lot of chemicals that have not been tested, and so -- so that's always a possibility as well.

And so if you just look at -- it's not just a simple process to look at a list of ingredients and say, well, none of these are reporting to be carcinogens or none of those are reporting to be endocrine disruptors, or whatever health impact that you're -- you're looking at, and to say, therefore, you know, we assume it's safe because we don't identify anything that's toxic in this formulation,

so --
BY MR. WELTER:
Q. Have you ever personally looked at a complete list of ingredients in any chemical hair relaxer product?
MR. SHIPMAN: Objection. Form.
THE WITNESS: No, I have not.
BY MR. WELTER:
Q. Were you aware that the defendants in this case have provided a lot of information about the constituent ingredients in -- in all the different hair -- chemical hair relaxers in this litigation?
A. Well, if I was specifically aware, I think that -- that I have assumed that at some point that that data was available for that.
Q. Have you seen it?
A. I think I recall briefly seeing some reports that, but it's, you know, based on the quick review, that it -- it seemed to be consistent with what I found in the Helm study and the California EPA and a few other studies. And so it's not something I relied on, so -- to form my opinion.
Q. Fair. When you say you -- you've

seen it in reports, are you talking about the expert reports on either side that you reviewed after you issued your report, or something else?

A. I don't -- well, I know certainly in the other expert reports, they talked about, again, the ingredients and contaminants for a similar list to what I had. I think I did see some reports that contain information that I did not include in mine.

Q. Sure. Mr. Atwood, if I could interject --

MR. SHIPMAN: Excuse me, Counsel.

MR. WELTER: Yeah.

MR. SHIPMAN: Stan, finish your answer.

Let him finish, Counsel.

THE WITNESS: Okay. I think there was a time, too, that I had access to -- to some reports on various products, looked at it briefly, and I wasn't sure -- you know, had so many different products and type of thing, and just scanning it briefly. And -- but, again, it's not something that I spent a lot of time on looking at or relied to form my opinion.

So --

BY MR. WELTER:

Q. So is it your testimony that you were provided with information about ingredients in the chemical hair relaxers that are at issue in this litigation that the defendants -- some -- at least some of the defendants have manufactured?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yes. Like I said, I do not know what the -- the source or where it came from, but -- but I had access to -- to some reports.

BY MR. WELTER:

Q. And -- and you generally reviewed the information, and you deemed it not relevant to forming your opinions in this case?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I did not see that it added anything, I guess.

BY MR. WELTER:

Q. Well, as -- as a toxicologist, wouldn't it be important to you to have a clear understanding as to the ingredients in the particular hair relaxer products in order to inform your opinions on biological plausibility?

MR. SHIPMAN: Objection to the form.
THE WITNESS: Yes. In this case, though, I was not, again, aware of, you know, the data I had access to. I did not have any information about, you know, how that data was generated, and so I wasn't sure how reliable that it was or may not have been. So --
BY MR. WELTER:
Q. Where was this data, like, physically located that you were able to access it?
A. Physically located?
Q. In other words, you've reviewed data; correct? You must have gone somewhere to get it. I'm trying to understand where you went.
A. Well, it was -- well, I recall at some point having a -- you know, on a discussion phone call or Zoom meeting, and there were information --
MR. SHIPMAN: Don't -- don't talk about any of that --
BY MR. WELTER:
Q. Yeah. Let's -- yeah. Mr. Atwood --
A. Yeah.
Q. -- I don't want to know about if it

was a conversation with counsel --

A. Yes.

Q. -- let's -- let's -- I know I probably should have said that ^ . I'm sure your attorney will object to me interjecting.

A. Right.

Q. If it's any discussions or communications with any of plaintiff's counsel, I don't want to know about that. Don't tell me about that inadvertently or otherwise.

A. Okay.

Q. But if you have reviewed documents or information about the list of ingredients or other information about the defendants' products in this litigation, my focus is simply on, tell me where -- you know, were you on a computer screen, and did you review it? How did that happen?

A. Okay.

MR. SHIPMAN: Counsel, let me interject. Anything upon which he has relied as a basis for opinion is fair game. You can ask him about it. But he's already made clear that whatever he was provided, he glanced at it and did not use

it and rely upon it as a basis of his opinion.

So, again, anything that was provided that was a basis of his opinions is fair game, you can ask him about. But if it's not a basis of his opinions, you can't ask him about it.

MR. WELTER: So your -- your position is that if he reviewed information about specific defendant ingredients and considered it, and then deemed it to be not relevant, I can't ask him what he reviewed?

MR. SHIPMAN: Of course. What he said --

MR. WELTER: He said he doesn't know what --

THE VIDEOGRAPHER: Excuse me one second. We've got to go off one second.

MR. WELTER: Okay.

THE VIDEOGRAPHER: Off the record.

(Recess taken from 10:02 a.m. until 10:04 a.m.)

THE VIDEOGRAPHER: On the record at 10:04 a.m.

BY MR. WELTER:

Q. Okay. Mr. Atwood, can you turn to page 5 of your report? And I want to direct you to just Footnote 2 at the bottom.

A. Okay. Yes.

Q. And Footnote 2 says, "I was given access to deposition transcripts to review. Additionally, I was given access to a database that contains thousands of documents produced by the defendants."

Did I read that correctly?

A. Yes.

Q. And did you have access to a database that contained thousands of documents produced by the defendants?

A. Yes. That's what I was talking about --

Q. And did that --

A. -- earlier.

Q. Did that database include list of ingredients?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yes. It -- I looked at it. This was late in the process, and then I was -- this was last fall. I was in the process of finalizing my report at

that time, and I looked at it.

It was a lot of records, and with various column labels that I wasn't sure what they were or how this -- this document was produced. And so I basically said, I don't see how I have any time to try to go into this to digest what is here. My report is almost finished. And so I did not spend much time with it.

So --

BY MR. WELTER:

Q. How were you given access to that database?

MR. SHIPMAN: Don't answer that question.

MR. WELTER: On what basis?

MR. SHIPMAN: Work product.

MR. WELTER: Well, no. He said that he was given access to the database --

MR. SHIPMAN: But now he --

MR. WELTER: -- and has included that in his report that he was given access.

MR. SHIPMAN: Okay. Don't answer the question.

You can -- you can ask him any

question about any information that he was provided access to upon which he relied. You absolutely can ask him that question, so ask away.

MR. WELTER: I respectfully disagree.

MR. SHIPMAN: I understand.

MR. WELTER: Let's move along.

BY MR. WELTER:

Q. Did you review any of the information of that database beyond what you've already testified to?

MR. SHIPMAN: Objection to form.

THE WITNESS: No.

BY MR. WELTER:

Q. Are you able to identify any specific products --

A. No.

Q. -- in that database?

A. No.

Q. Are you able to identify any specific defendants that those documents related to?

A. No.

Q. With respect to deposition transcripts that you referenced in Footnote 2, did you review any of those?

A. Again, would you repeat the question, please?

Q. Sure. I'm happy to do that. The first -- in Footnote 2 on page 5, the first sentence says, "I was given access to deposition transcripts to review."

In our lawyer world, deposition transcripts means testimony of people that had previously been given. You understand that now?

A. Yes.

Q. Did you review any deposition transcripts?

A. I -- again, yes, very long documents, and -- and was -- and just scanned through those. So I did look at some of those, yes.

Q. Do you remember whose testimony that was?

A. I think I remember one from Dr. Roque and maybe Dr. Panigrahy.

Q. Were these -- was this testimony that was taken after you issued your December 1st, 2025, report?

A. Oh, yes.

Q. Okay.

A. Yes.

Q. Did you -- were you provided with any testimony or deposition transcripts before you issued your report in this case?
A. No. No.
Q. Okay. Fair enough.
All right. So let's come back to our kind of general discussion about chemical hair relaxers. We were talking about the different component parts, and I asked you some questions about how it's applied to the hair. Then we went off on a side trip.
So let's come back to this. Do you have an understanding as to how chemicals from a chemical hair relaxer are absorbed into the body?
A. Well, that would just follow the general principles, that absorption through the skin, and generally chemicals that are fat soluble since the epidermis contains lipid layers generally absorb more quickly. And so that was -- you know, so certainly dermal absorption is well recognized as an important route of chemical exposure.
Q. Are there any other exposure pathways from chemical hair relaxers other than dermally?
A. Certainly. I think inhalation would

be applicable for volatile components of the hair relaxer that are released to the air while you're working with those and --

Q. Are the chemicals that you --

MR. SHIPMAN: Counsel, please let him finish.

BY MR. WELTER:

Q. Were you done with your answer, Mr. Atwood?

MR. SHIPMAN: No, he wasn't.

MR. WELTER: Well, let's have him say that.

MR. SHIPMAN: I'm sitting close to him. I know when his lips are still moving. He's still trying to talk.

MR. WELTER: Let's not try to interpret it. Let's --

MR. SHIPMAN: I'm not interpreting. I'm looking out the side of my eye. And this is three times you've interrupted him. Please don't. Okay?

BY MR. WELTER:

Q. Mr. Atwood, were you done with your answer?

A. Well, I was just going -- I'm not

sure now what I was going to say, but I think just that there were a number of studies that I looked at that I think were -- hairdressers were applying that, and where they actually did some air monitoring and -- and documented that released to the air.

Q. Which chemicals from chemical hair relaxers do you understand to be absorbed into the body through inhalation?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, there's potentially any chemical that would be present, and that would have some opportunity. They all have -- I don't know what the vapor pressures are for all the chemicals listed.

But most all of them are small molecules and -- and particularly during the process of hair relaxing, if you're adding a neutralizing agent, the acid-based reaction is going to produce some heat and would increase volatilization. So I would expect most -- most chemicals present in a chemical hair relaxer could -- would also be subject to

inhalation exposure.

BY MR. WELTER:

Q. Okay. Is there a difference between subject to inhalation exposure and actually being inhaled?

A. If it's in the air, you're going to inhale it, unless you've got a respirator.

Q. So it's your position that parabens, phthalates, cyclosiloxanes, and benzophenones can be inhaled into the system if they're present in chemical hair relaxers?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Yes, I would say that's a -- that's a possibility. I know that certainly the cyclosiloxanes are -- are volatile. The phthalates and parabens would be as well since they're...

BY MR. WELTER:

Q. And as you sit here today, can you identify any specific study that supports the statement that parabens, phthalates, and benzophenones can be inhaled into the body when they are present in chemical hair relaxers?

A. Yes. Well, any chemical that -- any chemical will -- has a vapor pressure and will

release chemicals to air. So any chemical released to the air that you're in the same room with, and so if you're applying something to your hair, then obviously you're generating vapors that are very close to your mouth and nose. And so, yes, you would --

Q. Is it your position that all chemicals and chemical hair relaxers are becoming vaporized, so that they can potentially be inhaled?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, I haven't investigated that, and I would have to do research on that, but my assumption would be that any chemical present had the potential to be vaporized.

BY MR. WELTER:

Q. Have you done any research to determine whether parabens can become airborne and inhaled?

A. Not specifically, but they certainly could.

Q. Other than formaldehyde, which we'll talk about, and cyclosiloxanes, which we'll talk about, have you done any research regarding any

of the other chemicals that you've identified as to their ability to become airborne and potentially inhaled?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, just general knowledge of basic physical chemical properties, and knowing that most all chemicals do have vapor pressure that -- that -- and so there is -- can be released.

Now, are there studies that -- I did not find studies that specifically measured all the chemicals present, you know, in the air and the hair salon. But there were some that did look at a few of the chemicals. So...

BY MR. WELTER:

Q. Okay. Are you done with your answer?

A. Yes.

Q. I'm trying to be good and --

A. No problem.

Q. -- not get yelled at, so --

MR. SHIPMAN: I'm not yelling.

MR. WELTER: Reprimanded.

MR. SHIPMAN: That's appropriate.

Thank you.

MR. WELTER: All right. Fair enough.

BY MR. WELTER:

Q. So -- so let's -- I'm going to get to what happens inside the body, but let me pause here and take a step back. You talked earlier about mixtures of chemicals, and I want to have a clear understanding as to what you mean by that.

So let me start with this. When these different chemicals are in the different component parts of the chemical hair relaxer kit, before they're taken out of the box, is it your position that those chemicals at that point are interacting with each other in some way, or are they simply present at that point?

MR. SHIPMAN: Objection to form.

THE WITNESS: Okay. That -- that question is a little confusing. Are you saying that before they're applied?

BY MR. WELTER:

Q. Correct. Right. And I'm going to -- we're going to go through the progression, but there's a chemical hair relaxer kit that's sitting on the shelf --

A. Right.

Q. -- in a store --
A. Right.
Q. -- hasn't been opened yet.
A. Right.
Q. It -- since it's been manufactured, it contains the constituent chemicals and whatever component parts they have; right?
A. True.
Q. Okay. While still in the containers, before any of the containers are opened, is it your position that something is happening where those chemicals are interacting and mixing in some way at that point in time?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Well, I'm not sure exactly what you're asking, but it sounds like -- I certainly -- each component is going to be composed of chemical mixtures. And to the extent that those chemical mixtures are together in a formulation, you know, they are -- they are mixed. You know, it's -- and so whether they're mixing chemically at that point, I have not investigated that, but they are there present. They're all dispersed within

the -- the formula of whatever component is there, so...

BY MR. WELTER:

Q. Okay. I almost stepped on you. I apologize.

A. No problem.

Q. All right. So let's go to the next step now. During the application process of a chemical hair relaxer, the various chemicals are being used on the hair; fair?

A. Yes.

Q. During that process before they are absorbed into the body, the process of applying the different chemicals ingredients to the hair, is it your position that those chemicals are enacted -- interacting in some fashion at that point?

MR. SHIPMAN: Objection to form.

THE WITNESS: No, that is not something that I can see is really relevant to my opinion. Because what I'm looking at, again, is once absorbed into the body and -- and how the reactions could take place there. And in reacting not talking about chemical reactions

between the chemicals, but how they affect the absorption or the toxicity once the interactions that are actually producing at the cellular level.

BY MR. WELTER:

Q. Let's now talk about what happens when the chemicals enter the body. Have you done any analysis on your own to quantify which chemicals from chemical hair relaxers are actually being absorbed into the body?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, no, that was not -- you know, that -- that particular -- if you're asking did I -- okay. Rephrase it -- or rephrase the question again. Let me make sure.

BY MR. WELTER:

Q. I'm happy to do that.

A. Okay.

Q. There -- there are ways for toxicologists to analyze chemicals and activities and exposure pathways to determine whether a chemical is actually being absorbed into the body; correct? That's one part of a toxicological analysis?

A. Yeah.
Q. Did you undertake that in this case with respect to the chemicals in chemical hair relaxer products as part of your mandate?
MR. SHIPMAN: Objection. Form.
THE WITNESS: No. Your -- your question seems to suggest that -- you know, that I would have a lab available to me and being able to conduct a metabolism study or something like that, which certainly I did not have.
But, no, that was -- having that data or being able to conduct it myself certainly was out of the question and -- and would not have been relevant to me forming my opinion, so...
BY MR. WELTER:
Q. Have you seen any studies of chemical hair relaxers where the authors have -- have analyzed the absorption of chemicals from the chemical hair relaxers into the body?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Well, I reviewed a number of studies of chemical hair relaxers that did measure aspects of

absorption or biological effects after the products were applied, and so -- you know, measurement of certain metabolites in urine or other molecular or -- effects that were reported or measured as well.

And there was one, I think, more vague type of a risk assessment and modeling study of skin absorption that I remember reviewing, but I did not find that study to be all that informative. I think it was the Pierce study. That's where they modeled absorption and basically, as I recall, they took the Helm data, data from Helm, assuming that the various components were there and conducting a risk assessment.

And, you know, I conducted risk assessments for 15 years of my career, and -- and would have never considered doing a risk assessment in that type of context. In the 20 year -- 20 years that I was doing hazard assessments with NTP risk assessment -- risk assessment never played a part of that.

Risk assessment is based on a lot of

assumptions that you generally use to support regulatory decisions and set tolerance limits and -- or groundwater standards, drinking water standards, so forth, and to determine cleanup levels at -- when you're remediating hazardous waste sites.

So in this case of -- of what is more pertinent, certainly to use a risk assessment model to negate data that's derived from epidemiology studies. And in my opinion, it is not an appropriate method to employ, so...

MR. WELTER: Move to strike as nonresponsive.

BY MR. WELTER:

Q. Mr. Atwood, my question simply was whether you were aware of any studies on the topic. And, again, I'd respectively just ask you to move the discussion along --

A. Okay. Sure.

Q. -- to focus on my questions.

A. Sure.

Q. Let's -- let's -- let me show you -- you mentioned the Helm study as containing some

information. So let's -- let's turn to that now. I'm going to show you what we've marked as Exhibit 6.

(Exhibit 6 marked for identification.)

THE WITNESS: Okay.

BY MR. WELTER:

Q. Is that the Helm study from 2018 that you -- that you mentioned?

A. Yes, it is.

Q. Okay. And this is a study that contains data on different ingredients in different types of products; right?

A. Yes.

Q. And -- and some of those products include chemical hair relaxers; correct?

A. Yes.

Q. And so -- and, again, I -- feel free to review the study, but I'm -- I'm just going to ask you some specific questions. Isn't it true that the only chemical hair -- strike that.

Isn't it accurate that -- that the Helm authors only looked at three chemical hair relaxer products that were purchased in 2008?

A. That is correct.

Q. And is it fair to say that even among those three different chemical hair relaxer products, the ingredients that were found and analyzed were different in each of those products; true?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, yes, and that -- I did not see that as being unusual. Certainly, any chemical product, you're going to have different formulations, so...

BY MR. WELTER:

Q. And --

A. And depending on which component you're analyzing too, so...

Q. And don't the authors say at the end of the study that because of budgetary constraints, they were only able to analyze a limited number of products?

A. Yes. I don't recall that, but I will --

Q. And -- and, again, I can -- I can point you to the section, but they -- they specifically point out that because the data sample was so small, that they were not able to

engage in a statistical comparison of the ingredients and the products. Do you recall that from the Helm study?

A. I do not recall that.

Q. Okay. Beyond the information about the three products -- strike that.

Beyond the information in the Helm study about the three chemical hair relaxer products and concentrations of those chemicals, are you -- have you looked at any other papers or studies that provide concentration data for the various constituent chemicals in chemical hair relaxers?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, again, I -- the -- the concentration data -- this -- this is the only one that I recall. I know the California EPA, they did provide some general -- as I recall, some general ranges of concentrations of some of the components. And I assume that they've got that data, but they did not put it in their report.

They did include, I think, information for, you know, over 100 --

seems like 185. I don't know if that is correct, but that seems a number that comes to mind.

BY MR. WELTER:

Q. Other than the Helm study and the California EPA study, can you point to any other papers, studies, data, regarding concentrations in chemical hair relaxer product?

A. Let me see -- refer to my report. There were a few other references that I looked at that reported -- I don't recall if they provided -- the others, I think the Irungu 2025 study just reported based on examination of ingredient levels. And Okeke, again, I think they identified ingredients but did not provide chemical analysis. So, yes, the Helm study would give it.

Q. With respect to the additional studies you just mentioned, do they examine concentration specifically in chemical hair relaxers or in personal care products?

MR. SHIPMAN: Objection. Form.

THE WITNESS: The ones that I just mentioned were -- as I understand it, were in chemical hair relaxer products.

BY MR. WELTER:
Q. Okay. And we can go back and -- when we're done with you today, we will go back and take a look at that.
Are you able to point to any other study, paper, data that you reviewed containing concentrations of the chemicals in chemical hair relaxers?
MR. SHIPMAN: Objection. Form.
THE WITNESS: No.
BY MR. WELTER:
Q. Now, if we could go back to the Helm study again.
A. Sure.
Q. And I'm going to direct you to page 450, and that's -- that's a chart that on the left-hand side has the -- some of these chemicals, and then as you go from left to right, it contains kind of a list of what chemicals are in different types of products; fair?
A. Yes.
Q. Okay. So let's go down -- let's -- because it's easiest, let's -- let's go to the last line under parabens. Do you see where there's an entry for methylparabens?

A. Yes.
Q. And the Helm authors found parabens in hot oil treatment; true?
A. Yes.
Q. And a leave-in conditioner product; true?
A. Yes.
Q. And a root stimulator, looks to be four root stimulator products; true?
A. Yes.
Q. And then in four of six hand -- hair lotions; correct?
A. Yes.
Q. Okay. Assuming that methylparabens are included in all of those other products, and they're being applied to the hair and to the scalp, could they potentially be absorbed into the body?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, certainly that -- you know, that anything present in other personal care products that's applied to the skin could be absorbed.
BY MR. WELTER:
Q. So the hair lotion, if it's applied

to the scalp and it contains a methylparaben, that methylparaben is being absorbed into the body; true?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, yes. Again, I was not asked to look at all other components. So -- but yes. Yeah, anything that's applied to the skin.

BY MR. WELTER:

Q. Okay. And, also, in this chart for the three hair relaxer products that were considered, they also contained methylparabens; right?

A. Yes.

Q. Okay. So just for our discussion purpose, hypothetical, if one or more of these other products contain methylparabens, and they're being absorbed into the body, and also a chemical hair relaxer containing a methylparaben is being absorbed into the body, once that methylparaben is in the body and makes its way through the bloodstream and wherever it goes, is there any way scientifically to identify the original source of that methylparaben?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, I guess your -- your question is certainly well beyond anything that I would research. But, no, you could not determine, but, again, my opinions are not based on any particular chemical, whether or not it's absorbed or from other sources on that.

To me, the fact that things -- when I considered the epidemiology studies in this case, realizing, okay, you know, what chemicals are present in these hair relaxers, and how are they different from other hair products.

So the thing that came into my mind then was it's going to be very difficult to have a true nonexposed group if you've got chemicals in other products. Which, to me, would make it even more unlikely that epidemiology studies would report a significant finding.

And so I considered that in my -- in forming my opinion.

BY MR. WELTER:

Q. You done?

A. Yes.

Q. Okay. My understanding, again, high level, is that when your opinion on biological plausibility is that assuming, in this case, a paraben enters the body, it in some way makes its way to the cancer sites; true?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, my opinion, again, is not based on any particular chemical, as I state that in my report that I could not say, well, it's a paraben or a phthalate or any other component of the hair relaxers that is causing this.

And so the biological plausibility comes from studies of complex chemical mixtures, and knowing that you just cannot simply assume that the toxic effect of a chemical mixture is going to be based on just considering one of the ingredients at a time. So...

BY MR. WELTER:

Q. And you're -- you're done?

A. Yes.

Q. Okay. Apologize if I cut you off there.

In your 20-plus years as a

toxicologist working with the NTP, when you've done assessments, and chemicals are physically in the body, is there any way to then go back and determine what the original source of the chemicals were? Is there any way to trace that back?

A. No. Only the extent that you -- if you're -- the data you're looking at or the study you're looking at was based on when we applied this product or this chemical. You know, typically you're looking at animal data, which is more of a controlled exposure circumstance.

And so -- and so in that case, you know, if you measure -- measured the chemical in the body, then you know what the source is. But in humans, that's -- that's pretty much impossible.

Q. Well, in cases where there are multiple possible exposures that -- to a certain chemical --

A. Right.

Q. -- are you able -- once the chemical is found to be present in the body through blood or urine, are you able to then go back and determine which source was -- it came from?

A. No. Again, only to the extent that the study reports what they were investigating and the products that they were looking at, so...

Q. So -- so -- and you cite to one study where, you know, there were parabens found in uterine tissue. You remember that?

A. Yes.

Q. Okay. The fact that a paraben is found in uterine tissue is not any evidence that it actually came from a chemical hair relaxer as opposed to some other source --

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. -- true?

A. Well, that -- what that does show is that once parabens are absorbed, they can -- regardless of the source, they can be transported to a specific tissue. And so from that standpoint, that was relevant data that -- that it can get there.

Q. Okay. And assuming it gets there, you can't tell the original source?

MR. SHIPMAN: Objection to the form.

THE WITNESS: That's true, but I -- you know, I did not need to -- in that

case, to know what the source was. That if multiple sources do that, it's just verifying that parabens, once they're absorbed in the body, can -- can transport and be detected in other tissues.
BY MR. WELTER:
Q. Okay. Let's switch topics.
If you could turn to page 1 of your report, and I think we can do this quickly because I asked you this at the outset. I just want to clear up some of the language so that we --
A. Page 1?
Q. 1 of your report, which is -- Section 1, which is "My Mandate."
A. Yes.
Q. Okay. Now, you told us earlier that your mandate in this case was to assess the biological plausibility of chemical hair relaxers, and whether they could cause uterine or ovarian cancer; true?
A. True.
Q. Okay. And -- and this is more just cleaning up the language than anything. You state in the first sentence of your mandate, it

says, "I was retained to perform a review of the scientific literature and to provide my professional opinion on the possible health effects associated with the use of hair straightener and relaxer products, hereinafter referred to as hair relaxer."

Did I read that correctly?

A. Yes.

Q. Okay. So -- so here the -- you mentioned possible health effects, and I just want to clarify, your mandate was not to assess all possible health effects. Your mandate was to assess uterine and ovarian cancer specifically; true?

And I think you say that in the next sentence.

MR. SHIPMAN: Objection.

THE WITNESS: Well, the next sentence basically is getting back, again, to the specific mandate, but as someone had experience in this, that I knew that -- that my investigation would go a little bit beyond that in order to address biological plausibility. So I'm looking at other -- other health effects that --

that could address -- be relevant to the question.

BY MR. WELTER:

Q. And that's perfectly fair. And I -- I totally get that you -- you would have naturally considered other information. But in terms of your mandate and then the opinions you're offering in this case, you're not offering opinions on all of the possible health effects associated with hair straightener and hair relaxer use; correct? Your opinions are limited to uterine cancer and ovarian cancer specifically?

A. That's correct.

Q. Okay. You also in this first sentence talked about hair straighteners and then relaxer products. And we talked a little bit earlier about what a chemical hair relaxer is and the difference between a hair straightener and a chemical hair relaxer. Is -- is your mandate focused on chemical hair relaxers, or did you also do an analysis of hair straighteners?

A. No, I did not. And there had been -- I should have put chemical used a --

Q. Okay.

A. -- modifier to just say that it's -- that I'm specifically talking about chemical hair straightener or relaxer products.

Q. Appreciate that. If you could turn to page 4. And under Executive Summary, the first sentence which says, "My mandate was to render an opinion regarding the biological plausibility that use of chemical hair relaxers could cause endocrine-related cancers, specifically ovarian and uterine cancer."

Did I read that correctly?

A. Yes.

Q. Is -- is endocrine-related cancers broader than just uterine and -- and ovarian cancer?

A. Well, certainly -- and I mentioned that in my report, that it -- certainly breast and -- and -- and there's some others that are involved. I think thyroid and maybe prostate as well, but...

Q. So, again, just so we're clear on your mandate, your mandate was not to consider all endocrine-related cancers, just uterine and ovarian; correct?

A. Right. And so that -- yes.

Q. Okay. Great. And your mandate was on biological plausibility; true?
A. True.
Q. And your opinions that you're offering in this case are based on biological plausibility; correct?
A. Correct.
Q. And -- and we'll talk later about the Bradford Hill, but biological plausibility is one of the nine criteria under Bradford Hill?
A. Yes.
Q. Okay. In your report, you do not offer any -- any general causation opinions that use of chemical hair relaxer products causes ovarian cancer; correct?
A. Okay. I'm not sure I follow that.
Q. Sure. I'll withdraw the question. Let me ask it again. Was it your mandate that we just talked about to form opinions on whether use of chemical hair relaxer products causes ovarian or uterine cancer?
MR. SHIPMAN: Objection to form.
THE WITNESS: Specifically, as I state here, was to look at the biological plausibility was just one of the

primary -- which is an important factor in addressing causality. And so indirectly I'd say yes. And, again, based on the totality of the evidence that I reviewed that my conclusion was that it is a -- it is biological plausibility, so...

BY MR. WELTER:

Q. And are you done?

A. Yes.

Q. Okay. The -- again, just make sure we're clear. Biological plausibility is one of the nine criteria under Bradford Hill; correct?

A. Right.

Q. And your -- your opinions are based on that -- that one criteria; correct?

A. They're not based on the one criteria I considered. Again, the overall -- because I reviewed many other studies, the epidemiology studies and many other relevant studies, as I discuss in my report, so -- and I address some of the other Hill criteria. Some of them in this case, obviously, were more important than others, and there's no requirement that you have to have all of them, of course, so...

Q. Sure. So to assess biological

plausibility, you applied a certain methodology; correct?

A. Yes.

Q. And that methodology is -- is -- is different in concept than doing a broader causation analysis; true?

MR. SHIPMAN: Objection to form.

THE WITNESS: Would you say it's broader than --

BY MR. WELTER:

Q. It's a -- it's a different -- in other words, to assess biological plausibility, there's a certain methodology you apply; true?

A. Yes. Biological plausibility is basically, yes, derived from mechanistic information that can come from a number of sources, but that is what the focus of my career was, again, at NTP.

Q. Okay. But to assess causation requires a broader, different methodology; true?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, it's -- it is a -- again, a component of that, and the -- and so I do address the other criteria in my biological plausibility

evaluation and -- and overall findings. But, yes, my focus was on -- was addressing the biological plausibility question.

BY MR. WELTER:

Q. As an expert witness in this litigation, are you offering a medical causation opinion on general causations to whether chemical hair relaxers cause uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: That was not, as I understand it, the question, you know, particularly if you say a medical. I'm not an MD, so I cannot offer a medical opinion.

BY MR. WELTER:

Q. Fair enough. Let me -- go ahead. You done?

A. Yes.

Q. Okay. Let me rephrase the question. Are you -- as an expert in this litigation, are you offering a -- a general causation opinion that -- that use of chemical hair relaxers causes uterine or ovarian cancer?

MR. SHIPMAN: Object to the form.

THE WITNESS: I am offering an opinion that that is biologically plausible -- plausible. And so carrying that -- if I believe that it's biologically plausible, then carrying that forward, then that also, I think, implies that -- that I'm offering a causality opinion.

BY MR. WELTER:

Q. Okay. Is your understanding that biological plausibility and causality are synonymous?

A. No, they would not necessarily be synonymous, but they certainly in some circumstances could be.

Q. Well, in this circumstance, your conclusions essentially were -- well, strike that.

When you're talking about biological plausibility, you're talking about whether it's -- it's mechanistically possible; right?

A. Yes.

Q. That's a -- that's a different conclusion than whether the exposure actually does cause the disease; fair?

A. Yes.
Q. Okay. It's that second part, you're not offering an opinion in this litigation that exposure to chemical hair relaxers actually causes uterine or ovarian cancer; correct?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, I'm not sure how to go from here. But, yes, my -- I'm offering an opinion on the biological plausibility of the -- of the relationship that chemical hair relaxers can cause ovarian and uterine cancer.
BY MR. WELTER:
Q. And your opinion is limited to biological plausibility; true?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, my opinion is -- is based on, again, the body of -- of -- of evidence streams that I considered. And so if you're asking me do I believe that, then I would say, yes, I would -- I would have come to -- to that conclusion that -- that chemical hair relaxers are a causative factor for -- for that. But that was not my specific mandate.

BY MR. WELTER:
Q. And there's nothing in your report where you state --
A. Right.
Q. -- that exposure to chemical hair relaxers causes uterine or ovarian cancer; true?
MR. SHIPMAN: Objection to form.
THE WITNESS: Yes, I don't recall that I would have made that -- that type of -- that statement anywhere in my report. But I look in the -- the -- let's see the way I -- yes. Yeah, in my opinion statement, that -- that there's sufficient data to support biologically plausible connection between -- so with ovarian cancer and use of hair relaxers.
BY MR. WELTER:
Q. Are you done?
A. Yes.
Q. Okay. Can you turn to page 7 of your report? And it's the Section 3.4, Methods and Evidence Types.
A. Okay.
Q. And my focus is on the first sentence. It says, "I use the same methods in

this evaluation that I used during my 20-plus-year tenure as a senior mechanistic toxicologist supporting NTP's report on carcinogens."

Did I read that correctly?

A. Yes.

Q. Okay. I want to put a tab there, and let's go to page 21 of your report as well. And, again, under Section 5, which says "Methodology." Let me know when you're there.

A. Okay.

Q. And it says -- the first sentence says, "The methodology I used in this report is consistent with methods used to identify and evaluate mechanistic studies for carcinogens while working as a senior toxicologist supporting the NTP's report on carcinogens for more than 20 years."

Did I read that correctly?

A. Yes.

Q. In those two places, are you referring to the same methodology?

A. Yes.

Q. And are the -- are the -- is the methodology that you're -- that you're relying on

contained in the handbook on methods for conducting cancer hazard evaluations published by the NTP?

A. Yes, that was --

Q. I under --

A. Yes, go ahead.

Q. I understand that in June 2025, a new version of that handbook was published?

A. Yes.

Q. And you had since been retired at that point; correct?

A. Right.

Q. But it was available to you as you were preparing and finalizing your report in this case; correct?

A. Well, it was available. I did -- I did not -- because at that point I was -- I was working on my report, and so I was following the -- you know, what I've done for my career was -- the last part of it was a 2015 handbook. I was involved in -- before I retired was working on that version, but the pandemic kind of slowed thing down -- things down a little bit. And...

Q. So is it -- you done?

A. Yes.

Q. And I do apologize.
A. Yes, yes.
Q. I -- I -- so is it your testimony that in forming your opinions in this case, you applied the methodology set forth in the 2015 version of this handbook?
A. That is primarily what I was working under to the extent, yes.
Q. Okay. Do you know what the differences are between the 2015 handbook and the 2025 handbook?
A. I could not tell you as I have not reviewed the 2025 handbook in detail, but I know the -- one of the things -- one of the factors that we were working on was just looking at mechanistic data and application of systematic review methods, which is something that had been under a lot of discussion and -- and trying to overcome the difficulties that are associated with systematic review of such a broad database.
Q. Were you aware that your name is listed as someone who, quote, contributed to drafting or critically reviewing of the handbook?
A. Yes.
Q. That's in the 2025 version?

A. Yes, yes. So, as I said, I was involved in -- in working on that before I left.
Q. Okay. And, again, I'm just -- I'm not looking for a long explanation.
A. Okay. Sure.
Q. I'm just trying to -- in terms of just topics or subjects --
A. Sure.
Q. -- can you -- can you generally tell me what topics you contributed to drafting in the handbook and whether it was the 2015 handbook or the 2025 handbook?
A. Well, I was involved with the 2015, but -- as well, and, of course, I was -- I was there, and it would have been primarily focusing on the mechanistic sections of that handbook.
The 2025 would have been the same thing, some of the preliminary work that I was -- contributed there. I could not tell you how much, if any of it, was actually incorporated. I know they went back and forth on just the general approach for that. And so it would have still been contributing toward the mechanistic section.
Q. Did you contribute to drafting any sections of either version of the handbook that

addressed biological plausibility?
A. I contributed to some in the -- the 2015.
Q. Which sections? Do you know --
A. I cannot -- I cannot recall that.
Q. Okay. Have you ever applied the methodology from this NTP handbook in assessing biological plausibility of chemical hair relaxer usage in uterine or -- strike that. That was a bad question. Let me start again.
A. Okay.
Q. Aside from your work with the NTP, have you ever applied this methodology to assess biological plausibility in any context before this litigation?
A. No. It would have just been at NTP, yes.
Q. And is it your position that you properly applied the methodology from the 2015 handbook in assessing the biological plausibility of chemical hair relaxers and uterine and ovarian cancer in your report?
A. Yes, to the -- to the best of my ability.
Q. Okay. As you sit here today, did you

deviate from the handbook methodology in any way?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I couldn't answer that specifically, you know, but I know that the methods I used were, again, consistent with the process that I used while working at the NTP. Because I don't have the handbook memorized by any means.

But -- but the basic process, again, was conducting literature search, and the difference was there. We had a research library, and that would do a much more expensive literature search in what I was able to do on my own.

BY MR. WELTER:

Q. You done?

A. Yes.

Q. Okay. As part of your research and developing your report in this case, at any point in time, did you go back and review the methodology sections from the handbook regarding biological plausibility?

A. Yes.

Q. And do you, like, do it to confirm you had properly applied all of the steps in the

methodology in that handbook?

A. Well, yes. Looking at that to -- to do the -- again, the best I could with -- with what I had, the resources I had available. So...

Q. When you say the best you could given the resources you had available, what resources did you not have available which you would have liked to have had?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, while I was working at NTP, we had some special software that aided a lot in evaluating the literature, and we could go in and tag the literature, and then -- so it was very simple to then -- to go in -- when you're writing a section, to go in and sort and find all the studies that were relevant to that topic.

And -- and we had other software that, although it wasn't applied as much for mechanistic studies, is more for the animal and epidemiology studies themselves, the cancer studies for that, but -- to evaluate, you know, the various aspects of study quality. So...

BY MR. WELTER:

Q. From a methodology perspective, do you believe that the report you prepared and the conclusions you reached would pass peer review at the NTP?

A. Yes.

Q. If you could turn to page 4 of your report. And in the executive summary, Section 3, kind of the third -- fourth line down to the right, the sentence that begins with the word "although." Do you see where I'm at?

A. Yes.

Q. Okay. Let me read the sentence here. It says, "Although biological plausibility has been defined by many, for purposes of this review, I relied primarily on the U.S. EPA definition."

Did I read that correctly?

A. Yes.

Q. When you say "primarily," are you also relying on any other definition of biological plausibility in support of your opinions in this litigation?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, other than just

generally being aware of what others say, and -- and that was part of my research, I was wondering if anyone had agreed upon a standard definition. And I could not find that all agencies are saying, okay, this is it, we finally defined it.

So I considered others, but the EPA one was -- is the one that I was relying on as well -- I think I also mentioned what Hill said about biological plausibility as well.

BY MR. WELTER:

Q. Is the definition -- were -- were you done?

A. Yes.

Q. Okay. Is the definition of biological plausibility you use, you know, as set forth by the U.S. EPA different from the definition of biological plausibility as used when applying the Bradford Hill criteria?

A. I don't think there's any real difference in that. I think, again -- I mean, the -- you asked -- the EPA definition also includes, you know, the consistency with which Hill included as a separate factor from

biological plausibility.

Q. Do you believe there are any other differences in the two definitions other than the consistency piece of it?

A. Well, just let me look and see what Hill said. I did have that.

MR. SHIPMAN: When you get to a good stopping place, can we take a break? Just a few minutes.

MR. WELTER: Absolutely. After this question is fine.

MR. SHIPMAN: Yeah.

THE WITNESS: Okay. If I could -- well, just skimming through what Hill -- this is what I remember, that he basically is just talking about this is saying that it's something that we cannot demand, and what is biologically plausible depends upon the biological knowledge of the day.

And so that basically was his emphasis on that, but in one of his concluding sentences, he said, "In short, association we observe may be one new to science or medicine, and we must not dismiss it too lightheartedly as just too

odd."

And so there's been a number of examples, I guess, as more knowledge is available that something that wasn't considered biologically plausibility at one point then, you know, became known as a primary -- not on biological plausibility, but as a causative factor. And so -- so I would say that they are -- they are consistent.

And so basically what the U.S. EPA is talking about is -- is looking at consistency of data, and of course when you're looking at mechanistic data, it comes from many different sources and test systems. And so you're looking at the overall consistency and coherence of that, which are Hill factors as well in demonstrating a plausible biological mechanism.

So basically my interpretation of that is -- is the -- are there known mechanisms by which a chemical or chemicals could act within the body to bring about a certain disease or effect,

so...

BY MR. WELTER:

Q. Thank you.

MR. WELTER: We can take a break.

THE VIDEOGRAPHER: Off the record at 11:04 a.m.

(Recess taken from 11:04 a.m. until 11:22 a.m.)

THE VIDEOGRAPHER: On the record at 11:22 a.m.

BY MR. WELTER:

Q. Mr. Atwood, are you ready to continue?

A. Yes.

Q. Okay. Super.

A. Move along.

Q. So in the -- any of the papers or studies you reviewed, have any of those folks assessed the biological plausibility of use of hair relaxers and cancer?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, I don't remember -- recall a specific. There may have been some, but I -- I just know that many of the studies that I looked at and reviewed, I guess more in general personal

care products, in that context as, you know, more and more investigation and certainly a lot more research into that area as looking at the -- the possible association or causal relationship between exposure to everyday products and -- and disease. But I do not know specifically or cannot recall at this point specifically about biological plausibility.

BY MR. WELTER:

Q. Okay. Have any of the authors in the papers that you cite in your report commented on the topic of biological plausibility regarding chemical hair relaxers and uterine or ovarian cancer?

A. Well, other than the epidemiology studies that -- that, you know -- the White Birther and Jane papers, their conclusions...

Q. Do those -- when you say the White and Jane papers, do either of those papers specifically discuss biological plausibility?

A. I don't recall. I'd have to look at that, if they actually use those terms or not, but they did certainly discuss, as I recall, some

possible factors that -- that could contribute to that. So I think it's inferred, but whether they specifically stated that, I do not recall, so...

Q. Going to mark --

MR. WELTER: Christine, what are we up to, 7?

THE REPORTER: Yes.

MR. WELTER: Okay.

(Exhibit 7 marked for identification.)

BY MR. WELTER:

Q. I'm going to mark as Exhibit 7 a study. In your report, do you recall citing to the Bailey study from 2025 entitled "Use of Hair Straighteners/Chemical Relaxers an Incidents of Non-reproductive Cancer"?

A. Yes.

Q. Okay. Let me hand you a copy of that study. And if I could direct you to page 2 and the third full paragraph down that starts with the word "although."

A. Uh-huh.

Q. Do you see that?

A. Yes.

Q. Okay. So and -- for the record, the

first phrase of this says, "Although the biological plausibility of the relationship between hair straighteners and cancer is still under investigation," and then it goes on from there.

A. Right.

Q. Did I read that first phrase correctly?

A. Yes.

Q. And one of the authors of this study is Dr. Chang who was the lead author in the October 2022 study; correct?

A. Correct.

Q. There are six authors on this Bailey study, all PhDs; correct?

A. Yes.

Q. And they're all -- I believe they're all epidemiologists; correct?

A. Well, I don't know that specifically, what their professions are, but --

Q. Okay.

A. -- let's...

Q. Fair enough.

A. Five of the six work for the epidemiology branch of NIHS.

Q. So the -- the Bailey authors, including Dr. Chang, as of October 2025 have stated that the biologic -- biological plausibility of the relationship between hair straighteners and cancer generally is still under investigation; true?

A. True.

Q. That's what they say?

A. True.

Q. And so your -- strike that.

Since October 2025, have you uncovered any additional evidence that you've considered in forming your opinions on biological plausibility that wasn't available to the authors from the Bailey study?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, of course, when this -- this paper was published in 2025, but it was obviously -- you know, how much of the literature was October 2025, and so when it was originally submitted for publication, so there would be several months there, but -- so I -- I can't specifically answer that question.

But this was a paper, obviously, that

came out toward the end when I was finishing completion of my report. So I guess the question -- the question is asked of me, is there anything that -- that more that -- that was available to me that they didn't have available to them, not --

BY MR. WELTER:

Q. Let --

A. -- not -- not likely, but it's possible there are some things that I considered, but there were -- there were plenty of papers that were relevant that I published prior to this, so I don't think they would have access to these.

Q. Sure. Are you done?

A. Yes.

Q. Okay. Thank you.

Are -- are the -- are the opinions you're offering in your report inconsistent with this statement from the Bailey study that biological plausibility of the relationship between hair straighteners and cancer is still under investigation?

A. I don't see that it's inconsistent.

The way I read this is that, you know, as far as I know, no. As you asked in a previous question, has any paper been published on the biological plausibility of this association, and -- and so that's what I was -- was tasked to do, to undertake that.

And -- and so I'd say it's still true that it's under investigation. I've conducted one investigation on that. I don't know how many others out there may be doing that, but -- or if NIHS or some of these authors are working on that as well, I have no idea.

Q. Okay. You can set that aside.

A. Okay.

Q. Are there other published peer-reviewed studies that address biological plausibility and hair straighteners that you're aware of?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, I have to look at my report, but I think my -- I think there's a lot of papers that I looked at that -- that can be -- that I used as resources or evidence to reach that conclusion. But, again, I know of no

paper that -- you know, with a title, the biological plausibility of -- of hair straighteners and uterine/ovarian cancer, so...

BY MR. WELTER:

Q. Okay. Let's change topics. I'm going to ask you a few questions with EDCs, endocrine-disrupting chemicals, and just to kind of set the stage -- and, again, if I -- if I misstate it, you, I'm sure, will correct me.

But just from a -- a broader perspective from reading your report, my understanding is that these EDCs and chemical hair relaxers are in some way absorbed into the body and then make their way to the two sites, the ovaries and the uterus, and they then bind with receptors in those tissues that otherwise are supposed to be receiving hormones, and by the EDCs binding with the receptors instead, that's the -- that's the effect that creates the disruption of the endocrine statement.

Is that a fair statement of --

MR. SHIPMAN: Object -- objection to form.

THE WITNESS: Well, that can be

certainly part of it, but -- but endocrine-disrupting effects can involve a lot of other effects other than just direct binding to the nuclear receptors. And those are outlined in the LaMarel study of -- they've identified the ten key characteristics of endocrine-disrupting effects, and a number of other papers that I reviewed discuss that.

And so it's not just a matter of just looking at simple binding to the estrogen receptor and the affinity of -- of that binding. But that is -- that is one way, but there are a number of other ways that -- that can interact to -- to have an effect.

BY MR. WELTER:

Q. And that's fair, so let me broaden the question. With respect to any -- any of the disruptions to the endocrine system, the fact that there is a disruption and effect doesn't mean that that necessarily increases the risk of cancer; true?

A. I would say yes, that that -- that would be true, yes.

Q. And do EDCs have adverse effect thresholds?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, that's -- that's certainly a question that I knew that would come up and something that I investigated. And my answer to that based on the -- the references that I reviewed that I would say it's inappropriate to try to identify thresholds for endocrine-disrupting chemicals. And the primary source of that is just endocrine society itself in addressing that question.

And there was a paper published -- let's see. Let's see. I know I have it here. It's -- not sure how he pronounces his name, but it's 2020, D-E-M-E-N-E-I-X, which published a paper specifically on endocrine disruptors, society's position that was addressing another -- a response to another paper that -- saying that threshold approaches are -- are appropriate.

BY MR. WELTER:

Q. Thank you for that answer. We'll talk about the nonmonotonic issue a little bit later today.

But to just bring it back to the simple question that I have is simply whether EDCs actually have in the -- in the literature, are there published adverse effect threshold for these kinds of chemicals?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, thresholds are something that is a risk assessment tool and an assumption that -- and so going -- you just simply go to the literature and look at the available studies and try to identify a no observed adverse effect level which would essentially be equivalent to a threshold.

And that's been an assumption in toxicology that -- from most substances, particularly, I would say, for acute effects that you can expose something -- expose -- either animals or people could be exposed to, and that they would be effect -- or a level that would not cause an effect.

However, that is -- you know, that is not something that can actually be scientifically demonstrated. It is a conceptual framework or scientific work.

BY MR. WELTER:

Q. Again, I appreciate the answer. My simple question is, is there data published anywhere -- wait. Let me finish the question.

A. Sure.

Q. Is there data published anywhere about adverse effect thresholds for any of the EDCs you identified?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yeah. That is not something that I researched. I'm not aware of any in -- in the studies that I reviewed. I am aware of, again, that several papers addressed that concept, and just the whole risk assessment paradigm as it's being used, and applying that as being inappropriate for that reason because it's in thresholds.

BY MR. WELTER:

Q. Let's refocus on where I started now --

A. Okay.
Q. -- which is this concept of these EDCs binding with the receptors and the target cancer sites. You with me?
A. Yeah. Agree.
Q. We agree that that is -- that is one way that the endocrine system can be disrupted; true?
A. Certainly.
Q. Okay. In those circumstances, when there has been a binding effect by an EDC to a receptor at the target location in the body, how do you then take that effect and assess whether it will or could eventually lead to cancer at that site?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, I don't know that I can really answer that question. That -- basically it's from a mechanistic standpoint, the application of the key characteristics of carcinogens. And so those are molecular effects that are known to be related to cancer causation.
And to the extent that you can measure those effects at the tissue of

interest or in -- in human or -- you know, in samples you collected from people or looked at in in-vitro studies with human cells, then that is an implication that -- that that is a possibility.

BY MR. WELTER:

Q. Now, you mentioned in that response "carcinogen," and my focus is on EDCs. We'll talk about carcinogen --

A. Okay.

Q. -- separately. I just want to make sure that we didn't talk past each other.

A. Okay.

Q. When you used the ward "carcinogen," did you mean EDCs?

A. Well, in that context, you know, the key characteristics of endocrine disruptors and certainly cancer is something that's been associated with endocrine disrupting effects. There's certainly many other outcomes as well in terms of neurological development and metabolic syndromes. And endocrine system, obviously, is very important to maintaining a lot of body systems.

And so disrupting -- disrupting

those -- those systems can have a wide ranging effect of which cancer is one possibility.

Q. Assuming that one of these EDCs binds with a receptor in the uterus, what change occurs at the cellular level that results in cancer?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, the changes that are -- that are most relevant, again, just looking at the studies that were available, again, looking at the key characteristics that -- of the -- some of the chemicals that I did consider in this that they -- I found, I think, very clear evidence that they could contribute to cellular proliferation.

They could enhance the metastasis and migration potential of cells, and could promote environment that is conducive to cancer growth in many different cell types, but...

BY MR. WELTER:

Q. Do you agree that in order for cancer to develop, there needs to be a genetic mutation?

MR. SHIPMAN: Objection to form.

THE WITNESS: No, I don't necessarily

agree with that. It's -- both genotoxic and nongenotoxic carcinogens are recognized. And so it does not necessarily have to involve a genetic effect to be the initiating effect.

BY MR. WELTER:

Q. Are there any published peer-reviewed studies reporting that a disruption of the endocrine system in uterine tissue results in cancer at that target site specifically?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, only -- I don't know that I could answer that specifically, but certainly, you know, number of studies that I reviewed talking about endocrine-related cancers in general, and talking about how that mechanism can be involved in, you know, breast, ovarian, and uterine cancers.

I also did look at work that had been done on coming up with adverse outcome pathways, which is takes the key events, many of them can be related to the key characteristics, and attempt to -- based on review of the data, to construct just a

pathway or a mechanistic pathway of how exposure to a chemical can result in a -- trying to identify what the molecular initiating event is, and then identifying other key events along that that would result in the final outcome of cancer.

And there is a database that's maintained on the EPA web -- website called adverse outcome, or AOP is the acronym, wiki, which is a collaborative database that is there. I did look at that. And so endocrine disruption has been identified as a key event or a -- a molecular initiating event and a number -- by number of researchers for both ovarian and uterine cancer.

BY MR. WELTER:

Q. Okay. And I appreciate that answer as to what you did and how you investigated it.

Coming back to my question, very simple, are you aware of any published studies that has reported a disruption in the endocrine system in the uterus that leads to cancer specifically in the uterus? Is there a study out there that talks to that particular issue?

A. Yeah.

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yeah. Well, I can't answer that as I'm not aware of -- but -- of any, but then that's not a specific question that I tried to -- to uncover in my literature search either.

BY MR. WELTER:

Q. And that's okay that you did research, and I'm just -- all I can ask you is what you know today.

A. So no.

Q. So, similarly, are there any other peer-reviewed studies confirming that an endocrine disruption in the ovaries leads to cancer specifically in the ovaries?

A. Well, again, you know, I'm not aware of specific studies, no. I did review the expert reports from some -- from the plaintiffs and -- and addressed the biology and -- of ovarian cancer. But specific published studies, I'm not aware of that or --

Q. Would you agree that different tissues in the body have different sensitivities?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, certainly because tissues that typically are rapidly dividing tend to be more sensitive to developing cancer than others, but certainly cancers have been found in almost every cell type and tissue of the body. So there are different susceptibilities and different risk factors.

But an important consideration is also that -- I think it's well over half the cancers that are defected in humans have unknown etiology or unknown risk factors or causal factors.

BY MR. WELTER:

Q. Well -- okay. Let's move along.

Let's talk a little bit about the -- the -- I'm going to refer to them as carcinogens, but I know in your report that they are either known carcinogens or suspected carcinogens. We talked about that earlier, that list of chemicals; right?

A. Okay. We're talking about NTP classification that --

Q. Yes.

A. Yes.
Q. Yeah. So formaldehyde, ethylene oxide perhaps. For our discussion purposes, if I just call them generically carcinogens --
A. That's fine.
Q. -- that's fine --
A. I understand.
Q. -- knowing that they may be classified in different ways. You understand that; right?
A. Yes.
MR. SHIPMAN: Hey, Stan, her head is going to explode, and there's going to be blood all over this counter, and then we'll have to get somebody in here to clear it up, and you'll be here until 9:00. They'll come get the body.
So wait. Don't talk over him. Okay.
THE WITNESS: Okay.
MR. SHIPMAN: Let him finish his question.
Did I just help you?
MR. WELTER: Yeah.
MR. SHIPMAN: Thank you.
THE WITNESS: Sorry.

BY MR. WELTER:

Q. We're good?

A. Where were we?

Q. We just did it again.

Okay. With respect to the carcinogens that you identified earlier in your testimony, would you agree that none of those carcinogens have been evaluated by any regulatory agency for carcinogenicity in uterine or ovarian tissue specifically?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, generally, and most of the data comes from animal data, and so an NTP conducts a bioassay for carcinogenicity, they do a full necropsy and tissue evaluation. And I know that the -- the diethylhexyl phthalate was associated with uterine cancer in either rats or mice. I don't remember which one now. But that is only one that's -- that I specifically recall.

BY MR. WELTER:

Q. Okay. Are there any published studies showing of the presence of any of these carcinogens that you identified actually causes

uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: That will -- certainly that was something that I looked into, but, again, in order to form my opinion, it was not as simple a matter of trying to identify any particular constituent that was a known ovarian or uterine carcinogenic agent.

There's actually -- I did search the NTP database, just out of curiosity, to see how many chemicals have been associated with ovarian/uterine cancer. It's a very short list at this point. Which indicates there's a lot of unknown information there. And, again, getting back that -- that most causal factors have not really been identified at this point.

BY MR. WELTER:

Q. Would you agree that identifying a chemical as a carcinogen is different from determining the minimum threshold dose necessary to cause cancer in humans?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Okay. State that

again, please.

BY MR. WELTER:

Q. Yeah, be happy to. Would you agree that identifying a chemical as a carcinogen, which is what you did at the NTP for years; correct?

A. Right.

Q. That -- that identifying a chemical as a carcinogen is different from determining the minimum threshold dose that is necessary to actually cause the cancer in humans?

MR. SHIPMAN: Same objection.

THE WITNESS: Well, I mean, the -- to determine a carcinogen, you look, you know, at the available epidemiology or animal cancer data that is available. With human studies, specific dose information is -- you know, in the terms of they were exposed to X amount of this chemical for X number of days or frequency for X number of years.

With -- with the studies in animals, they're -- they start with identifying what is called the maximum tolerated dose in order -- so with the idea they want to

have a dose that is high enough to have an effect without killing all the animals. And so the -- the idea there that -- you know, because your limitations of your study typically only have 50 animals in the group, but -- so just for the power of the test, they -- they use high doses in order to induce effect.

I don't know that you can actually determine that it's possible to determine what a minimal dose is. There's some databases that have been out there that will say what the dose is based on the available cancer data, what would expect to be called -- I think it's E -- ED or an effective dose 50, which is for 50 percent of the population.

And, of course, they're modeling -- EPA use it in their risk assessment approaches, take a lot of number modeling approaches to try to determine a dose that would -- you know, a benchmark dose that might be associated with a certain level within a population.

BY MR. WELTER:

Q. Are you done?
A. Yes.
Q. Okay.
A. I hope so.
Q. Again, I -- look, I just want to move this along.
A. Okay. Okay.
Q. And I appreciate --
A. Okay. I know you got to --
Q. I do truly appreciate your answers, and -- and -- but, again, I just want to focus on the question.
A. Sure.
Q. So let me go with the next question. Identifying something as a carcinogen is not the same thing as saying that it actually causes cancer; true?
MR. SHIPMAN: Objection to form.
BY MR. WELTER:
Q. Those are different concepts?
A. Well, I'm -- I would -- I don't know if I see a difference in those, if you identify it as a carcinogen. Then -- then you're identifying as something that -- that hasn't been associated with cancer in either humans or

animals.

Q. Is association the same as causation?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, in -- in that context, yes, I think it would be, but -- and that is -- particularly in animal studies, you know, you're -- you have a -- you know, I think a higher degree of certainty there because it's under very controlled conditions. They're not exposed to a lot of other particularly confounding factors. And so, you know -- so I would say in that case, yes, I don't see a -- a real difference there.

BY MR. WELTER:

Q. Aren't there a lot of carcinogens that are not known to cause cancer --

MR. SHIPMAN: Objection to form.

BY MR. WELTER:

Q. -- out there?

A. No. That are not -- I think all -- all chemicals that have been identified as carcinogens, I'd say are known to cause cancer in either humans or animals, so...

Q. Let's change topics again. I want to

talk to you about formaldehyde.
A. Okay.
Q. So you agree that humans are exposed to formaldehyde in small doses and levels every day?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Well, certainly. I mean, formaldehyde is -- is a product of metabolism, and so it's endogenously generated as well.
But a number of occupations are exposed to formaldehyde, you know, embalmers and anyone that's working with chemicals that can release formaldehyde as well. So there's certain occupations that are -- that have higher exposures.
BY MR. WELTER:
Q. Would you agree with the National Institute of Health which says, "Formaldehyde is naturally produced in very small amounts in our bodies as part of our normal everyday metabolism and causes us no harm"?
Do you agree with that?
A. Yeah, that's -- yes --
Q. Do you agree --

A. That's what I just -- just stated, yes.
Q. Okay. And would you agree that formaldehyde can be found in the air that we breathe at home and at work, in the food we eat, and in some products that we put on our skin?
A. Yes. I think it would be a -- I have not specifically looked at what all the ambient levels or levels of formaldehyde in other products or consumer products or food or air are, but I would not be surprised if --
Q. And just so we're clear, all these statements that I'm going through --
A. Right, sure.
Q. -- are from -- are from the National Institute of Health website.
A. Right.
Q. You know, would you agree that a major source of formaldehyde that we breathe every day is found in smog in the lower atmosphere?
A. Yes.
Q. Would you agree that automobile exhaust from cars without catalytic converters or those using oxygenated gasoline also contain

formaldehyde?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Yeah, I don't know if I specifically knew that as a source of this, but --
BY MR. WELTER:
Q. Would you agree that formaldehyde is produced by cigarettes and other tobacco products, gas cookers, and open fireplaces?
A. Yes.
Q. Would you agree that formaldehyde is used as a preservative in some foods, such as types of Italian cheeses, dried foods, and fish?
A. Yeah, I can't say that I was specifically aware of that.
Q. Isn't it -- isn't the issue with formaldehyde whether the dose is high enough to cause the harm?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, again, just getting back to this, I was not looking at any particular chemical, nor did I opine in my report that formaldehyde is likely causing -- causing these cancers.
I do know that there is evidence that

formaldehyde can act as a cocarcinogen or -- do that or can promote carcinogenesis of other toxic substances or carcinogens. And so, again, just getting back that I was considering this as a mixture problem and not as trying to look at individual chemicals.

BY MR. WELTER:

Q. Can you turn to page 9 of your report -- and I'm sorry if I cut you off.

A. No problem. No, you did not.

MS. PARFITT: I'm sorry. What page? What page are we on?

MR. WELTER: Page 9.

MS. PARFITT: Thank you.

MR. WELTER: Second line down, the sentence starts with "volatile."

BY MR. WELTER:

Q. You see where I'm at?

A. Yes.

Q. It states, "Volatile chemicals, e.g., formaldehyde and cyclosiloxanes, present in hair relaxers are released into the air during application of these products, thus inhalation exposure can be important. Heat generated or

applied to the hair would increase chemical release to the air."

Did I read that correctly?

A. Yes.

Q. At what point during the application of a chemical hair relaxer is heat applied?

A. Well, I'd also said heat generated. And, again, I don't have intimate knowledge of application of hair relaxers, like I did, that heat would be generated -- you know, if you're applying a caustic substance and then using an acid neutralizer, heat would be generated during that process.

And that's just a statement. If -- if heat were present, that would increase the volatility and release of the chemicals. They can be released with -- without that. So -- so that's just a statement that -- that could increase that. And so, I mean, one could use a hair dryer that would be heating it possibly. So...

Q. Okay. Is it your position that chemical hair relaxers during the application process, as a result of the nature of the chemicals or some chemical interaction, that that

is releasing formaldehyde?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, if -- if -- again, if formaldehyde is in the product or formaldehyde releasers are in the product, then certainly that -- that is a very likely possibility.
BY MR. WELTER:
Q. Okay.
A. So --
Q. And let's set aside formaldehyde releases. We'll get there.
A. Okay.
Q. Just formaldehyde right now.
A. Okay.
Q. Can you point to any authority that says that the chemicals in a chemical hair relaxer product releases formaldehyde into the atmosphere as a result of it being applied?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, again, this is -- you know, that's not something that I looked at specifically. This is just, again, in terms of general routes of exposure that -- and based on the

information that I had of formaldehyde being an ingredient that was present in at least some -- I'm not saying all chemical formulations of hair relaxers because I don't know that.

BY MR. WELTER:

Q. Sure.

A. But the information I was going on was saying that it can be present, and if it is, then volatilization could also be a source of exposure.

Q. Okay. Could you turn to page 26 of your report?

A. Sure.

Q. Section 6.1, "Chemicals of Concern," the third full paragraph down.

A. Okay.

Q. And the second line on the right starts with the word "based"?

A. Okay.

Q. You with me?

A. Yes.

Q. Okay. I'll read that.

"Based on the California EPA report and the Helm, et al., study, phthalate, paraben,

benzophenones, cyclosiloxanes, and formaldehyde were identified as chemicals of concern."

Did I read that correctly?

A. Yes.

Q. Is that -- when you talked about formaldehyde being released, were you referring -- and the studies that you saw that in, were you referring to the California EPA report in the Helm study?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Yes. I think, as I recall, that -- that the California EPA study identified formaldehyde. So...

MR. WELTER: Christine, what exhibit are we up to?

THE REPORTER: 8.

MR. WELTER: 8. Okay. I'm going to mark as Exhibit 8 the California EPA study.

(Exhibit 8 marked for identification.)

BY MR. WELTER:

Q. And I'll hand you Exhibit 8. Mr. Atwood, is that the study that you just mentioned?

A. Yes.
Q. Okay. And if I can ask you to turn to page 2 of the study, which is actually page 3 of the exhibit.
A. Okay.
Q. And the second full paragraph that starts with "the most commonly," do you see that?
A. Yes.
Q. Okay. And I'll read it.
"The most commonly used permanent hair straightening products are relaxers, keratin/Brazilian straighteners, and Japanese heat straighteners, also known as thermal reconditioning."
Did I read that correctly?
A. Yes.
Q. Would it be fair to the say that the California EPA in this paper examined three different types of hair straightening products?
A. Yes.
Q. Okay. And so if I could then ask you to turn to page 4. And there's a section there that says "Formaldehyde." Do you see that?
A. Yes.
Q. And then the -- the first phrase

under the section says "In keratin/Brazilian hair straightening products." Do you see that?
A. Yes.
Q. That is referring to the -- the second type of hair straightening product that the California EPA identified at page 2; correct?
A. Yes.
Q. That's not referring to chemical hair relaxers; correct?
A. Correct.
Q. Okay. And so it then goes on to describe a process of -- and I'll read it for the record.
It says, "A formaldehyde containing solution is first applied to the hair, followed by a heating -- followed by a heating their hair with a blow dryer which enhances the reactivity of formaldehyde with the added keratin and the keratin present in hair. When the hair is further heated with a flatiron, formaldehyde reactivity is furtherance enhanced and seals the cuticle."
Did I read that correctly?
A. Yes.
Q. So when you were discussing earlier

about blow drying the hair and the release of formaldehyde, is this -- is this just the activity you were referring to?

A. Not necessarily. I just think in more general terms. I don't think I was thinking about a specific thing. Just thinking of processing things that -- that could be applied to the hair that could generate heat.

Q. Is there anything in the California EPA document that says that there is even formaldehyde in chemical hair relaxers?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, this -- yeah, this second paragraph, they just -- the concentration of formaldehyde and formaldehyde containing straightening formulations. So I could not -- it varies by manufacture, and so the specific examples that they give are the Brazilian or keratin formulations.

And so it was, again, something that identified -- again, going back, that my opinions, again, are not based on any particular component of that. But -- and so whether or not formaldehyde is -- like

I said, it was also my understanding that -- we talked about before, you mentioned that there are some chemicals that can release formaldehyde that -- that are present or can be present in chemical hair relaxers is my understanding.

BY MR. WELTER:

Q. Okay.

A. And so, again, it's -- it was just part of, you know, the information that I had saying, okay, this is a chemical that could be there. But, again, I considered this from the beginning to be a mixture, complex mixture study. So --

Q. So, in other words, whether or not formaldehyde is present in a chemical hair relaxer is irrelevant to your analysis?

A. Yeah. If you removed it, if -- you know, we could reduce the -- my opinion, it would still be same. Like I said, I don't know if there's any particular ingredient that you could remove and say, okay, my opinion was based entirely on that ingredient.

Q. Okay. So if we removed any single ingredient that you've identified as chemicals of

concern in your report, your opinions would not change?

MR. SHIPMAN: Object to the form.

THE WITNESS: Yeah. Based on that, I can't think of any right now because, again, my -- I think -- again, I tried to focus on the studies that were of the mixture itself of the chemical hair relaxers, and the -- to the extent that I had information available for some of the chemicals that were in hair relaxers, then that was supporting information as well.

BY MR. WELTER:

Q. If you had a chemical hair -- if you -- strike that.

If you removed all of the chemicals that you've identified for chemical hair relaxer, would there still be biological plausibility that use of that product can cause ovarian or uterine cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yeah, I don't know that I can answer that, but seems like a hypothetical situation that -- again, that I don't know of any studies out there.

And that's -- when I started this, I was wondering if I would find any studies that actually did that and would say, okay, conduct a study and if we -- a safety study or toxicity study, and if we remove this ingredient, how does that compare?

But I did not find those, and so, again, looking at this as a mixture, again, getting back to the epidemiology studies, they did not attempt to do that as well to say, here are the chemicals that are present.

I know that at least Chang did identify some -- some chemicals that could be associated with that, and those were some that -- some of the ones that I discussed as well. So...

BY MR. WELTER:

Q. And so your -- your opinion, biological plausibility assumes that all of these chemicals that are in your report are present in chemical hair relaxers?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yeah, my -- my opinion is based, again, on it's a complex mixture

that has varied over time and that being able to get the type of data where you would be able to know specifically what each of these women were exposed to throughout the course of their life would be impossible in my opinion. And so it's just, again, the -- the study is based on the product and not particular chemical exposures themselves.

BY MR. WELTER:

Q. Define complex mixture.

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, a complex mixture, just simply would be something that is composed of multiple ingredients, likely with -- from different chemical categories. So that -- that pretty much covers it, I think.

BY MR. WELTER:

Q. Okay. So what -- what process did you go through to assess chemical hair relaxers that led to you the conclusion that it is a complex mixture?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, just the -- the

data that were available and studies -- again, the Helm and the -- you know, the California EPA as well as the -- I think the Okeke study that identified numerous components at present, and also a number of studies that just talk about just based on looking at the labels themselves that you can see it's -- it's composed of many different components.

BY MR. WELTER:

Q. Have you looked at labels themselves?

A. No, just looked at the studies that reported what they found on the labels.

Q. Well, did the studies report what they found on the labels, or did they identify specific target ingredients to search for in the products?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, I can -- let me look back at that, but it's my understanding that...

BY MR. WELTER:

Q. Are we looking at Helm, just for the record?

A. Well, I'm looking at mainly the ones

that I know looked at the labels --
Q. Mr. Atwood, I'm just -- I'm just -- for the record, I just need to identify what you're specifically looking --
MR. SHIPMAN: I believe --
THE WITNESS: I'm looking at page -- page 29 of my report.
BY MR. WELTER:
Q. Thank you.
A. The -- the third -- the last two paragraphs before Section 6.2, Literature Searches. And so the Irungu 2025, they -- and examined the ingredient labels in 22 different relaxer products purchased, and this, again, was in -- in Kenya. And compared that to what they, you know, compared to various European Union regulations or standards on that.
And the Okeke 2024 study looked at 41 chemical hair relaxers from five major retailers to identify -- primary focused on the allergens, but they did not conduct their own chemical analysis, so -- and so they did identify a number of chemicals present in that, so...
Q. In your CV, there is a 2010 NTP report entitled "Report on Carcinogens Background

Document for Formaldehyde."
Are you generally familiar with that report?
A. Yes.
Q. And you -- you were involved in some way as a field investigator; correct?
A. Not a field investigator, because this, again, was literature searches. And much as I did for this evaluation of chemical hair relaxers, it was looking at mechanistic data associated with formaldehyde, and that case addressing biological plausibility for new cancer data that had been available in humans. And the process was we upgraded formaldehyde from a reasonably anticipated carcinogen to a known to be human carcinogen.
Q. You worked under Dr. Garner?
A. Yes.
Q. Did that report conclude that exposure to formaldehyde increases the risk of or causes uterine cancer?
A. No, it did not.
Q. Did that 2010 report conclude that exposure to formaldehyde increases the risk of or causes ovarian cancer?

MR. SHIPMAN: Objection to form.
THE WITNESS: No. And, again, as I stated earlier that my opinion was not based on the presence of formaldehyde in this. But, again, I think that formaldehyde report did bring up some questions that were relevant to this because formaldehyde in that particular case was associated with leukemia in humans.
And so some of the objections that we got from industry on that was some of the same things we're talking about, formaldehyde's present everywhere. It's very reactive, so how could it possibly -- is there a biological and plausible mechanism to -- to form leukemia.
BY MR. WELTER:
Q. So if I understand your testimony, the result of this report was to identify formaldehyde as a known carcinogen; correct?
MR. SHIPMAN: Objection. Form.
BY MR. WELTER:
Q. It's upgraded?
A. Well, it was -- it was -- that was

not the objective. The objective, per se, was knowing that more data were available since the previous time they had evaluated formaldehyde, and I don't remember when that was. It was probably early on in the 1980s, I'm guessing. But that this time, other epidemiology data were available, that -- and I think probably because IARC may have evaluated it prior to NTP, and so in many cases, NTP kind of followed IARC.

And so -- so the data was basically to look at the evidence, and then to determine it goes through a whole recommendation process and a peer review, and to decide ultimately if the data are sufficient to support an upgrade in the listing. And in this case, it was.

Q. So one of the conclusions of the NP -- NTP was to upgrade the classification of formaldehyde to be a known carcinogen?

A. That's correct.

Q. Okay. But it being a known carcinogen did not mean that formaldehyde caused uterine or ovarian cancer; correct?

A. That's correct.

Q. Let's talk about formaldehyde releasers. Would you agree that some products

are not preserved with formaldehyde directly but, instead, with agents that break down and release formaldehyde under some conditions of usage?

A. Yes, that's my understanding.

Q. Okay. Would you agree that formaldehyde releasers are substances that release formaldehyde as a result of decomposition?

A. Yes.

Q. Okay. Would you agree that the purpose of formaldehyde in the formaldehyde releaser preservative is to suppress microbial growth such as fungi?

A. Yes.

Q. And would you agree that when this decomposition occurs in the container that the formaldehyde releaser is in, that small amounts of released formaldehyde suppress the growth inside the container?

A. Yes.

MR. SHIPMAN: Objection to form.

BY MR. WELTER:

Q. And -- and that interaction in the container metabolizes or degrades the formaldehyde; correct?

A. Well, yeah, I'm not sure if -- that I could speak specifically to that because, again, I have not investigated all the -- the processes of formaldehyde releasers, but that seems reasonable, so...

Q. Okay. And, again, I'm not -- and, obviously, my questioning is not just specific to your mandate but your 20-plus years of experience working for the NTP and being involved with this --

A. Right.

Q. -- report on formaldehyde.

A. Right.

Q. So I'm -- I'm just tapping into your knowledge there.

So -- and if the formaldehyde is released, it interacts with the microbial growth, the end result is that the formaldehyde no longer exists; correct?

MR. SHIPMAN: Objection to form.

THE WITNESS: I don't know that specifically, but -- so I don't know that I can answer that.

BY MR. WELTER:

Q. Would you agree that the purpose of

including a formaldehyde releaser in a product is to extend the shelf life of the product?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I can't answer that question. I have no specific knowledge of that, so...

BY MR. WELTER:

Q. Before being retained in this litigation, did you have any experience or understanding of what a formaldehyde releaser was or what was it -- what it was intended to do?

A. Well, I was familiar with the concept, and then certainly -- I can't remember specifically if that -- in our report back in 2010, if that was something. I expect that was something we dealt with in the production and use and exposure sections of the report, which I was not involved in writing, but...

Q. If -- if I were to -- I'm sorry. Are you done?

A. Yeah. Go ahead.

Q. Okay. If I were to represent to you at page 4 of that 2010 report, the NTP reported that there was no data currently available in formaldehyde releases, do you have any reason to

disagree with that?

A. I think that would be in the context of whether or not to list formaldehyde releasers as carcinogens --

Q. It's just --

A. -- in the context of that.

Q. Yeah, I'm just saying just the comment that they recognize formaldehyde releasers as a -- as a ingredient in products, but that there was no data regarding concentrations or -- or releaser or anything like that at that point.

MR. SHIPMAN: Objection to form.

BY MR. WELTER:

Q. Do you have a different recollection back then --

A. Oh, no, I have no recollection of the -- those specifics on that, other than I would -- would assume that formaldehyde releasers would have been identified as a possible source. I would think that what that is referring to, that we had no data specifically to investigate the exposures from formaldehyde releasers.

Q. Would you agree that formaldehyde in a water-based product becomes methylene glycol?

MR. SHIPMAN: Objection to form.
THE WITNESS: Yes, I think formalin is another name that is used as well.
BY MR. WELTER:
Q. And would you agree that a chemical hair relaxer is a water-based product?
A. Yes.
Q. Okay. I asked you this question generally before, but let me ask it specific to formaldehyde. Do you know in which specific chemical hair relaxer component parts of the kit formaldehyde is a -- the formaldehyde releasers are present?
MR. SHIPMAN: Objection to form.
THE WITNESS: No, I could not answer that.
BY MR. WELTER:
Q. And you couldn't tell me what levels of formaldehyde are released from formaldehyde releasers?
MR. SHIPMAN: Objection. Form.
THE WITNESS: No.
BY MR. WELTER:
Q. DMDM hydantoin is a formaldehyde releaser?

A. Yes.
Q. And that's something that you saw in the literature you reviewed as being a formaldehyde releaser in chemical hair relaxer products?
A. Yes. I think that may have been one that was identified at the Okeke study, but...
Q. Would you agree that the level of formaldehyde released from DMDM hydantoin is equal to the amount found naturally in a medium sized pear or apple?
MR. SHIPMAN: Objection to the form.
THE WITNESS: I would -- I have no idea how much formaldehyde would be released there in the relative comparison, but -- so I cannot answer that, but...
BY MR. WELTER:
Q. As you sit here today, do you know whether any DMDM hydantoin in a chemical hair relaxer product ever exceeded permissible levels that are deemed to be safe by any regulatory agency?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Well, again, there's a lot of formaldehyde questions, and -- and,

again, I've stated several times that the presence or absence of formaldehyde was not a key component of me formulating an opinion in this case.

I included it because it was something that had been identified as a component of some hair relaxers, and -- and to the extent that -- that it -- well, it was not, again, a focus of my investigation. It was there to -- to just -- to -- to address what I had seen in the literature as possible chemicals that could be present in chemical hair relaxers.

BY MR. WELTER:

Q. Before you -- we talked a little bit about inhalation of formaldehyde as the exposure pathway; right? Remember that?

A. Yes.

Q. Okay. Do you -- do you believe that formaldehyde from formaldehyde releasers can be dermally absorbed?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, I would think that would be a possibility certainly if

they're applied to the skin, yes.

BY MR. WELTER:

Q. Are there any studies or papers or authority you can point to that establishes that formaldehyde can be dermally absorbed into the skin, other than what may be possible?

A. Well, I mean, I'm sure that was addressed in the -- the NTP report on formaldehyde that we did in 2010 because we usually address the exposure pathways that are possible there. And so also chemicals that are released in the air also come in contact with skin and can be absorbed, you know, just positive from the air and contact with the skin to be -- you know, as a possible pathway as well.

Q. Sure. I'm not sure I followed the last part of that, but let me move to the next question.

You would defer to the NTP 2010 report in terms of what the exposure pathways would be?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, no, not defer completely to that. That's just one that I know I'm familiar with, and know that it

would be there. But, again, I did not conduct a -- this is not just a -- my mandate was not to just investigate formaldehyde. So...

BY MR. WELTER:

Q. As you sit here today, other than perhaps the NTP 2010 report, do you identify any other -- any other authority paper, scientific study, that recognizes that formaldehyde can be dermally absorbed?

A. Well, I'm sure the IARC monograph on formaldehyde goes into that as well, and so that would have been something that I would have reviewed at that time.

Q. As you sit here today, do you know whether IARC takes the position that formaldehyde can be dermally absorbed?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well -- well, I don't -- I would -- I would -- I would have to -- I don't know specifically because I do not recall. I'd have to have that. But I would, again, say that, yes, any chemical that comes in contact with the skin could be dermally absorbed.

BY MR. WELTER:
Q. Let's talk about parabens.
A. Okay.
Q. Parabens have not been evaluated for carcinogenic effects by IARC, the NTP, or the EPA; correct?
A. That's correct.
Q. And you state that on page 45 of your report. Okay?
A. Okay.
Q. I mean, I'm citing to the best here.
So -- and you also cite -- you also state at page 45, "The available human studies are insufficient to determine the carcinogenicity of parabens"; correct? You can turn to --
A. Yes, I'm getting there. So -- yes.
Q. And -- and there -- and you also state that there were no animal carcinogenicity studies for parabens; is that correct?
A. Yes. Not that I could identify.
Q. From the scientific literature, no parabens have been identified as known carcinogens; correct?
A. Correct.
Q. And are there any scientific studies

showing a causal association between parabens in uterine cancer?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, I -- I evaluated these individual chemicals as -- as components of the product, and, again, it is the product -- then there's certainly, again, the -- the fact that it has not been evaluated or identified as a carcinogen does not just necessarily mean that it could not be that. It just hasn't been investigated.

And I guess some papers that were very important to my opinion, and I was aware of some from my career as well, that looking at carcinogenic effects of low doses of various mixtures of chemicals that are present at doses that are -- in themselves are not carcinogenic or chemicals that have not caused cancer.

And the -- but the interactions in those mixtures can -- can and have and -- and in a number of studies produced cancer. And I think the Goodson 2015 papers that -- that evaluated where that

was a -- made up of over 60 scientists with expertise in various aspects of cancer.

And they -- they coined the term, I guess, or the hypothesis that mixtures of low level exposure -- or concentrations of chemicals that were on themselves not carcinogenic could combine to form what they called a virtual carcinogen.

BY MR. WELTER:

Q. Move to strike as nonresponsive.

Mr. Atwood, I appreciate the mixture --

A. Yeah.

Q. -- explanation. I understand your opinion. I read your report. I've heard you say it several times now.

A. Right.

Q. We're going to get to that.

A. Okay.

Q. The question was very different.

A. Okay.

Q. Very simple question, if you could just focus.

Simple question is: Are there any

scientific studies reporting a causal association between parabens and uterine cancer?

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. Are there? Yes or no?

A. Well, again, that was -- I -- I did not find any in that. So whether or not -- so I'm not aware of any.

Q. Okay. Are you aware of any scientific studies reporting a causal association between parabens and ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, it would be the -- the same answer, but I'm not aware of if it's really been studied either. So...

BY MR. WELTER:

Q. Would you agree that there are different types of parabens and chemical hair relaxers?

A. Yes. There's -- my understanding, there's various -- you know, that parabens are esters of para-aminobenzoic acid. And so you have various alkyl side change, you know, methyl, ethyl, various groups. Some are branch chain and

some are straight chain alkyl.
Q. And the Helm study that we looked at before actually lists in the three chemical hair relaxers it examined different parabens in different hair relaxer products; correct?
A. Yes.
Q. Did you individually assess the different parabens, or did you treat them as a class of parabens in your analysis?
A. I was --
MR. SHIPMAN: Objection to form.
THE WITNESS: I did look at studies that talked about -- you know, that there were a number of studies that looked at various parabens, and determined a relative potency. And typically it's related to the side chain or the chain link, or whether or not it's a branch chain.
But in general was looking at parabens as a class of chemicals that -- that could be present.
BY MR. WELTER:
Q. Are -- are you aware that regulatory agencies have separately assessed different types

of parabens for adverse health effects?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, in -- I did see a number of studies. I think one maybe from the -- maybe from the FDA looking at the safety of parabens and saw some, I think, on various other parabens. I'd have to look specifically at that, but, yes, I was aware of those.
BY MR. WELTER:
Q. Okay. Would you agree that different parabens may lead to different health effects?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, the paraben -- again, since you -- we have evidence of different parabens that are used -- commonly used in -- in the products, again, looking at it more as -- as a class and identifying effects that are associated with that and particularly the -- in this case, effects many in vitro studies that looked at the cellular effects that were consistent with either the key characteristics of endocrine disruption or -- or carcinogens as being

relevant to the biological plausibility question, so...

BY MR. WELTER:

Q. And, again, you reverted back to your opinion. My question was different.

A. Okay.

Q. Do different parabens -- methylparaben, propylparaben, butylparaben -- do they have different adverse health effects?

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. If you know.

A. Well --

Q. If you know.

A. -- I don't know particularly that -- about that. And, you know, other than the studies that I reviewed, they were looking at certain effects and reported -- well, one was a little bit more than the others. But typically when you have groups in a chemical class like that, that's, you know -- it is common to find similar -- similar effects, and you will see various -- and it's used -- and sometimes if you have two chemicals in a group that have been well studied and then others that have not been well

studied, then you sometimes use various techniques to extrapolate what the effects of those non-studied chemicals may be, but...

Q. For purposes of your biological plausibility opinion, does the type of paraben matter?

MR. SHIPMAN: Objection to form.

THE WITNESS: Again, what matters is the -- the mixture itself and the application of chemical hair relaxers. And I did not attempt -- and I stated in my report -- to -- nor was it necessary for me to identify particular chemical components that -- that were contributing to the effect reported in the epidemiology studies.

BY MR. WELTER:

Q. If a chemical hair relaxer product does not contain any of the parabens, does that change your opinion on biological plausibility?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No, it would not. Because, again, I'm focused on the -- on the mixture.

BY MR. WELTER:

Q. Would you agree that people in today's world are exposed to parabens from various different sources?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yes, I'm aware that -- that multiple products do contain parabens.

BY MR. WELTER:

Q. And -- and once a paraben is detected in the body, there's no way to trace that back to a -- an original source; correct?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yes, I think we -- you asked that question earlier, and I guess my answer would be the same, that, no, you cannot, unless you're conducting a specific study with a product and then measuring the change of that particular metabolite or -- either in blood or urine or some other body tissues to see any change. And there were a few studies that -- that addressed that.

BY MR. WELTER:

Q. What is the exposure pathway for a paraben from a chemical hair relaxer product?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, the -- the exposure pathways that we're talking about applying to the scalp, it would be primarily dermal. There could be some inhalation component there as well.

MR. WELTER: Could you just read back the answer.

(The reporter read back the last answer.)

BY MR. WELTER:

Q. I'm just asking you if you can identify a study. Not looking for the explanation.

Can you identify a study that has shown that parabens from chemical hair relaxer products become airborne and is capable of being inhaled? Do you know of such a study?

MR. SHIPMAN: Objection to form.

THE WITNESS: I don't recall seeing an inhalation study of parabens, but, again, just based -- based on their properties and -- and --

BY MR. WELTER:

Q. Assuming that the chemical hair relaxer product containing a paraben does not

come into contact with the scalp, would you agree that there would not be dermal absorption?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, if a chemical does not contact the skin, then, yeah, dermal absorption would be -- would not happen.

BY MR. WELTER:

Q. Do you know how quickly parabens are metabolized in the body once they enter the body?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, they are being an ester -- linking they're metabolized, not esterized that -- and so they are metabolized fairly quickly, but the fact that they have been detected intact in -- in breast tissue and other tissues indicates that it's not always complete, that it is possible for intact parabens to -- to be distributed in the body.

BY MR. WELTER:

Q. Okay. Is there any data assessing -- strike that.

Is there any data quantifying how -- what percentage or what quantity of parabens

remain in the body versus ones that are metabolized?

MR. SHIPMAN: Objection to form.

THE WITNESS: There is -- I would expect there's data on that. I did not -- I do not remember specifically reviewing any data. That's something I could research, but one study that I did -- do remember, I think it was in a study in breast tissue or a breast cancer tissue and -- that higher concentrations of parabens were detected in cancerous breast tissue than adjacent noncancerous tissue.

BY MR. WELTER:

Q. After the application of a -- strike that.

Earlier you testified that women used chemical hair relaxer products every couple months. Is it your testimony that -- that parabens are absorbed into the body, that a couple months later, they are still present when the woman again uses that chemical hair relaxer product, if you know?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, you're

looking at exposures that are common exposures, and parabens are not just present, as we've talked about, in the hair relaxers. So I would say it'd be highly unlikely for most women and probably men as well, that there's probably -- that parabens can be detected in the blood or in urine. There's just one of those that we have continual exposure from various products.

BY MR. WELTER:

Q. But when you detect them in the blood or the urine, you don't know where they come from?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, that gets back to if you're -- if it's just a general study, if you're just measuring blood and urine from a population or whether you're conducting studies for a particular exposure that you've recruited subjects to say, okay, apply this product, and 24 hours later, we're going to collect samples.

And see whether, in fact, you were

exposed to chemicals present in whatever the product was, so...

BY MR. WELTER:

Q. For how long do parabens have to be present in the body to actually disrupt the endocrine system?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, that's something that I did not specifically investigate. I just looked at studies that did report endocrine-disrupting effects, either in humans after application of products that contained parabens or in cellular systems that were -- that were exposed to parabens.

And so your question was how -- after answering I --

BY MR. WELTER:

Q. That's okay. And that's why it's important to focus on the question --

A. Yeah.

Q. -- so that we don't meander off.

A. Yeah.

Q. It was simply whether you know how long a paraben must be present in the body in

order to then cause the effect of disruption of the endocrine system.

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. Do you know -- do you know whether there's some range reported anywhere?

A. No. I -- I know there were studies that looked at, you know, particular -- that compared, you know, the binding to the estrogen receptor itself. But, again, that's not the only way that they can have impact.

There's other studies that do show that -- that exposure can have -- to parabens can have various endocrine-disrupting effects. And so a number of the parabens were on several lists that I looked at as -- as endocrine disruptors. But how long, I can't answer that.

Q. Let's shift -- shift topics and let's talk a little bit about phthalates. Phthalates are a class of chemical -- in chemicals; correct?

A. Correct.

Q. And are there specific phthalates that you are saying are in chemical hair relaxers?

A. That would just be current based on

the Helm study that identified, I think, the diethylhexyl phthalate as well as -- I think it -- look back, I believe it was diethyl.
Q. If I could help along --
A. It might be dibutyl.
Q. I have DEP and DEHP.
A. Okay. DEP is diethyl, and DEHP is diethylhexyl phthalate.
Q. Are those the two phthalates that were focused on here?
A. Those -- well, those were two that were detected there, but I think I -- there are certainly many different classes. There's what's considered low molecular weight versus high molecular weight. The diethylhexyl phthalate would be a high molecular weight one where the diethyl and dibutyl would be low molecular weights, which are more commonly used in personal care products, typically used as fragrance carriers or not specifically listed.
Q. And I appreciate that comment. And I know in your report you more generally talked about personal care products.
A. Right.
Q. And my question is a little bit more

specific. Other than DEP and DEHP, are you aware of any other phthalates that have been reported to be present specifically in chemical hair relaxers?

A. No, I'm not aware of any studies that have reported that.

Q. Again, I asked you these same questions before. I'm just asking for a yes or no. Are there any scientific studies reporting a causal association between phthalates and uterine cancer?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, again, I mentioned earlier that there are -- there is NTP studies with, I believe, diethylhexyl phthalate with association with uterine tumors. And, again, I can't remember if it was rats or mice, but it was one of those. So --

BY MR. WELTER:

Q. Sure. And those relate to phthalates that are not DEP or DEHP?

A. No. That was DEHP.

Q. Okay.

A. That was specifically DEHP, yes.

Q. Okay. Other than that one reference, are you aware of any other studies -- by the way, did that study report a causal association between that phthalate and ovarian cancer?
MR. SHIPMAN: Objection to form.
THE WITNESS: It was -- it was uterine, not ovarian, but --
BY MR. WELTER:
Q. I'm sorry. Uterine.
A. But the terminology the NTP uses when they conduct their cancer bioassays is -- they use descriptors of clear evidence, some evidence, or equivocal evidence, or no evidence. In this case, it was clear evidence.
Q. We can go back and confirm that after your deposition --
A. Yes.
Q. -- right?
A. Yes.
Q. Okay. How about with respect to scientific studies reporting causal association between phthalates and ovarian cancer?
A. I'm not aware of any.
Q. If DEP or DEHP are not present in chemical hair relaxers, does that change your

opinion on biological plausibility?
MR. SHIPMAN: Objection. Form.
THE WITNESS: Well, again, just as with the other chemical groups that we're going through, my opinion is not based on any one of those particular chemicals. And -- and so, no, it would not change my --
BY MR. WELTER:
Q. Do you -- do you have an understanding as to whether all chemical hair relaxers contain DEP or DH -- DEHP?
MR. SHIPMAN: Objection to form.
THE WITNESS: I have no way of knowing that. I just have to go on the -- the information that I found in my research to answer that question, and -- and the fact that most of these products are put in plastic bottles. You know, there's always a -- a chance of, you know, leaching of the -- because the phthalates are used as plasticizers, and they're present in all -- all plastics.
BY MR. WELTER:
Q. Sure. Do you have any basis for the

statement that any chemical hair relaxers have been contaminated by impurities from the containers?

MR. SHIPMAN: Objection. Form.

THE WITNESS: I have not referenced that or aware of any -- any studies that -- that have looked at that. I'm sure there's studies that -- I know that there's a lot of studies that looked at phthalates exposure in general from a lot of just plastic products that -- and there is some concern expressed in the literature about -- about those exposures.

BY MR. WELTER:

Q. But you're not saying here today that the containers of chemical hair relaxers are contaminating the products; correct?

A. I don't know that. I say it's certainly a possibility. So I would not -- you know, whether the -- the product -- whether the plasticizers are used directly as a fragrance carrier, or whether they're -- or could be present just based on leaking from the containers they're in.

Q. For DEP and DEHP, is the exposure

pathway dermal?
A. Well, with that, yes, it's dermal. And, again, inhalation is also a possibility for their -- their considered -- we call it semivolatile chemicals. So there is some release to the air.
MR. SHIPMAN: If you want to take a breath and eat --
MS. PARFITT: Lunch is here.
MR. WELTER: Sure. I probably just have a few more questions.
MR. SHIPMAN: Sure. Go ahead.
MR. WELTER: That would be great, and then --
THE WITNESS: A couple more.
MR. SHIPMAN: Yeah. You're fine.
BY MR. WELTER:
Q. Assuming that DEP or DEHP makes its way into the body, is there any way to confirm its original source?
MR. SHIPMAN: Objection to form.
THE WITNESS: Okay. So, yes, it's -- going through a similar line of questions for each one, and so just for -- no, unless you're conducting, again, a

specific study.

BY MR. WELTER:

Q. Sure. And let's -- let's -- and maybe we can shortcut this.

For all of the chemicals that you have identified in your report and earlier in your testimony, for all of those chemicals, once they're inside the body, there's no way to trace those back to determine the original source; correct?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yes. So it's -- again, if a chemical is present in the body, unless you know a specific exposure that contributed to that, that -- that's true.

BY MR. WELTER:

Q. Well, if there are -- I'm sorry. Did I cut you off again?

A. No. I'm finished.

Q. Okay. Well, if there are -- if there are multiple known exposures in a certain circumstance to chemicals from different sources, is there any way to determine where -- when the chemicals make their way into the body, is there any way to determine from which source those

chemicals emanated?

A. Not that I'm aware of, no. That's...

Q. Okay. And do phthalates have relatively short biological half-lives?

MR. SHIPMAN: Objection to form.

THE WITNESS: Yes. I don't remember specifically, but generally it's -- they're considered -- I guess what would be considered nonpersistent, that they generally do not bioaccumulate.

I would think diethylhexyl phthalate being a little higher in molecular weight, it might have a little bit more ability to accumulate in some tissues, but generally they're metabolized and excreted. Half lives on the order of several hours to several days. So...

BY MR. WELTER:

Q. And based on the studies that we talked about earlier and that you mentioned a couple of minutes ago, DEHP and DEHP [sic] are also present in other personal care products such as shampoos and lotion and things of that nature; right?

A. That is correct.

Q. I think that's a good breaking point.
A. Okay.
THE VIDEOGRAPHER: Off the record at 12:57 p.m.
(Recess taken from 12:57 p.m. until 1:35 p.m.)
THE VIDEOGRAPHER: On the record at 1:35 p.m.
BY MR. WELTER:
Q. Good afternoon, Mr. Atwood. Did you have a good lunch?
A. Yes. Ready to go.
Q. You're ready to go again? Okay. Good. We're about, I think, halfway through our time, and we still have some ground to cover. So why don't we get at it.
I want to pick up on something that we talked about a couple times this morning, but I -- I want to take another run at it, get some clarity.
You used the phrase many times this morning "mixture."
A. Yes.
Q. You remember that?
A. Yes.
Q. Okay. In order for there to be a

mixture, there have to be, in the first instance, individual chemicals that at some point are combining in some way to create the mixture; right?

A. That's right.

Q. No different than a recipe to, you know, food you make. You have the individual ingredients, and they're mixed together, and then they -- they become something else or they lead to something else; true?

A. Yes.

Q. Okay. I'm just very simply asking, what are the individual ingredients that you believe are necessary to make the mixture that supports your opinion on biological plausibility?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, I don't know that I can answer that specifically in this case. Again, we've got the -- the evidence of the epidemiology studies and other human studies that are looked at, and we're looking at exposure to chemical hair relaxers and reporting the presence or reporting some type of effect, and some of them are reporting specific chemicals.

And so the chemicals of concern I identified in my report would certainly be part of that. Again, there's other chemicals that are -- that are present that could be contributing to the effect, you know, to the extent that either trace byproducts or contaminants or other active ingredients are contributing to that is unknown but possible, so...

BY MR. WELTER:

Q. So as you sit here today, can you identify any single chemical that is a necessary component to create this mixture of chemicals that supports your biological plausibility opinion?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No, I could not do that.

BY MR. WELTER:

Q. Okay. Can you turn to page 49 of your report? And -- and you -- you'll realize in a second where I'm headed, but I ask you just be patient --

A. Okay. Sure.

Q. -- and work -- work with me --

A. Sure.

Q. -- on the first few questions.

A. Okay.

Q. On page 49, under Key Findings in Section 7.3.4, bullet point 2, you see where it says "at least six"?

A. Yes.

Q. Okay. And I'll read it for the record. "At lease six epidemiology studies have reported that chemical hair relaxer use, particularly long-term use, is associated with an increased risk of developing ovarian and uterine cancer. Some studies also suggest an increase risk of breast cancer."

Did I read that correctly?

A. Yes.

Q. Okay. So if you then turn to page 69 of your report. And it's actually last two words on the bottom of page 69, continuing onto page 70.

A. Right.

Q. And I will, again, read that for the record. It says, "Five studies reported an association of hair relaxer use and uterine cancers." And then you cite to five studies.

Did I read that correctly?
A. Right. Yes.
Q. Okay. So when you signed your report on December 1st, 2025, this is the -- you included these two statements that we just went over in your report; correct?
A. Yes. And those are two statements in an errata sheet that I handed you.
Q. We'll get there. Okay. We'll get there.
A. Yes.
(Exhibit 4 marked for identification.)
Q. And then this morning when we came here to do your deposition, you provided Exhibit 4, which is an errata sheet; correct?
A. Yes.
Q. And you made some corrections to your report?
A. Yes.
Q. And a -- and as is relevant to our discussion here now, you changed, essentially, the five studies reporting an association of hair relaxer use and uterine cancer to two studies regarding uterine cancer, and then in other

sections refer to three studies relating to uterine fibroids.

Is that generally a fair change that -- that you made today?

A. Yes.

Q. Okay. I want to break this down a little bit.

A. Okay.

Q. And we'll -- we'll get there. We'll get to the correction and all that.

A. Sure.

Q. When you originally did your studies and your investigation and you were preparing your report, did you review all five of the studies that you identify on page 70, specifically Wise, Chang, Bertrand, Kithikii --

A. Yes.

Q. -- and Ogunsina? Did you review all five of those studies before you issued your report?

A. Yes.

Q. And -- and when you drafted this language in your report, at that point in time, had you interpreted those five studies as being cancer studies?

A. No. And I went back over that because, again, early on when I first mentioned the -- I'd have to look and see if I can find it. I did mention the first that I addressed, I think, the Wise study. I believe it would be -- I think I can turn to it -- that I did clearly identify the Wise study as addressing a benign uterine tumor.

Let's see. Okay. Well, yes, on page 39, starting with the fifth sentence that starts "Recently, two studies, similar to Wise, et al., investigative association between hair straightener use and uterine fibroids are leiomyomas," and then in parentheses I say, "a common hormone dependent benign pelvic tumor."

Q. So that's confirmation that you actually reviewed those studies prior to issuing your report?

A. Yes.

Q. Because you talk about it?

A. Yes.

Q. Okay. Now, I understand that -- that this is the first time you've acted as an expert, right, in litigation?

A. Yes.

Q. Okay. But did you have an understanding back then that this report was going to be submitted to -- in the litigation to the other side and at some point in time the court?

A. Yes.

Q. And you understood that you had an obligation, certainly as a scientist, to make sure that the research you conducted and -- and what it said was accurately and truthfully represented in your report that the court eventually was going to read? You understood that?

A. Yes.

Q. Did you thoroughly review your report for accuracy before you signed off on it on December 1, 2025?

A. Yes. I -- I reviewed it, and then it was not until after submitted when I started reading it and reviewing it after it had been submitted that -- that I noticed these -- these changes that needed to be made.

Q. And when you signed your report on December 1, 2025, did you understand that you were attesting to the truth and accuracy of the

information that you were including in this report?

A. Yes.

Q. Okay. Would you agree with me that the statements that there are five studies that reported an association of hair relaxer use and uterine cancer is -- is -- is not an accurate statement?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Yes, in that context that I was, again -- well, what I wrote and what I meant to wrote -- when I looked back at that, I was -- you know, when I saw that, I would admit to write -- or, you know, cancer or uterine tumors. So both benign and malignant -- malignant tumors are -- are tumors, and so I was thinking tumor when I actually wrote cancer.

BY MR. WELTER:

Q. Your mandate was to assess the biological plausibility of uterine cancer; correct?

A. Right.

Q. Uterine fibroids is not a cancer;

correct?

A. No. But, again, I took a -- as far as the mandate, looking at any evidence of effect in those tissues as being relevant and address -- potentially addressing biological plausibility. Because it -- if it is there and causing one adverse effect, then -- then it is -- could also possibly cause other effects in those tissues.

Q. Do you have an understanding as to whether uterine fibroids increases the risk of uterine cancer?

MR. SHIPMAN: Objection to form.

THE WITNESS: No. That there are some benign tumors that do progress to malignancies, but uterine fibroids is not one of those. There is some association with, I think, endometriosis and risk of ovarian tumors, so...

BY MR. WELTER:

Q. But in this context, the studies about uterine fibroids are not evidence that eventually uterine cancer may develop; correct?

MR. SHIPMAN: Objection. Form.

THE WITNESS: They're not direct evidence for uterine cancers, but they are

I consider them evidence in terms of addressing biological plausibility.

BY MR. WELTER:

Q. Well, at a -- at a cellular or biological level, what is the relationship between a uterine fibroid and uterine cancer that you considered to be relevant?

A. The fact that there -- it indicated that there was an effect in the tissue. And so it addresses, one, exposure; two, a -- two, the hair relaxer products and a tissue of concern in this type, and so being the reproductive tissues there, specifically the uterus. And so that indicates that the -- that some components of the hair relaxers are being transported and can reach the tissues of interest and are causing effects. And so -- and so I took that as -- as evidence of exposure at the relevant tissues.

Q. At page 49, which is the first reference we -- we looked at with the arrow, it's in a section called "Key Findings on Carcinogenicity."

A. Right.

Q. Okay. So this sections isn't talking about just biological plausibility at this point.

It's talking about the topic of carcinogenicity.

Does the -- are the studies about uterine fibroids relevant to your analysis of the carcinogenicity of chemical hair relaxer products?

MR. SHIPMAN: Objection to form.

THE WITNESS: No, not specifically that, again, to biological -- biological plausibility.

BY MR. WELTER:

Q. At what point after you signed your report did you realize that you had made this error?

A. I can't remember specifically. It was -- it was after I turned in my report. I took a few weeks off, I think, from looking at anything, and then -- so sometime before the end of the year, I wanted to go back and review my report, and I did identify a number of just -- some are just kind of typographical errors. There's a period missing or, you know, incomplete sentence. And then these others that I came across was -- was at a different level than that. And so that was a misstatement, over -- at the time I submitted the report, and I did not catch

that before.
Q. My question is when did you -- when did you realize there was this mistake?
A. It would have been sometime either toward the end of December or early January probably.
Q. And at that point, did you bring that to the attention of anybody?
MR. SHIPMAN: Don't answer this question.
BY MR. WELTER:
Q. Excluding counsel, did you bring that to the attention of anybody?
MR. SHIPMAN: Don't that answer. Especially don't talk about what you talked about with counsel.
MR. WELTER: Yeah, no. I -- I think we're in agreement.
BY MR. WELTER:
Q. Let me rephrase. Other than conversations you may or may not have had with your counsel, did you bring this misstatement, this error, to anybody's attention?
A. Probably my wife, I guess I mentioned that, but no one else.

Q. When -- when did you create Exhibit 4?

A. Well, I created that original version, like I say, in that time frame, and then it was a longer version, and then I pared it down to bring to this deposition for clarity.

Q. Did the -- oh, go ahead. Finish your answer.

A. No, that's -- I'm finished.

Q. Did the -- do you still have the prior versions of Exhibit 4?

A. On my computer.

Q. What -- what would have been in the prior versions that is not included in what we were provided this morning?

A. Well, like I say, just a few places where there were -- I noticed there was a missing period in one place. I don't think I found any misspelled words, but I found one place where a statement was started and -- and complete sentence, or it did not have a proper transition from one statement to another.

Q. Other than grammatical or typographical errors, did the -- does the prior version of Exhibit 4 contain any other changes

that -- or any other information that's been removed?

A. No. Just -- yeah. Just the -- just the -- yeah, just the grammatical. So I did not consider those all that pertinent, but I did want to address things that could be more pertinent to the discussion.

Q. With respect to this misstatement that we've been talking about, this error in your report, if you had submitted your December 1st report for peer review, would it have been rejected based on this error?

MR. SHIPMAN: Objection. Form.

THE WITNESS: I don't know that I can answer that, but I think during the process it would have been something that I would have probably caught and whether or not a peer reviewer caught that, I say it's probable, but I can't --

BY MR. WELTER:

Q. But now your position today is that there are only two studies that reported association between hair relaxer use and uterine cancer, and that's Chang and Bertrand; correct?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, specifically the epidemiology studies, I considered those the -- the key or primary studies in that -- in that they reported specifically an ovarian cancer with the White study, I believe, reporting on the ovarian cancer.

The other studies on breast cancer and -- and the Bailey study as well are other studies that I considered pertinent or relevant to the mandate of biological plausibility.

BY MR. WELTER:

Q. Mr. Atwood, that wasn't my question, respectfully.

A. Yeah.

Q. I'm just trying to close out the --

A. Yeah.

Q. -- the correction here.

Initially, you said there were five studies that reported an association between --

A. Right.

Q. -- chemical hair relaxer use and uterine cancer, and the correction -- the end result of the correction is now --

A. Yes.

Q. -- with the correction, it now reads -- it should read there's two studies --

A. Two studies, yes.

Q. -- rather than five; correct?

A. Yes.

Q. And the two studies specifically are Chang and Bertrand; correct?

A. That's correct.

Q. All right. Let's talk a little bit about the Bradford Hill criteria. I think we mentioned that briefly this morning, and I do know that at Table 8.2 -- 8-2 you have -- you have a table that addresses that; correct?

A. Yes.

Q. Okay. So let's start here. Would you agree the Bradford Hill criteria is used to assess causality in humans?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Yes. Well, the Bradford Hill criteria long been applied to addressing the evidence of -- of causality for a particular exposure disease, so finally --

BY MR. WELTER:

Q. In humans?

A. Yes. In humans, yes.
Q. Okay. And we -- I think we talked about this before, that biological plausibility is one of the nine criteria under Bradford Hill; correct?
A. That's correct.
Q. Does your report contain your complete Bradford Hill analysis?
A. Yes. I would say so, yes.
Q. Okay. Do you believe that you performed a complete Bradford Hill analysis that would pass peer review in the scientific community?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, I can't -- can't answer that specifically because I do not know that.
BY MR. WELTER:
Q. Now, under the Bradford Hill analysis, did you conduct a separate Bradford Hill analysis for uterine and ovarian cancer, or did you combine -- combine the two cancers into one analysis?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, I was looking

at -- in that I was, again, looking at the totality of the evidence I reviewed. And so, you know, you've gotten, obviously, the two uterine cancer, ovarian cancer study, but that's -- I think it is appropriate to -- basically, in this, I just stated what I saw was available. And so I provided a brief outline in this table of what my findings were. So...

BY MR. WELTER:

Q. By the way, do you have any -- any notes or analysis beyond what's included in your report related to your Bradford Hill analysis?

A. No.

Q. Is it your position that under the Bradford Hill methodology, it is acceptable to combine two cancers and to examine them together?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, in reading the Bradford Hill, there are other -- let me turn to that report, and there was -- I think it's under consistency. Let's see. It may not --

BY MR. WELTER:

Q. Mr. Atwood, while you're looking for

that, for the record, are you referring -- are you reading through the 1965 Bradford Hill paper?

A. Yes. The 1965 -- the Hill 1965 paper.

Q. Thank you. Which we haven't marked as an exhibit, but we probably should --

A. Yeah.

Q. -- for identification purposes. So why don't we do that.

A. Okay. Yes. I think I found what I was looking for. Under consistency on page 9, then -- and there he gives an example of looking at cancers. In this case, occupational exposure and looking at cancers of the -- the lung and the -- and the nose. So nasal cancers and lung cancers that includes there.

MR. WELTER: Okay. Why don't we -- Christine, why don't we mark -- I didn't bring that one with me, so why don't we mark Mr. Atwood's version that he has in his book, and then we can make copies.

THE WITNESS: Yeah. So that's -- on page 9, the third -- well, the first column that -- I think that whole column kind of addresses that situation.

BY MR. WELTER:
Q. Okay. So that third column is --
A. But the third --
Q. Let me finish.
MR. SHIPMAN: Let him finish. Let him finish the question.
THE WITNESS: Yeah.
BY MR. WELTER:
Q. So what -- what page are you referring to on this paper?
A. Oh, okay. So it would be -- you know, looking -- page 297.
Q. And that would be page 297 on the right-hand column. You're saying that in that section, you're interpreting that as permitting you to combine two different cancers and assess them together as part of the Bradford Hill criteria?
MR. SHIPMAN: Objection to form.
THE WITNESS: I'm saying he provided that in a -- in an example here, and so the consistency that -- looking at that -- that there are studies that -- that -- more than one study that reports evidence of reproductive cancers and -- again, to

these, and so the application of this is -- and also mentioned the -- the breast cancer studies.

And so the consistency in terms of the -- the observed association, and so I interpret that as looking at consistent evidence that exposure to a chemical could cause cancer in -- in tissues, you know.

BY MR. WELTER:

Q. Okay. Now, in that response, you just changed the terminology to "reproductive cancers." Your mandate in this case was to assess ovarian cancer and uterine cancer, not -- not all reproductive cancers; correct?

A. Right.

Q. So are you saying that it's acceptable under Bradford Hill to include all studies on reproductive cancers when analyzing specifically uterine cancer or specifically ovarian cancer?

MR. SHIPMAN: Objection to form.

THE WITNESS: No. What I'm -- what I'm saying is that it's -- I'm just laying out the totality of evidence that I -- excuse me -- that I considered. And so,

yes, I agree there are two studies on -- on the ovarian cancer and only one epidemiology study so far on -- I mean, uterine cancer, then one on ovarian cancer.

BY MR. WELTER:

Q. Is considering the totality of circumstances a part of the Bradford Hill methodology?

A. Well, it's -- again, the one I was focused on was the biological plausibility aspect of this, and certainly under that, it is -- it is appropriate to do that.

Q. Are you done with your answer?

A. Hmm?

Q. Are you done with your answer?

A. Yes.

Q. And I appreciate -- and we've talked about this a lot -- that your opinions are on biological plausibility, but you include a broader Bradford Hill analysis that includes strength of association, consistency, and all of the other factors; true?

A. Right. That's correct.

Q. And that's Table 8-2?

A. Right.
Q. What I'm asking you is doing a broader Bradford Hill analysis, is it methodologically acceptable to apply a totality of the circumstance analysis?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, under -- no, that is not under the -- the specific descriptions of those is not -- not the normal analysis of that. And so the purpose of this table was just for me to summarize the evidence that I felt addressed these issues.
But, again, my primary thing -- my primary mandate was the biological plausibility aspect, and that's -- that's the one that I'm most familiar with, and then also the -- the strength and overall coherence or the -- the criteria that normally come into play with -- when you're evaluating mechanistic data rather than epidemiology data, per se.
MR. WELTER: Okay. Let's mark the exhibit now.
(Exhibit 9 marked for

identification.)
BY MR. WELTER:
Q. And Mr. Atwood will hopefully arrange to get a copy made and then give you back, you know, a version --
A. Well, you can keep this copy.
Q. Sounds good.
A. I will not need it. I've got more.
Q. Okay. Let's move along. Have you ever taken any formal educational courses that taught the Bradford Hill criteria?
A. No.
Q. Have you ever taken -- strike that.
While at the NTP, did you ever personally perform a Bradford Hill analysis?
A. Those -- I was certainly aware of those considerations and -- and generally that's -- the epidemiologists do that. But to the extent that mechanistic data that I was evaluating that, you know, the -- the factors that Bradford Hill laid out here were certainly considerations, as I mentioned previously, the biological plausibility, the temporal relationship, the overall coherence of the data, were certainly important in that -- that

consideration as well as the dose response information.

Q. And thank you for that answer. My question was slightly different. It's not whether they were a consideration.

My question is while you were at the NTP, did you ever personally conduct a Bradford Hill analysis to assess causality based on the methodology as set forth in the Bradford Hill paper? Did you ever personally do that?

MR. SHIPMAN: Objection to form.

THE WITNESS: No. Again, in the context of mechanistic data, say, that I -- I did do a formal analysis based on that information, but, you know, it was relying on the factors of the Bradford Hill. But I don't recall ever saying, okay, this is a Bradford Hill analysis.

BY MR. WELTER:

Q. The NTP reports in your CV, do any of those reports include a Bradford Hill analysis that you performed?

A. No.

Q. Have you ever performed a complete Bradford Hill analysis or did you just always

treat it as a consideration in -- in other work that you did?

A. Yes, it was always treated as a consideration.

Q. And I presume you've never conducted a Bradford Hill analysis that passed peer review; correct?

A. Well, yes, if I've never done one --

Q. Okay.

A. -- had one submitted for peer review, so...

Q. Would you agree that the first step under Bradford Hill, Exhibit 9, is to assess whether there's even a valid association between the exposure and the -- and the adverse health effect?

A. Yes, are you referring to the strength of the association, they were --

Q. No, I'm -- no, something a little bit different.

A. Okay.

Q. Before you even get to consideration of the nine criteria, isn't it accepted under the Bradford Hill criteria that you must find that there is an actual association between the

exposure and disease?

MR. SHIPMAN: Objection to form.

THE WITNESS: Well, in this case, I mean, the Bradford Hill, I think he talked about it's used when there is any study that reporting an association with that, then he talks about steps, then, to undergo to determine whether evidence that it is a causal factor or just a subject to just a chance or some bias.

BY MR. WELTER:

Q. Is it your position that the Bradford Hill criteria does not require their first to be an established valid association before you could apply the criteria?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, now you're -- define valid association, but I think as -- as we applied it at the NTP, if there were epidemiology studies available, that report association between exposure and a certain cancer, then that -- that was considered valid and you would then proceed with evaluation of that evidence.

I think Bradford Hill also talks

about that -- that -- that it's not always necessary to have to repeat a -- a study in order to make a decision. And it does emphasize that -- that if you have limited information, you -- that there still is an obligation or that you just do not use it as an excuse to not -- not make it some type of evaluation of the -- the evidence that you have.

BY MR. WELTER:

Q. Sure. So let's try it this way. We conduct a study. The study generates data on hazard risk, things of that nature. And it could either be a positive association, no association, or maybe even under rare circumstances a negative association.

Are you familiar with those concepts?

A. Yes.

Q. And so no association, a finding in a study of no association, does that -- under that circumstance would scientists continue to apply the Bradford Hill criteria to assess causation when the underlying data suggests no association?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, under that

circumstance, if you have no reason to -- to look at determining whatever you're investigating there if you have no association, but that depends on, again, how the study reported no association, because typically there's multiple evaluations conducted in the study. And so there could be some signal there and yet still no significant association reported.

BY MR. WELTER:

Q. Okay. Are you familiar with the term "statistically significant"?

A. Yes.

Q. And what do you understand that to be?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, statistically significant is -- again, it's typically based on evaluation of data, and you identify a p-value that basically is -- is a value that you would accept as being -- if you have a value that is -- equals that p-value or is less than that p-value, then that would give you evidence to reject or

nullify hypothesis and no difference. And so the lower the p-value, the greater the probability --

BY MR. WELTER:

Q. Okay.

A. -- that what you're seeing is a real effect and not just a random chance.

Q. Have -- are you familiar with the concept of competence interval?

A. Yes.

Q. Is that conceptually the same -- it's a different approach, but it's designed to accomplish the same -- the -- the same goal when you're assessing data; true?

A. Yes. With a confidence interval, you typically have a point estimate, which is your most likely evaluation of the -- the association between an exposed group and a controlled group, and the confidence interval is based on standard deviations that are statistically calculated around that. And so it depends -- you -- you -- the researcher decides on whether they want 95 percent or 90 percent or some other value.

Q. So you could have a -- based on the confidence interval approach, you could have a

positive association that when you overlay the confidence interval, it's not statistically significant because the confidence interval kind of goes across the zero line and doesn't establish a statistically significant association; true?

MR. SHIPMAN: Object -- objection to the form.

THE WITNESS: Well, in that case, when you've got a confidence interval, you don't just look at the confidence intervals themselves and know that -- as far as statistical significance, that -- you know, whether or not you conclude it's statistically significant or not is differing.

If you still have a point estimate, which is your most likely estimator, if it is greater than one, then that -- and if you got -- and so -- so say you've got a point estimate of 1.3 with a -- a confidence interval of .8 to 2.5, then you -- there are still -- that is still a positive signal in my -- in my opinion.

Although the researchers in that case

may not report, they'll say there was a positive association, but it was not statistically significant.

BY MR. WELTER:

Q. And would you agree -- under your example, would you agree that it is a positive association that is not statistically significant?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yes. But statistical significance is not -- and -- and it depends on the context of -- of the study and the other data that you are -- are looking at.

BY MR. WELTER:

Q. With respect to the Chang study from October 2022, did the authors find a statistically significant association between use of chemical hair relaxers and uterine cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, I'd like to -- I don't have that study memorized, but do you have a copy of that that I --

BY MR. WELTER:

Q. Sure. I can certainly provide it to

you, but before I do that, let me -- let me approach it another way that may be helpful.

When you were doing your analysis of all the evidence in this case, and you were performing your Bradford Hill analysis, did you go through the Chang study and map out the data with confidence intervals to -- to determine whether any positive associations were statistically significant? Did you do that?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I looked at the report and looked at the tables, and compared what was reported versus what was in the tables. And did find that -- that -- yes, that there were never the point estimates that did report as they did that there was a association or was a positive association with use of chemical hair relaxers and uterine cancers.

BY MR. WELTER:

Q. Okay. And I appreciate that there was a report and there's data suggesting a positive association. My question was a little bit different, so let me follow up.

A. Uh-huh.

Q. There's also in the Chang study confidence interval data associated with the other data -- with the positive association data points; correct?

A. Yes.

MR. SHIPMAN: Objection to form.

BY MR. WELTER:

Q. When you were analyzing your -- in this case, this litigation, and the issues, and fulfilling your mandate, did you go through the process of applying the confidence interval -- confidence interval data to the positive associations to determine whether those positive associations were statistically significant? Did you do that?

MR. SHIPMAN: Objection to the form.

THE WITNESS: The Chang study did that, so I did not believe that I needed to do that. And so looking at their data, saw what they reported, and -- and I did see, as they reported, that there was a increased risk.

Again, have to look at the numbers, but with frequent use, I believe it was about 2-1/2. I don't know if that was the

one. It was 2.5 for the frequent use and for ever versus never use. There was a value, you know. The point estimate was greater than 1, indicating that it was a positive study.

BY MR. WELTER:

Q. Okay. But as you sit here today, you don't know one way or the other whether the positive associations in the Chang study were statistically significant?

MR. SHIPMAN: Objection to the form.

Can he look at it? Do you have -- can he look at it?

MR. WELTER: I'm -- I'm --

MR. SHIPMAN: He said he wanted to look at the Chang study, Counsel, so let -- show it to him. You got it. Let me --

BY MR. WELTER:

Q. You may answer, Mr. Atwood.

MR. SHIPMAN: If you don't want to answer it without seeing --

MR. WELTER: No, no. Stop coaching the witness.

MR. SHIPMAN: I'm not.

MR. WELTER: You can't -- it's totally inappropriate to do that. You can't tell him he can refuse to answer the question. The question is -- the question --

MR. SHIPMAN: He said he wanted to see the Chang study --

MR. WELTER: The question -- the question is pending. I have a right to ask the question. It stands as it's asked.

BY MR. WELTER:

Q. You may answer, Mr. Atwood.

A. Okay. Well, yes, I certainly looked at the confidence intervals and -- and the -- and so, like I say, I do not remember specifically at this time the results. I know the -- certainly the -- the frequent use, but they also -- I believe ever versus never use in the Chang study also showed positive effect. And I do not specifically remember what the confidence intervals were in that case.

Q. With respect to the Bertrand study from 2022, did the authors find a statistically significant association between use of chemical

hair relaxers and uterine cancer?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, again, I was looking at these epidemiology studies to -- to review the data, to see what they reported and found, and I did look at the tables and the data, and I was satisfied that -- that their reporting was accurate.
I also, you know, reviewed the expert reports, the epidemiologists for the plaintiffs on this case, and their valuation of that. I didn't say that I agreed with their assessment -- assessment of that, and they did discuss a number of factors in epidemiology and interpretation of epidemiology data and how it is used.
BY MR. WELTER:
Q. I appreciate that answer and what you considered and all of that.
Coming back to my question, as you sit here today, did the Bertrand study find a statistically significant association between use of chemical hair relaxers and uterine cancer?
MR. SHIPMAN: Objection to the form.
BY MR. WELTER:

Q. If you know. If you don't know, tell me, and we'll move along.

A. Well, the Bertrand study, as I recall, they did find a significant association, yes.

Q. Well, isn't it true that the Bertrand study found no association for premenopausal women and uterine cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, it was -- they did divide it between premenopausal and postmenopausal women. The number of cases, as I recall, for premenopausal women was -- was very few, and so the statistical power of that -- that test would have been very low to determine the effect.

The other part of that is, you know, uterine cancer is more common in older women. And the premenopausal women, because of the few number of cases, they will eventually become postmenopausal women. So they're -- they're -- the data suggests that they're -- their risk would increase as they age as well.

BY MR. WELTER:

Q. Move to strike portions under nonresponsive.

Mr. -- Mr. Atwood, I know we're getting into the afternoon, and we're moving along. Focus on my question. I know sometimes I mix premenopausal and postmenopausal, and that led to you telling me anything you wanted to tell me. I'd appreciate you --

MR. SHIPMAN: Whoa, whoa, whoa, whoa, whoa. Now stop. Now stop. Stop testifying.

MR. WELTER: Appreciate -- let me --

MR. SHIPMAN: Stop testifying. Stop testifying. I appreciate your --

MR. WELTER: I'm -- I'm trying -- I'm trying to get a responsive answer to my question.

MR. SHIPMAN: Well, keep -- keep the editorial comments to a minimum.

MR. WELTER: All right. I appreciate that.

MR. SHIPMAN: I do too.

MR. WELTER: I will do my best.

MR. SHIPMAN: Thank you.

MR. WELTER: All right.
BY MR. WELTER:
Q. So with respect to -- again, just the takeaways from the Bertrand study, with respect to premenopausal women, the authors found no association; true?
MR. SHIPMAN: Objection to form.
THE WITNESS: Again, I can't answer that without -- like I say, I don't have it memorized, and I cannot answer that without looking at -- at the study. But, again, the report for epidemiologists who reviewed and analyzed that data, that, you know, I -- I concur with their opinions on that.
BY MR. WELTER:
Q. Okay.
A. I cannot answer specific questions about specific data without looking at it.
Q. So as you sit here today, without looking at the Bertrand study, you don't know whether any of findings were statistically significant?
MR. SHIPMAN: Counsel, Counsel, he said he would have to look at the report

to answer the question. Show him the report.

BY MR. WELTER:

Q. You may -- you may answer the question.

A. Yes. The -- the Bertrand study, as I recall it, show -- Steve Bertrand, that was the -- the Black women's health study. Is that -- I believe. And so they reported significant association with frequent use of hair relaxer, as I recall.

Q. With respect to the Wise study from 2021, as you sit here today, did the author -- do you know whether the authors found a statistically significant association between use of chemical hair relaxers and ovarian cancer?

MR. SHIPMAN: Objection to the form.

MR. WELTER: If you know.

THE WITNESS: Well, for the Wise study -- and, again, I tend to confuse some of them, but the ovarian cancer, I don't know if that -- I believe that was the one that did have more information on duration of use, if I remember -- or was that -- no. No. Wait a minute. That was

the --

MR. SHIPMAN: Don't guess, Stan. Don't guess.

THE WITNESS: I can't --

BY MR. WELTER:

Q. We don't -- we don't want you to guess. It was a very simple question.

A. No, I can't guess --

Q. As you sit here today, can you say one way or the other whether the authors found a statistically significant association between use of chemical hair relaxers and ovarian cancer?

MR. SHIPMAN: Objection.

BY MR. WELTER:

Q. If you can't, you can't.

MR. SHIPMAN: Objection.

THE WITNESS: Not without looking at the data. It is my recollection that -- that in all those studies, they reported statistical associations. And -- and so the numbers I remember were somewhere -- fairly consistent across the studies, somewhere around the doubling of risk.

BY MR. WELTER:

Q. When you considered the non-Bradford

Hill factors, did you weigh each of those factors as required by Bradford Hill?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I'm not sure I follow.

BY MR. WELTER:

Q. Do you understand the concept of weighing the factors under the Bradford Hill criteria?

A. Oh, what you're considering, yeah, the various factors that -- yes, so the strength of association would have been one of those factors that I think would have been most important for that. When you got the case of the two ovarian cancer studies, you -- you have consistency there. The dose response, the temporality that those factors, I think, would have been more important in those situations.

Q. So in terms of weighing the factors, that -- that's your -- the explanation you just gave us is the process you went through to weigh the factors?

A. Yes.

Q. Okay. With respect to strength of association, did you -- did you include in your report any statements about how -- about how

strong the association was?
MR. SHIPMAN: Objection to the form.
THE WITNESS: The table that we just looked at, I reported what the -- what the HR values were, and so...
BY MR. WELTER:
Q. Fair -- fair enough.
A. As measures of the strength.
Q. Okay. In -- in your report when you're generally talking about Bradford Hill and you're talking about strength of association, you -- you say that it's appropriate to describe it as robust or weak or moderate.
Do you remember generally that -- those qualifiers?
If -- if you don't, I can -- I can point you to the section of your report that --
A. Yeah, I'm not sure what you're referring to --
Q. Sure. Let me -- let me try it again. Under -- when you're assessing strength of association generally, as part of the methodology to -- to quantify how strong or how weak the association is.
A. For that -- you know, for my level

assessment on that, I -- I was just presenting an overview of what I saw. Was not trying to state -- I don't -- I did not state in my report for this one. I did report as far as when I got to -- I got biological plausibility, the factors that were most important in reaching my conclusions. And so that would imply that I considered those as being more pertinent to my evaluation.

Q. Under the consistency factor under Bradford Hill analysis, are the Chang and Bertrand studies consistent?

MR. SHIPMAN: Objection to form.

THE WITNESS: Okay. So -- so Chang and Bertrand, the -- that's the two -- well, that is the two sister study -- no, one's the -- Bertrand is the --

BY MR. WELTER:

Q. I'm going to give them to you.

A. Okay.

MS. PARFITT: I appreciate that. Thank you very much, Counsel.

THE WITNESS: Me trying to remember everything --

MR. WELTER: On the other issue, I

just didn't want a half an hour review of the data to -- to figure out a simple question.

MS. PARFITT: Can he use the one he has in his --

MR. WELTER: I'm going to mark it as an exhibit anyway to have it as part of the record. We're up to 10?

MS. PARFITT: We're on 10.

BY MR. WELTER:

Q. I'm going to mark as -- I'm going to mark as Exhibit 10 -- I'm going to mark as Exhibit 10 the Chang study and Exhibit 11 the Bertrand study.

MS. PARFITT: Thank you.

(Exhibits 10 and 11 marked for identification.)

BY MR. WELTER:

Q. Mr. Atwood, Exhibit 10 is the Chang study. Exhibit 11 is the Bertrand study. There you go. And hang -- hang for a question while I get copies to your -- plaintiffs' counsel, as if you don't already have these.

MS. PARFITT: Never saw them before.

MR. WELTER: I know. Exactly.

Right. Here you go.
MS. PARFITT: Thanks.
MR. WELTER: Sure.
BY MR. WELTER:
Q. All right. So let's -- let's try to streamline this a little bit, Mr. Atwood.
A. Okay.
Q. I know. I'm trying to refresh your memory.
A. Okay.
Q. Let's -- let's wait for the question --
A. Okay.
Q. -- and then this way you can focus and get through this.
Again, our focus right now is -- is we're talking about the consistency factors, one of the nine criteria under Bradford Hill. That's my focus.
A. Okay.
Q. My question was simply whether you consider the Chang and Bertrand studies, which are both uterine cancer studies, to be consistent in this context?
MR. SHIPMAN: Objection to the form.

THE WITNESS: Yes, I do consider them consistent, that they both evaluated hair relaxer use and uterine cancer, they both reported similar results, particularly in postmenopausal women. And the -- the association was -- was similar in both cases, approximately a doubling of risk. So I do consider those two reports consistent.

And, again, I looked at the epidemiology studies from Dr. Cote, and her assessment was that these were -- are consistent as well, and I agreed with her analysis as well.

BY MR. WELTER:

Q. We talked a little while ago that the Bertrand study found no association for premenopausal women; true?

A. Yeah, that is true.

Q. And Chang, based on the data, found there was an association for premenopausal women or that included premenopausal women; true?

MR. SHIPMAN: Objection. Form.

THE WITNESS: Well, I think in -- in both cases they reported a -- an

association with postmenopausal women. Again, looking at data again, it gets back to the statistical power being able to determine that. And so -- and so I see the results as consistent.

Again, there would be limitations with the statistical power if they're -- I don't think you have to have the same numbers or exact same results for every comparison in order to -- to be consistent for it -- or to determine there's consistency in -- among epidemiology studies.

But, again, you know, I use -- I've used epidemiology studies to -- to evaluate evidence, but epidemiology is not -- if I've ever been charged with doing the primary analysis of epidemiology study. We'll just put it that way.

BY MR. WELTER:

Q. In the Bertrand study, isn't it -- well, strike that.

If I could point you to page 5 of the Bertrand study on the left-hand column.

A. Okay. Okay.

Q. The first full paragraph that starts "to our knowledge."
A. Yes.
Q. Have you seen that and read that paragraph before, generally?
A. Yes.
Q. Okay. Bertrand goes through and points out significant differences between this study, the Bertrand study, and the Chang study from the prior year.
Is that a fair reading of that paragraph?
A. Yes.
Q. Despite the differences that Bertrand pointed out, is it still your position that these two studies are consistent in the context of satisfying the consistency factor for Bradford Hill?
A. Yes, I think so.
Q. With respect to ovarian cancer, to your -- well, strike that.
With respect to ovarian cancer in your report, you only identify one study, and that's the 2021 White study; correct?
MR. SHIPMAN: Objection to the form.

THE WITNESS: Yes. The -- the White study is the only published study that I know that specifically looked at hair relaxers and ovarian cancer.

BY MR. WELTER:

Q. Is it possible to satisfy the consistency criteria under Bradford Hill where only one study has been conducted?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No, but I think Bradford Hill also mentioned that it is not necessarily a requirement that you -- that you be able to do so, that one study -- you know, if you just have one study, that -- that it, again, is just one factor, and so it is not a requirement in it, so you would have to evaluate other information for that, but one study in itself can be sufficient.

BY MR. WELTER:

Q. Can be sufficient for what?

A. Well, for determining that there is a -- a risk in women that are in any population that's exposed to a particular product. Obviously, to determine consistency, you would

need more than one study, and I think Bradford Hill mentioned that, that it said that there's kind of a paradoxical position because in some cases, different results in different studies do not necessarily negate causality, or the same results in two studies do not necessarily enhance the causality. And so depending on the circumstances, so that's one factor to consider.

Q. With respect to the rep -- I'm drawing a blank on this. The replication factor, is that what they call it?

A. Well --

Q. I want to use the right nomenclature.

A. Well, that's -- that's fine.

Q. Where they can be -- where they can be --

A. Yes.

Q. -- the results can be replicated?

A. Yes.

Q. Can you satisfy that factor under Bradford Hill when you only have one study?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, I go back to the Bradford Hill report and just read what he states about that. He says --

this is on, again, page 297 of the Hill '65 paper.

The first column, the second paragraph, he says, "Once again, looking at the obverse of the coin, there will be occasions when repetition is absent or impossible and yet we should not hesitate to draw conclusions."

And so -- but, certainly, it is a factor if you do have the data, and he says -- on page 296, in the second column where he starts his discussion of consistency, he says that -- that it hasn't been repeatedly observed by different persons in different places, circumstances, and times.

So to the extent that you have that data, then that is meeting the consistency, but, again, he is not saying it's absolutely necessary. And so if you have -- that we should not hesitate to draw conclusions in the absence of the study being repeated.

BY MR. WELTER:

Q. So -- but you're not -- you're not

claiming that the -- that the White '21 study -- 2021 study related to ovarian cancer has since been repeated?
A. No, I'm not.
Q. And you're not claiming that the Chang findings have since been repeated with respect to uterine cancer; correct?
A. Well, I mean, the -- the Chang and Bertrand studies address the same cancer. So that -- there has been a repetition there that's -- I don't know which -- let's see. If I can look at it -- which one was published first?
Q. Chang was published was October 2022 --
A. October 2022.
Q. -- and Bertrand was 2023.
A. October 2, 2023.
Q. So I'm talking about the first study, which was Chang.
A. Yeah. If you're talking about whether it's been repeated in the -- in that particular cohort, it has not. But it has been repeated in another cohort, which I think is getting back to Hill's criteria, if it's been observed by different persons in different

places, circumstances, and time. So it's the different cohort, so I think that adds to the consistency.

Q. Okay. We drifted back to consistency. I'm on the repeatability --

A. Okay.

Q. -- factor.

A. Well, that's --

Q. Hold on. Wait for a question.

A. Sorry.

Q. The Chang results have not been repeated in Bertrand because the conclusions related to premenopausal women are different; isn't that correct?

MR. SHIPMAN: Objection. Objection to the form.

THE WITNESS: The overall observation in both of these, that they show a risk of uterine cancer. So it has been repeated.

Now, whether every single aspect in circumstance that they evaluated, you know, consistency or repetition, I don't know of any circumstances where that requirement would be forced upon a conclusion of consistency where you have

to have the same number of -- if it's a toxicology study, the same number of animals developing the same tumor at the same latency period, and so forth.

Or you've got to same number of women or whatever the metric is you're looking at. So certainly you can look at differences, but overall I see a consistency and a coherence between the two -- two studies that they are both reporting on uterine cancer among two populations of women.

One focuses more on white women, and the other Black women. And -- and so I think that's an important -- important finding.

BY MR. WELTER:

Q. What's an important finding?

A. That you've got in this case, that it has been repeated, and that was -- you're seeing similar results in two different populations.

Q. When you say "similar results," for premenopausal women, the results were exactly opposite, aren't they?

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. Chang says there's association, and Bertrand says no association for premenopausal women. Are those -- do you those to be similar results?

A. Well, as seen within the overall -- I'm looking at the overall conclusions of the papers, and they are similar. Now, the specific details, again, of premenopausal women, again, there's some severe limitations based on the number of -- of cases to be able to evaluate premenopausal women with the Bertrand study.

MR. WELTER: Christine, what are we up to, Number 12?

COURT REPORTER: Yes.

MR. WELTER: Mark the White study as Exhibit 12.

(Exhibit 12 marked for identification.)

BY MR. WELTER:

Q. Mr. Atwood, I'm going to hand to you Exhibit 12, which is the -- excuse me -- White study from 2021. And so if we could -- I'm just going to quickly go through Chang, Bertrand, and White. So if you would put them in that order,

and hopefully we can do this quickly.

Do you consider -- strike that.

You don't have to go to your report, but I'll tell you what you say, and if we need to go to your report, we'll do it. You make a statement in your report, page 74, that you do not consider the results of Chang, Bertrand, and White to be inconclusive.

MR. SHIPMAN: Objection to form.

BY MR. WELTER:

Q. Do you recall that statement? If you want to take a look at your report, I'm happy to --

A. Page 74?

Q. Page 74, yeah.

MS. PARFITT: You said 74? I don't think so.

MR. WELTER: I believe 74. I just need to find the reference here.

THE WITNESS: Yeah. That looks like different --

BY MR. WELTER:

Q. You know what it might have been? I might have had the reference wrong. So let's -- let's -- we can still get where we need to be a

different way. Why don't we -- why don't we -- I'll withdraw that question.

Would you agree that in all three studies that I have before you, Chang, Bertrand, and White, the authors all conclude that more research needs to be done?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, that is a -- I don't know that I've ever seen any study, epidemiology or toxicology study, that -- that phrased to that end -- it's not mentioned that there's always more information that we can gather.

But, again, getting back to the Hill criteria, I think he -- he addresses that. That if we have to go on the information that we have instead of just sitting back and let's wait on more and more studies.

Because there's been certainly cases throughout history where there's very strong evidence, but yet it took -- took a very long time before any action -- action was taken. And particularly think about cigarettes in that situation, but --

BY MR. WELTER:

Q. Well -- are you done?
A. Yes.
Q. Okay. Well, the authors in Chang, Bertrand, and White do not simply say more research. They actually say more research is needed; isn't that right?
MR. SHIPMAN: Objection to the form.
BY MR. WELTER:
Q. Well, let me withdraw the question.
Why don't -- why don't we go to the White study, 2021. If you could turn to the last page, which is page 1195.
A. Okay.
Q. And it's the left-hand side, the last paragraph on the --
A. Yes.
Q. I think it starts "in this large." You with me?
A. Yes.
Q. Okay. So the authors from White state, "In this large U.S. perspective cohort, we provide the first evidence of a possible relationship between frequent adult use of straighteners/relaxers, or pressing products and ovarian cancer risk. In addition, we observe

that permanent hair dye use may be associated with ovarian cancer risk differentially by histologic type.

"Given the novelty of these findings, more research is needed to confirm our results and identify constituents of these products that may be driving risk. It is particularly important for future studies to be conducted in racially/ethnically diverse populations, and inclusive of a wider variety of hair care products to help us better understand their role in determining ovarian cancer risk among U.S. women."

Did I read that correctly?

A. Yes.

Q. Since the White study was published in 2021, have there been any other ovarian cancer studies that have addressed any of the issues that White suggests still need to be developed and researched?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Not that I'm aware of. Again, it takes a very long time to -- to conduct epidemiology studies, as you see. All of these were -- cohorts were followed

for ten years or more.

And so, again, this is pretty standard type language for anyone that -- that reports -- particularly if it's the first evidence of a -- of a relationship. But they do -- do also state that -- that frequent use of hair relaxers, which are primarily used by African American and possibly -- may be associated with the occurrence of ovarian cancer. And so they do lay out some positive information here, and that they're not saying you can ignore our results until more information is available.

And, again, in a cancer hazard evaluation that is not conducted one cancer at a time, you know, with -- with the NTP there, you're looking at all of the relevant data that's addressed and say a association -- or, you know, with cancer and exposure to whatever chemical or exposure circumstances you're investigating.

And so I look at this as a whole and the evidence of that, and, again, the

epidemiologists that -- that reviewed this and -- and have written their reports and evaluated this data, and I've reviewed those, again, from Dr. Cote, and I -- again, just agree with her evaluation of -- of this association. So there is evidence there. It does show an increased risk.

And so I -- I understand certainly why the statements were made by that, that certainly -- that you can always say that more data is available, and that's important to gather that -- that data, but in the -- in the meantime, you know, what are you going to do with the data you have is an important question.

BY MR. WELTER:

Q. Thank you, Mr. Atwood. Again, I -- I would appreciate if you would just focus on the question that I'm asking.

Let's turn to the Chang -- let's turn to the Bertrand study. And so the Chang study is October 2022 and Bertrand end of 2023; is that right?

A. That's -- that's correct, yes.

Q. Okay. So the Bertrand study comes later and is, to your knowledge, the most recent study related to chemical hair relaxers and -- well, strike that.

Bertrand study comes after Chang; correct?

A. Yes. Bertrand is the 2023.

Q. Okay. And so if you go to page 239. It's actually on the bottom says page 5.

A. Okay.

Q. So it might be Volume 239 that I'm -- but it's page 5.

A. Well, yes.

Q. Right-hand side, top -- second sentence where it says "our findings highlight," you see that?

A. Yes.

Q. Now, it says, "Our findings highlight the importance of continued research regarding potential adverse effects of exposure to chemical hair relaxers and their constituents."

And then it goes on a sentence later to say, "If the present results are confirmed, efforts to reduce exposure to these potentially harmful products such as by identifying safer

alternatives to straightening hair, stricter regulation of cosmetic products, and policies prohibiting discrimination against natural hair could represent important steps to reducing racial disparities in this cancer type."

Are you aware of any subsequent studies that confirmed the findings of Bertrand?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, I don't know what is being done. I would not be surprised if efforts are not underway to that extent to continue to investigate this -- this matter. And I haven't conducted any recent literature searches, but I do not know of any other studies after the Bertrand study.

BY MR. WELTER:

Q. Well, there are studies that -- that have addressed these issues that were published subsequent to Bertrand; correct?

MR. SHIPMAN: Objection to form.

THE WITNESS: Again, there's -- there's other studies that have been published. The Bailey 2025 study that we looked at earlier is --

BY MR. WELTER:

Q. But that's non -- that's nonreproductive cancers; correct?

A. Right. But that is another cancer study of hair relaxers --

Q. I'm focused on the area in uterine cancer. That's your mandate, right, just those two cancers?

A. Right.

Q. Okay. On those two cancers, anything that there have been studies that have -- that have examined those two cancers and use of chemical hair relaxer since Bertrand; correct?

A. I'm not sure what you're referring to there, as I'm not aware of another epidemiology study that's looking at chemical hair relaxers and ovarian or uterine cancers.

Q. Okay. Before -- we're done with Bradford Hill. You can close your book on that. Then close the studies. We're not going to come back to that.

I'd like to pick up where we were before lunch just to get through a couple of the other chemicals that we had been talking about. And I'm going to try -- I spent some time during

lunch trying to digest your answers and maybe we can streamline some of the -- some of the questioning here.

So let's start with benzophenones. I think that's one of the EDCs that you mentioned, yes.

A. Yes.

Q. Okay. And if I -- by the way, if I misstate any DC for carcinogen or something, it's getting late in the day, please -- please correct me. Please correct me.

So benzophenones -- again, I'm going to try to streamline this -- your position is that a benzophenone doesn't necessarily have to be in a chemical hair relaxer to support your opinion on biological plausibility.

MR. SHIPMAN: Objection to form.

THE WITNESS: Yes. Again, I think we've gone through the list. My opinion is not based on any particular chemical group being present or absent in the mixture.

BY MR. WELTER:

Q. Okay. Do you know if benzo -- by the way, which benzophenone are -- are we referring

to? Do you know which one?
A. Well, there's a -- there's a whole class of them. I think -- was it -- let's see which one Helm identifies. I think it was benzophenone 3.
Q. I was about to say ben -- that is the one that Helm identifies.
A. Yes.
Q. Okay. Does Helm identify ben -- benzophenone 3 in --
A. Actually, it's benzophenone -- benzophenone 1.
Q. Does Helm identify that in connection with chemical hair relaxers?
A. Yes.
Q. Or whether it's 1 or 3, did you analyze the different benzophenones separately as part of your analysis in this case?
A. No. No, I did not.
Q. Are there other sources of exposure to benzophenones other than through chemical hair relaxers?
A. Well, yes, the benzophenones are primarily used as UV filters, and so they're used in sunscreens.

Q. And sunscreens are applied to the skin; correct?
A. Yes.
Q. So we could presume there would be some dermal exposure to benzophenones through application of sunscreens?
A. Yes.
Q. And to the extent there are benzophenones in chemical hair relaxer products, they have to touch the scalp to be dermally absorbed?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, just touch any skin surface, but to be -- to be dermally absorbed, yes, so...
BY MR. WELTER:
Q. Is it your position that benzophenones can be -- strike that.
Is it your position that benzophenones from chemical hair relaxer products are in some way released into the air and be -- and can be inhaled?
MR. SHIPMAN: Objection to form.
THE WITNESS: Well, I haven't researched that or recall finding any data

specifically regarding that, what the volatility of the benzophenones are, so I can't -- can't answer that. It's a -- it's a possibility, but I can't answer to what extent.

BY MR. WELTER:

Q. Let's talk about -- I'm sorry. You ready?

A. That's all right.

Q. You good?

A. Yes.

Q. Okay. Let's move on to cyclosiloxanes. Is that an EDC or carcinogen in your estimation?

A. Well, that was identified as a endocrine-disrupting chemical. There are no data on carcinogenicity to cyclosiloxanes that I could identify.

Q. Is cyclo -- is -- I want to make sure that I'm referring to it correctly. Is -- is cyclosiloxane the singular and cyclosiloxanes the plural? Or is it one word? You tell me. You're the -- you're the expert.

A. Again, there's a lot of different isomers of that, but it's just a cyclic silicone

structure that's --
Q. Okay. It a class of different --
A. Well, it --
Q. -- subparts or different parts?
A. Well, it's silicone, but they're -- they're bound in a circular confirmation. And so to the extent you have various branching --
Q. I'm just going to call it cyclosiloxanes. Is that okay?
A. That is fine.
Q. Thank you. Part of their scientific studies reported a causal association between any cyclosiloxanes and uterine cancer?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, again, no, there -- there's not any -- again, that's -- that's data that's missing, and it's -- so no, there's no -- there's no data that's been reported, and so the lack of data does not mean that -- you know, until you study it, you don't know, but...
BY MR. WELTER:
Q. Are there any scientific studies reporting causal association between cyclosiloxanes and ovarian cancer?

A. No.
Q. Is -- are cyclosiloxanes intendant -- intended ingredients in chemical hair relaxer products?
MR. SHIPMAN: Objection to the form.
BY MR. WELTER:
Q. Or are they contaminant or a byproduct? That's where I'm going.
A. Well, I'm not -- you know, again, it's just based on the reports from the Helm study that did report the presence of -- I believe there were -- let me look at that again. Yeah, I think there were three of them.
Q. Mr. Atwood, the reason I asked is because I thought at one point in your report, you had grouped cyclosiloxanes under a byproduct category?
A. No, I did not.
Q. Okay.
A. No, I did not --
Q. You didn't consider the cyclosiloxanes to be a byproduct of something?
A. No. No.
Q. Okay. Whether or not it's an intended ingredient in chemical hair relaxers,

you'll defer to the literature on that?
A. Yes. Defer to Helm for that.
Q. Okay. Fair enough.
How about dimethicone, is that -- is that an ingredient that you consider relevant to your analysis?
A. Would you repeat that, please?
Q. Sure. Is dimethicone an ingredient or chemical that you consider relevant to your analysis in any way?
A. No. I do not remember addressing that particular chemical in my report.
Q. Okay. If cyclosiloxanes are not present in chemical hair relaxers, does your change your opinion on biological plausibility?
MR. SHIPMAN: Objection to the form.
THE WITNESS: No, it does not.
BY MR. WELTER:
Q. What was the exposure -- well, strike that.
You told us earlier that you believe that the exposure pathway for cyclosiloxanes was to inhalation; correct?
A. Well, that would -- that would be one pathway. There was some data, again, from a hair

salon that reported that would. But it could also be dermally absorbed as well.

Q. Based on your review of the studies and the ingredients in different chemical hair relaxer products, can you tell me whether cyclosiloxanes are present in all chemical hair relaxer products?

A. No. I have no way of knowing that other than just the data that's been reported.

Q. Are there other cyclosiloxanes exposures that people are subjected to?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Again, I guess similar to the -- the other chemicals that we've talked about, that cyclosiloxanes, they're -- I think at least three of them that I recall seeing in the literature that can be present in personal care products.

BY MR. WELTER:

Q. Do you know what the half-life of cyclosiloxanes are?

A. I do not.

Q. Do you know how quickly they are metabolized in the body?

A. I do not.
Q. Let's talk about ethylene oxide. This is -- this falls under the carcinogen category; right?
A. Yes.
Q. Is ethylene oxide a known carcinogen?
A. Yes.
Q. To your knowledge, based on your review of all the studies, can you confirm whether ethylene oxide is -- has been found to be an ingredient specifically in any chemical hair relaxers?
A. Well, it's -- it's present because it's used in -- it's a typical byproduct to be found in that because any place where you have the chemical that's used to manufacture the -- I believe the polyethylene glycols that are common in -- in personal care products. And it was something, I believe, that I did see -- see as mentioned as -- as a likely byproduct or contaminant.
Q. You mentioned a couple of things there. You mentioned first just personal care products when you described that. You aware of any data showing polyethylene glycol being --

well, let me withdraw that. Let me back up another step.

Is it your testimony that the ingredient polyethylene glycol, something happens to that during the manufacturing process that creates ethylene oxide as a byproduct?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yeah. Ethylene oxide would be -- it's a product that's used to produce that, and it would just be a --

BY MR. WELTER:

Q. Okay.

A. -- a product there that could be present as a -- well, it's used in the reaction. So if -- if it all was not used up in that reaction, then there could be some residual ethylene oxide.

Q. Now I think I follow you and I appreciate the explanation.

A. Yes.

Q. You're saying in order to create polyethylene glycol and to include that as an ingredient in a chemical hair relaxer, that ethylene oxide is -- is made to create the polyethylene glycol?

A. Let me go back and refer to my report a little bit --
Q. Sure. Absolutely.
A. -- to see how I stated this. If I can find it. Okay. Maybe -- okay. Okay. I just -- just state that --
Q. Could you tell me what page and what --
A. I'm on page 35 of my report.
Q. Thank you.
A. And so there's just one paragraph there before Table 7.1 at the bottom. And I was just looking to see if I had discussed ethylene oxide there in -- in more detail. But I just said -- and so I do not --
Q. Sure.
A. So I do say at the bottom -- at end of that two other byproducts found in hair relaxers, ethylene oxide and 1,4-Dioxane. So --
Q. Great. And I -- I remember reading that, so let me kind of try to come back to my question.
I'm trying to understand how you reached the conclusion that ethylene oxide is -- is contained in a chemical in a finished chemical

hair relaxer product. Can you -- can you explain how you reached that conclusion?
A. I'm just -- I'm just raising that as a -- as a possibility as those are chemicals that I saw mentioned in the literature that I was reviewing that are common -- commonly used in -- in the process. And so just --
Q. Sure.
A. -- listing that as a -- as a -- as a likely possibility. So...
Q. So you're saying it's possible that it could be in chemical hair relaxers -- let me finish the question.
A. Okay. Sure.
Q. Let me withdraw that and ask another question.
And we've talked about a bunch of studies where the authors have examined ingredients in chemical hair relaxers; true? Helm is one of them?
A. Yes.
Q. Okay. And Helm or any other studies, I think you mentioned Irungu also, also talks about chemicals in chemical hair relaxers; right?
A. Right.

Q. In all of the studies that you reviewed, did you see ethylene oxide identified anywhere as an ingredient in chemical hair relaxers?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, okay, going back to -- this is what I was looking for -- on page 26, Section 6.1, the third paragraph under there. And then I -- I just have a sentence there, one two three -- the fifth sentence down toward the end.

It starts, "Other COC's or -- that may be present in hair relaxers as impurities, contaminants, or byproducts include various metals, nitrosamines, ethylene oxide, and 1,4-Dioxane." And I give a list of references there.

BY MR. WELTER:

Q. And what's list of references? Is that one Alsohaimi?

A. Yes. That's one.

Q. Okay. So let's take a look at Zhou and Alsohaimi, and I -- I can give them to you -- well, Mr. Atwood, I -- I know you're reading and I --

A. Yeah. And did you say Zhou? I did not list that one here. Oh, later down I did, yes.
Q. In the same paragraph.
A. Yes. Okay. Yes.
Q. Let's -- let's -- I think we're both trying to do things --
A. Okay.
Q. -- and it's getting late in the day --
A. Okay.
Q. -- and we're just -- I think we're both trying to accomplish --
A. Okay. Sure.
Q. Okay. So let's break this down a little bit. Let me direct your attention to page 26.
A. Sure.
Q. Down towards the bottom, five lines up on the right, there's a sentence starts "ethylene oxide." Do you see that?
A. Yes.
Q. And it says, "Ethylene and 1,4-Dioxane are carcinogenic chemicals often found in PCPs as byproducts that are produced

during the manufacturing process." And then you cite to Zhou and --
A. Right.
Q. -- Alsohaimi?
A. Yes.
Q. Okay. In -- in the Zhou and Alsohaimi studies, do they examine chemical hair relaxers for the presence of ethylene oxide?
A. Well, I don't know if they specifically included that. They talk about a lot of PCPs and --
Q. Okay. Let's look at them.
A. Yeah.
Q. And I will represent to you that the Alsohaimi paper talks about personal care products, which, as you mentioned, is being dispersants, lathering agents, and emulsifiers. Any reason to believe that was the focus of that study?
Or that's a bad question. I'm just -- I'm trying -- I'm trying to do this quickly, and that's --
A. Well, I would think -- you know, all of those things you're talking, I would think the ingredients are found in common ingredients in

shampoos and so forth.
Q. Agree 100 percent.
A. Yeah.
Q. My question simply is whether you have any evidence that ethylene oxide has been found to be an ingredient in any chemical hair relaxer product?
MR. SHIPMAN: Objection to the form.
THE WITNESS: I don't know of any specific studies that I've cited that specifically -- you know, again, the Helm study is the only one that provided actual analytical data for that.
BY MR. WELTER:
Q. And Helm doesn't list ethylene oxide in any of the three hair relaxers; correct?
A. No, no. Whether or not they analyzed for that, I do not know because...
Q. Move on to 1,4-Dioxane. Do you have any evidence that 1,4-Dioxane has ever been in a chemical hair relaxer product?
A. Well, basically, if you have ethylene oxide, then you have -- you're going to -- 1,4-Dioxane is a -- is a dimerization of the ethylene oxide, so that would be how that is --

that is produced.
Q. So would your answer be the same as --
A. Yes.
Q. Answers be the same for ethylene oxide --
A. Yes.
MR. SHIPMAN: Let him finish. Okay?
THE WITNESS: Sure.
MR. WELTER: Thank you, Gary.
MR. SHIPMAN: Sure.
BY MR. WELTER:
Q. Let me -- I'm going to wrap up this section. Do you have any evidence that either ethylene oxide or 1,4-Dioxane have been found to be present in any chemical hair relaxer products?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Not specifically, but just -- again, just based on the -- the hair relaxer kits do include shampoos and other products. And I know one of the defendant's experts in reading their expert -- their report -- I don't remember which one it was -- just made it -- stated something to the effect that other than

the hydroxides or the -- that are used in hair relaxer kits to achieve the high pH, that other components of the kit, shampoos, et cetera, are really no different from other -- other products that are in that category. And so that's -- that's basically the way that -- that I used to derive to make that.

BY MR. WELTER:

Q. But, again, in the shampoos and conditioners and the chemical hair relaxers, you have not seen labels or ingredient lists for any of those; correct?

A. No. And you would not expect to find any ingredient label that's going to list contaminants or byproducts.

Q. Are you aware of any testing of any of the neutralizing shampoos or conditioners in chemical hair relaxing products that confirm the presence of ethylene oxide or 1,4-Dioxane?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No. But, again, just based on the information I've reviewed, it concluded that it was highly likely that you could find that. And so, again, my

opinion is not based on whether or not these chemicals are there, but it's just covering and identifying to the best I could with what could be present.

MR. SHIPMAN: Hey, Counsel, when you get to a second, could we take a quick break?

MR. WELTER: Absolutely. Let me just -- one or two -- yeah.

MR. SHIPMAN: No problem. My kidneys are screaming at me.

MR. WELTER: No worries.

You did it, Gary. I lost my train of thought. We might as well take the break.

MS. PARFITT: Get it back.

MR. WELTER: I hate when those lawyers do that.

THE VIDEOGRAPHER: Off the record at 3:21 p.m.

(Recess taken from 3:21 p.m. until 3:33 p.m.)

THE VIDEOGRAPHER: On the record at 3:33 p.m.

BY MR. WELTER:

Q. Okay. Mr. Atwood, we're -- we're -- we're heading toward the home stretch here. I

think I was asking you about ethylene oxide, and I'm going to move along from that and let us --
A. Okay.
Q. I'm sorry. 1,4-Dioxane. Let's focus -- talk briefly about nitrosamines. Are nitrosamines a byproduct or -- or kind of a chemical ingredient?
A. Nitrosamines would be a byproduct of reactions of diethylamines with nitrates.
Q. Okay. And if we were looking for ingredients in chemical hair relaxers that could create nitro -- nitrosamines as a byproduct, we would be looking bi -- diethanol and nitrates?
A. Would be looking for the diethanolamines that they could be -- not just the di- but there can be triethanolamines. But nitrates are -- are widely available, even skin, even from the atmosphere, and so it's a common reaction.
Q. Are nitro -- nitrosamines in -- in a lot of products that people encounter?
A. I did not really investigate that. But, no, the diethanolamines are -- you know, to the extent that they are widely used or not in personal care products, I don't know. I don't

know that.

Q. To your knowledge, have you seen any testing of any finished or final chemical hair relaxer products to confirm the presence of nitrosamines?

A. No.

Q. And that includes the Helm study and the other studies, you didn't see any mention of nitrosamines as a -- as a finished ingredient? You may have seen some -- some of the other ingredients that you mentioned, but not a byproduct itself?

A. Yeah, that --

Q. That's my focus.

A. Yes. No, I didn't.

Q. Okay. Are you aware of any scientific studies that report a causal association between nitrosamines in uterine or ovarian cancer?

A. No.

Q. All right. Have we -- let me go back here. All right. I think we went through your entire list that you gave us this morning, except you mentioned diethanolamine kind of separate from nitrosamines.

A. Well, that's -- diethanolamine would be the precursor for a chemical reaction to produce the nitrosamines.

Q. Okay. So you don't consider diethanolamine itself to be a carcinogen or relevant?

A. There's some data in either rats or mice, again. But I think -- I think IARC may have it listed, NTP does not, if I remember correctly.

Q. Are you aware of any -- I'm sorry. I didn't mean to cut you off.

A. That's okay.

Q. Are you aware of any studies reporting a causal association between diethanolamine and uterine or ovarian cancer?

A. No.

Q. If you could go to page 79 of your report. And it would be the second full paragraph after the bullet points, be the second full paragraph that starts "in my opinion."

A. Yes.

Q. And I'm not going to read the whole sentence, but the last part -- you know what? I will read the whole sentence. It states, "In my

opinion to a reasonable degree of toxicological certainty, there is sufficient evidence from human studies as well as in vitro studies in human and animal tissues and cells to support a biologically plausible connection between long-term use of chemical hair relaxers and uterine and ovarian cancer in women."

Did I read that correctly?

A. Yes.

Q. My focus is on the phrase "long-term use." What do you mean by that?

A. Well, in this case, I mean, the one study did report on the long-term use, but also frequent use. And so it just gets set at a measure of exposure in women that use these products. And so to the extent that the studies reported looking at that and it's a place where, perhaps, should have qualified that a little bit better and just said either between the use of chemical hair relaxers, but frequent and long-term use is -- is what the data show, in my opinion.

Q. So it's not just long-term use, it's -- it's a combination of frequent use and long-term use --

A. Well, it could be --
Q. Wait, wait.
MR. SHIPMAN: Let him finish.
THE WITNESS: Sorry.
BY MR. WELTER:
Q. No, it's okay. You know what, this happens -- I'll tell you, every deposition we get to 3:00, 4:00, and everybody wants to go home, so -- all right.
Is it your position that in order for there be -- to be a biologically plausible connection between chemical hair relaxers and uterine or ovarian cancer in women, that there must be both a frequent use of the products and a long-term use of the products?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Yeah. No, the -- just basing that on what the studies -- the epidemiology studies report that -- that some of them report ever verses never. But showing a higher risk with frequent use, as it's determine -- as it's typically identified as at least four times per year.
The other aspect of that, which the

White -- if it was White or Bertrand that -- that reported on the -- the -- let me look at that. Yeah, so the White reported frequent use.

And so one of them reported on eight -- the age at first use, and so -- and so that did report on -- on -- give you some measure of the length of exposure or how long they've been using.

BY MR. WELTER:

Q. Sure. So let's -- let's unpack that a little bit because you jumped back and forth between White and -- and Chang, and I want to make sure that we're speaking --

MS. PARFITT: I think it was Bertrand. He says White or Bertrand just now.

MR. WELTER: Oh, I thought he said White.

THE WITNESS: I was just reading there.

BY MR. WELTER:

Q. Understood. Okay. So let's -- let's -- let's see if we can get some clarity here.

First, you said that four times per year, that is frequency; correct?
A. Yes.
Q. Okay. And you take that from the Chang study; correct?
A. Chang and I believe White also mentioned that.
Q. Okay. So let -- let me back up here. I want to focus just on uterine cancer at this point. I'm going to break up the discussion --
A. Okay.
Q. -- between uterine and ovarian --
A. Okay.
Q. -- for clarity purposes.
For uterine cancer, the four times per year, you take that information from the Chang study; correct?
A. Yes, I believe that is correct.
Q. And the Chang study is based on the sister study; correct?
A. Yes.
Q. Have you gone back and taken a look at the sister study?
A. Yes, I have, but I don't remember the last time I looked at it.

Q. Do you -- do you --
A. I have it here.
Q. Have you ever seen the questionnaires for the sister study as it relates to hair relaxers and straighteners?
A. Only to the extent that they reported it in their report that they asked for use within the last 12 months, as I recall. So --
Q. Right. So -- so we would have a snapshot from the sister study of -- did you say one year?
A. It would last 12 months, as I recall, yes.
Q. Okay. 12 months, so it would be one year.
A. Yes.
Q. So we have a -- just so we understand the data from the sister study, the -- the women who were asked the question reported -- the ones who reported four more times per year, that was a snapshot of a one-year period; correct?
A. Well, that's -- yes, that is what they ask. But the -- they also discuss that because they followed this cohort for over 10 years, and they talked about that, that --

essentially asking use in the last 12 years as a surrogate of generally that the use patterns continue for longer than one year. So as a surrogate of use over the --

Q. Sure. It was an assumption that was made --

A. Right.

Q. -- or extrapolation of the one year to an assumption of subsequent years of use?

A. Right. As being a reasonable estimate --

Q. Okay.

A. -- of use throughout the time.

Q. Okay. But -- but there was no empirical data to confirm whether -- whether these women had used chemical hair relaxers going back more than 12 months, or whether they continued to use them going forward from the date of a questionnaire?

A. Yeah. Specific question was in the last 12 months, and the authors discuss that as well.

Q. And so that's -- again, that's frequency -- uterine cancer frequency?

A. Yes.

Q. Still focused on uterine cancer, where do you pull the data on duration from?

A. Well, they followed them for -- for a 10-year period, and so that implies duration. And not only that, but they just followed for the 10-year period. And just based on what is known about use of these products, and there's other studies that -- that report on habits of these, and that it is very common for Black women to begin using these early in life, and to continue to use into adulthood with, I believe, a slight decrease as they get older.

Q. Other than the implication from the data from the Chang study, are -- is there any other data regarding duration of use of chemical hair relaxers in the context of uterine cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, Bertrand, he specifically -- I'm just looking here in his abstract, and hazard ratio for greater than 20 years of use, regardless of frequency.

And so they apparently ask a question that they were able to extrapolate or derive that data from. And so they --

they basically asked frequency, duration of use, 1 to 4 years, 5 to 9, 10 to 14, 15 to 19, and greater than 20 years in that study.

BY MR. WELTER:

Q. But they don't address frequency there?

A. They do also address frequency in terms of never, light, one to two times, three to four times, five to six times, or greater than seven times.

Q. So what is the -- in terms of duration, what is the shortest period time that a woman needs to use a chemical hair relaxer to support your opinion on biological plausibility and uterine cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yeah. There is no minimum time of use that I could answer that. I cannot tell you that because I would kind of presuppose, okay, if you want to use hair relaxers, if you just use it for three years then quit, you're okay.

You know, that's -- have a label "do not use this product for more than five

years." I don't know that anything has ever been regulated that way.

BY MR. WELTER:

Q. So if a woman used a chemical hair relaxer one time, is that sufficient to support your biological plausibility opinions on the potential cause uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, that's not a question I was asked to look at, and it's -- I'm not sure I see it relevant to my opinion. It's -- you know, the epidemiology studies clearly report its ever use versus never use or long-term use or frequency of use over a period of -- of at least ten years or more with the follow-up, and likely longer.

BY MR. WELTER:

Q. Page 79, the language we're focused on, your opinion regarding biological plausibility is qualified by long-term use, and then today you want to add infrequent use. So the reason I'm asking you these questions is to determine what those minimum threshold frequencies and durations are that would then be

sufficient to support your opinion, or are there -- are -- is there such a threshold in your mind?

A. No. There -- there is not, nor could I address that, and that certainly not a question that -- that we ever tried to ask or answer in terms of cancer hazard evaluations with NTP, nor have I seen IARC ever try to draw conclusions based on the information that they have on evaluating cancer hazard.

Q. So to be clear, in paragraph -- excuse me, page 79, under your opinion that I read into the record, if we removed long-term use of chemical hair relaxers --

A. Yeah.

Q. -- then your opinion doesn't change?

MR. SHIPMAN: Objection to the form.

THE WITNESS: That's true. I think that -- that was in there because that's -- you know, again, the -- that the studies show the increase in risk that -- and so, yes, the long-term could be deleted from that sentence, and just use in general. Without trying to define any type of use patterns for that, it just

represents it as a -- as a potential or as a risk.

BY MR. WELTER:

Q. Could you turn to page 11 of your report? It's really 11 to the top of 12.

A. Okay.

Q. Last sentence starts "pinpointing a toxic dose as complex, especially exposures such as hair relaxers." And then you -- on page 16, you make another mention of chronic exposures to hair relaxers.

When you use the word "chronic," what do you mean?

A. Well, chronic is basically -- is a measure of effect that could be following exposures that -- in toxicology, it's defined at least as 10 percent of a lifetime. And what this is in terms given that cancer is a multifactorial disease that typically takes decades to develop, you're talking about a chronic disease.

And so chronic can refer both to the time that it takes for a disease to develop as well as the exposure circumstances that may lead up -- lead up to that. And I discussed that in my report in terms of toxicology, how acute

versus chronic and levels in between are defined.

Q. And I apologize because I'm confused. You -- your answer, you talked about chronic, I think you said, diseases. But your report is talking about chronic as it relates to the exposure. So can you explain -- let me reask the question.

When you use the phrase "chronic exposure," are you referring to some combination of frequency and duration?

A. Yes. And basically gets back to -- to the number of studies that I reviewed on just the patterns of use of chemical hair relaxers. That they are not something that a woman is typically going to use once and stop. That they typically, again, begin -- often begin at early age.

And I believe one report said a typical duration of use is that -- that most of the women or a high percentage of the women that use -- reported using chemical hair relaxers reported they had used them for at least 20 years.

Q. So when you use word "chronic," is there some minimum period or duration of

frequency of exposure that falls into that definition?

A. Well, with humans, that's -- technically, in toxicology, we're dealing with animals. So typically a chronic study in rats or mice is defined as a year or more. With -- with other species, longer lived species, the rule of thumb is generally 10 percent. So, you know, with humans, say five -- five to seven years. But chronic exposure, I think, could be implied to for humans, you know, a year or more as well.

Q. Are you familiar with the term ADME?

A. Yes.

Q. I think you mentioned it earlier on --

A. Yes.

Q. -- today.

What does that stand for?

A. Absorption, distribution, metabolism, and excretion.

Q. Okay. Did you do an ADME assessment of any of the individual chemicals in chemical hair relaxers as part of your mandate?

A. I looked at that, and that was a question that -- that I investigated in terms is

there evidence of, first of all, exposure, you know, to these chemicals; absorption of these chemicals; and presence in tissues once they're absorbed; have they been defected by body fluids, body tissues; and have they been detected in urine.

And so that -- that analysis, you know, was important in determining that -- for me, anyway, in answering the questions that, yes, does chemical hair relaxers result in systemic exposure to these chemicals? And the evidence indicated that -- that they did. And that they were studies that -- that also addressed effects that were consistent with exposure to the chemicals.

Q. Is it your position that your report contains a methodologically reliable ADME assessment?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No. I was not tasked with conducting a -- a -- excuse me -- with an AD -- a formal ADME analysis, but to identify data that were relevant to that and -- and would report on that, yes, we do have data on exposure, we do have

data on absorption and excretion and distribution that -- that covers all of those points.

BY MR. WELTER:

Q. So as you sit here today, you did not perform a -- a full ADME analysis of any of the chemicals that are in chemical hair relaxers; correct?

A. Well, I'm not sure what your definition of a full analysis --

Q. Sure.

A. -- would be.

Q. Want me to go -- want me to go with the handbook?

A. No.

Q. You know what the handbook says on that.

A. Well, I don't -- but the handbook is --

Q. Let me withdraw the question and ask -- ask another question.

Did you conduct an ADME analysis of any of the chemicals in chemical hair relaxers in compliance with the way that analysis should be done in the NTP handbook?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I -- I looked at the data to address the questions that are typically asked there, without going into the -- does that -- and, again, it -- the questions -- the key questions for that ADME analysis are, is there evidence that -- that use of a product should result in absorption of chemicals present in that product? Is there reference that it is distributed to tissues that are relevant to their investigation? Is there evidence that -- and then looking at just general overview.

Are the -- are the -- any evidence that the chemicals are stored or bioaccumulated in the tissues? What is the half-life -- general half-life in the -- in the body once they're absorbed? And how are they excreted? And so to that extent, yes, I did conduct that analysis and looked at data pertinent to that evaluation.

BY MR. WELTER:

Q. Did you ever conduct an ADME analysis

while working for the NTP?
A. Yes.
Q. And Mr. Garner, your boss, came to you and said, Mr. Atwood, here's a chemical hair relaxer product, I want you to do an ADME analysis of the constituent ingredients in there. Would you have done what you did in this report or would you have done something else?
MR. SHIPMAN: Objection to the form.
THE WITNESS: No, I would have done what I did in this report. The only thing different, typically, I would do is -- because, generally, we're -- we were evaluating just a particular chemical and then looking at what is known about the metabolism and how it's metabolized. And so I would do a diagram of showing a metabolic diagram of the chemical and what happens to it in the body and then how is it -- what form it is when it's excreted.
BY MR. WELTER:
Q. But what you did in this report is not an ADM analysis; correct? You were answering a different question?
A. Well, no, it is an analysis then,

that it addressed the key questions that I had regarding ADME for the chemicals that are present in hair relaxers, so...

Q. Can you tell me where your analysis is on concentrations of the particular chemicals?

MR. SHIPMAN: Object --

BY MR. WELTER:

Q. Because that's -- you would need concentration data to start with an ADME analysis; correct?

A. No.

Q. You wouldn't?

A. No.

Q. You wouldn't. Okay.

A. No.

Q. Can you give me any analysis of the chemicals and how they're applied to the hair and how much of the original concentration is actually being absorbed into the body of any of the chemicals of the chemical hair relaxers?

MR. SHIPMAN: Objection to the form.

BY MR. WELTER:

Q. Did you do any kind of analysis like that?

A. Well, no. And I -- that was not --

anything that was considered that I would need to do in order to -- to render opinion in this case. I just needed -- that I needed to go and, first of all, answer does the application of chemical hair relaxers result in exposure, so...

Q. But isn't -- isn't the "A" in ADME an analysis of the absorption? That's what "A" stands for.

A. No, "A" -- "A" just stands for absorption.

Q. Absorption?

A. Just absorption.

Q. And so have you done any analysis to determine the -- the concentration or amount of any of the chemicals that were actually absorbed into a body from a chemical hair relaxer product?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I -- yes, I did. And the fact that I -- I looked at the data that conducted the research looking at that for hair relaxer studies and for components that are in hair relaxers, and to evaluate the studies that reported on absorption. They gave evidence of -- of absorption or effects within the body

following use of the products.

BY MR. WELTER:

Q. What is toxicokinetics?

A. Toxicokinetics refers basically to the rates of reaction of a chemical once it's absorbed and how it is handled, what happens to the chemicals once they are in the body, and the rates of how those take place.

Q. Did you perform a toxicokinetic analysis with respect to any of the chemicals in chemical hair relaxers?

A. No. And, again, that was not relevant to the mandate that I was given in this case.

Q. Do you -- do you believe that a toxicokinetic analysis could potentially inform your opinions on biological plausibility?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Not in this case. I mean, typically, toxicokinetic analysis are done to -- again, to develop models -- predicted models of -- of chemicals and how they may be -- how they are processed by the body, and are used in a -- generally in a risk assessment context

and -- and, you know, particularly if you get down to a very granular risk assessment where you're trying to not just look at the applied dose or the dose that somewhat -- that's in something that you eat or is applied to the skin or is inhaled, but you're looking at the tissue dose at the -- and so it's -- it's basically using that as a -- as another step in risk assessment.

BY MR. WELTER:

Q. Well, couldn't a toxicokinetic analysis inform you that whatever the chemicals you're studying have a shorter -- that are not -- that they're not persistent, they have a short half-life, and they are excreted from the body before there's any effect to the tissue? Isn't that part of why you would do a toxicokinetic analysis?

A. Well, that -- that type of data is available, and I looked at that on the general half-lives of these -- the chemicals at least that I've identified that are present in these products. And, yes, they're generally identified as what is called nonpersistent chemicals and

that they do not bioaccumulate in the body the way some chemicals do.

Q. Wouldn't -- couldn't a toxicokinetic analysis have ruled out some of the chemicals that you've identified in this litigation?

A. No. Again, that's -- that was not really a pertinent question to my review. Again, I just get back to the -- we're looking at exposure to a mixture and not just the individual components of that mixture. And a number of studies that -- that I review address that question and, certainly, the -- the paper that's put out by the Endocrine Society discusses that and -- and others that when you're evaluating complex mixtures, that it is important to consider the mixture as a whole because you can get effects that cannot be predicted by exposure to the individual chemicals even at -- at low concentrations.

Q. Your mandate was to start with the product, the chemical hair relaxer; correct?

A. Yes.

Q. In your time at the NTP, were you ever asked to do an analysis of a product versus a substance -- a combination of substances? You

understand the distinction?
A. A product versus a --
Q. In other words, in your -- at the time at the NTP, if you're doing a cancer analysis assessment, the carcinogen assessment, the focus initially is on the substance; correct?
A. Yes.
Q. Have you ever at the NTB -- NTP done any assessments where the initial focus was not on a substance but on a product?
A. Yes. There are several. And they should be in my CV. Mineral oils was one of them. There's others that are -- I can't remember specifically the -- you know, we did several on soots, tobacco smoke, coal tars. And at the time I was -- the last few years that I was at NTP, we were working on several mixtures at that time, which we just got started at the time I retired, but I -- some I've worked on more than others.
So we've done a lot of literature searches and were going through thousands of papers, reviewing those and the relevance. And so those were -- those were wood smoke, flame retardants, and -- well, wood smoke, flame

retardants, and there's one other. Maybe I'll think of it in a minute, but...

Q. In those instances, did you immediately use a methodology that this could -- assuming those were complex mixtures, and apply a nonmonotonic approach?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No, we did not apply any type of dose response information. Again, it would either be based on information from epidemiology studies such that we have here, or the dose metric would be on some type of exposure, you know, for wood smoke.

You know, whether or not you have a wood burning stove in your home, or in some populations, world populations, they cook using wood stoves or cook outside, forest fires and other sources of exposure.

And so the dose response was not something that was part of our analysis other than looking at the data. If you had animal data dose response, in those, it's difficult to do. Animal studies

of -- and how -- how you measure the dose in that case when you're talking about something like wood smoke or flame retardants.

Or the others that we're talking about were mixtures of polycyclic aromatic hydrocarbons, PAHs, that typically occur together -- no one's ever exposed to just one PAH -- and nitrated PAHs. So those were the other projects that were going on at the time.

BY MR. WELTER:

Q. Thank you.

A few times today you in response to questions were just commenting. You referred to the society. Do you remember that reference?

A. Did I --

Q. You referred to something called the society or the society --

A. Oh --

Q. -- something --

A. Did I -- if I said "society," I think it should have been in the context of the Endocrine Society.

Q. Yeah. That's what I'm talking --

A. I may have dropped the endocrine, but yes.

Q. Okay. And that's where I want to go with our conversation.

A. Yeah.

Q. So when you referred to the endocrine society, is that -- when you're referring to that, were you talking about the non-monatomic approach to assessing complex mixtures of chemicals? I just want to know if that's what you're --

A. Well, that's -- that's one thing, but they've addressed that, and I have that in my report. And certainly they -- yes, a large part of that was addressing some papers that -- you know, again, it gets back to appropriate risk assessment methodology for evaluating endocrine disruptors.

Of course endocrine disruptors is something that's become a very active area of research, particularly over the last 15 years, and -- and so trying to address how properly to -- to study these effects because they typically occur in exposure to mixtures as well. So...

Q. Let's talk a little bit about endocrine disruptors non-monatomic dose response. I understand you discuss that in your -- in your report. Let me take a step back from that.

While with the NTP, did you ever do any research -- strike that.

While with the NTP, did you ever use a non-monatomic approach in doing your work?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, I mean, I was not doing risk assessment work while at the NTP, and so -- so that was not relevant to the work that we were doing there. It was certainly a concept that would come up from time to time in dealing with chemicals.

But it was not something that we had to do with a dose response analysis. That is done more in -- that is what EPA does in -- in supporting risk assessment. And -- and when I worked as a risk assessor for the first 15 years of my career, that -- that was something that generally did not conduct their own independent dose response assessments.

There were a few cases where we did some analysis on that for when we had something that EPA had done an assessment of. But, again, that's -- that's what the benchmark dose or the cancer slope factor, which are metrics that they use in risk assessment to a compare exposure and determine whether or not levels are -- are within acceptable guidelines.

BY MR. WELTER:

Q. Does the NTP handbook on methods for conducting cancer hazard evaluations even mention NDM -- NMDR at all, to your knowledge?

A. Not that I'm aware of.

Q. Does the EPA cancer risk assessment generally rely on monatomic dose response models?

A. Well, certainly it was, you know, up through the year 2000, which was the last year that I conducted -- or 1999, really, would be the last year where I was conducting risk assessments.

And certainly the concept was out there, and there was much discussion within the risk assessment community about -- particularly in relation to endocrine disruptors and -- and

other effects of -- and I remember going to some seminars and workshops where that was a topic of discussion. So where it is right now, I don't know.

Q. You don't know?

A. Yes.

Q. Okay. But as you sit here today, you have no knowledge that the EPA has adopted a non-monatomic model as part of its cancer assessment?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I -- I don't know what they've done. I'd be surprised if -- I'm sure it's under consideration. I would be very surprised if it wasn't.

BY MR. WELTER:

Q. Has the NTP adopted a non-monatomic model?

A. Well, again, that's not what we did as part of the NTP group that I worked with. There may be other groups there that are working on that question, but --

Q. Are you aware of any regulatory agency that is -- that has a responsibility for cancer risk assessment or cancer hazard

assessment that has adopted a non-monatomic model for doing that work?

A. Well, again, cancer hazard assessment, you do not -- it may be part of the data evaluation in terms of exposure and effect, but, I mean, a formal adoption of that, I think they -- it would be based on whatever the data is telling them, and that would be brought out in the -- in the discussions and their evidence of whatever the conclusions were.

Q. Am I correct that the non-monatomic dose response approach is -- it relates to EDCs; correct?

MR. SHIPMAN: Objection to form.

THE WITNESS: It has a -- a broader application than that, and certainly I think much of the studies that are -- have been coming out of the last ten years or so that have investigated that are reporting that it's much more common than previously believed.

And so I think this is an example, again, of gaining more knowledge, and that kind of is moving -- trying to move the hazard assessment community and risk

assessment community forward in how we -- how things are conducted.

And it -- change typically meets -- occurs slowly or meets with resistance because it is -- because when it first came out, I remember first hearing about it probably in the early to mid '90s. And seeing it presented at some workshops and seminars, and just saying that this is something that could be of concern.

But they were -- a number of studies that had been published, you know, that have concluded, well, it's not likely -- it's likely to be more of the exception than the rule. But I think more modern studies are showing there's much more likely than previously believed.

And the Goodson 2015 study that I referred to earlier, they did an analysis of -- can't remember how many chemicals mixtures and reported evidence of non-monatomic dose responses and close to 60 percent of the studies that they investigated.

BY MR. WELTER:

Q. Do you know who Dr. Zoeller is?
A. I do now, yes. I've seen his name.
Q. You know he's -- you know he's an expert in this case?
A. Yes.
Q. And have you seen his report?
A. Yes.
Q. And I will represent to you that he testified last week that the non-monatomic dose response, in his view, this litigation, only applies to endocrine disrupting chemicals and not to carcinogens. Do you disagree with Dr. Zoeller on that point?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, I'm not sure what the context was of his -- his question there. I could see, you know, endocrine disruptors can also be carcinogens. And so a carcinogenic response could also be non-monatomic and the -- even going back to traditional risk assessment, the assumption was fair that there was no such thing as a safe dose of a carcinogen.
BY MR. WELTER:
Q. Is formaldehyde an EDC?

A. Well, that's the thing, that I don't believe that it is. I think I've seen it in some papers listed with some EDCs, but I -- and, again, there's -- there's some agencies in Europe that seem to be formulating lists and evaluating EDCs in a systematic manner. I don't think they're quite to the level or recognition that IARC or NTP are in evaluating cancer hazards, but, no, I'm not aware that formaldehyde has the evidence that formaldehyde itself is an EDC.

Q. Would -- is it your position that it would be scientifically acceptable to apply a non-monatomic dose response approach to formaldehyde?

A. I have no way of answering that question because I haven't done the research, or if the such data is available, if it's ever been investigated in that -- in that way.

Q. Have -- have you -- aside from this litigation, have you ever applied a non-monatomic dose response approach in reaching conclusions on biological plausibility?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, it seems like that's similar to questions you asked

earlier. Again, while working at the NTP, we looked at dose response in general as -- as evidence. For instance, in an animal study, you typically have three dose levels, and if you see no increase in cancer at the low dose levels, but you see an increase at the mid dose level and a higher increase at the upper dose level, then that's evidence of a dose response.

And there is some cases where actually you see a lower response at the higher dose level, and that could -- that could be due to a number of factors. It may be that most animals died. And so it was due to toxicity before cancer could develop.

And there's statistical ways that they have of evaluating that, but -- but something like that could be evidence of a non-monatomic dose response that is not recognized at the time.

BY MR. WELTER:

Q. You just mentioned three dose levels. Do you know the three dose levels for any of the specific chemicals that you have identified as

being present in chemical hair relaxers?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, that's not something that I saw as -- as relevant to that. I would just simply using that as an example of what the protocols are for NTP cancer bioassays. And typically as -- you know, to have at least 50 animals for exposure group and to have three dose levels because you need three dose levels in order to establish some type of dose response.

BY MR. WELTER:

Q. And you do state at -- you do state at page 12 of your report that at least three dose levels are needed to establish a dose response relationship; correct?

A. Correct.

Q. But you -- you don't -- you can't give me the dose levels -- any of these three dose levels for any of the individual chemicals in chemical hair relaxers today; correct?

A. No. Again, the information here was just provided as a -- a general background to the -- how dose response has been used in

toxicology and how it is evolving. And, again, that conducting a dose response analysis was not part of my mandate, nor did I perceive that as being a requirement for me to reach an opinion.

Q. I think you answered my next question, which is --

A. Okay.

Q. -- have you in your report conducted either a monatomic or non-monatomic dose response analysis of any of the chemicals individually or any combination of the chemicals from chemical hair relaxer products?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No. In my report I -- I give examples of what monatomic and non-monatomic dose responses are, and then I present some of the information that's related to the debate on when it's appropriate to use one versus the other. And particularly with EDCs, that using traditional -- the inadequacies of using a risk assessment methodology that is based on high-dose animal studies and on non-monatomic dose responses function are inadequate, and I find -- found many

studies that were reporting of that. And so, no, it was not necessary for me to try to conduct an analysis of my own.

BY MR. WELTER:

Q. Okay. And you didn't do it?

A. No, I did not.

Q. Before being retained in this litigation, you were aware of the non-monatomic dose response approach generally; right?

A. Yes.

Q. When you were retained in this litigation, did you have to do additional research on that approach in order to develop your opinions?

A. Certainly that would -- that's part of it because I'm looking at that and the association with endocrine-disrupting chemicals, and I certainly knew that that was one class of chemicals where non-monatomic dose responses were -- were likely or probable. And so I did -- part of my literature search was aimed at addressing or identifying literature that spoke to that question.

Q. Okay. Would you agree that -- that there's not a consensus in the scientific

community over the use of non-monatomic dose response approaches?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, it's -- you know, I know that certainly there are those who -- on both sides of the issue. But, you know, particularly when it comes to endocrine-disrupting chemicals, I consider the -- the -- the opinion and the analysis of the endocrine-disrupting society, which includes -- I looked that up. I think it's over 18,000 scientists in over a hundred countries, I think, that are members of that society, and that they published their statement on that. And I think I mentioned even in my report that their position was -- was an important factor that I considered in -- in reaching my own opinion.

BY MR. WELTER:

Q. And you acknowledge that there are both sides to this, so there are --

A. Certainly.

Q. -- another -- let me finish.

MR. SHIPMAN: Let him finish.

THE WITNESS: Sorry.
BY MR. WELTER:
Q. There's another portion of the scientific community that -- that rejects the non-monatomic dose response approach; correct?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, certainly, you're going to -- again, as I -- as I stated earlier that you're going to find scientists who fall on different positions and that is -- that is very common in science. It is the way -- you know, just good, healthy debate, hopefully --
BY MR. WELTER:
Q. Yeah.
A. -- on that, but --
Q. Would you -- would you agree with me that since -- I think it's 2012 to the present that the issue of using a non-monatomic dose response has been a sharply debated issue in the scientific community?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Yes, I -- I think -- well, earlier than that when the concept was first -- first identified, but I think

it is recognized under -- in many circumstances like that, certainly with -- you know, looking at endocrine, the effects of -- of hormones and vitamins and things like that in the body, that -- that oftentimes they're affected at low doses, but are not required -- you know, or at high doses can be toxic or detrimental or...

BY MR. WELTER:

Q. I don't want to have a long discussion about the non-monatomic approach, but I do have one particular question --

A. Sure.

Q. -- or series of questions that I want to focus your attention on.

My understanding is -- the concept is that there are some doses that may cause a response that are not necessarily detectable. Is that kind of one of the -- one of the first assumptions. I'm going to break it down. But is it -- isn't that -- was one of the general concerns that led to how do we evaluate things that may not be detectable?

A. Well --

MR. SHIPMAN: Objection to the form.

THE WITNESS: -- yes. Yes, if I understand your question correctly that -- I may have to get you to ask about that -- I think you're asking that -- that example of non-monatomic dose responses are the reason that they aren't acceptable is that in a risk assessment, you identify a no-observed effect level. And -- and that was just based on -- generally on animal studies exposing the animals to various concentrations of chemicals over a certain length of time.

And then looking at those animals and -- and it's called a no-observable effect level for a reason that they -- we did not see anything -- any morbidity in the animals or any evidence of lesions or disease.

And that's the whole -- that is the point that those type of studies could miss something that could be active at a lower dose than what is identified as the null.

BY MR. WELTER:

Q. Okay. You said it much better than I did. Thank you for that that.
A. Okay.
Q. So, again, the -- the concern was a potential gap in data for doses that fall below the no-observable level; correct?
A. Yes, that's -- that's certainly part of it, yes.
Q. And the question you -- the question scientists want to answer is whether there is an effect or response that is not observable or whether there's actually no effect. I mean, those would be the two options if you have a dose that falls below the no-observable level; right?
A. Right.
Q. Okay. So explain to me how the non-monatomic dose response approach distinguishes between a dose that has no effect and a dose that has a lower effect that's below the null?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, part of that, too, just gets -- gets into just the technological tools that you have to do -- that you have available to you to

investigate an effect and being able to get down to the sensitivity and the precision that you need to measure a -- a subtle effect that could be a precursor.

And one of the major tools that's being used now is just -- you may have heard of all the omyx type analysis. So you've got, you know, just a gene expression, you know, the transcript omyx, and so where they are actually able to go and expose, you know, either humans or animals to a substance, and then look at how gene expression is affected, which would be something that they could not measure a number of years ago.

And then being able to determine the -- the trick is being able to determine, you know, when those gene expression changes result in a downstream effect that can manifest as a disease or -- and so the -- the goal, then, is to be able to -- as -- particularly as we're moving away from animal studies -- is to be able to expose an animal -- or to expose cells or animals without having to

kill them, to low dose of chemicals and look at their gene expression changes. And then over -- over time, I imagine, have to look at this over -- you couldn't just do it once and have one measure of that.

But then look at something that would be a signature, you know, a precursor signature that's -- that's looked at the molecular level and cellular level of gene expression changes that could manifest itself in the disease.

And so those type of tools and others are being used now to measure those type of subtle changes, and that's where the whole adverse outcome pathway analysis is coming in to play as well because they can continue to probe more and more effects. They can not only look at gene expression, but they can look at metabolites and how that changes in the blood.

And there's also efforts to not just -- what they're calling the exposa, and so that is basically ability to -- even though it's not exposure to any

particular agent or chemical, but it's looking at the entirety of that person's being or life, and -- and what they can learn from exposure based on that.

And I'm not real versed in the exposome, but I know that's out there.

BY MR. WELTER:

Q. But you did none of that? What you just --

A. No.

Q. -- you did none of that --

A. No.

Q. -- in this case?

A. No.

Q. In -- in the handbook, the 2015 version of the handbook that we were discussing earlier, isn't it required that as part of a biological plausibility analysis, that you analyze alternative sources of exposure?

A. No. I mean, that would be mainly, I think, covering the epidemiology studies because as part of epidemiology study, you always look at potential confounding factors. And that's the -- one of the challenges with epidemiology studies that you're dealing with in human population that

have -- you know, you cannot do controlled experiment where you're exposed to this and this only, and you're not exposed to everything else.

And so in this case, that -- that was something that occurred to me from the very beginning, you know, and so the fact that if you have got epidemiology studies of hair relaxers that contain chemicals that are present in a lot of other personal care products, then that could be a -- you know, then that makes it very difficult or practically impossible to have a really -- a real control group that is not exposed.

And so if you -- if your control group is, in fact, not exposed to these chemicals, then that means you're comparing an exposed group with another exposed group. So that's a -- what's called a bias toward the null, making it more difficult to determine if there is, in fact, a difference between a person who uses product X versus a person who does not.

Q. Okay. And to your points, since there are so many other products out there containing similar chemicals, like shampoos and lotions and things of that nature, isn't it that

more important then to analyze those other products and sources of exposure, and at least consider what the effect is on use of chemical hand relaxers with those other products?

MR. SHIPMAN: Objection to form.

THE WITNESS: Okay. Sorry. Will you state that -- state that again, please?

BY MR. WELTER:

Q. Sure. Let me -- and --

A. I think I know what you're saying, but I want to make sure.

Q. You know -- you know, the -- the issue you just raised is that there are -- the chemicals we've been talking about in chemical hair relaxers; correct?

A. Correct.

Q. Those same chemicals are also present in other personal care products; correct?

A. Correct.

Q. So if we're talking about analyzing chemical hair relaxers, isn't it part of the assessment to at least attempt to eliminate other alternative exposures?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, that's -- I mean,

the -- the epidemiology studies in this case, they identify co-variants or what could be confounding factors that could be contributing to the effect, and all of the studies have to go through that analysis to -- to evaluate that.

And what you're talking about all these other exposures, that would only really matter if there's some reason there's a big difference in one group versus the other in use of all these. That would be something both groups would have in common.

And if both groups have that in common, is there any reason to -- you know, without conducting a survey, you know, with that, you'd have to go a little broader search and just PCP use in general. And there's probably not many women who do not use PCPs.

BY MR. WELTER:

Q. Right. So let me ask you this. Would your -- would your opinions on biological plausibility based on everything you've -- strike that.

Based on everything you've done, would your opinions on biological plausibility and their potential to cause uterine cancer and ovarian cancer apply equally to any of those personal care products that contain those same ingredients?

A. Well, you know, the -- there was -- you know, again, having to look at the studies that we have, and I expect other studies will be done, you know, we see the Bailey study that they followed up and looked at other nonreproductive cancers among hair relaxers.

There's also a study -- and I can't remember the author now, but I believe a recent one that was published. I think it was another Chang study that looked at daily use PCPs in relation to breast and ovarian and uterine cancers. And that study, you know, did, as I recall, report some evidence of breast. And so it was not as conclusive, in my opinion, as the studies that we have with chemical hair relaxers.

And so that's one of the questions that I thought of and asked of myself when I started this, okay, what is it, you know, about use of these chemical hair relaxers that is

different? And basically it is just, I guess, how it is applied. It's only product that I know of that is specifically used to -- to induce a chemical reaction in the hair, and that is applied as a highly caustic product.

And so to the extent that that is related, it certainly can affect absorption. Not only that, but another consideration in my mind is too that none of these exposures happen in a vacuum. Again, we've been talking about women are exposed to a lot of things.

And so one of the things, if you look at EPA's definition of what an adverse event is, it's not only causing something, but it's also increasing susceptibility to exposure to other agents. And so that is something else that -- that I think is likely at play here, the use of chemical hair relaxers, creating increased susceptibility to whatever other factors -- risk factors that departs from -- whether it be a genetic background, or whether it be other toxic insults in their life.

Q. With respect to chemically changing the hair, don't hair dyes and permanents, aren't those products that chemically change the hair?

MR. SHIPMAN: Objection to the form.
THE WITNESS: I don't know that hair dye -- they -- they color the hair. I don't know that they -- there's -- you know, what the chemical reactions are in that. They're certainly not breaking -- I don't think they're breaking any of the chemical bonds that are present in the hair and the alternate structure, but --
BY MR. WELTER:
Q. Sure. So if your theory is that there's a mixture of these chemicals that are entering the body, and because they're complex, that's what is leading to cancer, or at least creates a biologically plausible pathway to uterine and ovarian cancer, how does that fact that the product itself changing the hair factor into your analysis?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Well, the -- I think the -- the -- basically, the process in -- in having something to change the hair, as I understand it, requires application of a highly caustic agent. And about half -- more than half of the hundred-plus hair

relaxer studies that identified in the literature address either damage to the scalp or hair as a -- as a result of chemical hair relaxer use.

And also I was very aware that as far as dermal permeability, that scalp is more permeable that most other parts of the body in terms of skin, and that further the presence of all the hair follicles and damage to the skin could also result in increased exposure.

Not only to the -- to the chemicals in the hair products, but to any chemicals -- that damage does not heal itself overnight. So any other products that are substantively applied.

BY MR. WELTER:

Q. I read your report as it relates to reported scalp burns.

A. Right.

Q. I read all the studies. I could not find any study that quantified the frequency at which scalp burns were occurring when applying a chemical hair relaxer. Can you point to any data showing how frequently scalp burns occur?

A. Based on the number of studies that -- that I saw, I think it's reasonable it's fairly frequent, or there wouldn't be that many studies that address that issue.

Q. A lot of the papers that you cite to are commentaries and not independent studies; true?

MR. SHIPMAN: Objection to the form.

THE WITNESS: I think they're reviewed articles rather than just commentaries. So review article, then --

BY MR. WELTER:

Q. But there are some commentaries too?

A. Well, there were a few, yes. Not many though.

Q. But none of the papers quantify how frequent that occurrence happens; true?

A. No. I don't recall seeing any data in that. There may have been some that -- in the introduction. I'd have to go back and look at it again to -- to see if -- they may have reported that this is a common problem. I know certainly there's some forms of alopecia that were reported as a common problem among Black women that use these products.

Q. I know from our discussion this morning you don't know the details of how chemical hair relaxers are applied, but if -- if I were to tell you that the instructions required a Vaseline type coating gel on the scalp and that the relaxer product itself should not come into contact with the scalp, would that have been helpful information on your assessment on whether chemical hair relaxers were burning the scalp and how often that occurs?

MR. SHIPMAN: Counsel, I'll object -- can you show him what instructions from -- can you show what instructions that you're referring to there? Show him what --

BY MR. WELTER:

Q. Question stands.

A. Okay. Well, again, knowing that -- seeing data that address the -- the pH of these products, knowing that -- and I was generally aware and looking at that, that there was, yeah, some type of -- that the instructions include putting something on -- on your head. But, then again, saying, okay, you're mixing this in your hair, and yet it's not supposed to come in contact with your scalp.

Another possibility, I don't know if I've seen anyone else mention this, but if you're putting a Vaseline type product on there, that is a lipid soluble product that it could also increase the solubility of any proponents of it. In some respects, that could actually increase absorption itself, chemicals without the burns as a -- as a vehicle of going through that and then in contact with the skin.

Q. Did the chemical hair relaxers have to burn or damage or compromise the integrity of the scalp in order to support your opinion on biological plausibility?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No. That was one factor that considered, okay, part of my report that I did have a section in there of trying to evaluate and identifying any differences that -- hair relaxers versus other personal care products used. And so that is one factor that -- that can explain increased absorption from using this.

But, again, it's not -- again, there was no one piece of the evidence that --

in my report, that if removed it, I think that could have -- that I would change my opinion of that.

BY MR. WELTER:

Q. Have you as part of your research compared the pH levels in other hair dyes, hair permanent products, hair care products with the pH levels in chemical hair relaxer?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Not all of those products, but I know, I think, shampoos and -- and other common products are typically at a slightly acidic pH in the range of -- I think of 6 to near neutrality.

BY MR. WELTER:

Q. Which products are those?

A. I think shampoos, I think, in general, yes.

Q. What about hair dyes, hair permanents, you -- did you look at that for comparison purposes?

A. I have no specific knowledge of that. But, again, I did not see any discussions in any of the papers of other PCPs that I looked at or

anyone that was discussing that in terms of -- of looking at the pH value of the hair relaxer products and saying, oh, by the way, these other products are at pH 10 or 12 or something like that.

Q. Well, what you told us this afternoon is that one of the things that makes chemical hair relaxers unique is that they have these high pH levels. How do you know that's unique unless you've actually compared that to other similar products that contain higher pH levels with the similar ingredients that you've identified?

MR. WELTER: Objection to the form.

THE WITNESS: Well, again, that -- it's the only one that I saw mentioned in the literature that I reviewed. And, again, I did look at a lot of literature on PCPs in general in terms of just getting background information, and no other -- I know of no other personal care product that you have problems with chemical burns after applying. If there were, I don't think that product would -- would likely be on the market very long.

But -- so that's -- that is what

that's based on, just the lack of any information reported on that. And I did not specifically search -- I did do -- conduct some, I think, searches on pH and a combination with some other terms. I can't remember all of them now, but -- and certainly the papers that identified, it did not identify any other products.

BY MR. WELTER:

Q. Did you take into consideration the fact that chemical hair relaxers are only being applied for 15 minutes every two months with these chemicals versus --

A. Right.

Q. -- hand lotions and shampoos containing those same chemicals that are being applied and used on a daily basis?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yes, that was certainly a consideration that -- you know, a question that I had about that, but then it gets back to the epidemiology studies. And, again, I think the -- you know, my opinion, the epidemiology studies that I -- are sound and, again, the

epidemiologists for the plaintiffs reviewed these studies, and they -- their opinions agreed with mine, and they conduct a much more thorough assessment of those than -- than I could.

And so, again, my goal was then to address the biological plausibility of that relationship, and so to do that, again, when I'm looking at the expert reports from the defense, as I looked through that, it struck me that a lot -- I don't think there was any objection or argument that they raised that I did not think of myself before I undertook this.

And so I had no -- so I went in with a neutral opinion and -- and basically conducted a year of research before I wrote a word of my report on this, so --

BY MR. WELTER:

Q. Back to my question from a couple of minutes ago, with respect to these other personal care products that contain same groups of chemicals --

A. Right.

Q. -- that are being used on daily

basis.

A. Right.

Q. Do your biological plausibility opinions as they relate to uterine cancer and ovarian cancer also apply to these personal care products?

MR. SHIPMAN: Objection to the form.

THE WITNESS: No. I would not say they necessarily do until studies are available. Now, if subsequent studies -- again, there is one study on daily PCP use, which I think is informative in this case because it did not show the association with ovarian and uterine cancer.

So then it gets back to the question, okay, what is it about chemical hair relaxers then, even though they contain a lot of common components with other personal care products, what is it about them that you're getting these different responses?

And so as I opined earlier that -- that the fact that these three studies are showing a significant effect in spite of

the fact that you got exposures to these other products, again, I think would be unlikely -- you know, those exposures are likely common between all of that exposure groups in these studies. And so that is a common factor that they all have, and yet -- so there would be no -- there's no reason to think that there would be what epidemiologists call dis -- differential misclassification based on personal care product use that I could see.

And so, to me, that -- that just added -- that added a strength to these studies that -- you know, because there was a question that I had and wanted to investigate, and so that was an important piece of information to me that -- that gave me the opinion that these studies -- that there was something to these studies, that there is a -- a risk there.

BY MR. WELTER:

Q. So was the -- strike that.

Is it your position that you need an epidemiological study reporting an association between a product and disease in order to open

the door to a biological plausibility analysis and conclusion?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, in terms of a cancer hazard assessment, that's generally the case, either -- you know, typically with NTP, with one exception that I'll talk about here in just a -- just a minute, but typically, you know, the IARC or NTP --

THE VIDEOGRAPHER: Dropped your mic.

THE WITNESS: So typically the NTP or IARC are not going to take -- undertake a cancer hazard evaluation without evidence in either humans or experimental animals.

Now, there are some exceptions because both IARC and NTP recognize in some cases, if you've got a class of chemicals that some are well studied and have been identified as carcinogens, and then you've got other chemicals that are present that you've identified of which just have not been studied, then you can undertake a process to list a chemical that has not been studied in either humans

or animals as a carcinogens, just based on a read-across-type approach based on mechanistic data that you -- and -- and, in fact, I was part of one such assessment with NTP on haloacetic acids that I mentioned earlier, and that was what my publication was about.

BY MR. WELTER:

Q. You mentioned in your report three -- three theories. I'm going to combine them for time sake --

A. Okay.

Q. -- so hopefully we get through them.

You mentioned clear additive effect, synergistic effect, and human effect.

A. Yes.

Q. Remember those references?

A. Yes.

Q. And, again, I don't mean -- I don't mean to shortcut the question.

A. That's fine.

Q. I'm trying to kind of get to the point.

You mentioned those three concepts as certainly things that could occur?

A. Yes.

Q. But have -- have you actually analyzed the individual chemicals in chemical hair relaxers and determined that there is some kind of an additive effect amongst them?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Again, that -- that -- when addressing biological plausibility, I'm looking for evidence that such data are available for chemical mixtures. And there are many studies in the literature that report -- and, of course, interactions are a very common concept in toxicology that when you have two or more chemicals together, that those are the type of interactions that -- that can be -- that can happen.

And so there's a number of studies that -- that have addressed that, and -- and also focusing on the low dose exposure. Again, you've got a group of chemicals individually at doses that, you know, you could be exposed to or animals could be exposed to, and there would be no observable effect.

But when you put them together and expose the animals, or -- or if you have -- happen to have some evidence in humans of the effect, then, you know, that -- that is -- is weight.

And, again, the Goodson paper that I talked about, in their analysis of multiple mixtures with a well-qualified team of over 60 scientists well-versed in cancer causation, again, identified more than half of the -- of the assessment of the mixtures they evaluated as having non-monatomic dose responses.

BY MR. WELTER:

Q. I appreciate the response, I understand the concept, and I read your report.

A. Right.

Q. Coming back to my question, have you done or are you aware of anybody who's done any analysis of the chemicals that you identified as to whether there's an additive effect of one or more of them?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Yeah. Well, again, you know -- you know, what the entire

ingredient list would be of the different formulations over years, I'm not sure how you get that data. But, again, addressing biological plausibility was not necessary for me to -- but, no, I'm not aware of.

BY MR. WELTER:

Q. Thank you. And I'm really trying to get to the finish line here.

A. Sure.

Q. So I'm just asking if you're aware --

A. Got you.

Q. -- of a particular analysis --

A. Got you.

Q. -- just looking for a yes or no.

A. Okay. Sure.

Q. Okay. With respect to the concept of -- of synergistic effects, are you aware of any analysis of any of the ingredients we've talked about today or in your report in chemical hair relaxers that have been analyzed where anybody's concluded there is some synergistic effect in play?

MR. SHIPMAN: Objection to the form.

THE WITNESS: See, one study that I'm trying to -- no. The -- the Dairkee,

D-A-I-R-K-E-E, et al., 2023 study, I think that was a -- I mean, I think addresses that question in some sense in that they were looking at the effects of eliminating -- they mention phthalates and parabens as common products and personal care products.

And looking at the effects of eliminating exposures to those chemicals in women that used these products. So they replaced their products with similar products that did not contain those chemicals. And it's a very well-conducted study. They looked at gene expression.

They looked at -- let me -- looked at, again, to be -- and so, yes, they -- so that -- the sense that you have parabens and phthalates, and you don't have -- again, if you just eliminated one versus the other, compare that.

But the fact that there is at least those two chemicals, and there could possibly have been something else that was not present part of that, but over a 28-day period, they saw a reversal of

accumulation of cancer associated phenotypes, which, in breast tissue, these were noncancerous breast tissue.

So they showed evidence before they started. So this is an intervention-type study, which are rare, but they -- they do provide an additional source of evidence that when you're looking at a possible associations of exposures and disease, and if you remove that source of exposure, what effect does that have?

And if you see a reversal of that, then that is an extra set of evidence.

BY MR. WELTER:

Q. Is that an extra set of evidence of a synergistic effect between parabens and phthalates?

A. Well, I --

MR. SHIPMAN: Objection to the form.

THE WITNESS: You know, in this case, I think that it's a combination. It -- it could be. You ask if -- I'm not aware of any that said synergistic, but this is certainly, I think, an important paper that addresses at least two chemicals

that -- that are part -- that could be part of a mixture that -- that could have synergistic effects.

BY MR. WELTER:

Q. Okay. Dr. Zoeller testified in this litigation that he's not claiming there are any synergistic effects among EDCs in chemical hair relaxers. Do you disagree with that?

MR. SHIPMAN: Objection to the form.

THE WITNESS: Well, again, that's -- that's something that I have no data to specifically answer that. Again, there's data that I evaluated and studies that evaluated that do talk about synergistic effects of mixtures and low dose effects.

So -- and that -- you know, that type of information, to me, addresses the biologically plausible issue. And the lack of a specific study on something -- you know, something that -- you never have all the data that you like to have to make an opinion of that.

BY MR. WELTER:

Q. And the lack of data doesn't necessarily eliminate it as a possibility; right?

MR. SHIPMAN: Objection --
THE WITNESS: That's true.
BY MR. WELTER:
Q. But it also -- the lack of data doesn't establish it as fact; true?
A. Well, it works both ways, but, again, it's an evaluation of the entire body of evidence and -- and reaching conclusions on what is biologically plausible. So --
Q. With respect to cumulative exposure, again, you know, you haven't done any analysis of the chemicals and chemical hair relaxers to assess any cumulative -- cumulative exposure to those chemicals have you?
MR. SHIPMAN: Objection to the form.
THE WITNESS: Again, no. That was not part of what I've needed to do in order to form my opinions. So no.
MR. WELTER: Let's go off the record.
THE VIDEOGRAPHER: Off the record at 5:08 p.m.
(Recess taken from 5:08 p.m. until 5:08 p.m.)
THE VIDEOGRAPHER: On the record at 5:08 p.m.
BY MR. WELTER:

Q. Mr. Atwood, I have been told by the court reporter that essentially my -- my time is up today. I wish I could spend more time with you. I enjoyed our time together, but I have no further questions. Thank you for your time today.

MR. SHIPMAN: Give us just a few.

THE VIDEOGRAPHER: Off the record at 5:09 p.m.

(Recess taken from 5:09 p.m. until 5:13 p.m.)

THE VIDEOGRAPHER: On record at 5:13 p.m.

EXAMINATION

BY MR. SHIPMAN:

Q. Mr. Atwood, you've been asked several times today as to whether or not your opinions on biological plausibility frame any opinion that you have about causation. You remember those questions that you've been asked?

MR. WELTER: Object to the form.

THE WITNESS: Yes.

BY MR. SHIPMAN:

Q. Okay. Now, Mr. Atwood, based upon your background, training, and experience, based upon the research that you have done in this case

as outlined in your report, do you have an opinion to a reasonable degree of scientific certainty whether or not exposure to chemical hair relaxer products can be a cause of uterine cancer? First, do you have an opinion?

MR. WELTER: Object -- objection. Beyond the scope of the report. Beyond the scope of the deadline for disclosure of general causation expert opinion in this case. And object to the form.

BY MR. SHIPMAN:

Q. First, do you have an opinion, yes or no?

A. Well, during this process, yes, I've formed an opinion on that.

Q. All right. And what is that opinion?

MR. WELTER: Same objections.

THE WITNESS: Well, my opinion is that -- that use of chemical hair relaxers is a causal factor in -- in ovarian cancer and uterine cancer.

MR. SHIPMAN: All right. Thank you, sir. That's all the questions I have.

MR. WELTER: No further questions.

THE VIDEOGRAPHER: Off the record at

5:15 p.m. This concludes the deposition of Stanley Atwood.

- - -

(Read and sign reserved.)

- - -

(Deposition concluded at 5:15 p.m.)

- - -

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS HEREBY STIPULATED AND AGREED that all objections, except as to the form of question, will be reserved to the time of trial;

IT IS HEREBY STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

CERTIFICATE OF REPORTER

STATE OF NORTH CAROLINA )
) ss.
COUNTY OF WAKE )

I, Christine A. Taylor, Registered Professional Reporter and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location in this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof. Witness my hand, this 10th of March, 2026.

Christine A. Taylor,
Registered Professional Reporter
Notary Public 19960530077
State of North Carolina

GARY K. SHIPMAN, ESQ.
gshipman@shipmanlaw.com

RE: All MDL Hair Relaxer Cases v. Hair Relaxer
3/6/2026, Stanley T. Atwood , MS (#7935153)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at P1hairdepos@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

All MDL Hair Relaxer Cases v. Hair Relaxer

Stanley T. Atwood , MS (#7935153)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

_______________________________________  __________________

Stanley T. Atwood , MS                                Date

All MDL Hair Relaxer Cases v. Hair Relaxer

Stanley T. Atwood , MS (#7935153)

ACKNOWLEDGEMENT OF DEPONENT

I, Stanley T. Atwood , MS, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Stanley T. Atwood , MS Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 3:4,21 4:2,21 5:2,13,19

**0**

**00818** 1:5

**1**

**1** 3:22 6:10 13:5,9 14:18 17:13 91:8,13 91:14,15 198:17,24 226:4 259:12 259:16 287:2
**1,4** 49:13 268:19 270:16 271:24 273:19 273:20,24 274:15 275:20 277:4
**1.3** 222:21
**10** 7:6 15:13 42:25 237:8,9 237:12,13,16 237:19 284:24 286:4,6 287:2 290:17 292:8 336:4
**100** 4:9 45:21 55:6 82:25 273:2
**10020** 3:23
**106** 3:5
**10:02** 62:22
**10:04** 62:22,24
**10th** 354:16
**11** 7:9 237:13 237:16,20 290:4,5
**115** 6:22
**1195** 251:12
**11:04** 113:6,7
**11:22** 113:7,9
**12** 7:12 248:14 248:17,18,22 284:8,12,14 285:1,17,21 290:5 314:15 336:4
**12:57** 191:4,5
**13** 6:10
**14** 6:12 287:2
**1400** 5:4
**141** 5:3
**14203** 3:16
**146** 7:1
**15** 42:25 78:18 287:2 305:21 306:22 337:12
**1505** 5:14
**16** 6:13 290:9
**18,000** 317:12
**1825** 3:9
**185** 83:1
**19** 287:3
**1900** 2:6 4:3
**191** 4:22
**195** 6:15
**1965** 210:2,3,3
**1980s** 158:5
**1993** 17:20
**19960530077** 354:21
**1999** 29:9 307:19
**1:23** 1:5
**1:35** 191:5,7
**1st** 16:22 34:15 36:3 66:21 195:4 205:10

**2**

**2** 6:12 14:15,19 63:3,5 65:24 66:4 115:19 147:3 148:6 194:5 245:17
**2-1/2** 225:25
**2.5** 222:22 226:1
**20** 21:23 28:5 45:10 78:21,21 88:25 102:2,18 160:8 286:21 287:3 291:23 357:15
**200** 45:21
**2000** 307:18
**2000s** 28:15,16
**20036** 3:10
**2005** 28:16
**2007** 19:12
**2008** 80:24
**2010** 28:16 155:24 156:23 161:15,23 166:9,19 167:7
**2012** 318:18
**2015** 103:20 104:5,10 105:11,13 106:3,19 169:24 310:18 324:15
**2018** 45:15 80:8
**202.335.2600** 3:10
**2020** 122:18
**2021** 19:13 20:14 232:13 241:24 245:2 248:23 251:11 252:17
**2022** 17:23 20:18 116:12 223:17 227:24 245:14,15 254:23
**2023** 14:25 15:3 17:20,22 21:16 245:16

245:17 254:23 255:7 346:1
**2024** 155:18
**2025** 34:16 36:3 66:22 83:12 103:7 104:11,13,25 105:12,17 115:14 117:2 117:11,18,20 155:12 195:4 198:17,24 256:24
**2026** 1:15 2:1 8:4 14:25 15:7 354:16
**21** 102:8 245:1
**212.989.8844** 3:23
**214** 7:3
**21572** 354:19
**22** 23:8,15 155:13
**225** 5:9
**23219** 4:17
**237** 7:6,9
**239** 255:8,11
**24** 180:23
**248** 7:12
**26** 145:12 270:8 271:17
**28** 346:25
**2801** 3:22
**28405** 3:5
**29** 155:7
**2950** 4:22
**296** 244:11
**297** 211:12,13 244:1

**3**

**3** 6:13 16:1,3,6 16:11 109:8 147:3 259:5,10 259:16
**3.4** 101:21
**3/6/2026** 355:5
**30** 17:20 45:11 355:16
**300** 4:13
**301** 2:6
**303** 4:13
**3060** 1:6
**312.6066.7805** 5:10
**312.752.5241** 4:14
**312.767.1314** 4:23
**312.850.2651** 5:5
**312.855.1105** 4:4
**314.241.2018** 5:15
**31st** 14:25
**34** 6:16
**35** 268:9
**350** 6:4
**39** 197:10
**3:00** 281:8
**3:21** 276:19,20
**3:33** 276:20,22

**4**

**4** 6:15 94:5 109:7 147:22 161:23 195:12 195:16 204:2 204:11,25 287:2
**40** 9:11
**41** 155:18
**45** 168:8,13
**450** 84:16
**49** 193:20 194:4 201:19
**4:00** 281:8

**5**

**5** 6:16 34:3,7 35:14 63:2 66:4 102:9 240:23 255:9 255:12 287:2
**50** 23:16 136:5 136:16,16 314:8
**51** 15:8
**512.476.7834** 4:10
**575** 3:5
**5:08** 349:21,22 349:22,24
**5:09** 350:9,10
**5:13** 350:10,12
**5:15** 352:1,6

**6**

**6** 1:15 2:1 6:18 8:4 80:3,4 335:14
**6.1** 145:15 270:8
**6.2** 155:11
**60** 170:1 310:23 344:9
**60604** 5:4
**60606** 4:4,13,22 5:9
**63101** 5:15
**65** 244:2
**665** 3:15
**69** 194:17,19

**7**

**7** 6:22 101:20 115:6,9,12
**7.1** 268:12
**7.3.4** 194:5
**70** 194:20 196:15
**700** 3:9 5:9
**701** 5:14
**716.566.5400** 3:16

**74** 249:6,14,15 249:16,18
**78701** 4:9
**79** 279:18 288:19 289:12
**7935153** 1:25 355:5 356:2 357:2

**8**

**8** 6:3 7:1 15:13 146:16,17,18 146:20,23 222:22
**8-2** 207:12 213:25
**8.2** 207:12
**80** 6:18
**800** 4:9,17
**804.775.1050** 4:18
**81** 32:14

**9**

**9** 7:3 142:9,14 210:11,23 214:25 217:13 287:2
**90** 221:23
**90s** 310:7
**910.762.1990** 3:6
**93** 21:6
**95** 221:23
**9:00** 2:1 132:17
**9:01** 8:5

**a**

**a.m.** 2:1 8:5 62:22,22,24 113:6,7,7,9
**ability** 72:2 106:24 190:13 323:24 354:13
**able** 10:16 21:11 30:16 46:7 47:14 60:11 65:15,20 77:9,13 81:18 81:25 84:5 89:22,24 107:14 153:2,3 240:3 242:13 248:11 286:24 322:1,10,16,17 322:22,24
**above** 355:6 357:7
**absence** 165:2 244:22
**absent** 244:6 258:21
**absolutely** 37:24 65:3 111:10 244:20 268:3 276:8
**absorb** 67:19
**absorbed** 67:14 69:8 75:13,22 76:10,23 85:17 85:23 86:2,18 86:20 87:7 90:16 91:4 120:14 165:22 166:5,13 167:10,17,25 179:20 260:11 260:15 265:2 293:4 295:19 297:19 298:15 299:6
**absorption** 23:1 67:16,20 76:2 77:20 78:1,8,12 178:2,6 292:19 293:2 294:1 295:9 298:7,10 298:11,12,24 298:25 329:7 334:7,22
**abstract** 286:20
**accept** 220:22
**acceptable** 209:16 212:17 214:4 307:9 312:12 320:7
**accepted** 217:23
**access** 38:6 58:18 59:11 60:4,11 63:6,7 63:12 64:12,19 64:22 65:2 66:5 118:14
**accommodate** 11:18
**accomplish** 221:13 271:13
**accumulate** 190:14
**accumulation** 347:1
**accuracy** 198:16,25 355:9
**accurate** 80:22 199:7 228:8 354:12
**accurately** 198:10
**achieve** 275:2
**acid** 69:21 143:12 171:23
**acidic** 335:13
**acids** 30:21 342:5
**acknowledge** 317:21
**acknowledge...** 357:3
**acknowledg...** 355:12
**acronym** 129:10

**act** 112:24 142:1
**acted** 197:23
**action** 27:2 250:22,22
**active** 193:7 305:20 320:22
**activities** 76:21
**activity** 149:3
**actual** 41:6 217:25 273:12
**actually** 21:6 26:24 42:13 46:8 69:4 70:4 76:3,10,23 90:10 99:24 100:4 105:20 114:24 123:6 124:2 133:25 134:10 135:11 136:9 137:16 147:3 152:3 172:3 181:5 194:18 197:17 199:18 251:5 255:9 259:11 297:19 298:15 313:11 321:12 322:10 334:6 336:10 343:2
**acute** 123:20 290:25
**ad** 293:22
**add** 288:22
**added** 33:16 59:19 148:18 340:13,13
**adding** 69:20
**addition** 50:7,8 55:14 251:25
**additional** 35:19 46:24 83:18 117:12 316:12 347:7
**additionally** 63:7
**additions** 16:21 357:6
**additive** 342:14 343:5 344:21
**address** 44:16 92:23 93:1 96:20 97:24 119:16 165:11 166:10 200:4 205:6 245:9 287:6,8 289:5 295:3 301:11 305:22 331:2 332:4 333:18 338:7
**addressed** 106:1 124:18 130:20 166:8 176:22 197:4 214:13 252:18 253:19 256:19 293:13 297:1 305:13 343:19
**addresses** 201:10 207:13 210:25 250:15 346:2 347:25 348:17
**addressing** 35:7 37:16 96:2 98:3 122:13,21 156:12 197:7 200:5 201:2 207:21 264:11 305:15 316:22 343:8 345:3
**adds** 246:2
**adjacent** 179:13
**adm** 296:23
**adme** 292:12 292:21 293:17 293:22 294:6 294:22 295:7 295:25 296:5 297:2,9 298:6
**admit** 199:14
**adopted** 308:8 308:17 309:1
**adoption** 309:6
**adult** 251:23
**adulthood** 286:11
**advanced** 5:12
**adverse** 122:1 123:7,16 124:11 128:21 129:9 173:1 174:9 200:7 217:15 255:20 323:16 329:13
**afam** 2:5 3:12
**affect** 76:1 329:7
**affected** 319:6 322:13
**affiliated** 20:3 20:9
**affiliation** 20:14
**affiliations** 19:11 20:20
**affinity** 121:12
**african** 253:8
**afternoon** 191:9 230:5 336:6
**age** 229:25 282:6 291:17
**agencies** 110:5 172:25 312:4
**agency** 9:14 49:20,21 133:9 164:22 308:24
**agent** 69:20 134:9 324:1 330:24

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 363 of 449 PageID #:73064



**agents** 24:2 27:15 31:17 159:2 272:17 329:16
**ages** 43:12
**ago** 9:11 14:21 34:11 190:21 239:16 322:15 338:21
**agree** 125:5,6 127:22 128:1 130:23 133:7 134:20 135:3 139:3,18,23,25 140:3,18,23 141:7,11 158:25 159:5 159:10,15 160:25 162:24 163:5 164:8 171:18 173:11 176:1 178:1 199:4 207:16 213:1 217:12 223:5,6 250:3 254:5 273:2 316:24 318:17
**agreed** 110:3 228:13 239:13 338:3 353:2,7 353:10
**agreement** 203:18
**ahead** 10:9 37:25 39:4 98:17 103:6 161:21 188:12 204:7
**aided** 108:12
**aimed** 316:21
**air** 68:2 69:5,6 70:6 71:1,2 72:14 140:4,10 142:23 143:2 166:12,14 188:6 260:21
**airborne** 71:19 72:2 177:16
**al** 145:25 197:12 346:1
**alkyl** 171:24 172:1
**allen** 5:13
**allergens** 155:20
**allotted** 355:19
**alopecia** 332:23
**alsohaimi** 270:20,23 272:4,7,15
**alternate** 330:9
**alternative** 324:19 326:23
**alternatives** 256:1
**alyssa** 5:20
**ambient** 140:8
**amended** 13:9
**american** 20:23 253:8
**aminobenzoic** 171:23
**amount** 44:20 135:19 164:10 298:14
**amounts** 139:20 159:17
**analysis** 30:1 45:13 50:4 76:8,25 83:16 93:22 97:6 150:17 155:22 172:9 202:3 208:8,11,20,21 208:23 209:12 209:13 213:21 214:3,5,10 215:15 216:8 216:14,18,21 216:25 217:6 224:3,5 236:11 239:14 240:18 259:18 264:6 264:10 293:7 293:22 294:6 294:10,22,24 295:7,21,25 296:6,23,25 297:4,10,16,23 298:7,13 299:10,16,20 300:13,19 301:4,24 302:5 303:22 306:18 307:2 310:19 315:2,10 316:3 317:9 322:7 323:16 324:18 327:5 330:18 341:1 344:7,20 345:12,18 349:11
**analytical** 273:13
**analyze** 76:21 81:18 259:17 324:19 326:1
**analyzed** 77:20 81:4 231:13 273:17 343:3 345:20
**analyzing** 81:15 212:18 225:8 326:20
**anderson** 4:21
**animal** 22:25 30:18 32:11 89:11 108:22 133:13 135:16 138:6 168:18 280:4 303:24 303:25 313:4 315:23 320:10 322:23,24

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 364 of 449 PageID #:73065



**animals** 123:22 135:22 136:2,5 138:1,24 247:3 292:5 313:14 314:8 320:11 320:14,18 322:12,25 341:15 342:1 343:23 344:2
**answer** 10:19 10:24 11:3 33:9 36:24 37:23 38:1,15 38:21,22,25 39:1 43:22 44:7 45:11 46:2 47:4,19 55:21 58:15 64:14,23 68:8 68:24 72:18 107:3 117:24 122:7 123:1 124:6 125:18 128:13 129:18 130:4 151:23 160:23 161:4 163:15 164:16 171:14 176:15 177:8,9 182:17 186:17 192:18 203:9,14 204:8 205:15 208:16 213:14,16 216:3 226:20 226:22 227:3 227:13 228:18 230:17 231:8 231:10,18 232:1,4 261:3 261:4 274:2 287:19 289:6 291:3 298:4 321:10 348:12
**answered** 315:5
**answering** 181:17 293:9 296:23 312:15
**answers** 11:6 137:10 258:1 274:5
**anticipated** 156:15
**anybody** 203:8 203:13 344:19
**anybody's** 203:23 345:21
**anyway** 237:7 293:9
**aop** 129:9
**apologize** 75:5 88:23 104:1 291:2
**apparently** 286:23
**appearances** 3:1
**appears** 29:7
**appended** 357:7
**apple** 164:11
**applicable** 68:1 355:8
**application** 75:8 104:16 125:20 142:24 143:5,9,23 175:10 179:15 181:12 212:1 260:6 298:4 309:16 330:23
**applied** 40:13 40:20 41:3,25 42:14,19 67:10 73:19 78:2 85:16,22,25 86:8 89:9 97:1 104:5 106:6,13 106:19 107:25 108:20 143:1,6 144:19 148:15 149:7 166:1 207:20 218:19 260:1 297:17 300:4,6 312:20 329:2,5 331:16 333:3 337:12 337:17
**applies** 311:11
**apply** 97:13 180:22 214:4 218:15 219:21 303:5,8 312:12 328:4 339:5
**applying** 29:21 69:4 71:3 75:13 110:20 124:20 143:11 177:4 225:11 331:23 336:22
**appreciate** 9:21 14:12 16:4 31:25 38:16,23 44:7 46:2 47:4 47:5 53:6 94:4 124:6 129:18 137:8,10 170:12 183:21 213:18 224:21 228:18 230:9 230:13,15,21 236:21 254:19 267:19 344:15
**approach** 30:11 105:22 221:12,25 224:2 303:6 305:9 306:8 309:12 312:13 312:21 316:9 316:13 318:5 319:12 321:17 342:2
**approaches** 122:23 136:20

136:21 317:2
**appropriate** 72:25 79:12 122:24 209:6 213:13 235:12 305:16 315:19
**approximately** 15:6 23:16 37:10 239:7
**area** 114:4 257:6 305:20
**argument** 338:13
**aromatic** 304:6
**arrange** 215:3
**arrow** 201:20
**article** 6:18,22 7:3,6,9,12 332:11
**articles** 332:10
**ashcraft** 3:8
**ashcraftlaw.c...** 3:11
**aside** 13:1 14:18 47:22 106:12 119:13 144:11 312:19
**asked** 33:11 37:15 38:12 39:1 44:15 67:9 86:6 91:10 110:23 118:4 119:2 163:8 176:14 184:7 227:11 263:14 284:7 284:19 287:1 288:10 295:4 301:24 312:25 328:23 350:15 350:19
**asking** 9:4 11:24 12:2 14:1,2,11 74:16 76:14 100:20 177:11 184:8 192:12 214:2 254:20 277:1 285:1 288:23 320:5 345:10
**aspect** 213:11 214:16 246:20 281:25
**aspects** 21:10 28:18 77:25 108:25 170:2
**assess** 30:5 54:7 91:18 92:11,13 96:25 97:12,19 106:13 125:13 153:21 172:7 199:21 207:17 211:16 212:13 216:8 217:13 219:22 349:13
**assessed** 113:18 172:25
**assessing** 106:7 106:20 178:22 221:14 235:21 305:9
**assessment** 26:10,18,22 27:1 52:12 78:7,16,20,23 78:23,25 79:10 123:11 124:19 136:19 228:13 228:13 236:1 239:12 292:21 293:18 299:25 300:3,10 302:5 302:5 305:17 306:11,20 307:3,7,15,24 308:10,25 309:1,4,25 310:1 311:21 315:22 320:8 326:22 333:8 338:4 341:5 342:4 344:11
**assessments** 78:18,22 89:2 302:9 306:25 307:21
**assessor** 26:20 306:22
**associate** 17:14
**associated** 6:19 92:4 93:10 104:19 126:19 133:18 134:13 136:23 137:25 152:15 156:11 157:9 173:20 194:11 225:2 252:1 253:9 347:1
**association** 7:4 111:23 114:5 119:4 138:2 169:1 171:1,10 184:10,16 185:3,21 194:24 195:23 197:12 199:6 200:16 205:23 206:20 212:5 213:22 217:14 217:18,25 218:6,14,18,21 219:14,14,16 219:19,20,23 220:4,5,9 221:17 222:1,6 223:2,7,18 224:17,18,23 225:3 227:25 228:22 229:4,7 231:6 232:10 232:15 233:11

234:11,24 235:1,11,22,24 239:6,17,21 240:1 248:2,3 253:20 254:6 262:12,24 278:18 279:15 316:17 339:14 340:24
**associations** 224:8 225:13 225:14 226:9 233:20 347:9
**assume** 12:6 41:1,14 56:23 82:21 88:16 162:19
**assumed** 57:15
**assumes** 152:20
**assuming** 52:18 78:14 85:14 88:3 90:21 127:3 177:24 188:18 303:5
**assumption** 71:14 123:12 123:18 285:5,9 311:22
**assumptions** 79:1 319:21
**asthma** 6:19
**atmosphere** 140:21 144:19 277:18
**attached** 355:11
**attempt** 21:12 21:14 128:24 152:10 175:11 326:22
**attempted** 29:17
**attend** 28:11
**attention** 203:8 203:13,23 271:16 319:16
**attesting** 198:25
**attorney** 9:3 15:19 61:5 355:13
**atwood** 1:14 2:2 6:11,13,15 6:17 8:8,16,18 8:24 10:5 25:14 38:11 39:7 58:10 60:23 63:1 68:9,23 79:17 113:11 146:24 155:2 170:12 191:9 206:13 209:25 215:3 226:20 227:13 230:4 237:19 238:6 248:21 254:18 263:14 270:24 276:24 296:4 350:1,15 350:23 352:2 355:5 356:2,24 357:2,4,12
**atwood's** 210:20
**austin** 4:9
**author** 116:11 232:13 328:14
**authored** 17:3 29:13
**authority** 144:16 166:4 167:8
**authors** 77:19 80:23 81:16 85:2 114:12 116:10,14 117:1,14 119:11 223:17 227:24 231:5 232:14 233:10 250:5 251:3,20 269:18 285:21
**automobile** 140:23
**available** 22:21 57:16 77:8 103:13,16 108:4,6,7 112:4 117:14 118:5,6 123:14 127:10 135:15 135:16 136:14 151:10 154:1 156:13 158:2,7 161:24 168:13 209:7 218:20 253:14 254:12 277:17 300:21 312:17 321:25 339:10 343:10 355:6
**avenue** 4:9
**avlon** 4:1
**aware** 37:21 57:9,14 60:3 79:18 104:21 110:1 119:18 124:16,17 129:21 130:4 130:17,22 141:15 169:15 171:8,9,15 172:24 173:9 176:5 184:1,5 185:2,23 187:6 190:2 215:16 252:22 256:6 257:15 266:24 275:17 278:16 279:11,14 307:14 308:23 312:9 316:8 331:5 333:20 344:19 345:5 345:10,17 347:22

## b

**b** 3:14 6:8 33:3 33:8,18 35:13
**back** 32:14 35:3,18 43:22 45:16 53:22 54:14,22 67:6 67:12 73:6 84:2,3,12 89:3 89:6,24 92:19 105:21 107:20 123:4 129:20 134:17 141:21 142:5 149:22 152:9 154:20 161:14 162:16 174:4 176:10 177:7,9 180:17 183:3 185:15 189:9 197:1 198:2 199:13 202:18 215:4 228:20 240:2 243:23 245:24 246:4 250:14 250:17 257:21 267:1 268:1,21 270:6 276:15 278:21 282:12 283:8,22 285:17 291:11 301:8 305:16 306:4 311:20 332:20 337:22 338:20 339:16 344:18
**background** 7:2 155:25 314:24 329:21 336:19 350:24
**bacon** 3:21
**bacterial** 24:2
**bad** 106:10 272:20
**bailey** 115:14 116:14 117:1 117:15 118:21 206:8 256:24 328:10
**barber** 42:7
**barlow** 37:6,9
**based** 30:19 44:17 49:19 51:2 57:19 69:21 78:25 83:13 87:5 88:8,17 89:9 95:5 96:3,14 96:16 100:18 122:7 128:24 136:13 144:25 145:19,24 149:23 150:22 151:4 152:25 153:7 154:6 157:4 162:25 163:6 177:21 177:21 182:25 186:5 187:23 190:19 205:12 216:8,14 220:20 221:19 221:24 239:20 248:10 258:20 263:10 265:3 266:8 274:19 275:23 276:1 283:19 286:6 289:9 303:10 309:7 315:22 320:10 324:4 327:24 328:1 332:1 337:1 340:10 342:1,2 350:23,24
**basic** 39:9 72:6 107:9
**basically** 22:20 64:5 78:13 92:19 97:15 111:15,20 112:11,21 125:19 158:10 209:6 220:21 273:22 275:7 287:1 290:14 291:11 299:4 300:9 323:24 329:1 330:21 338:16
**basing** 281:18
**basis** 61:22 62:1,4,6 64:16 186:25 337:17 339:1
**beauty** 4:6 5:1 5:12
**becoming** 71:8
**beginning** 27:14 43:11 150:13 325:6
**begins** 109:10
**behalf** 2:4
**believe** 13:18 34:6,21 49:10 99:4 100:20 109:3 111:2 116:17 155:5 165:20 183:3 184:15 192:14 197:5 206:6 208:10 225:18 225:24 227:19 232:9,22 249:18 263:12 264:21 266:17 266:19 272:18 283:6,18 286:11 291:18 299:15 312:2 328:14
**believed** 309:21 310:17

**bell** 4:6 5:1
**ben** 259:6,9
**benchmark** 136:22 307:5
**benign** 197:7 197:15 199:16 200:14
**benzo** 258:24
**benzophenone** 258:14,25 259:5,10,11,12
**benzophenones** 48:23 70:9,22 146:1 258:4,12 259:17,21,23 260:5,9,18,20 261:2
**berman** 5:19
**bertrand** 7:9 196:16 205:24 207:7 227:23 228:21 229:3,6 231:4,21 232:6 232:7 236:12 236:15,17 237:14,20 238:22 239:17 240:21,24 241:7,9,14 245:9,16 246:12 248:3 248:12,24 249:7 250:4 251:4 254:22 254:23 255:1,5 255:7 256:7,16 256:20 257:13 282:1,16,16 286:18
**best** 14:7 16:19 34:18 106:23 108:3,5 168:11 230:24 276:3 354:13
**better** 36:21 252:11 280:19 321:1
**beyond** 30:24 31:1 65:10 82:5,7 87:3 92:23 209:12 351:7,7
**bi** 277:13
**bias** 218:10 325:18
**big** 327:10
**bind** 120:16
**binder** 12:11 12:11
**binding** 120:19 121:4,11,13 125:3,11 182:9
**binds** 127:3
**bioaccumulate** 190:10 301:1
**bioaccumulat...** 295:17
**bioassay** 133:14
**bioassays** 185:11 314:7
**biologic** 117:3
**biological** 29:25 43:18 44:13 45:3 46:11 47:10 51:13 52:1 53:2 54:7 55:13 56:4 59:25 78:1 88:2,13 91:19 92:24 94:7 95:2,5,9,24 96:6,11,25 97:12,14,25 98:3 99:11,19 100:9,15 106:1 106:8,14,20 107:22 109:14 109:22 110:10 110:17,19 111:1,19 112:7 112:19 113:18 114:9,14,22 116:2 117:3,13 118:22 119:3 119:16 120:2 151:18 152:20 156:12 157:16 174:1 175:4,20 186:1 190:4 192:15 193:14 199:22 200:5 201:2,5,25 202:8,8 206:10 208:3 213:11 213:20 214:15 215:23 236:5 258:16 264:15 287:15 288:6 288:20 299:17 312:22 324:18 327:23 328:2 334:13 338:7 339:3 341:1 343:8 345:4 350:17
**biologically** 52:21 53:11 54:17 99:2,5 101:14 111:18 112:5 280:5 281:11 330:15 348:18 349:9
**biologist** 18:10 36:14
**biology** 24:11 130:20
**birther** 114:19
**bit** 11:16 24:3 44:24 54:5 92:23 93:17 103:23 123:2 131:17 165:16 174:19 182:19

183:25 190:13 196:7 207:9 217:19 224:24 238:6 268:2 271:16 280:18 282:12 306:1
**black** 6:21 7:11 232:8 247:14 286:9 332:24
**blank** 243:10
**blood** 89:23 132:14 176:19 180:8,12,19 323:21
**bloodstream** 86:22
**blow** 148:17 149:1
**board** 17:17,20 20:23
**bodies** 139:21
**body** 67:14 69:9 70:22 73:5 75:13,23 76:7,10,24 77:21 85:18 86:3,18,20,21 88:4 89:3,15 89:23 91:4 100:18 112:24 120:15 125:12 126:23 130:24 131:7 132:17 176:10,20 178:10,10,20 179:1,20 181:5 181:25 188:19 189:8,13,24 265:25 293:4,5 295:19 296:19 297:19 298:16 298:25 299:7 299:24 300:16 301:1 319:5 330:13 331:8 349:7
**bonds** 39:18 330:8
**book** 210:21 257:19
**boss** 28:4 296:3
**bottles** 186:19
**bottom** 63:3 194:19 255:9 268:12,17 271:19
**boulevard** 5:3
**bound** 262:6
**box** 73:12
**bradford** 7:3 29:22 95:9,10 96:12 110:20 207:10,16,20 208:4,8,11,19 208:20 209:13 209:16,20 210:2 211:17 212:17 213:8 213:21 214:3 215:11,15,21 216:7,9,16,18 216:21,25 217:6,13,24 218:4,12,25 219:22 224:5 233:25 234:2,7 235:10 236:11 238:18 241:17 242:7,11 243:1 243:21,24 257:19
**bradley** 4:21
**branch** 116:25 171:25 172:18
**branching** 262:7
**brazilian** 147:12 148:1 149:19
**break** 11:16,20 111:8 113:4 159:2 196:6 271:15 276:7 276:14 283:10 319:21
**breaking** 191:1 330:6,7
**breaks** 39:18
**breast** 94:17 128:19 178:17 179:10,10,12 194:14 206:7 212:2 328:17 328:19 347:2,3
**breath** 188:8
**breathe** 140:5 140:19
**brian** 5:8
**brief** 9:18 22:7 22:7 209:8
**briefly** 57:18 58:20,23 207:11 277:5
**bring** 112:25 123:4 157:6 203:7,12,22 204:6 210:19
**briordan** 5:10
**broad** 23:17 24:2 104:20
**broaden** 121:18
**broader** 94:14 97:5,9,20 120:11 213:21 214:3 309:15 327:18
**brominade** 30:22
**brought** 13:17 309:8
**budgetary** 81:17
**buffalo** 3:16
**bullet** 194:5 279:20

**bunch** 24:25 269:17
**burn** 334:11
**burning** 303:16 333:9
**burns** 331:19 331:23,25 334:7 336:22
**butylparaben** 174:8
**byproduct** 49:25 263:8,16 263:22 266:14 266:20 267:6 277:6,8,12 278:12
**byproducts** 30:16 193:7 268:18 270:14 271:25 275:16

**c**

**c** 6:1 8:1
**calculated** 221:20
**california** 45:15 57:22 82:18 83:6 145:24 146:8 146:12,18 147:18 148:6 149:9 154:3
**call** 12:12 45:23 48:4 60:18 132:4 188:4 243:11 262:8 340:9
**called** 9:11 129:9 135:24 136:15 170:9 201:21 300:25 304:18 320:15 325:18
**calling** 323:23
**canal** 4:17
**cancer** 7:8,10 7:13 18:10,25 22:13,15,25 27:6 30:6,18 36:13 46:20 49:21 52:23 53:14 54:9,19 88:5 91:21 92:13 93:12,12 94:10,15 95:15 95:21 98:9,24 100:5,12 101:6 101:16 103:2 106:22 108:23 113:19 114:16 115:16 116:3 117:5 118:23 120:3 121:23 125:4,14,23 126:18 127:2,5 127:19,22 128:10 129:6 129:16,23 130:16,21 131:4 133:18 134:1,13,23 135:11,16 136:14 137:17 137:25 138:17 138:23 151:20 156:12,21,25 158:22 169:2 169:20,24 170:3 171:2,11 179:10 184:11 185:4,11,22 194:13,14 195:24,25 196:25 199:7 199:15,19,22 199:25 200:11 200:22 201:6 205:24 206:5,6 206:7,23 208:21 209:4,4 212:3,8,13,13 212:19,20 213:2,4,5 218:22 223:19 228:1,23 229:8 229:19 232:16 232:21 233:12 234:14 238:23 239:3 241:20 241:22 242:4 245:2,7,9 246:19 247:11 251:25 252:2 252:12,17 253:10,15,17 253:20 256:5 257:4,7 262:13 262:25 278:19 279:16 280:7 281:13 283:9 283:15 285:24 286:1,16 287:16 288:7 289:7,10 290:18 302:4 307:5,12,15 308:9,25,25 309:3 312:8 313:6,15 314:7 328:3,4 330:14 330:16 339:4,5 339:15 341:5 341:14 344:10 347:1 351:5,20 351:21
**cancerous** 179:12
**cancers** 6:25 94:9,13,23 128:16,19 131:5,12 141:24 194:25 200:25 208:22 209:17 210:13 210:14,15,16 211:16,25

212:12,14,18 224:19 257:3,8 257:10,12,17 328:12,18
**capable** 177:16
**carcinogen** 49:3,16 50:3 126:8,9,14 134:21 135:4,9 135:14 137:15 137:23 156:15 156:16 157:21 158:18,21 169:10 170:9 258:9 261:13 266:3,6 279:5 302:5 311:23
**carcinogenesis** 142:3
**carcinogenic** 134:9 168:5 169:16,19 170:8 271:24 311:19
**carcinogenicity** 133:9,15 168:14,18 201:22 202:1,4 261:17
**carcinogens** 22:11,12 25:1 25:3 49:5,6 55:25 56:19 102:4,15,17 125:21 128:2 131:18,20,20 132:4 133:6,8 133:25 138:16 138:23 142:4 155:25 162:4 168:23 173:25 311:12,18 341:20 342:1
**care** 16:7 83:21 85:22 114:1 183:19,23 190:22 252:10 265:18 266:18 266:23 272:15 277:25 325:9 326:18 328:5 334:20 335:7 336:20 338:22 339:5,20 340:10 346:7
**career** 9:9 17:5 26:8,9,15,18 27:5 78:18 97:17 103:19 169:15 306:23
**carolina** 1:16 2:7 3:5 20:3 354:2,6,21
**carrier** 187:22
**carriers** 183:20
**carrying** 99:3,5
**cars** 140:24
**case** 1:5 8:6 13:11 15:7,23 18:21 30:13 37:2 57:10 59:16 60:2 67:3 77:2 79:8 87:10 88:3 89:13 91:1,18 93:8 95:5 96:22 103:15 104:4 107:19 138:13 156:11 157:9 158:15 165:4 173:21 185:14 192:19 210:13 212:12 218:3 222:9,25 224:4 225:9 227:22 228:11 234:13 247:19 259:18 280:12 298:2 299:14 299:19 304:2 311:4 324:13 325:4 327:2 339:13 341:6 347:20 350:25 351:10
**cases** 8:7 15:16 23:19,20 89:18 158:9 229:13 229:21 239:7 239:25 243:4 248:11 250:19 307:1 313:10 341:18 355:4 356:1 357:1
**catalytic** 140:24
**catch** 202:25
**categories** 153:17
**category** 48:15 48:23 49:17 50:3,3 263:17 266:4 275:6
**caught** 205:17 205:18
**causal** 114:5 131:14 134:17 169:1 171:1,10 184:10 185:3 185:21 218:9 262:12,24 278:17 279:15 351:20
**causality** 30:5 96:2 99:7,11 207:17,22 216:8 243:5,7
**causation** 7:5 95:13 97:6,19 98:7,22 125:23 138:2 219:22 344:10 350:18 351:9
**causations** 98:8

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 372 of 449 PageID #:73073



**causative** 100:24 112:8
**cause** 52:22 53:13 54:18 91:20 94:9 98:9 99:25 100:11 123:24 134:23 135:11 138:17,23 141:18 151:19 182:1 200:8 212:8 288:7 319:18 328:3 351:4 354:15
**caused** 158:21 169:20
**causes** 95:14,20 98:23 100:5 101:6 133:25 137:16 139:22 156:21,25
**causing** 46:20 88:12 141:24 141:24 200:6 201:16 329:14
**caustic** 143:11 329:5 330:24
**caveat** 11:18
**cavo** 4:12
**cell** 127:19 131:6
**cells** 126:4 127:17 280:4 322:25
**cellular** 76:4 127:5,15 173:22 181:13 201:4 323:10
**certain** 13:11 47:25 78:3 89:19 97:1,13 112:25 136:23 139:15 174:18 189:21 218:22 320:12
**certainly** 19:5 19:21 31:15 33:23 37:19 38:3 39:23,24 40:25 53:19 58:4 67:20,25 70:15 71:21 74:17 77:11,14 79:9 81:9 85:20 87:2 94:16,17 99:14 114:3,25 121:1 122:5 125:9 126:18,20 128:14 131:1,5 134:3 139:7 144:6 161:13 165:25 169:8 183:13 187:19 193:2 198:8 213:12 215:16 215:21,25 223:25 227:14 227:17 244:9 247:7 250:19 254:9,11 289:5 301:12 305:14 306:14 307:17 307:22 309:16 316:15,18 317:5,23 318:7 319:2 321:7 329:7 330:6 332:22 337:7 337:19 342:25 347:24
**certainty** 138:9 280:2 351:3
**certificate** 17:13 354:1
**certification** 20:25 21:16,20 353:4
**certified** 17:17 17:20 20:22
**certify** 354:6,14
**cetera** 275:4
**cgw** 5:5
**chain** 171:25 172:1,17,17,19
**challenges** 324:24
**chance** 186:20 218:10 221:7
**chang** 7:6 116:11 117:2 152:13 196:16 205:24 207:7 223:16 224:6 225:1,17 226:9 226:16 227:7 227:19 236:11 236:14 237:13 237:19 238:22 239:20 241:9 245:6,8,13,19 246:11 248:2 248:24 249:7 250:4 251:3 254:21,22 255:5 282:13 283:5,6,17,19 286:14 328:16
**change** 120:6 127:4 138:25 151:2 171:24 175:20 176:18 176:21 185:25 186:7 196:3 264:15 289:16 310:3 329:25 330:22 335:2 356:4,7,10,13 356:16,19
**changed** 23:9 27:13 195:22 212:11
**changes** 127:7 198:22 204:25 322:19 323:2 323:11,15,21

355:10 357:6
**changing** 329:23 330:17
**chapter** 19:22
**chapters** 19:23
**characteristics** 121:7 125:21 126:17 127:11 128:24 173:24
**charged** 240:17
**chart** 84:16 86:10
**chayban** 5:20
**cheatham** 4:7
**cheeses** 141:13
**chem** 53:11,12
**chemical** 6:23 39:14,17,21,25 40:2,5,14 41:7 41:9,19,24 42:13,19 43:2 43:17 44:11 45:1,8,13 46:9 46:10,18,19 48:21 50:25 51:6,11,25 52:5,18,22 53:8,12 54:8 54:15,18 55:6 55:18 56:3 57:4,12 59:5 67:7,14,22,24 69:7,12,24 70:11,23,24,25 71:1,8,15 72:7 73:11,23 74:18 74:19 75:9,25 76:9,23 77:3 77:18,21,24 80:16,21,23 81:2,9 82:8,12 83:8,16,20,25 84:7 86:19 87:6 88:9,14 88:17 89:10,14 89:20,22 90:10 91:19 93:18,20 93:21,24 94:2 94:8 95:14,20 98:8,23 100:4 100:11,23 101:5 106:8,21 112:23 114:15 115:15 120:13 129:2 134:21 135:4,8,20 141:22 143:1,6 143:23,25 144:17 145:3 148:8 149:11 150:5,11,16 151:8,14,17 152:22 153:8 153:16,21 155:19,21 156:9 163:5,11 164:4,19 165:13 167:24 171:19 172:3 174:20 175:10 175:13,18 176:25 177:15 177:24 178:4 179:18,22 182:20,23 184:3 185:25 186:4,11 187:1 187:16 189:13 192:22 193:12 194:10 202:4 206:22 212:7 223:19 224:18 227:25 228:23 232:16 233:12 253:21 255:3 255:20 257:13 257:16 258:15 258:20 259:14 259:21 260:9 260:20 261:16 263:3,25 264:9 264:12,14 265:4,6 266:11 266:16 267:23 268:25,25 269:12,19,24 270:3 272:7 273:6,21 274:16 275:11 275:19 277:7 277:11 278:3 279:2 280:6,20 281:12 285:16 286:15 287:14 288:4 289:14 291:13,21 292:22 293:10 294:7,23 296:4 296:14,18 297:20 298:4 298:16 299:5 299:11 301:21 314:1,22 315:11 324:1 326:3,14,21 328:21,25 329:4,18 330:5 330:8 331:4,24 333:3,9 334:10 335:8 336:7,22 337:11 339:17 341:24 343:3 343:10 345:19 348:7 349:12 351:3,19
**chemically** 74:23 329:23 329:25
**chemicals** 6:20 7:1 23:18 30:6 30:15 31:6,13 42:18 44:25 45:1,4,9,24 46:5,8,23 47:1 47:8,15,23,25 48:5,6,20

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 374 of 449 PageID #:73075




49:15,16 50:2 50:24 53:4 54:25 55:15 56:2,11,13 67:13,17 68:4 69:7,16,24 71:1,8 72:1,8 72:13,16 73:7 73:10,13 74:6 74:12 75:9,14 75:15 76:1,7,9 76:21 77:3,20 82:9,12 84:7 84:18,19 87:11 87:17 89:2,5 112:24 120:8 122:11 123:8 127:12 131:22 134:12 138:22 139:14 142:7 142:21 143:16 143:25 144:17 145:15 146:2 150:3,25 151:11,16 152:11,14,21 155:23 165:12 166:11 169:5 169:17,20 170:7 172:21 174:24 175:3 181:1 182:20 186:6 188:5 189:5,7,22,24 190:1 192:2,25 193:1,4,13 257:24 265:14 269:4,24 271:24 276:2 292:22 293:2,3 293:11,15 294:7,23 295:9 295:16 297:2,5 297:17,20 298:15 299:7 299:10,22 300:13,22,25 301:2,4,18 305:10 306:16 310:20 311:11 313:25 314:21 315:10,11 316:17,19 317:8 320:12 323:1 325:8,16 325:24 326:14 326:17 330:12 331:12,14 334:7 337:13 337:16 338:23 341:19,21 343:3,15,22 344:20 346:9 346:13,22 347:25 349:12 349:14

**chemistry** 18:5

**chenneke** 4:18

**chicago** 4:4,13 4:22 5:4,9

**chloroethyl** 30:22

**chris** 4:8

**christian** 4:16

**christine** 1:23 10:12 115:5 146:14 210:18 248:13 354:5 354:20

**chronic** 290:10 290:12,14,20 290:21 291:1,3 291:5,8,24 292:5,10

**cigarettes** 141:8 250:24

**circular** 262:6

**circumstance** 89:12 99:16 189:22 214:5 219:21 220:1 246:21

**circumstances** 22:15 99:15 125:10 213:8 219:15 243:8 244:16 246:1 246:23 253:22 290:23 319:2

**cite** 32:20 90:4 114:13 168:12 194:25 272:2 332:5

**cited** 273:10

**citing** 115:13 168:11

**civil** 2:4

**claim** 46:11

**claiming** 245:1 245:5 348:6

**clamp** 9:23 10:2

**clarify** 35:21 92:11

**clarity** 191:19 204:6 282:24 283:14

**class** 172:9,21 173:18 174:20 182:20 259:3 262:2 316:18 341:18

**classes** 44:25 183:13

**classification** 131:24 158:17

**classified** 132:9

**clausen** 5:8

**clausen.com** 5:10

**cleaning** 91:24

**cleanup** 79:5

**clear** 10:9 12:2 38:21 59:22 61:24 73:8

91:11 94:21 96:11 127:13 132:16 140:12 185:12,14 289:11 342:14
**clearly** 197:6 288:13
**clients** 26:21
**clinical** 17:14
**close** 9:10 68:13 71:5 206:16 257:19 257:20 310:22
**cmalon** 4:10
**coaching** 226:23
**coal** 302:15
**coating** 333:5
**coauthored** 17:4
**coc's** 270:12
**cocarcinogen** 142:1
**coherence** 112:17 214:19 215:24 247:9
**cohort** 245:22 245:23 246:2 251:21 284:24
**cohorts** 252:25
**coiled** 39:17
**coin** 244:5
**coined** 170:4
**collaborative** 129:10
**collect** 26:12,25 180:23
**collected** 126:2
**collecting** 26:12
**college** 17:15
**color** 330:3
**column** 64:3 210:24,24 211:2,14 240:24 244:3 244:11
**combination** 280:24 291:9 301:25 315:11 337:5 347:21
**combine** 170:8 208:22,22 209:17 211:16 342:10
**combining** 192:3
**come** 11:8,9 28:20 31:19 35:9 40:11 41:13 67:6,12 97:16 100:22 122:6 132:17 166:12 178:1 180:13 214:20 257:20 268:21 306:14 333:6 333:24
**comes** 83:3 88:14 112:15 133:13 167:24 255:1,5 317:7
**coming** 54:14 128:21 129:20 228:20 309:18 323:17 344:18
**commencing** 2:1
**comment** 162:8 183:21
**commentaries** 332:6,11,13
**commented** 114:13
**commenting** 304:15
**comments** 29:1 38:4 230:20
**common** 30:15 174:21 180:1 197:15 229:19 266:17 269:6 272:25 277:18 286:9 309:20 318:11 327:13 327:15 332:22 332:24 335:12 339:19 340:4,6 343:13 346:6
**commonly** 147:7,10 173:17 183:18 269:6
**communicati...** 61:8
**community** 17:15 208:13 307:24 309:25 310:1 317:1 318:4,21
**compare** 152:6 307:7 346:20
**compared** 155:15,16 182:9 224:12 335:6 336:10
**comparing** 325:16
**comparison** 82:1 164:15 240:10 335:22
**compensation** 6:12 13:19 14:20
**competence** 221:9
**complete** 10:18 10:23 12:17 32:23 57:4 178:18 204:20 208:8,11 216:24 354:12 357:8
**completed** 11:2 355:16

**completely** 166:24
**completing** 21:3
**completion** 118:2
**complex** 23:19 88:14 150:13 152:25 153:11 153:13,23 290:8 301:15 303:5 305:9 330:13
**compliance** 294:24
**component** 40:4 42:18 51:6 67:9 73:11 74:7,17 75:1 81:14 88:11 97:23 149:24 163:11 165:3,7 177:6 193:13
**components** 40:12 68:1 78:15 82:21 86:7 154:5,9 169:6 175:14 201:14 275:3 298:22 301:10 339:19
**composed** 74:18 153:15 154:8
**compounds** 50:15
**compromise** 334:11
**computer** 12:16 61:16 204:12
**concentration** 82:11,16 83:20 149:15 297:9 297:18 298:14
**concentrations** 82:9,20 83:7 84:7 162:11 170:6 179:11 297:5 301:19 320:12
**concept** 2:5 3:12 97:5 124:18 125:2 161:13 221:9 234:6 306:14 307:22 318:24 319:17 343:13 344:16 345:16
**concepts** 137:20 219:17 342:24
**conceptual** 124:4
**conceptually** 221:11
**concern** 45:24 48:20 49:16 145:15 146:2 151:1 187:12 193:1 201:11 310:10 321:4
**concerns** 319:23
**conclude** 48:20 156:19,23 222:14 250:5
**concluded** 275:24 310:13 345:21 352:6
**concludes** 352:1
**concluding** 111:22
**conclusion** 46:21 47:11 96:5 99:24 100:22 119:25 153:22 246:25 268:24 269:2 341:2
**conclusions** 99:17 109:4 114:19 158:16 236:7 244:8,22 246:12 248:7 289:8 309:10 312:21 349:8
**conclusive** 328:20
**concur** 231:14
**conditioner** 85:5
**conditioners** 40:16 41:8 275:11,18
**conditions** 138:10 159:3
**conducive** 127:18
**conduct** 13:14 23:5 77:9,13 152:4 155:21 167:2 185:11 208:20 216:7 219:12 252:24 294:22 295:21 295:25 306:24 316:3 337:4 338:4
**conducted** 26:11 35:15 52:14 78:17 119:8 198:9 217:5 220:7 242:8 252:8 253:16 256:14 298:20 307:19 310:2 315:8 338:17 346:13
**conducting** 26:18 27:6 32:4 78:16 103:2 107:10

176:16 180:20 188:25 293:21 307:12,20 315:2 327:16
**conducts** 133:14
**confidence** 221:15,19,25 222:2,3,10,11 222:22 224:7 225:2,11,12 227:15,21
**confirm** 107:24 185:15 188:19 252:5 266:9 275:19 278:4 285:15
**confirmation** 197:16 262:6
**confirmed** 255:23 256:7
**confirming** 130:14
**confounding** 138:12 324:23 327:3
**confuse** 232:20
**confused** 291:2
**confusing** 73:18
**congress** 4:9
**congressiona...** 22:12
**connection** 15:19 25:24 27:22 101:15 259:13 280:5 281:12
**consensus** 316:25
**consider** 35:16 55:9 94:22 127:12 201:1 205:5 238:22 239:1,8 243:8 249:2,7 263:21 264:5,9 279:4 301:16 317:8 326:3
**consideration** 131:10 216:1,5 217:1,4,22 308:14 329:8 337:10,20
**considerations** 215:17,22
**considered** 6:16 33:4,15 33:18 34:15 52:25 62:11 78:19 86:12 87:9,21 93:6 96:17 100:19 110:7 112:5 117:13 118:11 150:12 183:14 188:4 190:8,9 201:7 206:2,9 212:25 218:23 228:19 233:25 236:8 298:1 317:18 334:16
**considering** 35:13 88:18 142:5 213:7 234:9
**consistency** 110:24 111:4 112:13,17 209:22 210:11 211:22 212:4 213:22 234:15 236:10 238:17 240:12 241:17 242:7,25 244:13,19 246:3,5,22,25 247:9
**consistent** 44:2 57:21 102:14 107:5 112:10 173:23 212:6 233:22 236:12 238:23 239:2,9 239:13 240:5 240:10 241:16 293:14
**consisting** 21:10
**constituent** 57:11 74:6 82:12 134:7 296:6
**constituents** 252:6 255:21
**constraints** 81:18
**construct** 128:25
**consumer** 140:10
**contact** 166:12 166:14 167:24 178:1,5 333:7 333:25 334:9
**contain** 17:2 24:5 52:19 53:9 54:16 55:18 58:8 86:17 140:25 175:19 176:6 186:12 204:25 208:7 325:8 328:5 336:11 338:22 339:18 346:12
**contained** 50:6 50:15 63:13 86:12 103:1 181:13 268:25
**container** 159:16,19,24
**containers** 74:9 74:10 187:3,16 187:23

**containing** 79:25 84:6 86:19 148:14 149:16 177:25 325:24 337:16
**contains** 12:12 12:17,22 33:4 63:8 67:18 74:6 80:12 84:19 86:1 293:17
**contaminant** 49:25 263:7 266:21
**contaminants** 58:6 193:7 270:14 275:16
**contaminated** 187:2
**contaminating** 187:17
**context** 78:21 106:14 114:1 126:16 138:5 162:2,6 199:10 200:20 216:13 223:12 238:24 241:16 286:16 299:25 304:23 311:16
**continual** 180:9
**continue** 113:12 219:21 256:12 285:3 286:10 323:18
**continued** 3:25 4:25 255:19 285:18
**continuing** 21:19 34:23 35:4 194:19
**contribute** 105:24 115:1 127:14
**contributed** 17:4 25:25 50:16 104:22 105:10,19 106:2 189:15
**contributing** 22:15 25:20 53:20,24 105:23 175:14 193:5,8 327:4
**control** 325:12 325:14
**controlled** 89:12 138:10 221:18 325:1
**conversation** 61:1 305:4
**conversational** 14:6
**conversations** 203:21
**converters** 140:24
**cook** 303:18,18
**cookers** 141:9
**copies** 210:21 237:22 355:14
**copy** 12:10 13:18 16:4,6 16:12 115:18 215:4,6 223:23
**corey** 5:18
**correct** 12:13 12:14,19,23,24 13:3,4 17:11 17:15,25 18:1 18:4,8,9,11,12 18:14,15,17,19 20:1,7 21:24 21:25 25:8 26:1 28:9,10 29:5,11,12 33:4 48:1,15 54:12 60:14 73:21 76:24 80:16,25 83:2 85:12 93:11,14 94:24 95:6,7 95:15 96:12,15 97:2 100:5 103:11,15 116:12,13,15 116:18 120:10 135:6 148:6,9 148:10 156:6 157:21 158:19 158:22,23 159:25 160:19 168:6,7,15,19 168:23,24 172:5 176:11 182:20,21 187:17 189:10 190:25 195:6 195:16 199:23 200:1,22 205:24 207:4,7 207:8,13 208:5 208:6 212:14 213:24 217:7 225:4 241:24 245:7 246:14 254:25 255:6 256:20 257:3 257:13 258:10 258:11 260:2 264:23 273:16 275:13 283:2,5 283:17,18,20 284:21 294:8 296:23 297:10 301:21 302:6 309:11,13 314:17,18,22 318:5 321:6 326:15,16,18 326:19 357:8
**correction** 196:10 206:18 206:23,24 207:1

**corrections** 12:22 195:18 357:6
**correctly** 63:10 92:7 94:11 102:5,19 109:18 116:8 143:3 146:3 147:15 148:23 194:15 195:1 252:14 261:20 279:10 280:8 320:3
**cosmetic** 256:2
**costello** 5:2
**cote** 36:8 239:11 254:4
**counsel** 8:9 12:16 36:21 37:22 38:20 58:12,16 61:1 61:8,20 68:5 203:12,16,22 226:16 231:24 231:24 236:22 237:22 276:5 333:11 353:4 354:15 355:14
**counter** 132:14
**countries** 317:13
**county** 354:3
**couple** 9:20 10:15 30:17 34:11 39:8 43:9 179:18,21 188:15 190:21 191:17 257:23 266:22 338:20
**course** 23:8,14 62:14 96:24 105:14 112:13 117:17 136:18 153:5 305:19 343:12
**courses** 215:10
**court** 1:1 8:10 10:12 198:5,11 248:15 350:2 353:13
**courtesy** 10:23
**cover** 191:14
**covered** 23:17 24:1
**covering** 276:3 324:21
**covers** 153:18 294:2
**crawford** 5:22
**create** 192:3 193:13 204:1 267:21,24 277:12
**created** 49:19 204:3
**creates** 120:20 267:6 330:15
**creating** 26:1 329:18
**criteria** 29:22 30:2 95:10 96:12,15,16,21 97:25 110:20 207:10,16,20 208:4 211:18 214:19 215:11 217:23,24 218:13,15 219:22 234:8 238:18 242:7 245:24 250:15
**critically** 104:23
**cumulative** 349:10,13,13
**curiosity** 134:11
**curly** 39:17
**current** 16:18 182:25
**currently** 17:7 20:19 161:24
**curtis** 42:8
**cut** 11:1 88:23 142:10 189:18 279:12
**cuticle** 148:22
**cutoff** 3:5
**cv** 1:5 13:18 16:16,18,24 17:2 19:11 20:2 21:22 24:4,17 25:21 27:10 29:5 155:24 216:20 302:12
**cyclic** 261:25
**cyclo** 261:19
**cyclosiloxane** 48:22 261:21
**cyclosiloxanes** 70:9,15 71:24 142:22 146:1 261:13,17,21 262:9,13,25 263:2,16,22 264:13,22 265:6,10,15,22

**d**

**d** 8:1 122:18 346:1
**d.c.** 3:10
**dabt** 6:17
**daily** 328:16 337:17 338:25 339:11
**dairkee** 345:25
**damage** 331:2 331:10,14 334:11
**data** 19:2,3,7 22:21,24,25,25 23:1,5,12 30:18 32:11,12

50:19 51:2 52:10 54:23 57:16 60:4,6 60:10,13 77:12 78:14,14 79:10 80:12 81:24 82:11,16,22 83:7 84:6 89:8 89:11 90:19 101:14 104:16 112:13,14 124:7,10 128:25 133:13 133:13 135:16 136:14 153:2 154:1 156:10 156:13 158:2,6 158:10,13 161:24 162:10 162:22 178:22 178:24 179:5,7 214:21,22 215:19,24 216:13 219:12 219:23 220:20 221:14 223:13 224:6,22 225:2 225:3,3,12,19 228:5,7,16 229:23 231:13 231:19 233:18 237:2 239:20 240:2 244:10 244:18 253:19 254:3,12,13,15 260:25 261:16 262:17,19,20 264:25 265:9 266:25 273:13 279:7 280:21 284:18 285:15 286:2,14,15,25 293:23,25 294:1 295:3,22 297:9 298:19 300:20 303:23 303:24 309:5,7 312:17 321:5 331:24 332:18 333:18 342:3 343:9 345:3 348:11,13,21 348:24 349:4

**database** 45:17 63:7,12,19 64:13,19 65:10 65:18 104:20 129:7,11 134:11

**databases** 136:12

**date** 8:3 285:18 354:8 356:24 357:12

**day** 10:8 11:2 14:6 21:9 28:21,22 39:13 111:19 139:5 140:20 258:10 271:10 346:25 357:15

**days** 34:11 135:20 190:17 355:16

**dc** 258:9

**deadline** 351:8

**dealing** 55:7 292:4 306:15 324:25

**dealt** 161:16

**debate** 315:18 318:13

**debated** 318:20

**decades** 290:19

**december** 16:22 33:12,13 34:15 36:3 37:13 66:21 195:4 198:17 198:24 203:5 205:10

**decide** 158:13

**decides** 221:22

**decision** 9:15 219:3

**decisions** 79:2

**deck** 5:23

**declare** 357:4

**decomposition** 159:8,16

**decrease** 286:12

**deem** 50:4

**deemed** 59:15 62:11 164:21 357:6

**defected** 131:12 293:4

**defendant** 2:5 3:12 4:1,6,20 5:1,7,12 62:10

**defendant's** 274:22

**defendants** 3:19 13:10 57:9 59:6,7 61:14 63:9,14 65:21

**defense** 37:2,16 338:10

**defer** 166:19,23 264:1,2

**define** 153:11 218:18 289:24

**defined** 44:5 109:15 110:6 290:16 291:1 292:6

**definition** 109:17,21 110:4,13,16,19 110:23 292:2 294:10 329:13

**definitions** 111:3

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 381 of 449 PageID #:73082



**degrades** 159:24
**degree** 18:2,5 21:2,4,7 24:10 138:8 280:1 351:2
**dehp** 183:6,7 184:1,22,23,25 185:24 186:12 187:25 188:18 190:21,21
**deleted** 289:23
**demand** 111:17
**demonstrate** 42:13
**demonstrated** 124:3
**demonstrating** 112:19
**dep** 183:6,7 184:1,22 185:24 186:12 187:25 188:18
**departs** 329:20
**dependent** 197:15
**depending** 81:14 243:7
**depends** 111:18 220:4 221:21 223:12
**deponent** 8:7 354:8,10,12 355:13 357:3
**deposing** 355:13
**deposition** 1:12 2:2 6:10 9:8,12 9:19 10:7 13:9 63:6 65:23 66:5,7,11 67:2 185:16 195:15 204:6 281:7 352:1,6 354:7 354:11
**depositions** 35:10
**derive** 275:8 286:25
**derived** 79:11 97:15
**dermal** 67:20 177:5 178:2,6 188:1,2 260:5 331:6
**dermally** 67:24 165:22 166:5 167:10,17,25 260:10,14 265:2
**dermatologist** 18:18
**describe** 42:17 148:12 235:12
**described** 266:24
**description** 6:9
**descriptions** 214:9
**descriptors** 185:12
**designed** 221:12
**despite** 241:14
**detail** 104:13 268:14
**details** 32:17 248:9 333:2
**detect** 180:12
**detectable** 319:19,24
**detected** 91:5 176:9 178:16 179:12 180:7 183:12 293:5
**determine** 44:20 71:19 76:22 79:5 87:4 89:4,25 135:14 136:10 136:10,21 158:11 168:14 189:9,23,25 218:8 224:7 225:13 229:16 240:4,11 242:25 281:22 288:24 298:14 307:8 322:16 322:18 325:19
**determined** 172:15 343:4
**determining** 134:22 135:9 220:2 242:22 252:12 293:8
**detrimental** 319:8
**develop** 127:23 200:22 290:19 290:22 299:21 313:16 316:13
**developed** 23:10 252:19
**developing** 107:19 131:4 194:12 247:3
**development** 126:21
**deviate** 107:1
**deviations** 221:20
**dh** 186:12
**di** 277:16
**diagram** 296:17,18
**dibutyl** 183:5 183:17
**died** 313:14
**diethanol** 277:13
**diethanolamine** 49:22 278:24 279:1,5,16

**diethanolami...** 277:15,23
**diethyl** 183:3,7 183:17
**diethylamines** 277:9
**diethylhexyl** 49:23 133:17 183:2,8,15 184:16 190:11
**difference** 33:6 39:20 70:3 93:19 107:11 110:22 137:22 138:14 221:1 325:20 327:10
**differences** 104:10 111:3 241:8,14 247:8 334:19
**different** 11:25 26:6 28:14 42:18 44:8 45:21 51:7 57:12 58:21 67:8 73:10,10 75:14 80:12,13 81:2,4,10 84:20 87:12 97:5,11,20 99:23 110:18 112:15 127:19 130:23,24 131:7,8 132:9 134:21 135:9 137:20 147:19 153:16 154:9 155:13 162:15 170:21 171:19 172:4,5,8,25 173:11,12,16 174:5,7,9 176:3 183:13 189:22 192:6 202:23 211:16 216:4 217:20 221:12 224:24 243:4,4 244:15 244:15 245:25 245:25 246:2 246:13 247:21 249:21 250:1 259:17 261:24 262:2,4 265:4 275:5 296:12 296:24 318:10 329:1 339:21 345:1
**differential** 340:9
**differentially** 252:2
**differing** 222:16
**difficult** 87:15 303:25 325:11 325:19
**difficulties** 104:19
**digest** 64:7 258:1
**dillon** 4:3
**dimerization** 273:24
**dimethicone** 264:4,8
**dioxane** 49:13 268:19 270:16 271:24 273:19 273:20,24 274:15 275:20 277:4
**diplomat** 20:23
**direct** 63:2 84:15 115:19 121:4 200:24 271:16
**directly** 159:1 187:21
**dis** 340:9
**disagree** 65:5 162:1 311:12 348:8
**disagreed** 36:19
**discipline** 17:25
**disciplines** 19:3
**disclosure** 351:8
**discontinued** 20:13
**discovered** 35:14,18
**discrimination** 256:3
**discuss** 48:1 96:20 114:22 114:25 121:9 228:14 284:23 285:21 306:3
**discussed** 27:4 43:7 45:6 152:17 268:13 290:24
**discusses** 301:13
**discussing** 148:25 324:16 336:1
**discussion** 39:12 47:6,7 48:4 60:17 67:7 79:20 86:15 104:18 132:3 195:22 205:7 244:12 283:10 307:23 308:3 319:12 333:1
**discussions** 9:6 28:25 29:2 61:7 309:9 335:24

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 383 of 449 PageID #:73084



**disease** 7:4 99:25 112:25 114:7 207:23 218:1 290:19 290:20,22 320:19 322:20 323:12 340:25 347:9
**diseases** 291:4
**disinfectant** 30:13,15
**dismiss** 111:25
**disparities** 256:5
**dispersants** 272:17
**dispersed** 74:25
**disrupt** 181:5
**disrupted** 125:7
**disrupting** 6:19 31:5,12,21 48:5,6 50:17 120:8 121:2,7 122:11 126:19 126:25,25 181:11 182:14 261:16 311:11 316:17 317:8 317:10
**disruption** 120:21 121:21 128:8 129:12 129:22 130:15 173:25 182:1
**disruptions** 121:20
**disruptors** 31:17 56:21 122:20 126:17 182:16 305:18 305:19 306:2 307:25 311:18
**dissertation** 24:8
**distinction** 302:1
**distinguishes** 321:18
**distributed** 178:20 295:11
**distribution** 23:1 292:19 294:2
**district** 1:1,1
**disulfide** 39:18
**diverse** 252:9
**divide** 229:11
**dividing** 131:3
**division** 1:2
**dmdm** 163:24 164:9,19
**doctor** 18:7
**doctorate** 17:24
**document** 7:2 13:1,12 14:23 34:12 64:5 149:10 156:1
**documented** 69:5
**documents** 13:11 61:12 63:8,13 65:21 66:13
**doing** 26:10 52:8 78:20,22 97:5 119:10 214:2 224:3 240:18 302:4 306:8,11,13 309:2
**door** 341:1
**dose** 134:22 135:10,17,24 136:1,11,13,16 136:21,22 141:17 216:1 234:15 290:8 300:4,4,8 303:9,12,21,24 304:1 306:2,18 306:25 307:5 307:16 309:12 310:22 311:9 311:23 312:13 312:21 313:2,5 313:6,7,8,9,12 313:20,23,24 314:9,10,11,16 314:16,20,21 314:25 315:2,9 315:16,23,24 316:9,19 317:1 318:5,19 320:6 320:23 321:13 321:17,18,19 323:1 343:20 344:13 348:15
**doses** 136:7 139:4 169:17 169:18 319:6,8 319:18 321:5 343:22
**doubling** 233:23 239:7
**downstream** 322:19
**dr** 28:1 36:8,8,9 36:10 37:6,6,6 37:7,9,9 66:18 66:19 116:11 117:2 156:17 239:11 254:4 311:1,12 348:5
**drafted** 196:22
**drafting** 104:23 105:10,24
**draw** 244:8,22 289:8
**drawing** 243:10
**dried** 141:13
**drift** 14:7

**drifted** 246:4
**drinking** 30:13 79:4
**drive** 4:22
**driving** 252:7
**dropped** 305:1 341:11
**dryer** 143:20 148:17
**drying** 149:1
**due** 313:13,15
**dues** 19:24 20:5 20:11
**duly** 8:19 354:9
**duration** 232:24 286:2,4 286:15 287:1 287:13 291:10 291:19,25
**durations** 288:25
**durham** 17:14
**dustin** 5:22
**dye** 252:1 330:3
**dyes** 329:24 335:6,20

**e**

**e** 4:16 6:1,8 8:1 8:1 122:18,18 122:18 136:15 346:1,1 356:3 356:3,3
**e.g.** 142:21
**earlier** 63:18 73:6 91:17 93:18 131:21 133:6 148:25 157:3 176:14 179:17 184:14 189:6 190:20 256:25 264:21 292:14 310:19 313:1 318:9,24 324:17 339:23 342:6
**early** 9:9 26:9 28:14,15 37:14 43:12,12 158:5 197:2 203:5 286:10 291:16 310:7
**easiest** 84:23
**east** 4:17
**eastern** 1:2 8:5
**eat** 140:5 188:8 300:6
**ed** 136:15
**edc** 50:2 53:13 125:11 261:13 311:25 312:10
**edcs** 48:9,19,19 50:23 51:7,10 51:24 52:19 53:9,20 54:12 54:16 55:18 120:7,13,19 122:1 123:6 124:12 125:3 126:8,15 127:3 258:5 309:12 312:3,6 315:20 348:7
**editorial** 230:20
**education** 21:19
**educational** 215:10
**effect** 44:1 46:22 88:16 112:25 120:20 121:16,21 122:1 123:7,16 123:24,25 124:11 125:11 125:13 127:2 128:5,5 136:2 136:8 175:15 182:1 192:24 193:5 200:3,7 201:9 217:16 221:7 227:20 229:17 274:25 290:15 300:17 309:5 320:9,16 321:11,12,18 321:19 322:1,4 322:20 326:3 327:4 339:25 342:14,15,15 343:5,25 344:4 344:21 345:22 347:11,16 353:12
**effective** 136:16
**effects** 50:17 52:16 55:8,12 78:1,4 92:4,10 92:12,25 93:9 121:2,3,8 123:21 125:22 125:25 126:19 168:5 169:16 173:1,12,19,21 173:23 174:9 174:18,22 175:2 181:11 182:14 200:8 201:16 255:20 293:13 298:25 301:17 305:23 308:1 319:4 323:18 345:17 346:4,8 348:3 348:7,15,15
**efficient** 16:9
**efforts** 38:23 44:19 255:24 256:11 323:22
**eight** 21:7 26:19,19 43:9 282:6

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 385 of 449 PageID #:73086



**either** 26:18 28:1 35:19 48:5 50:2,21 58:2 105:25 114:21 123:22 130:7 131:19 133:18 137:25 138:24 171:16 173:23 176:19 181:11 193:6 203:4 219:14 274:14 279:7 280:19 303:10 315:9 322:11 331:2 341:6,15 341:25
**eliminate** 326:22 348:25
**eliminated** 52:6 346:19
**eliminating** 346:5,9
**emanated** 190:1
**embalmers** 139:13
**emily** 5:22
**emphasis** 111:21
**emphasize** 219:4
**empirical** 285:15
**employ** 79:13
**employment** 16:25
**emulsifiers** 272:17
**enacted** 75:16
**encounter** 277:21
**endo** 18:13
**endocrine** 6:18 31:5,5,12,12,17 48:5,6 50:17 56:21 94:9,13 94:23 120:8,21 121:2,7,20 122:11,12,20 125:7 126:17 126:19,22 128:9,16 129:12,22 130:15 173:24 181:6,11 182:2 182:14,16 261:16 301:13 304:24 305:1,6 305:17,19 306:2 307:25 311:11,17 316:17 317:8 317:10 319:3
**endocrinolog...** 18:14
**endogenously** 139:9
**endometriosis** 200:17
**engage** 82:1
**enhance** 127:16 243:6
**enhanced** 148:21
**enhances** 148:17
**enjoyed** 350:4
**enter** 76:7 178:10
**entering** 330:13
**enterprises** 4:6 5:1
**enters** 88:4
**entire** 10:18 26:8 278:23 344:25 349:7
**entirely** 150:23
**entirety** 324:2
**entitled** 115:14 155:25
**entry** 84:25
**environment** 7:4 23:18 127:18
**environmental** 20:9
**epa** 27:16 45:15 49:20 57:22 82:18 83:6 109:16 110:7,18,23 112:11 129:8 136:19 145:24 146:8,12,18 147:18 148:6 149:10 154:3 168:6 306:19 307:3,15 308:8
**epa's** 329:13
**epidemiologi...** 29:14 340:24
**epidemiologist** 36:13
**epidemiologi...** 116:18 215:18 228:10 231:12 254:1 338:1 340:9
**epidemiology** 18:3 19:2,5 43:23 44:17 54:23,24 79:11 87:9,19 96:18 108:22 114:17 116:25 135:15 152:9 158:6 175:15 192:20 194:9 206:2 213:3 214:22 218:20 228:4 228:15,16 239:11 240:12 240:15,16,18 250:10 252:24

257:15 281:19 288:13 303:11 324:21,22,24 325:7 327:1 337:22,24
**epidermis** 67:18
**equal** 164:10
**equally** 328:4
**equals** 220:23
**equivalent** 123:17
**equivocal** 185:13
**errata** 6:15 195:8,16 355:11,13,16
**error** 202:13 203:23 205:9 205:12
**errors** 202:20 204:24
**esdillon** 4:5
**especially** 203:15 290:8
**esq** 3:4,9,14,14 3:15,22 4:3,8 4:12,16,21 5:3 5:8,14,19 355:1
**essentially** 99:17 123:17 195:22 285:1 350:2
**establish** 222:5 314:11,16 349:5
**established** 218:14
**establishes** 166:4
**ester** 178:13
**esterized** 178:14
**esters** 171:23
**estimate** 23:15 221:16 222:17 222:21 226:3 285:11
**estimates** 224:15
**estimation** 261:14
**estimator** 222:18
**estrogen** 121:11 182:9
**estrogens** 31:18
**et** 145:25 197:12 275:4 346:1
**ethan** 4:3
**ethnically** 252:9
**ethyl** 171:25
**ethylene** 49:11 132:2 266:2,6 266:10 267:6,8 267:17,24 268:13,19,24 270:2,16 271:21,23 272:8 273:5,15 273:22,25 274:5,15 275:20 277:1
**etiology** 131:13
**europe** 312:4
**european** 155:16
**evaluate** 19:2 22:13,24 23:5 23:6,12 26:14 30:12 31:16 102:15 108:24 240:16 242:17 248:11 298:23 319:23 327:6 334:18
**evaluated** 25:12 133:8 158:3,8 168:4 169:5,9,25 239:2 246:21 254:3 344:12 348:13,14
**evaluating** 26:17,21 27:7 108:12 214:21 215:20 289:10 296:14 301:14 305:17 312:5,8 313:18
**evaluation** 19:1 19:7,8 22:21 23:25 98:1 102:1 133:16 156:9 218:24 219:8 220:20 221:17 236:9 253:16 254:5 295:23 309:5 341:14 349:7
**evaluations** 23:16 27:6 49:20 103:2 220:7 289:7 307:12
**event** 129:4,13 129:14 329:13
**events** 128:22 129:5 354:15
**eventually** 27:9 125:14 198:12 200:22 229:22
**everybody** 281:8
**everyday** 114:6 139:21
**evidence** 49:22 53:1 55:4 90:9 96:4 100:19 101:22 117:12 119:24 127:14 141:25 158:11 173:15 185:12

185:12,13,13 185:14 192:20 200:3,21,25 201:1,17 207:21 209:2 211:24 212:7 212:24 214:12 218:8,24 219:8 220:25 224:4 240:16 250:21 251:22 253:5 253:25 254:7 273:5,20 274:14 280:2 293:1,11 295:7 295:13,15 298:24 309:9 310:21 312:10 313:3,9,19 320:18 328:19 334:25 341:14 343:9 344:3 347:4,7,13,15 349:7
**evolving** 315:1
**exact** 240:9
**exactly** 42:24 74:16 237:25 247:23
**examination** 6:3,4 8:22 21:5 21:5,8,10 83:13 350:13 353:5,11
354:10,13
**examine** 83:19 209:17 272:7
**examined** 8:19 41:21 147:18 155:13 172:4 257:12 269:18
**example** 210:12 211:21 223:6 309:22 314:6 320:5
**examples** 112:3 149:19 315:15
**exceeded** 164:20
**except** 278:23 353:8
**exception** 310:14 341:7
**exceptions** 341:16
**excluding** 203:12
**excreted** 190:15 295:20 296:20 300:16
**excretion** 23:2 292:20 294:1
**excuse** 9:22 58:12 62:18 212:25 219:7 248:22 289:12 293:21
**executive** 94:5 109:8
**exhaust** 140:24
**exhibit** 6:9,10 6:12,13,15,16 6:18,22 7:1,3,6 7:9,12 13:5,9 14:15,18,19 16:1,3,6,11,14 16:15,16 33:3 33:8,18 34:3,7 35:13,14 80:3 80:4 115:9,12 146:14,18,20 146:23 147:4 195:12,16 204:2,11,25 210:6 214:24 214:25 217:13 237:7,12,13,13 237:19,20 248:17,18,22
**exhibits** 13:1 16:12 237:16
**exists** 160:19
**expect** 33:15 69:23 136:14 161:15 179:5 275:14 328:9
**expensive** 107:13
**experience** 92:21 160:8 161:9 350:24
**experiment** 325:2
**experimental** 341:15
**expert** 6:13 35:25 37:2,16 38:7,9 58:2,5 98:6,21 130:18 197:23 228:9 261:23 274:23 311:4 338:9 351:9
**expertise** 18:22 170:2
**experts** 28:18 274:22
**explain** 269:1 291:6 321:16 334:22
**explanation** 105:4 170:15 177:13 234:19 267:19
**explode** 132:13
**exposa** 323:23
**expose** 123:21 123:22 322:11 322:24,25 344:2
**exposed** 123:23 135:19 138:11 139:3,12 153:4 176:2 181:1,14 221:18 242:24

304:8 325:2,3 325:13,15,17 325:17 329:11 343:23,24
**exposing** 320:11
**exposome** 324:6
**exposure** 22:14 24:1 30:5 67:22,23 70:1 70:4 76:22 89:12 99:24 100:4 101:5 114:6 129:2 142:25 144:25 145:11 156:20 156:24 161:17 165:17 166:10 166:20 170:6 176:24 177:3 180:10,21 182:13 187:10 187:25 189:14 192:22 201:10 201:18 207:22 210:13 212:7 217:15 218:1 218:21 253:21 253:22 255:20 255:24 259:20 260:5 264:19 264:22 280:15 282:8 290:23 291:6,9 292:1 292:10 293:1 293:11,14,25 298:5 301:9,17 303:13,20 305:24 307:7 309:5 314:9 323:25 324:4 324:19 326:2 329:15 331:11 340:4 343:21 347:10 349:10 349:13 351:3
**exposures** 23:18 89:19 139:16 153:9 162:23 180:1,2 187:13 189:21 265:11 290:8 290:10,16 326:23 327:8 329:9 340:1,3 346:9 347:9
**expressed** 187:12
**expression** 322:9,13,19 323:2,11,19 346:14
**extend** 10:22 161:2
**extent** 46:23 74:19 89:7 90:1 104:8 125:24 151:9 165:8 193:6 215:19 244:17 256:12 260:8 261:5 262:7 277:24 280:16 284:6 295:21 329:6
**extra** 347:13,15
**extrapolate** 175:2 286:24
**extrapolation** 285:8
**eye** 68:19

**f**

**f** 4:7
**fact** 87:8 90:8 121:20 169:8 178:15 180:25 186:18 201:8 298:19 325:6 325:15,20 330:16 337:11 339:24 340:1 342:4 346:21 349:5
**factor** 53:20 96:1 100:24 110:25 112:8 218:9 236:10 241:17 242:16 243:8,10,20 244:10 246:7 307:5 317:18 330:17 334:16 334:21 340:6 351:20
**factors** 104:14 112:18 115:1 131:9,14,14 134:17 138:12 213:23 215:20 216:16 228:15 234:1,1,7,10,12 234:16,18,21 236:5 238:17 313:13 324:23 327:3 329:19 329:20
**fail** 21:14
**fails** 355:18
**fair** 10:10,10 11:3,13,20,21 12:3,7,8 14:12 18:20 34:2 35:23 36:15 41:6 48:6,7 50:23 54:9 57:25 61:22 62:4 67:5 73:2 75:10 81:1 84:20 93:4 98:17 99:25 116:23 120:22 121:18 147:17 196:3 235:7,7 241:11 264:3

311:22
**fairly** 178:15 233:22 332:3
**fall** 48:14 49:15 50:2 63:24 318:10 321:5
**falls** 266:3 292:1 321:14
**familiar** 19:5 156:2 161:12 166:25 214:17 219:17 220:12 221:8 292:12
**far** 19:19 119:1 200:2 213:3 222:13 236:4 331:5
**fashion** 75:16
**fast** 54:5
**fat** 67:17
**fayetteville** 2:6
**fda** 173:5
**february** 15:7
**federal** 2:4
**federer** 4:21
**feel** 80:18
**felt** 55:13 214:12
**fibroid** 201:6
**fibroids** 196:2 197:13 199:25 200:10,15,21 202:3
**field** 25:7 26:11 26:24 27:21 156:6,7
**fifth** 197:10 270:10
**figure** 237:2
**filing** 353:5
**filters** 259:24
**final** 6:15 27:16 129:6 278:3
**finalizing** 63:25 103:14
**finally** 110:6 207:23
**find** 24:21 45:12 52:13 72:12 78:9 108:17 110:4 152:2,7 171:7 174:21 197:3 217:24 223:17 224:14 227:24 228:21 229:4 249:19 268:5 275:14,25 315:25 318:9 331:22
**finding** 87:20 219:19 247:16 247:18 260:25
**findings** 98:1 194:4 201:21 209:9 231:22 245:6 252:4 255:15,18 256:7
**fine** 47:6 52:7 111:11 132:5,6 188:16 243:14 262:10 342:21
**finish** 37:23,23 37:25 51:20 58:14,16 68:6 124:8 132:20 204:7 211:4,5 211:6 269:13 274:8 281:3 317:24,25 345:8
**finished** 64:8 189:19 204:9 268:25 278:3,9
**finishing** 118:2
**fireplaces** 141:9
**fires** 303:19
**first** 8:19 9:7 10:12,17 15:2 21:12,14 24:20 25:11 27:14 40:20 41:3 66:4,4 91:25 93:15 94:6 101:24 102:12 116:1,7 147:25 148:15 192:1 194:2 197:2,4 197:23 201:19 210:23 217:12 218:13 241:1 244:3 245:12 245:18 251:22 253:5 266:23 282:6 283:1 293:1 298:3 306:22 310:5,6 318:25,25 319:20 351:5 351:12
**fish** 141:13
**five** 21:17 44:5 116:24 155:19 194:23,25 195:23 196:14 196:19,24 199:5 206:19 207:4 271:19 287:10,25 292:9,9
**flame** 302:24 302:25 304:3
**flat** 40:2
**flatiron** 148:20
**fluids** 293:4
**focus** 14:2,10 25:17 38:16 44:10 46:24 61:15 79:22 97:17 98:2 101:24 126:8 137:11 151:7 165:9 170:24

181:20 230:6 238:14,16,19 254:19 272:18 277:5 278:14 280:10 283:9 302:6,9 319:16
**focused** 23:3 32:11,11 37:7 54:11 93:21 155:20 175:23 183:10 213:11 257:6 286:1 288:19
**focuses** 247:13
**focusing** 36:12 55:4 105:15 343:20
**folks** 113:17
**follicles** 331:9
**follow** 49:1 67:15 95:16 224:24 234:4 267:18 288:17
**followed** 23:9 148:15,16 158:9 166:16 252:25 284:24 286:3,5 328:11
**following** 103:18 290:15 299:1
**follows** 8:20
**food** 140:5,10 192:7
**foods** 141:12 141:13
**footnote** 63:3,5 65:24 66:4
**force** 353:12
**forced** 246:24
**foregoing** 354:7,11 357:5
**forest** 303:19
**form** 18:23 24:9 30:7 31:14 34:25 36:20 39:19 40:6,22 41:11 43:3,20 44:14 45:5 46:14 47:16 51:1,14 52:2,24 53:15 54:20 55:20 56:5 57:6,24 58:25 59:8,17 60:1 63:21 65:12 69:10 70:12 71:11 72:4 73:16 74:14 75:18 76:11 77:5,22 81:6 82:14 83:22 84:9 85:19 86:4,25 88:6 90:12,23 95:19,22 97:7 97:21 98:10,25 100:6,16 101:7 107:2 108:9 109:24 113:20 117:16 119:19 120:24 122:3 123:9 124:13 125:16 127:6 127:24 128:11 130:2,25 133:11 134:2,5 134:24 137:18 138:3,18 139:6 141:2,19 144:2 144:20 146:10 149:12 151:3 151:21 152:23 153:12,24 154:18 157:1 157:17,22 159:21 160:20 161:3 162:13 163:1,14,21 164:12,23 165:23 166:22 167:18 169:3 170:8 171:3,12 172:11 173:2 173:13 174:10 175:7,21 176:4 176:12 177:1 177:18 178:3 178:11 179:3 179:24 180:15 181:7 182:3 184:12 185:5 186:2,13 187:4 188:21 189:11 190:5 192:16 193:16 199:9 200:12,23 202:6 205:13 205:25 207:18 208:14,24 209:18 211:19 212:21 214:6 216:11 218:2 218:16 219:24 220:17 222:8 223:9,20 224:10 225:6 225:16 226:11 228:2,24 229:9 231:7 232:17 234:3 235:2 236:13 238:25 239:23 241:25 242:9 243:22 246:16 247:25 249:9 250:7 251:7 252:21 256:8,21 258:17 260:12 260:23 262:14 263:5 264:16 265:12 267:7 270:5 273:8 274:17 275:21 281:16 286:17 287:17 288:8

289:17 293:19 295:1 296:9,20 297:21 298:17 299:18 303:7 306:9 308:11 309:14 311:14 312:23 314:2 315:13 317:3 318:6,22 320:1 321:21 326:5 326:24 330:1 330:19 332:8 334:14 335:9 336:13 337:18 339:7 341:3 343:6 344:23 345:23 347:19 348:9 349:15 349:18 350:20 351:10 353:8
**formal** 215:10 216:14 293:22 309:6
**formaldehyde** 49:8 71:23 132:2 139:1,4 139:8,12,14,19 140:4,9,19 141:1,7,11,17 141:23 142:1 142:22 144:1,4 144:5,11,14,18 145:1 146:1,6 146:13 147:23 148:14,18,20 149:2,11,15,16 149:25 150:4 150:16 156:1 156:11,14,20 156:24 157:4,6 157:8,21 158:3 158:18,21,24 159:1,3,6,7,11 159:11,17,18 159:25 160:4 160:12,16,18 161:1,10,25 162:3,8,19,23 162:24 163:10 163:12,12,19 163:19,24 164:4,9,14,25 165:2,17,21,21 166:5,9 167:4 167:9,12,16 311:25 312:9 312:10,14
**formaldehyde's** 157:14
**formalin** 163:2
**formed** 351:15
**forming** 32:25 33:19 59:16 77:16 87:22 104:4 117:13
**forms** 332:23
**formula** 75:1
**formulating** 165:3 312:5
**formulation** 56:25 74:20
**formulations** 81:10 145:4 149:17,20 345:2
**forth** 30:22 79:5 104:5 105:21 110:18 216:9 247:4 273:1 282:12
**forward** 40:18 54:5 99:6 285:18 310:1
**found** 57:21 81:3 85:2 89:23 90:5,9 127:13 131:5 140:4,20 154:13,15 164:10 186:16 204:18,19 210:10 228:6 229:7 231:5 232:14 233:10 239:17,20 266:10,15 268:18 271:25 272:25 273:6 274:15 315:25
**four** 43:13 44:5 50:23 51:9,10 51:24 52:19 53:9 85:9,11 281:23 283:1 283:15 284:20 287:10
**fourth** 109:9
**fragrance** 183:19 187:21
**frame** 204:4 350:17
**framework** 124:4
**franklin** 4:3
**frederick** 5:19
**free** 80:18
**frequencies** 288:25
**frequency** 135:20 283:2 285:24,24 286:22 287:1,6 287:8 288:15 291:10 292:1 331:22
**frequent** 43:10 44:3 225:24 226:1 227:18 232:10 251:23 253:7 280:14 280:20,24 281:14,21 282:4 332:3,17
**frequently** 43:1 331:25

**friday** 1:15 8:4
**front** 12:10,15
**fulfilling** 225:10
**full** 10:10,16 16:6,12 115:20 133:15 145:16 147:6 241:1 279:19,21 294:6,10
**function** 315:24
**fungi** 159:13
**further** 148:20 331:8 350:5 351:24 354:14
**furtherance** 148:21
**future** 252:8

**g**

**g** 8:1
**gaining** 309:23
**game** 61:23 62:5
**gamma** 23:21
**gap** 321:5
**garner** 28:1,2 156:17 296:3
**gary** 3:4 8:14 51:21 274:10 276:13 355:1
**gas** 141:9
**gasoline** 140:25
**gather** 250:13 254:13
**gathering** 22:19
**gel** 40:13,20 41:2,7 333:5
**gene** 322:8,13 322:18 323:2 323:10,19 346:14
**general** 22:8 67:7,16 72:6 82:19,19 95:13 98:8,22 105:21 113:25 128:17 144:24 149:5 172:20 180:18 187:10 289:24 295:14,18 300:21 313:2 314:24 319:22 327:19 335:19 336:18 351:9
**generally** 28:23 35:18 59:14 67:17,19 79:1 105:9 110:1 117:5 133:12 156:2 163:9 183:22 190:7 190:10,14 196:3 215:17 235:10,14,22 241:5 285:2 292:8 296:13 299:25 300:24 306:24 307:16 316:9 320:10 333:19 341:5
**generate** 149:8
**generated** 60:6 139:10 142:25 143:7,10,12
**generates** 219:12
**generating** 71:4
**generically** 132:4
**genetic** 20:9 127:23 128:4 329:21
**geneticist** 18:16
**genotoxic** 128:1
**gerel** 3:8
**gerstman** 36:9
**gesturing** 11:7
**getting** 53:22 92:19 134:16 141:21 142:5 152:9 168:16 230:5 245:24 250:14 258:10 271:9 336:19 339:21
**ginex** 5:2
**give** 9:11 10:10 10:11,19 22:7 46:7 83:17 149:19 215:4 220:25 236:19 270:17,23 282:7 297:16 314:20 315:15 350:7
**given** 9:8 10:6 40:25 63:5,7 64:12,19,22 66:5,9 108:5 252:4 290:18 299:13 357:9
**gives** 210:12
**glanced** 61:25
**global** 3:20
**glycol** 162:25 266:25 267:4 267:22,25
**glycols** 266:17
**go** 10:7 16:14 16:15 26:24 32:13 37:25 39:4,8 40:18 54:22 62:19 64:7 73:22 75:7 84:2,3,12 84:18,22,23 89:3,24 92:22 98:17 100:8 102:8 103:6

107:20 108:13 108:15,16 123:13 137:14 153:21 161:21 185:15 186:15 188:12 191:11 191:12 202:18 204:7 224:6 225:10 237:21 238:1 243:23 248:24 249:3,5 250:16 251:10 255:8 268:1 278:21 279:18 281:8 294:13 294:13 298:3 305:3 322:10 327:5,17 332:20 349:19
**goal** 221:13 322:21 338:6
**godrej** 3:20
**goes** 14:6 32:16 86:22 116:4 148:11 158:12 167:12 222:4 241:7 255:22
**going** 10:25 11:9,22 12:6 14:7 22:1 32:13,16 35:18 39:8 42:7 47:5 48:3,8 54:2 68:25 69:1,21 70:6 73:4,21 73:22 74:18 80:2,19 81:10 84:15 87:15 88:17 115:4,12 120:7 123:13 131:18 132:13 132:13 140:13 145:8 146:17 149:22 170:19 180:23 186:5 188:23 198:3 198:12 236:19 237:6,11,11,12 248:21,24 254:15 257:20 257:25 258:12 262:8 263:8 270:6 273:23 274:13 275:15 277:2 279:23 283:10 285:16 285:18 291:15 295:4 302:22 304:10 308:1 311:20 318:8,9 319:21 334:8 341:13 342:10
**goldberg** 3:13 5:21 8:13 9:3
**goldbergsega...** 3:17,17,18
**good** 8:2,24,25 72:20 111:7 133:2 191:1,9 191:10,13 215:7 261:10 318:13
**goodman** 37:6 37:9
**goodson** 169:24 310:18 344:6
**gotten** 209:3
**grammatical** 204:23 205:4
**granular** 300:2
**great** 22:6 95:1 188:13 268:20
**greater** 221:2 222:19 226:4 286:20 287:3 287:10
**ground** 191:14
**groundwater** 79:3
**group** 22:11 25:12 28:24 42:5 87:16 136:6 174:24 221:18,18 258:21 308:20 314:9 325:12 325:15,17,17 327:10 343:21
**grouped** 263:16
**groups** 28:23 171:25 174:20 186:4 308:21 327:12,14 338:22 340:5
**growth** 127:19 159:13,18 160:17
**gshipman** 3:6 355:2
**guess** 28:16 31:18 37:8 59:19 87:1 112:3 113:25 118:3 169:13 170:5 176:14 190:8 203:24 233:2,3,7,8 265:13 329:1
**guessing** 158:5
**guide** 23:11 27:2
**guidelines** 307:9
**guo** 3:22

**h**

**h** 6:8 356:3
**habits** 286:8
**hair** 1:5 6:20 6:22 7:1,7,9,12 8:6,7 15:16,20 15:24 39:14,17 39:19,21,21,25 40:5,14 41:9 41:19,24 42:13

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 394 of 449 PageID #:73095



42:19,23 43:2 43:17 44:11 45:1,9 46:9,10 46:19 48:21 50:25 51:6,12 51:25 52:18,22 53:8,12 54:8 54:15,18 55:5 55:7,18 56:3 57:4,12,12 59:5,24 67:7 67:10,14,24 68:1 69:7,19 69:24 70:11,23 71:4,8 72:14 73:11,23 75:9 75:10,14 76:9 77:3,19,21,24 80:16,21,23 81:2 82:8,12 83:8,20,25 84:7 85:11,16 85:25 86:11,19 87:11,13 88:12 90:10 91:19 92:4,6 93:10 93:10,16,18,19 93:20,21,22 94:2,8 95:14 95:20 98:9,23 100:4,11,23 101:5,16 106:8 106:21 113:19 114:15 115:14 116:3 117:4 118:23 119:17 120:2,14 142:22 143:1,6 143:9,20,23 144:17 145:4 147:11,19 148:1,5,8,15,16 148:19,19 149:1,8,11 150:6,16 151:8 151:11,14,17 152:22 153:21 155:19 156:9 163:6,11 164:4 164:19 165:7 165:13 171:19 172:3,5 175:10 175:18 176:25 177:15,24 179:18,22 180:4 182:23 184:3 185:25 186:11 187:1 187:16 192:23 194:10,24 195:23 197:12 199:6 201:11 201:15 202:4 205:23 206:22 223:19 224:18 228:1,23 232:10,16 233:12 239:2 242:3 252:1,10 253:7 255:3,21 256:1,3 257:5 257:13,16 258:15 259:14 259:21 260:9 260:20 263:3 263:25 264:14 264:25 265:4,6 266:11 267:23 268:18 269:1 269:12,19,24 270:3,13 272:7 273:6,16,21 274:16,20 275:2,11,19 277:11 278:3 280:6,20 281:12 284:4 285:16 286:16 287:14,22 288:4 289:14 290:9,11 291:13,21 292:23 293:10 294:7,23 296:4 297:3,17,20 298:5,16,21,22 299:11 301:21 314:1,22 315:12 325:7 326:15,21 328:12,21,25 329:4,18,24,24 329:25 330:2,3 330:9,17,22,25 331:3,4,9,13,24 333:3,9,24 334:10,19 335:6,6,7,8,20 335:20 336:2,8 337:11 339:17 343:4 345:20 348:7 349:12 351:4,19 355:4 355:4 356:1,1 357:1,1

**hairdo** 42:8

**hairdressers** 69:3

**half** 21:9 26:20 28:22 131:11 190:4,15 237:1 265:21 295:18 295:18 300:16 300:22 330:24 330:25 344:11

**halfway** 191:13

**haloacetic** 30:21 342:5

**hand** 84:17 85:11 115:18 146:23 211:14 240:24 248:21 251:14 255:14 326:4 337:15 354:16

**handbook** 23:11 103:1,8 103:20 104:6 104:10,11,13 104:23 105:11 105:11,12,16 105:25 106:7 106:20 107:1,8 107:21 108:1 294:14,16,18 294:25 307:11 324:15,16
**handed** 13:2 195:8
**handled** 299:6
**hands** 11:7
**hang** 237:21,21
**happen** 61:18 178:7 329:9 343:17 344:3
**happening** 74:11
**happens** 73:5 76:6 267:4 281:7 296:19 299:6 332:17
**happy** 11:17,25 21:12 66:3 76:18 135:3 249:12
**hardip** 3:14
**hardy** 3:21
**harm** 139:22 141:18
**harmful** 255:25
**hate** 276:16
**hazard** 9:15 18:25 19:8 22:13 27:6 78:22 103:2 219:13 253:15 286:20 289:7 289:10 307:12 308:25 309:3 309:25 341:5 341:14
**hazardous** 9:16 25:12 56:10 79:6
**hazards** 26:17 312:8
**head** 11:7 14:4 14:5 132:12 333:22
**headed** 193:22
**heading** 39:8 276:25
**heal** 331:14
**health** 7:11 9:16 56:21 92:3,10,12,25 93:9 139:19 140:16 173:1 173:12 174:9 217:15 232:8
**healthy** 318:13
**heard** 170:16 322:7
**hearing** 310:6
**heat** 69:22 142:25 143:6,7 143:10,12,15 147:13 149:8
**heated** 148:20
**heating** 143:20 148:16,16
**helm** 45:14 48:25 57:21 78:13,14 79:25 80:8,23 82:3,7 83:5,16 84:12 85:2 145:25 146:9 154:2,23 172:2 183:1 259:4,7,9,13 263:10 264:2 269:20,22 273:11,15 278:7
**help** 10:3 35:7 132:22 183:4 252:11
**helped** 46:24
**helpful** 224:2 333:8
**henneke** 4:16
**hereinafter** 92:5
**hereto** 353:3 357:7
**hesitate** 244:7 244:21
**hey** 132:12 276:5
**heyl** 5:13
**heylroyster.c...** 5:16
**high** 39:9 88:1 136:1,7 141:17 183:14,16 275:2 291:20 315:23 319:8 336:8
**higher** 138:8 139:16 179:11 190:12 281:21 313:8,12 336:11
**highlight** 255:15,18
**highly** 180:5 275:24 329:5 330:24
**hill** 7:3 29:22 30:1 95:9,10 96:12,21 110:10,20,25 111:6,14 112:18 207:10 207:16,20 208:4,8,11,19 208:21 209:13 209:16,20 210:2,3 211:17 212:17 213:8 213:21 214:3

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 396 of 449 PageID #:73097



215:11,15,21 216:8,9,17,18 216:21,25 217:6,13,24 218:4,13,25 219:22 224:5 234:1,2,7 235:10 236:11 238:18 241:18 242:7,11 243:2 243:21,24 244:1 250:14 257:19
**hill's** 245:24
**hired** 19:4 22:23
**histologic** 252:3
**history** 250:20
**hmm** 213:15
**hold** 53:10 246:9
**holdings** 3:20
**home** 140:5 276:25 281:8 303:16
**hope** 137:4
**hopefully** 215:3 249:1 318:13 342:13
**hormone** 197:15
**hormones** 120:18 319:4
**hot** 85:3
**hour** 237:1
**hours** 9:20 14:24 15:6,8 15:10 180:23 190:16
**house** 4:7
**hoyt** 37:7
**hpassananti** 3:17
**hr** 235:5
**huh** 115:22 224:25
**human** 126:1,3 135:17 156:16 168:13 192:21 280:3,4 324:25 342:15
**humans** 30:6 89:16 131:12 134:23 135:11 137:25 138:24 139:3 156:13 157:10 181:12 207:17,25 208:1 292:3,9 292:11 322:11 341:15,25 344:4
**hundred** 317:13 330:25
**hydantoin** 163:24 164:9 164:19
**hydrocarbons** 304:7
**hydroxides** 275:1
**hypothesis** 170:5 221:1
**hypothetical** 53:7 86:16 151:24

**i**

**iarc** 49:20 158:8,9 167:11 167:16 168:5 279:8 289:8 312:8 341:9,13 341:17
**idea** 119:12 135:25 136:3 164:14
**ideas** 35:20
**identification** 13:6 14:16 16:2 34:4 80:5 115:10 146:21 195:13 210:8 215:1 237:17 248:19
**identified** 33:24 46:23 49:10,13 50:24 51:24 52:20 53:10 55:6,25 72:1 83:15 121:6 124:12 129:13 133:6 133:25 134:18 138:22 146:2 146:13 148:6 149:22 150:25 151:17 154:4 162:20 164:7 165:6 168:22 169:9 183:1 189:6 193:2 261:15 270:2 281:23 300:23 300:24 301:5 313:25 318:25 320:23 331:1 336:12 337:7 341:20,22 344:10,20
**identifies** 259:4 259:7
**identify** 22:14 23:6 28:18 45:23 46:17 47:14 49:5 52:5 56:24 65:15,20 70:20 86:23 102:14 122:10 123:15 129:3 134:7 137:22 152:14 154:15 155:3 155:20,22 157:20 167:7

168:20 175:13 177:12,14 193:12 196:15 197:7 202:19 220:21 241:23 252:6 259:9,13 261:18 293:23 320:8 327:2 337:8
**identifying** 129:4 134:20 135:4,8,23 137:15,24 173:19 255:25 276:3 316:22 334:18
**ignore** 253:12
**illinois** 1:1 4:4 4:13,22 5:4,9
**imagine** 323:3
**immediately** 303:4
**imminent** 9:15
**impact** 56:22 182:11
**implication** 126:4 286:13
**implied** 292:10
**implies** 99:6 286:4
**imply** 236:7
**importance** 255:19
**important** 10:14 59:22 67:21 96:1,22 126:23 131:10 142:25 169:14 181:20 215:25 234:13,17 236:6 247:15 247:15,18 252:8 254:13 254:16 256:4 293:8 301:15 317:17 326:1 340:16 347:24
**impossible** 89:17 153:6 244:7 325:11
**impurities** 187:2 270:14
**inadequacies** 315:21
**inadequate** 315:25
**inadvertently** 61:10
**inappropriate** 122:9 124:21 227:2
**incidence** 6:24
**incident** 7:7
**incidents** 115:15
**include** 27:10 58:9 63:19 80:16 82:24 212:17 213:20 216:21 234:24 267:22 270:15 274:20 333:21
**included** 51:11 64:21 85:15 110:25 165:5 195:5 204:14 209:12 239:22 272:10
**includes** 110:24 210:16 213:21 278:7 317:11
**including** 117:2 161:1 199:1
**inclusive** 252:10
**incomplete** 202:21
**inconclusive** 249:8
**inconsistent** 118:20,25
**incorporated** 105:20
**increase** 69:22 143:1,15,19 194:13 229:25 289:21 313:5,7 313:8 334:5,6
**increased** 44:3 44:4 194:12 225:22 254:7 329:18 331:11 334:22
**increases** 121:22 156:20 156:24 200:10
**increasing** 329:15
**independent** 306:25 332:6
**indicated** 201:8 293:12
**indicates** 134:15 178:18 201:14
**indicating** 226:4
**indirectly** 96:2
**individual** 142:7 169:5 192:2,7,13 292:22 301:9 301:18 314:21 343:3
**individually** 172:7 315:10 343:22
**induce** 136:8 329:3
**industrial** 26:21
**industries** 4:1
**industry** 26:19 157:12

**inferred** 115:2
**inform** 59:25 299:16 300:13
**information** 14:4 22:19 23:7 24:22 43:5 57:10 58:8 59:4,15 60:5,19 61:13 61:14 62:9 65:1,9 80:1 82:5,7,25 93:6 97:16 134:16 135:18 145:1,8 150:10 151:10 151:12 186:16 199:1 205:1 216:2,15 219:5 232:23 242:18 250:13,16 253:11,13 275:23 283:16 289:9 303:9,11 314:23 315:17 333:8 336:19 337:2 340:17 348:17
**informative** 78:10 339:12
**infrequent** 288:22
**ingredient** 83:14 145:2 150:21,23,25 152:6 155:13 162:9 263:25 264:5,8 266:11 267:4,23 270:3 273:6 275:12 275:15 277:7 278:9 345:1
**ingredients** 55:19 56:18 57:4,11 58:6 59:4,23 61:13 62:10 63:20 75:14 80:12 81:3 82:2 83:15 88:18 153:15 154:16 192:8,13 193:8 263:3 265:4 269:19 272:25 272:25 277:11 278:11 296:6 328:6 336:12 345:18
**inhalation** 67:25 69:9 70:1,4 142:24 165:17 177:6 177:20 188:3 264:23
**inhale** 70:7
**inhaled** 70:5,10 70:22 71:10,20 72:3 177:17 260:22 300:7
**initial** 12:22 54:15 302:9
**initially** 206:19 302:6
**initiating** 128:5 129:4,14
**input** 19:7
**inside** 73:5 159:19 189:8
**inspect** 26:24
**instance** 192:1 313:3
**instances** 303:3
**institute** 139:19 140:16
**instructions** 333:4,12,13,21
**insufficient** 168:14
**insults** 329:22
**intact** 178:16 178:19
**integrity** 334:11
**intendant** 263:2
**intended** 161:11 263:3 263:25
**interact** 47:9 121:15
**interacting** 73:14 74:12 75:16
**interaction** 143:25 159:23
**interactions** 76:3 169:21 343:13,16
**interacts** 160:17
**interest** 19:17 35:5 126:1 201:16
**interested** 19:21 37:19 38:3 354:15
**interject** 58:11 61:21
**interjecting** 61:5
**internal** 27:14
**international** 49:21
**interpret** 68:17 212:6
**interpretation** 112:21 228:15
**interpreted** 196:24
**interpreting** 68:18 211:15
**interrupt** 25:15
**interrupted** 68:20
**interval** 221:9 221:15,19,25 222:2,3,10,22

225:2,11,12
**intervals** 222:12 224:7 227:15,22
**intervention** 347:5
**intimate** 143:8
**introduce** 8:9 9:2
**introduction** 332:20
**investigate** 50:21 52:15 162:22 167:3 181:9 256:12 277:22 322:1 340:16
**investigated** 45:19 71:13 74:24 122:7 129:19 160:3 169:12 292:25 309:19 310:24 312:18
**investigating** 90:2 220:3 253:23
**investigation** 31:11 32:4 92:22 114:2 116:4 117:6 118:24 119:8,9 165:10 196:13 295:12
**investigations** 26:12
**investigative** 197:12
**investigator** 25:8 27:22 28:8 156:6,7
**involve** 121:2 128:4
**involved** 23:16 25:5,19 26:16 27:17 31:20 32:3,5 40:16 94:19 103:21 105:2,13 128:18 156:5 160:9 161:18
**ionizing** 23:21
**iron** 40:2
**irrelevant** 150:17
**irungu** 83:12 155:12 269:23
**isomers** 261:25
**issuance** 28:13
**issue** 24:23 41:22 59:5 123:2 129:25 141:16 236:25 317:6 318:19 318:20 326:13 332:4 348:18
**issued** 15:23 27:9 34:15,20 35:2 36:3 58:3 66:21 67:3 196:19
**issues** 35:7,8,22 214:13 225:9 252:18 256:19
**issuing** 15:22 197:17
**it'd** 180:4
**italian** 141:13

**j**

**j** 3:14 5:8,14
**jackson** 5:3
**james** 5:23
**jane** 114:19,21
**january** 14:25 37:13,14 203:5
**japanese** 147:12
**job** 1:25 25:11 26:4,4
**joe** 9:2
**join** 19:13,19
**joseph** 3:14 8:12
**jpms** 5:7
**july** 14:25 15:2
**jumped** 282:12
**june** 103:7
**jwelter** 3:17

**k**

**k** 3:4,9 4:7 346:1 355:1
**keep** 38:23 215:6 230:19 230:19
**kelbey** 5:23
**kenya** 155:15
**keratin** 147:12 148:1,18,19 149:20
**kevin** 4:12
**key** 121:6 125:20 126:17 127:10 128:22 128:23 129:5 129:13 165:3 173:24 194:4 201:21 206:3 295:6 297:1
**kidneys** 276:10
**kill** 323:1
**killing** 136:2
**kind** 10:18 39:9 54:3 67:7 84:19 103:22 109:9 120:8 158:9 202:20 210:25 222:3 243:3 268:21 277:6 278:24 287:21 297:23 309:24 319:20

342:22 343:5
**kinds** 123:8
**kit** 41:13,14 73:11,23 163:11 275:3
**kithikii** 196:16
**kits** 40:11,19 274:20 275:2
**knew** 20:16 92:21 122:5 141:4 316:18
**know** 11:3,12 11:24 14:3 15:5,12 16:11 19:16,19 23:17 24:11 27:25 33:20,21,23 35:4 37:10 39:25 40:8,9 40:11 41:6 42:23,24 43:10 43:12 44:16 45:20,23 46:24 50:12 51:5,23 52:11 53:25 54:23 55:2,22 56:23 57:19 58:4,21 59:10 60:4,5,17,25 61:3,9,16 62:16 67:20 68:14 69:15 70:14 72:14 74:21,22 76:13 77:8 78:2,17 82:18,25 83:1 85:21 87:10 89:10,14,15 90:5,25 91:1 98:12 102:10 103:19 104:9 104:13 105:21 106:4 107:4,4 108:24 110:17 110:24 112:6 113:23 114:2,7 114:18 116:19 117:19 119:1,2 119:9,25 120:1 122:16 124:1 125:17 126:1 126:16 128:13 128:14,18 130:11,17 131:19 133:16 135:15,18 136:4,9,22 137:9,21 138:7 138:8,12 139:12 140:18 141:3,25 143:10 144:22 145:5 150:10 150:19,20 151:22,25 152:13 153:3 154:2 155:1,16 160:21,22 163:10 164:18 166:13,15,25 166:25 167:15 167:21 171:22 171:24 172:13 174:12,14,15 174:16,21 177:17 178:9 179:23 180:13 181:24 182:5,5 182:7,8,9 183:22 186:19 186:20 187:8 187:18,20 189:14 192:7 192:17 193:6 199:13,15 202:21 205:14 207:12 208:17 209:3 211:12 212:8 215:5,20 216:15 222:12 222:14 225:25 226:3,8 227:17 228:9 229:1,1 229:18 230:4,6 231:14,21 232:14,18,22 235:25 237:25 238:8 240:14 242:3,14 245:11 246:22 246:23 249:23 250:9 253:17 253:20 254:14 256:10,15 258:24 259:1 262:20,21 263:9 265:21 265:24 270:24 272:9,23 273:9 273:11,18 274:21 277:23 277:25 278:1 279:24 281:6 287:24 288:1 288:12 289:20 292:8,11 293:2 293:8 294:16 300:1 302:14 303:14,15 305:10,16 307:17 308:4,5 308:12 310:12 311:1,3,3,17 313:24 314:8 317:4,5,7 318:12 319:3,7 322:8,9,11,18 323:8 324:6 325:1,6,10 326:10,12,12 327:16,17 328:7,8,10,18 328:24 329:2 330:2,4,5 332:22 333:1,2 334:1 335:11

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 401 of 449 PageID #:73102



336:9,20 337:20,23 340:3,14 341:6 341:9 343:23 344:4,25,25 347:20 348:16 348:20 349:11
**knowing** 72:7 88:15 132:8 158:2 186:15 265:8 333:17 333:19
**knowledge** 16:19 42:20 72:6 111:19 112:3 143:8 160:15 161:5 241:2 255:2 266:8 278:2 307:13 308:8 309:23 335:23
**known** 47:1 56:9 112:6,22 125:22 131:20 134:8 138:17 138:23 147:13 156:15 157:21 158:18,20 168:22 189:21 266:6 286:6 296:15

**l**

**l** 353:1
**lab** 77:8
**label** 275:15 287:24
**labels** 64:3 154:7,11,13,15 155:1,13 275:12
**lack** 262:19 337:1 348:19 348:24 349:4
**laid** 215:21
**laila** 5:24
**lamarel** 121:5
**language** 91:11 91:24 196:23 253:3 288:19
**laptop** 12:16
**large** 251:17,21 305:14 354:6
**lasted** 9:19
**late** 63:23 258:10 271:9
**latency** 247:4
**lathering** 272:17
**lawyer** 66:7
**lawyers** 276:17
**lay** 253:11
**layers** 67:18
**laying** 212:23
**leaching** 186:21
**lead** 27:21 28:8 42:6 47:10 116:11 125:14 173:12 192:9 290:23,24
**leading** 330:14
**leads** 129:23 130:15
**leaking** 187:23
**learn** 324:4
**lease** 194:9
**leave** 85:5
**led** 153:22 230:8 319:23
**left** 84:17,18 105:2 240:24 251:14
**legal** 355:23
**legal.com** 5:5
**lehnert** 3:15
**leiomyomas** 197:14
**length** 282:8 320:13
**lesions** 320:18
**leslie** 4:21
**leukemia** 157:9 157:17
**level** 17:13 76:4 88:2 123:16,24 127:5 136:23 164:8 170:6 201:5 202:23 235:25 312:7 313:7,8,12 320:9,16 321:6 321:14 323:10 323:10
**levels** 79:5 83:14 139:4 140:9,9 163:18 164:20 291:1 307:8 313:5,6 313:23,24 314:10,10,16 314:20,21 335:6,8 336:9 336:11
**levin** 5:19
**lfederer** 4:23
**liability** 1:6
**library** 107:12
**life** 153:5 161:2 265:21 286:10 295:18,18 300:16 324:3 329:22
**lifetime** 43:11 290:17
**light** 24:1 31:19 287:9
**lightheartedly** 111:25
**liked** 108:8
**likely** 50:14 118:10 141:23

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 402 of 449 PageID #:73103



144:7 153:16 221:17 222:18 266:20 269:10 275:24 288:17 310:13,14,17 316:20 329:17 336:24 340:4
**limitations** 136:4 240:6 248:10
**limited** 18:21 53:3 81:19 93:11 100:14 219:4
**limits** 79:3
**line** 84:24 109:9 142:16 145:18 188:23 222:4 345:8 356:4,7,10,13 356:16,19
**lines** 52:14 53:1 271:19
**link** 172:18
**linking** 178:13
**lipid** 67:18 334:4
**lips** 68:14
**list** 12:17 24:25 29:4 30:12,17 32:15,19,23,24 33:4,7 34:10 45:4 46:4,7 56:18 57:4 58:7 61:13 63:19 84:19 131:21 134:14 162:3 258:19 270:17,19 271:2 273:15 275:15 278:23 341:24 345:1
**listed** 25:7,20 28:7 30:21 33:7 69:16 104:22 183:20 279:9 312:3
**listing** 158:15 269:9
**lists** 172:3 182:15 275:12 312:5
**lit** 35:19
**litchfield** 4:12
**litchfieldcav...** 4:14
**literature** 23:6 26:16 27:7 29:21,25 31:4 46:25 52:9 92:2 107:10,13 108:13,14 117:20 123:6 123:14 130:7 155:11 156:8 164:3 165:12 168:21 187:13 256:14 264:1 265:17 269:5 302:21 316:21 316:22 331:2 336:16,17 343:11
**litigation** 1:6 14:25 15:20,24 33:1 35:25 41:22 57:13 59:6 61:15 98:7,21 100:3 106:15 109:23 161:9 197:24 198:3 225:9 301:5 311:10 312:20 316:8 316:12 348:6
**little** 11:16 24:3 44:24 54:5 73:18 92:22 93:17 103:23 123:2 131:17 165:16 174:19 182:19 183:25 190:12,13 196:7 207:9 217:19 224:23 238:6 239:16 268:2 271:16 280:18 282:12 306:1 327:17
**lived** 292:7
**lives** 190:4,16 300:22
**llc** 3:20,20 4:6 4:21
**llehnert** 3:18
**llp** 2:6 3:4,13 4:12,16 5:19
**located** 51:7 60:11,12
**location** 125:12 354:8
**logistically** 10:14
**long** 9:19 42:22 52:16 66:13 105:4 181:4,25 182:17 194:11 207:20 250:22 252:23 280:6 280:10,13,21 280:23,25 281:15 282:9 288:14,21 289:13,22 319:11 336:24
**longer** 5:19 160:18 204:5 285:3 288:17 292:7
**look** 13:8 14:19 42:11 46:25 56:8,16,17 66:15 72:15 84:4 86:6 95:24 101:11 111:5 114:23

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 403 of 449 PageID #:73104



119:21 123:14 128:20 129:11 135:14 137:5 142:7 154:20 158:11 172:12 173:8 183:3 197:3 220:2 222:11 225:23 226:12,13,16 228:6 231:25 245:12 247:7 249:12 253:24 263:12 270:22 272:12 282:3 283:22 288:10 300:4 322:12 323:2,4,7,19,20 324:22 328:8 329:12 332:20 335:21 336:17

**looked** 23:23 33:14 38:8 45:16 55:3 57:3 58:20 63:22 64:1 69:3 80:23 82:10 83:10 113:24 119:23 126:3 134:4 140:8 144:23 154:11,12 155:1,18 172:2 172:14 173:22 181:10 182:8 182:16 187:7,9 192:21 199:12 201:20 224:11 224:12 227:14 235:4 239:10 242:3 256:25 283:25 292:24 295:2,22 298:19 300:21 313:2 317:11 323:9 328:11 328:16 335:25 338:10 346:14 346:15,15

**looking** 26:7 30:14 31:9 35:3,19 36:16 38:3 39:24 40:10 45:3,7 48:24 52:8,11 55:11 56:22 58:25 68:19 75:22 89:8,9 89:11 90:3 92:24 104:15 105:4 108:2 112:12,14,16 114:4 121:11 127:9,10 141:21 152:8 154:7,23,25 155:4,6 156:10 169:16 172:20 173:5,18 174:17 177:12 180:1 192:22 200:3 202:16 208:25 209:1 209:25 210:11 210:12,14 211:12,22 212:6 223:14 225:19 228:4 231:11,19,21 233:17 240:2 244:4 247:6 248:7 253:18 257:16 268:13 270:7 277:10 277:13,14 280:17 286:19 295:13 296:15 298:20 300:7 301:8 303:23 316:16 319:3 320:14 324:2 333:20 336:2 338:9 343:9 345:14 346:4,8 347:8

**looks** 85:8 249:20

**lost** 276:13

**lot** 14:1,3,4 25:25 39:24 50:19 55:3 56:13 57:10 58:24 64:2 78:25 104:18 108:12 114:3 119:22 121:3 126:23 134:15 136:20 138:11 138:16 164:25 187:9,10 213:19 261:24 272:11 277:21 302:21 325:8 329:11 332:5 336:17 338:11 339:19

**lotion** 85:25 190:23

**lotions** 85:12 325:25 337:15

**louis** 5:15

**low** 169:16 170:6 183:14 183:17 229:16 301:18 313:6 319:6 323:1 343:20 348:15

**lower** 140:20 221:2 313:11 320:23 321:19

**lunch** 188:9 191:10 257:23 258:1

**lung** 210:14,15

**lynn** 3:15

**m**

**m** 122:18
**m.s.** 6:14,17
**made** 9:15 44:19 61:24 101:9 170:1 195:18 196:4 198:22 202:12 215:4 254:10 267:24 274:24 285:6 354:10 354:13 357:5
**madison** 4:13
**main** 3:15
**maintain** 20:24 21:19
**maintained** 21:15 129:8
**maintaining** 126:23
**major** 140:19 155:19 322:5
**majority** 27:5
**make** 10:15 16:8 35:21 38:21 40:17 76:16 87:18 96:10 120:15 126:11 189:24 192:7,14 198:8 210:21 219:3,7 249:5 261:19 275:8 282:14 290:10 326:11 348:21
**makes** 86:21 88:4 188:18 325:10 336:7
**making** 325:19
**malignancies** 200:15
**malignant** 199:16,16
**malon** 4:8
**mandate** 53:18 54:3,6,11 56:7 77:4 91:15,18 91:25 92:11,12 92:20 93:7,20 94:6,22,22 95:1,18 100:25 160:8 167:3 199:21 200:3 206:10 212:12 214:15 225:10 257:7 292:23 299:13 301:20 315:3
**mandated** 22:13
**manifest** 322:20 323:11
**manner** 312:6
**manufacture** 149:18 266:16
**manufactured** 59:7 74:5
**manufacturers** 52:13
**manufacturing** 267:5 272:1
**map** 224:6
**marcadis** 5:25
**march** 1:15 2:1 8:4 15:10 20:18 354:16
**mark** 115:4,12 146:18 210:18 210:20 214:23 237:6,11,12,12 248:16
**marked** 13:5 14:15 16:1,5 34:3 80:2,4 115:9 146:20 195:12 210:5 214:25 237:16 248:18
**market** 5:14 336:24
**marketing** 1:5
**maron** 4:21
**maronmarvel...** 4:23
**marvel** 4:21
**master's** 17:10 21:2,4 24:10 24:12
**materials** 33:4 33:7 35:13,13
**matter** 121:10 134:6 175:6 256:13 327:9
**matters** 175:8
**maximum** 135:24
**mcauliffe** 4:2
**mccambridge** 4:8
**mcguirewoods** 4:16
**mcguirewoo...** 4:18
**md** 6:11 98:14
**mdl** 1:6 8:6 15:16 355:4 356:1 357:1
**mean** 11:10,11 35:1 73:8 110:22 121:22 126:15 135:13 139:8 143:19 158:21 166:7 168:11 169:10 213:3 218:4 245:8 262:20 279:12 280:11 280:12 290:13 299:20 306:10 309:6 321:12 324:20 326:25 342:19,20 346:2

**meander** 181:22
**means** 66:8 107:8 325:16
**meant** 199:12
**measure** 77:25 89:14 125:25 280:15 282:8 290:15 304:1 322:3,15 323:5 323:14
**measured** 72:13 78:5 89:14
**measurement** 6:18 78:3
**measures** 235:8
**measuring** 176:18 180:18
**mechanism** 112:20 128:18 157:17
**mechanisms** 32:6 112:23
**mechanistic** 22:25 28:24 32:12 97:15 102:2,15 104:16 105:16 105:23 108:21 112:14 125:19 129:1 156:10 214:21 215:19 216:13 342:3
**mechanistica...** 99:21
**medical** 18:7 98:7,13,14
**medicine** 111:24
**medium** 164:10
**meeting** 28:21 28:22 60:18 244:18
**meetings** 27:17
**meets** 310:3,4
**member** 19:12 19:21,25 20:6 20:11
**members** 30:20 32:8 317:14
**memorized** 107:8 223:22 231:10
**memory** 238:9
**men** 180:6
**mention** 197:4 278:8 290:10 307:12 334:2 346:5
**mentioned** 14:21 79:25 80:9 83:19,24 92:10 94:16 110:9 126:7 146:25 150:3 184:14 190:20 197:2 203:24 207:11 212:2 215:22 242:11 243:2 250:12 258:5 266:20 266:22,23 269:5,23 272:16 278:11 278:24 283:7 292:14 313:23 317:16 336:15 342:6,9,14,24
**met** 9:1
**metabolic** 126:21 296:18
**metabolism** 23:2 77:9 139:9,21 292:19 296:16
**metabolite** 176:19
**metabolites** 78:3 323:20
**metabolized** 178:10,13,15 179:2 190:15 265:25 296:16
**metabolizes** 159:24
**metals** 50:18 270:15
**metastasis** 127:16
**method** 30:12 79:13
**methodologi...** 214:4 293:17
**methodology** 97:1,4,13,20 102:9,13,22,25 104:5 106:7,13 106:19 107:1 107:21 108:1 109:2 209:16 213:9 216:9 235:22 303:4 305:17 315:22
**methods** 23:9 30:17 101:21 101:25 102:14 103:1 104:17 107:5 307:11
**methyl** 171:24
**methylene** 162:25
**methylparaben** 86:1,2,19,21,24 174:8
**methylparabe...** 84:25 85:14 86:12,17
**metric** 247:6 303:12
**metrics** 307:6
**mic** 341:11
**mice** 133:19 184:18 279:8 292:6

**michelle** 3:9 8:15
**microbial** 159:12 160:17
**microphone** 9:23,24
**mid** 28:16 310:7 313:7
**migration** 127:17
**military** 3:5
**miller** 5:8
**mind** 31:19 83:3 87:14 289:3 329:8
**mine** 58:9 338:3
**mineral** 23:24 302:12
**minimal** 136:11
**minimum** 21:3 44:10,20 134:22 135:10 230:20 287:19 288:24 291:25
**minute** 14:21 232:25 303:2 341:9
**minutes** 42:25 111:9 190:21 337:12 338:21
**misclassificat...** 340:10
**missing** 202:21 204:17 262:17
**missouri** 5:15
**misspelled** 204:19
**misstate** 120:10 258:9
**misstatement** 202:24 203:22 205:8
**mistake** 203:3
**mix** 47:9 230:7
**mixed** 23:19 74:21 192:8
**mixing** 74:12 74:23 333:23
**mixture** 45:8 46:22 47:6,7 88:17 142:6 150:13,13 151:8 152:8,25 153:11,14,23 170:13 175:9 175:24 191:21 192:1,3,14 193:13 258:22 301:9,10,16 330:12 348:2
**mixtures** 23:19 73:7 74:18,20 88:15 169:17 169:22 170:5 301:15 302:17 303:5 304:6 305:9,24 310:21 343:10 344:8,12 348:15
**model** 79:10 308:9,18 309:1
**modeled** 78:12
**modeling** 78:8 136:18,20
**models** 299:21 299:22 307:16
**moderate** 235:13
**modern** 310:15
**modifier** 94:1
**molecular** 78:4 125:22 129:3 129:14 183:14 183:15,16,17 190:12 323:10
**molecules** 69:18
**mona** 5:24
**monatomic** 305:8 306:2,8 307:16 308:9 308:17 309:1 309:11 310:22 311:9,20 312:13,20 313:20 315:9,9 315:15,16,24 316:8,19 317:1 318:5,19 319:12 320:6 321:17 344:13
**monitoring** 69:5
**monograph** 167:11
**months** 43:9 117:23 179:19 179:21 284:8 284:12,14 285:17,21 337:12
**moore** 3:4 5:23
**morbidity** 320:17
**morning** 8:2,24 8:25 12:9 191:17,21 195:14 204:15 207:11 278:23 333:2
**mouth** 71:5
**move** 65:7 79:14,20 113:15 131:16 137:5 166:17 170:11 215:9 229:2 230:2 261:12 273:19 277:2 309:24
**movie** 42:5
**movies** 42:1,2
**moving** 68:15 230:5 309:24

322:23
**mparfitt** 3:11
**multifactorial** 290:18
**multiple** 89:19 91:2 153:15 176:6 189:21 220:6 344:8
**murray's** 4:20
**mutagenesis** 20:10
**mutation** 127:23

**n**

**n** 6:1,1 8:1 122:18 353:1
**name** 9:2 27:25 104:21 122:18 163:3 311:2
**names** 36:6,11
**nasal** 210:15
**national** 19:23 21:23 139:18 140:15
**natural** 256:3
**naturally** 93:6 139:20 164:10
**nature** 3:19,20 41:1 143:24 190:23 219:13 325:25
**ndm** 307:13
**near** 335:14
**necessarily** 51:11 56:2 99:13 121:22 127:25 128:4 149:4 169:10 242:12 243:5,6 258:14 319:19 339:9 348:25
**necessary** 45:2 46:9 134:22 135:10 175:12 192:14 193:12 219:2 244:20 316:2 345:4 357:6
**necropsy** 133:15
**need** 9:24 90:25 155:3 215:8 243:1 249:4,19 249:25 252:19 297:8 298:1 314:10 322:3 340:23
**needed** 27:2 198:22 225:18 251:6 252:5 298:3,3 314:16 349:17
**needs** 127:23 250:6 287:14
**negate** 79:10 243:5
**negative** 219:15
**neither** 354:14
**neuroendocri...** 31:22
**neurological** 126:21
**neutral** 338:16
**neutrality** 335:15
**neutralizer** 143:12
**neutralizing** 40:15 41:8 69:20 275:18
**never** 42:14 44:1 78:19,23 217:5,8 224:15 226:2 227:19 237:24 281:20 287:9 288:14 348:20
**new** 3:16,23,23 103:7 111:23 156:12
**night** 24:1 31:20
**nihs** 27:15 116:25 119:11
**nine** 95:10 96:12 208:4 217:23 238:18
**nitrated** 304:9
**nitrates** 277:9 277:13,17
**nitro** 277:12,20
**nitrosamines** 49:25 270:15 277:5,6,8,12,20 278:5,9,18,25 279:3
**nmdr** 307:13
**nomenclature** 243:13
**nomination** 22:18
**non** 6:24 115:16 175:3 233:25 257:2 305:8 306:2,8 308:9,17 309:1 309:11 310:22 311:9,20 312:13,20 313:20 315:9 315:16,24 316:8,19 317:1 318:5,19 319:12 320:6 321:17 344:13
**noncancerous** 179:13 347:3
**nonexposed** 87:16
**nongenotoxic** 128:2

**nonmonotonic** 123:2 303:6
**nonpersistent** 190:9 300:25
**nonreproduct...** 257:3 328:11
**nonresponsive** 79:15 170:11 230:3
**normal** 139:21 214:10
**normally** 214:20
**north** 1:16 2:7 3:5 4:3,22 20:3 354:2,6,21
**northern** 1:1
**nose** 71:5 210:15
**notary** 353:12 354:5,21 357:13,19
**note** 355:10
**noted** 357:7
**notes** 29:2 209:12
**notice** 2:3 6:10 13:10
**noticed** 198:21 204:17
**novel** 30:10
**novelty** 252:4
**november** 33:13
**np** 31:10 158:17
**ntb** 302:8
**ntp** 22:2,3,9,10 27:4 29:4,15 30:9 31:10 49:20 78:22 89:1 97:18 103:3 106:7,12 106:16 107:7 108:11 109:5 131:23 133:14 134:11 135:5 155:24 158:8,9 158:17 160:9 161:23 166:8 166:19 167:7 168:5 184:15 185:10 215:14 216:7,20 218:19 253:18 279:9 289:7 294:25 296:1 301:23 302:4,8 302:17 306:5,7 306:12 307:11 308:17,20 312:8 313:1 314:7 341:7,10 341:12,17 342:5
**ntp's** 102:3,17
**nuclear** 121:4
**null** 320:24 321:20 325:18
**nullify** 221:1
**number** 29:5 31:16,21 41:13 43:6 45:17 50:13,14 53:1 55:10 69:2 77:24 81:19 83:2 97:16 112:2 121:8,14 128:15 129:14 129:15 135:20 135:21 136:20 139:11 154:5 155:22 169:23 172:14 173:4 182:15 202:19 228:14 229:12 229:21 247:1,2 247:5 248:11 248:14 291:12 301:10 310:11 313:13 322:15 332:1 343:18
**numbers** 225:23 233:21 240:9
**numerous** 154:4
**nw** 3:9

**o**

**o** 6:1 8:1 353:1
**object** 61:5 98:25 120:23 151:3 222:7 297:6 333:11 350:20 351:6 351:10
**objection** 18:23 24:9 30:7 31:14 34:25 36:20 40:6,22 41:11 43:3,20 44:14 45:5 46:14 47:12 51:1,14,19 52:2,24 53:15 54:20 55:20 56:5 57:6 59:8 59:17 60:1 63:21 65:12 69:10 70:12 71:11 72:4 73:16 74:14 75:18 76:11 77:5,22 81:6 82:14 83:22 84:9 85:19 86:4,25 88:6 90:12,23 92:17 95:22 97:7,21 98:10 100:6,16 101:7 107:2

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 409 of 449 PageID #:73110



108:9 109:24 113:20 117:16 119:19 120:23 122:3 123:9 124:13 125:16 127:6,24 128:11 130:2 130:25 133:11 134:2,24 135:12 137:18 138:3,18 139:6 141:2,19 144:2 144:20 146:10 149:12 151:21 152:23 153:12 153:24 154:18 157:1,22 159:21 160:20 161:3 162:13 163:1,14,21 164:12,23 165:23 166:22 167:18 169:3 171:3,12 172:11 173:2 173:13 174:10 175:7,21 176:4 176:12 177:1 177:18 178:3 178:11 179:3 179:24 180:15 181:7 182:3 184:12 185:5 186:2,13 187:4 188:21 189:11 190:5 192:16 193:16 199:9 200:12,23 202:6 205:13 205:25 207:18 208:14,24 209:18 211:19 212:21 214:6 216:11 218:2 218:16 219:24 220:17 222:7 223:9,20 224:10 225:6 225:16 226:11 228:2,24 229:9 231:7 232:17 233:13,16 234:3 235:2 236:13 238:25 239:23 241:25 242:9 243:22 246:15,15 247:25 249:9 250:7 251:7 252:21 256:8 256:21 258:17 260:12,23 262:14 263:5 264:16 265:12 267:7 270:5 273:8 274:17 275:21 281:16 286:17 287:17 288:8 289:17 293:19 295:1 296:9 297:21 298:17 299:18 303:7 306:9 308:11 309:14 311:14 312:23 314:2 315:13 317:3 318:6,22 320:1 321:21 326:5,24 330:1 330:19 332:8 334:14 335:9 336:13 337:18 338:12 339:7 341:3 343:6 344:23 345:23 347:19 348:9 349:1,15 351:6

**objections** 157:11 351:17 353:8 354:10 354:13

**objective** 158:1 158:1

**obligation** 198:8 219:6

**observable** 320:15 321:6 321:11,14 343:25

**observation** 246:17

**observe** 111:23 251:25

**observed** 123:15 212:5 244:14 245:25 320:9

**obtain** 20:24

**obverse** 244:5

**obviously** 23:8 56:8 71:4 96:22 117:19 117:25 126:22 160:7 209:3 242:25

**occasions** 244:6

**occupational** 210:13

**occupations** 139:11,15

**occur** 304:7 305:24 331:25 342:25

**occurred** 325:5

**occurrence** 253:10 332:17

**occurring** 331:23

**occurs** 127:4 159:16 310:4 333:10

**october** 116:12 117:2,11,20 223:17 245:14 245:15,17

254:23
**odd** 112:1
**offer** 95:13 98:14
**offered** 21:5
**offering** 93:8,8 95:5 98:7,22 99:1,7 100:3,9 118:20
**oftentimes** 319:6
**ogunsina** 196:18
**oh** 66:23 162:17 204:7 211:11 234:9 271:2 282:18 304:20 336:3
**oil** 85:3
**oils** 23:24 302:12
**okay** 9:17,21 11:4,5,15,22 13:24 14:13,18 15:5,9,15 16:10,13,14 17:24 18:2 19:10 20:2,13 21:15,21 22:2 22:6 23:13 24:3,21 26:7 28:6 29:13 30:24 31:3 32:18 33:17,22 34:9,9,22 35:12,23 36:8 36:15 37:1 38:18 39:3,11 40:17 41:5 42:10,17 43:16 44:23 47:21 48:10,11 50:9 51:5,17 52:6 54:4,11,14 55:24 58:17 61:11,19 62:20 63:1,4 64:23 66:24 67:5 68:21 70:3 72:18 73:17 74:9 75:4 76:15,19 79:21 80:6,11 82:5 84:2,22 85:14 86:10,15 87:10 88:1,23 90:8 90:21 91:7,17 91:23 92:9 93:15,25 95:1 95:12,16 96:10 97:19 98:20 99:10 100:2 101:20,23 102:7,11 104:9 105:3,5 106:6 106:11,25 107:18 109:13 110:5,16 111:13 113:14 114:12 115:8 115:18,25 116:21 118:18 119:13,14 120:6 125:1,10 126:10,13 129:18 130:9 131:16,23 132:18,19 133:5,23 134:25 137:3,7 137:7,9 139:2 140:3 143:22 144:9,13,15 145:12,17,20 145:23 146:17 147:2,5,9,21 148:11 150:8 150:11,22,24 152:3 153:20 158:20 159:5 159:10 160:6 161:22 163:8 165:20 168:3,9 168:10 170:20 170:22 171:9 173:11 174:6 178:22 180:22 181:19 183:7 184:24 185:1 185:20 188:22 189:20 190:3 191:2,12,25 192:12 193:20 193:24 194:3,8 194:17 195:3,9 196:6,8 197:9 197:22 198:1 199:4 201:24 207:15 208:2 208:10 210:10 210:17 211:2 211:11 212:10 214:23 215:9 216:18 217:9 217:21 220:12 221:5 224:21 226:7 227:14 231:17 234:23 235:9 236:14 236:20 238:7 238:10,13,20 240:25,25 241:7 246:4,6 251:3,13,20 255:1,8,10 257:10,18 258:8,24 259:9 261:12 262:2,9 263:19,24 264:3,13 267:12 268:5,5 268:5 269:14 269:22 270:6 270:22 271:5,8 271:11,14,15 272:6,12 274:8

276:24 277:3 277:10 278:16 279:4,13 281:6 282:23 283:4,8 283:11,13 284:14 285:12 285:14 287:21 287:23 290:6 292:21 297:14 305:3 308:7 315:7 316:5,24 321:1,3,16 325:22 326:6 328:24 333:17 333:23 334:16 339:17 342:12 345:15,16 348:5 350:23
**okeke** 83:14 154:4 155:18 164:7
**old** 43:13
**older** 229:19 286:12
**omyx** 322:7,9
**once** 75:22 76:2 86:20 89:22 90:16 91:3 176:9 178:10 189:7 244:4 291:15 293:3 295:19 299:5,7 323:5
**one's** 236:17 304:8
**ones** 31:19 37:4 37:7 48:24 83:23 152:16 154:25 179:1 284:19
**open** 141:9 340:25
**opened** 74:3,10
**opine** 141:22
**opined** 339:23
**opinion** 43:19 44:12 45:2 46:11,21 51:12 52:1 53:2,10 56:4 57:24 58:25 61:22 62:2 75:21 77:16 79:12 87:22 88:2,7 92:3 94:7 98:8 98:15,22 99:2 99:8 100:3,9 100:14,17 101:12 134:5 150:19,22 152:19,24 153:6 157:3 165:4 169:14 170:16 174:5 175:5,20 186:1 186:5 192:15 193:15 222:24 258:16,19 264:15 276:1 279:21 280:1 280:22 287:15 288:12,20 289:1,12,16 298:2 315:4 317:9,19 328:20 334:12 335:3 337:24 338:16 340:18 348:22 350:17 351:2,5,9,12,15 351:16,18
**opinions** 18:21 32:25 33:20 37:17 59:16,25 62:4,6 87:5 93:7,9,11 95:4 95:13,19 96:14 104:4 109:23 117:13 118:19 149:23 151:1 213:19 231:14 288:6 299:17 316:14 327:23 328:2 338:3 339:4 349:18 350:16
**opportunity** 10:10 69:14
**opposed** 90:11
**opposite** 247:24
**options** 321:13
**order** 43:17 44:12 46:10 47:6 59:24 92:23 127:22 134:5 135:25 136:8 182:1 190:16 191:25 219:3 240:10 248:25 267:21 281:10 298:2 314:11 316:13 334:12 340:25 349:18
**organization** 19:14
**organizations** 19:20 20:14
**original** 25:10 86:24 89:4 90:22 176:11 188:20 189:9 204:3 297:18
**originally** 22:23 117:21 196:12
**outcome** 128:21 129:6,9 323:16
**outcomes** 126:20
**outline** 209:8
**outlined** 121:5 351:1

**outset** 91:10
**outside** 29:4,11 29:15 303:18
**ovarian** 7:13 52:23 53:14 54:9,19 91:21 92:13 93:12 94:10,14,24 95:15,20 98:9 98:24 100:5,12 101:6,15 106:21 114:15 120:3 128:19 129:15 130:20 133:9 134:1,8 134:13 151:19 156:25 158:22 171:11 185:4,7 185:22 194:12 200:18 206:5,6 208:21 209:4 212:13,20 213:2,4 232:16 232:21 233:12 234:14 241:20 241:22 242:4 245:2 251:25 252:2,12,17 253:10 257:17 262:25 278:19 279:16 280:7 281:13 283:12 288:7 328:4,17 330:16 339:5 339:14 351:20
**ovaries** 120:16 130:15,16
**overall** 96:17 98:1 112:17 214:18 215:24 246:17 247:8 248:6,7
**overcome** 104:19
**overlay** 222:1
**overnight** 331:15
**overview** 22:8 236:2 295:14
**own** 16:4 23:10 76:8 107:14 155:21 306:24 316:3 317:19
**oxide** 49:11 132:3 266:2,6 266:10 267:6,8 267:17,24 268:14,19,24 270:2,16 271:21 272:8 273:5,15,23,25 274:6,15 275:20 277:1
**oxygenated** 140:25

**p**

**p** 8:1 220:21,24 220:24 221:2 353:1
**p.c.** 5:2,8
**p.m.** 191:4,5,5 191:7 276:19 276:20,20,22 349:21,22,22 349:24 350:9 350:10,10,12 352:1,6
**p1hairdepos** 355:15
**page** 6:2,9 12:21 32:14 40:18 63:2 66:4 84:16 91:8,13 94:5 101:20 102:8 109:7 115:19 142:9,12,13,14 145:12 147:3,3 147:22 148:6 155:6,7 161:23 168:8,13 193:20 194:4 194:17,19,20 196:15 197:10 201:19 210:11 210:23 211:9 211:12,13 240:23 244:1 244:11 249:6 249:14,15 251:12,12 255:8,9,12 268:7,9 270:8 271:17 279:18 288:19 289:12 290:4,9 314:15 356:4,7,10,13 356:16,19
**pah** 304:9
**pahs** 304:7,9
**paid** 19:24
**pandemic** 103:22
**panel** 27:11,19
**panels** 28:12
**panigrahy** 36:9 66:19
**paper** 12:21 29:8 30:10 84:6 117:18,25 119:3 120:1 122:15,19,22 147:18 167:8 210:2,4 211:10 216:10 244:2 272:15 301:12 344:6 347:24
**papers** 12:13 17:3,8 29:18 29:21 31:1 32:20,24 34:19 34:24 35:14,17

82:10 83:7 113:16 114:13 114:19,21,21 118:12 119:22 121:8 124:18 166:3 169:13 169:25 248:8 302:23 305:15 312:3 332:5,16 335:25 337:7
**para** 171:23
**paraben** 88:4 88:10 90:8 145:25 173:14 175:5 176:9,25 177:25 181:25
**parabens** 48:14 70:8,16,21 71:19 84:24 85:2 90:5,16 91:3 168:2,4 168:15,19,22 169:1 171:2,11 171:19,22 172:4,8,9,15,21 173:1,6,7,12,16 174:7 175:19 176:2,7 177:15 177:20 178:9 178:19,25 179:12,20 180:2,7 181:4 181:13,15 182:13,15 346:6,18 347:16
**paradigm** 124:19
**paradoxical** 243:3
**paragraph** 115:20 145:16 147:6 149:14 241:1,5,12 244:4 251:15 268:11 270:8 271:4 279:20 279:21 289:11
**paragraphs** 155:11
**paralegal** 5:20
**pared** 204:5
**parentheses** 197:14
**parfitt** 3:9 8:15 142:12,15 188:9 236:21 237:4,9,15,24 238:2 249:16 276:15 282:15
**parker** 5:18
**part** 26:11,14 30:1 44:19 53:17 56:7 76:24 77:4 78:24 100:2 103:20 107:18 110:2 121:1 139:21 150:10 166:17 193:3 211:17 213:8 229:18 235:22 237:7 259:18 262:11 279:24 292:23 300:18 303:22 305:14 308:9,20 309:4 315:3 316:15 316:21 321:7 321:22 324:17 324:22 326:21 334:16 335:5 342:4 346:24 348:1,2 349:17
**participate** 28:25
**particular** 26:5 51:5 52:5 54:12 59:24 76:14 87:6 88:8 129:25 134:7 141:22 149:24 150:21 153:8 157:8 175:13 176:18 180:21 182:8 186:6 207:22 242:24 245:22 258:20 264:12 296:14 297:5 319:13 324:1 345:12
**particularly** 37:8 55:5 69:18 98:13 123:20 138:6 138:11 173:20 174:15 194:11 239:4 250:23 252:7 253:4 300:1 305:21 307:24 315:20 317:7 322:22
**parties** 353:3
**parts** 23:3 40:4 42:19 51:6 67:9 73:11 74:7 163:11 262:4 331:7
**party** 354:15
**pass** 21:11,14 29:18 109:4 208:12
**passananti** 3:14
**passed** 217:6
**past** 16:24 45:10 126:12
**path** 27:8
**pathway** 129:1 129:1 165:18 166:15 176:24 188:1 264:22 264:25 323:16 330:15

**pathways** 67:23 76:22 128:22 166:10 166:20 177:3
**patient** 193:23
**patterns** 285:2 289:25 291:13
**pause** 73:5
**pay** 20:5,10
**pcp** 327:18 339:11
**pcps** 271:25 272:11 327:20 328:16 335:25 336:18
**peal** 5:14
**pear** 164:11
**peer** 24:8 27:11 27:14,18 28:12 29:14,18,21,25 31:4 109:4 119:16 128:7 130:14 158:13 205:11,18 208:12 217:6 217:10
**peiyuan** 3:22
**pelvic** 197:15
**pending** 11:19 227:9 354:15
**people** 25:25 28:9 36:7 66:8 123:22 126:2 176:1 265:11 277:21
**perceive** 315:3
**percent** 136:16 221:23,23 273:2 290:17 292:8 310:23
**percentage** 178:25 291:20
**perfect** 11:1
**perfectly** 93:4
**perform** 92:1 215:15 294:6 299:9
**performed** 208:11 216:22 216:24
**performing** 224:5
**period** 20:4 33:12 43:16 44:10 202:21 204:18 247:4 284:21 286:4,6 287:13 288:15 291:25 346:25
**permanent** 147:10 252:1 335:7
**permanents** 329:24 335:21
**permeability** 331:6
**permeable** 331:7
**permissible** 164:20
**permitting** 211:15
**persistent** 300:15
**person** 27:25 325:20,21
**person's** 324:2
**personal** 83:21 85:22 113:25 183:18,23 190:22 265:18 266:18,23 272:15 277:25 325:9 326:18 328:5 334:20 336:20 338:21 339:5,20 340:10 346:6
**personally** 32:3 57:3 215:15 216:7,10
**persons** 244:15 245:25
**perspective** 109:2 120:12 251:21
**pertinent** 79:9 205:5,6 206:9 236:8 295:22 301:7
**pguo** 3:24
**ph** 275:2 333:18 335:6,8 335:13 336:2,4 336:9,11 337:4
**ph.d.** 3:22
**phds** 21:13 116:15
**phenolic** 50:15
**phenotypes** 347:2
**phone** 60:18
**phrase** 116:1,7 147:25 191:20 280:10 291:8
**phrased** 250:11
**phthalate** 49:24 88:11 133:17 145:25 183:2,8,15 184:16 185:4 190:11
**phthalates** 48:17 49:23 70:9,16,21 182:19,19,22 183:9 184:2,10 184:21 185:22 186:21 187:10 190:3 346:5,18 347:17
**physical** 72:6
**physically** 60:10,12 89:2

**pick** 191:16 257:22
**piece** 111:4 334:25 340:17
**pierce** 78:11
**pinpointing** 290:7
**place** 75:24 111:8 204:18 204:19 266:15 280:17 299:8
**places** 102:21 204:16 244:15 246:1
**plaintiff** 15:19 35:24
**plaintiff's** 36:6 61:8
**plaintiffs** 3:3 8:15 37:21 38:9 130:19 228:11 237:22 338:1
**plastic** 186:19 187:11
**plasticizers** 186:22 187:21
**plastics** 186:23
**plausibility** 30:1 43:18 44:13 45:3 46:12 47:10 51:13 52:1 53:3 54:7 55:14 56:4 59:25 88:3,13 91:19 92:24 94:8 95:2,6,9 95:25 96:6,11 97:1,12,14,25 98:3 99:11,20 100:10,15 106:1,8,14,20 107:22 109:14 109:22 110:11 110:17,19 111:1 112:5,8 113:18 114:10 114:14,22 116:2 117:4,14 118:22 119:4 119:17 120:2 151:18 152:20 156:12 174:1 175:5,20 186:1 192:15 193:14 199:22 200:5 201:2,25 202:9 206:11 208:3 213:11,20 214:16 215:23 236:5 258:16 264:15 287:15 288:6,21 299:17 312:22 324:18 327:24 328:2 334:13 338:7 339:3 341:1 343:8 345:4 350:17
**plausible** 52:21 53:12 54:17 99:3,3,5 101:14 111:18 112:19 157:16 280:5 281:11 330:15 348:18 349:9
**play** 47:8 214:20 323:17 329:17 345:22
**played** 78:24
**plaza** 3:22
**please** 8:9 11:3 11:24 66:2 68:5,21 135:1 258:10,10,11 264:7 326:7
**plenty** 118:12
**plural** 261:22
**plus** 21:23 88:25 102:2 160:8 330:25
**point** 31:9 33:25 36:7,17 41:9 45:4 46:5 46:18 57:16 60:17 73:13,15 74:13,23 75:17 81:23,24 83:6 84:5 103:11,17 107:19 112:6 114:8 134:14 134:18 143:5 144:16 162:12 166:4 191:1 192:2 194:5 196:23 198:4 201:25 202:11 203:7 221:16 222:17,21 224:15 226:3 235:17 240:23 263:15 283:10 311:13 320:21 331:24 342:23
**pointed** 241:15
**points** 225:4 241:8 279:20 294:3 325:22
**policies** 256:2
**polycyclic** 304:6
**polyethylene** 266:17,25 267:4,22,25
**population** 22:16 136:17 136:24 180:19 242:23 324:25
**populations** 247:12,21 252:9 303:17 303:17
**portion** 318:3

**portions** 230:2
**pose** 44:21
**posing** 53:7
**position** 62:8 70:8 71:7 73:13 74:11 75:15 106:18 122:20 143:22 167:16 205:21 209:15 218:12 241:15 243:3 258:13 260:17 260:19 281:10 293:16 312:11 317:17 340:23
**positions** 318:10
**positive** 166:13 219:14 222:1 222:24 223:2,6 224:8,17,23 225:3,12,13 226:5,9 227:20 253:11
**possibility** 56:15 70:14 126:5 127:2 144:7 165:25 187:19 188:3 261:4 269:4,10 334:1 348:25
**possible** 49:24 50:3 89:19 92:3,10,12 93:9 99:21 114:4 115:1 118:11 136:10 162:20 165:12 166:6,11,15 178:19 193:9 242:6 251:22 269:11 347:8
**possibly** 35:9 50:16,17 52:10 53:24 143:20 157:15 200:8 253:9 346:23
**post** 6:16 34:8
**postmenopau...** 229:12,22 230:7 239:5 240:1
**potency** 172:16
**potential** 48:19 71:16 127:17 255:20 288:7 290:1 321:5 324:23 328:3
**potentially** 69:12 71:9 72:3 85:17 200:5 255:24 299:16
**power** 136:6 229:15 240:3,7
**poyner** 2:5
**practically** 325:11
**practices** 1:5
**preceded** 28:12
**precipitated** 34:23
**precision** 322:3
**precursor** 279:2 322:4 323:8
**predicted** 299:22 301:17
**preliminary** 105:18
**premenopausal** 229:7,11,13,20 230:7 231:5 239:18,21,22 246:13 247:23 248:3,9,12
**prepare** 37:15 38:12
**prepared** 109:3
**preparing** 22:19 26:22 27:1 103:14 196:13
**presence** 53:20 133:24 157:4 165:2 192:23 263:11 272:8 275:20 278:4 293:3 331:9
**present** 5:17 16:22 50:25 51:25 54:25 56:2 69:13,24 70:10,23 71:15 72:13 73:15 74:25 85:21 87:11 89:23 142:22 143:15 145:2,9 148:19 150:5,5,16 152:12,21 154:5 155:23 157:14 163:13 165:13 169:18 172:22 179:21 180:3 181:1,5 181:25 184:3 185:24 186:23 187:23 189:13 190:22 193:4 255:23 258:21 264:14 265:6 265:18 266:13 267:14 270:13 274:16 276:4 295:9 297:2 300:23 314:1 315:17 318:18 325:8 326:17 330:8 341:22 346:24
**presented** 310:8
**presenting** 236:1

**preservative** 141:12 159:12
**preserved** 159:1
**pressing** 251:24
**pressure** 70:25 72:8
**pressures** 69:15
**presume** 217:5 260:4
**presuppose** 287:21
**pretty** 89:16 153:17 253:2
**previous** 119:2 158:3
**previously** 66:9 215:22 309:21 310:17
**primarily** 20:16 26:10 38:8 45:14 104:7 105:15 109:16,20 177:5 253:8 259:24
**primary** 26:21 37:7 96:1 112:7 122:12 155:20 206:3 214:14,15 240:18
**principally** 32:6
**principles** 19:6 67:16
**prior** 118:13 158:8 197:17 204:11,14,24 241:10
**probability** 221:3
**probable** 205:19 316:20
**probably** 9:4 9:14,20 15:11 22:2 23:15 24:20 28:16 29:10 61:4 158:5,7 180:6 180:7 188:10 203:6,24 205:17 210:6 310:7 327:19
**probe** 323:18
**problem** 72:21 75:6 142:6,11 276:10 332:22 332:24
**problems** 336:21
**procedure** 2:4
**procedures** 23:11
**proceed** 218:24
**process** 19:1 21:2,18 22:17 22:18,18 27:13 28:14,17 40:16 41:10 56:17 63:23,25 69:19 75:8,12,13 107:6,9 143:13 143:24 148:12 153:20 156:14 158:12 205:16 225:11 234:20 267:5 269:7 272:1 330:21 341:24 351:14
**processed** 299:23
**processes** 160:3
**processing** 149:7
**produce** 69:21 267:10 279:3
**produced** 13:12 63:8,13 64:5 139:20 141:8 169:23 271:25 274:1
**producing** 76:3
**product** 39:15 39:16,22 40:3 41:1 51:12,25 52:22 53:9,13 53:22 54:16,18 55:12 56:3 57:5 64:17 81:9 83:8 85:5 89:10 139:8 144:4,6,18 148:5 151:19 153:8 161:1,2 162:25 163:6 164:20 169:6,7 175:18 176:17 176:25 177:25 179:23 180:22 181:2 187:20 242:24 267:9 267:13 269:1 273:7,21 287:25 295:8 295:10 296:5 298:16 301:21 301:24 302:2 302:10 325:21 329:2,5 330:17 333:6 334:3,4 336:21,23 340:11,25
**production** 161:16
**products** 1:5 6:20 7:2,7,12 23:23 30:14,17 40:1 41:14,19 41:22 42:22 43:2 45:1,10 45:21 48:21 50:25 52:12

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 418 of 449 PageID #:73119



54:8 55:1 56:9 58:19,21 59:24 61:14 65:16 77:4 78:2 80:13,15,24 81:3,5,19 82:2 82:6,9 83:21 83:25 84:20 85:9,15,22 86:11,17 87:13 87:17 90:3 92:5 93:17 94:3 95:14,20 114:1,6 140:6 140:10,10 141:9 142:24 147:11,19 148:2 154:17 155:14 158:25 162:9 164:5 172:5 173:17 176:6 177:16 179:18 180:10 181:12 183:19 183:23 186:18 187:11,17 190:22 201:11 202:5 251:24 252:6,11 255:25 256:2 260:9,20 263:4 265:5,7,19 266:18,24 272:16 274:16 274:21 275:5 275:19 277:21 277:25 278:4 280:16 281:14 281:15 286:7 299:1 300:24 315:12 325:9 325:23 326:2,4 326:18 328:5 329:25 331:13 331:15 332:25 333:19 334:20 335:7,7,11,12 335:17 336:3,4 336:11 337:8 338:22 339:6 339:20 340:2 346:6,7,10,11 346:12 351:4

**professional** 17:5 19:10 20:20 24:5 92:3 354:5,20

**professions** 116:20

**program** 21:24

**progress** 200:14

**progression** 73:22

**prohibiting** 256:3

**projects** 304:10

**proliferation** 127:15

**promote** 127:18 142:2

**pronounces** 122:17

**proper** 204:21

**properly** 106:19 107:25 305:22

**properties** 47:1 56:10 72:7 177:22

**proponents** 334:5

**propylparaben** 174:8

**prostate** 94:19

**protocols** 23:10 314:6

**provide** 82:11 82:18 83:15 92:2 223:25 251:22 347:7

**provided** 13:10 13:19 16:7 34:10 35:16 57:10 59:4 61:25 62:3 65:2 67:1 83:12 195:15 204:15 209:8 211:20 273:12 314:24

**public** 27:17 42:12 353:12 354:5,21 357:19

**publication** 30:9 117:22 342:7

**publications** 17:3 24:4,5 29:3

**publish** 29:17 30:10

**published** 24:7 24:12 29:8,20 29:24 30:4 31:3 52:11 103:2,8 117:18 118:13 119:3 119:15 122:15 122:19 123:7 124:7,10 128:7 129:21 130:21 133:23 242:2 245:12,13 252:16 256:19 256:24 310:12 317:15 328:15

**pugliese** 36:9

**pull** 286:2

**purchased** 80:24 155:14

**purpose** 86:16 159:11 160:25 214:11

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 419 of 449 PageID #:73120



**purposes** 48:4 109:15 132:3 175:4 210:8 283:14 335:22
**pursuant** 2:3,3
**put** 14:18 82:22 93:24 102:7 140:6 186:19 240:19 248:25 301:13 344:1
**putting** 333:22 334:3

**q**

**qualified** 21:4 280:18 288:21 344:8
**qualifiers** 235:15
**quality** 108:25
**quantified** 331:22
**quantify** 76:8 235:23 332:16
**quantifying** 178:24
**quantity** 178:25
**question** 10:19 10:24 11:19,20 12:5,7 14:2,3 38:11,16,17,21 38:22,25 39:1 44:8 46:4 47:20,21 51:21 54:15 64:15,24 65:1,3 66:1 73:18 76:16 77:7,14 79:17 87:2 93:2 95:17 98:4,12 98:20 106:10 111:11 117:24 118:3,3 119:2 121:19 122:5 122:14 123:5 124:7,8 125:18 129:20 130:6 132:21 137:12 137:14 161:5 163:8 166:18 170:21,23,25 174:2,5 176:14 181:16,20 183:25 186:17 203:2,10 206:13 211:6 216:4,6 224:23 227:4,4,5,8,9 227:10 228:20 230:6,18 232:1 232:5 233:7 237:3,21 238:12,21 246:9 250:2 251:9 254:16 254:20 268:22 269:13,16 272:20 273:4 284:19 285:20 286:23 288:10 289:5 291:7 292:25 294:20 294:21 296:24 301:7,12 308:22 311:16 312:16 315:6 316:23 319:13 320:3 321:9,9 333:16 337:21 338:20 339:16 340:15 342:20 344:18 346:3 353:9
**questioning** 160:7 258:3
**questionnaire** 285:19
**questionnaires** 284:3
**questions** 9:5 11:22,24 12:2 14:1,5,10,11 39:9 67:9 79:22 80:20 120:7 157:7 164:25 184:8 188:11,23 194:2 231:18 288:23 293:9 295:3,6,6 297:1 304:15 312:25 319:15 328:22 350:5 350:19 351:23 351:24
**quick** 57:20 276:6
**quickly** 67:19 91:9 178:9,15 248:24 249:1 265:24 272:22
**quit** 287:23
**quite** 312:7
**quote** 104:22

**r**

**r** 8:1 346:1 356:3,3
**racial** 256:5
**racially** 252:9
**radiation** 23:20 23:21
**raised** 326:13 338:13
**raising** 269:3
**raleigh** 1:16 2:7 21:6 28:20
**randolph** 5:9
**random** 221:7
**range** 23:17 24:2 45:19 182:6 335:14
**ranges** 82:20
**ranging** 127:1

**rapidly** 131:2
**rare** 219:15 347:6
**rates** 299:5,8
**rather** 21:1 40:2 207:4 214:21 332:10
**ratio** 286:20
**rats** 133:19 184:18 279:7 292:5
**ravika** 5:25
**rays** 23:21,21 23:22
**razzaghi** 5:24
**reach** 119:24 201:15 315:4
**reached** 109:4 268:24 269:2
**reaching** 236:6 312:21 317:18 349:8
**reacting** 75:24
**reaction** 39:18 69:21 267:14 267:16 277:19 279:2 299:5 329:4
**reactions** 75:23 75:25 277:9 330:5
**reactive** 157:15
**reactivity** 148:17,21
**read** 30:11,19 34:19 63:10 92:7 94:11 102:5,19 109:13,18 116:7 119:1 143:3 145:23 146:3 147:9,15 148:12,23 170:16 177:7,9 194:8,15,22 195:1 198:12 207:2 241:4 243:24 252:14 279:23,25 280:8 289:13 331:18,21 342:2 344:16 352:4 355:9 357:5
**reading** 48:13 120:12 198:20 209:19 210:2 241:11 268:20 270:24 274:22 282:20
**reads** 207:2
**ready** 113:11 191:11,12 261:8
**real** 110:21 138:14 221:6 324:5 325:12
**realize** 38:5,7 56:12 193:21 202:12 203:3
**realizing** 87:10
**really** 53:17,18 75:20 125:18 134:18 171:15 275:4 277:22 290:5 301:7 307:19 325:12 327:9 345:7
**realm** 42:12
**rearranges** 39:19
**reask** 291:6
**reason** 42:10 46:19 124:21 161:25 220:1 263:14 272:18 288:23 320:7 320:16 327:9 327:15 340:8 355:11 356:6,9 356:12,15,18 356:21
**reasonable** 160:5 280:1 285:10 332:2 351:2
**reasonably** 156:15
**rebuttal** 37:16 37:18 38:13
**recall** 36:11,25 40:23 41:20 42:24 45:16 57:18 60:16 78:13 81:20 82:2,4,17,19 83:11 101:8 106:5 113:22 114:8,23,25 115:3,13 133:21 146:12 167:22 177:19 216:17 229:4 229:13 232:7 232:11 249:11 260:25 265:17 284:8,12 328:19 332:18
**receipt** 355:17
**received** 21:7 37:11,12,14
**receiving** 120:18
**recent** 255:2 256:14 328:14
**recently** 197:11
**receptor** 121:12 125:12 127:4 182:10
**receptors** 120:17,19 121:4 125:3
**recertification** 21:18

**recertify** 17:21
**recess** 62:22 113:7 191:5 276:20 349:22 350:10
**recipe** 192:6
**recognition** 312:7
**recognize** 162:8 341:17
**recognized** 67:21 128:3 313:21 319:1
**recognizes** 167:9
**recollection** 34:19 162:15 162:17 233:18
**recommendat...** 158:12
**reconditioning** 147:14
**record** 8:3 9:1 9:7 10:9,16 11:10,17 62:21 62:23 113:5,8 115:25 148:13 154:24 155:3 191:3,6 194:9 194:23 210:1 237:8 276:18 276:21 289:13 349:19,20,23 350:8,11 351:25 354:12
**recorded** 354:10
**records** 13:15 64:2
**recruited** 180:21
**reduce** 150:19 255:24
**reducing** 256:4
**refer** 22:1,5 48:8 83:9 131:18 196:1 268:1 290:21
**reference** 32:19 32:23 33:7 35:12 185:1 201:20 249:19 249:24 295:10 304:16
**referenced** 65:24 187:5 355:6
**references** 6:16 12:12,17 32:15 33:14,17,24 34:8,14 83:10 122:8 270:17 270:19 342:17
**referred** 92:6 304:15,18 305:6 310:19
**referring** 25:10 42:3 102:22 146:7,8 148:4 148:8 149:3 162:21 210:1 211:10 217:17 235:19 257:14 258:25 261:20 291:9 305:7 333:14
**refers** 299:4
**reflect** 14:24 16:24
**refocus** 124:24
**refresh** 238:8
**refuse** 227:3
**regarding** 71:25 83:7 94:7 107:21 114:14 162:10 195:25 255:19 261:1 286:15 288:20 297:2
**regardless** 47:23 90:17 286:21
**registered** 354:5,20
**regulated** 288:2
**regulation** 256:2
**regulations** 155:17
**regulatory** 9:13 79:2 133:8 164:21 172:24 308:23
**reject** 220:25
**rejected** 205:12
**rejects** 318:4
**relate** 184:21 339:4
**related** 65:21 94:9,13,23 125:23 128:16 128:23 172:17 209:13 245:2 246:13 255:3 315:18 329:7 354:15
**relates** 284:4 291:5 309:12 331:18
**relating** 196:1
**relation** 7:13 307:25 328:17
**relationship** 100:10 114:5 116:2 117:4 118:22 201:5 215:24 251:23 253:5 314:17 338:8
**relative** 164:15 172:16
**relatively** 190:4
**relax** 40:14
**relaxer** 1:5 7:9 8:6,7 15:16,20

15:24 39:14,21 40:5 41:19,25 42:13,19 43:2 45:1,10 46:10 46:20 48:21 50:25 51:6,12 51:25 52:18,22 53:8,13 54:8 54:15,18 55:5 56:3 57:5 59:24 67:14 68:2 69:25 73:11,23 75:9 77:4 80:24 81:2 82:8 83:8 83:25 86:11,19 90:10 92:5,6 93:11,17,18,20 94:3 95:14,20 106:8 143:6 144:18 150:17 151:17 155:14 163:6,11 164:4 164:20 172:5 175:18 176:25 177:15,25 179:18,22 194:10,24 195:24 199:6 201:11 202:4 205:23 206:22 232:11 239:3 257:13 258:15 260:9,20 263:3 265:5,7 267:23 269:1 273:7,21 274:16,20 275:2 278:4 287:14 288:5 296:5 298:16 298:21 301:21 315:12 331:1,4 331:24 333:6 335:8 336:2 351:4 355:4,4 356:1,1 357:1 357:1

**relaxers** 6:23 43:17 44:12 46:9 55:7,18 57:12 59:5 67:8,24 69:8 70:11,23 71:8 76:9 77:19,21 77:25 80:16 82:13 83:21 84:8 87:12 88:12 91:20 93:21 94:8 98:9,23 100:4 100:11,23 101:6,16 106:21 113:19 114:15 115:15 120:14 142:23 143:9,23 145:4 147:11 148:9 149:11 150:6 151:9,11 152:22 153:21 155:19 156:10 165:7,14 171:20 172:4 175:10 180:4 182:24 184:4 185:25 186:12 187:1,16 192:23 201:15 223:19 224:19 228:1,23 232:16 233:12 242:4 251:24 253:7 255:3,21 257:5,16 259:14,22 263:25 264:14 266:12 268:19 269:12,19,24 270:4,13 272:8 273:16 275:11 277:11 280:6 280:20 281:12 284:5 285:16 286:16 287:22 289:14 290:9 290:11 291:13 291:21 292:23 293:10 294:7 294:23 297:3 297:20 298:5 298:22 299:11 314:1,22 325:7 326:4,15,21 328:12,21,25 329:18 333:3,9 334:10,19 336:8 337:11 339:18 343:4 345:20 348:8 349:12 351:19

**relaxing** 41:10 69:19 275:19

**release** 71:1 139:14 143:2 143:16 149:1 150:4 159:2,7 188:5

**released** 68:2 69:6 71:2 72:10 142:23 143:17 146:6 159:18 160:17 163:19 164:9 164:15 166:12 260:21

**releaser** 159:12 159:17 161:1 161:10 162:11 163:25 164:4

**releasers** 144:5 158:25 159:6 160:4 162:3,9 162:19,23 163:12,20 165:21

**releases** 144:12 144:18 161:25
**releasing** 144:1
**relevance** 302:23
**relevant** 19:8 22:21 35:6 50:4 55:13 59:15 62:12 75:21 77:15 90:19 93:1 96:19 108:17 118:13 127:8 157:7 174:1 195:21 200:4 201:7,18 202:3 206:10 253:19 264:5,9 279:6 288:11 293:23 295:12 299:13 306:12 314:4
**reliable** 60:7 293:17
**relied** 32:25 57:23 58:25 61:22 65:2 109:16
**rely** 33:19 62:1 307:16
**relying** 102:25 109:21 110:8 216:16
**remain** 179:1
**remedial** 27:2
**remediating** 79:6
**remember** 9:12 9:19 19:15 37:5,12 42:4,7 42:8 43:14 45:18 66:16,18 78:9 90:6 111:15 113:22 133:19 158:4 161:13 165:18 179:6,9 184:18 190:6 191:23 202:14 227:16 227:21 232:24 233:21 235:14 236:23 264:11 268:20 274:23 279:9 283:24 302:14 304:16 308:1 310:6,20 328:14 337:6 342:17 350:18
**remind** 13:25
**remove** 150:22 152:5 347:10
**removed** 150:18,24 151:16 205:2 289:13 335:1
**render** 94:7 298:2
**rep** 243:9
**repeat** 66:1 219:2 264:7
**repeatability** 246:5
**repeated** 244:23 245:3,6 245:21,23 246:12,19 247:20
**repeatedly** 244:14
**repetition** 244:6 245:10 246:22
**rephrase** 12:1 76:15,15 98:20 203:20
**replaced** 346:11
**replicated** 243:18
**replication** 243:10
**report** 6:13,15 6:16 12:10,13 12:18,22 13:18 15:22 16:5,6 16:16 21:22 22:11,12,13,20 23:3,4,7 24:25 26:5,14 28:19 29:1 32:14,21 33:3,11,12 34:8,16,20 35:3,3 36:3,13 37:16,18 38:13 44:18 45:7,22 45:24 46:17 48:1,13 49:19 50:6,12 54:24 58:3 63:2,25 64:8,22 66:22 67:3 82:23 83:9 87:19 88:9 91:9,14 94:17 95:12 96:20 101:2,11 101:21 102:3,8 102:13,17 103:14,18 106:22 107:19 109:3,8 114:13 115:13 118:2 118:20 119:21 120:12 131:19 141:23 142:10 145:13,24 146:9 151:1 152:21 154:14 155:7,25,25 156:3,19,23 157:6,20 160:12 161:14 161:17,23 166:8,20 167:7 168:9 170:16 175:12 181:10

183:22 185:3 189:6 193:2,21 194:18 195:3,6 195:19 196:14 196:20,23 197:18 198:2 198:11,15,23 199:2 202:12 202:15,19,25 205:10,11 208:7 209:13 209:21 218:21 223:1 224:11 224:16,22 231:12,25 232:2 234:25 235:9,17 236:3 236:4 241:23 243:24 249:3,5 249:6,12 263:11,15 264:12 268:1,9 274:23 278:17 279:19 280:13 281:19,20 282:7 284:7 286:8 288:13 290:5,25 291:4 291:18 293:16 293:24 296:7 296:11,22 305:14 306:4 311:6 314:15 315:8,14 317:16 328:19 331:18 334:17 335:1 338:18 342:9 343:12 344:16 345:19 351:1,7

**reported** 1:23 43:24,24 45:13 48:25 78:5 83:11,13 129:22 154:13 161:23 174:18 175:15 182:6 184:2,6 194:10 194:23 199:6 205:22 206:4 206:20 220:5 220:10 224:13 225:20,21 228:6 232:9 233:19 235:4 239:4,25 262:12,19 265:1,9 280:17 282:2,4,5 284:6,19,20 291:21,22 298:23 310:21 331:19 332:21 332:23 337:2

**reporter** 8:10 10:13 115:7 146:16 177:9 248:15 350:2 354:1,5,20

**reporting** 55:12 56:19,20 128:8 171:1,10 184:9 185:21 192:23,24,25 195:23 206:6 218:6 228:8 247:11 262:24 279:15 309:20 316:1 340:24

**reports** 15:23 25:3,17 26:1 26:19,22 27:1 27:7,9,19,23 28:7,13 35:25 36:5,17,18 37:2,2,11 38:7 38:9 44:2 45:22 54:24 57:19 58:1,2,5 58:8,19 59:12 90:2 130:19 211:24 216:20 216:21 228:10 239:8 253:4 254:2 263:10 338:10

**represent** 161:22 256:4 272:14 311:8

**represented** 12:16 198:11

**representing** 3:3,12,19 4:1 4:20 5:1,7,12

**represents** 290:1

**reprimanded** 72:24

**reproductive** 6:24 115:16 201:12 211:25 212:11,14,18

**request** 13:15

**requested** 13:11

**require** 218:13

**required** 13:17 234:2 319:7 324:17 333:4 357:13

**requirement** 96:23 242:12 242:16 246:24 315:4

**requirements** 19:13,16 20:24 21:19

**requires** 97:20 330:23

**research** 17:14 31:10 32:4 34:23 35:15 49:21 71:14,18 71:25 87:3 107:11,18

110:2 114:3 130:10 179:8 186:17 198:9 250:6 251:5,5 252:5 255:19 298:20 305:21 306:6 312:16 316:13 335:5 338:17 350:25
**researched** 53:18 124:15 252:20 260:25
**researcher** 221:22
**researchers** 129:15 222:25
**reserved** 352:4 353:9
**residual** 267:16
**resistance** 310:4
**resources** 108:4,6,6 119:24
**respect** 35:12 40:19 49:2 50:23 65:23 77:3 83:18 121:19 133:5 185:20 205:8 223:16 227:23 231:3,4 232:12 234:23 241:20 241:22 243:9 245:7 299:10 329:23 338:21 345:16 349:10
**respectfully** 25:14 65:5 206:14
**respective** 353:4
**respectively** 79:19
**respects** 334:6
**respirator** 70:7
**respond** 11:6 11:19 12:6 14:3,11 38:17
**response** 11:12 13:15 31:24 38:8 122:21 126:7 212:10 216:1 234:15 303:9,21,24 304:14 306:2 306:18,25 307:16 309:12 311:10,19 312:13,21 313:2,9,11,20 314:12,17,25 315:2,9 316:9 317:2 318:5,20 319:19 321:11 321:17 344:15
**responses** 310:22 315:16 315:24 316:19 320:6 339:22 344:13
**responsibility** 308:24
**responsible** 32:6
**responsive** 230:17
**rest** 39:13
**result** 129:2,6 143:24 144:19 157:20 159:7 160:18 206:24 293:10 295:9 298:5 322:19 331:3,10
**results** 43:23 127:5 128:9 227:17 239:4 240:5,9 243:4 243:6,18 246:11 247:21 247:22,23 248:5 249:7 252:5 253:13 255:23
**retailers** 155:19
**retained** 15:2 15:15,18 92:1 161:8 316:7,11
**retardants** 302:25 303:1 304:4
**retired** 17:21 17:22,23 20:17 21:16 103:10 103:21 302:19
**retiring** 20:17
**return** 355:13 355:16
**reversal** 346:25 347:12
**reverted** 174:4
**review** 22:18 27:11,15,16,18 28:12 29:18 57:20 61:17 63:6 65:9,25 66:6,11 80:19 92:1 104:17,20 107:20 109:4 109:16 128:25 130:18 158:13 196:14,18 198:15 202:18 205:11 208:12 217:6,10 228:5 237:1 265:3 266:9 301:7,11 332:11 355:7
**reviewed** 24:8 27:14 29:14,21 29:25 31:4 37:11 43:6,14 51:3 58:2 59:14 60:13

61:12 62:9,13 77:23 84:6 96:4,18 104:13 113:17,25 119:16 121:9 122:8 124:17 128:7,15 130:14 164:3 167:14 174:17 197:17 198:18 209:2 228:9 231:13 254:1,3 270:2 275:23 291:12 332:10 336:16 338:2
**reviewer** 205:18
**reviewing** 34:24 36:17 37:19 78:9 104:23 179:6 198:20 269:6 302:23
**reviews** 27:15
**richmond** 4:17
**right** 10:5,25 17:22 25:4 26:2 32:2 38:19 49:6 61:6 67:6 73:2 73:21,25 74:2 74:4,7 75:7 80:13 84:18 86:13 89:21 94:25 96:13 99:21 101:4 103:12 109:10 116:6 131:22 132:10 135:7 140:14,17 144:14 145:18 151:5 160:11 160:13 165:18 170:18 183:24 185:18 190:24 192:4,5 194:21 195:2 197:24 199:24 201:23 206:21 207:9 211:14 212:15 213:24 214:1 227:9 230:21 231:1 238:1,5 238:16 243:13 251:6 254:24 255:14 257:4,7 257:9 261:9 266:4 269:24 269:25 271:20 272:3 278:21 278:22 281:9 284:9 285:7,10 308:3 316:9 321:14,15 327:22 331:20 337:14 338:24 339:2 344:17 348:25 351:16 351:22
**rigorous** 21:1
**riordan** 5:8
**risk** 7:10,13 26:10,18,20,22 27:1 44:4,21 78:7,16,17,20 78:23,23,25 79:9 121:22 123:11 124:19 131:8,13 136:19 156:20 156:24 194:12 194:14 200:10 200:17 219:13 225:22 229:24 233:23 239:7 242:23 246:18 251:25 252:2,7 252:12 254:8 281:21 289:21 290:2 299:25 300:2,10 305:16 306:11 306:20,21 307:6,15,20,24 308:25 309:25 311:21 315:22 320:8 329:19 340:20
**road** 3:5
**robinson** 5:22
**robust** 235:13
**rockefeller** 3:22
**role** 25:24 252:11
**roles** 26:6,8
**room** 71:2
**root** 85:8,9
**roque** 36:10 66:18
**route** 67:21
**routes** 144:24
**royster** 5:13
**rpr** 1:23
**rule** 292:7 310:15
**ruled** 301:4
**rules** 2:4 10:8 13:25
**run** 191:18

**s**

**s** 4:3 6:1,8 8:1 353:1,1 356:3
**safe** 56:24 164:21 311:23
**safer** 255:25
**safety** 52:11 152:4 173:6
**sake** 342:11
**sales** 1:5
**salon** 72:14 265:1
**samantha** 5:3

**sample** 81:25
**samples** 26:13 26:13,25 126:2 180:24
**sandy** 28:2
**sanghera** 5:3
**sara** 5:14
**satisfied** 228:7
**satisfy** 242:6 243:20
**satisfying** 241:17
**saw** 42:5,11 146:7 164:2 173:6 199:14 209:7 225:20 236:2 237:24 269:5 314:4 332:2 336:15 346:25
**saying** 52:6 73:19 110:5 111:16 122:22 137:16 145:3,9 150:11 162:7 182:23 187:15 211:14,20 212:16,23 216:17 244:19 253:12 267:21 269:11 310:9 326:10 333:23 336:3
**says** 20:3 63:5 66:5 92:1 94:6 101:25 102:9 102:12,13 109:14 116:1 139:19 144:17 147:23 148:1 148:14 149:10 194:6,23 243:25 244:4 244:11,13 248:2,3 255:9 255:15,18 271:23 282:16 294:16
**scalp** 40:13,21 55:8 85:17 86:1 177:4 178:1 260:10 331:3,6,19,23 331:25 333:5,7 333:9,25 334:12
**scanned** 66:14
**scanning** 58:22
**school** 25:11
**science** 17:10 111:24 318:12
**scientific** 19:6 32:20,24 92:2 124:4 167:8 168:21,25 171:1,10 184:9 185:21 208:12 262:11,23 278:17 316:25 318:4,21 351:2
**scientifically** 86:23 124:3 312:12
**scientist** 198:8
**scientists** 30:5 170:1 219:21 317:12 318:10 321:10 344:9
**scope** 351:7,8
**screaming** 276:11
**screen** 61:17
**se** 158:1 214:22
**sealing** 353:5
**seals** 148:21
**search** 107:10 107:13 130:7 134:10 154:16 316:21 327:18 337:3
**searches** 13:14 23:6 26:16 35:20 46:25 52:9 155:12 156:8 256:14 302:22 337:4
**second** 11:5 12:11,21 32:14 54:3 62:19,19 100:2 142:16 145:18 147:6 148:5 149:14 193:22 244:3 244:11 255:14 276:6 279:19 279:20
**section** 32:15 32:19 49:3 81:23 91:15 101:21 102:9 105:23 108:16 109:8 145:15 147:22 148:1 155:11 194:5 201:21 211:15 235:17 270:8 274:14 334:17
**sections** 105:16 105:25 106:4 107:21 161:17 196:1 201:24
**sediment** 26:13
**sedky** 5:24
**sedran** 5:19
**see** 25:6 36:2,6 37:20 58:7 59:18 64:6 75:20 81:8 83:9 84:24 101:12 109:11 111:5 115:23 118:25 122:16 122:16 134:12 137:22 138:14 142:19 147:7

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 428 of 449 PageID #:73129



147:23 148:2 154:8 173:3 174:22 176:20 180:25 194:5 197:3,9 209:22 225:21 227:7 228:5 240:4 245:11 247:8 252:24 255:16 259:3 266:19 266:19 268:4 268:13 270:2 271:21 278:8 282:24 288:11 311:17 313:5,6 313:11 320:17 328:10 332:21 335:24 340:11 345:24 347:12
**seeing** 38:4 40:24 57:18 177:19 221:6 226:22 247:20 265:17 310:8 332:18 333:18
**seem** 312:5
**seemed** 57:20
**seems** 45:20 77:7 83:1,2 151:23 160:4 312:24
**seen** 13:12 34:11 35:24 37:1 41:19,24 42:14 57:17 58:1 77:18 165:11 241:4 248:6 250:9 275:12 278:2 278:10 284:3 289:8 311:2,6 312:2 334:2
**segal** 4:8
**segalla** 3:13 5:21 8:13 9:3
**select** 12:12
**seminars** 308:2 310:9
**semivolatile** 188:5
**senior** 102:2,16
**sense** 39:7 346:3,17
**sensitive** 131:3
**sensitivities** 130:24
**sensitivity** 322:2
**sent** 355:14
**sentence** 66:5 91:25 92:16,18 93:16 94:6 101:25 102:12 109:10,13 142:17 197:10 202:22 204:21 255:15,22 270:10,11 271:20 279:24 279:25 289:23 290:7
**sentences** 111:22
**separate** 110:25 208:20 278:24
**separately** 126:11 172:25 259:17
**sequence** 40:25 41:6,16
**series** 319:15
**serve** 26:6 27:18
**served** 26:8
**set** 39:9 47:21 79:2 104:5 110:17 119:13 120:9 144:11 216:9 280:14 347:13,15
**setting** 32:1
**seven** 21:3 287:11 292:9
**several** 32:7 117:22 124:18 165:1 170:17 182:15 190:16 190:17 302:11 302:15,17 350:15
**severe** 248:10
**shaking** 11:7
**shampoo** 41:8
**shampoos** 40:15 190:23 273:1 274:20 275:4,10,18 325:24 335:11 335:18 337:15
**sharply** 318:20
**shb.com** 3:24
**sheet** 12:21 195:8,16 355:11
**shelf** 73:24 161:2
**shift** 23:25 39:6 44:24 182:18 182:18
**shipman** 3:4,4 6:4 8:14,14 18:23 24:9 30:7 31:14 34:25 36:20 37:22,25 38:20 39:4 40:6,22 41:11 43:3,20 44:14 45:5 46:14 47:12,16 50:5,9 51:1,14 51:19 52:2,24 53:15 54:20 55:20 56:5 57:6 58:12,14

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 429 of 449 PageID #:73130



59:8,17 60:1 60:20 61:20 62:14 63:21 64:14,17,20,23 65:6,12 68:5 68:10,13,18 69:10 70:12 71:11 72:4,23 72:25 73:16 74:14 75:18 76:11 77:5,22 81:6 82:14 83:22 84:9 85:19 86:4,25 88:6 90:12,23 92:17 95:22 97:7,21 98:10 98:25 100:6,16 101:7 107:2 108:9 109:24 111:7,12 113:20 117:16 119:19 120:23 122:3 123:9 124:13 125:16 127:6,24 128:11 130:2 130:25 132:12 132:20,24 133:11 134:2 134:24 135:12 137:18 138:3 138:18 139:6 141:2,19 144:2 144:20 146:10 149:12 151:3 151:21 152:23 153:12,24 154:18 155:5 157:1,22 159:21 160:20 161:3 162:13 163:1,14,21 164:12,23 165:23 166:22 167:18 169:3 171:3,12 172:11 173:2 173:13 174:10 175:7,21 176:4 176:12 177:1 177:18 178:3 178:11 179:3 179:24 180:15 181:7 182:3 184:12 185:5 186:2,13 187:4 188:7,12,16,21 189:11 190:5 192:16 193:16 199:9 200:12 200:23 202:6 203:9,14 205:13,25 207:18 208:14 208:24 209:18 211:5,19 212:21 214:6 216:11 218:2 218:16 219:24 220:17 222:7 223:9,20 224:10 225:6 225:16 226:11 226:15,21,25 227:6 228:2,24 229:9 230:10 230:14,19,23 230:25 231:7 231:24 232:17 233:2,13,16 234:3 235:2 236:13 238:25 239:23 241:25 242:9 243:22 246:15 247:25 249:9 250:7 251:7 252:21 256:8,21 258:17 260:12 260:23 262:14 263:5 264:16 265:12 267:7 270:5 273:8 274:8,11,17 275:21 276:5 276:10 281:3 281:16 286:17 287:17 288:8 289:17 293:19 295:1 296:9 297:6,21 298:17 299:18 303:7 306:9 308:11 309:14 311:14 312:23 314:2 315:13 317:3,25 318:6 318:22 320:1 321:21 326:5 326:24 330:1 330:19 332:8 333:11 334:14 335:9 337:18 339:7 341:3 343:6 344:23 345:23 347:19 348:9 349:1,15 350:7,14,22 351:11,22 355:1

**shipmanlaw....** 3:6 355:2

**shook** 3:21

**shop** 42:7

**short** 111:22 134:14 190:4 300:15

**shortcut** 189:4 342:20

**shorter** 300:14

**shortest** 287:13

**show** 43:25 79:24 80:2 90:15 182:12 226:17 232:1,7

246:18 254:7 280:21 289:21 333:12,13,14 339:13
**showed** 227:20 347:4
**showing** 44:3 133:24 169:1 266:25 281:21 296:17 310:16 331:25 339:25
**shown** 177:15
**sic** 190:21
**side** 36:6 56:12 58:2 67:11 68:19 84:17 171:24 172:17 198:4 251:14 255:14
**sides** 317:6,22
**sign** 352:4 355:12
**signal** 220:8 222:24
**signature** 323:8 323:9 354:19
**signed** 195:3 198:16,23 202:11 353:11 353:13 355:19
**significance** 222:13 223:11
**significant** 87:20 220:9,13 220:19 222:3,5 222:15 223:3,8 223:18 224:9 225:14 226:10 227:25 228:22 229:4 231:23 232:10,15 233:11 241:8 339:25
**silicone** 261:25 262:5
**similar** 58:7 174:22,22 188:23 197:11 239:4,6 247:21 247:22 248:4,8 265:13 312:25 325:24 336:10 336:12 346:11
**similarly** 130:13
**simple** 56:17 108:15 121:11 123:5 124:7 129:21 134:6 170:23,25 233:7 237:2
**simply** 25:17 38:12 45:3 46:4 61:15 73:15 79:17 88:16 123:5,13 153:14 181:24 192:12 238:21 251:4 273:4 314:5
**singing** 42:5
**single** 150:24 193:12 246:20
**singular** 261:21
**sir** 351:23
**sister** 236:16 283:20,23 284:4,10,18
**sit** 47:18 50:1 70:19 106:25 164:18 167:6 167:15 193:11 226:7 228:21 231:20 232:13 233:9 294:5 308:7
**site** 9:16 27:3 125:15 128:10
**sites** 25:13 26:25 79:7 88:5 120:15 125:4
**sitting** 68:13 73:24 250:17
**situation** 151:24 210:25 250:24
**situations** 234:17
**six** 56:1 85:11 116:14,24 194:6,9 287:10
**sized** 164:11
**skimming** 111:14
**skin** 67:17 78:8 85:23 86:8 140:6 166:1,6 166:13,14 167:25 178:5 260:2,14 277:17 300:6 331:8,10 334:9
**slight** 286:11
**slightly** 44:8 216:4 335:13
**slope** 307:5
**slowed** 103:22
**slowly** 310:4
**small** 69:17 81:25 139:4,20 159:17
**smog** 140:20
**smoke** 302:15 302:24,25 303:14 304:3
**smooth** 10:8
**smsm.com** 4:10
**snapshot** 284:10,21
**society** 19:12 19:22 20:4,10 122:13 301:13 304:16,19,19 304:22,24 305:7 317:10

317:14
**society's** 122:20
**software** 108:12,19
**soil** 26:12
**solubility** 334:5
**soluble** 67:18 334:4
**solution** 148:15
**solutions** 355:23
**somebody** 132:15
**somewhat** 300:5
**son** 3:20
**soon** 20:17
**soots** 23:24 302:15
**sorry** 132:25 142:10,12 161:19 185:9 189:17 246:10 261:7 277:4 279:11 281:4 318:1 326:6
**sort** 108:16
**sound** 337:25
**sounds** 74:16 215:7
**source** 59:10 86:24 89:4,15 89:25 90:11,17 90:22 91:1 122:12 140:19 141:4 145:10 162:20 176:11 188:20 189:9 189:25 347:7 347:10
**sources** 87:7 91:2 97:17 112:15 176:3 189:22 259:20 303:19 324:19 326:2
**space** 14:8
**speak** 11:6 160:2
**speaking** 282:14
**speal** 5:16
**special** 108:11
**species** 292:7,7
**specific** 14:9 19:15 23:10,18 41:22 44:25 45:9,18 46:18 53:4 54:25 55:15 62:10 65:15,20 70:20 80:20 90:18 92:20 100:25 113:22 130:5 130:18,21 135:17 149:6 149:18 154:16 160:7 161:5 163:9,10 176:17 182:22 184:1 189:1,14 192:25 214:8 231:18,19 248:8 273:10 285:20 313:25 335:23 348:19
**specifically** 42:4 44:16 47:25 50:20 57:14 71:21 72:12 81:24 83:20 92:13 93:13 94:2,10 95:23 107:4 114:7,9,22 115:3 116:19 117:24 122:19 128:10,14 129:24 130:16 133:10,21 140:8 141:4,15 144:23 153:3 155:4 160:2,22 161:14 162:22 167:21 173:8 179:6 181:9 183:20 184:3 184:25 190:7 192:18 196:16 201:13 202:7 202:14 206:1,4 207:6 208:16 212:19,19 227:16,21 242:3 261:1 266:11 272:10 273:11 274:18 286:19 302:14 329:3 337:3 348:12
**specifics** 162:18
**spend** 64:9 350:3
**spent** 14:24 15:6 21:23 39:23 58:24 257:25
**spite** 339:25
**split** 28:22
**spoke** 316:22
**spruill** 2:6
**ss** 354:2
**ssanghera** 5:5
**st** 5:15
**staff** 22:23
**stage** 39:10 120:9
**stan** 37:25 38:25 58:14 132:12 233:2
**stand** 292:18
**standard** 110:4 221:19 253:3

**standards** 79:4 79:4 155:17
**standpoint** 90:19 125:20
**stands** 227:10 298:8,9 333:16
**stanley** 1:14 2:2 6:11,13,17 8:8,16,18 352:2 355:5 356:2,24 357:2 357:4,12
**start** 39:13 73:9 106:10 135:23 207:15 258:4 297:9 301:20
**started** 40:10 124:24 152:1 198:19 204:20 302:18 328:24 347:5
**starting** 197:10
**starts** 115:20 142:17 145:19 147:7 197:11 241:1 244:12 251:17 270:12 271:20 279:21 290:7
**state** 9:10,13 19:11,22 20:8 20:8,22 25:11 46:16,16 88:9 91:25 95:24 101:3 134:25 168:8,13,18 236:3,3 251:21 253:6 268:6 314:14,14 326:7,7 354:2 354:6,21
**stated** 21:21 115:3 117:3 140:1 157:3 165:1 175:11 209:7 268:4 274:24 318:8
**statement** 6:12 13:19 14:20 70:21 101:10 101:13 118:21 120:21,22 143:14,18 187:1 199:8 204:20,22 249:6,11 317:15
**statements** 140:13 195:5,7 199:5 234:25 254:10
**states** 1:1 142:21 243:25 279:25
**statistical** 82:1 222:13 223:10 229:15 233:20 240:3,7 313:17
**statistically** 220:13,18 221:20 222:2,5 222:15 223:3,7 223:18 224:9 225:14 226:10 227:24 228:22 231:22 232:15 233:11
**stay** 42:22
**stenographic** 11:10
**stenographic...** 354:11
**step** 73:6 75:8 217:12 267:2 300:10 306:4
**stepped** 75:4
**steps** 107:25 218:7 256:4
**steroidal** 31:18
**steve** 232:7
**stimulator** 85:8 85:9
**stipulated** 353:2,7,10
**stop** 34:1 226:23 230:11 230:11,11,14 230:14 291:15
**stopping** 111:8
**store** 74:1
**stored** 295:16
**stove** 303:16
**stoves** 303:18
**straight** 172:1
**straighten** 39:17
**straightener** 92:5 93:10,19 94:3 197:13
**straighteners** 6:23 7:6 93:16 93:22 115:15 116:3 117:5 118:23 119:17 120:3 147:12 147:13 251:24 284:5
**straightening** 7:1 39:21,25 40:1 147:11,19 148:2,5 149:16 256:1
**straighter** 39:19
**streamline** 238:6 258:2,13
**streams** 100:19
**street** 2:6 3:9 3:15 4:3,17 5:9 5:14
**strength** 3:19 3:20 213:22 214:18 217:18 234:10,23

235:8,11,21 340:13
**stretch** 276:25
**stricter** 256:1
**strike** 51:9 79:14 80:21 82:6 99:17 106:9 117:10 151:15 170:11 178:23 179:15 215:13 230:2 240:22 241:21 249:2 255:4 260:18 264:19 306:6 327:24 340:22
**strong** 235:1,23 250:21
**struck** 338:11
**structure** 262:1 330:9
**studied** 171:15 174:25 175:1,3 341:19,23,25
**studies** 23:7 30:24 32:20,24 35:5 43:6,14 43:23,25 44:18 45:12 52:15 55:5,6,11 57:22 69:2 72:11,12 77:18 77:24 79:11,18 82:11 83:7,19 87:9,19 88:14 96:18,19,19 102:15 108:17 108:21,22,23 113:17,24 114:18 119:16 123:15 124:16 126:3 127:9 128:8,15 129:21 130:14 130:18,21 133:24 135:17 135:22 138:7 146:7 151:7,25 152:2,10 154:1 154:6,12,14 166:3 168:13 168:19,25 169:23 171:1 171:10 172:12 172:14 173:4 173:22 174:17 175:16 176:21 180:20 181:10 182:7,12 184:5 184:9,15 185:2 185:21 187:6,8 187:9 190:19 192:20,21 194:9,13,23,25 195:23,24 196:1,12,15,19 196:24,25 197:11,17 199:5 200:20 202:2 205:22 206:2,3,7,9,20 207:2,3,6 211:23 212:3 212:18 213:1 218:20 228:4 233:19,22 234:14 236:12 238:22,23 239:11 240:13 240:15 241:16 243:4,6 245:9 247:10 250:4 250:18 252:8 252:18,24 256:7,15,18,23 257:11,20 262:12,23 265:3 266:9 269:18,22 270:1 272:7 273:10 278:8 278:17 279:14 280:3,3,16 281:18,19 286:8 288:13 289:21 291:12 293:13 298:21 298:23 301:11 303:11,25 309:17 310:11 310:16,23 315:23 316:1 320:11,21 322:23 324:21 324:24 325:7 327:1,5 328:8 328:9,21 331:1 331:21 332:1,4 332:6 337:22 337:24 338:2 339:9,10,24 340:5,14,18,19 343:11,18 348:13
**study** 7:11 29:14 45:14,15 57:21 70:20 77:10 78:8,10 78:11 79:25 80:8,11,19 81:17 82:3,8 83:5,6,13,16 84:6,13 89:8 90:2,4 108:25 115:13,14,19 116:10,12,15 117:15 118:21 121:6 129:24 136:5 145:25 146:9,13,19,24 147:3 150:13 152:4,5,5 153:7 154:4 155:18 164:7 167:9 172:2 176:17 177:12

177:14,17,20 179:8,9 180:18 183:1 185:3 189:1 197:5,7 206:5,8 209:5 211:24 213:3 218:5 219:2,12 219:12,20 220:5,7 223:12 223:16,22 224:6 225:1,17 226:5,9,16 227:7,19,23 228:21 229:3,7 231:4,11,21 232:6,8,12,20 236:16 237:13 237:14,20,20 239:17 240:19 240:21,24 241:9,9,9,23,24 242:2,2,8,14,15 242:18 243:1 243:21 244:23 245:1,2,18 247:2 248:12 248:16,23 250:9,10 251:11 252:16 254:22,22 255:1,3,5 256:16,24 257:5,16 262:21 263:11 272:19 273:12 278:7 280:13 283:5,17,19,20 283:23 284:4 284:10,18 286:14 287:4 292:5 305:23 310:18 313:4 324:22 328:10 328:13,16,18 331:22 339:11 340:24 345:24 346:1,14 347:6 348:19

**studying** 300:14

**subject** 27:10 69:25 70:4 218:9

**subjected** 265:11

**subjects** 105:7 180:22

**submitted** 33:11,12 117:21 198:3 198:19,21 202:25 205:10 217:10

**subparts** 262:4

**subscribed** 357:14

**subsequent** 256:6,20 285:9 339:10

**substance** 22:22 143:11 301:25 302:6 302:10 322:12

**substances** 22:14 123:19 142:3 159:6 301:25

**substantively** 331:16

**subtle** 322:4 323:15

**sufficient** 101:13 158:14 242:19,21 280:2 288:5 289:1

**suggest** 77:7 194:13

**suggesting** 224:22

**suggests** 219:23 229:24 252:19

**suite** 2:6 3:5,9 3:22 4:3,9,13 4:22 5:4,9,14

**summarize** 214:12

**summarizes** 22:20

**summary** 94:5 109:8

**sunscreens** 259:25 260:1,6

**super** 113:14

**superfund** 25:12

**support** 43:18 44:12 45:2 46:11 51:12 52:1 56:3 79:2 101:14 109:22 158:14 258:15 280:4 287:15 288:5 289:1 334:12

**supported** 55:13

**supporting** 102:3,16 151:12 306:20

**supports** 70:20 192:15 193:14

**suppose** 35:9

**supposed** 41:15 120:18 333:24

**suppress** 159:12,18

**sure** 10:15,20 11:4 12:4 25:9 33:9 35:21 37:24 39:11 40:17 44:7 46:2 47:4 58:10,20 60:7 61:4 64:3 66:3

69:1 74:15 76:16 79:21,23 84:14 95:16,17 96:10,25 100:7 105:5,8 118:16 120:10 122:17 124:9 126:12 137:13 140:14 145:7,14 160:1 166:7,16,16 167:11 184:21 186:25 187:8 188:10,12 189:3 193:24 194:1 196:11 198:9 219:11 223:25 234:4 235:18,20 238:3 257:14 261:19 264:8 268:3,16 269:8 269:14 271:14 271:18 274:9 274:11 282:11 282:14 285:5 288:11 294:9 294:11 308:14 311:15 319:14 326:9,11 330:11 345:2,9 345:15
**surface** 260:14
**surprised** 140:11 256:11 308:13,15
**surrogate** 285:2,4
**survey** 327:16
**susceptibilities** 131:8
**susceptibility** 329:15,19
**suspected** 48:6 49:6 131:20
**swear** 8:10
**switch** 91:7
**sworn** 8:19 353:13 354:9 357:14
**syndromes** 126:22
**synergistic** 342:15 345:17 345:21 347:16 347:23 348:3,7 348:14
**synonymous** 99:12,14
**system** 31:5,12 70:10 121:20 125:7 126:22 128:9 129:23 181:6 182:2
**systematic** 104:16,20 312:6
**systemic** 293:10
**systems** 5:12 31:22 112:16 126:24 127:1 181:13

**t**

**t** 1:14 2:2 6:1,1 6:8,11,13,17 353:1,1 355:5 356:2,3,3,24 357:2,4,12
**tab** 102:7
**table** 49:19 207:12,13 209:9 213:25 214:11 235:3 268:12
**tables** 224:12 224:14 228:7
**tag** 108:13
**take** 10:16 11:15,20 13:8 14:19 21:4,14 29:2 73:6 75:24 84:4 111:8 113:4 125:13 136:20 188:7 191:18 249:12 270:22 276:6,14 283:4 283:16 299:8 306:4 337:10 341:13
**takeaways** 231:4
**taken** 2:3 62:22 66:21 73:12 113:7 191:5 215:10,13 250:23 276:20 283:22 349:22 350:10 354:7
**takes** 128:22 167:16 252:23 290:19,22
**talk** 12:20 13:2 24:3 29:3 55:24 60:20 68:15 71:24,24 76:6 95:8 123:2 126:9,12 131:17 132:18 139:1 154:6 158:24 168:2 182:19 197:20 203:15 207:9 261:7 266:2 272:10 277:5 306:1 341:8 348:14
**talked** 11:16 40:24 44:9 58:5 73:6 93:16,17 95:19 131:21 146:5 150:2 165:16 172:13 180:3

183:22 190:20 191:17 203:16 208:2 213:18 218:4 239:16 265:15 269:17 284:25 291:3 344:7 345:19
**talking** 10:22 29:15 58:1 63:15 67:8 75:25 94:2 99:19,20 111:16 112:12 128:15,17 131:23 157:13 177:3 201:24 202:1 205:9 235:10,11 238:17 245:18 245:20 257:24 272:24 290:20 291:5 304:2,5 304:25 305:8 326:14,20 327:7 329:10
**talks** 129:25 218:7,25 269:23 272:15
**tapping** 160:14
**tardy** 4:21
**target** 125:3,12 128:10 154:16
**tars** 302:15
**tasked** 119:5 293:20
**taught** 215:11
**taylor** 1:23 354:5,20
**team** 26:11 32:1,7 36:14 344:9
**technical** 17:15
**technically** 292:4
**techniques** 175:2
**technological** 321:24
**tell** 61:9,15 90:22 104:12 105:9,19 163:18 227:3 229:1 230:8 249:4 261:22 265:5 268:7 281:7 287:20 297:4 333:4
**telling** 10:25 230:8 309:8
**temporal** 215:23
**temporality** 234:16
**temptations** 42:6
**ten** 121:6 253:1 288:16 309:18
**tend** 131:3 232:20
**tendency** 14:5
**tenure** 102:2
**term** 52:16 170:4 194:11 220:12 280:6 280:10,13,21 280:23,25 281:15 288:14 288:21 289:13 289:22 292:12
**terminology** 185:10 212:11
**terms** 13:25 93:7 105:6 114:24 126:21 135:18 144:24 149:5 166:20 201:1 212:4 234:18 287:9 287:12 289:7 290:18,25 292:25 309:5 331:8 336:1,18 337:5 341:4
**test** 112:15 136:7 229:15
**tested** 56:14
**testified** 8:20 50:8 65:11 179:17 311:9 348:5
**testify** 354:9
**testifying** 230:12,14,15
**testimony** 10:11 52:20 56:1 59:3 66:8 66:16,20 67:2 104:3 133:7 157:19 179:19 189:7 267:3 354:10,12 355:9,17 357:8
**testing** 275:17 278:3
**texas** 4:9
**thank** 14:14 44:23 73:1 113:3 118:18 123:1 132:24 142:15 155:9 210:5 216:3 230:25 236:22 237:15 254:18 262:11 268:10 274:10 304:13 321:2 345:7 350:5 351:22
**thanks** 238:2
**theories** 342:10
**theory** 330:11
**thereof** 354:15
**thermal** 147:13
**thesis** 24:12,15

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 437 of 449 PageID #:73138



**thing** 10:17 11:5 13:16,24 20:5,10 50:11 58:22 87:14 103:23 105:18 137:16 149:6 214:14 296:11 305:12 311:23 312:1
**things** 10:15 23:20 33:18 43:13 87:8 103:23 104:14 118:11 149:7 157:13 190:23 205:6 219:13 266:22 271:7 272:24 310:2 319:5,23 325:25 329:11 329:12 336:7 342:25
**think** 12:2 19:18 30:10 33:10,13 35:18 36:8,9 37:7 44:4 46:16 49:24 52:3 54:22 56:1 57:15,18 58:7 58:17 66:18 67:25 69:1,3 78:6,11 82:24 83:12,14 91:9 92:15 94:19 99:6 110:9,21 110:22 115:2 118:14 119:21 119:22 127:13 131:11 136:15 138:5,8,21 140:7 146:11 149:4,5 151:5 151:6 153:18 154:3 157:5 158:7 162:2,21 163:2 164:6 165:24 169:24 173:4,6 176:13 179:9 183:1,2 183:12 190:11 191:1,13 197:5 197:6 200:17 202:16 203:17 204:18 205:15 207:10 208:2 209:5,22 210:10,24 218:4,18,25 234:12,16 239:24 240:8 241:19 242:10 243:1 245:23 246:2 247:15 249:17 250:15 250:23 251:17 258:5,18 259:3 259:4 263:13 265:16 267:18 269:23 271:6 271:12 272:23 272:24 277:1 278:22 279:8,8 282:15 289:18 291:4 292:10 292:14 303:2 304:22 309:6 309:17,22 310:15 312:2,6 315:5 317:11 317:13,16 318:18,23,25 320:5 324:21 326:10 328:15 329:17 330:7 330:20 332:2,9 335:1,11,14,18 335:18 336:23 337:4,23 338:12,14 339:12 340:2,8 346:1,2 347:21 347:24
**thinking** 52:9 149:5,6 199:18
**third** 21:13 109:9 115:20 145:16 155:10 210:23 211:2,3 270:8
**thorough** 338:4
**thoroughly** 198:15
**thought** 50:11 53:19 263:15 276:14 282:18 328:23
**thousands** 63:8 63:13 302:22
**threat** 9:16
**three** 68:20 80:23 81:2 82:6,8 86:11 147:18 172:3 196:1 250:3 263:13 265:16 270:10 273:16 287:9,23 313:4 313:23,24 314:9,10,15,20 339:24 342:9 342:10,24
**threshold** 122:23 123:7 123:17 134:22 135:10 288:24 289:2
**thresholds** 122:2,10 123:10 124:11 124:22
**thumb** 292:8
**thyroid** 94:19
**time** 8:4 9:7 11:15 20:5

26:9 27:13 28:15 31:16 32:10,16 36:12 39:24 42:6 43:16 48:24 50:21 58:18,24 64:1,6,9 74:13 88:19 107:20 153:1 158:3,6 167:14 191:14 196:23 197:23 198:4 202:25 204:4 227:17 246:1 250:22 252:23 253:17 257:25 283:25 285:13 287:13 287:19 288:5 290:22 301:23 302:4,16,18,19 304:11 306:15 306:15 313:21 320:13 323:3 342:11 350:2,3 350:4,5 353:9 354:8,10,13 355:18
**timeframe** 355:8
**times** 22:2 26:23 44:5 68:20 165:1 170:17 191:17 191:20 244:16 281:24 283:1 283:15 284:20 287:9,10,10,11 304:14 350:16
**tissue** 90:6,9,18 125:25 128:9 131:6 133:10 133:16 178:17 179:10,10,13 179:13 201:9 201:11 300:7 300:17 347:2,3
**tissues** 91:5 120:17 130:24 131:2 176:20 178:17 190:14 200:4,8 201:12 201:16,18 212:8 280:4 293:3,5 295:11 295:17
**title** 26:4 120:1
**titus** 4:12,14
**tobacco** 141:8 302:15
**today** 9:5 10:8 11:23 13:3 14:1 39:8 47:18 50:1,8 52:20 56:1 70:19 84:3 106:25 123:3 130:11 164:18 167:6,15 187:15 193:11 196:4 205:21 226:7 228:21 231:20 232:13 233:9 288:22 292:17 294:5 304:14 308:7 314:22 345:19 350:3,6,16
**today's** 8:3 176:2
**together** 47:10 74:20 192:8 209:17 211:17 304:8 343:15 344:1 350:4
**told** 91:17 264:21 336:6 350:1
**tolerance** 79:3
**tolerated** 135:24
**tony** 42:8
**took** 21:8 78:13 200:2 201:17 202:16 250:21 250:21
**tool** 123:12
**tools** 321:24 322:5 323:13
**top** 255:14 290:5
**topic** 24:15 79:19 108:18 114:14 202:1 308:2
**topics** 39:6 44:24 91:7 105:7,10 120:6 138:25 182:18
**totality** 96:4 209:2 212:24 213:7 214:4
**totally** 93:5 227:2
**touch** 260:10 260:13
**toward** 105:23 118:1 203:5 270:11 276:25 325:18
**towards** 271:19
**toxic** 56:25 88:16 142:3 290:8 319:8 329:21
**toxicity** 76:2 152:5 313:15
**toxicokinetic** 299:9,16,20 300:12,18 301:3
**toxicokinetics** 299:3,4
**toxicological** 18:22 76:25 280:1

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 439 of 449 PageID #:73140



**toxicologist** 19:4,19,20 22:24 32:10 59:21 89:1 102:3,16
**toxicologists** 76:21
**toxicology** 17:11,18,25 19:12,17,23 20:4,23 21:8 21:11,23 52:15 123:19 247:2 250:10 290:16 290:25 292:4 315:1 343:14
**trace** 89:5 176:10 189:8 193:6
**traditional** 311:21 315:21
**train** 276:13
**training** 350:24
**transcribed** 354:11
**transcript** 322:9 354:8 355:6,19 357:5 357:8
**transcripts** 63:6 65:24 66:6,8,12 67:2
**transition** 204:21
**transport** 91:4
**transported** 90:17 201:15
**treat** 172:8 217:1
**treated** 217:3
**treatment** 40:14 41:7 85:3
**trial** 353:9
**trials** 17:14
**trick** 322:17
**tried** 130:6 151:6 289:6
**triethanolami...** 277:16
**trip** 67:11
**true** 74:8 80:20 81:5 85:3,6,9 86:3 87:16 88:5 90:14,24 91:21,22 92:14 95:2,3 97:6,13 97:20 100:15 101:6 117:6,7 117:9 119:7 121:23,25 125:8 137:17 189:15 192:10 213:23 221:14 222:6 229:6 231:6 239:18 239:19,22 269:19 289:18 332:7,17 349:2 349:5 354:12 357:8
**truly** 137:10
**truth** 198:25 354:9,9,9
**truthfully** 198:10
**try** 10:22 14:11 52:4 64:7 68:16 122:9 123:15 136:21 219:11 235:20 238:5 257:25 258:13 268:21 289:8 316:2
**trying** 25:23 26:3 47:7 60:15 68:15 72:20 104:18 105:6 129:3 134:6 142:6 206:16 230:16 230:17 236:2 236:23 238:8 258:1 268:23 271:7,13 272:21,21 289:24 300:3 305:22 309:24 334:18 342:22 345:7,25
**tumor** 197:8,15 199:18 247:3
**tumors** 184:17 199:15,17,17 200:14,18
**turn** 16:3 34:6 63:1 80:1 91:8 94:4 101:20 109:7 142:9 145:12 147:2 147:22 168:15 193:20 194:17 197:6 209:21 251:11 254:21 254:21 290:4
**turned** 202:15
**two** 36:11 38:6 102:21 111:3 120:15 155:10 174:24 183:9 183:11 194:18 195:5,7,24 197:11 201:10 201:10 205:22 207:2,3,6 208:22 209:4 209:17 211:16 213:1 234:14 236:15,16 239:8 241:16 243:6 247:10 247:10,11,21 257:8,10,12 268:18 270:10 276:9 287:9 321:13 337:12

343:14 346:22 347:25
**type** 40:12 41:2 58:22 78:7,20 101:9 131:6 148:5 153:2 175:5 192:24 201:12 219:8 252:3 253:3 256:5 289:25 300:20 303:9 303:13 314:11 320:21 322:7 323:13,14 333:5,21 334:3 342:2 343:16 347:5 348:16
**typed** 354:12
**types** 80:13 84:20 101:22 127:20 141:13 147:19 171:19 172:25
**typical** 266:14 291:19
**typically** 89:11 131:2 136:5 172:16 174:19 183:19 220:6 220:19 221:16 281:23 290:19 291:15,16 292:5 295:4 296:12 299:20 304:7 305:24 310:3 313:4 314:7 335:13 341:6,9,12
**typographical** 202:20 204:24

**u**

**u** 353:1
**u.s.** 109:16 110:18 112:11 251:21 252:12
**uh** 115:22 224:25
**ultimately** 33:19 158:13
**ultraviolet** 23:22
**uncover** 130:6
**uncovered** 117:12
**under** 84:24 94:5 95:10 96:12 102:9 103:5 104:8,18 116:4 117:5 118:24 119:8 138:9 148:1 156:17 159:3 194:4 208:4,19 209:15,22 210:11 212:17 213:12 214:7,8 217:13,23 219:15,20,25 223:5 230:2 234:7 235:21 236:10,10 238:18 242:7 243:20 263:16 266:3 270:9 289:12 308:14 319:1
**undergo** 218:8
**underlying** 219:23
**understand** 9:6 11:23 12:9 14:20 25:23 26:3 27:8 47:8 60:15 65:6 66:9 69:8 83:24 98:12 103:7 132:7,9 157:19 170:15 197:22 198:24 220:15 234:6 252:11 254:9 268:23 284:17 302:1 306:3 320:3 330:23 344:16
**understanding** 35:8,22 40:19 48:14 51:3 54:6 55:17 59:23 67:13 73:8 88:1 99:10 120:13 150:1,6 154:21 159:4 161:10 171:21 186:11 198:2 200:9 319:17
**understood** 11:14 12:7 13:17 16:12 198:7,12 282:23
**undertake** 77:2 119:6 341:13 341:24
**undertook** 338:14
**underway** 256:11
**union** 155:16
**unique** 336:8,9
**united** 1:1
**unknown** 131:13,13 134:15 193:9
**unpack** 282:11
**unusual** 81:8
**upgrade** 158:14,17
**upgraded** 156:14 157:24
**upper** 313:8
**urine** 78:4 89:24 176:19 180:8,13,19

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 441 of 449 PageID #:73142



293:6
**usage** 106:9 159:3
**use** 6:22 7:6,9 7:12 30:11,16 41:15 43:1,7,8 43:11,11,17 44:1,3,11 52:21 53:11,12 54:7,17 61:25 79:1,9 92:4 93:11 94:8 95:14,19 98:23 101:16,25 110:17 113:18 114:24 115:14 136:7,19 143:19 151:19 161:16 175:1 185:12 194:10 194:11,24 195:24 197:13 199:6 205:23 206:22 219:6 223:18 224:18 225:24 226:1,2 227:18,19,25 228:22 232:10 232:15,24 233:11 237:4 239:3 240:14 243:13 251:23 252:1 253:7 257:12 280:6 280:11,13,14 280:15,19,21 280:23,24,25 281:14,15,22 282:4,6 284:7 285:1,2,4,9,13 285:18 286:7 286:11,15,21 287:2,14,19,22 287:22,25 288:14,14,14 288:15,21,22 289:13,23,25 290:12 291:8 291:13,15,19 291:21,24 295:8 299:1 303:4 306:7 307:6 315:19 317:1 326:3 327:11,18,20 328:16,25 329:17 331:4 332:24 339:12 340:11 351:19
**used** 6:20 23:11 26:13 39:16 41:9 75:10 93:24 102:1,13 102:14 107:5,6 110:19 119:24 124:20 126:14 141:12 147:10 163:3 173:16 173:17 174:23 179:17 183:18 183:19 186:22 187:21 191:20 207:16 218:5 228:16 240:15 253:8 259:24 259:24 266:14 266:16 267:9 267:14,15 269:6 275:1,8 277:24 285:16 288:4 291:22 299:24 314:25 322:6 323:14 329:3 334:20 337:17 338:25 346:10 355:19
**uses** 179:22 185:10 325:21
**using** 33:25 140:25 143:11 282:9 286:10 291:21 300:9 303:18 314:5 315:20,21 318:19 334:22
**usually** 166:10
**uterine** 7:8,10 52:22 53:13 54:8,19 90:6,9 91:20 92:13 93:12 94:10,14 94:23 95:21 98:9,24 100:5 100:12 101:6 106:9,21 114:15 120:3 128:9,19 129:16 133:9 133:18 134:1,8 134:13 151:19 156:21 158:22 169:2 171:2 184:10,17 185:7,9 194:12 194:24 195:24 195:25 196:2 197:8,13 199:7 199:15,22,25 200:10,11,15 200:21,22,25 201:6,6 202:3 205:23 206:23 208:21 209:4 212:13,19 213:4 223:19 224:19 228:1 228:23 229:8 229:19 238:23 239:3 245:7 246:19 247:11 257:6,17 262:13 278:18 279:16 280:7 281:13 283:9 283:12,15 285:24 286:1

286:16 287:16 288:7 328:3,17 330:16 339:4 339:14 351:4 351:21
**uterus** 120:16 127:4 129:23 129:24 201:13
**uv** 259:24

**v**

**v** 355:4 356:1 357:1
**vacuum** 329:10
**vague** 78:7
**valid** 217:14 218:14,18,23
**valuation** 228:12
**value** 220:21 220:22,23,24 220:24 221:2 221:23 226:3 336:2
**values** 235:5
**vapor** 69:15 70:25 72:8
**vaporized** 71:9 71:16
**vapors** 71:4
**variants** 327:2
**varied** 153:1
**varies** 149:17
**variety** 252:10
**various** 21:10 28:18 35:7 40:12,15 58:19 64:3 75:9 78:15 82:12 108:24 155:16 169:17 170:2 171:22,24,25 172:15 173:7 174:23 175:1 176:3 180:10 182:14 234:10 262:7 270:15 320:11
**vaseline** 333:5 334:3
**vehicle** 334:8
**verbalize** 11:13
**verbally** 11:6
**verify** 355:9
**verifying** 91:3
**veritext** 355:14 355:23
**veritext.com.** 355:15
**versed** 324:5 344:9
**verses** 281:20
**version** 16:8 103:8,22 104:6 104:25 105:25 204:4,5,25 210:20 215:5 324:16
**versions** 204:11 204:14
**versus** 8:7 44:1 179:1 183:14 224:13 226:2 227:19 288:14 291:1 301:24 302:2 315:19 325:21 327:11 334:19 337:13 346:20
**videographer** 5:18 8:2 9:22 10:1 62:18,21 62:23 113:5,8 191:3,6 276:18 276:21 341:11 349:20,23 350:8,11 351:25
**videos** 42:12
**videotape** 11:9
**videotaped** 1:12 2:2 6:10
**videotaping** 11:8
**view** 39:9 47:9 311:10
**virginia** 4:17
**virtual** 170:9
**viruses** 24:2
**vitamins** 319:4
**vitro** 126:3 173:21 280:3
**voelker** 5:13
**volatile** 68:1 70:16 142:17 142:21
**volatility** 143:16 261:2
**volatilization** 69:23 145:10
**volume** 255:11

**w**

**wacker** 4:22
**wait** 10:18,23 21:2 124:8 132:18 232:25 238:11 246:9 250:18 281:2,2
**waived** 353:6
**wake** 354:3
**want** 11:15 39:2 60:25 61:9 63:2 73:7 91:11 92:11 102:7 126:11 135:25 137:5 137:11 138:25 188:7 191:16 191:18 196:6 205:5 221:22 226:21 233:6 237:1 243:13 249:12 261:19

282:13 283:9 287:22 288:22 294:13,13 296:5 305:3,10 319:11,15 321:10 326:11
**wanted** 13:24 35:21 42:8 202:18 226:15 227:6 230:8 340:15
**wants** 281:8
**ward** 126:14
**washington** 3:10
**waste** 9:16 25:13 79:7
**water** 26:13 30:13 79:4 162:25 163:6
**way** 10:21 12:1 17:4 22:3 25:6 25:20 38:22 39:2 43:21 47:9,24 73:14 74:13 86:21,23 88:4,5 89:3,5 101:12 107:1 119:1 120:14 120:15 121:13 125:7 156:6 176:10 182:11 185:2 186:14 188:19,19 189:8,23,24,25 192:3 209:11 219:11 224:2 226:8 233:10 238:14 240:19 250:1 258:8,25 260:21 264:10 265:8 275:7 288:2 294:24 301:2 312:15 312:18 318:12 336:3
**ways** 76:20 121:14 132:9 313:17 349:6
**we've** 11:16 13:11 16:5 62:19 80:2 180:3 192:19 205:9 213:18 258:19 265:14 269:17 302:21 326:14 329:10 345:18
**weak** 235:13,23
**web** 129:8
**website** 129:8 140:16
**weed** 37:6
**week** 311:9
**weeks** 43:9 202:16
**weigh** 234:1,20
**weighing** 234:7 234:18
**weight** 183:14 183:15,16 190:12 344:5
**weights** 183:18
**welter** 3:14 6:3 8:12,12,23 9:2 9:24 10:4 13:7 14:17 19:9 24:13 30:23 31:23 34:5 35:11 36:23 37:24 38:10 39:5 40:7 41:4 41:17 43:15 44:6,22 46:1 47:3,13,17 50:7,22 51:4 51:16,20,22 52:17 53:5 54:1 55:16,23 57:2,8 58:13 59:2,13,20 60:9,22 62:8 62:16,20,25 64:11,16,18,21 65:5,7,8,14 68:7,11,16,22 70:2,18 71:17 72:17,24 73:2 73:3,20 75:3 76:5,17 77:17 79:14,16 80:7 81:12 83:4 84:1,11 85:24 86:9 87:23 88:20 90:13 91:6 93:3 96:7 97:10 98:5,16 99:9 100:13 101:1,17 107:15 109:1 110:12 111:10 113:2,4,10 114:11 115:5,8 115:11 118:8 120:5 121:17 122:25 124:5 124:23 126:6 127:21 128:6 129:17 130:8 131:15 132:23 133:1,22 134:19 135:2 136:25 137:19 138:15,19 139:17 141:6 142:8,14,16,18 144:8 145:6 146:14,17,22 150:7 151:13 152:18 153:10 153:19 154:10 154:22 155:8 157:18,23 159:22 160:24 161:7 162:14

163:4,17,23 164:17 165:15 166:2 167:5 168:1 170:10 171:4,17 172:23 173:10 174:3,11 175:17,25 176:8,23 177:7 177:10,23 178:8,21 179:14 180:11 181:3,18 182:4 184:20 185:8 186:9,24 187:14 188:10 188:13,17 189:2,16 190:18 191:8 193:10,19 199:20 200:19 201:3 202:10 203:11,17,19 205:20 206:12 207:24 208:18 209:10,24 210:17 211:1,8 212:9 213:6 214:23 215:2 216:19 218:11 219:10 220:11 221:4 223:4,15 223:24 224:20 225:7 226:6,14 226:19,23 227:1,8,12 228:17,25 230:1,13,16,21 230:24 231:1,2 231:16 232:3 232:18 233:5 233:14,24 234:5 235:6 236:18,25 237:6,10,18,25 238:3,4 239:15 240:20 242:5 242:20 244:24 247:17 248:1 248:13,16,20 249:10,18,22 250:25 251:8 254:17 256:17 257:1 258:23 260:16 261:6 262:22 263:6 264:18 265:20 267:11 270:18 273:14 274:10 274:12 275:9 276:8,12,16,23 281:5 282:10 282:18,22 287:5 288:3,18 290:3 294:4 295:24 296:21 297:7,22 299:2 300:11 304:12 307:10 308:16 310:25 311:24 313:22 314:13 316:4 317:20 318:2,14 319:10 320:25 324:7 326:8 327:21 330:10 331:17 332:12 333:15 335:4 335:16 336:13 337:9 338:19 340:21 342:8 344:14 345:6 347:14 348:4 348:23 349:3 349:19,25 350:20 351:6 351:17,24

**went** 11:17 27:12 60:15 67:10 105:21 195:5 197:1 234:20 278:22 338:15

**west** 4:13 5:3,9

**white** 7:12 114:18,20 206:5 241:24 242:1 245:1 247:13 248:16 248:22,25 249:8 250:5 251:4,11,20 252:16,19 282:1,1,3,13,16 282:19 283:6

**whoa** 230:10 230:10,10,10 230:11

**wide** 127:1

**wideikis** 5:2

**widely** 277:17 277:24

**wider** 252:10

**wiedner** 4:2

**wife** 203:24

**wiki** 129:10

**wildlife** 24:11

**wilmington** 3:5

**wise** 196:16 197:5,7,11 232:12,19

**wish** 350:3

**wishes** 38:22

**withdraw** 95:17 250:2 251:9 267:1 269:15 294:20

**witness** 8:11,16 10:3 18:24 24:10 30:8 31:15 35:1 38:2 39:3 40:23 41:12 43:4,21 44:15 45:6 46:15 50:10 51:2,15

Case: 1:23-cv-00818 Document #: 1828-11 Filed: 05/05/26 Page 445 of 449 PageID #:73146



52:3,25 53:16 54:21 55:21 56:6 57:7 58:17 59:9,18 60:2 63:22 65:13 69:11 70:13 71:12 72:5 73:17 74:15 75:19 76:12 77:6,23 80:6 81:7 82:15 83:23 84:10 85:20 86:5 87:1 88:7 90:24 92:18 95:23 97:8,22 98:6,11 99:1 100:7,17 101:8 107:3 108:10 109:25 111:13 113:21 117:17 119:20 120:25 122:4 123:10 124:14 125:17 127:7,25 128:12 130:3 131:1 132:19 132:25 133:12 134:3,25 135:13 138:4 139:7 141:3,20 144:3,21 146:11 149:13 151:4,22 152:24 153:13 153:25 154:19 155:6 157:2 160:21 161:4 163:2,15,22 164:13,24 165:24 166:23 167:19 169:4 171:13 172:12 173:3,14 175:8 175:22 176:5 176:13 177:2 177:19 178:4 178:12 179:4 179:25 180:16 181:8 184:13 185:6 186:3,14 187:5 188:15 188:22 189:12 190:6 192:17 193:17 199:10 200:13,24 202:7 205:14 206:1 207:19 208:15,25 209:19 210:22 211:7,20 212:22 214:7 216:12 218:3 218:17 219:25 220:18 222:9 223:10,21 224:11 225:17 226:24 228:3 229:10 231:8 232:19 233:4 233:17 234:4 235:3 236:14 236:23 239:1 239:24 242:1 242:10 243:23 246:17 249:20 250:8 252:22 256:9,22 258:18 260:13 260:24 262:15 264:17 265:13 267:8 270:6 273:9 274:9,18 275:22 281:4 281:17 282:20 286:18 287:18 288:9 289:18 293:20 295:2 296:10 298:18 299:19 303:8 306:10 308:12 309:15 311:15 312:24 314:3 315:14 317:4 318:1,7,23 320:2 321:22 326:6,25 330:2 330:20 332:9 334:15 335:10 336:14 337:19 339:8 341:4,12 343:7 344:24 345:24 347:20 348:10 349:2 349:16 350:21 351:18 354:16 355:8,10,12,18

**wmlaw.com** 4:5

**woman** 179:22 287:14 288:4 291:14

**women** 6:21 43:1,8,17 44:11 46:20 153:4 179:17 180:5 229:8,12 229:14,20,20 229:23 231:5 239:5,18,21,22 240:1 242:23 246:13 247:5 247:12,13,14 247:23 248:4,9 248:12 252:13 280:7,15 281:13 284:18 285:16 286:9 291:20,20 327:20 329:10 332:24 346:10

**women's** 7:11 232:8

**wondering** 110:3 152:2

**wood** 302:24 302:25 303:14 303:16,18 304:3
**word** 109:10 115:21 145:19 261:22 290:12 291:24 338:18
**words** 25:25 60:13 97:12 150:15 194:18 204:19 302:3
**work** 16:8 22:8 23:25 26:10 28:23 31:25 64:17 105:18 106:12 116:24 124:4 128:20 140:5 193:25 193:25 217:1 306:8,11,13 309:2
**worked** 18:24 28:9 156:17 302:19 306:21 308:20
**working** 9:10 9:13 15:6 17:7 22:10 26:20 40:10 50:12 68:3 89:1 102:16 103:18 103:21 104:7 104:15 105:2 107:6 108:11 119:11 139:13 160:9 296:1 302:17 308:21 313:1
**works** 349:6
**workshops** 308:2 310:8
**world** 66:7 176:2 303:17
**worldwide** 4:20
**worries** 276:12
**wrap** 274:13
**wright** 3:4
**write** 31:11 199:14
**writing** 27:7 108:16 161:18
**written** 254:2
**wrong** 249:24
**wrote** 199:11 199:12,18 338:18

**x**

**x** 6:8 23:21 122:18 135:19 135:20,21 325:21

**y**

**yeah** 10:1 17:16 25:16,18 39:6 46:3,6 58:13 60:23,23 60:24 77:1 86:7 101:12 111:12 124:14 125:5 130:1,3 132:2,23 135:3 139:24 141:3 141:14 149:13 150:18 151:4 151:22 152:24 160:1 161:21 162:7 170:14 178:5 181:21 181:23 188:16 203:17 205:3,4 206:15,17 210:7,22 211:7 234:9 235:18 239:19 245:20 249:15,20 263:13 267:8 271:1 272:13 273:3 276:9 278:13 281:17 282:3 285:20 287:18 289:15 304:25 305:5 318:15 333:20 344:24
**year** 15:7 44:5 45:18 78:21 102:2 202:18 241:10 281:24 283:2,16 284:11,15,20 284:21 285:3,8 286:4,6 292:6 292:11 307:18 307:18,20 338:17
**years** 9:11 17:20 18:25 21:3,7,17,23 23:8,15 25:6 26:5,20 28:5 43:13 45:11,17 78:18,21 88:25 102:18 135:5 135:21 160:8 253:1 284:25 285:1,9 286:21 287:2,3,23 288:1,16 291:23 292:9 302:16 305:21 306:22 309:18 322:15 345:2
**yelled** 72:22
**yelling** 72:23
**york** 3:16,23,23

**z**

**zero** 222:4
**zhou** 270:22 271:1 272:2,6
**zoeller** 311:1 311:12 348:5
**zoom** 3:14,15 3:22 4:3,8,12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.