# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: HAIR RELAXER )
MARKETING SALES PRACTICES AND )Case No.1:23-cv-00818
PRODUCTS LIABILITY LITIGATION )

The video-recorded deposition of CLARENCE BROWN, JR., MD, called by the Defendants for examination taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, before Valerie Calabria, CSR, RPR, taken at 10 North Dearborn Street, 6th Floor, Chicago, Illinois, on February 17, 2026, at 9:09 a.m.

Job No. 7852296

APPEARANCES:

DOUGLAS & LONDON, P.C.
BY: MS. STEPHANIE O'CONNOR
MS. SARA CASTRONUOVA (via videoconference)
MS. LARA J. SAY (via videoconference)
MS. KRISTIN PADDEN (via videoconference)
59 Maiden Lane, 6th Floor
New York, New York 10038
212.566.7500
soconnor@douglasandlondon.com
scastronuova@douglasandlondon.com
lsay@douglasandlondon.com
kpadden@douglasandlondon.com

appeared on behalf of the Plaintiffs;

DICELLO LEVITT LLC
BY: MS. DIANDRA "Fu" DEBROSSE (via videoconference)
MS. ALEXIUS MILLER (via videoconference)
MS. OMEGA L. ADAMS (via videoconference)
505 20th Street North, Suite 1500
Birmingham, Alabama 35203
312.214.7900
fu@dicellolevitt.com
amiller@dicellolevitt.com
oadams@dicellolevitt.com

appeared on behalf of the Plaintiffs;

ASHCRAFT & GEREL
BY: MR. PATRICK K. LYONS (via videoconference)
MS. MICHELLE A. PARFITT (via videoconference)
1825 K Street NW, Suite 700
Washington, DC 20006
202.783.6400
plyons@ashcraftlaw.com
mparfitt@ashcraftlaw.com

appeared on behalf of the Plaintiffs;

PARKER WAICHMAN LLP
BY: MS. LAILA A. RAZZAGHI (via videoconference)
6 Harbor Park Drive
Port Washington, New York 11050
516.466.6500
lrazzaghi@yourlawyer.com

appeared on behalf of the Plaintiffs;

APPEARANCES: (Continued)

LEVIN SEDRAN & BERMAN, LLP
BY: MR. FREDERICK S. LONGER (via videoconference)
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
215.592.1500
flonger@lfsblaw.com

appeared on behalf of the Plaintiffs;

JOHNSON LAW GROUP
BY: MR. JAKE LOESSIN (via videoconference)
2925 Richmond Avenue, Suite 1700
Houston, Texas 77098
713.626.9336
jloessin@johnsonlawgroup.com

appeared on behalf of the Plaintiffs;

LEVIN PAPANTONIO PROCTOR BUCHANAN O'BRIEN BARR MOUGEY P.A.
BY: MS. CHELSIE GREEN (via videoconference)
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
850.435.7000
cgreen@levinlaw.com

appeared on behalf of the Plaintiffs;

ELLIS GEORGE LLP
BY: MR. DENNIS S. ELLIS
MR. JAMES R. BLISS (via videoconference)
MR. OSCAR ALVAREZ (via videoconference)
2121 Avenue of the Stars, Suite 3000
Los Angeles, California 90067
310.274.7100
dellis@ellisgeorge.com
jbliss@ellisgeorge.com
oalvarez@ellisgeorge.com

appeared on behalf of the Defendant L'Oreal USA, Inc., L'Oreal USA Products, Inc., and SoftSheen-Carson, LLC;

APPEARANCES: (Continued)

HEYL, ROYSTER, VOELKER & ALLEN
BY: MS. SARA PEAL (via videoconference)
701 Market Street, Suite 1505
St. Louis, Missouri 63101
314.241.2018
speal@heylroyster.com

appeared on behalf of the Defendant Advanced Beauty, Inc.;

MARON MARVEL BRADLEY ANDERSON & TARDY LLC
BY: MS. LESLIE FEDERER (via videoconference)
MR. ROBERT W. PETTI (via videoconference)
191 North Wacker Drive, Suite 2950
Chicago, Illinois 60606
312.767.1314
lfederer@maronmarvel.com
rpetti@maronmarvel.com

appeared on behalf of the Defendants Murray's Worldwide and Luster Products;

DINSMORE & SHOHL LLP
BY: MS. AUDRIANA RODRIGUEZ (via videoconference)
200 South Biscayne Boulevard, Suite 2401
Miami, Florida 33131
786.957.1157
audriana.rodriguez@dinsmore.com

appeared on behalf of the Defendant McBride Laboratory Inc.;

CLAUSEN MILLER P.C.
BY: MS. VALENTINA BARTOLOMEO (via videoconference)
225 West Randolph Drive, Suite 700
Chicago, Illinois 60606
312.855.1010
vbartolomeo@clausen.com

appeared on behalf of the Defendant John Paul Mitchell Systems;

APPEARANCES: (Continued)

MCGUIREWOODS
BY: MR. PATRICK P. CLYDER
MS. NORIYA SHAHADAT (via videoconference)
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
312.849.8100
pclyder@mcguirewoods.com
nshahadat@mcguirewoods.com

appeared on behalf of the Defendant House of Cheatham, LLC;

ECKERT SEAMANS CHERIN & MELLOTT, LLC
BY: MS. KELBEY J. DECK (via videoconference)
275 Madison Avenue, 10th Floor
New York, New York 10016
646.513.2133
kdeck@eckertseamans.com

appeared on behalf of the Defendant Revlon;

SEGAL MCCAMBRIDGE SINGER & MAHONEY
BY: MR. PETER J. STRELITZ (via videoconference)
100 Congress Avenue, Suite 800
Austin, Texas 78701
512.476.7834
pstrelitz@smsm.com

appeared on behalf of the Defendant Wella Operations US, LLC;

WIEDNER & MCAULIFFE, LTD.
BY: MR. ETHAN S. DILLON (via videoconference)
One North Franklin Street, Suite 1900
Chicago, Illinois 60606
312.855.1105
edillon@wmlaw.com

appeared on behalf of the Defendant Avlon Industries;

APPEARANCES: (Continued)

LITCHFIELD CAVO, LLP
BY: MR. JOSEPH P. SULLIVAN (via videoconference)
303 West Madison Street, Suite 300
Chicago, Illinois 60606
312.781.6677
sullivanj@litchfieldcavo.com

appeared on behalf of the Defendant Beauty Bell Enterprises;

SHOOK, HARDY & BACON LLP
BY: MR. CHRISTOPHER V. COTTON (via videoconference)
MS. LATHEENA THOMAS (via videoconference)
2555 Grand Boulevard
Kansas City, Missouri 64108
816.474.6550
ccotton@shb.com
ltthomas@shb.com

appeared on behalf of the Defendant Strength of Nature;

GOLDBERG SEGALLA
BY: MS. LYNN A. LENHERT (via videoconference)
800 Maryland Avenue, Suite 640
St. Louis, Missouri 63105
314.4463350
llenhert@goldbergsegalla.com

appeared on behalf of the Defendant AFAM Concept, Inc.;

COSTELLO GINEX & WIDEIKIS, PC
BY: MS. SHIPRA MEHTA (via videoconference)
150 North Wacker Drive, Suite 1400
Chicago, Illinois 60606
312.850.2651
smehta@cgw-legal.com

appeared on behalf of the Defendants House of Cheatham, LLC, and Beauty Bell;

APPEARANCES: (Continued)

MARSH, ATKINSON & BRANTLEY
BY: MS. EMILY D. ROBINSON (via videoconference)
271 17th Street NW, Suite 1600
Atlanta, Georgia 30363
404.282.5050
emily.robinson@mablawfirm.com

appeared on behalf of the Defendant Dudley Beauty Corporation.

ALSO PRESENT:

Nick Page, videographer
Stefan Oxley, paralegal

* * * * *

Reported By: Valerie M. Calabria, CSR, RPR
License No.: 084-0039

INDEX


| WITNESS | EXAMINATION |
|---|---|
| CLARENCE BROWN, JR., MD | |
| BY MR. ELLIS | 10 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of deposition | 12 |
| Exhibit 2 | Expert report | 16 |
| Exhibit 3 | Statement of compensation | 83 |
| Exhibit 4 | International Journal of Environmental Health Research | 189 |
| Exhibit 5 | Expert Report of Cheryl Burgess, M.D. | 223 |
| Exhibit 6 | Expert Report of Gerald B. Kasting | 232 |
| Exhibit 7 | Label for a relaxer kit manufactured by L'Oreal, Dark and Lovely Triple Nourished Silkening Relaxer Bates LOUSA-0420201 | 271 |
| Exhibit 8 | Revlon Creme of Nature Bates Revlon-MDL-00753825 | 282 |
| Exhibit 9 | Dark & Lovely Lovely Triple Nourished Silkening Relaxer Bates LOUSA-0000714 | 288 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:09 a.m. on February 17, 2026. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the video-recorded deposition of Dr. Clarence William Brown, Jr., taken in the matter of The Hair Relaxer Marketing Sales Practices and Products Liability Litigation. The location of this deposition is being held at the offices of DiCello Levitt located at 10 North Dearborn, Chicago, Illinois.

My name is Nick page, representing Veritext. I'm the videographer. The court reporter is Valerie Calabria, also from the firm Veritext. I am not related to any parties in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel and all present will now please state their appearance and affiliations for the record, beginning with the noticing attorney.

MR. ELLIS: Good morning. Dennis Ellis on behalf of L'Oreal USA, Inc., L'Oreal USA Products, Inc., and SoftSheen-Carson, LLC.

MR. CLYDER: Good morning. Patrick Clyder, C-l-y-d-e-r, for House of Cheatham, LLC.

MS. O'CONNOR: Good morning. Stephanie O'Connor, Douglas & London, on behalf of the witness.

(Witness duly sworn.)

CLARENCE WILLIAM BROWN, JR., MD,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ELLIS:

Q. Good morning. Please state your full name and spell your last name for the record.

A. My name is Clarence William Brown, Junior. My last name is spelled B-r-o-w-n.

Q. You're a medical director, correct?

A. Yes.

Q. I'll refer to you as Dr. Brown, if that's okay.

A. Yes.

Q. Dr. Brown, you understand you're here today to give expert testimony in a matter relating

to hair relaxers?
A. Yes.
Q. What did you do to prepare for your deposition here today?
A. To prepare for my deposition today, I reviewed my expert opinion report, I reviewed references and source material that I used to prepare that report, and I spoke with counsel.
Q. How long did you talk to your counsel?
A. I spoke to counsel for several hours today, yesterday, the day before, and in the few weeks prior to that intermittently.
Q. You said "several hours today." Did you mean several hours today or collectively?
A. Collectively.
Q. All right. You didn't speak to her several hours before 9:00 a.m. today, right?
A. Not for several hours. We spoke in the room next door.
Q. For sure.
I see you have a copy of your report in front of you; is that correct?
A. Yes, that's correct.
Q. And it looks like you have some flags on some certain pages there; is that right?

A. Yes, that's correct.
Q. Do you have any notes on your report?
A. I do not believe there are notes on the report, but --
Q. Can you hand me it, please?
A. Sure.
Q. Thank you. I'm handing you back the report.
It has some tags on it. Do you feel more comfortable using that if I ask you questions about the report? I also have a copy for you if you want.
A. I feel more comfortable with this one.
MR. ELLIS: That's fine.
All right. Let me mark as our first in order the notice of deposition of Dr. Brown. We'll mark that as Exhibit 1, Madam Reporter.
Do you need a copy, Counsel?
MS. O'CONNOR: No, not necessarily. Thank you.
(Brown Deposition Exhibit 1 was marked for identification.)
BY MR. ELLIS:
Q. Dr. Brown, did you have an opportunity to review the notice of deposition prior to your

appearance here today?
A. Yes, I did.
Q. And you note that it requested you to bring some documents with you. Did you bring any documents responsive to the notice?
A. I, through counsel, provided the documents ahead of time.
Q. I believe I got a statement of compensation, and we already had a copy of your report. Were there any other documents you gave to your counsel that you thought were responsive to the deposition notice?
A. Nothing comes to mind.
Q. Now, you mentioned that you reviewed some source documents in preparation for your deposition here today. Do you recall which those -- what were those?
A. They are the references and the supplemental materials that are contained in the report itself.
Q. And were there any particular studies or documents that you looked at to prepare for your deposition here today that you were referring to?
A. No particular ones that I was referring to.

Q. Which ones did you look at to prepare for your deposition here today?
A. I looked at every one of the references that I used in preparation for the actual --
Q. Every single -- I'm sorry. I didn't mean to cut you off.
A. Yes.
Q. So every single study, you've looked at?
A. I looked at every reference, yes.
Q. Every reference, but it didn't mean that you actually pulled the study and looked at it, right?
A. I reviewed the relevant portion of the study in the context of the expert opinion report that was generated.
Q. Okay. So you did look at all studies that are referenced in your report, correct?
A. Correct.
Q. And you did that in preparation for your deposition here today, correct?
A. Correct.
Q. So if I asked you about those studies, they would be fresh in your mind; is that right?
MS. O'CONNOR: Object to the form.
You can answer.

THE WITNESS: I wouldn't agree that they're all fresh in my mind, but I have recently, within the past month, looked at those studies.
BY MR. ELLIS:
Q. At least as with respect to the issues that you cited them for in your report, they would be familiar with you -- to you, correct?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Familiar, yes.
BY MR. ELLIS:
Q. Because you did that to prepare for your deposition because you wanted to make sure that, if you referred to something in your report, you would be able to talk about it knowledgeably here today, right?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I did so so that I would be familiar with the reference in the context of the content that's contained in my expert report.
BY MR. ELLIS:
Q. You didn't want to be able to talk competently about those references here at your deposition, as well?

MS. O'CONNOR: Objection.
THE WITNESS: I did so so that I would be familiar with the reference in the context in which I generated the report.
MR. ELLIS: All right. Why don't you take a look at your report, and I'll mark that as Exhibit 2 for the record.
Counsel, I have an extra copy if you want.
MS. O'CONNOR: I'll take it. Thank you.
(Brown Deposition Exhibit 2 was marked for identification.)
BY MR. ELLIS:
Q. Can you just confirm for me that the report that I've attached as Exhibit 2 is your report that you'll be looking at that has your individual tabs on it.
A. Yes.
Q. Exhibit 2 reflects a true and accurate and correct copy of the report you issued in this case, correct?
A. Yes.
Q. It bears your signature, true?
A. Yes.
Q. And you were trying to be truthful, to

the best of your knowledge, based on a degree of medical certainty in your report, correct?
A. Yes.
Q. Turn to page 1 -- or 4, actually. It's called, in the report, the introduction. It begins "I've been asked to provide my opinion with reasonable medical and dermatological certainty as to whether biologically plausible mechanisms exist to explain the elevated risk of uterine and ovarian cancers observed in studies of women exposed to chemical hair relaxer/hair straightening products," correct?
A. Yes.
Q. I read that correctly?
A. Yes.
Q. That is a statement you made in your report?
A. Yes.
Q. It's a statement that you believe was truthful, correct?
A. I don't understand that.
Q. It's what you understood your charge was, right?
A. Okay. Yes.
Q. All right. What's your field of

expertise?
A. I am a dermatologist.
Q. You're not an epidemiologist, right?
A. As a practicing physician, we review a great deal of epidemiologic studies, interpret the results of epidemiologic studies, and are the target audience for epidemiologic studies.
Q. Is that no, you're not an epidemiologist?
A. So I am not an epidemiologist.
Q. So my statement is correct; you are not an epidemiologist, are you?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: No, I'm not an epidemiologist.
BY MR. ELLIS:
Q. You don't hold a Ph.D. in epidemiology, do you?
A. No, I do not.
Q. And other than whatever you learned to get your medical degree, you have no special training in epidemiology, correct?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I disagree with that statement.

BY MR. ELLIS:
Q. And what is that special training you have in epidemiology, Dr. Brown?
A. The formalized training I have as both an engineer and a physician in interpreting epidemiologic studies. As I mentioned, I am the target audience for epidemiologic studies.
Q. You said as an engineer?
A. Yes.
Q. Okay. And what field of expertise do you have in engineering?
A. I have degrees in chemical and biomedical engineering.
Q. You're a lawyer, too, right?
A. I have a law degree, but don't hold myself out as a lawyer.
Q. Well, you got barred in certain states, right?
A. Correct.
Q. Did you ever practice as a lawyer?
A. No, I did not.
Q. All right. Did you bring any of your legal training to your report and your engagement in this particular case?
A. I would be hard-pressed to understand

the context of how I would bring legal training to this report as a medical expert.

Q. I didn't suggest you did. I asked you did you do it.

A. I don't believe so, no.

Q. Okay. You're not a toxicologist?

A. As a chemical engineer and a dermatologist, we study the fields of toxicology and chemical preparation in topical products, but I do not have a degree in toxicology.

Q. You don't have a Ph.D. in toxicology, do you?

A. I do not have a degree in toxicology.

Q. Do you have any special training in toxicology?

A. Yes. As a chemical engineer and a medical doctor specializing in the field of dermatology, toxicology is a core component of both of those fields of education.

Q. You're not a biologist, correct?

A. As a medical doctor, we have a great deal of background and training specifically in the field of biology.

Q. You don't hold any degrees in biology, do you?

A. I do not --
MS. O'CONNOR: Objection.
THE WITNESS: I don't hold a specific degree in biology.
BY MR. ELLIS:
Q. You're not an oncologist, are you?
A. With that, I disagree. I am considered a cutaneous oncologist.
Q. So you don't have a specialty in oncology, correct?
MS. O'CONNOR: Objection.
THE WITNESS: I disagree. I do have a specialty within cutaneous oncology.
BY MR. ELLIS:
Q. You're talking about your Mohs practice; is that right?
A. Correct. The field encompasses cutaneous oncology.
Q. And you didn't do a special training or program in oncology, though, correct? Other than as a dermatologist who does Mohs surgery, right?
MS. O'CONNOR: Objection.
THE WITNESS: Well, I did complete a recognized formal fellowship in cutaneous oncology and Mohs surgery, yes.

BY MR. ELLIS:
Q. Did you do any special training in -- finish any program related to gynecology oncology?
A. I have not participated in a formal training program that board certifies one in gynecology and gyn-onc. However, as a medical student, we do actually engage in learning about gynecology and gyn-onc.
Q. Have you ever treated a woman with uterine or ovarian cancer for those conditions?
A. Yes.
Q. And how so?
A. When those conditions have been metastatic to the skin.
Q. Mm-hmm. And did you perform any treatment specifically due to the gynecological nature of those conditions?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yes. Specifically, removal of the metastatic lesions to the skin.
BY MR. ELLIS:
Q. And that was in the reproductive organs?
A. They were tissue from the reproductive organs that were metastatic to the skin.

Q. Explain that to me.
A. When the malignancy forms in its originating tissue or anatomic structure, it then has the ability to leave that structure and go to other organs. When that other organ is the skin, I have directly participated in care.
Q. Maybe I'm not saying it the right way.
Have you performed a hysterectomy?
A. No, I have not performed a hysterectomy.
Q. Have you performed an oophorectomy as a result of uterine or ovarian cancer?
A. No, I have not.
Q. All right. You're a skin doctor, right?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. Right. And if you have cancer to your skin, that's something you would remove, right?
A. Yes.
Q. But you wouldn't perform a full hysterectomy to a woman with uterine or ovarian cancer, correct?
A. Correct.
Q. You wouldn't diagnose uterine or ovarian

cancer in the first instance, correct?
A. That's not correct.
Q. How would you do that?
A. I have diagnosed uterine and ovarian cancer when it's been metastatic to the skin and that is the first known instance of the disease.
Q. You mentioned that women that are exposed to chemical hair relaxers was part of your charge to ascertain whether or not there was an elevated risk of uterine or ovarian cancers, correct?
A. I was not charged with forming an opinion of a causation of those chemicals in causing uterine or ovarian cancer.
Q. You have no opinions regarding whether or not chemical hair relaxers can cause uterine or ovarian cancer, correct?
A. I was not charged with issuing a report to give a causation opinion regarding the formation of ovarian and uterine cancer.
Q. I think I said it right, so I'm going to ask it again. You do not have any opinions as to whether or not the use of chemical hair relaxers can cause uterine or ovarian cancers, correct?
A. I don't understand how my former answer

isn't answering the question.
Q. Well, I do. So answer the question I asked.
MS. O'CONNOR: Objection to form, argumentative.
THE WITNESS: I wasn't asked to provide a causation opinion.
BY MR. ELLIS:
Q. So do you have one, if you weren't asked? Do you have an opinion as to whether or not chemical hair relaxers can cause uterine or ovarian cancer; yes or no?
MS. O'CONNOR: I'm going to object. I think the report is clear that he's not offering an opinion --
MR. ELLIS: It's a speaking objection.
BY MR. ELLIS:
Q. Just answer the question.
A. I am not offering an opinion as to the causation of uterine and ovarian cancer.
MR. ELLIS: Move to strike on the grounds it's nonresponsive.
Read it back.
(Record read as requested.)
MS. O'CONNOR: Objection. Same objection.

It's been asked and answered.
THE WITNESS: I am not offering an opinion as to whether or not the chemical hair relaxers and the chemicals contained in them caused uterine or ovarian skin cancer.
BY MR. ELLIS:
Q. Is that no, you don't have an opinion --
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. -- one way or another whether or not chemical hair relaxers --
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. -- can cause uterine or ovarian cancer?
MS. O'CONNOR: Objection. Beyond the scope.
THE WITNESS: I was not tasked with offering an opinion as to whether uterine and ovarian cancer --
BY MR. ELLIS:
Q. I'm asking a yes-or-no question. Do you have an opinion as to whether or not chemical hair relaxers can cause uterine or ovarian cancer?
MS. O'CONNOR: Objection; asked and answered, beyond the scope of his report. You know what his opinions are. Okay?

MR. ELLIS: It's just objection; form. It's objection; argumentative. It's objection; beyond the scope. It's not a speech.

Please read back the question.

(Record read as requested.)

THE WITNESS: I -- I have not been tasked with offering an opinion.

BY MR. ELLIS:

Q. So you don't have one, right?

A. I cannot give you an opinion at this time. I wasn't tasked with offering an opinion.

MR. ELLIS: Mark it as unanswered.

BY MR. ELLIS:

Q. Do you have an opinion as to whether or not chemical hair relaxer or straightening products can increase the risk of uterine or ovarian cancers; yes or no?

MS. O'CONNOR: Objection.

THE WITNESS: I wasn't tasked with offering an opinion if chemical hair relaxers have a causation factor -- are a causation factor in forming ovarian or uterine cancer.

MR. ELLIS: Move to strike on the grounds it's nonresponsive.

Read it back.

(Record read as requested.)

MS. O'CONNOR: Objection.

THE WITNESS: I was not tasked with offering an opinion as to the causation of chemical hair relaxers in the formation of ovarian and uterine cancer.

BY MR. ELLIS:

Q. You used the word "risk," "increased risk," not "causation," in the statement I'm referring to. Do you have an opinion as to whether or not women exposed to chemical hair relaxers or hair straightening products have an elevated risk of uterine or ovarian cancers; yes or no?

MS. O'CONNOR: Objection.

THE WITNESS: I wasn't tasked with forming a causation opinion.

BY MR. ELLIS:

Q. Is that a no, you don't have an opinion as to whether or not there's an elevated risk of uterine or ovarian cancer for women who use chemical hair relaxer products?

A. I was tasked with evaluating the reasonable plausibility of a biochemical mechanism for the absorption of the chemicals in chemical hair relaxers.

Q. And that's the limits of your opinions, correct?
A. That is the limits of my opinion.
Q. All right. Where are you currently employed?
A. I am currently employed by an organization that identifies itself as Emplify by Gundersen.
Q. And where is that located?
A. That is located in La Crosse, Wisconsin.
Q. I saw also, at least on some part of your report, where that was referred to as Onalaska, Wisconsin. Is that the same place, or is it different?
A. It is the suburb next to La Crosse.
Q. And you actually work in La Crosse or Onalaska?
A. Both.
Q. There's two different locations?
A. The outpatient clinic where I see patients is in Onalaska, and the primary medical facility, the hospital, is in La Crosse.
Q. Do you currently treat patients that present to you with issues related to hair relaxer use?

A. I do treat patients with issues of hair currently.

Q. Well, my question is a little different. It's do you treat patients that present to you with issues related to hair relaxer use?

A. In what time frame, sir?

Q. Like now.

A. Within the last week I have not.

Q. In the last four years since you've been at Gundersen have you?

A. I have treated patients within the last -- the earlier part of that time period when I was primarily practicing in or jointly practicing in Chicago and in La Crosse during that time.

Q. Well, I'm focused on La Crosse now.

A. Okay.

Q. All right. Because not a lot of Black people in La Crosse. You agree?

A. There are --

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: There are -- the representation of Black people is probably less than the national average, I would agree.

BY MR. ELLIS:
Q. Like less than 2 percent in La Crosse. You understand that, right?
MS. O'CONNOR: Objection.
THE WITNESS: I'm not familiar with the exact statistical representation, but it is lower than the national average for certain.
BY MR. ELLIS:
Q. 2 percent would be lower than the national average, right?
MS. O'CONNOR: Objection.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. Onalaska, do you know the percentage of Black people in that area?
A. I do not.
Q. Have you seen any Black patients presenting with hair relaxer issues in Onalaska at the outpatient clinic?
A. I don't believe so, no.
Q. Have you seen any Black women presenting at Gundersen in La Crosse with issues related to hair relaxer use?
A. I have not -- I cannot recall seeing a Black female in La Crosse with an issue of hair

relaxer use.

Q. Have you at any point in time since you joined Gundersen in 2022 treated a woman who was complaining of hair relaxer use?

A. I have treated women since 2022 with issues of hair and relaxer use, but not in Gundersen.

Q. You've worked at Gundersen since 2022?

A. I worked simultaneously in Chicago and in Gundersen, in La Crosse.

Q. At some point during from 2022 to the present?

A. 2020 -- throughout 2022 I was working at both organizations, and I had some part-time work that I was doing in Peoria.

Q. Mm-hmm. Have you seen any Black woman for any condition since -- at Gundersen?

A. Yes.

Q. And what conditions were they? Were they in any way related to chemical hair relaxer or hair use?

A. I don't believe those patients had issues of hair. Those were issues of skin, eczema, psoriasis.

Q. Not cancer, right?

A. I've removed skin cancer from several Black individuals, some men, some women.
Q. Over the entirety of your career?
A. Oh, even while at Gundersen.
Q. Even while at Gundersen?
A. Yes.
Q. Okay. You say "During the past 25 years of clinical practice, year of fellowship, and three years of residency, I have cared for hundreds of African-American and Black women who have used chemical straighteners and relaxers on a regular basis, and I am often called upon to treat this population of women for issues related to their hair and scalp."
All right. So if I read that correctly, you're saying that you have treated hundreds of women who, to your knowledge, used chemical hair straighteners and relaxers, true?
A. True.
Q. But that does not say that you treated them for issues related to their use of chemical straighteners and relaxers, correct?
MS. O'CONNOR: Objection.
THE WITNESS: I think the statement speaks for itself. It -- these are women that have presented

to me for issues related to their hair and scalp, and have used chemical hair relaxers.
BY MR. ELLIS:
Q. But you have not treated hundreds of women who presented to you in relationship to issues that they claim related to their use of chemical hair relaxers, correct?
MS. O'CONNOR: Objection.
THE WITNESS: No, I disagree with that. So when these women present with scarring alopecias, burns, irritation, hair fragility, and/or have questions about how to treat their hair and hair relaxers, this is the group of women that I have referenced.
BY MR. ELLIS:
Q. So your statement under oath is that you have treated hundreds of African-American and Black women related to their use of chemical straighteners and relaxers, and issues related thereto, correct?
MS. O'CONNOR: Objection.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. All right. Let's take a look. Go to your CV there.

A. Okay.
Q. So we know at Gundersen you never treated anybody for a condition related to hair relaxer use, right?
A. Correct.
Q. Cross that one out.
Advanced Skin and Mohs Surgery Center. And I'm looking at your resume here under the clinical part. Do you follow me?
A. Yes.
Q. Advanced Skin and Mohs Surgery Center. You didn't treat anybody at that facility for issues related to hair relaxer use, correct?
A. That's incorrect.
Q. When did you do that? What was their condition? How did you treat them?
MS. O'CONNOR: Okay. Objection.
You can answer.
THE WITNESS: So during that 22 years of clinical practice that's represented there, I treated hundreds of women for issues related to their scalp, their hair, including hair relaxer use.
BY MR. ELLIS:
Q. And so how did you determine that it

related to hair relaxer use?
A. That was based upon my clinical training, clinical background in the same fashion that I approach other dermatologic diseases to arrive at a diagnosis and to determine what factors were contributing to the diagnosis.
Q. Did you ask them had they used chemical hair relaxers?
A. Yes.
Q. And they said what?
A. "Yes."
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. And they said that they had a chemical burn or some other condition that related, in their mind, to chemical hair relaxer use; is that correct?
A. That's correct.
Q. And did you document these hundreds of patients that you saw in that regard?
A. Yes.
Q. And what treatment plan did you provide for those that presented with, say, for example, chemical burning?
A. For a woman who presented with a

chemical burn, the treatment plan would include -- for some, it would include oral antibiotics, topical antibiotics, the use of topical corticosteroids, counseling/education about hair care practices, encouragement to embrace more natural approaches to their hair and to minimize chemical use.

Q. You told women to not use relaxers and to go natural?

MS. O'CONNOR: Objection; misstates the testimony.

THE WITNESS: I have told women to minimize the use of commercial products designed to straighten and influence the hair texture and quality, and to embrace more natural approaches to their hair.

BY MR. ELLIS:

Q. You told Black women to go natural and not use relaxers; that's your testimony?

MS. O'CONNOR: Objection.

THE WITNESS: Yes, that's my testimony.

BY MR. ELLIS:

Q. Okay. What was the response?

MS. O'CONNOR: Objection.

THE WITNESS: The response was variable. Some

were very interested in learning more, hearing more, understanding -- as characteristics of their hair. And oftentimes they were gauging my commentary or my input versus what they're hearing at the salon or from professionals, other females in their family. Some weren't receptive. Most were.

BY MR. ELLIS:

Q. Did you ever tell them to follow the instructions for the hair relaxer products, assuming they applied it to themselves, copiously and not get it on their scalp or skin?

MS. O'CONNOR: Objection.

THE WITNESS: I did discuss with them that one of the reasons that they will receive the burn is because the ingredients in the product are caustic with a very high pH which easily breaks down the skin when it comes into contact with it.

BY MR. ELLIS:

Q. Did you ever tell them to follow the instructions copiously and not get the hair relaxer cream or product on their scalp and skin, as directed?

MS. O'CONNOR: Objection.

THE WITNESS: In the context of explaining why

the burn occurred, I explained that the application of the straightener chemical, the relaxer chemical to the skin contributed to the burn. However, I don't believe it's possible to avoid contact with the skin during the process of straightening --

MR. ELLIS: Move to strike on the grounds it's nonresponsive.

Read it back.

MS. O'CONNOR: Oppose the motion.

(Record read as requested.)

MS. O'CONNOR: Objection.

THE WITNESS: I have advised them that the only way to avoid the burn is for the product not to come into contact with the skin.

BY MR. ELLIS:

Q. That's what you advised them, is the only way to avoid the burn is to not let the product come to their scalp and skin?

A. Correct.

Q. That's not true.

MS. O'CONNOR: Objection.

BY MR. ELLIS:

Q. You don't get a burn every time that it touches your scalp and skin.

MS. O'CONNOR: Objection.

BY MR. ELLIS:
Q. You know that as a dermatologist, right?
MS. O'CONNOR: Objection; argumentative. Objection.
THE WITNESS: That is wrong.
BY MR. ELLIS:
Q. So if I put sodium hydroxide on my skin for two seconds, I will get a burn?
A. It will influence the integrity of your skin at any point it comes into contact with it.
Q. Your statement was, under oath, that the only way to avoid the burn was to not allow the product to touch their skin. My question is is that true or false?
MS. O'CONNOR: Objection; asked and answered.
THE WITNESS: That is true.
BY MR. ELLIS:
Q. If I touch sodium hydroxide to my skin for two seconds, will I get a burn, Dr. Brown?
A. Yes, you will.
Q. All right. What degree?
MS. O'CONNOR: Objection.
THE WITNESS: That would likely be a first-degree burn.

BY MR. ELLIS:
Q. All right. So under any circumstance, if sodium hydroxide touches my skin, no matter how it's in any product, how it's diluted or any other way, it's your testimony that that will cause a burn -- a first-degree burn?
MS. O'CONNOR: Objection -- objection; form, foundation.
THE WITNESS: I have been asked to offer an opinion as it relates to hair relaxers. I am not offering an opinion about any application of sodium hydroxide in any form or any formulation in any situation.
BY MR. ELLIS:
Q. So if I take the base cream with activator from a hair relaxer product and touch it on my hand and perform a patch test for two seconds, 30 seconds, it's your opinion I will automatically get a first-degree burn?
MS. O'CONNOR: Objection.
THE WITNESS: These -- that product, as it's manufactured and packaged, is highly alkaline, it's caustic. It will influence the skin, resulting in a burn of various degree, depending upon the duration in which it is in contact with your skin.

BY MR. ELLIS:
Q. Aha. Depending on the duration. You didn't say that before.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. You said that it would automatically cause a burn and the only way was to not let it touch it.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. And then I asked you if the duration was two seconds, would it cause a burn. You said yes.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. So are you amending your statement?
MS. O'CONNOR: Objection; argumentative.
THE WITNESS: No. My statements are entirely consistent.
BY MR. ELLIS:
Q. Is that it will cause a burn depending on the duration, correct?
MS. O'CONNOR: Objection; asked and answered.
THE WITNESS: The answer is yes to both of those questions.

BY MR. ELLIS:
Q. All right. And if the duration is two seconds or less, it's your opinion that it will cause a first-degree burn if you apply hair relaxer cream to your skin?
MS. O'CONNOR: Objection; form, foundation, misstates the testimony.
THE WITNESS: If the product comes into contact with the skin, it will immediately begin to exert its caustic effect, altering the integrity of the skin, which is the definition of a burn.
BY MR. ELLIS:
Q. The definition of a first-degree burn?
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Is that your testimony?
A. I'm sorry?
Q. Is that the definition of a first-degree burn, is that it will alter the integrity of your skin?
MS. O'CONNOR: Objection.
THE WITNESS: A first-degree burn is a partial loss of the integrity of the skin.
BY MR. ELLIS:
Q. Lincoln Park Dermatology, did you treat

hundreds of Black women who presented to you with issues related to chemical hair relaxer use there?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: My statement of having treated hundreds of women is within the context of my entire career before going to Gundersen. I treated definitely dozens of women at Lincoln Park Dermatology related to issues with hair and hair relaxer use.

BY MR. ELLIS:

Q. I'm just focused on the hair relaxer use. Did you treat dozens of Black women at Lincoln Park Dermatology for issues related to chemical hair relaxer use?

A. Yes.

Q. What conditions did they present with?

A. They presented with the same conditions that I mentioned earlier: Local factors, hair loss, scarring, in addition to allergic contact dermatitis.

Q. Allergic contact dermatitis?

A. Yes.

Q. All right. You didn't mention that one before at Advanced Skin and Mohs Surgery Center. What did you do to determine whether or not the

conditions you were treating them for were allergic reactions or burns related to the caustic nature, as you put it, of hair relaxers?

A. So the burn represents a visible loss of skin integrity. The -- "dermatitis" is a general term that is either irritant or allergic that is inflammation in the skin.

Q. Mm-hmm. And when you mentioned that you prescribed corticosteroids, was that to deal with dermatitis and the inflammation or was it to deal with the loss of integrity of the skin due to a burn?

MS. O'CONNOR: Objection.

THE WITNESS: Both.

BY MR. ELLIS:

Q. Mm-hmm. Because corticosteroids are going to deal with the inflammation, but are they going to deal with the repairing of the skin and loss of integrity due to the burn?

A. The base material of topical corticosteroids can help facilitate epidermal repair, wound healing.

Q. And you are aware that the use of corticosteroids for melanin skin could cause hypo- or hyperpigmentation. Did you consider that when

you supposedly prescribed those topical agents to deal with burns that resulted from hair relaxers?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Yes, those considerations are always considered in the context of treating patients who have darker skin types.

BY MR. ELLIS:

Q. And did you consider those when you were telling Black women, who you say presented themselves hundreds of times with burns to their scalp and skin, that if they used the corticosteroid topically, it may actually create permanent color loss on their skin?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: That question incorporates aspects of dermatologic care, skin physiology that are not entirely accurate. So I'm not able to answer that.

BY MR. ELLIS:

Q. Mm-hmm. You would agree that the use of corticosteroids could cause hypopigmentation?

A. Yes.

Q. You would agree that the use of corticosteroids for burns could cause

hypopigmentation?

MS. O'CONNOR: Objection.

THE WITNESS: Yes.

BY MR. ELLIS:

Q. You would agree that a condition that Black women care about often is hypopigmentation of their melanated skin?

MS. O'CONNOR: Objection.

THE WITNESS: I wouldn't disagree.

BY MR. ELLIS:

Q. And so when you prescribe corticosteroids to treat skin and scalp lesions resulting from chemical hair relaxer, you obviously informed these Black women that they may have hypopigmentation as a result of that treatment, right?

MS. O'CONNOR: Objection; form, foundation, argumentative.

THE WITNESS: Yes, that's part of the informed consent process. When one prescribes a medication, it's a benefit analysis. The patient is engaged in that process. In general, one indicates the length of duration, the frequency of treatment, the goals to be achieved, and acknowledging the risk if the instructions are not followed.

BY MR. ELLIS:
Q. So that's what you did, right? You told them that, "Hey, you have a slight chemical burn from the use of chemical hair relaxers. I'm going to prescribe a topical corticosteroid to treat it, and it might cause your skin to be permanently lighter in that area." That's what you told them, right?
MS. O'CONNOR: Objection. Objection.
THE WITNESS: No, that's not the manner in which I educate the patient or phrase my informed consent.
BY MR. ELLIS:
Q. What did you tell them in this particular instance when you prescribed a corticosteroid to a Black woman who presented to you with a chemical burn lesion on her scalp?
MS. O'CONNOR: Objection.
THE WITNESS: Scalp or forehead?
BY MR. ELLIS:
Q. Forehead.
A. On her forehead?
Q. Yeah.
A. Okay. And I ask because you pointed to your forehead.

So if the patient experienced a chemical burn to her forehead from the inappropriate application of this caustic chemical to the nonscalp area, we would have a discussion about the only way to avoid that happening again is not to get the chemical on to her skin, which is an area that it's not intended to be used on; and that in healing this, we have a process of inflammation that drives healing.

Inflammation is a double-edged sword. It cuts both ways. Inflammation can cause excessive pigment to form in individuals that are more darkly pigmented or have melanocytes that are more adept at producing pigment. Likewise, inflammation can cause -- can contribute to hypopigmentation.

Both of these are generally temporary, not permanent, but can be long-term, can be difficult to correct. In utilizing the topical corticosteroid, the goal is to tamponade or mitigate or push down a little bit the inflammation that drives the healing or is driving the process to try not to have the hyper, try not to have the hypo, but medicine is not an exact science, it is an art, and we would need to remain engaged. I

would like to see you in follow-up. If there is a problem, please reach out to me.

Q. And did they use the corticosteroids after that informed consent?

A. Yes.

Q. And did it treat their condition effectively?

MS. O'CONNOR: Objection.

THE WITNESS: Yes.

BY MR. ELLIS:

Q. And did you see any circumstances where the negative outcome of hyper- or hypopigmentation resulted from the use of corticosteroids?

A. I do not believe it was from the corticosteroids. I believe the corticosteroids, my professional opinion, took a situation in which hyper- or hypopigmentation was going to occur and lessened its intensity while also contributing to the more rapid healing of the burn.

Q. What about St. Joseph Dermatology in Michigan, in St. Joseph, Michigan? Did you treat any women that presented with conditions related to hair relaxer use?

A. Yes.

Q. Is that dozens or hundreds?

A. I would say that's more dozens.
Q. And what conditions did they present with?
A. The same conditions as in the other offices: Darkly-pigmented women using hair relaxer products present with local issues of breakage, scarring alopecia, irritant and allergic contact dermatitis, as well as burns.
Q. And you treated it in the same manner --
A. Yes.
Q. -- as you had -- as you testified previously with respect to your work at Advanced Skin and Lincoln Park?
A. Yes.
Q. And you provided the same informed consent information, as well?
A. Yes.
Q. And did you tell them at St. Joseph's Dermatology that a way to avoid the skin issues and lesion is to follow the instructions and not get it on your scalp or skin?
MS. O'CONNOR: Object to form.
You can answer.
THE WITNESS: Yes.

BY MR. ELLIS:
Q. And so in each instance that you treated a patient presenting to you with skin lesions or skin conditions as a result of their use of hair relaxer products, you told them that the instructions say do not apply it to your scalp or skin directly, right?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: In the context of my discussion with them, I reiterated what the instructions contain to them.
BY MR. ELLIS:
Q. And that was do not touch your skin or scalp, correct?
MS. O'CONNOR: Objection.
THE WITNESS: That is the only way to avoid the local effects -- negative effects caused by the product, yes.
BY MR. ELLIS:
Q. And so you told them do not allow the relaxer cream to touch your skin or scalp, correct?
MS. O'CONNOR: Objection. Objection; form, foundation.
THE WITNESS: For women who would choose to continue to undergo those treatments, in order to

avoid the concerns that brought them to me, I reiterated that the only way to minimize that risk is to try to make sure that the active chemical, the relaxer, that product, doesn't get on to the skin.

BY MR. ELLIS:

Q. And you told them that is part of the instructions, right?

MS. O'CONNOR: Objection.

THE WITNESS: Yes.

BY MR. ELLIS:

Q. So if you use chemical hair relaxers the way that they are instructed, they would not touch your skin or scalp, correct?

MS. O'CONNOR: Objection.

THE WITNESS: I disagree with that.

BY MR. ELLIS:

Q. If you use chemical hair relaxers as instructed, you are told not to allow it to touch your skin or scalp, correct?

A. While the instructions are to avoid contact with skin and scalp, the nature of the product makes it almost impossible -- truly impossible for that to occur.

Q. Have you relaxed anybody's hair before?

A. I have not directly relaxed hair, no.
Q. Have you ever seen somebody get a hair relaxer before?
A. Yes.
Q. And when did you see that? And I mean in person, not on video. Have you seen anybody get a hair relaxer in person?
A. I have not seen a hair relaxer performed in person, no.
Q. All right. You've got to watch.
All right. You have never seen anybody get a hair relaxer in person, correct?
MS. O'CONNOR: Objection; asked and answered.
THE WITNESS: Well, the video represent -- the videos that I have witnessed are people actually getting hair relaxer procedures.
BY MR. ELLIS:
Q. My statement is clear: You have not seen anybody get a hair relaxer with you standing there when it's happening, not watching it on a video, right?
MS. O'CONNOR: Now it's clear. Objection.
MR. ELLIS: No, it was in person. If he wants to say to the jury that that was not clear, that's fine.

THE WITNESS: I have not stood and witnessed in front of me, in the same space, a hair relaxer being performed.
BY MR. ELLIS:
Q. All right. And have you talked to anybody, like a beautician or a hairstylist, as part of your work here or otherwise who performs hair relaxers?
A. I've had patients who are beauticians that perform hair relaxers.
Q. And did you talk to them about the process of performing a hair relaxer?
A. I have in the past, yes.
Q. And what was that discussion?
A. The discussion was focused on actually the ability to avoid contact with the scalp.
Q. And what did they say?
A. They said it's impossible.
Q. And when did that occur?
A. A decade ago, two decades ago, in that range.
Q. Did anybody ever tell you that the key is to not get it on the skin or scalp?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I don't understand how to answer

the question, given that it is -- it's innate in the product instructions. So the product instructions say not to get it on the scalp.

BY MR. ELLIS:

Q. Right. And so when you were talking to these people, the hundreds of Black women you've treated or the beauticians that you've treated, that you talked to about the process of hair relaxing, did anybody ever tell you the key is to not get it on the skin and scalp?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Well, certainly not the patients. The patients themselves, particularly women who are performing this on their own, it is impossible for them to avoid getting it onto the scalp and surrounding skin areas. Even the professional stylists that I've discussed this with have said that it is impossible to avoid getting it on the scalp and surrounding skin.

BY MR. ELLIS:

Q. And I'm asking, did anybody say the contrary? Like, I'm a very good stylist or beautician and I never get it on the skin or scalp?

MS. O'CONNOR: Objection.

THE WITNESS: No, no one has ever said that to

me.

BY MR. ELLIS:

Q. Assume the following hypothetical: Hair relaxers are used as stated in the instructions, and it doesn't get on the skin or scalp. If that is correct, is there any opportunity for dermal absorption of the chemicals in the hair relaxer product?

MS. O'CONNOR: Objection.

THE WITNESS: I don't see how that hypothetical is possible. I'm sorry.

MR. ELLIS: So that's why I said assume the hypothetical.

So read it back.

(Record read as requested.)

MS. O'CONNOR: Objection; form, foundation, calls for speculation.

THE WITNESS: I cannot begin to understand how that would even be achievable, even with the process of rinsing the chemical from the hair.

BY MR. ELLIS:

Q. So we'll have some beauticians who aren't you that will talk about that issue.

Answer my question. If the chemical hair relaxer never touches your skin and scalp, is

there a possibility of dermal absorption through the skin; yes or no?

MS. O'CONNOR: Okay. Objection; form, foundation, and incomplete hypothetical.

THE WITNESS: I -- as the chemical is applied to the hair and it's in the hair, the chemical actually will influence the entire content of the hair that it comes into contact with. And that chemical, as it is attempted to be removed from the hair, will also come into contact with the surrounding skin.

MR. ELLIS: Move to strike on the grounds it's nonresponsive.

Read it back, please.

MS. O'CONNOR: It is responsive.

MR. ELLIS: It's not responsive.

MS. O'CONNOR: As soon as we're done with this, we're taking a break.

MR. ELLIS: You can take all the breaks you want. I'm just asking you a simple question.

MS. O'CONNOR: Finish your line of questioning.

BY MR. ELLIS:

Q. Tell the jury, Dr. Brown, how, if the chemical hair relaxer never touches their skin, it

can be absorbed into their bloodstream. Tell them that.

MS. O'CONNOR: Objection; form, foundation, incomplete hypothetical, and calls for speculation.

THE WITNESS: There is absolutely no way to avoid contact with the skin with this chemical. Whether it's the application of it or the removal of it, the innate aspects of the process are the application of an abundance of cream material that's slapped around and slopped around and gooped onto the scalp in the process of being applied to the hair. When it is rinsed away, that is liquefied. That liquid cannot be controlled, its path, its direction.

Ultimately, it's down the drain, but in the process of first application, you have water that has a directional force that is directing the product off the hair and onto the scalp to be rinsed away.

BY MR. ELLIS:

Q. So what chemicals are actually in the base and the activator that are endocrine-disrupting chemicals or carcinogens? Do you know that?

A. There is an entire milieu of chemicals

that are in the products.
Q. In the base and the activator that you say cannot be avoided from touching your skin, what are the concerning -- chemicals of concern in those two components? We're not talking about the shampoo or the conditioner.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Answer that question.
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I would ask that we bring the product and we can read the label and we can have an accurate representation of the chemicals.
MR. ELLIS: We'll definitely do that before the day's out, for sure.
MS. O'CONNOR: We're going to take a break. We've been going for an hour.
MR. ELLIS: Sure.
THE VIDEOGRAPHER: Off the record at 10:07.
(Short recess.)
THE VIDEOGRAPHER: Back on the record at 10:19.
BY MR. ELLIS:
Q. Dr. Brown, I want to just unpack a few things you told me. It's your opinion that any

time hair relaxer cream and base and activator touches the skin it causes a first-degree burn no matter the shortness of duration; is that right?

MS. O'CONNOR: Objection.

THE WITNESS: My -- my comment was focused on the highly alkaline products contained in the kit. When they touch the skin for any duration of time, they will begin to influence, due to their caustic nature, the integrity of that which they touch.

BY MR. ELLIS:

Q. And you consider that to be a first-degree burn, correct?

A. That is consistent with a burn. First-degree burn in this instance would be a partial loss of the thickness of the epidermis, no matter how slight.

Q. So if I understand you correctly, if hair relaxer base and activator touches the skin, even for two seconds, there will be a loss of the epidermis such that that constitutes a first-degree burn, no matter if the duration is two seconds, right?

MS. O'CONNOR: Objection; form, foundation, misstates the testimony.

THE WITNESS: No, that's not correct. That

wasn't what I said.
BY MR. ELLIS:
Q. That is what you said, but I'll ask it again.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. If hair relaxer base and activator touches the skin, it is your opinion that that causes a first-degree burn regardless of the duration, true?
MS. O'CONNOR: Objection.
THE WITNESS: As I stated it, that when the alkaline chemical touches the skin, even for a very brief duration, it will begin to influence the integrity that it has touched. The change in integrity of the skin would constitute a burn.
BY MR. ELLIS:
Q. And when you use the term "burn" in your testimony regarding the treatment of women who have used chemical hair relaxers or the fact that it is common to get a burn when using hair relaxers, you're using it with that understanding and in that context that even a brief duration of contact with the scalp or skin constitutes a burn, right?
MS. O'CONNOR: Objection; asked and answered.

THE WITNESS: That's not the context of the women that you've presented to me as a hypothetical or the women that I've cared for.

The women that I've cared for have come to me with very evident clinical manifestations of burns on their scalp and/or dermatitis on their scalp as well as other local influences from the application of the caustic nature of these alkaline chemicals.

BY MR. ELLIS:

Q. But I'm talking about when you use the term that hair relaxers cause burns, you're using it in the context, as you described it during your deposition here, a loss of integrity of the skin that, even in a slight duration, can compromise or remove the thickness of the epidermis, correct?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: That's not correct. You're blending statements together.

In the context of your hypothetical that you presented for two seconds of application, I indicated that that would be a very slight influence on the integrity of the skin that would still be under the definition of a burn.

BY MR. ELLIS:
Q. You didn't use the word "slight," but okay. I'll take you at what you're saying now.
If hair relaxer base and activator touches your skin, it causes a first-degree burn in your opinion, right?
MS. O'CONNOR: Objection.
THE WITNESS: As I've stated, that any -- for any duration of time those chemicals come into contact with the skin, they are going to begin to alter the integrity of the skin. If it's for two seconds, it would be slight. If it's for 20 minutes, it would probably be severe.
They are corrosive, caustic chemicals that change the integrity of the skin, leading to its breakdown. It happens over time. So if you start with a second, you're going to have a partial representation of what you would have if the chemical was on the skin for 20 minutes.
BY MR. ELLIS:
Q. And in your opinion, that constitutes a burn, first degree, right?
A. Correct. The burn starts somewhere, and it ends somewhere.
Q. And so if you put relaxer cream on your

skin contrary to as directed and you wash it off immediately as directed, you will have suffered a first-degree burn, in your opinion, right?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Correct. I believe I've answered that and that it will influence the integrity of the skin, compromising it. The level of compromise or its influence will be proportional to how long that chemical is in contact with the skin.

You don't immediately get a third-degree burn. It begins as a first degree. If the chemical is not removed, it penetrates deeper, deeper, deeper, deeper, deeper. But it begins with that very superficial slight or instantaneous influence, as you've described, from a second or two seconds of application.

BY MR. ELLIS:

Q. And that constitutes a first-degree burn, in your opinion, even if it's a second or two seconds, right?

MS. O'CONNOR: Objection.

THE WITNESS: By the definition of a burn, yes.

BY MR. ELLIS:
Q. You started talking about second- and third-degree burns. Have you ever seen a second- or third-degree burn as a result of use of chemical hair relaxers?
A. I believe I've seen some very, very early second-degree burns that are down into the very superficial dermis.
Q. When?
A. During the course of my career, 10 years ago, 12 years ago.
Q. And you confirmed that that was the result of a chemical hair relaxer use?
A. Yes, that was the result of chemical hair relaxer use.
Q. So you believe that a woman left chemical hair relaxer on their skin or scalp to the point, notwithstanding the pain and everything else, such that it burned their skin chemically to it reaching the dermis layer; is that what you're saying?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. All right. And that happened 10 or

12 years ago, I think you were saying?

A. Yes.

Q. Did you ask her "What are you doing?"

MS. O'CONNOR: Objection.

THE WITNESS: Well, yes, I did.

BY MR. ELLIS:

Q. And what did she say?

A. This was a home application. She regretted it, was very sad about it, was very worried that it would scar, which in this instance it probably would not scar. It was only the papillary dermis touching it. So she would not lose the hair permanently, but it would take weeks to a month to really reepithelialize, to heal, pigmentation to even, hair to regrow. And she expressed that she would be much more inclined to have professional services in the future.

Q. And did you say in that instance, "Look. You're not supposed to get it on your skin and scalp; you know that, right?"

A. Yes. That was part of the discussion. She acknowledged it. It was very difficult to avoid, impossible for someone to avoid getting it onto their scalp, and she neglected at the area when she was rinsing. She -- she missed it.

Q. And did she say anything about feeling the pain when it was left on her skin for an extended period of time?

A. Well, she described it as the entire scalp felt sensitivity. There was irritation on the entire scalp. But this particular area that she didn't rinse out, the active ingredient remained in contact. So the influence on the integrity of the skin continued to decline due to the corrosive nature or the caustic nature. So the burn penetrated more deeply there.

Q. And so in 25 years of practice, assuming -- taking you at your under-oath testimony, you've seen one application of chemical hair relaxer that reached the beginning stages of a second-degree burn?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Yes, that is true that I was able to see that patient within a day. It's not often that we can see every patient within a day. Oftentimes we are seeing burns that are partially healed within a few days.

BY MR. ELLIS:

Q. My statement is correct: In 25 years of

practice treating hundreds of Black women who have presented to you with chemical hair relaxer issues, you've seen one burn that you would stage at a beginning stage of a second-degree burn; is that right?

A. Yes, one that I would definitely classify as a second-degree burn.

Q. Well, you say was at the beginning stages of a second-degree burn. Now you're saying definitely characterize it as a second-degree burn. Is there a difference in what you said previously and now?

A. No. I mentioned that it was at the level of the papillary dermis, which meets the definition of a second-degree burn.

Q. I had asked you about your training in biology, toxicology, and epidemiology, and you acknowledged that you're not a Ph.D. in any of those fields of practice; is that right?

MS. O'CONNOR: Objection; asked and answered.

THE WITNESS: Yes.

BY MR. ELLIS:

Q. But you did say that you had some experience with those topics based on your training as a medical doctor and in other fellowships and

specialties that you worked in. Is that a fair statement?

A. Yes.

Q. With respect to toxicology, do you agree that dose matters?

A. In most instances, dose matters.

Q. In what instances does it not?

A. In some instances, even a minute amount of a material is entirely caustic or even lethal. There is no safe dose.

Q. But dose still matters even in that circumstance; it's just the nature of the chemical or constituent that we are talking about, right?

MS. O'CONNOR: Objection.

THE WITNESS: I'm not certain I understand.

BY MR. ELLIS:

Q. Well, there's some constituents that anything above zero dose is, as you say, caustic or even lethal. But in some instances, if it's not an immediately lethal dose, it -- the dose -- the size of the dose does matter. You agree with that, right?

MS. O'CONNOR: Objection.

THE WITNESS: Yes. Yes, both are true.

BY MR. ELLIS:
Q. And why does dose matter, based on your experience, knowledge, and skill and education?
A. The -- I'm not certain I understand. It's an extremely broad question. That -- dose is only one factor in -- are we talking about treatment of clinical disease?
Q. No. I was just talking about the field of toxicology you have a lot of experience in, even though you're not a Ph.D. So I was talking in that realm, to test what you're telling me about your knowledge of toxicology.
A. Okay.
Q. So in that context, why does dose matter?
A. Well, dose is only one factor in the exposure for any -- any chemical. So dose, there's duration, there's vehicle. There are confounding variables as with respect to, do you have any inhibitors? Are there any innate aspects to the recipient of that chemical? So it's one factor.
Q. Have you ever heard the saying "dose makes the poison"?
A. I have never heard that phrase, no.
Q. You did say that the magnitude of

exposure influences the biological effect. You agree with that, right?

MS. O'CONNOR: Objection.

THE WITNESS: Are you quoting my report?

BY MR. ELLIS:

Q. No. Your testimony right here.

MS. O'CONNOR: Objection.

THE WITNESS: If I used the term "the magnitude of the exposure," I don't recall that, but I'm not disputing it. If you'd like to read it back to me, I can certainly speak to it.

BY MR. ELLIS:

Q. Well, you said -- and I was paraphrasing -- but you said that exposure is one of the factors, along with dose. And I said the magnitude of the exposure could influence the biological effect on a person, right?

A. I thought you were asking if I said "magnitude."

Q. Do you agree with the statement, Dr. Brown, that the magnitude of exposure could influence the biological effect?

MS. O'CONNOR: Objection.

THE WITNESS: I would agree with the phrase "the magnitude," yes.

BY MR. ELLIS:
Q. The duration of the exposure could influence the biological effect; do you agree?
A. I agree. And duration may be contained within magnitude.
Q. Does the frequency of exposure influence the biological effect?
A. For many things, each of these terms that you have asked me will influence the biologic effect. For some things, it will not.
Q. Does concentration influence the biological effect?
A. In some instances, yes.
Q. Does the particular formulation of a particular product or ingredient influence the biological effect?
MS. O'CONNOR: Objection.
THE WITNESS: In some instances, yes.
BY MR. ELLIS:
Q. Does the route of exposure influence the biological effects?
A. Yes. And in the context that whatever the subject at question is, these variables that you're referencing, some may, some may not.
Q. So do you need to consider all of those

variables when you determine the effect of systemic distribution of a particular chemical or product?

MS. O'CONNOR: Objection.

THE WITNESS: It's too broad of a question. I'm sorry. I'll need more than that.

BY MR. ELLIS:

Q. So if you're considering the systemic distribution of a particular chemical as it is dermally absorbed, do you need to know all of those other variables in terms of magnitude of exposure, duration of exposure, frequency of exposure, concentration, formulation? Do you need to know those other variables?

MS. O'CONNOR: Objection.

THE WITNESS: Could you restate the first part of that question?

BY MR. ELLIS:

Q. Sure.

If you're considering the effect of the systemic distribution of a chemical or product, do you need to know the other variables that we just discussed, such as magnitude of exposure, duration of exposure, frequency of exposure, concentration, formulation?

MS. O'CONNOR: Objection.

THE WITNESS: My response to that question is maybe and maybe not.
BY MR. ELLIS:
Q. Please explain.
A. Well, it depends upon what the issue at -- you know, the issue at question really is. Is there a threshold, is there an amount of a substance that must be received? Or is this sort of a yes/no, that any substance being absorbed will exert the desired effect?
Q. If there's a safe level of that particular chemical and it's in systemic distribution within your bloodstream, do the variables that we discussed -- magnitude of exposure, duration of exposure, frequency of exposure, concentration, and formulation -- matter in your considerations?
MS. O'CONNOR: Objection; form and foundation.
THE WITNESS: I would -- my response is that while they may matter, there are other aspects of the exposure that one would have to take into consideration to have a full understanding of what the impact is.
BY MR. ELLIS:
Q. You would agree that certain chemicals

that, at certain concentrations or exposures are harmful to human health, could have a safe allowable dose that is lower that is not dangerous to human health? You're familiar with that circumstance, right?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I'm certainly familiar with that theory. Is there a specific chemical that you have in mind that --

BY MR. ELLIS:

Q. I'm starting with just the premise.

MS. O'CONNOR: Objection.

THE WITNESS: So I'm familiar with that theory.

BY MR. ELLIS:

Q. Right. Like, for example, water is safe in some levels, right?

A. No, not always. A teaspoon of water, you can drown.

Q. I'm not talking about its ability to drown you. I'm talking about its toxicological effect. Remember, we're on you as an almost-toxicologist right now.

And so water at certain levels is safe for human consumption, agreed?

MS. O'CONNOR: Objection; form, foundation, and argumentative.
THE WITNESS: There is the ability to consume or be exposed to water that is unsafe.
BY MR. ELLIS:
Q. I'm just making sure. We're talking to a jury. Is water safe to consume?
MS. O'CONNOR: Objection; foundation.
THE WITNESS: In limited quantities, yes.
BY MR. ELLIS:
Q. And water is unsafe to consume at certain levels, as well, right?
A. Yes.
Q. Did you do anything in your work for this case and issuing your opinions here to determine and identify any threshold levels for safe or harmful exposure to the chemicals that are in hair relaxers?
A. That was not a question I was tasked with in preparing this report.
Q. And so you did not do it, correct?
A. That's correct.
Q. You have no opinions as to whether or not the chemicals in hair relaxers have a safe dose level, correct?

A. Yeah, I was not asked to offer an opinion about the safety of chemical dose levels.

Q. And so you have no opinion regarding whether or not the chemicals in hair relaxers have a safe dose level?

A. I was only offered -- or asked to offer an opinion about the plausibility of a biomechanical mechanism through which the chemicals could be absorbed through the skin.

Q. Mm-hmm. Did you look at any particular products, their ingredient list or formulas?

A. Yes.

Q. Which products did you look at?

A. I looked at the ingredient lists and packaging materials for products by various manufacturers that were supplied by the defense.

Q. Which ones?

A. Products that were manufactured by Revlon, L'Oreal. I think there was TCB.

Q. And what was the purpose of that?

A. It's important for -- in conducting the work that I was tasked to do, to understand the breadth of the products that were contained within the materials that were marketed to these women.

Q. Did you do any research regarding the

chemicals that were listed on those ingredient lists?
A. I have reviewed a number of papers that looked at analysis of various products, all of which are referenced in my references and supplemental material list.
Q. I asked a different question, Dr. Brown.
Did you do any research to look into the ingredients, chemicals that were listed on those ingredient lists for those products?
MS. O'CONNOR: Objection. He answered it.
You can answer again.
THE WITNESS: My answer is yes, because I looked at primary reference sources that investigated the content of commonly found hair relaxer products that are available over-the-counter on the shelf and marketed to salons.
BY MR. ELLIS:
Q. Did you look at anything specific in relationship to individual chemical constituents in those products?
A. I'm afraid I don't understand that question.
Q. My question is did you look at any

papers, toxicological papers, epidemiology papers that looked at specific ingredients like parabens or phthalates or what you considered to be endocrine-disrupting chemicals outside of the context of maybe looking at Helm that talked about the broad ingredients that are in hair relaxer products?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: The expert -- the academic work of other researchers, experts that's contained in those reports are represented and referenced in my report, and that's where I focused my attention.

BY MR. ELLIS:

Q. Okay. Turn to page 6 of your report.

I thought you wrote "I reviewed product chemistry and pH analyses, biomonitoring studies measuring urinary or serum concentrations of phthalates, parabens, and other chemicals following hair product use, and clinical studies documenting scalp burns, inflammation, and alopecia associated with hair relaxer use."

I'm trying to understand how your testimony here mirrors what you said, that you reviewed product chemistry.

A. Where are you referencing, sir, on

page 6?
Q. It's your first full paragraph.
A. Okay.
Q. It begins with the sentence "Additionally, I reviewed product chemistry..."
What did you do to review product chemistry, Dr. Brown?
A. I reviewed the original scientific work of the authors that are represented in the reference list for my expert report as well as in the supplemental materials list.
Q. And that's what you meant when you said "I looked at product chemistry"?
A. Yes.
Q. You viewed what somebody else did?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yes, I reviewed the academic work of other researchers in those fields.
MR. ELLIS: Somebody needs to go on mute. Make sure everybody is on mute, please.
BY MR. ELLIS:
Q. You didn't yourself perform a toxicological analysis of any ingredients in any hair relaxer products, correct?

A. I was tasked with reviewing the feasibility of the biologic absorption of the molecules. I was not tasked with performing toxicology studies.
Q. So that's a "no"?
A. That is "no."
Q. Did you perform any toxicological analysis of any full formula products or anything like that?
MS. O'CONNOR: Objection.
THE WITNESS: I wasn't tasked with performing that and did not perform it.
BY MR. ELLIS:
Q. That's a "no"?
A. That's a "no."
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Did you perform any pH analysis of any chemicals or products that you reviewed?
A. I reviewed the pH analysis contained in the original academic work and publications by experts in those fields.
Q. But you didn't perform any pH analysis, right?
MS. O'CONNOR: Objection.

THE WITNESS: I did not perform at the bench any pH analysis on my own.

MR. ELLIS: I'll mark as Exhibit 3 a statement of compensation for Dr. Clarence Brown.

(Brown Deposition Exhibit 3 was marked for identification.)

BY MR. ELLIS:

Q. Dr. Brown, was this a document prepared on your behalf?

A. Yes.

Q. And does it reflect the compensation you received as of January 15, 2026, in this matter?

A. Yes, it does.

Q. Did you type this up, or was this prepared on your behalf?

A. Counsel prepared this.

Q. What about your report? Did you type up your report and prepare it? Or how did that take place? How did you prepare your report? Was -- did counsel send you a draft and --

MS. O'CONNOR: Objection.

BY MR. ELLIS:

Q. -- you edited it or did you type it up?

MS. O'CONNOR: Objection. You are not to answer any question about the draft report in

accordance with the Federal Rules and CMO No. 20 -- 19.

MR. ELLIS: I didn't ask him about the draft report.

MS. O'CONNOR: No. No, no, no. Not answering.

MR. ELLIS: Listen. Instruct him not to answer and move on.

MS. O'CONNOR: I will, and I have.

MR. ELLIS: That's fine.

BY MR. ELLIS:

Q. I'm asking you about your report. Did you type up your report, or did somebody send you a report that you edited?

MS. O'CONNOR: Okay. You're not to answer that question.

MR. ELLIS: Okay. Mark it.

MS. O'CONNOR: Good.

BY MR. ELLIS:

Q. Is the report your document? Do you own it?

A. Yes, the report is my work.

Q. And you mentioned that you had reviewed all of the references that are attached to your report. Do you remember that earlier?

A. Yes.
Q. And did you compile all those references, or were those provided to you?
A. Those were compiled by me.
Q. All of them?
A. Yes.
Q. Well, there's some references there that are documents in this case. You didn't compile those, right?
A. Oh, I'm sorry. I misunderstood the question, then. The references that represent academic publications that are available in the current body of the peer-reviewed medical literature, those are references that I compiled.
Q. And none of those references, the peer-reviewed literature, were provided to you by counsel; is that right?
MS. O'CONNOR: Objection.
You know what? You're not going to answer that. You're not going to answer that.
You're infringing on the privilege that I have with the expert, communications regarding the draft report. It's embodied in the CMO I have here today, as well.
MR. ELLIS: I don't think that's right, but

that's fine. Just instruct him not to answer.
MS. O'CONNOR: Then you should mark it for a ruling.
Do not answer.
MR. ELLIS: That's fine.
MS. O'CONNOR: Do not answer that.
MR. ELLIS: I think I'm doing it right, but if I'm wrong, that's fine.
MS. O'CONNOR: I'm glad you think so.
MR. ELLIS: I mean, every deposition I've ever taken in 30 years of practice I get to ask this question.
BY MR. ELLIS:
Q. What materials did counsel provide to you to help you prepare for your engagement in this case?
MS. O'CONNOR: You can answer that.
THE WITNESS: Counsel provided me with materials that were supplied to them by the defendants that consists of videos, some product information, and instructions for use. I was provided with a very cursory understanding of the question that I would be tasked with.
BY MR. ELLIS:
Q. Mm-hmm. Did you have any conversations

with counsel at the time of your engagement about what your charge would be in this case?

MS. O'CONNOR: Objection.

THE WITNESS: The -- yes, in the context that I had to understand what question was being asked and what specific question I was being charged to answer in the overall --

BY MR. ELLIS:

Q. And -- I'm sorry. I didn't mean to interrupt you.

And what question did you understand you were being charged to answer?

A. I was tasked with answering the -- speaking to the biological plausibility of the chemicals contained in hair relaxers, whether or not they were -- it was possible that they could contribute, through absorption, to the influence of the uterine and the ovarian tissue.

Q. And so was your work, as you understand it, related to dermal absorption of chemicals in hair relaxers into the bloodstream?

A. My work was related to -- in part, yes.

Q. And what was the other part, if that wasn't the exclusivity of what you were being charged with?

A. Understanding -- I was also asked to consider the way in which these chemicals actually function to exert the desired effect and the manner in which they would have to be used and how that would influence their absorption through the skin to the circulation.

Q. But you weren't charged with answering the question whether or not the chemicals in hair relaxers could cause uterine or ovarian cancer, correct?

A. That is correct. I was not asked to opine on causation of the chemicals.

Q. And were you in any way charged with opining on whether or not, once absorbed, whether or not those chemicals created a greater risk of uterine or ovarian cancer?

A. No, I was not asked to offer an opinion regarding the risk of those chemicals in causing uterine --

Q. And you do not have an opinion on the risk of developing uterine or ovarian cancer from the absorption of chemicals in hair relaxers; is that true?

A. I -- I was not asked to offer an opinion regarding the influence of those chemicals

regarding the risk of developing uterine or ovarian cancer.

Q. And so you don't have an opinion in that regard, true?

MS. O'CONNOR: Objection. It's been asked and answered many, many times.

You can answer it again.

THE WITNESS: I was not asked to offer an opinion regarding that issue.

BY MR. ELLIS:

Q. So you don't have an opinion in that regard, true?

MS. O'CONNOR: Objection. That's a different question.

THE WITNESS: I wasn't tasked with offering that opinion.

BY MR. ELLIS:

Q. So it's been asked. It has not been answered.

So you don't have an opinion on the risk of developing uterine and ovarian cancer from the absorption of chemicals in hair relaxers?

A. I was not asked to offer that opinion.

MR. ELLIS: Will you mark it. He's not answering the question.

BY MR. ELLIS:
Q. You were first engaged through a retainer in January 2025; is that right?
A. Yes, that's correct.
Q. And there's mention here of an invoice that's dated 11/30/2025. Do you recall what period that covered?
A. Yes. That covered the period of retainment through the drafting and delivery of the expert opinion.
Q. And so the first invoice you issued after the retainer invoice covered the entirety of the 11 months that you had been engaged in the matter?
A. I had received the retainer. And the first invoice covered the entirety of the time period up until the delivery of the expert opinion, crediting the amount that was received for the retainer.
Q. And what I'm focused on is whether or not work regarding that report began earlier than, say, 11/1. So was it a monthly invoice, or was it a period invoice for all the time from retaining you until delivery of your report?
A. It was a period invoice for that entire

duration.
Q. All right. Do you recall when you began working on your report?
A. Approximately, yes.
Q. When was that?
A. Shortly after receiving the retainer.
Q. So immediately after receiving the retainer you began working on your report?
A. Shortly after receiving the retainer.
Q. How did you begin working on the report immediately after receiving the retainer?
A. Well, as mentioned in the methodology of my expert opinion report, I considered the question that I was tasked with answering. I investigated on the -- the products at issue through primary literature that looked at product content and what those products were intended to accomplish, and by what means they were intending to accomplish that -- that goal.
I then looked to primary references that represented the question at issue in this case regarding ovarian and uterine carcinoma. I then began to explore primary sources that looked at risks associated -- local risks, both in the domestic literature, as well as the international

literature.

I then looked to references that those documents relied upon, pulling some of that literature that I thought was relevant. I relied upon my 30 years of clinical, practical experience, education experience, work in a scientific realm in that respect. Looked at some textbooks in dermatology, textbooks in ethnic hair that I have available, as well as a specific textbook that deals with dermal absorption, predominantly in the esthetics marketplace, but also in the therapeutic/pharmacologic sector, as well. And I began to assemble these into a single working draft.

Q. Mm-hmm. Did you have an engagement letter in this case?

A. I don't recall an engagement letter. There may have been an engagement letter, but I don't specifically recall an engagement letter.

Q. You didn't give that to counsel as part of the request for production for this deposition?

A. I did not give an engagement letter to counsel. I don't request an engagement letter.

Q. Mm-hmm. Who contacted you when you were first reached out to for retention in this case on

behalf of the plaintiffs?
A. Counsel present, Miss O'Connor -- I should say Ms. O'Connor.
MS. O'CONNOR: That's okay.
THE WITNESS: But take the compliment and run.
BY MR. ELLIS:
Q. And how did that contact take place? Was it by phone or e-mail?
A. That first contact with Ms. O'Connor was through a Zoom video meeting.
Q. Well, she couldn't just send you a Zoom link. She must have reached out to you before that, right?
A. It was coordinated, yes.
Q. Who coordinated it?
A. It was coordinated through a service called the Expert Institute.
Q. Is that a service that you're onboarded with or something like that that helps connect you with potential litigants?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: So it definitely serves as a reference source that can be -- to provide experts to the services of attorneys. I do not remember

how I became affiliated with that organization, or I do not remember an initial onboarding. I have since updated my CV on there, but I honestly do not remember how I came in contact with that organization.

BY MR. ELLIS:

Q. Mm-hmm. Do they -- does anybody from this Expert Institute, do they help you in preparation of your report in any way?

A. No.

Q. Did anybody other than yourself do any research or help you with your report?

MS. O'CONNOR: And I assume you mean other than counsel, in terms of collaborative efforts, right?

BY MR. ELLIS:

Q. You can answer.

A. No.

Q. Have you previously -- had you previously worked with Ms. O'Connor or anybody from her law firm?

A. No.

Q. Have you previously worked with any other members of the Plaintiffs' Steering Committee, if you know who those people are even?

A. No. The ones I'm aware of, I have not.
Q. At any point in time did you ever receive any instructions changing the scope of your work or your charge with respect to what you're supposed to do in this case?
A. No.
Q. Had you heard about this case before you were retained?
A. No.
Q. Did you ever read the complaint in this case?
A. No.
Q. Did Ms. O'Connor ever tell you anything about the facts of the case or anything like that?
MS. O'CONNOR: Objection.
Don't answer that. That's privileged.
MR. ELLIS: I don't think that's privileged.
MS. O'CONNOR: It is privileged, and it's also encompassed --
MR. ELLIS: Huh? It's allowed. I mean, you can tell him -- it's not -- it's not privileged. The only thing that's privileged is the draft report.
MS. O'CONNOR: No, no, no. Communications as

well, sir.

MR. ELLIS: That's not right.

MS. O'CONNOR: Okay. Well --

MR. ELLIS: Are you instructing him not to answer? Just do it. We'll just line them up.

MS. O'CONNOR: Let me hear the question back again.

(Record read as requested.)

MS. O'CONNOR: Okay. So reading from CMO 15 in this case, paragraph 8 in the General Causation Expert Discovery Schedule, "The limitations" -- and I'm quoting -- "on expert discovery set forth in Rule 26 of the Federal Rules of Civil Procedure, including the provision of Rule 26(b)(4), A through D, limiting discovery with respect to draft reports, communications with experts, and depositions of consulting experts shall apply to all expert discovery, not just general causation expert discovery, in all cases in this MDL."

MR. ELLIS: And once he's designated, he's no longer a consulting expert. So you'll stand by your objection and instruction --

MS. O'CONNOR: I stand by my objection.

MR. ELLIS: It's no problem. It's no problem. You know, we'll see who's right.

BY MR. ELLIS:
Q. You're going to follow your counsel's instruction not to answer the question, right?
A. Yes.
Q. And if she does that throughout the day, you're going do that, right?
A. Yes.
Q. I don't like to make a big grandstand about it, about how you can get sanctioned or she can get sanctioned and all that. But I'm just going to accept that if she instructs you not to answer, you're going to follow the instruction; is that fair?
A. Yes.
Q. All right. As part of your work on this case, did you interview anybody?
A. No.
Q. Did you talk to any plaintiffs?
A. No.
Q. You never discussed with any plaintiffs in this case how they used hair relaxers or their experiences, right?
A. That is correct. I did not.
Q. Were you provided at any point in time with any materials that aren't included in your

report, any attachments thereto?
A. I was provided with materials regarding the meeting that occurred in January.
Q. With counsel?
A. I'm sorry. I may not be understanding the question.
Q. Oh, the -- January this year, the Science Day?
A. Correct, the Science Day.
Q. So you got some materials there that aren't included in your report?
A. Well, my report was issued before Science Day.
Q. Oh, yeah. Fair point.
So after your report, you got some other materials in conjunction with your testimony at Science Day, right?
A. Correct.
Q. What were those materials?
A. Those materials would have comprised expert opinions that were provided by defense experts as well as plaintiff experts, again, after I issued my report; a schedule for Science Day; some logistics about Science Day. There were some visual representations that were presented at

Science Day. So there was -- these things were communicated and presented to me.

Q. So the videos that -- that you narrated, you got those after your report was issued?

A. Yes.

Q. So you had never seen those videos --

A. I'm sorry. I'm interrupting. I apologize. The videos provided by defense, those videos I had prior to issuing my report.

Q. Okay. And you had watched them?

A. Yes.

Q. When did you watch them?

A. I watched them on several occasions. In the month following when they were first given to me. The month leading up to the finalization of the report. I've watched them in the last month in preparation for this meeting.

Q. When were they first given to you, if you recall?

A. I don't specifically recall.

Q. Did you go to YouTube or do any other outside research and look at videos?

A. No.

Q. Since January 15th, the last invoice you issued on your statement of compensation, do you

have an estimate of the hours you've worked?
A. I haven't really begun to tally that in my head. I'm going to say it's, very rough estimate, 20 to 30 hours.
Q. Do you have any specific plans to perform any further work on this case after your deposition?
A. I don't have any specific plans other than I am -- I anticipate that if there's a trial, a court hearing, that I may be asked to present myself.
Q. And do you intend to do so if asked and subpoenaed?
A. Yes.
Q. What is your hourly rate?
A. I bill in this case $600 an hour.
Q. You don't receive any additional payments for a favorable verdict at trial, right?
A. No.
Q. As you approach your work in this particular case, you're doing it as a neutral scientist, right?
A. Yes.
Q. You're not favoring plaintiffs versus defendants, right?

A. I have no innate bias that leads me to favor any one individual over another. My participation is based upon the -- answering the question I was tasked with and being able to believe that my answer is relevant to the case.

Q. And you're answering that question objectively, right? Not favoring one side versus the other, right?

A. Yes.

MS. O'CONNOR: Objection.

You can answer.

BY MR. ELLIS:

Q. And you're doing that just based on the science and the literature and the materials you reviewed. You're just finding the correct answer regardless of whether or not it helps plaintiffs, hurts plaintiffs, helps defendants, hurts defendants. Fair statement?

MS. O'CONNOR: Objection; form.

THE WITNESS: In combination with my clinical and professional background, my formal education, yes.

BY MR. ELLIS:

Q. If I ask you a question, you'll tell me the truth and -- and the correct answer just the

same way if plaintiff asked you a question you would tell them, if it was the same question, the same answer, no matter who's asking it, right?
A. Yes. I'm under oath to tell the truth.
Q. And so when I say you're testifying neutrally on behalf of the facts and science without regard to who is asking the question or what side it helps or hurts, that's a true statement, right?
A. Yes, that's a true statement.
Q. You listed some items in your report about prior testimonies. It's your tab -- or Exhibit C.
A. Okay.
Q. Are these the -- all of the engagements that you've had, or are they the engagements over the last five -- four years?
A. These are the engagements for the period of December 1st, 2021, through December 1st, 2025.
Q. Right. Okay. And so you've had other engagements outside of these that happened before December of 2021?
MS. O'CONNOR: I think you meant '25. I'm sorry.
MR. ELLIS: I meant what I meant.

THE WITNESS: Yes.
BY MR. ELLIS:
Q. So there were some engagements prior to 2021, right?
A. Yes.
Q. All right. Got it.
The ones that are listed on Exhibit C, setting aside the Multiple Plaintiffs versus L'Oreal, are all of those other ones medical malpractice cases?
A. These are all medical malpractice cases, yes.
Q. And in those cases, outside of the one involving L'Oreal, did you testify on behalf of the plaintiff or the defendant?
A. In each case represented here, these are plaintiff cases for which I participated.
Q. And so you testified on behalf of a plaintiff that a particular physician did not meet the standard of care for the industry; is that right?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: They were not all physicians. Even if a physician is named, the service may have

been provided by a PA or a nurse practitioner.
BY MR. ELLIS:
Q. And so you testified in each one of the cases listed on your Exhibit C on behalf of the plaintiff that the medical professional did not meet the standard of care, true?
A. I haven't testified yet in every case listed here.
Q. Well, it says "testimony."
A. I'm sorry. I've been deposed.
Q. That's testimony.
A. Okay.
Q. You're a lawyer. Come on. That's testimony.
MS. O'CONNOR: Objection.
THE WITNESS: Only on paper.
BY MR. ELLIS:
Q. I'm supposed to do this whole big thing: You understand you've just taken an oath. It would be the same oath as you'd take at the time of trial, and that this testimony can be used for all purposes at the time of trial. You understand that?
A. I do understand that.
Q. All right. Let me get back to the

beginning.
All right. Now, in each one of the cases identified on Exhibit C, you testified on behalf of the plaintiff that the medical professional did not meet the standard of care, correct?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. Tell me about this Multiple Plaintiffs versus L'Oreal. What case was that?
A. That is this case.
Q. Oh. Well, you hadn't testified yet. Now I get it. I don't think so. Okay. It's not a different case?
A. It is not a different case.
Q. All right. All right.
MS. O'CONNOR: Are we getting to a natural breaking point?
MR. ELLIS: Sure.
MS. O'CONNOR: Why not ten minutes like we did before. Short break?
MR. ELLIS: That's fine.
THE VIDEOGRAPHER: Off the record at 11:13.

(Short recess.)

THE VIDEOGRAPHER: Back on the record at 11:23.

BY MR. ELLIS:

Q. Dr. Brown, you realize you're still under oath, correct?

A. Yes.

Q. And you understand that the oath you've taken is the same oath you'll take at the time of trial, right?

A. Yes.

Q. And that requires you to tell the truth, the whole truth, and nothing but the truth, right?

A. Yes.

Q. How many times have you been deposed?

A. Approximately 15.

Q. Fifteen. Have you ever testified at trial?

A. Yes.

Q. How many times have you testified at trial, Dr. Brown?

A. Approximately five.

Q. And has your opinion ever -- for any case ever been limited or excluded?

A. No.

Q. In the five times you testified at trial, are all those cases listed on your report within the last four years?

A. No.

Q. How many of those, if any, where you testified at trial relate to the medical malpractice matters listed in your report?

A. All five of those are medical malpractice.

Q. I said it all messed up.

Okay. All five of the times you've testified at trial were medical malpractice cases, correct?

A. It -- yes, those were all medical malpractice cases.

Q. And for any of those five, did that testimony occur in the last four years, as listed on your report?

A. The case of Joann Janke versus Mischke is a yes. That is the only one during this time period.

Q. In any particular case that you've been retained as an expert witness have you ever offered an opinion regarding dermal absorption of chemicals through a cosmetic product?

A. No, I don't recall making that opinion in another case.
Q. Have you made any opinions in another case regarding dermal absorption of a pharmaceutical product?
A. I was asked to give a -- I was asked to review a case by an attorney for which I did not have to offer a formal opinion that focused on absorption of intradermal lidocaine for an esthetic procedure that led to the patient's death.
Q. When was that?
A. That would be within the last two years, but I was never provided with the name of the physician or the patient. The attorney gave me some background, and the facts were very clearly aligned towards the -- there having been some negligence. And that was settled. I don't know if the case was ever filed.
Q. Did you ever issue a formal opinion in that case?
A. No.
Q. Did you ever provide testimony in that case?
A. No.
Q. Do you remember the name of the lawyer

who retained you?
A. Not off the top of my head, no.
Q. Do you remember the name of his law firm, if he had one?
A. I know it was in Kansas City.
Q. That case would have been a medical malpractice case, as well, right?
A. Yes.
Q. We talked about the oath you've taken to tell the truth, the whole truth, and nothing but the truth in this proceeding here today; is that right?
A. Yes.
Q. And you do that no matter what. If you're sending an e-mail, you're going to do your best to tell the truth, right?
A. Yes.
Q. You make it a practice to be truthful in your communications and all things you do, the best you can, right?
A. Yes.
Q. You'll do the same thing if you appear at trial in this case. You'll be under oath, under penalty of perjury, you'll tell the truth, the whole truth, and nothing but the truth, correct?

A. Yes.
Q. A couple times today I stepped over you and interrupted you. I apologize for that. If that happens, I'll do my best to prevent from doing that. And you likewise do the same, if I'm asking a question, try not to step over me when I'm asking a question. The court reporter is taking down all our words and phrases and literally can't take down two people speaking at the same time.
You understand that, right?
A. Yes.
Q. The court reporter is transcribing all your words and phrases. And at the end of the deposition, you'll actually have an opportunity to actually correct the deposition transcript if you find something that warrants being corrected, if it's incorrect. One way we try to avoid that, because it might bear on your credibility, is to make sure you understand my question as phrased. A few times so far, you've asked me to rephrase or you said you didn't understand the question.
Will you promise to continue to do that if I ask a question that you don't understand?
A. Yes.
Q. Now, if you do answer a question and you

haven't asked me to rephrase it or indicated you had difficulty understanding, I'll presume that you understood the question when it was phrased to you; is that fair?

A. Yes.

Q. Your learned counsel has made some objections here. As we talked about, if the objections are made and they're to the form of the question, you understand you have to answer the question, right?

A. Yes.

Q. Now, we've established that if your counsel makes an objection and instructs you not to answer on the grounds of privilege or anything like that, I'm just going to move on, I'm not going to test whether that -- you know, you're going to follow that instruction or not.

Is that a fair way to proceed? You'll -- I'll understand that if your counsel instructs you not to answer, you're going to follow that instruction?

A. Yes.

Q. You've been providing your best, most accurate testimony thus far; is that right?

A. Yes.

Q. And you don't have any reason why you don't believe that you can continue to provide your best and accurate testimony thus far, right?
A. Yes.
Q. You didn't conduct any independent laboratory testing as part of your engagement here, right?
A. With respect to the issues at hand in this case?
Q. Correct.
A. The answer is no.
Q. You didn't do any skin dermal absorption testing in a laboratory of hair relaxers, right?
A. No.
Q. You reviewed literature on that question as opposed to doing your own primary research, correct?
A. Correct.
Q. Did you do anything to determine dose calculations that a person might receive over time from using hair relaxers?
A. No.
Q. If I understand what you did based on your report, you evaluated literature and other materials to provide your opinions based on those

materials in this case; is that fair?
MS. O'CONNOR: Objection. Objection.
THE WITNESS: That is true in part. I relied upon those materials as well as my direct clinical involvement and care with patients who have used these product, as well as my more broad formal education and 30 years of clinical practice as a dermatologist.
BY MR. ELLIS:
Q. You did not do or conduct any individual studies or epidemiology work or toxicology work to render your opinions in this case in the first instance, true?
MS. O'CONNOR: Objection to the form.
You can answer.
THE WITNESS: That is true.
BY MR. ELLIS:
Q. Can you go over your education for me, please.
A. Beginning with?
Q. Elementary school -- no, college.
A. Certainly. College, I matriculated in 1987 to Carnegie Mellon University, located in Pittsburgh. I studied -- obtained a dual degree in chemical engineering and biomedical engineering,

graduating in 1991, at which point I entered medical school at the University of Pittsburgh in Pittsburgh and completed that medical degree in 1995. After which I relocated to Chicago where I undertook a formal first-year internship in internal medicine from '95 to '96. Followed in '96 to '99 an approved dermatology residency training program at Rush University in Chicago, which was joint with Cook County Hospital in Chicago at that time. After which I relocated to Kansas City, Missouri, where I completed a formal Mohs in cutaneous oncology and reconstruction fellowship, and then returned to Chicago. In 2014, I entered law school in Chicago at John Marshall Law School.

Q. And you got a JD, right?

A. I completed my JD in 2018.

Q. And you actually took the bar, right?

A. Yes. I took the bar in Illinois and Wisconsin.

Q. Successfully?

A. Yes.

Q. Welcome, Counselor. Doctor is better, so I'm going to refer to you as that.

All right. I've got a question. Did you ever eat a Primanti Bros. sandwich when you

were at Pittsburgh?
A. Of course, yes.
Q. That makes me feel a lot better, that somebody studying gross anatomy was down there at Primanti Bros.
Where are you from originally?
A. Just south of Pittsburgh, a small town called Floreffe, F-l-o-r-e-f-f-e.
Q. Do you know where Monroeville is?
A. Yes.
Q. My best friend from law school is there. I used to go there a lot.
A. It's east of Pittsburgh.
Q. Yeah.
I assume that during your educational career you took some classes in toxicology?
A. Yes.
Q. But as we talked about, you don't have a degree in toxicology, right?
A. That is correct.
Q. You took some classes in epidemiology?
A. Yes.
Q. But as we talked about, you don't have a degree in epidemiology, correct?
A. Yes, correct.

Q. You took some biology classes, obviously, right?
A. Yes.
Q. But you are -- don't have a degree in -- specifically in biology, do you?
A. Correct, yes.
Q. Did you ever take any class in exposure modeling?
A. I do not have a specific class in exposure modeling, no.
Q. Did you take any specific class or study in endocrine disruption research?
A. Well, we learned about the endocrine system, the principles of endocrine disruption, chemicals that may influence the endocrine system, both beneficial and, you know, with detrimental effects. And it's an aspect of dermatology we deal with daily. I did not take a specific class focused on endocrine-disrupting chemicals.
Q. Have you testified in any cases involving allegations against a personal care product or cosmetic product, other than this one?
A. The term "cosmetic product" is a bit broad. I have had some involvement in cases that relate to the use of lasers.

Q. It's not broad. A cosmetic product is anything that doesn't influence the structure or function of a body. Okay?
So in that context, have you ever been involved in any cases, in any engagement, that related to a personal care product or a cosmetic product?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Certainly. I'm pausing to take that definition into consideration. That is not how we use the term "cosmetic" in the field of dermatology. I do not believe so.
BY MR. ELLIS:
Q. That's the way the FDA uses it. Because if you don't, then you're going to be a regulated OTC or some other medical -- or medicine.
MS. O'CONNOR: Objection to the colloquy.
MR. ELLIS: Structural function claim. Can't make a structural function claim.
MS. O'CONNOR: Objection again.
BY MR. ELLIS:
Q. As part of your work towards your degree in dermatology, did you ever do any research on uterine cancer?

A. In my work in education as a dermatologist, we deal a great deal with the endocrine system and the function of these organs as they interplay with one another, including the pituitary, adrenal access, and adrenal crisis, as it relates to molecules influencing all of these.

And there's a focus on polycystic ovarian syndrome within dermatology as it relates to some of the uterine findings of persistent menses and infertility, the cysts within the ovary, and manifestations within the skin. That would be the application in the field of dermatology.

Q. And I asked did you do any research in uterine cancer.

A. Specific to uterine cancer, no.

Q. Have you done any research with respect to the endocrine system and disruption thereof?

A. I have not conducted bench-level research. But in the daily practice of dermatology, we are expected to apply principles that are known to disrupt the function of the endocrine system as a result of how we utilize topical products, topical steroids which are absorbed through the skin and can either suppress or compromise the function of that system.

Q. Have you written any papers or authored any peer-reviewed articles regarding uterine cancer or disruption of the endocrine system?

A. I have not written papers in that context, no.

Q. What about ovarian cancer? Have you done any specific research regarding ovarian cancer?

A. I myself have not conducted that research, no.

Q. Have you written any papers regarding ovarian cancer?

MS. O'CONNOR: I'll object to the form.

THE WITNESS: I have not written any papers that focus on ovarian cancer, no.

BY MR. ELLIS:

Q. You're not a gynecology oncology -- gynecological oncologist, right?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I do not practice gynecologic oncology except my role in participating, as we've mentioned, in early diagnosis when the malignancy metastasizes to the skin.

BY MR. ELLIS:
Q. What is Mohs micrographic surgery? Can you tell the jury what your primary field of practice is.
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Certainly my primary field of practice is really dermatology. More broadly, that encompasses all diseases of hair, nail, and skin.
And within the field of dermatology, there is a special board certification that deals with cutaneous oncology, diagnosis, detection -- detection, diagnosis, and treatment.
And the term "Mohs micrographic surgery" is specific to a type of surgery named after Dr. Frederick Mohs who pioneered a technique in which skin cancer is removed from the patient under local anesthesia while the patient is awake. The patient remains in the physician's office.
That tissue is then taken into a laboratory that is under the direction of the physician. It is processed into glass slides which are then stained and interpreted by that physician who performed the surgery to evaluate the margins, histopathologic evaluation, utilizing standard

staining as well as immunohistochemistry staining. And if the margins are positive, the surgeon goes back, takes more tissue using a system of inking and mapping that maintains the orientation of the specimen. And until -- stages are taken until the margins are completely clear, 100 percent of the margin is evaluated, and the patient will generally undergo reconstruction the same day.

BY MR. ELLIS:

Q. You have a specialty as a skin cancer surgeon, correct?

A. Correct. I'm considered an oncologic skin oncology surgeon, yes.

Q. Do you presently, at Gundersen, treat patients who present with general dermatological issues as opposed to something that relates to a possible lesion that may be cancerous?

A. Yes.

Q. How so?

A. Each day I see patients -- perform surgery, but I also see patients that have general appointments for anything that they are referred to the dermatologist for or they self-refer to the dermatologist for. We cover the urgent care, emergency room. I cover the urgent care, the

emergency room.
Q. Have you ever practiced law?
A. No.
Q. You still remain active as a lawyer in the states that you're barred in?
A. I maintain my law license and the required CLE every year. But I -- but I do not practice.
Q. Any particular reason?
A. The work I do in cutaneous oncology keeps me pretty busy, and I find it to be very rewarding. So I have chosen to continue in that capacity.
Q. I was asking you actually the opposite. Any particular reason why you still maintain your status as a lawyer?
A. Well, the academic pursuit is very interesting. I enjoy the analytic approach to the law. I enjoy the CLEs, even taking the CLEs. I certainly can't rule anything out in the future, but right now I have no plans to practice law.
Q. You're licensed to practice medicine, obviously, in Wisconsin and in Illinois; is that right?
A. Yes.

Q. Any other states?
A. Wisconsin, Illinois, Minnesota, Iowa, Indiana, Michigan. And I trained in Missouri. So that license is placed into -- I'm blanking on the term, but it's like a -- it's a permanent limbo, that I could reactivate it if I would like it to be reactivated.
Q. You're board certified in dermatology?
A. Yes.
Q. Any other specialties?
A. In Mohs micrographic surgery and cutaneous oncology. It's a separate board.
Q. With respect to cutaneous lesions and removal thereof, those are not systemic malignancies, agree?
A. No, I don't agree.
Q. How so? How do I have it wrong?
A. There are many systemic malignancies that manifest in the skin, including lymphomas, leukemias, even melanoma, ovarian/uterine cancer, lung cancer, breast cancer.
Many malignancies that arise in these tissues that are considered the skin have the potential to travel to distant organs and result in metastatic disease; melanoma, squamous cell

carcinoma, too.
Q. In those instances, would chemotherapy or radiation be a potential course of treatment?
A. In those instances, that is part of the overall treatment plan. It almost always centers as well on removing the primary lesions. There's localized surgery plus or minus regimented radiation therapy plus or minus chemotherapy.
Q. Is there a percentage of the cases you see as a Mohs surgeon that may result in some type of systemic malignancy warranting either chemotherapy or radiation treatment, as well?
A. While the question sounds very straightforward, it's actually not one I'm able to answer because each type of cancer is assigned a staging designation in each patient, and there may be some confounding variables for each patient. And so it's not quite so easy to assign an exact percentage.
Q. Cancer is generally not general, right?
A. True.
Q. Do you routinely document relaxer exposure in patient histories? Would that be something that you would note in their medical chart?

A. The history that's taken is generally directed based upon the reason the patient is presenting in dermatology.
Q. So in that particular instance where you're seeing lesions on heads or burns, you know, as you've described them as you treat them and as you describe them generally, do you make a note in the medical history of the patient that it was as a result of the use of a chemical hair relaxer?
A. Yes. There would be documentation that would support what the patient shares as their reported relaxer use in chemical or any type of hair product use, yes.
Q. Have you ever done a collection of those kind of notes and medical records to determine the incidence of that in your general population of patients?
A. No.
Q. The best estimate that you can give us is in your report where you say you've seen hundreds of African-American and Black women who have presented with issues related to chemical hair relaxers?
MS. O'CONNOR: Objection to the form.

BY MR. ELLIS:
Q. Is that right?
MS. O'CONNOR: Object to the form.
THE WITNESS: Yes, that's correct.
BY MR. ELLIS:
Q. I want to make sure I've got this right because I've asked it a few times. When you use the word "hundreds," you're taking about treating hundreds of Black women for issues related to chemical hair relaxer, not just treating hundreds of Black women who had a hair relaxer, correct?
MS. O'CONNOR: Object to the form.
THE WITNESS: I am referencing or my intention in that statement as I've described it is it's hundreds of women who have issues related to their scalp and hair for which hair relaxer use has played a definitive role.
BY MR. ELLIS:
Q. More specific than hundreds, do you have an estimate?
MS. O'CONNOR: Objection.
THE WITNESS: No, I do not.
BY MR. ELLIS:
Q. Is it -- "hundreds" is plural. So is that 200, or is that 1,000?

MS. O'CONNOR: Objection.
THE WITNESS: I estimate that it's in the lows to mid. My estimate would be 3 to 500.
BY MR. ELLIS:
Q. So if we use the high of your estimate, 500, your estimation is that, on average, you've seen about 20 Black women a year who presented to you with issues related to chemical hair relaxers?
MS. O'CONNOR: Objection to the form.
BY MR. ELLIS:
Q. Right?
MS. O'CONNOR: Objection; form and foundation.
THE WITNESS: It would vary sometimes year to year, but following residency, I would say that's an accurate representation.
BY MR. ELLIS:
Q. And how many patients of Black descent, on average, would you have seen in the last 25 years, on average?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: The -- prior to my move to Wisconsin, the demographics of my practice were very, very representative of the demographics of Chicago. I saw many, many, many men and women,

children of -- with darker-pigmented skin. I would have to estimate that it would be approximately 15 to 20 percent of my practice on any given year.
BY MR. ELLIS:
Q. And then how many patients would that relate to, that 15 to 20 percent of your practice --
MS. O'CONNOR: Objection.
You can answer.
BY MR. ELLIS:
Q. -- that you would see?
MS. O'CONNOR: Objection.
THE WITNESS: Unique patients, on an annual basis for a dermatologist, including myself, would be somewhere around 2,000, 2,400, 2,500 in a year, unique patients. So we're talking I would see a couple hundred, maybe 500 would be the upper limit, estimating, on an annual basis.
BY MR. ELLIS:
Q. So about 4 percent of the Black women you saw on an annual basis presented to you with some issue related to hair relaxers, right?
MS. O'CONNOR: Objection.
THE WITNESS: I think if that's what the numbers I just quoted calculate out to, then I

won't disagree.
MS. O'CONNOR: Well, objection.
MR. ELLIS: You can't answer for him, Counsel.
MS. O'CONNOR: I know I can't answer for him.
MR. ELLIS: And math is math.
MS. O'CONNOR: Math is math -- your math, that you haven't seen.
BY MR. ELLIS:
Q. It's right here. Do you want to see it?
A. So 20 divided by 500 in a year? Is that --
Q. Yeah, that's what it is. It's .04, which you then take the decimal point and put it behind --
A. Well, those are unique patients. So many patients will have multiple visits a year --
Q. But those are unique patients, right?
A. I mean --
Q. So about 4 percent of --
A. Okay.
Q. -- the Black women you saw presented with some issue related to a hair relaxer over time, right?
A. In the context of my practice for that period of time. That's not that dissimilar from

other diseases. Psoriasis is 3 percent incidence in the population.

Q. So those women that used hair relaxers that were African-American that presented to you were common for what you would see for other conditions in your practice, right?

A. Yeah, it was --

MS. O'CONNOR: Objection to form.

You can answer.

THE WITNESS: It was a common occurrence in my practice that I would see these folks.

BY MR. ELLIS:

Q. But not a dramatically large sample of people that saw you, as well. It was common for other conditions you would see in your practice. Is that a fair statement?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: We would consider it -- I would have considered -- I do consider this to be a common occurrence in my practice prior to my move to Wisconsin.

MR. ELLIS: Yeah, my question was a little bit different.

Why don't we read it back.

MS. O'CONNOR: Listen carefully, please.

THE WITNESS: Okay.

MR. ELLIS: You can't do that. That's not right.

MS. O'CONNOR: You keep changing your question.

MR. ELLIS: It's not fair. I'm not changing the question. I'm literally asking to read it back.

MS. O'CONNOR: You keep rephrasing. But let's hear the question --

MR. ELLIS: Of course, that's what a lawyer does. If I wasn't --

MS. O'CONNOR: Even when not asked.

Let's read it back. Okay?

MR. ELLIS: That's just not proper, Counsel. I'm sorry.

(Record read as requested.)

THE WITNESS: I'm not sure I understand the question. It's as common as other conditions in my practice, is that what you're asking?

BY MR. ELLIS:

Q. Yeah, that's what I'm saying.

MS. O'CONNOR: Same objection.

BY MR. ELLIS:

Q. Well, after your counsel told you to

listen carefully, I'll ask a new question. All right?
A. Okay.
Q. 4 percent of the women -- Black women that you saw presented on a yearly basis with some issue related to hair relaxer, according to your testimony.
Am I understanding that correctly?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yes. That's based upon the numbers that I just provided, yes.
BY MR. ELLIS:
Q. And do you view that 4 percent as a large number or a common number or a small number of patients that were afflicted with some issue related to chemical hair relaxer use?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I'm not sure that I have an opinion that it's large or small. My opinion is that it's something that we would -- that I frequently saw in the context of my practice.
BY MR. ELLIS:
Q. Like psoriasis or some other issues, eczema or something like that that you would see on

a regular basis; is that right?
A. Yes.
MS. O'CONNOR: Objection.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. And so there was nothing dissimilar to your treatment of women that presented with, according to you, some issue related to hair relaxers as opposed to those that presented with psoriasis or some form of contact dermatitis in relationship to the use of some other personal care or cosmetic product, fair?
MS. O'CONNOR: Objection.
THE WITNESS: No, I'm confused about the question. The -- are you asking if other women are using personal care products with other diseases?
BY MR. ELLIS:
Q. No. I'll try again.
The incidence upon which you saw women that presented to you with some issue related to hair relaxers, was that consistent with women that you saw who presented to you with some form of contact dermatitis, allergic response related to the use of other personal care or cosmetic products?

MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I honestly don't know. I'm not -- I haven't given it thought with respect to the incidence of irritations, allergies from other personal care products, specifically for women. I mean, it's an interesting question. I just don't have an answer.
BY MR. ELLIS:
Q. Well, let's see if we can find one. Women did present to you with complaints related to contact dermatitis or allergic response to certain personal care or cosmetic products, agreed?
A. Yes.
Q. And do you recall the number or percentage of incidents that happened in a given year in relationship to your patient population?
A. It's a challenging question because there are many types of products that fall under that umbrella and -- as opposed to one where it was hair relaxer. So that's why I'm sitting here with the gears turning in my mind trying to figure out what's lumped into that and what wouldn't be lumped into that.
My most forthright attempt to answer

the question is that because the classification of personal care products would include many different things, there would be a greater number of women that would present for issues related to those products than there are women that present for hair relaxer products.

Q. Did women ever present to you with either scalp or skin issues related to their use of hair dye?

A. Yes, I've had women present to me for issue related to the use of hair dye.

Q. And in relationship to the 4 percent of women that you saw that might have presented to you for hair relaxers, was that number on average greater or lower than those that presented for hair relaxers?

MS. O'CONNOR: Objection to form and foundation.

THE WITNESS: That -- that's a much smaller number of women.

BY MR. ELLIS:

Q. For hair dye?

A. For hair dye.

Q. Do you know what the pH for hair dye is?

A. There are many different types of dye.

Some are vegetable-based, some are chemical-based. So I can't generalize pH for hair dye.

Q. What about permanent hair dye?

A. As I sit here, I can't tell you the pH for permanent hair dye.

Q. Have you done any work to determine whether or not hair dye is generally within the range of hair relaxer pH levels?

A. That wasn't a question I was tasked with in the context of this litigation.

Q. Do you not know that hair dye has a pH level that is 10, 11?

MS. O'CONNOR: Objection. Object to the form, foundation.

You can answer.

THE WITNESS: I would have to review the specific product for the dye to determine its pH.

BY MR. ELLIS:

Q. Do you -- are you familiar with a chemical called paraphenylenediamine?

A. I am familiar with a chemical called paraphenylenediamine.

Q. PPD?

A. Mm-hmm.

Q. And you are aware that it is a

constituent ingredient in most hair dyes?
MS. O'CONNOR: Object to form, foundation.
THE WITNESS: I am aware that it can be found in hair dyes.
BY MR. ELLIS:
Q. You're aware it can cause allergic response?
A. I am aware that it can cause allergic contact dermatitis.
Q. That would be an allergic response, right?
A. It is one of the category of allergic responses.
Q. Are you aware that it is alleged -- and I use that term carefully -- that hair dye or paraphenylenediamine can cause chemically induced vitiligo?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: That is not the question I was tasked with in this case. The -- I don't believe that that specific question has been answered definitively.
BY MR. ELLIS:
Q. I might hire you as my next expert. All right.

The point I'm getting at is you would agree that hair dye can result in contact dermatitis or an allergic response, true?

MS. O'CONNOR: Object to the form, foundation.

THE WITNESS: I don't want to entirely agree with you because it's not the dye. It's this chemical that's contained within the dye formula, the milieu.

BY MR. ELLIS:

Q. We agree.

MS. O'CONNOR: Object to the form.

BY MR. ELLIS:

Q. Right?

MS. O'CONNOR: Objection.

BY MR. ELLIS:

Q. In relationship to those women that presented to you with a contact dermatitis or other allergic response to hair dye, you said that it's a smaller number than those, on average, that presented to you from some issue related to chemical hair relaxer. Am I saying that correctly?

A. Yes.

Q. And that would be on an annual basis? Is that the substance of your testimony?

A. Yes.

Q. How much lower?
A. I would see -- I have seen a half dozen or so women a year due to allergies related to components of hair dye products.
Q. So it was 20 per year for Black women who used hair relaxers and six or so for women that use hair dye, right? Is that right?
A. Roughly speaking.
MS. O'CONNOR: Object to the form.
BY MR. ELLIS:
Q. Would the same treatment protocol apply to either of those segments if they presented with the same conditions?
MS. O'CONNOR: Object to the form and foundation.
THE WITNESS: Which conditions?
BY MR. ELLIS:
Q. People that you saw from hair dye that had contact dermatitis or allergic response or people that you saw with hair relaxer use that presented with contact dermatitis or hair dye.
MS. O'CONNOR: Object to the form.
BY MR. ELLIS:
Q. Not hair dye, but allergic response.
MS. O'CONNOR: Object to the form and

foundation.
THE WITNESS: Could I get that read back to me.
BY MR. ELLIS:
Q. Let me do it again. It was pretty bad.
If the -- if the woman presented with the same condition regardless of whether or not she had used hair dye or hair relaxer, the same treatment protocol would be followed?
MS. O'CONNOR: Objection.
THE WITNESS: In the context of your question, you have laid the ground that both women have allergic contact dermatitis. So the approach for treating allergic contact dermatitis is uniform whether it's head, scalp, or what the issue is would be, number one, avoid the product because you cannot diminish the allergy and it will only increase with each repeated exposure, compromising the skin and its barrier properties with each exposure. And you would treat it with topical steroids.
BY MR. ELLIS:
Q. Are you a member of any professional organizations?
A. Yes.

Q. Which ones?
A. I'm a member of the AMA, the Wisconsin Medical Society, the La Crosse County Medical Society, the American Academy of Dermatology, the American College of Mohs Micrographic Surgery, the Illinois Bar Association, the Wisconsin Bar Association, the International Society for Dermatologic Surgery. I believe that's it.
Q. Have you ever taken a detailed exposure history of hair relaxer use for any of your patients?
A. Can you define for me what you mean by "detailed."
Q. Yeah. Like if somebody presented with an issue related to their chemical hair relaxer, have you ever asked them how long have they used it, how long were they using the product, have they used the product successfully without causing the condition that they're seeing you for, any of that?
A. Yes.
Q. And what have you found when you've done that detailed exposure history?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: These histories vary, you know, depending upon the individual patient. So they're

certainly not uniform consistency in all aspects.

So very often patients report a combination of home application and intermittent salon application. They report having changed products over time with an attempt to try to minimize localized adverse events, including scalp irritation, superficial burns, hair fragility, breakage. Most often it is frequent application, upwards of five, six times a year, and it extends over the period of decades.

BY MR. ELLIS:

Q. And you're not seeing the same woman every six weeks with the same condition, complaints regarding hair relaxer use? That's not common, right?

MS. O'CONNOR: Objection.

THE WITNESS: The numbers that I gave you were individual new patients. Once -- and I did make an attempt to clarify that earlier, that once a patient is an established patient and has an issue, I will then see them in return visits or follow-up visits until our issue is resolved or at least there is a path forward for them that is a sort of a workable treatment plan or management plan.

BY MR. ELLIS:
Q. You're not seeing the same patient every six weeks saying "I've got another issue with respect to an application of a hair relaxer," right?
MS. O'CONNOR: Objection.
THE WITNESS: It's not every patient that happens for. I have had patients that have had an issue, a year later they're back and they have a different issue and the conversation will focus on, "Well, we talked about how these products work, what is recommended by the manufacturer, what you need to do to try to minimize or try to avoid other issues. And so perhaps a very viable approach for you should be thinking about embracing a more natural approach to your hair."
BY MR. ELLIS:
Q. Mm-hmm. And you've also had some patients, I assume, that you saw once for an issue and never saw again at all regarding the use of chemical hair relaxers, right?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: There are patients who don't return to the practice, yes.

BY MR. ELLIS:
Q. I'm asking a different question. You've had and treated patients that you saw for an issue related to their use of chemical hair relaxers that remain with your practice that you've never dealt with them again related to their use of chemical hair relaxers, right?
MS. O'CONNOR: Form, foundation.
THE WITNESS: Yes, there are patients that would match that profile.
BY MR. ELLIS:
Q. Meaning that they successfully used a chemical hair relaxer without having any issue that was brought to your attention, correct?
MS. O'CONNOR: Form, foundation, objection.
THE WITNESS: Or they no longer use the chemical hair relaxer and so there isn't any potential for those adverse attempts.
MR. ELLIS: Let's answer my question first so we can add the latter. So I'll move to strike on the grounds of nonresponsive and read the question back.
MS. O'CONNOR: Oppose the motion.
(Record read as requested.)
THE WITNESS: There are patients that would

continue within the practice that have elected to discontinue use of chemical hair relaxers, and there are those that may have elected or did elect to employ the use of chemical hair relaxers in a salon setting as opposed to a home setting in order to make adjustments to the frequency of their use. So the answer would be that all of the above.

MR. ELLIS: Well, I just want my question answered. Okay. So move to strike on the grounds of nonresponsive.

Read it back.

MS. O'CONNOR: Object to the colloquy, and then I oppose the motion.

THE WITNESS: And there are patients who --

MR. ELLIS: There is no question, Doctor.

THE WITNESS: That's fine.

(Record read as requested.)

MS. O'CONNOR: Same objection.

THE WITNESS: I'm going to answer that if they didn't bring it to my attention, then I'm unable to say that they successfully used the chemical hair relaxer.

BY MR. ELLIS:

Q. You never saw a patient that presented with a chemical hair relaxer, then saw them again

for another condition with their hair relaxed still and there was no issue raised to you?

A. I cannot say yes to that question with absolute certainty.

Q. And you're still being a neutral scientist, right?

A. Yes.

MS. O'CONNOR: Dennis, just so you know, lunch is here. So whenever you want to break.

MR. ELLIS: Are you ready for lunch, Dr. Brown?

THE WITNESS: Sure.

MR. ELLIS: We'll take -- how long do you guys need?

MS. O'CONNOR: 30 minutes.

MR. ELLIS: That would be great.

THE VIDEOGRAPHER: Off the record at 12:19.

(Lunch recess taken from 12:19 p.m. to 1:00 p.m.)

A F T E R N O O N  S E S S I O N

THE VIDEOGRAPHER: Back on the record at 1:00 p.m.

EXAMINATION (resumed)

BY MR. ELLIS:

Q. Dr. Brown, you realize you're still under oath, correct?

A. Yes.

Q. All right. Do you have any opinions in this case?

A. The opinion I was tasked with answering or the question I was tasked with answering is whether or not there is a biologically plausible mechanism by which the chemicals that are found in hair relaxers and straighteners can enter into the skin to be absorbed by the dermal vasculature to be distributed throughout the body.

Q. And is that the substance of your opinion in this case?

A. Yes.

Q. Is there any other opinions you are prepared to offer at the time of trial in this case, other than the one you just stated?

A. That is the opinion I am prepared to offer.

Q. My question is a little sharper, and it's a really important one in the confines of our case. Otherwise, we have to do a lot more.
A. Okay.
Q. Is there any other opinion that you're prepared to offer at the time of trial, other than the one you just testified to?
A. No.
Q. You have no opinions regarding the causal connection between chemical hair relaxer use and uterine cancer or ovarian cancer, correct?
A. I have not been asked to generate an opinion between the causal connection of the chemicals --
MR. ELLIS: We are going to keep fighting over this one. All right? I need a no, or else I have got to ask you a different way. All right? So maybe there's something wrong with my question, but I need a yes or no, all right, to close this out.
So can you read back my question, please.
(Record read as requested.)
MS. O'CONNOR: I'm going to object to the question as being asked and answered many, many times.

MR. ELLIS: It's not been answered.
MS. O'CONNOR: Are you asking if he has a personal opinion or if he's going to be offering an opinion in this case? Because I can stipulate on the record that he will not be called to testify about the causal connection between chemical hair relaxers and uterine and ovarian cancer. He's not addressed it in his report. He's not done a causal analysis. That is very clear.
MR. ELLIS: So I just don't think it's clear.
BY MR. ELLIS:
Q. For example, turn to page 7 of your report.
A. 70?
Q. Seven. Your report is not that long. You write, "There exists epidemiological evidence to support a significantly increased risk of developing uterine and ovarian cancers with exposure to chemical hair relaxer products."
Is that an opinion you intend to offer in this case?
A. That is a statement I've offered in the context of the report that speaks to why the report was generated.
Q. It's not an opinion you are prepared to

offer in this case, correct?
A. I've only been tasked with offering an opinion about the biological plausibility of the chemicals in the hair relaxer and hair straighteners entering into the dermis, into the vasculature to be distributed.
Q. All right. I'm going to try this one more time. All right? And I am going to give you the admonition here. This might cause you to come back if you don't answer this one yes or no. All right?
MS. O'CONNOR: Object to the colloquy.
MR. ELLIS: I haven't even asked a question yet.
MS. O'CONNOR: I objected to the colloquy.
MR. ELLIS: I got it. Okay.
BY MR. ELLIS:
Q. All right. Dr. Brown, do you intend to offer any opinions at trial regarding the causal connection between the use of chemical hair relaxers and uterine and/or ovarian cancer; yes or no?
A. No.
Q. Do you have any personal opinion regarding the causal connection between the use of

chemical relaxers and uterine or ovarian cancers; yes or no?

MS. O'CONNOR: Objection; form, foundation, relevance.

THE WITNESS: I haven't arrived at a final opinion in answer to that question.

MR. ELLIS: That doesn't answer it.

Read it back.

Move to strike on the grounds it's nonresponsive.

MS. O'CONNOR: Oppose the motion.

(Record read as requested.)

MS. O'CONNOR: Objection; form, foundation, relevance.

THE WITNESS: As I mentioned, I was not tasked with offering an opinion as to the causal connection between the chemicals in the hair relaxer and uterine and ovarian cancer. And as I mentioned, I have not arrived at any opinion.

BY MR. ELLIS:

Q. So the answer is, as you sit here today, you currently do not have any professional or personal opinion you intend to offer at the time of trial regarding the causal connection between uterine and ovarian cancer and chemical hair

relaxer use, correct?

A. Correct.

Q. The statement that appears on page 7 of your report is a background statement, not a statement of opinion by you, true?

A. Correct.

Q. And that statement reads "There exists epidemiological evidence to support a significant increased risk of developing uterine and ovarian cancers with exposure to chemical hair relaxer products," correct?

A. Correct.

Q. And that is not a statement you intend to offer at the time of trial as an opinion, correct?

A. I have not been tasked with offering an opinion about the causal connection between these chemicals and ovarian and uterine cancer.

MR. ELLIS: Move to strike on the grounds it's nonresponsive.

Read it back.

MS. O'CONNOR: Oppose the motion.

(Record read as requested.)

THE WITNESS: I have to say, I'm not understanding how I haven't answered your question.

BY MR. ELLIS:
Q. Say it again?
A. I don't understand how I have not answered your question.
Q. It doesn't matter.
MS. O'CONNOR: Maybe it does. Maybe it does. Do you understand the question?
THE WITNESS: No, I don't. If I can't understand that I've answered it, perhaps I don't understand the question.
BY MR. ELLIS:
Q. The question is, is the statement that appears on 7 that I just read a statement that you intend to offer as an opinion in this case at the time of trial?
A. I thought I've already answered that statement just a few moments ago.
Q. Well, humor me and answer it again, Dr. Brown.
MS. O'CONNOR: Objection; asked and answered.
BY MR. ELLIS:
Q. So I'll read it again. All right? See, "asked and answered" doesn't mean you don't have to answer. It's just a statement to the form. Remember, I told you the rules. If there's some

objections to the form of the question. You still have to answer the question. This is one of those instances. It's not one where you can be instructed not to answer. That only goes to privilege. You're a lawyer. So I'm giving you a little free rules of evidence. All right?

A. Okay.

MS. O'CONNOR: Object to colloquy, the form, the foundation of the question.

Answer if you can.

BY MR. ELLIS:

Q. So the question simply is the statement that you wrote in your report -- "There exists epidemiological evidence to support an increased risk of developing uterine and ovarian cancers with exposure to chemical hair relaxer products" -- is not an opinion you hold that you intend to testify to at the time of trial, correct?

A. This is a background statement. It is not being offered as an opinion.

Q. And you won't offer that statement at the time of trial as an opinion, correct?

A. Correct.

Q. Turn to page 8. Under the heading "Ovarian Cancer," you write, "There is also

epidemiological evidence that supports the association between usage of chemical hair relaxers and ovarian cancer."

You wrote that, right?

A. Yes.

Q. That is similarly a background statement for your report and not an opinion you intend to offer at the time of trial, correct?

A. Yes, that is a background statement upon which is the justification for the controversy at hand.

MR. ELLIS: Move to strike on the grounds as nonresponse.

Please read it back.

(Record read as requested.)

THE WITNESS: Yes, that is a background statement that's presented in the context of my report because it is the basis for the controversy at hand.

BY MR. ELLIS:

Q. That's the way to do it, right there. Leading question, answer it yes or no, and then give the explanation. Got there.

All right. Page 9. You write, "While each of the studies referenced above have

limitations, such as the potential for exposure miscalculation in both the Sister Study and the lack of truly never-exposed group in the BWHS" -- which stands for Black Women Health Study -- "these limitations do obscure a concerning signal that is worthy of further investigation into potential biologically plausible mechanisms that could further elucidate the relationship between chemical hair relaxer products and uterine and ovarian cancer."

That is a statement you wrote, right?

A. Yes.

Q. And you agree that further investigation is needed, correct?

MS. O'CONNOR: Objection.

THE WITNESS: I would agree, further investigation is needed.

BY MR. ELLIS:

Q. Right. So there's no conclusions that we could reach right now because we need further investigation, right?

MS. O'CONNOR: Objection; form and foundation.

THE WITNESS: As I've stated in the background, there is a basis derived from the existing body of academic literature for which

there is a controversy and for which, because there is the controversy, there is a justification for further research.

BY MR. ELLIS:

Q. And you agree that that further investigation is needed, right?

A. Yes.

Q. The jury is still out, so to speak, right?

MS. O'CONNOR: Objection. Objection; mischaracterizes.

THE WITNESS: Yeah, that's not my -- that doesn't represent my agreement with the prior question.

BY MR. ELLIS:

Q. Well, you understand the phrase "the jury is still out"?

A. I don't believe that phrase applies here.

Q. Well, further investigation is needed. We haven't reached any final conclusions. You agree with that?

A. In the application of medical science and research, the conclusion perhaps once derived at -- is generally derived at when there is a

preponderance of research that supports it. But as this report stands today and we sit here, there is a reasonable plausibility for a biological mechanism that supports that these chemicals can actually be transported from their application on the skin surface into the end tissues of the uterine and the ovarian/uterine tissue. That is what I was asked to comment on.

Q. What distinguishes plausibility from proof?

MS. O'CONNOR: Objection to the form and the foundation.

THE WITNESS: The two terms are intertwined, almost as if in a double helix, that one supports the other. So I'm not sure that you can surgically distinguish the two.

BY MR. ELLIS:

Q. Well, in a court of law, possibility isn't proof.

A. I didn't say --

Q. So are you suggesting that in medical context that plausibility does mean proof?

MS. O'CONNOR: Object to the form and foundation of that question.

Where did he say "possible"?

MR. ELLIS: Plausibility is --
MS. O'CONNOR: Oh, well, now --
THE WITNESS: I would disagree that plausibility and possibility are the same thing.
BY MR. ELLIS:
Q. Okay. So did counsel's speaking objection help you answer?
A. No.
Q. Well, if you weren't going to say that before --
A. I was. I just waited.
MS. O'CONNOR: Maybe if you asked better questions.
MR. ELLIS: Well --
MS. O'CONNOR: Maybe if you did.
MR. ELLIS: -- just don't object. Object to form, object to vague and ambiguous, whatever the grounds is. Follow the deposition protocol. Don't give speaking objections.
MS. O'CONNOR: I've heard your depositions, too, Mr. Ellis.
MR. ELLIS: That's fine. And so did judge -- Special Master, and I never do what you do.
MS. O'CONNOR: Okay. Well --
MR. ELLIS: I have never in this case made a

speaking objection. And your side has taken that to the Special Master and suggested that I did, and she told Kelly Dermody that I did not. Okay?

MS. O'CONNOR: Ask questions.

MR. ELLIS: So don't start engaging in ad hominem attacks on me. I'm just telling you what the rules are. If you want to follow them, that is fine.

MS. O'CONNOR: I know the rules. Don't ask questions --

MR. ELLIS: If you don't want to follow the rules, that is fine --

MS. O'CONNOR: -- where you put words in there that he never said and then ask him to agree with something.

MR. ELLIS: It doesn't matter. That's a speaking objection. The objection is "Objection; mischaracterizes testimony." Objection's; vague and ambiguous." "Objection; lacks foundation." It's not "Objection. When did he ever say possible?"

Okay. That is not right.

MS. O'CONNOR: Valerie, all of those, thank you, you can put them on the record.

MR. ELLIS: That's not a proper objection,

Counsel, and you know that.
BY MR. ELLIS:
Q. Now, please explain to me the difference between plausibility and proof.
A. As I mentioned, I think the two are so closely aligned that it's very difficult, in the context of peer-reviewed academic research or scientific question, to tease apart these two terms in a black-and-white fashion.
Q. So plausibility is proof is what you're saying?
MS. O'CONNOR: Objection; form, foundation, mischaracterizes the testimony.
THE WITNESS: I'm not certain I'm able to answer the question.
BY MR. ELLIS:
Q. Why?
A. I'm unable to.
Q. Is there something wrong with the question?
MS. O'CONNOR: Objection; form, foundation, argumentative.
THE WITNESS: As I mentioned, these two terms in the context of a scientific hypothesis, a scientific study, they are incredibly closely

aligned. And it is merely shades of gray, not black and white, as to the difference between one and the other.

BY MR. ELLIS:

Q. Can you please explain to the jury how it is that your opinion there is a mechanism of action that creates the plausibility that chemical hair relaxers are able to be dermally absorbed into the bloodstream differs from proof of that fact?

A. Well, based upon my formal education as a dermatologist, with a dermal absorption -- epidermal absorption being a key aspect of that education and how we apply the use of topical creams, ointments, lotions, gels, sprays to deliver active ingredients to the systemic absorption by applying them to the skin, that three-plus decades in formal education allows me to say that that plausibility in the context of any similar molecule in a somewhat similar instance is possible -- or is provable.

Q. Freudian slip?

A. No.

Q. Because you said "possible."

A. In the context of not being impossible.

Q. You took issue with me when I said

"impossible," right?
A. I indicated that those were not -- it's probably why I put it in there is because I was thinking about what you said.
Q. Freudian slip?
A. No.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Step one in your -- is it "possible" or "plausibility" you would prefer me to use?
A. Plausibility.
Q. All right. Step one in your plausibility analysis is that the relaxer product must contact the skin, scalp, or nearby skin, correct?
A. Where are you referencing right here?
Q. I'm asking you a question.
A. I'm sorry.
Q. The first step in your plausibility analysis is the relaxer product must contact skin, scalp, or nearby skin, correct?
A. I would say the first step in the plausibility consideration of this question is are those chemicals in hair relaxers.
Q. What step is it where the hair relaxer

product must contact skin?

A. The application of the hair relaxer product.

Q. And so the hair relaxer product, to be dermally absorbed, must contact skin, true?

MS. O'CONNOR: Object to the form, foundation.

THE WITNESS: The product, in its application to the hair, in that process, is applied to both the hair and to the scalp. And if it's not applied to the scalp in any one location, the nature of the product being what it is, in the process of manipulating the hair, the product will come in contact with the skin and there will be absorption.

BY MR. ELLIS:

Q. So my statement is correct: For there to be dermal absorption, the hair relaxer product and its ingredients and chemicals must come in contact with skin, true?

MS. O'CONNOR: Object to the form and foundation.

THE WITNESS: I would say the product cannot be absorbed if it remains in the bottle. But once it's applied to the human, the answer is yes, it will be absorbed.

BY MR. ELLIS:
Q. Dr. Brown, we have a jury here. They're not here but they need you to answer the questions. All right? And I'm the guardian of that in this deposition here today.
And so there's just a simple question: For there to be dermal absorption, the hair relaxer product must come in contact with skin; yes or no?
MS. O'CONNOR: Object to the colloquy, the form, the foundation.
THE WITNESS: In asking your question, you seem to be strongly implying that there is some way in which it cannot come into contact with the skin. I cannot imagine any way in which it does not come in contact with the skin.
BY MR. ELLIS:
Q. You've said that several times.
A. Because I firmly believe that to be true.
Q. That's fine. Answer my question. Move to strike on the grounds it's nonresponsive.
A. I cannot comprehend --
Q. There's no question.
MS. O'CONNOR: All right, then.

MR. ELLIS: There's no question because she's going to read it because you didn't answer it.
MS. O'CONNOR: Valerie, did you understand --
MR. ELLIS: Listen closely to the question, Dr. Brown.
MS. O'CONNOR: Did you understand, Valerie, you were supposed to read the question back?
(Record read as requested.)
MS. O'CONNOR: Objection.
THE WITNESS: I cannot understand the nature of this question in the context of imagining the product not coming in contact with the skin.
BY MR. ELLIS:
Q. I think you need to listen to the question. The question asked, for there to be dermal absorption, the hair relaxer product must come in contact with the skin, true?
A. I cannot imagine any way it doesn't come into contact with the skin.
Q. So is that answer yes?
A. Final answer, yes.
Q. The components and ingredients of a hair relaxer product must then penetrate the epidermal barrier. You agree?
A. That's one mechanism by which they can

be absorbed.
Q. Is there another?
A. Yes, through the transappendageal process.
Q. The components must enter the bloodstream and then have systemic circulation, correct?
MS. O'CONNOR: Objection.
THE WITNESS: For what?
BY MR. ELLIS:
Q. For it to be absorbed through dermal absorption and to -- for there to be a plausibility, a mechanism of action for it to get into your bloodstream.
A. Oh, to enter the bloodstream, yes.
Q. Then for the work that you did in this case, those components or ingredients or relevant metabolites must distribute to uterine tissue. You agree with that?
A. Yes, I agree that they distribute to all tissue, including uterine tissue.
Q. Do you agree that they must reach a sufficient concentration in the uterus to produce biological meaningful effects?
A. I don't have an answer for that

question. It wasn't part of the issue that I was tasked to answer.

Q. Do you agree that they must be in a concentration that must -- that are capable of affecting and contributing to a malignant transformation or tumor formation in the uterus?

MS. O'CONNOR: Objection; beyond the scope.

You can answer.

THE WITNESS: The same response to the last question. I am not able to answer that. It wasn't one of the issues I was tasked with answering.

BY MR. ELLIS:

Q. Those steps that we just talked about, if any one of those steps in the chain does not occur, then there's not a pathway to create a malignancy in uterine or ovarian tissue. You agree?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Well, I would disagree. The pathway still exists. How the substance is made available to -- within the pathway for the influence that it exerts, that's the question at hand.

BY MR. ELLIS:

Q. And you don't have an opinion on whether

or not it exerts some condition on the tissue at hand. It's just that there is a pathway. Am I saying that the right way?

A. Yes. I was tasked with answering whether or not there was a biologically feasible pathway for these chemicals and hair relaxers and hair straighteners to enter into the dermal vasculature and be distributed through the dermal body.

Q. But you haven't answered the question about whether or not the distribution could reach uterine or ovarian tissue in a manner that could produce a malignancy, true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I wasn't tasked with answering that question.

BY MR. ELLIS:

Q. So you don't have an opinion in that regard, right?

A. I am not offering an opinion for that specific question.

Q. Are you in any way suggesting that uterine cancer or ovarian cancer could occur from relaxer exposure without systemic distribution of a relevant chemical?

MS. O'CONNOR: Objection; form, foundation beyond the scope.
THE WITNESS: I was not tasked with answering that question.
BY MR. ELLIS:
Q. So you don't have an opinion that exposure to chemical hair relaxers can cause uterine or ovarian cancer with or without systemic distribution, true?
A. I was only tasked with answering the question of whether or not there was a biologically plausible mechanism for these chemicals to enter into the vasculature and be distributed.
Q. Mm-hmm. Turn to page 10 of your report. You, on page 10, have a -- what is that diagram? Is it skin, generally, or is it the scalp?
A. This is a diagram from the Franklin Netter Atlas of Anatomy. That is a cross-sectional representation of the skin and scalp.
Q. Skin is comprised of the epidermis and dermis; is that right?
A. It is a term that is always comprised of the skin and epidermis but generally also includes the adipose tissue immediately beneath the dermis.
Q. Oh. The epidermis is avascular, no

blood vessels, right?

A. The epidermis is without blood vessels, correct.

Q. So if hair relaxer formulations were placed on the epidermis and didn't penetrate the epidermis, they would not, at that point, enter your bloodstream, true?

MS. O'CONNOR: Object to form and foundation.

THE WITNESS: I think that the question assumes that the epidermis is intact, which is not always the case. Any compromise in the epidermis would allow there to be penetration into the vasculature.

BY MR. ELLIS:

Q. Just answer my question and, don't assume what the question implies. It's just a question. All right?

MS. O'CONNOR: Objection to colloquy.

BY MR. ELLIS:

Q. If hair relaxer products is on the epidermis and it doesn't penetrate the epidermis, it would not be delivered to the bloodstream, true?

MS. O'CONNOR: Objection; form, foundation, and asked and answered.

THE WITNESS: That's not true. There are

other routes for absorption, even when the product is on the epidermis, whether it's appendageal, transfollicular.

BY MR. ELLIS:

Q. Mm-hmm. The epidermis doesn't have -- it's a nonvascular structure, right?

A. The epidermis is a nonvascular structure.

Q. And so it would need to penetrate the epidermis to be able to reach the bloodstream; yes or no?

A. These chemicals are caustic, so they are immediately breaking down the epidermis.

Q. You've said that several times, but it doesn't answer my question, Dr. Brown. The question is if it's on the epidermis and it does not penetrate the epidermis, it cannot -- medically, scientifically, based on all your skill, knowledge, and training -- - reach the bloodstream; yes or no?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I entirely disagree with the context of your question, because the nature of the product is caustic. So it's automatically breaking down and compromising the epidermis. There is no

possibility that it does not penetrate the epidermis. That's asking for a magical situation.

MR. ELLIS: Okay. Mark that. We'll take that testimony.

BY MR. ELLIS:

Q. Your testimony is that every time a hair relaxer touches your skin, it automatically enters the bloodstream by penetrating the epidermis in all circumstances, unless magically, it does not? That's your testimony to this jury --

MS. O'CONNOR: Objection; form, foundation, mischaracterizes the witness's testimony.

BY MR. ELLIS:

Q. -- correct?

A. As I stated, that when the hair relaxer active ingredients are placed onto the epidermis, they begin to de-nature the cells that comprise the stratum corneum and the epidermis due to the alkalinity, the caustic nature of the chemical, and it penetrates.

Q. Every time, unless magic prevents it. That's your testimony, right?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes the witness's testimony.

THE WITNESS: I cannot imagine a circumstance

in which the active ingredients of these hair relaxers and straighteners, these harshly alkaline chemicals that are caustic, cannot penetrate the epidermis.

BY MR. ELLIS:

Q. I'll take that testimony.

Hair is also not a vascular structure, right?

A. You would need to expand upon the use of the word "hair."

Q. So the hair on your head -- you don't bleed to death when you go to the barber to get a haircut, right?

A. The terminal shafts of hairs do not contain vascular structures.

Q. So if hair relaxer formulations are placed on hair and only hair, they will not reach your bloodstream, correct?

A. That's not entirely correct. The hair extends below the level of the epidermis.

Q. If it's on hair, and only hair on the top of your head, and does not go below the epidermis and hair shaft, it will not reach your bloodstream, correct?

A. If there is some mechanism by which the

hair can all be suspended from the surface of the scalp so that no hair ever touches the scalp except for the exact site from which it's emerged, and something is applied to it, then your theoretical situation could be argued.

Q. Not argued. That would be scientific fact that it wouldn't reach your bloodstream because there's no veins in your hair?

A. Well, you'd have to conduct that experiment for it to be scientific fact.

Q. Did you conduct that experiment?

A. I did not.

Q. Did you conduct the experiment that says that if it touches hair, that it goes below the epidermis and enters your bloodstream? Did you conduct that scientific experiment?

MS. O'CONNOR: Objection; argumentative.

You can answer.

THE WITNESS: There is no need for a scientific experiment with respect to placing an abundance of a cream onto the hair itself and then have the hair folded over onto the scalp. As I mentioned, if you can suspend every single terminal hair shaft so that it never touches the scalp, and then layer it with an abundance of cream -- that is

what you've proposed. That is the situation that you have outlined.
BY MR. ELLIS:
Q. No, I'm asking questions. I'm not outlining anything. So you have to remember that. Also remember to stay in your lane about experiments. Okay? Because you didn't do any experiments, right?
MS. O'CONNOR: Objection; form, foundation, argumentative.
BY MR. ELLIS:
Q. You didn't do any experiments to test any of your hypothesis, right?
MS. O'CONNOR: Same objection.
THE WITNESS: I did no benchtop experiments.
BY MR. ELLIS:
Q. Zero, right?
MS. O'CONNOR: Same objection.
THE WITNESS: On this subject, zero.
BY MR. ELLIS:
Q. If hair relaxer cream never reaches a vascular structure with blood supply, it cannot enter your bloodstream, true or false?
MS. O'CONNOR: Objection to form.
THE WITNESS: Could you repeat the question.

MR. ELLIS: Sure.
Read it back.
(Record read as requested.)
MS. O'CONNOR: Same objection.
THE WITNESS: It's possible it could enter through the lymphatic supply, it could be aerosolized.
BY MR. ELLIS:
Q. Did you do any tests to determine if that was true?
A. I wasn't tasked with performing that test.
Q. On page 10, you mentioned that the scalp includes sebaceous oil glands; is that true?
A. The skin comprised from the scalp does contain sebaceous oil glands, yes.
Q. And on page 13 at the top, you state, "However, the application of strong chemicals to the hair can dislodge the sebum from this reservoir and result in the chemicals occupying the reservoir space."
You wrote that?
A. Yes.
Q. Why do you believe this?
A. It's the same mechanism by which the

strong alkalinity of the hair relaxer active ingredient actually removes the sebum from the shaft of the hair. That allows the relaxer to enter into the hair to reach the cortex to break the disulfide bonds. So the strong alkalinity balances the relatively weaker acidic pH of the sebum, causing it to be removed and displaced.

Q. On page 13, I don't see a cite to any opinion or study. What are you basing that statement on?

A. There is a cite just prior to that regarding the presence of the sebaceous glands.

Q. On page 13. But I don't see any cite for the notion that the application of strong chemicals to the hair can dislodge the sebum from its reservoir. What are you relying on for that statement?

A. Well, as I mentioned, that in the articles that actually talk about the sebaceous glands, those are the reference -- or the basis for which I have made this statement, in addition to my collective experience as a dermatologist for 30 years and background and scientific understanding of the pathophysiology of the skin and hair follicles.

Q. So which part of that is why you're making the statement that the application of strong chemicals to the hair can dislodge the sebum from its reservoir?
A. All of it.
Q. And walk me through that. What study, which part of your training, which part of your education suggests that hair relaxer cream can displace the sebum from its reservoir?
MS. O'CONNOR: Object to the form, foundation.
THE WITNESS: Well, the references that are quoted here under the sebaceous gland, and the totality of my training as a dermatologist in the pathophysiology of the science and functioning of the hair shaft, the sebaceous gland, and the scalp skin.
BY MR. ELLIS:
Q. Okay. Sebaceous glands excrete oil, correct?
A. They excrete sebum, yes.
Q. And sebum is a form of oil; do you agree or don't agree? Am I saying it wrong or something?
A. I agree.
Q. And it's going outward, right?
A. Correct.

Q. And so there is a mechanism of action from the sebaceous gland that is secreting oil out of your skin into the hair shaft and reservoir, agree?
A. Not into the hair shaft, no.
Q. Not in the hair shaft, true. But into the follicle reservoir, agreed?
A. Yes.
Q. All right. And that natural secretion of oil into the hair follicle reservoir is a preventive layer for dermal absorption, agree?
MS. O'CONNOR: Objection.
THE WITNESS: Not in the context of the use of the hair relaxer chemical.
BY MR. ELLIS:
Q. I didn't tie it to hair relaxers yet.
In the normal context, the secretion of sebum from a sebaceous gland into the hair follicle reservoir is a preventive layer for dermal absorption, true or false?
MS. O'CONNOR: Objection.
THE WITNESS: I disagree with that.
BY MR. ELLIS:
Q. How so?
A. There are the -- just because this oil

exists doesn't mean it's a true barrier to absorption.

Q. Well, there's two parts that make it a barrier to absorption: One, that it exists; but then also that it is excreting outward and not pulling inward. Agree or disagree?

MS. O'CONNOR: Objection.

THE WITNESS: I disagree.

BY MR. ELLIS:

Q. Why?

A. The moving of the sebum outward doesn't prevent absorption.

Q. Turn to page 16. At the end of the first paragraph on page 16, you write, "In other words, the chemicals pool and remain in the reservoirs."

When you're talking about those reservoirs, you're talking about the hair follicle reservoirs, right?

A. Yes.

Q. And you're talking about the hair follicle reservoirs that have sebum in them, correct?

A. Prior to the application of the hair relaxer chemical, yes.

Q. What, in your opinion, is causing the sebum to be displaced through the application of hair relaxers?
A. It is the highly caustic, alkalinic nature of the hair relaxer chemical.
Q. And what pH level is required to do that?
A. Well, when the pH goes above 11, 12 in the alkalinity scale, stronger than bleach, the mildly acidic, the sebum is removed.
Q. And what's the pH level of bleach, hair bleach?
A. I wasn't tasked with evaluating hair bleach, so I'm not able to answer that specific question.
Q. You're not aware that the pH level of bleaching for hair or highlighting or dyes often reaches 11?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I wasn't tasked with evaluating those products. So I'm not prepared to comment on the pH of these chemicals today.
BY MR. ELLIS:
Q. If that is correct that the pH level of other hair treatments such as bleaching,

highlighting, dyeing hair reaches an alkalinity of 11 pH, would that in any way change your opinion about the displacement of sebum from the follicle reservoir through the use of chemical hair relaxers?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: It wouldn't.

BY MR. ELLIS:

Q. Why?

A. I'm basing my opinion on the pH of the actual chemical hair relaxers themselves.

Q. And so have you seen that sebum displaced by other hair applications that you're familiar with?

A. I don't understand what you're asking me.

Q. You're saying that the reason why the sebum or oil in the reservoir for the hair follicle is displaced is because of the high alkalinity or pH of chemical hair relaxers, correct?

A. That is correct.

Q. Are there any other hair treatments that have that same high alkalinity that would also displace the sebum or oil?

A. I am not aware, sitting here today, that there are other treatments that reach the pH level of 13 and 14.

Q. Well, you said 11 at first. Now you're changing it to 13 and 14?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I believe I said above 11.

BY MR. ELLIS:

Q. Mm-hmm.

A. Mm-hmm.

Q. I think you said 11 and above, but the record will be the record.

Are you aware of any other treatments such as perms, ammonium thioglycolate, dyes, bleaches, highlights, are you aware of their pH levels?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I was tasked with evaluating hair relaxer chemicals, and that's the pH I focused on in my report.

BY MR. ELLIS:

Q. Mm-hmm. Did you do anything to test your hypothesis or your opinions by looking to see whether or not other hair treatments could result in the same displacement of sebum as you are

opining occurs during the chemical relaxing process?

MS. O'CONNOR: Objection; form, foundation, relevance.

THE WITNESS: I was tasked with evaluating the likelihood of a biologically plausible mechanism for hair relaxers and hair straighteners. That was the focus of my investigative work.

BY MR. ELLIS:

Q. Did you find any authorities, studies, papers, notes between dermatologists on a cocktail napkin that supported your conclusion that the high alkalinity of chemical hair relaxers displaces the sebum in the follicle reservoir?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: It's a very lengthy question. Could I have it read back, please.

(Record read as requested.)

MS. O'CONNOR: Same objection.

THE WITNESS: This is a principle that is widely acknowledged in the context of dermatologic care of the scalp, that the sebum is a -- it is a somewhat delicate and somewhat labile product that in situations of skin disease, follicular disease, can be displaced relatively easily.

BY MR. ELLIS:
Q. Did you, after you issued your opinion, read any of the dermatological opinions offered by the defendants?
A. I'm sorry. You'd have to be more specific, "the defendants."
Q. Did you read any of -- read the opinion offered by Dr. Burgess?
A. Yes.
Q. Did you read the opinion offered by Dr. Kasting?
A. Yes.
Q. You understand that they disagree with your opinion regarding the displacement of the sebum in the follicle reservoir?
A. I understand that's their opinion.
Q. So you just said that it's commonly accepted that there is a displacement of the sebum due to the high alkalinity of chemical hair relaxers. And I asked you if there's any paper or anything to support your opinion in that regard, but you didn't offer me any paper or study that you relied upon.
A. I believe if we look further into my report there's mention of the follicular reservoir

and some references that relate to that.
Q. Yes. I looked at some of those. Patzelt and Lademann from 2013 on page 16, is that what you're referring to?
A. And Ogiso. And Lademann is one.
Q. And Otberg and Awad, those are the ones you cite on page 16, right?
A. They are cited here on page 16, yes.
Q. None of these studies had anything to do with relaxers, right?
A. I would have to look at each and every study to make absolutely certain that was correct, but I would say, in large part, that is my recollection.
Q. You just looked at the studies to prepare for your deposition.
A. Yes. I said I'm familiar with the studies, and that is consistent with the answer that I offered you.
Q. Mm-hmm. None of the studies that you cite on page 16 about this that reservoir effect had anything do with relaxers, right?
MS. O'CONNOR: Objection; form.
THE WITNESS: As I mentioned, I would have to look closely at every study to make sure that "hair

relaxer" is not mentioned in the context of every study, but it is my recollection that holds true.

BY MR. ELLIS:

Q. For example, Awad dealt with absorption relating to general absorptions of the sebaceous gland without reference to relaxers or pH levels of those constituents. Do you remember that?

A. I certainly remember that that particular reference deals with absorption through sebaceous glands, but I cannot say for absolute certain that it doesn't reference a chemical that's found in a hair relaxer.

Q. Otberg was a caffeine follicular penetration study. You remember that, right?

A. I do recall that it focused on caffeine.

Q. And Patzelt and Lademann didn't study relaxers. Do you remember that?

A. These articles actually looked at a variety of different chemicals. My overall recollection is they did not specifically address hair relaxers. But, again, I would need to look at every article to make absolutely certain.

Q. There is a paper that did deal with hair relaxer dermal absorption, right?

A. If you have a reference that you wish to

bring forward, I could certainly comment.
Q. Well, it's not a paper you relied upon or looked at, though, correct?
MS. O'CONNOR: Objection.
THE WITNESS: I don't know what the paper is you're referencing, so I'm unable to answer.
BY MR. ELLIS:
Q. Pierce 2024, which is a year or so before you issued your opinion in this case, right?
A. 2024 is the year before my opinion, yes.
MR. ELLIS: So we'll mark as Exhibit 4 Pierce, which I think is Tab 18.
THE CONCIERGE: 16, but thank you.
(Brown Deposition Exhibit 4 was marked for identification.)
BY MR. ELLIS:
Q. The first thing we'll do is we'll take a look at page 32 of your report. If I understand the drafting of your materials that you put together yourself, it goes in alphabetical order, and Pierce does not appear on page 32 or page 33; is that correct?
A. I would agree.
Q. And so Pierce is not a study that you considered when you offered your opinion in this

case; is that right?
MS. O'CONNOR: Objection.
THE WITNESS: If I may look here at my supplemental sources. I see the article listed here on the supplemental sources.
BY MR. ELLIS:
Q. So the supplemental sources was prepared by you, too?
A. The supplemental sources represented materials that were considered but may not have made it into a direct quote in the context of the body of my report.
Q. So you're familiar with Pierce, then, right?
A. I have seen the article before, yes.
Q. Okay. And you understand that Pierce discusses dermal absorption of chemical hair relaxer products, right?
A. Let me refresh my memory. So the Pierce article is an article that utilizes a modeling equation in the context that you have just described.
Q. And it discusses the absorption through the dermal layer of chemical hair relaxers, right?
A. It discusses the use of this modeling

equation for the absorption of chemicals through the skin.
Q. Chemical hair relaxers?
A. Chemical hair relaxers, yes.
Q. So you relied on papers that didn't deal with chemical relaxers, right?
A. I relied on papers that looked at the modeling of -- or looked at, investigated, dermal absorption, some of which looked at in vivo as well as in vitro absorption, correct.
Q. There's not any paper that you looked at that dealt with dermal absorption of chemical hair relaxers that's cited in your report, correct?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I don't believe that's true. There's articles in my report that looked at the urinary metabolites of these chemicals.
BY MR. ELLIS:
Q. But they don't address dermal absorption. They talk about post-use testing and opine as to whether or not there are markers or biomarkers in urine, but they didn't address the question you were charged with with respect to chemical relaxers, right?

MS. O'CONNOR: Object to the form, foundation.
THE WITNESS: I'm not sure that's entirely true. If you apply a product or chemical to the skin and then measure its urinary excretion, how do you think it gets into the urine if it's not transposed -- or transported across the skin?
BY MR. ELLIS:
Q. Well, if I was doing like you're doing, when I kept asking you a million times if it has to touch the skin, I can answer the same way as you: Inhalation, some other transarterial entrance of the skin. So you're doing a good impression of me, I'm doing a good impression of you.
My question is, sir, Dr. Brown, why is it that you cited to studies and reports that had nothing to do with chemical relaxers but Pierce didn't make it into your report?
MS. O'CONNOR: Objection; form, foundation, argumentative. Object to the colloquy and lead-up to the question.
THE WITNESS: As I attempted to answer and did mention, this article by Pierce focuses on a model, an equation to try to approximate what's happening in real time, in a real-time situation in vivo. And the model, this article doesn't provide any

real justification that this model actually does represent what's happening in vivo.

BY MR. ELLIS:

Q. Well, I think it does.

A. Well, I dispute that as an individual that reads these papers all the time and actually works with the skin and absorption -- transepidermal absorption every day. I find nothing in this article that's compelling that leads me to believe that this represents what actually happens when chemicals are placed on the skin. It's --

Q. So when you -- were you finished?

A. I could be.

Q. All right. So you didn't perform any tests on chemical relaxers to know their rate of absorption to the dermal layer, true?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Yes, I did not perform that test.

BY MR. ELLIS:

Q. You didn't cite to any studies that measured the exposure to the bloodstream of chemical hair relaxers once they're dermally

absorbed, correct?
MS. O'CONNOR: Objection; form, foundation, misstates the evidence.
THE WITNESS: I believe I've answered to the contrary, that the study I referenced for urinary excretion actually answers that question.
BY MR. ELLIS:
Q. It doesn't answer the issue of exposure and quantity, though, does it?
A. That wasn't part of the question that you just asked.
Q. That was the question I just asked. I just asked exposure. So follow my question, Dr. Brown.
MS. O'CONNOR: Don't talk down to the witness.
MR. ELLIS: I don't think I'm doing that. If I'm --
MS. O'CONNOR: You know what? Let's finish this up. We are going to take a break. You need to cool down.
MR. ELLIS: I'm totally cool.
MS. O'CONNOR: And the way that you talk to this witness --
MR. ELLIS: I'm totally cool.
MS. O'CONNOR: -- it's disrespectful. And

you're not cool. You're not cool.

MR. ELLIS: I don't think -- well, everybody thinks I'm cool. Look at me. Come on. There's nobody on this case or anywhere that doesn't think I'm at least cool.

MS. O'CONNOR: My God. I'm trying to understand this situation.

MR. ELLIS: Now, I am not intending to talk down to you, but I am intending to get answers to my questions for my clients.

MS. O'CONNOR: And you keep changing your question.

MR. ELLIS: Of course I do, because if I asked the same question, I'd hear a bunch of speaking objections from you about asked and answered.

MS. O'CONNOR: You just don't like the answers.

MR. ELLIS: I love all these answers, I just like the truth. So I love them. And as long as he's telling the truth, that is fine with me. I have no problem with any answer he is giving. Okay?

I don't think I'm talking down to you. I don't think you're talking down to me.

I think you're effectively defending

this witness, and I'm doing the best I can, which might not be perfect, but I'm trying.

BY MR. ELLIS:

Q. Okay? Is that fair enough?

A. Fair.

Q. Okay. You didn't perform any tests, there's no studies you relied upon that talk about the level of exposure of the chemicals in hair relaxers in the bloodstream once dermal absorption has happened, right?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

THE WITNESS: Measuring the bloodstream levels of these chemicals following exposure, I do not recall specific publication on that subject.

BY MR. ELLIS:

Q. Right. That was my question.

Schildroth that you relied upon, that tested and looked at it in uterine, it didn't measure the exposure levels in milligrams or the amounts in the blood.

Do you agree with that?

MS. O'CONNOR: Form, foundation, relevance.

THE WITNESS: I would have to look very specifically at Schildroth, but that is consistent

with my recollection.
BY MR. ELLIS:
Q. All right. Now, Pierce does do a calculation that relates to the level of chemical hair relaxer ingredients that would enter the bloodstream through dermal absorption, but you didn't cite it in your report, correct?
MS. O'CONNOR: Objection; form, foundation, mischaracterizes the evidence and the report.
THE WITNESS: Yes, I found the report to be noncompelling in the context of the question that I was asked to answer, and referenced the report only in the context of having seen it, considered it in my supplemental materials.
BY MR. ELLIS:
Q. And when you did that and decided not to consider Pierce, but considered these other reports that neither related to chemical hair relaxers nor measured the content or exposure or quantity of any chemical in chemical hair relaxers in the bloodstream, you were still being a neutral scientist, right?
MS. O'CONNOR: Objection; form, foundation, argumentative, and misstates the evidence.
THE WITNESS: Yes. Pierce actually did not

conduct any of those experiments. Pierce used a mathematical or computer equation that you can enter these parameters through basically an Excel spreadsheet equation to arrive at a numerical equation that it attempts to explain has relevance. But without elucidating the actual equation itself and how this was constructed, it provides no direct basis upon which to lead me to believe it's credible for modeling dermal absorption.

BY MR. ELLIS:

Q. Mm-hmm. In your studies, did you ever learn about or come into knowledge regarding fixed law?

A. I'm very familiar with fixed law.

Q. And can you explain for the jury what fixed law is.

A. Fixed law is an attempt -- I am reaching back to my undergraduate education in chemical engineering -- to model diffusion. It relies on diffusion coefficients. And if my memory serves me correctly, it relies on the substances that are diffusing and through which diffusion occurs to be modeled based upon Newtonian physics. And for a variety -- many, many, many types of chemicals, there will be coefficients of resistance or

promotion to understand how molecules are moving past each other at an atomic level so that diffusion occurs.

Q. And with respect to what the Pierce study did, was it performing a form of fixed law in determining the diffusion of chemical hair relaxers and their ingredients when they permeate the dermal layer and enter the bloodstream?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I think that's a very broad reach to explain what this article attempts to do with this mathematical equation. It relies on aerosolized coefficients, amongst many other assumptions, but the equation itself is a real black box: You feed in some parameters, and something comes out. We do not know -- I do not know, and I definitely cannot justify that this accurately represents what happens in real-life skin, in real-life instances.

And one limitation for this study is that it fails to take into consideration the caustic and degratory effects of the highly alkaline chemical when it's applied to the skin and how that will alter the diffusion properties of any agent. This assumes very fixed properties based

upon individual variables that are assigned to a chemical that I'm not even certain in what form, what fashion those designations were made.

BY MR. ELLIS:

Q. Fixed law is a generally accepted scientific method of determining diffusion and permeation?

MS. O'CONNOR: Objection.

THE WITNESS: In certain instances, and the properties of the agents have to themselves exist within the parameters for which fixed law applies. If these are Newtonian -- if Newtonian physics -- the limitations of Newtonian physics apply, as these substances are interacting with each other at a molecular level to move beyond one another to equilibrate.

BY MR. ELLIS:

Q. And fixed law is not relying on laboratory tests to measure it, it is an equation or a formulaic approach that looks at how those molecules are interacting; agree?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: No, I don't agree. It is relying upon independent studies that have determined variables that characterize the vast

array of chemicals or molecules, and then those variables are plugged into fixed law, and the fixed law has a great deal to do with the rate of diffusion which changes continually.

BY MR. ELLIS:

Q. And that's what Pierce was doing, too, was using the specific chemicals and using a mathematical model to measure, based on a conservative view of the exposure, amount, duration of those chemicals found in chemical hair relaxers, and what their concentration would be if dermal absorption happened and they reached systemic circulation, true?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

THE WITNESS: Some of what you have stated is true. They have made a few assumptions that are very conservative, granted. However, the black box of this equation, its accuracy, its applicability, how it's designed, is unknown and unavailable to me. I cannot apply this to a real-life situation.

BY MR. ELLIS:

Q. And you didn't yourself try to recreate through laboratory or other experiment, the real-life situation that you describe in your paper

that exists, that, according to you, results in chemical hair relaxers displacing the sebum in their follicle reservoir, and then being dermally absorbed and reaching systemic circulation, true?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

You can answer.

THE WITNESS: This did not -- this assumed that there was a stagnant nature to the barrier through which diffusion is occurring. It did not model the time-derived breakdown of the stratum corneum and the dissolution of corneocytes. It did not take into any consideration the nature of the follicle or the follicular reserved transappendageal absorption.

So even when I looked at what was available on this particular model online, it allows me to -- would allow me to put in a few parameters but then it was going to just chugalugga, chugalugga, and give me some number.

It didn't explain --

MR. ELLIS: I was focused on what you did.

THE WITNESS: Oh, I'm sorry.

MR. ELLIS: Move to strike.

And read back the question, please.

MS. O'CONNOR: Oppose the motion.

(Record read as requested.)

MS. O'CONNOR: Objection.

THE WITNESS: I did not conduct bench level research to recreate the in vivo situation that I described, no.

MR. ELLIS: Want to take a break now?

MS. O'CONNOR: Yeah.

THE VIDEOGRAPHER: Off the record at 2:14.

(Short recess.)

THE VIDEOGRAPHER: Back on the record at 2:35.

BY MR. ELLIS:

Q. Dr. Brown, you realize you're still under oath, correct?

A. Yes.

Q. Continuing on with our discussion about Pierce 2024, can you turn to page 4 of Pierce. That's Exhibit 4.

A. Yes.

Q. And there's a section called "Collection of Hair Relaxer Products" and about an inch into that paragraph it says, "Each hair relaxer kit evaluated by Helm, et al. 2018 contained a relaxer cream, activator, shampoo, and conditioner."

Helm was a study you reviewed as part

of your work here, right?
A. Yes.
Q. In some ways you relied upon Helm to reach your background conclusion that these hair relaxer chemicals contained endocrine-disrupting chemicals. Is that fair?
MS. O'CONNOR: I'll object to the form.
You can answer.
THE WITNESS: I don't necessarily think that's my conclusion. That was their conclusion, Helm.
My conclusion is that there's a plausible biomechanical mechanism for these chemicals traveling from the surface of the scalp to the ovary and -- uterus. Sorry.
BY MR. ELLIS:
Q. On page 6 of Pierce there's a part that refers to a discussion and it says, "This is the first published study to assess dermal absorption and the resultant internal dose of phthalates, parabens, and phthalate substitutes from the use of hair relaxers."
Do you agree with that statement or disagree with that statement?
MS. O'CONNOR: Objection.
You can answer.

THE WITNESS: Okay. I agree with that statement.
BY MR. ELLIS:
Q. This was the first study that looked at that internal dose issue, correct?
MS. O'CONNOR: Objection.
THE WITNESS: I'll concede, yes.
BY MR. ELLIS:
Q. Now, it says, "Comparison of absorbed doses to relevant benchmarks." It says, "In almost all circumstances the upperbound absorbed dose," it says, "for each chemical per application were below the estimated internal daily doses associated with each health-based guidance value, indicating that even if hair relaxers were applied daily, which is unlikely, these guidance values would not be exceeded."
Do you see that statement?
A. I see the statement.
Q. Did I read that correctly?
A. You read it correctly.
Q. Do you disagree or agree with that statement?
A. I do not disagree that that is an assumption that's made for a single parameter in

this article.
Q. Do you have any basis to disagree with the conclusion that's reached there that the absorbed doses of chemicals in hair relaxers would not surpass guidance levels in benchmarks?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: So I cannot disagree or agree with that statement without further understanding each of these agencies and their -- their guidance values.
BY MR. ELLIS:
Q. So you have no basis to disagree with the conclusion that's reached in Pierce that the absorbed doses for chemicals and hair relaxers would not surpass guidance levels and benchmarks, correct?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I do not disagree that that is what Pierce concluded.
BY MR. ELLIS:
Q. Mm-hmm. Do you have any basis to -- to disagree with that conclusion by Pierce?
A. Yes.
Q. What is that?

A. That basis, which I will attempt to expand upon, which I have mentioned earlier, is that the entire basis of this article is a black box proprietary formula utilizing these assumptions for individual variables as well as some variable-related markers, datasets, from outside sources to model the absorption across a stagnant, unchanged epidermis that is not representative of a real-life situation when hair relaxer chemical is applied to real skin surface and it undergoes a degradative process.

Q. You've done no work and have no basis to know what the internal dose level is of any chemical in hair relaxers for an individual who has been treated with chemical hair relaxers, true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Yes, very similar to this article, this is a mathematical modeling of it. This was not a real-life measurement of dosing.

BY MR. ELLIS:

Q. My question is a little bit different. You don't have any alternative numbers for the internal dose that will result from the use of chemical hair relaxers, true?

MS. O'CONNOR: Objection.

You can answer.
THE WITNESS: That is correct.
BY MR. ELLIS:
Q. You have done nothing to determine what the internal dose level is for any chemical that's found in chemical hair relaxers after it's been used, correct?
MS. O'CONNOR: Objection; form, foundation, argumentative.
THE WITNESS: That is correct in the context that was not the question I was asked to answer.
BY MR. ELLIS:
Q. And so you have no opinion and no knowledge regarding what the internal dose level is for a chemical found in chemical hair relaxers after it's been used by a woman, true?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I'd have to ask you to expand or clarify the question when you're saying "internal dose." Where?
BY MR. ELLIS:
Q. Internal dose in their body.
A. Where in their body?
Q. Anywhere.
A. Okay.

MS. O'CONNOR: Objection to the whole line of questioning.
THE WITNESS: I'm a bit confused by the question since this is another study that looks at urinary excretion.
BY MR. ELLIS:
Q. But it doesn't measure the dose level, correct?
A. Technically this article doesn't measure dose level. This assumes dosing level based upon parameters. There's no measurement of dose here.
Q. Just want my questions answered.
A. Okay. There's no measurement in either.
Q. There's no measurement in the study that you're referring to about the measured uterine benchmarks, right?
MS. O'CONNOR: Objection.
THE WITNESS: It is measured in the urinary excretion but not in the amount that's applied cutaneously.
BY MR. ELLIS:
Q. Correct. And it's also not equated to any health marker, biomarkers, or benchmarks in relationship to what the internal dose is, right?
MS. O'CONNOR: Objection; form, foundation,

misstates the evidence.
THE WITNESS: That would be true for that article, yes.
BY MR. ELLIS:
Q. And there's no article, other than Pierce, that measures the internal dose of chemical hair relaxers and their ingredients after dermal absorption, true?
MS. O'CONNOR: Objection; form, foundation, misstates the evidence.
THE WITNESS: I disagree, because I think you're not characterizing this article correctly. This measures nothing.
These are assumptions that are generated based upon parameters that are explained. There's no measurement taken in the construction of this article.
It uses variables, assigned values, some reference values for other variables, and a black box equation that you put it in, it chugs out a number. Nothing was measured.
BY MR. ELLIS:
Q. I'm just using the words they're using in Pierce, but I'll try better.
There is no study published that

assesses dermal absorption and resultant internal dose of phthalates, parabens, and phthalate substitutes from the use of hair relaxers other than Pierce, correct?

MS. O'CONNOR: Objection; form, foundation, same as before.

THE WITNESS: I would say that there's no study. I don't think Pierce actually performs that either.

BY MR. ELLIS:

Q. You certainly didn't rely in your work on any study that measured and assessed dermal absorption and resulting internal dose of phthalates, parabens, and phthalate substitutes from the use of hair relaxers, correct?

MS. O'CONNOR: Objection.

THE WITNESS: Can you restate the question, please?

BY MR. ELLIS:

Q. Sure.

You did not rely on any study that assessed dermal absorption and resulting internal dose of phthalates, parabens, and phthalate substitutes from the use of hair relaxers in issuing your report, correct?

A. See, I would disagree with that statement. The presence of those products as urinary metabolites, when they're applied cutaneously -- when they're known to be applied cutaneously, it's an assessment of that absorption.
Q. But it doesn't measure the internal dose, right?
A. Okay. I concede that.
Q. Okay. Let me ask my question again.
You did not rely on any study that assessed dermal absorption and the resulting internal dose of phthalates, parabens, and phthalate substitutes from the use of hair relaxers in issuing your report, correct?
MS. O'CONNOR: Objection; same as before.
THE WITNESS: Are you defining the urine as an external measurement?
MR. ELLIS: (No verbal response.)
THE WITNESS: Okay.
MS. O'CONNOR: Well, objection. I don't think there was a clarification. He asked you a question, and you just nodded your head. The record won't reflect that.
THE WITNESS: So --
MS. O'CONNOR: Do you have a question --

THE WITNESS: -- I find this question to be very confusing, because once it's internal, how are you classifying that as the dose? Once it's absorbed, we no longer consider that the dose. The dose is what is applied or taken in pill form, or applied topically. Once it's in the circulation, which I think is your question, that would not be termed "the dose."

MR. ELLIS: Read the question back.

(Record read as requested.)

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: So as I've helped myself to understand the question, my answer is no.

BY MR. ELLIS:

Q. You don't know whether or not the internal dose of any chemical found in hair relaxers exceeds the guidance values or benchmarks for a healthy dose, correct?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I'm unaware of what the organization or entity that would have defined such a dose or such an exposure safety level would be. So my answer is no.

BY MR. ELLIS:
Q. You've not found any paperwork or done any work on your own that would lead you to conclude that the internal dose of chemicals found in hair relaxers is at an unsafe level after dermal absorption, correct?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Can you read that back to me, please?
(Record read as requested.)
MS. O'CONNOR: Same objection.
THE WITNESS: I certainly have not done any investigation on my own with respect to that question. It was not a task I was assigned. And I do -- I am not aware of any study that looks at internal dosing, correct.
BY MR. ELLIS:
Q. On page 12 of Pierce, it refers to this IH SkinPerm, and it has a trademark.
Do you know if that's something the authors created? Or is that another creation of the industry?
A. My recollection based upon my review of this article and looking at IH SkinPerm online is that is a trademarked work product of an

industry -- an agency within the industry.
Q. Pierce actually says, "The IH SkinPerm Model estimates the absorbed dose within the observation period, as well as the mass of chemicals remaining in the stratum corneum," and it cites Tobaldi, et al., 2014.
You reviewed Tobaldi?
A. I did not review Tobaldi.
Q. Can you read the conclusion of Pierce on page 14 for the jury, out loud?
A. Certainly. "Conclusion: Using a well-accepted dermal modeling tool and conservative input parameters, potentially absorbed doses of phthalates and parabens as a result of consumer hair relaxer use were modeled. Modeled absorbed doses for each chemical were below estimated internal daily doses associated with most relevant health-based guidance values, indicating consumer exposure from product use is not expected to pose a health risk. This research fills an important gap in the peer-reviewed literature and can play an important role in future assessments of health risks associated with consumer use of hair products."
Q. As a neutral scientist for your work on

this case, you did not include that conclusion in your report, correct?

A. That is correct.

Q. And do you have any basis to disagree with that conclusion by Pierce?

A. Yes.

Q. And what is it?

A. The basis is encompassed by the totality of my comments on this article, in that this article, which attempts to model dermal absorption with a stagnant, unchanging stratum corneum in the epidermis, which is not representative of real-life application of caustic hair relaxer chemicals which degrade the stratum corneum and the epidermis, resulting in greater absorption over time -- and the nature of this proprietary equation is unknown, unable to be validated by me, and I do not see the direct implication or application to chemical hair relaxers in real life.

Q. But as you sit here today, you have no information that would allow you to estimate an internal daily dose level associated with chemical hair relaxers that is greater than the most relevant health-based guidance values, correct?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I have no information that accurately represents, either within this article or outside of this article, any ability to model or estimate the percutaneous absorption into the dermis of the chemicals that are contained in hair relaxers and hair straighteners.

BY MR. ELLIS:

Q. And as a result, you cannot say or testify that after dermal absorption, as you opined it occurs, into the bloodstream and systemic circulation, that there is an internal dose that is greater than relevant health-based guidance values, correct?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes the evidence.

THE WITNESS: Well, this article, taken in the best light, represents that there is absorption going on of these chemicals. But this article presents it in the context of an unchanging barrier for the stratum corneum and the epidermis, which is not applicable to real life.

MR. ELLIS: Move to strike on the grounds it's nonresponsive.

Read it back.

MS. O'CONNOR: Oppose the motion.

(Record read as requested.)
MS. O'CONNOR: Same objection.
THE WITNESS: Because I have not been presented with the data that represents relevant health-based guidance recommendations, nor has anyone conducted a sampling of vascular concentrations of these chemicals, my answer is yes.
BY MR. ELLIS:
Q. You cannot say that the internal dose from using chemical relaxers is at an unhealthy level, correct?
MS. O'CONNOR: Objection; form, foundation, beyond the scope.
THE WITNESS: I cannot say that there is any healthy level for these chemical hair relaxers, and I am unaware of any scientific publication that has established a level below which they would be considered healthy.
MR. ELLIS: Move to strike on the grounds it's nonresponsive.
MS. O'CONNOR: Oppose the motion.
THE COURT REPORTER: Do you want me to read it back?
MR. ELLIS: Yes, please.

(Record read as requested.)

MS. O'CONNOR: Same objection.

THE WITNESS: I think my response is exactly the same. I said that I cannot say there is any healthy level, and not having been provided with any substantive quantification by whatever this agency is, what the unhealthy and healthy levels are, that there are any levels that fail to meet them.

BY MR. ELLIS:

Q. You have not done any work to assess whether or not, after dermal absorption of chemicals contained in chemical hair relaxers, they exceed the most relevant health-based guidance values, correct?

MS. O'CONNOR: Objection. Same grounds as before.

THE WITNESS: That I have conducted work? I'm sorry, I'm not -- I'm lost in the question.

MR. ELLIS: Read it back.

(Record read as requested.)

MS. O'CONNOR: Same objection.

THE WITNESS: I have not been supplied with the agency's determination of what are relevant health-based parameters, and I have conducted no

work to measure intravascular concentrations of these chemicals to see if they fall higher or lower than those parameters.

BY MR. ELLIS:

Q. So you cannot opine whether or not after dermal absorption, as you opine it occurs, whether or not after systematic -- or systemic circulation, the internal dose of chemicals found in chemical hair relaxers exceed any relevant agency guidelines as to a healthy dose, correct?

MS. O'CONNOR: Objection; form, foundation. It's a different question.

THE WITNESS: Without being provided what the relevant healthy dose guidelines are, I can't speak to whether or not those are healthy or unhealthy. But I have conducted no intravascular sampling of these agents in women who have used them.

BY MR. ELLIS:

Q. And you have no knowledge based on any studies you've conducted, any studies you've read, or any work you've done to offer an opinion to this jury whether or not after dermal absorption, as you contend it occurs, there is an unhealthy level of chemicals from chemical hair relaxers in a woman's body, correct?

MS. O'CONNOR: Objection; form, foundation, argumentative.
THE WITNESS: I have only been tasked with answering whether or not there is a biologically plausible mechanism for these chemicals to be transported from the surface of the skin through transepidermal and dermal absorption, into the circulation system to reach the end organs of the ovary and the uterine lining.
MR. ELLIS: Move to strike on the grounds of nonresponsive.
Read it back.
(Record read as requested.)
MS. O'CONNOR: Objection; same grounds.
THE WITNESS: Yeah, I have not been asked to offer an opinion related to what is unhealthy or healthy regarding levels of these chemicals in the woman's body.
I've only been asked to offer an opinion regarding the biological plausibility that the chemicals can be absorbed from the surface of the skin, enter the circulation, and arrive at the end organ tissue.
BY MR. ELLIS:
Q. And thus you have no opinion you intend

to offer at the trial in this regard, right?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: In which regard?
BY MR. ELLIS:
Q. Okay. I've got to read the whole question back. You're not tracking?
A. Well, I want to make sure I'm answering the right question.
Q. Well, it's the one I just asked you but I'll do it again.
And you have no opinion based on any studies you've conducted or any studies you've read or any work you've done to offer an opinion to this jury that after dermal absorption, as you contend it occurs, there is an unhealthy level of chemicals from chemical hair relaxers in a woman's body?
MS. O'CONNOR: Objection; same grounds as before.
THE WITNESS: And the question was if I intend to offer an opinion on that?
BY MR. ELLIS:
Q. Yes.
A. And my answer remains the same: I was not tasked with offering an opinion in that

context, only in -- with respect to the biologic feasibility or plausibility that the chemicals present in hair relaxers, hair straighteners could be absorbed through the skin into the dermal circulatory system and then transported to the end organ tissue.

Q. So you have no opinion on that issue and you don't intend to offer any such opinion to the jury?

MS. O'CONNOR: Objection.

THE WITNESS: I'm definitely not offering that opinion, correct.

BY MR. ELLIS:

Q. Now, we talked a little bit about this. You did read Dr. Burgess's and Dr. Kasting's reports, right?

A. Yes.

MR. ELLIS: I want to mark as 5 expert report of Cheryl Burgess, MD?

(Brown Deposition Exhibit 5 was marked for identification.)

BY MR. ELLIS:

Q. I've handed you what we've marked in this proceeding as Exhibit 5, which is the expert report of Cheryl Burgess, MD, FAAD.

You've reviewed this before, correct?
A. Correct, yes.
Q. And I want to draw your attention to Paragraph 76, which is on page 27. And it says, "Drs. Pugliese and Brown assume that hair relaxers remain in the invagination pockets of the hair follicles even after neutralization, rinsing, and washing. Both advance this theory to support the assertion that hair relaxer ingredients are absorbed through the scalp long after the initial application. Neither provides relevant data to support the claim that chemicals from hair relaxers remain in hair follicle reservoirs leading to transdermal absorption. Moreover, these assertions fail to consider the basic physiology of the skin."
First question is did you ever talk to Dr. Pugliese about the work you were doing?
A. No.
Q. Did you ever read a draft of his report before you issued your own report?
A. No.
Q. Have you read a draft or a copy of his report issued in this case?
A. No.
Q. You did read Dr. Burgess's report,

correct?
A. Yes.
Q. And you read this part of her -- her report, Paragraph 76?
A. Yes.
Q. And when she says that there -- you don't provide relevant data to support the claim that chemicals from hair relaxers remain in hair follicle reservoirs leading to transdermal absorption, did you identify what data you had to support your conclusion in that regard?
A. When I read this? I'm sorry, the question is what did I do?
Q. Yeah. Did you -- did you -- did you say to yourself, "That's not true. This is the data that supports that"?
A. Yes.
Q. And what was it?
A. Well, it's interesting that in the other expert's report he acknowledges the well-established transappendageal absorption pathway for numerous products that we use as dermatologists, whether we're treating seborrheic dermatitis with antidandruff agents, we're treating scalp cirrhosis with topical steroids, we're

treating folliculitis with topical antibiotics, it's well established that the perifollicular reservoir holds those agents and over time the release of those agents not only on the surface of the skin but absorbed into the dermis is how they observe their effects.

So I believe that Dr. Burgess should have given this a great deal more thought before she issued this opinion.

Q. Well, Dr. Burgess actually gave it considerable thought and she referred to chemicals from hair relaxers noting that the things you just described are actually designed as medications to penetrate the transdermal level and actually were formulated for that regard.

So the speech you prepared in advance of today, we have it for the record, but can you answer my question?

MS. O'CONNOR: Objection; form, foundation. He answered your question.

BY MR. ELLIS:

Q. What data did you have? That is the question.

A. No speech was prepared and everything that I referenced, not everything is designed to be

absorbed. Numerous of those agents actually remain within the perifollicular reservoir and they observe their effects by remaining there.

Q. Dandruff shampoo is certainly designed to -- as a medicine to be absorbed, correct?

A. Dandruff shampoo, while it is absorbed in part, but it is designed also to remain in the perifollicular reservoir to observe its effect.

Q. So what is the data you have?

A. The data is the 30 years of collective practice in the clinical application of these products which are approved by the FDA to be used in this way on the scalp to exert these effects, perifollicular, and within the scalp itself.

Q. But chemical hair relaxers aren't designed to be on the scalp and to be absorbed?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

But go ahead.

THE WITNESS: And when they are, they exert the exact same pathways or they are absorbed through the same pathways in an exaggerated fashion because of the caustic nature of these chemicals as they degrade the organic structures with which they come into contact.

BY MR. ELLIS:
Q. There can be chemicals in products that help with dermal absorption, you agree, right?
MS. O'CONNOR: Object to the form.
BY MR. ELLIS:
Q. Transport agents.
MS. O'CONNOR: Object to the form.
THE WITNESS: I suppose there can be.
BY MR. ELLIS:
Q. There is.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Maybe I know that because I'm a cosmetic lawyer.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. There are ingredients that go in face creams, for example, that are designed to help make sure that you transport the beneficial parts of that product into the dermal layer. You agree?
MS. O'CONNOR: Objection; form.
THE WITNESS: I don't agree or disagree without actually seeing the data for that.
BY MR. ELLIS:
Q. You're not familiar with that as a

dermatologist?
A. I'm very familiar with principles with respect to the aesthetic agents that are used to enhance the appearance and treat skin disease.
Q. And are you familiar with cosmetic dermatology in some ways where you can use topical creams or ointments and they would contain a transport agent to help make sure the beneficial portions of those products are penetrated by -- through the epidermis and into the dermal layer, yes or no?
MS. O'CONNOR: Form, foundation.
THE WITNESS: I am not familiar with -- if you're referencing some proprietary agent, I'm not familiar with what you're speaking of.
BY MR. ELLIS:
Q. Did you reach any opinions or conclusions about any of the issues raised in Dr. Burgess's report?
A. We would have to --
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: -- look at specific issues and I can certainly comment.
BY MR. ELLIS:
Q. I just want to know if you have any. We

can go through it line by line, if you'd like. It might take us some time but I'm happy to do that if that's what you prefer.

I just want to know whether or not you have any opinions regarding Dr. Burgess' report as you sit here today.

A. Well, we did just spend time on Paragraph 76 and we're at a difference of opinion.

Q. Mm-hmm. Anything else?

A. Without actually addressing the specifics, I can say that I don't think we're necessarily aligned on the issue at hand.

Q. You didn't issue a rebuttal report, correct?

A. I did not issue a rebuttal report.

Q. Do you have any information you'd like to share with the jury in rebuttal to the points made by Dr. Burgess?

MS. O'CONNOR: Objection. Other than what's been testified to already.

THE WITNESS: And what's contained in the context -- or the content of my report which is --

BY MR. ELLIS:

Q. Your report came before hers. So I'm asking after seeing her report is there anything

not in your report that you have -- as you sit here today, you would like to offer in rebuttal to Dr. Burgess' report?

MS. O'CONNOR: Objection; form, foundation. That's not why he's here.

THE WITNESS: I believe any disagreement between the two reports actually speaks for itself.

BY MR. ELLIS:

Q. Is that a no, you don't have anything in rebuttal to Dr. Burgess' report, as you sit here today?

MS. O'CONNOR: Objection; form, foundation, argumentative, and not the purpose of this deposition.

THE WITNESS: It's not my intention to defer to any controversy that Dr. Burgess raises as being accurate and based on fact, but I see nothing overtly I need to respond to.

BY MR. ELLIS:

Q. So you have nothing to tell the jury specifically with relationship to Dr. Burgess' report, in rebuttal thereto, fair?

MS. O'CONNOR: Objection, same grounds.

THE WITNESS: We've discussed in some detail paragraph 76, and any other point within

Dr. Burgess's report upon which -- or at which we disagree, I point to my own report as being an accurate representation of my opinion.
BY MR. ELLIS:
Q. And you don't have any additional information not included in your report to offer as rebuttal to the points made by Dr. Burgess, other than what you've testified to with respect to paragraph 76, correct?
MS. O'CONNOR: Objection; mischaracterizes the witness's testimony.
THE WITNESS: I don't defer to any point that Dr. Burgess makes that differs from any opinion I have offered or point I have made. But I will say that I don't have any basis or any offering of a rebuttal today.
MR. ELLIS: Number 6 will be expert report of Gerald B. Kasting.
(Brown Deposition Exhibit 6 was marked for identification.)
BY MR. ELLIS:
Q. You mentioned that you had reviewed the rebuttal (sic) report of Dr. Kasting; is that correct?
A. I reviewed his expert report.

Was there also a rebuttal report?
Q. Did I say "rebuttal"?
A. You did.
Q. I did. So let's correct that.
You mentioned you reviewed the expert report of Dr. Kasting; is that correct?
A. That is correct.
Q. And on page 9, he discusses the entire -- he says, "This entire process is largely governed by fixed law of diffusion, as interpreted in the context of" --
MS. O'CONNOR: Okay. Can you let us get there, first of all, and then direct us to where you're reading from?
MR. ELLIS: I said page 9.
MS. O'CONNOR: You did say page 9, but that's a big page, all right?
MR. ELLIS: Big page.
MS. O'CONNOR: He's still turning his page while you're speaking. Please have the courtesy of directing myself and Dr. Brown to exactly where you're reading from.
MR. ELLIS: I'm reading from the penultimate paragraph.
MS. O'CONNOR: Ah, okay.

BY MR. ELLIS:
Q. Do you have it, Dr. Brown?
A. Yes.
Q. He writes, "This entire process is largely governed by fixed law of diffusion, as interpreted in the context of complex medium. The Fickian concept of diffusion is proportional to a chemical concentration gradient, must be replaced by the broader concept of a chemical potential gradient. This replacement can often be expressed by introducing partition coefficients between unlike phases."
Did I read that correctly?
A. You did.
Q. And did you consider fixed law and the law of diffusion in trying to determine whether or not chemicals that might be contained in chemical hair relaxers reached an internal dose level of an unsafe level after dermal absorption?
MS. O'CONNOR: Objection; asked and answered.
THE WITNESS: The answer is no.
BY MR. ELLIS:
Q. You didn't consider fixed law as a part of that discussion, right?
A. I did not consider fixed law in the

context of unsafe levels of these chemicals.

Q. Did you consider fixed law at all when you were dealing with the issue and considering the issue of dermal absorption of chemicals found in chemical hair relaxers through dermal absorption into the bloodstream?

MS. O'CONNOR: Objection; form.

You can answer.

THE WITNESS: Yes. Fixed law is a basic principle of physical chemistry that relates to how molecules interact with each other in the process of diffusion, as I mentioned earlier. It is not itself an accurate representation of all diffusion that occurs. It is generally best applied as they use the term "complex," when there are larger molecules involved but with some very fixed properties in the background.

So this is a very simplistic model for diffusion used in undergraduate science. As one progresses in science, much more intricate models are involved that may or may not approximate in vivo absorption and diffusion.

BY MR. ELLIS:

Q. Can you explain diffusion to the jury.

A. Sure. Diffusion is a term that is best

explained in the context of when one has a great deal of one substance localized in an area, and very little or nothing of that same substance in another area. One of the fundamental principles of thermodynamics is that as atoms and molecules are moving, they will tend to, A, occupy space, but also to equilibrate throughout the space their relevant concentrations. So there's a drive for highly concentrated substances to mix into or move into the space in which their concentration is very low.

And in this instance, we're talking about surface of skin through the stratum corneum epidermis, into the dermis, where they would then go into blood vessels and be whisked away -- so that's a compounding factor -- that almost, at the level of the blood vessel, would allow you to have a zero concentration, which would drive diffusion. There could be barriers to diffusion. But when the caustic nature of the substance is degrading the barrier, you can have enhanced diffusion. It's a very complex process that's not easily modeled, as we spent a great deal of time talking about.

Q. But the simple explanation is, is that as chemicals transport from the epidermis through

the dermal layer into the bloodstream, there is a less concentration of that chemical once it reaches the bloodstream, true?

A. That is an appropriate way to look at it, but the reason you have that is the bloodstream has taken the newly diffused chemical away, so that doesn't mean there's no diffusion. That's what's driving the diffusion, is the difference between high concentration and low concentration. If there was no bloodstream, then it would all just equal out somehow, if given enough time.

Q. But my simplistic statement is correct is that chemicals placed on skin, once they're dermally absorbed, do not maintain their same quantity and concentration level once they enter the bloodstream, true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: They definitely would not maintain the same concentration they had at the level of skin within the blood. They may be -- they will be transported everywhere the blood goes. They may concentrate at various sites, even beyond the concentration that was in the skin, depending upon factors innate to the site, innate to the chemical. But there will be a continuous drive for

more absorption, as long as that chemical is on the skin.

BY MR. ELLIS:

Q. And so you have to measure at some point, the content of the chemical in the bloodstream to know what the internal dose level is for the chemical once it is dermally absorbed, agree?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

THE WITNESS: No, not really, in the context that how the chemical exerts its effect distally may have no relationship to what the concentration is at the skin or even in the blood vessel. It could be concentrated distally, or maybe just a little bit is necessary to exert whatever effect it is -- it effects.

BY MR. ELLIS:

Q. I'm not asking about the effect. I am saying simply that it is a general principle that we can rely upon and the jury can take away, is that if you put an amount on skin, when it reaches your bloodstream, it's not the same amount as what you put on the skin, agree?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I believe your question -- and I'm not trying to be difficult as I rephrase this -- is that the concentration in the blood may not achieve the same concentration that was at the surface of the skin. That is a reasonable assumption -- unless you have an unlimited supply at the skin and necessary time, you could equilibrate everything. It will eventually equilibrate, given enough substance and given enough time.

BY MR. ELLIS:

Q. But if there is a limited amount, such as in a hair product or chemical hair relaxer product, the amount of that chemical in that product is not going to be the same equal amount in the bloodstream, agreed?

A. For --

MS. O'CONNOR: Objection; form, foundation, same as before.

THE WITNESS: For each individual application, you could never absorb more than you put on the skin. Is that a fair way to answer that?

BY MR. ELLIS:

Q. That is.

A. Okay.

Q. Right.
And, in fact, you would absorb less than what you put on the skin, correct?
MS. O'CONNOR: Objection.
THE WITNESS: That is a reasonable way to look at the situation, that unless it's all absorbed from the skin, assuming some would remain crusted to the skin or be removed by some fashion. But there will continue to be absorption as long as it remains on the skin.
BY MR. ELLIS:
Q. But it will not equal the same amount that was on the skin once it reaches your bloodstream, fair?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Not to speak down to you as an attorney, the amount -- the amount could be equal, but the concentration would be different. So those are terms that are a little different.
BY MR. ELLIS:
Q. No, I understand that, is that it's diluted once it reaches the bloodstream.
A. Yes.
Q. But I'm asking my question, which is:
The amount that touches your skin or

the concentration -- let me strike that.
The amount that touches your skin will not be the same amount that's in your bloodstream?
MS. O'CONNOR: Objection; form, foundation, asked and answered.
THE WITNESS: It's unlikely that you would ever absorb 100 percent of what touches the skin. You could absorb very, very, very close to that, like topical testosterone gel. But...
MR. ELLIS: Page 16.
MS. O'CONNOR: Of Exhibit 5?
MR. ELLIS: Yes.
BY MR. ELLIS:
Q. We talked a little bit about this in -- Dr. Kasting states, "To date the only study in the published literature to have attempted to evaluate the transdermally absorbed doses of hair relaxer ingredients from hair relaxer formulations uses an in silico industrial hygiene model based on data from a single and only available chemical analysis of three samples of hair relaxer products and a number of assumptions required by the model Pierce."
That's what we talked about, right?

A. Yes.
Q. You relied on -- it says "Plaintiffs' experts additionally rely on Schildroth and Braun, but this reliance is misplaced. Schildroth took a cross-sectional analysis in a cohort of Black women of urinary biomarkers, compounds, and metabolites for several phthalates, parabens, and phenols in relation to self-reported use of a variety of hair care products in the prior 24 hours and the prior 12 months."
Do you agree with that?
A. I don't agree with it being misplaced but I agree that the plaintiffs' experts relied on those two publications and I believe it's a very accurate statement regarding Pierce.
Q. It says, "Single samples of urinary biomarkers for these compounds is of limited value with respect to long-term use of products as these compounds have limited half lives in the body and are metabolized and cleared within a number of days."
So that focuses on what we talked about is that Schildroth, although it found these biomarkers in urine, it wasn't measuring the quantity of them or the amount of them in its

analysis. You agree?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: In Schildroth I believe the measurement was relevant to no exposure.

BY MR. ELLIS:

Q. Meaning did it exist or did it not exist?

A. Correct.

Q. Right. And Schildroth found that there were some chemicals found in urine but it didn't measure how much that internal dose was, fair?

MS. O'CONNOR: Object to form.

THE WITNESS: It didn't -- I want to answer this accurately that it did not measure blood concentration measures. That's what you're asking, I believe.

BY MR. ELLIS:

Q. There's nothing in Schildroth that allows us to know the internal dose received of the personal care products at issue that were being analyzed, fair?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: The analysis and conclusion, yes, only focused on urinary metabolites.

BY MR. ELLIS:

Q. Page 21. Not unlike Dr. Burgess, Dr. Kasting states, "Plaintiffs' experts assert but have not provided relevant supporting data that any of the hair relaxer products or compounds displacing the sebum from the hair shafts and the follicles to form a reservoir and that absorption through the hair follicle is a significant means of transdermal absorption of hair relaxer ingredients. While Dr. Brown and Pugliese cite to general discussions of well-known transappendageal pathway, they fail to identify a single source that discusses the impact of this pathway with respect to hair relaxers."

Do you agree with that?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

THE WITNESS: Yes, I agree that that is stated here. Yes.

BY MR. ELLIS:

Q. Do you agree with the statement that's made by Dr. Kasting?

MS. O'CONNOR: Objection.

Are you asking whether the statement is there or whether he agrees with his opinion as

reflected in that statement?

BY MR. ELLIS:

Q. I don't know if it's an opinion. He's making a statement about the work that you did and I'm asking do you agree with that. Is that an accurate statement of what you did?

A. Well, I agree with it in part, that these transappendageal pathways for absorption including the perifollicular reservoir are well known and well established and they have been shown to be used in other studies that I referenced and perhaps Dr. Kasting referenced looking at molecules such as 5-fluorouracil, caffeine, and others.

And so in the context of how medicine is practiced and how science influences real-life applications of these types of findings, just as I mentioned, there's other pharmaceutical products, we know that some are absorbed and some remain in the transappendageal structure, which is also termed the reservoir by myself and Dr. Pugliese and here we have Dr. Kasting acknowledging it.

Q. And he's also saying you have no studies that talked about the collection of chemical hair relaxer ingredients in that reservoir, and that's true, too, right, you didn't find any studies that

specifically dealt with chemical hair relaxers and its ability to stay within the follicle reservoir, correct?

A. As I mentioned, we found studies looking at a variety of pharmaceutical agents and nonpharmaceutical agents in those reservoirs but there is no study that specifically looks at a hair relaxer chemical in that reservoir.

Q. Nevertheless, on page 16 of your report, under "Reservoir Effects," you write, "The stratum corneum and the hair follicles all connect as a temporary bank storing chemicals over a period of hours, days, and weeks."

There's no cite there but what are you referring to as support for that statement?

A. Well, if you look earlier on page 15, that statement actually relates to the discussion under Item No. 2, hair follicle trails, and I do cite to Ogiso, Lademann, and several of the others earlier that we discussed in which experimental models and work have shown that those transappendageal structures or the reservoirs serve as an enhanced surface area which the content of the reservoir is able to diffuse through and able to be taken up through the circulation.

Q. But those are not related to chemical hair relaxers, right, those studies?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Well, as I mentioned those studies are focused on different molecules that serve as an example to be extrapolated more broadly in the use of pharmaceuticals as it relates to how the hair and the scalp interact.
BY MR. ELLIS:
Q. And Osigo doesn't make this bold statement about the ability of those chemicals to remain for a period of hours, days, and weeks either, does it?
A. If Osigo doesn't use those exact terms, Osigo speaks to the existence of the transappendageal reservoir as an ability to hold agents.
Q. But it doesn't talk about the continued permeation of the reservoir into the dermis for periods of hours, days, and weeks; that's your work?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: As long as the substance is present at any point touching the skin or the dermis, it will diffuse inwards.

BY MR. ELLIS:

Q. That's not necessarily true, is it, Dr. Brown?

A. That's entirely true.

Q. Well, you have the sebum there that is going to be regenerated, correct?

A. And over time, the sebum regeneration is what eventually displaces the other substances from the transappendageal reservoir, so that it eventually limits its ability to hold exogenous substances and allows the scalp to repair itself.

But the acute injury of these harsh chemicals compromises that function and that's what enables the hair to be straightened and as a result the chemical that comes into contact with these areas is absorbed.

Q. You said a few times now about that that the injury or -- I think I'm using your term correctly, from these harsh chemicals.

So is it your statement that every time a woman uses a hair relaxer product, she receives a first-degree burn?

MS. O'CONNOR: Objection; asked and answered many, many times.

Answer it again.

THE WITNESS: Every time the chemical is applied to the scalp, the caustic nature of the hair relaxer chemical will begin to degrade the natural integrity of the stratum corneum, and eventually the epidermis, so the degradation of the stratum corneum and epidermis is by definition a burn. So the answer is yes.

BY MR. ELLIS:

Q. Okay. And I want to be clear about this. Every time a woman gets a hair relaxer, she receives a first-degree burn, right?

MS. O'CONNOR: Objection; form, foundation, and mischaracterizes the witness's testimony.

THE WITNESS: Every time it's applied, the degradative process on the stratum corneum and epidermis is undertaken or occurs as a result of that contact, that is the similar effects of a first-degree burn, yes.

BY MR. ELLIS:

Q. And every woman that uses a chemical hair relaxer in the future will suffer a first-degree burn, right?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Every time that hair relaxer comes into contact with the stratum corneum of the

epidermis and begins the degratory process, those changes are equivalent to a first-degree burn.

BY MR. ELLIS:

Q. And in your opinion there's no circumstance, short of magic, where you can apply a hair relaxer product and a woman would not receive a first-degree burn, true?

MS. O'CONNOR: Objection; form, foundation, misstates, mischaracterizes the evidence.

THE WITNESS: There is no situation which I have observed or can envision that these chemicals are able to be kept off of the scalp, given the nature of the process at application.

BY MR. ELLIS:

Q. And therefore --

A. And therefore, in every instance, there will be degradative processes that occur because of the caustic nature of that chemical when it comes into contact with the stratum corneum and eventually deeper into the epidermis that is consistent with the findings of a first-degree burn.

Q. So when the pH-elevated product within a relaxer is placed on the hair in a chemical relaxing process and it displaces the sebum and the

reservoir becomes available for it to be a temporary bank storing chemicals over periods of hours, days, and weeks, what part of the chemical relaxer or shampoo or conditioner remains in that reservoir?

A. Well, it would be the highly alkaline chemical that is being -- that remains in the reservoir and then mixed with the milieu of every other of the steps that are involved in the process and the substances are being absorbed.

Q. Would the highly alkaline part of the product, the base and activator, have any protective nature to the chemicals in the shampoo and conditioner in that reservoir?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: It's unlikely given the highly alkaline nature to the product -- to the chemical relaxer itself that it will be displaced by the conditioner and shampoo that you mentioned.

MS. O'CONNOR: Let's take a break. It's been --

MR. ELLIS: No, I have a follow-up on this one.

MS. O'CONNOR: Wait a minute. We're taking a break.

MR. ELLIS: No, we're not.
MS. O'CONNOR: Yes, we are.
MR. ELLIS: I'm in a period of trying to finish a line of questioning --
MS. O'CONNOR: How many more questions?
MR. ELLIS: I don't know, it depends on his answer.
(Simultaneous speaking.)
MS. O'CONNOR: All right. We're taking a break.
MR. ELLIS: I don't agree.
MS. O'CONNOR: We've been going for well over an hour.
MR. ELLIS: I don't agree.
MS. O'CONNOR: I don't care.
MR. ELLIS: I want to follow up on this question, Counsel, and I think I have the right to, and I ask for you to allow me.
BY MR. ELLIS:
Q. So if the highly alkaline base is in the reservoir of the hair follicle, you would agree that the chemicals from the shampoo and the conditioner are not able to remain in that reservoir, correct?
MS. O'CONNOR: Objection; form, foundation,

misstates and mischaracterizes the witness's prior testimony.

BY MR. ELLIS:

Q. You can answer.

A. The reservoir will accommodate some of all of the chemicals that come in contact with the scalp, so together, they will create a milieu. And in the same instance, the scalp integrity is already compromised, so as the rinse, conditioner, as you've described them, are applied, components in those products as well will have access for percutaneous absorption.

Q. But it's the absorption of the base and the highly alkaline level that is going to occur in a more rapid place than the nonalkaline chemicals in products, agree?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes and misstates the witness's testimony.

THE WITNESS: I don't think you can generalize in that fashion. You have a compromised barrier as a result of the highly alkaline chemicals, so whatever comes into contact next will also have the ability to be absorbed.

BY MR. ELLIS:
Q. But if you look at your page here, 11, and you see the reservoir of the hair follicle, if that's already occupied by the highly alkaline base that has displaced the sebum, is it not true that the neutralizing shampoo and the conditioner will be received by the reservoir in a way that doesn't allow for as readily dermal absorption, because the pH base and activator is already occupying the reservoir?
MS. O'CONNOR: Objection; form, foundation, mischaracterizes the witness's testimony.
THE WITNESS: Well, all of the products in the kit are as a result of the caustic nature of the hair relaxer chemical. Every product in the kit is going to come into contact with the totality of the scalp, and the follicular structures have an enhanced absorption as a result of that. And in the reservoir itself, a very good portion of the reservoir space will contain the relaxer chemical, but it will also contain, in part, each of the other chemicals that are applied to the hair in the process.
BY MR. ELLIS:
Q. But the reservoir space that exists over

hours, days, and weeks, as you say, will be more readily absorbed by the pH level of the base and activator that was first applied, agreed?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes the witness's statement, opinions, and his report.

THE WITNESS: I'm not sure where we're missing each other. I know you're asking the question over and over, but I don't understand what you don't --

BY MR. ELLIS:

Q. Well, there's nobody standing there at the reservoir mixing them all up. If I put a layer of pH base and it's filled up the reservoir, and I try to put something on top of that, it's not going to hold in that reservoir, correct?

MS. O'CONNOR: Objection, same as before.

THE WITNESS: Well, the reservoir doesn't necessarily hold 100 percent if it's fixed and static. The next thing that comes along may displace -- will displace some of what's contained in the reservoir and then occupy that space. The hair relaxer chemical in its high alkalinity and its caustic nature, its ability to displace nearly all of the sebum that's been excreted and is being held there is the same way in which it removes the

sebum that is on the hair follicle so that the chemical can exert its effect.

So as the next step comes along to try to get that chemical off the hair follicle, it will displace a bit of what's in the reservoir, and it will mix in with this. The next chemical will mix in whatever is applied to the hair, and so you will have all of these substances not only on the surfaces, but occupying some of the reservoir space.

BY MR. ELLIS:

Q. But the next chemical that comes in is acidic and doesn't have a high pH level, so it's not going to displace the sebum.

MS. O'CONNOR: Objection -- wait.

BY MR. ELLIS:

Q. It's going to neutralize the base and activator, but it's not going to displace the sebum, as you opine. And therefore, it's not going to be as readily dermally absorbed, correct?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes the testimony.

THE WITNESS: No, I don't follow your thought process with that. The sebum has already been displaced.

BY MR. ELLIS:
Q. It's coming back.
A. Oh, but that takes time. It doesn't happen within 20 minutes, 30 minutes, or an hour. That's days or weeks to refill reservoirs.
Q. And as that base and the high pH level dissipates, the sebum will come back, true?
A. The base pH dissipating is not a factor in how the body produces the sebum. That's at a very low, constant low rate.
Q. Well, I think you said that it's the high pH level that displaces the sebum.
Am I saying that right?
A. Correct, yes.
Q. And so the activate -- the neutralizing shampoo and conditioner have a low pH level.
You know that, right?
A. They are not equally as far down on that pH scale as the alkaline relaxer is high on that scale. So that is not an apple -- that's an apple and an orange, not an apple and an apple.
Q. I don't know about that. They're designed to neutralize the shampoo -- they're neutralizing shampoos, so they're below 7 in their acidity, and so they are designed to bring down the

high alkalinity to stop the relaxing process of the base. And so, apples or oranges or plums and pears, I don't know.

But the bottom line is, they're acidic, they don't have high pH level, and your opinion is they don't displace the sebum; is that right?

MS. O'CONNOR: Objection; form, foundation. Object to the colloquy and the mischaracterization of the witness's testimony.

THE WITNESS: The neutralizing rinse and shampoo do not displace sebum because the sebum is already gone. There is no sebum to displace.

MR. ELLIS: Well --

THE WITNESS: And they're slightly acidic, so they're unlikely, in theory, to displace sebum if it was there. But it's already gone.

BY MR. ELLIS:

Q. Mm-hmm. You believe that every time?

A. Yes, I do.

Q. Every time you relax the hair, the sebum is displaced, no matter what?

A. Yes, I do.

MR. ELLIS: All right.

MS. O'CONNOR: I think now is a good time to

take a break. Okay.
THE VIDEOGRAPHER: Off the record at 3:48.
(Short recess.)
THE VIDEOGRAPHER: Back on the record at 4:06.
BY MR. ELLIS:
Q. You remember -- Dr. Brown, you realize you're still under oath, correct?
A. Yes.
Q. You remember, we had a discussion about the difference between plausibility and proof, and I used the phrase "possible."
Do you remember that?
A. Yes.
Q. And you said that plausibility is kind of connected to and almost like a DNA structure of proof.
You remember that?
A. Yes.
Q. Now, what I want to do is determine whether or not your definition of plausibility is what you're opining in this case. If you've never conducted any test or have no information about the internal dose level of chemical hair relaxer ingredients that are systemically circulated within the bloodstream, how can you opine that those

chemicals reach the reproductive organs of women?

MS. O'CONNOR: Objection; form, foundation, misstates the evidence.

You can answer.

THE WITNESS: So the mechanism through which the chemical hair relaxation procedure occurs brings the chemical into contact with the skin by the very nature of the caustic properties of the chemical and the steps involved in the chemical hair relaxation. These -- the chemical breaks down the integrity of the epidermal barrier. It displaces the sebum from the appendageal structure, the hair follicle reservoir, which is -- this is not unique to hair relaxer chemicals, but the reservoir is, as it's been acknowledged from even your own defense expert, it's a well-acknowledged absorption pathway.

There is a biologically plausible mechanism through which these chemicals can enter through the skin to reach the capillary plexus in the dermis, whereupon they are then transported through the circulation system to every tissue in the body, including the ovarian tissue and the uterine tissue.

BY MR. ELLIS:
Q. But wouldn't the concentration or volume or magnitude or exposure of those chemicals have to be at a sufficient level, such that they could travel through every tissue throughout the body?
MS. O'CONNOR: Objection; form, foundation, mischaracterizes the evidence.
THE WITNESS: No. As they're absorbed into the bloodstream, the blood goes everywhere, it mixes, it goes to all tissues within the body.
BY MR. ELLIS:
Q. Mm-hmm. And you've heard of the phrase "a teacup in the ocean"?
A. I may have heard that.
Q. How do you know because you didn't measure the internal dose level whether or not whatever volume is absorbed dermally is nothing more than a teacup in the ocean, it does not affect plausibly any organ tissue, let alone reproductive organ tissue?
MS. O'CONNOR: Objection; form, foundation, beyond the scope.
Answer if you can.
THE WITNESS: That is a question I was not tasked with. I was tasked for whether or not there

was a plausible model for the absorption of the chemical through the skin so that it could enter the circulatory system and arrive at the end tissue structures of the ovaries and the uterus.

BY MR. ELLIS:

Q. So you have no testimony that you can offer this jury as to what the volume, concentration, or magnitude is of any chemical that you believe is dermally absorbed from chemical hair relaxers once it reaches the reproductive organs, correct?

MS. O'CONNOR: Objection; form and foundation.

You can answer.

THE WITNESS: That is not a question I was tasked with answering and I am not able to answer that question.

BY MR. ELLIS:

Q. You don't know whether or not any chemical reaches the reproductive organs through dermal absorption in a manner that could affect those tissues, true?

MS. O'CONNOR: Objection.

THE WITNESS: That's not true. There are chemicals that are placed in the dermis that are absorbed into the circulatory system that influence

a woman's ability to become pregnant.

BY MR. ELLIS:

Q. I'm talking about chemical hair relaxers so let me rephrase.

You have no testimony to offer this jury as to what the volume, concentration, or magnitude is of any chemical that is dermally absorbed from chemical hair relaxers once it reaches the reproductive organs, correct?

MS. O'CONNOR: Objection; asked and answered.

You can answer it again.

THE WITNESS: I was tasked with whether or not there was a plausible -- biologically plausible mechanism through which the chemical could reach those end organs.

I was not tasked with quantifying or quantitating serum or cutaneous levels of exposure and what the end effects of those exposures might be.

BY MR. ELLIS:

Q. So you don't know whether or not what the volume, concentration, or magnitude is or exposure is of any chemical dermally absorbed from chemical hair relaxers once it reaches a reproductive organ, as you testified to, right?

MS. O'CONNOR: Form, foundation, again, asked and answered.
You can answer again.
THE WITNESS: I wasn't tasked with answering that question. That's not a question I've answered in my report or I'm an offering an answer to today.
BY MR. ELLIS:
Q. Or you have no plans to offer such an opinion to the jury at the time of trial, correct?
A. That is correct.
Q. And you don't know the concentration, magnitude, volume of any chemically absorbed -- chemical from hair relaxers once it reaches a reproductive organ as you claim it does, right?
MS. O'CONNOR: Objection; form, foundation.
You can answer.
THE WITNESS: I wasn't tasked with answering that question.
I was tasked only with answering as to whether or not it was biologically feasible or plausible that the chemicals could reach the end organs.
BY MR. ELLIS:
Q. Are you familiar with a topical inflammation arthritis drug -- a cream called

Voltaren?

A. I have heard of the drug Voltaren.

Q. Yeah. Do you know whether or not when topically applied to knees or other joints, that product is capable of reaching the reproductive organs of a woman?

MS. O'CONNOR: Objection; form, foundation, scope.

THE WITNESS: That product by the very fact that it penetrates inward to exert its effects is entering the blood system and would be transported to all organs.

BY MR. ELLIS:

Q. So a facial cream has the capacity for dermal absorption and then reaching the reproductive organs of a woman, true?

A. It depends on what's in the cream.

Q. Any chemical.

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Placing any chemical in a facial cream on intact skin on the face would still have some absorption and there would be the potential for some of that product to reach those end organs.

BY MR. ELLIS:

Q. The reproductive organs, correct?

A. All organs.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Including the reproductive organs, correct?
A. Yes.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. Lotion, if that was placed on your skin, it would be dermally absorbed and have the capacity to reach the reproductive organs, correct?
A. Again, being placed on intact epidermal skin is extremely different than being placed on compromised epidermal skin, so that product would have to be looked at on a --
Q. Lotion is the one I'm talking about now. Would it have the capacity for dermal absorption into the bloodstream and reach the end reproductive organs, yes or no?
A. Yes.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. A perfume sprayed on, would it have the capacity to reach through dermal absorption the end organs, the reproductive organs?

A. Yes.
Q. What about industrial products such as cleansers, bleaches, other chemicals without the use of gloves? If it was used without a protective barrier that allowed for dermal absorption, would it have the capacity to reach the end reproductive organs?
MS. O'CONNOR: Objection; form, foundation, calls for speculation.
THE WITNESS: Without having exact knowledge of the products that we're talking about, in general my answer would be yes.
BY MR. ELLIS:
Q. Is there any chemical that you're aware of that's used in personal care products or cleansers or other type of household products that, once it touches your skin, does not have the capacity to be dermally absorbed, reach your bloodstream and reach the end reproductive organs?
MS. O'CONNOR: Objection; form, foundation, same as before.
THE WITNESS: Very large molecular structures on intact skin are very unlikely to be able to penetrate. I think what comes to mind is wax.

BY MR. ELLIS:
Q. But other than wax or perhaps -- what about petroleum jelly, could that reach your end reproductive organs as well?
MS. O'CONNOR: Objection; same as before.
THE WITNESS: On intact skin it's very unlikely.
BY MR. ELLIS:
Q. So other than wax or Vaseline, those are about the only two things you can think of that wouldn't have the capacity for dermal absorption and to enter your bloodstream, have systemic circulation and reach your reproductive organs, correct?
MS. O'CONNOR: Objection; form, foundation, beyond the scope.
THE WITNESS: I don't have the ability to state that I know all of the properties for every chemical that's out there so I have to say I'm really not able to answer that question.
BY MR. ELLIS:
Q. But other than those two ingredients, you can't think of anything that wouldn't have the capacity to be dermally absorbed, systemically circulated through your bloodstream and reach your

end reproductive organs, correct?
MS. O'CONNOR: Objection; same as before. Same objections.
THE WITNESS: Yes, I have to say yes. It's no different than everything that you -- that we consume. As it's absorbed by our digestive system, it all enters the blood; it all reaches every -- every cell in our body.
BY MR. ELLIS:
Q. So in that regard, hair relaxers are not unusual in that, in your opinion, as long as the chemical, unless it has a large molecular structure, touches your skin, it is capable of dermal absorption, systemic circulation, and will reach your reproductive organs, agreed?
MS. O'CONNOR: Objection; form, foundation, misstates the witness's testimony for hours now.
THE WITNESS: Well, I'm not certain what the unusual reference relates to. I've explained the fact that where our body interfaces with the world around us, whether it's our gut, which we still consider to be external, it absorbs things that come in contact with it. Intact skin absorbs very little in general, but it absorbs some of most things it comes into contact with, not everything.

The two that we talked about, petrolatum and wax, are very unlikely, in my thought process, to be absorbed, but because many of the things that we're referencing aren't caustic chemicals that exist in a dangerous milieu.
BY MR. ELLIS:
Q. But they still could be absorbed?
A. They could --
MS. O'CONNOR: Objection.
THE WITNESS: They could still be absorbed.
BY MR. ELLIS:
Q. And they could still be systemically circulated, true?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I won't disagree that anything absorbed will be circulated -- it will be circulated.
BY MR. ELLIS:
Q. And it still will reach the reproductive organs of a woman, correct?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. And that is irrespective of whether or not it has a pH level as the same of relaxers or

not, correct?
MS. O'CONNOR: Objection; form, foundation, misstates the witness's testimony.
THE WITNESS: Anything that's absorbed, reaching the blood system will be circulated.
BY MR. ELLIS:
Q. And it will reach the reproductive organs, correct?
A. Yes.
Q. And so perhaps one of the things that you have told your patients is important, so let's mark as Exhibit 7 what purports to be a label for a relaxer kit manufactured by L'Oreal, Dark and Lovely Triple Nourished Silkening Relaxer. It's Bates Number 040201 and an accompanying document that I hope is maybe slightly easier to read but you may also look at the share screen, if it's too small.
(Brown Deposition Exhibit 7 was marked for identification.)
MR. ELLIS: Let me make sure that I'm telling you the right one. Yes, tab 7.
BY MR. ELLIS:
Q. Dr. Brown, is this a document that you received and considered in offering your opinions

in this case?
A. This document looks familiar, yes.
Q. And if you look at, from left to right, the second panel, there are two bullet points in the top box: Important, read before purchasing, I think it says?
MS. O'CONNOR: Dennis, you're going to have to help us out here.
MR. ELLIS: I'm going to ask you about this one, and these two bullet points. Would that be okay?
THE WITNESS: Yes.
BY MR. ELLIS:
Q. All right. The first box that has two bullet points at the bottom, can you read those first two for the jury?
A. The first box, which is entitled, "Important, read before purchasing: Do not use if you have a sensitive, irritated, or damaged scalp."
Q. And so you had mentioned that relaxers are often used on compromised skin as a result of the high alkalinity, and that women use it and the epidermis is compromised.
Are there instructions that tell the end user not to use relaxers in those

circumstances, yes or no?

MS. O'CONNOR: Objection; form, foundation. Mischaracterizes the witness's prior testimony.

THE WITNESS: I can't answer yes or no to the question. That wasn't exactly my testimony.

BY MR. ELLIS:

Q. I think my question, you can answer yes or no to.

MS. O'CONNOR: Objection; form, foundation, and mischaracterization by referring back to his prior testimony.

Can we have the question read back again?

(Record read as requested.)

MS. O'CONNOR: Same objection as before.

THE WITNESS: My response is the same, because that wasn't my testimony. I did not state that the relaxers are frequently used on compromised skin. I testified that the relaxer, due to the innate nature of high alkalinity of a relaxing chemical, the skin becomes compromised -- not that the skin was compromised before the individual applied the product.

BY MR. ELLIS:

Q. I thought you did say and talk about

that you had some patients that had used relaxers, and you told them, Maybe you should go to natural -- you told a Black woman, You should go natural. I think that's what you said. And then they still presented later with an issue, and I thought you said that the high alkalinity of the product already damaged their skin.

Do I have that wrong?

MS. O'CONNOR: Objection; form, foundation, and mischaracterizes the testimony.

THE WITNESS: Yes, that's not anything that I intended to convey. That -- I intended to convey that that patient is an example of someone who had either another instance or a different local event that brought them back to my office.

BY MR. ELLIS:

Q. Okay. The record will speak for itself. I think -- sometimes I think I have a photographic memory, but I might have got it wrong. So let's talk what you did testify to. You -- well, let me just ask you straight away:

Are there instructions that tell the end user not to use relaxers if they have compromised epidermis on their skin or scalp, yes or no?

MS. O'CONNOR: Objection.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. Could you read those last two boxes under the second -- the last two bullet points under the second box, the usage advisory safety warnings, I think that says. The last two bullets, read those.
A. Okay. The two that are not bolded, they read, "Keep relaxer off scalp and other skin areas." And the second is, "In case of contact with skin, rinse immediately."
Q. You're aware that those are instructions that go with this particular relaxer product, correct?
A. Yes.
Q. You're aware that those are instructions that go with all or most relaxer products, correct?
A. Yes.
Q. You're aware and agree that, as intended for use, relaxers are not to be applied to the scalp or the skin, correct?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Based upon what's presented here, I would say yes.

BY MR. ELLIS:
Q. And you -- in fact, when you've seen patients present themselves to you with skin lesions or contact dermatitis or first-degree burn that you're able to observe, or in the one instance, a second-degree burn, you have told them, Don't put the relaxer on your skin or scalp, correct?
A. Yes.
Q. Now, if a relaxer is being used as directed according to these safety warnings, it is not supposed to be applied to the skin or scalp, agree?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. But it's your opinion that that is impossible based on your experience, skill, knowledge as a medical dermatologist, correct?
A. That is correct, yes.
Q. Do you think you're more qualified to make that opinion and state that opinion to the jury, as opposed to a beautician or hairstylist that puts relaxers on hair for a living?
MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Can you restate the question, please.

MR. ELLIS: Read it back.

(Record read as requested.)

THE WITNESS: I'm sorry. Could you restate the opinion.

(Record read as requested.)

THE WITNESS: Yes. My answer is yes.

BY MR. ELLIS:

Q. You are more knowledgeable about the ability to apply a relaxer without touching skin and scalp than a beautician or hair stylist.

That's what you believe?

MS. O'CONNOR: Objection; form, foundation. That's not what he testified to.

Let's read that question back. It's getting late.

MR. ELLIS: Listen --

MS. O'CONNOR: Let's read the question back --

MR. ELLIS: -- listen, listen, we have got to -- we got to start following the rules. Okay? Because I just want to finish.

MS. O'CONNOR: No. My witness has to understand the question. All right?

MR. ELLIS: But you can't do that -- you

can't -- you can't --
MS. O'CONNOR:  Oh, yes, I can.  I can ask the court reporter to read a question back at the end of a -- towards the end of a long day.  All right? I'm perfectly capable of doing that, so I can be certain that my witness understands the question.
MR. ELLIS:  Okay, Counsel.  What I'm saying is this:  You can't do a speaking objection.  Okay? And then --
(Simultaneous speaking.)
MS. O'CONNOR:  I am not doing a speaking objection.
MR. ELLIS:  That was a speaking objection.
MS. O'CONNOR:  I asked the court reporter --
MR. ELLIS:  Why are you interrupting me?
MS. O'CONNOR:  You created an argument, not me.
MR. ELLIS:  Why are you interrupting me?
MS. O'CONNOR:  You created an argument, not me.  Okay?
MR. ELLIS:  I'm not making an argument at all. I'm just saying what the rules are.
MS. O'CONNOR:  Come on, Dennis.
MR. ELLIS:  You can't do a speaking objection saying you have to listen to the question --

MS. O'CONNOR: I can ask the court reporter to --
MR. ELLIS: -- and then --
MS. O'CONNOR: No, that is not what I said.
MR. ELLIS: -- ask it be read back because you think you he's going to answer wrong.
MS. O'CONNOR: That's not what I said.
MR. ELLIS: And like you don't want him to.
MS. O'CONNOR: That is not what I said. I asked the court reporter --
MR. ELLIS: That is what happened just now.
MS. O'CONNOR: How many times have I asked that during this entire time? That question --
MR. ELLIS: I don't think you've abused it, but that was an important question, and you broke the flow. You broke his ability to answer the question without your prompting. Okay? So I'm just asking if we can not do that part. If you want to later redirect after he's answered the question however he answers it, that's fine. But you can't say, "Listen to the question," "that's not what he asked," let's read it back."
Okay? So let me start over. Okay?
MS. O'CONNOR: Okay.

BY MR. ELLIS:
Q. It is your opinion that you are more qualified to address the ability to apply a relaxer to hair without touching the scalp or skin than a beautician or stylist, correct?
MS. O'CONNOR: Objection; form, foundation.
You can answer.
THE WITNESS: I would say I am equally able to offer that opinion.
BY MR. ELLIS:
Q. Even though you've never applied a relaxer in your life?
A. Yes.
MS. O'CONNOR: Objection.
BY MR. ELLIS:
Q. And even though you've never sat in a room where the relaxer has been applied?
MS. O'CONNOR: Objection.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. And even though you've never had a relaxer applied to your hair?
MS. O'CONNOR: Objection.
THE WITNESS: Yes.

BY MR. ELLIS:
Q. And you believe because you have a medical degree and maybe a law degree, you're equally capable of doing that, as opposed to somebody who's been trained, educated, and has performed that procedure thousands of times; is that correct?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. But if that person shows up to the time of trial and the jury believes them and not you, and believes that it is possible to perform a relaxer and apply it to hair without it ever touching the skin or the scalp, there can never be any dermal absorption, correct?
MS. O'CONNOR: Objection; form, foundation, mischaracterizes the testimony and the record.
THE WITNESS: As I answered previously, that in order to achieve that hypothetical, each and every terminal hair would have to extend continuously from the surface of the scalp, never touching the scalp, during the entire process of chemical hair relaxing and every step for every component of that process in order for it never to

touch the scalp, and it is not possible.

BY MR. ELLIS:

Q. My statement is correct, if the jury believes another witness who does this for a living and rejects your position that it's impossible, there would not be dermal absorption, correct?

MS. O'CONNOR: Objection; form and foundation.

THE WITNESS: If you can achieve the impossible, then I would answer yes to your question.

BY MR. ELLIS:

Q. You looked at other boxes and warnings related to other chemical hair relaxer products other than L'Oreal products; is that right?

A. Yes.

MR. ELLIS: I want to mark as next in order, this will be Tab 8. And it's Exhibit 8 as well.

(Brown Deposition Exhibit 8 was marked for identification.)

BY MR. ELLIS:

Q. Is this a document you saw during your work in this case?

A. Yes, I believe I saw this document.

Q. And this relates to a Revlon product known as Creme of Nature.

Do you understand that to be a no-lye relaxer?

A. I do see it states no-lye sodium hydroxide.

Q. And in the right upper quadrant of the document, Exhibit 8, it has "Important Do's and Don'ts." Do you see that?

A. Yes, I see a chart labeled "Do's and Don'ts."

Q. And your opinion on page -- well, let me just ask you since I'm having a little difficulty finding it.

Do you recall making the statement that relaxers are often used with heating products or heating equipment?

A. I'm not certain that that statement was made in this report. I would have to search for that.

Q. All right. Let me find it, then. I'll find it on a break. Okay. Do you see here that one of the don'ts is, "Don't use hot combs or other heated implements with relaxer cream," number 10?

A. I have this open also here.

Q. I can actually read this one. It's a little tough, but I can read it.

A. Sorry.
Q. It's number 10.
A. Yes. Thank you. Yes, I see that.
Q. And so you have an understanding that relaxers or relaxer cream is not supposed to be used at the same time as heating implements, correct?
A. Correct.
Q. And you see number 11. Can you read number 11 on this "Important Do's and Don'ts" for Creme of Nature by Revlon, number 11?
A. Yes. "Don't apply relaxer cream directly to scalp or surrounding skin area."
Q. That's your understanding, right, that that's not something you're supposed to do, correct?
MS. O'CONNOR: Objection.
THE WITNESS: Yes, that's my understanding of these instructions, yes.
BY MR. ELLIS:
Q. And that's your general understanding of how relaxers are to be used; is that right?
MS. O'CONNOR: Objection.
THE WITNESS: That -- that is my understanding of the recommendations from the manufacturer for

how the relaxers are to be used.
BY MR. ELLIS:
Q. Is that you're not supposed to apply it to your scalp or your skin, true?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yes.
BY MR. ELLIS:
Q. And on page 21 of your report you acknowledge -- this is Exhibit 2, I believe, your report, page 21 of your report -- you say "A preapplication agent," at the very last paragraph, "A preapplication agent that may include petrolatum or petroleum jelly base is usually applied to the hairline or the scalp before the relaxer to reduce the likelihood of chemical burn."
Is that petrolatum or petroleum jelly also capable of preventing or impeding dermal absorption?
A. It is impractical to make that type of claim for that agent.
Q. Is that petrolatum or petroleum jelly capable of preventing or impeding dermal absorption?
MS. O'CONNOR: Objection; asked and answered.
You can answer again.

THE WITNESS: It's impractical. The agent begins to liquefy and run immediately upon contact with the skin surface and it's applied in only thin ribbons around the perimeter of the scalp and in the partitions that are placed within the hair itself to section or quadrant the scalp.

BY MR. ELLIS:

Q. And so you believe that if you put petroleum jelly on dry skin, it is going to run?

A. Yes.

Q. Okay. How so?

A. The solid nature of petroleum jelly, when it comes into contact with the surface of the skin, the body temperature of the skin will facilitate it becoming somewhat liquid at that interface and it begins to move and run.

Q. You watch boxing at all?

A. No.

Q. Okay. They sweat and do a lot of stuff. They put some Vaseline on their skin to make the punches slide off and it stays there the whole time. But okay.

MS. O'CONNOR: Objection.

BY MR. ELLIS:

Q. Maybe the jury does. Maybe the jury

watches boxing.
MS. O'CONNOR: Objection to the colloquy.
BY MR. ELLIS:
Q. Assume that the petroleum jelly is in place and the relaxer comes in contact with it, with the petroleum jelly or petrolatum acting as a barrier to the skin.
Will that prevent or impede dermal absorption?
MS. O'CONNOR: Objection.
You can answer again.
THE WITNESS: If the chemical relaxer were to be immediately removed when it comes into contact with an abundance of petroleum jelly, that situation is one in which there may be very little to no absorption.
BY MR. ELLIS:
Q. And that actually is part of the instructions for chemical hair relaxers such as Creme of Nature by Revlon and also by L'Oreal on page 7. You can look at the other one that talks about the use of petrolatum.
A. I do not see on this instructions about the petrolatum.
MR. ELLIS: Sure. Let me go ahead and mark as

our next in order Exhibit 9 which is Bates number 714 and an accompanying page that may make it a little bit easier to read.

This is tab 6.

THE CONCIERGE: Thank you.

(Brown Deposition Exhibit 9 was marked for identification.)

BY MR. ELLIS:

Q. And under the box that says "Apply it," and I can actually read this on the page. If you go to the second page, it might be easier to read?

A. This hasn't loaded. Oh, maybe he hasn't shared it yet.

Q. You can actually read it on the second page of the document on page 2.

A. Okay.

Q. Under the section "Apply it."

A. Okay.

Q. It says, "Prior to application it is recommended that you apply petroleum jelly on hairline, nape of neck, and ear area only."

Do you see that?

A. Yes.

Q. And so you are aware as you write in Paragraph 21 of your report that a petrolatum or

petroleum jelly is recommended for use such that you prevent chemical burns. That's what you wrote in 21 of your report, right?

A. Let me look at page 21. I do write that it is applied for the purpose of reducing the likelihood of chemical burn but that's only part of the paragraph within which that statement is made, and the full context of the paragraph goes on to say that it's unlikely that such an application could shield the entire scalp.

Q. We understand your testimony. We're going to hear from the beautician and the hairstylist at some point in this trial as well.

You understand that, Dr. Brown, right?

MS. O'CONNOR: Objection.

BY MR. ELLIS:

Q. So I want you to focus on my questions.

A. Okay.

Q. Per L'Oreal's instruction to the user, you're supposed to put on petroleum jelly on the skin and surrounding area prior to applying the relaxer cream, agree?

A. Yes.

Q. And if you go back to Exhibit 7, which

is the box, correct? You're holding it up. You are not to apply a relaxer cream directly to the scalp or the skin, agree?

A. Agree.

Q. And if you do apply it to the scalp or the skin, you're instructed to rinse it off immediately, correct?

A. I'm going to trust you on that because I can't read this and I don't have this up. So...

Q. You already testified to it. You actually read it into the record?

A. I'm trusting you on it. I don't recall the specific wording, but I'm not disputing.

Q. I'm a lot of things but I'm not a liar.

And so if you put the petroleum jelly on, you try your best not to apply it to the skin or scalp, it incidentally touches the skin or scalp, you rinse it off immediately, you agree that would either restrict, prevent, or impede dermal absorption, true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: In this scenario the hypothetical you have just presented, I interpret it to imply that a small area of contact is made. That is not a practical application of how the

product is used. But in your scenario, if all of those things can be achieved, which I do not believe they can, then I would agree with your statement.

BY MR. ELLIS:

Q. And you have no problem with our jury here determining whether or not they believe your testimony about the impossibility of those circumstances, or the trained beautician and hairstylist who might testify that that can be achieved and is achieved every time that that skilled person applies a hair relaxer, right?

MS. O'CONNOR: Objection; form, foundation, argumentative.

You can answer.

THE WITNESS: I have lost my focus on that question. I'm sorry.

BY MR. ELLIS:

Q. That's okay. I just want to make sure I understand your testimony on a point we've talked about during the deposition, but I just -- I want to make sure that I -- I don't want to leave anything unturned.

You have not independently quantified a systemic dose from relaxer use, correct?

A. I have not measured a systemic dose as a result of topical relaxer use.

Q. You have not independently measured uterine tissue concentrations attributable to relaxer use, correct?

A. That is correct.

Q. You have not calculated carcinogenic threshold exceedance specific to relaxer exposure, correct?

A. I have not.

Q. You've discussed what I believe to be relaxer application to virgin hair for the first time, as you described it, where there's a lot of relaxer cream and all that.

How has -- how did, if at all, the touchup process where you're not applying to the entirety of the hair, but only the new growth, did that in any way affect your opinions with respect to dermal absorption?

A. The touchup process being so innately similar to the application process for virgin hair, acknowledging that the distal ends of the hair -- terminal hair shafts do not receive application, and only the first inch or two of the hair as it exits the scalp -- still places the hair relaxer

chemical in such close proximity to the scalp and in such great quantities as the hair is manipulated to accomplish the goal, it makes it impossible in the same fashion to avoid contact with the skin.

Q. So it's your opinion that even in the touchup process, it is impossible to avoid contact with the skin or scalp, true?

A. I would disagree only in the context that if you were to straighten just the distal end, maybe the distal one inch of an 8-inch-long strand of hair, you possibly could avoid contact with the scalp. But when you're applying a chemical paste with a brush and you're painting this on and tenting the hair and reapplying and flipping the hair as it's plicated and moving the hair back and forth, it's impossible to avoid contact with the scalp when you are doing a touchup on that proximal one to two inch of hair growth.

Q. And I'll ask you to confirm that you believe your opinion in this regard about impossibility is equal to, if not greater than, that of a beautician or a hairstylist that actually does this work, correct?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes and misstates the witness's

testimony.
THE WITNESS: I believe I'm equally qualified to make an opinion statement as I just have, saying that it is impossible to avoid contact with the scalp when these products are applied.
BY MR. ELLIS:
Q. Even in the circumstance where you're using a limited amount for a touchup, correct?
A. That is correct -- unless, as I have offered earlier, you're touching up the distal end of a long strand of hair.
Q. That shows your lack of knowledge, though. That would never happen.
A. I agree. It wouldn't -- I have knowledge. It's --
Q. Because you're only supposed to apply it to the new growth, and your hair doesn't grow out at the end --
MS. O'CONNOR: Objection --
BY MR. ELLIS:
Q. -- it grows out at the root --
MS. O'CONNOR: Objection. You're talking over each other. Please stop.
BY MR. ELLIS:
Q. As you sit here today, you cannot

provide a numeric systemic plasma concentration attributable to a relaxer use after it's been applied, correct?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: That is correct, yes.

BY MR. ELLIS:

Q. You cannot provide a numeric uterine tissue concentration after a relaxer has been applied, correct?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: That is correct, yes.

BY MR. ELLIS:

Q. You cannot identify a carcinogenic threshold specific to relaxer exposure, correct?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: That is correct, yes.

BY MR. ELLIS:

Q. You have not calculated a margin of exposure for relaxer chemicals after use, correct?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: That is correct, yes.

BY MR. ELLIS:
Q. You have not provided an alternative quantitative absorption model to the Pierce study that we looked at for relaxer chemicals; is that correct?
MS. O'CONNOR: Absorption -- excuse me. Objection.
THE WITNESS: That's correct, yes.
BY MR. ELLIS:
Q. You have not compared estimated exposure to animal tumor doses of chemicals in hair relaxers; is that right?
MS. O'CONNOR: Objection; scope.
You can answer.
THE WITNESS: Correct, that is not the question I was tasked with.
BY MR. ELLIS:
Q. And you have not necessarily, based on the question that was posed to you, reached any opinion or conclusion that systemic exposure to hair relaxers in the bloodstream is biologically meaningful, correct?
MS. O'CONNOR: Objection.
THE WITNESS: Yes, I was not asked to offer an opinion on anything but the plausibility of these

chemicals, when applied to the scalp, to be transported and reach the uterine and ovarian tissue.
BY MR. ELLIS:
Q. And you have not reached any conclusions that, to the extent that those chemicals reach the uterine and ovarian tissue, they create any mechanism of action that could lead to cancer, right?
MS. O'CONNOR: Objection; form, foundation, scope.
You can answer.
THE WITNESS: Yes, that is not the question I was tasked with.
MR. ELLIS: All right. Why don't we take five, and let's see if I can get organized and try and power us through until the end.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Off the record at 5:01.
(Short recess.)
THE VIDEOGRAPHER: Back on the record at 5:13.
BY MR. ELLIS:
Q. Did you -- Dr. Brown, you realize you're still under oath?
A. Yes.

Q. Did you review any particular products themselves, their ingredients list to determine their concentrations of particular concerning chemicals?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I reviewed the materials that were submitted by defense to plaintiff, then provided to me that represented, even one of which we saw today, the box.

BY MR. ELLIS:

Q. Did you reach any conclusions or opinions regarding the safety or efficacy or health risks posed by any particular ingredients in any relaxer products?

MS. O'CONNOR: Wow. Objection; form, foundation.

THE WITNESS: A lot in that question, but the entire breadth of the question addresses issues that I wasn't tasked to answer in my work in this case, which I was asked to address the biologic feasibility of the product from the relaxer chemical being absorbed into the skin and reaching the end organs of the uterus and ovaries.

BY MR. ELLIS:
Q. So you didn't reach any conclusions that a particular chemical ingredient should not have been in a relaxer product based on your opinion toxicologically or otherwise, right?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I wasn't asked to answer that question and I arrived at no opinion regarding that question.
BY MR. ELLIS:
Q. You didn't perform any ingredient-specific causal identification and analysis regarding to chemicals in hair relaxers; is that right?
MS. O'CONNOR: Objection; form.
THE WITNESS: That was not the question that I was tasked to answer, and I did not complete that task.
BY MR. ELLIS:
Q. And you've offered -- you have not developed and don't intend to offer any specific causation opinions regarding uterine or ovarian cancer caused by chemical hair relaxers, true?
MS. O'CONNOR: Objection.

You can answer again.
THE WITNESS: Yes, that is true.
BY MR. ELLIS:
Q. What you are offering is your opinion that, based on your literature review and your experience, skill, and knowledge, there is a plausible pathway for dermal absorption of ingredients in chemical hair relaxers, correct?
MS. O'CONNOR: Objection.
THE WITNESS: Yes, looking to my opinion report, that -- which concludes that there is a biologically plausible pathway for the chemicals contained in hair relaxers and hair straighteners to be absorbed into the dermis, enter the circulatory system, and arrive at the end organ tissue of the uterus and the ovaries.
BY MR. ELLIS:
Q. But you have not quantified systemic absorbed dose, have not measured uterine tissue concentrations, and have not identified threshold exceedance levels, correct?
A. That is correct. I was not tasked with those questions, and I have not investigated nor have I answered those questions in this report.
Q. Is it fair to summarize your testimony

this way: Your opinion is that, based on the literature, your experience and knowledge, there's a plausible pathway for the dermal absorption of ingredients in chemical hair relaxers, but you have not measured their effect on the woman's body?

MS. O'CONNOR: Okay. Form, foundation, misstates his testimony.

Over my objection, you can answer that again.

THE WITNESS: My -- the task put to me was to answer if there was a biologically feasible mechanism through which the chemicals in hair relaxers and hair straighteners could be absorbed through the skin and by transport through the circulatory system arrive at the end organ tissue, the uterine lining, and the ovaries.

MR. ELLIS: Move to strike on the grounds of nonresponsive.

Read my question back.

(Record read as requested.)

MS. O'CONNOR: Objection; form, foundation, mischaracterizes and misstates the witness's testimony and his opinions in this case.

THE WITNESS: Everything prior to the word "but," I agree that does represent my testimony and

the task that I was -- the task put to me, and I have not measured the -- I want to use the right word. I'm sorry.

Can you repeat everything after the word "but"?

(Record read as requested.)

THE WITNESS: Correct, I have not measured their effect on the woman's body.

BY MR. ELLIS:

Q. Have we now discussed all of the opinions you intend to offer in this case?

A. Yes.

Q. Is there any opinion that you hold that we have not discussed in this deposition here today and is not reflected in your report?

A. No.

Q. And do you have current existing plans to develop any new opinions as part of your engagement in this case?

A. No.

MR. ELLIS: Pass the witness.

MS. O'CONNOR: Okay. Thank you, Dr. Brown. I have no questions.

MR. ELLIS: I think we get two. You got anything?

MS. CASTRONUOVA: No.
THE VIDEOGRAPHER: Off the record at 5:21.
FURTHER DEPONENT SAITH NAUGHT
(Proceedings concluded at 5:21 p.m.)

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF COOK    )

I, Valerie M. Calabria, CSR, RPR, do hereby certify that CLARENCE BROWN, JR., MD, was duly sworn by me to testify the whole truth, and that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was not waived, and that the deposition was submitted to Ms. Stephanie O'Connor, Plaintiffs' counsel, for signature. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, if deponent does not appear or read and sign the deposition within 30 days, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of February, A.D. 2026.

Valerie M. Calabria, CSR, RPR
Illinois CSR License 084-003928

STEPHANIE O'CONNOR, ESQ.
soconnor@douglasandlondon.com

February 20, 2026

RE: All MDL Hair Relaxer Cases

2/17/2026 Clarenece W. Brown, Jr, MD 7852296

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at P1hairdepos@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

All MDL Hair Relaxer Cases

Clarence W. Brown, Jr., MD, 7852296

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE____________________________

______________________________________________________

REASON________________________________________________

PAGE______ LINE______ CHANGE____________________________

______________________________________________________

REASON________________________________________________

PAGE______ LINE______ CHANGE____________________________

______________________________________________________

REASON________________________________________________

PAGE______ LINE______ CHANGE____________________________

______________________________________________________

REASON________________________________________________

PAGE______ LINE______ CHANGE____________________________

______________________________________________________

REASON________________________________________________

PAGE______ LINE______ CHANGE____________________________

______________________________________________________

REASON________________________________________________

_________________________________   _______________

WITNESS Date

All MDL Hair Relaxer Cases
Clarence W. Brown, Jr., MD, JD 7852296

ACKNOWLEDGEMENT OF DEPONENT

I, WITNESS, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

WITNESS Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:2,16 3:2 4:2,7,13 5:8,13 5:18 6:7,18 7:2 8:20 10:7

**0**

**0000714** 8:21
**00753825** 8:19
**00818** 1:4
**04** 129:12
**040201** 271:15
**0420201** 8:17
**084-0039** 7:25
**084-003928** 304:23

**1**

**1** 8:8 9:8 12:17 12:21 17:4
**1,000** 126:25
**10** 1:12 8:4 9:14 66:10,25 136:12 170:14 170:15 177:13 283:22 284:2
**100** 5:14 121:6 241:8 255:18
**10016** 5:9
**10038** 2:5
**10:07** 60:19
**10:19** 60:22
**10th** 5:9
**11** 90:13 136:12 182:8 182:18 183:2 184:4,7,11 254:2 284:9,10 284:11
**11/1** 90:22
**11/30/2025** 90:6
**11050** 2:23
**11:13** 105:25
**11:23** 106:3
**12** 8:8 66:11 67:1 182:8 214:18 242:10
**12:19** 146:17 146:19
**13** 177:17 178:8,13 184:3 184:5
**14** 184:3,5 215:10
**1400** 6:19
**15** 83:12 96:9 106:16 128:2,6 246:16
**150** 6:19
**1500** 2:11
**1505** 4:3
**15th** 99:24
**16** 8:9 181:13 181:14 187:3,7 187:8,21 189:13 241:11 246:9
**1600** 7:3
**17** 1:14 9:2
**1700** 3:7
**17th** 7:3
**18** 189:12
**1825** 2:17
**189** 8:11
**19** 84:2
**1900** 5:19
**191** 4:8
**19106** 3:3
**1987** 113:23
**1991** 114:1
**1995** 114:4
**1:00** 146:19 147:3
**1st** 102:19,19

**2**

**2** 8:9 16:7,11 16:15,19 31:2 31:9 246:18 285:9 288:15
**2,000** 128:15
**2,400** 128:15
**2,500** 128:15
**2/17/2026** 305:5
**20** 64:12,19 84:1 100:4 127:7 128:3,6 129:10 139:5 257:4 305:3 307:15
**200** 4:14 126:25
**20006** 2:18
**2013** 187:3
**2014** 114:13 215:6
**2018** 114:16 203:23
**202.783.6400** 2:18
**2020** 32:13
**2021** 102:19,22 103:4
**2022** 32:3,5,8 32:11,13
**2024** 189:8,10 203:17
**2025** 90:3 102:19
**2026** 1:14 9:2 83:12 304:17 305:3
**20th** 2:11 304:17
**21** 244:2 285:8 285:10 288:25 289:3,4
**212.566.7500** 2:5
**2121** 3:18
**215.592.1500** 3:4

**22** 35:19
**223** 8:12
**225** 4:19
**232** 8:14
**24** 242:9
**2401** 4:14
**25** 33:7 68:12 68:25 102:23 127:18
**2555** 6:8
**26** 96:13,14
**27** 224:4
**271** 7:3 8:15
**275** 5:9
**282** 8:18
**288** 8:20
**2925** 3:7
**2950** 4:8
**29898** 304:21
**2:14** 203:9
**2:35** 203:11

**3**

**3** 8:10 83:3,5 127:3 130:1
**30** 41:18 86:11 92:5 100:4 113:7 146:15 178:23 227:10 257:4 304:9,10 305:17
**300** 6:3
**3000** 3:18
**303** 6:3
**30363** 7:3
**310.274.7100** 3:19
**312.214.7900** 2:12
**312.767.1314** 4:9
**312.781.6677** 6:4
**312.849.8100** 5:4
**312.850.2651** 6:20
**312.855.1010** 4:20
**312.855.1105** 5:20
**314.241.2018** 4:4
**314.4463350** 6:15
**316** 3:12
**32** 189:18,21
**32502** 3:13
**33** 189:21
**33131** 4:15
**35203** 2:12
**3:48** 259:2

**4**

**4** 8:11 17:4 96:14 128:20 129:19 132:4 132:14 135:12 189:11,14 203:17,18
**404.282.5050** 7:4
**4100** 5:3
**4:06** 259:4

**5**

**5** 8:12 223:18 223:20,24 241:12 245:13
**500** 3:3 127:3,6 128:17 129:10
**505** 2:11
**510** 3:3
**512.476.7834** 5:15
**516.466.6500** 2:23
**59** 2:4
**5:01** 297:19
**5:13** 297:21
**5:21** 303:2,5

**6**

**6** 2:22 8:14 80:14 81:1 204:16 232:17 232:19 288:4
**600** 3:12 100:16
**60601** 5:4
**60606** 4:9,20 5:19 6:3,19
**63101** 4:3
**63105** 6:14
**640** 6:14
**64108** 6:9
**646.513.2133** 5:10
**6th** 1:13 2:4

**7**

**7** 8:15 149:12 152:3 153:13 257:24 271:12 271:19,22 287:21 289:25
**70** 149:14
**700** 2:17 4:19
**701** 4:3
**713.626.9336** 3:8
**714** 288:2
**76** 224:4 225:4 230:8 231:25 232:9
**77** 5:3
**77098** 3:8
**7852296** 1:25 305:5 306:2 307:2
**786.957.1157** 4:15
**78701** 5:14

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 311 of 398 PageID #:73461




**8**

**8** 8:18 96:10 154:24 282:17 282:17,18 283:6 293:10
**800** 5:14 6:14
**816.474.6550** 6:9
**83** 8:10
**850.435.7000** 3:13

**9**

**9** 8:20 155:24 233:8,15,16 288:1,6
**90067** 3:18
**95** 114:6
**96** 114:6,6
**99** 114:7
**9:00** 11:17
**9:09** 1:14 9:2

**a**

**a.d.** 304:17
**a.m.** 1:14 9:2 11:17
**ability** 23:4 55:16 76:20 77:3 217:3 246:2 247:11 247:16 248:10 253:24 255:23 263:1 268:17 277:11 279:16 280:3
**able** 15:15,23 46:18 68:20 101:4 124:14 161:14 162:8 168:10 172:10 182:14 246:24 246:24 250:12 252:23 262:15 267:23 268:20 276:5 280:8
**above** 70:18 145:7 155:25 182:8 184:7,11 305:6 307:7
**absolute** 146:4 188:10
**absolutely** 59:5 187:12 188:22
**absorb** 239:21 240:2 241:8,9
**absorbed** 59:1 74:9 75:9 78:9 88:14 118:24 147:16 162:8 164:5,22,24 167:1,11 194:1 202:4 205:9,11 206:4,15 213:4 215:3,13,15 221:21 223:4 224:10 226:5 227:1,5,6,16,21 237:14 238:7 240:6 241:18 245:18 248:16 251:10 253:24 255:2 256:20 261:8,17 262:9 262:25 263:8 263:23 264:12 266:10 267:18 268:24 269:6 270:3,7,10,16 271:4 298:23 300:14,19 301:13
**absorbs** 269:22 269:23,24
**absorption** 28:24 57:7 58:1 82:2 87:17,20 88:5 88:22 89:22 92:10 107:24 108:4,9 112:12 162:11,12,15 164:13,16 165:7 166:16 167:12 172:1 180:11,20 181:2,4,12 188:4,9,24 190:17,23 191:1,9,10,12 191:21 193:7,8 193:17 196:9 197:6 198:9 201:12 202:15 204:18 207:7 210:8 211:1,13 211:22 212:5 212:11 214:6 216:10,15 217:4,9,17 219:12 220:6 220:22 221:7 222:15 224:14 225:10,21 228:3 234:19 235:4,5,22 238:1 240:9 244:7,9 245:8 253:12,13 254:8,18 260:17 262:1 262:20 265:15 265:22 266:17 266:24 267:5 268:11 269:14 281:16 282:6 285:18,23 287:9,16 290:20 292:19 296:3,6 300:7 301:3
**absorptions** 188:5
**abundance** 59:9 175:21,25 287:14

**abused** 279:14
**academic** 80:9 81:18 82:21 85:12 122:17 156:25 161:7
**academy** 141:4
**accept** 97:11
**accepted** 186:18 200:5 215:12
**access** 118:5 253:11
**accommodate** 253:5
**accompanying** 271:15 288:2
**accomplish** 91:17,18 293:3
**accordance** 84:1
**accuracy** 201:19 305:9
**accurate** 16:19 46:18 60:13 111:24 112:3 127:15 231:17 232:3 235:13 242:15 245:6
**accurately** 199:18 217:2 243:15
**achievable** 57:19
**achieve** 239:4 281:20 282:8
**achieved** 47:24 291:2,11,11
**acidic** 178:6 182:10 256:13 258:5,15
**acidity** 257:25
**acknowledge** 285:9
**acknowledged** 67:22 69:18 185:21 260:15 260:16
**acknowledge...** 307:3
**acknowledges** 225:20
**acknowledging** 47:24 245:21 292:22
**acknowledg...** 305:12
**acting** 287:6
**action** 9:19 162:7 167:13 180:1 297:8 304:15
**activate** 257:15
**activator** 41:16 59:22 60:2 61:1,18 62:7 64:4 203:24 251:12 254:9 255:3 256:18
**active** 53:3 68:7 122:4 162:15 173:16 174:1 178:1
**actual** 14:4 183:12 198:6
**actually** 14:11 17:4 22:7 29:16 46:13 54:15 55:15 58:7 59:21 88:2 110:14,15 114:17 122:14 124:14 158:5 178:2,19 188:18 193:1,6 193:11 194:6 197:25 211:8 215:2 226:10 226:13,14 227:1 228:23 230:10 231:7 246:17 283:24 287:18 288:10 288:14 290:11 293:22
**acute** 248:12
**ad** 160:6
**adams** 2:11
**add** 144:20
**addition** 44:19 178:21
**additional** 100:17 232:5
**additionally** 81:5 242:3
**additions** 307:6
**address** 188:20 191:20,23 280:3 298:21
**addressed** 149:8
**addresses** 298:19
**addressing** 230:10
**adept** 49:14
**adipose** 170:24
**adjustments** 145:6
**admonition** 150:9
**adrenal** 118:5,5
**advance** 224:8 226:16
**advanced** 4:6 35:7,11 44:24 51:12
**adverse** 142:6 144:18
**advised** 39:12 39:16
**advisory** 275:6
**aerosolized** 177:7 199:13

**aesthetic** 229:3
**afam** 6:17
**affect** 261:18 262:20 292:18
**affecting** 168:5
**affiliated** 94:1
**affiliations** 9:24
**afflicted** 132:16
**afraid** 79:23
**african** 33:10 34:17 125:21 130:4
**agencies** 206:10
**agency** 215:1 219:7 220:9
**agency's** 219:24
**agent** 199:25 229:8,14 285:11,12,20 286:1
**agents** 46:1 200:10 220:17 225:24 226:3,4 227:1 228:6 229:3 246:5,6 247:17
**ago** 55:20,20 66:11,11 67:1 153:17
**agree** 9:7 15:1 30:18,24 46:21 46:24 47:5 70:4,21 72:2 72:20,24 73:3 73:4 75:25 123:15,16 138:2,5,10 156:13,16 157:5,22 160:14 166:24 167:19,20,22 168:3,17 179:21,22,23 180:4,11 181:6 189:23 196:22 200:21,23 204:22 205:1 205:22 206:8 228:3,20,22 238:8,24 242:11,12,13 243:1 244:15 244:18,21 245:5,7 252:11 252:14,21 253:16 275:20 276:13 289:23 290:3,4,18 291:3 294:14 301:25
**agreed** 76:25 134:13 180:7 239:16 255:3 269:15
**agreement** 157:13
**agrees** 244:25
**ah** 233:25
**aha** 42:2
**ahead** 13:7 227:19 287:25
**al** 203:23 215:6
**alabama** 2:12
**alexius** 2:10
**aligned** 108:16 161:6 162:1 230:12
**alkaline** 41:22 61:6 62:13 63:9 174:2 199:23 251:6 251:11,17 252:20 253:14 253:22 254:4 257:19
**alkalinic** 182:4
**alkalinity** 173:19 178:1,5 182:9 183:1,20 183:24 185:13 186:19 255:22 258:1 272:22 273:20 274:6
**allegations** 116:21
**alleged** 137:14
**allen** 4:2
**allergic** 44:19 44:21 45:1,6 51:7 133:23 134:12 137:6,8 137:10,12 138:3,18 139:19,24 140:13,14
**allergies** 134:5 139:3
**allergy** 140:17
**allotted** 305:20
**allow** 40:12 52:20 53:19 171:12 202:18 216:21 236:17 252:18 254:8
**allowable** 76:3
**allowed** 95:21 267:5
**allows** 162:17 178:3 202:18 243:20 248:11
**alopecia** 51:7 80:20
**alopecias** 34:10
**alphabetical** 189:20
**alter** 43:19 64:11 199:24
**altering** 43:10
**alternative** 207:22 296:2

**alvarez** 3:17
**ama** 141:2
**ambiguous** 159:17 160:19
**amending** 42:15
**american** 33:10 34:17 125:21 130:4 141:4,5
**amiller** 2:13
**ammonium** 184:14
**amount** 70:8 75:7 90:18 201:9 209:19 238:22,23 239:12,14,15 240:12,17,17 240:25 241:2,3 242:25 294:8
**amounts** 196:21
**analyses** 80:16
**analysis** 47:21 79:4 81:24 82:8,18,20,23 83:2 149:9 163:13,20 241:21 242:5 243:1,24 299:14
**analytic** 122:18
**analyzed** 243:22
**anatomic** 23:3
**anatomy** 115:4 170:18
**anderson** 4:7
**anesthesia** 120:18
**angeles** 3:18
**animal** 296:11
**annual** 128:13 128:18,21 138:23
**answer** 14:25 15:9,18 18:14 18:24 22:19 23:15 24:25 25:2,18 30:21 35:18 42:23 46:4,19 51:23 55:25 57:24 60:9 68:18 79:12,13 81:17 83:25 84:8,15 85:20,20 86:1 86:4,6,17 87:7 87:12 89:7 93:22 94:17 95:16 96:5 97:3,12 101:5 101:11,15,25 102:3 103:23 105:8 110:25 111:9,14,20 112:11 113:15 117:9 119:20 120:6 124:15 127:21 128:9 129:3,4 130:9 132:10 134:2,8 134:25 136:15 144:19 145:7 145:19 150:10 151:6,7,21 153:18,24 154:2,4,10 155:22 159:7 161:15 164:23 165:3,21 166:2 166:20,21 167:25 168:2,8 168:10 171:15 172:15 175:18 182:14 183:7 187:18 189:6 191:15 192:10 192:21 193:19 194:8 195:21 197:12 202:7 204:8,25 206:7 208:1,11 213:12,14,24 218:7 222:3,24 226:18 234:21 235:8 239:22 243:3,14 248:25 249:7 252:7 253:4 260:4 261:23 262:13,15 263:11 264:3,6 264:16 267:12 268:20 273:4,7 277:8 279:6,16 280:7 282:9 285:25 287:11 291:15 295:5 295:12,18,24 296:14 297:12 298:6,20 299:7 299:8,18 300:1 301:8,11
**answered** 26:1 26:23 40:15 42:22 54:13 62:25 65:6 69:20 79:11 89:6,19 137:21 145:9 148:24 149:1 152:25 153:4,9,16,20 153:23 169:10 171:24 194:4 195:15 209:12 226:20 234:20 241:6 248:23 263:10 264:2,5 279:19 281:19 285:24 300:24
**answering** 25:1 84:6 87:13 88:7 89:25 91:14 101:3,6 147:11,12

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 315 of 398 PageID #:73465



168:11 169:4 169:15 170:3 170:10 221:4 222:8 262:15 264:4,17,19
**answers** 194:6 195:9,17,18 279:20
**antibiotics** 37:2 37:3 226:1
**anticipate** 100:9
**antidandruff** 225:24
**anybody** 35:3 35:12 54:6,12 54:19 55:6,22 56:9,21 94:7 94:11,20 97:16
**anybody's** 53:25
**apart** 161:8
**apologize** 99:8 110:3
**appear** 109:22 189:21 304:10 304:12
**appearance** 9:23,24 13:1 229:4
**appearances** 2:1 3:1 4:1 5:1 6:1 7:1
**appeared** 2:8 2:15,20,25 3:5 3:10,15,21 4:5 4:11,17,22 5:6 5:11,16,21 6:5 6:11,16,21 7:5
**appears** 152:3 153:13
**appendageal** 172:2 260:12
**appended** 307:7
**apple** 257:20 257:20,21,21
**apples** 258:2
**applicability** 201:19
**applicable** 217:21 305:8
**application** 39:1 41:11 49:3 59:7,9,16 63:8,21 65:17 67:8 68:14 118:12 142:3,4 142:8 143:4 157:23 158:5 164:2,7 177:18 178:14 179:2 181:24 182:2 205:12 216:13 216:18 224:11 227:11 239:20 250:13 288:19 289:9 290:25 292:12,21,23
**applications** 183:14 245:16
**applied** 38:11 58:5 59:11 164:8,9,23 175:4 199:23 205:15 207:10 209:19 212:3,4 213:5,6 235:14 249:2,14 253:10 254:22 255:3 256:7 265:4 273:22 275:21 276:12 280:11,17,22 285:13 286:3 289:5 294:5 295:3,10 297:1
**applies** 157:18 200:11 291:12
**apply** 43:4 52:6 96:17 118:20 139:11 162:13 192:3 200:13 201:21 250:5 277:11 280:3 281:14 284:12 285:3 288:9,17 288:20 290:2,5 290:16 294:16
**applying** 162:16 289:22 292:16 293:12
**appointments** 121:22
**approach** 36:4 100:20 122:18 140:13 143:14 143:16 200:20
**approaches** 37:6,15
**appropriate** 237:4
**approved** 114:7 227:12
**approximate** 192:23 235:21
**approximately** 91:4 106:16,22 128:2
**area** 31:15 48:7 49:4,7 67:24 68:6 236:2,4 246:23 284:13 288:21 289:22 290:24
**areas** 56:16 248:16 275:11
**argued** 175:5,6
**argument** 278:16,19,21
**argumentative** 25:5 27:2 40:3 42:16 47:18 77:2 161:22 175:17 176:10

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 316 of 398 PageID #:73466



192:19 197:24 208:9 221:2 231:13 291:14
**array** 201:1
**arrive** 36:5 198:4 221:22 262:3 300:15 301:15
**arrived** 151:5 151:19 299:9
**art** 49:25
**arthritis** 264:25
**article** 188:22 190:4,15,20,20 192:22,25 193:9 199:11 206:1 207:3,18 209:9 210:3,5 210:12,17 214:24 216:9 216:10 217:2,3 217:16,18
**articles** 119:2 178:19 188:18 191:17
**ascertain** 24:9
**ashcraft** 2:16
**ashcraftlaw.c...** 2:19,19
**aside** 103:8
**asked** 14:22 17:6 20:3 25:3 25:6,10 26:1 26:23 40:15 41:9 42:11,22 54:13 62:25 69:16,20 73:9 78:1,6 79:7 87:5 88:1,11 88:17,24 89:5 89:8,18,23 100:10,12 102:1 108:6,6 110:20 111:1 118:13 126:7 131:13 141:16 148:12,24 150:13 153:20 153:23 158:8 159:12 166:15 171:24 186:20 194:11,12,13 195:13,15 197:12 208:11 212:21 221:15 221:19 222:10 234:20 241:6 248:23 263:10 264:1 278:14 279:10,12,22 285:24 296:24 298:21 299:8
**asking** 26:20 56:21 58:20 72:18 84:12 102:3,7 110:5 110:6 122:14 131:7,20 133:15 144:2 149:2 163:17 165:12 173:2 176:4 183:16 192:9 230:25 238:19 240:24 243:16 244:24 245:5 255:8 279:18
**aspect** 116:17 162:12
**aspects** 46:17 59:8 71:20 75:20 142:1
**assemble** 92:13
**assert** 244:3
**assertion** 224:9
**assertions** 224:14
**assess** 204:18 219:11
**assessed** 211:12 211:22 212:11
**assesses** 211:1
**assessment** 212:5
**assessments** 215:22
**assign** 124:18
**assigned** 124:15 200:1 210:18 214:14
**associated** 80:21 91:24 205:13 215:17 215:23 216:22
**association** 141:6,7 155:2
**assume** 57:3,12 94:13 115:15 143:19 171:16 224:5 287:4
**assumed** 202:8
**assumes** 171:10 199:25 209:10
**assuming** 38:11 68:13 240:7
**assumption** 205:25 239:6
**assumptions** 199:14 201:17 207:4 210:14 241:23
**atkinson** 7:2
**atlanta** 7:3
**atlas** 170:18
**atomic** 199:2
**atoms** 236:5
**attached** 16:15 84:24 305:11
**attachments** 98:1
**attacks** 160:6
**attempt** 134:25 142:5,19 198:17 207:1

**attempted** 58:9 192:21 241:17
**attempts** 144:18 198:5 199:11 216:10
**attention** 80:12 144:14 145:20 224:3
**attorney** 9:25 108:7,14 240:17 304:14 304:14 305:13
**attorneys** 93:25
**attributable** 292:4 295:2
**audience** 18:7 19:7
**audio** 9:5
**audriana** 4:14
**audriana.rodr...** 4:16
**austin** 5:14
**authored** 119:1
**authorities** 185:10
**authors** 81:9 214:21
**automatically** 41:19 42:6 172:24 173:7
**available** 79:16 85:12 92:9 168:21 202:17 241:21 251:1 305:6
**avascular** 170:25
**avenue** 3:7,18 5:9,14 6:14
**average** 30:24 31:7,10 127:6 127:18,19 135:14 138:19
**avlon** 5:22
**avoid** 39:4,13 39:17 40:12 49:5 51:19 52:16 53:1,21 55:16 56:15,18 59:6 67:23,23 110:17 140:16 143:13 293:4,6 293:11,16 294:4
**avoided** 60:3
**awad** 187:6 188:4
**awake** 120:18
**aware** 45:23 95:1 136:25 137:3,6,8,14 182:16 184:1 184:13,15 214:15 267:14 275:13,17,20 288:24

**b**

**b** 8:14 10:18 96:14 232:18
**back** 12:7 25:23 27:4,25 39:8 57:14 58:14 60:21 72:11 96:6 104:25 106:2 121:3 130:24 131:8,14 140:2 143:9 144:22 145:11 147:2 148:20 150:10 151:8 152:21 155:14 166:7 177:2 185:17 198:18 202:25 203:11 213:9 214:8 217:24 218:24 219:20 221:12 222:7 257:2,7 259:4 273:10,12 274:15 277:3 277:16,19 278:3 279:5,22 289:25 293:15 297:21 301:19
**background** 20:22 36:3 101:21 108:15 152:4 154:19 155:6,9,16 156:24 178:23 204:4 235:17
**bacon** 6:7
**bad** 140:5
**balances** 178:6
**bank** 246:12 251:2
**bar** 114:17,18 141:6,6
**barber** 174:12
**barr** 3:11
**barred** 19:17 122:5
**barrier** 140:19 166:24 181:1,4 202:9 217:19 236:21 253:21 260:11 267:5 287:7
**barriers** 236:19
**bartolomeo** 4:19
**base** 41:15 45:20 59:22 60:2 61:1,18 62:7 64:4 251:12 252:20 253:13 254:4,9 255:2,13 256:17 257:6,8 258:2 285:13
**based** 17:1 36:2 69:24 71:2

101:3,13 112:23,25 125:2 132:11 136:1,1 162:10 172:18 198:23 199:25 201:8 205:14 209:10 210:15 214:23 215:18 216:24 217:12 218:5 219:14,25 220:19 222:12 231:17 241:20 275:24 276:18 296:18 299:4 300:5 301:1
**basic** 224:15 235:9
**basically** 198:3
**basing** 178:9 183:11
**basis** 33:12 128:14,18,21 132:5 133:1 138:23 155:18 156:24 178:20 198:8 206:2,13 206:22 207:1,3 207:12 216:4,8 232:15
**bates** 8:17,19 8:21 271:15 288:1
**baylen** 3:12
**bear** 110:18
**bears** 16:23
**beautician** 55:6 56:23 276:23 277:12 280:5 289:12 291:9 293:22
**beauticians** 55:9 56:7 57:22
**beauty** 4:6 6:6 6:22 7:6
**becoming** 286:15
**began** 90:21 91:2,8,23 92:13
**beginning** 9:25 68:15 69:4,8 105:1 113:20
**begins** 17:5 65:12,15 81:4 250:1 286:2,16
**begun** 100:2
**behalf** 2:8,15 2:20,25 3:5,10 3:15,21 4:5,11 4:17,22 5:6,11 5:16,21 6:5,11 6:16,21 7:5 10:2,7 83:9,15 93:1 102:6 103:14,18 104:4 105:4
**believe** 12:3 13:8 17:19 20:5 31:20 32:22 39:4 50:14,15 65:5 66:6,16 101:5 112:2 117:13 137:20 141:8 157:18 165:19 177:24 184:7 186:24 191:16 193:10 194:4 198:8 226:7 231:6 239:1 242:14 243:4 243:17 258:19 262:9 277:13 281:2 282:23 285:9 286:8 291:3,7 292:11 293:20 294:2
**believes** 281:12 281:13 282:4
**bell** 6:6,22
**bench** 83:1 118:18 203:4
**benchmarks** 205:10 206:5 206:16 209:16 209:23 213:18
**benchtop** 176:15
**beneath** 170:24
**beneficial** 116:16 228:19 229:8
**benefit** 47:21
**berman** 3:2
**best** 17:1 109:16,19 110:4 111:23 112:3 115:11 125:19 196:1 217:17 235:14 235:25 290:16
**better** 114:22 115:3 159:12 210:24
**beyond** 26:15 26:24 27:2 168:7 170:2 200:15 218:14 237:22 261:22 268:16
**bias** 101:1
**big** 97:8 104:18 233:17,18
**bill** 100:16
**biochemical** 28:23
**biologic** 73:9 82:2 223:1 298:21
**biological** 72:1 72:17,22 73:3 73:7,12,16,21

87:14 150:3 158:3 167:24 221:20
**biologically** 17:8 147:13 156:7 169:5 170:11 185:6 221:4 260:18 263:13 264:20 296:21 300:12 301:11
**biologist** 20:20
**biology** 20:23 20:24 21:4 69:17 116:1,5
**biomarkers** 191:23 209:23 242:6,17,24
**biomechanical** 78:8 204:12
**biomedical** 19:13 113:25
**biomonitoring** 80:16
**birmingham** 2:12
**biscayne** 4:14
**bit** 49:21 116:23 130:22 207:21 209:3 223:14 238:16 241:15 256:5 288:3
**black** 30:17,23 31:15,17,21,25 32:16 33:2,10 34:17 37:18 44:1,12 46:10 47:6,14 48:16 56:6 69:1 125:21 126:9 126:11 127:7 127:17 128:20 129:21 132:4 139:5 156:4 161:9 162:2 199:15 201:18 207:3 210:20 242:5 274:3
**blanking** 123:4
**bleach** 182:9,11 182:12,14
**bleaches** 184:15 267:3
**bleaching** 182:17,25
**bleed** 174:12
**blending** 63:19
**bliss** 3:17
**blood** 171:1,2 176:22 196:21 236:15,17 237:20,21 238:14 239:3 243:15 261:9 265:11 269:7 271:5
**bloodstream** 59:1 75:13 87:21 162:9 167:6,14,15 171:7,22 172:10,19 173:8 174:18 174:24 175:7 175:15 176:23 193:24 196:9 196:13 197:6 197:21 199:8 217:10 235:6 237:1,3,5,10,16 238:6,23 239:16 240:14 240:22 241:4 259:25 261:9 266:18 267:19 268:12,25 296:21
**board** 22:5 120:11 123:8 123:12
**body** 85:13 117:3 147:17 156:25 169:9 190:12 208:22 208:23 220:25 221:18 222:17 242:19 257:9 260:23 261:5 261:10 269:8 269:20 286:14
301:5 302:8
**bold** 247:10
**bolded** 275:9
**bonds** 178:5
**bottle** 164:22
**bottom** 258:4 272:15
**boulevard** 4:14 6:8
**box** 199:15 201:18 207:4 210:20 272:5 272:14,17 275:6 288:9 290:1 298:10
**boxes** 275:4 282:12
**boxing** 286:17 287:1
**bradley** 4:7
**brantley** 7:2
**braun** 242:3
**breadth** 78:23 298:19
**break** 58:18 60:16 105:23 146:9 178:4 194:19 203:7 251:20,25 252:10 259:1 283:20
**breakage** 51:6 142:8

**breakdown** 64:16 202:11
**breaking** 105:20 172:13 172:24
**breaks** 38:17 58:19 260:10
**breast** 123:21
**brief** 62:14,23
**bring** 13:4,4 19:22 20:1 60:11 145:20 189:1 257:25
**brings** 260:7
**broad** 71:5 74:4 80:6 113:6 116:24 117:1 199:10
**broader** 234:9
**broadly** 120:8 247:6
**broke** 279:15 279:16
**bros** 114:25 115:5
**brought** 53:1 144:14 274:15
**brown** 1:8 8:3 9:10 10:10,17 10:21,24 12:16 12:21,24 16:11 19:3 40:19 58:24 60:24 72:21 79:7 81:7 83:4,5,8 106:5,21 146:11 147:6 150:18 153:19 165:2 166:5 172:15 189:14 192:14 194:14 203:13 223:20 224:5 232:19 233:21 234:2 244:10 248:3 259:6 271:19 271:24 282:18 288:6 289:14 297:23 302:22 304:3 305:5 306:2 307:2
**brush** 293:13
**buchanan** 3:11
**bullet** 272:4,10 272:15 275:5
**bullets** 275:7
**bunch** 195:14
**burgess** 8:13 186:8 223:19 223:25 226:7 226:10 230:5 230:18 231:3 231:10,16,21 232:7,13 244:2
**burgess's** 223:15 224:25 229:19 232:1
**burn** 36:15 37:1 38:15 39:1,3,13,17,23 40:8,12,19,24 41:6,6,19,24 42:7,12,20 43:4,11,13,19 43:22 45:4,12 45:19 48:3,17 49:2 50:19 61:2,12,13,14 61:21 62:9,16 62:18,21,24 63:24 64:5,22 64:23 65:3,12 65:20,23 66:4 68:11,16 69:3 69:4,7,9,10,15 248:22 249:7 249:11,18,22 250:2,7,22 276:4,6 285:15 289:6
**burned** 66:19
**burning** 36:24
**burns** 34:11 45:2 46:2,11 46:25 51:8 63:6,12 66:3,7 68:22 80:20 125:5 142:7 289:2
**busy** 122:11
**bwhs** 156:3

**c**

**c** 10:5 102:13 103:8 104:4 105:3
**caffeine** 188:13 188:15 245:13
**calabria** 1:12 7:24 9:17 304:3,22
**calculate** 128:25
**calculated** 292:7 295:21
**calculation** 197:4
**calculations** 112:20
**california** 3:18
**called** 1:8 10:11 17:5 33:12 93:17 115:8 136:20,21 149:5 203:20 264:25
**calls** 57:17 59:4 267:9
**cancer** 22:10 23:11,18,23 24:1,5,14,17,20 25:12,20 26:5 26:14,18,22 27:22 28:6,20

32:25 33:1 88:9,16,21 89:2,21 117:25 118:14,15 119:2,6,8,12,15 120:17 121:10 123:20,21,21 124:15,20 148:11,11 149:7 150:21 151:18,25 152:18 154:25 155:3 156:10 169:23,23 170:8 297:8 299:24
**cancerous** 121:17
**cancers** 17:10 24:10,24 27:17 28:13 149:18 151:1 152:10 154:15
**capable** 168:4 265:5 269:13 278:5 281:4 285:17,22
**capacity** 122:13 265:14 266:10,17,24 267:6,18 268:11,24
**capillary** 260:20
**carcinogenic** 292:7 295:15
**carcinogens** 59:23
**carcinoma** 91:22 124:1
**care** 23:6 37:5 46:17 47:6 103:20 104:6 105:5 113:5 116:21 117:6 121:24,25 133:11,16,24 134:6,13 135:2 185:22 242:9 243:21 252:15 267:15
**cared** 33:9 63:3 63:4
**career** 33:3 44:6 66:10 115:16
**carefully** 130:25 132:1 137:15
**carnegie** 113:23
**carson** 3:22 10:3
**case** 1:4 16:21 19:24 77:15 85:8 86:16 87:2 91:21 92:16,25 95:5 95:7,11,14 96:10 97:16,21 100:6,16,21 101:5 103:16 104:7 105:12 105:13,16,17 106:24 107:19 107:22 108:2,4 108:7,18,20,23 109:6,7,23 112:9 113:1,12 137:20 147:10 147:19,23 148:3 149:4,21 150:1 153:14 159:25 167:17 171:11 189:9 190:1 195:4 216:1 224:23 259:21 272:1 275:11 282:22 298:21 301:23 302:11,19
**cases** 96:19 103:10,11,13 103:17 104:4 105:3 107:2,12 107:15 116:20 116:24 117:5 124:9 305:4 306:1 307:1
**castronuova** 2:3 303:1
**category** 137:12
**causal** 148:10 148:13 149:6,8 150:19,25 151:16,24 152:17 299:13
**causation** 24:13,19 25:7 25:20 27:20,21 28:4,9,16 88:12 96:10,18 299:23
**cause** 24:16,24 25:11 26:14,22 41:5 42:7,12 42:20 43:4 45:24 46:22,25 48:6 49:11,15 63:12 88:9 137:6,8,16 150:9 170:7
**caused** 26:4 52:17 299:24
**causes** 61:2 62:9 64:5
**causing** 24:14 88:18 141:18 178:7 182:1
**caustic** 38:16 41:23 43:10 45:2 49:3 61:8 63:8 64:14 68:10 70:9,18

172:12,24 173:19 174:3 182:4 199:22 216:13 227:23 236:20 249:2 250:18 254:14 255:23 260:8 270:4
**cavo** 6:2
**ccotton** 6:10
**cell** 123:25 269:8
**cells** 173:17
**center** 35:8,11 44:24
**centers** 124:5
**certain** 11:25 19:17 31:7 70:15 71:4 75:25 76:1,24 77:12 134:12 161:14 187:12 188:11,22 200:2,9 269:18 278:6 283:16
**certainly** 56:12 72:11 76:7 113:22 117:10 120:7 122:20 142:1 188:8 189:1 211:11 214:12 215:11 227:4 229:23
**certainty** 17:2 17:7 146:4
**certificate** 304:11
**certification** 120:11
**certified** 123:8
**certifies** 22:5
**certify** 304:3,7 304:13
**cgreen** 3:14
**cgw** 6:20
**chain** 168:14
**challenging** 134:18
**change** 62:15 64:15 183:2 306:4,7,10,13 306:16,19
**changed** 142:4
**changes** 201:4 250:2 305:10 307:6
**changing** 95:3 131:4,6 184:5 195:11
**characteristics** 38:2
**characterize** 69:10 200:25
**characterizing** 210:12
**charge** 17:22 24:9 87:2 95:4
**charged** 24:12 24:18 87:6,12 87:25 88:7,13 191:24
**chart** 124:25 283:8
**cheatham** 5:7 6:22 10:5
**chelsie** 3:12
**chemical** 17:11 19:12 20:7,9 20:16 24:8,16 24:23 25:11 26:3,11,21 27:15,20 28:4 28:11,21,24 32:20 33:11,18 33:21 34:2,7 34:18 36:7,14 36:16,24 37:1 37:7 39:2,2 44:2,14 47:13 48:3,4,17 49:2 49:3,6 53:3,12 53:18 57:20,24 58:5,6,9,25 59:6 62:13,20 64:19 65:9,13 66:4,13,14,17 68:14 69:2 70:12 71:17,21 74:2,8,20 75:12 76:8 78:2 79:21 113:25 125:9 125:12,22 126:10 127:8 132:17 136:1 136:20,21 138:7,21 141:15 143:21 144:4,6,13,17 145:2,4,21,25 148:10 149:6 149:19 150:20 151:1,25 152:10 154:16 155:2 156:8 162:7 169:25 170:7 173:19 180:14 181:25 182:5 183:4,12 183:21 185:1 185:13 186:19 188:11 190:17 190:24 191:3,4 191:6,12,25 192:3,16 193:16,25 197:4,18,20,20 198:18 199:6 199:23 200:2 201:10 202:2 205:12 207:9 207:14,15,24 208:5,6,15,15 210:6 213:17 215:16 216:18

216:22 218:11 218:16 219:13 220:8,24 222:17 227:15 234:8,9,17 235:5 237:2,6 237:25 238:1,5 238:7,12 239:13,14 241:21 245:23 246:1,8 247:1 248:15 249:1,3 249:20 250:18 250:24 251:3,7 251:17 254:15 254:20 255:22 256:2,4,6,12 259:23 260:6,7 260:9,9,10 262:2,8,9,19 263:3,7,8,14,23 263:24 264:13 265:18,20 267:14 268:19 269:12 273:20 281:24 282:13 285:15 287:12 287:19 289:2,6 293:1,12 298:23 299:3 299:24 300:8 301:4
**chemically** 66:19 137:16 264:12
**chemicals** 24:13 26:4 28:24 57:7 59:21,23,25 60:4,13 63:9 64:9,14 75:25 77:17,24 78:4 78:8 79:1,9 80:4,18 82:19 87:15,20 88:2 88:8,12,15,18 88:22,25 89:22 107:24 116:15 116:19 147:14 148:14 150:4 151:17 152:18 158:4 163:24 164:17 169:6 170:12 172:12 174:3 177:18 177:20 178:15 179:3 181:15 182:22 184:19 188:19 191:1 191:18 193:11 196:8,14 198:24 201:1,7 201:10 204:5,6 204:13 206:4 206:15 214:4 215:5 216:13 217:5,18 218:7 219:13 220:2,8 220:24 221:5 221:17,21 222:16 223:2 224:12 225:8 226:11 227:23 228:2 234:17 235:1,4 236:25 237:13 243:11 246:12 247:11 248:13,19 250:11 251:2 251:13 252:22 253:6,15,22 254:22 260:1 260:14,19 261:3 262:24 264:21 267:3 270:5 295:22 296:4,11 297:1 297:6 298:4 299:14 300:12 301:12
**chemistry** 80:16,24 81:5 81:7,13 235:10
**chemotherapy** 124:2,8,12
**cherin** 5:8
**cheryl** 8:12 223:19,25
**chicago** 1:13 4:9,20 5:4,19 6:3,19 9:14 30:14 32:9 114:4,8,9,13,14 127:25
**children** 128:1
**choose** 52:24
**chosen** 122:12
**christopher** 6:7
**chugalugga** 202:20,20
**chugs** 210:20
**circulated** 259:24 268:25 270:13,16,17 271:5
**circulation** 88:6 167:6 201:13 202:4 213:6 217:11 220:7 221:8,22 246:25 260:22 268:13 269:14
**circulatory** 223:5 262:3,25 300:15 301:15
**circumstance** 41:2 70:12 76:5 173:25 250:5 294:7
**circumstances** 50:11 173:9 205:11 273:1 291:9
**cirrhosis** 225:25

**cite** 178:8,11,13 187:7,21 193:23 197:7 244:10 246:14 246:19
**cited** 15:6 187:8 191:13 192:15
**cites** 215:6
**city** 6:9 109:5 114:10
**civil** 1:10 96:13 304:10
**claim** 34:6 117:19,20 224:12 225:7 264:14 285:20
**clarence** 1:7 8:3 9:9 10:10 10:17 83:4 304:3 306:2 307:2
**clarenece** 305:5
**clarification** 212:21
**clarify** 142:19 208:19
**class** 116:7,9,11 116:18
**classes** 115:16 115:21 116:1
**classification** 135:1
**classify** 69:7
**classifying** 213:3
**clausen** 4:18
**clausen.com** 4:21
**cle** 122:7
**cleansers** 267:3 267:16
**clear** 25:14 54:18,22,24 121:6 149:9,10 249:9
**cleared** 242:20
**clearly** 108:15
**cles** 122:19,19
**clients** 195:10
**clinic** 29:20 31:19
**clinical** 33:8 35:9,20 36:2,3 63:5 71:7 80:19 92:5 101:20 113:4,7 227:11
**close** 148:19 241:9 293:1
**closely** 161:6 161:25 166:4 187:25
**clyder** 5:2 10:4 10:4
**cmo** 84:1 85:24 96:9
**cocktail** 185:11
**coefficients** 198:20,25 199:13 234:11
**cohort** 242:5
**collaborative** 94:14
**collection** 125:14 203:20 245:23
**collective** 178:22 227:10
**collectively** 11:14,15
**college** 113:21 113:22 141:5
**colloquy** 117:18 145:12 150:12,15 154:8 165:10 171:18 192:19 258:9 287:2
**color** 46:14
**combination** 101:20 142:3
**combs** 283:21
**come** 39:14,18 58:10 63:5 64:9 104:13 150:9 164:12 164:17 165:8 165:14,15 166:17,18 195:3 198:12 227:25 253:6 254:16 257:7 269:23 278:23
**comes** 13:13 38:18 40:10 43:8 58:8 199:16 248:15 249:25 250:18 253:23 255:19 256:3,12 267:24 269:25 286:13 287:5 287:13
**comfortable** 12:10,13
**coming** 166:12 257:2
**comment** 61:5 158:8 182:21 189:1 229:23
**commentary** 38:4
**comments** 216:9
**commercial** 37:13
**committee** 94:25
**common** 62:21 130:5,10,14,20 131:19 132:15 142:14
**commonly** 79:15 186:17

**communicated** 99:2
**communicati...** 85:22 95:25 96:16 109:19
**compared** 296:10
**comparison** 205:9
**compelling** 193:9
**compensation** 8:10 13:9 83:4 83:11 99:25
**competently** 15:24
**compile** 85:2,8
**compiled** 85:4 85:14
**complaining** 32:4
**complaint** 95:10
**complaints** 134:11 142:13
**complete** 21:23 299:18 307:8
**completed** 114:3,11,16 305:17
**completely** 121:6
**complex** 234:6 235:15 236:22
**compliment** 93:5
**component** 20:18 281:25
**components** 60:5 139:4 166:22 167:5 167:17 253:10
**compounding** 236:16
**compounds** 242:6,17,19 244:5
**comprehend** 165:23
**comprise** 173:17
**comprised** 98:20 170:20 170:22 177:15
**compromise** 63:15 65:8 118:25 171:11
**compromised** 253:9,21 266:14 272:21 272:23 273:18 273:21,22 274:24
**compromises** 248:13
**compromising** 65:7 140:18 172:25
**computer** 198:2
**computerized** 304:5
**concede** 205:7 212:8
**concentrate** 237:22
**concentrated** 236:9 238:15
**concentration** 73:11 74:12,24 75:16 167:23 168:4 201:11 234:8 236:10 236:18 237:2,9 237:9,15,19,23 238:13 239:3,4 240:18 241:1 243:16 261:2 262:8 263:6,22 264:11 295:1,9
**concentrations** 76:1 80:17 218:7 220:1 236:8 292:4 298:3 300:20
**concept** 6:17 234:7,9
**concern** 60:4
**concerning** 60:4 156:5 298:3
**concerns** 53:1
**concierge** 189:13 288:5
**conclude** 214:4
**concluded** 206:20 303:4
**concludes** 300:11
**conclusion** 157:24 185:12 204:4,10,10,11 206:3,14,23 215:9,11 216:1 216:5 225:11 243:24 296:20
**conclusions** 156:19 157:21 229:18 297:5 298:12 299:2
**condition** 32:17 35:3,16 36:15 47:5 50:6 140:7 141:19 142:13 146:1 169:1
**conditioner** 60:6 203:24 251:4,14,19 252:23 253:9 254:6 257:16
**conditions** 22:10,13,17 32:19 44:16,17 45:1 50:22

51:2,4 52:4 130:6,15 131:19 139:13 139:16
**conduct** 112:5 113:10 175:9 175:11,13,16 198:1 203:4
**conducted** 118:18 119:9 218:6 219:18 219:25 220:16 220:20 222:13 259:22
**conducting** 78:21
**confines** 148:2
**confirm** 16:14 293:19
**confirmed** 66:12
**confounding** 71:18 124:17
**confused** 133:14 209:3
**confusing** 213:2
**congress** 5:14
**conjunction** 98:16
**connect** 93:19 246:11
**connected** 259:15
**connection** 148:10,13 149:6 150:20 150:25 151:17 151:24 152:17
**consent** 47:20 48:12 50:4 51:16
**conservative** 201:9,18 215:12
**consider** 45:25 46:9 61:11 73:25 88:2 130:18,19 197:17 213:4 224:15 234:15 234:23,25 235:2 269:22
**considerable** 226:11
**consideration** 75:22 117:11 163:23 199:21 202:13
**considerations** 46:5 75:17
**considered** 21:7 46:6 80:3 91:13 121:12 123:23 130:19 189:25 190:10 197:13,17 218:19 271:25
**considering** 74:7,19 235:3
**consistency** 142:1
**consistent** 42:18 61:13 133:21 187:18 196:25 250:21
**consists** 86:20
**constant** 257:10
**constituent** 70:13 137:1
**constituents** 70:17 79:21 188:7
**constitute** 62:16
**constitutes** 61:20 62:24 64:21 65:19 304:6
**constructed** 198:7
**construction** 210:16
**consulting** 96:17,21
**consume** 77:3,7 77:11 269:6
**consumer** 215:14,18,23
**consumption** 76:25
**contact** 38:18 39:4,14 40:10 41:25 43:9 44:19,21 51:7 53:22 55:16 58:8,10 59:6 62:23 64:10 65:9 68:8 93:7 93:9 94:4 133:10,23 134:12 137:9 138:2,17 139:19,21 140:13,14 163:14,20 164:1,5,13,18 165:8,14,16 166:12,17,19 227:25 248:15 249:17,25 250:19 253:6 253:23 254:16 260:7 269:23 269:25 275:11 276:4 286:2,13 287:5,13 290:24 293:4,6 293:11,16 294:4
**contacted** 92:24
**contain** 52:11 174:15 177:16 229:7 254:20

254:21
**contained** 13:19 15:21 26:4 61:6 73:4 78:23 80:10 82:20 87:15 138:7 203:23 204:5 217:5 219:13 230:21 234:17 255:20 300:13
**contend** 220:23 222:15
**content** 15:21 58:7 79:15 91:16 197:19 230:22 238:5 246:23
**context** 14:14 15:20 16:3 20:1 38:25 44:5 46:6 52:9 62:23 63:1,13 63:20 71:14 73:22 80:5 87:4 117:4 119:5 129:24 132:22 136:10 140:11 149:23 155:17 158:22 161:7,24 162:18,24 166:11 172:23 180:13,17 185:21 188:1 190:11,21 197:11,13 208:10 217:19 223:1 230:22 233:11 234:6 235:1 236:1 238:11 245:14 289:8 293:8
**continually** 201:4
**continue** 9:6 52:25 110:22 112:2 122:12 145:1 240:9
**continued** 3:1 4:1 5:1 6:1 7:1 68:9 247:18
**continuing** 203:16
**continuous** 237:25
**continuously** 281:22
**contrary** 56:22 65:1 194:5
**contribute** 49:15 87:17
**contributed** 39:3
**contributing** 36:6 50:18 168:5
**controlled** 59:13
**controversy** 155:10,18 157:1,2 231:16
**conversation** 143:10
**conversations** 9:4 86:25
**convey** 274:12 274:12
**cook** 114:9 304:2
**cool** 194:20,21 194:24 195:1,1 195:3,5
**coordinated** 93:14,15,16
**copies** 305:14
**copiously** 38:11 38:21
**copy** 11:21 12:11,18 13:9 16:8,20 224:22
**core** 20:18
**corneocytes** 202:12
**corneum** 173:18 202:12 215:5 216:11 216:14 217:20 236:13 246:11 249:4,6,15,25 250:19
**corporation** 7:6
**correct** 10:19 11:22,23 12:1 14:17,18,20,21 15:7 16:20,21 17:2,12,20 18:11,22 19:19 20:20 21:10,17 21:20 23:23,24 24:1,2,11,17,24 29:2 33:22 34:7,20 35:5 35:13 36:17,18 39:19 42:21 49:19 52:14,21 53:14,20 54:12 57:6 61:12,25 63:16,18 64:23 65:5 68:25 77:21,22,25 81:25 88:10,11 90:4 97:23 98:9,18 101:15 101:25 105:6 106:6 107:13 109:25 110:15 112:10,17,18 115:20,24,25 116:6 121:11 121:12 126:4 126:11 144:14 147:7 148:11 150:1 152:1,2

152:6,11,12,15 154:18,22,23 155:8 156:14 163:15,21 164:15 167:7 171:3 173:14 174:18,19,24 179:19,25 181:23 182:24 183:21,22 187:12 189:3 189:22 191:10 191:13 194:1 197:7 203:14 205:5 206:17 208:2,7,10 209:8,22 211:4 211:15,25 212:14 213:19 214:6,16 216:2 216:3,24 217:13 218:12 219:15 220:10 220:25 223:12 224:1,2 225:1 227:5 230:14 232:9,24 233:4 233:6,7 237:12 240:3 243:9 246:3 248:6 252:24 255:15 256:20 257:14 259:7 262:11 263:9 264:9,10 265:25 266:5 266:11 268:14 269:1 270:20 271:1,8 275:15 275:18,22 276:8,19,20 280:5 281:7,16 282:3,6 284:7 284:8,16 290:1 290:7 291:25 292:5,6,9 293:23 294:8,9 295:3,6,10,13 295:16,19,22 295:25 296:5,8 296:15,22 300:8,21,22 302:7 307:8

**corrected** 110:16

**corrections** 307:6

**correctly** 17:14 33:16 61:17 132:8 138:21 198:21 205:20 205:21 210:12 234:13 248:19

**corrosive** 64:14 68:10

**cortex** 178:4

**corticosteroid** 46:13 48:5,16 49:20

**corticosteroids** 37:4 45:9,16 45:21,24 46:22 46:25 47:12 50:3,13,15,15

**cosmetic** 107:25 116:22 116:23 117:1,6 117:12 133:12 133:24 134:13 228:13 229:5

**costello** 6:18

**cotton** 6:7

**counsel** 9:23 11:8,9,10 12:18 13:6,11 16:8 83:16,20 85:17 86:14,18 87:1 92:20,23 93:2 94:14 98:4 111:6,13 111:19 129:3 131:15,25 161:1 252:17 278:7 304:9,14 304:15 305:14

**counsel's** 97:2 159:6

**counseling** 37:4

**counselor** 114:22

**counter** 79:17

**county** 114:9 141:3 304:2

**couple** 110:2 128:17

**course** 66:10 115:2 124:3 131:11 195:13

**court** 1:1 9:16 100:10 110:7 110:12 158:18 218:23 278:3 278:14 279:1 279:10

**courtesy** 233:20

**courts** 1:11

**cover** 121:24 121:25

**covered** 90:7,8 90:12,16

**cream** 38:22 41:15 43:5 52:21 59:9 61:1 64:25 175:21,25 176:21 179:8 203:24 264:25 265:14,17,21 283:22 284:5 284:12 289:23 290:2 292:14

**creams** 162:14 228:18 229:7

**create** 46:13 168:15 253:7 297:7

**created** 88:15 214:21 278:16 278:19
**creates** 162:7
**creation** 214:21
**credibility** 110:18
**credible** 198:9
**crediting** 90:18
**creme** 8:18 282:25 284:11 287:20
**crisis** 118:5
**cross** 35:6 170:18 242:5
**crosse** 29:10,15 29:16,22 30:14 30:15,18 31:2 31:22,25 32:10 141:3
**crusted** 240:7
**csr** 1:12 7:24 304:3,22,23
**current** 85:13 302:17
**currently** 29:4 29:6,23 30:2 151:22
**cursory** 86:22
**cut** 14:6
**cutaneous** 21:8 21:13,18,24 114:12 120:12 122:10 123:12 123:13 263:17
**cutaneously** 209:20 212:4,5
**cuts** 49:11
**cv** 1:4 34:25 94:3
**cysts** 118:10

**d**

**d** 7:2 10:5 96:15
**daily** 116:18 118:19 205:13 205:15 215:17 216:22
**damaged** 272:19 274:7
**dandruff** 227:4 227:6
**dangerous** 76:3 270:5
**dark** 8:16,20 271:13
**darker** 46:7 128:1
**darkly** 49:13 51:5
**data** 218:4 224:11 225:7 225:10,15 226:22 227:9 227:10 228:23 241:20 244:4
**datasets** 207:6
**date** 241:16 306:24 307:12
**dated** 90:6
**day** 11:11 68:20,21 97:5 98:8,9,13,17,23 98:24 99:1 121:8,20 193:8 278:4 304:17 307:15
**day's** 60:15
**days** 68:23 242:21 246:13 247:12,20 251:3 255:1 257:5 304:10 305:17
**dc** 2:18
**de** 173:17
**deal** 18:5 20:22 45:9,10,17,18 46:2 116:17 118:2,2 188:23 191:5 201:3 226:8 236:2,23
**dealing** 235:3
**deals** 92:10 120:11 188:9
**dealt** 144:5 188:4 191:12 246:1
**dearborn** 1:13 9:14
**death** 108:10 174:12
**debrosse** 2:10
**decade** 55:20
**decades** 55:20 142:10 162:16
**december** 102:19,19,22
**decided** 197:16
**decimal** 129:13
**deck** 5:8
**declare** 307:4
**decline** 68:9
**deemed** 307:6
**deeper** 65:14 65:14,14,14,14 250:20
**deeply** 68:11
**defendant** 3:21 4:5,17,22 5:6 5:11,16,21 6:5 6:11,16 7:5 103:15
**defendants** 1:8 4:11 6:21 86:20 100:25 101:17,18 186:4,6
**defending** 195:25
**defense** 78:16 98:21 99:8 260:16 298:8

**defer** 231:15 232:12
**define** 141:12
**defined** 213:22
**defining** 212:16
**definitely** 44:7 60:14 69:6,10 93:23 199:17 223:11 237:18
**definition** 43:11,13,18 63:24 65:23 69:15 117:11 249:6 259:20
**definitive** 126:17
**definitively** 137:22
**degradation** 249:5
**degradative** 207:11 249:15 250:17
**degrade** 216:14 227:24 249:3
**degrading** 236:20
**degratory** 199:22 250:1
**degree** 17:1 18:21 19:15 20:10,13 21:3 40:21,24 41:6 41:19,24 43:4 43:13,18,22 61:2,12,14,20 62:9 64:5,22 65:3,12,12,19 66:3,4,7 68:16 69:4,7,9,10,15 113:24 114:3 115:19,24 116:4 117:23 248:22 249:11 249:18,22 250:2,7,21 276:4,6 281:3 281:3
**degrees** 19:12 20:24
**delicate** 185:23
**deliver** 162:14
**delivered** 171:22
**delivery** 90:9 90:17,24
**dellis** 3:19
**demographics** 127:23,24
**dennis** 3:16 10:1 146:8 272:7 278:23
**depending** 41:24 42:2,20 141:25 237:23
**depends** 75:5 252:6 265:17
**deponent** 303:3 304:10 305:13 307:3
**deposed** 104:10 106:15
**deposing** 305:13
**deposition** 1:7 8:8 9:9,12 11:4 11:5 12:16,21 12:25 13:12,16 13:23 14:2,20 15:13,25 16:11 63:14 83:5 86:10 92:21 100:7 110:14 110:15 159:18 165:5 187:16 189:14 223:20 231:14 232:19 271:19 282:18 288:6 291:21 302:14 304:4,6 304:8,8,10,11
**depositions** 1:11 96:17 159:20
**derived** 156:24 157:24,25 202:11
**dermal** 57:6 58:1 87:20 92:10 107:24 108:4 112:12 147:16 162:11 164:16 165:7 166:16 167:11 169:7,8 180:11 180:19 188:24 190:17,24 191:8,12,20 193:17 196:9 197:6 198:9 199:7 201:11 204:18 210:7 211:1,12,22 212:11 214:5 215:12 216:10 217:9 219:12 220:6,22 221:7 222:15 223:4 228:3,20 229:10 234:19 235:4,5 237:1 254:8 262:20 265:15 266:17 266:24 267:5 268:11 269:14 281:16 282:6 285:17,22 287:8 290:19 292:18 300:7 301:3
**dermally** 74:9 162:8 164:5 193:25 202:3 237:14 238:7 256:20 261:17

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 331 of 398 PageID #:73481



262:9 263:7,23 266:10 267:18 268:24
**dermatitis** 44:20,21 45:5 45:10 51:8 63:7 133:10,23 134:12 137:9 138:3,17 139:19,21 140:13,14 225:24 276:4
**dermatologic** 36:4 46:17 141:8 185:21
**dermatological** 17:7 121:15 186:3
**dermatologist** 18:2 20:8 21:21 40:2 113:8 118:2 121:23,24 128:14 162:11 178:22 179:13 229:1 276:19
**dermatologists** 185:11 225:23
**dermatology** 20:18 43:25 44:8,13 50:20 51:19 92:8 114:7 116:17 117:13,24 118:8,12,20 120:8,10 123:8 125:3 141:4 229:6
**dermis** 66:8,20 67:12 69:14 150:5 170:21 170:24 217:5 226:5 236:14 247:19,25 260:21 262:24 300:14
**dermody** 160:3
**descent** 127:17
**describe** 125:7 201:25
**described** 63:13 65:16 68:4 125:6 126:14 190:22 203:6 226:13 253:10 292:13
**description** 8:7
**designated** 96:20
**designation** 124:16
**designations** 200:3
**designed** 37:13 201:20 226:13 226:25 227:4,7 227:16 228:18 257:23,25
**desired** 75:10 88:3
**detail** 231:24
**detailed** 141:9 141:13,22
**detection** 120:12,13
**determination** 219:24
**determine** 35:25 36:5 44:25 74:1 77:16 112:19 125:15 136:6 136:17 177:9 208:4 234:16 259:19 298:2
**determined** 200:25
**determining** 199:6 200:6 291:7
**detrimental** 116:16
**develop** 302:18
**developed** 299:22
**developing** 88:21 89:1,21 149:18 152:9 154:15
**diagnose** 23:25
**diagnosed** 24:4
**diagnosis** 36:5 36:6 119:23 120:12,13
**diagram** 170:15,17
**diandra** 2:10
**dicello** 2:9 9:13
**dicellolevitt.c...** 2:13,13,14
**difference** 69:11 161:3 162:2 230:8 237:8 259:10
**different** 29:14 29:19 30:3 79:7 89:13 105:16,17 130:23 135:2 135:25 143:10 144:2 148:17 188:19 207:21 220:12 240:18 240:19 247:5 266:13 269:5 274:14
**differs** 162:9 232:13
**difficult** 49:19 67:22 161:6 239:2
**difficulty** 111:2 283:11
**diffuse** 246:24 247:25

**diffused** 237:6
**diffusing** 198:22
**diffusion** 198:19,20,22 199:3,6,24 200:6 201:4 202:10 233:10 234:5,7,16 235:12,13,19 235:22,24,25 236:18,19,21 237:7,8
**digestive** 269:6
**dillon** 5:18
**diluted** 41:4 240:22
**diminish** 140:17
**dinsmore** 4:13
**dinsmore.com** 4:16
**direct** 113:4 190:11 198:7 216:18 233:13
**directed** 38:23 65:1,2 125:2 276:11
**directing** 59:17 233:21
**direction** 59:14 120:21 304:5
**directional** 59:17
**directly** 23:6 52:7 54:1 284:13 290:2 304:15
**director** 10:19
**disagree** 18:25 21:7,12 34:9 47:9 53:16 129:1 159:3 168:19 172:22 180:22 181:6,8 186:13 204:23 205:22,24 206:2,8,13,19 206:23 210:11 212:1 216:4 228:22 232:2 270:15 293:8
**disagreement** 231:6
**discontinue** 145:2
**discovery** 96:11,12,15,18 96:19
**discuss** 38:14
**discussed** 56:17 74:22 75:14 97:20 231:24 246:20 292:11 302:10,14
**discusses** 190:17,23,25 233:8 244:13
**discussion** 49:4 52:9 55:14,15 67:21 203:16 204:17 234:24 246:17 259:9
**discussions** 244:11
**disease** 24:6 71:7 123:25 185:24,24 229:4
**diseases** 36:4 120:9 130:1 133:16
**dislodge** 177:19 178:15 179:3
**displace** 179:9 183:25 255:20 255:20,23 256:5,14,18 258:6,12,13,16
**displaced** 178:7 182:2 183:14 183:20 185:25 251:18 254:5 256:25 258:22
**displacement** 183:3 184:25 186:14,18
**displaces** 185:13 248:8 250:25 257:12 260:12
**displacing** 202:2 244:6
**dispute** 193:5
**disputing** 72:10 290:13
**disrespectful** 194:25
**disrupt** 118:21
**disrupting** 59:23 80:4 116:19 204:5
**disruption** 116:12,14 118:17 119:3
**dissimilar** 129:25 133:6
**dissipates** 257:7
**dissipating** 257:8
**dissolution** 202:12
**distal** 292:22 293:9,10 294:10
**distally** 238:12 238:15
**distant** 123:24
**distinguish** 158:16
**distinguishes** 158:9
**distribute** 167:18,20

**distributed** 147:17 150:6 169:8 170:13
**distribution** 74:2,8,20 75:13 169:11 169:24 170:9
**district** 1:1,1 1:10
**disulfide** 178:5
**divided** 129:10
**division** 1:2
**dna** 259:15
**do's** 283:6,8 284:10
**doctor** 20:17,21 23:13 69:25 114:22 145:15
**document** 36:19 83:8 84:20 124:22 271:15,24 272:2 282:21 282:23 283:6 288:15
**documentation** 125:10
**documenting** 80:20
**documents** 13:4,5,7,10,15 13:22 85:8 92:3
**doing** 32:15 67:3 86:7 100:21 101:13 110:4 112:16 192:8,8,12,13 194:16 196:1 201:6 224:17 278:5,11 281:4 293:17
**domestic** 91:25
**don'ts** 283:7,9 283:21 284:10
**door** 11:19
**dose** 70:5,6,10 70:11,18,20,20 70:21 71:2,5 71:14,16,17,22 72:15 76:3 77:24 78:2,5 112:19 204:19 205:5,11 207:13,23 208:5,14,20,22 209:7,10,11,24 210:6 211:2,13 211:23 212:7 212:12 213:3,4 213:5,8,17,19 213:23 214:4 215:3 216:22 217:11 218:10 220:8,10,14 234:18 238:6 243:12,20 259:23 261:16 291:25 292:1 300:19
**doses** 205:10 205:13 206:4 206:15 215:13 215:16,17 241:18 296:11
**dosing** 207:19 209:10 214:16
**double** 49:10 158:14
**douglas** 2:2 10:7
**douglasandlo...** 2:6,6,7,7 305:2
**dozen** 139:2
**dozens** 44:7,12 50:25 51:1
**dr** 9:9 10:21,24 12:16,24 19:3 40:19 58:24 60:24 72:21 79:7 81:7 83:4 83:8 106:5,21 120:16 146:11 147:6 150:18 153:19 165:2 166:5 172:15 186:8,11 192:14 194:14 203:13 223:15 223:15 224:17 224:25 226:7 226:10 229:19 230:5,18 231:3 231:10,16,21 232:1,7,13,23 233:6,21 234:2 241:16 244:2,3 244:10,22 245:12,20,21 248:3 259:6 271:24 289:14 297:23 302:22
**draft** 83:20,25 84:3 85:23 92:14 95:23 96:15 224:19 224:22
**drafting** 90:9 189:19
**drain** 59:15
**dramatically** 130:13
**draw** 224:3
**drive** 2:22 4:8 4:19 5:3 6:19 236:8,18 237:25
**drives** 49:9,22
**driving** 49:22 237:8
**drown** 76:19 76:21
**drs** 224:5
**drug** 264:25 265:2

**dry** 286:9
**dual** 113:24
**dudley** 7:6
**due** 22:16 45:11,19 61:8 68:9 139:3 173:18 186:19 273:19
**duly** 10:9,11 304:3
**duration** 41:25 42:2,11,21 43:2 47:23 61:3,7,21 62:10,14,23 63:15 64:9 71:18 73:2,4 74:11,23 75:15 91:1 201:9
**dye** 135:9,11,22 135:23,24,25 136:2,3,5,7,11 136:17 137:15 138:2,6,7,18 139:4,7,18,21 139:24 140:8
**dyeing** 183:1
**dyes** 137:1,4 182:17 184:14

**e**

**e** 10:5 93:8 109:15 115:8,8 147:1,1 304:9
306:3,3,3
**ear** 288:21
**earlier** 30:12 44:18 84:25 90:21 142:19 207:2 235:12 246:16,20 294:10
**early** 66:7 119:23
**easier** 271:16 288:3,11
**easily** 38:17 185:25 236:22
**east** 115:13
**eastern** 1:2
**easy** 124:18
**eat** 114:25
**eckert** 5:8
**eckertseaman...** 5:10
**eczema** 32:23 132:25
**edged** 49:10
**edillon** 5:20
**edited** 83:23 84:14
**educate** 48:11
**educated** 281:5
**education** 20:19 37:4 71:3 92:6 101:21 113:7 113:18 118:1 162:10,13,17 179:8 198:18
**educational** 115:15
**effect** 43:10 72:1,17,22 73:3,7,10,12,16 74:1,19 75:10 76:22 88:3 187:21 227:8 238:12,16,19 256:2 301:5 302:8
**effectively** 50:7 195:25
**effects** 52:17,17 73:21 116:17 167:24 199:22 226:6 227:3,13 238:17 246:10 249:17 263:18 265:10
**efficacy** 298:13
**efforts** 94:14
**either** 45:6 118:24 124:11 135:8 139:12 209:13 211:9 217:2 247:13 274:14 290:19
**elect** 145:3
**elected** 145:1,3
**elementary** 113:21
**elevated** 17:9 24:10 28:12,19 250:23
**ellis** 3:16,16 8:4 10:1,1,14 12:14,23 15:4 15:11,22 16:5 16:13 18:16 19:1 21:5,14 22:1,22 23:17 25:8,16,17,21 26:6,9,13,19 27:1,8,12,13,23 28:7,17 31:1,8 31:13 34:3,15 34:23 35:24 36:13 37:17,22 38:8,19 39:6 39:15,22 40:1 40:6,17 41:1 41:14 42:1,5 42:10,14,19 43:1,12,15,24 44:10 45:15 46:8,20 47:4 47:10 48:1,13 48:20 50:10 52:1,12,19 53:6,11,17 54:17,23 55:4 56:4,20 57:2 57:12,21 58:12 58:16,19,23 59:20 60:8,14

| | | | |
|---|---|---|---|
| 60:18,23 61:10<br>62:2,6,17<br>63:10 64:1,20<br>65:18 66:1,24<br>67:6 68:24<br>69:22 70:16<br>71:1 72:5,12<br>73:1,19 74:6<br>74:17 75:3,24<br>76:10,15 77:5<br>77:10 79:19<br>80:13 81:20,22<br>82:13,17 83:3<br>83:7,22 84:3,7<br>84:10,11,17,19<br>85:25 86:5,7<br>86:10,13,24<br>87:8 89:10,17<br>89:24 90:1<br>93:6 94:6,16<br>95:18,21 96:2<br>96:4,20,24<br>97:1 101:12,23<br>102:25 103:2<br>104:2,17<br>105:10,21,24<br>106:4 113:9,17<br>117:14,19,22<br>119:16 120:1<br>121:9 126:1,5<br>126:18,23<br>127:4,10,16<br>128:4,10,19<br>129:3,5,8 | 130:12,22<br>131:2,6,11,15<br>131:21,24<br>132:13,23<br>133:5,17 134:9<br>135:21 136:18<br>137:5,23 138:9<br>138:12,15<br>139:10,17,23<br>140:4,22<br>142:11 143:1<br>143:17 144:1<br>144:11,19<br>145:8,15,23<br>146:10,13,16<br>147:5 148:15<br>149:1,10,11<br>150:13,16,17<br>151:7,20<br>152:19 153:1<br>153:11,21<br>154:11 155:12<br>155:20 156:18<br>157:4,15<br>158:17 159:1,5<br>159:14,16,21<br>159:22,25<br>160:5,11,16,25<br>161:2,16 162:4<br>163:8 164:14<br>165:1,17 166:1<br>166:4,13<br>167:10 168:12<br>168:24 169:17 | 170:5 171:14<br>171:19 172:4<br>173:3,5,13<br>174:5 176:3,11<br>176:16,20<br>177:1,8 179:17<br>180:15,23<br>181:9 182:23<br>183:9 184:8,21<br>185:9 186:1<br>188:3 189:7,11<br>189:16 190:6<br>191:19 192:7<br>193:3,22 194:7<br>194:16,21,24<br>195:2,8,13,18<br>196:3,16 197:2<br>197:15 198:10<br>200:4,17 201:5<br>201:22 202:22<br>202:24 203:7<br>203:12 204:15<br>205:3,8 206:12<br>206:21 207:20<br>208:3,12,21<br>209:6,21 210:4<br>210:22 211:10<br>211:19 212:18<br>213:9,15 214:1<br>214:17 217:7<br>217:22 218:9<br>218:20,25<br>219:10,20<br>220:4,18 | 221:10,24<br>222:5,22<br>223:13,18,22<br>226:21 228:1,5<br>228:9,12,16,24<br>229:16,24<br>230:23 231:8<br>231:19 232:4<br>232:17,21<br>233:15,18,23<br>234:1,22<br>235:23 238:3<br>238:18 239:11<br>239:23 240:11<br>240:20 241:11<br>241:13,14<br>243:6,18 244:1<br>244:20 245:2<br>247:9 248:1<br>249:8,19 250:3<br>250:14 251:22<br>252:1,3,6,11,14<br>252:16,19<br>253:3 254:1,24<br>255:10 256:11<br>256:16 257:1<br>258:14,18,24<br>259:5 261:1,11<br>262:5,17 263:2<br>263:20 264:7<br>264:23 265:13<br>265:24 266:3,8<br>266:22 267:13<br>268:1,8,21 |

269:9 270:6,11 270:18,23 271:6,21,23 272:9,13 273:6 273:24 274:16 275:3 276:1,16 277:3,9,18,20 277:25 278:7 278:13,15,18 278:21,24 279:3,5,8,11,14 280:1,10,15,20 281:1,10 282:2 282:11,16,20 284:20 285:2,7 286:7,24 287:3 287:17,25 288:8 289:17 291:5,18 294:6 294:20,24 295:7,14,20 296:1,9,17 297:4,15,22 298:11 299:1 299:11,20 300:3,17 301:17 302:9 302:21,24
**ellisgeorge.c...** 3:19,20,20
**elucidate** 156:8
**elucidating** 198:6
**embodied** 85:23
**embrace** 37:5 37:15
**embracing** 143:15
**emerged** 175:3
**emergency** 121:25 122:1
**emily** 7:2
**emily.robinson** 7:4
**emplify** 29:7
**employ** 145:4
**employed** 29:5 29:6
**employee** 304:14,14
**enables** 248:14
**encompassed** 95:20 216:8
**encompasses** 21:17 120:9
**encouragement** 37:5
**endocrine** 59:23 80:4 116:12,13,14 116:15,19 118:3,17,22 119:3 204:5
**ends** 64:24 292:22
**engage** 22:7
**engaged** 47:21 49:25 90:2,13
**engagement** 19:23 86:15 87:1 92:15,17 92:18,19,22,23 112:6 117:5 302:19
**engagements** 102:15,16,18 102:21 103:3
**engaging** 160:5
**engineer** 19:5,8 20:7,16
**engineering** 19:11,13 113:25,25 198:19
**enhance** 229:4
**enhanced** 236:21 246:23 254:18
**enjoy** 122:18 122:19
**enter** 147:15 167:5,15 169:7 170:12 171:6 176:23 177:5 178:4 197:5 198:3 199:8 221:22 237:15 260:19 262:2 268:12 300:14
**entered** 114:1 114:13
**entering** 150:5 265:11
**enterprises** 6:6
**enters** 173:7 175:15 269:7
**entire** 44:6 58:7 59:25 68:4,6 90:25 207:3 233:9,9 234:4 279:13 281:23 289:10 298:19
**entirely** 42:17 46:18 70:9 138:5 172:22 174:19 192:2 248:4
**entirety** 33:3 90:12,16 292:16
**entitled** 272:17
**entity** 213:22
**entrance** 192:11
**environmental** 8:11
**envision** 250:11
**epidemiologic** 18:5,6,7 19:6,7
**epidemiologi...** 149:16 152:8 154:14 155:1

**epidemiologist** 18:3,9,10,12,15
**epidemiology** 18:17,22 19:3 69:17 80:1 113:11 115:21 115:24
**epidermal** 45:21 162:12 166:23 260:11 266:12,14
**epidermis** 61:15,20 63:16 170:20,23,25 171:2,5,6,10,11 171:21,21 172:2,5,7,10,13 172:16,17,25 173:2,8,16,18 174:4,20,23 175:15 207:8 216:12,14 217:20 229:10 236:14,25 249:5,6,16 250:1,20 272:23 274:24
**equal** 237:10 239:15 240:12 240:17 293:21
**equally** 257:18 280:8 281:4 294:2
**equated** 209:22
**equation** 190:21 191:1 192:23 198:2,4 198:5,6 199:12 199:14 200:19 201:19 210:20 216:16
**equilibrate** 200:16 236:7 239:8,9
**equipment** 283:15
**equivalent** 250:2
**errata** 305:11 305:13,17
**esq** 305:1
**established** 111:12 142:20 218:18 225:21 226:2 245:10
**esthetic** 108:9
**esthetics** 92:11
**estimate** 100:1 100:4 125:19 126:20 127:2,3 127:5 128:2 216:21 217:4
**estimated** 205:13 215:16 296:10
**estimates** 215:3
**estimating** 128:18
**estimation** 127:6
**et** 203:23 215:6
**ethan** 5:18
**ethnic** 92:8
**evaluate** 120:24 241:17
**evaluated** 112:24 121:7 203:23
**evaluating** 28:22 182:13 182:20 184:18 185:5
**evaluation** 120:25
**event** 274:14
**events** 142:6
**eventually** 239:8 248:8,10 249:5 250:20
**everybody** 81:21 195:2
**evidence** 149:16 152:8 154:6,14 155:1 194:3 196:12 197:9,24 201:15 202:6 210:1,10 217:15 227:18 238:10 244:17 250:9 260:3 261:7 304:11
**evident** 63:5
**exact** 31:5 49:24 124:18 175:3 227:21 247:14 267:10
**exactly** 219:3 233:21 273:5
**exaggerated** 227:22
**examination** 1:9 8:2 10:13 147:4
**examined** 10:12
**example** 36:23 76:16 149:12 188:4 228:18 247:6 274:13
**exceed** 219:14 220:9
**exceedance** 292:8 300:21
**exceeded** 205:17
**exceeds** 213:18
**excel** 198:3
**except** 119:22 175:2
**excessive** 49:12
**excluded** 106:24

**exclusivity** 87:24
**excrete** 179:18 179:20
**excreted** 255:24
**excreting** 181:5
**excretion** 192:4 194:6 209:5,19
**excuse** 296:6
**exert** 43:10 75:10 88:3 227:13,20 238:16 256:2 265:10
**exerts** 168:22 169:1 238:12
**exhibit** 8:8,9,10 8:11,12,14,15 8:18,20 12:17 12:21 16:7,11 16:15,19 83:3 83:5 102:13 103:8 104:4 105:3 189:11 189:14 203:18 223:20,24 232:19 241:12 271:12,19 282:17,18 283:6 285:9 288:1,6 289:25
**exhibits** 8:6
**exist** 17:8 200:10 243:7,8 270:5
**existence** 247:15
**existing** 156:25 302:17
**exists** 149:16 152:7 154:13 168:20 181:1,4 202:1 254:25
**exits** 292:25
**exogenous** 248:10
**expand** 174:9 207:2 208:18
**expected** 118:20 215:19
**experience** 69:24 71:3,9 92:5,6 178:22 276:18 300:6 301:2
**experienced** 49:1
**experiences** 97:22
**experiment** 175:10,11,13 175:16,20 201:24
**experimental** 246:20
**experiments** 176:7,8,12,15 198:1
**expert** 8:9,12 8:14 10:25 11:6 14:14 15:21 20:2 80:9 81:10 85:22 90:10,17 91:13 93:17 94:8 96:11,12 96:18,19,21 98:21 107:23 137:24 223:18 223:24 232:17 232:25 233:5 260:16
**expert's** 225:20
**expertise** 18:1 19:10
**experts** 80:10 82:22 93:24 96:16,17 98:22 98:22 242:3,13 244:3
**explain** 17:9 23:1 75:4 161:3 162:5 198:5,15 199:11 202:21 235:24
**explained** 39:1 210:15 236:1 269:19
**explaining** 38:25
**explanation** 155:23 236:24
**explore** 91:23
**exposed** 17:10 24:8 28:11 77:4 156:3
**exposure** 71:17 72:1,9,14,16,21 73:2,6,20 74:10,11,11,22 74:23,23 75:15 75:15,16,21 77:17 116:7,10 124:23 140:18 140:20 141:9 141:22 149:19 152:10 154:16 156:1 169:24 170:7 193:24 194:8,13 196:8 196:14,20 197:19 201:9 213:23 215:19 243:5 261:3 263:17,23 292:8 295:16 295:22 296:10 296:20
**exposures** 76:1 263:18
**expressed** 67:16 234:10

**extend** 281:21
**extended** 68:3
**extends** 142:9 174:20
**extent** 297:6
**external** 212:17 269:22
**extra** 16:8
**extrapolated** 247:6
**extremely** 71:5 266:13

**f**

**f** 115:8,8,8 147:1
**faad** 223:25
**face** 228:17 265:21
**facial** 265:14 265:20
**facilitate** 45:21 286:15
**facility** 29:22 35:12
**fact** 62:20 162:9 175:7,10 231:17 240:2 265:9 269:20 276:2
**factor** 27:21,21 71:6,16,21 236:16 257:8
**factors** 36:5 44:18 72:15 237:24
**facts** 95:14 102:6 108:15
**fail** 219:8 224:15 244:12
**fails** 199:21 305:19
**failure** 304:12
**fair** 70:1 97:13 98:14 101:18 111:4,18 113:1 130:16 131:6 133:12 196:4,5 204:6 231:22 239:22 240:14 243:12,22 300:25
**fall** 134:19 220:2
**false** 40:14 176:23 180:20
**familiar** 15:7 15:10,20 16:3 31:5 76:4,7,13 136:19,21 183:15 187:17 190:13 198:14 228:25 229:2,5 229:13,15 264:24 272:2
**family** 38:6
**far** 110:20 111:24 112:3 257:18
**fashion** 36:3 161:9 200:3 227:22 240:8 253:21 293:4
**favor** 101:2
**favorable** 100:18
**favoring** 100:24 101:7
**fda** 117:15 227:12
**feasibility** 82:2 223:2 298:22
**feasible** 169:5 264:20 301:11
**february** 1:14 9:2 304:17 305:3
**federal** 1:9 84:1 96:13 304:9
**federer** 4:7
**feed** 199:15
**feel** 12:9,13 115:3
**feeling** 68:1
**fellowship** 21:24 33:8 114:12
**fellowships** 69:25
**felt** 68:5
**female** 31:25
**females** 38:5
**fickian** 234:7
**field** 17:25 19:10 20:17,23 21:17 71:8 117:12 118:12 120:3,7,10
**fields** 20:8,19 69:19 81:19 82:22
**fifteen** 106:17
**fighting** 148:15
**figure** 134:22
**filed** 108:18
**filled** 255:13
**fills** 215:20
**final** 151:5 157:21 166:21
**finalization** 99:15
**financially** 9:19 304:15
**find** 110:16 122:11 134:10 185:10 193:8 213:1 245:25 283:19,20
**finding** 101:15 283:12
**findings** 118:9 245:16 250:21

**fine** 12:14 54:25 84:10 86:1,5,8 105:24 145:16 159:22 160:8 160:12 165:21 195:20 279:20
**finish** 22:3 58:21 194:18 252:4 277:22
**finished** 193:13
**firm** 9:17 94:21 109:4
**firmly** 165:19
**first** 10:11 12:15 24:1,6 40:24 41:6,19 43:4,13,18,22 59:16 61:2,12 61:14,20 62:9 64:5,22 65:3 65:12,19 74:15 81:2 90:2,11 90:16 92:25 93:9 99:14,18 113:12 114:5 144:19 163:19 163:22 181:14 184:4 189:17 204:18 205:4 224:16 233:13 248:22 249:11 249:18,22 250:2,7,21 255:3 272:14 272:16,17 276:4 292:12 292:24
**five** 102:17 106:22 107:1,8 107:11,16 142:9 297:16
**fixed** 198:12,14 198:16,17 199:5,25 200:5 200:11,18 201:2,2 233:10 234:5,15,23,25 235:2,9,16 255:18
**flags** 11:24
**flipping** 293:14
**flonger** 3:4
**floor** 1:13 2:4 5:9
**floreffe** 115:8
**florida** 3:13 4:15
**flow** 279:16
**fluorouracil** 245:13
**focus** 118:7 119:15 143:10 185:8 289:18 291:16
**focused** 30:15 44:11 55:15 61:5 80:12 90:20 108:8 116:19 184:19 188:15 202:22 243:25 247:5
**focuses** 192:22 242:22
**folded** 175:22
**folks** 130:11
**follicle** 180:7 180:10,19 181:18,22 183:3,19 185:14 186:15 202:3,14 224:13 225:9 244:8 246:2,18 252:21 254:3 256:1,4 260:13
**follicles** 178:25 224:7 244:7 246:11
**follicular** 185:24 186:25 188:13 202:14 254:17
**folliculitis** 226:1
**follow** 35:9 38:9,20 50:1 51:20 97:2,12 111:17,20 142:21 159:18 160:7,11 194:13 251:22 252:16 256:23
**followed** 47:25 114:6 140:9
**following** 57:3 80:19 99:14 127:14 196:14 277:21
**follows** 10:12
**force** 59:17
**foregoing** 304:4 307:5
**forehead** 48:19 48:21,22,25 49:2
**form** 14:24 25:4 27:1 41:7 41:12 43:6 44:3 46:15 47:17 49:12 51:22 52:8,22 55:24 56:11 57:16 58:3 59:3 60:10 61:23 63:17 65:4 66:22 75:18 76:6 77:1 80:8 101:19 111:8 113:14 119:13 125:24 126:3 126:12 127:9 127:12 130:8 130:17 132:18 133:10,22

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 341 of 398 PageID #:73491



135:17 136:13 137:2,18 138:4 138:11 139:9 139:14,22,25 141:23 143:22 144:8,15 151:3 151:13 153:24 154:1,8 156:22 158:11,23 159:17 161:12 161:21 164:6 164:19 165:11 168:18 169:14 170:1 171:8,23 172:21 173:11 173:23 176:9 176:24 179:10 179:21 182:19 184:6,17 185:3 185:15 187:23 192:1,18 194:2 196:11,23 197:8,23 199:5 199:9 200:2,22 201:14 202:5 204:7 206:18 207:16 208:8 208:17 209:25 210:9 211:5 213:5,20 214:7 216:25 217:14 218:13 220:11 221:1 226:19 227:17 228:4,7 228:21 229:12 229:21 231:4 231:12 235:7 237:17 238:9 238:25 239:18 240:15 241:5 243:13,23 244:7,16 247:3 247:22 249:12 249:23 250:8 251:15 252:25 253:17 254:11 255:4 256:21 258:8 260:2 261:6,21 262:12 264:1 264:15 265:7 265:19 267:8 267:20 268:15 269:16 270:14 270:21 271:2 273:2,9 274:9 275:23 276:14 276:25 277:14 280:6 281:8,17 282:7 285:5 290:21 291:13 293:24 297:10 298:16 299:16 301:6,21

**formal** 21:24 22:4 101:21 108:8,19 113:6 114:5,11 162:10,17

**formalized** 19:4

**formation** 24:19 28:5 168:6

**former** 24:25

**forming** 24:12 27:21 28:15

**forms** 23:2

**formula** 82:8 138:7 207:4

**formulaic** 200:20

**formulas** 78:11

**formulated** 226:15

**formulation** 41:12 73:14 74:12,24 75:16

**formulations** 171:4 174:16 241:19

**forth** 96:12 293:16

**forthright** 134:25

**forward** 142:23 189:1

**found** 79:15 137:3 141:21 147:14 188:12 197:10 201:10 208:6,15 213:17 214:2,4 220:8 235:4 242:23 243:10 243:11 246:4

**foundation** 41:8 43:6 44:3 46:15 47:17 52:8,23 55:24 56:11 57:16 58:4 59:3 60:10 61:23 63:17 65:4 66:22 75:18 76:6 77:1,8 80:8 127:12 130:17 132:18 135:18 136:14 137:2,18 138:4 139:15 140:1 141:23 143:22 144:8,15 151:3 151:13 154:9 156:22 158:12 158:24 160:19 161:12,21 164:6,20 165:11 168:18 169:14 170:1 171:8,23 172:21 173:11 173:23 176:9 179:10 182:19 184:6,17 185:3 185:15 192:1

192:18 194:2 196:11,23 197:8,23 199:9 200:22 201:14 202:5 206:18 207:16 208:8 208:17 209:25 210:9 211:5 213:20 214:7 216:25 217:14 218:13 220:11 221:1 226:19 227:17 229:12 229:21 231:4 231:12 237:17 238:9,25 239:18 240:15 241:5 243:23 244:16 247:3 247:22 249:12 249:23 250:8 251:15 252:25 253:17 254:11 255:4 256:21 258:8 260:2 261:6,21 262:12 264:1 264:15 265:7 265:19 267:8 267:20 268:15 269:16 270:14 270:21 271:2 273:2,9 274:9 275:23 276:14 276:25 277:14 280:6 281:8,17 282:7 285:5 290:21 291:13 293:24 297:10 298:17 301:6 301:21

**four** 30:9 102:17 107:3 107:17

**fragility** 34:11 142:7

**frame** 30:6

**franklin** 5:19 170:17

**frederick** 3:2 120:16

**free** 154:6

**frequency** 47:23 73:6 74:11,23 75:15 145:6

**frequent** 142:8

**frequently** 132:22 273:18

**fresh** 14:23 15:2

**freudian** 162:21 163:5

**friend** 115:11

**front** 11:22 55:2

**fu** 2:10,13

**full** 10:15 23:21 75:22 81:2 82:8 289:8

**fully** 304:11

**function** 88:3 117:3,19,20 118:3,21,25 248:13

**functioning** 179:14

**fundamental** 236:4

**further** 100:6 156:6,8,13,16 156:20 157:3,5 157:20 186:24 206:9 303:3 304:7,13

**future** 67:17 122:20 215:22 249:21

**g**

**gap** 215:20

**gauging** 38:3

**gears** 134:22

**gel** 241:10

**gels** 162:14

**general** 45:5 47:22 96:10,18 121:15,21 124:20 125:16 188:5 238:20 244:10 267:12 269:24 284:21

**generalize** 136:2 253:20

**generally** 49:17 121:7 124:20 125:1,7 136:7 157:25 170:16 170:23 200:5 235:14

**generate** 148:12

**generated** 14:15 16:4 149:24 210:15

**george** 3:16

**georgia** 7:3

**gerald** 8:14 232:18

**gerel** 2:16

**getting** 54:16 56:15,18 67:23 105:19 138:1 277:16

**ginex** 6:18

**give** 10:25 24:19 27:10 92:20,22 108:6 125:19 150:8 155:23 159:19 202:20

**given** 56:1 99:14,18 128:3 134:4,16 226:8 237:11 239:9,9

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 343 of 398 PageID #:73493



250:12 251:16 304:6 307:9
**giving** 154:5 195:21
**glad** 86:9
**gland** 179:12 179:15 180:2 180:18 188:6
**glands** 177:14 177:16 178:12 178:20 179:18 188:10
**glass** 120:22
**gloves** 267:4
**go** 9:7 23:4 34:24 37:9,18 81:20 99:21 113:18 115:12 174:12,22 227:19 228:17 230:1 236:15 274:2,3 275:14 275:18 287:25 288:11 289:25
**goal** 49:20 91:19 293:3
**goals** 47:23
**god** 195:6
**goes** 121:2 154:4 175:14 182:8 189:20 237:21 261:9 261:10 289:8
**going** 9:1 24:21 25:13 44:6 45:17,18 48:4 50:17 60:16,17 64:10,17 85:19 85:20 97:2,6 97:11,12 100:3 109:15 111:15 111:15,16,20 114:23 117:16 145:19 148:15 148:23 149:3 150:7,8 159:9 166:2 179:24 194:19 202:19 217:18 239:15 248:6 252:12 253:14 254:16 255:14 256:14 256:17,18,19 272:7,9 279:6 286:9 289:12 290:8
**goldberg** 6:13
**goldbergsega...** 6:15
**good** 9:1 10:1,4 10:6,15 56:22 84:18 192:12 192:13 254:19 258:25
**gooped** 59:10
**governed** 233:10 234:5
**gradient** 234:8 234:10
**graduating** 114:1
**grand** 6:8
**grandstand** 97:8
**granted** 201:18
**gray** 162:1
**great** 18:5 20:21 118:2 146:16 201:3 226:8 236:1,23 293:2
**greater** 88:15 135:3,15 216:15,23 217:12 293:21
**green** 3:12
**gross** 115:4
**ground** 140:12
**grounds** 25:21 27:23 39:6 58:12 111:14 144:21 145:9 151:9 152:19 155:12 159:18 165:22 217:22 218:20 219:16 221:10,14 222:18 231:23 301:17
**group** 3:6 34:13 156:3
**grow** 294:17
**grows** 294:21
**growth** 292:17 293:18 294:17
**guardian** 165:4
**guidance** 205:14,16 206:5,10,16 213:18 215:18 216:24 217:12 218:5 219:14
**guidelines** 220:9,14
**gundersen** 29:8 30:10 31:22 32:3,7,8,10,17 33:4,5 35:2 44:6 121:14
**gut** 269:21
**guys** 146:13
**gyn** 22:6,8
**gynecologic** 119:21
**gynecological** 22:16 119:18
**gynecology** 22:3,6,8 119:17

**h**

**h** 306:3
**hair** 1:3 9:10 11:1 17:11,11 24:8,16,23

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 344 of 398 PageID #:73494




| | | | |
|---|---|---|---|
| 25:11 26:3,11 26:21 27:15,20 28:4,11,12,21 28:25 29:24 30:1,5 31:18 31:23,25 32:4 32:6,20,21,23 33:14,18 34:1 34:2,7,11,12,12 35:3,13,22,22 36:1,8,16 37:4 37:6,14,16 38:3,10,21 41:10,16 43:4 44:2,8,8,11,14 44:18 45:3 46:2 47:13 48:4 50:23 51:5 52:4 53:12,18,25 54:1,2,7,8,12 54:16,19 55:2 55:8,10,12 56:8 57:3,7,20 57:25 58:6,6,8 58:10,25 59:12 59:18 61:1,18 62:7,20,21 63:12 64:4 66:5,13,15,17 67:13,15 68:15 69:2 77:18,24 78:4 79:15 80:6,19,21 | 81:25 87:15,21 88:8,22 89:22 92:8 97:21 112:13,21 120:9 125:9,13 125:22 126:10 126:11,16,16 127:8 128:22 129:22 130:3 132:6,17 133:8 133:21 134:21 135:5,9,11,14 135:15,22,23 135:24 136:2,3 136:5,7,8,11 137:1,4,15 138:2,18,21 139:4,6,7,18,20 139:21,24 140:8,8 141:10 141:15 142:7 142:14 143:4 143:16,21 144:4,7,13,17 145:2,4,21,25 146:1 147:15 148:10 149:6 149:19 150:4,4 150:20 151:17 151:25 152:10 154:16 155:2 156:9 162:8 163:24,25 164:2,4,8,9,12 | 164:16 165:8 166:16,22 169:6,7 170:7 171:4,20 173:6 173:15 174:1,7 174:10,11,16 174:17,17,19 174:21,21,23 175:1,2,8,14,21 175:22,24 176:21 177:19 178:1,3,4,15,25 179:3,8,15 180:3,5,6,10,14 180:16,18 181:18,21,24 182:3,5,11,13 182:17,25 183:1,4,12,14 183:19,21,23 184:19,24 185:7,7,13 186:19 187:25 188:12,21,23 190:17,24 191:3,4,12 193:25 196:8 197:5,18,20 199:6 201:10 202:2 203:21 203:22 204:4 204:21 205:15 206:4,15 207:9 207:14,15,24 | 208:6,15 210:7 211:3,15,24 212:13 213:17 214:5 215:15 215:23 216:13 216:18,23 217:5,6 218:16 219:13 220:9 220:24 222:17 223:3,3 224:5 224:6,9,12,13 225:8,8 226:12 227:15 234:18 235:5 239:13 239:13 241:18 241:19,22 242:8 244:5,6 244:8,9,14 245:23 246:1,7 246:11,18 247:2,8 248:14 248:21 249:3 249:10,21,24 250:6,24 252:21 254:3 254:15,22 255:22 256:1,4 256:7 258:21 259:23 260:6 260:10,13,14 262:9 263:3,8 263:24 264:13 269:10 276:24 277:12 280:4 |

280:22 281:14 281:21,24 282:13 286:5 287:19 291:12 292:12,17,21 292:22,23,24 292:25 293:2 293:11,14,15 293:15,18 294:11,17 296:11,21 299:14,24 300:8,13,13 301:4,12,13 305:4 306:1 307:1
**haircut** 174:13
**hairline** 285:14 288:21
**hairs** 174:14
**hairstylist** 55:6 276:23 289:13 291:10 293:22
**half** 139:2 242:19
**hand** 12:5 41:17 112:8 155:11,19 168:23 169:2 230:12 304:17
**handed** 223:23
**handing** 12:7
**happen** 257:4 294:13
**happened** 66:25 102:21 134:16 196:10 201:12 279:11
**happening** 49:5 54:20 192:23 193:2
**happens** 64:16 110:4 143:8 193:11 199:18
**happy** 230:2
**harbor** 2:22
**hard** 19:25
**hardy** 6:7
**harmful** 76:2 77:17
**harsh** 248:12 248:19
**harshly** 174:2
**head** 100:3 109:2 140:15 174:11,22 212:22
**heading** 154:24
**heads** 125:5
**heal** 67:14
**healed** 68:23
**healing** 45:22 49:8,9,22 50:19
**health** 8:11 76:2,4 156:4 205:14 209:23 215:18,20,22 216:24 217:12 218:5 219:14 219:25 298:13
**healthy** 213:19 218:16,19 219:5,7 220:10 220:14,15 221:17
**hear** 96:6 131:10 195:14 289:12
**heard** 71:22,24 95:7 159:20 261:12,14 265:2
**hearing** 38:1,4 100:10
**heated** 283:22
**heating** 283:14 283:15 284:6
**held** 9:13 255:25
**helix** 158:14
**helm** 80:5 203:23,25 204:3,10
**help** 45:21 86:15 94:8,12 159:7 228:3,18 229:8 272:8
**helped** 213:13
**helps** 93:19 101:16,17 102:8
**hereto** 307:7
**hereunto** 304:16
**hey** 48:3
**heyl** 4:2
**heylroyster.c...** 4:4
**high** 38:17 127:5 183:20 183:24 185:12 186:19 237:9 255:22 256:13 257:6,12,19 258:1,5 272:22 273:20 274:6
**higher** 220:2
**highlighting** 182:17 183:1
**highlights** 184:15
**highly** 41:22 61:6 182:4 199:22 236:9 251:6,11,16 252:20 253:14 253:22 254:4
**hire** 137:24
**histopathologic** 120:25
**histories** 124:23 141:24
**history** 125:1,8 141:10,22

**hmm** 22:15 32:16 45:8,16 46:21 78:10 86:25 92:15,24 94:7 136:24 143:18 170:14 172:5 184:9,10 184:22 187:20 198:11 206:22 230:9 258:19 261:12
**hold** 18:17 19:15 20:24 21:3 154:17 247:16 248:10 255:15,18 302:13
**holding** 290:1
**holds** 188:2 226:3
**home** 67:8 142:3 145:5
**hominem** 160:6
**honestly** 94:3 134:3
**hope** 271:16
**hospital** 29:22 114:9
**hot** 283:21
**hour** 60:17 100:16 252:13 257:4
**hourly** 100:15
**hours** 11:10,13 11:14,17,18 100:1,4 242:9 246:13 247:12 247:20 251:3 255:1 269:17
**house** 5:7 6:22 10:5
**household** 267:16
**houston** 3:8
**huh** 95:21
**human** 76:2,4 76:25 164:23
**humor** 153:18
**hundred** 128:17
**hundreds** 33:9 33:17 34:4,17 35:21 36:19 44:1,5 46:11 50:25 56:6 69:1 125:21 126:8,9,10,15 126:19,24
**hurts** 101:17 101:17 102:8
**hydroxide** 40:7 40:18 41:3,12 283:4
**hygiene** 241:20
**hyper** 49:23 50:12,17
**hyperpigmen...** 45:25
**hypo** 45:24 49:24
**hypopigment...** 46:22 47:1,6 47:15 49:16 50:12,17
**hypothesis** 161:24 176:13 184:23
**hypothetical** 57:3,11,13 58:4 59:4 63:2 63:20 281:20 290:23
**hysterectomy** 23:8,9,22

**i**

**identification** 12:22 16:12 83:6 189:15 223:21 232:20 271:20 282:19 288:7 299:13
**identified** 105:3 300:20
**identifies** 29:7
**identify** 77:16 225:10 244:12 295:15
**ih** 214:19,24 215:2
**illinois** 1:1,14 4:9,20 5:4,19 6:3,19 9:14 114:18 122:23 123:2 141:6 304:1,23
**imagine** 165:15 166:18 173:25
**imagining** 166:11
**immediately** 43:9 65:2,11 70:20 91:7,11 170:24 172:13 275:12 286:2 287:13 290:7 290:18
**immunohisto...** 121:1
**impact** 75:23 244:13
**impede** 287:8 290:19
**impeding** 285:17,22
**implements** 283:22 284:6
**implication** 216:18
**implies** 171:16
**imply** 290:24
**implying** 165:13

**important** 78:21 148:2 215:20,22 271:11 272:5 272:18 279:15 283:6 284:10
**impossibility** 291:8 293:21
**impossible** 53:23,24 55:18 56:15,18 67:23 162:24 163:1 276:18 282:5,9 293:3,6,16 294:4
**impractical** 285:19 286:1
**impression** 192:12,13
**inappropriate** 49:3
**inch** 203:21 292:24 293:10 293:10,18
**incidence** 125:16 130:1 133:19 134:5
**incidentally** 290:17
**incidents** 134:16
**inclined** 67:16
**include** 37:1,2 135:2 216:1 285:12
**included** 97:25 98:11 232:6
**includes** 170:23 177:14
**including** 35:22 96:14 118:4 123:19 128:14 142:6 167:21 245:9 260:23 266:4
**incomplete** 58:4 59:4
**incorporates** 46:16
**incorrect** 35:14 110:17
**increase** 27:16 140:18
**increased** 28:8 149:17 152:9 154:14
**incredibly** 161:25
**independent** 112:5 200:24
**independently** 291:24 292:3
**index** 8:1
**indiana** 123:3
**indicated** 63:22 111:1 163:2
**indicates** 47:22
**indicating** 205:14 215:18
**indirectly** 304:15
**individual** 16:17 79:21 101:2 113:10 141:25 142:18 193:5 200:1 207:5,14 239:20 273:22
**individuals** 33:2 49:12
**induced** 137:16
**industrial** 241:20 267:2
**industries** 5:22
**industry** 103:20 214:22 215:1,1
**infertility** 118:10
**inflammation** 45:7,10,17 49:8,10,11,15 49:21 80:20 264:25
**influence** 37:14 40:9 41:23 58:7 61:8 62:14 63:23 65:6,8,16 68:8 72:16,22 73:3 73:6,9,11,15,20 87:17 88:5,25 116:15 117:2 168:22 262:25
**influences** 63:8 72:1 245:15
**influencing** 118:6
**information** 51:16 86:21 216:21 217:1 230:16 232:6 259:22
**informed** 47:14 47:19 48:11 50:4 51:15
**infringing** 85:21
**ingredient** 68:7 73:15 78:11,14 79:1,10 137:1 178:2 299:3,13
**ingredients** 38:16 79:9 80:2,6 81:24 162:15 164:17 166:22 167:17 173:16 174:1 197:5 199:7 210:7 224:9 228:17 241:19 244:9 245:24 259:24 268:22 298:2,14 300:8 301:4

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 348 of 398 PageID #:73498



**inhalation** 192:11
**inhibitors** 71:20
**initial** 94:2 224:10
**injury** 248:12 248:18
**inking** 121:3
**innate** 56:1 59:8 71:20 101:1 237:24 237:24 273:19
**innately** 292:20
**input** 38:4 215:13
**instance** 24:1,6 48:15 52:2 61:14 67:10,18 113:13 125:4 162:19 236:12 250:16 253:8 274:14 276:6
**instances** 70:6 70:7,8,19 73:13,18 124:2 124:4 154:3 199:19 200:9
**instantaneous** 65:16
**institute** 93:17 94:8
**instruct** 84:7 86:1
**instructed** 53:13,19 154:4 290:6
**instructing** 96:4
**instruction** 96:22 97:3,12 111:17,21 289:20
**instructions** 38:10,21 47:25 51:20 52:6,10 53:8,21 56:2,3 57:4 86:21 95:3 272:24 274:22 275:13 275:17 284:19 287:19,23
**instructs** 97:11 111:13,20
**intact** 171:10 265:21 266:12 267:23 268:6 269:23
**integrity** 40:9 43:10,19,23 45:5,11,19 61:9 62:15,16 63:14,23 64:11 64:15 65:7 68:9 249:4 253:8 260:11
**intend** 100:12 149:20 150:18 151:23 152:13 153:14 154:17 155:7 221:25 222:20 223:8 299:22 302:11
**intended** 49:7 91:17 274:12 274:12 275:20
**intending** 91:18 195:8,9
**intensity** 50:18
**intention** 126:13 231:15
**interact** 235:11 247:8
**interacting** 200:14,21
**interested** 9:19 38:1 304:15
**interesting** 122:18 134:7 225:19
**interface** 286:16
**interfaces** 269:20
**intermittent** 142:3
**intermittently** 11:12
**internal** 114:6 204:19 205:5 205:13 207:13 207:23 208:5 208:14,19,22 209:24 210:6 211:1,13,22 212:6,12 213:2 213:17 214:4 214:16 215:17 216:22 217:11 218:10 220:8 234:18 238:6 243:12,20 259:23 261:16
**international** 8:11 91:25 141:7
**internship** 114:5
**interplay** 118:4
**interpret** 18:5 290:23
**interpreted** 120:23 233:10 234:6
**interpreting** 19:5
**interrupt** 87:10
**interrupted** 110:3
**interrupting** 99:7 278:15,18
**intertwined** 158:13
**interview** 97:16
**intradermal** 108:9

**intravascular** 220:1,16
**intricate** 235:20
**introducing** 234:11
**introduction** 17:5
**invagination** 224:6
**investigated** 79:15 91:14 191:8 300:23
**investigation** 156:6,13,17,21 157:6,20 214:13
**investigative** 185:8
**invoice** 90:5,11 90:12,16,22,23 90:25 99:24
**involved** 117:5 235:16,21 251:9 260:9
**involvement** 113:5 116:24
**involving** 103:14 116:21
**inward** 181:6 265:10
**inwards** 247:25
**iowa** 123:2
**irrespective** 270:24
**irritant** 45:6 51:7
**irritated** 272:19
**irritation** 34:11 68:5 142:7
**irritations** 134:5
**issue** 31:25 57:23 75:5,6 89:9 91:15,21 108:19 128:22 129:22 132:6 132:16 133:8 133:20 135:11 138:20 140:15 141:15 142:20 142:22 143:3,9 143:10,19 144:3,13 146:2 162:25 168:1 194:8 205:5 223:7 230:12 230:13,15 235:3,4 243:21 274:5
**issued** 16:20 90:11 98:12,23 99:4,25 186:2 189:9 224:20 224:23 226:9
**issues** 15:5 29:24 30:1,5 31:18,22 32:6 32:23,23 33:13 33:21 34:1,6 34:19 35:13,21 44:2,8,13 51:6 51:19 69:2 112:8 121:16 125:22 126:9 126:15 127:8 132:24 135:4,8 143:14 168:11 229:18,22 298:19
**issuing** 24:18 77:15 99:9 211:25 212:14
**item** 246:18
**items** 102:11

**j**

**j** 2:3 5:8,13
**jake** 3:7
**james** 3:17
**janke** 107:19
**january** 83:12 90:3 98:3,7 99:24
**jbliss** 3:20
**jd** 114:15,16 307:2
**jelly** 268:3 285:13,16,21 286:9,12 287:4 287:6,14 288:20 289:1 289:21 290:15
**jloessin** 3:9
**joann** 107:19
**job** 1:25
**john** 4:22 114:14
**johnson** 3:6
**johnsonlawgr...** 3:9
**joined** 32:3
**joint** 114:9
**jointly** 30:13
**joints** 265:4
**joseph** 6:2 50:20,21
**joseph's** 51:18
**journal** 8:11
**jr** 1:8 8:3 9:10 10:10 304:3 305:5 306:2 307:2
**judge** 159:22
**junior** 10:18
**jury** 54:24 58:24 77:7 120:3 157:8,17 162:5 165:2 173:10 198:15 215:10 220:22 222:15 223:9 230:17 231:20

235:24 238:21 262:7 263:6 264:9 272:16 276:23 281:12 282:3 286:25 286:25 291:6
**justification** 155:10 157:2 193:1
**justify** 199:17

**k**

**k** 2:16,17
**kansas** 6:9 109:5 114:10
**kasting** 8:14 186:11 232:18 232:23 233:6 241:16 244:3 244:22 245:12 245:21
**kasting's** 223:15
**kdeck** 5:10
**keep** 131:4,9 148:15 195:11 275:10
**keeps** 122:11
**kelbey** 5:8
**kelly** 160:3
**kept** 192:9 250:12
**key** 55:22 56:9 162:12
**kind** 125:15 259:14
**kit** 8:15 61:6 203:22 254:14 254:15 271:13
**knees** 265:4
**know** 26:24 31:14 35:2 40:2 59:24 67:20 74:9,12 74:21 75:6 85:19 94:25 96:25 108:17 109:5 111:16 115:9 116:16 125:5 129:4 134:3 135:24 136:11 141:24 146:8 160:9 161:1 189:5 193:16 194:18 199:16,17 207:13 213:16 214:20 228:13 229:25 230:4 238:6 243:20 245:3,18 252:6 255:8 257:17 257:22 258:3 261:15 262:18 263:21 264:11 265:3 268:18
**knowledge** 17:1 33:17 71:3,12 172:19 198:12 208:14 220:19 267:10 276:19 294:12 294:15 300:6 301:2
**knowledgeable** 277:10
**knowledgeably** 15:15
**known** 24:6 118:21 212:4 244:11 245:10 282:25
**kpadden** 2:7
**kristin** 2:4

**l**

**l** 2:11 10:5 115:8
**l'oreal** 3:22,22 8:16 10:2,2 78:19 103:9,14 105:12 271:13 282:14 287:20
**l'oreal's** 289:20
**la** 29:10,15,16 29:22 30:14,15 30:18 31:2,22 31:25 32:10 141:3
**label** 8:15 60:12 271:12
**labeled** 283:8
**labile** 185:23
**laboratory** 4:17 112:6,13 120:21 200:19 201:24
**lack** 156:3 294:12
**lacks** 160:19
**lademann** 187:3,5 188:16 246:19
**laid** 140:12
**laila** 2:22
**lane** 2:4 176:6
**lara** 2:3
**large** 130:13 132:15,20 187:13 267:22 269:12
**largely** 233:9 234:5
**larger** 235:15
**lasers** 116:25
**late** 277:17
**latheena** 6:8
**law** 3:6 19:15 94:21 109:3 114:14,14 115:11 122:2,6 122:19,21 158:18 198:13 198:14,16,17 199:5 200:5,11

200:18 201:2,3 233:10 234:5 234:15,16,23 234:25 235:2,9 281:3
**lawyer** 19:14 19:16,20 104:13 108:25 122:4,16 131:11 154:5 228:14
**layer** 66:20 175:25 180:11 180:19 190:24 193:17 199:8 228:20 229:10 237:1 255:12
**lead** 192:19 198:8 214:3 297:8
**leading** 64:15 99:15 155:22 224:13 225:9
**leads** 101:1 193:10
**learn** 198:12
**learned** 18:20 111:6 116:13
**learning** 22:7 38:1
**leave** 23:4 291:22
**led** 108:10
**left** 66:16 68:2 272:3
**legal** 19:23 20:1 305:23
**legal.com** 6:20
**length** 47:22
**lengthy** 185:16
**lenhert** 6:13
**lesion** 48:17 51:20 121:17
**lesions** 22:21 47:12 52:3 123:13 124:6 125:5 276:4
**leslie** 4:7
**lessened** 50:18
**lethal** 70:9,19 70:20
**letter** 92:16,17 92:18,19,22,23
**leukemias** 123:20
**level** 65:7 69:14 75:11 77:25 78:5 118:18 136:12 174:20 182:6,11,16,24 184:2 196:8 197:4 199:2 200:15 203:4 207:13 208:5 208:14 209:7 209:10,10 213:23 214:5 216:22 218:12 218:16,18 219:5 220:23 222:16 226:14 234:18,19 236:17 237:15 237:20 238:6 253:14 255:2 256:13 257:6 257:12,16 258:5 259:23 261:4,16 270:25
**levels** 76:17,24 77:12,16 78:2 136:8 184:16 188:6 196:13 196:20 206:5 206:16 219:7,8 221:17 235:1 263:17 300:21
**levin** 3:2,11
**levinlaw.com** 3:14
**levitt** 2:9 9:13
**lfederer** 4:10
**lfsblaw.com** 3:4
**liability** 1:4 9:11
**liar** 290:14
**license** 7:25 122:6 123:4 304:23
**licensed** 122:22
**lidocaine** 108:9
**life** 199:18,19 201:21,25 207:9,19 216:12,19 217:21 245:15 280:12
**light** 217:17
**lighter** 48:7
**likelihood** 185:6 285:15 289:6
**likely** 40:23
**likewise** 49:14 110:5
**limbo** 123:5
**limit** 128:17
**limitation** 199:20
**limitations** 96:11 156:1,5 200:13
**limited** 77:9 106:24 239:12 242:17,19 294:8
**limiting** 96:15
**limits** 29:1,3 248:10
**lincoln** 43:25 44:7,13 51:13
**line** 58:21 96:5 209:1 230:1,1

252:4 258:4 306:4,7,10,13 306:16,19
**lining** 221:9 301:16
**link** 93:12
**liquefied** 59:13
**liquefy** 286:2
**liquid** 59:13 286:15
**list** 78:11 79:6 81:10,11 298:2
**listed** 79:1,9 102:11 103:7 104:4,8 107:2 107:7,17 190:4
**listen** 84:7 130:25 132:1 166:4,14 277:18,20,20 278:25 279:21
**lists** 78:14 79:2 79:10
**litchfield** 6:2
**litchfieldcav...** 6:4
**literally** 110:8 131:7
**literature** 85:14,16 91:16 91:25 92:1,4 101:14 112:15 112:24 156:25 215:21 241:17
300:5 301:2
**litigants** 93:20
**litigation** 1:4 9:12 136:10
**little** 30:3 49:21 130:22 148:1 154:6 207:21 223:14 236:3 238:16 240:19 241:15 269:24 283:11,25 287:15 288:3
**lives** 242:19
**living** 276:24 282:4
**llc** 2:9 3:23 4:7 5:7,8,17 6:22 10:3,5
**llenhert** 6:15
**llp** 2:21 3:2,16 4:13 6:2,7
**loaded** 288:12
**local** 44:18 51:6 52:17 63:7 91:24 120:18 274:14
**localized** 124:7 142:6 236:2
**located** 9:13 29:9,10 113:23
**location** 9:12 164:10
**locations** 29:19
**loessin** 3:7
**logistics** 98:24
**london** 2:2 10:7
**long** 11:9 49:18 65:9 141:16,17 146:13 149:15 195:19 224:10 238:1 240:9 242:18 247:23 269:11 278:4 293:10 294:11
**longer** 3:2 96:21 144:16 213:4
**look** 14:1,16 16:6 34:24 67:18 78:10,13 79:8,20,25 99:22 186:24 187:11,25 188:21 189:18 190:3 195:3 196:24 229:22 237:4 240:5 246:16 254:2 271:17 272:3 287:21 289:4
**looked** 13:22 14:3,8,9,11 15:3 78:14 79:4,14 80:2 81:13 91:16,20 91:23 92:2,7 187:2,15
188:18 189:3 191:7,8,9,11,17 196:19 202:16 205:4 266:15 282:12 296:4
**looking** 16:16 35:8 80:5 184:23 214:24 245:12 246:4 300:10
**looks** 11:24 200:20 209:4 214:15 246:7 272:2
**los** 3:18
**lose** 67:13
**loss** 43:23 44:19 45:4,11 45:19 46:14 61:15,19 63:14
**lost** 219:19 291:16
**lot** 30:17 71:9 115:3,12 148:3 286:19 290:14 292:13 298:18
**lotion** 266:9,16
**lotions** 162:14
**loud** 215:10
**louis** 4:3 6:14
**lousa** 8:17,21
**love** 195:18,19
**lovely** 8:16,20 8:20 271:14

**low** 236:11 237:9 257:10 257:10,16
**lower** 31:6,9 76:3 135:15 139:1 220:2
**lows** 127:2
**lrazzaghi** 2:24
**lsay** 2:7
**ltthomas** 6:10
**lumped** 134:23 134:23
**lunch** 146:8,10 146:18
**lung** 123:21
**luster** 4:12
**lye** 283:1,3
**lymphatic** 177:6
**lymphomas** 123:19
**lynn** 6:13
**lyons** 2:16

**m**

**m** 7:24 304:3 304:22
**m.d.** 8:13
**mablawfirm....** 7:4
**madam** 12:17
**made** 17:16 108:3 111:6,8 159:25 168:20 178:21 190:11 200:3 201:17 205:25 230:18 232:7,14 244:22 283:17 289:7 290:24 307:5
**madison** 5:9 6:3
**magic** 173:21 250:5
**magical** 173:2
**magically** 173:9
**magnitude** 71:25 72:9,16 72:19,21,25 73:5 74:10,22 75:14 261:3 262:8 263:7,22 264:12
**mahoney** 5:13
**maiden** 2:4
**mail** 93:8 109:15
**maintain** 122:6 122:15 237:14 237:19
**maintains** 121:4
**make** 15:13 53:3 81:21 97:8 109:18 110:19 117:20 125:7 126:6 142:18 145:6 181:3 187:12 187:25 188:22 192:17 222:8 228:18 229:8 247:10 271:21 276:22 285:19 286:20 288:2 291:19,22 294:3
**makes** 53:23 71:23 111:13 115:3 232:13 293:3
**making** 77:6 108:1 179:2 245:4 278:21 283:13
**malignancies** 123:15,18,22
**malignancy** 23:2 119:23 124:11 168:16 169:13
**malignant** 168:5
**malpractice** 103:10,11 107:7,9,12,15 109:7
**management** 142:24
**manifest** 123:19
**manifestations** 63:6 118:11
**manipulated** 293:2
**manipulating** 164:12
**manner** 48:10 51:9 88:3 169:12 262:20
**manufactured** 8:16 41:22 78:18 271:13
**manufacturer** 143:12 284:25
**manufacturers** 78:16
**mapping** 121:4
**margin** 121:7 295:21
**margins** 120:24 121:2,6
**mark** 12:15,17 16:6 27:12 83:3 84:17 86:2 89:24 173:3 189:11 223:18 271:12 282:16 287:25
**marked** 12:22 16:12 83:6 189:15 223:21 223:23 232:20

271:20 282:19 288:7
**marker** 209:23
**markers** 191:22 207:6
**market** 4:3
**marketed** 78:24 79:17
**marketing** 1:4 9:11
**marketplace** 92:11
**maron** 4:7
**maronmarvel...** 4:10,10
**marsh** 7:2
**marshall** 114:14
**marvel** 4:7
**maryland** 6:14
**mass** 215:4
**master** 159:23 160:2
**match** 144:10
**material** 11:7 45:20 59:9 70:9 79:6
**materials** 13:19 78:15,24 81:11 86:14,19 97:25 98:2,10,16,19 98:20 101:14 112:25 113:1,4 189:19 190:10 197:14 298:7
**math** 129:5,5,6 129:6,6
**mathematical** 198:2 199:12 201:8 207:18
**matriculated** 113:22
**matter** 9:10 10:25 41:3 61:3,16,21 70:21 71:2,15 75:16,20 83:12 90:14 102:3 109:14 153:5 160:16 258:22
**matters** 70:5,6 70:11 107:7
**mcauliffe** 5:18
**mcbride** 4:17
**mccambridge** 5:13
**mcguirewoods** 5:2
**mcguirewoo...** 5:5,5
**md** 1:8 8:3 10:10 223:19 223:25 304:3 305:5 306:2 307:2
**mdl** 8:19 96:19 305:4 306:1 307:1
**mean** 11:14 14:6,10 54:5 86:10 87:9 94:13 95:21 129:18 134:7 141:12 153:23 158:22 181:1 237:7
**meaning** 144:12 243:7
**meaningful** 167:24 296:22
**means** 91:18 244:8
**meant** 81:12 102:23,25,25
**measure** 192:4 196:20 200:19 201:8 209:7,9 212:6 220:1 238:4 243:12 243:15 261:16
**measured** 193:24 197:19 209:15,18 210:21 211:12 292:1,3 300:19 301:5 302:2,7
**measurement** 207:19 209:11 209:13,14 210:16 212:17 243:5
**measures** 210:6 210:13 243:16
**measuring** 80:17 196:13 242:24
**mechanism** 28:23 78:8 147:14 158:4 162:6 166:25 167:13 170:12 174:25 177:25 180:1 185:6 204:12 221:5 260:5,19 263:14 297:8 301:12
**mechanisms** 17:8 156:7
**media** 9:8
**medical** 10:19 17:2,7 18:21 20:2,17,21 22:6 29:21 69:25 85:13 103:9,11 104:5 105:4 107:6,8 107:12,14 109:6 114:2,3 117:17 124:24 125:8,15 141:3 141:3 157:23 158:21 276:19 281:3

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 355 of 398 PageID #:73505



**medically** 172:18
**medication** 47:20
**medications** 226:13
**medicine** 49:24 114:6 117:17 122:22 227:5 245:14
**medium** 234:6
**meet** 103:19 104:6 105:5 219:8
**meeting** 93:10 98:3 99:17
**meets** 69:14
**mehta** 6:18
**melanated** 47:7
**melanin** 45:24
**melanocytes** 49:13
**melanoma** 123:20,25
**mellon** 113:23
**mellott** 5:8
**member** 140:23 141:2
**members** 94:24
**memory** 190:19 198:20 274:19
**men** 33:2 127:25
**menses** 118:10
**mention** 44:23 90:5 186:25 192:22
**mentioned** 13:14 19:6 24:7 44:18 45:8 69:13 84:23 91:12 119:23 151:15 151:19 161:5 161:23 175:23 177:13 178:18 187:24 188:1 207:2 232:22 233:5 235:12 245:17 246:4 247:4 251:19 272:20
**merely** 162:1
**messed** 107:10
**metabolites** 167:18 191:18 212:3 242:6 243:25
**metabolized** 242:20
**metastasizes** 119:24
**metastatic** 22:14,21,25 24:5 123:25
**method** 200:6
**methodology** 91:12
**miami** 4:15
**michelle** 2:17
**michigan** 50:21 50:21 123:3
**micrographic** 120:2,14 123:11 141:5
**microphones** 9:3
**mid** 127:3
**mildly** 182:10
**milieu** 59:25 138:8 251:8 253:7 270:5
**miller** 2:10 4:18
**milligrams** 196:20
**million** 192:9
**mind** 13:13 14:23 15:2 36:16 76:9 134:22 267:24
**minimize** 37:6 37:12 53:2 142:6 143:13
**minnesota** 123:2
**minus** 124:7,8
**minute** 70:8 251:24
**minutes** 64:13 64:19 105:22 146:15 257:4,4
**mirrors** 80:23
**miscalculation** 156:2
**mischaracteri...** 258:9 273:10
**mischaracteri...** 157:11 160:18 161:13 173:12 173:24 197:9 217:15 232:10 249:13 250:9 253:1,18 254:12 255:5 256:22 261:7 273:3 274:10 281:18 293:25 301:22
**mischke** 107:19
**misplaced** 242:4,12
**missed** 67:25
**missing** 255:7
**missouri** 4:3 6:9,14 114:11 123:3
**misstates** 37:10 43:7 61:24 194:3 196:12 197:24 201:15 202:6 210:1,10 227:18 238:10

244:17 250:9 253:1,18 260:3 269:17 271:3 293:25 301:7 301:22
**misunderstood** 85:10
**mitchell** 4:22
**mitigate** 49:21
**mix** 236:9 256:6,7
**mixed** 251:8
**mixes** 261:10
**mixing** 255:12
**mm** 22:15 32:16 45:8,16 46:21 78:10 86:25 92:15,24 94:7 136:24 143:18 170:14 172:5 184:9,10 184:22 187:20 198:11 206:22 230:9 258:19 261:12
**model** 192:22 192:25 193:1 198:19 201:8 202:11,17 207:7 215:3 216:10 217:3 235:18 241:20 241:23 262:1 296:3
**modeled** 198:23 215:15 215:15 236:22
**modeling** 116:8 116:10 190:20 190:25 191:8 198:9 207:18 215:12
**models** 235:21 246:21
**mohs** 21:15,21 21:25 35:7,11 44:24 114:11 120:2,14,16 123:11 124:10 141:5
**molecular** 200:15 267:22 269:12
**molecule** 162:18
**molecules** 82:3 118:6 199:1 200:21 201:1 235:11,16 236:5 245:12 247:5
**moments** 153:17
**monroeville** 115:9
**month** 15:3 67:14 99:14,15 99:16
**monthly** 90:22
**months** 90:13 242:10
**morning** 9:1 10:1,4,6,15
**motion** 39:9 144:23 145:13 151:11 152:22 203:1 217:25 218:22
**mougey** 3:11
**move** 25:21 27:23 39:6 58:12 84:8 111:15 127:22 130:20 144:20 145:9 151:9 152:19 155:12 165:21 200:15 202:24 217:22 218:20 221:10 236:9 286:16 301:17
**moving** 181:11 199:1 236:6 293:15
**mparfitt** 2:19
**multiple** 103:8 105:11 129:16
**murray's** 4:12
**mute** 9:5 81:20 81:21

**n**

**n** 10:18 147:1,1 147:1
**nail** 120:9
**name** 9:15 10:16,16,17,18 108:13,25 109:3
**named** 103:25 120:15
**nape** 288:21
**napkin** 185:12
**narrated** 99:3
**national** 30:23 31:7,10
**natural** 37:6,9 37:15,18 105:19 143:16 180:9 249:4 274:3,4
**nature** 6:12 8:18 22:17 45:2 53:22 61:9 63:9 68:10,10 70:12 164:10 166:10 172:23 173:17 173:19 182:5 202:9,13 216:16 227:23 236:20 249:2 250:13,18 251:13,17

254:14 255:23 260:8 273:20 282:25 284:11 286:12 287:20
**naught** 303:3
**nearby** 163:14 163:21
**nearly** 255:23
**necessarily** 12:19 204:9 230:12 248:2 255:18 296:18
**necessary** 238:16 239:7 307:6
**neck** 288:21
**need** 12:18 49:25 73:25 74:5,9,12,21 143:13 146:14 148:16,19 156:20 165:3 166:14 172:9 174:9 175:19 188:21 194:19 231:18
**needed** 156:14 156:17 157:6 157:20
**needs** 81:20
**negative** 50:12 52:17
**neglected** 67:24
**negligence** 108:17
**neither** 197:18 224:11
**netter** 170:18
**neutral** 100:21 146:5 197:21 215:25
**neutralization** 224:7
**neutralize** 256:17 257:23
**neutralizing** 254:6 257:15 257:24 258:11
**neutrally** 102:6
**never** 35:2 54:11 56:23 57:25 58:25 71:24 97:20 99:6 108:13 143:20 144:5 145:24 156:3 159:23,25 160:14 175:24 176:21 239:21 259:21 280:11 280:16,21 281:15,22,25 294:13
**nevertheless** 246:9
**new** 2:5,5,23 5:9,9 132:1 142:18 292:17 294:17 302:18
**newly** 237:6
**newtonian** 198:23 200:12 200:12,13
**nick** 7:8 9:15
**no.1:23** 1:4
**nodded** 212:22
**nonalkaline** 253:15
**noncompelling** 197:11
**nonpharmace...** 246:6
**nonresponse** 155:13
**nonresponsive** 25:22 27:24 39:7 58:13 144:21 145:10 151:10 152:20 165:22 217:23 218:21 221:11 301:18
**nonscalp** 49:4
**nonvascular** 172:6,7
**noriya** 5:3
**normal** 180:17
**north** 1:13 2:11 4:8 5:19 6:19 9:14
**northern** 1:1
**notary** 307:13 307:19
**note** 9:3 13:3 124:24 125:7 305:10
**noted** 307:7
**notes** 12:2,3 125:15 185:11
**notice** 8:8 12:16,25 13:5 13:12
**noticing** 9:25
**noting** 226:12
**notion** 178:14
**notwithstandi...** 66:18
**nourished** 8:17 8:20 271:14
**nshahadat** 5:5
**number** 8:7 79:3 132:15,15 132:15 134:15 135:3,14,20 138:19 140:16 202:20 210:21 232:17 241:23 242:20 271:15 283:22 284:2,9 284:10,11 288:1
**numbers** 128:25 132:12 142:17 207:22

**numeric** 295:1 295:8
**numerical** 198:4
**numerous** 225:22 227:1
**nurse** 104:1
**nw** 2:17 7:3

**o**

**o** 10:18 115:8 147:1,1,1
**o'brien** 3:11
**o'connor** 2:2 10:6,7 12:19 14:24 15:8,17 16:1,10 18:13 18:23 21:2,11 21:22 22:18 23:14 25:4,13 25:25 26:8,12 26:15,23 27:18 28:2,14 30:20 31:4,11 33:23 34:8,21 35:17 36:12 37:10,20 37:24 38:13,24 39:9,11,21,25 40:3,15,22 41:7,20 42:4,9 42:13,16,22 43:6,14,21 44:3 45:13 46:3,15 47:2,8 47:17 48:9,18 50:8 51:22 52:8,15,22 53:9,15 54:13 54:22 55:24 56:11,24 57:9 57:16 58:3,15 58:17,21 59:3 60:7,10,16 61:4,23 62:5 62:11,25 63:17 64:7 65:4,22 66:22 67:4 68:17 69:20 70:14,23 72:3 72:7,23 73:17 74:3,14,25 75:18 76:6,12 77:1,8 79:11 80:8 81:16 82:10,16,25 83:21,24 84:5 84:9,15,18 85:18 86:2,6,9 86:17 87:3 89:5,13 93:2,3 93:4,9,21 94:13,20 95:13 95:15,19,25 96:3,6,9,23 101:10,19 102:23 103:22 104:15 105:7 105:19,22 113:2,14 117:8 117:18,21 119:13,19 120:5 125:24 126:3,12,21 127:1,9,12,20 128:8,12,23 129:2,4,6 130:8,17,25 131:4,9,13,23 132:9,18 133:3 133:13 134:1 135:17 136:13 137:2,18 138:4 138:11,14 139:9,14,22,25 140:10 141:23 142:16 143:6 143:22 144:8 144:15,23 145:12,18 146:8,15 148:23 149:2 150:12,15 151:3,11,13 152:22 153:6 153:20 154:8 156:15,22 157:10 158:11 158:23 159:2 159:12,15,20 159:24 160:4,9 160:13,23 161:12,21 163:7 164:6,19 165:10,25 166:3,6,9 167:8 168:7,18 169:14 170:1 171:8,18,23 172:21 173:11 173:23 175:17 176:9,14,18,24 177:4 179:10 180:12,21 181:7 182:19 183:6 184:6,17 185:3,15,19 187:23 189:4 190:2 191:14 192:1,18 193:18 194:2 194:15,18,22 194:25 195:6 195:11,16 196:11,23 197:8,23 199:9 200:8,22 201:14 202:5 203:1,3,8 204:7,24 205:6 206:6,18 207:16,25 208:8,17 209:1 209:17,25 210:9 211:5,16 212:15,20,25 213:11,20

214:7,11 216:25 217:14 217:25 218:2 218:13,22 219:2,16,22 220:11 221:1 221:14 222:2 222:18 223:10 226:19 227:17 228:4,7,11,15 228:21 229:12 229:21 230:19 231:4,12,23 232:10 233:12 233:16,19,25 234:20 235:7 237:17 238:9 238:25 239:18 240:4,15 241:5 241:12 243:2 243:13,23 244:16,23 247:3,22 248:23 249:12 249:23 250:8 251:15,20,24 252:2,5,9,12,15 252:25 253:17 254:11 255:4 255:16 256:15 256:21 258:8 258:25 260:2 261:6,21 262:12,22 263:10 264:1 264:15 265:7 265:19 266:2,7 266:21 267:8 267:20 268:5 268:15 269:2 269:16 270:9 270:14,21 271:2 272:7 273:2,9,15 274:9 275:1,23 276:14,25 277:14,19,23 278:2,11,14,16 278:19,23 279:1,4,7,9,12 279:24 280:6 280:14,18,23 281:8,17 282:7 284:17,23 285:5,24 286:23 287:2 287:10 289:16 290:21 291:13 293:24 294:19 294:22 295:4 295:11,17,23 296:6,13,23 297:10 298:5 298:16 299:6 299:16,25 300:9 301:6,21 302:22 304:9 305:1

**oadams** 2:14

**oalvarez** 3:20

**oath** 34:16 40:11 68:13 102:4 104:19 104:20 106:6,8 106:9 109:9,23 147:7 203:14 259:7 297:24

**object** 14:24 25:13 51:22 119:13 126:3 126:12 136:13 137:2 138:4,11 139:9,14,22,25 145:12 148:23 150:12 154:8 158:23 159:16 159:16,17 164:6,19 165:10 171:8 179:10 192:1 192:19 204:7 228:4,7 243:13 258:9

**objected** 150:15

**objection** 15:8 15:17 16:1 18:13,23 21:2 21:11,22 22:18 23:14 25:4,16 25:25,25 26:8 26:12,15,23 27:1,2,2,18 28:2,14 30:20 31:4,11 33:23 34:8,21 35:17 36:12 37:10,20 37:24 38:13,24 39:11,21,25 40:3,4,15,22 41:7,7,20 42:4 42:9,13,16,22 43:6,14,21 44:3 45:13 46:3,15 47:2,8 47:17 48:9,9 48:18 50:8 52:8,15,22,22 53:9,15 54:13 54:22 55:24 56:11,24 57:9 57:16 58:3 59:3 60:7,10 61:4,23 62:5 62:11,25 63:17 64:7 65:4,22 66:22 67:4 68:17 69:20 70:14,23 72:3 72:7,23 73:17 74:3,14,25 75:18 76:6,12 77:1,8 79:11 80:8 81:16 82:10,16,25 83:21,24 85:18

87:3 89:5,13 93:21 95:15 96:22,23 101:10,19 103:22 104:15 105:7 111:13 113:2,2,14 117:8,18,21 119:19 120:5 125:24 126:21 127:1,9,12,20 128:8,12,23 129:2 130:8,17 131:23 132:9 132:18 133:3 133:13 134:1 135:17 136:13 137:18 138:14 140:10 141:23 142:16 143:6 143:22 144:15 145:18 151:3 151:13 153:20 156:15,22 157:10,10 158:11 159:7 160:1,17,17,17 160:19,20,25 161:12,21 163:7 166:9 167:8 168:7,18 169:14 170:1 171:18,23 172:21 173:11 173:23 175:17 176:9,14,18,24 177:4 180:12 180:21 181:7 182:19 183:6 184:6,17 185:3 185:15,19 187:23 189:4 190:2 191:14 192:18 193:18 194:2 196:11 197:8,23 199:9 200:8,22 201:14 202:5 203:3 204:24 205:6 206:6,18 207:16,25 208:8,17 209:1 209:17,25 210:9 211:5,16 212:15,20 213:11,20 214:7,11 216:25 217:14 218:2,13 219:2 219:16,22 220:11 221:1 221:14 222:2 222:18 223:10 226:19 227:17 228:11,15,21 229:21 230:19 231:4,12,23 232:10 234:20 235:7 237:17 238:9,25 239:18 240:4 240:15 241:5 243:2,23 244:16,23 247:3,22 248:23 249:12 249:23 250:8 251:15 252:25 253:17 254:11 255:4,16 256:15,21 258:8 260:2 261:6,21 262:12,22 263:10 264:15 265:7,19 266:2 266:7,21 267:8 267:20 268:5 268:15 269:2 269:16 270:9 270:14,21 271:2 273:2,9 273:15 274:9 275:1,23 276:14,25 277:14 278:8 278:12,13,24 280:6,14,18,23 281:8,17 282:7 284:17,23 285:5,24 286:23 287:2 287:10 289:16 290:21 291:13 293:24 294:19 294:22 295:4 295:11,17,23 296:7,13,23 297:10 298:5 298:16 299:6 299:16,25 300:9 301:8,21

**objection's** 160:18

**objections** 9:21 111:7,8 154:1 159:19 195:15 269:3

**objectively** 101:7

**obscure** 156:5

**observation** 215:4

**observe** 226:6 227:3,8 276:5

**observed** 17:10 250:11

**obtained** 113:24 304:12

**obviously** 47:13 116:2 122:23

**occasions** 99:13

**occupied** 254:4

**occupy** 236:6 255:21

**occupying** 177:20 254:9 256:9
**occur** 50:17 53:24 55:19 107:17 168:15 169:23 250:17 253:14
**occurred** 39:1 98:3
**occurrence** 130:10,20
**occurring** 202:10
**occurs** 185:1 198:22 199:3 217:10 220:6 220:23 222:16 235:14 249:16 260:6
**ocean** 261:13 261:18
**offer** 41:9 78:1 78:6 88:17,24 89:8,23 108:8 147:22,25 148:6 149:21 150:1,19 151:23 152:14 153:14 154:21 155:8 186:22 220:21 221:16 221:19 222:1 222:14,21 223:8 231:2 232:6 262:7 263:5 264:8 280:9 296:24 299:22 302:11
**offered** 78:6 107:23 149:22 154:20 186:3,8 186:10 187:19 189:25 232:14 294:10 299:21
**offering** 25:14 25:19 26:2,16 27:7,11,19 28:3 41:11 89:15 149:3 150:2 151:16 152:16 169:20 222:25 223:11 232:15 264:6 271:25 300:4
**office** 120:19 274:15
**offices** 9:13 51:5
**oftentimes** 38:3 68:22
**ogiso** 187:5 246:19
**oh** 33:4 85:10 98:7,14 105:14 159:2 167:15 170:25 202:23 257:3 278:2 288:12
**oil** 177:14,16 179:18,21 180:2,10,25 183:19,25
**ointments** 162:14 229:7
**okay** 10:22 14:16 17:24 19:10 20:6 26:25 30:16 33:7 35:1,17 37:23 48:24 58:3 64:3 71:13 80:14 81:3 84:15,17 93:4 96:3,9 99:10 102:14 102:20 104:12 105:15 107:11 117:3 129:20 131:1,14 132:3 145:9 148:4 150:16 154:7 159:6,24 160:3 160:22 173:3 176:7 179:18 190:16 195:22 196:4,6 205:1 208:25 209:13 212:8,9,19 222:6 233:12 233:25 239:25 249:9 259:1 272:11 274:17 275:9 277:21 278:7,8,20 279:17,23,23 279:24 283:20 286:11,19,22 288:16,18 289:19 291:19 297:18 301:6 302:22
**omega** 2:11
**onalaska** 29:13 29:17,21 31:14 31:18
**onboarded** 93:18
**onboarding** 94:2
**onc** 22:6,8
**once** 88:14 96:20 142:18 142:19 143:19 157:24 164:22 193:25 196:9 213:2,3,6 237:2,13,15 238:7 240:13 240:22 262:10 263:8,24 264:13 267:17
**oncologic** 121:12
**oncologist** 21:6 21:8 119:18

**oncology** 21:10 21:13,18,20,24 22:3 114:12 119:17,22 120:12 121:13 122:10 123:12
**ones** 13:24 14:1 78:17 95:1 103:7,9 141:1 187:6
**online** 202:17 214:24
**oophorectomy** 23:10
**open** 283:23
**operations** 5:17
**opine** 88:12 191:22 220:5,6 256:19 259:25
**opined** 217:9
**opining** 88:14 185:1 259:21
**opinion** 11:6 14:14 17:6 24:13,19 25:7 25:10,15,19 26:2,7,17,21 27:7,10,11,14 27:20 28:4,10 28:16,18 29:3 41:10,11,18 43:3 50:16 60:25 62:8 64:6,21 65:3 65:20 78:2,3,7 88:17,20,24 89:3,9,11,16,20 89:23 90:10,17 91:13 106:23 107:24 108:1,8 108:19 132:20 132:20 147:11 147:19,24 148:5,13 149:3 149:4,20,25 150:3,24 151:6 151:16,19,23 152:5,14,17 153:14 154:17 154:20,22 155:7 162:6 168:25 169:18 169:20 170:6 178:9 182:1 183:2,11 186:2 186:7,10,14,16 186:21 189:9 189:10,25 208:13 220:21 221:16,20,25 222:12,14,21 222:25 223:7,8 223:12 226:9 230:8 232:3,13 244:25 245:3 250:4 258:6 264:9 269:11 276:17,22,22 277:6 280:2,9 283:10 293:5 293:20 294:3 296:20,25 299:4,9 300:4 300:10 301:1 302:13
**opinions** 24:15 24:22 26:25 29:1 77:15,23 98:21 108:3 112:25 113:12 147:9,21 148:9 150:19 184:23 186:3 229:17 230:5 255:5 271:25 292:18 298:13 299:23 301:23 302:11 302:18
**opportunity** 12:24 57:6 110:14
**oppose** 39:9 144:23 145:13 151:11 152:22 203:1 217:25 218:22
**opposed** 112:16 121:16 133:9 134:20 145:5 276:23 281:4
**opposite** 122:14
**oral** 37:2
**orange** 257:21
**oranges** 258:2
**order** 12:16 52:25 145:5 189:20 281:20 281:25 282:16 288:1
**organ** 23:5 221:23 223:6 261:19,20 263:25 264:14 300:15 301:15
**organic** 227:24
**organization** 29:7 94:1,5 213:22
**organizations** 32:14 140:24
**organized** 297:16
**organs** 22:23 22:25 23:5 118:3 123:24 221:8 260:1 262:10,19 263:9,15 264:22 265:6 265:12,16,23 265:25 266:1,4 266:11,19,25 266:25 267:7 267:19 268:4 268:13 269:1

269:15 270:20 271:8 298:24
**orientation** 121:4
**original** 81:8 82:21
**originally** 115:6
**originating** 23:3
**oscar** 3:17
**osigo** 247:10,14 247:15
**otberg** 187:6 188:13
**otc** 117:17
**outcome** 9:20 50:12
**outlined** 176:2
**outlining** 176:5
**outpatient** 29:20 31:19
**outside** 80:4 99:22 102:21 103:13 207:6 217:3
**outward** 179:24 181:5 181:11
**ovarian** 17:9 22:10 23:11,22 23:25 24:4,10 24:14,17,20,24 25:11,20 26:5 26:14,17,22 27:16,21 28:5 28:13,20 87:18 88:9,16,21 89:1,21 91:22 118:8 119:6,7 119:12,15 123:20 148:11 149:7,18 150:21 151:1 151:18,25 152:9,18 154:15,25 155:3 156:9 158:7 168:16 169:12,23 170:8 260:23 297:2,7 299:23
**ovaries** 262:4 298:24 300:16 301:16
**ovary** 118:10 204:14 221:9
**overall** 87:7 124:5 188:19
**overtly** 231:18
**own** 56:14 83:2 84:20 112:16 214:3,13 224:20 232:2 260:16
**oxley** 7:8

**p**

**p** 5:2 6:2
**p.a.** 3:11
**p.c.** 2:2 4:18
**p.m.** 146:19,19 147:3 303:5
**p1hairdepos** 305:15
**pa** 104:1
**packaged** 41:22
**packaging** 78:15
**padden** 2:4
**page** 7:8 8:7 9:15 17:4 80:14 81:1 149:12 152:3 154:24 155:24 170:14,15 177:13,17 178:8,13 181:13,14 187:3,7,8,21 189:18,21,21 203:17 204:16 214:18 215:10 224:4 233:8,15 233:16,17,18 233:19 241:11 244:2 246:9,16 254:2 283:10 285:8,10 287:21 288:2 288:10,11,15 288:15 289:4 306:4,7,10,13 306:16,19
**pages** 11:25
**pain** 66:18 68:2
**painting** 293:13
**panel** 272:4
**papantonio** 3:11
**paper** 104:16 186:20,22 188:23 189:2,5 191:11 201:25
**papers** 79:3 80:1,1,1 119:1 119:4,11,14 185:11 191:5,7 193:6
**paperwork** 214:2
**papillary** 67:12 69:14
**parabens** 80:2 80:18 204:20 211:2,14,23 212:12 215:14 242:7
**paragraph** 81:2 96:10 181:14 203:22 224:4 225:4

230:8 231:25 232:9 233:24 285:11 288:25 289:7,8
**paralegal** 7:8
**parameter** 205:25
**parameters** 198:3 199:15 200:11 202:19 209:11 210:15 215:13 219:25 220:3
**paraphenylen...** 136:20,22 137:16
**paraphrasing** 72:14
**parfitt** 2:17
**park** 2:22 43:25 44:7,13 51:13
**parker** 2:21
**part** 24:8 29:11 30:12 32:14 35:9 47:19 53:7 55:7 67:21 74:15 87:22,23 92:20 97:15 112:6 113:3 117:23 124:4 168:1 179:1,7,7 187:13 194:10 203:25 204:16 225:3 227:7 234:23 245:7 251:3,11 254:21 279:18 287:18 289:6 302:18
**partial** 43:22 61:15 64:17
**partially** 68:22
**participated** 22:4 23:6 103:17
**participating** 119:22
**participation** 101:3
**particular** 13:21,24 19:24 48:15 68:6 73:14,15 74:2 74:8 75:12 78:10 100:21 103:19 107:22 122:9,15 125:4 188:9 202:17 275:14 298:1,3 298:14 299:3
**particularly** 56:13
**parties** 9:7,18 304:14
**partition** 234:11
**partitions** 286:5
**parts** 181:3 228:19
**pass** 302:21
**past** 15:3 33:7 55:13 199:2
**paste** 293:12
**patch** 41:17
**path** 59:14 142:23
**pathophysiol...** 178:24 179:14
**pathway** 168:15,20,21 169:2,6 225:22 244:11,13 260:17 300:7 300:12 301:3
**pathways** 227:21,22 245:8
**patient** 47:21 48:11 49:1 52:3 68:20,21 108:14 120:17 120:18,19 121:7 124:16 124:17,23 125:2,8,11 134:17 141:25 142:20,20 143:2,7 145:24 274:13
**patient's** 108:10
**patients** 29:21 29:23 30:1,4 30:11 31:17 32:22 36:20 46:7 55:9 56:13,13 113:5 121:15,20,21 125:17 127:17 128:5,13,16 129:15,16,17 132:16 141:11 142:2,18 143:8 143:19,23 144:3,9,25 145:14 271:11 274:1 276:3
**patrick** 2:16 5:2 10:4
**patzelt** 187:3 188:16
**paul** 4:22
**pausing** 117:10
**payments** 100:18
**pc** 6:18
**pclyder** 5:5
**peal** 4:2
**pears** 258:3
**peer** 85:13,16 119:2 161:7 215:21

**penalty** 109:24
**penetrate** 166:23 171:5 171:21 172:9 172:17 173:1 174:3 226:14 267:24
**penetrated** 68:11 229:9
**penetrates** 65:13 173:20 265:10
**penetrating** 173:8
**penetration** 171:12 188:14
**pennsylvania** 3:3
**pensacola** 3:13
**penultimate** 233:23
**people** 30:18,23 31:15 54:15 56:6 94:25 110:9 130:14 139:18,20
**peoria** 32:15
**percent** 31:2,9 121:6 128:3,6 128:20 129:19 130:1 132:4,14 135:12 241:8 255:18
**percentage** 31:14 124:9,19 134:16
**percutaneous** 217:4 253:12
**perfect** 196:2
**perfectly** 278:5
**perform** 22:15 23:21 41:17 55:10 81:23 82:7,12,18,23 83:1 100:6 121:20 193:15 193:20 196:6 281:13 299:12
**performed** 23:8 23:9,10 54:8 55:3 120:24 281:6
**performing** 55:12 56:14 82:3,11 177:11 199:5
**performs** 55:7 211:8
**perfume** 266:23
**perifollicular** 226:2 227:2,8 227:14 245:9
**perimeter** 286:4
**period** 30:12 68:3 90:6,8,17 90:23,25 102:18 107:21 129:25 142:10 215:4 246:12 247:12 252:3
**periods** 247:20 251:2
**perjury** 109:24
**permanent** 46:14 49:18 123:5 136:3,5
**permanently** 48:6 67:13
**permeate** 199:7
**permeation** 200:7 247:19
**perms** 184:14
**persistent** 118:9
**person** 54:6,7,9 54:12,23 72:17 112:20 281:11 291:12
**personal** 116:21 117:6 133:11,16,24 134:6,13 135:2 149:3 150:24 151:23 243:21 267:15
**pertaining** 1:11
**peter** 5:13
**petrolatum** 270:2 285:12 285:16,21 287:6,22,24 288:25
**petroleum** 268:3 285:13 285:16,21 286:9,12 287:4 287:6,14 288:20 289:1 289:21 290:15
**petti** 4:8
**ph** 38:17 80:16 82:18,20,23 83:2 135:24 136:2,4,8,11,17 178:6 182:6,8 182:11,16,22 182:24 183:2 183:11,21 184:2,15,19 188:6 250:23 254:9 255:2,13 256:13 257:6,8 257:12,16,19 258:5 270:25
**ph.d.** 18:17 20:11 69:18 71:10
**pharmaceutical** 108:5 245:17 246:5
**pharmaceutic...** 247:7

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 366 of 398 PageID #:73516




**pharmacologic** 92:12
**phases** 234:12
**phenols** 242:7
**philadelphia** 3:3
**phone** 93:8
**phones** 9:5
**photographic** 274:18
**phrase** 48:11 71:24 72:24 157:16,18 259:11 261:12
**phrased** 110:19 111:3
**phrases** 110:8 110:13
**phthalate** 204:20 211:2 211:14,23 212:13
**phthalates** 80:3 80:18 204:19 211:2,14,23 212:12 215:14 242:7
**physical** 235:10
**physician** 18:4 19:5 103:19,25 108:14 120:22 120:23
**physician's** 120:19
**physicians** 103:24
**physics** 198:23 200:12,13
**physiology** 46:17 224:15
**pick** 9:4
**pierce** 189:8,11 189:21,24 190:13,16,19 192:16,22 197:3,17,25 198:1 199:4 201:6 203:17 203:17 204:16 206:14,20,23 210:6,24 211:4 211:8 214:18 215:2,9 216:5 241:24 242:15 296:3
**pigment** 49:12 49:14
**pigmentation** 67:15
**pigmented** 49:13 51:5 128:1
**pill** 213:5
**pioneered** 120:16
**pittsburgh** 113:24 114:2,3 115:1,7,13
**pituitary** 118:5
**place** 9:6 29:13 83:19 93:7 253:15 287:5
**placed** 123:4 171:5 173:16 174:17 193:11 237:13 250:24 262:24 266:9 266:12,13 286:5
**places** 292:25
**placing** 175:20 265:20
**plaintiff** 98:22 102:1 103:15 103:17,19 104:5 105:4 298:8
**plaintiffs** 2:8 2:15,20,25 3:5 3:10,15 93:1 94:24 97:18,20 100:24 101:16 101:17 103:8 105:11 242:2 242:13 244:3 304:9
**plan** 36:22 37:1 124:5 142:24 142:24
**plans** 100:5,8 122:21 264:8 302:17
**plasma** 295:1
**plausibility** 28:23 78:7 87:14 150:3 158:3,9,22 159:1,4 161:4 161:10 162:7 162:18 163:10 163:11,13,19 163:23 167:13 221:20 223:2 259:10,14,20 296:25
**plausible** 17:8 147:13 156:7 170:12 185:6 204:12 221:5 260:18 262:1 263:13,13 264:21 300:7 300:12 301:3
**plausibly** 261:19
**play** 215:21
**played** 126:17
**please** 9:3,5,22 9:24 10:15 12:5 27:4 50:2 58:14 75:4 81:21 113:19 130:25 148:21 155:14 161:3 162:5 185:17 202:25 211:18

214:9 218:25 233:20 277:2 294:23
**plexus** 260:20
**plicated** 293:15
**plugged** 201:2
**plums** 258:2
**plural** 126:24
**plus** 124:7,8 162:16
**plyons** 2:19
**pockets** 224:6
**point** 32:2,11 40:10 66:18 95:2 97:24 98:14 105:20 114:1 129:13 138:1 171:6 231:25 232:2 232:12,14 238:5 247:24 289:13 291:20
**pointed** 48:24
**points** 230:17 232:7 272:4,10 272:15 275:5
**poison** 71:23
**polycystic** 118:7
**pool** 181:15
**population** 33:13 125:16 130:2 134:17
**port** 2:23
**portion** 14:13 254:19
**portions** 229:9
**pose** 215:19
**posed** 296:19 298:14
**position** 282:5
**positive** 121:2
**possibility** 58:1 158:18 159:4 173:1
**possible** 39:4 57:11 87:16 121:17 158:25 160:21 162:19 162:23 163:9 177:5 259:11 281:13 282:1
**possibly** 293:11
**post** 191:21
**potential** 93:20 123:24 124:3 144:18 156:1,6 234:9 265:22
**potentially** 215:13
**power** 297:17
**ppd** 136:23
**practical** 92:5 290:25
**practice** 19:20 21:15 33:8 35:20 68:12 69:1,19 86:11 109:18 113:7 118:19 119:21 120:4,8 122:8 122:21,22 127:23 128:3,7 129:24 130:6 130:11,15,20 131:20 132:22 143:24 144:5 145:1 227:11
**practiced** 122:2 245:15
**practices** 1:4 9:11 37:5
**practicing** 18:4 30:13,13
**practitioner** 104:1
**preapplication** 285:11,12
**predominantly** 92:10
**prefer** 163:10 230:3
**pregnant** 263:1
**premise** 76:11
**preparation** 13:15 14:4,19 20:9 94:9 99:17
**prepare** 11:3,5 11:8 13:22 14:1 15:12 83:18,19 86:15 187:16
**prepared** 83:8 83:15,16 147:22,24 148:6 149:25 182:21 190:7 226:16,24
**preparing** 77:20
**preponderance** 158:1
**prescribe** 47:11 48:5
**prescribed** 45:9 46:1 48:15
**prescribes** 47:20
**presence** 178:12 212:2
**present** 7:7 9:23 29:24 30:4 32:12 34:10 44:16 51:2,6 93:2 100:10 121:15 134:11 135:4,5 135:7,10 223:3 247:24 276:3
**presented** 33:25 34:5 36:23,25 44:1 44:17 46:10

48:16 50:22 63:2,21 69:2 98:25 99:2 125:22 127:7 128:21 129:21 130:4 132:5 133:7,9,20,22 135:13,15 138:17,20 139:12,21 140:6 141:14 145:24 155:17 218:4 274:5 275:24 290:23
**presenting** 31:18,21 52:3 125:3
**presently** 121:14
**presents** 217:19
**pressed** 19:25
**presume** 111:2
**pretty** 122:11 140:5
**prevent** 110:4 181:12 287:8 289:2 290:19
**preventing** 285:17,22
**preventive** 180:11,19
**prevents** 173:21
**previously** 51:12 69:11 94:19,20,23 281:19
**primanti** 114:25 115:5
**primarily** 30:13
**primary** 29:21 79:14 91:15,20 91:23 112:16 120:3,7 124:6
**principle** 185:20 235:10 238:20
**principles** 116:14 118:20 229:2 236:4
**prior** 11:12 12:25 99:9 102:12 103:3 127:22 130:20 157:13 178:11 181:24 242:9,9 253:1 273:3,11 288:19 289:22 301:24
**private** 9:4
**privilege** 85:21 111:14 154:5
**privileged** 95:17,18,19,22 95:23
**probably** 30:23 64:13 67:11 163:3
**problem** 50:2 96:24,24 195:21 291:6
**procedure** 1:10 96:13 108:10 260:6 281:6 304:10
**procedures** 54:16
**proceed** 111:18
**proceeding** 9:22 109:11 223:24
**proceedings** 303:4
**process** 39:5 47:20,22 49:8 49:22 55:12 56:8 57:20 59:8,11,16 164:8,11 167:4 185:2 207:11 233:9 234:4 235:11 236:22 249:15 250:1 250:13,25 251:9 254:23 256:24 258:1 270:3 281:23 281:25 292:16 292:20,21 293:6
**processed** 120:22
**processes** 250:17
**proctor** 3:11
**produce** 167:23 169:13
**produces** 257:9
**producing** 49:14
**product** 38:16 38:22 39:13,18 40:13 41:4,16 41:21 43:8 52:18 53:4,23 56:2,2 57:8 59:18 60:12 73:15 74:2,20 80:16,19,24 81:5,6,13 86:20 91:16 107:25 108:5 113:6 116:22 116:22,23 117:1,6,7 125:13 133:12 136:17 140:16 141:17,18 163:13,20 164:1,3,4,7,11 164:12,16,21 165:8 166:12 166:16,23

172:1,24 185:23 192:3 214:25 215:19 228:20 239:13 239:14,15 248:21 250:6 250:23 251:12 251:17 254:15 265:5,9,23 266:14 273:23 274:7 275:14 282:24 291:1 298:22 299:4
**production** 92:21
**products** 1:4 3:22 4:12 9:11 10:2 17:11 20:9 27:15 28:12,21 37:13 38:10 51:6 52:5 60:1 61:6 78:11,13,15,18 78:23 79:4,10 79:16,22 80:7 81:25 82:8,19 91:15,17 118:23 133:16 133:25 134:6 134:13,19 135:2,5,6 139:4 142:5 143:11 149:19 152:11 154:16 156:9 171:20 182:21 190:18 203:21 212:2 215:24 225:22 227:12 228:2 229:9 241:22 242:9,18 243:21 244:5 245:17 253:11 253:16 254:13 267:2,11,15,16 275:18 282:13 282:14 283:14 294:5 298:1,15
**professional** 50:16 56:17 67:17 101:21 104:5 105:5 140:23 151:22
**professionals** 38:5
**profile** 144:10
**program** 21:20 22:3,5 114:8
**progresses** 235:20
**promise** 110:22
**promotion** 199:1
**prompting** 279:17
**proof** 158:10 158:19,22 161:4,10 162:9 259:10,16
**proper** 131:15 160:25
**properties** 140:19 199:24 199:25 200:10 235:17 260:8 268:18
**proportional** 65:8 234:7
**proposed** 176:1
**proprietary** 207:4 216:16 229:14
**protective** 251:13 267:4
**protocol** 139:11 140:9 159:18
**provable** 162:20
**provide** 17:6 25:6 36:22 86:14 93:24 108:22 112:2 112:25 192:25 225:7 295:1,8
**provided** 13:6 51:15 85:3,16 86:18,22 97:24 98:2,21 99:8 104:1 108:13 132:12 219:5 220:13 244:4 296:2 298:9
**provides** 198:7 224:11
**providing** 111:23
**provision** 96:14
**proximal** 293:17
**proximity** 293:1
**psoriasis** 32:24 130:1 132:24 133:10
**pstrelitz** 5:15
**public** 307:19
**publication** 196:15 218:17
**publications** 82:21 85:12 242:14
**published** 204:18 210:25 241:17
**pugliese** 224:5 224:17 244:10 245:20
**pulled** 14:11
**pulling** 92:3 181:6
**punches** 286:21
**purchasing** 272:5,18
**purports** 271:12

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 370 of 398 PageID #:73520



**purpose** 78:20 231:13 289:5
**purposes** 104:22
**pursuant** 1:9 304:9
**pursuit** 122:17
**push** 49:21
**put** 40:7 45:3 64:25 129:13 160:13,24 163:3 189:19 202:18 210:20 238:22,24 239:21 240:3 255:12,14 276:7 286:8,20 289:21 290:15 301:10 302:1
**puts** 276:24

**q**

**quadrant** 283:5 286:6
**qualified** 276:21 280:3 294:2
**quality** 37:15
**quantification** 219:6
**quantified** 291:24 300:18
**quantifying** 263:16
**quantitating** 263:17
**quantitative** 296:3
**quantities** 77:9 293:2
**quantity** 194:9 197:19 237:15 242:25
**question** 25:1,2 25:18 26:20 27:4 30:3 40:13 46:16 56:1 57:24 58:20 60:9 71:5 73:23 74:4,16 75:1,6 77:19 79:7,24 79:25 83:25 84:16 85:11 86:12,23 87:5 87:6,11 88:8 89:14,25 91:13 91:21 96:6 97:3 98:6 101:4,6,24 102:1,2,7 110:6,7,19,21 110:23,25 111:3,9,10 112:15 114:24 124:13 130:22 131:5,7,10,19 132:1 133:15 134:7,18 135:1 136:9 137:19 137:21 140:11 144:2,19,21 145:8,15 146:3 147:12 148:1 148:18,20,24 150:13 151:6 152:25 153:4,7 153:10,12 154:1,2,9,12 155:22 157:14 158:24 161:8 161:15,20 163:17,23 165:7,12,21,24 166:1,4,7,11,15 166:15 168:1 168:10,22 169:10,16,21 170:4,11 171:9 171:15,16,17 172:15,16,23 176:25 182:15 185:16 191:24 192:14,20 194:6,10,12,13 195:12,14 196:17 197:11 202:25 207:21 208:11,19 209:4 211:17 212:9,22,25 213:1,7,9,14 214:14 219:19 220:12 222:7,9 222:20 224:16 225:13 226:18 226:20,23 239:1 240:24 252:17 255:8 261:24 262:14 262:16 264:5,5 264:18 268:20 273:5,7,12 277:1,16,19,24 278:3,6,25 279:13,15,17 279:20,21 282:10 291:17 296:16,19 297:13 298:18 298:19 299:9 299:10,17 301:19
**questioning** 58:22 209:2 252:4
**questions** 12:10 34:12 42:24 159:13 160:4 160:10 165:3 176:4 195:10 209:12 252:5 289:18 300:23 300:24 302:23
**quite** 124:18

**quote** 190:11
**quoted** 128:25 179:12
**quoting** 72:4 96:12

r

**r** 3:17 10:5,18 115:8 147:1 306:3,3
**radiation** 124:3 124:8,12
**raised** 146:2 229:18
**raises** 231:16
**randolph** 4:19
**range** 55:21 136:8
**rapid** 50:19 253:15
**rate** 100:15 193:16 201:3 257:10
**razzaghi** 2:22
**reach** 50:2 156:20 167:22 169:11 172:10 172:19 174:17 174:23 175:7 178:4 184:2 199:11 204:4 221:8 229:17 260:1,20 263:14 264:21 265:23 266:11 266:18,24 267:6,18,19 268:3,13,25 269:15 270:19 271:7 297:2,6 298:12 299:2
**reached** 68:15 92:25 93:12 157:21 201:12 206:3,14 234:18 296:19 297:5
**reaches** 176:21 182:18 183:1 237:2 238:22 240:13,22 262:10,19 263:9,24 264:13 269:7
**reaching** 66:20 198:17 202:4 265:5,15 271:5 298:23
**reactions** 45:2
**reactivate** 123:6
**reactivated** 123:7
**read** 17:14 25:23,24 27:4 27:5,25 28:1 33:15 39:8,10 57:14,15 58:14 60:12 72:10 95:10 96:8 130:24 131:7 131:14,17 140:2 144:21 144:24 145:11 145:17 148:20 148:22 151:8 151:12 152:21 152:23 153:13 153:22 155:14 155:15 166:2,7 166:8 177:2,3 185:17,18 186:3,7,7,10 202:25 203:2 205:20,21 213:9,10 214:8 214:10 215:9 217:24 218:1 218:23 219:1 219:20,21 220:20 221:12 221:13 222:6 222:13 223:15 224:19,22,25 225:3,12 234:13 271:16 272:5,15,18 273:12,14 275:4,8,10 277:3,4,7,16,19 278:3 279:5,22 283:24,25 284:9 288:3,10 288:11,14 290:9,11 301:19,20 302:6 304:10 305:9 307:5
**readily** 254:8 255:2 256:20
**reading** 96:9 233:14,22,23 304:7
**reads** 152:7 193:6
**ready** 146:10
**real** 192:24,24 193:1 199:14 199:18,19 201:21,25 207:9,10,19 216:12,19 217:21 245:15
**realize** 106:5 147:6 203:13 259:6 297:23
**really** 67:14 75:6 100:2 120:8 148:2 238:11 268:20
**realm** 71:11 92:6
**reapplying** 293:14
**reason** 112:1 122:9,15 125:2

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 372 of 398 PageID #:73522



183:18 237:5 304:12 305:11 306:6,9,12,15 306:18,21
**reasonable** 17:7 28:23 158:3 239:5 240:5
**reasons** 38:15
**rebuttal** 230:13 230:15,17 231:2,10,22 232:7,16,23 233:1,2
**recall** 13:16 31:24 72:9 90:6 91:2 92:17,19 99:19 99:20 108:1 134:15 188:15 196:15 283:13 290:12
**receipt** 305:18
**receive** 38:15 95:3 100:17 112:20 250:6 292:23
**received** 75:8 83:12 90:15,18 243:20 254:7 271:25
**receives** 248:22 249:11
**receiving** 91:6 91:7,9,11
**recently** 15:2
**receptive** 38:6
**recess** 60:20 106:1 146:18 203:10 259:3 297:20
**recipient** 71:21
**recognized** 21:24
**recollection** 187:14 188:2 188:20 197:1 214:23
**recommendat...** 218:5 284:25
**recommended** 143:12 288:20 289:1
**reconstruction** 114:12 121:8
**record** 9:2,7,25 10:16 16:7 25:24 27:5 28:1 39:10 57:15 60:19,21 96:8 105:25 106:2 131:17 144:24 145:17 146:17 147:2 148:22 149:5 151:12 152:23 155:15 160:24 166:8 177:3 184:12,12 185:18 203:2,9 203:11 212:23 213:10 214:10 218:1 219:1,21 221:13 226:17 259:2,4 273:14 274:17 277:4,7 281:18 290:11 297:19,21 301:20 302:6 303:2 304:6
**recorded** 1:7 9:9 304:4
**recording** 9:6
**records** 125:15
**recreate** 201:23 203:5
**redirect** 279:19
**reduce** 285:14
**reduced** 304:5
**reducing** 289:5
**reepithelialize** 67:14
**refer** 10:21 114:23 121:23
**reference** 14:9 14:10 15:20 16:3 79:14 81:10 93:24 178:20 188:6,9 188:11,25 210:19 269:19
**referenced** 14:17 34:14 79:5 80:11 155:25 194:5 197:12 226:25 245:11,12 305:6
**references** 11:7 13:18 14:3 15:24 79:5 84:24 85:3,7 85:11,14,15 91:20 92:2 179:11 187:1
**referencing** 73:24 80:25 126:13 163:16 189:6 229:14 270:4
**referred** 15:14 29:12 121:22 226:11
**referring** 13:23 13:24 28:10 187:4 209:15 246:15 273:10
**refers** 204:17 214:18
**refill** 257:5
**reflect** 83:11 212:23
**reflected** 245:1 302:15

**reflects** 16:19
**refresh** 190:19
**regard** 36:20 89:4,12 102:7 169:19 186:21 222:1,4 225:11 226:15 269:10 293:20
**regarding** 24:15,19 62:19 78:3,25 85:23 88:18,25 89:1 89:9 90:21 91:22 98:2 107:24 108:4 119:2,7,11 142:14 143:20 148:9 150:19 150:25 151:24 178:12 186:14 198:12 208:14 221:17,20 230:5 242:15 298:13 299:9 299:14,23
**regardless** 62:9 101:16 140:7
**regenerated** 248:6
**regeneration** 248:7
**regimented** 124:7
**regretted** 67:9
**regrow** 67:15
**regular** 33:11 133:1
**regulated** 117:16
**reiterated** 52:10 53:2
**rejects** 282:5
**relate** 107:6 116:25 128:6 187:1
**related** 9:18 22:3 29:24 30:5 31:22 32:20 33:13,21 34:1,6,18,19 35:3,13,21 36:1,15 44:2,8 44:13 45:2 50:22 87:20,22 117:6 125:22 126:9,15 127:8 128:22 129:22 132:6,17 133:8 133:20,23 134:11 135:4,8 135:11 138:20 139:3 141:15 144:4,6 197:18 207:6 221:16 247:1 282:13
**relates** 41:10 118:6,8 121:16 197:4 235:10 246:17 247:7 269:19 282:24
**relating** 10:25 188:5
**relation** 242:8
**relationship** 34:5 79:21 133:11 134:17 135:12 138:16 156:8 209:24 231:21 238:13
**relative** 304:13 304:14
**relatively** 178:6 185:25
**relax** 258:21
**relaxation** 260:6,10
**relaxed** 53:25 54:1 146:1
**relaxer** 1:3 8:15,17,20 9:10 17:11 27:15 28:21 29:24 30:5 31:18,23 32:1 32:4,6,20 35:4 35:13,22 36:1 36:16 38:10,21 39:2 41:16 43:4 44:2,9,11 44:14 47:13 50:23 51:5 52:5,21 53:4 54:3,7,8,12,16 54:19 55:2,12 57:7,25 58:25 61:1,18 62:7 64:4,25 66:13 66:15,17 68:15 69:2 79:16 80:6,21 81:25 124:22 125:9 125:12 126:10 126:11,16 129:22 132:6 132:17 134:21 135:6 136:8 138:21 139:20 140:8 141:10 141:15 142:14 143:4 144:13 144:17 145:22 145:25 148:10 149:19 150:4 151:18 152:1 152:10 154:16 156:9 163:13 163:20,25 164:2,4,16 165:8 166:16 166:23 169:24 171:4,20 173:7 173:15 174:16 176:21 178:1,3 179:8 180:14 181:25 182:5

184:19 188:1 188:12,24 190:18 197:5 203:21,22,23 204:5 207:9 215:15 216:13 224:9 239:13 241:18,19,22 244:5,9 245:24 246:8 248:21 249:3,10,21,24 250:6,24 251:4 251:18 254:15 254:20 255:22 257:19 259:23 260:14 271:13 271:14 273:19 275:10,14,18 276:7,10 277:11 280:3 280:12,17,22 281:14 282:13 283:2,22 284:5 284:12 285:14 287:5,12 289:23 290:2 291:12,25 292:2,5,8,12,14 292:25 295:2,9 295:16,22 296:4 298:15 298:22 299:4 305:4 306:1 307:1

**relaxers** 11:1 24:8,16,23 25:11 26:3,11 26:22 27:20 28:5,11,25 33:11,18,22 34:2,7,13,19 36:8 37:8,19 41:10 45:3 46:2 48:4 53:12,18 55:8 55:10 57:4 62:20,21 63:12 66:5 77:18,24 78:4 87:15,21 88:9,22 89:22 97:21 112:13 112:21 125:23 127:8 128:22 130:3 133:9,21 135:14,16 139:6 143:21 144:4,7 145:2 145:4 147:15 149:7 150:21 151:1 155:2 162:8 163:24 169:6 170:7 174:2 180:16 182:3 183:5,12 183:21 185:7 185:13 186:20 187:10,22 188:6,17,21 190:24 191:3,4 191:6,13,25 192:16 193:16 193:25 196:9 197:18,20 199:6 201:10 202:2 204:21 205:15 206:4 206:15 207:14 207:15,24 208:6,15 210:7 211:3,15,24 212:13 213:18 214:5 216:19 216:23 217:6 218:11,16 219:13 220:9 220:24 222:17 223:3 224:5,12 225:8 226:12 227:15 234:18 235:5 244:14 246:1 247:2 262:10 263:3,8 263:24 264:13 269:10 270:25 272:20,25 273:18 274:1 274:23 275:21 276:24 283:14 284:5,22 285:1 287:19 296:12 296:21 299:14 299:24 300:8 300:13 301:4 301:13

**relaxing** 56:9 185:1 250:25 258:1 273:20 281:24

**release** 226:4

**relevance** 151:4,14 185:4 196:23 198:5

**relevant** 14:13 92:4 101:5 167:17 169:25 205:10 215:17 216:24 217:12 218:4 219:14 219:24 220:9 220:14 224:11 225:7 236:8 243:5 244:4

**reliance** 242:4

**relied** 92:3,4 113:3 186:23 189:2 191:5,7 196:7,18 204:3 242:2,13

**relies** 198:19,21 199:12

**relocated** 114:4 114:10

**rely** 211:11,21 212:10 238:21 242:3

**relying** 178:16 200:18,24
**remain** 49:25 122:4 144:5 181:15 224:6 224:13 225:8 227:1,7 240:7 245:18 247:12 252:23
**remained** 68:8
**remaining** 215:5 227:3
**remains** 120:19 164:22 222:24 240:10 251:4,7
**remember** 76:22 84:25 93:25 94:2,4 108:25 109:3 153:25 176:5,6 188:7,8,14,17 259:6,9,12,17
**removal** 22:20 59:7 123:14
**remove** 23:19 63:16
**removed** 33:1 58:9 65:13 120:17 178:7 182:10 240:8 287:13
**removes** 178:2 255:25
**removing** 124:6
**render** 113:12
**repair** 45:22 248:11
**repairing** 45:18
**repeat** 176:25 302:4
**repeated** 140:18
**rephrase** 110:20 111:1 239:2 263:4
**rephrasing** 131:9
**replaced** 234:8
**replacement** 234:10
**report** 8:9,12 8:14 11:6,8,21 12:2,4,8,11 13:10,20 14:14 14:17 15:6,14 15:21 16:4,6 16:15,16,20 17:2,5,17 19:23 20:2 24:18 25:14 26:24 29:12 72:4 77:20 80:12,14 81:10 83:17,18,19,25 84:4,12,13,14 84:20,22,25 85:23 90:21,24 91:3,8,10,13 94:9,12 95:24 98:1,11,12,15 98:23 99:4,9 99:16 102:11 107:2,7,18 112:24 125:20 142:2,4 149:8 149:13,15,23 149:23 152:4 154:13 155:7 155:18 158:2 170:14 184:20 186:25 189:18 190:12 191:13 191:17 192:17 197:7,9,10,12 211:25 212:14 216:2 223:18 223:25 224:19 224:20,23,25 225:4,20 229:19 230:5 230:13,15,22 230:24,25 231:1,3,10,22 232:1,2,6,17,23 232:25 233:1,6 246:9 255:6 264:6 283:17 285:8,10,10 288:25 289:3 300:11,24 302:15
**reported** 7:24 125:12 242:8
**reporter** 9:17 12:17 110:7,12 218:23 278:3 278:14 279:1 279:10
**reports** 80:11 96:16 192:15 197:17 223:16 231:7
**represent** 54:14 85:11 157:13 193:2 301:25
**representation** 30:22 31:6 60:13 64:18 127:15 170:19 232:3 235:13
**representations** 98:25
**representative** 127:24 207:8 216:12
**represented** 35:20 80:11 81:9 91:21 103:16 190:9 298:9
**representing** 9:15

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 376 of 398 PageID #:73526



**represents** 45:4 193:10 199:18 217:2,17 218:4
**reproductive** 22:23,24 260:1 261:19 262:10 262:19 263:9 263:25 264:14 265:5,16,25 266:4,11,18,25 267:6,19 268:4 268:13 269:1 269:15 270:19 271:7
**request** 92:21 92:23
**requested** 13:3 25:24 27:5 28:1 39:10 57:15 96:8 131:17 144:24 145:17 148:22 151:12 152:23 155:15 166:8 177:3 185:18 203:2 213:10 214:10 218:1 219:1,21 221:13 273:14 277:4,7 301:20 302:6
**required** 122:7 182:6 241:23 307:13
**requires** 106:12
**research** 8:11 78:25 79:8 94:12 99:22 112:16 116:12 117:24 118:13 118:16,19 119:7,10 157:3 157:24 158:1 161:7 203:5 215:20
**researchers** 80:10 81:19
**reserved** 202:14
**reservoir** 177:19,20 178:16 179:4,9 180:3,7,10,19 183:4,19 185:14 186:15 186:25 187:21 202:3 226:3 227:2,8 244:7 245:9,20,24 246:2,8,10,24 247:16,19 248:9 251:1,5 251:8,14 252:21,24 253:5 254:3,7 254:10,19,20 254:25 255:12 255:13,15,17 255:21 256:5,9 260:13,15
**reservoirs** 181:16,18,19 181:22 224:13 225:9 246:6,22 257:5
**residency** 33:9 114:7 127:14
**resistance** 198:25
**resolved** 142:22
**respect** 15:5 51:12 70:4 71:19 92:7 95:4 96:15 112:8 118:16 123:13 134:4 143:4 175:20 191:24 199:4 214:13 223:1 229:3 232:8 242:18 244:13 292:18
**respond** 231:18
**response** 37:23 37:25 75:1,19 133:23 134:12 137:7,10 138:3 138:18 139:19 139:24 168:9 212:18 219:3 273:16
**responses** 137:13
**responsive** 13:5 13:11 58:15,16
**restate** 74:15 211:17 277:1,5
**restrict** 290:19
**result** 23:11 47:15 52:4 66:4,13,14 118:22 123:24 124:10 125:9 138:2 177:20 184:24 207:23 215:14 217:8 248:14 249:16 253:22 254:14 254:18 272:21 292:2
**resultant** 204:19 211:1
**resulted** 46:2 50:13
**resulting** 41:23 47:13 211:13 211:22 212:11 216:15
**results** 18:6 202:1
**resume** 35:8
**resumed** 147:4
**retained** 95:8 107:23 109:1

**retainer** 90:3 90:12,15,19 91:6,8,9,11
**retaining** 90:23
**retainment** 90:9
**retention** 92:25
**return** 142:21 143:24 305:13 305:17
**returned** 114:13
**review** 12:25 18:4 81:6 108:7 136:16 214:23 215:8 298:1 300:5 305:7
**reviewed** 11:6 11:6 13:14 14:13 79:3 80:15,24 81:5 81:8,18 82:19 82:20 84:23 85:13,16 101:15 112:15 119:2 161:7 203:25 215:7 215:21 224:1 232:22,25 233:5 298:7
**reviewing** 82:1
**revlon** 5:12 8:18,19 78:19 282:24 284:11 287:20
**rewarding** 122:12
**ribbons** 286:4
**richmond** 3:7
**right** 11:16,17 11:25 12:15 14:12,23 15:16 16:5 17:23,25 18:3 19:14,18 19:22 21:16,21 23:7,13,13,18 23:19 24:21 27:9 29:4 30:17 31:3,10 32:25 33:15 34:24 35:4 40:2,21 41:2 43:2 44:23 47:16 48:2,8 52:7 53:8 54:10,11,21 55:5 56:5 61:3 61:22 62:24 64:6,22 65:3 65:21 66:25 67:20 69:5,19 70:13,22 72:2 72:6,17 76:5 76:16,17,23 77:12 82:24 85:9,17,25 86:7 90:3 91:2 93:13 94:15 96:2,25 97:3,6 97:15,22 98:17 100:18,22,25 101:7,8 102:3 102:9,20 103:4 103:6,21 104:25 105:2 105:18,18 106:10,13 109:7,12,16,20 110:10 111:10 111:24 112:3,7 112:13 114:15 114:17,24 115:19 116:2 119:18 122:21 122:24 124:20 126:2,6 127:11 128:22 129:9 129:17,23 130:6 131:3 132:2 133:1 137:11,25 138:13 139:7,7 142:15 143:5 143:21 144:7 146:6 147:9 148:16,17,19 150:7,8,11,18 153:22 154:6 155:4,21,24 156:11,19,20 156:21 157:6,9 160:22 163:1 163:12,16 165:4,25 169:3 169:19 170:21 171:1,17 172:6 173:22 174:8 174:13 176:8 176:13,17 179:24 180:9 181:19 187:7 187:10,22 188:14,24 189:9 190:1,14 190:18,24 191:6,25 193:15 196:10 196:17 197:3 197:22 204:1 209:16,24 212:7 222:1,9 223:16 228:3 233:17 234:24 240:1 241:25 243:10 245:25 247:2 249:11 249:22 252:9 252:17 257:13 257:17 258:7 258:24 263:25 264:14 271:22 272:3,14 277:24 278:4 282:14 283:5 283:19 284:14

284:22 289:3 289:15 291:12 296:12 297:9 297:15 299:5 299:15 302:2
**rinse** 68:7 253:9 258:11 275:12 290:6 290:18
**rinsed** 59:12,19
**rinsing** 57:20 67:25 224:7
**risk** 17:9 24:10 27:16 28:8,9 28:12,19 47:24 53:2 88:15,18 88:21 89:1,21 149:17 152:9 154:15 215:20
**risks** 91:24,24 215:23 298:14
**robert** 4:8
**robinson** 7:2
**rodriguez** 4:14
**role** 119:22 126:17 215:22
**room** 11:19 121:25 122:1 280:17
**root** 294:21
**rough** 100:3
**roughly** 139:8
**route** 73:20
**routes** 172:1
**routinely** 124:22
**royster** 4:2
**rpetti** 4:10
**rpr** 1:12 7:24 304:3,22
**rule** 96:13,14 122:20 304:9
**rules** 1:9 84:1 96:13 153:25 154:6 160:7,9 160:12 277:21 278:22 304:9
**ruling** 86:3
**run** 93:5 286:2 286:9,16
**rush** 114:8

**s**

**s** 3:2,16 5:18 147:1,1,1 306:3
**sad** 67:9
**safe** 70:10 75:11 76:2,16 76:25 77:7,17 77:24 78:5
**safety** 78:2 213:23 275:6 276:11 298:13
**saith** 303:3
**sales** 1:4 9:11
**salon** 38:5 142:4 145:5
**salons** 79:18
**sample** 130:13
**samples** 241:22 242:16
**sampling** 218:6 220:16
**sanctioned** 97:9,10
**sandwich** 114:25
**sara** 2:3 4:2
**sat** 280:16
**saw** 29:11 36:20 127:25 128:21 129:21 130:14 132:5 132:22 133:19 133:22 135:13 139:18,20 143:19,20 144:3 145:24 145:25 282:21 282:23 298:10
**saying** 23:7 33:16 64:3 66:21 67:1 69:9 71:22 131:22 138:21 143:3 161:11 169:3 179:22 183:18 208:19 238:20 245:22 257:13 278:7 278:22,25 294:3
**says** 104:9 175:13 203:22 204:17 205:9 205:10,12 215:2 224:4 225:6 233:9 242:2,16 272:6 275:7 288:9,19
**scale** 182:9 257:19,20
**scalp** 33:14 34:1 35:22 38:12,22 39:18 39:24 46:12 47:12 48:17,19 51:21 52:6,14 52:21 53:14,20 53:22 55:16,23 56:3,10,16,19 56:23 57:5,25 59:11,18 62:24 63:6,7 66:17 67:20,24 68:5 68:6 80:20 126:16 135:8 140:15 142:6 163:14,21 164:9,10 170:16,19 175:2,2,22,24 177:13,15

179:15 185:22 204:13 224:10 225:25 227:13 227:14,16 247:8 248:11 249:2 250:12 253:7,8 254:17 272:19 274:24 275:10,22 276:7,12 277:12 280:4 281:15,22,23 282:1 284:13 285:4,14 286:4 286:6 289:10 290:3,5,17,18 292:25 293:1,7 293:12,17 294:5 297:1
**scar** 67:10,11
**scarring** 34:10 44:19 51:7
**scastronuova** 2:6
**scenario** 290:22 291:1
**schedule** 96:11 98:23
**schildroth** 196:18,25 242:3,4,23 243:4,10,19
**school** 113:21 114:2,14,14 115:11
**science** 49:24 98:8,9,13,17,23 98:24 99:1 101:14 102:6 157:23 179:14 235:19,20 245:15
**scientific** 81:8 92:6 161:8,24 161:25 175:6 175:10,16,20 178:23 200:6 218:17
**scientifically** 172:18
**scientist** 100:22 146:6 197:22 215:25
**scope** 26:15,24 27:3 95:3 168:7 170:2 218:14 261:22 265:8 268:16 296:13 297:11
**screen** 271:17
**seamans** 5:8
**search** 283:17
**sebaceous** 177:14,16 178:12,19 179:12,15,18 180:2,18 188:5 188:10
**seborrheic** 225:23
**sebum** 177:19 178:2,7,15 179:3,9,20,21 180:18 181:11 181:22 182:2 182:10 183:3 183:13,19,25 184:25 185:14 185:22 186:15 186:18 202:2 244:6 248:5,7 250:25 254:5 255:24 256:1 256:14,19,24 257:7,9,12 258:6,12,12,13 258:16,21 260:12
**second** 64:17 65:17,20 66:2 66:3,7 68:16 69:4,7,9,10,15 272:4 275:5,6 275:11 276:6 288:11,14
**seconds** 40:8,19 41:18,18 42:12 43:3 61:19,21 63:21 64:12 65:17,21
**secreting** 180:2
**secretion** 180:9 180:17
**section** 203:20 286:6 288:17
**sectional** 170:18 242:5
**sector** 92:12
**sedran** 3:2
**see** 11:21 29:20 50:1,11 54:5 57:10 68:20,21 96:25 121:20 121:21 124:10 128:11,16 129:9 130:5,11 130:15 132:25 134:10 139:2 142:21 153:22 178:8,13 184:23 190:4 205:18,19 212:1 216:17 220:2 231:17 254:3 283:3,7 283:8,20 284:3 284:9 287:23 288:22 297:16
**seeing** 31:24 68:22 125:5 141:19 142:12 143:2 228:23 230:25
**seem** 165:13

**seen** 31:17,21 32:16 54:2,6,8 54:11,19 66:3 66:6 68:14 69:3 99:6 125:20 127:7 127:18 129:7 139:2 183:13 190:15 197:13 276:2
**segal** 5:13
**segalla** 6:13
**segments** 139:12
**self** 121:23 242:8
**send** 83:20 84:13 93:11
**sending** 109:15
**sensitive** 9:3 272:19
**sensitivity** 68:5
**sent** 305:14
**sentence** 81:4
**separate** 123:12
**serum** 80:17 263:17
**serve** 246:22 247:6
**serves** 93:23 198:20
**service** 93:16 93:18 103:25
**services** 67:17 93:25
**set** 96:12 304:16
**setting** 103:8 145:5,5
**settled** 108:17
**seven** 149:15
**several** 11:10 11:13,14,17,18 33:1 99:13 165:18 172:14 242:7 246:19
**severe** 64:13
**shades** 162:1
**shaft** 174:23 175:24 178:3 179:15 180:3,5 180:6
**shafts** 174:14 244:6 292:23
**shahadat** 5:3
**shampoo** 60:6 203:24 227:4,6 251:4,13,19 252:22 254:6 257:16,23 258:12
**shampoos** 257:24
**share** 230:17 271:17
**shared** 288:13
**shares** 125:11
**sharper** 148:1
**shb.com** 6:10 6:10
**sheet** 305:11
**shelf** 79:17
**shield** 289:10
**shipra** 6:18
**shohl** 4:13
**shook** 6:7
**short** 60:20 105:23 106:1 203:10 250:5 259:3 297:20
**shortly** 91:6,9
**shortness** 61:3
**shown** 245:10 246:21
**shows** 281:11 294:12
**sic** 232:23
**side** 101:7 102:8 160:1
**sign** 304:10 305:12
**signal** 156:5
**signature** 16:23 304:9,12,21
**signed** 304:11 305:20
**significant** 152:8 244:8
**significantly** 149:17
**signing** 304:8
**silico** 241:20
**silkening** 8:17 8:20 271:14
**similar** 162:18 162:19 207:17 249:17 292:21
**similarly** 155:6
**simple** 58:20 165:6 236:24
**simplistic** 235:18 237:12
**simply** 154:12 238:20
**simultaneous** 252:8 278:10
**simultaneously** 32:9
**singer** 5:13
**single** 14:5,8 92:13 175:23 205:25 241:21 242:16 244:12
**sir** 30:6 80:25 96:1 192:14
**sister** 156:2
**sit** 136:4 151:21 158:2 216:20 230:6 231:1,10 294:25
**site** 175:3 237:24

**sites** 237:22
**sitting** 134:21 184:1
**situation** 41:13 50:16 173:2 175:5 176:1 192:24 195:7 201:21,25 203:5 207:9 240:6 250:10 287:15
**situations** 185:24
**six** 139:6 142:9 142:13 143:3
**size** 70:20
**skill** 71:3 172:18 276:18 300:6
**skilled** 291:12
**skin** 22:14,21 22:25 23:5,13 23:19 24:5 26:5 32:23 33:1 35:7,11 38:12,18,22 39:3,5,14,18,24 40:7,10,13,18 41:3,23,25 43:5,9,11,20,23 44:24 45:5,7 45:11,18,24 46:7,12,14,17 47:7,12 48:6 49:6 51:13,19 51:21 52:3,4,7 52:13,21 53:5 53:14,20,22 55:23 56:10,16 56:19,23 57:5 57:25 58:2,11 58:25 59:6 60:3 61:2,7,18 62:8,13,16,24 63:14,23 64:5 64:10,11,15,19 65:1,7,10 66:17,19 67:19 68:2,9 78:9 88:5 112:12 118:11,24 119:24 120:9 120:17 121:10 121:13 123:19 123:23 128:1 135:8 140:19 147:16 158:6 162:16 163:14 163:14,20,21 164:1,5,13,18 165:9,14,16 166:12,17,19 170:16,19,20 170:23 173:7 177:15 178:24 179:16 180:3 185:24 191:2 192:4,6,10,12 193:7,12 199:19,23 207:10 221:6 221:22 223:4 224:15 226:5 229:4 236:13 237:13,20,23 238:2,14,22,24 239:5,7,22 240:3,7,8,10,13 240:25 241:2,8 247:24 260:7 260:20 262:2 265:21 266:9 266:13,14 267:17,23 268:6 269:13 269:23 272:21 273:18,21,21 274:7,24 275:10,12,22 276:3,7,12 277:11 280:4 281:15 284:13 285:4 286:3,9 286:14,14,20 287:7 289:22 290:3,6,16,17 293:4,7 298:23 301:14
**skinperm** 214:19,24 215:2
**slapped** 59:10
**slide** 286:21
**slides** 120:22
**slight** 48:3 61:16 63:15,22 64:2,12 65:15
**slightly** 258:15 271:16
**slip** 162:21 163:5
**slopped** 59:10
**small** 115:7 132:15,20 271:18 290:24
**smaller** 135:19 138:19
**smehta** 6:20
**smsm.com** 5:15
**society** 141:3,4 141:7
**soconnor** 2:6 305:2
**sodium** 40:7,18 41:3,11 283:3
**softsheen** 3:22 10:3
**solid** 286:12
**solutions** 305:23
**somebody** 54:2 81:15,20 84:13 115:4 141:14 281:5

**somewhat** 162:19 185:23 185:23 286:15
**soon** 58:17
**sorry** 14:5 43:17 57:11 74:5 85:10 87:9 98:5 99:7 102:24 104:10 131:16 163:18 186:5 202:23 204:14 219:19 225:12 277:5 284:1 291:17 302:3
**sort** 75:8 142:23
**sounds** 124:13
**source** 11:7 13:15 93:24 244:12
**sources** 79:14 91:23 190:4,5 190:7,9 207:7
**south** 3:12 4:14 115:7
**space** 55:2 177:21 236:6,7 236:10 254:20 254:25 255:21 256:10
**speak** 11:16 72:11 157:8 220:14 240:16 274:17
**speaking** 25:16 87:14 110:9 139:8 159:6,19 160:1,17 195:14 229:15 233:20 252:8 278:8,10,11,13 278:24
**speaks** 33:24 149:23 231:7 247:15
**speal** 4:4
**special** 18:21 19:2 20:14 21:19 22:2 120:11 159:23 160:2
**specializing** 20:17
**specialties** 70:1 123:10
**specialty** 21:9 21:13 121:10
**specific** 21:3 76:8 79:20 80:2 87:6 92:9 100:5,8 116:9 116:11,18 118:15 119:7 120:15 126:19 136:17 137:21 169:21 182:14 186:6 196:15 201:7 229:22 290:13 292:8 295:16 299:13 299:22
**specifically** 20:22 22:16,20 92:19 99:20 116:5 134:6 188:20 196:25 231:21 246:1,7
**specifics** 230:11
**specimen** 121:5
**speculation** 57:17 59:4 267:9
**speech** 27:3 226:16,24
**spell** 10:16
**spelled** 10:18
**spend** 230:7
**spent** 236:23
**spoke** 11:8,10 11:18
**sprayed** 266:23
**sprays** 162:14
**spreadsheet** 198:4
**squamous** 123:25
**ss** 304:1
**st** 4:3 6:14 50:20,21 51:18
**stage** 69:3,4
**stages** 68:15 69:9 121:5
**staging** 124:16
**stagnant** 202:9 207:7 216:11
**stained** 120:23
**staining** 121:1 121:1
**stand** 96:21,23
**standard** 103:20 104:6 105:5 120:25
**standing** 54:19 255:11
**stands** 156:4 158:2
**stars** 3:18
**start** 64:17 160:5 277:21 279:23
**started** 66:2
**starting** 76:11
**starts** 64:23
**state** 9:22,24 10:15 177:17 268:18 273:17 276:22 304:1
**stated** 57:4 62:12 64:8 147:23 156:23 173:15 201:16 244:18

**statement** 8:10 13:8 17:16,19 18:11,25 28:9 33:24 34:16 40:11 42:15 44:4 54:18 68:25 70:2 72:20 83:3 99:25 101:18 102:9,10 126:14 130:16 149:22 152:3,4 152:5,7,13 153:12,13,17 153:24 154:12 154:19,21 155:6,9,17 156:11 164:15 178:10,17,21 179:2 204:22 204:23 205:2 205:18,19,23 206:9 212:2 237:12 242:15 244:21,24 245:1,4,6 246:15,17 247:11 248:20 255:5 282:3 283:13,16 289:7 291:4 294:3
**statements** 42:17 63:19
**states** 1:1,10 19:17 122:5 123:1 241:16 244:3 283:3
**static** 255:19
**statistical** 31:6
**status** 122:16
**stay** 176:6 246:2
**stays** 286:21
**steering** 94:24
**stefan** 7:8
**stenographic...** 304:5
**step** 110:6 163:9,12,19,22 163:25 256:3 281:24
**stephanie** 2:2 10:6 304:8 305:1
**stepped** 110:2
**steps** 168:13,14 251:9 260:9
**steroids** 118:23 140:21 225:25
**stipulate** 149:4
**stood** 55:1
**stop** 258:1 294:23
**storing** 246:12 251:2
**straight** 274:21
**straighten** 37:14 293:9
**straightened** 248:14
**straightener** 39:2
**straighteners** 33:11,18,22 34:19 147:15 150:5 169:7 174:2 185:7 217:6 223:3 300:13 301:13
**straightening** 17:11 27:15 28:12 39:5
**straightforward** 124:14
**strand** 293:10 294:11
**stratum** 173:18 202:11 215:5 216:11,14 217:20 236:13 246:10 249:4,6 249:15,25 250:19
**street** 1:13 2:11 2:17 3:3,12 4:3 5:19 6:3 7:3
**strelitz** 5:13
**strength** 6:12
**strike** 25:21 27:23 39:6 58:12 144:20 145:9 151:9 152:19 155:12 165:22 202:24 217:22 218:20 221:10 241:1 301:17
**strong** 177:18 178:1,5,14 179:2
**stronger** 182:9
**strongly** 165:13
**structural** 117:19,20
**structure** 23:3 23:4 117:2 172:6,8 174:8 176:22 245:19 259:15 260:12 269:13
**structures** 174:15 227:24 246:22 254:17 262:4 267:22
**student** 22:7
**studied** 113:24
**studies** 13:21 14:16,22 15:3 17:10 18:5,6,7 19:6,7 80:17 80:19 82:4 113:11 155:25 185:10 187:9 187:15,18,20

192:15 193:23 196:7 198:11 200:24 220:20 220:20 222:13 222:13 245:11 245:22,25 246:4 247:2,5
**study** 14:8,11 14:14 20:8 116:11 156:2,4 161:25 178:9 179:6 186:22 187:12,25 188:2,14,16 189:24 194:5 199:5,20 203:25 204:18 205:4 209:4,14 210:25 211:8 211:12,21 212:10 214:15 241:16 246:7 296:3
**studying** 115:4
**stuff** 286:19
**stylist** 56:22 277:12 280:5
**stylists** 56:17
**subject** 73:23 176:19 196:15
**submitted** 298:8 304:8
**subpoenaed** 100:13
**subscribed** 307:14
**substance** 75:8 75:9 138:24 147:18 168:20 236:2,3,20 239:9 247:23
**substances** 198:21 200:14 236:9 248:8,11 251:10 256:8
**substantive** 219:6
**substitutes** 204:20 211:3 211:14,24 212:13
**suburb** 29:15
**successfully** 114:20 141:18 144:12 145:21
**suffer** 249:21
**suffered** 65:2
**sufficient** 167:23 261:4
**suggest** 20:3
**suggested** 160:2
**suggesting** 158:21 169:22
**suggests** 179:8
**suite** 2:11,17 3:3,7,12,18 4:3 4:8,14,19 5:3 5:14,19 6:3,14 6:19 7:3
**sullivan** 6:2
**sullivanj** 6:4
**summarize** 300:25
**superficial** 65:15 66:8 142:7
**supplemental** 13:19 79:6 81:11 190:4,5 190:7,9 197:14
**supplied** 78:16 86:19 219:23
**supply** 176:22 177:6 239:6
**support** 125:11 149:17 152:8 154:14 186:21 224:8,12 225:7 225:11 246:15
**supported** 185:12
**supporting** 244:4
**supports** 155:1 158:1,4,14 225:16
**suppose** 228:8
**supposed** 67:19 95:5 104:18 166:7 276:12 284:5,15 285:3 289:21 294:16
**supposedly** 46:1
**suppress** 118:24
**sure** 11:20 12:6 15:13 53:3 60:15,18 74:18 77:6 81:21 105:21 110:19 126:6 131:18 132:19 146:12 158:15 177:1 187:25 192:2 211:20 222:8 228:19 229:8 235:25 255:7 271:21 287:25 291:19,22
**surface** 158:6 175:1 204:13 207:10 221:6 221:21 226:4 236:13 239:5 246:23 281:22 286:3,13
**surfaces** 256:9
**surgeon** 121:2 121:11,13 124:10
**surgery** 21:21 21:25 35:7,11 44:24 120:2,15 120:15,24

121:21 123:11 124:7 141:5,8
**surgically** 158:15
**surpass** 206:5 206:16
**surrounding** 56:16,19 58:11 284:13 289:22
**suspend** 175:23
**suspended** 175:1
**sweat** 286:19
**sword** 49:10
**sworn** 10:9,12 304:4 307:14
**syndrome** 118:8
**system** 116:14 116:15 118:3 118:17,22,25 119:3 121:3 221:8 223:5 260:22 262:3 262:25 265:11 269:6 271:5 300:15 301:15
**systematic** 220:7
**systemic** 74:1,7 74:20 75:12 123:14,18 124:11 162:15 167:6 169:24 170:8 201:12 202:4 217:10 220:7 268:12 269:14 291:25 292:1 295:1 296:20 300:18
**systemically** 259:24 268:24 270:12
**systems** 4:22

**t**

**t** 147:1 306:3,3
**tab** 102:12 189:12 271:22 282:17 288:4
**tabs** 16:17
**tags** 12:9
**take** 9:6 16:5 16:10 34:24 41:15 58:19 60:16 64:3 67:13 75:21 83:18 93:5,7 104:20 106:9 110:8 116:7,11 116:18 117:10 129:13 146:13 173:3 174:6 189:17 194:19 199:21 202:13 203:7 230:2 238:21 251:20 259:1 297:15
**taken** 1:9,12 9:10 86:11 104:19 106:9 109:9 120:20 121:5 125:1 141:9 146:18 160:1 210:16 213:5 217:16 237:6 246:25
**takes** 121:3 257:3
**talk** 11:9 15:15 15:23 55:11 57:23 97:18 178:19 191:21 194:15,22 195:8 196:7 224:16 247:18 273:25 274:20
**talked** 55:5 56:8 80:5 109:9 111:7 115:18,23 143:11 168:13 223:14 241:15 241:25 242:22 245:23 270:1 291:20
**talking** 21:15 56:5 60:5 63:11 66:2 70:13 71:6,8 71:10 76:20,21 77:6 128:16 181:17,18,21 195:23,24 236:12,23 263:3 266:16 267:11 294:22
**talks** 287:21
**tally** 100:2
**tamponade** 49:20
**tardy** 4:7
**target** 18:7 19:7
**task** 214:14 299:19 301:10 302:1,1
**tasked** 26:16 27:6,11,19 28:3,15,22 77:19 78:22 82:1,3,11 86:23 87:13 89:15 91:14 101:4 136:9 137:20 147:11 147:12 150:2 151:15 152:16 168:2,11 169:4 169:15 170:3 170:10 177:11 182:13,20 184:18 185:5 221:3 222:25 261:25,25 262:15 263:12

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 386 of 398 PageID #:73536



263:16 264:4 264:17,19 296:16 297:14 298:20 299:18 300:22
**tcb** 78:19
**teacup** 261:13 261:18
**tease** 161:8
**teaspoon** 76:18
**technically** 209:9
**technique** 120:16
**tell** 38:9,20 48:14 51:18 55:22 56:9 58:24 59:1 95:13,22 101:24 102:2,4 105:11 106:12 109:10,16,24 120:3 136:4 231:20 272:24 274:22
**telling** 46:10 71:11 160:6 195:20 271:21
**temperature** 286:14
**temporary** 49:18 246:12 251:2
**ten** 105:22
**tend** 236:6
**tenting** 293:14
**term** 45:6 49:18 62:18 63:12 72:8 116:23 117:12 120:14 123:5 137:15 170:22 235:15,25 242:18 248:18
**termed** 213:8 245:20
**terminal** 174:14 175:23 281:21 292:23
**terms** 73:8 74:10 94:14 158:13 161:8 161:23 240:19 247:14
**test** 41:17 71:11 111:16 176:12 177:12 184:22 193:21 259:22
**tested** 196:19
**testified** 10:12 51:11 103:18 104:3,7 105:3 105:14 106:17 106:20 107:1,6 107:12 116:20 148:7 230:20 232:8 263:25 273:19 277:15 290:10
**testify** 103:14 149:5 154:17 217:9 274:20 291:10 304:4
**testifying** 102:5
**testimonies** 102:12
**testimony** 10:25 37:11,19 37:21 41:5 43:7,16 61:24 62:19 68:14 72:6 80:23 98:16 104:9,11 104:14,21 107:17 108:22 111:24 112:3 132:7 138:24 160:18 161:13 173:4,6,10,12 173:22,24 174:6 232:11 249:13 253:2 253:19 254:12 256:22 258:10 262:6 263:5 269:17 271:3 273:3,5,11,17 274:10 281:18 289:11 291:8 291:20 294:1 300:25 301:7 301:23,25 304:6 305:9,18 307:8
**testing** 112:6 112:13 191:21
**testosterone** 241:10
**tests** 177:9 193:16 196:6 200:19
**texas** 3:8 5:14
**textbook** 92:9
**textbooks** 92:7 92:8
**texture** 37:14
**thank** 12:7,19 16:10 160:23 189:13 284:3 288:5 302:22
**theoretical** 175:4
**theory** 76:8,14 224:8 258:16
**therapeutic** 92:12
**therapy** 124:8
**thereof** 118:17 123:14
**thereto** 34:20 98:1 231:22
**thermodyna...** 236:5

**thickness** 61:15 63:16
**thin** 286:3
**thing** 95:23 104:18 109:22 159:4 189:17 255:19
**things** 60:25 73:8,10 99:1 109:19 135:3 226:12 268:10 269:22,25 270:4 271:10 290:14 291:2
**think** 24:21 25:13 33:24 67:1 78:19 85:25 86:7,9 95:18 102:23 105:15 128:24 149:10 161:5 166:14 171:9 184:11 189:12 192:5 193:4 194:16 195:2,4 195:23,24,25 199:10 204:9 210:11 211:8 212:20 213:7 219:3 230:11 248:18 252:17 253:20 257:11 258:25 267:24 268:10,23 272:6 273:7 274:4,18,18 275:7 276:21 279:6,14 302:24
**thinking** 143:15 163:4
**thinks** 195:3
**thioglycolate** 184:14
**third** 65:12 66:3,4
**thomas** 6:8
**thought** 13:11 72:18 80:15 92:4 134:4 153:16 226:8 226:11 256:23 270:3 273:25 274:6
**thousands** 281:6
**three** 33:8 162:16 241:22
**threshold** 75:7 77:16 292:8 295:16 300:20
**tie** 180:16
**time** 9:5,22 13:7 27:11 30:6,12,14 32:2,14 39:23 61:1,7 64:9,16 68:3 87:1 90:16,23 95:2 97:24 104:20 104:22 106:9 107:20 110:9 112:20 114:10 129:23,25 142:5 147:22 148:6 150:8 151:23 152:14 153:15 154:18 154:22 155:8 173:6,21 192:24,24 193:6 202:11 216:15 226:3 230:2,7 236:23 237:11 239:7 239:10 248:7 248:21 249:1 249:10,14,24 257:3 258:19 258:21,25 264:9 279:13 281:11 284:6 286:22 291:11 292:13 305:19
**timeframe** 305:8
**times** 46:11 89:6 106:15,20 107:1,11 110:2 110:20 126:7 142:9 148:25 165:18 172:14 192:9 248:17 248:24 279:12 281:6
**tissue** 22:24 23:3 87:18 120:20 121:3 158:7 167:18 167:21,21 168:16 169:1 169:12 170:24 221:23 223:6 260:22,23,24 261:5,19,20 262:3 292:4 295:9 297:3,7 300:16,19 301:15
**tissues** 123:23 158:6 261:10 262:21
**tobaldi** 215:6,7 215:8
**today** 10:25 11:4,5,11,13,14 11:17 13:1,16 13:23 14:2,20 15:15 85:24 109:11 110:2 151:21 158:2 165:5 182:22 184:1 216:20 226:17 230:6 231:2,11 232:16 264:6

294:25 298:10 302:14
**together** 63:19 189:20 253:7
**told** 37:8,12,18 48:2,7 52:5,20 53:7,19 60:25 131:25 153:25 160:3 271:11 274:2,3 276:6
**took** 50:16 114:17,18 115:16,21 116:1 162:25 242:4
**tool** 215:12
**top** 109:2 174:22 177:17 255:14 272:5
**topical** 20:9 37:3,3 45:20 46:1 48:5 49:19 118:23 118:23 140:20 162:13 225:25 226:1 229:6 241:10 264:24 292:2
**topically** 46:13 213:6 265:4
**topics** 69:24
**totality** 179:13 216:8 254:16
**totally** 194:21 194:24
**touch** 40:13,18 41:16 42:8 52:13,21 53:13 53:19 61:7,9 192:10 282:1
**touched** 62:15
**touches** 39:24 41:3 57:25 58:25 61:2,18 62:8,13 64:5 173:7 175:2,14 175:24 240:25 241:2,8 267:17 269:13 290:17
**touching** 60:3 67:12 247:24 277:11 280:4 281:15,23 294:10
**touchup** 292:15 292:20 293:6 293:17 294:8
**tough** 283:25
**towards** 108:16 117:23 278:4
**town** 115:7
**toxicological** 76:21 80:1 81:24 82:7
**toxicologically** 299:5
**toxicologist** 20:6 76:23
**toxicology** 20:8 20:10,11,13,15 20:18 69:17 70:4 71:9,12 82:4 113:11 115:16,19
**tracking** 222:7
**trademark** 214:19
**trademarked** 214:25
**trails** 246:18
**trained** 123:3 281:5 291:9
**training** 18:22 19:2,4,23 20:1 20:14,22 21:19 22:2,5 36:3 69:16,24 114:7 172:19 179:7 179:13
**transappenda...** 167:3 202:15 225:21 244:11 245:8,19 246:22 247:16 248:9
**transarterial** 192:11
**transcribing** 110:12
**transcript** 110:15 304:5 305:6,20 307:5 307:8
**transdermal** 224:14 225:9 226:14 244:9
**transdermally** 241:18
**transepidermal** 193:8 221:7
**transfollicular** 172:3
**transformation** 168:6
**transport** 228:6,19 229:8 236:25 301:14
**transported** 158:5 192:6 221:6 223:5 237:21 260:21 265:11 297:2
**transposed** 192:6
**travel** 123:24 261:5
**traveling** 204:13
**treat** 29:23 30:1,4 33:12 34:12 35:12,16 43:25 44:12 47:12 48:5

50:6,21 121:14 125:6 140:20 229:4
**treated** 22:9 30:11 32:3,5 33:16,20 34:4 34:17 35:3,21 44:4,6 51:9 52:2 56:7,7 144:3 207:15
**treating** 45:1 46:6 69:1 126:8,10 140:14 225:23 225:24 226:1
**treatment** 22:16 36:22 37:1 47:15,23 62:19 71:7 120:13 124:3,5 124:12 133:7 139:11 140:9 142:24
**treatments** 52:25 182:25 183:23 184:2 184:13,24
**trial** 100:9,18 104:21,22 106:10,18,21 107:2,6,12 109:23 147:22 148:6 150:19 151:24 152:14 153:15 154:18 154:22 155:8 222:1 264:9 281:12 289:13
**triple** 8:16,20 271:14
**true** 16:19,23 33:18,19 39:20 40:14,16 62:10 68:19 70:24 88:23 89:4,12 102:8,10 104:6 113:3,13,16 124:21 138:3 152:5 164:5,18 165:20 166:17 169:13 170:9 171:7,22,25 176:23 177:10 177:14 180:6 180:20 181:1 188:2 191:16 192:3 193:17 201:13,17 202:4 207:15 207:24 208:16 210:2,8 225:15 237:3,16 245:25 248:2,4 250:7 254:5 257:7 262:21 262:23 265:16 270:13 285:4 290:20 293:7 299:24 300:2 304:6 307:8
**truly** 53:23 156:3
**trust** 290:8
**trusting** 290:12
**truth** 101:25 102:4 106:12 106:13,13 109:10,10,11 109:16,24,25 109:25 195:19 195:20 304:4
**truthful** 16:25 17:20 109:18
**try** 49:23,23 53:3 110:6,17 133:18 142:5 143:13,13 150:7 192:23 201:23 210:24 255:14 256:4 290:16 297:16
**trying** 16:25 80:22 134:22 195:6 196:2 234:16 239:2 252:3
**tumor** 168:6 296:11
**turn** 17:4 80:14 149:12 154:24 170:14 181:13 203:17
**turning** 134:22 233:19
**two** 29:19 40:8 40:19 41:17 42:12 43:2 55:20 60:5 61:19,21 63:21 64:11 65:17,20 108:12 110:9 158:13,16 161:5,8,23 181:3 231:7 242:14 268:10 268:22 270:1 272:4,10,14,16 275:4,5,7,9 292:24 293:18 302:24
**type** 83:14,17 83:23 84:13 120:15 124:10 124:15 125:12 267:16 285:19
**types** 46:7 134:19 135:25 198:24 245:16

**u**

**ultimately** 59:15
**umbrella** 134:20
**unable** 145:20 161:18 189:6

216:17
**unanswered** 27:12
**unavailable** 201:20
**unaware** 213:21 218:17
**unchanged** 207:8
**unchanging** 216:11 217:19
**under** 34:16 35:8 40:11 41:2 63:24 68:13 102:4 106:6 109:23 109:23 120:18 120:21 134:19 147:7 154:24 179:12 203:14 246:10,18 259:7 275:5,6 288:9,17 297:24 304:5
**undergo** 52:25 121:8
**undergoes** 207:10
**undergraduate** 198:18 235:19
**understand** 10:24 17:21 19:25 24:25 31:3 55:25 57:18 61:17 70:15 71:4 78:22 79:23 80:22 87:5,11 87:19 104:19 104:22,24 106:8 110:10 110:19,21,23 111:9,19 112:23 131:18 153:3,7,9,10 157:16 166:3,6 166:10 183:16 186:13,16 189:18 190:16 195:7 199:1 213:14 240:21 255:9 277:24 283:1 289:11 289:14 291:20
**understanding** 38:2 62:22 75:22 86:22 88:1 98:5 111:2 132:8 152:25 178:24 206:9 284:4,14 284:18,21,24
**understands** 278:6
**understood** 17:22 111:3
**undertaken** 249:16
**undertook** 114:5
**unhealthy** 218:11 219:7 220:15,23 221:16 222:16
**uniform** 140:14 142:1
**unique** 128:13 128:16 129:15 129:17 260:14
**unit** 9:8
**united** 1:1,10
**university** 113:23 114:2,8
**unknown** 201:20 216:16
**unlimited** 239:6
**unpack** 60:24
**unsafe** 77:4,11 214:5 234:19 235:1
**unturned** 291:23
**unusual** 269:11 269:19
**updated** 94:3
**upper** 128:17 283:5
**upperbound** 205:11
**upwards** 142:9
**urgent** 121:24 121:25
**urinary** 80:17 191:18 192:4 194:5 209:5,18 212:3 242:6,16 243:25
**urine** 191:23 192:5 212:16 242:24 243:11
**usa** 3:22,22 10:2,2
**usage** 155:2 275:6
**use** 24:23 28:20 29:25 30:5 31:23 32:1,4,6 32:21 33:21 34:6,18 35:4 35:13,23 36:1 36:16 37:3,7,8 37:13,19 44:2 44:9,12,14 45:23 46:21,24 48:4 50:3,13 50:23 52:4 53:12,18 62:18 63:11 64:2 66:4,13,15 80:19,21 86:21 116:25 117:12 125:9,12,13 126:7,16 127:5 132:17 133:11

Case: 1:23-cv-00818 Document #: 1828-12 Filed: 05/05/26 Page 391 of 398 PageID #:73541



133:24 135:8 135:11 137:15 139:7,20 141:10 142:14 143:20 144:4,6 144:16 145:2,4 145:6 148:10 150:20,25 152:1 162:13 163:10 174:9 180:13 183:4 190:25 191:21 204:20 207:23 211:3,15,24 212:13 215:15 215:19,23 225:22 229:6 235:15 242:8 242:18 247:7 247:14 267:4 272:18,22,25 274:23 275:21 283:21 287:22 289:1 291:25 292:2,5 295:2 295:22 302:2

**used** 11:7 14:4 28:8 33:10,17 34:2 36:7 46:12 49:7 57:4 62:20 72:8 88:4 97:21 104:21 113:5 115:12 130:3 139:6 140:8 141:16 141:18 144:12 145:21 198:1 208:7,16 220:17 227:12 229:3 235:19 245:11 259:11 267:4,15 272:21 273:18 274:1 276:10 283:14 284:6 284:22 285:1 291:1 304:11 305:20

**user** 272:25 274:23 289:20

**uses** 117:15 210:18 241:19 248:21 249:20

**using** 12:10 51:5 62:21,22 63:12 112:21 121:3 133:16 141:17 201:7,7 210:23,23 215:11 218:11 248:18 294:8

**usually** 285:13

**uterine** 17:9 22:10 23:11,22 23:25 24:4,10 24:14,16,20,24 25:11,20 26:4 26:14,17,22 27:16,22 28:5 28:13,20 87:18 88:9,16,19,21 89:1,21 91:22 117:25 118:9 118:14,15 119:2 123:20 148:11 149:7 149:18 150:21 151:1,18,25 152:9,18 154:15 156:9 158:7,7 167:18 167:21 168:16 169:12,23 170:8 196:19 209:15 221:9 260:24 292:4 295:8 297:2,7 299:23 300:19 301:16

**uterus** 167:23 168:6 204:14 262:4 298:24 300:16

**utilize** 118:22

**utilizes** 190:20

**utilizing** 49:19 120:25 207:4

**v**

**v** 6:7

**vague** 159:17 160:18

**valentina** 4:19

**valerie** 1:12 7:24 9:17 160:23 166:3,6 304:3,22

**validated** 216:17

**value** 205:14 242:17

**values** 205:16 206:11 210:18 210:19 213:18 215:18 216:24 217:12 219:15

**variable** 37:25 207:6

**variables** 71:19 73:23 74:1,10 74:13,21 75:14 124:17 200:1 200:25 201:2 207:5 210:18 210:19

**variety** 188:19 198:24 242:8 246:5

**various** 41:24 78:15 79:4 237:22

**vary** 127:13 141:24

**vascular** 174:7 174:15 176:22 218:6
**vasculature** 147:16 150:6 169:8 170:13 171:13
**vaseline** 268:9 286:20
**vast** 200:25
**vbartolomeo** 4:21
**vegetable** 136:1
**vehicle** 71:18
**veins** 175:8
**verbal** 212:18
**verdict** 100:18
**verify** 305:9
**veritext** 9:16,18 305:14,23
**veritext.com** 305:15
**versus** 38:4 100:24 101:7 103:9 105:12 107:19
**vessel** 236:17 238:14
**vessels** 171:1,2 236:15
**viable** 143:14
**video** 1:7 9:6,9 54:6,14,21 93:10
**videoconfere...** 2:3,3,4,10,10 2:11,16,17,22 3:2,7,12,17,17 4:2,7,8,14,19 5:3,8,13,18 6:2 6:7,8,13,18 7:2
**videographer** 7:8 9:1,16 60:19,21 105:25 106:2 146:17 147:2 203:9,11 259:2 259:4 297:19 297:21 303:2
**videos** 54:15 86:20 99:3,6,8 99:9,22
**view** 132:14 201:9
**viewed** 81:15
**virgin** 292:12 292:21
**visible** 45:4
**visits** 129:16 142:21,22
**visual** 98:25
**vitiligo** 137:17
**vitro** 191:10
**vivo** 191:9 192:24 193:2 203:5 235:22
**voelker** 4:2
**voltaren** 265:1 265:2
**volume** 261:2 261:17 262:7 263:6,22 264:12

**w**

**w** 4:8 10:18 305:5 306:2 307:2
**wacker** 4:8 5:3 6:19
**waichman** 2:21
**wait** 251:24 256:15
**waited** 159:11
**waived** 304:8
**walk** 179:6
**walnut** 3:3
**want** 12:12 15:23 16:9 58:20 60:24 126:6 129:9 138:5 145:8 146:9 160:7,11 203:7 209:12 218:23 222:8 223:18 224:3 229:25 230:4 243:14 249:9 252:16 259:19 277:22 279:8 279:19 282:16 289:18 291:19 291:21,22 302:2
**wanted** 15:13
**wants** 54:23
**warnings** 275:7 276:11 282:12
**warranting** 124:11
**warrants** 110:16
**wash** 65:1
**washing** 224:8
**washington** 2:18,23
**watch** 54:10 99:12 286:17
**watched** 99:10 99:13,16
**watches** 287:1
**watching** 54:20
**water** 59:16 76:16,18,24 77:4,7,11
**wax** 267:24 268:2,9 270:2
**way** 23:7 26:10 32:20 39:13,17 40:12 41:5 42:7 49:5 51:19 52:16 53:2,13 59:5 88:2,13 94:9 102:1 110:17

111:18 117:15 148:17 155:21 165:13,15 166:18 169:3 169:22 183:2 192:10 194:22 227:13 237:4 239:22 240:5 254:7 255:25 292:18 301:1
**ways** 49:11 204:3 229:6
**we've** 60:17 111:12 119:22 223:23 231:24 252:12 291:20
**weaker** 178:6
**week** 30:8
**weeks** 11:12 67:13 142:13 143:3 246:13 247:12,20 251:3 255:1 257:5
**welcome** 114:22
**wella** 5:17
**west** 4:19 5:3 6:3
**whereof** 304:16
**whisked** 236:15
**whispering** 9:4
**white** 161:9 162:2
**wideikis** 6:18
**widely** 185:21
**wiedner** 5:18
**william** 9:9 10:10,17
**wisconsin** 29:10,13 114:19 122:23 123:2 127:23 130:21 141:2,6
**wish** 188:25
**witness** 8:2 10:8,9,11 15:1 15:10,19 16:2 18:15,25 21:3 21:12,23 22:20 23:16 25:6 26:2,16 27:6 27:19 28:3,15 30:22 31:5,12 33:24 34:9,22 35:19 37:12,21 37:25 38:14,25 39:12 40:5,16 40:23 41:9,21 42:17,23 43:8 43:22 44:4 45:14 46:5,16 47:3,9,19 48:10,19 50:9 51:24 52:9,16 52:24 53:10,16 54:14 55:1,25 56:12,25 57:10 57:18 58:5 59:5 60:11 61:5,25 62:12 63:1,18 64:8 65:5,23 66:23 67:5 68:19 69:21 70:15,24 72:4,8,24 73:18 74:4,15 75:1,19 76:7 76:13 77:3,9 79:13 80:9 81:18 82:11 83:1 86:18 87:4 89:8,15 93:5,23 101:20 103:1,24 104:16 105:9 107:23 113:3 113:16 117:10 119:14,21 120:7 126:4,13 126:22 127:2 127:13,22 128:13,24 130:10,18 131:1,18 132:11,19 133:4,14 134:3 135:19 136:16 137:3,19 138:5 139:16 140:2 140:11 141:24 142:17 143:7 143:23 144:9 144:16,25 145:14,16,19 146:12 151:5 151:15 152:24 153:8 155:16 156:16,23 157:12 158:13 159:3 161:14 161:23 164:7 164:21 165:12 166:10 167:9 168:9,19 169:15 170:3 171:9,25 172:22 173:25 175:19 176:15 176:19,25 177:5 179:11 180:13,22 181:8 182:20 183:8 184:7,18 185:5,16,20 187:24 189:5 190:3 191:16 192:2,21 193:20 194:4 194:15,23 196:1,13,24 197:10,25 199:10 200:9 200:23 201:16 202:8,23 203:4 204:9 205:1,7

206:8,19 207:17 208:2 208:10,18 209:3,18 210:2 210:11 211:7 211:17 212:16 212:19,24 213:1,13,21 214:8,12 217:1 217:16 218:3 218:15 219:3 219:18,23 220:13 221:3 221:15 222:4 222:20 223:11 227:20 228:8 228:22 229:13 229:22 230:21 231:6,15,24 232:12 234:21 235:9 237:18 238:11 239:1 239:20 240:5 240:16 241:7 243:4,14,24 244:18 247:4 247:23 249:1 249:14,24 250:10 251:16 253:20 254:13 255:7,17 256:23 258:11 258:15 260:5 261:8,24 262:14,23 263:12 264:4 264:17 265:9 265:20 267:10 267:22 268:6 268:17 269:4 269:18 270:10 270:15,22 271:4 272:12 273:4,16 274:11 275:2 275:24 276:15 277:1,5,8,23 278:6 280:8,19 280:24 281:9 281:19 282:4,8 284:18,24 285:6 286:1 287:12 290:22 291:16 294:2 295:6,13,19,25 296:8,15,24 297:13,18 298:7,18 299:8 299:17 300:2 300:10 301:10 301:24 302:7 302:21 304:6 304:16 305:8 305:10,12,19 306:24 307:4 307:12

**witness's** 173:12,24 232:11 249:13 253:1,18 254:12 255:5 258:10 269:17 271:3 273:3 293:25 301:22

**witnessed** 54:15 55:1

**wmlaw.com** 5:20

**woman** 22:9 23:22 32:3,16 36:25 48:16 66:16 140:6 142:12 208:16 248:21 249:10 249:20 250:6 265:6,16 270:20 274:3

**woman's** 220:24 221:18 222:17 263:1 301:5 302:8

**women** 17:10 24:7 28:11,20 31:21 32:5 33:2,10,13,17 33:25 34:5,10 34:13,18 35:21 37:8,12,18 44:1,5,7,12 46:10 47:6,14 50:22 51:5 52:24 56:6,14 62:19 63:2,3,4 69:1 78:24 125:21 126:9 126:11,15 127:7,25 128:20 129:21 130:3 132:4,4 133:7,15,20,21 134:6,11 135:3 135:5,7,10,13 135:20 138:16 139:3,5,6 140:12 156:4 220:17 242:5 260:1 272:22

**word** 28:8 64:2 126:8 174:10 301:24 302:3,5

**wording** 290:13

**words** 110:8,13 160:13 181:15 210:23

**work** 29:16 32:14 51:12 55:7 77:14 78:22 80:9 81:8,19 82:21 84:22 87:19,22 90:21 92:6 95:4 97:15 100:6,20 113:11,11 117:23 118:1

122:10 136:6 143:11 167:16 185:8 204:1 207:12 211:11 214:3,25 215:25 219:11 219:18 220:1 220:21 222:14 224:17 245:4 246:21 247:21 282:22 293:23 298:20
**workable** 142:24
**worked** 32:8,9 70:1 94:20,23 100:1
**working** 32:13 91:3,8,10 92:13
**works** 193:7
**world** 269:20
**worldwide** 4:12
**worried** 67:10
**worthy** 156:6
**wound** 45:22
**wow** 298:16
**write** 149:16 154:25 155:24 181:14 246:10 288:24 289:4
**writes** 234:4
**written** 119:1,4 119:11,14
**wrong** 40:5 86:8 123:17 148:18 161:19 179:22 274:8 274:19 279:6
**wrote** 80:15 154:13 155:4 156:11 177:22 289:2

**y**

**y** 10:5
**yeah** 48:23 78:1 98:14 115:14 129:12 130:7,22 131:22 141:14 157:12 203:8 221:15 225:14 265:3
**year** 33:8 98:7 114:5 122:7 127:7,13,14 128:3,15 129:10,16 134:17 139:3,5 142:9 143:9 189:8,10
**yearly** 132:5
**years** 30:9 33:7 33:9 35:19 66:10,11 67:1 68:12,25 86:11 92:5 102:17 107:3,17 108:12 113:7 127:19 178:23 227:10
**yesterday** 11:11
**york** 2:5,5,23 5:9,9
**yourlawyer.c...** 2:24
**youtube** 99:21

**z**

**zero** 70:18 176:17,19 236:18
**zoom** 93:10,11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.