# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 1:23-cv-00818<br>MDL No. 3060 |

VIDEO-RECORDED DEPOSITION OF
R. JEFFREY CHANG, M.D.
San Diego, California
Thursday, February 19, 2026
Volume 1

Reported by:
LESLIE JOHNSON
RPR, CCRR, CSR No. 11451
Job No.: 7863502
PAGES 1 - 503

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

Case No. 1:23-cv-00818
MDL No. 3060

---

VIDEO-RECORDED DEPOSITION OF R. JEFFREY CHANG, M.D., Volume 1, taken on behalf of Defendants, at DiCello Levitt LLP, 4747 Executive Drive, Suite 240, San Diego, California, beginning at 9:10 a.m. and ending at 8:15 p.m., on Thursday, February 19, 2026, before LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.

APPEARANCES:

For the Plaintiffs:

ASHCRAFT & GEREL
BY: MICHELLE PARFITT, ESQ.
PATRICK K. LYONS, ESQ. (Via Zoom)
1825 K Street NW, Suite 700
Washington, DC 20006
(202)335-2600
mparfitt@ashcraftlaw.com
plyons@ashcraftlaw.com

- and -

DICELLO LEVITT LLP
BY: OMEGA ADAMS, ESQ. (Via Zoom)
DIANDRA "FU" DEBROSSE, ESQ. (Via Zoom)
Financial Center
506 20th Street North
Birmingham, Alabama 35203
(205)855-5700
oadams@dicellolevitt.com
fu@dicellolevitt.com

- and -

APPEARANCES (Cont.)

PARKER WAICHMAN LLP
BY: LAILA RAZZAGHI, ESQ. (Via Zoom)
6 Harbor Park Drive
Port Washington, New York 11050
(866)883-6245
lrazzaghi@yourlawyer.com

- and -

SHIPMAN WRIGHT & MOORE LLP
BY: GARY K. SHIPMAN, ESQ.
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
(910)762-1990
gshipman@shipmanlaw.com

For the Defendant John Paul Mitchell Systems:

CLAUSEN MILLER PC
BY: MITCHELL D. TORRANCE, ESQ. (Via Zoom)
225 West Randolph Street, Suite 700
Chicago, Illinois 60606
(312)606-7757
mtorrence@clausen.com

APPEARANCES (Cont.):

For Defendant Beauty Bell:
COSTELLO GINEX & WIDEIKIS PC
BY: SHIPRA MEHTH, ESQ. (Via Zoom)
150 North Wacker Drive, Suite 1400
Chicago, Illinois 60601
(312)850-2651
smehta@cgw-legal.com

For Defendant McBride Laboratory Inc.:
DINSMORE & SHOHL LLP
BY: AUDRIANA RODRIGUEZ, ESQ. (Via Zoom)
200 South Biscayne Boulevard, Suite 2401
Miami, Florida 33131
(786)957-1145
audriana.rodriguez@dinsmore.com

For Defendant Revlon:
ECKERT SEAMANS CHERIN & MELLOTT LLC
BY: MAX R. LEWKOWSKI, ESQ. (via Zoom)
275 Madison Avenue, 10th Floor
New York, New York 10016
(646)513-2290
mlewkowski@eckertseamans.com

APPEARANCES (Cont.):

For Defendants L'Oreal USA, Inc.; L'Oreal USA Products, Inc.; SoftSheen-Carson LLC; SoftSheen-Carson (W.I.), Inc. (collectively, L'Oreal USA):

ELLIS GEORGE LLP
BY: NORA Z. NACCACHIAN, ESQ. (Via Zoom)
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
(310)274-7100
nnaccachian@ellisgeorge.com

For Defendant AFAM Concept, Inc. d/b/a JF Labs:

GOLDBERG SEGALLA
BY: HARDIP B. PASSANANTI, ESQ. (Via Zoom)
2600 Michelson Drive, Suite 900
Irvine, California 92612
(949)271-3398
hpassananti@goldbergsegalla.com

For Defendant Beauty Bell Enterprises LLC:

LITCHFIELD CAVO LLP
BY: KEVIN A. TITUS, ESQ. (Via Zoom)
303 West Madison, Suite 300
Chicago, Illinois 60606
(312)781-6668
titus@litchfieldcavo.com

APPEARANCES (Cont.):

For Defendant Murray's Worldwide:

MARON MARVEL BRADLEY ANDERSON & TARDY LLC
BY: LESLIE A. FEDERER, ESQ. (Via Zoom)
ROBERT PETTI, ESQ. (Via Zoom)
191 North Wacker Drive, Suite 2950
Chicago, Illinois 60606
(312)767-1314
lfederer@maronmarvel.com
rpetti@maronmarvel.com

For Defendant House of Cheatham:

SEGAL McCAMBRIDGE
BY: IAN M. SADLER, ESQ. (Via Zoom)
100 Congress Avenue, Suite 800
Austin, Texas 78701
(512)370-1211
isadler@smsm.com

APPEARANCES (Cont.):

For Defendant House of Cheatham:

MCGUIRE WOODS LLP
BY: NORIYA SHAHADAT, ESQ. (Via Zoom)
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
(804)775-1087
nshahadat@mcguirewoods.com

For Defendant Strength of Nature:

SHOOK HARDY & BACON
BY: PEIYUAN GUO, Ph.D., ESQ. (Via Zoom)
1 Rockefeller Plaza, Suite 2801
New York, New York 10020
(212)989-8844
pguo@shb.com

For Defendants Namaste and Sally Beauty:

SIDLEY AUSTIN LLP
BY: MICHAEL L. LISAK, ESQ.
1 South Dearborn
Chicago, Illinois 60603
(312)853-1086
mlisak@sidley.com

- and -

APPEARANCES (Cont.):


SIDLEY AUSTIN LLP
BY: SABRINA E. PALACIOS, ESQ.
787 Seventh Avenue
New York, New York 10019
(212)839-5300
sabrina.palacios@sidley.com
For Defendant Avlon Industries:
WIEDNER McAULIFFE
BY: ANNA M. RICORDATI, ESQ. (Via Zoom)
One North Franklin, Suite 1900
Chicago, Illinois 60606
(312)596-4984
amricordati@wmlaw.com


Also Present:

LOGAN BOLES, Videographer
DANIEL JOHNSON, Veritext Concierge
EMILY ROBINSON (Via Zoom)
PATTY JENSEN, Paralegal (Via Zoom)

# I N D E X


| WITNESS | EXAMINATION |
|---|---|
| R. JEFFREY CHANG, M.D. Volume 1 | |
| BY MR. LISAK | 16, 462, 491, 497 |
| BY MS. PARFITT | 390, 487, 495, 498 |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 58 | 18 |

EXHIBITS
R. JEFFREY CHANG, M.D.

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Videotaped Deposition of R. Jeffrey Chang, M.D. | 23 |
| Exhibit 1A | Additional Materials Considered | 26 |
| Exhibit 2 | Expert Report of R. Jeffrey Chang, MD | 43 |
| Exhibit 3 | The Plaintiffs' Steering Committee's Response and Objections to Defendants' Notice of Videotaped Deposition of R. Jeffrey Chang, MD | 45 |
| Exhibit 4 | Brito paper entitled "Skin Structure, Physiology, and Pathology in Topical and Transdermal Drug Delivery" | 121 |

EXHIBITS (Cont.)

R. JEFFREY CHANG, M.D.

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | Ramadon paper entitled "Enhancement strategies for transdermal drug delivery systems: current trends and applications" | 128 |
| Exhibit 6 | National Institutes of Health Evidence-based Methodology Workshop on Polycystic Ovary Syndrome December 3-5, 2012, Executive Summary | 146 |
| Exhibit 7 | Klein paper entitled "Estrogen Bioactivity in Fo-Ti and Other Herbs Used for Their Estrogen-Like Effects as Determined by a Recombinant Cell Bioassay" | 220 |
| Exhibit 8 | Gore Review paper entitled "EDC-2: The Endocrine Society's Second Scientific Statement on Endocrine-Disrupting Chemicals" | 234 |
| Exhibit 9 | Harris paper entitled "The Estrogenic Activity of Phthalate Esters In Vitro" | 260 |
| Exhibit 10 | Wei paper entitled "Comprehensive assessment of estrogenic activities of parabens by in silico approach and in vitro assays" | 264 |
| Exhibit 11 | Lee paper entitled "Effects of consumer products chemicals ingredients and their mixtures on the estrogen receptor/androgen receptor transcriptional activation" | 264 |
| Exhibit 12 | Liang paper entitled "Studying paraben-induced estrogen receptor- and steroid hormone-related endocrine disruption effects via multi-level approaches" | 264 |

EXHIBITS (Cont.)

R. JEFFREY CHANG, M.D.

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | Blair paper entitled "The Estrogen Receptor Relative Binding Affinities of 188 Natural and Xenochemicals: Structural Diversity of Ligands" | 270 |
| Exhibit 14 | Sandler paper entitled "The Sister Study Cohort: Baseline Methods and Participant Characteristics" | 275 |
| Exhibit 15 | Sister Study Personal Care Questionnaire - V3 | 280 |
| Exhibit 16 | White article entitled "Use of hair products in relation to ovarian cancer risk" | 283 |
| Exhibit 17 | Chang paper entitled "Use of Straighteners and Other Hair Products and Incident Uterine Cancer" | 306 |
| Exhibit 18 | Bertrand paper entitled "Hair relaxer use and risk of uterine cancer in the Black Women's Health Study" | 315 |
| Exhibit 19 | Black Women's Health Study | 317 |
| Exhibit 20 | Pierce article entitled "Evaluation of dermal exposure to phthalates and parabens resulting from the use of hair relaxers" | 328 |
| Exhibit 21 | Janjua article entitled "Systemic Uptake of Diethyl Phthalate, Dibutyl Phthalate, and Butyl Paraben Following Whole-Body Topical Application and Reproductive and Thyroid Hormone Levels in Humans" | 350 |
| Exhibit 22 | www.cancer.org printout entitled "Endometrial Cancer Risk Factors" | 355 |

EXHIBITS (Cont.)

R. JEFFREY CHANG, M.D.


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | www.cancer.gov printout entitled "Endometrial Cancer Prevention (PDQ)-Patient Version" | 360 |
| Exhibit 24 | www.cancer.org printout entitled "Causes, Risk Factors, and Prevention of Ovarian Cancer" | 379 |
| Exhibit 25 | Hernandez review article entitled "Systematic Review of the Epidemiology of Hair Relaxer Use and Hormone--Sensitive Reproductive Outcomes Among Black Adult Women in the United States" | 382 |
| Exhibit 26 | Documents produced at deposition | 390 |
| Exhibit 27 | www.cancer.gov printout entitled "Endometrial Cancer Prevention (PDQ)-Health Professional Version" | 439 |

San Diego, California; Thursday, February 19, 2026
9:10 a.m.

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:10 a.m. on February 19, 2026.

Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of R. Jeffrey Chang, M.D. taken by counsel for Defendants in the matter of all MDL Hair Relaxer Cases versus Hair Relaxer filed in the United States District Court for the Northern District of Illinois, Eastern Division. The case number is 1:23-cv-00818, and the location of the deposition is 4747 Executive Drive, San Diego, California 92121.

My name is Logan Boles, representing Veritext, and I am the videographer. I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. LISAK: Good morning. This is Michael Lisak for Namaste and Sally Beauty. I'm here on behalf of the defendants.

MS. PALACIOS: Good morning. Sabrina Palacios on behalf of Sally Beauty and Namaste. I'm here on behalf of the defendants.

MS. PARFITT: Good morning. Michelle Parfitt, Ashcraft & Gerel, and I'm here on behalf of plaintiffs.

MR. SHIPMAN: Good morning. Gary Shipman on behalf of the plaintiffs.

THE WITNESS: Introduce myself?

MR. LISAK: We'll do that in a second.

Michelle, before we get started, since you have the microphone on, I assume that, per the Deposition Protocol No. 219, I think, are you the one who is going to be the designated objector on behalf of the plaintiffs today?

MS. PARFITT: I will be.

MR. LISAK: Thank you.
MS. PARFITT: Thank you.

EXAMINATION

BY MR. LISAK:
Q Doctor, could you state your name and, if you have a business address, business address for the record.
A My name is Jeff Chang. I'm a reproductive endocrinologist, and I'm an emeritus professor. I live in La Jolla.
Q And you're here today for your deposition in the -- what we're calling the "Hair Relaxer litigation" that's pending in Illinois federal court.
Is that your understanding?
A Yes.
Q Okay. And I want to go over a few just ground rules to help all of us get through today as smoothly and as efficiently as possible. And most of them are to benefit Leslie, our court reporter.
It's very important that we try not to speak over each other. I will do my best. If you could do the same. I'm sure we'll both make some -- we'll start anticipating each other a little bit, as you would in normal conversation.

THE VIDEOGRAPHER: Counsel, could we go off the record real quick?
MR. LISAK: Sure.
THE VIDEOGRAPHER: The time is 9:13 a.m., and we are off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 9:19 a.m., and we are back on the record.
(Witness sworn.)
THE REPORTER: Thank you, Doctor.
Please proceed, Counsel.
BY MR. LISAK:
Q All right. After that smooth start and a few technical difficulties, I think we're good to go. But please let us know, Veritext, if we're having -- if you're having problems understanding Dr. Chang, most importantly.
In addition to trying not to speak over each other, it will be good for you to try to give audible responses, as opposed to shaking your head or nods or things like that. Okay?
A All right.
Q If I ask a question that you don't understand, which I can guarantee you will happen, would you please stop me and say, you know, "Mike,

I'm just not quite sure what you're asking. Could you ask it a different way? Could you define what you're asking?" I want to make sure we're connecting and on the same page today.

Okay?

A All right.

Q And of course, if you need a break at any point, at any time, just let us know.

A Yes.

Q The only thing I'll ask is, if there's a question pending, you finish -- you answer the question, and then we'll take the break.

All right?

A Thank you.

Q All right. Sure.

Have you ever been deposed before?

A No.

Q Wow. I feel honored.

What, if anything, did you do to prepare for today's deposition?

A Considerable. I mean, I started this a couple years ago. So I have reviewed hundreds of articles. And each article requires a considerable amount of time because it usually requires me to do more than one read. And subsequently, going through

the reading, the references are usually emphasized or underscored. Then it requires me to subsequently look up the references. So it consumes a huge amount of time.

Q For sure. And maybe my question -- I'll be a little bit more clear. I mean, I understand, not having your statement of compensation -- and it looks like you spent -- let me get this right -- at least through early February of 2026, 788 hours working on this case. Correct?

A If that's what it says.

Q Approximately, right?

A Yes.

Q But I guess my question is, specifically for today's deposition, as opposed to your work in analyzing the issues you were asked to look at and drafting your report, what, if anything, did you do specifically to prepare for your testimony today, if anything?

A Well, I read considerable articles, and I was asked to prepare a document. And I subsequently did that.

Q Right.

A Is there more that you want to know?

Q Well, I mean, when you say you prepared a

document, I assume you're referring to your report.
A Yes. My report. Excuse me.
Q So after -- let me ask it this way. And I don't want to know anything that you have discussed with --
A Okay.
Q -- the plaintiffs' attorneys. I don't want to know the content of any of that. I'm not entitled to know that.
But did you meet with them to prepare for today's deposition?
A Yes.
Q Okay. And do you know about how many times you met with them and approximately how long those meetings were?
A The meetings were from an hour to two hours. And I met infrequently with them, maybe once a month.
Q Okay. And in the last month or two, about how many times have you met with them?
A It's been more frequent.
Q And about how many times in the last, let's say, two months, approximately, have you met with the plaintiffs' attorney to prepare for your deposition?

A Probably about six or seven times.
Q And were each of those meetings about one to two hours? Is that what I understood?
A Yes.
Q And did you review your report to prepare for today's deposition?
A Yes.
Q Okay. Were there any specific -- you know, in your report, you have a list of references.
Were there any particular references you maybe re-reviewed in order to prepare for today's deposition?
A Many.
Q Okay. How about this: Did you speak with any other experts that you believe to have been retained by the plaintiffs in these cases to prepare for today's deposition?
A None.
Q And did you do any online research? Did you speak with any of your colleagues perhaps that are not part of this case?
A I was told that this was to be confidential.
Q Okay.
A And my perception was to avoid discussing

this with anybody. I was asked what I was doing. I told them I was doing a legal case, and that was the end of it.

Q So you've told us you haven't been deposed before as an expert witness.

Have you ever testified at trial as an expert witness?

A No.

Q Have you ever given a deposition or testified at trial, not as a retained expert in a case but perhaps as either a party or a fact witness --

A No.

Q -- perhaps as a treating physician or anything like that?

A No. I've never had any legal action taken against me or included me as the witness.

Q Okay. So this really is the first time you've served as a testifying expert in any case or testified as a fact witness or a party, to your best recollection?

A This is a novel experience.

Q Well, I'm glad to be part of that.

Okay. How about you? Have you ever been a plaintiff or -- a plaintiff in a case yourself?

A No, I have not.
Q Have you ever served as an expert witness -- as a consulting expert witness? In other words, you wouldn't have testified, but maybe you reviewed a case and had some conversations with attorneys about the case.
A Never.
Q Never issued a report before in a case?
A No.
Q Okay. All right. Let's mark as Exhibit 1 the notice of deposition.
(Exhibit 1 marked for identification.)
BY MR. LISAK:
Q So what I'm going to do today is give the court reporter the one that's marked, and then -- I have an extra one here because the protocol said three copies, so I have three copies.
Let's take a look at this. This is what we call the notice of deposition. Really what I want -- it sort of sets up the logistics for today. But what I really wanted to ask you about is -- if you go to page 4, there's a list of requests there -- and ask you, have you seen this notice of deposition before and, specifically, the requests that are on pages 4 and 5 of it?

A Yes.
Q Okay. And did you review items 1 through 9 and provide any of these items to Plaintiffs' counsel that hadn't previously been provided to them in order to respond to this notice?
That was a bad question, wasn't it?
A Yeah. Could you chop it up a little?
Q Told you that would happen. Pretty quick.
Could you -- maybe it would be better if I just sort of go through them a little bit. I don't want to spend too much time on them.
A Okay.
Q No. 1 asks whether or not -- for you to produce -- or for Plaintiffs to produce any notes that you may have created as part of your work in this case.
Do you have any notes?
A I've given them to my attorneys.
Q Okay.
MS. PARFITT: And for the record, Counsel, Dr. Chang has in front of him some materials that he's brought that I'm sure you'll inquire on. And there are perhaps just a few notes that he's made on them you may wish to examine.
MR. LISAK: Okay.

MS. PARFITT: And while I'm speaking, in addition -- I know you'll get to this question, but so I don't have to interrupt you -- he also, since the time of his report, has continued to do his reading. And this is not reference material to his report, but it's certainly additional materials he's read. And I have prepared -- counsel has prepared this for you. And maybe if you want to do that as a 1A.

MR. LISAK: Sure. Sure. So let's see.

So, if I understand this, Michelle, this is a list that your office prepared in coordination with Dr. Chang of references and other materials that Dr. Chang has read since issuing his report.

MS. PARFITT: I'm not sure since, but certainly just -- it may be things he read before and read after his report, but -- and you can certainly make the inquiry -- but certainly materials that were not on the, you know, other references that you may have.

MR. LISAK: The reference list.

MS. PARFITT: We just wanted to keep things current for you.

MR. LISAK: Sure. Thank you.

MS. PARFITT: You're welcome.

MR. LISAK: So let's mark this as 1A?

MS. PARFITT: Yeah.

VERITEXT CONCIERGE: Sorry, Counsel. Are we marking a new document as 1A?

MR. LISAK: Yes. It is -- I'm going to identify this. This is a document provided to me today by counsel entitled "Additional Materials Considered." It is a table of authors, reference titles, and the journals that they're in. It is an almost three-page document of references.

MS. PARFITT: May I see that?

VERITEXT CONCIERGE: So, just confirming, there is no electronic version?

MR. LISAK: There is no electronic version.

(Exhibit 1A marked for identification.)

BY MR. LISAK:

Q So, Dr. Chang, are these -- you have 1A in front of you?

A Yes.

Q Okay. Are these -- I just want to understand exactly what this is.

Are these references that you reviewed prior to finalizing and signing your report?

A No.

Q These are references that you reviewed subsequent to finalizing --
A Continuation of my report.
Q Okay. And after reading these additional references in 1A, is there any part of your report that you feel the need to change or amend?
A No.
Q Okay. So reading these references didn't change your opinions or your methodology?
A No. It strengthened them, actually.
Q And is there a particular reason why you didn't review these particular references before you finalized your report?
A Well, given what I was charged to do at the time, that I went ahead and prepared my report. But I continued to read because that is the nature of what I do. And you just don't stop. There's so much material on this subject matter, as you're well aware. And because of that, I just continued to read.
Q Okay. Well, unfortunately, I didn't have this before your deposition, so I wasn't given the opportunity to know exactly what you've read and to read these articles myself. So I'm not in a position to ask you about them today.

Do you understand that?
A Fine. That's -- I understand.
Q All right. Let's put this to the side for a minute. We may come back to that.
So it looks like you've -- and Plaintiffs' counsel indicated that you've brought some materials with you here today, and I see them in front of you.
A Yeah.
Q Could you identify what you have in your pile there?
A Well, these are references, as well as some of my summaries of those references, so that I don't get too bogged down going back and forth, although I still go back and forth, admittedly.
Q Sure.
Could I take a look at that?
A Sure.
MR. LISAK: I'm not sure the best way -- we can figure out on a break how to mark what he's brought with him.
MS. PARFITT: Sure.
BY MR. LISAK:
Q I'm trying not to mess up your system. All right. So we have sort of a printout -- it's a half an inch thick -- of a couple of studies. The

Chang 2022 study.

No relation, I assume?

A No. There's a lot of them.

Q Yeah. I understand.

Bertrand, 2023. White, 2021. Those are -- and those are the actual study you have here.

A Yes.

Q You also have the Sandler study about the Sister Study from -- I'm trying to find the date on this. It will be an exhibit, so we'll get to it.

A Sure.

Q Let's see what year it is. I always forget.

MS. PARFITT: It's 2017.

MR. LISAK: 2017. Yes. Thank you.

BY MR. LISAK:

Q And you've got the Lauren Wise study from 2012, and you've got the Llanos study from 2022. You've got the Hernandez study, which is the systematic or systematic review. I think this is 2025. And you've got the --

MS. PARFITT: Just objection to the characterization of the papers. But please proceed.

MR. LISAK: Okay. Sure.

/ / / /

BY MR. LISAK:
Q You've got the Okeke paper, O-K-E-K-E, from 2023. And you've got --
A The Farook paper.
Q -- the Farook paper. It looks like a portion of it.
A Yeah. My printer didn't print it.
Q Understood. From 2024.
And you've got the Gore -- a Gore paper, as well as Dr. Zoeller and Dr. Heindel from 2006; is that right?
A Yes.
Q And you've got this one page -- well, it goes to the other side. So one and a little bit. I guess these are your typed-out notes that you made, I guess, what, contemporaneously, more or less --
A Yes.
Q -- with reviewing these papers?
A Sort of kind of a cheat sheet that I can refer to.
Q Understood. There's a lot of numbers in there.
A Yes, unfortunately.
Q Yeah. And you've got some handwriting and some marginalia, if you will, on some of these other

studies.
When you say on the Chang paper of 2022 -- it says "Secondary Analysis," and you've got like some -- a circle with an X through it and a circle with a line through it, what do those indicate?
Do you know what I'm saying?
A Oh, that means it was recorded.
Q It was what?
A Recorded.
Q What does that mean?
A I put it in the bibliography.
Q I got it. Okay. So that's what both those things mean?
A Yes. I double-check it and --
Q Oh, I see.
A I mean, 400 references.
Q Yeah. Well, there aren't 400 references in your report, are there?
A No. But the key references I put in my report.
Q I see. We'll talk about that in a minute.
Under the Bertrand study, you have the word "good."
What does that mean?
A I liked the paper.

Q And I guess what we'll do is we'll figure out a way to make copies of these.
MS. PARFITT: That's fine.
BY MR. LISAK:
Q So let's put -- don't worry. I'll give you these back.
A That's fine.
Q Well, you know, if you need to refer to anything today, you need to just let us know, and we can do that.
A Okay. Fine.
Q Now, there's a manila folder --
MS. PARFITT: Let me see that so I can hand it back to him.
MR. LISAK: Yeah.
BY MR. LISAK:
Q There's a manila folder with the National Cancer Institute endometrial cancer prevention PDQ, health professional version --
MS. PARFITT: Michael, that is actually mine.
MR. LISAK: Oh, sorry.
MS. PARFITT: That's okay. Sorry about that.
MR. LISAK: Strike that.

MR. SHIPMAN: That was cool.
MS. PARFITT: We have our piles mixed. You can depose me on that.
MR. LISAK: Let me just ask Michelle first. Is this yours or his?
THE WITNESS: That's mine.
MS. PARFITT: That's his.
BY MR. LISAK:
Q Okay. All right. So now you have a clipped piece of paper with your notes. It looks like a list of references and a typed-out -- I guess it is a printed-out paper --
A Yes.
Q -- from 2012 --
A Yes.
Q -- entitled "The prevalence of endometrial hyperplasia and endometrial cancer in women with polycystic ovary syndrome or hyperandrogenism." The lead author seems to being Nina Sofie Lillegaard.
A Yes.
MS. PARFITT: And, Counsel, just because you said it's typed out, I just want to make sure the record reflects it is actually an article.
MR. LISAK: Yes, it is. I'm sorry if that wasn't clear.

MS. PARFITT: That's okay. Not a problem.
BY MR. LISAK:
Q But it looks like you printed it, and it's not from a journal itself.
A Right.
Q Okay. And then stapled to the back, I guess, are what? Your handwritten notes --
A Yes.
Q -- about this article?
A Yes.
MR. LISAK: All right. I'm going to give this back.
MS. PARFITT: Thank you.
MR. LISAK: Yep.
BY MR. LISAK:
Q Now we've got a printout of -- you've got some Post-it here that says "Risk of" -- is it O-V-C-A or ovarian? Some papers. The Harris paper from 2019 with some handwritten notes. Correct?
A Uh-huh.
Q And you've got the Censin 2019 -- I don't know. Is this a study, or what is that?
A It's a commentary.
Q Commentary.
Okay. And I don't see notes on that one.

And then you've got the Hall paper from 2013. And you've got some underlining and notes and marginalia and a Post-it on that, correct?

A Yes.

Q And then I think that was this clip, so I'm going to put the clip back on.

MS. PARFITT: Very good. Thank you.

BY MR. LISAK:

Q Now we've got one -- this is going to take half the deposition.

A I'm sorry.

Q We won't get to Georges at the Cove.

The next clip is a series of articles with your Post-it that says, I guess, "more parabens"?

A Yes.

Q And it's the Liang paper from 2023. You've got the checkmark. That means it made it to your references?

A (Witness nods head.)

Q Okay. I'm learning.

And you've got some -- I guess some underlining on it and some notes.

The next paper in this clip is the Wei paper, W-E-I, from 2022.

You've got the Lee paper from 2022. It's

got a checkmark, so it probably made its way to your reference list, right?

You've got the Ziv-Gal paper -- Z-I-V, dash, G-A-L -- from 2021. You have a check on it, and it says "Parabens," arrow down, "progestin receptors."

A Yes.

Q What did you mean by that?

A The parabens decrease progesterone receptors.

Q That's what you believe that paper stands for?

A In part.

MS. PARFITT: Objection.

BY MR. LISAK:

Q In part. Okay. I'll give that back to Michelle.

The next clip says "Gynecologic Endocrinology 2019," in your handwriting.

And this looks like another example where you printed off a paper, but it's not from the journal itself.

A Yeah.

Q And it looks like it's the Miyamoto paper from -- I guess that's the journal, "Gynecologic

Endocrinology" in 2019. And you have a Post-it note here that says "High dose suppresses endo CA"?

A Endometrial cancer.

Q Okay. High dose of what?

A Estrogen.

Q And then you've got -- the next paper is the Joshi paper, J-O-S-H-I, from 2012. You've got a note here that says "Suggests other pathways involving" -- I'm going to ask you what this says. Something -- what does it say?

A Other ways that -- other pathways that are responsible for suppressing endometrium.

Q So is that the word "mutation"?

Maybe just read that handwritten note for us.

A If I can.

Q If you can.

A "Suggest other pathways involving PTEN mutations and endometrial cancer other than that induced by ER binding," in estrogen receptor-binders.

Q Okay. Thank you.

And this got a check on it as well. The next one is -- is the Saito paper, 2011. It's got a check on it. And you say in addition to -- to the

Miyamoto paper --

A (Witness nods head.)

Q -- I guess. Okay.

All right. Let me clip these back together. We're getting our way through.

MS. PARFITT: Coming down the home stretch.

MR. LISAK: Yeah.

BY MR. LISAK:

Q And then the next clip, this first page looks, if I'm correct, like typed-out notes of yours concerning the Shukla paper. Is that right?

A Yes. Kind of a summary.

Q Okay. And then, of course, the Shukla paper is next to it. And you've got a check on it and you've written the word "good."

A Yes.

Q What did it mean there?

A It's a good paper.

Q Good paper.

And then you've got quite a bit of underlining and some handwritten notes and marginalia on that, correct?

A Yes.

Q And then there's the Kim paper from 2018.

Again, there's some notes in it.

You've got the Richardson paper from 2018. Again, some notes in it, marginalia, underlining.

So let me clip that.

And then the final thing, I think, that you've brought is in a pink -- hot pink folder.

MS. PARFITT: Valentine's Day.

BY MR. LISAK:

Q Okay. It is a printout from Hall. Looks like a 2013 paper from the NIH public access website; is that correct?

And you've got some -- some -- a Post-it note. You've got some underlining.

A That's unrelated.

Q The -- the --

A Yes.

Q -- note that says "Teleconference November 20th of" --

A I have no idea what that's about.

Q Nothing to do with this case?

A No. It's just a folder.

Q You're just recycling the folder?

A Yes.

Q Good for you.

And it has a Tab A on it.

Does that have anything to do with this case?
A I don't know what that is.
MS. PARFITT: Okay. And, Counsel, one last thing. You'll see before him, he has a large binder.
MR. LISAK: That was my next question.
MS. PARFITT: I figured. So I'm going to try and make this short. These are all -- they are -- not all of them. They are some of the references, hard copies of them. You have them all. They're all listed in his references. It's just duplicative of many of the things he has just reviewed and shown with you.
Counsel put these together just for ease of reference. Didn't know if you were coming with documents or you were coming electronically. A little bit easier to read the paper. So they're here.
MR. LISAK: Well, thank you for explaining.
MS. PARFITT: But it's not all of them. It's not all of them.
MR. LISAK: Understood.
MS. PARFITT: It doesn't -- that means

nothing. It's just those are what we could easily pull.

MR. LISAK: I appreciate you doing that and explaining that.

BY MR. LISAK:

Q So, just to be clear, there is nothing in that binder that isn't in some way referenced in your report?

A Right.

Q Okay. Thank you.

MS. PARFITT: Of course.

BY MR. LISAK:

Q Any other notes in any format that you've taken as part of your work in this case, other than what we may have just seen in Exhibit 1A?

A Right. Correct.

Q Is that correct?

Have you reviewed any documents produced by any of the defendants in this case to form your opinions?

A Yes. Yes.

Q Which documents?

A Oh, I don't have them with me. I just read them, and these are referenced. These include some of the references that were cited by the

defendants.
Q Okay. Let me ask it a better way.
In this case, the defendants have produced a lot of documents --
A Yes.
Q -- to the plaintiffs.
And many of those documents are, for lack of a better term, company documents. And they would have had what we call Bates numbers on them. It's a numbering system.
A Uh-huh.
Q And I guess my -- maybe Michelle can answer it for me.
Has Dr. Chang reviewed any materials produced by the defendants in this case?
MS. PARFITT: Thank you. Dr. Chang has not been provided with any company Bates-numbered documents.
MR. LISAK: Thank you.
THE WITNESS: Thank you.
MS. PARFITT: Of course.
BY MR. LISAK:
Q If you take a look at No. 9, and then we can move on from -- in the Exhibit No. 1, which is the notice of deposition.

A Okay.
Q Request No. 9. You'll see a list of names there. And let me just ask you this.
Have you ever met with, spoken on the phone, video conference, emailed, texted with any of the other plaintiffs' experts that are listed in No. 9 of the deposition notice?
A No, I have not.
Q Okay. So you can put Exhibit 1 to the side. I don't know which side. We kind of lost --
MS. PARFITT: How about I be keeper of your documents.
THE WITNESS: All right.
MS. PARFITT: Thank you.
BY MR. LISAK:
Q Are you still doing okay?
A I'm okay right now.
Q Good. Okay.
A So far.
Q So far. This is the easy stuff, right?
Attached to your report was -- why don't we mark No. 2 as his report.
(Exhibit 2 marked for identification.)
BY MR. LISAK:
Q All right. Maybe we can find a clip or

something. Exhibit 2 is the expert report of R. Jeffrey Chang, M.D., dated December 1, 2025. I'm going to give the court reporter a copy. Why don't we put a clip on that so we don't mess it up.

I'll go out on a limb and --

VERITEXT CONCIERGE: Just confirming that this is Tab 2?

MR. LISAK: Tab 2. Yeah. I guess I need to say the tab numbers.

BY MR. LISAK:

Q Let me ask you, is that your signature, or at least electronic signature on the front of Exhibit 2?

A Yes. That's my signature.

Q And attached to your report, which is Exhibit 2, is Exhibit 1 of your report, just to confuse us, is a CV.

Do you see that? I may have missed it, but I didn't find a date on the CV.

A It's Exhibit 1?

Q Yes. Exhibit 1 to your report. And that's the CV that was provided along with your report.

It's not dated, which is fine, but is this a relatively current and accurate version of your

CV?
A Yes.
Q Is there anything that you've done since the preparation of this CV in terms of updates or changes or corrections that you think are relevant to your testimony today?
A No.
(Exhibit 3 marked for identification.)
BY MR. LISAK:
Q Okay. Let's talk a little bit about -- well, let's do Exhibit -- Tab 3, please, which is "Plaintiffs' Steering Committee Response and Objections to Defendants' Notice of Videotaped Deposition," which I don't really want to ask you about, but attached to that is -- looks like you have a copy of it in front of you as well -- is that statement of compensation. That's what I want to ask you a couple questions about.
Okay. So this is Exhibit 3 to the deposition, and it's Tab 3 as well.
A Okay.
Q If you can -- don't worry about all the crazy lawyer stuff on every page until the last page.
A Okay.

Q And this is Statement of Compensation, R. Jeffrey Chang, M.D. It has columns, dates, hours billed, and amount, correct?
A Yes.
Q And is this, to the best of your recollection, an accurate and complete listing of the hours you've billed and the approximate time frame and the amounts that you've billed Plaintiffs' counsel for your work in this case between December 6 of 2023 and February 2, 2026?
A Yes, it is.
Q And I think we mentioned this earlier. That came to approximately 788 hours, correct?
A Yes.
Q And what's your rate of your compensation for your time?
A $700 an hour.
Q And is your compensation for your time the same when you're reviewing materials and having meetings as it is when you're providing testimony such as in a deposition or a trial?
A Since this is my first deposition, I would have to say yes.
Q Okay. And so, in your statement of compensation, between December 6 of 2023 and

February 2 of 2026, you've billed Plaintiffs' counsel approximately $551,000, correct?
A Yes.
Q And I take it you've spent some time since February 2nd through today as well on this case?
A Yes.
Q Can you ballpark about how many hours you've spent since February 2nd on this case before we started?
A What's the date today?
Q Today is February 19th. So, like, the last two weeks maybe, about?
A Four hours a day.
Q Four hours a day?
A Yeah. Approximately.
Q Every day from the 2nd through today?
A Not every day. Some days I'm moving. We sold our house.
Q Oh, congrats.
A No.
Approximately.
Q Yeah. So maybe 40 hours?
MS. PARFITT: Don't guess, Dr. Chang.
THE WITNESS: I can't -- I'd have to go look. I'd like to be more exacting. I'm sorry.

BY MR. LISAK:

Q Sure. I don't want you to guess, but like, if I understand, you're saying approximately, on average, four hours a day on work days between February 2nd and today?

A I should probably say two to four.

MS. PARFITT: Objection.

THE WITNESS: Because there are days when I didn't do anything. I was moving.

BY MR. LISAK:

Q Two to four hours per day since February 2nd through today?

A Approximately.

MS. PARFITT: Objection.

BY MR. LISAK:

Q The same rate, $700 an hour?

A Yes.

Q Now, I understand there's an agreement that Plaintiffs' counsel are not providing us today -- this is fine -- invoices themselves.

But just to be clear, you did create invoices and send them to Plaintiffs' counsel, correct?

A Yes, I did.

Q And those invoices would have the time

that you spent and some sort of general description of your activities in those invoices, correct?

A Yes.

MS. PARFITT: Objection to any further inquiry with regard to his invoices. We have an agreement.

MR. LISAK: Okay. I'm just trying to determine whether or not the invoices exist and sort of what would be on them. I'm not asking for them today.

BY MR. LISAK:

Q For these 788 hours in what is Exhibit 3, is there any way for you to ballpark about how much of those 788 hours you spent, you know, conducting searches to find articles, reading the articles themselves and writing your report and meeting with counsel? Is there any way to separate that, roughly?

A Well, meeting with counsel, maybe 2 or 3 percent.

Q Okay. And percentage is fine.

Of that number, about what percent would you ballpark you spent, you know, doing your PubMed searches and researching and finding references versus actually reading them?

A I really can't separate that out, to be honest with you.
Q Okay.
A Because when you -- as you may be aware, going through a PubMed search, if they say there's 12 articles, that's easy. If they say 200, then you have to begin to scan, to look at the titles. Just the titles themselves, it may go on for 20 pages.
Q Right. Let me ask you about that.
I think you said in your report you used PubMed to find your research. Is that right?
A Most of it, yes.
Q Most of it.
Did you use any other databases or search platforms to find your references?
A Google.
Q Google.
And when you did your PubMed search, do you know what search terms or keywords you used?
A Quite a few.
Q Could you give us some of them?
A "Endometrial cancer," "endocrine-disrupting chemicals." That's probably -- "parabens," "phthalates," you know, "bisphenol-A." And then all the authors.

Q What do you mean "all the authors"?
A Well, the authors that I was looking up to see if there was any relevance of the article to what I'm seeking to understand.
Q Okay. Any other chemicals specifically other than parabens, phthalates, and --
A Well, EDCs.
Q EDCs.
A That covers a large --
Q Right. So, when you said "EDCs" -- you used "EDCs," you also maybe typed out "endocrine-disrupting chemicals" or just --
A Either one. It gives you the same information.
Q It does give you the same. Okay.
But in terms of -- okay. And that's sort of a characterization of a large family of chemicals, correct?
A It's a blanket, yes.
Q Blanket term.
In terms of specific chemicals that you've searched, if I understand it, it's BPA, phthalates, and parabens --
A I restricted my --
MS. PARFITT: Objection.

BY MR. LISAK:
Q -- correct?
A I restricted my search generally to that.
Q To those three specific chemicals, in addition to the EDCs generally?
A Yeah.
Q Okay. I doubt you needed to, but did you use "PCOS" or "polycystic ovary syndrome" in your search?
A On occasion.
Q On occasion for the PubMed for this --
A Yes.
Q Okay. How about "chemical hair relaxers" or "relaxers"?
A Yes.
Q Okay. Any others that you could -- and if you think of others as we go, if you could let me know any other search terms that you recall using in finding your references for this.
A Yes. "Endometrial cancer," "ovarian cancer." I'm sure I used others. They just don't come to mind.
Q That's fine. If you think of them, just let us know.
Did counsel send you references, or did

you find them all yourself, or was it a mix?

MS. PARFITT: Objection.

THE WITNESS: Most of them, the vast majority are mine. Or if I couldn't get access to them because I couldn't print them out for one reason or another, then I requested them to find this article for me.

BY MR. LISAK:

Q Okay. Let's talk a little bit -- you're still good to keep going?

A Yeah.

Q Okay.

MR. LISAK: Most importantly, Leslie, are you still good?

THE REPORTER: Yes. If you could slow down just a tad.

MR. LISAK: Slow down. All right. That's the first one today. There will be more.

BY MR. LISAK:

Q Let's talk a little bit about your education and training and experience. Okay?

A Sure.

Q And if you want, you can look at your CV.

A I don't want to look at that anymore.

Q But let me try to --

MS. PARFITT: Feel free to have it in front of you.

BY MR. LISAK:

Q Yeah. If you change your mind, let us know.

A Okay.

Q You're a doctor of obstetrics and gynecology, correct?

A Yes.

Q And you are board certified in reproductive endocrinology, right?

A Yes.

Q You -- if I understand your CV, you received your M.D. from the University of Oregon Medical School, right?

A Yes.

Q Did any of your coursework for your specialty in REI include specifically assessing parabens?

A No.

Q Phthalates?

A No.

Q Any phenols?

A No.

Q Now, you completed your residency in

OB-GYN at UCLA Harbor General Hospital between 1970 and 1974; is that correct?

A Yes.

Q And then you completed your specialty training in reproductive endocrinology at UCLA Harbor General between 1973 and 1974?

A Yes. Let me explain.

I completed my clinical training in three years instead of four.

Q Okay.

A And then, subsequently, in my fourth year, I took the entire year in the laboratory doing research. And then I added another year to make it a two-year fellowship.

Q I see.

Did you receive any education or training specifically regarding parabens, phenols, or phthalates during your residency or fellowship?

A No.

Q After completing your training at the University of California Medical Center, you joined the faculty at UC San Francisco School of Medicine in 1976?

A Correct on that. I went to San Francisco on a second fellowship for two years. But during

the second year of that fellowship, I was appointed as an assistant clinical professor.

Q What was that second fellowship in?

A That was -- my first fellowship was focused on the endocrinology of pregnancy. My second fellowship was focused on prolactin secreting pituitary tumors and regulation of the hypothalamic-pituitary-ovarian axis.

Q Does that have anything to do with ovarian cancer or uterine cancer?

A Only in the aspect as that is -- the relationship of the hormone to the ovary.

Q I see.

But it wasn't specifically focused on ovarian or uterine cancer?

A Correct.

Q So then, after spending about a year in UC San Francisco, you joined the faculty at UCLA School of Medicine, and you were there until 1986.

Does that sound right?

A Correct.

Q I'm just trying to do this so we can go through it quick, but please correct me if I have anything wrong.

A Sure.

Q After UCLA School of Medicine, you went to UC Davis School of Medicine, where you taught until 1997?
A Correct.
Q And then when you left UC Davis, you joined the faculty of UC San Diego School of Medicine where you taught until about 2021?
A Yes.
Q And in 2021, you became professor emeritus?
A Yes.
Q And can you just explain what "professor emeritus" means?
A Upon retirement, if you maintain your -- once you retire, you're considered emeritus professor.
Q Okay. Are you -- since 2021, as an emeritus professor, are you still teaching medical students?
A Occasionally, I teach medical students, residents and fellows.
Q And you're teaching them about -- do you mind if I use the term "REI," reproductive endocrinology?
A Yes, you may use that term. But most it

of it is reproductive endocrinology.
Q Say it again.
A Most of it is reproductive endocrinology.
Q Okay. So that's what you're teaching, to the extent you're still teaching part-time?
A Yes.
Q About how many hours are you spending teaching these days?
A I only spend one hour twice a month. However, in preparation for the discussions, it requires anywhere from 8 to 12 hours per session.
Q I see.
Are you still seeing patients clinically?
A No, I'm not.
Q When did you stop seeing patients clinically?
A 2021.
Q Okay. I forgot to ask you one question about your statement of compensation.
So, over the period of that statement, which I think is December 2023 through February of 2026, the $551,000 that you billed Plaintiffs' counsel, about what percentage of your income does that represent?
MS. PARFITT: Objection. Don't answer.

THE WITNESS: I can't tell you.
MR. LISAK: Why is that a no answer?
MS. PARFITT: Do you want to rephrase it?
THE WITNESS: Because my wife takes care of all that. I'm sorry. Really. I know I get something, but I don't know how much.
BY MR. LISAK:
Q I don't want to ask you your other sources of income. I don't prefer to do that. And so what I'm asking is --
MS. PARFITT: And I would entirely object to that, so . . .
MR. LISAK: What's that? Of course.
BY MR. LISAK:
Q What I'm trying to get a sense of, the $551,000 that you billed Plaintiffs' counsel between February -- sorry, December of 2023 and February of -- early February of 2026, approximately what percentage of your income does that represent?
MS. PARFITT: And Counsel, asked and answered. And I believe he stated he does not know.
BY MR. LISAK:
Q You do not know?
A (Witness shakes head.)
Q Okay. Even roughly?

MS. PARFITT: Again, asked and answered. Don't guess. Don't guess, Dr. Chang.

THE WITNESS: I really don't know. I don't do any of the finances in my marriage.

BY MR. LISAK:

Q Would you call it a significant portion of your income?

MS. PARFITT: Objection to the term "significant." It's very abstract.

THE WITNESS: I can't --

MS. PARFITT: Don't guess.

THE WITNESS: I can't.

BY MR. LISAK:

Q Let's move on.

Throughout your career, your clinical specialty has been reproductive endocrinology, fair?

A Yes, it has.

Q And reproductive endocrinology, as I understand it -- and please correct me if I'm wrong -- focuses on fertility hormones and ovulatory disorders?

A As well as disorders of the hypothalamic-pituitary-ovarian axis.

Q Okay. Now, if I understand it, to the extent you treated patients with cancer prior to

2021, your focus would have been on oncofertility, right?

A Correction. I never treated anyone for endometrial cancer.

Q Okay. How about ovarian cancer?

A No. I'm not an oncologist. I'm a reproductive endocrinologist. If I find these patients, I refer them to oncology.

Q Understood.

I saw one or two papers in your CV that talked about oncofertility.

Could you explain what oncofertility is and what your either clinical or research work in those areas has been, if any?

A Well, in approximately -- I can't remember the exact time, but it was in the 2000s -- I received a phone call from Dr. Teresa Woodruff at Northwestern. And at that time, she was planning to submit a proposal for an NIH director's grant.

Apparently, the NIH director has discretionary funds. And I'm not quite sure how much, but it was in the millions, hundreds of millions. And he was able to award perhaps 10 to 12 grants to institutions across the United States in all disciplines as a purpose for him to dispensing

his funds. So it was called NIH Director's Grant.

So, when I received this phone call, she was interested in looking how -- looking to try and preserve fertility in young women with cancer. And because of my interest in the ovary, she asked if I would be willing to join them and write a proposal to look at certain aspects of this subject matter.

At the time, "oncofertility" was unknown as a term. And currently, it now exists on Wikipedia as a term --

Q Correct.

A -- granted to her ingenuity and branding.

Subsequently, I wrote a grant, assisted in the second grant, and also was participating in a portion of the grant that required education.

Now, this grant was a multidiscipline, multi-site grant that was huge. In was thicker than any notebook I see here. There was, I believe, four or five -- one of the institutions dropped out, but there were five institutions that compiled this grant.

And it covered law, it covered business, it covered religion, it covered philosophy, as well as the sciences. And it covered, importantly, education.

So educational levels in this grant required that at the post-doctoral level, at the doctoral level, at the level of fellows, residents, medical students, and high school students. And herein is where I became very involved in high school teaching. And much to my chagrin and disappointment, I was asked to be one of the sites that taught high school students.

And so from that point forward, I had an involvement with actually the science, as well as the -- one of the goals is to focus on education.

Q If I -- thank you for that answer.

So, if I understand it, your involvement with -- if we use the term that now exists, "oncofertility" --

A Yes.

Q -- was not focused upon determining the cause -- the diagnosis, the cause, and treatment of the cancer itself, but fertility aspects related to the fact that a woman may have had cancer, to preserve her fertility?

A Yes. It was to entertain the notion that we could obtain ovarian tissue from women who had cancer, i.e., normal ovarian tissue, and perform research on that tissue.

Q Okay. And if I understand a prior answer -- I just want to make sure it's clear -- your academic and research and clinical focus in your career has not been on the diagnosis and causes of either ovarian or endometrial cancer. Fair?

MS. PARFITT: Objection.

THE WITNESS: Well, that's -- generally, yes.

BY MR. LISAK:

Q And I think you told me you did not diagnose and treat uterine and ovarian cancer patients. You would refer them to an oncologist?

A Yes.

Q And as a result, I take it, that you've never told a woman what the cause of her uterine or ovarian cancer was, correct?

MS. PARFITT: Objection.

THE WITNESS: Not exactly.

BY MR. LISAK:

Q What do you mean by that?

A Well, in women who have polycystic ovary syndrome, which comprised the majority of my patients, they're at risk for endometrial cancer.

Q Okay. Other than that, have you ever told a woman who said "I have endometrial cancer" or "I

have ovarian cancer. Why did I get this disease?" -- have you ever had that conversation with a patient?

MS. PARFITT: Objection.

THE WITNESS: They've never asked me that. I've never been asked that question.

BY MR. LISAK:

Q Okay. Are you or have you ever been a member of any scientific or professional medical societies that are focused on cancer, such as the American Cancer Society or anything like that?

A No.

Q Have you ever been a -- I know you've done a lot of editorial work for different journals and things like that.

Have any of those journals where you've been an editor or provided editorial services been focused on cancer?

A Not that I can recall.

Q In your CV, you mentioned that -- is it okay if I say "PCOS" instead of polycystic ovary system all day long?

A Sure.

Q In your CV, you mention -- and in your report too, I think, that PCOS was your primary

focus area of research throughout your career; is that correct?

A Yes. Except for my fellowship training.

Q Understood.

Which you've described.

A Yes.

Q And in your CV, on page 20, you note under "Research Interests" that they include abnormal androgen metabolism, polycystic ovarian syndrome, and disorders of ovulation, right?

A Yes.

Q Your -- in your CV, your research interests do not include endocrine-disrupting chemicals, right?

MS. PARFITT: Objection.

THE WITNESS: Correct.

BY MR. LISAK:

Q They don't include uterine cancer, do they?

MS. PARFITT: Objection.

THE WITNESS: No.

BY MR. LISAK:

Q They don't include ovarian cancer, right?

MS. PARFITT: Objection.

THE WITNESS: No.

BY MR. LISAK:

Q Have you ever authored or co-authored any publications concerning parabens?

A No.

Q How about phthalates?

A No.

Q How about any phenols?

A No.

Q How about chemical hair relaxers?

A No.

Q How about dermal absorption?

A No.

Q How about uterine cancer?

A No.

Q How about ovarian cancer?

A No. I don't recall.

Q Okay. Have you ever authored any publications regarding the epidemiology of reproductive cancers?

A I don't recall if I've done that.

Q All right. Prior to your work in this case, have you ever published or presented orally where you called hair relaxers a cause of either uterine or ovarian cancer?

MS. PARFITT: Objection.

THE WITNESS: No.
BY MR. LISAK:
Q Prior to your work in this case, have you ever published or presented orally that either parabens, phthalates, or phenols can cause or contribute to either uterine or ovarian cancers?
MS. PARFITT: Objection.
THE WITNESS: No.
BY MR. LISAK:
Q The -- on your CV -- or sorry, in your report, you say that "Over the past 35 years, most of my research efforts have been supported by funding from the National Institutes of Health," right?
A Correct.
Q And included under the NIH would be the National Cancer Institute or NCI, correct?
A Yes.
Q Also, the National Institute of Environmental Health Sciences or NIEHS?
A Yes.
Q Do you consider those organizations to be well-respected scientific organizations?
A Yes, I do.
Q Do you believe that those organizations

provide reliable information on cancer and endocrinology?

A Yes, I do.

Q Have you ever conducted any original research on hair relaxers in any respect?

A No, I have not.

Q How about parabens?

A No, I have not.

Q Phthalates?

A No.

Q Phenols?

A No.

Q Have you ever published a study or given an oral presentation where you said that what you would characterize as endocrine-disrupting chemicals cause or contribute to ovarian or uterine cancer?

A No.

Q I looked through your CV and did an electronic search trying to find the terms "parabens," "phthalates" or "phenols," as well as "EDCs," "endocrine-disrupting chemicals." I couldn't find any of those terms, at least in the titles of all of your publications that you mentioned, presentations that you mentioned in your CV.

Do you think that's correct?
A Yes.
Q All right. I'm just going to keep going. You still good?
A Yes.
MR. LISAK: Leslie, you okay?
THE REPORTER: Yes.
MR. LISAK: Okay.
BY MR. LISAK:
Q Let's take a look at -- if you look at page 5 of your report, which is Exhibit 2 to the deposition, in the upper -- the top paragraph before your executive summary. Let me know when you're there.
A Okay.
Q Do you see that paragraph at the top there of page 5?
There's a sentence there that says "While my expertise in the area of obstetrics, gynecology, and reproductive endocrinology" -- sorry. I misread that, I think.
MS. PARFITT: Are you with him?
THE WITNESS: Yeah.
BY MR. LISAK:
Q Let me start again.

"While my expertise is in the area of obstetrics, gynecology, and reproductive endocrinology, I routinely consider studies and scientific literature from various scientific and medical fields, including epidemiology, endocrinology, biology, toxicology, and pathology."

Did I read that correctly?

A Uh-huh.

Q Is that a "yes"?

A Yes.

Q You're doing pretty good.

Let me ask you some questions prompted by that.

You are -- you're not board certified in gynecologic oncology, correct?

A Correct.

Q And you don't hold yourself out as an expert in gynecologic oncology, correct?

A Correct.

Q You're not a toxicologist, right?

A Correct.

Q Not board certified in toxicology?

A Correct.

Q You don't have a degree in toxicology. You don't publish in toxicology, correct?
A Yes.
Q Not a member of any toxicologic societies or professional --
A I am not.
Q Okay. You're not a cancer biologist, right?
A No, I am not.
MS. PARFITT: Objection.
BY MR. LISAK:
Q You don't have any degrees in cancer biology, right?
A Correct.
Q You've not conducted bench research on carcinogenesis, right?
MS. PARFITT: Objection.
THE WITNESS: Correct.
BY MR. LISAK:
Q You've not published primary research on the mechanisms of cancer causation, have you?
A Correct.
Q You're not a medical geneticist, correct?
A Correct.
Q You don't do patient counseling on genetic

syndromes, do you?
A Correct.
Q Including Lynch syndrome, right?
A Correct.
Q You're not an epidemiologist, right?
MS. PARFITT: Objection.
THE WITNESS: I have some awareness of epidemiology because some of the material I read during the course of my work involves epidemiology.
BY MR. LISAK:
Q Understood. I don't question that at all.
My question is little bit more specific.
Do you consider yourself an epidemiologist?
A No, I do not.
MS. PARFITT: Objection.
BY MR. LISAK:
Q Do you have any formal degrees in epidemiology?
A No, I do not.
Q Do you have any certifications in epidemiology?
A No.
Q Do you -- have you ever published any papers in peer-reviewed journals that are focused on

epidemiology?

MS. PARFITT: Objection.

THE WITNESS: I don't think so. I'd have to go back and look, but . . .

BY MR. LISAK:

Q Have you ever conducted a Bradford Hill analysis?

A Formally, no.

Q You don't teach epidemiology, do you?

A No, I do not.

Q You're not a member of any epidemiology societies, correct?

A No.

Q Now, we're almost done with this section. You probably know where I'm going here.

You're not a dermatologist, correct?

A I'm aware of dermatologic disorders as a result of my investigation into the subject matter at hand.

Q Prior to being retained by the plaintiffs as an expert in this case, were you aware of dermatology research?

A Well, to some degree, but not very deep.

Q Okay. That's not a pun on dermatology, is it?

A Beg your pardon?
Q "Deep."
Sorry. Let me ask it this way.
A Well, patients with polycystic ovary syndrome do get acne.
Q Okay. And then you refer them to a dermatologist?
A Generally, if it's severe, yes.
Q Prior to your work in this case, had you ever conducted a review of issues related to dermal absorption?
MS. PARFITT: Objection.
THE WITNESS: No, I had not.
BY MR. LISAK:
Q You're not certified as a dermatologist?
A No.
Q You don't teach dermatology?
A No.
Q You've never published on dermatology?
MS. PARFITT: Objection.
THE WITNESS: I'm just trying to think.
I may have had one publication as a request to publish dermatological manifestations of polycystic ovary syndrome.
/ / / /

BY MR. LISAK:
Q And would that be in your CV?
A It should be.
Q Okay. I didn't -- I didn't see it. And I'm not saying it's not there. I don't know. Perhaps on a break, you could look at your CV and tell us what that paper is.
A Yeah. The first author was Chuan, C-H-U-A-N.
Q Okay.
MS. PARFITT: And Counsel, if you want him to look now on your time, but we're not going to have him do any exercise during any breaks.
MR. LISAK: Okay.
MS. PARFITT: It will be a long day anyways.
MR. LISAK: Understood.
MS. PARFITT: Thank you.
BY MR. LISAK:
Q What are the -- did you say "dermatologic manifestations" --
A Acne.
Q It's acne.
Anything to do with dermal absorption issues?

A No.

Q Anything to do with the absorption of chemicals into the blood system --

A No.

Q -- or the urinary system?

A No.

Q Did your dermatology work ever, on that paper that you mentioned, have anything to do with endocrine-disrupting chemicals, parabens, phthalates, or phenols?

A No.

Q Have you ever taught students about dermatology?

A No.

Q Are you a member of any dermatology professional associations?

A No.

Q So I take it the information in your report about dermatology and dermatology absorption issues that are in your report, those are things that you first learned about and wrote about as part of your work in this case for Plaintiffs, right?

MS. PARFITT: Objection. Form.

THE WITNESS: Yes.

BY MR. LISAK:
Q Have you ever done any dermatologic research yourself --
A No.
Q -- including dermal absorption?
A Not primarily.
MS. PARFITT: Objection. Asked and answered.
THE REPORTER: I'm sorry. What was your answer?
THE WITNESS: Not primarily or secondarily.
BY MR. LISAK:
Q How about tertiary?
Is everyone still good?
Do you want a break?
A I'm good.
MS. PARFITT: I'm good.
MR. LISAK: It's going to be one of those contest days where I see how long I can go.
BY MR. LISAK:
Q Okay. You mentioned pathology, going back to this report, is something that you've considered.
You're not a pathologist, correct?
A No, I am not.

Q Okay. If you have a pathological question, do you generally refer to a pathologist?
A Yes, I do.
Q All right. Let's talk about -- in your report -- we've talked a bit about your references today and the additional references in 1A that you brought with you today.
Page 43 of your report begins a list of references, and it goes through page 59. Correct?
A Yes.
Q Now, some of these references you include, actually, in the body of your report after an assertion or some citation of data, correct?
A Uh-huh. Yes.
Q But a lot of these are not actually referenced specifically in your report itself, right?
A Yes.
Q So how did you -- are the references that are in your report and that you read after your report in Exhibit 1A -- those are the references upon which you base your opinions -- correct? --
A Yes. Yes.
Q -- in this case?
A (Witness nods head.)

Q Is there a particular reason why some of these references in your report made their way into the body of your report, but many of them, of course, didn't?

A Well, actually, when I read that, I realized that. And I'm not sure how that happened. I cannot recall.

It was a time when I was really focused on this, trying to put this together in a format that is similar to what others have done. And I noticed that too. And I'm not sure why.

Q Okay. Did you rely upon every reference in your report for your opinions, or was some of it -- you know, sometimes it's just like background.

A Well, they form -- they contribute to it.

But it may -- if you will, the surrounding kind of flow of information allows me then to pick out the precise articles which I can make the point. I think that's how they got in there, to be honest with you.

Q I mean, you drafted your report, right?

A I know I drafted it. So you can imagine how surprised I was when I received this.

Q Okay.

A Okay? I really -- again, I have to assume

that's what I did.
Q When you say you received this, what do you mean, your list of references?
A No. When I received the report and it was laid out. So I said "Wait a minute, I didn't refer" -- I said "God, there's a lot of references," and I started going through it. And it was done, so I just left it.
Q But you understand, if you're citing -- if you're -- if you have language in your report and you don't specifically cite a paper supporting that language, I can't really know what reference you're relying upon for that statement.
A I understand that. But I think that all the references that I did cite in the report appear in the references.
Q Yes. All of the references you cite in your report are in your reference list. But there are many, many, many references that you say you reviewed and relied upon that are not cited in your report, correct?
A That may have been the case here.
Q Is the case that, if you cited a reference in your report, you were specifically relying upon that reference for the proposition that it was --

A Absolutely.
Q Okay. Looking at your reference list, is there any way to say which ones you came up or which ones were provided to you by counsel?
MS. PARFITT: Objection.
THE WITNESS: Actually --
MS. PARFITT: Asked and answered.
THE WITNESS: -- most of my references were generated by me, not by counsel.
BY MR. LISAK:
Q Okay. As a result of the PubMed search you described earlier?
A Yes.
I mean, I would venture, yes, 90 to 99 percent of these were mine.
Q From yourself?
A Yes.
Q So, if you were asked what study or studies or references you relied upon for a certain statement in your report and there's no specific reference there, how would you be able to tell me or the jury what reference you're relying upon for that statement?
MS. PARFITT: Objection. Form.
THE WITNESS: Well, I didn't reference --

I only used the reference to prove my point. There is no portion in this report that goes without a reference that is necessary.

BY MR. LISAK:

Q I mean, did you originally list the references and then they fell out?

MS. PARFITT: Objection. Misstates his testimony.

BY MR. LISAK:

Q You said when you received it back, you were surprised to see the references not --

A Yeah. And I'm -- because when I went back and read it, I said "Wait a minute. There's more references here than I cited." And I'm not quite sure how that happened.

Q Okay.

A And I said that, most likely, the defense will probably bring that up.

Q I'm glad to meet your expectations.

Let's move on.

On page 4 -- let me ask you this.

A Okay.

Q Would you agree that the scientific community knows more about the genetic determinants of uterine and ovarian cancer today than it did 20

years ago?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q If you know.

A I really can't answer that.

Q Because that's outside of your area of expertise?

MS. PARFITT: Objection.

THE WITNESS: Yeah. I would be guessing.

BY MR. LISAK:

Q Would you also be guessing if I asked you whether the scientific community continues to learn more and more about genetic determinants of uterine and ovarian cancers as we sit here today?

MS. PARFITT: Objection. Form.

THE WITNESS: I would hope so.

MS. PARFITT: Speculation.

BY MR. LISAK:

Q On page 4 of your report, in that middle paragraph -- let me know when you're there --

A Yes.

Q -- that starts "Recent and emerging data."

Do you see that?

A Uh-huh.

Q There is a sentence where you say:

"This led to a careful examination of recent publications that have highlighted a significant association with chemical hair relaxer use and increased use" -- sorry -- "increased risk of uterine and ovarian cancer."

Do you see that?

A Yes.

Q And then if you look at -- on page 5, at the paragraph that begins at the bottom, you say:

"Evidence derived from original research reported in peer-reviewed epidemiologic studies demonstrates that exposure to chemical hair relaxers can cause uterine and ovarian cancer."

Do you see that language?

A Yes.

MS. PARFITT: You're referring to the executive summary?

THE WITNESS: Yes.

MR. LISAK: Yes. Bottom of page 5, first sentence, last paragraph.

BY MR. LISAK:

Q Do you agree that "association" and "causation" are not synonymous terms in the

scientific community?
A Correct.
Q Two things can be associated without being -- without there being a causal relationship, right?
A Yes.
Q For example, gray hair is associated with heart disease, right?
MS. PARFITT: Objection.
THE WITNESS: Yes.
BY MR. LISAK:
Q People with gray hair are more likely to have heart disease than people without gray hair, right?
MS. PARFITT: Objection.
THE WITNESS: Probably.
BY MR. LISAK:
Q Yeah.
But gray hair doesn't cause heart disease, right?
A I would not think so.
Q The underlying factor in that correlation is age, right?
MS. PARFITT: Objection.
THE WITNESS: Age?

BY MR. LISAK:
Q Age.
A Oh, age. Yes.
MS. PARFITT: Objection.
BY MR. LISAK:
Q Age is the confounder that explains both the gray hair and the heart disease, right?
MS. PARFITT: Objection.
THE WITNESS: Yes.
BY MR. LISAK:
Q So an association can exist, even when there's no causal relationship, right?
A Yes.
Q And that's why epidemiology seeks to distinguish between association and causation, right?
A Yes.
Q I think I saw the term "cause-in-fact" in your report used.
Is that a term you've ever used before in any of your scientific publications?
A Restate the question.
Q I think I saw the phrase "cause-in-fact" in your report.
A Oh.

Q Is that a phrase you have ever used in any of your publications prior to this case?
A I can't recall. I have a lot of publications.
Q You do.
All right. Page 4 of your report, the second paragraph -- let me try to find it. Sorry. It's the top -- you say at the top -- the top paragraph there, you say -- it's in the middle -- "Moreover, this included a thorough review of relevant in vitro and in vivo studies conducted on estrogen-sensitive reproductive tissues of animals and humans," right?
A Yes.
Q Now, Doctor, do you agree that, in medicine and science, not all types of evidence carry the same weight?
A Yes.
Q And when assessing whether an exposure causes a disease in humans, well-conducted human epidemiologic studies are generally more informative than animal or cell culture studies, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Can you restate that?
/ / / /

BY MR. LISAK:
Q Sure.
I think you agreed with me that science and medicine looks at different types of evidence in a different sort of hierarchy, if you will, correct?
MS. PARFITT: Objection. Misstates the evidence.
THE WITNESS: Yes.
BY MR. LISAK:
Q And when you're trying to determine whether or not a particular exposure causes a particular health outcome in a person, the most useful information, as long as it's conducted properly, are epidemiologic studies of humans, as opposed to rodent studies, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Can you repeat that question? Because I'm not sure I'm interpreting --
MR. LISAK: Sure. Yeah. I apologize.
THE WITNESS: -- and I want to make sure I'm clearly --
BY MR. LISAK:
Q When you're looking at whether or not an exposure to a chemical, let's say, causes a particular outcome, let's say cancer, the scientific

community looks at well-conducted human epidemiologic studies examining that exact question as being of a higher value in determining whether there is an association or causal relationship than, for example, studying that exposure and that health outcome in mice.

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Do you agree?

A It's difficult to necessarily place a value for one to another because they're different worlds, number one.

Number two, I think that is a -- we have to be careful here because you have to look at the whole picture, the totality of the subject matter. And to just pick out one aspect and compare it to one other aspect when in fact there are other considerations to be made, I think we need to be careful about that.

Q Understood and agreed. And I'm not saying there is no value in animal studies at all. I'm not trying to trick you. I'm just trying to get an understanding of your opinion.

And if there's a -- if the scientific and medical community has a certain view of the

hierarchy of evidence, even if you're considering the totality of the evidence, when you're looking at whether an exposure causes cancer, for example, the highest value, if you will, of scientific evidence would be well-conducted human epidemiologic studies, as opposed to laboratory studies of mice?

MS. PARFITT: Objection. Asked and answered. Misstates the --

BY MR. LISAK:

Q Correct?

A Again, I'm having some difficulty with that because I cannot view science as comparing just epidemiology versus studying mice or any animal. Because I usually consider the entirety.

Q Sure.

A Epidemiology studies, in vitro studies in mice, in vitro studies in human tissues, clinical studies.

I'm not sure I'm responding to you as you would prefer.

Q Let me try to ask it in a different way.

It seems like we agree that there's a hierarchy of scientific evidence --

MS. PARFITT: Objection. Misstates testimony.

BY MR. LISAK:
Q -- right?
A Yes.
Q What's your hierarchy of scientific evidence? How would you describe that if someone asked you?
MS. PARFITT: Objection.
THE WITNESS: The epitome is doing it in humans.
BY MR. LISAK:
Q There we go. That was my question.
A And that involves not necessarily correlations, but, actually, if you give someone a pill or a substance and this happens and you can track the mechanism for that happening, even if it's necessarily down to the gene level, then you can convince me.
I'm a very skeptic scientist.
Q Okay.
A And you have to really prove to me that this relationship exists.
Q All right. And part of that proof would be well-conducted and reproduced human epidemic studies showing statistically significant association between exposure and outcome, right?

MS. PARFITT: Objection to the form of the question.
BY MR. LISAK:
Q You can answer.
A It contributes to it, yes.
Q And animal studies and also, if you will, mechanistic studies of human tissue in a Petri dish, for lack of a better term, they have value in creating hypotheses to be examined, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
BY MR. LISAK:
Q And they may have value in helping explain a mechanism of something that's been shown in human studies to either be associated or caused?
A Correct.
Q But you would not look at a mouse study and based on that alone say that an exposure caused that same outcome in humans --
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q -- right?
A It's possible, but you would have to have additional data.
Q And part of the reason for that is, while

we're all mammals, rodents and humans are not the same, right?

A Correct.

Q And there are biologic and genetic differences between rodents and humans?

A Yes, there are.

Q And animal studies are studies that often involve high-dose lifetime exposure specifically intended to find a toxic response, right?

MS. PARFITT: Objection. Form.

THE WITNESS: Correct. However, I think most investigators understand the difference of pharmacologic doses versus physiologic doses. And in most papers they would cite the relativeness of these forms of approach.

BY MR. LISAK:

Q In your report, at page 3 -- and I think you may have mentioned this already today -- under "methodology," the first sentence --

A Yes.

Q -- you say:

"The methodology I employed in addressing the role of chemical hair relaxers and their relationship to uterine and ovarian cancer is based on a weight of

the evidence approach," right?
A Yes.
Q How -- you didn't define in your report what that weight-of-evidence approach is, correct?
A Right. Correct.
MS. PARFITT: Objection.
BY MR. LISAK:
Q And you didn't set out any written criteria in the report for how much weight you gave to any particular study or any particular type of study versus other studies, right?
A Correct.
Q You didn't assign in your report any numerical weights, scores, or rankings to studies as part of your analysis, right?
MS. PARFITT: Objection. Asked and answered.
THE WITNESS: Correct.
BY MR. LISAK:
Q And there is no table or information in the report where I could see for all the studies you reviewed and relied upon, at least the ones that are cited in the body of the report, which -- how much weight they were given as compared to other studies, right?

MS. PARFITT: Objection. Misstates the record.

THE WITNESS: Correct.

BY MR. LISAK:

Q You -- at least in your report, you didn't test whether your conclusions would change if different studies were weighted differently, right?

MS. PARFITT: Objection. Misstates.

THE WITNESS: Correct.

BY MR. LISAK:

Q Most of the studies you relied upon included the author's own limitations and cautions, which is pretty typical, right?

A Correct.

Q But your report doesn't explain how your conclusions account for the limitations and cautions in each of those papers you cited in a systemic way, right?

MS. PARFITT: Objection. Misstates the evidence. Misstates the report.

THE WITNESS: Correct.

MS. PARFITT: Misstates his testimony.

BY MR. LISAK:

Q Another expert reviewing the same literature that you reviewed could reasonably reach

a different conclusion using a different weighting system in this methodological approach?

MS. PARFITT: Objection.

THE WITNESS: Perhaps.

BY MR. LISAK:

Q It would be reasonable, right?

MS. PARFITT: Objection. Form.

THE WITNESS: I would be surprised, but perhaps I'd offer that.

BY MR. LISAK:

Q Yeah.

When you -- and this weight-of-the-evidence approach, did you consider the sample size in your assessment of the studies that you looked at in determining how much weight to give one versus another?

A I considered the sample size. I'm not sure I weighted it.

Q I well may have missed it because your report is long, but did you discuss sample-size issues as -- in your report as either supportive or non-supportive of your opinions?

A No. I think it speaks for itself, the papers.

Q The papers?

A Yeah.
Q So a sample size is important to you in your assessment of a study, correct?
A Generally, yes.
Q And the larger the sample size, generally, the more confident you might feel in the data, right?
A Yes.
MS. PARFITT: Objection to form.
BY MR. LISAK:
Q So, if, for example, you're looking at a study with a sample size of less than 30 versus a sample size of 10,000, you might have more confidence in the study with the sample size of 10,000 than --
A Depending on the results.
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q The results?
A If it's overwhelming and the question is difficult, that you won't get that many subjects, be they animals or humans in the study, then you must put forward the evidence on what you have.
Q You have more statistical variability in a smaller sample size, don't you?

A Of course. But if you see a strong association, then you can draw your conclusions.

Q So a strong association in a small sample size is enough for you?

A It depends on your manipulations. I'll give you an example.

Q Okay.

A I did a study where it took about two and a half years to complete. And in the end, I only had eight subjects. However, these eight subjects went through incredible manipulations, each of which served as their own control.

So this -- to complete the study would take a year and a half. These individuals had to go through 24-hour insulin infusions. It was an aspect of polycystic ovary syndrome.

And we found statistical differences that were important and published a paper, presented it. And it was accepted the first time around. And my colleagues came up and asked me how was I able to ever accomplish such a study. Not many subjects. And obviously, I'm very careful about human protection. And nevertheless, we had very informative data that came out of that.

Q When you used the term "manipulations,"

what exactly are you meaning?
A Oh. When you draw blood.
Q I see.
A For instance, I would maybe draw blood every 10 minutes for 24 hours on a woman.
Q But even then, a well-conducted study that you feel confident in with the sample size of eight, for you to be -- for medical -- excuse me.
For the scientific community to be certain of those findings, you would want that reproduced at least in another study, right?
MS. PARFITT: Objection. Misstates his testimony.
THE WITNESS: Absolutely. I have always stated that.
BY MR. LISAK:
Q Reproducibility is an important fact that the scientific community wants to see to know whether or not a reported result or conclusion is real or not?
MS. PARFITT: Objection to form.
THE WITNESS: Yes. I would too. And I stated as such during my presentations.
BY MR. LISAK:
Q You present- --

A I made presentations on my research.
Q I see.
A And I've indicated I would prefer that someone else repeat the study, though I fear that it will never be repeated again because of the manipulations that the humans had to go through.
Q I see.
On page 3 -- also on page 3 of your report, sort of towards -- almost the end of that first paragraph under "Methodology," you say: "I began to explore the vast literature of how these EDCs entered the dermal layer of the human scalp," right?
A I think I'm with you.
MS. PARFITT: It's on page 3, first paragraph.
THE WITNESS: Oh, yeah. Here we are. I got it. I got it.
BY MR. LISAK:
Q Sorry. Let me withdraw that, because I have another question first. I'll get to that next one.
A Okay.
Q It's the second sentence of that same paragraph under "Methodology." You say:

"I began my research by performing an extensive literature review to identify the most prevalent endocrine-disrupting chemicals, EDCs, contained in chemical hair relaxers."

Do you see that?

A Yes.

Q And as part of that research, I take it that those chemicals and the chemicals that you focused on in your report were parabens, phthalates, and phenols?

A Yes.

Q So your report is not, if I understand it, offering any opinions or analyses of any other specific chemicals and their potential relationship with cancer, other than parabens, phthalates, and phenols?

MS. PARFITT: Objection. Misstates the evidence in his report.

BY MR. LISAK:

Q Is that fair?

A Yes. I realized that I could not study everything or we wouldn't be here today, because I would not be ready.

Q Okay. But you understand this is --

MS. PARFITT: Let him finish.

BY MR. LISAK:

Q Oh, are you still talking, sir?

A So what I chose to do was to focus on what I considered to be major components of hair relaxers.

Now, that may be true, may not be true. But from my perception, this is what I chose to do.

Q Right. You understood --

MS. PARFITT: Wait. Are you finished?

MR. LISAK: I'm sorry.

MS. PARFITT: He pauses, so, Counsel, I appreciate it.

MR. LISAK: Yeah.

THE WITNESS: When I approach a subject of this nature, I need to cover the waterfront. And I know dermal absorption is not my expertise; however, in trying to get from A to B to C to D, et cetera, I need to invest in the totality of the subject matter.

And, therefore, kind of starting from zero, had to proceed and go through this. And I realized that I needed to focus, and I chose these because these are prevalent in hair relaxers. And that's how I came to my decision to focus on this.

And in doing so, I realized how complex this was, to the extent that I spent a lot of time trying to understand dermatology physiology, which I've only scratched the surface probably.

BY MR. LISAK:

Q Okay. Are you done?

A Yes.

Q Sorry. I didn't mean to interrupt you before. I'm still figuring out your cadence.

A Sorry.

Q That's all right. No worries.

But you understand this is our opportunity to ask you your opinions --

A Oh, of course.

Q -- and the bases of the opinions you're going to offer at trial, right?

A Of course.

Q And in looking at your report -- and I understand your prior answer -- the specific chemicals that you researched, that you evaluated, and that you offered opinions upon fall into the category of the parabens, the phthalates, and phenols, correct?

A Yes.

Q There is no other chemicals, unless I

missed it, that you analyze and provide opinions about in terms of potential association or cause between those chemicals and uterine and ovarian cancer, other than parabens, phenols, phthalates; fair?

MS. PARFITT: Objection. Form.

THE WITNESS: It's a long question.

BY MR. LISAK:

Q I can break it down.

A Could you break it down?

Q Sure.

In looking at your report, the only analyses and opinions that I saw that you were offering -- and correct me if I'm wrong -- were whether or not, in your opinion, ovarian cancer and uterine cancer are caused or contributed to by exposure to parabens, phthalates, and phenols, right?

MS. PARFITT: Objection. Form. Misstates his report --

THE WITNESS: Correct.

MS. PARFITT: -- and the information contained in his report.

BY MR. LISAK:

Q I mean, I didn't see any other chemicals

analyzed. Right?

MS. PARFITT: Objection.

THE WITNESS: Correct.

BY MR. LISAK:

Q So I can't ask you about your opinion on those chemicals, can I?

A You can.

Q But I don't even know which ones you looked at, other than parabens, phenols, and phthalates, right?

A Not really. I couldn't give you a lot of information.

Q Okay. And in doing this research and reading, did you look at any specific formulas for any particular hair relaxer products or hair relaxer kits?

In other words, did you look at a specific bottle or container of any particular hair relaxer product or hair relaxer-related product and look at -- specifically look at the ingredient list, for example, the formula?

A I tried to do it on a couple of products. And I did see parabens.

Well, actually, it's interesting. When you look at what we call a package insert or

information provided, sometimes I didn't see those substances that I was working on listed, but I knew they had to be in there.

Q Well, how did you know they had to be in there?

A Well, I assumed they had to be in there. Let's put it that way.

Q That's different.

A But I didn't specifically see those. And when I looked at the ingredients, I said "How did they get these hair relaxers to behave as they're described in the literature if those substances aren't there?"

So I went and started looking up some of these chemicals, and they didn't have the description of what they do.

Q Did you list anywhere in your report or your reference list --

A No. That was just -- I just did it on the side. I did not put that in there.

Q So I have no way of knowing --

A You cannot confirm that.

Q And are you able to say, as you sit here today, which products you looked at and what dates they would have been in --

A No. I just went online and looked at it and tried to find the product or went to the store. And then I couldn't read the -- it was so finely printed, I couldn't read it either.

Q You went to stores and looked at hair relaxer products?

A I go to CVS to pick up my own drugs, so I happened to stop by and see if I could find it.

Q But if I understood what you just said, some of the pro -- as you called them -- did you call them "package inserts" or "product inserts"?

A Just on the tube.

Q On the tube.

A You try and read it, and you can't -- I couldn't read it.

Q But for some of them that you read, you actually didn't see some of the products that you analyzed in your report, right?

A Right.

Q So you just sort of assumed that phthalates, parabens, and phenols were present -- are present, or were present, in all chemical hair relaxer products and kits --

MS. PARFITT: Objection.

/ / / /

BY MR. LISAK:

Q -- for purposes of your analysis, fair?

MS. PARFITT: Objection. Misstates his testimony.

THE WITNESS: I would assume that most of them are, but I can't say for certain.

BY MR. LISAK:

Q Okay. Are you aware that the formulas' ingredients in hair relaxers changed over time?

A I can't specifically cite a reference I read, but I would assume so.

Q And that would be true -- in other words, one company's product might be different than another company's, but also, a particular company's product may have been formulated -- been reformulated over the years, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: It may have been. You probably know more about that than I.

BY MR. LISAK:

Q But that sort of analysis wasn't part of your --

A Correct.

Q -- methodology and opinions, right?

A Correct.

Q I'm just trying to get an understanding of your knowledge base. Okay?
A It's limited.
MR. LISAK: Okay. Would you all mind if I took a break? See? You won.
MR. SHIPMAN: Sure.
MR. LISAK: Is that okay? How long have we been going?
THE VIDEOGRAPHER: A little over an hour and a half.
MR. LISAK: Okay. It's a good time for a break. It doesn't need to be long.
MS. PARFITT: Very good. Sure.
MR. SHIPMAN: 10 minutes. Is that good for you?
MS. PARFITT: Okay. Thank you.
THE VIDEOGRAPHER: The time is 10:55 a.m., and we are off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 11:19 a.m., and we are back on the record.
BY MR. LISAK:
Q Doctor, how you doing?
A I'm managing.
Q Good. Good to continue?

A Yes.
Q I think I know the answer to this, but have you ever applied any hair relaxers to your own hair?
A No, I have not.
Q Have you ever seen it done to someone else?
A Not hair relaxers.
Q What have you -- something else in mind?
A I've watched my mother dye her hair. What a mess.
Q Okay. Yeah. But you haven't -- if I understand what you're saying, you haven't seen, either in real life or by a video, how someone would apply chemical hair relaxer to their hair?
A No, I have not.
Q Are you familiar with the fact that, prior to applying the hair relaxer to a person's hair, the instructions for use generally instruct someone to apply a sort of protective gel to their scalp before applying the actual chemical relaxer?
Are you familiar with that?
MS. PARFITT: Objection. Dr. Chang said he's not seen anyone applying --
/ / / /

BY MR. LISAK:
Q Well, you may have read about it.
You said you did some extensive reading on chemical hair relaxers in your report, so I'm just trying to understand --
A I'm not --
MS. PARFITT: Objection.
THE WITNESS: I'm not sure -- you just want me to answer --
BY MR. LISAK:
Q Well, you've not seen it in real life. You haven't seen a video of it. I'm asking -- maybe ask it this way:
In all of the reading that you've done for your report in this case, did you read any -- whether they're publications or websites or instructions for use for chemical hair relaxers to see how these actually are applied in real life?
A I have not read anything to indicate how you do this technique.
Q So you don't know whether or not a protective gel is applied to the scalp before applying the actual chemical hair relaxer, fair?
MS. PARFITT: Objection. Asked and answered.

THE WITNESS: You mean in the course of using a hair relaxer --

BY MR. LISAK:

Q Yes.

A -- whether they have used a protective gel or not?

Q Right.

A I'm totally ignorant of the process, other than it's applied to the scalp.

Q Okay. So you wouldn't also know whether or not the chemical hair relaxer is rinsed out and approximately how much longer -- how long it sits on the hair before it's rinsed out? That's not in your knowledge base, right?

MS. PARFITT: Again, objection, Counsel.

I believe the witness has indicated that he's not read about that information.

THE WITNESS: Yeah. I don't know.

BY MR. LISAK:

Q And last question in this area.

You also then wouldn't be familiar with whether or not any heat is applied as part of the chemical hair relaxant process, right?

MS. PARFITT: And again, I assume your questions are beyond his general knowledge.

MR. LISAK: Well, I don't know his general -- that's what I'm asking. I'm trying to figure out his general knowledge.

MS. PARFITT: Well, the question, unfortunately, I think it's quite vague.

BY MR. LISAK:

Q Do you understand my question?

A Is this related to other techniques?

Q Well, I guess what I'm asking is, you give some opinions about dermal absorption, and I'm just about to jump into that. And so this is foundational, at least in my opinion, to maybe understand the basis for your opinions about dermal absorption.

And so my last question in that regard is whether you know or not -- it's fine if you don't -- whether or not any heat is applied as part of the chemical hair relaxant process.

A Of that which I have read?

Q Of that which you've read. Because I know you've not seen it done.

A No.

MS. PARFITT: Objection.

THE WITNESS: For that which I've read. When I think of what I have read in terms of

parabens, phthalates, and bisphenols that's contained in the entirety of these preparations, that I'm not familiar with the process of -- or application.

BY MR. LISAK:

Q How it's actually applied?

A Right.

Q Right. And are you familiar with -- when you say "chemical hair relaxers" in your report -- and maybe you're familiar with this or not, but there's the actual chemical hair relaxer, but there are also often -- as part of a kit, there are shampoos and conditioners and other products that are sort of sold as part of that hair relaxer kit.

Are you familiar with what is in these kits and what are the other products and how they're used in any way?

MS. PARFITT: Objection. Compound.

THE WITNESS: Well, parabens, phthalates, and bisphenols are a portion of a large number of products that I assume in these hair relaxers.

And as a result, we're talking about all these compounds collectively. The parabens, phthalates, and bisphenols are just an example to gain knowledge. But in fact, the product itself,

there's an enormous number of products, apparently -- when I saw the listings of what's in it, there's a lot of different things in there. So it's the totality of all these ingredients together.

BY MR. LISAK:

Q Right.

A I can't state which -- what does what for each one of these. But there have been lists of 20, 30 compounds sometimes that I've read.

Q Your report and -- as you described earlier, is focused on the phenols --

A As an example.

Q -- phthalates, and parabens, right?

MS. PARFITT: Objection. Misstates his testimony and the information in his report.

THE WITNESS: When she says "objection" --

BY MR. LISAK:

Q Well, let me tell you this.

A -- what's the process here?

Q The process is, unless she tells you not to answer, you answer.

A Okay.

Q Let me -- now that you've raised it, you know, on January 29th of 2026, Judge Jan said the following thing:

"Unless expressly asked, counsel shall not object by articulating all the many reasons why a question is perceived to be defective. Making one specific objection, whether it's 'leading,' 'foundation,' what have you, is acceptable. A single targeted objection gives the questioning attorney an opportunity to cure. Stringing together lots of specific objections is not necessary. And if you have more than one objection, which you can have, then absolutely 'Objection as to form,' in my view, properly preserves."

Now, I haven't -- I've been letting you go a little bit because, you know, we've been -- Michelle, you and I have been doing this a long time, right? But I think we're getting to a point where some of the objections are bordering on coaching, to me, and are speaking objections.

MS. PARFITT: All right. Well, Counsel, that's certainly not the intention, to make them coaching. Again, many of your questions, again, respectfully, are so compound.

MR. LISAK: Then say "form."

MS. PARFITT: I have been saying "form," but it doesn't seem to be -- to stop the process of the compound nature of your question.

So we'll both try and work together. Maybe if you can resist the compound questions, I'll have to resist the nature of the objections. But I'm well aware of the Court's order. I'm certainly trying to stay within the confines of that judge's order, but also have a record that is clear.

MR. LISAK: Sure.

MS. PARFITT: That is also a goal for me as well.

MR. LISAK: "Compound" is fine. If you want to say "form." And I apologize if that's the case. But "Misstates his prior testimony," "Misstates his report," "speculation," "asked and answered," those things are not proper objections.

MS. PARFITT: I'm very well aware of which ones are and aren't, and I'm going to defend this deposition in the best way that I can, Counsel. If you have a problem with it or you feel at some point in time you need to go to the judge -- but I've read the order as well. So let's see if we can make it through and --

MR. LISAK: Yes. Agreed.

MS. PARFITT: -- with a clear record.
MR. LISAK: Is that fine for you?
MS. PARFITT: Sure.
BY MR. LISAK:
Q But to answer your question, Dr. Chang, unless Plaintiffs' counsel instructs you to not answer -- and I may disagree with that, and we'll --
MS. PARFITT: We'll talk about it.
BY MR. LISAK:
Q -- we'll talk about it.
But unless she says to not answer, what's important is, like, when I ask a question, just pause for a second. Give her an opportunity to object.
A Okay.
Q And then it gives me an opportunity, if I think there is something to be corrected in the question, to ask it differently.
MS. PARFITT: And, Counsel, that is -- and for the court reporter, Dr. Chang, when a question is asked, before you answer, do give me an opportunity to object or not object. Because it's my only opportunity to do that. And we don't want to speak over one another.
So the first person that gets to respond

is me after his question, if I want to object or not, and then you get to respond --

THE WITNESS: Okay.

MS. PARFITT: -- to the question after that.

THE WITNESS: Okay.

MS. PARFITT: Okay.

All right. Let's keep going.

MR. LISAK: Let's go.

BY MR. LISAK:

Q All right. Let's take a look at page 5 of your report, which is in the executive summary, I believe.

In the first paragraph, about halfway through -- let me know when you're there, sir.

A Yep.

Q You say:

"Following dermal exposure, these chemical hair relaxers are readily absorbed through the skin and enter the blood to be distributed from the blood throughout bodily tissues."

And then you cite Brito 2024 and Ramadon 2022, correct?

A Yes.

Q And you also cite these two papers on page 11 of your report, where you say --
MS. PARFITT: Why don't you turn to it.
BY MR. LISAK:
Q Let me know when you're there.
A Yep.
Q You say: "Many, if not most, chemical hair relaxers gain entrance to the human body by skin application and dermal absorption."
A Yes.
Q Same papers, right?
A Yeah.
Q Okay. Let's take a look at the Brito paper, which is Tab 4, which I guess will be Exhibit 4.
(Exhibit 4 marked for identification.)
BY MR. LISAK:
Q All right. Is this the Brito paper that you cited in your report?
A Yes.
Q And it's entitled "Skin structure physiology and pathology and topical and transdermal drug delivery." Lead author is Brito. It's in "Pharmaceuticals," which is the journal, 2024, 16, 1403, correct?

A Correct.
Q Now, the focus on this study is to understand skin absorption for the purpose of improving the efficacy of transdermal drugs, right?
A Yes.
Q It has nothing to do with hair relaxers, right?
MS. PARFITT: Objection.
BY MR. LISAK:
Q Does this study -- does this paper -- does this study study hair relaxers or talk about hair relaxers in any way?
MS. PARFITT: Objection.
THE WITNESS: It describes more or less the physiology and application of substances but doesn't -- I'd have to go through this and look at it again, but --
BY MR. LISAK:
Q As you sit here today, do you agree that you don't know whether or not it --
A It's a generalized physiologic statement.
Q It's not about hair relaxers specifically?
MS. PARFITT: Objection.
THE WITNESS: I'd have to go through it again. I don't -- I don't know.

BY MR. LISAK:

Q You don't know?

A I make the assumption that it's applicable -- it's a general physiology of the dermis.

Q Okay. Likewise, it doesn't report specifically about parabens, phthalates, or phenols, or any hair products, right?

A It does not specifically, as I recall.

Q It's about transdermal drugs?

A Yeah.

Q Okay. If you look in the abstract, in the middle of the paragraph there, it says:

"However, the structure and physiological function of the skin can vary according to different factors, such as the area of the body and between individuals. These variations, along with external environmental exposures, aging and pathological conditions, introduce complexities that must be carefully considered when designing effective delivery" --

MS. PARFITT: Effective. Excuse me. Effective.

BY MR. LISAK:

Q Effective. Sorry. Thank you.

-- "effective delivery systems," right?

A Right.

Q So how something is potentially absorbed into the skin depends on many factors, right?

A True.

Q And when you cited this paper at page 5 of your report, this sentence we read earlier, you said:

"Following dermal exposure, these chemical hair relaxers are readily absorbed through the skin and enter the blood to be distributed from the blood throughout the bodily tissues," right?

And you cited Brito, right?

MS. PARFITT: Objection. There's another citation.

BY MR. LISAK:

Q Well, Brito and Ramadon, right?

A Right. That's what I cited.

Q Nowhere in Brito does it actually say that chemicals or transdermal drugs are readily absorbed, right?

MS. PARFITT: Objection. Form.

THE WITNESS: Well, the inclusion of the Brito reference is to allow for an understanding of the physiology as part of that explanation, not directly hair relaxers. That comes with the second reference.

BY MR. LISAK:

Q Right.

A But it provides a basis for the physiologic process.

Q I understand your answer, and I appreciate that. But my question is: Nowhere in the Brito paper does it say that chemicals or transdermal drugs --

A Correct.

Q -- are readily absorbed, right?

MS. PARFITT: Objection. Asked and answered.

THE WITNESS: Again, in context of the statement of the sentence there, this is a reference that allows for the subsequent reference to be understood in its entirety.

BY MR. LISAK:

Q But, I'm sorry, I'm not sure if you've answered my question about the Brito paper. I understand you're citing them together for that

sentence in your report. I'm asking you specifically about the Brito paper, and we're going to get to the Ramadon paper next.

Nowhere in the Brito paper does it say that chemicals or even transdermal drugs, which is the focus of this paper, are readily absorbed, right?

MS. PARFITT: Objection. Asked and answered.

MR. LISAK: He hasn't answered it.

MS. PARFITT: He has answered it.

Move on to another question.

BY MR. LISAK:

Q Is that correct, sir?

MS. PARFITT: He's answered -- objection. He's answered the question. Move on.

THE WITNESS: As I've stated before, this is presented to allow the understanding of the Ramadon paper.

BY MR. LISAK:

Q The focus of the Brito paper is to determine new approaches to make it easier for transdermal drugs to be absorbed.

A But the information contained in the Brito paper allows one to understand the mechanism by

which substances are absorbed through the skin.
Q Let's take a look at -- on page 20 of the Brito paper, there's a table. Table 2, I guess.
MS. PARFITT: Go to page 20.
MR. LISAK: Yes.
BY MR. LISAK:
Q And the title of the table is "Summary of the main distinctions and considerations between human and animal skin commonly used in research."
Do you see that?
A Yes.
Q And it talks about humans, mouse, rat, porcine, and zebra fish, right?
A Yes.
Q And it -- if you look at the columns -- sorry, the rows -- it includes stratum corneum, epidermis, and dermis, as well as hair follicles and other factors, right?
A Right.
Q And it notes that, for mice or a mouse, for stratum corneum, epidermis and dermis, mouse skin is, as they call it, thin, right?
A Correct.
Q Now, if you go down the table where it says "Main disadvantages" under the "Mouse" column,

it says "thin skin and high permeability," correct?
A Correct.
Q It says "significant structural differences in the stratum corneum and hair follicle density," right?
A Yes.
Q And it also says "less accurate for predicting human drug absorption," right?
MS. PARFITT: And again, you're asking whether that's what it says?
MR. LISAK: Right. Right now.
BY MR. LISAK:
Q Correct?
A That's what it says.
Q And so, according to the Brito paper that you cited, the authors note that these are disadvantages of mouse skin as compared to human skin in determining dermal absorption, right?
A Yes.
(Exhibit 5 marked for identification.)
BY MR. LISAK:
Q All right. Let's take a look at what is Tab 5, which is the Ramadon article. I will identify it for the record as it's being prepared. "Enhancement strategies for transdermal drug

delivery systems: Current trends and applications" -- Ramadon is the lead author -- "in drug delivery and translational research," 2022, 12:758-791.

And again, you've cited this paper. We've talked about it. Page 5 and page 11 of your report.

If you look at abstract, it says:

"The authors will review current trends and future applications of transdermal technologies with specific focus on providing a comprehensive understanding of transdermal drug delivery systems and enhancement strategies."

Right?

MS. PARFITT: Do you see where he is, Doctor?

THE WITNESS: No.

BY MR. LISAK:

Q I'm sorry. It's the third sentence of the abstract.

MS. PARFITT: Thank you.

THE WITNESS: Okay.

BY MR. LISAK:

Q And like the Brito paper, this study is not focused on chemical hair relaxers, right?

MS. PARFITT: Objection.
THE WITNESS: This study is on generally how transdermal drug delivery systems work.
BY MR. LISAK:
Q Right. Not chemical hair relaxers and how they work, right?
MS. PARFITT: Objection.
THE WITNESS: The paper itself is about drug delivery systems.
BY MR. LISAK:
Q Okay.
A There is no mention.
Q No mention of chemical hair relaxers?
A That appears to be the case.
Q Also no mention of phthalates, phenols, or parabens, right?
MS. PARFITT: Objection.
THE WITNESS: Correct.
BY MR. LISAK:
Q On page 762 of this article -- let me wait for you to get there. Let me know when you're there.
A Yes.
Q On the left-hand column on page 762, there's a paragraph that begins "The second

pathway."
Do you see that?
A Uh-huh.
Q It says:
"The second pathway of drug absorption from the skin is transappendageal" -- I'm not sure if I'm saying that correct -- "which is defined as drug delivery via hair follicles or sweat glands in the skin."
Right?
A Yes.
Q It goes on to say:
"This route is necessary for the transport of polar or ionisable compounds and is useful for transport of large macromolecules, which have problems passing through the epidermal cells due to the molecular size and different partition properties," right?
A Yes.
MS. PARFITT: "Right," meaning is that what the article states?
THE WITNESS: That's what the sentence states.

BY MR. LISAK:

Q Now, it goes on to conclude -- I want to ask you first is this what it says, and then I'm going to have some questions about this.

"Nevertheless, the usage of this pathway is somewhat limited due to the smaller absorption area, about 0.1 percent of total skin area, compared to that available for the transepidermal route."

Did I read that correctly?

A That's what is written, yes.

Q Now, do you believe that the chemicals in hair relaxers travel down the hair follicle through the skin and into the bloodstream? Right?

A That's one path that may be taken.

Q Do you know whether parabens, phthalates, or phenols would be considered macromolecules?

MS. PARFITT: Objection.

THE WITNESS: It depends on which of the compounds you're talking about. Because some are larger, some are smaller, according to the molecular weight.

BY MR. LISAK:

Q And just to make sure I understand what you're saying, when we talk about -- maybe we should

have done this earlier. When we talk about phthalates and parabens and phenols, each one of those are sort of a family of compounds, right?

MS. PARFITT: Objection.

THE WITNESS: Well, they are linked by their structural formulas, yes.

BY MR. LISAK:

Q There are more than one type -- and we're going to get to this. But there is more than one type of paraben, right?

A Yes.

Q More than one type of phthalate?

A Right.

Q More than one type of phenol?

A Right.

Q Okay. Are you able to tell me which, if any, of the different types of parabens, phenols, or phthalates are -- would be considered macromolecules?

MS. PARFITT: Objection.

THE WITNESS: I've not read where they're described in that regard.

BY MR. LISAK:

Q Okay. All right. We can put this -- also, let me ask this.

Is there anywhere in the Ramadon paper where you note the authors indicated that chemicals are readily absorbed -- make sure I get it right -- readily absorbed into the blood system?

MS. PARFITT: Objection.

THE WITNESS: These papers were provided in an effort to explain how hair relaxers may be absorbed into the human. They are reference papers, and it's written with that intent.

BY MR. LISAK:

Q Even though neither of the papers are about chemical hair relaxers, phenols, parabens, or phthalates, right?

MS. PARFITT: Objection. Asked and answered.

THE WITNESS: It's not the intent of this section to describe how those particular chemicals are absorbed. This is an explanation of how any chemical may be absorbed.

BY MR. LISAK:

Q Let's talk a bit about PCOS. I'm sorry. I know you -- you made a face. I thought you'd like me to talk about that.

If you don't mind, I want to go through a couple definitions, make sure we're on the same

page, and you correct me if I'm having -- if I'm wrong about any of this. All right?
A Sure.
Q So anovulation, A-N-O-V-U-L-A-T-I-O-N, is a failure of the ovaries to release an egg during a menstrual cycle; is that right?
A Correct.
Q And then androgens are a group of sex hormones, primarily testosterone and DHT, that drive male reproductive development but are also produced in the ovaries and adrenal glands of women, correct?
A Correct.
Q Corpus luteum, a temporary endocrine structure within the ovary that forms from a ruptured follicle after ovulation, essential for producing progesterone to prepare the endometrium for implantation. Once the progestin is no longer needed, the corpus luteum dissolves away until the next menstrual cycle.
A Correct.
Q Follicle stimulating hormone or FSH is a reproductive hormone released by the pituitary gland to simulate ovaries to recruit, support, and grow follicles which contain eggs during the menstrual cycle. It works alongside other hormones, such as

estrogen and LH, to regulate the menstrual cycle.
A Correct.
Q Luteinizing hormone or LH is a reproductive hormone released by the pituitary gland that helps grow ovarian follicles in the first few days of a menstrual cycle. A surge in LH following this follicular growth triggers ovulation in women and also causes the corpus luteum to produce more progesterone.
A Correct.
Q Hyperandrogenism, a condition defined by elevated androgen levels, such as testosterone in women, resulting in symptoms like hirsutism, acne, alopecia, and irregular menstrual cycles, correct?
A Yes.
Q Okay. I feel like I'm taking my boards or something.
All right. So you're offering, if I understand your report, a biological mechanism or plausibility opinion that is linking the process of PCOS to what hair relaxer does for uterine cancer.
Is that -- am I getting that correct?
MS. PARFITT: Objection.
THE WITNESS: Incorrect.
/ / / /

BY MR. LISAK:
Q Okay. Let me ask it a different way.
You're offering an opinion of, in your opinion, the biological mechanism that link a hypothesis of exposure to chemical hair relaxers and uterine cancer, and using PCOS as an analogy for that; is that correct?
MS. PARFITT: Objection to the form of the question.
THE WITNESS: It's incorrect.
BY MR. LISAK:
Q Let me see if I understand your report, and let me break it down.
It's your opinion, I think -- and tell me if I'm wrong -- that PCOS involves chronic -- as you call it, chronic unopposed estrogen, right?
A Correct.
Q And that chronic unopposed estrogen increases the risk of endometrial hyperplasia and Type 1 endometrial cancer, right?
A Correct.
Q And that chemical hair relaxers contain some potentially endocrine-active chemicals?
A Correct.
Q And that those chemicals can possibly

activate estrogen receptors in the endometrium --
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q -- right?
MS. PARFITT: Objection. Form.
THE WITNESS: That chemicals can activate --
BY MR. LISAK:
Q Let me say it again.
That those chemicals in the chemical hair relaxers, the ones that you believe are endocrine-active, can possibly activate estrogen receptors in the endometrium.
A Correct.
MS. PARFITT: Objection.
Dr. Chang, again, give me a chance to object before you answer.
THE WITNESS: Okay. I'm sorry.
BY MR. LISAK:
Q And then, therefore, in your opinion, relaxers increase uterine or endometrial cancer risk.
MS. PARFITT: Objection. You said relaxers increase or chemical relaxers?
MR. LISAK: The chemical relaxers --

MS. PARFITT: I didn't hear that part. Thank you.

MR. LISAK: -- increase uterine or endometrial cancer risk.

THE WITNESS: I think we need to put a -- back up a little bit and put a perspective on this.

BY MR. LISAK:

Q Okay.

A The description of polycystic ovary syndrome and its attendant estrogen secretion is provided to show an example of how estrogen affects the endometrium. All right? It's not a referent to hair relaxers. It's just estrogen.

Q Okay.

A Okay? Let's separate the two. And so it's the effect that women who have polycystic ovary syndrome are at increased risk for endometrial cancer in this case. And it is presumed by most of us that it is the estrogen that drives the development of endometrial cancer in these women.

Q I didn't see in your report -- correct me if I'm wrong, but you're not offering an opinion that chemical hair relaxers cause or contribute to PCOS, correct?

MS. PARFITT: Objection.

THE WITNESS: I don't believe I address that issue in the report.

BY MR. LISAK:

Q That's what I thought. I'm just trying to make sure I didn't miss it.

A No. You're correct.

Q So, when you come to trial, you're not intending to say chemical hair relaxers cause or contribute to PCOS --

A Right.

Q -- right?

A Correct.

Q And just to break it down a little bit more, you're not offering an opinion in your report, or intending to at trial, that parabens, phthalates, or phenols cause or contribute to PCOS, correct?

A Correct.

Q So I'm just trying to understand -- because there's a lot in your report on PCOS.

A Of course.

Q And obviously, given what your testimony was just now, I'm just trying to understand exactly --

A Okay.

Q -- how the PCOS fits in.

And you've described it a little bit, but let me talk to you a little bit about that more.

Okay?

A Okay.

Q Would you describe it as essentially like an analogy, that the way that -- what causes PCOS, in your opinion, is the process or the mechanism by which you believe chemical hair relaxers are also causing endometrial cancer?

MS. PARFITT: Objection. Form.

THE WITNESS: They're two distinct features. They're two absolutely distinct features. And aside from the estrogen activity, that they're separate entities.

BY MR. LISAK:

Q Okay.

A Okay?

So, if you want to talk about polycystic ovary syndrome and its link to endometrial cancer, we can talk about that. But I would not say that polycystic ovary syndrome is a duplication or representation of hair relaxers in totality in relation to endometrial cancer.

Is that fair enough?

Q It is, yeah. And if I confuse that as we

keep going --

A It's okay. Understandable. Yeah. Okay.

Q And we've been talking about uterine or endometrial cancer.

When you talk about PCOS in your report, and as you've been doing today, is that also how you are presenting or analogizing to PCOS or ovarian cancer or just uterine and endometrial cancer?

A No. The effects of chronic estrogen production in women who have this disorder is linked to and can cause ovarian cancer.

Q It's your opinion that having PCOS can cause or increase the risk for ovarian cancer, not just endometrial cancer?

A Correct.

Q And the way that you are using PCOS as an example, I think you said, or a representation for the mechanism by which you think chemical hair relaxers may cause uterine cancer, is that the same mechanism -- mechanistic example for PCOS and ovarian cancer?

A I'm trying to link --

MS. PARFITT: Objection. Compound.

Go ahead.

THE WITNESS: I'm trying to link that

polycystic ovary syndrome and its production of estrogen, solely estrogen --

BY MR. LISAK:

Q Okay.

A -- really is the impetus for development of uterine cancer.

Q And what about ovarian cancer?

A Recent studies have demonstrated that it's associated with ovarian cancer as well.

Q That's a more recent --

A Yes.

Q -- information?

A Yes.

Q Is that the consensus, in your opinion, that --

A It's one of the few publications that address that convincingly.

Q And that's cited in your report, I believe.

A Yes.

Q We'll get there a little later.

So, if I understand PCOS, it's diagnosed based on clinical features, such as ovulatory dysfunction and the hyperandrogenism, amongst other things?

A In part, yes.
Q Also perhaps insulin resistance, right?
A Incorrect.
MS. PARFITT: Objection.
BY MR. LISAK:
Q Oh, sorry.
How does insulin resistance fit in with PCOS?
MS. PARFITT: Objection.
THE WITNESS: First of all, no one knows what causes PCOS. It affects anywhere between 5 and 25 percent of the world's population, depending on who you read and which definition you use.
Insulin resistance is an associated feature of polycystic ovary syndrome.
BY MR. LISAK:
Q Not necessarily a cause, but a feature of it; is that what you're saying?
MS. PARFITT: Objection.
BY MR. LISAK:
Q I'm just trying to understand.
A That's unknown.
Q And when you say no one knows what causes PCOS, you've devoted your whole career to PCOS, correct?

A Correct.
Q And I think I saw you gave a TED Talk in 2019 at Mt. Carmel High School, right?
A Yes, I did.
Q And it was very interesting. But one of the things you said in it was that no one knows what causes PCOS.
So that's still your opinion?
MS. PARFITT: Objection.
THE WITNESS: I think that that would be in concurrence with most of my colleagues internationally. Yeah.
BY MR. LISAK:
Q Let me ask some more questions about PCOS.
I mean, a core feature of it is chronic anovulation, right?
A Yes.
Q And so, when ovulation doesn't occur, progesterone isn't produced at luteal phase levels.
A Correct.
Q So, when you say "unopposed estrogen," that means estrogen exposure without progestin opposition?
A Correct.
Q It is the absence of progesterone that

makes that natural estrogen produced in a woman's body unopposed?

A Correct.

Q PCOS also -- it involves androgen excess, LH/FSH disregulation, insulin resistance, and other factors besides unopposed estrogen, right?

MS. PARFITT: Objection.

THE WITNESS: If you're saying that that's the composite image of polycystic ovary syndrome, that's part of it, yes.

MR. LISAK: Now, if we can mark Tab 6.

MS. PARFITT: Is Tab 6 also Exhibit 6?

MR. LISAK: Yes. It's still lined up. I can't promise it will stay lined up.

MS. PARFITT: Thank you.

(Exhibit 6 marked for identification.)

BY MR. LISAK:

Q This is the National Institutes of Health Evidence-Based Methodology Workshop on Polycystic Ovary Syndrome, December 3rd to 5th of 2012.

It says "Final Report."

And you were actually a speaker and served on the steering committee for this workshop, right?

A Yes.

Q And if you look at page 4 of this final

report, under "Causes, Predictors, and Long-Term Consequences of PCOS," the report says "The etiology of the syndrome is multifactorial and involves interactions between 'nature'" --

A Where are you?

Q Sorry. Page 4 under "Causes."

A "Causes." Okay. All right. I see it. Okay.

Q Let me start again.

The first sentence under "Causes" on page 4 says "The etiology of the syndrome is multifactorial and involves interactions between 'nature' and 'nurture,'" correct?

A That's what it says.

Q And do you agree that the cause or the etiology of PCOS not only is unknown, as you've just told us, but is multifactorial, right?

MS. PARFITT: Objection.

THE WITNESS: As stated, it appears to be multifactorial, but no one really knows. So to make that statement, if you asked me that statement, I would have to say in response it's unclear. There are certain assumptions that have been made here to make that statement.

/ / / /

BY MR. LISAK:
Q Did you get a chance to look at this report --
A When you talk about -- sorry.
MS. PARFITT: Let him finish, please.
THE WITNESS: When you talk about etiology, that is a very, very fundamental basis for disorder.
When they're talking about multifactorial here, they're talking about the complemental features of this to indicate -- to describe a disorder. And it should not be attributed to the etiology.
Now, maybe one of those multifactors could be etiologic, but in fact, they accompany a disorder. And in some instances, it's unclear how they fit. It's a very complex disorder.
BY MR. LISAK:
Q Yeah.
A And today, much of it remains unexplained to myself as well as my colleagues.
Q Understood. Yeah.
Let me ask you this: Did you get a chance to review this report before it was finalized as a member of the steering committee and a speaker?

A I might have briefly read it.
Q Okay. Let me ask you about this next sentence. It says: "Androgens appear to be clearly implicated in the pathogenesis based on animal models and clinical presentation."
Do you see where I've read that?
A Yes.
Q Do you agree with that statement?
A It is implicated in the pathogenesis of parts of the disorder. And I think what they're getting at is that androgen excess is responsible for the hair growth. Androgen excess is probably linked to the morphology of the polycystic nature of the ovary.
But more than that, it also probably contributes to some of the other features, metabolic in particular. But it's -- again, it's in the soup. And to -- one cannot specifically say that androgens are definitively involved in this process because we don't know.
I mean, it's -- you have to understand that, in the endocrinology, it's circuitry. So, if in fact you want to pick one portion out of the circuit and link it to the next subsequent portion, how do you know that that element is preceded by

another factor or trigger?

So, when you look at the disorder as it's been described by some, it's a circular phenomenon, because that's the nature of endocrinology. To designate one specific event in the circle is very difficult because we do not have the data.

Q Are you done? I don't want to interrupt you.

A No. What I'm saying is that this can be argued. And currently we do argue this. And what comes out in these summaries is kind of an attempt to generalize and provide some guidance. But within the internal, you know, investigations of this disorder, we continue to have differing opinions of a sort.

So this is well recognized amongst the experts who study the disorder. And we, over the past decade, have met every year -- every other year to discuss this in different portions of the world. The top investigators have collectively come together for a three-day conference to really discuss this topic.

So it is very, very complex. And to simplify it, I think, is for the public consumption.

Q Sure.

A But within the context of this disorder, it is incredibly complex.

Q Okay. Understood. You know, from reading about it before today, I agree with you on that.

A We're all confused. We all have our biases. And there is evidence to support the biases.

MS. PARFITT: Dr. Chang, there is no question pending.

THE WITNESS: Okay.

BY MR. LISAK:

Q Let me talk to you a little bit about the endocrine system, and we'll come back to it a little later too, because you mentioned a couple things about it.

You agree that the endocrine system is an extremely complicated system?

MS. PARFITT: Objection.

THE WITNESS: Yes.

BY MR. LISAK:

Q And it essentially works as sort of a -- you called it circuitry, but sort of a feedback loop process, right?

A I did say that.

Q And I understand your testimony that this

NIH panel that you've served as a steering committee member of and speaker was, you know, to some extent, intended for public consumption, but the report does not in any way describe PCOS as a condition caused by endocrine-disrupting chemicals, does it?

MS. PARFITT: Objection. Form.

THE WITNESS: I don't believe that was mentioned.

BY MR. LISAK:

Q It doesn't mention parabens, phenols, or phthalates, does it?

MS. PARFITT: Objection. Form.

THE WITNESS: No.

BY MR. LISAK:

Q It doesn't identify any chemical exposure as a cause or contributor to PCOS, right?

MS. PARFITT: Objection.

THE WITNESS: It doesn't, but some have written that there are links to it.

BY MR. LISAK:

Q Do you ascribe to those opinions?

A I don't know.

Q Do you know if any of those some that you don't know whether or not you agree with address phenols, phthalates, or parabens as a cause or

contributor to PCOS?

MS. PARFITT: Objection.

THE WITNESS: They don't specifically mention. They just -- as far as I recall, they're just EDCs.

BY MR. LISAK:

Q EDCs -- I mean, there's thousands of them, right?

MS. PARFITT: Objection.

THE WITNESS: Yes. I would imagine.

BY MR. LISAK:

Q If you look at page 8 of this final report, letter (e).

MS. PARFITT: And the report, you're talking about the NIH report?

MR. LISAK: Sorry.

MS. PARFITT: Not to be confused with his report.

MR. LISAK: Yeah. Exhibit 6.

BY MR. LISAK:

Q Letter (e) says -- and this is -- to be complete, this is under "Panel Recommendations," which starts on page 6. And the bottom of page 7, No. 5 says "We recommend several important research and clinical priorities," right?

And then if you go to page 8, letter (e) says:

"Conduct suitably powered studies to determine if the syndrome is associated with endometrial, breast, and ovarian cancers, and, if so, determine optimal prevention, detection, and treatment."

Correct?

A Yes. That's what it states.

Q So, at least at the time of the final report here in December of 2012, it was unknown whether PCOS is associated with both endometrial, breast, and ovarian cancers, right?

MS. PARFITT: Objection. This is an executive summary. It is not a final report.

MR. LISAK: The document is called "Final Report" at the top of page 1.

MS. PARFITT: At the top of page 1, it also says "Executive Summary."

BY MR. LISAK:

Q Do you agree?

A The question is?

Q The question is: At the time of the issuance of the final report of the executive summary of the National Institutes of Health

Evidence-Based Methodology Workshop on Polycystic Ovary Syndrome, December 3 to 5, 2012, it was the panel's recommendation and statement that studies -- suitably powered studies need to be conducted in order to determine if PCOS is associated with endometrial, breast, and ovarian cancers, right?

MS. PARFITT: Objection. Form.

THE WITNESS: That's what it states.

BY MR. LISAK:

Q Let's take a look at page 4 of your actual report, which I think is Exhibit 2. Let me know when you've got that.

A Yep.

Q If you look towards the bottom of the second-to-last full paragraph.

A Uh-huh.

Q You say:

"The failure to ovulate or anovulation is associated with continuous production of and exposure to modest levels of estrogen without progesterone."

A Correct.

Q "Persistence of this situation increases the risk of uterine and ovarian cancer in women with PCOS."

A Correct.
Q Right?
The clinical feature that you're referring to there is not that there are elevated levels of estrogen, but there are -- is an exposure to modest levels of estrogen without progesterone, right?
MS. PARFITT: Objection. Form.
THE WITNESS: That's what it says here.
BY MR. LISAK:
Q When you say "modest levels of estrogen" -- and you're talking there about a woman's naturally producing estrogen, right?
MS. PARFITT: Objection.
THE WITNESS: Yes.
BY MR. LISAK:
Q And a woman's body produces more than one type of naturally occurring estrogen, correct?
A Correct.
Q Estradiol is the most significant one --
A Yes.
Q -- in terms of level?
A Well, in terms of bioactivity.
Q And when you talk about bioactivity, does that include binding affinity?
A Yes.

Q And when I say "binding affinity," I'm talking about estrogen receptor binding affinity, right?

A Yes.

Q The other natural estrogens also can bind to estrogen receptors, correct?

MS. PARFITT: Objection.

THE WITNESS: Yes, but weaker.

BY MR. LISAK:

Q Right.

And how effective or how powerful something binds to the estrogen receptor is important in whether or not that has any biological effects, fair?

MS. PARFITT: Objection.

THE WITNESS: It contributes, yes.

BY MR. LISAK:

Q So it's not just the level of estrogen. It's how well it binds to the estrogen receptor that matters, right?

A Correct.

Q You're not offering an opinion that chemical hair relaxers cause or contribute to anovulation, are you?

MS. PARFITT: Objection. Form.

THE WITNESS: I don't believe I stated that.
BY MR. LISAK:
Q And you're not offering an opinion that chemical hair relaxers cause or contribute to reduced levels of progesterone, are you?
MS. PARFITT: Objection. Form.
THE WITNESS: I don't believe I stated that either.
BY MR. LISAK:
Q Are you aware of any data reporting an increased incidence of PCOS as a result of exposure to chemical hair relaxers?
MS. PARFITT: Objection to form.
THE WITNESS: I'm not aware of any data regarding EDCs in polycystic ovary syndrome, period.
BY MR. LISAK:
Q Okay. Now, we talked a little bit about hierarchy of evidence earlier.
Do you agree that receptor -- the estrogen receptor activation in vitro studies does not automatically mean that there is estrogen receptor activation in human endometrium in vivo tissue --
MS. PARFITT: Objection. Form.
/ / / /

BY MR. LISAK:
Q -- correct?
A Can you restate that, please?
Q Sure. It sounded better in my mind, but . . .
Do you agree that simply because you see an estrogen receptor activation in an in vitro study in a mouse, let's say, it doesn't automatically mean you're going to see estrogen receptor activation in human endometrium tissue? Fair?
MS. PARFITT: Objection. Form.
THE WITNESS: Actually, these studies in rodents are very important. And if you find that there is activity, you presume that that activity exists -- you don't know. You presume that activity exists in humans.
BY MR. LISAK:
Q Right. It's a hypothesis that it exists, right?
MS. PARFITT: Objection. Misstates testimony.
THE WITNESS: Not a hypothesis necessarily.
BY MR. LISAK:
Q But you're assuming it, right?

MS. PARFITT: Objection.

THE WITNESS: Well, understand that our whole basis of understanding ovulation is based on the rodent because of the very close proximity of all the hormonal circulation.

I mean, if you look at the mouse and you look at the rat and the human, they're very comparable. And that's the assumption that's made by investigators.

BY MR. LISAK:

Q But to sort of confirm that assumption, you would need information on the chemical itself, in other words, the exact compound, right?

MS. PARFITT: Objection.

THE WITNESS: Now, what are you referring to now? This is a different question?

BY MR. LISAK:

Q Sorry. The question of -- I think you said that if you see ER activation in a mouse model, you assume that it also activates to some extent in human endometrial tissue, right?

A Correct. Now, let me qualify that. It depends on the dose that you're using.

Q That's what I'm trying to get to.

A All right. So, if you slam your

accelerator in your car, you're going to be going quite fast. But not everybody slams their accelerator, right? So that has to be something that has to be investigated.

Q And the dose is important?

MS. PARFITT: Objection.

THE WITNESS: If you're regarding the studies you're mentioning, the dose would be a factor.

BY MR. LISAK:

Q Yeah. The exposure route would also be a factor?

A It depends on what route you're taking and how it might impact that particular factor.

Q For example, dermal absorption versus subcutaneous injection might be a relevant consideration?

MS. PARFITT: Objection. Form.

THE WITNESS: Comparative.

BY MR. LISAK:

Q What do you mean by "comparative"?

A Not relative.

Q Oh. How about the absorption from a mouse's skin, which we've heard earlier is thinner than a human's, versus a human skin?

MS. PARFITT: Objection to the rhetorical comment.

BY MR. LISAK:

Q That would also be a factor to consider, right?

MS. PARFITT: Objection. Compound. Rhetorical. Please.

MR. LISAK: I don't know what "rhetorical" means in an objection, but -- I've never heard that one.

THE WITNESS: Could you repeat the question?

BY MR. LISAK:

Q We're talking about factors that may be relevant in your assessment, I think, of whether or not the assumption of ER activation in a mouse model is also activating the estrogen receptor in human endometrial tissue. Okay?

You've talked about dose -- we've talked about dose. We've talked about the chemical compound. We've talked about exposure route. Right?

A Yes.

Q And so I'm trying to determine what other factors you might consider in testing that

assumption. And I'm asking is whether and to what extent that chemical is absorbed in mouse skin versus human skin is a factor.

A Well, if you are posing that you find this absorptive process in the mouse or rat, we assume that that's going to be the same in the human. It needs no be tested.

Q Right. Because mouse skin isn't the same as human skin, right?

MS. PARFITT: Objection.

THE WITNESS: It isn't the same as human skin, but the physiology -- the basis for that physiology is felt to be uniform until proven otherwise. It's a model.

BY MR. LISAK:

Q Right.

What about the metabolism of a mouse versus a human? Is that an important factor to consider?

MS. PARFITT: Objection. Form.

THE WITNESS: I would think that it would be an important factor. I don't study mice. I don't study rats. I don't study rodents. And I think you need to address that with someone who does.

BY MR. LISAK:
Q Okay. So rodent models and rodent experiments are not your area of expertise?
A I didn't say that.
MS. PARFITT: Objection.
THE WITNESS: I recognize these studies, and I try to interpret them as best I can. And to some extent, they can be very informative. In other regards, they're probably not applicable.
BY MR. LISAK:
Q But to answer some of these questions I'm asking you, you think I should talk to someone else, right?
MS. PARFITT: Objection. Misstates testimony.
THE WITNESS: No, no, no. I think you ought to explain or try to explain to me what you're trying to show and allow me to then interpret that.
BY MR. LISAK:
Q Yeah. I'm just trying to ask you the questions about what factors you might consider in testing the assumption that ER activation in a mouse is seen in human endometrial tissue.
MS. PARFITT: Objection. Form.
THE WITNESS: Again, you know, the

progression of research is from animal into human, in vitro, in vitro, in vivo, in vivo. So we use these as guides to take us to the next level.

BY MR. LISAK:

Q Do you know what level of EDCs are required to cause ER activation in human endometrial tissue?

A I believe there have been studies. I don't know if I'm recalling them now. But they have been able to stimulate growth of endometrial tissue.

Q And so my -- is that -- my question was actually about ER -- estrogen receptor activation as opposed to tissue growth.

Is that the same thing to you?

A State that question again. I think I can answer it if I can visualize it.

Q Let me ask it again.

Do you have an opinion, based on your training, education, experience, and the materials you've reviewed, as to what level of endocrine-disrupting chemicals are required to cause estrogen receptor activation in human endometrial tissue?

MS. PARFITT: Objection.

THE WITNESS: I can't address what level,

but I can address that these endocrine-disrupting chemicals do activate estrogen receptor activity. I think that's been shown in several studies by this time.

BY MR. LISAK:

Q But you don't know at what level, right?

MS. PARFITT: Objection.

THE WITNESS: Maybe 10 to the minus 7th, 8th, 9th molar.

BY MR. LISAK:

Q 10 to the minus 7th or?

A 8th, around that.

They're much less than that of estradiol.

Q Right. Estradiol is a much higher level than these exogenous endocrine-disrupting chemicals?

MS. PARFITT: Objection.

THE WITNESS: Well, you have to be careful. You have to be careful. Because you need to think of if you're -- in the context of hair relaxers, this is a -- there's several EDCs that are in these relaxers. And so you cannot take one specific EDC and say "Does this show an equivalent activity to estradiol?" Because we all know it's going to be less. But if you compact them together, then some can approach close to the bioactivity of

estradiol.

BY MR. LISAK:

Q And the endocrine-disrupting chemicals that you've reviewed and presented in your report in chemical hair relaxers focused on parabens, phthalates, and phenols, right?

MS. PARFITT: Objection. Misstates the evidence.

THE WITNESS: As a representation of the whole package. And the activation is dose-dependent for sure.

BY MR. LISAK:

Q Do you have an opinion as to what levels of parabens, phenols, and phthalates, when combined, is required before you see ER activation in human endometrial tissue?

MS. PARFITT: Objection. Form. Misstates the testimony.

THE WITNESS: Could you restate that question again?

BY MR. LISAK:

Q Sure.

I think you answered this question as to endocrine-disrupting chemicals generally. And I'm asking now, do you have an opinion as to what

levels -- if you combine the levels of phenols, phthalates, and parabens that may be in chemical hair relaxers, what that combined level of those three compounds is required before you see ER activation in human endometrial tissue?

MS. PARFITT: Objection. Misstates testimony.

THE WITNESS: I don't believe that that has been done. That study has not been done. But if you recall, if you combine parabens, a variety of parabens together, they can closely approach that of estradiol. The same can be said of the phthalates as well.

BY MR. LISAK:

Q Is that true for all of the parabens and phthalates or specific ones?

A The ones that have been described.

There's a paper on parabens, in fact, that combine these together and show that it's relatively close. Not quite, but enough to affect estrogen activity.

Q Do you recall which paper that is?

A Yes.

MS. PARFITT: It's about 12:30. We're in the middle of a question, but after he's done.

MR. LISAK: Do you want to take a break for lunch after we finish here? Sure.

MS. PARFITT: It's probably a good time. Yeah.

THE WITNESS: It was one of these three papers.

BY MR. LISAK:

Q If you hand them to me, I can identify them, and then I can hand them back maybe.

The Liang paper in "Science of the Total Environment" 869 2023 entitled "Studying paraben-induced estrogen receptor and steroid hormone-related endocrine disruption effects via multilevel approaches"; the Wei paper, W-E-I, also in "Science of the Total Environment," 845 2022, "Comprehensive assessment of estrogenic activities of parabens by in silico approach and in vitro assays"; and the Lee paper in "Chemosphere" 302 2022, "Effects of consumer products, chemicals, ingredients and their mixtures on the estrogen receptor, androgen receptor, transcriptional activation."

And you've got checks on all those papers, so I assume that means you included them in your reference list.

A Yeah. I'm sorry. I don't -- I can't cite the specific paper, but --

Q It's fine. It's not a memory contest. If you need to refer to things, please do.

MR. LISAK: Did you want to end here for lunch?

MS. PARFITT: Why don't we -- if this is a good stopping place for you right now, why don't we do that, take a quick lunch.

MR. SHIPMAN: 30 minutes. We've got stuff back there.

MR. LISAK: Sure. Thank you.

THE VIDEOGRAPHER: The time is 12:24 p.m., and we are off the record.

(Lunch recess taken.)

THE VIDEOGRAPHER: The time is 1:08 p.m., and we are back on the record.

BY MR. LISAK:

Q Doctor, we had a break for lunch.

Are you good to continue?

A Yeah.

Q I want to ask you a couple questions about ovarian cancer, and then we'll move on and probably come back to it again too, so . . .

I think you mentioned earlier that there's

been some more recent studies and data reporting a potential association between PCOS and ovarian cancer, correct?

A Yes.

Q But in your report, page 23 -- I'll wait for you to get there.

A Yeah.

Q At the bottom --

A Yeah.

Q -- there's a section that is called "Chronic Anovulation."

A Okay.

Q And you have a sentence there that says:

"While past studies have reported that women with irregular vaginal bleeding are not at increased risk for ovarian cancer, recent studies have demonstrated a greater likelihood of ovarian cancer in these individuals."

Correct?

A Uh-huh.

Q Is that a "yes"?

A Yes.

Q Is that the sort of, generally speaking, body of changing research that you were talking

about earlier?

MS. PARFITT: Objection.

THE WITNESS: Can you -- I'm not sure where we're going here.

BY MR. LISAK:

Q Sure.

A What does it link to?

Q Yeah. So if I understand what you're saying, until more recently in the studies that you may have been referring to, the consensus in the scientific community that there wasn't a correlation between irregular vaginal bleeding and an increased risk of ovarian cancer, correct?

A Right. That -- those past studies remarked that irregular vaginal bleeding was not posing an increased risk for ovarian cancer.

Q Do you agree that there are studies and are data out there that show that the data regarding PCOS and ovarian cancer risk are less consistent than they are for endometrial cancer?

MS. PARFITT: Objection. Form.

THE WITNESS: Can you restate that question?

BY MR. LISAK:

Q Sure.

A I'm not quite sure what you're getting at here.
Q Yeah. So, if I understand your testimony and reading your report, there are certainly consistent data that have been reported over the years saying that PCOS is a risk factor for endometrial cancer.
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q Are there data reporting that PCOS is a risk factor for ovarian cancer?
A Yes.
Q Okay. Is there, in your opinion, consensus in the community as to whether or not PCOS is a risk factor for ovarian cancer?
MS. PARFITT: Objection. Form.
THE WITNESS: I think that you need to restate that because -- what do you mean by "community"? Do you mean the scientific community?
BY MR. LISAK:
Q Sure.
A Now? Forever? I mean, at the present time?
Q Presently.

A I think some of this information is just evolving.
Q Okay. And what is your opinion as to whether or not PCOS is a risk factor for ovarian cancer?
A I'm not sure that you can say "risk factor." I think "association" would be better at this time. I think that studies are emerging as we speak. And as I referred to one of the studies that had been done, a fairly large study, epidemiol- -- not epidem-, but combining and looking at patients compared to controls.
Q In your mind, when you use the term "risk factor," is that something that has more certain data supporting a correlation than the word "association"?
MS. PARFITT: Objection. Form.
THE WITNESS: Well, it shows that there is greater risk.
BY MR. LISAK:
Q A risk factor is stronger than an association, in your opinion?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q The reason I'm asking is, when you

answered the question, you said "I'm not sure if it's a risk factor yet, but there is an association that's been reported."

A Let's put it this way. Let me correct myself.

Q Okay.

A It is a risk factor --

Q All right.

A -- based on the most recent evidence I have seen.

Q Okay. And that's relatively recent evidence, you're saying?

A Yes, it is.

MS. PARFITT: Objection.

BY MR. LISAK:

Q Prior to this relatively recent evidence, were -- did you believe that PCOS was associated or a risk factor with ovarian cancer?

A Yes.

MS. PARFITT: Objection.

BY MR. LISAK:

Q And why?

A Because of the previous studies that have shown that there's an increased risk for ovarian cancer. There are studies that do not show an

increased risk. I understand that. But at this point in time, my stance is that there is increased risk, particularly with this most recent data.

Q What, if you know, is the mechanism by which PCOS may increase the risk for ovarian cancer?

MS. PARFITT: Objection. Form.

THE WITNESS: Do you want to restate that? I hope I'm trying to answer what you're trying to say.

BY MR. LISAK:

Q Sure. If I understand your testimony, you believe, and you previously believed, that PCOS was a risk factor or associated with ovarian cancer.

And I'm asking you whether you have an opinion or not -- it's fine if you don't -- as to what is the mechanism or the biological mechanism by which PCOS, in your mind, is a risk factor for ovarian cancer.

A It would be linked to the persistence of estrogen production. Estrogen production, you know, especially with the observation that the tubal epithelium is replete with estrogen receptors, the reporting is not necessarily consistent in terms of where in the tube it is, but it certainly is uniform in determining that there are receptors there on

these epithelial cells in the tubal lining.

And it's through that process and through the mutations in the B53 gene that allows for the exposure to occur, where part of the ovary is concerned.

Q And previously, was it thought that the genesis or the pathogenesis of ovarian cancer began within the ovary, as opposed to in the tube?

A I think, generally, it was felt that it arose de novo, surface epithelium of the ovary. But subsequent studies have indicated that, clearly, this is a phenomenon that is linked to tubal input.

Now, having said that, there are elements in terms of general ovarian cancer that the proximity of the tube with the ovary is constant.

Q Okay.

A I mean, that's undeniable. And that when the ovary is attempting to release an egg, that the follicle in which the egg is contained moves to the surface of the ovarian epithelium. And at the time it's doing that, the tube will -- the tube and the ovary are always proximal. They sit in the pelvis.

So, at the time of surgery, if you go in and look, there's the tube, there's the ovary. They're sitting right there in the pelvis of the

woman. And so they're always in proximal contact. But in particular, at the time of ovulation, as this follicle starts to move to the surface of the ovary, it starts to bulge, the tube is circumventing the surface, looking for that site. And it really actually covers that site. And what it's doing is trying to facilitate ovum pickup.

Now, within the follicular fluid, there's a great deal of substance, proteins, steroids, you know, a variety of factors, including EDCs. And that's been clearly shown.

THE REPORTER: That's been what?

THE WITNESS: Endocrine-disrupting chemicals. Clearly shown.

And so at the time of ovulation, there is an admixture of these elements back and forth. Because the tube gets bathed in them. And as a result, as much as you have estrogen receptors that are responsible to or respond to circulating levels of estradiol, you also have the fact that the follicular fluid, with all its contents, actually just bathes the tube, I think lending to the process of carcinogenesis.

BY MR. LISAK:

Q Thank you.

Do ovarian cancer and endometrial cancer arise in different cell types or tissues from each other?
A Yeah. The endometrium is endometrial tissue.
Q Right.
A Ovarian is from the surface epithelium.
Q And the cells within those tissues are different?
A Yeah. One are surface cells; one are glandular cells.
Q Okay. Do you agree that estrogen receptor activation alone is not a recognized primary driver of high-grade serous ovarian carcinoma?
MS. PARFITT: Objection. Form.
THE WITNESS: State that question again.
BY MR. LISAK:
Q Sure.
Do you agree or not that estrogen receptor activation alone is not a recognized primary driver of high-grade serous ovarian carcinoma?
MS. PARFITT: Objection. Form.
THE WITNESS: That estrogen receptor activity is not?
/ / / /

BY MR. LISAK:

Q On its own a recognized primary cause or driver of high-grade serous ovarian cancer.

MS. PARFITT: Objection.

THE WITNESS: I'm sorry. You've got to rephrase that. I'm losing it a little bit. Maybe it's lunch.

BY MR. LISAK:

Q Let me ask it maybe this way.

High-grade serious ovarian cancer --

A Serous.

Q Serous.

A You're talking about serous.

Q Yeah. Not serious. Serous.

A I thought you said "serious."

Q High-grade serous ovarian cancers are understood to originate in the fallopian tube epithelium, correct?

A As opposed to low-grade?

Q Yeah.

A Well, it seems that, if you're talking about serous cancers of the ovary, that these are of a -- they're not high-grade necessarily. They're low-grade.

Q Okay. Do you agree that -- we can move on

to a different topic.

Do you agree that obesity is a recognized risk factor for endometrial cancer?

MS. PARFITT: Objection to form.

THE WITNESS: That obesity is a risk factor for?

BY MR. LISAK:

Q Endometrial cancer.

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Do you want to take a look at your report at page 24?

A No. It is considered that it is related to the -- it can probably contribute to a risk for endometrial cancer, yes.

Q At page 24 of your report --

MS. PARFITT: Turn to your report, Doctor.

BY MR. LISAK:

Q -- under "Chronic Anovulation in Women with Polycystic Ovary Syndrome," in the first paragraph, half the way through -- let me know when you're there.

A Okay.

Q You say:

"As most women with PCOS are

overweight or frankly obese, the
extra-glandular nonovarian production of
estrogen accounts for constant endometrial
stimulation and contributes to simple
endometrial hyperplasia that may become
atypical and lead to uterine cancer."
Correct?
A Correct.
Q Does that mean that not all endometrial hyperplasia leads to atypicality in cancer?
MS. PARFITT: Objection. Form.
THE WITNESS: Well, to get back to your -- your issue about -- to get back to your issue about obesity, obesity -- the enzyme aromatase primarily resides within adipose tissue and is responsible for the conversion of androgen to estrogen.
BY MR. LISAK:
Q Right.
A And in that setting, then that contributes to estrogen exposure by the endometrium. And it's believed that, with this mechanism, that in fact obesity poses an additional risk -- whatever the etiology of major risk is, additional risk for the onset of endometrial cancer.
Q Obesity is also associated with lower SHBG

levels, which increases free bioactive estradiol, correct?
A Correct.
Q And therefore, obesity can independently increase endometrial estrogenic stimulation, right?
MS. PARFITT: Objection. Form.
THE WITNESS: I don't believe you can say independently. I think that's a bit of an overstatement. But it can become part of the process.
BY MR. LISAK:
Q Obesity is also associated with insulin resistance, right?
A Yes.
Q And it is also associated with hyperinsulinemia right? Yes?
A Obesity?
Q Right.
A Yes.
Q And both of those conditions are also implicated in endometrial cancer --
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q -- right?
A Can you state that again?

Q Sure.
Both insulin resistance and hyperinsulinemia are both risk factors for endometrial cancer, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: It's not clear to me that those are risk factors. They're a result of obesity. If it's indirectly associative, I'm not sure that that really -- phenomena has been looked at very carefully.
BY MR. LISAK:
Q Okay. Weight reduction in women with PCOS can improve ovulatory function, correct?
A That's been associative.
Q Weight loss can improve insulin sensitivity, correct?
A Correct.
Q Weight loss can increase SHBG levels and reduce free estradiol, correct?
A Yes.
Q So weight reduction is a part of standard PCOS management; is that fair?
A Fair.
MS. PARFITT: Objection. Form.
Give me time to object.

THE WITNESS: Sorry.
MS. PARFITT: No worries.
BY MR. LISAK:
Q Improving ovulatory function restores progesterone production, correct?
A If one ovulates, yes, they do produce progesterone.
Q Restoration of cyclic progesterone exposure reduces the risk of endometrial hyperplasia, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Right.
BY MR. LISAK:
Q Let's talk a little bit about the endocrine system a bit more. We've talked a little bit about that.
In your report at pages 9 to 10, you list something that you refer to as 10 key characteristics of EDCs, and you cite the La Merrill paper from 2019.
A Yes.
Q Okay. And you list out these 10 -- you call them KC1 through KC10 on pages 9 to 10, right?
A Yes.
Q Do you have an opinion as to which, if

any, of these key characteristics of EDCs that would be relevant to parabens?

MS. PARFITT: Objection. Form.

THE WITNESS: I think that I wouldn't ascribe it just to parabens, but the mixture of all these EDCs.

I mean, throughout this discussion we've had, you've referred to parabens, phthalates, and phenols specifically. But my response to these has really meant to underscore the fact that there's a mixture of these in these endocrine-disrupting -- in these haircare products, relaxers.

And so I hope that my inference is more generally the mixture rather than just those -- just those, but also in addition to the entire potpourri that is involved in these particular products.

Is that fair enough?

BY MR. LISAK:

Q I understand your answer.

Are you done with it for now?

A Yeah.

Q But in your report, as we've talked about, you only talk about and present data and opinions about phthalates, parabens, and phenols, right?

MS. PARFITT: Objection. Misrepresents.

THE WITNESS: Those are examples. They're part and parcel of the entire gamut of endocrine disruptors that are contained in these hair relaxers.

BY MR. LISAK:

Q What other endocrine disruptors are in chemical hair relaxers?

A Well, they have -- I can't list them all, but --

Q They're not in your report, are they?

A No, they're not. But I've read about them. The class of EDCs in these hair relaxers, they're not just parabens, phthalates, and bisphenols.

Would you agree to that?

Q Well, that's actually not how it works.

MS. PARFITT: Let him finish.

BY MR. LISAK:

Q Maybe if we were having a drink later, but . . .

A But it is the entirety -- you cannot -- when I think of hair relaxers, I just don't think of parabens, phthalates, and phenols. I really don't. I think there are other compounds that are constructed in the casings that they make that these

products are contained in. And I don't know what other specific ingredients because I've not necessarily concentrated on every single EDC in these products. I've chosen the parabens and the phthalates and bisphenols as representative examples of the mixture.

So I hope that you're not implying in your line of questioning to me that you're making it out that I'm just relying on just those products as the argument. It's a representation --

MS. PARFITT: Let him finish.

THE WITNESS: Sorry. It's a representation of what is contained in the hair relaxers.

BY MR. LISAK:

Q But I think you agreed earlier I can only ask you about what you've put in your report, right?

A Understood.

MS. PARFITT: Counsel, he put it in his --

MR. LISAK: You're not going to speak objection.

MS. PARFITT: I'm not. But please don't misrepresent what's in the report, which is -- references the mixture. So don't misrepresent what's in his report, Counsel. I have to put that

on the record.
BY MR. LISAK:
Q You don't know what is in the ingredient list of specific chemical --
A I used to know that, but --
MS. PARFITT: Different question.
THE WITNESS: -- in the focus of this -- of preparing this, to at least allow me to put my arms around in detail, I used those as examples.
BY MR. LISAK:
Q I can only ask you about what's in your report.
A I understand that, but I'm telling you --
MS. PARFITT: Then ask him about what's in the report. In his report is the mixture of chemicals in the hair relaxer products.
BY MR. LISAK:
Q Where -- can you point me --
MR. LISAK: You've got to stop.
MS. PARFITT: Counsel, I'm sorry. You cannot -- you cannot misrepresent the witness.
MR. LISAK: You've got to stop.
BY MR. LISAK:
Q Where in your report do you talk about the mixtures, as opposed to phenols, phthalates, and

parabens?
A Again, I will preface my comment to you that the intent of this report was to use these specific -- these three specific products as an example. I made that choice because I looked at it, and there were several things I could have written about, but I chose these.
So I -- you know, I didn't include some of the other products that I had read about. And right now, to be quite honest with you, I'm having a little mental block because the time is passing. And if you would have asked me a couple weeks ago or three weeks ago, I probably would have told you. But I admit, you know, with time, getting a little tired and --
Q We can take a break whenever you want.
A Well, no. It's more than that, and you know that.
So, again, there are other products that are involved in these hair -- you know, hair relaxers that are part and parcel of this entire mixture.
Q The materials that you reviewed for your opinions in this case are comprised in the reference list in your report, which is Exhibit 2, and the

additional references that you read both before and after finalizing your report that are in Exhibit 1A, fair?

A Fair. But I'm just telling you now.

Q Sure. So, if I go to your reference list in your report and Exhibit 1A, the additional references that we learned about for the first time today, then I should be able to see the other chemicals that you may have read about that you think may be in some hair relaxer products, fair?

MS. PARFITT: Objection, Counsel.

THE WITNESS: Like I say, I cannot attest to that accurately. I have to admit that there are several different products besides EDCs, besides the ones I've mentioned, that have been included in hair relaxers.

BY MR. LISAK:

Q And I didn't see it, but anywhere in your report, do you state that parabens, phthalates, and phenols are representative of the chemicals that you are considering for your opinions?

MS. PARFITT: Objection. Misstates his testimony, Counsel. He's talking about the chemical hair relaxer product. He's made that very clear. You want to make this about ingredients. We know

where you're going.
BY MR. LISAK:
Q Doctor, you've said that you chose these three chemicals -- phenols, phthalates, and parabens -- as -- I think you said representative of the chemicals that -- as endocrine disruptors --
A A portion. I picked those out of the gemish.
Q Right. And I'm just asking if anywhere in your report you say "These chemicals I picked as examples or representations of the chemicals that I believe to be in chemical hair relaxers for purposes of my opinions."
A I'm not sure I stated that in the report. But if this is a session to clarify what this report represents, then, as of this moment, I'm telling you this is what was intended.
Q Okay.
A Because I didn't put it down on paper. I don't know how you deal with in the legal profession on both sides here. But my intent was not to just say "These are the only compounds that are responsible for these neoplastic disorders."
My intent was to make -- use these as -- if we had to -- if I had to do the entire thing, we

wouldn't be meeting today. There's just too much for me to go into every individual compound I could identify. And both of us, I think, are comfortable understanding that there are both than just these compounds in hair relaxers.

If I had to go into every one of them, this would be a very lengthy session. It would probably take more than a day.

Q Let's go back to these key characteristics of EDCs that you mentioned in your report.

Instead of asking specifically about parabens, phthalates, and phenols, which, if any, of these, do you believe are characteristics of the EDCs --

A Shall we go through --

Q -- in chemical hair relaxers?

A Shall we go through them?

MS. PARFITT: Objection to form.

BY MR. LISAK:

Q I'm not asking you to explain what 1 through 10 are. I'm asking you to say, if you know or have an opinion, which of these 10 apply to endocrine-disrupting chemicals in chemical hair relaxers.

A Okay. No. 1.

Q Okay.
MS. PARFITT: Objection to form.
You may answer.
THE WITNESS: No. 3. No. 6. That's a starter. I'd have to look at this a little more carefully.
BY MR. LISAK:
Q Okay.
A It would take some time. But at least those for sure.
Q Right.
And for either parabens, phthalates, or phenols, do you believe that, as you have them on pages 9 through 10 of your report, any of them --
A Primarily No. 1.
Q Okay. KC1 is the primary key characteristics of EDCs that you believe exist with parabens, phthalates, and phenols?
MS. PARFITT: I'm going to object to form.
BY MR. LISAK:
Q Correct?
MS. PARFITT: Again, this witness has indicated he's talking about the chemical relaxer products, not the ingredients.
THE WITNESS: Again, the products.

BY MR. LISAK:

Q Okay.

A Most of them by binding to the estrogen receptor.

Q So, for chemical hair relaxers, you believe the most -- the primary key characteristics of EDCs that relate to the EDCs in chemical hair relaxers as a product is KC1?

MS. PARFITT: Objection. He's identified other key characteristics, Counsel.

BY MR. LISAK:

Q Did you just say "primarily KC1"?

MS. PARFITT: He would -- that was with regard to the phenols, phthalates, and parabens.

Counsel, you have to ask --

MR. LISAK: You wouldn't let me ask the question. You objected, and then you started a speaking objection about these are about chemical hair relaxers.

MS. PARFITT: Because you are --

MR. LISAK: We don't need to debate it.

Let me start again.

MS. PARFITT: We need a clear question. Thank you.

/ / / /

BY MR. LISAK:

Q For chemical hair relaxers, generally, which of the key characteristics of EDCs do you think are applicable to chemical hair relaxers generally?

MS. PARFITT: Objection.

THE WITNESS: No. 1, EDCs may bind to a receptor and act in an inappropriate cellular response that results in a health risk. That's for sure.

BY MR. LISAK:

Q Any others?

MS. PARFITT: Other than the ones he said before?

MR. LISAK: Tdh, tdh, tdh, tdh, tdh, tdh.

MS. PARFITT: I mean -- Counsel, I mean --

MR. LISAK: That's why I'm asking him.

MS. PARFITT: Well, he already told you KC3 and KC6.

MR. LISAK: You are now testifying, Michelle.

THE WITNESS: No. 3 --

MS. PARFITT: Counsel, be fair. Just be fair.

/ / / /

BY MR. LISAK:
Q You told us before, KC1, KC3, and KC6. And then you said "primarily KC1."
MS. PARFITT: You said "primarily."
MR. LISAK: He agreed with it. The record will speak for itself.
MS. PARFITT: It will.
THE WITNESS: All right. To settle this thing, all three of them. Okay?
BY MR. LISAK:
Q And when you say "all three of them," you mean KC1, KC3 and KC6?
A KC6. Yes. Okay.
Q And do you believe that parabens, phthalates and phenols exhibit the characteristics in KC1, KC3, and KC6?
MS. PARFITT: Objection. Form.
THE WITNESS: My response would be that any EDC that has been shown to have estrogenic bioactivity would apply to these three KCs.
BY MR. LISAK:
Q Okay. Let's talk with the endocrine system a little generally. Okay?
A Okay.
Q The endocrine system is the body's hormone

signaling system. Fair?
A Are you referring to part of my document?
Q No. These are general questions about the endocrine system.
A What was that question again?
Q The endocrine system is the body's hormone signaling system?
A Yes. Uh-huh. Yes.
Q And it regulates normal physiological functions, such as growth metabolism, reproduction and development, right?
A You're reading from a text?
Q I'm reading from my notes. You tell me if I'm wrong. Okay?
A Okay.
Q Do you agree with that?
A Yes.
Q I can restate it.
A Yes.
Q Hormones act as chemical messengers that travel through the bloodstream to target tissues, correct?
A Yes.
Q And we've talked about this a little earlier. The endocrine system operates through

feedback loops, right?
A Yes.
Q How do you define a feedback loop? I've seen different ways of it being described.
A A feedback loop is a mechanism whereby one organ releases a substance, hormone -- it could be a cytokine -- to a target organ. The target organ then, upon -- in response to that trigger, produces another item, another hormone, another cytokine, and then feeds back to the organ of origin or another organ that then feeds back to the organ of origin.
Q Okay. So it essentially allows the body to adjust hormone levels up and down as needed?
A Yes.
Q And this process is sometimes referred to as homeostasis?
A Homeostasis applied -- can be applied to a lot of organs. It's a general term. It's just not for the endocrine system.
Q But it does apply to the endocrine system?
A Yes, it does.
Q Homeostasis is something that is designed so that stability of the endocrine system can be maintained despite internal and external changes?
A Correct.

Q Small fluctuations in hormone levels are normal and expected, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Again --
BY MR. LISAK:
Q Small fluctuations in hormone levels in a person's body are normal and expected, right?
MS. PARFITT: Objection.
THE WITNESS: Is this a general statement?
BY MR. LISAK:
Q Yes.
A In general, yes.
Q The endocrine system is designed to be robust and self-correcting.
Would you agree with that?
A Yes, I would.
Q Not every change in hormone signaling is harmful to human health, fair?
MS. PARFITT: Objection. Form. Broad.
THE WITNESS: Can you restate?
BY MR. LISAK:
Q Yeah. Just because there is a change in hormone signaling in a person's endocrine system, it doesn't mean that it's necessarily harmful to your health?

A Correct.
MS. PARFITT: Objection.
And Dr. Chang, again --
THE WITNESS: Sorry.
MS. PARFITT: That's okay. No worries. Just give me time to object. Thank you.
BY MR. LISAK:
Q In fact, many normal life events involve significant hormonal changes, right?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q I can give you some examples, right? Puberty?
A Yes.
Q Menstrual cycling?
A Yes.
Q Pregnancy?
A Yes.
Q Menopause?
A Conditional, yes.
Q But those hormonal changes that we've just talked about don't automatically cause disease, do they?
MS. PARFITT: Objection. Form.
THE WITNESS: I'm not so sure that's

correct.

BY MR. LISAK:

Q Do you think puberty automatically causes disease?

A No. I think that when you're talking about feedback systems, as you are, once a disorder takes place, some of the feedback mechanisms are not good.

Q Right. I'm not talking about disorders.

A Okay.

Q I'm talking about --

A Normal function.

Q -- normal -- right. We're talking about normal life events that involve significant hormonal changes.

You agree that that occurs, right?

A Right.

Q And some of it -- I just went through some examples. Puberty, menstrual cycle, pregnancy, menopause.

My question is, those normal life events that involve significant hormonal changes do not automatically result in human disease, fair?

MS. PARFITT: Objection to form.

THE WITNESS: Usually not.

BY MR. LISAK:

Q Cancer is not the inevitable result of altered hormone signaling, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Correct.

BY MR. LISAK:

Q Many substances intentionally alter hormone levels without causing cancer, right?

MS. PARFITT: Objection. Form.

THE WITNESS: Example?

BY MR. LISAK:

Q Oral contraceptives, right?

MS. PARFITT: Counsel, what was the question?

THE WITNESS: What was the question?

BY MR. LISAK:

Q Well, you asked me for an example of --

A I just forgot the question.

Q Sure.

Many substances -- or some substances, if you don't like the word "many."

Some substances intentionally alter hormone levels without causing cancer, right?

MS. PARFITT: Objection.

THE WITNESS: Some do, yes.

BY MR. LISAK:
Q Okay. And an example, I gave you oral contraceptives, right?
A Okay.
Q And oral contraceptives are specifically designed to act on the endocrine system, right?
A Yes.
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q And they intentionally alter estrogen and progesterone signaling, right?
A Yes.
Q And oral contraceptives have a far greater estrogen receptor binding affinity than either parabens, phthalates, or phenols, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: I would assume so, yes.
MS. PARFITT: Don't make any assumptions, Doctor. If you know.
THE WITNESS: Okay.
BY MR. LISAK:
Q Do you have an opinion that oral contraceptives -- let me ask it this way. Let me just ask it again.
Oral contraceptives have a far greater

estrogen receptor binding affinity than parabens, phthalates, and phenols, to your knowledge?

MS. PARFITT: Objection. Form.

If you know.

BY MR. LISAK:

Q Every question is if you know, just for the record.

MS. PARFITT: Fair.

Same objection.

THE WITNESS: Are you speaking of oral contraceptives as one item, or are you dividing it between the estrogen and progesterone component?

BY MR. LISAK:

Q Does that make a difference to your answer?

A Potentially, yes.

Q So do oral contraceptives that focus upon estrogen, do they have a far greater estrogen receptor binding affinity than either parabens, phthalates, or phenols?

MS. PARFITT: Objection. Form.

THE WITNESS: The estrogen component in birth control pills, which is usually an isomer of estradiol, would have far more binding capacity than endocrine-disrupting chemicals.

BY MR. LISAK:
Q Including parabens, phthalates, and phenols, right?
MS. PARFITT: Objection. Form. Objection. Form.
BY MR. LISAK:
Q If you know.
A Well, if you're talking about EDCs in hair relaxers, and there's a composite mixture of these, some of the studies that I've read, if you combine these elements, that each together with their estrogen activity can begin to start to come close to estradiol bioactivity.
Q And those were -- you said was one of the three studies that you mentioned earlier that we've identified on the record, correct?
A Right.
Q Now, estrogen -- oral contraceptives that are targeting estrogen have not been shown to either cause or increase the risk of endometrial or ovarian cancer, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: I believe that is the case.
BY MR. LISAK:
Q And in fact, oral contraceptives that

focus on the estrogen aspect and binding to the estrogen receptor actually decrease the risk of both ovarian and endometrial cancer, right?

MS. PARFITT: Objection. Form.

THE WITNESS: Can you rephrase that question --

BY MR. LISAK:

Q Sure. I'll break it down.

A -- and precisely what you're asking?

Q Yeah, sure.

Oral contraceptives, I mean, have been -- there's studies showing that oral contraceptive use actually decreases the risk of both ovarian cancer and uterine cancer, right?

MS. PARFITT: Objection. Form.

THE WITNESS: Yeah.

BY MR. LISAK:

Q I'm sorry. I didn't hear your answer.

Is that correct?

A To my knowledge, yes.

Q And that includes oral contraceptives that focus on the estrogen component, right?

A Can you cite an example of an oral contraceptive that focuses on the estrogen component?

Q I mean, are you familiar with any yourself?
A I want you to rephrase the question. Because most oral contraceptives contain progesterone. So, in that light, what are you really asking? I don't understand.
Q Well, I'm asking -- well, let me -- let's make sure I understood your first answer.
I think you said that you agreed that the use of oral contraceptives has been shown to decrease the risk of ovarian and endometrial cancer, right?
A Yes.
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q And some of those oral contraceptives would include both estrogen and progesterone focus?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q Or not focus. Would involve the use of estrogen and progesterone compounds?
MS. PARFITT: Objection. Form.
THE WITNESS: Well, most combined contraceptives are estrogen and progesterone.
/ / / /

BY MR. LISAK:
Q Right.
A So what is your question?
Q So, if most -- if your testimony is that you agree that oral contraceptive use has been shown to decrease the risk of ovarian and endometrial cancer, it is also your testimony, if I understand it, that most oral contraceptives include both estrogen and progesterone, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
BY MR. LISAK:
Q Do some oral contraceptives include just estrogen?
A Not to my knowledge.
Q Do some oral contraceptives include just progesterone?
A Yes.
Q Whether a hormonal change causes harm depends on multiple factors.
Do you agree with that?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
BY MR. LISAK:
Q The dose of an exposure is one I think we

talked about earlier, right?

A Remind me.

Q That -- I think you said the dose matters as to whether or not a hormonal change -- or maybe I'm not using the right word. How about "level"?

The level of a hormonal change and whether -- it is relevant to whether it causes harm in the body, correct?

MS. PARFITT: Objection. Misstates the testimony.

THE WITNESS: Sorry, but can you frame that a little bit better?

BY MR. LISAK:

Q Sure. Let me think.

I think you agreed that whether hormonal change causes harm depends on multiple factors, right?

A Yes.

Q What would those factors be, in your opinion?

A Repeat the question again.

Q Sure.

Whether hormonal change causes harm depends on multiple factors. And now -- which I think you agreed.

And then my question is, in your opinion, what are those factors?
A You mean like dose and duration?
Q Right. Okay. Dose is one and duration is one, right?
A (Witness nods head.)
Q How about frequency?
A That's implied in the duration, yes.
Q Well, we talk about --
A Frequency per times per week, et cetera, et cetera.
Q Right. So there's duration --
A And years and stuff like that.
Q Right. There's duration, there's dose, and there's --
A Yeah. Okay. Frequency.
Q -- duration, right?
A You already mentioned that.
Q And also, the target tissue in the body, that's a factor as to whether or not hormonal change can cause harm, right?
A Yes.
Q Okay. Simply observing a change in hormonal activity does not establish cancer causation, right?

MS. PARFITT: Objection to form.
THE WITNESS: Yes.
BY MR. LISAK:
Q Okay. I think we talked earlier that there are -- people are exposed to thousands of chemicals every day, right?
A Yes.
Q And that includes chemicals or mixtures of substances that have endocrine-disrupting compounds?
A Yes.
Q There's no evidence that everyday mixed exposure to weak endocrine-disrupting chemicals cause cancer, is there?
MS. PARFITT: Objection. Form.
THE WITNESS: You're asking me -- again?
BY MR. LISAK:
Q Are you aware of any evidence that establishes that people's exposure every day to low levels of endocrine-disrupting cancers -- chemicals cause cancer?
MS. PARFITT: Objection. Form. Misstates his testimony.
BY MR. LISAK:
Q Are you aware of any evidence? It's a question.

Go ahead.
MS. PARFITT: Objection to form.
THE WITNESS: I mean, isn't that the reason why we're here?
BY MR. LISAK:
Q Well --
A We're saying that endocrine-disrupting chemicals --
MS. PARFITT: Wait. Let him finish.
THE WITNESS: -- cause uterine cancer.
MS. PARFITT: Did you get that?
THE WITNESS: I mean, not breast cancer, but the ovarian cancer. That's what we're here for. Aren't we?
BY MR. LISAK:
Q Well, I'm asking you about these everyday exposures. I mean --
A Yeah, daily exposures.
I mean, are you meaning every single day, or are you talking about an interval of time?
What are you talking about?
Q Well, let me ask it this way: Do you agree that people are exposed to endocrine-disrupting chemicals, for example, in our diet?
MS. PARFITT: Objection to form.

THE WITNESS: Yeah. They can consume it. That's not what we're talking about, is it?

BY MR. LISAK:

Q My question is, is it your opinion that that exposure to endocrine-disrupting chemicals that may be in our diet cause either uterine or ovarian cancer?

MS. PARFITT: Objection. Form.

THE WITNESS: That's not what we're here for. That's not what my charge was, to talk about dietary consumption of endocrine-disrupting chemicals. So I can't address that.

BY MR. LISAK:

Q But I'm trying to understand -- I understand what your opinions are about endocrine-disrupting chemicals that you believe are in chemical hair relaxers.

A Right.

Q Right? But I'm also asking whether you have an opinion -- and if you don't, that's fine -- as to whether or not these other thousands of endocrine-disrupting chemicals that we both agree that we're exposed to every day cause uterine or ovarian cancer as well.

MS. PARFITT: Objection. Form. Asked and

answered. He said he hadn't studied.

THE WITNESS: I can't respond to that because I haven't gone and looked at that. I'm aware that the majority of endocrine-disrupting chemicals are through -- by ingestion.

BY MR. LISAK:

Q And that would include diet?

A But I haven't -- well, eating is diet. If you want to make the connection, they're one and the same. I have not investigated that area.

Q Do you know whether or not soy products contain phytoestrogens?

MS. PARFITT: Objection. Form.

THE WITNESS: I understand that soy is considered -- contains some phytoestrogens, yeah.

BY MR. LISAK:

Q And do you know whether or not phytoestrogens can interact with estrogen receptors?

MS. PARFITT: Objection. Form.

THE WITNESS: They appear to.

BY MR. LISAK:

Q Do you have an opinion as to whether soy consumption has been shown to cause or contribute to either uterine or ovarian cancer?

MS. PARFITT: Objection. Form.

THE WITNESS: I have no opinion.

BY MR. LISAK:

Q Have you reviewed that as part of your opinions in this case?

A No.

Q Have you looked at any dietary endocrine-disrupting chemicals and whether or not they might be -- cause or contribute to any form of cancer?

MS. PARFITT: Objection. Asked and answered. He gave you an explanation. He said he didn't study it.

THE WITNESS: I can't address that.

BY MR. LISAK:

Q Is the presence of an endocrine-disrupting chemical the same thing as having a biological effect? In other words, because you see the presence of an endocrine-disrupting chemical in the urine or the blood of a person, is that synonymous to you with the fact that that chemical would be having a biological effect in the body?

MS. PARFITT: Objection to the form.

THE WITNESS: I can't respond to that because I don't know the parameters of which led to the presence of the chemical in the urine.

BY MR. LISAK:

Q Do you know whether or not regulatory agencies treat all endocrine-disrupting chemicals as cancer-causing?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Have you looked at that?

A Whether a regulatory agency considers endocrine-disrupting chemicals a carcinogen?

Q No. Here is my question: Regulatory agencies do not treat all endocrine-disrupting chemicals as carcinogens, fair?

MS. PARFITT: Objection. Form.

THE WITNESS: I don't know if some of these regulatory agencies have considered it the issue at all.

BY MR. LISAK:

Q Are you familiar with -- have you looked at -- I mean, I've got -- I can't remember all your references. But did you look at any regulatory agencies', you know, reports, guidances, statements, what have you?

A Can you cite one for me?

Q Well, I'm asking if you reviewed any yourself as part of your opinions in this case.

A I've seen some.
Q Do you know which ones? Do you recall which ones?
A There was one in which it was comprised of what appears to me almost an arbitrary board of individuals. And they did not seem to feel that there was a risk. But if you look at the board, it was almost like it wasn't any authorized, recognized, authoritative board.
Q Is that in your reference list?
A No, it isn't. I read that lately.
Q Okay. And it's not in Exhibit 1A either, right?
A No.
Q Anyway, do you remember what regulatory agency you're talking about?
A It was the group of -- it was about two or three dozen individuals. And it's unclear how this board came about. It looks like it was just -- I don't even know who sponsored it, to be honest with you.
Q You're not relying upon that for your opinions, I guess?
A No. I mean, I disregard it.
Q Just to make sure I've asked this -- I may

have asked this before.

Binding affinity refers to how strongly a substance binds to a receptor?

A Generally, yes.

Q Okay. It's different than the level of the chemical?

A Right.

Q Okay. Many EDCs bind thousands or tens of thousands of times more weakly than natural estrogens to receptors, correct?

MS. PARFITT: Objection to form.

THE WITNESS: All right.

BY MR. LISAK:

Q When endogenous estrogen is present, weakly binding substances generally have little to no biological effect. Fair?

MS. PARFITT: Objection. Form.

THE WITNESS: Repeat the question, please.

BY MR. LISAK:

Q When endogenous estrogen is present -- so estrogen produced naturally by the body.

When endogenous estrogen is present, weakly binding substances generally have little to no biological effect, fair?

MS. PARFITT: Objection. Form.

I didn't mean to interrupt your question, Counsel.

BY MR. LISAK:

Q You're just looking at the realtime?

MS. PARFITT: The monitor. Yes, yes, yes. Just the realtime.

THE WITNESS: This keeps moving. I'm sorry.

BY MR. LISAK:

Q Every time we talk, it keeps moving.

A It just keeps moving.

Q I can ask it again if you want.

A Correct. Yes.

Q So you agree with my question?

A Yeah.

Q Let's mark as Exhibit -- Tab 8, which I think is Exhibit 8.

MS. PALACIOS: Counsel, this is 7. I think it's 7.

MR. LISAK: I was on a streak. Okay. Tab 8, which is Exhibit 7.

(Exhibit 7 marked for identification.)

MS. PARFITT: Thank you.

BY MR. LISAK:

Q All right. Let me identify this for the

record. This is an article that you co-authored entitled "Estrogen Bioactivity in Fo-Ti and Other Herbs Used for Their Estrogen-Like Effects as Determined by a Recombinant Cell Bioassay." It was published in the "Journal of Clinical Endocrinology and Metabolism." The reference number is 88(9): 4077-4079, and it was published in 2003. Correct?

A Yes.

Q In the abstract -- do you remember this paper?

A Yes.

Q In the abstract, a couple sentences in, you say -- or the article says: "We adapted a recombinant cell bioassay to measure estrogen bioactivity in herbs," right?

A Right.

Q Then it goes on to say:

"We studied, in vitro, estrogen bioactivity in red clover, dong quai" -- I'm not sure if I'm saying that correctly -- "black cohosh, soy, licorice, chaste tree berry, Fo-Ti, and hops," right?

A Right.

Q So this is a study where you all were

looking at the bioactivity of these natural substances in terms of the, I guess, estrogen receptor bioactivity. Is that --
A Occupancy.
Q Pardon?
A Occupancy.
Q What does "occupancy" mean?
A Basically a bioactive, how it attaches.
Q I see. Okay. So how it binds to the estrogen receptor?
A The amount of binding.
Q And the abstract says:

"Soy, clover, licorice, and hops have a large amount of measurable estrogen bioactivity, as suspected, based on previous reports using other methods."

Right?
A Yes.
Q Are you aware of any data that reports soy, clover, licorice and hops as causing or contributing to either uterine or ovarian cancer?
MS. PARFITT: Objection. Form.
THE WITNESS: At this time, I can't recall.
/ / / /

BY MR. LISAK:

Q And then you go on to say "We discovered surprisingly high estrogen activity in extracts of fo-ti not previously reported." Right?

A Right.

Q Forgive my ignorance. What is fo-ti?

A Don't ask me.

Q Okay. It's an herb?

A Yeah, apparently.

Q Okay. And you all described -- discovered a surprisingly high estrogen level of that substance?

A Yeah.

Q It goes on to say "We also discovered that removal of a glycone group from soy increases its estrogen bioactivity significantly." Right?

A Right.

Q If we take a look at page -- the next page, there's a table there, Table 1.

A Uh-huh.

Q And it says "Estradiol-like activity in herbs."

Do you see that?

A Uh-huh.

Q And estradiol is the natural estrogen that

women make?

A Yes.

Q It's the largest one, right?

A Yes.

Q And if I understand this table, it's taking these studied substances or herbs and seeing what the estrogen bioactivity or occupation is, and then comparing that to natural estradiol itself, right?

A Yes.

Q And then -- so, if you look at -- there's a column there that says "Potency compared with estradiol itself," right?

A Yes.

Q And there's a fraction there, which is -- if I understand it, is what is the level of estrogen bioactivity for that substance as compared to naturally occurring estradiol, right?

A Yes.

Q And so, for hops, you report that it is 1 over 120,000 in terms of comparing its estrogen bioactivity to naturally occurring estradiol, correct?

A Yes.

Q And for licorice, it's 1 over 1650, right?

A Yes.
Q Soy is 1 over 330, right?
A Yes.
Q Red clover is 1 over 400?
A Yes.
Q Fo-Ti is 1 over 300?
A Yes.
Q And soyA is 1 over 80, correct?
A Yes.
Q And are you aware of any data that shows any of those substances that we just walked through in Table 1 have been shown to cause or contribute to either uterine or ovarian cancer?
MS. PARFITT: Objection. Form.
THE WITNESS: I cannot recall.
BY MR. LISAK:
Q And there's a column there that says "Significance." And it must be in here somewhere, but what does that stands for, the a; a,b; b,c? Do you see that -- d?
A Yeah. Should be described in the statistics.
Q Oh, in the method?
A Should be.
Q I just couldn't find it. It is probably

in here somewhere, but I just couldn't -- maybe we can find it.

A Oh, it says here "Values below the table" -- "Values with different letters are significantly different from each other."

Q I see.

A That's what that refers to.

Q So the significance is comparing them to the -- to the fraction reported in the potency?

A Exactly. Like a,a; b,b; c,c.

Q I got it. Okay. Thank you.

All right. Do you know what the comparative -- the potency compared with estradiol is for any of the endocrine-disrupting chemicals that you believe to be in chemical hair relaxers?

MS. PARFITT: Objection.

THE WITNESS: State the question again.

BY MR. LISAK:

Q Sure.

So, looking at Table 1, you and your co-investigators and authors reported a fraction that you described as potency compared with estradiol itself, right?

And I'm asking is whether you know what those data -- what those values would be for any of

the endocrine-disrupting chemicals that you believe --
A No.
MS. PARFITT: Objection. Form again. Doctor --
BY MR. LISAK:
Q Let me just finish the question, because we don't want to talk over each other.
Do you know what the potency compared with estradiol -- with estradiol itself are for any of the endocrine-disrupting chemicals that you believe are in chemical hair relaxers?
MS. PARFITT: Objection. Form.
THE WITNESS: Do I know what the equivalency --
BY MR. LISAK:
Q No. In the Table 1, you've reported as a fraction how potent, to use the table's term --
A Right.
Q -- these -- the estrogenic bioactivity is for these substances, as compared to naturally occurring estradiol, right?
A Okay.
Q And I'm asking is whether you know what the same fraction would be, comparing the potency of

any of the endocrine-disrupting chemicals in chemical hair relaxers to naturally occurring estradiol, are likely reported in this table in this paper.

MS. PARFITT: Objection. Form. Assumes he studied it.

THE WITNESS: That's been done. You would have to consider the model system that was used. Because you can always develop equivalencies based on the model. And there have been efforts to do this.

BY MR. LISAK:

Q Have you undertaken those efforts yourself?

A No.

Q Are those data reported in the references you talk about in your report?

MS. PARFITT: Objection. Form.

THE WITNESS: They should be.

BY MR. LISAK:

Q So you're saying, in your report, you report on data that's been published in peer-reviewed journals showing the potency of endocrine-disrupting chemicals in chemical hair relaxers as compared to estradiol?

MS. PARFITT: Objection. Form.
Do you understand the question?
THE WITNESS: I think I do.
Could you state it again, please?
BY MR. LISAK:
Q Sure. I'll try.
If it's in there, I missed it. So please tell me if it is in there.
But in your report, do you present data or your opinions concerning the potency compared with estradiol for any of the chemicals that you believe contained within -- between -- in chemical hair relaxers.
MS. PARFITT: You're asking report or opinion?
Do you understand the question, Doctor? Whether or not you're rendering an opinion.
MR. LISAK: Well, I'm asking if they're in his report first.
THE WITNESS: I know I've read that. I know of instances. I'm just trying to recall if I recognize any of the authors that are related to the question that you asked. I'm blanking a little bit here, so be patient with me.
/ / / /

BY MR. LISAK:
Q Sure.
A Here is one. Harris.
Q Let me follow you. Where are you? You're in your report in your reference list?
A Page 48. "Estrogenic activity of phthalate esters in vitro."
MS. PARFITT: I'm sorry. What?
THE WITNESS: Harris. Page 48.
BY MR. LISAK:
Q Let me ask you a question about that one. 48. I have -- are you saying page 48 or reference 48?
A Page 48.
Q Oh, okay.
MS. PARFITT: Page 48.
BY MR. LISAK:
Q What's the reference number?
A It's under Harris. Oh, no, no. It's under -- yeah, Harris. "Estrogenic activities of phthalate esters in vitro."
Q I'm sorry. I'm just not seeing it.
A It's in the middle of the page on 48. Harris, et al. They're alphabetical.
Q We're looking at page 48 of the reference

list in your report?
A Yes. I see it right here. It's 48. It says "Harris C., et al. "Estrogenic activities of phthalate esters in vitro."
Q I got it. Okay. Got it. Thank you.
And is it your recollection that the Harris paper on page 48 of your report reports on the potency of chemicals in chemical hair relaxers as compared to with estradiol?
A I believe it did.
Q Okay.
A As I recall.
Q Do you happen to know what those data report?
A I think they were in vitro data.
Q Meaning what, mouse models?
A Looking at receptor binding.
Q Those are mouse models?
A No. Using estradiol binding to estrogen receptor. I don't know what the tissue was at this time.
Q Okay. It's an ovarian cancer study, right?
A I can't recall.
Q I'm just looking at the title.

A Okay.
Q "Polycystic ovary syndrome oligomenorrhea and risk of ovarian cancer histotypes: Evidence from Ovarian Cancer Association Consortium," Australian Ovarian Cancer" --
MS. PARFITT: There are two. It's the one above.
THE WITNESS: It's the one above.
MS. PARFITT: It's the 1997 study.
BY MR. LISAK:
Q Okay. So Harris, "The estrogenic activity of phthalate esters in vitro," "Environmental Health Perspectives," 1997, right?
A Yes.
Q So that's looking specifically at phthalates and the estrogenic activity, correct?
A There's another study on page 49, Jobling, J-O-B-L-I-N-G.
Q Give me one sec.
A "A variety of environmentally persistent chemicals, including some phthalate plasticizers, are weakly estrogenic."
Q Let me find it. I'm sorry.
A It's on the bottom of page 49.
Q Jobling.

A Jobling.
Q So this is about phthalates, and it calls them "weakly estrogenic" -- right? -- in the title?
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q Okay. Do you happen to recall, for either the Harris or the Jobling studies, what the data were that they recorded in terms of phthalate?
A I can't recall. I can't recall. But I believe there may be others. I'd have to go through this.
Q Any others that you --
A In terms of in vitro assays, here is Soto, S-O-T-O, page 56. "The E-SCREEN assay as a tool to identify estrogens: an update on estrogenic environmental pollutants."
Q Do you know whether any of the chemicals in the Soto reference that you just mentioned are any of the same chemicals in chemical hair relaxers?
MS. PARFITT: Objection. Form.
Don't guess.
THE WITNESS: I can't say.
BY MR. LISAK:
Q Any others?

A Not in my cursory review, no.
Q Okay.
A I can't pick out any, but there may be others.
Q Sure.
A I mean, I have a file on it, so I know there are papers here.
Q Let's take a look at Tab 9.
A Tab 9.
Q It's coming. I've got it coming for you. I'm going to put a clip on it. It's Exhibit No. 8 to your deposition.
MS. PARFITT: Thank you.
MR. LISAK: Here's a clip if you want.
MS. PARFITT: Thanks, Mike.
(Exhibit 8 marked for identification.)
BY MR. LISAK:
Q Let me identify this for the record. This is titled "EDC-No. 2: The Endocrine Society's Second Scientific Statement on Endocrine-Disrupting Chemicals." Lead author Gore. Published in 2015 in "Endocrine Reviews." The citation is -- this is a paper you cite in your report, right?
A Uh-huh.
Q Yes?

A Uh-huh. Yes. Yes.
Q Okay. One of the authors is RT Zoeller.
Do you see that?
A Uh-huh.
Q Have you ever spoken with Dr. Zoeller?
A No.
Q Do you know whether or not he's another retained expert for the Plaintiffs in the case?
A I think his name appears on the list.
Q Have you read his report?
A Yes.
Q Did you read his report after you served yours?
A Yes. It was provided to me.
Q Okay. What other reports from either Plaintiffs' or Defendants' experts have you reviewed before today, other than Dr. Zoeller's?
A Dr. Farley. That's the one I kind of reviewed most intently. The others I breezed through. I didn't really capture a lot.
Q Now, if we take a look -- I think these pages are numbered with E, right?
A Yeah. They're tough.
Q So take a look at page E15. Let me know when you have that.

A Okay.

Q Up in the left-hand column, a couple of sentences in, it says:

"Sample size needed to be high enough to have adequate power to draw accurate statistical conclusions using appropriate statistical methods."

Do you see that?

A Yeah.

Q Do you agree that sample size needs to be high enough to have adequate power to draw accurate statistical conclusions?

A Yes.

Q And let's take a look at page E57. There's a section there that begins "Hormone-sensitive cancers in females."

Do you see that?

A Yes.

Q And if you look at the right-hand column on page E57, about halfway through, there's a sentence that says:

"Much of the research investigating the effects of EDCs and cancer has focused on the breast, prostate, and testes; whereas other less

common hormone-related diseases, such as endometrial and ovarian cancer, have received little attention."

Do you see that?

A Yes.

Q Do you agree with that statement?

MS. PARFITT: Objection. Form. The isolated -- yeah. Objection. Form.

THE WITNESS: Well, understand that this is a statement that appeared in -- what was the year?

BY MR. LISAK:

Q 2015.

A -- 2015, which means that they probably started writing it in 2014 or maybe in 2013. So it may be the case that -- it's difficult -- it's hard for me to comment on this because I don't know the extent to which the -- what their research covered.

Q You read and cited this Gore 2015 paper in your report, right?

A Yes, I did.

Q And is it your testimony today that you're --

A No. I cited it --

MS. PARFITT: Objection. Form.

Go ahead.
THE WITNESS: I cited it as a reference to the recognition that a professional society such as the Endocrine Society was totally aware of this, and that they wanted to make a point of it to the membership and, therefore, sought to publish this.
BY MR. LISAK:
Q Right.
MS. PARFITT: Let him finish.
THE WITNESS: And to be quite frank with you, this is the second statement --
BY MR. LISAK:
Q Right.
A -- the first appearing in 2009.
And so it represents a concerted effort by the Endocrine Society to notify investigators and members of the society, as well as others that are interested, that this was on their horizon, they were well aware of it, and in fact, they were the first major organization to point this out.
Q And what they're pointing out, at least in the sentence that I read you, is that much of the research investigating the effects of EDCs and cancer, at least through the publication of this reference, has focused on the breast, prostate and

testes, whereas less common hormone-related diseases, such as endometrial and ovarian cancer, have received little attention.

And my question was simply, do you agree with that statement in 2015?

MS. PARFITT: I'm going to object to the question as compound. You're pointing out one sentence in a 150-page document. Just be fair, Counsel.

MR. LISAK: Well, I'll hold you to that standard when you take our experts' depositions.

MS. PARFITT: Please. Please do. And I assure you that I will --

THE WITNESS: I will qualify this by just talking about endometrial cancer to start with.

BY MR. LISAK:

Q What do you mean you'll qualify it?

A Because there had been several studies earlier about reproductive tissues regarding the effects of EDCs on, for instance, endometrial cells. In fact, to be quite clear, the recognition of EDCs probably go back to the early 2000s.

Q So I'm just trying to understand --

MS. PARFITT: Are you done?

THE WITNESS: No.

It's interesting. A lot of those publications did not come from the United States. They came from Asia, they came from Europe, pointing out that we are concerned about EDCs in these cosmetic products.

And so I was -- I discovered this through my readings, and I was surprised about it, in that it took such a long time. And I suspect it was priorities in terms of research, et cetera, et cetera, that it finally came to the attention. But I was well aware of this, actually, even before the first endocrine statement. Because one of my colleagues had published on this, had told me about this early on. And so I was well aware of it.

And I would -- I'm a little surprised at this statement, to be quite frank with you. I didn't detect it when I read it. But I am surprised at it because my perception was that ongoing science was being conducted regarding the effect of EDCs on reproductive tissues, including the uterus and endometrium, prior to this coming out.

Now, they may have considered the amount that was being produced --

BY MR. LISAK:

Q Right.

A -- was insufficient to join the group that potentially was being paid to. Nevertheless, it's quite clear to me that efforts were being made to determine the action and the effects of these EDCs on the reproductive system, including the uterus.

Q And to be fair, I guess, to the authors here and the Endocrine Society, they weren't saying there were no studies, there was no data on endometrial and ovarian cancer. They were saying, as I understand it, that most of the research or much of the research had been focused on breast, prostate, and testes, not that there was none, right?

MS. PARFITT: Objection. Form. He's indicated he was surprised at the wording.

BY MR. LISAK:

Q Let's take a look at E64.

MS. PARFITT: E64. E64.

BY MR. LISAK:

Q At the bottom left-hand column, there's a section on, letter D, "Uterine cancer, ovarian cancer and EDCs."

Do you see that?

A Uh-huh.

Q Is that a "yes"?

A Yes.
Q And I take it you read this before --
A Yes, I've read it.
Q -- your report?
A Yes. It was one of the first I read.
Q And it begins by saying:
"Endometrial adenocarcinoma, commonly referred to as uterine cancer, is the most common malignancy of the female genital tract, and incidence rates are rising as life expectancy increases."
Do you see that?
A Yes, I do.
Q Do you agree with that statement?
A Yes.
Q And is one of the reasons that cancer incidences rise as people live longer because cancer is a disease of aging, generally?
MS. PARFITT: Objection. Form.
THE WITNESS: I think you can generalize that to most cancers, in addition to uterine cancer.
BY MR. LISAK:
Q Because as we age, we have more natural cell replication errors that may not be corrected by our body's natural systems, right?

A That's what we believe now.
Q Okay. And both ovarian and endometrial cancer would be subject to that same process, right?
MS. PARFITT: Objection. Form.
THE WITNESS: I can only opine that, and it's an opinion that that's true.
BY MR. LISAK:
Q Okay. It says here "Type II endometrial cancer is associated with endometrial atrophy in older women and is estrogen-independent," correct?
A Yes.
Q Do you agree with that?
A Yes.
Q Does that mean Type II endometrial cancer is not caused or contributed to, in your opinion, as a result of estrogen bioactivity?
MS. PARFITT: Objection. Form.
THE WITNESS: No.
BY MR. LISAK:
Q I'm sorry. It's not or you don't agree with that?
A I'm just saying that you cannot discount the role of estrogen in post-menopausal cancer.
Q Although you do agree that it is estrogen-independent?

A Not all --

MS. PARFITT: Objection. Form.

THE WITNESS: -- are all estrogen-independent.

BY MR. LISAK:

Q Not all Type II endometrial cancers?

A Right.

Q Some are?

MS. PARFITT: Objection.

THE WITNESS: Right.

BY MR. LISAK:

Q Which ones are and which ones aren't?

A I can't recall. I think you have to understand that, when these tissues are taken for examination, they'll perform receptor studies. And you can have older women with endometrial cancer exhibiting estrogen receptor -- the presence of estrogen receptors. So, you know, I think that's a very important observation.

Q Okay.

A I mean, the estrogen receptor doesn't go away as you pass menopause. I mean, you've got to believe -- because if you have women that go through menopause, they're hot-flashing four or five years later, you give them estrogen and they stop

hot-flashing. How can that happen without active estrogen receptors?

Q Let's take a look at this last sentence here on this paragraph. It says "Despite the role of hormones" -- "despite the role hormones play in disease progression, only a handful of studies have examined the risks of EDC exposure in endometrial cancers," right?

MS. PARFITT: Are you asking if that's true or is that what you just said?

BY MR. LISAK:

Q Is that what it says?

MS. PARFITT: Objection. Form.

Is that what it says?

THE WITNESS: It's stated in there, yes.

BY MR. LISAK:

Q And now my question is: Do you agree with that statement?

MS. PARFITT: Objection. Form.

THE WITNESS: Without references, it's difficult. I don't know upon which they base this. If only a handful of studies, I would like to have reference to the handful of studies.

BY MR. LISAK:

Q Well, when you read this Gore Endocrine

Society publication for the purposes of your report, there is a reference list of 1,322 publications, right?

A I understand that. I understand that.

Q So, presumably, the authors in the Endocrine Society reviewed 1,322 references before making that statement on page E64 that only a handful of studies have examined the risks of EDC exposure in endometrial cancer, fair?

MS. PARFITT: Objection, Counsel. Form. We don't know what they reviewed.

BY MR. LISAK:

Q Well, they tell you what they've reviewed, right?

MS. PARFITT: For the document.

THE WITNESS: What's the question?

BY MR. LISAK:

Q Presumably, the Endocrine Society and the authors of this paper, which list the references at the end from No. 1 through No. 1,322, reviewed these papers before this publication was made, right?

MS. PARFITT: Objection. Form. Talking about one statement.

THE WITNESS: It depends on the format that they used to prepare the paper, who was

assigned what sections of the paper. Believe me, not everybody did a thorough investigation individually of every aspect of this paper.

BY MR. LISAK:

Q When you read this statement in Exhibit --

A Yes.

Q -- the exhibit we're talking about --

A I think I know what you're talking to.

MS. PARFITT: Exhibit 8.

MR. LISAK: Exhibit 8.

BY MR. LISAK:

Q -- did you then go to the reference list and see "Well, how many papers did they cite about" --

A Not many.

Q Right. So they may have been correct when they say only a handful of studies examined the risks --

A No, no, no.

MS. PARFITT: Objection. It's not a question.

Don't answer. There's no question.

BY MR. LISAK:

Q Well, what did you mean by "not many"?

A With regard to what?

Q I don't know. That's what I'm asking you.
Before I could get my question out, Michelle objected, and you said "not many." So --
A It was in regard to something you might have said. I wouldn't have just said it just out of thin air.
Q Well, when you read this statement on page E64, when you would have read it whether as part of your pre-litigation following-up journals or as part of your review of this publication for your report, which you cite, did you then go to the reference list to see how many studies, if any, in the reference list related to risks of ED exposure in endometrial cancer?
A I looked at them. But for this sentence that we're talking about here that you referred to -- what was it, back on 64?
Q E64.
A Where they didn't cite a reference.
Q Right.
A Okay. I didn't consider that to be thorough.
Q Okay.
A Actually, that section on the EDCs and endometrial cancer was a little disappointing.

Q Let's take a look at page --
A But --
Q Sorry. Go ahead.
A I want to add that it's notable that they did this because they're one of the first, you know, legitimate organizations that advocated -- that caution about using endocrine-disrupting chemicals and the subsequent deleterious effects it could have on health in both men and women.
Q Is your answer done?
A Yes.
Q Last question about this language.
The Endocrine Society talks about the role of hormones that play in disease progression and endometrial cancer. They don't talk about the role of hormones in disease initiation, fair?
MS. PARFITT: Objection. Form.
THE WITNESS: If that's what it says.
BY MR. LISAK:
Q Is there a difference in your mind -- and I understand you're not an oncologist -- treating disease progression and initiation when it comes to cancer?
MS. PARFITT: Objection.
THE WITNESS: There's not a difference in

what? Can you restate that again?
BY MR. LISAK:
Q Is there a difference in your mind, when we talk about disease initiation versus disease progression, when you talk about cancer?
A Yes. Yes.
Q Last thing on this exhibit. If you look at E66, there's a gray box form there. And it says "Key Points: Hormone-Sensitive Cancers in Females."
Do you see that? E66. The gray box?
MS. PARFITT: E66.
THE WITNESS: Oh, the box here. Okay. Key points. Okay. Yeah.
BY MR. LISAK:
Q If you look to the sixth bullet point down, it starts "Mechanisms."
Do you see that?
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q Thanks.
A Excuse me.
Q No, you're doing all right.
It says:
"Mechanisms of action for female

reproductive cancers are not well understood; the roadblocks result from the innate complexity of tissue-specific multicell communication, lack of appropriate in vitro test systems, variables such as obesity and cyclicity, and latency, often two to three years in rodents and 40 to 50 years in women, from the time of exposure to adverse outcomes," right?

MS. PARFITT: That's what it says.

THE WITNESS: That's what it says.

BY MR. LISAK:

Q Do you agree that the mechanism of action for female reproductive cancers are not well understood?

MS. PARFITT: Objection. Form.

THE WITNESS: Well, that's what they wrote at that time. And I wasn't there. I wasn't at that time. It's their opinion.

BY MR. LISAK:

Q I'm asking you if you agree with it.

MS. PARFITT: Objection. Form.

THE WITNESS: I can't make a comment on -- I didn't understand this at that time because I was

not aware of it. So I don't know from what perspective they're coming from in making that statement.

BY MR. LISAK:

Q Well, they go on to say, after that statement, that the -- these roadblocks, in other words, roadblocks to understanding the mechanisms, "result from innate complexity of tissue-specific multicell communication, lack of appropriate in vitro test systems, variables such as obesity and cyclicity and latency, from the time of exposure to adverse outcomes."

Do you agree that those factors that I just read make understanding the mechanism of action for female reproductive cancers complex and difficult to understand?

MS. PARFITT: Objection. Form.

THE WITNESS: That's a difficult question you ask. I'm not sure I can answer that, given what is provided here, honestly. Because they're making statements here that in fact make me wonder how thoroughly this was investigated. Even though some of these are my colleagues. I just don't know -- they assign certain sections of these two investigators or authors.

And in my thinking, by the year 2008 or '07, when this was initiated, that there existed some reasonable research to show that these EDCs collectively -- either individually or collectively, had some effect.

BY MR. LISAK:

Q Do you believe that there was innate complexity of tissue-specific multicell communication in relation to female reproductive cancers?

MS. PARFITT: Objection. Form.

THE WITNESS: I can't comment on that. That's a loaded sentence.

BY MR. LISAK:

Q It's not my sentence.

A I know it is. I'm just telling you it's loaded, because it says a lot of things in one sentence, and it's probably inappropriate. It would have been better if they had particulated it and indicated what they really meant. But this is kind of a "Throw it in the box, and now let's make a generalized statement."

Q Do you believe, at least in 2015, there was a lack of appropriate in vitro test systems?

MS. PARFITT: Objection. Form.

THE WITNESS: By that time, there were publications out that we were looking at that we -- I don't know what they thought about, you know, Doobling (phonetic) or the ones I just cited to you that you saw and you're aware of. So to make that kind of a statement seems a little awkward, don't you think?

BY MR. LISAK:

Q Do you believe variables such as obesity, cyclicity, and latency make understanding the mechanisms of action for female reproductive cancers complex?

MS. PARFITT: Objection. Form.

THE WITNESS: Are you just asking for my opinion?

MS. PARFITT: Yes.

BY MR. LISAK:

Q Yeah.

A I think it provides fodder for a better analysis. Does it make it more complex? It might. But it doesn't discount the ability to carefully examine the information and the data and come out with reasonable expectations, as we've seen in subsequent publications.

Q Okay. You can put that one to the side.

A Okay.
Q Are you still doing okay? Do you need a break?
A No. I'm okay.
MS. PARFITT: Why don't we take a quick break.
MR. LISAK: How long have we been going?
THE VIDEOGRAPHER: We've been going for an hour and 36 currently. Oh, total? 4 hours and 20 minutes.
The time is 2:43 p.m., and we are off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 3:04 p.m., and we are back on the record.
BY MR. LISAK:
Q Doctor, we just had a break. Are you good to continue?
A Yes.
Q I want to ask you a couple questions about those three papers you identified for us that you thought perhaps one of those three may have some information about EDC potency that we were talking about when we talked about your paper that looked at potency of different types of herbs. Okay.

And I think you said one was the Jobling paper, page 49 of your references. One was the Harris paper on page 48. And one was the Soto paper on page 56.

We took a look at those papers on the last break, and I did -- we didn't see any potency data being reported in the Jobling paper.

A Okay.

Q Is that --

A That could be the case, yes.

Q Let me ask you about the Harris paper. There was some potency data there.

MS. PARFITT: Counsel, do you have the article?

MR. LISAK: Well, they're being copied.

MS. PARFITT: Okay. Let's hold two seconds.

MR. LISAK: Sure.

THE REPORTER: Do you want to go off the record briefly?

MS. PARFITT: Yeah, we can.

MR. LISAK: If you want, I can do another section and come back to it.

THE VIDEOGRAPHER: The time is 3:06 p.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 3:10 p.m., and we are back on record.

MR. LISAK: Okay. Thank you.

We just took a quick break. Michelle, thank you for getting copies of those items that we talked about earlier.

MS. PARFITT: Of course.

BY MR. LISAK:

Q Doctor, before we took a break, we had just finished talking about the Jobling study that we talked about earlier today.

I want to ask you some questions about the Harris study that you identified on page 48 of your report in your reference list. In particular, this is -- the title is "The Estrogenic Activity of Phthalate Esters In Vitro."

Do you have that, sir?

A Yes, I do. It's in front of me.

Q So this paper is concerning the estrogenic activity of phthalate esters in particular, not any other endocrine-disrupting chemicals, right?

A Yes.

Q And if you take a look at -- and for the record, it's in "Environmental Health Perspective,"

Volume 105, No. 8, August of 1997.

If you go to page 806 of the article, which is within the "Discussion" section of the report, the far right-hand column, the second full paragraph, do you see where it says "All of the phthalates"?

Do you see that, sir?

A Yes.

Q The authors report:

"All of the phthalates that showed activity were very weak estrogens. The most potent, BBP, was approximately 1 million-fold less potent than estradiol."

Correct?

A Yes.

Q And --

MS. PARFITT: And again, is that correct? Let's just make that clear.

Is that what the document says?

THE WITNESS: It's the sentence, yes.

MS. PARFITT: I appreciate that.

Thank you, Michael.

BY MR. LISAK:

Q So you don't have any reason to disagree

with that, correct?

A Right.

MS. PARFITT: Objection. Okay.

THE WITNESS: Sorry.

MS. PARFITT: Please, Dr. Chang, just give me enough time to get that objection in there. Okay? Thank you.

THE VIDEOGRAPHER: Counsel, the concierge is just asking, is this a digital exhibit or no?

MR. LISAK: Well -- well, let's mark it. It's in your binder. This can be --

MS. PALACIOS: It's not one of the tabs.

MR. LISAK: Yeah, it's not in the tabs. Maybe we should mark it, though, as Exhibit 9.

MS. PARFITT: I think, to keep the record straight.

MR. LISAK: Yeah. And I think we actually may only have one physical copy of it, Michelle, so I apologize.

MS. PARFITT: That is correct. Yes.

VERITEXT CONCIERGE: This is the concierge. Just confirming there is no digital exhibit.

MR. LISAK: Correct.

VERITEXT CONCIERGE: Thank you.

(Exhibit 9 marked for identification.)
BY MR. LISAK:
Q Do you have an opinion as to whether phthalates, and the most potent phthalate in this study at least of BBP, was approximately 1 million-fold less potent than naturally occurring estradiol, whether that would be associated, in your opinion, with uterine ovarian cancer?
MS. PARFITT: Objection. Form.
THE WITNESS: Again, I will repeat what I stated earlier, is that it's difficult for me to just isolate one particular EDC, i.e., phthalates, when we're talking about a mixture of phthalates. But in this particular instance, that is the data, so I agree.
BY MR. LISAK:
Q Do you have an opinion as to what cumulative level of EDCs need to exist before you believe they will cause or contribute to uterine or endometrial cancer?
MS. PARFITT: Objection. Form. That question was asked several hours ago when he indicated he was talking about mixtures.
MR. LISAK: I'm asking him about mixture.
/ / / /

BY MR. LISAK:
Q If there's a product that has a mixture of endocrine-disrupting chemicals in it, what is the total amount of estrogenic activity that you believe is necessary in that mixture before it would begin to cause or contribute to endometrial or uterine cancer?
MS. PARFITT: Objection.
BY MR. LISAK:
Q Endometrial or ovarian cancer.
MS. PARFITT: Objection. That question was asked in the past. That's when we were talking about frequency and duration. I think he did answer your question earlier as to chemical hair relaxers.
BY MR. LISAK:
Q You can answer.
MS. PARFITT: Objection.
THE WITNESS: I believe that, in regards to parabens, I submitted you three articles of which the combined effect of parabens can approach the bioequivalency of estradiol. This particular paper does not address that.
BY MR. LISAK:
Q Right. I'm not asking just about this paper. I can't remember. I apologize. Did you

identify which of those three papers are for the parabens?

A It's in one of them. I'm sorry that I -- I was hastily putting this together in terms of the additional data or additional papers I had read. And I think it was very convincing to me that, if you put -- combine the parabens together, they approach -- clearly, they begin to approach equivalency to estradiol.

Q They're not the same as estradiol or greater than estradiol?

A No, they're not the same --

MS. PARFITT: Objection.

Again, Dr. Chang.

BY MR. LISAK:

Q They're not the same as estradiol, correct?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Same level?

A What do you mean the same level?

Q Well, you said they approach -- what did you say? These three combined -- this paper shows to you that these three -- the parabens combined -- did you say approach the level of estradiol?

A Yes. They were not at the same level of estradiol. Maybe slightly decreased, but clearly capable of enacting an estrogen -- probably an estrogen response.

Q And when you say "level," are you talking about dose or amount, or are you talking about binding affinity?

A It was binding or bioactivity, I think. We can go back to those papers if you'd like, and we can look at them.

Q Can you just identify them? Because I can't remember if we got that on the record.

A Was it one of these?

MS. PARFITT: Take your time, Doctor.

THE WITNESS: Okay. What happened to them?

MS. PARFITT: If you'd tell me what you're looking for.

THE WITNESS: I had given you three papers, and they're on parabens, and they're missing.

MS. PARFITT: Should we have them marked as exhibits?

MR. LISAK: Sure.

THE WITNESS: I think they were being

copied.

MR. LISAK: Should we go off the record while we find them?

MS. PARFITT: Let's go off the record for a moment.

THE VIDEOGRAPHER: The time is 3:17 p.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 3:24 p.m., and we are back on the record.

BY MR. LISAK:

Q Okay. We took another break to kind of figure out some logistics on these three papers that you were referring to before we took a break.

As I think you described, the three papers related to parabens that you reviewed in terms of the level of parabens -- how would you describe these three papers? I don't want to misquote you. In terms of how they fit into your analysis.

MS. PARFITT: Objection. Broad.

Go ahead.

THE WITNESS: It's not the three papers. It was one of the three papers I referred to.

(Exhibit 10 marked for identification.)

(Exhibit 11 marked for identification.)

(Exhibit 12 marked for identification.)

BY MR. LISAK:

Q Okay.

A And that paper is the Liang paper.

Q Okay. So just for the record, we've marked Exhibit 10, which is the Wei paper, W-E-I; Exhibit 11, the Lee paper; and Exhibit 12, the Liang paper.

And also, for the record, there's some checkmarks and underlining and notes.

Those are your handwriting, right?

A Yeah.

Q And again, tell us which one of these three papers --

A The Liang paper.

Q The Liang paper. Okay. So let's --

MS. PARFITT: Otherwise known as Exhibit 12.

MR. LISAK: Otherwise known as Exhibit 12. Thank you.

BY MR. LISAK:

Q Is this the paper you are relying upon for your testimony that the estrogenic bioactivity of the parabens, at least studied in what is Exhibit 12, approach the levels for estradiol?

A Yes.
Q And are you able to show us in Exhibit 12 what that level or those levels are?
A I believe so. If you turn to page 4.
Q Okay.
A That last paragraph on the left side:

"The study using the HitHunter assay showed a typical S-shaped curve for the dose response of E2," estradiol, "in its competition percent for human ER beta binding domain at the test concentration range of 10 to the -7," dash, "10 to 2 micromolar." And that's Figure 2C. "The calculated EC50, that's a 50 percent effective dose concentration value, was 9.4 nanomolars for E2, showing the sensitivity of the assay in evaluating estrogen stimulation. The similar competitive binding curves were observed in the treatments for propylparaben and butylparaben, 10 to the minus 4th to 10 to the 10 squared micromolar, indicating considerable binding capacities of these two parabens for ER beta, in Figure 2C. The calculated EC50s or effective

concentrations at 50 percent value were 13.9 and 4.1 micrometers per propylparaben and butylparaben respectively."

So if you consider that the EC50 for E2 was 9.4 nanomolars, then these two begin to approach somewhat closer approximation of estradiol, showing that it's not zero, nor is it .111 or 0000. It's within an acceptable relative range, which is -- was new to me when I read this, and reaffirming that, if you consider parabens as a group, plus phthalates as a group, plus bisphenols and all the other EDCs that are located in these hair relaxers, that this mixture together combined would, to me, have significance in terms of binding to the estrogen receptor.

Q Okay. And this study was done in "Zebrafish"?

A Yes.

Q Okay. You can put that to the side for now. Let me give you 12 to add to the pile.

A That goes here?

Q To the pile of exhibits.

A Whatever. Okay.

Q We went off a little bit on this other topic on parabens, but we were talking about the

three papers you mentioned earlier -- the other three papers --
A Yes.
Q -- concerning binding affinity. The Jobling and Harris we've talked about. The other one was the Soto paper.
That one -- the focus of that paper was on a screening method, right?
A Yes.
Q And there was a table. It looked like Table 3. I don't know if you have it in front of you because it's not in the binder.
MS. PARFITT: Let's get the article in front. It's not --
MR. LISAK: I think you said it wasn't here.
MS. PARFITT: It is not in our binder. So . . .
BY MR. LISAK:
Q Let me ask you this: Do you recall your review of the Soto paper?
A I reviewed it. I recall that.
Q Okay.
A I don't know why it's not in the binder.
MS. PARFITT: We don't have a copy. So

I'm concerned about an examination without the document in front of him, Counsel.

BY MR. LISAK:

Q Is there anything you specifically recall about the Soto paper, as you sit here today, in terms of the binding affinity of the studied compounds?

A It demonstrated --

MS. PARFITT: Let me object to the extent I don't want you speculating.

THE WITNESS: Okay.

BY MR. LISAK:

Q If you don't remember, you don't remember.

MS. PARFITT: Right.

THE WITNESS: And I can't provide detailed information.

BY MR. LISAK:

Q Let's shift gears a little bit.

Or actually, I just want to ask you one more thing.

MR. LISAK: Which is the tab that's the Blair paper?

MS. PARFITT: I'm sorry. Which one?

MR. LISAK: I'm asking -- here it is. Never mind.

BY MR. LISAK:

Q There's a paper with the lead author Blair. The title is "The Estrogen Receptor Relative Binding Affinities of 188 Natural and Xenochemicals: Structural Diversity of Ligands" in "Toxicological Sciences," 54, 138-153, in 2000.

Let me give you a copy of that. I'm going to mark it as Exhibit 13.

(Exhibit 13 marked for identification.)

BY MR. LISAK:

Q I didn't see this article in the reference list in your report, or I don't think I saw it in Exhibit 1A, which are the additional references we learned about today.

Looking at this paper, do you think you had reviewed this paper for purposes of your report?

A I can't say that I have.

Q The keywords for this paper, if you look at the abstract, are "estrogen receptor competitive-binding assay," "relative binding affinity," "estrogens," "antiestrogens," "alkylphenols," "organochlorines," "pesticides," "parabens," and "phthalates."

Can you think of a reason why this paper might not have come up in your PubMed search, given

the words you gave us that you used?

MS. PARFITT: Counsel, objection. Speculation. And it is not listed in his reference list. If you want him to comment on the document, he'll have to take some time to do it.

BY MR. LISAK:

Q Well, I'm just asking a question about it first.

I think you told us some of the terms you used in your PubMed search were "endometrial cancer," "endocrine-disrupting chemicals," "parabens," "phthalates," "phenols," "BPA," "PCOS," "hormone relaxer" -- sorry, "hair relaxer products," and some of the other terms.

Some of those overlap with the keywords related to this study.

Do you know why you might not have seen this study?

MS. PARFITT: Objection. Form. Again, it's not listed in his references.

THE WITNESS: Can't explain.

BY MR. LISAK:

Q If you take a look at Table 6.

MS. PARFITT: Counsel, I'll object to the extent he's testified he's not seen this paper. If

you're going to question him with regards to the paper, we need to give him some time to look at the paper.

He's already stated this is not -- it's not listed on his references or materials considered, and he's just stated this is not something that he's reviewed prior to his deposition. So if you're going to question him, we need to give him time to look at the document. We're not going to go to certain sections of it or to certain tables and have him comment.

THE WITNESS: I would have to thoroughly kind of read this, to be honest with you. I can't do it. I know you want to request that. You can't have it, because I can't do it in the time allotted.

MS. PARFITT: I've made my objection. Thank you.

MR. LISAK: Let's put this to the side for now.

MS. PARFITT: Good.

BY MR. LISAK:

Q I'll shift gears a little bit.

I think you told us earlier that you had never conducted -- well, you didn't conduct a Bradford Hill analysis for your report, correct?

A I read it. And -- did I personally do a Bradford Hill analysis?
Q Right.
A In what respect?
Q In your report. I'm just trying to lay the foundation that I think you told us earlier you didn't conduct a Bradford Hill analysis as part of your work in this case, and therefore, that's why it is not in your report.
A Exactly.
Q Okay. And I think you told us earlier that you -- while you're familiar with the term "Bradford Hill analysis," you have never conducted a formal Bradford Hill analysis prior to your work in this case, correct?
MS. PARFITT: Objection. Form. Misstates his testimony.
BY MR. LISAK:
Q Is that correct?
A No.
Q But you're familiar a little bit with the analysis?
MS. PARFITT: Objection to "familiar a little bit."
/ / / /

BY MR. LISAK:

Q You've heard the term "Bradford Hill analysis"?

A I've heard the term.

Q And do you know whether or not -- whether the strength of association in a Bradford Hill analysis depends on how large and consistent risk estimates are across studies?

MS. PARFITT: Objection. Form.

THE WITNESS: Cannot comment on that.

BY MR. LISAK:

Q All right. Do you know whether or not the dose-response or biologic gradient is an important factor in a Bradford Hill analysis?

MS. PARFITT: Objection. Form.

You may answer.

THE WITNESS: Ask the question again, please.

BY MR. LISAK:

Q Do you know whether or not a dose-response relationship or, as it's sometimes called, the biologic gradient, is an important factor in conducting a Bradford Hill analysis?

MS. PARFITT: Objection. Form.

THE WITNESS: I think so.

BY MR. LISAK:
Q Okay. All right. You did review, looking at your references, and you did comment on the epidemiologic studies in this case, correct?
A Yes.
Q So let's take a look at Tab 43.
MR. LISAK: It's coming.
MS. PARFITT: This will be Exhibit 14.
(Exhibit 14 marked for identification.)
BY MR. LISAK:
Q So 43 is actually a paper that I saw you had printed out and brought with you today, the Sandler paper.
MS. PARFITT: Do you want to get yours, Doctor?
THE WITNESS: Where is that?
BY MR. LISAK:
Q You can just use the one that I marked. It's the same paper.
MS. PARFITT: It's in your package. The Sandler paper. It's under your --
THE WITNESS: It's one of these.
BY MR. LISAK:
Q I'll just identify it while you're looking for it. It's called the "Sister Study cohort:

Baseline Methods and Participant Characteristics," lead author Sandler --

A Yes, I've got it.

Q "Environmental Health Perspectives."

Do you have it?

A Yeah.

Q And if you look at the abstract, it says:

"The Sister Study was designed to address gaps in the study of environment and breast cancer by taking advantage of more frequent breast cancer diagnoses among women with a sister history of breast cancer and the presumed enrichment of shared environmental and genetic exposures."

Correct?

A Yes.

Q The objective was, the Sister Study sought a large cohort of women never diagnosed with breast cancer who had a sister, full or half, diagnosed with breast cancer, right?

A Right.

Q So the folks studied as part of the Sister Study, they all had a family history of breast cancer, right?

MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q And the Sister Study also, if you look at page 2, at the top right-hand corner, it says "A history of cancer other than breast was not considered a basis for exclusion." Right?
A Correct.
Q So the participants in the study not only had a sister with breast cancer, but if they themselves had a history of other types of cancer, meaning not breast cancer, they would not be automatically excluded from the study, right?
MS. PARFITT: Objection.
BY MR. LISAK:
Q Correct?
A I understand that, yes.
Q So let's take a look at the table on page -- it's Table 2 on page 5. And it lays out some information about the study participants and the passive cohort.
Do you see that in Table 2?
A Uh-huh.
Q Excuse me. Under "Race/ethnicity," it says that The non-Hispanic Black participants in the study was 4,462 people, which comprised 8.8 percent

of the total study participants, correct?
A Uh-huh.
Q Is that a "yes"?
MS. PARFITT: Are you there?
THE WITNESS: Yes.
BY MR. LISAK:
Q So the vast majority of the study participants in the Sister Study were not non-Hispanic Black individuals, correct?
A Correct.
Q If you take a look at Table 3 on page 6, it has some other information about the study participants. It's called "Health and lifestyle characteristics of Sister Study participants at baseline, 2003-2009."
One of the things it notes is the smoking status, correct?
A Yes.
Q And it says, for study participants, 8.2 percent were current smokers and 35.7 percent were former smokers, correct?
A Correct.
Q It also gives BMI information. And 31.8 percent had a BMI of between 25 and 29.9, correct?

A Correct.
Q 17.3 percent had a BMI of between 30.0 and 34.9, correct?
A Yes.
Q And 7.8 percent had a BMI of between 35.0 and 39.9, correct?
A Correct.
Q And 5 percent had a BMI equal to or greater than 40.0, correct?
A Yes.
Q And then if you look at "Personal history of cancer other than breast or NMSC."
What is NMSC, if you know?
A It's non-melanoma skin cancer.
Q So, in terms of folks with ovarian cancer, 0.3 percent of the study participants had already had a history of ovarian cancer, correct?
A Correct.
Q And 4.9 percent had some other form of cancer?
A Noted.
Q Okay. Let's take a look at Tab 45, which will be Exhibit 15, I think.
MS. PARFITT: I'm sorry. That was Tab 44 before that. The Sandler study was --

MS. PALACIOS: Tab 43.
MS. PARFITT: Thank you.
(Exhibit 15 marked for identification.)
BY MR. LISAK:
Q So what this is, sir, is the -- you see it says on the left here "The Sister Study, Personal Care Questionnaire, Version 3."
A Uh-huh.
Q Do you see that?
A Yes.
Q You understand, as part of the Sister Study, study participants filled out a questionnaire about their health history, if you will, right?
A Yeah.
Q And if you take a look at question 103, which is on page --
A 18.
Q -- 18. You're quicker than me. It asks for the study participants to answer this question. "In the past 12 months, how frequently have you or someone else straightened or relaxed your hair, or used hair-pressing products?" Correct?
A Correct.
Q So that question isn't specifically asking how often in the past 12 months you or someone else

used chemical hair relaxers, right?
MS. PARFITT: Objection.
THE WITNESS: What was the question again?
BY MR. LISAK:
Q The question 103 that asks about -- that we just read doesn't ask about "In the past 12 months, how frequently have you or someone else used chemical hair relaxers only?" Right?
A Right.
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q It lumps together the use of straightening or relaxed your hair or used hair-pressing products, right?
A Right.
MS. PARFITT: Objection. Form.
THE WITNESS: Sorry.
BY MR. LISAK:
Q So the questionnaire didn't distinguish which women used chemical hair relaxers versus straightening products versus hair-pressing products, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Appears to be the case.
/ / / /

BY MR. LISAK:
Q So, if you look at the results in the study -- and we're going to look at the studies that relied upon this data -- you can't tell which study participants who had either endometrial cancer or ovarian cancer used chemical hair relaxers versus pressing products versus straighteners, right?
MS. PARFITT: Objection. Form. Misstates the evidence in this case.
BY MR. LISAK:
Q Correct?
A Correct.
Q And they're only asking about the use of these various products lumped together over the past 12 months, right?
A Right.
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q Not lifetime use, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Right.
BY MR. LISAK:
Q And is there anything that you recall from -- I'll wait until I get to the actual study.
Okay. So let's take a look at the White

Study, which is Tab 46.
MS. PARFITT: And you have it there, Dr. Chang.
THE WITNESS: Yes.
(Exhibit 16 marked for identification.)
BY MR. LISAK:
Q So Exhibit 16 is the White --
MS. PARFITT: I believe Exhibit 17.
THE WITNESS: I have it.
MR. LISAK: Oh, sorry. Is it -- it's 16.
THE REPORTER: 16.
MS. PALACIOS: 16.
MR. LISAK: I'm sorry. Some confusion. 16. Okay.
BY MR. LISAK:
Q So this is the White Study in "Carcinogenesis" 2021, Volume~42, No. 9, 1189-1195.
This is an article you reviewed, relied upon, and discussed in your report, correct?
A Uh-huh. Yes.
Q And this study focuses on the use of hair products and ovarian cancer, correct?
A Correct.
Q Relied upon the Sister Study data. That was the questionnaire we just looked at.

A Right.

Q So it's looking at data from exposure over the last 12 months to relaxers, straighteners, and hair-pressing products over the previous 12 months, right?

A Right.

Q In fact, if you look at page 1193, the bottom left-hand corner, the authors themselves say "A potential limitation is that our questionnaire asked about use hair straighteners/relaxers or pressing products," right?

A Where are you?

Q Underneath Table 3 on the left-hand side, the first sentence.

MS. PARFITT: First paragraph.

THE WITNESS: Okay.

BY MR. LISAK:

Q First paragraph. I just read the first sentence.

A Okay.

Q You agree, the authors state a potential limitation is that their questionnaire asked about the use of hair straighteners/relaxers or pressing products, right?

A Correct.

Q They go on to say:

"Pressing hair is a more temporary method of hair straightening that uses a heated comb or flatiron. It can be done in combination with some type of hair product, although this would be distinct from products used for chemical straightening/relaxing of hair."

Right?

A Correct.

Q So, based on the exposure data in the questionnaire, it's unknown whether someone used a chemical relaxer, a hot comb, a flatiron, Brazilian blowout, keratin straightening, or other heat pressing products, fair?

MS. PARFITT: Objection. Form.

THE WITNESS: Fair.

BY MR. LISAK:

Q If you look at page 1194 -- it's kind of funny. It begins, actually, on the bottom of page 1193. The last sentence says:

"Identifying more specific chemicals of concern remains an ongoing challenge. We did not ask about specific formulations."

And that sentence --
MS. PARFITT: I'm afraid -- I think he's lost.
BY MR. LISAK:
Q Okay. If you look at the bottom of page 1193 --
A Okay. I see it.
Q -- there's a sentence -- I'll start it again, but just so you know, the sentence starts at the bottom of page 1193, and then because of the tables in 1194, the sentence doesn't conclude until 1195.
A Okay.
Q I'll read that.
A Okay.
Q You tell me if I read it correctly, and then I'll ask you a question. Okay?
A Okay.
Q It says:
"Identifying more specific chemicals of concern remains an ongoing challenge. We did not ask about specific formulations, brands or ingredients of products that were used, and thus are unable to hypothesize about the effects of

individual chemicals."

Did I read that correctly?

MS. PARFITT: He's simply asking if he read it correctly.

THE WITNESS: Yes.

BY MR. LISAK:

Q And do you agree that that is a limitation on interpreting their data?

MS. PARFITT: Objection. Form.

THE WITNESS: Yes. Yes.

BY MR. LISAK:

Q Okay. If you look at page 1190, under "Results" -- let me know when you're there.

A Yep.

Q It says:

"On average, at baseline, women who went on to develop ovarian cancer were older, more likely to be non-Hispanic White, have lower education attainment and a higher BMI than women in the full cohort."

Correct?

MS. PARFITT: Is that what it says, or is that his opinion?

/ / / /

BY MR. LISAK:
Q I read that correctly?
MS. PARFITT: Thank you.
THE WITNESS: Yeah, that's correct.
BY MR. LISAK:
Q But you noted in page 40 of your report -- sorry. Withdraw that partial question.
Why didn't you note in your report regarding this study that the women who went on to develop ovarian cancer tended to be older, White, have a lower education attainment, and have higher BMI than women in the full cohort?
MS. PARFITT: Objection. Form.
THE WITNESS: What was the question again?
BY MR. LISAK:
Q Why didn't you note this data, the results of the authors where they say that women who went on to develop ovarian cancer were older, more likely to be White -- non-Hispanic White, have lower educational attainment, and a higher BMI than women in the full cohort?
MS. PARFITT: Objection.
BY MR. LISAK:
Q You didn't note that in your report, did you?

MS. PARFITT: Objection. Form.
THE WITNESS: I didn't realize that it was statistically significant.
BY MR. LISAK:
Q So, if it's not statistically significant, it wasn't worth noting?
MS. PARFITT: Objection. Misstates his testimony. That's not what he testified to.
BY MR. LISAK:
Q Did you just say you didn't realize it was statistically significant?
MS. PARFITT: Objection. Form.
THE WITNESS: Well, my interpretation was that -- I realized that, and I pointed it out with some marks down here. But the take-home message for me was that they hadn't included risk of ovarian cancer, still recognizing that these features existed.
BY MR. LISAK:
Q In your report at page 41, if you want to look at it --
MS. PARFITT: Please go to your report, Doctor. Do you have that in front of you? Yeah. Page 41.
/ / / /

BY MR. LISAK:
Q Page 41 at the top, you note in reference to this paper that "The findings revealed a positive association of hair straighter use and ovarian cancer (HR = 1.29, 95 percent confidence interval 0.7 through 2.38)," correct?
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q And because the confidence interval crosses 1.0, you can't rule out chance concerning that finding, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: That's interesting.
I began to look at these statistical manipulations, and becoming aware of the trend to begin to understand what the meaning of hazard ratios and confidence limits are. And so, having read about this, as an opinion by statisticians who are epidemiologists, I have a new appreciation for this, in that, while confidence limits may cross 1, classically, they'll render not significant.
BY MR. LISAK:
Q You're saying if a confidence level --
MS. PARFITT: Wait. Let him finish.

MR. LISAK: I'm trying to understand.
Oh, you're still talking.
MS. PARFITT: Let him finish.
THE WITNESS: So when the confidence interval spans 1 --
BY MR. LISAK:
Q Right.
A -- generally, in the past, they've considered this to be non-significant.
Q Right.
A However, recently, I've become aware of the fact that this is not totally correct. In fact, if you look at -- it's .7, which is not far removed from 1, all the way to 2.38. And with the odds -- hazard ratio being 1 point -- roughly 1.3, that there's a trend here.
And the trend makes this more than just what it appears to be, in that you have to consider the spectrum. And while this is not classically considered statistically significant, it does indicate a trend. And that's a trend in the positive direction.
Q Is it -- and I understand you're not an epidemiologist, but is it your testimony that statistical significance is no longer important to

epidemiologists?

MS. PARFITT: Objection. Misstates his testimony.

THE WITNESS: I didn't say that.

Do you want to restate your question?

BY MR. LISAK:

Q Is the fact that a reported data or hazard ratio crosses 1.0, when you're looking that -- at that, does that affect in any way your assessment of whether a hazard ratio is real or not?

MS. PARFITT: Objection. I believe asked and answered.

THE WITNESS: What it -- I'm not saying that there is a statistical significance. I'm saying there's a trend. And that trend is important for anticipating. So it's as if the case if it's less than P .05, it's significant.

Well, what about the P that's .06 or .07? Are we to just totally disregard the data that reflects that particular statistical value?

And after years and years of research and doing statistics and accepting these, quote, "principles," after reading the recent declaration of reconsideration, that in fact, while this is, quote, "not statistically significant" by classical

standards, it is very important because of the trend positively moving forward.

BY MR. LISAK:

Q Are you able to tell us what materials you've read that you've been referring to generally that you've been reading about the importance of statistical significance in epidemiological findings?

A Yes.

MS. PARFITT: Objection as to the importance of statistical significance. We're talking about statistical significance. Misstates his testimony.

BY MR. LISAK:

Q Is it listed in the references of your report or Exhibit 1A?

MS. PARFITT: Yes, it is, Counsel.

MR. LISAK: It wasn't a question for you, Michelle.

MS. PARFITT: I thought you were asking me. I honestly thought you were asking me.

THE WITNESS: No. It was a statement made, issued -- I just read it recently. And it was constructed by about 2,000 epidemiology statisticians. And I think -- who is it?

Rutherford was the guy -- somebody like that -- who kind of pioneered this, began to say, "Hey, we need to look at this a little differently. This is not" -- we're throwing out a lot of the baby with the bathwater, so to speak.

And I think that he had a valid point. Because I had wondered about this myself because one of my papers got rejected because the value was .06.

BY MR. LISAK:

Q Right. So, in your personal experience, you're aware of the fact that, in peer-reviewed journals, often submitted papers don't get published if they don't have statistically significant results, right?

MS. PARFITT: Counsel, objection. Form. Speculative. "Other journals"? What's that mean? I mean . . .

BY MR. LISAK:

Q You can answer.

MS. PARFITT: Objection.

BY MR. LISAK:

Q Did you just tell us that one of your submitted papers was rejected for publication because you didn't have statistically significant data?

MS. PARFITT: If that's the question, that's a different question.

BY MR. LISAK:

Q Is that correct?

A Yes.

Q Are you aware -- and if you're not, you can just say "I don't know" -- that journals will reject publications that don't report statistically significant findings for epidemiologic studies?

MS. PARFITT: Objection. Form.

How would he know what journals do?

THE WITNESS: I can't answer that question. I don't know.

BY MR. LISAK:

Q Well, you said in your report that you follow -- I want to get it correct. While your expertise is in the area of obstetrics, gynecology and reproductive endocrinology, I routinely consider studies and scientific literature from various scientific and medical fields, including epidemiology and other things, right?

A Yep.

Q And when you consider those papers as part of your clinical or academic activities, when you read something that's reported that's statistically

significant versus something that isn't, before this case at least, did you consider results that were statistically significant to be more certain than those that were not?

MS. PARFITT: Objection. Form. Misstates his testimony.

MR. LISAK: It's not restating any of his testimony. I'm asking --

MS. PARFITT: It is, Counsel. I mean, you're --

MR. LISAK: No.

BY MR. LISAK:

Q Go ahead. You can answer.

MS. PARFITT: And compound.

THE WITNESS: I had an answer on the tip of my tongue, but you folks are talking back and forth. I forgot about it.

MR. LISAK: Well, you've got to tell Michelle to stop the speaking objections, and then you can remember my question.

MS. PARFITT: Counsel, what's the question?

THE WITNESS: Can you repeat the question?

BY MR. LISAK:

Q I will try.

Prior to your work in this report, when you were reviewing -- as part of your clinical and academic activities, when you read something that was reported as statistically significant versus something that wasn't, did you consider statistically significant results to be more certain than those that were not statistically significant?

MS. PARFITT: Objection. Form.

THE WITNESS: When using the P value in applying statistics in science, basic science as opposed to epidemiology, those are kind of like apples and oranges in terms of the methodology that's used.

When -- I have always looked at epidemiology and accepted the dictum that they don't cross 1. But, as I indicated previously, having been aware of this new movement that's been going on for about one to two years now, that I thought it was very reasonable. But I have noted the trends in the past had not said much about them. But I said "That's curious. It's not there, but the trend is there," but obviously accepted the paper with a question in my mind "Are we missing something?"

BY MR. LISAK:

Q Okay.

A And I'm glad to see that this has now emerged, this statement by statisticians worldwide, that maybe we're kind of throwing the baby out with the bathwater. Maybe there is more information here that we need to look at and consider. And I think that's reasonable.

Q In your report, you talked about this hazard ratio of 1.29 with a confidence interval of 0.70 to 2.38 as a positive association. But if you look at the White Study itself at page 1191 --

MS. PARFITT: Your White paper.

Counsel, just give him one moment to get to that. Page 1191.

THE WITNESS: Got it.

MS. PARFITT: Got it?

BY MR. LISAK:

Q Underneath Table 1, it says "We did observe an imprecise but positive association between ever use of straighteners and incident ovarian cancer," citing that same data that you cite in your report, correct?

A Right.

Q Is there a reason you didn't use the word "imprecise" about this association like the authors themselves did?

MS. PARFITT: Objection. Form.
THE WITNESS: No.
BY MR. LISAK:
Q Do you agree that -- I think you mentioned in your report that, in your opinion, the majority of the users of chemical hair relaxers were African American women or women of color, correct?
A Noted.
Q But only 8.8 percent of the women in the Sister Study were African American women or women of color, correct?
A Yes.
Q Does that fact affect your opinions in any way as to whether or not the data reported in the White Study are -- whether it's an -- whether the study population is indicative of most of the women that are using chemical hair relaxers?
MS. PARFITT: Objection. Form.
THE WITNESS: Restate the question, please.
BY MR. LISAK:
Q Did the fact that only 8.8 percent of the women in the Sister Study consist of women who were of color or African American affect your reliance upon the White paper as to whether or not it is

applicable to the majority of women that use chemical hair relaxers?

A No.

MS. PARFITT: Objection to form.

BY MR. LISAK:

Q If you can look at Table 2 on page 1192, under "straightener/relaxers" -- again -- right? -- we're talking not just about relaxers, right? And it reports data for both never and ever users. And for ever users, individuals with ovarian cancer, there were 24 ever users of either straighteners or relaxers with ovarian cancer in the study participants, correct?

A Correct.

Q Would you consider that a small sample size?

MS. PARFITT: Objection. Form.

THE WITNESS: No.

BY MR. LISAK:

Q And the hazard ratios and the confidence intervals for ever users of straighteners or relaxers for those 24 women, age-adjusted hazard ratio of 1.37, confidence interval 0.89 to 2.10, that crosses 1.0, correct?

A Yes.

Q The age and race ethnicity adjusted hazard ratio is 1.26, confidence interval 0.69 to 2.30, that also crosses 1.0, correct?
A Yes.
MS. PARFITT: Are you tracking, Doctor?
BY MR. LISAK:
Q And then we've already talked about the multivariable adjusted hazard ratio of 1.29 with a confidence interval of 0.7 to 2.38, which crosses 1.0, correct?
MS. PARFITT: Objection.
THE WITNESS: Correct.
BY MR. LISAK:
Q If you look at Table 3, under -- which is on page 1193, it talks about straighteners/relaxers, frequency of use in the 12 months prior to baseline.
Do you see that?
A Yes.
Q And for people that used those types of products -- again, all these products over the last 12 months -- less than or equal to four times a year versus greater than four times a year as presented, and as well as never users, correct?
A Correct.
Q And for people that used those types of

products greater than four times per year, at least in the prior 12 months, there were 20 individuals with ovarian cancer, correct?

A Yes.

Q And for people that used it less than or equal to four times per year, there were four, correct?

A Yes.

Q Okay. The last thing I want to ask you, I think, about this paper is, on page 1195, towards the end, middle of the paragraph, there's a sentence that reads:

"Given the novelty of these findings, more research is needed to confirm our results and identify constituents of these products that may be driving this risk."

Correct?

A Correct.

MS. PARFITT: Again, is that what it says?

BY MR. LISAK:

Q That's what it says, right?

A That's what it says. Yeah.

Q Do you agree that the authors of this paper, in this conclusion, do not say that the use

of relaxers, straighteners, and hair-pressing products cause ovarian cancer?

They don't reach that conclusion, do they?

MS. PARFITT: Objection. Form.

THE WITNESS: What they do provide is the plausibility that these hair straighteners/relaxers cause cancer.

BY MR. LISAK:

Q Can you say that again? I'm not sure I understood that.

MS. PARFITT: Read it back.

(Record read.)

BY MR. LISAK:

Q So how is it that this paper provides plausibility that they cause cancer if the authors themselves don't reach that conclusion?

MS. PARFITT: Objection. Form.

You may answer, Doctor.

THE WITNESS: That's generally a statement that everybody puts in their papers. I've put that in my papers before. I've read that. It's to -- it's to indicate that they likely are going to do more on this, but it also does not -- does not devalue in any way the data that is being presented here.

BY MR. LISAK:

Q The authors say that more research is needed to confirm their results, right?

MS. PARFITT: Objection. Form. Asked and answered.

THE WITNESS: Everybody says that.

BY MR. LISAK:

Q So you don't think they were being intentional in using that language?

MS. PARFITT: Objection, Counsel. Asked and answered.

THE WITNESS: I cannot speak for the authors.

BY MR. LISAK:

Q Okay. Well, you are -- you have been for the last two minutes.

MS. PARFITT: Objection, Counsel.

THE WITNESS: I've been commenting on the paper. I have not been --

MS. PARFITT: Misstates his testimony.

Go ahead, Dr. Chang.

THE WITNESS: I'm commenting on the paper. I haven't spoken for the authors.

BY MR. LISAK:

Q One more question. Table 5. Oh, sorry.

That's . . .

A Wrong paper?

Q Hold on. Yeah. Table 5.

A Okay.

Q If you look at page 190 -- 1194, it has some information about the use of straighteners or relaxers for non-Hispanic White women and African American/Black women, correct?

A Yes.

Q And it reports frequent versus never users, a hazard ratio for African American women of 1.82 with a confidence interval of 0.64 to 5.18. And that crosses 1.0, correct?

A Correct.

Q And would you describe -- and you may not know as a non-epidemiologist that the confidence interval of 0.64 to 5.18 is a wide confidence interval, correct?

MS. PARFITT: Objection. Just ask the question. You don't have to characterize him as an epidemiologist or not.

BY MR. LISAK:

Q You can answer.

A In considering that hazard ratio and confidence limits, the extension of the confidence

limits to 5.18, together with the nearness of the .64 to 1, would be -- again, become a trend. And for me, that's a very bothersome trend moving towards significance.

Q Let's take a look at Tab 47, which is the Chang 2022 study.

A Okay.

(Exhibit 17 marked for identification.)

BY MR. LISAK:

Q This is going to be Exhibit 17. This is data concerning the use of straighteners and other hair products and uterine cancer, as opposed to ovarian cancer, right?

A Yes.

Q And this is based upon the same study and study population and questionnaire as the White paper we just discussed, correct?

A Correct.

Q This is all based on the Sister Study, this paper, right?

So whatever -- the same issues as to this is data concerning 8.8 percent non-Hispanic African American -- non-Hispanic White women, correct?

A Uh-huh.

Q In other words, 8.8 percent of the study

participants that the Chang paper is based on were African American or Black women, correct?

A Yes.

Q And it also combines the use of different types of hair products together, not just chemical hair relaxers?

A Right.

Q And it also only bases its data upon the use of such products over the past 12 months, right?

A Yes.

Q Okay. These are also study patients that all had a sister -- having a sister with breast cancer wouldn't exclude you from the study, correct?

A Correct.

Q And the same percentage of smokers and BMI and ovarian and other forms of cancer that we talked about in the White study, correct?

A Correct.

MS. PARFITT: Objection. Form.

THE WITNESS: Sorry.

BY MR. LISAK:

Q So for any of the individuals with uterine cancer reported in the Chang study, you wouldn't be able to tell which ones of them have used chemical hair relaxers in the prior 12 months, right?

MS. PARFITT: Objection. Form.
THE WITNESS: Correct.
BY MR. LISAK:
Q If you take a look at Bates -- sorry, not Bates but page 1642, bottom right-hand corner. Let me know when you're there.
A Okay.
Q There's a sentence that reads:

"More research is warranted to confirm our novel findings in different populations, particularly in African American and/or Black women because of the high prevalence of straightener use, and to evaluate the potential contribution of hair products to health disparities in uterine cancer."

Right?
MS. PARFITT: Is the question is that what that statement says?
BY MR. LISAK:
Q Is that what it says?
A That's what it says, yes.
Q So the authors are reporting that they believe more research is warranted to confirm their novel findings, right?

MS. PARFITT: Objection. Form.
THE WITNESS: Correct.
BY MR. LISAK:
Q And actually, if you look at Table 5 on Bates -- sorry, on page 1643, it presents some data on the race and ethnicity of the study participants, correct?
A Correct.
Q And so, for folks who reported as ever using straighteners, relaxers, or pressing products over the previous 12 months prior to enrollment, the hazard ratio for African American/Black women is 1.66, confidence interval 0.67 to 4.09, correct?
A Yes.
Q Crosses 1.0?
A Yes.
Q And it actually reports that non-Hispanic White women, their hazard ratio for ever users was 1.94 with a confidence interval of 1.09 to 3.47, correct?
A Yes.
Q So that doesn't cross 1, right?
A Right.
Q So they're presenting statistically significant data for ever users of these products

for non-Hispanic Whites, but not statistically significant data for African American/Black women, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Again, I maintain that the trend here is fairly substantial. It's point -- confidence intervals are .67 to 4.09, which is substantial. And so --

MS. PARFITT: Let him finish.

THE WITNESS: -- with the hazard ratio of 1.66, I think that must be considered and not ignored as a flat no. It's something that's trending. So it clearly is a positive association.

BY MR. LISAK:

Q They are presenting data that shows that the hazard ratio for non-Hispanic White women using these products has a higher hazard ratio than African American/Black women, right?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q For ever users.

MS. PARFITT: Objection. Form. He's answered the question.

MR. LISAK: He didn't answer it.

MS. PARFITT: He did.

MR. LISAK: He started talking about statistical significance. I didn't ask about that.

MS. PARFITT: Counsel, he answered your question.

BY MR. LISAK:

Q Did these data report a higher hazard ratio for a non-Hispanic White women than African American/Black women for ever use of these products and uterine cancer?

MS. PARFITT: Objection. Form. Asked and answered.

THE WITNESS: Doesn't it say that?

BY MR. LISAK:

Q Do you agree that --

A 1.66 to 1.94.

Q Right.

A Okay. So what's the question?

Q So you agree that they're presenting data showing that, based on this questionnaire at least, more non-Hispanic White women had uterine cancer than African American or Black women for ever users, right?

MS. PARFITT: Objection. Form. Asked and answered.

THE WITNESS: I think that's a relative

question, in that it's not clear that if you compare 1.6 -- excuse me, 1.66 against 1.94, is there a major difference here. Is there a major difference? I don't know.

BY MR. LISAK:

Q I'm asking, do you think that's a major difference?

A I think they're moving the same direction.

Q Is .3 not different to you?

MS. PARFITT: He's just answered the -- Counsel, objection. Form. He just answered the question.

BY MR. LISAK:

Q Is that not a major difference?

MS. PARFITT: He just answered. He said he thinks they're almost the same. What more do you want? Move on, please.

BY MR. LISAK:

Q So 1.66 and 1.94 is almost the same to you?

A They're notable. They're notable. They're progressing. These are very positive associations.

Q And if you look at the frequent users under "Race and Ethnicity," it also reports a higher

hazard ratio for non-Hispanic White women than African American/Black women for frequent users of these products, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
BY MR. LISAK:
Q And you may not -- it may not matter to you, but for White women, that is a confidence interval of 1.25 to 5.67, which does not include 1.0, correct?
MS. PARFITT: Objection, Counsel.
THE WITNESS: Correct.
BY MR. LISAK:
Q You can answer.
MS. PARFITT: We can do without "It may not matter to you."
You may answer the question, Dr. Chang.
THE WITNESS: Correct.
BY MR. LISAK:
Q Does it matter to you that the confidence interval doesn't cross 1?
MS. PARFITT: Objection. He's testified numerous times now the relevance of crossing 1.
THE WITNESS: I'm not sure what the point of your question is, or is it just to state what is

written here?

BY MR. LISAK:

Q Well, I'm trying to understand, when you looked at this data and you cited this data in your report, what was most important to you and whether you considered some of the data.

And so I'm asking you, when you reached your conclusions in your report, did it matter to you that there was a statistically significant finding of hazard ratio for frequent users of these products for non-Hispanic White women, as opposed to a non-statistically significant finding for frequent African American and Black women using these products over the prior 12 months?

MS. PARFITT: Objection. Form. Argumentative. You've asked the question.

BY MR. LISAK:

Q Did that figure into your opinions in this case?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q You can answer.

MS. PARFITT: Objection. Form.

THE WITNESS: As I indicated previously, that I've become aware of the change in statistical

evaluation or interpretation, and as a result, you know, I have now modified my interpretation. While it may not be statistically significant, the trend is something to be noted.

BY MR. LISAK:

Q Okay. Let's take a look at Tab 48, which is the Bertrand study. This is Exhibit 18.

Do you have it?

MS. PARFITT: Yes. Thank you.

(Exhibit 18 marked for identification.)

BY MR. LISAK:

Q And the version that's been marked is your -- as the exhibit was your copy, and it has your notes on it.

A That's okay.

Q And you see it's kind of faint there from the copying, but that was the study that you wrote "good" on, right?

A Yeah.

Q And you told us you thought that was a good study?

A Yeah.

Q I didn't notice you writing the word "good" on your copies of the Chang or White studies. Correct?

MS. PARFITT: Objection. Form.
THE WITNESS: True.
BY MR. LISAK:
Q Okay. Let's take a look at the Bertrand study. Now, this is not based on the Sister Study. This is the Black Women's Health Study, correct?
A Correct.
Q So the women that were the study participants here were African American or Black women, correct?
A Correct.
Q And that would be a more relevant population to those that use chemical hair relaxers, correct?
MS. PARFITT: Objection. Form.
Listen to the question, Doctor.
THE WITNESS: Are you stating that Black women use hair relaxers more frequently?
BY MR. LISAK:
Q Well, I thought you did in your report.
A I'm asking you.
Q Well, the way this works is I ask the questions, if you don't mind.
A All right.
Q But did you state in your report that

African American women used chemical hair relaxers more frequently than non-Hispanic White women?

A Yes, I did.

Q And so this -- the Black Women's Health Study would be a more relevant population for the question as to whether or not exposure to chemical hair relaxers are associated with gynecological cancer. Fair?

MS. PARFITT: Objection. Form.

THE WITNESS: Fair.

BY MR. LISAK:

Q I'm going to come right back to the study, but let's take a look at tab 49, which is the questionnaire for the Black Women's Health Study.

A Tab 49.

Q It's coming.

(Exhibit 19 marked for identification.)

BY MR. LISAK:

Q Okay. Here is the questionnaire.

MR. LISAK: And this is for Michelle.

MS. PARFITT: Got it. Thank you.

BY MR. LISAK:

Q Now, if you look at the questionnaire for the Black Women's Health Study, if you take a look at Question No. 27 on page 4.

Do you see that? Question 27?
A Yes.
Q And so this asks "Have you ever used a chemical hair straightener?" Correct?
A Yes.
Q So this is not combining straighteners -- non-chemical hair straighteners and pressing products. This is specifically asking about the use of chemical hair straighteners or relaxers, correct?
A Yes.
Q And so that is a more -- in terms of the exposure in the Black Women's Health Study and the Sister Study, we are able to look more specifically at the exposure to say it relates to chemical hair relaxers, as opposed to the different types of products that the Sister Study combined together, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: True.
BY MR. LISAK:
Q And it asks about whether they ever used them, not about whether they used products over the last 12 months, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.

BY MR. LISAK:
Q And then it asks "At what age did you first use those chemical hair relaxers?" Right?
A Yes.
Q And it also asks "How often do you or did you use chemical hair straighteners?" Right?
A Yes.
Q And it asks "In total, how many years have you used hair relaxers or hair straighteners?" Correct?
A Yes.
Q It also asks "How many times have you experienced burns, a break in the skin, not just tingling, during the application of chemical straighteners?" Correct?
A Correct.
Q And it also asks "Which of the following chemical hair straighteners have you used most often? Lye, no lye, don't know." Correct?
A Correct.
Q So, looking at this questionnaire, this is a much more specific and detailed questionnaire regarding the historic use of chemical hair relaxers than was asked about in the Sister Study, correct?
MS. PARFITT: Objection. Form.

THE WITNESS: Correct. Correct.
BY MR. LISAK:
Q And in a more relevant population, African American women, correct?
MS. PARFITT: Objection to the "more relevant population."
BY MR. LISAK:
Q Relevant to the majority of women who used these products per your own report, correct?
MS. PARFITT: Objection to the "use of more relevant data."
THE WITNESS: It seems to be the case.
BY MR. LISAK:
Q Okay. Let's go back to the Bertrand study itself, which I forget what exhibit number it was.
MS. PARFITT: Bertrand is 18.
MR. LISAK: 18. Okay.
BY MR. LISAK:
Q Now, in the abstract, the authors say: "Whether hair relaxer use increases risk of uterine cancer is unknown."
That's part of the background of the paper, correct?
MS. PARFITT: Are you just asking him if that's what it says?

MR. LISAK: Yes.
THE WITNESS: That's what it states.
BY MR. LISAK:
Q And let's take a look at Table 2, which is on page 3.
Do you have that?
A Yes.
Q And this presents the hazard ratios with 95 percent confidence intervals for uterine cancer in relation to hair relaxer use between 1997 and 2019, correct?
A Yes.
Q And under "Hair relaxer use," "never/light," "moderate" and "heavy" is presented at the top of that table, correct?
A Correct.
Q For heavy use, the age-adjusted hazard ratio is 1.02, correct?
A Yes.
Q So only .02 above 1.0, correct?
A Correct.
Q You understand that 1.0 is what epidemiologists would call the null hypothesis?
MS. PARFITT: Objection. Form.
/ / / /

BY MR. LISAK:
Q Correct?
A Correct.
Q And then under "multivariable hazard ratio" for heavy users, they report 1.18 with a confidence interval of 0.81 to 1.71, correct?
A Correct.
Q And so the heavy use hazard ratios both cross 1, correct?
A Correct.
Q And are barely over 1.0, correct?
MS. PARFITT: Objection. Form. "Barely"? What's that mean?
BY MR. LISAK:
Q Well, earlier you told me that 1.66 and 1.94 weren't really different.
Do you consider 1.02 and 1.18 significantly different --
MS. PARFITT: Objection.
BY MR. LISAK:
Q -- in terms of reporting an association?
MS. PARFITT: Objection. Form.
THE WITNESS: I can't respond to that.
BY MR. LISAK:
Q Why not?

A Are they significantly different?
Q Yeah. I mean, do you consider 1.02 --
A Significantly different from what?
Q 1.18.
MS. PARFITT: Objection. Form.
THE WITNESS: Oh, you mean the comparison between heavy and moderate?
BY MR. LISAK:
Q Well, I'm getting there.
MS. PARFITT: No.
BY MR. LISAK:
Q Right now I'm asking the difference between, under "heavy," the age-adjusted hazard ratio and the multivariable hazard ratio.
Do you consider -- let me ask it this way.
Do you consider a hazard ratio of 1.02 or 1.18 to exhibit a positive association between exposure and outcome?
MS. PARFITT: Objection. Form.
THE WITNESS: Mildly positive.
BY MR. LISAK:
Q And if you look at the difference between the heavy and moderate users of hair relaxers, when you look at moderate, age-adjusted hazard ratio is 1.18. The confidence interval is 0.83 to 1.68,

correct?
MS. PARFITT: Is that what this table states?
THE WITNESS: It says right here.
BY MR. LISAK:
Q So the confidence interval crosses 1.0, correct?
A Yes.
Q And the multivariable hazard ratio for moderate users is 1.23. Confidence interval 0.86 to 1.76. Crosses 1.0, correct?
MS. PARFITT: Is that what the table says?
THE WITNESS: Yes.
BY MR. LISAK:
Q And do agree that the hazard ratio both for age-adjusted and multivariable is higher for moderate use, as opposed to heavy use?
MS. PARFITT: Objection. Form.
THE WITNESS: That's what it states.
BY MR. LISAK:
Q So that is not evidence of dose response, correct?
MS. PARFITT: Objection. Misstates his testimony and his report.
MR. LISAK: I haven't asked him yet. So

how could it misstate his testimony?

MS. PARFITT: I've read his report. I think you have too.

MR. LISAK: Well, his report isn't his testimony. It's his report.

MS. PARFITT: Well, his report is indeed his testimony. But go ahead and ask your question.

BY MR. LISAK:

Q Do you consider the fact that moderate users had a higher association than heavy users to be evidence or lack of evidence of a dose response from the use of hair relaxers?

MS. PARFITT: Objection. Form.

THE WITNESS: It begs the question, certainly.

MS. PARFITT: Do you want to finish that question? Are you done?

MR. LISAK: He was finished.

MS. PARFITT: Are you done?

THE WITNESS: Well, the --

MR. LISAK: Michelle, that is incredibly inappropriate, what you just did. He was clearly done.

MS. PARFITT: All right. If he's done, that's fine. I'll reserve my questions for later.

That's fine. We'll move forward. I'll ask my questions. But, Counsel I will tell you, he does pause, as you have seen.

MR. LISAK: I've been trying.

MS. PARFITT: I know you're trying. We have to keep trying.

MR. LISAK: There's some long pauses.

MS. PARFITT: There are some long pauses, but that is how he testifies. Just give him time.

BY MR. LISAK:

Q Now, if you continue to look at Table 2, Doctor -- and I don't want to spend -- go through all of these data, but there's also data presented not just in terms of never, light, moderate and heavy use, but also duration of use, frequency of use, age at first use, and number of burns, correct?

A Correct.

Q And those were some of the questions we saw in the questionnaire, correct?

A Correct.

Q And none of the data reported -- well, let me do it this way.

In terms of duration of use, folks that said they've used it for greater to or equal 20 years --

MS. PARFITT: Are you there, Doctor?
THE WITNESS: Yes.
BY MR. LISAK:
Q Do you see that?
A Yes.
Q For age adjusted, HR is 1.16 with a confidence interval of 0.81 to 1.65. Crosses 1.0, correct?
A Correct.
Q And for multivariable hazard ratio, reports 1.28 with a confidence interval of 0.89 to 1.84. It crosses 1.0, correct?
A Correct.
Q For folks under frequency of use -- sorry, I just asked you about frequency of first use.
Age of first use. None of those results do not cross 1.0, correct?
A Correct.
Q And if you look at number of burns greater than or equal to 10 times, the age-adjusted HR is 1.10. The confidence interval is 0.74 to 1.62. Multivariable hazard ratio, 1.08 to 0.73 through 1.61.
A Wait a minute. Where are you?
Q Sorry. Under "number of burns" --

A Okay.
Q -- at the bottom, greater to -- greater than or equal to 10 times.
A Okay.
Q Age-adjusted HR is 1.10 with a confidence interval of 0.74 to 1.62. That crosses 1.0, correct?
A Yes.
Q And multivariable hazard ratio is 1.08 with a confidence interval of 0.73 to 1.61. That crosses 1.0 as well.
MS. PARFITT: And again, is that what the data says in the table?
THE WITNESS: Yes.
MS. PARFITT: Thank you.
BY MR. LISAK:
Q Let me ask you this, Doctor.
MR. LISAK: Where is the Pierce Study? Which tab?
MS. PALACIOS: Tab 50.
MR. LISAK: 50.
MS. PALACIOS: Yep.
(Exhibit 20 marked for identification.)
BY MR. LISAK:
Q This is Exhibit 20, the Pierce Study.

MS. PARFITT: Thank you.
Do you have yours in front of you as well?
Do you have yours?
THE WITNESS: Do I have it here?
BY MR. LISAK:
Q This is included in your reference list, but I didn't see it cited or discussed in your report, correct?
Is that correct, sir?
A I believe you're correct.
Q And this study is entitled "Evaluation of dermal exposure to phthalates and parabens resulting from the use of hair relaxers," right?
A Yes.
Q Published in the "International Journal of Environmental Health Research," 2025, Volume 35, No. 7, pages 1707-1726, correct?
A Yes.
Q Is there a particular reason you didn't cite or discuss this paper in your report?
MS. PARFITT: Objection. Form.
THE WITNESS: I can't recall.
BY MR. LISAK:
Q Okay. When you look at page 5 of your report, in the paragraph above the executive

summary -- I'll let you get there. Page 5 of your actual report.

A What page?

MS. PARFITT: Page 5.

BY MR. LISAK:

Q Page 5 of your report in the paragraph at the top.

A Yes.

Q You say:

"I considered studies that supported a role for chemical hair relaxers and EDCs in the development of uterine and ovarian cancers as well as studies that did not."

Correct?

A Yes, I did.

Q So did you consider the Pierce Study or not?

A It looks familiar. I might have missed this.

Q Let me ask you about it.

In the abstract, it states:

"Hair relaxers have been suggested as a source of exposure to parabens and phthalates. However,

dermally absorbed doses of these chemicals resulting from consumer use of hair relaxers have yet to be quantified, and results from epidemiological studies have consistently demonstrated that there is no increased for hormone-sensitive, reproductive cancers associated with the use of hair relaxers among Black women."

Right? It says that?

A Yes, it stated that.

MS. PARFITT: Objection. Yes.

BY MR. LISAK:

Q Are you aware of any papers prior to this one that present quantitative data concerning the absorbed doses of parabens and phthalates from chemical hair relaxers other than in this paper?

MS. PARFITT: Objection. Form. He's testified he's talking about the mixture.

THE WITNESS: There is data to show that material like ointment containing parabens and phthalates applied to the skin are absorbed quite readily.

BY MR. LISAK:

Q Were those data from papers looking specifically at chemical hair relaxers?

MS. PARFITT: Objection. Form.
THE WITNESS: This was -- if you turn to my statement.
MS. PARFITT: Are you talking about your report?
THE WITNESS: My report. If I can find it.
MS. PARFITT: Take your time.
THE WITNESS: It's on page 14 of my report.
BY MR. LISAK:
Q Okay.
A And this was a study by Messerlian in which they were performing ultrasounds on pregnant women mid-gestation.
Q I'm sorry. Which author? Is it Koniecki or Nakai?
A No. It's Messerlian, M-E-S-S-E-R-L-I-A-N, 2017.
Q Oh, I see it. At the top.
A Yes.
And what they did at mid-gestation is, the women came in for their routine ultrasounds, and the gel that is applied to the abdomen to effect -- facilitate the test sample contains phthalates, and

parabens.

And what they did is that they took a urine sample prior to, applied the gel, and at intervals of one-half hour, you know, 12 hours, et cetera, et cetera, 7 to 12 hours, and they were able to detect the presence of parabens in the urine of those women who had been exposed to this gel.

Q So that was not -- to be fair, that wasn't in a chemical hair relaxer, correct?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q That study?

A No. It's just parabens, which is, you know, a component of hair relaxers.

They didn't put a hair relaxer on the abdomen.

My interpretation, had they done so, they would have had similar results. In fact, the results may have been even more marked.

Q Do you know whether a protective gel is applied to the abdomen before the ultrasound before that gel is applied?

MS. PARFITT: Objection. Form.

THE WITNESS: There is no -- no.

/ / / /

BY MR. LISAK:

Q It's applied directly to the skin.

A Let me explain how an ultrasound is done.

Q I know how an ultrasound is done.

MS. PARFITT: Counsel, he's -- let him finish his statement. Thank you. Appreciate the comment.

THE WITNESS: So the patient is brought in. And generally, the -- to be honest with you, the abdomen is not cleaned necessarily. Some do, some don't. They apply the gel. And then subsequently, after the gel is applied -- they don't wait. They just start doing the ultrasound because, you know, time is money. And perform it. And they just did this study. And I thought it was a very illuminating study, in that the rapid absorption of the parabens had showed up in the urine very soon thereafter.

BY MR. LISAK:

Q That gel is applied directly to the skin.

A Exactly.

Q There is no protective gel or barrier --

A No.

Q -- between that gel and the skin, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Not when I did it.

BY MR. LISAK:

Q Okay. Let's go back to the Pierce Study.

A Okay.

Q If you take a look at page 1718 at the top. Let me know when you're there.

A 1718?

Q Yeah. At the top. There's a paragraph that begins with "MP, EP, and BP."

Do you see that?

A Yeah.

Q And the second sentence there is:

"Systemic doses associated with the use of cosmetics and/or personal care products have been reported to be several orders of magnitude higher than the daily systemic doses of parabens associated with the use of the hair relaxer products evaluated in this analysis."

Did I read that correctly? I'm just asking if I read that correctly initially.

A Yeah. Yeah.

Q Is that something -- you did list this article in your references. I know it's not cited in your report, but is that something -- that

language we just read on page 11 -- sorry, 1718, did that consider -- did that -- did you consider that in reaching your opinions in this case?

A Now, what -- clarification. Systemic doses, is that systemic doses applied, or is that -- what do they mean by "systemic doses"?

Q Well, they go on to talk about that in the rest of the paragraph and cite some studies.

Did you look into that when you read this paper?

A No. But I'm just seeing this now. And I'm not sure what they mean when they say "systemic doses."

Q Well, it says: "Previous studies have estimated upper-bound systemic doses of BP as high as 0.35 mg/kg per day for cosmetics and as high as 0.1 mg/kg per day for personal care products," citing the Cowan-Ellsberry and Robison, 2009, Csiszar, et al. 2017; Cherian, 2020.

And then it goes on to say: "In addition, estimated upper-bound systemic doses associated with the use of personal care products have been reported to be as high as 1.6," same units of measurements for MP, and as high as 0.8, same units of measurement for EP, citing some of these same

papers.

MS. PARFITT: Counsel, is there a question?

MR. LISAK: Well, he's asking me what the levels --

MS. PARFITT: I appreciate that. You're reading the --

THE WITNESS: Are they trying to say that it's systemic levels or -- "doses" means an administration, generally.

BY MR. LISAK:

Q Well, when you read this -- because it is in your reference list.

A I missed this.

Q Okay.

A But I'm just seeing it now.

Q All right. Well --

MS. PARFITT: Let him finish.

THE WITNESS: I'm just seeing it now. And it's a little bit awkward stated.

When I see a dose, I feel that this is something that's been administered. If they mean systemic levels, which I'm not sure they do, but -- I'm a little confused.

/ / / /

BY MR. LISAK:
Q Okay. They present the data, though. This study did a quantitative modeling of dermal exposure to phthalates and parabens that were specifically in chemical hair relaxers, right?
MS. PARFITT: Objection. Form. The document speaks for itself.
MR. LISAK: That's what the title of the paper is.
MS. PARFITT: I hear that.
BY MR. LISAK:
Q And when you look at the abstract, do you agree with me that they present modeled data for dermal exposure to phthalates and parabens resulting from the use of chemical hair relaxers?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q Right?
A Has this model been applied before?
Q Well, I mean, you've read this paper, right?
A Yeah, but I've forgotten it.
Q And it wasn't discussed in your report.
A No, it wasn't.
MS. PARFITT: Is there a question?

BY MR. LISAK:

Q Well, he keeps asking me questions about it, so I'm --

MS. PARFITT: I know.

BY MR. LISAK:

Q If you look at page 1720 and the "Conclusion," they conclude:

"Using a well-accepted dermal modeling tool and conservative input parameters, potentially absorbed doses of phthalates, and parabens as a result of consumer hair relaxer use were modeled. Modeled absorbed doses for each chemical were below estimated internal daily doses associated with the most relevant health-based guidance values, including consumer exposure from product use, is not expected to pose a health risk."

Correct?

MS. PARFITT: Objection. Did you read it correctly?

BY MR. LISAK:

Q I read that correctly?

A Yes, you read it correctly.

Q And do you disagree with that statement?

MS. PARFITT: Objection. Form.

THE WITNESS: I need to go back and reread this. There's some reason why --

MR. SHIPMAN: Take your time. You can read the whole ting if you want to, Doctor.

THE WITNESS: Because --

MR. LISAK: We have one person defending this deposition.

MR. SHIPMAN: I've already gone through this, Counsel.

MR. LISAK: I know you have. And that's why -- there is. The protocol says what it says.

THE WITNESS: The model -- I think I had problems -- as soon as I read that, I felt that -- I had real questions about the model, the technique.

Can you explain a little more the model to me?

MS. PARFITT: Dr. Chang, he doesn't answer the questions. He's just asking you.

THE WITNESS: Sorry.

MS. PARFITT: That's all right.

THE WITNESS: This is a model that was developed by the American Industrial Hygiene Association, the Exposure Assessment Strategies Committee, and Dermal Project Team.

BY MR. LISAK:
Q Where are you reading from?
A This is at page 1708 at the bottom.
Q Okay.
A Estimate dermal absorption -- estimate phthalate absorption resulting from the use of hair relaxers. It's a model, basically.
Q Right. I described it as a model to you, correct? Because that's what it says in the paper.
MS. PARFITT: Is there a question pending?
BY MR. LISAK:
Q Well, I'm not -- I actually don't have a question pending.
We can put this to the side if you want.
A Is there any relevant real data to confirm the model?
Q When you read the paper, did you -- when you read the paper --
A I felt that the model was inappropriate, but I can't -- I cannot point out the reason why.
Q Do you have expertise in dermal absorption models?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q That's a question.

A I'm aware of modeling. And modeling is not as precise as taking actual values obtained through experimental projects.
Q Because it is a subject of a model, do you reject its findings?
MS. PARFITT: Objection. Form.
THE WITNESS: I question them. I don't reject them. I question them.
BY MR. LISAK:
Q Do you have the experience or expertise to comment on the "Methodology" section where they talk about the models or models used?
MS. PARFITT: Objection. Form. He's already testified he's questioning the model.
MR. LISAK: I didn't ask if he's questioning it.
BY MR. LISAK:
Q I asked, do you have the expertise and experience in the types of models that are described in the "Methodology" sections of page 1708 through 1709?
MS. PARFITT: Objection. Form.
THE WITNESS: I would have to research this and look at this. I'm sorry.
/ / / /

BY MR. LISAK:

Q Well, that's fine.

MS. PARFITT: Hold on. Let him finish.

THE WITNESS: Is this a methodology that this group has published before?

Oh, I'm sorry.

MS. PARFITT: Dr. Chang, just -- you are responding. He's asking questions.

THE WITNESS: My feeling is that modeling is a method -- a way of answering questions. But modeling is not doing a questionnaire in terms of obtaining information. And so when studies are done using models, that, for me, is suspect across the board. And for that reason, most likely, I didn't put much credence into this paper.

Modeling is a way of not involving the objective in a vital and energy-dependent way. Modeling facilitates trying to perform a study of this nature. Okay?

BY MR. LISAK:

Q Are you done?

A No.

Q Okay.

A And I consider this, as well as my colleagues, because we've discussed this before,

that modeling is a secondary level of science. I'm done.

Q Okay.

A Sorry.

Q No. Fine.

Would you have to -- I think you said you'd have to research the modeling to understand it better; is that fair?

MS. PARFITT: Objection. Form. Asked and answered.

BY MR. LISAK:

Q Is that what you said?

A Yes.

Q Okay. So until you would have an opportunity to research this modeling, you would need to do that to be able to answer questions, it sounds like, about whether or not you think the modeling is a fair methodological approach to answer the questions in the objective of the study; is that fair?

MS. PARFITT: Objection. Completely misstates what he's just told you about modeling and the fact that this was a secondary type of --

MR. LISAK: Michelle, seriously. I don't want to have to call the judge this late in the day.

MS. PARFITT: I don't either. But you can't put words in his mouth that are absolutely false, Michael.

MR. LISAK: Well, you can't coach him. You've been coaching him, and I've been letting it go.

MS. PARFITT: I'm not going to coach, but you can't put falsehoods into his --

MR. LISAK: I'm not putting any falsehoods.

MS. PARFITT: Let's -- you heard what he said. You heard what he said.

BY MR. LISAK:

Q Let's go back.

I think you said you'd need to research this model to understand it better. Correct?

A Well, initially, I said I questioned the model primarily. Then I said I'd have to go back and more thoroughly look at this.

MS. PARFITT: Did you finish?

THE WITNESS: Yeah.

BY MR. LISAK:

Q And until you -- first you said you'd question it. Then you said "I'd need to research it to answer more thoroughly." So all my question is

is, is it fair of you to say the model is not a reliable way to answer the question posed in the study until you at least have had the opportunity to research the model?

MS. PARFITT: Objection.

BY MR. LISAK:

Q Or do you just reject the model outright?

MS. PARFITT: Objection.

THE WITNESS: Absolutely not. I did not say that. What I said is that modeling is a secondary level of trying to answer a question. And modeling usually is done in the absence of the ability to perform the study itself.

In this case, the authors have taken the opportunity to do modeling for this particular study to try and prove their point. I don't want to say that modeling is a lazy man's way of getting at the answer, but you've seen that the literature is replete with studies that have really investigated actual numbers. This does not do that.

BY MR. LISAK:

Q Doesn't this study rely upon those actual studies with actual numbers in constructing the model?

MS. PARFITT: Objection.

THE WITNESS: Those studies are primarily accomplished -- they go out and get the patients. They have them submit the questionnaires. Modeling is not the same.

BY MR. LISAK:

Q When you're talking about questionnaires, you're talking about use in epidemiological findings. We're talking about dermal absorption in this paper, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: The same thing applies. The same thing applies. They need to do the study, putting the stuff on the skin and looking at the data.

Did they do -- they didn't do that. They took the data secondarily and then modeled it.

BY MR. LISAK:

Q Right. That's how you create models, right?

A I know. And that, to me, is a secondary level of study.

MR. LISAK: Why don't we take a break.

Where are we at time-wise?

THE VIDEOGRAPHER: 6 hours and 1 minute.

The time is 4:57 p.m., and we are off the

record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 5:12 p.m., and we are back on the record.

BY MR. LISAK:

Q Doctor, we just had a break.

Good to go?

A Yep.

Q Okay. Let me ask you this: During these breaks, have you been discussing your testimony at all with counsel?

A No.

Q Quickly, jumping back to PCOS just for a little bit.

A Okay.

Q You described it earlier in your opinion as being a risk factor for both ovarian cancer and uterine cancer, correct?

A Yes.

Q Is it true that none of the epidemiologic studies that we've discussed in detail in the last section -- the Bertrand, the Chang and the White studies -- none of those studies controlled for women who had a history of PCOS, correct?

MS. PARFITT: Objection. I believe asked

and answered.
THE WITNESS: I believe that's correct.
BY MR. LISAK:
Q Okay. Let's take a look at what is Tab 14.
A Tab --
Q You don't have it yet. You'll get it.
A I keep looking for --
Q I know. I understand. Especially when you're new to the process.
A Yeah. This is very new. Very new.
Q And I'll identify it for the record as its coming. This is -- the lead author is Janjua, J-A-N-J-U-A.
You've read that paper, correct?
MS. PARFITT: Do you have it in front of you?
THE WITNESS: I just can't remember, but . . .
BY MR. LISAK:
Q I'll give it to you in a sec.
It's "Systemic Uptake of Diethyl Phthalate, Dibutyl Phthalate, and Butyl Paraben Following Whole-Body Topical Application and Reproductive and Thyroid Hormone Levels in Humans"

published in "Environmental Science and Technology," Volume~41, No. 14, 2007.

Here is a copy.

A Okay.

MR. LISAK: And here is a copy for Michelle.

MS. PARFITT: Thank you, Michael.

(Exhibit 21 marked for identification.)

BY MR. LISAK:

Q This is a study that you -- I think you listed in your references.

A Yes, I did.

Q Did you cite it in your paper? In your report, rather.

A Yes, I think I did. Yeah. I think I did.

Q So, if you look at the first page --

MS. PARFITT: I apologize, Michael. What number is this?

MR. LISAK: I'm sorry. That's a good point.

THE REPORTER: 21.

MS. PARFITT: Thank you.

BY MR. LISAK:

Q If you looking on the first page, on the right-hand column, there's a paragraph that begins

"In vitro."

Do you see that?

A Uh-huh.

Q And it says:

"In vitro and animal studies have shown that both parabens and phthalates can penetrate the skin. However, there are no studies reporting systemic absorption of these chemicals after dermal application in humans."

Did I read that correctly?

A Correct.

Q And if you look at the materials and methods on page 5565, the study population is 26 healthy and paid Caucasian male volunteers, aged 21 no 36, mean age 26 years old, correct?

A Uh-huh.

Q Is that a "yes"?

A Yes.

Q And then, if you look at the right-hand column, there's a paragraph in italics that begins "First week."

Do you see that?

A In italics?

Q Right-hand -- yeah. Just the first word.

It says "First week" up on the right-hand corner.
A Oh, the table?
Q No. Right-hand column.
A Oh, right-hand.
Q On Bates -- on page 5565. Second full paragraph, beginning with the word "First week."
A Oh, here. Yes. I'm sorry.
Q And so the first week, it says that:

"Immediately after a 0 h blood sample was drawn, basic cream formulation without phthalates and butylparaben was applied by staff to the whole body, except for the scalp and genital areas, and then test persons waited 20 minutes to let the cream absorb into the skin before dressing. Cream application was repeated every day for five days."

Correct?
A Yes.
Q And at the end of that paragraph -- well, then it says:

"The same procedure was used for the treatment week, except for the fact that a daily prepared test cream formulation was used. Showering, bathing,

and swimming were not allowed until four hours after the daily application."
Correct?
A Yes.
MS. PARFITT: Again, is that -- that's what it says, right?
THE WITNESS: That's what it says.
BY MR. LISAK:
Q So, in this study, they applied a whole-body cream, other than to the genitals and scalp, of 26 men that had to stay on them for -- and they did it on a daily basis for five days. And they drew blood both before applying the cream and four hours after, and the test subjects applying the cream that was being studied were not allowed to shower, bathe, or swim, at least until four hours after the application, correct?
A Correct.
Q And then they looked at -- if you look at -- in the abstract, the last sentence where they provide the -- their conclusion and their data, they say:
"The systemic absorption of these compounds did not seem to have any short-term influence on the levels of

reproductive and thyroid hormones in the examined young men."

Correct?

MS. PARFITT: Are you there, Doctor?

THE WITNESS: Correct.

BY MR. LISAK:

Q And they were looking specifically at diethyl phthalate, dibutyl phthalate, and butylparabens, correct?

A Yes.

Q Did you consider that data in your opinions?

A I considered it, yes.

Q Does that provide contrary evidence to the absorption of these types of compounds than the ultrasound gel study you talked about earlier?

MS. PARFITT: Objection. Form.

THE WITNESS: Are you saying that does this study -- is it similar to the study that I cited?

BY MR. LISAK:

Q Yes.

MS. PARFITT: Objection. Form.

THE WITNESS: Now, what was -- again, I know they applied it, but the solution did

contain --
BY MR. LISAK:
Q It contained the phthalates and the parabens identified in the title of the article as well as described --
A It's similar to.
Q Okay. Similar to the study you cited, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
(Exhibit 22 marked for identification.)
BY MR. LISAK:
Q Let's look at Tab 37.
A Is that something coming?
Q Yes. Whenever I say "tab," you know you're getting a little present from me.
This is Exhibit 22. This is a printout of the American Cancer Society "Endometrial Cancer Risk Factors," printed on February 2nd of 2026 at 3:07 p.m.
Do you see that, sir?
A Uh-huh.
Q Is that a "yes"?
A Yes. Yes, it is.
Q And the title of this is "Endometrial

Cancer Risk Factors." The second paragraph on the front page there says:

"Although certain factors can increase the risk for developing endometrial cancer, they don't always cause the disease. Many who have risk factors never develop endometrial cancer."

Did I read that correctly?

A Yes.

Q Do you agree with that statement from the American Cancer Society?

MS. PARFITT: Objection. Form.

THE WITNESS: It's reasonable.

BY MR. LISAK:

Q It goes on to say:

"Some with endometrial cancer don't have any known risk factors. Even if someone with endometrial cancer has one or more risk factors, there's no way to know which, if any, of them caused the cancer."

Did I read that correctly?

A It seems reasonable.

Q Okay. Well, I read it correctly, and then my next question is, do you agree with it? And I

take it your answer is?

A Yes.

MS. PARFITT: Objection.

BY MR. LISAK:

Q Now, it goes on to talk about different factors that increase the risk for endometrial cancer and factors that lower the risk of endometrial cancer, correct?

A Yes.

Q And if we look at page 4 of 6, if you look at the top, it says "Chemical Exposure," and in parentheses it says "hair relaxers."

Do you see that?

A Uh-huh.

Q Is that a "yes"?

A Yes.

Q And it says:

"Some studies have found that using chemical hair straighteners (relaxers) often and for many years might increase the risk of endometrial cancer."

Did I read that correctly?

A Sentence as read, yes.

Q They say "might increase the risk," correct?

MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q Not causes.
A That's what is stated.
Q It doesn't say it causes?
A That is what is written, yes.
Q And it doesn't say it is a risk factor, right?
MS. PARFITT: Objection. Form.
THE WITNESS: "Might increase the risk."
BY MR. LISAK:
Q So it doesn't say it's a risk factor, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Correct.
BY MR. LISAK:
Q It doesn't say it's associated with endometrial cancer, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Correct.
MS. PARFITT: Dr. Chang, let me finish.
BY MR. LISAK:
Q It goes on to say "However, scientists aren't sure which chemical in the straighteners might be causing the risk."

Did I read that correctly?
A Yes.
Q If we go on to --
MS. PARFITT: Did you complete?
MR. LISAK: I mean, you can ask him if you want --
MS. PARFITT: That's fine, Counsel.
BY MR. LISAK:
Q It goes on to say:
"Further studies have found that the increased risk for endometrial cancer was particularly high in Black women who were postmenopausal."
Correct?
A Yes.
Q That's what it says.
And we talked about the studies that this is based upon, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
BY MR. LISAK:
Q Now, it then goes on to say factors that lower the risk for endometrial cancer, right? On page 4. Same page.
A Oh, yes. Yes.

Q And the first one there is oral contraceptives pills. It says:

"Oral contraceptive pills, OCP, including both estrogen-progestin contraceptives, as well as progestin-only contraceptives."

That that is something that lowers the risk of endometrial cancer, correct?

A Correct.

Q And you agreed with that?

A I agree.

Q It goes on to say:

"The risk is lowest when they are taken long-term. And this protection lasts for at least 10 years after the pills are stopped."

That's what it says, right?

A That's what it says.

Q Do you disagree with that?

A No. That's as written.

Q Okay. Let's take a look at Tab 39.

(Exhibit 23 marked for identification.)

BY MR. LISAK:

Q This is Exhibit 23. This is the National Cancer Institute Endometrial Cancer Prevention PDQ,

Patient Version, printed on February 2nd of 2026 at 5:54.

Do you see that?

A Yes.

Q And if you look at page 6.

Are you there?

A Yes.

Q Under "Hormonal Contraceptives," it says:

"Taking hormonal contraceptive (birth control pills) that combine estrogen and progestin (combined oral contraceptives) decreases the risk of endometrial cancer. The protective effect of this type of birth control increases with the length of time they are used and can last for many years after oral contraceptive use has been stopped."

Did I read that correctly?

A Correct.

Q And I take it from your prior answers, when the similar answer from the American Cancer Institute -- you agree with that statement as well from the National Cancer Institute?

A Correct.

MS. PARFITT: Objection.

BY MR. LISAK:

Q Now, if you look at the bottom of page 6, there's a section that's called "Hair products, including dyes, bleach, highlights, straighteners and permanents."

Do you see that?

A Yes.

Q And the National Cancer Institute says "There is not enough evidence to show a link between hair products and endometrial cancer."

Did I read that correctly?

MS. PARFITT: Objection. Form. And the representation it's the National Cancer Institute.

BY MR. LISAK:

Q Do you see that this is a document from the National Cancer Institute, NCI?

Do you doubt that?

MS. PARFITT: Objection. Form. You've represented that this is the position.

Go ahead.

THE WITNESS: This is not -- this paper was not created by the National Cancer Institute.

BY MR. LISAK:

Q Do you see where it says "NIH," National Cancer Institute, at the top?

A It's just a sign up there. That's all it is. It's just a sign. But this was created by a professional group.
Q By who?
A A professional group, I understand. I've seen this.
Q What do you mean by that, "professional group"? I'm just trying to understand.
A Not a professional group, but this is not a directive from the National Cancer Institute.
Q "The physician data query, PDQ, is the National Cancer Institute's comprehensive cancer information database. The PDQ database contains summaries of the latest published information on cancer prevention, detection, genetics, treatment, supportive care, and complementary and alternative medicine."
Do you understand that?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q Page 7.
A Yes. I understand what was written, yes.
Q The PDQ is a service of the NCI, correct?
A Correct.
Q Okay. Now, let's take a look at page 6

where it starts "Hair products, including dyes, bleaches, highlights, straighteners and permanents."

And then this document, which is Exhibit 23 -- okay? -- says: "There is not enough evidence to show a link between hair products and endometrial cancer" --

MS. PARFITT: Counsel, let me object. For one, the document you handed us, which I believe is Exhibit 23, does not appear to be a complete document. I don't see the references for the citation. It looks as though you've given me only a partial document. This is not the entire -- if you go online --

MR. LISAK: I'm not going to print the whole webpage, but it is updated on May 6th of 2025. I think Dr. Chang just mentioned he's seen this before, correct?

THE WITNESS: Yes. Yes.

MS. PARFITT: Counsel, my point is, this particular document -- and I will object to the use of this document -- does not -- is not a complete document with the references cited to support the various sections of the document.

MR. LISAK: With that objection on the record --

MS. PARFITT: Well, it's only a partial document. You're examining him on a document that is not complete.

MR. LISAK: It's not a partial document. It is a portion of a website.

MS. PARFITT: It is a portion of a website.

MR. LISAK: Right.

MS. PARFITT: Precisely. It does not reflect the entire document nor the references that support or lack -- do not support.

MR. LISAK: Well, you had the full document with you, didn't you, when you handed it to us earlier.

MS. PARFITT: I do have the full document.

BY MR. LISAK:

Q Right. Okay. And is it -- let me ask you this, Doctor.

Do you see how this document, Exhibit 23, ends on page -- it says "9 of 9" at the bottom, right?

A Yes.

Q Okay. So now let me ask you, in this nine-page document, of which all pages are in Exhibit 23, under the section beginning on page 6

that continues to page 7, once again, I'm going to ask you if I've read this correctly.

MS. PARFITT: Counsel, I'm going to object to -- I'm going to object to the use of this document. This document does not --

MR. LISAK: You've done that already.

MS. PARFITT: Well, no, no. You're not going to examine the witness on a document that is not complete with the references. There is a document --

MR. LISAK: Are you saying you can only ask someone a question about a document that doesn't contain the references?

MS. PARFITT: Why don't we examine a witness on a document that is complete, as opposed to selecting pieces of a document and examining them.

MR. LISAK: Michelle, my position is that this is a complete document.

MS. PARFITT: Michael, and my position is --

MR. LISAK: Page 9 of 9.

MS. PARFITT: No. Michael, if you want to examine him on the patient -- or excuse me, the physician data query, provide the witness with the

complete document. You know it's not the complete document. You know that. And still you're insisting on examining him.

MR. LISAK: Are you instructing him not to answer?

MS. PARFITT: I think I'm going to instruct him not to answer the document you want to show him.

MR. LISAK: That's improper.

MS. PARFITT: You know what's improper? Improper is showing a witness a document that you know not to be complete and trying to trick them into --

MR. LISAK: I'm not trying to trick him.

MS. PARFITT: You are trying. If you're not afraid of the document --

MR. LISAK: I'm not afraid at all.

MS. PARFITT: -- why don't you give him the full document? Michael, you have to show the whole document --

BY MR. LISAK:

Q Doctor, let me ask you a question about this document.

MS. PARFITT: You can't cherry-pick what you want.

MR. LISAK: I'm not cherry-picking.

MS. PARFITT: You are indeed.

MR. LISAK: And that's why all nine pages are here.

MS. PARFITT: Michael, all nine pages is not the complete document. You show me where there's a reference.

BY MR. LISAK:

Q Doctor, do you need to review the references to answer a question as to whether or not the document says there is not enough evidence to show a link between hair products and endometrial cancer?

MS. PARFITT: Objection.

BY MR. LISAK:

Q Do you need to read references that may or may not be elsewhere on the NCI's website to answer whether I read that language correctly?

MS. PARFITT: Objection. That's precisely the point.

BY MR. LISAK:

Q Did I read it correctly?

MS. PARFITT: Did you read what correctly?

MR. LISAK: The sentence I just read.

MS. PARFITT: Without the references, and

you want him to answer the question?

BY MR. LISAK:

Q Doctor, can you only answer -- I mean, your report barely contains any references in the body of the report.

MS. PARFITT: Counsel --

BY MR. LISAK:

Q Should those opinions be struck?

MS. PARFITT: Are you making some --

MR. LISAK: That's an incomplete document.

MS. PARFITT: It is not --

MR. LISAK: He had no idea where -- he said his references were in there before and they fell out. Some kind of magical wand was waved over them and the references went away.

MS. PARFITT: Counsel --

MR. LISAK: Should his report be stricken if there's not a citation to what he says?

MS. PARFITT: Counsel, you are misrepresenting what he has testified about his report, what he indicated. He specifically cited --

MR. LISAK: Why are you so afraid of this sentence?

MS. PARFITT: Why are you so afraid of providing him the references for the statement you

want him to agree with or disagree with?

MR. LISAK: I just asked him if I read it correctly. That's all I asked him. I didn't ask him if he agreed with it.

MS. PARFITT: Oh, that's all you're going to say is "Is that what the document says?" on an incomplete document?

BY MR. LISAK:

Q Did I read that question correctly -- the sentence correctly?

A Repeat the question.

Q Sure. You can have the same objections to it.

There is not enough evidence to show a link between hair products and endometrial cancer in Exhibit 23, correct?

MS. PARFITT: And the question is, is that what that document says?

MR. LISAK: Yes, for the 18th time.

MS. PARFITT: Well, you might have to do it 19 times.

BY MR. LISAK:

Q Did I read it correctly, sir?

A What the document says? I think that you read it right off the pages.

Q Right.
And I think you said you reviewed this document?
A I've seen this document.
Q You've seen it.
It was not included in your references, though, correct?
A Yes. I just reviewed this late.
Q You said late?
A I reviewed this a couple days ago.
Q And when you reviewed it, did you see whether or not there was a list of references that were part of this document?
MS. PARFITT: Counsel --
MR. LISAK: It's a question.
MS. PARFITT: I object to any questions regarding an incomplete document. What was provided to the witness was a document with references. Why you choose not to examine him on the full document is --
MR. LISAK: Well, first of all, I'm trying to save a couple of trees. And second of all --
MS. PARFITT: Excuse me. Save a couple trees by providing a witness with a document that does not have the references, when in fact --

MR. LISAK: Michelle --

MS. PARFITT: Excuse me, Michael.

-- when in fact a PDQ exists with the references for each category that say there is adequate evidence or inadequate evidence. That is completely improper, Counsel. Completely improper, and you know it.

MR. LISAK: When you look at the link, the address on this document, "www.cancer.gov/types/uterine/patient/endometrial-prevention-pdq," you go on th website, as we sit here today, all that is there are these nine pages. There is no reference list.

MS. PARFITT: Counsel, I will represent to you that, unfortunately, your search of the website is incomplete. And I want to give you the benefit of the doubt that it's not intentional, but when you go on the website -- I did too, and I have a complete document that, after each section with regard to adequate evidence or inadequate evidence for the topics, they list references that support or not support that proposition.

MR. LISAK: Dr. Chang has reviewed a lot of studies. They're in his -- referenced in his report. They're in Exhibit 1A. So you are familiar with the evidence concerning whether or not there is

an association between hair products and endometrial cancer.

MS. PARFITT: Counsel, you are asking --

MR. LISAK: That's why we're here today, right?

MS. PARFITT: No, no. Counsel, listen, you are examining him on a document that first you misrepresented as physician NCI and NIH. And if you read the document, you'll see it's quite clear it's an editorial board.

Two, after each section -- it's not the references in his report. It's the references in --

MR. LISAK: It is the NCI's comprehensive cancer database.

MS. PARFITT: Michael, let me finish. It is --

MR. LISAK: It is a service of the NCI.

MS. PARFITT: No. You know what it says, Michael? It says they are not policy statements of the NCI or the NIH, complete PDQ.

MR. LISAK: Did I say it was a policy statement? All I'm saying is --

MS. PARFITT: It is not a statement of NIH or NCI.

And furthermore, Michael, it is completely

unfair, completely unfair. And I don't want to represent that it's intentional on your part, but the references I'm speaking about are not general references that he notes in his report, but references which post the section that you're talking about. In this case, it would be on hair relaxers, and it cites what this group relied upon for purposes of making that statement.

MR. LISAK: You can ask him about it on your --

MS. PARFITT: I will. I will.

MR. LISAK: Okay.

MS. PARFITT: But I find it -- I do find it disingenuous.

MR. LISAK: I'll tell you what. I'm not going to allow you to ask those questions if you don't allow me to ask my questions.

MS. PARFITT: Oh, Michael, I'll ask whatever questions I wish to ask.

MR. LISAK: I'm going to do that too.

MS. PARFITT: You can ask any questions you want. But what I'm suggesting to you --

MR. LISAK: Then let me ask the questions.

MS. PARFITT: -- is you should not -- and it's highly improper -- use a document that you know

to be incomplete in an effort to try to get a response from my client.

MR. LISAK: When I see "9 of 9," I don't think it's incomplete. I'm sorry.

MS. PARFITT: Well, you know, Michael, maybe you need to look at your research a little bit more closely. Again, I'm not trying to make this personal. But unfortunately --

MR. LISAK: I don't take anything personally.

MS. PARFITT: Well, I appreciate that. But I do take -- take -- I'm concerned, Michael, that you would use a document that you know is not complete in an attempt to examine the witness.

MR. LISAK: I think it's complete.

MS. PARFITT: It's highly improper.

MR. LISAK: I think it's complete. If I didn't think it was complete, I wouldn't ask about it. Okay?

MS. PARFITT: Well, Michael, I don't think that that's really a response, that you wouldn't ask about it.

BY MR. LISAK:

Q Doctor, when you reviewed this -- I think you said you looked at it late.

MS. PARFITT: He didn't review this document. Why don't you ask him if he reviewed the --
MR. LISAK: He just told me --
THE WITNESS: I looked at it very late. I didn't do an intense --
MR. LISAK: He just said he looked at it.
MS. PARFITT: You showed him the document you put in front of him. You did not show him the document that he reviewed.
BY MR. LISAK:
Q Doctor, did you review these nine pages before today?
A I reviewed these nine pages, but I questioned the validity of this because it's not clear -- is this something that the National Cancer Institute -- is this a program of the Cancer Institute, or is this a program in which the editors or the authors are a group of individuals -- this is an editorial board.
Q It says "PDQ." All I can tell you is --
A These are boards made up of experts, but it's still a board.
Q Okay.
A And they're updating and -- based on what

data? They just assume that we understand they've updated and read the most recent data? And what does this cover? What span of time?

Q Well, it says "Updated May 6 of 2025."

A Well, but it doesn't tell me how they went about doing it. Did they actually read the articles?

Q And it says "PDQ is a service of the NCI," correct?

MS. PARFITT: Objection.

THE WITNESS: That's not my issue.

MR. LISAK: Okay.

THE WITNESS: My issue is that --

MS. PARFITT: Let him finish. Let him finish.

THE WITNESS: My issue is that, in my mind, it's unclear how they arrived at the decision to make these recommendations. You could have just passed this forward from a previous edition.

It's difficult, when they say it's updated -- quote, "updated," then there shouldn't be much more data available. It would seem to me, in codifying this document, that they at least list a few references. But there's none. It's just opinions.

BY MR. LISAK:

Q Okay.

A What is said is said. What is written is written. I don't disagree with that.

Q And I agree with you that it's an opinion.

A But that interpretation --

Q It's an opinion, right? Just like you have opinions in this case, right?

A But it's an opinion upon which I do not know what it's based. What's the basis for their opinion? Is it just something that they decided to say based on what has been written previously, or is there new information? Because we know things have been -- they're constantly being published.

MS. PARFITT: I think, Counsel, my second objection is, you're showing him the patient version. I'm sure you're aware that there is also a healthcare professional version.

THE WITNESS: There is a "Go to health professional version" here.

MS. PARFITT: Right. And the one that you're showing him is a patient version.

MR. LISAK: That's fine. I'm allowed to show him what I want to show him. Right? I mean, this is my deposition, right? And I'm showing him

what I believe is a complete document.

MS. PARFITT: The patient version.

MR. LISAK: The patient version.

BY MR. LISAK:

Q And it sounds like you disagree with the statement I read to you, which is fine.

A I can't comment on this.

Q Okay. Let's look at Tab 40.

(Exhibit 24 marked for identification.)

BY MR. LISAK:

Q This is Exhibit 24. Okay.

This is American Cancer Society printed -- website printed on February 2, 2026, 3:02 p.m. It's an eight-page document. All eight pages are here.

You can take a look at page 4.

MS. PARFITT: Perhaps -- let me object.

THE WITNESS: Wait a minute. I'm missing -- I only have one page. Is that what it should be?

MS. PARFITT: And I only have pages 3 through 8.

MR. LISAK: Give us a sec. That really is an incomplete document, and we'll fix that.

Let's mark this instead as 24.

VERITEXT CONCIERGE: Counsel, am I clawing

back Tab 40?

MR. LISAK: No. It's just what I handed as Tab 40 wasn't complete. This is a complete version of it.

Here is one for you, Michelle.

MS. PARFITT: Thank you. Here you go, Dr. Chang.

BY MR. LISAK:

Q Okay. "Causes, Risk Factors, and Prevention of Ovarian Cancer," American Cancer Society.

Have you looked at this before?

A No.

Q Just quickly, if you'd take a look at page 4, under "Acquired genetic mutations," it says "Most" -- well, tell me if I'm reading this correctly.

"Most gene mutations related to ovarian cancer are not inherited. Instead, they occur during a person's life and are called acquired mutations."

Did I read that correctly?

A Yes.

Q And acquired mutations include naturally -- natural cell replication errors that

occur as we age that we talked about earlier, right?
A Uh-huh.
Q Is that a "yes"?
A Yes. Excuse me.
Q It goes on to say:
"In some cancers, these mutations may be caused by radiation or harmful chemicals, but there is no evidence for this in ovarian cancer."
Right?
A That's what it says.
Q Do you disagree with that?
MS. PARFITT: Objection.
THE WITNESS: It's stated.
BY MR. LISAK:
Q But do you --
A No objection.
Q No objection.
And it says:
"So far, no chemical" -- "no specific chemical in the environment or in our diets has been clearly linked to mutations that cause ovarian cancer."
Did I read that correctly?
A Yes.

Q Do you disagree with that statement?
MS. PARFITT: Objection. Form.
THE WITNESS: No.
BY MR. LISAK:
Q It concludes: "In most cases, the cause of these acquired mutations is still unknown."
Did I read that correctly?
A You read that correctly.
Q Do you disagree with that statement?
MS. PARFITT: Objection. Form.
THE WITNESS: In most cases, yes.
BY MR. LISAK:
Q Okay.
MR. LISAK: Tab 53, please. And this is the Hernandez Study that you brought with you today.
(Exhibit 25 marked for identification.)
BY MR. LISAK:
Q This is Exhibit 25, Doctor.
Now, this is a review article, "Systemic Review of the Epidemiology of Hair Relaxer Use and Hormone-Sensitive Reproductive Outcomes Among Black Adult Women in the United States," in the "Journal of Applied Toxicology," published in 2025, correct?
A Yes.
Q And you reviewed this -- did you review

this before finalizing your report or after?
A After.
Q And although this -- your report was dated December 1st of 2025, correct?
A Correct.
Q And this was a paper, according to the exhibit, that was accepted on November 25th of 2024, correct?
A Correct.
Q Is there a particular reason you wouldn't have discussed this paper in your report itself?
MS. PARFITT: Objection. Form.
THE WITNESS: I tended to focus on those papers which showed evidence. However, I did consider other papers. And obviously, I missed this one.
BY MR. LISAK:
Q And if you look -- but you have read it before today?
A Yes.
Q And the conclusion on page 1414 -- let me know when you're there.
Are you on page 1414?
A The tables are upside-down.
Q I'm sorry.

A Okay.
Q Do you have the conclusion of Hernandez in front of you?
A Yes.
Q It says "Despite" --
A 14 of 23, right?
Q No. You might be look looking at the wrong thing. Is this the --
A It's 14 of 23. Maybe I should look at this one. Where is it?
Q Look at the exhibit.
A Okay.
Q If you look at Bates -- sorry, page 1414.
MS. PARFITT: I think that's where he was confused.
MR. LISAK: That's the page number.
MS. PARFITT: The page numbers of the document at the bottom.
THE WITNESS: 1414. Is that the one?
MS. PARFITT: Yes.
BY MR. LISAK:
Q And I guess Section 5, "Conclusions," do you see that?
A I'm there.
Q Okay. Thanks.

Tell me if I've read this correct.

"Despite recent suggestions implicating hair relaxer use and their chemical constituents as risk factors of hormone-related female health outcomes, the overall findings of our current review suggest that Black women likely do not experience increased risk of breast cancer, ovarian cancer, or uterine cancer due to hair relaxer use."

Did I read that correctly?

A You read that correctly.

Q I take it you disagree with that conclusion?

A Yes, I do.

Q But in your report, you said you considered contrary evidence to your opinions.

You didn't cite the Hernandez paper, which is Exhibit 24, and you didn't cite the Pierce paper that we talked earlier, correct?

A Correct.

MS. PARFITT: Objection. Form.

THE WITNESS: Correct.

BY MR. LISAK:

Q What, if any, papers did you actually cite

that contradicted your opinions in this case in your report?

A I did note some, I believe.

Q Not that are in your reference list --

A No.

Q -- but that you actually discussed in your report.

MS. PARFITT: Counsel, he did cite the Pierce matter. I think you just represented he did not.

MR. LISAK: I think he told us he --

MS. PARFITT: It's in his reference list.

MR. LISAK: Yes. But I'm saying the body of his report --

THE WITNESS: I think I read it.

MS. PARFITT: We just need to make that clear.

MR. LISAK: He's agreed that he didn't discuss it or cite it in the body of his report, correct?

MS. PARFITT: But he did include it in the reference list.

MR. LISAK: We've said that multiple times.

MS. PARFITT: I just want to be sure the

record is clear.
MR. LISAK: It is really clear. And now it's even more clear.
MS. PARFITT: Good.
BY MR. LISAK:
Q My question is, you didn't discuss or cite either the Pierce paper or the Hernandez paper in the body of your report. The Pierce paper is in your references. The Hernandez paper is not.
What papers did you actually cite and discuss in the body of your report that present contrary conclusions to your opinions in this case?
A Obviously, the one I didn't cite, obviously, I didn't include. I mean . . .
Q Right. I'm asking what you did include that is contrary to your opinions in this case.
MS. PARFITT: Objection. Form.
THE WITNESS: I'd have to go through this.
BY MR. LISAK:
Q Okay. Well, let me ask you then -- I take it it would take some time. You'd have to go through your entire report to tell me?
A Yeah.
Q Okay. Let's just put that aside then.
A Sorry about that.

Q The opinions that you intend to offer at trial in this case are in your report, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Yes.

BY MR. LISAK:

Q And the methodology and the bases for your opinions that you intend to offer at trial are in your report, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Yes.

BY MR. LISAK:

Q The materials you relied upon in addition to your education, training and experience are contained or listed either in your report or Exhibit 1A, correct?

MS. PARFITT: Objection. Form. I assume you're including his testimony today?

THE WITNESS: Yes.

MS. PARFITT: Dr. Chang, let me complete -- I assume you were considering his testimony today?

MR. LISAK: Yes.

MS. PARFITT: Thank you, Counsel.

BY MR. LISAK:

Q Fair?

A Repeat the question.
Q Sure.
So, when you come to trial in this case, the opinions, the methodology, and the basis of your opinions that you intend to offer at trial are contained either in your report, which includes your reference list, Exhibit 1A, which are those additional references, as well as your education, training and experience, as well as your testimony that you provided today, fair?
A Yes. Fair.
MR. LISAK: Okay. I'm going to stop for now and reserve any remaining time. Not sure how much is left after our argument. But why don't we go off the record for a second and see where we're at time-wise.
THE VIDEOGRAPHER: The time is 5:51 p.m., and we are off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time is 6:07 p.m., and we are back on the record.
MR. LISAK: Doctor, I don't have any questions, but we talked about it with counsel. We just want to put something on the record.
Earlier today, I went through, hopefully

in a complete and clear fashion, the materials and notes and studies that you brought with you today. And we've had those copied. And I'm going to mark them as a collective exhibit, which is Exhibit 26.

Is that okay, Counsel?

MS. PARFITT: That's fine. Yes, that is fine.

(Exhibit 26 marked for identification.)

MR. LISAK: I'll put these in the exhibit pile. Thank you.

MS. PARFITT: All right. Are we back on?

MR. LISAK: We'll still on. We're on.

MS. PARFITT: Very good.

EXAMINATION

BY MS. PARFITT:

Q All right. Dr. Chang, you have been asked many questions by counsel today during the course of the seven hours. I'm going to jump around, so I want you to hold on and stay with me here.

All right?

A Okay.

Q And if at any point in time my questions aren't clear, I want you to indicate as well. I only want you to answer questions that you understand.

A Okay.
Q All right?
A Yes.
Q You were asked over the course of hours about specific chemical components or ingredients that were contained in the chemical hair relaxer products.
In your opinion, is it appropriate to analyze the issues in this case and the opinions you hold that exposure to chemical hair relaxers causes ovarian cancer and uterine cancer, focusing on a single chemical?
MR. LISAK: Objection to form.
THE WITNESS: Yes. Yes. Absolutely. The --
BY MS. PARFITT:
Q Yes, absolutely what?
Did you hear my question?
A Repeat the question.
Q Let me ask it again.
You were asked questions about specific chemical ingredients or components in the chemical hair relaxers.
You remember that series of questions?
A Yes.

Q All right. For your opinions in this case, is it appropriate to analyze this data just focusing on a single chemical?

A Absolutely not.

MR. LISAK: Objection. If you don't mind giving me just a pause so I can get my objection.

THE WITNESS: I'm doing the same thing.

MR. LISAK: Yeah. Objection to form.

Go ahead.

THE WITNESS: Absolutely not.

BY MS. PARFITT:

Q Why not?

A This is a mixture. And that's got to be understood. It has to be underscored. Because no single one element is going to be sufficient to do the things that we are proposing that I feel -- excuse me. I have to stop. Stop.

THE VIDEOGRAPHER: Oh, go off the record?

THE WITNESS: Yes.

THE VIDEOGRAPHER: Okay. I apologize.

The time is 6:10 p.m., and we are off the record.

(Discussion held off the record.)

THE VIDEOGRAPHER: The time is 6:11 p.m., and we're back on the record.

THE WITNESS: So, to take this back up, the issue here is not any single phthalate, single paraben, single EDC. This is a mixture of which there's a combination of these EDCs that are included in these hair relaxers that result in the plausibility of cancer generation, carcinogenesis. It's something that is quite clear. The data is quite clear. And the mechanisms involved clearly indicate a pathway to cancer.

BY MS. PARFITT:

Q Now, you mentioned EDCs.

Is it your understanding that, as part of the mixture, there are also carcinogens included?

MR. LISAK: Objection to form.

THE WITNESS: Yes. There are unknown aspects about this, but clearly, these are carcinogens that comprise these hair relaxers. There -- I only examined three. And that's just probably a small portion.

And the other thing is that these studies usually had -- many of the studies did not -- had to -- they included parabens, phthalates and bisphenols that were couched in a way that the response to these EDCs appeared to be minimal. But on a collective basis, I think it's quite clear that

the totality of the estrogenic activities of these EDCs constitutes a very credible threat to oncogenesis.

BY MS. PARFITT:

Q Dr. Chang, was your mandate to examine and opine on the individual chemical ingredients or the mixture, the chemical hair relaxer and their causal relationship to ovarian and uterine cancer?

MR. LISAK: Objection to form.

BY MS. PARFITT:

Q You may answer.

A It was the composite. It was the composite. It was not a singular class of compounds nor a singular compound in any of the classes. So I only used the mention of parabens, phthalates, and bisphenols as an example of how these can affect the induction of cancer.

So to relegate my testimony just to those three compounds is erroneous.

Q When you say "compounds," are you referring to the chemical ingredients?

A The chemical ingredients, the phthalates, the parabens and the bisphenols. What those are to represent is the composite, which includes other substances that demonstrate estrogenicity and the

likely carcinogenesis.

Q And when you use the word "composite," are you also meaning the mixture?

MR. LISAK: Objection to form. Leading the witness.

BY MS. PARFITT:

Q You may answer.

A When I say "composite," I mean the entire package that's involved in these hair relaxers. So I cannot name all EDCs in these hair relaxers, but there are many, and they're in different concentrations. It's impossible to create exactly the content in these hair relaxers to test.

Therefore, they have not only looked at single phthalates but several phthalates in a group. And there are publications that look at combinations of these endocrine-disrupting chemicals.

Q But your charge, Dr. Chang, was what? To answer what question?

MR. LISAK: Objection to form. Sorry Objection to form.

THE WITNESS: Hair relaxers --

MR. LISAK: Can you let me finish my objection, please?

THE WITNESS: Oh, I'm sorry.

MR. LISAK: Objection to form. Asked and answered.

Go ahead.

BY MS. PARFITT:

Q You may answer.

A Yeah. My charge was to look at endocrine-disrupting chemicals, hair relaxers, i.e., do these hair relaxers --

Q Are they chemical hair relaxers or hair relaxers?

MR. LISAK: I don't think he was finished with his answer.

MS. PALACIOS: Counsel, please.

MR. LISAK: Well, I don't know. I heard it all day long from your side of the table. So let's -- I think, if I'm supposed to let him finish, then maybe you should.

THE WITNESS: These were chemical relaxers that involved parabens, phthalates, bisphenols that represented it -- represented all those similar compounds, these EDCs, these chemicals that are contained in the products that are used for relaxing hair.

BY MS. PARFITT:

Q Okay. You were asked by counsel -- I told

you I was going to jump around -- about a number of other substances, I think, that might exhibit these estrogenic activities that you've talked about all day, like soy. I believe that was one question.

Is there a difference between the route of exposure for something like soy versus the route of exposure of a chemical hair relaxer used to relax the hair?

A Absolutely.

Q What is the difference?

A The difference is that you consume soy. Hair relaxers you apply to the skin.

Q And what happens when you apply the chemical hair relaxer to the skin? What is the mechanism?

A The mechanism --

MR. LISAK: Objection to form. Misstates his -- objection to the foundation, because he said he doesn't know how these things are applied -- he's never seen it -- as well as to the form of the question.

MS. PARFITT: Counsel, you told me not to narrate. So objection is fine.

MR. LISAK: Have you heard of goose and gander?

MS. PARFITT: I have. I have. But --

MR. LISAK: Okay.

THE WITNESS: Repeat the question, please.

BY MS. PARFITT:

Q What is the difference between -- strike that.

What is the mechanism by which chemical hair relaxers can cause and have the biologically plausible mechanism for causing ovarian and uterine cancer?

MR. LISAK: Objection to form. And foundation.

MS. PARFITT: Let me start over. That was a really lousy question.

BY MS. PARFITT:

Q My question is: What is the route of exposure four chemical hair relaxers?

A The route of exposures for hair relaxers is through the scalp, i.e., through the skin.

Q Okay. And what happens when the chemical hair relaxers enter the skin? What is the process?

MR. LISAK: Objection to form. Foundation.

THE WITNESS: Various chemical hair relaxers proceed through the skin in different ways.

For instance, if it's a high-alcoholic substance and it -- for instance, I believe they're parabens. Parabens can enter the skin very easily. They're lipophilic. Skin is lipophilic. But the dermis actually has a hydrophilic inner portion.

So, when these chemicals hit that portion, one would think they couldn't pass through. However, there are specific enzymes that convert these compounds to substances that then can penetrate the entire dermis where they then enter in the deep portions, which contain blood vessels. They're picked up by the blood vessels through absorption and then passed throughout the body, affecting tissues that are sensitive to estrogen, and then ultimately either metabolize or are excreted out through the urine.

BY MS. PARFITT:

Q Well, that leaves me to ask you this:

Is there a difference between the route of exposure for an endocrine-disrupting chemical in the chemical hair relaxer products that contain, as you said, this high-alkaline, high-pH, and other endocrine-disrupting chemicals that you've discussed in other personal care products that contain perhaps some of these same chemical ingredients?

MR. LISAK: Objection to form. And foundation.

BY MS. PARFITT:

Q You may answer.

A Can you simplify your question, please?

Q Yes.

What is the difference between the route of exposure of EDCs in chemical hair relaxers versus other endocrine-disrupting chemicals that you might use in other personal care products?

MR. LISAK: Objection to foundation for this witness and the form of the question.

BY MS. PARFITT:

Q You may answer.

A I'm struggling a little bit with your question.

Q Well, you just talked about the high alkalinity of a chemical hair relaxer when it is placed -- or administered to the scalp of a woman's head.

A Right.

Q What is the difference between that process and that route of exposure versus exposure to women with other types of personal care products that are not exposing the scalp?

MR. LISAK: Objection to form. Foundation.

THE WITNESS: So you're talking about other substances or other forms, like using -- like a Brazilian or something of that nature?

BY MS. PARFITT:

Q No. I'm talking about what is different about the route of exposure of a chemical hair relaxer that's applied to a woman in order to straighten her hair versus other personal care products that might contain chemical hair -- or excuse me, contain EDCs?

MR. LISAK: Objection to form. And foundation still.

Go ahead.

BY MS. PARFITT:

Q Let me try it again.

A I'm really struggling with the question.

Q Okay. Well, let me ask, you talked about the high pH associated with the chemical hair relaxers, correct?

A Yes.

Q All right. How does that impact the process of -- what is -- let me back up here.

What is the difference between the route

of exposure of a chemical hair relaxer that is of high pH, highly alkaline, and other types of personal care products that one might use?

MR. LISAK: Objection to form. Foundation.

THE WITNESS: Well, those -- I'll try to answer this.

BY MS. PARFITT:

Q Well, I think I'm going to the route of exposure. What's --

A As opposed --

Q You talked about the route of exposure of a chemical hair relaxer.

A As opposed to ingestion or . . .

Q Correct.

A Okay.

Q What's different?

A Well, this is a direct absorption into the skin. It's facilitated by the nearness of the blood vessels.

The other methods, inhalation, ingestion -- ingestion, they have to go through the stomach. The stomach is tremendously acidic. Inhalation, they intake that, and it gets into the lungs. That's a very large surface area. It's not

direct. It's not direct.
So it's direct on the skin. It goes automatically right into the system. The proximity of the application on the skin to that at the blood vessels is very, very narrow.
Q Okay. And once it hits the systemic system, what is the mechanism by which the chemical hair relaxer can cause these ovarian or uterine cancers?
MR. LISAK: Objection to foundation for this witness and the form of the question.
THE WITNESS: If I understand the question correctly, that these chemical hair relaxers exhibit estrogenic activity. So as they move through the circulation, they're going to target and situate themselves on estrogen-responsive organs.
Now, that's an important consideration because, in particular, usually the reproductive tissues are targets for estrogen-sensitive stimulation. In particular, including the breasts that you have, the uterus, the tube, the ovary. If you want, you can include the vagina and the cervix.
BY MS. PARFITT:
Q Dr. Chang, it's your understanding that hair relaxer use often can begin as a child or a

young woman?

A Yes. Yes.

MR. LISAK: Objection to foundation. Sorry.

BY MS. PARFITT:

Q And based upon your review and your readings, do you understand that a young woman who might use it in childhood may continue to use that hair relaxer --

MR. LISAK: Objection to form.

BY MS. PARFITT:

Q -- over the course of their lifetime?

MR. LISAK: And speculation.

Go ahead.

THE WITNESS: It's been reported in several articles that actually initiation, application of these hair relaxers may occur in adolescence and actually pre-adolescence. Young women follow the examples of their parents, generally, or their older siblings.

And therefore, if it's initiated early on and it's successful, given the social pressures of today, then they will continue to use this for decades. And even beyond post menopause, they will continue to use these hair relaxers.

BY MS. PARFITT:
Q What is the impact, if any, of this cumulative exposure to endocrine-disrupting chemicals contained in the chemical hair relaxer product?
MR. LISAK: Objection to form. Foundation. Asked and answered.
THE WITNESS: If you can envision a situation where not only are they using these products over decades, but the frequency and the dose that they're using only adds to the effectiveness of these -- of these agents in terms of creating a cancerous or an oncogenic state.
Some will use -- as has been demonstrated in the publications that we've looked at, some will use it greater than four times, you know, a month. They'll use it from age 10, 8, whatever, throughout. And they will use it in variable doses.
So there's ample opportunity. There is ample opportunity to have a -- the complete, thorough impact of these hair relaxers is substantial through a woman's lifetime.
BY MS. PARFITT:
Q Do you have an opinion whether or not this frequent and cumulative exposure for durations of

time with the chemical hair relaxers can cause uterine or ovarian cancer?

MR. LISAK: Objection to form. Foundation. Asked and answered. It's the entire subject of his report that we talked about for six hours.

Go ahead.

MS. PARFITT: Thank you, Counsel.

THE WITNESS: Well, in fact, I do believe that's the case. And the evidence is certainly there from the epidemiologic studies. The actual in vitro and studies conducted in cells, animals and human cells, point to the fact that these chemicals can for sure stimulate cancer cell growth.

The other consideration that has not been discussed here is the fact that, if you look at the tissue samples in the examination of these cancer tissue samples, that anywhere between 20 to 80 percent of them are missing allele in PTEN with regard to the uterine cancers.

If you have a missing allele at PTEN, you will have an increased risk for uterine cancer. This has been shown experimentally. And even if you knock out the uterine receptor, you still have an increased risk of hyperplasia -- atypical

hyperplasia and endometrial cancer.

So in my mind, if you consider women -- so remember, 20 to 80 percent is the range in which a PTEN is missing an allele in their gene pair. That automatically puts them at risk. So it follow that's, if they're exposed to these endocrine-disrupting chemicals, these hair relaxers, that this certainly can be a stimulus for uterine cancer.

Now, this is not only true of certain, like, parabens, but also phthalates. There's been published work. If you look at XE -- CXCL12, which is similar to phthalates, it was published quite clearly, this compound in studies using human cells has shown that it can propagate cancer cell growth.

The other thing is that the study by Shukla is very interesting. Shukla did this in mice. And he did a very clever study. What he did is he used two doses of a phthalate. And the dose of phthalate was geared to that which appears in the urine of pregnant women. This study was conducted in mice over a year. They fed the mice phthalates every day.

And what they did at six months is that they sacrificed some of the mice, and they looked at their gene profiles. They did not see necessarily

changes in the endometrium of the URI of these mice. However, what they did see, they saw activation of a series of gene transcripts that are linked to cancer.

BY MS. PARFITT:

Q And Dr. Chang, what is the significance? Why is it that you want to discuss Shukla with us to your opinions that exposure to chemical hair relaxer can cause ovarian and uterine cancer?

MR. LISAK: Objection to form. Foundation.

THE WITNESS: Because this study, in and of itself, by itself, as they look after six months, they didn't see any tissue changes. They saw induction or stimulation, activation of these genes. But by one year, they now found endometrial hyperplasia, atypical endometrial hyperplasia.

But more importantly, they saw another series of genes that are implicated in oncogenesis. Not only were they stimulating genes that are responsible for cancer cell growth, but also for inflammation, which is part and parcel of carcinogenesis.

So, if you combine that data with the fact that there's a PTEN allele missing in 20 to

80 percent of women with cancer, that means that there are women out there already susceptible to endometrial cancer. All they need is a trigger.

And in my mind, the dose duration, the length of time of use of these hair relaxers will provide ample evidence that it certainly is plausible and may well be in fact the cause of endometrial cancer in these patients.

BY MS. PARFITT:

Q Dr. Chang, you were asked many questions about not only your research in the area of PCOS, but your use of PCOS as an example or a reference of estrogenic exposure.

Is it fair to say that your use of PCOS was a clinical model for purposes of this discussion of chronic estrogen exposure leading a woman exposed to chemical hair relaxers to cause cancer of the ovary or the uterus?

MR. LISAK: Objection to form. Foundation. Asked and answered.

THE WITNESS: In polycystic ovary, it is stated unopposed estrogen exposure. And this has been well documented. The levels of estrogen are in the normal range for premenopausal women. And one of the cardinal features of the polycystic ovary

syndrome is irregular vaginal bleeding.

And where does this bleeding come from? This bleeding is a reflection of the constant but volatile secretion pattern of estrogen. So, if you were to sample a woman with this disorder on a daily basis for, say, two months, you will find that her estrogen levels bounce back and forth in the normal range.

If you were to do ultrasounds to measure her endometrial lining, it would follow the pattern of estrogen secretion. So the reason they bleed is because sometimes a high level or a constant level of estrogen stimulation builds the lining up, but there may be an inexplicable sudden drop in the estrogen, which is viewed as withdrawal. And the support of the lining is lost. And so, subsequently, that lining sloughs and gives you bleeding. So that's the genesis of the bleeding.

Having said that, the constant stimulation of these individuals to estrogen secretion, which is a cardinal feature of polycystic ovary syndrome, can result in excessive stimulation of the endometrium.

BY MS. PARFITT:

Q Why is it that you chose to use as reference as a model, a clinical model, the PCOS in

talking about your opinions that chemical hair relaxer exposure can cause ovarian/uterine cancer?

MR. LISAK: Objection. Form. Foundation. Asked and answered, including just in the last --

THE WITNESS: Polycystic ovary syndrome is the human model. It's a human model of unopposed estrogen secretion. You cannot create this model in an animal, be it a rodent, be it a rat, be it a non-human primate. Because I've tried it, and you can't do it. At least I have not been able to do it to this point. So rephrase the question again. I'm sorry.

BY MS. PARFITT:

Q My question really was why you used PCOS as a model for -- a clinical model for your discussion of chronic estrogen exposure that's -- that can cause cancers.

A Because there's very few other models that are naturally occurring. Polycystic ovary syndrome gives you an opportunity to look at the effects of unopposed estrogen secretion.

And this is a real phenomenon. It is recognized by all the experts who examine and research polycystic ovary syndrome. Moreover, you can see this occurring not initially at the expected

time or age in which you see endometrial cancer. As I stated in my document, I've experienced endometrial cancer in at least a half a dozen women 30 years of age or less. And that's a brutal diagnosis to make.

Q What is a brutal diagnosis to make?

A To make the diagnosis of endometrial cancer in a young woman, particularly those that aren't even 30 years of age. It's devastating, absolutely devastating.

But it demonstrates the impact of estrogen on the endometrium if it's unopposed by progesterone. There's no question in my mind that estrogen is a perpetrator of endometrial cancer. And I think that I'm pretty much in agreement with all my colleagues, or they are in agreement with me, that this is the mechanism.

So using polycystic ovary as the model of unopposed estrogen secretion is very appropriate for this particular subject matter.

Q You've heard the term "modifiable and non-modifiable risk factors" -- correct? -- in your line of practice?

A Yes.

Q All right. Is the use of chemical hair

relaxers a modifiable risk factor for both uterine cancer and ovarian cancer?

A I would consider that to be true, that they are modifiable risk factors for uterine and ovarian cancer.

Q You've spent a career -- well, let me ask you. How long have you spent -- studied disorders involving estrogen, ovulation, and reproductive cancers?

A Since I joined the faculty at UCLA in 1977.

Q Tell us, if you will, why estrogen is biologically important to the uterine and ovarian tissue.

A Well, basically, these are tissues that are nourished by estrogen and progesterone. And estrogen is very important, from the outset, as an embryo, through fetal development, through being a newborn, adolescence -- childhood, adolescence and beyond. It is a critical factor.

If you are not -- if you do not have estrogen, you will not fully develop your sexual genitalia for women. It's critical.

Q Of the chemicals that you've discussed today and in your report that are contained in the

chemical hair relaxer products, did you find support for estrogenic bioactivity of those chemicals?

MR. LISAK: Objection to form.

THE WITNESS: Yes. I think several of the papers that -- recited that there is clear evidence that these compounds can mimic estrogen. They show estrogen activity. In fact, the paper by Hall and Korach looks at phthalates in particular. And when they do their dose response and look at the samples, the phthalates they used, really the CXCL12, it wasn't quite equivalent to estradiol, but it was close. It was getting close. And that's a remarkable portion of that experiment or that paper that was published.

BY MS. PARFITT:

Q Can chemical substance -- chemical substances with even a weaker estrogenic potency still produce clinically meaningful results?

MR. LISAK: Objection to form.

THE WITNESS: Well, if you're referring to hair relaxers, yes. It's not one, you know, agent or ingredient, one class, not one single hair -- endocrine disruptor. It's a mixture. So you have to pile on the various hair relaxers, the various chemicals. It's an additive effect.

So given that these hair relaxers contain a number of these EDCs and in quantities probably that are highly variable -- they may be variable. I don't know if they're uniform, but I would suspect that each company has their own formulation for it. It may be different.

And as a result, the combined effect of these collection -- this mixture of hair relaxers, of phthalates and EDCs in these hair relaxers constitutes a significant impact of estrogenicity.

BY MS. PARFITT:

Q Dr. Chang, for purposes of your opinion, did you conduct a causal assessment as to whether or not exposure to chemical hair relaxers can cause ovarian and uterine cancer?

MR. LISAK: Objection to form.

THE WITNESS: Causal analysis?

BY MS. PARFITT:

Q Causal analysis, causal assessment, yes.

MR. LISAK: Same objection. Form.

THE WITNESS: Yes. I mean --

BY MS. PARFITT:

Q And what was the basis for that causal analysis? What type of evidence did you rely on for purposes of your opinions that exposure to chemical

hair relaxers can cause ovarian and uterine cancer?

MR. LISAK: Objection to form. Asked and answered. It was the entire topic of the last six hours, as well as his report.

Go ahead.

BY MS. PARFITT:

Q You may answer.

A Well, I relied on the data that has been done in basic research. I relied on data that -- epidemiologic data. I relied on data that was conducted in laboratory animals. I relied on data that was conducted in human cells, both cancer cells and normal cells.

These types of data are -- they build on one another. And the fact that we now know that cancer in women is -- the increased risk is almost predicated by genetic abnormalities in those genes that arrest or prevent cancer formation.

If you were to consider that all women are the same, in that they do not express these risks in terms of their genetic code analysis, that would be an error. That would be an error. These women, unbeknownst to them, us, or anybody, because they undergo total, you know, DNA analysis, there's a certain percentage of women out there that are at

definite risk for uterine cancer, as shown by the fact that the abnormalities of missing an allele and, in this instance, the PTEN gene, puts them at remarkable increased risk for uterine cancer, as demonstrated by the absence of that allele in the tissues of the cancers that have been removed.

As a result, that means that, as I indicated earlier, you miss one allele in the mouse model, in the rat model, that you then develop uterine cancer. Period. You can even knock out the estrogen receptor, and you still get uterine cancer.

That's a very -- that's a very significant finding. To draw that information together, to create this concept, I think is really important. And it lends high credibility to the plausibility and likelihood that these EDCs, these hair relaxers can cause cancer.

Q So what you have done in developing your opinions, though, that chemical hair relaxer exposure can cause ovarian and uterine cancer is to really integrate the mechanistic, experimental, and epidemiological evidence; is that fair?

MR. LISAK: Objection to leading. Object to the form. Leading question.

/ / / /

BY MS. PARFITT:

Q You may answer.

A Well, aside from the question, in my studies, in my evaluation of the material, the data, looking at the papers and reading them and just considering the things I have found, putting together the picture, I think it's quite clear. I think one of the critical issues --

Q What is quite clear?

A That EDCs, the hair relaxers, contribute -- they can cause cancer.

Q What cancers?

A Uterine and ovarian cancer.

What is missing in most of the papers, at least clinically, is they don't emphasize the fact that these PTEN that are missing an allele, they're extremely at high risk for uterine cancer in and of themselves.

Q So are you suggesting that, as a result of the PTEN with a woman who has endometrial cancer, they are even at a higher -- they're a higher risk group of women when they're exposed to chemical hair relaxer.

Is that what you're saying?

MR. LISAK: Objection to form.

BY MS. PARFITT:

Q I'm just trying to understand what your point is.

MR. LISAK: Just let me finish.

THE WITNESS: I thought you'd finished.

MR. LISAK: Sorry. Yeah. Form and foundation.

BY MS. PARFITT:

Q You may answer.

A Yes. Definitely. Definitely. Because I was curious, is there anything about the host, i.e., the woman, that would make them more susceptible.

And so when I looked at the data, which is plentiful, that women who -- it's like BRCA. If you have a mutation for the BRCA gene, individual behavior is modified such that women are willing to undergo removal of their breasts because of that.

I view the risk for endometrial cancer to be similar. If you know that you are missing an allele for the PTEN gene -- if I was a woman -- and I can't speak for women, but if you -- if the findings were further investigated, just with that little bit I looked and found this information, I would be deeply concerned in my risk for developing uterine cancer.

And if that is superimposed, that risk is then laden with the exposure of factors that you know can induce estrogen activity.

Q Like what?

A Like chemical hair relaxers that are used for a huge interval of time. They're used frequently and in various doses. So, in constructing this picture, it's quite clear to me that not only is it highly plausible, but in fact likely that these hair relaxers -- these chemical hair relaxers contained in these products can stimulate ovarian and uterine cancer.

Q Now, Dr. Chang, I'm going to jump around here a little bit.

You were asked some questions about the Sister Study results, right? White and Chang. Remember that?

A Uh-huh.

Q All right. If you want to pull those articles in front of you so you have access to them.

A Yes, I do. Where did I put them?

Oh, here they are.

Q Now, you understand that the questionnaire that you were shown from the Sister Study asked the women whether or not they were exposed to hair

relaxers, hair straighteners, and pressers as well.
Do you remember that?
A Yes.
Q What is the -- in your opinion, what is the impact of the study results that the authors included along with the chemical hair relaxers, pressers? What does that do to the overall results of the study?
MR. LISAK: Objection to form.
THE WITNESS: Excuse me. Rephrase the question.
BY MS. PARFITT:
Q Sure.
What impact, if any, does the fact that the hazard ratios for the -- and we'll talk about first the Chang study -- included exposure to not just chemical hair relaxers, but to these hair pressers?
MR. LISAK: Objection to form.
BY MS. PARFITT:
Q How would that impact the study results?
MR. LISAK: That's an incomplete list of products.
THE WITNESS: Well, if you go to the top of page 1638, that initial portion, the upper

portion, that clearly the trend is moving to -- there is a positive association. It states that it may not be significant in one initial, but subsequently, for those frequent users greater than four times a year, that that was clearly highly significant. The hazard ratio was 2.55 with markedly impressive confidence intervals which moved upward.

So these data are quite convincing in and of themselves as kind of looking at the overall picture in terms of looking at the results. This is without necessarily breaking down everything. But specifically, just the higher adjusted hazard rates of uterine cancer among women whoever used hair straighteners.

BY MS. PARFITT:

Q I want you to look at Table 3. And specifically the column "Hair product use is defined as 'straighteners,' 'relaxers' or 'pressing products'."

Do you see that?

A Yes.

Q Are pressing products chemical hair relaxers?

MR. LISAK: Objection. Foundation.

THE WITNESS: They're hair straighteners.
BY MS. PARFITT:
Q Are they chemical hair straighteners?
MR. LISAK: Asked and answered. Form. Foundation.
THE WITNESS: My understanding is they iron, don't they?
BY MS. PARFITT:
Q What, if any, impact would it have on the hazard ratios of including pressing products with chemical hair relaxers?
A It would likely increase the hazard ratio.
Q So the results that are published in Table 4, for instance, for greater than four times of a hazard ratio of 2.55 would actually be higher; is that what you're saying?
A Exactly.
MR. LISAK: Objection to form. Foundation. Rank speculation.
Go ahead.
BY MS. PARFITT:
Q Dr. Chang, let me ask you: Referencing greater than four times a year, the hazard ratio here is listed as 2.55.
Do you see that?

A Where are we? Back on Table 3?
Q We're right on Table 4. Table 3, rather. Table 3.
A Yes.
Q And you go over to "straighteners."
A Yes.
Q All right. Do you see on the far -- the fully adjusted hazard ratio is 2.55 with a confidence interval of 1.46 to 4.45.
Do you see that?
A Right.
Q That's statistically significant, correct?
A Yes, it is.
Q So what impact, if any, would inclusion of pressing products with chemical hair relaxers have on that hazard ratio of 2.55?
MR. LISAK: Objection to form. Foundation. Rank speculation.
BY MS. PARFITT:
Q You may answer.
A Well, given the inclusion of pressing products not being a hair relaxer, that it would push the data toward the null.
Q And what does that mean, when you push it to the null?

A It would increase the significance, the hazard ratio.
Q So that number would actually underestimate the risk; is that correct?
A Exactly.
MR. LISAK: Objection to form. Foundation. Speculation.
BY MS. PARFITT:
Q You were asked about the authors writing "More research is warranted" or "More research is needed."
What does that mean to someone like yourself who spent his career doing research and a clinician?
What does that mean?
MR. LISAK: Objection to form. Foundation. Speculation. You objected vociferously to my questions about the same language, that he had no idea what the authors meant, and now you're asking the same question.
MS. PARFITT: I'm not asking -- I'm asking what it means to him.
BY MS. PARFITT:
Q What does it mean when --
MR. LISAK: That's what I asked, and you

objected.

BY MS. PARFITT:

Q -- more research is warranted?

MR. LISAK: Go ahead. Form. Foundation. Speculation.

THE WITNESS: As I stated previously many times, this is standard -- this is a standard narrative in most papers. Data is data. And this is good data. You can't deny it.

Would you prefer to see additional data? Of course we would. But that does not discount the findings of this study. The findings of the study are consistent with the fact that the use of these hair straighteners -- I mean, the use of these hair relaxers are associated with the increased risk for uterine cancer.

BY MS. PARFITT:

Q Do you have an opinion, Dr. Chang, whether or not the use of chemical hair relaxers can cause ovarian and uterine cancer in premenopausal women?

MR. LISAK: Objection to form.

BY MS. PARFITT:

Q And the basis for that opinion.

A It may be less likely, but it can.

I view the impact of these hair relaxers

on uterine and ovarian cancer as a phenomena of time, dose, and duration.
Q And explain what you mean by that.
A I mean, the late -- the number of years this is being used, the frequency with which they're being used, and the dose that is being used. Because while I can't comment, but I am sure that the amount that's applied to the scalp is not consistent among all women.
So, in that light, yes, the impact of a lifetime, essentially, of exposure to these chemical hair relaxers certainly is plausible that it can cause cancer.
Q In both premenopausal and post-menopausal women?
A It can. It's just that, in post-menopausal women, the exposure to the elements that I already described is also increased.
Q All right. Let's turn to the Black Women's Health Study, the Bertrand paper, if you will, for just a moment.
And while you're getting there, counsel asked you -- or pointed out that you didn't put "good" on either the White paper or the Chang paper, but you did put the word "good" on the Bertrand

paper.

Do you recall that question?

A Yes.

Q Okay. Explain. Why did you put "good" on Bertrand and you didn't put "good" on Chang and White?

MR. LISAK: Objection. Objection. Asked and answered.

THE WITNESS: Okay.

MR. LISAK: Go ahead.

THE WITNESS: At the moment when I read it, I liked it. It was a good paper, and I wrote "good."

BY MS. PARFITT:

Q Okay. Are the study results of Bertrand, Chang, and White all good -- or excuse me. Are all -- strike that.

I'll come back to it. Let's just stick with the Bertrand paper here for a moment.

Do you understand that, for purposes of the referent number, that the investigators combined the never users with light users?

MR. LISAK: Objection to form. Foundation.

THE WITNESS: I'm aware of it.

BY MS. PARFITT:
Q All right. What impact, if any, to the study results would occur because the authors combined never users with light users?
MR. LISAK: Objection to form. Foundation.
THE WITNESS: As I had indicated previously with the Chang study, that this pushes the data analysis and the results toward the null.
BY MS. PARFITT:
Q Which means what?
A It means that there is no relationship.
So what they're doing -- what they did that -- what they did was only almost handicap the data analysis by including infrequent users.
Do I make myself clear?
Q When you say "handicap," what do you mean?
A Lessen the likelihood that you'd find a significant impact of these hair relaxers and the use of these hair relaxers on uterine cancer.
Q So the hazard ratios that are contained in the Bertrand study underestimate the actual risk to the woman; is that correct?
MR. LISAK: Objection to form. Foundation. Speculation.

THE WITNESS: That would be my impression.

BY MS. PARFITT:

Q Is that your opinion?

A That's my opinion.

Q You were asked several questions about statistical significance.

You remember that discussion, correct?

A Yes.

Q Does the fact that a study finding includes non-statistical -- strike that.

Is the fact that a study finding is non-statistical -- does that negate or lessen the importance of that study finding?

MR. LISAK: Objection to form. Asked and answered.

THE WITNESS: It's based on what has been found to be, quote, "statistically significant." I think we've taken the high road as an institution to demand ultimate proof. But that's changed since the statisticians of the world decided that we're missing out. We're not picking up on clues that could lead us to valuable information.

And by saying that, what I mean is that they're not paying attention to hazard ratios, confidence limits to the extent that they could be

more useful than they have been.

In other words, positive association should not be ignored, should not be disregarded because they don't fit the definition that formerly codified significance. And because of that, I think researchers now can be enlightened by the fact that trends are very important, especially if the trends follow -- the trends follow, as exhibited in some of these papers that we're talking about now -- the Chang paper, the Bertrand paper, the White paper. If in fact those trends are persistent, they have clinical meaning.

BY MS. PARFITT:

Q And when you say "clinical meaning," what do you mean?

A What I mean is that these hair relaxers absolutely can cause cancer. We cannot discount that probability. To do so would be abandoning our mission. Absolutely. You cannot throw out the baby with the bathwater. You have to be very careful with data that show positive associations. Period.

Q And when you talk about data, does data represent human beings?

A Absolutely it represents human beings.

Q And what does that mean?

MR. LISAK: Objection to form.

THE WITNESS: Look, we can't take human beings and test them because we value life too much. Because if we test them, you can bring on injury and harm. That is not what we want to do. We want to find the best models. We want to find the right protocols and implement our studies to determine -- to provide a preliminary finding, a platform so that we can proceed further without risking significant injury to humans.

This is an ethical issue that pervades all science I'm aware of, except for exceptional circumstances that have occurred in past history, such as Tuskegee.

So it is imperative that -- for sure clinical researchers like myself do observe this and resist all means which we could endanger humans. As a result, we must go to other species that most likely recapitulate our biological function.

It turns out that rodent models are very, very good. In fact, the basis for our understanding of ovulation and the dynamics of the hypothalamic-pituitary-ovarian axis in terms of hormone production is based on the mouse and rat model. Without that information, we would be far

behind in our knowledge of what constitutes the basis for normal ovulation in women.

BY MS. PARFITT:

Q Dr. Chang, it was pointed out you've never testified before in a case.

Why was it that you undertook to study this issue of the causal relationship of chemical hair relaxer exposure in ovarian and uterine cancer? Why was that important?

MR. LISAK: Objection to form.

You mean in addition to being retained and compensated by Plaintiffs?

MS. PARFITT: Objection, Counsel.

THE WITNESS: When I initially was approached to look at this, I didn't have a lot of knowledge about this. And at the outset, I questioned whether this was a reasonable concept.

BY MS. PARFITT:

Q And when you're talking about knowledge of this, the association between chemical hair relaxers and uterine and ovarian cancer?

A Exactly. Yeah.

MR. LISAK: Objection to form.

THE WITNESS: And I think I related my concerns to my legal team.

BY MS. PARFITT:

Q Dr. Chang, you're not to talk about anything you relayed to us.

A I'm sorry.

Q Yeah. And let me rephrase it, if it's not clear.

What, if any, public health impact does exposure to chemical hair relaxers to women result in?

MR. LISAK: Objection to form. Foundation.

BY MS. PARFITT:

Q What is the public health impact of exposure to chemical hair relaxers?

MR. LISAK: Objection to form.

THE WITNESS: The public health impact? It's enormous. Just by observing what has been written in these epidemiology papers, the number of women that use hair relaxers. I can't calculate it, but I would guess it's in the millions. Tens of millions, it may well be.

So I think it's substantial that the impact on the women of America for sure, not to speak of the world, would be significant, if that's the answer -- what you're trying to ask that

question.

BY MS. PARFITT:

Q And it's significant why?

MR. LISAK: Objection to form.

THE WITNESS: It's significant because we're talking about ovarian and uterine cancer. People die from ovarian and uterine cancer. We're not at that point in time where we can save women all the time that develop ovarian and uterine cancer. And for that reason, this is very, very important.

BY MS. PARFITT:

Q It's very important why?

MR. LISAK: Objection. Form. It's been asked and answered like 15 times.

MS. PARFITT: Let him finish.

THE WITNESS: It's important because we want to protect women from developing uterine cancer and ovarian cancer.

BY MS. PARFITT:

Q And how do you -- and how do you protect them in this context?

MR. LISAK: Objection to form and foundation for this witness.

/ / / /

BY MS. PARFITT:

Q You may answer.

A What we have discovered in this particular process is quite clear to me, that these hair relaxers -- these chemical hair relaxers that are used by women from pre-adolescence to post-menopause with substantial frequency and dose, that it poses a significant risk for uterine and ovarian cancer.

And I think that you cannot underscore that fact more emphatically than now. It's like, why would you want to endanger half the population of the United States and the world by not making that connection? Particularly when we now know that there are women out there who are at increased risk for uterine cancer just by the findings that we get from the pathology investigations of the PTEN missing allele.

So we have a subject population that is definitely at risk. They just need a little prodding. They need a little stimulation. And in my mind, these chemical hair relaxers can in fact do that because of their estrogenicity, their ability to bind the estrogen receptor and then activate the processes.

And in fact, it's just not the allele

missing the PTEN gene. There are other pathways that I cited before, the study by Shukla, how it shows all these different avenues that can proceed to oncogenesis, especially, in particular, the Wnt pathway. The Wnt pathway is very important in the creation of cancer.

Q Dr. Chang, you were shown an article by counsel entitled "Systemic Uptake of Diethyl Phthalate, Dibutyl Phthalate, and Butylparaben Following Whole-Body Topical Application and Reproductive and Thyroid Hormone Levels in Humans."

It was a Janjua article. Do you recall that?

A Right.

Q Do you have it in front of you?

A Uh-huh. I don't have it in front of me, but I recall it.

Q All right. Let me just show you a copy. It's, for purposes of the record, Exhibit No. 21.

Counsel asked you -- let me ask you, did the study results assume application on normal skin?

A Yes.

Q What's the significance of that versus -- what's the significance of that finding?

A It shows that I believe these hair

relaxers that were -- excuse me -- that these phthalates were used on normal skin. They penetrated the skin. They appeared in the urine after application on a daily basis for four hours each day.

Q And how, if at all, did the study results in Janjua -- if I'm pronouncing that correctly -- impact your opinions in this case?

MR. LISAK: Objection to form. Asked and answered.

THE WITNESS: That these particular hair relaxers, these chemicals, the phthalates, can penetrate the skin quite easily, enter the circulation, expose suspect requisite tissues, and then be metabolized and excreted in the urine.

BY MS. PARFITT:

Q Dr. Chang, you were shown by counsel a document, which I believe was marked as Exhibit 23. It was the patient data query -- or excuse me, the physician -- it was actually the patient data query.

Do you recall that document that counsel and I had quite a bit of discussion about?

A Yes.

Q How could you forget?

Now, Dr. Chang, there's a -- are you aware

of the fact that there's a patient version of the PDQ and a physician, professional version?

A Now I am.

Q Let me show you the -- and you are a physician --

A Yes, I am.

Q -- as well, correct?

All right. So let me show you what we'll have marked as Exhibit -- which one did we leave off with?

MS. PALACIOS: 27.

MS. PARFITT: 27? Okay. We'll mark it Exhibit 27.

(Exhibit 27 marked for identification.)

BY MS. PARFITT:

Q And I want to show you the patient data query for physicians or professionals.

MR. LISAK: Can I take a quick peek?

MS. PARFITT: You can take a quick peek, yes. Let me show it to counsel, since we're working with one.

MR. LISAK: Is this an extra one, or this is it?

MS. PARFITT: No. That's the only one.

And Counsel, I'll represent the highlights

are mine.

MR. LISAK: Okay. That's getting there. The highlights on this document are --

MS. PARFITT: Mine.

MR. LISAK: -- yours.

And this it printed from the same website --

MS. PARFITT: Correct.

MR. LISAK: -- that I used -- for the public and patients was used, correct?

MS. PARFITT: Correct.

MR. LISAK: Okay.

MS. PARFITT: Thank you.

MR. LISAK: I'm not seeing any attached reference list.

MS. PARFITT: May I see it? I'll show you.

BY MS. PARFITT:

Q Let me show you, Dr. Chang, the section of the -- well, first, have you seen the physician --

A No, I haven't.

Q -- version of that?

MR. LISAK: Seriously, you made a big deal about the references.

MS. PARFITT: I know. I'm going right

there. I was going right there. Going right there.
MR. LISAK: Well, if I could see that as well. Because when you handed me the exhibit, it didn't include references.
MS. PARFITT: Yes, it does, Counsel. It's right there.
MR. LISAK: What you handed me didn't.
MS. PARFITT: That's what I handed you. This is all part of the same document.
MR. LISAK: The eight references here, IARC, Bandera, Horn-Ross, Xu, Zeleniuch, Liu, Neuhouser, and Chang, right?
MS. PARFITT: That's right. Okay.
BY MS. PARFITT:
Q Dr. Chang, let me show you what we have marked as Exhibit No. 27. I'll represent to you that it is a professional physician version of the patient -- or excuse me, of the physician data query. And specifically, let me reference your attention to the section of hair products, including dyes, bleach, highlights, straighteners, and permanents.
Do you see that?
A Yes.
Q Okay. Now, counsel showed you a patient

version of that document. And again, he focused your attention -- and I believe it was Exhibit 23. And he also showed you a section on hair relaxers and dyes.

Do you recall that?

A Uh-huh.

Q Now, the document you have in front of you, Exhibit 27, how many paragraphs do the authors spend discussing the adequacy of the data to support whether or not chemical hair relaxers can cause uterine cancer or endometrial cancer?

A Does that include the summary?

Q We haven't gotten to that yet. Just the section with regard to hair relaxers.

A There's one three-line paragraph.

Q Three-line paragraph. Okay.

How many references are contained in that document?

A Eight references.

Q So how many references did you study for purposes of your opinions that chemical hair relaxers can cause ovarian cancer and uterine cancer?

MR. LISAK: Objection to form.

THE WITNESS: Well over 400.

BY MS. PARFITT:
Q All right. And so the authors of that particular document listed eight; is that correct?
A Yes.
Q Okay. Do the authors include Chang?
A Yes. At the bottom.
Q Okay. And what do they say about Chang? Is that an abstract? Is that the whole document? What is it?
A Abstract.
Q Okay. So that's not even the whole document; is that correct?
A Correct.
Q That's not the published, peer-reviewed document?
A Right.
Q Do the authors include Bertrand?
A In that particular paper, no.
Q Okay.
A And do the authors --
MR. LISAK: Let him finish. He was saying "but."
THE WITNESS: Bertrand appears to be in Reference 6.
/ / / /

BY MS. PARFITT:
Q Well, the Bertrand article, that's about vitamin D.
A Oh.
Q We're talking about the Bertrand article on --
A No. It's not cited.
Q -- on uterine cancer.
A It's not cited.
Q Is the White article listed there?
A No, it's not cited.
Q Okay. Now, I want you to -- now, do you have -- from looking at that document, does it tell you who the reviewers were that published that information regarding inadequate data to support the causal relationship between hair relaxers and uterine cancer?
A Yes. It says "This summary is reviewed regularly and updated as necessary by the PDQ screening and prevention editorial board."
Q Do you know who those people are?
Does that document tell you who those people are?
A No, it doesn't tell me who they are.
Q Is it fair to say you have no idea who the

authors are of that particular one paragraph discussing the adequacy of evidence?

A Yes. It states "Additionally, this is editorially independent of the National Cancer Institute. The summary reflects an independent review of the literature and does not represent a policy statement of the NCI or the National Institutes of Health."

Q Have you, for purposes of your opinion, reviewed the NIH studies that addressed -- and NIEHS studies that addressed the relationship or association between chemical hair relaxers and ovarian and uterine cancer?

A Yes, I have.

Q And so you have reviewed those peer-reviewed published articles; is that correct?

A Yes, I have.

Q Have you seen, in your review of the literature, any peer-reviewed article that refutes the findings of Chang, Bertrand, or White?

MR. LISAK: Objection to form. Asked and answered.

BY MS. PARFITT:

Q Peer-reviewed.

MR. LISAK: Asked and answered. Form.

BY MS. PARFITT:

Q Systematic review.

MR. LISAK: Objection. Form.

THE WITNESS: Some -- not an original systematic review. There are papers that have summarized or reviewed reviews that draw their own conclusions of their review, which is not necessarily the conclusion of the original review. And that most likely is in the -- what's her name?

BY MS. PARFITT:

Q Pierce? Hernandez?

A Hernandez paper.

Q So other than -- so you have not -- you have not -- in the course of your review of the literature regarding chemical hair relaxers and ovarian and uterine cancer, you have not identified any prospective longitudinal studies that refute the findings of Chang, Bertrand, or White; is that correct?

A Correct.

MR. LISAK: Objection to form.

THE WITNESS: Correct.

BY MS. PARFITT:

Q So the only studies that you have reviewed that perhaps may refute any of those study findings

are what you call review papers or -- I think with regard to the one paper you were shown by counsel, you described it as a secondary source.

A Uh-huh. Yes.

Q And when you say "secondary source," what do you mean?

A That it's not -- the initial attempt was performed elsewhere, and secondarily, then it was reviewed.

Q Is that the same level of evidence as the novel independent reviews that you have reviewed?

A Absolutely not. Absolutely not.

Q Do you -- and when you were practicing clinical medicine, did you ever review -- did you ever rely on, for purposes of patient treatment, the patient -- or excuse me, the physician data query that I showed you earlier?

A No.

Q Why not?

A I almost didn't know it existed.

Q Now that you know it exists, is this the type of information you would rely on for clinical treatment?

MR. LISAK: Objection to form. Speculation.

THE WITNESS: It would be difficult. Most of us who are in academic medicine, and many who are not, when a paper comes out, one of the first things we do is look at the authorship for -- to determine the authenticity and quality. It gives you a clue.

If we don't recognize it and it's an interesting topic, then we start to go ahead and assess the paper according to what we've been trained to do and how we practice our science and research in publishing information.

BY MS. PARFITT:

Q All right. Directing your attention to the Pierce paper that you were shown earlier by counsel. I believe it's Exhibit No. 20. And it's entitled "Evaluation of dermal exposure to phthalates and parabens resulting from the use of hair relaxers," by Jennifer Pierce, et al.

Who is the group supporting that research? Do you see that underneath the author's name?

A It says "Benchmark Risk Group, Chicago Illinois."

Q In the course of your academic and professional research experience over decades, have you ever relied on data or reports from the Benchmark Risk Group?

A I was unaware of the Benchmark Risk Group until I encountered this project.
Q Do you know who they are?
A It sounds like they may have been --
MR. LISAK: Object -- sorry. Objection to form and foundation.
Go ahead.
THE WITNESS: I would surmise that they are sponsored by the industry that produces chemical hair relaxers.
BY MS. PARFITT:
Q And that's from your review of the paper; is that correct?
A Yes.
Q Counsel asked you the question when he showed you the questionnaire for the Sister Study whether or not you knew of the products, hair relaxers, hair straighteners, and pressers, what percentage of the women used which one.
Do you remember that question? It was something like that.
A Something along that line, but not specifically.
Q Okay. Does the fact that you don't know precisely exactly how many women use presser,

chemical hair relaxer or chemical hair straighteners impact any of the opinions that you've shared today that chemical hair relaxer exposure can cause ovarian cancer --

MR. LISAK: Objection to form. Foundation.

BY MS. PARFITT:

Q -- or uterine cancer?

A You need not know how many women. The studies speak for themselves. These are women that were enrolled in the Sister Study and followed for a reasonable amount of time. These epidemiology studies are classics. They're very difficult to do. It takes a lot of time and patience and expense to do these things. It's not a simple matter.

These studies have to be some of the most careful studies that have been performed, largely because they're extensive screening methods, the breakdown in how they categorize various aspects of the use of hair relaxers and the duration of which some of these women were followed to determine the impact of hair relaxers on uterine cancer and ovarian cancer.

Q Dr. Chang, you were asked a lot of questions by counsel today with regard to your

opinions in this case.

Did anything that counsel shared with you or showed you change or alter your opinions in this case that exposure to chemical hair relaxers can cause ovarian and uterine cancer in women?

MR. LISAK: Objection to form.

THE WITNESS: Well, I thought counsel asked questions that were appropriate. However, despite this, I remain convinced that, from my review of the studies that have been performed to date and the acknowledgment that we have women are susceptible to uterine cancer by virtue of their genetic makeup, there is little doubt in my mind that these chemical hair relaxers can cause cancer.

BY MS. PARFITT:

Q And do you hold these opinions to a reasonable degree of medical and scientific certainty?

A Absolutely.

MS. PARFITT: Counsel, I'm going to look over my notes. Just give me a moment.

MR. LISAK: Sure. I will have some questions in response, but --

THE WITNESS: Sure.

MR. LISAK: -- hopefully focused and

quick.

THE WITNESS: Hopefully.

MR. LISAK: My questions will be.

THE WITNESS: Hopefully. As long as you limit them to one paragraph.

MR. LISAK: I'll say the same thing about your answers, sir.

THE WITNESS: Yeah. I didn't get a chance to say a lot.

BY MS. PARFITT:

Q Dr. Chang, is the methodology that you employed for purposes of the opinions you've shared today that chemical hair relaxer exposure can cause ovarian and uterine cancer the same methodology that you employ in your academic research and clinical practice?

MR. LISAK: Objection to form.

THE WITNESS: Yes. Absolutely. I have fortunately been funded by the NIH 40 years. And in that time, the demands to produce a grant that is worthy of funding consumes an incredible amount of time, as attested by my wife's complaints.

It is with the same rigor that I approached this subject matter, to the extent that the number of papers I have read -- it's impossible

to keep current all these papers. I wouldn't expect anybody to be able to do this. And despite that, though, the message is quite clear. The number of papers that allude to, that suggest, that show the estrogenicity, the impact it can have on --

BY MS. PARFITT:

Q With chemical hair relaxers?

A Chemical hair relaxers.

-- the genes, the tissues, the effects on receptor, there's no question that this link is real. And I think that this needs to be continued.

Q What needs to be continued?

A The efforts to show -- as the epidemiologists state, they'd like to see more data. Sure we'd like to see more data. But the initial efforts to show this, combined with some of the studies that have been performed, together with the knowledge that there are certain women out there that are very susceptible, not unlike BRCA women, I think really makes a very clear story, a clear point that exposure -- reasonable exposure, duration of exposure to these chemical hair relaxers, the EDCs contained therein, these products can institute the carcinogenesis of the uterus and the ovary in women.

Q You mentioned something just now about

keep studying.

For purposes of the opinion you share today that chemical hair relaxer exposure can cause ovarian and uterine cancer, do you need any more evidence in order to hold that opinion?

MR. LISAK: Objection to form.

THE WITNESS: No. I don't need more evidence. In fact -- but more evidence will be forthcoming, just by the virtue of science. But no. I'm convinced at this point in time that the collective evidence that I've just mentioned, I think indisputably puts women who use these products, these chemical hair relaxers, the chemicals -- the EDCs that are contained in these chemicals, in these hair relaxers, clearly can turn on cancer.

BY MS. PARFITT:

Q Okay. Counsel alluded to the fact that, looking at Hernandez and I believe a couple other articles that he showed you, that you missed that. You missed that --

MR. LISAK: I never said that. He said he had missed them. So I would like you to correct that question.

MS. PARFITT: That's fair, Counsel.

BY MS. PARFITT:
Q The fact that you've testified that there were a couple articles that you missed in the course of your review of the literature, does that alter in any fashion the opinions you hold to a reasonable degree of medical certainty that exposure to chemical hair relaxer can cause ovarian and uterine cancer?
MR. LISAK: Objection to form.
THE WITNESS: Well, after reading these articles carefully, no, it doesn't change my mind whatsoever.
BY MS. PARFITT:
Q In response to counsel's questions, you said that you did have a chance to consider the opinions of -- I believe it was Dr. Farley?
A Yes.
Q All right. What is your critique of Dr. Farley's opinions in this case? That's the defense expert that was hired by the companies here.
MR. LISAK: Objection to form.
THE WITNESS: Well, I find that Dr. Farley's statement, there are some assumptions made there that are incorrect or ignored. Or data ignored. I think some of his statements are

overreaching. In fact, some of his statements are outright false.

BY MS. PARFITT:

Q What are you alluding to?

A The fact that it's a leap of faith that phthalates can cause cancer, in the context of what we're speaking of. He failed to appreciate the recognized abnormalities of women who have uterine cancer, in that a significant number, 20 to 80 percent, take your pick, suffer a missing allele in the PTEN gene.

That's critical. Because that means that you don't need to overwhelm the normal PTEN gene. If it's sitting there with an allele missing, you can just leave that without exposure to estrogen or estrogen-like -- estrogen properties of hair relaxers. You can leave those alone, and they will develop uterine cancer by themselves.

So, if that susceptibility is there, you know, and that these chemical hair relaxers have estrogenic properties, bind the receptor, and then set in motion those transcripts that are responsible for the development of ovarian and uterine cancer. I mean --

Q Any other critique that you have of

Dr. Farley generally?

MR. LISAK: Of Dr. Farley's report?

MS. PARFITT: Of Dr. Farley's report.

THE WITNESS: I feel Dr. Farley's report was rather brief. I think that it's as if he -- I just felt it was brief. I don't think it addressed all the information that's available in the literature.

BY MS. PARFITT:

Q Did anything that Dr. Farley criticized you for in his report impact any of the opinions that you hold within your report or, frankly, your expert testimony here today?

Does it change anything with regard to your opinions in your report or your expert testimony today?

MR. LISAK: Objection to form. And foundation. I don't know how he's -- since his report -- Dr. Farley's report was served after Dr. Chang's report, how that could affect or impact the opinions that Dr. Chang expressed in his report.

MS. PARFITT: He had a chance to read Dr. Farley's report before coming here today.

MR. LISAK: Right. So I understand the question as to his deposition testimony today, but I

have an objection as to the impossibility of foundation --

MS. PARFITT: As to the report.

MR. LISAK: -- as to the report. Go ahead.

MS. PARFITT: But certainly as to his testimony today.

THE WITNESS: When I first read the report --

BY MS. PARFITT:

Q So let me clear it up here, Doctor.

Is there anything that you've read in Dr. Farley's critique of you and your opinions that impact your testimony that you've given today that chemical hair relaxer exposure can cause ovarian and uterine cancer?

MR. LISAK: Objection to form.

THE WITNESS: I got lost in the words.

BY MS. PARFITT:

Q Okay. Let me ask you this.

A I'm sorry. It's getting late. I understand. I'm trying to bring this to an end.

Based upon Dr. Farley's critique of you and the report and criticisms of some of your opinions contained in your report, does that alter

any of the opinions that you hold today and you've shared with all of us, judge and jury, regarding the fact that, to a reasonable degree of certainty, medical and scientific, chemical hair relaxer exposure can cause ovarian or uterine cancer?

MR. LISAK: Objection to form.

THE WITNESS: No. It's -- his report is very brief. Some of the statements are not completely or absolutely incorrect.

I note a sense of disregard for my statements. And I can understand that. I accept that. But in all honesty, I feel that I can amply justify my position in this supported by data.

BY MS. PARFITT:

Q You were asked at the beginning of this deposition, oh so many hours ago, that you weren't a toxicologist, you weren't a pharmacologist.

Remember those questions?

A Yes.

Q All right.

MR. LISAK: I didn't ask about pharmacology, but I did ask about by oncology, genetics, cancer biology, epidemiology, toxicology --

MS. PARFITT: Thank you, Counsel.

MR. LISAK: -- dermatology, right?
MS. PARFITT: You did ask about that several times.
BY MS. PARFITT:
Q Dr. Chang, are you, however, an expert regarding chemical hair relaxer and its relationship or association and causal association with ovarian cancer and uterine cancer?
MR. LISAK: Objection to form and foundation.
Are you now asking him to qualify himself as an expert witness instead of the Court doing it?
MS. PARFITT: I'll do a better question then.
BY MS. PARFITT:
Q Dr. Chang, do you have -- do you have the appropriate expertise as it pertains to chemical hair relaxer and the cancers, ovarian and uterine cancer, to opine that chemical hair relaxers can cause ovarian and uterine cancer?
MR. LISAK: Objection to form. Foundation. If he doesn't have the expertise, I'm not sure how he can tell you whether he has the expertise or not. But go ahead.
MS. PARFITT: Well, Counsel, you asked him

early on whether or not he was an expert in toxicology, whether he was an expert in pharmacology. And I'm asking --

MR. LISAK: Right. That's not what you're asking him. You're asking him if he thinks he's an expert in chemical hair relaxers.

MS. PARFITT: I am asking him whether he's an expert --

MR. LISAK: Right. You're asking him to qualify himself instead of the Court qualifying him. Go ahead.

MS. PARFITT: Counsel, you're not the judge here, so let me ask him --

MR. LISAK: Believe me. Nor are you, nor is Dr. Chang. No offense.

BY MS. PARFITT:

Q Do you have expertise in chemical hair relaxers and the diseases of ovarian and uterine cancer in order to opine on this topic?

MR. LISAK: Objection to form and foundation.

Go ahead.

THE WITNESS: Well, I perceive the question to assess myself. And having had this experience over the -- more than two years, I would

consider myself certainly an expert in hair relaxers.

BY MS. PARFITT:

Q Chemical hair relaxers?

A Chemical hair relaxers. Certainly overwhelmingly more than my colleagues and, I suspect, most other reproductive endocrinologists.

MS. PARFITT: All right. I believe that's all I have at this time, Counsel, depending on what you have to ask.

MR. LISAK: Do you want a break? I have --

THE WITNESS: No.

FURTHER EXAMINATION

BY MR. LISAK:

Q Okay. You said that Dr. Farley's report contains statements that are outright false.

Are you calling Dr. Farley a liar?

MS. PARFITT: Objection, Counsel.

THE WITNESS: No. Absolutely not.

MS. PARFITT: Misstates his testimony.

THE WITNESS: He's probably a very nice man.

BY MR. LISAK:

Q Well, you did say he had statements in his

reports that were outright false, correct?
MS. PARFITT: Objection, Counsel.
THE WITNESS: Well, they're inaccurate. Let's put it that way.
BY MR. LISAK:
Q Okay. Fair.
A Fair enough.
Q In the Pierce paper, you were speculating about the funding for that paper as being -- I think you said you thought it maybe was funded by industry, correct?
A I didn't say that.
MS. PARFITT: No, he didn't. Objection -- and let me object, Dr. Chang.
That misrepresents misstates his testimony.
BY MR. LISAK:
Q What did you say about the Benchmark Group paper, Dr. Pierce, in terms of --
MS. PARFITT: And if you need to look at it --
BY MR. LISAK:
Q Well, let me ask it this way.
A Didn't I mention it was an independent group, not associated with academic?

Q You did. And you said other things. And the record speaks for itself.

But if you look at page 1720 of the Pierce Study, under "Funding," it says "The authors reported there is no funding associated with the work featured in this article."

Did you note that?

A Yes.

Q Okay. All right.

When counsel was just asking you about the NCI PDQ on uterine cancer, she asked you whether or not the White epidemiologic paper was cited in those eight references, correct?

A Right.

Q But the White paper is focused on ovarian cancer, not uterine cancer, correct?

A Correct.

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q So it wouldn't be cited in that, would it?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Right?

MS. PARFITT: Objection. Form. Speculative.

BY MR. LISAK:
Q You can answer. I mean, that PDQ, Exhibit 27, is about uterine cancer, right?
A Correct. Correct.
Q And the White paper is about ovarian cancer?
A Correct.
Q All right. Now, you also said in response to some questions from counsel that, because we can't test on humans, generally speaking, which is a good thing -- I think you said we need to use models. Right?
A We need to use --
MS. PARFITT: Objection. Form.
THE WITNESS: We need to use animal models, live animal models, that recapitulate the functions that we're looking at. And in this case, it's the reproductive system. And those models are well established.
BY MR. LISAK:
Q Okay. So is it your opinion that you wouldn't -- because we can't test on humans, we shouldn't use models of -- based on actual human data to analyze the questions you've been asked to analyze in this case?

MS. PARFITT: Objection. Form. Misstates his testimony.

THE WITNESS: I'm saying that we need to use the animal models.

BY MR. LISAK:

Q That's not my question.

A Well, rephrase.

Q Yeah. Because we can't test on humans, thankfully, is it your testimony that it's inappropriate to construct a model to answer the questions posed to you in this case based upon underlying human data in the construction of that model? Is that inappropriate?

MS. PARFITT: Objection. Form.

THE WITNESS: I don't believe we can use models that are artificial. If you're referring to the Hernandez paper --

BY MR. LISAK:

Q Pierce.

A -- Pierce paper, that's an artificial model.

Q So you think it's inappropriate to rely upon that paper and the data in that paper for answering the question as to whether or not chemical hair relaxers and the chemicals within them cause or

contribute to ovarian or uterine cancer?
MS. PARFITT: Objection. Form. Asked and answered.
THE WITNESS: It's not inappropriate.
BY MR. LISAK:
Q Okay.
MS. PARFITT: Wait.
THE WITNESS: But it's not applicable because of the nature of the model.
BY MR. LISAK:
Q To you, it's not applicable that the Pierce paper, which is the only --
A There's some artificial assumptions in that.
Q Well, I mean, let me finish my question, if you don't mind.
A All right.
Q If I understand, it's not applicable in your opinion to rely upon a quantitative modeling of phthalate and paraben absorption from chemical hair relaxers and determine whether or not the reported levels in that paper have ever been associated with increased risk or the cause of any adverse health effects. It is inapplicable to you, right?
MS. PARFITT: Objection. Form. Asked and

answered. He's answered it several times.

MR. LISAK: No. This is his first time he's said it's inapplicable.

MS. PARFITT: Counsel --

THE WITNESS: Let's put it this way. It's not inapplicable. It's poorly applicable.

BY MR. LISAK:

Q All right. Have you ever --

A I mean, I wouldn't --

MS. PARFITT: Let him finish.

THE WITNESS: I would not disregard it out of hand, but I would read it and look at it, which I did, and I felt this would be a poor model to assume what they're trying to show. Rather -- you know, it's a very difficult subject to do -- to test. You need volume. And the model gets around that because of the model itself. It assumes certain things. As opposed to the studies that we're talking about in humans, this is gathering human data. This is, you know, feet on the ground.

BY MR. LISAK:

Q Have you ever told a woman that her ovarian cancer or uterine cancer were caused by exposure to chemical hair relaxers?

MS. PARFITT: Objection. Form.

THE WITNESS: No.

BY MR. LISAK:

Q Have you ever told a woman that her ovarian or uterine cancer were caused by exposure to endocrine-disrupting chemicals?

A No.

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q You talked earlier about the scientists that conducted the Black Women's Health Study and published the Bertrand paper, that they handicapped the data, right?

A Well, if you would consider --

MS. PARFITT: Just let me object to the question. But you may answer.

THE WITNESS: If you are talking about inclusion, a very few that use -- used hair relaxers, it would favor the analysis toward the null, toward no difference.

BY MR. LISAK:

Q Is it your testimony that the scientists that designed and conducted the Black Women's Health Study and published the Bertrand paper were intending to bias the results?

MS. PARFITT: Objection, Counsel.

Misstates his testimony entirely.
THE WITNESS: I have no idea what they were intending to do.
BY MR. LISAK:
Q You just think they handicapped the data?
MS. PARFITT: Counsel, the question is asked and answered.
THE WITNESS: I don't know.
BY MR. LISAK:
Q That's what you said, right?
A I don't know what they -- if they did it out of ignorance, which --
Q So they might have been ignorant to you?
MS. PARFITT: Objection, Counsel. He did not say --
MR. LISAK: He said they might have been ignorant.
MS. PARFITT: He did not. Misstates his testimony.
BY MR. LISAK:
Q Did you not just say they might have been ignorant?
A Let me finish. Okay?
MS. PARFITT: Objection. Form.
THE WITNESS: At that level of expertise,

I doubt if they were ignorant. Okay? One possibility is, yes, they could have done it out of ignorance, but I really doubt that that's the case. I think they were out to make a point and to prove a point. I think they really felt -- they believed their hypothesis. And it made that be -- to make it more credible, they included those patients. So despite the fact that those patients were included, they still found significance.

BY MR. LISAK:

Q Right. And you called it a good study in your handwriting on the paper.

A Right. I wrote "good." I liked it.

Q Right. There you go.

You talked about this Shukla paper. Maybe I'm saying the name wrong. Shukla 2024.

A Shukla.

Q Yeah. That was a study where six different phthalates that are identified in the study were orally administered or ingested by mice, correct? Is that right?

A Yes.

MS. PARFITT: If we can just get the study in front of him, Counsel, please.

THE WITNESS: I know the study.

MS. PARFITT: Well, still put it in front of you, Dr. Chang. Take a moment.

THE WITNESS: I have it right here.

BY MR. LISAK:

Q Do you have it?

A Yeah.

Q Oh, sorry.

The Shukla study, 2024, was the oral administration or ingestion --

A It was '25.

Q Oh, sorry, 2025.

The study was the oral administration of six specific phthalates identified in the study administered orally to mice, right?

A Yeah. Ad libitum.

Q Pardon?

A Ad libitum, where they can freely eat.

Q And the study found an increased number of uterine glands at the lower dose of those phthalates, but no change at the higher dose, correct?

A Yes. Yes.

Q So you're not seeing a dose response in that study, are you?

MS. PARFITT: Objection. Form.

BY MR. LISAK:
Q Is that correct?
MS. PARFITT: Objection. Form.
THE WITNESS: True.
BY MR. LISAK:
Q And the mice were followed for how long?
A A year.
Q In your opinion, is that long enough to observe cancer development?
MS. PARFITT: In mice?
THE WITNESS: For a mouse?
BY MR. LISAK:
Q For a mouse.
A Yes.
Q And do you have an opinion as to whether the doses that were administered either at -- the doses that were administered or observed were comparable to the doses that you would see from these same phthalates in chemical hair relaxers?
A Yeah.
MS. PARFITT: Objection. Form.
THE WITNESS: Yeah, they base the doses to be within the range of daily human, infant, and occupational exposure.
/ / / /

BY MR. LISAK:

Q Okay. Now, do you know whether or not parabens, phthalates, or phenols are mutagenic?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Let me ask it this way.

Parabens are not mutagenic, correct?

MS. PARFITT: Objection. Form.

If you know.

BY MR. LISAK:

Q If you know. Every question is if you know. You can always tell me "I don't know."

A I'm not sure.

Q Okay. I can't remember if I just asked about -- was it parabens?

MS. PALACIOS: Phthalates.

MR. LISAK: Phthalates. Okay.

THE WITNESS: Phthalates.

BY MR. LISAK:

Q Same question for parabens.

Do you know whether or not parabens are mutagenic?

A I have not investigated that.

Q Do you know whether phenols or BPA in particular is mutagenic?

MS. PARFITT: Objection. Form.
THE WITNESS: I suspect it is, but I --
MS. PARFITT: Don't guess.
THE WITNESS: I don't know.
BY MR. LISAK:
Q Do you know whether or not most human carcinogens are mutagenic?
MS. PARFITT: Objection. Form.
If you know.
THE WITNESS: I do know that diethylstilbestrol is, but it's a transgenerational mutagenesis.
BY MR. LISAK:
Q Let me make sure I'm asking the right question.
A Okay. What happens is that -- you know the diethylstilbestrol story, don't you?
Q No. But we're not here to talk about that.
A Well, it's in estrogen.
Q Okay. My question is whether or not you know -- and if you don't, that's fine -- that most human carcinogens are mutagenic.
MS. PARFITT: Objection. Form.
/ / / /

BY MR. LISAK:

Q Correct?

MS. PARFITT: Objection. Form. Don't speculate.

BY MR. LISAK:

Q If you don't know, you can just say "I don't know."

A I would have to investigate that.

Q Okay. Counsel asked you a lot of questions about questions that I asked you concerning phthalates, parabens, and phenols, right?

A Yes.

MS. PARFITT: Objection.

BY MR. LISAK:

Q Those were the chemicals that you actually discussed in great detail in your report, fair?

MS. PARFITT: Objection. Form. Asked and answered truly for hours.

MR. LISAK: Well, you asked about it in your exam, so now I'm following up.

MS. PARFITT: I clarified it, Counsel.

MR. LISAK: Clarified it. Okay.

BY MR. LISAK:

Q Parabens, phthalates and phenols were the specific chemicals or family of chemicals that you

discussed in great detail in your report, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
MS. PARFITT: Relevance.
BY MR. LISAK:
Q Do you have any -- do you think it was inappropriate for me to ask you about those chemicals that you discussed in your report?
MS. PARFITT: Objection, Counsel. It's inappropriate? What kind of question is that?
MR. LISAK: Well, your insinuation was that I was cherrypicking.
BY MR. LISAK:
Q So let me ask you, did you think it was inappropriate for me to ask you about those three chemicals that you discussed in great detail in your report?
MS. PARFITT: Objection. Form.
THE WITNESS: As long as you understood that they were representative of the body of hair relaxers that are contained in the products.
BY MR. LISAK:
Q Where in your report do you say that these chemicals are representative of chemicals in chemical hair relaxers?

MS. PARFITT: Counsel -- objection. Form. You asked that precise question hours ago.
You may answer that.
THE WITNESS: We talked about that.
BY MR. LISAK:
Q I don't remember you saying in your report anywhere --
A No. We discussed this here in session.
Q Right. But nowhere in your report did you say these chemicals are representative of what's in chemical hair relaxers.
A That was an assumption.
Q Okay. And, if you don't discuss other chemicals in your report, I can't really ask you about them, right?
MS. PARFITT: Objection, Counsel. You can ask him about anything you wish today, and you have.
BY MR. LISAK:
Q Correct?
MS. PARFITT: Objection. Form.
BY MR. LISAK:
Q Why would I ask you questions about chemicals you don't even mention in your report?
MS. PARFITT: Objection. Form.
What kind of question is that?

THE WITNESS: It's your privilege. You have the floor.

BY MR. LISAK:

Q In your report, you do not state that your opinions and the basis of your analysis were dependent upon endocrine-disrupting chemicals as being part of a mixture.

You don't say that in your report, do you?

MS. PARFITT: Objection. Completely misstates his report and the content of his report, Counsel.

MR. LISAK: You're really, really mis- -- you know, speaking objections and coaching the witness.

Let's finish up.

MS. PARFITT: Let's be candid with the witness. Let's not play games. Okay, Michael, go ahead. Let's just ask our questions.

BY MR. LISAK:

Q In your report, do you state that your opinions and the basis of your analysis were dependent upon endocrine-disrupting chemicals as being part of a mixture?

MS. PARFITT: Objection, Counsel. Form.

/ / / /

BY MR. LISAK:
Q Did I miss that in your report?
MS. PARFITT: Objection, Counsel.
THE WITNESS: Restate.
BY MR. LISAK:
Q In your report, did you state that your opinions and basis of your analysis in this case were dependent upon endocrine-disrupting chemicals as being part of, as you called it, a mixture?
MS. PARFITT: Objection, Counsel. That's in the report.
THE WITNESS: Did I say that in my report?
BY MR. LISAK:
Q Yeah.
MS. PARFITT: Objection.
THE WITNESS: I implied that in my report.
BY MR. LISAK:
Q You implied it, but you didn't state it --
MS. PARFITT: Objection, Counsel.
BY MR. LISAK:
Q -- right?
A That was intentional.
Q It was intentional to imply and not state?
A No. It was intended to be representative of the mixture, the group of hair relaxer --

chemical hair relaxers. Perhaps I made an error in being too presumptuous at this level of sharing.
Q I'm not quite sure what that means, but that's fine.
A Well, I'm a scientist. You're not.
Q That is for sure.
A And maybe I should have reduced it to a level where you would understand.
Q Dumb enough for me.
A No. I didn't say that. You said that.
Q I'm trying to interpret what you're saying.
A I'm just trying to respond to you.
Q Okay. In your report, when you talk -- well, sorry, not in your report, but today you've talked about this -- these chemicals as a mixture. And I think you used the term "additive" at some point. Is that right?
A Additive or potentiate.
Q Additive or what?
A Or potentiate. I don't know. I just raised the question.
Q What does "potentiate" mean? I'm sorry.
A May amplify.
Q I see.

Well, let me ask this, because "additive," to me, means that you're adding two things together or there's a cumulative dose or exposure. Fair?

A Fair.

Q Have you heard of the term "synergistic"?

A Yes.

Q Is it your opinion that the chemicals in chemical hair relaxers, in that mixture, as you've described it today, act in a cumulative/additive fashion or in a synergistic fashion or both?

MS. PARFITT: Objection. Form.

THE WITNESS: I can't say that because I don't know.

BY MR. LISAK:

Q Okay. You talked, in response to some questions from Plaintiffs' counsel, that the root of exposure for chemical hair relaxer was dermal or through the skin, correct?

A Yes.

Q As opposed to inhalation or ingestion?

A Yes.

Q And -- but you don't know whether or not chemical hair relaxers were actually applied directly to the skin, as opposed to on -- being separated from the skin and the chemical by a

protective gel or barrier?

MS. PARFITT: Objection, Counsel. Again, misstates his testimony.

BY MR. LISAK:

Q Let me ask it this way: If chemical hair relaxers -- if a protective gel is put on the scalp and the skin before the application of the chemical hair relaxers, then there is not direct dermal contact between the hair relaxers and the scalp, right?

MS. PARFITT: Objection, Counsel. Misstates.

THE WITNESS: I can't answer that question.

BY MR. LISAK:

Q Because you don't know?

MS. PARFITT: No. That's not --

THE WITNESS: I've not experienced that.

BY MR. LISAK:

Q Right. And you haven't experienced --

A I haven't seen it.

Q Right.

A You know, I haven't read the instructions on how you do it. I do know that, when you apply these, you see them in the urine. So they must have

been absorbed.
Q You are aware of studies that show that endocrine-disrupting chemicals are seen in the urine from -- specifically from the use of chemical hair relaxers?
A Correction.
Q That's not a study that exists, right?
A I've not seen it. But in other forms. And it's not clear to me that everybody puts this protective layer on. I don't know.
Q Why are you saying that? You say you have no idea.
A I don't know if they do or not. Do they -- I can't ask him.
MS. PARFITT: You don't ask him questions, but you can complete your comment.
BY MR. LISAK:
Q But as an expert, I can ask you a hypothetical.
And so my hypothetical is, if there is -- if a woman applies a protective gel or barrier on top of her scalp or skin before applying the chemical hair relaxer, then there is no direct contact between the chemical hair relaxer and the skin, correct?

MS. PARFITT: Objection. Counsel, I can't -- "applies it on her head." All over her head? I mean, what --

MR. LISAK: Just stop speaking objections. You're coaching him. It's egregious.

MS. PARFITT: No, it's not egregious. Why don't you be clear?

MR. LISAK: It's a hypothetical.

MS. PARFITT: Hypothetical.

MR. LISAK: If you don't understand my hypothetical, tell me, and I'll state it differently.

MS. PARFITT: I object to the hypothetical.

THE WITNESS: Please state it differently.

BY MR. LISAK:

Q If a woman applies a protective gel to her scalp before applying the chemical hair relaxer to her hair, then there is no -- there would be no direct contact between the chemicals in those chemical hair relaxers and the scalp --

MS. PARFITT: Objection. Form.

Do not speculate.

BY MR. LISAK:

Q -- right?

MS. PARFITT: Objection. Form.
Do not speculate.
BY MR. LISAK:
Q I mean, this is common sense, isn't it?
MS. PARFITT: No. Objection.
THE WITNESS: I can't respond to that because I don't know.
BY MR. LISAK:
Q You don't know.
Are you aware that the skin on our scalp is thicker than in other parts of our body?
MS. PARFITT: Objection. Form.
THE WITNESS: No.
BY MR. LISAK:
Q You are aware, however, that human skin is thicker than the skin of mice, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: I'm not aware of that.
BY MR. LISAK:
Q Didn't we talk about that in one of the studies we talked about earlier as an exhibit, that one of the disadvantages in studying endocrine-disrupting chemicals and their dermal absorption --
A On recall, yes. You pointed that out.

Q Okay.

MR. LISAK: I'm done. Thank you.

MS. PARFITT: Doctor, I have a couple more.

FURTHER EXAMINATION

BY MS. PARFITT:

Q Dr. Chang, I want to direct your attention to page 11 of your expert report that was submitted on December 1, 2025. If you can turn to that.

A Page 11? Okay.

Q Page 11.

And specifically, under Section 2 entitled "Absorption and metabolism of topical EDCs."

Do you see that?

A Yes.

Q Counsel just asked you, or insisted, that nowhere in your report did you talk about the mixture of ingredients contained in chemical hair relaxer.

Please read that paragraph into the record.

MR. LISAK: That misstates my question, but go ahead.

THE WITNESS: "In rendering my opinions contained herein."

BY MS. PARFITT:
Q No. Read -- starts with "with."
A Oh.
"With respect to chemical hair relaxers, application of these substances to the hair is associated with substantial dermal contact. Entry of chemical hair relaxers through the skin is the principal route of absorption. In rendering my opinions contained herein, I have considered the routes of exposure to the mixture of ingredients contained in chemical hair relaxer products."
Q So true, you did reference "mixture of chemicals" in your expert report, correct?
A Yes.
Q You were asked about the transdermal absorption route for chemical hair relaxer. We just talked about it a few minutes ago.
Do you remember that?
A Yes.
Q All right. What is the difference between a Black woman and a White woman in the transdermal exposure of chemical hair relaxers to their scalp?
MR. LISAK: Objection to form. And

foundation.

THE WITNESS: I believe I understand, but restate the question.

BY MS. PARFITT:

Q Sure. I said counsel asked you about -- or we've talked about the transdermal mechanism of -- and route of exposure of chemical hair relaxers.

My question is: Is there any difference between the transdermal exposure of chemical hair relaxers to Black women's scalps versus White women's scalps?

MR. LISAK: Objection to form. Foundation.

THE WITNESS: I'm unaware of any difference.

BY MS. PARFITT:

Q You were asked some questions about dose.

What is the metric you use for dose in your evaluation of whether or not -- or your opinions with regard to whether or not there is increased risk with increased dose and duration of the product, chemical hair relaxer?

A My metric?

MR. LISAK: I'm sorry. Objection to form.

BY MS. PARFITT:
Q Yes.
A Not registering.
Q All right. Let me ask you this question: Based upon your review of the literature and study of more than 400 papers, do you have an opinion as to whether or not the evidence supports that, with increased frequency and duration, you see increased risk with chemical hair relaxers --
MR. LISAK: Objection to form.
BY MS. PARFITT:
Q -- in women who have ovarian and uterine cancer?
MR. LISAK: Objection to form.
THE WITNESS: Yes.
BY MS. PARFITT:
Q So, when you use the word "dose" in the context of exposure of chemical hair relaxer in ovarian and uterine cancer, what are you referring to?
A A composite exposure, amount of exposure, a dose.
Q And amount of exposure is what?
A It depends on years of use, the frequency of use, the dose, the amount that they use.

Q Okay. Dr. Chang, when is the last time you treated a patient in a clinical setting?

A 2021.

Q 2021?

A Yes.

Q Did that -- your clinical practice precede the Bertrand, White, and Chang papers?

A Yes.

MS. PARFITT: Okay. I don't think I have any further questions.

FURTHER EXAMINATION

BY MR. LISAK:

Q Two questions. This is the ping-pong version of the deposition portion, but I swear, just two questions.

And one of them is because I misspoke earlier, and I was asking you about parabens, phthalates, and phenols and whether they're mutagenic. And I think I confused myself, and I didn't ask specifically about phthalates. I asked about parabens and phenols.

Do you know whether or not phthalates are mutagenic?

MS. PARFITT: Objection.

THE WITNESS: No. You asked about

phthalates.

BY MR. LISAK:

Q I did. Okay. So, if I --

A You didn't?

Q I don't know. My boss is telling me maybe not. So let me just be --

A A similar response.

Q Just to be clear on the record. Okay.

For parabens, phthalates, and phenols, what I call "the three Ps," do you know whether or not any of those three are mutagenic or not?

MS. PARFITT: Objection. Form. Asked and answered.

Don't speculate.

THE WITNESS: Point of information. What do you mean "mutagenic"?

BY MR. LISAK:

Q Do you understand the term "mutagenic"?

A Yes. To stimulate mutagenesis, abnormalities, changes.

Q Damages and changes to the DNA, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Okay.

BY MR. LISAK:

Q Do you know whether or not -- it's fine if

you don't -- whether any of those three chemicals that I asked about --

A I've not investigated that aspect.

Q Okay. Now, you were asked some questions just now about cumulative dose and that it includes -- hopefully, I'm paraphrasing correctly -- frequency, duration, and dose, correct?

MS. PARFITT: Objection. Form. I think that misstates what he testified to.

BY MR. LISAK:

Q Is that -- or levels. Frequency, duration and levels.

MS. PARFITT: Objection, Counsel. I believe I asked him whether dose was defined by frequency and duration, but you may ask.

BY MR. LISAK:

Q I think we spoke earlier that there are essentially three components to something that we might call cumulative dose.

A Levels is a measure.

Q Levels is a measure. Sometimes people call it the -- okay. So let's call it levels.

A Dose, duration, and frequency.

Q Okay. That's what I'm getting at, right.

And so dose, duration, and frequency are

the three components, if you will, that go into sort of cumulative dose to exposure to a chemical over a person's lifetime, correct?

MS. PARFITT: Objection. Form. Any chemical.

BY MR. LISAK:

Q How about endocrine-disrupting chemicals?

MS. PARFITT: Objection. Form.

BY MR. LISAK:

Q Frequency, duration and dose are the three components that make up the cumulative exposure that a person might have to endocrine-disrupting chemicals over their lifetime, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: It's not clear to me that that's the only factor or factors that you consider.

BY MR. LISAK:

Q When you're determining how much to -- how much of an endocrine-disrupting chemical someone was exposed to during their lifetime, what other factors would you look at other than frequency, duration, and dose?

MS. PARFITT: Objection. Form.

THE WITNESS: Conditions of the scalp.

/ / / /

BY MR. LISAK:
Q Okay. Now, the Bertrand paper that we've talked about, that -- we looked at the questionnaire and we looked at the paper.
That paper, that study, did account for frequency, duration, and dose, right?
MS. PARFITT: Objection. Form.
THE WITNESS: Yes.
BY MR. LISAK:
Q Correct?
A Yes.
MR. LISAK: That's all I have.

FURTHER EXAMINATION

BY MS. PARFITT:
Q Dr. Chang, your evaluation of the Chang, Bertrand, and White studies, findings of increased risk were based on -- what type of data did the authors have?
MR. LISAK: Objection to form.
THE WITNESS: Clarify "data."
BY MS. PARFITT:
Q Sure.
MR. LISAK: Pardon?
THE WITNESS: Clarify "data."
MS. PARFITT: Clarify the data.

BY MS. PARFITT:
Q My question is this: In the Bertrand, Chang, and White study, what information did the authors have with regard to how to measure whether or not there was an increased risk with chemical hair relaxers in ovarian and/or uterine cancer?
MR. LISAK: Objection to form. Foundation. Asked and answered.
BY MS. PARFITT:
Q What did they have available to them?
MR. LISAK: Objection to form. Foundation. Asked and answered.
THE WITNESS: The history of patients, of the subjects.
BY MS. PARFITT:
Q And history of their frequency?
A Their frequency --
Q And --
A -- and dose and the duration of use.
MS. PARFITT: I don't think I have any further questions. Thank you.
MR. LISAK: Very quickly, because she keeps asking you questions -- and I promise, if she stops asking you questions after me, I won't ask you any more questions.

THE WITNESS: If I pass out, is that okay?

FURTHER EXAMINATION

BY MR. LISAK:

Q The White and Chang papers that you were just asked about, in terms of the frequency, duration, and levels of exposure to the products studied in the Sister Study, it was only for the prior 12 months, right?

A Yes.

Q And again, we don't know how many of any of the study participants actually used chemical hair relaxers, right?

MS. PARFITT: Objection. Asked and answered. He's already testified it doesn't matter.

BY MR. LISAK:

Q You can answer again.

A I can't integrate the question.

Q You can't what?

A I can't integrate the question. I'm getting tired.

Q Last question.

A You've got to make it simple for me to answer.

Q Yeah, sure.

Because the products in the Sister Study,

as we looked at the questionnaire, and the limitations even described by the authors themselves in the White and Chang papers, we don't know how many of the study participants -- whether they got ovarian cancer or did not get ovarian cancer, whether they got endometrial cancer or they did not, we don't know exactly which products they used, right?

MS. PARFITT: Objection. Form. Asked and answered.

THE WITNESS: They were generalized in terms of hair straighteners.

What was the other category? Hair straighteners --

BY MR. LISAK:

Q Pressing.

A Hair-pressing products.

Q And chemical hair relaxers, right?

A Okay, yeah.

Q Okay.

MR. LISAK: That's it. Thanks.

MS. PARFITT: I do have one.

FURTHER EXAMINATION

BY MS. PARFITT:

Q Dr. Chang, I asked you earlier, does it

matter to your opinions what percentage of the women that were studied in the Sister Study used hair relaxer, hair straightener, presser, or -- I think I got them all -- chemical hair relaxer, chemical straighteners, or presser.

Does it matter?

A For the Sister Study?

Q For the Sister Study and the White study.

A Yeah. I think that if you include the pressers -- what is it you mentioned?

Q Pressers.

A Pressers. I think that that biases toward the null.

Q And do the study -- are the study -- in your opinion, are the study findings in the Sister Study, both White and Chang, impacted by not knowing specifically what products these women used, whether it be hair straightener, hair relaxer, or pressers?

A Pressers.

I think, as an initial study, it was probably a good thing they didn't know because it removed bias.

MS. PARFITT: I have no further questions.

THE WITNESS: If anybody has any further questions, I'm going to walk out of here.

MR. LISAK: No, I don't. I really, really appreciate your time. Thank you.

MS. PARFITT: I have no further questions.

THE WITNESS: Okay.

MS. PARFITT: Thank you, Dr. Chang.

THE VIDEOGRAPHER: Before we go off the record, I just have to place video orders at this time.

Sir, would you like your copy of the video standard or synced to the transcript?

MR. LISAK: I assume we have some kind of standing order. I don't know.

Can we get back to you on that?

THE VIDEOGRAPHER: If you have a standing order, I can just say "standing order."

MR. LISAK: Standing order. But I don't know if we do, so . . .

THE VIDEOGRAPHER: All good. And would you like to place an order?

MS. PARFITT: I'm with counsel here, whatever our standing order is.

THE VIDEOGRAPHER: Alrighty. We are off the record -- one second, Counsel.

We are off the record at 8:15 p.m., and this concludes today's testimony given by R. Jeffrey

Chang, M.D. The total number of media used was 10 and will be retained by Veritext.

(TIME NOTED: 8:15 P.M.)

DECLARATION UNDER PENALTY OF PERJURY

I, R. JEFFREY CHANG, M.D., the witness herein, declare under penalty of perjury that I have read the foregoing in its entirety; and that the testimony contained therein, as corrected by me, is a true and accurate transcription of my testimony elicited at said time and place.

Executed this ______ day of _________ 2026, at

_____________________, __________________________.

(City) (State)

____________________________________

R. JEFFREY CHANG, M.D.

REPORTER'S CERTIFICATION

I, Leslie Johnson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 24, 2026

Leslie Johnson

LESLIE JOHNSON

CSR No. 11451, RPR, CCRR

MICHELLE PARFITT, ESQ.
mparfitt@ashcraftlaw.com

February 24th, 2026

RE: All MDL Hair Relaxer Cases v. Hair Relaxer
2/19/2026, R. Jeffrey Chang , MD (#7863502)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at p1hairdepos@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

All MDL Hair Relaxer Cases v. Hair Relaxer

R. Jeffrey Chang , MD (#7863502)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

_____________________________________     __________________

R. Jeffrey Chang , MD                                    Date

All MDL Hair Relaxer Cases v. Hair Relaxer
R. Jeffrey Chang , MD (#7863502)

ACKNOWLEDGEMENT OF DEPONENT

I, R. Jeffrey Chang , MD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
R. Jeffrey Chang , MD Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 3:3 4:10 5:4 5:11,18 7:4 8:12 15:14

**0**

**0** 352:9
**0.1** 132:7 336:17
**0.3** 279:16
**0.35** 336:16
**0.64** 305:12,17
**0.67** 309:13
**0.69** 301:2
**0.7** 290:6 301:9
**0.70** 298:9
**0.73** 327:22 328:10
**0.74** 327:21 328:6
**0.8** 336:24
**0.81** 322:6 327:7
**0.83** 323:25
**0.86** 324:10
**0.89** 300:23 327:11
**0000** 267:7
**00818** 1:5 2:5 14:19
**02** 321:20
**05** 292:17
**06** 292:18 294:8
**07** 253:2 292:18

**1**

**1** 1:16,24 2:16 8:14,21 10:4 10:17 14:13 23:10,12 24:2 24:13 42:24 43:9 44:2,16 44:20,21 137:20 154:17 154:18 193:20 193:25 194:15 196:7 223:19 224:20,25 225:2,4,6,8,12 226:20 227:17 246:20 258:13 260:6 290:21 291:5,14,15 297:16 298:17 306:2 309:22 313:21,23 322:9 347:24 487:9
**1,322** 246:2,6 246:20
**1.0** 290:11 292:8 300:24 301:3,10 305:13 309:15 313:10 321:20 321:22 322:11 324:6,11 327:7 327:12,17 328:6,11
**1.02** 321:18 322:17 323:2 323:16
**1.08** 327:22 328:9
**1.09** 309:19
**1.10** 328:5
**1.10.** 327:21
**1.16** 327:6
**1.18** 322:5,17 323:17
**1.18.** 323:4,25
**1.23.** 324:10
**1.25** 313:9
**1.26** 301:2
**1.28** 327:11
**1.29** 290:5 298:8 301:8
**1.3** 291:15
**1.37** 300:23
**1.46** 424:9
**1.6** 312:2 336:23
**1.61.** 327:23 328:10
**1.62.** 327:21 328:6
**1.65.** 327:7
**1.66** 309:13 310:11 311:15 312:2,19 322:15
**1.68** 323:25
**1.71** 322:6
**1.76.** 324:11
**1.82** 305:12
**1.84.** 327:12
**1.94** 309:19 312:2,19 322:16
**1.94.** 311:15
**10** 11:16 61:23 100:5 110:14 166:8,11 185:17,18,22 185:23 193:21 193:22 194:14 264:24 265:6 266:12,12,21 266:21,22 327:20 328:3 360:15 405:17 501:1
**10,000** 98:13,15
**100** 7:15
**10016** 5:21
**10019** 9:6
**10020** 8:15
**103** 280:15 281:5
**105** 258:1
**106** 4:12
**10:55** 110:17
**10th** 5:20

**11** 11:18 121:2 129:6 264:25 265:7 336:1 487:8,10,11
**11050** 4:6
**111** 267:7
**11451** 1:22 2:20 503:25
**1189-1195** 283:17
**1190** 287:12
**1191** 298:10,13
**1192** 300:6
**1193** 284:7 285:21 286:6 286:10 301:15
**1194** 285:19 286:11 305:5
**1195** 286:12 302:10
**11:19** 110:20
**12** 11:21 50:6 58:11 61:23 265:1,7,18,19 265:25 266:2 267:20 280:20 280:25 281:6 282:15 284:3,4 301:16,21 302:2 307:9,25 309:11 314:14 318:23 333:4,5 497:8
**120,000** 224:21
**121** 10:23
**128** 11:4
**12:24** 170:13
**12:30** 168:24
**12:758-791** 129:4
**13** 12:4 270:8,9
**13.9** 267:2
**138-153** 270:6
**14** 12:6 275:8,9 332:9 349:5 350:2 384:6,9
**1400** 5:6
**1403** 121:25
**1414** 383:21,23 384:13,19
**146** 11:6
**15** 12:8 279:23 280:3 435:15
**150** 5:6 239:8
**16** 10:6 12:10 121:24 283:5,7 283:10,11,12 283:14
**1638** 421:25
**1642** 308:5
**1643** 309:5
**1650** 224:25
**17** 12:12 283:8 306:8,10
**17.3** 279:2
**1707-1726** 329:17
**1708** 341:3 342:20
**1709** 342:21
**1718** 335:5,7 336:1
**1720** 339:6 464:3
**18** 10:12 12:14 280:17,18 315:7,10 320:16,17
**1825** 3:6
**188** 12:5 270:4
**18th** 370:19
**19** 1:15 2:19 12:16 14:1,5 317:17 370:21
**190** 305:5
**1900** 9:12
**191** 7:7
**1970** 55:1
**1973** 55:6
**1974** 55:2,6
**1976** 55:23
**1977** 413:11
**1986** 56:19
**1997** 57:3 232:9,13 258:1 321:10
**19th** 47:11
**1:08** 170:16
**1:23** 1:5 2:5 14:19
**1a** 10:18 25:9 26:1,4,16,18 27:5 41:15 79:6,21 191:2 191:6 218:12 270:13 293:16 372:24 388:15 389:7
**1st** 383:4

**2**

**2** 10:19 11:12 43:22,23 44:1 44:7,8,13,16 46:10 47:1 49:19 70:11 127:3 155:11 190:25 234:19 266:12 277:4 277:18,21 300:6 321:4 326:11 379:13 487:12
**2,000** 293:24
**2.10** 300:23
**2.30** 301:2
**2.38** 290:6 298:9 301:9
**2.38.** 291:14
**2.55** 422:6 423:15 424:8 424:16
**2.55.** 423:24

**2/19/2026** 504:5
**20** 12:17 50:8 66:7 83:25 116:8 127:2,4 255:9 302:2 326:24 328:23 328:25 352:14 406:18 407:3 408:25 448:14 456:9 506:15
**200** 5:13 50:6
**2000** 270:6
**20006** 3:7
**2000s** 61:16 239:22
**2003** 221:7
**2003-2009** 278:15
**2006** 30:10
**2007** 350:2
**2008** 253:1
**2009** 238:14 336:18
**2011** 37:24
**2012** 11:8 29:18 33:14 37:7 146:20 154:11 155:2
**2013** 35:2 39:10 237:15
**2014** 237:15
**2015** 234:21 237:13,14,19 239:5 253:23
**2017** 29:14,15 332:19 336:19
**2018** 38:25 39:2
**2019** 34:19,21 36:19 37:1 145:3 185:20 321:11
**202** 3:8
**2020** 336:19
**2021** 29:5 36:4 57:7,9,17 58:17 61:1 283:17 491:3,4
**2022** 29:1,18 31:2 35:24,25 120:24 129:3 169:15,19 306:6
**2023** 29:5 30:3 35:16 46:10,25 58:21 59:17 169:11
**2024** 30:8 120:23 121:24 383:7 471:16 472:8
**2025** 29:21 44:2 329:16 364:15 377:4 382:23 383:4 472:11 487:9
**2026** 1:15 2:19 14:1,6 19:9 46:10 47:1 58:22 59:18 116:24 355:19 361:1 379:13 502:10 503:22 504:3
**205** 3:18
**20th** 3:16 39:18
**21** 12:19 350:8 350:21 351:15 437:19
**212** 8:16 9:7
**2121** 6:7
**219** 15:22
**22** 12:23 355:11,17
**220** 11:9
**225** 4:19
**23** 10:17 13:4 171:5 360:22 360:24 364:4,9 365:19,25 370:16 384:6,9 438:18 442:2
**23219-3916** 8:8
**234** 11:12
**24** 13:6 99:15 100:5 181:12 181:16 300:11 300:22 379:9 379:11,24 385:19 503:22
**240** 2:17
**2401** 5:13
**24th** 504:3
**25** 13:8 144:12 278:24 382:16 382:18 472:10
**25th** 383:7
**26** 10:18 13:11 351:14,16 353:11 390:4,8
**260** 11:14
**2600** 6:14
**264** 11:16,18,21
**27** 13:12 317:25 318:1 439:11,12,13 439:14 441:16 442:8 465:3
**270** 12:4
**271-3398** 6:16
**274-7100** 6:9
**275** 5:20 12:6
**280** 12:8
**2801** 8:14
**283** 12:10
**28405** 4:13
**29.9** 278:24
**2950** 7:7
**29th** 116:24
**2:43** 255:11
**2c** 266:13,24
**2nd** 47:5,8,16 48:5,12 355:19 361:1

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 511 of 640 PageID #:74059



**3**

**3** 10:20 45:8,11 45:19,20 49:12 49:20 94:17 101:8,8,15 155:2 194:4 196:22 268:11 278:11 280:7 284:13 301:14 312:9 321:5 379:20 422:17 424:1,2,3
**3-5** 11:8
**3.47** 309:19
**30** 98:12 116:9 170:10 412:4,9 504:16
**30.0** 279:2
**300** 6:21 225:6
**302** 169:18
**303** 6:21
**306** 12:12
**3060** 1:6 2:6
**30th** 6:7
**31.8** 278:24
**310** 6:9
**312** 4:21 5:8 6:23 7:9 8:23 9:14
**315** 12:14
**317** 12:16
**328** 12:17
**330** 225:2
**33131** 5:14
**335-2600** 3:8
**34.9** 279:3
**35** 68:11 329:16
**35.0** 279:5
**35.7** 278:20
**350** 12:19
**35203** 3:17
**355** 12:23
**36** 255:9 351:16
**360** 13:4
**37** 355:13
**370-1211** 7:17
**379** 13:6
**382** 13:8
**39** 360:21
**39.9** 279:6
**390** 10:7 13:11
**3:02** 379:13
**3:04** 255:14
**3:06** 256:24
**3:07** 355:20
**3:10** 257:2
**3:17** 264:6
**3:24** 264:9
**3rd** 146:20

**4**

**4** 10:23 23:22 23:25 83:21 84:19 88:6 121:14,15,16 146:25 147:6 147:11 155:10 255:9 266:4 317:25 357:10 359:24 379:15 380:15 423:14 424:2
**4,462** 277:25
**4.09** 309:13 310:7
**4.1** 267:2
**4.45.** 424:9
**4.9** 279:19
**40** 47:22 251:8 288:6 379:8 380:1,3 452:19
**40.0** 279:9
**400** 31:16,17 225:4 442:25 490:6
**4077-4079** 221:7
**41** 289:20,24 290:2 350:2
**42** 283:17
**43** 10:19 79:8 275:6,11 280:1
**439** 13:12
**44** 279:24
**45** 10:20 279:22
**46** 283:1
**462** 10:6
**47** 306:5
**4747** 2:17 14:20
**48** 230:6,9,12 230:12,13,14 230:16,23,25 231:2,7 256:3 257:14 315:6
**487** 10:7
**49** 232:17,24 256:2 317:13 317:15
**491** 10:6
**495** 10:7
**497** 10:6
**498** 10:7
**4:57** 347:25
**4th** 266:21

**5**

**5** 11:4 23:25 70:11,17 85:9 85:21 120:11 124:8 128:20 128:23 129:6 144:11 153:24 155:2 277:18 279:8 304:25 305:3 309:4 329:24 330:1,4 330:6 384:22
**5.18** 305:17 306:1

**5.18.** 305:12
**5.67** 313:9
**50** 251:8 266:14 267:1 328:20,21
**503** 1:24
**506** 3:16
**512** 7:17
**513-2290** 5:22
**53** 382:14
**54** 270:6
**551,000** 47:2 58:22 59:16
**5565** 351:14 352:5
**56** 233:15 256:4
**575** 4:12
**58** 10:12
**59** 79:9
**596-4984** 9:14
**5:12** 348:3
**5:51** 389:17
**5:54** 361:2
**5th** 146:20

**6**

**6** 4:5 11:6 46:10,25 146:11,12,12 146:16 153:19 153:23 194:4 271:23 278:11 347:24 357:10 361:5 362:2 363:25 365:25 377:4 443:24
**606-7757** 4:21
**60601** 5:7
**60603** 8:22
**60606** 4:20 6:22 7:8 9:13
**64** 248:17 306:2
**646** 5:22
**6637** 503:23
**67** 310:7
**6:07** 389:20
**6:10** 392:21
**6:11** 392:24
**6th** 364:15

**7**

**7** 11:9 153:23 220:18,19,21 220:22 266:12 291:13 329:17 333:5 363:21 366:1
**7.8** 279:5
**700** 3:6 4:19 46:17 48:16
**762** 130:20,24
**762-1990** 4:14
**767-1314** 7:9
**775-1087** 8:9
**781-6668** 6:23
**786** 5:15
**7863502** 1:23 504:5 505:2 506:2
**787** 9:5
**78701** 7:16
**788** 19:9 46:13 49:12,14
**7th** 166:8,11

**8**

**8** 11:12 58:11 153:12 154:1 220:16,17,21 234:11,16 247:9,10 258:1 379:21 405:17
**8.2** 278:20
**8.8** 277:25 299:9,22 306:22,25
**80** 225:8 406:19 407:3 409:1 456:10
**800** 7:15 8:7
**804** 8:9
**806** 258:2
**839-5300** 9:7
**845** 169:15
**850-2651** 5:8
**853-1086** 8:23
**855-5700** 3:18
**866** 4:7
**869** 169:11
**88** 221:6
**883-6245** 4:7
**8:15** 2:19 500:24 501:3
**8th** 166:9,12

**9**

**9** 11:14 24:3 42:23 43:2,7 185:17,23 194:14 221:6 234:8,9 259:14 260:1 283:17 365:20,20 366:22,22 375:3,3
**9.4** 266:16 267:5
**90** 82:14
**900** 6:14
**90067** 6:8
**910** 4:14
**92121** 14:21
**92612** 6:15
**949** 6:16
**95** 290:5 321:9
**957-1145** 5:15
**989-8844** 8:16
**99** 82:15
**9:10** 2:18 14:2 14:5
**9:13** 17:4

**9:19** 17:7
**9th** 166:9

**a**

**a.m.** 2:18 14:2 14:5 17:4,7 110:17,20
**abandoning** 431:18
**abdomen** 332:24 333:16 333:21 334:10
**ability** 254:21 346:13 436:22
**able** 61:23 82:21 99:20 107:23 133:16 165:10 191:8 266:2 293:4 307:24 318:13 333:6 344:16 411:10 453:2
**abnormal** 66:8
**abnormalities** 416:17 417:2 456:8 492:20
**above** 232:7,8 321:20 329:25 504:6 506:7
**absence** 145:25 346:12 417:5
**absolutely** 82:1 100:14 117:13 141:12 345:2 346:9 391:14 391:17 392:4 392:10 397:9 412:10 431:17 431:19,24 447:12,12 451:19 452:18 459:9 462:20
**absorb** 352:15
**absorbed** 120:20 124:5 124:13,23 125:15 126:6 126:23 127:1 134:3,4,8,18,19 163:2 331:1,15 331:21 339:10 339:13 484:1
**absorption** 67:11 75:11 76:24 77:2,20 78:5 103:17 114:10,14 121:9 122:3 128:8,18 131:6 132:7 161:15 161:23 334:16 341:5,6,21 347:8 351:8 353:23 354:15 399:13 402:18 467:20 486:24 487:13 488:9 488:18
**absorptive** 163:5
**abstract** 60:9 123:12 129:7 129:20 221:9 221:12 222:12 270:19 276:7 320:19 330:22 338:12 353:20 443:8,10
**academic** 64:3 295:24 297:3 448:2,22 452:15 463:25
**accelerator** 161:1,3
**accept** 459:11
**acceptable** 117:7 267:8
**accepted** 99:19 297:15,22 339:8 383:7
**accepting** 292:22
**access** 39:10 53:4 420:20
**accompany** 148:15
**accomplish** 99:21
**accomplished** 347:2
**account** 96:16 495:5
**accounts** 182:3
**accuracy** 504:9
**accurate** 44:25 46:6 128:7 236:6,11 502:7
**accurately** 191:13
**acidic** 402:23
**acknowledge...** 506:3
**acknowledg...** 451:11 504:12
**acne** 75:5 76:22 76:23 136:13
**acquired** 380:15,21,24 382:6
**act** 196:8 198:20 204:6 482:9
**action** 14:24 22:16 241:4 250:25 251:14 252:14 254:11 503:18,19
**activate** 138:1 138:7,12 166:2 436:23
**activates** 160:20
**activating** 162:17
**activation** 11:20 158:21

158:23 159:7,9 160:19 162:16 164:22 165:6 165:12,22 167:10,15 168:5 169:22 179:13,20 408:2,15
**active** 137:23 138:12 245:1
**activities** 11:16 49:2 169:16 230:20 231:3 295:24 297:3 394:1 397:3
**activity** 11:15 141:13 159:14 159:14,15 166:2,23 168:21 179:24 206:12 211:24 223:3,21 230:6 232:11,16 257:16,21 258:11 261:4 403:14 414:7 420:3
**actual** 29:6 111:21 112:23 115:11 155:10 282:24 330:2 342:2 346:20 346:22,23 406:11 429:22 465:23
**actually** 27:10 32:20 33:23 49:25 63:10 79:12,15 80:5 82:6 92:13 106:24 108:17 112:18 115:6 124:22 146:22 159:12 165:12 178:6,21 187:16 207:2 207:13 240:11 248:24 259:17 269:19 275:11 285:20 309:4 309:17 341:12 377:6 385:25 386:6 387:10 399:5 404:16 404:18 423:15 425:3 438:20 476:15 482:23 497:11
**ad** 472:15,17
**adams** 3:13
**adapted** 221:13
**add** 249:4 267:20
**added** 55:13
**adding** 482:2
**addition** 17:18 25:2 37:25 52:5 186:15 242:21 336:20 388:12 433:11
**additional** 10:18 25:6 26:7 27:4 79:6 93:24 182:22 182:23 191:1,6 262:5,5 270:13 389:8 426:10
**additionally** 445:3
**additions** 506:6
**additive** 414:25 481:17,19,20 482:1,9
**address** 16:6,6 140:1 143:17 152:24 163:24 165:25 166:1 214:12 216:13 261:22 276:9 372:9
**addressed** 445:10,11 457:6
**addressing** 94:23
**adds** 405:11
**adenocarcino...** 242:7
**adequacy** 442:9 445:2
**adequate** 236:5 236:11 372:5 372:19
**adipose** 182:15
**adjust** 199:13
**adjusted** 300:22 301:1,8 321:17 323:13 323:24 324:16 327:6,20 328:5 422:13 424:8
**administered** 337:22 400:19 471:20 472:14 473:16,17 503:8
**administration** 337:10 472:9 472:12
**admit** 190:14 191:13
**admittedly** 28:14
**admixture** 178:16
**adolescence** 404:18,18 413:19,19 436:6
**adrenal** 135:11
**adult** 13:10 382:22
**advantage** 276:10
**adverse** 251:9 252:12 467:23

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 515 of 640 PageID #:74063



**advocated** 249:6
**afam** 6:11
**affect** 168:20 292:9 299:13 299:24 394:16 457:20
**affecting** 399:14
**affects** 139:11 144:11
**affiliations** 15:5
**affinities** 12:4 270:4
**affinity** 156:24 157:1,2 204:14 205:1,19 219:2 263:7 268:4 269:6 270:21
**afraid** 286:2 367:16,17 369:22,24
**african** 299:6 299:10,24 305:7,11 306:22 307:2 308:11 309:12 310:2,18 311:7 311:21 313:2 314:13 316:9 317:1 320:3
**age** 86:23,25 87:2,3,6 242:23 300:22 301:1 319:2 321:17 323:13 323:24 324:16 326:16 327:6 327:16,20 328:5 351:16 381:1 405:17 412:1,4,9
**aged** 351:15
**agencies** 217:3 217:11,15,21
**agency** 217:8 218:16
**agent** 414:21
**agents** 405:12
**aging** 123:19 242:18
**ago** 18:22 84:1 190:12,13 260:22 371:10 459:16 478:2 488:19
**agree** 14:11 83:23 85:24 88:15 90:9 91:22 122:19 147:15 149:8 151:4,16 152:24 154:21 158:20 159:6 172:17 179:12 179:19 180:25 181:2 187:15 198:16 200:15 202:16 209:5 209:21 213:23 214:22 220:14 236:10 237:6 239:4 242:14 243:12,20,24 245:17 251:14 251:22 252:13 260:15 284:21 287:7 299:4 302:24 311:14 311:18 324:15 338:13 356:10 356:25 360:11 361:22 370:1 378:5
**agreed** 89:3 90:20 118:25 188:16 197:5 208:9 210:15 210:25 360:10 370:4 386:18
**agreement** 48:18 49:6 412:15,16
**ahead** 27:15 142:24 213:1 238:1 249:3 264:21 296:13 304:21 325:7 362:20 392:9 396:3 401:15 404:14 406:7 416:5 423:20 426:4 428:10 448:7 449:7 458:5 460:24 461:11,22 479:18 487:23
**air** 248:6
**al** 230:24 231:3 336:19 448:17
**alabama** 3:17
**alcoholic** 399:1
**alkaline** 399:22 402:2
**alkalinity** 400:18
**alkylphenols** 270:22
**allele** 406:19,21 407:4 408:25 417:2,5,8 418:16 419:20 436:17,25 456:10,14
**allotted** 272:15 504:19
**allow** 125:2 126:18 164:18 189:8 374:16 374:17
**allowed** 353:1 353:15 378:23
**allows** 80:17 125:20 126:25 177:3 199:12

**allude** 453:4
**alluded** 454:18
**alluding** 456:4
**alongside** 135:25
**alopecia** 136:14
**alphabetical** 230:24
**alrighty** 500:22
**alter** 203:7,22 204:10 451:3 455:4 458:25
**altered** 203:3
**alternative** 363:16
**amend** 27:6
**america** 434:23
**american** 65:11 299:7,10,24 305:8,11 306:23 307:2 308:12 309:12 310:2,18 311:8 311:21 313:2 314:13 316:9 317:1 320:4 340:23 355:18 356:11 361:21 379:12 380:10
**amount** 18:24 19:4 46:3 222:11,14 240:22 261:4 263:6 427:8 450:12 452:21 490:21,23,25
**amounts** 46:8
**ample** 405:19 405:20 409:6
**amplify** 481:24
**amply** 459:12
**amricordati** 9:15
**analogizing** 142:7
**analogy** 137:6 141:6
**analyses** 102:14 105:13
**analysis** 31:3 74:7 95:15 109:2,21 254:20 264:19 272:25 273:2,7 273:13,14,22 274:3,7,14,23 335:19 415:17 415:19,24 416:21,24 429:9,15 469:18 479:5 479:21 480:7
**analyze** 105:1 391:9 392:2 465:24,25
**analyzed** 106:1 108:18
**analyzing** 19:16
**anderson** 7:4
**androgen** 11:20 66:9 136:12 146:4 149:11,12 169:21 182:16
**androgens** 135:8 149:3,18
**angeles** 6:8
**animal** 88:22 90:21 91:13 93:6 94:7 127:9 149:4 165:1 351:5 411:8 465:15 465:16 466:4
**animals** 88:12 98:22 406:12 416:11
**anna** 9:11
**anovulation** 135:4 145:16 155:19 157:24 171:11 181:19
**answer** 10:10 18:11 42:13 58:25 59:2 63:12 64:2 78:10 84:5 93:4 104:19 111:2 112:9 116:21,21 119:5,7,11,21 125:10 138:17 164:11 165:16 176:8 186:19 194:3 205:15 207:18 208:8 247:22 249:10 252:19 261:13 261:16 274:16 280:19 294:19 295:12 296:13 296:15 303:18 305:23 310:24 313:14,17 314:22 340:18 344:16,18 345:25 346:2 346:11,18 357:1 361:21 367:5,7 368:10 368:17 369:1,3 390:24 394:11 395:7,19 396:5 396:12 400:4 400:14 402:7 416:7 418:2 419:9 424:20 434:25 436:2 465:2 466:10 469:15 478:3 483:13 497:16 497:23
**answered** 59:21 60:1

78:8 82:7 91:8 95:17 112:25 118:17 125:17 125:24 126:9 126:10,11,15 126:16 134:15 167:23 175:1 215:1 216:11 292:12 304:5 304:11 310:23 311:3,11,24 312:10,11,15 344:10 349:1 396:2 405:7 406:4 409:20 411:4 416:3 423:4 428:8 430:15 435:15 438:10 445:22 445:25 467:3 468:1,1 470:7 476:18 492:13 496:8,12 497:14 498:10
**answering** 343:10 466:24
**answers** 361:20 452:7
**anticipating** 16:24 292:16
**antiestrogens** 270:21
**anybody** 22:1 416:23 453:2 499:24
**anymore** 53:24
**anyway** 218:15
**anyways** 76:16
**apologize** 89:19 118:14 259:19 261:25 350:17 392:20
**apparently** 61:20 116:2 223:9
**appear** 81:15 149:3 215:20 364:9
**appearance** 15:2
**appearances** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 15:4
**appeared** 237:10 393:24 438:3
**appearing** 238:14
**appears** 130:14 147:19 218:5 235:9 281:24 291:18 407:19 443:23
**appended** 506:7
**apples** 297:12
**applicable** 123:4 164:9 196:4 300:1 467:8,11,18 468:6 504:8
**application** 12:21 115:4 121:9 122:15 319:14 349:24 351:10 352:16 353:2,17 403:4 404:17 437:10 437:21 438:4 483:7 488:5
**applications** 11:5 129:2,9
**applied** 111:3 112:18,22 113:9,22 114:17 115:6 199:17,17 331:21 332:24 333:3,21,22 334:2,12,20 336:5 338:19 352:12 353:9 354:25 382:23 397:19 401:9 427:8 482:23
**applies** 347:11 347:12 484:21 485:2,17
**apply** 111:15 111:20 193:22 197:20 199:20 334:11 397:12 397:13 483:24
**applying** 111:18,21,24 112:23 297:10 353:13,14 484:22 485:18
**appointed** 56:1
**appreciate** 41:3 103:13 125:10 258:22 334:6 337:6 375:11 456:7 500:2
**appreciation** 290:20
**approach** 11:17 94:15 95:1,4 97:2,13 103:15 166:25 168:11 169:17 261:20 262:8,8 262:22,25 265:25 267:5 344:18
**approached** 433:15 452:24
**approaches** 11:23 126:22 169:14
**appropriate** 236:7 251:5 252:9 253:24 391:8 392:2

412:19 451:8 460:17
**approximate** 46:7
**approximately** 19:12 20:14,23 46:13 47:2,15 47:21 48:3,13 59:18 61:15 113:12 258:12 260:5
**approximation** 267:6
**arbitrary** 218:5
**area** 66:1 70:19 71:2 84:6 113:20 123:17 132:7,8 164:3 215:10 295:17 402:25 409:11
**areas** 61:14 352:13
**argue** 150:10
**argued** 150:10
**argument** 188:10 389:14
**argumentative** 314:16
**arms** 189:9
**aromatase** 182:14
**arose** 177:10
**arrest** 416:18
**arrived** 377:17
**arrow** 36:5
**article** 12:10,17 12:19 13:8 18:23 33:23 34:9 51:3 53:7 128:23 130:20 131:23 221:1 221:13 256:14 258:2 268:13 270:11 283:18 335:24 355:4 382:19 437:7 437:12 444:2,5 444:10 445:19 464:6
**articles** 18:23 19:20 27:24 35:13 49:15,15 50:6 80:18 261:19 377:7 404:16 420:20 445:16 454:20 455:3,11
**articulating** 117:2
**artificial** 466:16,20 467:13
**ascribe** 152:21 186:5
**ashcraft** 3:3 15:14
**ashcraftlaw.c...** 3:9,10 504:2
**asia** 240:3
**aside** 141:13 387:24 418:3
**asked** 19:16,21 22:1 59:20 60:1 62:5 63:7 65:5,6 78:7 82:7,18 84:11 91:7 92:6 95:16 99:20 112:24 117:1 118:16 119:21 125:16 126:8 134:14 147:21 190:12 203:17 214:25 216:10 218:25 219:1 229:23 260:22 261:12 284:10 284:22 292:11 304:4,10 311:10,23 314:16 319:24 324:25 327:15 342:18 344:9 348:25 370:2,3 390:16 391:4 391:21 396:1 396:25 405:7 406:4 409:10 409:20 411:4 416:2 420:15 420:24 423:4 425:9,25 427:23 428:7 430:5,14 435:15 437:20 438:9 445:21 445:25 449:15 450:24 451:8 459:15 460:25 464:11 465:24 467:2,25 470:7 474:14 476:9 476:10,17,19 478:2 487:16 488:17 489:5 489:18 491:20 491:25 492:12 493:2,4,14 496:8,12 497:5 497:13 498:9 498:25
**asking** 18:1,3 49:9 59:10 112:12 114:2,9 126:1 128:9 163:1 164:12 167:25 174:25 176:14 192:9 193:11,20,21 196:17 207:9 208:6,7 212:15 213:16 214:19 217:24 226:24 227:24 229:14

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 519 of 640 PageID #:74067



229:18 245:9 248:1 251:22 254:14 259:9 260:24 261:24 269:24 271:7 280:24 282:13 287:3 293:20 293:21 296:8 312:6 314:7 316:21 318:8 320:24 323:12 335:21 337:4 339:2 340:19 343:8 373:3 387:15 425:20 425:21,21 460:11 461:3,5 461:5,7,9 464:10 475:14 491:17 496:23 496:24
**asks** 24:13 280:18 281:5 318:3,21 319:2 319:5,8,12,17
**aspect** 56:11 90:16,17 99:15 207:1 247:3 493:3
**aspects** 62:7 63:19 393:16 450:19
**assay** 233:15 266:8,17 270:20
**assays** 11:17 169:18 233:14
**assertion** 79:13
**assess** 448:8 461:24
**assessing** 54:18 88:19
**assessment** 11:16 97:14 98:3 162:15 169:16 292:9 340:24 415:13 415:19
**assign** 95:13 252:24
**assigned** 247:1
**assistant** 56:2
**assisted** 62:13
**associated** 86:3 86:7 93:15 143:9 144:14 154:4,12 155:5 155:19 175:17 176:13 182:25 183:12,15 243:9 260:7 317:7 331:7 335:13,17 336:21 339:15 358:17 401:20 426:15 463:25 464:5 467:22 488:6
**association** 85:3,24 87:11 87:15 90:4 92:25 99:2,3 105:2 171:2 174:7,16,22 175:2 232:4 274:6 290:4 298:9,18,24 310:13 322:21 323:17 325:10 340:24 373:1 422:2 431:2 433:20 445:12 460:7,7
**associations** 77:16 312:23 431:21
**associative** 184:8,14
**assume** 15:21 20:1 29:2 80:25 109:5,11 113:24 115:21 160:20 163:5 169:24 204:17 377:1 388:16 388:20 437:21 468:13 500:11
**assumed** 107:6 108:20
**assumes** 228:5 468:17
**assuming** 159:25
**assumption** 123:3 160:8,11 162:16 163:1 164:22 478:12
**assumptions** 147:23 204:18 455:23 467:13
**assure** 239:13
**atrophy** 243:9
**attached** 43:21 44:15 45:15 440:14 504:11
**attaches** 222:8
**attainment** 287:19 288:11 288:20
**attempt** 150:11 375:14 447:7
**attempting** 177:18
**attendant** 139:10
**attention** 237:3 239:3 240:10 430:24 441:20 442:2 448:12 487:7
**attest** 191:12
**attested** 452:22
**attorney** 15:6 20:24 117:8 503:18 504:13

**attorneys** 20:7 23:6 24:18
**attributed** 148:12
**atypical** 182:6 406:25 408:17
**atypicality** 182:10
**audible** 17:20
**audio** 14:10
**audriana** 5:12
**audriana.rodr...** 5:16
**august** 258:1
**austin** 7:16 8:19 9:3
**australian** 232:5
**authenticity** 448:5
**author** 33:19 76:8 121:23 129:2 234:21 270:2 276:2 332:16 349:13
**author's** 96:12 448:19
**authored** 67:2 67:2,17 221:1
**authoritative** 218:9
**authorized** 218:8
**authors** 26:8 50:25 51:1,2 128:16 129:8 134:2 226:21 229:22 235:2 241:6 246:5,19 252:25 258:9 284:8,21 288:17 298:24 302:24 303:15 304:2,13,23 308:23 320:19 346:14 376:19 421:5 425:9,19 429:3 442:8 443:2,5,17,20 445:1 464:4 495:18 496:4 498:2
**authorship** 448:4
**automatically** 158:22 159:8 201:22 202:3 202:23 277:12 403:3 407:5
**available** 132:9 377:22 457:7 496:10 504:6
**avenue** 5:20 6:7 7:15 9:5
**avenues** 437:3
**average** 48:4 287:16
**avlon** 9:9
**avoid** 21:25
**award** 61:23
**aware** 27:19 50:4 74:17,21 109:8 118:7,18 158:11,15 212:17,24 215:4 222:19 225:10 238:4 238:19 240:11 240:14 252:1 254:5 290:16 291:11 294:11 295:6 297:17 314:25 331:13 342:1 378:17 428:25 432:12 438:25 484:2 486:10,15,18
**awareness** 73:7
**awkward** 254:6 337:20
**axis** 56:8 60:23 432:23

**b**

**b** 6:11,13 103:18 225:19 225:19 226:10 226:10 232:18
**b53** 177:3
**baby** 294:4 298:3 431:19
**back** 17:8 28:4 28:13,14 32:6 32:14 34:6,12 35:6 36:16 38:4 74:4 78:22 83:10,12 110:21 139:6 151:13 169:9 170:11,17,24 178:16 182:12 182:13 193:9 199:10,11 239:22 248:17 255:15 256:23 257:3 263:9 264:10 296:16 303:11 317:12 320:14 335:3 340:2 345:14 345:18 348:4 348:13 380:1 389:21 390:11 392:25 393:1 401:24 410:7 424:1 428:18 500:13
**background** 80:14 320:22
**bacon** 8:12
**bad** 24:6
**ballpark** 47:7 49:13,23
**bandera** 441:11

**barely** 322:11 322:13 369:4
**barrier** 334:22 483:1 484:21
**base** 79:22 110:2 113:14 245:21 473:22
**based** 11:7 93:18 94:25 143:23 146:19 149:4 155:1 160:3 165:18 175:9 222:15 228:9 285:11 306:15,19 307:1 311:19 316:5 339:16 359:18 376:25 378:10,12 404:6 430:16 432:24 458:23 465:23 466:11 490:5 495:17
**baseline** 12:7 276:1 278:15 287:16 301:16
**bases** 104:15 307:8 388:6
**basic** 297:10 352:10 416:9
**basically** 222:8 341:7 413:15
**basis** 114:13 125:8 148:7 160:3 163:12 277:6 353:12 378:10 389:4 393:25 410:6 415:23 426:23 432:21 433:2 438:4 479:5,21 480:7
**bates** 42:9,17 308:4,5 309:5 352:5 384:13
**bathe** 353:16
**bathed** 178:17
**bathes** 178:22
**bathing** 352:25
**bathwater** 294:5 298:4 431:20
**bbp** 258:12 260:5
**beauty** 5:3 6:18 8:18 15:8,11
**becoming** 290:16
**beg** 75:1
**began** 101:11 102:1 177:7 290:15 294:2
**beginning** 2:18 15:5 352:6 365:25 459:15
**begins** 79:8 85:10 130:25 236:15 242:6 285:20 335:9 350:25 351:21
**begs** 325:14
**behalf** 2:16 15:9,11,12,14 15:17,24
**behave** 107:11
**behavior** 419:16
**beings** 431:23 431:24 432:3
**believe** 21:15 36:11 59:21 62:18 68:25 113:16 120:13 132:12 138:11 140:1 141:8 143:19 152:7 158:1,8 165:8 168:8 175:17 176:12 183:7 192:12 193:13 194:13,17 195:6 197:14 206:23 214:16 226:15 227:2 227:11 229:11 231:10 233:11 243:1 244:23 247:1 253:7,23 254:9 260:19 261:4,18 266:4 283:8 292:11 308:24 329:10 348:25 349:2 364:8 379:1 386:3 397:4 399:2 406:9 437:25 438:18 442:2 448:14 454:19 455:16 461:14 462:8 466:15 489:2 493:14
**believed** 176:12 182:21 471:5
**bell** 5:3 6:18
**bench** 72:15
**benchmark** 448:20,25 449:1 463:18
**benefit** 16:20 372:15
**berry** 221:22
**bertrand** 12:14 29:5 31:22 315:7 316:4 320:14,16 348:22 427:20 427:25 428:5 428:15,19 429:22 431:10 443:17,23 444:2,5 445:20 446:18 469:11 469:23 491:7 495:2,16 496:2

**best** 16:22 22:20 28:18 46:5 118:20 164:7 432:6
**beta** 266:10,24
**better** 24:9 42:2,8 93:8 159:4 174:7 210:12 253:19 254:19 344:8 345:16 460:13
**beyond** 113:25 404:24 413:20
**bias** 469:24 499:22
**biases** 151:6,7 499:12
**bibliography** 31:11
**big** 440:23
**billed** 46:3,7,8 47:1 58:22 59:16
**bind** 157:5 196:7 219:8 436:23 456:21
**binder** 40:6 41:7 259:11 268:12,17,24
**binders** 37:21
**binding** 12:4 37:20 156:24 157:1,2 195:3 204:14 205:1 205:19,24 207:1 219:2,15 219:23 222:11 231:17,19 263:7,8 266:11 266:19,23 267:14 268:4 269:6 270:4,20 270:20
**binds** 157:12 157:19 219:3 222:9
**bioactive** 183:1 222:8
**bioactivity** 11:9 156:22,23 166:25 197:20 206:13 221:2 221:15,19 222:1,3,15 223:16 224:7 224:17,22 227:20 243:16 263:8 265:23 414:2
**bioassay** 11:11 221:4,14
**bioequivalency** 261:21
**biologic** 94:4 274:13,22
**biological** 136:19 137:4 157:13 176:16 216:16,21 219:16,24 432:19
**biologically** 398:8 413:13
**biologist** 72:7
**biology** 71:7 72:13 459:23
**birmingham** 3:17
**birth** 205:23 361:10,14
**biscayne** 5:13
**bisphenol** 50:24
**bisphenols** 115:1,20,24 187:14 188:5 267:11 393:23 394:16,23 396:19
**bit** 16:24 19:6 24:10 30:14 38:21 40:18 45:10 53:9,20 73:12 79:5 117:16 134:21 139:6 140:13 141:1,2 151:12 158:18 180:6 183:8 185:14 185:15,16 210:12 229:23 267:24 269:18 272:22 273:21 273:24 337:20 348:14 375:6 400:15 419:23 420:14 438:22
**black** 12:15,16 13:10 221:21 277:24 278:9 305:8 307:2 308:12 309:12 310:2,18 311:8 311:21 313:2 314:13 316:6,9 316:17 317:4 317:14,24 318:12 331:8 359:12 382:21 385:7 427:19 469:10,22 488:23 489:11
**blair** 12:4 269:22 270:3
**blanket** 51:19 51:20
**blanking** 229:23
**bleach** 362:4 441:21
**bleaches** 364:2
**bleed** 410:11
**bleeding** 171:15 172:12 172:15 410:1,2 410:3,18,18

**block** 190:11
**blood** 77:3 100:2,4 120:21 120:21 124:14 124:14 134:4 216:19 352:9 353:13 399:11 399:12 402:19 403:4
**bloodstream** 132:14 198:21
**blowout** 285:14
**bmi** 278:23,24 279:2,5,8 287:20 288:12 288:20 307:15
**board** 54:10 71:16,24 218:5 218:7,9,19 343:14 373:10 376:20,23 444:20
**boards** 136:16 376:22
**bodily** 120:22 124:15
**body** 12:21 79:12 80:3 95:23 121:8 123:17 146:2 156:16 171:25 199:12 200:7 210:8 211:19 216:21 219:21 349:24 352:12 353:10 369:5 386:13,19 387:8,11 399:13 437:10 477:20 486:11
**body's** 197:25 198:6 242:25
**bogged** 28:13
**boles** 9:17 14:22
**bordering** 117:19
**boss** 492:5
**bothersome** 306:3
**bottle** 106:18
**bottom** 85:10 85:21 153:23 155:14 171:8 232:24 241:20 284:8 285:20 286:5,10 308:5 328:2 341:3 362:2 365:20 384:18 443:6
**boulevard** 5:13
**bounce** 410:7
**bound** 336:15 336:21
**box** 250:8,10 250:12 253:21
**bp** 335:9 336:15
**bpa** 51:22 271:12 474:24
**bradford** 74:6 272:25 273:2,7 273:13,14 274:2,6,14,23
**bradley** 7:4
**branding** 62:12
**brands** 286:23
**brazilian** 285:13 401:5
**brca** 419:14,15 453:19
**break** 18:7,12 28:19 76:6 78:16 105:9,10 110:5,12 137:13 140:13 169:1 170:19 190:16 207:8 255:3,6,17 256:6 257:5,10 264:12,14 319:13 347:22 348:6 462:11
**breakdown** 450:19
**breaking** 422:12
**breaks** 76:13 348:10
**breast** 154:5,13 155:6 213:12 236:24 238:25 241:11 276:10 276:11,13,19 276:21,24 277:5,9,11 279:12 307:12 385:8
**breasts** 403:20 419:17
**breezed** 235:19
**brief** 457:5,6 459:8
**briefly** 149:1 256:20
**bring** 83:18 432:4 458:22
**brito** 10:23 120:23 121:13 121:18,23 124:16,20,22 125:2,11,24 126:2,4,21,24 127:3 128:15 129:24
**broad** 200:19 264:20
**brought** 24:22 28:6,20 39:6 79:7 275:12 334:8 382:15 390:2
**brutal** 412:4,6
**build** 416:14
**builds** 410:13

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 524 of 640 PageID #:74072



**bulge** 178:4
**bullet** 250:15
**burns** 319:13 326:16 327:19 327:25
**business** 16:6,6 62:22
**butyl** 12:20 349:23
**butylparaben** 266:21 267:3 352:11 437:9
**butylparabens** 354:9

**c**

**c** 34:18 76:9 103:18 225:19 226:10,10 231:3
**ca** 37:2
**cadence** 104:9
**calculate** 434:19
**calculated** 266:14,25
**california** 1:14 2:18 6:8,15 14:1,21 55:21 503:4
**call** 23:19 42:9 60:6 61:17 62:2 106:25 108:11 127:22 137:16 185:23 321:23 344:25 447:1 492:10 493:19,22,22
**called** 62:1 67:23 108:10 151:22 154:16 171:10 274:21 275:25 278:13 362:3 380:21 471:11 480:9
**calling** 16:12 462:18
**calls** 233:2
**canal** 8:7
**cancer** 12:10 12:13,14,23 13:4,7,12 32:18,18 33:17 37:3,19 50:22 52:20,21 56:10 56:10,15 60:25 61:4,5 62:4 63:19,20,24 64:5,11,16,23 64:25 65:1,10 65:11,18 66:18 66:23 67:13,15 67:24 68:17 69:1,16 72:7 72:12,21 83:25 85:6,15 89:25 91:3 94:25 102:16 105:4 105:15,16 136:21 137:6 137:20 138:21 139:4,18,20 141:9,19,23 142:4,8,8,11,13 142:14,19,21 143:6,7,9 155:24 170:23 171:3,17,18 172:13,16,19 172:20 173:7 173:12,16 174:5 175:18 175:25 176:5 176:13,18 177:7,14 179:1 179:1 180:3,10 181:3,8,15 182:6,10,24 183:21 184:4 203:2,8,23 206:21 207:3 207:13,14 208:11 209:7 211:24 212:13 212:20 213:10 213:12,13 214:7,24 215:24 216:9 217:4 222:21 225:13 231:22 232:3,4,5 236:24 237:2 238:24 239:2 239:15 241:9 241:21,22 242:8,16,17,21 243:3,9,14,23 244:16 246:9 248:14,25 249:15,23 250:5 260:8,20 261:7,10 271:11 276:10 276:11,13,20 276:21,25 277:5,9,10,11 279:12,14,15 279:17,20 282:5,6 283:22 287:17 288:10 288:18 289:17 290:5 298:20 300:10,12 302:3 303:2,7 303:15 306:12 306:13 307:13 307:16,23 308:16 311:9 311:20 317:8 320:21 321:9 348:17,18 355:18,18 356:1,5,7,11,16 356:18,21 357:7,8,21 358:18 359:11

359:23 360:8 360:25,25 361:13,21,23 362:8,10,13,16 362:22,25 363:10,12,12 363:15 364:6 368:13 370:15 373:2,14 376:16,17 379:12 380:10 380:10,19 381:9,23 385:9 385:9,9 391:11 391:11 393:6,9 394:8,17 398:10 406:2 406:14,17,22 407:1,8,14 408:4,9,21 409:1,3,8,17 411:2 412:1,3 412:8,14 413:2 413:2,5 415:15 416:1,12,16,18 417:1,4,10,11 417:17,20 418:11,13,17 418:20 419:18 419:25 420:12 422:14 426:16 426:20 427:1 427:13 429:20 431:17 433:8 433:21 435:6,7 435:10,18,19 436:8,15 437:6 442:11,11,22 442:23 444:8 444:17 445:4 445:13 446:16 450:4,8,22,23 451:5,12,14 452:14 454:4 454:16 455:8 456:6,9,18,23 458:16 459:5 459:23 460:8,8 460:19,20 461:19 464:11 464:16,16 465:3,6 467:1 468:23,23 469:4 473:9 490:13,19 496:6 498:5,5 498:6

**cancerous** 405:13

**cancers** 67:19 68:6 84:14 154:6,13 155:6 180:16,22 212:19 236:16 242:21 244:6 245:8 250:9 251:1,15 252:15 253:10 254:11 330:13 331:7 381:6 403:9 406:20 411:17 413:9 417:6 418:12 460:18

**candid** 479:16

**capable** 263:3

**capacities** 266:23

**capacity** 205:24

**capture** 235:20

**car** 161:1

**carcinogen** 217:9

**carcinogenesis** 72:16 178:23 283:17 393:6 395:1 408:23 453:24

**carcinogens** 217:12 393:13 393:17 475:7 475:23

**carcinoma** 179:14,21

**cardinal** 409:25 410:21

**care** 12:8 59:4 280:7 335:14 336:17,22 363:16 399:24 400:10,24 401:10 402:3

**career** 60:15 64:4 66:1 144:24 413:6 425:13

**careful** 85:1 90:14,19 99:22 166:18,18 431:20 450:17

**carefully** 123:21 184:10 194:6 254:21 455:11

**carmel** 145:3

**carry** 88:17

**carson** 6:3,3

**case** 1:5 2:5 14:18 19:10 21:21 22:2,11 22:19,25 23:5 23:6,8 24:16 39:20 40:2 41:14,19 42:3 42:15 46:9 47:5,8 67:22 68:3 74:21 75:9 77:22 79:24 81:22,23 88:2 112:15 118:15 130:14 139:18 190:24 206:23 216:4 217:25 235:8 237:16 256:10

273:8,15 275:4 281:24 282:9 292:16 296:2 314:19 320:12 336:3 346:14 374:6 378:8 386:1 387:12 387:16 388:2 389:3 391:9 392:2 406:10 433:5 438:8 451:1,4 455:19 465:17,25 466:11 471:3 480:7 503:15
**cases** 14:16 21:16 382:5,11 504:4 505:1 506:1
**casings** 187:25
**categorize** 450:19
**category** 104:22 372:4 498:13
**caucasian** 351:15
**causal** 86:4 87:12 90:4 394:7 415:13 415:17,19,19 415:23 433:7 444:16 460:7
**causation** 72:21 85:25 87:15 211:25
**cause** 63:18,18 64:15 67:23 68:5 69:16 85:15 86:19 87:18,23 105:2 139:23 140:8 140:16 142:11 142:13,19 144:17 147:15 152:16,25 157:23 158:5 165:6,21 180:2 201:22 206:20 211:21 212:13 212:20 213:10 214:6,23 215:23 216:8 225:12 260:19 261:6 303:2,7 303:15 356:6 381:23 382:5 398:8 403:8 406:1 408:9 409:7,17 411:2 411:17 415:14 416:1 417:17 417:20 418:11 426:19 427:13 431:17 442:10 442:22 450:3 451:5,14 452:13 454:3 455:7 456:6 458:15 459:5 460:20 466:25 467:23
**caused** 93:15 93:18 105:16 152:4 243:15 356:20 381:7 468:23 469:4
**causes** 13:6 64:4 88:20 89:11,24 91:3 136:8 141:6 144:11,23 145:7 147:1,6 147:7,10 202:3 209:19 210:7 210:16,23 358:3,5 380:9 391:10
**causing** 141:9 203:8,23 217:4 222:20 358:25 398:9
**caution** 249:7
**cautions** 96:12 96:16
**cavo** 6:19
**ccrr** 1:22 503:25
**cell** 11:10 88:22 179:2 221:4,14 242:24 380:25 406:14 407:14 408:21
**cells** 131:18 177:1 179:8,10 179:11 239:20 406:12,13 407:13 416:12 416:12,13
**cellular** 196:8
**censin** 34:21
**center** 3:15 55:21
**certain** 62:7 82:19 90:25 100:9 109:6 147:23 174:14 252:24 272:10 272:11 296:3 297:6 356:3 407:9 416:25 453:18 468:17
**certainly** 25:6 25:16,18,18 117:22 118:7 173:4 176:24 325:15 406:10 407:8 409:6 427:12 458:6 462:1,5
**certainty** 451:18 455:6 459:3
**certification** 503:1

**certifications** 73:21
**certified** 2:20 54:10 71:16,24 75:15 503:3
**certify** 503:4,17
**cervix** 403:22
**cetera** 103:18 211:10,11 240:9,10 333:5 333:5
**cgw** 5:9
**chagrin** 63:6
**challenge** 285:24 286:22
**chance** 138:16 148:2,23 290:11 452:8 455:15 457:22
**chang** 1:13 2:15 10:4,15 10:17,19,22 11:2 12:2,12 13:2 14:14 16:8 17:17 24:21 25:13,14 26:18 29:1 31:2 42:14,16 44:2 46:2 47:23 60:2 111:23 119:5 119:20 138:16 151:8 201:3 259:5 262:14 283:3 304:21 306:6 307:1,23 313:17 315:24 340:18 343:7 348:22 358:21 364:16 372:22 380:7 388:19 390:16 394:5 395:18 403:24 408:6 409:10 415:12 420:13 420:16 421:16 423:22 426:18 427:24 428:5 428:16 429:8 431:10 433:4 434:2 437:7 438:17,25 440:19 441:12 441:15 443:5,7 445:20 446:18 450:24 452:11 457:21 460:5 460:16 461:15 463:14 472:2 487:7 491:1,7 495:15,15 496:3 497:4 498:3,25 499:16 500:5 501:1 502:3,18 504:5 505:2,24 506:2,4,12
**chang's** 457:20
**change** 27:6,9 54:4 96:6 200:17,22 209:19 210:4,6 210:16,23 211:20,23 314:25 451:3 455:11 457:14 472:20 505:4,7 505:10,13,16 505:19
**changed** 109:9 430:19
**changes** 45:5 199:24 201:9 201:21 202:15 202:22 408:1 408:14 492:20 492:21 504:10 506:6
**changing** 171:25
**characteristics** 12:7 185:19 186:1 193:9,13 194:17 195:6 195:10 196:3 197:15 276:1 278:14
**characterizati...** 29:23 51:17
**characterize** 69:15 305:20
**charge** 214:10 395:18 396:6
**charged** 27:14
**chaste** 221:22
**cheat** 30:19
**cheatham** 7:12 8:3
**check** 31:14 36:4 37:23,25 38:15
**checkmark** 35:17 36:1
**checkmarks** 265:10
**checks** 169:23
**chemical** 52:13 67:9 85:4,14 89:24 94:23 102:5 108:22 111:15,21 112:4,17,23 113:11,23 114:18 115:9 115:11 120:19 121:7 124:12 129:25 130:5 130:13 134:12 134:19 137:5 137:22 138:10 138:24,25 139:23 140:8 141:8 142:18 152:15 157:23 158:5,13

160:12 162:20
163:2 167:5
168:2 187:7
189:4 191:23
192:12 193:16
193:23 194:23
195:5,7,18
196:2,4 198:20
214:17 216:16
216:18,20,25
219:6 226:15
227:12 228:2
228:24 229:12
231:8 233:20
261:14 281:1,8
281:20 282:6
285:7,13 299:6
299:17 300:2
307:5,24
316:13 317:1,6
318:4,7,9,14
319:3,6,14,18
319:23 330:11
331:16,25
333:9 338:5,15
339:13 357:11
357:19 358:24
381:20,21
385:4 391:5,6
391:10,12,22
391:22 392:3
394:6,7,21,22
396:9,18 397:7
397:14 398:7
398:17,20,24
399:20,21,25
400:8,18 401:8
401:11,20
402:1,13 403:7
403:13 405:4
406:1 408:8
409:17 411:1
412:25 414:1
414:16,16
415:14,25
417:19 418:22
420:5,10 421:6
421:17 422:23
423:3,11
424:15 426:19
427:11 433:7
433:20 434:8
434:14 436:5
436:21 442:10
442:21 445:12
446:15 449:9
450:1,1,3
451:4,14
452:13 453:7,8
453:22 454:3
454:13 455:7
456:20 458:15
459:4 460:6,17
460:19 461:6
461:17 462:4,5
466:24 467:20
468:24 473:19
477:25 478:11
481:1 482:8,17
482:23,25
483:5,7 484:4
484:23,24
485:18,21
487:18 488:4,7
488:13,18,24
489:7,10,23
490:9,18 494:2
494:5,19 496:5
497:11 498:18
499:4,4

**chemicals**
11:13,19 50:23
51:5,12,18,21
52:4 66:14
69:15,21 77:3
77:9 102:4,9,9
102:15 104:20
104:25 105:3
105:25 106:6
107:15 124:23
125:12 126:5
132:12 134:2
134:17 137:23
137:25 138:6
138:10 152:5
165:21 166:2
166:15 167:3
167:24 169:19
178:14 189:16
191:9,20 192:4
192:6,10,11
193:23 205:25
212:6,8,12,19
213:8,24 214:5
214:12,16,22
215:5 216:7
217:3,9,12
226:14 227:1
227:11 228:1
228:24 229:11
231:8 232:21
233:18,20
234:21 249:7
257:22 261:3
271:11 285:23
286:21 287:1
331:1 351:9
381:8 395:17
396:7,21 399:6
399:23 400:9
405:4 406:13
407:7 413:24
414:2,25
438:12 454:14
454:15 466:25
469:5 476:15
476:25,25
477:8,16,24,24
478:10,14,23
479:6,22 480:8
481:16 482:7
484:3 485:20
486:23 488:15
493:1 494:7,13

**chemosphere**
169:18

**cherian** 336:19
**cherin** 5:18
**cherry** 367:24 368:1
**cherrypicking** 477:12
**chicago** 4:20 5:7 6:22 7:8 8:22 9:13 448:20
**child** 403:25
**childhood** 404:8 413:19
**choice** 190:5
**choose** 371:19
**chop** 24:7
**chose** 103:4,8 103:23 190:7 192:3 410:24
**chosen** 188:4
**chronic** 137:15 137:16,18 142:9 145:15 171:11 181:19 409:16 411:16
**chuan** 76:8
**circle** 31:4,4 150:5
**circuit** 149:24
**circuitry** 149:22 151:22
**circular** 150:3
**circulating** 178:19
**circulation** 160:5 403:15 438:14
**circumstances** 432:13
**circumventing** 178:4
**citation** 79:13 124:18 234:22 364:11 369:18
**cite** 81:11,15,17 94:14 109:10 120:23 121:1 170:1 185:19 207:23 217:23 234:23 247:13 248:11,19 298:20 329:20 336:8 350:13 385:18,19,25 386:8,19 387:6 387:10,13
**cited** 41:25 81:20,23 83:14 95:23 96:17 121:19 124:8 124:16,21 128:16 129:5 143:18 237:19 237:24 238:2 254:4 314:4 329:7 335:24 354:20 355:7 364:22 369:21 437:2 444:7,9 444:11 464:12 464:20
**cites** 374:7
**citing** 81:9 125:25 298:20 336:18,25
**city** 502:12
**clarification** 336:4
**clarified** 476:21,22
**clarify** 192:15 495:20,24,25
**class** 187:12 394:13 414:22
**classes** 394:14
**classical** 292:25
**classically** 290:22 291:19
**classics** 450:13
**clausen** 4:17
**clausen.com** 4:22
**clawing** 379:25
**cleaned** 334:10
**clear** 19:6 33:25 41:6 48:21 64:2 118:9 119:1 184:6 191:24 195:23 239:21 241:3 258:19 312:1 373:9 376:16 386:17 387:1,2,3 390:1,23 393:7 393:8,25 414:5 418:7,9 420:8 429:16 434:6 436:4 453:3,20 453:20 458:11 484:9 485:7 492:8 494:15
**clearly** 89:21 149:3 177:11 178:11,14 262:8 263:2 310:13 325:22 381:22 393:8 393:16 407:13 422:1,5 454:15
**clever** 407:17
**client** 375:2
**clinical** 55:8 56:2 60:15 61:13 64:3 91:17 143:23 149:5 153:25 156:3 221:5 295:24 297:2 409:15 410:25 411:15 431:12 431:14 432:16 447:14,22 452:15 491:2,6
**clinically** 58:13 58:16 414:18

418:15
**clinician** 425:14
**clip** 35:5,6,13 35:23 36:18 38:4,10 39:4 43:25 44:4 234:11,14
**clipped** 33:10
**close** 160:4 166:25 168:20 206:12 414:12 414:12
**closely** 168:11 375:7
**closer** 267:6
**clover** 221:19 222:13,20 225:4
**clue** 448:5
**clues** 430:21
**coach** 345:4,7
**coaching** 117:20,23 345:5 479:13 485:5
**code** 416:21
**codified** 431:5
**codifying** 377:23
**cohort** 12:7 275:25 276:19 277:20 287:21 288:12,21
**cohosh** 221:21
**colleagues** 21:20 99:20 145:11 148:21 240:13 252:23 343:25 412:16 462:6
**collection** 415:8
**collective** 390:4 393:25 454:11
**collectively** 6:4 115:23 150:20 253:4,4
**color** 299:7,11 299:24
**column** 127:25 130:24 224:12 225:17 236:2 236:19 241:20 258:4 350:25 351:21 352:3 422:18
**columns** 46:2 127:15
**comb** 285:4,13
**combination** 285:5 393:4
**combinations** 395:16
**combine** 168:1 168:10,19 206:10 262:7 361:10 408:24
**combined** 167:14 168:3 208:23 261:20 262:23,24 267:13 318:16 361:11 415:7 428:21 429:4 453:16
**combines** 307:4
**combining** 174:11 318:6
**come** 28:4 52:22 140:7 150:20 151:13 170:24 206:12 240:2 254:22 256:23 270:25 317:12 389:3 410:2 428:18
**comes** 125:4 150:11 249:22 448:3
**comfortable** 193:3
**coming** 38:6 40:16,17 234:10,10 240:21 252:2 275:7 317:16 349:13 355:14 457:23
**comment** 162:2 190:2 237:17 251:24 253:12 271:4 272:11 274:10 275:3 334:7 342:11 379:7 427:7 484:16
**commentary** 34:23,24
**commenting** 304:18,22
**committee** 45:12 146:23 148:25 152:1 340:25
**committee's** 10:20
**common** 237:1 239:1 242:9 486:4
**commonly** 127:9 242:8
**communication** 251:4 252:9 253:9
**community** 83:24 84:12 86:1 90:1,25 100:9,18 172:11 173:15 173:20,20
**compact** 166:24
**companies** 455:20

**company** 42:8 42:17 415:5
**company's** 109:13,14,14
**comparable** 160:8 473:18
**comparative** 161:19,21 226:13
**compare** 90:16 312:1
**compared** 95:24 128:17 132:8 174:12 224:12,17 226:13,22 227:9,21 228:25 229:10 231:9
**comparing** 91:12 224:8,21 226:8 227:25
**comparison** 323:6
**compensated** 433:12
**compensation** 19:7 45:17 46:1,15,18,25 58:19
**competition** 266:10
**competitive** 266:19 270:20
**compiled** 62:20
**complaints** 452:22
**complemental** 148:10
**complementary** 363:16
**complete** 46:6 99:9,13 153:22 359:4 364:9,21 365:3 366:9,15 366:19 367:1,1 367:12 368:6 372:18 373:20 375:14,15,17 375:18 379:1 380:3,3 388:20 390:1 405:20 484:16 506:8
**completed** 54:25 55:4,8 504:16
**completely** 344:21 372:6,6 373:25 374:1 459:9 479:9
**completing** 55:20
**completion** 503:15
**complex** 104:1 148:17 150:23 151:2 252:15 254:12,20 394:13,19,20 396:21 399:9 414:6
**complexities** 123:21
**complexity** 251:3 252:8 253:8
**complicated** 151:17
**component** 205:12,22 207:22,25 333:14
**components** 103:5 391:5,22 493:18 494:1 494:11
**composite** 146:9 206:9 394:12,13,24 395:2,8 490:21
**compound** 115:18 117:24 118:3,5,13 142:23 160:13 162:6,21 193:2 239:7 296:14 394:14 407:13
**compounds** 115:23 116:9 131:15 132:20 133:3 168:4 187:24 192:22 193:5 208:21 212:9 269:7 353:24 354:15
**comprehensive** 11:16 129:11 169:16 363:12 373:13
**comprise** 393:17
**comprised** 64:22 190:24 218:4 277:25
**concentrated** 188:3
**concentration** 266:11,15
**concentrations** 267:1 395:12
**concept** 6:11 417:14 433:17
**concern** 285:23 286:21
**concerned** 177:5 240:4 269:1 375:12 419:24
**concerning** 38:12 67:3 229:10 257:20 268:4 290:11 306:11,22 331:14 372:25 476:11

**concerns** 433:25
**concerted** 238:15
**concierge** 9:18 26:3,12 44:6 259:8,21,22,25 379:25
**conclude** 132:2 286:11 339:7
**concludes** 382:5 500:25
**conclusion** 97:1 100:19 302:25 303:3,16 339:7 353:21 383:21 384:2 385:14 446:8
**conclusions** 96:6,16 99:2 236:6,12 314:8 384:22 387:12 446:7
**concurrence** 145:11
**condition** 136:11 152:4
**conditional** 201:20
**conditioners** 115:13
**conditions** 123:20 183:20 494:24
**conduct** 154:3 272:24 273:7 415:13
**conducted** 69:4 72:15 74:6 75:10 88:11,20 89:13 90:1 91:5 92:23 100:6 155:4 240:19 272:24 273:13 406:12 407:20 416:11 416:12 469:10 469:22
**conducting** 49:14 274:23
**conference** 43:5 150:21
**confidence** 98:14 290:5,10 290:18,21,24 291:4 298:8 300:20,23 301:2,9 305:12 305:16,17,25 305:25 309:13 309:19 310:7 313:8,20 321:9 322:6 323:25 324:6,10 327:7 327:11,21 328:5,10 422:7 424:9 430:25
**confident** 98:6 100:7
**confidential** 21:23
**confines** 118:8
**confirm** 107:22 160:11 302:15 304:3 308:10 308:24 341:15
**confirming** 26:12 44:6 259:22
**confounder** 87:6
**confuse** 44:17 141:25
**confused** 151:5 153:17 337:24 384:15 491:19
**confusion** 283:13
**congrats** 47:19
**congress** 7:15
**connecting** 18:4
**connection** 215:9 436:13
**consensus** 143:14 172:10 173:15
**consequences** 147:2
**conservative** 339:9
**consider** 68:22 71:4 73:13 91:14 97:13 162:4,25 163:19 164:21 228:8 248:21 267:4,10 291:18 295:18 295:23 296:2 297:5 298:5 300:15 322:17 323:2,15,16 325:9 330:17 336:2,2 343:24 354:11 383:15 407:2 413:3 416:19 455:15 462:1 469:13 494:16
**considerable** 18:21,23 19:20 266:23
**consideration** 161:17 403:17 406:15
**considerations** 90:18 127:8
**considered** 10:18 26:8 57:15 78:23 97:17 103:5 123:22 132:17 133:18 181:13 215:15 217:15

240:22 272:6 277:6 291:9,20 310:11 314:6 330:10 354:13 385:17 488:11
**considering** 91:1 191:21 305:24 388:20 418:6
**considers** 217:8
**consist** 299:23
**consistent** 172:19 173:5 176:23 274:7 426:13 427:9
**consistently** 331:5
**consortium** 232:4
**constant** 177:15 182:3 410:3,12,19
**constantly** 378:14
**constituents** 302:16 385:4
**constitutes** 394:2 415:10 433:1
**construct** 466:10
**constructed** 187:25 293:24
**constructing** 346:23 420:8
**construction** 466:12
**consulting** 23:3
**consume** 214:1 397:11
**consumer** 11:18 169:19 331:2 339:12 339:17
**consumes** 19:3 452:21
**consumption** 150:24 152:3 214:11 215:23
**cont** 4:1 5:1 6:1 7:1 8:1 9:1 11:1 12:1 13:1
**contact** 178:1 483:9 484:24 485:20 488:7
**contain** 135:24 137:22 208:4 215:12 355:1 366:13 399:11 399:21,24 401:11,12 415:1
**contained** 102:5 105:23 115:2 126:24 177:19 187:3 188:1,13 229:12 355:3 388:14 389:6 391:6 396:22 405:4 413:25 420:11 429:21 442:17 453:23 454:14 458:25 477:21 487:18 487:25 488:10 488:12 502:6
**container** 106:18
**containing** 331:20
**contains** 215:15 332:25 363:13 369:4 462:17
**contemporan...** 30:16
**content** 20:8 395:13 479:10
**contents** 178:21
**contest** 78:20 170:3
**context** 125:18 151:1 166:19 435:22 456:6 490:18
**continuation** 27:3
**continue** 14:10 110:25 150:14 170:20 255:18 326:11 404:8 404:23,25
**continued** 25:4 27:16,19 453:11,12
**continues** 84:12 366:1
**continuous** 155:19
**contraceptive** 207:12,24 209:5 360:3 361:9,17
**contraceptives** 203:12 204:3,5 204:13,23,25 205:11,17 206:18,25 207:11,21 208:4,10,16,24 209:8,13,16 360:2,5,6 361:8,12
**contradicted** 386:1
**contrary** 354:14 385:17 387:12,16
**contribute** 68:6 69:16 80:15 139:23 140:9 140:16 157:23 158:5 181:14

215:23 216:8 225:12 260:19 261:6 418:11 467:1
**contributed** 105:16 243:15
**contributes** 93:5 149:16 157:16 182:4 182:19
**contributing** 222:21
**contribution** 308:14
**contributor** 152:16 153:1
**control** 99:12 205:23 361:10 361:14
**controlled** 348:23
**controls** 174:12
**conversation** 16:25 65:2
**conversations** 14:9 23:5
**conversion** 182:16
**convert** 399:8
**convince** 92:17
**convinced** 451:9 454:10
**convincing** 262:6 422:9
**convincingly** 143:17
**cool** 33:1
**coordination** 25:12
**copied** 256:15 264:1 390:3
**copies** 23:17,17 32:2 40:11 257:6 315:24 504:14
**copy** 44:3 45:16 259:18 268:25 270:7 315:13 350:3,5 437:18 500:9
**copying** 315:17
**core** 145:15
**corner** 277:4 284:8 308:5 352:1
**corneum** 127:16,21 128:4
**corpus** 135:13 135:18 136:8
**correct** 19:10 34:19 35:3 38:11,23 39:11 41:16,17 46:3 46:13 47:2 48:23 49:2 51:18 52:2 54:8 55:2,24 56:16,21,23 57:4 60:19 62:11 64:16 66:2,16 68:15 68:17 70:1 71:17,18,20,21 71:23,25 72:2 72:14,18,22,23 72:24 73:2,4 74:12,16 78:24 79:9,13,22 81:21 86:2 89:5 91:10 93:16 94:3,11 95:4,5,12,18 96:3,9,14,21 98:3 104:23 105:14,21 106:3 109:16 109:23,25 120:24 121:25 122:1 125:14 126:14 127:23 128:1,2,13 130:18 131:8 135:1,7,11,12 135:20 136:2 136:10,14,22 137:7,17,21,24 138:14 139:21 139:24 140:6 140:12,16,17 142:15 144:25 145:1,20,24 146:3 147:13 154:8 155:22 156:1,17,18 157:6,21 159:2 160:22 171:3 171:20 172:13 175:4 180:18 182:7,8 183:2 183:3 184:4,13 184:16,17,19 185:5,10 194:21 198:22 199:25 201:1 202:1 203:3,5 204:15 206:16 206:21 207:19 209:9 210:8 219:10 220:13 221:7 224:23 225:8 232:16 243:10 247:16 258:15,18 259:1,20,24 262:17 272:25 273:15,19 275:4 276:16 277:7,15 278:1 278:9,10,17,21 278:22,25 279:1,3,6,7,9 279:17,18 280:22,23 282:11,12,19 283:19,22,23

284:25 285:10 287:22 288:4 290:6,12 291:12 295:4 295:16 298:21 299:7,11 300:13,14,24 301:3,10,12,23 301:24 302:3,7 302:18,19 305:8,13,14,18 306:17,18,23 307:2,13,14,17 307:18 308:2 309:2,7,8,13,20 310:3 313:3,10 313:12,18 315:25 316:6,7 316:10,11,14 318:4,9,17,23 319:10,15,16 319:19,20,24 320:1,1,4,9,23 321:11,15,16 321:18,20,21 322:2,3,6,7,9 322:10,11 324:1,7,11,22 326:16,17,19 326:20 327:8,9 327:12,13,17 327:18 328:7 329:8,9,10,17 330:15 333:9 334:24 339:19 341:9 345:16 347:9 348:18 348:24 349:2 349:15 351:12 351:16 352:18 353:3,17,18 354:3,5,9 357:8,25 358:13,15,18 358:20 359:14 359:18 360:8,9 361:19,24 363:23,24 364:17 370:16 371:7 377:9 382:23 383:4,5 383:8,9 385:1 385:20,21,23 386:20 388:2,8 388:15 401:21 402:15 412:22 424:12 425:4 429:23 430:7 439:7 440:8,10 440:11 443:3 443:12,13 445:16 446:19 446:20,22 449:13 454:23 463:1,11 464:13,16,17 465:4,4,7 471:21 472:21 473:2 474:7 476:2 477:1 478:19 482:18 484:25 486:16 488:15 492:21 493:7 494:3,13 495:10 506:8

**corrected** 119:17 242:24 502:6

**correcting** 200:14

**correction** 61:3 484:6

**corrections** 45:5 506:6

**correctly** 71:9 132:10 221:21 286:16 287:2,4 288:2 335:20 335:21 339:21 339:23,24 351:11 356:8 356:22,24 357:22 359:1 361:18 362:11 366:2 368:18 368:22,23 370:3,9,10,23 380:17,22 381:24 382:7,8 385:11,12 403:13 438:7 493:6

**correlation** 86:22 172:11 174:15

**correlations** 92:13

**cosmetic** 240:5

**cosmetics** 335:14 336:16

**costello** 5:4

**couched** 393:23

**counsel** 14:15 15:3 17:1,11 24:4,20 25:7 26:3,7 28:6 33:21 40:4,15 46:9 47:2 48:19,22 49:17 49:19 52:25 58:23 59:16,20 76:11 82:4,9 103:12 113:15 117:1,21 118:20 119:6 119:19 188:19 188:25 189:20 191:11,23 195:10,15 196:16,23 203:13 220:2 220:18 239:9 246:10 256:13 259:8 269:2 271:2,24 293:17 294:15

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 536 of 640 PageID #:74084



296:9,21 298:12 304:10 304:17 311:3 312:11 313:11 326:2 334:5 337:2 340:10 348:11 359:7 364:7,19 366:3 369:6,16,19 371:14 372:6 372:13 373:3,6 378:15 379:25 386:8 388:23 389:23 390:5 390:17 396:13 396:25 397:22 406:8 427:22 433:13 437:8 437:20 438:17 438:21 439:20 439:25 441:5 441:25 447:2 448:14 449:15 450:25 451:2,7 451:20 454:18 454:25 459:25 460:25 461:12 462:9,19 463:2 464:10 465:9 468:4 469:25 470:6,14 471:24 476:9 476:21 477:9 478:1,16 479:11,24 480:3,10,19 482:16 483:2 483:11 485:1 487:16 489:5 493:13 500:20 500:23 504:14
**counsel's** 455:14
**counseling** 72:25
**couple** 18:22 28:25 45:18 106:22 134:25 151:14 170:22 190:12 221:12 236:2 255:20 371:10,22,23 454:19 455:3 487:3
**course** 18:7 38:14 41:11 42:21 59:13 73:9 80:4 99:1 104:14,17 113:1 140:20 257:8 390:17 391:4 404:12 426:11 446:14 448:22 455:3
**coursework** 54:17
**court** 1:1 2:1 14:17 16:14,20 23:15 44:3 119:20 460:12 461:10
**court's** 118:7
**cove** 35:12
**cover** 103:16 377:3
**covered** 62:22 62:22,23,23,24 237:18
**covers** 51:9 178:6
**cowan** 336:18
**crazy** 45:23
**cream** 352:10 352:15,16,24 353:10,13,15
**create** 48:21 347:18 395:12 411:7 417:14
**created** 24:15 362:22 363:2
**creating** 93:9 405:13
**creation** 437:6
**credence** 343:15
**credibility** 417:15
**credible** 394:2 471:7
**criteria** 95:9
**critical** 413:20 413:23 418:8 456:12
**criticisms** 458:24
**criticized** 457:10
**critique** 455:18 456:25 458:13 458:23
**cross** 290:21 297:16 309:22 313:21 322:9 327:17
**crosses** 290:11 292:8 300:24 301:3,9 305:13 309:15 324:6 324:11 327:7 327:12 328:6 328:11
**crossing** 313:23
**csiszar** 336:19
**csr** 1:22 503:25
**culture** 88:22
**cumulative** 260:18 405:3 405:25 482:3,9 493:5,19 494:2 494:11
**cure** 117:9
**curious** 297:21 419:11
**current** 11:5 25:23 44:25 129:1,8 278:20

385:6 453:1
**currently** 62:9 150:10 255:9
**cursory** 234:1
**curve** 266:8
**curves** 266:19
**cutoff** 4:12
**cv** 1:5 2:5 14:19 44:17,19,22 45:1,4 53:23 54:13 61:10 65:20,24 66:7 66:12 68:10 69:18,25 76:2 76:6
**cvs** 108:7
**cxcl12** 407:11 414:10
**cycle** 135:6,19 135:25 136:1,6 202:19
**cycles** 136:14
**cyclic** 185:8
**cyclicity** 251:6 252:11 254:10
**cycling** 201:15
**cytokine** 199:7 199:9

**d**

**d** 4:18 6:11 10:1 103:18 225:20 241:21 444:3
**daily** 213:18 335:16 339:14 352:24 353:2 353:12 410:5 438:4 473:23
**damages** 492:21
**daniel** 9:18
**dash** 36:4 266:12
**data** 79:13 84:22 93:24 98:6 99:24 150:6 158:11 158:15 171:1 172:18,18 173:5,11 174:15 176:3 186:23 222:19 225:10 226:25 228:16,22 229:9 231:13 231:15 233:8 241:8 254:22 256:6,12 260:14 262:5 282:4 283:24 284:2 285:11 287:8 288:16 292:7,19 294:25 298:20 299:14 300:9 303:24 306:11 306:22 307:8 309:5,25 310:2 310:15 311:6 311:18 314:4,4 314:6 320:11 326:13,13,21 328:13 331:14 331:19,24 338:2,13 341:15 347:14 347:16 353:21 354:11 363:11 366:25 377:1,2 377:22 392:2 393:7 408:24 416:8,9,10,10 416:11,14 418:4 419:13 422:9 424:23 426:8,8,9,10 429:9,15 431:21,22,22 438:19,20 439:16 441:18 442:9 444:15 447:16 448:24 453:14,15 455:24 459:13 465:24 466:12 466:23 468:19 469:12 470:5 495:17,20,24 495:25
**database** 363:13,13 373:14
**databases** 50:14
**date** 29:9 44:19 47:10 451:11 503:20 505:24 506:12
**dated** 44:2,24 383:3 503:22
**dates** 46:2 107:24
**davis** 57:2,5
**day** 39:7 47:13 47:14,16,17 48:4,11 65:22 76:15 150:21 193:8 212:6,18 213:19 214:23 336:16,17 344:25 352:17 396:15 397:4 407:22 438:5 502:10 506:15
**days** 47:17 48:4 48:8 58:8 78:20 136:6 352:17 353:12 371:10 504:16
**dc** 3:7
**de** 177:10
**deal** 178:9 192:20 440:23
**dearborn** 8:21

**debate** 195:21
**debrosse** 3:14
**decade** 150:18
**decades** 404:24 405:10 448:23
**december** 11:8 44:2 46:10,25 58:21 59:17 146:20 154:11 155:2 383:4 487:9
**decided** 378:11 430:20
**decision** 103:25 377:17
**declaration** 292:23 502:1
**declare** 502:4 506:4
**decrease** 36:9 207:2 208:11 209:6
**decreased** 263:2
**decreases** 207:13 361:12
**deemed** 506:6
**deep** 74:23 75:2 399:11
**deeply** 419:24
**defective** 117:4
**defend** 118:19
**defendant** 4:16 5:3,10,17 6:11 6:18 7:3,12 8:3 8:11 9:9
**defendants** 2:16 6:3 8:18 10:21 14:15 15:9,12 41:19 42:1,3,15 45:13 235:16
**defending** 340:7
**defense** 83:17 455:20
**define** 18:2 95:3 199:3
**defined** 131:8 136:11 422:18 493:14
**definite** 417:1
**definitely** 419:10,10 436:19
**definition** 144:13 431:4
**definitions** 134:25
**definitively** 149:19
**degree** 72:1 74:23 451:17 455:6 459:3
**degrees** 72:12 73:18
**deleterious** 249:8
**delivery** 10:24 11:5 121:23 123:23 124:3 129:1,3,12 130:3,9 131:9
**demand** 430:19
**demands** 452:20
**demonstrate** 394:25
**demonstrated** 143:8 171:17 269:8 331:5 405:14 417:5
**demonstrates** 85:13 412:11
**density** 128:5
**deny** 426:9
**dependent** 167:10 343:17 479:6,22 480:8
**depending** 98:16 144:12 462:9
**depends** 99:5 124:6 132:19 160:23 161:13 209:20 210:16 210:24 246:24 274:7 490:24
**deponent** 504:13 506:3
**depose** 33:3
**deposed** 18:16 22:4
**deposing** 504:13
**deposition** 1:12 2:15 10:17,21 13:11 14:14,20 15:22 16:11 18:20 19:15 20:11,25 21:6 21:12,17 22:9 23:11,19,24 27:22 35:10 42:25 43:7 45:14,20 46:21 46:22 70:12 118:20 234:12 272:8 340:8 378:25 457:25 459:16 491:14 503:14
**depositions** 239:11
**derived** 85:11
**dermal** 12:17 67:11 75:10 76:24 78:5 101:12 103:17 114:10,13 120:18 121:9 124:11 128:18 161:15 329:12 338:3,14 339:8 340:25 341:5

341:21 347:8 351:9 448:15 482:17 483:8 486:23 488:7
**dermally** 331:1
**dermatologic** 74:17 76:20 78:2
**dermatological** 75:23
**dermatologist** 74:16 75:7,15
**dermatology** 74:22,24 75:17 75:19 77:7,13 77:15,19,19 104:3 460:1
**dermis** 123:5 127:17,21 399:4,10
**describe** 92:5 134:17 141:5 148:11 152:4 264:17 305:15
**described** 66:5 82:12 107:12 116:10 133:22 141:1 150:3 168:17 199:4 223:10 225:21 226:22 264:15 341:8 342:19 348:16 355:5 427:18 447:3
482:9 498:2
**describes** 122:14
**description** 10:16 11:3 12:3 13:3 49:1 107:16 139:9
**designate** 150:5
**designated** 15:23
**designed** 199:22 200:13 204:6 276:8 469:22
**designing** 123:22
**despite** 199:24 245:4,5 384:5 385:2 451:9 453:2 471:8
**detail** 189:9 348:21 476:16 477:1,16
**detailed** 269:15 319:22
**detect** 240:17 333:6
**detection** 154:7 363:15
**determinants** 83:24 84:13
**determine** 49:8 89:10 126:22 154:4,6 155:5
162:24 241:4 432:7 448:4 450:21 467:21
**determined** 11:10 221:4
**determining** 63:17 90:3 97:15 128:18 176:25 494:18
**devalue** 303:24
**devastating** 412:9,10
**develop** 228:9 287:17 288:10 288:18 356:7 413:22 417:9 435:9 456:18
**developed** 340:23
**developing** 356:4 417:18 419:24 435:18
**development** 135:10 139:20 143:5 198:11 330:12 413:18 456:23 473:9
**devoted** 144:24
**dht** 135:9
**diagnose** 64:11
**diagnosed** 143:22 276:19 276:20
**diagnoses** 276:11
**diagnosis** 63:18 64:4 412:5,6,7
**diandra** 3:14
**dibutyl** 12:20 349:23 354:8 437:9
**dicello** 2:16 3:12
**dicellolevitt.c...** 3:19,20
**dictum** 297:15
**die** 435:7
**diego** 1:14 2:17 14:1,20 57:6
**diet** 213:24 214:6 215:7,8
**dietary** 214:11 216:6
**diethyl** 12:20 349:22 354:8 437:8
**diethylstilbes...** 475:11,17
**diets** 381:22
**difference** 94:12 205:14 249:20,25 250:3 312:3,3 312:7,14 323:12,22 397:5,10,11 398:5 399:19

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 540 of 640 PageID #:74088



400:7,22 401:25 469:19 488:22 489:9 489:16
**differences** 94:5 99:17 128:4
**different** 18:2 65:14 89:4,5 90:11 91:21 96:7 97:1,1 107:8 109:13 116:3 123:16 131:19 133:17 137:2 150:19 160:16 179:2,9 181:1 189:6 191:14 199:4 219:5 226:4,5 255:25 295:2 307:4 308:10 312:9 318:15 322:16,18 323:1,3 357:5 395:11 398:25 401:7 402:17 415:6 437:3 471:19
**differently** 96:7 119:18 294:3 485:12,15
**differing** 150:14
**difficult** 90:10 98:21 150:6 237:16 245:21 252:16,18 260:11 377:20 448:1 450:13 468:15
**difficulties** 17:14
**difficulty** 91:11
**digital** 259:9,22
**dinsmore** 5:11
**dinsmore.com** 5:16
**direct** 402:18 403:1,1,2 483:8 484:23 485:20 487:7
**directing** 448:12
**direction** 291:22 312:8 503:10
**directive** 363:10
**directly** 125:4 334:2,20 482:24
**director** 61:20
**director's** 61:19 62:1
**disadvantages** 127:25 128:17 486:22
**disagree** 119:7 258:25 339:25 360:19 370:1 378:4 379:5 381:12 382:1,9 385:13
**disappointing** 248:25
**disappointment** 63:7
**disciplines** 61:25
**discount** 243:22 254:21 426:11 431:17
**discovered** 223:2,10,14 240:6 436:3
**discretionary** 61:21
**discuss** 97:20 150:19,22 329:20 386:19 387:6,11 408:7 478:13
**discussed** 20:4 283:19 306:17 329:7 338:23 343:25 348:21 383:11 386:6 399:23 406:16 413:24 476:16 477:1,8,16 478:8
**discussing** 21:25 348:10 442:9 445:2
**discussion** 186:7 258:3 392:23 409:15 411:16 430:7 438:22
**discussions** 58:10
**disease** 65:2 86:8,13,19 87:7 88:20 201:22 202:4 202:23 242:18 245:6 249:14 249:16,22 250:4,4 356:6
**diseases** 237:1 239:2 461:18
**dish** 93:7
**disingenuous** 374:14
**disorder** 142:10 148:8 148:12,16,17 149:10 150:2 150:14,17 151:1 202:6 410:5
**disorders** 60:21 60:22 66:10 74:17 192:23 202:9 413:7

**disparities** 308:15
**dispensing** 61:25
**disregard** 218:24 292:19 459:10 468:11
**disregarded** 431:3
**disregulation** 146:5
**disrupting** 11:13 50:23 51:12 66:13 69:15,21 77:9 102:4 152:5 165:21 166:1 166:15 167:3 167:24 178:13 186:11 193:23 205:25 212:9 212:12,19 213:7,24 214:5 214:11,16,22 215:4 216:7,15 216:18 217:3,9 217:11 226:14 227:1,11 228:1 228:24 234:20 249:7 257:22 261:3 271:11 395:17 396:7 399:20,23 400:9 405:3 407:7 469:5 479:6,22 480:8 484:3 486:23 494:7,12,19
**disruption** 11:22 169:13
**disruptor** 414:23
**disruptors** 187:3,6 192:6
**dissolves** 135:18
**distinct** 141:11 141:12 285:7
**distinctions** 127:8
**distinguish** 87:15 281:19
**distributed** 120:21 124:14
**district** 1:1,2 2:1,2 14:17,18
**diversity** 12:5 270:5
**dividing** 205:11
**division** 1:3 2:3 14:18
**dna** 416:24 492:21
**doctor** 16:5 17:10 54:7 88:15 110:23 129:16 170:19 181:17 192:3 204:19 227:5 229:16 255:17 257:10 263:14 275:15 289:23 301:5 303:18 316:16 326:12 327:1 328:17 340:5 348:6 354:4 365:18 367:22 368:9 369:3 375:24 376:12 382:18 389:22 458:11 487:3
**doctoral** 63:2,3
**document** 19:21 20:1 26:4,6,10 154:16 198:2 239:8 246:15 258:20 269:2 271:4 272:9 338:7 362:15 364:3,8,10,12 364:20,21,22 364:23 365:2,2 365:4,10,13,15 365:19,24 366:5,5,8,10,12 366:15,16,19 367:1,2,7,11,16 367:19,20,23 368:6,11 369:10 370:6,7 370:18,24 371:3,4,13,17 371:18,19,24 372:9,18 373:7 373:9 374:25 375:13 376:2,8 376:10 377:23 379:1,14,23 384:18 412:2 438:18,21 440:3 441:9 442:1,7,18 443:3,8,12,15 444:13,22
**documented** 409:23
**documents** 13:11 40:17 41:18,22 42:4 42:7,8,18 43:12
**doing** 22:1,2 41:3 43:16 49:23 55:12 71:13 92:8 104:1 106:13 110:23 117:17 142:6 177:21 178:6 250:23 255:2 292:22 334:13 343:11 377:6 392:7 425:13 429:13 460:12

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 542 of 640 PageID #:74090



**domain** 266:11
**dong** 221:19
**doobling** 254:4
**dose** 37:2,4 94:8 160:23 161:5,8 162:19 162:20 167:10 209:25 210:3 211:3,4,14 263:6 266:9,15 274:13,20 324:21 325:11 337:21 405:11 407:18 409:4 414:9 427:2,6 436:7 472:19 472:20,23 482:3 489:18 489:19,22 490:17,22,25 493:5,7,14,19 493:23,25 494:2,10,22 495:6 496:19
**doses** 94:13,13 331:1,15 335:13,17 336:5,5,6,13,15 336:21 337:9 339:10,13,14 405:18 407:18 420:7 473:16 473:17,18,22
**double** 31:14
**doubt** 52:7 362:17 372:16 451:13 471:1,3
**dozen** 218:18 412:3
**dr** 17:17 24:21 25:13,14 26:18 30:10,10 42:14 42:16 47:23 60:2 61:17 111:23 119:5 119:20 138:16 151:8 201:3 235:5,17,18 259:5 262:14 283:3 304:21 313:17 340:18 343:7 358:21 364:16 372:22 380:7 388:19 390:16 394:5 395:18 403:24 408:6 409:10 415:12 420:13 423:22 426:18 433:4 434:2 437:7 438:17 438:25 440:19 441:15 450:24 452:11 455:16 455:19,23 457:1,2,3,4,10 457:19,20,21 457:23 458:13 458:23 460:5 460:16 461:15 462:16,18 463:14,19 472:2 487:7 491:1 495:15 498:25 500:5
**drafted** 80:21 80:22
**drafting** 19:17
**draw** 99:2 100:2,4 236:5 236:11 417:13 446:6
**drawn** 352:10
**dressing** 352:16
**drew** 353:13
**drink** 187:19
**drive** 2:17 4:5 5:6 6:14 7:7 14:20 135:9
**driver** 179:13 179:20 180:3
**drives** 139:19
**driving** 302:17
**drop** 410:14
**dropped** 62:19
**drug** 10:24 11:4 121:23 128:8,25 129:3 129:12 130:3,9 131:5,9
**drugs** 108:7 122:4 123:10 124:23 125:13 126:5,23
**due** 131:18 132:6 385:10
**dumb** 481:9
**duplication** 141:21
**duplicative** 40:13
**duration** 211:3 211:4,8,12,14 211:17 261:13 326:15,23 409:4 427:2 450:20 453:21 489:22 490:8 493:7,11,15,23 493:25 494:10 494:21 495:6 496:19 497:6
**durations** 405:25
**dye** 111:10
**dyes** 362:4 364:1 441:21 442:4
**dynamics** 432:22
**dysfunction** 143:24

**e**

**e** 9:4 10:1 30:2 30:2 35:24 153:13,21 154:1 169:14 233:15 235:22 265:6 332:18 332:18 505:3,3 505:3
**e15** 235:24
**e2** 266:9,16 267:4
**e57** 236:14,20
**e64** 241:17,18 241:18 246:7 248:8,18
**e66** 250:8,10,11
**earlier** 46:12 82:12 116:11 124:9 133:1 158:19 161:24 170:25 172:1 188:16 198:25 206:15 210:1 212:4 239:19 257:7,12 260:11 261:14 268:1 272:23 273:6,11 322:15 348:16 354:16 365:14 381:1 385:20 389:25 417:8 447:17 448:13 469:9 486:21 491:17 493:17 498:25
**early** 19:9 59:18 239:22 240:14 404:21 461:1
**ease** 40:15
**easier** 40:18 126:22
**easily** 41:1 399:3 438:13
**east** 8:7
**eastern** 1:3 2:3 14:18
**easy** 43:20 50:6
**eat** 472:17
**eating** 215:8
**ec50** 266:14 267:4
**ec50s** 266:25
**eckert** 5:18
**eckertseaman...** 5:23
**ed** 248:13
**edc** 11:12 166:22 188:3 197:19 234:19 245:7 246:8 255:23 260:12 393:3
**edcs** 51:7,8,10 51:11 52:5 69:21 101:12 102:4 153:5,7 158:16 165:5 166:20 178:10 185:19 186:1,6 187:12 191:14 193:10,14 194:17 195:7,7 196:3,7 206:8 219:8 236:23 238:23 239:20 239:21 240:4 240:19 241:4 241:22 248:24 253:3 260:18 267:11 330:12 393:4,11,24 394:2 395:10 396:21 400:8 401:12 415:2,9 417:16 418:10 453:22 454:14 487:13
**edition** 377:19
**editor** 65:17
**editorial** 65:14 65:17 373:10 376:20 444:20
**editorially** 445:4
**editors** 376:18
**education** 53:21 55:16 62:15,25 63:11 165:19 287:19 288:11 388:13 389:8
**educational** 63:1 288:20
**effect** 139:16 216:17,21 219:16,24 240:19 253:5 261:20 332:24 361:13 414:25 415:7
**effective** 123:22,24,25 124:2,3 157:11 266:15,25
**effectiveness** 405:12
**effects** 11:10,18 11:23 142:9 157:14 169:13 169:19 221:3 236:23 238:23 239:20 241:4 249:8 286:25 411:20 453:9 467:24
**efficacy** 122:4
**efficiently** 16:19
**effort** 134:7 238:15 375:1
**efforts** 68:12 228:10,13

241:3 453:13 453:16
**egg** 135:5 177:18,19
**eggs** 135:24
**egregious** 485:5,6
**eight** 99:10,10 100:7 379:14 379:14 441:10 442:19 443:3 464:13
**either** 22:11 51:13 61:13 64:5 67:23 68:4,6 93:15 97:21 108:4 111:14 158:9 194:12 204:14 205:19 206:19 214:6 215:24 218:12 222:21 225:13 233:7 235:15 253:4 282:5 300:11 345:1 387:7 388:14 389:6 399:15 427:24 473:16
**electronic** 26:13,14 44:12 69:19
**electronically** 40:17
**element** 149:25 392:15
**elements** 177:13 178:16 206:11 427:17
**elevated** 136:12 156:4
**elicited** 502:7
**ellis** 6:5
**ellisgeorge.c...** 6:10
**ellsberry** 336:18
**emailed** 43:5
**embryo** 413:18
**emerged** 298:2
**emerging** 84:22 174:8
**emeritus** 16:9 57:10,13,15,18
**emily** 9:19
**emphasize** 418:15
**emphasized** 19:1
**emphatically** 436:10
**employ** 452:15
**employed** 94:22 452:12
**employee** 503:18
**enacting** 263:3
**encountered** 449:2
**endanger** 432:17 436:11
**endo** 37:2
**endocrine** 11:12,13,22 50:22 51:12 66:13 69:15,21 77:9 102:4 135:13 137:23 138:12 151:13 151:16 152:5 165:21 166:1 166:15 167:3 167:24 169:13 178:13 185:15 186:11 187:2,6 192:6 193:23 197:22,25 198:4,6,25 199:19,20,23 200:13,23 204:6 205:25 212:9,12,19 213:7,23 214:5 214:11,15,22 215:4 216:7,15 216:18 217:3,9 217:11 226:14 227:1,11 228:1 228:24 234:19 234:20,22 238:4,16 240:12 241:7 245:25 246:6 246:18 249:7 249:13 257:22 261:3 271:11 395:17 396:7 399:20,23 400:9 405:3 407:6 414:23 469:5 479:6,22 480:8 484:3 486:23 494:7 494:12,19
**endocrinolog...** 16:9 61:7
**endocrinolog...** 462:7
**endocrinology** 36:19 37:1 54:11 55:5 56:5 57:24 58:1,3 60:16 60:18 69:2 70:20 71:3,7 149:22 150:4 221:5 295:18
**endogenous** 219:14,20,22
**endometrial** 12:23 13:4,12 32:18 33:16,17 37:3,19 50:22 52:20 61:4 64:5,23,25

137:19,20 138:21 139:4 139:17,20 141:9,19,23 142:4,8,14 154:5,12 155:6 160:21 162:18 164:23 165:6 165:10,22 167:16 168:5 172:20 173:7 179:1,4 181:3 181:8,15 182:3 182:5,9,24 183:5,21 184:4 185:9 206:20 207:3 208:11 209:6 237:2 239:2,15,20 241:9 242:7 243:2,8,9,14 244:6,16 245:7 246:9 248:14 248:25 249:15 260:20 261:6 261:10 271:10 282:5 355:18 355:25 356:5,7 356:16,18 357:6,8,21 358:18 359:11 359:23 360:8 360:25 361:13 362:10 364:6 368:12 370:15 372:10 373:1 407:1 408:16 408:17 409:3,8 410:10 412:1,3 412:7,14 418:20 419:18 442:11 498:6

**endometrium** 37:12 135:16 138:1,13 139:12 158:23 159:10 179:4 182:20 240:21 408:1 410:22 412:12

**ends** 365:20

**energy** 343:17

**enhancement** 11:4 128:25 129:13

**enlightened** 431:6

**enormous** 116:1 434:17

**enrichment** 276:13

**enrolled** 450:11

**enrollment** 309:11

**enter** 120:20 124:13 398:21 399:3,10 438:13

**entered** 101:12

**enterprises** 6:18

**entertain** 63:22

**entire** 55:12 186:15 187:2 190:21 192:25 364:12 365:10 387:22 395:8 399:10 406:4 416:3

**entirely** 59:11 470:1

**entirety** 91:14 115:2 125:21 187:21 502:5

**entities** 141:14

**entitled** 10:23 11:4,9,12,14,16 11:18,21 12:4 12:6,10,12,14 12:17,19,23 13:4,6,8,12 20:9 26:7 33:16 121:21 169:11 221:2 329:11 437:8 448:15 487:12

**entrance** 121:8

**entry** 488:7

**environment** 169:11,15 276:9 381:21

**environmental** 68:20 123:19 232:12 233:17 257:25 276:4 276:14 329:16 350:1

**environment...** 232:20

**envision** 405:8

**enzyme** 182:14

**enzymes** 399:8

**ep** 335:9 336:25

**epidem** 174:11

**epidemic** 92:23

**epidemiol** 174:10

**epidemiologic** 85:13 88:21 89:14 90:2 91:5 275:4 295:9 348:20 406:11 416:10 464:12

**epidemiologi...** 293:7 331:4 347:7 417:22

**epidemiologist** 73:5,14 291:24 305:16,21

**epidemiologi...** 290:20 292:1 321:23 453:14

**epidemiology** 13:8 67:18 71:6 73:8,9,19 73:22 74:1,9 74:11 87:14 91:13,16 293:24 295:21 297:11,15 382:20 434:18 450:12 459:23 266:10,24
**epidermal** 131:18
**epidermis** 127:17,21
**epithelial** 177:1
**epithelium** 176:22 177:10 177:20 179:7 180:18
**epitome** 92:8
**equal** 279:8 301:21 302:6 326:24 327:20 328:3
**equivalencies** 228:9
**equivalency** 227:15 262:9
**equivalent** 166:22 414:11
**er** 37:20 160:19 162:16 164:22 165:6,12 167:15 168:4 266:10,24
**errata** 504:11 504:13,16
**erroneous** 394:19
**error** 416:22,22 481:1
**errors** 242:24 380:25
**especially** 176:21 349:9 431:7 437:4
**esq** 3:4,5,13,14 4:4,11,18 5:5 5:12,19 6:6,13 6:20 7:5,6,14 8:5,13,20 9:4 9:11 504:1
**essential** 135:15
**essentially** 141:5 151:21 199:12 427:11 493:18
**establish** 211:24
**established** 465:19
**establishes** 212:18
**esters** 11:15 230:7,21 231:4 232:12 257:17 257:21
**estimate** 341:5 341:5
**estimated** 336:15,21 339:14
**estimates** 274:8
**estradiol** 156:19 166:13 166:14,23 167:1 168:12 178:20 183:1 184:19 205:24 206:13 223:21 223:25 224:8 224:13,18,22 226:13,23 227:10,10,22 228:3,25 229:11 231:9 231:19 258:14 260:7 261:21 262:9,10,11,16 262:25 263:2 265:25 266:9 267:6 414:11
**estrogen** 11:9 11:10,19,22 12:4 37:5,20 88:12 136:1 137:16,18 138:1,12 139:10,11,13 139:19 141:13 142:9 143:2,2 145:21,22 146:1,6 155:21 156:5,6,11,12 156:17 157:2,6 157:12,18,19 158:20,22 159:7,9 162:17 165:12,22 166:2 168:20 169:12,20 176:20,20,22 178:18 179:12 179:19,23 182:3,16,20 195:3 204:10 204:14 205:1 205:12,18,18 205:22 206:12 206:18,19 207:1,2,22,24 208:17,21,24 209:9,14 215:18 219:14 219:20,21,22 221:2,3,14,18 222:2,10,14 223:3,11,16,25 224:7,16,21 231:19 243:10 243:16,23,25 244:4,17,18,21 244:25 245:2 263:3,4 266:18 267:14 270:3

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 547 of 640 PageID #:74095



270:19 360:4 361:11 399:14 403:16,19 409:16,22,23 410:4,7,11,13 410:15,20 411:7,16,21 412:11,14,19 413:8,12,16,17 413:22 414:6,7 417:11 420:3 436:23 456:15 456:16,16 475:20
**estrogenic** 11:14,16 169:16 183:5 197:19 227:20 230:6,20 231:3 232:11,16,22 233:3,16 257:16,20 261:4 265:23 394:1 397:3 403:14 409:13 414:2,17 456:21
**estrogenicity** 394:25 415:10 436:22 453:5
**estrogens** 157:5 219:10 233:16 258:11 270:21
**et** 103:18 211:10,11 230:24 231:3 240:9,10 333:5 333:5 336:19 448:17
**ethical** 432:11
**ethnicity** 277:23 301:1 309:6 312:25
**etiologic** 148:15
**etiology** 147:2 147:11,16 148:7,13 182:23
**europe** 240:3
**evaluate** 308:14
**evaluated** 104:20 335:19
**evaluating** 266:17
**evaluation** 12:17 315:1 329:11 418:4 448:15 489:20 495:15
**event** 150:5
**events** 201:8 202:14,21
**everybody** 161:2 247:2 303:20 304:6 484:9
**everyday** 212:11 213:16
**evidence** 11:7 85:11 88:16 89:4,7 91:1,2,4 91:23 92:5 95:1,4 96:20 97:13 98:23 102:19 146:19 151:6 155:1 158:19 167:8 175:9,12,16 212:11,17,24 232:3 282:9 324:21 325:11 325:11 354:14 362:9 364:5 368:11 370:14 372:5,5,19,19 372:25 381:8 383:14 385:17 406:10 409:6 414:5 415:24 417:22 445:2 447:10 454:5,8 454:8,11 490:7
**evolving** 174:2
**exact** 61:16 90:2 160:13
**exacting** 47:25
**exactly** 26:22 27:23 64:18 100:1 140:23 226:10 273:10 334:21 395:12 423:17 425:5 433:22 449:25 498:7
**exam** 476:20
**examination** 10:3 16:3 85:2 244:15 269:1 390:14 406:17 462:14 487:5 491:11 495:13 497:2 498:23
**examine** 24:24 254:22 366:8 366:14,24 371:19 375:14 394:5 411:23
**examined** 93:9 245:7 246:8 247:17 354:2 393:18
**examining** 90:2 365:2 366:16 367:3 373:7
**example** 36:20 86:7 90:5 91:3 98:11 99:6 106:21 115:24 116:12 139:11 142:17,20 161:15 190:5 203:10,17 204:2 207:23

213:24 394:16 409:12
**examples** 187:1 188:5 189:9 192:11 201:12 202:19 404:19
**except** 66:3 352:12,23 432:12
**exceptional** 432:12
**excess** 146:4 149:11,12
**excessive** 410:22
**exclude** 307:13
**excluded** 277:12
**exclusion** 277:6
**excreted** 399:16 438:15
**excuse** 20:2 100:8 123:24 250:22 277:23 312:2 366:24 371:23 372:2 381:4 392:17 401:12 421:10 428:16 438:1 438:19 441:18 447:16
**executed** 502:10
**executive** 2:17 11:8 14:20 70:13 85:19 120:12 154:15 154:19,24 329:25
**exercise** 76:13
**exhibit** 10:17 10:18,19,20,23 11:4,6,9,12,14 11:16,18,21 12:4,6,8,10,12 12:14,16,17,19 12:23 13:4,6,8 13:11,12 23:10 23:12 26:16 29:10 41:15 42:24 43:9,23 44:1,13,16,16 44:20,21 45:8 45:11,19 49:12 70:11 79:21 121:15,16 128:20 146:12 146:16 153:19 155:11 190:25 191:2,6 197:15 218:12 220:16 220:17,21,22 234:11,16 247:5,7,9,10 250:7 259:9,14 259:23 260:1 264:24,25 265:1,6,7,7,18 265:19,25 266:2 270:8,9 270:13 275:8,9 279:23 280:3 283:5,7,8 293:16 306:8 306:10 315:7 315:10,13 317:17 320:15 323:17 328:23 328:25 350:8 355:11,17 360:22,24 364:4,9 365:19 365:25 370:16 372:24 379:9 379:11 382:16 382:18 383:7 384:11 385:19 388:15 389:7 390:4,4,8,9 397:2 403:13 437:19 438:18 439:9,13,14 441:3,16 442:2 442:8 448:14 465:3 486:21
**exhibited** 431:8
**exhibiting** 244:17
**exhibits** 10:14 11:1 12:1 13:1 263:23 267:22
**exist** 49:8 87:11 194:17 260:18
**existed** 253:2 289:18 447:20
**exists** 62:9 63:14 92:21 159:15,16,18 372:3 447:21 484:7
**exogenous** 166:15
**expect** 453:1
**expectancy** 242:11
**expectations** 83:19 254:23
**expected** 200:2 200:7 339:18 411:25
**expense** 450:14
**experience** 22:22 53:21 165:19 294:10 342:10,19 385:8 388:13 389:9 448:23 461:25
**experienced** 319:13 412:2 483:18,20
**experiment** 414:13
**experimental** 342:3 417:21

**experimentally** 406:23
**experiments** 164:3
**expert** 10:19 22:5,7,10,19 23:2,3 44:1 71:20 74:21 96:24 235:8 455:20 457:13 457:15 460:5 460:12 461:1,2 461:6,8 462:1 484:18 487:8 488:15
**expertise** 70:19 71:1 84:7 103:17 164:3 295:17 341:21 342:10,18 460:17,22,24 461:17 470:25
**experts** 21:15 43:6 150:17 235:16 239:11 376:22 411:23
**explain** 55:7 57:12 61:12 93:13 96:15 134:7 164:17 164:17 193:20 271:21 334:3 340:16 427:3 428:4
**explaining** 40:21 41:4
**explains** 87:6
**explanation** 125:3 134:18 216:11
**explore** 101:11
**expose** 438:14
**exposed** 212:5 213:23 214:23 333:7 407:6 409:16 418:22 420:25 494:20
**exposing** 400:25
**exposure** 12:17 85:14 88:19 89:11,24 90:5 91:3 92:25 93:18 94:8 105:17 120:18 124:11 137:5 145:22 152:15 155:20 156:5 158:12 161:11 162:21 177:4 182:20 185:9 209:25 212:12 212:18 214:5 245:7 246:9 248:13 251:9 252:11 284:2 285:11 317:6 318:12,14 323:18 329:12 330:24 338:4 338:14 339:17 340:24 357:11 391:10 397:6,7 398:17 399:20 400:8,23,23 401:8 402:1,10 402:12 405:3 405:25 408:8 409:13,16,22 411:2,16 415:14,25 417:20 420:2 421:16 427:11 427:17 433:8 434:8,14 448:15 450:3 451:4 452:13 453:21,21,22 454:3 455:6 456:15 458:15 459:5 468:24 469:4 473:24 482:3,17 488:11,24 489:7,10 490:18,21,21 490:23 494:2 494:11 497:6
**exposures** 123:19 213:17 213:18 276:15 398:18
**express** 416:20
**expressed** 457:21
**expressly** 117:1
**extension** 305:25
**extensive** 102:2 112:3 450:18
**extent** 58:5 60:25 104:2 152:2 160:20 163:2 164:8 237:18 269:9 271:25 430:25 452:24
**external** 123:19 199:24
**extra** 23:16 182:2 439:22
**extracts** 223:3
**extremely** 151:17 418:17

**f**

**face** 134:22
**facilitate** 178:7 332:25
**facilitated** 402:19
**facilitates** 343:18
**fact** 22:11,20 63:20 87:18,23 90:17 100:17

111:17 115:25 148:15 149:23 168:18 178:20 182:21 186:10 201:8 206:25 216:20 238:19 239:21 252:21 284:7 291:12 291:12 292:7 292:24 294:11 299:13,22 325:9 333:18 344:23 352:23 371:25 372:3 406:9,13,16 408:24 409:7 414:7 416:15 417:2 418:15 420:9 421:14 426:13 430:9 430:11 431:6 431:11 432:21 436:10,21,25 439:1 449:24 454:8,18 455:2 456:1,5 459:3 471:8
**factor** 86:22 150:1 161:9,12 161:14 162:4 163:3,18,22 173:6,12,16 174:4,7,14,21 175:2,7,18 176:13,17 181:3,6 211:20 274:14,22 348:17 358:7 358:12 413:1 413:20 494:16
**factors** 12:23 13:6 123:16 124:6 127:18 146:6 162:14 162:25 164:21 178:10 184:3,7 209:20 210:16 210:19,24 211:2 252:13 355:19 356:1,3 356:7,17,19 357:6,7 359:22 380:9 385:4 412:22 413:4 420:2 494:16 494:20
**faculty** 55:22 56:18 57:6 413:10
**failed** 456:7
**fails** 504:18
**failure** 135:5 155:18
**faint** 315:16
**fair** 60:16 64:5 102:21 105:5 109:2 112:23 141:24 157:14 159:10 184:22 184:23 186:17 191:3,4,10 196:23,24 198:1 200:18 202:23 205:8 217:12 219:16 219:24 239:8 241:6 246:9 249:16 285:15 285:17 317:8 317:10 333:8 344:8,18,20 346:1 388:25 389:10,11 409:14 417:22 444:25 454:25 463:6,7 476:16 482:3,4
**fairly** 174:10 310:6
**faith** 456:5
**fall** 104:21
**fallopian** 180:17
**false** 345:3 456:2 462:17 463:1
**falsehoods** 345:8,10
**familiar** 111:17 111:22 113:21 115:3,8,10,15 208:1 217:18 273:12,21,23 330:19 372:24
**family** 51:17 133:3 276:24 476:25
**far** 43:19,20 153:4 204:13 204:25 205:18 205:24 258:4 291:13 381:20 424:7 432:25
**farley** 235:18 455:16 457:1 457:10 462:18
**farley's** 455:19 455:23 457:2,3 457:4,19,23 458:13,23 462:16
**farook** 30:4,5
**fashion** 390:1 455:5 482:10 482:10
**fast** 161:2
**favor** 469:18
**fear** 101:4
**feature** 144:15 144:17 145:15 156:3 410:21
**featured** 464:6
**features** 141:12 141:12 143:23 148:11 149:16 289:17 409:25

**february** 1:15 2:19 14:1,5 19:9 46:10 47:1,5,8,11 48:5,12 58:21 59:17,17,18 355:19 361:1 379:13 503:22 504:3
**fed** 407:21
**federal** 16:13 503:14
**federer** 7:5
**feedback** 151:22 199:1,3 199:5 202:6,7
**feeds** 199:10,11
**feel** 18:18 27:6 54:1 98:6 100:7 118:21 136:16 218:6 337:21 392:16 457:4 459:12
**feeling** 343:9
**feet** 468:20
**fell** 83:6 369:14
**fellows** 57:21 63:3
**fellowship** 55:14,18,25 56:1,3,4,6 66:3
**felt** 163:13 177:9 340:14 341:19 457:6 468:13 471:5
**female** 242:9 250:25 251:15 252:15 253:9 254:11 385:5
**females** 236:16 250:9
**fertility** 60:20 62:4 63:19,21
**fetal** 413:18
**fields** 71:6 295:20
**figure** 28:19 32:1 114:3 264:13 266:13 266:24 314:18
**figured** 40:8
**figuring** 104:9
**file** 234:6
**filed** 14:16
**filled** 280:12
**final** 39:5 146:21,25 153:12 154:10 154:15,16,24
**finalized** 27:13 148:24
**finalizing** 26:24 27:2 191:2 383:1
**finally** 240:10
**finances** 60:4
**financial** 3:15
**financially** 14:25 503:17
**find** 29:9 43:25 44:19 49:15 50:11,15 53:1 53:6 61:7 69:19,22 88:7 94:9 108:2,8 159:13 163:4 225:25 226:2 232:23 264:3 332:6 374:13 374:13 410:6 414:1 429:18 432:6,6 455:22
**finding** 49:24 52:19 290:12 314:10,12 417:13 430:9 430:11,13 432:8 437:24
**findings** 100:10 290:3 293:8 295:9 302:14 308:10,25 342:5 347:8 385:6 419:22 426:12,12 436:15 445:20 446:18,25 495:16 499:15
**fine** 28:2 32:3,7 32:11 44:24 48:20 49:21 52:23 114:16 118:13 119:2 170:3 176:15 214:20 325:25 326:1 343:2 344:5 359:7 378:23 379:6 390:6,7 397:23 475:22 481:4 492:25
**finely** 108:3
**finish** 18:11 103:1 148:5 169:2 187:17 188:11 213:9 227:7 238:9 290:25 291:3 310:9 325:16 334:6 337:18 343:3 345:20 358:21 373:15 377:14,15 395:23 396:16 419:4 435:16 443:21 467:15 468:10 470:23 479:15
**finished** 103:10 257:11 325:18 396:11 419:5
**first** 22:18 33:5 38:10 46:22 53:18 56:4 76:8 77:21

85:21 94:19 99:19 101:10 101:15,21 119:25 120:14 132:3 136:5 144:10 147:10 181:20 191:7 208:8 229:19 238:14,20 240:12 242:5 249:5 271:8 284:14,15,18 284:18 319:3 326:16 327:15 327:16 345:23 350:16,24 351:22,25 352:1,6,8 360:1 371:21 373:7 421:16 440:20 448:3 458:8 468:2
**fish** 127:13
**fit** 144:7 148:17 264:19 431:4
**fits** 140:25
**five** 62:19,20 244:24 352:17 353:12
**fix** 379:23
**flashing** 244:24 245:1
**flat** 310:12
**flatiron** 285:4 285:13
**floor** 5:20 6:7 479:2
**florida** 5:14
**flow** 80:17
**fluctuations** 200:1,6
**fluid** 178:8,21
**fo** 11:9 221:2 221:22 223:4,6 225:6
**focus** 61:1 63:11 64:3 66:1 103:4,23 103:25 122:2 126:6,21 129:11 189:7 205:17 207:1 207:22 208:17 208:20 268:7 383:13
**focused** 56:5,6 56:14 63:17 65:10,18 73:25 80:8 102:10 116:11 129:25 167:5 236:24 238:25 241:11 442:1 451:25 464:15
**focuses** 60:20 207:24 283:21
**focusing** 391:11 392:3
**fodder** 254:19
**fold** 258:13 260:6
**folder** 32:12,17 39:6,21,22
**folks** 276:23 279:15 296:16 309:9 326:23 327:14
**follicle** 128:4 132:13 135:15 135:21 177:19 178:3
**follicles** 127:17 131:9 135:24 136:5
**follicular** 136:7 178:8,21
**follow** 230:4 295:16 404:19 407:5 410:10 431:8,8
**followed** 450:11,21 473:6
**following** 12:20 116:25 120:18 124:11 136:6 248:9 319:17 349:24 437:10 476:20
**foregoing** 502:5 503:5,7 503:11,13 506:5
**forever** 173:23
**forget** 29:13 320:15 438:24
**forgive** 223:6
**forgot** 58:18 203:18 296:17
**forgotten** 338:22
**form** 41:19 77:24 80:15 82:24 84:2,15 88:23 89:16 90:7 93:1,10 93:20 94:10 97:7 98:9,17 100:21 105:6 105:19 109:17 117:13,25 118:1,14 124:25 137:8 138:2,5 141:10 152:6,12 155:7 156:7 157:25 158:7,14,24 159:11 161:18 163:20 164:24 167:17 172:21 173:17 174:17 174:23 176:6 179:15,22

181:4,9 182:11 183:6,22 184:5 184:24 185:11 186:3 193:18 194:2,19 197:17 200:3 200:19 201:10 201:24 202:24 203:4,9 204:8 204:16 205:3 205:21 206:4,5 206:22 207:4 207:15 208:14 208:18,22 209:10,22 212:1,14,21 213:2,25 214:8 214:25 215:13 215:19,25 216:8,22 217:5 217:13 219:11 219:17,25 222:22 225:14 227:4,13 228:5 228:18 229:1 233:21 237:7,8 237:25 241:14 242:19 243:4 243:17 244:2 245:13,19 246:10,22 249:17 250:8 251:17,23 252:17 253:11 253:25 254:13 260:9,21 262:18 271:19 273:16 274:9 274:15,24 277:1 279:19 281:10,16,23 282:8,17,20 285:16 287:9 288:13 289:1 289:12 290:13 294:15 295:10 296:5 297:8 299:1,18 300:4 300:17 303:4 303:17 304:4 307:19 308:1 309:1 310:4,19 310:22 311:10 311:23 312:11 313:4 314:15 314:20,23 316:1,15 317:9 318:18,24 319:25 321:24 322:12,22 323:5,19 324:18 325:13 329:21 331:17 332:1 333:10 333:23 334:25 338:6,16 340:1 341:23 342:6 342:13,22 344:9 347:10 354:17,23 355:9 356:12 358:1,9,14,19 359:19 362:12 362:18 363:19 382:2,10 383:12 385:22 387:17 388:3,9 388:16 391:13 392:8 393:14 394:9 395:4,20 395:21 396:1 397:17,20 398:11,22 400:1,12 401:1 401:13 402:4 403:11 404:10 405:6 406:3 408:10 409:19 411:3 414:3,19 415:16,20 416:2 417:24 418:25 419:6 421:9,19 423:4 423:18 424:17 425:6,16 426:4 426:21 428:23 429:5,24 430:14 432:1 433:10,23 434:10,15 435:4,14,23 438:9 442:24 445:21,25 446:3,21 447:24 449:6 450:5 451:6 452:17 454:6 455:9,21 457:17 458:17 459:6 460:9,21 461:20 464:18 464:21,24 465:14 466:1 466:14 467:2 467:25 468:25 469:7 470:24 472:25 473:3 473:21 474:4,8 475:1,8,24 476:3,17 477:2 477:18 478:1 478:20,24 479:24 482:11 485:22 486:1 486:12,17 488:25 489:13 489:25 490:10 490:14 492:12 492:22 493:8 494:4,8,14,23 495:7,19 496:7 496:11 498:9

**formal** 73:18 273:14

**formally** 74:8

**format** 41:13 80:9 246:24
**formation** 416:18
**former** 278:21
**formerly** 431:4
**forms** 94:15 135:14 307:16 401:4 484:8
**formula** 106:21
**formulas** 106:14 109:8 133:6
**formulated** 109:15
**formulation** 352:10,25 415:5
**formulations** 285:25 286:23
**forth** 28:13,14 178:16 296:17 410:7 503:6
**forthcoming** 454:9
**fortunately** 452:19
**forward** 63:9 98:23 293:2 326:1 377:19
**found** 99:17 357:18 359:10 408:16 418:6 419:23 430:17 471:9 472:18
**foundation** 117:6 273:6 397:18 398:12 398:23 400:2 400:11 401:2 401:14 402:5 403:10 404:3 405:7 406:4 408:11 409:20 411:3 419:7 422:25 423:5 423:19 424:18 425:7,17 426:4 428:24 429:6 429:25 434:11 435:24 449:6 450:6 457:18 458:2 460:10 460:22 461:21 489:1,14 496:8 496:12
**foundational** 114:12
**four** 47:13,14 48:4,6,11 55:9 62:18 244:24 301:21,22 302:1,6,6 353:1,14,16 398:17 405:16 422:5 423:14 423:23 438:4
**fourth** 55:11
**fraction** 224:15 226:9,21 227:18,25
**frame** 46:8 210:11
**francisco** 55:22 55:24 56:18
**frank** 238:10 240:16
**franklin** 9:12
**frankly** 182:1 457:12
**free** 54:1 183:1 184:19
**freely** 472:17
**frequency** 211:7,10,16 261:13 301:16 326:15 327:14 327:15 405:10 427:5 436:7 490:8,24 493:7 493:11,15,23 493:25 494:10 494:21 495:6 496:16,17 497:5
**frequent** 20:21 276:11 305:10 312:24 313:2 314:10,12 405:25 422:4
**frequently** 280:20 281:7 316:18 317:2 420:7
**front** 24:21 26:19 28:7 44:12 45:16 54:2 257:19 268:11,14 269:2 289:23 329:2 349:16 356:2 376:9 384:3 420:20 437:15,16 442:7 471:24 472:1
**fsh** 135:21 146:5
**fu** 3:14,20
**full** 155:15 258:4 276:20 287:20 288:12 288:21 352:5 365:12,15 367:19 371:19
**fully** 413:22 424:8
**function** 123:15 184:13 185:4 202:12 432:19
**functions** 198:10 465:17

**fundamental** 148:7
**funded** 452:19 463:10
**funding** 68:13 452:21 463:9 464:4,5
**funds** 61:21 62:1
**funny** 285:20
**further** 49:4 359:10 419:22 432:9 462:14 487:5 491:10 491:11 495:13 496:21 497:2 498:23 499:23 499:24 500:3 503:13,17
**furthermore** 373:25
**future** 129:9

**g**

**g** 36:4 232:18
**gain** 115:25 121:8
**gal** 36:3
**games** 479:17
**gamut** 187:2
**gander** 397:25
**gaps** 276:9
**gary** 4:11 15:16
**gateway** 8:6
**gathering** 468:19
**geared** 407:19
**gears** 269:18 272:22
**gel** 111:20 112:22 113:5 332:24 333:3,7 333:20,22 334:11,12,20 334:22,24 354:16 483:1,6 484:21 485:17
**gemish** 192:8
**gene** 92:16 177:3 380:18 407:4,25 408:3 417:3 419:15 419:20 437:1 456:11,13
**general** 49:1 55:1,6 113:25 114:2,3 123:4 177:14 198:3 199:18 200:9 200:12 374:3
**generalize** 150:12 242:20
**generalized** 122:21 253:22 498:11
**generally** 52:3 52:5 64:7 75:8 79:2 88:21 98:4,5 111:19 130:2 167:24 171:24 177:9 186:14 196:2,5 197:23 219:4 219:15,23 242:18 291:8 293:5 303:19 334:9 337:10 404:20 457:1 465:10
**generated** 82:9
**generation** 393:6
**genes** 408:15 408:19,20 416:17 453:9
**genesis** 177:7 410:18
**genetic** 72:25 83:24 84:13 94:4 276:14 380:15 416:17 416:21 451:13
**geneticist** 72:23
**genetics** 363:15 459:23
**genital** 242:10 352:13
**genitalia** 413:23
**genitals** 353:10
**george** 6:5
**georges** 35:12
**gerel** 3:3 15:14
**gestation** 332:15,22
**getting** 38:5 117:18 136:22 149:11 173:1 190:14 257:6 323:9 346:17 355:16 414:12 427:22 440:2 458:21 493:24 497:20
**ginex** 5:4
**give** 17:19 23:14 32:5 34:11 36:16 44:3 50:21 51:15 92:13 97:16 99:6 106:11 114:9 119:13,21 138:16 184:25 201:6,12 232:19 244:25 259:5 267:20 270:7 272:2,9 298:12 326:9 349:21 367:18 372:15 379:22 451:21
**given** 22:9 24:18 27:14,22

69:13 95:24 140:21 252:19 263:19 270:25 302:13 364:11 404:22 415:1 424:21 458:14 500:25 503:12 506:9
**gives** 51:13 117:8 119:16 278:23 410:17 411:20 448:5
**giving** 392:6
**glad** 22:23 83:19 298:1
**gland** 135:22 136:4
**glands** 131:10 135:11 472:19
**glandular** 179:11 182:2
**glycone** 223:15
**go** 14:11 16:17 17:1,15 23:22 24:10 28:14 44:5 47:24 50:8 52:17 56:22 74:4 78:20 92:11 99:14 101:6 103:22 108:7 117:15 118:22 120:9 122:16 122:24 127:4 127:24 134:24 142:24 154:1 177:23 191:5 193:2,6,9,15,17 213:1 223:2 233:11 238:1 239:22 244:21 244:23 247:12 248:11 249:3 252:5 256:19 258:2 263:9 264:2,4,21 272:10 285:1 289:22 296:13 304:21 320:14 325:7 326:12 335:3 336:7 340:2 345:6,14 345:18 347:2 348:7 359:3 362:20 364:13 372:10,17 378:19 380:6 387:18,21 389:15 392:9 392:18 396:3 401:15 402:22 404:14 406:7 416:5 421:24 423:20 424:5 426:4 428:10 432:18 448:7 449:7 458:4 460:24 461:11 461:22 471:14 479:17 487:23 494:1 500:6
**goal** 118:11
**goals** 63:11
**god** 81:6
**goes** 30:14 79:9 83:2 131:13 132:2 221:17 223:14 267:21 336:20 356:15 357:5 358:23 359:9,22 360:12 381:5 403:2
**going** 14:5 15:23 18:25 23:14 26:5 28:13 34:11 35:6,9 37:9 40:8 44:3 50:5 53:10 70:3,3 74:15 76:12 78:19,22 81:7 104:16 110:8 118:19 120:8 126:2 132:4 133:9 142:1 159:9 161:1,1 163:6 166:24 172:4 188:20 192:1 194:19 234:11 239:6 255:7,8 270:7 272:1,8,10 282:3 297:17 303:22 306:10 317:12 345:7 364:14 366:1,3 366:4,8 367:6 370:5 374:16 374:20 389:12 390:3,18 392:15 397:1 402:9 403:15 420:13 440:25 441:1,1 451:20 499:25
**goldberg** 6:12
**goldbergsega...** 6:17
**good** 14:4 15:7 15:10,13,16 17:14,19 31:23 35:7 38:16,19 38:20 39:24 43:18 53:10,14 70:4 71:13 78:15,17,18 110:11,13,14 110:25,25 169:3 170:8,20 202:8 255:17 272:20 315:18 315:21,24 348:7 350:19 387:4 390:13 426:9 427:24

427:25 428:4,5 428:12,13,16 432:21 465:11 471:11,13 499:21 500:18
**google** 50:16,17
**goose** 397:24
**gore** 11:12 30:9 30:9 234:21 237:19 245:25
**gotten** 442:13
**grade** 179:14 179:21 180:3 180:10,16,19 180:23,24
**gradient** 274:13,22
**grant** 61:19 62:1,13,14,15 62:16,17,21 63:1 452:20
**granted** 62:12
**grants** 61:24
**gray** 86:7,12,13 86:19 87:7 250:8,10
**great** 178:9 476:16 477:1 477:16
**greater** 171:18 174:19 204:13 204:25 205:18 262:11 279:9 301:22 302:1 326:24 327:19 328:2,2 405:16 422:4 423:14 423:23
**ground** 16:18 468:20
**group** 135:8 218:17 223:15 241:1 267:10 267:11 343:5 363:3,5,8,9 374:7 376:19 395:15 418:22 448:18,20,25 449:1 463:18 463:25 480:25
**grow** 135:23 136:5
**growth** 136:7 149:12 165:10 165:13 198:10 406:14 407:14 408:21
**gshipman** 4:15
**guarantee** 17:24
**guess** 19:14 30:15,16 32:1 33:11 34:7 35:14,21 36:25 38:3 42:12 44:8 47:23 48:2 60:2,2,11 114:9 121:14 127:3 218:23 222:2 233:22 241:6 384:22 434:20 475:3
**guessing** 84:9 84:11
**guidance** 150:12 339:16
**guidances** 217:21
**guides** 165:3
**guo** 8:13
**guy** 294:1
**gyn** 55:1
**gynecologic** 36:18,25 71:17 71:20
**gynecological** 317:7
**gynecology** 54:8 70:19 71:2 295:17

**h**

**h** 37:7 76:9 352:9 505:3
**hair** 1:5 2:5 12:10,12,14,18 13:9 14:15,16 16:12 52:13 67:9,23 69:5 85:4,14 86:7 86:12,13,19 87:7 94:23 102:5 103:5,24 106:15,15,18 106:19 107:11 108:5,22 109:9 111:3,4,8,10,15 111:15,18,18 112:4,17,23 113:2,11,13,23 114:18 115:9 115:11,14,21 120:19 121:8 122:6,11,11,22 123:8 124:12 125:4 127:17 128:4 129:25 130:5,13 131:9 132:13,13 134:7,12 136:21 137:5 137:22 138:10 139:13,23 140:8 141:8,22 142:18 149:12 157:23 158:5 158:13 166:19 167:5 168:3 187:3,7,12,22 188:13 189:16 190:20,20 191:10,15,24 192:12 193:5 193:16,23 195:5,7,19 196:2,4 206:8

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 558 of 640 PageID #:74106



214:17 226:15 227:12 228:2 228:24 229:12 231:8 233:20 261:14 267:12 271:13 280:21 280:22 281:1,8 281:13,13,20 281:21 282:6 283:21 284:4 284:10,23 285:2,3,6,8 290:4 299:6,17 300:2 303:1,6 306:12 307:5,6 307:25 308:15 316:13,18 317:1,7 318:4 318:7,9,14 319:3,6,9,9,18 319:23 320:20 321:10,13 323:23 325:12 329:13 330:11 330:23 331:2,8 331:16,25 333:9,14,15 335:18 338:5 338:15 339:12 341:6 357:12 357:19 362:3 362:10 364:1,5 368:12 370:15 373:1 374:6 382:20 385:3 385:10 391:6 391:10,23 393:5,17 394:7 395:9,10,13,22 396:7,8,9,9,23 397:7,8,12,14 398:8,17,18,21 398:24 399:21 400:8,18 401:8 401:10,11,20 402:1,13 403:8 403:13,25 404:9,17,25 405:4,21 406:1 407:7 408:8 409:5,17 411:1 412:25 414:1 414:21,22,24 415:1,8,9,14 416:1 417:16 417:19 418:10 418:22 420:5 420:10,11,25 421:1,6,17,17 422:14,18,23 423:1,3,11 424:15,22 426:14,14,19 426:25 427:12 429:19,20 431:16 433:8 433:20 434:8 434:14,19 436:4,5,21 437:25 438:11 441:20 442:3 442:10,14,21 444:16 445:12 446:15 448:17 449:10,17,18 450:1,1,3,20,22 451:4,14 452:13 453:7,8 453:22 454:3 454:13,15 455:7 456:16 456:20 458:15 459:4 460:6,18 460:19 461:6 461:17 462:1,4 462:5 466:25 467:20 468:24 469:17 473:19 477:20,25 478:11 480:25 481:1 482:8,17 482:23 483:5,8 483:9 484:4,23 484:24 485:18 485:19,21 487:18 488:4,6 488:7,13,18,24 489:7,10,23 490:9,18 496:6 497:12 498:12 498:13,17,18 499:2,3,4,18,18 504:4,4 505:1 505:1 506:1,1

**haircare** 186:12

**half** 28:25 35:10 99:9,14 110:10 181:21 276:20 333:4 412:3 436:11

**halfway** 120:14 236:20

**hall** 35:1 39:9 414:7

**hand** 32:14 74:19 130:24 169:8,9 236:2 236:19 241:20 258:4 277:4 284:8,13 308:5 350:25 351:20 351:25 352:1,3 352:4 468:12

**handed** 364:8 365:13 380:2 441:3,7,8

**handful** 245:6 245:22,23 246:8 247:17

**handicap** 429:14,17

**handicapped** 469:11 470:5

**handwriting** 30:24 36:19

265:11 471:12
**handwritten** 34:7,19 37:14 38:22
**happen** 17:24 24:8 231:13 233:7 245:1
**happened** 80:6 83:15 108:8 263:15
**happening** 92:15
**happens** 92:14 397:13 398:20 475:16
**harbor** 4:5 55:1 55:6
**hard** 40:11 237:16
**hardip** 6:13
**hardy** 8:12
**harm** 209:19 210:7,16,23 211:21 432:5
**harmful** 200:18 200:24 381:7
**harris** 11:14 34:18 230:3,9 230:19,20,24 231:3,7 232:11 233:8 256:3,11 257:14 268:5
**hastily** 262:4
**hazard** 290:17 291:15 292:7 292:10 298:8 300:20,22 301:1,8 305:11 305:24 309:12 309:18 310:10 310:16,17 311:6 313:1 314:10 321:8 321:17 322:4,8 323:13,14,16 323:24 324:9 324:15 327:10 327:22 328:9 421:15 422:6 422:13 423:10 423:12,15,23 424:8,16 425:2 429:21 430:24
**he'll** 271:5
**head** 17:20 35:19 38:2 59:24 79:25 211:6 400:20 485:2,3
**health** 11:6 12:15,16 13:13 32:19 68:13,20 89:12 90:5 146:18 154:25 196:9 200:18 200:25 232:12 249:9 257:25 276:4 278:13 280:13 308:15 316:6 317:4,14 317:24 318:12 329:16 339:16 339:18 378:19 385:5 427:20 434:7,13,16 445:8 467:23 469:10,22
**healthcare** 378:18
**healthy** 351:15
**hear** 139:1 207:18 338:10 391:18
**heard** 161:24 162:9 274:2,4 345:11,12 396:14 397:24 412:21 482:5
**heart** 86:8,13 86:19 87:7
**heat** 113:22 114:17 285:14
**heated** 285:4
**heavy** 321:14 321:17 322:5,8 323:7,13,23 324:17 325:10 326:15
**heindel** 30:10
**held** 392:23
**help** 16:18
**helping** 93:13
**helps** 136:5
**herb** 223:8
**herbs** 11:9 221:3,15 223:22 224:6 255:25
**hereto** 506:7
**hernandez** 13:8 29:19 382:15 384:2 385:18 387:7,9 446:11 446:12 454:19 466:17
**hey** 294:2
**hierarchy** 89:5 91:1,23 92:4 158:19
**high** 37:2,4 63:4,5,8 94:8 128:1 145:3 179:14,21 180:3,10,16,23 223:3,11 236:4 236:11 308:13 336:15,16,23 336:24 359:12 399:1,22,22 400:17 401:20 402:2 410:12 417:15 418:17 430:18

**higher** 90:3 166:14 287:20 288:11,20 310:17 311:6 312:25 324:16 325:10 335:16 418:21,21 422:13 423:15 472:20
**highest** 91:4
**highlighted** 85:3
**highlights** 362:4 364:2 439:25 440:3 441:21
**highly** 374:25 375:16 402:2 415:3 420:9 422:5
**hill** 74:6 272:25 273:2,7,13,14 274:2,6,14,23
**hired** 455:20
**hirsutism** 136:13
**hispanic** 277:24 278:9 287:18 288:19 305:7 306:22 306:23 309:17 310:1,16 311:7 311:20 313:1 314:11 317:2
**historic** 319:23
**history** 276:12 276:24 277:5 277:10 279:11 279:17 280:13 348:24 432:13 496:13,16
**histotypes** 232:3
**hit** 399:6
**hithunter** 266:7
**hits** 403:6
**hold** 71:19 239:10 256:16 305:3 343:3 390:19 391:10 451:16 454:5 455:5 457:12 459:1
**home** 38:6 289:15
**homeostasis** 199:16,17,22
**honest** 50:2 80:19 190:10 218:20 272:13 334:9
**honestly** 252:20 293:21
**honesty** 459:12
**honored** 18:18
**hope** 84:16 176:8 186:13 188:7
**hopefully** 389:25 451:25 452:2,4 493:6
**hops** 221:22 222:13,20 224:20
**horizon** 238:18
**hormonal** 160:5 201:9,21 202:14,22 209:19 210:4,6 210:15,23 211:20,24 361:8,9
**hormone** 11:22 12:21 13:9 56:12 135:21 135:22 136:3,4 169:13 197:25 198:6 199:6,9 199:13 200:1,6 200:17,23 203:3,8,23 236:16 237:1 239:1 250:9 271:13 331:6 349:25 382:21 385:5 432:24 437:11
**hormones** 60:20 135:9,25 198:20 245:5,5 249:14,16 354:1
**horn** 441:11
**hospital** 55:1
**host** 419:11
**hot** 39:6 244:24 245:1 285:13
**hour** 20:16 46:17 48:16 58:9 99:15 110:9 255:9 333:4
**hours** 19:9 20:17 21:3 46:2,7,13 47:7 47:13,14,22 48:4,11 49:12 49:14 58:7,11 100:5 255:9 260:22 333:4,5 347:24 353:2 353:14,16 390:18 391:4 406:6 416:4 438:4 459:16 476:18 478:2
**house** 7:12 8:3 47:18
**hpassananti** 6:17
**hr** 290:5 327:6 327:20 328:5
**huge** 19:3 62:17 420:6

**huh** 34:20 42:11 71:10 79:14 84:24 131:3 155:16 171:21 173:8 198:8 223:20 223:24 233:4 234:24 235:1,4 241:24 250:18 277:22 278:2 280:8 283:20 290:7 306:24 351:3,17 355:22 357:14 381:2 420:18 437:16 442:6 447:4
**human** 88:20 90:1 91:5,17 92:23 93:7,14 99:22 101:12 121:8 127:9 128:8,17 134:8 158:23 159:10 160:7,21 161:25 162:17 163:3,6,9,11,18 164:23 165:1,6 165:22 167:15 168:5 200:18 202:23 266:10 406:13 407:13 411:6,6,9 416:12 431:23 431:24 432:2 465:23 466:12 468:19 473:23 475:6,23 486:15
**human's** 161:25
**humans** 12:22 88:13,20 89:14 92:9 93:19 94:1,5 98:22 101:6 127:12 159:16 349:25 351:10 432:10 432:17 437:11 465:10,22 466:8 468:19
**hundreds** 18:22 61:22
**hydrophilic** 399:5
**hygiene** 340:23
**hyperandrog...** 33:18 136:11 143:24
**hyperinsuline...** 183:16 184:3
**hyperplasia** 33:17 137:19 182:5,10 185:10 406:25 407:1 408:17 408:17
**hypothalamic** 56:8 60:23 432:23
**hypotheses** 93:9
**hypothesis** 137:5 159:18 159:22 321:23 471:6
**hypothesize** 286:25
**hypothetical** 484:19,20 485:8,9,11,14

**i**

**i.e.** 63:24 260:12 396:7 398:19 419:11
**ian** 7:14
**iarc** 441:11
**idea** 39:19 369:12 425:19 444:25 470:2 484:12
**identification** 23:12 26:16 43:23 45:8 121:16 128:20 146:16 220:22 234:16 260:1 264:24,25 265:1 270:9 275:9 280:3 283:5 306:8 315:10 317:17 328:23 350:8 355:11 360:22 379:9 382:16 390:8 439:14
**identified** 195:9 206:16 255:21 257:14 355:4 446:16 471:19 472:13
**identify** 26:6 28:9 102:3 128:24 152:15 169:8 193:3 220:25 233:16 234:18 262:1 263:11 275:24 302:15 349:12
**identifying** 285:22 286:20
**ignorance** 223:6 470:12 471:3
**ignorant** 113:8 470:13,17,22 471:1
**ignored** 310:12 431:3 455:24 455:25
**ii** 243:8,14 244:6
**illinois** 1:2 2:2 4:20 5:7 6:22

7:8 8:22 9:13 14:18 16:13 448:21
**illuminating** 334:16
**image** 146:9
**imagine** 80:22 153:10
**immediately** 352:9
**impact** 161:14 401:23 405:2 405:21 412:11 415:10 421:5 421:14,21 423:9 424:14 426:25 427:10 429:2,19 434:7 434:13,16,23 438:8 450:2,22 453:5 457:11 457:20 458:14
**impacted** 499:16
**imperative** 432:15
**impetus** 143:5
**implantation** 135:17
**implement** 432:7
**implicated** 149:4,9 183:21 408:19
**implicating** 385:3
**implied** 211:8 480:16,18
**imply** 480:23
**implying** 188:7
**importance** 293:6,11 430:13
**important** 16:21 98:2 99:18 100:17 119:12 153:24 157:13 159:13 161:5 163:18 163:22 244:19 274:13,22 291:25 292:15 293:1 314:5 403:17 413:13 413:17 417:14 431:7 433:9 435:11,13,17 437:5
**importantly** 17:17 53:13 62:24 408:18
**impossibility** 458:1
**impossible** 395:12 452:25
**imprecise** 298:18,24
**impression** 430:1
**impressive** 422:7
**improper** 367:9 367:10,11 372:6,6 374:25 375:16
**improve** 184:13,15
**improving** 122:4 185:4
**inaccurate** 463:3
**inadequate** 372:5,19 444:15
**inapplicable** 467:24 468:3,6
**inappropriate** 196:8 253:18 325:22 341:19 466:10,13,22 467:4 477:7,10 477:15
**inch** 28:25
**incidence** 158:12 242:10
**incidences** 242:17
**incident** 12:13 298:19
**include** 41:24 54:18 66:8,13 66:18,23 79:11 156:24 190:8 208:17 209:8 209:13,16 215:7 313:9 380:24 386:21 387:14,15 403:22 441:4 442:12 443:5 443:17 499:9
**included** 22:17 68:16 88:10 96:12 169:24 191:15 289:16 329:6 371:6 393:5,13,22 421:6,16 471:7 471:8
**includes** 127:16 207:21 212:8 389:6 394:24 430:10 493:6
**including** 15:3 71:6 73:3 78:5 178:10 206:2 232:21 240:20 241:5 295:20 339:16 360:4 362:4 364:1 388:17 403:20 411:4 423:10 429:15 441:20
**inclusion** 125:1 424:14,21

469:17
**income** 58:23 59:9,19 60:7
**incomplete** 369:10 370:7 371:17 372:15 375:1,4 379:23 421:22
**incorrect** 136:24 137:10 144:3 455:24 459:9
**increase** 138:21 138:24 139:3 142:13 176:5 183:5 184:18 206:20 356:4 357:6,21,24 358:10 423:12 425:1
**increased** 85:5 85:5 139:17 158:12 171:16 172:12,16 175:24 176:1,2 331:6 359:11 385:8 406:22 406:25 416:16 417:4 426:15 427:18 436:14 467:23 472:18 489:22,22 490:8,9 495:16 496:5
**increases** 137:19 155:23 183:1 223:15 242:11 320:20 361:14
**incredible** 99:11 452:21
**incredibly** 151:2 325:21
**independent** 243:10,25 244:4 445:4,5 447:11 463:24
**independently** 183:4,8
**indicate** 31:5 112:19 148:11 291:21 303:22 390:23 393:9
**indicated** 28:6 101:3 113:16 134:2 177:11 194:23 241:15 253:20 260:23 297:16 314:24 369:21 417:8 429:7
**indicating** 266:22
**indicative** 299:16
**indirectly** 184:8
**indisputably** 454:12
**individual** 193:2 287:1 394:6 419:15
**individually** 247:3 253:4
**individuals** 99:14 123:18 171:19 218:6 218:18 278:9 300:10 302:2 307:22 376:19 410:20
**induce** 420:3
**induced** 11:22 37:20 169:12
**induction** 394:17 408:15
**industrial** 340:23
**industries** 9:9
**industry** 449:9 463:11
**inevitable** 203:2
**inexplicable** 410:14
**infant** 473:23
**inference** 186:13
**inflammation** 408:22
**influence** 353:25
**information** 51:14 69:1 77:18 80:17 89:13 95:20 105:22 106:12 107:1 113:17 116:15 126:24 143:12 160:12 174:1 254:22 255:23 269:16 277:19 278:12 278:23 298:4 305:6 343:12 363:13,14 378:13 417:13 419:23 430:22 432:25 444:15 447:22 448:10 457:7 492:15 496:3
**informative** 88:21 99:24 164:8
**infrequent** 429:15
**infrequently** 20:17
**infusions** 99:15
**ingenuity** 62:12
**ingested** 471:20
**ingestion** 215:5 402:14,22,22

472:9 482:20
**ingredient** 106:20 189:3 414:22
**ingredients** 11:19 107:10 109:9 116:4 169:20 188:2 191:25 194:24 286:23 391:5 391:22 394:6 394:21,22 399:25 487:18 488:12
**inhalation** 402:21,24 482:20
**inherited** 380:19
**initial** 421:25 422:3 447:7 453:15 499:20
**initially** 335:21 345:17 411:25 433:14
**initiated** 253:2 404:21
**initiation** 249:16,22 250:4 404:16
**injection** 161:16
**injury** 432:4,10
**innate** 251:3 252:8 253:7
**inner** 399:5
**input** 177:12 339:9
**inquire** 24:22
**inquiry** 25:18 49:5
**insert** 106:25
**inserts** 108:11 108:11
**insinuation** 477:11
**insisted** 487:16
**insisting** 367:3
**instance** 100:4 239:20 260:14 399:1,2 417:3 423:14
**instances** 148:16 229:21
**institute** 32:18 68:17,19 360:25 361:22 361:23 362:8 362:13,16,22 362:25 363:10 376:17,18 445:5 453:23
**institute's** 363:12
**institutes** 11:6 68:13 146:18 154:25 445:8
**institution** 430:18
**institutions** 61:24 62:19,20
**instruct** 111:19 367:7
**instructed** 10:10
**instructing** 367:4
**instructions** 111:19 112:17 483:23
**instructs** 119:6
**insufficient** 241:1
**insulin** 99:15 144:2,7,14 146:5 183:12 184:2,15
**intake** 402:24
**integrate** 417:21 497:17 497:19
**intend** 388:1,7 389:5
**intended** 94:9 152:3 192:17 480:24
**intending** 140:8,15 469:24 470:3
**intense** 376:6
**intent** 134:9,16 190:3 192:21 192:24
**intention** 117:22
**intentional** 304:9 372:16 374:2 480:22 480:23
**intentionally** 203:7,22 204:10
**intently** 235:19
**interact** 215:18
**interactions** 147:4,12
**interest** 62:5
**interested** 14:25 62:3 238:18 503:17
**interesting** 106:24 145:5 240:1 290:14 407:16 448:7
**interests** 66:8 66:13
**internal** 150:13 199:24 339:14
**international** 329:15
**internationally** 145:12
**interpret** 164:7 164:18 481:11

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 565 of 640 PageID #:74113




**interpretation** 289:13 315:1,2 333:17 378:6
**interpreting** 89:18 287:8
**interrupt** 25:3 104:8 150:7 220:1
**interval** 213:20 290:5,10 291:5 298:8 300:23 301:2,9 305:12 305:17,18 309:13,19 313:9,21 322:6 323:25 324:6 324:10 327:7 327:11,21 328:6,10 420:6 424:9
**intervals** 300:21 310:7 321:9 333:4 422:7
**introduce** 15:18 123:20
**invest** 103:19
**investigate** 476:8
**investigated** 161:4 215:10 252:22 346:19 419:22 474:23 493:3
**investigating** 236:23 238:23
**investigation** 74:18 247:2
**investigations** 150:13 436:16
**investigators** 94:12 150:20 160:9 226:21 238:16 252:25 428:21
**invoices** 48:20 48:22,25 49:2 49:5,8
**involve** 94:8 201:8 202:14 202:22 208:20
**involved** 63:5 149:19 186:16 190:20 393:8 395:9 396:19
**involvement** 63:10,13
**involves** 73:9 92:12 137:15 146:4 147:3,12
**involving** 37:9 37:18 343:16 413:8
**ionisable** 131:15
**iron** 423:7
**irregular** 136:14 171:15 172:12,15 410:1
**irvine** 6:15
**isadler** 7:18
**isolate** 260:12
**isolated** 237:8
**isomer** 205:23
**issuance** 154:24
**issue** 140:2 182:13,13 217:16 377:11 377:13,16 393:2 432:11 433:7
**issued** 23:8 293:23
**issues** 19:16 75:10 76:25 77:20 97:21 306:21 391:9 418:8
**issuing** 25:14
**italics** 351:21 351:24
**item** 199:9 205:11
**items** 24:2,3 257:6

**j**

**j** 37:7 232:18 349:14,14
**jan** 116:24
**janjua** 12:19 349:13 437:12 438:7
**january** 116:24
**jeff** 16:8
**jeffrey** 1:13 2:15 10:4,15 10:17,19,22 11:2 12:2 13:2 14:14 44:2 46:2 500:25 502:3,18 504:5 505:2,24 506:2 506:4,12
**jennifer** 448:17
**jensen** 9:20
**jf** 6:11
**job** 1:23
**jobling** 232:17 232:25 233:1,8 256:1,7 257:11 268:5
**john** 4:16
**johnson** 1:21 2:20 9:18 503:3,24
**join** 62:6 241:1
**joined** 55:21 56:18 57:6 413:10
**jolla** 16:10
**joshi** 37:7

**journal** 34:4 36:22,25 121:24 221:5 329:15 382:22
**journals** 26:9 65:14,16 73:25 228:23 248:9 294:12,16 295:7,11
**judge** 116:24 118:22 344:25 459:2 461:13
**judge's** 118:8
**jump** 114:11 390:18 397:1 420:13
**jumping** 348:13
**jury** 82:22 459:2
**justify** 459:13

**k**

**k** 3:5,6 4:11 30:2,2
**kc1** 185:23 194:16 195:8 195:12 197:2,3 197:12,16
**kc10** 185:23
**kc3** 196:19 197:2,12,16
**kc6** 196:19 197:2,12,13,16
**kcs** 197:20
**keep** 25:22 53:10 70:3 120:8 142:1 259:15 326:6 349:8 453:1 454:1
**keeper** 43:11
**keeps** 220:7,10 220:11 339:2 496:23
**keratin** 285:14
**kevin** 6:20
**key** 31:19 185:18 186:1 193:9 194:16 195:6,10 196:3 250:9,13
**keywords** 50:19 270:18 271:15
**kg** 336:16,17
**kim** 38:25
**kind** 30:19 38:13 43:10 80:17 103:21 150:11 235:18 253:20 254:6 264:12 272:13 285:19 294:2 297:11 298:3 315:16 369:14 422:10 477:10 478:25 500:11
**kit** 115:12,14
**kits** 106:16 108:23 115:16
**klein** 11:9
**knew** 107:2 449:17
**knock** 406:24 417:10
**know** 17:15,25 18:8 19:24 20:4,8,9,13 21:9 25:2,19 27:23 31:6 32:8,9 34:22 40:3,16 43:10 49:14,23 50:19 50:24 52:18,24 54:5 59:5,6,21 59:23 60:3 65:13 70:13 74:15 76:5 80:14,22 81:12 84:4,20 100:18 103:17 106:8 107:4 109:19 111:2 112:21 113:10,18 114:1,16,20 116:24 117:16 120:15 121:5 122:20,25 123:2 130:21 132:16 134:22 149:20,25 150:13 151:3 152:2,22,23,24 155:11 159:15 162:8 164:25 165:5,9 166:6 166:23 176:4 176:20 178:10 181:21 188:1 189:3,5 190:8 190:14,18,20 191:25 192:20 193:21 204:19 205:4,6 206:7 215:11,17 216:24 217:2 217:14,21 218:2,20 226:12,24 227:9,14,24 229:20,21 231:13,20 233:18 234:6 235:7,24 237:17 244:18 245:21 246:11 247:8 248:1 249:5 252:1,23 253:16 254:3,3 268:11,24 271:17 272:14 274:5,12,20 279:13 286:9 287:13 295:7 295:11,13

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 567 of 640 PageID #:74115



305:16 308:6 312:4 315:2 319:19 326:5 333:4,14,20 334:4,14 335:6 335:24 339:4 340:11 347:20 349:9 354:25 355:15 356:20 367:1,2,10,12 372:7 373:18 374:25 375:5 375:13 378:10 378:13 383:22 396:14 397:19 405:16 414:21 415:4 416:15 416:24 419:19 420:3 436:13 440:25 444:21 447:20,21 449:3,24 450:9 456:20 457:18 468:14,20 470:8,11 471:25 474:2,9 474:11,12,12 474:21,24 475:4,6,9,10,16 475:22 476:6,7 479:13 481:21 482:13,22 483:16,23,24 484:10,13 486:7,9 491:22 492:5,10,25 497:10 498:3,7 499:21 500:12 500:17

**knowing** 107:21 499:16

**knowledge** 110:2 113:14 113:25 114:3 115:25 205:2 207:20 209:15 433:1,16,19 453:18

**known** 265:17 265:19 356:17

**knows** 83:24 144:10,23 145:6 147:20

**koniecki** 332:16

**korach** 414:8

**l**

**l** 8:20 36:4 135:4 232:18 332:18

**l'oreal** 6:3,3,4

**la** 16:10 185:19

**laboratory** 5:10 55:12 91:6 416:11

**labs** 6:11

**lack** 42:7 93:8 251:4 252:9 253:24 325:11 365:11

**laden** 420:2

**laid** 81:5

**laila** 4:4

**language** 81:10 81:12 85:16 249:12 304:9 336:1 368:18 425:18

**large** 40:5 51:9 51:17 115:20 131:16 174:10 222:14 274:7 276:19 402:25

**largely** 450:17

**larger** 98:5 132:21

**largest** 224:3

**lasts** 360:15

**late** 344:25 371:8,9 375:25 376:5 427:4 458:21

**lately** 218:11

**latency** 251:7 252:11 254:10

**latest** 363:14

**lauren** 29:17

**law** 62:22

**lawyer** 45:23

**lay** 273:5

**layer** 101:12 484:10

**lays** 277:18

**lazy** 346:17

**lead** 33:19 121:23 129:2 182:6 234:21 270:2 276:2 349:13 430:22

**leading** 117:5 395:4 409:16 417:23,24

**leads** 182:10

**leap** 456:5

**learn** 84:12

**learned** 77:21 191:7 270:14

**learning** 35:20

**leave** 439:9 456:15,17

**leaves** 399:18

**led** 85:1 216:24

**lee** 11:18 35:25 169:18 265:7

**left** 57:5 81:8 130:24 236:2 241:20 266:6 280:6 284:8,13 389:14

**legal** 22:2,16 192:20 433:25 504:23

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 568 of 640 PageID #:74116



**legal.com** 5:9
**legitimate** 249:6
**lending** 178:22
**lends** 417:15
**length** 361:15 409:5
**lengthy** 193:7
**leslie** 1:21 2:20 7:5 16:20 53:13 70:6 503:3,24
**lessen** 429:18 430:12
**letter** 153:13,21 154:1 241:21
**letters** 226:4
**letting** 117:15 345:5
**level** 11:23 63:2 63:3,3 92:16 156:21 157:18 165:3,5,20,25 166:6,14 168:3 210:5,6 219:5 223:11 224:16 260:18 262:20 262:21,25 263:1,5 264:17 266:3 290:24 344:1 346:11 347:21 410:12 410:12 447:10 470:25 481:2,8
**levels** 12:22 63:1 136:12 145:19 155:21 156:4,6,10 158:6 167:13 168:1,1 178:19 183:1 184:18 199:13 200:1,6 203:8,23 212:19 265:25 266:3 337:5,9 337:23 349:25 353:25 409:23 410:7 437:11 467:22 493:11 493:12,20,21 493:22 497:6
**levitt** 2:16 3:12
**lewkowski** 5:19
**lfederer** 7:10
**lh** 136:1,3,6 146:5
**liability** 1:6 2:6
**liang** 11:21 35:16 169:10 265:4,7,15,16
**liar** 462:18
**libitum** 472:15 472:17
**licorice** 221:21 222:13,20 224:25
**life** 111:14 112:11,18 201:8 202:14 202:21 242:11 380:20 432:3
**lifestyle** 278:13
**lifetime** 94:8 282:19 404:12 405:22 427:11 494:3,13,20
**ligands** 12:5 270:5
**light** 208:5 321:14 326:14 427:10 428:22 429:4
**liked** 31:25 428:12 471:13
**likelihood** 171:18 417:16 429:18
**likely** 83:17 86:12 228:3 287:18 288:18 303:22 343:14 385:7 395:1 420:10 423:12 426:24 432:19 446:9
**likewise** 123:6
**lillegaard** 33:19
**limb** 44:5
**limit** 452:5
**limitation** 284:9,22 287:7
**limitations** 96:12,16 498:2
**limited** 110:3 132:6
**limits** 290:18 290:21 305:25 306:1 430:25
**line** 10:11 31:5 188:8 412:23 442:15,16 449:22 505:4,7 505:10,13,16 505:19
**lined** 146:13,14
**lining** 177:1 410:10,13,16 410:17
**link** 137:4 141:19 142:22 142:25 149:24 172:7 362:9 364:5 368:12 370:15 372:8 453:10
**linked** 133:5 142:10 149:13 176:19 177:12 381:22 408:3
**linking** 136:20
**links** 152:19
**lipophilic** 399:4 399:4
**lisak** 8:20 10:6 15:7,8,19 16:1

16:4 17:3,12
23:13 24:25
25:10,21,24
26:1,5,14,17
28:18,22 29:15
29:16,24 30:1
32:4,15,16,22
32:25 33:4,8
33:24 34:2,11
34:14,15 35:8
36:15 38:8,9
39:8 40:7,20
40:24 41:3,5
41:12 42:19,22
43:15,24 44:8
44:10 45:9
48:1,10,15
49:7,11 52:1
53:8,13,17,19
54:3 59:2,7,13
59:14,22 60:5
60:13 64:9,19
65:7 66:17,22
67:1 68:2,9
70:6,8,9,24
72:11,19 73:10
73:17 74:5
75:14 76:1,14
76:17,19 78:1
78:13,19,21
82:10 83:4,9
84:3,10,18
85:21,23 86:11
86:17 87:1,5
87:10 89:1,9
89:19,22 90:8
91:9 92:1,10
93:3,12,21
94:16 95:7,19
96:4,10,23
97:5,10 98:10
98:18 100:16
100:24 101:19
102:20 103:2
103:11,14
104:5 105:8,24
106:4 109:1,7
109:20 110:4,7
110:11,22
112:1,10 113:3
113:19 114:1,6
115:5 116:5,17
117:25 118:10
118:13,25
119:2,4,9
120:9,10 121:4
121:17 122:9
122:18 123:1
124:1,19 125:6
125:22 126:10
126:13,20
127:5,6 128:11
128:12,21
129:18,23
130:4,10,19
132:1,23 133:7
133:23 134:10
134:20 137:1
137:11 138:3,8
138:19,25
139:3,7 140:3
141:15 143:3
144:5,16,20
145:13 146:11
146:13,17
148:1,18
151:11,20
152:9,14,20
153:6,11,16,19
153:20 154:16
154:20 155:9
156:9,15 157:9
157:17 158:3
158:10,17
159:1,17,24
160:10,17
161:10,20
162:3,8,13
163:15 164:1
164:10,19
165:4 166:5,10
167:2,12,21
168:14 169:1,7
170:5,12,18
172:5,24
173:21 174:20
174:24 175:15
175:21 176:10
178:24 179:17
180:1,8 181:7
181:10,18
182:17 183:11
183:23 184:11
185:3,13
186:18 187:5
187:18 188:15
188:20 189:2
189:10,17,19
189:22,23
191:17 192:2
193:19 194:7
194:20 195:1
195:11,16,21
196:1,11,15,17
196:20 197:1,5
197:10,21
200:5,10,21
201:7,11 202:2
203:1,6,11,16
204:1,9,21
205:5,13 206:1
206:6,24 207:7
207:17 208:15
208:19 209:1
209:12,24
210:13 212:3
212:16,23
213:5,15 214:3
214:13 215:6
215:16,21
216:2,14 217:1
217:6,17
219:13,19
220:3,9,20,24
223:1 225:16
226:18 227:6

| | | | |
|---|---|---|---|
| 227:16 228:12 228:20 229:5 229:18 230:1 230:10,17 232:10 233:24 234:14,17 237:12 238:7 238:12 239:10 239:16 240:24 241:16,19 242:22 243:7 243:19 244:5 244:11 245:11 245:16,24 246:12,17 247:4,10,11,23 249:19 250:2 250:14 251:13 251:21 252:4 253:6,14 254:8 254:17 255:7 255:16 256:15 256:18,22 257:4,9 258:24 259:10,13,17 259:24 260:2 260:16,24 261:1,9,15,23 262:15,19 263:24 264:2 264:11 265:2 265:19,21 268:15,19 269:3,12,17,21 | 269:24 270:1 270:10 271:6 271:22 272:18 272:21 273:18 274:1,11,19 275:1,7,10,17 275:23 277:2 277:14 278:6 280:4 281:4,11 281:18 282:1 282:10,18,22 283:6,10,13,15 284:17 285:18 286:4 287:6,11 288:1,5,15,23 289:4,9,19 290:1,23 291:1 291:6 292:6 293:3,14,18 294:9,18,21 295:3,14 296:7 296:11,12,18 296:24 297:24 298:16 299:3 299:21 300:5 300:19 301:6 301:13 302:21 303:8,13 304:1 304:7,14,24 305:22 306:9 307:21 308:3 308:20 309:3 310:14,20,24 311:1,5,13 | 312:5,13,18 313:6,13,19 314:2,17,21 315:5,11 316:3 316:19 317:11 317:18,20,22 318:20 319:1 320:2,7,13,17 320:18 321:1,3 322:1,14,20,24 323:8,11,21 324:5,14,20,25 325:4,8,18,21 326:4,7,10 327:3 328:16 328:18,21,24 329:5,23 330:5 331:12,23 332:11 333:11 334:1,19 335:2 337:4,11 338:1 338:8,11,17 339:1,5,22 340:7,11 341:1 341:11,24 342:9,15,17 343:1,20 344:11,24 345:4,9,13,22 346:6,21 347:5 347:17,22 348:5 349:3,20 350:5,9,19,23 353:8 354:6,21 | 355:2,12 356:14 357:4 358:2,11,16,22 359:5,8,21 360:23 362:1 362:14,23 363:20 364:14 364:24 365:4,8 365:12,16 366:6,11,18,22 367:4,9,14,17 367:21 368:1,3 368:8,15,21,24 369:2,7,10,12 369:17,22 370:2,8,19,22 371:15,21 372:1,8,22 373:4,13,17,21 374:9,12,15,20 374:23 375:3,9 375:15,17,23 376:4,7,11 377:12 378:1 378:23 379:3,4 379:10,22 380:2,8 381:15 382:4,12,14,17 383:17 384:16 384:21 385:24 386:11,13,18 386:23 387:2,5 387:19 388:5 388:11,22,24 |

389:12,22 390:9,12 391:13 392:5,8 393:14 394:9 395:4,20,23 396:1,11,14 397:17,24 398:2,11,22 400:1,11 401:1 401:13 402:4 403:10 404:3 404:10,13 405:6 406:3 408:10 409:19 411:3 414:3,19 415:16,20 416:2 417:23 418:25 419:4,6 421:9,19,22 422:25 423:4 423:18 424:17 425:6,16,25 426:4,21 428:7 428:10,23 429:5,24 430:14 432:1 433:10,23 434:10,15 435:4,14,23 438:9 439:18 439:22 440:2,5 440:9,12,14,23 441:2,7,10 442:24 443:21 445:21,25 446:3,21 447:24 449:5 450:5 451:6,22 451:25 452:3,6 452:17 454:6 454:22 455:9 455:21 457:2 457:17,24 458:4,17 459:6 459:21 460:1,9 460:21 461:4,9 461:14,20 462:11,15,24 463:5,17,22 464:19,22 465:1,20 466:5 466:18 467:5 467:10 468:2,7 468:21 469:2,8 469:20 470:4,9 470:16,20 471:10 472:4 473:1,5,12 474:1,5,10,17 474:19 475:5 475:13 476:1,5 476:14,19,22 476:23 477:5 477:11,13,22 478:5,18,21 479:3,12,19 480:1,5,13,17 480:20 482:14 483:4,15,19 484:17 485:4,8 485:10,16,24 486:3,8,14,19 487:2,22 488:25 489:13 489:25 490:10 490:14 491:12 492:2,17,24 493:10,16 494:6,9,17 495:1,9,12,19 495:23 496:7 496:11,22 497:3,15 498:15,21 500:1,11,16

**list** 21:9 23:22 25:12,21 33:11 36:2 43:2 79:8 81:3,18 82:2 83:5 106:20 107:17,18 169:25 185:17 185:22 187:8 189:4 190:25 191:5 218:10 230:5 231:1 235:9 246:2,19 247:12 248:12 248:13 257:15 270:12 271:4 329:6 335:23 337:13 371:12 372:12,20 377:23 386:4 386:12,22 389:7 421:22 440:15

**listed** 40:12 43:6 107:2 271:3,20 272:5 293:15 350:11 388:14 423:24 443:3 444:10

**listen** 316:16 373:6

**listing** 46:6

**listings** 116:2

**lists** 116:8

**litchfield** 6:19

**litchfieldcav...** 6:24

**literature** 71:4 96:25 101:11 102:2 107:12 295:19 346:18 445:6,19 446:15 455:4 457:8 490:5

**litigation** 1:6 2:6 16:13 248:9

**little** 16:24 19:6 24:7,10 30:14 40:18 45:10 53:9,20 73:12 110:9 117:16

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 572 of 640 PageID #:74120



139:6 140:13 141:1,2 143:21 151:12,13 158:18 180:6 185:14,15 190:11,14 194:5 197:23 198:24 210:12 219:15,23 229:23 237:3 239:3 240:15 248:25 254:6 267:24 269:18 272:22 273:21 273:24 294:3 337:20,24 340:16 348:14 355:16 375:6 400:15 419:23 420:14 436:19 436:20 451:13
**liu** 441:11
**live** 16:10 242:17 465:16
**llanos** 29:18
**llc** 5:18 6:3,18 7:4
**llp** 2:17 3:12 4:3,10 5:11 6:5 6:19 8:4,19 9:3
**loaded** 253:13 253:17
**located** 267:12
**location** 14:19
**logan** 9:17 14:22
**logistics** 23:20 264:13
**long** 20:14 65:22 76:15 78:20 89:13 97:20 105:7 110:7,12 113:12 117:17 147:1 240:8 255:7 326:7,8 360:14 396:15 413:7 452:4 473:6,8 477:19
**longer** 113:12 135:17 242:17 291:25
**longitudinal** 446:17
**look** 19:3,16 23:18 28:16 42:23 47:25 50:7 53:23,24 62:7 70:10,10 74:4 76:6,12 85:9 90:14 93:17 106:14 106:17,19,20 106:25 120:11 121:13 122:16 123:12 127:2 127:15 128:22 129:7 146:25 148:2 150:2 153:12 155:10 155:14 160:6,7 177:24 181:11 194:5 217:20 218:7 223:18 224:11 234:8 235:21,24 236:14,19 241:17 245:3 249:1 250:7,15 256:5 257:24 263:10 270:18 271:23 272:2,9 275:6 276:7 277:3,17 278:11 279:11 279:22 280:15 282:2,3,25 284:7 285:19 286:5 287:12 289:21 290:15 291:13 294:3 298:5,10 300:6 301:14 305:5 306:5 308:4 309:4 312:24 315:6 316:4 317:13,23,24 318:13 321:4 323:22,24 326:11 327:19 329:24 335:5 336:9 338:12 339:6 342:24 345:19 349:4 350:16 351:13 351:20 353:19 355:13 357:10 357:10 360:21 361:5 362:2 363:25 372:8 375:6 379:8,15 380:14 383:18 384:7,9,11,13 395:16 396:6 406:16 407:11 408:13 411:20 414:9 422:17 432:2 433:15 448:4 451:20 463:20 464:3 468:12 494:21
**looked** 69:18 97:15 106:9 107:10,24 108:1,5 184:9 190:5 215:3 216:6 217:7,18 248:15 255:24 268:10 283:25 297:14 314:4 353:19 375:25 376:5,7 380:12 395:14 405:15 407:24 419:13 419:23 495:3,4

498:1
**looking** 51:2 62:3,3 82:2 89:23 91:2 98:11 104:18 105:12 107:14 174:11 178:5 220:4 222:1 226:20 230:25 231:17,25 232:15 254:2 263:18 270:15 275:2,24 284:2 292:8 319:21 331:24 347:13 349:8 350:24 354:7 384:7 418:5 422:10 422:11 444:13 454:19 465:17
**looks** 19:8 28:5 30:5 33:10 34:3 36:20,24 38:11 39:9 45:15 89:4 90:1 218:19 330:19 364:11 414:8
**loop** 151:22 199:3,5
**loops** 199:1
**los** 6:8
**losing** 180:6
**loss** 184:15,18
**lost** 43:10 286:3 410:16 458:18
**lot** 29:3 30:21 42:4 65:14 79:15 81:6 88:3 104:2 106:11 116:3 140:19 199:18 235:20 240:1 253:17 294:4 372:22 433:15 450:14,24 452:9 476:9
**lots** 117:10
**lousy** 398:14
**low** 180:19,24 212:18
**lower** 182:25 287:19 288:11 288:19 357:7 359:23 472:19
**lowers** 360:7
**lowest** 360:13
**lrazzaghi** 4:8
**lumped** 282:14
**lumps** 281:12
**lunch** 169:2 170:6,9,15,19 180:7
**lungs** 402:25
**luteal** 145:19
**luteinizing** 136:3
**luteum** 135:13 135:18 136:8
**lye** 319:19,19
**lynch** 73:3
**lyons** 3:5

**m**

**m** 7:14 9:11 332:18
**m.d.** 1:13 2:15 10:4,15,17 11:2 12:2 13:2 14:14 44:2 46:2 54:14 501:1 502:3,18
**machine** 503:9
**macromolecu...** 131:17 132:17 133:19
**made** 24:23 30:15 35:17 36:1 80:2 90:18 101:1 134:22 147:23 160:8 190:5 191:24 241:3 246:21 272:16 293:23 376:22 440:23 455:24 471:6 481:1 503:9 506:5
**madison** 5:20 6:21
**magical** 369:14
**magnitude** 335:16
**main** 127:8,25
**maintain** 57:14 310:5
**maintained** 199:24
**major** 103:5 182:23 238:20 312:3,3,6,14
**majority** 53:4 64:22 215:4 278:7 299:5 300:1 320:8
**make** 16:23 18:3 25:18 32:2 33:22 40:9 55:13 64:2 80:18 89:20 117:22 118:23 123:3 126:22 132:24 134:3,25 140:5 147:20,24 187:25 191:25 192:24 204:18 205:14 208:8 215:9 218:25 224:1 238:5 251:24 252:14 252:21 253:21

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 574 of 640 PageID #:74122




254:5,10,20 258:19 375:7 377:18 386:16 412:5,6,7 419:12 429:16 471:4,6 475:14 494:11 497:22
**makes** 146:1 291:17 453:20
**makeup** 451:13
**making** 117:4 188:8 246:7 252:2,20 369:9 374:8 436:12
**male** 135:10 351:15
**malignancy** 242:9
**mammals** 94:1
**man** 462:23
**man's** 346:17
**management** 184:22
**managing** 110:24
**mandate** 394:5
**manifestations** 75:23 76:21
**manila** 32:12 32:17
**manipulations** 99:5,11,25 101:6 290:16
**marginalia** 30:25 35:3 38:23 39:3
**mark** 23:10 26:1 28:19 43:22 146:11 220:16 259:10 259:14 270:8 379:24 390:3 439:12
**marked** 23:12 23:15 26:16 43:23 45:8 121:16 128:20 146:16 220:22 234:16 260:1 263:22 264:24 264:25 265:1,6 270:9 275:9,18 280:3 283:5 306:8 315:10 315:12 317:17 328:23 333:19 350:8 355:11 360:22 379:9 382:16 390:8 438:18 439:9 439:14 441:16
**markedly** 422:7
**marketing** 1:5 2:5
**marking** 26:4
**marks** 289:15
**maron** 7:4
**maronmarvel...** 7:10,11
**marriage** 60:4
**marvel** 7:4
**material** 25:5 27:18 73:8 331:20 418:4
**materials** 10:18 24:21 25:6,13 25:19 26:7 28:6 42:14 46:19 165:19 190:23 272:5 293:4 351:13 388:12 390:1
**matter** 14:15 27:18 62:7 74:18 90:15 103:20 313:7 313:16,20 314:8 386:9 412:20 450:15 452:24 497:14 499:1,6
**matters** 157:20 210:3
**max** 5:19
**mcauliffe** 9:10
**mcbride** 5:10
**mccambridge** 7:13
**mcguire** 8:4
**mcguirewoo...** 8:10
**md** 10:19,22 504:5 505:2,24 506:2,4,12
**mdl** 1:6 2:6 14:15 504:4 505:1 506:1
**mean** 18:21 19:6,25 31:10 31:13,16,24 36:8 38:18 51:1 64:20 80:21 81:3 82:14 83:5 104:8 105:25 113:1 145:15 149:21 153:7 158:22 159:8 160:6 161:21 173:19,20,23 177:17 182:9 186:7 196:16 196:16 197:12 200:24 207:11 208:1 211:3 213:3,12,17,19 217:19 218:24 220:1 222:7 234:6 239:17 243:14 244:21 244:22 247:24 262:21 294:16

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 575 of 640 PageID #:74123




294:17 296:9 322:13 323:2,6 336:6,12 337:22 338:20 351:16 359:5 363:7 369:3 378:24 387:14 395:8 415:21 424:24 425:12 425:15,24 426:14 427:3,4 429:17 430:23 431:15,16,25 433:11 447:6 456:24 465:2 467:15 468:9 481:23 485:3 486:4 492:16

**meaning** 100:1 131:22 213:19 231:16 277:11 290:17 395:3 431:12,14

**meaningful** 414:18

**means** 31:7 35:17 40:25 57:13 145:22 162:9 169:24 237:14 337:9 409:1 417:7 425:22 429:11 429:12 432:17 456:12 481:3 482:2

**meant** 186:10 253:20 425:19

**measurable** 222:14

**measure** 221:14 410:9 493:20,21 496:4

**measurement** 336:25

**measurements** 336:23

**mechanism** 92:15 93:14 126:25 136:19 137:4 141:7 142:18,20 176:4,16,16 182:21 199:5 251:14 252:14 397:15,16 398:7,9 403:7 412:17 489:6

**mechanisms** 72:21 202:7 250:16,25 252:7 254:11 393:8

**mechanistic** 93:7 142:20 417:21

**media** 14:13 501:1

**medical** 54:15 55:21 57:18,20 63:4 65:9 71:5 72:23 90:25 100:8 295:20 451:17 455:6 459:4

**medicine** 55:22 56:19 57:1,2,7 88:16 89:4 363:17 447:14 448:2

**meet** 20:10 83:19

**meeting** 49:16 49:19 193:1

**meetings** 20:15 20:16 21:2 46:20

**mehth** 5:5

**melanoma** 279:14

**mellott** 5:18

**member** 65:9 72:4 74:11 77:15 148:25 152:2

**members** 238:17

**membership** 238:6

**memory** 170:3

**men** 249:9 353:11 354:2

**menopausal** 243:23 427:14 427:17

**menopause** 201:19 202:20 244:22,24 404:24 436:6

**menstrual** 135:6,19,24 136:1,6,14 201:15 202:19

**mental** 190:11

**mention** 65:24 130:12,13,15 152:10 153:4 394:15 463:24 478:23

**mentioned** 46:12 65:20 69:24,24 77:8 78:22 94:18 151:14 152:8 170:25 191:15 193:10 206:15 211:18 233:19 268:1 299:4 364:16 393:11 453:25 454:11 499:10

**mentioning** 161:8

**merrill** 185:19

**mess** 28:23 44:4 111:11

**message** 289:15 453:3
**messengers** 198:20
**messerlian** 332:13,18
**met** 20:14,17 20:20,23 43:4 150:18
**metabolic** 149:16
**metabolism** 66:9 163:17 198:10 221:6 487:13
**metabolize** 399:15
**metabolized** 438:15
**method** 225:23 268:8 285:3 343:10
**methodologi...** 97:2 344:18
**methodology** 11:7 27:9 94:19,22 101:10,25 109:24 146:19 155:1 297:12 342:11,20 343:4 388:6 389:4 452:11 452:14
**methods** 12:7 222:16 236:7 276:1 351:14 402:21 450:18
**metric** 489:19 489:24
**mg** 336:16,17
**miami** 5:14
**mice** 90:6 91:6 91:13,17 127:20 163:22 407:17,21,21 407:24 408:1 471:20 472:14 473:6,10 486:16
**michael** 8:20 15:7 32:20 258:23 345:3 350:7,17 366:20,23 367:19 368:5 372:2 373:15 373:19,25 374:18 375:5 375:12,20 479:17
**michelle** 3:4 15:13,20 25:11 33:4 36:17 42:12 117:17 196:21 248:3 257:5 259:18 293:19 296:19 317:20 325:21 344:24 350:6 366:18 372:1 380:5 504:1
**michelson** 6:14
**micrometers** 267:2
**micromolar** 266:13,22
**microphone** 15:21
**microphones** 14:7
**mid** 332:15,22
**middle** 84:19 88:9 123:13 168:25 230:23 302:11
**mike** 17:25 234:15
**mildly** 323:20
**military** 4:12
**miller** 4:17
**million** 258:13 260:6
**millions** 61:22 61:23 434:20 434:21
**mimic** 414:6
**mind** 52:22 54:4 57:23 110:4 111:9 134:24 159:4 174:13 176:17 249:20 250:3 269:25 297:23 316:23 377:17 392:5 407:2 409:4 412:13 436:21 451:13 455:11 467:16
**mine** 32:21 33:6 53:4 82:15 440:1,4
**minimal** 393:24
**minus** 166:8,11 266:21
**minute** 28:4 31:21 81:5 83:13 327:24 347:24 379:17
**minutes** 100:5 110:14 170:10 255:10 304:16 352:14 488:19
**mis** 479:12
**misquote** 264:18
**misread** 70:20
**misrepresent** 188:23,24 189:21
**misrepresented** 373:8
**misrepresenti...** 369:20
**misrepresents** 186:25 463:15

**missed** 44:18 97:19 105:1 229:7 330:19 337:14 383:15 454:20,21,23 455:3
**missing** 263:21 297:23 379:18 406:19,21 407:4 408:25 417:2 418:14 418:16 419:19 430:21 436:17 437:1 456:10 456:14
**mission** 431:19
**misspoke** 491:16
**misstate** 325:1
**misstates** 83:7 89:6 91:8,24 96:1,8,19,20,22 100:12 102:18 105:19 109:3 116:14 118:15 118:16 159:20 164:14 167:7 167:17 168:6 191:22 210:9 212:21 273:16 282:8 289:7 292:2 293:12 296:5 304:20 324:23 344:22 397:17 462:21 463:15 466:1 470:1,18 479:10 483:3 483:12 487:22 493:9
**mitchell** 4:16 4:18
**mix** 53:1
**mixed** 33:2 212:11
**mixture** 186:5 186:11,14 188:6,24 189:15 190:22 206:9 260:13 260:24 261:2,5 267:13 331:18 392:13 393:3 393:13 394:7 395:3 414:23 415:8 479:7,23 480:9,25 481:16 482:8 487:18 488:12 488:14
**mixtures** 11:19 169:20 189:25 212:8 260:23
**miyamoto** 36:24 38:1
**mlewkowski** 5:23
**mlisak** 8:24
**model** 160:19 162:16 163:14 228:8,10 338:19 340:13 340:15,16,22 341:7,8,16,19 342:4,14 345:16,18 346:1,4,7,24 409:15 410:25 410:25 411:6,6 411:7,15,15 412:18 417:9,9 432:25 466:10 466:13,21 467:9 468:13 468:16,17
**modeled** 338:13 339:12 339:13 347:16
**modeling** 338:3 339:9 342:1,1 343:9,11,16,18 344:1,7,15,18 344:22 346:10 346:12,15,17 347:3 467:19
**models** 149:5 164:2 231:16 231:18 341:22 342:12,12,19 343:13 347:18 411:18 432:6 432:20 465:12 465:16,16,18 465:23 466:4 466:16
**moderate** 321:14 323:7 323:23,24 324:10,17 325:9 326:14
**modest** 155:20 156:5,10
**modifiable** 412:21,22 413:1,4
**modified** 315:2 419:16
**molar** 166:9
**molecular** 131:19 132:21
**moment** 192:16 264:5 298:12 427:21 428:11 428:19 451:21 472:2
**money** 334:14
**monitor** 220:5
**month** 20:18,19 58:9 405:16
**months** 20:23 280:20,25 281:7 282:15 284:3,4 301:16 301:21 302:2 307:9,25

309:11 314:14 318:23 407:23 408:13 410:6 497:8
**moore** 4:10
**morning** 14:4 15:7,10,13,16
**morphology** 149:13
**mother** 111:10
**motion** 456:22
**mouse** 93:17 127:12,20,21 127:25 128:17 159:8 160:6,19 162:16 163:2,5 163:8,17 164:22 231:16 231:18 417:8 432:24 473:11 473:13
**mouse's** 161:24
**mouth** 345:2
**move** 42:24 60:14 83:20 126:12,16 170:23 178:3 180:25 312:17 326:1 403:14
**moved** 422:7
**movement** 297:17
**moves** 177:19
**moving** 47:17 48:9 220:7,10 220:11 293:2 306:3 312:8 422:1
**mp** 335:9 336:24
**mparfitt** 3:9 504:2
**mt** 145:3
**mtorrence** 4:22
**multi** 11:23 62:17
**multicell** 251:4 252:9 253:8
**multidiscipline** 62:16
**multifactorial** 147:3,12,17,20 148:9
**multifactors** 148:14
**multilevel** 169:14
**multiple** 209:20 210:16 210:24 386:23
**multivariable** 301:8 322:4 323:14 324:9 324:16 327:10 327:22 328:9
**murray's** 7:3
**mutagenesis** 475:12 492:19
**mutagenic** 474:3,7,22,25 475:7,23 491:19,23 492:11,16,18
**mutation** 37:13 419:15
**mutations** 37:19 177:3 380:15,18,21 380:24 381:6 381:23 382:6
**mute** 14:9

**n**

**n** 10:1 76:9 135:4,4 232:18 332:18 349:14
**naccachian** 6:6
**nakai** 332:17
**namaste** 8:18 15:8,11
**name** 14:22 16:5,8 235:9 395:10 446:9 448:19 471:16 503:21
**names** 43:2
**nanomolars** 266:16 267:5
**narrate** 397:23
**narrative** 426:8
**narrow** 403:5
**national** 11:6 32:17 68:13,17 68:19 146:18 154:25 360:24 361:23 362:8 362:13,16,22 362:24 363:10 363:12 376:16 445:4,7
**natural** 12:5 146:1 157:5 219:9 222:1 223:25 224:8 242:23,25 270:4 380:25
**naturally** 156:12,17 219:21 224:18 224:22 227:21 228:2 260:6 380:25 411:19
**nature** 8:11 27:16 103:16 118:3,6 147:4 147:13 149:13 150:4 343:19 401:5 467:9
**nc** 4:13
**nci** 68:17 362:16 363:23 373:8,17,20,24 377:8 445:7

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 579 of 640 PageID #:74127



464:11
**nci's** 368:17 373:13
**nearness** 306:1 402:19
**necessarily** 90:10 92:12,16 144:17 159:23 176:23 180:23 188:3 200:24 334:10 407:25 422:12 446:8
**necessary** 83:3 117:11 131:14 261:5 444:19 506:6
**need** 18:7 27:6 32:8,9 44:8 90:18 103:16 103:19 110:12 118:22 139:5 155:4 160:12 163:24 166:18 170:4 173:18 195:21,23 255:2 260:18 272:2,9 294:2 298:5 340:2 344:16 345:15 345:24 347:12 368:9,16 375:6 386:16 409:3 436:19,20 450:9 454:4,7 456:13 463:20 465:11,13,15 466:3 468:16
**needed** 52:7 103:23 135:18 199:13 236:4 302:14 304:3 425:11
**needs** 163:7 236:10 453:11 453:12
**negate** 430:12
**neither** 134:11 503:17
**neoplastic** 192:23
**neuhouser** 441:12
**never** 22:16 23:7,8 61:3 64:15 65:5,6 75:19 101:5 162:9 269:25 272:24 273:13 276:19 300:9 301:23 305:10 321:14 326:14 356:7 397:20 428:22 429:4 433:4 454:22
**nevertheless** 99:23 132:5 241:2
**new** 4:6 5:21,21 8:15,15 9:6,6 26:4 126:22 267:9 290:20 297:17 349:10 349:11,11 378:13
**newborn** 413:19
**nice** 462:22
**niehs** 68:20 445:10
**nih** 39:10 61:19 61:20 62:1 68:16 152:1 153:15 362:24 373:8,20,23 445:10 452:19
**nina** 33:19
**nine** 365:24 368:3,5 372:12 376:12,14
**nmsc** 279:12,13
**nnaccachian** 6:10
**nods** 17:21 35:19 38:2 79:25 211:6
**non** 97:22 277:24 278:9 279:14 287:18 288:19 291:9 305:7,16 306:22,23 309:17 310:1 310:16 311:7 311:20 313:1 314:11,12 317:2 318:7 411:9 412:22 430:10,12
**nonovarian** 182:2
**nora** 6:6
**noriya** 8:5
**normal** 16:25 63:24 198:9 200:2,7 201:8 202:12,13,14 202:21 409:24 410:7 416:13 433:2 437:21 438:2 456:13
**north** 3:16 5:6 7:7 9:12
**northern** 1:2 2:2 14:17
**northwestern** 61:18
**notable** 249:4 312:21,21
**notary** 506:13 506:19
**note** 14:7 37:1 37:8,14 39:13 39:17 66:7 128:16 134:2 288:8,16,24

290:2 386:3 459:10 464:7 504:10
**notebook** 62:18
**noted** 279:21 288:6 297:19 299:8 315:4 501:3 506:7
**notes** 24:14,17 24:23 30:15 33:10 34:7,19 34:25 35:2,22 38:11,22 39:1 39:3 41:13 127:20 198:13 265:10 278:16 315:14 374:4 390:2 451:21
**notice** 10:17,21 23:11,19,23 24:5 42:25 43:7 45:13 315:23
**noticed** 80:10
**noticing** 15:6
**notify** 238:16
**noting** 289:6
**notion** 63:22
**nourished** 413:16
**novel** 22:22 308:10,25 447:11
**novelty** 302:13
**november** 39:18 383:7
**novo** 177:10
**nshahadat** 8:10
**null** 321:23 424:23,25 429:9 469:19 499:13
**number** 10:16 11:3 12:3 13:3 14:19 49:22 90:12,13 115:20 116:1 221:6 230:18 320:15 326:16 327:19,25 350:18 384:16 397:1 415:2 425:3 427:4 428:21 434:18 452:25 453:3 456:9 472:18 501:1
**numbered** 42:17 235:22
**numbering** 42:10
**numbers** 30:21 42:9 44:9 346:20,23 384:17
**numerical** 95:14
**numerous** 313:23
**nurture** 147:13
**nw** 3:6

**o**

**o** 30:2 34:18 37:7 135:4,4 232:18 233:15 233:15
**oadams** 3:19
**oath** 503:8
**ob** 55:1
**obese** 182:1
**obesity** 181:2,5 182:14,14,22 182:25 183:4 183:12,17 184:8 251:6 252:10 254:9
**object** 59:11 117:2 119:14 119:22,22 120:1 138:17 184:25 194:19 201:6 239:6 269:9 271:24 364:7,20 366:3 366:4 371:16 379:16 417:23 449:5 463:14 469:14 485:13
**objected** 195:17 248:3
425:17 426:1
**objection** 29:22 36:14 48:7,14 49:4 51:25 53:2 58:25 60:8 64:6,17 65:4 66:15,20 66:24 67:25 68:7 72:10,17 73:6,16 74:2 75:12,20 77:24 78:7 82:5,24 83:7 84:2,8,15 86:9,15,24 87:4,8 88:23 89:6,16 90:7 91:7,24 92:7 93:1,10,20 94:10 95:6,16 96:1,8,19 97:3 97:7 98:9,17 100:12,21 102:18 105:6 105:19 106:2 108:24 109:3 109:17 111:23 112:7,24 113:15 114:23 115:18 116:14 116:16 117:5,7 117:12,13 122:8,13,23 124:17,25 125:16 126:8

126:15 130:1,7 130:17 132:18 133:4,20 134:5 134:14 136:23 137:8 138:2,5 138:15,23 139:25 141:10 142:23 144:4,9 144:19 145:9 146:7 147:18 151:18 152:6 152:12,17 153:2,9 154:14 155:7 156:7,13 157:7,15,25 158:7,14,24 159:11,20 160:1,14 161:6 161:18 162:1,6 162:9 163:10 163:20 164:5 164:14,24 165:24 166:7 166:16 167:7 167:17 168:6 172:2,21 173:17 174:17 174:23 175:14 175:20 176:6 179:15,22 180:4 181:4,9 182:11 183:6 183:22 184:5 184:24 185:11

186:3,25 188:21 191:11 191:22 193:18 194:2 195:9,18 196:6 197:17 200:3,8,19 201:2,10,24 202:24 203:4,9 203:24 204:8 204:16 205:3,9 205:21 206:4,5 206:22 207:4 207:15 208:14 208:18,22 209:10,22 210:9 212:1,14 212:21 213:2 213:25 214:8 214:25 215:13 215:19,25 216:10,22 217:5,13 219:11,17,25 222:22 225:14 226:16 227:4 227:13 228:5 228:18 229:1 233:21 237:7,8 237:25 241:14 242:19 243:4 243:17 244:2,9 245:13,19 246:10,22 247:20 249:17

249:24 251:17 251:23 252:17 253:11,25 254:13 259:3,6 260:9,21 261:8 261:11,17 262:13,18 264:20 271:2 271:19 272:16 273:16,23 274:9,15,24 277:1,13 281:2 281:10,16,23 282:8,17,20 285:16 287:9 288:13,22 289:1,7,12 290:13 292:2 292:11 293:10 294:15,20 295:10 296:5 297:8 299:1,18 300:4,17 301:11 303:4 303:17 304:4 304:10,17 305:19 307:19 308:1 309:1 310:4,19,22 311:10,23 312:11 313:4 313:11,22 314:15,20,23 316:1,15 317:9

318:18,24 319:25 320:5 320:10 321:24 322:12,19,22 323:5,19 324:18,23 325:13 329:21 331:11,17 332:1 333:10 333:23 334:25 338:6,16 339:20 340:1 341:23 342:6 342:13,22 344:9,21 346:5 346:8,25 347:10 348:25 354:17,23 355:9 356:12 357:3 358:1,9 358:14,19 359:19 361:25 362:12,18 363:19 364:24 368:14,19 377:10 378:16 381:13,17,18 382:2,10 383:12 385:22 387:17 388:3,9 388:16 391:13 392:5,6,8 393:14 394:9 395:4,20,21,24

396:1 397:17 397:18,23 398:11,22 400:1,11 401:1 401:13 402:4 403:10 404:3 404:10 405:6 406:3 408:10 409:19 411:3 414:3,19 415:16,20 416:2 417:23 418:25 421:9 421:19 422:25 423:18 424:17 425:6,16 426:21 428:7,7 428:23 429:5 429:24 430:14 432:1 433:10 433:13,23 434:10,15 435:4,14,23 438:9 442:24 445:21 446:3 446:21 447:24 449:5 450:5 451:6 452:17 454:6 455:9,21 457:17 458:1 458:17 459:6 460:9,21 461:20 462:19 463:2,13 464:18,21,24 465:14 466:1 466:14 467:2 467:25 468:25 469:7,25 470:14,24 472:25 473:3 473:21 474:4,8 475:1,8,24 476:3,13,17 477:2,9,18 478:1,16,20,24 479:9,24 480:3 480:10,15,19 482:11 483:2 483:11 485:1 485:22 486:1,5 486:12,17 488:25 489:13 489:25 490:10 490:14 491:24 492:12,22 493:8,13 494:4 494:8,14,23 495:7,19 496:7 496:11 497:13 498:9

**objections** 10:21 15:1 45:13 117:10 117:19,20 118:6,17 296:19 370:12 479:13 485:4

**objective** 276:18 343:17 344:19

**objector** 15:23

**observation** 176:21 244:19

**observe** 298:18 432:16 473:9

**observed** 266:19 473:17

**observing** 211:23 434:17

**obstetrics** 54:7 70:19 71:2 295:17

**obtain** 63:23

**obtained** 342:2

**obtaining** 343:12

**obviously** 99:22 140:21 297:22 383:15 387:13,14

**occasion** 52:10 52:11

**occasionally** 57:20

**occupancy** 222:4,6,7

**occupation** 224:7

**occupational** 473:24

**occur** 145:18 177:4 380:20 381:1 404:17 429:3

**occurred** 432:13

**occurring** 156:17 224:18 224:22 227:22 228:2 260:6 411:19,25

**occurs** 202:16

**ocp** 360:3

**odds** 291:14

**offense** 461:15

**offer** 97:9 104:16 388:1,7 389:5

**offered** 104:21

**offering** 102:14 105:14 136:18 137:3 139:22 140:14 157:22 158:4

**office** 25:12

**oh** 31:7,15 32:22 41:23 47:19 87:3,25 100:2 101:17 103:3 104:14 144:6 161:23 225:23 226:3 230:15,19 250:12 255:9

283:10 291:2 304:25 323:6 332:20 343:6 352:2,4,7 359:25 370:5 374:18 392:18 395:25 420:22 444:4 459:16 472:7,11 488:3
**ointment** 331:20
**okay** 16:17 17:21 18:5 20:6,13,19 21:8,14,24 22:18,24 23:10 24:2,12,19,25 26:21 27:4,8 27:21 29:24 31:12 32:11,23 33:9 34:1,6,25 35:20 36:16 37:4,22 38:3 38:14 39:9 40:4 41:10 42:2 43:1,9,16 43:17,18 45:10 45:19,21,25 46:24 49:7,21 50:3 51:5,15 51:16 52:7,13 52:16 53:9,12 53:21 54:6 55:10 57:17 58:4,18 59:25 60:24 61:5 64:1,24 65:8 65:21 67:17 70:6,8,15 72:7 74:24 75:6 76:4,10,14 78:22 79:1 80:12,24,25 82:2,11 83:16 83:22 92:19 99:7 101:23 102:25 104:6 106:13 109:8 110:2,4,7,11,16 111:12 113:10 116:22 119:15 120:3,6,7 121:13 123:6 123:12 129:22 130:11 133:16 133:24 136:16 137:2 138:18 139:8,14,15 140:24 141:3,4 141:16,17 142:2,2 143:4 147:7,8 149:2 151:3,10 158:18 162:18 164:2 171:12 173:14 174:3 175:6,11 177:16 179:12 180:25 181:23 184:12 185:22 192:18 193:25 194:1,8,16 195:2 197:9,13 197:22,23,24 198:14,15 199:12 201:5 202:10 204:2,4 204:20 211:4 211:16,23 212:4 218:12 219:5,8 220:20 222:9 223:8,10 226:11 227:23 230:15 231:5 231:11,22 232:1,11 233:7 234:2 235:2,15 236:1 243:2,8 244:20 248:21 248:23 250:12 250:13 254:25 255:1,2,4,25 256:8,16 257:4 259:3,7 263:15 264:12 265:3,5 265:16 266:5 267:16,19,23 268:23 269:11 273:11 275:2 279:22 282:25 283:14 284:16 284:20 286:5,7 286:13,15,17 286:18 287:12 297:25 302:9 304:15 305:4 306:7 307:11 308:7 311:17 315:6,15 316:4 317:19 320:14 320:17 328:1,4 329:24 332:12 335:3,4 337:15 338:2 341:4 343:19,23 344:3,14 348:9 348:15 349:4 350:4 355:7 356:24 360:21 363:25 364:4 365:17,23 374:12 375:19 376:24 377:12 378:2 379:8,11 380:9 382:13 384:1,12,25 387:20,24 389:12 390:5 390:21 391:1 392:20 396:25 398:2,20 401:19 402:16 403:6 428:4,9 428:15 439:12 440:2,12 441:13,25

442:16 443:5,7 443:11,19 444:12 449:24 454:18 458:20 462:16 463:6 464:9 465:21 467:6 470:23 471:1 474:2,14 474:17 475:16 475:21 476:9 476:22 478:13 479:17 481:14 482:15 487:1 487:10 491:1,9 492:3,8,23 493:4,22,24 495:2 497:1 498:19,20 500:4
**okeke** 30:2
**old** 351:16
**older** 243:10 244:16 287:18 288:10,18 404:20
**oligomenorrh...** 232:2
**omega** 3:13
**once** 20:17 57:15 135:17 202:6 366:1 403:6
**oncofertility** 61:1,11,12 62:8 63:15
**oncogenesis** 394:3 408:19 437:4
**oncogenic** 405:13
**oncologist** 61:6 64:12 249:21
**oncology** 61:8 71:17,20 459:22
**ones** 82:3,4 95:22 106:8 118:19 138:11 168:16,17 191:15 196:13 218:2,3 244:12 244:12 254:4 307:24
**ongoing** 240:18 285:23 286:21
**online** 21:19 108:1 364:13
**onset** 182:24
**operates** 198:25
**opine** 243:5 394:6 460:19 461:19
**opinion** 90:23 105:15 106:5 114:12 136:20 137:3,4,14 138:20 139:22 140:14 141:7 142:12 143:14 145:8 157:22 158:4 165:18 167:13,25 173:14 174:3 174:22 176:15 185:25 193:22 204:22 210:20 211:1 214:4,20 215:22 216:1 229:15,17 243:6,15 251:20 254:15 260:3,8,17 287:24 290:19 299:5 348:16 378:5,7,9,11 391:8 405:24 415:12 421:4 426:18,23 430:3,4 445:9 454:2,5 465:21 467:19 473:8 473:15 482:7 490:7 499:15
**opinions** 27:9 41:20 79:22 80:13 97:22 102:14 104:13 104:15,21 105:1,13 109:24 114:10 114:13 150:14 152:21 186:23 190:24 191:21 192:13 214:15 216:4 217:25 218:23 229:10 299:13 314:18 336:3 354:12 369:8 377:25 378:8 385:17 386:1 387:12 387:16 388:1,7 389:4,5 391:9 392:1 408:8 411:1 415:25 417:19 438:8 442:21 450:2 451:1,3,16 452:12 455:5 455:16,19 457:11,15,21 458:13,25 459:1 479:5,21 480:7 487:24 488:10 489:21 499:1
**opportunity** 27:23 104:12 117:9 119:13 119:16,22,23 344:15 346:3 346:15 405:19 405:20 411:20
**opposed** 17:20 19:15 89:15

91:6 165:13 177:8 180:19 189:25 297:11 306:12 314:11 318:15 324:17 366:15 402:11 402:14 468:18 482:20,24
**opposition** 145:23
**optimal** 154:6
**oral** 69:14 203:12 204:2,5 204:13,22,25 205:10,17 206:18,25 207:11,12,21 207:23 208:4 208:10,16 209:5,8,13,16 360:1,3 361:11 361:16 472:8 472:12
**orally** 67:22 68:4 471:20 472:14
**oranges** 297:12
**order** 21:11 24:5 118:7,9 118:23 155:5 401:9 454:5 461:19 500:12 500:15,15,16 500:19,21
**orders** 335:16 500:7
**oregon** 54:14
**organ** 199:6,7,7 199:10,11,11
**organization** 238:20
**organizations** 68:22,23,25 249:6
**organochlori...** 270:22
**organs** 199:18 403:16
**origin** 199:10 199:11
**original** 69:4 85:11 446:4,8 503:14
**originally** 83:5
**originate** 180:17
**ought** 164:17
**outcome** 14:25 89:12,25 90:6 92:25 93:19 323:18
**outcomes** 13:9 251:9 252:12 382:21 385:5
**outright** 346:7 456:2 462:17 463:1
**outset** 413:17 433:16
**outside** 84:6
**ovarian** 12:10 13:7 34:18 52:20 56:8,9 56:15 60:23 61:5 63:23,24 64:5,11,16 65:1 66:9,23 67:15,24 68:6 69:16 83:25 84:14 85:6,15 94:25 105:3,15 136:5 142:7,11 142:13,21 143:7,9 154:5 154:13 155:6 155:24 170:23 171:2,16,18 172:13,16,19 173:12,16 174:4 175:18 175:24 176:5 176:13,18 177:7,14,20 179:1,7,14,21 180:3,10,16 206:20 207:3 207:13 208:11 209:6 213:13 214:6,24 215:24 222:21 225:13 231:22 232:3,4,5 237:2 239:2 241:9,21 243:2 260:8 261:10 279:15,17 282:6 283:22 287:17 288:10 288:18 289:16 290:4 298:20 300:10,12 302:3 303:2 306:13 307:16 330:13 348:17 380:10,19 381:9,23 385:9 391:11 394:8 398:9 403:8 406:2 408:9 411:2 413:2,5 413:13 415:15 416:1 417:20 418:13 420:12 426:20 427:1 432:23 433:8 433:21 435:6,7 435:9,19 436:8 442:22 445:13 446:16 450:4 450:23 451:5 452:14 454:4 455:7 456:23 458:15 459:5 460:7,18,20 461:18 464:15

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 586 of 640 PageID #:74134



465:5 467:1 468:23 469:4 490:12,19 496:6 498:5,5
**ovaries** 135:5 135:11,23
**ovary** 11:7 33:18 52:8 56:12 62:5 64:21 65:21 75:4,24 99:16 135:14 139:9 139:16 141:19 141:21 143:1 144:15 146:9 146:20 149:14 155:2 158:16 177:4,8,10,15 177:18,22,24 178:3 180:22 181:20 232:2 403:21 409:18 409:21,25 410:21 411:5 411:19,24 412:18 453:24
**overall** 385:6 421:7 422:10
**overlap** 271:15
**overreaching** 456:1
**overstatement** 183:9
**overweight** 182:1
**overwhelm** 456:13
**overwhelming** 98:20
**overwhelmin...** 462:6
**ovulate** 155:18
**ovulates** 185:6
**ovulation** 66:10 135:15 136:7 145:18 160:3 178:2,15 413:8 432:22 433:2
**ovulatory** 60:20 143:23 184:13 185:4
**ovum** 178:7
**own** 96:12 99:12 108:7 111:3 180:2 320:9 415:5 446:6

**p**

**p** 292:17,18 297:9
**p.m.** 2:19 170:13,16 255:11,14 256:24 257:2 264:6,9 347:25 348:3 355:20 379:13 389:17 389:20 392:21 392:24 500:24 501:3
**p1hairdepos** 504:15
**package** 106:25 108:11 167:10 275:20 395:9
**page** 10:11,16 11:3 12:3 13:3 18:4 23:22 26:10 30:13 38:10 45:23,24 66:7 70:11,17 79:8,9 83:21 84:19 85:9,21 88:6 94:17 101:8,8,15 120:11 121:2 124:8 127:2,4 129:6,6 130:20 130:24 135:1 146:25 147:6 147:11 153:12 153:23,23 154:1,17,18 155:10 171:5 181:12,16 223:18,19 230:6,9,12,14 230:16,23,25 231:7 232:17 232:24 233:15 235:24 236:14 236:20 239:8 246:7 248:8 249:1 256:2,3 256:4 257:14 258:2 266:4 277:4,18,18 278:11 280:16 284:7 285:19 285:20 286:5 286:10 287:12 288:6 289:20 289:24 290:2 298:10,13 300:6 301:15 302:10 305:5 308:5 309:5 317:25 321:5 329:24 330:1,3 330:4,6 332:9 335:5 336:1 339:6 341:3 342:20 350:16 350:24 351:14 352:5 356:2 357:10 359:24 359:24 361:5 362:2 363:21 363:25 365:20 365:24,25 366:1,22 379:14,15,18 380:15 383:21 383:23 384:13

384:16,17 421:25 464:3 487:8,10,11 505:4,7,10,13 505:16,19
**pages** 1:24 23:25 50:8 185:17,23 194:14 235:22 329:17 365:24 368:3,5 370:25 372:12 376:12 376:14 379:14 379:20
**paid** 241:2 351:15
**pair** 407:4
**palacios** 9:4 15:10,11 220:18 259:12 280:1 283:12 328:20,22 396:13 439:11 474:16
**panel** 152:1 153:22
**panel's** 155:3
**paper** 10:23 11:4,9,12,14,16 11:18,21 12:4 12:6,12,14 30:2,4,5,9 31:2 31:25 33:10,12 34:18 35:1,16 35:23,24,25 36:3,11,21,24 37:6,7,24 38:1 38:12,15,19,20 38:25 39:2,10 40:18 76:7 77:8 81:11 99:18 121:14 121:18 122:10 124:8 125:12 125:24 126:2,3 126:4,6,19,21 126:25 127:3 128:15 129:5 129:24 130:8 134:1 168:18 168:22 169:10 169:14,18 170:2 185:20 192:19 221:10 228:4 231:7 234:23 237:19 246:19,25 247:1,3 255:24 256:2,3,3,7,11 257:20 261:21 261:25 262:23 265:4,4,6,7,8 265:15,16,22 268:6,7,21 269:5,22 270:2 270:15,16,18 270:24 271:25 272:2,3 275:11 275:13,19,21 290:3 297:22 298:11 299:25 302:10,25 303:14 304:19 304:22 305:2 306:17,20 307:1 320:23 329:20 331:16 336:10 338:9 338:20 341:9 341:17,18 343:15 347:9 349:15 350:13 362:21 383:6 383:11 385:18 385:19 387:7,7 387:8,9 414:7 414:13 427:20 427:24,24 428:1,12,19 431:10,10,10 443:18 446:12 447:2 448:3,8 448:13 449:13 463:8,9,19 464:12,15 465:5 466:17 466:20,23,23 467:12,22 469:11,23 471:12,15 495:2,4,5
**papers** 29:23 30:18 34:18 61:10 73:25 94:14 96:17 97:24,25 121:1 121:11 134:6,8 134:11 169:6 169:23 234:7 246:21 247:13 255:21 256:5 262:1,5 263:9 263:20 264:13 264:15,18,22 264:23 265:14 268:1,2 294:8 294:12,23 295:23 303:20 303:21 331:13 331:24 337:1 383:14,15 385:25 387:10 414:5 418:5,14 426:8 431:9 434:18 446:5 447:1 452:25 453:1,4 490:6 491:7 497:4 498:3
**paraben** 11:21 12:20 133:10 169:12 349:23 393:3 467:20
**parabens** 11:17 12:18 35:14

36:5,9 50:24 51:6,23 54:19 55:17 67:3 68:5 69:7,20 77:9 102:10,16 104:22 105:4 105:17 106:9 106:23 108:21 115:1,19,23 116:13 123:7 130:16 132:16 133:2,17 134:12 140:15 152:10,25 167:5,14 168:2 168:10,11,15 168:18 169:17 186:2,5,8,24 187:13,23 188:4 190:1 191:19 192:5 193:12 194:12 194:18 195:14 197:14 204:15 205:1,19 206:2 261:19,20 262:2,7,24 263:20 264:16 264:17 265:24 266:24 267:10 267:25 270:23 271:12 329:12 330:25 331:15 331:20 333:1,6 333:13 334:17 335:17 338:4 338:14 339:11 351:6 355:4 393:22 394:15 394:23 396:19 399:2,3 407:10 448:16 474:3,7 474:15,20,21 476:11,24 491:17,21 492:9

**paragraph** 70:12,16 84:20 85:10,22 88:7 88:9 101:10,16 101:25 120:14 123:13 130:25 155:15 181:21 245:4 258:5 266:6 284:15 284:18 302:11 329:25 330:6 335:8 336:8 350:25 351:21 352:6,20 356:1 442:15,16 445:1 452:5 487:20

**paragraphs** 442:8

**paralegal** 9:20

**parameters** 216:24 339:10

**paraphrasing** 493:6

**parcel** 187:2 190:21 408:22

**pardon** 75:1 222:5 472:16 495:23

**parentheses** 357:12

**parents** 404:19

**parfitt** 3:4 10:7 15:13,14,25 16:2 24:20 25:1,15,22,25 26:2,11 28:21 29:14,22 32:3 32:13,20,23 33:2,7,21 34:1 34:13 35:7 36:14 38:6 39:7 40:4,8,22 40:25 41:11 42:16,21 43:11 43:14 47:23 48:7,14 49:4 51:25 53:2 54:1 58:25 59:3,11,20 60:1,8,11 64:6 64:17 65:4 66:15,20,24 67:25 68:7 70:22 72:10,17 73:6,16 74:2 75:12,20 76:11 76:15,18 77:24 78:7,18 82:5,7 82:24 83:7 84:2,8,15,17 85:18 86:9,15 86:24 87:4,8 88:23 89:6,16 90:7 91:7,24 92:7 93:1,10 93:20 94:10 95:6,16 96:1,8 96:19,22 97:3 97:7 98:9,17 100:12,21 101:15 102:18 103:1,10,12 105:6,19,22 106:2 108:24 109:3,17 110:13,16 111:23 112:7 112:24 113:15 113:24 114:4 114:23 115:18 116:14 117:21 118:1,11,18 119:1,3,8,19 120:4,7 121:3 122:8,13,23 123:24 124:17 124:25 125:16 126:8,11,15 127:4 128:9

129:15,21
130:1,7,17
131:22 132:18
133:4,20 134:5
134:14 136:23
137:8 138:2,5
138:15,23
139:1,25
141:10 142:23
144:4,9,19
145:9 146:7,12
146:15 147:18
148:5 151:8,18
152:6,12,17
153:2,9,14,17
154:14,18
155:7 156:7,13
157:7,15,25
158:7,14,24
159:11,20
160:1,14 161:6
161:18 162:1,6
163:10,20
164:5,14,24
165:24 166:7
166:16 167:7
167:17 168:6
168:24 169:3
170:7 172:2,21
173:17 174:17
174:23 175:14
175:20 176:6
179:15,22
180:4 181:4,9
181:17 182:11
183:6,22 184:5
184:24 185:2
185:11 186:3
186:25 187:17
188:11,19,22
189:6,14,20
191:11,22
193:18 194:2
194:19,22
195:9,13,20,23
196:6,13,16,18
196:23 197:4,7
197:17 200:3,8
200:19 201:2,5
201:10,24
202:24 203:4,9
203:13,24
204:8,16,18
205:3,8,21
206:4,22 207:4
207:15 208:14
208:18,22
209:10,22
210:9 212:1,14
212:21 213:2,9
213:11,25
214:8,25
215:13,19,25
216:10,22
217:5,13
219:11,17,25
220:5,23
222:22 225:14
226:16 227:4
227:13 228:5
228:18 229:1
229:14 230:8
230:16 232:6,9
233:21 234:13
234:15 237:7
237:25 238:9
239:6,12,24
241:14,18
242:19 243:4
243:17 244:2,9
245:9,13,19
246:10,15,22
247:9,20
249:17,24
250:11 251:11
251:17,23
252:17 253:11
253:25 254:13
254:16 255:5
256:13,16,21
257:8 258:18
258:22 259:3,5
259:15,20
260:9,21 261:8
261:11,17
262:13,18
263:14,17,22
264:4,20
265:17 268:13
268:17,25
269:9,14,23
271:2,19,24
272:16,20
273:16,23
274:9,15,24
275:8,14,20
277:1,13 278:4
279:24 280:2
281:2,10,16,23
282:8,17,20
283:2,8 284:15
285:16 286:2
287:3,9,23
288:3,13,22
289:1,7,12,22
290:13,25
291:3 292:2,11
293:10,17,20
294:15,20
295:1,10 296:5
296:9,14,21
297:8 298:11
298:15 299:1
299:18 300:4
300:17 301:5
301:11 302:20
303:4,11,17
304:4,10,17,20
305:19 307:19
308:1,18 309:1
310:4,9,19,22
310:25 311:3
311:10,23
312:10,15
313:4,11,15,22
314:15,20,23

315:9 316:1,15
317:9,21
318:18,24
319:25 320:5
320:10,16,24
321:24 322:12
322:19,22
323:5,10,19
324:2,12,18,23
325:2,6,13,16
325:19,24
326:5,8 327:1
328:12,15
329:1,21 330:4
331:11,17
332:1,4,8
333:10,23
334:5,25 337:2
337:6,18 338:6
338:10,16,25
339:4,20 340:1
340:18,21
341:10,23
342:6,13,22
343:3,7 344:9
344:21 345:1,7
345:11,20
346:5,8,25
347:10 348:25
349:16 350:7
350:17,22
353:5 354:4,17
354:23 355:9
356:12 357:3
358:1,9,14,19
358:21 359:4,7
359:19 361:25
362:12,18
363:19 364:7
364:19 365:1,6
365:9,15 366:3
366:7,14,20,23
367:6,10,15,18
367:24 368:2,5
368:14,19,23
368:25 369:6,9
369:11,16,19
369:24 370:5
370:17,20
371:14,16,23
372:2,13 373:3
373:6,15,18,23
374:11,13,18
374:21,24
375:5,11,16,20
376:1,8 377:10
377:14 378:15
378:21 379:2
379:16,20
380:6 381:13
382:2,10
383:12 384:14
384:17,20
385:22 386:8
386:12,16,21
386:25 387:4
387:17 388:3,9
388:16,19,23
390:6,11,13,15
391:16 392:11
393:10 394:4
394:10 395:6
396:4,24
397:22 398:1,4
398:13,15
399:17 400:3
400:13 401:6
401:16 402:8
403:23 404:5
404:11 405:1
405:23 406:8
408:5 409:9
410:23 411:13
414:15 415:11
415:18,22
416:6 418:1
419:1,8 421:12
421:20 422:16
423:2,8,21
424:19 425:8
425:21,23
426:2,17,22
428:14 429:1
429:10 430:2
431:13 433:3
433:13,18
434:1,12 435:2
435:12,16,20
436:1 438:16
439:12,15,19
439:24 440:4,8
440:11,13,16
440:18,25
441:5,8,13,14
443:1 444:1
445:23 446:1
446:10,23
448:11 449:11
450:7 451:15
451:20 452:10
453:6 454:17
454:25 455:1
455:13 456:3
457:3,9,22
458:3,6,10,19
459:14,25
460:2,4,13,15
460:25 461:7
461:12,16
462:3,8,19,21
463:2,13,20
464:18,21,24
465:14 466:1
466:14 467:2,7
467:25 468:4
468:10,25
469:7,14,25
470:6,14,18,24
471:23 472:1
472:25 473:3
473:10,21
474:4,8 475:1
475:3,8,24
476:3,13,17,21
477:2,4,9,18
478:1,16,20,24

479:9,16,24 480:3,10,15,19 482:11 483:2 483:11,17 484:15 485:1,6 485:9,13,22 486:1,5,12,17 487:3,6 488:1 489:4,17 490:1 490:11,16 491:9,24 492:12,22 493:8,13 494:4 494:8,14,23 495:7,14,21,25 496:1,9,15,20 497:13 498:9 498:22,24 499:23 500:3,5 500:20 504:1
**park** 4:5
**parker** 4:3
**part** 21:21 22:23 24:15 27:5 36:13,16 41:14 58:5 77:22 92:22 93:25 95:15 102:8 109:21 113:22 114:17 115:12,14 125:3 139:1 144:1 146:10 177:4 183:9 184:21 187:2 190:21 198:2 216:3 217:25 248:9,10 273:7 276:23 280:11 295:23 297:2 320:22 371:13 374:2 393:12 408:22 441:9 479:7,23 480:9
**partial** 288:7 364:12 365:1,4
**participant** 12:7 276:1
**participants** 277:8,19,24 278:1,8,13,14 278:19 279:16 280:12,19 282:5 300:13 307:1 309:6 316:9 497:11 498:4
**participating** 62:14
**particular** 21:10 27:11,12 80:1 89:11,12 89:25 95:10,10 106:15,18 109:14 134:17 149:17 161:14 178:2 186:16 257:15,21 260:12,14 261:21 292:20 329:19 346:15 364:20 383:10 403:18,20 412:20 414:8 436:3 437:4 438:11 443:3 443:18 445:1 474:25
**particularly** 176:3 308:11 359:12 412:8 436:13
**particulated** 253:19
**parties** 14:11
**partition** 131:19
**parts** 149:10 486:11
**party** 14:24 22:11,20 503:19
**pass** 244:22 399:7 497:1
**passananti** 6:13
**passed** 377:19 399:13
**passing** 131:18 190:11
**passive** 277:20
**past** 68:11 150:18 171:14 172:14 261:12 280:20,25 281:6 282:14 291:8 297:20 307:9 432:13
**path** 132:15
**pathogenesis** 149:4,9 177:7
**pathological** 79:1 123:20
**pathologist** 78:24 79:2
**pathology** 10:23 71:8 78:22 121:22 436:16
**pathway** 131:1 131:5 132:6 393:9 437:5,5
**pathways** 37:8 37:11,18 437:1
**patience** 450:14
**patient** 13:5 65:3 72:25 229:24 334:8 361:1 366:24 372:10 378:16 378:22 379:2,3 438:19,20 439:1,16 441:18,25

447:15,16 491:2
**patients** 58:13 58:15 60:25 61:8 64:12,23 75:4 174:11 307:11 347:2 409:8 440:10 471:7,8 496:13
**patrick** 3:5
**pattern** 410:4 410:10
**patty** 9:20
**paul** 4:16
**pause** 119:13 326:3 392:6
**pauses** 103:12 326:7,8
**paying** 430:24
**pc** 4:17 5:4
**pcos** 52:8 65:21 65:25 134:21 136:21 137:6 137:15 139:24 140:9,16,19,25 141:6 142:5,7 142:12,16,20 143:22 144:8 144:11,24,24 145:7,14 146:4 147:2,16 152:4 152:16 153:1 154:12 155:5 155:25 158:12 171:2 172:19 173:6,11,15 174:4 175:17 176:5,12,17 181:25 184:12 184:22 271:12 348:13,24 409:11,12,14 410:25 411:14
**pdq** 13:5,13 32:18 360:25 363:11,13,23 372:3,10 373:20 376:21 377:8 439:2 444:19 464:11 465:2
**peek** 439:18,19
**peer** 73:25 85:12 228:23 294:11 443:14 445:16,19,24
**peiyuan** 8:13
**pelvis** 177:22 177:25
**penalty** 502:1,4
**pending** 16:13 18:11 151:9 341:10,13
**penetrate** 351:7 399:10 438:13
**penetrated** 438:3
**people** 86:12,13 212:5 213:23 242:17 277:25 301:19,25 302:5 435:7 444:21,23 493:21
**people's** 212:18
**perceive** 461:23
**perceived** 117:3
**percent** 49:20 49:22 82:15 132:7 144:12 266:10,14 267:1 277:25 278:20,20,24 279:2,5,8,16,19 290:5 299:9,22 306:22,25 321:9 406:19 407:3 409:1 456:10
**percentage** 49:21 58:23 59:19 307:15 416:25 449:19 499:1
**perception** 21:25 103:8 240:18
**perform** 63:24 244:15 334:14 343:18 346:13
**performed** 447:8 450:17 451:10 453:17
**performing** 102:2 332:14
**period** 58:20 158:16 417:10 431:21
**perjury** 502:1,4
**permanents** 362:5 364:2 441:22
**permeability** 128:1
**perpetrator** 412:14
**persistence** 155:23 176:19
**persistent** 232:20 431:11
**person** 89:12 119:25 216:19 340:7 494:12
**person's** 111:18 200:7 200:23 380:20 494:3
**personal** 12:8 279:11 280:6 294:10 335:14 336:17,22 375:8 399:24 400:10,24

401:10 402:3
**personally** 273:1 375:10
**persons** 352:14
**perspective** 139:6 252:2 257:25
**perspectives** 232:13 276:4
**pertains** 460:17 503:13
**pervades** 432:11
**pesticides** 270:22
**petri** 93:7
**petti** 7:6
**pguo** 8:17
**ph** 399:22 401:20 402:2
**ph.d.** 8:13
**pharmaceutic...** 121:24
**pharmacologic** 94:13
**pharmacologist** 459:17
**pharmacology** 459:22 461:3
**phase** 145:19
**phenol** 133:14
**phenols** 54:23 55:17 67:7 68:5 69:11,20 77:10 102:11 102:17 104:23 105:4,17 106:9 108:21 116:11 123:7 130:15 132:17 133:2 133:17 134:12 140:16 152:10 152:25 167:6 167:14 168:1 186:9,24 187:23 189:25 191:20 192:4 193:12 194:13 194:18 195:14 197:15 204:15 205:2,20 206:3 271:12 474:3 474:24 476:11 476:24 491:18 491:21 492:9
**phenomena** 184:9 427:1
**phenomenon** 150:3 177:12 411:22
**philosophy** 62:23
**phone** 43:5 61:17 62:2
**phones** 14:9
**phonetic** 254:4
**phrase** 87:23 88:1
**phthalate** 11:15 12:20,20 133:12 230:7 230:21 231:4 232:12,21 233:9 257:17 257:21 260:4 341:6 349:23 349:23 354:8,8 393:2 407:18 407:19 437:9,9 467:20
**phthalates** 12:17 50:24 51:6,22 54:21 55:18 67:5 68:5 69:9,20 77:10 102:10 102:16 104:22 105:4,17 106:10 108:21 115:1,19,24 116:13 123:7 130:15 132:16 133:2,18 134:13 140:15 152:11,25 167:6,14 168:2 168:12,16 186:8,24 187:13,23 188:5 189:25 191:19 192:4 193:12 194:12 194:18 195:14 197:15 204:15 205:2,20 206:2 232:16 233:2 258:6,10 260:4 260:12,13 267:10 270:23 271:12 329:12 330:25 331:15 331:21 332:25 338:4,14 339:11 351:6 352:11 355:3 393:22 394:15 394:22 395:15 395:15 396:19 407:10,12,21 414:8,10 415:9 438:2,12 448:16 456:6 471:19 472:13 472:20 473:19 474:3,16,17,18 476:11,24 491:18,20,22 492:1,9
**physical** 259:18
**physician** 22:14 363:11 366:25 373:8 438:20 439:2,5 440:20 441:17 441:18 447:16

**physicians** 439:17
**physiologic** 94:13 122:21 125:9
**physiological** 123:15 198:9
**physiology** 10:23 104:3 121:22 122:15 123:4 125:3 163:12,13
**phytoestrogens** 215:12,15,18
**pick** 14:8 80:17 90:16 108:7 149:23 234:3 367:24 456:10
**picked** 192:7 192:10 399:12
**picking** 368:1 430:21
**pickup** 178:7
**picture** 90:15 418:7 420:8 422:11
**piece** 33:10
**pieces** 366:16
**pierce** 12:17 328:18,25 330:17 335:3 385:19 386:9 387:7,8 446:11 448:13,17 463:8,19 464:3 466:19,20 467:12
**pile** 28:10 267:20,22 390:10 414:24
**piles** 33:2
**pill** 92:14
**pills** 205:23 360:2,3,16 361:10
**ping** 491:13
**pink** 39:6,6
**pioneered** 294:2
**pituitary** 56:7 56:8 60:23 135:22 136:4 432:23
**place** 14:11 90:10 170:8 202:7 500:7,19 502:8 503:6
**placed** 400:19
**plaintiff** 22:25 22:25
**plaintiffs** 3:2 10:20 15:15,17 15:24 20:7,24 21:16 24:3,14 28:5 42:6 43:6 45:12 46:8 47:1 48:19,22 58:22 59:16 74:20 77:22 119:6 235:8,16 433:12 482:16
**planning** 61:18
**plasticizers** 232:21
**platform** 432:8
**platforms** 50:15
**plausibility** 136:20 303:6 303:15 393:6 417:15
**plausible** 398:9 409:7 420:9 427:12
**play** 245:5 249:14 479:17
**plaza** 8:6,14
**please** 14:7,9 15:2 17:11,15 17:25 29:23 45:11 56:23 60:19 148:5 159:3 162:7 170:4 188:22 219:18 229:4,7 239:12,12 259:5 274:18 289:22 299:20 312:17 382:14 395:24 396:13 398:3 400:5 471:24 485:15 487:20
**plentiful** 419:14
**plus** 267:10,11
**plyons** 3:10
**point** 18:8 63:9 80:18 83:1 117:18 118:21 176:2 189:18 238:5,20 250:15 291:15 294:6 310:6 313:24 341:20 346:16 350:20 364:19 368:20 390:22 406:13 411:11 419:3 435:8 453:20 454:10 471:4,5 481:18 492:15
**pointed** 289:14 427:23 433:4 486:25
**pointing** 238:21 239:7 240:3
**points** 250:9,13
**polar** 131:15
**policy** 373:19 373:21 445:7
**pollutants** 233:17
**polycystic** 11:7 33:18 52:8

64:21 65:21 66:9 75:4,24 99:16 139:9,16 141:18,21 143:1 144:15 146:9,19 149:13 155:1 158:16 181:20 232:2 409:21 409:25 410:21 411:5,19,24 412:18
**pong** 491:13
**poor** 468:13
**poorly** 468:6
**population** 144:12 299:16 306:16 316:13 317:5 320:3,6 351:14 436:11 436:18
**populations** 308:11
**porcine** 127:13
**port** 4:6
**portion** 30:6 60:6 62:15 83:2 115:20 149:23,24 192:7 365:5,6 393:19 399:5,6 414:13 421:25 422:1 491:14
**portions** 150:19 399:11
**pose** 339:18
**posed** 346:2 466:11
**poses** 182:22 436:7
**posing** 163:4 172:16
**position** 27:25 362:19 366:18 366:20 459:13
**positive** 290:3 291:22 298:9 298:18 310:13 312:22 323:17 323:20 422:2 431:2,21
**positively** 293:2
**possibility** 471:2
**possible** 16:19 93:23
**possibly** 137:25 138:12
**post** 34:17 35:3 35:14 37:1 39:12 63:2 243:23 374:5 404:24 427:14 427:17 436:6
**postmenopau...** 359:13
**potency** 224:12 226:9,13,22 227:9,25 228:23 229:10 231:8 255:23 255:25 256:6 256:12 414:17
**potent** 227:18 258:12,13 260:4,6
**potential** 102:15 105:2 171:2 284:9,21 308:14
**potentially** 124:5 137:23 205:16 241:2 339:10
**potentiate** 481:19,21,23
**potpourri** 186:15
**power** 236:5,11
**powered** 154:3 155:4
**powerful** 157:11
**practice** 412:23 448:9 452:16 491:6
**practices** 1:5 2:5
**practicing** 447:13
**pre** 248:9 404:18 436:6
**precede** 491:6
**preceded** 149:25
**precise** 80:18 342:2 478:2
**precisely** 207:9 365:9 368:19 449:25
**predicated** 416:17
**predicting** 128:8
**predictors** 147:1
**preface** 190:2
**prefer** 59:9 91:20 101:3 426:10
**pregnancy** 56:5 201:17 202:19
**pregnant** 332:14 407:20
**preliminary** 432:8
**premenopausal** 409:24 426:20 427:14
**preparation** 45:4 58:10
**preparations** 115:2

**prepare** 18:19 19:18,21 20:10 20:24 21:5,11 21:16 135:16 246:25
**prepared** 19:25 25:7,7,12 27:15 128:24 352:24
**preparing** 189:8
**presence** 216:15,18,25 244:17 333:6
**present** 9:16 15:3 100:25 108:21,22,22 173:23 186:23 219:14,20,22 229:9 331:14 338:2,13 355:16 387:11
**presentation** 69:14 149:5
**presentations** 69:24 100:23 101:1
**presented** 67:22 68:4 99:18 126:18 167:4 301:22 303:24 321:14 326:13
**presenting** 142:7 309:24 310:15 311:18
**presently** 173:25
**presents** 309:5 321:8
**preserve** 62:4 63:21
**preserves** 117:14
**presser** 449:25 499:3,5
**pressers** 421:1 421:7,18 449:18 499:10 499:11,12,18 499:19
**pressing** 280:22 281:13 281:21 282:7 284:4,11,23 285:2,15 303:1 309:10 318:7 422:19,23 423:10 424:15 424:21 498:16 498:17
**pressures** 404:22
**presumably** 246:5,18
**presume** 159:14,15
**presumed** 139:18 276:13
**presumptuous** 481:2
**pretty** 24:8 71:13 96:13 412:15
**prevalence** 33:16 308:13
**prevalent** 102:3 103:24
**prevent** 416:18
**prevention** 13:4,6,12 32:18 154:7 360:25 363:15 372:10 380:10 444:20
**previous** 175:23 222:16 284:4 309:11 336:14 377:19
**previously** 24:4 176:12 177:6 223:4 297:16 314:24 378:12 426:6 429:8
**primarily** 78:6 78:11 135:9 182:14 194:15 195:12 197:3,4 345:18 347:1
**primary** 65:25 72:20 179:13 179:20 180:2 194:16 195:6
**primate** 411:9
**principal** 488:8
**principles** 292:23
**print** 30:7 53:5 364:14
**printed** 33:12 34:3 36:21 108:4 275:12 355:19 361:1 379:12,13 440:6
**printer** 30:7
**printout** 12:23 13:4,6,12 28:24 34:16 39:9 355:17
**prior** 26:24 60:25 64:1 67:21 68:3 74:20 75:9 88:2 104:19 111:17 118:15 175:16 240:21 272:7 273:14 297:1 301:16 302:2 307:25 309:11 314:14 331:13 333:3 361:20 497:8 503:7

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 597 of 640 PageID #:74145



**priorities** 153:25 240:9
**private** 14:8
**privilege** 479:1
**pro** 108:10
**probability** 431:18
**probably** 21:1 36:1 48:6 50:23 74:15 83:18 86:16 104:4 109:19 149:12,15 164:9 169:3 170:23 181:14 190:13 193:8 225:25 237:14 239:22 253:18 263:3 393:19 415:2 462:22 499:21
**problem** 34:1 118:21
**problems** 17:16 131:17 340:14
**procedure** 352:22
**proceed** 17:11 29:23 103:22 398:25 432:9 437:3
**proceeding** 15:1
**proceedings** 503:5,7,9,15
**process** 113:8 113:23 114:18 115:3 116:19 116:20 118:2 125:9 136:20 141:7 149:19 151:23 163:5 177:2 178:22 183:10 199:15 243:3 349:10 398:21 400:23 401:24 436:4
**processes** 436:24
**prodding** 436:20
**produce** 24:14 24:14 136:8 185:6 414:18 452:20
**produced** 13:11 41:18 42:3,15 135:10 145:19 146:1 219:21 240:23
**produces** 156:16 199:8 449:9
**producing** 135:16 156:12
**product** 106:19 106:19 108:2 108:11 109:13 109:15 115:25 191:24 195:8 261:2 285:6 339:17 405:5 422:18 489:23
**production** 142:10 143:1 155:20 176:20 176:20 182:2 185:5 432:24
**products** 1:5 2:5 6:3 11:19 12:10,12 106:15,22 107:24 108:6 108:17,23 115:13,16,21 116:1 123:8 169:19 186:12 186:16 188:1,4 188:9 189:16 190:4,9,19 191:10,14 194:24,25 215:11 240:5 271:13 280:22 281:13,21,22 282:7,14 283:22 284:4 284:11,24 285:7,15 286:24 301:20 301:20 302:1 302:16 303:2 306:12 307:5,9 308:15 309:10 309:25 310:17 311:8 313:3 314:11,14 318:8,16,22 320:9 335:15 335:18 336:17 336:22 362:3 362:10 364:1,5 368:12 370:15 373:1 391:7 396:22 399:21 399:24 400:10 400:24 401:11 402:3 405:10 414:1 420:11 421:23 422:20 422:23 423:10 424:15,22 441:20 449:17 453:23 454:13 477:21 488:13 497:6,25 498:7 498:17 499:17
**profession** 192:20
**professional** 13:13 32:19 65:9 72:5 77:16 238:3 363:3,5,7,9 378:18,20

439:2 441:17 448:23
**professionals** 439:17
**professor** 16:9 56:2 57:9,12 57:16,18
**profiles** 407:25
**progesterone** 36:9 135:16 136:9 145:19 145:25 155:21 156:6 158:6 185:5,7,8 204:11 205:12 208:5,17,21,24 209:9,17 412:13 413:16
**progestin** 36:5 135:17 145:22 360:4,5 361:11
**program** 376:17,18
**progressing** 312:22
**progression** 165:1 245:6 249:14,22 250:5
**project** 340:25 449:2
**projects** 342:3
**prolactin** 56:6
**promise** 146:14 496:23
**prompted** 71:14
**pronouncing** 438:7
**proof** 92:22 430:19
**propagate** 407:14
**proper** 118:17
**properly** 89:14 117:14
**properties** 131:20 456:16 456:21
**proposal** 61:19 62:6
**proposing** 392:16
**proposition** 81:25 372:21
**propylparaben** 266:20 267:2
**prospective** 446:17
**prostate** 236:25 238:25 241:12
**protect** 435:18 435:21
**protection** 99:23 360:14
**protective** 111:20 112:22
113:5 333:20 334:22 361:13 483:1,6 484:10 484:21 485:17
**proteins** 178:9
**protocol** 15:22 23:16 340:12
**protocols** 432:7
**prove** 83:1 92:20 346:16 471:4
**proven** 163:13
**provide** 24:3 69:1 105:1 150:12 269:15 303:5 353:21 354:14 366:25 409:6 432:8
**provided** 24:4 26:6 42:17 44:22 65:17 82:4 107:1 134:6 139:11 235:14 252:20 371:17 389:10
**provides** 125:8 254:19 303:14
**providing** 46:20 48:19 129:11 369:25 371:24
**proximal** 177:22 178:1
**proximity** 160:4 177:15 403:3
**ps** 492:10
**pten** 37:18 406:19,21 407:4 408:25 417:3 418:16 418:20 419:20 436:16 437:1 456:11,13
**puberty** 201:13 202:3,19
**public** 39:10 150:24 152:3 434:7,13,16 440:10 506:19
**publication** 75:22 238:24 246:1,21 248:10 294:23
**publications** 67:3,18 69:23 85:2 87:21 88:2,4 112:16 143:16 240:2 246:2 254:2,24 295:8 395:16 405:15
**publish** 72:2 75:23 238:6
**published** 67:22 68:4 69:13 72:20

73:24 75:19 99:18 221:5,7 228:22 234:21 240:13 294:12 329:15 343:5 350:1 363:14 378:14 382:23 407:11,12 414:14 423:13 443:14 444:14 445:16 469:11 469:23
**publishing** 448:10
**pubmed** 49:23 50:5,11,18 52:11 82:11 270:25 271:10
**pull** 41:2 420:19
**pun** 74:24
**purpose** 61:25 122:3
**purposes** 109:2 192:12 246:1 270:16 374:8 409:15 415:12 415:25 428:20 437:19 442:21 445:9 447:15 452:12 454:2
**push** 424:23,24
**pushes** 429:8
**put** 28:3 31:11 31:19 32:5 35:6 40:15 43:9 44:4 80:9 98:23 107:7,20 133:24 139:5,6 175:4 188:17 188:19,25 189:8 192:19 234:11 254:25 262:7 267:19 272:18 303:20 333:15 341:14 343:15 345:2,8 376:9 387:24 389:24 390:9 420:21 427:23 427:25 428:4,5 463:4 468:5 472:1 483:6
**puts** 303:20 407:5 417:3 454:12 484:9
**putting** 262:4 345:9 347:13 418:6

**q**

**quai** 221:19
**qualify** 160:22 239:14,17 460:11 461:10
**qualifying** 461:10
**quality** 448:5
**quantified** 331:3
**quantitative** 331:14 338:3 467:19
**quantities** 415:2
**query** 363:11 366:25 438:19 438:20 439:17 441:19 447:16
**question** 17:23 18:11,12 19:5 19:14 24:6 25:2 40:7 58:18 65:6 73:11,12 79:2 87:22 89:18 90:2 92:11 93:2 98:20 101:21 105:7 113:20 114:4,7 114:15 117:3 118:3 119:5,12 119:18,20 120:1,4 125:11 125:24 126:12 126:16 137:9 151:9 154:22 154:23 160:16 160:18 162:12 165:11,15 167:20,23 168:25 172:23 175:1 179:16 189:6 195:17 195:23 198:5 202:21 203:14 203:15,18 205:6 207:6 208:3 209:3 210:21 211:1 212:25 214:4 217:10 219:18 220:1,14 226:17 227:7 229:2,16,23 230:11 239:4,7 245:17 246:16 247:21,22 248:2 249:12 252:18 260:22 261:11,14 271:7 272:1,8 274:17 280:15 280:19,24 281:3,5 286:17 288:7,14 292:5 293:18 295:1,2 295:13 296:20 296:22,23 297:23 299:19 304:25 305:20 308:18 310:23 311:4,17 312:1 312:12 313:17 313:25 314:16

316:16 317:6 317:25 318:1 325:7,14,17 337:3 338:25 341:10,13,25 342:7,8 345:24 345:25 346:2 346:11 356:25 366:12 367:22 368:10 369:1 370:9,11,17 371:15 387:6 389:1 391:18 391:19 395:19 397:4,21 398:3 398:14,16 400:5,12,16 401:18 403:11 403:12 411:11 411:14 412:13 417:24 418:3 421:11 425:20 428:2 435:1 449:15,20 453:10 454:24 457:25 460:13 461:24 466:6 466:24 467:15 469:15 470:6 474:11,20 475:15,21 477:10 478:2 478:25 481:22 483:14 487:22 489:3,9 490:4 496:2 497:17 497:19,21

**questioned** 345:17 376:15 433:17

**questioning** 117:8 188:8 342:14,16

**questionnaire** 12:9 280:7,12 281:19 283:25 284:9,22 285:12 306:16 311:19 317:14 317:19,23 319:21,22 326:19 343:11 420:23 449:16 495:3 498:1

**questionnaires** 347:3,6

**questions** 10:9 45:18 71:14 113:25 117:23 118:5 132:4 145:14 164:11 164:21 170:22 198:3 255:20 257:13 316:23 325:25 326:2 326:18 339:2 340:15,19 343:8,10 344:16,19 371:16 374:16 374:17,19,21 374:23 389:23 390:17,22,24 391:21,24 409:10 420:15 425:18 430:5 450:25 451:8 451:23 452:3 455:14 459:18 465:9,24 466:11 476:10 476:10 478:22 479:18 482:16 484:15 489:18 491:10,13,15 493:4 496:21 496:23,24,25 499:23,25 500:3

**quick** 17:2 24:8 56:23 170:9 255:5 257:5 439:18,19 452:1

**quicker** 280:18

**quickly** 348:13 380:14 496:22

**quite** 18:1 38:21 50:20 61:21 83:14 114:5 161:2 168:20 173:1 190:10 238:10 239:21 240:16 241:3 331:21 373:9 393:7,8 393:25 407:12 414:11 418:7,9 420:8 422:9 436:4 438:13 438:22 453:3 481:3

**quote** 292:22 292:25 377:21 430:17

**r**

**r** 1:13 2:15 5:19 10:4,15,17,19 10:22 11:2 12:2 13:2 14:14 44:1 46:2 332:18 500:25 502:3 502:18 504:5 505:2,3,3,24 506:2,4,12

**race** 277:23 301:1 309:6 312:25

**radiation** 381:7

**raised** 116:23 481:22

**ramadon** 11:4 120:23 124:20 126:3,19

128:23 129:2 134:1
**randolph** 4:19
**range** 266:12 267:8 407:3 409:24 410:8 473:23
**rank** 423:19 424:18
**rankings** 95:14
**rapid** 334:16
**rat** 127:12 160:7 163:5 411:8 417:9 432:24
**rate** 46:15 48:16
**rates** 242:10 422:13
**rather** 186:14 350:14 424:2 457:5 468:14
**ratio** 291:15 292:8,10 298:8 300:23 301:2,8 305:11,24 309:12,18 310:10,16,17 311:7 313:1 314:10 321:18 322:5 323:14 323:14,16,24 324:9,15 327:10,22 328:9 422:6 423:12,15,23 424:8,16 425:2
**ratios** 290:18 300:20 321:8 322:8 421:15 423:10 429:21 430:24
**rats** 163:23
**razzaghi** 4:4
**reach** 96:25 303:3,16
**reached** 314:7
**reaching** 336:3
**read** 18:25 19:20 25:7,14 25:16,17 27:16 27:20,23,24 37:14 40:18 41:24 71:9 73:8 79:20 80:5 83:13 108:3,4,14,15 108:16 109:11 112:2,15,19 113:17 114:19 114:20,24,25 116:9 118:22 124:9 132:10 133:21 144:13 149:1,6 187:11 190:9 191:1,9 206:10 218:11 229:20 235:10 235:12 237:19 238:22 240:17 242:2,3,5 245:25 247:5 248:7,8 252:14 262:5 267:9 272:13 273:1 281:6 284:18 286:14,16 287:2,4 288:2 290:19 293:5 293:23 295:25 297:3 303:11 303:12,21 325:2 335:20 335:21 336:1,9 337:12 338:20 339:20,23,24 340:5,14 341:17,18 349:15 351:11 356:8,22,24 357:22,23 359:1 361:18 362:11 366:2 368:16,18,22 368:23,24 370:2,9,23,25 373:9 377:2,6 379:6 380:22 381:24 382:7,8 383:18 385:1 385:11,12 386:15 428:11 452:25 457:22 458:8,12 468:12 483:23 487:20 488:2 502:4 504:9 506:5
**readily** 120:19 124:12,23 125:15 126:6 134:3,4 331:22
**reading** 19:1 25:5 27:4,8 49:15,25 106:14 112:3 112:14 151:3 173:4 198:12 198:13 292:23 293:6 337:7 341:2 380:16 418:5 455:10
**readings** 240:7 404:7
**reads** 302:12 308:8
**ready** 102:24
**reaffirming** 267:9
**real** 17:2 100:20 111:14 112:11,18 292:10 340:15 341:15 411:22 453:11

**realize** 289:2 289:10
**realized** 80:6 102:22 103:23 104:1 289:14
**really** 22:18 23:19,21 45:14 50:1 59:5 60:3 80:8,25 81:12 84:5 92:20 106:11 143:5 147:20 150:21 178:5 184:9 186:10 187:23 208:6 235:20 253:20 322:16 346:19 375:21 379:22 387:2 398:14 401:18 411:14 414:10 417:14,21 453:20 471:3,5 478:14 479:12 479:12 500:1,1
**realtime** 220:4 220:6
**reason** 27:11 53:6 80:1 93:25 174:25 213:4 258:25 270:24 298:23 329:19 340:3 341:20 343:14 383:10 410:11 435:10 504:11 505:6,9,12,15 505:18,21
**reasonable** 97:6 253:3 254:23 297:19 298:6 356:13 356:23 433:17 450:12 451:17 453:21 455:5 459:3
**reasonably** 96:25
**reasons** 117:3 242:16
**recall** 52:18 65:19 67:16,20 80:7 88:3 123:9 153:4 168:10,22 218:2 222:24 225:15 229:21 231:12,24 233:7,10,10 244:13 268:20 268:22 269:4 282:23 329:22 428:2 437:12 437:17 438:21 442:5 486:25
**recalling** 165:9
**recapitulate** 432:19 465:16
**receipt** 504:17
**receive** 55:16
**received** 54:14 61:17 62:2 80:23 81:2,4 83:10 237:3 239:3
**recent** 84:22 85:2 143:8,10 171:1,17 175:9 175:11,16 176:3 292:23 377:2 385:2
**recently** 172:9 291:11 293:23
**receptor** 11:20 11:20,22 12:4 37:21 157:2,12 157:19 158:20 158:21,22 159:7,9 162:17 165:12,22 166:2 169:12 169:21,21 179:12,19,23 195:4 196:8 204:14 205:1 205:19 207:2 219:3 222:3,10 231:17,20 244:15,17,21 267:15 270:3 270:19 406:24 417:11 436:23 453:10 456:21
**receptors** 36:6 36:10 138:1,13 157:6 176:22 176:25 178:18 215:18 219:10 244:18 245:2
**recess** 17:6 110:19 170:15 255:13 257:1 264:8 348:2 389:19
**recited** 414:5
**recognition** 238:3 239:21
**recognize** 164:6 229:22 448:6
**recognized** 150:16 179:13 179:20 180:2 181:2 218:9 411:23 456:8
**recognizing** 289:17
**recollection** 22:21 46:6 231:6
**recombinant** 11:10 221:4,14
**recommend** 153:24
**recommendat...** 155:3

**recommendat...** 153:22 377:18
**reconsideration** 292:24
**record** 14:5,12 15:5 16:7 17:2 17:5,8 24:20 33:23 96:2 110:18,21 118:9 119:1 128:24 170:14 170:17 189:1 197:5 205:7 206:16 221:1 234:18 255:12 255:15 256:20 256:25 257:3 257:25 259:15 263:12 264:2,4 264:7,10 265:5 265:9 303:12 348:1,4 349:12 364:25 387:1 389:15,18,21 389:24 392:18 392:22,23,25 437:19 464:2 487:21 492:8 500:7,23,24 503:8,11
**recorded** 1:12 2:15 14:13 31:7,9 233:9
**recording** 14:10
**recruit** 135:23
**recycling** 39:22
**red** 221:19 225:4
**reduce** 184:19
**reduced** 158:6 481:7
**reduces** 185:9
**reduction** 184:12,21
**refer** 30:20 32:8 61:8 64:12 75:6 79:2 81:6 170:4 185:18
**reference** 25:5 25:21 26:8 36:2 40:16 80:12 81:12,18 81:23,25 82:2 82:21,22,25 83:1,3 107:18 109:10 125:2,5 125:19,20 134:8 169:25 190:24 191:5 218:10 221:6 230:5,12,18,25 233:19 238:2 238:25 245:23 246:2 247:12 248:12,13,19 257:15 270:11 271:3 290:2 329:6 337:13 368:7 372:12 386:4,12,22 389:7 409:12 410:25 440:15 441:19 443:24 488:14
**referenced** 41:7 41:24 79:16 372:23 504:6
**references** 19:1 19:3 21:9,10 25:13,20 26:10 26:23 27:1,5,8 27:12 28:11,12 31:16,17,19 33:11 35:18 40:11,12 41:25 49:24 50:15 52:19,25 79:5 79:6,9,11,19,21 80:2 81:3,6,15 81:16,17,19 82:8,19 83:6 83:11,14 188:24 191:1,7 217:20 228:16 245:20 246:6 246:19 256:2 270:13 271:20 272:5 275:3 293:15 335:24 350:11 364:10 364:22 365:10 366:9,13 368:10,16,25 369:4,13,15,25 371:6,12,18,25 372:4,20 373:12,12 374:3,4,5 377:24 387:9 389:8 440:24 441:4,10 442:17,19,20 464:13
**referencing** 423:22
**referent** 139:12 428:21
**referred** 174:9 186:8 199:15 242:8 248:16 264:23
**referring** 20:1 85:18 156:3 160:15 172:10 198:2 264:14 293:5 394:21 414:20 466:16 490:19
**refers** 219:2 226:7
**reflect** 365:10
**reflection** 410:3

**reflects** 33:23 292:20 445:5
**reformulated** 109:16
**refute** 446:17 446:25
**refutes** 445:19
**regard** 49:5 114:15 133:22 195:14 247:25 248:4 372:19 406:20 442:14 447:2 450:25 457:14 489:21 496:4
**regarding** 55:17 67:18 158:16 161:7 172:18 239:19 240:19 288:9 319:23 371:17 444:15 446:15 459:2 460:6
**regards** 164:9 261:18 272:1
**registering** 490:3
**regularly** 444:19
**regulate** 136:1
**regulates** 198:9
**regulation** 56:7
**regulatory** 217:2,8,10,15 217:20 218:15
**rei** 54:18 57:23
**reject** 295:8 342:5,8 346:7
**rejected** 294:8 294:23
**relate** 195:7
**related** 11:22 14:24 63:19 75:10 106:19 114:8 169:13 181:13 229:22 237:1 239:1 248:13 264:16 271:16 380:18 385:5 433:24
**relates** 318:14
**relation** 12:10 29:2 141:23 253:9 321:10
**relationship** 56:12 86:4 87:12 90:4 92:21 94:24 102:15 274:21 394:8 429:12 433:7 444:16 445:11 460:6
**relative** 12:4 161:22 267:8 270:3,20 311:25 503:18
**relatively** 44:25 168:19 175:11 175:16
**relativeness** 94:14
**relax** 397:7
**relaxant** 113:23 114:18
**relaxed** 280:21 281:13
**relaxer** 1:5 2:5 12:14 13:9 14:16,16 16:12 85:4 106:15,15 106:18,19 108:6,23 111:15,18,21 112:23 113:2 113:11 115:11 115:14 136:21 189:16 191:10 191:24 194:23 271:13,13 285:13 320:20 321:10,13 333:9,15 335:18 339:12 382:20 385:3 385:10 391:6 394:7 397:7,14 399:21 400:18 401:9 402:1,13 403:8,25 404:9 405:4 408:8 411:2 414:1 417:19 418:23 424:22 433:8 450:1,3 452:13 454:3 455:7 458:15 459:4 460:6,18 480:25 482:17 484:23,24 485:18 487:19 488:13,18 489:23 490:18 499:3,4,18 504:4,4 505:1 505:1 506:1,1
**relaxers** 12:18 52:13,14 67:9 67:23 69:5 85:14 94:24 102:5 103:6,24 107:11 109:9 111:3,8 112:4 112:17 115:9 115:21 120:19 121:8 122:6,11 122:12,22 124:12 125:4 129:25 130:5 130:13 132:13 134:7,12 137:5 137:22 138:11 138:21,24,24 138:25 139:13 139:23 140:8 141:8,22 142:19 157:23

158:5,13 166:20,21 167:5 168:3 186:12 187:4,7 187:12,22 188:14 190:21 191:16 192:12 193:5,16,24 195:5,8,19 196:2,4 206:9 214:17 226:15 227:12 228:2 228:25 229:13 231:8 233:20 261:14 267:12 281:1,8,20 282:6 284:3,10 284:23 299:6 299:17 300:2,7 300:8,12,22 301:15 303:1,6 305:7 307:6,25 309:10 316:13 316:18 317:1,7 318:9,15 319:3 319:9,23 323:23 325:12 329:13 330:12 330:23 331:3,8 331:16,25 333:14 338:5 338:15 341:7 357:12,20 374:7 391:10 391:23 393:5 393:17 395:9 395:10,13,22 396:7,8,9,10,18 397:12 398:8 398:17,18,21 398:25 400:8 401:21 403:13 404:17,25 405:21 406:1 407:7 409:5,17 413:1 414:21 414:24 415:1,8 415:9,14 416:1 417:16 418:10 420:5,10,11 421:1,6,17 422:19,24 423:11 424:15 426:15,19,25 427:12 429:19 429:20 431:16 433:20 434:8 434:14,19 436:5,5,21 438:1,12 442:3 442:10,14,22 444:16 445:12 446:15 448:17 449:10,18 450:20,22 451:4,14 453:7 453:8,22 454:13,15 456:17,20 460:19 461:6 461:18 462:2,4 462:5 466:25 467:21 468:24 469:18 473:19 477:21,25 478:11 481:1 482:8,23 483:6 483:8,9 484:5 485:21 488:5,8 488:24 489:8 489:11 490:9 496:6 497:12 498:18

**relaxing** 285:8 396:22

**relayed** 434:3

**release** 135:5 177:18

**released** 135:22 136:4

**releases** 199:6

**relegate** 394:18

**relevance** 51:3 313:23 477:4

**relevant** 45:5 88:11 161:16 162:15 186:2 210:7 316:12 317:5 320:3,6 320:8,11 339:15 341:15

**reliable** 69:1 346:2

**reliance** 299:24

**relied** 81:20 82:19 95:22 96:11 282:4 283:18,24 374:7 388:12 416:8,9,10,11 448:24

**religion** 62:23

**rely** 80:12 346:22 415:24 447:15,22 466:22 467:19

**relying** 81:13 81:24 82:22 188:9 218:22 265:22

**remain** 451:9

**remaining** 389:13

**remains** 148:20 285:23 286:21

**remarkable** 414:13 417:4

**remarked** 172:15

**remember** 61:15 217:19 218:15 221:9 261:25 263:12 269:13,13 296:20 349:18

391:24 407:3 420:17 421:2 430:7 449:20 459:18 474:14 478:6 488:20
**remind** 210:2
**remotely** 15:4
**removal** 223:15 419:17
**removed** 291:13 417:6 499:22
**render** 290:22
**rendering** 229:17 487:24 488:9
**repeat** 89:17 101:4 162:11 210:21 219:18 260:10 296:23 370:11 389:1 391:19 398:3
**repeated** 101:5 352:16
**rephrase** 59:3 180:6 207:5 208:3 411:11 421:10 434:5 466:7
**replete** 176:22 346:19
**replication** 242:24 380:25
**report** 10:19 19:17 20:1,2 21:5,9 23:8 25:4,6,14,17 26:24 27:3,5 27:13,15 31:18 31:20 41:8 43:21,22 44:1 44:15,16,21,23 49:16 50:10 65:25 68:11 70:11 77:19,20 78:23 79:5,8 79:12,16,20,21 80:2,3,13,21 81:4,10,15,18 81:21,24 82:20 83:2 84:19 87:19,24 88:6 94:17 95:3,9 95:13,21,23 96:5,15,20 97:20,21 101:9 102:10,13,19 104:18 105:12 105:20,23 107:17 108:18 112:4,15 115:9 116:10,15 118:16 120:12 121:2,19 123:6 124:9 126:1 129:6 136:19 137:12 139:21 140:2,14,19 142:5 143:18 146:21 147:1,2 148:3,24 152:3 153:13,14,15 153:18 154:11 154:15,17,24 155:11 167:4 171:5 173:4 181:11,16,17 185:17 186:22 187:10 188:17 188:23,25 189:12,15,15 189:24 190:3 190:25 191:2,6 191:19 192:10 192:14,15 193:10 194:14 224:20 228:17 228:21,22 229:9,14,19 230:5 231:1,7 231:14 234:23 235:10,12 237:20 242:4 246:1 248:11 257:15 258:4,9 270:12,16 272:25 273:5,9 283:19 288:6,8 288:24 289:20 289:22 293:16 295:8,15 297:1 298:7,21 299:5 311:6 314:5,8 316:20,25 320:9 322:5 324:24 325:2,4 325:5,6 329:8 329:20,25 330:2,6 332:5 332:6,10 335:25 338:23 350:14 369:4,5 369:17,21 372:24 373:12 374:4 383:1,3 383:11 385:16 386:2,7,14,19 387:8,11,22 388:2,8,14 389:6 406:5 413:25 416:4 457:2,3,4,11,12 457:15,19,19 457:20,21,23 458:3,4,9,24,25 459:7 462:16 476:16 477:1,8 477:17,23 478:7,9,14,23 479:4,8,10,10 479:20 480:2,6 480:11,12,16 481:14,15 487:8,17 488:15

**reported** 1:21 85:12 100:19 171:14 173:5 175:3 223:4 226:9,21 227:17 228:3 228:16 256:7 292:7 295:25 297:4 299:14 307:23 309:9 326:21 335:15 336:22 404:15 464:5 467:21
**reporter** 2:20 16:20 17:10 23:15 44:3 53:15 70:7 78:9 119:20 178:12 256:19 283:11 350:21 503:4
**reporter's** 503:1
**reporting** 158:11 171:1 173:11 176:23 308:23 322:21 351:8
**reports** 217:21 222:16,19 231:7 235:15 300:9 305:10 309:17 312:25 327:11 448:24 463:1
**represent** 58:24 59:19 372:13 374:2 394:24 431:23 439:25 441:16 445:6
**representation** 141:22 142:17 167:9 188:10 188:13 362:13
**representations** 192:11
**representative** 188:5 191:20 192:5 477:20 477:24 478:10 480:24
**represented** 362:19 386:9 396:20,20
**representing** 14:22
**represents** 192:16 238:15 431:24
**reproduced** 92:23 100:10
**reproducibility** 100:17
**reproduction** 198:10
**reproductive** 12:21 13:9 16:8 54:11 55:5 57:23 58:1,3 60:16 60:18 61:7 67:19 70:20 71:3 88:12 135:10,22 136:4 239:19 240:20 241:5 251:1,15 252:15 253:9 254:11 295:18 331:7 349:25 354:1 382:21 403:18 413:8 437:11 462:7 465:18
**request** 43:2 75:23 272:14
**requested** 53:6 503:16
**requests** 23:22 23:24
**required** 62:15 63:2 165:6,21 167:15 168:4 506:13
**requires** 18:23 18:24 19:2 58:11
**requisite** 438:14
**reread** 340:2
**research** 21:19 50:11 55:13 61:13 63:25 64:3 66:1,8,12 68:12 69:5 72:15,20 74:22 78:3 85:12 101:1 102:1,8 106:13 127:9 129:3 153:24 165:1 171:25 236:22 237:18 238:23 240:9 241:10,11 253:3 292:21 302:14 304:2 308:9,24 329:16 342:23 344:7,15 345:15,24 346:4 375:6 409:11 411:24 416:9 425:10 425:10,13 426:3 448:10 448:18,23 452:15
**researched** 104:20
**researchers** 431:6 432:16
**researching** 49:24

**reserve** 325:25 389:13
**residency** 54:25 55:18
**residents** 57:21 63:3
**resides** 182:15
**resist** 118:5,6 432:17
**resistance** 144:2,7,14 146:5 183:13 184:2
**respect** 69:5 273:4 488:4
**respected** 68:23
**respectfully** 117:24
**respectively** 267:3
**respond** 24:5 119:25 120:2 178:19 215:2 216:23 322:23 481:13 486:6
**responding** 91:19 343:8
**response** 10:21 45:12 94:9 147:22 186:9 196:9 197:18 199:8 263:4 266:9 274:13 274:20 324:21 325:11 375:2 375:21 393:24 414:9 451:23 455:14 465:8 472:23 482:15 492:7
**responses** 17:20
**responsible** 37:12 149:11 178:19 182:15 192:23 408:21 456:22
**responsive** 403:16
**rest** 336:8
**restate** 87:22 88:24 159:3 167:19 172:22 173:19 176:7 198:18 200:20 250:1 292:5 299:19 480:4 489:3
**restating** 296:7
**restoration** 185:8
**restores** 185:4
**restricted** 51:24 52:3
**result** 64:14 74:18 82:11 100:19 115:22 158:12 178:18 184:7 202:23 203:2 243:16 251:2 252:8 315:1 339:11 393:5 410:22 415:7 417:7 418:19 432:18 434:8
**resulting** 12:18 136:13 329:12 331:2 338:14 341:6 448:16
**results** 98:16 98:19 196:9 282:2 287:13 288:16 294:14 296:2 297:6 302:15 304:3 327:16 331:4 333:18,19 414:18 420:16 421:5,7,21 422:11 423:13 428:15 429:3,9 437:21 438:6 469:24
**retained** 21:16 22:10 74:20 235:8 433:11 501:2
**retire** 57:15
**retirement** 57:14
**return** 504:13 504:16
**revealed** 290:3
**review** 11:12 13:8,8 21:5 24:2 27:12 29:20 75:10 88:10 102:2 129:8 148:24 234:1 248:10 268:21 275:2 368:9 376:1,12 382:19,20,25 385:6 404:6 445:6,18 446:2 446:5,7,8,14 447:1,14 449:12 451:10 455:4 490:5 503:15 504:7
**reviewed** 18:22 21:11 23:5 26:23 27:1 40:14 41:18 42:14 73:25 81:20 85:12 95:22 96:25 165:20 167:4 190:23 216:3 217:24 228:23 235:16,19 246:6,11,13,20 264:16 268:22 270:16 272:7

283:18 294:11 371:2,8,10,11 372:22 375:24 376:2,10,14 382:25 443:14 444:18 445:10 445:15,16,19 445:24 446:6 446:24 447:9 447:11
**reviewers** 444:14
**reviewing** 30:18 46:19 96:24 297:2
**reviews** 234:22 446:6 447:11
**revlon** 5:17
**rhetorical** 162:1,7,8
**richardson** 39:2
**richmond** 8:8
**ricordati** 9:11
**right** 17:13,22 18:6,13,15 19:8,12,23 23:10 28:3,24 30:11 33:9 34:5,11 36:2 38:4,12 41:9 41:16 43:13,17 43:20,25 50:9 50:11 51:10 53:17 54:11,15 56:20 61:2 66:10,14,23 67:21 68:14 70:3 71:22 72:8,13,16 73:3,5 77:23 79:4,17 80:21 86:5,8,14,20,23 87:7,12,16 88:6,13,22 89:15 92:2,22 92:25 93:9,22 94:2,9 95:1,5 95:11,15,25 96:7,13,18 97:6 98:7 100:11 101:13 103:9 104:11 104:16 105:18 106:1,10 108:18,19 109:24 113:7 113:14,23 115:7,8 116:6 116:13 117:18 117:21 120:8 120:11 121:11 121:18 122:4,7 123:8 124:3,4 124:6,15,16,20 124:21,24 125:7,15 126:7 127:13,18,19 127:22 128:5,8 128:11,11,18 128:22 129:14 129:25 130:5,6 130:16 131:11 131:20,22 132:14 133:3 133:10,13,15 133:24 134:3 134:13 135:2,6 136:18 137:16 137:20 138:4 139:12 140:10 140:11 144:2 145:3,16 146:6 146:23 147:7 147:17 151:23 152:16 153:8 153:25 154:13 155:6 156:2,6 156:12 157:3 157:10,20 159:18,19,25 160:13,21,25 161:3 162:5,22 163:8,9,16 164:13 166:6 166:14 167:6 170:8 172:14 175:8 177:25 179:6 182:18 183:5,13,16,18 183:24 185:12 185:23 186:24 188:17 190:9 192:9 194:11 197:8 198:11 199:1 200:2,7 201:9,12 202:9 202:13,16,17 203:8,12,23 204:3,6,11 206:3,17 207:3 207:14,22 208:12 209:2 210:1,5,17 211:4,5,12,14 211:17,21,25 212:6 214:18 214:19 218:13 219:7,12 220:25 221:15 221:16,23,24 222:17 223:4,5 223:16,17 224:3,9,13,18 224:25 225:2 226:12,23 227:19,22 231:2,23 232:13 233:3 234:23 235:22 236:19 237:20 238:8,13 240:25 241:13 242:25 243:3 244:7,10 245:8 246:3,14,21

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 610 of 640 PageID #:74158



247:16 248:20 250:23 251:10 257:22 258:4 259:2 261:24 265:11 268:8 269:14 273:3 274:12 275:2 276:21,22,25 277:4,6,12 280:13 281:1,8 281:9,14,15,22 282:7,15,16,21 284:1,5,6,11,24 285:9 291:7,10 294:10,14 295:21 298:22 300:7,8 302:22 304:3 306:13 306:20 307:7,9 307:25 308:5 308:17,25 309:22,23 310:18 311:16 311:22 315:18 316:24 317:12 319:3,6 323:12 324:4 325:24 329:13 331:9 337:17 338:5 338:18,21 340:21 341:8 347:18,19 350:25 351:20 351:25 352:1,3 352:4 353:6 355:8 358:8 359:23 360:17 365:8,17,21 370:25 371:1 373:5 378:7,8 378:21,24,25 381:1,10 384:6 387:15 390:11 390:16,20 391:2 392:1 400:21 401:23 403:3 412:25 420:16,19 424:2,7,11 427:19 429:2 432:6 437:14 437:18 439:8 440:25 441:1,1 441:6,12,13 443:2,16 448:12 455:18 457:24 459:20 460:1 461:4,9 462:8 464:9,14 464:23 465:3,8 465:12 467:17 467:24 468:8 469:12 470:10 471:11,13,14 471:21 472:3 472:14 475:14 476:11 478:9 478:15 480:21 481:18 483:10 483:20,22 484:7 485:25 488:22 490:4 493:24 495:6 497:8,12 498:8 498:18

**rigor** 452:23

**rinsed** 113:11 113:13

**rise** 242:17

**rising** 242:11

**risk** 12:11,14 12:23 13:6 34:17 64:23 85:5 137:19 138:22 139:4 139:17 142:13 155:24 171:16 172:13,16,19 173:6,12,16 174:4,6,13,19 174:21 175:2,7 175:18,24 176:1,3,5,13,17 181:3,5,14 182:22,23,23 184:3,7 185:9 196:9 206:20 207:2,13 208:11 209:6 218:7 232:3 274:7 289:16 302:17 320:20 339:18 348:17 355:18 356:1,4 356:6,17,19 357:6,7,21,24 358:7,10,12,25 359:11,23 360:8,13 361:12 380:9 385:4,8 406:22 406:25 407:5 412:22 413:1,4 416:16 417:1,4 418:17,21 419:18,24 420:1 425:4 426:15 429:22 436:8,14,19 448:20,25 449:1 467:23 489:22 490:9 495:17 496:5

**risking** 432:9

**risks** 245:7 246:8 247:18 248:13 416:20

**road** 4:12 430:18

**roadblocks** 251:2 252:6,7

**robert** 7:6

**robinson** 9:19

**robison** 336:18

**robust** 200:14

**rockefeller** 8:14
**rodent** 89:15 160:4 164:2,2 411:8 432:20
**rodents** 94:1,5 159:13 163:23 251:8
**rodriguez** 5:12
**role** 94:23 243:23 245:4,5 249:13,15 330:11
**root** 482:16
**ross** 441:11
**roughly** 49:18 59:25 291:15
**route** 131:14 132:9 161:11 161:13 162:21 397:5,6 398:16 398:18 399:19 400:7,23 401:8 401:25 402:9 402:12 488:9 488:18 489:7
**routes** 488:11
**routine** 332:23
**routinely** 71:3 295:18
**rows** 127:16
**rpetti** 7:11
**rpr** 1:22 503:25
**rt** 235:2
**rule** 290:11
**rules** 16:18
**ruptured** 135:15
**rutherford** 294:1

**s**

**s** 37:7 233:15 266:8 332:18 332:18 505:3
**sabrina** 9:4 15:10
**sabrina.palac...** 9:8
**sacrificed** 407:24
**sadler** 7:14
**saito** 37:24
**sales** 1:5 2:5
**sally** 8:18 15:8 15:11
**sample** 97:14 97:17,21 98:2 98:5,12,13,14 98:25 99:3 100:7 236:4,10 300:15 332:25 333:3 352:10 410:5
**samples** 406:17 406:18 414:9
**san** 1:14 2:17 14:1,20 55:22 55:24 56:18 57:6
**sandler** 12:6 29:8 275:13,21 276:2 279:25
**save** 371:22,23 435:8
**saw** 61:10 87:18,23 105:13 116:2 145:2 254:5 270:12 275:11 326:19 408:2 408:14,18
**saying** 31:6 48:3 76:5 90:20 111:13 118:1 131:8 132:25 144:18 146:8 150:9 172:9 173:6 175:12 213:7 221:20 228:21 230:12 241:7,9 242:6 243:22 290:24 292:13 292:15 354:18 366:11 373:22 386:13 418:24 423:16 430:23 443:21 466:3 471:16 478:6 481:12 484:11
**says** 19:11 31:3 34:17 35:14 36:5,18 37:2,8 37:9 39:17 70:18 116:16 119:11 123:13 127:25 128:1,3 128:7,10,14 129:7 131:4 132:3 146:21 147:2,11,14 149:3 153:21 153:24 154:2 154:19 156:8 171:13 221:13 222:12 223:21 224:12 225:17 226:3 231:3 236:3,21 243:8 245:4,12,14 249:18 250:8 250:24 251:11 251:12 253:17 258:5,20 276:7 277:4,24 278:19 280:6 285:21 286:19 287:15,23 298:17 302:20 302:22,23 304:6 308:19 308:21,22 320:25 324:4

324:12 328:13 331:9 336:14 340:12,12 341:9 351:4 352:1,8,21 353:6,7 356:2 357:11,12,17 359:16 360:2 360:17,18 361:8 362:8,24 364:4 365:20 368:11 369:18 370:6,18,24 373:18,19 376:21 377:4,8 380:15 381:11 381:19 384:5 444:18 448:20 464:4
**scalp** 101:12 111:20 112:22 113:9 352:13 353:11 398:19 400:19,25 427:8 483:6,9 484:22 485:18 485:21 486:10 488:24 494:24
**scalps** 489:11 489:12
**scan** 50:7
**school** 54:15 55:22 56:18 57:1,2,6 63:4,6 63:8 145:3
**science** 63:10 88:16 89:3 91:12 169:10 169:15 240:18 297:10,10 344:1 350:1 432:12 448:9 454:9
**sciences** 62:24 68:20 270:6
**scientific** 11:12 65:9 68:23 71:4,5 83:23 84:12 86:1 87:21 89:25 90:24 91:4,23 92:4 100:9,18 172:11 173:20 234:20 295:19 295:20 451:17 459:4
**scientist** 92:18 481:5
**scientists** 358:23 469:9 469:21
**scores** 95:14
**scratched** 104:4
**screen** 233:15
**screening** 268:8 444:20 450:18
**seamans** 5:18
**search** 50:5,14 50:18,19 52:3 52:9,18 69:19 82:11 270:25 271:10 372:14
**searched** 51:22
**searches** 49:15 49:24
**sec** 232:19 349:21 379:22
**second** 11:12 15:19 55:25 56:1,3,6 62:14 88:7 101:24 119:13 125:4 130:25 131:5 155:15 234:20 238:11 258:4 335:12 352:5 356:1 371:22 378:15 389:15 500:23
**secondarily** 78:12 347:16 447:8
**secondary** 31:3 344:1,23 346:11 347:20 447:3,5
**seconds** 256:17
**secreting** 56:6
**secretion** 139:10 410:4 410:11,20 411:7,21 412:19
**section** 74:14 134:17 171:10 236:15 241:21 248:24 256:23 258:3 342:11 348:22 362:3 365:25 372:18 373:11 374:5 384:22 440:19 441:20 442:3 442:14 487:12
**sections** 247:1 252:24 272:10 342:20 364:23
**see** 25:10 26:11 28:7 29:12 31:15,21 32:13 34:25 40:5 43:2 44:18 51:3 55:15 56:13 58:12 62:18 70:16 76:4 78:20 83:11 84:23 85:7,16 95:21 99:1 100:3,18 101:2,7 102:6 105:25 106:23 107:1,9 108:8 108:17 110:5 112:18 118:23

Case: 1:23-cv-00818 Document #: 1828-13 Filed: 05/05/26 Page 613 of 640 PageID #:74161



127:10 129:15 131:2 137:12 139:21 147:7 149:6 159:6,9 160:19 167:15 168:4 191:8,18 216:17 222:9 223:23 225:20 226:6 231:2 235:3 236:8,17 237:4 241:23 242:12 247:13 248:12 250:10 250:17 256:6 258:5,7 270:11 277:21 280:5,9 286:7 298:1 301:17 315:16 318:1 327:4 329:7 332:20 335:10 337:21 351:2,23 355:21 357:13 361:3 362:6,15 362:24 364:10 365:19 371:11 373:9 375:3 384:23 389:15 407:25 408:2 408:14 411:25 412:1 422:21 423:25 424:7 424:10 426:10 440:16 441:2 441:23 448:19 453:14,15 473:18 481:25 483:25 487:14 490:8

**seeing** 58:13,15 224:6 230:22 336:11 337:16 337:19 440:14 472:23

**seeking** 51:4

**seeks** 87:14

**seem** 118:2 218:6 353:24 377:22

**seems** 33:19 91:22 180:21 254:6 320:12 356:23

**seen** 23:23 41:15 111:6,13 111:24 112:11 112:12 114:21 164:23 175:10 199:4 218:1 254:23 271:17 271:25 326:3 346:18 363:6 364:16 371:4,5 397:20 440:20 445:18 483:21 484:3,8

**segal** 7:13

**segalla** 6:12

**selecting** 366:16

**self** 200:14

**send** 48:22 52:25

**sense** 59:15 459:10 486:4

**sensitive** 13:9 14:8 88:12 236:16 250:9 331:6 382:21 399:14 403:19

**sensitivity** 184:16 266:17

**sent** 504:14

**sentence** 70:18 84:25 85:22 94:19 101:24 124:9 125:19 126:1 129:19 131:24 147:10 149:3 171:13 236:21 238:22 239:8 245:3 248:15 253:13 253:15,18 258:21 284:14 284:19 285:21 286:1,8,9,11 302:11 308:8 335:12 353:20 357:23 368:24 369:23 370:10

**sentences** 221:12 236:3

**separate** 49:17 50:1 139:15 141:14

**separated** 482:25

**series** 35:13 391:24 408:3 408:19

**serious** 180:10 180:14,15

**seriously** 344:24 440:23

**serous** 179:14 179:21 180:3 180:11,12,13 180:14,16,22

**served** 22:19 23:2 99:12 146:22 152:1 235:12 457:19

**service** 363:23 373:17 377:8

**services** 65:17

**session** 58:11 192:15 193:7 478:8

**set** 95:8 456:22 503:6

**sets** 23:20

**setting** 182:19 491:2

**settle** 197:8
**seven** 21:1 390:18
**seventh** 9:5
**several** 153:24 166:3,20 190:6 191:14 239:18 260:22 335:15 395:15 404:16 414:4 430:5 460:3 468:1
**severe** 75:8
**sex** 135:8
**sexual** 413:22
**shahadat** 8:5
**shakes** 59:24
**shaking** 17:20
**shampoos** 115:13
**shaped** 266:8
**share** 454:2
**shared** 276:14 450:2 451:2 452:12 459:2
**sharing** 481:2
**shb.com** 8:17
**shbg** 182:25 184:18
**sheet** 30:19 504:11
**shift** 269:18 272:22
**shipman** 4:10 4:11 15:16,16 33:1 110:6,14 170:10 340:4,9
**shipmanlaw....** 4:15
**shipra** 5:5
**shohl** 5:11
**shook** 8:12
**short** 40:9 353:25
**shorthand** 2:20 503:3,9
**show** 139:11 164:18 166:22 168:19 172:18 175:25 253:3 266:2 331:19 362:9 364:5 367:8,19 368:6 368:12 370:14 376:9 378:24 378:24 414:6 431:21 437:18 439:4,8,16,20 440:16,19 441:15 453:4 453:13,16 468:14 484:2
**showed** 258:11 266:8 334:17 376:8 383:14 441:25 442:3 447:17 449:16 451:3 454:20
**shower** 353:16
**showering** 352:25
**showing** 92:24 207:12 228:23 266:16 267:6 311:19 367:11 378:16,22,25
**shown** 40:14 93:14 166:3 175:24 178:11 178:14 197:19 206:19 208:10 209:5 215:23 225:12 351:6 406:23 407:14 417:1 420:24 437:7 438:17 447:2 448:13
**shows** 174:18 225:10 262:23 310:15 437:3 437:25
**shukla** 38:12 38:14 407:16 407:16 408:7 437:2 471:15 471:16,17 472:8
**siblings** 404:20
**side** 28:3 30:14 43:10,10 107:20 254:25 266:6 267:19 272:18 284:13 341:14 396:15
**sides** 192:21
**sidley** 8:19 9:3
**sidley.com** 8:24 9:8
**sign** 363:1,2 504:12
**signaling** 198:1 198:7 200:17 200:23 203:3 204:11
**signature** 44:11 44:12,14 503:23
**signed** 504:19
**significance** 225:18 226:8 267:14 291:25 292:14 293:7 293:11,12 306:4 311:2 408:6 425:1 430:6 431:5 437:23,24 471:9
**significant** 60:6 60:9 85:3 92:24 128:3 156:19 201:9 202:14,22 289:3,5,11 290:22 291:9 291:20 292:17

292:25 294:13 294:24 295:9 296:1,3 297:4 297:6,7 309:25 310:2 314:9,12 315:3 415:10 417:12 422:3,6 424:12 429:19 430:17 432:9 434:24 435:3,5 436:8 456:9
**significantly** 223:16 226:5 322:18 323:1,3
**signing** 26:24
**silico** 11:17 169:17
**similar** 80:10 266:18 333:18 354:19 355:6,7 361:21 396:20 407:12 419:19 492:7
**simple** 182:4 450:15 497:22
**simplify** 150:24 400:5
**simply** 159:6 211:23 239:4 287:3
**simulate** 135:23
**single** 117:7 188:3 213:19 391:12 392:3 392:15 393:2,2 393:3 395:15 414:22
**singular** 394:13 394:14
**sir** 103:3 120:15 126:14 257:18 258:7 280:5 329:9 355:21 370:23 452:7 500:9
**sister** 12:6,8 29:9 275:25 276:8,12,18,20 276:23 277:3,9 278:8,14 280:6 280:11 283:24 299:10,23 306:19 307:12 307:12 316:5 318:13,16 319:24 420:16 420:24 449:16 450:11 497:7 497:25 499:2,7 499:8,15
**sit** 84:14 107:23 122:19 177:22 269:5 372:11
**site** 62:17 178:5 178:6
**sites** 63:7
**sits** 113:12
**sitting** 177:25 456:14
**situate** 403:15
**situation** 155:23 405:9
**six** 21:1 406:5 407:23 408:13 416:3 471:18 472:13
**sixth** 250:15
**size** 97:14,17 97:21 98:2,5 98:12,13,14,25 99:4 100:7 131:19 236:4 236:10 300:16
**skeptic** 92:18
**skin** 10:23 120:20 121:9 121:21 122:3 123:15 124:6 124:13 127:1,9 127:22 128:1 128:17,18 131:6,10 132:8 132:14 161:24 161:25 163:2,3 163:8,9,12 279:14 319:13 331:21 334:2 334:20,24 347:13 351:7 352:15 397:12 397:14 398:19 398:21,25 399:3,4 402:19 403:2,4 437:21 438:2,3,13 482:18,24,25 483:7 484:22 484:25 486:10 486:15,16 488:8
**slam** 160:25
**slams** 161:2
**slightly** 263:2
**sloughs** 410:17
**slow** 53:15,17
**small** 99:3 200:1,6 300:15 393:19
**smaller** 98:25 132:7,21
**smehta** 5:9
**smokers** 278:20 278:21 307:15
**smoking** 278:16
**smooth** 17:13
**smoothly** 16:19
**smsm.com** 7:18
**social** 404:22
**societies** 65:10 72:4 74:12
**society** 65:11 238:3,4,16,17

241:7 246:1,6 246:18 249:13 355:18 356:11 379:12 380:11
**society's** 234:19
**society’s** 11:12
**sofie** 33:19
**softsheen** 6:3,3
**sold** 47:18 115:14
**solely** 143:2
**solution** 354:25
**solutions** 504:23
**somebody** 294:1
**somewhat** 132:6 267:6
**soon** 334:17 340:14
**sorry** 26:3 32:22,23 33:24 35:11 47:25 59:5,17 68:10 70:20 75:3 78:9 85:5 88:7 101:20 103:11 104:8,10 124:2 125:23 127:16 129:19 134:21 138:18 144:6 147:6 148:4 153:16 160:18 170:1 180:5 185:1 188:12 189:20 201:4 207:18 210:11 220:8 230:8,22 232:23 243:20 249:3 259:4 262:3 269:23 271:13 279:24 281:17 283:10 283:13 288:7 304:25 307:20 308:4 309:5 327:14,25 332:16 336:1 340:20 342:24 343:6 344:4 350:19 352:7 375:4 383:25 384:13 387:25 395:20,25 404:4 411:12 419:6 434:4 449:5 458:21 472:7,11 481:15,23 489:25
**sort** 23:20 24:10 28:24 30:19 49:1,8 51:16 89:5 101:9 108:20 109:21 111:20 115:14 133:3 150:15 151:21 151:22 160:11 171:24 494:1
**soto** 233:14,19 256:3 268:6,21 269:5
**sought** 238:6 276:18
**sound** 56:20
**sounded** 159:4
**sounds** 344:17 379:5 449:4
**soup** 149:17
**source** 330:24 447:3,5
**sources** 59:8
**south** 5:13 8:21
**soy** 215:11,14 215:22 221:21 222:13,20 223:15 225:2 397:4,6,11
**soya** 225:8
**span** 377:3
**spans** 291:5
**speak** 16:22 17:18 21:14,20 119:24 174:9 188:20 197:6 294:5 304:12 419:21 434:24 450:10
**speaker** 146:22 148:25 152:2
**speaking** 25:1 117:20 171:24 195:18 205:10 296:19 374:3 456:7 465:10 479:13 485:4
**speaks** 97:23 338:7 464:2
**specialty** 54:18 55:4 60:16
**species** 432:18
**specific** 21:8 51:21 52:4 73:12 82:20 102:15 104:19 106:14,17 117:4,10 129:10 150:5 166:22 168:16 170:2 188:2 189:4 190:4,4 251:3 252:8 253:8 285:22 285:24 286:20 286:22 319:22 381:21 391:5 391:21 399:8 472:13 476:25
**specifically** 19:14,18 23:24 51:5 54:18 55:17 56:14 79:16 81:11,24 94:8 106:20

107:9 109:10 122:22 123:7,9 126:2 149:18 153:3 186:9 193:11 204:5 232:15 269:4 280:24 318:8 318:13 331:25 338:5 354:7 369:21 422:13 422:18 441:19 449:23 484:4 487:12 491:20 499:17
**spectrum** 291:19
**speculate** 476:4 485:23 486:2 492:14
**speculating** 269:10 463:8
**speculation** 84:17 118:16 271:3 404:13 423:19 424:18 425:7,17 426:5 429:25 447:25
**speculative** 294:16 464:25
**spend** 24:11 58:9 326:12 442:9
**spending** 56:17 58:7
**spent** 19:8 47:4 47:8 49:1,14 49:23 104:2 413:6,7 425:13
**spoke** 493:17
**spoken** 43:4 235:5 304:23
**sponsored** 218:20 449:9
**squared** 266:22
**stability** 199:23
**staff** 352:12
**stance** 176:2
**standard** 184:21 239:11 426:7,7 500:10
**standards** 293:1
**standing** 500:12,14,15 500:16,21
**stands** 36:11 225:19
**stapled** 34:6
**stars** 6:7
**start** 16:24 17:13 70:25 147:9 195:22 206:12 239:15 286:8 334:13 398:13 448:7
**started** 15:20 18:21 47:9 81:7 107:14 195:17 237:15 311:1
**starter** 194:5
**starting** 103:21
**starts** 84:22 153:23 178:3,4 250:16 286:9 364:1 488:2
**state** 15:2,4 16:5 116:7 165:15 179:16 183:25 191:19 226:17 229:4 284:21 313:25 316:25 405:13 453:14 479:4 479:20 480:6 480:18,23 485:11,15 502:12 503:4
**stated** 59:21 100:15,23 126:17 147:19 158:1,8 192:14 245:15 260:11 272:4,6 331:10 337:20 358:4 381:14 409:22 412:2 426:6
**statement** 11:13 19:7 45:17 46:1,24 58:19,20 81:13 82:20,23 122:21 125:19 147:21,21,24 149:8 155:3 200:9 234:20 237:6,10 238:11 239:5 240:12,16 242:14 245:18 246:7,23 247:5 248:7 252:3,6 253:22 254:6 293:22 298:2 303:19 308:19 332:3 334:6 339:25 356:10 361:22 369:25 373:22,23 374:8 379:6 382:1,9 445:7 455:23
**statements** 217:21 252:21 373:19 455:25 456:1 459:8,11 462:17,25
**states** 1:1 2:1 13:10 14:17 61:24 131:23 131:25 154:9 155:8 240:2 321:2 324:3,19 330:22 382:22 422:2 436:12 445:3

**stating** 316:17
**statistical** 98:24 99:17 236:6,7,12 290:15 291:25 292:14,20 293:7,11,12 311:2 314:25 430:6,10,12
**statistically** 92:24 289:3,5 289:11 291:20 292:25 294:13 294:24 295:8 295:25 296:3 297:4,6,7 309:24 310:1 314:9,12 315:3 424:12 430:17
**statisticians** 290:19 293:25 298:2 430:20
**statistics** 225:22 292:22 297:10
**status** 278:17
**stay** 118:8 146:14 353:11 390:19
**steering** 10:20 45:12 146:23 148:25 152:1
**steroid** 11:22 169:12
**steroids** 178:9
**stick** 428:18
**stimulate** 165:10 406:14 420:12 492:19
**stimulating** 135:21 408:20
**stimulation** 182:4 183:5 266:18 403:20 408:15 410:13 410:19,22 436:20
**stimulus** 407:8
**stomach** 402:23,23
**stop** 17:25 27:17 58:15 108:8 118:2 189:19,22 244:25 296:19 389:12 392:17 392:17 485:4
**stopped** 360:16 361:17
**stopping** 170:8
**stops** 496:24
**store** 108:2
**stores** 108:5
**story** 453:20 475:17
**straight** 259:16
**straighten** 401:10
**straightened** 280:21
**straightener** 300:7 308:13 318:4 499:3,18
**straighteners** 12:12 282:7 284:3,10,23 298:19 300:11 300:21 301:15 303:1,6 305:6 306:11 309:10 318:6,7,9 319:6,9,15,18 357:19 358:24 362:4 364:2 421:1 422:15 422:19 423:1,3 424:5 426:14 441:21 449:18 450:1 498:12 498:14 499:5
**straightening** 281:12,21 285:3,8,14
**straighter** 290:4
**strategies** 11:4 128:25 129:13 340:24
**stratum** 127:16 127:21 128:4
**streak** 220:20
**street** 3:6,16 4:19 8:7
**strength** 8:11 274:6
**strengthened** 27:10
**stretch** 38:7
**stricken** 369:17
**strike** 32:25 398:5 428:17 430:10
**stringing** 117:9
**strong** 99:1,3
**stronger** 174:21
**strongly** 219:2
**struck** 369:8
**structural** 12:5 128:3 133:6 270:5
**structure** 10:23 121:21 123:14 135:14
**struggling** 400:15 401:18
**students** 57:19 57:20 63:4,4,8 77:12
**studied** 215:1 221:18 224:6 228:6 265:24 269:6 276:23 353:15 413:7 497:7 499:2

**studies** 28:25 31:1 71:4 82:19 85:13 88:11,21,22 89:14,15 90:2 90:21 91:5,6 91:16,16,17,18 92:24 93:6,7 93:15 94:7,7 95:11,14,21,24 96:7,11 97:14 143:8 154:3 155:3,4 158:21 159:12 161:8 164:6 165:8 166:3 171:1,14 171:17 172:9 172:14,17 174:8,9 175:23 175:25 177:11 206:10,15 207:12 233:8 239:18 241:8 244:15 245:6 245:22,23 246:8 247:17 248:12 274:8 275:4 282:3 295:9,19 315:24 330:10 330:14 331:4 336:8,14 343:12 346:19 346:23 347:1 348:21,23,23 351:5,8 357:18 359:10,17 372:23 390:2 393:20,21 406:11,12 407:13 418:4 432:7 445:10 445:11 446:17 446:24 450:10 450:13,16,17 451:10 453:17 468:18 484:2 486:21 495:16

**study** 12:7,8,15 12:16 29:1,6,8 29:9,17,18,19 31:22 34:22 69:13 82:18 93:17 95:10,11 98:3,12,14,22 99:8,13,21 100:6,11 101:4 102:22 122:2 122:10,11,11 129:24 130:2 150:17 159:7 163:22,23,23 168:9 174:10 216:12 221:25 231:22 232:9 232:17 257:11 257:14 260:5 266:7 267:16 271:16,18 275:25 276:8,9 276:18,24 277:3,8,12,19 277:25 278:1,7 278:8,12,14,19 279:16,25 280:6,12,12,19 282:3,4,24 283:1,16,21,24 288:9 298:10 299:10,15,16 299:23 300:12 306:6,15,16,19 306:25 307:11 307:13,17,23 309:6 315:7,17 315:21 316:5,5 316:6,8 317:5 317:12,14,24 318:12,13,16 319:24 320:14 328:18,25 329:11 330:17 332:13 333:12 334:15,16 335:3 338:3 343:18 344:19 346:3,13,15,22 347:12,21 350:10 351:14 353:9 354:16 354:19,19 355:7 382:15 407:15,17,20 408:12 420:16 420:24 421:5,8 421:16,21 426:12,12 427:20 428:15 429:3,8,22 430:9,11,13 433:6 437:2,21 438:6 442:20 446:25 449:16 450:11 464:4 469:10,23 471:11,18,20 471:23,25 472:8,12,13,18 472:24 484:7 490:6 495:5 496:3 497:7,11 497:25 498:4 499:2,7,8,8,14 499:14,15,16 499:20

**studying** 11:21 90:5 91:13 169:11 454:1 486:22

**stuff** 43:20 45:23 170:10 211:13 347:13

**subcutaneous** 161:16

**subject** 27:18 62:7 74:18

90:15 103:15 103:19 243:3 342:4 406:5 412:20 436:18 452:24 468:15
**subjects** 98:21 99:10,10,21 353:14 496:14
**submit** 61:19 347:3
**submitted** 261:19 294:12 294:23 487:8
**subscribed** 503:21 506:14
**subsequent** 27:2 125:20 149:24 177:11 249:8 254:24
**subsequently** 18:25 19:2,21 55:11 62:13 334:12 410:17 422:4
**substance** 92:14 178:9 199:6 219:3 223:12 224:17 399:1 414:16
**substances** 107:2,12 122:15 127:1 203:7,20,20,22 212:9 219:15 219:23 222:2 224:6 225:11 227:21 394:25 397:2 399:9 401:4 414:17 488:5
**substantial** 310:6,8 405:22 434:22 436:7 488:6
**successful** 404:22
**sudden** 410:14
**suffer** 456:10
**sufficient** 392:15
**suggest** 37:18 385:7 453:4
**suggested** 330:24
**suggesting** 374:22 418:19
**suggestions** 385:2
**suggests** 37:8
**suitably** 154:3 155:4
**suite** 2:17 3:6 4:12,19 5:6,13 6:14,21 7:7,15 8:14 9:12
**summaries** 28:12 150:11 363:14
**summarized** 446:6
**summary** 11:8 38:13 70:13 85:19 120:12 127:7 154:15 154:19,25 330:1 442:12 444:18 445:5
**superimposed** 420:1
**support** 135:23 151:6 364:22 365:11,11 372:20,21 410:16 414:1 442:9 444:15
**supported** 68:12 330:11 459:13
**supporting** 81:11 174:15 448:18
**supportive** 97:22,22 363:16
**supports** 490:7
**supposed** 396:16
**suppresses** 37:2
**suppressing** 37:12
**sure** 16:23 17:3 18:1,3,15 19:5 24:22 25:10,10 25:15,24 28:15 28:17,18,21 29:11,24 33:22 48:2 52:21 53:22 56:25 61:21 64:2 65:23 80:6,11 83:15 89:2,18 89:19,20 91:15 91:19 97:18 105:11 110:6 110:13 112:8 118:10 119:3 125:23 131:7 132:24 134:3 134:25 135:3 140:5 150:25 159:4 167:11 167:22 169:2 170:12 172:3,6 172:25 173:1 173:22 174:6 175:1 176:11 179:18 184:1,9 191:5 192:14 194:10 196:10 201:25 203:19 207:8,10 208:8 210:14,22 218:25 221:20 226:19 229:6

230:2 234:5 252:19 256:18 263:24 303:9 313:24 336:12 337:23 358:24 370:12 378:17 386:25 389:2 389:13 406:14 421:13 427:7 432:15 434:23 451:22,24 453:15 460:23 474:13 475:14 481:3,6 489:5 495:22 497:24
**surface** 104:4 177:10,20 178:3,5 179:7 179:10 402:25
**surge** 136:6
**surgery** 177:23
**surmise** 449:8
**surprised** 80:23 83:11 97:8 240:7,15 240:17 241:15
**surprisingly** 223:3,11
**surrounding** 80:16
**susceptibility** 456:19
**susceptible** 409:2 419:12 451:12 453:19
**suspect** 240:8 343:13 415:4 438:14 462:7 475:2
**suspected** 222:15
**swear** 491:14
**sweat** 131:10
**swim** 353:16
**swimming** 353:1
**sworn** 17:9 506:14
**symptoms** 136:13
**synced** 500:10
**syndrome** 11:7 33:18 52:8 64:22 66:9 73:3 75:5,24 99:16 139:10 139:17 141:19 141:21 143:1 144:15 146:9 146:20 147:3 147:11 154:4 155:2 158:16 181:20 232:2 410:1,21 411:5 411:19,24
**syndromes** 73:1
**synergistic** 482:5,10
**synonymous** 85:25 216:19
**system** 28:23 42:10 65:22 77:3,5 97:2 134:4 151:13 151:16,17 185:15 197:23 197:25 198:1,4 198:6,7,25 199:19,20,23 200:13,23 204:6 228:8 241:5 403:3,7 465:18
**systematic** 13:8 29:20,20 446:2 446:5
**systemic** 12:19 96:17 335:13 335:17 336:4,5 336:6,12,15,21 337:9,23 349:22 351:8 353:23 382:19 403:6 437:8
**systems** 4:16 11:5 124:3 129:1,13 130:3 130:9 202:6 242:25 251:5 252:10 253:24

**t**

**t** 135:4 233:15 505:3,3
**tab** 39:25 44:7 44:8,9 45:11 45:20 121:14 128:23 146:11 146:12 220:16 220:21 234:8,9 269:21 275:6 279:22,24 280:1 283:1 306:5 315:6 317:13,15 328:19,20 349:5,6 355:13 355:15 360:21 379:8 380:1,3 382:14
**table** 26:8 95:20 127:3,3 127:7,24 223:19,19 224:5 225:12 226:4,20 227:17 228:3 268:10,11 271:23 277:17 277:18,21 278:11 284:13 298:17 300:6 301:14 304:25 305:3 309:4

321:4,15 324:2 324:12 326:11 328:13 352:2 396:15 422:17 423:14 424:1,2 424:2,3
**table's** 227:18
**tables** 272:11 286:11 383:24
**tabs** 259:12,13
**tad** 53:16
**take** 14:11 18:12 23:18 28:16 35:9 42:23 47:4 64:14 70:10 77:18 99:14 102:8 120:11 121:13 127:2 128:22 155:10 165:3 166:21 169:1 170:9 181:11 190:16 193:8 194:9 223:18 234:8 235:21,24 236:14 239:11 241:17 242:2 245:3 249:1 255:5 257:24 263:14 271:5 271:23 275:6 277:17 278:11 279:22 280:15 282:25 289:15 306:5 308:4 315:6 316:4 317:13,24 321:4 332:8 335:5 340:4 347:22 349:4 357:1 360:21 361:20 363:25 375:9,12,12 379:15 380:14 385:13 387:20 387:21 393:1 432:2 439:18 439:19 456:10 472:2
**taken** 2:16 14:14 17:6 22:16 41:14 110:19 132:15 170:15 244:14 255:13 257:1 264:8 346:14 348:2 360:14 389:19 430:18 503:5
**takes** 59:4 202:7 450:14
**talk** 31:21 45:10 53:9,20 79:4 119:8,10 122:11 132:25 133:1 134:21 134:23 141:2 141:18,20 142:5 145:2 148:4,6 151:12 156:23 164:12 185:14 186:23 189:24 197:22 211:9 214:10 220:10 227:8 228:17 249:15 250:4,5 336:7 342:11 357:5 421:15 431:22 434:2 475:18 481:14 486:20 487:17
**talked** 61:11 79:5 129:6 158:18 162:19 162:19,20,21 185:15 186:22 198:24 201:22 210:1 212:4 255:24 257:7 257:12 268:5 298:7 301:7 307:16 354:16 359:17 381:1 385:20 389:23 397:3 400:17 401:19 402:12 406:5 469:9 471:15 478:4 481:16 482:15 486:21 488:19 489:6 495:3
**talking** 103:3 115:22 132:20 142:3 148:9,10 153:15 156:11 157:2 162:14 171:25 180:13 180:21 191:23 194:23 202:5,9 202:11,13 206:8 213:20 213:21 214:2 218:16 239:15 246:22 247:7,8 248:16 255:23 257:11 260:13 260:23 261:12 263:5,6 267:25 291:2 293:12 296:16 300:8 311:1 331:18 332:4 347:6,7 347:8 374:6 401:3,7 411:1 431:9 433:19 435:6 444:5 468:18 469:16
**talks** 127:12 249:13 301:15
**tardy** 7:4
**target** 198:21 199:7,7 211:19 403:15

**targeted** 117:7
**targeting** 206:19
**targets** 403:19
**taught** 57:2,7 63:8 77:12
**tdh** 196:15,15 196:15,15,15 196:15
**teach** 57:20 74:9 75:17
**teaching** 57:18 57:22 58:4,5,8 63:6
**team** 340:25 433:25
**technical** 17:14
**technique** 112:20 340:15
**techniques** 114:8
**technologies** 129:10
**technology** 350:1
**ted** 145:2
**teleconference** 39:17
**tell** 59:1 76:7 82:21 116:18 133:16 137:14 198:13 229:8 246:13 263:17 265:13 282:4 286:16 293:4 294:22 296:18 307:24 326:2 374:15 376:21 377:5 380:16 385:1 387:22 413:12 444:13 444:22,24 460:23 474:12 485:11
**telling** 189:13 191:4 192:16 253:16 492:5
**tells** 116:20
**temporary** 135:13 285:3
**tended** 288:10 383:13
**tens** 219:8 434:20
**teresa** 61:17
**term** 42:8 51:20 57:23,25 60:8 62:9,10 63:14 87:18,20 93:8 99:25 147:1 174:13 199:18 227:18 273:12 274:2,4 353:25 360:14 412:21 481:17 482:5 492:18
**terms** 45:4 50:19 51:16,21 52:18 69:19,22 85:25 105:2 114:25 156:21 156:22 176:23 177:14 222:2 224:21 233:9 233:14 240:9 262:4 264:16 264:19 267:14 269:6 271:9,14 279:15 297:12 318:11 322:21 326:14,23 343:11 405:12 416:21 422:11 432:23 463:19 497:5 498:12
**tertiary** 78:14
**test** 96:6 251:5 252:10 253:24 266:11 332:25 352:14,24 353:14 395:13 432:3,4 465:10 465:22 466:8 468:15
**tested** 163:7
**testes** 236:25 239:1 241:12
**testified** 22:6 22:10,20 23:4 271:25 289:8 313:22 331:18 342:14 369:20 433:5 455:2 493:9 497:14
**testifies** 326:9
**testifying** 22:19 196:20 503:8
**testimony** 19:18 45:6 46:20 83:8 91:25 96:22 100:13 109:4 116:15 118:15 140:21 151:25 159:21 164:15 167:18 168:7 173:3 176:11 191:23 209:4,7 210:10 212:22 237:22 265:23 273:17 289:8 291:24 292:3 293:13 296:6,8 304:20 324:24 325:1,5,7 348:10 388:17 388:21 389:9 394:18 457:13 457:16,25 458:7,14 462:21 463:16 466:2,9 469:21 470:1,19 483:3 500:25 502:5,7 503:12 504:9 504:17 506:8

**testing** 162:25 164:22
**testosterone** 135:9 136:12
**texas** 7:16
**text** 198:12
**texted** 43:5
**th** 372:10
**thank** 16:1,2 17:10 18:14 25:24 29:15 34:13 35:7 37:22 40:20 41:10 42:16,19 42:20 43:14 63:12 76:18 110:16 124:2 129:21 139:2 146:15 170:12 178:25 195:24 201:6 220:23 226:11 231:5 234:13 257:4,6 258:23 259:7 259:25 265:20 272:17 280:2 288:3 315:9 317:21 328:15 329:1 334:6 350:7,22 380:6 388:23 390:10 406:8 440:13 459:25 487:2 496:21 500:2,5
**thankfully** 466:9
**thanks** 234:15 250:21 384:25 498:21
**thick** 28:25
**thicker** 62:17 486:11,16
**thin** 127:22 128:1 248:6
**thing** 18:10 39:5 40:5 116:25 165:14 192:25 197:9 216:16 250:7 269:20 302:9 347:11,12 384:8 392:7 393:20 407:15 452:6 465:11 499:21
**things** 17:21 25:16,23 31:13 40:13 65:15 77:21 86:3 116:3 118:17 143:25 145:6 151:14 170:4 190:6 253:17 278:16 295:21 378:13 392:16 397:19 418:6 448:3 450:15 464:1 468:17 482:2
**think** 15:22 17:14 29:20 35:5 39:5 45:5 46:12 50:10 52:17,23 58:21 64:10 65:25 70:1,21 74:3 75:21 80:19 81:14 86:21 87:18,23 89:3 90:13,18 94:11 94:17 97:23 101:14 111:2 114:5,25 117:18 119:17 137:14 139:5 142:17,18 145:2,10 149:10 150:24 155:11 160:18 162:15 163:21 163:24 164:12 164:16 165:15 166:3,19 167:23 170:25 173:18 174:1,7 174:8 177:9 178:22 183:8 186:4 187:22 187:22,24 188:16 191:10 192:5 193:3 196:4 202:3,5 208:9 209:25 210:3,14,15,25 212:4 220:17 220:19 229:3 231:15 235:9 235:21 242:20 244:13,18 247:8 254:7,19 256:1 259:15 259:17 261:13 262:6 263:8,25 264:15 268:15 270:12,15,24 271:9 272:23 273:6,11 274:25 279:23 286:2 293:25 294:6 298:5 299:4 302:10 304:8 310:11 311:25 312:6,8 325:3 340:13 344:6,17 345:15 350:10 350:15,15 364:16 367:6 370:24 371:2 375:4,15,17,18 375:20,24 378:15 384:14 386:9,11,15 393:25 396:11 396:16 397:2 399:7 402:9

412:15 414:4 417:14 418:7,8 430:18 431:5 433:24 434:22 436:9 447:1 453:11,20 454:12 455:25 457:5,6 463:9 465:11 466:22 470:5 471:4,5 477:6,14 481:17 491:9 491:19 493:8 493:17 496:20 499:3,9,12,20
**thinking** 253:1
**thinks** 312:16 461:5
**thinner** 161:24
**third** 129:19
**thorough** 88:10 247:2 248:22 405:21
**thoroughly** 252:22 272:12 345:19,25
**thought** 134:22 140:4 177:6 180:15 254:3 255:22 293:20 293:21 297:18 315:20 316:20 334:15 419:5 451:7 463:10
**thousands** 153:7 212:5 214:21 219:8,9
**threat** 394:2
**three** 23:17,17 26:10 52:4 55:8 150:21 168:4 169:5 190:4,13 192:4 197:9,11,20 206:15 218:18 251:7 255:21 255:22 261:19 262:1,23,24 263:19 264:13 264:15,18,22 264:23 265:14 268:1,2 393:18 394:19 442:15 442:16 477:15 492:10,11 493:1,18 494:1 494:10
**throw** 253:21 431:19
**throwing** 294:4 298:3
**thursday** 1:15 2:19 14:1
**thyroid** 12:21 349:25 354:1 437:11
**ti** 11:9 221:2,22 223:4,6 225:6
**time** 14:10 15:2 17:4,7 18:8,24 19:4 22:18 24:11 25:4 27:15 46:7,16 46:18 47:4 48:25 58:5 61:16,18 62:8 76:12 80:8 99:19 104:2 109:9 110:11 110:17,20 117:18 118:22 154:10,23 166:4 169:3 170:13,16 173:24 174:8 176:2 177:20 177:23 178:2 178:15 184:25 190:11,14 191:7 194:9 201:6 213:20 220:10 222:23 231:21 240:8 251:9,19,20,25 252:11 254:1 255:11,14 256:24 257:2 259:6 263:14 264:6,9 271:5 272:2,9,15 326:9 332:8 334:14 340:4 347:23,25 348:3 361:15 370:19 377:3 387:21 389:13 389:16,17,20 390:22 392:21 392:24 406:1 409:5 412:1 420:6 427:2 435:8,9 450:12 450:14 452:20 452:22 454:10 462:9 468:2 491:1 500:2,8 501:3 502:8 503:6 504:18
**timeframe** 504:8
**times** 20:14,20 20:22 21:1 211:10 219:9 301:21,22 302:1,6 313:23 319:12 327:20 328:3 370:21 386:24 405:16 422:5 423:14 423:23 426:7 435:15 460:3 468:1
**ting** 340:5
**tingling** 319:14
**tip** 296:15

**tired** 190:15 497:20
**tissue** 63:23,24 63:25 93:7 158:23 159:10 160:21 162:18 164:23 165:7 165:10,13,23 167:16 168:5 179:5 182:15 211:19 231:20 251:3 252:8 253:8 406:17 406:18 408:14 413:14
**tissues** 88:12 91:17 120:22 124:15 179:2,8 198:21 239:19 240:20 244:14 399:14 403:19 413:15 417:6 438:14 453:9
**title** 127:7 231:25 233:3 257:16 270:3 338:8 355:4,25
**titled** 234:19
**titles** 26:9 50:7 50:8 69:23
**titus** 6:20,24
**today** 15:24 16:11,18 18:4 19:18 23:14,20 26:7 27:25 28:7 32:9 45:6 47:5,10,11,16 48:5,12,20 49:10 53:18 79:6,7 83:25 84:14 94:18 102:23 107:24 122:19 142:6 148:20 151:4 191:8 193:1 235:17 237:22 257:12 269:5 270:14 275:12 372:11 373:4 376:13 382:15 383:19 388:17 388:21 389:10 389:25 390:2 390:17 404:23 413:25 450:2 450:25 452:13 454:3 457:13 457:16,23,25 458:7,14 459:1 478:17 481:15 482:9
**today's** 18:20 19:15 20:11 21:6,11,17 500:25
**together** 38:5 40:15 80:9 116:4 117:9 118:4 125:25 150:21 166:24 168:11,19 206:11 262:4,7 267:13 281:12 282:14 306:1 307:5 318:16 417:13 418:7 453:17 482:2
**told** 21:22 22:2 22:4 24:8 64:10,15,24 147:17 190:13 196:18 197:2 240:13 271:9 272:23 273:6 273:11 315:20 322:15 344:22 376:4 386:11 396:25 397:22 468:22 469:3
**tongue** 296:16
**took** 55:12 99:8 110:5 240:8 256:5 257:5,10 264:12,14 333:2 347:16
**tool** 233:15 339:9
**top** 70:12,16 88:8,8,8 150:20 154:17 154:18 277:4 290:2 321:15 330:7 332:20 335:6,8 357:11 362:25 421:24 484:22
**topic** 150:22 181:1 267:25 416:3 448:7 461:19
**topical** 10:23 12:21 121:22 349:24 437:10 487:13
**topics** 372:20
**torrance** 4:18
**total** 132:8 169:10,15 255:9 261:4 278:1 319:8 416:24 501:1
**totality** 90:15 91:2 103:19 116:4 141:22 394:1
**totally** 113:8 238:4 291:12 292:19
**tough** 235:23
**toward** 424:23 429:9 469:18 469:19 499:12
**towards** 101:9 155:14 302:10 306:4

**toxic** 94:9
**toxicologic** 72:4
**toxicological** 270:5
**toxicologist** 71:22 459:17
**toxicology** 71:7 71:24 72:1,2 382:23 459:24 461:2
**track** 92:15
**tracking** 301:5
**tract** 242:10
**trained** 448:9
**training** 53:21 55:5,8,16,20 66:3 165:19 388:13 389:9
**transappenda...** 131:7
**transcribed** 503:10
**transcript** 500:10 503:11 503:14,16 504:6,19 506:5 506:8
**transcription** 502:7
**transcriptional** 11:20 169:21
**transcripts** 408:3 456:22
**transdermal** 10:24 11:4 121:22 122:4 123:10 124:23 125:12 126:5 126:23 128:25 129:10,12 130:3 488:17 488:23 489:6 489:10
**transepidermal** 132:9
**transgenerati...** 475:11
**translational** 129:3
**transport** 131:15,16
**travel** 132:13 198:21
**treat** 64:11 217:3,11
**treated** 60:25 61:3 491:2
**treating** 22:14 249:21
**treatment** 63:18 154:7 352:23 363:15 447:15,23
**treatments** 266:20
**tree** 221:22
**trees** 371:22,24
**tremendously** 402:23
**trend** 290:16 291:16,17,21 291:21 292:15 292:15 293:1 297:21 306:2,3 310:6 315:3 422:1
**trending** 310:13
**trends** 11:5 129:1,9 297:19 431:7,7,8,11
**trial** 22:6,10 46:21 104:16 140:7,15 388:2 388:7 389:3,5
**trick** 90:22 367:12,14
**tried** 106:22 108:2 411:9
**trigger** 150:1 199:8 409:3
**triggers** 136:7
**true** 103:7,7 109:12 124:7 168:15 243:6 245:10 316:2 318:19 348:20 407:9 413:3 473:4 488:14 502:6 503:11 506:8
**truly** 476:18
**try** 16:21 17:19 40:9 53:25 62:3 88:7 91:21 108:14 118:4 164:7,17 229:6 296:25 346:16 375:1 401:17 402:6
**trying** 17:18 28:23 29:9 49:7 56:22 59:15 69:19 75:21 80:9 89:10 90:22,22 103:18 104:3 110:1 112:5 114:2 118:8 140:4,18,22 142:22,25 144:21 160:24 162:24 164:18 164:20 176:8,8 178:7 214:14 229:21 239:23 273:5 291:1 314:3 326:4,5 326:6 337:8 343:18 346:11 363:8 367:12 367:14,15 371:21 375:7 419:2 434:25

458:22 468:14 481:11,13
**tubal** 176:21 177:1,12
**tube** 108:12,13 176:24 177:8 177:15,21,21 177:24 178:4 178:17,22 180:17 403:21
**tumors** 56:7
**turn** 121:3 181:17 266:4 332:2 427:19 454:15 487:9
**turns** 432:20
**tuskegee** 432:14
**twice** 58:9
**two** 20:16,19 20:23 21:3 47:12 48:6,11 55:14,25 61:10 86:3 90:13 99:8 121:1 139:15 141:11 141:12 218:17 232:6 251:7 252:24 256:16 266:24 267:5 297:18 304:16 373:11 407:18 410:6 461:25 482:2 491:13 491:15
**type** 95:10 133:8,10,12,14 137:20 156:17 243:8,14 244:6 285:5 344:23 361:14 415:24 447:22 495:17
**typed** 30:15 33:11,22 38:11 51:11
**types** 88:16 89:4 133:17 179:2 255:25 277:10 301:19 301:25 307:5 318:15 342:19 354:15 372:9 400:24 402:2 416:14
**typical** 96:13 266:8

**u**

**u** 76:9 135:4 349:14
**uc** 55:22 56:17 57:2,5,6
**ucla** 55:1,5 56:18 57:1 413:10
**uh** 34:20 42:11 71:10 79:14 84:24 131:3 155:16 171:21 173:8 198:8 223:20,24 233:4 234:24 235:1,4 241:24 250:18 277:22 278:2 280:8 283:20 290:7 306:24 351:3 351:17 355:22 357:14 381:2 420:18 437:16 442:6 447:4
**ultimate** 430:19
**ultimately** 399:15
**ultrasound** 333:21 334:3,4 334:13 354:16
**ultrasounds** 332:14,23 410:9
**unable** 286:25
**unaware** 449:1 489:15
**unbeknownst** 416:23
**unclear** 147:22 148:16 218:18 377:17
**undeniable** 177:17
**under** 31:22 66:7 68:16 94:18 101:10 101:25 127:25 147:1,6,10 153:22 181:19 230:19,20 275:21 277:23 287:12 300:7 301:14 312:25 321:13 322:4 323:13 327:14 327:25 361:8 365:25 380:15 464:4 487:12 502:1,4 503:10
**underestimate** 425:4 429:22
**undergo** 416:24 419:17
**underlining** 35:2,22 38:22 39:3,13 265:10
**underlying** 86:22 466:12
**underneath** 284:13 298:17 448:19
**underscore** 186:10 436:9
**underscored** 19:2 392:14
**understand** 17:24 19:6

25:11 26:22 28:1,2 29:4 48:3,18 51:4 51:22 54:13 60:19,24 63:13 64:1 81:9,14 94:12 102:13 102:25 104:3 104:12,19 111:13 112:5 114:7,13 122:3 125:10,25 126:25 132:24 136:19 137:12 140:18,22 143:22 144:21 149:21 151:25 160:2 172:8 173:3 176:1,11 186:19 189:13 208:6 209:7 214:14,15 215:14 224:5 224:16 229:2 229:16 237:9 239:23 241:10 244:14 246:4,4 249:21 251:25 252:16 277:16 280:11 290:17 291:1,23 314:3 321:22 344:7 345:16 349:9 363:5,8,18,22 377:1 390:25 403:12 404:7 419:2 420:23 428:20 457:24 458:22 459:11 467:18 481:8 485:10 489:2 492:18

**understandable** 142:2

**understanding** 16:15 17:16 90:23 110:1 125:2 126:18 129:12 160:3 193:4 252:7,14 254:10 393:12 403:24 423:6 432:21

**understood** 21:3 30:8,21 40:24 61:9 66:4 73:11 76:17 90:20 103:9 108:9 125:21 148:22 151:3 180:17 188:18 208:8 251:2,16 303:10 392:14 477:19

**undertaken** 228:13

**undertook** 433:6

**unexplained** 148:20

**unfair** 374:1,1

**unfortunately** 27:21 30:23 114:5 372:14 375:8

**uniform** 163:13 176:24 415:4

**unit** 14:13

**united** 1:1 2:1 13:10 14:17 61:24 240:2 382:22 436:12

**units** 336:23,24

**university** 54:14 55:21

**unknown** 62:8 144:22 147:16 154:11 285:12 320:21 382:6 393:15

**unopposed** 137:16,18 145:21 146:2,6 409:22 411:6 411:21 412:12 412:19

**unrelated** 39:14

**update** 233:16

**updated** 364:15 377:2,4,21,21 444:19

**updates** 45:4

**updating** 376:25

**upper** 70:12 336:15,21 421:25

**upside** 383:24

**uptake** 12:20 349:22 437:8

**upward** 422:8

**uri** 408:1

**urinary** 77:5

**urine** 216:19,25 333:3,6 334:17 399:16 407:20 438:3,15 483:25 484:3

**usa** 6:3,3,4

**usage** 132:5

**use** 12:10,12,14 12:18 13:9 50:14 52:8 57:23,25 63:14 85:4,5 111:19 112:17 144:13 165:2 174:13 190:3 192:24 207:12 208:10 208:20 209:5 227:18 275:18 281:12 282:13

282:19 283:21 284:10,23 290:4 298:19 298:23 300:1 301:16 302:25 305:6 306:11 307:4,9 308:13 311:8 316:13 316:18 318:8 319:3,6,23 320:10,20 321:10,13,17 322:8 324:17 324:17 325:12 326:15,15,16 326:16,23 327:14,15,16 329:13 331:2,8 335:14,18 336:22 338:15 339:12,17 341:6 347:7 361:17 364:20 366:4 374:25 375:13 382:20 385:3,10 395:2 400:10 402:3 403:25 404:8,8 404:23,25 405:14,16,17 405:18 409:5 409:12,14 410:24 412:25 422:18 426:13 426:14,19 429:20 434:19 448:16 449:25 450:20 454:12 465:11,13,15 465:23 466:4 466:15 469:17 484:4 489:19 490:17,24,25 490:25 496:19

**used** 11:10 50:10,19 51:11 52:21 83:1 87:19,20 88:1 99:25 113:5 115:17 127:9 189:5,9 221:3 228:8 246:25 271:1,10 280:22 281:1,7 281:13,20 282:6 285:7,12 286:24 297:13 301:19,25 302:5 307:24 317:1 318:3,21 318:22 319:9 319:18 320:8 326:24 342:12 352:22,25 361:15 394:15 396:22 397:7 407:18 411:14 414:10 420:5,6 422:14 427:5,6 427:6 436:6 438:2 440:9,10 449:19 469:17 481:17 497:11 498:7 499:2,17 501:1 504:19

**useful** 89:13 131:16 431:1

**users** 299:6 300:9,10,11,21 301:23 305:11 309:18,25 310:21 311:21 312:24 313:2 314:10 322:5 323:23 324:10 325:10,10 422:4 428:22 428:22 429:4,4 429:15

**uses** 285:4

**using** 52:18 97:1 113:2 137:6 142:16 160:23 210:5 222:16 231:19 236:6 249:7 266:7 297:9 299:17 304:9 309:10 310:16 314:13 339:8 343:13 357:19 401:4 405:9,11 407:13 412:18 503:9

**usually** 18:24 19:1 91:14 202:25 205:23 346:12 393:21 403:18

**uterine** 12:13 12:14 56:10,15 64:11,15 66:18 67:13,24 68:6 69:16 83:25 84:13 85:6,15 94:24 105:3,16 136:21 137:6 138:21 139:3 142:3,8,19 143:6 155:24 182:6 207:14 213:10 214:6 214:23 215:24 222:21 225:13 241:21 242:8 242:21 260:8 260:19 261:6 306:12 307:22 308:16 311:9 311:20 320:20 321:9 330:13 348:18 372:10 385:9 391:11 394:8 398:9 403:8 406:2,20 406:22,24

407:8 408:9 411:2 413:1,4 413:13 415:15 416:1 417:1,4 417:10,11,20 418:13,17 419:25 420:12 422:14 426:16 426:20 427:1 429:20 433:8 433:21 435:6,7 435:9,18 436:8 436:15 442:11 442:22 444:8 444:17 445:13 446:16 450:8 450:22 451:5 451:12 452:14 454:4 455:7 456:8,18,23 458:16 459:5 460:8,18,20 461:18 464:11 464:16 465:3 467:1 468:23 469:4 472:19 490:12,19 496:6
**uterus** 240:20 241:5 403:21 409:18 453:24

**v**

**v** 34:18 36:3 135:4 504:4 505:1 506:1
**v3** 12:9
**vagina** 403:22
**vaginal** 171:15 172:12,15 410:1
**vague** 114:5
**valentine's** 39:7
**valid** 294:6
**validity** 376:15
**valuable** 430:22
**value** 90:3,11 90:21 91:4 93:8,13 266:15 267:1 292:20 294:8 297:9 432:3
**values** 226:3,4 226:25 339:16 342:2
**variability** 98:24
**variable** 405:18 415:3,3
**variables** 251:6 252:10 254:9
**variations** 123:18
**variety** 168:10 178:10 232:20
**various** 71:5 282:14 295:19 364:23 398:24 414:24,24 420:7 450:19
**vary** 123:16
**vast** 53:3 101:11 278:7
**venture** 82:14
**verify** 504:9
**veritext** 9:18 14:23 17:15 26:3,12 44:6 259:21,25 379:25 501:2 504:14,23
**veritext.com.** 504:15
**version** 13:5,13 26:13,15 32:19 44:25 280:7 315:12 361:1 378:17,18,20 378:22 379:2,3 380:4 439:1,2 440:22 441:17 442:1 491:14
**versus** 14:16 49:25 91:13 94:13 95:11 97:16 98:12 161:15,25 163:3,18 250:4 281:20,21 282:6,7 296:1 297:4 301:22 305:10 397:6 400:8,23 401:10 437:23 489:11
**vessels** 399:11 399:12 402:20 403:5
**video** 1:12 2:15 14:10,13 43:5 111:14 112:12 500:7,9
**videographer** 9:17 14:4,23 17:1,4,7 110:9 110:17,20 170:13,16 255:8,14 256:24 257:2 259:8 264:6,9 347:24 348:3 389:17,20 392:18,20,24 500:6,14,18,22
**videotaped** 10:17,21 45:13
**view** 90:25 91:12 117:14 419:18 426:25
**viewed** 410:15

**virginia** 8:8
**virtue** 451:12 454:9
**visualize** 165:16
**vital** 343:17
**vitamin** 444:3
**vitro** 11:15,17 88:11 91:16,17 158:21 159:7 165:2,2 169:17 221:18 230:7 230:21 231:4 231:15 232:12 233:14 251:5 252:10 253:24 257:17 351:1,5 406:12
**vivo** 88:11 158:23 165:2,2
**vociferously** 425:17
**volatile** 410:4
**volume** 1:16 2:16 10:4 258:1 283:17 329:16 350:2 468:16
**volunteers** 351:15

**w**

**w** 35:24 169:14 265:6
**w.i.** 6:3
**wacker** 5:6 7:7
**waichman** 4:3
**wait** 81:5 83:13 103:10 130:20 171:5 213:9 282:24 290:25 327:24 334:13 379:17 467:7
**waited** 352:14
**walk** 499:25
**walked** 225:11
**wand** 369:14
**want** 16:17 18:3 19:24 20:4,8 23:20 24:11 25:8 26:21 33:22 45:14,17 48:2 53:23,24 59:3 59:8 64:2 76:11 78:16 89:20 100:10 112:9 118:14 119:23 120:1 132:2 134:24 141:18 149:23 150:7 169:1 170:5,22 176:7 181:11 190:16 191:25 208:3 215:9 220:12 227:8 234:14 249:4 255:20 256:19,22 257:13 264:18 269:10,19 271:4 272:14 275:14 289:20 292:5 295:16 302:9 312:17 325:16 326:12 340:5 341:14 344:25 346:16 359:6 366:23 367:7,25 369:1 370:1 372:15 374:1,22 378:24 386:25 389:24 390:19 390:23,24 403:22 408:7 420:19 422:17 432:5,5,6 435:18 436:11 439:16 444:12 462:11 487:7
**wanted** 23:21 25:22 238:5
**wants** 100:18
**warranted** 308:9,24 425:10 426:3
**washington** 3:7 4:6
**watched** 111:10
**waterfront** 103:16
**waved** 369:14
**way** 18:2 20:3 28:18 32:2 36:1 38:5 41:7 42:2 49:13,17 75:3 80:2 82:3 91:21 96:17 107:7,21 112:13 115:17 118:20 122:12 137:2 141:6 142:16 152:4 175:4 180:9 181:21 204:23 213:22 291:14 292:9 299:14 303:24 316:22 323:15 326:22 343:10,16,17 346:2,17 356:19 393:23 463:4,23 468:5 474:6 483:5
**ways** 37:11 199:4 398:25
**we've** 34:16 35:9 79:5 117:16 129:5 142:3 161:24 162:19,20,21 170:10 185:15 186:7,22

198:24 201:21 206:15 254:23 255:8 265:5 268:5 301:7 343:25 348:21 386:23 390:3 405:15 430:18 448:8 489:6 495:2
**weak** 212:12 258:11
**weaker** 157:8 414:17
**weakly** 219:9 219:15,23 232:22 233:3
**webpage** 364:15
**website** 39:11 365:5,7 368:17 372:11,14,17 379:13 440:7
**websites** 112:16
**week** 211:10 351:22 352:1,6 352:8,23
**weeks** 47:12 190:12,13
**wei** 11:16 35:23 169:14 265:6
**weight** 88:17 94:25 95:4,9 95:24 97:13,15 132:22 184:12 184:15,18,21
**weighted** 96:7 97:18
**weighting** 97:1
**weights** 95:14
**welcome** 25:25
**went** 27:15 55:24 57:1 83:12 99:11 107:14 108:1,2 108:5 202:18 267:24 287:17 288:9,17 369:15 377:5 389:25
**west** 4:19 6:21
**whatsoever** 455:12
**whereof** 503:20
**whispering** 14:8
**white** 12:10 29:5 282:25 283:7,16 287:19 288:10 288:19,19 298:10,11 299:15,25 305:7 306:16 306:23 307:17 309:18 310:16 311:7,20 313:1 313:8 314:11 315:24 317:2 348:22 420:16 427:24 428:6 428:16 431:10 444:10 445:20 446:18 464:12 464:15 465:5 488:23 489:11 491:7 495:16 496:3 497:4 498:3 499:8,16
**whites** 310:1
**wide** 305:17
**wideikis** 5:4
**wiedner** 9:10
**wife** 59:4
**wife's** 452:22
**wikipedia** 62:10
**willing** 62:6 419:16
**wilmington** 4:13
**wise** 29:17 347:23 389:16
**wish** 24:24 374:19 478:17
**withdraw** 101:20 288:7
**withdrawal** 410:15
**witness** 10:3,9 15:18 17:9 22:5,7,12,17,20 23:3,3 33:6 35:19 38:2 42:20 43:13 47:24 48:8 53:3 59:1,4,24 60:3,10,12 64:7,18 65:5 66:16,21,25 68:1,8 70:23 72:18 73:7 74:3 75:13,21 77:25 78:11 79:25 82:6,8 82:25 84:9,16 85:20 86:10,16 86:25 87:9 88:24 89:8,17 89:20 92:8 93:11 94:11 95:18 96:3,9 96:21 97:4,8 100:14,22 101:17 103:15 105:7,21 106:3 109:5,18 112:8 113:1,16,18 114:24 115:19 116:16 120:3,6 122:14,24 125:1,18 126:17 129:17 129:22 130:2,8 130:18 131:24 132:19 133:5

| | | | |
|---|---|---|---|
| 133:21 134:6 134:16 136:24 137:10 138:6 138:18 139:5 140:1 141:11 142:25 144:10 145:10 146:8 147:19 148:6 151:10,19 152:7,13,18 153:3,10 155:8 156:8,14 157:8 157:16 158:1,8 158:15 159:12 159:22 160:2 160:15 161:7 161:19 162:11 163:11,21 164:6,16,25 165:25 166:8 166:17 167:9 167:19 168:8 169:5 172:3,22 173:18 174:18 176:7 178:13 179:16,23 180:5 181:5 182:12 183:7 184:6 185:1,12 186:4 187:1 188:12 189:7 189:21 191:12 194:4,22,25 196:7,22 197:8 | 197:18 200:4,9 200:20 201:4 201:25 202:25 203:5,10,15,25 204:17,20 205:10,22 206:23 207:5 207:16 208:23 209:11,23 210:11 211:6 212:2,15 213:3 213:10,12 214:1,9 215:2 215:14,20 216:1,13,23 217:14 219:12 219:18 220:7 222:23 225:15 226:17 227:14 228:7,19 229:3 229:20 230:9 232:8 233:23 237:9 238:2,10 239:14,25 242:20 243:5 243:18 244:3 244:10 245:15 245:20 246:16 246:24 249:18 249:25 250:12 251:12,18,24 252:18 253:12 254:1,14 258:21 259:4 | 260:10 261:18 263:15,19,25 264:22 269:11 269:15 271:21 272:12 274:10 274:17,25 275:16,22 278:5 281:3,17 281:24 282:21 283:4,9 284:16 285:17 287:5 287:10 288:4 288:14 289:2 289:13 290:14 291:4 292:4,13 293:22 295:12 296:15,23 297:9 298:14 299:2,19 300:18 301:12 303:5,19 304:6 304:12,18,22 307:20 308:2 309:2 310:5,10 311:12,25 313:5,12,18,24 314:24 316:2 316:17 317:10 318:19,25 320:1,12 321:2 322:23 323:6 323:20 324:4 324:13,19 325:14,20 | 327:2 328:14 329:4,22 331:19 332:2,6 332:9 333:24 334:8 335:1 337:8,19 340:2 340:6,13,20,22 342:7,23 343:4 343:9 345:21 346:9 347:1,11 349:2,18 353:7 354:5,18,24 355:10 356:13 358:10,15,20 359:20 362:21 364:18 366:8 366:15,25 367:11 371:18 371:24 375:14 376:5 377:11 377:13,16 378:19 379:17 381:14 382:3 382:11 383:13 384:19 385:23 386:15 387:18 388:4,10,18 391:14 392:7 392:10,19 393:1,15 395:5 395:22,25 396:18 398:3 398:24 400:12 401:3 402:6 |

403:11,12 404:15 405:8 406:9 408:12 409:21 411:5 414:4,20 415:17,21 419:5 421:10 421:24 423:1,6 426:6 428:9,11 428:25 429:7 430:1,16 432:2 433:14,24 434:16 435:5 435:17,24 438:11 442:25 443:23 446:4 446:22 448:1 449:8 451:7,24 452:2,4,8,18 454:7 455:10 455:22 457:4 458:8,18 459:7 460:12 461:23 462:13,20,22 463:3 465:15 466:3,15 467:4 467:8 468:5,11 469:1,16 470:2 470:8,25 471:25 472:3 473:4,11,22 474:18 475:2,4 475:10 477:3 477:19 478:4 479:1,14,17 480:4,12,16 482:12 483:13 483:18 485:15 486:6,13,18 487:24 489:2 489:15 490:15 491:25 492:15 492:23 494:15 494:24 495:8 495:20,24 496:13 497:1 498:11 499:24 500:4 502:3 503:20 504:8 504:10,12,18

**witnesses** 503:7

**wmlaw.com** 9:15

**wnt** 437:4,5

**woman** 63:20 64:15,25 100:5 178:1 401:9 404:1,7 409:16 410:5 412:8 418:20 419:12 419:20 429:23 468:22 469:3 484:21 485:17 488:23,23

**woman's** 146:1 156:12,16 400:19 405:22

**women** 13:10 33:17 62:4 63:23 64:21 135:11 136:7 136:13 139:16 139:20 142:10 155:24 171:15 181:19,25 184:12 224:1 243:10 244:16 244:23 249:9 251:8 276:12 276:19 281:20 287:16,20 288:9,12,17,20 299:7,7,9,10,10 299:16,23,23 300:1,22 305:7 305:8,11 306:23 307:2 308:12 309:12 309:18 310:2 310:16,18 311:7,8,20,21 313:1,2,8 314:11,13 316:8,10,18 317:1,2 320:4 320:8 331:8 332:15,23 333:7 348:24 359:12 382:22 385:7 400:24 404:19 407:2 407:20 409:1,2 409:24 412:3 413:23 416:16 416:19,22,25 418:22 419:14 419:16,21 420:25 422:14 426:20 427:9 427:15,17 433:2 434:8,19 434:23 435:8 435:18 436:6 436:14 449:19 449:25 450:9 450:10,21 451:5,11 453:18,19,24 454:12 456:8 490:12 499:1 499:17

**women's** 12:15 12:16 316:6 317:4,14,24 318:12 427:20 469:10,22 489:11,12

**won** 110:5

**wonder** 252:21

**wondered** 294:7

**woodruff** 61:17

**woods** 8:4

**word** 31:23 37:13 38:16

174:15 203:21 210:5 298:23 315:23 351:25 352:6 395:2 427:25 490:17
**wording** 241:15
**words** 23:4 106:17 109:12 160:13 216:17 252:7 271:1 306:25 345:2 431:2 458:18
**work** 19:15 24:15 41:14 46:9 48:4 61:13 65:14 67:21 68:3 73:9 75:9 77:7 77:22 118:4 130:3,6 273:8 273:14 297:1 407:11 464:6
**working** 19:10 107:2 439:20
**works** 135:25 151:21 187:16 316:22
**workshop** 11:7 146:19,23 155:1
**world** 150:19 430:20 434:24 436:12
**world's** 144:12
**worlds** 90:12
**worldwide** 7:3 298:2
**worries** 104:11 185:2 201:5
**worry** 32:5 45:22
**worth** 289:6
**worthy** 452:21
**wow** 18:18
**wright** 4:10
**write** 62:6
**writing** 49:16 237:15 315:23 425:9
**written** 38:16 95:8 132:11 134:9 152:19 190:6 314:1 358:6 360:20 363:22 378:3,4 378:12 434:18
**wrong** 56:24 60:20 105:14 135:2 137:15 139:22 198:14 305:2 384:8 471:16
**wrote** 62:13 77:21 251:18 315:17 428:12 471:13
**www.cancer....** 13:4,12 372:9
**www.cancer....** 12:23 13:6

**x**

**x** 10:1 31:4
**xe** 407:11
**xenochemicals** 12:5 270:4
**xu** 441:11

**y**

**yeah** 24:7 26:2 28:8 29:4 30:7 30:24 31:17 32:15 36:23 38:8 44:8 47:15,22 52:6 53:11 54:4 70:23 76:8 83:12 84:9 86:18 89:19 97:11 98:1 101:17 103:14 111:12 113:18 121:12 123:11 141:25 142:2 145:12 148:19 148:22 153:19 161:11 164:20 169:4 170:1,21 171:7,9 172:8 173:3 179:4,10 180:14,20 186:21 200:22 207:10,16 211:16 213:18 214:1 215:15 220:15 223:9 223:13 225:21 230:20 235:23 236:9 237:8 250:13 254:18 256:21 259:13 259:17 265:12 276:6 280:14 288:4 289:23 302:23 305:3 315:19,22 323:2 335:8,11 335:22,22 338:22 345:21 349:11 350:15 351:25 387:23 392:8 396:6 419:6 433:22 434:5 452:8 466:8 471:18 472:6,15 473:20,22 480:14 497:24 498:19 499:9
**year** 29:12 55:11,12,13,14 56:1,17 99:14 150:18,18 237:11 253:1 301:21,22

302:1,6 407:21 408:16 422:5 423:23 473:7
**years** 18:22 55:9,25 68:11 84:1 99:9 109:16 173:6 211:13 244:24 251:7,8 292:21 292:21 297:18 319:8 326:25 351:16 357:20 360:15 361:16 412:4,9 427:4 452:19 461:25 490:24
**yep** 34:14 120:16 121:6 155:13 287:14 295:22 328:22 348:8
**york** 4:6 5:21 5:21 8:15,15 9:6,6
**young** 62:4 354:2 404:1,7 404:18 412:8
**yourlawyer.c...** 4:8

**z**

**z** 6:6 36:3
**zebra** 127:13
**zebrafish** 267:17
**zeleniuch** 441:11
**zero** 103:22 267:7
**ziv** 36:3
**zoeller** 30:10 235:2,5
**zoeller's** 235:17
**zoom** 3:5,13,14 4:4,18 5:5,12 5:19 6:6,13,20 7:5,6,14 8:5,13 9:11,19,20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.