# Exhibit 12

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Civil Action Number 1:23-CV-00818

IN RE: HAIR RELAXER MARKETING )
SALES PRACTICES AND PRODUCTS )
LIABILITY LITIGATION )

VIDEO DEPOSITION

OF

MICHELLE LYNN COTE, PH.D.

The video deposition upon oral examination of MICHELLE LYNN COTE, PH.D., a witness produced and sworn before me, Tara Gandel Hudson, RPR, CRR, a Notary Public in and for the County of Hancock, State of Indiana, taken on behalf of the defendant Strength of Nature and Godrej (SON) Holdings, Inc. at the offices of Wagner Reese, LLP 11939 N. Meridian Street, Carmel, Hamilton County, Indiana, on the 12th day of February, 2026, scheduled to commence at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to the time and place thereof.

Job No. 7852435

APPEARANCES

FOR THE PLAINTIFFS:

Michelle Parfitt
ASHCRAFT & GEREL
1825 K Street NW
Suite 700
Washington, DC
mparfitt@ashcraftlaw.com

Gary K. Shipman
SHIPMAN WRIGHT & MOORE LLP
575 Military Cutoff Road
Suite 106
Wilmington, NC  28405
gshipman@shipmanlaw.com

Stephanie O'Connor
Lara J. Say
DOUGLAS & LONDON PC
One State Street
35th Floor
New York, NY 10004
soconnor@douglasandlondon.com
lsay@douglasandlondon.com
(Appearing via Zoom.)

Omega Adams
Diandra "Fu" Debrosse
DiCELLO LEVITT LLP
505 20th Street North
Financial Center
Birmingham, AL  35203
oadams@dicellolevitt.com
fu@dicellolevitt.com
(Appearing via Zoom.)

Jake Loessin
JOHNSON LAW GROUP
2925 Richmond Avenue
Suite 1700
Houston, TX  77098
jloessin@johnsonlawgroup.com
(Appearing via Zoom.)

APPEARANCES
(Continued)

FOR THE PLAINTIFFS:

Frederick S. Longer
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA 19106
flonger@lfsblaw.com
(Appearing via Zoom.)

FOR THE DEFENDANT:
Namaste

Daniel A. Spira
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, IL 60603
dspira@sidley.com
Julia M. Steiner
SIDLEY AUSTIN LLP
830 Brickell Plaza
Miami, FL 33131
julia.steiner@sidley.com

FOR THE DEFENDANT:
RNA Corporation

Daniel L. Stanner
TABET DiVITO ROTHSTEIN LLC
The Rookery Building
209 South LaSalle Street
Seventh Floor
Chicago, IL 60604
dstanner@tdrlawfirm.com

APPEARANCES
(Continued)

FOR THE DEFENDANT:
Murray's Worldwide

Leslie A. Federer
Robert Petti
MARON MARVEL BRADLEY ANDERSON & TARDY LLC
191 North Wacker Drive
Suite 2950
Chicago, IL 60606
lfederer@maronmarvel.com
rpetti@maronmarvel.com
(Appearing via Zoom.)

FOR THE DEFENDANT:
Advanced Beauty Inc.

Sara J. Peal
HEYL ROYSTER VOELKER & ALLEN PC
701 Market Street
Peabody Plaza
Suite 1505
St. Louis, MO  63101
(Appearing via Zoom.)

FOR THE DEFENDANT:
John Paul Mitchell Systems

Shontia (Tia) Harris
CLAUSEN MILLER PC
225 West Randolph Street
Suite 700
Chicago, IL  60606
sharris@clausen.com
(Appearing via Zoom.)

APPEARANCES
(Continued)

FOR THE DEFENDANT:
AFAM Concept, Inc., d/b/a JF Labs

Lynn Lehnert
GOLDBERG SEGALLA
8000 Maryland Avenue
Suite 640
St. Louis, MO  63105
llehnert@goldbergsegalla.com
(Appearing via Zoom.)

FOR THE DEFENDANT:
Beauty Bell Enterprises LLC

Kevin A. Titus
LITCHFIELD CAVO LLP
303 West Madison
Suite 300
Chicago, IL  60606
titus@litchfieldcavo.com
(Appearing via Zoom.)

Shipra Mehta
COSTELLO GINEX & WIDEIKIS PC
150 North Wacker Drive
Suite 1400
Chicago, IL  60601
smehta@cgw-legal.com
(Appearing via Zoom.)

FOR THE DEFENDANT:
House of Cheatham

Ian M. Sadler
SEGAL McCAMBRIDGE
100 Congress Avenue
Suite 800
Austin, TX  78701
isadler@SMSM.com
(Appearing via Zoom.)

APPEARANCES
(Continued)

FOR THE DEFENDANT:
Avlon Industries
Anna Morrison-Ricordati
WIEDNER McAULIFFE
One North Franklin
Suite 1900
Chicago, IL 60606
amricordati@wmlaw.com
(Appearing via Zoom.)

FOR THE DEFENDANT:
Revlon, Inc.
Justina Nzegwu
ECKERT SEAMANS CHERIN & MELLOTT LLC
275 Madison Avenue
Tenth Floor
New York, NY 10016
jnzegwu@eckertseamans.com
(Appearing via Zoom.)

FOR THE DEFENDANT:
McBride Research Laboratories
Ravika R. Marcadis
DINSMORE & SHOHL LLP
200 South Biscayne Boulevard
Suite 2401
Miami, FL 33131
ravika.rameshwar@dinsmore.com
(Appearing via Zoom.)

THE VIDEOGRAPHER:

Levern McFadden

APPEARANCES
(Continued)

THE CONCIERGE:

Joshua Bostic
(Appearing via Zoom.)

ALSO PRESENT:
(All appearing via Zoom.)

J. Bliss
Chris Cotton
Patty Jensen
Patrick Lyons
James Moore
Kristin Padden
Sabrina E. Palacios
Laila Razzaghi
Bruno Reategui
Emily Robinson

INDEX OF EXAMINATION

PAGE

DIRECT EXAMINATION ...............................12
Questions by Daniel A. Spira
CROSS-EXAMINATION ...............................388
Questions by Michelle Parfitt
REDIRECT EXAMINATION ............................420
Questions by Daniel Spira

INDEX OF EXHIBITS

Deposition Exhibit:
Exhibit 1 - Defendants' Notice of Deposition ..17
Exhibit 2 - Plaintiffs' Response to Notice ....19 of Deposition
Exhibit 3 - Cote Presentation - Incidence .....24 and Outcome Disparities in High Grade Endometrial Cancers
Exhibit 4 - Cote Statement of Compensation ...28
Exhibit 5 - Cote's Expert Report ..............46
Exhibit 6 - Michelle Lynn Cote , PhD MPH ......74 Materials_Notes - Exhibit Slip Sheet
Exhibit 7 - Cote publication_Cigarette .......117 Smoking
Exhibit 8 - White article [Cote literature ...144 cite 083]
Exhibit 9 - Sister Study Questionnaire .......148
Exhibit 10 - Article _"Non-differential .......177 misclassification"

INDEX OF EXHIBITS
(Continued)

PAGE

Deposition Exhibit:

Exhibit 11 - Chang [Cote literature cite 75] ..209

Exhibit 12 - Hair Relaxer Use and Risk of .....249 Uterine Cancer in the Black Women's Health Study

Exhibit 13 - Black Women's Health Study Questionnaires....................254

Exhibit 14 - Bradford Hill Article ............300

Exhibit 15 - Fedak article [Cote reference ....302 92]

Exhibit 16 - Federal Judicial Center - ........320 Reference Manual on Scientific Evidence

Exhibit 17 - J&J Cote Deposition ..............327

Exhibit 18 - Sarink article [Cote reference ...368 52]

(9:12 a.m.)

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:12 a.m. on February 12, 2026. Please note that the microphones are sensitive, and they pick up whispering and private conversation. Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 in the video-recorded deposition of Michele Lynn Cote in the matter of Hair Relaxer Marketing Sales Practices and Products Liability Litigation filed in the United States District Court for the Northern District of Illinois, Eastern Division.

Case Number 1:23-cv-00818.

The location of this deposition is Wagner Reese LLP at 11939 North Meridian Street, Carmel, Indiana, 46032.

My name is Levern McFadden representing Veritext Legal Solutions, and I'm the videographer. The court reporter is Tara Hudson, also representing Veritext

Legal Solutions.

All counsel --

(A discussion was held off the record to correct technical issues.)

THE VIDEOGRAPHER: All counsel appearing by Zoom will appear on the stenographic record.

All counsel who are present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. SPIRA: Dan Spira from Sidley Austin on behalf of Namaste.

MS. PARFITT: Michelle --

MS. STEINER: Julia Steiner from Sidley Austin.

MR. STANNER: Dan Stanner on behalf of RNA Corporation.

MS. PARFITT: Michelle Parfitt, Ashcraft and Gerel, on behalf of the plaintiffs.

MR. SHIPMAN: Gary Shipman on behalf of the plaintiffs.

THE VIDEOGRAPHER: Will the court reporter please now swear in or affirm the

witness, and then counsel may begin.

MICHELE L. COTE, PH.D. M.P.H.,

having been first duly sworn to tell the truth, the whole truth and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION,

QUESTIONS BY DANIEL A. SPIRA:

Q Good morning. My name is Dan Spira. I'll be taking the deposition this morning.

Can you please state your name for the record.

A Yes, Michele Lynn Cote.

Q I think I'll pronounce that correctly, but if I'm not doing so at any point, please let me know.

A You're welcome to call me "Michele."

Q Okay. Thank you.

And you have been deposed before; correct?

A Correct. One time.

Q One time. Okay. Just as a -- was it in 2014?

A No.
Q No?
A No, not 2014.
Q Excuse me. 2024?
A Yes. I believe so.
Q Okay. So I'll go over just a couple of refresher ground rules.

We need to try to speak one at a time so that our court reporter can get an accurate transcription. I'll do my best to wait for you to answer a question before I ask my next question. And likewise, if you can let me finish my question, even if you know where the question is going, then it'll help us get a clear record.

We need audible responses. Things like nods of the head or gestures obviously are not taken down on the transcript. So verbal "yes," "no," responses are helpful for the transcription as well.

If I don't ask a question -- excuse me.

If I ask a question that you

don't understand, just let me know. If you do answer a question, I'll assume that you did understand it.

Is that fair?

A Yes.

Q Okay. And if you need a break at any time, just let us know. We'll try to take a break roughly every hour or so. But if you need a break, just let us know. And my only request is that if we are in the middle or nearing an end of a line of questioning or in the middle of a question, that we finish that before we go on break. Okay?

A Okay.

Q Great.

MS. PARFITT: Mr. Spira, may I make one comment, if you will?

MR. SPIRA: Sure.

MS. PARFITT: Dr. Cote, you were very kind to indicate that you may be called "Michele," which you certainly can at breaks.

But if you wouldn't mind referring to Dr. Cote as "Dr. Cote."

MR. SPIRA: That is my plan.
MS. PARFITT: I assumed as much from talking to you earlier. So thank you.
BY MR. SPIRA:
Q Dr. Cote, is there any reason that you are not able to give complete and accurate testimony today?
A No.
Q And you're testifying today as an expert on behalf of the plaintiffs in the hair relaxer litigation pending in federal court; is that correct?
A Yes.
Q How many times have you served as an expert witness in previous litigation?
A Just one case.
Q Was that the talc litigation?
A Yes.
Q Was that both in federal court and in state court, if you recall?
A So I haven't appeared in court at all. So I understand it's for the federal case.

Q Okay.
A But I've not yet appeared in court.
Q Okay. And did you issue expert reports in both venues or just in one?
A I wrote one expert report for talc. Where it went from there, I don't know.
Q And you already indicated you gave one deposition. That was for that litigation?
A Yes. And then there was a shorter follow-up deposition. Last summer, maybe. August 2025.
Q And that was also for the talc litigation?
A Yes.
Q And you said you've never testified in court before?
A Correct.
Q In the talc litigation, you also served as an expert for the plaintiffs; correct?
A Correct.
Q Okay. You've never -- you've

never given expert testimony on behalf of the defense in any other litigation, I take it?

A No.

Q To your knowledge, have your expert opinions ever been excluded or limited by a court?

A Not to my knowledge, no.

Q Have you ever been a party to a lawsuit yourself?

A No.

Q Have you ever provided testimony before as a fact witness as opposed to serving as an expert?

A No.

Q If we could introduce as an exhibit, it's what we have uploaded as Tab 1.

(Deposition Exhibit 1 was presented for identification.)

Q All right. You've been handed what's been marked as Exhibit 1, and this is the notice of videotaped deposition of Michele Lynn Cote, Ph.D., MPH.

Do you see that there?

A I do.
Q Have you seen this document before?
A I have.
Q Okay. And did you have an opportunity to review the production requests that start on page 4 of the document?
A Yes.
Q Okay. And do you have any documents with you here today?
A Yes. I have a couple of binders of references and my report.
Q Okay. And when you say "a couple of references"?
A These are the references included in my expert report.
Q Okay. All right. We'll get to that.
Did you bring anything with you today other than your expert report and the materials that are referenced in your expert report?
A No.
Q Do you have any unpublished

data upon which you're basing your expert opinions in this case?
A No.
Q Did you conduct any data analyses in preparing your report?
A No.
Q Let's introduce what we'll mark as Exhibit 2. This is Tab 2 of the electronic materials.
(Deposition Exhibit 2 was presented for identification.)
Q Dr. Cote, do you have in front of you the document with the title The Plaintiffs' Steering Committee's Response and Objections to Defendants' Notice of Videotaped Deposition of Michele Lynn Cote, Ph.D., MPH?
A I do. Yes.
Q And have you seen this document before?
A I believe so. Yes.
Q When do you recall seeing this document?
A I believe within the last couple days.

Q If we go down to page 5, you'll see that the requests correspond with those that we just looked at in Exhibit 1.

Do you see that there?

A Yes. Okay. Yes.

Q And there are responses that are provided to each of the requests.

Do you see that?

A I do.

Q Okay. So Request Number 1 asks for:

"A complete copy of Dr. Cote's file for this case, including all published and unpublished literature, documents, notes taken, medical records, pleadings, depositions, expert reports, and any other materials where data reviewed or relied on by Dr. Cote for formulating any opinions offered in this case."

Do you see that there?

A Yes.

Q Are all of the materials that you considered for this case listed in your expert report?

A In my expert report are materials considered. Yes.
Q Right. So are there any materials outside of those listed in your expert report that you considered in connection with your opinions in this case?
A No.
Q Turning to Request Number 2. Excuse me, actually sticking with Request Number 1 for a minute.
You considered a number of studies and other literature in connection with your opinions; right?
A Yes.
Q Do you have any versions of those with notes on them or highlighting or anything like that?
A I think maybe a couple here of the epi, which you're welcome to have and look at.
Q And those are ones you brought with you today?
A Yeah.
Q We'll set those aside and --

A Okay. I'd like to use them throughout the course of this and then --
Q Understood. Understood. Okay.
If we look at -- and are --
And those ones that you just referenced that you brought with you today, are those the only studies on which you have any notes or highlighting?
A Yes.
Q Request Number 2 asks for:
"All documents setting forth or referring to, in whole or in part, the data or other information considered or relied upon by Dr. Cote to prepare" -- there's a typo there -- it should be "her opinions in this case."
Do you see that?
A I do.
Q And again, is there anything responsive to that outside of your expert report?
A No.
Q And the materials referenced in your report?
A No.

Q Okay. Request Number 3 asks for:

"All documents prepared by Dr. Cote to use at any meetings with attorneys representing the PFC, including but not limited, to handouts, brochures, slides or presentations, materials used in public seminars or speeches."

Do you see that there?

A I do.

Q Were there any --

And I don't -- I'm not entitled to, like, things like correspondence with the attorneys, but were there any materials you brought to meetings with attorneys such as presentations you had given in seminars or otherwise that are relevant to this litigation --

MS. PARFITT: Counsel, that would be with the exception of the one PowerPoint that we provided you.

MR. SPIRA: Understood.

A Correct. Correct. That is all I have was the PowerPoint that I -- the presentation I gave back in the fall.

BY MR. SPIRA:
Q Okay.
A And that was to -- not to a legal audience. That was to a professional audience.
Q Why don't we -- why don't we mark that one real quick. That's Tab 2B in the electronic version.
(Deposition Exhibit 3 was presented for identification.)
Q Is this the presentation that you just referenced a moment ago?
A Yes.
Q What was -- what was the context in which you gave this presentation?
A I was invited as a keynote speaker to the Heartland Association of Gynecologic Oncology meeting that took place in Iowa City, Iowa.
Q When did that meeting take place?
A I believe it was September. It was the middle of September. I'm not aware of the exact date, but I can find it

online.

Q Of --

A 2025.

Q It was in the fall -- fall of 2025?

A Yeah. A couple months ago.

Q I take it this presentation does not discuss hair relaxer products; correct?

A Correct.

Q Does this presentation discuss risk factors for either uterine or ovarian cancer?

A No.

Q Was this a presentation that you prepared yourself?

A Yes.

Q If we could turn back to Exhibit 2. I believe we're on Request Number 4, which asks for:

"Documents reflecting unpublished data, including but not limited to the deponent's own data, reviewed by or relied upon by Dr. Cote to provide the opinions offered in this

case."

Do you see that?

A I do.

Q And again, you're not relying on any unpublished data in connection with this case?

A Correct.

Q You didn't --

And again, you did not run any of your own data analyses in this case?

A No, I did not.

Q Request Number 5 asks for:

"All documents constituting, setting forth, or referring to, in whole or in part, exhibits to be used as a summary of or support for the opinions which Dr. Cote prepared."

Do you see that there?

A I do.

Q Outside of your expert report, do you have any documents responsive to that request?

A No.

Q Request 6 asks for:

"Documents including slide

presentations and other materials written or created by Dr. Cote except published literature that relate to this litigation, chemical hair relaxers, uterine cancer, ovarian cancer, formaldehyde, parabens, phthalates, benzophenones, NDMA or endocrine-disrupting chemicals, or occupational exposures."

Do you see that there?

A I do.

Q Outside of the presentation that we marked as Exhibit 3, do you have any documents responsive to this request?

A No.

Q Request Number 7 asks for:

"Documents, including but not limited to, billing statements, billing records, employee records, time sheets, and/or invoices that reflect the amount of time spent or amount of compensation received for any of Dr. Cote's work relating to this case, including any retainer that Dr. Cote has requested or been paid."

Do you see that there?

A I do.
MS. PARFITT: And Counsel, we have provided counsel for defendants an invoice of payments that have been made to Dr. Cote. You should have received those prior to this deposition.
MR. SPIRA: You're referring to the statement of compensation?
MS. PARFITT: Correct.
BY MR. SPIRA:
Q Okay. Yeah. Let's mark as Exhibit 4 what we have electronically as 2A.
Dr. Cote, you have in front of you what's been marked as Exhibit 4.
(Deposition Exhibit 4 was presented for identification.)
Q You see that this has the name of the case at the top and then says Statement of Compensation, Michele L. Cote, Ph.D., MPH?
A Yes.
Q Does this appear to accurately reflect the compensation that you have billed at least through January 9, 2026?

A Yes.
Q And you billed --
Through January 9, 2006, you had billed 139.75 hours; is that right?
A That is what the math looks like. Yes.
Q And you've been billing time as an expert in this litigation since November 2023.
Does that sound right?
A Yes.
Q Do you know about when you started working on this case? Like, was it -- that looks like that invoice is dated November 2, 2023. Do you know when you would have started working on this case?
A Yes. My guess is because I invoice quarterly, that it would have been for the prior quarter. So maybe the summer of 2023 would be about when I started.
Q You've been billing time on this litigation for a little -- what is that? -- a little less than three years?

A Yes. With a break in 2024, it appears.
Q Right. It looks like -- does this indicate that --
Well, it looks like perhaps some work was done in -- you would have billed time. Does this indicate you would have billed time prior to November 2, 2023, and that your next invoice after that was April of 2025?
A Yes.
Q So you did some --
You spent about 23 hours between the summer and fall of 2023 and then no work in 2024?
MS. PARFITT: Objection.
A I believe that to be accurate. Yes.
BY MR. SPIRA:
Q When were you retained by plaintiffs as an expert in this litigation?
A I guess -- I mean, I don't have a retainer. Like, there wasn't a date that I said I need X amount of money to,

you know, move forward with considering this. But I would assume that sometime in midsummer of 2023 was when I began looking at the literature to determine whether or not this was something I wanted to continue to pursue.

Q Do you remember when you were first contacted by plaintiffs' counsel?

A I was first contacted by plaintiffs' counsel for the talc litigation case. So that was probably 2023.

MS. PARFITT: Dr. Cote, if I may, I believe the question was relevant to the hair relaxer case.

A Yeah. For hair relaxer, I would -- I would have to assume it was sometime in the summer of 2023.

BY MR. SPIRA:

Q Would that have been -- excuse me. Would that have been from Ms. Parfitt?

A Yes.

Q And you're working with -- you've worked with Ms. Parfitt on both the

talc litigation and the hair relaxer litigation. Is that accurate?
A Correct. Yes.
Q You worked on the talc litigation earlier than the hair relaxer litigation?
A Correct.
Q At some point, in the context of those discussions, you were asked if you would also serve as an expert in the hair relaxer litigation?
MS. PARFITT: I would object to the -- to the form of that question. It's close, but not necessarily did we talk about talc and then we talked about hair relaxer. To that extent, maybe you can make the distinction.
MR. SPIRA: Sure. I'm happy to rephrase.
BY MR. SPIRA:
Q Around when do you recall being asked if you would consider serving as an expert in the hair relaxer litigation?
A I believe it would have been the summer of 2023.

Q I think you mentioned that you then began looking at the relevant literature around that time?
A Correct.
Q Okay. Do you have an estimate of how many hours you've billed to the hair relaxer litigation since January 9 of 2026?
A That's an excellent question.
I would assume it's somewhere around 30 hours, given I participated in Science Day. So that was early January and is not included in this invoice.
Q I think this -- I can check. I think Science Day was shortly before January 9?
A It was, but I won't bill for -- I've not billed at all this year.
Q Okay. So work that you did in December --
A Is included on that 1-9-2026.
Q Okay. So this 1-9-2026 would have included --
Would this have included work that you did to prepare your expert

report?

A Yes.

Q This also would have included at least some of the preparation that you did for Science Day?

MS. PARFITT: I'm going to object to any question or inquiry with regard to Science Day, including hours. She can give you the total of what she's been doing, and you can ask whether it be research or report. But with regard to how much time she spent on Science Day, I'm going to object to that.

MR. SPIRA: Okay.

MS. PARFITT: I think you can rephrase it we can go --

MR. SPIRA: Yeah, I guess -- I mean, what I'm trying to get at is how much time she spent on the expert report. So it's kind of -- so we can --

MS. PARFITT: Yeah.

(Simultaneous discussion interrupted by the reporter.)

BY MR. SPIRA:

Q About how much time -- about

how much time of this 139.75 would you say you spent working on your expert report?

A I would say it would be 90, 95 percent of the time would be direct reading, writing, revising the expert report. Yeah.

Q 90 to 95 percent of the --

A The 140 hours there, roughly.

Q And you said you billed about 30 hours, you would estimate, since January 9?

A I have not billed anything since this -- from this time forward. Yeah, I haven't billed anything yet.

Q You would estimate that you have spent about 30 hours that have not yet been billed since January 9?

A Yes. That's my estimate.

Q And so would that 30 hours have all pertained to preparation for this deposition?

A No.

Q What else would that have included?

A Science Day.

Q Okay. So even --
MR. SPIRA: I'm not getting into the contents --
MS. PARFITT: And you're trying very hard. I appreciate that.
BY MR. SPIRA:
Q Again, so my understanding is Science Day --
Okay. Maybe I'm misunderstanding the date, what is meant by the date here.
MS. PARFITT: And Science Day was January 6, if that helps you.
MR. SPIRA: That is my understanding.
BY MR. SPIRA:
Q This date of January 9, 2026, what does that represent?
A That is the date that I submitted the invoice, but the invoice was only through 12-31-2025.
Q I see. So your next invoice will capture everything from January 1 forward?
A Yes.

Q Okay.
A Yeah.
Q How much time would you say you spent preparing for today's deposition?
A Probably 25 hours.
Q What did you do to prepare?
A A lot of rereading of materials. And then yesterday, I had a discussion with Michelle and Gary.
Q Was yesterday the first discussion you had with Michelle and Gary in preparation for your deposition?
A No.
Q When was the first discussion that you had with any plaintiffs' counsel in preparation for your deposition?
A Probably about two weeks ago. After the Science Day.
Q Was that also with Michelle and Gary?
A Yes.
Q Have you spoken with any other plaintiffs' counsel in preparation for your deposition?
A Yes.

Q Who would that have been?
A Primarily Stephanie and Fu.
Q And you mentioned that you -- so how many discussions with plaintiffs' counsel did you have to prepare for your deposition?
A Maybe three.
Q And how long were those discussions?
A Yesterday was about six hours. The times before that, less than two each time or around two each time.
Q And you mentioned that you rereviewed some materials in preparation for your deposition?
A Yes.
Q What would that have included?
A My expert report. Several of the papers that are included in my expert report. Probably ten to twenty papers.
I reviewed some of the expert reports from your side. In particular, Dr. Lucille Adams-Campbell, who is also an epidemiologist. That's primarily it.
Q Have you reviewed any

deposition transcripts related to this litigation, experts or fact witnesses?

A I briefly reviewed Dr. Roque, who is a GYN oncologist.

Q Dr. Roque is another of the plaintiffs' experts in this litigation?

A Correct. Yes.

Q Why did you review Dr. Cote's deposition transcript?

A Dr. Roque's transcript? To get a sense of the questions that were asked and how the day went for him.

Q Did you have any discussions with Dr. Roque about his deposition?

A No.

Q You mentioned that you reviewed Dr. Adams-Campbell's expert report; is that right?

A Yes.

Q Do you know Dr. Adams-Campbell personally?

A I do.

Q How do you know Dr. Adams-Campbell?

A Oh, boy. I mean, cancer

epidemiology is a pretty small world. We both held the same grant mechanism. It was a Komen graduate training in disparities research grant at the same time. So we would see each other occasionally at meetings.

She served as an external advisory board member when I was at Karmanos Cancer Institute in Detroit, so maybe we would see her once a year there. Much of that time, it was over Zoom because of the pandemic.

Q Have you ever coauthored any publications with Dr. Adams-Campbell?

A Not to my knowledge, no.

Q Have either of you ever been a peer reviewer for the other's publications?

A That I --

MS. PARFITT: Objection to the extent that there could be some confidentiality with regard to that.

So I think we do need to protect that aspect of it as to who the -- who the reviewers were for the peer review

publications. So maybe there's another way to get at that question.
BY MR. SPIRA:
Q Outside of this litigation, have you ever had opportunity to review any of Dr. Adams-Campbell's publications related to uterine or ovarian cancer?
A That I can say pretty confidently no because she does not have a large number of uterine or ovarian cancer-specific publications.
Q Okay. And what about more broadly? I understand you may not recall exact specifics, but more generally speaking, have you had an opportunity to review her publications outside of this litigation?
A Again, I review probably on average ten papers a year, so that's a couple hundred papers over the course of my career. I don't recall specifically ever reviewing one of hers, but that isn't to say --
We also tend to publish in large groups and kind of consortium, but

that isn't to say she wasn't included on one of papers I reviewed. I would have no way of even being able to go back and look at that.

Q Okay. Other than Dr. Adams-Campbell, did you review any other expert reports in this litigation, any other of the defendants' expert reports?

A I did. I reviewed Dr. Weed.

Q Any other besides Dr. Weed and Dr. Adams-Campbell?

A No. Those are two primary ones.

Q Did you review Dr. Goodman's expert report?

A No, not in any detail that I can remember.

Q Why did you review Dr. Adams-Campbell and Dr. Weed's expert reports?

A It was my understanding they were the epidemiologists who serve on your side.

Q Have you reviewed any of the

plaintiffs, the other plaintiffs' expert reports in this litigation?

A No, I've not.

Q You haven't reviewed Dr. Gerstman's expert report?

A No, I don't believe so.

Q Are you familiar with Dr. Gerstman?

A No. I mean, I know the name, but do I know him personally? No.

Q Have you had any discussions with any of the plaintiffs' experts about your opinions in this litigation?

MS. PARFITT: Counsel, mindful that there was a Science Day, and there were four experts that were presented by the plaintiffs and two from yours. There would be occasion that they would be, obviously, in the same room, in the courtroom, and there would have been conversations greeting one another.

So I don't -- that is -- my understanding is anything part and parcel to Science Day is not to be invaded by either side.

MR. SPIRA: Okay. I mean, yeah, my question wasn't about Science Day, per se.
MS. PARFITT: If we exclude Science Day, I think you can ask the question excluding anything that happened during the Science Day. As you know, they were in court together. The courtesies, I'm sure, were extended. Yeah.
MR. SPIRA: Yeah. I'm not asking about courtesies, or "Hello, nice to meet you."
MS. PARFITT: Right. But I think if you ask the question: "Outside of Science Day, have there been any communications or correspondence," that sort of thing, perhaps, would be better.
MR. SPIRA: Okay. I understand.
MS. PARFITT: Thank you.
MR. SPIRA: And we may have to -- I'll just flag for the record --
MS. PARFITT: Sure.
MR. SPIRA: -- we may have to look at that at a break. I know -- I know that the content of Science Day is not admissible for any other purpose in this

litigation, but I'm not sure that all -- all discussions, all work in the lead-up to Science Day is out of bounds for questioning. But we'll take a closer look at that during a break.

MS. PARFITT: If you would. I believe that is.

MR. SPIRA: Okay. So outside -- for now, we'll stick to outside the context of Science Day.

BY MR. SPIRA:

Q Outside the context of Science Day, have you had any discussions with any of the plaintiffs' experts about your opinions in this litigation?

A No.

Q And what about discussions with any plaintiffs' -- excuse me.

Have you had any discussions with other plaintiffs' experts about their opinions in this litigation?

A No.

Q Did you review -- and I think you already mentioned you have not reviewed reports from other experts

disclosed by plaintiffs; correct?
A Correct.
Q And that would include both draft and final form of their expert reports?
MS. PARFITT: Objection. You're entitled to inquire about final reports. You may answer. It's going to be the same answer.
MR. SPIRA: Yeah.
A Correct.
MR. SPIRA: To be clear, I was not asking for the contents of any drafts --
MS. PARFITT: I appreciate that.
MR. SPIRA: -- unless she had relied on them.
BY MR. SPIRA:
Q Why don't we introduce -- I think we're on Exhibit 5. This will be Tab 3 from the electronic set.
(Deposition Exhibit 5 was presented for identification.)
BY MR. SPIRA:
Q If you prefer to use the version with you, this is going to be your

expert report.
MS. PARFITT: Counsel, I'm just putting Exhibit 5 on, her copy, so she can refer to it as such. Thank you.
BY MR. SPIRA:
Q Okay. Dr. Cote, you've been handed what's been marked as Exhibit 5.
A Yes.
Q And do you recognize this document?
A I do.
Q Is this the expert report that you issued in this litigation?
A I believe so. Yes.
Q If we turn to page 28 in the physical copy, it's pdf page 33.
A Yes. I'm there with my signature.
Q Yes. And that is your -- that is, in fact, your signature?
A Yes.
Q It's dated December 1 of 2025?
A Yes.
Q Okay. Did you draft this expert report?

A I did.
Q Did anyone assist you in drafting this?
A No.
Q Exhibit 1 to your expert report, which I don't think it's a page number, but it starts on pdf page 48.
A I'm sorry. Can you take me there again?
Q It's Exhibit 1 to your report. Unfortunately, there's no page number, but it comes after your signature, after the list of references.
A Okay. Yes, I'm there.
Q You see that this is a résumé or curriculum vitae?
A Yes.
Q And is this -- is this an accurate CV?
A Yes.
Q Is it up to date?
A As of November 13, yes.
Q Have there been any significant changes to your employment positions?
A No.

Q Are there any publications that you've authored that are not reflected in your CV that are relevant to your opinions in this case?
A No.
Q Any presentations you've given that are relevant -- that are not reflected in your CV that are relevant to your opinions in this case?
A No.
Q Any other qualifications or certifications you've received that are relevant to your opinions that are not reflected on your CV?
A No.
Q I understand you have a Ph.D. in epidemiologic science and a master's of public health in epidemiology; is that correct?
A Yes.
Q You do not have a medical degree; correct?
A Correct.
Q You're not an oncologist; right?

A Correct.
Q You're not qualified to treat cancer?
A Correct.
Q You're not qualified to treat humans; correct?
A Correct.
Q You're not an expert in toxicology; correct?
A Correct.
Q Or biochemistry?
A Correct.
Q Or oncology, if that's how you say that one?
MS. PARFITT: You said "oncology"?
MR. SPIRA: Oncology.
A Correct.
BY MR. SPIRA:
Q You're not an expert in cancer biology; correct?
A Correct.
Q You're not an expert in pathology; correct?
A Correct.
Q You're not an endocrinologist;

correct?
A Correct.
Q You're not an expert on endocrine disruption; correct?
A Correct.
Q You're not an expert on cosmetics or personal care products; is that correct?
A Correct.
Q You're not a dermatologist; correct?
A Correct.
Q You have issued a number of publications in your career as an epidemiologist; correct?
A Correct.
Q You've not had occasion to publish any studies on hair products; is that correct?
A That is correct.
Q You haven't published any studies on the contents of hair products; correct?
A Correct.
Q You are not an expert on

parabens; correct?
A Correct.
Q You're not an expert on phthalates; is that correct?
A Correct.
Q You're not an experted on formaldehyde; is that correct?
A Correct.
Q You're not an expert on phenols; is that correct?
A Correct.
MS. PARFITT: And Counsel, not to upset the tempo of that, I'm going to object to all the questions about "you're not," just for the record.
MR. SPIRA: Is that a form objection?
MS. PARFITT: That is a form objection.
BY MR. SPIRA:
Q You're not an expert on heavy metals; is that correct?
A Correct.
Q Your report that we have here in front of us contains all of your

opinions in this litigation and the bases for those opinions; is that correct?

A That is correct. But I will note that there are some references missing from -- here, it cuts off. Mine is page 6. My references actually go to about 90. So I'm not sure what happened on this copy.

Q Let me see.

A 93 maybe.

Q May just be a printing error, hopefully.

So I see -- you're talking about the Literature Cited section of your report?

A Correct.

Q I see on my copy, Citations 1 through 93. Is that what you have?

A No. I'm not -- this copy I have through 67.

Q Oh. Strange.

A But yours is correct.

Q There should be 93 --

A Yes.

Q -- references?

Okay. And subject to that qualification that there should be 93 references in your Literature Cited section, or that there are 93 citations in your Literature Cited section, your report contains all of your opinions and the bases for those opinions; is that correct?

A Yes.

Q Do you currently intend to conduct any further analysis relevant to your opinions in this litigation?

MS. PARFITT: Object to the word "analysis." Perhaps you could explain what you mean by "analysis." Are you talking about calculations? analysis? further review?

BY MR. SPIRA:

Q Dr. Cote, did you understand my question?

A When you use the term "analysis" to an epidemiologist, I think calculations and numbers primarily.

If you're talking about further analysis, including continuing doing readings, those sorts of things, a broader

interpretation of "analysis," yes, I do plan on doing a broader interpretation of analysis.

Q Okay. And so in terms of the first aspect of that answer, calculations, actual data analysis, you have no current intention of doing any sort of calculations or data analyses; is that correct?

A Correct.

Q Your only caveat was that you may continue to review literature relevant to your opinions?

A Correct.

MS. PARFITT: Counsel, that would also include in the event there is testimony from your experts that haven't taken place yet in the relevant field that she's testifying in. I'm sure she'll be provided that information to review as well.

BY MR. SPIRA:

Q Do you currently intend to offer any supplemental expert reports in this litigation?

A No.
Q Is there anything in your report that you believe is not accurate?
A No.
Q Is there anything in your report that you feel the need to correct?
A Other than those references, no.
MS. STEINER: And I'm sorry to interrupt. The references aren't wrong. You'll see you have two separate -- you have Cited and then Additional Materials --
THE WITNESS: But some of those --
MS. STEINER: -- goes to 93. And then the next, it starts renumbering at your additional materials.
THE WITNESS: I appreciate that. Okay. Thank you.
MR. SPIRA: So that's -- that's very helpful. So let's -- let's clarify that for the record.
BY MR. SPIRA:
Q If you see beginning on -- it's pdf page 34. Comes directly after your

signature. So it would be page 29 if the numbering continued.
MS. STEINER: But it doesn't. It renumbered at 1.
A Yes.
BY MR. SPIRA:
Q So right now, we're on -- if we can go to pdf page 34, the literature-cited section. So you have a section here that's Literature Cited. And it looks like that goes 1 through 93, pages 1 through 8. Do you see that there?
A Yes, yes. This looks correct. Thank you.
Q And then right after that, we have a section titled Additional Materials Considered.
Do you see that there?
A Yes.
Q And that is labeled 1 through 67.
A Yes. That's it.
Q So you've got the correct version of your report in front of you?
A I do. Thank you.

Q And what is the distinction between literature cited and additional materials considered?
A The literature cited actually appears in the report. So there's a citation in my expert opinion report.
The additional materials considered are things that I read and considered but didn't necessarily, you know, make it directly in as a reference.
Q Okay. You took them into account in forming your opinions --
A Yes.
Q -- but you did not feel the need to cite them in the actual text of your report?
MS. PARFITT: I'll object to Counsel's phrasing. I think that misstates what Dr. Cote said.
A I considered these additional materials, but they aren't included as a citation in the report.
BY MR. SPIRA:
Q Okay.
A But they were considered.

Q Have you read all of those references, the ones that are listed as additional materials considered?

A I have read them to some extent, yes. I may not have read every single last word in detail, but yes.

Q Have you read all of the literature cited?

A Yes.

Q Is there anything outside of the literature cited for the additional materials considered that was relevant to forming your opinions in this litigation?

A No.

Q Did you have any --

In connection with reaching your opinions in this litigation, did you have any communications with any authors of the studies discussed in your report?

A No.

Q And there are --

Well, there are three primary epidemiological studies that are discussed in your report; correct?

MS. PARFITT: Objection. Form.

BY MR. SPIRA:

Q Not a trick question. I'm referring to White, Chang, and Bertrand.

A Correct.

Q Okay?

A Yes.

Q Outside of forming your opinions, have you had any discussions -- or I guess let me start that question over.

With regard to those three studies, the White study, the Chang study, and the Bertrand study, have you ever had any discussions with any of the authors on those studies about those publications?

A No, I have not.

Q Apologies for the slightly personal question, but have you ever used a chemical hair relaxer?

A No, I've not.

Q You're not an expert in chemical hair relaxers. Is that fair?

MS. PARFITT: Objection.

A Correct. I'm not an expert in chemical hair relaxers.

BY MR. SPIRA:
Q You've never published analyses of -- I think I may have already asked this, so apologies. But you've never published analyses of chemical hair relaxers as an exposure?
MS. PARFITT: Just objection to the extent asked and answered.
You may answer.
A Correct.
BY MR. SPIRA:
Q You have not done a review of the constituent ingredients of any particular chemical hair relaxer product; is that correct?
MS. PARFITT: Objection.
A Correct.
THE VIDEOGRAPHER: Was that an objection?
MS. PARFITT: It was an objection. Thank you.
BY MR. SPIRA:
Q Before you got involved in this litigation, before you were asked to consider serving as an expert in this

litigation, had you reviewed any epidemiological evidence on hair relaxers and cancer risk?

A I'm continuously reviewing literature about different risk factors, especially for uterine and ovarian, because those are -- female cancers are one of my primary areas of expertise.

So yes, I'm sure I looked at them as they came through. They are in journals that I look at, the very least, the table of contents every time they come out.

Q Do you recall when you would have reviewed those? I guess let me rephrase that.

Do you have a specific recollection of having reviewed any of those publications, or you are just answering on the basis that they were published in journals that you regularly read?

MS. PARFITT: Objection. Form.

A I'm answering on the basis that these are journals I usually -- I usually

read. And this is the type of research that I pay closer attention to.

BY MR. SPIRA:

Q Okay. You don't have a specific recollection of having read the White, Chang, or Bertrand studies prior to being approached about serving as an expert in this litigation?

(Simultaneous discussion interrupted by the reporter.)

Q You do not have a specific recollection of having read the White, Chang, or Bertrand studies prior to being approached about serving as an expert in this litigation; is that correct?

MS. PARFITT: Objection. Form. Misstates her testimony.

A I have no recollection of the date that I might have first read the abstract to any of those articles or the article in its entirety.

BY MR. SPIRA:

Q Prior to being approached to consider serving as an expert in this litigation, had you formed any opinions

about any association or causal link between chemical hair relaxers and either uterine or ovarian cancer?

A No. It was not an area that I researched prior to this outside of my normal day-to-day reading of what's being published in peer-reviewed journals.

Q Your causation opinions that are set forth in your expert report were developed in connection with your work in this litigation; is that correct?

A Correct. Causation is a larger, more time-consuming endeavor than just reading a single association paper, study. So I did not embark upon an expert opinion type of review until I was asked to.

Q Okay. And if we turn to page 1 of your report, it begins with the heading My Mandate.

A Yes.

Q You were asked in this litigation to answer two questions; is that correct?

A Yes.

Q Okay. And those were: Can the use of chemical hair relaxers cause uterine cancer? And can the use of chemical hair relaxers cause ovarian cancer? Is that correct?

A Correct.

Q You're offering the opinion in this case -- actually, if we turn to -- well, that's fine.

You're offering the opinion in this case that use of chemical hair relaxers can cause uterine and ovarian cancer; is that correct?

A That is correct.

Q Your opinions are not specific to any particular hair relaxer product; is that correct?

A That's correct.

Q Your opinions are not specific to any type of uterine cancer or any type of ovarian cancer; is that correct?

MS. PARFITT: Objection. Form.

You may answer.

A I'm assuming you mean like histologic subtype of the cancer.

BY MR. SPIRA:
Q Exactly.
A Correct.
Q Your opinions are not specific to any racial or ethnic group; is that correct?
A That's correct.
Q You do explain in your report that the vast majority of women who use chemical hair relaxers are Black or African American women; is that correct?
A That's correct.
Q If you turn to page 12 of your report, which is pdf page 17.
A Yes.
Q You see at the very top of that page, you cite to the Llanos, et al, report?
A Yes.
Q Or publication?
And you cite the Women's Circle of Care study, and you specifically state that:
"Llanos, et al., report that 88 percent of African American women

reported regular use of chemical hair relaxers/straighteners while only 5 percent of white women reported regular use."

Did I read that correctly?

A Yes, you read that correctly.

Q On the same page, you also cite the SELF study; is that correct?

A Yes.

Q And in that study, it was noted that:

"89 percent of Black or African American women reported ever using chemical hair relaxers in their lifetime."

Is that correct?

A Correct. That's what the study reported.

Q Okay. And the Bertrand study. You also reviewed the Bertrand study; correct?

A Correct.

Q And that reported that:

"Up to 95 percent of the self-identified adult Black women in the U.S. reported ever use of hair relaxers"?

A I believe so, yes.
Q You understand that chemical hair relaxers are specifically intended for tightly coiled hair, which is common among Black women but not among women of other races; is that correct?
MS. PARFITT: Objection. Form. Misstates the evidence.
A Yeah, I'm -- Black women tend to have that hair type more frequently, but that doesn't mean that women who self-identify as white or other racial or ethnic groups don't have similar textured hair.
BY MR. SPIRA:
Q Your opinions are not specific to any age group; is that correct?
A That is correct.
Q Your opinions are not specific to any frequency of using chemical hair relaxers; is that correct?
MS. PARFITT: Objection. Form.
A That is correct.
BY MR. SPIRA:
Q Your opinions are not specific

to any duration of having used chemical hair relaxers; is that correct?
MS. PARFITT: Objection.
A That is correct.
BY MR. SPIRA:
Q You offered your opinions to a reasonable degree of scientific certainty; is that correct?
A That is correct.
Q And what do you mean by that, by "reasonable degree of scientific certainty"?
A I believe that more likely than not, these chemical hair relaxers can be a cause of uterine and ovarian cancers.
Q And you're not offering any opinions about whether -- whether chemical hair relaxer products actually caused uterine cancer in any specific individual; correct?
MS. PARFITT: For clarification, she will not be giving case-specific opinions in this case -- in this deposition. Is that the question?

BY MR. SPIRA:

Q My question is, you're not offering any opinions about whether chemical hair relaxers actually caused uterine cancer in any specific individual; is that correct?

MS. PARFITT: Objection. Form.

You may answer.

A That's correct.

BY MR. SPIRA:

Q And same question with regard to ovarian cancer. You're not offering any opinions in this litigation about whether chemical hair relaxers actually caused ovarian cancer in any specific individual; is that correct?

MS. PARFITT: Objection. Form.

A That is correct.

BY MR. SPIRA:

Q When you've offered opinions in prior litigation, were those opinions also made to a reasonable degree of scientific certainty?

A When you talk about prior litigation, I'm assuming you're meaning

talc because that's the only one that I've been involved in?

Q Correct.

A Yes.

Q You stand by your testimony in the talc litigation and that prior litigation?

MS. PARFITT: Objection to the relevance.

You can answer that.

A Yes.

BY MR. SPIRA:

Q You stand by your expert report issued in the talc litigation?

MS. PARFITT: Objection. Relevance.

A Yes.

BY MR. SPIRA:

Q Okay. When did you reach your opinion that chemical hair relaxers can cause uterine and ovarian cancer?

MS. PARFITT: I'm going to object to the form. She's already testified the date of her report.

You may answer.

A Yes. It would be late November as the report was finally coming together. November of 2025.

BY MR. SPIRA:

Q So as of -- you don't think --

As of summer of 2025, you don't think you had reached an opinion as to whether chemical hair relaxers could cause uterine or ovarian cancer; is that correct?

MS. PARFITT: Objection. Asked and answered. She's provided her response.

A Correct. I was still deep in data review, peer-reviewed literature review, and the writing process at that point.

BY MR. SPIRA:

Q Did you reach your opinion regarding --

Did you repeat your --

Did you reach your opinion regarding uterine cancer and regarding ovarian cancer at the same time?

A Yes.

MR. SPIRA: We've been going about

an hour. Is now an okay time for a quick break?

MS. PARFITT: That would be great.

THE VIDEOGRAPHER: We're off the record. This is the end of Media Unit 1 at 10:13 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are now on the record. Beginning of Media Unit 2 at 10:31 a.m.

BY MR. SPIRA:

Q All right. Dr. Cote, we discussed that you brought some materials with you today at the deposition; is that correct?

A Yes.

Q And you have a folder with you that has some materials that you've made some notes and markings on; is that correct?

A Yes.

Q If we could note that as, I believe, Exhibit 6. And we discussed we only have one copy, but during the break, we'll make some copies of that Exhibit 6.

(Deposition Exhibit 6 aways presented for identification.)

Q Dr. Cote, ovarian cancer and uterine cancer are two distinct cancers; right?

A Yes.

Q They occur in different organs in the body; correct?

A Yes.

Q What is ovarian cancer?

A Ovarian cancer, actually most subtypes seem to originate in the fallopian tubes. And it's a cancer of the ovaries. Tends to occur in women somewhere in their 60s. I think about age 66 was the usual age of onset.

It's oftentimes asymptomatic or the symptoms are very vague. They are vague gastrointestinal symptoms, so the women aren't diagnosed until later stage. And that usually means they don't have as many opportunities for long-term survival.

It's one of -- it is responsible -- it's the highest mortality rate for gynecologic cancers, at least in

the United States.

Q Are there -- you mentioned that most subtypes originated in the fallopian tubes; is that correct?

A Yes. That's the current understanding.

Q Are there some subtypes that are understood to not originate in the fallopian tubes?

A Yes, that's the current general understanding.

MS. PARFITT: Excuse me. I'm sorry.

You said are there some subtypes that are understood to not originate in the fallopian tubes? Is that right?

MR. SPIRA: That's correct.

THE VIDEOGRAPHER: Is your microphone on?

MS. PARFITT: Oh, sorry.

BY MR. SPIRA:

Q You identify in your report at least five different subtypes of ovarian cancer; is that right?

A I believe. Where are you looking in my report?
Q I'm on page 10. And I'm referring to high-grade serous, low-grade serous, endometrioid, clear cell, and mucinous; is that correct?
A Yes, that's correct. Table 4.
Q And you indicate that those are the five principle histologic types of ovarian cancer; is that right?
A Based on the current understanding, yes, these are the most common histologic subtypes.
Q And when you say "based on current understanding," what do you mean by that? Is there some -- is there some ongoing study in the scientific community as to potential additional subtypes of ovarian cancer?
A I think there's always additional study going on where they are trying to look within the subtypes at different characteristics of those tumors to further stratify them to improve treatment options.

Q Okay. And some of the different subtypes have different risk factors associated with them; is that correct?

A Yes. It does appear that there's some subtypes that have somewhat different risk factors that have been identified.

Q Okay. Now, in your report at page 11, which is pdf page 16, you've got a heading here of Risk Factors.

Do you see that there?

A I do.

Q We are within, I think, the ovarian cancer section of your report; is that right?

A Yes. That's correct.

Q And you identify some of the risk factors for ovarian cancer as age, not having given birth, height, history of endometriosis, family history of breast cancer, family history of ovarian cancer, BRCA1 mutations, BRCA2 mutations, Lynch Syndrome, postmenopausal hormone therapies, high BMI, and genital use of

talcum powder; is that correct?

A Yes, that is correct. Those are lists of -- you started with the kind of the nonmodifiable things like age and family history and familial syndromes, and you finished with a couple that are more potentially modifiable.

Q Okay. And as opposed to ovarian cancer, uterine cancer originates in the uterus; is that correct?

A Yes, that's correct.

Q And there are also different subtypes of uterine cancer; correct?

A Yes, that is correct.

Q If we look at page 8 of your report, you identify subtypes as endometrioid, including both low grade and high grade; serous; mixed; clear cell; carcinosarcoma; and sarcoma.

Do you see that there?

A Yes, I do.

Q You spent some time in your report, particularly on page 7, discussing the significant racial disparities in incidence and mortality for uterine

cancer; is that correct?

A Yes, that's correct.

Q Is that relevant to your ultimate opinion in this case?

A No, it's not relevant to my ultimate opinion. It's just the epidemiology of uterine cancer.

Q Okay. And you identify risk factors for uterine cancer, and I'm on page 9 of your report now.

A Yes.

Q You see there's a heading there for Risk Factors, and we're now under the heading of Uterine Cancer.

A Yes.

Q You identify risk factors for uterine cancers as age, not having given birth, early menarche, late menopause, age at first and last birth, endometriosis, polycystic ovarian syndrome, family history of uterine cancer, family history of colorectal cancer, Lynch Syndrome, higher BMI, conditions associated with diabetes, use of hormone replacement with unopposed estrogen, and use of Tamoxifen;

is that correct?

A It's actually conditions associated with metabolic syndrome including diabetes. So metabolic syndrome, there's a number of different conditions that make up metabolic syndrome.

Q Okay. So thank you for that clarification.

With that clarification, those are risk factors that you identify for uterine cancer; is that correct?

A These are commonly established risk factors in the field. Yes.

MS. PARFITT: And Counsel, you're talking about nonmodifiable risk factors, or are you talking about modifiable as well?

MR. SPIRA: I think the question was clear, Counsel.

MS. PARFITT: Okay, well -- all right. I'm not sure it was.

MR. SPIRA: Okay. Well --

MS. PARFITT: So I'll object. Form.

MR. SPIRA: Okay. And I appreciate you're just trying to clarify --
MS. PARFITT: I am.
MR. SPIRA: -- but if we could stick to objections --
MS. PARFITT: Trying not to. I really am trying not to. Thank you.
BY MR. SPIRA:
Q Okay. And so as between ovarian cancer and uterine cancer, there are some risk factors that are unique to ovarian cancer, some that are unique to uterine cancer, and some that overlap; correct?
A Yes. That is correct.
Q For example, you identified Tamoxifen use as a risk factor for uterine cancer but not for ovarian cancer; is that correct?
A Yes, that's correct.
Q And you identify use of talc powder as a risk factory for ovarian cancer but not for uterine cancer; correct?
A Yes, that is correct.

Q And you note, for example, that smoking actually has an inverse association with uterine cancer but not with ovarian cancer; is that right?
A Yes. That is correct.
Q Okay. And we could say the same about virtually any two types of cancer; right? They are going to have different sets of risk factors associated with them?
A I wouldn't quite say that. I mean, I think that these two cancers -- although they are in different organs, they are still part of the female reproductive -- female reproductive system. There's probably more overlap than not.
So, like, if I was to compare something like uterine with, let's say, liver cancer, they probably have a quite distinct risk factor profile.
Q Yeah. Right. And so whatever -- whatever two cancers we take, uterine and liver, uterine and ovarian, there may be some overlap, but each one

has a unique set of risk factors, understanding there's going to be some overlap depending on the cancers; correct?

MS. PARFITT: Objection. Form.

You may answer.

A That's correct. But I think there's certain types of cancers depending on kind of their etiologies that have much more similar risk profiles than different profiles. And in this case, uterine and ovarian have much more similar risk profile.

You'll notice even, like, the names of the histologic subtypes, those were all derived originally in ovarian cancer and then applied to uterine cancer.

So they're much more closely related than something like uterine and liver.

BY MR. SPIRA:

Q Okay. But we do see examples where some of the risk factors are unique to one or the other; correct?

A Yes. That's correct.

Q And some exposures might be

protective of one and not the other; correct?

MS. PARFITT: Objection. Form.

BY MR. SPIRA:

Q Like smoking, as a sort of strange example?

A Yes. Smoking is something we don't publicize highly as a public health message to prevent uterine cancer, but it does indeed exist.

Q And so to draw reliable conclusions about risk factors for a specific cancer type, as an epidemiologist, you would want to review epidemiological data specific to that cancer type; right?

MS. PARFITT: Objection. Misstates her testimony.

A Yes. And that is -- that is what I did.

BY MR. SPIRA:

Q And similarly, if you want to draw conclusions about whether a particular exposure is a risk factor for a given outcome, you would want to review

epidemiological data specific to that exposure; correct?

MS. PARFITT: Objection. Form.

A And I'm not sure what you're actually asking her.

BY MR. SPIRA:

Q Well, in epidemiology, one -- to oversimplify things, often epidemiology -- epidemiologists look at -- they study an exposure, and they try to determine whether it's associated with an outcome; correct?

A Yes, correct.

Q And that helps to assess whether -- helps to assess whether that exposure is associated with that outcome, perhaps whether that exposure is causing that outcome; correct?

Or is a risk factor for that outcome?

MS. PARFITT: And I know you're trying. So objection. Compound.

If you can answer the question.

A Yeah. Let me -- let me try to restate it.

So yes, epidemiology, part of epidemiology is, you know, we're interested in knowing the distribution and determinants of disease, "determinants" meaning risk factors, with the ultimate goal of trying to intervene so that you can reduce the risk of whatever said disease is.

So you would look at an exposure. And that exposure could be, I'll use an example of cigarette smoking. And you can look at an outcome which is lung cancer. So that is a typical epidemiologic study.

We say that, you know, an association exists. That's what we're looking for is in a single study. It's really just in association. Causation is -- is more than that.

BY MR. SPIRA:

Q Right. An epidemiological study on its own, typically can show you an association but not causation; is that correct?

A Yes, that is correct.

Q If you are -- all else being equal, in order to draw some of those conclusions that you just spoke about, with regard to whether a particular exposure -- let me try to use the same word you did -- if you're trying to determine whether an exposure is a determinant or a risk factor for a given outcome, you want to look at data regarding that particular exposure; right?

MS. PARFITT: I'm going to object again to form.

If you can answer that.

A Yes. You would want to describe how you were capturing exposure information. And in a manuscript, that's what I look for. It's one of the first things I look for. How did they define the exposure? How did they define the outcome?

Q Do you agree an expert should use the same methodology in litigation as they use in their professional work.

A I agree that the same methodology should be employed when

you're, say, analyzing a manuscript. You've been asked to analyze a manuscript that is going out to peer review. You look at the same sorts of things that I looked at when I applied, you know, my knowledge to developing this report.

BY MR. SPIRA:

Q And not just, you know, beyond looking at the same sorts of things, you want to apply the same methodology; isn't that right?

MS. PARFITT: Objection. Asked and answered.

A So the methodology for a single paper that I am analyzing as part of my daily service to my field, so to speak, that is going out for peer review, and I'm serving as a peer reviewer, that is really just analyzing the single paper, kind of what's in front of you, which is done for something like this, to develop an opinion and ultimately an expert report.

It's much more than just looking at a single paper. It's looking at data from multiple fields and really

considering other facets, which I'm sure we will get into. It isn't the exact same methodology. The expert report requires a lot more work from -- work to be considered from other areas. A lot more research from other areas to be considered.

BY MR. SPIRA:

Q Okay. I mean, I understand the distinction you're talking about.

A Mm-hmm.

Q So in your work as an epidemiologist outside the context of litigation, do you -- do you personally analyze data from multiple fields, consider all facets, and come to an opinion about whether an exposure can cause an outcome?

MS. PARFITT: I'll object to form. It's quite broad. "In your work."

You may answer if you can.

A Yeah. We need to step back.

Like if I'm being asked to review a single manuscript, no. I do not carry it all the way through to a causal

analysis. I review more details that are specific just to that manuscript. And it's things that I also considered putting together an expert report.

But, you know, some of it is, you know, looking in detail at the abstract. Do the conclusions that are listed in the abstract actually match the conclusions that are listed in the paper? Do the data support what they are actually listing as a conclusion?

And then again, more details about, you know, how -- how the study was designed, things that the authors did to look for, you know, random error, confounding bias, those sorts of things.

Do they include a section on the limitations of their work, those kinds of items.

So it's -- again, it's what I do when I'm analyzing a single manuscript that is going to peer review, I mean, all the way down to, you know, just the language used. It's somewhat different than here. Here is the same methodology

but on a much more broader scale.
BY MR. SPIRA:
Q Okay. Okay. So you said when you're reviewing a single manuscript, you don't carry it all the way through to a causal analysis. You review more details specific to that manuscript.
Outside of reviewing a single manuscript, are there instances in your work outside of litigation where you do carry it all the way through to a causal analysis and take those additional steps that you take for purposes of litigation?
MS. PARFITT: Objection. Form.
You may answer.
A Yeah. I mean, there's -- in my professional life at this point in time with what I'm doing is, I'm generating a lot of novel -- novel research, novel findings, using my own data.
I publish, as I'm sure you saw from my CV, a lot of, I'll just say, like, single manuscripts. I'm not spending a lot of time doing things like systematic reviews, opinion pieces, anything of that

nature.

So most of my work -- most of my academic research productivity, to get really in the weeds with academic-speak, is publishing peer-reviewed manuscripts.

In my teaching, I do teach an intro to epidemiology, fundamentals of epidemiology course. We do not go deep into causality there.

But certainly, I have postdoctoral fellows that I have trained or am currently training, even fellows in other fields, gynecologic oncology fellows at my last position. And those would be places that we would have some discussions about causality and what that means.

BY MR. SPIRA:

Q Okay. So maybe to be a little more concrete about it, in your expert report, you review the epidemiological studies, and you ultimately conduct a Bradford Hill analysis; is that correct?

A I would say the first thing I do when I'm looking at any of this is, look to see what literature is out there,

epidemiologic or not, to see if there's any sort of biological possibility to why examine this particular exposure in this particular outcome. That's kind of my starting point with everything.

And then from there, it is reviewing epidemiologic literature, but it's also reviewing a lot of the other basic finds literature in the area in terms of, in this case, you know, toxicology. Looking at how these different chemicals may impact the human body, how it might impact other, like, animal models, different, like, systems, different -- yeah. Different models to look at the overall exposures.

So it's a much broader look than just read a couple of epidemiology papers and then offer a causal opinion.

Q Understood. And I didn't intend to minimize that step of reviewing the relevant literature.

So in terms of your -- in terms of your work here for this expert report, you described the literature search and

review that you conducted. And then you also conduct in your report a -- what's known as a Bradford Hill analysis; correct?

A The Bradford Hill is just kind of a way to frame, frame my overall opinion.

Q Outside of the context of litigation -- of litigation, in your work as an epidemiologist, do you conduct Bradford Hill analyses?

A Yes. I have discussions with, like I said, my trainees, primarily, about kind of more in-depth epidemiologic methods, including Bradford Hill sorts of analyses.

Q Outside of your discussions with your trainees, do you apply Bradford Hill in your work as an epidemiologist?

MS. PARFITT: Objection. Asked and answered.

A Yes. It's always considered. I mean, the Bradford Hill framework is always considered when you're -- when you're trying to describe your data and

your findings. But as an epidemiologist, the work that I publish is not meant to establish causality. It's meant to share new findings in the field.

BY MR. SPIRA:

Q Okay. One tool, one type of study that epidemiologists conduct and use is a cohort study; right?

A That's correct. A cohort study is an epidemiologic study. Yes.

Q And what is a cohort study?

A So a cohort study -- and I actually run a cohort study, and director of a Komen tissue bank. So I'll use that cohort as a description.

So you recruit people into the study based on some type of exposure, and that can be -- an exposure can be something as simple as age or gender or occupation.

Other good examples of cohort studies are things like the Nurses Health Study, which you probably know by the title was recruiting nurses. And certainly here, you know, what we'll talk

about at length today is the Black Women's Health Study. They recruited women into the study they found self-identification as Black or African American.

The cohort has been rolls of people at one point in time, and then follows them forward through time so you can look at multiple different outcomes in this group of people. So it's called a longitudinal cohort study, "longitudinal" meaning following over time.

Q Okay. And so the idea is to compare a population of people who have an exposure to a group of people who do not have an exposure and see if there's a difference in risk between those groups on a specific outcome. Is that fair?

MS. PARFITT: Objection to form.

You may answer.

A That isn't quite how I would describe it. I mean, it's -- you can -- you can utilize cohort studies to examine associations between outcomes and exposures, yes.

BY MR. SPIRA:

Q And estimates of risk in cohort studies are typically reported as relative risks or odds ratios or hazard ratios; is that right?

A No. In cohort studies, generally it would just be hazard ratios or relative risks.

Q Okay. Epidemiologists also often use something in cohort studies called a confidence interval; right?

A Confidence intervals are not unique to cohort studies. I mean, it's a statistical term.

Q I understand. I didn't mean to suggest they were exclusive to cohort studies, but they are often used in cohort studies; correct?

MS. PARFITT: I'll just object to form.

You can answer.

A Yeah. I would say that yes, confidence intervals are included around point estimates that are obtained when you analyze different types of studies,

including cohort studies. So confidence intervals are around an estimate; they are not around a cohort study, if that makes sense.

BY MR. SPIRA:

Q Yes. I think I understand. The typical approach is to use 95 percent confidence intervals; right?

MS. PARFITT: Objection. Form.

A Historically, that 95 percent confidence intervals is what has been used in the last couple of decades.

I think prior to that it was even broader. It was like 68 percent confidence intervals. So it is really just a cut point that doesn't necessarily have any scientific or statistical or clinical meaning.

BY MR. SPIRA:

Q And in some of your publications, you include a hazard ratio with a 95 percent confidence interval; correct?

A Yes, that's correct.

Q So to give -- just to use an

example, and I will admit I'm making up these numbers, these are not tied to anything we're looking at today, but just to give an example with the concepts.

An epidemiological study might have a hazard ratio of 1.2 with a confidence interval of .8 to 1.5. Are you with me so far?

A Yes. I'm with you so far.

Q In that scenario, and I want to say that's the 95 percent confidence interval, is .8 to 1.5. In that scenario, we are 95 percent confident that the exposure measured is associated with somewhere between a 20 percent reduction in the outcome and a 50 percent increase in the outcome; is that right?

MS. PARFITT: Objection to form.

A Yeah. I'm not sticking with you on the numbers in terms of what you said. But let's see, .8 to 1.5 is a reduction and an increase.

The 95 percent confidence, that's a little bit simplistic. So it's really more of a measure of how confident

you are in -- yes, the risk estimate falling within that category. Assuming a lot of different other conditions are met, there's -- in these statistical models, you can generate a point estimate, and you can generate 95 percent confidence intervals around a bunch of different -- using a bunch of different types of statistical models.

So there's different assumptions that go with all the models. So you are assuming all of those assumptions are met, that 95 percent confidence interval kind of gives you a range of what you would expect.

BY MR. SPIRA:

Q And understanding there's assumptions that go into it, I want to make sure my -- my phrasing is right, that a .8 lower end of the 95 percent confidence interval would represent a 20 percent reduction in the outcome, and my 1.5 upper end of the 95 percent confidence interval would represent a 50 percent increase in the outcome; right?

MS. PARFITT: Is that the question?
You clarified it. I'm going to object.
You can answer that if you're able to, Dr. Cote.
A Yeah. I'm -- the .8 percent when you're saying lower, higher, this and that, we would say, you know, that -- we say things like "inverse associations." We use different terminology. We try to stay away from "protective" and that sort of terminology.
But, yeah, I'm not -- I'm not sure where else to go with that. We talk about increases in risk. A lot of times we would -- we would take that .8 percent, and we would call it flipping it. Divide it by 1 so that you could still talk about things in a different direction.
BY MR. SPIRA:
Q Okay. Yeah. And I'm just trying to get the terminology right so when we get to actual data, we're on the same page.
So when you talk -- you said,

"We talk about increases in risk."

So would you agree that a 1.5 -- if 1.5 is the upper end of the 95 percent confidence interval, that represents that we are 95 percent confident that the upper -- that the increase in risk is 50 percent?

MS. PARFITT: Objection. Form.

You may answer.

A It's not about being 95 percent confident about that specific number. It's confident about the range. That if you were looking at this multiple times, that you would expect the estimate to fall within the range.

It's not necessarily about a specific number. It's more about estimating a range.

BY MR. SPIRA:

Q Okay. So, then, taking that whole range I gave, and again, I think it was .8 to 1.5, was the 95 percent confidence interval in my hypothetical. We would be 95 percent confident --

I can already tell I've lost

you.
MS. PARFITT: Objection. Misstates her testimony. Please.
MR. SPIRA: I'm not trying to --
MS. PARFITT: I know you're not trying to. I understand.
(Simultaneous discussion interrupted by the reporter.)
BY MR. SPIRA:
Q Tell me in your words, what is a 95 percent confidence interval? Why don't we start there.
A So it is a rounded estimate, and maybe to -- this is a little bit overly simplified.
But if you were to repeat that estimate in the population numerous times, that it would fall -- the estimate would fall within that range.
Q Okay.
A So it isn't about 95 percent confident. It would fall within that range. It's just -- it's 95 times, like, out of a hundred, it would fall within that range.

Q Okay. So I think my use of "confident" is what was, perhaps, you're not on the same page with?
A Yeah. Yeah.
Q Okay. Okay.
Okay. So would you say that in the example, I gave a hazard ratio of 1.2 and a confidence interval -- 95 percent confidence interval of .8 to 1.5, that the -- the true association between the exposure and the outcome is 95 percent likely to fall between .8 and 1.5?
MS. PARFITT: Objection. Form.
A So I would say at this point, I feel like we're conflating a lot --
MS. PARFITT: Misstates the testimony.
I'm sorry, Dr. Cote.
A I feel like right now, we're conflating a lot of different terms here. Things like true association and all of that.
And also, this overall focus on "Here's one single estimate, here's one single confidence interval," I'm

struggling to answer very specific questions when it's really looking at a broader collection of data than just a single point.

BY MR. SPIRA:

Q Maybe this will get us where we're needed.

If you turn to the definitions in your expert report. This is on Roman Numeral I of your report. It's Glossary of Common Epidemiologic Terms. This is pdf page 3. You define confidence interval there.

Do you see that?

A I do.

Q You say that:

"Based in probability, a confidence interval is calculated to correspond with the measure of effects (or effect measure). If the underlying statistical model is correct and there is no bias, a confidence interval will, over unlimited repetitions of the study, contain the true measure of association with a frequency no less than its

confidence interval (usually 95 percent in epidemiologic studies)."
Do you see that there?
A Yes, I do.
Q In the example I gave, with a hazard ratio of 1.2 and a 95 percent confidence interval of .8 to 1.5, assuming that the statistical model is correct and there's no bias, that confidence interval, that .8 to 1.5, will, over unlimited repetitions of the study, contain the true measure of association no less than 95 percent of the time; correct?
MS. PARFITT: Objection. Form. Misstates the testimony.
You may answer.
A I'm still not a hundred percent sure with what you're trying to say here. But this is the textbook definition of a confidence interval. And again, it's -- it will contain the true measure. It doesn't tell you the true measure. If that's --
BY MR. SPIRA:
Q Right. Yeah, I think that's

what I'm getting at.
A Okay.
Q Yeah.
A Okay.
Q So -- right. So in that example, 1.2, the hazard ratio, is not necessarily the true measure of association; correct?
MS. PARFITT: Again, objection. Misstates her testimony.
You can answer.
A Correct.
BY MR. SPIRA:
Q And over -- I'm really just trying to sub in numbers for what's written here.
Over unlimited repetitions of the study, the true measure of association with a frequency -- with the true measure of association with a frequency no less than 95 percent of the time, would fall between .8 and 1.5; correct?
In the hypothetical that I've been providing.
A In the hypothetical --

MS. PARFITT: Objection.
A -- along with the idea that we're not in a world where there's unlimited replications over time.
So there is -- there's a lot of assumptions built in here that kind of don't necessarily apply to real-world situations that you could test for in a real-world study.
BY MR. SPIRA:
Q Understanding that it may not be the true measure of association, does a hazard ratio of 1.2 correspond to a 20 percent increase in an outcome?
A By a strict definition, I would say yes. If you had an odds ratio or relative risk of 1.2, it would be interpreted as a 20 percent increase in risk. Yes.
Q Now, in the example we've been using -- sorry.
And likewise, the --
Scratch that.
Now, in the example we've been using, an epidemiological study with a

hazard ratio of 1.2, the confidence interval of 0.8 to 1.5, we could say that that result is not statistically significant; correct?

MS. PARFITT: Objection to form. Misstates testimony.

Go ahead.

A You could say that that estimate was not statistically significant. Yes.

BY MR. SPIRA:

Q And the reason we can say that is when you have a confidence interval that crosses over 1.0, that means, meaning the confidence interval stated otherwise, includes values that are both less than and more than 1.0, the result is, by definition, not statistically significant; correct?

A Correct. That estimate, by definition, is not statistically significant.

Q Okay. Another way to say that is that we cannot reject the null hypothesis; correct?

A If the null hypothesis is stated as there's no difference between the two groups under study, that the null hypothesis --

Q Yes.

A -- you would state it in that way?

Q Yes.

A Then yes, you would say that you had failed to reject the null hypothesis.

Q So the null hypothesis, in the example I've been giving, is the concept that there is no statistical association between an exposure and an outcome?

A Yes, that would be the null hypothesis.

Q And observational epidemiologic studies start with the null hypothesis, however defined. And then produce data as to whether the null hypothesis can be rejected; is that correct?

MS. PARFITT: I'll just object to the simplistic nature of that.

But if you can answer --

MR. SPIRA: Counsel, I know -- it's a speaking objection. I know you're not trying to -- I know you're trying to help along, but if you can stick to form.
MS. PARFITT: I will certainly try. I really am trying, Dan.
MR. SPIRA: I understand.
A I'm reading.
Observational.
MS. PARFITT: Do you need to repeat it?
A Yeah. Can you repeat -- can you repeat that question?
BY MR. SPIRA:
Q Sure.
Well, let's stick with -- let's stick with cohort studies as opposed to more broad answers.
So in cohort, and in an epidemiologic cohort study, one starts with the null hypothesis and then determines and produces data to determine whether the null hypothesis can be rejected; is that correct?
MS. PARFITT: Objection. Form.

A So when you start to analyze a study, when you are doing this, as I said, again, you want to make sure it's -- the question that you're asking is a reasonable question, there's biologic plausibility and all of that.

Not trying to study, you know, driving a blue car gives you liver cancer. You want it to have some sort of basis.

From there, you develop a null hypothesis. But it's really just, yes, a single data point kind of within the whole of a study.

But you do develop -- you'll see them usually written at the end of an Introduction section of a manuscript. You know, "We're going to study the association between this and that." They don't tend to talk about, like, "Our null hypothesis is this, and this is how we're going to study it."

So it's -- again, it's a little bit broader than just a single null hypothesis "yes" or "no."

BY MR. SPIRA:

Q But the null hypothesis is, even if it's not stated in those terms, you start with a null hypothesis and determine whether it can be rejected; correct?

A Or whether you failed to reject the null hypothesis, yes.

Q But it is the starting point?

A It's not necessarily the starting point. It's one piece of a larger question about association.

Q Okay. And if a risk estimate -- excuse me.

If a confidence interval includes, one, it is not statistically significant, and therefore, as you said, another way to say that is we cannot rule out the null -- reject the null hypothesis.

Another way to say that is, chance cannot be ruled out as an explanation for an association; is that correct?

MS. PARFITT: Objection.

A There isn't a single number or measure that you look at in epidemiologic studies, be it case control or cohort, that would say we've completely ruled out chance.

So chance is, it's random error. It's kind of inherent in all types of measurements.

And I'll give an example of random error versus systematic error would be if we were weighing people in this room and the scale was just off. Sometimes it was off by three pounds positive; sometimes it was off by two pounds. That's just kind of random error that oftentimes you can't even identify.

Systematic error would be if it was always in one direction. It's always three pounds heavier or something along those lines.

There isn't one simple number, measure, analysis that we look at and we say, "Okay. Well, you know, these are absolutely due to chance," or, "These are absolutely not due to chance."

BY MR. SPIRA:
Q Yeah. I understand. And that's not -- I don't think that's what I'm trying to suggest.
But if a result is not statistically significant, another way to say that is that chance cannot be ruled out?
MS. PARFITT: Objection. Misstates her testimony.
A I'm going to repeat the question back to you.
So if a point estimate is not statistically significant, chance cannot be ruled out but it can -- that was your statement.
I would also say you can't -- the reverse is not true.
BY MR. SPIRA:
Q Understood.
A You can't say chance is ruled in.
Q Got it.
A That this is absolutely chance or it's absolutely not.

Q Okay. I'm with you. Okay.
In some of your peer-reviewed published epidemiological studies, you use some of the statistical analyses we've been talking about; right?
Let me -- it's an imprecise question.
You often describe your findings in terms of whether they are statistically significant; correct?
A I would say in the past, we, as a field, not just me, initially 20, 25 years ago, there was much more evidence -- evidence. That's not the word. Much more insistence on presenting things in terms of statistical significance or not.
And certainly, as the field has kind of grown and changed, some of that probably has to do with the introduction of genetic epidemiology. There has been less of an emphasis on statistical significance, more of an emphasis on really looking at the association and kind of a broader interpretation of things. Confidence intervals are usually suggested

to be presented versus things like single p-values, for an example of what I have seen just in the last 20 years that has changed over time.

Q Confidence intervals like you just said, that is something you would use and refer to in studies that you publish; correct?

MS. PARFITT: Objection. Form. Asked and answered.

A Yes. Confidence intervals are usually included when you're presenting point estimates. And some of this is also journal-dependent.

BY MR. SPIRA:

Q Why don't we look at an example. If we could pull up, electronically, it's Tab 26. I believe we are on.

MS. PARFITT: Exhibit Number 7.

MR. SPIRA: Thank you. Exhibit 7.

(Deposition Exhibit 7 was presented for identification.)

BY MR. SPIRA:

Q You have in front of you what's

been marked as Exhibit 7. And this is a publication titled "Cigarette smoking in Relation to Survival in Black women with ovarian cancer: Evidence from the African American Cancer Epidemiology Study (AACES)."
Do you see that there?
A Yes, correct.
Q And you are listed as one of the authors on this study. Do you see that?
A Yes, correct.
Q This was published in 2025 in Annals of Epidemiology?
A Yes. Correct.
Q And it assesses the association between an exposure, smoking, and an outcome, survival, in Black women with cancer; is that right?
A Yes. In Black women with ovarian cancer specifically.
Q With ovarian cancer. Okay.
So the abstracts in the Results section says:
"Compared with women who never

smoked cigarettes, women who currently smoke cigarettes experience worse but not statistically significant survival."

Do you see that there?

A Yes, correct.

Q And the parenthetical indicates that the hazard ratio is 1.41 with a 95 percent confidence interval of .95 to 2.10.

Do you see that there?

A I do.

Q And then it goes on -- the sentence goes on:

"Whereas women who had quit smoking had comparable survival hazard ratio 1.06, 95 percent confidence interval .82 to 1.35."

Right?

A Yes.

Q So both of those are -- both of those are examples of a --

Well, let's -- I guess let's stick with the first one, the 1.41 hazard ratio comparing women who currently smoke cigarettes to women who never smoke

cigarettes. Okay?
A Yes.
Q So we have a hazard ratio of 1.41 with a 95 percent confidence interval of .95 to 2.10. That is an example of a positive association that is not statistically significant; is that right?
A I mean, yes. I mean, he just -- he never states the word "positive" there. He just says they experience worse survival, although it's not statistically significant. The word "positive," I'm not sure fits in there. It's worse survival.
Q Okay.
If we look at -- skip down to page 5. It has -- the page at the bottom of the page will be 52, but it's the fifth page of the document. In the right-hand column, the third full paragraph that starts with "however."
Do you see that there?
A Yes.
Q The second sentence in that paragraph says:

"First, even though the magnitude of the association between current smoking and increased mortality was substantial (OR1.41), it was not statistically significant lower bound of the 95 percent confidence interval 0.95."
Do you see that there?
A Yes, I do.
Q And that's restating the same data that we saw in the abstract; right?
A Yes.
MS. PARFITT: Objection. Form.
BY MR. SPIRA:
Q Then if you go to the next page, page 6 of the pdf. It has 53 at the bottom.
In the right-hand column -- excuse me, the left-hand column, first full paragraph starts with "In summary."
Do you see that there?
A I do.
Q If you skip down to the sentence four lines down that says "however."
Do you see that there?

A I do.
Q Okay. It says:
"However, due to the lack of statistical precision, the observed association was not statistically significant, emphasizing the continued need for evidence on this topic to better clarify the presence and magnitude of this association, thereby permitting more definitive inferences to be drawn."
Do you see that there?
(Reporter request for clarification.)
A I do.
Q I just --
Okay. So this indicates that:
"Given the lack of statistically significant finding, the study emphasizes the continued need for additional evidence to better clarify the presence and magnitude of the association that was observed."
MS. PARFITT: Objection. Form.
BY MR. SPIRA:
Q Correct?

MS. PARFITT: The document speaks for itself.

A Yes. That is what the conclusion of this states. Yes.

BY MR. SPIRA:

Q Okay. All right. We can set that one aside and go back to your report.

So we've talked about cohort studies. Epidemiologists also use something called a meta-analysis; correct?

A Epidemiologists, statisticians, clinicians, the -- sorry --

Yeah. I mean, they are broadly used in scientific and medical literature.

Q Okay. There are no -- there are no meta-analyses that were relevant to your review of the epidemiological data in this litigation; is that correct?

MS. PARFITT: Objection. Form.

A Correct. I did not identify any meta-analyses or pooled analyses looking at the question, "Is there an association between chemical hair relaxers and uterine cancer or ovarian cancer?" I did not find any of those.

BY MR. SPIRA:
Q And you did not conduct any yourself, I assume?
A Correct. I did not conduct a meta-analysis, no.
Q I think we've already talked about that association does not equal causation; correct?
A Yes, that is correct.
Q Observational studies --
Is a cohort study an observational study? Does it fall under that -- is that a terminology they would use?
A Yes, I would call a cohort study an observational study. And how I would distinguish it is, we are not inserting any kind of intervention like in a randomized clinical trial or some sort of clinical trial where you expose one group to a drug or an exercise protocol, and the other just kind of stays normal. Cohort studies, you just watch what happens over time.
Q Okay. And cohort studies can

show an association, but they do not alone show causation; correct?

A That is correct.

Q Okay. If an association is revealed by cohort studies or other observational studies, further analysis must be done to assess whether that association is causal or whether it's due to something else like chance, bias, or confounding; is that right?

MS. PARFITT: Objection. Form.

Read it again.

A So as stated:

"If an association is revealed" --

(Reporter request for clarification.)

A "If an association is revealed by cohort studies or other observational studies, further analysis must be done to assess whether that association is casual -- causal -- sorry, and whether it is due to something else by chance, bias, or confounding."

I would say no, actually. You

are --

Again, I think maybe we're -- where we're struggling here is the term "analysis." Like, do we need -- are we meaning an analysis with numbers, or are we meaning an analysis of all sorts of other data.

I would say in a single study, whether you see an association or not, however you want to define what an association is, you're still looking at things like bias, chance, and confounding within the study.

BY MR. SPIRA:

Q Okay. So I guess if analysis -- if the word "analysis," further analysis is something you're not quite comfortable with, what word would you use? Once you have an association in a cohort study, what has to be done to determine whether that association is causal?

What would you use rather than calling it "analysis"?

A I mean, in a single study,

still nothing in a single study.

So if I have an association, and I'm going to say an association means a point estimate. So I've come up with a point estimate and confidence intervals. So that's the association.

Within that study, I am looking -- and again, no matter what that is, could these possibly be due to, you know, chance or random error, bias, confounding.

So you do some initial -- I'll just say analysis with numbers of the data that you've been analyzing within that study to look for, you know, was bias addressed.

An example of that might be, you know, doing a sensitivity analysis to look at medically confirmed cases. So most of these observational studies, as you know, collect information from the participants. And well-designed studies that are trying to address bias will say, Okay, we're going to try to get medical records or some other confirmation, like

from a cancer registry or something, that this person does actually have the cancer that she or he reported.

And then we'll do another analysis with numbers, just call it that, a sensitivity analysis, as a way to address that potential kind of misclassification of the exposure bias.

So that's -- so you're doing that analysis within that analysis with numbers. Let's call it that. You're doing the analysis with numbers within that study.

But you're also doing additional analyses looking at other studies, be they epidemiologic studies, be they animal studies, be they cell line studies, whatever, to see, again, does this all make sense.

But even at that point in a single epidemiologic study, so you're trying to couch things in, does this make biologic sense? Do the data we have here fit with other -- with what other people have seen? Those sorts of things.

At the end of the day, we still don't say, "This is a causal association from a study."

Q Right. I guess -- yeah. So I'm -- so I understand that.

So I'm -- so we've already talked about that a cohort study can reflect an association but not a causation, understanding you take all those steps within the context of the study.

My question is more because that's -- because that study may reflect an association, how do you get to -- like outside the context of that study, how do you get to causation?

A Yeah. So causation is a much more broad and detailed type of analysis where you're pulling from, as I've said it, multiple different fields. You're looking at things like the biological plausibility. You're looking at coherence to other studies' analogies. There's a great example that I use a lot with analogies. The association between

cigarette smoking and lung cancer. How about cigar smoking and lung cancer? That would be -- you would say, "Yeah. The analogy there kind of fits."

Some of that can be limited by just what we know as a field in terms of, like, science. So it's constantly evolving. And that is part of a broader look. You can look for things like dose response relationships. You can look for, really, just kind of the overall coherence. Does this make sense with what we know about how the disease develops.

Q Okay. And so to determine whether an observed association is causal, epidemiologists sometimes conduct what is known as a Bradford Hill analysis; correct?

A You can use Bradford Hill as a framework to look for that, but that would be something that -- way outside what would be expected for you to publish a manuscript. You wouldn't include that in a manuscript.

Q Yeah. I'm not talking about a

manuscript. I'm talking about how you get from association to causation. One tool, one framework, to use your word, to do that is a Bradford Hill analysis; correct?
A Yes.
Q Some of the terms you use in explaining things you look at, biological plausibility, dose response, cohesiveness --
A Coherence.
Q Coherence. Excuse me. Those are criteria that are within a Bradford Hill analysis; correct?
MS. PARFITT: Objection.
A I think it's part of the framework. They aren't specific criteria. I mean, Bradford Hill himself, if you read the paper, he says, "This isn't meant to be a checklist. This isn't something you mark off. Just because you don't have one of them doesn't mean that it isn't a causal association."
BY MR. SPIRA:
Q Understood. Understood. Those things you mentioned are part of the

Bradford Hill framework?
A Yes.
Q Okay. Do you understand that there are hair straightener products that are not considered chemical hair relaxers?
MS. PARFITT: Objection. Form.
You may answer.
A Yes. I do understand that there are ways to straighten a person's hair that don't involve chemical hair products.
BY MR. SPIRA:
Q Okay. Chemical hair relaxers?
A Chemical hair relaxers or straighteners. Yes.
Q And you understand there are hair pressing products that are not considered chemical hair relaxer products; is that correct?
A Yes.
Q So a flat iron, for instance, is not a chemical hair relaxer product; right?
A Yes.
Q Sorry to phrase it -- a hot

comb is not a chemical hair relaxer product; correct?

A Correct.

Q Chemical hair relaxer products do not require mechanical devices like straightening irons or hot combs; is that correct?

MS. PARFITT: I'll just object to the question. Form.

A Again, not having personal experience with using chemical hair products, I mean, there is still like a pulling and a straightening. You don't just put the product on your hair and expect it to, like, melt your hair straight, let's say.

I mean, there's still a process in place where the hair is brushed and smoothed with the chemical product applied, you know, to your hair and your scalp.

BY MR. SPIRA:

Q There's no electrical device used in the application; is that correct?

A There we go.

MS. PARFITT: Objection.

A You know, again, I am not privy to the many, many, many different ways that women have tried to change the texture of their hair over the last century.

But my understanding is with these chemical hair -- chemical hair products that are meant -- chemical straightening products, sorry -- that yes, it doesn't -- you don't need heat on top of those, is my understanding.

BY MR. SPIRA:

Q Okay. Keratin treatment is not a chemical hair relaxer product; correct?

A I'm not super familiar with keratin treatments.

Q Brazilian blowouts are not chemical hair relaxer products; correct?

A Again, I'm not really familiar with what constitutes a Brazilian blowout. I don't know what sort of chemicals or process is used in that.

Q And I think you mentioned your understanding is that chemical hair

relaxers as do not use heat to straighten hair; correct?

MS. PARFITT: Objection. Misstates her testimony.

A My understanding is that you -- the chemical hair relaxers, along with, I'll just say like the physical straightening of the hair does not require heat on top of that. Yeah.

BY MR. SPIRA:

Q Some hair straightening or pressing products other than chemical hair relaxers do use heat to straighten hair; correct?

A You need to be more specific than that. I'm not --

Q Is there -- are there to straighten hair that do use heat?

A Yes. I think we just talked about, like, flat irons are products -- they're not products. It's a tool. Let's use that word instead of "product." It's a tool that's used to straighten hair just through the use of heat. It's temporary but, yeah.

Q Is shampoo considered a chemical hair relaxer product?

MS. PARFITT: Objection. Form.

A No.

BY MR. SPIRA:

Q Is a conditioner considered a chemical hair relaxer product?

MS. PARFITT: Objection.

A I believe that there -- I mean, whatever's in the box that comes with the -- the hair straightening product that you bought is really what I considered as a chemical hair product here.

So if there is some sort of conditioner or neutralizer, maybe, would be the word I would use. I mean, when I talk about chemical hair relaxers, that's what I'm talking about. Everything in the box. Not necessarily --

I mean, I'm sure there's something that you use to rinse out your hair that's included in that chemical hair straightener product box, that maybe you could call that a shampoo.

But when I'm talking about

chemical hair relaxers, it's really everything in the box. It's not this product, that product, a conditioner, and so forth.

BY MR. SPIRA:

Q Okay. So everything sold -- let me back up.

So your understanding is that chemical hair relaxers can be sold as part of a kit; is that correct?

A Yes. Correct. Chemical hair relaxers are sold in kit form.

Q Is it your understanding that they are always sold in kits, or can chemical hair relaxers be sold on their own?

MS. PARFITT: Objection. Form.

A I have not looked at all of the different ways people have access to chemical hair relaxers. So, you know, again, it would be speculative for me to say, but I would imagine a hairdresser --

MS. PARFITT: And don't speculate, Doctor. If you know.

A No, I don't know.

A hairdresser has kits. A hairdresser has access to other products.

BY MR. SPIRA:

Q Well, I guess that's what I'm trying to --

I'm trying to make sure I know when you refer to chemical hair relaxer products, are you -- you're referring to anything that is sold in a kit as part of a chemical hair relaxer kit; is that right?

MS. PARFITT: Objection. Form.

Go ahead.

A I am considering any chemical hair relaxer, any substances applied to a woman's scalp with the intention of straightening her hair. Whether that is in a kit form, whether it is a single bottle, whether it is -- those are the only two examples I have. But it's whatever substances are used with the intention -- whatever chemical substances are used with the intention of straightening hair.

BY MR. SPIRA:
Q So if a chemical hair relaxing creme is sold on its own, in that particular instance, that is the chemical hair relaxer product; is that right?
MS. PARFITT: Objection. Form. Misstates her testimony.
A It's any product that is utilized to straighten -- that is, the intention is to straighten hair. Any chemical product that is utilized to straighten hair.
BY MR. SPIRA:
Q Well, I guess that's where I'm getting lost, maybe. Because if a chemical hair relaxing kit is sold with a shampoo or conditioner, it sounded like you were including that shampoo or conditioner as a part of chemical hair relaxer product; is that right?
MS. PARFITT: Objection. Misstates her testimony.
A I'm considering everything in that box is considered chemical hair relaxing products. The intention of that

kit is to process the hair, whether there's one bottle in it or 15 bottles in it. Everything in that kit is intended to chemically straighten hair. Whether you can get that in one bottle and one application or a hundred bottles, it's the chemical straightener.

BY MR. SPIRA:

Q Okay. So it's whatever is sold in the kit?

MS. PARFITT: Objection. Asked and answered.

A The kit can also just be a single bottle.

BY MR. SPIRA:

Q Exactly. That's what I'm trying to get at. It's whatever is sold together. Like that's what the chemical relaxer product is for purposes of your opinions in this case?

A Yes. For purposes of opinions in this case, whether it's one bottle, whether it's five bottles --

Q Okay.

A -- it is a chemical hair

relaxer, if that's the intention.

Q And have you done any review of whether particular chemical hair relaxer products are sold as one bottle, as multiple bottles, or as -- let me start over.

Have you done any review of whether particular chemical hair relaxer products are sold as one bottle or as multiple bottles that come in a kit?

A No. I have not done a survey of how chemical hair relaxers are packaged and presented to their customers.

MR. SPIRA: Is now a good time for another break?

MS. PARFITT: It would be.

THE VIDEOGRAPHER: We are now off the record. The end of Media Unit 2 at 11:48 a.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We are now on the record. The beginning of Media Unit 3 at 11:50 a.m.

BY MR. SPIRA:

Q Dr. Cote, with respect to the two questions you were asked to address in this litigation --

(Reporter request for clarification.)

Q With respect to the two questions you were asked to address in this litigation, can the use of chemical hair relaxers cause uterine cancer, and can the use of chemical hair relaxers cause ovarian cancer, you looked at data that came out of two cohort studies; correct?

A Yes. Correct.

Q And that's the Sister Study and the Black Women's Health Study; correct?

A Yes. That's correct.

Q There are three publications that analyze data from those cohorts that are relevant to your opinions; correct?

MS. PARFITT: Objection. Form.

You can answer that.

A Yes. There are three papers that came out of those two cohorts that

are relevant to the questions about chemical hair relaxers and ovarian or uterine cancer. Yes.

BY MR. SPIRA:

Q Okay. And that's what we have referred to earlier as the White study, the Chang study, and the Bertrand study; correct?

A Yes, correct.

Q When I refer to them by those names, you know what I'm talking about?

A Yes.

Q Okay. What is the Sister Study?

MS. PARFITT: I'll just object to the broad nature.

You may answer.

A Okay. So the Sister Study is a longitudinal cohort study that is -- was developed by a team of investigators at the NIEHS, National Institute for Environmental Health Sciences.

They recruited, starting in the early 2000s, women into the Sister Study. The Sister Study is named because all of

the women that were recruited in had a sister with breast cancer.

And since that time --

They do an initial baseline interview intake. And since that time, they have continued to follow these women every couple of years with additional questionnaires to -- it was the first study that was really intended to look at environmental exposures and cancer risk.

BY MR. SPIRA:

Q Okay. If we can introduce an exhibit, it's electronic Tab 8.

MS. PARFITT: I think it's Exhibit 8 as well.

MR. SPIRA: It's Exhibit 8 as well?

MS. PARFITT: Yes.

(Deposition Exhibit 8 was presented for identification.)

BY MR. SPIRA:

Q Okay. And Exhibit 8 in front of you is what we've been referring to as the White study; correct?

A Yes, correct.

Q The title is "Use of Hair

Products in Relation to Ovarian Cancer Risk."

Do you see that there?

A Yes.

Q If we go down to the second page of the document with the heading Methods.

Do you see that there?

A I do.

Q And it's -- there's a subheading Study Population.

Do you see that?

A Yes.

Q It says:

"The Sister Study is a nationwide prospective cohort of 50,884 U.S. women which was designed to investigate environmental and lifestyle risk factors for cancer. Study participants were enrolled between 2003 and 2009. Women were eligible if they were ages 35 to 74 years, resided in the USA, including Puerto Rico, and had no history of breast cancer themselves but had a sister who had been diagnosed with

breast cancer. At baseline, participants completed structured questionnaires providing information on their demographics, reproductive history, and lifestyle factors, including personal care product use. A trained examiner measured height and water at a home visit."

Do you see that there?

A Yes, I do.

Q And is that a -- to your understanding, is that an accurate overview of the Sister Study?

A Yes. Given that the people who actually wrote this paper were the people who developed the Sister Study, I would believe that to be accurate.

Q And which -- which of the authors developed the Sister Study?

A I know at the very least, Dale Sandler was part of the original team. The others may have come along a little bit later. But Dr. Sandler, this was -- she was there from the very inception of the study.

And there was also probably

many other people at NIEHS who were involved. But Dale was one of the original ones, yes.

Q Sister Study participants were predominantly nonHispanic white women; is that correct?

A Yes. I believe the Sister Study enrolled with the intention to try to replicate the racial and ethnic populations in the United States.

And in the United States, it is still primarily -- well, still, and also back in the early 2000s, a primarily nonHispanic white population.

Q And the proportion of the Sister Study that was comprised of African American or Black women was around 8.8 percent; is that right?

A Each study varies a little bit based on inclusion and exclusion material.

So, yeah, if you look here at Table 1, when I say "inclusion" and "exclusion," like for here, for the ovarian study, they removed women who had an oophorectomy or who had had their

ovaries removed because they were no longer at risk.

And so that's when I say the numbers change a little bit, it's because they have different inclusion criteria for each.

So yes, the full cohort was about 8 percent African American or Black, 5 percent Hispanic, Latina, and so on.

Q Have you reviewed the questionnaires the participants in the Sister Study completed?

A Yes. The questionnaires are extensive and available online. So anybody can review their questions, questionnaires.

Q Let's pull up Tab 9. It will also be Exhibit 9. Nice when it coincides like that.

MS. PARFITT: Yes, it is.

(Deposition Exhibit 9 was presented for identification.)

BY MR. SPIRA:

Q Okay. We have got Exhibit 9 in front of you.

A Mm-hmm.
Q And it's got a logo at the top. It says the "Sister Study."
Do you see that there?
A I do.
Q And it says "Personal Care Questionnaire - V3."
Do you see that?
A I do.
Q Is it your understanding that this is a Sister Study questionnaire?
A Yes, I would assume this is a Sister Study document. Yep.
Q So this is a questionnaire that participants in the Sister Study would complete that form the basis for some of the data that was analyzed by future publications relying on Sister Study data; is that right?
A Yes. I don't know necessarily about the way that it was administered, whether it was a paper copy like this, or if this was something that at some point they moved to do this online. But, yeah, this is -- this is exactly the tool or the

type of tool that you would use to collect these data.

Q Okay. And the questionnaire asks about a wide variety of personal care products; correct?

A Yes, it does.

Q It asks about use of things like mascara, eye shadow, eyeliner, lipstick, as well as a variety of hair products; is that right?

A Yes, that's correct.

Q Okay. If we go to page --

One second.

Page 18. Pdf page 20.

Do you see Question 103 listed there?

A I do.

Q Okay. And that says:

"In the past 12 months" -- with 'past twelve months' underlined -- "how frequently have you or someone else straightened or relaxed your hair or used hair pressing products. (Mark one.)"

Do you see that there?

A I do.

Q And the options are:
"Did not use, one to two times a year, every three to four months, every five to eight weeks, once a month, or more than once a month."
Do you see that there?
A Yes, I do.
Q Okay. And this is the question that was relied upon in the White study; is that correct?
MS. PARFITT: Just objection. Form.
A My understanding is this is one of the questions that they relied upon, yes, in this White study.
BY MR. SPIRA:
Q Yeah. So maybe I can be more specific. With regard to -- that's fair.
The White study looks at a number of different products, not just hair relaxers, straighteners, and pressing products; correct?
A Yes, I believe so. If you look at the White study, and I believe it's Table 2, yeah, they analyzed a couple of

other different questions here -- or different exposures here as well.

Q Okay. With regard to use of hair straighteners, relaxers, or pressing products, this is the relevant question that the White study relied on; is that right?

MS. PARFITT: Objection. Misstates the document, the testimony, and the evidence.

A So I believe, although it is not written in their paper by number, that Table 2, the question or the row at the very -- second-to-last from the bottom, straighteners, relaxers, relied on data collected in Question 103.

BY MR. SPIRA:

Q Okay. And this question asks about product use in the past 12 months. And "past 12 months" is underlined in the question; correct?

A Yes.

Q Okay. The answer to that question does not tell us whether respondents have used -- excuse me. Let

me start that question over.
The answer to that question does not tell us whether respondents had their hair straightened, relaxed, or pressed prior to the last twelve months of answering the survey; correct?
A That is correct. They just asked women to recall use in the last 12 months.
Q For example, there could be women who straightened, relaxed, or pressed their hair consistently for 30 years and then stopped more than 12 months before answering this questionnaire, and their truthful, accurate answer would be to fill in the circle for "Did not use"; correct?
A Yes. Because they hadn't used it within the last 12 months, although they had used it prior to that time.
Q Now that Question 103 is not specific to chemical hair relaxer products; correct?
A That is correct. They ask about:

"Have you or somebody else straightened or relaxed your hair or used pressing products?" Yes.

Q So it includes use of a flat iron, for instance; is that correct?

A My understanding is it would be however the women interpreted that.

Q And that could be interpreted to include a flat iron; correct?

MS. PARFITT: Objection. Form.

A Yes. Women could interpret "used hair pressing products" as using flat irons.

BY MR. SPIRA:

Q It could include use of a hot comb; correct?

A It is potentially true, yes, that they could also have used a hot hair comb and called that a hair pressing product.

Q It could include keratin treatments; correct?

A Yes.

Q It includes straightening or pressing products that require a

mechanical or electrical device; correct?

MS. PARFITT: Objection. Form.

A I think it could include all of those things that we have talked about. Yes.

BY MR. SPIRA:

Q And it includes straighten -- sorry.

It includes straightening or pressing procedures that require the use of heat; correct?

MS. PARFITT: Objection. Form.

A It doesn't specifically say that it requires heat in this question.

BY MR. SPIRA:

Q But it would include things that require heat to apply; correct?

MS. PARFITT: Objection. Form.

A It is possible a woman could interpret it as such. Yes.

BY MR. SPIRA:

Q So for any given participant in the study that answers Question 103 by indicating that their hair was straightened, relaxed, or pressed within

the last 12 months, we do not know whether or not they have ever used a chemical hair relaxer product; correct?

A Correct. We do not know what exactly they used to straighten or relax their hair.

Q So stated differently, we don't know whether any given participant in the Sister Study has used a chemical hair relaxer product; correct?

MS. PARFITT: Objection. Misstates the evidence.

A Based on this single question alone, we do not have full information about what types of products were used by women who report using or having somebody else straighten or relax their hair.

BY MR. SPIRA:

Q Or pressed?

A Or pressed their hair.

Q The Sister Study also does not ask participants about specific brands of products used; correct?

A That is correct. The Sister Study does not ask about brands.

Q Okay. So for any Sister Study participant who did use a chemical hair relaxer product, we do not know which particular chemical hair relaxer product or products they used; right?

A Correct. We don't have details on the types of products that were used.

MR. SPIRA: Do you want to pause there for lunch?

MS. PARFITT: Go a few more. She's going to let us know. If you're all right, Dan.

MR. SHIPMAN: I think she just stuck her head in.

MS. PARFITT: Tell you where I was. Yes, let's do it.

THE VIDEOGRAPHER: We are now off the record. The end of Media Unit 3 at 12:08 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are now on the record. The beginning of Media Unit 4 at 12:56 p.m.

BY MR. SPIRA:

Q All right. Dr. Cote, if we

could turn back to Exhibit 8. It should be the White study.

A Yes.

Q Okay. And we talked about this a little bit before the break. This study is titled "Use of Hair Products in Relation to Ovarian cancer risk"; correct?

A Yes.

Q It was published in Carcinogenesis in 2021; correct?

A Yes, Carcinogenesis 2021.

Q The authors are Alexandra White, Dale Sandler, Symielle Gaston, Chandra Jackson, and Katie O'Brien.

Do you see that there?

A Yes.

Q Do you know, have you ever met any of those authors?

A I think I have met maybe both Katie O'Brien and Dr. White.

Q Okay.

A But not within probably the last five or more years.

Q Have you ever authored any publications with any of these authors?

A No, not to my knowledge.
Q Have you had any written or oral communication with any of them about this study?
A No.
Q Now, you did review this study in connection with preparing your report; correct?
A Yes.
Q Okay. And this study relied on data from the Sister Study, as we already talked about; right?
A Yes.
Q In particular, we looked at Question 103 from the Sister Study; right?
A Yes. That is what we were doing before break.
Q Okay. Relying on data from the Sister Study, the White paper seeks to determine whether there is an association between use of various hair products and ovarian cancer; correct?
A Yes. That's their stated purpose.
Q Okay. And in particular, the

White paper analyzes associations between ovarian cancer and the following products: Permanent, semi-permanent and temporary dyes, bleach, highlights, hair straighteners/relaxers, or pressing products, and hair permanents or body waves; is that correct?

A Yes. I mean, you're reading from Table 2, I believe.

Q Yeah, I'm looking on the second page of the document under Exposure Assessment.

A Assessment. Okay. Yes.

Q The White paper reported results based on estimated hazard ratios at 95 percent confidence intervals; correct?

A Yes, they did.

Q If we look on the study population at the top of page 2, towards the bottom of that section, it explains that after various exclusions, there were data from 40,559 women who were analyzed as part of the White paper; correct?

A Yes. And why those exclusions

are important is to make sure that the people in the study who are actually being assessed are actually at risk for the disease. So this is a standard thing that you would see in these types of analyses.

So I'm trying to see here, you know, like, they removed, you know, women with a history of a bilateral oophorectomy which was about -- almost 9,000 women. So 8,909 women. If there were some that didn't contribute any follow-up time and so on. But this is kind of standard practice on how you kind of carve out your study population from a cohort study.

Q If we could turn to page 4, Table 2.

A Yes.

Q So the authors report a hazard ratio of 1.29 for every use of hair straighteners, relaxing -- relaxers, or pressing products.

Do you see that there?

A Yes, I do.

Q They refer to it in this table as straighteners --

(A discussion was held off the record to correct technical issues.)

Q It refers in this table to straighteners/relaxers as a shorthand, but you understand that also includes pressing products; correct?

A Yes.

Q And that 1.29 hazard ratio, they also report a confidence interval of 0.70 to 2.38.

Do you see that there?

A Yes, I do.

Q And that is not statistically significant; correct?

A Correct.

Q Now in that same table --

So we see in that same table on that same line, same set of lines under straighteners/relaxers, that this is based on data from the Sister Study revealing that 35,713 women reported never having used straighteners, relaxers, or pressing products in the last 12 months; correct?

A I'm sorry. Where were you again?

Q Still on Table 2. I can repeat the question if helpful.

A Yeah. Please repeat the question.

Q Okay. So we just looked at the hazard ratio and confidence interval that was reported?

A Right.

Q In that same category under straighteners and relaxers, it reflects that that calculation was based, in part, on data revealing that 35,713 women reported never having used straighteners, relaxers, or pressing products in the last 12 months; correct?

A Yes. Correct. I was just really trying to make sure we were distinguishing between percent time and the noncases category. Yeah.

Q Got it.

And of those 35,713 women who reported never having used straighteners, relaxers, or pressing products in the last 12 months, 213 of them developed ovarian cancer; correct?

A Yes. That's what the numbers on the table indicate.
Q Okay. And in comparison, there were 3,769 women who reported having used straighteners, relaxers, or pressing products in the last 12 months; correct?
A Yes.
Q And 24 of those women developed ovarian cancer; correct?
A Yes.
Q Now, out of those 35,713 in the Never use category, we do not know how many of them used straighteners, relaxers, or pressing products prior to the last 12 months before they answered the Sister Study questionnaire; correct?
MS. PARFITT: Objection. Form.
A It's correct. This question is just about the 12 months prior to use.
I do want to take a step back and correct something from a moment ago. And I don't think it was intentionally meant as anything.
But the 200 -- I'll use the 213 ovarian cancer cases as an example. You

kind of said came from the larger population. It didn't. They are stratified there. That's a minute point but just to be clear.
BY MR. SPIRA:
Q I see.
A Those are column percentages, not row percentages.
Q Okay. Yeah. The 90-10 in both directions made it confusing.
A Yes.
Q Okay. So the -- the total number of Never users would be 35,713 plus 213?
A Correct.
Q Okay. And the number of Ever users of straighteners, relaxers, or pressing products in the last 12 months would be 3,769 plus 24?
A Yes.
Q Okay. So that means in the Never use category, if my math is correct, would be 35,926?
A Are you going to make me do math? Because I will.

So in the Never user category?
Q Correct.
A 300 -- 369,104. Is that what you said?
Q No. No, no. I mean, you're looking at person time?
A Ah, yes. See, I'm doing it, too, then.
Yeah.
Okay. So yes. Never users, 35,926.
Q Okay. So out of that 35,926 in the Never use category, we don't know how many of them used straighteners, relaxers, or pressing products prior to the last 12 months before they answered the Sister Study questionnaire; correct?
A Yes, that is correct.
Q And as we talked about, there could be any number of those 35,926 who used those products for many years but did not use them in the last 12 months before answering the questionnaire; right?
A That is true. They would be classified as Never users, even though

they had used at some time in the past.
Q Okay. Now, we do know that -- and I think I'm now interpreting this table correctly.
We do know that of that Never use group, 35,713 did not develop ovarian cancer; correct?
A Correct. At this point in time. Yeah.
Q At the time of the study?
A At the time of the study.
Q Yeah.
A Yep.
Q Okay. Now, if some of those -- if some of those 35,713 women who did not develop ovarian cancer were recategorized as users of the products based on use earlier in life, then all else staying the same, that would move the results further towards the null; correct?
A It would potentially, yeah, bias the results towards the null.
Q And likewise, if some of the 213 Never users who developed ovarian cancer were recategorized as Ever users

based on use outside the last 12 months, that would increase the association between product use and ovarian cancer; right?

MS. PARFITT: I'm going to object to the form there.

You may answer.

A Never users who developed --

Yes. You're talking about differential in this classification here and what direction that takes. Yes.

BY MR. SPIRA:

Q But based on the data we have, we don't know how many of the Never use group that developed ovarian cancer and how many of the Never use group that did develop ovarian cancer would be reclassified as Ever users if we had data further back than 12 months; correct?

MS. PARFITT: Objection. Form.

You may answer.

A So yes. But I think, you know, and we can -- we can stay fixated on a single row here and everything all day.

I mean, I think they do have

some data here that suggests, and that's Question 102, that some of these women who report in the last 12 months never using, used at younger ages, here between the ages of 10 and 13, and that's in their population here.

I think we have other good data from similar populations, including the Black Women's Health study, including that fibroid study we talked about earlier this morning, that show a really large proportion of women do start using these products, and they start as young children.

So the misclassification here, in my expert opinion, and I think in the authors' analysis of their own data -- and again, they have more data that they are privy to than I do -- would suggest that where you're going to see this kind of misclassification is in the reported Never user group here.

BY MR. SPIRA:

Q Okay.

A Which would then drive things

towards the null. It would underestimate the true association or the actual risk.

Q Well, as to that last point, wouldn't that -- that would depend on how many Never users who developed ovarian cancer were reclassified and how many Never users who did not develop ovarian cancer were reclassified?

MS. PARFITT: Objection. Misstates her testimony.

Objection. Misstates her testimony.

A What you're trying to say is that if it was potentially differential between those two groups, and I don't think we have any reason, scientifically or otherwise, to think that it would be different between those two groups. Hence, the nondifferential.

BY MR. SPIRA:

Q Right. But we just don't know --

My point is just that from this study, we don't know what those numbers would be. We don't know how many Never

users with ovarian cancer would be reclassified, and we don't know how many Never users without ovarian cancer would be reclassified?

MS. PARFITT: Objection. Form. Misstates her testimony. Asked and answered.

A My feeling here is that we do have some of those data, and the authors do, for the Sister Study. But in addition, we know, based on patterns of use that we have seen in multiple other studies, that overall, usage tends to decrease a little bit with age specific to hair straightening products, not talking about hair dyes or anything else.

So that --

And again, I will direct you to where it is in the paper, too. You know, they talk about -- I'll find it. It is on page 1193 at the bottom after Table 3, some --

"Therefore, some women who are categorized as being exposed to straightening products may have used" --

(Reporter request for clarification.)

A Yes. And this is -- actually, this isn't where I was wanting to go with it. Let me find it. This is a point that we can -- I can make later.

This is the question about the types of products used. Let me find the other misclassification one.

BY MR. SPIRA:

Q Well, and I --

MS. PARFITT: Please let her finish. Let her finish. Just give her a moment. Appreciate the courtesy.

MR. SPIRA: I think I'm able to help out. Because I think we're maybe talking past each other a little bit.

MS. PARFITT: Okay. But let me -- I appreciate that. Let her at least try to finish her statement.

A Yeah. Well, let me -- I'll go back to where we were, then, because it's the same ultimate point is:

"Therefore, some women who are categorized as being exposed to the

straightening products may have used products that are less harsh" --

(Reporter request for clarification.)

A -- "than chemical straighteners/relaxers. Thus the effect estimates reported here may underestimate the true association."

And I think I just found it.

No, that's fine. I think that that's --

MS. PARFITT: Thank you.

A Yes.

BY MR. SPIRA:

Q Okay. But so I am totally with you that misclassification probably happens here based on only asking about the 12 months; right? We know that there are women who start using hair straightening, relaxer, or pressing products earlier in life and stop and that may be captured in the data; correct?

A Yes.

Q Okay.

My point is we don't know from

the data reported in White, whether there are -- how many women would be reclassified from those that did develop ovarian cancer and how many would be reclassified from the group of those who did not develop ovarian cancer?

MS. PARFITT: Objection. Asked and answered.

You can respond.

A Correction -- or correct, from what was presented here. We don't have those data.

BY MR. SPIRA:

Q So you mentioned the concept of differential misclassification and nondifferential classification. We don't know whether in this -- from what's reported here in White, we don't know whether there is a different proportion of women who develop cancer that would be reclassified as compared to those who did not develop ovarian cancer?

MS. PARFITT: Objection. Form.

A So in this particular study, no. But we can look at various other

studies, and we can also think and analyze this, not with numbers but overall, would there be any reason where the misclassification would be greater or lesser proportionately speaking as to whether you 20, 30, however many years later, developed ovarian cancer or did not.

And overall in these sorts of studies, cohort studies in particular, you see nondifferential classification. You can't --

In all of my reading, I could not come across any reason why misclassification might be more common in one group or in the other, meaning in the case group versus those who didn't develop the disease.

BY MR. SPIRA:

Q But we don't -- again, I come back to we don't have the data here to determine whether this is differential or nondifferential. We don't have it in the White paper; correct?

MS. PARFITT: Objection. Misstates

her testimony. Asked and answered.

A They did not present those data here.

But again, there's wide, broad literature looking at differential and nondifferential. And when you consider what's the -- what would the rationale be for one group of women versus the other group of women, those who did or didn't develop ovarian cancer, however many decades later, but there would be nondifferential or -- I'm sorry, differential misclassification between those two groups.

Nondifferential classification in this case and in cases like this with other types of exposures would be the norm.

BY MR. SPIRA:

Q Are you familiar with the International Journal of Epidemiology?

A Yes, I am.

Q Is that a journal that you regularly review?

A Actually, I have served as a

reviewer for them. And I think I have published with them on occasion, say, in larger groups. I don't think I've been a primary author there.

Q Okay. Let's pull up as Exhibit 9 Tab 18.

MS. STEINER: Exhibit 10.

MR. SPIRA: Exhibit 10. Sorry.

(Deposition Exhibit 10 was presented for identification.)

BY MR. SPIRA:

Q Okay. You have what's been marked as Exhibit 10. You see that this is a study titled:

"Proper Interpretation of Nondifferential Misclassification Effects: Expectations versus Observations."

Do you see that there?

A I do.

Q Do you know any of these authors on this study?

A Not personally, no.

Q This was published in the International Journal of Epidemiology; is that right?

A Yes. Back in 2005.
Q If you turn to the second page of this.
A Mm-hmm.
Q The first full paragraph on the left-hand side, three sentences in. Starts with "Even though."
Do you see that sentence?
A Yes, I do.
Q If says:
"Even though misclassification may be nondifferential on average, due to random variation, the misclassification rates in a single study (realization) will most likely be differential."
Do you see that there?
A I see that written there, yes. I don't necessarily see where they base that statement on any sort of data or analysis.
Q Okay. Let's turn back to Exhibit 8.
Okay. So we talked about the fact that this study only captures data from the last 12 months; correct?

A Yes.
Q Okay.
MS. PARFITT: Just going to object to that question. Misstates the study results.
But you can answer.
MR. SPIRA: I think she already answered.
BY MR. SPIRA:
Q We also discussed that the Sister Study asked participants about the use of straighteners, relaxers, and pressing products as one combined category; correct?
A Yes.
Q The Sister Study did not ask questions specific to each of those product categories; correct?
A As stated previously, they asked it as one question. Yes.
Q They didn't ask about specific brands; correct?
MS. PARFITT: Asked and answered. Objection.
A Again, yes, they did not ask

about specific brands.
BY MR. SPIRA:
Q And we see that in the same table we've been looking at, Table 2. Again, we have 3,769 Ever users of these products that did not develop ovarian cancer, and we have 24 Ever use -- Ever users of these products that did develop ovarian cancer; correct?
A Yes.
Q Of those 3,769, we do not know how many of them used chemical hair relaxer products and how many used different types of straighteners or pressing products; correct?
MS. PARFITT: Objection. Asked and answered.
A Again, it's not presented separately in the way the question is framed. But we do know from other literature that chemical hair products are being used in these populations.
BY MR. SPIRA:
Q Right. I understand. I'm not suggesting that they are not used. I'm

just saying that of these 3,769 women, we don't know how many used chemical hair relaxers versus how many used the other products that we talked about earlier; right?

MS. PARFITT: Objection. Asked and answered. Misstates her testimony.

A Can you reframe the question?

BY MR. SPIRA:

Q Yeah. I understand that data shows that chemical hair relaxers are used. But of the 3,769 Ever users that did not develop ovarian cancer, we don't know how many used chemical hair relaxer products?

MS. PARFITT: Objection. Asked and answered. She's given a response.

MR. SPIRA: Actually, she asked me to restate the question.

MS. PARFITT: She did. She did. There's no doubt it. But the question has been asked and answered.

Go ahead.

A Yes. In this particular study, they do not delineate what proportion of

women used each type of those. And also probably, frankly, multiple types of those. They just asked one question.

BY MR. SPIRA:

Q And same would be true of the 24 Ever users who developed ovarian cancer; right?

MS. PARFITT: Objection. Asked and answered.

You may answer.

A They asked all the women whether or not they ultimately developed cancer, ovarian cancer, or not. They asked them the same question. That's part of good methodology, to not change your questionnaire.

BY MR. SPIRA:

Q Understood.

So we don't know from the White study what the hazard ratio or confidence interval would be if we isolated the effect of only chemical hair relaxer products on ovarian cancer; correct?

MS. PARFITT: Objection.

A So from this particular study,

we do not know what the hazard ratio would be for just chemical hair relaxers. That is correct.

But looking at the other products that they included in this categorization, to me, in my expert opinion, that is the product that there's the biologic plausibility where there could be an exposure that led to -- and we can talk about the different pathways that lead to ovarian carcinogenesis.

It isn't using a flat iron on the ends of your hair that -- it's -- it's using these chemical mixtures that are high pH that can break the barrier of the scalp and be absorbed into a person's body.

And as we'll discuss, I think, if we ever get to these other tables, you know, this is usually not just a one-time use. I mean, they report frequent use. And again, not necessarily from this study, but it's -- it's over years.

So to continuously say, yeah, you can't isolate out and say, "This exact

number of women, and this is the exact hazard ratio."

What you can say is there's really no biological plausibility that these irons -- and it goes back to what I was pointing out here is that they are saying that if we have kind of misclassified women based on they're using these -- I'm just going to use flat irons as a pressing product thing, based on the flat irons, we're misclassifying those women. And we're actually underestimating what the true association could be.

BY MR. SPIRA:

Q You know, so you used flat irons as an example. Do you know whether there are chemicals in keratin treatments?

MS. PARFITT: Objection. It was asked and answered a bit earlier.

MR. SPIRA: I think, actually, earlier I asked whether a keratin treatment is a chemical hair relaxer product. Now I'm asking a different question which is:

BY MR. SPIRA:

Q Do you know what chemicals are contained within keratin treatments?

MS. PARFITT: Same objection.

A I do not know what chemicals are contained within keratin hair products. From all of my readings, I would assume that it is a mixture of chemicals and not just one chemical as we see in chemical hair relaxing products.

BY MR. SPIRA:

Q Do you know what chemicals are contained in Brazilian blowouts?

MS. PARFITT: Objection. That question was very similar before. Asked and answered.

You may answer again, Doctor.

A Again, I don't know what chemicals are contained within these sorts of products. From my readings, I would assume it's a mixture of different chemicals. And if I recall, and this is not from my scientific review, this is more from just functioning as a woman in this world. Some of the chemicals in

Brazilian blowouts included formaldehyde at one point, I believe.

BY MR. SPIRA:

Q Right. So there's some overlap. There are products --

My point is there are products within this category, straighteners, relaxers, and pressing products, that are not chemical hair relaxers but that also contain chemicals; correct?

MS. PARFITT: Objection. Asked and answered. Many times now.

A I'm repeating your question back.

"There are products within this category, straighteners, relaxers, and pressing products, that are not chemical hair relaxers but that also contain chemicals"?

I'm not sure. To me, that seems like a very circular question.

I mean, chemical hair relaxers are any sort of chemicals meant to straighten hair.

BY MR. SPIRA:

Q So if a keratin treatment or a Brazilian blowout uses chemicals, you would consider that a chemical hair relaxer product that is encompassed by your opinions?

A My opinions encompass all chemical hair relaxers, whatever constitutes -- whatever is in those mixtures of chemicals.

Again, to your point, there's no specific questions about name brands here, about particular type of product. Nothing. This is chemical hair relaxers.

And that is the understanding. It's how the question is stated and phrased. And it probably is more reliable for the women who are answering the question.

Q But my point is, you don't know what all the ingredients are in the products encompassed by this question that are not chemical hair relaxer products; right?

MS. PARFITT: Objection. Asked and

answered multiple times.
We probably need to move on.
But if you can answer it, go ahead and answer it.
A And my answer would be I don't need to know what all the ingredients are in these products that have the same intention, which is they are chemical products you apply with the goal of breaking the bonds of your hair to straighten it. That's the goal.
BY MR. SPIRA:
Q With all due respect -- and I appreciate the objection. But my question was not, do you need to know. My question was, do you know. Do you know the chemicals contained in products within the category of straighteners, relaxers, and pressing products that are not considered chemical hair relaxer products?
MS. PARFITT: Respectfully object to the question. I believe it's been answered in many different ways.
I'm not sure you have a different response, but, Dr. Cote, if you

want to answer now for the multiple time --

A I'm reading it again.

So I do not know the specific chemicals contained in the products contained in this category. But from my extensive reading in this area, I understand that these chemicals, these mixtures of many, many chemicals have properties that once they are absorbed into the body, can lead to various biologically plausible pathways that lead to carcinogenesis. In this case, ovarian carcinogenesis.

THE VIDEOGRAPHER: Excuse me one moment.

BY MR. SPIRA:

Q So you mentioned just now in your response, from your extensive reading in this area, did you do any extensive reading on keratin treatments, for instance?

A I did not specifically do a review reading anything about keratin treatments.

Q Or Brazilian blowouts?
A These products were discussed in some of the literature that I read, but I did not directly focus my review on a specific product. I focused on chemical hair straighteners, whatever they may be.
It's interesting because it's really difficult to find what are in these products, especially over long periods of time such as the long periods of time these women would be using these products.
And that's a major concern as somebody who uses personal products.
Q Right. You don't know -- well, scratch that. We'll come back to that later.
Let's go to Table 5 on page 6.
A Yes.
Q Okay. This table is titled "Associations Between Hair Products Used in the 12 Months Prior Baseline and Incident Invasive Ovarian Cancer by Race/Ethnicity."
Do you see that?
A Yes, I do.

Q And in the African American/Black population, there was a nonstatistically significant effect between Ever use of straighteners, relaxers, or pressing products in the last 12 months and ovarian cancer; correct?

A Which are you looking at? The Ever versus Never? Are you looking at the Frequent versus Never? Which specific one do you want me to --

Q Right now, I'm looking at Ever versus Never. And I can repeat my question if it's helpful.

A Yeah, please repeat.

Q In the African American/Black population, there was a nonstatistically significant effect between Ever use of straighteners, relaxers, or pressing products in the last 12 months or ovarian cancer; right?

A I would say these data indicate there's a positive association between use of these products and ovarian cancer. Yes.

Q Right. A positive association

that is not statistically significant; correct?

A Correct.

Q And likewise, in --

And just to make it clear, we're looking at the hazard ratio of 1.28 with a confidence interval of .46 to 3.52; correct?

A That is correct.

Q Because that confidence interval includes one that is not statistically significant; correct?

A Yes. Correct.

Q And then in the African American/Black population, there was also a nonstatistically significant effect between Frequent use of straighteners, relaxers, or pressing products in the last 12 months and ovarian cancer; correct?

A So there was a positive association between Frequent versus Never users in the African American and in the nonHispanic white population. Yes.

Q And it was not statistically significant; correct?

A Correct. Neither of those reached statistical significance.

Q Again, just based on the data presented here, we don't know what those hazard ratios or confidence intervals would be in that African American/Black population if women were reclassified based on use outside of the last 12 months?

MS. PARFITT: Objection. Misstates her prior testimony.

MR. SPIRA: I'm not trying to characterize prior testimony. I'm asking a new question about a new table. So I'm not -- I apologize if I come across as characterizing prior testimony. I'm trying to ask a new question.

A So the question as to whether, again, whether we know. And you're talking about a new table, but it's essentially the same population that has just been further stratified here by race and ethnicity.

And you're asking whether or not we know what the hazard ratios would

be if we knew whether or not -- the exact misclassification that was occurring.
BY MR. SPIRA:
Q Correct.
MS. PARFITT: I'll also object to the speculative nature of the question.
A Based on what we have already talked about, we do not know what the actual hazard ratio would be if we had the ability to measure misclassification if it had been presented to us here. No.
BY MR. SPIRA:
Q Let's go to page 5.
UNIDENTIFIED ZOOM SPEAKER: I'm sorry, Counsel. Witness is not centered in the camera.
(A discussion was held off the record to correct technical issues.)
A Okay. Page 5.
Page 5. Are you meaning 1193?
Q Yes, I was. Now I'm realizing I think I might be on the wrong page. Give me one moment.
Let's go to -- let's go first to page --

Yeah, let's go to page 7 in the document.

MS. PARFITT: And, Dan, just 1195 of the article?

MR. SPIRA: Correct.

MS. PARFITT: Thank you.

MR. SPIRA: Thank you.

BY MR. SPIRA:

Q In the last paragraph before the Supplemental Material section, it starts:

"In this large U.S. prospective cohort, we provide the first evidence of a possible relationship between frequent adult use of straighteners/relaxers or pressing products in ovarian cancer risk."

Do you see that there?

A I do.

Q Do you agree that this study is the first evidence of a possible relationship between that exposure and outcome?

A I believe it's the first epidemiologic evidence, but it's not the first evidence that there may be chemicals

in these chemical hair relaxers that increase the risk in cancer.

Earlier in the paper, they discuss, I think, their findings in breast. So it's not the very first of its kind in terms of epidemiology, but it was the first that's presented data for ovarian cancer specifically.

Q And then two sentences further, it says:

"Given the novelty of these findings, more research is needed to confirm our results and identify constituents of these products that may be driving risk."

Do you see that there?

A Yes, I do.

As an epidemiologist, it's one of our favorite things to say.

Q If you go to page 4, which is 1192. In the right-hand column, the last sentence of the first paragraph, it starts with "Future research."

Do you see that sentence?

A Yes, I do.

Q It says:
"Future research is needed in larger and more diverse populations with greater representation of racial/ethnic minorities to evaluate how hair straighteners or other products used by particular racial/ethnic groups might contribute to ovarian cancer risk and survival."
Do you see that there?
A Yes, I do see that there.
Q Do you agree with that statement?
A I believe that it is always important to consider racial and ethnic minorities in our research so that our findings, we know are applicable to the broader population.
I also know that both women's health issues and especially until -- well, in the recent past, looking at racial disparities and health disparities has been painfully and woefully underfunded. I think that's part of what the authors here are highlighting.

Q White is the only epidemiological study that exists in which the exposure being evaluated include chemical hair relaxer products and the outcome measured is ovarian cancer; correct?

MS. PARFITT: Objection.

You may answer.

A To date, I believe that it is the only epidemiologic study that has been published thus far looking at chemical hair straighteners and ovarian cancer. Yes.

BY MR. SPIRA:

Q And therefore, no epidemiological study has found a statistically significant association between Ever use of chemical hair relaxer products and ovarian cancer; correct?

MS. PARFITT: Objection. Misstates her report and testimony.

A Yes. That does misstate my report and testimony.

So we have walked through the White paper in bits and pieces in here and

there. I'm going to describe what I find to be useful and what parts of this paper helped form my opinion.

BY MR. SPIRA:

Q I'm going to let you do that, but I want to be clear about what my question was also.

MS. PARFITT: She got your question. I think you're interrupting her response.

MR. SPIRA: My question is about --

MS. PARFITT: Counsel.

MR. SPIRA: -- Ever use of chemical hair relaxer products and ovarian cancer.

MS. PARFITT: Continue.

A So I would say, and it's right from Ever use, it's right from the Table 2 that we have been beating to death, that we see a positive association with the hazard ratio in a multivariable adjusted model of 1.29.

So we see a positive association.

Going back to my further point, you know, there are strengths in this

study that need to be considered in the -- when we take -- in the findings of the study in the full context of it.

When we're selecting out an odds -- not an odds ratio -- a hazard ratio here, and then we take it out in another strata, you're missing the whole of the moon. You're looking at very small slices.

And so I'm going to highlight some of the ways I have looked at this and some of the findings that have informed my opinion as to whether there's an association just based on this paper between ovarian cancer and chemical hair relaxers.

BY MR. SPIRA:

Q And I'm going to let you do that. I'm going to let you do that. I'm just going to move to strike all of this explanation. I did not ask for "Tell me everything from the White study that goes to your opinions in your report."

I asked whether any study has found a statistically significant

association between the use of chemical hair relaxers and ovarian cancer.

MS. PARFITT: And she is answering that question.

MR. SPIRA: She is not.

(Simultaneous discussion interrupted by the reporter.)

MS. PARFITT: She is answering that question. You opened it up. You asked the question. Let her answer it.

(Simultaneous discussion interrupted by the reporter.)

MS. PARFITT: I appreciate that. You can go ahead and start what you like, but she's going to answer your specific question.

MR. SPIRA: And I will -- I will move to strike the response that she previewed and will not answer the question.

MS. PARFITT: She did not preview anything. She's attempting to answer your question.

Dr. Cote, I'd ask that you proceed and answer Counsel's question.

A So the first question was, actually, is there an association between Ever/Never use, and the response is yes.

And you see it. You know, as I mentioned, you see it in Table 2 with the overall study population.

You see it again in Table 4, looking at both serous and nonserous. So they have stratified there looking at subtype. You see it at 1.33. You see it at 1.49.

And, you know, again, you know, these are repeated. We never talked about Frequency versus Never use. So this was looking at, I believe they defined more frequent use at four or more times over the past year.

And you continue to see in here -- and again, I'm not somebody who is going to continuously point out this is statistically significant, that is statistically significant, because I feel like it oftentimes misses the point.

You know, here you see hazard ratio in Table 4 for the nonserous ovarian

Frequent versus Never users of a four-fold increase in risk that is statistically significant.

This paper was -- dozens of investigators and reviewers recognize the strengths of the Sister Study, which I won't go into because you didn't ask. But this study has been used, has over 350 peer-reviewed publications in this.

This is a quality study from a team of highly qualified investigators that have analyzed these data in detail. And ultimately, they are reporting, and I will read to them -- or read to you all what they find, which is in their final conclusion there:

"First evidence, as you pointed out, of a possible relationship between Frequent use of adult straighteners, relaxers, or pressing products and ovarian cancer risk."

MR. SPIRA: I'll, for the record, move to strike that entire response.

BY MR. SPIRA:

Q I appreciate the explanation.

I understand that you're drawing on this study in your report, that you point to various findings in the report, and that you are pulling out positive associations.

But I don't think you answered my question which was that, no study has ever found a statistically significant association between the use -- between the Ever use of chemical hair relaxer products and ovarian cancer; is that correct?

MS. PARFITT: I'll object to Counsel's reference that she is -- suggesting that she's cherry-picking only positive studies. She's giving you the results.

MR. SPIRA: I didn't say cherry-picking.

MS. PARFITT: You didn't. But you focused on the fact that she was only focusing on positive results. What she's done and attempted to do is give you a fulsome explanation of how this study informs the reader --

MR. SPIRA: Counsel, if you have a form objection, that's fine.

MS. PARFITT: I would, but Counsel, you can't -- then don't describe the questions as positive, negative, or what she is doing. We can both -- we can both play that game.

BY MR. SPIRA:

Q Dr. Cote, my question is simply this. "Yes" or "no." Has any study ever found a statistically significant association between Ever use of chemical hair relaxer products and ovarian cancer?

MS. PARFITT: Objection. Asked and answered.

A This study did not show a statistically significant association between Ever use of hair straighteners and ovarian cancer.

BY MR. SPIRA:

Q Okay. Looking briefly at page 4, Table 2. I promise I'm not going to ask you the same question we've been talking about, but it is the same table.

White did not find a statistically significant association between other hair products studied and

ovarian cancer; correct?
A Are you looking at Ever/Never use?
Q Yes. I'm looking at Ever/Never use for permanent hair dye, semi-permanent hair dye, temporary hair dye, bleach, highlights, and hair permanent/body waves.
A And you're looking at Ever/Never use, and you wanted to know whether there is a statistically significant association?
Q Correct.
A So she -- they do identify in a subgroup nonserous ovarian cancer has a statistically significant association between permanent hair dye and ovarian cancer. It's the 1.94. Yes.
Q Where are you looking?
A Table 4 under Ever/Never. So yes. They identified permanent hair dye, and they also mention that in the -- in the discussion.
Q And outside of that, outside of permanent hair dye and serous, in the serous cancer subtype, do they find any

statistically significant association between any of these other hair products studied and ovarian cancer?

MS. PARFITT: And Counsel, not to interrupt your question. I think you said serous. Did you mean nonserous?

MR. SPIRA: Yes. Thank you.

MS. PARFITT: You're welcome.

A Yes. No. As presented in Table 4, that was the one other finding, that finding also held for Frequent versus Never.

BY MR. SPIRA:

Q And you're referring to Table 3?

A Table 4 still.

Q Let's look at Table 3 because that -- that remains -- the lack of statistically significant findings for those hair products remains true when frequency of use is considered; correct?

MS. PARFITT: Objection.

A Can you define "those hair products" for me. There's, like, ten of them here. So.

BY MR. SPIRA:

Q Right. So the authors did not find a statistically significant association between the use of any of the following products and ovarian cancer cases regardless of frequency of use?

Permanent hair dye. Sorry.

Permanent hair dye, semi-permanent hair dye, temporary hair dye, bleach, highlights, and hair permanent/body waves.

A Yes. In Table 3, the only statistically significant association they found was between greater than "four times per year use" of straighteners and relaxers with a hazard ratio of 2.19 and the confidence interval of 1.12 to 4.27. That was the only statistically significant association seen here.

They also noted that the p-value for trend was statistically significant. So that was trend of number of times per year used.

Q Let's look at -- let's mark the next exhibit as Tab 10.

MS. PARFITT: Exhibit 11. Yes.

(Deposition Exhibit 11 was presented for identification.)

BY MR. SPIRA:

Q So Tab 10, Exhibit 11, is titled "Use of Straighteners and Other Hair Products and Incident Uterine Cancer."

Do you see that?

A I do.

Q And this was published in 2022?

A Yes.

Q And the first listed author is Chang. We've been referring to this as the Chang study; correct?

A Yes.

Q Do you know -- I'm going to butcher the pronunciation -- but Che-Jung Chang?

A I do not, no.

Q Do you know any of the other authors on this study?

A Again, I have a passing knowledge of Katie O'Brien and Alexander White. And I know who Dale Sandler is,

but the rest of the authors I do not know.
Q Have you had any written or oral communications with them about this study?
A No.
Q And you've also reviewed this study in connection with preparing your report?
A Yes.
Q This study, like White, relied on data from the Sister Study; correct?
A Yes.
Q And with regard to hair straighteners, relaxers, and pressing products, it relied on the same question that White relied on; correct? Question 103 that we looked at previously.
MS. PARFITT: Objection. Form.
A They may have also, like the other, there was -- you know, they had the question about the younger age as well. But yes, it's the same questionnaire.
BY MR. SPIRA:
Q And relying on the Sister Study data, the Chang paper seeks to determine

whether there's an association between use of various hair products and uterine cancer; correct?
A Yes.
Q Like the White paper, it looks at a variety of different hair products; right?
A Yes, correct.
Q If you look at page 1 on the bottom right, there's a sentence that begins "However, to our knowledge."
Do you see that?
A I do.
Q It says:
"However, to our knowledge, no study has investigated the influence of hair product use on uterine cancer."
Do you see that there?
A Yes.
Q At least with respect to epidemiological studies, is that your understanding?
A Yeah. With respect to epidemiologic studies, it has not examined the uterine cancer outcome. Though there

are other outcomes that involve the uterus or involve the reproductive tract and reproductive outcomes. Yes.

Q And the Chang paper similarly reports results based on estimated hazard ratios and 95 percent confidence intervals; correct?

A Yes. That is true.

Q And looking on page 2, in the last -- the last paragraph of the Study Population, they made clear that after various exclusions, data from 33,947 women in the Sister Study were analyzed as part of this publication?

A Yes. And here again, they have to exclude -- for instance, this is a fairly large number of women with a hysterectomy.

So, you know, again, not going to do the math, but about a third of the population had to be removed because they had had a hysterectomy prior to -- prior to enrollment in the study or prior to diagnosis.

No, this was prior to

enrollment. There we go.

Q And if we look at the -- look at page 3. The second sentence under the Results section, the authors note that:

"The study population consists of 7.4 percent Black/African American, 4.4 percent Hispanic/Latina nonBlack, 85.6 percent nonHispanic white, and 2.5 percent all other race and ethnicity."

A Yes. And again, this reflects some of those exclusions. So here, there's about a percentage fewer of African Americans than were even in the White study, most likely because of the hysterectomy, the exclusion criteria of hysterectomy, which is more common among Black women.

Q A little further down in that same section on the same page, it specifies that:

"The participants who ever used -- of the participants that ever used straighteners, about 59.9 percent were African American/Black"?

Do you see that?

A I'm not quite there, but I will get there.
Yes, found it.
Q And we already discussed that nonBlack women are far less likely to use chemical hair relaxers; correct?
A Yes.
MS. PARFITT: Objection.
Go ahead.
A I don't know what "far" is meant to symbolize, but they are less likely to use hair relaxers than Black women.
BY MR. SPIRA:
Q Yeah, I think we -- I mean, just to put a number on it. I think we saw at the beginning of the day that you cite in your report data suggesting that 88 percent of African American women reported regular use of chemical hair relaxers and straighteners, while only 5 percent of white women reported regular use; right?
A That was from one study, I believe. Yes.

Q So about 40 percent of the participants, of the women whose data was analyzed as part of the Chang study, are unlikely to have ever used chemical hair relaxers; right?
MS. PARFITT: Objection. Speculative.
A Yeah. I cannot put a number on that.
BY MR. SPIRA:
Q Okay. If we look at page 5, Table 2. Are you there?
A Yes. I'm sorry.
Q No, that's okay.
So the authors report in the Straighteners, Relaxers, or Pressing Products category, the authors report a hazard ratio of 1.80 for Ever use with a confidence interval of 1.12 to 2.88.
Do you see that there?
A I do.
Q And that was based on -- okay. Now, I think they -- now looking at the numbers, it looks like where they have got the 30,329 Never users -- do you see where

I am?

A I do. Yes.

Q It looks like that includes the 332 cases of uterine cancer.

A Yes. They have that listed as Full Cohort. Yes.

Q It's reported a little different --

A Than in the last one.

Q -- that in the last one. Okay.

And likewise, that 3,036 Ever users includes 38 cases of uterine cancer?

A Yes.

Q Okay. Now again, similar question to before but the White study. But out of those 30,329 women in the Never use category, we don't know how many of them actually used straighteners, relaxers, or pressing products prior to the last 12 months before they answered the Sister Study questionnaire; correct?

MS. PARFITT: Objection. Misstates the testimony in her report and here today.

A So based on what we know from

what they reported, they used, and it could be any combination of those, straighteners, relaxers, or pressing products.

BY MR. SPIRA:

Q Right. I guess my question was -- that's right.

And it also could be that some of the Never use women used those products, but they only used them prior to the last 12 months?

A Yes.

Q Okay.

A There are some of those Never use -- who reported Never use in the last 12 months had used it earlier during their life course.

Q Right. And from the data reported here in Chang, we don't know how many of the Never users fall into that category; right?

MS. PARFITT: Objection. Asked and answered.

A Correct. We don't have a way to estimate how many Ever users based on

the data here.

I'm sorry. How many of the Never users based on the data here were actually Ever users at some point in their life.

BY MR. SPIRA:

Q Okay. I apologize. I'm going to do a little bit of math here again.

So if I look at 30,329 minus 332, would that give me the number of Never users who did not develop uterine cancer?

MS. PARFITT: Objection.

A I believe so, based on the numbers here in Table 2, up until the point of time of analysis.

BY MR. SPIRA:

Q Okay. And you can check my math if you like, but I'll represent that that is 29,997.

A Yes. That's correct.

Q And so if some of those 29,997 who did not develop uterine cancer were recategorized as users of straighteners, relaxing, or pressing products, then all

else being equal, that would move the results further towards the null; correct?

A Again, we're back to this discussion of misclassification and whether it's differential or nondifferential. And what you're describing there is differential misclassification. But yes, would most likely move it towards the null.

Q And so to -- scratch that.

Okay. And with regard to the 3,036 Ever users, we don't know how many of those used chemical hair relaxers as opposed to other products encompassed by the Sister Study question; correct?

MS. PARFITT: Objection. Misstates her prior testimony.

A So we know that those 3,036 women reported that at some time in their last 12 months, they had used some form or combination thereof of straighteners, relaxers, or pressing products.

BY MR. SPIRA:

Q Right. But there's no questions -- but that allowed them to or

would have given them occasion to specify which type of product within that category?

A Correct.

MS. PARFITT: Objection.

A Correct. The questionnaire, again, as is good practice, has not changed between these analyses.

MR. STANNER: Dan, we've been going for about an hour 20.

MS. PARFITT: Yeah. Let's make it short if we can.

THE VIDEOGRAPHER: We're now off the record. This is the end of Media Unit 4 at 2:16 p.m.

(A recess was taken.)

THE REPORTER: When do you want your final?

MS. PARFITT: Ten days.

THE REPORTER: Middle of next week?

MS. PARFITT: Perfect.

THE VIDEOGRAPHER: We are now on the record. The beginning of Media Unit 5 at 2:32 p.m.

BY MR. SPIRA:

Q All right. Dr. Cote, when we went off the record, I think we were talking about the Chang study.

A Yes.

Q If we could turn to page 8, Table 5 of that study.

A Okay.

Q So in this table, the authors evaluate "Associations Between Straightener, Relaxer, or Pressing Product Use in the 12 Months Prior to Enrollment and Uterine Cancer in the Sister Study Stratified by Participant Characteristics."

Do you see that in the title?

A Yes.

Q And one of those characteristics is Race and Ethnicity; correct?

A It is.

Q And in this table, the authors report in the African American/Black population, Ever use of hair straighteners, relaxers, or pressing

products in the last 12 months has a 1.66 hazard ratio with a confidence interval of 0.67 to 4.09.

Do you see that there?

A I do.

Q And that is not statistically significant; correct?

A By this definition of statistical significance; correct.

Q And in the African American/Black population, Frequent use of hair straighteners, relaxers, or pressing products in the last 12 months has a 2.12 hazard ratio with a confidence interval of 0.83 to 5.39; correct?

A Yes. That is correct.

Q And that is also not statistically significant; correct?

A Correct.

Q In your report, you do not cite that data regarding the hazard ratios and confidence intervals specific to the African American and Black population analyzed in Chang; is that correct?

A I can look in my report, but

more so, I'm going to tell you what this table is used for and why the authors did it.

And what it really is, is -- and they list it right here at the very top of the column. They are looking at whether or not these factors, Race Ethnicity, BMI, and Physical Activity, are potentially effect modifiers.

So it's less about trying to provide estimates for each of these subgroups which are likely underpowered, and it's more about checking to see if there are big differences or, you know, differences between these subpopulations.

And for Race and Ethnicity, you don't see any difference between these two populations in terms of the risk estimates. You see increased risk in both.

It's, you know, the same for BMI. Whether you're obese or not obese, you're not seeing any differences in risk. You're seeing increased risk for both groups.

The risk is higher for the Frequent users, as you might expect.

For Physical Activity amongst Low and High, there's, again, overall not -- not a big difference here.

And this, to me, is a good double-check of these data. Just saying we don't -- we don't expect this from everything. At least in my opinion, that I've read, we don't expect to see big differences between Black and white women in terms of how these exposures, these chemicals might be interacting in the body.

So that's the purpose of this. It's not to say the numbers are this in white women necessarily or this in Black women, it's really to look at effect modification.

Q Dr. Cote, do you remember my question?

A You mentioned that I put the nonHispanic white in but did not put the nonHispanic -- or yeah, nonHispanic Black in or the African American/Black in.

Q So I guess I'm -- I guess I'm not sure if you confirmed. I don't think you confirmed.
A Okay. Well, I'll take my time to confirm it then. Can you tell me what page that I indicated one but not the other?
Q Well, I'm not sure you indicated either. My question was just that in your report, you do not cite data regarding the hazard ratios and confidence intervals specific to Black women; correct?
A And I just told you exactly why I didn't cite it. Because it wasn't looking for risk estimates. It was part of the evaluation as to whether there was effect modification occurring in the study.
Q I appreciate that. It was the first part of what you just said that I don't think you provided before, which is that you did not cite it.
A Well, I'm putting why I didn't upfront.

Q Okay. But we agree that you did not; is that correct?
A For the reasons --
MS. PARFITT: Objection. Asked and answered.
A For the reasons stated, yeah. This is -- this is statistical and epidemiology methods 101 looking for effect modifiers.
BY MR. SPIRA:
Q And you agree that Black women are the population in the Chang study most likely to have used chemical hair relaxer products; correct?
A I believe that Chang themselves, the authors of this article, indicate that Black women are more likely to indicate they used straighteners, relaxers, and pressing products. Yes.
Q In the nonHispanic white population, the authors report that Ever use of hair straighteners, relaxers, or pressing products had a 1.94 hazard ratio with a 1.09 to 3.47 confidence interval; correct?

MS. PARFITT: Objection. Asked and answered.

A Yes, that is correct. But again, I don't think that the intention of these tables is to assign hazard ratios by race and ethnicity. It is to examine whether there is modification by race and ethnicity.

BY MR. SPIRA:

Q And that measure that I just read, 1.94 with the confidence interval of 1.09 to 3.47, is statistically significant; correct?

MS. PARFITT: Objection. Asked and answered.

MR. SPIRA: I have not -- I have not asked that question.

A It is statistically significant, but in my opinion, it is not an important consideration when you're examining potential modification in this instance.

BY MR. SPIRA:

Q And in the nonHispanic white population, the authors report that

frequent use of hair straighteners, relaxers, or pressing products had a 2.66 hazard ratio with a 1.25 to 5.6 confidence interval; correct?
A That is what they indicate in the table, correct. They are presenting all of the data analyses that they deemed to be important to determine whether this study was appropriately analyzed.
Q And that -- that figure is also statistically significant; correct?
A Indeed, it is.
Q In your report -- I apologize if you mentioned this as to the nonHispanic white category -- but I believe in your report, you also do not cite data regarding the hazard ratios and confidence intervals specific to white women from the Chang study; is that correct?
MS. PARFITT: Objection.
A I will now go to my report and look to see what I did and did not include with respect to the Chang study.
Correct. For all the studies,

and this was everything we have talked about so far today and what's upcoming, I have a table. It's on page 15. It is Table 5. And it's just the Adjusted Overall Measure of Effect. And that is what I reported consistently for the studies.

I do mention if there is anything with respect to dose or response, such as here for Chang, the frequency of use.

BY MR. SPIRA:

Q And we know that as cited earlier in your study -- excuse me, as cited earlier in your report that we looked at, chemical hair relaxer use among white women is around 5 percent; is that correct?

MS. PARFITT: I will object. It's been asked and answered.

A Yeah. Again, you know, looking at -- we have some of that right here, so let's look at it. In Table 2 in the Full Cohort. That's Full Cohort data. Race and Ethnicity. I'm not finding that

directly in the paper, but I can look.

BY MR. SPIRA:

Q Yeah. I don't -- I didn't see it directly in this paper either. I was referring to your expert report.

A Yeah. And again, I would need to look and see what I used as a reference for the expert report. That may not have been data from the Sister Study. That may have been in my discussion about -- let me know where it is -- about just overall patterns of use.

And again, it's not necessarily what was in the Sister Study or not.

Q Yeah. I mean, I'll read it directly. It says:

"Using data from the case-control Women's Circle of Care study, a study of breast cancer, Llanos, et al, report 88 percent of African American women reported regular use of chemical relaxers/straighteners while only 5 percent of white women reported regular use"?

MS. PARFITT: And just for the

record, that's page 12 of Dr. Cote's report.

MR. SPIRA: Thank you.

MS. PARFITT: Of course.

A For the record, that is not the Sister Study. As stated in here very clearly, this is Women's Circle of Care study, a study of breast cancer.

BY MR. SPIRA:

Q And in Chang, the statistically significant effects we're seeing in white women could be due to use of -- let me rephrase that.

We don't know whether the nonHispanic white women in the Chang study who developed uterine cancer ever used chemical hair relaxers; correct?

MS. PARFITT: Objection. Asks for speculation.

A So the women who -- who reported "yes" to that question, reported "yes" to using either straighteners, relaxers, or pressing products or some combination of those.

There is no biological reason

that I can come up with, after extensive reading and reasoning, as to how using a hot hair comb or a flat iron could increase risk of any sort of cancer.

The other two products are the products that have mixtures of chemicals in them that are able to break the hair bonds, have high enough pH levels that they break down the skin on your scalp, and can expose a woman.

So those are the products that are most likely responsible for the increase in risk that are seen in this study.

BY MR. SPIRA:

Q Well, I think you said earlier, used that same phrase "extensive reading," but you acknowledge you haven't done extensive reading on other types of products that can be used for straightening and pressing; isn't that correct?

MS. PARFITT: Objection. Relevance.

A Yeah. So I've done extensive

reading about all of the different chemicals, as are disclosed, in a wide variety of hair products that are meant to straighten hair. I did not do an extensive search for every last bit of literature about one singular type of product. No.

Going back to the point about the odds ratio and about what this question is asking, it's asking about straighteners, relaxers, and pressers. And I'm telling you the first two straighteners and relaxers, there's actually biological plausibility as to how those chemicals could induce carcinogenesis.

There is not biological plausibility that I have found that using a flat iron is going to increase my risk of any type of cancer.

BY MR. SPIRA:

Q And I'm not -- well, we'll get into biological plausibility. All I'm pointing out here, all I'm asking you to confirm, is that the population less

likely to have used chemical hair relaxers, there's a statistically significant effect. And in the population likely to have used chemical hair relaxers, there is no statistically significant effect.

Is that true?

MS. PARFITT: Objection. Asked and answered. In a very fulsome way.

A The point of Table Number 5, which is where I think you're referring to the -- statistically significant versus positive, but nonstatistically significant effect, again, is not being used because it's adequately powered to really detect associations or to provide measures of effect in those populations.

It's looking to see if they are potential modifiers.

BY MR. SPIRA:

Q I understand that. And you've provided that explanation before. And I'm not -- right now, I'm not asking you about the purpose of Table 5.

I'm asking you, the population

less likely to have used chemical hair relaxers, there's a statistically significant effect between product use and uterine cancer. And the population more likely to use chemical hair relaxers, there is no statistically significant effect between product use and uterine cancer?

MS. PARFITT: Objection. Asked and answered. If you need to give your response once again --

MR. SPIRA: Counsel, please stop coaching. You can object to "asked and answered."

MS. PARFITT: Counsel, don't -- honestly, Dan, you've asked that question several times.

MR. SPIRA: She didn't answer the question.

MS. PARFITT: She has been answering your question. You don't like it, but she's been answering it.

So you keep asking the same question. I can ask the court reporter to read it back. It's the same question.

She gives an answer. Same question. She gives an answer.

I get it. You don't like the answer. But you can't keep -- you can, if you want to spend the next few hours asking the same question. But if you do, she gets to give a response. That's all. That's all I'm saying. Not a speaking objection.

MR. SPIRA: Well, it was a speaking objection.

MS. PARFITT: Again, I have to respond to what you're doing. I mean, it's your deposition but --

BY MR. SPIRA:

Q Dr. Cote.

A Yes.

Q I'm not asking you right now about the purpose of Table 5. I'm asking if you can, just based on the statistical data presented here, confirm that in the population more likely to have used chemical hair relaxer products, there's no statistically significant effect between product use and uterine cancer. And in

the population unlikely to have used chemical hair relaxer products, there is a statistically significant association between product use and uterine cancer. "Yes" or "no"?

MS. PARFITT: Objection. Asked and answered.

A And I will say, again, that I don't feel it is -- would be correct for me to answer your question about statistical significance and which population may or may not be more or less likely to use chemical hair relaxers, straighteners, pressing products, based on data that is not presented for that reason.

BY MR. SPIRA:

Q Okay. So you're not going to answer the question?

MS. PARFITT: Objection, Counsel.

A I answered the question. I don't believe where you're trying to indicate, I should use those data to answer the question. I don't believe that that actually answers the question. I

believe it's misleading, and I don't believe that looking at two numbers actually encapsulates everything else that is going on in this study.

BY MR. SPIRA:

Q If we go to Table -- page 4, Table 1.

MS. PARFITT: Dan, for those that might be following, it's 1639. I just want to make sure I'm on the same page. It's Chang.

MR. SPIRA: Yeah.

MS. PARFITT: And again, I'm not trying to inject myself in your transcript.

BY MR. SPIRA:

Q Okay. And so I just want to confirm here in the -- do you see where it lists Race and Ethnicity?

A I do.

Q And it indicates here that of the Full Eligible Cohort, considered in this study, there were 2,523 African American/Black including Hispanic/Latina Black.

Do you see that?
A Correct.
Q And there were 29,060 nonHispanic white women.
Do you see that?
A I do.
I would like to point out a reason why we should look a little more closely at the Full Eligible Cohort numbers. And it goes back to the 15,000 or so women that were excluded from the study because they had a prior hysterectomy.
And I think, based on what we saw -- I think it was in the Chang paper -- about what the full cohort was, like the entire cohort of the Sister Study, the 44,000-odd women. We see more exclusions here of African American women, most likely based on hysterectomy.
My concern about this and why I bring it up now, since we're picking apart the hazard ratios, is that removing this group of women, which is important and the right thing to do, because they are no

longer at risk for disease, because they no longer have a uterus, is more common in the African American population and may be introducing a type of bias known as collider bias or depletion of the susceptibles bias and what you could potentially see happening there.

These would be women who, you know, they get hysterectomies -- women get hysterectomies for many reasons, but a lot of it is for disregulated bleeding. And we know that African American women are more likely to have something that causes disregulated bleeding, and that's fibroids, uterine fibroids. So they're benign growths that cause a lot of discomfort, pain, bleeding.

You can see on page -- we're right on that right page, 1639. It says:

"Previous studies have demonstrated that exposure to straighteners was associated with lower sex steroid hormone levels" --

(Reporter request for clarification.)

A -- "sex steroid hormone levels and elevated risk of uterine leiomyomatas."

That's why we say "fibroids." That's L-E-I-O-M-Y-O-M-A-T-A.

So a concern here, since we're looking at numbers, a potential bias is the fact that we have removed -- "we" meaning the global "we," the authors have removed a larger number of Black women who were actually exposed to hair straighteners from this study before they had the opportunity, so to speak, to get uterine cancer, based on the fact that they had a hysterectomy.

Again, this would potentially decrease risk in this population. It would make the hazard ratios smaller, more towards 1.

Q And I'll move to strike all of that. My question was about how many nonHispanic white women were in the study. I didn't ask about any of that. So move to strike.

MR. SHIPMAN: Counsel, I know

you've been crawling all over Michelle about her speaking objections. Do we need to get a judge on the phone given that you've moved to strike? Do we need to get a ruling?

MR. SPIRA: No. A motion to strike is for the record. It's for later.

MR. SHIPMAN: That's not permitted under -- look, you cautioned her about what she's not permitted to do. I just pulled up the depo protocol, and your little motions aren't permitted.

MR. SPIRA: Neither is two people defending the deposition.

MR. SHIPMAN: I understand.

MR. SPIRA: I think I'm permitted to make my record. That's all I'm doing.

MR. SHIPMAN: Appreciate it.

BY MR. SPIRA:

Q To study the effect of chemical hair relaxers, do you agree that it would be helpful to have an epidemiological study that specifically measures chemical hair relaxers in the population that typically uses them?

MS. PARFITT: Objection. Form.
A Yeah. Please restate the question.
BY MR. SPIRA:
Q Well, you mentioned the exclusion of a lot of African American women from this study based on hysterectomies and other exclusion criteria; correct?
A Correct.
Q Okay. And so we're left with 2,523 African American women; correct?
A Yes.
Q And that's -- that's like 7.4 percent of the study population; correct?
A Yes.
Q And we know that African American women are the population most likely to use chemical hair relaxer products; correct?
A That is correct.
Q Okay. And so if we wanted to assess the association between chemical hair relaxer products and uterine cancer,

it would be -- the most effective study design would isolate chemical hair relaxer products and the population that actually uses them; correct?

MS. PARFITT: Objection. Form.

A No. I think what you're suggesting is -- would actually introduce bias into the study. We're going to --

We're going to study people that we think are most likely to be exposed. That would not be a good study design. No.

BY MR. SPIRA:

Q Okay. Do you think it would be helpful to have a -- to be able to assess the effect of chemical hair relaxer products, would it be helpful to have a more highly powered study?

MS. PARFITT: Objection. Form.

A I have no comments or no -- the power in the study is adequate, to my knowledge. So having another study with more power? Is that what you're asking?

Q Yeah.

MS. PARFITT: Objection. Form.

A I think from the evidence that I have seen, from the epidemiologic evidence and all of the other lines of evidence that I have read, I am comfortable, content, and feel that there -- believe that these data are adequate; that they are strong; that they are consistent; and that I don't need to see more in order to render an expert opinion on whether or not I think there is a causal association between these hair straighteners and these cancers.
BY MR. SPIRA:
Q Well, let's look at page 7 of this study.
MS. PARFITT: And just for the record, we're still on Chang?
MR. SPIRA: Yes.
MS. PARFITT: Very good.
MR. SPIRA: 1642.
MS. PARFITT: Thank you so much.
BY MR. SPIRA:
Q Okay. On the bottom right, bottom right of the page, you see the sentence that begins "More research is

warranted"?
A I do.
Q It says:
"More research is warranted to confirm our novel findings in different populations, particularly in African American and/or Black women because of the high prevalence of straightener use and to evaluate the potential contribution of hair products to health disparities and uterine cancer. Future efforts are also needed to identify the chemical ingredients which might result in the elevated rates."
Do you see that?
A I do see that.
Q The authors are calling for further research in different populations, particularly African American/Black women; right?
MS. PARFITT: Objection.
A The authors state that there's further research needed in different populations. Yes.

BY MR. SPIRA:

Q And specifically --

A Specifically African American populations. Yes.

Q Let's quickly just go to pdf page 5, which corresponds to page 1640, Table 2.

A Yes.

Q And in this table the authors found no statistically significant associations between use of other types of hair products and uterine cancer; correct? I'm speaking again about permanent dyes, semi-permanent dyes, temporary dyes, bleach, highlights, and hair permanents/body waves.

A Yes. I do not see where they identified another statistically significant association outside of straighteners, relaxers, or pressing products. But also, why they are showing this is not necessarily -- I'm not here to rule in or rule out these other products.

What they are doing with this table is showing that they have looked at

a variety of different exposures. It would be a leading question if they designed their questionnaire and just asked about a single product.

So this, again, is part of the authors showing part of their study design and their methodology as to, you know, how they are trying to address things like confounding and bias.

Q Well, and their study design --

Their study was not specifically to examine hair straighteners, relaxers, and pressing products; right? The design was to look at many different hair products and incidents of uterine cancer?

A The study was actually -- the study was actually designed to look at a large number of chemical exposures in a large number of outcomes. That is, by definition, what a cohort study is able to do, is to look at different outcomes.

Q Right. Okay. Sorry. You said different outcomes. Did you mean different exposures?

A It looks at both different exposures and different outcomes.
Q Let's turn to Tab 6.
MS. PARFITT: It would be Exhibit 12.
MS. STEINER: You're on Exhibit 12. Yes.
(Deposition Exhibit 12 was presented for identification.)
BY MR. SPIRA:
Q This is titled "Hair Relaxer Use and Risk of Uterine Cancer in the Black Women's Health Study."
Do you see that?
A Yes.
Q And this is what we've been referring to as the Bertrand study?
A Yes.
Q If you look at page 3.
A Yes.
Q The first paragraph under Study Population says:
"The U.S.-based Black Women's Health Study (BWHS) includes 59,000 women who self-identified as Black and were

between the age of 21 and 69, had enrollment in 1995.

"Participants completed a self-administered questionnaire about their personal and family medical history as well as behavioral and other factors that might influence health, such as medication use, cigarette smoking, and diet.

"Since 1997, participants have completed follow-up questionnaires every two years to update information and to identify incident diagnoses of cancer and other health conditions."

Do you see that?

A Yes.

Q Okay. Is that a -- is that an accurate description of the Black Women's Health Study?

A To the best of my knowledge, yes. I mean, these are the authors of this paper. Julia Palmer, Lynn Rosenberg. At the very minimum, those two were involved in the development of this study 30 some years ago.

So I would -- I would trust that that is a description, an accurate description of the study population.

MS. PARFITT: Dan, if I may, you've handed us as Exhibit Number 12 -- I'm looking at my publication in the Environmental Research. This looks like the public access version.

Do you have -- and I believe the one that's attached to Dr. Cote's report is -- it's this.

MR. SPIRA: This is the version we have.

MS. PARFITT: I have a copy of the final version. Let me -- let's take two seconds, and I can grab you one.

MR. SPIRA: All right. Why don't we go off the record.

THE VIDEOGRAPHER: We are now off the record. The end of Media Unit 5 at 3:06 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are now on the record. Beginning of Media Unit 6 at 3:23 p.m.

MS. PARFITT: All right. Thank you so much. Exhibit Number, I believe it's now 12, was presented to Dr. Cote. It was not the published version of the Bertrand study.

We have provided counsel with the published version of the Bertrand study. We went out at about 3:06. We're back about 3:23. Now we're going to proceed.

So the record is absolutely clear, the document that will be marked will be the final published version of Bertrand, et al. And I guess that's 12.

BY MR. SPIRA:

Q Dr. Cote, we have been discussing the Bertrand's publication that came out of the Black Women's Health Study; correct?

A Yes.

Q Okay. And this was published in 2023?

A Yes.

Q Do you know any of the authors on this study?

A I do know, again, arm's length distance, Kim Bertrand and Julie Palmer.
Q Have you had any written or oral communications with any of these authors about this study?
A No.
Q And you reviewed this study in connection with your report; correct?
A Yes.
Q As the title suggests, this relied on data from the Black Women's Health Study; correct?
A Yes.
Q Okay. Have you reviewed the questionnaire that was used in the Black Women's Health Study?
A Yes, I have.
Q We can introduce as Exhibit 13 Tab 11.
(Deposition Exhibit 13 was presented for identification.)
Q What's in front of you is a document entitled the Black Women's Health Study. Do you see that?
A Yes, I do.

Q This is a questionnaire used as part of the Black Women's Health Study; is that correct?
A Yes, that's my understanding.
Q It asks about a wide variety of exposures, health conditions, and lifestyle habits; correct?
A Yes, correct.
Q And if we go to Question 27, which is on the fourth page of the document, the question reads:
"Have you ever used a chemical hair straightener?"
Correct?
A Yes, that's the first part of Question 27.
Q Right. And then if the participant answers "yes," there's subparts A through E; correct?
A Yes. Correct.
Q And those ask the age when the participants first used chemical hair straighteners, how many times per year the participants used the products, how many years the participant used the products,

how many times the participant has experienced burns during application of the products, and whether the participant uses lye or no-lye chemical hair straighteners; correct?

A Yes, correct.

Q So as distinguished from the Sister Study that only asked about product use in the last 12 months, this study asks about lifetime product use; correct?

A Yes. Correct. Although they are not asking, like, about current use.

Q Okay.

A This question.

Q And unlike the Sister Study that asks about straighteners, relaxers, and pressing products combined, Question 27 in the Black Women's Health Study is asking specifically about chemical hair relaxing products; correct?

A They actually ask just:

"Have you ever used a chemical hair straightener."

They don't even use the word "product."

Q Right. Okay. But you understand that chemical hair straighteners are synonymous with the products at issue in this litigation?
MS. PARFITT: Objection. Form.
You can answer.
A Yeah. That would be my interpretation, and likely these women's interpretation is that it is all of the products in the box of the straightener that they use.
BY MR. SPIRA:
Q Now, like the Sister Study, the Black Women's Health Study questionnaire does not ask about use of any specific hair relaxer product brands; correct?
A It does not ask about any specific hair product brands. Correct.
Q Now, let's go back to the Bertrand study.
Bertrand -- the Bertrand study is the only study that isolates chemical hair relaxer products as the exposure and for which uterine cancer is the outcome; is that correct?

MS. PARFITT: Objection to form.
You may answer.
A I would say it is the only questionnaire we have to date that asks specifically about chemical hair relaxer alone.
BY MR. SPIRA:
Q Right.
And just to clarify, I'm not asking about the questionnaire. I agree with you on the questionnaire.
My question is that -- is do you agree that Bertrand is the only epidemiological publication that analyzed data based on chemical hair relaxer products alone and uterine cancer?
MS. PARFITT: Objection. Form.
A I believe the Sister Study also analyzes chemical hair relaxers and straighteners. It does include pressing products, but as I've stated before and will state again, I don't see any biological way that those straightening irons, hot combs, et cetera, would impact risk of carcinogenesis. So I would

consider that question really asking -- in the Sister Study, is what I mean by that question -- really asking about chemical straighteners and relaxers.

BY MR. SPIRA:

Q Okay. But it doesn't -- does the question analyzed in the Sister Study and, therefore, in White and Chang, include relaxers, straighteners, and pressing products, whereas Bertrand is the only publication based on data that specifically asked only about hair relaxer products; correct?

MS. PARFITT: Objection.

You can answer.

Misstates her testimony.

A As I stated, the Sister Study does also ask about hair straighteners and relaxers.

BY MR. SPIRA:

Q And pressing products?

A Pressing products are included in that. I also want to be sure that we don't characterize the Black Women's Health Study here as only asking about

chemical hair straightener products.
They ask about a number of different things. And you mentioned this before. They are asking -- in this questionnaire alone, we're only seeing a small section of what they are asking about.
They ask about a whole bunch of other exposures, too, which again, is good practice in epidemiology.
Q Right. And I'm talking about -- but Bertrand is only looking at hair relaxer use; right?
A This specific analysis, yes.
Q And it's the only publication that only looks at hair relaxer use as the exposure?
MS. PARFITT: Again, objection. Asked and answered. Misstates her testimony. Third time.
A So there are multiple studies that have looked at hair relaxers with respect to different reproductive outcomes. Some of them we listed in the Chang study, looking at reproductive

outcomes, fibroid tumors of the uterus, and so on.
BY MR. SPIRA:
Q Okay. But specific to uterine cancer, do you agree that it's the only epidemiological study that looks only at hair relaxer use as the exposure?
MS. PARFITT: Objection.
A I've answered the question now I think three times in a row. I believe that the Chang study also answers the question about chemical hair relaxers and uterine cancer. I believe it has data to address the question.
BY MR. SPIRA:
Q The Bertrand study reports results based on estimated hazard ratios and 95 percent confidence intervals; correct?
A Yes, I believe so. You're looking at things like Table 2 now on page 3.
Q Yeah. Or even just the page 1, the abstract, the methods. It says that they use -- estimate hazard ratios and

95 percent confidence intervals.
A Yes. And that's in their statistical methods as well.
Q Looking at page 2 under the Study Population, we see that, like the other studies we have looked at, there are various exclusions for various reasons, and that in total, 44,798 Black Women Health Study participants were included in these analyses.
Do you see that?
A I do. And I point out again that there is roughly 10 percent of the study population -- of what could be the whole study population is excluded due to hysterectomy.
Q Under the Case Ascertainment section, still on page 2, it says that through 2019, 347 incident uterine cancer cases were diagnosed.
Do you see that?
A Yes, I do.
Q And the authors analyzed any associations between hair relaxer use and uterine cancer by dividing participants

into three categories: Never/Light use, Moderate use, and Heavy use; correct?

A Yes.

Q And then they looked at the incidence of uterine cancer in each of those groups; right?

A Not in each of those groups, no.

They used the Never and the Light users kind of as the reference category.

Q Right. I meant in each of those three groups. In the Never/Light use, in the Moderate use, and in the Heavy use, in each of those three groups they looked at the incidence of uterine cancer; right?

MS. PARFITT: Objection.

A So they -- they look at the -- yes, the number of cases that have developed in each of those three groups. But ultimately, they provide hazard ratios and 95 percent confidence intervals for the Moderate and Heavy group. Because their referent group includes Light users.

BY MR. SPIRA:

Q And the authors also look at trends based on duration of use, frequency of use per year, age of first use, and number of --

(Reporter request for clarification.)

Q -- burns; correct?

A Yes. You're listing these from Table 2. That is correct.

Q So the analyses they are doing, they are pulling data from that Question Number 27, that we just looked at a moment ago, from the Black Women's Health Study questionnaire; correct?

A Yes. It's fairly -- it's well aligned.

Q Okay. Looking at page 3. In the first full paragraph, it says:

"Compared to never" -- I'll give you --

MS. PARFITT: I'm sorry, Dan. I lost you too. Page 3?

MR. SPIRA: Page 3. First full paragraph.

MS. PARFITT: Thank you very much.
BY MR. SPIRA:
Q Do you see the sentence that begins "Compared to"? Second sentence.
MS. PARFITT: Second sentence, first paragraph. Okay. That's where I lost you. Thanks.
A Yes, now I do.
BY MR. SPIRA:
Q It says:
"Compared to Never/Slight users" --
Excuse me.
"Compared to Never/Light use --
(Reporter request for clarification.)
Q "Compared to Never/Light use of hair relaxers, the multivariable adjusted hazard ratios for uterine cancer were 1.23 with a 95 percent confidence interval of 0.86 to 1.76 for Moderate use and 1.18 with a 95 percent confidence interval of 0.81 to 1.71 for Heavy use."
Do you see that?
A Yes, I do.

Q Those results are not statistically significant; correct?

MS. PARFITT: Objection.

You can answer.

A The results are not statistically significant, but I feel this is potentially because of the use of the Light users in this Never/Light use referent group.

That referent group is not actually unexposed. There's some level of exposure. And this would be another case where it would decrease the association seen.

So this would reduce the effect size. It would lower the hazard ratio, however you want to put it.

My second concern goes back to the removal of all of the women from the study who had a hysterectomy.

Again, this is -- it is good science to do, but it also removes women who could be the most susceptible to the effects of these chemical mixtures in the hair relaxers.

MR. SPIRA: I'll move to strike the portion of that response.

MS. PARFITT: We would object to that, Counsel. Thank you. The testimony stands.

MR. SPIRA: You really are objecting --

MS. PARFITT: Yeah. Yeah. I am actually -- you know what? There you go. At least we're keeping our humor here, Dan.

BY MR. SPIRA:

Q Continuing on in that same paragraph, it says:

"Women who reported using hair relaxers for 20 or more years had a slightly increased risk of uterine cancer compared to Never/Light use.

"The hazard ratio of 1.28 and the 95 percent confidence interval of 0.89 to 1.84. But this result was not statistically significant, and there was no clear linear trend in associations for duration of use. Likewise, there were no apparent trends for frequency of use, age

of first use, or number of burns."

Do you see that there?

A Yes. I do see that here.

Q And so the authors here state that there was no statistically significant difference in rate of uterine cancer as between the Never/Light use group and the group of women who used chemical hair relaxer products for 20 or more years; correct?

MS. PARFITT: Objection.

A I'm not sure. Actually, I lost my place there.

BY MR. SPIRA:

Q Do you want me to repeat the question?

A Yes, please.

Oh, no. Yeah. Repeat the question so I can catch where you were.

Q So I'm still on page 3 in the paragraph we've been reading.

A Okay.

Q The authors are stating here that:

"There was no statistically

significant difference in rate of uterine cancer as between the Never/Light use group and the group of women who used chemical hair relaxer products for 20 or more years."

Correct?

MS. PARFITT: Objection.

A So yes. We are still just reading through their results.

BY MR. SPIRA:

Q Okay. And they are also saying that:

"As the years of chemical hair relaxer use increase, there was no corresponding increase in association between chemical hair relaxer use and uterine cancer."

A I think it is important to point out there that while that is what they say, they only capture 20 or more years of use. And there would be situations here where that 20 or more years could actually be 30, 40, even 50 years of use.

So it is not a surprise, to me

at least, that you may not see a linear trend here.

For that reason, because we are not catching, really, the full extended use, so to speak, that's a -- it's bounded at 20, coupled with the fact that -- again, we don't really have a clean, truly nonuser referent group.

Q And as frequency of chemical hair relaxer use increased, meaning the more times someone used the product per year, there was also no increase in the association between chemical hair relaxer use and uterine cancer; correct?

MS. PARFITT: Objection. Misstate the testimony -- or, excuse me, misstates the data.

A Looking here. Again, show me where that is.

BY MR. SPIRA:

Q Why don't we look at Table 2 which is on the same page. So let's look at the actual data.

A Yeah.

Q Okay. So we talked about

the -- we talked about the results in the first three lines there. Never/Light -- the Never/Light use category compared to Moderate and compared to Heavy; right? We already talked about that?

A Right. And that I think the Never/Light use category is actually resulting in an overall underestimation of risk in all of these estimates that I fear we're about to go through one at a time.

Q I understand. All I'm trying to do is make sure we're in the same place here, know where we are in the data.

If you look at the Duration of Use.

A Gotcha. Yeah.

Q There is no linear trend, as I think you called it. There is no clear linear trend that as the years of use increase, the rate of uterine cancer increases; correct?

MS. PARFITT: Objection. Form.

A That's correct. And the rationale, one of the potential rationales for that is, like I said, the 20 years is

kind of like a 20-plus bounded number. We don't know. Again, it could be 20, it could be 30, it could be 40, and so on.

And it's looking at duration of use, but it's not also combined with frequency of use within those time periods. So that's a second reason.

And then the third reason that I think there may -- you know, it's my opinion that there's lack of a linear association is that this might really just be due to the period of exposure and essentially reaching your -- the biologically significant limit at some earlier exposure period in your life.

From that time on, the amount of exposure becomes less -- the association, the dose response association becomes less apparent and not linear.

BY MR. SPIRA:

Q Dr. Cote, I understand -- you've written a lengthy report with all of your opinions. I understand you have reasons for why you're weighing certain things and others. I'm really just trying

to get through the data so that we can get to those other aspects of your opinions, so I would appreciate if you could answer the question that I'm asking.

A My concern --

MS. PARFITT: Counsel, I believe she has. I think -- I'm not trying to be argumentative, but I do think that she has attempted the best she can to answer your question.

MR. SPIRA: Okay.

MS. PARFITT: So I think maybe we move forward --

BY MR. SPIRA:

Q My next question -- it's a very simple one -- in the Frequency of Use category, as the frequency of use increases, we do not see a corresponding increase in the incidence of uterine cancer; is that correct?

MS. PARFITT: Objection. Form.

A There is not a -- I'm going to call it a dose relationship because it's not a dose and duration relationship. It is simply just a frequency of use or dose

relationship.

Though all are positively associated with uterine cancer, and it goes back to the frequency of use, this is still a snapshot here at one point in time.

If you look back at the questionnaire, Question Number 27, it just says:

"How often do you or did you use chemical hair straighteners?"

So we don't know what that time frame was. We don't know if they have used it three or four times a year for 30 years or when they were in their teens which is --

BY MR. SPIRA:

Q Right. We don't have -- we don't have that data; right?

A We don't have those data to assess that.

Q Right. Just like in the Sister Study, we don't have the data going back more than 12 months; right? We have the data that's available based on the cohorts

that were conducted; right?

A We have the data based on what they have published so far, yes.

Q Okay. And looking at Age of First Use, there's no clear trend here that as the Age of First Use is reduced, there's no increase in -- there's no clear trend of an increase in the rate of uterine cancer; is that correct?

MS. PARFITT: Objection. Objection to form. Misstates the data.

A I'll point out here that they do flip the referent group here. So these were people who used the hair straighteners for the first time when they were quote/unquote older. So 30 years of age or older and less.

What they provide here is they just provide the estimates. What they are not providing is like a trend. You could do an analysis here to look and see if there was a positively associated trend with age at use.

BY MR. SPIRA:

Q And if we look at number of

burns, as the number of burns increases, there is no corresponding trend of an increase in uterine cancer; is that correct?

MS. PARFITT: Objection. Form.

A There appears to be no -- yeah, no trend in terms with number of burns, which it's hard for me to believe that we're talking about a product that literally causes burns in your scalp, and we're debating the safety of that.

BY MR. SPIRA:

Q And in this Table 2, and we're going to get to the other tables in this study, but in this Table 2, none of these hazard ratios -- excuse me, none of these confidence intervals that they report are statistically significant events; correct?

MS. PARFITT: Objection.

A In Table 2. Yeah, I think there's another issue in Table 2 looking at Age at First Use. These are just comparing among all users. And that was kind of the point I want to highlight with those.

These are among everybody who used. So these are among all of at-risk people. Again, I don't think that these are -- we should be looking at these specific point estimates and confidence intervals and trying to talk a lot about them, even as single estimates or even as a group. So just to highlight that difference there in the reference group as well.

BY MR. SPIRA:

Q In the Age at First Use you're talking about?

A Yeah. Mm-hmm. And number of burns, actually, too. Excludes, you know, the people who reported Never/Light use.

Q Okay. I think you used the phrase "dose relationship" or "dose response."

Looking at this table, there's no dose response reflected in any of the categories, the Moderate versus Heavy use, the Duration of Use, the Frequency of Use, the Age of First Use, or the Number of Burns?

MS. PARFITT: Objection. Misstates her testimony.
A I mean, I'll just take them one by one.
Like you wouldn't expect -- Number of Burns has nothing to do with duration that I could identify.
The other categories are really -- they are not a full look at dose response. It's a partial look. It's looking at just duration, and it's looking at frequency. It's not looking at that frequency and duration combined, which would really be the dose response variable you would be interested in.
And second to that, again, we have got this issue with the upper limits here, including Frequency of Use. They are truncated. Duration of Use truncated at 20 years. Frequency of Use truncated at seven years. And those are -- those make it difficult to say whether or not there's evidence of a quote/unquote dose response relationship.

BY MR. SPIRA:

Q You would want -- you would want more data?

MS. PARFITT: Objection. Misstates what her testimony is.

A I think that there's --

MS. PARFITT: And it's vague.

A Yeah. I mean, want more data in what regard?

BY MR. SPIRA:

Q Well, you said that based on the data here, you don't feel like you can get a full picture of dose response. So I'm saying in order to get that full picture, you would want additional data available?

MS. PARFITT: Objection. It really does misstate her testimony completely. It's not what she's stating. It's not what she's testifying to.

A Yeah. I feel that we have -- the authors have utilized this data to some extent that there are additional analyses that could be performed that might clarify some of these issues.

BY MR. SPIRA:

Q Okay. Let's look at page 4. Let's look at Table 4. And this table breaks down the data based on whether the participant is premenopausal or postmenopausal at baseline; correct?

A Yes. I believe that they do switch over, though, so it isn't quite baseline. Let's see where they --

It's something -- give me a minute here.

I'm not seeing an explanation of that. Perhaps it's -- no, it's not in the footnotes either. Okay.

Yes. My assumption is that this is based on menopausal status at study entry.

Q Okay. And start with -- we're going to talk about both pre- and postmenopausal. But to start with the premenopausal, none of the findings in the premenopausal women shows a statistically significant relationship between chemical hair relaxer use and uterine cancer; correct?

MS. PARFITT: Objection. Misstates the findings.

MR. SPIRA: Again, if you have an objection to form, that's fine. But please don't comment on -- if she doesn't agree with my characterization of the findings, she can say so.

MS. PARFITT: It's actually a proper objection. Misstates the evidence is actually a proper objection.

MR. SPIRA: Your objection was "Misstates the findings." You're coaching the witness as to what the study says.

MS. PARFITT: Misstates the evidence in this case or the data in this case. But let's move on.

A So, I mean, you're asking a question here for me to make a summary statement about I think 11 different hazard ratios, if I looked at these. So I would say that, no. In one case here, you do see a positive association. But what I think the potential bias here is what I was trying to state earlier in terms of losing women who are at the highest risk

to hysterectomy.

So before they have the opportunity to develop uterine cancer, they have already had a hysterectomy.

That's one concern. It's depletion of the susceptibles. And that would be a concern with these data.

The other -- and this is why I keep looking at this carefully -- is the fact that you know -- we know women shift from premenopausal to postmenopausal. And in most cohort studies, because they follow women, and they know that this is an important life shift, they would -- the person could move categories.

So the person here would be the number of person years you spent as a premenopausal woman. And then when you reported menopause, you would then shift into the postmenopausal.

So if it is indeed just characterizing people as premenopausal without making that shift, it is another concern for these premenopausal cases.

MR. SPIRA: I'll move to strike as

not responsive.

BY MR. SPIRA:

Q Is a hazard ratio of --

MS. PARFITT: Counsel, I believe she has answered your question as asked.

BY MR. SPIRA:

Q Is a hazard ratio of .84 with a confidence interval of .45 to 1.58 a statistically significant finding?

MS. PARFITT: Objection.

Do you need to repeat it?

MR. SPIRA: I'll repeat it so it's clear for the record.

BY MR. SPIRA:

Q Is a hazard ratio of .84 with a confidence interval of .45 to 1.58 a statistically significant finding?

MS. PARFITT: Objection.

A As I have repeated multiple times today, no. The hazard ratio of .84 with a confidence interval of .45 to 1.58 is not statistically significant. But I feel picking out a single number or a single estimate and set of numbers here mischaracterizes the overall findings of

the study that I use to inform my expert opinion.

And when I provide explanations as to why I don't think that -- why statistical significance of a single number is not a critical part of my detailed epidemiologic analysis of these papers, and ultimately informing my expert opinion, and I'm continuously being shut down and told that that's not important, frankly, I don't think your single question is looking at one hazard ratio is important.

So it makes it really difficult for me to express my opinion when I'm being directed to just look at one single number in a study.

I would never do that to form my whole opinion of a paper or certainly of a causal association.

BY MR. SPIRA:

Q And I appreciate that. And I'm trying to cover all of the data in this table. I'm trying to cover all of the data in this study. I have to take it

piece by piece so that we cover all of our bases here.

But -- and I promise I'm going to turn to the other half of this chart in a moment.

We talked about several of the charts already. I'm just trying to establish that in the premenopausal group, the hazard ratios, the confidence intervals reported here, none of them are statistically significant findings?

MS. PARFITT: Counsel --

BY MR. SPIRA:

Q Is that correct?

MS. PARFITT: -- objection. Asked and answered.

A I have given you examples of the bias that I think exists potentially in this study as to why it is -- the majority of the findings here are not statistically significant. It is likely due to bias. I do not -- these findings don't hold weight.

Furthermore, again, this split of premenopausal versus postmenopausal

is -- I wouldn't expect to see differences in terms of the etiology of disease. I don't think there's anything particularly different going on in these premenopausal versus postmenopausal women.

BY MR. SPIRA:

Q Okay. Now, turning to postmenopausal women. We do see a statistically significant effect based on Moderate or Heavy use; correct?

A Correct. For both categories.

Again, compared to a referent group that contains women who were indeed exposed at some level to hair relaxers.

Q We do not see a consistent dose response in postmenopausal women; correct?

MS. PARFITT: Objection.

BY MR. SPIRA:

Q Based on either Duration of Use or Frequency of Use?

MS. PARFITT: Same objection.

A No. But we do -- if we're going to pick apart hazard ratios here, we do see statistically significant increases and positive associations pretty much

across the board with both Duration of Use and Frequency of Use.

BY MR. SPIRA:

Q Well, I don't think we see across the board, or pretty much across the board, statistical significance in both groups.

It looks like they are -- in the Duration of Use, there are two statistically significant findings, and in the Frequency of Use, there's one statistically significant finding; is that correct?

A It is. But out of those nine different estimates, eight of nine are positively associated with uterine cancer risk.

Q Okay. I think you were making the point earlier that the subgroup analysis of pre- and postmenopausal women would also, then, have women in the premenopausal group who could have developed uterine cancer after entering menopause; is that correct? Is that one of the points you were making earlier?

A No. Actually, the point with the premenopausal and postmenopausal categorization is unclear. At what point -- if they do, at what point the Person-years shifts.

And again, just this idea that a woman, you know, spends a lot more -- a woman in this study, anyway, because the study entry is, I think age 21 -- spends a lot more of her time in the postmenopausal realm. The other maybe more minor point is just how they define postmenopausal in the study.

Q So are you --

Is it your testimony that they are not measuring menopausal status only at baseline, or you're not sure based on the study how they are measuring menopausal status?

A Yeah. It is my testimony from reading this paper that it is unclear how menopausal status is being measured in this study.

Q Okay.

A So again, this just brings

light to particularly the premenopausal group because that is the group where we would see movement.

Q Okay. Are there any epidemiological studies that we have not discussed yet that examines the potential association between an exposure that includes chemical hair relaxers and an outcome of uterine cancer?

A So epidemiologic study's not discussed yet.

No. These are the studies that address -- the Sister Study and the Black Women's Health Study.

Q And to be clear, I was referring to publications. So the Chang and Bertrand would be the only responsive publications to that question?

MS. PARFITT: Objection. Form.

A With respect to epidemiologic studies, yes.

BY MR. SPIRA:

Q And no epidemiological study has found a statistically significant association between Ever use of chemical

hair relaxers and uterine cancer in the population of Black women; correct?

MS. PARFITT: Objection.

A Actually, I think the study that we just were discussing, the Black Women's Health Study, the Bertrand study, does.

I mean, right here in their -- I'm going to read to you from the Results in their abstract:

"Among postmenopausal women compared to Never/Light use, which again leads to the underestimation of the hazard ratio, was 1.6 for Moderate use and 1.64 for heavy use."

BY MR. SPIRA:

Q Right. I'm not -- right now, I'm not asking -- we just -- we talked about the postmenopausal findings and that those were statistically significant.

What I'm asking right now is in the population of Black women. Not broken down by menopausal status or Frequency of Use or Duration of Use or anything else.

I'm talking about the

population -- the overall population of Black women. No epidemiological study has found a statistically significant association between Ever use of chemical hair relaxers and uterine cancer?

MS. PARFITT: Objection. The question was asked, and I believe she's answered it.

A So we do see -- you're just wanting to know specifically in Black women, in the Black Women's Health Study?

BY MR. SPIRA:

Q No. I'm not asking specifically about the Black Women's Health Study. I'm asking about in the population of Black women.

A Okay. So I've not done that analysis. That would require me actually analyzing -- doing a meta-analysis and analyzing data from Bertrand and from the Sister Study, putting them together, and coming up with a hazard ratio. Have not done that analysis. I've not seen that analysis done.

Q Okay. They don't -- neither

one of them independently makes that finding. And to your point, the meta-analysis of those findings has not been done across the two studies?

A Correct.

MR. SPIRA: Why don't we take a quick break if that's okay.

MS. PARFITT: Sure. Of course.

THE VIDEOGRAPHER: We're now off the record. The end of Media Unit 6 at 4:09 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are now on the record. Beginning of Media Unit 7 at 4:26 p.m.

BY MR. SPIRA:

Q All right. Dr. Cote, turning to your expert report on page 6. The second-to-last paragraph there says:

"In order to best synthesize."

Do you see that paragraph there?

A I do.

Q It says:

"In order to best synthesize

all of the data from various lines of evidence, I summarized my reading and analysis of this work using a process formally described by a medical epidemiologist and statistician in 1965, which included nine considerations by which to evaluate human epidemiologic evidence to determine if causation can be deduced: Strength of association, consistency, specificity, temporality, biological gradient, plausibility, coherence, experiment, and analogy."

Do you see that there?

A I do.

Q And you're referring --

By the "medical epidemiologist and statistician," you're referring to Sir Austin Bradford Hill?

A I am.

Q He was a renowned British epidemiologist and statistician?

A That's my understanding. Yes. I don't believe I was alive during his time, but yes.

Q And his 1965 address to the

Royal Society of Medicine is the foundational text for the criteria or factors or whatever you want to call them, that you're referring to here; right?

A Yeah. It provides a framework for assessing causality that's been widely used since 1965, continues to be used today.

Q And the reason to --

The reason to for this --

The reason to utilize this framework is that, as we discussed, epidemiological studies can show an association, and these considerations help assess whether an association is causal; is that correct?

A The analysis involved when you look at all the different considerations for Bradford Hill can help determine whether or not you, as the reviewer, have the opinion that it is a causal association, whereas the epidemiologic studies just look at associations between an exposure and an outcome. Yes.

Q Okay. Have you published any

peer-reviewed literature applying a Bradford Hill analysis?

A I don't believe so. My literature tends to be novel, new data from grants and studies that I'm actively managing and analyzing.

There isn't much of a call for these types of analyses in the broader scientific community.

Q Okay. And have you published any peer-reviewed literature regarding -- regarding the -- regarding Bradford Hill's methodology?

A Again --

MS. PARFITT: Objection.

A Again, just writing commentaries, opinion pieces, you know, my thoughts about Bradford Hill and how to apply it, there is really very limited room for that or need for that, frankly, in the scientific literature. A lot of that is covered in our epi textbooks.

BY MR. SPIRA:

Q I didn't see any. I just wanted to make sure we didn't miss some

commentary you made on the subject.

A Correct. My point is that there are just -- there are not super-high-value types of publications in my world. These are things we do actively every day when we're talking about our data, when we're writing papers.

It isn't something that I feel the need to write a separate manuscript about and try to shop it around as an uninvited commentary.

Q Now, in this expert report, you did not apply -- well, let me start over.

In your expert report, you applied -- you combined uterine cancer and ovarian cancer when applying Bradford Hill's framework; correct?

A In the write-up, I considered them together. When I was actually doing the analysis, I considered them separately. But as I was writing it, they were essentially the same.

So to avoid just copy/paste and self-plagiarism, I combined both uterine and endometrial into kind of a

reproductive -- female reproductive cancers outcome.

Q Can you identify any peer-reviewed publications in which an author conducts one combined Bradford Hill analysis across two cancer outcomes that occur in different organs in the body?

A As I already stated, I don't put a lot of weight into publication of, "Here's my thoughts on Bradford Hill for something."

I can't even think of articles that have that. I mean, maybe there's some for tobacco smoke or cigarette smoke and lung cancer after all this time kind of showing a historical perspective.

But ultimately, that's not the kind of research that people publish or that I would spend my time reading.

Q Okay. And because of that, you're not aware of any that do a combined analysis of two distinct cancer outcomes in different organs of the body; correct?

MS. PARFITT: Objection. Asked and answered.

A That's correct. And if this is a major issue, I'm happy to revise my expert report. It does not change my opinions whatsoever.

If this is going to cause a whole line of questioning, I can add another section: Bradford Hill analysis stratified by ovarian and stratified by uterine.

BY MR. SPIRA:

Q Okay. Well, as we discussed, uterine and ovarian cancer have some overlapping and some distinct risk factors; correct?

A I believe in this case that the pathways, the mechanisms driving carcinogenesis, are similar for both. And the risk factors that would be impacted or could be measured, let's say, in those pathways or through those mechanisms, are essentially the same.

Q I'm not sure -- I'm not sure that answered my question.

I understand you believe that hair relaxers are a risk factor in both,

but I'm asking more generally.

I think we talked about, the very beginning of the day, there are some overlapping and some distinct risk factors for ovarian and uterine cancer; correct?

A Correct. We did.

Q And each of the epidemiological studies that we have discussed, like Chang and Bertrand, each of those only evaluates cancer in one organ; correct?

A That is correct.

Q Are you aware that in his 1965 address, Bradford Hill states that before applying his criteria, there must be evidence of association that is, quote, perfectly clear-cut?

A I believe in this case, that has been met.

Q Okay. Do you --

A I believe there is clear evidence of an association between uterine cancer and chemical hair relaxers. And I also believe there's clear evidence of an association between ovarian cancer and chemical hair relaxers. I believe that

criteria has been met.

Q Okay. Again, I just want to confirm that you're aware that Hill states in his address, his 1965 address, that there must be evidence of an association that is perfectly clear-cut?

MS. PARFITT: Objection. The question's been asked; the question's been answered.

MR. SPIRA: The question has not been answered. The question has been asked.

MS. PARFITT: Counsel, again, you don't like the answer, but she did answer your question --

(Simultaneous discussion interrupted by the reporter.)

A So Bradford Hill had a lot to say on this topic, obviously, and it has lasted decades.

One of his many things was that there's evidence of an association. He doesn't put a number of studies. He does not put a number of "This is what the estimate of effect has to be." He doesn't

put anything.

In fact, even before that comes: is there some sort of biological plausibility? Again, it goes back to I'm driving a blue car, and I have kidney cancer. Therefore, blue cars and kidney -- blue cars cause kidney cancer.

No. There's no biological plausibility there. Perhaps if you were bathing in the blue paint, there might be.

But there's more steps than just, is there association? No association, we're going to ignore this matter entirely. There's multiple lines of evidence that suggests that these chemical mixtures in these hair straightening products can drive carcinogenesis.

BY MR. SPIRA:

Q Let's mark as an Exhibit Tab 12.

MS. PARFITT: It's Exhibit 14.

MS. STEINER: 14.

(Deposition Exhibit 14 was presented for identification.)

BY MR. SPIRA:
Q You see that the document in front of you is the address by Sir Austin Bradford Hill?
A I do indeed.
Q This is from 1965, as we've been discussing?
A Yes.
Q Okay. And on the first page, right-hand column, second paragraph -- second full paragraph, the second sentence begins:
"Our observations reveal an association between two variables, perfectly clear-cut, and beyond what we would care to attribute to the play of chance. What aspects of that association should we especially consider before deciding that the most likely interpretation of it is causation?"
Do you see that?
A Yes. You read that correctly.
Q Okay. Now let's go back to your report.
Actually, let's -- sorry, let's

mark as an exhibit -- no, I'm sorry. We'll start with your report.

Okay. The analysis we've been talking about where you use the Bradford Hill framework begins on page 23 of your report. Correct?

A I'm getting there. Yes.

Q Okay. And the first --

Well, the first two considerations that you list are Strength of Association and Consistency; correct?

A Yes.

Q Let's mark as an exhibit Tab 32.

MS. PARFITT: This is 15.

MR. SPIRA: Thank you.

(Deposition Exhibit 15 was presented for identification.)

BY MR. SPIRA:

Q So Exhibit 15 is an article titled:

"Applying the Bradford Hill Criteria in the 21st Century: How Data Integration Has Changed Causal Inference in Molecular Epidemiology."

Do you see that?
A I do.
Q And this is an article that you cite in your report; correct?
A I believe I, at the very least, relied on it. I'm well familiar with this.
Q If we go to page 2, the first -- excuse me, the first full paragraph on the right-hand side that begins with "Defining."
Do you see that?
A I do.
Q If you look at the last sentence of that paragraph, it says:
"Today statistical significance, not the magnitude of the association, is the accepted benchmark for judging the strength of an observed association, and thus its potential causality."
Do you see that?
A I do see that. I don't agree with it, but I do see it.
Q Okay. Let's go back to your

report. Page 23.
Now, in the White study that we looked at earlier, there was no statistically significant association between product Ever use and ovarian cancer; correct?
MS. PARFITT: Objection.
A So where are you pulling this from in my report? Or we're going back to the White paper?
BY MR. SPIRA:
Q I was just -- we had already gone through the White paper. I was just reciting, I think, what we have already covered.
A Okay. I mean, but it is not, just to be clear, part of what I have here --
Q It is not --
A -- Bradford Hill.
Q Correct. It is not part of your Bradford Hill section.
MS. PARFITT: So do we have a question?
MR. SPIRA: Yes.

BY MR. SPIRA:

Q In the White study, there was no statistically significant association between product Ever use and ovarian cancer; correct?

MS. PARFITT: Objection. Asked and answered.

A Between Ever use, there was not, but between Frequent use, there was. And increased risk of ovarian cancer has a ratio of 2.9, confidence interval 1.12 to 4.27.

BY MR. SPIRA:

Q Yeah, okay. And in this section of the Bradford Hill -- excuse me, in this section of your report on Strength of Association and Consistency, as I think you just flagged, you do not cite the association between product Ever use and ovarian cancer from White; correct?

MS. PARFITT: Clarification. In this section only right here, page 23?

A So correct. That page 23, that is -- if you're looking at the second paragraph under Strength of Association

and Consistency, that is, I don't believe, pulled from White. That's pulled from Chang.

BY MR. SPIRA:

Q Correct.

And in this section on Strength of Association and Consistency -- excuse me, let me start that question over.

In the Bertrand study, we saw that there was no statistically significant association between --

"There's no statistically significant association in women who were Moderate users or with women who were Heavy users as compared to the Light/Never use groups."

And I believe -- and I'm reading from the last paragraph of page 23 of your report.

Do you see that there?

MS. PARFITT: Objection. The question was asked and answered.

A I mean, the data are right here in my report. But as we've discussed, and as I've discussed in the report, I believe

that there are issues. And in terms of how the reference group, the unexposed group was characterized, that would reduce the hazard ratio, would make the hazard ratio smaller in this study. And to -- trying to get to it -- back to the point of both Bradford Hill and Fedak, you need to be able to consider things like random error, bias, and confounding. And that means you need to consider it in your positive associations, you need to consider it your statistically significant associations, you need to consider it across the board.

Pulling one single number out and hanging everything on that saying, "Well, you didn't see it in the overall population Ever/Never" does not negate all of the supporting data that you see underneath from both epidemiologic studies as well as all of the other basic science studies.

I have not hung my hat on a single number, one number, one estimate, one statistically significant finding

throughout my entire report because I no longer think that that constitutes good science.

BY MR. SPIRA:

Q Right. And I'm trying --

There are certain numbers that you include in this section of your report, including the ones from Bertrand that I just read. There are others that you do not.

I'm zeroing in because the entirety of what we have is based on the individual findings; right?

So I have to look at individual findings to get the full picture.

A No --

MS. PARFITT: Objection.

A -- absolutely not. The entirety of this is not based on just these findings. That's exactly my point.

The entirety is based on, again, multiple lines of evidence. It's based on biologic plausibility. It's based on coherence to what we know. It's based on a lot more than just trying to

pull a single number.

When you're looking at strength of association and kind of consistency within the findings, I believe that there is a good strength of association here. You know, a 1.5 to twofold increase in risk, to me, is strength of association.

I study genetics. Years ago when I first started studying germline variation -- and you would get an odds ratio here because they are normally case-controlled studies -- you would get an odds ratio of 1.1.

You think 1.1, a 10 percent increase in risk? Well, guess what? That is actually -- that can be a clinically significant increase in risk. It has changed. And that, I think, is what this Fedak paper is somewhat getting at, is that molecular epidemiology has changed this.

So strength of association back in the '50s when you were studying it, maybe that was a much larger odds ratio.

I'll slow down.

But, you know, nowadays, if you told me for a product that I don't need to use, it was going to increase my risk of a cancer, a deadly potential -- potentially deadly, most likely for ovarian, deadly cancer, there's no way I would use it.

So when I'm talking about totality, that's what I'm talking about. It's not just saying like, "Oh, you've got a head cold."

It's looking at what the outcomes are once you develop the disease. It's looking at all of the underlying biology of the disease, the evidence for biological plausibility, and now, also, the epidemiologic data, which in my mind is sufficient and supports a strong and consistent association.

BY MR. SPIRA:

Q Okay. But so a lot of what you just said goes to some of the other Bradford Hill considerations. You mentioned biological plausibility. You mentioned coherence. Right now, I'm just focused on the section of Strength of

Association and Consistency that you've got here.

MS. PARFITT: Counsel, that's what she's responded to.

A Correct. I keep being --

BY MR. SPIRA:

Q There's no question pending.

MR. SHIPMAN: Well, then make it one.

MS. PARFITT: In the rhetorical, I'm at a loss. But go ahead and ask your next question. Not rhetorical question.

MR. SPIRA: I appreciate if only one person would defend the deposition.

MS. PARFITT: We've done a great job of doing it so far.

MR. SHIPMAN: I've looked at the order. There's nothing that requires us to --

MR. SPIRA: It's common practice.

MR. SHIPMAN: I understand. I'm uncommon.

BY MR. SPIRA:

Q Okay. In the Strength of Association and Consistency section, your

analysis of that, that aspect of the framework, you do not cite the hazard ratios or confidence intervals between product use and uterine cancer in Black women that was reported in the Chang study; correct?

MS. PARFITT: Objection. Completely misstates what she's done in this case.

You can answer, Dr. Cote.

A Correct. And I told you why earlier, that that was an analysis that was looking at the two different groups. It was not trying to provide a risk estimate for a Black woman versus a risk estimate for white women.

There isn't biological basis for why we might see those differences in the estimates. I did not include those stratifications here.

BY MR. SPIRA:

Q Okay. Now, there are instances of exposures and outcomes that have been well established where there is a much higher strength of association; correct?

MS. PARFITT: Objection to the question. Vague. Broad. Undecipherable. Any other objection I can find.

MR. SPIRA: Yeah, "objection to form" would be fine.

MS. PARFITT: Well, a question that made some sense would be fine.

MR. SPIRA: Counsel --

MS. PARFITT: And I don't mean that with disrespect.

MR. SPIRA: Counsel, this has gone on --

MS. PARFITT: No, it hasn't gone on. Actually, it hasn't gone on. But when you ask a question like that, that is basically throwing in an ether as to what kind of response she's supposed to give, it's a little difficult on the other side to not respond.

If you could make a precise question that she could answer, that might move it along.

MR. SPIRA: I understand. And the correct response to that --

MS. PARFITT: Objection.

MR. SPIRA: -- under the rules is "objection to form."

MS. PARFITT: Objection to form.

MR. SPIRA: Thank you.

BY MR. SPIRA:

Q Are you aware that the hazard ratio for an association between smoking and lung cancer is around 10?

A I am very well aware of that. I wrote a dissertation about lung cancer.

Q Is that about right in terms of the hazard ratio?

A I would actually say it's probably somewhat lower, and it's dependent on various other factors, but we can go with 10. That is not outside the range of possibilities.

Q Okay. And that would be considered a strong association under this aspect of the Bradford Hill framework; correct?

A I'm not going to put a label of "strong" associated with a single number, even an imaginary hypothetical number from thousands of studies.

I will say that a 10-fold increase in risk is what you see associated with cigarette smoking and lung cancer.

Q Okay. Can you point to any literature that assesses a hazard ratio of below 2 to be a strong association that weighs in favor of finding causation?

MS. PARFITT: Objection. Form.

A Again, that is a terribly broad question. And I have not done causal association analyses of every factor known and every outcome known.

So again, you can't just look in isolation at a number. You know, you've got -- I'll go back to the smoking example. And I'll go back to my dissertation.

So I was looking at five -- seven single nucleotide polymorphisms, so small changes in five different genes. And we were finding odds ratios that were 1.1, 1.3, 1.4. And ultimately, those can be highly impactful in a population when that is a very common variant. Just

like -- and that's what -- that's what I'm here for. What does this do to the individual woman, yes.

But ultimately, what does it do on a population level. So those can be absolutely critical strong findings when you're looking at a disease like lung cancer that's also rapidly fatal. It's significant.

Whether it's more or less likely to be causal I don't think is the issue here.

BY MR. SPIRA:

Q Yeah, and I guess --

I guess what I'm saying is I absolutely agree with you that just because a hazard ratio is 1.1 or 1.3 or 1.4, like the example you gave, can be significant.

I guess my question is, would you consider a hazard ratio of 1.1 or 1.3 or 1.4 to have a -- to have a strength of association that weighs in favor of causation separate and apart from biological plausibility and other

considerations?

MS. PARFITT: Objection. Form.

A Again, this is what I have been struggling with this whole afternoon is trying to pull out a small -- I'm just going to it call it a small piece of the moon and ignore the rest of the whole moon.

That is not -- specifically, that is not what a causal analysis should be. It needs to be integration and incorporation of all of the factors that I've been talking about and that are included in these criteria, coupled with the seriousness of the outcome. That's the --

BY MR. SPIRA:

Q Okay.

MS. PARFITT: Let her finish.

A That is the big picture. Slicing and dicing is not. And Hill cautioned against it. And I think Fedak -- I keep saying that name differently every time, I apologize -- also does not recommend that this be used

as some sort of rule-in/rule-out sort of list checkmark.

BY MR. SPIRA:

Q Yeah. Understood.

So just to be clear, there's no -- there is no number, no hazard ratio, no --

A That's right.

Q -- no hazard ratio that you would -- that there is no -- let me start the question over.

There is no specific hazard ratio, no number that you would characterize as showing the strength of association or not showing the strength of association?

MS. PARFITT: Objection. Form.

If you can understand the question.

A No. I'm not going to put a single number and say "This shows strength of association or does not show strength of association." There is not a single number.

If it were that cut and dry, it

would be a lot easier, but it's not.
It forces you to look at the totality of all of the other information that's out there.
BY MR. SPIRA:
Q Can you point to any literature regarding the application of Bradford Hill's framework that assesses a hazard ratio of less than 2 as showing a strong association?
MS. PARFITT: Objection. The question was asked and answered multiple times.
A I did answer this question, and I did say that I have not done --
First of all, big publications just examining Bradford Hill criteria are not a large part of the body of scientific literature. These are not the kind of studies, if they did exist, that I would read on a regular basis.
So I have not looked at this question, so, therefore, that is going to continue to be my answer.

(Deposition Exhibit 16 was presented for identification.)

BY MR. SPIRA:

Q Let's mark Tab 34. And I don't know that we have this printed because it is like a thousand pages long. We do have it up on the --

MS. PARFITT: What is this, Tab 34?

MR. SPIRA: It's the Reference Manual on Scientific Evidence, Fourth Edition.

MS. PARFITT: Is there a specific page? It's a very large document.

THE WITNESS: I think -- I think they might be pulling it up here.

MS. PARFITT: But I'm just asking, is there a page?

MR. SPIRA: Yeah. Well, first, I was just going to ask some foundational questions on the first couple pages.

MS. PARFITT: Counsel, this is going to be a bit difficult because I don't have the document here. I'll move over here by Dr. Cote so I can see what you're putting on the screen.

THE WITNESS: That's okay. But you're about to roll over your computer.
MS. PARFITT: Okay. That's not good.
BY MR. SPIRA:
Q Are you familiar with this document that's up on the screen, the Reference Manual on Scientific Evidence?
A I probably need to see more of it, like different sections, to be able to say a hundred percent one way or another. But I do read and pay attention to a lot of the publications that come out of the National Academies.
Q Let's go to page 971 of the pdf. It's also the page number on the bottom of the page.
THE WITNESS: Can you guys in Zoomland do this for us?
MR. SPIRA: I think they will. It will just take a second.
A What page again?
BY MR. SPIRA:
Q 971.
A Okay. 971.

Q Do you see there's a section here on General Causation?
A Yes.
Ooh, got big.
Q Got big.
And the first sentence there says:
"Once epidemiologists conclude that an association exists, the next question is whether an inference of causation is appropriate."
Do you see that?
A I do see that.
Q Let's go to page --
MS. PARFITT: And I would object to the extent that the witness does not have a copy of the entire document. It's -- she can't see what's before; she can't see what's after. She can't see a table of content. So I would object to the document in its entirety because it's very difficult for her to respond.
With that objection, continue.
MR. SPIRA: Okay. And I'll just -- I'll point out that there have been use of

electronic exhibits throughout the litigation.

MS. PARFITT: Well, no. No, that is absolutely fine. But when it's a thousand-page document and you're just getting -- I don't -- I don't even think there's a question. You had to read something and said "Did it say that?" Is that the question?

MR. SPIRA: My question so far is just orienting us to the General Causation section. Yes.

MS. PARFITT: Well, it was a little bit more than that. You said:

"Once epidemiologists" --

(Reporter request for clarification.)

MS. PARFITT: My objection was it wasn't just referencing the witness. You referenced a specific portion of a thousand-page document and read it. And if "Is that what it says?" -- that's the question?

MR. SPIRA: You made your objection.

MS. PARFITT: Thank you.
BY MR. SPIRA:
Q Let's go to page 981. There's a section here that says Replication of the Findings.
Do you see that?
A I do see Replication of the Findings. Yes.
Q It says:
"Rarely, if ever, does a single study persuasively demonstrate a cause/effect relationship. It is important that a study be repeated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists."
Do you see that?
A I see that statement. I don't necessarily agree with it.
Q You don't agree with that statement?
A I don't agree with -- yeah, in --
As selected out here, without

the context of everything else surrounding it, I don't. And if -- you know, I will go back, since we're talking about Bradford Hill, I'll go back and say, you know, both here in his papers and in other things that have been written since, all scientific work is incomplete. This is directly from Bradford Hill, and this is the last paragraph in there:

"That does not confer upon us freedom to ignore the knowledge we already have or postpone the action that it appears to demand at a given time."

He doesn't say you have to have four studies, they have to all be in different populations.

Q Okay.

A A single study -- I will agree with the very first one:

"Rarely, if ever, does a single study persuasive demonstrate a cause/effect relationship."

Because a single study of epidemiology, is what I'm interpreting this, does not demonstrate a cause/effect

relationship.
MS. PARFITT: And Counsel, could I just have an identification of the date of this document, since I don't have it in front of me? What version? What year? What edition?
MR. SPIRA: It is the Fourth Edition. And I'm sure we can get the year.
MS. PARFITT: It was updated. That's why I'm asking.
MR. SPIRA: Copyright -- if we can go to page 2. Just to reflect for the record, this is copyrighted 2025.
THE WITNESS: Okay.
MS. PARFITT: Thank you so much.
BY MR. SPIRA:
Q Okay. Let's go back to your expert report on page 23.
Finding consistency under Bradford Hill's framework requires more than one epidemiological study on a given exposure and outcome; correct?
A I actually think that consistency can be interpreted both as

internal consistency as well as consistency with other findings.

Q Okay. Let's mark as an exhibit Tab 13.

MS. STEINER: Tab 34, Exhibit 16.

MS. PARFITT: We're on Exhibit 17. Exhibit 17. I'm sorry, you said Tab what?

MS. STEINER: 13.

MS. PARFITT: Okay. Good. Tab 13, Exhibit 17.

(Deposition Exhibit 17 was presented for identification.)

MS. PARFITT: So have we left this now?

MR. SPIRA: Yes.

MS. PARFITT: Okay. So we can pull that down. Thank you very much.

(Simultaneous discussion.)

BY MR. SPIRA:

Q You have the document in front of you there?

A I do.

Q Okay. This was your Amended Expert Report issued in the talc litigation; is that correct?

A Yes, I believe so.
Q Okay.
MS. PARFITT: Let's give the date of it. It's May 28, 2024.
BY MR. SPIRA:
Q Have you updated this expert report, as far as you know?
A I'm trying to think if I provided an update before the deposition this summer. Let's see. Does this one have -- I believe I've had one amendment here.
Q And what did that amendment pertain to?
A New data that had come in from the time that this was submitted and kind of the second deposition.
Q Okay. New -- analysis of new studies that have happened later in time?
A Correct. It was maybe a paragraph or two. It was not -- there were no substantial changes to my findings.
Q Okay. If we can go to page 36. It's pdf page 38. Actually, let's go one

page above that to 35.
And this is a section of this report where you similarly go through the Bradford Hill framework; correct?
A Correct. Yep.
Q And if we see at the very bottom of page 35, the heading Strength and Consistency?
A Yes.
Q And then that section follows onto page 36; correct?
A Yes.
Q Okay. And I'll direct you to the last two sentences from the first paragraph on page 36. It says:
"The second factor, consistency, is the assessment of other studies carried out in different populations. One cannot assess consistency for a single study, but several studies with similar measures of effect would be evidence that there is a consistent association between the exposure and disease."
Do you see that?

A I do. And, in fact, I think that it exists still, in the hair straighteners.

We have different studies in different study populations over different time frames. Not to the extent that we do in talc. We don't have 40 years plus worth of data as we do in talc, but it still exists.

Q And with regard to ovarian cancer in our current litigation, I'm now back to --

MS. PARFITT: Can we put this down?

MR. SPIRA: For now. We might come back.

MS. PARFITT: Thank you.

BY MR. SPIRA:

Q With respect to ovarian cancer, there is only one epidemiological study that assesses an association between chemical hair relaxers and ovarian cancer?

MS. PARFITT: Counsel, that was -- objection. Asked and answered. Several times.

A Yes. I mean, we have discussed

at length that the -- currently, the only epidemiologic study that exists is the White paper from the Sisters Study.

BY MR. SPIRA:

Q Okay.

Okay. And with regard to uterine cancer -- I completely understand all the caveats you've provided throughout the day. But with regard to uterine cancer, we have already discussed that Chang found a statistically significant association in the Ever use group, and Bertrand did not; correct?

MS. PARFITT: Objection. Asked and answered.

A Again, we could go back, and we can look at single hazard ratios and their 95 percent confidence intervals. We can talk about statistically significant versus a positive association, and so on and so forth.

I think that there are consistent findings in uterine cancer between the Black Women's Health Study and the Sister Study for uterine cancer.

That is my expert opinion from reading the entire text, manuscripts, backward and forward.

BY MR. SPIRA:

Q I appreciate that. I just -- I just want to clarify because my question was simply to confirm that Chang found a statistically significant association in the Ever use group whereas Bertrand did not.

And I understand your answer explained why -- you said -- you started by saying we could go back and we could look at that, but I don't think you answered my question as to whether that is correct, my characterization of that Chang found a statistically significant association in the Ever use group and Bertrand did not?

MS. PARFITT: Counsel, objection. Asked and answered. She has again given the explanation in a fulsome, fulsome manner. If you want to go through your response again, have at it. It's your time.

MR. SPIRA: I understand the response. I'm just asking "yes" or "no," is that correct?

MS. PARFITT: She gave you an answer. She gave you her answer. She did. Again, you don't like it. We can't help that, though, Dan. I mean sometimes --

I don't want to do a speaking objection. You don't like the answer, ask her again. She's going to give you the same long answer. It's your time.

MR. SPIRA: It's a "yes" or "no" question.

MS. PARFITT: It's not a "yes" or "no" question. She just -- did she answer that with a "yes" or "no"? No, because it's not a "yes" or "no" answer.

MR. SPIRA: She's allowed to give her explanation, but she still has to answer the question.

MS. PARFITT: Dan, the rules according to -- Mr. Spira, but those are not the rules. The rules are answer the question that you asked. She is required

to do that.
MR. SPIRA: Absolutely.
MS. PARFITT: She is. You just don't like of the way she's answering it.
BY MR. SPIRA:
Q Chang found a statistically significant association in the Ever use group; correct?
MS. PARFITT: Objection. Asked, answered -- it's argumentative at this point in time.
A My continued stance throughout the course of today is that picking a single hazard ratio and confidence interval and deeming it statistically significant or not statistically significant, and ignoring the multiple lines of data that support a biologically plausible rationale behind why we see an association, is not --
A single hazard ratio does not impact my expert opinion that hair relaxer causes uterine cancer. It does not change my opinion that hair relaxer causes ovarian cancer.

And to continue to be asked about a single hazard ratio plucked out of dozens of hazard ratios is not changing my opinion whatsoever.

BY MR. SPIRA:

Q I understand it's not changing your opinion. Right now, I'm not asking for your opinion. I'm asking for the factual findings from those studies.

MS. PARFITT: Objection. She has provided you with her best response to your question. It's been asked and answered, and now it truly is argumentative.

A At this point I could read --

MS. PARFITT: There's no -- there's no --

A Okay.

BY MR. SPIRA:

Q Well, let me -- what was the thought you were going to provide there? At this point, you could read the data from the studies?

A At this point, I could read these papers to you. It doesn't

necessarily mean that I would apply them in the same manner that you would apply them or another expert would apply them.

We can continue to just read data from here, or we can look at a comprehensive analysis that examined the totality of data.

Q You gave moderate to strong weight to the consistency factor -- excuse me, to both the strength of association and consistency factors; is that correct?

A Yes. That is correct.

Q What does that mean, moderate to strong --

(Reporter request for clarification.)

MS. PARFITT: "Moderate to strong weight."

Q -- weight.

A Yes. I felt that taken together, looking at all of the different hazard ratios, across the three studies, showed both strength of association and consistency in their findings.

Q Yeah. And so I guess I'm

asking when you say, "I gave moderate to strong weight to the strength of association and consistency," what does it mean to give those moderate to strong weight?

A Again, it's not weak. It's not -- it's when I'm doing this overall assessment, when I'm looking at the whole of the moon, I'm saying that I gave moderate to strong weight to these two factors when I considered my overall opinion.

This is my area of expertise. I understand how to look at these studies very, very well in terms of random error, bias, confounding. I feel like the studies are extraordinarily well done.

In fact, I don't even have to feel that. There's 750 articles out there using these studies.

So in my opinion, the evidence provided by these studies from two of the largest prospective cohort studies, it is moderate to strong weight. When I look at their findings, I say I see enough

evidence here to support a causal association.

Q Does moderate to strong weight refer to the strength of the evidence or the strength of the weight that you're giving to that evidence or both?

MS. PARFITT: Objection. Asked and answered.

A Yeah, it's -- I mean, moderate to strong weight in the total -- in consideration of the totality of the evidence. Compared to something like experimental data here, which bears no weight to because we can't do experiments on people where we expose them to hair relaxers and wait to see what kind of cancers or other reproductive, you know, system issues they have. That gets very low weight or even no weight. So that's me trying to fill in pieces of the moon.

BY MR. SPIRA:

Q Under Hill's description of specificity, it pertains -- in 1965 -- to whether there was a one-to-one relationship between an exposure and

disease; correct?

A Yes. Yes.

Q Under that 1965 formulation of the specificity criteria, it would not be satisfied here; right?

A According to Hill's criteria, no, it would not be satisfied. And this is one of the criteria that -- you know, Hill himself even noted that, you know, this -- as we developed more as a scientific community and we learned more about human biology and carcinogenesis, that he wouldn't -- he would expect this to fall.

And again, in a lot of the, you know, later papers that have also examined this specificity, that one-to-one relationship, isn't a strongly considered factor for a lot of it, just given what we know about carcinogenesis now versus 1965.

Q Have you seen the specificity criteria or guidelines describes in more recent years as an assessment of whether the available studies examine the specific exposure and outcome in question?

A I'm not sure what guidelines you're referring to. No.
Q You haven't seen specificity described that way?
A Not to my knowledge.
Q Okay. In the Temporality section, you say that while -- reading from the second sentence here, you say that:
"While conceptually simple, it can be more difficult to determine in diseases where there is a long latency period between the exposure and the onset of clinically apparent disease."
Do you see that there?
A I do.
Q And cancer would be one example of that where you don't know in a given person when the cancer was actually initiated; correct?
A When you're talking about uterine cancers or ovarian cancers.
Q Yeah.
A I would say that, yes, we don't necessarily know the initiation of

disease.

Q Okay. Biologic gradient, another way to -- another term for that is "dose response"; correct?

A Yes.

Q Under Bradford Hill's framework, a stronger or a clearer linear dose response is evidence of causation; correct?

MS. PARFITT: Objection. Asked earlier.

You may answer.

A Yeah. I'm looking at the Bradford Hill exhibit right now.

And he mentions that it can be difficult to quantify, but it is important to consider if it exists.

And as we discussed also in great detail, we have some evidence from, I believe it was the Sister Study, on dose, and in the Black Women's Health Study, which is, again, kind of not confounded. But the estimates are impacted towards the null based on this Light and Heavy reference group.

We don't see strong evidence of dose response, although I think there is some evidence of portions of that. So of the dose, which is kind of the four or more times used.

And again, I think some of the issues with dose response is we have truncated the tail of the number of years as well as the number of applications. So we have truncated it at 20. We don't go beyond that.

BY MR. SPIRA:

Q You note in this section of your report that no difference was seen between the Moderate and Heavy use groups in the Bertrand study; correct?

MS. PARFITT: Objection. Asked and answered.

A I do know that they have similar, yes, hazard ratios.

BY MR. SPIRA:

Q Yeah. I'm just reading it. It says:

"No differences were seen."

You see that there?

A Yep.
Q You do not cite in this section of your report the Bertrand data showing a lack of dose response based on duration of use or frequency of use; correct?
MS. PARFITT: Objection.
A And I just explained to you why I didn't because I feel like being that those data are truncated at the upper edges or ends of exposure, that it isn't -- it isn't a valid way of assessing dose response.
BY MR. SPIRA:
Q Under Bradford Hill's framework, that data from Bertrand showing a lack of dose response weighs against finding that an association is causal; is that correct?
MS. PARFITT: Objection. Misstates her testimony and the data.
A No, I don't think it does at all. And furthermore, I think probably even in the time of Bradford Hill, but certainly in the time now, we recognize things such as kind of a maximum dose that

you can reach and not expect to see a linear dose response relationship for very good reasons. Which is you hit the body burden of what your body needs in terms of initiation of the carcinogenic process at a fairly low or nonlinear dose.

Second to that, again, is that the Black Women's Health Study, again, does not really give -- they give the lower bound of exposure, but they are not giving full range of the upper bound.

BY MR. SPIRA:

Q Do you have any opinion as to the dose, the amount of exposure of chemical hair relaxers required to contribute to ovarian cancer?

MS. PARFITT: Objection to the form of the question.

A In my opinion, for a product or products that have actually, like, no medicinal values, they are not going to save your life, any dose that increases risk of developing -- especially ovarian, one of the most deadly cancers still today -- that there is no safe dose. That

would be my expert opinion.
BY MR. SPIRA:
Q Right. You said in your response "Any dose that increases risk of developing the condition."
So I guess I'm asking, are you able in this case to define what -- that dose that increases risk? Are you able to define that dose?
MS. PARFITT: Objection. Asked and answered.
A That would be absolutely unethical to do in a human population. To dose somebody with a mixture of chemicals that we know have properties that drive carcinogenesis and try to decide when or watch them develop cancer. Totally unethical, so no.
BY MR. SPIRA:
Q And I'm not suggesting otherwise. I'm asking if you have an opinion on the dose, not whether you would run a study on humans.
MS. PARFITT: Again, the question's been asked and answered. She's talked

about the tables.

If you can --

A Again, I think there is no dose here that can be said to be a hundred percent a safe dose or an -- a dose that doesn't have some sort of biological impact. And that goes back to the concern about the Black Women's Health Study that includes the light -- by their definition, lightly exposed women as part of their unexposed group.

BY MR. SPIRA:

Q Is your opinion the same with regard to both ovarian cancer and uterine cancer on this point?

MS. PARFITT: Objection. Asked and answered.

A With respect to -- let me just rephrase your question.

So with respect to is there a -- I'm going to use the word "safe" dose of these chemical hair relaxers with respect to ovarian cancer?

BY MR. SPIRA:

Q Yeah. Or do you have an

opinion as to what an unsafe dose is?

MS. PARFITT: Objection. The question was asked and answered multiple times in her discussion --

BY MR. SPIRA:

Q Yeah. And I'm just trying to clarify that your answer you gave is applicable to both ovarian and uterine cancer.

A Correct. I believe that there's no safe dose of a product that, again, has no medicinal value that has a lot of components that have been shown to increase different carcinogenic processes that can lead to ovarian cancer.

BY MR. SPIRA:

Q You note in this section of your report on page 25, in the second paragraph on Biologic Gradient, kind of two thirds of the way down, that paragraph, the sentence beginning "Additionally."

Do you see that there?

A Yes, I do.

Q You say:

"Additionally, it is possible that the main effects of the exposure happened during critical developmental periods that occur early in life, and anything afterwards does not continue to increase risk. In other words, a threshold of exposure is met at an early age."

Do you see that?

A I do.

Q And we saw that in Bertrand, there was no -- there was a lack of a dose response based on age of first use; correct?

A In Bertrand, it was only age at first use. It wasn't looking at kind of the combined age at first use and -- I'm going to use the word "intensity" of use. So number of doses and all of that. It was simply just looking at age.

Age does not capture, in whole, what you would need to look at whether they were being exposed during that window of opportunity necessarily.

And there's also probably

multiple windows of -- not opportunities -- "susceptibility" is a better word.

There's probably multiple time periods that include early childhood, adolescents while you're developing, perhaps even in utero.

Q And you don't cite that data from Bertrand in this section of your report; correct?

MS. PARFITT: Objection. Form.

A Which data are you referring to?

BY MR. SPIRA:

Q The data from Bertrand that looks at age at first use and the corresponding hazard ratio and confidence intervals for development of uterine cancer.

A No. Because I don't think age at first use captures dose response here at all.

Q Okay. In the last paragraph of this section, you conclude that there is:

"Some evidence of a

dose-response relationship between use of chemical hair relaxers and uterine and ovarian cancers."

And that you gave that this was a moderate factor in your assessment. Do you see that?

MS. PARFITT: Objection. Compound.

A Yes. Correct. I see where you're reading from, yes.

BY MR. SPIRA:

Q So you gave this less weight than strength of association and consistency; is that correct?

MS. PARFITT: Objection. Form.

A I -- it's overlapping. The other, I gave moderate to strong, and this is moderate. It is not necessarily like a stepwise thing here, either. Again, I'm just trying to build out my totality of the assessment. And this is moderate weight.

BY MR. SPIRA:

Q Yeah. And I guess that's what I was trying to get at, is how does moderate compare to moderate to strong?

A Again, they are overlapping.
Q Do you agree that the mere presence of a carcinogen in a product is not enough to make it biologically plausible that that product causes a specific cancer?
MS. PARFITT: Objection.
A That is too broad of a question. Can you be more specific?
BY MR. SPIRA:
Q Well, there are certain carcinogens that cause certain types of cancer and not others; right?
MS. PARFITT: Objection. Form.
A Again, that's your -- you're being very vague. There's certain carcinogens that cause certain types of cancers. Give me some examples.
BY MR. SPIRA:
Q I mean, we have talked about tobacco throughout the day. Tobacco causes lung cancer. It doesn't cause every kind of cancer.
A So again, I haven't done a total assessment of what it causes or does

not cause. But with very few exceptions, and we talked about one today about uterine cancer and tobacco smoking --

Q Yeah.

A -- tobacco smoke is associated with the vast majority of cancer types.

Whether there's a full causal assessment backing that, I don't have -- I don't have time for that.

But, yeah.

Q You've offered opinions in other litigation that exposure -- certain exposures to talc powder are associated with ovarian cancer; right?

A Yes. That's my opinion.

Q But you haven't offered opinions that talc powder causes other types of cancer; correct?

MS. PARFITT: Objection.

A I've not done that analysis. No.

BY MR. SPIRA:

Q Okay. Is there --

Is there anything you're aware of that is a universal carcinogen, meaning

it causes all types of cancer?

MS. PARFITT: Objection. Asked and answered.

A Yeah. I've not done a broad analysis of that, but I would think that potentially some types of radiation.

BY MR. SPIRA:

Q Okay. And so it's your opinion in this case that hair relaxers contain chemicals that are considered carcinogens; is that correct?

MS. PARFITT: Objection. Asked and answered.

A I think that these hair straightening products contain mixtures of chemicals, some of which have been identified as carcinogens, and some of which have been identified as things like endocrine-disrupting chemicals that have carcinogenic properties.

BY MR. SPIRA:

Q Okay. And my point is just as you've been saying, we have to look at the totality, the totality of the evidence. The fact that a product contains something

that's labeled as a carcinogen does not in and of itself mean that it causes specific types of cancer we're interested in; right? We have to do it -- we have to look at the data specific to those cancers?

MS. PARFITT: Objection. Form.

A Yeah. And I'm still not sure what the question is here. So I will try to reframe it into what I think you're trying to ask.

So just because something contains a carcinogen does not mean that it causes, in this case, uterine or ovarian cancer. Correct?

So an example of that might be bacon. That contains some sort of carcinogen. Does that cause ovarian or cause uterine cancer? Is that what you're saying?

BY MR. SPIRA:

Q That's kind of what I'm getting at. Yeah. The fact that bacon contains some carcinogen doesn't mean that it causes ovarian and uterine cancer?

A Correct. Just simply the presence of that does not necessarily mean that it causes one particular type of cancer or another type of cancer. It does, however, mean that it has the capability of initiating that process.

Q So sticking with that example. So I think we're on the same page that the presence of a carcinogen in bacon does not mean it causes uterine or ovarian cancer. Does the presence of a carcinogen in bacon make it biologically plausible that it causes uterine or ovarian cancer?

MS. PARFITT: Objection. Form. Confounding.

A So that would be kind of --

So again, to restate, the fact that there was a product that contained carcinogens and other things would be kind of my entry interest, so to speak, of, okay, it's -- there's one small piece of biologic plausibility that this item contains a carcinogen. That would be the start, I think, of a much broader exploration of different pathways that

doesn't have to be directly carcinogenic or mutagenic.

BY MR. SPIRA:

Q So it's --

Your starting point would be that it's a carcinogen, and then you would have to look further to see whether it's biologically plausible for it to cause the specific cancers that you're interested in at that time?

A I would explore what other types of evidence exist as well. Yes.

Q Okay.

A And certainly with a lot of these products that are known carcinogens, we don't necessarily have direct human research there. That's where you start relying on things like cell lines and animal --

(Reporter request for clarification.)

A -- models.

Q So one of the chemicals you refer to throughout your report is formaldehyde; correct?

A I refer to it a time or two in the report. Yes. It's my understanding that that, at least at one point of time in some of the products, it has been one of the chemicals in the mixture.
Q Do you know which chemical hair relaxer products contain formaldehyde?
A I do not.
Q Do you know the time periods at which any particular chemical relaxer products contained formaldehyde?
A I do not know the time frame that these products contained formaldehyde or any of the other mixtures of the dozens or hundreds of chemicals included in these hair relaxer products.
Q Do you know which chemical hair relaxer products contain formaldehyde releasers?
A No. I do not know the specific components and chemicals included in any specific hair product manufactured now, manufactured 20 years ago.
Q Do you know the quantity of formaldehyde contained in any chemical

hair relaxer product?
MS. PARFITT: Objection.
BY MR. SPIRA:
Q Now or in the past.
MS. PARFITT: Objection.
A Again, no. The data and the information, the product label, so to speak, for the dozens, hundreds of products that have been available to women over the last five or six decades, commercially available, I do not know how much formaldehyde was in those products. But from my reading, I believe that at least some of those products have contained formaldehyde at least in the past and perhaps in the current day.
BY MR. SPIRA:
Q What reading are you referring to?
A The reading that is all laid out in my expert report here of the different types of chemicals that are -- the chemical mixtures that are included in a lot of these products.
Q Do you agree that no

peer-reviewed publication has concluded that formaldehyde causes uterine cancer?

MS. PARFITT: Objection. Form.

A I have not done a full analysis looking to see if formaldehyde -- like if there's been association studies in humans with formaldehyde. It would be -- again, it would be tough to do like an observational study because we're not, at least knowingly, exposed to formaldehyde as a single substance where you could ask a person that, with possibly the exception of something like a pathology lab where they are managing or handling formaldehyde as a way to fix tissues.

BY MR. SPIRA:

Q You said you're not aware of any human data. Are you aware of any animal data showing that formaldehyde could be a cause of uterine cancer?

A To clarify, the human data specific to uterine cancer. Correct? Formaldehyde specific to human -- I'm sorry.

Yes. Specific to uterine

cancer in humans. And so now your question is, am I aware of it in any lab or animal studies?

Q Correct.

A I can read back through my report. But I did not do an overall assessment of formaldehyde, a single component in this mixture of chemicals, and uterine cancer or ovarian cancer risk.

Q Okay.

A I was not tasked with that.

Q Okay. You also refer throughout your report to endocrine-disrupting chemicals; correct?

A Yes, I do.

Q And endocrine-disrupting chemicals are an umbrella term for a class of chemicals that have many applications; correct?

A Correct. I believe that is very close to how I started my definition.

Q Yes. It might actually be verbatim.

Do you know how many different chemicals are considered

endocrine-disrupting chemicals?
A Dozens if not hundreds. And I think one of the interesting things with these chemicals is that they can change slightly over time. So it can be -- there can be various members of a certain class of these chemicals. And that can kind of change and evolve over time.
Q Would it surprise you if there were 1,000 or more chemicals that have been labeled as endocrine-disrupting chemicals?
MS. PARFITT: Objection. The question's been asked and answered.
A I guess it's depending on what time frame you're looking at. But no, it would not surprise me.
BY MR. SPIRA:
Q Okay.
A Again, given the fact that they can kind of morph and change over time.
Q Is it your opinion that if a product to which people are exposed contains one or more endocrine-disrupting chemicals, then it is, per se,

biologically plausible for that product to cause uterine or ovarian cancer?

MS. PARFITT: Objection.

A My hesitation is with the word "cause" again because we're talking about causal associations and everything that needs to be considered before you make a causal association.

But I would say that endocrine-disrupting chemicals as a class could be associated. And actually, I think evidence nicely suggests and supports the idea that these endocrine-disrupting chemicals interfere with your hormone system, with your endocrine system, through their ability to mimic estrogen and disrupt all sorts of bodily processes ultimately leading to carcinogenesis, especially in estrogen-sensitive tissues.

BY MR. SPIRA:

Q And that's your opinion regardless of what endocrine-disrupting chemical is at issue?

MS. PARFITT: Objection. The

question is asked and answered.

A Again, in this expert report, endocrine-disrupting chemicals -- I'm just going to call them EDCs to make everyone's life easier.

BY MR. SPIRA:

Q That's fine. Sure.

A You know, these EDCs, these are complex mixtures. And the Endocrine Society has laid out for the last couple of decades concerns. Particularly now, I think the issues have highlighted the potential additive effects of low levels of exposure to these EDCs that might be different than just looking at one single EDC at a time.

Q So your opinion is about mixtures of EDCs. Am I understanding that correctly?

MS. PARFITT: Objection.

You may answer.

A My opinion is about the chemicals that are found within these chemical hair relaxing products. And that includes, to the best of my reading

knowledge, EDCs.

BY MR. SPIRA:

Q Okay. So which EDCs are present in chemical hair relaxer products?

MS. PARFITT: Objection. Counsel, the question been asked and answered.

A Yeah. Again, if I don't have them listed here in my report, I'm not going to come up with them at this point in my day.

But there is parabens, there's phthalates, there's -- I mean I named -- those are two broad classes of them. All of those, to the best of my reading, are included in chemical hair straighteners.

BY MR. SPIRA:

Q And do you know which chemical hair relaxer products contain parabens?

MS. PARFITT: Objection. She's answered the question.

A Right. We had this discussion earlier that, no, I do not know which specific products contain which specific chemicals now or in the past.

BY MR. SPIRA:
Q Same answer with regard to phthalates? Same answer with regard to phenols?
MS. PARFITT: Same objection.
A Correct. I don't know what the specific components are. It's really just this mixture of multiple chemicals.
BY MR. SPIRA:
Q And I take it with regard to any particular chemical hair relaxer product, you don't know what type of parabens, types of phthalates, or types of phenols might be included; is that right?
MS. PARFITT: Objection.
A No. But I do know that there are still multiple types of EDCs included in these chemical hair relaxing products.
BY MR. SPIRA:
Q Do you know what amount of EDCs is contained in any chemical hair relaxer products?
MS. PARFITT: Objection.
A No. But again, I do know that there is some amount of EDCs contained in

these hair relaxing products.
BY MR. SPIRA:
Q Do you know if the EDCs are contained in the actual hair relaxing creme as opposed to other products sold in the kit?
MS. PARFITT: Objection.
A No. The consideration of these hair relaxing products is the entire part of the process. It is not just one or two of the steps. It's everything in the kit as a whole.
BY MR. SPIRA:
Q And the same question with formaldehyde. You don't know whether formaldehyde is contained in the actual hair relaxing creme versus other products sold in a hair relaxing kit; correct?
MS. PARFITT: Objection.
A When you say -- I mean, the products sold as a kit are sold together. So.
BY MR. SPIRA:
Q Right. I'm distinguishing, like, the actual hair relaxing creme

versus other things in the kit.
A The other steps in the process.
MS. PARFITT: Objection. That question was asked and answered as well earlier.
A Correct. Considering the hair product, even though there might be multiple steps and multiple different products, it's considered one exposure for the purposes of this expert report.
BY MR. SPIRA:
Q Okay.
MR. SPIRA: Let's mark Tab 20.
MR. SHIPMAN: Counsel, how much time.
MR. SPIRA: Why don't we go off the record.
THE VIDEOGRAPHER: Counsel, may we go off the record?
MS. PARFITT: Yes.
THE VIDEOGRAPHER: We're now off the record, the end of Media Unit 7, at 5:50 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We are now on

the record at the beginning of Media Unit8 at 5:52 p.m.
BY MR. SPIRA:
Q Okay. Let's mark Tab 20 as the next exhibit?
MS. STEINER: Exhibit 18.
(Deposition Exhibit 18 was presented for identification.)
BY MR. SPIRA:
Q All right. You've got Exhibit 18 in front of you. This is titled:
"BPA --
(Reporter request for clarification.)
Q "BPA, Parabens, and Phthalates in Relation to Endometrial Cancer Risk: A Case-Control Study Nested in the Multiethnic Cohort."
Do you see that there?
A I do.
Q Are you familiar with this study?
A I believe I am, yes.
Q This was a study conducted on

postmenopausal women. Are you aware of that?

A I'm familiar with the MEC cohort. I'm looking to see how they recruited because I didn't think it was recruiting all postmenopausal women. They restricted their --

Q In the Methods section, about six lines down, it says:

"This study included postmenopausal women."

A Okay. But, yeah, the MEC study is a larger group with not just postmenopausal women.

Q If we look at page 3, Table 2.

A Yes.

Q This table assesses the presence of various chemicals in urine samples and associations with endometrial cancer risk; correct?

A Yes, that's what Table 2 is showing, is tertiles of EDC metabolite exposure.

Q And almost all of the findings here are not statistically significant;

correct?
MS. PARFITT: Objection.
A So again, I'm looking at 25, at least, different odds ratios here. So to be able to say -- I mean, there's positive associations here, undoubtedly. Twofold increase in risk, 77 percent increase in risk and so on, and some in the opposite direction as well, yes.
BY MR. SPIRA:
Q Right. And very few that are statistically significant; correct?
MS. PARFITT: Objection. Question's asked and answered.
A Correct. And I think that the authors of this -- I want to mention that this is a research letter which does not allow for -- there's a word limit with a lot of these types of things that are -- they're original research, but they are not full papers.
So you put something in as a research letter if you've got limited data and -- or you have data that have some significant limitations that might impede

you publishing a full manuscript.

BY MR. SPIRA:

Q And some of the chemicals for which there's no statistically significant association include types of parabens; right?

MS. PARFITT: Objection. Misstates her testimony.

A Yeah. It does look like there's at least five.

BY MR. SPIRA:

Q And phthalates as well; correct?

MS. PARFITT: Wait. Excuse me. Misstates her testimony.

A There are -- those metabolites are included here. Yeah.

BY MR. SPIRA:

Q And let's turn back to your expert report.

A I want to point out on this that a limitation, a major limitation of this is that it was just a single spot urine. So it's one point in time.

And we -- actually, we don't

necessarily know how long -- I'm going to use the term "half-life." But how long these certain chemicals stay in your body. Some of them are probably very short; some of them are probably longer. And that's not really fully captured in these data.

So it does not surprise me that you're not seeing statistically significant associations here.

Q And you list this study as one that you considered in your expert report but not -- it's not one that you cite in your expert report; correct?

A Yeah, I don't believe. I did not rely on this for reasons stated.

Q Okay. On page 25 of your report.

A Yes. That's 26.

Q You make -- in the very last paragraph, you make one reference to "heavy metals."

A Yes.

Q I believe that's the only reference in your report to heavy metals. Do you have an opinion that chemical hair

relaxer products contain heavy metals?
MS. PARFITT: Objection.
A I do believe that I have read and that there are certain heavy metals, including like cadmium and lead, that are included in a lot of these chemical hair relaxer products.
BY MR. SPIRA:
Q And I take it you don't know which chemical hair relaxer products contain heavy metals or in what quantities; is that correct?
MS. PARFITT: Objection.
A Correct. I do not know which products might contain these heavy metals, nor do I know the quantities.
BY MR. SPIRA:
Q Would you agree that no peer-reviewed publication has concluded that heavy metals cause uterine cancer or ovarian cancer?
MS. PARFITT: Objection.
A I did not do a comprehensive study looking for the association between uterine cancer or ovarian cancer. Given

that -- I mean, this is an emerging area of research. There could potentially be data out there.

(Reporter request for clarification.)

BY MR. SPIRA:

Q You said you didn't do a comprehensive study looking for this association. Did you do any search for an association between heavy metals and uterine or ovarian cancer?

MS. PARFITT: Objection. Asked and answered.

A My studies and my -- or my process for how I approached this review are laid out here. And the search terms, as well, are also laid out here. And I did not use cadmium or lead as a specific search term.

BY MR. SPIRA:

Q Okay.

A My interest was looking at these hair products as a whole.

Q Okay. But sitting here today, you're not aware of a specific study

limited to those that you've obviously -- obviously limited to those that you've actually reviewed that finds -- that concludes that heavy metals cause uterine or ovarian cancer; correct?

MS. PARFITT: Counsel, objection. She just said she didn't do that as part of her review for this paper.

A Correct. I did not review single chemicals, heavy metals, formaldehyde, single types of chemicals that are included in these chemical hair products and the risk of ovarian or the risk of uterine cancer.

My task was to look at chemical hair relaxers as a whole.

BY MR. SPIRA:

Q Are there any particular chemicals that, in your opinion, are necessary to be present for hair relaxers to cause uterine or ovarian cancer?

MS. PARFITT: Objection.

A So what epidemiologists think of the word "necessary" may be differently as compared to other -- other disciplines.

And I am --

I can read the medical literature. I have read extensively in this area, but I'm not a toxicologist. So I'm not going to make a statement about one particular chemical that has to be included in the mixture of chemicals in these products.

BY MR. SPIRA:

Q Are you aware that formaldehyde, parabens, and phthalates are all present in numerous other products applied to people's bodies?

MS. PARFITT: Objection to the relevance of the particular report.

A I'm aware that these sort of -- I'm just going to group them together and call them "chemicals" -- are in other products. But I think the key here is just the route of exposure. And that's simply putting something on your skin might -- is a different route of exposure versus high pH chemicals that can break down kind of the protective barrier, the derma layer of your skin, and kind of sit

in a reservoir on your hair, in your hair shaft. It would be different than, same thing, inhaling the chemicals or eating the chemicals.

BY MR. SPIRA:

Q Yeah. But -- and you didn't do a comprehensive review of the potential for nonchemical hair relaxer products to enter the body; correct?

MS. PARFITT: Objection. Asked and answered.

A So my task here was not to rule in other sorts of products or to rule out other sorts of products. It was to examine the association between these chemical hair relaxers and uterine or ovarian cancer considering other potential confounding variables.

BY MR. SPIRA:

Q Right. And because that was not your task, it's not something that you did; right?

MS. PARFITT: Objection. Counsel, she's answered the question.

MR. SPIRA: She said it wasn't her

tasks. I'm just trying to get a clear record that it was not something she did.

MS. PARFITT: Counsel, it's late in the day.

MR. SPIRA: Exactly.

MS. PARFITT: And you keep asking the same questions. So I am trying to move it along. Get some new territory.

A Correct. My -- what I did as my review was to examine chemical hair relaxers and their potential association and causation of uterine and ovarian cancer. Certainly, some of my review included a multitude of other products because, as we discussed earlier, good epidemiologic methods, you design your studies to look at multiple exposures, particularly those that you might expect to confound associations.

So I have read a lot about these other types of products and methods of exposure, but my opinions here, based on the biologic plausibility about the route of exposure, about the high pH, the chemicals that are included in these

mixtures, that's where my opinion lies.
It's not about these other products.
BY MR. SPIRA:
Q On page 26 of your report, in the Coherence section, you say in the second-to-last sentence:
"By definition, a chemical that is labeled as a carcinogen would support coherence."
Do you see that there?
A Yes. I agree.
Q So would you say that no matter what cancer outcome is being evaluated, if a product contains something that has been labeled as a carcinogen, coherence is established?
MS. PARFITT: Objection.
A So again, I'm not quite sure that I am understanding the point of your question very much because, again, we're talking about multiple factors here in this framework of Bradford Hill, coherence is one.
So again, this might be limited by scientific knowledge. In my opinion,

to get back to the expert report, it gives evidence for coherence which is part of causality, but it doesn't give evidence for causality.

Q Okay. You did not cite the -- well, we've already established you did not cite the Sarink article in this section of the report, and you already explained the reasons for that; correct?

A Yes. Yes. Just to refer you, that's this research letter that was -- I don't remember which --

Q The most recent exhibit.

A The most recent exhibit. Yes.

MS. PARFITT: It was Exhibit 18.

MR. SPIRA: 18. Thank you.

MS. PARFITT: Of course.

A Yes. Correct.

BY MR. SPIRA:

Q We previously discussed that the White and Chang studies both did not find statistically significant effects in hair dyes, bleach, highlights, hair permanents.

Do you remember that

discussion?

A It was a while ago, but I -- if I recall correctly, so let's see, White and Chang?

Q Right. Both of them --

A Both of them, the Sister Study.

Q Okay.

A I do believe.

MS. PARFITT: Chang is 11. White is 8.

THE WITNESS: White is 8.

MS. PARFITT: While you're doing that --

A So actually, I believe White examined -- had a statement about permanent hair dye as well. They did. Not in the overall findings. But in their nonserous ovarian, they recorded a 1.90 hazard ratio with a 1.03 to 3.51 confidence interval.

BY MR. SPIRA:

Q Are you aware that hair dyes, bleaches, highlights, and hair permanents often contain endocrine-disrupting chemicals?

MS. PARFITT: Objection. Form.

A I am aware of that, but what I think is potentially lacking in terms of the biologic plausibility would be, again, the mechanism of how the product enters the body.

So the high pH that is needed to break the chemical bonds in the hair also breaks down the dermal layer and allows for the absorption. And I think as we saw in one of the studies, it breaks down the dermal layer so much in some of these users of the product, that it literally burns their scalp.

BY MR. SPIRA:

Q Have you studied in connection with your report whether there were mechanisms through which hair dyes, bleaches, highlights, and hair permanents could enter the body?

MS. PARFITT: Objection.

A Were there mechanisms through which -- no. My focus of the report was and continues to be on chemical hair relaxers and how they may enter the body.

BY MR. SPIRA:

Q Okay. In the Experimental Evidence section of your report on page 26, you note that obtaining experimental evidence is not feasible here; correct?

A Correct --

Q Okay.

A -- in humans.

Q And so that factor is not satisfied --

That experimentation, experimental evidence is not available here as that term is defined in Bradford Hills' framework; correct?

MS. PARFITT: Objection.

A Correct. I did not consider experimental evidence in terms of as I give this example here, one of the ways you could do it is to just completely discontinue chemical hair relaxers, and then it would be a very long wait, but wait to see if you saw reductions in these two cancer types. And that would take decades and, frankly, just isn't feasible.

BY MR. SPIRA:
Q Okay.
A It's not possible to assess in humans.
Q In the Analogy section of your report on page 26, you refer to the association between cigarettes and lung cancer as analogized to cigars and lung cancer.
Do you see that section?
A Yes. Yes, I do.
Q You're not suggesting that the evidence of association between chemical hair relaxers and uterine or ovarian cancer is as strong or robust as it was -- as it is between tobacco and lung cancer; correct? That's not the analysis you're doing here?
A No. I'm using the cigarette and cigar examples as kind of an analogy of similar products.
What I am also talking about here, though, is in terms of the analogy of feasibility and biologic plausibility, it's kind of what we know about the

relationship between estrogen and obesity and in some of these cancers, including uterine and ovarian.

So it's two different analogies here. One is of the actual exposure, and the other is, does it fit in, does it make sense with what we know about the biological pathways.

Q Are you aware that when the surgeon general determined that smoking caused lung cancer, there were 29 case-control studies and seven cohort studies showing statistically significant effects?

MS. PARFITT: Objection.

A As I mentioned, yes. Lung cancer was one of my areas of research as a graduate student.

I would also say that that was a lost opportunity, and there's been incredible modeling. Like, when I say "modeling," like big statistical analysis modeling. What would have happened, how many lives would have been saved if they would have literally done what we're

talking about here, an experimental pulled tobacco off of the shelves. The literally millions upon millions of years life lost in people if they would have acted at that first report versus waiting another decade plus to accumulate all of that evidence.

And again, this is part of Bradford Hill's little talk is, there is no set amount of "you need to hit" -- how much is enough? He doesn't put constraints on that. He says "Use what we know today, and make your decisions and your public health interventions from there."

BY MR. SPIRA:

Q Are you offering opinions in this case about whether hair relaxer products should be pulled from shelves or -- I'll leave it there.

MS. PARFITT: Objection.

A Yeah. It is outside of my realm of thinking as to what pulls a product from the shelf or not. It is my expert opinion that these are agents that have really no overall benefit to society.

So there is -- this is not a drug that's curing cancer here or something that's reducing your risk of heart disease. It is something that is for cosmetic use only, has no direct benefit to the person using it, and has potential negative health outcomes, reproductive cancer included in those.

And that consumers should be aware of what these potential risks are.

As to whether it stays on the market or not is not part of my report. No.

MS. PARFITT: I'm going to stop. We, I believe, are at seven hours.

THE VIDEOGRAPHER: (Nods head.)

MS. PARFITT: Let's go off the record for a second.

MR. SPIRA: We can go off the record.

THE VIDEOGRAPHER: We're off the record. The end of Media Unit 8 at 6:13 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We're now on the

record, beginning of Media Unit 9, at 6:15 p.m.

CROSS-EXAMINATION,

QUESTIONS BY MICHELLE PARFITT:

Q All right. Dr. Cote, I have a few questions for you. I appreciate your time here today.

I'm going to jump around. We covered a lot of material over the last seven hours, so I will be jumping around. So try to stay with me, too, so we can get through this and get you home.

At the very start of this deposition oh-so-many hours ago, Counsel asked you what you were not. And you recall that you were asked whether you were an expert in toxicology, endocrinology, endocrinology disruption, chemistry, all the other disciplines.

Do you recall that series of questions?

A I do.

Q All right. I understand you may not be board certified in those particular medical specialties, but as an

epidemiologist who's been practicing over 25 years plus, what is your experience in addressing those other disciplines of science for purposes of your research and academic work?

MR. SPIRA: Object to form.

A Sure.

So there is didactic training in degrees, as you mentioned. And as you stated earlier, I'm an epidemiologist. I also spent about 20 years in a Department of Cancer Biology when I was at Wayne State University. I think I've graduated -- I was on a dissertation committee for somewhere around ten students but led two cancer biology dissertations.

So I have a very strong working knowledge and ability, most importantly, ability to read the literature in all areas of cancer biology.

I was also a core faculty member for what's called a P-50 grant. It's a program project grant that was sponsored by the National Institute for

Environmental Health Science. And there I served as their -- we had working groups within there. And I served as their environment and cancer working group leader. So again, we reviewed a lot of literature.

I had a lot of discussions with people. In fact, most of my collaborators in those areas are not epidemiologists. They are toxicologists, endocrinologists. Even within my cancer work, I work with a lot of pathologists and a lot of bioinformatics and biostatistic people.

And so I really feel like from all of the work I've done over the last now 20, 25 years, I'm in a -- I understand the literature in a wide variety of areas. And that's part of what epidemiology is, is trying to pull together data from a lot of sources and apply it to human health.

BY MS. PARFITT:

Q All right. Specifically, you were asked whether or not you were an expert in the field of chemical hair relaxers.

Do you recall that question?

A Yes, I do.

Q Are you an expert in the field of whether or not chemical hair relaxers can cause ovarian cancer and uterine cancer?

MR. SPIRA: Object to form.

A Yes. I'm not even sure what an expert in chemical hair relaxers is or if one exists. I mean, would that be a person who works in a beauty salon and applies these products? That person can consider themselves as an expert.

But what I am at the end of this process, and after hours upon hours of reading, is I feel I am well equipped to render an expert opinion as to whether chemical hair relaxers are a cause of uterine cancer or are a cause of ovarian cancer.

BY MS. PARFITT:

Q You were asked several questions about risk factors for both ovarian cancer and uterine cancer.

Do you remember that

discussion?
A I do.
Q All right. Are chemical hair -- and let me retract that.
And there are things known as modifiable risk factors and nonmodifiable risk factors; correct?
A Yes, that's correct.
Q What's the difference?
A So -- and we discussed this briefly, I believe, earlier. A modifiable risk factor is something that you can change. It's something modified; it's something you can modify. So it would be things like whether or not you use oral contraceptive pills would be a modifiable risk factor. Whether you smoke is a modifiable risk factor. And certainly, whether you use chemical hair relaxers is a modifiable risk factors.
A nonmodifiable risk factor would be something like aging. That is, your age is a nonmodifiable risk factor. To some extent, certainly pregnancy is, and number of pregnancies is not a

modifiable risk factor. So that's the difference between the two.

Q And to clarify the record, you just stated, you testified that chemical hair relaxers are, in fact, modifiable risk factors. Is that for both ovarian cancers and uterine cancers?

MR. SPIRA: Object to form.

BY MS. PARFITT:

Q And let me break it down. Are chemical hair relaxers a modifiable risk factor for uterine cancer?

A Yes. Chemical hair relaxers are a modifiable risk factor for uterine cancers.

Q Are chemical hair relaxers a modifiable risk factor for ovarian cancers?

A Yes. Chemical hair relaxers are a modifiable risk factor for ovarian cancers.

Q You were asked some questions early on about racial disparities and their relevance to epidemiology.

Do you recall that question?

A I do.
Q What are, if they are, racial disparities relevant to?
MR. SPIRA: Object to form.
A Yeah. More specific about the "relevant to."
BY MS. PARFITT:
Q Do you have an opinion as to whether or not racial disparities impact the epidemiological studies that you have reviewed for purposes of your opinion here today on chemical hair relaxers and ovarian cancer and uterine cancer?
MR. SPIRA: Object to form.
A So my overall opinion that uterine cancer or that -- I'm sorry, chemical hair relaxers are a cause of uterine cancer and chemical hair relaxers are a cause of ovarian cancer does not differ by race.
I do think one of the things that we have discussed at length today is the information that's available in different racial and ethnic groups. And I will say that uterine cancer, much like

triple-negative breast cancer, is a more aggressive disease in Black women. They tend to get high-grade tumors that behave much more like ovarian cancers where the overall five-year survival is 50 or 60 percent. And those survival rates have not changed much over time.

There's less research in the area of women's health in general, uterine cancer in particular, and even understanding potential differences in ovarian cancer survival, which is much worse in Black women, is very, very understudied.

So those things bring us to where we are today in terms of the amount of -- the amount of literature that's available. But with that said, I am confident in the studies -- in the Sister Study and in the Black Women's Health Study -- with respect to their findings, given the caveats that I have talked about that an association exists between use of these chemical hair relaxers and these two gynecologic cancers.

BY MS. PARFITT:
Q You were asked several questions about the presence of chemical hair relaxers that were stated in the various studies that you reviewed, Chang, White, and Bertrand.
Is it your opinion that the women in the Sister Study, which would have been the Chang and the White studies, were exposed to chemical hair relaxers?
A Yes. It is my opinion that the women in the Sister Study as a whole were exposed to chemical hair relaxers. Yes.
Q Similarly, is it your opinion that the women in the Black Women's Health Study and the publication, Bertrand, that evolved from that, were exposed to chemical hair relaxers or straighteners?
A Yes. I also believe that the women in the Black Women's Health Study were exposed to chemical hair relaxers and straighteners.
Q I'm going to talk to you for a little bit about some definitions.
Throughout the course of your

testimony, you talked quite a bit about null; that the hazard ratios trended towards the null.

What do you mean by that?

A Yeah. When I say something trends towards the null, it means that if you look at a null being 1, you know, higher numbers, 1, 2, 3, 4, 5, to the right and fractional numbers to the left, that when I say something is -- you know, that it underestimates the association or drives it towards the null, I mean it drives it towards 1.

So instead of the association being 2.5, it actually comes in at a 1.4 or a 1.1. So again, these are numbers that are just -- I'm using them for descriptive purposes only. They are not -- I'm not suggesting that those numbers were something that I analyzed from these data. So it's a reduction in the hazard ratio. So instead of saying you've got a twofold increase in risk, it's only 1.2-fold increase in risk.

Q So it actually underestimates

the risk to the population from the exposure; is that correct?

MR. SPIRA: Object to the form.

A Yes, it would. It's absolutely an underestimation of risk when something -- whether it's bias being introduced into the study or something else, when I say it's driving the association towards the null, it is underestimating the risk in the population.

BY MS. PARFITT:

Q All right. You used the word "novel," I believe, several times throughout the course of your testimony. When you use the word "novel," does that term mitigate against the scientific reliability of a study?

A No. I mean, as scientists and researchers, I think, kind of across the spectrum of disciplines, we want to publish novel findings. We don't necessarily want to publish a lot of repetitive data.

In the field of epidemiology,

we do repeat studies. And that is just kind of part of our field.

But still, being able to say that there's a novel association doesn't mean that there hasn't been a lot of other underlying work. You know, I always, when I talk to basic scientists, I say, you know, I hope my work in humans informs their work in whatever model system they want to work within and vice versa.

So the work that is being done by our basic science colleagues informs what we do in epidemiology and vice versa.

These novel associations don't mean that they are novel ideas. This idea that -- I'll use EDCs as an example. The Endocrine Society has been looking at this issue for decades, and there's been evidence trying to examine what are the impacts of these EDCs on human health? This is decades worth of work. This just happens to be a novel association in this particular single study.

Q All right. You also were directed by Counsel to narratives and the

various studies, Bertrand, Chang, White, where the statement was made by the investigators, "More research is needed."

Do you recall that discussion?

A Yes, I do.

Q What does that mean to someone as an academic in research as yourself, "more research needed," and, frankly, in your profession?

A Sure. Sure. And I think I say, you know, it somewhat flippantly that almost every epidemiologic study, and actually almost every scientific study, will end their paper saying that more work is needed in the future. And really, what it's talking about is things like future directions of work, how can -- our work all builds on each other. And that's the beauty of science.

And so when I say future work is needed, it might be so that I can adequately examine, you know, a particular population or so that I can -- not me personally, but so that the field can better define the exposure or better

define the outcome. It's not saying we need to do another 15 of these exact type studies.

Q Thank you.

Similarly, you were asked numerous questions about your use of the Bradford Hill framework; correct?

A Yes.

Q You remember those questions? All right.

Does the Bradford Hill framework also ask that the scientist use scientific judgment?

MR. SPIRA: Object to form.

A I think the basis of Bradford Hill is that this is all scientific judgment. That, again, he doesn't lay out and say "These are things that must exist, that you must consider." For him, this was all just kind of a thought exercise.

I think he actually errs less on the side of caution. He's saying "Don't let insufficient evidence in your mind in one area preclude all of the additional evidence in all of these other

areas."

So, you know, everybody -- scientists who have been trained in this -- everybody interprets Bradford Hill somewhat differently.

And again, just because there is no checklist, just because one condition isn't fully 100 percent met in one person's opinion doesn't mean that another person is going to say that's okay.

BY MS. PARFITT:

Q All right. Similarly, you were asked about statistical significance. In particular, you were directed to various tables in studies: Chang, White, and Bertrand.

Do you recall that exercise?

A I do.

Q All right. Does the fact that you have opined or given an opinion that some of those tables that you were referred to did not demonstrate a statistical significant result, does that -- what relevance does that have to

your opinions?
A I'm going to rephrase the question.
Q Sure. You do a better job.
A Mostly I got distracted by the Wi-Fi dying, I think, on your iPad.
Q That's all right. I can rephrase if you like.
A Are you asking me --
Q Why don't I rephrase it.
A Yeah.
Q During the course of your testimony, there were several tables that you were referred to, and you were asked specifically whether the relative risks were statistically significant or not statistically significant.
Do you recall that?
A I do.
Q All right. What was the -- what is the relevance to a nonstatistical finding in those tables?
A I'm not sure that helped clarify the question here. But, you know --

But so as you probably heard from me saying repeatedly today, picking one hazard ratio, one confidence interval, determining whether it's statistically significant or not, is a tiny piece of the overall pie.

And considering just that piece in isolation is detrimental to understanding the paper, the single manuscript as a whole, and also ultimately to understanding -- or not understanding, but developing an opinion in the area.

And simply, the absence of a statistically significant association does not mean an association does not exist.

Q All right. And that's probably better what my question should have been. The absence of the statistical relation does not mean that that evidence is not relevant to the study issue?

A It does not -- I'll go a step further and say just because something isn't statistically significant, it can still absolutely be relevant, and it can still absolutely be a true association.

Q And the fact that some of those relative risks were not statistically significant, did that alter in any way your opinions in Chang, White, and Bertrand that the study findings demonstrated that exposure to chemical hair relaxers can cause ovarian or uterine cancer?

A No. Overall, the lack of statistical significance in some of the -- in some of the analyses, did not impact my overall opinion with respect to the causality -- with respect to causality.

MR. SPIRA: Counsel, I just want to flag. Apparently the Zoom is down or frozen for everyone. Not just in this room.

MS. STEINER: We all lost service.

MR. SPIRA: Do we know if it's working elsewhere?

THE REPORTER: Do you want to go off the record?

MR. SPIRA: Sure.

THE WITNESS: So you guys saw it too?

THE VIDEOGRAPHER: We're at the end of the Media Unit 9 at 6:35 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are now on the record, the beginning of Media Unit 10, at 6:48 p.m.

MS. PARFITT: Thank you.

BY MS. PARFITT:

Q Dr. Cote, before we were cut off --

THE WITNESS: Microphone?

BY MS. PARFITT:

Q Dr. Cote, before we lost connection, we were talking about certain definitions. The last one I'd asked you about is you've used several times the word "dose response."

What is the metric for measuring the relative risk of exposure in the hair relaxer you use. Is it -- you've mentioned duration. You've mentioned frequency. What is the metric that you use for purposes of defining what is a dose response?

A Yeah. So the metric would be

determined by what the actual exposure is. So I'm using this in the case of hair relaxers, a metric that you would want to see would be -- interestingly, it has elements of all of the pieces that have been collected here between the studies.

But the age at first use, you would like to look at the number of years of use, and then you would like to look at the number of applications per year.

And understanding that you may have to, for the sake of people who are answering these questions, break that down into some sort of categories. In a perfect world, what you would get was the yearly number of uses used in the number of years over the entire lifespan of a person. But that may not be feasible to collect in this type of study.

Q All right. Dr. Cote, do you have an opinion to a reasonable degree of certainty whether women who are exposed to chemical hair relaxer during a premenopausal phase of their life or stage of their life are at increased risk of

ovarian and uterine cancers?
A So you -- when you're saying they were exposed to chemical hair relaxers --
Q Right.
A -- you're saying during their teenage years or childhood years or their 20s?
Q Right.
A So the exposure still precluded the onset of disease -- potential onset of disease.
Yeah, my opinion would hold; that I cannot imagine many reasons from a biological perspective where you would see wide differences between the groups. The mechanisms would still be the same.
I will say that for premenopausal women, they potentially still have some protections just in terms of, like, their hormones. They may be somewhat protected from it just with progesterone and some other circulating hormones.
The other would be even younger

women by the very nature don't have the opportunity to be as exposed, so to speak, as older women; that it is very hard to disentangle, like, the duration of exposure with an aging person.

But from a biological perspective, I would not see any reason that the overall association doesn't hold for all groups.

BY MS. PARFITT:

Q All right. Premenopausal and postmenopausal.

A Postmenopausal. Yes.

Q Dr. Cote, you were asked by Counsel whether it would be helpful to have more powerful studies in order to strengthen the opinions you've shared with us today. Is that something that you believe, as a scientist and researcher and an expert in this area, feel you need in order to render the opinions you have today?

MR. SPIRA: Object to form.

A No. The opinions that I've rendered today, unless there was new

evidence introduced to the contrary, there aren't additional single studies that I can think of that I would say we need to have that would influence my opinion. And my opinion is that I believe that there's a causal association between ovarian cancer and chemical hair relaxers and uterine cancer and chemical hair relaxers.

BY MS. PARFITT:

Q There was a lot of time spent today talking independently of Chang, White, and Bertrand by Counsel, and you were asked lots of questions about those studies.

What is the significance to you as an expert in this case -- strike that.

How do the Bertrand, Chang, and White studies inform your opinion with regard to whether or not, one, chemical hair relaxers can cause ovarian cancer? And the follow-up question, how do Bertrand, Chang, and White inform your opinion as to whether or not chemical hair relaxers can cause ovarian cancer?

MR. SPIRA: Object to form.

A So I may ramble here and not directly answer this question. But these are two very large studies containing tens of thousands of women in different populations over slightly different periods of time in terms of the years of enrollment, although both studies are still ongoing.

They are -- they were -- they are well-maintained cohorts. I guess what I mean by that is they have worked very hard to limit lost follow-up. They are missingness of data points is very small. So these are really good, solid studies.

The data that they present supports association between the chemical hair relaxers and ovarian cancer, chemical hair relaxers and uterine cancer, and overall supports my opinion that it is causal relationships exist that uterine cancer -- sorry -- that chemical hair relaxer can be a cause of uterine cancer and chemical hair relaxers can be a cause of -- uterine cancer? Did I say that twice?

BY MS. PARFITT:

Q You said --

A Uterine and ovarian cancer, yes.

Q Since the publication of Chang and Bertrand, are you aware of any other independent peer-reviewed studies, cohort studies, any type of novel work that has -- involving a cohort, that has refuted any of the findings of Chang, Bertrand, and White that you've studied?

A No. I have -- I am unaware of any studies that have refuted the findings in those manuscripts. I believe there was one kind of letter to the editor that may have addressed the Chang paper. And the points that were made in that letter, the authors of that Sister Study analysis responded to in ways that I found to be convincing, and I agreed with their conclusions.

Q All right. For purposes of your opinion, did you consider studies that not only supported the opinions that you have rendered here in this case, but

also those that perhaps were adverse to the opinions you hold in the case?

A Well, sure. I mean, I just gave an example of one which was the letter to the editor that directly -- that directly, point by point, went over that paper.

I've also looked at a couple of the kind of reviews that have been done. I hesitate there to say systematic or whatever because they are not necessarily described very well.

And so I have read those reviews, too, and those reviews tend to just say there's no association between chemical hair relaxers and ovarian cancer and chemical hair relaxers and uterine cancer.

But again, I put less weight in those just simply because they are just kind of a summary and a regurgitation of the actual science and the analysis that went on in the specific study publication.

Q All right. Was there anything that Counsel shared with you today or

asked you today that changes in any way the opinions you hold that chemical hair relaxer exposure can cause ovarian and uterine cancers?

MR. SPIRA: Object to form.

A No. There were no questions. No part of this process today changed my overall expert opinion that these chemical hair relaxers are a cause of uterine cancer and are a cause of ovarian cancer.

BY MS. PARFITT:

Q You were asked early on what expert reports of the defendants that you had an opportunity to read. Do you remember that question?

A Yes.

Q I believe you shared with us that you read the report of Dr. Weed and Dr. Adams-Campbell. Do you recall that?

A Yes, I do.

Q What, if any, opinions do you share with us with regard to the opinions that were rendered by -- we can first talk about Dr. Weed?

A Yeah, sure. So I did read his

report which, more or less, read as just a rebuttal to my report. And I fundamentally disagree with him on several areas, including just the overall premise of well, you know, you can't do a Bradford Hill-type of analysis if you don't have a statistically significant association. I completely disagree with that.

I also think -- and again, I don't know Dr. Weed personally. But looking at his CV and things, he hasn't done this kind of work. He --

Q What do you mean "this kind of work"?

A "This kind of work," I'm pointing to paper. Sorry.

He has not developed stuff to -- again, this is my review of his CV and his web page. You know, he does not participate in the development of the analysis of -- and that's both the statistical analysis as well as just the overall analysis, he's not writing papers like the Chang paper, like the White paper, like the Bertrand paper.

He seems to write a lot of opinion papers about how one should go about assessing causality. But he really hasn't been in the academic trenches doing this sort of work.

And so I kind of read it and thought, well, you know, I tried to consider, "Does he have some points here?" And, you know, overall, I disagreed.

And I didn't really consider many of his criticisms to be valid. And they certainly didn't change my mind about my work.

Q Or your opinions?

A Or my opinions.

Q All right. Similarly, having read the report of Dr. Adams-Campbell, what are your opinions with regard to those opinions that Dr. Adams-Campbell holds as it relates to exposure to chemical hair relaxers in ovarian and uterine cancer?

A As I said, I've known Dr., you know, Lucille Adams-Campbell for probably at least 15 years now. And she has, at

least in the more recent past, focused more of her careers on implementation science and things like screening and that in different populations. She has somewhat of -- more of her work has been in breast cancer, less work in female reproductive cancers.

And I was surprised by some -- that some points in her -- in her document, in her expert report, again, kind of the fixation on statistical significance.

There were some other minor points in there that she brought up that I didn't feel made any sense in terms of what we were reviewing in terms of epidemiologic studies. We were both reviewing, but we found the same papers. You know, I think we had the same overall opinions on, you know, the study quality and, you know, overall.

More lights are going out here.

Yeah. But overall, I mean, I read her opinions. Again, none of them moved me to change my opinions on the case

and on the review.

And some of them were a little bit antiquated. And I think I'll leave it at that.

BY MS. PARFITT:

Q All right. You were asked -- hopefully this will be the last question -- about the kits, the hair -- chemical hair relaxer kits, and what you understood the active ingredient -- or, excuse me, the active ingredients to be.

Do you remember that series of questions?

MR. SPIRA: Object to form.

A Yes.

BY MS. PARFITT:

Q Okay. What is your understanding of what's contained in those kits, and specifically whether or not those kits contain EDCs and carcinogens?

A Yeah. My understanding of what is contained in those kits and whether, you know, what specific product it is in terms of whether it's what neutralizes, you know, the other solution, whether it's

a conditioner, it's the totality of everything that is in that kit contains chemicals that could be defined as endocrine-disrupting chemicals, as well as other things.  And again, at various points in time, various types of products could contain things such as formaldehyde and other carcinogens.

That is what is in the kits. It's considering them as a whole that these are really complex mixtures of a large number of chemicals.

That is my understanding.

MS. PARFITT:  I don't believe at this time I have any further questions, Dr. Cote.

MR. SPIRA:  I'm sorry.  I didn't hear you.

MS. PARFITT:  I said I don't recall if I have any further questions.

MR. SPIRA:  Can we go off the record for 30 seconds?

THE VIDEOGRAPHER:  We are now off the record, the end of Media Unit 10, at 7:05 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We are now on the record, beginning of Media Unit 11, at 7:07 p.m.

REDIRECT EXAMINATION,

QUESTIONS BY DANIEL A. SPIRA:

Q Dr. Cote, you said a few minutes ago that you found some of Dr. Adams-Campbell's opinions to be antiquated.

Do you remember that?

A I do.

Q What did you mean by that?

A I think some of -- perhaps not opinions. I didn't mean to say her opinion. But some of the criticisms she brought up or even some of -- not even criticisms, but some of the areas that she brought up in her report aren't kind of the standard way of thinking anymore. And the biggest, most glaring one to make, I know you'll probably follow up and ask -- is an over -- in my opinion, an overreliance on statistically significant

findings. And that's one.
Q Any others besides that one?
MS. PARFITT: Objection.
A There were some -- maybe "antiquated" is not quite the right word. But there were some inconsistencies in terms of she talked some and tried -- and presented some data from the Surveillance Epidemiology and End Results, or SEER, S-E-E-R, program. And said that this is the CDC's program. It's not. It's a program that was established by the National Cancer --
THE REPORTER: I'm sorry. There's a lot of extra noise going on.
A It's a program that --
THE WITNESS: I'll talk to you.
A It's a program that was initiated by the National Cancer Institute in 1974.
There was a comment in there about this isn't -- this particular finding needs to be adjusted for multiple comparisons. And that's also just -- from a statistical standpoint, it's really not

within the common protocols that we use in most epidemiologic studies. Multiple comparisons come out when you are looking at hundreds, or maybe even like a half a million markers. Multiple comparisons kind of came to be, so to speak, in epidemiologic research around the time when we started doing genotyping and being able to look a half a million markers in a single person.

But one of the underlying assumptions of multiple comparisons is that you have independent hypotheses that you're testing. And so multiple comparisons aren't necessarily appropriate to use. And so there were just -- there were some inconsistencies in there that, yeah, that I noted.

BY MR. SPIRA:

Q Okay. Any others besides those three that you just mentioned, the reliance on statistical significance, the citation to the SEER study or --

A Yeah, I mean --

(Simultaneous discussion

interrupted by the reporter.)

Q Are there other aspects of Dr. Adams-Campbell's report besides the ones you've mentioned that you have in mind when you refer to them as antiquated?

A Those are a couple that were just off the top of my head. I do not have a list of them here. I didn't have much time to review her documents.

So those are just the three that occurred to me as I was sitting here at the end of ten hours.

Q Would you agree that Dr. Adams-Campbell is well regarded in the field of epidemiology?

MS. PARFITT: Objection.

A I agree that, yeah, Lucille Campbell-Adams [sic] is a well-regarded epidemiologist.

BY MR. SPIRA:

Q And you're aware she was a founder of the Sister Study?

A I am aware that she was a founder of the Sister Study.

MS. PARFITT: I'm going to object

to "the founder."

A Yeah. Let me use the correct -- the correct terminology. So it's --

Q I'm sorry. I meant the Black Women's Health Study. I think I said the Sister Study.

MS. PARFITT: That too --

Q I meant the Black Women's --

THE REPORTER: Hold on a minute. I can't do it with everybody talking at the same time.

(Simultaneous discussion interrupted by the reporter.)

BY MR. SPIRA:

Q You understand that Dr. Adams-Campbell was one of the principal cofounders of the Black Women's Health Study. Is that true?

A Close. Dr. Adams-Campbell was a coprincipal investigator on the Black Women's Health Study. There were, I believe, three women at Boston University that were also principal investigators in this -- on the study at the study's

inception, and Lucille at the time was maybe at Howard University. Yes.

MR. SPIRA: Okay. No further questions.

MS. PARFITT: I have no further questions. And thank you. Thank you very much. Appreciate that.

THE WITNESS: Thank you, everybody.

THE VIDEOGRAPHER: We're now off the record. This is the end of Media Unit 11 and concludes today's testimony at 7:12 p.m.

MR. SPIRA: Are you waiving signature or do you want to review?

MS. PARFITT: She'll review.

THE REPORTER: To you or to the doctor?

MS. PARFITT: To me. And I'll get it to the doctor.

THE REPORTER: This says it was expedited on the 17th; is that correct?

MR. SPIRA: Expedited whatever we can do -- you're talking about for the final one?

THE REPORTER: Yes.

MR. SPIRA: Yeah, that's fine.
THE REPORTER: I don't remember if you wanted a rough.
MR. SPIRA: I think we probably do want a rough. Yeah, we need a rough.
(The following occurred at 12:45 p.m.)
THE REPORTER: She is with you? That's okay. Your final, when would you like that?
MS. PARFITT: If we have the rough -- honestly, whenever the standard time. I don't know what you've been doing. Do we have a standard order here?
THE REPORTER: Nobody has given me a standard order.
MS. PARFITT: Nobody's given you anything.
THE REPORTER: Ten days, usually. Ten business days.
MS. PARFITT: Can we expedite that?
THE REPORTER: You can.
MS. PARFITT: Let's expedite that.
(A discussion was held off the record.)

THE REPORTER: Do you want a copy of this?

MR. STANNER: I do. I'll take an expedited, too. Or somebody -- I assume somebody is ordering it expedited. I'll do the same.

THE REPORTER: Do you want a rough?

MR. STANNER: No, I don't need a rough.

(Time noted: 7:15 p.m.)

AND FURTHER THE DEPONENT SAITH NOT.

______________________________

MICHELE LYNN COTE, PH.D. MPH

STATE OF INDIANA )
) SS:
COUNTY OF HANCOCK )

I, Tara Gandel Hudson, RPR, CRR, a Notary Public in and for the County of Hancock, State of Indiana at large, do hereby certify that the deponent herein, MICHELE LYNN COTE, PH.D. MPH, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Defendants at the offices of Wagner Reese, 11939 N. Meridian Street, Carmel, Hamilton County, Indiana, on the 12th day of February, 2026, scheduled to commence at 9:00 a.m., pursuant to the Federal Rules of Civil Procedure;

That said deposition was reported stenographically and transcribed to English under my direction, and that the transcript is a true record of the testimony given by said deponent; and that the signature of said deponent to her deposition was requested;

That the parties were represented by their counsel as aforementioned.

I do further certify that I am a disinterested person in this cause of action; that I am not a

relative or attorney of either party, or otherwise interested in the event of this action, and am not in the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of February, 2026.

Tara Gandel Hudson

Tara Gandel Hudson

Seal

Notary Public, State of Indiana

Commission No. 682534

My Commission Expires March 27, 2030

Michelle Parfitt
mparfitt@ashcraftlaw.com

February 17, 2026

RE: All MDL Hair Relaxer Cases v. Hair Relaxer

2/12/2026, Michelle Lynn Cote PhD MPH (#7852435)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at P1hairdepos@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

All MDL Hair Relaxer Cases v. Hair Relaxer

Michelle Lynn Cote PhD MPH (#7852435)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________   _______________

Michelle Lynn Cote PhD MPH   Date

All MDL Hair Relaxer Cases v. Hair Relaxer

Michelle Lynn Cote PhD MPH (#7852435)

ACKNOWLEDGEMENT OF DEPONENT

I, Michelle Lynn Cote PhD MPH, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Michelle Lynn Cote PhD MPH Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:3,7,11 3:4 4:5,12 5:15 6:11,17

**0**

**0.67** 222:3
**0.70** 162:10
**0.8** 109:2
**0.81** 264:23
**0.83** 222:15
**0.86** 264:21
**0.89** 266:20
**0.95.** 121:6
**00818** 1:3 10:18
**083** 8:20

**1**

**1** 3:11 8:10 10:11 17:18,19 17:22 20:3,10 21:11 36:23 47:22 48:5,10 53:17 57:4,11 57:12,20 64:18 73:5 101:18 147:22 211:9 238:7 241:19 260:23 397:7,8 397:13
**1,000** 361:10
**1-9-2026** 33:21 33:22
**1.0** 109:14,17
**1.03** 381:19
**1.06** 119:16
**1.09** 226:24 227:12
**1.1** 309:14 315:23 316:17 316:21
**1.1.** 309:13 397:16
**1.12** 208:17 215:19 305:11
**1.18** 264:21
**1.2** 99:6 104:7 106:6 107:6 108:13,17 109:1 397:24
**1.23** 264:19
**1.25** 228:3
**1.28** 192:6 266:19
**1.29** 161:19 162:8
**1.29.** 199:21
**1.3** 315:23 316:17,21
**1.33.** 202:10
**1.35.** 119:17
**1.4** 316:18,22 397:15
**1.4.** 315:23
**1.41** 119:7,23 120:4
**1.49.** 202:11
**1.5** 99:21 100:23 102:3,3 102:22 104:9 104:12 106:7 106:10 107:22 109:2 309:6
**1.5.** 99:7,12
**1.58** 282:8,16 282:21
**1.6** 289:14
**1.64** 289:14
**1.66** 222:1
**1.71** 264:23
**1.76** 264:21
**1.80** 215:18
**1.84.** 266:21
**1.90** 381:18
**1.94** 226:23 227:11
**1.94.** 206:17
**10** 8:22 76:3 169:5 177:7,8 177:9,13 208:25 209:5 261:13 309:14 314:8,16 315:1 406:6 419:24
**100** 5:22 402:8
**10004** 2:12
**10016** 6:13
**101** 226:8
**102** 169:2
**103** 150:15 152:16 153:21 155:23 159:15 210:17
**106** 2:8
**10:13** 73:6
**10:31** 73:10
**11** 9:4 77:10 209:1,2,5 253:19 280:19 381:9 420:4 425:11
**117** 8:18
**1192** 196:21
**1193** 171:21 194:20
**11939** 1:19 10:20 428:12
**1195** 195:3
**11:48** 141:19
**11:50** 141:24
**12** 8:3 9:5 10:4 66:13 150:19 152:19,20 153:8,13,19 156:1 162:23 163:15,24 164:6,14,19 165:18 166:15 166:22 168:1 168:19 169:3 173:18 178:25 190:21 191:6 191:19 192:19

193:8 216:20 217:11,16 219:20 221:12 222:1,13 231:1 249:5,6,8 251:5 252:3,14 255:9 273:24 300:21
**12-31-2025** 36:21
**12:08** 157:19
**12:45** 426:7
**12:56** 157:23
**12th** 1:20 428:13
**13** 9:7 48:22 169:5 253:18 253:20 327:4,8 327:9
**139.75** 29:4 35:1
**14** 9:9 300:22 300:23,24
**140** 35:8
**1400** 5:16
**144** 8:20
**148** 8:21
**15** 9:10 140:2 229:3 302:15 302:17,20 401:2 416:25
**15,000** 239:10
**150** 5:16
**1505** 4:13
**16** 9:11 77:10 320:1 327:5
**1639** 238:9 240:19
**1640** 247:6
**1642** 245:20
**17** 8:10 9:13 66:14 327:6,7 327:10,11 430:3
**1700** 2:21
**177** 8:22
**17th** 425:21 429:5
**18** 9:14 150:14 177:6 368:6,7 368:11 380:15 380:16
**1825** 2:4
**19** 8:11
**1900** 6:6
**191** 4:6
**19106** 3:6
**1965** 292:5,25 293:7 298:12 299:4 301:6 338:23 339:3 339:20
**1974** 421:20
**1995** 250:2
**1997** 250:10
**1:23** 1:3 10:18

**2**

**2** 8:11 19:8,8 19:10 21:9 22:10 25:19 29:15 30:8 73:9 141:18 151:25 152:13 160:9,20 161:16 163:1 180:4 199:17 202:5 205:20 212:9 215:12 218:15 229:23 247:7 260:21 261:4,18 263:10 269:21 275:13,15,20 275:21 303:8 315:7 319:9 326:13 369:15 369:21 397:8
**2,523** 238:23 243:12
**2.10.** 119:9 120:5
**2.12** 222:13
**2.19** 208:16
**2.38.** 162:10
**2.5** 213:9 397:15
**2.66** 228:2
**2.88.** 215:19
**2.9** 305:11
**2/12/2026** 430:5
**20** 99:15 100:22 108:14 108:18 116:12 117:3 150:14 175:6 220:10 266:16 267:9 268:4,20,22 269:6 270:25 271:1,2 277:20 342:10 357:23 367:13 368:4 389:11 390:16 432:15
**200** 6:18 164:24
**2000s** 143:24 147:13
**2003** 145:20
**2005** 178:1
**2006** 29:3
**2009** 145:21
**2014** 12:25 13:3
**2019** 261:19
**2021** 158:10,11
**2022** 209:11
**2023** 29:9,15,21 30:9,14 31:3 31:12,18 32:25 252:22

**2024** 13:4 30:1 30:15 328:4
**2025** 16:14 25:3,5 30:10 47:22 72:3,6 118:13 326:14
**2026** 1:20 10:4 28:25 33:8 36:17 428:13 429:6 430:3
**2030** 429:12
**209** 3:19 9:4
**20s** 408:8
**20th** 2:16
**21** 250:1 287:9
**21162** 429:9
**213** 163:24 164:24 165:14 167:24
**21st** 302:23
**225** 4:18
**23** 30:13 302:5 304:1 305:22 305:23 306:18 326:19
**24** 8:12 164:8 165:19 180:7 182:6
**2401** 6:18
**249** 9:5
**25** 37:5 116:12 347:18 370:3 372:16 389:2 390:16
**254** 9:8
**26** 117:18 372:18 379:4 383:4 384:6
**27** 254:9,16 255:18 263:13 273:8 429:12
**275** 6:12
**28** 8:14 47:15 328:4
**28405** 2:8
**29** 57:1 385:11
**29,060** 239:3
**29,997** 218:20 218:22
**2925** 2:21
**2950** 4:6
**2:16** 220:15
**2:32** 220:24
**2a** 28:13
**2b** 24:7

**3**

**3** 8:12 23:1 24:9 27:12 46:20 105:12 141:23 157:18 171:21 207:15 207:17 208:12 213:3 249:19 260:22 263:18 263:23,24 267:20 369:15 397:8
**3,036** 216:11 219:12,18
**3,769** 164:4 165:19 180:5 180:11 181:1 181:12
**3.47** 226:24 227:12
**3.51** 381:19
**3.52** 192:7
**30** 33:11 35:10 35:16,19 153:12 175:6 250:25 268:23 271:3 273:14 274:16 419:22 430:16
**30,329** 215:25 216:16 218:9
**300** 5:12 9:9 166:3
**302** 9:10
**303** 5:12
**32** 302:14
**320** 9:11
**327** 9:13
**33** 47:16
**33,947** 212:12
**33131** 3:14 6:19
**332** 216:4 218:10
**34** 56:25 57:8 320:4,8 327:5
**347** 261:19
**35** 145:22 329:1,7
**35,713** 162:21 163:12,21 164:11 165:13 167:6,15
**35,926** 165:23 166:11,12,20
**350** 203:8
**35203** 2:17
**35th** 2:12
**36** 328:24 329:11,15
**368** 9:14
**369,104** 166:3
**38** 216:12 328:25
**388** 8:4
**3:06** 251:21 252:8
**3:23** 251:25 252:9

**4**

**4** 8:14 18:7 25:20 28:12,15 28:16 76:7 157:22 161:15 196:20 202:7 202:25 205:20 206:19 207:10 207:16 220:15 238:6 279:2,3

397:8
**4.09.** 222:3
**4.27.** 208:17 305:12
**4.4** 213:7
**40** 215:1 268:23 271:3 330:7
**40,559** 160:23
**420** 8:5
**44,000** 239:18
**44,798** 261:8
**45** 282:8,16,21
**46** 8:15 192:7
**46032** 10:21
**48** 48:7
**4:09** 291:11
**4:26** 291:15

**5**

**5** 8:15 20:1 26:12 46:19,21 47:3,7 67:3 120:17 148:9 190:17 194:13 194:19,20 214:22 215:11 220:23 221:7 229:4,17 230:23 234:10 234:24 236:19 247:6 251:20 397:8
**5.39** 222:15
**5.6** 228:3
**50** 99:16 100:25 102:7 268:23 389:23 395:5
**50,884** 145:16
**500** 3:5
**505** 2:16
**50s** 309:23
**510** 3:5
**52** 9:15 120:18
**53** 121:15
**575** 2:7
**59,000** 249:24
**59.9** 213:23
**5:50** 367:23
**5:52** 368:2

**6**

**6** 8:16 26:24 36:13 53:6 73:23,25 74:1 121:15 190:17 249:3 251:24 291:10,18
**60** 395:6
**60601** 5:17
**60603** 3:11
**60604** 3:20
**60606** 4:7,19 5:13 6:7
**60s** 74:15
**63101** 4:14
**63105** 5:7
**640** 5:6
**66** 74:16
**67** 53:20 57:21
**68** 98:14
**682534** 429:11
**69** 250:1
**6:13** 387:23
**6:15** 388:2
**6:35** 406:2
**6:48** 406:6

**7**

**7** 8:18 27:15 78:23 117:20 117:21,22 118:1 195:1 245:14 291:14 367:22
**7.4** 213:6 243:15
**700** 2:4 4:19
**701** 4:12
**74** 8:16 145:22
**75** 9:4
**750** 337:19
**77** 370:7
**77098** 2:22
**7852435** 1:25 430:5 431:2 432:2
**78701** 5:23
**7:05** 419:25
**7:07** 420:5
**7:12** 425:12
**7:15** 427:10

**8**

**8** 8:20 57:12 78:15 99:7,12 99:21 100:20 101:6,16 102:22 104:9 104:12 106:7 106:10 107:22 144:13,15,16 144:18,21 148:8 158:1 178:22 221:6 381:10,11 387:22
**8,909** 161:10
**8.8** 147:18
**800** 5:22
**8000** 5:6
**82** 119:17
**830** 3:14
**84** 282:7,15,20
**85.6** 213:8
**88** 66:25 214:19 230:20
**89** 67:12

**9**

**9** 8:21 28:25 29:3 33:7,16 35:11,17 36:17

79:10 148:17 148:18,21,24 177:6 388:1 406:2
**9,000** 161:9
**90** 35:3,7 53:7
**90-10** 165:9
**92** 9:10
**93** 53:10,18,23 54:2,4 56:15 57:11
**95** 35:4,7 67:23 98:7,10,22 99:11,13,23 100:6,13,20,23 102:4,5,10,22 102:24 103:11 103:21,23 104:8,11 106:1 106:6,13 107:21 119:8,8 119:16 120:4,5 121:6 160:16 212:6 260:18 261:1 262:23 264:20,22 266:20 331:18
**971** 321:15,24 321:25
**981** 324:3
**9:00** 1:21 428:14
**9:12** 10:1,3

**a**

**a.m.** 1:21 10:1 10:3 73:6,10 141:19,24 428:14
**aaces** 118:6
**ability** 194:10 362:16 389:19 389:20
**able** 15:7 42:3 101:5 172:15 232:7 244:15 248:21 307:8 321:10 345:7,8 370:5 399:3 422:9
**above** 329:1 430:6 432:7
**absence** 404:13 404:18
**absolutely** 114:24,25 115:24,25 252:11 308:18 316:6,16 323:4 334:2 345:12 398:4 404:24 404:25
**absorbed** 183:16 189:10
**absorption** 382:10
**abstract** 63:20 90:7,8 121:10 260:24 289:10
**abstracts** 118:23
**academic** 92:3 92:4 389:5 400:7 416:4
**academies** 321:14
**accepted** 303:18 324:16
**access** 137:19 138:2 251:8
**account** 58:12
**accumulate** 386:6
**accuracy** 430:9
**accurate** 13:10 15:8 30:17 32:2 48:19 56:3 146:11,16 153:15 250:18 251:2
**accurately** 28:23
**acknowledge** 232:18
**acknowledge...** 432:3
**acknowledg...** 430:12
**acted** 386:4
**action** 1:3 325:12 428:25 429:2
**active** 418:10 418:11
**actively** 294:5 295:5
**activity** 223:8 224:3
**actual** 55:6 58:15 101:23 170:2 194:9 269:23 366:4 366:16,25 385:5 407:1 413:22
**actually** 21:10 53:6 58:4 65:8 69:18 70:4,14 74:11 80:2 82:2 85:5 90:8 90:10 95:13 125:25 128:2 146:14 161:2,3 172:3 176:25 181:18 184:12 184:20 202:2 216:18 218:4 233:14 237:25 238:3 241:11 244:3,7 248:17 248:18 255:21 265:11 266:9 267:12 268:23

270:7 276:15 280:8,10 287:1 289:4 290:18 295:19 301:25 309:16 313:14 314:13 326:24 328:25 340:19 344:20 360:22 362:11 371:25 375:3 381:14 397:15,25 400:13 401:21
**adams** 2:15 38:23 39:17,20 39:24 40:14 41:6 42:6,12 42:20 414:19 416:17,19,24 420:10 423:3 423:14,18 424:17,20
**add** 297:6
**addition** 171:11
**additional** 56:12,17 57:16 58:2,7,20 59:3 59:11 76:18,21 91:12 122:20 128:15 144:7 278:15,23 401:25 410:2
**additionally** 347:22 348:1
**additions** 432:6
**additive** 363:13
**address** 127:23 128:7 142:3,8 248:8 260:14 288:13 292:25 298:13 299:4,4 301:3
**addressed** 127:16 412:16
**addressing** 389:3
**adequate** 244:21 245:7
**adequately** 234:15 400:22
**adjusted** 199:20 229:4 264:18 421:23
**administered** 149:21 250:4
**admissible** 44:25
**admit** 99:1
**adolescents** 349:6
**adult** 67:24 195:15 203:19
**advanced** 4:10
**adverse** 413:1
**advisory** 40:8
**afam** 5:4
**affiliations** 11:10
**affirm** 11:25
**affixed** 429:5
**aforemention...** 428:9,23
**african** 66:11 66:25 67:12 96:4 118:4 147:16 148:8 191:1,15 192:14,22 193:6 213:6,13 213:24 214:19 221:23 222:10 222:23 224:25 230:20 238:23 239:19 240:3 240:12 243:6 243:12,18 246:6,19 247:3
**afternoon** 317:4
**age** 68:17 74:15 74:16 77:19 78:4 79:17,18 95:19 171:14 210:21 250:1 254:21 263:4 266:25 274:4,6 274:17,23 275:22 276:12 276:24 287:9 348:8,13,15,17 348:20,21 349:16,20
392:23 407:7
**agents** 386:24
**ages** 145:22 169:4,5
**aggressive** 395:2
**aging** 392:22 409:5
**ago** 24:12 25:6 37:17 116:13 164:21 250:25 263:14 309:8 357:23 381:2 388:14 420:9
**agree** 10:10 87:21,24 102:2 195:19 197:12 226:1,11 242:21 257:10 257:13 260:5 280:6 303:23 316:16 324:20 324:21,23 325:18 351:2 358:25 373:18 379:11 423:13 423:17
**agreed** 412:20
**ah** 166:7
**ahead** 109:7 138:13 181:23 188:4 201:14 214:9 311:11

**al** 2:17 66:17 66:24 230:19 252:14
**alexander** 209:24
**alexandra** 158:12
**aligned** 263:17
**alive** 292:23
**allen** 4:12
**allotted** 430:19
**allow** 370:18
**allowed** 219:25 333:19
**allows** 382:10
**alter** 405:3
**amended** 327:23
**amendment** 328:11,13
**american** 66:11 66:25 67:13 96:4 118:5 147:17 148:8 191:2,15 192:15,22 193:6 213:6,24 214:19 221:23 222:11,23 224:25 230:20 238:24 239:19 240:3,12 243:6 243:12,19 246:7,19 247:3
**americans** 213:13
**amount** 27:19 27:20 30:25 271:16 344:14 365:20,25 386:9 395:16 395:17
**amricordati** 6:7
**analogies** 129:23,25 385:4
**analogized** 384:8
**analogy** 130:4 292:12 384:5 384:20,23
**analyses** 19:5 26:10 55:8 61:2,5 94:11 94:16 116:4 123:16,21,21 128:15 161:5 220:8 228:7 261:10 263:11 278:24 294:8 315:12 405:11
**analysis** 54:10 54:13,14,15,21 54:24 55:1,3,6 90:1 91:6,12 92:22 94:3 114:22 123:10 124:5 125:6,20 126:4,5,6,16,16 126:17,24 127:13,18 128:5,6,10,10 128:12 129:18 130:17 131:4 131:13 169:17 178:20 218:16 259:14 274:21 283:7 286:20 290:18,19,23 290:24 291:3 292:3 293:17 294:2 295:20 296:6,22 297:7 302:3 312:1,12 317:10 328:18 336:6 352:20 353:5 359:4 384:17 385:22 412:18 413:22 415:6,21,22,23
**analyze** 88:2 89:15 97:25 112:1 142:20 175:1
**analyzed** 149:17 151:25 160:23 203:12 212:13 215:3 222:24 228:9 257:14 258:7 261:23 397:20
**analyzes** 160:1 257:19
**analyzing** 88:1 88:15,19 90:21 127:14 290:19 290:20 294:6
**anderson** 4:5
**animal** 93:14 128:17 356:19 359:19 360:3
**anna** 6:5
**annals** 118:14
**answer** 13:11 14:2 46:8,9 55:5 61:9 64:23 65:23 70:8 71:10,25 83:5 85:23 87:13 89:21 91:15 96:19 97:21 101:4 102:9 105:1 106:16 107:11 110:25 132:7 142:23 143:17 152:23 153:2 153:15 168:7 168:21 179:6 182:10 185:17 188:3,4,5 189:1 198:8 201:10,15,19 201:22,25 235:18 236:1,2

236:4 237:10 237:19,24 256:6 257:2 258:15 265:4 272:3,9 299:14 299:14 312:10 313:21 319:14 319:24 332:11 333:5,5,10,12 333:16,18,21 333:24 341:12 347:7 363:21 365:2,3 411:2
**answered** 61:8 72:12 88:13 94:21 117:10 140:12 164:15 166:16 171:7 174:8 176:1 179:8,23 180:17 181:7 181:17,22 182:9 184:19 185:16 186:12 188:1,23 204:5 205:13 216:20 217:23 226:5 227:2,15 229:20 234:9 235:10,14 237:7,21 259:19 260:9 282:5 284:16 290:8 296:25 297:23 299:9 299:11 305:7 306:22 319:12 330:23 331:15 332:15,21 334:10 335:13 338:8 342:18 345:11,25 346:17 347:3 353:3,13 361:14 363:1 364:6,20 367:4 370:14 374:13 377:11,24
**answering** 62:20,24 153:6 153:14 166:23 187:18 201:3,8 235:21,22 334:4 407:13
**answers** 111:18 155:23 237:25 254:18 260:11
**antiquated** 418:3 420:11 421:5 423:5
**anybody** 148:15
**anymore** 420:21
**anyway** 287:8
**apart** 239:22 285:23 316:24
**apologies** 60:17 61:4
**apologize** 193:15 218:7 228:13 317:24
**apparent** 266:25 271:19 340:14
**apparently** 405:15
**appear** 11:6 28:23 77:5
**appearances** 2:1 3:1 4:1 5:1 6:1 7:1 11:9
**appeared** 15:23 16:2
**appearing** 2:14 2:19,23 3:7 4:8 4:14,20 5:8,14 5:18,24 6:8,14 6:20 7:5,6 11:6
**appears** 30:2 58:5 275:6 325:13
**appended** 432:7
**applicable** 197:17 347:8 430:8
**application** 133:24 140:6 255:2 319:7
**applications** 342:9 360:18 407:10
**applied** 83:16 88:5 133:20 138:15 295:15 376:13
**applies** 391:12
**apply** 88:10 94:18 108:7 155:17 188:9 294:19 295:13 336:1,2,3 390:20
**applying** 294:1 295:16 298:14 302:22
**appreciate** 36:5 46:14 56:18 81:1 172:14,19 188:14 201:13 203:25 225:20 242:18 272:3 283:22 311:13 332:5 388:6 425:7
**approach** 98:7
**approached** 63:7,14,23 374:15
**appropriate** 322:11 422:15
**appropriately** 228:9

**april** 30:10
**area** 64:4 93:9 189:7,20 337:13 374:1 376:4 395:9 401:24 404:12 409:20
**areas** 62:8 89:5 89:6 385:17 389:21 390:9 390:17 402:1 415:4 420:19
**argumentative** 272:8 334:10 335:14
**arm's** 253:1
**article** 8:20,22 9:9,10,14 63:21 195:4 226:16 302:20 303:3 380:7
**articles** 63:20 296:12 337:19
**ascertainment** 261:17
**ashcraft** 2:3 11:20
**ashcraftlaw.c...** 2:5 430:2
**aside** 21:25 123:7
**asked** 32:9,22 39:11 61:3,8 61:24 64:16,22 72:11 88:2,12 89:23 94:20 117:10 140:11 142:3,8 153:8 171:6 174:7 176:1 179:11 179:20,23 180:16 181:6 181:16,18,22 182:3,8,11,14 184:19,21 185:15 186:11 187:25 200:24 201:9 205:12 217:22 226:4 227:1,14,17 229:20 234:8 235:9,13,16 237:6 248:4 255:8 258:12 259:19 282:5 284:15 290:7 296:24 299:8 299:12 305:6 306:22 319:12 330:23 331:14 332:21 333:25 334:9 335:1,12 338:7 341:10 342:17 345:10 345:25 346:16 347:3 353:2,12 361:14 363:1 364:6 367:4 370:14 374:12 377:10 388:15 388:16 390:23 391:22 393:22 396:2 401:5 402:14 403:14 406:15 409:14 410:13 414:1 414:12 418:6
**asking** 44:9 46:13 85:5 112:4 173:17 184:23 193:13 193:24 233:10 233:10,24 234:23,25 235:23 236:6 236:18,19 244:23 255:12 255:19 257:10 258:1,3,25 259:4,6 272:4 280:17 289:18 289:21 290:13 290:15 298:1 320:16 326:11 333:2 335:7,8 337:1 345:6,21 378:6 403:9
**asks** 20:10 22:10 23:1 25:20 26:12,24 27:15 150:4,7 152:18 231:18 254:5 255:9,16 257:4
**aspect** 40:24 55:5 312:1 314:20
**aspects** 272:2 301:17 423:2
**assess** 85:14,15 125:7,21 243:24 244:15 273:21 293:15 329:19 384:3
**assessed** 161:3
**assesses** 118:16 315:6 319:8 330:20 369:17
**assessing** 293:6 343:11 416:3
**assessment** 160:12,13 329:17 337:8 339:23 350:5 350:20 351:25 352:8 360:7
**assign** 227:5
**assist** 48:2
**associated** 77:3 79:23 80:3 82:9 85:11,16 99:14 240:22 273:3 274:22 286:16 314:23 315:3 352:5,13 362:11

**association** 24:18 64:1,14 82:3 86:16,18 86:23 104:10 104:21 105:24 106:12 107:8 107:18,20 108:12 110:14 112:18 113:12 113:23 116:23 118:16 120:6 121:2 122:5,9 122:21 123:23 124:7 125:1,4 125:8,14,18,21 126:9,11,19,21 127:2,3,6 129:2,8,14,25 130:15 131:2 131:22 159:20 168:2 170:2 173:8 184:13 191:22,25 192:21 198:17 199:19,23 200:14 201:1 202:2 204:8 205:10,15,24 206:11,15 207:1 208:4,13 208:19 211:1 237:3 243:24 245:11 247:19 265:13 268:15 269:13 271:11 271:18,18 280:22 283:20 288:7,25 290:4 292:9 293:14 293:15,22 298:15,21,24 299:5,22 300:12,13 301:14,17 302:11 303:18 303:20 304:4 305:3,17,19,25 306:7,11,13 309:3,5,7,22 310:18 311:1 311:25 312:25 314:7,19 315:7 315:12 316:23 318:15,16,22 318:23 319:10 322:9 329:23 330:20 331:12 331:20 332:8 332:18 334:7 334:20 336:10 336:23 337:3 338:2 343:17 350:12 359:6 362:8 371:5 373:24 374:9 374:10 377:15 378:11 384:7 384:13 395:23 397:11,14 398:9 399:4,22 404:14,15,25 409:8 410:6 411:16 413:15 415:7

**associations** 96:23 101:9 160:1 190:20 204:4 221:10 234:16 247:11 261:24 266:23 285:25 293:23 307:11,13 362:6 369:19 370:6 372:9 378:19 399:14

**assume** 14:2 31:2,17 33:10 124:3 149:12 185:8,21 427:4

**assumed** 15:2

**assuming** 65:24 70:25 100:2,12 106:7

**assumption** 279:15

**assumptions** 100:11,13,18 108:6 422:12

**asymptomatic** 74:17

**attached** 251:10 430:11

**attempted** 204:21 272:9

**attempting** 201:22

**attention** 63:2 321:12

**attorney** 11:11 429:1 430:13

**attorneys** 23:5 23:14,16 429:3

**attribute** 301:16

**audible** 13:17

**audience** 24:4,5

**audio** 10:8

**august** 16:14

**austin** 3:10,13 5:23 11:13,16 292:18 301:3

**author** 177:4 209:13 296:5

**authored** 49:2 158:24

**authors** 59:18 60:14 90:14 118:10 146:18 158:12,18,25 161:18 169:17 171:9 177:21 197:25 208:2 209:22 210:1 213:4 215:15 215:17 221:9 221:22 223:2

226:16,21 227:25 241:9 246:17,22 247:9 248:6 250:21 252:24 253:5 261:23 263:2 267:4,23 278:22 370:16 412:18
**available** 148:14 273:25 278:16 339:24 358:9,11 383:13 394:23 395:18 430:6
**avenue** 2:21 5:6 5:22 6:12
**average** 41:19 178:12
**avlon** 6:4
**avoid** 295:23
**aware** 24:25 296:21 298:12 299:3 314:6,9 352:24 359:17 359:18 360:2 369:1 374:25 376:10,16 381:22 382:2 385:9 387:10 412:6 423:21 423:23
**aways** 74:1

**b**

**b** 5:4
**back** 23:25 25:18 42:3 89:22 115:12 123:7 137:7 147:13 158:1 164:20 168:19 172:22 175:21 178:1,21 184:5 186:14 190:15 199:24 219:3 233:8 235:25 239:10 252:9 256:19 265:18 273:4,7,23 300:4 301:23 303:25 304:9 307:6 309:22 315:16,17 325:3,4 326:18 330:12,15 331:16 332:13 346:7 360:5 371:19 380:1
**backing** 352:8
**backward** 332:3
**bacon** 354:17 354:23 355:9 355:11
**bank** 95:14
**barrier** 183:15 376:24
**base** 178:18
**based** 76:11,14 95:17 105:17 147:20 156:13 160:15 162:19 163:11 167:17 168:1,13 171:11 173:17 184:8,10 193:3 193:8 194:7 200:14 212:5 215:22 216:25 217:25 218:3 218:14 236:20 237:14 239:14 239:20 241:14 243:7 249:23 257:15 258:11 260:17 263:3 273:25 274:2 278:11 279:4 279:16 285:9 285:19 287:17 308:12,19,21 308:23,24,25 341:24 343:4 348:13 378:22
**baseline** 144:4 146:1 190:21 279:6,9 287:17
**bases** 53:1 54:7 284:2
**basic** 93:9 307:21 399:7 399:12
**basically** 313:16
**basing** 19:1
**basis** 62:20,24 112:9 149:16 312:17 319:21 401:15
**bathing** 300:10
**bears** 338:13
**beating** 199:18
**beauty** 4:10 5:10 391:11 400:19
**began** 31:3 33:2
**beginning** 11:10 56:24 73:9 141:23 157:22 214:17 220:23 251:24 291:14 298:3 347:21 368:1 388:1 406:5 420:4
**begins** 64:19 211:11 245:25 264:4 301:12 302:5 303:11
**behalf** 1:18 11:13,17,20,23 15:11 17:1

428:11
**behave** 395:3
**behavioral** 250:6
**believe** 13:5 19:21,24 24:23 25:19 30:17 31:14 32:24 43:6 45:7 47:14 56:3 68:1 69:13 73:23 76:1 117:18 136:9 146:16 147:7 151:23,24 152:11 160:9 186:2 188:22 195:23 197:14 198:9 202:15 214:25 218:14 226:15 228:16 237:22,24 238:1,2 245:6 251:9 252:2 257:18 260:10 260:13,20 272:6 275:8 279:7 282:4 290:7 292:23 294:3 297:15 297:24 298:17 298:20,23,25 303:5 306:1,17 306:25 309:4 328:1,11 341:20 347:10 358:13 360:20 368:24 372:14 372:23 373:3 381:8,14 387:15 392:11 396:19 398:14 409:19 410:5 412:14 414:17 419:14 424:23
**bell** 5:10
**benchmark** 303:18
**benefit** 386:25 387:6
**benign** 240:16
**benzophenones** 27:6
**berman** 3:4
**bertrand** 60:3 60:13 63:6,13 67:18,19 143:7 249:17 252:4,7 252:14 253:2 256:20,21,21 257:13 258:10 259:12 260:16 288:17 289:6 290:20 298:9 306:9 308:8 331:13 332:9 332:19 342:16 343:3,15 348:11,15 349:9,15 396:6 396:16 400:1 402:17 405:5 410:12,17,22 412:6,11 415:25
**bertrand's** 252:17
**best** 13:11 250:20 272:9 291:20,25 335:11 363:25 364:14
**better** 44:16 122:7,20 349:3 400:25,25 403:4 404:17
**beyond** 88:8 301:15 342:11
**bias** 90:16 105:22 106:9 125:9,23 126:12 127:10 127:15,23 128:8 167:22 240:4,5,6 241:7 244:8 248:9 280:23 284:18,22 307:9 337:16 398:6
**big** 223:14 224:5,10 317:20 319:16 322:4,5 385:22
**biggest** 420:22
**bilateral** 161:8
**bill** 33:17
**billed** 28:25 29:2,4 30:7,8 33:6,18 35:9 35:12,14,17
**billing** 27:17,17 29:7,23
**binders** 18:13
**biochemistry** 50:11
**bioinformatics** 390:13
**biologic** 112:5 128:23 183:8 308:23 341:2 347:19 355:22 378:23 382:4 384:24
**biological** 93:2 129:21 131:7 184:4 231:25 233:14,17,23 257:23 292:11 300:3,8 310:15 310:23 312:17 316:25 346:6 385:8 408:15 409:6
**biologically** 189:12 271:14

334:18 351:4 355:12 356:8 362:1
**biology** 50:20 310:14 339:12 389:12,16,21
**biostatistic** 390:13
**birmingham** 2:17
**birth** 77:20 79:18,19
**biscayne** 6:18
**bit** 99:24 103:14 112:23 146:22 147:19 148:4 158:5 171:14 172:17 184:19 218:8 233:5 320:22 323:14 396:24 397:1 418:3
**bits** 198:25
**black** 9:6,7 66:10 67:12,24 68:5,9 96:1,4 118:3,18,20 142:17 147:17 148:8 169:9 191:2,15 192:15 193:6 213:6,17,24 214:12 221:23 222:11,23 224:11,17,24 224:25 225:12 226:11,17 238:24,25 241:10 246:7 246:19 249:13 249:23,25 250:18 252:18 253:11,15,23 254:2 255:18 256:14 258:24 261:8 263:14 288:13 289:2,5 289:22 290:2 290:10,11,14 290:16 312:4 312:15 331:24 341:21 344:8 346:8 395:2,13 395:20 396:15 396:20 424:5,9 424:18,21
**bleach** 160:4 206:6 208:10 247:15 380:23
**bleaches** 381:23 382:19
**bleeding** 240:11,14,17
**bliss** 7:7
**blowout** 134:21 187:3
**blowouts** 134:18 185:13 186:1 190:1
**blue** 112:8 300:5,6,7,10
**bmi** 77:25 79:23 223:8,22
**board** 40:8 286:1,5,6 307:14 388:24
**bodies** 376:13
**bodily** 362:18
**body** 74:8 93:13 160:6 183:17 189:11 206:7 208:11 224:14 247:16 296:7,23 319:18 344:3,4 372:3 377:9 382:6,20,25
**bonds** 188:10 232:8 382:8
**bostic** 7:4
**boston** 424:23
**bottle** 138:19 140:2,5,14,22 141:4,9
**bottles** 140:2,6 140:23 141:5 141:10
**bottom** 120:17 121:16 152:14 160:21 171:21 211:10 245:23 245:24 321:17 329:7
**bought** 136:12
**boulevard** 6:18
**bound** 121:5 344:10,11
**bounded** 269:5 271:1
**bounds** 45:3
**box** 136:10,19 136:23 137:2 139:24 256:10
**boy** 39:25
**bpa** 368:13,16
**bradford** 9:9 92:22 94:3,5 94:11,15,18,23 130:17,19 131:4,12,17 132:1 292:18 293:19 294:2 294:12,18 295:16 296:5 296:10 297:7 298:13 299:18 301:4 302:4,22 304:20,22 305:15 307:7 310:22 314:20 319:7,17 325:4 325:8 326:21 329:4 341:6,14 343:14,23 379:22 383:14 386:8 401:7,11

401:15 402:4 415:5
**bradley** 4:5
**brands** 156:22 156:25 179:22 180:1 187:12 256:16,18
**brazilian** 134:18,21 185:13 186:1 187:3 190:1
**brca1** 77:23
**brca2** 77:23
**break** 14:6,8,9 14:14 30:1 44:23 45:5 73:2,24 141:15 158:5 159:17 183:15 232:7,9 291:7 376:23 382:8 393:10 407:13
**breaking** 188:10
**breaks** 14:23 279:4 382:9,11
**breast** 77:21 144:2 145:24 146:1 196:5 230:19 231:8 395:1 417:6
**brickell** 3:14
**briefly** 39:3 205:19 392:11
**bring** 18:20 239:22 395:15
**brings** 287:25
**british** 292:20
**broad** 89:20 111:18 129:18 143:16 176:4 313:2 315:10 351:8 353:4 364:13
**broader** 54:25 55:2 91:1 93:17 98:14 105:3 112:23 116:24 130:8 197:18 294:8 355:24
**broadly** 41:13 123:13
**brochures** 23:6
**broken** 289:22
**brought** 21:22 22:6 23:15 73:13 417:14 420:18,20
**bruno** 7:11
**brushed** 133:18
**build** 350:19
**building** 3:19
**builds** 400:18
**built** 108:6
**bunch** 100:7,8 259:8
**burden** 344:4
**burns** 255:2 263:8 267:1 275:1,1,7,10 276:15,25 277:6 382:14
**business** 426:20
**butcher** 209:18
**bwhs** 249:24

**c**

**cadmium** 373:5 374:18
**calculated** 105:18
**calculation** 163:11
**calculations** 54:15,22 55:5 55:8
**call** 12:18 101:17 124:15 128:5,11 136:24 272:23 293:3 294:7 317:6 363:4 376:18
**called** 14:22 96:9 97:11 123:10 154:19 270:18 389:23
**calling** 126:24 246:17
**camera** 194:16
**campbell** 38:23 39:20,24 40:14 42:6,12,20 414:19 416:17 416:19,24 423:14,18 424:17,20
**campbell's** 39:17 41:6 420:10 423:3
**cancer** 9:6 25:13 27:4,5 39:25 40:9 41:7,11 50:3 50:19 62:3 64:3 65:3,5,13 65:20,21,25 69:19 70:5,12 70:15 71:21 72:9,22,23 74:3,4,10,11,13 75:25 76:10,19 77:15,19,22,22 78:9,9,13 79:1 79:7,9,14,21,22 80:12 81:10,10 81:12,13,18,18 81:23,23 82:3 82:4,8,20 83:16,16 84:9 84:13,16 86:13 112:8 118:4,5 118:19,21,22

123:24,24 128:1,2 130:1 130:2 142:10 142:12 143:3 144:2,10 145:1 145:19,24 146:1 158:7 159:22 160:2 163:25 164:9 164:25 167:7 167:16,25 168:3,15,17 170:6,8 171:1 171:3 174:4,6 174:20,22 175:7 176:10 180:7,9 181:13 182:7,13,13,23 190:22 191:6 191:20,23 192:19 195:16 196:2,8 197:8 198:5,12,19 199:14 200:15 201:2 203:21 204:10 205:11 205:17 206:1 206:14,17,25 207:3 208:5 209:8 211:3,17 211:25 216:4 216:12 218:12 218:23 221:13 230:19 231:8 231:16 232:4 233:20 235:4,8 236:25 237:4 241:14 243:25 246:11 247:12 248:16 249:12 250:13 256:24 257:16 260:5 260:13 261:19 261:25 262:5 262:16 264:19 266:17 267:7 268:2,17 269:14 270:20 272:20 273:3 274:9 275:3 279:24 281:3 286:16,23 288:9 289:1 290:5 295:15 295:16 296:6 296:15,22 297:12 298:5 298:10,22,24 300:6,7 304:6 305:5,10,20 310:4,6 312:4 314:8,10 315:4 316:8 330:11 330:18,21 331:7,10,23,25 334:23,25 340:17,19 344:16 345:17 346:14,15,23 347:9,15 349:19 351:6 351:13,22,23 352:3,6,14,18 353:1 354:3,15 354:19,25 355:4,4,10,13 359:2,20,22 360:1,9,9 362:2 368:17 369:20 373:20 373:21,25,25 374:11 375:5 375:14,21 377:17 378:13 379:13 383:24 384:8,9,15,16 385:11,17 387:2,8 389:12 389:16,21 390:4,11 391:5 391:6,19,20,24 391:24 393:12 394:13,13,16 394:18,19,25 395:1,10,12 405:8 410:7,8 410:20,24 411:17,18,21 411:22,24 412:3 413:16 413:18 414:10 414:10 416:22 417:6 421:13 421:19

**cancers** 8:13 62:7 69:15 74:4,25 79:17 82:12,23 83:3 83:7 245:12 296:2 338:17 340:22,22 344:24 350:3 351:18 354:6 356:9 385:2 393:7,7,15,18 393:21 395:4 395:25 408:1 414:4 417:7

**capability** 355:6

**capture** 36:23 268:20 348:21

**captured** 173:22 372:6

**captures** 178:24 349:21

**capturing** 87:15

**car** 112:8 300:5

**carcinogen** 351:3 352:25 354:1,13,18,24 355:9,11,23 356:6 379:8,15

**carcinogenesis** 158:10,11

183:11 189:13 189:14 233:16 257:25 297:17 300:18 339:12 339:20 345:16 362:19
**carcinogenic** 344:5 347:14 353:20 356:1
**carcinogens** 351:12,17 353:10,17 355:19 356:15 418:20 419:8
**carcinosarco...** 78:19
**care** 51:7 66:22 146:5 149:6 150:4 230:18 231:7 301:16
**career** 41:21 51:14
**careers** 417:2
**carefully** 281:9
**carmel** 1:20 10:21 428:12
**carried** 329:18
**carry** 89:25 91:5,11
**cars** 300:6,7
**carve** 161:13
**case** 10:18 15:18,25 19:2 20:13,20,24 21:7 22:16 26:1,6,10 27:22 28:19 29:13,17 31:11 31:15 49:4,9 65:8,11 69:22 69:23 79:4 83:10 93:10 114:3 140:20 140:22 175:17 176:16 189:13 230:18 261:17 265:12 280:15 280:16,21 297:15 298:17 309:12 312:9 345:7 353:9 354:14 368:18 385:12 386:17 407:2 410:16 412:25 413:2 417:25
**cases** 127:19 164:25 176:16 208:6 216:4,12 261:20 262:20 281:24 430:4 431:1 432:1
**casual** 125:22
**catch** 267:19
**catching** 269:4
**categories** 179:18 262:1 276:22 277:8 281:15 285:11 407:14
**categorization** 183:6 287:3
**categorized** 171:24 172:25
**category** 100:2 163:9,19 164:12 165:22 166:1,13 179:14 186:7 186:16 188:18 189:6 215:17 216:17 217:21 220:3 228:15 262:11 270:3,7 272:17
**causal** 64:1 89:25 91:6,11 93:19 125:8,22 126:22 129:2 130:15 131:22 245:11 283:20 293:15,21 302:24 315:11 316:11 317:10 324:15 338:1 343:17 352:7 362:6,8 410:6 411:20
**causality** 92:9 92:16 95:3 293:6 303:21 380:3,4 405:13 405:13 416:3
**causation** 64:8 64:12 86:18,23 124:8 125:2 129:9,16,17 131:2 292:8 301:20 315:8 316:24 322:2 322:11 323:11 341:8 378:12
**cause** 65:2,4,12 69:15 71:21 72:8 89:18 142:10,12 240:16 297:5 300:7 324:12 325:22,25 351:12,17,22 352:1 354:18 354:19 356:8 359:20 362:2,5 373:20 375:4 375:21 391:5 391:18,19 394:17,19 405:7 410:20 410:24 411:22 411:23 414:3,9 414:10 428:25
**caused** 69:18 70:4,15 385:11
**causes** 240:13 275:10 334:23 334:24 351:5

351:22,25 352:17 353:1 354:2,14,25 355:3,10,13 359:2
**causing** 85:17
**caution** 401:22
**cautioned** 242:9 317:22
**caveat** 55:11
**caveats** 331:8 395:22
**cavo** 5:11
**cdc's** 421:11
**cell** 76:5 78:18 128:17 356:18
**center** 2:17 9:11
**centered** 194:15
**century** 134:6 302:23
**certain** 83:7 271:24 308:6 351:11,12,16 351:17 352:12 361:6 372:3 373:4 406:14
**certainly** 14:22 92:10 95:25 111:5 116:17 283:19 343:24 356:14 378:13 392:18,24
416:12
**certainty** 69:7 69:12 70:23 407:22
**certifications** 49:12
**certified** 388:24
**certify** 428:5,24
**cetera** 257:24
**cgw** 5:17
**chance** 113:22 114:5,6,24,25 115:7,14,21,24 125:9,23 126:12 127:10 301:17
**chandra** 158:14
**chang** 9:4 60:3 60:12 63:6,13 143:7 209:14 209:15,19 210:25 212:4 215:3 217:19 221:4 222:24 226:12,15 228:19,24 229:10 231:10 231:15 238:11 239:15 245:17 258:8 259:25 260:11 288:16 298:8 306:3
312:5 331:11 332:7,16 334:6 380:21 381:4,9 396:5,9 400:1 402:16 405:4 410:11,17,22 412:5,10,16 415:24
**change** 134:4 148:4 182:15 297:3 334:23 361:4,8,21 392:13 416:12 417:25 431:4,7 431:10,13,16 431:19
**changed** 116:18 117:4 220:8 302:24 309:18,20 395:7 414:7
**changes** 48:24 315:21 328:22 414:1 430:10 432:6
**changing** 335:3 335:6
**characteristics** 76:23 221:15 221:19
**characterizati...** 280:6 332:16
**characterize** 193:13 258:24
318:14
**characterized** 307:3
**characterizing** 193:16 281:22
**chart** 284:4
**charts** 284:7
**che** 209:18
**cheatham** 5:20
**check** 33:14 218:18 224:7
**checking** 223:13
**checklist** 131:19 402:7
**checkmark** 318:2
**chemical** 27:4 60:19,22,25 61:5,14 64:2 65:2,4,11 66:10 67:1,14 68:2,20 69:1 69:14,17 70:4 70:14 71:20 72:8 123:23 132:5,10,13,14 132:18,22 133:1,4,11,19 134:8,8,9,15,19 134:25 135:6 135:12 136:2,7 136:13,17,22 137:1,9,11,15

137:20 138:7 138:10,14,22 139:2,4,11,16 139:19,24 140:7,18,25 141:3,8,12 142:9,11 143:2 153:22 156:2,9 157:2,4 173:5 180:12,21 181:2,11,14 182:22 183:2 183:14 184:22 185:9,10 186:9 186:17,22 187:4,8,14,23 188:8,20 190:5 196:1 198:4,11 198:18 199:13 200:15 201:1 204:9 205:10 214:6,20 215:4 219:13 226:13 229:16 230:21 231:17 234:1,4 235:1,5 236:23 237:2,13 242:20,23 243:20,24 244:2,16 246:12 248:19 254:12,22 255:4,19,22 256:2,22 257:5 257:15,19 258:3 259:1 260:12 265:24 267:9 268:4,13 268:16 269:9 269:13 273:11 279:23 288:8 288:25 290:4 298:22,25 300:16 330:21 344:15 346:22 350:2 357:6,10 357:17,25 358:23 362:24 363:24 364:4 364:15,17 365:11,18,21 372:25 373:6 373:10 375:12 375:15 376:6 377:16 378:10 379:7 382:8,24 383:21 384:13 390:24 391:4,9 391:18 392:3 392:19 393:4 393:11,13,16 393:19 394:12 394:17,18 395:24 396:3 396:10,13,18 396:21 405:6 407:23 408:3 410:7,8,19,23 411:16,17,21 411:23 413:16 413:17 414:2,8 416:21 418:9

**chemically** 140:4

**chemicals** 27:7 93:12 134:22 184:17 185:2,5 185:9,12,19,22 185:25 186:10 186:19,23 187:3,10 188:17 189:5,8 189:9 195:25 224:13 232:6 233:2,15 345:14 353:10 353:16,19 356:23 357:5 357:15,21 358:22 360:8 360:14,17,18 360:25 361:1,4 361:7,10,12,25 362:10,14 363:3,23 364:24 365:8 369:18 371:3 372:3 375:10 375:11,19 376:7,18,23 377:3,4 378:25 381:25 419:3,4 419:12

**chemistry** 388:19

**cherin** 6:11

**cherry** 204:13 204:17

**chicago** 3:11,20 4:7,19 5:13,17 6:7

**childhood** 349:5 408:7

**children** 169:14

**chris** 7:8

**cigar** 130:2 384:20

**cigarette** 8:18 86:11 118:2 130:1 250:8 296:14 315:3 384:19

**cigarettes** 119:1,2,25 120:1 384:7

**cigars** 384:8

**circle** 66:21 153:16 230:18 231:7

**circular** 186:21

**circulating** 408:23

**citation** 58:6,22 422:23

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 452 of 539 PageID #:74640



**citations** 53:17 54:4
**cite** 8:20 9:4 58:15 66:17,21 67:7 214:18 222:20 225:10 225:15,23 228:17 303:4 305:18 312:2 343:2 349:8 372:12 380:5,7
**cited** 53:14 54:3,5 56:12 57:9,10 58:2,4 59:8,11 229:13 229:15
**city** 24:20
**civil** 1:3,21 428:15
**clarification** 69:21 80:9,10 122:13 125:17 142:6 172:2 173:4 240:25 263:7 264:16 305:21 323:17 336:16 356:21 368:15 374:5
**clarified** 101:2
**clarify** 56:21 81:2 122:8,20 257:9 278:25 332:6 347:7 359:21 393:3 403:24
**class** 360:17 361:6 362:10
**classes** 364:13
**classification** 168:10 174:16 175:11 176:15
**classified** 166:25
**clausen** 4:18
**clausen.com** 4:20
**clean** 269:7
**clear** 13:16 46:12 76:5 78:18 80:20 165:4 192:5 199:6 212:11 252:12 266:23 270:18 274:5,7 282:13 288:15 298:16,20,23 299:6 301:15 304:17 318:5 378:1
**clearer** 341:7
**clearly** 231:7
**clinical** 98:18 124:19,20
**clinically** 309:16 340:14
**clinicians** 123:12
**close** 32:14 360:21 424:20
**closely** 83:17 239:9
**closer** 45:4 63:2
**coaching** 235:13 280:12
**coauthored** 40:13
**cofounders** 424:18
**coherence** 129:22 130:12 131:10,11 292:12 308:24 310:24 379:5,9 379:15,22 380:2
**cohesiveness** 131:9
**cohort** 95:8,9 95:11,12,13,15 95:21 96:5,10 96:22 97:2,6 97:10,13,16,17 98:1,3 111:17 111:19,20 114:3 123:8 124:11,15,23 124:25 125:5 125:19 126:20 129:7 142:13 143:19 145:16 148:7 161:14 175:10 195:13 216:6 229:24 229:24 238:22 239:9,16,17 248:21 281:12 337:23 368:19 369:4 385:12 412:7,9
**cohorts** 142:20 142:25 273:25 411:10
**coiled** 68:4
**coincides** 148:18
**cold** 310:10
**collaborators** 390:8
**colleagues** 399:12
**collect** 127:21 150:1 407:19
**collected** 152:16 407:6
**collection** 105:3
**collider** 240:5
**colorectal** 79:22
**column** 120:20 121:17,18 165:7 196:21 223:6 301:10
**comb** 133:1 154:16,19

232:3
**combination** 217:2 219:21 231:24
**combined** 179:13 255:17 271:5 277:13 295:15,24 296:5,21 348:17
**combs** 133:6 257:24
**come** 62:12 89:16 127:4 141:10 146:21 175:14,20 190:15 193:15 232:1 321:13 328:15 330:14 364:9 422:3
**comes** 48:12 56:25 136:10 300:3 397:15
**comfortable** 126:18 245:5
**coming** 72:2 290:22
**commence** 1:21 428:14
**comment** 14:18 280:5 421:21
**commentaries** 294:17
**commentary** 295:1,11
**comments** 244:20
**commercially** 358:11
**commission** 429:11,12
**committee** 389:15
**committee's** 19:14
**common** 68:4 76:13 105:11 175:15 213:16 240:2 311:20 315:25 422:1
**commonly** 80:13
**communication** 159:3
**communicati...** 44:15 59:18 210:3 253:4
**community** 76:17 294:9 339:11
**comparable** 119:15
**compare** 82:18 96:13 350:25
**compared** 118:25 174:21 263:20 264:4 264:11,14,17 266:18 270:3,4 285:12 289:12 306:15 338:12 375:25
**comparing** 119:24 275:23
**comparison** 164:3
**comparisons** 421:24 422:3,5 422:12,15
**compensation** 8:14 27:20 28:8,20,24
**complete** 15:7 20:12 149:16 432:8
**completed** 146:2 148:12 250:3,11 430:16
**completely** 114:4 278:18 312:8 331:7 383:20 415:8
**complex** 363:9 419:11
**component** 360:8
**components** 347:13 357:21 365:7
**compound** 85:22 350:7
**comprehensive** 336:6 373:23 374:8 377:7
**comprised** 147:16
**computer** 321:2
**concept** 5:4 110:13 174:14
**concepts** 99:4
**conceptually** 340:10
**concern** 190:12 239:21 241:6 265:18 272:5 281:5,7,24 346:7
**concerns** 363:11
**concierge** 7:3
**conclude** 322:8 349:24
**concluded** 359:1 373:19
**concludes** 375:4 425:11
**conclusion** 90:11 123:4 203:16
**conclusions** 84:12,23 87:3 90:7,9 412:21

**concrete** 92:19
**condition** 345:5 402:8
**conditioner** 136:6,15 137:3 139:17,19 419:1
**conditions** 79:23 80:2,6 100:3 250:14 254:6
**conduct** 19:4 54:10 92:21 94:2,10 95:7 124:2,4 130:16
**conducted** 94:1 274:1 368:25
**conducts** 296:5
**confer** 325:10
**confidence** 97:11,12,23 98:1,8,11,15,22 99:7,11,23 100:6,14,21,24 102:4,23 103:11 104:8,9 104:25 105:12 105:18,22 106:1,7,9,20 109:1,13,15 113:15 116:25 117:5,11 119:8 119:16 120:4 121:6 127:5 160:16 162:9 163:6 182:20 192:7,10 193:5 208:17 212:6 215:19 222:2 222:14,22 225:11 226:24 227:11 228:3 228:18 260:18 261:1 262:23 264:20,22 266:20 275:17 276:5 282:8,16 282:21 284:9 305:11 312:3 331:18 334:14 349:17 381:20 404:3
**confident** 99:13 99:25 102:6,11 102:12,24 103:22 104:2 395:19
**confidentiality** 40:22
**confidently** 41:9
**confirm** 196:13 225:5 233:25 236:21 238:18 246:5 299:3 332:7
**confirmation** 127:25
**confirmed** 127:19 225:2,3
**conflating** 104:15,20
**confound** 378:19
**confounded** 341:23
**confounding** 90:16 125:10 125:24 126:12 127:11 248:9 307:9 337:16 355:15 377:18
**confusing** 165:10
**congress** 5:22
**connection** 21:6,13 26:5 59:16 64:10 159:7 210:7 253:8 382:16 406:14
**consider** 32:22 61:25 63:24 89:16 176:6 187:4 197:15 258:1 301:18 307:8,10,12,13 316:21 341:17 383:17 391:13 401:19 412:23 416:8,10
**consideration** 227:20 338:11 366:8
**considerations** 292:6 293:14 293:18 302:10 310:22 317:1
**considered** 20:24 21:2,5 21:12 22:13 57:17 58:3,8,9 58:20,25 59:3 59:12 89:5,7 90:3 94:22,24 132:5,18 136:1 136:6,12 139:24 188:19 200:1 207:21 238:22 295:18 295:20 314:19 337:11 339:18 353:10 360:25 362:7 367:9 372:11
**considering** 31:1 89:1 138:14 139:23 367:6 377:17 404:7 419:10
**consistency** 292:10 302:11 305:17 306:1,7 309:3 311:1,25 326:20,25

327:1,2 329:8 329:17,20 336:9,11,24 337:3 350:13
**consistent** 245:8 285:15 310:18 329:23 331:23
**consistently** 153:12 229:6
**consists** 213:5
**consortium** 41:25
**constantly** 130:7
**constituent** 61:13
**constituents** 196:14
**constitutes** 134:21 187:9 308:2
**constituting** 26:13
**constraints** 386:11
**consumers** 387:9
**consuming** 64:13
**contacted** 31:8 31:9
**contain** 105:24 106:11,21 186:10,18 353:9,15 357:7 357:18 364:18 364:23 373:1 373:11,15 381:24 418:20 419:7
**contained** 185:3,6,13,19 188:17 189:5,6 355:18 357:11 357:13,25 358:15 365:21 365:25 366:4 366:16 418:18 418:22
**containing** 411:3
**contains** 52:25 54:6 285:13 353:25 354:13 354:17,23 355:23 361:24 379:14 419:2
**content** 44:24 245:5 322:20
**contents** 36:3 46:13 51:22 62:12
**context** 24:15 32:8 45:10,12 89:13 94:8 129:10,15 200:3 325:1
**continue** 10:9 31:6 55:12 199:15 202:18 319:24 322:23 335:1 336:4 348:5
**continued** 3:2 4:2 5:2 6:2 7:2 9:2 57:2 122:6 122:19 144:6 334:12
**continues** 293:7 382:24
**continuing** 54:24 266:13
**continuously** 62:4 183:24 202:20 283:9
**contraceptive** 392:16
**contrary** 410:1
**contribute** 161:11 197:8 344:16
**contribution** 246:9
**control** 114:3 230:18 368:18 385:12
**controlled** 309:12
**conversation** 10:6
**conversations** 43:21
**convincing** 412:20
**copies** 73:25 430:14
**coprincipal** 424:21
**copy** 20:12 47:3,16 53:8 53:17,19 73:24 149:22 251:14 295:23 322:17 427:1
**copyright** 326:12
**copyrighted** 326:14
**core** 389:22
**corporation** 3:17 11:18
**correct** 11:4 12:22,23 15:13 16:20,23,24 23:23,23 25:9 25:10 26:7 28:9 32:3,7 33:4 39:7 46:1 46:2,11 49:19 49:22,23 50:1 50:4,6,7,9,10 50:12,17,20,21 50:23,24 51:1 51:2,4,5,8,9,11

51:12,15,16,19
51:20,23,24
52:1,2,4,5,7,8
52:10,11,22,23
53:2,3,16,22
54:7 55:9,10
55:14 56:6
57:13,23 59:24
60:4,24 61:10
61:15,17 63:15
64:11,12,24
65:5,6,13,14,17
65:18,21 66:3
66:6,7,11,12
67:8,15,16,20
67:21 68:6,17
68:18,21,23
69:2,4,8,9,20
70:6,9,16,18
71:3 72:10,13
73:15,20 74:8
75:4,18 76:6,7
77:4,17 78:1,2
78:10,11,13,14
79:1,2 80:1,12
81:14,15,19,20
81:24,25 82:5
83:3,6,23,24
84:2 85:2,12
85:13,18 86:24
86:25 92:22
94:4 95:9
97:18 98:23,24
105:21 106:8
106:13 107:8
107:12,22
109:4,19,20,25
110:22 111:24
113:6,24
116:10 117:8
118:8,12,15
119:5 122:25
123:10,18,20
124:4,8,9
125:2,3 130:18
131:4,13
132:19 133:2,3
133:7,24
134:15,19
135:2,14
137:10,11
142:14,15,17
142:18,21
143:8,9 144:23
144:24 147:6
150:5,11
151:10,22
152:21 153:6,7
153:17,23,24
154:5,9,16,22
155:1,11,17
156:3,4,10,23
156:24 157:6
158:7,10 159:8
159:22 160:7
160:17,24
162:2,6,14,15
162:23 163:15
163:16,25
164:6,9,16,18
164:21 165:15
165:22 166:2
166:17,18
167:7,8,20
168:19 173:22
174:10 175:24
178:25 179:14
179:18,22
180:9,15
182:23 183:3
186:10 191:6
192:2,3,8,9,12
192:13,19,25
193:1 194:4,18
195:5 198:6,19
204:10 206:1
206:12 207:21
209:15 210:11
210:16 211:3,8
212:7 214:6
216:21 217:24
218:21 219:2
219:15 220:4,6
221:20 222:7,9
222:15,16,18
222:19,24
225:13 226:2
226:14,25
227:3,13 228:4
228:6,11,20,25
229:18 231:17
232:22 237:9
239:2 243:9,10
243:12,16,21
243:22 244:4
247:12 252:19
253:8,12 254:3
254:7,8,14,19
254:20 255:5,6
255:10,11,20
256:16,18,25
258:13 260:19
262:2 263:8,10
263:15 265:2
267:10 268:6
269:14 270:21
270:23 272:20
274:9 275:4,18
279:6,25
284:14 285:10
285:11,16
286:13,24
289:2 291:5
293:16 295:2
295:17 296:23
297:1,14 298:5
298:6,10,11
302:6,11 303:4
304:6,21 305:5
305:20,23
306:5 311:5
312:6,11,25
313:24 314:21
326:23 327:25
328:20 329:4,5
329:11 331:13

332:16 333:3 334:8 336:11 336:12 339:1 340:20 341:4,9 342:16 343:5 343:18 347:10 348:14 349:10 350:8,13 352:18 353:11 354:15 355:1 356:25 359:22 360:4,14,19,20 365:6 366:18 367:6 369:20 370:1,12,15 371:13 372:13 373:12,14 375:5,9 377:9 378:9 380:9,18 383:6,7,15,17 384:17 392:7,8 398:2 401:7 424:3,3 425:21 432:8
**correction** 174:10
**corrections** 432:6
**correctly** 12:16 67:5,6 167:4 301:22 363:19 381:3
**correspond** 20:2 105:19 108:13
**corresponden...** 23:13 44:15
**corresponding** 268:15 272:18 275:2 349:17
**corresponds** 247:6
**cosmetic** 387:5
**cosmetics** 51:7
**costello** 5:15
**cote** 1:12,17 8:12,14,16,18 8:20 9:4,10,13 9:14 10:13 12:2,14 14:20 14:25,25 15:6 17:24 19:12,17 20:18 22:14 23:4 25:24 26:17 27:2,23 28:5,14,21 31:13 47:6 54:18 58:19 73:12 74:3 101:5 104:18 142:2 157:25 188:25 201:24 205:7 221:2 224:20 236:16 252:3,16 271:21 291:17 312:10 320:24 388:5 406:9,13 407:20 409:14 419:16 420:8 427:15 428:6 430:5 431:2,24 432:2,4,12
**cote's** 8:15 20:12 27:21 39:8 231:1 251:10
**cotton** 7:8
**couch** 128:22
**counsel** 11:2,5 11:8 12:1 23:19 28:2,3 31:8,10 37:15 37:23 38:5 43:14 47:2 52:12 55:15 80:15,20 111:1 194:15 199:12 204:24 205:1 207:4 235:12 235:15 237:20 241:25 252:6 266:4 272:6 282:4 284:12 299:13 311:3 313:8,11 320:21 326:2 330:22 332:20 364:5 367:14 367:18 375:6 377:23 378:3 388:14 399:25 405:14 409:15 410:12 413:25 428:23 430:14
**counsel's** 58:18 201:25 204:12
**county** 1:18,20 428:2,4,13
**couple** 13:7 18:12,15 19:25 21:19 25:6 41:20 78:6 93:18 98:12 144:7 151:25 320:20 363:10 413:8 423:6
**coupled** 269:6 317:14
**course** 22:2 41:20 92:8 217:17 231:4 291:8 334:13 380:17 396:25 398:15 403:12
**court** 1:1 10:16 10:24 11:24 13:9 15:13,21 15:22,23 16:3 16:19 17:7 44:7 235:24
**courtesies** 44:7 44:10
**courtesy** 172:14

**courtroom** 43:20
**cover** 283:23 283:24 284:1
**covered** 294:22 304:15 388:9
**crawling** 242:1
**created** 27:2
**creme** 139:3 366:5,17,25
**criteria** 131:12 131:16 148:5 213:15 243:9 293:2 298:14 299:1 302:23 317:14 319:17 339:4,6,8,22
**critical** 283:6 316:6 348:3
**criticisms** 416:11 420:17 420:19
**cross** 8:4 388:3
**crosses** 109:14
**crr** 1:17 428:3
**curing** 387:2
**current** 55:6 75:5,10 76:11 76:15 121:3 255:12 330:11 358:16
**currently** 54:9 55:23 92:12 119:1,24 331:1
**curriculum** 48:16
**customers** 141:13
**cut** 98:16 298:16 299:6 301:15 318:25 406:9
**cutoff** 2:7
**cuts** 53:5
**cv** 1:3 10:18 48:19 49:3,8 49:14 91:22 415:11,18

**d**

**d** 5:4
**daily** 88:16
**dale** 146:19 147:2 158:13 209:25
**dan** 11:12,17 12:9 111:6 157:12 195:3 220:9 235:16 238:8 251:4 263:22 266:11 333:7,22
**daniel** 3:10,18 8:4,6 12:8 420:7
**data** 19:1,4 20:17 22:13 25:22,23 26:5 26:10 55:6,8 72:14 84:15 85:1 87:9 88:25 89:15 90:10 91:20 94:25 101:23 105:3 110:20 111:22 112:12 121:10 123:17 126:7 127:13 128:23 142:12 142:20 149:17 149:18 150:2 152:15 159:11 159:18 160:23 162:20 163:12 168:13,18 169:1,7,17,18 171:9 173:22 174:1,12 175:21 176:2 178:19,24 181:10 191:21 193:3 196:7 203:12 210:11 210:25 212:12 214:18 215:2 217:18 218:1,3 222:21 224:7 225:10 228:7 228:17 229:24 230:9,17 236:21 237:15 237:23 245:6 253:11 257:15 258:11 260:13 263:12 269:17 269:23 270:13 272:1 273:19 273:20,23,25 274:2,11 278:3 278:8,12,15,22 279:4 280:15 281:7 283:23 283:25 290:20 292:1 294:4 295:7 302:23 306:23 307:19 310:16 328:15 330:8 334:18 335:22 336:5,7 338:13 343:3,9 343:15,20 349:8,12,15 354:5 358:6 359:18,19,21 370:23,24 372:6 374:3 390:19 397:21 398:24 411:13 411:15 421:8
**date** 24:25 30:24 36:10,11 36:17,19 48:21 63:19 71:24 198:9 257:4 326:3 328:3 431:24 432:12

**dated** 29:15 47:22
**day** 1:20 33:12 33:15 34:5,8 34:12 35:25 36:8,12 37:18 39:12 43:15,24 44:2,4,6,14,24 45:3,10,13 64:6,6 129:1 168:24 214:17 295:6 298:3 331:9 351:21 358:16 364:10 378:4 428:13 429:5 432:15
**days** 19:25 220:19 426:19 426:20 430:16
**dc** 2:5
**deadly** 310:4,5 310:5 344:24
**dearborn** 3:11
**death** 199:18
**debating** 275:11
**debrosse** 2:15
**decade** 386:5
**decades** 98:12 176:11 299:20 358:10 363:11 383:25 399:18 399:21
**december** 33:20 47:22
**decide** 345:16
**deciding** 301:19
**decisions** 386:12
**declare** 432:4
**decrease** 171:14 241:17 265:13
**deduced** 292:9
**deemed** 228:7 432:6
**deeming** 334:15
**deep** 72:13 92:8
**defend** 311:14
**defendant** 1:18 3:8,16 4:3,10 4:16 5:3,9,19 6:3,9,15
**defendants** 8:10 19:15 28:3 42:8 414:13 428:11
**defending** 242:14
**defense** 17:2
**define** 87:18,19 105:12 126:10 207:23 287:12 345:7,9 400:25 401:1
**defined** 110:20 202:15 383:14 419:3
**defining** 303:11 406:23
**definition** 106:19 108:15 109:18,21 222:8 248:21 346:9 360:21 379:7
**definitions** 105:8 396:24 406:15
**definitive** 122:10
**degree** 49:22 69:7,11 70:22 407:21
**degrees** 389:9
**delineate** 181:25
**demand** 325:13
**demographics** 146:4
**demonstrate** 324:11 325:21 325:25 402:23
**demonstrated** 240:21 405:6
**department** 389:11
**depend** 170:4
**dependent** 117:14 314:15
**depending** 83:3 83:7 361:15
**depletion** 240:5 281:6
**depo** 242:11
**deponent** 427:11 428:6 428:19,20 430:13 432:3
**deponent's** 25:23
**deposed** 12:21
**deposing** 430:13
**deposition** 1:10 1:16 8:9,10,11 9:3,13 10:12 10:19 12:10 16:10,13 17:19 17:23 19:10,16 24:9 28:6,16 35:21 37:4,12 37:16,24 38:6 38:15 39:1,9 39:14 46:21 69:24 73:14 74:1 117:22 144:18 148:21 177:9 209:2 236:14 242:14 249:8 253:20 300:24 302:17

311:14 320:1 327:11 328:9 328:17 368:7 388:14 428:10 428:16,21
**depositions** 20:16
**depth** 94:14
**derived** 83:15
**derma** 376:25
**dermal** 382:9 382:12
**dermatologist** 51:10
**describe** 87:15 94:25 96:21 116:8 199:1 205:2
**described** 93:25 292:4 340:4 413:12
**describes** 339:22
**describing** 219:7
**description** 95:15 250:18 251:2,3 338:22
**descriptive** 397:18
**design** 244:2,12 248:6,10,14 378:16
**designed** 90:14 127:22 145:17 248:3,18
**detail** 42:17 59:6 90:6 203:12 341:19
**detailed** 129:18 283:7
**details** 90:1,12 91:6 157:6
**detect** 234:15
**determinant** 87:8
**determinants** 86:4,4
**determine** 31:4 85:11 87:7 111:22 113:5 126:21 130:14 159:20 175:22 210:25 228:8 292:8 293:19 340:11
**determined** 385:10 407:1
**determines** 111:22
**determining** 404:4
**detrimental** 404:8
**detroit** 40:9
**develop** 88:21 112:10,14 167:6,16 168:17 170:7 174:3,6,20,22 175:17 176:10 180:6,8 181:13 218:11,23 281:3 310:12 345:17
**developed** 64:10 143:20 146:15,18 163:24 164:8 167:24 168:8 168:15 170:5 175:7 182:6,12 231:16 262:21 286:23 339:10 415:17
**developing** 88:6 344:23 345:5 349:6 404:12
**development** 250:24 349:18 415:20
**developmental** 348:3
**develops** 130:13
**device** 133:23 155:1
**devices** 133:5
**diabetes** 79:24 80:4
**diagnosed** 74:20 145:25 261:20
**diagnoses** 250:13
**diagnosis** 212:24
**diandra** 2:15
**dicello** 2:16
**dicellolevitt.c...** 2:18,18
**dicing** 317:21
**didactic** 389:8
**diet** 250:9
**differ** 394:20
**difference** 96:16 110:2 223:17 224:5 267:6 268:1 276:9 342:14 392:9 393:2
**differences** 223:14,15,23 224:11 285:1 312:18 342:24 395:11 408:16
**different** 62:5 74:7 75:24 76:23 77:2,2,7 78:12 80:5 82:9,13 83:9 90:24 93:12,14 93:15,15 96:8 97:25 100:3,7

100:8,10 101:10,19 104:20 129:20 134:3 137:19 148:5 151:20 152:1,2 170:18 174:19 180:14 183:10 184:23 185:21 188:23 188:25 211:6 216:8 233:1 246:5,18,23 248:1,15,22,24 248:25 249:1,2 259:3,23 280:19 285:4 286:15 293:18 296:7,23 312:13 315:21 321:10 324:14 324:14 325:16 329:18 330:4,5 330:5 336:21 347:14 355:25 358:22 360:24 363:15 367:8 370:4 376:22 377:2 385:4 394:24 411:4,5 417:4
**differential** 8:22 168:10 170:14 174:15 175:22 176:5 176:13 178:15 219:5,7
**differently** 156:7 317:24 375:24 402:5
**difficult** 190:8 277:22 283:14 313:18 320:22 322:22 340:11 341:16
**dinsmore** 6:17
**dinsmore.com** 6:19
**direct** 8:3 12:7 35:4 171:18 329:13 356:16 387:5
**directed** 283:16 399:25 402:15
**direction** 101:19 114:18 168:11 370:9 428:18
**directions** 165:10 400:17
**directly** 56:25 58:10 190:4 230:1,4,16 325:8 356:1 411:2 413:5,6
**director** 95:13
**disagree** 415:3 415:8
**disagreed** 416:9
**disciplines** 375:25 388:19 389:3 398:21
**disclosed** 46:1 233:2
**discomfort** 240:17
**discontinue** 383:21
**discuss** 25:8,11 183:18 196:4
**discussed** 59:19 59:23 73:13,23 179:10 190:2 214:4 288:6,11 293:12 297:11 298:8 306:24 306:25 330:25 331:10 341:18 378:15 380:20 392:10 394:22
**discussing** 78:23 252:17 289:5 301:7
**discussion** 11:3 34:22 37:9,11 37:14 63:9 103:7 141:20 162:1 194:17 201:6,11 206:22 219:4 230:10 299:16 327:18 347:4 364:21 381:1 392:1 400:4 420:1 422:25 424:13 426:24
**discussions** 32:9 38:4,9 39:13 43:11 45:2,13,17,19 60:8,14 92:15 94:12,17 390:7
**disease** 86:4,8 130:13 161:4 175:18 240:1 285:2 310:12 310:14 316:7 329:24 339:1 340:14 341:1 387:4 395:2 408:11,12
**diseases** 340:12
**disentangle** 409:4
**disinterested** 428:24
**disparities** 8:13 40:4 78:24 197:22,22 246:10 393:23 394:3,9
**disregulated** 240:11,14
**disrespect** 313:10

**disrupt** 362:17
**disrupting** 27:7 353:19 360:14 360:16 361:1 361:11,24 362:10,14,23 363:3 381:24 419:4
**disruption** 51:4 388:18
**dissertation** 314:10 315:18 389:14
**dissertations** 389:17
**distance** 253:2
**distinct** 74:4 82:21 296:22 297:13 298:4
**distinction** 32:17 58:1 89:10
**distinguish** 124:17
**distinguished** 255:7
**distinguishing** 163:18 366:24
**distracted** 403:5
**distribution** 86:3
**district** 1:1,1 10:16,17
**diverse** 197:3
**divide** 101:17
**dividing** 261:25
**division** 1:2 10:17
**divito** 3:18
**doctor** 137:24 185:17 425:17 425:19
**document** 18:2 18:8 19:13,19 19:23 47:10 120:19 123:1 145:6 149:13 152:9 160:11 195:2 252:12 253:23 254:11 301:2 320:13 320:23 321:7 322:17,21 323:5,21 326:4 327:20 417:10
**documents** 18:11 20:15 22:11 23:3 25:21 26:13,21 26:25 27:13,16 423:9
**doing** 12:16 34:10 54:24 55:2,7 91:18 91:24 112:2 127:18 128:9 128:12,14 159:17 166:7 205:4 236:13 242:17 247:24 263:11 290:19 295:19 311:16 337:7 381:12 384:18 416:4 422:8 426:14
**dose** 130:9 131:8 229:9 271:18 272:23 272:24,25 276:18,18,21 277:9,14,23 278:13 285:15 341:4,8,21 342:2,4,7 343:4,12,16,25 344:2,6,14,22 344:25 345:4,8 345:9,14,22 346:3,5,5,21 347:1,11 348:12 349:21 350:1 406:17 406:24
**doses** 348:19
**double** 224:7
**doubt** 181:21
**douglas** 2:11
**douglasandlo...** 2:13,13
**dozens** 203:4 335:3 357:14 358:8 361:2
**dr** 14:20,25,25 15:6 19:12 20:12,18 22:14 23:4 25:24 26:17 27:2,21 27:23 28:5,14 31:13 38:23 39:3,5,8,10,14 39:17,20,24 40:14 41:6 42:6,10,11,12 42:15,20,20 43:5,8 47:6 54:18 58:19 73:12 74:3 101:5 104:18 142:2 146:22 157:25 158:20 188:25 201:24 205:7 221:2 224:20 231:1 236:16 251:10 252:3,16 271:21 291:17 312:10 320:24 388:5 406:9,13 407:20 409:14 414:18,19,24 415:10 416:17 416:19,23 419:16 420:8 420:10 423:3 423:14 424:17

424:20
**draft** 46:4 47:24
**drafting** 48:3
**drafts** 46:13
**draw** 84:11,23 87:2
**drawing** 204:1
**drawn** 122:10
**drive** 4:6 5:16 169:25 300:17 345:15
**drives** 397:12 397:13
**driving** 112:8 196:15 297:16 300:5 398:8
**drug** 124:21 387:2
**dry** 318:25
**dspira** 3:12
**dstanner** 3:21
**due** 114:24,25 122:3 125:8,23 127:9 178:12 188:13 231:12 261:15 271:12 284:22
**duly** 12:3 428:7
**duration** 69:1 263:3 266:24 270:14 271:4 272:24 276:23 277:7,11,13,19 285:19 286:1,9 289:24 343:4 406:21 409:4
**dye** 206:5,6,6 206:16,20,24 208:7,8,9,10 381:16
**dyes** 160:4 171:16 247:13 247:14,14 380:23 381:22 382:18
**dying** 403:6

**e**

**e** 7:10 241:5 254:19 421:10 421:10 431:3,3 431:3
**earlier** 15:3 32:5 143:6 167:18 169:10 173:21 181:4 184:19,21 196:3 217:16 229:14,15 232:16 271:15 280:24 286:19 286:25 304:3 312:12 341:11 364:22 367:5 378:15 389:10 392:11
**early** 33:12 79:18 143:24 147:13 348:4,7 349:5 393:23 414:12
**easier** 319:1 363:5
**eastern** 1:2 10:17
**eating** 377:3
**eckert** 6:11
**eckertseaman...** 6:13
**edc** 363:16 369:22
**edcs** 363:4,8,14 363:18 364:1,3 365:17,20,25 366:3 399:16 399:20 418:20
**edges** 343:10
**edition** 320:11 326:6,8
**editor** 412:15 413:5
**effect** 105:20 173:6 182:22 191:3,17 192:16 223:9 224:18 225:18 226:9 229:5 234:3,6,14,17 235:3,7 236:24 242:20 244:16 265:15 285:9 299:25 324:12 325:22,25 329:22
**effective** 244:1
**effects** 105:19 177:16 231:11 265:24 348:2 363:13 380:22 385:14
**efforts** 246:11
**eight** 151:4 286:15
**either** 25:12 40:16 43:25 64:2 225:9 230:4 231:22 279:14 285:19 350:18 429:1,3
**electrical** 133:23 155:1
**electronic** 19:9 24:8 46:20 144:13 323:1
**electronically** 28:12 117:18
**elements** 407:5
**elevated** 241:2 246:14
**eligible** 145:21 238:22 239:9
**embark** 64:15
**emerging** 374:1

**emily** 7:12
**emphasis** 116:21,22
**emphasizes** 122:19
**emphasizing** 122:6
**employ** 429:3
**employed** 87:25
**employee** 27:18
**employment** 48:24
**encapsulates** 238:3
**encompass** 187:7
**encompassed** 187:5,22 219:14
**endeavor** 64:13
**endocrine** 27:7 51:4 353:19 360:13,16 361:1,11,24 362:10,14,16 362:23 363:3,9 381:24 399:17 419:4
**endocrinolog...** 50:25
**endocrinolog...** 390:10
**endocrinology** 388:18,18
**endometrial** 8:13 295:25 368:17 369:19
**endometrioid** 76:5 78:17
**endometriosis** 77:21 79:19
**ends** 183:13 343:10
**english** 428:17
**enrolled** 145:20 147:8
**enrollment** 212:23 213:1 221:12 250:2 411:7
**enter** 377:9 382:20,25
**entering** 286:23
**enterprises** 5:10
**enters** 382:5
**entire** 203:23 239:17 308:1 322:17 332:2 366:9 407:17
**entirely** 300:14
**entirety** 63:21 308:12,19,21 322:21
**entitled** 23:12 46:7 253:23
**entry** 279:17 287:9 355:20
**environment** 390:4
**environmental** 143:22 144:10 145:18 251:7 390:1
**epi** 21:20 294:22
**epidemiologic** 49:17 86:14 93:1,7 94:14 95:10 105:11 106:2 110:18 111:20 114:2 128:16,21 195:24 198:10 211:24 245:2 283:7 288:10 288:20 292:7 293:22 307:20 310:16 331:2 378:16 400:12 417:17 422:2,7
**epidemiologi...** 59:23 62:2 84:15 85:1 86:21 92:20 99:5 108:25 116:3 123:17 198:2,16 211:21 242:22 257:14 260:6 288:5,23 290:2 293:13 298:7 326:22 330:19 394:10
**epidemiologist** 38:24 51:15 54:21 84:14 89:13 94:10,19 95:1 196:18 292:5,16,21 389:1,10 423:19
**epidemiologi...** 42:23 85:9 95:7 97:9 123:9,11 130:16 322:8 323:15 324:16 375:23 390:9
**epidemiology** 40:1 49:18 79:7 85:7,9 86:1,2 92:7,8 93:18 116:20 118:5,14 176:21 177:24 196:6 226:8 259:10 302:25 309:20 325:24 390:18 393:24 398:25 399:13 421:9 423:15

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 465 of 539 PageID #:74653



**equal** 87:2 124:7 219:1
**equipped** 391:16
**errata** 430:11 430:13,16
**error** 53:11 90:15 114:7,10 114:10,15,17 127:10 307:9 337:15
**errs** 401:21
**especially** 62:6 190:9 197:20 301:18 344:23 362:19
**essentially** 193:21 271:13 295:22 297:21
**establish** 95:3 284:8
**established** 80:13 312:24 379:16 380:6 421:12
**estimate** 33:5 35:10,15,18 98:2 100:1,5 102:14 103:13 103:17,18 104:24 109:9 109:20 113:14 115:13 127:4,5 217:25 260:25 282:24 299:25 307:24 312:15 312:16
**estimated** 160:15 212:5 260:17
**estimates** 97:2 97:24 117:13 173:7 223:11 223:19 225:16 270:9 274:19 276:5,7 286:15 312:19 341:23
**estimating** 102:18
**estrogen** 79:25 362:17,19 385:1
**et** 66:17,24 230:19 252:14 257:24
**ether** 313:16
**ethnic** 66:5 68:13 147:9 197:4,7,15 394:24
**ethnicity** 190:23 193:23 213:9 221:19 223:8,16 227:6 227:8 229:25 238:19
**etiologies** 83:8
**etiology** 285:2
**evaluate** 197:5 221:10 246:9 292:7
**evaluated** 198:3 379:13
**evaluates** 298:9
**evaluation** 225:17
**event** 55:16 429:2
**events** 275:18
**everybody** 276:1 402:2,4 424:11 425:8
**everyone's** 363:4
**evidence** 9:12 62:2 68:8 116:13,14 118:4 122:7,20 152:10 156:12 195:13,20,24 195:25 203:17 245:1,3,4 277:23 280:9 280:15 292:2,8 298:15,21,23 299:5,22 300:15 308:22 310:14 320:10 321:8 329:22 337:21 338:1,4 338:6,12 341:8 341:19 342:1,3 349:25 353:24 356:12 362:12 380:2,3 383:3 383:5,13,18 384:13 386:6 399:19 401:23 401:25 404:19 410:1
**evolve** 361:8
**evolved** 396:17
**evolving** 130:8
**exact** 24:25 41:14 89:2 183:25 184:1 194:1 401:2
**exactly** 66:2 140:16 149:25 156:5 225:14 308:20 378:5
**examination** 1:16 8:2,3,4,5 12:7 388:3 420:6
**examine** 93:3 96:22 227:6 248:12 339:24 377:15 378:10 399:19 400:22
**examined** 12:5 211:24 336:6 339:16 381:15
**examiner** 146:6

**examines** 288:6
**examining** 227:21 319:17
**example** 81:16 82:1 84:6 86:11 99:1,4 104:7 106:5 107:6 108:20 108:24 110:13 114:9 117:2,17 120:5 127:17 129:24 153:10 164:25 184:16 315:17 316:18 340:17 354:16 355:7 383:19 399:16 413:4
**examples** 83:21 95:21 119:21 138:20 284:17 351:18 384:20
**excellent** 33:9
**except** 27:2
**exception** 23:20 359:12
**exceptions** 352:1
**exclude** 44:3 212:16
**excluded** 17:6 239:11 261:15
**excludes** 276:15
**excluding** 44:5
**exclusion** 147:20,23 213:15 243:6,8
**exclusions** 160:22,25 212:12 213:11 239:19 261:7
**exclusive** 97:16
**excuse** 13:4,24 21:10 31:20 45:18 75:12 113:14 121:18 131:11 152:25 189:15 229:14 264:13 269:16 275:16 303:9 305:15 306:7 336:9 371:14 418:11
**exercise** 124:21 401:20 402:18
**exhibit** 8:9,10 8:11,12,14,15 8:16,17,18,20 8:21,22 9:3,4,5 9:7,9,10,11,13 9:14 17:17,19 17:22 19:8,10 20:3 24:9 25:19 27:12 28:12,15,16 46:19,21 47:3 47:7 48:5,10 73:23,25 74:1 117:20,21,22 118:1 144:13 144:15,16,18 144:21 148:18 148:21,24 158:1 177:6,7 177:8,9,13 178:22 208:25 209:1,2,5 249:5,6,8 251:5 252:2 253:18,20 300:20,22,24 302:1,13,17,20 320:1 327:3,5 327:6,7,10,11 341:14 368:5,6 368:7,11 380:13,14,15
**exhibits** 8:8 9:2 26:15 323:1
**exist** 84:10 319:20 356:12 401:18 404:15 411:20
**exists** 86:16 198:2 284:18 322:9 330:2,9 331:2 341:17 391:10 395:23
**expect** 100:15 102:14 133:15 224:2,8,10 277:5 285:1 339:13 344:1 378:18
**expectations** 177:17
**expected** 130:22
**expedite** 426:21,23
**expedited** 425:21,22 427:4,5
**experience** 119:2 120:11 133:11 389:2
**experienced** 255:2
**experiment** 292:12
**experimental** 338:13 383:2,5 383:13,18 386:1
**experimentat...** 383:12
**experiments** 338:14
**expert** 8:15 15:11,16 16:4 16:6,22 17:1,6 17:14 18:17,21 18:23 19:1 20:16,25 21:1 21:5 22:20

26:20 29:8 30:21 32:10,23 33:25 34:19 35:2,5 38:18 38:19,21 39:17 42:7,8,16,20 43:1,5 46:4 47:1,12,25 48:5 50:8,19 50:22 51:3,6 51:25 52:3,9 52:21 55:24 58:6 60:21,24 61:25 63:8,14 63:24 64:9,15 71:13 87:21 88:22 89:3 90:4 92:19 93:24 105:9 169:16 183:6 230:5,8 245:9 283:1,8 291:18 295:12,14 297:3 326:19 327:24 328:6 332:1 334:22 336:3 345:1 358:21 363:2 367:10 371:20 372:11,13 380:1 386:24 388:17 390:24 391:3,9,13,17 409:20 410:16 414:8,13 417:10

**experted** 52:6

**expertise** 62:8 337:13

**experts** 39:2,6 43:12,16 45:14 45:20,25 55:17

**expires** 429:12

**explain** 54:13 66:8

**explained** 332:12 343:7 380:9

**explaining** 131:7

**explains** 160:21

**explanation** 113:23 200:21 203:25 204:22 234:22 279:12 332:22 333:20

**explanations** 283:3

**exploration** 355:25

**explore** 356:11

**expose** 124:20 232:10 338:15

**exposed** 171:24 172:25 241:11 244:11 285:14 346:10 348:23 359:10 361:23 396:10,13,17 396:21 407:22 408:3 409:2

**exposure** 61:6 84:24 85:2,10 85:16,17 86:10 86:10 87:5,7 87:10,15,19 89:17 93:3 95:17,18 96:14 96:15 99:14 104:11 110:15 118:17 128:8 160:11 183:9 195:21 198:3 240:21 256:23 259:17 260:7 265:12 271:12 271:15,17 288:7 293:24 326:23 329:24 338:25 339:25 340:13 343:10 344:10,14 348:2,7 352:12 363:14 367:9 369:23 376:20 376:22 378:22 378:24 385:5 398:2 400:25 405:6 406:19 407:1 408:10 409:5 414:3 416:20

**exposures** 27:8 83:25 93:16 96:24 144:10 152:2 176:17 224:12 248:1 248:19,25 249:2 254:6 259:9 312:23 352:13 378:17

**express** 283:15

**extended** 44:8 269:4

**extensive** 148:14 189:7 189:19,20 232:1,17,19,25 233:5

**extensively** 376:3

**extent** 32:16 40:21 59:5 61:8 278:23 322:16 330:6 392:24

**external** 40:7

**extra** 421:15

**extraordinarily** 337:17

**eye** 150:8

**eyeliner** 150:8

**f**

**facets** 89:1,16

**fact** 17:13 39:2 47:20 178:24 204:19 241:8 241:14 269:6 281:10 300:2 330:1 337:18 353:25 354:23 355:17 361:20 390:8 393:5 402:20 405:1
**factor** 81:17 82:21 84:24 85:19 87:8 297:25 315:12 329:16 336:9 339:19 350:5 383:10 392:12 392:17,18,21 392:23 393:1 393:12,14,17 393:20
**factors** 25:12 62:5 77:3,7,11 77:19 79:9,13 79:16 80:11,14 80:16 81:11 82:9 83:1,22 84:12 86:5 145:19 146:5 223:7 250:6 293:3 297:14 297:18 298:4 314:15 317:12 336:11 337:11 379:21 391:23 392:6,7,20 393:6
**factory** 81:22
**factual** 335:9
**faculty** 389:22
**failed** 110:10 113:7
**fails** 430:18
**fair** 14:4 60:22 96:17 151:18
**fairly** 212:17 263:16 344:6
**fall** 23:25 25:4 25:4 30:14 102:14 103:18 103:19,22,24 104:12 107:21 124:12 217:20 339:14
**falling** 100:2
**fallopian** 74:13 75:3,9,16
**familial** 78:5
**familiar** 43:7 134:16,20 176:20 303:6 321:6 368:22 369:3
**family** 77:21,22 78:5 79:20,21 250:5
**far** 99:8,9 198:11 214:5 214:10 229:2 274:3 311:16 323:10 328:7
**fatal** 316:8
**favor** 315:8 316:23
**favorite** 196:19
**fear** 270:9
**feasibility** 384:24
**feasible** 383:5 383:25 407:18
**february** 1:20 10:4 428:13 429:6 430:3
**fedak** 9:10 307:7 309:19 317:23
**federal** 1:21 9:11 15:13,21 15:25 428:15
**federer** 4:4
**feel** 56:6 58:14 104:15,19 202:22 237:9 245:5 265:6 278:12,21 282:23 295:8 337:16,19 343:8 390:14 391:16 409:20 417:15
**feeling** 171:8
**fellows** 92:11 92:12,13
**felt** 336:20
**female** 62:7 82:14,15 296:1 417:6
**fewer** 213:12
**fi** 403:6
**fibroid** 169:10 260:1
**fibroids** 240:15 240:15 241:4
**field** 55:18 80:14 88:16 95:4 116:12,17 130:6 390:24 391:3 398:25 399:2 400:24 423:15
**fields** 88:25 89:15 92:13 129:20
**fifth** 120:18
**figure** 228:10
**file** 20:13
**filed** 10:15
**fill** 153:16 338:20
**final** 46:4,7 203:15 220:18 251:15 252:13 425:24 426:9
**finally** 72:2

**financial** 2:17
**find** 24:25 123:25 171:20 172:5,8 190:8 199:1 203:15 205:23 206:25 208:3 313:3 380:22
**finding** 122:18 207:10,11 229:25 282:9 282:17 286:12 291:2 307:25 315:8,22 326:20 343:17 403:22 421:23
**findings** 91:20 95:1,4 116:9 196:4,12 197:17 200:2 200:12 204:3 207:19 246:5 279:21 280:2,7 280:12 282:25 284:11,20,22 286:10 289:19 291:3 308:13 308:15,20 309:4 316:6 324:5,8 327:2 328:23 331:23 335:9 336:24 337:25 369:24 381:17 395:21 398:22 405:5 412:10,13 421:1
**finds** 93:9 375:3
**fine** 65:9 173:10 204:25 280:4 313:5,7 323:4 363:7 426:1
**finish** 13:13 14:13 172:13 172:13,20 317:19
**finished** 78:6
**first** 12:3 31:8 31:9 37:10,14 55:5 63:19 79:19 87:17 92:23 119:23 121:1,18 144:8 178:5 194:24 195:13,20,23 195:25 196:5,7 196:22 202:1 203:17 209:13 225:21 233:12 249:21 254:15 254:22 263:4 263:19,24 264:6 267:1 270:2 274:5,6 274:15 275:22 276:12,24 301:9 302:8,9 303:9,9 309:9 319:16 320:18 320:20 322:6 325:19 329:14 348:13,16,17 349:16,21 386:5 407:7 414:23 428:7
**fit** 128:24 385:6
**fits** 120:13 130:4
**five** 75:24 76:9 140:23 151:4 158:23 315:19 315:21 358:10 371:10 395:5
**fix** 359:15
**fixated** 168:23
**fixation** 417:11
**fl** 3:14 6:19
**flag** 44:20 405:15
**flagged** 305:18
**flat** 132:21 135:20 154:4,9 154:13 183:12 184:9,11,15 232:3 233:19
**flip** 274:13
**flippantly** 400:11
**flipping** 101:17
**flonger** 3:6
**floor** 2:12 3:20 6:12
**focus** 104:23 190:4 382:23
**focused** 190:5 204:19 310:25 417:1
**focusing** 204:20
**fold** 203:1 315:1 397:24
**folder** 73:17
**follow** 16:13 144:6 161:11 250:11 281:13 410:21 411:12 420:23
**following** 96:11 160:2 208:5 238:9 426:6
**follows** 12:6 96:7 329:10
**footnotes** 279:14
**forces** 319:2
**foregoing** 428:10 432:5
**form** 32:13 46:4 52:16,18 59:25 62:23 63:16 65:22 68:7,22 70:7 70:17 71:23

80:25 83:4
84:3 85:3
87:12 89:19
91:14 96:18
97:20 98:9
99:18 102:8
104:13 106:14
109:5 111:4,25
117:9 121:12
122:23 123:19
125:11 132:6
133:9 136:3
137:12,17
138:12,18
139:6 142:22
149:16 151:12
154:10 155:2
155:12,18
164:17 168:6
168:20 171:5
174:23 199:3
204:25 210:18
219:20 243:1
244:5,19,25
256:5 257:1,17
270:22 272:21
274:11 275:5
280:4 283:18
288:19 313:5
314:2,3 315:9
317:2 318:17
344:17 349:11
350:14 351:14
354:7 355:14
359:3 382:1
389:6 391:7
393:8 394:4,14
398:3 401:14
409:23 410:25
414:5 418:14
**formaldehyde** 27:5 52:7
186:1 356:25
357:7,11,13,18
357:25 358:12
358:15 359:2,5
359:7,10,14,19
359:23 360:7
366:15,16
375:11 376:11
419:7
**formally** 292:4
**formed** 63:25
**forming** 58:12
59:13 60:7
**formulating** 20:19
**formulation** 339:3
**forth** 22:11
26:14 64:9
137:4 331:21
**forward** 31:1
35:13 36:24
96:7 272:13
332:3
**found** 96:3
173:9 198:16
200:25 204:7
205:9 208:14
214:3 233:18
247:10 288:24
290:3 331:11
332:7,17 334:6
363:23 412:19
417:18 420:9
**foundational** 293:2 320:19
**founder** 423:22
423:24 424:1
**four** 43:16
121:23 151:3
202:16 203:1
208:14 273:14
325:15 342:4
**fourth** 254:10
320:10 326:7
**fractional** 397:9
**frame** 94:6,6
273:13 357:12
361:16
**framed** 180:20
**frames** 330:6
**framework** 94:23 130:20
131:3,16 132:1
293:5,12
295:17 302:5
312:2 314:20
319:8 326:21
329:4 341:7
343:15 379:22
383:15 401:7
401:12
**franklin** 6:6
**frankly** 182:2
283:11 294:20
383:25 400:8
**frederick** 3:4
**freedom** 325:11
**frequency** 68:20 105:25
107:19,20
202:14 207:21
208:6 229:10
263:3 266:25
269:9 271:6
272:16,17,25
273:4 276:23
277:12,13,18
277:20 285:20
286:2,11
289:23 343:5
406:22
**frequent** 183:21 191:9
192:17,21
195:14 202:16
203:1,19
207:11 222:11
224:2 228:1
305:9
**frequently** 68:10 150:21

**front** 19:12 28:14 52:25 57:24 88:20 117:25 144:21 148:25 253:22 301:3 326:5 327:20 368:11
**frozen** 405:16
**fu** 2:15,18 38:2
**full** 120:20 121:19 148:7 156:14 178:5 200:3 216:6 229:23,24 238:22 239:9 239:16 263:19 263:24 269:4 277:9 278:13 278:14 301:11 303:9 308:15 344:11 352:7 359:4 370:21 371:1
**fully** 372:6 402:8
**fulsome** 204:22 234:9 332:22 332:22
**functioning** 185:24
**fundamentally** 415:3
**fundamentals** 92:7
**further** 54:10 54:16,23 76:24 125:6,20 126:17 167:19 168:19 193:22 196:9 199:24 213:18 219:2 246:18,23 356:7 404:22 419:15,20 425:3,5 427:11 428:24
**furthermore** 284:24 343:22
**future** 149:17 196:23 197:2 246:11 400:15 400:16,20

**g**

**game** 205:5
**gandel** 1:17 428:3 429:7
**gary** 2:6 11:22 37:9,11,20
**gaston** 158:13
**gastrointestinal** 74:19
**gender** 95:19
**general** 75:10 322:2 323:11 385:10 395:9
**generally** 41:14 97:7 298:1
**generate** 100:5 100:6
**generating** 91:18
**genes** 315:21
**genetic** 116:20
**genetics** 309:8
**genital** 77:25
**genotyping** 422:8
**gerel** 2:3 11:20
**germline** 309:9
**gerstman** 43:8
**gerstman's** 43:5
**gestures** 13:18
**getting** 36:2 107:1 139:15 302:7 309:19 323:6 354:22
**ginex** 5:15
**give** 15:7 34:9 98:25 99:4 114:9 172:13 194:23 204:21 218:10 235:10 236:7 263:21 279:10 313:17 328:3 333:11 333:19 337:4 344:9,9 351:18 380:3 383:19
**given** 17:1 23:17 33:11 49:6 77:20 79:17 84:25 87:8 122:17 146:13 155:22 156:8 181:17 196:11 220:1 242:3 284:17 325:13 326:22 332:21 339:19 340:18 361:20 373:25 395:22 402:21 426:15 426:17 428:19 432:9
**gives** 100:14 112:8 236:1,2 380:1
**giving** 69:22 110:13 204:14 338:6 344:11
**glaring** 420:22
**global** 241:9
**glossary** 105:10
**go** 10:10 13:6 14:13 20:1 34:16 42:3 53:6 57:8 92:8 100:11,18 101:14 109:7 121:14 123:7 133:25 138:13 145:5 150:12 157:10 172:4 172:21 181:23

188:3 190:17 194:13,24,24 195:1 196:20 201:14 203:7 213:1 214:9 228:22 238:6 247:5 251:18 254:9 256:19 266:9 270:10 301:23 303:8 303:25 311:11 314:16 315:16 315:17 321:15 322:14 324:3 325:3,4 326:13 326:18 328:24 328:25 329:3 331:16 332:13 332:23 342:10 367:16,19 387:17,19 404:21 405:21 416:2 419:21
**goal** 86:6 188:9 188:11
**godrej** 1:19
**goes** 56:15 57:11 119:12 119:13 184:5 200:22 239:10 265:18 273:4 300:4 310:21 346:7
**going** 10:3 13:15 34:6,13 46:8,25 52:13 71:22 72:25 76:21 82:8 83:2 87:11 88:3,17 90:22 101:2 112:17 112:21 115:11 127:3,24 157:11 165:24 168:5 169:20 179:3 184:9 199:1,5,24 200:10,18,19 200:20 201:15 202:20 205:20 209:17 212:19 218:7 220:9 223:1 233:8,19 237:18 238:4 244:8,9 252:9 272:22 273:23 275:14 279:19 284:3 285:4,23 289:9 297:5 300:13 304:9 310:3 314:22 317:6 318:20 319:23 320:19 320:22 333:11 335:21 344:21 346:21 348:18 363:4 364:9 372:1 376:5,17 387:14 388:8 396:23 402:10 403:2 417:22 421:15 423:25
**goldberg** 5:5
**goldbergsega...** 5:7
**good** 10:2 12:9 95:21 141:14 169:7 182:15 220:7 224:6 244:11 245:19 259:9 265:21 308:2 309:5 321:4 327:9 344:3 378:15 411:14
**goodman's** 42:15
**gotcha** 270:16
**grab** 251:16
**grade** 8:13 76:4 76:4 78:17,18 395:3
**gradient** 292:11 341:2 347:19
**graduate** 40:3 385:18
**graduated** 389:14
**grant** 40:2,4 389:23,24
**grants** 294:5
**great** 14:16 73:3 129:24 311:15 341:19
**greater** 175:4 197:4 208:14
**greeting** 43:21
**ground** 13:7
**group** 2:20 66:5 68:17 96:9,14 124:21 167:6 168:15 168:16 169:22 174:5 175:16 175:17 176:8,9 239:24 262:24 262:25 265:9 265:10 267:8,8 268:3,3 269:8 274:13 276:8,9 284:8 285:13 286:22 288:2,2 307:2,3 331:12 332:9,18 334:8 341:25 346:11 369:13 376:17 390:4
**groups** 41:25 68:13 96:16 110:3 170:15 170:18 176:14 177:3 197:7 223:25 262:6,7 262:13,15,21

286:7 306:16 312:13 342:15 390:2 394:24 408:16 409:9
**grown** 116:18
**growths** 240:16
**gshipman** 2:9
**guess** 29:18 30:23 34:17 60:9 62:15 119:22 126:15 129:4 138:4 139:14 217:6 225:1,1 252:14 309:15 316:14 316:15,20 336:25 345:6 350:23 361:15 411:10
**guidelines** 339:22 340:1
**guys** 321:18 405:24
**gyn** 39:4
**gynecologic** 24:19 74:25 92:13 395:25

**h**

**h** 431:3
**habits** 254:7
**hair** 1:6 9:5 10:13 15:12 25:8 27:4 31:15,16 32:1 32:5,11,15,23 33:7 51:18,22 60:19,22,25 61:5,14 62:2 64:2 65:2,4,11 65:16 66:10 67:1,14,25 68:3,4,10,14,20 69:2,14,18 70:4,14 71:20 72:8 123:23 132:4,5,10,10 132:13,14,17 132:18,22 133:1,4,11,14 133:15,18,20 134:5,8,8,15,19 134:25 135:2,6 135:8,11,12,13 135:18,23 136:2,7,11,13 136:17,22,22 137:1,9,11,15 137:20 138:7 138:10,15,17 138:24 139:2,5 139:10,12,16 139:19,24 140:1,4,25 141:3,8,12 142:10,11 143:2 144:25 150:9,22,23 151:21 152:4 153:4,12,22 154:2,12,18,19 155:24 156:2,6 156:9,17,20 157:2,4 158:6 159:21 160:4,6 161:19 171:15 171:16 173:19 180:12,21 181:2,11,14 182:22 183:2 183:13 184:22 185:6,10 186:9 186:18,22,24 187:4,8,14,23 188:10,20 190:6,20 196:1 197:5 198:4,12 198:18 199:14 200:15 201:2 204:9 205:11 205:16,25 206:5,6,6,7,16 206:20,24 207:2,20,23 208:7,8,9,9,10 209:7 210:13 211:2,6,17 214:6,12,20 215:4 219:13 221:24 222:12 226:13,22 228:1 229:16 231:17 232:3,7 233:3,4 234:1 234:4 235:1,5 236:23 237:2 237:13 241:11 242:21,24 243:20,25 244:2,16 245:11 246:10 247:12,15 248:12,15 249:11 254:13 254:22 255:4 255:19,23 256:2,16,18,23 257:5,15,19 258:12,18 259:1,13,16,22 260:7,12 261:24 264:18 265:25 266:15 267:9 268:4,13 268:16 269:10 269:13 273:11 274:14 279:24 285:14 288:8 289:1 290:5 297:25 298:22 298:25 300:16 330:2,21 334:22,24 338:15 344:15 346:22 350:2 353:9,14 357:6

357:16,17,22 358:1 363:24 364:4,15,18 365:11,18,21 366:1,4,9,17,18 366:25 367:6 372:25 373:6 373:10 374:23 375:12,16,20 377:1,1,8,16 378:10 380:23 380:23 381:16 381:22,23 382:8,18,19,24 383:21 384:14 386:17 390:24 391:4,9,18 392:4,19 393:5 393:11,13,16 393:19 394:12 394:17,18 395:24 396:4 396:10,13,18 396:21 405:7 406:20 407:2 407:23 408:3 410:7,8,20,23 411:17,18,21 411:23 413:16 413:17 414:2,9 416:21 418:8,9 430:4,4 431:1 431:1 432:1,1

**hairdresser** 137:22 138:1,2

**half** 284:4 372:2 422:4,9

**hamilton** 1:20 428:12

**hancock** 1:18 428:2,4

**hand** 120:19 121:17,18 178:6 196:21 301:10 303:10 429:5

**handed** 17:21 47:7 251:5

**handling** 359:14

**handouts** 23:6

**hanging** 307:16

**happened** 44:5 53:7 328:19 348:3 385:23

**happening** 240:7

**happens** 124:24 173:17 399:22

**happy** 32:18 297:2

**hard** 36:5 275:8 409:3 411:12

**harris** 4:17

**harsh** 173:2

**hat** 307:23

**hazard** 97:4,7 98:21 99:6 104:7 106:6 107:6 108:13 109:1 119:7,15 119:23 120:3 160:15 161:18 162:8 163:6 182:20 183:1 184:2 192:6 193:5,25 194:9 199:20 200:5 202:24 208:16 212:5 215:18 222:2,14,21 225:11 226:23 227:5 228:3,17 239:23 241:18 260:17,25 262:22 264:19 265:16 266:19 275:16 280:20 282:3,7,15,20 283:12 284:9 285:23 289:13 290:22 307:4,4 312:2 314:6,12 315:6 316:17 316:21 318:6,9 318:12 319:8 331:17 334:14 334:21 335:2,3 336:22 342:20 349:17 381:19 397:2,22 404:3

**head** 13:18 157:14 310:10 387:16 423:7

**heading** 64:19 77:11 79:12,14 145:6 329:7

**health** 9:6,7 49:18 84:8 95:22 96:2 142:17 143:22 169:9 197:20 197:22 246:10 249:13,24 250:7,14,19 252:18 253:12 253:16,23 254:2,6 255:18 256:14 258:25 261:9 263:14 288:14 289:6 290:11,15 331:24 341:21 344:8 346:8 386:13 387:7 390:1,20 395:9 395:20 396:15 396:20 399:20 424:6,19,22

**hear** 419:18

**heard** 404:1

**heart** 387:4
**heartland** 24:18
**heat** 134:11 135:1,9,13,18 135:24 155:11 155:14,17
**heavier** 114:19
**heavy** 52:21 262:2,14,24 264:23 270:4 276:22 285:10 289:15 306:15 341:25 342:15 372:21,24 373:1,4,11,15 373:20 374:10 375:4,10
**height** 77:20 146:7
**held** 11:3 40:2 141:20 162:1 194:17 207:11 420:1 426:24
**hello** 44:10
**help** 13:15 111:3 172:16 293:14,19 333:7
**helped** 199:3 403:23
**helpful** 13:21 56:21 163:2 191:13 242:22 244:15,17 409:15
**helps** 36:13 85:14,15
**hereto** 432:7
**hereunto** 429:4
**hesitate** 413:10
**hesitation** 362:4
**heyl** 4:12
**high** 8:13 76:4 77:25 78:18 183:15 224:4 232:8 246:8 295:4 376:23 378:24 382:7 395:3
**higher** 79:23 101:7 224:1 312:25 397:8
**highest** 74:24 280:25
**highlight** 200:10 275:24 276:8
**highlighted** 363:12
**highlighting** 21:17 22:8 197:25
**highlights** 160:4 206:7 208:10 247:15 380:23 381:23 382:19
**highly** 84:8 203:11 244:18 315:24
**hill** 9:9 92:22 94:3,5,11,15,19 94:23 130:17 130:19 131:4 131:13,17 132:1 292:18 293:19 294:2 294:18 296:5 296:10 297:7 298:13 299:3 299:18 301:4 302:5,22 304:20,22 305:15 307:7 310:22 314:20 317:21 319:17 325:4,8 329:4 339:9 341:14 343:23 379:22 401:7,11,16 402:4 415:6
**hill's** 294:12 295:17 319:8 326:21 338:22 339:6 341:6 343:14 386:8
**hills** 383:15
**hispanic** 148:9 213:7 238:24
**histologic** 65:25 76:9,13 83:14
**historical** 296:16
**historically** 98:10
**history** 77:20 77:21,22 78:5 79:21,21 145:24 146:4 161:8 250:5
**hit** 344:3 386:9
**hmm** 89:11 149:1 178:4 276:14
**hold** 284:23 408:13 409:8 413:2 414:2 424:10
**holdings** 1:19
**holds** 416:20
**home** 146:7 388:12
**honestly** 235:16 426:12
**hope** 399:8
**hopefully** 53:12 418:7
**hormone** 77:24 79:24 240:23 241:1 362:15
**hormones** 408:21,24

**hot** 132:25 133:6 154:15 154:18 232:3 257:24
**hour** 14:8 73:1 220:10
**hours** 29:4 30:13 33:6,11 34:8 35:8,10 35:16,19 37:5 38:10 236:5 387:15 388:10 388:14 391:15 391:15 423:12
**house** 5:20
**houston** 2:22
**howard** 425:2
**hudson** 1:17 10:25 428:3 429:7
**human** 93:12 292:7 339:12 345:13 356:16 359:18,21,23 390:20 399:20
**humans** 50:6 345:23 359:6 360:1 383:9 384:4 399:8
**humor** 266:10
**hundred** 41:20 103:24 106:17 140:6 321:11 346:4
**hundreds** 357:15 358:8 361:2 422:4
**hung** 307:23
**hypotheses** 422:13
**hypothesis** 109:25 110:1,4 110:11,12,17 110:19,21 111:21,23 112:11,20,24 113:2,4,8,20
**hypothetical** 102:23 107:23 107:25 314:24
**hysterectomies** 240:9,10 243:8
**hysterectomy** 212:18,22 213:15,16 239:13,20 241:15 261:16 265:20 281:1,4

**i**

**ian** 5:21
**idea** 96:12 108:2 287:6 362:13 399:15
**ideas** 399:15
**identification** 17:20 19:11 24:10 28:17 46:22 74:2 96:3 117:23 144:19 148:22 177:10 209:3 249:9 253:21 300:25 302:18 320:2 326:3 327:12 368:8
**identified** 67:24 77:8 81:16 206:20 247:18 249:25 353:17,18
**identify** 68:12 75:23 77:18 78:16 79:8,16 80:11 81:21 114:16 123:20 196:13 206:13 246:12 250:13 277:7 296:3
**ignore** 300:13 317:7 325:11
**ignoring** 334:17
**il** 3:11,20 4:7 4:19 5:13,17 6:7
**illinois** 1:1 10:17
**imaginary** 314:24
**imagine** 137:22 408:14
**impact** 93:12 93:13 257:24 334:22 346:7 394:9 405:11
**impacted** 297:18 341:24
**impactful** 315:24
**impacts** 399:20
**impede** 370:25
**implementati...** 417:2
**important** 161:1 197:15 227:20 228:8 239:24 268:18 281:14 283:10 283:13 324:13 341:16
**importantly** 389:19
**imprecise** 116:6
**improve** 76:24
**inception** 146:23 425:1
**incidence** 8:12 78:25 262:5,16 272:19
**incident** 190:22 209:7 250:13 261:19
**incidents** 248:16

**include** 46:3 55:16 90:17 98:21 130:23 154:9,15,21 155:3,16 198:3 228:23 257:20 258:9 308:7 312:19 349:5 371:5
**included** 18:17 33:13,21,23,24 34:3 35:24 38:17,19 42:1 58:21 97:23 117:12 136:22 183:5 186:1 258:22 261:9 292:6 317:14 357:15,21 358:23 364:15 365:14,17 369:10 371:17 373:6 375:12 376:7 378:14 378:25 387:8
**includes** 109:16 113:16 154:4 154:24 155:7,9 162:5 192:11 216:3,12 249:24 262:25 288:8 346:9 363:25
**including** 20:13 23:5 25:22 26:25 27:16,22 34:8 54:24 78:17 80:4 94:15 98:1 139:18 145:23 146:5 169:8,9 238:24 277:18 308:8 373:5 385:2 415:4
**inclusion** 147:20,22 148:5
**incomplete** 325:7
**inconsistencies** 421:6 422:17
**incorporation** 317:12
**increase** 99:16 99:22 100:25 102:7 108:14 108:18 168:2 196:2 203:2 232:4,13 233:19 268:14 268:15 269:12 270:20 272:19 274:7,8 275:3 309:6,15,17 310:3 315:2 347:14 348:6 370:7,7 397:23 397:24
**increased** 121:3 223:19 223:24 266:17 269:10 305:10 407:25
**increases** 101:15 102:1 270:21 272:18 275:1 285:24 344:22 345:4,8
**incredible** 385:21
**independent** 412:7 422:13
**independently** 291:1 410:11
**index** 8:2,8 9:2
**indiana** 1:18,20 10:21 428:1,5 428:13 429:11
**indicate** 14:21 30:4,7 76:8 164:2 191:21 226:17,18 228:5 237:23
**indicated** 16:9 225:6,9
**indicates** 119:6 122:16 238:21
**indicating** 155:24
**individual** 69:19 70:5,16 308:13,14 316:3
**induce** 233:15
**industries** 6:4
**inference** 302:24 322:10
**inferences** 122:10
**influence** 211:16 250:7 410:4
**inform** 283:1 410:18,22
**information** 22:13 55:20 87:16 127:21 146:3 156:14 250:12 319:3 358:7 394:23
**informed** 200:12
**informing** 283:8
**informs** 204:23 399:8,12
**ingredient** 418:10
**ingredients** 61:13 187:21 188:6 246:13 418:11
**inhaling** 377:3
**inherent** 114:7

**initial** 127:12 144:4
**initially** 116:12
**initiated** 340:20 421:19
**initiating** 355:6
**initiation** 340:25 344:5
**inject** 238:14
**inquire** 46:7
**inquiry** 34:7
**inserting** 124:18
**insistence** 116:15
**instance** 132:21 139:4 154:5 189:22 212:16 227:22
**instances** 91:9 312:22
**institute** 40:9 143:21 389:25 421:19
**insufficient** 401:23
**intake** 144:5
**integration** 302:24 317:11
**intend** 54:9 55:23 93:21
**intended** 68:3 140:3 144:9
**intensity** 348:18
**intention** 55:7 138:16,22,23 139:10,25 141:1 147:8 188:8 227:4
**intentionally** 164:22
**interacting** 224:13
**interest** 355:20 374:22
**interested** 86:3 277:15 354:3 356:9 429:2
**interesting** 190:7 361:3
**interestingly** 407:4
**interfere** 362:14
**internal** 327:1
**international** 176:21 177:24
**interpret** 154:11 155:20
**interpretation** 55:1,2 116:24 177:15 256:8,9 301:20
**interpreted** 108:18 154:7,8 326:25
**interpreting** 167:3 325:24
**interprets** 402:4
**interrupt** 56:10 207:5
**interrupted** 34:23 63:10 103:8 201:7,12 299:17 423:1 424:14
**interrupting** 199:9
**interval** 97:11 98:22 99:7,12 100:14,21,24 102:4,23 103:11 104:8,9 104:25 105:13 105:18,22 106:1,7,9,20 109:2,13,15 113:15 119:8 119:16 120:4 121:6 162:9 163:6 182:21 192:7,11 208:17 215:19 222:2,14 226:24 227:11 228:4 264:20 264:22 266:20 282:8,16,21 305:11 334:15 381:20 404:3
**intervals** 97:12 97:23 98:2,8 98:11,15 100:7 116:25 117:5 117:11 127:5 160:16 193:5 212:7 222:22 225:12 228:18 260:18 261:1 262:23 275:17 276:6 284:10 312:3 331:18 349:18
**intervene** 86:6
**intervention** 124:18
**interventions** 386:13
**interview** 144:5
**intro** 92:7
**introduce** 17:16 19:7 46:18 144:12 244:7 253:18
**introduced** 398:7 410:1
**introducing** 240:4
**introduction** 112:16 116:19
**invaded** 43:24
**invasive** 190:22

**inverse** 82:2 101:9
**investigate** 145:18
**investigated** 211:16
**investigator** 424:21
**investigators** 143:20 203:5 203:11 324:15 400:3 424:24
**invited** 24:17
**invoice** 28:3 29:14,19 30:9 33:13 36:20,20 36:22
**invoices** 27:19
**involve** 132:10 212:1,2
**involved** 61:23 71:2 147:2 250:24 293:17
**involving** 412:9
**iowa** 24:20,20
**ipad** 403:6
**iron** 132:21 154:5,9 183:12 232:3 233:19
**irons** 133:6 135:20 154:13 184:5,9,11,16 257:24
**isadler** 5:23
**isolate** 183:25 244:2
**isolated** 182:21
**isolates** 256:22
**isolation** 315:15 404:8
**issue** 16:4 256:4 275:21 277:17 297:2 316:12 362:24 399:18 404:20
**issued** 47:13 51:13 71:14 327:24
**issues** 11:4 162:2 194:18 197:20 278:25 307:1 338:18 342:7 363:12
**it'll** 13:15
**item** 355:22
**items** 90:19

**j**

**j** 2:10 4:11 7:7
**j&j** 9:13
**jackson** 158:14
**jake** 2:20
**james** 7:9
**january** 28:25 29:3 33:7,12 33:16 35:11,17 36:13,17,23
**jensen** 7:8
**jf** 5:4
**jloessin** 2:22
**jnzegwu** 6:13
**job** 1:25 311:16 403:4
**john** 4:16
**johnson** 2:20
**johnsonlawgr...** 2:22
**joshua** 7:4
**journal** 117:14 176:21,23 177:24
**journals** 62:11 62:21,25 64:7
**judge** 242:3
**judging** 303:19
**judgment** 401:13,17
**judicial** 9:11
**julia** 3:13 11:15 250:22
**julia.steiner** 3:15
**julie** 253:2
**jump** 388:8
**jumping** 388:10
**jung** 209:18
**justina** 6:11

**k**

**k** 2:4,6
**karmanos** 40:9
**katie** 158:14,20 209:24
**keep** 235:23 236:4 281:9 311:5 317:23 378:6
**keeping** 266:10
**keratin** 134:14 134:17 154:21 184:17,21 185:3,6 187:2 189:21,24
**kevin** 5:11
**key** 376:19
**keynote** 24:17
**kidney** 300:5,7 300:7
**kim** 253:2
**kind** 14:21 34:20 41:25 78:3 83:8 88:19 93:4 94:5,14 100:14 108:6 112:12 114:7,15 116:18,23 124:18,22 128:7 130:4,11 161:12,13 165:1 169:20

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 480 of 539 PageID #:74668



184:7 196:6 262:10 271:1 275:24 295:25 296:15,18 309:3 313:17 319:19 328:16 338:16 341:22 342:4 343:25 347:19 348:16 351:23 354:22 355:16,19 361:7,21 376:24,25 384:20,25 398:20 399:2 401:20 412:15 413:9,21 415:12,13,15 416:6 417:11 420:20 422:6
**kinds** 90:18
**kit** 137:10,12 138:9,10,18 139:16 140:1,3 140:10,13 141:10 366:6 366:11,18,21 367:1 419:2
**kits** 137:14 138:1 418:8,9 418:19,20,22 419:9
**knew** 194:1
**know** 12:17 13:14 14:1,7,9 16:8 29:12,15 31:1 39:20,23 43:9,10 44:6 44:23,23 58:10 85:21 86:2,15 88:5,8 90:5,6 90:13,15,23 93:10 95:23,25 101:8 103:5 111:1,2,3 112:7,17 114:23 127:10 127:15,18,21 130:6,13 133:20 134:2 134:22 137:20 137:24,25 138:6 143:11 146:19 149:20 156:1,4,8 157:3,11 158:17 161:7,7 164:12 166:13 167:2,5 168:14 168:22 170:22 170:24,25 171:2,11,19 173:18,25 174:17,18 177:20 180:11 180:20 181:2 181:14 182:19 183:1,20 184:15,16 185:2,5,12,18 187:20 188:6 188:15,16,16 189:4 190:14 193:4,19,25 194:8 197:17 197:19 199:25 202:4,12,12,24 206:9 209:17 209:21,25 210:1,20 212:19 214:10 216:17,25 217:19 219:12 219:18 223:14 223:21 229:13 229:21 230:11 231:14 240:9 240:12 241:25 243:18 248:7 252:24 253:1 266:9 270:13 271:2,9 273:12 273:13 276:15 281:10,10,13 287:7 290:10 294:17 308:24 309:6 310:1 315:15 320:5 325:2,5 328:7 338:17 339:8,9 339:16,20 340:18,25 342:19 345:15 357:6,9,12,17 357:20,24 358:11 360:24 363:8 364:17 364:22 365:6 365:12,16,20 365:24 366:3 366:15 372:1 373:9,14,16 384:25 385:7 386:12 397:7 397:10 399:6,8 400:11,22 402:2 403:25 405:19 415:5 415:10,19 416:7,9,24 417:19,20,21 418:23,25 420:23 426:13
**knowing** 86:3
**knowingly** 359:10
**knowledge** 17:5,8 40:15 88:6 159:1 209:24 211:11 211:15 244:22 250:20 325:11 340:5 364:1 379:25 389:19

**known** 94:3 130:17 240:4 315:12,13 356:15 392:5 416:23
**komen** 40:3 95:14
**kristin** 7:10

**l**

**l** 3:18 12:2 28:20 241:5
**lab** 359:13 360:2
**label** 314:22 358:7
**labeled** 57:20 354:1 361:11 379:8,15
**laboratories** 6:16
**labs** 5:4
**lack** 122:3,17 207:18 271:10 343:4,16 348:12 405:9
**lacking** 382:3
**laid** 358:20 363:10 374:16 374:17
**laila** 7:11
**language** 90:24
**lara** 2:10
**large** 41:10,25 169:11 195:12 212:17 248:19 248:20 319:18 320:13 411:3 419:12 428:5
**larger** 64:13 113:12 165:1 177:3 197:3 241:10 309:24 369:13
**largest** 337:23
**lasalle** 3:19
**lasted** 299:20
**late** 72:1 79:18 378:3
**latency** 340:12
**latina** 148:9 213:7 238:24
**law** 2:20
**lawsuit** 17:10
**lay** 401:17
**layer** 376:25 382:9,12
**lead** 45:2 183:11 189:11 189:12 347:15 373:5 374:18
**leader** 390:5
**leading** 248:2 362:18
**leads** 289:13
**learned** 339:11
**leave** 386:19 418:3
**led** 183:9 389:16
**left** 121:18 178:6 243:11 327:13 397:9
**legal** 10:23 11:1 24:4 430:23
**legal.com** 5:17
**lehnert** 5:5
**leiomyomatas** 241:3
**length** 96:1 253:1 331:1 394:22
**lengthy** 271:22
**leslie** 4:4
**lesser** 175:5
**letter** 370:17,23 380:11 412:15 412:17 413:5
**level** 265:11 285:14 316:5
**levels** 232:8 240:23 241:1 363:13
**levern** 6:22 10:22
**levin** 3:4
**levitt** 2:16
**lfederer** 4:7
**lfsblaw.com** 3:6
**liability** 1:7 10:15
**lies** 379:1
**life** 91:17 167:18 173:21 217:17 218:5 271:15 281:14 344:22 348:4 363:5 372:2 386:3 407:24 407:25
**lifespan** 407:17
**lifestyle** 145:18 146:5 254:7
**lifetime** 67:14 255:10
**light** 262:1,10 262:13,25 264:14,17 265:8,8 266:18 267:7 268:2 270:2,3,7 276:16 288:1 289:12 306:15 341:25 346:9
**lightly** 346:10
**lights** 417:22
**likely** 69:13 104:12 178:15 213:14 214:5 214:12 219:9 223:12 226:13

226:17 232:12 234:1,4 235:1 235:5 236:22 237:13 239:20 240:13 243:20 244:10 256:8 284:21 301:19 310:5 316:11
**likewise** 13:13 108:22 167:23 192:4 216:11 266:24
**limit** 271:14 370:18 411:12
**limitation** 371:22,22
**limitations** 90:18 370:25
**limited** 17:7 23:6 25:23 27:17 130:5 294:19 370:23 375:1,2 379:24
**limits** 277:17
**line** 14:11 128:17 162:18 297:6 431:4,7 431:10,13,16 431:19
**linear** 266:23 269:1 270:17 270:19 271:10 271:19 341:7 344:2
**lines** 114:20 121:23 162:18 245:3 270:2 292:1 300:14 308:22 334:18 356:18 369:9
**link** 64:1
**lipstick** 150:9
**list** 48:13 223:5 302:10 318:2 372:10 423:8
**listed** 20:24 21:4 59:2 90:8 90:9 118:9 150:15 209:13 216:5 259:24 364:8
**listing** 90:11 263:9
**lists** 78:3 238:19
**litchfield** 5:11
**litchfieldcav...** 5:13
**literally** 275:10 382:14 385:25 386:2
**literature** 8:20 9:4 20:14 21:13 27:3 31:4 33:3 53:14 54:3,5 55:12 57:9,10 58:2,4 59:8,11 62:5 72:14 92:25 93:7,9 93:22,25 123:14 176:5 180:21 190:3 233:6 294:1,4 294:11,21 315:6 319:6,19 376:3 389:20 390:6,17 395:17
**litigation** 1:7 10:15 15:12,17 15:19 16:11,16 16:21 17:2 23:18 27:3 29:8,24 30:22 31:11 32:1,2,5 32:6,11,23 33:7 39:2,6 41:4,17 42:7 43:2,13 45:1 45:15,21 47:13 53:1 54:11 55:25 59:13,17 61:24 62:1 63:8,15,25 64:11,23 70:13 70:21,25 71:6 71:7,14 87:22 89:14 91:10,13 94:9,9 123:18 142:4,9 256:4 323:2 327:25 330:11 352:12
**little** 29:24,25 92:18 99:24 103:14 112:22 146:21 147:19 148:4 158:5 171:14 172:17 213:18 216:7 218:8 239:8 242:12 313:18 323:13 386:8 396:24 418:2
**liver** 82:20,24 83:19 112:8
**lives** 385:24
**llanos** 66:17,24 230:19
**llc** 3:18 4:5 5:10 6:11
**llehnert** 5:7
**llp** 1:19 2:7,16 3:4,10,13 5:11 6:17 10:20
**location** 10:19
**loessin** 2:20
**logo** 149:2
**london** 2:11
**long** 38:8 74:22 190:9,10 320:6 333:12 340:12 372:1,2 383:22
**longer** 3:4 148:2 240:1,2 308:2 372:5

**longitudinal** 96:10,10 143:19
**look** 21:21 22:4 42:3 44:22 45:4 62:11 76:22 78:15 85:9 86:9,12 87:9,17,18 88:4 90:15 92:25 93:16,17 96:8 114:2,22 117:16 120:16 127:15,19 130:9,9,10,20 131:7 144:9 147:21 151:23 160:19 174:25 207:17 208:24 211:9 213:2,2 215:11 218:9 222:25 224:18 228:23 229:23 230:1,7 239:8 242:9 245:14 248:14,18,22 249:19 262:19 263:2 269:21 269:22 270:14 273:7 274:21 274:25 277:9 277:10 279:2,3 283:16 293:18 293:23 303:14 308:14 315:14 319:2 331:17 332:14 336:5 337:14,24 348:22 353:23 354:5 356:7 369:15 371:9 375:15 378:17 397:7 407:8,9 422:9
**looked** 20:3 62:9 88:5 137:18 142:12 159:14 163:5 200:11 210:17 229:16 247:25 259:22 261:6 262:4,16 263:13 280:20 304:3 311:17 319:22 413:8
**looking** 31:3 33:2 76:2 86:17 88:9,24 88:24 90:6 92:24 93:11 99:3 102:13 105:2 116:23 123:22 126:11 127:8 128:15 129:21,22 160:10 166:6 176:5 180:4 183:4 191:7,8 191:11 192:6 197:21 198:11 200:8 202:8,9 202:15 205:19 206:2,4,8,18 212:9 215:23 223:6 225:16 226:8 229:21 234:18 238:2 241:7 251:6 259:12,25 260:21 261:4 263:18 269:18 271:4 274:4 275:21 276:4 276:20 277:11 277:11,12 281:9 283:12 305:24 309:2 310:11,13 312:13 315:19 316:7 336:21 337:8 341:13 348:16,20 359:5 361:16 363:15 369:4 370:3 373:24 374:8,22 399:17 415:11 422:3
**looks** 29:5,14 30:3,5 57:11 57:13 151:19 211:5 215:24 216:3 249:1 251:7 259:16 260:6 286:8 349:16
**losing** 280:25
**loss** 311:11
**lost** 102:25 139:15 263:23 264:7 267:12 385:20 386:3 405:18 406:13 411:12
**lot** 37:7 89:4,5 91:19,22,24 93:8 100:3 101:15 104:15 104:20 108:5 129:24 240:10 240:16 243:6 276:6 287:7,10 294:21 296:9 299:18 308:25 310:20 319:1 321:12 339:15 339:19 347:13 356:14 358:24 370:19 373:6 378:20 388:9 390:5,7,12,12 390:19 398:23 399:5 410:10 416:1 421:15
**lots** 410:13

**louis** 4:14 5:7
**low** 76:4 78:17 224:4 338:19 344:6 363:13
**lower** 100:20 101:7 121:5 240:22 265:16 314:14 344:10
**lsay** 2:13
**lucille** 38:23 416:24 423:17 425:1
**lunch** 157:9
**lung** 86:13 130:1,2 296:15 314:8,10 315:3 316:7 351:22 384:7,8,16 385:11,16
**lye** 255:4,4
**lynch** 77:23 79:22
**lynn** 1:12,17 5:5 8:16 10:12 12:14 17:24 19:16 250:22 427:15 428:6 430:5 431:2,24 432:2,4,12
**lyons** 7:9

**m**

**m** 3:13 5:21 241:5,5
**m.p.h.** 12:2
**made** 28:4 70:22 73:18 165:10 212:11 295:1 313:7 323:24 400:2 412:17 417:15 432:5
**madison** 5:12 6:12
**magnitude** 121:2 122:8,21 303:17
**main** 348:2
**maintained** 411:10
**major** 190:12 297:2 371:22
**majority** 66:9 284:20 352:6
**make** 14:17 32:17 58:10 73:25 80:6 100:19 112:3 128:19,22 130:12 138:6 161:1 163:17 165:24 172:6 192:5 220:11 238:10 241:18 242:17 270:12 277:22 280:18 294:25 307:4 311:8 313:20 351:4 355:12 362:7 363:4 372:19,20 376:5 385:6 386:12 420:22
**makes** 98:3 283:14 291:1
**making** 99:1 281:23 286:18 286:25
**managing** 294:6 359:14
**mandate** 64:20
**manner** 332:23 336:2
**manual** 9:12 320:10 321:8
**manufactured** 357:22,23
**manuscript** 87:16 88:1,2 89:24 90:2,21 91:4,7,9 112:16 130:23 130:24 131:1 295:9 371:1 404:10
**manuscripts** 91:23 92:5 332:2 412:14
**marcadis** 6:17
**march** 429:12
**mark** 19:7 24:7 28:11 131:20 150:23 208:24 300:20 302:1 302:13 320:4 327:3 367:13 368:4
**marked** 17:22 27:12 28:15 47:7 118:1 177:13 252:12
**markers** 422:5 422:9
**market** 4:12 387:12
**marketing** 1:6 10:14
**markings** 73:19
**maron** 4:5
**maronmarvel...** 4:7,8
**marvel** 4:5
**maryland** 5:6
**mascara** 150:8
**master's** 49:17
**match** 90:8
**material** 147:20 195:10 388:9
**materials** 8:17 18:22 19:9 20:17,23 21:2 21:4 22:23 23:7,15 27:1 37:8 38:14 56:13,17 57:16

58:3,7,21 59:3 59:12 73:13,18
**math** 29:5 165:22,25 212:20 218:8 218:19
**matter** 10:13 12:5 127:8 300:14 379:12 428:9
**maximum** 343:25
**mcauliffe** 6:5
**mcbride** 6:16
**mccambridge** 5:21
**mcfadden** 6:22 10:22
**mdl** 430:4 431:1 432:1
**mean** 30:23 34:18 39:25 43:9 44:1 54:14 65:24 68:11 69:10 76:15 82:12 89:9 90:22 91:16 94:23 96:21 97:13,15 120:8,8 123:13 126:25 131:17 131:21 133:12 133:17 136:9 136:16,20 160:8 166:5 168:25 183:21 186:22 207:6 214:15 230:15 236:13 248:24 250:21 258:2 277:3 278:8 280:17 289:8 296:13 304:16 306:23 313:9 330:25 333:7 336:1,13 337:4 338:9 351:20 354:2,13,24 355:2,5,10 364:12 366:20 370:5 374:1 391:10 397:4 397:12 398:19 399:5,15 400:6 402:9 404:15 404:19 411:11 413:3 415:13 417:23 420:14 420:16 422:24
**meaning** 70:25 86:5 96:11 98:18 109:14 126:5,6 175:16 194:20 241:9 269:10 352:25
**means** 74:21 92:16 109:14 127:3 165:21 307:10 397:6
**meant** 36:10 95:2,3 131:18 134:9 164:23 186:23 214:11 233:3 262:12 424:5,9
**measure** 99:25 105:19,20,24 106:12,21,22 107:7,18,19 108:12 114:2 114:22 194:10 227:10 229:5
**measured** 99:14 146:6 198:5 287:22 297:19
**measurements** 114:8
**measures** 234:16 242:23 329:21
**measuring** 287:16,18 406:19
**mec** 369:3,12
**mechanical** 133:5 155:1
**mechanism** 40:2 382:5
**mechanisms** 297:16,20 382:18,22 408:17
**media** 10:11 73:5,9 141:18 141:23 157:18 157:22 220:14 220:23 251:20 251:24 291:10 291:14 367:22 368:1 387:22 388:1 406:2,5 419:24 420:4 425:10
**medical** 20:15 49:21 123:14 127:24 250:5 292:4,16 376:2 388:25
**medically** 127:19
**medication** 250:8
**medicinal** 344:21 347:12
**medicine** 293:1
**meet** 44:10
**meeting** 24:19 24:21
**meetings** 23:4 23:15 40:6
**mehta** 5:15
**mellott** 6:11
**melt** 133:15
**member** 40:8 389:23

**members** 361:6
**menarche** 79:18
**menopausal** 279:16 287:16 287:19,22 289:23
**menopause** 79:18 281:19 286:24
**mention** 206:21 229:8 370:16
**mentioned** 33:1 38:3,13 39:16 45:24 75:2 131:25 134:24 174:14 189:18 202:5 224:22 228:14 243:5 259:3 310:23 310:24 385:16 389:9 406:21 406:21 422:21 423:4
**mentions** 341:15
**mere** 351:2
**meridian** 1:20 10:21 428:12
**message** 84:9
**met** 100:3,13 158:17,19 298:18 299:1 348:7 402:8
**meta** 123:10,16 123:21 124:5 290:19 291:3
**metabolic** 80:3 80:4,6
**metabolite** 369:22
**metabolites** 371:16
**metals** 52:22 372:21,24 373:1,4,11,15 373:20 374:10 375:4,10
**methodology** 87:22,25 88:10 88:14 89:3 90:25 182:15 248:7 294:13
**methods** 94:15 145:7 226:8 260:24 261:3 369:8 378:16 378:21
**metric** 406:18 406:22,25 407:3
**miami** 3:14 6:19
**michele** 10:12 12:2,14,19 14:22 17:24 19:16 28:20 427:15 428:6
**michelle** 1:12 1:17 2:3 8:5,16 11:14,19 37:9 37:11,19 242:1 388:4 430:1,5 431:2,24 432:2 432:4,12
**microphone** 75:20 406:11
**microphones** 10:5
**middle** 14:11 14:12 24:24 220:20
**midsummer** 31:3
**military** 2:7
**miller** 4:18
**million** 422:5,9
**millions** 386:3 386:3
**mimic** 362:17
**mind** 14:24 310:16 401:24 416:12 423:5
**mindful** 43:14
**mine** 53:5
**minimize** 93:21
**minimum** 250:23
**minor** 287:11 417:13
**minorities** 197:5,16
**minus** 218:9
**minute** 21:11 165:3 279:11 424:10
**minutes** 420:9
**mischaracteri...** 282:25
**misclassificat...** 8:23 128:8 169:15,21 172:9 173:16 174:15 175:4 175:15 176:13 177:16 178:11 178:13 194:2 194:10 219:4,8
**misclassified** 184:8
**misclassifying** 184:11
**misleading** 238:1
**misses** 202:23
**missing** 53:5 200:7
**missingness** 411:13
**misstate** 198:22 269:15 278:18
**misstates** 58:19 63:17 68:8 84:17 103:2 104:16 106:15 107:10 109:6

115:9 135:3 139:7,21 152:8 156:11 170:9 170:11 171:6 175:25 179:4 181:7 193:10 198:20 216:22 219:16 258:16 259:19 269:16 274:11 277:1 278:4 280:1,9 280:12,14 312:8 343:19 371:7,15
**misunderstan...** 36:10
**mitchell** 4:16
**mitigate** 398:17
**mixed** 78:18
**mixture** 185:8 185:21 345:14 357:5 360:8 365:8 376:7
**mixtures** 183:14 187:10 189:9 232:6 265:24 300:16 353:15 357:14 358:23 363:9 363:18 379:1 419:11
**mm** 89:11 149:1 178:4 276:14
**mo** 4:14 5:7
**model** 105:21 106:8 199:21 399:9
**modeling** 385:21,22,23
**models** 93:14 93:15 100:4,9 100:11 356:22
**moderate** 262:2 262:14,24 264:21 270:4 276:22 285:10 289:14 306:14 336:8,13,17 337:1,4,10,24 338:3,9 342:15 350:5,16,17,20 350:25,25
**modifiable** 78:7 80:17 392:6,11,16,18 392:20 393:1,5 393:11,14,17 393:20
**modification** 224:19 225:18 227:7,21
**modified** 392:13
**modifiers** 223:9 226:9 234:19
**modify** 392:14
**molecular** 302:25 309:20
**moment** 24:12 164:21 172:14 189:16 194:23 263:13 284:5
**money** 30:25
**month** 151:4,5
**months** 25:6 150:19,20 151:3 152:19 152:20 153:5,9 153:13,19 156:1 162:23 163:15,24 164:6,15,19 165:18 166:16 166:22 168:1 168:19 169:3 173:18 178:25 190:21 191:6 191:19 192:19 193:9 216:20 217:11,16 219:20 221:12 222:1,13 255:9 273:24
**moon** 200:8 317:7,8 337:9 338:20
**moore** 2:7 7:9
**morning** 10:2 12:9,11 169:11
**morph** 361:21
**morrison** 6:5
**mortality** 74:24 78:25 121:3
**motion** 242:6
**motions** 242:12
**move** 31:1 167:19 188:2 200:20 201:18 203:23 219:1,9 241:20,23 266:1 272:13 280:16 281:15 281:25 313:22 320:23 378:8
**moved** 149:24 242:4 417:25
**movement** 288:3
**mparfitt** 2:5 430:2
**mph** 8:16 17:24 19:17 28:21 427:15 428:6 430:5 431:2,24 432:2,4,12
**mucinous** 76:6
**multiethnic** 368:19
**multiple** 88:25 89:15 96:8 102:13 129:20 141:5,10 171:12 182:2

188:1 189:1 259:21 282:19 300:14 308:22 319:12 334:17 347:3 349:1,4 365:8,17 367:8 367:8 378:17 379:21 421:23 422:2,5,12,14
**multitude** 378:14
**multivariable** 199:20 264:18
**murray's** 4:3
**mutagenic** 356:2
**mutations** 77:23,23
**mute** 10:7

**n**

**n** 1:19 428:12
**namaste** 3:9 11:13
**name** 10:22 12:9,12 28:18 43:9 187:12 317:23
**named** 143:25 364:12
**names** 83:14 143:11
**narratives** 399:25
**national** 143:21 321:14 389:25 421:13,19
**nationwide** 145:16
**nature** 1:19 92:1 110:24 143:16 194:6 409:1
**nc** 2:8
**ndma** 27:6
**nearing** 14:11
**necessarily** 32:14 58:9 98:16 102:16 107:7 108:7 113:10 136:19 149:20 178:18 183:22 224:17 230:13 247:22 324:20 336:1 340:25 348:24 350:17 355:2 356:16 372:1 398:23 413:11 422:15
**necessary** 375:20,24 432:6
**need** 13:8,17 14:6,9 30:25 40:23 56:6 58:15 89:22 111:10 122:7 122:19 126:4 134:11 135:15 188:2,6,15 200:1 230:6 235:10 242:2,4 245:8 282:11 294:20 295:9 307:7,10,11,13 310:2 321:9 348:22 386:9 401:2 409:20 410:3 426:5 427:8
**needed** 105:7 196:12 197:2 246:12,23 382:7 400:3,8 400:15,21
**needs** 317:11 344:4 362:7 421:23
**negate** 307:18
**negative** 205:3 387:7 395:1
**neither** 193:1 242:13 290:25
**nested** 368:18
**neutralizer** 136:15
**neutralizes** 418:24
**never** 16:18,25 17:1 61:2,4 118:25 119:25 120:9 162:21 163:13,22 164:12 165:13 165:22 166:1 166:10,13,25 167:5,24 168:8 168:14,16 169:3,21 170:5 170:7,25 171:3 191:8,9,12 192:21 202:3 202:13,14 203:1 206:2,4 206:9,19 207:12 215:25 216:16 217:9 217:14,15,20 218:3,11 262:1 262:9,13 263:20 264:11 264:14,17 265:8 266:18 267:7 268:2 270:2,3,7 276:16 283:18 289:12 306:15 307:18
**new** 2:12 6:13 95:4 193:14,14 193:17,20 294:4 328:15 328:18,18 378:8 409:25

**nice** 44:10 148:18
**nicely** 362:12
**niehs** 143:21 147:1
**nine** 286:14,15 292:6
**nobody's** 426:17
**nods** 13:18 387:16
**noise** 421:15
**non** 8:22
**nonblack** 213:7 214:5
**noncases** 163:19
**nonchemical** 377:8
**nondifferential** 170:19 174:16 175:11,23 176:6,12,15 177:16 178:12 219:6
**nonhispanic** 147:5,14 192:23 213:8 224:23,24,24 226:20 227:24 228:15 231:15 239:4 241:22
**nonlinear** 344:6
**nonmodifiable** 78:4 80:16 392:6,21,23
**nonserous** 202:8,25 206:14 207:6 381:18
**nonstatistical** 403:21
**nonstatistically** 191:3,16 192:16 234:13
**nonuser** 269:8
**norm** 176:18
**normal** 64:6 124:22
**normally** 309:11
**north** 2:16 4:6 5:16 6:6 10:20
**northern** 1:1 10:16
**notarial** 429:5
**notary** 1:18 428:3 429:11 432:13,19
**note** 10:4 53:4 73:22 82:1 213:4 342:13 347:17 383:4 430:10
**noted** 67:10 208:20 339:9 422:18 427:10 432:7
**notes** 8:17 20:15 21:17 22:8 73:19
**notice** 1:21 8:10,11 17:23 19:15 83:13
**noticing** 11:11
**novel** 91:19,19 91:19 246:5 294:4 398:14 398:16,22 399:4,14,15,22 412:8
**novelty** 196:11
**november** 29:9 29:15 30:8 48:22 72:1,3
**nowadays** 310:1
**nucleotide** 315:20
**null** 109:24 110:1,3,10,12 110:16,19,21 111:21,23 112:10,19,23 113:2,4,8,19,19 167:20,22 170:1 219:2,9 341:24 397:2,3 397:6,7,12 398:9
**number** 1:3 10:18 20:10 21:9,11,12 22:10 23:1 25:20 26:12 27:15 41:10 48:7,11 51:13 80:5 102:11,17 114:1,21 117:20 151:20 152:12 165:13 165:16 166:20 184:1 208:22 212:17 214:16 215:8 218:10 234:10 241:10 248:19,20 251:5 252:2 259:2 262:20 263:5,13 267:1 271:1 273:8 274:25 275:1,7 276:14,24 277:6 281:17 282:23 283:6 283:17 299:23 299:24 307:15 307:24,24 309:1 314:23 314:24 315:15 318:6,13,21,24 321:16 342:8,9 348:19 392:25 407:8,10,16,16

419:12
**numbering** 57:2
**numbers** 54:22 99:2,20 107:15 126:5 127:13 128:5,11,12 148:4 164:1 170:24 175:2 215:24 218:15 224:16 238:2 239:10 241:7 282:24 308:6 397:8,9,16,20
**numeral** 105:10
**numerous** 103:17 376:12 401:6
**nurses** 95:22,24
**nw** 2:4
**ny** 2:12 6:13
**nzegwu** 6:11

**o**

**o** 241:5,5
**o'brien** 158:14 158:20 209:24
**o'connor** 2:10
**oadams** 2:18
**obese** 223:22 223:22
**obesity** 385:1
**object** 32:12 34:6,13 52:14 54:12 58:17 71:22 80:24 87:11 89:19 97:19 101:3 110:23 133:8 143:15 168:5 179:3 188:21 194:5 204:11 229:19 235:13 266:3 322:15 322:20 389:6 391:7 393:8 394:4,14 398:3 401:14 409:23 410:25 414:5 418:14 423:25
**objecting** 266:7
**objection** 30:16 40:20 46:6 52:17,19 59:25 60:23 61:7,16 61:19,20 62:23 63:16 65:22 68:7,22 69:3 70:7,17 71:8 71:15 72:11 83:4 84:3,17 85:3,22 88:12 91:14 94:20 96:18 98:9 99:18 102:8 103:2 104:13 106:14 107:9 108:1 109:5 111:2,25 113:25 115:9 117:9 121:12 122:23 123:19 125:11 131:14 132:6 134:1 135:3 136:3,8 137:17 138:12 139:6,21 140:11 142:22 151:11 152:8 154:10 155:2 155:12,18 156:11 164:17 168:20 170:9 170:11 171:5 174:7,23 175:25 179:24 180:16 181:6 181:16 182:8 182:24 184:18 185:4,14 186:11 187:25 188:14 193:10 198:7,20 204:25 205:12 207:22 210:18 214:8 215:6 216:22 217:22 218:13 219:16 220:5 226:4 227:1,14 228:21 231:18 232:23 234:8 235:9 236:9,11 237:6,20 243:1 244:5,19,25 246:21 256:5 257:1,17 258:14 259:18 260:8 262:18 265:3 267:11 268:7 269:15 270:22 272:21 274:10,10 275:5,19 277:1 278:4,17 280:1 280:4,9,10,11 282:10,18 284:15 285:17 285:21 288:19 289:3 290:6 294:15 296:24 299:7 304:7 305:6 306:21 308:17 312:7 313:1,3,4,25 314:2,3 315:9 317:2 318:17 319:11 322:23 323:18,25 330:23 331:14 332:20 333:10 334:9 335:10 338:7 341:10 342:17 343:6

343:19 344:17 345:10 346:16 347:2 349:11 350:7,14 351:7 351:14 352:19 353:2,12 354:7 355:14 358:2,5 359:3 361:13 362:3,25 363:20 364:5 364:19 365:5 365:15,23 366:7,19 367:3 370:2,13 371:7 373:2,13,22 374:12 375:6 375:22 376:14 377:10,23 379:17 382:1 382:21 383:16 385:15 386:20 421:3 423:16
**objections** 19:15 81:5 242:2
**observational** 110:18 111:9 124:10,12,16 125:6,19 127:20 359:9
**observations** 177:17 301:13
**observed** 122:4 122:22 130:15 303:19
**obtained** 97:24
**obtaining** 383:4
**obviously** 13:19 43:19 299:19 375:1,2
**occasion** 43:18 51:17 177:2 220:1
**occasionally** 40:6
**occupation** 95:20
**occupational** 27:8
**occur** 74:7,14 296:7 348:4
**occurred** 423:11 426:6
**occurring** 194:2 225:18
**odd** 239:18
**odds** 97:4 108:16 200:5,5 233:9 309:10 309:13,24 315:22 370:4
**offer** 55:24 93:19
**offered** 20:19 25:25 69:6 70:20 352:11 352:16
**offering** 65:7 65:10 69:16 70:3,12 386:16
**offices** 1:19 428:11
**oftentimes** 74:17 114:16 202:23
**oh** 39:25 53:21 75:21 267:18 310:9 388:14
**okay** 12:20,24 13:6 14:6,14 14:15 16:1,4 16:25 18:5,10 18:14,18 20:5 20:10 22:1,3 23:1 24:2 28:11 33:5,19 33:22 34:14 36:1,9 37:1 41:12 42:5 44:1,17 45:8 47:6,24 48:14 54:1 55:4 56:19 58:11,24 60:5 63:4 64:18 65:1 67:18 71:19 73:1 77:1,9 78:8 79:8 80:8 80:21,23 81:1 81:9 82:6 83:21 89:9 91:3,3 92:18 95:6 96:12 97:9 101:21 102:20 103:20 104:1,5,5,6 107:2,4 109:23 113:13 114:23 116:1,1 118:22 120:1,15 122:2 122:16 123:6 123:15 124:25 125:4 126:15 127:24 130:14 132:3,13 134:14 137:6 140:9,24 143:5 143:13,18 144:12,21 148:24 150:3 150:12,18 151:8 152:3,18 152:23 157:1 158:4,21 159:10,18,25 160:13 163:5 164:3 165:9,12 165:16,21 166:10,12 167:2,14 169:24 172:18 173:15,24 177:5,12 178:21,23 179:2 190:19

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 492 of 539 PageID #:74680



194:19 205:19 215:11,14,22 216:10,14 217:13 218:7 218:18 219:11 221:8 225:4 226:1 237:18 238:17 243:11 243:23 244:14 245:23 248:23 250:17 252:21 253:14 255:13 256:1 258:6 260:4 263:18 264:6 267:22 268:11 269:25 272:11 274:4 276:17 279:2 279:14,18 285:7 286:18 287:24 288:4 290:17,25 291:7 293:25 294:10 296:20 297:11 298:19 299:2 301:9,23 302:3,8 303:25 304:16 305:14 310:20 311:24 312:22 314:18 315:5 317:18 321:1,3,25 322:24 325:17 326:15,18 327:3,9,16,23 328:2,18,24 329:13 331:5,6 335:18 340:6 341:2 349:23 352:23 353:8 353:22 355:21 356:13 360:10 360:12 361:19 364:3 367:12 368:4 369:12 372:16 374:21 374:24 380:5 381:7 383:2,8 384:2 402:11 418:17 422:20 425:3 426:9

**older** 274:16,17 409:3

**omega** 2:15

**once** 40:10 126:19 151:4,5 189:10 235:11 310:12 322:8 323:15

**oncologist** 39:4 49:24

**oncology** 24:19 50:13,15,16 92:13

**ones** 21:22 22:5 42:14 59:2 147:3 308:8 423:4

**ongoing** 76:17 411:8

**online** 25:1 148:14 149:24

**onset** 74:16 340:13 408:11 408:11

**ooh** 322:4

**oophorectomy** 147:25 161:8

**opened** 201:9

**opined** 402:21

**opinion** 58:6 64:16 65:7,10 71:20 72:7,18 72:21 79:4,6 88:21 89:17 91:25 93:19 94:7 169:16 183:7 199:3 200:13 224:9 227:19 245:10 271:10 283:2,9 283:15,19 293:21 294:17 332:1 334:22 334:24 335:4,7 335:8 337:12 337:21 344:13 344:19 345:1 345:22 346:13 347:1 352:15 353:8 361:22 362:22 363:17 363:22 372:25 375:19 379:1 379:25 386:24 391:17 394:8 394:11,15 396:7,11,14 402:9,21 404:12 405:12 407:21 408:13 410:4,5,18,23 411:19 412:23 414:8 416:2 420:17,24

**opinions** 17:6 19:2 20:19 21:6,14 22:16 25:25 26:16 43:13 45:15,21 49:3,9,13 53:1 53:2 54:6,7,11 55:13 58:12 59:13,17 60:8 63:25 64:8 65:15,19 66:4 68:16,19,25 69:6,17,23 70:3,13,20,21 140:20,21 142:21 187:6,7 200:23 271:23 272:2 297:4 352:11,17 378:22 386:16 403:1 405:4

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 493 of 539 PageID #:74681



409:17,21,24 412:24 413:2 414:2,21,22 416:14,15,18 416:19 417:20 417:24,25 420:10,16
**opportunities** 74:22 349:2
**opportunity** 18:6 41:5,15 241:13 281:3 348:24 385:20 409:2 414:14
**opposed** 17:14 78:8 111:17 219:14 366:5
**opposite** 370:8
**options** 76:25 151:1
**or1.41** 121:4
**oral** 1:16 159:3 210:3 253:4 392:15
**order** 87:2 245:9 278:14 291:20,25 311:18 409:16 409:21 426:14 426:16
**ordering** 427:5
**organ** 298:10
**organs** 74:7 82:13 296:7,23
**orienting** 323:11
**original** 146:20 147:3 370:20
**originally** 83:15
**originate** 74:12 75:8,16
**originated** 75:3
**originates** 78:9
**outcome** 8:13 84:25 85:12,16 85:18,20 86:12 87:9,20 89:18 93:4 96:17 99:16,17 100:22,25 104:11 108:14 110:15 118:18 195:22 198:5 211:25 256:24 288:9 293:24 296:2 315:13 317:15 326:23 339:25 379:13 401:1
**outcomes** 96:8 96:23 212:1,3 248:20,22,24 249:2 259:24 260:1 296:6,22 310:12 312:23 387:7
**outside** 21:4 22:20 26:20 27:11 41:4,16 44:13 45:8,9 45:12 59:10 60:7 64:5 89:13 91:8,10 94:8,17 129:15 130:21 168:1 193:8 206:23 206:23 247:19 314:16 386:21
**ovarian** 25:12 27:5 41:7,10 62:6 64:3 65:4 65:12,21 69:15 70:12,15 71:21 72:9,23 74:3 74:10,11 75:24 76:10,19 77:15 77:19,22 78:9 79:20 81:10,12 81:18,22 82:4 82:24 83:11,15 118:4,21,22 123:24 142:12 143:2 145:1 147:24 158:7 159:22 160:2 163:24 164:9 164:25 167:6 167:16,24 168:3,15,17 170:5,7 171:1 171:3 174:4,6 174:22 175:7 176:10 180:6,9 181:13 182:6 182:13,23 183:11 189:13 190:22 191:6 191:19,23 192:19 195:16 196:8 197:8 198:5,12,19 199:14 200:15 201:2 202:25 203:20 204:10 205:11,17 206:1,14,16 207:3 208:5 295:16 297:8 297:12 298:5 298:24 304:5 305:4,10,20 310:5 330:10 330:18,21 334:25 340:22 344:16,23 346:14,23 347:8,15 350:3 352:14 354:15 354:18,25 355:10,13 360:9 362:2 373:21,25 374:11 375:5 375:13,21

377:17 378:12 381:18 384:14 385:3 391:5,19 391:24 393:6 393:17,20 394:13,19 395:4,12 405:7 408:1 410:6,20 410:24 411:17 412:3 413:16 414:3,10 416:21
**ovaries** 74:14 148:1
**overall** 93:16 94:6 104:23 130:11 171:13 175:2,9 202:6 224:4 229:5 230:11 270:8 282:25 290:1 307:17 337:7 337:11 360:6 381:17 386:25 394:15 395:5 404:6 405:9,12 409:8 411:19 414:8 415:4,23 416:9 417:19 417:21,23
**overlap** 81:13 82:16,25 83:3 186:5
**overlapping** 297:13 298:4 350:15 351:1
**overly** 103:15
**overreliance** 420:25
**oversimplify** 85:8
**overview** 146:12
**own** 25:23 26:10 86:22 91:20 137:16 139:3 169:17

**p**

**p** 117:2 208:21 389:23
**p.m.** 157:19,23 220:15,24 251:21,25 291:11,15 367:23 368:2 387:23 388:2 406:2,6 419:25 420:5 425:12 426:7 427:10
**p1hairdepos** 430:15
**pa** 3:6
**packaged** 141:12
**padden** 7:10
**page** 8:2 9:3 18:7 20:1 47:15,16 48:6 48:7,11 53:6 56:25 57:1,8 64:18 66:13,14 66:17 67:7 76:3 77:10,10 78:15,23 79:10 101:24 104:3 105:12 120:17 120:17,18,19 121:15,15 145:6 150:12 150:14,14 160:11,20 161:15 171:21 178:3 190:17 194:13,19,20 194:22,25 195:1 196:20 205:20 211:9 212:9 213:3,19 215:11 221:6 225:6 229:3 231:1 238:6,10 240:18,19 245:14,24 247:6,6 249:19 254:10 260:22 260:23 261:4 261:18 263:18 263:23,24 267:20 269:22 279:2 291:18 301:9 302:5 303:8 304:1 305:22,23 306:18 320:13 320:17 321:15 321:16,17,22 322:14 323:5 323:21 324:3 326:13,19 328:24,25 329:1,7,11,15 347:18 355:8 369:15 372:16 379:4 383:4 384:6 415:19 431:4,7,10,13 431:16,19
**pages** 57:12 320:6,20
**paid** 27:24
**pain** 240:17
**painfully** 197:23
**paint** 300:10
**palacios** 7:10
**palmer** 250:22 253:2
**pandemic** 40:12
**paper** 64:14 88:15,19,24 90:9 131:18 146:14 149:22

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 495 of 539 PageID #:74683



152:12 159:19 160:1,14,24 171:19 175:24 196:3 198:25 199:2 200:14 203:4 210:25 211:5 212:4 230:1,4 239:16 250:22 283:19 287:21 304:10 304:13 309:19 331:3 375:8 400:14 404:9 412:16 413:7 415:16,24,25 415:25

**papers** 38:19 38:20 41:19,20 42:2 93:19 142:24 283:8 295:7 325:5 335:25 339:16 370:21 415:23 416:2 417:18

**parabens** 27:5 52:1 364:11,18 365:13 368:16 371:5 376:11

**paragraph** 120:20,25 121:19 178:5 195:9 196:22 212:10 249:21 263:19,25 264:6 266:14 267:21 291:19 291:21 301:10 301:11 303:10 303:15 305:25 306:18 325:9 328:21 329:15 347:19,21 349:23 372:20

**parcel** 43:23

**parenthetical** 119:6

**parfitt** 2:3 8:5 11:14,19,19 14:17,20 15:2 23:19 28:2,9 30:16 31:13,22 31:25 32:12 34:6,15,21 36:4,12 40:20 43:14 44:3,12 44:18,21 45:6 46:6,14 47:2 50:15 52:12,18 54:12 55:15 58:17 59:25 60:23 61:7,16 61:20 62:23 63:16 65:22 68:7,22 69:3 69:21 70:7,17 71:8,15,22 72:11 73:3 75:12,21 80:15 80:21,24 81:3 81:6 83:4 84:3 84:17 85:3,21 87:11 88:12 89:19 91:14 94:20 96:18 97:19 98:9 99:18 101:1 102:8 103:2,5 104:13,16 106:14 107:9 108:1 109:5 110:23 111:5 111:10,25 113:25 115:9 117:9,20 121:12 122:23 123:1,19 125:11 131:14 132:6 133:8 134:1 135:3 136:3,8 137:17 137:23 138:12 139:6,21 140:11 141:16 142:22 143:15 144:14,17 148:20 151:11 152:8 154:10 155:2,12,18 156:11 157:10 157:15 164:17 168:5,20 170:9 171:5 172:12 172:18 173:12 174:7,23 175:25 179:3 179:23 180:16 181:6,16,20 182:8,24 184:18 185:4 185:14 186:11 187:25 188:21 193:10 194:5 195:3,6 198:7 198:20 199:8 199:12,15 201:3,8,13,21 204:11,18 205:1,12 207:4 207:8,22 209:1 210:18 214:8 215:6 216:22 217:22 218:13 219:16 220:5 220:11,19,21 226:4 227:1,14 228:21 229:19 230:25 231:4 231:18 232:23 234:8 235:9,15 235:20 236:12 237:6,20 238:8 238:13 243:1 244:5,19,25 245:16,19,21 246:21 249:4 251:4,14 252:1

256:5 257:1,17 258:14 259:18 260:8 262:18 263:22 264:1,5 265:3 266:3,8 267:11 268:7 269:15 270:22 272:6,12,21 274:10 275:5 275:19 277:1 278:4,7,17 280:1,8,14 282:4,10,18 284:12,15 285:17,21 288:19 289:3 290:6 291:8 294:15 296:24 299:7,13 300:22 302:15 304:7,23 305:6 305:21 306:21 308:17 311:3 311:10,15 312:7 313:1,6 313:9,13,25 314:3 315:9 317:2,19 318:17 319:11 320:8,12,16,21 321:3 322:15 323:3,13,18 324:1 326:2,10 326:16 327:6,9 327:13,16 328:3 330:13 330:16,22 331:14 332:20 333:4,15,22 334:3,9 335:10 335:16 336:17 338:7 341:10 342:17 343:6 343:19 344:17 345:10,24 346:16 347:2 349:11 350:7 350:14 351:7 351:14 352:19 353:2,12 354:7 355:14 358:2,5 359:3 361:13 362:3,25 363:20 364:5 364:19 365:5 365:15,23 366:7,19 367:3 367:20 370:2 370:13 371:7 371:14 373:2 373:13,22 374:12 375:6 375:22 376:14 377:10,23 378:3,6 379:17 380:15,17 381:9,12 382:1 382:21 383:16 385:15 386:20 387:14,17 388:4 390:21 391:21 393:9 394:7 396:1 398:12 402:12 406:7,8,12 409:10 410:9 412:1 414:11 418:5,16 419:14,19 421:3 423:16 423:25 424:8 425:5,15,18 426:11,17,21 426:23 430:1

**part** 22:12 26:15 43:23 82:14 86:1 88:15 130:8 131:15,25 137:9 138:9 139:19 146:20 160:24 163:11 182:14 197:24 212:13 215:3 225:16,21 248:5,6 254:2 254:15 283:6 304:17,21 319:18 346:10 366:9 375:7 380:2 386:7 387:12 390:18 399:2 414:7

**partial** 277:10

**participant** 155:22 156:8 157:2 221:14 254:18,25 255:1,3 279:5

**participants** 127:22 145:20 146:1 147:4 148:11 149:15 156:22 179:11 213:21,22 215:2 250:3,10 254:22,24 261:9,25

**participate** 415:20

**participated** 33:11

**particular** 38:22 61:14 65:16 84:24 87:4,10 93:3,4 139:4 141:3,8 157:4 159:14 159:25 174:24 175:10 181:24 182:25 187:13 197:7 355:3 357:10 365:11 375:18 376:6 376:15 388:25 395:10 399:23

400:22 402:15 421:22
**particularly** 78:23 246:6,19 285:3 288:1 363:11 378:18
**parties** 10:9 428:22
**parts** 199:2
**party** 17:9 429:1,3
**passing** 209:23
**past** 116:11 150:19,20 152:19,20 167:1 172:17 197:21 202:17 358:4,16 364:24 417:1
**paste** 295:23
**pathologists** 390:12
**pathology** 50:23 359:13
**pathways** 183:10 189:12 297:16,20 355:25 385:8
**patrick** 7:9
**patterns** 171:11 230:12
**patty** 7:8
**paul** 4:16
**pause** 157:8
**pay** 63:2 321:12
**payments** 28:4
**pc** 2:11 4:12,18 5:15
**pdf** 47:16 48:7 56:25 57:8 66:14 77:10 105:12 121:15 150:14 247:5 321:16 328:25
**peabody** 4:13
**peal** 4:11
**peer** 40:17,25 64:7 72:14 88:3,17,18 90:22 92:5 116:2 203:9 294:1,11 296:4 359:1 373:19 412:7
**pending** 15:12 311:7
**people** 95:16 96:6,9,13,14 114:11 128:24 137:19 146:13 146:14 147:1 161:2 242:13 244:9 274:14 276:3,16 281:22 296:18 338:15 361:23 386:4 390:8,13 407:12
**people's** 376:13
**percent** 35:4,7 66:25 67:3,12 67:23 98:7,10 98:14,22 99:11 99:13,15,16,23 100:6,13,20,22 100:23,25 101:6,16 102:4 102:5,7,10,22 102:24 103:11 103:21 104:8 104:11 106:1,6 106:13,17 107:21 108:14 108:18 119:8 119:16 120:4 121:6 147:18 148:8,9 160:16 163:18 212:6 213:6,7,8,9,23 214:19,22 215:1 229:17 230:20,23 243:15 260:18 261:1,13 262:23 264:20 264:22 266:20 309:14 321:11 331:18 346:5 370:7 395:6 402:8
**percentage** 213:12
**percentages** 165:7,8
**perfect** 220:21 407:15
**perfectly** 298:16 299:6 301:15
**performed** 278:24
**period** 271:12 271:15 340:13
**periods** 190:9 190:10 271:7 348:4 349:5 357:9 411:6
**permanent** 160:3,3 206:5 206:5,7,16,20 206:24 208:7,8 208:9,11 247:13,14 381:16
**permanents** 160:6 247:16 380:24 381:23 382:19
**permitted** 242:8,10,12,16
**permitting** 122:9
**person** 128:2 166:6 281:15

281:16,17 287:5 311:14 340:19 359:12 387:6 391:11 391:12 402:10 407:18 409:5 422:10 428:25
**person's** 132:9 183:16 402:9
**personal** 51:7 60:18 133:10 146:5 149:6 150:4 190:13 250:5
**personally** 39:21 43:10 89:14 177:22 400:24 415:10
**perspective** 296:16 408:15 409:7
**persuasive** 325:21
**persuasively** 324:11
**pertain** 328:14
**pertained** 35:20
**pertains** 338:23
**petti** 4:5
**pfc** 23:5
**ph** 183:15 232:8 376:23 378:24 382:7
**ph.d.** 1:12,17 12:2 17:24 19:17 28:21 49:16 427:15 428:6
**phase** 407:24
**phd** 8:16 430:5 431:2,24 432:2 432:4,12
**phenols** 52:10 365:4,14
**philadelphia** 3:6
**phone** 242:3
**phones** 10:7
**phrase** 132:25 232:17 276:18
**phrased** 187:17
**phrasing** 58:18 100:19
**phthalates** 27:6 52:4 364:12 365:3,13 368:16 371:12 376:11
**physical** 47:16 135:7 223:8 224:3
**pick** 10:5 285:23
**picking** 204:13 204:17 239:22 282:23 334:13 404:2
**picture** 278:13 278:15 308:15 317:20
**pie** 404:6
**piece** 113:11 284:1,1 317:6 355:21 404:5,7
**pieces** 91:25 198:25 294:17 338:20 407:5
**pills** 392:16
**place** 1:22 10:9 24:20,22 55:18 133:18 267:13 270:12
**places** 92:15
**plagiarism** 295:24
**plaintiffs** 2:2 3:3 8:11 11:21 11:23 15:11 16:23 19:14 30:21 31:8,10 37:15,23 38:4 39:6 43:1,1,12 43:17 45:14,18 45:20 46:1
**plan** 15:1 55:2
**plausibility** 112:6 129:22 131:8 183:8 184:4 233:14 233:18,23 292:11 300:4,9 308:23 310:15 310:23 316:25 355:22 378:23 382:4 384:24
**plausible** 189:12 334:19 351:5 355:12 356:8 362:1
**play** 205:5 301:16
**plaza** 3:14 4:13
**pleadings** 20:16
**please** 10:4,7 11:25 12:12,17 103:3 163:3 172:12 191:14 235:12 243:2 267:17 280:5
**plucked** 335:2
**plus** 165:13,19 271:1 330:7 386:6 389:2
**point** 12:17 32:8 72:16 91:17 93:5 96:6 97:24 98:16 100:5 104:14 105:4 112:12 113:9 113:11 115:13 117:13 127:4,5 128:20 149:23 165:3 167:8

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 499 of 539 PageID #:74687



170:3,23 172:5 172:23 173:25 186:2,6 187:11 187:20 199:24 202:20,23 204:2 218:4,16 233:8 234:10 239:7 261:12 268:19 273:5 274:12 275:24 276:5 286:19 287:1,4,4,11 291:2 295:2 307:6 308:20 315:5 319:6 322:25 334:11 335:15,22,24 346:15 353:22 356:5 357:3 364:9 371:21 371:24 379:19 413:6,6
**pointed** 203:17
**pointing** 184:6 233:24 415:16
**points** 286:25 411:13 412:17 416:8 417:9,14 419:6
**polycystic** 79:20
**polymorphis...** 315:20
**pooled** 123:21
**population** 96:13 103:17 145:11 147:14 160:20 161:14 165:2 169:6 191:2,16 192:15,23 193:7,21 197:18 202:6 212:11,21 213:5 221:24 222:11,23 226:12,21 227:25 233:25 234:3,25 235:4 236:22 237:1 237:12 240:3 241:17 242:24 243:15,19 244:3 249:22 251:3 261:5,14 261:15 289:2 289:22 290:1,1 290:16 307:18 315:24 316:5 345:13 398:1 398:11 400:23
**populations** 147:10 169:8 180:22 197:3 223:18 234:17 246:6,18,24 247:4 324:14 325:16 329:19 330:5 411:5 417:4
**portion** 266:2 323:20
**portions** 342:3
**position** 92:14
**positions** 48:24
**positive** 114:13 120:6,10,13 191:22,25 192:20 199:19 199:22 204:4 204:14,20 205:3 234:13 280:22 285:25 307:11 331:20 370:5
**positively** 273:2 274:22 286:16
**possibilities** 314:17
**possibility** 93:2
**possible** 155:19 195:14,20 203:18 348:1 384:3
**possibly** 127:9 359:12
**postdoctoral** 92:11
**postmenopau...** 77:24 279:6,20 281:11,20 284:25 285:5,8 285:16 286:20 287:2,10,12 289:11,19 369:1,6,11,14 409:12,13
**postpone** 325:12
**potential** 76:18 128:7 227:21 234:19 241:7 246:9 270:24 280:23 288:6 303:20 310:4 363:13 377:7 377:17 378:11 387:7,10 395:11 408:11
**potentially** 78:7 154:17 167:21 170:14 223:9 240:7 241:16 265:7 284:18 310:4 353:6 374:2 382:3 408:19
**pounds** 114:13 114:14,19
**powder** 78:1 81:22 352:13 352:17
**power** 244:21 244:23

**powered** 234:15 244:18
**powerful** 409:16
**powerpoint** 23:21,24
**practice** 161:13 220:7 259:10 311:20
**practices** 1:6 10:14
**practicing** 389:1
**pre** 279:19 286:20
**precise** 313:20
**precision** 122:4
**preclude** 401:24
**precluded** 408:10
**predominantly** 147:5
**prefer** 46:24
**pregnancies** 392:25
**pregnancy** 392:24
**premenopausal** 279:5,21,22 281:11,18,22 281:24 284:8 284:25 285:4 286:22 287:2 288:1 407:24 408:19 409:11
**premise** 415:4
**preparation** 34:4 35:20 37:12,16,23 38:14
**prepare** 22:14 33:25 37:6 38:5
**prepared** 23:3 25:16 26:17
**preparing** 19:5 37:4 159:7 210:7
**presence** 122:8 122:21 351:3 355:2,9,11 369:18 396:3
**present** 7:6 11:8 176:2 364:4 375:20 376:12 411:15
**presentation** 8:12 23:25 24:11,16 25:7 25:11,15 27:11
**presentations** 23:7,16 27:1 49:6
**presented** 17:20 19:11 24:10 28:17 43:16 46:22 74:2 117:1,23 141:13 144:19 148:22 174:11 177:10 180:18 193:4 194:11 196:7 207:9 209:3 236:21 237:15 249:9 252:3 253:21 300:25 302:18 320:2 327:12 368:8 421:8
**presenting** 116:15 117:12 228:6
**pressed** 153:5 153:12 155:25 156:19,20
**pressers** 233:11
**pressing** 132:17 135:12 150:23 151:21 152:4 154:3,12 154:19,25 155:10 160:5 161:21 162:5 162:22 163:14 163:23 164:5 164:14 165:18 166:15 173:20 179:13 180:15 184:10 186:8 186:17 188:19 191:5,18 192:18 195:16 203:20 210:14 215:16 216:19 217:3 218:25 219:22 221:11 221:25 222:12 226:19,23 228:2 231:23 232:21 237:14 247:20 248:13 255:17 257:20 258:10,21,22
**pretty** 40:1 41:8 285:25 286:5
**prevalence** 246:8
**prevent** 84:9
**preview** 201:21
**previewed** 201:19
**previous** 15:16 240:20
**previously** 179:19 210:17 380:20
**primarily** 38:2 38:24 54:22 94:13 147:12 147:13
**primary** 42:13 59:22 62:8 177:4

**principal** 424:18,24
**principle** 76:9
**printed** 320:5
**printing** 53:11
**prior** 28:6 29:20 30:8 63:6,13,23 64:5 70:21,24 71:6 98:13 153:5,20 164:14,19 166:15 190:21 193:11,13,16 212:22,22,23 212:25 216:19 217:10 219:17 221:12 239:12
**private** 10:6
**privy** 134:2 169:19
**probability** 105:17
**probably** 31:11 37:5,17 38:20 41:18 82:16,20 95:23 116:19 146:25 158:22 173:16 182:2 187:17 188:2 314:14 321:9 343:22 348:25 349:4 372:4,5 404:1,16 416:24 420:23 426:4
**procedure** 1:21 428:15
**procedures** 155:10
**proceed** 201:25 252:10
**process** 72:15 133:17 134:23 140:1 292:3 344:5 355:6 366:10 367:2 374:15 391:15 414:7
**processes** 347:14 362:18
**produce** 110:20
**produced** 1:17
**produces** 111:22
**product** 61:14 65:16 132:22 133:2,14,19 134:15 135:22 136:2,7,11,13 136:23 137:3,3 139:5,8,11,20 140:19 146:6 152:19 154:20 156:3,10 157:3 157:4 168:3 179:18 183:7 184:10,23 187:5,13 190:5 211:17 220:2 221:11 233:7 235:3,7 236:25 237:4 248:4 255:8,10,25 256:16,18 269:11 275:9 304:5 305:4,19 310:2 312:4 344:19 347:11 351:3,5 353:25 355:18 357:22 358:1,7 361:23 362:1 365:12 367:7 379:14 382:5,13 386:23 418:23
**production** 18:6
**productivity** 92:3
**products** 1:6 10:14 25:8 51:7,18,22 69:18 132:4,11 132:17,18 133:4,12 134:9 134:10,19 135:12,20,21 138:2,8 139:25 141:4,9 145:1 150:5,10,23 151:20,22 152:5 153:23 154:3,12,25 156:15,23 157:5,7 158:6 159:21 160:2,6 161:21 162:6 162:23 163:14 163:23 164:6 164:14 165:18 166:15,21 167:17 169:13 171:15,25 172:8 173:1,2 173:21 179:13 180:6,8,13,15 180:21 181:4 181:15 182:23 183:5 185:7,10 185:20 186:5,6 186:8,15,17 187:22,23 188:7,9,17,19 188:20 189:5 190:2,9,11,13 190:20 191:5 191:19,23 192:18 195:16 196:14 197:6 198:4,19 199:14 203:20 204:9 205:11 205:25 207:2 207:20,24 208:5 209:7

210:15 211:2,6 215:17 216:19 217:4,10 218:25 219:14 219:22 222:1 222:13 226:14 226:19,23 228:2 231:23 232:5,6,11,20 233:3 236:23 237:2,14 243:21,25 244:3,17 246:10 247:12 247:21,23 248:14,15 254:24,25 255:3,17,20 256:4,10,23 257:16,21 258:10,13,21 258:22 259:1 267:9 268:4 300:17 344:20 353:15 356:15 357:4,7,11,13 357:16,18 358:9,12,14,24 363:24 364:4 364:18,23 365:18,22 366:1,5,9,17,21 367:9 373:1,7 373:10,15 374:23 375:13 376:8,12,19 377:8,13,14 378:14,21 379:2 384:21 386:18 391:12 419:6
**profession** 400:9
**professional** 24:5 87:23 91:17
**profile** 82:21 83:12
**profiles** 83:9,10
**progesterone** 408:23
**program** 389:24 421:10 421:11,12,16 421:18
**project** 389:24
**promise** 205:20 284:3
**pronounce** 12:15
**pronunciation** 209:18
**proper** 177:15 280:9,10
**properties** 189:10 345:15 353:20
**proportion** 147:15 169:12 174:19 181:25
**proportionately** 175:5
**prospective** 145:16 195:12 337:23
**protect** 40:24
**protected** 408:22
**protections** 408:20
**protective** 84:1 101:11 376:24
**protocol** 124:21 242:11
**protocols** 422:1
**provide** 25:25 195:13 223:11 234:16 262:22 274:18,19 283:3 312:14 335:21
**provided** 17:12 20:7 23:21 28:3 55:20 72:12 225:22 234:22 252:6 328:9 331:8 335:11 337:22
**provides** 293:5
**providing** 107:24 146:3 274:20
**public** 1:18 23:8 49:18 84:8 251:8 386:13 428:4 429:11 432:19
**publication** 8:18 66:20 118:2 212:14 251:6 252:17 257:14 258:11 259:15 296:9 359:1 373:19 396:16 412:5 413:23
**publications** 40:14,18 41:1 41:6,11,16 49:1 51:14 60:15 62:19 98:21 142:19 149:18 158:25 203:9 288:16 288:18 295:4 296:4 319:16 321:13
**publicize** 84:8
**publish** 41:24 51:18 91:21 95:2 117:7 130:22 296:18 398:22,23
**published** 20:14 27:2

51:21 61:2,5 62:21 64:7 116:3 118:13 158:9 177:2,23 198:11 209:11 252:4,7,13,21 274:3 293:25 294:10
**publishing** 92:5 371:1
**puerto** 145:23
**pull** 117:17 148:17 177:5 309:1 317:5 327:16 390:19
**pulled** 242:11 306:2,2 386:1 386:18
**pulling** 129:19 133:13 204:4 263:12 304:8 307:15 320:15
**pulls** 386:22
**purpose** 44:25 159:24 224:15 234:24 236:19
**purposes** 91:13 140:19,21 367:10 389:4 394:11 397:18 406:23 412:22
**pursuant** 1:21 428:14
**pursue** 31:6
**put** 133:14 214:16 215:8 224:22,23 265:17 296:9 299:23,24 300:1 314:22 318:20 330:13 370:22 386:10 413:19
**putting** 47:3 90:3 225:24 290:21 320:25 376:21

**q**

**qualification** 54:2
**qualifications** 49:11
**qualified** 50:2 50:5 203:11
**quality** 203:10 417:20
**quantify** 341:16
**quantities** 373:12,16
**quantity** 357:24
**quarter** 29:20
**quarterly** 29:19
**question** 13:11 13:12,14,15,23 13:25 14:2,13 31:14 32:13 33:9 34:7 41:2 44:2,4,13 54:19 60:2,9 60:18 69:24 70:2,11 80:19 85:23 101:1 111:13 112:4,5 113:12 115:12 116:7 123:22 129:12 133:9 150:15 151:8 152:5,13,16,18 152:21,24 153:1,2,21 155:14,23 156:13 159:15 163:2,4 164:18 169:2 172:7 179:4,20 180:19 181:8 181:19,21 182:3,14 184:24 185:15 186:13,21 187:16,19,22 188:14,15,22 191:13 193:14 193:17,18 194:6 199:7,9 199:11 201:4,9 201:10,16,20 201:23,25 202:1 204:6 205:7,21 207:5 210:15,17,21 216:15 217:6 219:15 224:21 225:9 227:17 231:21 233:10 235:16,19,21 235:24,25 236:1,6 237:10 237:19,21,24 237:25 241:21 243:3 248:2 254:9,11,16 255:14,17 257:12 258:1,3 258:7 260:9,12 260:14 263:12 267:16,19 272:4,10,15 273:8 280:18 282:5 283:12 288:18 290:7 297:23 299:10 299:11,15 304:24 306:8 306:22 311:7 311:12,12 313:2,6,15,21 315:11 316:20 318:11,19 319:12,14,23

322:10 323:7,9 323:10,23 332:6,15 333:14,16,21 333:25 335:12 339:25 344:18 346:19 347:3 351:9 354:9 360:2 363:1 364:6,20 366:14 367:4 377:24 379:20 391:1 393:25 403:3,24 404:17 410:21 411:2 414:15 418:8
**question's** 299:8,8 345:24 361:14 370:14
**questioning** 14:12 45:4 297:6
**questionnaire** 8:21 149:7,11 149:14 150:3 153:14 164:16 166:17,23 182:16 210:22 216:21 220:6 248:3 250:4 253:15 254:1 256:14 257:4 257:10,11 259:5 263:15 273:8
**questionnaires** 9:8 144:8 146:2 148:11 148:13,16 250:11
**questions** 8:4,5 8:6 12:8 39:11 52:14 64:23 105:2 142:3,8 143:1 148:15 151:14 152:1 179:17 187:12 205:3 219:25 320:20 378:7 388:4,6,21 391:23 393:22 396:3 401:6,9 407:13 410:13 414:6 418:13 419:15,20 420:7 425:4,6
**quick** 24:7 73:1 291:7
**quickly** 247:5
**quit** 119:14
**quite** 82:11,20 89:20 96:20 126:18 214:1 279:8 379:18 397:1 421:5
**quote** 274:16 277:23 298:15

**r**

**r** 6:17 421:10 431:3,3
**race** 190:23 193:22 213:9 221:19 223:7 223:16 227:6,7 229:24 238:19 394:20
**races** 68:6
**racial** 66:5 68:12 78:24 147:9 197:4,7 197:15,22 393:23 394:2,9 394:24
**radiation** 353:6
**ramble** 411:1
**randolph** 4:18
**random** 90:15 114:6,10,15 127:10 178:13 307:8 337:15
**randomized** 124:19
**range** 100:15 102:12,15,18 102:21 103:19 103:23,25 314:17 344:11
**rapidly** 316:8
**rarely** 324:10 325:20
**rate** 74:25 267:6 268:1 270:20 274:8
**rates** 178:14 246:14 395:6
**rather** 126:23
**ratio** 98:21 99:6 104:7 106:6 107:6 108:13,16 109:1 119:7,16 119:24 120:3 161:19 162:8 163:6 182:20 183:1 184:2 192:6 194:9 199:20 200:5,6 202:25 208:16 215:18 222:2 222:14 226:23 228:3 233:9 265:16 266:19 282:3,7,15,20 283:12 289:14 290:22 305:11 307:4,5 309:11 309:13,24 314:7,12 315:6 316:17,21 318:6,9,13 319:9 334:14 334:21 335:2 349:17 381:19 397:22 404:3

**rationale** 176:7 270:24 334:19
**rationales** 270:24
**ratios** 97:4,4,7 160:15 193:5 193:25 212:6 222:21 225:11 227:5 228:17 239:23 241:18 260:17,25 262:22 264:19 275:16 280:20 284:9 285:23 312:3 315:22 331:17 335:3 336:22 342:20 370:4 397:2
**ravika** 6:17
**ravika.rames...** 6:19
**razzaghi** 7:11
**reach** 71:19 72:18,21 344:1
**reached** 72:7 193:2
**reaching** 59:16 271:13
**read** 58:8 59:1 59:4,5,7 62:22 63:1,5,12,19 67:5,6 93:18 125:12 131:17 190:3 203:14 203:14 224:10 227:11 230:15 235:25 245:4 289:9 301:22 308:9 319:21 321:12 323:7 323:21 335:15 335:22,24 336:4 360:5 373:3 376:2,3 378:20 389:20 413:13 414:14 414:18,25 415:1 416:6,17 417:24 430:9 432:5
**reader** 204:23
**reading** 35:5 64:6,14 111:8 160:8 175:13 189:3,7,19,21 189:24 232:2 232:17,19 233:1 267:21 268:9 287:21 292:2 296:19 306:18 332:2 340:7 342:22 350:9 358:13 358:18,20 363:25 364:14 391:16
**readings** 54:25 185:7,20
**reads** 254:11
**real** 24:7 108:7 108:9
**realization** 178:14
**realizing** 194:21
**really** 81:7 86:18 88:18,25 92:4 98:15 99:25 105:2 107:14 111:6 112:11 116:23 130:11 134:20 136:12 137:1 144:9 163:17 169:11 184:4 190:8 223:4 224:18 234:15 258:1,3 266:6 269:4,7 271:11 271:25 277:9 277:14 278:17 283:14 294:19 344:9 365:7 372:6 386:25 390:14 400:15 411:14 416:3 416:10 419:11 421:25
**realm** 287:11 386:22
**reason** 15:6 109:12 170:16 175:3,14 231:25 237:16 239:8 269:3 271:7,8 293:9 293:10,11 409:7 430:11 431:6,9,12,15 431:18,21
**reasonable** 69:7,11 70:22 112:5 407:21
**reasoning** 232:2
**reasons** 226:3,6 240:10 261:7 271:24 344:3 372:15 380:9 408:14
**reategui** 7:11
**rebuttal** 415:2
**recall** 15:22 19:22 32:21 41:13,21 62:14 153:8 185:22 381:3 388:16 388:20 391:1 393:25 400:4 402:18 403:18 414:19 419:19
**recategorized** 167:16,25 218:24
**receipt** 430:17

**received** 27:21 28:5 49:12
**recent** 197:21 339:23 380:13 380:14 417:1
**recess** 73:7 157:20 220:16 251:22 291:12 367:24 387:24 406:3
**reciting** 304:14
**reclassified** 168:18 170:6,8 171:2,4 174:3 174:5,21 193:7
**recognize** 47:9 203:5 343:24
**recollection** 62:18 63:5,12 63:18
**recommend** 317:25
**record** 10:3,10 11:4,7,10 12:13 13:16 44:20 52:15 56:22 73:5,9 141:18,21,23 157:18,22 162:2 194:18 203:22 220:14 220:23 221:3 231:1,5 242:7 242:17 245:17 251:18,20,24 252:11 282:13 291:10,14 326:14 367:17 367:19,22 368:1 378:2 387:18,20,22 388:1 393:3 405:22 406:5 419:22,24 420:2,4 425:10 426:25 428:19
**recorded** 10:12 381:18
**recording** 10:8
**records** 20:15 27:18,18 127:25
**recruit** 95:16
**recruited** 96:2 143:23 144:1 369:5
**recruiting** 95:24 369:6
**redirect** 8:5 420:6
**reduce** 86:7 265:15 307:3
**reduced** 274:6
**reducing** 387:3
**reduction** 99:15,22 100:22 397:21
**reductions** 383:23
**reese** 1:19 10:20 428:12
**refer** 47:4 117:7 138:7 143:10 161:24 338:4 356:24 357:1 360:12 380:10 384:6 423:5
**reference** 9:10 9:12,14 58:10 204:12 230:7 262:10 276:9 307:2 320:9 321:8 341:25 372:20,24
**referenced** 18:22 22:6,23 24:12 323:20 430:6
**references** 18:13,15,16 48:13 53:4,6 53:25 54:3 56:7,10 59:2
**referencing** 323:19
**referent** 262:25 265:9,10 269:8 274:13 285:12
**referred** 143:6 402:23 403:14
**referring** 14:25 22:12 26:14 28:7 60:3 76:4 138:8 144:22 207:14 209:14 230:5 234:11 249:17 288:16 292:15,17 293:4 340:2 349:12 358:18
**refers** 162:3
**reflect** 27:19 28:24 129:8,13 326:13
**reflected** 49:2,8 49:14 276:21
**reflecting** 25:21
**reflects** 163:10 213:10
**reframe** 181:8 354:10
**refresher** 13:7
**refuted** 412:10 412:13
**regard** 34:7,11 40:22 60:11 70:11 87:4 151:18 152:3 210:13 219:11 278:9 330:10 331:6,9 346:14 365:2,3,10 410:19 414:22

416:18
**regarded** 423:14,18
**regarding** 72:19,22,22 87:10 222:21 225:11 228:17 294:11,12,12 319:7
**regardless** 208:6 362:23
**registry** 128:1
**regular** 67:1,3 214:20,22 230:21,23 319:21
**regularly** 62:21 176:24
**regurgitation** 413:21
**reject** 109:24 110:10 113:7 113:19
**rejected** 110:22 111:24 113:5
**relate** 27:3
**related** 39:1 41:7 83:18
**relates** 416:20
**relating** 12:5 27:22
**relation** 118:3 145:1 158:7 368:17 404:18
**relationship** 195:14,21 203:18 272:23 272:24 273:1 276:18 277:24 279:23 324:12 324:15 325:22 326:1 338:25 339:18 344:2 350:1 385:1
**relationships** 130:10 411:20
**relative** 97:3,8 108:17 403:15 405:2 406:19 429:1
**relax** 156:5,17
**relaxed** 150:22 153:4,11 154:2 155:25
**relaxer** 1:6 9:5 10:13 15:12 25:8 31:15,16 32:1,5,11,16,23 33:7 60:19 61:14 65:16 69:18 132:18 132:22 133:1,4 134:15,19 136:2,7 138:7 138:10,15 139:5,20 140:19 141:1,3 141:8 153:22 156:3,10 157:3 157:4 173:20 180:13 181:14 182:22 184:22 187:5,23 188:20 198:4 198:18 199:14 204:9 205:11 221:11 226:13 229:16 236:23 237:2 243:20 243:25 244:2 244:16 249:11 256:16,23 257:5,15 258:12 259:13 259:16 260:7 261:24 267:9 268:4,14,16 269:10,13 279:24 334:22 334:24 357:7 357:10,16,18 358:1 364:4,18 365:11,21 373:1,7,10 377:8 386:17 406:20 407:23 411:22 414:3 418:9 430:4,4 431:1,1 432:1 432:1
**relaxers** 27:4 60:22,25 61:6 62:2 64:2 65:2 65:4,12 66:10 67:2,14,25 68:3,21 69:2 69:14 70:4,14 71:20 72:8 123:23 132:5 132:13,14 135:1,6,13 136:17 137:1,9 137:12,15,20 141:12 142:10 142:11 143:2 151:21 152:4 152:15 160:5 161:20 162:4 162:19,22 163:10,14,23 164:5,13 165:17 166:14 173:6 179:12 181:3,11 183:2 186:8,9,16,18 186:22 187:8 187:14 188:18 191:5,18 192:18 195:15 196:1 200:16 201:2 203:20 208:16 210:14 214:6,12,21 215:5,16 216:19 217:3 219:13,22

221:25 222:12 226:19,22 228:2 230:22 231:17,23 233:11,13 234:2,5 235:2 235:5 237:13 242:21,24 247:20 248:13 255:16 257:19 258:4,9,19 259:22 260:12 264:18 265:25 266:16 285:14 288:8 289:1 290:5 297:25 298:22,25 330:21 338:16 344:15 346:22 350:2 353:9 375:16,20 377:16 378:11 382:25 383:21 384:14 390:25 391:4,9,18 392:19 393:5 393:11,13,16 393:19 394:12 394:17,18 395:24 396:4 396:10,13,18 396:21 405:7 407:3 408:4 410:7,8,20,24 411:17,18,23 413:16,17 414:9 416:21

**relaxing** 139:2 139:16,25 161:20 185:10 218:25 255:20 363:24 365:18 366:1,4,9,17,18 366:25

**releasers** 357:19

**relevance** 71:9 71:16 232:24 376:15 393:24 402:25 403:21

**relevant** 23:18 31:14 33:2 49:3,7,8,13 54:10 55:12,18 59:12 79:3,5 93:22 123:16 142:21 143:1 152:5 394:3,6 404:20,24

**reliability** 398:18

**reliable** 84:11 187:17

**reliance** 422:22

**relied** 20:18 22:14 25:24 46:16 151:9,14 152:6,15 159:10 210:10 210:15,16 253:11 303:6

**rely** 372:15

**relying** 26:4 149:18 159:18 210:24 356:18

**remains** 207:18 207:20

**remember** 31:7 42:18 224:20 380:12,25 391:25 401:9 414:15 418:12 420:12 426:2

**removal** 265:19

**removed** 147:24 148:1 161:7 212:21 241:8,10

**removes** 265:22

**removing** 239:23

**render** 245:9 391:17 409:21

**rendered** 409:25 412:25 414:23

**renowned** 292:20

**renumbered** 57:4

**renumbering** 56:16

**repeat** 72:20 103:16 111:10 111:12,13 115:11 163:1,3 191:12,14 267:15,18 282:11,12 399:1

**repeated** 202:13 282:19 324:13

**repeatedly** 404:2

**repeating** 186:13

**repetitions** 105:23 106:11 107:17

**repetitive** 398:24

**rephrase** 32:19 34:16 62:16 231:13 346:19 403:2,8,10

**replacement** 79:24

**replicate** 147:9

**replication** 324:4,7

**replications** 108:4

**report** 8:15 16:6 18:13,17 18:21,23 19:5

20:25 21:1,5 22:21,24 26:20 34:1,11,19 35:2,6 38:18 38:20 39:17 42:16 43:5 47:1,12,25 48:6,10 52:24 53:15 54:5 56:3,6 57:24 58:5,6,16,22 59:19,24 64:9 64:19 66:8,14 66:18,24 71:13 71:24 72:2 75:23 76:2 77:9,15 78:16 78:23 79:10 88:6,22 89:3 90:4 92:20 93:24 94:2 105:9,10 123:7 156:16 159:7 161:18 162:9 169:3 183:21 198:21,23 200:23 204:2,3 210:8 214:18 215:15,17 216:23 221:23 222:20,25 225:10 226:21 227:25 228:13 228:16,22 229:15 230:5,8 230:20 231:2 251:11 253:8 271:22 275:17 291:18 295:12 295:14 297:3 301:24 302:2,6 303:4 304:1,9 305:16 306:19 306:24,25 308:1,8 326:19 327:24 328:7 329:3 342:14 343:3 347:18 349:10 356:24 357:2 358:21 360:6,13 363:2 364:8 367:10 371:20 372:11 372:13,17,24 376:15 379:4 380:1,8 382:17 382:23 383:3 384:6 386:5 387:12 414:18 415:1,2 416:17 417:10 420:20 423:3

**reported** 67:1,3 67:13,17,22,25 97:3 128:3 160:14 162:21 163:7,13,22 164:4 169:21 173:7 174:1,18 214:20,22 216:7 217:1,15 217:19 219:19 229:6 230:21 230:23 231:21 231:21 266:15 276:16 281:19 284:10 312:5 428:16

**reporter** 10:24 11:25 13:9 34:23 63:10 103:8 122:12 125:16 142:5 172:1 173:3 201:7,12 220:17,20 235:24 240:24 263:6 264:15 299:17 323:16 336:15 356:20 368:14 374:4 405:21 421:14 423:1 424:10 424:14 425:16 425:20,25 426:2,8,15,19 426:22 427:1,7

**reporting** 203:13

**reports** 16:5 20:16 38:22 42:7,9,21 43:2 45:25 46:5,7 55:24 212:5 260:16 414:13

**represent** 36:18 100:21 100:24 218:19

**representation** 197:4

**represented** 428:22

**representing** 10:23,25 23:5

**represents** 102:5

**reproductive** 82:15,15 146:4 212:2,3 259:23 259:25 296:1,1 338:17 387:8 417:7

**request** 14:10 20:10 21:9,11 22:10 23:1 25:20 26:12,22 26:24 27:13,15 122:12 125:16 142:5 172:1 173:3 240:24 263:6 264:15 323:16 336:15 356:20 368:14 374:4

**requested** 27:23 428:21

**requests** 18:7 20:2,7
**require** 133:5 135:8 154:25 155:10,17 290:18
**required** 333:25 344:15 432:13
**requires** 89:3 155:14 311:18 326:21
**rereading** 37:7
**rereviewed** 38:14
**research** 6:16 34:11 40:4 63:1 89:6 91:19 92:3 196:12,23 197:2,16 245:25 246:4 246:18,23 251:7 296:18 356:17 370:17 370:20,23 374:2 380:11 385:17 389:4 395:8 400:3,7 400:8 422:7
**researched** 64:5
**researcher** 409:19
**researchers** 398:20
**reservoir** 377:1
**resided** 145:22
**respect** 142:2,7 188:13 211:20 211:23 228:24 229:9 259:23 288:20 330:18 346:18,20,23 395:21 405:12 405:13
**respectfully** 188:21
**respond** 174:9 236:13 313:19 322:22
**responded** 311:4 412:19
**respondents** 152:25 153:3
**response** 8:11 19:14 72:12 130:10 131:8 181:17 188:25 189:19 199:10 201:18 202:3 203:23 229:9 235:11 236:7 266:2 271:18 276:19,21 277:10,14,24 278:13 285:16 313:17,24 332:24 333:2 335:11 341:4,8 342:2,7 343:4 343:12,16 344:2 345:4 348:13 349:21 350:1 406:17 406:24
**responses** 13:17,21 20:6
**responsible** 74:24 232:12
**responsive** 22:20 26:21 27:13 282:1 288:17
**rest** 210:1 317:7
**restate** 85:25 181:19 243:2 355:17
**restating** 121:9
**restricted** 369:7
**result** 109:3,17 115:5 246:13 266:21 402:24
**resulting** 270:8
**results** 118:23 160:15 167:19 167:22 179:5 196:13 204:15 204:20 212:5 213:4 219:2 260:17 265:1,5 268:9 270:1 289:9 421:9
**retained** 30:20
**retainer** 27:23 30:24
**retract** 392:4
**return** 430:13 430:16
**reveal** 301:13
**revealed** 125:5 125:15,18
**revealing** 162:20 163:12
**reverse** 115:18
**review** 18:6 39:8 40:25 41:5,16,18 42:6,15,19 45:23 54:16 55:12,20 61:12 64:16 72:14,15 84:14,25 88:3 88:17 89:24 90:1,22 91:6 92:20 94:1 123:17 141:2,7 148:15 159:6 176:24 185:23 189:24 190:4 374:15 375:8,9 377:7 378:10 378:13 415:18 418:1 423:9

425:14,15 430:7
**reviewed** 20:18 25:24 38:21,25 39:3,16 42:2 42:10,25 43:4 45:25 62:1,15 62:18 64:7 67:19 72:14 92:5 116:2 148:10 203:9 210:6 253:7,14 294:1,11 296:4 359:1 373:19 375:3 390:5 394:11 396:5 412:7
**reviewer** 40:17 88:18 177:1 293:20
**reviewers** 40:25 203:5
**reviewing** 41:22 62:4 91:4,8 93:7,8 93:21 417:16 417:18
**reviews** 91:25 413:9,14,14
**revise** 297:2
**revising** 35:5
**revlon** 6:10
**rhetorical** 311:10,12
**richmond** 2:21
**rico** 145:23
**ricordati** 6:5
**right** 17:21 18:18 21:3,14 29:4,10 30:3 39:18 44:12 49:25 57:7,15 73:12 74:5 75:17,25 76:10 77:16 80:22 82:4,8,22 84:16 86:21 87:10 88:11 95:8 97:5,11 98:8 99:17 100:19,25 101:22 104:19 106:25 107:5 116:5 118:19 119:18 120:7 120:19 121:10 121:17 123:6 125:10 129:4 132:23 138:11 139:5,20 147:18 149:19 150:10 152:7 157:5,12,25 159:12,15 163:8 166:23 168:4 170:21 173:18 177:25 180:24 181:5 182:7 186:4 187:24 190:14 191:11,20,25 196:21 199:16 199:17 208:2 211:7,10 214:23 215:5 217:6,7,18,21 219:24 221:2 223:5 229:22 234:23 236:18 239:25 240:19 240:19 245:23 245:24 246:20 248:14,23 251:17 252:1 254:17 256:1 257:8 259:11 259:13 262:6 262:12,17 270:4,6 273:18 273:19,22,24 274:1 289:8,17 289:17,21 291:17 293:4 301:10 303:10 305:22 306:23 308:5,13 310:24 314:11 318:8 335:7 339:5 341:14 345:3 351:13 352:14 354:4 364:21 365:14 366:24 368:10 370:11 371:6 377:20,22 381:5 388:5,23 390:22 392:3 397:9 398:13 399:24 401:10 402:13,20 403:7,20 404:16 407:20 408:5,9 409:11 412:22 413:24 416:16 418:6 421:5
**rinse** 136:21
**risk** 9:5 25:12 62:3,5 77:2,7 77:11,19 79:8 79:13,16 80:11 80:14,16 81:11 81:17,22 82:9 82:21 83:1,9 83:11,22 84:12 84:24 85:19 86:5,7 87:8 96:16 97:2 100:1 101:15 102:1,7 108:17 108:19 113:13 144:10 145:2 145:19 148:2 158:7 161:3 170:2 195:16 196:2,15 197:8

203:2,21 223:18,19,23 223:24 224:1 225:16 232:4 232:13 233:19 240:1 241:2,17 249:12 257:25 266:17 270:9 276:2 280:25 286:17 297:13 297:18,25 298:4 305:10 309:7,15,17 310:3 312:14 312:15 315:2 344:23 345:4,8 348:6 360:9 368:17 369:20 370:7,8 375:13 375:14 387:3 391:23 392:6,7 392:12,17,18 392:20,21,23 393:1,6,11,14 393:17,20 397:23,24 398:1,5,10 406:19 407:25

**risks** 97:4,8 387:10 403:15 405:2

**rna** 3:17 11:18

**road** 2:7

**robert** 4:5

**robinson** 7:12

**robust** 384:15

**roll** 321:2

**rolls** 96:5

**roman** 105:9

**rookery** 3:19

**room** 43:19 114:11 294:20 405:17

**roque** 39:3,5,14

**roque's** 39:10

**rosenberg** 250:22

**rothstein** 3:18

**rough** 426:3,5 426:5,12 427:7 427:9

**roughly** 14:8 35:8 261:13

**rounded** 103:13

**route** 376:20,22 378:24

**row** 152:13 165:8 168:24 260:10

**royal** 293:1

**royster** 4:12

**rpetti** 4:8

**rpr** 1:17 428:3

**rule** 113:18 247:23,23 318:1,1 377:12 377:13

**ruled** 113:22 114:4 115:7,15 115:21

**rules** 1:21 13:7 314:1 333:22 333:24,24 428:15

**ruling** 242:5

**run** 26:9 95:13 345:23

**résumé** 48:15

**s**

**s** 3:4 421:10 431:3

**sabrina** 7:10

**sadler** 5:21

**safe** 344:25 346:5,21 347:11

**safety** 275:11

**saith** 427:11

**sake** 407:12

**sales** 1:6 10:14

**salon** 391:11

**samples** 369:19

**sandler** 146:20 146:22 158:13 209:25

**sara** 4:11

**sarcoma** 78:19

**sarink** 9:14 380:7

**satisfied** 339:5 339:7 383:11

**save** 344:22

**saved** 385:24

**saw** 91:21 121:10 214:17 239:15 306:9 348:11 382:11 383:23 405:24

**saying** 101:7 181:1 184:7 224:7 236:8 268:11 278:14 307:16 310:9 316:15 317:23 332:13 337:9 353:23 354:20 397:22 400:14 401:1,22 404:2 408:2,6

**says** 28:19 118:24 120:10 120:25 121:23 122:2 131:18 145:14 149:3,6 150:18 178:10 196:10 197:1 211:14 230:16 240:19 246:3 249:22 260:24 261:18 263:19 264:10 266:14 273:9 280:13 291:19,24

303:15 322:7 323:22 324:4,9 329:15 342:23 369:9 386:11 425:20
**scale** 91:1 114:12
**scalp** 133:21 138:16 183:16 232:9 275:10 382:14
**scenario** 99:10 99:12
**scheduled** 1:20 428:14
**science** 33:12 33:15 34:5,8 34:12 35:25 36:8,12 37:18 43:15,24 44:2 44:3,6,14,24 45:3,10,12 49:17 130:7 265:22 307:21 308:3 389:4 390:1 399:12 400:19 413:22 417:3
**sciences** 143:22
**scientific** 9:12 69:7,11 70:22 76:17 98:17 123:14 185:23 294:9,21 319:18 320:10 321:8 325:7 339:11 379:25 398:17 400:13 401:13,16
**scientifically** 170:16
**scientist** 401:12 409:19
**scientists** 324:17 398:19 399:7 402:3
**scratch** 108:23 190:15 219:10
**screen** 320:25 321:7
**screening** 417:3
**se** 44:2 361:25
**seal** 429:5,10
**seamans** 6:11
**search** 93:25 233:5 374:9,16 374:19
**second** 120:24 145:5 150:13 152:14 160:10 178:2 213:3 264:4,5 265:18 271:7 277:16 291:19 301:10 301:11,11 305:24 321:21 328:17 329:16 340:8 344:7 347:18 379:6 387:18
**seconds** 251:16 419:22
**section** 53:14 54:4,5 57:9,10 57:16 77:15 90:17 112:16 118:24 160:21 195:10 213:4 213:19 259:6 261:18 297:7 304:22 305:15 305:16,22 306:6 308:7 310:25 311:25 322:1 323:12 324:4 329:2,10 340:7 342:13 343:2 347:17 349:9,24 369:8 379:5 380:8 383:3 384:5,10
**sections** 321:10
**sedran** 3:4
**see** 17:25 20:2 20:4,8,21 22:17 23:9 26:2,18 27:9 27:25 28:18 36:22 40:5,10 48:15 53:9,13 53:17 56:11,24 57:12,18 66:16 77:12 78:20 79:12 83:21 92:25 93:1 96:15 99:21 105:14 106:3 112:15 118:7 118:10 119:4 119:10 120:22 121:7,20,25 122:11 126:9 128:18 145:3,8 145:12 146:8 149:4,8 150:15 150:24 151:6 158:15 161:5,6 161:22 162:11 162:17 165:6 166:7 169:20 175:11 177:13 177:18 178:8 178:16,17,18 180:3 185:10 190:24 195:17 196:16,24 197:10,11 199:19,22 202:4,5,7,10,10 202:18,24 209:9 211:12 211:18 213:25 215:20,25 221:16 222:4 223:13,17,19

224:10 228:23 230:3,7 234:18 238:18 239:1,5 239:18 240:7 240:18 245:9 245:24 246:15 246:16 247:17 249:14 250:15 253:24 257:22 261:5,11,21 264:3,24 267:2 267:3 269:1 272:18 274:21 279:9 280:22 285:1,8,15,24 286:4 288:3 290:9 291:21 292:13 294:24 301:2,21 303:1 303:12,22,23 303:24 306:20 307:17,19 312:18 315:2 320:24 321:9 322:1,12,13,18 322:18,19 324:6,7,18,19 328:10 329:6 329:25 334:19 337:25 338:16 340:15 342:1 342:25 344:1 347:23 348:9 350:6,8 356:7 359:5 368:20 369:4 379:10 381:3 383:23 384:10 407:4 408:15 409:7

**seeing** 19:22 223:23,24 231:11 259:5 279:12 372:8

**seeks** 159:19 210:25

**seem** 74:12

**seems** 186:21 416:1

**seen** 18:2 19:19 117:3 128:25 171:12 208:19 232:13 245:2 265:14 290:23 339:21 340:3 342:14,24

**seer** 421:9 422:23

**segal** 5:21

**segalla** 5:5

**selected** 324:25

**selecting** 200:4

**self** 67:8,24 68:12 96:3 249:25 250:4 295:24

**semi** 160:3 206:5 208:9 247:14

**seminars** 23:8 23:17

**sense** 39:11 98:4 128:19,23 130:12 313:7 385:7 417:15

**sensitive** 10:5 362:20

**sensitivity** 127:18 128:6

**sent** 430:14

**sentence** 119:13 120:24 121:23 178:8 196:22,24 211:10 213:3 245:25 264:3,4 264:5 301:11 303:15 322:6 340:8 347:21 379:6

**sentences** 178:6 196:9 329:14

**separate** 56:11 295:9 316:24

**separately** 180:19 295:21

**september** 24:23,24

**series** 388:20 418:12

**seriousness** 317:15

**serous** 76:4,5 78:18 202:8 206:24,25 207:6

**serve** 32:10 42:23

**served** 15:15 16:22 40:7 176:25 390:2,3

**service** 88:16 405:18

**serving** 17:14 32:22 61:25 63:7,14,24 88:18

**set** 21:25 46:20 64:9 83:1 123:6 162:18 282:24 386:9 429:4

**sets** 82:9

**setting** 22:11 26:14

**seven** 277:21 315:20 385:12 387:15 388:10

**seventh** 3:20

**several** 38:18 235:17 284:6 329:21 330:23 391:22 396:2 398:14 403:13 406:16 415:3

**sex** 240:23 241:1
**shadow** 150:8
**shaft** 377:2
**shampoo** 136:1 136:24 139:17 139:18
**share** 95:3 414:22
**shared** 409:17 413:25 414:17
**sharris** 4:20
**she'll** 55:19 425:15
**sheet** 8:17 430:11
**sheets** 27:18
**shelf** 386:23
**shelves** 386:2 386:18
**shift** 281:10,14 281:19,23
**shifts** 287:5
**shipman** 2:6,7 11:22,22 157:13 241:25 242:8,15,18 311:8,17,21 367:14
**shipmanlaw....** 2:9
**shipra** 5:15
**shohl** 6:17
**shontia** 4:17
**shop** 295:10
**short** 220:12 372:4
**shorter** 16:13
**shorthand** 162:4
**shortly** 33:15
**show** 86:22 125:1,2 169:11 205:14 269:18 293:13 318:22
**showed** 336:23
**showing** 247:21 247:25 248:6 296:16 318:14 318:15 319:9 343:3,15 359:19 369:22 385:13
**shown** 347:13
**shows** 181:11 279:22 318:21
**shut** 283:9
**sic** 423:18
**side** 38:22 42:24 43:25 178:6 303:10 313:18 401:22
**sidley** 3:10,13 11:12,16
**sidley.com** 3:12 3:15
**sign** 430:12
**signature** 47:18 47:20 48:12 57:1 425:14 428:20 429:9
**signed** 430:19
**significance** 116:16,22 193:2 222:9 237:11 283:5 286:6 303:17 402:14 405:10 410:15 417:12 422:22
**significant** 48:23 78:24 109:4,10,18,22 113:17 115:6 115:14 116:10 119:3 120:7,12 121:5 122:6,18 162:14 191:3 191:17 192:1 192:12,16,25 198:17 200:25 202:21,22 203:3 204:7 205:9,15,24 206:11,15 207:1,19 208:3 208:13,19,22 222:7,18 227:13,19 228:11 231:11 234:3,6,12,13 235:3,6 236:24 237:3 247:10 247:19 265:2,6 266:22 267:6 268:1 271:14 275:18 279:23 282:9,17,22 284:11,21 285:9,24 286:10,12 288:24 289:20 290:3 304:4 305:3 306:11 306:13 307:12 307:25 309:17 316:9,19 331:11,19 332:8,17 334:7 334:16,17 369:25 370:12 370:25 371:4 372:9 380:22 385:13 402:24 403:16,17 404:5,14,23 405:3 415:7 420:25
**similar** 68:13 83:9,11 169:8 185:15 216:14 297:17 329:21 342:20 384:21

**similarly** 84:22 212:4 329:3 396:14 401:5 402:13 416:16
**simple** 95:19 114:21 272:16 340:10
**simplified** 103:15
**simplistic** 99:24 110:24
**simply** 205:7 272:25 332:7 348:20 355:1 376:21 404:13 413:20
**simultaneous** 34:22 63:9 103:7 201:6,11 299:16 327:18 422:25 424:13
**single** 59:6 64:14 86:17 88:14,19,24 89:24 90:21 91:4,8,23 104:24,25 105:4 112:12 112:23 114:1 117:1 126:8,25 127:1 128:21 138:18 140:14 156:13 168:24 178:14 248:4 276:7 282:23 282:24 283:5 283:11,16 307:15,24 309:1 314:23 315:20 318:21 318:23 324:10 325:18,20,23 329:20 331:17 334:14,21 335:2 359:11 360:7 363:15 371:23 375:10 375:11 399:23 404:9 410:2 422:10
**singular** 233:6
**sir** 292:17 301:3
**sister** 8:21 142:16 143:13 143:18,24,25 144:2 145:15 145:25 146:12 146:15,18 147:4,7,16 148:12 149:3 149:11,13,15 149:18 156:9 156:21,24 157:1 159:11 159:15,19 162:20 164:15 166:16 171:10 179:11,16 203:6 210:11 210:24 212:13 216:21 219:15 221:13 230:9 230:14 231:6 239:17 255:8 255:15 256:13 257:18 258:2,7 258:17 273:22 288:13 290:21 331:25 341:20 381:6 395:19 396:8,12 412:18 423:22 423:24 424:7
**sisters** 331:3
**sit** 376:25
**sitting** 374:24 423:11
**situations** 108:8 268:22
**six** 38:10 358:10 369:9
**size** 265:16
**skin** 232:9 376:21,25
**skip** 120:16 121:22
**slices** 200:9
**slicing** 317:21
**slide** 26:25
**slides** 23:7
**slight** 264:11
**slightly** 60:17 266:17 361:5 411:5
**slip** 8:17
**slow** 309:25
**small** 40:1 200:8 259:6 315:21 317:5,6 355:21 411:13
**smaller** 241:18 307:5
**smehta** 5:17
**smoke** 119:2,24 119:25 296:14 296:14 352:5 392:17
**smoked** 119:1
**smoking** 8:19 82:2 84:5,7 86:11 118:2,17 119:15 121:3 130:1,2 250:8 314:7 315:3,16 352:3 385:10
**smoothed** 133:19
**smsm.com** 5:23
**snapshot** 273:5
**society** 293:1 363:10 386:25 399:17
**soconnor** 2:13

**sold** 137:6,9,12 137:14,15 138:9 139:3,16 140:9,17 141:4 141:9 366:5,18 366:21,21
**solid** 411:14
**solution** 418:25
**solutions** 10:23 11:1 430:23
**somebody** 154:1 156:16 190:13 202:19 345:14 427:4,5
**somewhat** 77:6 90:24 309:19 314:14 400:11 402:5 408:22 417:5
**son** 1:19
**sorry** 48:8 56:9 75:13,21 104:18 108:21 123:12 125:22 132:25 134:10 155:8 162:24 176:12 177:8 194:15 208:7 215:13 218:2 248:23 263:22 301:25 302:1 327:7 359:24 394:16 411:21 415:16 419:17 421:14 424:5
**sort** 44:16 55:7 84:5 93:2 101:11 112:9 124:19 134:22 136:14 178:19 186:23 232:4 300:3 318:1,1 346:6 354:17 376:16 407:14 416:5
**sorts** 54:25 88:4,9 90:16 94:15 126:6 128:25 175:9 185:19 362:17 377:13,14
**sound** 29:10
**sounded** 139:17
**sources** 390:20
**south** 3:11,19 6:18
**speak** 13:8 88:16 92:4 241:13 269:5 355:20 358:8 409:2 422:6
**speaker** 24:18 194:14
**speaking** 41:15 111:2 175:5 236:8,10 242:2 247:13 333:9
**speaks** 123:1
**specialties** 388:25
**specific** 41:11 62:17 63:5,11 65:15,19 66:4 68:16,19,25 69:19,22 70:5 70:15 84:13,15 85:1 90:2 91:7 96:17 102:11 102:17 105:1 131:16 135:15 151:18 153:22 156:22 171:14 179:17,21 180:1 187:12 189:4 190:5 191:9 201:15 222:22 225:12 228:18 256:15 256:18 259:14 260:4 276:5 318:12 320:12 323:20 339:24 351:6,9 354:2 354:5 356:9 357:20,22 359:22,23,25 364:23,23 365:7 374:18 374:25 394:5 413:23 418:23
**specifically** 41:21 66:22 68:3 118:21 155:13 189:23 196:8 242:23 247:2,3 248:12 255:19 257:5 258:12 290:10 290:14 317:9 390:22 403:15 418:19
**specificity** 292:10 338:23 339:4,17,21 340:3
**specifics** 41:14
**specifies** 213:20
**specify** 220:1
**spectrum** 398:21
**speculate** 137:23
**speculation** 231:19
**speculative** 137:21 194:6 215:7
**speeches** 23:8
**spend** 236:5 296:19
**spending** 91:23
**spends** 287:7,9

**spent** 27:20 30:13 34:12,19 35:2,16 37:4 78:22 281:17 389:11 410:10

**spira** 3:10 8:4,6 11:12,12 12:8 12:10 14:17,19 15:1,5 23:22 24:1 28:7,10 30:19 31:19 32:18,20 34:14 34:17,24 36:2 36:6,14,16 41:3 44:1,9,17 44:19,22 45:8 45:11 46:10,12 46:15,17,23 47:5 50:16,18 52:16,20 54:17 55:22 56:20,23 57:6 58:23 60:1 61:1,11 61:22 63:3,22 66:1 68:15,24 69:5 70:1,10 70:19 71:12,18 72:4,17,25 73:11 75:18,22 80:19,23 81:1 81:4,8 83:20 84:4,21 85:6 86:20 88:7 89:8 91:2 92:17 95:5 97:1 98:5,19 100:16 101:20 102:19 103:4,9 105:5 106:24 107:13 108:10 109:11 111:1,7 111:14 113:1 115:1,19 117:15,21,24 121:13 122:24 123:5 124:1 126:14 131:23 132:12 133:22 134:13 135:10 136:5 137:5 138:3 139:1,13 140:8,15 141:14 142:1 143:4 144:11 144:16,20 148:23 151:16 152:17 154:14 155:6,15,21 156:18 157:8 157:24 165:5 168:12 169:23 170:20 172:10 172:15 173:14 174:13 175:19 176:19 177:8 177:11 179:7,9 180:2,23 181:9 181:18 182:4 182:17 184:14 184:20 185:1 185:11 186:3 187:1 188:12 189:17 193:12 194:3,12 195:5 195:7,8 198:14 199:4,11,13 200:17 201:5 201:17 203:22 203:24 204:16 204:24 205:6 205:18 207:7 207:13 208:1 209:4 210:23 214:14 215:10 217:5 218:6,17 219:23 221:1 226:10 227:9 227:16,23 229:12 230:2 231:3,9 232:15 233:21 234:20 235:12,18 236:10,15 237:17 238:5 238:12,16 242:6,13,16,19 243:4 244:13 245:13,18,20 245:22 247:1 249:10 251:12 251:17 252:15 256:12 257:7 258:5,20 260:3 260:15 263:1 263:24 264:2,9 266:1,6,12 267:14 268:10 269:20 271:20 272:11,14 273:17 274:24 275:12 276:11 278:1,10 279:1 280:3,11 281:25 282:2,6 282:12,14 283:21 284:13 285:6,18 286:3 288:22 289:16 290:12 291:6 291:16 294:23 297:10 299:10 300:19 301:1 302:16,19 304:11,25 305:1,13 306:4 308:4 310:19 311:6,13,20,23 312:21 313:4,8 313:11,23 314:1,4,5 316:13 317:17 318:3 319:5 320:3,9,18 321:5,20,23 322:24 323:10 323:24 324:2

Case: 1:23-cv-00818 Document #: 1828-14 Filed: 05/05/26 Page 519 of 539 PageID #:74707



326:7,12,17 327:15,19 328:5 330:14 330:17 331:4 332:4 333:1,13 333:19,23 334:2,5 335:5 335:19 338:21 342:12,21 343:13 344:12 345:2,19 346:12,24 347:5,16 349:14 350:10 350:22 351:10 351:19 352:22 353:7,21 354:21 356:3 358:3,17 359:16 361:18 362:21 363:6 364:2,16 365:1 365:9,19 366:2 366:13,23 367:11,13,16 368:3,9 370:10 371:2,11,18 373:8,17 374:6 374:20 375:17 376:9 377:5,19 377:25 378:5 379:3 380:16 380:19 381:21 382:15 383:1 384:1 386:15 387:19 389:6 391:7 393:8 394:4,14 398:3 401:14 405:14 405:19,23 409:23 410:25 414:5 418:14 419:17,21 420:7 422:19 423:20 424:15 425:3,13,22 426:1,4

**split** 284:24

**spoke** 87:3

**spoken** 37:22

**sponsored** 389:25

**spot** 371:23

**ss** 428:1

**st** 4:14 5:7

**stage** 74:20 407:24

**stance** 334:12

**stand** 71:5,13

**standard** 161:4 161:12 420:21 426:12,14,16

**standpoint** 421:25

**stands** 266:5

**stanner** 3:18 11:17,17 220:9 427:3,8

**start** 18:7 60:9 103:12 110:19 112:1 113:4 141:5 153:1 169:12,13 173:19 201:14 279:18,20 295:13 302:2 306:8 318:10 355:24 356:17 388:13

**started** 29:13 29:16,22 78:3 309:9 332:12 360:21 422:8

**starting** 93:5 113:9,11 143:23 356:5

**starts** 48:7 56:16 111:20 120:21 121:19 178:7 195:11 196:22

**state** 1:18 2:11 11:9 12:12 15:22 66:22 110:6 246:22 257:22 267:4 280:24 389:13 428:1,4 429:11

**stated** 109:15 110:2 113:3 125:13 156:7 159:23 179:19 187:16 226:6 231:6 257:21 258:17 296:8 372:15 389:10 393:4 396:4

**statement** 8:14 28:8,20 115:16 172:20 178:19 197:13 280:19 324:19,22 376:5 381:15 400:2

**statements** 27:17

**states** 1:1 10:16 75:1 120:9 123:4 147:10 147:11 298:13 299:3

**stating** 267:23 278:19

**statistical** 97:14 98:17 100:4,9 105:21 106:8 110:14 116:4,16,21 122:4 193:2 222:9 226:7 236:20 237:11 261:3 283:5 286:6 303:16 385:22 402:14 402:24 404:18 405:10 415:22

417:11 421:25 422:22
**statistically** 109:3,9,18,21 113:16 115:6 115:14 116:10 119:3 120:7,12 121:5 122:5,18 162:13 192:1 192:12,24 198:17 200:25 202:21,22 203:2 204:7 205:9,15,24 206:10,15 207:1,19 208:3 208:13,18,21 222:6,18 227:12,18 228:11 231:10 234:2,5,12 235:2,6 236:24 237:3 247:10 247:18 265:2,6 266:22 267:5 267:25 275:18 279:22 282:9 282:17,22 284:11,21 285:9,24 286:10,12 288:24 289:20 290:3 304:4 305:3 306:10 306:12 307:12 307:25 331:11 331:19 332:8 332:17 334:6 334:15,16 369:25 370:12 371:4 372:8 380:22 385:13 403:16,17 404:4,14,23 405:2 415:7 420:25
**statistician** 292:5,17,21
**statisticians** 123:11
**status** 279:16 287:16,19,22 289:23
**stay** 101:11 168:23 372:3 388:11
**staying** 167:18
**stays** 124:22 387:11
**steering** 19:14
**steiner** 3:13 11:15,15 56:9 56:15 57:3 177:7 249:6 300:23 327:5,8 368:6 405:18
**stenographic** 11:7
**stenographic...** 428:17
**step** 89:22 93:21 164:20 404:21
**stephanie** 2:10 38:2
**steps** 91:12 129:10 300:11 366:11 367:2,8
**stepwise** 350:18
**steroid** 240:23 241:1
**stick** 45:9 81:5 111:4,16,17 119:23
**sticking** 21:10 99:19 355:7
**stop** 173:21 235:12 387:14
**stopped** 153:13
**straight** 133:16
**straighten** 132:9 135:1,13 135:18,23 139:9,10,12 140:4 155:7 156:5,17 186:24 188:11 233:4
**straightened** 150:22 153:4 153:11 154:2 155:25
**straightener** 132:4 136:23 140:7 221:11 246:8 254:13 255:23 256:10 259:1
**straighteners** 67:2 132:15 151:21 152:4 152:15 160:5 161:20,25 162:4,19,22 163:10,13,22 164:5,13 165:17 166:14 173:6 179:12 180:14 186:7 186:16 188:18 190:6 191:4,18 192:17 195:15 197:6 198:12 203:19 205:16 208:15 209:6 210:14 213:23 214:21 215:16 216:18 217:3 218:24 219:21 221:25 222:12 226:18,22 228:1 230:22 231:22 233:11 233:13 237:14 240:22 241:12

245:12 247:20 248:13 254:23 255:5,16 256:3 257:20 258:4,9 258:18 273:11 274:15 330:3 364:15 396:18 396:22
**straightening** 133:6,13 134:10 135:8 135:11 136:11 138:17,24 154:24 155:9 171:15,25 173:1,20 232:21 257:23 300:17 353:15
**strange** 53:21 84:6
**strata** 200:7
**stratifications** 312:20
**stratified** 165:3 193:22 202:9 221:14 297:8,8
**stratify** 76:24
**street** 1:20 2:4 2:11,16 3:5,19 4:12,18 10:21 428:12
**strength** 1:19 292:9 302:10 303:19 305:16 305:25 306:6 309:2,5,7,22 310:25 311:24 312:25 316:22 318:14,15,21 318:22 329:7 336:10,23 337:2 338:4,5 350:12
**strengthen** 409:17
**strengths** 199:25 203:6
**strict** 108:15
**strike** 200:20 201:18 203:23 241:20,24 242:4,6 266:1 281:25 410:16
**strong** 245:7 310:17 314:19 314:23 315:7 316:6 319:9 336:8,14,17 337:2,4,10,24 338:3,10 342:1 350:16,25 384:15 389:18
**stronger** 341:7
**strongly** 339:18
**structured** 146:2
**struggling** 105:1 126:3 317:4
**stuck** 157:14
**student** 385:18
**students** 389:16
**studied** 205:25 207:3 382:16 412:11
**studies** 21:13 22:7 51:18,22 59:19,23 60:12 60:15 63:6,13 92:21 95:22 96:22 97:3,6 97:10,13,17,18 97:25 98:1 106:2 110:19 111:17 114:3 116:3 117:7 123:9 124:10 124:23,25 125:5,6,19,20 127:20,22 128:16,16,17 128:18 129:23 142:13 171:13 175:1,10,10 204:14 211:21 211:24 228:25 229:7 240:20 259:21 261:6 281:12 288:5 288:12,21 291:4 293:13 293:23 294:5 298:8 299:23 307:20,22 309:12 314:25 319:20 325:15 328:19 329:18 329:21 330:4 335:9,23 336:22 337:14 337:17,20,22 337:23 339:24 359:6 360:3 374:14 378:17 380:21 382:11 385:12,13 394:10 395:19 396:5,9 399:1 400:1 401:3 402:16 407:6 409:16 410:2 410:14,18 411:3,7,14 412:7,8,13,23 417:17 422:2
**study** 8:21 9:6 9:7 60:12,12 60:13 64:15 66:22 67:8,10 67:16,18,19 76:17,21 85:10 86:14,17,22 90:13 95:7,8,9 95:10,11,12,13 95:17,23 96:2

96:3,10 98:3 99:5 105:23 106:11 107:18 108:9,25 110:3 111:20 112:2,7 112:13,17,21 118:5,10 122:19 124:11 124:12,16,16 126:8,13,20,25 127:1,7,15 128:13,21 129:3,7,11,13 129:15 142:16 142:17 143:6,7 143:7,14,18,19 143:24,25 144:9,23 145:11,15,19 146:12,15,18 146:24 147:4,8 147:16,19,24 148:12 149:3 149:11,13,15 149:18 151:9 151:15,19,24 152:6 155:23 156:9,21,25 157:1 158:2,5 159:4,6,10,11 159:15,19 160:19 161:2 161:14,14 162:20 164:16 166:17 167:10 167:11 169:9 169:10 170:24 171:10 174:24 177:14,21 178:14,24 179:4,11,16 181:24 182:20 182:25 183:23 195:19 198:2 198:10,16 200:1,3,22,24 202:6 203:6,8 203:10 204:2,6 204:22 205:8 205:14 209:15 209:22 210:4,7 210:10,11,24 211:16 212:10 212:13,23 213:5,14 214:24 215:3 216:15,21 219:15 221:4,7 221:13 225:19 226:12 228:9 228:19,24 229:14 230:9 230:14,18,19 231:6,8,8,15 232:14 238:4 238:23 239:12 239:18 241:12 241:22 242:20 242:23 243:7 243:15 244:1,8 244:9,11,18,21 244:22 245:15 248:6,10,11,17 248:18,21 249:13,17,21 249:24 250:19 250:24 251:3 252:5,8,19,25 253:5,7,12,16 253:24 254:2 255:8,9,15,18 256:13,14,20 256:21,22 257:18 258:2,7 258:17,25 259:25 260:6 260:11,16 261:5,9,14,15 263:14 265:20 273:23 275:15 279:17 280:13 283:1,17,25 284:19 287:8,9 287:13,18,23 288:13,14,23 289:4,6,6 290:2,11,15,21 304:2 305:2 306:9 307:5 309:8 312:6 324:11,13 325:18,21,23 326:22 329:20 330:5,19 331:2 331:3,24,25 341:20,22 342:16 344:8 345:23 346:8 359:9 368:18 368:23,25 369:10,12 372:10 373:24 374:8,25 381:6 395:20,21 396:8,12,16,20 398:7,18 399:23 400:12 400:13 404:20 405:5 407:19 412:18 413:23 417:20 422:23 423:22,24 424:6,7,19,22 424:25

**study's** 288:10 424:25

**studying** 309:9 309:23

**stuff** 415:17

**sub** 107:15

**subgroup** 206:14 286:19

**subgroups** 223:12

**subheading** 145:11

**subject** 54:1 295:1
**submitted** 36:20 328:16
**subparts** 254:19
**subpopulations** 223:15
**subscribed** 432:14
**substance** 359:11
**substances** 138:15,21,22
**substantial** 121:4 328:22
**subtype** 65:25 202:10 206:25
**subtypes** 74:12 75:3,7,15,24 76:13,18,22 77:2,6 78:13 78:16 83:14
**sufficient** 310:17
**suggest** 97:16 115:4 169:19
**suggested** 116:25
**suggesting** 180:25 204:13 214:18 244:7 345:20 384:12 397:19
**suggests** 169:1 253:10 300:15 362:12
**suite** 2:4,8,21 3:5 4:6,13,19 5:6,12,16,22 6:6,18
**summarized** 292:2
**summary** 26:16 121:19 280:18 413:21
**summer** 16:14 29:21 30:14 31:18 32:25 72:6 328:10
**super** 134:16 295:4
**supplemental** 55:24 195:10
**support** 26:16 90:10 334:18 338:1 379:8
**supported** 412:24
**supporting** 307:19
**supports** 310:17 362:13 411:16,19
**supposed** 313:17
**sure** 14:19 32:18 44:8,21 45:1 53:7 55:19 62:9 80:22 85:4 89:1 91:21 100:19 101:14 106:18 111:15 112:3 120:13 136:20 138:6 161:1 163:17 186:20 188:24 225:2,8 238:10 258:23 267:12 270:12 287:17 291:8 294:25 297:22,22 326:8 340:1 354:8 363:7 379:18 389:7 391:8 400:10 400:10 403:4 403:23 405:23 413:3 414:25
**surgeon** 385:10
**surprise** 268:25 361:9,17 372:7
**surprised** 417:8
**surrounding** 325:1
**surveillance** 421:8
**survey** 141:11 153:6
**survival** 74:22 118:3,18 119:3 119:15 120:11 120:14 197:9 395:5,6,12
**susceptibility** 349:2
**susceptible** 265:23
**susceptibles** 240:6 281:6
**swear** 11:25
**switch** 279:8
**sworn** 1:17 12:3 428:7 432:14
**symbolize** 214:11
**symielle** 158:13
**symptoms** 74:18,19
**syndrome** 77:24 79:20,22 80:3,5,7
**syndromes** 78:5
**synonymous** 256:3
**synthesize** 291:20,25
**system** 82:16 338:18 362:15 362:16 399:9

**systematic** 91:24 114:10 114:17 413:10
**systems** 4:16 93:14

**t**

**t** 241:5 431:3,3
**tab** 17:18 19:8 24:7 46:20 117:18 144:13 148:17 177:6 208:25 209:5 249:3 253:19 300:21 302:14 320:4,8 327:4 327:5,7,9 367:13 368:4
**tabet** 3:18
**table** 62:12 76:7 147:22 151:25 152:13 160:9 161:16 161:24 162:3 162:16,17 163:1 164:2 167:4 171:21 180:4,4 190:17 190:19 193:14 193:20 199:17 202:5,7,25 205:20,22 206:19 207:10 207:15,16,17 208:12 215:12 218:15 221:7,9 221:22 223:2 228:6 229:3,4 229:23 234:10 234:24 236:19 238:6,7 247:7 247:9,25 260:21 263:10 269:21 275:13 275:15,20,21 276:20 279:3,3 283:24 322:19 369:15,17,21
**tables** 183:19 227:5 275:14 346:1 402:16 402:22 403:13 403:22
**tail** 342:8
**take** 10:9 14:8 17:3 24:21 25:7 45:4 48:8 82:23 91:12,13 101:16 129:9 164:20 200:2,6 225:4 251:15 277:3 283:25 291:6 321:21 365:10 373:9 383:24 427:3
**taken** 1:18 13:19 20:15 55:18 73:7 157:20 220:16 251:22 291:12 336:20 367:24 387:24 406:3 428:10
**takes** 168:11
**talc** 15:19 16:7 16:15,21 31:10 32:1,4,15 71:1 71:6,14 81:21 327:24 330:7,8 352:13,17
**talcum** 78:1
**talk** 32:14 70:24 95:25 101:14,18,25 102:1 112:19 136:17 171:20 183:10 276:6 279:19 331:19 386:8 396:23 399:7 414:23 421:17
**talked** 32:15 123:8 124:6 129:7 135:19 155:4 158:4 159:12 166:19 169:10 178:23 181:4 194:8 202:13 229:1 269:25 270:1,5 284:6 289:18 298:2 345:25 351:20 352:2 395:22 397:1 421:7
**talking** 15:3 53:13 54:15,23 80:16,17 89:10 116:5 130:25 131:1 136:18 136:25 143:11 168:9 171:15 172:17 193:20 205:22 221:4 259:11 275:9 276:13 289:25 295:6 302:4 310:7,8 317:13 325:3 340:21 362:5 379:21 384:22 386:1 400:16 406:14 410:11 424:11 425:23
**tamoxifen** 79:25 81:17
**tara** 1:17 10:25 428:3 429:7
**tardy** 4:5
**task** 375:15 377:12,21
**tasked** 360:11
**tasks** 378:1
**tdrlawfirm.co...** 3:21

**teach** 92:6
**teaching** 92:6
**team** 143:20 146:20 203:11
**technical** 11:4 162:2 194:18
**teenage** 408:7
**teens** 273:15
**tell** 12:3 102:25 103:10 106:22 152:24 153:3 157:15 200:21 223:1 225:5 428:7
**telling** 233:12
**tempo** 52:13
**temporality** 292:10 340:6
**temporary** 135:24 160:3 206:6 208:9 247:14
**ten** 38:20 41:19 207:24 220:19 389:15 423:12 426:19,20
**tend** 41:24 68:9 112:19 395:3 413:14
**tends** 74:14 171:13 294:4
**tens** 411:3
**tenth** 6:12
**term** 54:20 74:22 97:14 126:3 341:3 360:17 372:2 374:19 383:14 398:17
**terminology** 101:10,12,22 124:13 424:3
**terms** 55:4 93:10,23,23 99:20 104:20 105:11 113:3 116:9,15 130:6 131:6 196:6 223:18 224:12 275:7 280:24 285:2 307:1 314:11 337:15 344:4 374:16 382:3 383:18 384:23 395:16 408:20 411:6 417:15,16 418:24 421:7
**terribly** 315:10
**territory** 378:8
**tertiles** 369:22
**test** 108:8
**testified** 12:6 16:19 71:23 393:4
**testifying** 15:10 55:19 278:20
**testimony** 15:8 17:1,13 55:17 63:17 71:5 84:18 103:3 104:17 106:15 107:10 109:6 115:10 135:4 139:7,22 152:9 170:10,12 171:6 176:1 181:7 193:11 193:13,16 198:21,23 216:23 219:17 258:16 259:20 266:4 269:16 277:2 278:5,18 287:15,20 343:20 371:8 371:15 397:1 398:15 403:13 425:11 428:19 430:9,17 432:8
**testing** 422:14
**text** 58:15 293:2 332:2
**textbook** 106:19
**textbooks** 294:22
**texture** 134:5
**textured** 68:13
**thank** 12:20 15:3 44:18 47:4 56:19 57:14,25 61:21 80:8 81:7 117:21 173:12 195:6,7 207:7 231:3 245:21 252:1 264:1 266:4 302:16 314:4 324:1 326:16 327:17 330:16 380:16 401:4 406:7 425:6,6,8
**thanks** 264:7
**therapies** 77:25
**thereof** 1:22 219:21
**thing** 44:16 92:23 161:4 184:10 239:25 350:18 377:3
**things** 13:18 23:13 54:25 58:8 78:4 85:8 87:18 88:4,9 90:3,14,16 91:24 95:22 101:9,19 104:21 116:15 116:24 117:1 126:12 128:22 128:25 129:21 130:9 131:7,25 150:7 155:4,16

169:25 196:19 248:8 259:3 260:21 271:25 295:5 299:21 307:8 325:6 343:25 353:18 355:19 356:18 361:3 367:1 370:19 392:5 392:15 394:21 395:15 400:16 401:18 415:11 417:3 419:5,7
**think** 12:15 21:19 33:1,14 33:15 34:15 40:23 44:4,12 45:23 46:19 48:6 54:21 58:18 61:3 72:5,7 74:15 76:20 77:14 80:19 82:12 83:6 98:6,13 102:21 104:1 106:25 115:3 124:6 126:2 131:15 134:24 135:19 144:14 155:3 157:13 158:19 164:22 167:3 168:22 168:25 169:7 169:16 170:16 170:17 172:15 172:16 173:9 173:10 175:1 177:1,3 179:7 183:18 184:20 194:22 196:4 197:24 199:9 204:5 207:5 214:15,16 215:23 221:3 225:2,22 227:4 232:16 234:11 239:14,15 242:16 244:6 244:10,14 245:1,10 260:10 268:18 270:6,18 271:9 272:7,8,12 275:20 276:3 276:17 278:6 280:19,23 283:4,11 284:18 285:3 286:4,18 287:9 289:4 296:12 298:2 304:14 305:17 308:2 309:14,18 316:11 317:22 320:14,14 321:20 323:6 326:24 328:8 330:1 331:22 332:14 342:2,6 343:21,22 346:3 349:20 353:5,14 354:10 355:8 355:24 361:3 362:12 363:12 369:5 370:15 375:23 376:19 382:3,10 389:13 394:21 398:20 400:10 401:15,21 403:6 410:3 415:9 417:19 418:3 420:15 424:6 426:4
**thinking** 386:22 420:21
**third** 120:20 212:20 259:20 271:8
**thirds** 347:20
**thought** 335:21 401:20 416:7
**thoughts** 294:18 296:10
**thousand** 320:6 323:5,21
**thousands** 314:25 411:4
**three** 29:25 38:7 59:22 60:11 114:13 114:19 142:19 142:24 151:3 178:6 260:10 262:1,13,15,21 270:2 273:14 336:22 422:21 423:10 424:23
**threshold** 348:7
**throwing** 313:16
**tia** 4:17
**tied** 99:2
**tightly** 68:4
**time** 1:22 10:7 12:23,24 13:9 14:7 27:18,20 29:7,23 30:7,8 33:3 34:12,19 34:25 35:1,4 35:13 37:3 38:12,12 40:5 40:11 62:12 64:13 72:23 73:1 78:22 91:17,24 96:6 96:7,11 106:13 107:21 108:4 117:4 124:24 141:14 144:3,5 153:20 161:11 163:18 166:6 167:1,9,10,11 183:20 189:2

190:10,10 218:16 219:19 225:4 259:20 270:10 271:6 271:16 273:6 273:12 274:15 287:10 292:24 296:15,19 317:24 325:13 328:16,19 330:6 332:25 333:12 334:11 343:23,24 349:4 352:9 356:10 357:1,3 357:9,12 361:5 361:8,16,21 363:16 367:15 371:24 388:7 395:7 410:10 411:6 419:6,15 422:7 423:9 424:12 425:1 426:13 427:10 430:18
**timeframe** 430:8
**times** 15:15 38:11 101:15 102:13 103:17 103:23 151:2 186:12 188:1 202:16 208:14 208:23 235:17 254:23 255:1 260:10 269:11 273:14 282:20 319:13 330:24 342:5 347:4 398:14 406:16
**tiny** 404:5
**tissue** 95:14
**tissues** 359:15 362:20
**title** 19:13 95:24 144:25 221:16 253:10
**titled** 57:16 118:2 158:6 177:14 190:19 209:6 249:11 302:21 368:12
**titus** 5:11,13
**tobacco** 296:14 351:21,21 352:3,5 384:16 386:2
**today** 15:8,10 18:11,21 21:23 22:7 73:14 96:1 99:3 216:24 229:2 282:20 293:8 303:16 334:13 344:25 352:2 374:24 386:12 388:7 394:12 394:22 395:16 404:2 409:18 409:22,25 410:11 413:25 414:1,7
**today's** 37:4 425:11
**together** 44:7 72:2 90:4 140:18 290:21 295:19 336:21 366:21 376:17 390:19
**told** 225:14 283:10 310:2 312:11
**took** 24:19 58:11
**tool** 95:6 131:2 135:21,23 149:25 150:1
**top** 28:19 66:16 134:11 135:9 149:2 160:20 223:6 423:7
**topic** 122:7 299:19
**total** 34:9 165:12 261:8 338:10 351:25
**totality** 310:8 319:3 336:7 338:11 350:19 353:24,24 419:1
**totally** 173:15 345:17
**tough** 359:8
**towards** 160:20 167:20,22 170:1 219:2,9 241:19 341:24 397:3,6,12,13 398:9
**toxicologist** 376:4
**toxicologists** 390:10
**toxicology** 50:9 93:11 388:17
**tract** 212:2
**trained** 92:11 146:6 402:3
**trainees** 94:13 94:18
**training** 40:3 92:12 389:8
**transcribed** 428:17
**transcript** 13:20 39:9,10 238:15 428:18 430:6,19 432:5 432:8
**transcription** 13:10,22
**transcripts** 39:1

**treat** 50:2,5
**treatment** 76:25 134:14 184:22 187:2
**treatments** 134:17 154:22 184:17 185:3 189:21,25
**trenches** 416:4
**trend** 208:21 208:22 266:23 269:2 270:17 270:19 274:5,8 274:20,22 275:2,7
**trended** 397:2
**trends** 263:3 266:25 397:6
**trial** 124:19,20
**trick** 60:2
**tried** 134:4 416:7 421:7
**triple** 395:1
**true** 104:10,21 105:24 106:11 106:21,22 107:7,18,19 108:12 115:18 154:17 166:24 170:2 173:8 182:5 184:13 207:20 212:8 234:7 404:25 424:19 428:18 432:8
**truly** 269:7 335:13
**truncated** 277:19,19,20 342:8,10 343:9
**trust** 251:1
**truth** 12:4,4,5 428:7,8,8
**truthful** 153:15
**try** 13:8 14:7 85:10,24 87:5 101:10 111:5 127:24 147:8 172:19 295:10 345:16 354:9 388:11
**trying** 34:18 36:4 76:22 81:2,6,7 85:22 86:6 87:6 94:25 101:22 103:4,6 106:18 107:15 111:3,3 111:6 112:7 115:4 127:23 128:22 138:5,6 140:17 161:6 163:17 170:13 193:12,17 223:10 237:22 238:14 248:8 270:11 271:25 272:7 276:6 280:24 283:23 283:24 284:7 307:6 308:5,25 312:14 317:5 328:8 338:20 347:6 350:19 350:24 354:11 378:1,7 390:19 399:19
**tubes** 74:13 75:4,9,16
**tumors** 76:23 260:1 395:3
**turn** 25:18 47:15 64:18 65:8 66:13 105:8 158:1 161:15 178:2 178:21 221:6 249:3 284:4 371:19
**turning** 21:9 285:7 291:17
**twelve** 150:20 153:5
**twenty** 38:20
**twice** 411:25
**two** 37:17 38:11,12 42:13 43:17 56:11 64:23 74:4 82:7,12,23 110:3 114:14 138:20 142:3,7 142:13,25 151:2 170:15 170:18 176:14 196:9 223:17 232:5 233:12 238:2 242:13 250:12,23 251:15 286:9 291:4 296:6,22 301:14 302:9 312:13 328:21 329:14 337:10 337:22 347:20 357:1 364:13 366:10 383:24 385:4 389:16 393:2 395:24 411:3
**twofold** 309:6 370:6 397:23
**tx** 2:22 5:23
**type** 63:1 64:16 65:20,20 68:10 84:13,16 95:6 95:17 129:18 150:1 182:1 187:13 220:2 233:6,20 240:4 355:3,4 365:12 401:2 407:19 412:8 415:6
**types** 76:9 82:7 83:7 97:25 100:8 114:7

156:15 157:7 161:5 172:8 176:17 180:14 182:2 232:19 247:11 294:8 295:4 351:12 351:17 352:6 352:18 353:1,6 354:3 356:12 358:22 365:13 365:13,17 370:19 371:5 375:11 378:21 383:24 419:6
**typical** 86:13 98:7
**typically** 86:22 97:3 242:25
**typo** 22:15

**u**

**u.s.** 67:25 145:17 195:12 249:23
**ultimate** 79:4,6 86:5 172:23
**ultimately** 88:22 92:21 182:12 203:13 262:22 283:8 296:17 315:23 316:4 362:18 404:10
**umbrella** 360:17
**unaware** 412:12
**unclear** 287:3 287:21
**uncommon** 311:22
**undecipherable** 313:2
**under** 79:13 110:3 124:12 160:11 162:18 163:9 206:19 213:3 242:9 249:21 261:4 261:17 305:25 314:1,19 326:20 338:22 339:3 341:6 343:14 428:17
**underestimate** 170:1 173:7
**underestimates** 397:11,25
**underestimati...** 184:12 398:10
**underestimati...** 270:8 289:13 398:5
**underfunded** 197:24
**underlined** 150:20 152:20
**underlying** 105:20 310:13 399:6 422:11
**underneath** 307:20
**underpowered** 223:12
**understand** 14:1,3 15:24 41:13 44:17 49:16 54:18 68:2 89:9 97:15 98:6 103:6 111:7 115:2 129:5 132:3,8,16 162:5 180:24 181:10 189:8 204:1 234:21 242:15 256:2 270:11 271:21 271:23 297:24 311:21 313:23 318:18 331:7 332:11 333:1 335:6 337:14 388:23 390:16 424:16
**understanding** 36:7,15 42:22 43:23 75:6,11 76:12,15 83:2 100:17 108:11 129:9 134:7,12 134:25 135:5 137:8,13 146:11 149:10 151:13 154:6 187:15 211:22 254:4 292:22 357:2 363:18 379:19 395:11 404:9,11,11 407:11 418:18 418:21 419:13
**understood** 22:3,3 23:22 75:8,15 93:20 115:20 131:24 131:24 182:18 318:4 418:10
**understudied** 395:14
**undoubtedly** 370:6
**unethical** 345:13,18
**unexposed** 265:11 307:2 346:11
**unfortunately** 48:11
**unidentified** 194:14
**uninvited** 295:11
**unique** 81:11 81:12 83:1,22

97:13
**unit** 10:11 73:5 73:9 141:18,23 157:18,22 220:14,23 251:20,24 291:10,14 367:22 387:22 388:1 406:2,6 419:24 420:4 425:11
**unit8** 368:1
**united** 1:1 10:15 75:1 147:10,11
**universal** 352:25
**university** 389:13 424:23 425:2
**unlimited** 105:23 106:10 107:17 108:4
**unopposed** 79:25
**unpublished** 18:25 20:14 25:22 26:5
**unquote** 274:16 277:23
**unsafe** 347:1
**upcoming** 229:2
**update** 250:12 328:9
**updated** 326:10 328:6
**upfront** 225:25
**uploaded** 17:17
**upper** 100:23 102:3,6 277:17 343:9 344:11
**upset** 52:13
**urine** 369:18 371:24
**usa** 145:23
**usage** 171:13
**use** 9:5 22:1 23:4 46:24 54:20 65:2,3 65:11 66:9 67:1,4,25 77:25 79:24,25 81:17,21 86:11 87:5,22,23 95:7,14 97:10 98:7,25 101:10 104:1 116:3 117:6 123:9 124:14 126:19 126:23 129:24 130:19 131:3,6 135:1,13,18,22 135:24 136:16 136:21 142:9 142:11 144:25 146:6 150:1,7 151:2 152:3,19 153:8,16 154:4 154:15 155:10 157:2 158:6 159:21 161:19 164:12,19,24 165:22 166:13 166:22 167:6 167:17 168:1,3 168:14,16 171:12 179:12 180:7 183:21 183:21 184:9 191:4,17,22 192:17 193:8 195:15 198:18 199:13,17 201:1 202:3,14 202:16 203:19 204:8,9 205:10 205:16 206:3,5 206:9 207:21 208:4,6,15 209:6 211:1,17 214:5,12,20,23 215:18 216:17 217:9,15,15 221:12,24 222:11 226:22 228:1 229:11 229:16 230:12 230:21,24 231:12 235:3,5 235:7 236:25 237:4,13,23 243:20 246:8 247:11 249:12 250:8 255:9,10 255:12,24 256:11,15 259:13,16 260:7,25 261:24 262:1,2 262:2,14,14,15 263:3,4,4 264:14,17,21 264:23 265:7,8 266:18,24,25 267:1,7 268:2 268:14,16,21 268:24 269:5 269:10,14 270:3,7,15,19 271:5,6 272:16 272:17,25 273:4,11 274:5 274:6,23 275:22 276:12 276:16,22,23 276:23,24 277:18,19,20 279:24 283:1 285:10,19,20 286:1,2,9,11 288:25 289:12 289:14,15,24 289:24 290:4 302:4 304:5

305:4,8,9,19 306:16 310:3,6 312:4 322:25 331:12 332:9 332:18 334:7 342:15 343:5,5 346:21 348:13 348:16,17,18 348:18 349:16 349:21 350:1 372:2 374:18 386:11 387:5 392:15,19 395:23 398:16 399:16 401:6 401:12 406:20 406:23 407:7,9 422:1,16 424:2
**used** 23:7 26:15 60:18 69:1 90:24 97:17 98:11 123:14 133:24 134:23 135:23 138:21 138:23 150:22 152:25 153:18 153:20 154:2 154:12,18 156:2,5,9,15,23 157:5,7 162:22 163:13,22 164:4,13 166:14,21 167:1 169:4 171:25 172:8 173:1 180:12 180:13,22,25 181:2,3,12,14 182:1 184:15 190:20 197:6 203:8 208:23 213:22,22 215:4 216:18 217:1,9,10,16 219:13,20 223:2 226:13 226:18 230:7 231:16 232:17 232:20 234:1,4 234:14 235:1 236:22 237:1 253:15 254:1 254:12,22,24 254:25 255:22 262:9 267:8 268:3 269:11 273:14 274:14 276:2,17 293:7 293:7 317:25 342:5 398:13 406:16 407:16 430:19
**useful** 199:2
**user** 166:1 169:22
**users** 165:13,17 166:10,25 167:17,24,25 168:8,18 170:5 170:7 171:1,3 180:5,8 181:12 182:6 192:22 203:1 215:25 216:12 217:20 217:25 218:3,4 218:11,24 219:12 224:2 262:10,25 264:12 265:8 275:23 306:14 306:15 382:13
**uses** 187:3 190:13 242:25 244:4 255:4 407:16
**using** 67:13 68:20 91:20 100:8 108:21 108:25 133:11 154:12 156:16 169:3,12 173:19 183:12 183:14 184:8 190:11 230:17 231:22 232:2 233:18 266:15 292:3 337:20 384:19 387:6 397:17 407:2
**usual** 74:16
**usually** 62:25 62:25 74:21 106:1 112:15 116:25 117:12 183:20 426:19
**uterine** 9:6 25:12 27:4 41:7,10 62:6 64:3 65:3,12 65:20 69:15,19 70:5 71:21 72:9,22 74:4 78:9,13,25 79:7,9,14,17,21 80:12 81:10,13 81:17,23 82:3 82:19,24,24 83:10,16,18 84:9 123:24 142:10 143:3 209:7 211:2,17 211:25 216:4 216:12 218:11 218:23 221:13 231:16 235:4,7 236:25 237:4 240:15 241:2 241:14 243:25 246:11 247:12 248:16 249:12 256:24 257:16 260:4,13 261:19,25 262:5,16 264:19 266:17 267:6 268:1,17

269:14 270:20 272:19 273:3 274:9 275:3 279:24 281:3 286:16,23 288:9 289:1 290:5 295:15 295:24 297:9 297:12 298:5 298:21 312:4 331:7,9,23,25 334:23 340:22 346:14 347:8 349:18 350:2 352:3 354:14 354:19,25 355:10,13 359:2,20,22,25 360:9 362:2 373:20,25 374:11 375:4 375:14,21 377:16 378:12 384:14 385:3 391:5,19,24 393:7,12,14 394:13,16,18 394:25 395:9 405:7 408:1 410:8 411:18 411:20,22,24 412:3 413:17 414:4,9 416:22

**utero** 349:7
**uterus** 78:10 212:1 240:2 260:1
**utilize** 96:22 293:11
**utilized** 139:9 139:11 278:22

**v**

**v** 430:4 431:1 432:1
**v3** 149:7
**vague** 74:18,19 278:7 313:2 351:16
**valid** 343:11 416:11
**value** 208:21 295:4 347:12
**values** 109:16 117:2 344:21
**variable** 277:14
**variables** 301:14 377:18
**variant** 315:25
**variation** 178:13 309:10
**varies** 147:19
**variety** 150:4,9 211:6 233:3 248:1 254:5 390:17
**various** 159:21 160:22 174:25 189:11 204:3 211:2 212:12 261:7,7 292:1 314:15 361:6 369:18 396:5 400:1 402:15 419:5,6
**vast** 66:9 352:6
**venues** 16:5
**verbal** 13:20
**verbatim** 360:23
**verify** 430:9
**veritext** 10:23 10:25 430:14 430:23
**veritext.com.** 430:15
**versa** 399:10,13
**version** 24:8 46:25 57:24 251:8,12,15 252:4,7,13 326:5
**versions** 21:16
**versus** 114:10 117:1 175:17 176:8 177:17 181:3 191:8,9 191:12 192:21 202:14 203:1 207:11 234:12 276:22 284:25 285:5 312:15 331:20 339:20 366:17 367:1 376:23 386:5
**vice** 399:10,13
**video** 1:10,16 10:8,12
**videographer** 6:21 10:2,24 11:5,24 61:18 73:4,8 75:19 141:17,22 157:17,21 189:15 220:13 220:22 251:19 251:23 291:9 291:13 367:18 367:21,25 387:16,21,25 406:1,4 419:23 420:3 425:9
**videotaped** 17:23 19:16
**virtually** 82:7
**visit** 146:7
**vitae** 48:16
**voelker** 4:12

**w**

**wacker** 4:6 5:16
**wagner** 1:19 10:20 428:11

**wait** 13:11 338:16 371:14 383:22,23
**waiting** 386:5
**waiving** 425:13
**walked** 198:24
**walnut** 3:5
**want** 84:14,22 84:25 87:9,14 88:10 99:10 100:18 112:3,9 126:10 157:8 164:20 189:1 191:10 199:6 220:17 236:5 238:10,17 258:23 265:17 267:15 275:24 278:2,3,8,15 293:3 299:2 332:6,23 333:9 370:16 371:21 398:21,23 399:10 405:14 405:21 407:3 425:14 426:5 427:1,7
**wanted** 31:5 206:9 243:23 294:25 426:3
**wanting** 172:4 290:10
**warranted** 246:1,4
**washington** 2:5
**watch** 124:23 345:17
**water** 146:7
**waves** 160:7 206:7 208:11 247:16
**way** 41:2 42:3 89:25 90:23 91:5,11 94:6 109:23 110:7 113:18,21 115:6 128:6 130:21 149:21 180:19 217:24 234:9 257:23 310:6 321:11 334:4 340:4 341:3 343:11 347:20 359:15 405:3 414:1 420:21
**wayne** 389:12
**ways** 132:9 134:3 137:19 188:23 200:11 383:19 412:19
**we've** 72:25 108:20,24 114:4 116:4 123:8 124:6 129:6 144:22 180:4 205:21 209:14 220:9 249:16 267:21 301:6 302:3 306:24 311:15 380:6
**weak** 337:6
**web** 415:19
**weed** 42:10,11 414:18,24 415:10
**weed's** 42:20
**weeds** 92:4
**week** 220:20
**weeks** 37:17 151:4
**weighing** 114:11 271:24
**weighs** 315:8 316:23 343:16
**weight** 284:23 296:9 336:9,18 336:19 337:2,5 337:10,24 338:3,5,10,14 338:19,19 350:11,21 413:19
**welcome** 12:18 21:20 207:8
**went** 16:7 39:12 221:3 252:8 413:6,23
**west** 4:18 5:12
**whatever's** 136:10
**whatsoever** 297:4 335:4
**whereof** 429:4
**whispering** 10:6
**white** 8:20 60:3 60:12 63:6,12 67:3 68:12 143:6 144:23 147:5,14 151:9 151:15,19,24 152:6 158:2,13 158:20 159:19 160:1,14,24 174:1,18 175:24 182:19 192:23 198:1 198:25 200:22 205:23 209:25 210:10,16 211:5 213:8,14 214:22 216:15 224:11,17,23 226:20 227:24 228:15,18 229:17 230:23 231:11,15 239:4 241:22 258:8 304:2,10 304:13 305:2 305:20 306:2 312:16 331:3 380:21 381:3,9 381:11,14

396:6,9 400:1 402:16 405:4 410:12,18,22 412:11 415:24
**wi** 403:6
**wide** 150:4 176:4 233:2 254:5 390:17 408:16
**wideikis** 5:15
**widely** 293:6
**wiedner** 6:5
**wilmington** 2:8
**window** 348:23
**windows** 349:1
**witness** 1:17 12:1 15:16 17:13 56:14,18 194:15 280:13 320:14 321:1 321:18 322:16 323:19 326:15 381:11 405:24 406:11 421:17 425:8 429:4 430:8,10,12,18
**witnesses** 39:2
**wmlaw.com** 6:7
**woefully** 197:23
**woman** 155:19 185:24 232:10 281:18 287:7,8 312:15 316:3
**woman's** 138:16
**women** 66:9,11 66:25 67:3,13 67:24 68:5,5,9 68:11 74:14,20 96:2 118:3,18 118:20,25 119:1,14,24,25 134:4 143:24 144:1,6 145:17 145:21 147:5 147:17,24 153:8,11 154:7 154:11 156:16 160:23 161:7,9 161:10 162:21 163:12,21 164:4,8 167:15 169:2,12 171:23 172:24 173:19 174:2 174:20 176:8,9 181:1 182:1,11 184:1,8,12 187:18 190:11 193:7 212:12 212:17 213:17 214:5,13,19,22 215:2 216:16 217:9 219:19 224:11,17,18 225:12 226:11 226:17 228:19 229:17 230:21 230:23 231:12 231:15,20 239:4,11,18,19 239:24 240:8,9 240:12 241:10 241:22 243:7 243:12,19 246:7,19 249:24 261:8 265:19,22 266:15 267:8 268:3 279:22 280:25 281:10 281:13 285:5,8 285:13,16 286:20,21 289:2,11,22 290:2,11,16 306:13,14 312:5,16 346:10 358:9 369:1,6,11,14 395:2,13 396:8 396:12,15,20 407:22 408:19 409:1,3 411:4 424:23
**women's** 9:6,7 66:21 96:1 142:17 169:9 197:19 230:18 231:7 249:13 249:23 250:18 252:18 253:11 253:16,23 254:2 255:18 256:8,14 258:24 263:14 288:14 289:6 290:11,14 331:24 341:21 344:8 346:8 395:9,20 396:15,20 424:6,9,18,22
**word** 54:12 59:6 87:6 116:14 120:9 120:12 126:16 126:18 131:3 135:22 136:16 255:24 346:21 348:18 349:3 362:4 370:18 375:24 398:13 398:16 406:17 421:5
**words** 103:10 348:6
**work** 27:21 30:6,15 33:19 33:24 45:2 64:10 87:23 89:4,4,12,20 90:18 91:10 92:2 93:24

94:9,19 95:2 292:3 325:7 389:5 390:11 390:11,15 399:6,8,9,10,11 399:21 400:14 400:17,17,20 412:8 415:12 415:14,15 416:5,13 417:5 417:6

**worked** 31:25 32:4 411:11

**working** 29:13 29:16 31:24 35:2 389:18 390:2,4 405:20

**works** 391:11

**world** 40:1 108:3,7,9 185:25 295:5 407:15

**worldwide** 4:3

**worse** 119:2 120:11,14 395:13

**worth** 330:8 399:21

**wright** 2:7

**write** 295:9,18 416:1

**writing** 35:5 72:15 294:16 295:7,21 415:23

**written** 1:21 27:1 107:16 112:15 152:12 159:2 178:17 210:2 253:3 271:22 325:6

**wrong** 56:10 194:22

**wrote** 16:6 146:14 314:10

**x**

**x** 30:25

**y**

**y** 241:5

**yeah** 21:24 25:6 28:11 31:16 34:17,21 35:6,14 37:2 44:1,8,9 46:10 68:9 82:22 85:24 89:22 91:16 93:15 97:22 99:19 101:6,13,21 104:4,4 106:25 107:3 111:12 115:2 123:13 129:4,17 130:3 130:25 135:9 135:25 147:21 149:24 151:17 151:25 160:10 163:3,19 165:9 166:9 167:9,12 167:21 172:21 181:10 183:24 191:14 195:1 211:23 214:15 215:8 220:11 224:24 226:6 229:21 230:3,6 230:15 232:25 238:12 243:2 244:24 256:7 260:23 266:8,8 267:18 269:24 270:16 275:6 275:20 276:14 278:8,21 287:20 293:5 305:14 313:4 316:14 318:4 320:18 324:23 336:25 338:9 340:23 341:13 342:22 346:25 347:6 350:23 352:4,10 353:4 354:8,23 364:7 369:12 371:9 371:17 372:14 377:6 386:21 394:5 397:5 403:11 406:25 408:13 414:25 417:23 418:21 422:18,24 423:17 424:2 426:1,5

**year** 33:18 40:10 41:19 151:3 202:17 208:15,23 254:23 263:4 269:12 273:14 326:5,9 395:5 407:10

**yearly** 407:16

**years** 29:25 116:13 117:3 144:7 145:22 153:13 158:23 166:21 175:6 183:23 250:12 250:25 254:25 266:16 267:10 268:5,13,21,23 268:24 270:19 270:25 273:15 274:16 277:20 277:21 281:17 287:5 309:8 330:7 339:23 342:8 357:23 386:3 389:2,11 390:16 407:8 407:17 408:7,7 411:6 416:25

**yep** 149:13 167:13 329:5

343:1
**yesterday** 37:8 37:10 38:10
**york** 2:12 6:13
**young** 169:13
**younger** 169:4 210:21 408:25

**z**

**zeroing** 308:11
**zoom** 2:14,19 2:23 3:7 4:8,14 4:20 5:8,14,18 5:24 6:8,14,20 7:5,6 11:6 40:11 194:14 405:15
**zoomland** 321:19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.