# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| | ) | Case No. 1:23-cv-00818 |
| IN RE: HAIR RELAXER | ) | |
| MARKETING SALES PRACTICES | ) | MDL No. 3060 |
| AND PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | Judge Mary M. Rowland |
| | ) | |
| | ) | |

ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL M. CROWLEY, PhD
Thursday, March 12, 2026

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL M. CROWLEY, PhD, produced as a witness at the instance of the Defendant Strength of Nature LLC, and duly sworn, was taken in the above-styled and numbered cause on the 12th of March, 2026, from 9:06 a.m. to 4:23 p.m., before Sharon Ross, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine, at Texas Trial Lawyers Association, 1220 Colorado Street, Suite 500, Austin, Texas pursuant to the Federal Rules of Civil Procedure and/or any provisions stated on the record or attached hereto.

Reported by:
SHARON ROSS, Texas CSR #1961,
Hawaii CSR #432, RMR, CRR, CRC
Realtime Systems Administrator

APPEARANCES

For Plaintiffs:

Diandra "Fu" Debrosse
Omega Adams (viz Zoom)
DICELLO LEVITT LLP
505 20th Street North, Suite 1500
Birmingham, Alabama 35203
312.214.7900
205.855.5700
Fu@dicellolevitt.com
Oadams@dicellolevitt.com

- and -

Mark M. Ambramowitz (via Zoom)
DICELLO LEVITT
8160 Norton Parkway
Mentor, Ohio 44060
440.953.8888
Mabramowitz@dicellolevitt.com

- and -

Frederick S. Longer (via Zoom)
LEVIN SEDRAN & BERMAN, LLP
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
215.592.1500
Flonger@lfsblaw.com

- and -

Kristin Padden
DOUGLAS & LONDON
PO Box 600
Venice, California 90294-0600
212.566.7500
Kpadden@douglasandlondon.com

APPEARANCES (Continued)

For Defendant House of Cheatham LLC:
Christian E. Henneke
Noriya Shahadat
McGUIREWOODS
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
804.775.1050
804.775.1087
Chenneke@mcguirewoods.com
Nshahadat@mcguirewoods.com

- and -

Christina A. Denmark (via Zoom)
SEGAL McCAMBRIDGE
100 Congress Avenue, Suite 800
Austin, Texas 78701
512.370.1225
Cdenmark@smsm.com

For Defendant Strength of Nature Global LLC and Strength of Nature LLC and Godrej SON Holdings, inc.:
LaTheena "Bebe" Thomas (via Zoom)
SHOOK, HARDY & BACON LLP
JPMorgan Chase Tower
600 Travis Street, Suite 3400
Houston, Texas 77002
713.546.5688
Ltthomas@shb.com

For Defendant John Paul Mitchell Systems:

James D. Gildner (via Zoom)
CLAUSEN MILLER PC
225 West Randolph Street, Suite 700
Chicago, Illinois 60606
312.606.7928
Jgildner@clausen.com

APPEARANCES (Continued)

For Defendant L'Oréal USA, Inc., L'Oréal USA Products, Inc. and SoftSheen-Carson, LLC:

Alice H. Gilbert (via Zoom)
ELLIS GEORGE LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
310.274.7100
Agilbert@ellisgeorge.com

For Defendant Revlon, Inc., Revlon Consumer Products Corporation, Revlon Group Holdings LLC, and Roux Laboratories, Inc.:

Kelbey J. Deck (via Zoom)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
275 Madison Avenue, 10th Floor
New York, New York 10016
646.513.2379
Kdeck@eckertseamans.com

For Defendant McBride Research Laboratories, Inc.:

Audriana Rodriguez
DINSMORE
200 South Biscayne Boulevard, Suite 2401
Miami, Florida 33131
786.957.1145
Audriana.rodriguez@dinsmore.com

For Defendant Beauty Bell Enterprises, LLC:

Kevin A. Titus
LITCHFIELD CAVO LLP
303 West Madison, Suite 400
Chicago, Illinois 60606
312.781.6668
Titus@litchfieldcavo.com

- and -

Shipra Mehta
COSTELLO GINEX & WIDEIKIS, PC
141 West Jackson Boulevard, Suite 1400
Chicago, Illinois 60604
312.219.4861
Smehta@cgw-legal.com

APPEARANCES (Continued)

For Defendant AFAM Concept, Inc. d/b/a JF Labs, Inc.:

Hardip B. Passananti
GOLDBERGSEGALLA
2600 Michelson Drive, Suite 900
Irvine, California 92612
949.271.3398
Hpassananti@goldbergsegalla.com

For Defendant Avlon Industries, Inc.:

Anna Morrison-Ricordati
WIEDNER McAULIFFE
One North Franklin, Suite 1900
Chicago, Illinois 60606
312.596.4984
Amricordati@wmlaw.com

For Defendant Murray's Worldwide, Inc.:

Richard Wiese
MARON MARVEL
191 North Wacker Drive, Suite 2950
Chicago, Illinois 60606
312.579.2035
Rwiese@maronmarvel.com

Also Present:

Emily Robinson (via Zoom)
Sara Peal (via Zoom)
Dustin Crawford (via Zoom)
Michelle A. Parfitt (via Zoom)

Concierge:

Michael Robson (via Zoom)

Videographer:

Peter Zierlein, Veritext Legal Solutions

INDEX


| | PAGE |
|---|---|
| Appearances.................................. | 2 |
| Exhibit Index................................ | 6 |
| MICHAEL M. CROWLEY, PhD | |
| Examination By Mr. Henneke................ | 7 |
| Examination By Ms. Gilbert................ | 210 |
| Errata and Signature......................... | 213 |
| Reporter's Certification..................... | 215 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Second Amended Notice of Videotaped Deposition of Michael Crowley, PhD | 17 |
| Exhibit 2 | CV of M. Crowley | 20 |
| Exhibit 3 | Statement of Compensation of M. Crowley | 26 |
| Exhibit 4 | Expert Report of M. Crowley | 48 |

PROCEEDINGS

THE VIDEOGRAPHER: Here begins the deposition of Dr. Michael Crowley. Today's date is March 12th, 2026; and the time is 9:06 a.m. 0

Will counsel please identify themselves for the record after which the court reporter will swear in the witness?

MS. DEBROSSE: Diandra Debrosse of DiCello Levitt for the plaintiffs and the PFC.

MR. HENNEKE: Christian Henneke of McGuireWoods representing House of Cheatham and for the defendants today.

THE REPORTER: Okay. Sir, if you could raise your right hand, please.

(Witness sworn.)

MICHAEL M. CROWLEY, PhD,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HENNEKE:

Q. Good morning. Could you please state your name for the record?

A. Michael Crowley.

Q. All right. We are here today to take your deposition -- an expert deposition in the hair relaxer MDL litigation that's pending in the Northern District

of the Federal Court in Illinois.
Is that your understanding?
A. Yes.
Q. And you are serving as a paid plaintiffs' expert witness in that litigation; is that correct?
A. Yes.
Q. All right. My name is Christian Henneke, as I just introduced myself and I represent House of Cheatham, or just referred to as HOC, and we're one of the defendants in that litigation.
But for today's deposition, I am here on behalf of all of defendants in the MDL, okay?
A. Okay.
Q. It's my understanding that you've had your deposition taken several times before; is that right?
A. Yes.
Q. In fact, I believe just in the last four years you've had it taken at least eight times; is that right?
A. Yes.
Q. Is there any other times you've had your deposition taken in the last four years?
A. I was deposed last Thursday in an intellectual property matter.
Q. Okay. So that's an additional one than what you have listed in your report?

A. I don't know if it's listed.
Q. Well, we'll go over that list later; and if that's not in that list, then you can just add it.
A. Will do.
Q. Okay. And in all those eight depositions and including the one that you were taken last week -- so that makes nine -- were you an expert in those cases?
A. Yes, I was offered --
Q. So you were a retained expert in those cases?
A. Yes.
Q. All right. Were you a retained expert on behalf of the plaintiff in all nine?
A. I'm not sure who the plaintiff or the defendant was in those matters.
Q. Okay. We'll go --
A. Most of them were intellectual property matters.
Q. Okay. Nonetheless, since you've had your deposition taken a lot in the last four years, I still want to go over a few ground rules just so we can make up the time that we have together today go as smoothly as possible.
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) So essentially when we're talking to each other, let's make sure we don't speak

over one another or each other.

And you wait until I finish my question before you begin your answer, and I'll try to wait until you've finished your answer before I begin by next question. Is that okay?

A. Yes.

Q. All right. We also need to make sure we give audible responses. Court Reporter Sharon is here today to record everything that we say.

So I see you like to nod your head up and down; but just to make sure, when you're giving an answer, just say yes or no or articulate your answer because she can't record your head bobbing or hand gestures or anything along those lines, okay?

A. Okay.

Q. All right. If I have a question that you don't understand, please let me know. I'll try my best to rephrase the question so it comes off more clearly; but if you do go ahead and answer it, we'll just assume that you understood my question. Is that okay?

A. Yes.

Q. All right. And, lastly, if you need a break at any time -- I'll need breaks, too. So we'll go and -- go and take a break.

I just ask that if there's a question

pending, that you answer that question before we take the break, all right?

A. Okay.

Q. Is there any reason today you cannot give complete and accurate testimony?

A. No.

Q. All right. Are you taking any medications that might impair your ability to answer my questions today?

A. No. I am diabetic, and I wear a glucose monitor. My phone will vibrate if I need to stop and get some sugar or something. So I'll let you know if that happens.

Q. Sure.

A. But that won't stand in the way of me providing answers to your questions.

Q. Yeah. If that happens, just let me know; and we'll take a break.

A. Yeah.

Q. All right. Your test -- it's your understanding that you're testifying today as an expert on behalf of the plaintiffs; is that correct?

A. Yes.

Q. All right. Have you ever testified -- I already asked that question.

So you're not aware if you've testified on

behalf of the defense?

MS. DEBROSSE: Object to form, asked and answered.

But you may respond.

A. I'd have to check, but I believe I have offered testimony on behalf of defendants in intellectual property matters.

Q. (BY MR. HENNEKE) Okay. How about in toxic tort type cases or medical malpractice or anything along those lines? Have you ever testified on behalf of the defendants?

MS. DEBROSSE: Object to form, compound.

Q. (BY MR. HENNEKE) You can answer.

A. I don't believe so.

Q. All right. Have you ever testified in any criminal matters?

A. Like this?

Q. Like a criminal case, somebody's been charged with a crime.

A. In a courtroom, no.

Q. Okay.

A. I mean, I've given statements to police when I saw a drunk driver.

Q. But you didn't testify in those --

A. No.

Q. -- matters?

Have you ever testified in a medical malpractice case, to your knowledge?

A. I have submitted an expert report in a matter that involves medical malpractice.

Q. Did you ever give a deposition in that case?

A. Not yet, no.

Q. So this is a pending case, still ongoing?

A. That's my understanding.

Q. Do you know what that case involves, meaning is it -- it's medical malpractice. So it's a doctor or a hospital that has issues?

A. A compounding pharmacy prepared a medication. A doctor administered it to his patient, and it blinded her.

Q. And you're representing -- or you're an expert on behalf of the plaintiffs in that case?

A. I am opining on behalf of the patient and her husband --

Q. Okay.

A. -- I believe, and I assume that they're the ones that brought the matter.

But I'm not a lawyer. I can't remember exactly who's the -- I believe they're the plaintiffs.

Q. Okay. Thank you. All right. Have you ever

testified in any cases involving cause of cancer?
A. I testified in the Johnson & Johnson MDL regarding baby powder.
Q. Any others?
A. And your question was with respect to cause of cancer?
Q. Cause of cancer, yes, sir.
A. I believe that's the only one. I've testified in some intellectual property matters. I think most of those were not for the treatment of cancer or cancer causation.
Q. Okay.
A. But I'd have to check.
Q. How about any cases involving the diagnosis of cancer?
A. I don't believe I've testified in a matter regarding diagnosis of cancer.
Q. Okay. And how about any cases involving the treatment of cancer?
A. I don't believe I've testified in any matters involving the treatment of cancer.
Q. Okay. Let's go back to the Johnson & Johnson MDL that you testified in. Did those cases -- did that case involve uterine cancer?
A. I believe it did, yes.

Q. All right. And did that case involve ovarian cancer?
A. I think it was specific to -- well, I -- I'd have to go back and check. I have not looked at that in some time, and I don't remember the specifics.
It was a cancer of -- regarding female reproductions and I can't remember if it was uterine or -- but I believe it was ovarian --
Q. Okay.
A. -- off the top of my head.
Q. And that's the only one that you can recall that you testified related to reproductive female cancer?
A. I believe so.
Q. All right. To your knowledge, has any of your expert opinions ever been excluded by a court?
A. I understand in the Johnson & Johnson MDL that a special master has recommended a narrowing of the opinions that I gave.
Q. And what -- go ahead. I'm sorry.
A. I don't believe it's been excluded. I also understand that that is a recommendation and it has not yet been adopted by the court and that the proceedings with respect to that are ongoing.
Q. Now, what is your understanding of how the

special master limited your testimony or recommended a limiting of your testimony?

A. I'm not a lawyer. So I've read this recommendation. I don't exactly understand all of it.

But my understanding is that she found me qualified and that with respect to giving opinions on the properties of the chemicals that I offered opinions on, I understand that she narrowed it with respect to causation.

Q. Meaning -- what does that -- what does that mean, narrowed it as to causation, to your knowledge?

A. My -- my understanding is that she recommended that I not give opinions on the cancer causation of those specific chemicals.

Q. Okay. Was there any other times that you could recall that a court has limited or excluded your expert opinions?

A. That's the only one I'm aware of.

Q. Okay. Have you ever been a party to a lawsuit yourself?

A. Yes.

Q. And what lawsuit was that?

A. I pursued litigation against my former employer. It was a business that I was an owner of. We sold it, and the buyers paid for some of it up front and

had to pay the remainder over time.

And I stuck around to help run the business for a while afterwards and reached a point where I chose to exit. They still owed me money and chose not to pay it. So I sued to get the remainder of my sale money.

Q. Did that case go to trial?

A. No.

Q. Did you settle?

A. An arbitrator ruled in my favor.

Q. Okay.

A. And then I had to go to court to enforce the payment.

Q. And you did do so?

A. Yes.

Q. Okay. All right. Let's mark as Exhibit 1 the notice of your deposition.

(Crowley Exhibit 1 marked.)

THE WITNESS: Thank you.

THE REPORTER: Uh-huh.

Q. (BY MR. HENNEKE) This is the notice of your deposition for today.

Have you seen this document before?

A. Yes.

Q. And did you have an opportunity to review the production requests that, I believe, begin on Page 4 of

the document?

A. Yes, I did.

Q. All right. There's nine numbered items here that are in this request. Did you have an opportunity to review those requests and bring any responsive documents with you?

A. I did review the requests. I have brought my report and Exhibit A and Exhibit B to my report. All other requests have been produced.

Q. Okay. So those -- so you didn't have any additional documents that were responsive to these nine items?

MS. DEBROSSE: And I'll just give -- object to form -- the objections that we served on you defense counsel.

But you may respond.

A. I understand that I have produced everything in compliance with this notice of deposition.

Q. (BY MR. HENNEKE) All right. So there -- so other than the documents that counsel provided to us that are in your report and -- I think we've had a list of the statement of your -- of time that you spent -- your -- I call it an invoice but your -- of your -- the time that you spent and the charges that you made for this case, there are no other documents that you brought

with you?

MS. DEBROSSE: Same objection.

But you may answer.

A. That's correct.

Q. (BY MR. HENNEKE) Okay. A question about your CV real quick, which was request No. 1. We did have a CV that, I believe, is Exhibit A to your report.

Is that the most recent and accurate copy of your CV?

A. I believe so.

Q. It dates from December, I believe.

A. December of last year?

Q. Yes, of last year -- or at least that's when we received it was in December of last year.

Is that the most recent and accurate copy of your CV?

A. I -- yes, I believe so. Although, unlike some of my patents and patent applications, there may have been office actions that I'm not aware of; but the contents are current.

Q. How often do you update your CV?

A. Well, if I am giving an invited lecture or talk, if I publish something, if I become aware that one of my patents or patent applications has had something happen, I'll go update it.

Q. All right. To make things a little confusing today, I am going to mark Exhibit A to your report as a separate exhibit to this deposition.

MR. HENNEKE: And so -- I'm not sure how we're going to do that logistically here -- let's mark his CV as Exhibit 2. And the copy I have here -- we'll butcher one of these reports.

A. I'm going to put this here (indicating).

(Crowley Exhibit 2 marked.)

Q. (BY MR. HENNEKE) Here we go. All right. So just to confirm a couple of things that is listed here in your report -- I mean, I'm sorry -- in your CV, you attended the university -- or Washington University in St. Louis for your undergraduate degree; is that right?

A. No.

Q. Or did I get that wrong? University of Missouri?

A. Yes.

Q. Sorry. University of Missouri. And was that in St. Louis?

A. Yes.

Q. And that's where you got a BS in chemistry?

A. Yes.

Q. Okay. And then you got an MA in organic chemistry from Washington University, also in St. Louis?

A. Yes.
Q. Okay. And then you received a PhD in molecular pharmaceu -- how do you pronounce that -- pharmaceutics?
A. Yes --
Q. And that was from --
A. -- pharmaceutics.
Q. -- University of Texas here in Austin?
A. Yes.
Q. All right. Is there any other additional background, any coursework or training specifically related to cosmetic chemistry that you took in your education at University of Missouri, Washington University, or University of Texas?
A. I guess I'm curious as -- what do you mean by "education"?
Q. Like did you take any coursework or any classes that you had or any of the research that you did in getting an MA or PhD that involved cosmetic chemistry?
A. Well, I would offer that chemistry is chemistry. It's an applied science that's applicable to a broad range of industries.
Q. Sorry. But there was nothing specific on cosmetic chemistry?
A. The principles are broadly applied across multiple industries. I can't remember if a textbook

gave an example of environmental chemistry or cosmetic chemistry.

I feel like there probably were examples across many industrial spectrums but I -- I can't be sure.

But, as I said, chemistry is a applied science. It -- you know, a life science and it applies to a broad range of industries.

Q. Was your specialty and your coursework organic chemistry or physical chemistry?

MS. DEBROSSE: Object to form.

You may answer.

A. At Missouri or Wash -- WashU?

Q. (BY MR. HENNEKE) Well, let's take University of Missouri first.

A. Well, I took courses in both.

Q. Right. But as you began to specialize when you went to WashU, was that more physical or organic chemistry?

A. It was both. I was doing physical/organic chemistry.

Q. And then how about for your PhD?

A. My doctoral work was in molecular pharmaceutics, which, you know, I was in the College of Pharmacy here; but, I mean, we take classes in chemical

engineering, chemistry, biology, biochem, a fair amount of stats, and, of course, you know, pharmacy.

So it's a unique program that in my discipline is focused on how drugs and chemicals -- which many drugs are, although they can be biological, too -- interact with the human body.

And our effort is focused primarily on ADME -- absorption, distribution, metabolism, elimination -- and how we deliver those drugs and the resulting pharmacokinetics and so forth.

That's a high-level description of what that program is.

Q. Okay. In that listing that you just gave about all the coursework and the research that you did, I did not hear cosmetic chemistry; is that right?

MS. DEBROSSE: Object to form.

A. No, you did not hear cosmetic chemistry; but you did hear chemistry.

Q. (BY MR. HENNEKE) Okay. Did you do any coursework on dermal toxicology?

A. We did coursework on drug delivery through the skin; but as far as dermal toxicology, I'd have to think about that.

I mean, we certainly consider the impact of our drug delivery systems on our route of

administration.

Q. Okay. Did you ever take any classes or have any coursework that addressed the formulation of hair products?

A. There are books on emulsions which are in -- the same type of systems as some shampoos, for example.

I've written a chapter in Remington's on that. There are medicated shampoos. I've seen compositions, for example, for antifungal shampoos for dandruff.

I don't believe I took a class but we certainly covered those things -- those types of topics.

Q. Would you consider yourself a dermatologist?

A. I'm not a medical doctor nor am I a dermatologist.

Q. How about coursework or training specifically in oncology?

A. I did not take a class titled "Oncology." However, I have studied the treatment of that, you know, formulating oncology drugs.

If you look in my CV, the last patent application is for bezuclastinib, which is a new medication to treat a couple of different cancers, GISTs, GI stromal tumors, and mastocytosis. I'm an inventor of that composition and the drug delivery

system for that.

I have taken courses that obviously teach fundamentals of cancer, and I've worked on other cancer drugs.

Q. And those tumors that you were talking about, where in the body are those tumors found?

A. GIST, GI --

Q. Gas --

A. Yeah, gastrointestinal stromal tumors.

Q. Okay. Same question as to cancer biology: Did any of your education or coursework involve cancer biology?

A. I did not take a cancer biology -- a course titled cancer biology but topics -- I mean, I've taken biology; and I've certainly learned about cancer specifically from a drug delivery perspective.

Q. And then the same question about epidemiology. I noticed you mentioned stats. Have you taken any education -- did your education, background, or coursework that you took involve epidemiology?

A. I have awareness of epidemiology. I did not take an epidemiology class. I am not an epidemiologist but I can read epidemiology and understand it and I certainly have a working and fundamental understanding of statistics.

But just so the record's clear, I'm not an epidemiologist; and I will not be offering epidemiology opinions today.

Q. All right. Thank you.

MR. HENNEKE: All right. Let's mark the next one as Exhibit 3.

Q. (BY MR. HENNEKE) And this is a document that was provided to us by counsel, and it's a statement of your compensation for this case.

MS. DEBROSSE: So, Counsel, this is defendants' 3?

MR. HENNEKE: Yes.

MS. DEBROSSE: Okay. Okay.

(Discussion off the record.)

(Crowley Exhibit 3 marked.)

MR. HENNEKE: Okay. Well, let's use this one. That doesn't have the -- well, it's already been marked. That's fine.

Q. (BY MR. HENNEKE) All right. What we've marked as Exhibit 3 in this case is your "Statement of Compensation."

Does this list all of the time that you spent working on this case?

A. I believe so.

Q. And it lists the amount that you've been paid

for the time you spent working on this case; is that right?
A. Yes.
Q. Okay. What is your billable hour? How much is your billable hour?
A. It was 650 when I started. I recently increased it to 750.
Q. Do you know about when you increased that amount?
A. January 1 of this year.
Q. I see that there's no descriptions on this statement of compensation. Do you keep, like, notes or anything on time you spent working on this case?
MS. DEBROSSE: I'm going to object to form.
You may answer.
You've seen the objections in our response to your notice of deposition. We will not be providing any detail as it's protected by work product doctrine, and there are other objections.
But you may respond.
A. I submit an invoice with a date, the amount of time, and a very brief description of the work performed.
Q. (BY MR. HENNEKE) And you did that for all the time that you billed that is reflected here?

A. Yes.
Q. Okay. One other question, you have -- you said 650 for time spent before January 1st, 2006, and 750 after.
Do you have a different billable rate, for example, for the time we're spending here today during your deposition?
A. No.
Q. So it's the same rate?
A. Yes.
Q. All right. Looking at your statement of compensation, it looks like you were probably retained around September of 2023; is that right?
A. That may be correct. I was contacted at some point and I don't recall if I was contacted and work started immediately at that point, but that would be the first time that I did any work that was billable.
Q. Okay. So my understanding --
A. Actually August --
Q. I'm sorry.
A. Yeah, my apologies. I didn't mean to interrupt.
Just for accuracy, the bill date of 9-7-23 would reflect work performed in August.
Q. Understood.

A. Yeah.
Q. So we could say maybe roughly August of 2023 is when you were first retained in this case?
A. Yes.
Q. Okay. And it looks like for the first -- roughly for the first year or two you maybe had a couple of conference calls over the course of two years based upon the hours that were spent?
MS. DEBROSSE: Object to form.
A. I mean, I would have to go back and look at those invoices to understand what I was doing.
Yes, I -- I had some conference calls, and I did do some literature searching and familiarized myself with some of the questions I was being asked.
Q. (BY MR. HENNEKE) All right. And then your work began in earnest in September -- let's see -- in August/September of 2025?
MS. DEBROSSE: Object to form, mischaracterizes the document.
You may answer.
A. Well, that's when I began reviewing defendants' documents and work on my report, I guess you could say, in earnest.
Q. (BY MR. HENNEKE) Yeah. And then the majority of time was spent there in November of 2025, and I

assume that would be drafting your expert report?

MS. DEBROSSE: Object to form.

A. Well, I spent a lot of time reviewing documents as well. I can't break out what percent.

Q. (BY MR. HENNEKE) All right. So -- so that month of November of 2025 you were both reviewing documents and drafting your report. Is that accurate?

A. Yes, I believe so.

Q. All right. And then you have some time spent in January of 2026. Was that preparing for this deposition?

A. I believe so but I -- again, I'd have to go back and check my invoice.

Q. And then do you have additional time that you have spent in this case that's not reflected in this statement of compensation?

A. Yes. I -- I was with counsel yesterday, and I'm here today. So I'd like to get paid for that.

Q. Okay. All right. We established that at least you take notes, meaning notes about the time that you spent and reflected in your invoices.

Do you take any additional notes like when you're doing work?

MS. DEBROSSE: Object to form, same objection as prior related to the notes.

You may answer.
A. I have -- I keep a time sheet. I don't consider that a note.
Occasionally I'll jot some things down on a pad of paper as I'm working, you know, on a draft of something, for example, or make a list to remind myself of thoughts; but we've produced everything that's not privileged.
Q. (BY MR. HENNEKE) Okay. So it's not your practice to read an article or read a peer-reviewed publication and to make notes or annotate it?
A. I occasionally highlight them.
Q. And after you highlight them, do you keep these documents?
MS. DEBROSSE: Object to form.
You can respond.
A. Usually I just keep the electronic version. I don't want to have to file a bunch of paper.
Q. (BY MR. HENNEKE) And do you highlight the electronic version?
A. Yes.
Q. And so you record -- you save them -- those highlights on your computer or somewhere?
A. Yes.
Q. All right. Well, let's go back to your CV.

A. Yeah.
Q. And that's what I believe we marked as Exhibit 2.
A. Yeah.
Q. So do you believe that the CV that's attached as Exhibit A to your report and that we've marked as Exhibit 2 to this deposition includes all the qualifications that you believe are relevant to the opinions you are offering in this litigation?
A. I don't think you can capture work experience and all the training that I've received in a CV. It's a high-level summary of what I've done and my accomplish -- accomplishments.
But, no, it doesn't describe all the work that I have done, all the training I've received, nor does it describe all of my work experience.
For example, Theridian Technology is a -- my consulting practice and I work with a number of different customers.
And I can't disclose what I'm doing for them because it's confidential, but you get a high-level summary of the things that I've done.
Q. You kind of beat me to the punch of a couple of questions that I was going to ask, but I'll go ahead and ask them anyways.

Is there any specific qualifications that you believe is relevant to the opinions you're offering in this litigation that is not included on your CV other than what you just stated?

A. You know, as an example, Texas EnteroSorbents, it's a Texas A&M spin-out company that was looking at pharmaceutical uses of clay -- a unique clay.

They also spun out a cosmetic company, and I helped the investors create facial creams based upon that clay.

So earlier you were asking about my experience with cosmetics. That's an example that's not reflected explicitly in the CV.

You also see that I worked at Warner-Jenkinson. They're manufacturers of FD&C colorants.

I headed up the pharmaceutical technical side. We had a food side. We had a cosmetics side. We even had a technical side that made and supported things like printing inks.

I shared lab space with people that served the cosmetic industry. We also had a site specific to serving the cosmetic industry in New Jersey, and we would have technical team meetings and work together.

So I believe the CV is an accurate

reflection of my education, training, and experience; but it doesn't capture all of it.

Q. Is there any more insight that you can provide to us about your experience that's not reflected here?

A. I guess, if you have a specific question on that, I'd be happy to answer it; but as it relates to this matter, I think you have a very clear, you know, summary of my education, training, and experience.

Q. Are there any specific publications that you've authored that are not reflected on your CV that are relevant to your opinions in this case?

A. I'm sorry. Could you repeat the question? What --

Q. Sure. Are there any specific publications that you've authored or been a coauthor of that are not reflected in this CV that you think are relevant to your opinions in this case?

A. Okay. I want to make sure I understand your question.

Q. Sure.

A. You're asking if I have a publication that's not on this?

Q. Correct.

A. Geez, I think I have all -- all my peer-reviewed publications.

I write reports for clients all the time; but they're not public, if you will.

Q. Understood. How about presentations? Have you given presentations that are relevant to your opinions in this case that are not listed on this CV?

A. Very similar answer. You know, I give presentations at team meetings with clients; but, again, they're not public but, you know, some of the same, you know, chemical principles that are, you know, inside the report in this matter would apply.

Q. All right. And then a follow-up question there is: Are any of your clients in the cosmetic industry?

A. I've done some work with Alcon in the past, and I think they were owned by a cosmetic company. I'm not currently working with Alcon, but most of my current clients are developing drugs.

I worked at Mission Pharmacal. They made drug products. They made nutritional supplements, and I think they made some products that fall under the cos -- cosmetic banner.

I don't know if they still make them or not; but, to the best of my knowledge, I'm not directly working for a cosmetic company.

Q. All right. Did any of your coursework for your specialty -- which is pharmaceutics; is that right?

A. Chemistry and molecular pharmaceutics. And, you know, our division is referred to as molecular pharmaceutics and drug -- and drug delivery.

Q. Right. So did any of your coursework for your specialty, as you defined it, involve parabens?

A. Yes.

Q. Okay. And how did it involve parabens?

A. Well, you know, we're taught that they can be used as a preservative.

When I was in graduate school, I was teaching pharmaceutical compounding; and we teach the students how to use parabens and compound parabens into liquids.

Q. Anything else?

A. Well, I gave a poster on the chemical stability of parabens.

Q. Did you do that at a conference?

A. Yes.

Q. What was the conference, if you recall?

A. It was the American Association of Pharmaceutical Science conference.

Q. About what time or what year was that or was that as you were -- was that as you were a grad student?

A. I -- yes, I think it's in my list. I mean --

Q. Okay.

A. -- I could tell you the year if you want me to check.
Q. If it's in your list, we're good.
A. Yeah.
Q. Same question for phthalates: Did any of your coursework for your specialty involve phthalates?
A. Yes.
Q. And how did it involve phthalates?
A. Well, I took polymer science; and we learned about polyethylene terephthalate and polymer chemistry.
In pharmaceutical science, hypromellose phthalate is used as an enteric polymer. Diethyl phthalate is used sometimes as a plasticizer on films for tablets, for example.
So those are some examples of where I learned about phthalates and/or chemistry in the course room and in the application of their use.
Q. Same question as to phenols, did any of your coursework for your specialty involve phenols?
A. Well, it's a chemical group; and, I mean, there are functionalities present in lots of drugs and excipients.
But are -- do you have a specific phenol in mind?
Q. I do not.

A. Okay.
Q. How about aldehydes?
A. Yes.
Q. Did any of your coursework involve aldehydes? Could you explain how it did?
A. Well, it -- I mean, aldehydes are an organic chemistry functional group. I learned about that as an undergrad.
But the gentleman who trained me for my doctoral work, Jim McGinity, published a paper -- I think it was in the early '70s -- on instability of steroid ointments that were in polyeth -- polyethylene glycol ointment bases.
And he was one of the first to elucidate that the degradation of these steroids was due to the presence of formaldehyde, formic acid, and some of the degradants of that particular polymer.
One of the first papers I published at the University of Texas was with polyethylene oxide, which is very similar to polyethylene glycol. It's a much larger molecular weight.
And we were processing them by a thermal process, and I characterized how the polymer degraded. I did go and look at doing some gas chromatography analyses on that polymer to see if we could detect which

aldehydes were formed, and I went and spoke with an analytical chemist from the chemistry department about how we might conduct that work.

So I have experience with aldehydes. I didn't ultimately measure them. I wanted to publish the paper and continue with my research, but we believe they're formed in the same way that they are from polyethylene glycol.

Q. Okay. How about coursework for your specialty involving peroxides?

A. Very much the same answer that I just gave. Peroxides are formed oftentimes from degradation of these polymers; and, again, they're used in synthetic chemistry.

So, for example, the polymer science course that I took, we learned about ethylene oxide being used and how it's catalyzed to make some of these polymers, including, you know, organoperoxides that result from the degradation of a polymer and hydroperoxides.

Q. And did your coursework for your specialty involve assessing the interactions of metals?

A. Yes. We took courses on using chelating agents, for example, to address metallic impurities and excipients.

Metals are used as catalysts in polymer

chemistry as well. So, yes, I've been trained; and I have understanding of organic metallic chemistry.

Q. Now, did any of this course -- sorry for interrupting. Were you done?

All right. Did any of this coursework talking about the different chemical compounds involve risk assessment?

A. Yes. So in the pharmaceutical sciences, when we're developing a product, we do excipient compatibility studies to verify that there's no risk of these chemicals or their degradants or a contaminant degrading our drug.

And one of the things we're very concerned with is: What is that degradant, and would it have a biological impact on the patient? So those kinds of things are part of that training.

Risk is a broad word. So you think about the risk to the composition, but you also think about the risk to the patient or end-user.

We also take a look at risk on process -- manufacturing process. I wrote my dissertation on melt extrusion processes, thermal processes.

And I will tell you I stood at a conference and had a very well-known professor from another school remark: Why would you ever make a drug with a LEGO

machine?

And that had impact because he couldn't believe that our drugs would be able to survive that kind of process.

So the risk assessment is part of an overall strategy to develop a safe and efficacious product.

Q. Okay. So what I heard on risk assessment is that you look at it two ways. One is risk assessment to the physical drug itself -- does it degrade -- and then risk assessment, as well, to the harms that may be caused by that product to the human body.

Is that a fair characterization?

MS. DEBROSSE: Object to form.

A. Yeah. I mean, it's a -- it's a broad assessment, but those are two aspects of it.

I mentioned some of the process things, too, because you've got operators that are working with that. You don't want to expose them to something dangerous, for example.

Q. (BY MR. HENNEKE) So you take all of those into account?

A. Yes. I mean, we -- we even contemplate how our package might interact with our composition and do things to ensure that there's not a chemical or physical

interaction between the composition and the packaging components. That's also part of the risk analysis.

Q. All right. Going back to your CV, you're currently president of Theri -- Theridian.

How do you pronounce that?

A. It's Theridian and my --

Q. Theridian. Theridian Technologies?

A. My wife thought of it. It's a marriage of the words "therapy" and "meridian."

Q. And so you're currently president of Theridian Technologies?

A. Yes.

Q. Okay. You -- and what does Theridian Technologies do?

My understanding is that it's consulting services for drug product development; is that right?

A. Yes, amongst other things.

Q. All right. And it says on your CV that you were cofounder of -- another word -- Oticara?

A. Oticara.

Q. Oticara, Inc. And that was a pharmaceutical company developing treatments for infectious diseases?

A. Yes, it is. It's not past tense. It's still active.

Q. Oh, it's still active --

A. Yes.
Q. -- but you're no longer affiliated with it?
A. Oh, no, I very much am. I cofounded it; and I give them free consulting, basically.
But my wife is deaf. She went deaf because of ear infections, chronic middle ear infections.
So I created -- I started this company looking to find safe medications for middle ear infections with a doctor that had been treating her.
And as often is the case, the product that we created showed great efficacy; and when it came time to raise money, the money people said: That is a fascinating product. We want to put it in people's noses instead of the ear because we can make more money that way.
So the focus is on chronic rhinosinusitis right now instead of ear infections.
Q. And the same drug can treat both issues?
A. It's such a complicated story. The drug is --
Q. That's fine.
A. -- is a potent steroid. And for the ear, we also include a broad spectrum antimycotic that has efficacy against both bacteria and fungi.
Q. And your CV indicates that you're an adjunct professor at the University of Texas here in Austin?

A. Yes.
Q. All right. And you still teach classes at the College of Pharmacy?
A. I am invited to come and give lectures.
Q. Right.
A. I'm not the formal teach -- everyday teacher. I get invited.
Q. How often do you give a lecture in a typical semester?
A. I haven't given one this semester yet. I think I gave two or three last -- last year.
It just depends on -- I've been giving talks on product development. I've been giving talks that focus on interactions with FDA and documenting new drug applications and the process of complying with FDA rules and regs.
I've given lectures on entrepreneurship and intellectual property as well.
Q. Now, do any of the lectures that you give at the University of Texas -- do they involve any of the opinions you're going to be offering in this case?
A. Well, I mean, I'm under a protective order here. So I will not be discussing anything that's confidential; but, I mean, the discussions that I have are about science in general.

So the principles would be the same, but I would never disclose or divulge anything that's confidential or privileged.
Q. Yeah. You slightly misunderstood my question, but that's fine. It was probably not well said.
I'm more concerned about whether the lectures that you give involve the same topics that you're going to be offering in this case.
A. Yeah, the -- the discussion I give on FDA regulations speaks very directly about inactive ingredients, for example, and safety. So some of the same topics are discussed, yes.
Q. Now, in reviewing your CV, do you have any professional experience involved in the development of chemical hair relaxers?
A. I've never developed a chemical hair relaxer.
Q. Do you have any professional experience involved in the development of cosmetic hair products?
MS. DEBROSSE: Object to form.
You may answer.
A. I have made shampoos.
Q. (BY MR. HENNEKE) And in what instances have you made shampoos?
A. Fun at home with my wife and daughter.
Q. Okay. So -- but not a professional experience

involving the development of cosmetic hair products?

A. That's correct.

Q. How about -- did any of your professional experience involve the development of cosmetics?

A. Yes.

Q. In what instances did it involve those?

A. Well, I spoke earlier about the facial creams --

Q. Right.

A. -- at Texas EnteroSorbents, and I provided support as part of the technical team at Warner-Jenkinson.

I can't recall -- I mean, it's been a long time. I worked there in the '90s, but I sat right next to cosmetic chemists that were working with cosmetic companies.

And we had team meetings in groups on general problem solving, customer-focused issues for the company. So we took a team approach.

I mean, one of the guys that sat next to me made the ink -- edible ink for the M on M&Ms. And they used ethyl acetate as a solvent, and we brain stormed how to make the printing -- manufacturing for it not smell bad and the answer was to put isoamyl acetate in it and it smelled like bananas.

So there were discussions like that with some of the cosmetic folks, but I didn't lead them. I was just there listening and offering help.

Q. So it's fair to say it was tangential?

A. Yes.

Q. All right. Before we go any further, let's lay out what we mean by hair relaxers.

What is your standing definition of a hair relaxer?

MS. DEBROSSE: Object to form.

You may answer.

A. Well, in my report, I specifically address chemical hair relaxers with a high pH.

Q. (BY MR. HENNEKE) What does that mean?

A. Well, I'm going to go to my report.

Q. Sure.

A. (Incomprehensible.)

Q. And as he's going to the report, let's go ahead and mark his report as --

A. Oh --

Q. -- Exhibit 4.

A. -- yeah. Sorry about that.

Q. No, no, that's fine.

A. I should have told you when you brought our report. I'll work off the one you're handing me and set

this one aside, if that's okay.
Q. Yeah. Let's mark -- let's go ahead and mark the full report as Exhibit 4.
(Crowley Exhibit 4 marked.)
A. If it's okay with you, I'm going to separate the report --
Q. (BY MR. HENNEKE) That's fine.
A. -- from the exhibits.
Q. Yeah, I mean, I've got that done for you already; but then it would be multiple markings. So let's just go ahead -- you can go ahead and separate it.
A. A lot of paper.
Q. Yes, it is.
THE WITNESS: By any chance, do you have another binder clip for this?
THE REPORTER: It's over there (indicating).
MS. DEBROSSE: What was Exhibit 3?
MS. SHAHADAT: (Incomprehensible.)
MS. DEBROSSE: Yes, thank you.
MR. HENNEKE: All right. What was the question that was pending?
THE REPORTER: There wasn't. Let's go ahead and mark this as Exhibit 4. He asked about separating the document and the binder clip.

Q. (BY MR. HENNEKE) Okay. So I think I asked: What is your standing definition of a hair relaxer?

THE REPORTER: Sorry.

MR. HENNEKE: That's fine.

A. Well, I was specifically asked to review chemical hair relaxers with high pH.

And on Page 15 of my report, I describe them as containing sodium hydroxide, lithium hydroxide, calcium hydroxide, guanidine carbonate, or a combination of these; and I cite to Gavazzoni Dias.

Q. (BY MR. HENNEKE) All right. In your mind, is there a difference between hair relaxer and chemical hair relaxers?

A. You know, I -- I wasn't asked to consider that. So I'd have to think about that.

They -- my understanding is these high pH hair relaxers are effectively the same in that the high pH swells the hair and rearranges disulfide bonds and the keratin protein of hair.

All of the hair relaxers that I looked at in the defendants' documents are chemical hair relaxers. They're based on chemicals.

Q. Okay. Are you aware that there's something called a hair relaxer kit?

A. Yes. I understand that there are multiple

tubes within these kits, and I understand they're also called systems.

Q. What does that mean, "systems"?

A. That it's multiple tubes that are applied as part of a product.

Q. Okay. And are these tubes, in your mind, involved in the straightening aspect of a hair relaxer kit?

A. It's the entire system, as I understand it, or the entire kit that's used. I think system is often used in salons, and maybe they don't have tubes. They have larger containers, but the function is effectively the same.

One component is the high alkaline portion. Another component is a -- for example, a neutralizer. It might have an anti-frizz portion to it. A shampoo and a conditioner and -- for example, those might make up a kit.

Q. So do your opinions in this case involve all those different systems that are a part of a hair relaxer kit?

MS. DEBROSSE: Object to form.

A. My opinions are based on the chemical ingredients and constituents used in the hair relaxer kits or systems.

There are chemical and physical properties and biological properties. The degradants and contaminants and so forth is outlined in my report.

Q. (BY MR. HENNEKE) All right. So there are different -- there are different parts or different systems in the hair relaxer kit and I'll -- so you didn't look at one specific one. You're looking at the entire kit?

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) Is that correct?

MS. DEBROSSE: Sorry, Counsel. Object to form.

A. I -- I'm not sure I understand the question. I looked at the compositions of the different components within those kits and the chemicals present in each one.

Q. (BY MR. HENNEKE) All right. So that's -- that's what I'm trying to get at.

So you're not looking at one component of the kit. You're looking at the entire hair relaxer kit; is that correct?

A. Yes. I reviewed the chemical constituents in the hair relaxer products across the spectrum, the entire kit.

Q. So you looked at the relaxer creams, and that's one component of a hair relaxer kit?

A. Yes. I believe they sometimes were called relaxer creams. I saw lots of different names.

Q. A base, for example?

A. Yeah.

Q. Could be called a base; is that right?

A. I saw things called base, yes.

Q. And you also included in your analysis the liquid activator; is that correct?

A. Yes. I saw compositions just called activators.

Q. And you also looked at the compositions of neutralizing shampoos?

A. Yes. I saw compositions of neutralizing shampoos.

Q. Did you also look at the compositions of conditioning treatment?

A. Yes. I saw compositions for conditioners.

Q. And did you also look at the constituents of a replenishing pack?

A. I saw documents titled replenisher, I think. I don't know if it said replenishing pack, I think.

I mean, I'd have to check my materials considered list because I can't recall the exact names of those compositions. Sometimes it was just a number, you know, batch such-and-such --

Q. And then did you look --

A. -- or form -- sorry. I apologize. I interrupted you. Formula such-and-such.

Q. And then did you also look at the protective oils or gels?

And I'm talking about here the gel that's used to protect the scalp during application of the hair relaxers.

MS. DEBROSSE: Object to form.

You can answer.

A. Yes. I saw documents like that. I -- you know, I also saw where it was mostly petroleum jelly for some.

I don't -- I don't recall -- maybe I did see a protective gel. If it's in my list, I saw it.

Q. (BY MR. HENNEKE) Have you ever seen a physical hair relaxer kit?

A. Yes.

Q. And when have you seen a physical hair relaxer kit?

A. Well, I went to the store and bought some to have a look.

Q. And did you take out each of the different components of that hair relaxer kit?

A. Yes. I opened the box and looked at them and

read the instructions for use.
Q. Have you ever watched a video of the application of the products in a hair relaxer kit?
A. Yes.
Q. And when did you have a chance to look at those videos?
A. Oh, I can't recall exactly when.
Q. But it was recently in the -- in the work that you did in drafting your report?
A. I --
MS. DEBROSSE: Object to form.
You may respond.
A. Yes, I -- you know, my wife likes to get pedicures; and we go to a salon. They do relaxers at the salon. I've seen that there. I saw Denzel Washington use a relaxer in the movie Malcolm X.
So I had some familiarity with them; but, you know, I saw the videos as part of my preparation for this report.
Q. (BY MR. HENNEKE) Did any of your professional experience involve the formulation of chemical hair relaxers?
MS. DEBROSSE: Object to form, asked and answered.
But you may respond.

A. I have not formulated a hair relaxer product.
Q. (BY MR. HENNEKE) Did any of your professional experience involve the testing of the chemicals in chemical hair relaxers?
A. Well, I have tested for some of the chemicals that I've offered opinions on here; but I haven't tested a hair relaxer for those chemicals.
Q. Has any of your professional experience involved the testing of cosmetic hair products?
MS. DEBROSSE: Object to form, asked and answered.
A. Could you repeat it? I want to be accurate.
Q. (BY MR. HENNEKE) Yeah, that question was a little more broad than the one asked before.
Did your -- any of your professional experience involve the testing of cosmetic hair products?
A. No. I haven't tested a cosmetic hair product, but the tests that I saw in some of the documents are no different than how we test a drug product. I mean, I know how to measure a pH, for example.
Q. Has any of your professional experience involved the study of dermal absorption of chemicals from cosmetic products?
A. I mean, obviously I've done work with

transdermal systems and I helped create that facial mask, but I want to make sure I understood your question. Could you repeat it again?

Q. So has any of your professional experience involved the study of dermal absorption of chemicals from cosmetic products?

A. Dermal absorption studies of chemicals from cosmetic products, I mean, as we've discussed, the principles of drug delivery through the skin, their chemicals are the same but I haven't -- I don't believe I've done a study of a cosmetic product like that.

Q. Okay.

A. And I was going to ask you if we could take a short break. Have we been going long enough to --

Q. I've got two quick questions --

A. Okay.

Q. -- on that same line, and then I'm happy to take a break as well.

A. Okay. Thanks.

Q. All right. Very quick. Has any of your professional experience involved the study of dermal absorption of chemicals from cosmetic hair products?

A. I have not done any formal studies on the dermal absorption of chemicals from cosmetic hair products; but as I have mentioned, I have done studies

of drugs through skin.
Q. All right. And one more. Has any of your professional experience involved the study of dermal absorption of chemicals from chemical hair relaxers?
A. Very similar question, I think. Could you repeat it one more time?
Q. So this one's a little different, and I'm talking specifically about chemical hair relaxers.
Has any of your professional experience involved the study of dermal absorption of chemicals from chemical hair relaxers?
A. I have not formally done a study where I've gone to a lab and done lab work, for example, on dermal absorption of chemicals from chemical hair relaxers; but I obviously have done that with drugs.
Q. Let's take a break.
A. Thank you.
THE VIDEOGRAPHER: Going off the record.
The time is 10:20 a.m.
THE VIDEOGRAPHER: Back on the record.
The time is 10:37 a.m.
(Recess from 10:20 a.m. to 10:37 a.m.)
Q. (BY MR. HENNEKE) All right. Dr. Crowley, I had a couple of follow-up questions I was thinking about during the break.

You had mentioned you bought a couple of hair relaxer kits just to take a look at them?
A. Yes.
Q. Do you recall what brands did you buy?
A. Not with certainty. I think it was Dark & Lovely and an African Pride maybe, and I do not recall the name of the third.
Q. So there were three?
A. I bought three.
Q. And did you take apart all three of them to look at the different components of them?
A. Yes, I opened all three.
Q. And you looked -- and as you stated, you looked at the ingredients to all three?
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) And when I say "all three," the ingredients of all the components in each of those three hair relaxer kits?
MS. DEBROSSE: Object to form.
A. I -- yes, I opened up all three. I looked at the instructions for use. I read the boxes. I looked at the -- each component of the kits or systems, whatever they're formally called, looked at the ingredients.
Q. (BY MR. HENNEKE) Did you open up any of the

containers?
A. No.
Q. So you just looked at the packaging, let's say, of the components of each of the hair relaxer kits that you bought?
A. That's correct.
Q. Okay. And you read the instructions on each of the components of the hair relaxer kits that you bought?
A. Yes.
Q. Okay. And that's all you did with them?
A. Yes.
Q. You also mentioned that you looked at some application videos. Do you recall whose application videos they were, like which product brand?
A. I do not recall whose product brand it was.
Q. Do you recall any -- was there anybody famous in any of these videos that you watched?
A. I didn't recognize them.
Q. Okay. So you don't recall who made them?
A. Not off the top of my head.
Q. What color -- sorry.
(Discussion off the record.)
Q. (BY MR. HENNEKE) When you were watching the videos, do you remember the color of the box that was used of the hair relaxer kits?

A. No.
Q. So you don't remember anything about which products that were being applied when you watched these application videos?
A. I -- I don't recall whose product it was.
Q. Okay. All right. I've got a few more questions about your prior experience as an expert witness.
As I promised earlier, we would go through at least the eight that you listed on your CV -- or in your report.
In those cases did you -- so there's eight of them, and you provided depositions in those eight. Did you ever testify at trial in any of those cases?
A. Yes. Oh, I --
Q. Which ones did you testify at trial? And I think you've got a list in your report.
A. I do. It's in the back. I'm headed there.
I testified at trial in Chiesi versus Aurobindo, Merck Sharp & Dohme versus Mylan, and Orexo versus Sun.
Q. And were each of those cases involving pharmaceuticals?
A. Yes.
Q. Have you worked as a consulting expert --

that -- and what I mean by a "consulting expert," in the legal field -- over the last four years?

A. Yes.

Q. Did any of those cases or matters where you were a consulting legal expert involve cosmetic hair products?

MS. DEBROSSE: Object to form, mischaracterizes the witness' testimony.

But you may respond.

A. No. And I want to get clarification. You just said "consulting legal expert"?

Q. (BY MR. HENNEKE) Correct. That's what I meant. When I asked you the question about a consulting expert, I meant in the legal field, not as a consulting expert like for your companies but where a lawyer retained you as a consulting expert.

A. Okay. Yeah, thanks for clearing that up.

I have served as a consulting expert in legal matters, but they have not involved cosmetic products.

Q. Okay.

A. So, for example, I've consulted with the Attorney General's office here in Texas.

Q. Okay. All right. And just to run through the eight cases in which you've given a deposition, I just

wanted to talk just bri -- basically find out what they were about very quickly.
Otsuka Pharmaceutical versus Zenara Pharma Private, Ltd., I assume that that was a pharmaceutical case?
A. Yes, intellectual -- pharmaceutical intellectual property matter.
Q. All right. Chiesi? Did I get that right?
A. Chiesi.
Q. Chiesi. Ah. Chiesi versus Aurobindo Pharma, what did that involve?
A. Pharmaceutical intellectual property.
Q. Merck Sharp versus Mylan?
A. Same, pharmaceutical intellectual property.
Q. Hoffman-La Roche versus Fresenius?
A. Fresenius.
Q. Fresenius.
A. Yeah, it's okay. It's tough.
Same, pharmaceutical intellectual property.
Q. Yeah, I'm a phonetic pronouncer, if you haven't figured that out.
Orexo and Orexo versus Sun Pharmaceutical?
A. Same, pharmaceutical intellectual property.
Q. Supernus Pharmaceutical versus Apotex?
A. Apotex. The same, pharmaceutical intellectual

property.

Q. Kinderfarms versus Genexa?

A. Same, pharmaceutical -- well, yes, pharmaceutic -- it's an over-the-counter pharmaceutical. Pharmaceutical intellectual property.

And just as a note, that was in front of the US Patent and Trademark Office. That wasn't in a courtroom. It's a -- I think a little bit different legal process.

Q. And Braintree Laboratories versus Lupin Limited.

A. Same, pharmaceutical intellectual property.

Q. And then you said you gave a deposition last week?

A. Yes.

Q. What case was that again?

A. I haven't thought about it since then but -- so give me just a moment.

I am working on behalf of Sun and opposed to a company called Veloxis in a pharmaceutical intellectual property matter.

Q. And I believe you mentioned you did the Johnson & Johnson MDL.

When did you give a deposition in that case, if you can recall? Because it's not on this list.

A. It's more than four years. I'd have to go get you the name.

Q. That's fine. It was more than four years ago.

All right. Also, in your CV I think you have about a dozen or so -- maybe a little bit more than a dozen peer-reviewed publications; is that right?

A. Well, I mean, I have some book chapters, too. I --

Q. We'll get to that, but I'm just talking about the peer-reviewed publications that appeared in periodicals. Let's start with them first.

A. Okay.

Q. So you -- about 12 or so related to chemistry, pharmaceutical sciences, and pharmaceutical technology; is that right?

A. At a very high level, yes. I mean, for example, the second paper is a stability paper, obviously involves pharmaceuticals and chemistry; but, you know, relevant to this matter, it deals with degradation of ingredients.

The first paper deals on measuring reac -- reaction kinetics and binding kinetics of metals with proteins.

So you characterized them that way. I mean, high level, that's probably a fair assessment.

Q. But what you're trying to relate is that the themes of these articles relate to the work that you did in this case. Is that what you're stating?

A. Yeah. I mean, they're part of my education, training, and experience; and all of that helps inform on the work that I did and have done in this matter.

Q. All right. So would you say that any of these publications -- peer-reviewed publications that you have involve chemicals that are found in cosmetics?

A. I would have to go look at each one to remind myself which chemicals we used. I mean, I mentioned I have used polyethylene glycol that's present in some of these products; and I've worked with parabens and phthalates.

I just don't have committed to memory the chemicals from each of these publications over these years.

You know, for example, publications 7 and 8 on the melt extrusion, there might be four or 500 chemicals listed in those. There's a lot.

But the chemistry of these things is the same whether it's a pharmaceutical or a cosmetic.

Q. But it's fair to say that none of these peer-reviewed publications specifically were looking at cosmetics and the chemicals that were used in cosmetics?

MS. DEBROSSE: Object to form.

A. I mean, the chemical -- a paraben is a paraben. A diethyl phthalate is a phthalate.

These were directed towards pharmaceuticals rather than cosmetics, but this underlying science is what it is.

Q. (BY MR. HENNEKE) All right. And before we go on to my next question, we were talking about the hair relaxer kit.

So just so we -- through the rest of this deposition so we know -- understand when we use the term "chemical hair products" or "chemical hair relaxers," you're referring to all of the components that are -- that are in a chemical hair relaxer kit; is that correct?

Let me rephrase that. I'm sorry. That was a bad question.

When we re -- so moving forward today, as we've talked about chemical hair relaxers, you're referring to the components -- all of them -- in a hair relaxer kit; is that correct?

A. Well, I think maybe for the purposes of the deposition, if we need to get specific about a certain component --

Q. We will.

A. -- we can call that out. And if there's any confusion on whether I'm speaking about all the components within a kit, please ask for clarification.

If you ask me a question and I have some thoughts on that, I'll ask for clarification; but, you know, my report deals with the chemicals in the kit.

And they may be present in more than one component within the kit, for example; but we can get into the specifics as necessary.

Q. Okay. So did any of your pub -- did any of your publications involve looking at the chemicals from chemical hair relaxers?

MS. DEBROSSE: And object to form, asked and answered.

(Brief interruption.)

THE REPORTER: Michelle?

MS. DEBROSSE: Michelle -- Michelle, you've got to mute yourself. Sorry. Sorry, Counsel.

A. Could you repeat the question?

Q. (BY MR. HENNEKE) Sure. Did any of your publications involve the chemicals from -- and what I mean by from, from -- directly from chemical hair relaxers?

MS. DEBROSSE: Object to form.

A. I think that's very difficult to answer. I --

because the chem -- it's the chem -- some of the chemicals are the same. What -- the ones that are present in the chemical hair relaxers and the kits are the same ones that we use in pharmaceuticals.

You know, for example, my book chapter in Remington's, "Solutions, Emulsions, Suspensions, and Extracts," those compositions are effectively what's in those relaxers.

So I have experience and familiar -- familiarity with them from my work in the pharmaceutical sciences. I have formulated with them. I have tested them in a pharmaceutical context.

Q. So your -- so let me understand. Your test -- your testimony is that you've looked at chemicals that may be in chemical hair relaxers and may be in pharmaceuticals, but you're looking at them as components of pharmaceuticals in your publications; is that correct?

MS. DEBROSSE: Object to form, mischaracterizes the witness' testimony.

You may answer.

A. I think you are getting my point. My work has predominantly been focused on pharmaceuticals. I do have some experience with some cosmetics, as we previously talked.

But, yeah, what I'm saying is I have direct experience with many of the chemical ingredients present in the chemical hair relaxer kits and have worked with them, have tested them, have formulated with them, have done stability studies with them, have written to the FDA, et cetera, et cetera.

I have very specific experience with the same exact chemicals.

Q. (BY MR. HENNEKE) But it's fair to say that you haven't looked at a chemical hair relaxer kit --

MS. DEBROSSE: Object to --

Q. (BY MR. HENNEKE) -- and then tested the chemicals?

MS. DEBROSSE: Object to form.

A. Yes, I have not tested a chemical hair relaxer kit for those chemicals.

You know, candidly I didn't need to. I -- their presence was confirmed for me in the documents.

Q. (BY MR. HENNEKE) All right. Does any of your work -- I mean, does any of your publications involve the toxicology of chemicals in cosmetics?

A. Sort of a similar answer, some of my work involves toxicology of chemicals but, again, directed towards pharma applications.

So, for example, the last one describing

the abuse-deterrent properties of an opioid composition, we were very concerned about toxicity there.

And those studies involved intentionally degrading a drug delivery system to mimic what opioid abusers were doing on the street in order to abuse the opiates.

And we did look at thermal degradation. What happens when they burn it up or do this or do that?

So you could -- going back to the word you used before, it's part of the risk assessment.

I've done a lot of work with melt extrusion. We're very aware of the risks that that kind of process poses. So, again, my context is about pharmaceutical applications.

No. 9 is an inhaled fentanyl product that was being developed for breakthrough cancer pain. That work had actually started before the opioid crisis had really taken off; and when it did, that put an end to that product pretty quickly because it would be very easy to abuse.

Q. But it's fair to say that none of the work -- or none of your publications have involved the use -- the toxicology of the use of chemical hair relaxers; is that right?

A. That's correct. I have not published on the

toxicology of chemical hair relaxer products.
Q. Or the chem -- okay. Have you done any -- do your publications involve examining the carcinogenity [sic] of chemical hair relaxers?
A. Well, going back to what I said earlier, I'm not here to provide causation opinions or epidemiology.
But in everything I do, we look at the risks; and that could include carcinogenesis, usually with respect to the drug.
Q. But that's the drugs in the pharmaceutical area, right, not to the chemicals in chemical hair relaxers -- or the use of the chemicals in chemical hair relaxers?
A. Your question's not clear.
Q. Yeah, that was -- that was a bad question.
It doesn't involve the use of -- the carcinogenity of the use of chemical hair relaxers?
MS. DEBROSSE: Object to form.
A. I want to make sure I understood your question.
Q. (BY MR. HENNEKE) Sure.
A. You're saying the publications don't speak to....
Q. The carcinogenity of the use of chemical hair relaxers.
A. I have not published a paper on the

carcinogenicity of chemical hair relaxers.

Q. Do you look -- do any of your publications look at nitrosamines?

A. I don't know if any of them mention them specifically but every time I develop a drug product, I mean, there's an FDA guidance and we have to take that into account.

And I'll give you an example. The -- Oticara uses polysorbate in its composition and we use a super -- I think they call it super high refined -- it's horribly expensive -- because we are very concerned about damaging tissue in the middle ear.

And we couldn't take a chance on having -- I apologize. You asked about nitrosamines, and I was thinking about a different degradant but -- no, it's -- I'm going to go back and answer your question.

I don't believe I've published any -- on nitrosamines there but that's something that we consider every time we develop a new composition.

Q. Now, let's go to those book chapters. So you've got four book chapters; is that right?

A. Yes. It's effectively the same chapter. It's been revised and, in one case, condensed for effectively the same publisher.

Q. And that's relating to pharmaceutical sciences?

A. Yes.

Q. And these four book -- I mean -- I'm sorry.

And this book chapter done four times, does it relate to chemical hair relaxers?

A. No, it does not; but "Solutions, Emulsions, Suspensions and Extracts" is the title of that chapter. It deals with creams, lotions, ointments, gels, jellies, all sorts of liquid dosage forms used in pharmaceuticals.

And those are the identical kind of compositions in hair relaxer using many of the same chemicals.

And I'll toot Remington's horn. It is considered a treatise in the pharmaceutical space. So I was honored to write that chapter. I didn't write it originally. I inherited it. That book's been around for well over 100 years.

Q. You've mentioned today that you do do independent research; is that right?

A. Yes.

Q. Okay. Does any of your independent research involve looking at chemicals in cosmetics other than what you've already discussed today?

A. No. I'm not doing any independent research on cosmetics. I am obviously doing independent research

with chemicals for drug delivery systems.

Q. Are you doing any independent research on chemicals in hair relaxers?

A. I'm not doing any independent research on hair relaxers, but I use chemicals all the time.

Q. All right. Are you doing any independent research on dermal toxicology?

A. So topically-applied materials are things I'm working on, was engaged by an ENT recently who wants me to come up with some ideas on treating eosinophilic esophagitis which is a condition -- inflammatory condition between the throat and the stomach and white papering drug product ideas. And we will most definitely consider toxicological aspects of how we might treat that.

Now, I realize that that's a mucosal surface but that -- I mean, we consider those things every time we develop a product.

Q. All right. Let's go back to -- skip over your CV now and go back to your report.

A. Okay.

Q. We discussed already when you were first retained approximately was August of 2023, I believe; is that correct?

A. I think that's correct.

Q. All right. Who were you retained by, if you recall?

A. I was retained by an attorney named David Dearing from Beasley Allen.

Q. And at what point in time did you start having interactions with DiCello Levitt?

A. I couldn't tell you. I'd have to go back and look. Yeah, I don't even know if I documented that.

Q. Okay.

A. Usually, if I had a call with attorneys, I would just put Teams meeting and not even list who was there.

Q. Do you recall what the --

MS. DEBROSSE: And let me just -- just instruct you not to delve into attorney/client work product and work product and other doctrines that we've talked about before, okay? We have objections on the record, okay?

But go ahead.

Q. (BY MR. HENNEKE) Yeah, and most of my questions are not going to ask about the content of any discussions that you had; but if they do, she will definitely object.

Do you recall the names of the law firms that were present at any of these meetings?

A. I recall names of some of the attorneys. I can't remember Jennifer's last name but she -- I think she's with a different firm.

Q. So a Jennifer. Anybody else?

A. Michelle. And you're specifically asking about attorneys outside of DiCello or Beasley?

Q. No, just names of anybody you can remember meeting or being a part of your conference calls.

A. There were some others. I can't remember them all.

Q. Okay. How did you communicate with counsel regarding the scope of your opinions? Was it just verbally over conference calls or were there exchange of emails?

MS. DEBROSSE: And, again, just not the substance of the communication; but you may respond.

A. We had meetings and there were emails and, of course, like, when I wrote my report, there were drafts of it.

Q. (BY MR. HENNEKE) Did you have any written communication with counsel regarding the scope of your report?

MS. DEBROSSE: And I'm going to object to the extent that it gets into any work product.

But you may answer that.

A. I'm sorry. Could you please repeat it?
Q. (BY MR. HENNEKE) Do you have any written communications with counsel regarding the scope of your report?
MS. DEBROSSE: And you are not to discuss the drafting of the report or various drafts, anything protected by the Rule.
We have our objections and objection to the response to your notice of depositions. That's going to be a standing objection throughout this deposition, okay?
Your drafts and my mental impressions or the mental impressions of the lawyers in this case are protected.
So to the extent you can answer his question without stepping into any of that, you may respond.
Q. (BY MR. HENNEKE) That's a yes/no question.
A. I'm not sure I understand --
Q. I'm just ask --
A. -- exactly --
Q. Yeah.
A. -- what you're asking. You're asking for --
Q. So I'm just --
A. -- what?

Q. No, no. I'm not asking for drafts. I'm asking: Did you have written communications with counsel?
A. Yeah. There was --
MS. DEBROSSE: Same objection.
A. There --
MS. DEBROSSE: I'm just not clear -- I think he's confused and I'm going to instruct him not --
MR. HENNEKE: Yeah, that's fine.
MS. DEBROSSE: -- to answer because we don't --
Q. (BY MR. HENNEKE) All I'm asking is --
MS. DEBROSSE: -- (incomprehensible).
Q. (BY MR. HENNEKE) -- yes or no, did you have --
THE REPORTER: Wait.
Q. (BY MR. HENNEKE) -- written communications --
THE REPORTER: Wait. I'm sorry. I didn't finish -- I didn't hear what she --
MR. HENNEKE: Sure, sure. I'm sorry. Go ahead.
MS. DEBROSSE: I said "Same objection." And I said "I think he's confused" -- I'm actually reading what you typed, and I'm going to instruct him not to answer because we're just entering work product territory and draft report territory.

And from his face, I can tell he may not be able to distinguish. So I'm just going to get that objection on the record.

Q. (BY MR. HENNEKE) Have you had any communications with other experts retained in this litigation?

A. Yes.

Q. What were the extent of those communications?

A. I had a very brief Zoom or Teams meetings with Stanley, Tom, and Dipak.

Did I say their names correctly?

Q. You did. I'm just laughing because now I'm trying to figure out who Stanley goes with, and I know Dipak is Panigrahy.

A. I used their first names specifically because I can't remember how to pronounce his last name.

Q. And did you say Tom?

A. Yes.

Q. That's Brown, right?

MS. DEBROSSE: Huh-uh.

Q. (BY MR. HENNEKE) No, I guessed wrong.

MS. DEBROSSE: It's Zoeller.

Q. (BY MR. HENNEKE) Zoeller. So Panigrahy, Zoeller, and Atwood; is that right?

A. Yes.

Q. Was it all three at the same time?
A. No.
Q. So you had three separate meetings with each of them?
A. Yes.
Q. Now, when you say "brief," what does brief mean to you? How long was it?
A. Maybe 15 to 30 minutes.
Q. For each one?
A. Yes.
Q. Who else was present during those communications?
A. Counsel.
Q. Did you share anything written with Dipak Panigrahy?
A. I did not personally.
Q. Did you share anything written with Zoeller?
A. Same. I never sent them anything or received anything from them.
Q. Did you -- are you aware that they were sent anything from you?
MS. DEBROSSE: Object to form.
A. I understand they had received a copy of my report, as I had received theirs.
MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) Do you know if you received a copy of their reports prior to the submittal of your report in this case?
A. I'm not sure your question's clear to me. Are you asking if I saw their reports?
Q. Did you see -- you saw their reports?
A. Yes.
Q. Okay. Did you -- did you see their report during the drafting of your report?
A. I -- I can't be sure. The timing of these discussions were as the reports were being concluded, so that effectively we could ask each other if there were any --
MS. DEBROSSE: Objection. You can't testify about any of the communications, work product, impressions. I'm just going to stop you right there.
MR. HENNEKE: Well, he can testify as to the communications with these other people.
MS. DEBROSSE: Yes, he can; but he was getting into, I believe, territory that involved his role with the attorneys in the case and communications regarding the final draft.
To the extent you're not getting into that territory, you may continue your response.
Q. (BY MR. HENNEKE) Yes. So, Dr. Crowley, all

I'm asking to -- my questions are going to be limited to your communications with these three other experts and your direct communications with them.

A. Okay.

Q. All right. So what was the -- when you met with Dr. Panigrahy, what did you discuss with him?

A. I had never met him before. So I believe we gave each other a brief background and then any questions on my report.

Q. So was it just him asking you questions about your report?

A. And I could do the same with him.

Q. Okay. Do you know what questions you asked of him?

A. I don't recall.

Q. Do you know what questions he asked of you?

A. I think all three asked the same question: Did you confirm the presence of all these chemicals in the defendants' products?

And the answer was: Yes.

Q. And how did you confirm the presence of these chemicals in the defendants' products?

A. From the defendants' documents.

Q. So when we go into your report and we look at those chemicals, it's your testimony that these

chemicals all -- appeared in all of the products?

MS. DEBROSSE: Object to form, mischaracterizes witness' prior testimony.

But you may respond.

A. Yeah, I didn't say they were in all the products but the -- they were present in the defendants' products -- at one point in time or another in a product, yes.

Q. (BY MR. HENNEKE) Okay. Any other questions that you can recall from Dr. Panigrahy?

A. No, I don't recall.

Q. And were there any written communications between Dr. Panigrahy and yourself?

MS. DEBROSSE: Object to form, asked and answered.

A. I don't believe so.

Q. (BY MR. HENNEKE) Okay. Dr. Zoeller, are there any other questions you recall Dr. Zoeller asking you?

A. So maybe I can save us time. The nature of each phone call was identical between the experts.

I gave them an opportunity to ask questions. I was given an opportunity to ask questions. I didn't have questions for any of them.

In each of the phone calls they said: You've looked at these documents and found these classes

of chemicals in these products?
And the answer was: Yes.
That was the question.
There were some background introductory stuff because I had never met either of them -- any of them before those calls.
So it was very brief. At one point -- I can't remember which one -- we talked about fishing. So there was some personal discussions, too.
Q. All right. And just to complete, for Dr. Atwood, was there any -- I don't think Dr. Atwood is a doctor. I think he's a Mr. Atwood.
In your communications with Mr. Atwood, is there anything you recall that you have not already explained?
A. No, that -- the nature of the discussions was con -- fairly consistent.
Q. All right. So the defendants have their own experts in this case. Have you had a chance to review any of their reports?
A. Yes.
Q. And whose reports did you review?
A. I reviewed Dr. Hoyt, Dr. Goodman. I reviewed the ones that they -- counsel sent to me, but I don't remember all their names.

Q. How many do you think you reviewed?
A. I think it was five or six.
Q. Do you recall a Dr. Kasting?
A. Yes. That name sounds correct.
Q. How about a Dr. Barlow?
A. I can't be sure.
Q. How about a Dr. Anderson?
A. I think so.
Q. And how about a Dr. Chodosh?
A. Yes.
Q. Did you provide any written commentary on any of these expert reports?
MS. DEBROSSE: Object to form.
A. No.
Q. (BY MR. HENNEKE) Did you provide any commentary on these expert reports?
A. I --
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) Just yes or no.
A. Well, it's privileged.
Q. Well --
A. Of course, we talked about them with counsel.
Q. Okay. Okay.
MS. DEBROSSE: You don't respond about anything that has to do with your communications with

counsel if it will -- okay? Just (incomprehensible).

Q. (BY MR. HENNEKE) Just to run through, do you remember Farley, looking at that report?

A. I'm not good with names. Sorry. I should be but --

Q. This one might be Gogoi, G-O-G-O-I.

A. That does not ring a bell.

Q. Burgess?

A. Diane Burgess? I don't think so. Okay. No, she's a professor in pharmacy at Connecticut. I -- so I may have seen a Burgess. I recognize that name. I just don't remember the names of all the folks that....

MS. SHAHADAT: It's Cheryl Burgess.

Q. (BY MR. HENNEKE) It's Cheryl Burgess. Does that ring a bell?

A. Maybe. I -- I may have.

Q. Schulman?

A. I can go back and get you the names of the reports that were provided, if you'd like.

Q. All right. Just two more. Weed?

A. Say again.

Q. Weed, W-E-E-D?

A. I don't think so.

Q. And Adams-Campbell?

A. Maybe.

Q. Do you know or do you recall -- were you ever asked to do a rebuttal report to any of these experts?
A. No.
Q. All right. Let's go over your charge in this case. Can you explain what you were asked to do?
A. Yes. It's outlined in my report.
Q. Uh-huh.
A. So "I was asked to review" the chemical "ingredients in cosmetic hair relaxer products and identify reactive species ... present as impurities, contaminants, and degradants. In addition, I was asked to analyze how" the "ingredients, impurities, contaminants and degradants may react with one another and their Effect on human users of hair relaxer products."
I would effectively say I was asked to look and describe the chemical, physical, and known biological properties of these ingredients, consider how they might behave in a composition, and provide that information.
Q. Were you asked to review all ingredients in chemical hair relaxers or were you directed to specific ingredients?
A. I think the best way to answer that question is, when I was tasked, I asked for the compositions. I

requested that information.

And you pointed to my invoices statement. You'll -- you'll note that it was a long time between that request and receipt of the documents and the database.

So I asked for that. That's the normal course of business for me when I look at a composition.

It's -- or do that kind of thing is to -- well, show me the formula, show me what it is, where are its properties, and then sort of go from there.

Q. So you did look at the formulas for the different defendants in this case?

A. Yes. I -- as I said, I requested the compositions, and I have looked at what's in this list.

There's an enormous number of them. I couldn't look at them all. I think the database had 1.2 million documents in it, but I looked at composition for each of the defendants.

Q. Did you take into account the different formula changes in the hair relaxer products over time?

A. So I understand that the documents -- products changed over time. I -- I actually searched the database for what I would call a formulary change log, didn't find that.

But I did not go through and say: Okay.

What did this composition look like in 1990 to 2023?
I looked at the compositions; and I would see dates on some of them, formula numbers, all that kind of information.
But, no, I didn't -- I did not go through and say: Okay. What was hair relaxer product A like from this time to that time?
I understand they do change, though.
Q. So, when doing your work, you didn't look at a particular chemical and see how long it remained in the product?
A. I -- I did not do that. I wasn't asked to do that.
Q. So you were just identifying whether it was ever in the product?
MS. DEBROSSE: Object to form.
A. I was verifying their use in the hair relaxer products; and I looked at hundreds, if not thousands, of these documents and found them -- their use over and over.
So, for example, when I would go to the Everlaw database and if I searched the term "paraben," it would come back with 22,000 hits. If I searched that database for "phthalates," I think I got over 10,000.
So I had, you know, these documents here

and the database; and I went and started looking at different classes of chemicals.

I did not try to build some sort of timeline on their use for a specific product. It would have been an enormous task for me to do that.

Q. When you were looking at these different classes of chemicals, were you also looking at the amount of these chemicals in the products?

A. Well, of course. The formularies were right there, you know, X percent of this, X percent of that. So I looked at the compositions.

Q. And did you take that -- their compositions into account when you drafted your report?

A. Yeah, of course. You know, I'm trained to look at a drug delivery system or a composition and, you know, you -- you see a composition and -- is this present? Is that present? Really the question is: What's there?

Q. Okay. We'll come back to that.

Going back, you had mentioned reactive species. Am I correct you were asked to identify reactive species present as impurities?

A. I -- I think it would be fair to say I was asked to look at impurities, contaminants, degradants. Some of them are more reactive than others.

Q. So you looked at reactive species in each one of those? Impurities?
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) So reactive species in impurities?
A. I feel like we're parsing words here.
Q. Okay.
A. An impurity could be reactive, so could a contaminant, so could a degradant. So "reactive species" is a very broad term.
Q. All right. Well, let's define "reactive species."
A. I don't believe I did in my report. Maybe I did. Let me take a look.
Molecules or -- and -- pardon me. "Molecules or atoms that are produced through chemical interactions," it's right there in the first sentence of my sum -- "Task and Summary of Opinions."
Q. So did you identify reactive species present as impurities?
A. Yes. I identified impurities that are reactive.
Q. And did you identify contaminants that are reactive?
A. Yes. I identified contaminants that are

reactive.

Q. And did you identify degradants that are reactive?

A. Yes. I identified degradants that are reactive.

Q. What is an impurity?

A. I think I described that. It might be a footnote. I hope you appreciate I'm just trying to be accurate --

Q. You're fine.

A. -- and consistent.

Yeah, footnote No. 2 on Page 22, "A chemical impurity is any component of a material that is not ... desired or intended chemical entity" -- "not the desired or ... chemical entity. Impurities may originate from starting materials or raw materials; by-products and intermediates; degradation products; residual solvents, reagents, or catalysts; and/or contaminants introduced during manufacturing, storage, or packaging."

And I cite to -- I think it's pronounced Abdin.

Q. So a contaminant, then, is a type of impurity?

MS. DEBROSSE: Object to form.

A. Perhaps. I mean, as I've noted here, you can

get a contaminant introduced during manufacturing; and you can get a contaminant that's present before you even open up the container of the material.

Q. (BY MR. HENNEKE) What's the difference between a contaminant and an impurity?

A. Well, an impurity, generally speaking, would be, for example, diethanolamine present in a raw material that's not intended to be diethanolamine.

And a contaminant might be some dirt from your manufacturing facility or one of your machines or dust got in your product. So, I mean, you could look at it that way, I suppose.

Q. Okay.

A. But if there's ever -- if there's anything inside the report and you're not sure is that a contaminant or an impurity, I can try to answer questions on that.

Q. All right. And then can you define a degradant for me?

A. I think I also have a brief definition for that in here. And, again, I want to be consistent.

Q. Uh-huh.

A. And if you happen to know where it is and want to direct me to it to save some time but I believe --

Q. Take 30 seconds and look. I'm going to get a

cup of coffee.

A. Okay.

MS. DEBROSSE: Oh, you're fine.

THE VIDEOGRAPHER: Do you want to stay on the record?

MR. HENNEKE: Yes. I'm just going to walk in and grab it.

A. (Witness complies.) You're asking me to define impurity --

Q. (BY MR. HENNEKE) No.

A. -- or degradant?

Q. Degradant.

A. I am not finding where I think I gave a high-level definition of a degradant. So I'm happy to provide one --

Q. Go ahead and provide --

A. -- with the understanding that --

Q. Fair.

A. -- what's in the report is sort of -- it's basically a reaction product in which a chemical has degraded, whether through a mechanism of acids or bases, light, heat, oxidation from air.

Q. How did you go about determining that the impurities you write about in your report were present in chemical hair relaxers?

A. Well, it's a couple of steps. So I relied upon the defendants' documents to verify their presence in a product or products at some period of time, I think, from -- like the oldest I saw was 1990 up to about -- I think the most current was 2023.

And then I relied upon the scientific literature. I looked at product specification sheets and compendia records.

The technical literature includes IFRA monographs for some of these chemicals where they just flat out say, you know, this is an impurity or a degradant.

So that is how that information was gathered.

Q. Okay. Let me go back and see because I'm trying to understand here.

So you're saying that in the coun -- that in the master formulas, they actually list an impurity as being an ingredient?

MS. DEBROSSE: Object to form, misrep -- mischaracterizes the witness' testimony.

A. I don't believe I've said that, no.

Q. (BY MR. HENNEKE) Okay. That's what I'm trying to understand.

A. I look at -- I looked at product specifications

for raw materials.

Q. Okay.

A. And in some cases they are explicitly listed. I saw some email threads, for example, on nitrosamines in which -- well, I read a long email between -- I think it was Revlon and a raw material vendor where Revlon employees were asking the vendor: Do you test this raw material for the presence of nitrosamines, and what are the specifics of that?

So there was awareness that it could be an impurity in the raw materials in that case. In other cases, it is not uncommon -- it is very common for some of these raw materials to specify -- for example, I saw sodium oral sulfate, and they describe the -- the nitrite or nitrate amount.

They also -- you know, there's a little water here. So you look at those specs and you can see what is tested for by the vendor and what the defendants would be aware of when they bought it.

Q. Okay. Again, when you were looking at this -- doing this review to determine that these impurities were present, did you determine the amount of these impurities that were present in chemical hair relaxers?

A. I did not go do any testing, but you can see spec sheets. And in some cases I saw certificates of

analysis, which is a document produced by a raw material manufacturer or vendor for a specific lot where they have tested for those things.

So I did see some of that.

Q. Right, but you didn't actually go and try to determine how much of that impurity would be imparted to the chemical hair relaxer?

MS. DEBROSSE: Object to form.

A. I want to make sure I understand your question. Are you asking me if I did some testing for impurities?

Q. (BY MR. HENNEKE) I'm not asking if you did any testing because you've already said you didn't do any testing.

What I'm asking is: You -- you were looking at these spec sheets?

A. Oh, geez, I just knocked my microphone off. Thanks for your patience.

Q. Sure. You were looking at these spec sheets. You saw that an impurity was listed in these spec sheets.

Did you go about and determine how much of this impurity would be imparted onto the product?

A. I under -- I think I understand your question more clearly now.

No, I did not go and, say, look at a

composition that had, say, 5 percent of an ingredient that had this much known impurity or what have you in it. I was not asked to do that.

Q. Okay. And the same type of question: If you saw this raw material spec sheet, that would be good for that particular batch or that particular lot; is that correct?

A. Well, I want to make sure I'm tracking with you again.

So the manufacturer's specification would apply to anywhere where that raw material is used, and it might be used in more than one product.

It's also standard practice to verify that the product meets the specification. It is also typical practice to qualify a vendor and a raw material, especially when they have impurities that could be dangerous.

And that's -- that's something we do in pharmaceuticals. And I've recommended to companies that if you're going to use this vendor, you've got to test every single lot because their reputation is what it is. It moves around, and it can impact the drug.

So, I mean, there's a number of different ways to mitigate against these things; but, yeah, I think the question that you're asking is -- you look at

the product spec. You look at the C of A; and, you know, in some instances an impurity might be very low in one lot but then very high in another.

Q. But you would agree with me that a raw material spec lays out what an acceptable specification is for that raw material?

MS. DEBROSSE: Object to form.

A. It's what the vendor is selling and what they're saying. We'll meet this, but it may or may not be acceptable to the person who's using it.

And the example I gave earlier with the polysorbate, we originally formulated that product with USP-grade polysorbate; but it degraded our steroid from the hydroperoxides present in it.

So we called them up and said: We want the higher-purity stuff. They have four different grades available. All meet the USP with various levels of peroxides.

And the same applies in the cosmetic space, too. I know that there's different grades of raw materials available and you can get -- it costs more to get cleaner stuff.

Q. Yeah, but these ha -- the lot or the -- when you're buying like raw material, it has to meet the raw material specifications that are set by the company?

A. I'm not going to make any assumptions because I -- I don't know what their company policies are. I'm going to assume that they have a good quality assurance and quality control unit.

I'm also aware of circumstances where materials get in short supply, and you'll get a call from a vendor that we've got material but it's not going to meet your spec.

Q. Yeah, but you're not off -- you're not here today or in this case to offer any opinions about the lack of quality control?

A. No. No, I'm not here to criticize quality control; but I'm not going to assume, based on your question, that those things are in place. So I'll be a little bit more specific than that.

Q. So how --

A. If I may --

Q. Sure. Go ahead.

A. -- just to try to make sure we have a clean record?

I understood your question. You know, by raw material, you have their product spec'd. Some companies have some that are even tighter.

When I worked at Warner-Jenkinson, there were some companies that did that to us. I only want

material that complies with this that was tighter than our own specs. We charged more for it.

So that may be the case with some of the defendants, that they, you know, had different specs than raw material vendors.

Q. But you're only guessing there?

A. I saw some emails about that but I -- I couldn't connect that email to the underlying specs. It -- there were so many documents.

There was an email thread where there were discussions -- I think it was Luster -- about getting a raw material that had tighter specs than what the vendor sold it for. I don't know if it ever happened, but I saw that.

Q. So you saw an email where Luster was actually asking for a raw material that didn't have the impurities?

A. No, I didn't say that.

MS. DEBROSSE: And just give me a second. Object to form, mischaracterizes the witness' testimony.

You may respond.

A. It was -- it appeared to be an internal email -- I think it was Luster -- about concerns with the raw material and that they discussed: Should we create our own specification that's tighter than?

Didn't mean it was gone.
Does that clarify?
Q. (BY MR. HENNEKE) It does, yeah.
All right. Same line of question on contaminants: How did you determine that these contaminants were present in chemical hair relaxers?
A. In general, same process. You look at the technical literature. You look at the raw material specs. I looked at the defendants' documents.
Q. But you didn't do actually any testing to determine the contaminants that were present?
A. That's correct. I did not do any testing to verify the presence or absence of those.
Q. Okay. How did you go about determining that degradants were present in chemical hair -- hair relaxers?
A. Again, high level, very similar process but, also, based upon, you know, my education, training, and work as -- look, I've worked with PEG a lot. I've dealt with those impurities a lot.
One of my patents is directed to resolving degradation issues of drugs because of excipients. So I -- I already had familiarity.
I also understand the basics of chemical principles that if you mix this with that, this is

what's going to happen.

So it -- that's -- that's basically it and I -- you know, some of the reports in the literature describe them.

Q. All right. Did you do any testing to determine that degradants were present in chemical hair relaxers?

A. No, I did not.

Q. All right. And I don't think I asked the question about impurities. So I will ask it; and if I did, I did.

What testing did you do to determine that impurities were present in chemical hair relaxers?

A. I did not do any testing on impurities in the hair relaxers.

Q. Why didn't you do any testing of chemical hair relaxers to determine the presence of degradants, contaminants, or impurities?

MS. DEBROSSE: I object to form, compound.

You can respond.

THE WITNESS: I couldn't hear you.

MS. DEBROSSE: Just object to form.

You can answer.

THE WITNESS: Okay.

A. I wasn't asked to do any. I looked at some documents, and I noticed that the defendants weren't

doing it either.

I mean, I saw product spec sheets where, you know, they measure pH or viscosity and report a color or what have you.

You know, I think it's your clients' responsibility to check for those things.

Q. (BY MR. HENNEKE) Did you want to do any testing of the chemical hair relaxer products?

A. It would be fair to say I was very curious. I didn't feel like I had to. I provided cites to reports of nitrosamines being present in cosmetics and some of these others.

In fact, many of the documents -- some of the IFRA things that I've cited made clear they're there.

Q. But if I recall correctly, you cited to the presence of these degradants and contaminants and impurities in cosmetics --

MS. DEBROSSE: Objection, form.

Q. (BY MR. HENNEKE) -- but not chemical hair relaxers. Sorry.

MS. DEBROSSE: Object to form, foundation.

A. Well, a hair relaxer is a cosmetic.

Q. (BY MR. HENNEKE) But you didn't look specifically at chemical hair relaxers; is that right?

Or your citations are not specifically to chemical hair relaxers?

MS. DEBROSSE: Object to form, foundation.

A. I mean, I did look at hair relax -- my whole report's about hair relaxers.

Q. (BY MR. HENNEKE) I understand that. That's not my question.

My question was: The citations that you used are to cosmetics generally; is that right?

MS. DEBROSSE: Object --

A. No.

MS. DEBROSSE: -- to form, foundation.

Let me get in there.

THE WITNESS: Okay. Apologies.

MS. DEBROSSE: Okay.

A. No. Some are very specific to chemical hair relaxers.

Q. (BY MR. HENNEKE) Okay.

MS. DEBROSSE: Counsel, whenever you have a moment, considering Dr. Crowley's medical condition, we did get lunch for everyone. So whenever you have a break, it should be here in a few minutes.

A. May I take a quick peak at time?

Q. (BY MR. HENNEKE) Sure.

A. Are you ready for a break or do you want to --

do you have a few more?
Q. I mean, it's good. Just let me go through -- let me see. I've got about a page here. Let's get through that, maybe 10, 15 minutes; and then we can take a break. How about that?
A. Fair enough.
Q. Okay. That will be a good breaking point.
So am I correct that you're opining about the behavior of chemical compounds in chemical hair relaxers under differing environmental conditions?
MS. DEBROSSE: Object to form, foundation.
A. I'm opining on their -- I'm -- please repeat your question.
Q. (BY MR. HENNEKE) All right.
A. I forgot.
Q. Let's take a step back.
A. Yeah.
Q. When you're -- when you're looking at the chemicals in chemical hair relaxers and considering the impurities, contaminants, and degradants, wouldn't it make sense to look at the chemical hair relaxers under differing environmental conditions?
A. Thank you for that clarification. I certainly considered it, and that would be consistent with a stability study.

So, for example, I saw a document, as part of my review yesterday, reporting stability at 25 degrees centigrade. They didn't report the humidity. And it noted that that composition was stable for three months.

They also reported a temperature cycling which is a standard stability stress technique for two-phase systems like creams or ointments and they indicated that it was stable under temperature cycling and I don't remember the temperatures that they used.

It is often done -- and I think I put it in my report -- to stress your samples. You know, the International Conference on Harmonisation has come up with these climactic zones, 25/60 where -- 25 centigrade, 60 percent relative humidity, 40/75, 30/65. They've got all these climactic zones based on where in the world you're going to be selling your product.

So, as I've noted in my report, that's how you challenge the stabil -- chemical stability of a product. That's one way you do it.

Q. All right. So if you're opining on the behavior of chemical compounds in chemical hair relaxers, wouldn't you want to put them under different type of environmental conditions, as you just explained, such as pH extremes?

A. Well, I'm -- we're talking about products here, right? So when you say a pH extreme, are you talking about the component that is already at really high alkaline conditions? I'm not -- I'm not sure I'm tracking you.

Q. Well, that's one aspect of it; but you would also want to look at differing pHs within the body as they're being applied, wouldn't you?

MS. DEBROSSE: Object to form.

A. Well, I mean, the pH of the skin is what it is. I mean, they're not swallowing them.

Q. (BY MR. HENNEKE) Right.

A. Remingto -- in my case, I may use the same excipient for oral administration that I might use for transdermal. So let's back up.

It is, I think, good practice to do force degradation studies; and generally that involves acid and based catalyzed hydrolysis, exposure to light so you can examine photolysis, oxidation conditions, so perox -- you know, hit it with some peroxide or introduce reactive oxygen species.

And then, of course, thermal, how does temperature affect? We all know and love Arrhenius from, you know, chemistry that affects reaction rates. So I think when developing a drug product or a cosmetic,

all of those are considered.

But with respect to the hair relaxers, if I understand your question correctly, you're asking me should they take one component and expose it to high pH to see what happens?

Q. Yes.

A. That's your question. Okay. Yes, I think so. I think that would be a good practice to examine potential chemical reactions from one component to the other.

Q. But you didn't do any of that in your work?

A. No, I was not asked to.

Q. All right. Am I correct that you were asked to analyze how these ingredients, impurities, contaminants, and degradants may react with one another?

A. Yeah. That's outlined in my tasks.

Q. Right. And am I correct that you were asked to comment on how chemicals might enter the body during typical product use?

A. Yes, that's correct. I was asked to provide context on absorption and permeation.

Q. All right. Were you asked to quantify the amount of any specific toxic compound that'd actually be formed during typical product use?

A. No, I was not asked to provide amounts of an

impurity, a degradant. I was not asked to do any sort of dose-response analysis as part of my tasks.

Q. So you were just --

A. Other --

Q. I'm sorry. Yeah.

A. Other experts will address dose and amount --

Q. All right.

A. -- type questions.

Q. So you were simply asked to say: Is it there or is it not there?

MS. DEBROSSE: Object to form, mischaracterizes the witness' prior testimony and the report.

A. There was more to what I was asked. I was asked to verify the presence of these chemicals; provide insight into their properties, chemical properties, physical properties, bio -- known biological properties; provide information on degradants, impurities, contaminants; provide information on how they might interact with one another which is, again, what I do as sort of -- routinely as part of my, you know, daily work.

Q. (BY MR. HENNEKE) All right. Were you -- am I correct that you were asked to quantify the amount of any specific carcinogenic compound that would actually

be formed during typical product use?
MS. DEBROSSE: Object to form.
A. I want to make sure I heard you.
Q. (BY MR. HENNEKE) Sure.
A. You asked me: I was asked or was not asked?
Q. Were you asked?
A. I was not asked to provide an analysis of quantifiable -- quantifiable amounts of a carcinogen.
Q. Okay. Were you asked to opine on specific causation between hair relaxer use and any particular health outcome?
A. I was not --
MS. DEBROSSE: Just give me a chance -- just getting an objection on the record that this expert is to general causation, not specific causation. He can't remember the (incomprehensible.)
You may answer.
A. Apologies for....
Q. (BY MR. HENNEKE) You can answer.
A. I will not be providing causation opinions.
Q. Okay. Were you asked to determine whether the use of chemical hair relaxers causes uterine cancer?
A. Again, I was -- I was not asked to provide a causation opinion.
Q. Were you asked to determine whether the use of

chemical hair relaxer causes ovarian cancer?

A. I was not asked for a causation opinion.

Q. Did you conduct an independent review of the regulatory standards concerning chemical hair relaxers?

A. I mean, I certainly read about some of the regulatory standards and have experience with them from more of a food and drug perspective. Well, some of them are consistent with cosmetics.

In some cases I saw chemicals that I recognized and then would see another piece of information on an amount inside a formula, for example.

But, you know, I think there was a fragrance that's -- you know, you can't use more than 4 percent of this.

So, to answer your question, some of the regulations were right there in front of me as part of my work on this matter.

Q. So did you review the regulatory standards concerning chemical hair relaxers or you just tangentially saw them in your review?

A. I mean, I did review some regulatory standards; but I don't know that I would frame it as for hair relaxers. It was cosmetics or --

Q. Let's try it this way: You did not opine in your report on regulatory standards concerning chemical

hair relaxers; is that correct?
A. I mean, there's some regulatory information in there.
Q. But I can't turn to a specific section of your report and there's not a systematic review of the regulatory standards; is that right?
MS. DEBROSSE: Object to form.
A. Ye -- I mean, they sort of underline what you're doing but I think I understand your question and I'll try to get you an answer.
There's not a section in my report either criticizing or praising regulations; but they were very much a part of my review, right, and my report.
Q. Are you going to be offering any opinions about whether or not any defendants met regulatory standards?
A. It's hard to answer that, you know. I saw a product formulary and I recognized it and I Googled it. And some of the ingredients in the formulary were not on the label.
So, if I was asked about that, I'd say that's a compliance issue.
Q. Do you recall in what instance you saw that?
A. It was in the defendants' documents.
Q. But you don't know which specific defendant, as you sit here today?

A. I can't remember, but I can go find it.
Q. All right. Did you conduct an independent review of the safety standards concerning chemical hair relaxers?
A. Well, I -- I think my report deals with a risk analysis, and that includes a safety analysis on how these products might impact a human.
So -- and my report was independent. I did it all myself.
Q. Okay. I think that's a good time to take a break.
MS. DEBROSSE: Okay. And I think the lunch is in the kitchen as well.
MR. HENNEKE: Okay.
THE VIDEOGRAPHER: Going off the record.
The time is 11:57 a.m.
(Recess from 11:57 a.m. to 12:42 p.m.)
THE VIDEOGRAPHER: Back on the record. The time is 12:42 a.m.
Q. (BY MR. HENNEKE) Good af -- I think we're afternoon now. Good afternoon, Dr. Crowley.
A. Good afternoon.
Q. Let's see. I had a couple of follow-up questions from -- or maybe just really one.
We were talking about the MSDS and the raw

material specification sheets and impurities, degradants, and contaminants.

Is it your opinion that any amount of an impurity is unsafe?

MS. DEBROSSE: Object to form, compound.

But you may respond.

A. Well, I don't think I've rendered that opinion in my report; and it's sort of a very general question because it's not specific to an impurity, a degradant, or a contaminant.

So I would have to take a look at a specific impurity or chemical before I'd offer any opinion as to its safety.

And then with respect to amounts, as I've said, I'm not -- I'm not here to provide dose-response toxicology assessments. It wasn't necessary for me to form my opinions.

Q. (BY MR. HENNEKE) Okay. So your opinions are essentially to identify -- just talking about impurities, contaminants and degradants, to identify whether they potentially could be there?

MS. DEBROSSE: Object to form, mischaracterizes the witness' prior testimony and the report.

But you may answer if you can. Just --

A. Ye -- so that's not exactly what I've said in my report and during testimony today.

My -- with respect to those, I knew they were there. I saw -- saw them in the defendants' documents. Their presence is reported in the literature.

And I want to make sure I understood your question. Could you repeat it again?

Q. (BY MR. HENNEKE) Sure. My question was to identify whether or not they were present.

A. Yes. That -- that would be -- a portion of what I've opined upon in my report, I acknowledge that they're in the documents in many cases or they've been published in the literature or just from my own work, the chemicals are the chemicals.

They're present in these materials. And they will form, when they're com -- you know, formulated into a composition under certain conditions.

So at one point I think you said potentially there. They are there in many cases because it's a known impurity in a raw material, for example, or chemical A and chemical B, if they're in the solution, they're going to react.

Q. Okay. But you're -- as we said before, you're not here to testify to the amount that is present?

MS. DEBROSSE: Object to form.

A. That's correct. I'm -- first of all, it wasn't necessary for me to form my opinions.

And I have described -- for example, in one section of my report, it states, you know, this impurity -- I think it was diethanolamine -- is known to be present at, you know, up to 14 percent of this raw material, for example.

So I've described circumstances where an amount is -- of an impurity is typically present or things like that but I'm not giving those response tox opinions.

Q. (BY MR. HENNEKE) Okay. How did you go about determining the major categories of chemical ingredients in hair relaxers?

A. Well, as outlined in my report, I requested the list of the compositions and began reviewing them.

I also did a larger search. I identified the Helm article, Lavilla, as we discussed earlier.

I mean, I wrote that chapter in Remington's on Solutions, Suspensions, Emulsions. A cream, a lotion, those are emulsions. So I already knew many of them because the chemicals are the chemicals, right?

So I started with the evidence and went from there based on what I knew and what was in the

literature and, of course, what was in the defendants' documents.

Q. All right. So you developed a list yourself?

A. What list --

Q. So --

A. -- are you referring to?

Q. Basically there's a number of chemicals that are listed in table 1 through 20 and some of those lists were -- or have citations to them.

And when I say "list," some of the chemicals that are put into those tables have citations to them; and some do not.

Did you develop the list that -- of the chemicals that went into those tables yourself?

MS. DEBROSSE: Object to form, foundation.

A. The chemicals in the report, I devel -- you know, I put them in the report. It's my name on it.

I -- I think I cited to just about -- well, the Lavilla table, for example, is cited; and I verified that some of the chemicals in that list were present in the defendants' products from the documents that were produced.

But if you've got a specific table that you have a question about, for example, you know, table 15, polyvinylpyrrolidone, PVP --

MS. DEBROSSE: I'm sorry, Dr. Crowley. What page are you on?

THE WITNESS: I'm sorry. Page 41.

MS. DEBROSSE: Okay.

A. You know, I found that in the defendants' documents as an ingredient.

Q. (BY MR. HENNEKE) And that's my question. Did you -- so the chemicals that are listed in your various tables in your report, did you confirm that those chemicals were found in the defendants' documents?

A. Yes. So, for example, table 16, "Magnesium nitrate," I don't believe that's on Lavilla's list, per se.

Q. Say that again. I'm sorry.

A. "Magnesium nitrate" listed in table 16, if you go back to table -- I think it's table 1. Lavilla --

Q. I believe so, yes.

A. He didn't list that --

Q. Table 14.

A. I apologize.

Q. No, you're fine.

A. Table 16 on Page 42, I don't believe that Lavilla, for example, pointed to magnesium nitrate; but I identified that as a problem for nitrosamine formation.

Q. All right. Let me ask the que -- try it one more time.

So what I'm trying to get at is the chemicals that are listed in tables 1 through 20, those are all chemicals that you confirmed were in defendants' documents in master formulas?

MS. DEBROSSE: Object to form, compound.

A. I verified they're in the defense documents. I don't know that they all came from master formulas because I saw batch sheets, and they're called different things.

I'm not trying to be difficult, but they were present in those documents. That's what I'm getting at, yeah.

Q. Okay. And you would testify that those are -- that all the chemicals listed in tables 1 through 20 were all ingredients in defendants' products?

MS. DEBROSSE: Object to form, compound.

A. I believe that that is an accurate statement. I found these chemicals in the defense documents.

And, you know, in some cases like, if you go to Page 34, table 4, the DEA amide hair relaxer ingredients, you know, I saw Cocamide DEA and Lauramide DEA in many, many of the compositions. Capramide DEA, I saw in some, you know, but fewer.

So with respect to these tables and these chemicals, I -- every single one of them there, I found in a defendants' document.

Q. (BY MR. HENNEKE) Did you conduct a systematic review to see if they were in all of defendants' documents?

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) And let me rephrase that.

Did you do a systematic review to determine whether these chemicals were in every single defendants' products?

A. The answer to --

MS. DEBROSSE: Object to form.

You may answer.

A. That's a long list.

Q. (BY MR. HENNEKE) It is a long list.

A. And they are broken out by defendant and abbreviation. So when I was compiling this report and I looked at those classes of chemicals, I did try to go to each of the defendants' documents that are listed here, find a formula, and verify that they -- each of the chem -- classes were present.

In some cases, it was abundant. In other instances, I went to Everlaw and searched the term, like I said, with parabens and, I think, phthalates and some

of the others. And I would look through, and you can see the codes on what it finds.

So, yes, I did verify that they were present. I don't know that I would call it systematic. I didn't build a table that said this chemical is in this defendant's product here, here, here, here, and here.

Q. Okay. So the answer is, no, you didn't do a system -- systemic review?

A. Well, what is --

Q. It's just a --

MS. DEBROSSE: I'm sorry. Go ahead, Counsel.

Q. (BY MR. HENNEKE) Yeah. So you did not do a review to confirm that every single ingredient that you list in your tables is in every single defendants' products?

MS. DEBROSSE: Object to form.

A. Perhaps I should have -- what do you mean by systemic -- a systematic review?

Q. (BY MR. HENNEKE) Did you go -- okay. Let's take House of Cheatham, for example.

Did you go through and check to make sure House of -- all of the ingredients that you list in tables 1 through 20 appears in one of House of

Cheatham's products?
A. I did for the category of chemicals but not each specific chemical mentioned in my report, per se.
Q. Okay. And what do you mean by -- what did you say, major categories?
What do you mean by major categories?
A. Well, parabens.
Q. That's one.
A. Phthalates.
Q. Phthalates. So each of the -- so parabens, phthalates, aldehydes?
A. (Witness nods head.)
Q. Is that a yes?
A. Well, I focused more on aldehyde -- formaldehyde and aldehyde releasers. I did search for hyde, H-Y-D-E, to see what kind of hits I'd get, and I got a lot.
But I did do search for all these different classes, if you will, the cyclosiloxanes and so forth, and would verify that I got hits.
And in many cases I would go and just start going through these to look for formula so I can verify it. That's how I did it.
Q. Okay. All right. One of the degradation pathways that you discuss in your report is high

alkaline pH; is that right?
A. Yes. I discuss high alkaline pH.
Q. What do you consider to be a high alkaline pH?
A. Well, I suppose that depends on context; and in this instance the pH of the hair relaxers is typically around 12.
Some cases, I saw some as low as 10 and as high as -- I think north of 13. I consider that to be high alkaline.
Q. Okay. What testing supports that alkaline pH at 12 to 14 creates degradation when using chemical hair relaxers?
A. Can you repeat that for me, please?
Q. Sure. What testing supports that alkaline pH at 12 to 14, that range, creates degradation when using chemical hair relaxers?
A. Degradation of what?
Q. You tell me.
A. Well, I mean --
MS. DEBROSSE: Object to form.
A. -- the section of my report describing the chemistry of hair relaxers that degrades the keratin in hair, right?
Q. (BY MR. HENNEKE) Uh-huh.
A. So it would break in in rearranging disulfide

bonds. And I provided cites where, you know, they measured the amino acid loss that -- I would consider that degradation of hair keratin, right?

And then I've also cited for some of the other ingredients that are susceptible to degradation under those conditions and there you just look at spec sheets and they'll say: This is stable between pH of X and Y.

Polyethylene glycol, for example, is not stable at a pH of 12.

Q. All right. You're looking at cites to support this opinion; is that right? You're not actually doing any testing yourself?

MS. DEBROSSE: Object to form, mischaracterizes the prior testimony.

You may respond.

A. Did you say I'm looking at sites?

Q. (BY MR. HENNEKE) You said cite -- you were referring to cites in your answer? You said you were looking at citations that showed that the -- this degradation is occurring, and I'm saying: Did you do any testing?

A. I didn't need to do testing to support my opinions. And just a request, so we're clear, is when you said --

Q. Sure.
A. -- cites, I thought you meant like a website.
Q. Okay. Yeah, yeah, that's fine.
A. So that's -- if you want to say stuff like citations, thank you for clarifying that.
So I'm also relying upon my experience. I mean, I did the poster on the parabens. And we only examined pHs from, I think, 4 to 8; and they degrade at 8.
So I didn't need to go do the research. I mean, in the case of parabens, I already have; and, again, the chemicals are the chemicals.
Q. Uh-huh. But, also, in the instance that you brought up about the degradation of the keratins in the hair, that is the purpose of a chemical hair relaxer -- is to break down the hair so it becomes straight; isn't that correct?
A. Well, I guess that's a matter of perspective. I think the goal is to make it straight.
If you read the products that say we're just rearranging disulfide bonds, they don't say anything about amino acid loss in the hair. I mean, it's denaturing that protein. That's a degradation process.
You know, as I've written my report, you

know, not only does it do that to the keratin in the hair, you know, one of the consequences is that it makes the hair more permeable.

I mean, that's not my research. That's been published and verified many times, you know.

And we've talked about scalp burns, right? And there's keratin in the skin. And Adav and coworkers have demonstrated the proteomics of what happens when that happens to keratin.

And similarly there's loss of amino acids. And, I mean, you're going to form mutant proteins, peptides that -- I mean, those are degradation processes.

So I didn't need to go do experiments. It's published.

Q. Okay. Where did -- so you also talk about elevated temperatures being a degradation pathway.

Do you state anywhere what you believe an elevated temperature to be?

A. Well, again, it -- it depends on context. I understand that when the high alkaline chemical hair relaxer is applied to the hair, heat is generated.

I saw in the literature and in some of the brochures roughly what that might be. I didn't need to do an experiment to determine that.

I also understand that hair dryers are used to various types and that they can vary in the temperature that they, you know, would expose the person to.

And then other styling -- I think they're called styling tools. I -- flat irons and rollers and things of that nature get to various temperatures.

And I did look to see what those were but, you know, some of these reactive -- reactive species that are formed -- formaldehyde -- are very reactive, you know.

And it will definitely have Arrhenius kinetics or temperature-dependent kinetics associated with how it might react, but it wasn't necessary to do that analysis to form my opinions.

Q. So you were just talking about, you know, some different types of styling that might produce heat.

Please explain where you think in the use of chemical hair relaxers that an elevated temperature can occur.

A. Well, as I mentioned, when applied, some of them kind of -- they generate heat. So it happens when they're applied. They get warm.

I also understand you've got to rinse it out, so hot water. How hot that water is, you know --

and I saw some instructions for use that advised against using a hair dryer. I saw others that didn't say anything about using a hair dryer.

So it's hard for me to put bands around what kind of temperatures people's hairs might experience, but elevated temperatures occur.

Q. But you don't have a range of what you consider an elevated temperature to be?

A. Again, it's -- it's relative, right? An elevated temperature for what, for degradation to occur? I mean, that's specific to each chemical.

Q. But nowhere in your report do you list what an elevated temperature has to be for each individual chemical for degradation to occur?

MS. DEBROSSE: Object to form.

A. No. I -- and, as I said, it wasn't necessary for me to form my opinions to tie a specific temperature to it.

It's going to be unique to the combination and the conditions that they undergo and experience as well rather than focus on, say, a specific ingredient.

But I did -- like I said, I did look up the temperature of a flat iron, typical temperatures of hair dryers and, you know, tap water -- you know, how hot someone's tap water might be.

Q. (BY MR. HENNEKE) So is it your testimony that when somebody blow dries their hair or uses a flat iron, that there's still chemicals present in the hair that could degrade from the use of the chemical hair relaxer?

A. I believe there are residuals present in my report. I indicated and provided citations to studies that demonstrate that with respect to skin exposure followed by a wash-off doesn't always remove it.

And it's my opinion that when the hair relaxer contacts the skin and insults the tissue with a burn, it opens it up and becomes more permeable. And some of those chemicals are absorbed and you can wash it off, but it's not all going away.

Q. Did you ever do any testing to determine how much is left in the hair and on the scalp after being washed away?

MS. DEBROSSE: Object to form, asked and answered regarding testing.

You may answer.

A. No, I didn't do the testing. It wasn't required for me to form my opinions. It's well documented in the literature.

Q. (BY MR. HENNEKE) So it's well -- and I don't think it's well documented in the literature of the amounts that may be present after washing it off.

MS. DEBROSSE: Object to form.
A. I provided a citation of an example with a pharmaceutical where the amounts were disclosed where, you know, they applied --
Q. (BY MR. HENNEKE) That's pharmaceutical.
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) That's not chemical hair relaxer, right?
MS. DEBROSSE: And, Counsel, please let him complete his answer.
Q. (BY MR. HENNEKE) I'm sorry. I'm sorry.
A. I have some citations in there that specifically address the so-called rinse and wash-off and residue. There's -- and I believe that came from a cosmetics book.
Now, I think your question is more directed to some of the chemicals in the hair relaxers. I didn't do that. I think your client should and I didn't find it in their documents and I did search for it. I think I searched for residues.
Q. But my question right now is: You didn't do any of that work?
MS. DEBROSSE: Object to form, asked and answered.
A. Yeah. I didn't do the -- I didn't do that kind

of testing. I didn't need to do it to support my opinions.

Q. (BY MR. HENNEKE) Okay. So in your report you talk about oxidative conditions as being another type of degradation pathway; is that right?

A. Yes. I discussed oxidation.

Q. What is the length of exposure that needs to take place for degradation to occur because of oxidation?

MS. DEBROSSE: Object to form, vague.

You may respond.

A. I -- I don't think I can answer that. You're asking the length of exposure --

Q. (BY MR. HENNEKE) Well --

A. -- for oxidation to occur? Is --

Q. Yeah, let me rephrase it.

What is the length -- so oxidation occurs when a product is put on the hair; is that correct?

A. Could form -- oxidation reactions could occur inside the tube before it's ever opened.

Q. All right. So what is the length of time that must occur before oxidation occurs?

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) So length of time for the product to be exposed to the air.

A. I -- there's no way I can answer that question because it's just not specific enough. It would depend on the chemical, I suppose.

Oxidation of one chemical would proceed at a different reaction rate than another chemical. So there's no way for me to answer a broad question like that. I'd need to know more specifics.

Q. So reading your report, then, an oxidation pathway -- and oxidation conditions is just another type of pathway for degradation; and that oxidation conditions occur in the tube, can occur when the product is put on the hair; is that right?

A. Yeah, that's correct. It can -- oxidation can occur -- I mean, it's -- it's a type of reaction. It's loss of electrons, right?

It could happen when they're manufactured, when two chemicals are brought together. It can be catalyzed by impurities like metals. They're a great surface to support oxidation reactions.

So it can occur in a number of places and under a number of different conditions.

Q. And, again, you didn't do any testing to determine what length of time is necessary for oxidation to occur --

MS. DEBROSSE: Object --

Q. (BY MR. HENNEKE) -- for any chemical?
MS. DEBROSSE: Object to form, asked and answered.
A. That's correct. I didn't do any testing. It wasn't necessary to come to my conclusions.
Q. (BY MR. HENNEKE) All right. I'm going to ask you a series of specific questions here that you've -- you've already answered but I'm doing this for the record.
Recognizing that chemical hair relaxers contain numerous ingredients that may interact, did you determine dose response in your methodology?
MS. DEBROSSE: Object to form, asked and answered.
A. I did not do a dose-response analysis. It was not necessary for me to come to my opinions.
I understand that other experts in this matter will provide dose-response relationships.
Q. (BY MR. HENNEKE) Okay. Did you determine duration of use of a product in your methodology?
A. Well, I read the instructions for use that describe, you know, keep it on your hair for this amount of time. So I'm not sure I understand your question.
Q. Yeah. When I was asking about duration of use, I mean how some -- how long somebody used the product

over time, meaning did they use it for five years or ten years or 15 years periodically whenever they wanted to straighten their hair?
A. So I read -- I've read some things where people talked about perhaps -- we can use the word "chronic" -- repeat use and things like that; but that information was not necessary for me to come to my opinions.
You know, I was asked: Are these chemicals there? What do they degrade to and so forth, as I've said.
So the number of times a person used it is not necessary for me to verify the presence of these chemicals.
Q. Did you determine the biological plausibility of these chemicals in chemical hair relaxers in causing cancers?
MS. DEBROSSE: Object to form, beyond the scope.
A. I'm not offering causation opinions.
Q. (BY MR. HENNEKE) And -- okay. All right. I just want -- now we're going to talk about materials you reviewed for your opinions.
A. (Witness nods head.)
Q. And a lot of them -- a lot of these, you've already discussed in reference to some of the questions

you've given me today, but I just want to systematically go through the materials you reviewed just so we both under -- I understand what you've done.

A. Okay.

Q. All right.

A. Do you have paper copies of these with you?

Q. I do not. I'm just going to talk about them generically right now; and if we want to go through some of the stuff, we'll do it specifically.

A. Okay.

Q. Okay.

A. I'd like to refresh my memory --

Q. Certainly.

A. -- against the documents. So I'll let you know if I'd like to see it.

Q. Definitely. You state in your report that you reviewed over 40 peer-reviewed studies; is that right?

A. I believe that's correct. I'll look in the back and count my cites. Well, there's not a number on them; but I can count them up for you, if you'd like.

Q. We can est --

A. What's that?

Q. I said let's just say approximately. I said over 40.

A. (Witness nods head.)

Q. All right. Do you consider each of these peer-reviewed studies to be authoritative sources?

A. Well, I mean, and how would you define an authoritative source?

Q. I'm the one asking the questions today.

MS. DEBROSSE: I object to form.

Q. (BY MR. HENNEKE) These peer-reviewed studies that you are citing to -- they are your citations -- that you rely upon them for the -- for some of the opinions that you make in your report; is that correct?

A. Yeah. I -- I relied upon the literature in forming my opinions along with my experience, education, training, et cetera.

Q. Okay. So that would be an authoritative -- an authoritative source would be a stud -- would be an article or peer-reviewed study that you're relying upon to help form your opinions?

A. Well, you're qualifying this by an authoritative source. It was a source.

Q. All right. And you're fighting me back on authoritative. Do you not consider them to be authoritative?

A. I consid --

MS. DEBROSSE: Object to form, argumentative.

You may respond.

A. I consider, like, the United States Pharmacopeia, the National Formulary, the Food Chemical Codex.

Many people consider Remington's, the book I published that chapter in, authoritarian; but trying to tag authoritative to each of these citations is difficult.

Some of them came from the European Union on cosmetic review. Some of them came from IFRA. In my experience, not all of those are -- I mean, I wouldn't put them in the same as, like, the USP or the Food Chemical Codex.

So it's hard for me to provide a veracity ranking for one article over another, per se. When I reviewed these documents, I certainly considered, you know, was it peer reviewed?

I saw some articles during my research, didn't cite them because I didn't think they were good and reliable work.

Q. But the ones that you did cite, you did think were good and reliable?

A. Yes.

Q. Or -- I'm sorry. Let -- cite is the wrong word.

The ones that you listed in your -- that are attached to your expert report, you did think were good and reliable; is that correct?

A. Yes. You know, as an example, I saw a paper written a few years ago by Pierce. I read it, and I chose not to cite to it.

It's a computer algorithm that models permeability of chemicals, and that particular model relies on water solubility as one of its inputs.

And they did -- the chemicals they reported on, they got the solubilities correct; but I think permeability is more complex than that. And I think models based on chemical activity are more accurate.

I also think they used -- I think it was 5 milligrams per square centimeter for their maximum adhesive component and I found that to be incredibly small.

That's 5 mi -- assuming it's a water-based contact, it's 5 microliters, 5 one-millionth of a liter per square centimeter. I found that to be a very small contact per surface area.

They -- I think they acknowledged in the paper correctly that the model did not use permeability through scalp and that there are anatomical differences.

And as I cited in my report -- I mean, it's

probably one of the main reasons I didn't point to it -- is the scalp is very permeable compared to other places on the body.

But the two issues -- I mean, it's -- they weren't looking at it in a composition. They were looking at, you know, a drop of ingredient getting in -- on skin in very small amounts.

And so I found that article not persuasive, and so that would be an example of one where I wouldn't consider that authoritative.

Q. So you didn't list it?

A. Correct.

Q. All right. Did you give that level of scrutiny to every article that you list?

A. I tried to.

Q. Okay. And that's what I was getting to as authoritative, that you ga -- that you provided your education, background, and analysis of the articles that you did cite to.

A. Yeah. I considered the defendants' documents, the stuff that I've cited to.

Q. I'm only talking about a peer review right now.

A. Right.

Q. We'll get to those others.

A. Right. But they form the basis of my opinions;

and, you know, I looked at that the way I do every day in my work as I read and reviewed.

Q. Okay. All right. And you also looked at case-specific documents that you were provided by counsel; is that correct?

A. You're talking about the -- the defendants' documents?

Q. Yes, I am.

A. Yeah. Okay.

Q. And those consisted of product formulas. I'm going to run through a list. So that -- product formulas is one set --

A. Yes.

Q. -- or one example.

A. Yes.

Q. MSDS sheets were another example?

A. Yes.

Q. Raw material spec sheets were another example?

A. Yes.

Q. Chemical analyses?

A. I -- I saw test results.

Q. Test results?

A. But can't -- sometimes they were in spreadsheets, and sometimes they were in documents. There was lots of different formats.

So I'm not trying to be cagey. You may use a descriptor, and I'm going to say I saw things like that but called many different things.

Q. Understood.

A. Yeah.

Q. And then you also testified earlier about having seen emails discussing different ingredients or different characteristics of the products; is that correct?

A. Yes.

Q. All right. Is there any type of document that I haven't described from the defendants' documents that you --

A. I -- respectfully, I don't think I could list all the things that I saw. I mean, I saw annual reports.

Q. Okay.

A. Okay? I saw presentations. There were all kinds of documents. There were a lot of documents in there.

And I'd do a search and start scrolling through and look and I -- a lot of times you can't tell what it is. It's just a Bates number, and you click it -- what is this -- and then move on to the next. So I saw a lot.

Q. Okay. Is it fair to say that the documents that you list in your report don't include all of the documents that you reviewed?

And I'll use the Pierce study as an example. That was one you reviewed but you're not relying upon and you didn't put it in your report; is that correct?

MS. DEBROSSE: Object to form, compound.

You may respond.

A. That -- I mean, that is an example; but I read stuff every day. And I'm -- in my normal course of business, I am looking at things that might have some relevance to this but were unnecessary.

So I did look at other articles and things like that that I didn't specifically cite to.

Q. (BY MR. HENNEKE) Okay. At any point in time, did you review a study done by White that's called the "White study"?

A. Could you provide some context on what it is? What kind of study is it?

Q. It's an epidemiological study.

A. I don't think I've seen any epidemiology.

Q. All right. And there's two others that I'm going to talk about that are epidemiological studies.

One done by Chang, have you reviewed that

one?
A. I have not.
Q. And one done by Bertrand, did you review that one?
A. What was the name?
Q. Bertrand, with a B.
A. Ber --
Q. B-E-R-T-R-A-N-D, Bertrand.
A. No, I didn't look at epidemiological studies.
Q. Will you be testifying that chemical hair relaxers contain ingredients that are hazardous to health?
A. I have given that testimony today. It's in my -- and in my report.
Q. So you will be?
A. I mean, I suppose it depends on how the question's asked.
I won't be giving causation opinions but I -- as outlined in my report, formaldehyde is a known carcinogen. If someone asks me: Is formaldehyde hazardous to human health, the answer is yes.
Q. And then they would ask you the follow-up questions about dose response -- I mean, dose response, duration of use, and you're not offering any opinions on those; is that correct?

MS. DEBROSSE: Object to form.
You may respond.
A. Other experts will provide those opinions.
Q. (BY MR. HENNEKE) Okay. Are you going to be -- are you saying that all chemical -- are you testifying or opining that all chemical hair relaxers contain ingredients that cause cancer?
A. My report outlines specific chemicals, degradants, impurities that are known carcinogens; and they are present in the products.
Other experts will provide causation opinions.
Q. And are you going to be testifying that all chemical hair relaxers undergo degradation during use that create chemicals that are hazardous to health?
A. I -- I'd appreciate if you can repeat it to make sure I heard --
Q. Sure.
A. -- it clearly.
Q. Are you going to be opining that all chemical hair relaxers undergo degradation during use that create chemicals that are hazardous to health?
A. I -- I think -- I'm thinking, if you don't mind. I'd be grateful if you could repeat it one more time for me.

Q. Yeah.
A. I want to make sure I'm hearing you. Can you repeat that just so I don't --
Q. No, it's not that I don't want to do it again; but I think I got the question right. Let her....
(Requested portion was read.)
A. I paused because degradation happens not just during use, right? So they can happen when they're made. They can happen inside the tube sitting in your client's warehouse. It can happen on a truck as it ships across the country, and it can happen sitting on a store shelf before -- or getting to a salon before it's ever applied in use. So --
Q. (BY MR. HENNEKE) With that qualification that you just provided, can you answer that question?
A. Right. I will be offering -- I will be opining that degradation of the chemical ingredients in the hair relaxers can produce chemicals that are known to be hazardous to human health.
Q. All right. Are you going to be opining that all chemical hair relaxers undergo degradation that create chemicals that cause cancer?
A. I -- I would say basically the same answer that I just gave, and I will repeat that I am not giving causation opinions.

I have identified some chemicals that are known carcinogens, but other experts will offer the causation opinions.

Q. Okay. All right. Let's quick -- take a quick break, three-, four-minute break. I'm getting ready to start another section.

THE VIDEOGRAPHER: Going off the record. The time is 1:30.

(Recess from 1:30 p.m. to 1:46 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 1:46.

Q. (BY MR. HENNEKE) All right. We're still afternoon, but good afternoon anyways.

I promised we would go through some of these tables, and that's what we're going to proceed to do -- is ask you some questions about the tables that you have in your report. We're going to start with table 1, and I believe it's on Page 14.

So table 1, you labeled as "Impurities and contaminants in Cosmetics"; and you give a citation to Lavilla, et al. for 2018; is that right?

Is that where all this information came from that's listed in table 1?

A. Table 1 came from Lavi -- I pronounce it Lavilla, I suppose; and he's titled it "Some impurities

and contaminants in cosmetics."

Q. All right. And then as I was asking questions before we last broke, you went through and looked at each of the impurities or contaminants that are listed here to confirm that they were in defendants' products; is that correct?

A. The classes, yes. So, for example, I verified some metals; and that's present in a later table where I identified metallic impurities in some of these ingredients.

Q. So the first -- I'm sorry for interrupting but just let me clarify what I'm -- before we go on.

So the first column is the impurity or the contaminant; is that correct?

A. Yes.

Q. And the second column is the ingredients that are in the products that may contain that impurity or contaminant --

A. That's correct.

Q. -- is that right?

And then when you say potential contamination causes, that's contamination causes by the impurity or contaminant; is that right?

A. Well, I mean, that comes from Lavilla.

Q. Right.

A. Right? So that's what he's pointed to. I don't know that I've -- I've provided other ways where some of these can occur. I -- I wouldn't say that I'm 100 percent consistent with Lavilla, right?

So, for example, nitrosamines, he states manufacturing and storage processes. In my section I speak very specifically about how nitrosamines can be formed, and it can be formed from more than one ingredient.

So in some cases what Lavilla describes is only part of what I've provided.

Q. Okay. But when you list the main ingredient, this is the main ingredient that may contain it or does contain it?

A. I think these are example ingredients that Lavilla is giving. He's not specifically saying these are the only ones or a --

Q. Right.

A. -- a main ingredient.

Q. All right. So is it -- so I guess what I'm trying to get at is: You're looking at table 1. Did you confirm that the main ingredients that may cause it -- are they in cosmetics or did you confirm that they're actually in chemical hair relaxers?

MS. DEBROSSE: Object to form.

A. I verified -- and I think some of my subsequent tables, for example, describe that, you know, for -- let's look at table 8 on Page 36.

Cocamide DEA is present in defendants' compositions. I verified that.

Q. Okay.

A. Okay? I -- I saw diethanolamine. There's a section in my report that describes that.

I'm going down to Di -- 1,4-Dioxane. There's cites to that for other ingredients in a subsequent table; but I saw PEG stearates and PEG esters, if you will.

Ethylene oxide also appears in my text and subsequent table, and I give examples of raw materials. So let's go to -- if you don't mind, I'd like to go to that table. So it's table 2 on Page 27.

Q. Uh-huh.

A. Every -- every item in the first column, Compound Name: I verified was in defendants' compositions in the hair relaxers from the defendants' documents.

I didn't, per se, do that with Lavilla's table; but there's overlap between the two. I hope you can appreciate the distinction.

Q. I do.

A. Yes.
Q. And that was the source of my question or that's what I was trying to get to -- is that table 1 is a table that you cited to from another publication?
A. Yes.
Q. But you didn't confirm every single thing that's listed here in table 1 is in a chemical hair relaxer product, but you did do that for table 2?
A. That's more or less fair. And I would say table 1 is more of a sort of class, if you will.
Table 2 is -- these are there. They're in the products, and they fall within the same classes.
Q. Understood.
A. Yeah.
Q. And I think we may be able to go through table 1 somewhat quickly, then. Did you do --
A. I want to go back to it.
Q. Sure. I'm sorry. Page 14.
A. (Witness complies.)
Q. Did you do any systematic review of these chem -- when I say -- I'm just talking about table 1 and not what you did in table 2 or table 3 or table 4.
I'm just saying: Did you consider any epidemiological evidence related to table 1?
MS. DEBROSSE: Object to form, asked and

answered.
But you may respond.
A. As I've said earlier, I'm not offering epidemiological opinions.
Q. (BY MR. HENNEKE) Okay. All right. Did you undergo for table 1 any type of tox analysis of these chemicals?
And what I'm referring to here is like ADME-Tox analysis.
MS. DEBROSSE: Object to form.
A. So I have some familiarity with tox of some of these and --
Q. (BY MR. HENNEKE) Okay.
A. And -- but I think you used the word systematic or formal tox analysis. I did not do a systemic toxicological analysis of what's in table 1 from Lavilla. It wasn't necessary to come to my opinions.
As my report, I think, pretty clearly states, I mean, the properties of a lot of these ingredients are well-known. I've cited to the publications.
Other experts will be giving causation opinions.
Q. Okay. Are you familiar with KCCs, which is the 10 Key Characteristics of Carcinogens?

A. I have heard of them, and I am aware of them.
Q. Okay. You did -- what is your understanding of a KCC analysis?
A. It's been a while. You know, I would prefer to refresh myself by looking at a -- you know, a source for that but it -- you know, it's high level, ten or so items that are, you know, believed to be associated with cancer causation.
Q. Okay. Well, that leads me to my next question. I was trying to give you the background for what I'm going to -- my ultimate question was: Did you do a KCC analysis of any of the chemicals listed in table 1?
A. No, I did not. It wasn't necessary to come to my opinions, and other experts will be giving causation opinions.
Q. All right. Are you familiar with IARC?
THE REPORTER: Uh --
MR. HENNEKE: IARC, I-A-R-C, capital I, capital A, R-C.
A. Yes. I've cited to them in my report.
Q. (BY MR. HENNEKE) All right. Did you do an IARC analysis of any of the chemicals listed in table 1?
A. I mean, I've cited to some of the IARC reports and I've read them, but I don't know what you mean by an "IARC analysis."

I -- I think what you're referring to is the steps that IARC goes through in order to give a classification. Is that your question?

Q. Yes.

A. No, I did not do that.

Q. Are you familiar with the RTES -- I'm sorry -- RTECS database, the Registry of Toxic Effects of Chemical Substances?

A. Yes.

Q. What is your understanding of RTECS analysis?

A. I have used it before. It's -- it's a tox database.

Q. All right. They -- did you apply an RTECS review in your work in this case?

A. In this case I did not do an RTECS analysis. Other experts will be providing toxin and causation opinions.

Q. Okay. Are you familiar with Bradford Hill analysis used in epidemiology?

A. "Familiar" might be strong. I'm -- I've heard of it. I've never done one.

Q. All right. So you did not apply any Bradford Hill analysis in your work in this case?

A. No, I did not. I won't be giving epidemiological opinions.

Q. All right. And then I'm going to talk about a couple of cri -- criteria for Bradford Hill. There's nine of them. I'm only going to ask you questions about a few of them.

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) One of the criteria for Bradford Hill analysis is temporality.

Do you have an understanding of temporality?

A. I am familiar with the term but I did -- like I said, I won't be giving epidemiological opinions.

Q. So you're not going to be talking about duration of use of the chemicals that are listed in table 1?

And what I mean by "duration of use" is duration over time.

MS. DEBROSSE: Object to form.

A. I -- yeah, I won't be giving opinions on duration of use over time opinions.

Q. (BY MR. HENNEKE) Another criteria for Bradford Hill is called biological gradient.

Do you have an understanding of what biological gradient is?

MS. DEBROSSE: Object to form.

A. I mean, I have heard of it; and, again, I won't

be giving epidemiological opinions.
Q. (BY MR. HENNEKE) So you're not going to be any -- giving any opinions about dose or dose response?
A. That's correct. I will not be giving dose or dose-response opinions.
Q. All right. A third criteria for Bradford Hill analysis is biological plausibility.
Do you have an understanding of biological plausibility?
MS. DEBROSSE: Object to form.
A. Yes, I have an understanding.
Q. (BY MR. HENNEKE) What is your understanding?
A. Biological plausibility, in general, means the likelihood of a biological activity or interaction with a living cell, those kinds of things.
Q. Did you consider biological plausibility in your analysis of the chemicals listed in table 1?
A. I -- I mean, I report on some of the biological properties of these chemicals, of course, citing to literature for many of the chemicals in my report, not just table 1.
So, I mean, I've reported, as I said, properties of these chemicals in these hair relaxers.
Q. But your testimony is going to center on those properties and not talk about dose and not talk about

duration. That's correct?

MS. DEBROSSE: Object to form, asked and answered.

A. That's -- that's correct. I'm not giving epidemiological opinions or epidemiological analyses.

Q. (BY MR. HENNEKE) All right. And one -- one more criteria for Bradford Hill we're going to talk about is experimental evidence.

What is your understanding of experimental evidence?

MS. DEBROSSE: Object to form.

A. Evidence from an experiment.

Q. (BY MR. HENNEKE) And did you consider any data from clinical trials in the use of chemical hair relaxers in your consideration of the chemicals listed in table 1?

A. Well, that -- my answer is going to be complicated, and it's not intentional. It's just your question's hard to answer without being thorough.

You know, I work with these chemicals all the time. And as much as, you know, we want to believe that they're inert, they're not; and they're multifunctional, right?

So an emulsifier might help make your cream, but in some cases it helps dissolve another

material in a composition and it -- through my many years of experience and training, part of the analysis and learning about the properties of these chemicals is understanding their safety.

And that includes reading clinical studies, animal stud -- preclinical studies, those kinds of things.

So the suggestion that I didn't have some of that in mind from my experience and in my review, you know, it's part of the -- it's part of the analysis.

Q. But you didn't conduct any testing of any of the chemicals listed in table 1; is that right?

A. I work with them all the time but in -- as it relates to this matter, I did not do any testing of the chemicals in table 1. You know, for this matter, I didn't need to to arrive at -- at my opinions.

I want to finish up the clinical study thing. I won't be offering causation opinions, as I've said; but clinical analysis of these chemicals is -- I mean, widespread knowledge of them.

Q. But you're not relying upon any clinical trials of the use of chemical hair relaxers related to these chemicals listed in table 1?

A. I mean, I've cited to a lot of literature. Is there a clinical trial that you want to ask me about

specifically?
Q. In the use of chemical hair relaxers?
A. Yeah. Your que --
MS. DEBROSSE: Object to form.
You may answer.
A. Yeah, I'm trying to just get a -- what clinical trial information are you specifically referring to, an ingredient or the hair relaxer product specifically?
Q. (BY MR. HENNEKE) The hair relaxer product specifically related to the ingredients listed in table 1.
MS. DEBROSSE: Object to form.
A. I mean, I've relied on a number of citations from the literature; and so far, as much as they point to clinical trial information, I'm relying upon them.
Q. (BY MR. HENNEKE) Can you point to the clinical trials you're referring to?
A. Let me take a look. Well, I should have probably asked: Human clinical trials or animals?
Q. Let's start with human, and we'll go backwards to animal.
A. Well, do you have Abdin handy for me to look at?
Q. We'll come back to that. She's trying to pull it up, and it's not loading on her computer.

A. Okay.
Q. Is that the only one you want to take a look at?
A. I haven't gone through the entire list --
Q. Oh.
A. -- but I -- again, not trying to be cagey, but some of the cites do point to human clinical trials.
And, you know, some of the cites talk to, you know, is it a human clinical trial when you put a hair relaxer on someone and then ask to sniff some of their hair so you can measure the chemical changes?
I don't know if that was a formal clinical trial, per se. You know, one of those reports from the, I think, '70s or '80s, they were in salons and just took hair samples to do chemical analysis.
Is that a clinical trial? I don't know.
Q. Would you -- I mean, I don't know. Would you define that as a clinical trial?
A. In my experience, you write a protocol. You get IRB approval, and it's pretty formal.
Q. Uh-huh. That's what I would consider --
A. Yeah.
Q. -- a clinical trial to be.
A. Right, right. So, you know, like I said, I've relied upon what I've relied upon.

Q. Okay. All right. I think we've gone through reactive species and ingredients. Let's skip over to keratin denaturation.
Is that how you pronounce it, denaturation?
A. Denaturation.
Q. Denaturation. All right. Would you agree with me that the purpose of chemical hair relaxers is to break the bonds within the hair to make the keratin molecule soft and stretched?
A. I believe that's one of the stated objectives on the boxes, but there's more to it than just that.
Q. And what is "more to it"?
A. Well, as I mentioned earlier, it's a rearrangement of the disulfide bonds inside the keratin protein. It changes the morphology of the hair. There's a change in the amino acid content.
I'm going to go to the section in my report where I talk about hair relaxer chemistry and some of the others.
Look, I've pointed to Adav, you know, provided some proteomics, amongst other things. So there's a lot that's happening.
Q. But it's these breaking down of the bond which allows the hair to lose its natural crinkled state and allow it to be styled; is that right?

MS. DEBROSSE: Object to form.
A. I'm sorry. I was looking at my report --
Q. (BY MR. HENNEKE) Sure.
A. -- and not listening to you. So just --
Q. No, go ahead.
A. -- please give me a moment.
Q. Look at your report.
A. 15. Okay. On Page 16 I state "The straightening product reacts with keratin, breaking and rearranging the disulfide bridges, which makes the spiral keratin molecule soft and stretched."
And I cite the -- a mouthful --
MS. DEBROSSE: I'm sorry. One moment. Can we get off the record for a moment? I have to take a call. Keep going on the record. I'll be right back, I promise. I just --
THE VIDEOGRAPHER: We're going off the record. The time is 2:10.
(Recess from 2:10 p.m. to 2:18 p.m.)
THE VIDEOGRAPHER: Back on the record. The time is 2:18.
Q. (BY MR. HENNEKE) All right. I think there was a question pending that we were looking at before we took our break just now.
A. I do not recall the question.

Q. I don't either.
(Discussion off the record.)
(Requested portion was read.)
Q. (BY MR. HENNEKE) We were talking about the keratin breaking down, and you were looking up an answer related to that.
A. Okay. Yeah, I just read from my report the sentence that "The straightening product reacts with keratin, breaking and rearranging the disulfide bridges, which makes the spiral keratin molecule soft and stretched"; and I cite to Gavazzoni Dias.
Q. What, then, is released when keratin proteins in the hair are altered?
A. I need some clarification there. You -- you're asking what is released?
Q. Yeah. So you talked about -- or you have a section in your report that talks about keratins being -- you know, that basically they're breaking down and they're going through a process.
Why do you talk about the keratin proteins in the hair? Why is that important to you?
A. Well, for a number of reasons. And I think you asked more than one question.
Q. I did.
A. So I'm going to do my best to answer them in

sequence.

So in terms of what's -- what's released, I've provided a report that the amino acid content changes. And I'm going to go to the section on Agav because I think there's more there.

So they report the structural and proteomic alterations related to pH-induced changes and protein deamidation in hair. This is Agav 2025.

Their proteomics analysis identified alteration in hair proteome along with significant deamidation of keratins, Types I and II, and keratin-associated proteins or KAPs.

About 180 proteins were identified and 145 proteins were -- were identified following alkaline hydrolysis.

Using gene otality, these -- ontology, these proteins are involved in intermediate filament-based processes, intermediate filament organization, epidermal cell differentiation, skin development, intermediate filament cytoskeleton organization, tissue development, nucleoside diphosphate phosphorylation, ribonucleoside diphosphate metabolic processes, and other biological processes.

And below that I talk about some of those cluster proteins. I think a -- an important

consideration is post-translational protein modification analysis revealing that hair proteins exposed to various pH levels underwent extensive deamidation, including 164 peptides that deamidated under alkaline conditions.

They downregulated several proteins including -- and I list them -- and then identified proteins that are structural molecules in constituents of the cytoskeleton and chromatin. So those are some of the things.

I have another paper -- I think it was Robbins -- that describe the changes in amino acid contents to -- and I want to verify that.

Yeah, it was some of the Robbins papers and I think on one he was a coauthor and I can't think of who the primary author is but if you'll give me a moment....

Tol -- I don't know how to say it. I'm going to spell it. The cite is to T-O-L-G-Y-E-S-I, maybe Tolgyesi.

Alpha-helical chains are unfolded. Alkaline hydrolysis of MI peptide bonds and beta elimination of cystine are prominent.

So there's some additional citationals.

Q. Is it your opinion that keratin alteration is connected to a creation of harm in the body?

A. I believe that when the hair relaxers -- the high alkaline hair relaxer contacts the skin, that's harmful.

Q. Okay.

A. The skin is the largest organ in the body. So, yes, I believe the products cause harm.

Q. Is it your opinion that keratin alteration from the use of chemical hair relaxers is connected to cancer development?

A. Again, I'm not going to be giving causation opinions. Other experts will be providing epidemiology, dose response, and causation.

Q. Okay. Is it your opinion that keratin alteration from the use of chemical hair relaxers is connected to uterine cancer?

A. Same answer. Other experts will be providing causation opinions.

Q. Okay. And is it your opinion that keratin alteration from the use of chemical hair relaxers is connected to ovarian cancer?

A. Again, other experts will be providing causation opinions.

Q. All right. All right. Let's turn to table 2. And I have an understanding of what's in table 2, but I think it's better if you provide us with that.

What is your understanding of table 2?
A. Table 2 is titled hair relaxers -- "Hair Relaxer Ingredients With Reactive Species," provided a compound name that's a chemical ingredient found in the defendants' products.
The second column is titled "Impurity/Degradant/Contaminant," and the third column is a "Literature Source" that supports the presence of those in those materials.
Q. And when you say supports the presence in those materials, you're talking about the impurity degradant or contaminant; is that right?
A. Yes.
Q. Okay. So the first one listed here is "DMDM hydantoin"?
A. Yes.
Q. And the impurity listed is "Formaldehyde"?
A. Yes.
Q. Which defendants' products did DMDM hydantoin appear in?
A. That's a long list of defendants' products. I found it in each of the defendant -- I found the presence of that ingredient in each of the defendants' products.
Q. So your testimony, as you're siting here today,

is that DMDM hydantoin is in every single one of the defendants' products?

MS. DEBROSSE: Object to form, mischaracterizes the witness' testimony.

A. I searched the defendants' prod -- formularies and Everlaw and found a product at one point in time, you know, between the two time frames I mentioned for each of the defendants that at one point contained it.

Q. (BY MR. HENNEKE) Now, earlier today we went through the different aspects -- I'm sorry -- the different components of a hair relaxer kit.

Do you recall that?

A. Yes.

Q. When you were doing your work, did you try to identify which component DMDM hydantoin appeared in?

A. Well, some of them had a title on it; others, just formula such-and-such. It didn't tell you what component it was.

So in some cases it was very obvious which component it was in, and in others it was just here's a formula number.

So, you know, the documents are what they are. I'm -- I saw that there -- more importantly, it's a system. It's a kit, right?

Q. Correct. But you -- I mean, sitting here

today, you couldn't tell me which component contained DMDM hydantoin for House of Cheatham's product?

MS. DEBROSSE: Object to form.

A. Not off my memory. I would have to go look at the documents.

Q. (BY MR. HENNEKE) And you didn't create a database which would lay this out for you; is that correct?

MS. DEBROSSE: Object to form.

A. I mean, the documents live in a database called Everlaw. So I wasn't going to go make a new one.

And it wasn't necessary, you know, to do that to arrive at my opinions.

Q. (BY MR. HENNEKE) How did you determine that it was not necessary for you to derive your opinions?

MS. DEBROSSE: I object to form.

A. It -- I mean, it's present. The doc -- I mean, it's listed in the defendants' formularies and in their documents.

You know, none of the experts on behalf of defendants have suggested otherwise. No one said: No, it's not there. No, it wasn't used.

So, it was there.

Q. Did you determine the amount that was present in any of the defendants' products?

And I'm talking about DMDM hydantoin.
A. The formularies list the composition and the, you know, formula weight percent. So I -- I didn't have to figure that out. It was -- it was listed.
Q. All right. Did you try to figure out the dose response that would occur from the use of the product that had DMDM hydantoin in it?
MS. DEBROSSE: Object to form, asked and answered throughout the deposition.
A. Same answer I've given before. I won't be providing dose-response opinions. Other experts will do that.
Q. (BY MR. HENNEKE) Did you look at the MSDS sheet for DMDM hydantoin?
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) I'm sorry. Yeah, yes, for the DMDM hydantoin.
MS. DEBROSSE: Same objective -- same objection. Pardon me.
THE WITNESS: I can't hear you. What did you say?
MS. DEBROSSE: Okay. Same objection. Object to form.
You may answer.
A. I may have. If it's in my list, I -- I may

have but I can't say -- I mean, I've looked at so many documents, I couldn't tell you if I did or not.

Q. (BY MR. HENNEKE) All right. For the next compound listed, I'm not even going to try to pronounce that one, I-M --

MR. HENNEKE: Do you see it?

(Counsel indicating: I-M-I-D-A-Z-O-L-I-D-I-N-Y-L urea.)

Q. (BY MR. HENNEKE) Let's call it Imid.

A. How about Imid urea?

Q. Imid urea, that's perfect.

All right. So for Imid urea, did you confirm that -- this one has an impurity listed as formaldehyde, according to your table; is that right?

A. Yeah. Table 2 lists formaldehyde as an impurity for that chemical.

Q. So for I-M -- Imid urea, did you confirm that it was in each of the defendants' products?

A. I will give the same answer I gave previously. I searched the database and I looked at the defendants' documents and I found it as a component in the hair relaxers.

Q. All right. Do you know how many products this Imid urea was in for each defendants' --

A. No. I don't know how many products for each of the defendants it was present in.

Q. All right. Do you know which component of the hair relaxer kit Imid urea appeared in?
A. Same answer as before. Some of them are labeled what component they are; and others, it's a formula sheet.
I mean, some of these appeared in Excel spreadsheets. There's just a formula code.
Q. Okay. Did you ever determine the quantity of Imid urea in any of the defendants' products?
A. I didn't have to determine the quantity. It was listed, as I indicated before.
Q. All right. Did you determine the dose response necessary for Imid urea to cause harm in the human body?
A. Yeah. Same answer as with the prior, I won't be giving dose-response opinions. Other experts will do that.
Q. The next one is Dia urea. And, again, it's a long....
(Counsel indicated: D-I-A-Z-O-L-I-D-I-N-Y-L urea.)
A. Can I suggest Diazo?
Q. (BY MR. HENNEKE) Diazo is perfect.
A. Diazo urea.
Q. And for Diazo urea, formaldehyde is the impurity again; is that right?
A. Yes.

Q. And for Diazo urea, did you confirm that it appears in at least one of every defendant's product?

A. Yes. I searched the database for it and looked at the defendants' products and found it in their formularies.

Q. All right. Do you know whether or not -- I'm sorry.

Which component of the hair relaxer kit did Diazo urea appear in? Do you know?

A. Not off the top of my head. Same answer as the other two ingredients.

Q. And is it your opinion that Diazo urea can cause harm in the human body?

A. That's a slightly different question than what you were doing with the other two.

I have listed here that formaldehyde is an impurity degradant or a contaminant, and then formaldehyde is a carcinogen. So....

Q. Did you at any point in time attempt to determine the dose response with the use of Diazo urea in a hair -- chemical hair relaxer?

MS. DEBROSSE: Object to form, asked and answered throughout the day.

A. Yeah, same answer. I'm not giving dose-response opinions.

Q. (BY MR. HENNEKE) All right. If I go through each of the chemicals listed in table 2, would you give the exact same answer that you've been giving to the first three that we went over?

MS. DEBROSSE: Object to form. I believe you had a second set of questions for the last --

MR. HENNEKE: You're correct. I did.

MS. DEBROSSE: -- chemical.

Q. (BY MR. HENNEKE) We'll take the last -- the last set.

If I asked those set -- that last set of questions for each of the chemicals that are listed in table 2, would your answer remain the same?

MS. DEBROSSE: And let me -- let me give him my ELMO so he can see his responses, if you're okay with that.

MR. HENNEKE: That's fine.

MS. DEBROSSE: Okay. You'll be able to scroll up.

Q. (BY MR. HENNEKE) I'm just trying to save us some time from going through each one. That's why I asked that broad question.

A. I believe the answers and responses would be consistent with what I've already told you, but I'd like the opportunity just to look at these other ones. So --

Q. Go right ahead.
A. -- in case there's --
Q. Go right ahead.
A. -- something there that would --
Q. And if there's one that draws your attention, we'll go over that.
A. Generally the responses are going to be consistent. If you ask me about human health concerns with citric acid, that's a little bit different, right?
I'm pointing at nitrite and nitrate impurities in it. I mean, they can -- one of the ingredients for a nitrosamine.
But the question you asked about human health concerns --
Q. Okay.
A. -- with respect to it would be different.
Q. And how would it be different?
A. I think citric acid having nitrite and nitrate salts is not a big issue if you're drinking some orange juice. It's been fortified with it.
But in the hair relaxers, the nitrites and nitrates aren't dangerous until they see an amine. So inside the product they can be a problem, but I trust you're appreciating the specificity that I'm giving here.

Q. I do. And I guess my follow-up question along those lines is: It's your testimony that it's any amount?

A. No, I think you've misunderstood what I've said. And, as I've said, I'm not giving dose response.

I want to couch the response -- it's tied to being present in a hair relaxer product. In the case of, like, citric acid, the impurity are nitrate salts.

So that's a different thing than having formaldehyde.

Q. And I -- going back to nitric salts, do -- and I guess it's not that any -- I mean, I guess there has to be a certain amount of nitric salts created to actually lead to harm --

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) -- is that right?

MS. DEBROSSE: Object to form.

A. I -- yeah, again, I'm not giving dose-response opinions. Other experts will do that.

Q. (BY MR. HENNEKE) Yeah. So your testimony is just to say that this is present, and then you let others do the other lifting?

MS. DEBROSSE: Object to form, mischaracterizes the witness' testimony, vague.

A. I'm providing information not just on presence

but on their properties. And the properties include chemical and physical and biological properties of the impurities, degradants, and possible reactants that can happen as a result of them.

So it's all in the report. I -- I'm not going to narrow it to just they're there.

Q. And when you refer to "properties," what properties are you referring to?

A. As I've said, chemical, physical. So in some cases I've talked about physical properties and known biological properties.

Q. And I guess what I'm having a hard time understanding is: And then what? Meaning -- you're saying that they have properties. But properties do what? What does that mean?

I mean, you say something has biological properties. Well, you know, I'm not a -- I don't understand. What do you do with some -- with the knowledge that something has biological properties?

MS. DEBROSSE: Object to form.

A. Well, you know, for example, I've said and cited to formaldehyde being classified as a carcinogen, right?

So other experts will give causation opinions on how the presence of these, you know, results

in the cancers at the heart of this.

At the same time, I've also talked about that formaldehyde can play a role in catalyzing the formation of nitrosamines. That's straightforward chemistry.

Q. (BY MR. HENNEKE) Now, does there need to be a certain amount of formaldehyde present to lead to the creation of nitrosamines?

A. Basic chemistry is, you know, if you've got the ingredients there in the right conditions, a reaction can happen.

As I've said, other experts will offer the opinions on amounts and dose relationships.

Q. In what you've seen in your review of plai -- defendants' documents, was there enough formaldehyde present in the chemical hair -- in the chemical hair relaxer products that would lead to the creation of nitrosamines?

A. I believe there is. I believe that there is formaldehyde formed.

Q. Okay. But you didn't do any testing to confirm that belief, did you?

MS. DEBROSSE: Object to form.

A. I didn't do any testing, and I didn't need to to come to my opinions.

Q. (BY MR. HENNEKE) Yeah.
A. I've cited to sources and literature that have identified nitrosamines in cosmetic products, including shampoos and conditioners.
Q. But you do -- didn't do any work to determine the amount of nitrosamines that are formed using the amount of formaldehyde that may be in a chemical hair relaxer product, did you?
MS. DEBROSSE: Object to form.
A. I put a lot of work into that report, respectfully.
As I said, I didn't -- I didn't make any measurements of the amount of formaldehyde that was formed. And, as I've said, I won't be offering dose-response opinions.
Q. (BY MR. HENNEKE) And that testimony would go for any of the impurities that are listed in table 2?
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) So if we just replaced formaldehyde with any of the impurities that you list throughout table 2, you would have the same answer?
A. Generally speaking, yes, I -- you know, I did see in defendants' docs some instances where they did their own testing that verified that it was there.
But, no, I did not do any testing. Other

experts will provide dose-response opinions.

Q. Sometimes asking questions gets me in trouble, but I'm just curious. Petrolatum -- why is petrolatum listed in here as containing impurities?

That's -- petrolatum is petroleum jelly; is that right?

A. Yes. So I've cited that, you know, it has iron, nickel, and copper, according to van Heugten; and metals are great catalysts for chemical reactions.

Q. How much metals did -- of iron, nickel, or copper need to be present to have catalyst reactions?

A. Well, I suppose it depends on the reaction; but, I mean, they're there. And if you go to look at that report, I'd be happy to take a deeper look at it or list it.

So -- and I -- I know that petroleum jelly is listed as a protectorant, right? It's not a protectorant.

Methylparaben and propylparaben are not very water soluble. They have a high Log P or oil soluble. They're extremely miscible with petroleum jelly. So are many of the phthalates.

Diethyl phthalate solubility in water is very poor, but it's extremely soluble in petroleum jelly.

And I provided some citations in my report on the absorption section and permeation sections. So the suggestion that it's a protectorant, I just disagree. I think it serves as a vehicle for some of these chemicals.

Q. So, in your mind, for a protect -- for something to be a protectorant, it needs to be a 100 percent protectorant?

MS. DEBROSSE: Object to form, mischaracterizes the witness' testimony, vague.

A. That is not what I said, and I'm not going to be giving opinions on what may or may not protect a chemical hair relaxer because I haven't considered that, but it's described as a protectorant.

I provided several cites on occlusion and things like that. Not one of the experts for the defendants provided a single cite to dispute what I put forth with respect to petroleum jelly as a protectant.

I think Dr. Hoyt suggests, well, it's seclusive; and it blocks it without a single literature support.

We teach pharmacists how to dissolve parabens in petroleum jelly, Vaseline. They're very miscible.

Q. (BY MR. HENNEKE) What --

A. Hydrates --
Q. -- very what, "miscible"?
MS. DEBROSSE: I'm sorry, Counsel. Can he just finish?
MR. HENNEKE: I'm sorry. I just didn't -- actually know what that word was.
A. Miscible.
Q. (BY MR. HENNEKE) Oh, miscible. Okay. Go ahead.
A. It -- yeah, I -- I lost my train of thought.
Q. I'm sorry. I shouldn't have --
A. It's okay. It's okay. Give me a moment.
I don't believe it's a protectorant. It's been demonstrated repeatedly in the literature, specifically with drug delivery, that an occlusion like that actually hydrates the skin.
It actually prevents water loss and that for lipid soluble material, it actually improves their transport. And I've pointed to that here.
Q. All right. What is -- going back to that "very miscible," what is -- what do you mean by "very miscible"?
A. Soluble.
Q. And what is very -- I mean, and you -- how would you define "very miscible," then, in connection

with what you were just describing?
A. They dissolve --
Q. Okay.
A. -- right? And -- but, respectfully, don't get me started on solubility. It's what I do immensely, and I can talk about molecular species all day and waste your time.
And if you want to ask, well, what is -- how much is solubility? I use the USP definitions. So they dissolve in it.
Q. But not like sugar dissolves in water?
MS. DEBROSSE: Object to form.
Q. (BY MR. HENNEKE) I mean, I would consider that to be very miscible. I mean, I'm trying to get an idea of what you consider to be very miscible.
A. United States Pharmacopeia has definitions on solubility. There's soluble, poorly soluble, and miscible, lots of categories.
And they're married to a concentration, and I would respectfully go to literature and find the solubility of methylparaben and the other parabens in hair relaxer products in Vaseline.
And I did verify that they are soluble in petroleum jelly, as is diethyl phthalate. They dissolve. I mean --

Q. Yeah, when you say --
A. DEP is a liquid. So you get -- but parabens -- methyl and propylparabens, for example, are solids. You put them in petroleum jelly, they dissolve.
Q. So if you put parabens in petroleum jelly, you would not see the parabens there anymore? They would totally dissolve 100 percent?
A. Well, again, that's probably not the greatest scientific -- they're there. It's loss of crystal habit, right?
So the solid form's gone, and you have a molecular solution or a molecular dispersion.
THE REPORTER: Molecular --
THE WITNESS: Dispersion.
Q. (BY MR. HENNEKE) Okay. Hey, you cite a good bit of time talking about absorption in your report.
Have you conducted any studies measuring the actual dermal absorption of specific chemicals or com -- chemical compounds from chemical hair relaxers?
MS. DEBROSSE: Object to form, asked and answered.
A. I did not make any measurements of chemicals from the chemical hair relaxers in skin. It was not necessary for me to form my opinions.
Q. (BY MR. HENNEKE) Okay. And why was it not

necessary for you to form your opinions?
A. Well, they're present. And I do drug delivery all day every day, and I understand the principles of how chemicals are absorbed.
I've cited to studies in which damaged skin becomes more permeable, and it improves absorption. I have also provided evidence on the anatomical differences in the skin that the scalp is a site anatomically that absorbs better than other portions of the body.
I provided evidence that the washing and rinsing doesn't remove it all and a lot of evidence. And, again, none of the experts on behalf of the defense disputed any of that. There was some discussion on absorption, but it was really in response to dose-response stuff.
But the facts, as I've presented them in my report with respect to skin absorption studies, largely unchallenged, not disputed.
Q. Yeah, but you're here to testify -- or you're here to opine that it can't happen. You're not here to quantify how much is happening; is that right?
A. I would --
MS. DEBROSSE: Object to form.
A. -- I would characterize it as I'm offering

that -- the opinion that it's -- not can't, that it does happen; and I am not offering an opinion on how much.

Q. (BY MR. HENNEKE) And you're not offering any opinion about how duration of exposure is factored into that analysis?

A. I will check my report. I think I have some comments on duration.

I mean, I cited to -- yeah, on Page 21 I cite to -- I believe it's pronounced Bronaugh and Maibach. It's below figure 3, second-to-last sentence on the page.

"A chemicals' exposure is a function of the concentration in contact with the skin and the duration of skin contact. Absorption of cosmetic ingredients can represent a major route of uptake and systemic exposure."

So, you know, I've cited to literature where duration is certainly considered; but I think, going back to your question, I'm not providing any measurements of duration.

Q. And you're not here to say that it needs to remain -- for harm to have occurred, it needs to remain on the skin for 30 seconds or 20 seconds or 10 minutes; is that right?

MS. DEBROSSE: Object to form, asked and

answered throughout the day.
A. I'm not giving causation opinions. I understand the principles of absorption. I'm not giving opinions on how long a hair relaxer is in contact with the skin, et cetera, but obviously aware that duration of contact plays a role in absorption.
Q. (BY MR. HENNEKE) All right. Earlier you -- we've talked a little bit about stability of the product.
And I -- I'm assuming here, when you talked about stability in your report, you're talking about stability in the packaging? Am I correct there?
A. Well --
MS. DEBROSSE: Object to form.
You may answer.
THE WITNESS: I'm having a hard time hearing you again.
MS. DEBROSSE: Object to form.
You may answer.
A. Stability can happen, and it replaces. So --
Q. (BY MR. HENNEKE) Yeah, and let's start backwards. I'm sorry for interrupting, but let's -- what do you consider stability of a product to be? Let's start there.
A. Well, there's chemical stability and physical

stability.

And so let's do the easy one first: Physical stability. Some of the products have viscosity. In a stable product the viscosity is constant against time. An unstable product, the viscosity changes. It could increase. It could decrease.

So that's an example of physical stability. And we've talked a lot about chemical stability today, too. And in the context of this, it's -- you know, there's not a change in the chemicals.

Polyethylene glycol degrades to run autocat -- claytc -- sorry about that -- autocataclytic [sic] oxidation reaction is very hard to stop.

You can draw a vacuum on it and try to get all the air out and put it in a product solvent or something like that, but I didn't -- you know, once that reaction starts, it kind of keeps going.

So chemical stability is defined in my report as, you know, resistance to change against time in some sort of specific attribute.

Q. All right. Is stability also an assessment of the acceptable use over time of the product?

MS. DEBROSSE: Object to form.

A. I didn't understand you clearly.

Q. (BY MR. HENNEKE) Sure.
A. Assessment of what?
Q. Assessment of the acceptable use over time of the product.
MS. DEBROSSE: Same objection.
A. I suppose that -- that could be one attribute but I -- I think a proper stability program evaluates a lot more than that.
Q. (BY MR. HENNEKE) But there are known analytical methods for determining stability; is that right?
A. I provided a cite to -- let me cite it. They provide, in that chapter, methodology to quantitate a number of these.
It might have been Lavilla, but I want to verify.
Q. Lavilla was pretty prolific.
A. Mr. Robbins was interesting, too; and I understand he is one of the so-called godfathers of these hair relaxers.
I read one of his books and saw a picture of him. And I Googled him and read his obituary and -- well, beyond being a beloved person -- he had a lot of friends -- he had a very long career doing these things.
But, yeah, Lavilla's main chemical

contaminants in cosmetics, regulatory aspects, and analytical methods.

So he -- he cites to some analytical methodology. And, again, going back to your opinion, there's compendial methodology for a lot of these things but I -- and I will tell you, from my own experience, once you combine them into a product, you might be developing something new because just because you can test the raw material with one analytical technique does not mean that that technique is sufficient once it's in a composition.

For example, X-ray work for crystallinity, it's pretty easy to go measure the crystalline properties and the defraction pattern for a neat chemical but you put that in the mixture and suddenly you've got interference, as a simple example.

So sometimes very specific analytical methods are required to make these measurements. Other times you just use a compendial method.

MS. DEBROSSE: Are you good?

THE WITNESS: Have we been going another hour?

MS. DEBROSSE: I have no idea.

MS. SHAHADAT: We have.

MR. HENNEKE: We have.

A. Do you want to keep going and finish your line of questioning or do you want to take a break?

Q. (BY MR. HENNEKE) We're fine. We can take a break real quick.

A. Thank you.

THE VIDEOGRAPHER: Going off the record. The time is 3:06.

(Recess from 3:06 p.m. to 3:25 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 3:25.

Q. (BY MR. HENNEKE) All right. Before we went on break, we were talking about stability.

And I guess what I want to get at is: What is your ultimate opinion by including a discussion about stability in your report?

A. Well, I'm going to turn to that section.

Q. Certainly.

A. I think the passage where I cite to Kelm makes a lot of sense in response to your question at the bottom of Page 12.

"The ultimate goal of most stability programs, especially in the later stages of product development, is determination of the absolute or actual stability of the product over its projected commercial shelf life. This is pragmatically accomplished through

testing of the chemical and physical properties at ambient conditions throughout the length of time corresponding to that desired shelf life" and, then, so on, how you do basically stability studies.

And it's contrasted to short-term studies, but a stability study can help you identify if some of these problem chemicals that I've identified in my report are formed. So that's one key aspect of it.

Q. So are you testifying that there's a lack of stability in these products and that these -- that certain chemicals are being formed?

A. Well, it's -- let me restate what I just said; and that is, the presence of these chemicals can be identified through analytical testing, including on stability programs.

You know, some of them, like polyethylene glycol, the degradation rate is happening over time; and you're generating peroxides which can give you oxidation reactions and so on and so forth.

But it also involves testing the product in end use, right? So what happens when it's opened? On some of the instructions for use I saw, once you've opened it, use it and throw it away. So it -- it gives information.

Q. I'm sorry to interrupt. Go ahead.

A. It gives information on how the product behaves, you know, from a chemical and a physical stability standpoint.

I've also cited to you should examine your product under conditions of proper use and misuse where someone doesn't follow the instructions. That's all part of product design and risk analysis.

Q. Now, are you testifying that the defendants have not done stability studies?

A. No, I am not offering that testimony. I did see some documents that the defendants had showing a result.

I did look for stability studies. I didn't -- I didn't find an enormous amount. I did find where they would have a consumer complaint and they would go pull the lot and do some testing to verify the viscosity was in spec or the pH was where it was.

But I didn't see a single assay where they were looking for some of these degradants, contaminants, or impurities.

For example, nitrosamines, I looked -- I really looked to find in-house testing or documents where samples were sent out of house, which is candidly how my clients do it. They don't do it in-house. They hire someone.

And what I found was -- well, let's see if it's in the raw materials rather than: Is it present in the product after we've made it? I didn't find any of that.

Now, there were a lot of documents; but I found no evidence of the product being tested.

Q. All right. But you're not here to testify or opine that due to a lack of stability, a certain amount of a chemical is being created?

MS. DEBROSSE: Object to form.

A. I mean, I have given testimony that I believe these chemicals are formed and are present. And as I've said a lot, I'm not -- I'm not giving testimony on dose.

Q. (BY MR. HENNEKE) And you're not testifying as to quantity?

A. That's correct.

Q. All right. Are you going to add any testimony or discuss which part of the hair relaxer kit is at issue due to a lack of stability?

And what I mean by that, is it the neutralizing shampoo? Is it the conditioner? Is it the protective base?

A. Okay.

Q. That's what I'm --

A. Okay. I saw a document yesterday in an Excel

spreadsheet where it said stable for three months.

I was surprised -- with a formulary, and I was surprised by that because I -- in my experience, that's a very long -- very short shelf life.

I don't know how they even make something like that, get it out into commerce, and have someone buy it and use it within three months; but I saw that document.

That, in my opinion, is insufficient stability and perhaps it was being generated, but that is what the document said.

Q. Do you recall whose product that was?

A. I think I can find the document; but sitting here, I don't remember. I mean, there's 5,000 right here.

Q. But you personally have not conducted any stability testing of any of the defendants' products?

MS. DEBROSSE: Object to form, asked and answered throughout the day.

A. I did not conduct any stability testing. I didn't need to to come to my opinions.

Q. (BY MR. HENNEKE) So you don't believe you needed to do any testing?

MS. DEBROSSE: Object to form. He has asked that -- he has answered that question at least 20

times today.
A. I didn't need to do the testing to arrive at my opinions.
Q. (BY MR. HENNEKE) Okay. Is it your opinion -- sorry.
Is it your opinion that rigorous long-term safety studies should have been conducted to ensure this -- that biological activity does not cause harm through the use of chemical hair relaxers?
A. Can you repeat your question?
Q. Sure. Is it your opinion that rigorous long-term safety studies should have been done to ensure that the use of chemical hair relaxers does not cause harm?
A. Yeah, a very general opinion. I think safety studies -- rigorous safety studies should be done for any product so you don't harm people.
Q. Are you going to be -- sorry.
A. That said, I looked in the defendants' documents for that kind of thing. I couldn't find it. I didn't -- I mean, I really couldn't. I looked for some animal testing and things like that.
So with respect to these chemical hair relaxers, yes, I -- I think a very rigorous safety assessment should have occurred.

Q. Now, were you provided the universe of documents that defendants produced?

A. I was provided the documents that are in Everlaw, and I understand that documents were requested that were not produced. So I can only state I saw what I saw.

Q. Did you ask counsel for the plaintiffs whether or not there were safety studies that defendants produced?

A. Is that privileged?

Q. Well, did you ask to see --

MS. DEBROSSE: Did you -- well, let me get an objection on the record. Did you -- well, I'm going to let him ask the question.

Can you reframe the question, please?

Q. (BY MR. HENNEKE) Did you ask the defen -- I mean, the counsel for plaintiff whether there were safety studies that the defendants produced?

MS. DEBROSSE: I'm going to object to that question.

And let me look at your question. Are you asking him whether he requested safety studies?

MR. HENNEKE: Yes.

Q. (BY MR. HENNEKE) Did you request safety studies from the -- from counsel for plaintiff?

MS. DEBROSSE: Object to form.
But you may respond.
A. Yes, I did.
Q. (BY MR. HENNEKE) And what was the response?
MS. DEBROSSE: Object to form. And that's -- that's work -- we're not going to get into our discussions. He made the request, and I think that's what he testified here today.
So I'm going to instruct you not to answer.
Q. (BY MR. HENNEKE) Did they provide you with any safety studies after you made the request?
A. I was provided access to Everlaw and there's 1.2 million documents in there and I went and searched.
Q. Okay. Were you told that defendants did not conduct any safety studies of their own products?
MS. DEBROSSE: Object to form. I'm going to instruct him not to answer that question.
I think you could rephrase that question, Counselor.
Q. (BY MR. HENNEKE) Do you have any knowledge of whether or not defendants conducted safety studies?
A. I believe that they did some safety studies, the extent to which didn't rise to the level that I'm used to seeing.
And I was unable to find a whole lot -- I

mean, I was looking for animal studies. I was looking for studies on skin substitutes, and I didn't find much of it in Everlaw.

And, I mean, perhaps I was using the wrong search threads but I did look -- I did look for it.

Q. And did you review the safety studies that you did see?

A. Yes. I -- I looked at many of those documents and with the same vigor that I looked at what's in it.

Q. And what's your opinion after having looked at those safety studies?

A. What I saw did not rise to the standard that I would have thought.

Q. Based upon what standard?

A. Well, candidly what I would have advised them to do, what I would have thought a reasonable person of skill would do, and what a responsible company would do to ensure that they weren't harming their customers.

And the scalp burns were deeply troubling to me, to realize young kids 10 years old get repeated insults to their tissue.

And I was troubled by some of the chemicals that I saw present, knowing that they could be absorbed through that damaged skin and the degradants that are formed and absence of verification on what is in there.

The denaturing of the keratin protein, it's not just in your hair. I mean, it's the most abundant protein in your epidermis.

So I was troubled that I didn't see any studies to assess the damage done to the skin.

Q. But you've said earlier that you're not a dermatologist, correct?

A. I'm not a dermatologist.

Q. All right. Are you going to be opining at trial about any opinion related to the lack of safety studies that you claim the defendants didn't do?

A. I mean, if you ask me the question you just asked me, I'll give the same answer.

Q. All right. All right. You would agree with me that your opinions regarding nitrosamine formation are based on theoretical possibilities rather than measured outcomes --

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) -- is that correct?

MS. DEBROSSE: Object to form.

A. No. I disagree.

Q. (BY MR. HENNEKE) And why do you disagree?

A. Well, they're not theoretical. The chemistry is known.

I did not do any measurements. That part,

as I've stated throughout the day, was unnecessary for me to arrive at my opinions.

Q. Does the mere presence of amines and nitrosating agents establish that nitrosamines will form?

A. Well, that's what I call the "got all the ingredients to bake the cake." Does the cake get baked? Right.

So, as I've stated in my report, nitrosamines can be formed under certain conditions; and you need the ingredients.

And I provided evidence that all the ingredients are there and can be there on the surface of the skin due to the biological response to an alkaline insult, nitrous oxide being formed as part of an inflammation response.

The nitrate and nitrite salts are present in the sweat glands right below the hair follicle and damaged tissue becomes more permeable and then the amine portion coming from the hair relaxer product.

Q. But you're not here to determine how much nitrosamines are formed during this process?

MS. DEBROSSE: Object to form. He may have answered that question 50 times today.

MR. HENNEKE: I'm sure he has, but he'll

give it to me again.
MS. DEBROSSE: Okay.
A. I'm not offering a dose-response opinion.
Q. (BY MR. HENNEKE) Do you have any opinion on the threshold needed, the amount of nitrosamines necessary for nitrosamines to be harmful to the body?
MS. DEBROSSE: Object to form.
A. Well, as I've said, I'm not giving any dose response. I have read those reports, and I also know it depends on which nitrosamine.
Q. (BY MR. HENNEKE) So you're saying that there are certain nitrosamines that you know what the threshold is needed to cause harm to the body?
A. Other experts will --
MS. DEBROSSE: Object to form.
You may respond.
A. Yeah. Other experts will be giving the dose-response opinions.
I've pointed to a number of documents with respect to nitrosamines and there's regulatory limits on some of them and those limits are established based on tox studies.
I also know that it varies based on which nitrosamine it is. For example, N-D -- let me go to my report for a second.

NDELA. There it is, N-nitrosodiethanolamine, N-D-E-L-A, I mean, that's different than some of the other nitrosamines I've pointed out.

Q. (BY MR. HENNEKE) And how is that one different?

A. Well, they're different chemicals.

Q. Okay.

A. Right? And I think they have -- my recollection is there's different thresholds for each and it -- I can verify that for you if you provide me with the -- with the report that I've cited to.

I don't know if I've answered your question. I'm talking about reporting -- limitations but you were asking about how much for harm.

Q. Yes.

A. So that part of it, other experts will offer that opinion. I got a little mixed up on --

Q. That's fine.

A. -- thresholds.

Q. So let me see if I understand after we've been talking for -- how many hours now, four, five, six -- seven hours today.

My understanding of your role as an expert in this litigation is to provide opinions as to the

presence or -- of certain compounds that are related to ingredients that are in the products. That's just part of it, not the whole, but that's part of the opinions that you're here to offer.

MS. DEBROSSE: Object to form.

Q. (BY MR. HENNEKE) Is that correct?

A. Yeah, that's part of my opinions, the presence of these chemicals in the hair relaxers.

Q. Okay. The other part of your opinion, to my understanding, is that while you don't do a toxicology -- or a tox analysis of these compounds, you do cite to publications that say whether or not this compound or an impurity is carcinogenic; is that correct?

A. Yes. I -- that -- that's in my report.

Q. Okay. But you're not here to give any testimony as to the resulting effect on the human body by the chemicals that you identified through the use of chemical hair relaxers?

A. I don't know what -- that I would agree with that. I'm not giving a cancer causation; but in certain instances, you know, I've made it very clear. The alkaline hair relaxer damages tissue on the scalp. It makes that skin more permeable, and that's harm.

I've also gone into the changes to the

proteins in keratin and some other things like that. So....

Q. But to repeat my same question, but this time rather than to say harm to the body, we can say cause -- leads to the development of reproductive cancers in a woman's body. You're not here to offer that opinion?

A. I'm not here to offer opinions on cancer causation.

Q. Okay. All right. I'm going to take five minutes or so to convene. We may be coming to an end.

MS. DEBROSSE: Okay. All right.

MR. HENNEKE: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 3:49.

(Recess from 3:49 p.m. to 4:06 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 4:06.

Q. (BY MR. HENNEKE) All right. I just have a very few short questions for you.

One is: We've talked today about your work in product development within Pharma, and we talked about the one instance you developed a cream. And I -- you developed that cream in the cosmetics.

Have you done any work besides what you've mentioned today in product development outside Pharma?

A. Yes, nutritional supplements which are regulated as food items.

One of the things I thought about at lunch was we actually teach the pharmacists how to make lip balm, sometimes medicated, sometimes not.

And another thing that I thought about was the paraben poster that we discussed earlier. I trained a young guy named Kirk Overhoff. He's, I think, the lead on that poster.

Kirk came to our labs and that study was done because he had won a scholarship or financial support from a company in San Antonio called DPT.

And DPT stands for Dermatological Products of Texas; and they're a very large contract manufacturer of creams, lotions, gels for both pharmaceutical and cosmetic industry.

And I've been down there and visited. I have colleagues that work there. I've had pharmaceutical products made there but I -- I mean, I've developed all kinds of products within predominantly the pharmaceutical space, nutritional supplement space.

But I -- I would reiterate, as I said earlier, I mean, the chemicals are the chemicals; and the formulations are the formulations. They're consistent. You know, a cream is a cream. One has a

drug in it. One's moisturizing.
Q. So you weren't involved specifically in developing the creams for the application of pharmaceuticals?
A. I mean I --
Q. Am I --
A. I've made moisturizing creams --
MS. DEBROSSE: Object to form.
Just let me get in there, but go ahead.
A. I've made creams that are consistent with cosmetic use that are also used for pharmaceuticals.
And I -- I've helped develop some stupid, crazy products. We had a plumber that wanted us to make a tablet with dye in it so they could put it in the water part and determine if the water was leaking.
So I've worked in several different design spaces.
Q. (BY MR. HENNEKE) Okay. Have you ever worked in the design space of the development of chemical hair relaxers?
MS. DEBROSSE: Object to form, asked and answered.
A. I have not developed a chemical hair relaxer.
Q. (BY MR. HENNEKE) Okay. All right. And earlier today we talked about various plaintiffs'

experts that you met with, and we've also talked about some defense experts that you saw their reports.

Have you reviewed any deposition transcripts?

A. I have not. Let me think about that for just a moment.

Q. When I say "deposition transcripts," I'm specifically talking about the experts in this case -- anybody's deposition transcript.

A. I have not been provided a transcript to read.

Q. I'm trying to understand. I'm -- you're not being cagey. You haven't seen any deposi -- you haven't listened to anybody's deposition?

A. I haven't listened to anyone's deposition.

Q. Okay. Have you reviewed any summaries of deposition transcripts?

A. I was --

MS. DEBROSSE: Object to form to the extent that that asks you to ask -- answer any questions involving work product, our impressions, summaries from lawyers, et cetera.

You may respond.

Q. (BY MR. HENNEKE) I was just asking if you've seen any summaries of deposition tran -- of depositions.

MS. DEBROSSE: Same objection and

limitation.

THE WITNESS: Am I allowed to speak?

MS. DEBROSSE: Go ahead.

A. To be candid with you, I know what a deposition transcript is.

Q. (BY MR. HENNEKE) Uh-huh.

A. I've been deposed before. I review my own. I've never seen anything called a deposition summary. So I don't know what it is.

Q. Okay. So you haven't read anything that described the testimony provided by any experts in this case?

MS. DEBROSSE: Same objection.

A. I don't believe so.

MR. HENNEKE: All right. Thank you. I think I'm done.

MS. DEBROSSE: Okay. I'm just going to take five minutes --

MR. HENNEKE: Yes, ma'am.

MS. DEBROSSE: -- and think about some redirect.

THE VIDEOGRAPHER: Going off the record. The time is 4:11.

(Recess from 4:11 p.m. to 4:22 p.m.)

THE VIDEOGRAPHER: Back on the record. The

time is 4:22.

MS. DEBROSSE: We don't have any questions for Dr. Crowley. Thank you.

MR. HENNEKE: Excellent.

MS. DEBROSSE: All right. Thank you very much.

THE VIDEOGRAPHER: Do counsel on Zoom have any --

MR. HENNEKE: Thank you, Doctor.

THE VIDEOGRAPHER: -- questions?

MS. GILBERT: I -- actually I do have a couple of questions. Sorry. Did I interrupt somebody?

THE VIDEOGRAPHER: I don't think so. Go ahead.

(Discussion off the record.)

EXAMINATION

BY MS. GILBERT:

Q. Yes, this is Alice Gilbert. I represent defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., and SoftSheen-Carson, LLC.

Dr. Crowley, I just have a couple of very quick questions for you, if you don't mind.

Towards the beginning of your deposition, you mentioned that you purchased a selection of hair relaxant products to take a look at; and I think you

said one of those was a Dark & Lovely product; is that right?
A. Yes.
Q. Do you recall what the name of the Dark & Lovely product was or anything else about what might have been in the title?
A. I do not.
Q. Do you remember approximately when you purchased it?
A. It would have been shortly after I began working on this matter. So it would have been 2023 time frame.
Q. Okay. And do you recall where you purchased it?
A. H-E-B, the local grocery chain, I believe.
Q. Sorry. I'm not familiar with that. What city is that in?
A. Austin, Texas.
Q. Austin. Okay. And is it correct that you bought these products to examine their components and take a look at them as opposed to doing any testing on them?
A. That's correct.
MS. DEBROSSE: Object to form, asked and answered.

Q. (BY MS. GILBERT) Okay. That's all the questions I have for you today. Thank you very much.

THE VIDEOGRAPHER: Does anyone else have anything for this witness?

All right. This concludes the deposition of Dr. Michael Crowley. Going off the record. The time is 4:23.

(The deposition was concluded at 4:23 p.m.)

REPORTER'S CERTIFICATION

I, SHARON ROSS, Certified Shorthand Reporter, do hereby certify:

That on Thursday, March 12, 2026, at 9:06 a.m., appeared before me MICHAEL M. CROWLEY, PhD, the witness whose deposition is contained herein; that prior to being examined was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That a request for an opportunity to review and make changes to this transcript:

X Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

Was waived.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated March 16, 2026.

SHARON ROSS, HI CSR NO. 432,
TX CSR NO. 1961, CRR, RMR, CRC
Realtime Systems Administrator

Diandra "Fu" Debrosse
Fu@dicellolevitt.com

March 26, 2026

RE: All MDL Hair Relaxer Cases v. Hair Relaxer

3/12/2026, Michael M. Crowley , PhD (#7958576)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at p1hairdepos@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

All MDL Hair Relaxer Cases v. Hair Relaxer
Michael M. Crowley , PhD (#7958576)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________

________________________________________ ___________________
Michael M. Crowley , PhD Date

All MDL Hair Relaxer Cases v. Hair Relaxer

Michael M. Crowley , PhD (#7958576)

ACKNOWLEDGEMENT OF DEPONENT

I, Michael M. Crowley , PhD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Michael M. Crowley , PhD Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 218 of 286 PageID #:74945



&

**&** 2:14,18 3:15 4:10,23 14:2 14:22 15:17 58:5 60:20 63:23 211:1,4

0

**0** 7:4
**00818** 1:3

1

**1** 6:11 17:15,17 19:6 27:10 118:8 119:16 120:4,16 122:25 147:18 147:19,23,24 149:21 151:3,7 151:10,16,21 151:24 152:6 152:16 153:12 153:22 155:14 156:17,21 157:16 158:12 158:15,23 159:11
**1,4** 150:9
**1.2** 88:16 198:13
**10** 106:4 124:7 152:25 186:23 199:20
**10,000** 89:24
**100** 3:10 73:17 149:4 181:7 184:7
**10016** 4:11
**10:20** 57:19,22
**10:37** 57:21,22
**10th** 4:10
**11:57** 114:16 114:17
**12** 1:10 64:13 124:6,11,15 125:10 191:20 213:4
**1220** 1:19
**12:42** 114:17 114:19
**12th** 1:16 7:4
**13** 124:8
**14** 117:7 119:19 124:11 124:15 147:18 151:18
**1400** 4:24
**141** 4:24
**145** 164:13
**15** 49:7 80:8 106:4 118:24 135:2 162:8
**1500** 2:4
**16** 119:11,15,22 162:8 213:18
**164** 165:3
**17** 6:11
**180** 164:13
**1900** 5:9
**191** 5:14
**19106** 2:15
**1961** 1:24 213:23
**1990** 89:1 95:4
**1:23** 1:3
**1:30** 147:8,9
**1:46** 147:9,11
**1st** 28:3

2

**2** 6:3,13 20:6,9 32:3,7 92:12 150:16 151:8 151:11,22 166:23,24 167:1,2 171:14 174:2,13 179:17,21
**20** 6:13 118:8 120:4,16 122:25 186:23 195:25 216:15
**200** 4:15
**2006** 28:3
**2018** 147:21
**2023** 28:13 29:2 74:23 89:1 95:5 211:11
**2025** 29:17,25 30:6 164:8
**2026** 1:10,16 7:4 30:10 213:4,18 214:3
**205.855.5700** 2:6
**20th** 2:4
**21** 186:8
**210** 6:6
**212.566.7500** 2:20
**2121** 4:4
**213** 6:7
**215** 6:8
**215.592.1500** 2:15
**22** 92:12
**22,000** 89:23
**225** 3:21
**23219-3916** 3:5
**2401** 4:15
**25** 107:2,14
**25/60** 107:14
**25421** 213:22
**26** 6:15 214:3
**2600** 5:4
**27** 150:16
**275** 4:10
**2950** 5:14
**2:10** 162:18,19
**2:18** 162:19,21

**3**

**3** 6:15 26:6,11 26:15,20 48:18 151:22 186:10
**3/12/2026** 214:5
**30** 80:8 93:25 186:23 214:16
**30/65** 107:15
**303** 4:20
**3060** 1:4
**30th** 4:4
**310.274.7100** 4:5
**312.214.7900** 2:5
**312.219.4861** 4:25
**312.579.2035** 5:15
**312.596.4984** 5:10
**312.606.7928** 3:22
**312.781.6668** 4:21
**33131** 4:16
**34** 120:22
**3400** 3:16
**35203** 2:5
**36** 150:3
**3:06** 191:7,8
**3:25** 191:8,10
**3:49** 205:14,15

**4**

**4** 6:17 17:25 47:21 48:3,4 48:24 112:13 120:22 126:8 151:22
**40** 136:17,24
**40/75** 107:15
**400** 4:20
**41** 119:3
**42** 119:22
**432** 1:24 213:23
**440.953.8888** 2:11
**44060** 2:10
**48** 6:17
**4:06** 205:15,17
**4:11** 209:23,24
**4:22** 209:24 210:1
**4:23** 1:16 212:7 212:8

**5**

**5** 98:1 139:14 139:18,19,19
**5,000** 195:14
**50** 201:24
**500** 1:20 2:14 65:19
**505** 2:4
**510** 2:14
**512.370.1225** 3:11

**6**

**6** 6:4
**60** 107:15
**600** 2:19 3:16
**60604** 4:24
**60606** 3:22 4:21 5:9,14
**646.513.2379** 4:11
**650** 27:6 28:3

**7**

**7** 6:5 65:18
**700** 3:21
**70s** 38:11 160:14
**713.546.5688** 3:17
**750** 27:7 28:3
**77002** 3:17
**786.957.1145** 4:16
**78701** 3:11
**7958576** 214:5 215:2 216:2

**8**

**8** 65:18 126:8,9 150:3
**800** 3:5,10
**804.775.1050** 3:6
**804.775.1087** 3:6
**80s** 160:14
**8160** 2:10

**9**

**9** 70:15
**9-7-23** 28:23
**900** 5:4
**90067** 4:5
**90294-0600** 2:19
**90s** 46:14
**92612** 5:4
**949.271.3398** 5:5
**9:06** 1:16 7:4 213:4

**a**

**a&m** 33:6
**a.m.** 1:16 7:4 57:19,21,22,22 114:16,17,19 213:4
**abbreviation** 121:18
**abdin** 92:22 159:22
**ability** 11:8 213:8

**able** 41:3 79:2 151:15 174:18
**above** 1:15 214:6 216:7
**absence** 102:13 199:25
**absolute** 191:23
**absorbed** 130:12 185:4 199:23
**absorbs** 185:9
**absorption** 23:8 55:23 56:5,7,22,24 57:4,10,14 109:21 181:2 184:16,18 185:6,15,18 186:14 187:3,6
**abundant** 121:23 200:2
**abuse** 70:1,5,20
**abusers** 70:5
**acceptable** 99:5 99:10 188:23 189:3
**access** 198:12
**accomplish** 32:13
**accomplished** 191:25
**accomplishm...** 32:13
**account** 41:22 72:7 88:19 90:13
**accuracy** 28:23 214:9
**accurate** 11:5 19:8,15 30:7 33:25 55:12 92:9 120:19 139:13
**acetate** 46:22 46:24
**acid** 38:16 108:17 125:2 126:22 161:16 164:3 165:11 175:9,18 176:8
**acids** 94:21 127:10
**acknowledge** 116:12
**acknowledged** 139:22
**acknowledge...** 216:3
**acknowledg...** 214:12
**actions** 19:19
**activator** 52:8
**activators** 52:10
**active** 42:24,25
**activity** 139:13 156:14 196:8
**actual** 184:18 191:23
**actually** 28:19 70:17 78:22 88:22 95:18 97:5 101:15 102:10 109:23 110:25 125:12 149:24 176:14 182:6,16,17,18 206:4 210:11
**adams** 2:3 86:24
**adav** 127:7 161:20
**add** 9:3 194:17
**addition** 87:11
**additional** 8:24 18:11 21:9 30:14,22 165:23
**additions** 216:6
**address** 39:23 47:12 110:6 131:13
**addressed** 24:3
**adhesive** 139:16
**adjunct** 43:24
**adme** 23:8 152:9
**administered** 13:14
**administration** 24:1 108:14
**administrator** 1:25 213:24
**adopted** 15:23
**advised** 129:1 199:15
**af** 114:20
**afam** 5:2
**affect** 108:23
**affects** 108:24
**affiliated** 43:2
**african** 58:6
**afternoon** 114:21,21,22 147:13,13
**agav** 164:4,8
**agents** 39:23 201:4
**agilbert** 4:6
**ago** 64:3 139:5
**agree** 99:4 161:6 200:14 204:20
**ah** 62:10
**ahead** 10:19 15:20 32:24 47:18 48:2,11 48:11,24 75:19 78:20 94:16 100:18 122:12 162:5 175:1,3 182:9 192:25 207:9 209:3

210:14
**air** 94:22 132:25 188:16
**al** 147:21
**alabama** 2:5
**alcon** 35:13,15
**aldehyde** 123:14,15
**aldehydes** 38:2 38:4,6 39:1,4 123:11
**algorithm** 139:7
**alice** 4:3 210:18
**alkaline** 50:14 108:4 124:1,2 124:3,9,10,14 127:21 164:14 165:4,21 166:2 201:14 204:23
**allen** 75:4
**allotted** 214:19
**allow** 161:25
**allowed** 209:2
**allows** 161:24
**alpha** 165:20
**alteration** 164:10 165:24 166:7,14,19
**alterations** 164:7
**altered** 163:13
**ambient** 192:2
**ambramowitz** 2:9
**amended** 6:12
**american** 36:20
**amide** 120:22
**amine** 175:22 201:19
**amines** 201:3
**amino** 125:2 126:22 127:10 161:16 164:3 165:11
**amount** 23:1 26:25 27:9,21 90:8 96:15,22 109:23 110:6 110:24 112:11 115:3 116:25 117:10 134:22 169:24 176:3 176:13 178:7 179:6,7,13 193:14 194:8 202:5
**amounts** 109:25 111:8 115:14 130:25 131:3 140:7 178:13
**amricordati** 5:10
**analyses** 38:25 141:20 157:5
**analysis** 42:2 52:7 97:1 110:2 111:7 114:6,6 128:15 134:15 140:18 152:6,9,15,16 153:3,12,22,25 154:10,15,19 154:23 155:7 156:7,17 158:2 158:10,19 160:15 164:9 165:2 186:5 193:7 204:11
**analytical** 39:2 189:10 190:2,3 190:9,17 192:14
**analyze** 87:12 109:14
**anatomical** 139:24 185:7
**anatomically** 185:9
**anderson** 85:7
**angeles** 4:5
**animal** 158:6 159:21 196:22 199:1
**animals** 159:19
**anna** 5:8
**annotate** 31:11
**annual** 142:15
**answer** 10:3,4 10:12,12,19 11:1,8 12:13 19:3 22:12 27:15 29:20 31:1 34:6 35:6 39:11 45:20 46:24 47:11 53:10 67:25 68:21 69:22 72:16 76:25 77:15 78:10,24 82:20 84:2 87:24 93:16 103:22 111:17 111:19 112:15 113:10,16 115:25 121:12 121:14 122:8 125:19 130:19 131:10 132:12 133:1,6 144:21 146:15,23 157:17,19 159:5 163:5,25 166:16 170:10 170:24 171:18 172:3,14 173:10,24 174:3,13 179:21 187:15 187:19 198:9 198:17 200:13 208:19

**answered** 12:3 54:24 55:11 67:14 83:15 130:18 131:24 134:3,8,14 152:1 157:3 170:9 173:23 184:21 187:1 195:19,25 201:24 203:13 207:22 211:25
**answers** 11:15 174:23
**anti** 50:16
**antifungal** 24:9
**antimycotic** 43:22
**antonio** 206:12
**anybody** 59:16 76:4,7
**anybody's** 208:9,13
**anymore** 184:6
**anyone's** 208:14
**anyways** 32:25 147:13
**apart** 58:10
**apologies** 28:21 105:14 111:18
**apologize** 53:2 72:14 119:20
**apotex** 62:24 62:25
**appear** 167:20 173:9
**appearances** 2:1 3:1 4:1 5:1 6:3
**appeared** 64:10 83:1 101:22 168:15 172:2,6 213:5
**appears** 122:25 150:13 173:2
**appended** 216:7
**applicable** 21:20 214:8
**application** 24:22 37:17 53:7 54:3 59:13,13 60:4 207:3
**applications** 19:18,24 44:15 69:24 70:14
**applied** 21:20 21:24 22:6 50:4 60:3 74:8 108:8 127:22 128:21,23 131:4 146:13
**applies** 22:7 99:19
**apply** 35:10 98:11 154:13 154:22
**appreciate** 92:8 145:16 150:24
**appreciating** 175:24
**approach** 46:19
**approval** 160:20
**approximately** 74:23 136:23 211:8
**arbitrator** 17:9
**area** 71:11 139:21
**argumentative** 137:25
**arrhenius** 108:23 128:12
**arrive** 158:16 169:13 196:2 201:2
**article** 31:10 117:19 137:16 138:15 140:8 140:14
**articles** 65:2 138:18 140:18 143:14
**articulate** 10:12
**aside** 48:1
**asked** 11:24 12:2 29:14 48:24 49:1,5 49:14 54:23 55:10,14 61:13 67:13 72:14 82:13,16,17 83:14 87:2,5,8 87:11,16,21,25 88:6 89:12 90:21,24 98:3 103:8,24 109:12,13,17 109:20,22,25 110:1,9,14,15 110:24 111:5,5 111:5,6,7,9,21 111:23,25 112:2 113:20 130:17 131:23 134:2,13 135:8 144:17 151:25 157:2 159:19 163:23 170:8 173:22 174:11 174:22 175:13 184:20 186:25 195:18,25 200:13 207:21 211:24
**asking** 33:11 34:21 76:5 77:23,23 78:1 78:2,12 81:5 82:1,10 83:18 94:8 96:7 97:10,11,14

98:25 101:16 109:3 132:13 134:24 137:5 148:2 163:15 180:2 197:22 203:15 208:23
**asks** 144:20 208:19
**aspect** 50:7 108:6 192:8
**aspects** 41:16 74:14 168:10 190:1
**assay** 193:18
**assess** 200:5
**assessing** 39:21
**assessment** 40:7 41:5,8,9 41:11,16 64:25 70:10 188:22 189:2,3 196:25
**assessments** 115:16
**associated** 128:13 153:7 164:12
**association** 1:19 36:20
**assume** 10:19 13:21 30:1 62:4 100:3,13
**assuming** 139:18 187:10
**assumptions** 100:1
**assurance** 100:3
**atoms** 91:16
**attached** 1:22 32:5 139:2 214:11
**attempt** 173:19
**attended** 20:13
**attention** 175:5
**attorney** 61:23 75:3,15 213:12 213:13,16 214:13
**attorneys** 75:10 76:1,6 81:21
**attribute** 188:21 189:6
**atwood** 79:24 84:11,11,12,13
**audible** 10:8
**audriana** 4:14
**audriana.rodr...** 4:17
**august** 28:19 28:24 29:2,17 74:23
**aurobindo** 60:20 62:10
**austin** 1:20 3:11 21:7 43:25 211:18 211:19
**author** 165:15
**authored** 34:10 34:15
**authoritarian** 138:6
**authoritative** 137:2,4,14,15 137:19,21,22 138:7 140:10 140:17
**autocat** 188:13
**autocataclytic** 188:13
**available** 99:17 99:21 214:6
**avenue** 3:10 4:4 4:10
**avlon** 5:7
**aware** 11:25 16:18 19:19,23 49:23 70:12 80:20 96:19 100:5 153:1 187:5
**awareness** 25:21 96:10

**b**

**b** 5:2,3 18:8 116:22 144:6,8 211:15
**baby** 14:3
**back** 14:22 15:4 29:10 30:13 31:25 42:3 57:20 60:18 70:9 71:5 72:16 74:19,20 75:7 86:18 89:23 90:19,20 95:15 106:16 108:15 114:18 119:16 136:19 137:20 147:10 151:17 159:24 162:15 162:20 176:11 182:20 186:19 190:4 191:9 205:16 209:25
**background** 21:10 25:19 82:8 84:4 140:18 153:10
**backwards** 159:20 187:22
**bacon** 3:15
**bacteria** 43:23
**bad** 46:24 66:17 71:15
**bake** 201:7
**baked** 201:7
**balm** 206:5
**bananas** 46:25
**bands** 129:4
**banner** 35:20
**barlow** 85:5

**base** 52:3,5,6 194:22
**based** 29:7 33:9 49:22 50:23 100:13 102:18 107:16 108:18 117:25 139:13 139:18 164:18 199:14 200:16 202:21,23
**bases** 38:13 94:21
**basic** 178:9
**basically** 43:4 62:1 94:20 103:2 118:7 146:23 163:18 192:4
**basics** 102:24
**basis** 140:25
**batch** 52:25 98:6 120:10
**bates** 142:23
**beasley** 75:4 76:6
**beat** 32:23
**beauty** 4:18
**bebe** 3:15
**began** 22:17 29:16,21 117:17 211:10
**beginning** 210:23
**begins** 7:2
**behalf** 8:12 9:12 11:21 12:1,6,10 13:17,18 63:19 169:20 185:13
**behave** 87:19
**behaves** 193:2
**behavior** 106:9 107:22
**belief** 178:22
**believe** 8:17 12:5,14 13:21 13:24 14:8,16 14:20,25 15:8 15:14,21 17:25 19:7,10,11,17 24:11 26:24 30:8,12 32:2,5 32:8 33:2,25 39:6 41:3 52:1 56:10 63:22 72:17 74:23 81:20 82:7 83:16 91:13 93:24 95:22 119:12,17,22 120:19 127:18 130:5 131:14 136:18 147:18 157:21 161:10 166:1,6 174:5 174:23 178:19 178:19 182:13 186:9 194:11 195:22 198:22 209:14 211:15
**believed** 153:7
**bell** 4:18 86:7 86:15
**beloved** 189:23
**ber** 144:7
**berman** 2:14
**bertrand** 144:3 144:6,8
**best** 10:17 35:22 87:24 163:25 213:8
**beta** 165:21
**better** 166:25 185:9
**beyond** 135:17 189:23
**bezuclastinib** 24:22
**big** 175:19
**bill** 28:23
**billable** 27:4,5 28:5,17
**billed** 27:25
**binder** 48:15 48:25
**binding** 64:22
**bio** 110:17
**biochem** 23:1
**biological** 23:5 40:15 51:2 87:18 110:17 135:14 155:21 155:23 156:7,8 156:13,14,16 156:18 164:23 177:2,11,16,19 196:8 201:14
**biology** 23:1 25:10,12,13,14 25:15
**birmingham** 2:5
**biscayne** 4:15
**bit** 63:8 64:5 100:15 175:9 184:16 187:8
**blinded** 13:14
**blocks** 181:20
**blow** 130:2
**bobbing** 10:13
**body** 23:6 25:6 41:12 108:7 109:18 140:3 165:25 166:5 172:13 173:13 185:10 202:6 202:13 204:17 205:4,6
**bond** 161:23
**bonds** 49:18 125:1 126:21 161:8,14 165:21
**book** 64:7 68:5 72:20,21 73:2

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 225 of 286 PageID #:74952



73:3 131:15 138:5
**book's** 73:16
**books** 24:5 189:21
**bottom** 191:20
**bought** 53:21 58:1,9 59:5,8 96:19 211:20
**boulevard** 4:15 4:24
**box** 2:19 53:25 59:24
**boxes** 58:21 161:11
**bradford** 154:18,22 155:2,7,20 156:6 157:7
**brain** 46:22
**braintree** 63:10
**brand** 59:14,15
**brands** 58:4
**break** 10:22,24 11:2,17 30:4 56:14,18 57:16 57:25 105:22 105:25 106:5 114:11 124:25 126:16 147:5,5 161:8 162:24 191:2,4,12
**breaking** 106:7 161:23 162:9 163:5,9,18
**breaks** 10:23
**breakthrough** 70:16
**bri** 62:1
**bridges** 162:10 163:9
**brief** 27:22 67:15 79:9 80:6,6 82:8 84:7 93:20
**bring** 18:5
**broad** 21:21 22:8 40:17 41:15 43:22 55:14 91:10 133:6 174:22
**broadly** 21:24
**brochures** 127:24
**broke** 148:3
**broken** 121:17
**bronaugh** 186:9
**brought** 13:22 18:7,25 47:24 126:14 133:17
**brown** 79:19
**bs** 20:22
**build** 90:3 122:5
**bunch** 31:18
**burgess** 86:8,9 86:11,13,14
**burn** 70:8 130:11
**burns** 127:6 199:19
**business** 16:24 17:2 88:7 143:12
**butcher** 20:7
**buy** 58:4 195:7
**buyers** 16:25
**buying** 99:24

**c**

**c** 99:1 153:18 153:19
**cagey** 142:1 160:6 208:12
**cake** 201:7,7
**calcium** 49:9
**california** 2:19 4:5 5:4
**call** 18:23 67:1 72:10 75:10 83:20 88:23 100:6 122:4 162:15 171:8 201:6
**called** 49:24 50:2 52:1,5,6,9 58:23 63:20 99:15 120:10 128:6 131:13 142:3 143:17 155:21 169:10 189:19 206:12 209:8
**calls** 29:7,12 76:8,13 83:24 84:6
**campbell** 86:24
**canal** 3:5
**cancer** 14:1,6,7 14:10,10,15,17 14:19,21,24 15:2,6,13 16:13 25:3,3 25:10,11,13,14 25:15 70:16 111:22 112:1 145:7 146:22 153:8 166:8,15 166:20 204:21 205:7
**cancers** 24:23 135:16 178:1 205:5
**candid** 209:4
**candidly** 69:17 193:23 199:15
**capital** 153:18 153:19
**capramide** 120:24
**capture** 32:10 34:2
**carbonate** 49:9
**carcinogen** 111:8 144:20

173:18 177:22
**carcinogenesis** 71:8
**carcinogenic** 110:25 204:13
**carcinogenicity** 72:1
**carcinogenity** 71:3,17,23
**carcinogens** 145:9 147:2 152:25
**career** 189:24
**carson** 4:2 210:20
**case** 1:3 12:18 13:3,6,8,10,17 14:24 15:1 17:6 18:25 26:9,20,23 27:1,13 29:3 30:15 34:11,17 35:5 43:10 44:21 45:8 50:19 62:5 63:16,25 65:3 72:23 77:13 81:3,21 84:19 87:5 88:12 96:11 100:10 101:3 108:13 126:11 141:4 154:14,15,23 175:2 176:7 208:8 209:12
**cases** 9:7,9 12:9 14:1,14,18,23 60:12,14,22 61:4,25 96:3 96:12,25 112:9 116:13,20 120:21 121:23 123:21 124:7 149:10 157:25 168:19 177:10 214:4 215:1 216:1
**catalyst** 180:11
**catalysts** 39:25 92:18 180:9
**catalyzed** 39:17 108:18 133:18
**catalyzing** 178:3
**categories** 117:14 123:5,6 183:18
**category** 123:2
**causation** 14:11 16:9,11 16:13 71:6 111:10,15,15 111:20,24 112:2 135:19 144:18 145:11 146:25 147:3 152:22 153:8 153:14 154:16 158:18 166:10 166:12,17,22 177:24 187:2 204:21 205:8
**cause** 1:15 14:1 14:5,7 145:7 146:22 149:22 166:6 172:13 173:13 196:8 196:13 202:13 205:4 213:17
**caused** 41:12
**causes** 111:22 112:1 148:22 148:22
**causing** 135:15
**cavo** 4:20
**cdenmark** 3:12
**cell** 156:15 164:19
**center** 156:24
**centigrade** 107:3,15
**centimeter** 139:15,20
**certain** 66:23 116:18 176:13 178:7 192:11 194:8 201:10 202:12 204:1 204:21
**certainly** 23:24 24:12 25:15,24 106:23 112:5 136:13 138:16 186:18 191:17
**certainty** 58:5
**certificates** 96:25
**certification** 6:8 213:1
**certified** 1:17 213:3
**certify** 213:3,16
**cetera** 69:6,6 137:13 187:5 208:21
**cgw** 4:25
**chain** 211:15
**chains** 165:20
**challenge** 107:19
**chance** 48:14 54:5 72:13 84:19 111:13
**chang** 143:25
**change** 88:23 89:8 161:16 188:11,20 215:4,7,10,13 215:16,19
**changed** 88:22
**changes** 88:20 160:11 161:15 164:4,7 165:11 188:6 204:25 213:10 214:10 216:6

**chapter** 24:7 68:5 72:22 73:3,6,15 117:20 138:6 189:13
**chapters** 64:7 72:20,21
**characteristics** 142:8 152:25
**characterizati...** 41:13
**characterize** 185:25
**characterized** 38:23 64:24
**charge** 87:4
**charged** 12:18 101:2
**charges** 18:24
**chase** 3:16
**cheatham** 3:2 7:11 8:9 122:22
**cheatham's** 123:1 169:2
**check** 12:5 14:13 15:4 30:13 37:2 52:22 104:6 122:23 186:6
**chelating** 39:22
**chem** 68:1,1 71:2 121:22 151:21
**chemical** 22:25 35:9 36:15 37:20 40:6 41:25 45:15,16 47:13 49:6,12 49:21 50:23 51:1,21 54:21 55:4 57:4,8,11 57:14 66:2,12 66:12,14,19 67:12,22 68:3 68:15 69:2,3 69:10,15 70:23 71:1,4,11,12,17 71:23 72:1 73:4 87:8,17 87:22 89:10 91:16 92:13,14 92:15 94:20,25 96:23 97:7 102:6,15,24 103:6,12,15 104:8,20,25 105:2,16 106:9 106:9,19,21 107:19,22,22 109:9 110:16 111:22 112:1,4 112:19,25 114:3 115:12 116:22,22 117:14 122:5 123:3 124:11 124:16 126:15 127:21 128:19 129:11,14 130:4 131:7 133:3,4,5 134:1,10 135:15 138:3 138:13 139:13 141:20 144:10 145:5,6,14,20 146:17,21 149:24 151:7 154:8 157:14 158:22 159:2 160:11,15 161:7 166:8,14 166:19 167:4 171:15 173:21 174:8 177:2,9 178:16,16 179:7 180:9 181:13 184:19 184:19,23 187:25 188:9 188:19 189:25 190:15 192:1 193:2 194:9 196:9,13,23 204:19 207:19 207:23
**chemicals** 16:7 16:14 23:4 40:11 49:22 51:15 55:3,5,7 55:23 56:5,7 56:10,22,24 57:4,10,14 65:9,11,16,20 65:25 67:6,11 67:21 68:2,14 69:8,13,16,21 69:23 71:11,12 73:12,22 74:1 74:3,5 82:18 82:22,25 83:1 84:1 90:2,7,8 95:10 106:19 109:18 110:15 112:9 116:15 116:15 117:23 117:23 118:7 118:11,14,16 118:20 119:8 119:10 120:4,5 120:16,20 121:2,10,19 123:2 126:12 126:12 130:3 130:12 131:17 133:17 135:8 135:13,15 139:8,10 145:8 145:15,22 146:18,22 147:1 152:7 153:12,22 155:13 156:17 156:19,20,23 157:15,20

158:3,12,15,19 158:23 174:2 174:12 181:5 184:18,22 185:4 186:12 188:11 192:7 192:11,13 194:12 199:22 203:7 204:8,18 206:23,23
**chemist** 39:2
**chemistry** 20:22,25 21:11 21:18,19,20,23 22:1,2,6,10,10 22:19,21 23:1 23:15,17,18 36:1 37:10,16 38:7 39:2,14 40:1,2 64:13 64:18 65:21 108:24 124:22 161:18 178:5,9 200:23
**chemists** 46:15
**chenneke** 3:7
**cherin** 4:10
**cheryl** 86:13,14
**chicago** 3:22 4:21,24 5:9,14
**chiesi** 60:19 62:8,9,10,10
**chodosh** 85:9
**chose** 17:3,4 139:6
**christian** 3:3 7:10 8:7
**christina** 3:9
**chromatin** 165:8
**chromatogra...** 38:24
**chronic** 43:6,16 135:5
**circumstances** 100:5 117:9
**citation** 131:2 147:20
**citationals** 165:23
**citations** 105:1 105:8 118:9,11 125:20 126:5 130:6 131:12 137:8 138:7 159:13 181:1
**cite** 49:10 92:21 125:18 138:19 138:21,24 139:6 140:19 143:15 162:12 163:11 165:18 181:17 184:15 186:9 189:12 189:12 191:18 204:12
**cited** 104:14,16 118:18,19 125:4 139:25 140:21 151:4 152:20 153:20 153:23 158:24 177:22 179:2 180:7 185:5 186:8,17 193:4 203:12
**cites** 104:10 125:1,11,19 126:2 136:19 150:10 160:7,8 181:15 190:3
**citing** 137:8 156:19
**citric** 175:9,18 176:8
**city** 211:16
**civil** 1:21
**claim** 200:11
**clarification** 61:10 67:3,5 106:23 163:14
**clarify** 102:2 148:12
**clarifying** 126:5
**class** 24:11,18 25:22 151:10
**classes** 21:16 22:25 24:2 44:2 83:25
90:2,7 121:19 121:22 123:19 148:7 151:12
**classification** 154:3
**classified** 177:22
**clatyc** 188:13
**clausen** 3:21
**clausen.com** 3:23
**clay** 33:7,7,10
**clean** 100:19
**cleaner** 99:22
**clear** 26:1 34:7 71:14 78:7 81:4 104:14 125:24 204:22
**clearing** 61:17
**clearly** 10:18 97:24 145:19 152:18 188:25
**click** 142:23
**client** 75:15 131:18
**client's** 146:10
**clients** 35:1,7 35:12,16 104:5 193:24
**climactic** 107:14,16
**clinical** 157:14 158:5,17,19,21 158:25 159:6

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 229 of 286 PageID #:74956



159:15,16,19 160:7,9,12,16 160:18,23
**clip** 48:15,25
**cluster** 164:25
**coauthor** 34:15 165:14
**cocamide** 120:23 150:4
**code** 172:7
**codes** 122:2
**codex** 138:4,13
**coffee** 94:1
**cofounded** 43:3
**cofounder** 42:19
**colleagues** 206:18
**college** 22:24 44:3
**color** 59:21,24 104:4
**colorado** 1:20
**colorants** 33:16
**column** 148:13 148:16 150:18 167:6,7
**com** 116:17 184:19
**combination** 49:9 129:19
**combine** 190:7
**come** 44:4 74:10 89:23 90:19 107:13 134:5,16 135:7 152:17 153:13 159:24 178:25 195:21
**comes** 10:18 148:24
**coming** 201:20 205:10
**comment** 109:18
**commentary** 85:11,16
**comments** 186:7
**commerce** 195:6
**commercial** 191:24
**committed** 65:15
**common** 96:12
**communicate** 76:11
**communication** 76:16,21
**communicati...** 77:3 78:2,16 79:5,8 80:12 81:15,18,21 82:2,3 83:12 84:13 85:25
**companies** 46:16 61:15 98:19 100:23 100:25
**company** 33:6 33:8 35:14,23 42:22 43:7 46:19 63:20 99:25 100:2 199:17 206:12
**compared** 140:2
**compatibility** 40:10
**compendia** 95:8
**compendial** 190:5,19
**compensation** 6:15 26:9,21 27:12 28:12 30:16
**compiling** 121:18
**complaint** 193:15
**complete** 11:5 84:10 131:10 216:8
**completed** 214:16
**completion** 213:12,14
**complex** 139:12
**compliance** 18:18 113:21
**complicated** 43:19 157:18
**complies** 94:8 101:1 151:19
**complying** 44:15
**component** 50:14,15 51:18 51:25 58:22 66:24 67:8 92:13 108:3 109:4,9 139:16 168:15,18,20 169:1 171:20 172:1,4 173:8
**components** 42:2 51:14 53:24 58:11,17 59:4,8 66:13 66:20 67:3 68:17 168:11 211:20
**composition** 24:25 40:18 41:24 42:1 70:1 72:9,19 87:19 88:7,17 89:1 90:15,16 98:1 107:4 116:18 140:5 158:1 170:2 190:11

**compositions** 24:9 51:14 52:9,11,13,15 52:17,24 68:7 73:11 87:25 88:14 89:2 90:11,12 117:17 120:24 150:5,20
**compound** 12:12 36:12 103:18 109:23 110:25 115:5 120:7,18 143:8 150:19 167:4 171:4 204:13
**compounding** 13:13 36:11
**compounds** 40:6 106:9 107:22 184:19 204:1,11
**computer** 31:23 139:7 159:25
**computerized** 1:18
**con** 84:17
**concentration** 183:19 186:13
**concept** 5:2
**concerned** 40:13 45:6 70:2 72:11 213:16
**concerning** 112:4,19,25 114:3
**concerns** 101:23 175:8 175:14
**concierge** 5:21
**concluded** 81:11 212:8
**concludes** 212:5
**conclusions** 134:5
**condensed** 72:23
**condition** 74:11 74:12 105:20
**conditioner** 50:17 194:21
**conditioners** 52:17 179:4
**conditioning** 52:16
**conditions** 106:10,22 107:24 108:4 108:19 116:18 125:6 129:20 132:4 133:9,11 133:21 165:4 178:10 192:2 193:5 201:10
**conduct** 39:3 112:3 114:2 121:4 158:11 195:20 198:15
**conducted** 184:17 195:16 196:7 198:21
**conference** 29:7,12 36:17 36:19,21 40:23 76:8,13 107:13
**confidential** 32:21 44:24 45:3
**confirm** 20:11 82:18,21 119:9 122:15 148:5 149:22,23 151:6 171:12 171:16 173:1 178:21
**confirmed** 69:18 120:5
**confused** 78:8 78:22
**confusing** 20:1
**confusion** 67:2
**congress** 3:10
**connect** 101:8
**connected** 165:25 166:8 166:15,20
**connecticut** 86:10
**connection** 182:25
**consequences** 127:2
**consid** 137:23
**consider** 23:24 24:13 31:3 49:14 72:18 74:14,17 87:18 124:3,8 125:2 129:7 137:1,21 138:2,5 140:10 151:23 156:16 157:13 160:21 183:13,15 187:23
**consideration** 157:15 165:1
**considered** 52:23 73:14 106:24 109:1 138:16 140:20 181:13 186:18
**considering** 105:20 106:19
**consisted** 141:10
**consistent** 84:17 92:11 93:21 106:24 112:8 149:4 174:24 175:8 206:25 207:10

**constant** 188:5
**constituents** 50:24 51:21 52:18 165:7
**consulted** 61:22
**consulting** 32:18 42:15 43:4 60:25 61:1,5,11,13,14 61:16,18
**consumer** 4:7 193:15
**contact** 139:19 139:21 186:13 186:14 187:4,6
**contacted** 28:14,15
**contacts** 130:10 166:2
**contain** 134:11 144:11 145:6 148:17 149:13 149:14
**contained** 168:8 169:1 213:5
**container** 93:3
**containers** 50:12 59:1
**containing** 49:8 180:4
**contaminant** 40:11 91:9 92:23 93:1,2,5 93:9,16 115:10 148:14,18,23 167:7,12 173:17
**contaminants** 51:3 87:11,13 90:24 91:23,25 92:19 102:5,6 102:11 103:17 104:17 106:20 109:14 110:19 115:2,20 147:20 148:1,4 190:1 193:19
**contamination** 148:22,22
**contemplate** 41:23
**content** 75:21 161:16 164:3
**contents** 19:20 165:12
**context** 68:12 70:13 109:21 124:4 127:20 143:19 188:10
**continue** 39:6 81:24
**continued** 3:1 4:1 5:1
**contract** 206:14
**contrasted** 192:5
**control** 100:4 100:11,13
**convene** 205:10
**copies** 136:6 214:14
**copper** 180:8 180:11
**copy** 19:8,15 20:6 80:23 81:2
**corporation** 4:8
**correct** 8:5 11:21 19:4 28:14 34:23 46:2 51:10,20 52:8 59:6 61:12 66:15,21 68:18 70:25 74:24,25 85:4 90:21 98:7 102:12 106:8 109:13,17,20 110:24 113:1 117:2 126:17 132:18 133:13 134:4 136:18 137:10 139:3 139:11 140:12 141:5 142:9 143:7 144:25 148:6,14,19 156:4 157:1,4 168:25 169:8 174:7 187:12 194:16 200:7 200:19 204:6 204:14 211:19 211:23 213:8 216:8
**corrections** 216:6
**correctly** 79:11 104:16 109:3 139:23
**corresponding** 192:3
**cos** 35:19
**cosmetic** 21:11 21:18,23 22:1 23:15,17 33:8 33:22,23 35:12 35:14,20,23 45:18 46:1,15 46:15 47:2 55:9,16,18,24 56:6,8,11,22,24 61:5,19 65:22 87:9 99:19 104:23 108:25 138:10 179:3 186:14 206:16 207:11
**cosmetics** 33:12 33:18 46:4 65:9,25,25

66:5 68:24 69:21 73:22,25 104:11,18 105:9 112:8,23 131:15 147:20 148:1 149:23 190:1 205:23
**costello** 4:23
**costs** 99:21
**couch** 176:6
**coun** 95:17
**counsel** 7:5 18:15,20 26:8 26:10 30:17 51:11 67:18 76:11,21 77:3 78:3 80:13 84:24 85:22 86:1 105:19 122:13 131:9 141:5 171:7 172:19 182:3 197:7,17,25 210:7 214:14
**counselor** 198:19
**count** 136:19 136:20
**counter** 63:4
**country** 146:11
**couple** 20:11 24:23 29:6 32:23 57:24 58:1 95:1 114:23 155:2 210:12,21
**course** 23:2 25:13 29:7 37:16 39:15 40:3 76:18 85:22 88:7 90:9,14 108:22 118:1 143:11 156:19
**courses** 22:16 25:2 39:22
**coursework** 21:10,16 22:9 23:14,20,21 24:3,16 25:11 25:20 35:24 36:4 37:6,19 38:4 39:9,20 40:5
**court** 1:1 7:6 8:1 10:8 15:16 15:23 16:16 17:11
**courtroom** 12:20 63:8
**covered** 24:12
**coworkers** 127:7
**crawford** 5:19
**crazy** 207:13
**crc** 1:24 213:23
**cream** 117:21 157:25 205:22 205:23 206:25 206:25
**creams** 33:9 46:8 51:24 52:2 73:7 107:8 206:15 207:3,7,10
**create** 33:9 56:1 101:25 145:15,21 146:22 169:6
**created** 43:7,11 176:13 194:9
**creates** 124:11 124:15
**creation** 165:25 178:8,17
**cri** 155:2
**crime** 12:19
**criminal** 12:16 12:18
**crinkled** 161:24
**crisis** 70:17
**criteria** 155:2,6 155:20 156:6 157:7
**criticize** 100:12
**criticizing** 113:12
**crowley** 1:9,13 6:5,12,14,16,17 7:3,16,22 17:17 20:9 26:15 48:4 57:23 81:25 114:21 119:1 210:3,21 212:6 213:5 214:5 215:2,24 216:2 216:4,12
**crowley's** 105:20
**crr** 1:24 213:23
**crystal** 184:9
**crystalline** 190:13
**crystallinity** 190:12
**csr** 1:24,24 213:23,23
**cup** 94:1
**curious** 21:14 104:9 180:3
**current** 19:20 35:15 95:5
**currently** 35:15 42:4,10
**customer** 46:18
**customers** 32:19 199:18
**cv** 1:3 6:14 19:6 19:7,9,16,21 20:6,12 24:21 31:25 32:5,11 33:3,13,25 34:10,16 35:5 42:3,18 43:24

45:13 60:10 64:4 74:20
**cycling** 107:6,9
**cyclosiloxanes** 123:19
**cystine** 165:22
**cytoskeleton** 164:20 165:8

**d**

**d** 3:20 5:2 86:22 123:16 144:8 171:7,7 172:19,19 202:24 203:2
**daily** 110:21
**damage** 200:5
**damaged** 185:5 199:24 201:19
**damages** 204:23
**damaging** 72:12
**dandruff** 24:10
**dangerous** 41:20 98:17 175:22
**dark** 58:5 211:1,4
**data** 157:13
**database** 88:5 88:16,23 89:22 89:24 90:1 154:7,12 169:7 169:10 171:19 173:3
**date** 7:3 27:21 28:23 215:24 216:12
**dated** 213:18
**dates** 19:11 89:3
**daughter** 45:24
**david** 75:3
**day** 141:1 143:11 173:23 183:6 185:3,3 187:1 195:19 201:1 216:15
**days** 214:16
**dea** 120:22,23 120:24,24 150:4
**deaf** 43:5,5
**deals** 64:19,21 67:6 73:7 114:5
**dealt** 102:19
**deamidated** 165:4
**deamidation** 164:8,11 165:3
**dearing** 75:4
**debrosse** 2:3 7:8,8 9:23 12:2 12:12 18:13 19:2 22:11 23:16 26:10,13 27:14 29:9,18 30:2,24 31:15 41:14 45:19 47:10 48:18,20 50:22 51:9,11 53:9 54:11,23 55:10 58:15,19 61:7 66:1 67:13,17,24 68:19 69:11,14 71:18 75:14 76:15,23 77:5 78:5,7,10,13,21 79:20,22 80:22 80:25 81:14,19 83:2,14 85:13 85:18,24 89:16 91:3 92:24 94:3 95:20 97:8 99:7 101:19 103:18 103:21 104:19 104:22 105:3 105:10,12,15 105:19 106:11 108:9 110:11 111:2,13 113:7 114:12 115:5 115:22 117:1 118:15 119:1,4 120:7,18 121:7 121:13 122:12 122:18 124:20 125:14 129:15 130:17 131:1,6 131:9,23 132:10,23 133:25 134:2 134:13 135:17 137:6,24 143:8 145:1 149:25 151:25 152:10 155:5,17,24 156:10 157:2 157:11 159:4 159:12 162:1 162:13 168:3 169:3,9,16 170:8,15,18,22 173:22 174:5,8 174:14,18 176:15,17,23 177:20 178:23 179:9,18 181:9 182:3 183:12 184:20 185:24 186:25 187:14 187:18 188:24 189:5 190:20 190:23 194:10 195:18,24 197:12,19 198:1,5,16 200:18,20 201:23 202:2,7 202:15 204:5 205:11 207:8 207:21 208:18

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 234 of 286 PageID #:74961



208:25 209:3 209:13,17,20 210:2,5 211:24 214:1
**december** 19:11,12,14
**deck** 4:9
**declare** 216:4
**decrease** 188:7
**deemed** 216:6
**deeper** 180:14
**deeply** 199:19
**defen** 197:16
**defendant** 1:14 3:2,13,19 4:2,7 4:13,18 5:2,7 5:12 9:13 113:24 121:17 167:22
**defendant's** 122:6 173:2
**defendants** 7:12 8:10,12 12:6,11 26:11 29:21 49:21 82:19,22,23 83:6 84:18 88:12,18 95:2 96:18 101:4 102:9 103:25 113:15,23 116:4 118:1,21 119:5,10 120:5 120:17 121:3,5 121:10,20 122:16 140:20 141:6 142:12 148:5 150:4,19 150:20 167:5 167:19,21,23 168:2,5,8 169:18,21,25 171:17,19,23 171:25 172:9 173:4 178:15 179:23 181:17 193:8,11 195:17 196:19 197:2,8,18 198:14,21 200:11 210:19
**defense** 12:1 18:14 120:8,20 185:13 208:2
**define** 91:11 93:18 94:8 137:3 160:18 182:25
**defined** 36:5 188:19
**definitely** 74:14 75:23 128:12 136:16
**definition** 47:8 49:2 93:20 94:14
**definitions** 183:9,16
**defraction** 190:14
**degradant** 40:14 72:15 91:9 93:18 94:11,12,14 95:12 110:1 115:9 167:7,11 173:17
**degradants** 38:17 40:11 51:2 87:11,13 90:24 92:2,4 102:15 103:6 103:16 104:17 106:20 109:15 110:18 115:2 115:20 145:9 177:3 193:19 199:24
**degradation** 38:15 39:12,19 64:20 70:7 92:17 102:22 108:17 123:24 124:11,15,17 125:3,5,21 126:14,23 127:12,17 129:10,14 132:5,8 133:10 145:14,21 146:7,17,21 192:17
**degrade** 41:10 126:8 130:4 135:9
**degraded** 38:23 94:21 99:13
**degrades** 124:22 188:12
**degrading** 40:12 70:4
**degree** 20:14
**degrees** 107:3
**deliver** 23:9
**delivery** 23:21 23:25 24:25 25:16 36:3 56:9 70:4 74:1 90:15 182:15 185:2
**delve** 75:15
**demonstrate** 130:7
**demonstrated** 127:8 182:14
**denaturation** 161:3,4,5,6
**denaturing** 126:23 200:1
**denmark** 3:9
**denzel** 54:15
**dep** 184:2
**department** 39:2
**depend** 133:2

**dependent** 128:13
**depends** 44:12 124:4 127:20 144:16 180:12 202:10
**deponent** 213:11,13 214:13 216:3
**deposed** 8:22 209:7
**deposi** 208:12
**deposing** 214:13
**deposition** 1:8 1:12 6:12 7:3 7:24,24 8:11 8:15,21 9:19 13:6 17:16,21 18:18 20:3 27:17 28:7 30:11 32:7 61:25 63:13,24 66:11,23 77:10 170:9 208:3,7 208:9,13,14,16 208:24 209:4,8 210:23 212:5,8 213:5,7,12,14
**depositions** 9:5 60:13 77:9 208:24
**derive** 169:15
**dermal** 23:20 23:22 55:23 56:5,7,21,24 57:3,10,13 74:7 184:18
**dermatological** 206:13
**dermatologist** 24:13,15 200:7 200:8
**describe** 32:14 32:16 49:7 87:17 96:14 103:4 134:22 150:2 165:11
**described** 92:7 117:4,9 142:12 181:14 209:11
**describes** 149:10 150:8
**describing** 69:25 124:21 183:1
**description** 6:10 23:11 27:22
**descriptions** 27:11
**descriptor** 142:2
**design** 193:7 207:16,19
**desired** 92:14 92:15 192:3
**detail** 27:18
**detect** 38:25
**determination** 191:23
**determine** 96:21,22 97:6 97:21 102:5,11 103:5,11,16 111:21,25 121:9 127:25 130:14 133:23 134:12,19 135:14 169:14 169:24 172:8 172:10,12 173:20 179:5 201:21 207:15
**determining** 94:23 102:14 117:14 189:10
**deterrent** 70:1
**devel** 118:16
**develop** 41:6 72:5,19 74:18 118:13 207:12
**developed** 45:16 70:16 118:3 205:22 205:23 206:20 207:23
**developing** 35:16 40:9 42:22 108:25 190:8 207:3
**development** 42:16 44:13 45:14,18 46:1 46:4 164:20,21 166:9 191:23 205:5,21,25 207:19
**di** 150:9
**dia** 172:17
**diabetic** 11:9
**diagnosis** 14:14 14:17
**diandra** 2:3 7:8 214:1
**diane** 86:9
**dias** 49:10 163:11
**diazo** 172:20 172:21,22,23 173:1,9,12,20
**dicello** 2:4,9 7:8 75:6 76:6
**dicellolevitt.c...** 2:6,7,11 214:2
**diethanolamine** 93:7,8 117:6 150:7
**diethyl** 37:12 66:3 180:23 183:24
**difference** 49:12 93:4
**differences** 139:24 185:8

**different** 24:23 28:5 32:19 40:6 50:20 51:5,5,5,14 52:2 53:23 55:20 57:7 58:11 63:8 72:15 76:3 88:12,19 90:2 90:6 98:23 99:16,20 101:4 107:23 120:10 123:18 128:17 133:5,21 141:25 142:3,7 142:8 168:10 168:11 173:14 175:9,16,17 176:9 203:3,6 203:7,10 207:16
**differentiation** 164:19
**differing** 106:10,22 108:7
**difficult** 67:25 120:12 138:8
**dinsmore** 4:15
**dinsmore.com** 4:17
**dioxane** 150:9
**dipak** 79:10,14 80:14
**diphosphate** 164:21,22
**direct** 69:1 82:3 93:24
**directed** 66:4 69:23 87:22 102:21 131:16
**directly** 35:22 45:10 67:22
**dirt** 93:9
**disagree** 181:4 200:21,22
**discipline** 23:4
**disclose** 32:20 45:2
**disclosed** 131:3
**discuss** 77:5 82:6 123:25 124:2 194:18
**discussed** 45:12 56:8 73:23 74:22 101:24 117:19 132:6 135:25 206:7
**discussing** 44:23 142:7
**discussion** 26:14 45:9 59:22 163:2 185:14 191:14 210:15
**discussions** 44:24 47:1 75:22 81:11 84:9,16 101:11 198:7
**diseases** 42:22
**dispersion** 184:12,14
**dispute** 181:17
**disputed** 185:14,19
**dissertation** 40:21
**dissolve** 157:25 181:22 183:2 183:10,25 184:4,7
**dissolves** 183:11
**distinction** 150:24
**distinguish** 79:2
**distribution** 23:8
**district** 1:1,1 7:25
**disulfide** 49:18 124:25 126:21 161:14 162:10 163:9
**division** 1:2 36:2
**divulge** 45:2
**dmdm** 167:14 167:19 168:1 168:15 169:2 170:1,7,14,17
**doc** 169:17
**docs** 179:23
**doctor** 13:11,14 24:14 43:9 84:12 210:9
**doctoral** 22:23 38:10
**doctrine** 27:18
**doctrines** 75:16
**document** 17:22 18:1 26:7 29:19 48:25 97:1 107:1 121:3 142:11 194:25 195:8,11,13
**documented** 75:8 130:22,24
**documenting** 44:14
**documents** 18:6,11,20,25 29:22 30:3,7 31:14 49:21 52:20 53:11 55:19 69:18 82:23 83:25 88:4,17,21 89:19,25 95:2 101:9 102:9 103:25 104:13 113:23 116:5 116:13 118:2

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 237 of 286 PageID #:74964



118:21 119:6 119:10 120:6,8 120:13,20 121:6,20 131:19 136:14 138:16 140:20 141:4,7,24 142:12,19,19 143:1,3 150:21 168:22 169:5 169:10,19 171:2,20 178:15 193:11 193:22 194:5 196:20 197:2,3 197:4 198:13 199:8 202:19
**dohme** 60:20
**doing** 22:20 29:11 30:23 32:20 38:24 70:5 73:24,25 74:2,4,6 89:9 96:21 104:1 113:9 125:12 134:8 168:14 173:15 189:24 211:21
**dosage** 73:8
**dose** 110:2,6 115:15 134:12 134:15,18 144:23,23 156:3,3,4,5,25 166:12 170:5 170:11 172:12 172:15 173:20 173:25 176:5 176:18 178:13 179:15 180:1 185:16 194:13 202:3,8,18
**douglas** 2:18
**douglasandlo...** 2:20
**downregulated** 165:5
**dozen** 64:5,6
**dpt** 206:12,13
**dr** 7:3 57:23 81:25 82:6 83:10,13,17,18 84:11,11,23,23 85:3,5,7,9 105:20 114:21 119:1 181:19 210:3,21 212:6
**draft** 31:5 78:25 81:22
**drafted** 90:13
**drafting** 30:1,7 54:9 77:6 81:9
**drafts** 76:18 77:6,12 78:1
**draw** 188:15
**draws** 175:5
**dries** 130:2
**drinking** 175:19
**drive** 5:4,14
**driver** 12:23
**drop** 140:6
**drug** 23:21,25 24:25 25:16 35:18 36:3,3 40:12,25 41:10 42:16 43:18,19 44:15 55:20 56:9 70:4 71:9 72:5 74:1,13 90:15 98:22 108:25 112:7 182:15 185:2 207:1
**drugs** 23:4,5,9 24:20 25:4 35:16 37:21 41:3 57:1,15 71:10 102:22
**drunk** 12:23
**dryer** 129:2,3
**dryers** 128:1 129:24
**due** 38:15 194:8,19 201:14
**duly** 1:14 7:17 213:6
**duration** 134:20,24 144:24 155:13 155:15,16,19 157:1 186:4,7 186:13,18,20 187:5
**dust** 93:11
**dustin** 5:19
**dye** 207:14

**e**

**e** 3:3 86:22,22 123:16 144:8 165:18 203:2 211:15 215:3,3 215:3
**ear** 43:6,6,8,14 43:17,21 72:12
**earlier** 33:11 46:7 60:9 71:5 99:11 117:19 142:6 152:3 161:13 168:9 187:7 200:6 206:7,23 207:25
**early** 38:11
**earnest** 29:16 29:23
**east** 3:5
**eastern** 1:2
**easy** 70:20 188:2 190:13
**eckert** 4:10
**eckertseaman...** 4:12

**edible** 46:21
**education** 21:12,15 25:11 25:19,19 34:1 34:8 65:4 102:18 137:12 140:18
**effect** 87:14 204:17
**effectively** 49:17 50:12 68:7 72:22,23 81:12 87:16
**effects** 154:7
**efficacious** 41:6
**efficacy** 43:11 43:23
**effort** 23:7
**eight** 8:18 9:5 60:10,12,13 61:25
**either** 84:5 104:1 113:11 163:1
**electronic** 31:17,20
**electrons** 133:15
**elevated** 127:17 127:19 128:19 129:6,8,10,13
**elimination** 23:9 165:22
**ellis** 4:4
**ellisgeorge.c...** 4:6
**elmo** 174:15
**elucidate** 38:14
**email** 96:4,5 101:8,10,15,23
**emails** 76:14,17 101:7 142:7
**emily** 5:18
**employees** 96:7
**employer** 16:24
**emulsifier** 157:24
**emulsions** 24:5 68:6 73:5 117:21,22
**enforce** 17:11
**engaged** 74:9
**engineering** 23:1
**enormous** 88:15 90:5 193:14
**ensure** 41:25 196:7,12 199:18
**ent** 74:9
**enter** 109:18
**enteric** 37:12
**entering** 78:24
**enterosorbents** 33:5 46:10
**enterprises** 4:18
**entire** 50:9,10 51:8,19,23 160:4
**entity** 92:14,15
**entrepreneurs...** 44:17
**environmental** 22:1 106:10,22 107:24
**eosinophilic** 74:10
**epidemiologi...** 143:21,24 144:9 151:24 152:4 154:25 155:11 156:1 157:5,5
**epidemiologist** 25:22 26:2
**epidemiology** 25:17,20,21,22 25:23 26:2 71:6 143:22 154:19 166:11
**epidermal** 164:19
**epidermis** 200:3
**errata** 6:7 214:11,13,16
**esophagitis** 74:11
**especially** 98:16 191:22
**essentially** 9:24 115:19
**est** 136:21
**establish** 201:4
**established** 30:19 202:21
**esters** 150:12
**et** 69:6,6 137:13 147:21 187:5 208:21
**ethyl** 46:22
**ethylene** 39:16 150:13
**european** 138:9
**evaluates** 189:7
**everlaw** 89:22 121:24 168:6 169:11 197:4 198:12 199:3
**everyday** 44:6
**evidence** 117:24 151:24 157:8,10,12 185:7,11,12 194:6 201:12
**exact** 52:23 69:8 174:3
**exactly** 13:24 16:4 54:7 77:21 116:1
**examination** 6:5,6 7:18

210:16
**examine** 108:19 109:8 193:4 211:20
**examined** 126:8 213:6
**examining** 71:3
**example** 22:1 24:6,9 28:6 31:6 32:17 33:5,12 37:14 39:15,23 41:20 45:11 50:15,17 52:3 55:21 57:13 61:22 64:17 65:18 67:8 68:5 69:25 72:8 89:21 93:7 96:4,13 99:11 107:1 112:11 116:21 117:4,8 118:19,24 119:11,23 122:22 125:9 131:2 139:4 140:9 141:14 141:16,18 143:5,10 148:7 149:5,15 150:2 177:21 184:3 188:8 190:12 190:16 193:21 202:24
**examples** 22:3 37:15 150:14
**excel** 172:6 194:25
**excellent** 210:4
**exchange** 76:13
**excipient** 40:9 108:14
**excipients** 37:22 39:24 102:22
**excluded** 15:16 15:21 16:16
**exhibit** 6:4,11 6:13,15,17 17:15,17 18:8 18:8 19:7 20:2 20:3,6,9 26:6 26:15,20 32:3 32:6,7 47:21 48:3,4,18,24
**exhibits** 6:9 48:8
**exit** 17:4
**expensive** 72:11
**experience** 32:10,16 33:12 34:1,4,8 39:4 45:14,17,25 46:4 54:21 55:3,8,16,22 56:4,21 57:3,9 60:7 65:5 68:9 68:24 69:2,7 112:6 126:6 129:6,20 137:12 138:11 158:2,9 160:19 190:6 195:3
**experiment** 127:25 157:12
**experimental** 157:8,9
**experiments** 127:14
**expert** 6:17 7:24 8:5 9:7,9 9:11 11:20 13:4,16 15:16 16:16 30:1 60:7,25 61:1,5 61:11,14,15,16 61:18 85:12,16 111:14 139:2 203:24
**experts** 79:5 82:2 83:20 84:19 87:2 110:6 134:17 145:3,11 147:2 152:22 153:14 154:16 166:11 166:16,21 169:20 170:11 172:15 176:19 177:24 178:12 180:1 181:16 185:13 202:14 202:17 203:17 208:1,2,8 209:11
**explain** 38:5 87:5 128:18
**explained** 84:15 107:24
**explicitly** 33:13 96:3
**expose** 41:19 109:4 128:3
**exposed** 132:25 165:2
**exposure** 108:18 130:7 132:7,13 186:4 186:12,16
**extensive** 165:3
**extent** 76:24 77:15 79:8 81:23 198:23 208:18
**extracts** 68:7 73:6
**extreme** 108:2
**extremely** 180:21,24
**extremes** 107:25
**extrusion** 40:22 65:19 70:12

**f**

**face** 79:1
**facial** 33:9 46:7 56:1
**facility** 93:10
**fact** 8:17 104:13
**factored** 186:4
**facts** 185:17
**fails** 214:18
**fair** 23:1 41:13 47:4 64:25 65:23 69:9 70:21 90:23 94:18 104:9 106:6 143:1 151:9
**fairly** 84:17
**fall** 35:19 151:12
**familiar** 68:9 152:24 153:16 154:6,18,20 155:10 211:16
**familiarity** 54:17 68:10 102:23 152:11
**familiarized** 29:13
**famous** 59:16
**far** 23:22 159:14
**farley** 86:3
**fascinating** 43:13
**favor** 17:9
**fd&c** 33:15
**fda** 44:14,15 45:9 69:6 72:6
**federal** 1:21 8:1
**feel** 22:3 91:6 104:10
**female** 15:6,12
**fentanyl** 70:15
**fewer** 120:25
**field** 61:2,14
**fighting** 137:20
**figure** 79:13 170:4,5 186:10
**figured** 62:21
**filament** 164:18,18,20
**file** 31:18
**films** 37:13
**final** 81:22
**financial** 206:11
**find** 43:8 62:1 88:24 114:1 121:21 131:18 183:20 193:14 193:14,22 194:3 195:13 196:20 198:25 199:2
**finding** 94:13
**finds** 122:2
**fine** 26:18 43:20 45:5 47:23 48:7 49:4 64:3 78:9 92:10 94:3 119:21 126:3 174:17 191:3 203:19
**finish** 10:2 78:18 158:17 182:4 191:1
**finished** 10:4
**firm** 76:3
**firms** 75:24
**first** 7:17 22:15 28:17 29:3,5,6 38:14,18 64:11 64:21 74:22 79:15 91:17 117:2 148:11 148:13 150:18 167:14 174:4 188:2
**fishing** 84:8
**five** 85:2 135:1 203:22 205:9 209:18
**flat** 95:11 128:6 129:23 130:2
**flonger** 2:16
**floor** 4:4,10
**florida** 4:16
**focus** 43:16 44:14 129:21
**focused** 23:4,7 46:18 68:23 123:14
**folks** 47:2 86:12
**follicle** 201:18
**follow** 35:11 57:24 114:23 144:22 176:1 193:6
**followed** 130:8
**following** 164:14
**follows** 7:17
**food** 33:18 112:7 138:3,12 206:2
**footnote** 92:8 92:12
**force** 108:16
**foregoing** 213:8,9 216:5
**forgot** 106:15
**form** 9:23 12:2 12:12 18:14 22:11 23:16 27:14 29:9,18 30:2,24 31:15 41:14 45:19 47:10 50:22 51:9,12 53:2,9

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 241 of 286 PageID #:74968



54:11,23 55:10 58:15,19 61:7 66:1 67:13,24 68:19 69:14 71:18 80:22,25 83:2,14 85:13 85:18 89:16 91:3 92:24 95:20 97:8 99:7 101:20 103:18,21 104:19,22 105:3,12 106:11 108:9 110:11 111:2 113:7 115:5,17 115:22 116:17 117:1,3 118:15 120:7,18 121:7 121:13 122:18 124:20 125:14 127:11 128:15 129:15,17 130:17,21 131:1,6,23 132:10,19,23 134:2,13 135:17 137:6 137:17,24 140:25 143:8 145:1 149:25 151:25 152:10 155:5,17,24 156:10 157:2 157:11 159:4 159:12 162:1 168:3 169:3,9 169:16 170:8 170:15,23 173:22 174:5 176:15,17,23 177:20 178:23 179:9,18 181:9 183:12 184:20 184:24 185:1 185:24 186:25 187:14,18 188:24 194:10 195:18,24 198:1,5,16 200:18,20 201:5,23 202:7 202:15 204:5 207:8,21 208:18 211:24

**form's** 184:11

**formal** 44:6 56:23 152:15 160:12,20

**formaldehyde** 38:16 123:15 128:10 144:19 144:20 167:17 171:13,14 172:23 173:16 173:18 176:10 177:22 178:3,7 178:15,20 179:7,13,20

**formally** 57:12 58:23

**formation** 119:25 178:4 200:15

**formats** 141:25

**formed** 39:1,7 39:12 109:24 111:1 128:10 149:8,8 178:20 179:6,14 192:8 192:11 194:12 199:25 201:10 201:15,22

**former** 16:23

**formic** 38:16

**forming** 137:12

**forms** 73:8

**formula** 53:3 88:9,19 89:3 112:11 121:21 123:22 168:17 168:21 170:3 172:5,7

**formularies** 90:9 168:5 169:18 170:2 173:5

**formulary** 88:23 113:17 113:18 138:3 195:2

**formulas** 88:11 95:18 120:6,9 141:10,12

**formulated** 55:1 68:11 69:4 99:12 116:17

**formulating** 24:20

**formulation** 24:3 54:21

**formulations** 206:24,24

**forth** 23:10 51:3 123:19 135:9 181:18 192:19

**fortified** 175:20

**forward** 66:18

**found** 16:5 25:6 65:9 83:25 89:19 119:5,10 120:20 121:2 139:16,20 140:8 167:4,22 167:22 168:6 171:20 173:4 194:1,6

**foundation** 104:22 105:3 105:12 106:11 118:15

**four** 8:17,21 9:19 61:2 64:1 64:3 65:19 72:21 73:2,3 99:16 147:5 203:22
**fragrance** 112:13
**frame** 112:22 211:12
**frames** 168:7
**franklin** 5:9
**frederick** 2:13
**free** 43:4
**fresenius** 62:15 62:16,17
**friends** 189:24
**frizz** 50:16
**front** 16:25 63:6 112:16
**fu** 2:3,6 214:1,2
**full** 48:3
**fun** 45:24
**function** 50:12 186:12
**functional** 38:7
**functionalities** 37:21
**fundamental** 25:24
**fundamentals** 25:3
**fungi** 43:23
**further** 47:6 213:16

**g**

**g** 86:6,6 165:18
**ga** 140:17
**gas** 25:8 38:24
**gastrointestinal** 25:9
**gateway** 3:4
**gathered** 95:14
**gavazzoni** 49:10 163:11
**geez** 34:24 97:16
**gel** 53:6,15
**gels** 53:5 73:7 206:15
**gene** 164:16
**general** 44:25 46:18 102:7 111:15 115:8 156:13 196:15
**general's** 61:23
**generally** 93:6 105:9 108:17 175:7 179:22
**generate** 128:22
**generated** 127:22 195:10
**generating** 192:18
**generically** 136:8
**genexa** 63:2
**gentleman** 38:9
**george** 4:4
**gestures** 10:14
**getting** 21:18 68:22 81:20,23 101:11 111:14 120:14 140:6 140:16 146:12 147:5
**gi** 24:24 25:7
**gilbert** 4:3 6:6 210:11,17,18 212:1
**gildner** 3:20
**ginex** 4:23
**gist** 25:7
**gists** 24:24
**give** 10:7 11:4 13:6 16:13 18:13 35:6 43:4 44:4,8,19 45:7,9 63:18 63:24 72:8 101:19 111:13 140:13 147:20 150:14 153:10 154:2 162:6 165:15 171:18 174:2,14 177:24 182:12 192:18 200:13 202:1 204:16
**given** 12:22 35:4 44:10,17 61:25 83:22 136:1 144:13 170:10 194:11 216:9
**gives** 192:23 193:1
**giving** 10:11 16:6 19:22 44:12,13 117:11 144:18 146:24 149:16 152:22 153:14 154:24 155:11 155:18 156:1,3 156:4 157:4 166:10 172:15 173:24 174:3 175:24 176:5 176:18 181:12 187:2,3 194:13 202:8,17 204:21
**glands** 201:18
**global** 3:13
**glucose** 11:9
**glycol** 38:13,20 39:8 65:12 125:9 188:12 192:17
**go** 9:2,15,20,21 10:19,23,24

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 243 of 286 PageID #:74970



14:22 15:4,20 17:6,11 19:25 20:10 29:10 30:12 31:25 32:24 38:24 47:6,15,18 48:2,11,11,23 54:14 60:9 64:1 65:10 66:7 72:16,20 74:19,20 75:7 75:19 78:19 82:24 86:18 87:4 88:10,25 89:5,21 94:16 94:23 95:15 96:24 97:5,21 97:25 100:18 102:14 106:2 114:1 117:13 119:16 120:22 121:19 122:12 122:21,23 123:21 126:10 127:14 136:2,8 147:14 148:12 150:15,15 151:15,17 159:20 161:17 162:5 164:4 169:4,11 174:1 175:1,3,6 179:16 180:13 182:8 183:20 190:13 192:25 193:16 202:24 207:9 209:3 210:13
**goal** 126:19 191:21
**godfathers** 189:19
**godrej** 3:14
**goes** 79:13 154:2
**gogoi** 86:6
**going** 20:2,5,8 27:14 32:24 42:3 44:21 45:8 47:15,18 48:5 56:13,14 57:18 70:9 71:5 72:16 75:21 76:23 77:9 78:8,23 79:2 81:16 82:1 90:20 93:25 94:6 98:20 100:1,3 100:7,13 103:1 107:17 113:14 114:15 116:23 123:22 127:11 129:19 130:13 134:6 135:21 136:7 141:11 142:2 143:24 145:4,13,20 146:20 147:7 147:15,17 150:9 153:11 155:1,3,12 156:2,24 157:7 157:17 161:17 162:15,17 163:19,25 164:4 165:18 166:10 169:11 171:4 174:21 175:7 176:11 177:6 181:11 182:20 186:19 188:18 190:4 190:21 191:1,6 191:16 194:17 196:18 197:13 197:19 198:6,9 198:16 200:9 205:9,13 209:17,22 212:6
**goldbergsega...** 5:3
**goldbergsega...** 5:5
**good** 7:20 37:3 86:4 98:5 100:3 106:2,7 108:16 109:8 114:10,20,21 114:22 138:19 138:22 139:3 147:13 184:15 190:20
**goodman** 84:23
**googled** 113:17 189:22
**grab** 94:7
**grad** 36:23
**grade** 99:13
**grades** 99:16 99:20
**gradient** 155:21,23
**graduate** 36:10
**grateful** 145:24
**great** 43:11 133:18 180:9
**greatest** 184:8
**grocery** 211:15
**ground** 9:20
**group** 4:8 37:20 38:7
**groups** 46:17
**guanidine** 49:9
**guess** 21:14 29:22 34:5 126:18 149:20 176:1,12,12 177:12 191:13
**guessed** 79:21
**guessing** 101:6
**guidance** 72:6
**guy** 206:8
**guys** 46:20

**h**

**h** 4:3 123:16 211:15 215:3
**ha** 99:23
**habit** 184:10
**hair** 1:4 7:24 24:3 45:15,16 45:18 46:1 47:7,8,13 49:2 49:6,12,13,17 49:18,19,20,21 49:24 50:7,20 50:24 51:6,19 51:22,25 53:7 53:17,19,24 54:3,21 55:1,4 55:7,9,16,18 56:22,24 57:4 57:8,11,14 58:2,18 59:4,8 59:25 61:5 66:8,12,12,14 66:19,20 67:12 67:22 68:3,15 69:3,10,15 70:23 71:1,4 71:11,12,17,23 72:1 73:4,11 74:3,4 87:9,14 87:22 88:20 89:6,17 94:25 96:23 97:7 102:6,15,15 103:6,12,14,15 104:8,20,23,25 105:2,4,5,16 106:9,19,21 107:22 109:2 111:10,22 112:1,4,19,22 113:1 114:3 117:15 120:22 124:5,11,16,22 124:23 125:3 126:15,15,16 126:22 127:2,3 127:21,22 128:1,19 129:2 129:3,23 130:2 130:3,4,9,15 131:7,17 132:18 133:12 134:10,22 135:3,15 144:10 145:6 145:14,21 146:17,21 149:24 150:20 151:7 156:23 157:14 158:22 159:2,8,9 160:10,11,15 161:7,8,15,18 161:24 163:13 163:21 164:8 164:10 165:2 166:1,2,8,14,19 167:2,2 168:11 171:20 172:2 173:8,21,21 175:21 176:7 178:16,16 179:7 181:13 183:22 184:19 184:23 187:4 189:20 194:18 196:9,13,23 200:2 201:18 201:20 204:8 204:19,23 207:19,23 210:24 214:4,4 215:1,1 216:1 216:1
**hairs** 129:5
**hand** 7:14 10:13
**handing** 47:25
**handy** 159:22
**happen** 19:25 93:23 103:1 133:16 146:8,9 146:10,11 177:4 178:11 185:21 186:2 187:20
**happened** 101:13
**happening** 161:22 185:22 192:17
**happens** 11:12 11:16 70:8 109:5 127:8,9 128:22 146:7 192:21
**happy** 34:6 56:17 94:14 180:14
**hard** 113:16 129:4 138:14 157:19 177:12 187:16 188:14
**hardip** 5:3
**hardy** 3:15
**harm** 165:25 166:6 172:13 173:13 176:14 186:22 196:8 196:14,17 202:13 203:15 204:24 205:4
**harmful** 166:3 202:6
**harming** 199:18
**harmonisation** 107:13
**harms** 41:11
**hawaii** 1:24
**hazardous** 144:11,21 145:15,22 146:19

**he'll** 201:25
**head** 10:10,13 15:10 59:20 123:12 135:23 136:25 173:10
**headed** 33:17 60:18
**health** 111:11 144:12,21 145:15,22 146:19 175:8 175:14
**hear** 23:15,17 23:18 78:18 103:20 170:20
**heard** 41:8 111:3 145:17 153:1 154:20 155:25
**hearing** 146:2 187:17
**heart** 178:1
**heat** 94:22 127:22 128:17 128:22
**helical** 165:20
**helm** 117:19
**help** 17:2 47:3 137:17 157:24 192:6
**helped** 33:9 56:1 207:12
**helps** 65:5 157:25
**henneke** 3:3 6:5 7:10,10,19 8:7 9:24 12:8 12:13 17:20 18:19 19:5 20:4,10 22:14 23:19 26:5,7 26:12,16,19 27:24 29:15,24 30:5 31:9,19 41:21 45:22 47:14 48:7,21 49:1,4,11 51:4 51:10,16 53:16 54:20 55:2,13 57:23 58:16,25 59:23 61:12 66:7 67:20 69:9,12,19 71:20 75:20 76:20 77:2,18 78:9,12,14,16 78:19 79:4,21 79:23 81:1,17 81:25 83:9,17 85:15,19 86:2 86:14 91:4 93:4 94:6,10 95:23 97:11 102:3 104:7,20 104:24 105:6 105:18,24 106:14 108:12 110:23 111:4 111:19 114:14 114:20 115:18 116:9 117:13 119:7 121:4,8 121:16 122:14 122:21 124:24 125:18 130:1 130:23 131:5,7 131:11 132:3 132:14,24 134:1,6,19 135:20 137:7 143:16 145:4 146:14 147:12 152:5,13 153:18,21 155:6,20 156:2 156:12 157:6 157:13 159:9 159:16 162:3 162:22 163:4 168:9 169:6,14 170:13,16 171:3,6,8 172:21 174:1,7 174:9,17,20 176:16,20 178:6 179:1,16 179:19 181:25 182:5,8 183:13 184:15,25 186:3 187:7,21 189:1,9 190:25 191:3,11 194:14 195:22 196:4 197:16 197:23,24 198:4,10,20 200:19,22 201:25 202:4 202:11 203:5 204:6 205:12 205:18 207:18 207:24 208:23 209:6,15,19 210:4,9
**hereto** 1:22 213:16 216:7
**heugten** 180:8
**hey** 184:15
**hi** 213:23
**high** 23:11 32:12,21 47:13 49:6,16,17 50:14 64:16,25 72:10 94:14 99:3 102:17 108:3 109:4 123:25 124:2,3 124:8,9 127:21 153:6 166:2 180:20
**higher** 99:16
**highlight** 31:12 31:13,19
**highlights** 31:23

**hill** 154:18,23 155:2,7,21 156:6 157:7
**hire** 193:25
**hit** 108:20
**hits** 89:23 123:16,20
**hoc** 8:9
**hoffman** 62:15
**holdings** 3:14 4:8
**home** 45:24
**honored** 73:15
**hope** 92:8 150:23
**horn** 73:13
**horribly** 72:11
**hospital** 13:12
**hot** 128:25,25 129:24
**hour** 27:4,5 190:22
**hours** 29:8 203:22,23
**house** 3:2 7:11 8:8 122:22,24 122:25 169:2 193:22,23,24
**houston** 3:17
**hoyt** 84:23 181:19
**hpassananti** 5:5
**huh** 17:19 79:20 87:7 93:22 124:24 126:13 150:17 160:21 209:6
**human** 23:6 41:12 87:14 114:7 144:21 146:19 159:19 159:20 160:7,9 172:13 173:13 175:8,13 204:17
**humidity** 107:3 107:15
**hundreds** 89:18
**husband** 13:19
**hydantoin** 167:15,19 168:1,15 169:2 170:1,7,14,17
**hyde** 123:16
**hydrates** 182:1 182:16
**hydrolysis** 108:18 164:15 165:21
**hydroperoxid...** 39:19 99:14
**hydroxide** 49:8 49:8,9
**hypromellose** 37:11

**i**

**iarc** 153:16,18 153:22,23,25 154:2
**idea** 183:14 190:23
**ideas** 74:10,13
**identical** 73:10 83:20
**identified** 91:21,25 92:4 117:18 119:24 147:1 148:9 164:9,13,14 165:6 179:3 192:7,14 204:18
**identify** 7:5 87:10 90:21 91:19,23 92:2 115:19,20 116:10 168:15 192:6
**identifying** 89:14
**ifra** 95:9 104:14 138:10
**ii** 164:11
**illinois** 1:1 3:22 4:21,24 5:9,14 8:1
**imid** 171:8,9,10 171:11,16,23 172:2,9,13
**immediately** 28:16
**immensely** 183:5
**impact** 23:24 40:15 41:2 98:22 114:7
**impair** 11:8
**imparted** 97:6 97:22
**important** 163:21 164:25
**importantly** 168:23
**impressions** 77:12,13 81:16 208:20
**improves** 182:18 185:6
**impurities** 39:23 87:10,12 90:22,24 91:2 91:5,20,21 92:15 94:24 96:21,23 97:10 98:16 101:17 102:20 103:9 103:12,13,17 104:18 106:20 109:14 110:18 115:1,20 133:18 145:9 147:19,25

148:4,9 175:11 177:3 179:17 179:20 180:4 193:20
**impurity** 91:8 92:6,13,23 93:5,6,16 94:9 95:11,18 96:11 97:6,19,22 98:2 99:2 110:1 115:4,9 115:12 116:21 117:6,10 148:13,17,23 167:7,11,17 171:12,15 172:24 173:17 176:8 204:13
**inactive** 45:10
**include** 43:22 71:8 143:2 177:1
**included** 33:3 52:7
**includes** 32:7 95:9 114:6 158:5
**including** 9:6 39:18 165:3,6 179:3 191:14 192:14
**incomprehen...** 47:17 48:19 78:13 86:1 111:16
**increase** 188:6
**increased** 27:7 27:8
**incredibly** 139:16
**independent** 73:19,21,24,25 74:2,4,6 112:3 114:2,8
**index** 6:1,4
**indicated** 107:9 130:6 172:11 172:19
**indicates** 43:24
**indicating** 20:8 48:17 171:7
**individual** 129:13
**induced** 164:7
**industrial** 22:4
**industries** 5:7 21:21,25 22:8
**industry** 33:22 33:23 35:12 206:16
**inert** 157:22
**infections** 43:6 43:6,9,17
**infectious** 42:22
**inflammation** 201:16
**inflammatory** 74:11
**inform** 65:5
**information** 87:20 88:1 89:4 95:13 110:18,19 112:11 113:2 135:6 147:22 159:7,15 176:25 192:24 193:1
**ingredient** 95:19 98:1 119:6 122:15 129:21 140:6 149:9,12,13,19 159:8 167:4,23
**ingredients** 45:11 50:24 58:14,17,24 64:20 69:2 87:9,12,18,21 87:23 109:14 113:18 117:14 120:17,23 122:24 125:5 134:11 142:7 144:11 145:7 146:17 148:10 148:16 149:15 149:22 150:10 152:20 159:10 161:2 167:3 173:11 175:12 178:10 186:14 201:7,11,13 204:2
**inhaled** 70:15
**inherited** 73:16
**ink** 46:21,21
**inks** 33:20
**inputs** 139:9
**inside** 35:9 93:15 112:11 132:20 146:9 161:14 175:23
**insight** 34:3 110:16
**instability** 38:11
**instance** 1:13 113:22 124:5 126:13 205:22
**instances** 45:22 46:6 99:2 121:24 179:23 204:22
**instruct** 75:15 78:8,23 198:9 198:17
**instructions** 54:1 58:21 59:7 129:1 134:21 192:22 193:6
**insufficient** 195:9

**insult** 201:15
**insults** 130:10 199:21
**intellectual** 8:22 9:16 12:6 14:9 44:18 62:6,7,12,14,19 62:23,25 63:5 63:12,21
**intended** 92:14 93:8
**intentional** 157:18
**intentionally** 70:3
**interact** 23:6 41:24 110:20 134:11
**interaction** 42:1 156:14
**interactions** 39:21 44:14 75:6 91:17
**interesting** 189:18
**interference** 190:16
**intermediate** 164:17,18,20
**intermediates** 92:17
**internal** 101:22
**international** 107:13
**interrupt** 28:22 192:25 210:12
**interrupted** 53:3
**interrupting** 40:4 148:11 187:22
**interruption** 67:15
**introduce** 108:21
**introduced** 8:8 92:19 93:1
**introductory** 84:4
**inventor** 24:25
**investors** 33:9
**invited** 19:22 44:4,7
**invoice** 18:23 27:21 30:13
**invoices** 29:11 30:21 88:2
**involve** 14:24 15:1 25:11,20 36:5,7 37:6,8 37:19 38:4 39:21 40:6 44:20 45:7 46:4,6 50:19 54:21 55:3,16 61:5 62:11 65:9 67:11,21 69:20 71:3,16 73:22
**involved** 21:18 45:14,18 50:7 55:9,23 56:5 56:21 57:3,10 61:19 70:3,22 81:20 164:17 207:2
**involves** 13:5 13:10 64:18 69:23 108:17 192:20
**involving** 14:1 14:14,18,21 39:10 46:1 60:22 208:20
**irb** 160:20
**iron** 129:23 130:2 180:8,10
**irons** 128:6
**irvine** 5:4
**isoamyl** 46:24
**issue** 113:21 175:19 194:19
**issues** 13:12 43:18 46:18 102:22 140:4
**item** 150:18
**items** 18:3,12 153:7 206:2

**j**

**j** 4:9
**jackson** 4:24
**james** 3:20
**january** 27:10 28:3 30:10
**jellies** 73:7
**jelly** 53:12 180:5,16,22,25 181:18,23 183:24 184:4,5
**jenkinson** 33:15 46:12 100:24
**jennifer** 76:4
**jennifer's** 76:2
**jersey** 33:23
**jf** 5:2
**jgildner** 3:23
**jim** 38:10
**john** 3:19
**johnson** 14:2,2 14:22,22 15:17 15:17 63:23,23
**jot** 31:4
**jpmorgan** 3:16
**judge** 1:5
**juice** 175:20

**k**

**kaps** 164:12
**kasting** 85:3
**kcc** 153:3,11
**kccs** 152:24
**kdeck** 4:12

**keep** 27:12 31:2 31:13,17 134:22 162:15 191:1
**keeps** 188:18
**kelbey** 4:9
**kelm** 191:18
**keratin** 49:19 124:22 125:3 127:1,7,9 161:3,8,14 162:9,11 163:5 163:9,10,12,20 164:12 165:24 166:7,13,18 200:1 205:1
**keratins** 126:14 163:17 164:11
**kevin** 4:19
**key** 152:25 192:8
**kids** 199:20
**kind** 32:23 41:4 70:12 73:10 88:8 89:4 123:16 128:22 129:5 131:25 143:20 188:18 196:20
**kinderfarms** 63:2
**kinds** 40:15 142:19 156:15 158:6 206:20
**kinetics** 64:22 64:22 128:13 128:13
**kirk** 206:8,10
**kit** 49:24 50:8 50:10,18,21 51:6,8,19,19,23 51:25 53:17,20 53:24 54:3 66:9,14,21 67:3,6,8 69:10 69:16 168:11 168:24 172:2 173:8 194:18
**kitchen** 114:13
**kits** 50:1,25 51:15 58:2,18 58:22 59:4,8 59:25 68:3 69:3
**knew** 116:3 117:22,25
**knocked** 97:16
**know** 9:1 10:17 11:11,16 13:10 22:7,24 23:2 24:19 27:8 31:5 33:5 34:7 35:6,8,9,9,21 36:2,8 39:18 49:14 52:21,25 53:12 54:13,18 55:21 64:19 65:18 66:11 67:6 68:5 69:17 72:4 75:8 79:13 81:1 82:13,16 87:1 89:25 90:10,14,16 93:23 95:11 96:16 99:2,20 100:2,21 101:4 101:13 102:18 103:3 104:3,5 107:12 108:20 108:23,24 110:21 112:12 112:13,22 113:16,24 116:17 117:5,7 118:17,24 119:5 120:9,21 120:23,25 122:4 125:1 126:25 127:1,2 127:5 128:3,9 128:11,16,25 129:24,24 131:4 133:7 134:22 135:8 136:14 138:17 139:4 140:6 141:1 149:2 150:2 153:4,5 153:6,7,24 157:20,21 158:10,15 160:8,9,12,13 160:16,17,24 161:20 163:18 165:17 168:7 168:22 169:12 169:20 170:3 171:22,24 172:1 173:6,9 177:17,21,25 178:9 179:22 180:7,16 182:6 186:17 188:10 188:17,20 192:16 193:2 195:5 202:9,12 202:23 203:13 204:20,22 206:25 209:4,9
**knowing** 199:23
**knowledge** 13:3 15:15 16:11 35:22 158:20 177:19 198:20
**known** 40:24 87:17 98:2 110:17 116:21 117:6 144:19 145:9 146:18 147:2 152:20 177:10 189:9 200:24

**kpadden** 2:20
**kristin** 2:18

**l**

**l** 165:18 171:7 171:7 172:19 172:19 203:2
**l'oréal** 4:2,2 210:19,19
**la** 62:15
**lab** 33:21 57:13 57:13
**label** 113:19
**labeled** 147:19 172:4
**laboratories** 4:8,13 63:10
**labs** 5:2 206:10
**lack** 100:11 192:9 194:8,19 200:10
**large** 206:14
**largely** 185:18
**larger** 38:21 50:12 117:18
**largest** 166:5
**lastly** 10:22
**latheena** 3:15
**laughing** 79:12
**lauramide** 120:23
**lavi** 147:24
**lavilla** 117:19 118:19 119:16 119:23 147:21 147:25 148:24 149:4,10,16 152:17 189:15 189:17
**lavilla's** 119:12 150:22 189:25
**law** 75:24
**lawsuit** 16:19 16:22
**lawyer** 13:23 16:3 61:15
**lawyers** 1:19 77:13 208:21
**lay** 47:6 169:7
**lays** 99:5
**lead** 47:2 176:14 178:7 178:17 206:9
**leads** 153:9 205:5
**leaking** 207:15
**learned** 25:15 37:9,16 38:7 39:16
**learning** 158:3
**lecture** 19:22 44:8
**lectures** 44:4 44:17,19 45:7
**left** 130:15
**legal** 5:24 61:2 61:5,11,14,19 63:9 214:23
**legal.com** 4:25
**lego** 40:25
**length** 132:7,13 132:17,21,24 133:23 192:2
**level** 23:11 32:12,21 64:16 64:25 94:14 102:17 140:13 153:6 198:23
**levels** 99:17 165:3
**levin** 2:14
**levitt** 2:4,9 7:9 75:6
**lfsblaw.com** 2:16
**liability** 1:5
**life** 22:7 191:25 192:3 195:4
**lifting** 176:22
**light** 94:22 108:18
**likelihood** 156:14
**likes** 54:13
**limitation** 209:1
**limitations** 203:14
**limited** 16:1,16 63:11 82:1
**limiting** 16:2
**limits** 202:20 202:21
**line** 56:17 102:4 191:1 215:4,7,10,13 215:16,19
**lines** 10:14 12:10 176:2
**lip** 206:4
**lipid** 182:18
**liquid** 52:8 73:8 184:2
**liquids** 36:13
**list** 9:2,3 18:21 26:22 31:6 36:24 37:3 52:23 53:15 60:17 63:25 75:11 88:14 95:18 117:17 118:3,4,10,13 118:20 119:12 119:18 121:15 121:16 122:16 122:24 129:12 140:11,14 141:11 142:14 143:2 149:12 160:4 165:6 167:21 170:2 170:25 179:20 180:15
**listed** 8:25 9:1 20:11 35:5

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 251 of 286 PageID #:74978



60:10 65:20 96:3 97:19 118:8 119:8,15 120:4,16 121:20 139:1 147:23 148:4 151:7 153:12 153:22 155:13 156:17 157:15 158:12,23 159:10 167:14 167:17 169:18 170:4 171:4,12 172:11 173:16 174:2,12 179:17 180:4 180:17
**listened** 208:13 208:14
**listening** 47:3 162:4
**listing** 23:13
**lists** 26:25 118:8 171:14
**litchfield** 4:20
**litchfieldcav...** 4:22
**liter** 139:19
**literature** 29:13 95:7,9 102:8 103:3 116:6,14 118:1 127:23 130:22 130:24 137:11 156:20 158:24 159:14 167:8 179:2 181:20 182:14 183:20 186:17
**lithium** 49:8
**litigation** 1:5 7:25 8:5,10 16:23 32:9 33:3 79:6 203:25
**little** 20:1 55:14 57:7 63:8 64:5 96:16 100:15 175:9 187:8 203:18
**live** 169:10
**living** 156:15
**llc** 1:14 3:2,13 3:14 4:2,8,10 4:18 210:20
**llp** 2:4,14 3:15 4:4,20
**loading** 159:25
**local** 211:15
**log** 88:23 180:20
**logistically** 20:5
**london** 2:18
**long** 46:13 56:14 80:7 88:3 89:10 96:5 121:15,16 134:25 167:21 172:18 187:4 189:24 195:4 196:6,12
**longer** 2:13 43:2
**look** 24:21 29:10 38:24 40:20 41:9 51:7 52:15,18 53:1,4,22 54:5 58:2,11 65:10 70:7 71:7 72:2 72:2 75:8 82:24 87:16 88:7,11,16 89:1,9 90:14 90:24 91:14 93:11,25 95:25 96:17 97:25 98:25 99:1 102:7,8,19 104:24 105:4 106:21 108:7 115:11 122:1 123:22 125:6 128:8 129:22 136:18 142:22 143:14 144:9 150:3 159:18 159:22 160:2 161:20 162:7 169:4 170:13 174:25 180:13 180:14 193:13 197:21 199:5,5 210:25 211:21
**looked** 15:4 49:20 51:14,24 52:11 53:25 58:13,13,20,21 58:23 59:3,12 68:14 69:10 83:25 88:14,17 89:2,18 90:11 91:1 95:7,25 102:9 103:24 121:19 141:1,3 148:3 171:1,19 173:3 193:21 193:22 196:19 196:21 199:8,9 199:10
**looking** 28:11 33:6 43:8 51:7 51:18,19 65:24 67:11 68:16 73:22 86:3 90:1,6,7 96:20 97:15,18 106:18 125:11 125:17,20 140:5,6 143:12 149:21 153:5 162:2,23 163:5 193:19 199:1,1
**looks** 28:12 29:5

**los** 4:5
**lose** 161:24
**loss** 125:2 126:22 127:10 133:15 182:17 184:9
**lost** 182:10
**lot** 9:19 30:3 48:12 65:20 70:11 97:2 98:6,21 99:3 99:23 102:19 102:20 123:17 135:24,24 142:19,22,25 152:19 158:24 161:22 179:10 185:12 188:9 189:8,23 190:5 191:19 193:16 194:5,13 198:25
**lotion** 117:22
**lotions** 73:7 206:15
**lots** 37:21 52:2 141:25 183:18
**louis** 20:14,20 20:25
**love** 108:23
**lovely** 58:6 211:1,5
**low** 99:2 124:7
**ltthomas** 3:18
**lunch** 105:21 114:12 206:3
**lupin** 63:10
**luster** 101:11 101:15,23

**m**

**m** 1:5,9,12 2:9 6:5,14,16,17 7:16 46:21 171:5,7,16 213:5 214:5 215:2,24 216:2 216:4,12
**m&ms** 46:21
**ma** 20:24 21:18
**ma'am** 209:19
**mabramowitz** 2:11
**machine** 1:19 41:1 213:7
**machines** 93:10
**made** 18:24 33:19 35:17,18 35:19 45:21,23 46:21 59:19 104:14 146:9 194:3 198:7,11 204:22 206:19 207:7,10 213:11,13 216:5
**madison** 4:10 4:20
**magnesium** 119:11,15,23
**maibach** 186:10
**main** 140:1 149:12,13,19 149:22 189:25
**major** 117:14 123:5,6 186:15
**majority** 29:24
**make** 9:20,25 10:7,11 20:1 31:6,11 34:18 35:21 39:17 40:25 43:14 46:23 50:17 56:2 71:19 97:9 98:8 100:1,19 106:21 111:3 116:7 122:23 126:19 137:10 145:17 146:2 157:24 161:8 169:11 179:12 184:22 190:18 195:5 206:4 207:13 213:10
**makes** 9:7 127:2 162:10 163:10 191:18 204:24
**malcolm** 54:16
**malpractice** 12:9 13:3,5,11
**manufactured** 133:16
**manufacturer** 97:2 206:14
**manufacturer's** 98:10
**manufacturers** 33:15
**manufacturing** 40:21 46:23 92:19 93:1,10 149:6
**march** 1:10,16 7:4 213:4,18 214:3
**mark** 2:9 17:15 20:2,5 26:5 47:19 48:2,2 48:24
**marked** 17:17 20:9 26:15,18 26:19 32:2,6 48:4
**marketing** 1:4
**markings** 48:10
**maron** 5:13
**maronmarvel...** 5:15
**marriage** 42:8
**married** 183:19

**marvel** 5:13
**mary** 1:5
**mask** 56:2
**master** 15:18 16:1 95:18 120:6,9
**mastocytosis** 24:24
**material** 92:13 93:3,8 96:6,8 97:1 98:5,11 98:15 99:4,6 99:24,25 100:7 100:22 101:1,5 101:12,16,24 102:8 115:1 116:21 117:8 141:18 158:1 182:18 190:9
**materials** 52:22 74:8 92:16,16 96:1,11,13 99:21 100:6 116:16 135:21 136:2 150:14 167:9,11 194:2
**matter** 8:23 13:4,22 14:16 34:7 35:10 62:7 63:21 64:19 65:6 112:17 126:18 134:18 158:14 158:15 211:11 213:9
**matters** 9:14,17 12:7,16 13:1 14:9,20 61:4 61:19
**maximum** 139:15
**mcauliffe** 5:8
**mcbride** 4:13
**mccambridge** 3:10
**mcginity** 38:10
**mcguirewoods** 3:4 7:11
**mcguirewoo...** 3:7,7
**mdl** 1:4 7:25 8:12 14:2,23 15:17 63:23 214:4 215:1 216:1
**mean** 12:22 16:11 20:12 21:14 22:25 23:24 25:14 28:21 29:10 36:24 37:20 38:6 41:15,23 44:22,24 46:13 46:20 47:7,14 48:9 50:3 52:22 55:20,25 56:8 61:1 64:7 64:16,25 65:4 65:11 66:2 67:22 69:20 72:6 73:2 74:17 80:6 92:25 93:11 98:23 102:1 104:2 105:4 106:2 108:10 108:11 112:5 112:21 113:2,8 117:20 122:19 123:4,6 124:19 126:7,11,22 127:4,11,12 129:11 133:14 134:25 137:3 138:11 139:25 140:4 142:15 143:10 144:16 144:23 148:24 152:19 153:23 153:24 155:15 155:25 156:18 156:22 158:20 158:24 159:13 160:17 168:25 169:10,17,17 171:1 172:6 175:11 176:12 177:15,16 180:13 182:21 182:24 183:13 183:14,25 186:8 190:10 194:11,20 195:14 196:21 197:17 199:1,4 200:2,12 203:2 206:19,23 207:5
**meaning** 13:10 16:10 30:20 135:1 177:13
**means** 156:13
**meant** 61:13,14 126:2
**measure** 39:5 55:21 104:3 160:11 190:13
**measured** 125:2 200:16
**measurements** 179:13 184:22 186:20 190:18 200:25
**measuring** 64:21 184:17
**mechanism** 94:21
**medical** 12:9 13:2,5,11 24:14 105:20
**medicated** 24:8 206:5
**medication** 13:13 24:23
**medications** 11:7 43:8

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 254 of 286 PageID #:74981



**meet** 99:9,17,24 100:8
**meeting** 75:11 76:8
**meetings** 33:24 35:7 46:17 75:25 76:17 79:9 80:3
**meets** 98:14
**mehta** 4:23
**mellott** 4:10
**melt** 40:21 65:19 70:11
**memory** 65:15 136:12 169:4
**mental** 77:12 77:13
**mention** 72:4
**mentioned** 25:18 41:17 56:25 58:1 59:12 63:22 65:11 73:18 90:20 123:3 128:21 161:13 168:7 205:25 210:24
**mentor** 2:10
**merck** 60:20 62:13
**mere** 201:3
**meridian** 42:9
**met** 82:5,7 84:5 113:15 208:1
**metabolic** 164:22
**metabolism** 23:8
**metallic** 39:23 40:2 148:9
**metals** 39:21,25 64:22 133:18 148:8 180:9,10
**method** 190:19
**methodology** 134:12,20 189:13 190:4,5
**methods** 189:10 190:2 190:18
**methyl** 184:3
**methylparaben** 180:19 183:21
**mi** 139:18 165:21
**miami** 4:16
**michael** 1:9,12 5:22 6:5,12 7:3 7:16,22 212:6 213:5 214:5 215:2,24 216:2 216:4,12
**michelle** 5:19 67:16,17,17 76:5
**michelson** 5:4
**microliters** 139:19
**microphone** 97:16
**middle** 43:6,8 72:12
**miller** 3:21
**milligrams** 139:15
**million** 88:17 198:13
**millionth** 139:19
**mimic** 70:4
**mind** 37:24 49:11 50:6 145:24 150:15 158:9 181:6 210:22
**minute** 147:5
**minutes** 80:8 105:22 106:4 186:23 205:10 209:18
**mischaracteri...** 29:19 61:8 68:20 83:3 95:21 101:20 110:12 115:23 125:15 168:4 176:24 181:10
**miscible** 180:21 181:24 182:2,7 182:8,21,22,25 183:14,15,18
**misrep** 95:20
**mission** 35:17
**missouri** 20:17 20:19 21:12 22:13,15
**misunderstood** 45:4 176:4
**misuse** 193:5
**mitchell** 3:19
**mitigate** 98:24
**mix** 102:25
**mixed** 203:18
**mixture** 190:15
**model** 139:8,23
**models** 139:7 139:13
**modification** 165:1
**moisturizing** 207:1,7
**molecular** 21:2 22:23 36:1,2 38:21 183:6 184:12,12,13
**molecule** 161:9 162:11 163:10
**molecules** 91:15,16 165:7
**moment** 63:18 105:20 162:6 162:13,14 165:16 182:12 208:6

**money** 17:4,5 43:12,12,14
**monitor** 11:10
**monographs** 95:10
**month** 30:6
**months** 107:5 195:1,7
**morning** 7:20
**morphology** 161:15
**morrison** 5:8
**mouthful** 162:12
**move** 142:24
**moves** 98:22
**movie** 54:16
**moving** 66:18
**msds** 114:25 141:16 170:13
**mucosal** 74:16
**multifunctional** 157:23
**multiple** 21:25 48:10 49:25 50:4
**murray's** 5:12
**mutant** 127:11
**mute** 67:18
**mylan** 60:20 62:13

**n**

**n** 144:8 171:7 172:19 202:24 203:2,2
**name** 7:20 8:7 58:7 64:2 76:2 79:16 85:4 86:11 118:17 144:5 150:19 167:4 211:4
**named** 75:3 206:8
**names** 52:2,23 75:24 76:1,7 79:11,15 84:25 86:4,12,18
**narrow** 177:6
**narrowed** 16:8 16:11
**narrowing** 15:18
**national** 138:3
**natural** 161:24
**nature** 1:14 3:13,14 83:19 84:16 128:7
**ndela** 203:1
**neat** 190:14
**necessary** 67:9 115:16 117:3 128:14 129:16 133:23 134:5 134:16 135:7 135:12 152:17 153:13 169:12 169:15 172:13 184:24 185:1 202:6 216:6
**need** 10:7,22,23 11:10 66:23 69:17 125:23 126:10 127:14 127:24 132:1 133:7 158:16 163:14 178:6 178:24 180:11 195:21 196:2 201:11
**needed** 195:23 202:5,13
**needs** 132:7 181:7 186:21 186:22
**neutralizer** 50:15
**neutralizing** 52:12,13 194:21
**never** 45:2,16 80:18 82:7 84:5 154:21 209:8
**new** 4:11,11 24:22 33:23 44:14 72:19 169:11 190:8
**nickel** 180:8,10
**nine** 9:7,12 18:3,11 155:3
**nitrate** 96:15 119:12,15,23 175:10,18 176:8 201:17
**nitrates** 175:22
**nitric** 176:11 176:13
**nitrite** 96:15 175:10,18 201:17
**nitrites** 175:21
**nitrosamine** 119:24 175:12 200:15 202:10 202:24
**nitrosamines** 72:3,14,18 96:4,8 104:11 149:5,7 178:4 178:8,18 179:3 179:6 193:21 201:4,10,22 202:5,6,12,20 203:3
**nitrosating** 201:4
**nitrosodietha...** 203:2
**nitrous** 201:15
**nod** 10:10

**nods** 123:12 135:23 136:25
**noriya** 3:3
**normal** 88:6 143:11
**north** 2:4 5:9 5:14 124:8
**northern** 1:1 7:25
**norton** 2:10
**noses** 43:14
**notary** 216:13 216:19
**note** 31:3 63:6 88:3 214:10
**noted** 92:25 107:4,18 216:7
**notes** 27:12 30:20,20,22,25 31:11
**notice** 6:12 17:16,20 18:18 27:17 77:9
**noticed** 25:18 103:25
**november** 29:25 30:6
**nshahadat** 3:7
**nucleoside** 164:21
**number** 32:18 52:24 88:15 98:23 118:7 133:20,21 135:11 136:19 142:23 159:13 163:22 168:21 189:14 202:19
**numbered** 1:15 18:3
**numbers** 89:3
**numerous** 134:11
**nutritional** 35:18 206:1,21

**o**

**o** 86:6,6 165:18 171:7 172:19
**oadams** 2:7
**obituary** 189:22
**object** 9:23 12:2,12 18:13 22:11 23:16 27:14 29:9,18 30:2,24 31:15 41:14 45:19 47:10 50:22 51:9,11 53:9 54:11,23 55:10 58:15,19 61:7 66:1 67:13,24 68:19 69:11,14 71:18 75:23 76:23 80:22,25 83:2,14 85:13 85:18 89:16 91:3 92:24 95:20 97:8 99:7 101:20 103:18,21 104:22 105:3 105:10 106:11 108:9 110:11 111:2 113:7 115:5,22 117:1 118:15 120:7 120:18 121:7 121:13 122:18 124:20 125:14 129:15 130:17 131:1,6,23 132:10,23 133:25 134:2 134:13 135:17 137:6,24 143:8 145:1 149:25 151:25 152:10 155:5,17,24 156:10 157:2 157:11 159:4 159:12 162:1 168:3 169:3,9 169:16 170:8 170:15,23 173:22 174:5 176:15,17,23 177:20 178:23 179:9,18 181:9 183:12 184:20 185:24 186:25 187:14,18 188:24 194:10 195:18,24 197:19 198:1,5 198:16 200:18 200:20 201:23 202:7,15 204:5 207:8,21 208:18 211:24
**objection** 19:2 30:25 77:8,10 78:5,21 79:3 81:14 104:19 111:14 170:19 170:22 189:5 197:13 208:25 209:13
**objections** 18:14 27:16,19 75:17 77:8
**objective** 170:18
**objectives** 161:10
**obvious** 168:19
**obviously** 25:2 55:25 57:15 64:18 73:25 187:5
**occasionally** 31:4,12
**occlusion** 181:15 182:15

**occur** 128:20 129:6,10,14 132:8,15,19,22 133:11,11,14 133:20,24 149:3 170:6
**occurred** 186:22 196:25
**occurring** 125:21
**occurs** 132:17 132:22
**offer** 21:19 100:10 115:12 147:2 178:12 203:17 204:4 205:6,7
**offered** 9:8 12:5 16:7 55:6
**offering** 26:2 32:9 33:2 44:21 45:8 47:3 113:14 135:19 144:24 146:16 152:3 158:18 179:14 185:25 186:2,3 193:10 202:3
**office** 19:19 61:23 63:7
**oftentimes** 39:12
**oh** 42:25 43:3 47:20 54:7 60:15 94:3 97:16 160:5 182:8
**ohio** 2:10
**oil** 180:20
**oils** 53:5
**ointment** 38:13
**ointments** 38:12 73:7 107:8
**okay** 7:13 8:12 8:13,24 9:5,15 9:18 10:5,14 10:15,20 11:3 12:8,21 13:20 13:25 14:12,18 14:22 15:9 16:15,19 17:10 17:15 18:10 19:5 20:24 21:2 23:13,19 24:2 25:10 26:13,13,16 27:4 28:2,18 29:5 30:19 31:9 34:18 36:7,25 38:1 39:9 41:8 42:13 45:25 48:1,5 49:1,23 50:6 56:12,16 56:19 59:7,10 59:19 60:6 61:17,21,24 62:18 64:12 67:10 71:2 73:21 74:21 75:9,17,18 76:11 77:11 81:8 82:4,13 83:9,17 85:23 85:23 86:1,9 88:25 89:6 90:19 91:7 93:13 94:2 95:15,23 96:2 96:20 98:4 102:14 103:23 105:14,15,18 106:7 109:7 111:9,21 114:10,12,14 115:18 116:24 117:13 119:4 120:15 122:8 122:21 123:4 123:24 124:10 126:3 127:16 132:3 134:19 135:20 136:4 136:10,11 137:14 140:16 141:3,9 142:17 142:18 143:1 143:16 145:4 147:4 149:12 150:6,7 152:5 152:13,24 153:2,9 154:18 160:1 161:1 162:8 163:7 166:4,13,18 167:14 170:22 172:8 174:15 174:18 175:15 178:21 182:8 182:12,12 183:3 184:15 184:25 194:23 194:25 196:4 198:14 202:2 203:8 204:9,16 205:9,11,12 207:18,24 208:15 209:10 209:17 211:13 211:19 212:1
**old** 199:20
**oldest** 95:4
**omega** 2:3
**once** 188:17 190:7,10 192:22
**oncology** 24:17 24:18,20
**one's** 57:7 207:1
**ones** 13:22 60:16 68:2,4 84:24 138:21 139:1 149:17 174:25

**ongoing** 13:8 15:24
**ontology** 164:16
**open** 58:25 93:3
**opened** 53:25 58:12,20 132:20 192:21 192:23
**opens** 130:11
**operators** 41:18
**opiates** 70:6
**opine** 111:9 112:24 185:21 194:8
**opined** 116:12
**opining** 13:18 106:8,12 107:21 145:6 145:20 146:16 146:20 200:9
**opinion** 111:24 112:2 115:3,7 115:13 125:12 130:9 165:24 166:7,13,18 173:12 186:1,2 186:4 190:4 191:14 195:9 196:4,6,11,15 199:10 200:10 202:3,4 203:18 204:9 205:6
**opinions** 15:16 15:19 16:6,7 16:13,17 26:3 32:9 33:2 34:11,17 35:4 44:21 50:19,23 55:6 71:6 76:12 91:18 100:10 111:20 113:14 115:17 115:18 117:3 117:12 125:24 128:15 129:17 130:21 132:2 134:16 135:7 135:19,22 137:10,12,17 140:25 144:18 144:24 145:3 145:12 146:25 147:3 152:4,17 152:23 153:14 153:15 154:17 154:25 155:11 155:18,19 156:1,3,5 157:5 158:16 158:18 166:11 166:17,22 169:13,15 170:11 172:15 173:25 176:19 177:25 178:13 178:25 179:15 180:1 181:12 184:24 185:1 187:2,4 195:21 196:3 200:15 201:2 202:18 203:25 204:3,7 205:7
**opioid** 70:1,4 70:17
**opportunity** 17:24 18:4 83:21,22 174:25 213:10
**opposed** 63:19 211:21
**oral** 1:8,12 96:14 108:14
**orange** 175:19
**order** 44:22 70:5 154:2
**orexo** 60:20 62:22,22
**organ** 166:5
**organic** 20:24 22:9,18,20 38:6 40:2
**organization** 164:19,21
**organoperoxi...** 39:18
**originally** 73:16 99:12
**originate** 92:16
**otality** 164:16
**oticara** 42:19 42:20,21 72:9
**otsuka** 62:3
**outcome** 111:11
**outcomes** 200:17
**outlined** 51:3 87:6 109:16 117:16 144:19
**outlines** 145:8
**outside** 76:6 205:25
**ovarian** 15:1,8 112:1 166:20
**overall** 41:6
**overhoff** 206:8
**overlap** 150:23
**owed** 17:4
**own** 84:18 101:2,25 116:14 179:24 190:6 198:15 209:7
**owned** 35:14
**owner** 16:24
**oxidation** 94:22 108:19 132:6,9 132:15,17,19 132:22 133:4,8 133:9,10,13,19 133:23 188:14

192:18
**oxidative** 132:4
**oxide** 38:19 39:16 150:13 201:15
**oxygen** 108:21

**p**

**p** 180:20
**p.m.** 1:16 114:17 147:9,9 162:19,19 191:8,8 205:15 205:15 209:24 209:24 212:8
**p1hairdepos** 214:15
**pack** 52:19,21
**package** 41:24
**packaging** 42:1 59:3 92:20 187:12
**pad** 31:5
**padden** 2:18
**page** 6:2,10 17:25 49:7 92:12 106:3 119:2,3,22 120:22 147:18 150:3,16 151:18 162:8 186:8,11 191:20 215:4,7 215:10,13,16 215:19
**paid** 8:4 16:25 26:25 30:18
**pain** 70:16
**panigrahy** 79:14,23 80:15 82:6 83:10,13
**paper** 31:5,18 38:10 39:6 48:12 64:17,17 64:21 71:25 136:6 139:4,23 165:10
**papering** 74:13
**papers** 38:18 165:13
**paraben** 66:2,2 89:22 206:7
**parabens** 36:5 36:7,12,12,16 65:13 121:25 123:7,10 126:7 126:11 181:23 183:21 184:2,5 184:6
**pardon** 91:15 170:19
**parfitt** 5:19
**parkway** 2:10
**parsing** 91:6
**part** 40:16 41:5 42:2 46:11 50:5,20 54:18 65:4 70:10 76:8 107:1 110:2,21 112:16 113:13 149:11 158:2 158:10,10 193:7 194:18 200:25 201:15 203:17 204:2,3 204:7,9 207:15
**particular** 38:17 89:10 98:6,6 111:10 139:8
**parties** 213:16
**parts** 51:5
**party** 16:19 213:11,13
**passage** 191:18
**passananti** 5:3
**past** 35:13 42:23
**patent** 19:18,24 24:21 63:7
**patents** 19:18 19:24 102:21
**pathway** 127:17 132:5 133:9,10
**pathways** 123:25
**patience** 97:17
**patient** 13:14 13:18 40:15,19
**pattern** 190:14
**paul** 3:19
**paused** 146:7
**pay** 17:1,4
**payment** 17:12
**pc** 3:21 4:23
**peak** 105:23
**peal** 5:18
**pedicures** 54:14
**peer** 31:10 34:25 64:6,10 65:8,24 136:17 137:2,7,16 138:17 140:22
**peg** 102:19 150:11,11
**pending** 7:25 11:1 13:8 48:22 162:23
**pennsylvania** 2:15
**people** 33:21 43:12 81:18 135:4 138:5 196:17
**people's** 43:13 129:5
**peptide** 165:21
**peptides** 127:12 165:4
**percent** 30:4 90:10,10 98:1 107:15 112:14

117:7 149:4 170:3 181:8 184:7
**perfect** 171:10 172:21
**performed** 27:23 28:24
**period** 95:3
**periodically** 135:2
**periodicals** 64:11
**permeability** 139:8,12,23
**permeable** 127:3 130:11 140:2 185:6 201:19 204:24
**permeation** 109:21 181:2
**perox** 108:20
**peroxide** 108:20
**peroxides** 39:10,12 99:18 192:18
**person** 99:10 128:3 135:11 189:23 199:16
**personal** 84:9
**personally** 80:16 195:16
**perspective** 25:16 112:7 126:18
**persuasive** 140:8
**peter** 5:24
**petrolatum** 180:3,3,5
**petroleum** 53:12 180:5,16 180:21,24 181:18,23 183:24 184:4,5
**pfc** 7:9
**ph** 47:13 49:6 49:16,18 55:21 104:3 107:25 108:2,10 109:4 124:1,2,3,5,10 124:14 125:7 125:10 164:7 165:3 193:17
**pharma** 62:3 62:10 69:24 205:21,25
**pharmacal** 35:17
**pharmaceu** 21:3
**pharmaceutic** 63:4
**pharmaceutical** 33:7,17 36:11 36:21 37:11 40:8 42:21 62:3,4,6,12,14 62:19,22,23,24 62:25 63:3,4,5 63:12,20 64:14 64:14 65:22 68:10,12 70:14 71:10 72:25 73:14 131:3,5 206:15,19,21
**pharmaceutic...** 60:23 64:18 66:4 68:4,16 68:17,23 73:9 98:19 207:4,11
**pharmaceutics** 21:3,6 22:24 35:25 36:1,3
**pharmacists** 181:22 206:4
**pharmacokin...** 23:10
**pharmacopeia** 138:3 183:16
**pharmacy** 13:13 22:25 23:2 44:3 86:10
**phase** 107:8
**phd** 1:9,13 6:5 6:12 7:16 21:2 21:18 22:22 213:5 214:5 215:2,24 216:2 216:4,12
**phenol** 37:23
**phenols** 37:18 37:19
**philadelphia** 2:15
**phone** 11:10 83:20,24
**phonetic** 62:20
**phosphorylat...** 164:22
**photolysis** 108:19
**phs** 108:7 126:8
**phthalate** 37:12,13 66:3 66:3 180:23 183:24
**phthalates** 37:5 37:6,8,16 65:14 89:24 121:25 123:9 123:10,11 180:22
**physical** 22:10 22:18,20 41:10 41:25 51:1 53:16,19 87:17 110:17 177:2,9 177:10 187:25 188:3,8 192:1 193:2
**picture** 189:21

**piece** 112:10
**pierce** 139:5 143:4
**place** 100:14 132:8
**places** 133:20 140:2
**plai** 178:14
**plaintiff** 9:12 9:13 197:17,25
**plaintiffs** 2:2 7:9 8:4 11:21 13:17,24 197:7 207:25
**plasticizer** 37:13
**plausibility** 135:14 156:7,9 156:13,16
**play** 178:3
**plays** 187:6
**plaza** 3:4
**please** 7:5,14 7:20 10:17 67:3 77:1 106:12 124:13 128:18 131:9 162:6 197:15
**plumber** 207:13
**po** 2:19
**point** 17:3 28:15,16 68:22 75:5 83:7 84:7 106:7 116:19 140:1 143:16 159:14,16 160:7 168:6,8 173:19
**pointed** 88:2 119:23 149:1 161:20 182:19 202:19 203:4
**pointing** 175:10
**police** 12:22
**policies** 100:2
**polyeth** 38:12
**polyethylene** 37:10 38:12,19 38:20 39:8 65:12 125:9 188:12 192:16
**polymer** 37:9 37:10,12 38:17 38:23,25 39:15 39:19,25
**polymers** 39:13 39:17
**polysorbate** 72:9 99:12,13
**polyvinylpyr...** 118:25
**poor** 180:24
**poorly** 183:17
**portion** 50:14 50:16 116:11 146:6 163:3 201:20
**portions** 185:9
**poses** 70:13
**possibilities** 200:16
**possible** 9:22 177:3
**post** 165:1
**poster** 36:15 126:7 206:7,9
**potent** 43:21
**potential** 109:9 148:21
**potentially** 115:21 116:20
**powder** 14:3
**practice** 31:10 32:18 98:13,15 108:16 109:8
**practices** 1:4
**pragmatically** 191:25
**praising** 113:12
**preclinical** 158:6
**predominantly** 68:23 206:20
**prefer** 153:4
**preparation** 54:18
**prepared** 13:13
**preparing** 30:10
**presence** 38:16 69:18 82:18,21 95:2 96:8 102:13 103:16 104:17 110:15 116:5 135:12 167:8,10,23 176:25 177:25 192:13 201:3 204:1,7
**present** 5:17 37:21 51:15 65:12 67:7 68:3 69:2 75:25 80:11 83:6 87:10 90:17,17,22 91:19 93:2,7 94:24 96:22,23 99:14 102:6,11 102:15 103:6 103:12 104:11 116:10,16,25 117:7,10 118:20 120:13 121:22 122:4 130:3,5,25 145:10 148:8 150:4 169:17 169:24 171:25 176:7,21 178:7 178:16 180:11 185:2 194:2,12 199:23 201:17

**presentations** 35:3,4,7 142:18
**presented** 185:17
**preservative** 36:9
**president** 42:4 42:10
**pretty** 70:19 152:18 160:20 189:17 190:13
**prevents** 182:17
**previously** 68:25 171:18
**pride** 58:6
**primarily** 23:7
**primary** 165:15
**principles** 21:24 35:9 45:1 56:9 102:25 185:3 187:3
**printing** 33:20 46:23
**prior** 30:25 60:7 81:2 83:3 110:12 115:23 125:15 172:14 213:5,12,13
**private** 62:4
**privileged** 31:8 45:3 85:20 197:10
**probably** 22:3 28:12 45:5 64:25 140:1 159:19 184:8
**problem** 46:18 119:24 175:23 192:7
**procedure** 1:21
**proceed** 133:4 147:15
**proceedings** 7:1 15:23 213:9
**process** 38:23 40:20,21 41:4 41:17 44:15 63:9 70:13 102:7,17 126:24 163:19 201:22
**processes** 40:22 40:22 127:13 149:6 164:18 164:23,23
**processing** 38:22
**prod** 168:5
**produce** 128:17 146:18
**produced** 1:13 18:9,17 31:7 91:16 97:1 118:22 197:2,5 197:9,18
**product** 27:18 40:9 41:7,12 42:16 43:10,13 44:13 50:5 55:1,18,20 56:11 59:14,15 60:5 70:15,19 72:5 74:13,18 75:16,16 76:24 78:24 81:15 83:8 89:6,11 89:15 90:4 93:11 94:20 95:3,7,25 97:22 98:12,14 99:1,12 100:22 104:2 107:17 107:20 108:25 109:19,24 111:1 113:17 122:6 132:18 132:25 133:11 134:20,25 141:10,11 151:8 159:8,9 162:9 163:8 168:6 169:2 170:6 173:2 175:23 176:7 179:8 187:9,23 188:4,5,16,23 189:4 190:7 191:22,24 192:20 193:1,5 193:7 194:3,6 195:12 196:17 201:20 205:21 205:25 208:20 211:1,5
**production** 17:25
**products** 1:5 4:2,7 24:4 35:18,19 45:18 46:1 51:22 54:3 55:9,17 55:24 56:6,8 56:22,25 60:3 61:6,20 65:13 66:12 71:1 82:19,22 83:1 83:6,7 84:1 87:9,15 88:20 88:21 89:18 90:8 92:17,17 95:3 104:8 108:1 114:7 118:21 120:17 121:11 122:17 123:1 126:20 142:8 145:10 148:5,17 151:12 166:6 167:5,19,21,24 168:2 169:25

171:17,22,24 172:9 173:4 178:17 179:3 183:22 188:3 192:10 195:17 198:15 204:2 206:13,19,20 207:13 210:19 210:25 211:20
**professional** 45:14,17,25 46:3 54:20 55:2,8,15,22 56:4,21 57:3,9
**professor** 40:24 43:25 86:10
**program** 23:3 23:12 189:7
**programs** 191:22 192:15
**projected** 191:24
**prolific** 189:17
**prominent** 165:22
**promise** 162:16
**promised** 60:9 147:14
**pronounce** 21:3 42:5 79:16 147:24 161:4 171:4
**pronounced** 92:21 186:9
**pronouncer** 62:20
**proper** 189:7 193:5
**properties** 16:7 51:1,2 70:1 87:18 88:10 110:16,16,17 110:17 152:19 156:19,23,25 158:3 177:1,1 177:2,7,8,10,11 177:14,14,17 177:19 190:14 192:1
**property** 8:23 9:16 12:7 14:9 44:18 62:7,12 62:14,19,23 63:1,5,12,21
**propylparaben** 180:19
**propylparabens** 184:3
**protect** 53:7 181:6,12
**protectant** 181:18
**protected** 27:18 77:7,14
**protective** 44:22 53:4,15 194:22
**protectorant** 180:17,18 181:3,7,8,14 182:13
**protein** 49:19 126:23 161:15 164:7 165:1 200:1,3
**proteins** 64:23 127:11 163:12 163:20 164:12 164:13,14,17 164:25 165:2,5 165:7 205:1
**proteome** 164:10
**proteomic** 164:6
**proteomics** 127:8 161:21 164:9
**protocol** 160:19
**provide** 34:3 71:6 85:11,15 87:19 94:15,16 109:20,25 110:15,18,19 111:7,23 115:15 134:18 138:14 143:19 145:3,11 166:25 180:1 189:13 198:10 203:11,25
**provided** 18:20 26:8 46:10 60:13 86:19 104:10 125:1 130:6 131:2 140:17 141:4 146:15 149:2 149:11 161:21 164:3 167:3 181:1,15,17 185:7,11 189:12 197:1,3 198:12 201:12 208:10 209:11
**providing** 11:14 27:17 111:20 154:16 166:11,16,21 170:11 176:25 186:19
**provisions** 1:22
**pub** 67:10
**public** 35:2,8 216:19
**publication** 31:11 34:21 151:4
**publications** 34:9,14,25 64:6,10 65:8,8 65:16,18,24 67:11,21 68:17 69:20 70:22

71:3,21 72:2 152:21 204:12
**publish** 19:23 39:5
**published** 38:10,18 70:25 71:25 72:17 116:14 127:5 127:15 138:6
**publisher** 72:24
**pull** 159:24 193:16
**punch** 32:23
**purchased** 210:24 211:9 211:13
**purity** 99:16
**purpose** 126:15 161:7
**purposes** 66:22
**pursuant** 1:20
**pursued** 16:23
**put** 20:8 43:13 46:24 70:18 75:11 107:11 107:23 118:11 118:17 129:4 132:18 133:12 138:12 143:6 160:9 179:10 181:17 184:4,5 188:16 190:15 207:14
**pvp** 118:25

**q**

**qualification** 146:14
**qualifications** 32:8 33:1
**qualified** 16:6
**qualify** 98:15
**qualifying** 137:18
**quality** 100:3,4 100:11,12
**quantifiable** 111:8,8
**quantify** 109:22 110:24 185:22
**quantitate** 189:13
**quantity** 172:8 172:10 194:15
**que** 120:1 159:3
**question** 10:2,5 10:16,18,20,25 11:1,24 14:5 19:5 25:10,17 28:2 34:5,12 34:19 35:11 37:5,18 45:4 48:22 51:13 55:13 56:3 57:5 61:13 66:8,17 67:4 67:19 71:15,19 72:16 77:16,18 82:17 84:3 87:24 90:17 97:9,23 98:4 98:25 100:14 100:21 102:4 103:9 105:7,8 106:13 109:3,7 112:15 113:9 115:8 116:8,9 118:24 119:7 131:16,21 133:1,6 134:23 146:5,15 151:2 153:9,11 154:3 162:23,25 163:23 173:14 174:22 175:13 176:1 186:19 191:19 195:25 196:10 197:14 197:15,20,21 198:17,18 200:12 201:24 203:14 205:3
**question's** 71:14 81:4 144:17 157:19
**questioning** 191:2
**questions** 11:8 11:15 29:14 32:24 56:15 57:24 60:7 75:21 82:1,9 82:10,13,16 83:9,18,22,22 83:23 93:17 110:8 114:24 134:7 135:25 137:5 144:23 147:16 148:2 155:3 174:6,12 180:2 205:19 208:19 210:2 210:10,12,22 212:2
**quick** 19:6 56:15,20 105:23 147:4,4 191:4 210:22
**quickly** 62:2 70:19 151:16

**r**

**r** 144:8,8 153:18,19 215:3,3
**raise** 7:14 43:12
**randolph** 3:21
**range** 21:21 22:8 124:15 129:7
**ranking** 138:15

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 265 of 286 PageID #:74992



**rate** 28:5,9 133:5 192:17
**rates** 108:24
**rather** 66:5 129:21 194:2 200:16 205:4
**raw** 92:16 93:7 96:1,6,7,11,13 97:1 98:5,11 98:15 99:4,6 99:20,24,24 100:22 101:5 101:12,16,24 102:8 114:25 116:21 117:7 141:18 150:14 190:9 194:2
**ray** 190:12
**reac** 64:21
**reached** 17:3
**react** 87:13 109:15 116:23 128:14
**reactants** 177:3
**reaction** 64:22 94:20 108:24 133:5,14 178:10 180:12 188:14,18
**reactions** 109:9 132:19 133:19 180:9,11 192:19
**reactive** 87:10 90:20,22,25 91:1,4,8,9,11 91:19,22,24 92:1,3,5 108:21 128:9,9 128:10 161:2 167:3
**reacts** 162:9 163:8
**read** 16:3 25:23 31:10,10 54:1 58:21 59:7 96:5 112:5 126:20 134:21 135:4,4 139:5 141:2 143:10 146:6 153:24 163:3,7 189:21 189:22 202:9 208:10 209:10 214:9 216:5
**reading** 78:23 133:8 158:5
**ready** 105:25 147:5
**reagents** 92:18
**real** 19:6 191:4
**realize** 74:16 199:20
**really** 70:18 90:17 108:3 114:24 185:15 193:22 196:21
**realtime** 1:25 213:24
**rearrangement** 161:14
**rearranges** 49:18
**rearranging** 124:25 126:21 162:10 163:9
**reason** 11:4 214:11 215:6,9 215:12,15,18 215:21
**reasonable** 199:16
**reasons** 140:1 163:22
**rebuttal** 87:2
**recall** 15:11 16:16 28:15 36:19 46:13 52:23 53:14 54:7 58:4,6 59:13,15,16,19 60:5 63:25 75:2,13,24 76:1 82:15 83:10,11,18 84:14 85:3 87:1 104:16 113:22 162:25 168:12 195:12 211:4,13
**receipt** 88:4 214:17
**received** 19:14 21:2 32:11,15 80:18,23,24 81:1
**recent** 19:8,15
**recently** 27:6 54:8 74:9
**recess** 57:22 114:17 147:9 162:19 191:8 205:15 209:24
**recognize** 59:18 86:11
**recognized** 112:10 113:17
**recognizing** 134:10
**recollection** 203:10
**recommendat...** 15:22 16:4
**recommended** 15:18 16:1,12 98:19
**record** 1:22 7:6 7:21 10:9,13 26:14 31:22 57:18,20 59:22 75:18 79:3 94:5 100:20 111:14 114:15 114:18 134:9

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 266 of 286 PageID #:74993



147:7,10 162:14,15,18 162:20 163:2 191:6,9 197:13 205:13,16 209:22,25 210:15 212:6
**record's** 26:1
**records** 95:8
**redirect** 209:21
**reduced** 213:7
**refer** 177:7
**reference** 135:25
**referenced** 214:6
**referred** 8:9 36:2
**referring** 66:13 66:20 118:6 125:19 152:8 154:1 159:7,17 177:8
**refined** 72:10
**reflect** 28:24
**reflected** 27:25 30:15,21 33:13 34:4,10,16
**reflection** 34:1
**reframe** 197:15
**refresh** 136:12 153:5
**regarding** 14:3 14:17 15:6 76:12,21 77:3 81:22 130:18 200:15
**registry** 154:7
**regs** 44:16
**regulated** 206:2
**regulations** 45:10 112:16 113:12
**regulatory** 112:4,6,18,21 112:25 113:2,6 113:15 190:1 202:20
**reiterate** 206:22
**relate** 65:1,2 73:4
**related** 15:12 21:11 30:25 64:13 151:24 158:22 159:10 163:6 164:7 200:10 204:1
**relates** 34:6 158:14
**relating** 72:25
**relationships** 134:18 178:13
**relative** 107:15 129:9
**relax** 105:4
**relaxant** 210:25
**relaxer** 1:4 7:24 45:16 47:9 49:2,12 49:24 50:7,21 50:24 51:6,19 51:22,24,25 52:2 53:17,19 53:24 54:3,16 55:1,7 58:2,18 59:4,8,25 66:9 66:14,21 69:3 69:10,15 71:1 73:11 87:9,14 88:20 89:6,17 97:7 104:8,23 111:10 112:1 120:22 126:15 127:22 130:4 130:10 131:8 151:8 159:8,9 160:10 161:18 166:2 167:3 168:11 172:2 173:8,21 176:7 178:17 179:8 181:13 183:22 187:4 194:18 201:20 204:23 207:23 214:4,4 215:1,1 216:1 216:1
**relaxers** 45:15 47:7,13 49:6 49:13,17,20,21 53:8 54:14,22 55:4 57:4,8,11 57:14 66:12,19 67:12,23 68:3 68:8,15 70:23 71:4,12,13,17 71:24 72:1 73:4 74:3,5 87:22 94:25 96:23 102:6,16 103:6,12,14,16 104:21,25 105:2,5,17 106:10,19,21 107:23 109:2 111:22 112:4 112:19,23 113:1 114:4 117:15 124:5 124:12,16,22 128:19 131:17 134:10 135:15 144:11 145:6 145:14,21 146:18,21 149:24 150:20 156:23 157:15 158:22 159:2 161:7 166:1,8 166:14,19 167:2 171:21

175:21 184:19 184:23 189:20 196:9,13,24 204:8,19 207:20
**released** 163:12 163:15 164:2
**releasers** 123:15
**relevance** 143:13
**relevant** 32:8 33:2 34:11,16 35:4 64:19
**reliable** 138:20 138:22 139:3
**relied** 95:1,6 137:11 159:13 160:25,25
**relies** 139:9
**rely** 137:9
**relying** 126:6 137:16 143:6 158:21 159:15
**remain** 174:13 186:22,22
**remainder** 17:1 17:5
**remained** 89:10
**remark** 40:25
**remember** 13:23 15:5,7 21:25 59:24 60:2 76:2,7,9 79:16 84:8,25 86:3,12 107:10 111:16 114:1 195:14 211:8
**remind** 31:6 65:10
**remingto** 108:13
**remington's** 24:7 68:6 73:13 117:20 138:5
**remove** 130:8 185:12
**rendered** 115:7
**repeat** 34:12 55:12 56:3 57:6 67:19 77:1 106:12 116:8 124:13 135:6 145:16 145:24 146:3 146:24 196:10 205:3
**repeated** 199:20
**repeatedly** 182:14
**rephrase** 10:18 66:16 121:8 132:16 198:18
**replaced** 179:19
**replaces** 187:20
**replenisher** 52:20
**replenishing** 52:19,21
**report** 6:17 8:25 13:4 18:8 18:8,21 19:7 20:2,12 29:22 30:1,7 32:6 35:10 47:12,15 47:18,19,25 48:3,6 49:7 51:3 54:9,19 60:11,17 67:6 74:20 76:18,22 77:4,6 78:25 80:24 81:3,8,9 82:9,11,24 86:3 87:2,6 90:13 91:13 93:15 94:19,24 104:3 107:3,12 107:18 110:13 112:25 113:5 113:11,13 114:5,8 115:8 115:24 116:2 116:12 117:5 117:16 118:16 118:17 119:9 121:18 123:3 123:25 124:21 126:25 129:12 130:6 132:3 133:8 136:16 137:10 139:2 139:25 143:2,6 144:14,19 145:8 147:17 150:8 152:18 153:20 156:18 156:20 161:17 162:2,7 163:7 163:17 164:3,6 177:5 179:10 180:14 181:1 184:16 185:18 186:6 187:11 188:20 191:15 192:8 201:9 202:25 203:12 204:15
**report's** 105:5
**reported** 1:18 1:23 107:6 116:5 139:10 156:22
**reporter** 1:17 7:6,13 10:8 17:19 48:16,23 49:3 67:16 78:15,17 153:17 184:13 213:3
**reporter's** 6:8 213:1

**reporting** 107:2 203:14
**reports** 20:7 35:1 81:2,5,6 81:11 84:20,22 85:12,16 86:19 103:3 104:10 142:16 153:23 160:13 202:9 208:2
**represent** 8:8 186:15 210:18
**representing** 7:11 13:16
**represents** 213:8
**reproductions** 15:7
**reproductive** 15:12 205:5
**reputation** 98:21
**request** 18:4 19:6 88:4 125:24 197:24 198:7,11 213:10
**requested** 88:1 88:13 117:16 146:6 163:3 197:4,22
**requests** 17:25 18:5,7,9
**required** 130:21 190:18 216:13
**research** 4:13 21:17 23:14 39:6 73:19,21 73:24,25 74:2 74:4,7 126:10 127:4 138:18
**residual** 92:18
**residuals** 130:5
**residue** 131:14
**residues** 131:20
**resistance** 188:20
**resolving** 102:21
**respect** 14:5 15:24 16:6,8 71:9 109:2 115:14 116:3 121:1 130:7 175:16 181:18 185:18 196:23 202:20
**respectfully** 142:14 179:11 183:4,20
**respond** 12:4 18:16 27:20 31:16 54:12,25 61:9 76:16 77:17 83:4 85:24 101:21 103:19 115:6 125:16 132:11 138:1 143:9 145:2 152:2 198:2 202:16 208:22
**response** 27:16 77:9 81:24 110:2 115:15 117:11 134:12 134:15,18 144:23,23 156:3,5 166:12 170:6,11 172:12,15 173:20,25 176:5,6,18 179:15 180:1 185:15,16 191:19 198:4 201:14,16 202:3,9,18
**responses** 10:8 174:15,23 175:7
**responsibility** 104:6
**responsible** 199:17
**responsive** 18:5 18:11
**rest** 66:10
**restate** 192:12
**result** 39:18 177:4 193:12
**resulting** 23:10 204:17
**results** 141:21 141:22 177:25
**retained** 9:9,11 28:12 29:3 61:16 74:23 75:1,3 79:5
**return** 214:13 214:16
**revealing** 165:2
**review** 17:24 18:5,7 49:5 84:19,22 87:8 87:21 96:21 107:2 112:3,18 112:20,21 113:5,13 114:3 121:5,9 122:9 122:15,20 138:10 140:22 143:17 144:3 151:20 154:14 158:9 178:14 199:6 209:7 213:10 214:7
**reviewed** 31:10 34:25 51:21 64:6,10 65:8 65:24 84:23,23 85:1 135:22 136:2,17,17

137:2,7,16 138:16,17 141:2 143:3,5 143:25 208:3 208:15
**reviewing** 29:21 30:3,6 45:13 117:17
**revised** 72:23
**revlon** 4:7,7,8 96:6,6
**rhinosinusitis** 43:16
**ribonucleoside** 164:22
**richard** 5:13
**richmond** 3:5
**ricordati** 5:8
**right** 7:14,23 8:7,15,18 9:11 10:7,16,22 11:2,7,19,23 12:15 13:25 15:1,15 17:15 18:3,19 20:1 20:10,14 21:9 22:17 23:15 26:4,5,19 27:2 28:11,13 29:15 30:5,9,19 31:25 35:11,24 35:25 36:4 40:5 42:3,16 42:18 43:17 44:2,5 46:9,14 47:6 48:21 49:11 51:4,16 52:5 56:20 57:2,23 60:6 61:24 62:8,8 64:4,6,15 65:7 66:7 69:19 70:24 71:11 72:21 73:19 74:6,19 75:1 79:19,24 81:16 82:5 84:10,18 86:20 87:4 90:9 91:11,17 93:18 97:5 102:4 103:5,8 104:25 105:9 106:14 107:21 108:2,12 109:13,17,22 110:7,23 112:16 113:6 113:13 114:2 117:23 118:3 120:1 123:24 124:1,23 125:3 125:11,12 127:6 129:9 131:8,21 132:5 132:21 133:12 133:15 134:6 135:20 136:5,8 136:17 137:1 137:20 140:13 140:22,23,25 141:3 142:11 143:23 146:5,8 146:16,20 147:4,12,21 148:2,20,23,25 149:1,4,18,20 152:5 153:16 153:21 154:13 154:22 155:1 156:6 157:6,23 158:12 160:24 160:24 161:1,6 161:25 162:15 162:22 166:23 166:23 167:12 168:24 170:5 171:3,11,13,22 172:1,12,24 173:6 174:1 175:1,3,9 176:16 177:23 178:10 180:6 180:17 182:20 183:4 184:10 185:22 186:24 187:7 188:22 189:11 191:11 192:21 194:7 194:17 195:14 200:9,14,14 201:8,18 203:9 205:9,11,18 207:24 209:15 210:5 211:2 212:5
**rigorous** 196:6 196:11,16,24
**ring** 86:7,15
**rinse** 128:24 131:13
**rinsing** 185:12
**rise** 198:23 199:12
**risk** 40:7,10,17 40:18,19,20 41:5,8,9,11 42:2 70:10 114:5 193:7
**risks** 70:12 71:8
**rmr** 1:24 213:23
**robbins** 165:11 165:13 189:18
**robinson** 5:18
**robson** 5:22
**roche** 62:15
**rodriguez** 4:14
**role** 81:21 178:3 187:6 203:24
**rollers** 128:6
**room** 37:17
**ross** 1:17,24 213:3,23

**roughly** 29:2,6 127:24
**route** 23:25 186:15
**routinely** 110:21
**roux** 4:8
**rowland** 1:5
**rtecs** 154:7,10 154:13,15
**rtes** 154:6
**rule** 77:7
**ruled** 17:9
**rules** 1:21 9:20 44:16
**run** 17:2 61:24 86:2 141:11 188:12
**rwiese** 5:15

**s**

**s** 2:13 165:18 215:3
**safe** 41:6 43:8
**safety** 45:11 114:3,6 115:13 158:4 196:7,12 196:15,16,24 197:8,18,22,24 198:11,15,21 198:22 199:6 199:11 200:10
**sale** 17:5
**sales** 1:4
**salon** 54:14,15 146:12
**salons** 50:11 160:14
**salts** 175:19 176:8,11,13 201:17
**samples** 107:12 160:15 193:23
**san** 206:12
**sara** 5:18
**sat** 46:14,20
**save** 31:22 83:19 93:24 174:20
**saw** 12:23 52:2 52:6,9,13,17,20 53:11,12,15 54:15,18 55:19 81:5,6 95:4 96:4,13,25 97:19 98:5 101:7,14,15 104:2 107:1 112:9,20 113:16,22 116:4,4 120:10 120:23,25 124:7 127:23 129:1,2 138:18 139:4 141:21 142:2,15,15,18 142:25 150:7 150:11 168:23 189:21 192:22 194:25 195:7 197:5,6 199:12 199:23 208:2
**saying** 69:1 71:21 95:17 99:9 125:21 145:5 149:16 151:23 177:14 202:11
**says** 42:18
**scalp** 53:7 127:6 130:15 139:24 140:2 185:8 199:19 204:23
**scholarship** 206:11
**school** 36:10 40:24
**schulman** 86:17
**science** 21:20 22:7,7 36:21 37:9,11 39:15 44:25 66:5
**sciences** 40:8 64:14 68:11 72:25
**scientific** 95:6 184:9
**scope** 76:12,21 77:3 135:18
**scroll** 174:19
**scrolling** 142:21
**scrutiny** 140:13
**se** 119:13 123:3 138:15 150:22 160:13
**seamans** 4:10
**search** 117:18 123:15,18 131:19 142:21 199:5
**searched** 88:22 89:22,23 121:24 131:20 168:5 171:19 173:3 198:13
**searching** 29:13
**seclusive** 181:20
**second** 6:12 64:17 101:19 148:16 167:6 174:6 186:10 202:25
**seconds** 93:25 186:23,23
**section** 113:4 113:11 117:5 124:21 147:6 149:6 150:8 161:17 163:17 164:4 181:2

191:16
**sections** 181:2
**sedran** 2:14
**see** 10:10 27:11 29:16 33:14 38:25 53:15 81:6,8 89:3,10 90:16 95:15 96:17,24 97:4 106:3 109:5 112:10 114:23 121:5 122:2 123:16 128:8 136:15 171:6 174:15 175:22 179:23 184:6 193:11,18 194:1 197:11 199:7 200:4 203:21
**seeing** 198:24
**seen** 17:22 24:8 27:16 53:16,19 54:15 86:11 142:7 143:22 178:14 208:12 208:24 209:8
**segal** 3:10
**selection** 210:24
**selling** 99:8 107:17
**semester** 44:9 44:10
**sense** 106:21 191:19
**sent** 80:18,20 84:24 193:23 214:14
**sentence** 91:17 163:8 186:10
**separate** 20:3 48:5,11 80:3
**separating** 48:25
**september** 28:13 29:16,17
**sequence** 164:1
**series** 134:7
**served** 18:14 33:21 61:18
**serves** 181:4
**services** 42:16
**serving** 8:4 33:23
**set** 47:25 99:25 141:12 174:6 174:10,11,11
**settle** 17:8
**seven** 203:23
**several** 8:15 165:5 181:15 207:16
**shahadat** 3:3 48:19 86:13 190:24
**shampoo** 50:16 194:21
**shampoos** 24:6 24:8,9 45:21 45:23 52:12,14 179:4
**share** 80:14,17
**shared** 33:21
**sharon** 1:17,24 10:8 213:3,23
**sharp** 60:20 62:13
**shb.com** 3:18
**sheet** 31:2 98:5 170:14 172:5 214:11
**sheets** 95:7 96:25 97:15,18 97:20 104:2 115:1 120:10 125:7 141:16 141:18
**shelf** 146:12 191:25 192:3 195:4
**shipra** 4:23
**ships** 146:11
**shook** 3:15
**short** 56:14 100:6 192:5 195:4 205:19
**shorthand** 1:17 213:3,7
**shortly** 211:10
**show** 88:9,9
**showed** 43:11 125:20
**showing** 193:11
**sic** 71:4 188:14
**side** 33:18,18 33:18,19
**sign** 214:12
**signature** 6:7 213:22
**signed** 214:19
**significant** 164:10
**similar** 35:6 38:20 57:5 69:22 102:17
**similarly** 127:10
**simple** 190:16
**simply** 110:9
**single** 98:21 121:2,10 122:15,16 151:6 168:1 181:17,20 193:18
**sir** 7:13 14:7
**sit** 113:25
**site** 33:22 185:8
**sites** 125:17
**siting** 167:25
**sitting** 146:9,11 168:25 195:13
**six** 85:2 203:22

**skill** 199:17
**skin** 23:22 56:9 57:1 108:10 127:7 130:7,10 140:7 164:19 166:2,5 182:16 184:23 185:5,8 185:18 186:13 186:14,23 187:5 199:2,24 200:5 201:14 204:24
**skip** 74:19 161:2
**slightly** 45:4 173:14
**small** 139:17,20 140:7
**smehta** 4:25
**smell** 46:24
**smelled** 46:25
**smoothly** 9:21
**smsm.com** 3:12
**sniff** 160:10
**sodium** 49:8 96:14
**soft** 161:9 162:11 163:10
**softsheen** 4:2 210:20
**sold** 16:25 101:13
**solid** 184:11
**solids** 184:3
**solubilities** 139:11
**solubility** 139:9 180:23 183:5,9 183:17,21
**soluble** 180:20 180:21,24 182:18,23 183:17,17,23
**solution** 116:22 184:12
**solutions** 5:24 68:6 73:5 117:21 214:23
**solvent** 46:22 188:16
**solvents** 92:18
**solving** 46:18
**somebody** 130:2 134:25 210:12
**somebody's** 12:18
**someone's** 129:25
**somewhat** 151:16
**son** 3:14
**sorry** 15:20 20:12,19 21:22 28:20 34:12 40:3 47:22 49:3 51:11 53:2 59:21 66:16 67:18,18 73:2 77:1 78:17,19 86:4 104:21 110:5 119:1,3,14 122:12 131:11 131:11 138:24 148:11 151:18 154:6 162:2,13 168:10 170:16 173:7 182:3,5 182:11 187:22 188:13 192:25 196:5,18 210:12 211:16
**sort** 69:22 88:10 90:3 94:19 110:1,21 113:8 115:8 151:10 188:21
**sorts** 73:8
**sounds** 85:4
**source** 137:4,15 137:19,19 151:2 153:5 167:8
**sources** 137:2 179:2
**south** 4:15
**space** 33:21 73:14 99:19 206:21,21 207:19
**spaces** 207:17
**speak** 9:25 71:21 149:7 209:2
**speaking** 67:2 93:6 179:22
**speaks** 45:10
**spec** 96:25 97:15,18,19 98:5 99:1,5 100:8 104:2 125:6 141:18 193:17
**spec'd** 100:22
**special** 15:18 16:1
**specialize** 22:17
**specialty** 22:9 35:25 36:5 37:6,19 39:9 39:20
**species** 87:10 90:21,22 91:1 91:4,10,12,19 108:21 128:9 161:2 167:3 183:6
**specific** 15:3 16:14 21:22 33:1,22 34:5,9 34:14 37:23 51:7 66:23 69:7 87:22

90:4 97:2 100:15 105:16 109:23 110:25 111:9,15 113:4 113:24 115:9 115:12 118:23 123:3 129:11 129:17,21 133:2 134:7 141:4 145:8 184:18 188:21 190:17
**specifically** 21:10 24:16 25:16 47:12 49:5 57:8 65:24 72:5 76:5 79:15 104:25 105:1 131:13 136:9 143:15 149:7 149:16 159:1,7 159:8,10 182:15 207:2 208:8
**specification** 95:7 98:10,14 99:5 101:25 115:1
**specifications** 95:25 99:25
**specificity** 175:24
**specifics** 15:5 67:9 96:9 133:7
**specify** 96:13
**specs** 96:17 101:2,4,8,12 102:9
**spectrum** 43:22 51:22
**spectrums** 22:4
**spell** 165:18
**spending** 28:6
**spent** 18:22,24 26:23 27:1,13 28:3 29:8,25 30:3,9,15,21
**spin** 33:6
**spiral** 162:11 163:10
**spoke** 39:1 46:7
**spreadsheet** 195:1
**spreadsheets** 141:24 172:7
**spun** 33:8
**square** 139:15 139:20
**st** 20:14,20,25
**stabil** 107:19
**stability** 36:15 64:17 69:5 106:25 107:2,7 107:19 187:8 187:11,12,20 187:23,25 188:1,3,8,9,19 188:22 189:7 189:10 191:12 191:15,21,24 192:4,6,10,15 193:3,9,13 194:8,19 195:10,17,20
**stable** 107:4,9 125:7,10 188:4 195:1
**stages** 191:22
**stand** 11:14
**standard** 98:13 107:7 199:12 199:14
**standards** 112:4,6,18,21 112:25 113:6 113:15 114:3
**standing** 47:8 49:2 77:10
**standpoint** 193:3
**stands** 206:13
**stanley** 79:10 79:13
**stars** 4:4
**start** 64:11 75:5 123:21 142:21 147:6 147:17 159:20 187:21,24
**started** 27:6 28:16 43:7 70:17 90:1 117:24 183:5
**starting** 92:16
**starts** 188:18
**state** 1:18 7:20 127:18 136:16 161:24 162:8 197:5
**stated** 1:22 33:4 58:13 161:10 201:1,9
**statement** 6:15 18:22 26:8,20 27:12 28:11 30:16 88:2 120:19
**statements** 12:22
**states** 1:1 117:5 138:2 149:5 152:19 183:16
**stating** 65:3
**statistics** 25:25
**stats** 23:2 25:18
**stay** 94:4
**stearates** 150:11
**stenotype** 1:18
**step** 106:16
**stepping** 77:16
**steps** 95:1 154:2

Case: 1:23-cv-00818 Document #: 1828-15 Filed: 05/05/26 Page 274 of 286 PageID #:75001



**steroid** 38:12 43:21 99:13
**steroids** 38:15
**stomach** 74:12
**stood** 40:23
**stop** 11:10 81:16 188:14
**storage** 92:19 149:6
**store** 53:21 146:12
**stormed** 46:22
**story** 43:19
**straight** 126:16 126:19
**straighten** 135:3
**straightening** 50:7 162:9 163:8
**straightforward** 178:4
**strategy** 41:6
**street** 1:20 2:4 2:14 3:5,16,21 70:5
**strength** 1:14 3:13,13
**stress** 107:7,12
**stretched** 161:9 162:11 163:11
**stromal** 24:24 25:9
**strong** 154:20
**structural** 164:6 165:7
**stuck** 17:2
**stud** 137:15 158:6
**student** 36:23
**students** 36:12
**studied** 24:19
**studies** 40:10 56:7,23,25 69:5 70:3 108:17 130:6 136:17 137:2,7 143:24 144:9 158:5,6 184:17 185:5,18 192:4 192:5 193:9,13 196:7,12,16,16 197:8,18,22,25 198:11,15,21 198:22 199:1,2 199:6,11 200:5 200:11 202:22
**study** 55:23 56:5,11,21 57:3,10,12 106:25 137:16 143:4,17,18,20 143:21 158:17 192:6 206:10
**stuff** 84:5 99:16 99:22 126:4 136:9 140:21 143:11 185:16
**stupid** 207:12
**styled** 1:15 161:25
**styling** 128:5,6 128:17
**submit** 27:21
**submittal** 81:2
**submitted** 13:4
**subscribed** 216:14
**subsequent** 150:1,11,14
**substance** 76:16
**substances** 154:8
**substitutes** 199:2
**suddenly** 190:15
**sued** 17:5
**sufficient** 190:10
**sugar** 11:11 183:11
**suggest** 172:20
**suggested** 169:21
**suggestion** 158:8 181:3
**suggests** 181:19
**suite** 1:20 2:4 2:14 3:10,16 3:21 4:15,20 4:24 5:4,9,14
**sulfate** 96:14
**sum** 91:18
**summaries** 208:15,20,24
**summary** 32:12 32:22 34:8 91:18 209:8
**sun** 60:21 62:22 63:19
**super** 72:10,10
**supernus** 62:24
**supplement** 206:21
**supplements** 35:18 206:1
**supply** 100:6
**support** 46:11 125:11,23 132:1 133:19 181:21 206:12
**supported** 33:19
**supports** 124:10,14 167:8,10
**suppose** 93:12 124:4 133:3 144:16 147:25 180:12 189:6
**sure** 9:13,25 10:7,11 11:13 20:4 22:5

34:14,18,20 47:16 51:13 56:2 67:20 71:19,20 77:19 78:19,19 81:4 81:10 85:6 93:15 97:9,18 98:8 100:18,19 105:24 108:4 111:3,4 116:7 116:9 122:23 124:14 126:1 134:23 145:17 145:18 146:2 151:18 162:3 189:1 196:11 201:25
**surface** 74:17 133:19 139:21 201:13
**surprised** 195:2,3
**survive** 41:3
**susceptible** 125:5
**suspensions** 68:6 73:6 117:21
**swallowing** 108:11
**swear** 7:6
**sweat** 201:18
**swells** 49:18
**sworn** 1:14 7:15,17 213:6 216:14
**synthetic** 39:13
**system** 25:1 50:9,10 70:4 90:15 122:9 168:24
**systematic** 113:5 121:4,9 122:4,20 151:20 152:14
**systematically** 136:1
**systemic** 122:9 122:20 152:15 186:15
**systems** 1:25 3:19 23:25 24:6 50:2,3,20 50:25 51:6 56:1 58:22 74:1 107:8 213:24

**t**

**t** 144:8 165:18 215:3,3
**table** 118:8,19 118:23,24 119:11,15,16 119:16,19,22 120:22 122:5 147:18,19,23 147:24 148:8 149:21 150:3 150:11,14,16 150:16,23 151:3,4,7,8,10 151:11,15,21 151:22,22,22 151:24 152:6 152:16 153:12 153:22 155:14 156:17,21 157:16 158:12 158:15,23 159:10 166:23 166:24 167:1,2 171:13,14 174:2,13 179:17,21
**tables** 118:11 118:14 119:9 120:4,16 121:1 122:16,25 147:15,16 150:2
**tablet** 207:14
**tablets** 37:14
**tag** 138:7
**take** 7:23 10:24 11:1,17 21:16 22:14,25 24:2 24:18 25:13,22 30:20,22 40:20 41:21 53:23 56:13,18 57:16 58:2,10 72:6 72:13 88:19 90:12 91:14 93:25 105:23 106:4,16 109:4 114:10 115:11 122:22 132:8 147:4 159:18 160:2 162:14 174:9 180:14 191:2,3 205:9 209:18 210:25 211:21
**taken** 1:15 8:15 8:18,21 9:6,19 25:2,14,18 70:18 213:7
**talk** 19:23 62:1 127:16 132:4 135:21 136:7 143:24 155:1 156:25,25 157:7 160:8 161:18 163:20 164:24 183:6
**talked** 66:19 68:25 75:17 84:8 85:22 127:6 135:5 163:16 177:10 178:2 187:8,10 188:9 205:20 205:21 207:25 208:1

**talking** 9:25 25:5 40:6 53:6 57:8 64:9 66:8 108:1,2 114:25 115:19 128:16 140:22 141:6 151:21 155:12 163:4 167:11 170:1 184:16 187:11 191:12 203:14,22 208:8
**talks** 44:13,13 163:17
**tangential** 47:4
**tangentially** 112:20
**tap** 129:24,25
**task** 90:5 91:18
**tasked** 87:25
**tasks** 109:16 110:2
**taught** 36:8
**teach** 25:2 36:11 44:2,6 181:22 206:4
**teacher** 44:6
**teaching** 36:11
**team** 33:24 35:7 46:11,17 46:19
**teams** 75:11 79:9
**technical** 33:17 33:19,24 46:11 95:9 102:8
**technique** 107:7 190:9,10
**technologies** 42:7,11,14
**technology** 32:17 64:14
**tell** 37:1 40:23 75:7 79:1 124:18 142:22 168:17 169:1 171:2 190:6
**temperature** 107:6,9 108:23 127:19 128:3 128:13,19 129:8,10,13,17 129:23
**temperatures** 107:10 127:17 128:7 129:5,6 129:23
**temporality** 155:7,9
**ten** 135:1 153:6
**tense** 42:23
**terephthalate** 37:10
**term** 66:11 89:22 91:10 121:24 155:10 192:5 196:6,12
**terms** 164:2
**territory** 78:25 78:25 81:20,24
**test** 11:19 55:20 68:13 96:7 98:20 141:21,22 190:9
**tested** 55:5,6,18 68:11 69:4,12 69:15 96:18 97:3 194:6
**testified** 7:17 11:23,25 12:10 12:15 13:2 14:1,2,8,16,20 14:23 15:12 60:19 142:6 198:8
**testify** 12:24 60:14,16 81:15 81:17 116:25 120:15 185:20 194:7
**testifying** 11:20 144:10 145:5 145:13 192:9 193:8 194:14
**testimony** 11:5 12:6 16:1,2 61:8 68:14,20 82:25 83:3 95:21 101:20 110:12 115:23 116:2 125:15 130:1 144:13 156:24 167:25 168:4 176:2,20 176:24 179:16 181:10 193:10 194:11,13,17 204:17 209:11 214:9,17 216:8
**testing** 55:3,9 55:16 96:24 97:10,12,13 102:10,12 103:5,11,13,15 104:8 124:10 124:14 125:13 125:22,23 130:14,18,20 132:1 133:22 134:4 158:11 158:14 178:21 178:24 179:24 179:25 192:1 192:14,20 193:16,22 195:17,20,23 196:2,22 211:21
**tests** 55:19
**texas** 1:18,19 1:20,24 3:11 3:17 21:7,13 33:5,6 38:19 43:25 44:20

46:10 61:23 206:14 211:18
**text** 150:13
**textbook** 21:25
**thank** 13:25 17:18 26:4 48:20 57:17 106:23 126:5 191:5 209:15 210:3,5,9 212:2
**thanks** 56:19 61:17 97:17
**that'd** 109:23
**theirs** 80:24
**themes** 65:2
**theoretical** 200:16,23
**therapy** 42:9
**theri** 42:4
**theridian** 32:17 42:4,6,7,7,10 42:13
**thermal** 38:22 40:22 70:7 108:22
**thing** 88:8 151:6 158:18 176:9 196:20 206:6
**things** 20:1,11 24:12 31:4 32:22 33:19 40:13,16 41:17 41:25 42:17 52:6 65:21 74:8,17 97:3 98:24 100:14 104:6,14 117:11 120:11 128:7 135:4,6 142:2,3,15 143:12,14 156:15 158:7 161:21 165:9 181:16 189:24 190:5 196:22 205:1 206:3
**think** 14:9 15:3 18:21 23:22 32:10 34:7,16 34:24 35:14,19 36:24 38:11 40:17,18 44:10 49:1,15 50:10 52:20,21 57:5 58:5 60:17 63:8 64:4 66:22 67:25 68:22 72:10 74:25 76:2 78:8,22 82:17 84:11,12 85:1 85:2,8 86:9,23 87:24 88:16 89:24 90:23 92:7,21 93:20 94:13 95:3,5 96:5 97:23 98:25 101:11 101:23 103:8 104:5 107:11 108:16,25 109:7,8 112:12 113:9 114:5,10 114:12,20 115:7 116:19 117:6 118:18 119:16 121:25 124:8 126:8,19 128:5,18 130:24 131:16 131:18,19 132:12 138:19 138:21 139:2 139:11,12,14 139:14,22 142:14 143:22 145:23 146:5 149:15 150:1 151:15 152:14 152:18 154:1 160:14 161:1 162:22 163:22 164:5,25 165:10,14,14 166:25 175:18 176:4 181:4,19 186:6,18 189:7 191:18 195:13 196:15,24 198:7,18 203:9 206:8 208:5 209:16,20 210:13,25
**thinking** 57:24 72:15 145:23
**third** 58:7 156:6 167:7
**thomas** 3:15
**thorough** 157:19
**thought** 42:8 63:17 126:2 182:10 199:13 199:16 206:3,6
**thoughts** 31:7 67:5
**thousands** 89:18
**thread** 101:10
**threads** 96:4 199:5
**three** 44:11 58:8,9,10,12,14 58:16,18,20 80:1,3 82:2,17 107:4 147:5 174:4 195:1,7
**threshold** 202:5,13
**thresholds** 203:10,20
**throat** 74:12
**throw** 192:23

**thursday** 1:10 8:22 213:4
**tie** 129:17
**tied** 176:6
**tighter** 100:23 101:1,12,25
**time** 7:4 9:21 10:23 15:5 17:1 18:22,24 26:22 27:1,13 27:22,25 28:3 28:6,17 29:25 30:3,9,14,20 31:2 35:1 36:22 43:11 46:14 57:6,19 57:21 72:5,19 74:5,18 75:5 80:1 83:7,19 88:3,20,22 89:7,7 93:24 95:3 105:23 114:10,16,19 120:2 132:21 132:24 133:23 134:23 135:1 143:16 145:25 147:8,11 155:16,19 157:21 158:13 162:18,21 168:6,7 173:19 174:21 177:12 178:2 183:7 184:16 187:16 188:5,20,23 189:3 191:7,10 192:2,17 205:3 205:14,17 209:23 210:1 211:11 212:6 214:18
**timeframe** 214:8
**timeline** 90:4
**times** 8:15,18 8:20 16:15 73:3 127:5 135:11 142:22 190:19 196:1 201:24
**timing** 81:10
**tissue** 72:12 130:10 164:21 199:21 201:19 204:23
**title** 73:6 168:16 211:6
**titled** 24:18 25:14 52:20 147:25 167:2,6
**titus** 4:19,22
**today** 7:12,23 9:21 10:8 11:4 11:8,20 17:21 20:2 26:3 28:6 30:18 66:18 73:18,23 100:10 113:25 116:2 136:1 137:5 144:13 167:25 168:9 169:1 188:9 196:1 198:8 201:24 203:23 205:20,25 207:25 212:2
**today's** 7:3 8:11
**together** 9:21 33:24 133:17
**tol** 165:17
**told** 47:24 174:24 198:14
**tolgyesi** 165:19
**tom** 79:10,17
**took** 21:11 22:16 24:11 25:20 37:9 39:16,22 46:19 160:14 162:24
**tools** 128:6
**toot** 73:13
**top** 15:10 59:20 173:10
**topically** 74:8
**topics** 24:12 25:14 45:7,12
**tort** 12:9
**totally** 184:7
**tough** 62:18
**towards** 66:4 69:24 210:23
**tower** 3:16
**tox** 117:11 152:6,9,11,15 154:11 202:22 204:11
**toxic** 12:8 109:23 154:7
**toxicity** 70:2
**toxicological** 74:14 152:16
**toxicology** 23:20,22 69:21 69:23 70:23 71:1 74:7 115:16 204:11
**toxin** 154:16
**tracking** 98:8 108:5
**trademark** 63:7
**train** 182:10
**trained** 38:9 40:1 90:14 206:7
**training** 21:10 24:16 32:11,15 34:1,8 40:16 65:5 102:18 137:13 158:2
**tran** 208:24
**transcript** 208:9,10 209:5

213:8,10 214:6 214:19 216:5,8
**transcripts** 208:4,7,16
**transdermal** 56:1 108:15
**translational** 165:1
**transport** 182:19
**travis** 3:16
**treat** 24:23 43:18 74:15
**treating** 43:9 74:10
**treatise** 73:14
**treatment** 14:10,19,21 24:19 52:16
**treatments** 42:22
**trial** 1:19 17:6 60:14,16,19 158:25 159:7 159:15 160:9 160:13,16,18 160:23 200:10
**trials** 157:14 158:21 159:17 159:19 160:7
**tried** 140:15
**trouble** 180:2
**troubled** 199:22 200:4
**troubling** 199:19
**truck** 146:10
**true** 213:8 216:8
**trust** 175:23
**try** 10:3,17 90:3 93:16 97:5 100:19 112:24 113:10 120:1 121:19 168:14 170:5 171:4 188:15
**trying** 51:17 65:1 79:13 92:8 95:16,23 120:3,12 138:6 142:1 149:21 151:3 153:10 159:6,24 160:6 174:20 183:14 208:11
**tube** 132:20 133:11 146:9
**tubes** 50:1,4,6 50:11
**tumors** 24:24 25:5,6,9
**turn** 113:4 166:23 191:16
**two** 29:6,7 41:9 41:16 44:11 56:15 86:20 107:8 133:17 140:4 143:23 150:23 168:7 173:11,15
**tx** 213:23
**type** 12:9 24:6 92:23 98:4 107:24 110:8 132:4 133:9,14 142:11 152:6
**typed** 78:23
**types** 24:12 128:2,17 164:11
**typewriting** 213:7
**typical** 44:8 98:14 109:19 109:24 111:1 129:23
**typically** 117:10 124:5

**u**

**uh** 17:19 79:20 87:7 93:22 124:24 126:13 150:17 153:17 160:21 209:6
**ultimate** 153:11 191:14 191:21
**ultimately** 39:5
**unable** 198:25
**unchallenged** 185:19
**uncommon** 96:12
**under** 35:19 44:22 97:23 106:10,21 107:9,23 116:18 125:6 133:21 136:3 165:4 193:5 201:10
**undergo** 129:20 145:14 145:21 146:21 152:6
**undergrad** 38:8
**undergraduate** 20:14
**underline** 113:8
**underlying** 66:5 101:8
**understand** 10:17 15:17,22 16:4,8 18:17 25:23 29:11 34:18 49:25 50:1,9 51:13 66:11 68:13 77:19 80:23 88:21 89:8 95:16,24 97:9

97:23 102:24 105:6 109:3 113:9 127:21 128:1,24 134:17,23 136:3 177:18 185:3 187:3 188:25 189:19 197:4 203:21 208:11
**understanding** 8:2,14 11:20 13:9 15:25 16:5,12 25:24 28:18 40:2 42:15 49:16 94:17 153:2 154:10 155:8 155:22 156:8 156:11,12 157:9 158:4 166:24 167:1 177:13 203:24 204:10
**understood** 10:20 28:25 35:3 56:2 71:19 100:21 116:7 142:4 151:13
**underwent** 165:3
**unfolded** 165:20
**union** 138:9
**unique** 23:3 33:7 129:19
**unit** 100:4
**united** 1:1 138:2 183:16
**universe** 197:1
**university** 20:13,13,16,19 20:25 21:7,12 21:13,13 22:14 38:19 43:25 44:20
**unnecessary** 143:13 201:1
**unsafe** 115:4
**unstable** 188:5
**update** 19:21 19:25
**uptake** 186:15
**urea** 171:7,9,10 171:11,16,23 172:2,9,13,17 172:19,22,23 173:1,9,12,20
**usa** 4:2,2 210:19,19
**use** 26:16 36:12 37:17 54:1,16 58:21 66:11 68:4 70:22,23 71:12,16,17,23 72:9 74:5 89:17,19 90:4 98:20 108:13 108:14 109:19 109:24 111:1 111:10,22,25 112:13 128:18 129:1 130:4 134:20,21,24 135:1,5,6 139:23 142:1 143:4 144:24 145:14,21 146:8,13 155:13,15,19 157:14 158:22 159:2 166:8,14 166:19 170:6 173:20 183:9 188:23 189:3 190:19 192:21 192:22,23 193:5 195:7 196:9,13 204:18 207:11
**used** 36:9 37:12 37:13 39:13,16 39:25 46:22 50:10,11,24 53:7 59:25 65:11,12,25 70:10 73:8 79:15 98:11,12 105:9 107:10 128:1 134:25 135:11 139:14 152:14 154:11 154:19 169:22 198:24 207:11 214:19
**user** 40:19
**users** 87:14
**uses** 33:7 72:9 130:2
**using** 39:22 73:11 99:10 124:11,15 129:2,3 164:16 179:6 199:4
**usp** 99:13,17 138:12 183:9
**usually** 31:17 71:8 75:10
**uterine** 14:24 15:7 111:22 166:15

**v**

**v** 214:4 215:1 216:1
**vacuum** 188:15
**vague** 132:10 176:24 181:10
**van** 180:8
**varies** 202:23
**various** 77:6 99:17 119:8 128:2,7 165:2 207:25

**vary** 128:2
**vaseline** 181:23 183:22
**vehicle** 181:4
**veloxis** 63:20
**vendor** 96:6,7 96:18 97:2 98:15,20 99:8 100:7 101:12
**vendors** 101:5
**venice** 2:19
**veracity** 138:14
**verbally** 76:13
**verification** 199:25
**verified** 118:19 120:8 127:5 148:7 150:1,5 150:19 179:24
**verify** 40:10 95:2 98:13 102:13 110:15 121:21 122:3 123:20,22 135:12 165:12 183:23 189:16 193:16 203:11 214:9
**verifying** 89:17
**veritext** 5:24 214:14,23
**veritext.com.** 214:15
**version** 31:17 31:20
**versus** 60:19,20 60:21 62:3,10 62:13,15,22,24 63:2,10
**vibrate** 11:10
**video** 54:2
**videographer** 5:23 7:2 57:18 57:20 94:4 114:15,18 147:7,10 162:17,20 191:6,9 205:13 205:16 209:22 209:25 210:7 210:10,13 212:3
**videos** 54:6,18 59:13,14,17,24 60:4
**videotaped** 1:8 1:12 6:12
**vigor** 199:9
**virginia** 3:5
**viscosity** 104:3 188:4,4,6 193:17
**visited** 206:17
**viz** 2:3

**w**

**w** 86:22
**wacker** 5:14
**wait** 10:2,3 78:15,17
**waived** 213:14
**walk** 94:6
**walnut** 2:14
**want** 9:20 31:18 34:18 37:1 41:19 43:13 55:12 56:2 61:10 71:19 93:21,23 94:4 97:9 98:8 99:15 100:25 104:7 105:25 107:23 108:7 111:3 116:7 126:4 135:21 136:1,8 146:2 146:4 151:17 157:21 158:17 158:25 160:2 165:12 176:6 183:8 189:15 191:1,2,13
**wanted** 39:5 62:1 135:2 207:13
**wants** 74:9
**warehouse** 146:10
**warm** 128:23
**warner** 33:15 46:12 100:24
**wash** 22:13 130:8,12 131:13
**washed** 130:16
**washing** 130:25 185:11
**washington** 20:13,25 21:12 54:16
**washu** 22:13,18
**waste** 183:6
**watched** 54:2 59:17 60:3
**watching** 59:23
**water** 96:17 128:25,25 129:24,25 139:9,18 180:20,23 182:17 183:11 207:15,15
**way** 11:14 39:7 43:15 64:24 87:24 93:12 107:20 112:24 133:1,6 141:1 213:16
**ways** 41:9 98:24 149:2
**we've** 18:21 26:19 31:7

32:6 56:8 66:19 75:16 100:7 127:6 161:1 187:8 188:9 194:3 203:21 205:20 208:1
**wear** 11:9
**website** 126:2
**weed** 86:20,22
**week** 9:6 63:14
**weight** 38:21 170:3
**went** 22:18 39:1 43:5 53:21 90:1 117:24 118:14 121:24 148:3 168:9 174:4 191:11 198:13
**west** 3:21 4:20 4:24
**white** 74:12 143:17,18
**wideikis** 4:23
**widespread** 158:20
**wiedner** 5:8
**wiese** 5:13
**wife** 42:8 43:5 45:24 54:13
**witness** 1:13 7:7,15 8:5 17:18 48:14 60:8 61:8 68:20 83:3 94:8 95:21 101:20 103:20 103:23 105:14 110:12 115:23 119:3 123:12 135:23 136:25 151:19 168:4 170:20 176:24 181:10 184:14 187:16 190:21 209:2 212:4 213:5 214:8,10 214:12,18
**wmlaw.com** 5:10
**woman's** 205:6
**won** 206:11
**word** 40:17 42:19 70:9 135:5 138:25 152:14 182:6
**words** 42:9 91:6
**work** 22:23 27:18,22 28:15 28:17,24 29:16 29:22 30:23 32:10,14,16,18 33:24 35:13 38:10 39:3 47:25 54:8 55:25 57:13 65:2,6 68:10 68:22 69:20,22 70:11,17,21 75:15,16 76:24 78:24 81:15 89:9 102:19 109:11 110:22 112:17 116:14 131:22 138:20 141:2 154:14 154:23 157:20 158:13 168:14 179:5,10 190:12 198:6 205:20,24 206:18 208:20
**worked** 25:3 33:14 35:17 46:14 60:25 65:13 69:3 100:24 102:19 207:16,18
**working** 25:24 26:23 27:1,13 31:5 35:15,23 41:18 46:15 63:19 74:9 211:11
**world** 107:17
**worldwide** 5:12
**write** 35:1 73:15,15 94:24 160:19
**written** 24:7 69:5 76:20 77:2 78:2,16 80:14,17 83:12 85:11 126:25 139:5
**wrong** 20:16 79:21 138:24 199:4
**wrote** 40:21 76:18 117:20

**x**

**x** 54:16 90:10 90:10 125:7 190:12 213:11

**y**

**y** 123:16 125:8 165:18 171:7 172:19
**ye** 113:8 116:1
**yeah** 11:16,18 25:9 28:21 29:1,24 32:1,4 37:4 41:15 45:4,9 47:22 48:2,9 52:4 55:13 61:17 62:18,20 65:4 69:1 71:15 75:8,20 77:22 78:4,9 83:5 90:14 92:12 98:24 99:23

100:9 102:3 106:17 109:16 110:5 120:14 122:14 126:3,3 131:25 132:16 133:13 134:24 137:11 140:20 141:9 142:5 146:1 151:14 155:18 159:3,6 160:22 163:7 163:16 165:13 170:16 171:14 172:14 173:24 176:18,20 179:1 182:10 184:1 185:20 186:8 187:21 189:25 196:15 202:17 204:7

**year** 19:12,13 19:14 27:10 29:6 36:22 37:1 44:11

**years** 8:17,21 9:19 29:7 61:2 64:1,3 65:17 73:17 135:1,2 135:2 139:5 158:2 199:20

**yesterday** 30:17 107:2 194:25

**york** 4:11,11

**young** 199:20 206:8

**z**

**z** 171:7 172:19

**zenara** 62:3

**zierlein** 5:24

**zoeller** 79:22 79:23,24 80:17 83:17,18

**zones** 107:14 107:16

**zoom** 2:3,9,13 3:9,15,20 4:3,9 5:18,18,19,19 5:22 79:9 210:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.