# Exhibit 15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------x

IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

Case No.1:23-cv-00818

MDL No. 3060

Judge Mary M. Rowland

------------------------------x

March 11, 2026
9:38 a.m.

VIDEOTAPED DEPOSITION of SILVINA PUGLIESE, MD, held at the law offices of DiCello Levitt LLP, 485 Lexington Avenue, 10th Floor New York, New York, before Judith Thaten, a Certified Livenote Reporter and Notary Public of the State of New York.

Job No. 7933458

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS
SHIPMAN WRIGHT & MOORE, LLP
575 Military Cutoff Road, Suit 106
Wilmington, North Carolina 28405
BY: GARY K. SHIPMAN, ESQ.
gshipman@shipmanlaw.com
-and-
ASHCRAFT & GEREL LLP
1825 K Street NW, Suite 700
Washington, DC 20006
BY: MICHELLE A. PARFITT, ESQ.
mparfitt@ashcraftlaw.com

ON BEHALF OF DEFENDANT - Luster Products
MARON MARVEL BRADLEY ANDERSON & TARDY LLC
191 N Wacker Drive, Suite 2950
Chicago, Illinois 60606
BY: ROBERT PETTI, ESQ.
rpetti@maronmarvel.com

ON BEHALF OF DEFENDANT - Beauty Bell
LITCHFIELD CAVO, LLP
303 West Madison Street, Suite 300
Chicago, Illinois 60606
BY: JOSEPH SULLIVAN, ESQ. (via Zoom)
sullivanj@litchfieldcavo.com
KEVIN TITUS, ESQ. (via Zoom)
titusk@litchfieldcavo.com
-and-
COSTELLO GINEX & WIDEIKIS, PC
150 N. Wacker Drive, Suite 1400
Chicago, Illinois 60606
BY: SHIPRA MEHTA, ESQ. (via Zoom)
smehta@cgw-legal.com

A P P E A R A N C E S (cont'd)

ON BEHALF OF DEFENDANT - John Paul Mitchell Systems
CLAUSEN MILLER PC
10 S LaSalle Street
Chicago, Illinois 60603
BY: VALENTINA BARTOLOMEO, ESQ. (via Zoom,)
vbartolomeo@clausen.com

ON BEHALF OF DEFENDANT - McBride Research Laboratories, Inc.
DINSMORE & SHOHL, LLP
200 S. Biscayne Boulevard, Suite 2401
Miami, Florida 33131
BY: AUDRIANA RODRIGUEZ, ESQ. (via Zoom)
audriana.rodriguez@dinsmore.com

ON BEHALF OF DEFENDANT - Murray's Worldwide
MARON MARVEL BRADLEY ANDERSON & TARDY LLC
191 N. Wacker Drive, Suite 2950
Chicago, Illinois 60606
BY: LESLIE A. FEDERER, ESQ. (via Zoom)
lfederer@maronmarvel.com

ON BEHALF OF DEFENDANT - House of Cheatam
McGUIREWOODS, LLP
800 East Canal Street
Richmond, Virginia 23219
BY: JORDAN LaPOINTE, ESQ. (via Zoom)
jlapointe@mcguirewoods.com

ON BEHALF OF DEFENDANT - AFAM Concept Inc. d/b/a JF Labs
GOLDBERG & SEGALLA, LLP
665 Main Street, Suite 400
Buffalo, New York 14203
BY: LYNN LEHNERT, ESQ. (via Zoom)
llehnert@goldbergsegalla.com

A P P E A R A N C E S (cont'd)

ON BEHALF OF DEFENDANT - Dudley Beauty Corp., LLC

MARSH ATKINSON & BRANTLEY
271 17th Street NE, Suite 1600
Atlanta, Georgia 30363
BY: EMILY D. ROBINSON, ESQ. (via Zoom)
emily.robinson@mablawfirm.com

ON BEHALF OF DEFENDANT - Revlon, Inc.

ECKERT SEAMANS CHERIN & MELLOTT LLC
275 Madison Avenue, 10th Floor
New York, New York 10016
BY: JUSTINA A. NZEGWU, ESQ. (via Zoom)
jnzegwu@eckertseamans.com

ON BEHALF OF DEFENDANT - RNA Corporation

TABET DIVITO & ROTHSTEIN
209 S LaSalle Street, Suite 700
Chicago, Illinois 60604
BY: DANIEL STANNER, ESQ. (via Zoom)
dstanner@tdrlawfirm.com

ON BEHALF OF DEFENDANT - Avlon Industries, Inc.

WIEDNER & MCAULIFFE
One North Franklin Street, 19th Floor
Chicago, Illinois 60606
BY: KRISTEN A. SCHANK, ESQ. (via Zoom)
kaschank@wmlaw.com

ON BEHALF OF DEFENDANT - Advanced Beauty Systems, Inc.

Heyl, Royster, Voelker & Allen, P.C
701 Market Street, Suite 1505
Saint Louis, Missouri 63101
BY: SARA PEAL, ESQ. (via Zoom)
speal@heylroyster.com

ALSO PRESENT:

JULIAN COSMA, Legal Video Specialist
Veritext Legal Solutions
MACK ROBSON, IT Concierge
Veritext Legal Solutions

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except to the form of the question, shall be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the court.

* * * *

PUGLIESE

VIDEOGRAPHER: Good morning. We are going on the record at 9:38 a.m. EDT on March 11th, 2026. Please note that microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Silvina Pugliese, MD, taken by counsel for defendant in the matter of Hair Relaxer Marketing Sales Practices and Products Liability Litigation filed in the United States District Court for the Northern District of Illinois Eastern Division. Case Number 1:23-cv-00818.

The location of this

PUGLIESE

deposition is New York, New York.

My name is Julian Cosma representing Veritext, and I am the videographer.

The court reporter is Judith Thaten from the firm Veritext.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are objections to proceeding, please state them at the time of your appearance. All appearances have been noted on the stenographic record.

Will the court reporter please swear in the witness and counsel may proceed.

S-I-L-V-I-N-A P-U-G-L-I-E-S-E, MD,

Having been duly sworn by a Notary Public within and for the State of New York, stated an address as 1111 Franklin Avenue, Garden City, New

PUGLIESE

York, was examined and testified as follows:

EXAMINATION BY MR. PETTI:

Q Thank you.

Good morning, Doctor. Looks like finally getting started.

My name is Robert Petti. I introduced myself before we got started. I represent one of the defendants in this matter, Luster Products, and I will be taking this deposition today on behalf of all defendants.

MR. SHIPMAN: Gary Shipman, counsel for PSC, together with Michelle Parfitt.

(Clarification by the reporter.)

MR. PETTI: You cut me off right before I was asking.

Q I was going to ask her to state her name and where she currently is employed.

A Hi. Good morning. My name is Silvina Pugliese. I'm a clinical

associate professor of dermatology. I'm currently employed at NYU on Long Island.

Q And I see you brought with you today a binder or maybe two. There is a second one inside the first one.

A Sure. So I brought -- so, one, I brought a binder with my reports and just a few references in case they were asked and not available. And this was a binder that has a few other articles that were also in my report and materials referenced.

Q So it's all reference materials for --

A Yeah. Uh-huh.

Q Okay. Doctor, have you given a deposition before?

A No, I have not.

Q This is -- have you testified in court proceedings in any kind before?

A I have not testified in court proceedings before.

PUGLIESE

Q Okay. I'm sure that the lawyers went over with you some of the basic ground rules, but I'm just going to do it again while we're on the record.

It's basically a question-answer session. I will do my best to not step on your answers, if you will also wait for me to complete the questions so that we could keep the record clear for the court reporter. If we are talking over each other too much, we will hear about it.

At times there will also be instances, I'm sure today, where counsel will object to some of my questions. If you will allow him the courtesy to make the objection for the record and then proceed with your answer, unless there is an instance where he would direct you not to answer. Hopefully, we will avoid that situation today, but we'll see how it goes.

PUGLIESE

One of the basic tenets of giving a deposition and recorded testimony is that responses need to be verbal. Yes, nos, uh-huhs and uh-uhs aren't taken down very well later and aren't interpreted later very well. So verbal responses; yes, nos; and complete answers is what we would ask for.

We're getting started a little late, but I don't -- I don't know exactly how long we'll take. But if, at any point, you need a break for any reason, just let me know. We'll go off the record, take the break.

The only thing I would ask is that if I have asked a question, you answer that question and then we will go off the record.

Really there is not much more to it. It shouldn't be more complicated than that.

Is that all understood?

A Yes.

PUGLIESE

Q And now that I've said the word, it comes back to my mind that if I do ask a question, and today it's very likely that this will happen where you don't understand what I'm asking or my question is not clear enough, please let me know.

If you start to answer a question, I am going to assume, either today or later on when reading the transcript, that you have understood what the question was. But if there is confusion, let me know.

At times, my question may be so forward that he objects to it and we can talk about it and correct the question at the time.

A Sure. Yeah.

Q Is that fair?

A Yes.

MR. PETTI: Okay. I am going to hand you --

(Whereupon, a discussion was held off the record.)

MR. PETTI: We are going to mark Exhibit 1. This is the Notice of -- or the Second Amended Notice of Deposition.

(Defendants' Second Amended Notice of Videotaped Deposition of Silvina Pugliese, M.D., FAAD, was marked Pugliese Exhibit 1, for identification, as of this date.)

MR. PETTI: I do believe we have trial tech operating today. And we do not have a screen for the witness, but I will do my best to match up exhibits to tabs for the record for those that are listening online and for Veritext as well. This would be Tab 1 of the exhibits.

Q Doctor, have you seen this document before?

A Yes, I have.

Q Okay. And when was the last time you reviewed it?

A Well, certainly, for the

PUGLIESE

address, you know, this morning. But the last time I kind of looked at it in detail was over the weekend.

Q And if you will turn to page 4, it's titled "Exhibit A".

Are you there?

A I am there.

Q Okay. And at the bottom half is what's listed as "Requests." And this is just requests we made for documents to be produced. I just wanted to go through a couple of these.

You have produced your report in this case with a complete listing of all references that were utilized to prepare the report, correct?

A Yes.

Q And is there anything that you prepared along with your report that did not make it into your report, any unpublished portions of your report?

A No, nothing other than preliminary drafts.

PUGLIESE

Q And one of the questions on page 5 is were there -- did you have any communications between yourself and any of the other experts in this case in preparing your report. It's Number 9.

A Yeah. Reviewing all the names just to make sure, but no, no communications with any of those expert witnesses.

Q Okay. You can set that aside.

A Uh-huh. Yes.

Q So are you familiar with the context of this litigation, what this litigation is about?

A Yes.

Q And in your own words, what would that be?

A So what I was asked to provide an expert opinion on, based on my specialty and career, is the plausibility, the biological plausibility of chemical hair relaxers

PUGLIESE

making their way through the layers of the skin, making their way through the hair follicles, and being absorbed into the body, and exerting some downstream effects.

Q I understand that's -- that was, I think that's what your mandate is, is what you called it in the report; is that correct?

A Yeah. Yeah.

Q But do you understand what the litigation itself is about, what the lawsuit is about?

A Yes. You know, I haven't reviewed any particular, say, plaintiff complaints. But in general broad strokes, it is a litigation involving the safety of the use of chemical hair relaxer products.

Q And as we go through today's deposition, we'll be referring to chemical hair relaxer products.

How do you define "chemical hair relaxer products"?

PUGLIESE

A Yeah. So I define "chemical hair relaxer products" as being the mixture that -- in which they're currently marketed and formulated. So I define them as all of the components currently available for use, the chemical to relax the hair in one kit.

Q Do you understand chemical hair relaxers to be different than other straightening products that are available on the market or through salon use?

A And are you speaking about other products or other ways of straightening the hair?

Q We're going to talk about both, yes.

So you're familiar with there are other ways of straightening the hair or other products that can be used to straighten the hair?

A I am familiar, yes.

Q Okay. And at least one of those is known as a "Brazilian style

PUGLIESE
hair straightener," have you heard that term before?
A I have heard the term "Brazilian hair straightening," yes.
Q And do you separate that from the chemical hair relaxers that we're talking about here today, or do you consider them to be the same?
A Yeah. So you will see, you know, in my report, there is kind of mention of both. They do have some similarities and they have some differences.
Most of the literature utilized revolve specifically around chemical hair relaxers being -- meaning separate from the straighteners, but there are some citations that I utilize that do look at chemical hair straighteners as well.
Q When you say "chemical hair straighteners versus chemical hair relaxers," are you referring to the same thing, or do you differentiate

PUGLIESE

straightener from relaxer?

A So to, kind of, answer your question that you initially posed, chemical straighteners I think about as being primarily more those keratin-based treatments, as opposed to chemical hair relaxers, which I think in context of what might be called lye versus no-lye relaxers.

Q And in your report, do you use those words as what we would call terms of art, a straightener being what you just described as a straightener, and a chemical hair relaxer being what you just described as a chemical hair relaxer, a lye or no-lye based?

A Is there a portion of my report that you wanted me to --

Q We'll get to the report.

A Yeah.

Q I just wanted -- and maybe it will be better when we get there. I may ask the question again. And I'll be yelled at for asking the same

PUGLIESE

question twice.

But I'm just trying to understand right now in your general usage of the term "straightener" versus the term "relaxer," did you apply different definitions to those words in your report?

A I think it might make more sense to go through it with the report in case there is specific instances. I just want to make sure I'm being as accurate as possible in my response.

Q And that's fair. And we'll do that when we get into the report. We're not getting to the report just yet.

A Thank you.

MR. PETTI: Actually, let's go to the report because we're going to be referring to it so often.

THE WITNESS: Sure. Thank you.

MR. PETTI: Marking as

PUGLIESE

Exhibit 2. This is also Tab 2 for those that are viewing the electronic exhibits.

This document is titled "Expert Opinion Report, Silvina Pugliese, MD."

(Expert Opinion Report of Silvina Pugliese, M.D., was marked Pugliese Exhibit 2, for identification, as of this date.)

Q Doctor, is this a copy of the report you prepared in this matter?

I should say is this an accurate copy of the report that you prepared in this matter?

A I'm looking through all the pages to confirm.

Q Take your time.

(Pause.)

A Yes.

Q So if we can start with page 3 of the report because I believe the first is just the title page, and then the second page is the table of

contents. So starting with page 3 is where you start the body of the report.

You state that you're a board-certified dermatologist, medical, educator and a practicing oncodermatologist.

Could you define oncodermatology for us?

A Absolutely. Oncodermatology is a subspecialty field of dermatology that focuses on the care of cancer patients. And you can think about this in two ways.

So, of course, we take care of skin cancer patients, so patients who have squamous, S-Q-U-A-M-O-U-S, cell cancer; basal, B-A-S-A-L, cancer; basal cell cancer; and melanoma. There are other less common skin cancers, but for the sake of brevity, I'll just mention those.

But really the main focus of oncodermatology, or I should say the second focus, is taking care of

PUGLIESE

patients who have any type of cancer. So in clinic I will see all types of cancer patients, and that ranges from breast to lung to pancreatic to ovarian to prostate. Also all of the hematologic cancers as well.

And our role as dermatologists there, and there are many things that we do, but we primarily focus on reducing the cutaneous toxicity of cancer therapy.

So whether that be traditional chemotherapy, whether it's targeted therapy, whether it's immunotherapy, we kind of manage the side effects through radiation, dermatitis radiation therapy, and the side effects of that.

But, basically, the day-to-day clinical work involves managing the toxicities of those various cancer treatments, with the ultimate goal of allowing patients to safely remain on therapy. And, of

PUGLIESE

course, stopping any therapies if there is any life-threatening drug rash.

In addition to that, within oncodermatology I have a particular focus on survivorship. So that's patients who have had cancer, have been treated for cancer, are essentially in remission or are being monitored.

So there are a number of concerns that come up in the cancer survivorship population as it pertains to the skin. So, for example, increased surveillance of skin cancer, long-standing issues like hair loss, radiation -- long-term radiation changes, bone marrow transplantation, and kind of the long-term effects of bone marrow transplantation.

So that's, I would say, you know, trying to be brief, a synopsis of what oncodermatology is and what my clinical work pertains of.

Q Okay. We will take the brief explanation. Thank you.

PUGLIESE

I don't mean to belittle it at all. I tend to keep things light.

You mentioned that you're there -- one of your roles, one of the many roles, is managing the toxicity of medication or chemotherapy treatments.

A Yep.

Q And that is managing the toxicity to the skin, correct?

A Managing toxicity to the skin, to the hair, to the nails, mucous membranes, and kind of all the -- all of the areas that encompass dermatology.

Q Okay. So all the dermatological areas?

A Uh-huh.

(Clarification by the reporter.)

A Yes. So the dermatologic toxicity of treatment for cancers.

Q In your current practice, do you still see patients?

A Yes. I am primarily clinic

PUGLIESE

based, so I see patients primarily.

Q Do you do any teaching currently?

A Yes. So I do teaching currently. I recently moved from California to New York. So I spent 12 years at Stanford. While at Stanford, I was the director of our pre-clerkship curriculum for the medical students at Stanford University School of Medicine. In that role I was charged with running the curriculum for those students in dermatology.

So that consisted of a course that took place annually. And within that course, they were taught the basics of dermatology. Of course, we always want to teach more, but we have limited hours, so some of the more common skin conditions.

And also within a separate course that I was asked to be involved in on pharmacology, spoke about the effect of medications utilized in

PUGLIESE

dermatology, many topical, what side effects there are to those medications. And also kind of pathophysiologically, how those medications work, pharmacology of those medications.

And after moving, I am currently -- I'm involved in teaching our medicine residents at NYU on Long Island. So they rotate through the dermatology clinics.

I also -- I consider also as medical education but give talks to other departments on different, again, toxicities and cancer treatment and how they affect the skin, issues in survivorship.

So, yes, I do a good degree of teaching. And that's, you know, at the institution level. But I also do give talks, both regionally, nationally, and internationally on different topics on oncodermatology and skin cancer.

Q When you were at Stanford,

PUGLIESE

was that primarily an educational position, research position? Did you see more patients, or are you seeing more patients now?

I'm just trying to understand what the balance was at Stanford versus what the balance is now.

A Yeah. Very similar. So I have been an academic dermatologist my entire career. I'm primarily a clinical academic dermatologist, meaning that I primarily see patients, and the rest of the time is more for administrative and teaching responsibilities.

And of that, there can be things like clinical research, of course, but, yeah, primarily clinical.

Q And as part of your clinical work and inpatient treatment, you do diagnose skin cancers?

A Yes.

Q Have you ever diagnosed -- have you ever -- in your practice, do

PUGLIESE

you diagnose any other types of cancers, or is it primarily skin cancers and what follows?

A So yes, we do diagnose other cancers, and that can come in a variety of ways. So sometimes patients will come to clinic for a lesion, a spot on the skin, referred with the concern that it could be a skin cancer. And actually we find out that it is a metastatic lesion.

We find that out by obtaining a skin biopsy in the clinic, sending it to pathology, and then they read it as, for example, you know, lung cancer metastatic to the skin, breast cancer metastatic to the skin, et cetera.

There are some other cancers that, for example, let's say Kaposi sarcoma, K-A-P-O-S-I, S-A-R-C-O-M-A. This is a cancer that can present on the skin, but can also present, you know, systemically. So that will be a cancer that often we do diagnose in

clinic. Again, via skin biopsy.

And I guess the other way that cancer is diagnosed in certain cases is a patient will come in with itch. So, for example, generalized itch all over the body. Or they'll have what we call -- there are certain rashes that we call paraneoplastic. So that's P-A-R-A-N-E-O-P-L-A-S-T-I-C.

So these are skin conditions that present. So we can see them, but they're actually related to an underlying internal cancer. So those would be conditions like paraneoplastic pemphigus. Sometimes we could even see them with things that are fairly common like chronic hives.

I'm sorry. Let me go back and spell. P-A-R-A-N-E-O-P-L-A-S-T-I-C, P-E-M-P-H-I-G-U-S.

So, for example, using the itch example, if a patient comes in for generalized itch, there is kind of

PUGLIESE

things that we think about. Could it be related to medications that they're taking? Could it be related to just their skin barrier? Could they have eczema? Could they have, we call it, pruritus of immunosenescence. I-M-M-U-N-O-S-E-N-E-S-C-E-N-C-E.

So -- and then, of course, another thing that we can see is an occult malignancy. So a cancer that has yet to be diagnosed. And that's as part of the history-taking process. We ask questions, like, "Have you had weight gain -- weight loss" -- I'm sorry. "What is your current age appropriate cancer screening? Are you up-to-date?"

And we can often order certain tests or work with a primary care physician sometimes to order certain tests in order to see whether there could be an underlying cancer.

So, unfortunately, that's another way that sometimes systemic

PUGLIESE

cancers are diagnosed in the dermatology clinic.

Q Thank you.

Have you ever diagnosed anybody with uterine cancer, any patient?

A I have not directly diagnosed anybody with uterine cancer. I have seen patients with uterine cancer who come to clinic, again, for different toxicities to management of that cancer.

Q So you would -- same question for ovarian cancer.

A I have not personally diagnosed a patient with ovarian cancer, but I would -- I see numerous patients with ovarian cancer who come to clinic for toxicity treatment.

Q And that's to manage the toxicity of the medication to the dermis?

A To --

Q Am I saying that correctly?

PUGLIESE

A Well, sort of.
Q I'm just trying to get an understanding --
A Yeah.
Q -- of your role in the treatment --
A Yeah.
Q -- of -- of these different cancers from a high level.
A Of course. Yeah.
Q So if somebody were to come in with either ovarian or uterine cancer or reproductive cancer, we'll just call them generally if that's okay with you, female reproductive cancer.
A I guess for the purposes of this question, we can use that terminology.
Q Because I'm just trying to understand what your role in treatment of those cancers would be.
A So my role in treatment would be sometimes I will see a patient before they initiate treatment. That

PUGLIESE

is sometimes requested by the patient or it's requested by the oncologist if there is some thought that there could be some toxicity to the treatment they will be started on.

Other times I might be -- see the patient later. I might see them after a surgery, for example, for scars. Or I might see them during the course of treatment.

And, lastly, I might see a patient, you know, after they have the diagnosis of uterine or ovarian cancer, that they've been treated, and they come into clinic for, again, for those immuno survivorship concerns.

So those would be the way that I am involved in the care of those patients.

Q Thank you.

When you talk about -- is it treating for or monitoring the toxicity of the medications, what goes into that process?

PUGLIESE

A So my eyes, seeing -- like, visualizing what things look like. So a lot of it is seeing what the toxicity looks like on the skin. So that's the nice thing about dermatology. It's very visual. So for some things we can see clearly what is going on.

Another I would say tool that we have is the use of skin biopsies. So, again, because the skin is accessible, we're able to take a portion of skin, or multiple biopsies from the skin, to get more information about what is happening. In terms of dermatopathology, that could point towards the cause of the rash and also potential treatment options for the rash.

Other, you know, ways that we make the diagnosis about specific toxicities is when clinical trials are done on these medications, they have to report adverse outcomes. So if they report, you know, rash, sometimes they

PUGLIESE

will say only rash.

Other times they'll have dermatologists involved and they will be a little bit more helpful and they'll say what type of rash. So we often have an idea, at least with medications that are FDA approved and publicly available for use.

(Clarification by the reporter.)

A They often will have already information on toxicity, how common it is to see things like rash or itch or, you know, mucositis. M-U-C-O-S-I-T-I-S.

And for medications, of course, that are in clinical trial, that's often what we, dermatologists, are asked to do if they're involved in those trials is try to better classify those toxicities. So that, again, patients can stay on treatment.

Q And in making those evaluations, I assume you need to know

PUGLIESE

which medications patients are on?

A So, interestingly, sometimes patients will come in and there are some rashes where kind of by seeing them, you can start making a list of treatments they might be on already because, you know, some reactions go along very well with certain medications.

So often I will have an idea when they come in. Again, dermatology is very visual of potentially the treatment the patient might be on.

But, obviously, because we have electronic medical records and have reviewed my patient information before clinic, I know what they're on and what cancer they have.

That being said, when we do things like kodachromes in dermatology -- K-O-D-A-C-H-R-O-M-E. So that's for teaching purposes for residents and when we present at conferences and things of the sort.

PUGLIESE

Sometimes when you see a picture, you can kind of already start deducing what treatment a patient is on.

And, of course, knowing what kind of cancer they have and knowing the referring oncologist, you also kind of -- or I also have an idea what medication they might be on.

Q In evaluating the toxicity of the medications or the treatment that they're -- a patient is undergoing, do you ever perform any toxicological evaluation of the medication and its reaction?

A So, no, I don't need to perform any toxicological evaluation largely, of course, because, in the case of oncology therapeutics, we have a lot of data available that looks at what the toxicities are. And these medications have to go through intensive pre and post-regulation testing.

Q What is pre and

PUGLIESE

post-regulation testing?

A So I will say like first we'll talk about -- I guess I should specify like pre-FDA approval and post-FDA approval.

So, one, pre-FDA approval. There are a number of different phases of clinical trials in order to be able to market a medication for use. And those involve everything from just, you know, in vitro testing, to animal studies, to eventually human safety studies.

And then, of course, utilizing those medications in a broader population in order to have a better sense of both efficacy, because that's the deal in the case of cancer treatment. But then also toxicity.

So is this a medication that is going to have life-threatening reactions and is going to be really unsafe for use? Or is it a medication that can be utilized in most patients?

PUGLIESE

Once a medication is FDA approved, then it is utilized. There are avenues by which sort of this post-approval side effects, post-market approval side effects, can be documented. So patients can tell what their side effect is.

And then, of course, there are always follow-up studies looking at toxicities of these treatments.

Q But you don't do those studies yourself?

A So in the case of the dermatology, part of that is the clinical research that we do. And I can -- maybe I can use an example just to make it a little bit more --

Q Sure.

A -- concrete.

So going back to a class of medications that we use for -- I will start with melanoma. Although, now it's used for a number of different systemic cancers. We'll call them the

PD-1. So PD-1. So Programmed Death-1 inhibitor and PD-L inhibitors.

(Clarification by the reporter.)

A When the PD-1 inhibitors were in clinical trial, we started seeing some interesting rashes. They weren't life-threatening rashes, but they were what I call quality of life-threatening rashes to my patients, where they're very itchy, they're very uncomfortable, they're involving a large body surface area. And in those cases, patients often will want to stop treatments because their reaction is so severe.

So, initially, you know, I didn't really know what kind of rash they were having. The studies -- there were still some clinical trials at the time going on at Stanford, but the studies really said "rash" as a side effect. But we have so many rashes. A lot of dermatology is rash. So it's always best to try to subcategorize

PUGLIESE

those rashes.

So now, you know, 12 years later, we know that immunotherapies and medications like PD-1, PDL-1, they cause a variety of different types of rashes. So everything from psoriasis-like rashes, to eczema-like rashes, to something called a bullous pemphigoid -- B-U-L-L-O-U-S P-E-M-P-H-I-G-O-I-D -- to just itch on the skin, to a regular rash that we call morbilliform rash -- M-O-R-B-I-L-L-I-F-O-R-M.

And all this to say that a lot of the clinical research that's been done by oncodermatologists have helped to classify those rashes and also to provide treatments for patients.

Because one of the problems with immunotherapy is that we know that oral steroids can help these rashes. However, the oral steroids really go against the pro-immune effects of the

PUGLIESE

immunotherapy. So if you think immunotherapy is trying to amp up the immune system, steroids are dampening it.

So we don't want to do anything that's going to mitigate the positive effect on the treatment of the cancer itself.

So for that reason a lot of the oncodermatology research has been really important in helping to provide algorithms for treatment of those toxicities.

So, for example, for psoriasis, if it's a psoriasiform, P-S-O-R-I-A-S-I-F-O-R-M, rash, then we know we can use some of the treatments that we use for classic psoriasis.

We know that if it's bullous pemphigoid, we can use some of the treatments that we utilize for bullous pemphigoid.

So that, you know, to answer your question, is how

oncodermatologists are involved in cancer therapies.

MR. SHIPMAN: Doctor, let me interrupt you at this point.

THE WITNESS: Uh-huh.

MR. SHIPMAN: Having being married to a court reporter now for 36 years --

MR. PETTI: This is the most important person.

MR. SHIPMAN: -- I do not -- blood on my shirt today would not look pretty.

THE WITNESS: I'm sorry, Judy.

MR. SHIPMAN: And I just fear that before lunch her head will explode. We won't get this deposition done. He'll have to come back from Chicago. I'll have to come back from Wilmington.

MR. PETTI: They're going to have to clean this room.

MR. SHIPMAN: That's right.

That's right. They'll be hazmat units all over the place.

MR. PETTI: And she's going to take me with her.

MR. SHIPMAN: That's true. You are sitting on that side.

THE WITNESS: My apologies. My apologies. I will really slow down.

MR. SHIPMAN: It's unnatural what you're doing, but just try to take your time --

THE WITNESS: Yes.

MR. SHIPMAN: -- so that she can get down everything.

THE WITNESS: Okay. Thank you.

(Whereupon, a discussion was held off the record.)

Q And I think as we go -- some of this preliminary stuff, I think, lends itself to you explaining the -- what you do --

A Yeah.

PUGLIESE

Q -- and what you practice is. And as we get into some more specifics, hopefully we'll have shorter answers that will help you.

But you mentioned during that answer something about an algorithm that you utilize for treatments.

Is the algorithm matching up a cancer with treatment, or is the algorithm matching up therapies with how you might -- I don't -- I don't want to say treatment, but that's kind of what's coming into my head.

A So --

Q Does what I'm asking about the algorithm make sense?

A I believe so.

By "algorithm" really I mean guidelines. So there are guidelines that are published in multiple journals that look at specific medications, cancer treatments, specific toxicities, and what the recommendations are for treatments of those toxicities.

PUGLIESE

Does that answer your question?

Q It -- it gets me closer to what I was hoping to be in understanding it.

So when you see a specific toxicity of a medication, it would -- that would be plugged into the algorithm?

A Oh, no. There is no, like -- this is not a --

Q Okay.

A -- computer system or AI. It's sort of a framework for my thinking in my brain.

Q I understand that it's not a computer system.

A Yeah.

Q I am just trying -- when I hear "algorithm," I sometimes think in terms of the logic that goes into an algorithm, and there's a number that comes in here and then a number that gets spit out at the end.

PUGLIESE

But it's not like that. It's more you match a treatment with a -- what the patient is presenting for?

A Treatment is very specialized --

Q Sure.

A -- which is why it's hard to, you know, input X and get out Y. But generally we do want to treat specific skin toxicity. It wouldn't make sense to treat a toxicity, you know, seen to another cancer therapeutic if the patient is not on that therapeutic, and also doesn't have any signs on the skin or on pathology or, on labs sometimes, of that other reaction.

Q Okay. I am not going to go down that rabbit hole too far.

A Okay.

Q It's -- I probably could, and I think that that's not what we're here for today.

A Uh-huh.

Q But in your practice, have

you ever -- I am going to move us back closer to talk about hair relaxers.

Have you ever treated a patient with an injury from use of hair relaxer?

A Yes, I have treated patients who presented for different conditions of the scalp and of the hair in which they were also chemical hair relaxer users. And that did come up in conversation.

Q You say that there are also chemical hair relaxer users.

Have you diagnosed anybody with -- any patient with an injury from the use of chemical hair relaxers?

MR. SHIPMAN: Objection to the form.

A So it might help to kind of review what the specific toxicities are in this case, not this litigation but in the case of this question.

And that sometimes patients will come in with hair loss. And

PUGLIESE

usually -- I mean, it would make my job easier if the patient said, you know, I have this and this is why. But often they come in and they have, you know, a --

Q I don't know if they would come in if they knew that answer, but...

A But, you know, as a chief -- you know, what we call a chief complaint or a main concern, and then really why they're there is hopefully so that I can, you know, ask some questions and they can provide some information, and together we can, you know, try to figure out the cause.

So in the case of hair loss here, if a patient comes in for hair loss, of course I will ask what products they are using, and that list of products includes chemical hair relaxers.

If a patient comes in for a rash, then I would ask, you know, "What

PUGLIESE

have you been" -- and on the scalp, the head, I would ask, "What have you been applying to the scalp? What do you apply to the scalp?"

So, yes, in that -- to answer your question, if I have had patients that came in for scalp rashes, and if they said I am using a chemical hair relaxer, we could say this is an irritant -- this could be an irritant or allergic contact dermatitis to the chemical hair relaxer.

Q In those cases, is it -- are there other products that they may be using that you would classify or give them a response of that product may also be the -- an irritant or causing the rash along with the chemical hair relaxer?

A Yes. Of course. There is a ton of products that patients can use. So in the specific case of a rash on the scalp, I would ask about all products being utilized to the scalp.

PUGLIESE

And then, you know, sometimes you have to do a little bit more investigative work to identify the particular product. And, again, that depends on the type of rash that we're seeing on the scalp.

Q Prior to this report, have you ever done any research or given a presentation or written a paper on endocrine-disrupting chemicals?

A Prior to first being asked to consider this litigation, other than thinking about endocrine-disrupting chemicals in the way they come up via my patients, I had not myself written a paper on it or given a presentation.

I will say as an oncodermatologist, especially in the area of survivorship, patients do ask, you know, after someone has been diagnosed with cancer, there is -- it's a very emotional time. Going through cancer treatment is a very difficult time. Survivorship is a very difficult

PUGLIESE

time.

And I think there is a great interest in patients, and especially where we have now so much information at our fingertips for patients to try to minimize the use of anything they might think or be worried about being in some way toxic to themselves down the line or, you know, preventing future cancers or things of the sort.

So there have been some questions that have come up, of course, in my practice about endocrine-disrupting chemicals and they're -- what products they're in, and what to avoid during cancer treatment or after cancer treatment.

Q You -- you mentioned at the beginning of that answer that you think about endocrine-disrupting chemicals as they come up in your practice.

Is the back half of that answer the extent of how endocrine-disrupting chemicals might

PUGLIESE

come up in your practice?

MR. SHIPMAN: Objection to the form.

A I am sorry. You have to clarify that, please.

Q Okay.

A I'm not sure what you are asking.

Q Well, how do endocrine-disrupting chemicals come up in your practice, aside from what you just said? Is there any other way?

A Endocrine-disrupting chemicals come up in practice primarily in terms of -- again, in dermatology we are prescribing medications that are often used topically. So patients do have great interest in knowing what is in those medications and what potential effects they might have on the -- you know, on their health overall.

Q Okay. Can you prescribe medications that are classified as endocrine-disrupting chemicals?

PUGLIESE

A I'm sorry?

Q Do you prescribe any medications that are classified as endocrine-disrupting chemicals?

A I think that's a little bit of a broad question.

Q It may be.

A Yeah. If you had kind of a list of the particular endocrine-disrupting chemicals that you're asking about, I can tell you whether they're available for, you know, compounding or things that I would prescribe through a pharmacy.

Q Well, that's why I am asking --

A Yeah.

Q That's why I'm asking the question, is to see if you know of any medications -- or that you are prescribing that contain endocrine-disrupting chemicals.

A I can say there are some over-the-counter medications that we

PUGLIESE

will recommend a lot in dermatology. So things like sunscreens, moisturizers, and I can't obviously speak for all of those -- you know, every single brand. But some of those can have some ingredients that would be characterized as endocrine-disrupting chemicals.

Q When you -- do you consider sunscreen a medication?

A It's an over-the-counter treatment that filters UV light. If we think about medication as things are purely prescribed, there is no prescription-strength, you know, sunscreen.

But it is topical medication that is applied to the skin that I will recommend that may have some endocrine-disrupting chemicals in it.

Q Do you classify chemical hair relaxer as a medication?

A I do not classify chemical hair relaxer as a medication.

PUGLIESE

(Whereupon, a discussion was held off the record.)

Q Prior to this report, have you performed any research or written any papers on reproductive cancers?

A Prior to this report, I did not research or write any literature on reproductive cancers.

Again, as an oncodermatologist, I mostly interact with reproductive cancers once they're, you know, diagnosed, and we're managing some sort of treatment-related adverse effect.

Q And prior to this report, have you ever performed any research on chemical hair relaxers or their absorption into the skin?

A Prior to this report, I did not perform any of those studies that you mentioned. Really, I -- what I was kind of asked to review, you know, the question at hand, I didn't have an opinion about chemical hair relaxers,

PUGLIESE

other than what I would see, again, in clinical practice as something to think about for hair loss and rashes on the scalp.

Also something that was mentioned, of course, in textbooks and literature related to the certain dermatologic conditions. But no, I didn't, you know, myself do any research on chemical hair relaxers.

Q What about chemical hair straighteners, the Brazilian-type products, have you done any research on this prior to this report?

A No. So prior to this report, I also did not do any research on chemical hair straighteners.

Q Have you done any -- prior to the report, have you done any research or drafted any publications on the epidemiology of reproductive cancer, specifically?

A Prior to the report, I did not draft any epidemiologic studies, if

PUGLIESE

that answers your question.

Q It does.

We can have short answers so that she is safe.

Have you given any prior presentations on EDCs?

A I have not given any prior presentations specifically on EDCs. The only time -- just making sure my answer is accurate, the only time I have touched on EDCs is I have given cancer survivorship talks.

So to, for example, patients that have undergone bone marrow transplantation in which, you know, a downstream ballet of bone marrow transplant is a development of skin cancers.

So as part of a symposium for survivors, I was asked to talk about skincare, including photo protection, meaning protecting yourself from sun exposure, UV exposure, to prevent cancers.

PUGLIESE

And because of the population, I did touch on some of the information available on different forms of sunscreen and endocrine-disrupting chemicals that may be present in those sunscreens so that patients can make an informed decision on which sun protective methods they would prefer to utilize.

Q As part of that -- if I call that a study; is that fair?

A It wasn't a study. It was a, you know, presentation.

Q Okay.

A And to create it, of course I reviewed, you know, a handful of references that were pertinent to the subject.

Q As part of that research, did you research any papers on the absorption of some sunscreen?

A Yeah. That talk now was, you know, probably -- I don't know -- at least two years ago. So in order to

PUGLIESE

really provide an accurate answer as to what's available currently in the literature regarding endocrine-disrupting chemicals and sunscreens, I would have to review more data to give you the most informed answer.

Q And I -- having given presentations, I appreciate how something two years cannot necessarily stay with you completely.

My question was slightly different, though.

If you recall, do you recall researching any papers on the absorption or absorption rates of sunscreens?

A Again, it was a while ago. I don't remember, you know, all the specifics of what I reviewed, but it is a topic that I would say is a fairly hot topic because sunscreen is ubiquitous. And we recommend it a lot as dermatologists.

PUGLIESE

But I think the most important thing here is that patients have a choice. So we talk about photo protection as really a collection of different things that you can do.

So one, of course, is UPF clothing which does not involve any chemical sunscreens.

Another option, of course, is the zinc oxide, titanium dioxide, so sunscreen products or sunscreen ingredients where they're -- and I'll generalize, but less concern for the presence of endocrine-disrupting chemicals.

So I think just the ability of patients to be informed about the options that they have and any potential outstanding questions that exist in fully evaluating those ingredients is, you know, my focus in -- in giving that information and providing that presentation.

Q And I'm not trying to put you

PUGLIESE

on a memory test for what you researched --

A No, no. Of course.

Q -- in other papers. I know what we're here to talk about.

A Yeah.

Q Because I just thought I'd ask that. I was curious. And that will come up from some of the answers at times.

A Sure.

Q You -- we talked earlier this is the first time you testified in any litigation, correct?

A This is the first time that I have been at a deposition. I have also never been involved in a trial. But I have been retained as an expert witness in three other cases.

Q What were those cases?

A So the first one was a product liability. I was -- in that particular case on -- I was retained by the defense. That case dealt with a

PUGLIESE

particular chemotherapeutic product and a toxicity involving the skin.

The two other cases were medical malpractice. One of them involved pathology. So a pathology read that there was concern had not been entirely accurate. And for that particular case, I was retained by the plaintiff -- let me make sure -- no. My apologies -- by the defense.

The third case was a medical malpractice case where it involved a death of a patient due to an undiagnosed toxicity to treatment to a medication. And in that case I was retained by the defense.

Q So two med-mals and then a product liability?

A Yes.

Q Okay. In the -- excuse me.

In the product liability that you said you were retained to opine on, the toxicity to the skin, correct?

A Opine on, yes, toxicity to

PUGLIESE

the skin.

Q What was the product, if you can recall?

A I don't know if I can give, like, kind of all details. I haven't done any work on it.

Q No, no. I don't want all the details. Just the name of the product.

A Of the chemotherapy?

Q Yes. It was a chemotherapy -- okay.

A It was a systemic chemotherapy, yeah. It was not a topical product.

Q I understand. Okay. Sorry about that.

A No worries.

If you have a product, it might be.

Q I heard product liability --

A Oh, yes, yes.

Q -- and just thought product.

A No worries.

Q Have you ever drafted any

PUGLIESE

reports or papers involving epidemiology of cancers?

A No, I have not drafted any reports or papers on epidemiology of cancers.

If we want to talk about presentations, the only thing I will mention is sometimes I will discuss epidemiology of, you know, cancer incidents after a bone -- and I will give the bone marrow example again, or radiation therapy. So sometimes epidemiology does come up in those particular presentations.

Q Are you familiar with what is commonly known as the Bradford Hill principles?

A I am not familiar enough to recite them.

Q But you are familiar with biologic plausibility?

A I am familiar with biologic plausibility.

Q And have you ever drafted --

PUGLIESE

other than the report in this case, which we'll obviously go through in some more detail, but have you ever drafted any other papers or reports where you make a biologic plausibility conclusion, if that makes sense?

A Well, I will answer you, and you tell me if this makes sense. So --

Q I will.

A -- clinically, I think this is something that I do quite often.

So when a patient comes to clinic, again, they don't say, "I am here because of this rash that is X and Y caused it."

So we'll use the oncoderm population. But a patient comes in with a cancer on a treatment, and as you know, patients are not often on just one treatment. They might be on two chemotherapies at a time, three. They might be on immunotherapy and something else. They might be on, you know, multiple antibiotics.

PUGLIESE

So part of what we have to do in clinic is try to weave through all those confounders. So we have to think about, "Okay. What are the main toxicities seen with these different medications? What is a timeline of development of the rash? How can we best describe this rash?"

Again, either clinically or with pathology. Sometimes with labs to make sure we have the right diagnosis.

So we take all those different pieces of data to formulate what we call, you know, an assessment of what the biologic plausibility is of this medication over another medication causing the toxicity that we see.

Q And as part of that evaluation, do you need to know the dose of the medications that are being utilized?

MR. SHIPMAN: Objection to form.

A So as part of that

PUGLIESE

evaluation, the dose is not quite as important as what medication is being utilized. In some cases we might recommend -- I mean, I would never myself as a dermatologist do a dose reduction, but I might say for this particular toxicity that we know is hard to treat, if these interventions don't work, there might need to be spacing out of treatment or reduction in the dose.

But no, we don't need to for the purposes of coming to our assessments of which medication is causing the toxicity itself need to know the dose. Of course we include the dose in notes and we can see it, but we don't need to know it to come to our conclusion.

Q And that's for -- generally for rashes or skin conditions -- dermal conditions, would that be a more accurate way of saying it?

I am trying to use the right

language --

A Yeah, yeah, yeah.

Q -- so we are on the same page.

A Skin rash is fine.

Q Okay.

A You know, skin toxicity. Cutaneous adverse events.

Q Okay.

A Uh-huh.

Q Just looking back at what we marked as Exhibit 2, your report --

A Uh-huh. Yes.

Q -- is -- is the body of the report, which I believe is the first 13 pages, that is all your work, or did anybody else contribute to the drafting of that report?

A This is all my work.

Q Okay.

And I believe you mentioned -- you stated earlier that none of the other experts had any input into the drafting of the report?

PUGLIESE

A No.

Q You didn't have communication?

A I did not speak with any other experts.

MR. PETTI: Why don't we take a five-minute break? It's been just over an hour, so...

VIDEOGRAPHER: Stand by.

We are going off the record at 10:37 a.m.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: We are back on the record at 10:47 a.m.

Q Doctor, I just want to go through a couple just housekeeping things.

You were retained by the plaintiff's steering committee in this matter, correct?

A Yes.

Q And your current rate for your expert work in this matter is $900

PUGLIESE

an hour?

A Yes.

Q And do you know offhand how many hours you have spent on this report and in this litigation in general?

A Sure. In 2025 it was 46 hours. This year, 2026, it's been approximately 30 to 35 hours.

Q And I believe you provided us with a rate -- not a rate sheet, but an invoice or -- not an invoice, but -- what do I call it? -- a summary --

A Compensation report?

Q Yes.

A summary of the hours spent. I don't have that with me now, but we do have that. And I believe that accurately reflects what you have -- the time you spent.

Have you -- outside of the hours that you have billed for work on this case, have you spent any time unbilled reviewing chemical hair

PUGLIESE

relaxers on your own?

A No.

Q Have you spent any time reviewing chemical hair relaxer usage or absorption as part of your practice?

A Well, if by "reviewing chemical hair relaxer usage" you mean kind of on an individual basis reviewing with patients whether they use chemical hair relaxers, then yes; otherwise, no.

Q And I asked you before about it, if anybody else had provided input into the report. But did you employ the use of AI in drafting your report in any capacity?

A No. Much to my husband's chagrin, who uses a lot of AI, I do not utilize it in day-to-day use. So I did not utilize any AI.

Q Not for any research either?

A No. No.

Q Have you reviewed any of the defense expert reports in this matter?

PUGLIESE

A Yes. The defense expert reports which I reviewed were Dr. Kasting and Dr. Burgess.

Q None of the other -- other defense reports? Sorry.

A No other defense reports.

Q What did you review those reports for?

A Well, with Dr. Cheryl Burgess, as the -- as also a board-certified dermatologist, I was, of course, interested in -- in seeing her methodology and the logic behind her opinions.

And for Dr. Kasting, he, although not a dermatologist, spoke about dermal absorption of products in the skin, and I was curious since that was what I was tasked to comment on and give my expert opinion on, whether -- you know, what his methodology, what his opinion was.

So those two reports were quite pertinent to the information that

PUGLIESE

I had to review and summarize for my -- for my own report.

Q As we sit here today, do you have any criticisms of the report of Dr. Burgess?

MR. SHIPMAN: Objection to the form.

A I think that Dr. Burgess has provided some generalizations in her report that I did not have references that I felt supported those generalizations. I had, you know, read her report also with the thought that she might have some information that I wasn't privy to. I don't know what proprietary information from the manufacturer or something that, you know, she had more insight on. But I did not find that to be present in her report.

And I also found some of her explanations on absorption particular as they pertain to the hair follicle on what we call transfollicular absorption

PUGLIESE

to really be concluded without any references to support those conclusions.

So as far as you might call that a criticism, you know, those were my, say, main takeaway points.

But, actually, I believe I have a copy of her report if you would like me to review anything specific about it. I'm happy to, you know, give particular opinions on different things she might have said.

Q Not right now.

A Okay.

Q Right now I am just asking you some general --

A Sure.

Q -- and if there are any general critiques of Dr. Kasting's report.

A Yeah. Dr. Kasting -- again, I was, you know, just curious about his opinion, given that, you know, he has worked in the field of product, you

PUGLIESE

know, composition and manufacturing. And I was kind of, again, curious to see what his opinions were.

I did find that he didn't have a strong understanding of dermatology in terms of how conditions present on the skin. So I did find that, again, insofar as that is a criticism to be lacking from his report, and I would say that, you know, bench-to-bedside translation rate of how things actually manifest when they're utilized on the skin and what the patient experiences with those products. So I did find that, you know, to be a little lacking.

And I guess the last thing was -- and we will probably talk about it in the future, I imagine, but the particular reference by Pierce in which they looked at phthalates and parabens --

(Clarification by the reporter.)

PUGLIESE

A Pierce, P-I-E-R-C-E, looking at phthalates and parabens and the use of a modeling methodology called IHSkinPerm.

(Clarification by the reporter.)

A So IHSkinPerm. I, of course, had been interested in that reference and that information, but I felt that there really wasn't a thorough discussion. Again, this is pointing back to that bench-to-bedside translation of how this particular model doesn't, you know, translate into real-world use. And he didn't, you know, have much of a discussion on that point.

Q You mentioned Pierce.

A Yeah.

Q The Pierce article, I should say.

A Uh-huh.

Q Did you consider that when you were drafting your report?

PUGLIESE

A Yeah. Let me -- I have it if -- is it okay if I pull it out?
Q Which --
A The Pierce?
Q Yeah.
A Yeah. Okay. Perfect. Let me just -- probably in this one, too, but...
Q Right now I'm just asking if you considered it in drafting your report.
A Oh, sure. I will just get it out so that -- in case any other questions arise, it's at the ready.
Q Okay.
A Okay. There it is.
Q But you did not cite it in your report, correct?
A Let me double-check that for you --
Q Sure.
A -- because I do believe -- let me check. I am not sure if it was in my citations, but I want to

PUGLIESE

double-check if it was in the "Materials Considered."

Q You're referring to the "Materials Considered" list that's Appendix B to your report?

A Yes. Thank you. Yeah.

(Whereupon, a discussion was held off the record.)

A Actually, no. It's after -- you're right. In this Appendix B.

Q It's like the last six pages --

A Yeah.

Q -- of your report, I think.

There it is.

A Yeah. No, I don't think it was in the "Materials Considered." And I don't believe it was in my original report.

It was in -- I had been asked to update with any sources that were utilized. So that information was submitted early last week.

Q You believe Pierce was part

PUGLIESE

of that?

A I'm certain Pierce was part of that.

Q I have that somewhere. I will just have to find it. We can look at it later.

A Sure. No worries.

Q Do you have any formal or training outside of the classroom in toxicology?

A So beyond board-certified as a dermatologist, I have -- my field is oncodermatology. And other than the understanding of toxicology as it pertains to use of dermatology medications, what we learned through medical school, what we learned through residency and clinical practice, I am not a toxicologist.

Q And are you familiar with the term -- I am going to try to get this one right -- "pharmacokinetics"?

A Yes.

Q And what is pharmacokinetics?

PUGLIESE

A So kind of a general definition is thinking about the movement of medications.

Q Systemically?

A So in different ways. Across the skin barrier, through the hair follicle, within the body. Basically, if we put a medication in one place, whether that's topically, orally, or systemically, IV, how does that medication go where it needs to be?

So it's a pretty broad definition.

Q In essence, it has to do with -- you mentioned it being -- for medications applied during -- what is your training or how do you apply pharmacokinetics in your practice?

A Yeah. Well, you know, some people will joke and say that dermatologists prescribe a lot of topical steroids, you know, and I will generalize and say we prescribe a lot of topical medications.

PUGLIESE

By "topical medication" it is an umbrella term that I am just using for any medication that you don't ingest, that you apply to the skin, you know, that's not transdermal. It's something that you are layering on the skin.

So that is, like, really what I would consider to be bread and butter of our practice. We have to understand how medications work, right? How these medications work.

So, one, what effect do they have on the skin rash that we're treating? Rash, for purposes of making this a little bit more simple, but skin rash that we're treating, what effect will that medication have locally? What is the intended effect?

And sometimes that effect is primarily related to how it sits on the skin.

Other times we know that medications need to be delivered a

PUGLIESE

little bit deeper into the skin. So here I'm talking about, let's say, the dermis. So the layer directly beneath the epidermis. So we do need to know what do we need to do to have these medications delivered to the dermis.

Whether that is prescribing a certain type of the medication that's more likely to absorb because of either preservatives within that medication, because of what we call the vehicle. So vehicle is, for example, an ointment. You can think about something like petroleum jelly compared to a cream where you think of just, you know, maybe the standard moisture you used this morning.

So we do know --

Q How did you know?

(Whereupon, a discussion was held off the record.)

A No worries.

So, yes, that's vehicle.

We talked about, you know,

PUGLIESE

other additives to a medication.

There are sometimes things that we can do to improve absorption. So, you know, for some conditions, a procedure called microneedling is done where small -- think of it as little needles penetrating the skin to open up some areas of the epidermis so that those medications can then make their way more easily into the dermis.

And then I would say the last consideration here is while we want topical medications in some cases to have primarily a localized effect, we also know that these medications can have undesirable systemic effects.

So part of, you know, the knowledge of pharmacokinetics is understanding, "Okay. What is the likelihood these medications can systemically be absorbed, depending on patient condition, the skin barrier, how we're utilizing them, et cetera? And then what would happen that we'd

PUGLIESE

have to, again, inform the patient of possible systemic effects?"

Q Okay. Thorough answer. I like it.

Same type of questions about epidemiology. Do you have any formal training outside of schooling in epidemiology?

A Yeah. So, again, you know, I am a board-certified dermatologist. My specialization interest is oncodermatology. Throughout medical school, residency, epidemiology does play a pivotal role because a lot of what we learn is how to evaluate studies so that we can utilize them for our patients. And, obviously, any time that we're involved in any kind of research, there needs to be, you know, some understanding of epidemiology.

I guess the only other -- just to, again, just be comprehensive, one point probably about four years ago I had done just a research course at

PUGLIESE

Stanford on, you know, just some particular areas, foundations of research, essentially clinical research. And there was, like, a small lecture on epidemiology and some of -- some of those sessions.

Or a few lectures. I can't really recall the exact cadence. But that was probably, you know, maybe going along more with the schooling portion, even though I was not school -- enrolled in that course.

Q Would you hold yourself out to be an epidemiologist?

A I wouldn't describe myself as an epidemiologist, but I don't believe that I need to be an epidemiologist to be able to, you know, provide an informed and intelligent conclusion on, you know, papers that talk about epidemiology.

Q Let's turn to the report a little bit.

A Sure.

PUGLIESE

Q So, again, for the record, this Exhibit 2, I believe we marked it as. It's Tab 2 for those online.

I want to turn to page 3.

A I am there.

Q And under the "Mandate" section, it states that "I have been retained to undertake a review of the published scientific literature to enable me to render an opinion to a reasonable degree of medical certainty, based on my review of the literature and my background, training and experience, regarding whether it is biologically plausible that the use of chemical hair relaxer products can contribute to the development of uterine and ovarian cancers in product users."

Did I read that correctly?

A Yes.

Q How did you generate this mandate?

A So I generated the mandate

PUGLIESE

having reviewed the literature when I was asked to give an opinion on whether there was any biological possibility or any plausibility that chemical hair relaxers could be linked to what I call the sort of undesirable downstream effects, including uterine and ovarian cancers.

So this is the -- I would say kind of, in some ways, conclusion of what I was tasked to do and the way that I understood it. And it's here so that there -- it can be clear as to what my -- my role was in this litigation.

Q And I know we touched on it before, but for this mandate, what was the definition of "chemical hair relaxer products" that you applied to your literature review?

A Yes. So I started very broadly, you know, kind of looking at chemical hair relaxers and also hair straighteners. I did not specifically

PUGLIESE

look at any, you know, heat, other than obviously the heat and the straightener. But no just, like, only heat sources of chemical hair straightener for the purposes of this litigation.

And then as you will see, most of my references do discuss specifically chemical hair relaxers. So that would be, you know, to be a little bit more clear, those that we call kind of lye versus a no-lye as opposed to the straightening products.

However, I do touch on the straightening products in some areas because I think that there are some important considerations that the straightening products can provide -- shed some light on.

Q By "only heat," do you mean, like, hot comb or...

A Yeah. You know, drying the hair, hot pressing the hair, hot combs, you know, all those kind of...

PUGLIESE

Q I just want to be clear we're clear on --

A Yes. Absolutely.

Q Have you ever -- have you ever used a chemical hair relaxer yourself?

A I have not used a chemical hair relaxer. Perhaps embarrassing to my middle school self, I did perm my hair at one point -- not currently, but at one point when I was in middle school. I did not, you know, find the process to be pleasant. I did not continue that.

But yes, I did perm, which is, you know -- and I'm not using the word "perm" like in the -- I would say more, like, general vernacular. I am using it to say to make the hair from straight to curly, just to be clear.

Q Have you ever seen a chemical hair relaxer applied to somebody in person?

A I have not seen a chemical

PUGLIESE

hair relaxer applied to somebody in person. As you know from the review of "Materials Considered," I have reviewed videos that, you know, instruct both beauticians, as well as home users, as to how to apply the chemical hair relaxers.

Q Have you ever handled a chemical hair relaxer yourself?

A I have not handled a chemical hair relaxer myself. And, again, here it's thinking about the products that are commercially available, not the individual ingredients therein.

Q Have you ever -- have you even been to the store and opened or seen a chemical hair relaxer kit?

A I think if I had been to the store and opened it, I might be in trouble for another reason, but...

Q You can take the Fifth on that portion of it.

A But other than -- no, I have not, you know, other than seeing them

PUGLIESE

on the shelf, I have not purchased one. I haven't brought one home to interrogate.

Again, my, you know, opinion here is based on what is peer reviewed and well-researched literature looking at the components of chemical hair relaxers as they currently exist on the market.

Q And I think you mentioned earlier when we were talking about chemical hair relaxers that you are aware that chemical hair relaxers can be sold in a kit.

A Yes.

Q Do you know what the component parts of those kits tend to be?

A Yeah. So my understanding is they do vary. In reviewing, you know, the literature -- and grateful that there is a good degree of literature talking about chemical hair relaxer kits. But, in general, there is some

PUGLIESE

sort of active ingredient.

Sometimes, those are just alone or there is an activating chemical that you mix to the main ingredient. So that's kind of two different ways that that active ingredient -- the relaxer ingredient is present.

And then there are generally some sort of shampoos, sometimes a conditioner as well, is my understanding that the exact known number can vary.

And that is -- and then -- I guess, oh, the other thing would be there is generally some sort of product that has -- with the intent to sort of protect the skin. But I, you know -- we'd probably touch on that a little bit later. But there is also another product that it can be utilized and placed onto the skin prior to use in some kits.

Q You say that the intent is to

protect the skin. You do not consider the product in a hair relaxer kit -- a chemical hair relaxer kit that is intended to protect the skin to protect the skin?

MR. SHIPMAN: Objection to the form.

A I think, you know, especially in reviewing the ingredients in the chemical hair relaxer mixture of products, in reviewing the videos of application, and in having understanding of what it is like to have to apply something to all areas of the scalp, you know, making your way through the hair, but while also not completely including the areas of hair that you need to treat with the chemical hair relaxer, I do think that it is a very, you know, challenging task and in many ways quite impossible.

Q You said something that -- do you believe that the hair relaxing cream is intended to be applied to the

scalp or to the hair?

MR. SHIPMAN: Object to the form.

A So the -- to clarify, the protective gel is intended to apply to the scalp. The chemical hair relaxer product is -- the instructions are to apply it only to the hair specifically. I know -- any area -- any hair, new hair that you are trying to straighten, if that answers your questions.

Q Let's go back to the report.

At the bottom of page 3, you state, "In reaching my opinions, I have used the same methods that I would use in my academic and professional work."

What methods are you referring to?

A Yeah. So generally, you know, first, of course, in setting that mandate, understanding what the task at hand is. Other -- and by "my methodology," I mean doing a thorough literature search.

PUGLIESE

And that's kind of -- split it into a few different components. One, of course, making sure I was very clear on the pharmacokinetics, you know, the mechanics of the absorption. I looked into what do we know about topical medications that are utilized in dermatology, how they operate when they're applied directly to the skin for that local effect, and what happens when they have that systemic effect that they often do.

And then the second piece of this was trying to get a good handle around what is out there in terms of chemical hair relaxers and some of those undesirable downstream effects. And there was a lot, you know, to really parse through there.

But, yes, essentially it was, A, examination of what is available in the literature, review of those articles, summation of those articles, and really trying to write it in a

PUGLIESE

comprehensive way so that it was, you know, easily accessible to a person reading it who may not be medical.

Q You mentioned the comprehensive literature review. You also state that on page 4 of your report, that you performed a comprehensive literature search.

What does that mean to you?

A So a literature search, there are a number of different databases available. You can go into the databases and look for keywords. Keywords are chosen by the authors of those articles, that literature, so that their papers can be found.

So I utilize a medley of different terms. Again, depending on whether this was an evaluation of pharmacokinetics, absorption, versus what do topical medications do on the skin, and then chemical hair relaxer question.

Q Do you -- did you save a list

PUGLIESE

of the search terms that you used?

A I did not save a list of the search terms. I'm happy to kind of review what, you know, those were, but I don't have a list available here to review.

Q And which databases did you search, if you can recall?

A Yeah. I utilized PubMed primarily.

(Clarification by the reporter.)

THE WITNESS: PubMed.

Q Were there any others?

A Early on there might be, but PubMed was the one that I relied on for my, you know, drafting of this report.

Q So the citations you have in your report would generally, or all, have come from PubMed?

A Uh-huh. Yes.

Q Do you recall if you searched for absorption rates of chemical hair relaxers?

PUGLIESE

A I know I definitely recall -- you know, as -- as somebody who is based in science, you know, you want as specific of information on the question that you're looking as possible. And what really surprised me was that a lot of the things that I would have liked to know were not available when it came specifically to the different mixtures of chemical hair relaxers.

And, again, it was a little different experience for me because working with cancer treatment -- again, because -- and we talked about this earlier, but the different process to approve all those medications, usually there is a bit more data, a bit more science to review when formulating, you know, conclusions of toxicity.

So I did -- I do recall, obviously, utilizing chemical hair relaxers in my search and trying to link it to the different terms that we've seen in pharmacokinetics. And,

PUGLIESE

again, I wasn't able to find any, you know, specific literature on that or any specific, you know, manufacturer data on that.

Q You said that there was data that you -- I don't have the exact language, but there was data that you were hopeful to find that you were not able to find.

What are some of that data?

A Yeah. So I -- I will just keep using the cancer example. But if a patient has a cancer treatment, you can generally go through the Phase 2, 3 studies on that medication to see what the safety profile was, what the incidence of rash was. So that's helpful information to have at the outset.

Also, there is generally, again, the kind of once a medication is on the market, the adverse event reporting system where you can also have a sense of what toxicities

PUGLIESE

patients are reporting.

And, again, there is, you know, kind of a battery of oncodermatology literature that looks at toxicities.

So it was, you know, somewhat surprising. And, again, it's just partially working with a cosmetic product.

Q Was this the first time -- sorry.

Was this the first time that you had done a comprehensive literature search in review for a paper on a cosmetic product?

A No. There, I mean, there -- I can probably go through my CV, but I definitely -- there was one -- there was a natural ingredient in cosmeceuticals -- C-O-S-M-E-C-E-U-T-I-C-A-L-S -- that was from now over a decade ago looking at, you know, ingredients in these natural cosmetic products.

PUGLIESE

Let me think if there were -- maybe that's the one that pops -- with that specific question prompt that pops to mind as would be most relevant.

Q And you just said it was over a decade ago.

But do you recall, was that paper in reference to or, I guess, about the product and the causing of any form of cancer?

A That product was -- I'm sorry.

That paper was highlighting just some of the natural, quote/unquote, natural ingredients -- because it's a broad term -- present in cosmeceutical products. It was more so, you know, defining what they are, why they're utilized. There was, I'm sure, some discussion of safety, but more so -- again, I'd have to go back and read it, but probably related to localized toxicity, you know.

Q So I take it that in your

PUGLIESE

search for absorption rates of chemical hair relaxers, you did not find any papers on the absorption rates of chemical hair relaxers?

A In my search for absorption of chemical hair relaxers, I did not find any papers that looked specifically at chemical hair relaxers as they're present in the mixture I discussed and absorption rates.

But I didn't feel that that information was really pertinent in the same way that I discuss, you know, how dose of certain chemotherapy and immunotherapy, et cetera, isn't -- you know, we can see the toxicity just with the exposure.

Again, I didn't find it to be relevant to my opinion.

Q And the toxicity you are talking about that you can see with the exposure is the dermal toxicity?

MR. SHIPMAN: Objection to form.

PUGLIESE

A So you're asking about toxicity to the chemical hair relaxer?

Q I'm talking about -- from the answer you just gave, about the toxicity -- you referred back to an earlier discussion on --

A Oh, the oncoderm --

Q Yes.

A -- cases.

Yeah. So the toxicity can be epidermal. It could be dermal. It can be affecting the hair. It can be affecting the nails or the mucous membranes. So not purely dermal.

Q But it's observational?

A So it's -- there is a component, of course, of visualizing the toxicity. And then sometimes additional testing is done.

Q What type of additional testing?

A So skin biopsies, laboratory work, and, again, framing the exposure of the treatment in the context of the

PUGLIESE

patient. So when was the medication administered? Are we seeing kind of repeat rash with administration? Are we seeing worsening of rash with administration?

So, you know, it varies depending on -- on the patient, but I wouldn't say that it's just -- just observation alone.

Q Did you -- going back to the search, did you do any search for the absorption rates of the component parts of the hair relaxer kit?

MR. SHIPMAN: Object to the form.

A So, again, when I looked at what we know or what we want to know regarding absorption, there really wasn't anything that looked at the chemical hair relaxer mixture kind in the composite form that is currently utilized. And I think touched on that a little bit with, you know, Pierce and the problems with that study.

PUGLIESE

But, yes, there was nothing that I found that looked at commercial available chemical hair relaxers and measured any absorption.

Q And that's the same for the component parts of the kit?

A So yes, it's kind of the same because chemical hair relaxer mixture, component parts of the kit, I kind of am using that terminology to discuss all ingredients that are utilized at the time of chemical hair relaxer application.

Q Did you -- did you search for the absorption rates of any specific ingredient?

A So, again, I know I didn't find it to be awfully helpful to look for individual ingredients because that's not how these, you know, products are utilized.

So to the degree that I, you know, was able to find specific ingredients, some information on

PUGLIESE

absorption, like, for example, that -- what was pointed out by casing that Pierce study, again, I am not sure it's applicable because we're not really testing real-world exposure. So what I reviewed regarding absorption had to do with what do we know chemical hair relaxers -- oh, I'm sorry.

What do we know chemical hair relaxers add to the skin if they make their way from the hair to the scalp? And what do we know about the skin barrier porosity that would lead to systemic absorption? And what do we know that's been documented in epidemiologic studies about systemic downstream effects?

Q When you say that the specific ingredients -- something at the beginning of that question, and I am not going to word it properly. You weren't looking at specific ingredients.

Is that because the chemical

hair relaxer particle itself is a combination of multiple ingredients?

Does that make sense, what I'm asking?

A Could you repeat that one more time?

Q Would that -- when you said you didn't look for specific ingredients, and you said it's because it's something along the lines of that's not what we were applying or what we were looking at.

Is it because the chemical hair relaxer particle that would be absorbed potentially is a compound of multiple ingredients?

A Yeah. So as I have kind of discussed, the chemical hair relaxer product being a mixture, we're not looking at any of those ingredients. So I did not find it to be helpful to look at any of those ingredients in isolation because that's not how they're utilized.

PUGLIESE

Q They're utilized as a compound? They're formed as a single particle or multiple particles?

A So the different components of the hair relaxer kit are utilized in conjunction.

Q Just for some housekeeping, if we go to page --

A Uh-huh.

Q Take your time.

If we go to page 14 of your report, that page is titled "References."

A Yes.

Q And the next two -- three pages, through page 16, these are all references that are actually cited as part of the report, correct?

A These are references that are cited in the report, yes.

Q And then there is a separate -- we will call it a list, under Appendix B that you referenced earlier entitled the "Materials

PUGLIESE

Considered."

What's the difference between these materials and the materials that your references list and how you used them?

A Yeah. "Materials Considered" were different references that I utilized to, in some cases, set the framework; in other cases, kind of hash out my understanding, to try to get some redundancy on certain questions that I had. So they were -- but they were things that I did not specifically cite when I drafted my report and kind of made the report, finalized.

Q Were all of the materials in the "Materials Considered" list materials you discovered on your own as part of your comprehensive literature search?

A Let me review them just to make sure I am answering that accurately.

You know, just offhand I can

PUGLIESE

say, you know, the videos were not. But that I think is fairly self-explanatory.

So many of these did come up during literature review, and I don't want to completely misspeak, but some may have come up when I reviewed the expert witness reports that we talked about earlier, Kasting and Burgess.

But, again, I want to make sure my timeline is perfect on that, but...

Q Well, this was -- this was provided with your report that was submitted. I don't know the date. But we received it December 1st.

A December 1st, yeah. Then this must have been all from the process of initial literature.

Q You saw right where I was going.

A Yeah. Yeah.

Q Okay. And you mentioned videos.

PUGLIESE

Which documents are the videos?

A I believe they are the ones that have the, you know, like, a name and then a number.

Q How were those provided to you?

A Through a -- like a Dropbox mechanism.

Q And from who?

A So those were provided by the plaintiff team.

Q Did you have access to the full set of documents that would have been produced by the defendants in this case?

A The -- like, you mean all the defense expert reports, all the defense depositions?

Q No.

A Oh, no.

Q I mean in drafting your report --

A Uh-huh.

PUGLIESE

Q -- did you have -- were you given access to all the documents that had been produced by the actual defendants, like from Loreal or Luster or --

A Oh, no, no. I actually was not -- I did not review any individual defendant reports.

Q Just the -- just the videos that are listed here?

A Yeah. Only the videos, but I didn't review any specific patient, you know, information or defendant information, I guess.

Q Well, just to be sure we're clear. The defendants are not patients.

A Of course. Yes. I am sorry. I do -- because, again, I'm clinical. I'm in clinic most of my week --

Q Yeah, I --

A -- yes.

Q I understand, but just so when we look back later, I don't want

PUGLIESE

to --

A Easy to misspeak, yes.

Q Because many of the plaintiffs are patients somewhere, and I don't want to --

A Of course. Absolutely. That's an important distinction. I appreciate that.

Q One of the items on page 2 of the "Materials Considered" list, the third one down, is "Hill, A.B. (1965), The Environment and disease: Association or causation?"

Do you see that?

A Oh, this is on page 2.

Q Page 2 of the appendix.

A Okay.

Do you have that reference to review? I don't know if it's in this. I think this is just references, like my report references.

Q That's not the "Materials Considered."

A Okay.

PUGLIESE

Q Do you know what --

A Do you have a copy of it?

Q I don't.

Do you know what this is?

A I can't offhand tell you, yeah.

Q Would it be the Bradford Hill paper where he published his process for reviewing causation and epidemiology?

A Based on the author, that would be a good guess. But, I don't know.

I don't remember the specifics of all these papers. I wish I did.

Q We may come back to that later.

And those were papers that -- or materials, instead of calling them papers because I know some were videos.

A Yeah.

Q Those were materials that you considered in drafting your report, but

PUGLIESE

they did not make it to the body of your report as references.

A So, you know, the drafting of the -- it's like a final project. You know, I was -- I considered a lot of things that I didn't specifically, you know, speak about in that report, I would say. And I mean citing specific, you know, references.

Q And I know that you don't have in that list we looked at earlier, you don't have Pierce on that list.

Did you not even -- you didn't even consider Pierce as part of the -- your review of the literature?

A Great question.

I didn't include Pierce. I didn't consider it because I felt that it was only focusing on two particular ingredients, and that it was not applicable to real-world application. So I didn't find it to be, you know, compelling.

And, again, when I reviewed

the report of Dr. Kasting, I thought there might be a little flushing out of that discrepancy, but I was not able to find that in the report.

Q So you excluded Pierce from consideration?

A I didn't exclude Pierce.

MR. SHIPMAN: Objection to form.

A No, that's inaccurate. I did not exclude Pierce.

But I'm happy -- if you'd like to go into Pierce, I am happy to talk about it. But I didn't find it to be an important aspect of formulating my opinion. Because, again, it's looking at two ingredients only and not in the context that they're utilized in chemical hair relaxer use.

Q So the "Materials Considered" list is only documents and materials you thought were important in consideration for the drafting of the paper?

PUGLIESE

A No, that's also inaccurate.

The "Materials Considered" list is a list of different sources that were utilized as I was learning more about chemical hair relaxers, learning more about the question in this case. But I didn't necessarily, you know, want to walk through that entire process or felt that I had to in the report.

But it is, to my knowledge, you know, a comprehensive list of what I utilized in order to formulate my opinion.

Q In doing your review -- and I think the answer to this is -- did you analyze any specific chemical hair relaxers or test any specific chemical hair relaxers for their contents?

A I did not personally test any chemical hair relaxer products. I didn't, you know, feel that I personally needed to do that in order to formulate my opinion.

PUGLIESE

And in, you know, reviewing the reports of Dr. Kasting and Dr. Burgess, neither of the defense expert witnesses, you know, performed their own independent testing of those products either.

Q But those -- those reports were after your report, correct?

A I am not sure of when they were drafted, but I am guessing, since they did talk about my report they must have been after, but I don't know if he started beforehand and then, you know --

Q That's fair.

A -- made an addendum. I am not sure. I have not spoken to any of the expert witnesses.

Q Let me ask that in a better way.

A Sure.

Q You did not review either Dr. Kasting's report or Dr. Burgess's report prior to completion of your

PUGLIESE

report?

A No, I did not review their reports prior to the completion of my report.

Q Different direction.

Did you review the labels of any chemical hair relaxers that are at issue in this case?

A Yes. So it's -- during the course of the last few months, of course, there's been curiosity about what ingredients are in general on the currently available chemical hair relaxers in use. But I didn't, you know, look at specifically those products and, you know, use only those products to answer these questions.

Because, again, the literature that's available is inclusive of the chemical hair relaxer products that are currently available that is not only, you know, these particular products in this case. So I did a more, I would say, comprehensive

PUGLIESE

review of the chemical hair relaxers.

Q But you did not review any labels of the defendants that are in this case, their chemical hair relaxers?

A So, again, I did not review any information specific to particular defendants in this case. I formulated my opinion based on what we know about ingredients in chemical hair relaxers and what they do to the skin.

Q How did you define the ingredients that are in chemical hair relaxers for the purposes of your report?

A I utilized dermatology textbooks, utilized a few papers that talk about chemical hair relaxer use, appropriate use of chemical hair relaxers.

There is a very helpful paper. It was a paper by Dr. Okeke in 2024 that looked at ingredients, contact allergens. The focus of their

PUGLIESE

paper was contact allergens in commercially available chemical hair relaxers. So they, you know, did list those ingredients. And that was helpful. I thought that was actually quite comprehensive.

But no, I wasn't provided with any -- no manufacturer information on these products. I did ask Mr. Shipman and Ms. Parfitt if they were privy, you know, if they had that information from the defense. But my understanding is that it was not received.

Q Which information was not received?

A Specifically, the particular products and their comprehensive ingredient list.

Q What about any ingredient list?

A To my knowledge, that information was not available.

Other than, of course, like

PUGLIESE

walking to the store and doing field research.

Q Did you review the instructions for use in application of the chemical hair relaxers?

A Yes. That, you know, came up in a few of the papers. So yes, I did review that.

Q Did you review instructions of use -- or I'm sorry. Let me strike that actually.

Did you review the instructions for application of chemical hair relaxers from any of the manufacturers of the chemical hair relaxers?

A I do recall in my review of one of the depositions for Dr. Brown they had kind of read out those instructions. It was one of the exhibits. So I did review that information.

Obviously, that was post-report, but yes, I guess to answer

PUGLIESE

your question just accurately, I did at some point review that. But not prior to the -- the writing of the report.

Q Did you review any specific usage history by plaintiffs or any plaintiffs or generally the usage of chemical hair relaxers? And by "usage" I mean how often it should be applied, the amount that was applied.

Did you review any of the information like that?

A So I did not have specific information from any of the plaintiffs, so I wasn't able to review that -- those particular details. But in the literature that I have cited, there is discussion of how often chemical hair relaxers are generally used.

And, of course, in a few of the epidemiologic studies they did, you know, talk about usage, a generalizable usage in certain patient populations and also kind of frequency of use as they defined it.

PUGLIESE

Q And when you say "as they defined it," you mean the authors of the paper or the individuals that were --

A The authors of the papers, just to be clear.

Q Thank you.

What do you understand to be the common usage of how often hair relaxers should be used, or is directed to be used?

A So in terms of frequency, and this assuming a patient that is regularly relaxing their hair, they will generally utilize this product every -- along the order of eight to ten, eight to twelve weeks.

Q And do you have any idea how the volume or amount of hair relaxer cream that is used during any application to the hair?

A Other than, no, you know, seeing the videos and seeing what was applied, I don't have specific data on

PUGLIESE

the amount of -- if we're talking about the chemical hair relaxer specifically, the active ingredient, no, I don't have a number for that.

Q Same question about the amount or volume of a shampoo that's contained in the hair relaxer kit that's applied.

A So, again, don't have, you know, a specific number. I am just not sure that that's really pertinent to the formation of my opinion.

Since, you know, my opinion, based on my review of the literature, based on my knowledge, is that this is, you know, exposure that we're looking at. And while frequency is important, you know, specific like this ML or that ML in the case of gram, in the case of the milligram in the case of the cream components, I'm not sure that's pertinent or useful for me in formulating my opinion.

Q And you don't -- and just so

that we're clear, let's turn to page 13 of your report real quick.

A Sure.

Q And I should have asked this earlier.

The last line of your report, page 13 -- let me know when you are there?

A I am there.

Q "It is my opinion to a reasonable degree of medical certainty that it is biologically plausible for chemical hair relaxers to be absorbed into systemic circulation and cause cancers such as uterine and ovarian cancer."

Did I read that accurately?

A Yes.

Q And is that your -- is that your opinion as you sit here today still?

A Yes.

Q And that's when we refer to the conclusions of your report or your

PUGLIESE

opinion, it's safe to say that we are referring to this sentence and the report in general, but that's the conclusion?

A That is -- again, you know, my role was really to discuss absorption. So I would say that I have a number of conclusions regarding how that absorption occurs. You know, conclusions regarding how chemical hair relaxers affect the skin and the hair.

But, yes, if we're talking specifically about what can happen within systemic circulation, one of the things that there does seem to be an increased risk for in reviewing the epidemiology is increased risk of uterine and ovarian cancer.

Q Is increased risk the same as causation?

A I think that causation is challenging because it's hard to have one study that says X causes Y. But when we come to the conclusion about

PUGLIESE

causality, it's really based on the totality of information, the different studies that are weighed and considered.

And for me the biological plausibility really harkens back to what are these ingredients? What is the mixture of these ingredients? What happens when they're applied to the skin? Can they absorb into the skin?

And then based on the epidemiology that we have looking at chemical hair relaxers in terms of, you know, not only cancers, but other downstream effects, you know, could they cause it.

So when I am reviewing all that information, I do believe that there is evidence of causality. But, again, my -- really my primary role here is to help elucidate how chemical hair relaxers function on the skin and how they may absorb into the skin.

Q But you do have an opinion in

PUGLIESE

here about causation?

A I have an opinion now. I mean, I certainly had no opinion, you know, when I started this report or when I started this, you know, involvement in this litigation.

Again, I don't -- again, I'm not a chemical hair relaxer. I don't speak on chemical hair relaxers, you know. But as I spent months now, you saw -- we went over the number of hours. As I spent all that time looking at the literature, yes, of course, I'm going to form an opinion on that.

Q One thing I can say for sure, everybody in this room is cognizant of the number of hours that are spent on the chemical hair relaxer right now. So yes, I do appreciate that.

Jumping back --

MR. PETTI: Well, we've been going about another hour. Can we take five minutes? Because I'm

PUGLIESE

going to go a different direction here.

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER: We are going off the record at 11:41 a.m.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: We are back on the record at 11:55 a.m.

Q Welcome back.

I want to turn to some more stuff in your report.

A Sure.

Q If we can go -- we are going to focus a little bit here. If we can go to page 4.

Are you there?

A I am there.

Q At the very top, you talk about undertaking -- or you undertook a weight-of-the-evidence analysis.

What does weight-of-evidence analysis mean to you?

PUGLIESE

A So in the way that I utilize it here, I meant that I -- by "evidence" here it's the literature that I reviewed and provided an evaluation of how those different literature reports, studies, et cetera. Not to use the word to define the word, but weighed or played a role in helping me formulate that evaluation.

So, you know, some examples would include that, you know, if it was a study that looked at an ingredient -- I am trying to keep it pertinent, but an ingredient that was in another product, you know, it's not something that I necessarily would include in here.

And then as I looked at the individual studies that I looked at, so here talking about the epidemiology, utilizing what I, through evaluation, thought to be well-fabricated studies. And by that I mean created, not made up, but well designed is a better word,

PUGLIESE

studies that could lend some of the epidemiologic evidence to some of the conclusions that I came to.

Q Was there an objective criteria that you applied in weighing the evidence?

MR. SHIPMAN: Objection to form.

A Can you ask that one more time?

Q Is there -- yes. Did you -- I will try to ask it a little bit differently.

A Yeah, yeah.

Q Did your application of the weight-of-the-evidence analysis involve applying objective criteria to the literature you reviewed?

A Well, I think, you know, the most important parameter of objectivity for me was that, you know, coming into this litigation, I didn't have an opinion really one way or another about chemical hair relaxers, other than, as

PUGLIESE

I specified earlier, what I've seen in clinical practice.

So for me I looked really at everything, not everything in the world, but everything within the parameters of my search. And then I do believe that I did an objective review of -- of those -- of the evidence. But there is not one -- if you have an example of one kind of parameter system that you were thinking about, I am happy to think about that more intentionally, but I did not use one particular guideline to define objectivity.

Q For instance, EPA has a weight-of-the evidence framework.

Did you use EPA's weight-of-the-evidence framework in this case?

A Does their weight-of-the-evidence framework kind of apply to cutaneous absorption? Or is it weight of the evidence having to

PUGLIESE

do with carcinogenesis? I am just curious to hear what type of weight-of-the-evidence analysis they have.

Q They have a few different weight-of-the-evidence analysis.

Did you apply any of the EPA's weight-of-the-evidence analysis in your review?

A So I did not apply specifically the EPA weight-of-the-evidence analysis in my review.

Q Did you apply any formalized weight-of-the-evidence analysis to your review?

A I didn't. You know, I guess all the weight of analyses -- evidence analyses, but I did not apply a rubric for weight of analysis to come up with my opinion.

Q Did you create any type of a decision tree or flowchart for your decision-making process?

PUGLIESE

A I didn't diagram anything out to come up with my opinion.

Q Did you employ any type of a scoring methodology for the articles you reviewed?

A So, you know, I'm aware of different scoring methodologies that are utilized, again, primarily as they relate to therapeutics. But I did not apply those scoring criteria to -- to this particular evaluation.

Q Earlier we talked about another comment you had in your report. Let me see if I can find it because I don't misstate it. Give me one second.

Oh, at the bottom of page 3.

A Page 3, sure.

Q It's a line or two up.

That you use the same methods that you would use in academic and professional work.

Are there other instances where you apply a weight-of-the-evidence analysis in your

PUGLIESE

professional work --

(Clarification by the reporter.)

Q Are there other instances where you apply a weight-of-the-evidence analysis to your professional work where you utilize any type of formalized scoring system or methodology?

A Specifically, related to weight of evidence?

Q Yes.

A So the main place I would say would be there are particular literature reviews where they do have scoring criteria for different -- for when they're compiling, let's say, a systemic review, they'll have a different recommendation level, you know, based on the -- the particular source that they reviewed, or the source that they reviewed, to come up with that recommendation.

So that's probably what I see

PUGLIESE

most commonly. I utilize that when it's available because it's not available in all reviews. But when it's available, you know, I do utilize that to kind of learn, you know, which sources to utilize and what the strength of the recommendation is based on those parameters.

But, of course, you know, when I'm counseling a patient, I'm not saying, like, this recommendation is -- that's not a process that I go through when, you know, in direct clinical care, but it is a process that is seen in the dermatology literature for certain reviews.

Q So at the beginning of the answer you talked about scoring of articles that you have seen in other reviews.

Are those articles that were scored by other folks that you could then see what the score they assigned was and decide if that was applicable?

PUGLIESE

I am trying to understand --
A Yeah, how they do it.
So usually the way that I see it was the scoring pertaining to strength or recommendation of a therapeutic.
Q Okay.
A So they'll say the strength of recommendation based on these particular types of articles that were reviewed, and it ranges. And it could be, like, very strong or less.
Maybe I can give you kind of a more applicable example.
Q Well, let me --
A Yeah.
Q That scoring recommendation, that's not scoring each of the articles that you used to come up with a recommendation?
A Yes, I see what you're saying. Yeah. Okay.
Ask the question again, with the understanding that you're talking

PUGLIESE

about scoring the articles before recommendation.

Q Well, let's -- maybe we can cut to the chase on it.

A Yeah.

Q When -- when you're reviewing those scored recommendations, as a way to put it, are the articles that support that recommendation also scored?

A In certain reviews they will mention how -- who -- specifically in the methodology how many reviewers were there with each article, how do they -- if they had discrepancies in opinion, how do they resolve those. They might mention some weight-of-evidence analysis in that case. But I did not utilize one of those metrics specifically to formulate my opinions here.

Q Do you have a method for review of a weight-of-the-evidence analysis that you teach?

PUGLIESE

A I do not have a specific weight-of-the-evidence analysis that I teach.

Q I think we covered how you assembled the body of evidence that you were weighing in this.

Was there any other ways that you collected evidence, other than the literature review and the searches on PubMed or the like?

A Collected sources. No.

And then we talked about, you know, obviously reviewing the other -- the defendant expert witness reports and looking at some of the references.

Q But that was all after you had already generated --

A Yeah.

Q -- your report we're talking about in this case?

A Yes. This report specifically, materials considered, the specific references are cited after the report.

PUGLIESE

Q Do you recall how many documents or reference materials that were excluded from your report that didn't make it on to your list of materials considered?

A I don't have a specific number, no.

Q Were there others that were not considered or did not make the list of materials considered other than Pierce?

A So Pierce was not considered for the report, considered later upon the evaluation of Kasting. But I imagine that there probably were, but there wasn't any that I can remember the author or the title or the specific reason why it was excluded.

Q And you didn't keep a list of those?

A I did not keep a list of -- other than maybe if there was a draft that then, you know, by final draft, I removed that reference, that could have

PUGLIESE

been one. But I am not sure the references really changed all that much.

Q Okay. Do you understand what I mean by the term "risk of bias"?

A Yes.

MR. SHIPMAN: Objection to form.

A I mean, risk of bias as it pertains to -- well, maybe you can tell me kind of what you -- what your definition is, and if you mean it more so in terms of general review --

Q I can try.

A -- clinical practice. Yeah.

Q Did you perform any type of risk of bias or study quality assessment for each of the materials that you reviewed for your report?

A Yeah. So, again, I don't -- again, not a specific risk of bias methodology, other than in reviewing the studies, looking at their -- the study population, their evaluation of

confounders within that study population. So I would consider all that to be an evaluation of bias, but I did not use any particular metric of bias.

Q As parts of your weight-of-the-evidence review, did you -- did your methodology include any quantitative risk assessments or dose response modeling?

MR. SHIPMAN: Objection to form.

A So I think we sort of maybe touched on this in a bit of a different way earlier in the way it was worded, but there were not specific dosage considerations here.

My weight-of-evidence analysis was based on the literature that you see and what's available based on these chemical hair relaxer products and their availability and use.

Q And yeah, I think you're right. We did talk about this.

PUGLIESE

Let me -- correct me if I'm misstating it. It may save us some time.

A Sure.

Q It's your opinion, then, the exposure amount or amount used in any application of the chemical hair relaxer is not relevant to your ultimate conclusions?

A So it's my opinion that I can make these conclusions based on the literature that's available that looks at the way these products are currently utilized. So the way they're utilized is associated with different conditions that are systemic in nature.

But that's not -- you know, I can't say this dose or that does. It's just the way these products are being utilized, we're seeing these side effects.

Q That's close to what I asked.

But you did not consider it because you did not believe that it was

PUGLIESE

necessary to consider an exposure rate or an exposure amount?

A Other than looking at frequency of dosing, again in the epidemiologic studies, and, you know, looking at -- they did see how many years patients had -- I'm sorry -- how many years subjects in those studies had been exposed, you know, I would consider that to be a measurement. But it was not an individual measurement of subject by subject.

Q And just want to -- just to close some of these off.

You did not consider a rate of absorption of chemical hair relaxer?

A Yeah. So, again, no. And I don't think that the rate of absorption is needed in order to formulate my expert opinion on this topic.

Q Do you know if weight-of-evidence approach -- or weight-of-the-evidence analysis, I should say, is commonly used in

PUGLIESE

epidemiology to determine cancer causation?

MR. SHIPMAN: Objection to form.

A So I'm unable to comment, you know, in detail of weight of analysis in the way, you know, that you're defining it as an epidemiologic term.

Again, the focus of my involvement in this litigation was to discuss the absorption of chemical hair relaxers. They're -- what we know that they can do when they come in contact with the skin. And in really just kind of trying to clarify some of those epidemiologic conditions.

So I did not -- you know, I can't, you know, comment too much beyond that in specific terminology utilized in epidemiology. I'm not sure that's pertinent to the conclusions.

Q What do you understand epidemiology to be the study of?

A So kind of a general

PUGLIESE

definition, epidemiology studies the -- it's a broad field, but studies kind of the incidence of certain things occurring. It's a very broad way of defining it.

Q I like that definition.

A I'm sure an epidemiologist would not, but...

Q No, they would not.

In any of your peer-reviewed publications, have you applied the same weight-of-the-evidence method?

A So, again, if we're kind of talking about weight of evidence, reviewing what's available in the literature and coming to conclusions of what is more supported, then yes, I have applied that methodology in my peer-reviewed publications.

Q But not with other scoring systems?

A For the particular articles, not with a scoring system specifically for the things that I have personally

PUGLIESE

published.

Q We've mentioned it a couple of times. It's everybody in this room's favorite topic, but Bradford Hill criteria.

How familiar are you with the Bradford Hill criteria?

A I am not that familiar with it in order to be able to really formulate a thorough response.

Q Did you apply Bradford Hill's criteria to your conclusions in this report?

A You know, I did not. If I cannot define them clearly and give you a thorough response, then no, I did not apply them to these conclusions. At least not in any definitive way.

Q You did evaluate biologic plausibility, though, correct?

A I evaluated biologic plausibility. Again, just kind of walking in the way that I think about it and understand it, walking through

PUGLIESE

how chemical hair relaxers are applied, how they're utilized, and what they do to the skin.

And what do we know about absorption that can help us understand what happens when these chemical hair relaxers absorb into the body.

And also -- and where really the epidemiology for me was sort of like an exclamation point, right, where what do the epi studies show about increased incidents of different conditions that have an association with chemical hair relaxer use.

Q How would you, yourself, define "biologic plausibility"?

A So I would define biologic plausibility as is this something a series of events that can occur where it medically makes sense for these series of events to occur and have a particular outcome.

Q Is biological plausibility the same as a reasonable degree of

medical certainty?

MR. SHIPMAN: Objection to the form.

A I don't believe that they're necessarily the same thing. So reasonable degree of medical certainty to me means, you know, based on what we currently know, how we currently practice medicine, is this conclusion reasonable. Rather than biologic plausibility to me means, like, could this happen if these -- if those series of events are present in that fashion.

So I do think that there is a distinction between those two definitions.

Q Are biologic plausibility and causation the same thing to you?

A So biological plausibility, again, is not the same to me as causation. But biological plausibility to me is sort of a step in the direction of causation. Because if something is biologically implausible,

then, you know, causation is not an outcome we would expect.

Q How do you define causation?

A So in the simplest, you know, definition, I would say this leads to this, right. So X leads to Y.

Q In your opinion, what steps do you need to take to determine whether X leads to Y or not?

A So, you know, I know not to hark back to clinical practice, but first we have to -- and I will use it as an example again because I think it just makes -- at least it makes sense to me.

But when you're evaluating a patient for toxicity to treatment --

(Whereupon, a discussion was held off the record.)

A So when evaluating toxicity to different treatments, you know, the first thing that we want to know is, well, of course, is the patients receiving that treatment, to what do we

PUGLIESE

know about potential side effects of that treatment. Again, timeline to administration of the medication treatment development.

So we take all that information together to come to a conclusion as to whether that particular treatment could have caused the outcome that we're seeing.

Does that answer your question?

I think the sirens might have...

Q I think we are getting there, yes. But, yes, they were distracting.

So the steps you identified in that response, did you apply all of those to your conclusions in this report?

A Well, it's, you know, similar, right. So, one, understanding what products we're talking about, understanding what effect those products have locally, and what's been

PUGLIESE

reported in terms of systemic effects.

And then drawing as much information as possible from what's available that looks at use, frequency, et cetera of those products and some of these associations.

Q Is there anything else?

A So in response to my -- the answer that I gave earlier, I don't believe I gave anything else. But if I left anything out, let me know.

Q In your publications, do you commonly use the term "reasonable degree of medical certainty"?

A I think that, you know, I try to be mindful of sort of the audience that I am writing for. So that is not necessarily a language that I would use in clinic. You know, it's not language that I would use in a paper.

But it seemed, you know, writing a report for litigation, it seems like appropriate language.

Q This one might be tricky for

PUGLIESE

me to ask in a way that makes sense.

A Okay.

Q But do you undertake the same methodological approach to determine plausible versus casual?

MR. SHIPMAN: Objection to the form.

Q I clued you in that that was coming.

MR. SHIPMAN: Thank you.

A I think it's a nuance. I wouldn't say that some tenets of methodology are that different, but generally you would need -- usually kind of -- you know, plausibility, we're looking at can this happen.

Causation more so in very general terms, again, is do we have enough evidence that points toward this happening. That's kind of how I think about it.

So while we might have one study that can tell us about plausibility, like this has been

PUGLIESE

reported and can happen, it's really the compilation of all that, that allows us to come to the conclusion about causation.

Q And, again, to reach an opinion on causation, you don't believe that a dose or an amount of exposure is necessary?

A So no, for the purposes of what I was asked to review and, you know, formulating my expert opinion, I don't believe that that information is pertinent to that opinion.

Q And this -- you may have had this answered already, but you don't know what dose of a chemical hair relaxer is necessary to cause cancer, any cancers?

A So, again, I don't have a specific number, but, you know, I think that certainly the dose that is currently commercially available has studies that show an association with the development of cancer.

PUGLIESE

(Pause.)

Q Is there any way to repeat the methodology you -- you employed to perform your weight-of-the-evidence analysis here?

MR. SHIPMAN: Object to the form.

A Again, we talked about -- so the method that I utilized in terms of a literature search. So now having other reports that I reviewed, maybe I would expand that search. Who knows.

But, yeah, I think I would be able to replicate it, because, again, it's not different from what I do professionally in my academic pursuits or in my clinical practice.

Q Could others replicate it?

A Well, in looking at Dr. Burgess and Dr. Kasting's reports, their methodology appeared to -- you know, I don't want to say similar because I do think there were distinctions. But I don't recall there

PUGLIESE

being a discussion of weight-of-the-evidence of analysis there.

And it seems to me that's sort of -- a similar literature review was performed. So sensibly, if somebody wanted to research this question, they could utilize a similar search terminology and they would have the benefit of having a formulated report now, whereas, you know, at the start of this, there really wasn't -- you know, I had no direction. It was more so trying to dig through the literature.

Q Do you know anything about the potential weight of error -- sorry -- rate of error, not weight of error -- rate of error for opinions based on weight of evidence literature reviews?

A No. So I can't comment on that. I am not sure how it's pertinent here, but -- I can't comment directly

PUGLIESE

on that.

Q Do you believe that there is a general acceptance in the medical community that hair relaxer products, chemical hair relaxer products can cause cancer?

MR. SHIPMAN: Objection to the form.

A I think that there is certainly a general acceptance that chemical hair relaxers can cause toxicity to the skin and to the hair. I mean, that's information that's available. It's not really a hypothesis.

I mean, it's available in textbooks. It's available in multiple peer-reviewed sources, in really the -- much of our dermatology literature. So certainly I don't think there is any question there about chemical hair relaxers.

And I think that there is mounting concern in the dermatology

PUGLIESE

community that chemical hair relaxers can be associated with increased risk of certain cancers.

Q Are you familiar -- are you familiar with IARC, the International Association of Research on Cancer -- can't remember the acronym for the first time.

A I have heard of that acronym.

(Clarification by the reporter.)

MR. PETTI: IARC, I-A-R-C.

Q Do you know if IARC has issued an opinion on chemical hair relaxers and cancers?

(Clarification by the reporter.)

Q Do you know if IARC has issued an opinion on chemical hair relaxers and cancers?

A Oh, it's a research consortium? International Association of Research on Cancer.

Q I am totally blanking on it

PUGLIESE

for the first time.

(Clarification by the reporter.)

A Yeah. I am not familiar with all of the associations and all their guidelines, but if you have it up, I am happy to review it.

Q Let's go back to the report.

A Sure.

Q On page 4. Turning to "Chemical hair relaxers and the skin," that section.

A Yeah.

Q In the first paragraph, there is a listing of a number of -- I guess we'll call them ingredients that are -- in addition to the active ingredients.

For the court reporter's sake, and the safety of all of us, I'm not going to read the whole list into the record, but -- you will thank me later if I show it to you.

Do you know if any of these ingredients are cancer -- are

PUGLIESE

considered to be cancer-causing ingredients?

A So in isolation there are some ingredients where there is some concern that they might be associated with certain cancers. So those ingredients include formaldehyde and other formaldehyde releasers. Other things, phthalates and parabens have also some literature that are obviously on their association or possible association with cancer.

And then benzophenone, one of the UV filters.

So out of just my, you know, review of that list, those would be the ones that I would list that as having had some concern.

Q And I just want to clear something up. You mentioned formaldehyde. Formaldehyde isn't listed in this paragraph as an ingredient itself. It's listed as, in a parenthetical, about preservatives;

is that correct?

A So when I wrote this, I wrote about -- I reference the active ingredient as just being like that, relaxer product. But we know that it is mixed with these other ingredients.

Not to confuse it based on the sentence, but I consider these all to be in that mixture of chemical hair relaxer kits. Because to my knowledge I don't believe that sodium hydroxide is ever applied in the context of relaxing the hair without anything else being applied after.

(Clarification by the reporter.)

Q My question was slightly different.

Do you believe that formaldehyde is an ingredient, a direct ingredient I should say, in chemical hair relaxers?

A Well, this is a place where I really did find that Okeke article that

PUGLIESE

I referenced earlier to be helpful. Because one of the points that came up in that article was that -- and I believe also it was in Helm was the other reference, was that often the ingredients that are listed on the package label or manufacturer label are not comprehensive with the entirety of all the ingredients that are available within that product.

And so formaldehyde, actually interestingly, came up in the allergic contact article that dealt primarily with chemical hair relaxers. And, again, formaldehyde releasers are in chemical hair relaxers.

Q Do you understand a formaldehyde releaser to be the same thing as direct formaldehyde as an ingredient?

MR. SHIPMAN: Object to the form.

A So formaldehyde is not the same as a formaldehyde releaser, but

PUGLIESE

true to the name, a formaldehyde releaser, when kind of broken down, will release formaldehyde.

Q At the same concentration as if formaldehyde itself was an ingredient?

A Again, I'm not sure the dose is important here because when we're thinking about the effect of formaldehyde, you know, I'm not sure that that dose makes a difference.

Q So is it your opinion that any amount of formaldehyde can cause cancer?

A So --

MR. SHIPMAN: Objection to the form.

A -- that, I would say, is a vast generalization.

My comment here relates to, in terms of transparency, it should be known that formaldehyde can be found in chemical hair relaxers. So that if someone is actively trying to avoid

formaldehyde, then they should be able to see that on the ingredient label.

Q But -- okay.

But do you believe that formaldehyde in any amount in any dose can or will cause cancer?

MR. SHIPMAN: Objection to the form.

A So I'm aware that formaldehyde is a listed carcinogen. But in order to provide a comprehensive answer as to the incidence of formaldehyde causing cancer, I'd have to undergo a thorough review of it in the same way that I have for chemical hair relaxers.

Q You mean you haven't done that review?

A Excuse me?

Q And you have not performed that review?

A Of?

Q Formaldehyde?

A Of formaldehyde?

PUGLIESE

Q Yes.

A So my -- really my task was to review chemical hair relaxers and not to, you know, perform a comprehensive review of every potential ingredient listed or unlisted that could possibly be in a chemical hair relaxer.

So my review was based on chemical hair relaxers as we understand their ingredient mixture to be.

Q Okay. And so you have not performed that -- that comprehensive literature review of formaldehyde or formaldehyde donors themselves?

A I have not performed a comprehensive review of formaldehyde and formaldehyde releasers specifically. And I don't think that that review is really pertinent to my opinion here on chemical hair relaxers.

Q Again, on here we also have the chemicals that were mentioned at the beginning of the day, parabens and

PUGLIESE

phthalates.

Are these the only parabens and phthalates that you understand to be ingredients in chemical hair relaxers -- and when I say the only ones that you understand the parentheticals after the word "phthalates and parabens"?

A No. Because I wrote these include but are not limited to, so these are some of the parabens and phthalates, but not all.

Q What are some of the others?

A Well, I think -- would you like me to pull up the Okeke article?

Q Yes. We can pull that up.

A Yeah. I think that has --

Q Yeah.

A -- some helpful information.

And maybe Helm might be helpful here too.

Q Well, let me just reask it this way so we don't have to go through the whole -- the list.

PUGLIESE

Your -- your language of included but not limited to on the listing phthalates with the parenthetical and parabens at the parenthetical, you reference items Number 2 and Number 3 from your list of references. And that would be the Helm article. And is 3 Okeke?

A I could tell you right away.

MS. PARFITT: Okeke is 5.

A Yes. The allergic contact dermatitis paper, which is the Okeke paper, that is 5.

(Clarification by the reporter.)

Q So let me just ask it this way.

When you state these include but are not limited to, are you also including by reference the other -- any other phthalates or parabens listed in Okeke or Helm?

A So I am -- my reference pertains to Helm and Irungu,

I-R-U-N-G-U, specifically referencing those ingredients in their paper.

Q Okay.

A Papers.

Q Yeah. I didn't want to have to go through the listing in the paper, so I think that that answers my question now.

Thank you.

Do you have any exposure evidence as to the concentration of phthalates or parabens in any chemical hair relaxers?

MR. SHIPMAN: Objection to the form.

A So I think we may have touched on this a little bit when we talked about phthalates and parabens. I did not find any evidence available in the literature that looked at, you know, exposure to chemical hair relaxer and subsequent paraben phthalate.

I would say absorption specifically. And that would, again,

PUGLIESE

be information that I would be interested in having if the manufacturer has that at hand. But no, I did not see that specifically.

Q Which information specifically from the manufacturers would you want to have access to?

A Yeah. So, like, safety, systemic absorption, whether they did any measurements in the scan of where the chemical hair relaxer products could be found after utilization. So testing you could do with, you know, tape stripping or you could do it with a biopsy in certain cases. So it would be helpful if we really wanted to get in the weeds and have those data points to have that.

Q And how would those data points be helpful to you?

A I think they would be helpful to me in answering the questions that you have for me about specific absorption. Because what I could tell

PUGLIESE

you is that based on what I've seen are all available in the literature, we don't have those numbers, but we can still come to the same conclusions.

Q How can you come to the same conclusions if you don't know the dose?

A Because --

MR. SHIPMAN: Objection to the form.

A -- you know, when chemical hair relaxers are applied to the skin at their current dose, they cause irritant contact dermatitis, allergic contact dermatitis, chemical burns.

(Clarification by the reporter.)

A So that is something that is occurring with, you know, the currently available, and previously available, chemical hair relaxers.

So I don't think my -- when my patients come to clinic, they're not saying -- they're not worried about the dose that was utilized; they're worried

PUGLIESE

about the reaction that they're having.

Q The dermal reaction that they're having?

A The dermal reaction that they're having in that particular case, yeah. Or if it's the case of hair loss, you know, the effect they're having on the hair.

Q That is something I know about.

A Are you saying you've utilized chemical hair relaxers?

Q No. I am saying I have lost hair.

I'm trying to avoid going over some of the same ground we've gone over --

A Sure, sure. Take your time.

Q -- so just give me a minute.

A Yeah, of course.

Q In formulating your opinions here today, did you have to make any assumptions about pattern of use?

MR. SHIPMAN: Objection to

PUGLIESE

the form.

A I utilized -- you know, to make my -- to formulate my opinion, use in terms of frequency, so a normal, quote/unquote, user potentially using those products every eight to ten, eight to twelve weeks.

The second, you know, I would say assumption would be how to define like a never-user compared to a frequent user. So those would be, you know, some I would say assumptions.

Q And did you understand in my last question I was referring to chemical hair relaxer use?

A Yes. Yeah.

Q Okay.

And does the usage of the actual chemical hair relaxer cream versus the usage rate of the shampoo or a conditioner or some other component of the kit make any difference to your conclusions in this case?

A Because they're all utilized

PUGLIESE

together, it's -- it doesn't make a difference. I think of it as just being the mixture of those products altogether.

So, for example, you know, if a patient were to come in with a rash to a topical medication, you know, it's -- it's hard to know. I mean, I can evaluate the rash based on them using this steroid with those preservatives in it, and then they develop that rash. But it's not -- you know, I can make that conclusion based on what they're using and looking at the totality of those ingredients.

I don't think there is -- you know, that's kind of the way that I thought about this process in coming up with that -- with my opinions in it.

Q And the totality of the ingredients is what we referred to either -- earlier, the ingredients taken from Helm and the references in your report?

PUGLIESE

A So yes, there I mentioned, you know, some of them. Of course, the active relaxer ingredients. And then all of the different ingredients that are present in these kits.

Q On page 7 of your report, it's in the middle in the -- sorry. Looking at page 7.

A Sure. Yeah.

Q The paragraph about two-thirds way down that starts "Partitioning is the term."

A Let's see. Yes.

Q There is a sentence -- the next sentence is "Enhancers such as propylene glycol (a common ingredient in chemical hair relaxers) and ethanol can be added to topical formulations to improve solubilization as well as alter the barrier structure to improve partitioning."

And we'll talk about partitions later. But I just wanted to focus on propylene glycol for a minute,

PUGLIESE

if that's okay.

Do you know how -- what the rate of change the additional of propylene glycol to a hair relaxer would be, as -- in terms of absorption to the skin?

A I do not know the specific rate of change in terms of a number, other than knowing that propylene glycol is generally added in order to increase the rate of absorption.

Q Do you know if it changes the molecular structure of any of the other chemical hair relaxer particles that it may be -- that may be part of the compound, the chemical hair relaxer compound?

A I -- if you'd like to mention a particular ingredient, I am happy to think more on that. But offhand I cannot mention one ingredient where I specifically know that propylene glycol will alter that ingredient.

Q Did you determine whether or

PUGLIESE

not propylene glycol is present in and at what concentration in any chemical of the hair relaxers at issue in this case?

A Again, I did not look at, you know, specific individual products. We know that propylene glycol was the top contact allergen identified in a broad range of chemical hair relaxers. Again, as mentioned in Okeke in that review. So we could certainly kind of look at some of those brands.

But, no, I did not look at specifically off-the-shelf formulations.

MR. PETTI: So, Gary, I'm going to get into some of the specific references in papers. Do we want to take a lunch? We're almost at 1:00?

MR. SHIPMAN: Yeah.

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER: We're going

PUGLIESE

off the record at 12:42 p.m.

(Whereupon, a lunch recess was taken at 12:42 p.m.)

PUGLIESE

A F T E R N O O N   S E S S I O N

(Time noted: 1:12 p.m.)

S-I-L-V-I-N-A  P-U-G-L-I-E-S-E, MD,

Resumed, having been previously sworn by a Notary Public within and for the State of New York, was further examined and testified under oath as follows:

VIDEOGRAPHER:  We are back on the record at 1:12 p.m.

CONTINUED EXAMINATION BY MR. PETTI:

Q    Doctor, welcome back.
Are you ready to continue?
Everything is okay?

A    I am ready.

Q    I know you were checking on some patients.

A    No, I am good.

Q    Nothing you need to -- okay.
Perfect.  Just making sure.
Let's go back into your report.  And I want to turn to page 5.
Let me know when you are ready to go.

A    Okay.

PUGLIESE

Q And at the top of page 5, the paragraph starts "Chemical hair relaxers are very alkaline."
Do you see where I am?
A Yes.
Q And not quite halfway down through there, there is a mention of a paper by -- would you pronounce it "Chiwar"?
A Your guess is as good as mine, but, yeah.
Q As long as we're on the same page.
Yeah. And that's -- that was a mouse study. So if I refer to that simply as "the mouse study," do you understand what I am talking about?
A Sure. I mean...
Q I just want to be sure that when I --
A This mouse -- yeah.
Q -- the Chiwar mouse study.
A Sure.
Q And you state in this first

sentence that "In Chiwar et al.'s mouse study, mice exposed to a chemical formulation containing formaldehyde, sodium hydroxide, and parabens developed significant epidermal thinning."

It goes on, but do you see that sentence I am looking at?

A Yes.

Q I wanted to talk a little bit about that study.

A Sure. Do you have it? I'm sure I have --

Q I do. Oh, great.

A Thank you.

MR. PETTI: I will give it to the reporter. This is Exhibit Number 3.

And for those online looking at exhibits, this would be Tab 4, but it's going to be Exhibit 3.

(Dose-Dependent Histopathological and Structural Impact of Chemical

PUGLIESE

Hair-Straighteners on Scalp Epithelium and Hair-Fibres Using Albino Wistar Rats, was marked Pugliese Exhibit 3, for identification, as of this date.)

Q The court reporter has passed to you what is marked as Exhibit 3. The "Dose-Dependent Histopathological and Structural Impact of Chemical Hair-Straighteners on Scalp Epithelium and Hair-Fibres Using Albino Wistar Rats."

Did I pronounce everything correctly?

A I feel like Wistar rats, yeah. I believe everything is correct, yeah.

Q And this is the paper you're referring to as the Chiwar et al. mouse study, correct?

A Yes. This is the study.

Q Okay.

And in your report -- and I apologize, but I will be bouncing back

PUGLIESE

and forth --

A Sure.

Q -- between your report and the study -- you talk about the report "is significant because the subsequently compromised skin barrier promotes increased absorption of topicals applied to the skin, including chemicals contained in chemical hair relaxers."

So what did you take this study to mean in drafting your report?

A So I utilized this as an animal study showing the effect on animals of chemical hair relaxers.

Q And if we turn -- now we can turn to the report. We'll go through it.

A The report or the Chiwar --

Q I'm sorry, the Chiwar paper.

A All right. Uh-huh.

Q I will try to be accurate in how I name things.

And if we could turn to what

PUGLIESE

would be page 2 of the paper. It's denoted as page 160 at the bottom.

A Uh-huh.

Q And on the second column, it starts "Animals" and then halfway down it refers to "Chemicals."

Do you see where I am at?

A Uh-huh.

(Clarification by the reporter.)

A Yes.

Q It states that the "Hair Straightener Formulation: A commercially available chemical hair straightener containing active ingredients including formaldehyde, sodium hydroxide, parabens, and other reactive compounds was used."

Did I read that correctly?

A Yes.

Q Do you know, or do we know from this paper, what commercially available hair straightener was used?

A I can see if there was, you

PUGLIESE

know, any additional information provided at the end that would have parsed that out a bit more, just to make sure.

(Pause.)

A No. So it does not seem that the name of a particular formulation of chemical hair relaxers.

Q Well, it doesn't say the chemical hair relaxers. It says chemical hair straightener, correct?

A It says chemical hair straighteners, and then also they mention sodium hydroxide, paraben, and formaldehyde.

Q Well, do you understand formaldehyde at this rate to be used in chemical hair relaxers versus chemical hair straighteners as we discussed at the beginning of the deposition?

A So formaldehyde, in my understanding, is utilized in chemical -- I'm sorry -- hair straighteners, chemical hair

PUGLIESE

straighteners. Formaldehyde releasers have been found in chemical hair relaxers.

And, again, you know, Okeke had brought up that point about there being some formaldehyde also present in chemical hair relaxers. I don't believe there was a dose or a percentage mentioned in that paper.

Q So you don't know if this was a chemical hair relaxer product as referenced in this litigation versus a chemical hair straightener such as potentially a Brazilian hair-straightening product?

A So they are defining it as a hair-straightener formulation. As you can see, they're only listing, you know, three of the products. They don't provide any additional information.

Q And just for clarification, three of the ingredients that are in the product?

PUGLIESE

A Yes. They are only including three of the ingredients that are in the product. And they mentioned just other reactive compounds.

Q And then moving down under "Chemicals." And for some reason the next heading isn't bolded. "Animal Grouping and Exposure Protocol."

Do you see where I'm at?

A Yes.

Q And in that paragraph, about a sentence or two down, it starts -- it talks about "Group I served as the vehicle control and received normal saline applied with the same volume and protocol as the treatment groups," and it continues, "including a repeated dose administered one week after the initial application. Groups II, III, and IV each received a single topical dose of the chemical hair straightener with exposure durations of 10, 20, and 30 minutes, respectively."

Do you see where I am

PUGLIESE

reading?

A Yes.

Q Okay. And then it goes on. "Groups V, VI, and VII were administered repeated doses, consisting of an initial application followed by a second identical application one week later, with exposure times of 10, 20, and 30 minutes, respectively."

I read all that correctly?

A Yes.

Q Okay. So we have the seven subjects and -- well, six subjects, one control group.

Do you understand these durations to be the typical amount of time that the chemical hair relaxer would be applied to hair?

A My understanding is that the chemical hair relaxing products can be applied up to 20 minutes, sometimes more, depending on the product.

Q And are chemical hair relaxing products applied directly to

PUGLIESE

the scalp or are they applied to the hair?

MR. SHIPMAN: Object to the form.

A So the intended use of chemical hair relaxers as the instructions, you know, seem to state is to -- you know, as discussed earlier, apply to the new growth of hair.

However, as we also discussed earlier, I do think it is a really challenging ask, just because of the anatomy. In order to put something onto the entirety of the scalp that is going to serve as a physical barrier to protect the scalp and then place something on the hair and expect it to not come in contact with the scalp at all is, I think, really, again, a challenging task or challenging ask.

So, yes, my understanding is the instructions are placing the chemical hair relaxer product on the

PUGLIESE

hair itself. And also I don't see how it just does not make its way onto the scalp.

Q But you do not how much stays on the hair versus how much would get on the scalp in any application?

MR. SHIPMAN: Objection to the form.

A So, again, kind of dose specific information, I'm not sure it's, you know, right partnering here, since -- with the instructions currently in these products, we are seeing this localized cutaneous toxicity as represented by rash on the scalp.

Q Is that in every use of every hair relaxer?

A So it is a known side effect profile of use of these chemical hair relaxing products.

Q And by -- well, strike that.

If you will turn to the next page, at the bottom page 161 of the

PUGLIESE

paper -- the journal this was taken from. There is a heading right at the top. "Treatment Area and Application Protocol."

Do you see where I am?

A Yes.

Q Okay. Do they have dose information in the second paragraph of volume of 1.5 milliliters of the chemical hair straightener, creating a dose density of approximately 1.5 milliliters per centimeter squared?

Am I reading that correctly as the dose that was applied to the rats? Or mice. I'm sorry.

A Yes. That is correct.

Q Why do you think they included that information if dose is not necessary to make the determination as you've made in this case?

MR. SHIPMAN: Objection to the form.

A Well, I -- you know, this is an animal study looking at safety of

PUGLIESE

these products. It is not -- it is actually very common to utilize animal studies to extrapolate how these medications might react when placed on patients or how these products might react when placed on patients.

And I think that, you know, ethically, you know, there are obviously some concerns with putting, like, a known caustic substance at high dosage onto, you know, human skin.

Q And in preparing your report, I assume you reviewed the entire article, including the results of the study?

A I did.

Q Let's turn to the results portion. If you would -- it's on the same page. Next column, "Results." And I'm going to jump down to where it talks about Figure 2.

Do you see where I am at, towards the bottom of the page?

A Yes.

PUGLIESE

Q And that is -- that is the results for 10 minutes of a single dose, but that's -- this is just to the hair, correct?

A These are the hair shaft findings with 10-minute applications.

Q And does the hair shaft findings have any influence on your opinions in this case?

A As they pertain to systemic absorption or the effect on the scalp. They don't. If we want to talk about hair loss, you know, that would be a different conversation.

Q I wanted to rule it for absorption purposes. That was -- I could have asked that question a little more clearly.

But yes, you saw where I was going, I think.

So if we turn to page 164 of the report.

A 164?

Q Yes.

PUGLIESE

A Okay.

Q The "Histopathological Findings."

What does "histopathological" mean, just to have it on the record?

A Yeah. So when you are basically evaluating tissue, and pathology, you are looking for features of that tissue, I don't want to say always abnormalities because it's not always abnormal. But you're looking at the tissue that is grossed and then cut into smaller pieces to evaluate what we are seeing.

So that could be structures. It could be cells. It could be signs of inflammation. Whatever it is.

Q So this --

A Cancer.

Q Sorry. Didn't mean --

A Yeah, yeah.

Q -- to cut you off.

This section of the report would be addressing the skin or the

PUGLIESE

effects of the study on the skin.

A So the --

Q How would you say it more eloquently than me?

A Yeah. You know, I think this is what you are -- what you see in rats that have had this mixture applied to their mice skin, I guess. Mice skin. And what would -- what you would find in terms of the microscopic changes under the skin.

Q Okay.

A Or of the skin.

Q So if we go to the section that starts Figure 8. And it first talks about the control group.

Do you see where I am first?

A Uh-huh. Yes.

Q Okay. And then second -- if you -- about the middle of that section, it talks about sections from the 10-minute exposure.

Do you see where I am, Figure 9?

PUGLIESE

A Uh-huh. Yes.

Q "Demonstrated mild thinning of the" -- why don't you read --

A Yeah.

Q -- for us what it -- what it -- what the section sort of 10-minute exposure were?

A Sure.

"Sections from the 10-minute exposure (Figure 9) demonstrated mild thinning of the suprabasal layers in subtle irregularity of the epidermal-dermal junction. The stratum corneum remained present but slightly loosened. Dermal collagen bundles appeared minimally separated."

Q Could you translate that for us and tell us what that means is happening with the mouse skin as we were referring to it?

A So mild thinning, I think, is fairly self-explanatory. The layers appear thinner than normal.

And the -- so the

PUGLIESE

epidermal-dermal junction is where the top layer of the skin meets the, I guess, the second -- the dermis, the deeper layer of the skin. There are different structures that hold the skin together, so when that barrier, that dermal-epidermal junction, I should say, is impaired, like in the case of blistering conditions, you would get blisters on the skin. Or sometimes in the case of severe drug rashes, you would get sloughing off of the skin.

So what they're saying here is that that junction appears irregular.

And that they also saw that the stratum corneum was there but had slightly loosened. I am not sure if they mean loosened from the layer beneath the stratum corneum, whether it loosened from -- I mean, it has to be the layer, I believe. I don't know where else they would have looked at, but...

PUGLIESE

Q This is not the same, though, as blistering that you mentioned, is it?

A Well, it said subtle irregularity of the epidermal-dermal junction. I mean, that's a little bit, I would say of a vague descriptor. But they don't mention blister there.

Q And this would not be the same as ulcerated skin, would it?

MR. SHIPMAN: Objection to the form.

A So they --

(Telephonic interruption.)

THE WITNESS: I'm sorry. Do you mind if I take this? Because I think it's one of my children calling.

MR. PETTI: That's fine. Yeah.

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER: We are going off the record at 1:29 p.m.

PUGLIESE

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: We are back on the record at 1:31 p.m.

A Yes. So I believe the question had been about chemical burn; is that correct?

Q I had asked if this is -- is this description for the 10-minute exposure -- the section from the 10-minute exposure was indicative of what you would consider ulcerated skin.

A It does not appear to be consistent with ulcerated skin. It does appear to be consistent with, to use their word, irregularity in the skin barrier and that junction.

Q And moving to the next paragraph.

The "By 20 minutes exposure, the epidermis displayed focal degeneration and partial detachment of the upper layers, accompanied by loss of keratinocyte" --

PUGLIESE

A Perfect.

Q -- "cohesion. The dermis exhibited more pronounced collagen fiber loosening."

In your terms, what does that tell you about what was happening with the skin?

A Yeah. So --

Q Or the layers of the skin, I should say.

A Yeah. So here this to me represents more significant abnormalities in the skin. They're seeing some detachments between layers of the skin. So kind of loss of that barrier function in the way that those -- when we think about, you know, kind of the brick-and-mortar descriptor for how things absorb into the skin, we want there to be kind of a tight collection of layers of the skin, tight collection of cells. The keratinocytes individually attached to one another.

So when that is impaired,

that's when we deal with some of the concerns that we have about our increased absorption.

Q So this by 20 minutes exposure -- I will ask about the 10 in a second -- would be indicative to you of a skin condition that is -- may result in increased absorption?

A Yes.

Q Is that a fair way to say?

A Uh-huh. Yes.

Q And would you say the same for the 10-minute exposure, or just to a lesser degree?

A I think that if we -- you know, to kind of make that clinical evaluation, it would be helpful to see what the skin looks like as well and then pair that, you know, with the pathology. That could be kind of a way of coming to a more comprehensive answer.

So there is some irregularity in the 10-minute exposure, and more so

PUGLIESE

as you can see with the 20-minute exposure.

Q And I just -- real quick on the next page, on 165, there are some images of slides that I think they copied as best we could.

Are these helpful to you at all in answering the questions we just discussed, and would you want to see the actual skin to better answer that question?

A We'll say the amount of pathology, you know, can be challenging. I definitely don't want to call myself a medical pathologist.

And this is essentially showing visually the changes that were verbally described in the first portion. So it kind of -- if you were a pathologist, you would not need those descriptors. So it sort of is the same as information in a visual image.

Q Understood.

A Yeah.

PUGLIESE

Q So part of the study that they go on to discuss, the 10-minute, 20-minute, and 30-minute of repeated use at one week -- at the one-week interval.

Is a one week interval the normal course of use of chemical hair relaxer in regular daily use?

A As discussed earlier, the more standard use is every eight to twelve weeks.

Q So the frequency that they tested in this -- or that was tested in this study would have been at a -- strike that.

The frequency tested in this Chiwar mouse study, the one-week interval between applications, is not the same as the regular course of use as you understand it?

A It is more frequent.

Q Again, if you were -- if you were to learn that the hair-straightener formula -- or I'm

PUGLIESE

sorry -- hair-straightener formulation was for a product that was not akin to the chemical hair straighteners at issue in this litigation, would this paper still be relevant to you?

A I think it's relevant because it does show the effect that these ingredients can have on animal studies, which, again, we do utilize very regularly in drug development. So I think, again, if someone showed me only this paper, would it be the most relevant thing? No, not directly.

However, utilizing this information in conjunction with the other sources I have cited, I'm able to, you know, utilize it to formulate my opinion.

Q Do you know which chemical or which combination of chemicals in the chemical hair-straightener formulation at issue in this study -- or utilized in this study -- caused the irregularities in the skin found in the

PUGLIESE

10-minute exposure, 20-minute exposure, 30 -- in the exposures?

A It would seem to be that combination of ingredients. If I had to rank them in terms of likelihood, certainly, you know, sodium hydroxide would be highest on that list. And also they did not, you know, test each product independent of one another. I did look at that, the combination.

Q You say each product independent --

A Each ingredient.

Q Thank you.

A Yes, just to clarify.

Q Just wanted to be sure --

A Yes, yes. One product, multiple ingredients.

Q It's like patients.

A Exactly.

Q I understand.

And you don't know one way or another if one of the other, quote/unquote, reactive compounds that

would have caused the damage?

A I think, you know, again, on its own, this one paper, of course, hard to generalize. But utilizing this in conjunction with what we know about the activity of these ingredients on the skin, you know, that probably would not be my first inclination.

Q Okay. You can set that aside for now.

A Okay.

Q Turning to page 7 of your report.

MR. PETTI: This is Exhibit 2 for those listening at home.

Q At the top it states "Absorption into the skin: The transepidermal pathway."

We're on the same page?

A Yes.

Q Okay. Just got to find where I am trying to start from.

A Sure.

Q About halfway down,

PUGLIESE

underneath the images there, there is a paragraph that starts "Skin absorption depends on several variables."

Do you see where I am at?

A I do. Yes.

Q And one of the variables that you list at the beginning is the "Smaller molecules move through the layers of the skin faster than larger molecules."

Do you see where I am at?

A Yes.

Q Did you evaluate the particle size or the molecule size of any chemical hair relaxer particles?

A I did not evaluate the molecule size of the chemical hair relaxers. In this portion, I'm kind of setting the stage generally for what we know about absorption.

Q Do you know one way or another if the molecule size for the chemical hair relaxer is smaller or what's -- let me back up.

PUGLIESE

Can you define what smaller would be to you? Do you know offhand the particle sizes that we're talking about? Are we talking nanometers?

A I think it's micrometers. I mean, I'd have to go back and review, honestly, to give you the exact number, but yes, I am not sure.

Q Either micrometers or nano -- something in the very, very small --

A It's small.

Q Yes.

A Because they're molecules.

Q But we don't know the size one way or the other of any particular chemical hair relaxer molecules?

A I couldn't list for you the size of those different ingredients, like, all of them and their size.

Q Let me ask this, then.

You talked about the ingredients and the molecular size of the ingredients.

Do the ingredients combine to

PUGLIESE

form a compound that is a different particle?

A Can you repeat that?

Q Do the ingredients of the chemical hair relaxer combine to form a different particle or particle size once they're combined to each other, or do they separate?

And are you -- are we talking about the individual ingredient molecule being absorbed? Does that make sense, what I am asking?

(Interruption in the proceedings.)

VIDEOGRAPHER: We are going off the record at 1:40 p.m.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: We are back on the record at 1:42 p.m.

MR. PETTI: Can you read back the last question just to reset us a little bit, please?

(Whereupon, a discussion was

PUGLIESE

held off the record.)

Q Let me try a different approach and see if we can make more sense of it.

When the ingredients are compounded and the hair relaxer is formed, would you be more concerned from an absorption review of the size of the particle of the compounded chemical hair relaxer or the individual molecular sizes for the ingredients?

A I am not sure that the sizes of them, other than, of course, if they're small molecules involved, they would be more likely to directly penetrate through an intact skin barrier.

In terms of the ingredient mixture, it's more so are we -- are there other agents, other ingredients, added that help to facilitate absorption, because that would lead to some of that separation, you know, that you had alluded to.

PUGLIESE

But I think that really the -- the main point here is that here we're assuming, for the purposes of this discussion in this portion, that in a situation where we have an intact skin barrier, a small molecule is more likely to diffuse readily as compared to a large molecule.

Q And when you talked about separation, that's when we'll get into partitioning, correct?

A Yes.

Q And can you explain for us what the -- what partitioning -- the process of partitioning is in your field?

A Yeah. So I will use topical steroid kind of as an example.

When you have, let's say, a -- an active topical steroid product. I will just use the term "hydrocortisone" because that's kind of one that is more common. H-Y-D-R-O-C-O-R-T-I-S-O-N-E.

PUGLIESE

Again, you can kind of put it into a vehicle -- ointment, cream, solution, foam, what have you. And that mixture with the vehicle has different effects on absorption.

So when we apply, or someone applies, a hydrocortisone ointment onto the skin, partitioning refers to hydrocortisone leaving that ointment formulation and absorbing into the epidermis and deeper dermal layers in certain cases.

Q And here you note that -- if we go down to the next paragraph where it starts, "Partitioning is the term used for separation," you note this is back to where you note enhancers such as propylene glycol.

Do you know what chemical ingredients are partitioned off from the hair relaxer upon its application?

A So specifically I'm unable to kind of comment on which specific ingredients within that chemical hair

PUGLIESE

relaxer mixture are partitions and absorbent to the skin. Certainly what we know in terms of the skin barrier not being an ideal intact skin barrier is that those ingredients as a whole are more likely to, you know, skip the process of normal transepidermal diffusion and more readily diffuse into the skin.

Q Does the propylene glycol -- and just so I am clear, does it increase absorption, or does it increase partitioning in your opinion?

MR. SHIPMAN: Objection.

Q I am just trying to understand -- sorry. I am just trying to understand what we're saying in this paragraph of the paper.

A So I refer to -- in this portion of the paper what I am trying do is hit on some main -- again, it's not a comprehensive pharmacokinetics review, but some of the main features that we think about in terms of

PUGLIESE

pharmacokinetics, and, you know, what -- how you would expect them to impact absorption of different topical medications or topical products.

So I utilize propylene glycol here as an example to say, one, that it is one of the enhancers utilized to facilitate partitionings, so separation of those ingredients.

And also, obviously, propylene glycol we know is also a common allergic contact allergen. That's redundant. Allergen. Contact allergen. And what that means is that it can cause rash on the skin that can further break down the skin barriers.

So that's an aside. So I wouldn't say the only purpose of propylene glycol is this or that, but that it can have multiple functionalities.

Q Okay. Thank you.

When you talk in the first sentence about partitioning, separating

PUGLIESE

the active ingredient from the vehicle, do you know what the active ingredient is in chemical hair relaxers and what the vehicle is in the chemical hair relaxers?

MR. SHIPMAN: Objection to form.

A You know, here again, if we're talking specifically about the active ingredient that leads to the straightening of the hair, I think we can say, for example, sodium hydroxide as the active relaxer. But when we talk about the chemical hair relaxer mixture, it's hard to say this ingredient or that ingredient is going to, you know, partition.

In terms of vehicle, you know, cream would be the vehicle that I would apply here -- the terminology I would apply. So, basically, the vehicle is the cream in the case of the cream relaxers.

Q Is the cream itself a

PUGLIESE

compound or is the cream its own ingredient, in your understanding?

A My understanding is it's a -- it's a combination, in the same way that, let's say, the cream we used this morning, you know, is a combination of multiple things.

Q I think we're on the same page. I just want to be -- I have to be sure that I know what we're talking about sometimes.

A No, no. Of course. Yeah, yeah.

Q And, again, this -- I know this is in the same line of something that I have asked many times today, but we don't know any rate of increase -- I already asked this.

But we don't know any rate of increase if an absorption just by the inclusion of propylene glycol, correct?

A A specific rate of increase other than up or down, no, no specific number.

PUGLIESE

Q Going down to the next paragraph, it starts, "It is important to note that topical absorption."

Do you see that, where I am at?

A I do.

Q And you state that "The scalp is one area of the body that is susceptible to increased absorption."

Do you see where I am at still?

A Uh-huh. Yes, I do.

Q What other areas of the body are susceptible to increased absorption?

A So some other areas of the body, the eyelids, scrotal skin, any area where there is skin on skin. So armpits, groin folds, buttocks, anywhere because, again, you have that kind of thinner skin, and also naturally occlusive environments. Face more so than the body, in general.

Q And then you include, "A

PUGLIESE

study of percutaneous hydrocortisone (topical steroid) penetration noted that the scalp absorbed 3.5 times the amount of hydrocortisone as the inner forearm."

Why is that included in this report?

A Yes. So my purpose in including this was, in this portion of my report I was trying to explain how we think about absorption of topical medications. So topical hydrocortisone is a medication that we use all the time in dermatology.

So the point here is that different areas of the skin will absorb medications in a different amount. And the scalp, because of the presence of multiple hair follicles, absorbs more so than this example, the inner forearm.

So because of that reason, it was to explain how a medication that is intended for topical use, we do know

PUGLIESE

that it absorbs, and that the absorption is not going to be the same in one place over another. In particular, to highlight the increased absorption of the scalp.

Q Is the topical steroid designed as a delivery system for the medication?

MR. SHIPMAN: Objection to form.

A You mean the cream formulation of it or ointment? When you say "delivery system," just -- can you clarify that?

Q I could try, because I am trying to understand here as well.

A Sure.

Q The topical steroid, you say it comes in a cream form or a liquid form of some kind --

A Yeah.

Q -- that is applied to the skin.

A Yes.

PUGLIESE

Q Is that cream or the product itself, I don't know if you call it a hydrocortisone cream, a product is the right reference, but you know what I mean.

A Like a medication, yeah.

Q Is that designed to promote dermal absorption of the medication?

A Is the cream itself designed to promote --

Q Is the product itself?

A The combination of --

Q Yes.

A -- hydrocortisone with the cream?

Q Yes.

A So generally, topical steroids -- you know, the example I always give is if someone is having asthma exacerbation, we wouldn't, you know, slather them with hydrocortisone. It's never going to, you know, absorb to that degree. So the intent is always to have more localized effects,

PUGLIESE

in the case in here of topical steroids.

So we get some epidermal absorption, and also sometimes dermal absorption. Again, depending on skin barrier and other things.

So I guess that's a roundabout way of hopefully answering your question that the combination's intent to be kind of a topical medication that can have some dermal absorption.

But it is the combination of products that does that. If we wanted, you know, a more direct delivery, we would, you know, inject the -- we don't have hydrocortisone for injection in dermatology generally, but we would inject the steroid right into the dermis.

Q For the medication, the hydrocortisone topical steroid medication, is it supposed to stay on the surface of the skin or is it

PUGLIESE

supposed to absorb into the skin when it's applied?

A So it's a -- the topical steroid medications, in general their goal is to have a localized effect. So to treat any pathology that's visible in the epidermis or present in the dermis, meaning some of it will treat the very top layer of the skin and some may be absorbed a bit deeper.

Q And that's what you want it to do, to be absorbed --

A You want it to --

Q -- at least some layers of the skin?

A You want it to be absorbed necessarily into the skin. What you don't want is systemic absorption.

So, for example, I will have patients that we prescribe a -- or I prescribe a topical steroid for use, and then they get systemic absorption and have, you know, insomnia or, you know, some other systemic issue that

PUGLIESE

you wouldn't expect with -- you know, the goal of a topical steroid is not to do that.

So really the goal when we use in dermatology is to have a localized effect in the skin so there is some absorption inherent there. It's not always the kind of deep absorption that we think about when we think about delivery for something that is intended to have systemic effect.

Q Are there topical medications that are intended to have systemic effect?

A The main ones that I can think about would be transdermal medications. So these are medications that you apply that come in, for example, like a patch. And those are slowly -- and I don't talk about them here because I didn't think they were pertinent because they do stay on the skin.

It's a different mode of

PUGLIESE

delivery. They stay on the skin for longer. But those are medications that are intended to have more of a systemic effect without necessarily ingesting anything.

Q The next line is the last -- it's the last line on page 7. You state, "In other words, products applied to the scalp will absorb more than products applied to other areas of the body."

We're going on to page 8 there, obviously.

"This is true for medications as well as cosmetic products."

But you don't cite to any papers to show that the absorption rate is the same for non-medications or for cosmetic products?

A Yes. And I use one example here of the hydrocortisone. But, you know, that's -- there is information available in other topical medications. And, you know, they -- I can't really

PUGLIESE

comment specifically on all the cosmetic products in the world and what's available in terms of absorption.

But my point here is that there is -- in some ways, there is not necessarily a difference between topical medications that are intended to have a localized effect, and, you know, cosmetic products that are also intended to have a localized effect. For example, skin hydration.

Q The next paragraph is "When we talk about skin condition" -- we're on page 8.

A Yes.

Q I think you know where we are.

A Yeah. Uh-huh.

Q I just want to make sure, for the record.

Then it goes on. "We are interested in knowing whether the skin barrier is intact."

PUGLIESE

The obvious question, and I think the obvious answer, is why is that important?

A It's important for a couple of different reasons. One of the main ones being safety.

So if we have skin that is not intact and we, you know, put something on top of it, and by that something I mean a topical medication, we'll have more absorption of this product. We could have pain, sensitivity, some symptoms that develop on a patient who applies certain medications to open skin. Sometimes we can exacerbate the skin condition.

So it is really important. And one thing that often, clinically, we'll talk about is, let's say there is a rash and part of that rash has wounds within it. And there are some examples of this, like an ulcer, and then someone develops a contact dermatitis around it, we would advise a patient to

PUGLIESE

protect the ulcerated open skin and then to apply the topical steroids to the intact skin, with the understanding that the absorption would be less when applied to the clinically impact -- intact skin as opposed to ulcerated skin.

Q You used a term there, "clinically intact skin."

What's the difference between clinically intact skin and just regular intact skin, if there is one?

A Sure. In this particular way of describing it, I'm speaking about what, you know, an ulcer versus non-ulcerated skin. Other places you can see that is like a scratch on the skin or an excoriation. We can have open skin.

Sometimes when you see very dry skin with cracks, you know, it could be another example of skin that is not intact.

But I use the ulcer example

PUGLIESE

to try to make, you know, just like the clearest distinction of something, especially when you are counseling patients, you want to be really cognizant to be clear in instructions of where to apply these medications.

Q And this is just some naivety on my part.

Is there a baseline for what would be considered clinically intact versus non-intact, clinically non-intact? Does that make sense to you?

A Yes. But I don't -- I think the definitions would vary because we're talking about -- in this particular way I use it, is there an ulcer or no ulcer.

But there is also, you know, a role for saying certain rashes can cause changes to the skin that cause it to not be intact.

Sometimes certain skin conditions, genetic skin conditions,

acquired skin conditions can also change the skin so that there is increased absorption. And that can look very different from an ulcer and still there can be increased absorption.

Q If there is any increase in absorption, is that considered not intact skin, or can there -- I will leave it at that.

A Well, if we're talking specifically about the transepidermal absorption, so we're talking about absorption of outside things through the epidermis through all those layers, one method by which we can have increased absorption is to not have that skin be intact.

Now, this completely bypasses, of course, any transfollicular, you know, absorption, but speaking only -- but speaking only for the intact skin -- I want to make sure I don't lose my train my

PUGLIESE

thought -- speaking only for the non-intact skin, you would expect to have increased absorption if the skin was not intact.

Q And that brings me, I think, to the ultimate question -- hopefully this closes the loop -- that can there be clinically intact skin that has increased absorption?

MR. SHIPMAN: Objection to form.

A There can be. So, again, it really depends. There is not one definition, one way to generalize clinically intact skin. And I think that's kind of where the nuance is.

So skin can appear normal, another generalization, meaning if you look at it, you might not see tons of change and still have an absorption issue. So that, you know, would be an example of how the skin. I think that's more the question, can the -- maybe -- look normal and there still be

PUGLIESE

increased absorption.

Q You're onto where I was going, yes. And I think the quicker way of asking it would have been is clinically intact skin a technical term in the medical profession, or is that more of a nuanced term that may have many meanings?

A Yeah, I don't think it's necessarily, you know, the most -- it's not medical. We don't say ulcer -- Stage 2 ulcer and then clinically intact ulcer, right. So it's not medical in that way.

Q Okay. Could have saved us some time.

A No worries.

Q So going down a couple of lines, there is a sentence: "When this occurs" -- and I should probably read both sentences because the "this" refers back.

"If the skin barrier is compromised (as can occur with frequent

PUGLIESE

use of chemical hair relaxers), ingredients within the product will be absorbed to a greater degree due to loss of skin barrier integrity."

Did I read that sentence correctly?

A Yes.

Q And then it goes on. "When this occurs, topical medications intended to have a localized effect can result in systemic toxicity."

Is -- I read that correctly as well?

A Yes, you did.

Q What is "systemic toxicity" for the record?

A So, again, this is another general term really meant to be an unintended systemic side effect. And by, you know, the use of toxicity, you know, negative unintended systemic side effect.

Q If there is compromised skin and medication is applied to

PUGLIESE

compromised skin, is it necessarily going to result in systemic toxicity?

A So --

MR. SHIPMAN: Objection to form.

A -- applying a medication to skin that is compromised will lead to increased absorption. So it's something that I think is important for, clinically, my patients to know about if I'm prescribing medications that are applied to the skin.

Q Is it the compromise of the skin barrier that leads to the systemic toxicity, or is it the medication itself?

A I would think of it as being really kind of a combination. So the -- if you apply, you know, I don't know, something completely inert to the skin and it's compromised, then there is no problem. But if you use a medication that's not applied to the skin and it's compromised, there's no

PUGLIESE

problem.

If you utilize a medication that can be absorbed into the skin and can have a negative effect internally, then that's where the problem becomes -- you know, where the problem arises. It's the combination of those factors.

Q Does it become important to know the dose that is absorbed of the medication, to know if it will become systemic, toxic?

A You know, I don't -- again, in my practice, the dose is not something that I think matters in terms of understanding that toxicity. So if a patient -- I will use the case of minoxidil since we kind of alluded to it earlier for hair loss. If we utilize -- some use minoxidil. Patients will sometimes develop headaches topically. It's not that common, but it can occur.

So it's really not neither

PUGLIESE

here, there that we know how much was absorbed into the skin, but if the patient has repeated headaches when they apply minoxidil to the scalp, that is an undesirable systemic side effect.

So we know that it occurs, and we don't need to know the dose that is absorbed to know that that's a side effect of treatment and we want to stop that medication.

Q Is that the same for any medication?

A There are some medications -- again, this is like -- there are so many different types of medications, and they probably do reviews on all of them.

One thing that does come to mind sometimes, though, that is a little bit more dose dependent would be lidocaine. So lidocaine toxicity is very important because it can be fatal. And we talked a little about lidocaine toxicity here, but --

PUGLIESE

Q Okay.

A Yeah. So that, you know, is something that, of course, we have to think about when we inject lidocaine for procedures. But, you know, patients could also have undesirable effects from applying lidocaine to ulcers, which actually is pretty common because it -- patients feel like it helps with the pain, so they want to do it. But we really discuss not doing that because of this risk.

So I would say in that case the lidocaine toxicity is, in terms of fatality, you know, is dose dependent.

Q You may have just circumvented a whole number of questions with that answer. Because in the next section you talk about the example of a patient who applied a topical anesthetic cream that was 2.5 percent lidocaine and 2.5 percent prilocaine.

You're a much better speller

PUGLIESE

than I am, off the cuff. So I am letting her actually just look at the words.

A Only with certain words, I'm sure.

Q I will rewind.

"For example, a patient who applied a topical anesthetic cream (lidocaine 2.5 percent and prilocaine 2.5 percent) to ulcerated skin of the penis/scrotum (another area of the skin prone to increased absorption) developed a serious and life-threatening condition called methemoglobinemia."

MR. PETTI: That one you might have struggled with.

Q Did I read that sentence correctly? Even if I butchered the last word.

A You did read it correctly. And it's methemoglobinemia.

Q So tell me a little bit about that study and why is it a reference in

your report?

A So in this portion where I talk about transepidermal absorption, I was utilizing examples that are present in the literature to highlight some of the different things that we look at when we think about absorption. One of those being the intact skin barrier.

In this particular example, a topical that really, you know, should not have systemic toxicity -- a low percentage of lidocaine, a low percentage of prilocaine -- was actually applied to ulcerated skin. So we had -- and of the penis and scrotum, which, again, is one of the more -- the thinnest areas of the skin. So we -- of the body.

So we have two components there. We have an ulceration. And then we have already thin skin. So it's kind of trying to highlight the combination of factors that we consider when we think about application of

PUGLIESE

topicals.

And it also is meant to explain that lidocaine and prilocaine are not intended for internal numbing in any way, right. They're intending to be topical medications to numb the skin only on the outside, right.

But in this case, those two topical medications were able to absorb to a degree where they caused a life-threatening condition called a methemoglobinemia.

So it's to highlight the fact that medications that are intended for topical use can, when applied to areas of high absorption, and skin that is not intact, any compromised skin barrier, can result in life-threatening or very serious side effects.

Q Is the absorption rate of the scrotum comparable to the scalp?

A So the absorption rate of the scrotum is not directly comparable. As I stated, you know, it's another area

PUGLIESE

of the skin that has increased absorption as compared to, let's say, the back.

So it's sort of utilized as another example of what can happen in an area where we do have increased absorption.

Q And earlier we discussed that the absorption rate of the scalp in relation to the forearm was 3, 3.5 times the absorption rate for the scalp?

A That was the measurement in the study that I cited.

Q And do you know what the measurement in this study for the scrotal skin is compared to the forearm?

A I don't know specifically in this study. I believe scrotal skin has about 10 times the absorption of, like, a normal body area like the back.

(Whereupon, a discussion was held off the record.)

PUGLIESE

MR. PETTI: This is Tab 7 as Exhibit 4.

(Methemoglobinemia Induced by Application of an Anesthetic Cream, was marked Pugliese Exhibit 4, for identification, as of this date.)

Q Is this the study that we were discussing?

A Yes.

Q I don't want to have to say that word again.

A Yes.

Q Okay.

A There are some things underlined. I don't know if this is your copy.

(Whereupon, a discussion was held off the record.)

Q I want to quickly turn to page 2.

A Sure.

Q And the second column, the first full paragraph, towards the end,

PUGLIESE

it talks about absorption from the scrotal skin.

A Yes.

Q "Absorption from scrotal skin is 40 times higher than the forearm."

Do you see where I am reading?

A Yes. I see that, yes.

Q Do you agree with that or no?

A Again, I think they cite here. This one, Maibach study, M-A-I-B-A-C-H. The actual -- the author lists first is Feldmann.

Let me just compare that reference for hydrocortisone.

Okay. The same hydrocortisone study. I was checking to make sure it was the same source utilized in my report.

Q And did this study also -- or the harm that's discussed in the study, also result from excessive use? If you look on the first page, in the first paragraph, the last sentence: "We

PUGLIESE

describe an adult presented with MetHb resulting from excessive topical application of local anesthetics for painful scrotal ulcers."

Do you see where I am looking?

A I see where you're looking.

Q Did I read that correctly?

A You did read that correctly.

I am trying to see if they actually describe how often the patient applied it, just to get an idea of what they -- how they're defining the excessive.

But, yes, that is what they wrote.

Q If you want to take a second, because I can't remember if that's that in here or not either, to be honest. I think it just says applying excessively, every few hours.

A Every few hours daily for two weeks. Okay. And then -- so --

Q Does every few hours daily

PUGLIESE

for two weeks sound excessive to use of this type of cream?

A Well, certainly for intact skin. I mean, it should never be -- you know, we would not want to apply a topical anesthetic -- I'm sorry, not intact -- to ulcerated, eroded skin, to clarify. So already that's many times too many in that case.

Also, you can see that he added occlusion, which is another -- he used occlusive dressings, which is another thing that we do when we want to increase penetration of a topical into the skin. So that's kind of another problematic thing.

And then on top of that, it was the excessive use; every few hours. So who knows what every few hours means, but it was applied a lot to skin that was eroded, ulcerated. And he utilized occlusion on top of that.

So it's sort of like three factors that contributed to the --

PUGLIESE

these side effects.

Q He did a lot wrong.

A Sorry?

Q He did a lot wrong in his application.

A You know, it's hard because I think we prescribe a lot of topical medications. And once they all accumulate in your, you know, cupboards, it's hard to know what's for what. So it's not uncommon for patients to have a rash and use one of the things that they find, especially if the instructions are not labeled on the exact tube.

Q That's why we throw medications away when we're done with them, or we should.

Okay. Thank you. I don't -- that's what I wanted to look at on that one.

(Whereupon, a discussion was held off the record.)

Q All right. Going back to

PUGLIESE

page 8 of your report.

A Okay.

Q When you say "This demonstration" -- or "This demonstrates how a compromised skin barrier can result in desirable systemic absorption with serious side effects."

But there was more than just the compromised skin barrier applied in that report, correct -- or that paper, correct?

A So in that particular paper, we talked about it being ulcerated. It also being, like, the area of thinner skin. And then it sounds like there was -- we don't know the exact parameters, but some reported excessive application of that topical.

But this was essentially utilized to demonstrate one component of absorption, which is that if the skin is compromised, you will absorb more of the medication.

Q But the example cited had

PUGLIESE

more than just compromised skin contributing to the absorption rate being increased, correct?

A In this particular case, there was one example. Truthfully, the concept of a compromised skin barrier allowing increased absorption is -- I should have cited more, but it's so basic to dermatology that it's something that almost, you know, I felt didn't need citation. But, yes, perhaps a textbook citation would have been helpful.

And, again, this was one example of the anesthetic cream. But I think it's pretty well established that if the skin barrier is compromised, things will absorb more readily into them.

Q Do they always -- but do they always result in an undesirable systemic absorption with serious side effects?

(Clarification by the

reporter.)

MR. SHIPMAN: Objection to form.

A So, you know, I guess, fortunately not or else we couldn't prescribe any topicals. But, you know, the point is that medications that are intended for topical application can have undesirable systemic effects.

Q Then did you go to state "the same absorption risk is present for any product applied to the skin."

Do you see where I am at, the next line?

A Yes.

Q Does particle size not matter at that point? If there is a compromise to the skin, you can -- you could have systemic absorption with serious side effects of any product?

A So if there is a compromise in the skin barrier, you can have absorption of any product. Of course, there are sometimes some -- you know, I

PUGLIESE

don't want to answer in a general way because we want to look at what is a degree of compromise of the skin barrier. Again, what type of products are being used, how likely are they.

You mentioned small molecules. So small molecule things, whether the skin barrier is compromised or not, would theoretically absorb through the intact portion of the epidermis, right, more so than a large molecule.

So assuming there's portions of intact scattered or portions of compromised skin barrier, I would still expect small molecule ingredient or small molecule period to absorb more readily to the skin.

Q And I apologize. I didn't mean to turn my back towards you there.

A Oh, no.

Q That was -- the chair just started turning.

A No offense taken.

PUGLIESE

Q I apologize for that.

Okay. Turning -- staying on page 8 and just moving to the next section, "Absorption into the skin: transfollicular pathway."

Starting at the beginning, you discuss that "The hair piercing into the skin creates a U-shaped invagination (or pocket) with increased surface area for greater absorption."

Do you see where I am at?

A Yes.

Q Could you just explain to us the basic mechanism of what we're talking about there?

A Sure. So kind of, if you look at just the skin of the hand, this is the surface area available for absorption. If I put something on the skin, this is the area that it will have the opportunity to absorb through.

When we think about areas that have hair follicles, and the scalp has a high density of hair follicles,

PUGLIESE

we're actually seeing all these little homes to the hair follicles, right, like, that will look like this.

So you have this -- almost can look like little waves I guess. And that creates these natural increased surface areas that lend themselves to just more topography for absorption as opposed to just one flat plain.

Q Peaks and valleys basically?

A Yeah. Peaks and valleys could be one way of thinking about it, yes.

Q And then we talk about the -- in the next sentence you talk about the lower -- can you --

A Infundibulum.

Q Yes.

A I-N-F-U-N-D-I-B-U-L-U-M.

Q Can you tell us about the lower infundibulum, please, and how that plays into absorption?

A Sure. So my reason for

PUGLIESE

adding some information on the particular formulation of the infundibulum and adding the lower infundibulum here is that the skin barrier is not quite the same as the true epidermal skin barrier that we see on the surface of the skin.

So because it is not as rigid, and by "rigid" I don't mean inflexible. I mean just that it's not as -- the regular skin barrier is not as friendly to things going through as the lower infundibulum, which has an interrupted skin barrier.

So an interrupted skin barrier is going to allow for greater absorption because we don't have that same precise brick-and-mortar model with the layers of the skin that we have in the epidermis.

Q So the permeability is different.

A So it allows for greater absorption because it does not have

PUGLIESE

that same degree of barrier protection.

Q And earlier I talked about particle size a bit, and it was in your report.

Does particle size impact what can get into the lower portion of that U-shaped basin?

A I would expect there to be similar pharmacokinetics there at play where a small molecule would be able to get through a, you know, partial barrier faster, or more easily, more readily, than a large molecule.

Q And as far as absorption goes, I believe in here there is a discussion of this turning into a reservoir where particles can stay -- I think it's on the next page -- yes.

And at the top of page 9 you talk about the lower portion of the follicle being a "long-term reservoir."

Do you see that quote?

A Uh-huh.

(Clarification by the

PUGLIESE

reporter.)

A Yes.

Q "While particles may be gone from the skin after one day, they continue to be present in the hair follicle, including portions of the particles that are still detectable by day 10."

Is that the case with any particle that may get on the scalp?

MR. SHIPMAN: Objection to form.

A So, again, here what I'm trying to explain here is that because of that, again, imagination, because of the difference that was reported -- and, again, this is another Maibach, M-A-I-B-A-C-H, paper here, who has done a lot of studies on just absorption of different particles through the skin.

It appears that within that follicle, the -- it's not called a "reservoir," but we think of it as being a reservoir, meaning that it's

PUGLIESE

like a safe space where ingredients, products, molecules can persist for longer than they would on the epidermal skin barrier.

So that's what I, you know, explained here, that has been reported within the field of dermatology to be a known variable in absorption.

Q If they're detectable, if the particles -- I'm sorry. I'm going to start over.

If particles are still detectable after 10 days, does that mean they're not being absorbed into the skin?

A Again, you know, it's hard to say because we're thinking what do we think about in terms of particles here? Is it a compounded mixture? Is it just one particular ingredient? Have we looked at specifically what portion remains in the reservoir? What portion is absorbed?

So I think there are a lot of

PUGLIESE

variables at play. But the point here is to say that it is difficult to remove things from the skin on the scalp or other areas of many hair follicles because of the presence of this, quote/unquote, reservoir.

Q Do you know if chemical hair relaxer particles or their component parts, the particles of their component parts, to get into the lower reservoir, which is what you have termed the long-term reservoir?

MR. SHIPMAN: Objection to the form.

A Yes. So I was, you know, really interested. I was hoping that when I reviewed the reports of Dr. Burgess and Dr. Kasting who had touched on this question of the reservoir and whether, you know, chemical hair relaxers were -- were in any studies, you know, found to be there, they actually didn't -- there was no evidence that kind of backed

PUGLIESE

their assertion that they were not.

So I was curious to kind of, you know, see if that was available, again, from any manufacturer data or what have you. So specifically there is nothing that I have seen that has done post any application analysis of the reservoir.

Q So the converse is also true, that there is no -- you don't have any evidence that the hair particle -- the chemical hair relaxer particles do get into that reservoir?

MR. SHIPMAN: Objection to form.

A What I do have evidence of is that, you know, I don't find this to be kind of a far-flung theory of sorts. Like, the transfollicular pathway is a well-known mechanism of absorption into the skin.

And we have studies that have done some work looking at barrier function that have quantified that they

PUGLIESE

can remain -- particles can remain in that area for longer than we would expect them to remain on the regular epidermis.

So I, you know, am utilizing this information to describe how we have to think about absorption really holistically based on this information.

Q But no evidence as to whether chemical hair relaxer particles get into a long-term reservoir in the hair follicle?

MR. SHIPMAN: Objection to the form.

A Yeah. So other than, you know, understanding how chemical hair relaxers are similar to other particle ingredients that absorb into the skin, I can't think of, you know, anything ingredient-wise or, like, mechanistically that would lead me to believe that they, you know, wouldn't also absorb into the hair follicle.

So yes, I would sort of

PUGLIESE

utilize all the information that I have looked at to opine that they have the ability to absorb through the transfollicular pathway and remain in that area.

Q Is that a hypothesis, or do you have evidence of that?

A So I don't have a particular study that I have done, that I have done to look at that. But, again, it's utilizing what we know about absorption and then taking what we know about chemical hair relaxers and extrapolating that information to how they might act similar to or different from, in some cases, to other medications that we know about and have data on.

Q What about other cosmetic products?

A Same. With other cosmetic products, again, I'd have to do more research. I did not, you know, look to see every cosmetic product on the

PUGLIESE

market and what happens in terms of their presence -- well, A, absorption through the hair follicle, and then also, you know, their presence within the hair follicle.

That -- I think that would be kind of another case entirely, but if tasked with that, I would be able to provide a more affirmative conclusion on that.

Q Well, and the reason I request about other cosmetics is because you mentioned other medications and what the -- what other medications do with this lower reservoir, long-term reservoir.

And are you saying that the absorption principles would be the same for medication as they are for cosmetics?

A Well, you know, there is a lot of variables of transfollicular medication administration. You know, I don't -- there is a lot of time and

PUGLIESE

effort into being able to deliver certain medications through the hair follicle, so I feel like it's this whole field.

But, again, any topical product applied to the skin, if it absorbs, should be absorbing through both the epidermis and in through the follicular pathway as well.

Q And you mentioned that there is this whole field of study and, I assume a number of reports, or maybe a vast number of reports, I don't know, on medications being applied for delivery through transfollicular routes.

A Yeah.

Q Do you know if there is the same volume of studies, or any studies, regarding cosmetics?

A Again, I'd have to, you know, kind of review all the studies on cosmetics to be able to come to a well-informed opinion on that. I think

PUGLIESE

a part of -- I don't want to call it a problem, but part of the difference is that, as we've talked about before, all of the phases in terms of experimentation that go into a consumer product, a cosmetic product, compared to a pharmaceutical product, are going to just naturally afford there to be varying levels of evidence.

(Clarification by the reporter.)

Q And you don't have that evidence on chemical hair relaxers for this report, correct?

MR. SHIPMAN: Objection to the form.

A So I don't specifically have information as it pertains to chemical hair relaxers. Again, I don't believe that that information is available.

MR. PETTI: Let's take five minutes.

VIDEOGRAPHER: We are going off the record at 2:32 p.m.

PUGLIESE

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: We are back on the record at 2:42 p.m.

Q Okay. We are plugging along still, and we're going to stick with your report for a little while longer, Doctor.

A Sure.

Q We're going to stay on page 9, I think is where we left off. And I know we're just kind of doing a basic walk-through of some of the concepts that are discussed.

I want to turn to, you know, the section on "How much of what is applied to the skin is absorbed internally?" section. And, particularly, the second paragraph that starts, "We know rates of absorption for some medications."

Do you see where I am?

A I do.

Q Okay. Why is it important to

PUGLIESE

know the rates of absorption for some medications?

A Well, I assume -- in general it is important to know because of safety. So, you know, this first example that talks about medications that might be teratogenic, T-E-R-A-T-O-G-E-N-I-C.

We do want to know is there any significant absorption when that form of medication is utilized.

And also I think it's important to think about because I assume there would be, you know, some questions related to what do we know about absorption of different things. And I was trying to find, you know, examples that could be utilized to explain what we know about absorption and how at certain levels we make certain recommendations. We as a medical community.

Q And why do you need to make certain recommendations about -- let me

unpack that a little.

What type of recommendations are we talking about that are made with regard to medications and absorption?

A Yeah. Well, okay. I will cause the case of, you know, pregnancy. Obviously, in the case of pregnancy, even if we don't really have absorption studies, we're going to err on the side of caution because we -- for many medications -- I don't want to say many.

For some medications that we utilize in dermatology, we really have to weigh the risk-benefit ratio of utilizing that medication compared to, you know -- so the benefit of utilizing that medication compared to any negative risk it might impart on a pregnant woman or the fetus, or the baby.

So it is really important that we have an understanding that these medications have the capacity to

PUGLIESE

absorb into the skin because, you know -- I will give the example of acne because it's easy and ties into this paragraph.

But when someone comes to the clinic for acne and they're a patient of child-bearing age, you know, who is female essentially or has child-bearing potential, then in those cases we would ask "Are you currently pregnant? Are you planning to conceive?" so that we can alert the patient that if they're pregnant, there are certain medications we won't prescribe out of safety precautions. If they're not pregnant, we would modify their treatment regimen if they do try to conceive in the future.

Q And is the absorption rate necessary to know -- I guess does the absorption rate affect a yes/no of prescribing a certain medication?

And let me say it a little bit further.

PUGLIESE

Are you saying that when -- because the pregnancy example seems to be we're not going to do it or we can't do it. And there seems to be a hard line of certain medications at any dose is going to be a no for pregnancy.

Am I understanding you correctly?

A In general, because we tend to be very conservative when prescribing medications to pregnant women.

There are some cases where, you know, they'll look at dosing. So, for example, if it's a lactating mom, they might measure the medication content of the milk, right. If it's -- sometimes they'll try to measure, like, levels at time of birth and the baby of certain medications that mom was exposed to during pregnancy.

So those are some ways of measuring, but, again, because it is a variable process, I wouldn't say that,

PUGLIESE

"Okay. The cutoff is always this percent or that percent for different medications."

Q But are there medications that, when you're reviewing the absorption rate for that medication or its delivery system, I think would probably be -- or do you consider the delivery system in the active ingredient or active medication to be the medication in total?

MR. SHIPMAN: Objection to the form.

A So generally if we want to use this example of -- here of tazarotene, T-A-Z-A-R-O-T-E-N-E.

So here they're looking at a gel formulation. So this particular absorption percentage is related to that gel formulation, and they look at two potencies, .05 percent and .1 percent.

Q And is that -- when you say potency, that is not the absorption

PUGLIESE

rate, that is of the medication?

A Oh, yes. Just of the medication.

Q And just so I understand, is that -- there -- there are two different formulations of that gel, one that is the .05 and one that is the .1?

A So -- well, there are two that they looked at in this particular example that I utilize.

Q But there could be more formulations?

A Tazarotene comes as a cream. There are -- there are different formulations, yes.

Q How do you determine which formulation should be used by an individual patient?

A Well -- okay. So, for example, higher formulations of tazarotene are going to be more irritating to the skin. And by that I mean they can dry out the skin. They can cause an irritant contact

PUGLIESE

dermatitis.

So let's say I have a patient -- oh, and I guess the other thing these are very strong topical retinoids, R-E-T-I-N-O-I-D-S. So they're essentially in the same family as tretinoin, T-R-E-T-I-N-O-I-N. But they are stronger.

So if a patient, you know, has used tretinoin in a .1 percent, so that's a higher formulation for the tretinoin, and they tolerate that well, meaning they don't have any irritation of the skin, they don't have dry skin, it's not flaring their eczema, then that is a patient that we can start on .05 percent, or even in some cases, .1 percent.

Now, if it's a patient that, you know, is not tolerating a lower strength, I would say, retinoid, then we might start with -- you know, we might keep them at that tretinoin. We might always recommend starting at this

PUGLIESE

lower range, but spacing it out or doing something of the sort.

So it is a case-by-case analysis where we consider the patient's underlying skin type. Do they have any concomitant skin conditions? Are they utilizing something already that has -- I don't want to say prepared, but have they become accustomed to using a retinoid already?

So that is kind of how -- there is not really a specific everybody gets the same thing or we always do it this way. It's quite variable.

Q And are you looking simply -- are you looking first at the dermal effects and then at any systemic effects that it might have on the patient or both?

A In the use of tazarotene?

Q Tazarotene as an example. If that's a proper example for potential

systemic effects. I don't know if it is or is not.

A Yes. So in general for most topical medications because they're expected to have a localized effect, so to, you know, reduce sebum production, to treat the actual acne in this case, or in the case of tazarotene I should say. They also talk about psoriasis use.

In this particular case, we would not necessarily -- the systemic counseling would be this medication can absorb into the skin, and it is a known teratogen. Because of that reason, we don't recommend using it if you're pregnant or planning to become pregnant.

So that's kind of how -- we don't measure systemic absorption. We want to counsel against it because the measurement of systemic absorption in a worst-case scenario would be severe fetal abnormalities. So we wouldn't,

PUGLIESE

you know --

Q You just don't take the risk?

A Yeah. We don't take the risk.

Q Is that the same with the other example you used, the 5-fluorouracil?

A 5-fluorouracil. That's 5 dash F-L-U-O-R-O-U-R-A-C-I-L.

So this is a common medication. It's a chemotherapy, so it is used in systemic form for cancer patients. We utilize it in topical formulation, generally as a cream, for patients who have precancers, like actinic keratosis or patients who have non-melanoma skin cancers.

In this particular case when we prescribe 5-fluorouracil cream, we'll always go over the localized effects because they do cause significant toxicity in the skin. They cause severe irritant contact dermatitis because they're treating

PUGLIESE

underlying sun damage or they're treating skin cancer.

So that is a known side effect of the treatment. We have to counsel or else get a lot of phone calls if we don't counsel.

But, importantly, there is an enzyme deficiency. And that's what I listed here. It's dihydropyrimidine, D-I-H-Y-D-R-O-P-Y-R-I-M-I-D-I-N-E, dehydrogenase, D-E-H-Y-D-R-O-G-E-N-A-S-E, deficiency.

So what happens, patients can have a deficiency to this particular enzyme. So even with topical application, if they're not able to effectively break down this medication, they can actually have systemic toxicity.

So patients may feel unwell. They may feel fatigued. And, of course, like, in a worst-case scenario, it could result in death. Knock on wood it's very rare with topical

PUGLIESE

application, but you certainly want a patient to know that if they develop these symptoms that is not normal as compared to the irritant contact with it, which is normal.

Q Would you adjust the medication to compensate if they were having those side effects, or would you pull it completely?

A If a patient was having those side effects, I would pull it completely just because of the, you know, unpredictable nature of that reaction. And especially with, you know, an outcome being obviously death, we would not -- you know, we would use another modality to treat their actinic keratosis or their skin cancers.

Q If they're having this skin irritation, are you able to adjust the either absorption rate or the amount that's delivered to lessen or provide a greater dose of that medication to treat more aggressively?

A Sorry. Can you ask that question one more time? I want to make sure I understand it.

MR. PETTI: Can you read it back.

(Whereupon, the record was read.)

A So this is a medication that if there is persistent skin cancer in an area, or if there is significant sun damage in the area, the expected response actually is that the skin becomes quite inflamed.

Now, the times that we do ask patients to reduce application are if they're having significant pain, they're having bleeding, they've developed erosion, there is concern for secondary infection, those would be times where we would say, "Hey, we're going to, you know, shorten the treatment, the duration of treatment, for this topical medication."

Q So there are instances where

PUGLIESE

you either adjust up or adjust down the either frequency of application or the concentration of application?

A We don't -- I don't adjust really ever up. It's kind of the indication twice a day. But if a patient is having a reaction, too much reaction, and discomfort, concern for infection, then we would stop the treatment.

Q Would you restart it at any point with a lesser dose?

A That's a good question. I will be honest, patients often do not want to restart if they have had that kind of reaction. So we have to think about other treatment options. And, fortunately, we have other treatment options.

So I think that's kind of just in practice what tends to happen if someone has a very severe response. They generally will not, you know, opt for that treatment again, or at least

PUGLIESE

not for a large area of skin involvement.

Q For the topical chemotherapy that's being discussed, is -- when you -- I assume you put in a prescription for that?

A Yes. The 5-fluorouracil is a prescription medication.

Q Is it in a constant dose, the formulation?

A The 5 percent?

Q Yes.

A Yes. There's -- it's 5 percent.

Q Are there others? Is there a 2 percent or a 6 percent or?

A I believe they might have a 1 percent that -- I don't -- I mean, I think it's 1 percent, but I am not entirely sure. 5 percent is the more standard dosing, so that's the one that tends to be utilized.

Q And then here you mention the systemic absorption has been measured

PUGLIESE

to be between 6 and 13 percent. And that's in the middle of the paragraph, just for reference.

A Yes, I see that.

Q Is that adjustable? The absorption rate, is that something that can be adjusted based on what -- your prescription?

A It's not -- again, we are not kind of -- we are not in clinical practice measuring the absorption systemically, other than to say we're good for these systems. I don't -- I don't know how, you know, kind of you would adjust that absorption.

I just want to add one point to that, which is --

Q Please.

A -- I can tell you how to increase absorption, but not necessarily, like, dose-wise. So sometimes what we'll do is occlusion, we talked about a few times today. But we'll have patients, you know, put the

5-fluorouracil on their skin and wrap it with an occlusive, plastic wrap. So that would increase the delivery of the medication.

But, again, it's not -- we're not measuring by how much more, but usually patients have more reaction and we can visually, in that case, see that.

Q Is that so that you just don't get the effect of any evaporation or --

A So we know --

Q -- is it a pressure thing?

A Yeah. It's more -- the actual occlusion is one of the physical things that we can do to increase absorption. So we talked about vehicle before and ointments being more occlusive. And this is a way of having, like, an external occlusive barrier of sorts.

Q Why would you do that in a patient? Why would you provide an

PUGLIESE

occlusive --
A Yeah.
Q -- barrier to increase absorption?
A We would do it to increase absorption. So, for example, let's say we had a patient that had red rash all over their body, what we would call erythrodermic, E-R-Y-T-H-R-O-D-E-R-M-I-C.
So what this -- imagine if a patient is red all over. And then we give them, like, a jar of medication and bring that home. It's very challenging to that home, kind of put this medication on everywhere and it gets very messy.
So sometimes when patients are hospitalized for different conditions, including this condition of redness everywhere, we'll do a treatment where we apply steroid ointment all over the body, and then we wrap them.

PUGLIESE

So this is actually -- patients used to be admitted to dermatology units for this treatment for different conditions, like, for psoriasis in the past. But it is a way of enhancing the absorption of that product.

So we have, like, an ointment, we have the occlusion, and we have the ability to use it regularly to improve the absorption.

Q Why do you want to improve the absorption?

A So, again, it's hard if we have -- we just put a cream -- we ask the patient to self-apply cream, for example. It might be tough if the rash is everywhere for them to put it everywhere.

And if we want there to be -- if the skin is very inflamed in these cases, if the skin is really showing a lot of signs of rash, then we want to be more aggressive in terms of our

PUGLIESE

treatment because it will improve that skin condition much faster if we're able to deliver medication more, I'd say, aggressively. Aggressive seems like an aggressive term, but more aggressively.

And I guess the other side of this is what else can we do. Because the other option would be systemic medications. So we could give someone an oral steroid, but then we run into some other side effects.

So we're trying to manage something topically in the most advanced way possible. And that's what occlusion allows us to do.

Q Is giving someone fewer -- just to play this out.

If you gave them the oral steroid, does that change -- how does that change the delivery from absorption? Is it -- if we're using the term "aggressive," would that be even more aggressive?

PUGLIESE

A It's just different. I mean, if we're -- yeah. If we're using a medication that is directly, you know, swallowed, absorbed into the body, and then circulated to all organ systems in that case, right, so has an effect on, you know, blood pressure, blood sugar, the bones, it affects the mood. It can also affect sleep, right. So it's affecting all these different areas; whereas when we do topical application, we're really trying to do more skin-directed treatment.

The caveat here, of course, is that all of those things together -- large surface area, ointment, occlusion, frequent use -- is going to actually lead to some systemic absorption, more so than we would usually see, right. However, not nearly as much as an oral medication and oral steroid.

Q And that's where knowing the rates of absorption becomes important?

PUGLIESE

A I think it's important to know that all these different variables can increase absorption so that we can counsel patients that they can develop -- they might develop some of these symptoms, yeah.

Q I want to move to the next paragraph here.

The study that addressed the absorption concern is not limited to only topical medications. It's important to -- sorry.

"An important study reported in the New England Journal of Medicine describes the case of a 26-year-old female who developed acute kidney injury on three separate occasions directly after hair-straightening treatments contained 10 percent glyoxylic acids."

Did I read that correctly?

A That was perfect.

Q All right. We got there.

Is glyoxylic acid a component

PUGLIESE

or ingredient in the chemical hair relaxers at issue in this case?

A So this particular study looked at chemical hair straighteners. Way back, you know, at the beginning of the day we sort of talked a little bit about sources that were utilized and I mentioned that I utilized a number of sources looking at chemical hair relaxers and a few that discussed chemical hair straighteners to highlight certain points. And this was one of those studies.

Q What was the point that was being highlighted with this study?

A Yeah. So one of the, you know, things that really surprised me about the report of Dr. Burgess, and obviously, this was -- I read this after this report, but it was this, you know, idea that it was just, you know, not possible for these products to -- you know, they're intended for hair use. It's not possible for them to

PUGLIESE

touch the scalp in any way, shape, or form. And, you know, they're unable to, therefore, absorb into the body.

So this to me was a really important study that actually shows, you know, in practice this product, yes, a hair straightener, but it -- the intent here is not to apply that to the scalp. It's to apply it to the hair. And yet we're having this reproducible side effect of acute kidney injury.

And the timing is important because I know we talked a lot about what about other products and things of the sort. But, you know, that direct temporal association does allow us to think of it more critically about the agents that are applied directly before the effect seen.

(Clarification by the reporter.)

MR. PETTI: Let's mark as Number 5.

This is the "Kidney Injury

PUGLIESE

and Hair-Straightening Products Containing Glyoxylic Acid" from the New England Journal of Medicine report that is referenced on page 9 of the doctor's report. For those at home or online, it is Tab 8.

(Kidney Injury and Hair-Straightening Products Containing Glyoxylic Acid, was marked Pugliese Exhibit 5, for identification, as of this date.)

Q Doctor, the court reporter has handed you a copy of the New England Journal of Medicine paper that we're discussing here -- or is discussed in your report.

Is this an accurate copy of that paper?

A Yes, this is an accurate report.

Q Okay. And right in the first paragraph, it states that "recently described 26 patients in Israel who had

PUGLIESE

acute kidney injury after a 'Brazilian' hair-straightening procedure."

Do you see that?

A I do, yes.

Q Do you understand the Brazilian hair-straightening procedure to be different from the chemical hair relaxers that we're discussing in this case?

A So I think I have answered this to explain that there are chemical hair relaxers. And then when we think about these straighteners, Brazilian keratin products, they are different formulations. And yet I think that the application process, we can take information from what we know about application of the products that have glycolic acid to know what might happen when they're applied onto the hair and absorbed into the scalp.

Q But this is a different product, correct?

A So this --

PUGLIESE

MR. SHIPMAN: Objection to the form.

A -- is a hair-straightening product as described that contains glyoxylic acid.

Q And I asked this before, and I don't know if there was an answer. But is glyoxylic acid contained in the chemical hair relaxers at issue in this lawsuit?

A So my -- I believe I answered this to say that glyoxylic acid is primarily utilized in chemical hair straighteners. What I am sort of failing to see is the kind of the difference of why a chemical hair straightener would absorb to the body but a chemical hair relaxer would not. I am not sure the mechanism of absorption should not be different for those -- for those different products.

Q Is the application different?

A So the application of chemical hair straighteners, there are

PUGLIESE

some components that, again, a little bit different ingredients in those active activator components to straighten the hair. It doesn't have kind of the same exact effect on the hair cortex. And there's also a component of heat application as well.

Q So it's a different application process?

A So they are components of the application process that are different, and yet it is a topical product that is applied with some frequency applied to the hair. That has been documented to have similar cutaneous reactions to the scalp as the chemical hair relaxers in question.

Q So it's a different application, that's a yes?

A So there -- like I've said, there are different components of the application.

Q Is the glyoxylic acid an active ingredient in the

PUGLIESE

Brazilian-style hair-straightening procedure?

A The glyoxylic acid is considered to be an active ingredient in the hair-straightening products.

Q Is it a -- is it an active ingredient in the chemical hair relaxing products at issue in this case?

A Again, we talked about this a little bit earlier. I did not look specifically at the products at issue in this case, other than to review what's known about chemical hair relaxer products that are commercially available. Some of that information was just published. And at least, you know, based on what's listed in those studies, who knows.

We're not sure. Some ingredients are not listed. But based on that listing that is available, they are not listed in chemical hair relaxer products.

PUGLIESE

Q If you look at the paper -- not your report, but the paper, at the bottom of the first column, the paragraph starts "Each episode."
Do you see where I am at?
A Yes, I see it.
Q "Each episode of acute kidney injury had coincided with a hair treatment at the same salon on the day the symptoms began."
Do you see where I am reading?
A I do.
Q Did I state that correctly?
A Yes. If they have the hair treatment at the same salon on the day of symptoms?
Q Yes.
A Yes.
Q Okay. Are you aware of any symptoms that systemically are occurring in individuals using chemical hair relaxers?
MR. SHIPMAN: Objection to

PUGLIESE

the form.

A Can you ask that one more time, please.

Q Yeah, I can try.

And I appreciate that sometimes my questions are --

A No, no, no.

Q It's okay.

A I just want to make sure my answers are helpful.

Q Yep. They have been very helpful.

I don't know if they want to hear you say that, but...

Are you aware of any systemic harms or a -- any systemic harm that is, you know, occurring on the same day of application of a chemical hair relaxer akin to the same day the harm occurred to the kidney in this case study?

MR. SHIPMAN: Object to the form.

A I am not sure that, you know,

PUGLIESE

the timeline of development -- I mean, it's very different. We're thinking about carcinogenesis. I'm not sure that, you know, cancers develop in one day.

Q Yeah, and I'm not crazy enough to suggest that.

A Okay.

Q I'm talking about any systemic -- because you considered the kidney injury to be the result of systemic circulation of the glyoxylic acid, correct?

A You know, according to the authors and the New England Journal of Medicine peer reviewers, they felt pretty, you know, confident that this was an important finding.

Q Is there anything that is akin to this finding that studied chemical -- that you are aware of that studied chemical hair relaxers in systemic -- an undesirable systemic result occurring in the same day?

PUGLIESE

A I think specifically within the same day, I'd have to kind of look through all the literature. I think that when we're speaking in this litigation about chemical hair relaxers, we seem, you know, to be a bit more focused in the literature on the accumulated effects of frequency of use of these agents and how those -- that frequency of use can lend itself to some changes in endocrine activity that can impact patients many years into treatment.

Q So you're not aware of the type of study that I described?

A For the purposes of carcinogenesis, I'm not sure that the study makes sense.

Q I didn't ask about carcinogenesis, though. I asked about any type of systemic harm or systemic undesirable effect.

A So, you know, other than, like, no localized burns, pain -- I

PUGLIESE

mean consider pain to be some degree of systemic toxicity, but...

Q That's not what I am asking about. I'm not asking about any type of irritation to the skin or a chemical burn that may occur from the use of hair relaxers.

Because I assume that that's not what this is. I assume that the harm to the kidney that's discussed in this paper is not the same as an irritation to the skin, correct?

MR. SHIPMAN: Objection to form.

A Can you repeat that? I am not sure that makes sense to me.

Q It might not.

Is the kidney injury that is being assessed in this -- the kidney injury and hair-straightening products paper akin to the type of injury or the type of occurrence of skin irritation from use of hair relaxer?

A It is an injury occurring in

PUGLIESE

a patient who did have a scalp reaction, a skin reaction. Now, the mechanism of injury is a little different in the skin compared to the kidney, but it is a toxicity seen with the same ingredients.

Q Is skin irritation a systemic harm?

MR. SHIPMAN: Objection to the form.

A Well, I think it depends on how we want to define "irritation." So if we have -- you know, kind of using it a little bit loosely, right. But it is a way that we describe different changes in the skin.

So in the case of irritant or allergic contact dermatitis, the irritation looks one way on the skin. In the case of allergic contact dermatitis, now, that irritation is also ongoing internally. So patients can have significant itch, and sometimes there can be, you know, some

PUGLIESE

forms of allergic contact dermatitis that are quite serious.

In the same way, we think about psoriasis as being a skin irritation. We know that that is -- also has a systemic component to it based on the inflammatory pathways.

So the -- you know, visually sometimes we see something on the skin that can have a systemic counterpart.

Q Are you comparing the irritation to the skin that may be caused by use of a chemical hair relaxer to psoriasis?

A I am only comparing it to give you the example of what irritation means and the broad spectrum of definition.

Q In the spectrum of definition where we land on the skin irritation caused by chemical hair relaxer, is that akin to the -- to psoriasis? Would you consider them the same?

A They are different

PUGLIESE

conditions. The irritation is more in line with an irritant contact dermatitis or an allergic contact dermatitis.

Q And would you consider an allergic contact dermatitis or -- what's the first one you --

A Irritant.

Q -- irritant contact dermatitis to be the same as the kidney injury that is described in the New England Journal of Medicine paper?

A They're -- I mean, they're obviously different things. You know, kidney injury is involving a different organ.

Q They were able to -- well, if you look at the paper, I will direct you to where I am looking at --

A Sure.

Q -- just so that there is no confusion. On the second -- first page, second column, middle of that paragraph.

PUGLIESE

"Urinalysis performed the day after cream application revealed the presence of elongated calcium oxalate monohydrate crystals, similar to those observed after ethylene glycol intoxication, in the mice exposed to hair-straightening cream."

Did I read that correctly?

A Yes.

Q Okay. Why is urinalysis important in study?

A So urinalysis, you know, in order for something to make its way into the urine, it has to make its way from area of -- if we're talking about systemic -- topical application, area of application absorbed into the skin to the kidney filtered out into the urine.

So when they evaluate the urine for different products, if they evaluate for different metabolites, what they're looking for is presence of these -- I don't want to call them

"toxins," but presence of other products in the urine.

So it's important here because they're highlighting that this calcium oxalate monohydrate crystals are an atypical presence within the urine that is, again, temporally associated to the application of the chemical hair relaxer.

Q Is it safe to call the calcium oxalate monohydrate crystals a marker or indicator? Does that term make sense to you in this context?

A I don't know if I would utilize that term, but I think it would speak cleaner to say that they found calcium oxalate monohydrate crystals.

Q Did you review any urinalysis of any subjects or patients that had been -- or had used chemical hair relaxers in this case?

A Again, I did not review any Defendant -- I'm sorry, Plaintiff -- reports, medical records, or anything

of the sort. There is a urinary metabolite study that I know has been talked about already in the context of litigation having to do with increased urinary metabolites of certain ingredients that are present in chemical hair relaxers.

(Clarification by the reporter.)

A But -- but no. To answer your question, I did not personally review any of the plaintiff reports in this case.

Q And the report you just cited, is that the only paper or material that you reviewed that had any type of urinary analysis?

A Again, I did review that paper. And I -- I don't believe I reviewed others. I'd have to look at everything that was referenced in the past.

Q Is the kidney injury in the New England Journal of Medicine caused

PUGLIESE

by the same biologic mechanism as reproductive carcinogenesis?

(Clarification by the reporter.)

MR. SHIPMAN: Objection to the form.

A So, again --

(Whereupon, a discussion was held off the record.)

A Again, it's not an accurate comparison, other than to say that we can't -- we -- you know, this case, the concern is that application of something to the hair is absorbed into the body and causes kidney injury.

So the way I compare them is that it is not a completely, you know, impossible scenario for something -- for a chemical hair relaxer applied to the hair to make its way onto the scalp and then be absorbed.

So in coming to that conclusion of biologic plausibility, the knowledge of how this particular

PUGLIESE

straightening product has been shown to absorb into the skin and effect the kidney, I do find it to be helpful --

(Clarification by the reporter.)

A Again, in the totality reviewing all of the evidence available to come to -- to the opinion that I formed.

Q And in the New England Journal of Medicine article, they were able to identify the ingredient that caused the kidney injury, correct?

MR. SHIPMAN: Objection to the form.

A So in this particular article, they looked at this, you know, one patient and they were able to, in this particular study, based on application of the same product on just those three occasions, make that direct association.

So that is, you know, obviously helpful when things happen

PUGLIESE

that way. More difficult to do so when you're looking at, you know, tens of thousands of patients using a variety of different products.

Q So you can't apply the same analysis that is used in this New England Journal of Medicine article to the chemical hair relaxers at issue in this case and determining causation of cancer?

MR. SHIPMAN: Objection to the form.

A You know, I just think in general you can't kind of compare one case report with a mouse -- an animal study to, you know, large prospective cohort studies. But I don't think that you can't evaluate the individual studies to formulate an opinion.

MR. PETTI: Can you read that last -- what she said at the end there, back.

(Whereupon, the record was read.)

PUGLIESE

Q I just want to be sure we're talking about the same thing. The individual study in that answer would be the New England Journal of Medicine study, or would it be the White, Bertrand, and Chang studies?

(Clarification by the reporter.)

A So this is only one article --

Q Yes.

A -- utilizing my opinion.

Q Yes.

A And that's what I'm trying to emphasize.

Q Okay.

On page 10 of your report.

A Uh-huh. Yes.

Q On the first -- the top part before the first paragraph, you're still referencing the New England Journal of Medicine article.

And it says, "In the case report, the recurrent nature of

PUGLIESE

symptoms directly after chemical hair relaxer treatment allowed for a temporal association to be established."

Why is that important?

A I'm sorry. Could you direct me to -- okay.

I think I answered this just in general in the past, talking about how, when we have multiple exposures, it can be hard to pinpoint which one is the positive agent. What made this case report very compelling was that they utilized the same product. They utilized it on repeated occasions. And the symptoms all developed within a very short timeframe.

So that made it very easy to isolate this.

Q And in our case, as you stated, it's more complicated.

A So I am not sure I would say that it's more complicated in the sense that it's just different information.

PUGLIESE

So we have many more patients. We're not just looking at the one patient. We are looking at, again, many, many patients, many different products. And there were many potential downstream effects.

So it was just a whole -- it's much more nuanced. We can't look at one study to give us information. We have to review a bunch of different studies and summarize them and put them together and come to a conclusion.

Q When you say we're looking at many different patients, are you talking about individuals that are reported in studies, or are you talking about patients as plaintiffs in this lawsuit?

A So, again, I have not reviewed any information that is specific to any plaintiffs in this lawsuit. So what I mean is just users of chemical hair relaxers, if we're talking about localized toxicity. And

PUGLIESE

users of the hair relaxers who have developed what I will just generalize as a downstream effect. And two examples are ovarian and uterine cancer.

Q How many patients have developed that condition that you're aware of?

A Do you want cite specific --

Q I want you to --

A -- papers?

I mean, I'm sorry, yeah, but, do you want to reference one in particular? Do you want to go over Chang, Bertrand, and White?

Q If I want to go over them, I will pull them up.

A Yeah.

Q And we may. But right now I'm just asking -- you used the term many. And I just want to know if -- what the number is for you that you -- in looking at those papers or any other papers, how many patients that used

PUGLIESE

chemical hair relaxers developed uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

A Would you -- should we just grab one and kind go through it? It might help to have specific numbers to look at.

Q I don't -- I just -- I am getting a baseline here.

You don't know the numbers offhand we sit here?

A I mean, I don't know if anybody knows the exact number. I am sure there is -- I can tell you numbers that have been published. But, you know, I don't know every single patient in the world who has developed cancer related to the chemical hair relaxers.

Q How many are you working from, from the studies that you reviewed for your paper?

MR. SHIPMAN: Objection to the form.

PUGLIESE
A Again, I'm happy to review --
Q Please.
A -- if you want to look at those numbers.
Yeah. No worries.
MR. PETTI: We'll pause.
VIDEOGRAPHER: Off the record?
MR. PETTI: That's fine. We'll stay on the record.
(Whereupon, a discussion was held off the record.)
A So I will go through some of the epi to look at those numbers. I think it's important to note that the epidemiology really focused on increased risk of these cancers. And that even with this information is hard to say this many number of patients across the board have developed these cancers.
But what we do know from these studies, these three studies that I am mentioning now, are that there

PUGLIESE

have been an increased association with the development of urine and ovarian cancer in patients who are users of chemical hair relaxers.

Q And those three studies are the White, Bertrand, and Chang studies, correct?

A Yes.

Q Just so we're clear for the record.

A Oh, yeah.

Q And you cite those in your report on page 12. I believe there is a paragraph on each one of them; is that correct?

A Yes, I do. Let me make sure it's page 12. But I do cite them.

Q Do any one of the three come to a conclusion on causation?

MR. SHIPMAN: Objection to the form.

A Yeah. I think as we talked about, that in order to come to a conclusion on causation, you really

PUGLIESE

need to -- in cases where you can't necessarily test a particular product because of concern, it would be, I think, unethical to change -- to test a product that is -- that has association with carcinogenesis and then observe women for localized systemic toxicity, and then monitor whether they develop cancer.

So in the absence of that capability, then the best that we can do is look at what is available in the literature. These are three epi studies that look at women who are users of these products through many years. There are two studies that are large cohorts broken into three papers.

But essentially what these are attempting to do is look at the association between use and cancers.

Q Do each of those studies call for further investigation into the association between use of chemical hair relaxers and uterine or ovarian

PUGLIESE

cancers?

MR. SHIPMAN: Objection to the form.

A I don't think I have ever read a study that, you know, doesn't call for more investigation or research. I think that's just the nature of science where we do always want to know more information.

And part of just writing, you know, these papers is to have a section on limitations and sort of next steps in consideration.

Q Do all of the papers referenced your report or your materials considered state that more study is needed for the topic of those papers?

MR. SHIPMAN: Objection to the form.

A I'd have to review, you know, every single paper. But, again, these papers generally will say that more evaluation is needed. More evidence is

PUGLIESE

needed. You want a larger, more powered study. We want more patients, of course.

We always want to have the most information as possible, especially when we're making a very serious diagnosis in patients.

Q How is that different from your report? Do you believe more study is needed for your conclusions?

MR. SHIPMAN: Objection to the form.

A I feel like I need until the end of a lifetime for more study, you know.

But it's -- I have spent a lot of time on -- as you know, we went over the hours and that -- you know, this has really taken up a lot of my time in reading more about this topic and understanding how it affects users of these products.

So I do feel very qualified to -- to make the opinion that I have

PUGLIESE

made. I've researched these questions well, and these are -- whether they are appreciated or not, these are my opinions.

And just kind of while we're on this topic to point out, I did mention early on that I did not come to this litigation with any real already formed bias in terms of this question. So you will see, and Dr. Burgess even pointed out in her -- her own kind of report that I do mention for which, you know, has some issue with some of these epi studies.

But I did do my best to review both negative, positive associations, and to really try to interrogate the entirety of what's available.

Q Do you believe that more study is needed before a causal connection or causal conclusion can be made as to whether chemical hair relaxers cause uterine or ovarian

PUGLIESE

cancer?

MR. SHIPMAN: Objection to the form.

A So I think that, again, I have answered this question. But more study -- these papers will always say that more study is needed.

And, again, I don't feel that it would be a safe human study to look at this question in actual human subjects. And so what we have is current epi. And, of course, opportunities for future epi in order to formulate the most comprehensive causative statements.

(Pause.)

Q You don't have an opinion one way or the other on which chemical or ingredient in the chemical hair relaxers may be a cause of uterine or ovarian cancer?

MR. SHIPMAN: Objection to the form.

A I do think that has been

PUGLIESE

asked a few times. In formulating my opinion, it really was considering a mixture of the ingredients that are available in chemical hair relaxer products.

Q Are you familiar with the term "fate and transport"?

(Clarification by the reporter.)

A Fate and transport?

Q Yes.

A No.

Q Is that a testimony you use in systemic movement or pharmacokinetics?

A I am guessing it is or else you wouldn't be asking it, but...

Q I actually -- this one I don't know.

A I don't know.

Q This is me applying principles from other areas to the --

A Oh, I see.

Q -- human organism.

PUGLIESE

But that's not a term you have used before --

A No.

Q -- in systemic pharmacokinetics?

A It's not a term I have used before.

MR. PETTI: Why don't we take five minutes? I might have a couple more, but I am going to clean up the end here --

MR. SHIPMAN: Okay.

MR. PETTI: -- so we can cut chase.

MR. SHIPMAN: That's perfect.

VIDEOGRAPHER: We are going off the record at 3:37 p.m.

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER: We are back on the record at 3:50 p.m.

MR. PETTI: Doctor, I don't think I have any further questions for you today.

PUGLIESE

MR. SHIPMAN: I think I have just one, or maybe one and a half.

EXAMINATION BY MR. SHIPMAN:

Q Doctor, as it pertains to the concept of follicular transport of the reservoir function, is there anything unique about this concept in chemical hair relaxer products?

A Kind of going back to that discussion when I sort of made a little bit of a comment earlier that some things in dermatology -- I should have maybe written this a little bit more thinking about a nonmedical, non-dermatology audience.

But there is nothing about chemical hair relaxers that would imply to me -- any or imply -- any kind of different absorption that what we see with other products applied to the skin.

So my opinion is that I would utilize the understanding I have with other products in how they would absorb

through the follicle and how they would remain in the reservoir than I would in considering chemical hair relaxers. So there is nothing about chemical hair relaxers specifically that would cause me to kind of change that opinion.

MR. SHIPMAN: Thank you, ma'am.

That's all the questions I have.

MR. PETTI: No follow-up on that.

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER: Okay. We are going off the record at 3:51 p.m.

This concludes today's testimony given by Silvina Pugliese, MD. The total number of media units used was nine, and will be retained by Veritext.

(Time noted: 3:51 p.m.)

C E R T I F I C A T I O N

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, JUDITH THATEN, Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That SILVINA PUGLIESE, MD, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of March, 2026.

__________________________

JUDITH THATEN

I N D E X


| WITNESS | PAGE |
|---|---|
| SILVINA PUGLIESE, MD | |
| Examination by: | |
| MR. PETTI | 8 |
| MR. SHIPMAN | 323 |


E X H I B I T S

(Retained by Veritext Legal Solutions)


| PUGLIESE | | PAGE |
|---|---|---|
| Exhibit 1 | Defendants' Second Amended Notice of Videotaped Deposition of Silvina Pugliese, M.D., FAAD | 13 |
| Exhibit 2 | Expert Opinion Report of Silvina Pugliese, M.D. | 21 |
| Exhibit 3 | Dose-Dependent Histopathological and Structural Impact of Chemical Hair-Straighteners on Scalp Epithelium and Hair-Fibres Using Albino Wistar Rats | 184 |
| Exhibit 4 | Methemoglobinemia Induced by Application of an Anesthetic Cream | 243 |
| Exhibit 5 | Kidney Injury and Hair-Straightening Products Containing Glyoxylic Acid | 290 |

GARY K. SHIPMAN, ESQ.
gshipman@shipmanlaw.com

March 25th, 2026

RE: All MDL Hair Relaxer Cases v. Hair Relaxer
3/11/2026, Silvina Pugliese MD (#7933458)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at p1hairdepos@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

All MDL Hair Relaxer Cases v. Hair Relaxer
Silvina Pugliese MD (#7933458)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________
PAGE______ LINE______ CHANGE______________________________
__________________________________________________________
REASON____________________________________________________

_____________________________________    __________________
Silvina Pugliese MD                                    Date

All MDL Hair Relaxer Cases v. Hair Relaxer
Silvina Pugliese MD (#7933458)

ACKNOWLEDGEMENT OF DEPONENT

I, Silvina Pugliese MD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Silvina Pugliese MD Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

&

**&** 2:3,7,10,19 3:9,13,21 4:4,7 4:11,15,20

0

**00818** 1:4 6:24
**05** 270:22 271:8 272:18

1

**1** 6:14 13:3,9 13:18 41:2,2,2 41:6 42:5,5 270:23 271:8 272:11,19 280:19,20 326:11
**1.5** 193:10,13
**10** 3:4 189:23 190:9 195:3,7 197:23 198:8 198:10 201:10 201:12 203:6 203:14,25 205:3 207:2 242:22 256:9 257:14 287:20 309:18
**10016** 4:8
**106** 2:4
**10:37** 71:12
**10:47** 71:16
**10th** 1:13 4:8
**11** 1:8
**1111** 7:25
**11:41** 132:7
**11:55** 132:11
**11th** 6:4
**12** 26:8 42:3 315:14,18
**12:42** 180:2,4
**13** 70:17 128:2 128:8 281:2 326:11
**14** 110:12
**1400** 2:19
**14203** 3:22
**150** 2:19
**1505** 4:20
**15th** 325:21
**16** 110:17
**160** 186:3
**1600** 4:4
**161** 192:25
**164** 195:22,24
**165** 204:5
**17436** 325:24
**17th** 4:4
**1825** 2:7
**184** 326:13
**191** 2:11 3:14
**1965** 115:12
**19th** 4:16
**1:00** 179:21
**1:12** 181:3,10
**1:23** 6:24
**1:29** 200:25
**1:31** 201:5
**1:40** 211:17
**1:42** 211:21
**1st** 112:17,18

2

**2** 21:2,2,10 70:13 88:3,4 101:15 115:10 115:16,17 170:7 186:2 194:22 208:15 233:13 243:22 280:17 326:12
**2.5** 238:23,23 239:10,11
**20** 189:23 190:9,22 201:21 203:5 204:2 205:4 207:2 329:15
**200** 3:9
**20006** 2:8
**2024** 122:24
**2025** 72:8
**2026** 1:8 6:4 72:9 325:21 327:3
**209** 4:12
**21** 326:12
**23219** 3:18
**2401** 3:9
**243** 326:16
**25th** 327:3
**26** 287:16 290:25
**271** 4:4
**275** 4:8
**28405** 2:4
**290** 326:17
**2950** 2:11 3:14
**2:32** 264:25
**2:42** 265:5

3

**3** 21:23 22:2 88:5 96:14 101:15 137:17 137:18 170:7,9 183:19,22 184:5,8 242:11 326:13
**3.5** 220:4 242:11
**3/11/2026** 327:5
**30** 72:10 189:24 190:10 205:4 207:3 327:16
**300** 2:14
**303** 2:14
**30363** 4:5
**3060** 1:5

**323** 326:6
**33131** 3:10
**35** 72:10
**36** 44:9
**3:37** 322:18
**3:50** 322:22
**3:51** 324:17,24

**4**

**4** 14:6 98:7 132:18 162:11 183:21 243:3,7 326:16
**40** 244:6
**400** 3:21
**46** 72:9
**485** 1:12

**5**

**5** 15:3 170:11 170:14 181:22 182:2 275:8,9 275:9,20 280:8 280:12,15,21 282:2 289:24 290:12 326:17
**575** 2:4

**6**

**6** 280:17 281:2
**60603** 3:5
**60604** 4:12
**60606** 2:11,15 2:20 3:14 4:16
**63101** 4:21
**665** 3:21

**7**

**7** 177:7,9 208:13 226:8 243:2
**700** 2:7 4:12
**701** 4:20
**7933458** 1:25 327:5 328:2 329:2

**8**

**8** 197:16 226:13 227:16 248:2 252:4 290:8 326:6
**800** 3:17

**9**

**9** 15:7 197:25 198:11 255:20 265:12 290:6
**900** 71:25
**9:38** 1:9 6:4

**a**

**a.b.** 115:12
**a.m.** 1:9 6:4 71:12,16 132:7 132:11
**ability** 62:17 261:4 284:11
**able** 35:12 39:9 87:19 101:2,10 107:24 118:4 125:15 150:10 158:15 167:2 206:17 241:10 255:11 262:9 263:2,24 276:17 277:21 285:4 302:18 307:13,19
**abnormal** 196:12
**abnormalities** 196:11 202:14 274:25
**above** 327:6 329:7
**absence** 316:11
**absolutely** 22:10 91:4 115:7
**absorb** 84:10 130:11,24 151:8 202:20 220:17 222:23 224:2 226:10 241:10 248:23 249:19 251:10 251:18 252:22 260:19,24 261:4 268:2 274:15 289:4 292:18 307:3 323:25
**absorbed** 16:4 85:22 109:16 128:14 211:12 220:4 224:11 224:13,17 234:4 236:4,11 237:3,9 257:15 257:24 265:18 286:5 291:22 303:18 306:15 306:22
**absorbent** 215:3
**absorbing** 214:11 263:8
**absorbs** 220:20 221:2 263:8
**absorption** 57:19 60:22 61:17,17 73:6 74:18 75:23,25 85:4 97:6 98:21 99:24 104:2,4,6,11 106:13,19 107:5,16 108:2 108:7,15 129:8 129:10 135:24 147:17,19 148:12 151:6 171:24 172:10 172:25 178:6 178:12 185:8 195:12,17

203:4,9 208:18 209:3,21 212:9 212:23 214:6 215:13 216:4 218:21 219:4 219:10,16 220:12 221:3,6 222:9 223:5,6 223:13 224:19 224:23 225:8 225:10 226:18 227:5 228:12 229:5 231:4,7 231:9,14,15,18 231:22 232:4 232:10,21 233:2 235:9 239:13 240:4,8 241:17,21,23 242:3,8,10,12 242:22 244:2,5 248:7,22 249:3 249:8,23 250:12,20,24 252:5,11,20 253:10,24 254:18,25 255:15 256:20 257:9 259:21 260:8 261:12 262:3,19 265:21 266:2 266:11,17,20 267:5,9 268:20 268:22 270:7 270:20,25 274:21,23 277:22 280:25 281:7,12,16,21 282:19 283:5,7 284:7,12,14 285:23 286:20 286:25 287:4 287:11 292:21 323:20

**academic** 28:10 28:12 96:17 137:21 158:17

**acceptance** 160:4,11

**access** 113:14 114:3 172:8

**accessible** 35:12 98:3

**accompanied** 201:24

**accumulate** 247:10

**accumulated** 298:9

**accuracy** 327:9

**accurate** 20:13 21:15 59:11 61:2 64:8 69:24 185:23 290:19,21 306:11

**accurately** 72:20 111:24 125:2 128:18

**accustomed** 273:11

**acid** 287:25 290:3,11 291:20 292:6,9 292:13 293:24 294:4 297:14 326:18

**acids** 287:21

**acknowledge...** 329:3

**acknowledg...** 327:12

**acne** 268:3,7 274:8

**acquired** 231:2

**acronym** 161:8 161:10

**act** 261:16

**actinic** 275:17 277:18

**action** 7:12 325:17

**activating** 94:4

**activator** 293:4

**active** 94:2,7 127:4 162:18 164:4 177:4 186:16 213:21 217:2,3,11,14 270:10,11 293:4,25 294:5 294:7

**actively** 166:25

**activity** 208:7 298:12

**actual** 114:4 175:20 204:11 244:13 274:8 282:17 320:11

**actually** 20:19 29:11 30:13 76:8 77:13 80:10 110:18 114:7 123:6 124:12 165:12 194:3 238:9 239:3 240:15 245:12 253:2 258:24 276:19 278:13 284:2 286:19 289:6 321:19

**acute** 287:17 289:12 291:2 295:8

**add** 108:11 281:17

**added** 177:19 178:11 212:22 246:12

**addendum** 120:17

**adding** 254:2,4

**addition** 24:4 162:18
**additional** 105:20,21 178:4 187:2 188:21
**additions** 329:6
**additives** 85:2
**address** 7:25 14:2
**addressed** 287:10
**addressing** 196:25
**adjust** 277:7,21 279:2,2,5 281:16
**adjustable** 281:6
**adjusted** 281:8
**administer** 7:10
**administered** 106:3 189:19 190:6
**administration** 106:4,6 154:4 262:24
**administrative** 28:15
**admitted** 284:3
**adult** 245:2
**advanced** 4:19 285:16
**adverse** 35:24 57:14 70:9 101:23
**advise** 228:25
**afam** 3:20
**affect** 27:16 129:12 268:22 286:10
**affecting** 105:13,14 286:11
**affects** 286:9 318:22
**affirmative** 262:10
**afford** 264:9
**age** 31:16 268:8
**agent** 310:13
**agents** 212:21 289:19 298:10
**aggressive** 284:25 285:5,6 285:24,25
**aggressively** 277:25 285:5,7
**ago** 60:25 61:19 86:24 102:23 103:7
**agree** 6:12 244:10
**agreed** 5:2,7,10
**ai** 47:14 73:16 73:19,21
**akin** 206:3 296:20 297:21 299:22 301:23
**al** 184:20
**al.'s** 183:2
**albino** 184:4,12 326:15
**alert** 268:13
**algorithm** 46:7 46:9,11,17,19 47:10,21,23
**algorithms** 43:13
**alkaline** 182:4
**allen** 4:20
**allergen** 179:9 216:13,14,15
**allergens** 122:25 123:2
**allergic** 51:12 165:13 170:12 173:14 216:13 300:19,21 301:2 302:4,7
**allotted** 327:19
**allow** 10:18 254:17 289:17
**allowed** 310:3
**allowing** 23:24 249:8
**allows** 157:4 254:24 285:17
**alluded** 212:25 236:19
**alter** 177:20 178:24
**altogether** 176:5
**amended** 13:4 13:6 326:11
**amount** 125:10 126:20 127:2,7 146:7,7 147:3 157:8 166:14 167:6 190:17 204:13 220:5 220:18 277:22
**amp** 43:3
**analyses** 136:19,20
**analysis** 132:23 132:25 134:17 136:4,7,9,13,16 136:21 137:25 138:7 141:19 141:25 142:3 145:20 147:24 148:7 158:6 159:3 259:8 273:5 305:18 308:7
**analyze** 119:18
**anatomy** 191:15
**anderson** 2:10 3:13
**anesthetic** 238:22 239:9

243:5 246:7 249:16 326:16
**anesthetics** 245:4
**animal** 39:12 185:15 189:8 193:25 194:3 206:9 308:16
**animals** 185:16 186:6
**annually** 26:16
**answer** 10:8,21 10:23 11:19 12:9 19:3 43:24 46:7 47:2 50:8 51:6 53:20,24 59:11 61:2,8 67:8 86:4 105:5 119:17 121:18 124:25 139:19 154:11 155:10 167:13 203:23 204:11 228:3 238:19 251:2 292:8 305:11 309:4
**answered** 157:16 291:11 292:12 310:9 320:6
**answering** 111:23 172:23 204:9 223:9
**answers** 10:9 11:9 46:4 59:2 59:4 63:10 96:12 171:8 296:11
**antibiotics** 67:25
**anybody** 32:6,9 49:15 70:18 73:14 313:15
**apologies** 45:8 45:9 64:11
**apologize** 184:25 251:20 252:2
**appear** 198:24 201:14,16 232:18
**appearance** 7:16
**appearances** 7:17
**appeared** 158:22 198:17
**appears** 199:15 256:22
**appended** 329:7
**appendix** 80:6 80:11 110:24 115:17
**applicable** 108:5 117:22 139:25 140:15 185:9 189:16 190:19,22,25 191:2 193:15 197:8 221:23 224:3 226:10 226:11 229:6 234:25 235:13 235:24 238:21 239:9 240:15 241:16 245:13 246:21 248:10 250:13 263:7 263:15 265:18 289:19 291:21 293:14,14 306:20 323:21
**application** 95:13 107:14 117:22 124:5 124:14 126:22 134:16 146:8 189:20 190:7,8 192:7 193:4 214:22 240:25 243:5 245:4 247:6 248:19 250:9 259:8 276:17 277:2 278:16 279:3,4 286:12 291:17 291:19 292:23 292:24 293:8 293:10,12,20 293:23 296:19 303:3,17,18 304:9 306:14 307:21 326:16 327:8
**applications** 195:7 205:19
**applied** 56:19 82:17 89:20 91:23 92:2 95:25 97:10 125:9,10 126:25 127:9 130:10 134:6 149:12,19 151:2 164:13 164:15 173:12
**applies** 214:8 228:15
**apply** 20:6 51:5 82:18 83:5 92:7 95:15 96:6,9 135:24 136:8,11,15,20 137:11,24 138:6 150:12 150:18 154:18 191:10 214:7 217:21,22 225:19 229:3 230:7 235:20 237:5 246:6 283:23 284:17 289:9,10 308:6

**applying** 51:4 109:12 134:18 235:7 238:8 245:21 321:22
**appreciate** 61:10 115:9 131:21 296:6
**appreciated** 319:4
**approach** 147:23 156:5 212:4
**appropriate** 31:17 122:20 155:24
**approval** 39:5 39:6,7 40:5,6
**approve** 100:17
**approved** 36:8 40:3
**approximately** 72:10 193:12
**area** 41:14 52:20 96:10 193:4 219:9,19 239:12 241:25 242:7,23 248:15 252:11 252:19,21 260:3 261:6 278:11,12 280:2 286:17 303:16,17
**areas** 25:14,17 85:9 87:3 90:16 95:15,18 219:14,17 220:17 226:11 240:18 241:16 252:23 253:8 258:5 286:11 321:23
**arises** 236:8
**armpits** 219:20
**art** 19:13
**article** 78:21 141:15 164:25 165:4,14 169:16 170:9 194:15 307:12 307:18 308:8 309:11,23
**articles** 9:13 97:24,24 98:16 137:5 139:20 139:22 140:11 140:19 141:2,9 149:23
**ashcraft** 2:7
**ashcraftlaw.c...** 2:9
**aside** 15:13 54:12 208:10 216:18
**asked** 9:11 11:18 15:21 26:23 36:20 52:12 57:23 59:21 73:13 80:21 89:3 128:5 146:23 157:11 195:18 201:9 218:17 218:19 292:7 298:21 321:2
**asking** 8:20 12:6 19:25 46:16 54:9 55:12,17,19 76:16 79:10 105:2 109:5 211:13 233:5 299:4,5 312:21 321:18
**aspect** 118:16
**assembled** 142:6
**assertion** 259:2
**assessed** 299:20
**assessment** 68:15 144:19
**assessments** 69:15 145:10
**assigned** 139:24
**associate** 9:2
**associated** 146:16 161:3 163:6 304:9
**association** 115:14 151:14 157:24 161:7 161:23 163:12 163:13 289:17 307:23 310:4 315:2 316:6,21 316:24
**associations** 155:7 162:6 319:18
**assume** 12:10 36:25 194:14 263:13 266:4 266:15 280:6 299:9,10
**assuming** 126:14 213:4 251:14
**assumption** 175:10
**assumptions** 174:24 175:13
**asthma** 222:21
**atkinson** 4:4
**atlanta** 4:5
**attached** 202:24 327:11
**attempting** 316:20
**attorney** 327:13
**atypical** 304:7
**audience** 155:17 323:16

**audio** 6:10
**audriana** 3:10
**audriana.rodr...** 3:11
**author** 116:12 143:18 244:14
**authorized** 7:9
**authors** 98:15 126:3,6 297:16
**availability** 145:23
**available** 9:11 17:7,12 36:9 38:20 55:13 60:4 61:3 92:14 97:22 98:13 99:6 100:9 107:4 121:14,20,22 123:3,24 139:3 139:4,5 145:21 146:13 149:16 155:5 157:23 160:15,17,18 165:10 171:20 173:3,20,20 186:15,24 226:24 227:4 252:19 259:4 264:21 294:17 294:23 307:8 316:13 319:20 321:5 327:6
**avenue** 1:13 4:8 7:25
**avenues** 40:4
**avlon** 4:15
**avoid** 10:23 53:17 166:25 174:16
**aware** 93:14 137:7 167:10 295:21 296:16 297:22 298:15 312:9
**awfully** 107:19

**b**

**b** 3:20 22:18 42:10,14 80:6 80:11 110:24 244:13 253:21 256:19 326:8
**baby** 267:22 269:20
**back** 12:3 30:19 40:21 44:21,22 49:2 53:23 70:12 71:15 78:13 96:13 103:22 105:6 106:11 114:25 116:18 130:7 131:22 132:10,12 153:12 162:9 181:9,12,21 184:25 201:4 209:25 210:7 211:20,22 214:18 233:23 242:4,23 247:25 251:21 265:4 278:6 288:6 308:23 322:21 323:10
**backed** 258:25
**background** 88:14
**balance** 28:7,8
**ballet** 59:17
**barrier** 31:5 82:7 85:23 108:14 177:21 185:7 191:17 199:7 201:18 202:17 212:18 213:7 215:4,5 223:7 227:25 233:24 234:5 235:15 240:9 241:19 248:6 248:10 249:7 249:18 250:23 251:5,9,16 254:6,7,12,15 254:17 255:2 255:13 257:5 259:24 282:23 283:4
**barriers** 216:17
**bartolomeo** 3:5
**basal** 22:18,19
**based** 15:22 19:7,17 26:2 88:13 93:6 100:4 116:12 122:10 127:15 127:16 130:2 130:12 138:21 139:8 140:10 145:20,21 146:12 152:8 159:21 164:8 168:10 173:2 176:10,14 260:9 281:8 294:19,22 301:8 307:20
**baseline** 230:10 313:11
**basic** 10:4 11:2 249:10 252:15 265:14
**basically** 10:7 23:20 82:8 196:8 217:22 253:12
**basics** 26:18
**basin** 255:8
**basis** 73:9
**battery** 102:4
**bearing** 268:8,9

**beauticians** 92:6
**beauty** 2:13 4:3 4:19
**bedside** 77:12 78:13
**began** 295:11
**beginning** 53:20 108:21 139:18 168:25 187:21 209:8 252:7 288:6
**behalf** 2:3,10 2:13 3:3,8,13 3:16,20 4:3,7 4:11,15,19 8:12
**believe** 13:11 21:23 46:18 70:16,22 72:11 72:19 76:8 79:23 80:19,25 87:17 88:3 95:24 113:4 130:19 135:8 146:25 152:5 155:11 157:7 157:13 160:3 164:12,20 165:5 167:5 184:17 188:9 199:23 201:6 242:21 255:16 260:23 264:20 280:18 292:12 305:20 315:14 318:10 319:21
**belittle** 25:2
**bell** 2:13
**bench** 77:12 78:13
**beneath** 84:4 199:21
**benefit** 159:11 267:16,18
**benzophenone** 163:14
**bertrand** 309:7 312:16 315:7
**best** 10:9 13:14 41:25 68:9 204:7 316:12 319:16
**better** 19:23 36:21 39:18 120:20 133:25 204:11 238:25
**beyond** 81:12 148:20
**bias** 144:6,10 144:18,22 145:4,6 319:10
**billed** 72:23
**binder** 9:6,9,12
**biologic** 66:22 66:23 67:6 68:16 150:20 150:22 151:17 151:18 152:11 152:18 306:2 306:24
**biological** 15:24 89:4 130:6 151:24 152:20,22
**biologically** 88:16 128:13 152:25
**biopsies** 35:10 35:13 105:23
**biopsy** 29:14 30:2 172:16
**birth** 269:20
**biscayne** 3:9
**bit** 36:5 40:18 52:3 55:6 83:17 84:2 87:24 90:12 94:21 100:18 100:18 106:24 132:17 134:13 145:15 171:18 183:11 187:4 200:7 211:24 224:11 237:21 239:24 255:4 268:25 288:7 293:3 294:12 298:8 300:15 323:12,14
**blanking** 161:25
**bleeding** 278:18
**blister** 200:9
**blistering** 199:10 200:3
**blisters** 199:11
**blood** 44:13 286:8,8 325:17
**board** 22:5 74:12 81:12 86:11 314:21
**body** 16:5 22:3 30:7 41:13 70:15 82:8 117:2 142:6 151:8 219:9,14 219:18,24 226:12 240:19 242:23 283:9 283:24 286:5 289:4 292:18 306:16
**bolded** 189:8
**bone** 24:17,19 59:15,17 66:11 66:12
**bones** 286:9
**bottom** 14:9 96:14 137:17 186:3 192:25 194:24 295:4
**boulevard** 3:9
**bouncing** 184:25

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 339 of 409 PageID #:75788



**bradford** 66:17 116:8 150:5,8 150:12
**bradley** 2:10 3:13
**brain** 47:16
**brand** 56:6
**brands** 179:13
**brantley** 4:4
**brazilian** 17:25 18:5 58:13 188:15 291:2,7 291:14 294:2
**bread** 83:10
**break** 11:14,16 71:8 216:17 276:18
**breast** 23:5 29:17
**brevity** 22:21
**brick** 202:19 254:19
**brief** 24:21,24 71:13 132:8 201:2 211:18 265:2 322:19
**bring** 283:15
**brings** 232:6
**broad** 16:17 55:7 82:13 103:17 149:3,5 179:9 301:18
**broader** 39:17
**broadly** 89:23
**broken** 166:3 316:18
**brought** 9:5,8,9 93:3 188:6
**brown** 124:19
**buffalo** 3:22
**bullous** 42:9 43:20,22
**bunch** 311:11
**bundles** 198:16
**burgess** 74:4,11 75:6,9 112:10 120:4 158:21 258:19 288:19 319:11
**burgess's** 120:24
**burn** 201:7 299:7
**burns** 173:15 298:25
**butchered** 239:20
**butter** 83:10
**buttocks** 219:20
**bypasses** 231:21

**c**

**c** 2:2 3:2 4:2 29:21 30:10,21 31:8,8 36:16 37:22 78:2 102:22,22,22 161:13 213:25 244:13 256:19 266:9 275:10 283:11 325:2,2
**cadence** 87:9
**calcium** 303:4 304:6,12,18
**california** 26:7
**call** 19:12 30:8 30:9 31:6 33:15 40:25 41:10 42:13 50:11 60:11 68:15 72:14 75:25 76:5 84:12 89:6 90:13 110:23 162:17 204:16 222:3 264:2 283:9 303:25 304:11 316:22 317:7
**called** 16:9 19:9 42:9 78:4 85:6 239:15 241:12 256:23
**calling** 116:21 200:19
**calls** 276:7
**canal** 3:17
**cancer** 22:12 22:16,18,18,19 23:2,4,12,23 24:7,8,11,14 27:15,24 29:10 29:16,17,22,25 30:4,14 31:11 31:17,23 32:6 32:9,10,13,15 32:18,19 33:14 33:14,16 34:14 37:19 38:6 39:19 43:9 44:3 46:10,23 48:13 52:22,24 53:17,18 58:22 59:13 66:10 67:19 100:14 101:13,14 103:11 128:17 129:19 148:2 157:18,25 160:7 161:7,24 162:25 163:2 163:13 166:15 167:7,14 196:20 275:13 276:3 278:10 308:11 312:6 313:3,19 315:4 316:10 320:2 320:22
**cancers** 22:20 23:7 25:22 28:22 29:3,4,6 29:19 32:2

33:10,22 40:25 53:11 57:6,9 57:12 59:19,25 66:3,6 88:19 89:9 128:16 130:15 157:19 161:4,16,21 163:7 275:18 277:19 297:5 314:18,22 316:21 317:2
**capability** 316:12
**capacity** 73:17 267:25
**carcinogen** 167:11
**carcinogenesis** 136:2 297:4 298:18,21 306:3 316:7
**care** 22:12,15 22:25 31:21 34:19 139:15
**career** 15:23 28:11
**carolina** 2:4
**case** 1:4 6:23 9:10 14:15 15:5 20:11 38:19 39:19 40:14 49:22,23 50:18 51:23 63:24,25 64:9 64:12,13,16 67:2 72:24 79:14 113:17 119:8 121:9,24 122:5,9 127:20 127:20,21 135:21 141:19 142:21 174:6,7 175:24 179:5 193:21 195:10 199:9,12 217:23 223:2 236:18 238:14 241:9 246:10 249:5 256:10 262:8 267:7,8 273:4,4 274:8 274:9,12,24 275:19 276:23 282:9 286:7 287:16 288:3 291:10 294:10 294:14 296:21 300:18,21 304:22 305:14 306:13 308:10 308:16 309:24 310:14,21
**cases** 30:5 41:14 51:14 63:20,21 64:4 69:4 85:14 105:10 111:9 111:10 172:16 214:13 261:17 268:10 269:14 272:18 284:23 316:2 327:4 328:1 329:1
**casing** 108:3
**casual** 156:6
**causal** 319:22 319:23
**causality** 130:2 130:20
**causation** 115:14 116:10 129:21,22 131:2 148:3 152:19,22,24 153:2,4 156:18 157:5,7 308:10 315:20,25
**causative** 320:16
**cause** 35:17 42:6 50:17 128:15 130:17 157:18 160:7 160:12 166:14 167:7 173:13 216:16 230:22 230:22 267:7 271:25 275:22 275:24 319:25 320:21 324:6
**caused** 67:16 154:9 206:24 208:2 241:11 301:14,22 305:25 307:14
**causes** 129:24 306:16
**causing** 51:18 68:18 69:16 103:10 163:2 167:14
**caustic** 194:11
**caution** 267:11
**caveat** 286:15
**cavo** 2:14
**cell** 22:18,19
**cells** 196:17 202:23
**centimeter** 193:13
**certain** 30:4,8 31:20,22 37:9 58:8 81:3 84:9 104:15 111:12 125:23 139:17 141:12 149:4 161:4 163:7 172:16 214:13 228:15 230:21 230:24 239:5 263:3 266:21 266:22,25 268:14,23 269:6,21 288:13 305:6

**certainly** 13:25 131:4 157:22 160:11,21 179:12 207:7 215:3 246:4 277:2
**certainty** 88:12 128:12 152:2,7 155:15
**certification** 5:4
**certified** 1:14 22:5 74:12 81:12 86:11
**certify** 325:8,15
**cetera** 29:18 85:24 104:16 133:7 155:6
**cgw** 2:21
**chagrin** 73:19
**chair** 251:23
**challenging** 95:21 129:23 191:14,22,22 204:15 283:16
**chang** 309:7 312:16 315:7
**change** 178:4,9 231:3 232:21 285:21,22 316:5 324:7 328:4,7,10,13 328:16,19
**changed** 144:3
**changes** 24:17 178:13 197:11 204:18 230:22 298:12 300:17 327:10 329:6
**characterized** 56:8
**charged** 26:13
**chase** 141:5 322:15
**cheatam** 3:16
**check** 79:20,24 80:2
**checking** 181:16 244:18
**chemical** 15:25 16:19,23,24 17:2,8,9 18:7 18:17,20,22,23 19:5,8,15,16 49:10,14,17 50:22 51:9,13 51:19 56:22,24 57:18,25 58:11 58:12,18 62:9 72:25 73:5,8 73:11 88:17 89:5,19,24 90:5,10 91:6,8 91:22,25 92:7 92:10,11,18 93:8,13,14,24 94:5 95:4,11 95:20 96:7 97:17 98:23 99:24 100:11 100:22 104:2,5 104:7,9 105:3 106:21 107:4,9 107:13 108:8 108:10,25 109:14,19 118:20 119:6 119:18,19,22 121:8,14,21 122:2,5,11,14 122:19,20 123:3 124:6,15 124:16 125:8 125:18 127:3 128:14 129:11 130:14,22 131:9,10,20 134:25 145:22 146:8 147:17 148:12 151:2,7 151:15 157:17 160:6,12,22 161:2,15,20 162:12 164:10 164:22 165:15 165:17 166:24 167:16 168:4,8 168:11,22 169:5 171:13 171:22 172:12 173:11,15,21 174:13 175:16 175:20 177:18 178:15,17 179:3,10 182:3 183:3,25 184:10 185:10 185:16 186:15 187:9,11,12,13 187:19,19,24 187:25 188:3,8 188:12,14 189:22 190:18 190:21,24 191:7,25 192:21 193:11 201:7 205:8 206:4,20,22 209:16,18,24 210:17 211:6 212:11 214:20 214:25 217:4,5 217:15 234:2 258:8,22 259:13 260:11 260:17 261:14 264:14,19 288:2,5,10,12 291:8,12 292:10,14,17 292:19,25 293:17 294:8 294:15,24 295:23 296:19 297:22,23

298:6 299:6 301:14,22 304:10,21 305:8 306:20 308:9 310:2 311:24 313:2 313:20 315:5 316:24 319:24 320:19,20 321:5 323:8,18 324:4,5 326:14
**chemicals** 52:11,15 53:15 53:21,25 54:11 54:15,25 55:5 55:11,23 56:9 56:21 60:6 61:5 62:16 168:24 185:10 186:7 189:7 206:21
**chemotherap...** 64:2
**chemotherapi...** 67:22
**chemotherapy** 23:14 25:7 65:10,12,14 104:15 275:12 280:4
**cherin** 4:7
**cheryl** 74:10
**chicago** 2:11,15 2:20 3:5,14 4:12,16 44:21
**chief** 50:10,11
**child** 268:8,9
**children** 200:18
**chiwar** 182:10 182:23 183:2 184:20 185:20 185:21 205:18
**choice** 62:4
**chosen** 98:15
**chronic** 30:18
**circulated** 286:6
**circulation** 128:15 129:15 297:13
**circumvented** 238:18
**citation** 249:12 249:13
**citations** 18:19 79:25 99:19
**cite** 79:18 111:15 226:17 244:11 312:10 315:13,18
**cited** 110:18,21 125:17 142:24 206:17 242:15 248:25 249:9 305:16
**citing** 117:9
**city** 7:25
**clarification** 8:17 25:19 36:10 41:4 77:24 78:6 99:12 138:3 161:11,17 162:3 164:16 170:15 173:16 186:10 188:23 249:25 255:25 264:11 289:21 305:9 306:4 307:5 309:8 321:9
**clarify** 54:6 96:5 148:16 207:16 221:15 246:9
**class** 40:21
**classic** 43:19
**classified** 54:24 55:4
**classify** 36:21 42:18 51:16 56:22,24
**classroom** 81:10
**clausen** 3:4
**clausen.com** 3:6
**clean** 44:24 322:12
**cleaner** 304:17
**clear** 10:12 12:7 89:14 90:12 91:2,3 91:21 97:5 114:17 126:7 128:2 163:20 215:12 230:6 315:10
**clearest** 230:3
**clearly** 35:8 150:16 195:19
**clerkship** 26:10
**clinic** 23:3 25:25 29:8,14 30:2 32:3,11 32:20 34:16 37:18 67:14 68:3 114:21 155:20 173:23 268:7
**clinical** 8:25 23:21 24:23 28:12,18,19,20 35:22 36:18 39:9 40:16 41:7,20 42:16 58:3 81:19 87:4 114:20 135:3 139:14 144:16 153:12 158:18 203:17 281:11

**clinically** 67:11 68:10 228:19 229:6,10,12 230:11,12 232:9,16 233:6 233:13 235:11
**clinics** 27:11
**close** 146:23 147:15
**closer** 47:4 49:3
**closes** 232:8
**clothing** 62:8
**clued** 156:9
**cognizant** 131:18 230:6
**cohesion** 202:3
**cohort** 308:18
**cohorts** 316:18
**coincided** 295:9
**collagen** 198:16 202:4
**collected** 142:9 142:12
**collection** 62:5 202:22,23
**column** 186:5 194:20 243:24 295:4 302:24
**comb** 90:22
**combination** 109:3 206:21 207:5,11 218:5 218:7 222:13 223:14 235:19 236:8 240:24
**combination's** 223:10
**combine** 210:25 211:6
**combined** 211:8
**combs** 90:24
**come** 24:11 29:6,8 30:5 32:11,19 33:12 34:16 37:4,12 44:21,22 49:11 49:25 50:5,8 52:15 53:13,22 54:2,11,15 63:10 66:14 69:19 99:21 112:5,8 116:18 129:25 136:21 137:3 138:23 140:20 148:14 154:7 157:4 173:5,6,23 176:7 191:20 225:19 237:19 263:24 307:9 311:13 315:19 315:24 319:8
**comes** 12:3 30:24 47:24 50:19,24 67:13 67:18 221:20 268:6 271:14
**coming** 46:14 69:14 134:22 149:17 156:10 176:19 203:22 306:23
**comment** 74:20 137:14 148:6 148:19 159:23 159:25 166:21 214:24 227:2 323:12
**commercial** 107:3
**commercially** 92:14 123:3 157:23 186:15 186:23 294:16
**committee** 71:21
**common** 22:20 26:21 30:17 36:13 126:10 177:17 194:3 213:24 216:13 236:24 238:9 275:11
**commonly** 66:17 139:2 147:25 155:14
**communication** 71:4
**communicati...** 15:4,10
**community** 160:5 161:2 266:23
**comparable** 241:22,24
**compare** 244:15 306:17 308:15
**compared** 84:15 175:11 213:8 242:3,18 264:7 267:17 267:19 277:5 300:5
**comparing** 301:12,16
**comparison** 306:12
**compelling** 117:24 310:14
**compensate** 277:8
**compensation** 72:15
**compilation** 157:3
**compiling** 138:18
**complaint** 50:12
**complaints** 16:17
**complete** 10:10 11:9 14:15

329:8
**completed** 327:16
**completely** 61:12 95:18 112:7 231:20 235:21 277:10 277:13 306:18
**completion** 120:25 121:4
**complicated** 11:23 310:22 310:24
**component** 93:18 105:18 106:13 107:7 107:10 175:22 248:21 258:9 258:10 287:25 293:8 301:7
**components** 17:6 93:8 97:3 110:5 127:22 240:20 293:2,4 293:11,22
**composite** 106:22
**composition** 77:2
**compound** 109:16 110:3 178:17,18 211:2 218:2
**compounded** 212:7,10 257:20
**compounding** 55:14
**compounds** 186:19 189:5 207:25
**comprehensive** 86:23 98:2,6,9 102:14 111:20 119:13 121:25 123:7,19 165:9 167:12 168:6 168:14,18 203:22 215:23 320:15
**compromise** 235:14 250:19 250:22 251:4
**compromised** 185:7 233:25 234:24 235:2,8 235:22,25 241:18 248:6 248:10,23 249:2,7,18 251:9,16
**computer** 47:14,18
**conceive** 268:12,18
**concentration** 166:5 171:12 179:3 279:4
**concept** 3:20 249:7 323:6,8
**concepts** 265:15
**concern** 29:9 50:12 62:14 64:7 160:25 163:6,19 278:19 279:9 287:11 306:14 316:4
**concerned** 212:8
**concerns** 24:11 34:17 194:10 203:3
**concierge** 4:24
**concluded** 76:2
**concludes** 324:18
**conclusion** 67:7 69:20 87:20 89:11 129:5,25 152:10 154:8 157:4 176:14 262:10 306:24 311:13 315:20 315:25 319:23
**conclusions** 76:4 100:20 128:25 129:9 129:11 134:4 146:10,12 148:22 149:17 150:13,18 154:19 173:5,7 175:24 318:11
**concomitant** 273:7
**concrete** 40:20
**condition** 85:23 203:8 227:15 228:17 239:15 241:12 283:21 285:3 312:8
**conditioner** 94:12 175:22
**conditions** 26:21 30:11,15 49:8 58:9 69:22,23 77:7 85:5 146:16 148:17 151:14 199:10 230:25 230:25 231:2 273:8 283:21 284:5 302:2
**conferences** 37:25
**confident** 297:18
**confirm** 21:18
**confounders** 68:4 145:2
**confuse** 164:8
**confusion** 12:14 302:23

**conjunction** 110:7 206:16 208:6
**connection** 319:23
**conservative** 269:11
**consider** 18:9 27:12 52:13 56:10 78:24 83:10 95:2 117:15,19 145:3 146:24 147:2,11,16 164:9 201:13 240:24 270:9 273:5 299:2 301:24 302:6
**consideration** 85:13 118:7,24 317:14
**considerations** 90:18 145:18
**considered** 79:11 80:3,5 80:18 92:4 111:2,7,18 115:11,24 116:25 117:6 118:21 119:3 130:5 142:23 143:6,10,11,13 143:14 163:2 230:11 231:9 294:5 297:11 317:17
**considering** 321:3 324:4
**consisted** 26:15
**consistent** 201:15,16
**consisting** 190:6
**consortium** 161:23
**constant** 280:10
**consumer** 264:6
**cont'd** 3:2 4:2
**contact** 51:12 122:25 123:2 148:14 165:14 170:12 173:14 173:15 179:9 191:20 216:13 216:14 228:24 271:25 275:24 277:5 300:19 300:21 301:2 302:3,4,7,10
**contain** 55:22
**contained** 127:8 185:10 287:20 292:9
**containing** 183:4 186:16 290:3,11 326:18
**contains** 292:5
**content** 269:18
**contents** 22:2 119:20
**context** 15:16 19:9 105:25 118:19 164:13 304:14 305:4
**continue** 6:11 91:15 181:13 256:6
**continued** 181:11
**continues** 189:18
**contribute** 70:18 88:18
**contributed** 246:25
**contributing** 249:3
**control** 189:15 190:15 197:17
**conversation** 49:12 195:15
**conversations** 6:8
**converse** 259:10
**copied** 204:7
**copies** 327:14
**copy** 21:12,15 76:9 116:3 243:18 290:15 290:19
**corneum** 198:15 199:18 199:21
**corp** 4:3
**corporation** 4:11
**correct** 12:17 14:17 16:10 25:10 63:15 64:24 71:22 79:19 110:19 120:9 146:2 150:21 164:2 184:17,21 187:12 193:17 195:5 201:8 213:12 218:22 248:11,12 249:4 264:15 291:24 297:14 299:13 307:14 315:8,16 329:8
**corrections** 329:6
**correctly** 32:25 88:21 184:15 186:20 190:11 193:14 234:7 234:13 239:20 239:22 245:9 245:10 269:9 287:22 295:15

303:9
**cortex** 293:7
**cosma** 4:23 7:3
**cosmeceutical** 103:18
**cosmeceuticals** 102:21
**cosmetic** 102:9 102:16,25 226:16,20 227:3,11 261:20,22,25 264:7
**cosmetics** 262:13,21 263:21,24
**costello** 2:19
**counsel** 5:3 6:17 7:21 8:15 10:17 274:22 276:6,7 287:5 327:14
**counseling** 139:11 230:4 274:14
**counter** 55:25 56:12
**counterpart** 301:11
**county** 325:4
**couple** 14:13 71:18 150:3 228:5 233:19 322:11
**course** 22:15 24:2 26:15,17 26:18,23 28:19 31:9 33:11 34:11 36:18 38:5,18 39:15 40:9 50:20 51:21 53:13 58:7 60:16 62:7,10 63:4 69:17 74:13 78:8 86:25 87:13 96:21 97:4 105:18 114:19 115:7 121:11,12 123:25 125:20 131:15 139:10 153:24 174:21 177:3 205:8,20 208:4 212:14 218:13 231:21 238:4 250:24 276:23 286:15 318:4 320:13
**court** 1:2 5:13 6:21 7:6,19 9:22,24 10:12 44:8 162:19 184:7 290:14
**courtesy** 10:19
**covered** 142:5
**cracks** 229:22
**crazy** 297:7
**cream** 84:16 95:25 126:21 127:21 175:20 214:3 217:20 217:23,24,25 218:2,6 221:12 221:20 222:2,4 222:10,16 238:22 239:9 243:6 246:3 249:16 271:14 275:15,20 284:16,17 303:3,8 326:17
**create** 60:16 136:23
**created** 133:24
**creates** 252:9 253:7
**creating** 193:11
**criteria** 134:6 134:18 137:11 138:17 150:6,8 150:13
**critically** 289:18
**criticism** 76:6 77:10
**criticisms** 75:5
**critiques** 76:20
**crystals** 303:5 304:6,12,18
**cuff** 239:2
**cupboards** 247:11
**curiosity** 121:12
**curious** 63:9 74:19 76:23 77:3 136:3 259:3
**curly** 91:21
**current** 25:23 31:16 71:24 173:13 320:13
**currently** 8:22 9:3 17:5,7 26:4 26:6 27:8 61:3 91:11 93:9 106:22 121:14 121:22 146:14 152:9,9 157:23 173:19 192:14 268:11
**curriculum** 26:10,13
**cut** 8:19 141:5 196:13,23 322:14
**cutaneous** 23:12 70:9 135:24 192:15 293:16
**cutoff** 2:4 270:2

**cv** 1:4 6:24 102:18

**d**

**d** 3:20 4:5 37:22 42:11 213:25 253:21 272:6 276:11 276:11,11,13 276:13 283:11 326:2
**daily** 205:9 245:23,25
**damage** 208:2 276:2 278:12
**dampening** 43:4
**daniel** 4:13
**dash** 275:10
**data** 38:20 61:7 68:14 100:18 101:5,6,8,11 126:25 172:18 172:20 259:5 261:19
**databases** 98:12,14 99:8
**date** 13:10 21:11 31:18 112:16 184:6 243:8 290:13 328:24 329:12
**day** 23:21,21 73:20,20 168:25 256:5,9 279:7 288:7 295:10,17 296:18,20 297:6,25 298:3 303:2 325:21 329:15
**days** 257:14 327:16
**dc** 2:8
**deal** 39:19 203:2
**dealt** 63:25 165:14
**death** 41:2 64:14 276:24 277:16
**decade** 102:23 103:7
**december** 112:17,18
**decide** 139:25
**decision** 60:8 136:24,25
**declare** 329:4
**deducing** 38:3
**deemed** 329:6
**deep** 225:9
**deeper** 84:2 199:5 214:12 224:11
**defendant** 2:10 2:13 3:3,8,13 3:16,20 4:3,7 4:11,15,19 6:17 114:9,14 142:15 304:24
**defendants** 8:10,13 13:6 113:16 114:5 114:17 122:4,9 326:11
**defense** 63:25 64:11,17 73:25 74:2,6,7 113:19,19 120:4 123:13
**deficiency** 276:9,13,15
**define** 16:24 17:2,6 22:8 122:13 133:8 135:15 150:16 151:17,18 153:4 175:10 210:2 300:13
**defined** 125:25 126:3
**defining** 103:19 148:9 149:6 188:17 245:14
**definitely** 100:2 102:19 204:15
**definition** 82:3 82:14 89:19 144:13 149:2,7 153:6 232:15 301:19,20
**definitions** 20:7 152:17 230:16
**definitive** 150:19
**degeneration** 201:23
**degree** 27:18 88:12 93:23 107:23 128:12 151:25 152:7 155:15 203:15 222:24 234:4 241:11 251:4 255:2 299:2
**dehydrogenase** 276:12
**deliver** 263:2 285:4
**delivered** 83:25 84:7 277:23
**delivery** 221:8 221:14 223:16 225:11 226:2 263:16 270:8 270:10 282:4 285:22
**demonstrate** 248:21
**demonstrated** 198:3,11
**demonstrates** 248:5
**demonstration** 248:5

**denoted** 186:3
**density** 193:12 252:25
**departments** 27:14
**dependent** 183:23 184:9 237:21 238:16 326:13
**depending** 85:22 98:19 106:8 190:23 223:6
**depends** 52:6 209:4 232:14 300:12
**deponent** 327:13 329:3
**deposing** 327:13
**deposition** 1:11 5:5,11 6:15 7:2 8:12 9:19 11:3 13:5,7 16:22 44:20 63:17 187:21 325:10 326:11
**depositions** 113:20 124:19
**dermal** 69:22 74:18 104:23 105:12,15 174:3,5 198:14 198:16 199:2,8 200:6 214:12 222:9 223:5,12 273:19
**dermatitis** 23:18 51:12 170:13 173:14 173:15 228:24 272:2 275:25 300:19,22 301:2 302:4,5 302:7,11
**dermatologic** 25:21 58:9
**dermatological** 25:17
**dermatologist** 22:5 28:10,12 69:6 74:12,17 81:13 86:11
**dermatologists** 23:9 36:4,19 61:25 82:22
**dermatology** 9:2 22:11 25:15 26:14,18 27:2,11 32:3 35:6 37:12,22 40:15 41:24 54:16 56:2 77:7 81:16 97:9 122:17 139:16 160:20 160:25 220:15 223:19 225:6 249:10 257:8 267:15 284:4 323:13,16
**dermatopath...** 35:16
**dermis** 32:23 84:4,7 85:11 199:4 202:3 223:21 224:9
**describe** 68:9 87:16 245:2,12 260:7 300:16
**described** 19:14,16 204:19 290:25 292:5 298:16 302:12
**describes** 287:16
**describing** 229:15
**description** 201:10
**descriptor** 200:8 202:19
**descriptors** 204:22
**designed** 133:25 221:8 222:8,10
**desirable** 248:7
**detachment** 201:23
**detachments** 202:15
**detail** 14:4 67:4 148:7
**details** 65:6,9 125:16
**detectable** 256:8 257:10 257:14
**determination** 193:20
**determine** 148:2 153:9 156:5 178:25 271:17
**determining** 308:10
**develop** 176:13 228:14 236:22 277:3 287:6,6 297:5 316:9
**developed** 183:6 239:14 278:19 287:17 310:17 312:3,8 313:2,19 314:21
**development** 59:18 68:8 88:18 154:5 157:25 206:11 297:2 315:3
**develops** 228:24

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 349 of 409 PageID #:75798



**diagnose** 28:22 29:2,5,25
**diagnosed** 28:24 30:4 31:12 32:2,5,8 32:17 49:15 52:22 57:13
**diagnosis** 34:14 35:21 68:12 318:8
**diagram** 137:2
**dicello** 1:12
**difference** 111:3 166:12 175:23 176:3 227:8 229:11 256:17 264:3 292:17
**differences** 18:14
**different** 17:10 20:7 27:14,23 32:11 33:9 39:8 40:24 42:6 49:8 60:4 61:14 62:6 68:6,14 76:12 82:6 94:7 97:3 98:12,19 100:10,13,16 100:24 110:5 111:8 119:4 121:6 130:3 132:2 133:6 136:6 137:8 138:17,20 145:15 146:16 151:13 153:22 156:14 158:16 164:19 177:5 195:15 199:6 210:19 211:2,7 212:3 214:6 216:4 220:17 220:18 225:25 228:6 231:5 237:16 240:7 254:23 256:21 261:16 266:17 270:3 271:7,15 283:20 284:5 286:2,11 287:3 291:8,15,23 292:21,22,23 293:3,9,12,19 293:22 297:3 300:5,16 301:25 302:15 302:16 303:22 303:23 308:5 310:25 311:5 311:11,15 318:9 323:20
**differentiate** 18:25
**differently** 134:14
**difficult** 52:24 52:25 258:3 308:2
**diffuse** 213:8 215:9
**diffusion** 215:9
**dig** 159:15
**dihydropyri...** 276:10
**dinsmore** 3:9
**dinsmore.com** 3:11
**dioxide** 62:11
**direct** 10:22 139:14 164:21 165:20 223:16 289:16 302:19 307:22 310:7
**directed** 126:11 286:14
**direction** 121:6 132:2 152:24 159:14
**directly** 32:8 84:4 97:10 159:25 190:25 206:14 212:16 241:24 286:4 287:19 289:19 310:2
**director** 26:9
**discomfort** 279:9
**discovered** 111:19
**discrepancies** 141:16
**discrepancy** 118:4
**discuss** 66:9 90:9 104:14 107:11 129:7 148:12 205:3 238:12 252:8
**discussed** 104:11 109:19 187:20 191:9 191:12 204:10 205:10 242:9 244:22 265:15 280:5 288:11 290:18 299:11
**discussing** 243:10 290:17 291:9
**discussion** 12:24 45:19 57:2 78:12,17 80:8 84:21 103:21 105:7 125:18 132:4 153:19 159:2 179:23 200:22 211:25 213:5 242:24 243:19 247:23 255:17 306:9 314:12

323:11 324:14
**disease** 115:13
**displayed** 201:22
**disrupting** 52:11,14 53:15 53:21,25 54:11 54:14,25 55:5 55:11,23 56:8 56:21 60:6 61:5 62:15
**distinction** 115:8 152:16 230:3
**distinctions** 158:25
**distracting** 154:16
**district** 1:2,2 6:21,22
**division** 1:3 6:23
**divito** 4:11
**doctor** 8:5 9:18 13:20 21:12 44:4 71:17 181:12 265:9 290:14 322:23 323:5
**doctor's** 290:6
**document** 13:21 21:5
**documented** 40:7 108:16 293:15
**documents** 14:12 113:2,15 114:3 118:22 143:3
**doing** 45:12 96:24 119:16 124:2 238:12 265:13 273:3
**donors** 168:16
**dosage** 145:17 194:12
**dose** 68:21 69:2 69:6,12,17,18 104:15 145:10 146:19 157:8 157:17,22 166:8,12 167:6 173:7,13,25 183:23 184:9 188:9 189:19 189:22 192:10 193:8,12,15,19 195:4 236:11 236:15 237:8 237:21 238:16 269:6 277:24 279:13 280:10 281:22 326:13
**doses** 190:6
**dosing** 147:5 269:15 280:22
**double** 79:20 80:2
**downstream** 16:5 59:17 89:7 97:18 108:18 130:16 311:6 312:4
**dr** 74:4,4,10,16 75:6,9 76:20 76:22 118:2 120:3,4,24,24 122:23 124:19 158:21,21 258:19,19 288:19 319:11
**draft** 58:25 143:23,24
**drafted** 58:21 65:25 66:4,25 67:5 111:15 120:11
**drafting** 70:18 70:25 73:16 78:25 79:11 99:18 113:23 116:25 117:4 118:24 185:13
**drafts** 14:25
**drawing** 155:3
**dressings** 246:13
**drive** 2:11,19 3:14
**dropbox** 113:9
**drug** 24:3 199:12 206:11
**dry** 229:22 271:24 272:15
**drying** 90:23
**dstanner** 4:13
**dudley** 4:3
**due** 64:14 234:4
**duly** 7:23 325:11
**duration** 278:23
**durations** 189:23 190:17

**e**

**e** 2:2,2 3:2,2 4:2 4:2 7:22,22 30:10,21,22 31:8,8,8,8 37:22 42:11 78:2,2 102:22 102:22 181:2,2 181:4,4 213:25 266:9,9 270:17 270:17 272:6,8 276:11,13,13 276:13 283:11 283:11 325:2 326:2,8 328:3 328:3,3
**earlier** 63:13 70:23 93:12 100:16 105:7 110:25 112:10

117:12 128:6 135:2 137:13 145:16 155:10 165:2 176:23 191:10,13 205:10 236:20 242:9 255:3 294:12 323:12
**early** 80:24 99:16 319:8
**easier** 50:3
**easily** 85:11 98:3 255:13
**east** 3:17
**eastern** 1:3 6:23
**easy** 115:3 268:4 310:19
**eckert** 4:7
**eckertseaman...** 4:9
**eczema** 31:6 42:8 272:16
**edcs** 59:7,9,12
**edt** 6:4
**education** 27:13
**educational** 28:2
**educator** 22:6
**effect** 5:12 26:25 40:8 41:23 43:8 57:15 83:14,18 83:20,21 85:15 97:11,12 154:24 166:10 174:8 185:15 192:20 195:12 206:8 224:6 225:7,12,15 226:5 227:10 227:12 234:11 234:20,23 236:5 237:6,10 274:6 276:5 282:12 286:7 289:12,20 293:6 298:23 307:3 312:4
**effectively** 276:18
**effects** 16:6 23:17,19 24:18 27:3 40:5,6 42:25 54:21 85:17 86:3 89:8 97:18 108:18 130:16 146:22 154:2 155:2 197:2 214:6 222:25 238:8 241:20 247:2 248:8 249:24 250:10 250:21 273:20 273:21 274:2 275:22 277:9 277:12 285:13 298:9 311:7
**efficacy** 39:18
**effort** 263:2
**eight** 126:17,18 175:7,8 205:11
**either** 12:10 33:13 68:10 73:22 84:10 120:7,23 176:23 210:10 245:20 277:22 279:2,3
**electronic** 21:4 37:16
**elongated** 303:4
**eloquently** 197:5
**elucidate** 130:22
**embarrassing** 91:9
**emily** 4:5
**emily.robinson** 4:6
**emotional** 52:23
**emphasize** 309:16
**employ** 73:15 137:4
**employed** 8:23 9:3 158:4
**enable** 88:11
**encompass** 25:14
**endocrine** 52:11,14 53:15 53:21,25 54:11 54:14,25 55:5 55:11,23 56:8 56:21 60:6 61:5 62:15 298:12
**england** 287:15 290:4,16 297:16 302:13 305:25 307:11 308:8 309:5,22
**enhancers** 177:16 214:18 216:8
**enhancing** 284:7
**enrolled** 87:13
**entire** 28:11 119:10 194:14
**entirely** 64:8 262:8 280:21
**entirety** 165:9 191:16 319:19
**entitled** 110:25
**environment** 115:13
**environments** 219:23

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 352 of 409 PageID #:75801



**enzyme** 276:9 276:16
**epa** 135:17 136:12
**epa's** 135:19 136:9
**epi** 151:12 314:15 316:14 319:15 320:13 320:14
**epidemiologic** 58:25 108:17 125:21 134:3 147:6 148:9,17
**epidemiologist** 87:15,17,18 149:8
**epidemiology** 58:22 66:3,5 66:10,14 86:7 86:9,14,21 87:6,22 116:11 129:18 130:13 133:21 148:2 148:21,24 149:2 151:10 314:17
**epidermal** 105:12 183:6 198:14 199:2,8 200:6 223:4 254:7 257:4
**epidermis** 84:5 85:9 201:22 214:12 224:8 231:16 251:12 254:21 260:5 263:9
**episode** 295:5,8
**epithelium** 184:3,11 326:15
**eroded** 246:8 246:22
**erosion** 278:19
**err** 267:10
**errata** 327:11 327:13,16
**error** 159:18,19 159:20,20
**erythrodermic** 283:10
**especially** 52:19 53:4 95:9 230:4 247:14 277:15 318:7
**esq** 2:5,8,12,15 2:16,20 3:5,10 3:15,18,22 4:5 4:9,13,17,21 327:1
**essence** 82:15
**essentially** 24:8 87:4 97:21 204:17 248:20 268:9 272:7 316:19
**established** 249:17 310:5
**et** 29:18 85:24 104:16 133:7 155:6 183:2 184:20
**ethanol** 177:18
**ethically** 194:9
**ethylene** 303:6
**evaluate** 86:16 150:20 176:10 196:14 209:14 209:17 303:21 303:23 308:19
**evaluated** 150:22
**evaluating** 38:10 62:21 153:17,21 196:8
**evaluation** 38:14,17 68:20 69:2 98:20 133:6,10,22 137:12 143:15 144:25 145:4 203:18 317:25
**evaluations** 36:25
**evaporation** 282:12
**event** 101:23
**events** 70:9 151:20,22 152:14
**eventually** 39:13
**everybody** 131:18 150:4 273:15
**evidence** 130:20 132:23 132:24 133:4 134:3,7,17 135:9,18,20,23 135:25 136:4,7 136:9,13,16,19 137:25 138:7 138:12 141:18 141:24 142:3,6 142:9 145:8,19 147:23,24 149:13,15 156:20 158:5 159:3,21 171:12,20 258:25 259:12 259:17 260:10 261:8 264:10 264:14 307:8 317:25
**exacerbate** 228:17
**exacerbation** 222:21
**exact** 87:9 94:13 101:7 210:8 247:16

248:17 293:6 313:15
**exactly** 11:13 207:21
**examination** 8:3 97:22 181:11 323:4 325:12 326:5
**examined** 8:2 181:7
**example** 24:13 29:16,20 30:6 30:23,24 34:9 40:17 43:15 59:14 66:12 84:13 101:13 108:2 135:11 140:15 153:14 176:6 213:19 216:7 217:13 220:21 222:19 224:20 225:20 226:21 227:13 229:23,25 232:23 238:21 239:8 240:10 242:6 248:25 249:6,16 266:7 268:3 269:3,16 270:16 271:11 271:21 273:24 273:25 275:7 283:7 284:18 301:17
**examples** 133:11 228:22 240:5 266:19 312:5
**except** 5:8
**excessive** 244:23 245:3 245:15 246:2 246:19 248:18
**excessively** 245:22
**exclamation** 151:11
**exclude** 118:8 118:12
**excluded** 118:6 143:4,19
**excoriation** 229:19
**excuse** 64:21 167:20
**exerting** 16:5
**exhibit** 13:3,9 14:6 21:2,10 70:13 88:3 183:18,22 184:5,8 208:15 243:3,6 290:12 326:11,12,13 326:16,17
**exhibited** 202:4
**exhibits** 13:15 13:19 21:4 124:22 183:21
**exist** 62:21 93:9
**expand** 158:13
**expect** 153:3 191:19 216:3 225:2 232:3 251:17 255:9 260:4
**expected** 274:6 278:12
**experience** 88:15 100:13
**experiences** 77:15
**experimentat...** 264:6
**expert** 15:10,22 21:6,8 63:19 71:25 73:25 74:2,21 112:9 113:19 120:5 120:19 142:15 147:21 157:12 326:12
**experts** 15:5 70:24 71:6
**explain** 213:14 220:11,24 241:4 252:14 256:15 266:20 291:12
**explained** 257:7
**explaining** 45:23
**explanation** 24:25
**explanations** 75:23
**explanatory** 112:4 198:23
**explode** 44:19
**exposed** 147:10 183:3 269:22 303:7
**exposure** 59:24 59:24 104:18 104:23 105:24 108:6 127:17 146:7 147:2,3 157:8 171:11 171:22 189:9 189:23 190:9 197:23 198:8 198:11 201:11 201:12,21 203:6,14,25 204:3 207:2,2
**exposures** 207:3 310:11
**extent** 53:24
**external** 282:22
**extrapolate** 194:4
**extrapolating** 261:15
**eyelids** 219:18
**eyes** 35:2

**f**

**f** 42:14 43:17 181:2 253:21 275:10 325:2
**faad** 13:8 326:12
**fabricated** 133:23
**face** 219:23
**facilitate** 212:22 216:9
**fact** 241:14
**factors** 236:9 240:24 246:25
**failing** 292:16
**fails** 327:18
**fair** 12:20 20:14 60:12 120:16 203:11
**fairly** 30:17 61:22 112:3 198:23
**familiar** 15:15 17:19,23 66:16 66:19,21,23 81:21 150:7,9 161:5,6 162:5 321:7
**family** 272:7
**far** 48:19 76:5 255:15 259:19
**fashion** 152:14
**faster** 209:10 255:13 285:3
**fatal** 237:23
**fatality** 238:16
**fate** 321:8,11
**fatigued** 276:22
**favorite** 150:5
**fda** 36:8 39:5,6 39:7 40:2
**fear** 44:17
**features** 196:9 215:24
**federer** 3:15
**feel** 104:12 119:23 184:16 238:10 263:4 276:21,22 318:14,24 320:9
**feldmann** 244:14
**felt** 75:12 78:10 117:19 119:10 249:11 297:17
**female** 33:16 268:9 287:17
**fetal** 274:25
**fetus** 267:21
**fewer** 285:18
**fiber** 202:5
**fibres** 184:3,12 326:15
**field** 22:11 76:25 81:13 124:2 149:3 213:17 257:8 263:5,12
**fifth** 92:22
**figure** 50:17 194:22 197:16 197:25 198:11
**filed** 6:20
**filing** 5:4
**filtered** 303:19
**filters** 56:13 163:15
**final** 117:5 143:24
**finalized** 111:16
**finally** 8:6
**financially** 7:12
**find** 29:11,13 75:20 77:5,8 77:16 81:6 91:13 101:2,9 101:10 104:3,8 104:19 107:19 107:24 109:22 117:23 118:5 118:15 137:15 164:25 171:20 197:10 208:22 247:14 259:18 266:18 307:4
**finding** 297:19 297:21
**findings** 195:7 195:9 196:4
**fine** 70:6 200:20 314:10
**fingertips** 53:6
**firm** 7:7
**first** 9:7 21:24 39:3 52:12 63:14,16,22 70:16 96:21 102:11,13 153:13,23 161:9 162:2,15 182:25 197:16 197:18 204:19 208:9 216:24 243:25 244:14 244:24,24 266:6 273:19 290:23 295:4 302:8,23 309:20,21
**five** 71:8 131:25 264:23 322:10
**flaring** 272:16
**flat** 253:10
**floor** 1:13 4:8 4:16
**florida** 3:10
**flowchart** 136:24
**flung** 259:19

**fluorouracil** 275:8,9,20 280:8 282:2
**flushing** 118:3
**foam** 214:4
**focal** 201:22
**focus** 22:23,25 23:11 24:6 62:22 122:25 132:17 148:10 177:25
**focused** 298:8 314:17
**focuses** 22:12
**focusing** 117:20
**folds** 219:20
**folks** 139:23
**follicle** 75:24 82:8 255:22 256:7,23 260:13,24 262:4,6 263:4 324:2
**follicles** 16:4 220:20 252:24 252:25 253:3 258:6
**follicular** 263:10 323:6
**follow** 40:10 324:12
**followed** 190:7
**follows** 8:2 29:4 181:8
**force** 5:12
**forearm** 220:6 220:22 242:11 242:19 244:6
**foregoing** 329:5
**form** 5:8 49:19 54:4 68:24 75:8 95:8 96:4 103:11 104:25 106:16,22 118:10 131:15 134:9 144:9 145:13 148:5 152:4 156:8 158:8 160:9 165:23 166:18 167:9 171:16 173:10 175:2 191:5 192:9 193:23 200:13 211:2,6 217:8 221:11,20,21 232:12 235:6 250:4 256:13 258:15 259:16 260:15 264:17 266:12 270:14 275:13 289:3 292:3 296:2,24 299:15 300:11 306:7 307:16 308:13 313:5 313:25 315:22 317:4,21 318:13 320:4 320:24
**formal** 81:9 86:7
**formaldehyde** 163:8,9,22,22 164:21 165:12 165:16,19,20 165:24,25 166:2,4,6,11,14 166:23 167:2,6 167:11,14,24 167:25 168:15 168:16,18,19 183:4 186:17 187:16,18,22 188:2,7
**formalized** 136:15 138:9
**formation** 127:13
**formed** 110:3 212:8 307:10 319:10
**forms** 60:5 301:2
**formula** 205:25
**formulate** 68:14 119:14 119:25 133:10 141:21 147:20 150:11 175:4 206:18 308:20 320:15
**formulated** 17:5 122:9 159:11
**formulating** 100:19 118:16 127:24 157:12 174:22 321:2
**formulation** 183:4 186:14 187:8 188:18 206:2,22 214:11 221:13 254:3 270:19 270:21 271:18 272:12 275:15 280:11
**formulations** 177:19 179:16 271:7,13,16,21 291:16
**forth** 185:2 325:11
**fortunately** 250:6 279:19
**forward** 12:16
**found** 75:22 98:17 107:3 166:23 172:13 188:3 206:25 258:23 304:17

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 356 of 409 PageID #:75805



**foundations** 87:3
**four** 86:24
**framework** 47:15 111:10 135:18,20,23
**framing** 105:24
**franklin** 4:16 7:25
**frequency** 125:24 126:13 127:18 147:5 155:5 175:5 205:13,17 279:3 293:14 298:9,11
**frequent** 175:12 205:22 233:25 286:18
**friendly** 254:13
**full** 113:15 243:25
**fully** 62:21
**function** 130:23 202:17 259:25 323:7
**functionalities** 216:22
**further** 5:7,10 181:7 216:17 268:25 316:23 322:24 325:15
**future** 53:11 77:20 268:19 320:14

**g**

**g** 7:22 30:22 42:11 171:2 181:4 266:9 276:13
**gain** 31:15
**garden** 7:25
**gary** 2:5 8:14 179:17 327:1
**gel** 96:6 270:19 270:21 271:7
**general** 16:17 20:4 72:7 76:17,20 82:2 91:19 93:25 121:13 129:4 144:14 148:25 156:19 160:4 160:11 219:24 224:5 234:19 251:2 266:4 269:10 274:4 308:15 310:10
**generalizable** 125:22
**generalization** 166:20 232:19
**generalizations** 75:10,13
**generalize** 62:14 82:24 208:5 232:15 312:3
**generalized** 30:6,25
**generally** 33:15 48:10 69:21 94:10,17 96:20 99:20 101:15 101:21 125:7 125:19 126:16 156:15 178:11 209:20 222:18 223:19 270:15 275:15 279:24 317:24
**generate** 88:23
**generated** 88:25 142:18
**genetic** 230:25
**georgia** 4:5
**gerel** 2:7
**getting** 8:6 11:11 20:16 154:15 313:11
**ginex** 2:19
**give** 27:13,21 51:16 61:7 65:5 66:12 74:21 76:11 89:3 137:16 140:14 150:16 174:20 183:17 210:8 222:20 268:3 283:14 285:11 301:17 311:10
**given** 9:18 52:9 52:17 59:6,8 59:12 61:9 76:24 114:3 324:19 325:13 329:9
**giving** 11:3 62:23 285:18
**glycol** 177:17 177:25 178:5 178:11,23 179:2,8 214:19 215:11 216:6 216:12,20 218:22 303:6
**glycolic** 291:20
**glyoxylic** 287:21,25 290:3,11 292:6 292:9,13 293:24 294:4 297:13 326:18
**go** 6:12 11:15 11:20 14:13 16:21 20:10,20 30:19 37:8 38:22 42:24 45:21 48:18 67:3 71:17 82:12 96:13 98:13 101:15 102:18 103:22 110:9,12

118:14 132:2 132:16,18 139:13 162:9 169:24 171:7 181:21,24 185:18 197:15 205:3 210:7 214:15 250:11 264:6 275:21 312:15,17 313:7 314:14
**goal** 23:24 224:6 225:3,5
**goes** 10:25 34:24 47:22 183:8 190:4 227:23 234:9 255:16
**going** 6:3 8:21 10:4 12:10,22 13:2 17:17 20:21 35:8 39:22,23 40:21 41:21 43:7 44:23 45:4 48:18 49:2 52:23 71:11 81:22 87:11 106:11 108:22 112:22 131:15 131:24 132:2,6 132:16 162:21 174:16 179:18 179:25 183:22 191:17 194:21 195:21 200:24 211:16 217:17 219:2 221:3 222:23 226:13 233:4,19 235:3 247:25 254:13 254:17 257:11 264:8,24 265:7 265:11 267:10 269:4,7 271:22 278:22 286:18 322:11,17 323:10 324:17
**goldberg** 3:21
**goldbergsega...** 3:23
**good** 6:2 8:5,24 27:18 93:23 97:15 116:13 181:18 182:11 279:14 281:14
**grab** 313:7
**gram** 127:20
**grateful** 93:22
**great** 53:3 54:19 117:17 183:15
**greater** 234:4 252:11 254:17 254:24 277:24
**groin** 219:20
**grossed** 196:13
**ground** 10:4 174:17
**group** 189:14 190:15 197:17
**grouping** 189:9
**groups** 189:17 189:20 190:5
**growth** 191:10
**gshipman** 2:5 327:2
**guess** 30:3 33:17 39:4 77:18 86:22 94:16 103:9 114:15 116:13 124:25 136:18 162:16 182:11 197:9 199:4 223:8 250:5 253:6 268:21 272:4 285:8
**guessing** 120:11 321:17
**guideline** 135:15
**guidelines** 46:20,20 162:7

**h**

**h** 30:22 37:22 42:11 213:25 244:13 256:19 276:11,13 283:11 326:8 328:3
**hair** 1:4 6:18 15:25 16:4,19 16:23,25 17:3 17:8,10,16,21 17:22 18:2,5,7 18:17,20,22,23 19:8,15,16 24:15 25:12 49:3,5,9,10,14 49:17,25 50:18 50:19,22 51:9 51:13,19 56:22 56:25 57:18,25 58:4,11,12,18 72:25 73:5,8 73:11 75:24 82:7 88:17 89:5,19,24,24 90:5,10,24,24 91:6,9,11,20,23 92:2,7,10,12,18 93:8,13,14,24 95:3,4,11,17,18 95:20,24 96:2 96:7,9,10,11 97:17 98:23 99:24 100:11 100:22 104:3,5 104:7,9 105:3 105:13 106:14 106:21 107:4,9 107:13 108:8 108:10,12

109:2,15,19 110:6 118:20 119:6,18,20,22 121:8,14,21 122:2,5,11,14 122:19,20 123:3 124:6,15 124:16 125:8 125:18 126:10 126:15,20,22 127:3,8 128:14 129:11,12 130:14,23 131:9,10,20 134:25 145:22 146:8 147:17 148:12 151:2,7 151:15 157:17 160:5,6,12,13 160:22 161:2 161:15,20 162:12 164:10 164:14,23 165:15,17 166:24 167:17 168:4,8,11,22 169:5 171:14 171:22 172:12 173:12,21 174:7,9,13,15 175:16,20 177:18 178:5 178:15,17 179:4,10 182:3 184:2,3,11,12 185:10,16 186:13,15,24 187:9,11,12,13 187:19,20,24 187:25 188:3,8 188:12,14,16 188:18 189:22 190:18,19,21 190:24 191:3,7 191:11,19,25 192:2,6,19,21 193:11 195:5,6 195:8,14 205:8 205:25 206:2,4 206:22 209:16 209:18,24 210:17 211:6 212:7,11 214:22,25 217:4,5,12,15 220:20 234:2 236:20 252:8 252:24,25 253:3 256:6 258:5,8,22 259:12,13 260:11,12,17 260:24 261:14 262:4,6 263:3 264:14,20 287:19 288:2,5 288:10,12,24 289:8,10 290:2 290:10 291:3,7 291:8,13,21 292:4,10,14,17 292:19,25 293:5,7,15,17 294:2,6,8,15,24 295:9,16,24 296:19 297:23 298:6 299:8,21 299:24 301:14 301:22 303:8 304:10,21 305:8 306:15 306:20,21 308:9 310:2 311:24 312:2 313:2,20 315:5 316:25 319:24 320:20 321:5 323:9,18 324:4 324:5 326:14 326:15,18 327:4,4 328:1 328:1 329:1,1

**half** 14:9 53:23 323:3

**halfway** 182:7 186:6 208:25

**hand** 12:23 57:24 96:23 172:4 252:18 325:21

**handed** 290:15

**handful** 60:17

**handle** 97:15

**handled** 92:9 92:11

**happen** 12:5 85:25 129:14 152:13 156:17 157:2 242:6 279:22 291:20 307:25

**happening** 35:15 156:21 198:20 202:7

**happens** 97:11 130:10 151:7 262:2 276:14

**happy** 76:11 99:4 118:13,14 135:13 162:8 178:20 314:2

**hard** 48:8 69:9 129:23 176:9 208:5 217:16 247:7,11 257:17 269:5 284:15 310:12 314:19

**hark** 153:12

**harkens** 130:7

**harm** 244:22 296:17,20 298:22 299:11 300:9

**harms** 296:17
**hash** 111:10
**hazmat** 45:2
**he'll** 44:20
**head** 44:18 46:14 51:3
**headaches** 236:23 237:4
**heading** 189:8 193:3
**health** 54:22
**hear** 10:14 47:21 136:3 296:15
**heard** 18:2,4 65:21 161:10
**heat** 90:2,3,5 90:21 293:8
**held** 1:12 12:25 45:20 57:3 80:9 84:22 132:5 153:20 179:24 200:23 212:2 242:25 243:20 247:24 306:10 314:13 324:15
**helm** 165:5 169:21 170:8 170:23,25 176:24
**help** 42:23 46:5 49:20 130:22 151:6 212:22 313:8
**helped** 42:18
**helpful** 36:5 101:19 107:19 109:22 122:22 123:6 165:2 169:20,22 172:17,21,22 203:18 204:8 249:14 296:11 296:13 307:4 307:25
**helping** 43:12 133:9
**helps** 238:11
**hematologic** 23:7
**hereinbefore** 325:10
**hereto** 5:3 329:7
**hereunto** 325:20
**hey** 278:21
**heyl** 4:20
**heylroyster.c...** 4:22
**hi** 8:24
**high** 33:10 194:11 241:17 252:25
**higher** 244:6 271:21 272:12
**highest** 207:8
**highlight** 221:5 240:6,23 241:14 288:13
**highlighted** 288:16
**highlighting** 103:14 304:5
**hill** 66:17 115:12 116:8 150:6,8
**hill's** 150:12
**histopatholog...** 183:24 184:9 196:3,5 326:13
**history** 31:13 125:6
**hit** 215:22
**hives** 30:18
**hold** 87:14 199:6
**hole** 48:19
**holistically** 260:9
**home** 92:6 93:3 208:16 283:15 283:16 290:7
**homes** 253:3
**honest** 245:20 279:15
**honestly** 210:8
**hopeful** 101:9
**hopefully** 10:23 46:4 50:13 223:9 232:7
**hoping** 47:5 258:17
**hospitalized** 283:20
**hot** 61:23 90:22 90:24,24
**hour** 71:9 72:2 131:24
**hours** 26:20 72:5,9,10,17,23 131:13,19 245:22,23,25 246:19,20 318:19
**house** 3:16
**housekeeping** 71:18 110:8
**huh** 9:17 15:14 25:18 44:6 48:24 70:11,14 78:23 99:22 110:10 113:25 185:22 186:4,9 197:19 198:2 203:12 219:13 227:20 255:24 309:19
**huhs** 11:5
**human** 39:13 194:12 320:10 320:11 321:25
**husband's** 73:18

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 360 of 409 PageID #:75809



**hydration** 227:13
**hydrocortisone** 213:23 214:8 214:10 220:2,5 220:13 222:4 222:15,22 223:18,23 226:22 244:16 244:18
**hydroxide** 164:12 183:5 186:18 187:15 207:7 217:13
**hypothesis** 160:16 261:7

**i**

**iarc** 161:6,13 161:14,19
**idea** 36:7 37:11 38:8 126:19 245:13 288:22
**ideal** 215:5
**identical** 190:8
**identification** 13:10 21:11 184:6 243:7 290:13
**identified** 154:17 179:9
**identify** 52:4 307:13
**ihskinperm** 78:5,8
**ii** 189:20
**iii** 189:20
**illinois** 1:2 2:11 2:15,20 3:5,14 4:12,16 6:22
**image** 204:23
**images** 204:6 209:2
**imagination** 256:16
**imagine** 77:20 143:16 283:12
**immune** 42:25 43:4
**immuno** 34:17
**immunosene...** 31:7
**immunothera...** 42:4
**immunothera...** 23:16 42:22 43:2,3 67:23 104:16
**impact** 183:25 184:10 216:4 229:6 255:6 298:13 326:14
**impaired** 199:9 202:25
**impart** 267:20
**implausible** 152:25
**imply** 323:18 323:19
**important** 43:12 44:11 62:3 69:3 90:18 115:8 118:16,23 127:18 134:21 166:9 219:3 228:4,5,18 235:10 236:10 237:23 265:25 266:5,14 267:23 286:25 287:2,13,14 289:6,13 297:19 303:12 304:4 310:6 314:16
**importantly** 276:8
**impossible** 95:22 306:19
**improve** 85:4 177:20,21 284:12,13 285:2
**inaccurate** 118:11 119:2
**incidence** 101:18 149:4 167:13
**incidents** 66:11 151:13
**inclination** 208:9
**include** 69:17 117:18 133:12 133:17 145:9 163:8 169:11 170:19 219:25
**included** 170:3 193:19 220:7
**includes** 50:22
**including** 59:22 89:8 95:18 170:21 185:9 186:17 189:2 189:18 194:15 220:10 256:7 283:21
**inclusion** 218:22
**inclusive** 121:21
**increase** 178:12 215:13,14 218:18,21,23 231:8 246:15 281:21 282:4 282:18 283:4,6 287:4
**increased** 24:14 129:17 129:18,20 151:13 161:3 185:8 203:4,9 219:10,15

221:5 231:4,6 231:18 232:4 232:10 233:2 235:9 239:13 242:2,7 249:4 249:8 252:10 253:8 305:5 314:18 315:2
**independent** 120:6 207:10 207:13
**indication** 279:7
**indicative** 201:12 203:7
**indicator** 304:13
**individual** 73:9 92:15 107:20 114:8 133:20 147:12 179:7 211:11 212:11 271:19 308:19 309:4
**individually** 202:24
**individuals** 126:4 295:23 311:16
**induced** 243:4 326:16
**industries** 4:15
**inert** 235:21
**infection** 278:20 279:10
**inflamed** 278:14 284:22
**inflammation** 196:18
**inflammatory** 301:8
**inflexible** 254:11
**influence** 195:9
**inform** 86:2
**information** 35:14 36:13 37:17 50:16 53:5 60:4 62:23 74:25 75:15,17 78:10 80:23 100:5 101:19 104:13 107:25 114:14 114:15 122:8 123:9,13,16,24 124:23 125:12 125:14 130:3 130:19 154:7 155:4 157:13 160:14 169:20 172:2,6 187:2 188:22 192:11 193:9,19 204:23 206:16 226:23 254:2 260:7,9 261:2 261:15 264:19 264:21 291:18 294:17 310:25 311:10,21 314:19 317:10 318:6
**informed** 60:8 61:7 62:18 87:20 263:25
**infundibulum** 253:19,23 254:4,5,14
**ingest** 83:5
**ingesting** 226:5
**ingredient** 94:2 94:6,8,8 102:20 107:17 123:20,21 127:4 133:13 133:15 163:24 164:5,21,22 165:21 166:7 167:3 168:7,12 177:17 178:20 178:22,24 207:14 211:11 212:19 217:2,3 217:11,17,17 218:3 251:17 257:21 260:21 270:11 288:2 293:25 294:5,8 307:13 320:20
**ingredients** 56:7 62:13,22 92:15 95:10 102:24 103:16 107:12,20,25 108:20,24 109:3,10,17,21 109:23 117:21 118:18 121:13 122:11,14,24 123:5 130:8,9 162:17,18,25 163:3,5,8 164:7 165:7,10 169:5 171:3 176:16,22,23 177:4,5 186:17 188:24 189:3 206:9 207:5,19 208:7 210:19 210:23,24,25 211:5 212:6,12 212:21 214:21 214:25 215:6 216:10 234:3 257:2 260:19 293:3 294:22 300:7 305:7 321:4
**inherent** 225:8
**inhibitor** 41:3
**inhibitors** 41:3 41:6

**initial** 112:20 189:20 190:7
**initially** 19:4 41:17
**initiate** 33:25
**inject** 223:17 223:20 238:5
**injection** 223:18
**injury** 49:5,16 287:18 289:12 289:25 290:9 291:2 295:9 297:12 299:19 299:21,22,25 300:4 302:12 302:16 305:24 306:16 307:14 326:17
**inner** 220:5,21
**inpatient** 28:21
**input** 48:9 70:24 73:14
**inside** 9:7
**insight** 75:19
**insofar** 77:9
**insomnia** 224:24
**instance** 10:21 135:17
**instances** 10:16 20:11 137:23 138:5 278:25
**institution** 27:20
**instruct** 92:5
**instructions** 96:8 124:5,10 124:14,21 191:8,24 192:13 230:6 247:15
**intact** 212:17 213:6 215:5 227:25 228:9 229:4,7,10,12 229:13,24 230:11,12,13 230:23 231:10 231:19,24 232:3,5,9,16 233:6,14 240:9 241:18 246:4,8 251:11,15
**integrity** 234:5
**intelligent** 87:20
**intended** 83:20 95:5,25 96:6 191:6 220:25 225:12,14 226:4 227:9,12 234:11 241:5 241:15 250:9 288:24
**intending** 241:6
**intensive** 38:23
**intent** 94:18,25 222:24 223:11 289:9
**intentionally** 135:14
**interact** 57:11
**interest** 53:4 54:19 86:12
**interested** 7:13 74:13 78:9 172:3 227:24 258:17 325:18
**interesting** 41:8
**interestingly** 37:3 165:13
**internal** 30:14 241:5
**internally** 236:5 265:19 300:23
**international** 161:6,23
**internationally** 27:22
**interpreted** 11:7
**interrogate** 93:4 319:19
**interrupt** 44:5
**interrupted** 254:15,16
**interruption** 200:15 211:14
**interval** 205:6 205:7,19
**interventions** 69:9
**intoxication** 303:7
**introduced** 8:8
**invagination** 252:10
**investigation** 316:23 317:7
**investigative** 52:4
**invoice** 72:13 72:13
**involve** 39:11 62:8 134:17
**involved** 26:23 27:8 34:19 36:4,20 44:2 63:18 64:6,13 86:19 212:15
**involvement** 131:7 148:11 280:3
**involves** 23:21
**involving** 16:18 41:13 64:3 66:2 302:16
**irregular** 199:16

**irregularities** 206:25
**irregularity** 198:13 200:6 201:17 203:24
**irritant** 51:11 51:11,18 173:14 271:25 275:24 277:5 300:18 302:3,9 302:10
**irritating** 271:23
**irritation** 272:14 277:21 299:6,13,23 300:8,13,20,22 301:6,13,17,21 302:2
**irungu** 170:25
**island** 9:4 27:10
**isolate** 310:20
**isolation** 109:24 163:4
**israel** 290:25
**issue** 121:9 179:4 206:5,23 224:25 232:22 288:3 292:10 294:9,13 308:9 319:14
**issued** 161:15 161:20
**issues** 24:15 27:16
**itch** 30:6,7,24 30:25 36:14 42:11 300:24
**itchy** 41:12
**items** 115:10 170:6
**iv** 82:11 189:21

**j**

**jar** 283:14
**jelly** 84:15
**jf** 3:20
**jlapointe** 3:19
**jnzegwu** 4:9
**job** 1:25 50:2
**john** 3:3
**joke** 82:21
**jordan** 3:18
**joseph** 2:15
**journal** 193:2 287:15 290:4 290:16 297:16 302:13 305:25 307:12 308:8 309:5,23
**journals** 46:21
**judge** 1:6
**judith** 1:14 7:7 325:6,25
**judy** 44:16
**julian** 4:23 7:3
**jump** 194:21
**jumping** 131:22
**junction** 198:14 199:2,8 199:15 200:7 201:18
**justina** 4:9

**k**

**k** 2:5,7 29:21 37:22 327:1
**kaposi** 29:20
**kaschank** 4:17
**kasting** 74:4,16 76:22 112:10 118:2 120:3 143:15 258:19
**kasting's** 76:20 120:24 158:21
**keep** 10:11 25:3 101:13 133:14 143:20,22 272:24
**keratin** 19:7 291:15
**keratinocyte** 201:25
**keratinocytes** 202:23
**keratosis** 275:17 277:19
**kevin** 2:16
**keywords** 98:14,15
**kidney** 287:17 289:12,25 290:9 291:2 295:8 296:21 297:12 299:11 299:19,20 300:6 302:11 302:16 303:19 305:24 306:16 307:4,14 326:17
**kind** 9:22 14:3 18:11 19:3 23:16 24:18 25:13 27:4 30:25 37:5 38:3,6,7 41:18 46:13 49:20 55:9 57:23 65:6 73:9 77:3 82:2 86:19 89:11,23 90:13 90:25 94:6 97:2 99:4 101:22 102:4 106:3,21 107:8 107:10 109:18 111:10,15 124:20 125:24 135:11,23 139:6 140:14 144:12 148:15

148:25 149:3 149:14 150:23 156:16,21 166:3 176:18 179:12 192:10 202:16,19,21 203:17,21 204:20 209:19 213:19,23 214:2,24 219:22 221:21 223:11 225:9 232:17 235:19 236:19 240:23 246:16 252:17 258:25 259:3 259:19 262:8 263:23 265:13 273:13 274:20 279:6,17,21 281:11,15 283:16 292:16 293:6 298:3 300:14 308:15 313:7 319:6,12 323:10,19 324:7
**kit** 17:8 92:18 93:15 95:3,4 106:14 107:7 107:10 110:6 127:8 175:23
**kits** 93:18,25 94:24 164:11 177:6
**knew** 50:8
**knock** 276:24
**know** 11:13,15 12:8,14 14:2 16:15 18:11 24:21 27:19 29:16,24 34:13 35:20,25 36:15 36:25 37:8,18 39:12 41:17,18 42:3,4,22 43:18,20,24 48:9,12 50:3,5 50:7,10,11,14 50:17,25 52:2 52:21 53:10 54:22 55:14,20 56:5,16 57:13 57:23 58:10 59:16 60:14,17 60:24,24 61:20 62:22 63:5 65:5 66:10 67:20,25 68:15 68:20 69:8,17 69:19 70:8 72:4 74:22 75:13,16,19 76:6,11,23,24 77:2,11,17 78:15,17 82:20 82:23 83:6,24 84:5,17,19,20 84:25 85:5,16 85:18 86:10,20 87:2,10,19,21 89:17,23 90:2 90:11,23,25 91:13,17 92:3 92:5,25 93:5 93:17,21 94:19 95:9,16,21 96:10,21 97:6 97:7,19 98:3 99:5,18 100:2 100:3,4,9,20 101:3,4 102:4 102:7,24 103:19,24 104:14,17 106:7,18,18,24 107:18,21,24 108:8,10,13,16 111:25 112:2 112:16 113:5 114:14 115:20 116:2,5,14,22 117:4,6,8,10,11 117:23 119:9 119:13,23 120:2,5,13,15 121:16,17,23 122:10 123:4 123:12 124:7 125:22 126:23 127:11,14,17 127:19 128:8 129:6,10 130:15,16 131:5,6,11 133:11,12,16 134:20,22 136:18 137:7 138:21 139:5,6 139:10,14 142:14 143:24 146:18 147:6 147:10,22 148:7,8,13,18 148:19 150:15 151:5 152:8,9 153:2,5,11,11 153:22,23 154:2,21 155:12,16,20 155:22 156:16 157:12,17,21 158:23 159:12 159:14,17 161:14,19 162:24 163:16 164:6 166:11 168:5 171:22 172:14 173:7 173:11,19 174:8,10 175:3 175:9,13 176:6 176:8,9,14,18 177:3 178:3,8 178:13,23 179:7,8 181:16

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 365 of 409 PageID #:75814




181:23 186:22 186:22 187:2 188:5,11,20 191:8,9 192:12 193:24 194:8,9 194:12 195:14 197:6 199:23 202:18 203:17 203:20 204:14 206:18,20 207:7,9,23 208:3,6,8 209:21,22 210:3,15 212:24 214:20 215:4,7 216:2 216:12 217:3,9 217:18,20 218:7,11,15,18 218:20 220:25 222:3,5,19,22 222:23 223:16 223:17 224:24 224:25 225:2 226:23,25 227:11,18 228:9 229:16 229:22 230:2 230:20 231:22 232:22 233:11 234:21,22 235:11,20,21 236:7,11,12,14 237:2,7,8,9 238:3,6,16 240:11 241:25 242:16,20 243:17 246:6 247:7,10,11 248:17 249:11 250:5,7,25 255:12 257:6 257:17 258:8 258:16,21,23 259:4,18 260:6 260:17,20,23 261:12,13,18 261:24 262:5 262:22,24 263:14,19,22 265:13,16,21 266:2,5,6,10,15 266:16,18,20 267:7,18 268:3 268:8,21 269:15 272:10 272:21,23 274:2,7 275:2 277:3,14,16,17 278:22 279:24 281:15,15,25 282:14 286:4,8 287:3 288:6,18 288:22,22,24 289:3,7,14,16 291:18,20 292:8 294:19 296:14,18,25 297:5,15,18 298:7,24 300:14,25 301:6,9 302:15 303:13 304:15 305:3 306:13 306:18 307:18 307:24 308:3 308:14,17 312:22 313:12 313:14,18,18 314:23 317:6 317:10,12,22 318:16,18,19 319:14 321:20 321:21

**knowing** 38:5,6 54:19 178:10 227:24 286:24

**knowledge** 85:19 119:12 123:23 127:16 164:11 306:25

**known** 17:25 66:17 94:13 166:23 192:20 194:11 257:9 259:21 274:15 276:4 294:15

**knows** 158:13 246:20 294:20 313:15

**kodachromes** 37:21

**kristen** 4:17

**l**

**l** 7:22,22 22:18 30:10,21 41:3 42:10,10,14,14 102:22 181:4,4 253:21 275:10 275:10

**label** 165:8,8 167:3

**labeled** 247:15

**labels** 121:7 122:4

**laboratories** 3:8

**laboratory** 105:23

**labs** 3:20 48:16 68:11

**lacking** 77:10 77:17

**lactating** 269:16

**land** 301:21

**language** 70:2 101:8 155:19 155:20,24 170:2

**lapointe** 3:18

**large** 41:13 213:9 251:12 255:14 280:2 286:17 308:17

316:18
**largely** 38:18
**larger** 209:10 318:2
**lasalle** 3:4 4:12
**lastly** 34:12
**late** 11:12
**law** 1:12
**lawsuit** 16:14 292:11 311:19 311:23
**lawyers** 10:3
**layer** 84:4 199:3,5,20,23 224:10
**layering** 83:7
**layers** 16:2 198:12,23 201:24 202:10 202:15,22 209:10 214:12 224:15 231:16 254:20
**lead** 108:14 212:23 235:8 260:22 286:19
**leads** 153:6,7 153:10 217:11 235:15
**learn** 86:16 139:6 205:24
**learned** 81:17 81:18
**learning** 119:5 119:7
**leave** 231:11
**leaving** 214:10
**lecture** 87:6
**lectures** 87:8
**left** 155:12 265:12
**legal** 4:23,24,25 326:9 327:23
**legal.com** 2:21
**lehnert** 3:22
**lend** 134:2 253:8 298:11
**lends** 45:23
**lesion** 29:8,12
**leslie** 3:15
**lessen** 277:23
**lesser** 203:15 279:13
**letting** 239:3
**level** 27:20 33:10 138:20
**levels** 264:10 266:21 269:20
**levitt** 1:12
**lexington** 1:13
**lfederer** 3:15
**liability** 1:5 6:20 63:23 64:19,22 65:21
**lidocaine** 237:22,22,24 238:5,8,15,23 239:10 240:13 241:4
**life** 24:3 39:22 41:9,10 239:15 241:12,19
**lifetime** 318:15
**light** 25:3 56:13 90:20
**liked** 100:8
**likelihood** 85:21 207:6
**likely** 12:5 84:10 212:16 213:8 215:7 251:6
**limitations** 317:13
**limited** 26:20 169:11 170:3 170:20 287:11
**line** 53:10 128:7 137:19 218:16 226:7,8 250:15 269:6 302:3 328:4,7 328:10,13,16 328:19
**lines** 109:11 233:20
**link** 100:24
**linked** 89:6
**liquid** 221:20
**list** 37:6 50:21 55:10 80:5 98:25 99:3,6 110:23 111:5 111:18 115:11 117:12,13 118:22 119:4,4 119:13 123:4 123:20,22 143:5,10,20,22 162:21 163:17 163:18 169:25 170:7 207:8 209:8 210:18
**listed** 14:10 114:11 163:23 163:24 165:7 167:11 168:7 170:22 276:10 294:19,22,24
**listening** 13:17 208:16
**listing** 14:15 162:16 170:4 171:7 188:19 294:23
**lists** 244:14
**litchfield** 2:14
**litchfieldcav...** 2:16,17
**literature** 18:15 57:8 58:8 61:4 88:10,13 89:2 89:21 93:7,22 93:23 96:25

97:23 98:6,9 98:11,16 101:3 102:5,14 111:20 112:6 112:20 117:16 121:20 125:17 127:15 131:14 133:4,7 134:19 138:16 139:16 142:10 145:20 146:13 149:17 158:11 159:6 159:16,21 160:20 163:11 168:15 171:21 173:3 240:6 298:4,8 316:14
**litigation** 1:5 6:20 15:16,17 16:13,18 49:22 52:13 63:15 72:6 89:16 90:7 131:7 134:23 148:11 155:23 188:13 206:5 298:6 305:5 319:9
**little** 11:12 36:5 40:18 52:3 55:6 77:17 83:17 84:2 85:7 87:24 90:12 94:20 100:12 106:24 118:3 132:17 134:13 171:18 183:11 195:18 200:7 211:24 237:21,24 239:24 253:2,6 265:8 267:2 268:24 288:7 293:2 294:12 300:4,15 323:11,14
**livenote** 1:14
**llc** 2:10 3:13 4:3,7
**llehnert** 3:23
**llp** 1:12 2:3,7 2:14 3:9,17,21
**local** 97:11 245:4
**localized** 85:15 103:24 192:15 222:25 224:6 225:7 227:10 227:12 234:11 274:6 275:21 298:25 311:25 316:8
**locally** 83:19 154:25
**location** 6:25
**logic** 47:22 74:14
**long** 9:4 11:13 24:15,16,18 27:10 182:13 255:22 258:13 260:12 262:16
**longer** 226:3 257:4 260:3 265:8
**look** 18:20 35:3 44:14 46:22 81:6 90:2 98:14 107:19 109:9,23 114:25 121:16 179:6,13,14 207:11 231:5 232:20,25 239:3 240:7 244:24 247:21 251:3 252:18 253:4,6 261:11 261:24 269:15 270:21 294:12 295:2 298:3 302:19 305:21 311:9 313:9 314:4,15 316:13,15,20 320:10
**looked** 14:3 77:22 97:7 104:8 106:17 106:20 107:3 117:12 122:24 133:13,19,20 135:4 171:21 199:24 257:22 261:3 271:10 288:5 307:18
**looking** 21:17 40:10 70:12 78:2 89:23 93:7 100:6 102:23 108:23 109:13,21 118:18 127:17 130:13 131:14 142:16 144:24 147:4,7 156:17 158:20 176:15 177:9 183:9,20 193:25 196:9 196:12 245:7,8 259:24 270:18 273:18,19 288:10 302:20 303:24 308:3 311:3,4,14 312:24
**looks** 8:5 35:5 38:20 102:5 146:13 155:5 203:19 300:20
**loop** 232:8
**loosely** 300:15
**loosened** 198:16 199:19 199:20,22
**loosening** 202:5

**loreal** 114:5
**lose** 231:25
**loss** 24:15 31:15 49:25 50:18,20 58:4 174:8 195:14 201:24 202:16 234:5 236:20
**lost** 174:14
**lot** 35:4 38:20 41:24 42:16 43:10 56:2 61:24 73:19 82:22,24 86:15 97:19 100:7 117:6 246:21 247:3,5,8 256:20 257:25 262:23,25 276:6 284:24 289:14 318:18 318:20
**louis** 4:21
**low** 240:12,13
**lower** 253:18 253:23 254:4 254:14 255:7 255:21 258:11 262:16 272:21 273:2
**lunch** 44:18 179:20 180:3
**lung** 23:5 29:16
**luster** 2:10 8:10 114:5
**lye** 19:9,10,17 19:17 90:13,13
**lynn** 3:22

**m**

**m** 1:6 22:17 29:21 30:22 31:8,8 36:16 37:22 42:11,14 42:14 43:17 102:22 244:13 253:21 256:19 276:11 283:11
**m.d.** 13:8 21:9 326:12,13
**ma'am** 324:9
**mablawfirm....** 4:6
**mack** 4:24
**made** 14:11 111:16 120:17 133:24 193:21 267:4 310:13 310:19 319:2 319:24 323:11 329:5
**madison** 2:14 4:8
**maibach** 244:12 256:18
**main** 3:21 22:23 50:12 68:5 76:7 94:5 138:14 213:3 215:22,24 225:16 228:6
**make** 10:19 14:21 15:9 20:9,12 35:21 40:18 46:17 48:11 50:2 60:8 64:10 67:6 68:12 85:10 91:20 108:11 109:4 111:23 112:11 117:2 143:5,10 146:12 174:23 175:4,23 176:2 176:14 187:5 192:3 193:20 203:17 211:13 212:4 227:21 230:2,13 231:24 244:19 266:21,24 278:3 296:10 303:14,15 304:14 306:21 307:22 315:17 318:25
**makes** 67:7,9 151:21 153:15 153:15 156:2 166:12 298:19 299:17
**making** 16:2,3 36:24 37:6 59:10 83:16 95:16 97:4 136:25 181:20 318:7
**malignancy** 31:11
**malpractice** 64:5,13
**mals** 64:18
**manage** 23:16 32:21 285:14
**management** 32:12
**managing** 23:22 25:6,9 25:11 57:13
**mandate** 16:8 88:7,24,25 89:18 96:22
**manifest** 77:13
**manufacturer** 75:18 101:4 123:9 165:8 172:4 259:5
**manufacturers** 124:16 172:7
**manufacturing** 77:2
**march** 1:8 6:4 325:21 327:3
**mark** 13:3 289:23

**marked** 13:9 21:9 70:13 88:3 184:4,8 243:6 290:12
**marker** 304:13
**market** 4:20 17:12 39:10 40:5 93:10 101:23 262:2
**marketed** 17:5
**marketing** 1:4 6:18
**marking** 20:25
**maron** 2:10 3:13
**maronmarvel...** 2:12 3:15
**marriage** 325:17
**married** 44:8
**marrow** 24:17 24:19 59:15,17 66:12
**marsh** 4:4
**marvel** 2:10 3:13
**mary** 1:6
**match** 13:15 48:3
**matching** 46:9 46:11
**material** 305:17
**materials** 9:14 9:16 80:3,5,18 92:4 110:25 111:4,4,7,17,18 111:19 115:11 115:23 116:21 116:24 118:21 118:22 119:3 142:23 143:3,6 143:11 144:19 317:17
**matter** 6:18 8:10 21:13,16 71:22,25 73:25 250:17 325:19
**matters** 236:16
**mcauliffe** 4:15
**mcbride** 3:8
**mcguirewoods** 3:17
**mcguirewoo...** 3:19
**md** 1:11 6:16 7:22 21:7 181:4 324:20 325:9 326:4 327:5 328:2,24 329:2,4,12
**mdl** 1:5 327:4 328:1 329:1
**mean** 25:2 46:19 50:2 69:5 73:8 90:21 96:24 98:10 102:17 113:18,23 117:9 125:9 126:3 131:4 132:25 133:24 144:6,10,13 160:14,17 167:18 176:9 182:19 185:13 196:6,21 199:20,22 200:7 210:7 221:12 222:6 228:11 246:5 251:21 254:10 254:11 257:15 271:24 280:19 286:2 297:2 299:2 302:14 311:23 312:13 313:14
**meaning** 18:17 28:13 59:23 224:9 232:19 256:25 272:14
**meanings** 233:9
**means** 152:8,12 198:19 216:15 246:21 301:18
**meant** 133:3 234:19 241:3
**measure** 269:17,19 274:21
**measured** 107:5 280:25
**measurement** 147:11,12 242:14,17 274:23
**measurements** 172:11
**measuring** 269:24 281:12 282:7
**mechanics** 97:6
**mechanism** 113:10 252:15 259:21 292:20 300:4 306:2
**mechanistica...** 260:22
**med** 64:18
**media** 6:14 324:21
**medical** 22:5 26:11 27:13 37:16 64:5,12 81:18 86:13 88:12 98:4 128:12 152:2,7 155:15 160:4 204:16 233:7 233:12,15 266:23 304:25
**medically** 151:21

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 370 of 409 PageID #:75819



**medication** 25:7 32:22 38:9,14 39:10 39:21,24 40:2 47:8 56:11,14 56:18,23,25 64:16 68:17,17 69:3,15 82:9 82:12 83:2,4 83:19 84:9,11 85:2 101:16,22 106:2 154:4 176:8 220:14 220:24 221:9 222:7,9 223:12 223:22,24 228:11 234:25 235:7,16,24 236:3,12 237:11,13 248:24 262:20 262:24 266:12 267:17,19 268:23 269:17 270:7,11,12 271:2,4 274:14 275:12 276:18 277:8,24 278:9 278:24 280:9 282:5 283:14 283:17 285:4 286:4,22
**medications** 26:25 27:3,5,6 31:3 34:24 35:23 36:8,17 37:2,10 38:11 38:22 39:16 40:22 42:5 46:22 54:17,20 54:24 55:4,21 55:25 68:7,21 81:17 82:4,17 82:25 83:12,13 83:25 84:7 85:10,14,16,21 97:8 98:22 100:17 194:5 216:5 220:13 220:18 224:5 225:13,18,18 226:3,15,19,24 227:9 228:16 230:7 234:10 235:12 237:14 237:16 241:7 241:10,15 247:9,18 250:8 261:18 262:14 262:15 263:3 263:15 265:22 266:3,7 267:5 267:12,14,25 268:14 269:6 269:12,21 270:4,5 274:5 285:11 287:12
**medicine** 26:12 27:9 152:10 287:15 290:5 290:16 297:17 302:13 305:25 307:12 308:8 309:5,23
**medley** 98:18
**meets** 199:3
**mehta** 2:20
**melanoma** 22:19 40:23 275:18
**mellott** 4:7
**membranes** 25:13 105:15
**memory** 63:2
**mention** 18:12 22:22 66:9 141:13,18 178:19,22 182:8 187:15 200:9 280:24 319:8,13
**mentioned** 25:4 46:6 53:19 57:22 58:7 70:23 78:19 82:16 93:11 98:5 112:24 150:3 163:21 168:24 177:2 179:11 188:10 189:4 200:3 251:7 262:14 263:11 288:9
**mentioning** 314:25
**messy** 283:18
**metabolite** 305:3
**metabolites** 303:23 305:6
**metastatic** 29:12,17,18
**methb** 245:2
**methemoglo...** 239:16,23 241:13 243:4 326:16
**method** 141:23 149:13 158:10 231:17
**methodologi...** 156:5
**methodologies** 137:8
**methodology** 74:14,22 78:4 96:24 137:5 138:10 141:14 144:23 145:9 149:19 156:14 158:4,22
**methods** 60:9 96:16,18 137:20

**metric** 145:5
**metrics** 141:20
**miami** 3:10
**mice** 183:3 193:16 197:9,9 303:7
**michelle** 2:8 8:16
**micrometers** 210:6,10
**microneedling** 85:6
**microphones** 6:5
**microscopic** 197:11
**middle** 91:10 91:12 177:8 197:21 281:3 302:24
**mild** 198:3,11 198:22
**military** 2:4
**milk** 269:18
**miller** 3:4
**milligram** 127:21
**milliliters** 193:10,13
**mind** 12:3 103:5 200:17 237:20
**mindful** 155:17
**mine** 182:12
**minimally** 198:17
**minimize** 53:7
**minoxidil** 236:19,21 237:5
**minute** 71:8 174:20 177:25 195:7 197:23 198:8,10 201:10,12 203:14,25 204:2 205:3,4 205:4 207:2,2
**minutes** 131:25 189:24 190:10 190:22 195:3 201:21 203:5 264:23 322:10
**missouri** 4:21
**misspeak** 112:7 115:3
**misstate** 137:16
**misstating** 146:3
**mitchell** 3:3
**mitigate** 43:7
**mix** 94:5
**mixed** 164:7
**mixture** 17:4 95:11 104:10 106:21 107:9 109:20 130:9 164:10 168:12 176:4 197:8 212:20 214:5 215:2 217:16 257:20 321:4
**mixtures** 100:10
**ml** 127:19,20
**modality** 277:18
**mode** 225:25
**model** 78:15 254:19
**modeling** 78:4 145:11
**modify** 268:17
**moisture** 84:17
**moisturizers** 56:4
**molecular** 178:14 210:23 212:12
**molecule** 209:15,18,23 211:12 213:7,9 251:8,13,17,18 255:11,14
**molecules** 209:9,11 210:14,17 212:15 251:8 257:3
**mom** 269:16,21
**monitor** 316:9
**monitored** 24:9
**monitoring** 34:23
**monohydrate** 303:5 304:6,12 304:18
**months** 121:11 131:11
**mood** 286:9
**moore** 2:3
**morbilliform** 42:13
**morning** 6:2 8:5,24 14:2 84:18 218:7
**mortar** 202:19 254:19
**mounting** 160:25
**mouse** 182:16 182:17,22,23 183:2 184:20 198:20 205:18 308:16
**move** 49:2 209:9 287:8
**moved** 26:6
**movement** 82:4 321:15
**moving** 27:7 189:6 201:19 252:4

**mparfitt** 2:9
**mucositis** 36:15
**mucous** 25:12 105:14
**multiple** 35:13 46:21 67:25 109:3,17 110:4 160:18 207:19 216:21 218:8 220:20 310:11
**murray's** 3:13
**mute** 6:8

**n**

**n** 2:2,11,19 3:2 3:14 4:2 7:22 30:10,21 31:8 31:8,8 171:2 181:2,2,2,4 213:25 253:21 253:21 266:9 270:17 272:6,8 272:8 276:11 276:13 325:2 326:2
**nails** 25:12 105:14
**naivety** 230:8
**name** 7:3 8:7 8:22,24 65:9 113:5 166:2 185:24 187:8
**names** 15:9
**nano** 210:10
**nanometers** 210:5
**nationally** 27:22
**natural** 102:20 102:24 103:15 103:16 253:7
**naturally** 219:23 264:9
**nature** 146:17 277:14 309:25 317:9
**ne** 4:4
**nearly** 286:22
**necessarily** 61:11 119:8 133:17 152:6 155:19 224:18 226:5 227:8 233:11 235:2 274:13 281:22 316:3
**necessary** 147:2 157:9,18 193:20 268:21 329:6
**need** 11:4,14 36:25 38:16 68:20 69:10,13 69:16,19 83:25 84:5,6 87:18 95:19 153:9 156:15 181:19 204:21 237:8 249:12 266:24 316:2 318:14
**needed** 119:24 147:20 317:18 317:25 318:2 318:11 319:22 320:8
**needles** 85:8
**needs** 82:12 86:20
**negative** 234:22 236:5 267:20 319:17
**neither** 120:4 236:25
**never** 63:18 69:5 175:11 222:23 246:5
**new** 1:13,13,15 3:22 4:8,8 7:2 7:2,24,25 26:7 96:10 181:6 191:10 287:15 290:4,16 297:16 302:12 305:25 307:11 308:7 309:5,22 325:3,4,8
**nice** 35:6
**nine** 324:22
**no.1:23** 1:4
**non** 226:19 229:17 230:12 230:13 232:3 275:18 323:16
**nonmedical** 323:15
**normal** 175:5 189:15 198:24 205:8 215:8 232:18,25 242:23 277:4,6
**north** 2:4 4:16
**northern** 1:2 6:22
**nos** 11:5,8
**notary** 1:15 5:11 7:23 181:6 325:7 329:13,19
**note** 6:5 214:14 214:17,18 219:4 314:16 327:10
**noted** 7:17 181:3 220:3 324:24 329:7
**notes** 69:18
**notice** 13:4,5,7 326:11
**nuance** 156:12 232:17
**nuanced** 233:8 311:9
**numb** 241:7
**number** 6:23 15:7 24:10

39:8 40:24 47:23,24 94:14 98:12 113:6 127:5,11 129:9 131:12,19 143:8 157:21 162:16 170:7,7 178:9 183:19 210:8 218:25 238:18 263:13 263:14 288:9 289:24 312:23 313:15 314:20 324:21
**numbers** 173:4 313:8,12,16 314:5,15
**numbing** 241:5
**numerous** 32:18
**nw** 2:7
**nyu** 9:3 27:9
**nzegwu** 4:9

**o**

**o** 22:17 29:21 29:21 30:10,21 31:8 36:16 37:22,22 42:10 42:11,14,14 43:17,17 102:22 181:2,2 181:2 213:25 213:25,25 266:9 270:17 272:6,8 275:10 275:10 276:11 276:13 283:11 325:2
**oath** 7:10 181:7
**object** 10:17 96:3 106:15 158:7 165:22 191:4 296:23
**objection** 10:19 49:18 54:3 68:23 75:7 95:7 104:24 118:9 134:8 144:8 145:12 148:4 152:3 156:7 160:8 166:17 167:8 171:15 173:9 174:25 192:8 193:22 200:12 215:15 217:7 221:10 232:11 235:5 250:3 256:12 258:14 259:15 260:14 264:16 270:13 292:2 295:25 299:14 300:10 306:6 307:15 308:12 313:4 313:24 315:21 317:3,20 318:12 320:3 320:23
**objections** 5:8 7:14
**objective** 134:5 134:18 135:8
**objectivity** 134:21 135:16
**objects** 12:16
**observation** 106:10
**observational** 105:16
**observe** 316:7
**observed** 303:6
**obtaining** 29:13
**obvious** 228:2 228:3
**obviously** 37:15 56:4 67:3 86:18 90:3 100:22 124:24 142:14 163:11 194:10 216:11 226:14 267:8 277:16 288:20 302:15 307:25
**occasions** 287:18 307:22 310:16
**occlusion** 246:12,23 281:23 282:17 284:10 285:17 286:18
**occlusive** 219:23 246:13 282:3,21,22 283:2
**occult** 31:11
**occur** 151:20 151:22 233:25 236:24 299:7
**occurred** 296:21
**occurrence** 299:23
**occurring** 149:5 173:19 295:23 296:18 297:25 299:25
**occurs** 129:10 233:21 234:10 237:7
**offense** 251:25
**offhand** 72:4 111:25 116:6 178:21 210:3 313:13
**offices** 1:12
**oh** 47:11 65:22 79:13 94:16 105:8 108:9 113:22 114:7 115:16 137:17 161:22 183:15

251:22 271:3 272:4 315:12 321:24
**ointment** 84:14 214:3,8,10 221:13 283:24 284:10 286:17
**ointments** 282:20
**okay** 9:18 10:2 12:22 13:23 14:9 15:12 17:24 24:24 25:16 33:15 45:17 47:13 48:18,20 54:7 54:23 60:15 64:21 65:12,16 68:5 70:7,10 70:21 76:15 79:3,7,16,17 85:20 86:4 112:24 115:18 115:25 140:8 140:23 144:5 156:3 167:4 168:13 171:4 175:18 178:2 181:14,19,25 184:23 190:4 190:13 193:8 196:2 197:13 197:20 208:10 208:12,22 216:23 233:16 238:2 243:15 244:17 245:24 247:20 248:3 252:3 265:6,25 267:6 270:2 271:20 290:23 295:21 296:9 297:9 303:11 309:17 310:8 322:13 324:16
**okeke** 122:23 164:25 169:16 170:9,11,13,23 179:11 188:5
**old** 287:16
**once** 40:2 57:12 101:22 211:8 247:9
**oncoderm** 67:17 105:8
**oncodermato...** 22:7 52:19 57:11
**oncodermato...** 42:17 44:2
**oncodermato...** 22:9,10,24 24:5,22 27:23 43:11 81:14 86:13 102:5
**oncologist** 34:3 38:7
**oncology** 38:19
**ones** 113:4 163:18 169:7 225:16 228:7
**ongoing** 300:23
**online** 13:17 88:4 183:20 290:7
**open** 85:8 228:16 229:2 229:20
**opened** 92:17 92:20
**operate** 97:9
**operating** 13:12
**opine** 64:23,25 261:3
**opinion** 15:22 21:6,8 57:25 74:21,23 76:24 88:11 89:3 93:5 104:20 118:17 119:15 119:25 122:10 127:13,14,24 128:11,21 129:2 130:25 131:3,4,15 134:24 136:22 137:3 141:16 146:6,11 147:21 153:8 157:7,12,14 161:15,20 166:13 168:22 175:4 206:19 215:14 263:25 307:9 308:20 309:13 318:25 320:18 321:3 323:23 324:7 326:12
**opinions** 74:15 76:12 77:4 96:15 141:21 159:20 174:22 176:20 195:10 319:5
**opportunities** 320:14
**opportunity** 252:22
**opposed** 19:7 90:14 229:7 253:10
**opt** 279:24
**option** 62:10 285:10
**options** 35:18 62:19 279:18 279:20
**oral** 42:23,24 285:12,20 286:22,23
**orally** 82:10
**order** 31:19,21 31:22 39:9,17

60:25 119:14 119:24 126:17 147:20 150:10 167:12 178:11 191:15 303:14 315:24 320:14
**organ** 286:6 302:17
**organism** 321:25
**original** 80:19
**outcome** 7:13 151:23 153:3 154:10 277:16 325:18
**outcomes** 35:24
**outset** 101:20
**outside** 72:22 81:10 86:8 231:15 241:8
**outstanding** 62:20
**ovarian** 23:5 32:15,17,19 33:13 34:14 88:19 89:8 128:16 129:19 312:5 313:3 315:3 316:25 319:25 320:22
**overall** 54:22
**own** 15:19 73:2 75:3 111:19 120:6 208:4 218:2 319:12
**oxalate** 303:4 304:6,12,18
**oxide** 62:11

**p**

**p** 2:2,2 3:2,2 4:2,2 7:22 29:21 30:10,10 30:21,21,22,22 42:11,11 43:17 78:2 181:4 276:11
**p.c** 4:20
**p.m.** 180:2,4 181:3,10 200:25 201:5 211:17,21 264:25 265:5 322:18,22 324:17,24
**p1hairdepos** 327:15
**package** 165:8
**page** 14:6 15:3 21:23,24,25 22:2 70:5 88:5 96:14 98:7 110:9,12,13,17 115:10,16,17 128:2,8 132:18 137:17,18 162:11 177:7,9 181:22 182:2 182:14 186:2,3 192:25,25 194:20,24 195:22 204:5 208:13,20 218:10 226:8 226:13 227:16 243:22 244:24 248:2 252:4 255:19,20 265:12 290:6 302:24 309:18 315:14,18 326:3,10 328:4 328:7,10,13,16 328:19
**pages** 21:18 70:17 80:13 110:17
**pain** 228:13 238:11 278:17 298:25 299:2
**painful** 245:5
**pair** 203:20
**pancreatic** 23:5
**paper** 52:10,17 102:15 103:9 103:14 116:9 118:25 122:23 122:23 123:2 126:4 155:21 170:13,14 171:3,7 182:9 184:19 185:21 186:2,23 188:10 193:2 206:6,13 208:4 215:19,21 248:11,13 256:19 290:16 290:20 295:2,3 299:12,22 302:13,19 305:16,20 313:23 317:23
**papers** 57:6 60:21 61:16 63:5 66:2,5 67:5 87:21 98:17 104:4,8 116:16,20,22 122:18 124:8 126:6 171:5 179:19 226:18 312:12,24,25 316:18 317:12 317:15,19,24 320:7
**paraben** 171:23 187:15
**parabens** 77:23 78:3 163:10 168:25 169:3,9 169:12 170:5 170:22 171:13 171:19 183:5 186:18

**paragraph** 162:15 163:23 177:11 182:3 189:12 193:9 201:20 209:3 214:15 215:19 219:3 227:14 243:25 244:25 265:20 268:5 281:3 287:9 290:24 295:5 302:25 309:21 315:15
**parameter** 134:21 135:11
**parameters** 135:7 139:9 248:18
**paraneoplastic** 30:9,15
**parenthetical** 163:25 170:5,6
**parentheticals** 169:8
**parfitt** 2:8 8:16 123:11 170:11
**parse** 97:20
**parsed** 187:4
**part** 28:20 31:13 40:15 59:20 60:11,20 68:2,19,25 73:6 80:25 81:3 85:18 110:19 111:20 117:15 178:16 205:2 228:21 230:9 264:2,3 309:20 317:11
**partial** 201:23 255:12
**partially** 102:9
**particle** 109:2 109:15 110:4 209:14 210:4 211:3,7,7 212:10 250:17 255:4,6 256:11 259:12 260:18
**particles** 110:4 178:15 209:16 255:18 256:4,8 256:21 257:11 257:13,19 258:9,10 259:13 260:2 260:11
**particular** 16:16 24:5 52:5 55:10 63:24 64:2,9 66:15 69:8 75:23 76:12 77:21 78:14 87:3 117:20 121:24 122:8 123:18 125:16 135:15 137:12 138:15,21 140:11 145:5 149:23 151:23 154:9 174:6 178:20 187:8 210:16 221:5 229:14 230:18 240:10 248:13 249:5 254:3 257:21 261:9 270:19 271:10 274:12 275:19 276:15 288:4 306:25 307:17 307:20 312:15 316:3
**particularly** 265:20
**parties** 5:3 6:12 325:16
**partition** 217:18
**partitioned** 214:21
**partitioning** 177:13,22 213:12,15,16 214:9,16 215:14 216:25
**partitionings** 216:9
**partitions** 177:24 215:2
**partnering** 192:12
**parts** 93:18 106:13 107:7 107:10 145:7 258:10,11
**party** 7:11
**passed** 184:7
**past** 284:6 305:23 310:10
**patch** 225:20
**pathologist** 204:16,21
**pathology** 29:15 48:16 64:6,6 68:11 196:9 203:21 204:14 224:7
**pathophysiol...** 27:4
**pathway** 208:19 252:6 259:20 261:5 263:10
**pathways** 301:8
**patient** 30:5,24 32:7,17 33:24 34:2,8,13 37:14,17 38:4 38:12 48:4,14 49:5,16 50:3 50:19,24 64:14 67:13,18 77:15

85:23 86:2 101:14 106:2,8 114:13 125:23 126:14 139:11 153:18 176:7 228:15,25 236:18 237:4 238:21 239:8 245:12 268:7 268:13 271:19 272:4,10,17,20 273:22 277:3 277:11 279:8 282:25 283:8 283:13 284:17 300:2 307:19 311:3 313:18
**patient's** 273:6
**patients** 22:13 22:16,16 23:2 23:4,24 24:7 25:24 26:2 28:4,5,13 29:7 32:10,19 34:20 36:23 37:2,4 39:25 40:7 41:11,14 42:20 49:7,24 51:7 51:22 52:16,20 53:4,6 54:18 59:14 60:8 62:3,18 67:20 73:10 86:18 102:2 114:18 115:5 147:8 153:24 173:23 181:17 194:6,7 207:20 224:21 230:5 235:11 236:22 238:7 238:10 247:13 275:14,16,17 276:14,21 278:16 279:15 281:25 282:8 283:19 284:3 287:5 290:25 298:13 300:23 304:20 308:4 311:2,5,15,18 312:7,25 314:20 315:4 318:3,8
**pattern** 174:24
**paul** 3:3
**pause** 21:20 158:2 187:6 314:7 320:17
**pc** 2:19 3:4
**pd** 41:2,2,3,6 42:5
**pdl** 42:5
**peaks** 253:12 253:13
**peal** 4:21
**peer** 93:6 149:11,20 160:19 297:17
**pemphigoid** 42:10 43:21,23
**pemphigus** 30:16
**penetrate** 212:17
**penetrating** 85:8
**penetration** 220:3 246:15
**penis** 239:12 240:16
**people** 82:21
**percent** 238:23 238:23 239:10 239:11 270:3,3 270:22,23 272:11,18,19 280:12,15,17 280:17,19,20 280:21 281:2 287:20
**percentage** 188:10 240:13 240:14 270:20
**percutaneous** 220:2
**perfect** 79:7 112:12 181:20 202:2 287:23 322:16
**perform** 38:13 38:17 57:21 144:17 158:5 168:5
**performed** 57:5 57:17 98:8 120:5 159:7 167:21 168:14 168:17 303:2
**period** 251:18
**perm** 91:10,16 91:18
**permeability** 254:22
**persist** 257:3
**persistent** 278:10
**person** 44:11 91:24 92:3 98:3
**personally** 32:16 119:21 119:24 149:25 305:12
**pertain** 75:24 195:11
**pertaining** 140:5
**pertains** 24:12 24:23 81:16 144:11 170:25 264:19 323:5
**pertinent** 60:18 74:25 104:13 127:12,23 133:14 148:22 157:14 159:24

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 378 of 409 PageID #:75827



168:21 225:23
**petroleum** 84:15
**petti** 2:12 8:3,7 8:19 12:22 13:2,11 20:19 20:25 44:10,23 45:4 71:7 131:23 161:13 179:17 181:11 183:17 200:20 208:15 211:22 239:17 243:2 264:22 278:5 289:23 308:21 314:7,10 322:9 322:14,23 324:12 326:6
**pharmaceutical** 264:8
**pharmacokin...** 81:23,25 82:19 85:19 97:5 98:21 100:25 215:23 216:2 255:10 321:16 322:6
**pharmacology** 26:24 27:6
**pharmacy** 55:15
**phase** 101:15
**phases** 39:8 264:5
**phone** 276:6
**phones** 6:9
**photo** 59:22 62:4
**phthalate** 171:23
**phthalates** 77:22 78:3 163:10 169:2,4 169:9,13 170:4 170:22 171:13 171:19
**physical** 191:17 282:17
**physician** 31:21
**pick** 6:6
**picture** 38:2
**piece** 97:14
**pieces** 68:14 196:14
**pierce** 77:21 78:2,19,21 79:5 80:25 81:3 106:24 108:4 117:13 117:15,18 118:6,8,12,14 143:12,13
**piercing** 252:8
**pinpoint** 310:12
**pivotal** 86:15
**place** 6:11 26:16 45:3 82:9 138:14 164:24 191:18 221:4
**placed** 94:23 194:5,7
**places** 229:17
**placing** 191:24
**plain** 253:11
**plaintiff** 16:16 64:10 113:13 304:24 305:13
**plaintiff's** 71:21
**plaintiffs** 2:3 115:5 125:6,7 125:14 311:18 311:22
**planning** 268:12 274:18
**plastic** 282:3
**plausibility** 15:24,25 66:22 66:24 67:6 68:16 89:5 130:7 150:21 150:23 151:17 151:19,24 152:12,18,20 152:22 156:16 156:25 306:24
**plausible** 88:16 128:13 156:6
**play** 86:15 255:10 258:2 285:19
**played** 133:9
**plays** 253:24
**pleasant** 91:14
**please** 6:5,8 7:15,20 12:7 54:6 211:24 253:23 281:19 296:4 314:3
**plugged** 47:9
**plugging** 265:6
**pocket** 252:10
**point** 11:14 35:16 44:5 78:18 86:24 91:11,12 125:3 151:11 188:6 213:3 220:16 227:6 250:8,18 258:2 279:13 281:17 288:15 319:7
**pointed** 108:3 319:12
**pointing** 78:12
**points** 76:7 156:20 165:3 172:18,21 288:13
**pops** 103:3,4
**population** 24:12 39:17

60:3 67:18 144:25 145:3
**populations** 125:23
**porosity** 108:14
**portion** 19:18 35:13 87:12 92:23 194:19 204:20 209:19 213:5 215:21 220:10 240:3 251:11 255:7 255:21 257:22 257:23
**portions** 14:22 251:14,15 256:7
**posed** 19:4
**position** 28:3,3
**positive** 43:8 310:13 319:17
**possibility** 89:4
**possible** 20:13 86:3 100:6 155:4 163:12 285:16 288:23 288:25 318:6
**possibly** 168:8
**post** 38:23 39:2 39:6 40:5,5 124:25 259:8
**potencies** 270:22
**potency** 270:25
**potential** 35:18 54:20 62:20 154:2 159:18 168:6 268:10 273:25 311:6
**potentially** 37:13 109:16 175:6 188:15
**powered** 318:3
**practice** 25:23 28:25 46:2 48:25 53:14,22 54:2,12,15 58:3 73:6 81:19 82:19 83:11 135:3 144:16 152:10 153:12 158:18 236:15 279:22 281:12 289:7
**practices** 1:5 6:19
**practicing** 22:6
**pre** 26:10 38:23 38:25 39:5,7
**precancers** 275:16
**precautions** 268:16
**precise** 254:19
**prefer** 60:10
**pregnancy** 267:7,8 269:3 269:7,22
**pregnant** 267:21 268:11 268:14,16 269:12 274:18 274:19
**preliminary** 14:25 45:22
**prepare** 14:17
**prepared** 14:20 21:13,16 273:10
**preparing** 15:6 194:13
**prescribe** 54:23 55:3,15 82:22 82:24 224:21 224:22 247:8 250:7 268:15 275:20
**prescribed** 56:15
**prescribing** 54:17 55:22 84:8 235:12 268:23 269:12
**prescription** 56:16 280:7,9 281:9
**presence** 62:15 220:19 258:6 262:3,5 303:4 303:24 304:2,7
**present** 4:23 29:22,23 30:12 37:24 60:7 75:20 77:8 94:9 103:17 104:10 152:14 177:6 179:2 188:7 198:15 224:8 240:5 250:12 256:6 305:7
**presentation** 52:10,17 60:14 62:24
**presentations** 59:7,9 61:10 66:8,15
**presented** 49:8 245:2
**presenting** 48:4
**preservatives** 84:11 163:25 176:12
**pressing** 90:24
**pressure** 282:15 286:8
**pretty** 44:14 82:13 238:9 249:17 297:18
**prevent** 59:24
**preventing** 53:10
**previously** 173:20 181:5

**prilocaine** 238:24 239:10 240:14 241:4
**primarily** 19:6 23:11 25:25 26:2 28:2,11 28:13,19 29:3 54:15 83:22 85:15 99:11 137:9 165:14 292:14
**primary** 31:20 130:21
**principles** 66:18 262:19 321:23
**prior** 52:8,12 57:4,7,16,20 58:15,16,19,24 59:6,8 94:23 120:25 121:4 125:3
**private** 6:7
**privy** 75:16 123:12
**pro** 42:25
**probably** 48:21 60:24 77:19 79:8 86:24 87:10 94:20 102:18 103:23 138:25 143:16 208:8 233:21 237:17 270:9
**problem** 235:23 236:2,6 236:7 264:3
**problematic** 246:17
**problems** 42:21 106:25
**procedure** 85:6 291:3,7 294:3
**procedures** 238:6
**proceed** 7:21 10:20
**proceeding** 7:15
**proceedings** 9:22,25 211:15
**process** 31:13 34:25 91:14 100:16 112:20 116:9 119:10 136:25 139:13 139:15 176:19 213:16 215:8 269:25 291:17 293:10,12
**produced** 14:12,14 113:16 114:4
**product** 51:17 52:5 63:23 64:2,19,22 65:3,9,15,19,21 65:23 76:25 88:19 94:17,22 95:3 96:8 102:10,16 103:10,12 109:20 126:16 133:16 164:6 165:11 188:12 188:16,25 189:4 190:23 191:25 206:3 207:10,12,18 213:21 222:2,4 222:12 228:13 234:3 250:13 250:21,24 261:25 263:7 264:7,7,8 284:8 289:7 291:24 292:5 293:13 307:2 307:21 310:15 316:3,6
**production** 274:7
**products** 1:5 2:10 6:19 8:11 16:20,23,25 17:3,11,15,21 50:21,22 51:15 51:22,25 53:16 58:14 62:12 74:18 77:16 88:17 89:20 90:14,16,19 92:13 95:12 102:25 103:18 107:22 119:22 120:7 121:17 121:18,22,24 123:10,19 145:22 146:14 146:20 154:23 154:25 155:6 160:5,6 172:12 175:7 176:4 179:7 188:20 190:21,25 192:14,22 194:2,6 216:5 223:15 226:9 226:11,16,20 227:3,11 251:5 257:3 261:21 261:23 288:23 289:15 290:2 290:10 291:15 291:19 292:22 294:6,9,13,16 294:25 299:21 303:22 304:3 308:5 311:5 316:16 318:23 321:6 323:9,21 323:25 326:18
**profession** 233:7
**professional** 96:17 137:22

138:2,8
**professionally** 158:17
**professor** 9:2
**profile** 101:17 192:21
**programmed** 41:2
**project** 117:5
**promote** 222:8 222:11
**promotes** 185:8
**prompt** 103:4
**prone** 239:13
**pronounce** 182:9 184:14
**pronounced** 202:4
**proper** 273:25
**properly** 108:22
**proprietary** 75:17
**propylene** 177:17,25 178:5,10,23 179:2,8 214:19 215:11 216:6 216:12,20 218:22
**prospective** 308:17
**prostate** 23:6
**protect** 94:19 95:2,5,5 191:18 229:2
**protecting** 59:23
**protection** 59:22 62:5 255:2
**protective** 60:9 96:6
**protocol** 189:9 189:17 193:5
**provide** 15:22 42:19 43:12 50:15 61:2 87:19 90:19 167:12 188:21 262:10 277:23 282:25
**provided** 72:11 73:14 75:10 112:15 113:7 113:12 123:8 133:5 187:3
**providing** 62:24
**pruritus** 31:7
**psc** 8:15
**psoriasiform** 43:16
**psoriasis** 42:8 43:16,19 274:10 284:6 301:5,15,23
**public** 1:15 5:12 7:23 181:6 325:7 329:19
**publications** 58:21 149:12 149:20 155:13
**publicly** 36:9
**published** 46:21 88:10 116:9 150:2 294:18 313:17
**pubmed** 99:10 99:14,17,21 142:11
**pugliese** 1:11 6:1,16 7:1 8:1 8:25 9:1 10:1 11:1 12:1 13:1 13:8,9 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,7,9,10 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1

138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1,5 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1,6
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1,12 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:20 325:9
326:4,10,12,13
327:5 328:2,24
329:2,4,12

**pull** 79:3 169:16,17 277:10,12 312:18

**purchased** 93:2

**purely** 56:15 105:15

**purpose** 216:19 220:9

**purposes** 33:17 37:23 69:14 83:16 90:6 122:15 157:10 195:17 213:4 298:17

**pursuits** 158:17

**put** 62:25 82:9 141:9 191:15 214:2 228:9 252:20 280:6 281:25 283:16 284:16,19 311:12

**putting** 194:10

### q

**qualified** 318:24

**quality** 41:10 144:18

**quantified** 259:25

**quantitative** 145:10

**question** 5:8 10:8 11:18,19 12:4,7,10,13,15 12:18 19:4,24

20:2 32:14 33:18 43:25 47:3 49:23 51:7 55:7,20 57:24 59:2 61:13 98:24 100:5 103:4 108:21 117:17 119:7 125:2 127:6 140:24 154:12 159:9 160:22 164:18 171:9 175:15 195:18 201:7 204:12 211:23 223:10 228:2 232:7,24 258:20 278:3 279:14 293:18 305:12 319:10 320:6,11
**questions** 10:11 10:18 15:2 31:14 50:15 53:13 62:20 79:15 86:6 96:12 111:12 121:18 172:23 204:9 238:19 266:16 296:7 319:2 322:24 324:10
**quick** 128:3 204:4
**quicker** 233:4
**quickly** 243:21
**quite** 67:12 69:2 74:25 95:22 123:7 182:7 254:6 273:16 278:14 301:3
**quote** 103:16 175:6 207:25 255:23 258:7

**r**

**r** 2:2 3:2 4:2 29:21 30:10,21 37:22 42:14,14 43:17,17 78:2 161:13 171:2 181:2 213:25 213:25 266:9 270:17 272:6,8 275:10,10 276:11,11,13 283:11,11,11 325:2 328:3,3
**rabbit** 48:19
**radiation** 23:17 23:18 24:16,16 66:13
**range** 179:10 273:2
**ranges** 23:4 140:12
**rank** 207:6
**rare** 276:25
**rash** 24:3 35:17 35:19,25 36:2 36:6,14 41:18 41:22,24 42:12 42:13 43:17 50:25 51:19,23 52:6 67:15 68:8,9 70:6 83:15,16,18 101:18 106:4,5 176:7,10,13 192:16 216:16 228:21,21 247:13 283:8 284:18,24
**rashes** 30:9 37:5 41:8,9,11 41:23 42:2,7,8 42:9,18,23 51:8 58:4 69:22 199:12 230:21
**rate** 71:24 72:12,12 77:12 147:2,16,19 159:19,20 175:21 178:4,9 178:12 187:18 218:18,20,23 226:18 241:21 241:23 242:10 242:12 249:3 268:20,22 270:7 271:2 277:22 281:7
**rates** 61:17 99:24 104:2,4 104:11 106:13 107:16 265:21 266:2 286:25
**rather** 152:11
**ratio** 267:16
**rats** 184:4,13 184:16 193:16 197:7 326:15
**reach** 157:6
**reaching** 96:15
**react** 194:5,7
**reaction** 38:15 41:16 48:17 174:2,3,5 277:15 279:8,9 279:17 282:8 300:3,3
**reactions** 37:8 39:23 293:16
**reactive** 186:19 189:5 207:25
**read** 29:15 64:7 75:13 88:21 103:23 124:20 128:18 162:21 186:20 190:11 198:4 211:22 233:21 234:6 234:13 239:19

239:22 245:9 245:10 278:5,8 287:22 288:20 303:9 308:21 308:25 317:6 327:9 329:5
**readily** 213:8 215:9 249:19 251:19 255:14
**reading** 12:11 98:4 190:2 193:14 244:8 295:13 318:21
**ready** 79:15 181:13,15,24
**real** 78:16 108:6 117:22 128:3 204:4 319:9
**really** 11:21 22:23 39:23 41:18,22 42:24 43:12 45:9 46:19 50:13 57:22 61:2 62:5 76:2 78:11 83:9 87:9 97:20,25 100:7 104:13 106:19 108:5 127:12 129:7 130:2,7,21 134:24 135:4 144:3 148:15 150:10 151:9 157:2 159:13 160:15,19 164:25 168:3 168:21 172:17 191:13,21 213:2 225:5 226:25 228:18 230:5 232:14 234:19 235:19 236:25 238:12 240:11 258:17 260:8 267:9,15 267:23 273:14 279:6 284:23 286:13 288:18 289:5 314:17 315:25 318:20 319:18 321:3
**reask** 169:23
**reason** 11:15 43:10 92:21 143:19 189:7 220:23 253:25 262:12 274:16 327:11 328:6,9 328:12,15,18 328:21
**reasonable** 88:12 128:12 151:25 152:7 152:11 155:14
**reasons** 228:6
**recall** 61:15,15 65:4 87:9 99:9 99:23 100:2,21 103:8 124:18 143:2 158:25
**receipt** 327:17
**received** 112:17 123:15 123:17 189:15 189:21
**receiving** 153:25
**recently** 26:6 290:24
**recess** 71:13 132:8 180:3 201:2 211:18 265:2 322:19
**recite** 66:20
**recommend** 56:2,20 61:24 69:5 272:25 274:17
**recommendat...** 138:20,24 139:8,12 140:6 140:10,18,21 141:3,10
**recommendat...** 46:24 141:8 266:22,25 267:3
**record** 6:3,13 7:18 10:6,12 10:20 11:16,20 12:25 13:16 45:20 57:3 71:11,16 80:9 84:22 88:2 132:5,7,11 153:20 162:22 179:24 180:2 181:10 196:6 200:23,25 201:5 211:17 211:21 212:2 227:22 234:17 242:25 243:20 247:24 264:25 265:5 278:7 306:10 308:24 314:9,11,13 315:11 322:18 322:22 324:15 324:17 325:13
**recorded** 6:15 11:3
**recording** 6:10
**records** 37:16 304:25
**recurrent** 309:25
**red** 283:8,13
**redness** 283:22
**reduce** 274:7 278:16
**reducing** 23:11

**reduction** 69:7 69:11
**redundancy** 111:12
**redundant** 216:14
**refer** 128:24 182:16 215:20
**reference** 9:15 77:21 78:9 103:9 115:19 143:3,25 164:4 165:6 170:6,21 170:24 222:5 239:25 244:16 281:4 312:14
**referenced** 9:14 110:24 165:2 188:13 290:5 305:22 317:16 327:6
**references** 9:10 14:16 60:18 75:11 76:3 90:9 110:14,18 110:20 111:5,8 115:21,22 117:3,10 142:16,24 144:3 170:8 176:24 179:19
**referencing** 171:2 309:22
**referred** 29:9 105:6 176:22
**referring** 16:22 18:24 20:21 38:7 80:4 96:19 129:3 175:15 184:20 198:21
**refers** 186:7 214:9 233:23
**reflects** 72:20
**regard** 267:5
**regarding** 61:4 88:15 106:19 108:7 129:9,11 263:21
**regimen** 268:17
**regionally** 27:21
**regular** 42:12 205:9,20 229:12 254:12 260:4
**regularly** 126:15 206:11 284:11
**regulation** 38:23 39:2
**relate** 137:10
**related** 7:11 30:13 31:3,4 57:14 58:8 83:22 103:23 138:11 266:16 270:20 313:20 325:16
**relates** 166:21
**relation** 242:11
**relax** 17:8
**relaxer** 1:4 6:18 16:20,23 16:25 17:3 19:2,15,17 20:6 49:6,10 49:14 51:10,13 51:20 56:23,25 73:5,8 88:17 89:20 91:6,9 91:23 92:2,10 92:12,18 93:24 94:8 95:3,4,11 95:20 96:7 98:23 105:3 106:14,21 107:9,13 109:2 109:15,19 110:6 118:20 119:22 121:21 122:19 126:20 127:3,8 131:9 131:20 145:22 146:9 147:17 151:15 157:18 160:5,6 164:6 164:11 168:9 171:22 172:12 175:16,20 177:4 178:5,15 178:17 188:12 190:18 191:25 192:19 205:9 209:16,24 210:17 211:6 212:7,11 214:22 215:2 217:14,15 258:9 259:13 260:11 292:19 294:16,24 296:20 299:24 301:15,22 304:10 306:20 310:3 321:5 323:9 327:4,4 328:1,1 329:1 329:1
**relaxers** 15:25 17:10 18:7,17 18:24 19:8,10 49:3,17 50:23 57:18,25 58:11 73:2,11 89:6 89:24 90:10 92:8 93:9,13 93:14 97:17 99:25 100:11 100:23 104:3,5 104:7,9 107:4 108:9,11 119:6 119:19,20 121:8,15 122:2 122:6,11,15,21

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 386 of 409 PageID #:75835



123:4 124:6,15 124:17 125:8 125:19 126:11 128:14 129:12 130:14,23 131:10 134:25 148:13 151:2,8 160:12,23 161:2,16,21 162:12 164:23 165:15,17 166:24 167:17 168:4,11,22 169:6 171:14 173:12,21 174:13 177:18 179:4,10 182:4 185:11,16 187:9,11,19 188:4,8 191:7 209:19 217:4,6 217:24 234:2 258:22 260:18 261:14 264:14 264:20 288:3 288:11 291:9 291:13 292:10 293:17 295:24 297:23 298:7 299:8 304:22 305:8 308:9 311:24 312:2 313:2,20 315:5 316:25 319:25 320:21 323:18 324:4,6

**relaxing** 95:24 126:15 164:14 190:21,25 192:22 294:9

**release** 166:4

**releaser** 165:19 165:25 166:3

**releasers** 163:9 165:16 168:19 188:2

**relevant** 103:5 104:20 146:9 206:6,7,14

**relied** 99:17

**remain** 23:25 260:2,2,4 261:5 324:3

**remained** 198:15

**remains** 257:23

**remember** 61:20 116:15 143:17 161:8 245:19

**remission** 24:9

**remove** 258:4

**removed** 143:25

**render** 88:11

**repeat** 106:4 109:6 158:3 211:4 299:16

**repeated** 189:18 190:6 205:4 237:4 310:16

**replicate** 158:15,19

**report** 9:13 14:14,17,20,21 14:23 15:6 16:10 18:11 19:11,19,20 20:8,10,15,16 20:20 21:6,8 21:13,15,23 22:3 35:24,25 52:8 57:4,7,16 57:20 58:15,16 58:20,24 67:2 70:13,16,19,25 72:6,15 73:15 73:16 75:3,5 75:11,14,21 76:9,21 77:11 78:25 79:12,19 80:6,15,20 87:23 96:13 98:8 99:18,20 110:13,19,21 111:15,16 112:15 113:24 115:22 116:25 117:3,8 118:2 118:5 119:11 120:9,12,24,25 121:2,5 122:16 124:25 125:4 128:3,7,25 129:4 131:5 132:14 137:14 142:20,22,25 143:4,14 144:20 150:14 154:20 155:23 159:12 162:9 176:25 177:7 181:22 184:24 185:4,5,13,18 185:20 194:13 195:23 196:24 208:14 220:8 220:11 240:2 244:20 248:2 248:11 255:5 264:15 265:8 288:19,21 290:5,6,18,22 295:3 305:15 308:16 309:18 309:25 310:14 315:14 317:16 318:10 319:13 326:12

**reported** 155:2 157:2 248:18 256:17 257:7 287:14 311:17

**reporter** 1:14 7:6,19 8:18

10:12 25:20 36:11 41:5 44:8 77:25 78:7 99:13 138:4 161:12 161:18 162:4 164:17 170:16 173:17 183:18 184:7 186:11 250:2 256:2 264:12 289:22 290:14 305:10 306:5 307:6 309:9 321:10 325:6
**reporter's** 162:19
**reporting** 101:24 102:2
**reports** 9:9 66:2,5 67:5 73:25 74:3,6,7 74:9,24 112:9 113:19 114:9 120:3,8 121:4 133:7 142:15 158:12,21 258:18 263:13 263:14 304:25 305:13
**represent** 8:9
**represented** 192:16
**representing** 7:4
**represents** 202:13
**reproducible** 289:11
**reproductive** 33:14,16 57:6 57:9,12 58:22 306:3
**request** 262:13
**requested** 34:2 34:3
**requests** 14:10 14:11
**required** 329:13
**research** 3:8 28:3,18 40:16 42:16 43:11 52:9 57:5,8,17 58:11,14,17,20 60:20,21 73:22 86:20,25 87:4 87:5 124:3 159:8 161:7,22 161:24 261:24 317:8
**researched** 63:3 93:7 319:2
**researching** 61:16
**reserved** 5:9
**reservoir** 255:18,22 256:24,25 257:23 258:7 258:11,13,21 259:9,14 260:12 262:16 262:17 323:7 324:3
**reset** 211:23
**residency** 81:19 86:14
**residents** 27:9 37:24
**resolve** 141:17
**respective** 5:3
**respectively** 189:24 190:10
**response** 20:13 51:17 145:11 150:11,17 154:18 155:9 278:13 279:23
**responses** 11:4 11:8
**responsibilities** 28:16
**rest** 28:14
**restart** 279:12 279:16
**result** 203:9 234:12 235:3 241:19 244:23 248:7 249:22 276:24 297:12 297:25
**resulting** 245:3
**results** 194:15 194:18,20 195:3
**resumed** 181:5
**retained** 63:19 63:24 64:9,17 64:23 71:20 88:9 324:22 326:9
**retinoid** 272:22 273:11
**retinoids** 272:6
**return** 327:13 327:16
**revealed** 303:3
**review** 49:21 57:23 61:6 74:8 75:2 76:10 88:9,13 89:21 92:3 97:23 98:6 99:5,7 100:19 102:15 111:22 112:6 114:8,13 115:20 117:16 119:16 120:23 121:3,7 122:2 122:3,7 124:4 124:9,10,13,18 124:22 125:3,5

125:11,15 127:15 135:8 136:10,14,17 138:19 141:24 142:10 144:14 145:8 157:11 159:6 162:8 163:17 167:15 167:19,22 168:4,6,10,15 168:18,21 179:12 210:7 212:9 215:24 263:23 294:14 304:19,23 305:13,19 311:11 314:2 317:22 319:17 327:7
**reviewed** 13:24 16:16 37:17 60:17 61:21 73:24 74:3 89:2 92:4 93:6 108:7 112:8 117:25 133:5 134:19 137:6 138:22,23 140:12 144:20 149:11,20 158:12 160:19 194:14 258:18 305:17,21 311:21 313:23
**reviewers** 141:14 297:17
**reviewing** 15:8 72:25 73:5,7 73:10 93:21 95:10,12 116:10 120:2 129:17 130:18 141:7 142:14 144:23 149:16 270:6 307:8
**reviews** 138:16 139:4,17,21 141:12 159:22 237:17
**revlon** 4:7
**revolve** 18:16
**rewind** 239:7
**richmond** 3:18
**right** 8:20 20:4 44:25 45:2 68:12 69:25 76:14,16 79:10 80:11 81:23 83:12 112:21 131:20 145:25 151:11 153:7 154:22 170:10 185:22 192:12 193:3 222:5 223:20 233:14 241:6,8 247:25 251:12 253:3 269:18 286:7 286:10,21 287:24 290:23 300:15 312:20
**rigid** 254:10,10
**risk** 129:17,18 129:20 144:6 144:10,18,22 145:10 161:3 238:13 250:12 267:16,20 275:3,5 314:18
**rna** 4:11
**road** 2:4
**robert** 2:12 8:7
**robinson** 4:5
**robson** 4:24
**rodriguez** 3:10
**role** 23:8 26:12 33:6,21,23 86:15 89:15 129:7 130:21 133:9 230:21
**roles** 25:5,6
**room** 44:24 131:18
**room's** 150:5
**rotate** 27:10
**rothstein** 4:11
**roundabout** 223:9
**routes** 263:17
**rowland** 1:6
**royster** 4:20
**rpetti** 2:12
**rubric** 136:20
**rule** 195:16
**rules** 10:4
**run** 285:12
**running** 26:13

**s**

**s** 2:2 3:2,4,9 4:2 4:12 7:22,22 22:17,17,18 29:21,21 30:10 30:21,22 31:8 31:8 36:16,16 42:10 43:17,17 102:22,22 181:2,2,2,4,4 213:25 272:6 276:13 326:8 328:3
**safe** 59:5 129:2 257:2 304:11 320:10
**safely** 23:25
**safety** 16:19 39:13 101:17 103:21 162:20 172:9 193:25 228:7 266:6 268:15
**saint** 4:21
**sake** 22:21 162:20

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 389 of 409 PageID #:75838



**sales** 1:5 6:19
**saline** 189:16
**salon** 17:13 295:10,17
**sara** 4:21
**sarcoma** 29:21
**save** 98:25 99:3 146:3
**saved** 233:16
**saw** 112:21 131:12 195:20 199:17
**saying** 32:25 69:24 139:12 140:23 173:24 174:12,14 199:14 215:18 230:21 262:18 269:2
**says** 129:24 187:11,13 245:21 309:24
**scalp** 49:9 51:2 51:4,5,8,24,25 52:7 58:5 95:16 96:2,7 108:12 184:2 184:11 191:2 191:16,18,20 192:4,7,17 195:12 219:8 220:4,19 221:6 226:10 237:5 241:22 242:10 242:13 252:24 256:11 258:5 289:2,10 291:22 293:17 300:2 306:21 326:14
**scan** 172:11
**scars** 34:10
**scattered** 251:15
**scenario** 274:24 276:23 306:19
**schank** 4:17
**school** 26:12 81:18 86:14 87:13 91:10,13
**schooling** 86:8 87:11
**science** 100:4 100:19 317:9
**scientific** 88:10
**score** 139:24
**scored** 139:23 141:8,11
**scoring** 137:5,8 137:11 138:9 138:17 139:19 140:5,18,19 141:2 149:21 149:24
**scratch** 229:18
**screen** 13:13
**screening** 31:17
**scrotal** 219:18 242:18,21 244:3,5 245:5
**scrotum** 239:12 240:16 241:22 241:24
**sealing** 5:4
**seamans** 4:7
**search** 96:25 98:9,11 99:2,4 99:9 100:23 102:15 104:2,6 106:12,12 107:15 111:21 135:7 158:11 158:13 159:10
**searched** 99:23
**searches** 142:10
**sebum** 274:7
**second** 9:7 13:4 13:6 21:25 22:25 97:14 137:16 175:9 186:5 190:8 193:9 197:20 199:4 203:7 243:24 245:18 265:20 302:23 302:24 326:11
**secondary** 278:20
**section** 88:8 162:13 196:24 197:15,22 198:7 201:11 238:20 252:5 265:17,19 317:12
**sections** 197:22 198:10
**see** 9:5 10:24 18:10 23:3 25:24 26:2 28:4,13 30:12 30:16 31:10,22 32:18 33:24 34:7,8,10,12 35:8 36:14 38:2 47:7 55:20 58:2 68:18 69:18 77:4 90:8 101:16 104:17 104:22 115:15 137:15 138:25 139:24 140:4 140:22 145:21 147:7 167:3 172:5 177:14 182:5 183:8 186:8,25 188:19 189:10 189:25 192:2 193:6 194:23 197:7,18,24

203:18 204:2 204:10 209:5 209:12 212:4 219:5,11 229:18,21 232:20 244:7,9 245:6,8,11 246:11 250:14 252:12 254:7 255:23 259:4 261:25 265:23 281:5 282:9 286:21 291:4 292:16 295:6,7 295:12 301:10 319:11 321:24 323:20
**seeing** 28:4 35:2,4 37:5 41:7 52:7 74:13 92:25 106:3,5 126:24 126:24 146:21 154:10 192:15 196:15 202:15 253:2
**seem** 129:16 187:7 191:8 207:4 298:7
**seemed** 155:22
**seems** 155:24 159:5 269:3,5 285:5
**seen** 13:20 32:10 48:12 68:6 91:22,25 92:18 100:25 135:2 139:15 139:20 173:2 259:7 289:20 300:6
**segalla** 3:21
**self** 91:10 112:4 198:23 284:17
**sending** 29:14
**sense** 20:10 39:18 46:17 48:11 67:7,9 101:25 109:4 151:21 153:15 156:2 211:13 212:5 230:13 298:19 299:17 304:14 310:24
**sensibly** 159:7
**sensitive** 6:6
**sensitivity** 228:14
**sent** 327:14
**sentence** 129:3 164:9 177:15 177:16 183:2,9 189:13 216:25 233:20 234:6 239:19 244:25 253:17
**sentences** 233:22
**separate** 18:6 18:18 26:22 110:23 211:9 287:18
**separated** 198:17
**separating** 216:25
**separation** 212:24 213:11 214:17 216:9
**series** 151:20 151:22 152:13
**serious** 239:14 241:20 248:8 249:23 250:21 301:3 318:8
**serve** 191:17
**served** 189:14
**session** 10:8
**sessions** 87:7
**set** 15:12 111:9 113:15 208:10 325:11,21
**setting** 96:21 209:20
**seven** 190:13
**several** 209:4
**severe** 41:16 199:12 274:24 275:24 279:23
**shaft** 195:6,8
**shampoo** 127:7 175:21
**shampoos** 94:11
**shape** 289:2
**shaped** 252:9 255:8
**shed** 90:20
**sheet** 72:12 327:11
**shelf** 93:2 179:15
**shipman** 2:3,5 8:14,14 44:4,7 44:12,17,25 45:6,11,15 49:18 54:3 68:23 75:7 95:7 96:3 104:24 106:15 118:9 123:11 134:8 144:8 145:12 148:4 152:3 156:7,11 158:7 160:8 165:22 166:17 167:8 171:15 173:9 174:25 179:22 191:4 192:8 193:22 200:12 215:15 217:7 221:10 232:11 235:5

250:3 256:12 258:14 259:15 260:14 264:16 270:13 292:2 295:25 296:23 299:14 300:10 306:6 307:15 308:12 313:4 313:24 315:21 317:3,20 318:12 320:3 320:23 322:13 322:16 323:2,4 324:8 326:6 327:1
**shipmanlaw....** 2:5 327:2
**shipra** 2:20
**shirt** 44:13
**shohl** 3:9
**short** 59:4 310:18
**shorten** 278:22
**shorter** 46:4
**shorthand** 325:6
**show** 151:12 157:24 162:23 206:8 226:18
**showed** 206:12
**showing** 185:15 204:18 284:23
**shown** 307:2
**shows** 289:6
**side** 23:17,19 27:2 40:5,6,8 41:22 45:7 146:21 154:2 192:20 234:20 234:22 237:6,9 241:20 247:2 248:8 249:23 250:21 267:10 276:4 277:9,12 285:8,13 289:12
**sign** 327:12
**signature** 325:24
**signed** 5:11,12 327:19
**significant** 183:6 185:6 202:13 266:11 275:23 278:11 278:17 300:24
**signs** 48:15 196:17 284:24
**silvina** 1:11 6:16 8:25 13:8 21:7,9 324:20 325:9 326:4,12 326:12 327:5 328:2,24 329:2 329:4,12
**similar** 28:9 154:22 158:23 159:6,9 255:10 260:18 261:16 293:16 303:5
**similarities** 18:13
**simple** 83:17
**simplest** 153:5
**simply** 182:17 273:18
**single** 56:6 110:3 189:21 195:3 313:18 317:23
**sirens** 154:13
**sit** 75:4 128:21 313:13
**sits** 83:22
**sitting** 45:7
**situation** 10:24 213:6
**six** 80:12 190:14
**size** 209:15,15 209:18,23 210:15,19,20 210:23 211:7 212:9 250:17 255:4,6
**sizes** 210:4 212:12,13
**skin** 16:3 22:16 22:20 24:13,14 25:10,12 26:21 27:16,24 28:22 29:3,9,10,14,17 29:18,23 30:2 30:11 31:5 35:5,10,11,13 35:14 42:12 48:11,15 56:19 57:19 59:18 64:3,24 65:2 69:22 70:6,8 74:19 77:8,14 82:7 83:5,8,15 83:17,23 84:2 85:8,23 94:19 94:23 95:2,5,6 97:10 98:23 105:23 108:11 108:13 122:12 129:12 130:11 130:11,23,24 148:15 151:4 160:13 162:12 173:12 178:7 185:7,9 194:12 196:25 197:2,9 197:9,12,14 198:20 199:3,5 199:6,11,13 200:11 201:13 201:15,18 202:8,10,14,16 202:20,22 203:8,19 204:11 206:25 208:8,18 209:3

209:10 212:17 213:7 214:9 215:3,4,5,10 216:16,17 219:18,19,19 219:22 220:17 221:24 223:6 223:25 224:2 224:10,16,18 225:7,24 226:2 227:13,15,24 228:8,16,17 229:2,4,7,8,10 229:12,13,17 229:19,20,22 229:23 230:22 230:24,25 231:2,3,10,19 231:24 232:3,4 232:9,16,18,23 233:6,24 234:5 234:24 235:2,8 235:13,15,22 235:25 236:4 237:3 239:11 239:12 240:9 240:15,18,22 241:8,17,18 242:2,18,21 244:3,5 246:5 246:8,16,21 248:6,10,16,23 249:2,7,18 250:13,19,23 251:4,9,16,19 252:5,9,18,21 254:5,7,8,12,15 254:16,20 256:5,21 257:5 257:16 258:4 259:22 260:19 263:7 265:18 268:2 271:23 271:24 272:15 272:15 273:6,7 274:15 275:18 275:23 276:3 277:19,20 278:10,13 280:2 282:2 284:22,23 285:3 286:14 299:6,13,23 300:3,5,8,17,20 301:5,10,13,21 303:18 307:3 323:22

**skincare** 59:22

**skip** 215:7

**slather** 222:22

**sleep** 286:10

**slides** 204:6

**slightly** 61:13 164:18 198:15 199:19

**sloughing** 199:13

**slow** 45:9

**slowly** 225:21

**small** 85:7 87:5 210:11,12 212:15 213:7 251:7,8,17,18 255:11

**smaller** 196:14 209:9,24 210:2

**smehta** 2:21

**sodium** 164:12 183:5 186:18 187:15 207:7 217:13

**sold** 93:15

**solubilization** 177:20

**solution** 214:4

**solutions** 4:24 4:25 326:9 327:23

**somebody** 33:12 91:23 92:2 100:3 159:8

**somewhat** 102:7

**sorry** 30:19 31:16 44:15 54:5 55:2 65:16 74:6 102:12 103:13 108:9 114:19 124:11 147:8 159:19 177:8 185:21 187:24 193:16 196:21 200:16 206:2 215:17 246:7 247:4 257:11 278:2 287:13 304:24 310:7 312:13

**sort** 33:2 37:25 40:4 47:15 53:11 57:14 89:7 94:2,11 94:17,18 145:14 151:10 152:23 155:17 159:6 198:7 204:22 242:5 246:24 260:25 273:3 288:7 289:16 292:15 305:2 317:13 323:11

**sorts** 259:19 282:23

**sound** 246:2

**sounds** 248:16

**source** 138:22 138:23 244:19

**sources** 80:22 90:5 119:4 139:7 142:12 160:19 206:17 288:8,10

**space** 257:2
**spacing** 69:11 273:2
**speak** 56:5 71:5 117:8 131:10 304:17
**speaking** 17:14 229:15 231:23 231:23 232:2 298:5
**speal** 4:22
**specialist** 4:23
**specialization** 86:12
**specialized** 48:6
**specialty** 15:23
**specific** 20:11 35:21 46:22,23 47:7 48:10 49:21 51:23 76:10 100:5 101:3,4 103:4 107:16,24 108:20,23 109:9 114:13 117:9 119:18 119:19 122:8 125:5,13 126:25 127:11 127:19 142:2 142:24 143:7 143:18 144:22 145:17 148:20 157:21 172:24 178:8 179:7,19 192:11 214:24 218:23,24 273:14 311:22 312:10 313:8
**specifically** 18:16 58:23 59:9 89:25 90:10 96:9 100:10 104:9 111:14 117:7 121:16 123:18 127:3 129:14 136:12 138:11 141:13,21 142:23 149:24 168:20 171:2 171:25 172:5,7 178:23 179:15 214:23 217:10 227:2 231:13 242:20 257:22 259:6 264:18 294:13 298:2 324:6
**specifics** 46:3 61:21 116:16
**specified** 135:2
**specify** 39:5
**spectrum** 301:18,20
**spell** 30:20
**speller** 238:25
**spent** 26:7 72:5 72:17,21,24 73:4 131:11,13 131:19 318:17
**spit** 47:25
**split** 97:2
**spoke** 26:24 74:17
**spoken** 120:18
**spot** 29:8
**squamous** 22:17
**squared** 193:13
**ss** 325:4
**stage** 209:20 233:13
**stand** 71:10
**standard** 84:17 205:11 280:22
**standing** 24:15
**stanford** 26:8,9 26:11 27:25 28:7 41:21 87:2
**stanner** 4:13
**start** 12:9 21:22 22:3 37:6 38:3 40:23 159:13 208:23 257:12 272:17,23
**started** 8:6,9 11:11 34:6 41:7 89:22 120:14 131:5,6 251:24
**starting** 22:2 252:7 272:25
**starts** 177:12 182:3 186:6 189:13 197:16 209:3 214:16 219:3 265:21 295:5
**state** 1:15 7:15 7:24 8:22 22:4 96:15 98:7 170:19 181:6 182:25 191:8 219:8 226:9 250:11 295:15 317:17 325:3,7
**stated** 7:24 70:23 241:25 310:22
**statements** 320:16
**states** 1:2 6:21 88:8 186:13 208:17 290:24
**stay** 36:23 61:12 223:24 225:23 226:2 255:18 265:11 314:11
**staying** 252:3

**stays** 192:5
**steering** 71:21
**stenographic** 7:18
**step** 10:9 152:23
**steps** 153:8 154:17 317:13
**steroid** 176:11 213:19,21 220:3 221:7,19 223:20,23 224:5,22 225:3 283:23 285:12 285:21 286:23
**steroids** 42:23 42:24 43:4 82:23 222:19 223:3 229:3
**stick** 265:7
**stipulated** 5:2,7 5:10
**stop** 41:15 237:10 279:10
**stopping** 24:2
**store** 92:17,20 124:2
**straight** 91:21
**straighten** 17:22 96:11 293:5
**straightener** 18:2 19:2,13 19:14 20:5 90:4,6 186:14 186:16,24 187:12 188:14 188:18 189:22 193:11 205:25 206:2,22 289:8 292:18
**straighteners** 18:18,21,23 19:5 58:13,18 89:25 184:2,11 187:14,20,25 188:2 206:4 288:5,12 291:14 292:15 292:25 326:14
**straightening** 17:11,16,20 18:5 90:14,16 90:19 188:16 217:12 287:19 290:2,10 291:3 291:7 292:4 294:2,6 299:21 303:8 307:2 326:18
**stratum** 198:14 199:18,21
**street** 2:7,14 3:4,17,21 4:4 4:12,16,20
**strength** 56:16 139:8 140:6,9 272:22
**strike** 124:11 192:23 205:16
**stripping** 172:15
**strokes** 16:18
**strong** 77:6 140:13 272:5
**stronger** 272:9
**structural** 183:24 184:10 326:14
**structure** 177:21 178:14
**structures** 196:16 199:6
**struggled** 239:18
**students** 26:11 26:14
**studied** 297:21 297:23
**studies** 39:13 39:14 40:10,13 41:19,22 57:21 58:25 86:17 101:16 108:17 125:21 130:4 133:7,20,23 134:2 144:24 147:6,9 149:2 149:3 151:12 157:24 194:4 206:9 256:20 258:23 259:23 263:20,20,23 267:10 288:14 294:20 308:18 308:20 309:7 311:12,17 313:22 314:24 314:24 315:6,7 316:15,17,22 319:15
**study** 60:12,13 106:25 108:4 129:24 133:13 144:18,25 145:2 148:24 156:24 182:16 182:17,23 183:3,12 184:21,22 185:5,13,15 193:25 194:16 197:2 205:2,15 205:18 206:23 206:24 220:2 239:25 242:15 242:17,21 243:9 244:12 244:18,21,22 261:10 263:12 287:10,14 288:4,16 289:6 296:22 298:16 298:19 303:12 305:3 307:20 308:17 309:4,6

311:10 317:6 317:18 318:3 318:10,15 319:22 320:7,8 320:10
**stuff** 45:22 132:14
**style** 17:25 294:2
**subcategorize** 41:25
**subject** 60:19 147:13,13
**subjects** 147:9 190:14,14 304:20 320:12
**submitted** 80:24 112:16
**subscribed** 329:14
**subsequent** 171:23
**subsequently** 185:7
**subspecialty** 22:11
**substance** 194:11
**subtle** 198:13 200:5
**sugar** 286:8
**suggest** 297:8
**suit** 2:4
**suite** 2:7,11,14 2:19 3:9,14,21 4:4,12,20
**sullivan** 2:15
**sullivanj** 2:16
**summarize** 75:2 311:12
**summary** 72:14 72:17
**summation** 97:24
**sun** 59:23 60:9 276:2 278:11
**sunscreen** 56:11,17 60:5 60:22 61:23 62:12,12
**sunscreens** 56:3 60:7 61:6 61:18 62:9
**support** 76:3 141:10
**supported** 75:12 149:18
**supposed** 223:24 224:2
**suprabasal** 198:12
**sure** 9:8 10:2 10:16 12:19 15:9 20:12,23 40:19 48:7 54:8 59:10 63:12 64:10 68:12 72:8 76:18 79:13,22 79:24 81:8 87:25 97:4 103:21 108:4 111:23 112:12 114:16 120:10 120:18,22 127:12,22 128:4 131:17 132:15 137:18 144:2 146:5 148:21 149:8 159:24 162:10 166:8,11 174:19,19 177:10 181:20 182:19,20,24 183:13,14 185:3 187:5 192:11 198:9 199:19 207:17 208:24 210:9 212:13 218:11 221:18 227:21 229:14 231:25 239:6 243:23 244:19 252:17 253:25 265:10 278:4 280:21 292:20 294:21 296:10,25 297:4 298:18 299:17 302:21 309:2 310:23 313:16 315:17
**surface** 41:13 223:25 252:11 252:19 253:8 254:8 286:17
**surgery** 34:9
**surprised** 100:7 288:18
**surprising** 102:8
**surveillance** 24:14
**survivors** 59:21
**survivorship** 24:6,12 27:17 34:17 52:20,25 59:13
**susceptible** 219:10,15
**swallowed** 286:5
**swear** 7:20
**sworn** 5:13 7:23 181:5 325:11 329:14
**symposium** 59:20
**symptoms** 228:14 277:4 287:7 295:11 295:18,22 310:2,17

**synopsis** 24:21
**system** 43:4 47:14,18 101:24 135:11 138:9 149:24 221:8,14 270:8 270:10
**systemic** 31:25 40:25 65:13 85:17 86:3 97:12 108:15 108:17 128:15 129:15 138:19 146:17 155:2 172:10 195:11 224:19,23,25 225:12,14 226:4 234:12 234:16,20,22 235:3,15 236:13 237:6 240:12 248:7 249:23 250:10 250:20 273:20 274:2,13,21,23 275:13 276:19 280:25 285:10 286:19 296:16 296:17 297:11 297:13,24,24 298:22,22 299:3 300:8 301:7,11 303:17 316:8 321:15 322:5
**systemically** 29:24 82:5,11 85:22 281:13 295:22
**systems** 3:3 4:19 149:22 281:14 286:6

**t**

**t** 30:10,21 36:16 102:22 181:2 213:25 266:9,9 270:17 270:17 272:6,8 272:8 283:11 325:2,2 326:8 328:3,3
**tab** 13:18 21:2 88:4 183:21 243:2 290:8
**tabet** 4:11
**table** 21:25
**tabs** 13:15
**take** 6:11 11:13 11:16 21:19 22:15 24:24 35:12 45:5,13 68:13 71:7 92:22 103:25 110:11 131:25 153:9 154:6 174:19 179:20 185:12 200:17 245:18 264:22 275:3,4 291:17 322:9
**takeaway** 76:7
**taken** 6:16 11:6 71:14 132:9 176:24 180:4 193:2 201:3 211:19 251:25 265:3 318:20 322:20
**talk** 12:17 17:17 34:22 39:4 49:3 59:21 60:23 62:4 63:6 66:7 77:19 87:21 118:15 120:12 122:19 125:22 132:21 145:25 177:23 183:11 185:5 195:13 216:24 217:15 225:21 227:15 228:20 238:20 240:4 253:16 253:17 255:21 274:10
**talked** 63:13 84:25 100:15 112:9 137:13 139:19 142:13 158:9 171:19 210:22 213:10 237:24 248:14 255:3 264:4 281:24 282:19 288:7 289:14 294:11 305:4 315:23
**talking** 10:13 18:8 84:3 93:12,24 104:22 105:4 127:2 129:13 133:21 140:25 142:20 149:15 154:23 182:18 210:4,5 211:10 217:10 218:11 230:17 231:12 231:14 252:16 267:4 297:10 303:16 309:3 310:10 311:16 311:17,25
**talks** 27:13,21 59:13 189:14 194:22 197:17 197:22 244:2 266:7
**tape** 172:15
**tardy** 2:10 3:13
**targeted** 23:15
**task** 95:22 96:22 168:3 191:22

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 397 of 409 PageID #:75846



**tasked** 74:20 89:12 262:9
**taught** 26:17
**tazarotene** 270:17 271:14 271:22 273:23 273:24 274:9
**tdrlawfirm.co...** 4:13
**teach** 26:19 141:25 142:4
**teaching** 26:3,5 27:8,19 28:15 37:23
**team** 113:13
**tech** 13:12
**technical** 233:6
**telephonic** 200:15
**tell** 40:7 55:12 67:9 116:6 144:11 156:24 170:10 172:25 198:19 202:7 239:24 253:22 281:20 313:16
**temporal** 289:17 310:4
**temporally** 304:8
**ten** 126:18 175:7
**tend** 25:3 93:18 269:10
**tends** 279:22 280:23
**tenets** 11:2 156:13
**tens** 308:3
**teratogen** 274:16
**teratogenic** 266:8
**term** 18:3,4 20:5,6 24:16 24:18 81:22 83:3 103:17 144:6 148:9 155:14 177:13 213:22 214:16 229:9 233:6,8 234:19 255:22 258:13 260:12 262:16 285:6 285:24 304:13 304:16 312:21 321:8 322:2,7
**termed** 258:12
**terminology** 33:19 107:11 148:20 159:10 217:21
**terms** 19:13 35:15 47:22 54:16 77:7 97:16 98:19 99:2,4 100:24 126:13 130:14 144:14 155:2 156:19 158:10 166:22 175:5 178:6,9 197:11 202:6 207:6 212:19 215:4 215:25 217:19 227:4 236:16 238:15 257:19 262:2 264:5 284:25 319:10
**test** 63:2 119:19,21 207:9 316:3,5
**tested** 205:14 205:14,17
**testified** 8:2 9:21,24 63:14 181:7
**testimony** 11:4 321:14 324:19 325:13 327:9 327:17 329:8
**testing** 38:24 39:2,12 105:20 105:22 108:6 120:6 172:14
**tests** 31:20,22
**textbook** 249:13
**textbooks** 58:7 122:18 160:18
**thank** 8:4 20:18 20:23 24:25 32:4 34:21 45:17 80:7 126:8 156:11 162:22 171:10 183:16 207:15 216:23 247:20 324:8
**thaten** 1:14 7:7 325:6,25
**theoretically** 251:10
**theory** 259:19
**therapeutic** 48:13,14 140:7
**therapeutics** 38:19 137:10
**therapies** 24:2 44:3 46:11
**therapy** 23:12 23:15,18,25 66:13
**thin** 240:22
**thing** 11:17 18:25 31:10 35:6 62:3 66:8 77:18 94:16 131:17 152:6 152:19 153:23 165:20 206:14 228:19 237:19 246:14,17 272:5 273:15 282:15 309:3

**things** 23:10 25:3 28:18 30:17 31:2 35:3,7 36:14 37:21,25 53:11 55:14 56:3,14 62:6 71:19 76:12 77:13 85:3 100:8 111:14 117:7 129:16 149:4 149:25 163:10 185:24 202:20 218:8 223:7 231:15 240:7 243:16 247:14 249:19 251:8 254:13 258:4 266:17 282:18 286:16 288:18 289:15 302:15 307:25 323:13
**think** 16:8 19:5 19:8 20:9 22:13 31:2 43:2 45:21,22 47:21 48:22 53:3,8,20 55:6 56:14 58:3 62:2,17 67:11 68:4 75:9 80:15,17 84:14 84:16 85:7 90:17 92:19 93:11 95:9,20 103:2 106:23 112:3 115:21 119:17 129:22 134:20 135:13 142:5 145:14 145:24 147:19 150:24 152:15 153:14 154:13 154:15 155:16 156:12,21 157:21 158:14 158:24 160:10 160:21,24 168:20 169:15 169:18 171:8 171:17 172:22 173:22 176:3 176:17 178:21 191:13,21 193:18 194:8 195:21 197:6 198:22 200:18 202:18 203:16 204:6 206:7,12 208:3 210:6 213:2 215:25 217:12 218:9 220:12 225:10 225:11,17,22 227:18 228:3 230:15 232:6 232:16,23 233:4,10 235:10,18 236:16 238:5 240:8,25 244:11 245:21 247:8 249:17 252:23 255:19 256:24 257:19 257:25 260:8 260:20 262:7 263:25 265:12 266:13,14 270:8 279:17 279:21 280:20 287:2 289:18 291:11,13,16 298:2,4 300:12 301:4 304:16 308:14,18 310:9 314:16 315:23 316:5 317:5,8 320:5 320:25 322:24 323:2
**thinking** 47:16 52:14 82:3 92:13 135:12 166:10 253:14 257:18 297:3 323:15
**thinner** 198:24 219:22 248:15
**thinnest** 240:18
**thinning** 183:7 198:3,12,22
**third** 64:12 115:12
**thirds** 177:12
**thorough** 78:11 86:4 96:24 150:11,17 167:15
**thought** 34:4 63:8 65:23 75:14 118:2,23 123:6 133:23 176:19 232:2
**thousands** 308:4
**threatening** 24:3 39:22 41:9,10 239:15 241:12,19
**three** 63:20 67:22 110:17 188:20,24 189:3 246:24 287:18 307:22 314:24 315:6 315:19 316:14 316:18
**throw** 247:17
**ties** 268:4
**tight** 202:21,22
**time** 5:9 6:9 7:16 12:18 13:24 14:3 21:19 28:14 41:21 45:13

52:23,25 53:2 59:10,11 63:14 63:16 67:22 72:21,24 73:4 86:18 102:11 102:13 107:13 109:7 110:11 131:13 134:11 146:4 161:9 162:2 174:19 181:3 190:18 220:15 233:17 262:25 269:20 278:3 296:4 318:18,21 324:24 327:18
**timeframe** 310:18 327:8
**timeline** 68:7 112:12 154:3 297:2
**times** 10:15 12:15 34:7 36:3 63:11 83:24 150:4 190:9 218:17 220:4 242:12 242:22 244:6 246:9 278:15 278:21 281:24 321:2
**timing** 289:13
**tissue** 196:8,10 196:13
**titanium** 62:11
**title** 21:24 143:18
**titled** 14:6 21:5 110:13
**titus** 2:16
**titusk** 2:17
**today** 8:12 9:6 10:16,24 12:4 12:11 13:12 18:8 44:13 48:23 75:4 128:21 174:23 218:17 281:24 322:25
**today's** 16:21 324:18
**together** 8:15 50:16 154:7 176:2 199:7 286:16 311:13
**tolerate** 272:13
**tolerating** 272:21
**ton** 51:22
**tons** 232:20
**took** 26:16
**tool** 35:9
**top** 132:21 179:8 182:2 193:4 199:3 208:17 224:10 228:10 246:18 246:23 255:20
309:20
**topic** 61:22,23 147:21 150:5 317:18 318:21 319:7
**topical** 27:2 56:18 65:15 82:23,25 83:2 85:14 97:8 98:22 176:8 177:19 189:21 213:18,21 216:4,5 219:4 220:3,12,13,25 221:7,19 222:18 223:2 223:11,23 224:4,22 225:3 225:13 226:24 227:9 228:11 229:3 234:10 238:22 239:9 240:11 241:7 241:10,16 245:3 246:7,15 247:8 248:19 250:9 263:6 272:5 274:5 275:14 276:16 276:25 278:24 280:4 286:12 287:12 293:13 303:17
**topically** 54:18 82:10 236:23 285:15
**topicals** 185:9 241:2 250:7
**topics** 27:23
**topography** 253:9
**total** 270:12 324:20
**totality** 130:3 176:16,21 307:7
**totally** 161:25
**touch** 60:3 90:15 94:20 289:2
**touched** 59:12 89:17 106:23 145:15 171:18 258:20
**tough** 284:18
**toward** 156:20
**towards** 35:17 194:24 243:25 251:21
**toxic** 53:9 236:13
**toxicities** 23:22 27:15 32:12 35:22 36:22 38:21 40:11 43:14 46:23,25 49:21 68:6

101:25 102:6
**toxicity** 23:12 25:6,10,11,22 32:20,22 34:5 34:23 35:4 36:13 38:10 39:20 47:8 48:11,12 64:3 64:15,24,25 68:18 69:8,16 70:8 100:20 103:24 104:17 104:21,23 105:3,6,11,19 153:18,21 160:13 192:16 234:12,16,21 235:3,16 236:17 237:22 237:25 238:15 240:12 275:23 276:20 299:3 300:6 311:25 316:8
**toxicological** 38:13,17
**toxicologist** 81:20
**toxicology** 81:11,15
**toxins** 304:2
**traditional** 23:14
**train** 231:25
**training** 81:10 82:18 86:8 88:14
**transcript** 12:12 325:12 327:6,19 329:5 329:8
**transdermal** 83:6 225:17
**transepidermal** 208:19 215:8 231:13 240:4
**transfollicular** 75:25 231:22 252:6 259:20 261:5 262:23 263:16
**translate** 78:15 198:18
**translation** 77:12 78:14
**transparency** 166:22
**transplant** 59:18
**transplantation** 24:17,19 59:16
**transport** 321:8,11 323:6
**treat** 48:10,12 69:9 95:19 224:7,9 274:8 277:18,25
**treated** 24:8 34:15 49:4,7
**treating** 34:23 83:16,18 275:25 276:3
**treatment** 25:22 27:15 28:21 32:20 33:7,21,23,25 34:5,11 35:18 36:23 37:14 38:4,11 39:20 43:8,13 46:10 46:13 48:3,5 52:24 53:18,18 56:13 57:14 64:15 67:19,21 69:11 100:14 101:14 105:25 153:18,25 154:3,5,9 189:17 193:4 237:10 268:17 276:5 278:23 278:23 279:11 279:18,19,25 283:23 284:4 285:2 286:14 295:10,17 298:14 310:3
**treatments** 19:7 23:23 25:7 37:7 40:11 41:15 42:19 43:18,22 46:8,23,25 153:22 287:20
**tree** 136:24
**tretinoin** 272:8 272:11,13,24
**trial** 5:9 13:12 36:18 41:7 63:18
**trials** 35:22 36:21 39:9 41:20
**tricky** 155:25
**trouble** 92:21
**true** 45:6 166:2 226:15 254:7 259:10 325:13 329:8
**truthfully** 249:6
**try** 36:21 41:25 45:12 50:17 53:6 68:3 81:22 111:11 134:13 144:15 155:16 185:23 212:3 221:16 230:2 268:18 269:19 296:5 319:18
**trying** 20:3 24:21 28:6 33:3,20 43:3 47:20 62:25

69:25 96:11 97:15,25 100:23 133:14 140:2 148:16 159:15 166:25 174:16 208:23 215:16,17,21 220:11 221:17 240:23 245:11 256:15 266:18 285:14 286:13 309:15
**tube** 247:16
**turn** 14:5 87:23 88:5 128:2 132:13 181:22 185:17,18,25 192:24 194:18 195:22 243:21 251:21 265:16
**turning** 162:11 208:13 251:24 252:3 255:17
**twelve** 126:18 175:8 205:12
**twice** 20:2 279:7
**two** 9:6 22:14 60:25 61:11 64:4,18 67:22 74:24 94:6 110:16 117:20 118:18 137:19 152:16 177:12 189:13 240:20 241:9 245:24 246:2 270:22 271:6,9 312:4 316:17
**type** 23:2 36:6 52:6 58:13 84:9 86:6 105:21 136:3 136:23 137:4 138:9 144:17 246:3 251:5 267:3 273:6 298:16,22 299:5,22,23 305:18
**types** 23:3 29:2 42:6 140:11 237:16
**typical** 190:17

**u**

**u** 7:22 22:17,17 30:22 31:8 36:16 42:10,10 102:22 171:2,2 181:4 252:9 253:21,21,21 255:8 275:10 275:10
**ubiquitous** 61:24
**uh** 9:17 11:5,5 15:14 25:18 44:6 48:24 70:11,14 78:23 99:22 110:10 113:25 185:22 186:4,9 197:19 198:2 203:12 219:13 227:20 255:24 309:19
**uhs** 11:5
**ulcer** 228:23 229:16,25 230:19,19 231:5 233:12 233:13,14
**ulcerated** 200:11 201:13 201:15 229:2,7 229:17 239:11 240:15 246:8 246:22 248:14
**ulceration** 240:21
**ulcers** 238:9 245:5
**ultimate** 23:24 146:10 232:7
**umbrella** 83:3
**unable** 148:6 214:23 289:3
**unbilled** 72:25
**uncomfortable** 41:12
**uncommon** 247:12
**under** 88:7 110:24 181:7 189:6 197:12
**undergo** 167:15
**undergoing** 38:12
**undergone** 59:15
**underlined** 243:17
**underlying** 30:14 31:23 273:6 276:2
**underneath** 209:2
**understand** 12:6 16:7,12 17:9 20:4 28:6 33:21 47:17 65:16 83:11 114:24 126:9 140:2 144:5 148:23 150:25 151:6 165:18 168:11 169:4,7 175:14 182:18 187:17 190:16 205:21 207:22 215:17,18 221:17 271:5 278:4 291:6
**understanding** 33:4 47:6 77:6

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 402 of 409 PageID #:75851



81:15 85:20 86:21 93:20 94:13 95:14 96:22 111:11 123:14 140:25 154:22,24 187:23 190:20 191:23 218:3,4 229:4 236:17 260:17 267:24 269:8 318:22 323:24
**understood** 11:24 12:12 89:13 204:24
**undertake** 88:9 156:4
**undertaking** 132:22
**undertook** 132:22
**undesirable** 85:17 89:7 97:18 237:6 238:7 249:22 250:10 297:24 298:23
**undiagnosed** 64:15
**unethical** 316:5
**unfortunately** 31:24
**unintended** 234:20,22
**unique** 323:8
**unit** 6:14
**united** 1:2 6:21
**units** 45:3 284:4 324:21
**university** 26:11
**unlisted** 168:7
**unnatural** 45:11
**unpack** 267:2
**unpredictable** 277:14
**unpublished** 14:22
**unquote** 103:16 175:6 207:25 258:7
**unsafe** 39:24
**unwell** 276:21
**update** 80:22
**upf** 62:7
**upper** 201:24
**urinalysis** 303:2,11,13 304:19
**urinary** 305:2,6 305:18
**urine** 303:15,20 303:22 304:3,8 315:3
**usage** 20:5 73:5 73:8 125:6,7,8 125:22,23 126:10 175:19 175:21
**use** 16:19 17:7 17:13 19:12 33:18 35:10 36:9 39:10,24 40:17,22 43:18 43:19,21 49:5 49:17 51:22 53:7 67:17 69:25 73:11,16 73:20 78:3,16 81:16 88:16 94:23 96:16 118:20 121:15 121:17 122:19 122:20 124:5 124:11 125:24 133:8 135:14 135:19 137:20 137:21 145:5 145:23 151:15 153:13 155:5 155:14,19,21 174:24 175:4 175:16 191:6 192:18,21 201:17 205:5,8 205:9,11,20 213:18,22 220:14,25 224:22 225:6 226:21 229:25 230:18 234:2 234:21 235:23 236:18,21 241:16 244:23 246:2,19 247:13 270:16 273:23 274:11 277:17 284:11 286:18 288:25 298:10,11 299:7,24 301:14 316:21 316:24 321:14
**used** 17:21 40:24 54:18 84:18 91:6,8 96:16 99:2 111:5 125:19 126:11,12,21 140:20 146:7 147:25 186:19 186:24 187:18 214:17 218:6 229:9 246:13 251:6 271:18 272:11 275:7 275:13 284:3 304:21 308:7 312:21,25 322:3,7 324:21 327:19
**useful** 127:23
**user** 175:6,11 175:12

Case: 1:23-cv-00818 Document #: 1828-17 Filed: 05/05/26 Page 403 of 409 PageID #:75852



**users** 49:11,14 88:20 92:6 311:23 312:2 315:4 316:16 318:22
**uses** 73:19
**using** 30:23 50:21 51:9,16 83:3 91:17,20 101:13 107:11 175:6 176:11 176:15 184:3 184:12 273:11 274:17 285:23 286:3 295:23 300:14 308:4 326:15
**usually** 50:2 100:17 140:4 156:15 282:8 286:21
**uterine** 32:6,9 32:10 33:13 34:14 88:19 89:8 128:16 129:19 312:5 313:3 316:25 319:25 320:21
**utilization** 172:13
**utilize** 18:19 43:22 46:8 60:10 73:20,21 86:17 98:18 126:16 133:2 138:8 139:2,5 139:7 141:20 159:9 194:3 206:10,18 216:6 236:3,21 261:2 267:15 271:11 275:14 304:16 323:24
**utilized** 14:16 18:16 26:25 39:25 40:3 51:25 68:22 69:4 77:14 80:23 94:22 97:8 99:10 103:20 106:23 107:12,22 109:25 110:2,6 111:9 118:19 119:5,14 122:17,18 137:9 146:15 146:15,21 148:21 151:3 158:10 173:25 174:13 175:3 175:25 185:14 187:23 206:23 216:8 242:5 244:20 246:23 248:21 266:12 266:19 280:23 288:8,9 292:14 310:15,16
**utilizing** 39:16 85:24 100:22 133:22 206:15 208:5 240:5 260:6 261:12 267:17,18 273:8 309:13
**uv** 56:13 59:24 163:15

**v**

**v** 7:22 181:4 190:5 327:4 328:1 329:1
**vague** 200:8
**valentina** 3:5
**valleys** 253:12 253:13
**variable** 257:9 269:25 273:17
**variables** 209:4 209:7 258:2 262:23 287:3
**varies** 106:7
**variety** 29:6 42:6 308:4
**various** 23:23
**vary** 93:21 94:14 230:16
**varying** 264:10
**vast** 166:20 263:14
**vbartolomeo** 3:6
**vehicle** 84:12 84:13,24 189:15 214:3,5 217:2,5,19,20 217:23 282:19
**verbal** 11:5,8
**verbally** 204:19
**verify** 327:9
**veritext** 4:24,25 7:4,8 13:17 324:23 326:9 327:14,23
**veritext.com.** 327:15
**vernacular** 91:19
**versus** 18:23 19:10 20:5 28:7 90:13 98:21 156:6 175:21 187:19 188:13 192:6 229:16 230:12
**vi** 190:5
**video** 4:23 6:10 6:15
**videographer** 6:2 7:5 71:10 71:15 132:6,10 179:25 181:9 200:24 201:4 211:16,20

264:24 265:4 314:8 322:17 322:21 324:16
**videos** 92:5 95:12 112:2,25 113:3 114:10 114:12 116:22 126:24
**videotaped** 1:11 13:7 326:11
**viewing** 21:3
**vii** 190:5
**virginia** 3:18
**visible** 224:7
**visual** 35:7 37:13 204:23
**visualizing** 35:3 105:18
**visually** 204:18 282:9 301:9
**vitro** 39:12
**voelker** 4:20
**volume** 126:20 127:7 189:16 193:10 263:20

**w**

**wacker** 2:11,19 3:14
**wait** 10:10
**waived** 5:6
**walk** 119:9 265:14
**walking** 124:2 150:24,25
**want** 20:12 26:19 41:15 43:6 46:13 48:10 65:8 66:7 71:17 79:25 85:13 88:5 91:2 100:4 106:18 112:7,11 114:25 115:6 119:9 132:13 147:14 153:23 158:23 163:20 171:6 172:8 179:20 181:22 182:20 195:13 196:10 202:21 204:10,15 218:10 224:12 224:14,17,19 227:21 230:5 231:24 237:10 238:11 243:12 243:21 245:18 246:6,14 251:2 251:3 264:2 265:16 266:10 267:12 270:15 273:10 274:22 277:2 278:3 279:16 281:17 284:13,21,24 287:8 296:10 296:14 300:13 303:25 309:2 312:10,11,14 312:15,17,22 314:4 317:10 318:2,3,5
**wanted** 14:13 19:19,22 159:8 172:17 177:24 183:11 195:16 207:17 223:15 247:21
**washington** 2:8
**waves** 253:6
**way** 16:2,3 30:3 31:25 34:18 52:15 53:9 54:13 69:24 85:11 89:12 95:16 98:2 104:14 108:12 120:21 133:2 134:24 140:4 141:8 145:16 145:16 146:14 146:15,20 148:8 149:5 150:19,24 156:2 158:3 167:16 169:24 170:18 176:18 177:12 192:3 202:17 203:11 203:21 207:23 209:22 210:16 218:5 223:9 229:14 230:18 232:15 233:5 233:15 241:6 251:2 253:14 273:16 282:21 284:6 285:16 288:6 289:2 300:16,20 301:4 303:14 303:15 306:17 306:21 308:2 320:19 325:18
**ways** 17:15,20 22:14 29:7 35:20 82:6 89:11 94:7 95:22 142:8 227:7 269:23
**we've** 100:25 131:23 150:3 174:17 264:4
**weave** 68:3
**weeds** 172:18
**week** 80:24 114:21 189:19 190:8 205:5,5 205:7,18
**weekend** 14:4
**weeks** 126:18 175:8 205:12 245:24 246:2

**weigh** 267:16
**weighed** 130:4 133:9
**weighing** 134:6 142:7
**weight** 31:15 31:15 132:23 132:24 134:17 135:18,20,23 135:25 136:4,7 136:9,13,16,19 136:21 137:25 138:7,12 141:18,24 142:3 145:8,19 147:23,24 148:7 149:13 149:15 158:5 159:3,18,19,21
**welcome** 132:12 181:12
**went** 10:3 131:12 318:18
**west** 2:14
**whereof** 325:20
**whispering** 6:7
**white** 309:6 312:16 315:7
**wideikis** 2:19
**wiedner** 4:15
**wilmington** 2:4 44:22
**wise** 260:21 281:22
**wish** 116:16
**wistar** 184:4,12 184:16 326:15
**witness** 7:20 13:14 20:23 44:6,15 45:8 45:14,17 63:19 99:14 112:9 142:15 200:16 325:10,14,20 326:3 327:8,10 327:12,18
**witnesses** 15:11 120:5,19
**wmlaw.com** 4:17
**woman** 267:21
**women** 269:13 316:8,15
**wood** 276:25
**word** 12:3 91:18 108:22 133:8,8,25 169:8 201:17 239:21 243:13
**worded** 145:16
**words** 15:19 19:12 20:7 226:9 239:4,5
**work** 23:21 24:23 27:5 28:21 31:20 52:4 65:7 69:10 70:17,20 71:25 72:23 83:12,13 96:17 105:24 137:22 138:2,8 259:24
**worked** 76:25
**working** 100:14 102:9 313:21
**world** 78:16 108:6 117:22 135:6 227:3 313:19
**worldwide** 3:13
**worried** 53:8 173:24,25
**worries** 65:18 65:24 81:8 84:23 233:18 314:6
**worsening** 106:5
**worst** 274:24 276:23
**wounds** 228:21
**wrap** 282:2,3 283:25
**wright** 2:3
**write** 57:8 97:25
**writing** 125:4 155:18,23 317:11
**written** 52:10 52:16 57:5 323:14
**wrong** 247:3,5
**wrote** 164:3,3 169:10 245:17

**x**

**x** 1:3,7 48:9 67:15 129:24 153:7,10 326:2 326:8

**y**

**y** 48:9 67:16 129:24 153:7 153:10 213:25 276:11,11,13 283:11
**yeah** 9:17 12:19 15:8 16:11,11 17:2 18:10 19:21 28:9,19 33:5,8 33:11 45:25 47:19 55:9,18 60:23 63:7 65:14 70:3,3,3 76:22 78:20 79:2,6,7 80:7 80:14,17 82:20 86:10 90:23 93:20 96:20 99:10 101:12 105:11 109:18 111:7 112:18 112:23,23

114:12,22 116:7,23 134:15,15 140:3,17,23 141:6 142:19 144:16,21 145:24 147:18 158:14 162:5 162:14 169:18 169:19 171:6 172:9 174:7,21 175:17 177:10 179:22 182:12 182:15,22 184:17,18 196:7,22,22 197:6 198:5 200:21 202:9 202:12 204:25 213:18 218:13 218:14 221:22 222:7 227:20 233:10 238:3 253:13 260:16 263:18 267:6 275:4 282:16 283:3 286:3 287:7 288:17 296:5 297:7 312:13,19 314:6 315:12 315:23

**year** 72:9 287:16

**years** 26:8 42:3 44:9 60:25 61:11 86:24 147:8,9 298:13 316:17

**yelled** 19:25

**yep** 25:8 296:12

**york** 1:13,13,15 3:22 4:8,8 7:2 7:2,24 8:2 26:7 181:6 325:3,4 325:8

**z**

**z** 270:17

**zinc** 62:11

**zoom** 2:15,16 2:20 3:6,11,15 3:18,22 4:5,9 4:13,17,21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.