# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) Case No. ) 1:23-cv-00818 |

The video deposition of DARIO ROQUE, MD, called by the Defendant for examination taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, before Valerie Calabria, CSR, RPR, taken at 10 North Dearborn Street, 6th Floor, Chicago, Illinois, on January 28, 2026, at 9:04 a.m.

Job No. 7852368

APPEARANCES:
DOUGLAS & LONDON, P.C.
BY: MS. STEPHANIE O'CONNOR
MS. SARA CASTRONUOVA
MR. GARY J. DOUGLAS (via videoconference)
MS. LARA J. SAY (via videoconference)
59 Maiden Lane, 6th Floor
New York, New York 10038
212.566.7500
soconnor@douglasandlondon.com
scastronuova@douglasandlondon.com
gdouglas@douglasandlondon.com
lsay@douglasandlondon.com

DICELLO LEVITT LLC
BY: MS. DIANDRA "Fu" DEBROSSE
MS. ALEXIUS MILLER (via videoconference)
MS. OMEGA L. ADAMS (via videoconference)
505 20th Street North, Suite 1500
Birmingham, Alabama 35203
312.214.7900
fu@dicellolevitt.com
amiller@dicellolevitt.com
oadams@dicellolevitt.com
ASHCRAFT & GEREL
BY: MR. PATRICK K. LYONS (via videoconference)
1825 K Street NW, Suite 700
Washington, DC 20006
202.783.6400
plyons@ashcraftlaw.com

appeared on behalf of the Plaintiffs;

COSTELLO GINEX & WIDEIKIS, PC
BY: MR. DAN COSTELLO
MR. MICHAEL P. TURIELLO
150 North Wacker Drive, Suite 1400
Chicago, Illinois 60606
312.850.2651
dcostello@cgw-legal.com
mturiello@cgw-legal.com
appeared on behalf of the Defendant House of Cheatham, LLC, and Beauty Bell;

APPEARANCES: (Continued)

LITCHFIELD CAVO, LLP
BY: MR. JOSEPH P. SULLIVAN (via videoconference)
303 West Madison Street, Suite 300
Chicago, Illinois 60606
312.781.6677
sullivanj@litchfieldcavo.com

appeared on behalf of the Defendant Golkow;

MCGUIREWOODS
BY: MS. ZOE SMITH (via videoconference)
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
312.849.8100
zsmith@mcguirewoods.com

appeared on behalf of the Defendant House of Cheatham, LLC;

HEYL, ROYSTER, VOELKER & ALLEN
BY: MS. SARA PEAL (via videoconference)
701 Market Street, Suite 1505
St. Louis, Missouri 63101
815.963.4454
speal@heylroyster.com

appeared on behalf of the Defendant Advanced Beauty, Inc.;

TABET DiVITO & ROTHSTEIN LLC
BY: MS. MEGAN E. RYAN (via videoconference)
209 South LaSalle Street, 7th Floor
Chicago, Illinois 60604
312.762.9450
mryan@tdrlaw.com

appeared on behalf of the Defendant RNA Corporation;

APPEARANCES: (Continued)

SHOOK, HARDY & BACON LLP
BY: MR. PEIYUAN GUO, Ph.D. (via videoconference)
1 Rockefeller Plaza, Suite 2801
New York, New York 10020
212.989.8844
pguo@shb.com

appeared on behalf of the Defendant
Strength of Nature;

WIEDNER & MCAULIFFE, LTD.
BY: MS. ANNA M. RICORDATI (via videoconference)
One North Franklin Street, Suite 1900
Chicago, Illinois 60606
312.855.1105
amricordati@wmlaw.com

appeared on behalf of the Defendant
Avlon;

ECKERT SEAMANS CHERIN & MELLOTT, LLC
BY: MS. KELBEY J. DECK (via videoconference)
275 Madison Avenue, 10th Floor
New York, New York 10016
646.513.2133
kdeck@eckertseamans.com

appeared on behalf of the Defendant
Revlon;

DINSMORE & SHOHL LLP
BY: MS. RAVIKA R. MARCADIS
200 South Biscayne Boulevard, Suite 2401
Miami, Florida 33131
786.957.1157
ravika.rameshwar@dinsmore.com

appeared on behalf of the Defendant
McBride Laboratory Inc.;

APPEARANCES: (Continued)

MARON MARVEL BRADLEY ANDERSON & TARDY LLC
BY: MS. LESLIE FEDERER (via videoconference)
MR. ROBERT W. PETTI (via videoconference)
191 North Wacker Drive, Suite 2950
Chicago, Illinois 60606
312.767.1314
lfederer@maronmarvel.com
rpetti@maronmarvel.com

appeared on behalf of the Defendant Murray's Worldwide and Luster Products;

CLAUSEN MILLER P.C.
BY: MR. JAMES D. GILDNER (via videoconference)
225 West Randolph Drive, Suite 700
Chicago, Illinois 60606
312.855.1010
jgildner@clausen.com

appeared on behalf of the Defendant John Paul Mitchell Systems;

SEGAL MCCAMBRIDGE SINGER & MAHONEY
BY: MR. MITCHELL P. MORINEC (via videoconference)
233 South Wacker Drive, Suite 5500
Chicago, Illinois 6060
312.645.7800
mmorInec@smsm.com

appeared on behalf of the Defendant Wella Operations US, LLC.

ALSO PRESENT:

Nick Page, videographer

* * * * *

Reported By: Valerie M. Calabria, CSR, RPR
License No.: 084-003928

INDEX


| WITNESS | EXAMINATION |
| --- | --- |
| DARIO ROQUE, MD | |
| BY MR. COSTELLO | 11 |
| BY MS. O'CONNOR | 371 |
| BY MR. COSTELLO (Further) | 390 |


EXHIBITS


| NUMBER/DESCRIPTION | | PAGE |
| --- | --- | --- |
| Exhibit 1 | Notice of deposition | 14 |
| Exhibit 2 | The Plaintiff's Steering Committee's Response and Objections to Defendants' Notice of Videotaped Deposition of Dario Rafael Roque, MD | 16 |
| Exhibit 3 | Statement of Compensation | 46 |
| Exhibit 4 | Roque expert report | 60 |
| Exhibit 5 | Gynecologic Oncology, Guide for authors | 135 |
| Exhibit 6 | Elsevier, What is peer review? | 150 |
| Exhibit 7 | Elsevier, Publishing ethics | 160 |
| Exhibit 8 | Reference 1, "The Environment and Disease: Association or Causation?" | 198 |
| Exhibit 9 | Reference 8, "Impact of risk factors on early cancer evolution" | 204 |

EXHIBITS


| NUMBER/DESCRIPTION | | PAGE |
|---|---|---|
| Exhibit 10 | Reference 23, "A Class of Environmental and Endogenous Toxins Induces BRCA2 Haploinsufficiency and Genome Instability" | 214 |
| Exhibit 11 | Reference 26, "Racioethnic Disparities in Endometrial Cancer Outcomes" | 255 |
| Exhibit 12 | Reference 28, "Health Disparities in Uterine Cancer" | 273 |
| Exhibit 13 | Reference 55, Endometrial Cancer Prevention (PDQ) | 283 |
| Exhibit 14 | Reference 75, "Use of hair products in relation to ovarian cancer risk" | 301 |
| Exhibit 15 | Reference 78, "Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women" | 327 |
| Exhibit 16 | Reference 78, Supplemental material for measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women | 333 |
| Exhibit 17 | Reference 57, "Hair relaxer use and risk of uterine cancer in the Black Women's Health Study" | 372 |
| Exhibit 21 | Reference 57, "Hair relaxer use and risk of uterine cancer in the Black Women's Health Study" | 354 |


(Exhibit 21 not contained herein.)

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:04 a.m. on January 28th, 2026. Please note the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record. 09:04

This is Media Unit No. 1 of the video-recorded deposition of Dr. Dario Roque taken in the matter of In Regards to Hair Relaxers Product Marketing Sales Practices and Products Liability Litigation. The location of this deposition is being held at the offices of DiCello Levitt, 10 North Dearborn, Chicago, Illinois. 09:04

My name is Nick Page, representing Veritext. I'm the videographer. The court reporter is Valerie Calabria, also from the firm Veritext. I am not related to any parties in this action, nor am I financially interested in the outcome. 09:04 09:05

If there are any objections to the proceedings, please state them at the time of your appearance. Counsel and all present will now please state their appearances and affiliations for

the record, beginning with the noticing attorney.
MR. COSTELLO: Dan Costello and Mike Turiello on behalf of House of Cheatham and Beauty Bell.
MS. DEBROSSE: Diandra Debrosse, co-lead MDL on behalf of the plaintiffs. 09:05
MS. O'CONNOR: Stephanie O'Connor, Douglas & London, on behalf of the plaintiffs.
MS. CASTRONUOVA: Sara Castronuova, Douglas & London, attorney for Plaintiffs.
MS. DEBROSSE: Would you identify yourselves 09:05 online, please.
MS. PEAL: Sara Peal, Heyl, Royster, Voelker & Allen, here for Advanced Beauty.
MR. LYONS: Patrick Lyons from Ashcraft & Gerel for the plaintiffs. 09:06
MR. DOUGLAS: Gary Douglas from Douglas & London for the plaintiff.
MS. MILLER: Alexius Miller for the plaintiff, DiCello Levitt.
MS. ADAMS: Omega Adams from DiCello Levitt 09:06 for the plaintiffs.
MS. SAY: Lara Say, Douglas & London, for the plaintiffs.
MS. RYAN: Megan Ryan of Tabet Divito &

Rothstein for RNA Corporation.

MS. DECK: Kelbey Deck from Eckert Seamans Cherin & Mellott for Defendant Revlon.

MS. MORRISON-RICORDATI: Anna Morrison-Ricordati, Wiedner McAuliffe, for Defendant Avlon. 09:06

MR. GUO: Peiyuan Guo from Shook Hardy & Bacon for Strength of Nature.

MS. MARCADIS: Ravika Marcadis --

MR. PETTI: Robert Petti -- go ahead, Ravika. 09:06

MS. MARCADIS: Thank you, Robert.

Ravika Marcadis, Dinsmore & Shohl, on behalf of McBride Research Laboratories.

MR. PETTI: Robert Petti, Maron Marvel, Luster Products. 09:07

MR. GILDNER: James Gildner on behalf of Clausen Miller for John Paul Mitchell Systems.

MS. FEDERER: Leslie Federer on behalf of Maron -- I'm sorry -- Maron Marvel, on behalf of Murray's Worldwide. 09:07

MR. SULLIVAN: Joe Sullivan from Litchfield Cavo on behalf of Golkow.

MS. SMITH: Zoe Smith from McGuireWoods on behalf of House of Cheatham, LLC.

MR. MORINEC: Mitch Morinec, M-o-r-i-n-e-c, on behalf of Wella Operations US, LLC.

(Witness duly sworn.)

DARIO ROQUE, MD,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. COSTELLO:

Q. Can you please state your name for the record. 09:08

A. My name is Dario Roque.

Q. Okay. Dr. Roque, have you ever given a deposition before?

A. Yes, I have.

Q. On about how many occasions? 09:08

A. I'll have to estimate about five or six.

Q. In what context were those given?

A. Usually for med mal cases. I've given a few as a treating physician.

Q. Okay. How many have you given as a treating physician? 09:08

A. Off the top of my head, two.

Q. Okay. And when was the last time you gave a deposition?

A. About -- I want to say about a month ago, sometime in December.
Q. What was the nature of the case?
A. That, I was the treating physician. I believe it was a patient of mine that has since passed away from ovarian cancer. And it was in the talc litigation. So I was giving a deposition as a treating physician. 09:09
Q. Okay. Do you know the name of the case?
A. Uhn-uhn. Not off the top of my head. 09:09
Q. Okay. So I know you've given a deposition on a few different occasions. Maybe a little bit different just as far as the length that we're here for today, but I just want to go through some ground rules to make sure we're on the same page. Okay? 09:09
A. Sounds good.
Q. Obviously, it's being recorded, and all your testimony is being taken down. So if I ask you a question, I just need for you to make your response verbal. If you say uhn-uhn or uh-huh, we all do it in everyday conversation. I may ask you is that a yes or a no. I'm not trying to be rude. I'm just trying to make sure that we have it 09:09

clearly captured for the court reporter. Okay?
A. I will try my best.
Q. Additionally, since she's taking down all of the testimony, there may be times where you may anticipate where my question is going to go and we might start to talk over each other. I just ask for you to wait, to make her job easier. She'll be much happier with both of us if we're not talking over each other throughout the day. And it also makes for a clean record. Okay?
A. Okay.
Q. If I ask you a question and you answer, is it okay to presume that you understood my question?
A. That's reasonable. I may ask you to rephrase it or repeat it if that's not the case.
Q. And that was my next point. If you don't understand my question for any reason, please let me know, and I'll do my best to either rephrase or repeat it. Okay?
A. Yes.
Q. Are you familiar with the term "to a reasonable degree of medical certainty"?
A. Yes.

Q. And what does that mean to you?
A. That means, you know, more likely than not there is a causation for a specific outcome.
Q. Okay. And as you give your testimony here today, are you giving your opinions to a reasonable degree of medical certainty? 09:11
A. That is correct.
MR. COSTELLO: Okay. So I have a list of exhibits. They're all in paper here. If you want them in electronic form, we can do that, as well. But I will go ahead and start. 09:11
(Roque Deposition Exhibit 1 was marked for identification.)
BY MR. COSTELLO:
Q. We've marked Exhibit No. 1. This is a copy of the notice of deposition for your deposition here today. Have you seen this document before? 09:11
A. Yes.
Q. And when did you see it? 09:11
A. Recently. Yesterday, I believe.
Q. Okay. And in prep -- is that the first time you saw it was yesterday?
A. Yes.

Q. So if we look at the document on pages 4 and 5, you need to flip, starting on page 4, there's some requests there. Do you see that, starting at number 1?
A. Yes. 09:12
Q. And if we look under "Requests," there's -- it starts on page 4 into page 5, it's 1 through 9. Do you see that, if you look?
A. Yes, I do.
Q. So there's about nine categories of 09:12 documents that were requested for your deposition. Did you search for these documents?
A. I believe I worked with the plaintiffs' counsel to make sure that -- that we could provide everything that we -- that I had in my possession. 09:12
Q. Okay. Do you maintain an electronic or a paper file for this particular case?
A. Electronic.
Q. And that's something you have in your possession? 09:12
A. With me right now?
Q. No. That's something that -- you have an electronic file maintained, and that's something you can access, right?

A. I can access it, correct.
Q. Okay. And if asked to produce the contents of your file, that's something that you could do, true?
MS. O'CONNOR: Objection. 09:13
You can answer.
THE WITNESS: Yes. It's a file that we -- that I have access to that I have worked on in collaboration with the plaintiffs' counsel.
(Roque Deposition Exhibit 2 was marked for identification.) 09:13
BY MR. COSTELLO:
Q. Okay. I have placed in front of you Exhibit No. 2. Do you see that?
A. Yes. 09:14
Q. Okay. And that document is the plaintiffs' steering committee -- I think the abbreviation is also PSC -- the response and objections to the deposition. Do you see the title there? 09:14
A. I do.
Q. Okay. And if we look at number 1 on this document in the responses -- there's actually two sets of objections. There's general responses

to defendant's notice. And then if we look -- give me one second. If we go to page 5. Okay. And you're on page 5 now?
A. Yes.
Q. So it says in the request number 1 for production is "A complete copy of Dr. Roque's file for this case, including all published and unpublished literature, documents, notes taken, medical records, pleadings, depositions, expert reports, and any other material or data reviewed or relied upon by Dr. Roque in formulating any opinions offered in the case, and copies of published literature and Bates-numbered documents already produced in litigation insofar as those documents are unannotated and already referenced in Dr. Roque's expert report reference list." 09:15 09:15 09:16
Do you see that? Do you see it says "do not need to be produced"?
A. Mm-hmm. Yes. Sorry.
Q. That's okay. We all do it. 09:16
And the response is that "PSC incorporates by reference the general objections." And if we skip down, it says "With regard to a complete copy of Dr. Roque's file, the PSC refers

Defendants to the materials, documents, and things identified in the reference list in Dr. Roque's expert opinion report with reference list the 'Materials Considered List' attached to said report and served on Defendants' counsel on December 1st, 2025." 09:16

Do you see that?

A. Yes.

Q. Okay. I just want to make sure that we're clear as far as what we're starting with. 09:16 The documents that -- or the materials considered list, this is a complete list of all the documents, materials, and literature that you relied on in giving your opinions, true?

A. My -- the written report that you have, 09:17 that includes my report, my opinions. And the references include all of the references that I relied on that I use in the document. There are other sources that I used to look at information, sometimes cross-referencing a different article. 09:17 Some of those sources are listed in the materials considered list. I may not have necessarily referenced those within the document if I didn't specifically address that document or publication,

but it was something -- if it was something that I used for background information to learn more, to look up a term, it should be listed on the materials considered list.

Q. Okay. And just so you and I are talking about the same thing, you're not aware of and didn't consider any other literature in your analysis of general causation in this case other than what's listed in the materials considered list, true? 09:17 09:18

A. I mean, I think that's a little broad. I think, for the most part, everything that I considered, as far as I can recollect, it is included in the materials considered list. But from time to time I may have seen a website that linked me to a different website, and not, you know -- intentionally, I may have not necessarily disclosed that to the plaintiffs' counsel. But that would be in the minority of situations. Just maybe a handful of times. 09:18 09:18

Q. And since I'm entitled to know all the bases and material that you've relied upon in giving your opinions, is there anything you can tell me as you sit here today as a website or other

document that you haven't already disclosed?
A. Nothing really that comes to mind. It could have been, you know, like, sometimes when looking for pictures, like, trying to look for pictures that are more -- that are easier to understand by the lay public. Because sometimes, you know, medical illustrations can be very complex. So it's possible that I may have looked at different websites, but nothing that I could recall off the top of my mind. 09:19 09:19
Q. Okay. And other than what you just referenced as far as potentially looking at medical illustrations or documentation from medical for a layperson, you can't think of anything else, any other source as you sit here today, other than what's listed in your materials considered list? 09:19
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Again, I think you're asking a very broad question. There's -- I cannot -- there might be, like, websites or other sources that I may have looked at that I cannot recall right here and now, but I'm not going to -- I don't feel comfortable answering that question in the 09:19

affirmative because there might be other sources that I considered either to reference, understand a better term that I was not necessarily familiar with. So there's other sources that I may have used. 09:20

BY MR. COSTELLO:

Q. You're not aware of any other information related to products that are at issue in this case other than what's listed in your materials considered list, true? 09:20

A. I feel like -- respectfully, I feel like I already answered that question. We're talking about this case regarding chemical hair relaxers. As I mentioned, I may have cross-referenced or accessed other websites to get a better 09:20 understanding of what the reference material or the materials that I considered we're discussing. But I cannot sit here right now and tell you, yeah, this is what I looked at.

Q. Okay. As you sit here today, can you 09:20 think of any specific website, documents, or literature related to the products at issue in this case, other than what's disclosed in your materials considered list?

A. Nothing that I can think of, but I can also not say that I -- that there's no sources I might have looked at, again, more for the purposes of background. But I may have used it, again, for background, but they may not be referenced. 09:21
Q. You're not -- other than the materials considered list, you're not aware of any other information related to the manufacturers of the product at issue, true?
A. Can you repeat that question. 09:21
Q. Sure. I asked you about products. Now I'm asking you about manufacturers.
A. Mm-hmm.
Q. As you sit here today, you're not aware of any other information that you reviewed related 09:21 to the manufacturers of the products at issue other than what's listed in your materials considered list, true?
A. Yeah. I mean, I don't believe I know much about the specific chemicals or the 09:21 manufacturing process. I think of them as a group of products that serve a similar purpose. And because of that, like, I do think their manufacturing or their contents tend to be quite

similar.

Q. Just to go back for a second, I know you say you don't feel comfortable, there might have been other things. Would there be anyplace else or any place at all that you would have kept track of websites or other things that you reviewed other than your materials considered list in your report? 09:22

A. No, I would not have a record of that.

Q. There's no other literature or authority that you reviewed or are able to identify which suggests or found a link between the use of chemical hair relaxers and uterine or ovarian cancer other than what's in your report and the materials considered list, true? 09:22

MS. O'CONNOR: I'll object to the form. 09:22

You can answer.

THE WITNESS: You know, I think those are very broad questions that you're asking. I mean, I would consider some of the websites that I may have looked at, it could have been regulatory websites; it could have been websites from, for example, European agencies that, when reading one report or reading one regulatory agency about a specific chemical, may have linked me to another website 09:23

where I looked. Sometimes that may have been discussing the chemicals; sometimes it's not. But right now I cannot recall any of those.

But it's not -- for the purpose of my opinion, the way that I formulated it, I did my literature search, which we can talk about it later, how I conducted my analysis. Everything that I took into consideration to form the basis of my opinion is in the reference section and also in the materials considered list, understanding that, yes, there might have been some things that I may have looked. 09:23 09:23

BY MR. COSTELLO:

Q. Okay. And I think maybe you answered it in the last part of your answer. I'm just looking to see if there's anything outside of all the research we've looked at, your report. We've looked at all the references to your report. We've looked at all the references to the references in your report. I just want to know if there's anything else other than what's in your report and the materials considered list that you can tell us about today that you either kept track of in a different way or is something that you can think of 09:24 09:24

as you sit here today for your deposition.
A. No, nothing that I can produce that I -- you know, I didn't keep track of other places that I may have evaluated or looked at or read.
Q. Okay. And so this is just very specific now to make sure we're on the same page. To the literature and authority, so other than what's listed in your report and the materials considered list, that is the sole basis as far as literature and authority to suggest a link between the use of chemical hair relaxers and uterine or ovarian cancer, true? 09:24 09:25
MS. O'CONNOR: Objection.
THE WITNESS: So are you asking me for the purpose of me writing the report or after the report? Because I also looked -- after the report, I was -- I was able to read some of the other experts on the defendants' side and plaintiffs' side. So that didn't form the basis of my opinion, but I want to make sure that we're being clear because I did read some of those, not in their completion. But is that what we're talking about? 09:25 09:25
BY MR. COSTELLO:
Q. You didn't -- anything that you --

strike that.

The sole basis of your opinion is the literature and authority and your -- strike that.

I just want -- I'm just asking right now about the literature and authority that you reviewed or were able to identify which suggests or found a link between the use of chemical hair relaxers and uterine or ovarian cancer. All of those are contained in your report in your materials considered list, true? 09:25 09:26

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Yeah. The information that I relied on, the literature and, you know, journal articles, websites that I considered to form the basis of my opinion, that is on the reference and materials list. 09:26

BY MR. COSTELLO:

Q. Thank you. And as you sit here today, there's no other material you intend to rely upon to support your opinions in this case other than what's contained in your report, true? 09:26

MS. O'CONNOR: Objection.

THE WITNESS: Well, as of today. I mean, if a

paper comes out today or next week that addresses this subject, obviously, it's the way I practice, right? So evidence is changing every day, every year. So if something comes up in the literature that is relevant to the issue at hand, I would, obviously, address it and I would have to change my report accordingly. 09:26

BY MR. COSTELLO:

Q. Okay. I mean, since the time you wrote your report, there's no new authority or literature that you're aware of, true? 09:27

A. As of today, I'm not aware of anything, no.

Q. And you're not aware of any materials that you reviewed, relied upon, or considered that are in disagreement with your opinions, are you? 09:27

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I think part of my report includes some papers that disagree with my opinion. I would reference you to, you know, the paper by Hernandez, the paper by Farooq that I think they commented -- they looked at some of the epidemiological evidence. And I think they're -- 09:27

the way that I read their paper and their conclusion, it sounds like they don't agree that there's a causal association. I obviously disagree with that.

But just to make things clear because I -- you know, in my practice and certainly when writing this report, my opinion and my conclusion is based on reviewing all of the evidence. I'm not only going to cherry-pick and look at issues that form that -- or that contribute to that causal association that I found in my report. So I did consider and I looked -- I would consider the Farooq study, the Hernandez study, there was another -- I believe, an opinion piece -- I can't remember the name of the author -- but also disagreed with my opinion. And I considered those, and I discuss them in my report.

BY MR. COSTELLO:

Q. In front of you, back to Exhibit No. 2, number 2 response, it says "The PSC incorporates by reference the general objections stated above. Answering further, and subject to and without waiver of the foregoing objection, see expert opinion report of Dr. Roque with attachments served

upon defense counsel."

That request, if we look above that, is all documents setting forth or relying -- setting forth referring to, in whole or in part, the data or other information considered or relied upon by Dr. Roque to prepare his opinions in this case. 09:29

Do you see that?

A. Can you -- so are we talking about request number 4? Sorry. You lost me a little bit there. 09:29

Q. Sure. We're on Exhibit No. 2.

A. Yep.

Q. Request for production number 2.

A. What page are we on? 09:29

Q. We are on page --

A. I see it. Yep.

Q. -- page 6. Are you there?

A. Yep.

Q. So if we look at the top of page 6, the request for the production and then the response that I just read into the record, you would agree with me that it is specifically requesting, in whole or in part, the data or other information 09:29

considered or relied upon by Dr. Roque to prepare his opinions in this case.

Do you see that?

A. Yes.

Q. And then it says "See expert" -- in response, it says "See expert opinion report of Dr. Roque with attachments thereto served upon defense counsel on December 1st, 2025." 09:30

So before we get into the substance of your opinions, I'm just making sure that this is accurate. The response that we received is that the documents and data and other information that you considered is your report and the attachments, right? 09:30

A. This is accurate, right. So that response is accurate. 09:30

Q. You did not review, rely upon, or consider any data in coming to your opinions in this case other than what is referenced in your report, true? 09:30

A. That's correct.

Q. You're unaware of any data, other than what's listed in your report, that support your opinions, true?

A. Can you repeat that question.
Q. Sure. You're unaware of any data, other than what's listed in your report, that supports your opinions, true?
A. That's correct. 09:31
Q. The universe of data that you considered in coming to your opinions is identified in the four corners of your report and the attachments, true?
MS. O'CONNOR: Object to the form. 09:31
You can answer.
THE WITNESS: Can you repeat that. I don't know if I understand the part about the four corners.
BY MR. COSTELLO: 09:31
Q. Sure. Yeah. We're talking about data here.
A. Yeah, yeah.
Q. So, I guess, the question is the universe of data that you considered in coming to 09:31 your opinions is identified in the four corners of your report and the attachments?
A. Yes, that's correct.
Q. Okay. You did not consider or review

the formulation of the products of any of the defendants in this case, true?

MS. O'CONNOR: Objection.

THE WITNESS: I don't know if I can agree with that question because very much the basis of my report and the mechanisms through which I believe these chemicals are causing, you know, the harm, endometrial -- or uterine and ovarian cancer, is because of the chemicals contained in these products. And I do -- I've reviewed literature that discusses the formulation and some of the chemicals that are contained in these products. So I didn't see, you know, like a manufacturer list of what's in them. But there's definitely literature that discusses the chemicals in these products, and I used that, you know, as part of the basis of my opinion. 09:31 09:32 09:32

BY MR. COSTELLO:

Q. Okay. So just to follow up on the last answer, you didn't review any chemical formulations from the company as to their products, true? 09:32

A. I did not review anything from the company.

Q. Okay. And you don't list that anywhere

in your report that you reviewed chemical formulations from each individual defendant in this case, true?

A. From each individual company, is that the question? 09:33

Q. Yes.

A. No.

Q. Or any of the companies, you didn't review the chemical formulations and include that in your report, true? 09:33

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I did not review those, you know, individual formulations. Again, I reviewed the formulation from -- that are reported in the literature. 09:33

BY MR. COSTELLO:

Q. You did not review any documents produced by the defense regarding their different products, true? 09:33

A. That is correct.

Q. You did not review or rely upon or consider the deposition of any party in this case, true?

A. Correct.
Q. You never -- you did not review any third-party depositions in this case, true?
A. That's correct.
Q. Never reviewed any treating physicians' testimony in this case, true? 09:33
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Repeat the question.
BY MR. COSTELLO: 09:33
Q. Sure. You have not reviewed or relied upon any treating physician in this case as far as giving your opinions, true?
A. Yeah, I do not have access to any testimony from a treating physician in this case. 09:34
Q. You were not provided any, true?
A. Correct.
MS. O'CONNOR: Objection.
You can answer.
BY MR. COSTELLO: 09:34
Q. Same document still, Exhibit No. 2. The question asks "All documents prepared by Dr. Roque to use at any meetings with attorneys representing the plaintiff, including, but not limited to,

handouts, brochures, slides or presentations, materials used in public seminars or speeches."

Do you see that?

A. Yes.

Q. Okay. And the response is "Dr. Roque is not in possession of any documents responsive to this request." 09:34

Do you see that?

A. Yes.

Q. Is that true? 09:34

A. That's accurate.

Q. If you look at number 4 --

A. Mm-hmm, yes.

Q. I won't be rude if I ask if that's a yes, but we all do it. 09:34

A. Yes.

Q. I'm sorry. Number 4, it says "All documents reflecting unpublished data, including, but not limited to, the deponent's own data reviewed or relied upon by Dr. Roque to provide the opinions offered in this case." 09:35

And if we look at the answer, it says "Answering further and without waiving objection, see expert opinion report of Dr. Roque with

attachments thereto served on defense counsel."
Do you see that?
A. Yes.
Q. It goes on to the next page, then it picks up. 09:35
A. Yep.
Q. I just have a couple questions about that. The answer there refers to reports and attachments; do you agree?
A. Yes. 09:35
Q. Okay. We're talking about the same thing. It's your expert opinion report and the attachments thereto. We can -- for making it easier for the deposition, would it be fair to say that everything that's part of your expert opinion 09:35 report includes the attachments and the supporting information?
A. Yes, that's -- I think that's fair.
Q. So I don't have to say the "attachments thereto" every time? 09:36
A. Yes, that's fine.
Q. You consider your expert report encompassing everything that supported it as well, true?

A. Correct.
Q. Okay. You have no unpublished data relating to a link between chemical hair relaxers and uterine or ovarian cancer, true?
MS. O'CONNOR: Objection. 09:36
THE WITNESS: I think that's a little vague. Do I have data, or is there data that I can -- do I own data that is not -- can you clarify that question.
BY MR. COSTELLO: 09:36
Q. Sure. Because the question that we asked for specifically requested published or unpublished data. And I'm asking you now, do you have access to unpublished data relating a link between chemical hair relaxers and uterine or 09:36 ovarian cancer?
MS. O'CONNOR: Object to the form, mischaracterizes the request.
You can answer.
THE WITNESS: Yeah, I do not have my own data 09:36 or access to unpublished data.
BY MR. COSTELLO:
Q. Okay. You have not been involved in the collection or analysis of any such data outside of

this litigation, true?
A. That's correct.
Q. You are not aware of any -- strike that.
Let me ask you this. You're not aware of any data regarding a link between chemical hair relaxers and uterine or ovarian cancer outside of the dates which you set out in your report and the attachments, true? 09:37
MS. O'CONNOR: Objection.
THE WITNESS: I'm not sure I understand the question. Like, when you say "dates," I'm not sure what dates you're referring to. 09:37
BY MR. COSTELLO:
Q. Sure. I'll get to that in a minute.
Just to follow up on -- close the loop on one other thing. You're not aware of any data regarding a link between chemical hair relaxers and ovarian or uterine cancer outside of what is set out in your report and the attachments, true? 09:37 09:37
MS. O'CONNOR: Objection.
THE WITNESS: You know, again, the data that is published that I reference in my report and is included in the materials list is the data that I

relied on to form the basis of my report. If there's unpublished data, obviously, I don't have access to that. I don't have my own data. Certainly, if anything was to be produced, you know, in the future, I would very much use that data to either -- you know, unlikely to change my opinion, but definitely, you know, addend the report as needed. 09:38

BY MR. COSTELLO:

Q. Okay. And as you sit here today, you're not aware of any unpublished data that establishes a link between chemical hair relaxers and uterine and ovarian cancer, true? 09:38

A. There is no unpublished data that I'm aware that establishes that link. 09:38

Q. You have not begun any independent research regarding a potential link between chemical hair relaxers and uterine and ovarian cancers in your academic or professional life outside of the lawsuit after being hired by the plaintiffs' attorneys, have you? 09:38

MS. O'CONNOR: Objection to form.

You can answer.

THE WITNESS: Correct. I mean, I have done a

lot of research for the purpose of this litigation, but, no, I don't have any, you know, research projects that I have started with addressing this question.

BY MR. COSTELLO: 09:39

Q. Okay. If you go to request for production number 5, it would be -- it's on page 7. It's just below. It says "any documents constituting setting forth or referring to, in whole or in part, exhibits to be used as a summary 09:39 of or support for the opinions which Dr. Roque prepared." And, again, there's a reference to your report and the attachments.

Fair to say that there's nothing -- there's no other document other than what's 09:39 contained in your report and the exhibits, true?

A. That's correct.

Q. You didn't prepare any exhibits and demonstratives outside of what is in the report, excluding Science Day, true? 09:40

A. Yeah. So thank you for making that clarification. But, yeah, that's true.

Q. And similarly, if we look at number 6, it includes any -- it requests all documents

including any slide presentations or other materials written or created by Dr. Roque except published literature that relate to this litigation regarding chemical hair relaxers, uterine cancer, ovarian cancer, formaldehyde, parabens, phthalates, 09:40
benzophenones, NDMA or endocrine-disrupting chemicals, or occupational exposures.

You didn't create any slides or written materials regarding this, other than the exclusion for Science Day, true? 09:41

A. That's correct.

Q. Okay. If we look at request number 7, I believe it's on page 8. This request asks for any and all documents, including, but not limited to, billing statements, billing records, employee 09:41
records, time sheets, and invoices, that reflect the amount of time spent or compensation received for any of Dr. Roque's work, including any retainer that Dr. Roque has requested or been paid.

Do you see that? 09:41

A. I see that.

Q. And I believe what we received was a total for the work that you have. Do you produce like a statement of work for your invoices?

A. No. I usually just bill by the hour.
Q. Okay. And it looks like from what we received that there was a retainer invoice for $2500 from February 7th of 2025. Do you recall how long prior to this you were contacted regarding this litigation? 09:42
A. I would say maybe a month or so, but I can't really tell you the specific day. I only know because, interestingly, I had been contacted by, you know, someone on the other side of the issue. And I had actually said that I wasn't sure, like, if I -- because I didn't have all the information at the time. And then plaintiffs' counsel contacted me shortly thereafter and we had a discussion. So maybe like a month beforehand, but I can't recall. 09:42 09:42
Q. Okay. And you received the retainer payment before you commenced any work on the case, true?
A. Yes. 09:42
Q. So then we know that you hadn't performed any work relating to your analysis of a potential causal link between chemical hair relaxers and uterine or ovarian cancer before

February 7th of 2025, true?

MS. O'CONNOR: Objection.

THE WITNESS: That's -- you know, I would -- I don't know if I like the way you're asking the question. I had not performed the work for the 09:43 purpose of writing a report, but I was aware of the papers that have been published because, you know, we're talking about -- this was in 2025. The papers showing the epidemiological data have been published from like 2021, so earlier years. So I 09:43 had been aware and I had -- I was familiar with those papers.

So in a way I had done some of the work because this is what I do. I keep up with the evidence, and this was evidence that was relevant 09:43 to my practice. But if the question is had I started writing a report and looking at all the data prior to retainment, no, that's not the case.

BY MR. COSTELLO:

Q. Okay. Little bit different question. 09:43 You had not done any analysis of a potential link in your professional or academic life before being hired on February 7th of 2025, true?

MS. O'CONNOR: Objection to form.

You can answer.
THE WITNESS: Well, are we talking about an analysis to answer this question or just analysis in general? Because I do analysis and see patients and review the literature fairly frequently. 09:44
BY MR. COSTELLO:
Q. Sure. I guess my question is you had not done any analysis of a potential link, to answer the question in your professional or academic life, as to whether chemical hair relaxers cause uterine or ovarian cancer prior to February 7th of 2025? 09:44
MS. O'CONNOR: Object to form.
You can answer.
THE WITNESS: So, yeah, beyond reading, you know, the observational studies, I had not really dug really deep into some of the causal analysis and reviewing some of the, you know, toxicology literature, endocrine literature, et cetera. So not to the extent that I've done for the purpose of this litigation. 09:44 09:44
BY MR. COSTELLO:
Q. So other than reading the literature, you had not done an analysis to answer that

question prior to February 7th of 2025, true?
MS. O'CONNOR: Object to the form.
THE WITNESS: I think we have to make -- because you're asking two different questions sometimes. I want to make sure that the question 09:45 is related to the purpose of hair relaxers and uterine and endometrial cancer. I do analysis and differential diagnosis and literature reviews all the time. So I just want to make sure that we're talking about the same thing. 09:45
BY MR. COSTELLO:
Q. Okay. I just wanted to make sure that I was capturing your testimony clearly because I -- what I thought I heard you say was, other than reviewing the literature, you had not done an 09:45 analysis to answer the question as to whether or not chemical hair relaxers caused ovarian or uterine cancer prior to February 7th of 2025, true?
MS. O'CONNOR: Object to form.
THE WITNESS: And my answer to that was that I 09:45 not only -- "review the literature" is a little bit vague. I've read the articles that -- the observational studies that show that association for uterine cancer, ovarian cancer. So I have

reviewed those articles. If -- so that's the way I'm going to leave it. But I had not done a causal analysis based on my review of those articles because those would not necessarily be enough evidence to form my opinion. 09:46

BY MR. COSTELLO:

Q. Okay. And I think maybe you anticipated my next question, which is prior to February 7, 2025, you had not done a causal analysis as to whether or not chemical hair relaxers cause ovarian 09:46 or uterine cancer, true?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Right. That's correct.

(Roque Deposition Exhibit 3 was 09:46 marked for identification.)

BY MR. COSTELLO:

Q. Okay. I guess I'll make this easier. Okay. I put in front of you Exhibit No. 3. Do you see that? 09:47

A. Yes.

Q. Okay. And this is what was produced to us in response to -- in response to the request for the work that you've done on this case. And it

looks like a statement of compensation; you would agree?
A. Yes.
Q. Okay. And I didn't want you to have to memorize the dates because I know that you probably didn't. So having this document in front of you, it looks like we can see on there the retainer for five hours that was the February 7th of 2025 date that I was referencing, true? 09:47
A. Yes. 09:47
Q. Okay. And then we notice that the next date here is October 26th of 2005. Do you see that?
MS. O'CONNOR: Objection. '25.
BY MR. COSTELLO: 09:48
Q. If I misspoke, I apologize. October 26th of 2025.
A. Yes, I see that.
Q. Okay. Just -- as far as how you keep track of your time, do you keep time sheets? 09:48
A. I keep track of it just on, you know, like a -- yeah, on my computer, like a form that I just say, you know, I spent two hours. I obviously have a day job.

Q. Understood.
A. So a lot of the work that I did was evenings, weekends. But, yeah, like, I will keep track of the time that I was dedicating to reviewing the literature, writing the report. 09:48
Q. And is this a Word document, an Excel document, or some other format?
A. Yes, probably like a Word document, I would describe it.
Q. And did you record what work you did on which day? 09:48
A. I would -- I would say probably like on a weekly -- I wouldn't -- yeah, not on a daily way. I would say, you know, for this week, this is how much time I would kind of keep track of. 09:49
Q. So your best recollection is that it is a weekly summary?
MS. O'CONNOR: Objection.
THE WITNESS: Well, when I provided it, I mean, as I keep track of it, yeah, it would probably be a weekly summary and then I would add it for the month. 09:49
BY MR. COSTELLO:
Q. How much of the time that's billed here,

this 114 hours for October 26 of 2025, how much of that time was for research?

A. Oh God. Just for research or the research and the writing the report, as well?

Q. The research? 09:49

A. Just the research, the bulk of it. I mean, I would say -- I don't know -- 60 percent, but, I mean, yeah, a lot.

Q. Okay. And your best estimate is 60 percent? 09:49

MS. O'CONNOR: Objection.

THE WITNESS: It's a lot of time. I mean, I -- yeah.

BY MR. COSTELLO:

Q. How much time was spent on writing the report? 09:50

A. Also a lot of time.

Q. I guess I'm just trying to figure out what the breakdown is, how much time was spent researching, how much time was spent writing, how much time was spent in meetings. 09:50

A. Right. So, I mean, I think I can tell you that there was not a lot of time spent on meetings. I would say less than 5 percent of the

time. And that probably is an overestimate in terms of meetings. The reason I'm having a hard time saying research versus writing is because all of that happens almost at the same time, right? Like, the initial research that I'm doing, reading 09:50 some papers, that's kind of like, I guess, some background details to start writing my report. But then as I'm writing, then I'm also referencing and reading again. So it's kind of hard for me to break down that time. 09:50

Q. Okay. What date -- so, for instance, by looking at this, what we have in front of us, we can't tell what you did on any specific day, true?

A. Yeah. This is just the hours that are billed, you know, the retainer, then the hours 09:51 through October, between, you know, February and October, and then between October and December. I mean, the month of November was quite busy.

Q. Okay. But we don't know what you did on which specific days or what months by this. We can 09:51 just see the number of hours and the date of the invoice, true?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I mean, what I did was did a lot of research analysis, wrote the report, met with counsel from time to time. So that's what I did. If you want me to tell you a specific day, nights and weekends. 09:51

BY MR. COSTELLO:

Q. Okay. What date prior to October 26, 2025, did you actually begin your substantive work in this case?

MS. O'CONNOR: Objection. 09:51

THE WITNESS: I couldn't tell you. I mean, I think there is a lot of literature on the subject matter. So I would say, like, around mid-February to March almost immediately. Because, you know, once I started to do the research, read the 09:52 background information, get a better understanding in order to be able to make that causal analysis, I realized that there's, as I said in my report, hundreds and hundreds of papers that are relevant to the subject matter. So I wanted to make sure I 09:52 didn't wait until the last minute, which is -- I didn't get to where I am by waiting until the last minute. So...

BY MR. COSTELLO:
Q. Is the Word document that you referenced for me earlier, would that reflect when you worked on -- began work on doing the research that you just talked about? 09:52
A. I'm not sure. Probably.
Q. You would agree with me that, just looking at this, we don't know how much time you spent on research, when you started, or anything -- any of those details, true? 09:52
MS. O'CONNOR: Objection.
THE WITNESS: I mean, if you want a specific breakdown, yeah, you couldn't tell from this, other than what I'm telling you, you know. And if you look at my report, it's a long report, a lot of 09:53 references. So that took a lot of time. So I can tell you that the writing of the report, the research of the report is the bulk of what's listed here.
BY MR. COSTELLO: 09:53
Q. Okay. So forgive me for this next question since I can't tell from Exhibit No. 3. Had you reviewed all of the materials necessary to reach your opinions by October 26 of 2025?

MS. O'CONNOR: Objection.
THE WITNESS: I had reviewed, yes, the bulk of the material. I think there was one paper, if I recall, that was published around that time addressing, you know -- like, there was an 09:53 association identified with chemical hair relaxers and thyroid cancer and pancreatic cancer. So I don't think that was something that I had looked at by October, but it's something that I, you know, became aware of, again, as I kept track of this 09:54 literature.
BY MR. COSTELLO:
Q. And that's something that's referenced in your report, true?
A. I added -- yeah, I added that to my 09:54 report. That's correct.
Q. Okay. So if we look at the next date on here, it's December 2nd of 2025. It's the third date here.
A. Yes. 09:54
Q. Okay. And there's listed 54 hours, true?
A. That's true.
Q. What work went into the 54 hours? How

much time was spent meeting with attorneys versus drafting your report?

A. So during that time, again, the majority of it was the drafting of the report. I think meeting with attorneys, maybe like five of those hours. But I definitely spent a lot more time here because, if I recall, the report, I signed it on November 30th, if I'm not mistaken. So this was kind of like the last few weeks leading up to the final report. So there was a lot of me going through it, making sure that the references were accurate, you know, moving some sentences around, some sections around, just to make sure that I was satisfied with the final product. So, yeah, the bulk of this, I would say over 45 hours was dedicated to the writing of the report. There was still some research because, again, there were -- I believe that paper was something that I identified around this time. 09:54 09:55 09:55

Q. Okay. What is the hourly rate that you're charging for this litigation? 09:55

A. For this, it's listed on my report. It is $500 per hour.

Q. Is that different for time spent in

depositions or trial?
A. I usually charge a different rate for depositions and trials. For the purpose of this, just to keep it clean I'm just charging the same hourly rate. 09:55
Q. Okay. So the last invoice that we have is from December 2nd of 2025. Have you sent any further invoices?
A. Not since December.
Q. How much time have you spent working on 09:56 this case since December 2nd of 2025?
A. A lot, because, you know, as you know, there was Science Day. So that took a lot of preparation; again, reviewing my report, making sure that, you know, that I prepared for that 09:56 process. I've never testified in federal court. So that was a little -- I wanted to make sure that I was prepared for that. And shortly thereafter I was aware of the deposition. So that has also taken a lot of time. So, yeah, I can't give you a 09:56 number, but it's a decent amount of time.
Q. Do you have any estimate?
A. I can't sit here and give you an estimate. I mean, it's many hours.

Q. Is it more or less than the time you spent writing the report?
A. No, no. So I would say, you know, the report is already written. So most of the time I'm spending right now is, again, reviewing the report, 09:57 going back and reviewing some of the papers again to, you know, remind myself, making sure that I -- that I can see what I wrote, making sure that there's no newer literature. So definitely not as much time as what I spent writing the first report 09:57 or doing the research for the first report.
Q. Give me one second to get back to -- so let's go back to Exhibit No. 2 for just a minute just to close this out. If we look at number 8 --
A. Page 8. 09:57
Q. -- I think it's page 8.
A. Okay.
Q. I'm sorry. I flipped to the wrong document. It asks for any and all communications between Dr. Roque and the authors of any studies or 09:58 abstracts relating to this litigation, chemical hair relaxers, uterine cancer, ovarian cancer, formaldehyde, parabens, phthalates, benzophenones, NDMA or endocrine-disrupting chemicals, or

occupational exposures regarding those studies. And it just says "Dr. Roque is not in possession of any communications that are responsive to this request."
Do you see that? 09:58
A. Yes.
Q. Is that accurate?
A. That is accurate.
Q. You didn't reach out to any of the authors of anything that's listed in your report or 09:58 the attachments to discuss any of their findings or data, true?
A. That's true.
Q. And you didn't discuss with any of the authors of any of the references that are listed in 09:58 your report any reservations that they may have had that caused them to say more study was needed before a causal relationship could be identified, true?
MS. O'CONNOR: Objection. 09:59
You can answer.
THE WITNESS: I did not discuss with the authors. I mean, I saw what they wrote on their report and their papers. But, no, I did not

personally discuss that with him.
BY MR. COSTELLO:
Q. Okay. Including not discussing the fact -- any reservations that they might have as far as a causal relationship, true? 09:59
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: No, I did not discuss any of those concerns with the authors.
BY MR. COSTELLO: 09:59
Q. Okay. We're almost done with this document. If we go to number 9 --
A. Mm-hmm, yes.
Q. -- it says "any and all communications between Dr. Roque and Clarence William Brown, 09:59 R. Jeffrey Chang, Michele Lynn Cote, Michael Crowley" -- I'm going to mess up that name; I apologize in advance -- "Dipak Panigrahy, Silvina Pugliese, Sameer Sharma, and Thomas Zoeller, Ph.D., related to this litigation, chemical hair relaxers, 10:00 uterine cancer, ovarian cancer," same as before. And it says no -- "Dr. Roque is not in possession of any communications that are responsive to this request."

Do you see that?

A. With the exception of Science Day, correct?

Q. With the exception of Science Day.

A. Yeah, that's correct. I don't have any communications, but I just want to make sure because, obviously, I met -- or I saw a few of these experts on Science Day. 10:00

Q. Understood. And I guess what I would be looking for is if there's any written communications between you and any of these individuals outside of Science Day. 10:00

A. No.

Q. None exist, true?

A. That's correct. 10:00

Q. You have no correspondence other than -- strike that. Okay.

MR. COSTELLO: Keep going? Do you want to take a break, or no? It's been about an hour.

MS. O'CONNOR: Been about an hour. What do you think? Do you want to keep going? 10:01

THE WITNESS: I'm fine.

MR. COSTELLO: We'll get into the report now?

MS. O'CONNOR: Yeah.

(Roque Deposition Exhibit 4 was marked for identification.)

BY MR. COSTELLO:

Q. Okay. I'm sure you're familiar with this document. 10:01

A. Yes, very.

Q. Spent a lot of time on it?

A. That's correct.

Q. Okay. What we've marked for the purposes of the deposition is the expert opinion 10:02 report of Dr. Dario Roque, MD. Exhibit 4 -- let's see. Exhibit 4 and the attachments are, as we talked about, the bases for your opinions that you're going to be testifying to here today, true?

A. Yes. 10:02

Q. If we look at -- skip ahead here -- I believe it's page 4. So if we look at page 4, it's just the introduction. And it was -- the introduction says "I was asked to offer my opinion with a reasonable degree of medical certainty as to 10:03 whether chemical hair relaxer use can cause uterine cancer or ovarian cancer in the women who use these products."

Do you see that?

MS. O'CONNOR: Object to the form. It's "and" and not "or."
MR. COSTELLO: I'm sorry?
MS. O'CONNOR: It's "and" and not "or."
MR. COSTELLO: Okay. 10:03
THE WITNESS: Do you want to ask it again?
BY MR. COSTELLO:
Q. I'll ask it again.
"I was asked to offer my opinion with a reasonable degree of medical certainty as to 10:03 whether chemical hair relaxer use can cause uterine cancer and ovarian cancer in the women who use these products."
Do you see that?
A. Yes. 10:03
Q. And as you testified to a little bit ago when we looked at Exhibit No. 3, which is that compensation of billing, you were contacted sometime shortly before February of 2025 in regards to this case, true? 10:03
A. That's accurate.
Q. And other than when we talked about before, the fact that you reviewed articles, you have not done any research, collected any data, or

published any articles as to whether or not there was a relationship between chemical hair relaxers and uterine or ovarian cancer, true?

MS. O'CONNOR: Objection.

You can answer. 10:04

THE WITNESS: So if -- I just want to make sure you're not using the term "research" very -- because I think it can be a little bit broad. From my perspective, sometimes "research" is just the act of reading the literature and knowing. So if 10:04 you're referring to that as actual experiments or, you know, research studies...

BY MR. COSTELLO:

Q. Let me follow up on a couple things. You've never been asked to investigate the causal 10:04 link prior to February of 2025, true?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: The causal link for chemical hair relaxers and uterine or ovarian cancer, that's 10:04 what we're talking about, correct?

BY MR. COSTELLO:

Q. Yes.

A. Yeah. No, prior to February 2025, I had

not been asked to investigate that link.
Q. You never gave a presentation or spoken about it in a professional setting prior to February 2025, true?
MS. O'CONNOR: Objection. 10:05
You can answer.
THE WITNESS: I've never given -- yeah. Prior to this, I had not given a presentation or lecture or written a paper about chemical hair relaxers and a causal relationship to uterine and ovarian 10:05 cancer.
BY MR. COSTELLO:
Q. Okay. And prior to February of 2025, you had never addressed the issue of chemical hair relaxers and uterine and ovarian cancer in any 10:05 professional setting, true?
MS. O'CONNOR: Objection.
THE WITNESS: No, I had not given a lecture. I mean, I can't say off the top of my head whether there was, you know, like an abstract at a meeting 10:06 that I may have seen. I can vaguely recall some abstracts on posters or some meetings, but I was not necessarily involved in that discussion or conversation. I was not a member of that research

team.

BY MR. COSTELLO:

Q. Okay. So you wouldn't have published, presented, or spoke about, as part of a team, the causal relationship between chemical hair relaxers and uterine and ovarian cancer prior to February of 2025, true? 10:06

A. That is correct.

Q. Okay. If we look at page 4 still on Exhibit No. 4, which is your report, I just want to dive into the report. It says -- one second. I believe it is the third paragraph. It says "In my current role, I spend over 80 percent of my professional time delivering clinical care to patients with gynecologic cancers, including endometrial and ovarian cancer. Within my clinical practice, I manage patients throughout the spectrum of their disease course, including performing surgery, administering systematic therapy, i.e., chemotherapy, targeted therapy, immunotherapy, et cetera, as well as providing follow-up and survivorship care for those patients who achieve cure or remission." 10:06 10:07 10:07

Did I say that properly?

A. For the most part. So, yeah, gynecologic cancer and systemic therapy, not systematic therapy.

Q. Okay. Just so that I get a better sense of your clinical practice, I will have some follow-up questions. You're not involved in providing gynecologic care to patients, true? 10:07

A. I am involved in providing gynecological care to patients.

Q. You're not generally involved in the diagnosis -- the initial diagnosis of the cancer, true? 10:08

A. That's not accurate. The majority of cases patients do come to us already with an established diagnosis, so either uterine cancer, ovarian, cervical, because that was diagnosed by their referring provider, either their OB/GYN or their general -- PCP, sometimes from the ER. So in some instances they come to us without a diagnosis. For example, they might have gone to the ER complaining of pain and they had imaging that showed a pelvic mass. So those imaging findings may have been highly suspicious for ovarian cancer, but that diagnosis was not necessarily established. 10:08 10:08

So in many instances patients come to us without an actual cancer diagnosis.

Q. Okay. Well, then let me follow up with a couple things you just said. Is it generally speak -- strike that. 10:08

Is it generally true that the patient will come to you for treatment, already carrying a diagnosis of some form of gynecologic cancer?

MS. O'CONNOR: Objection.

THE WITNESS: So, like, I answered that. But 10:09 the -- many patients come to us already with an established diagnosis, you know, either from a biopsy -- usually we rely on biopsies to make a diagnosis. We don't rely on imaging or clinical suspicion. So many patients do come to us with 10:09 that diagnosis for either cervical, uterine, in some instances even ovarian cancer. But many patients come to us just based on clinical findings. You know, someone found a cervical mass, no biopsy; someone had an ultrasound that showed a 10:09 thickened uterine lining without a biopsy. Some patients come to us with a pelvic mass without a biopsy. So, yeah, there's many instances where we are actually making the diagnosis. But, yeah, many

of our patients do come to us with an established diagnosis.

BY MR. COSTELLO:

Q. Okay. And I guess what I'm trying to figure out is can you tell me what percentage of your care and treatment is gynecological care to patients versus performing the surgeries and therapies and those types of things after they've already been referred to you? 10:10

MS. O'CONNOR: Objection. 10:10

You can answer.

THE WITNESS: That's -- can you -- that's a -- I don't know if I understand your question. That's very broad.

BY MR. COSTELLO: 10:10

Q. Sure. So when we talk about there are instances where people come with a pelvic mass or there might be imaging -- I'm sorry -- there might be results that indicate that there is potentially cancer, I'm just trying to figure out is that the majority of cases that you see? Is that 80 percent of what you see versus the 10 to 20 percent exception where somebody comes in with a pelvic mass and they're referred to you at that point in 10:10

time?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I mean, I can't tell you if it's 60 versus 30. Yeah, most patients do come to us with an established diagnosis. But it's not a small amount of patients that come to us without an established diagnosis because a lot of it depends on who is referring the patient. So, you know, if the referring provider is an OB/GYN and the diagnosis is uterine cancer, endometrial cancer, those providers have the skill set to do the work-up, get the biopsy done, and then refer to us; versus if the referring provider is an internal medicine physician, someone that doesn't do GYN procedures, then those patients get referred to us because the patient complained of postmenopausal bleeding, thickened endometrial stripe. And sometimes the internal medicine doctor bypasses the OB/GYN, sometimes they don't. 10:10 10:11 10:11 10:11

Same thing in the ER. Sometimes we get consulted in the ER if there's patients with cancer; sometimes you won't get consulted at all. At the end of the day, we -- you know, I care for

patients with gynecological cancers whether they come to me diagnosed or undiagnosed. Once the diagnosis has been established either by myself or the referring provider, then I assume their care, and then I manage the rest of their care, you know, 10:12 surgery, chemotherapy, et cetera.

BY MR. COSTELLO:

Q. You can't tell me as you sit here today what percentage is referred to you with a diagnosis versus which percentage you would perform the 10:12 diagnosis of cancer?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Yeah, I mean, if you want me to estimate, I hate guessing. But -- 10:12

BY MR. COSTELLO:

Q. You can estimate.

A. -- I think the majority of patients do come with a diagnosis. So maybe 70/30, 80/20 breakdown. 10:12

Q. Okay. Do you know Dr. Shulman at Northwestern?

A. I know him. I mean, his office is, I think, around mine. So we've talked a little bit,

but not -- I don't see him a lot.
Q. Okay. Is he somebody who refers patients to you?
A. Yes.
Q. And what is your understanding of what type of physician he is? 10:12
A. So he's a general OB/GYN. I believe he does have a specialty in genetics. I believe he does ultrasounds, as well. So he's -- broadly speaking, he's a general OB/GYN. 10:13
Q. Do you have any criticisms of him as a physician?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I have no reason to criticize him as a physician. 10:13
BY MR. COSTELLO:
Q. Maybe you could just clarify for me. If somebody sends you a patient, like a referring physician like Dr. Shulman, after you perform surgery or targeted chemotherapy or some type of immunotherapy, does the referring physician get a copy of the treatment records? Is that something that's common? 10:13

A. You know, it's -- I think it varies a little bit. Especially I think that has changed a lot with electronic medical records.

Q. Sure.

A. Especially when the physician is also in the same facility because they do have access to those records. 10:13

Q. Is that MyChart type of thing?

A. No, different. So MyChart is usually for patients. But when we talk about -- we use Epic, which is one of the major electronic medical record systems. So all of the physicians that work and see patients at Northwestern, they have access to that Epic system. I try to be intentional about, you know, when seeing a new patient or, you know, for follow-up, to send them a copy of my visit note. I don't usually send operative notes and things like that. But it's not easy because sometimes the referring physician is not listed. But if -- you know, you mentioned Dr. Shulman. So he has access to all of my notes for any patients that he refers to me that he wanted to look up. 10:14 10:14 10:14

Q. Okay. And maybe it was a poor question. The referring physician would have access to the

notes, including any diagnosis that you made, true?
A. If they're -- you know, if they're at Northwestern, they're a Northwestern physician, they should be able to see my notes. We get referrals from institutions and clinics outside of Northwestern. So in those cases, I do try to -- you know, there's, like, a way to attach my note and send them a letter saying this is my note for today, and they should be able to see it. 10:15
Q. And Dr. Shulman is in the Northwestern system, true? 10:15
A. Yeah.
Q. As far as the care that you typically provide -- I know you gave me an estimate -- you typically provide treatment through surgery, and if necessary, systematic therapy like chemotherapy or targeted therapy or immunotherapy; is that fair? 10:15
A. I just want to correct, again. You keep saying "systematic." It's systemic.
Q. I'm sorry. 10:15
A. That's okay. I just want to make sure that we're talking about the same thing.
Q. Yeah, I can ask the question again. You provide treatment through surgery, and if

necessary, systemic therapy like chemotherapy, targeted therapy, or immunotherapy, correct?
A. Yes. I do full-spectrum uterine oncology care.
Q. You say that you provide follow-up/survivorship care for those patients who achieve care or remission. In providing that follow-up care, have you ever advised a patient to cease using chemical hair relaxers? 10:16
A. So it hasn't come up in the context of, you know, that survivorship. The times where it has come up is more, you know, patients ask a lot of times usually during the initial visit, you know, what could have caused my cancer or what led to this. And I see -- in my clinic days, sometimes I'm seeing 28, 30 patients. So my time is really limited. And I sit down with all of my patients. I spend a lot of time with my patients. So in instances where it has come up where they say, you know, what could have caused this, in people -- for example, African-American women that we know have higher rates of utilization of chemical hair relaxers, I have started to mention this as a risk factor, as a potential cause. 10:16 10:16 10:17

But for each individual patient, I will have to look at the whole record, the whole medical history, look at all the risk factors. So I don't really have the time in my current practice when I'm just like seeing these patients, treating them, to go down this causal analysis for each individual patient. I have brought up this is a risk factor, the same way that I bring up obesity being a risk factor. But, you know, when I'm seeing patients, my main goal is to care for them, help them with their cancer, support them through it, support their family. I don't, you know, necessarily ask them, saying, you know, this is something that you were doing that could have caused this. Like, I don't think that's my role. 10:17 10:17 10:18

Q. To follow up on that, was the first time that you ever advised a patient to cease using chemical hair relaxers after February of 2025?

MS. O'CONNOR: Object to the form.

Are we starting to get into any HIPAA areas here? I just want to raise that. I have concerns, including concerns about Dr. Shulman and notes in the Northwestern medical records. I just hope we're not going in some direction here -- 10:18

MR. COSTELLO: I'm asking general questions.
MS. O'CONNOR: Okay.
Over my question objection, you can answer that.
THE WITNESS: Can you repeat the question. 10:18
MR. COSTELLO: Can you read it back.
(Record read as requested.)
MS. O'CONNOR: Object to the form.
THE WITNESS: Yeah, so I don't think I said that I have advised a patient to stop using 10:19 chemical hair relaxers. What I said is, like, it has come up in discussion when talking about risk factors, potential exposures that could have caused a cancer. But I don't believe I've ever had that discussion. And that question, you know, that 10:19 sounds like you changed the question a little bit. I don't believe I agreed to the premise that I have advised patients to stop using chemical hair relaxers.
BY MR. COSTELLO: 10:19
Q. In providing follow-up care, have you ever asked a patient if they've used chemical hair relaxers?
MS. O'CONNOR: Objection.

THE WITNESS: Without them asking me about it?
BY MR. COSTELLO:
Q. Yes.
A. You know, it's not something that I generally take a history because, again, my primary focus is caring for the patient, helping them understand the treatment plan, which is very, very complex, especially for women that have metastatic disease that require not only surgery but chemotherapy. The number of new chemotherapy drugs that have evolved over the last few years has just skyrocketed. So some of these medications are very, very complex for patients to understand. And at that point, you know, like, the damage has already been done. They already have a cancer diagnosis. 10:19 10:20 10:20
So me spending a lot of time talking, this is what would have caused it and, you know, this is the reason we're here, like, I don't really see a lot of benefit at that junction. Certainly it's a discussion that I -- if it comes up and they want to discuss it, I'll be happy to spend the time with them, understanding that, again, I will tell them, you know, in order to establish the causal 10:20

relationship for your specific case, I will have to review -- the same way that I've done for this case, I have to review, you know, your medical history, your pathology report, exposures, et cetera. So that would take a lot -- a lot of time for each individual patient. 10:21

Q. Would you need all of that in order to assess an individual as to whether or not their cancer is causally linked to chemical hair relaxers? 10:21

MS. O'CONNOR: Object to the form.

THE WITNESS: I think it's not something that I can, you know, during a visit. But, you know, looking at the time, we're talking about the time I spent writing this report, looking at all the literature. Right now I have a lot more understanding, a lot more knowledge about the issue at hand. But I would certainly -- for each individual patient, that would be -- getting to that causal analysis and saying, you know, this could be a potential -- a possible cause of your cancer, that will take time. Yes, it's not something that I can just see a patient -- and it's just not what I do. You know, I don't do it for 10:21 10:21

obesity. I don't do it for genetic syndromes. I think each patient is -- it's a very individual case, and there's many, many factors that contribute to these cancers. Cancers are a very complex disease. 10:22
BY MR. COSTELLO:
Q. Okay. And just so I can understand your answer, when you talk to a patient, whether it be obesity or other factors, you don't go through and give them a specific this is what caused your 10:22 cancer; rather, you would advise them of risk factors; is that fair?
MS. O'CONNOR: Object to the form.
THE WITNESS: We talk about different risk factors. I -- yeah, we're not sitting there and 10:22 going through the causal analysis of, you know, this is definitely what caused the cancer. But -- and to be honest, the majority of the time is more focused on the plan of care, you know: Do you need surgery? What surgery are we talking about? After 10:22 the surgery, we review the pathology report. Based on the pathology report, you know, what treatment recommendations -- or what treatments we'll recommend: chemotherapy, radiation, combination of

both. And sometimes, you know, some people do well and they only need surveillance. So that is what the bulk of my time and discussion with patients entails.

BY MR. COSTELLO: 10:23

Q. Just to follow up on a couple of things, you don't have any brochures, pamphlets, or other literature that you provide to patients in follow-up care advising them of a risk of cancer related to chemical hair relaxers, true? 10:23

A. I don't have any of my own. I mean, I know patients go online, they see things. Yeah.

Q. But it's nothing you provide your patients as far as your care and treatment, true?

A. No, I have not provided any brochures. 10:23 But I also don't provide brochures for many other risk factors.

Q. And your involvement with training medical students, residents, or fellows, have you ever instructed those students or physicians in 10:23 training regarding a causal link between chemical hair relaxers and uterine or ovarian cancer?

MS. O'CONNOR: Object to the form.

THE WITNESS: I mean, I think the discussion

may have come up, again, when the observational studies were published. It's publicly available. You know, especially when you're a medical student, a resident, or fellow, you're very much on top of these types of papers. So it may have come up in a conversation with a medical student, they either brought it up or they read the paper and mentioned something. It may have come up a couple times. 10:24

BY MR. COSTELLO:

Q. As you sit here today, you can't think of a specific lecture or instruction that you gave to medical students or other physicians in training regarding a causal link between chemical hair relaxers and uterine or ovarian cancer, true? 10:24

MS. O'CONNOR: Objection. 10:24

THE WITNESS: I don't recall, like, a lecture, per se. But I think -- you know, I'm constantly teaching, right? So I have medical students; I have residents; I have fellows; sometimes I have PA students. So I think of anything that we discuss as teaching. But if we're talking about teaching is me writing, you know, doing a presentation, a PowerPoint, no, I have not done that. 10:24

BY MR. COSTELLO:

Q. Are all of the students, residents, and fellows focused on gynecologic oncology or on some other path to become general OB/GYNs, the ones that you instruct? 10:25

A. Well, that -- so I'm going to need to clarify because I think that's a very broad question.

Q. Sure.

A. But usually when I'm saying students, 10:25 I'm talking about medical students.

Q. Understood.

A. Medical students in general are going through their training to become doctors. So my interaction with them could be in a lecture, you 10:25 know, when they're like first or second year where they're not doing clinical training yet. Most of my interactions with medical students are when they do their rotation in our service, in the gynecologic oncology service with us. They're 10:25 usually with us for anywhere between two to four weeks.

During that time, yes, that training, that focus, that education is very much focused on

gynecological cancers. But many of those students go and become something else, like a radiologist, neurologist. Many of them do become OB/GYNs and some of them become gynecologic oncologists. When we're talking about residents, it's the same thing. 10:26
It's a little bit more focused because these are OB/GYN residents, although sometimes we get urology residents and medical oncology residents. Just because we are so specialized, that is a unique opportunity for them. 10:26

But, yeah, for the OB/GYN residents, which are the bulk of the residents I train, they do several rotations with us, again, in our service which is a GYN oncology service. It's usually a month. So during that time, they're spending a lot 10:26
of time caring for our patients on inpatient service. They see patients with us in clinic. They go with us to the operating room. So that month, their service is very much focused on gynecologic oncology. But then they also rotate on 10:27
the labor floor, they do urogynecology. So they do other rotations.

The fellows, that's much more specialized. So gynecologic oncology fellows,

that's a subspecialty training focused only on gynecologic oncology. So usually fellows is -- most of the country is a three-year fellowship. They spend one year doing research either in the lab or other, you know -- in a basic science lab or 10:27 doing other type of research, and then they do two years of clinical training. And during that time, they're running inpatient service. They see patients with us in clinic. They're going with us to the OR. But that's very much focused on GYN 10:27 oncology.

So I know it was a long answer, but it was a broad question.

Q. Sure. Let me follow up just on one specific thing you said. Talking about the 10:27 residents now specifically, do you instruct the residents who may be future OB/GYNs to advise their future patients to avoid chemical hair relaxers?

MS. O'CONNOR: Object to the form.

THE WITNESS: Again, as I mentioned earlier, I 10:28 have not had a discussion or told patients to avoid chemical hair relaxers because I'm not seeing these patients in a general OB/GYN type of practice. So, again, the patients that I'm seeing are either

already diagnosed with cancer or come to us with signs and symptoms that are highly concerning for uterine cancer, ovarian cancer, et cetera.

So I think it's certainly, in the context of the available literature, is something 10:28 that I cannot say right now that we haven't discussed in the context of, you know, like, rounds or, oh, I saw this article about chemical hair relaxers and uterine cancer; what do you think? So we have those kinds of discussions not only for 10:28 this, but for many things. So that's just the nature of an academic medical practice.

BY MR. COSTELLO:

Q. Okay. And so because that's not part of your practice, you don't instruct future OB/GYNs to 10:29 advise their future patients to avoid chemical hair relaxers?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I think if it comes up when 10:29 we've had the discussion, based on my understanding of the literature right now, I do -- I have brought it up in front of them when I'm seeing patients in clinic with them, like, the idea of this is a known

risk factor. So it is something that, yeah, it has come up. So whether they take that as advice or not, I mean, I can't tell. There's a lot of things that I advise them to do that they don't do. So...

BY MR. COSTELLO: 10:29

Q. And is this -- when you've spoken about them -- when you've spoken to this about them as a risk factor, is this after your retention in this case in February of 2025?

MS. O'CONNOR: Objection. 10:29

THE WITNESS: That's probably -- yeah, I would say it has occurred with much more frequency over the last year just because, again, I have access and, you know, awareness to, like, all of the literature on the topic. I think with -- when it 10:30 was just my awareness after reading the observational studies, I think my understanding about the mechanisms through which I believe these chemicals are causing uterine or ovarian cancer was a little narrower. Now that I have a deeper 10:30 understanding, I have formed my opinions, I think it has come up more frequently.

BY MR. COSTELLO:

Q. After February of 2025?

A. Yeah, I think that would be accurate.
Q. Okay. Part of your report is your CV. I believe it's on page 75. I think it's Exhibit A to the report.
A. Sorry. 10:30
Q. Take your time. Yeah. I'm sorry. That's the page of the PDF.
A. Oh, I found it.
Q. Yeah. It's Exhibit A.
A. Yeah. 10:31
Q. And if we skip ahead to page 8 of your CV, I believe it would be -- at least the document I'm looking at, it's page 83. Give me one second to get there.
So if we look at page 83, there is a 10:31 section listed where it says "Clinical Trials." Do you see that?
A. Yes.
Q. And it's "institutional principal investigator." Do you see that? 10:31
A. That's correct.
Q. PI?
A. Mm-hmm, yes.
Q. Okay. None of these clinical trials

relate to the opinions that you're offering in this case, true?

A. That's correct.

Q. None of the clinical trials relate to the risks associated with chemical hair relaxers, 10:32 true?

A. Yeah. The only -- just to be complete, so one of -- the one -- number 5 that says the Phase II study of androgen receptor inhibition by darolutamide in combination with leupro- -- 10:32

Q. She's not going to be able to get that.

A. I'm sorry. I'm sorry. I'm sorry. So, yeah, number 4 -- sorry -- number 5 on the clinical trials list, so these are drugs and treatments that deal with the endocrine system. So I'm only 10:32 bringing it up because that is, basically, the mechanisms through which I believe chemical hair relaxers are causative for uterine and ovarian cancer. But this specific trial is not looking at chemical hair relaxers. But, again, to the extent 10:33 of endocrine systems and what we're discussing.

Q. Number 5, just so that we're on the same page, that does not -- that trial did not deal with the related risks associated with chemical hair

relaxers as causative to these types of cancers, true?
A. Correct.
Q. And it did not relate to risk associated with chemical hair relaxers as far as EDCs, true? 10:33
A. Correct.
Q. Although those may be drugs that are used for treatment, all of the studies that we have gone through, they are not specific to chemical hair relaxers and causation for ovarian and uterine cancer, true? 10:33
A. Correct.
Q. We can go back to page 75. I think it's the first page of your CV. I'm sorry. Exhibit A is 75. But if we go to your -- I think it's the very first page. 10:33
A. Yep.
Q. Sorry. Just give me one second to pull it up.
As far as certifications, you're board certified in obstetrics and gynecology and board certified as a gynecologic oncologist; is that right? 10:34
A. That's correct.

Q. Are those ten-year certifications?
A. They renew it every year. So I have to for -- I have to, basically, read it's like 30 articles or 15 articles, a lot of articles, and then answer questions relating to. So it's almost like a maintenance of certification that I have to do -- 10:34
Q. Okay.
A. -- every year. There's not another board or another test that I have to take unless I fail to, you know, do the maintenance or certification process. 10:35
Q. Okay. So it's basically a continuing education requirement that you have to certify every year? 10:35
A. Correct.
Q. We all know about that.
Okay. Just as far as your background, I just want to make sure that -- obviously, I have your CV in front. Do you have any training relating to biostatistics? 10:35
A. I mean, I think, if the question is whether I have a degree in biostatistics, the answer will be no. But I think I use biostatistics

ever since I was -- even in medical school we -- there was a course in biostatistics and epidemiology throughout my residency. I would have reviewed journal articles that are, you know -- you're looking at biostatistics, epidemiology. So I understand it. If the question is whether I am a card-carrying, you know, biostatistician, I am not. But I do have the training to understand, you know, when reading articles and papers, what they're talking about.

Q. Okay. Do you have a degree or training in chemical hazards, safety, and exposure?

A. You know, same thing. I don't have a degree in toxicology. But my current clinical practice, as we talked about earlier, there's a surgical aspect, there is the aspect where I'm providing or treating patients with chemotherapy. So talk about, you know, chemical safety and hazard exposures, these are very, very toxic chemicals that we are using to treat patients. So I have to understand the toxicity, how do I adjust the dose based on the toxicity.

I also review clinical trials. So one aspect of clinical trials is efficacy

component, which is, you know, what most people care about and want to know. But there's also the safety and side effect component. So in my mind, that very much constitutes, you know, chemical safety and hazard exposure. 10:37

Q. Okay. I'm just going to run down a list here. I think we're going to -- I think you might have addressed a couple of these. Do you have a degree or training in chemical exposure and exposure management? 10:37

A. I think I will have to use the same answer in the sense that I don't have the training, but I'm constantly dealing with chemical exposure. I think chemotherapy is not something that the lay public has been exposed to. We have to deal with, 10:37 you know, sometimes there's a chemotherapy spill, so that's chemical exposure for everybody. So I don't have the training, but I do have experience with these topics and this field.

Q. What about a degree or training in 10:37 cosmetic products or cosmetic product regulation?

A. I don't have any training or experience with regulation.

Q. Okay. What about training or experience

in dermatology?
A. So a lot of experience not necessarily as a dermatologist. But one of the cancers that I treat is vulvar cancer. And the vulva -- not to go down an anatomy thing, but the vulva is very much part of -- is a skin organ. It's in the skin. So we treat vulvar cancer, which is fairly -- is a skin cancer, although of the GYN organs. In fact, we get referrals from dermatologists to treat this condition because we're much more exposed to it. We're probably considered the experts in vulvar cancer, which is a skin condition. 10:38 10:38
We also treat premalignant lesions of the vulvar area, which is a skin condition. So we treat this with medications, laser. Sometimes we use steroids, depending on the condition. So I do have a decent amount of experience with dermatology. Again, I'm not a dermatologist by training, but I deal with dermatological issues in my practice. 10:38 10:39
Q. Okay. You don't deal with any dermatological issues with the scalp, true?
A. No. I can't say that I have done anything on the scalp.

Q. Do you have a degree or training in endocrinology?

A. So same thing. I am not an endocrinologist. But a lot of cancers that I treat and the treatments that we use are very much based 10:39 on endocrinology. So we know that the uterus, the ovaries -- the ovaries, in my mind, are an endocrine organ. The uterus responds to exposures from hormones produced by the endocrine system. So I know the pathogenesis of endometrial cancer. 10:39 Ovarian cancer is very much related to estrogen exposure, progesterone. So a lot of these hormones -- I mean, the hormones that are made in the ovaries, which is very much driven by the hypothalamic pituitary access, which are endocrine 10:39 organs.

I also -- some of the chemotherapies that we use more recently, so immunotherapy, for example, drugs like Keytruda or pembrolizumab -- sorry, p-e-m-b-r-o-z-u-l-i-m-a-b [sic] -- so these 10:40 are drugs that the way they work is by helping the immune system recognize cancer cells, but they can cause an autoimmune type of reaction. And one of the most common types of autoimmune reactions is

immunotherapy-induced hypothyroidism, h-y-p-o-t-h-y-r-o-i-d-i-s-m. And when that happens, like, I feel comfortable treating those patients for that diagnosis. So I start them on thyroid replacement therapy. 10:40

I've had patients that develop diabetes as a result of this, which, again, I'm not managing diabetes, so that's something that I would refer out. But I do have a decent amount of exposure, understanding of how the endocrine system works. 10:41

Q. Okay. You don't hold yourself out as an endocrinologist, do you?

MS. O'CONNOR: Objection.

You can answer. 10:41

THE WITNESS: I'm not going to give you that long answer again. So if the question is whether I have a degree in endocrinology and I am board certified in endocrinology, I am not. But I do have a decent amount of experience and understanding of the endocrine system. 10:41

BY MR. COSTELLO:

Q. Do you have training or a degree in epidemiology?

A. So, you know, similar here to the question about biostatistics. So epidemiology, I have training. Like, we did -- in medical school you take an epidemiology course. You deal with epidemiology in just your general practice. 10:41 There's many articles that we rely on for the purpose of understanding risk factors for the cancers that I treat. That's very much epidemiology.

I am not a card-carrying 10:41 epidemiologist. I am not -- I can't say that I'm -- I don't know if they do a board certification. But like a degree in epidemiology, I do not have that. But I do have the skill set to understand the epidemiology, epidemiological 10:42 studies, analyze the data in a critical manner to help me guide the care that I provide for patients.

Q. Okay. And as far as your practice as a clinician, you don't do epidemiological studies, true? 10:42

A. I wouldn't agree with that, necessarily. I mean, I think -- I'm not doing large epidemiological studies. But within my group, we have -- one of my partners, she does have, like, an

MPH degree. And she -- some of the research that she does and we help as a group making sure we have the right research question, what are we addressing. So a lot of that research comes from big databases or surgical databases. For example, you know, NSQIP is one of those; N-S-Q-I-P, I think it's called. But it's like a big, large national database that can be used to conduct epidemiological studies. 10:42

So there's research questions that you can formulate and use that database or all the databases. So I have been part of some of those studies. I have conducted small projects with residents that it's essentially doing survey questionnaires, which, again, I wouldn't consider a huge epidemiological study. But when we're doing survey research, in my mind, that's epidemiology. So I have done some of that. 10:43 10:43

Q. Okay. And none of that relates to causation between chemical hair relaxers and an ovarian and endometrial cancer, true? 10:43

A. Correct. None of those studies that I have been involved with relate to chemical hair relaxers and uterine and ovarian cancer.

Q. Maybe just to speed up some of these, I'm just going to run down the list and you can tell me what training and experience or degrees you might have in any of these. Okay?
Environmental exposures, genetics, gynecology and reproductive endocrinology, neuroendocrinology, occupational medicine, pathology, pathology of cancer, public health, and toxicology. 10:44
MS. O'CONNOR: Well, objection. 10:44
BY MR. COSTELLO:
Q. Can you tell me what -- do you hold a degree in any of those that I've just listed?
A. I'm not -- that's -- you're trying to make me answer a very complex question with multiple areas of expertise that I do have experience with. So I'm happy to answer every single one of them individually like we're doing or -- 10:44
Q. What training do you have in toxicology? 10:44
A. Again, the -- I don't have a degree in toxicology, but I deal with toxicology from the perspective of understanding how chemotherapy drugs work, how they can affect the body. That is -- it

is a toxic chemical that is not natural-occurring that we put into someone's body that we need to understand -- we're using it for the purpose of treating cancer. But we know that these drugs also have significant impact in the human body that are not natural. So I need to understand how that process works, how to reduce the doses, what is the exposure these patients are having. 10:45

When we do clinical trials, especially like the earlier phase type of trials that I'm often involved with, we're constantly monitoring the dose at which the patients are responding without having any side effects. So it is something that I -- again, I don't have a degree, but I do deal with it a fair amount. 10:45 10:45

Q. And tell me about public health. What type of training do you have in public health?

A. So, I mean, I think of public health -- we talked about epidemiology and biostatistics, which, again, those are within the public health field. And as I mentioned, I have taken -- have lectures both in medical school -- actually, courses in medical school, lectures during residency, during fellowship that I address public 10:45

health, biostatistics.

I am involved, as I mentioned, in some epidemiological studies. Have been involved in the past, will probably be involved in the future, have done projects that deal with public 10:46
health -- different aspects of public health with residents. I understand the general principles of biostatistics, epidemiology types of research, observational, randomized trials, case control. Yeah, so all of those things deal with public 10:46
health, in my opinion. So I have experience with it. I don't have a degree, but I have experience.

Q. Okay. And I think we covered this. But as far as the studies that you've been involved in prior to this litigation, none of them dealt with 10:46
the causation between chemical hair relaxers and ovarian or uterine cancers, true?

A. That's correct.

Q. If we go to page -- I think it's the sixth page of your CV, which is, at least on mine, 10:47
page 81 of the exhibit, there's a section titled "Grant Proposals Submitted." Do you see that?

A. Hold on. I have the wrong page.

Q. It might be page 6 of your CV.

A. Yep.
Q. You have it in front of you now?
A. Yes.
Q. Okay. Is it fair to say that none of the grant proposals relate to causation between chemical hair relaxers and cancers? 10:47
A. That's a fair statement.
Q. And also fair that none of the grant proposals relate to causation between chemical hair relaxers and EDCs? 10:47
A. That's a fair statement.
Q. And then just as far as the grants and sponsored awards, which is -- I think it's page 6 through 8, there's quite a few. But please tell me if I'm wrong that none of the grants or sponsored awards relate to causation between chemical hair relaxers and ovarian or uterine cancer, true? 10:48
A. Yeah. The main goal or the objective of these grants are not -- that's not the main objective. Now, some of this -- we're always collecting data on patients. So if someone was to report -- I am just trying to think broadly and not -- if they were to report, you know, chemical hair relaxer use and they develop ovarian cancer, I 10:48

mean -- but, yeah, that's not the primary objective of the research.

Q. Okay. Just to close that out as far as the grants and sponsored awards, none of those relate to causation between chemical hair relaxers and EDCs, true? 10:48

A. That's correct.

Q. When I use the term "EDC," you know what I'm talking about, right? Endocrine-disruptor chemicals? 10:49

A. Yes.

Q. Okay. If we go to page 9 through 11 there's a section entitled "Invited Talks." Do you see that?

A. Yes. 10:49

Q. Okay. Give me one second to get there. None of these relates to causation between chemical hair relaxers and the types of cancers that are outlined in your report, true?

A. That's accurate. 10:49

Q. And none of these invited talks relate to chemical hair relaxers and EDCs, true?

A. That's correct.

Q. And if we go to scholarly works, which

is pages 11 through 21 of your CV, none of these relate to causation between chemical hair relaxers and the type of cancers outlined in your report, true?

A. That's correct. 10:49

Q. And none of these publications or scholarly works relate to causation between chemical hair relaxers and EDCs, true?

A. That's correct.

MR. COSTELLO: Why don't we take a five-minute 10:50 bathroom break.

MS. O'CONNOR: Yeah.

MR. COSTELLO: Thank you. We can go off the record.

10:50 THE VIDEOGRAPHER: Off the record at . 10:50

(Short recess.)

THE VIDEOGRAPHER: Back on the record at 11:05.

BY MR. COSTELLO:

Q. Thank you. Doctor, we took a break. 11:05 And before we move on to your report, I just want to make sure that I had a couple things clear. I asked you about a number of different disciplines. I can list them. We talked about biostatistics and

chemical hazards, chemical exposure, cosmetic products or cosmetic product regulation, dermatology, endocrinology, epidemiology, environmental exposures, genetics, gynecology, neuroendocrinology, occupational medicine, 11:06 pathology, pathology of cancer, public health, and toxicology. I think I asked you about training. I just want to be clear. You don't have a degree in any of those disciplines that I just listed, true?

A. You know, I just want to make sure for 11:06 the purpose of the record and we're clear, I don't have a degree.

Q. Okay.

A. But I don't want to be representative of me not having experience, understanding, or 11:06 knowledge of those fields, especially when we're talking about genetics, pathology, dermatology. As I mentioned, this is something that I deal with on a daily basis. It is part of my practice. So if we're talking about a degree, the answer is no. 11:06 But I want to make sure that there is no misrepresentation that I have no experience whatsoever in dealing with these fields.

Q. Thank you. And is it fair to say that

the disciplines that we just went through, you are not board certified in any of those, correct?
A. Right. I am not board certified in dermatology or genetics, yeah.
Q. And you don't hold yourself out as a physician who practices in those areas, true? 11:07
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yeah, this is where it's a blurry line we're walking here. Because even 11:07 though I don't have a degree in genetics, I get referrals to me all the time. Actually, you brought up Dr. Shulman earlier. So he's a geneticist. I assume he's board certified. I think. I'm actually not sure. But we get 11:07 referrals from him all the time about patients that have, you know, genetic mutations that increase their risk for ovarian cancer, uterine cancer, for the purpose of counseling about the management of these patients. So I have -- I'm struggling a lot 11:08 with the way that you're asking the question because, yes, I don't have a degree, but I do have experience and in some ways I'm considered an expert when it comes to some of these fields.

BY MR. COSTELLO:
Q. Okay. Let me just follow up. Maybe I can clear this up. You don't hold yourself out as board certified in dermatology, true?
A. I do not. 11:08
Q. You don't hold yourself out as board certified in endocrinology, true?
A. Correct.
Q. You don't hold yourself out as board certified, if there is a board, for epidemiology? 11:08
A. I'm not sure if there's a board. I don't have a degree in epidemiology other than, you know, I've got my experience.
Q. You're not board certified as a geneticist; is that true? 11:08
A. I don't have a board certification. I do have a broad understanding, and I'm qualified to counsel patients about genetic risk factors when it comes to gynecological cancers.
Q. You're not board certified in 11:08 reproductive endocrinology?
A. I am not board certified in reproductive endocrinology, but I have received training. Because, you know, we talked earlier about

residency, right? So during my residency training, I did several rotations; I can't remember off the top of my head. But I did rotations in reproductive endocrinology. That's part of the curriculum to become an OB/GYN. So even though I don't have a board certification, that field was very much tested when I did my general OB/GYN boards. 11:09

So in a way, even though I'm not board certified, necessarily, in reproductive endocrinology -- and, in fact, this would also apply to genetics. So even though I don't have the board certification in reproductive endocrinology or genetics, I am board certified in OB/GYN and reproductive endocrinology, genetics, when it comes to, like, the GYN track, reproductive genetics, I would say, that is very much part of the board certification of OB/GYN. 11:09 11:09

Q. You're not board certified in neuroendocrinology? 11:10

A. No.

Q. You're not board certified in occupational medicine?

A. I don't -- it's not the same as physical

medicine and rehabilitation. I'm not sure if there's a field of occupational medicine.
Q. Okay. You don't hold yourself out as an occupational medicine physician, do you?
A. No. 11:10
Q. You're not board certified in oncodermatology, true?
A. That's, again, a broad statement because I would consider -- again, I'm not board certified. But the vulvar diseases that I manage are primarily 11:10 diseases of the skin, which is what dermatology deals with. And even board-certified dermatologists refer those patients to me. So even though I don't have the board certification, I do have the expertise to manage skin conditions of the 11:10 vulva.
Q. Okay. But you're not board certified, true?
A. Would you mind repeating the question.
Q. I just want a clear yes or no. You're 11:11 not board certified in oncodermatology, true?
A. I'm not board certified in oncodermatology.
Q. And you're not board certified in

pathology?

A. Again, that also falls within OB/GYN in general. Like, we deal with pathology. Especially me, I do surgeries, like, two, three days a week. So I'm constantly relying on pathology. I'm 11:11
looking at pathological slides. I rely on the pathology report to make treatment decisions for patients. So, again, I don't have a board certification, but I do have the experience, the expertise, and the ability to use pathology reports 11:11
to help come up with treatment decisions for patients, or recommendations, treatment recommendations.

Q. So I'll just move to strike the testimony other than that you're not board 11:11
certified in pathology.

MS. O'CONNOR: Oppose the motion.

BY MR. COSTELLO:

Q. As far as toxicology, you're not board certified in toxicology, true? 11:11

A. I think you asked me that question already earlier. I'm not board certified, but I do have -- I deal with toxicology and the effects of external agents, chemotherapy in this case, on the

patients -- you know, on the human body. So I do have to have an understanding of toxicity, how it works, how we adjust the treatment to adjust those toxicities. So that, in my mind, falls within toxicology. 11:12

Q. Okay. Prior -- strike that.
You don't have a degree in public health, true?

A. I think you're asking me the same question a different way, so I'm going to give you 11:12 the same answer.

Q. I'm just asking, do you have a degree in public health?

MS. O'CONNOR: Objection.

THE WITNESS: The way I understand that 11:12 question is you want me to give this definitive "no," which I'm not comfortable with because I just don't want it to be misrepresented that I have no experience, understanding, or way to read and interpret epidemiological studies, including 11:13 observational studies. So, yes, I don't have a degree, but I -- you know, I know what I'm reading and I know how to interpret the data.

BY MR. COSTELLO:
Q. Just to circle back before we jump into your report, I just want to make sure that I have your testimony clearly. Prior to February of 2025, was it your custom and practice to ask about hair relaxers as a clinician? 11:13
A. It's, again, not something that I said was my custom and practice. Even now, it's not something that I consistently ask. A lot of times is -- when the conversation has come up is either patient or their family member has asked about possible risk factors for their cancer. It's certainly, you know, newer data than we have data for some of the other risk factors for uterine and ovarian cancer. But, yeah, it's not something that I was consistently discussing prior to, yeah, this year. 11:13 11:14
Q. And prior to February of 2025, it was not your custom and practice to advise patients that chemical hair relaxers cause cancer, true? 11:14
MR. COSTELLO: Objection; asked and answered.
You can answer it again.
THE WITNESS: You know, I can't really -- yeah, I can't really answer that question because

it's quite possible, since I was aware of the results of the epidemiological study, even though I had not done the deep analysis that I have done for the purposes of my opinion, I was aware of the epidemiological studies, as I previously testified. 11:14
So it's quite possible that I may have mentioned those findings to a patient or family member if they asked about risk factors.

BY MR. COSTELLO:

Q. I guess I'm not asking if you ever did. 11:15
I'm just asking, was it your custom and practice to advise patients that chemical hair relaxers cause cancer prior to February 2005?

MS. O'CONNOR: Objection.

BY MR. COSTELLO: 11:15

Q. '25. I'm sorry.

MS. O'CONNOR: Objection.

THE WITNESS: If it came up in the discussion after I was aware of the literature, it's something that I would have probably discussed with the 11:15
patient or their family.

BY MR. COSTELLO:

Q. Okay. Getting back to your opinions here, which is Exhibit No. 4, if we go to page 5 of

your report, I believe it's the first paragraph under the "Methodological Approach of Expert." Do you see that?

A. Yes.

Q. Okay. And it says that you would have followed the methodology that was outlined in your report -- true? -- to arrive at your opinion that there's a causal link between chemical hair relaxers and the type of cancers; is that right? 11:16

A. Yes, I would have used this methodological approach that I described in my report. 11:16

Q. In your clinical practice --

MR. COSTELLO: We'll go off the record for just a second. 11:16

THE VIDEOGRAPHER: Off the record at 11:16 a.m.

(Discussion had off the record.)

THE VIDEOGRAPHER: Back on the record at 11:19 a.m.

11:19

BY MR. COSTELLO:

Q. Doctor, there was a brief interruption, so I'm just going to start my question over. Okay?

A. Okay.

Q. In your clinical practice, have you ever asked about chemical hair relaxers as part of a social history?

A. You know, I don't believe I have consistently asked about that in a social history. 11:19

Q. Okay. Did you ever do so before you were hired in February of 2025 for this litigation?

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: So, again, you know, if it came 11:19 up as a discussion, it's possible that I would consider that part of the social history, again, if the patient was initiating the discussion. But it was not something that I was necessarily actively asking about. 11:19

BY MR. COSTELLO:

Q. Okay. And you maybe anticipated my next question as far as actively asking about. Was this part of your patient questionnaire in your clinical practice at any time prior to February of 2025? 11:20

A. I don't believe, no, it was in the patient questionnaire.

Q. And I asked you before February of 2025. Is it part of your patient questionnaire now, after

February of 2025?
A. No.
Q. Is it something that in the clinical setting you would inquire about by taking an oral history if it didn't come up directly from the patient? 11:20
A. Again, it's not -- by the time these patients come to me, they already have the diagnosis. So I don't really -- my primary focus is more on, you know, the history, the symptoms, 11:20 when the symptoms started, the actual diagnosis, and dealing with that diagnosis. By the time these patients are coming to me, many of them, you know, they are already diagnosed or have clinical signs and symptoms that are highly concerning. So trying 11:20 to get at the causal -- what caused their cancer is just not what I want to dedicate the time to in those situations.
Most patients also don't necessarily want to -- you know, want focus on the treatment 11:21 plan. So it just takes a lot of time. So when it comes up, I discuss it. But it's not something that I'm, you know, digging deep. Again, I'm not -- when I see patients in front of me, I'm not

asking if they're obese or if they have other, you know, environmental risk factors that might increase some of the risks for cancer. So if it comes up, we discuss it. But I'm not actively asking about it, no. 11:21

Q. You're not actively asking about it. The only time that you would discuss it is if the patient brought it to your attention?

A. In my current practice, yes. I mean, I think it's something that might -- but, yeah, like, 11:21 I'm not -- it's not something that I always ask.

Q. And in your clinical practice have you ever cautioned a patient to stop using chemical hair relaxers?

MS. O'CONNOR: Objection. 11:21

You can answer it again.

THE WITNESS: Yeah, I feel -- you know, we talked about this, I'm pretty sure. But if it comes up, I'm not necessarily telling patients to, like, stop. The way that it has come up is more in 11:22 discussion as a risk factor. So by the time patients show up to me, they already have the cancer. So the last thing that I want to do is assign blame like, you know, this is the reason you

developed this cancer. That's just not something that I see myself discussing with patients.

I mean, certainly if it came up -- sometimes patients come in with their family member and that family member may be using chemical hair relaxer, so I can see how that's a situation. So I would be cautious, given the evidence that is available and my knowledge of the causal -- based on the causal analysis that I did for this litigation. 11:22 11:22

BY MR. COSTELLO:

Q. Okay. And you say you would be cautious, but you wouldn't advise them to stop using the products, true?

A. Well, I'm not treating the family member. So I don't have a patient-doctor relationship with them. I think certainly for patients, if the question is, you know, should I stop doing this because I'm concerned that I might develop ovarian or uterine cancer, so if the question that they're saying is based on I'm worried I'm using this chemical hair relaxer and I'm concerned about the possibility of developing uterine/ovarian cancer, I would absolutely say, 11:22 11:23

yeah, then you should probably stop using it. But, again, for my patients, they already have the diagnosis. So it doesn't -- it hasn't really come up in that context.

Q. If we look at -- back to your report, it talks about "the methodology I currently use in my clinical practice of treating patients with gynecological cancers and in my academic endeavors, including teaching, publishing journals, articles, textbooks, chapters, and presenting on topics as an invited lecturer or speaker at professional conferences and meetings." 11:23 11:23

In your academic endeavors, have you ever instructed a medical student, resident, or fellow that a causal link existed between a chemical or any substance and a particular cancer where there was insufficient data to draw such a conclusion? 11:24

MS. O'CONNOR: Object to the form.

THE WITNESS: That's a very broad question. Can you be more specific about the chemical that we're talking about? 11:24

BY MR. COSTELLO:

Q. I guess I'm trying to establish you

wouldn't advise in your academic setting medical students, residents, or fellows that a causal link existed between any substance and a particular cancer where there was insufficient data to draw such a conclusion, right? 11:24

MS. O'CONNOR: Object to the form.

THE WITNESS: Yeah, like, I don't know if I -- because I feel like it might be a little bit different question than the initial one. But we certainly have discussions about, you know, 11:24 environmental exposures that have been shown to increase the risk and should be considered risk factors for uterine and ovarian cancer; you know, estrogen, for example. If someone is taking estrogen as an external substance, so that is known 11:25 to be carcinogenic.

We know -- in the case of chemical hair relaxers, we do have the epidemiological evidence that demonstrates that there is a strong association for uterine and ovarian cancer. So 11:25 it's something that it may have come up during discussions, as I mentioned earlier. If you want me to point you to a specific date or time, I probably couldn't remember. But I'm sure it's come

up.
BY MR. COSTELLO:
Q. You would agree with me that it would be improper in the academic setting to tell medical students, residents, or fellows that a causal link existed between a chemical and any substance where there was insufficient data to draw such a conclusion, true? 11:25
MS. O'CONNOR: Objection.
THE WITNESS: If there's no data, I mean, like, if we're talking about, you know, do moon rocks cause uterine and ovarian cancer, yeah, we're probably not going to be discussing that. But I think if there's evidence -- and science is constantly evolving, right? So some of the discussions we are having today are very different from the discussions we were having five years ago when it comes to treatment, risk factors, et cetera, because we're constantly learning more and more about these cancers, their risk factors. 11:25 11:26 11:26
So, yeah, I'm not going to just out of the blue talk about a risk factor that has not been investigated. But if it's something that has been reported in the literature and it's something

that raises some red flags, it's quite possible and highly likely that we would discuss it if it relates to gynecological cancers.

BY MR. COSTELLO:

Q. Okay. And the hypothetical question that I asked you was it would be improper to advise them that a causal link existed between a chemical or any substance and any particular cancer where there was insufficient data to draw such a conclusion; you would agree that would be improper? 11:26

MS. O'CONNOR: Objection.

THE WITNESS: But the problem with the question is "insufficient data" is very subjective, right? I mean, we're here litigating this for something that I think we have very sufficient data 11:27 to establish a causal analysis, and I believe there's experts on the other side that feel differently. So that's why I have a problem with the question. Because "sufficient data," that's very, very, very subjective. 11:27

BY MR. COSTELLO:

Q. Okay. But the question is asking you if there's insufficient data, it would be improper to draw a conclusion between a causal link and any

substance, any particular cancer, and it would be improper in the academic setting to tell residents or fellows that that was a cause, true?

MS. O'CONNOR: Objection.

THE WITNESS: I think the issue that I have with the question -- and you can rephrase it if you want, and I might be able to answer it -- but the issue I have with the question is "insufficient" terminology is very subjective. For some people, the data that we have, you know, for this topic, chemical hair relaxers, for me the data we have is very sufficient and extensive and it elevates to a level of causation. But, obviously, for some people that are also experts, you know, in their field that are on the defendants' side feel differently. So they might say -- and I think some of the arguments that have been made is that we don't have sufficient data, where I feel differently. 11:27 11:27 11:28

So to me, if the question -- if you're saying -- you're using "insufficient" as like no data, absolutely. We're not going to be talking about some random exposure that someone may have about, you know, like going outside or, like, 11:28

again, moon rocks would be -- if we have the data and there is an association, that may or may not be sufficient, depending on who is reading and interpreting the data.

BY MR. COSTELLO: 11:28

Q. Do you believe that causality is subjective in science?

A. No. But I think there's certain framework that you can follow, and I think -- I'm sure we'll get to it at some point, but I followed 11:29 the Bradford Hill framework to establish that causality using the totality of the evidence that was available to me. Again, there's other people that, using the same framework, seem to feel differently. But to me, you know, to your previous 11:29 question, you know, it's about whether sufficient or insufficient, and I believe there is sufficient data. And if there is sufficient data from my perspective, that's what I think might be subjective, right? Because the same data that I'm 11:29 looking at is being looked at by other people and they're interpreting it differently. So that's the main reason I have an issue with that question where I think there's some subjectivity there.

Q. And I think you -- in one of your answers you referenced moon rocks. I guess my question is if the data is insufficient we're talking about, something that is insufficient in the hypothetical situation, would it be improper to advise medical students, residents, fellows that there is a causal link between any chemical or substance that causes cancer, if there's insufficient data, whether it be moon rocks or some other analogy you want to draw, would it be, in that situation, improper to advise them that there's a causal link? 11:30 11:30

MS. O'CONNOR: Objection.

THE WITNESS: So I think, you know, if there is just like one paper that all of a sudden says there might be an association between exposure X and this is why, that would not amount, in my opinion, to the level of causality. So that, in my mind, would be insufficient data. One paper out of the blue, that's just not enough data to make that causation. But my issue, again, is that we have a lot of data. In my report there's hundreds of studies, and I think other expert reports also have hundreds of references. So I would argue that 11:30 11:30

there is sufficient data in that scenario. But some experts might say the data that we have is insufficient to establish the causality. Yeah, that's the best way that I can answer that question. 11:31

BY MR. COSTELLO:

Q. Have you ever instructed in the academic setting a medical student, resident, or fellow that a causal link existed between something and a particular form of cancer where there existed no 11:31 peer-reviewed studies reaching that conclusion?

A. If there's no peer-reviewed literature, right -- and this is where we're talking about sufficient versus insufficient. If there's no peer-reviewed literature, that -- subjectively, you 11:31 could say, yeah, that is insufficient data, we have no data. So if we have no data or the data that we have is not sufficient to establish the causal relationship using the framework -- you know, the framework that we have available to us, yeah, 11:31 there's no reason to establish that causality.

Q. Have you ever instructed a medical student, resident, or fellow in the academic setting that a causal link existed between

something and a particular form of cancer when the authors of the only studies analyzing the data concluded that there was insufficient evidence to conclude that a causal link existed and that more study was needed? 11:32

MS. O'CONNOR: Objection to form, foundation.

Go ahead.

THE WITNESS: So, again, I mean, I think in medicine and science in general we have the data available to us and we're able to interpret the 11:32 data on our own. Like, I mean, I respect and I see the author's perspective, but I also look at the tables, at the data that's there. And if I believe it's something that could be real, I don't necessarily take the author's perspective of 11:32 there's nothing here because maybe the authors are looking at it from a different lens, the same way that some authors say we found the cure for cancer, like a hypothetical.

Unless I see evidence to document 11:33 that and as I do my -- you know, my own type of analysis, my own type of investigation, my own research, I might disagree. And it happens frequently where I disagree with the author's

conclusions. This is part of the peer review process. We don't always agree with what the authors are writing.

BY MR. COSTELLO:

Q. I guess I'm just looking for a yes or no. Have you ever instructed a medical student, resident, or fellow that a causal link existed between something and a particular form of cancer when the authors of the only studies analyzing the data concluded there was insufficient evidence -- this is what the author said -- to conclude that a causal link existed and more study was needed; yes or no? 11:33 11:33

MS. O'CONNOR: Objection.

THE WITNESS: You're asking a very complex question and asking me to give you a yes-or-no answer. This is not a yes-or-no-answer type of question. I think context is very important. 11:33

BY MR. COSTELLO:

Q. Can you give a yes or no? 11:34

A. I'm not going to give a yes-or-no answer for this question.

Q. Okay. What level of certainty in your academic endeavors do you need before instructing a

medical student, resident, or fellow that a causal link exists between something and any form of cancer?

A. I mean, I think we need -- it depends what we're looking at. But when we think about causality for cancer, we have to rely on the totality of the evidence. So we certainly have to rely on epidemiological studies. Then if the epidemiological studies make sense or show, like, a relationship and they're well-done studies, then we go back and say, well, so what's happening here, why is there a relationship there, what is the mechanism through which this is happening. So then we can look at the -- you know, the other available literature on the specific topic, the exposures, the mechanism of action, whether or not there's biological plausibility for this to be happening, whether there's other similar instances where similar either chemicals or exposures can lead to the same -- the same, you know, condition. So it's a very extensive analysis and discussion that we would have before we say, yeah, this is something that likely amounts to the level of causality.

Q. You would agree you don't just assume a

link exists in the absence of data, true?

A. Yeah. Without any data you cannot, right. There's nothing that we can work on without any specific data.

Q. As far as teaching, very similar questions to the academic endeavors, but I just want to make sure that I have this clear. Have you ever taught a medical student, resident, or fellow that a causal link has been established between chemical hair relaxers and uterine or ovarian cancer? 11:35 11:35

MS. O'CONNOR: Objection. How many times are you going to ask the same thing?

BY MR. COSTELLO:

Q. Can you answer? 11:36

A. Can I answer?

Yeah, I've answered that. I think, again, it has come up in the context of just regular teaching during rounds where the literature from the epidemiological studies has come up because it's out there, it's been published in reputable journals, and it has definitely come up. So any sort of discussion that I have with medical students, residents, fellows about it, which I'm 11:36

sure it has occurred, so I would consider that to be teaching. I mean, if your question is whether I made a PowerPoint about it and gave a one-hour lecture, no, I have not done that.

Q. Would you agree that based upon the information you have available to you in this case, including your review of the literature, the available data and studies that you -- that have examined this issue, so the studies have examined this issue, that you don't have sufficient support to teach medical students or residents or fellows that a causal link exists between the use of chemical hair relaxers and uterine or ovarian cancer? 11:36 11:36

MS. O'CONNOR: Objection. 11:37

You can answer.

THE WITNESS: I mean, I think it is not something I have done. Sometimes I'm asked to give an invited lecture or like a grand rounds lecture. And if someone was to ask me, you know, can you give -- we're interested in knowing this question of the relationship -- or the association between chemical hair relaxers and uterine/endometrial cancer, I would feel comfortable doing the same 11:37

analysis, presenting all of the evidence that I have analyzed and reviewed for this case to make a compelling argument that there is a causal analysis.

And, you know, it's not just me saying this. There's a lot of literature for -- that has been talking about EDCs, which at the end of the day is what we're talking about here, the chemicals in chemical hair relaxers that have shown a lot of diseases and conditions that are associated with these chemicals. And from my understanding of the way these chemicals work in the body, what they do, and my understanding of how endometrial cancer evolves, I think there is a biological plausible explanation, which is confirmed by the epidemiological literature. 11:37 11:38 11:38

BY MR. COSTELLO:

Q. Okay. Outside of this litigation, nobody has asked you to give that type of presentation, true? 11:38

A. Correct. And even if they would right now, because I'm in the middle of it, I don't know if I would. I would have to obviously discuss with counsel, Plaintiffs' counsel. But I don't know if

I would feel comfortable, necessarily, going through that in the middle of the litigation.

Q. Okay. And fair to say that, as you sit here today, you haven't done any type of presentation that -- to residents -- medical 11:38 students, residents, or fellows regarding a causal link between the use of chemical hair relaxers and uterine or ovarian cancer, true?

MS. O'CONNOR: Objection; asked and answered.

You can answer it again. 11:39

THE WITNESS: Again, no presentations, no PowerPoints. It's been discussed which -- in terms of what I do as an educator in an academic medical center, any sort of discussion that we have with medical students, residents, and fellows, I 11:39 consider that to be teaching. Whether it's formal or not, that's arguable. But I can't say that is not something that has come up.

BY MR. COSTELLO:

Q. I noticed from your CV that, as far as 11:39 publishing journal articles, you're a reviewer for a few different publications; is that true? I can go specific if you want.

A. Yeah, if you don't mind.

Q. The section editor for gynecologic oncology.
A. Can you point me to the page, please.
Q. Give me one second. I believe it's page 5 of your CV. 11:40
A. Okay. Yeah.
Q. Give me one second just to get back to it. Okay. You have it in front of you?
A. Yes.
Q. And it lists that you're a section 11:40 editor for gynecologic oncology from 2024 to present; is that right?
A. Yeah. But just to clarify because it's a little confusing, so this is not Gynecologic Oncology journal. This is the -- it's a compendium 11:41 of what's called Advances in Oncology. So this was Volume 5. And they have different oncology specialties. So they usually have two or three articles a year for each subspecialty. So over the last two years I was the section editor for the GYN 11:41 oncology section within Advances in Oncology, Volume 5.
Q. And then also it says the Journal of Minimally Invasive Gynecology. Do you see that?

A. Yes.
Q. Is that the same one, or is that a different publication?
A. That's a different publication.
Q. Is that -- you're part of the editorial board? 11:41
A. Correct.
Q. And the Journal of Minimally Invasive Gynecology?
A. I see. Sorry. So, yes, I'm currently one of the executive deputy editors for JMIG, or Journal of Minimally Invasive Gynecology. But prior to that, I was on the editorial board. So it's the same journal. But it was -- from 2017 to 2023 I was on the editorial board. Since 2023 I have been, you know, one of the executive deputy editors for the same journal. 11:41 11:42
Q. Okay. You would agree that there's criteria that you follow for submission of peer-reviewed articles, true? 11:42
A. Absolutely.
Q. And had -- would you submit your report in this case to any journal -- peer-reviewed journal for publication?

MS. O'CONNOR: Objection to form.
THE WITNESS: I don't think any peer-reviewed journal would publish a 68- or 70-page report. But if we -- if I was to create a review of this using the -- you know, the analysis and the methods that 11:42 I use to create some sort of review or findings, yeah, it's something that I would feel comfortable submitting to a peer-reviewed journal.
BY MR. COSTELLO:
Q. Okay. You would want your peers at the 11:43 Gynecologic Oncology or the Journal of Minimally Invasive Gynecology to subject this report to peer review?
MS. O'CONNOR: Objection.
THE WITNESS: I don't think I would have an 11:43 issue with it. I mean, I think I feel very comfortable with the methodology that I use, the references that I use, my analysis. And certainly, you know, people might criticize it, they may or may not accept it because it may not be within the 11:43 scope of the journal. For example, the Journal of Minimally Invasive Gynecology probably wouldn't accept this kind of report because it's outside of their scope.

BY MR. COSTELLO:
Q. You would agree that you would do much more as far as your research before submitting your report for a peer-reviewed publication, true?
MS. O'CONNOR: Objection. 11:44
THE WITNESS: I don't know if I understand the question. More research than I've done for this or just --
BY MR. COSTELLO:
Q. Yes. 11:44
A. So, I mean, I think the research that I've done is quite extensive. So as far as I can tell as of today, I think I have included, as we mentioned earlier, the available literature on my references list, on my materials considered list. 11:44 So I think the research process is ongoing. So I would certainly want to -- I would do like -- you know, review the literature again, make sure that everything is up to date. But, yeah, to send something to a peer-reviewed journal, it takes a 11:44 lot of effort, time, research, yeah.
(Roque Deposition Exhibit 5 was marked for identification.)

BY MR. COSTELLO:
Q. Okay. I'm going to show you Exhibit 5. Let me know when you've had a chance to put it in front of you.
A. Okay. 11:45
Q. This is Gynecologic Oncology. Do you see that?
A. Yes.
Q. It says "ScienceDirect" at the top. Do you see it? 11:45
A. Yep.
Q. Are you familiar with this?
A. Yep.
Q. And what is it?
A. So I'm looking at it. I just want to 11:45 make sure -- so this is the journal of record, like, the main journal for the Society of Gynecologic Oncology. And this looks to be the guide for authors who are submitting their report -- I mean, their papers. 11:46
Q. Okay. And this would apply to research papers; is that true?
A. Yeah. Within -- as long as they're within the scope of gynecologic oncology. And, you

know, there's different types of research papers. So different journals accept different types of articles. You know, some journals don't accept case series or case reports. Some journals only accept invited reviews. So it really varies a lot. 11:46 But in general, like, if you want to send, like, a peer-reviewed or regional research type of paper, this is kind of like the format that most people need to follow.

Q. Okay. And if you go to page 3, it talks 11:46 about the article types?

A. Page 3.

Q. It looks like this.

A. Yep. Okay.

Q. Okay. And the article types, it deals 11:46 with research papers, true?

A. Sorry. Is there a question?

Q. Yeah. I'm just going through -- I'm just going to make a record --

A. Okay. 11:47

Q. -- of the ones that are listed on page here -- on page 3 here. It lists research papers, true?

A. Yes.

Q. Systematic review and/or meta-analysis articles, true?
A. Yes.
Q. Letters to the editor?
A. Yes. 11:47
Q. And clinical commentary, right?
A. Yes.
Q. What is peer reviewed?
A. So, yeah, it's the process through which you submit, you know, an article, whether it's 11:47 regional research, review articles, systematic review, so the ones listed here. But there's other categories. After you have -- you've written it, you review with your collaborators, and then you send it to a specific journal. And then that 11:47 journal, essentially, it's received by the editorial office. You have the people, the deputy editors or the editors, that then send it out to reviewers that have specific expertise on the subject matter. It can be three, four, depending 11:48 on, you know -- I can't speak to Gynecologic Oncology. But in general, there's more than one person reviewing the paper.
Many times some journals also require

a statistical reviewer to look at the paper. So it's the idea of making sure that the paper meets the standards for the methodology, scientific process, making sure that the results make sense. Usually the reviewers would suggest whether to accept the paper or not, based on their review. They might recommend changes. They might reject the paper if it's totally, you know, nonsensical. So it's the act of having peers with an expertise in the subject matter review research work. 11:48 11:48

Q. Okay. And so part of the peer review process is obviously an independent review, correct?

A. Independent review by separate reviewers, is that the question? 11:49

Q. Yes.

A. Yeah, there's reviewers not associated with the research that are usually reviewing the work.

Q. And that scientific validity is required? 11:49

A. Yes. You will --

MS. O'CONNOR: Objection.

THE WITNESS: The -- you want to make sure

that -- the reviewers, what they're doing is reviewing the paper and make sure they agree with the methodology. The statisticians, when one is required, they're also looking at the methodology.

What I would say is that, you know, 11:49 depending on the type of paper, for example, if you're submitting a review paper, then you're not -- I wouldn't consider that a regional research or a research paper, necessarily. That's more almost like a narrative discussion or review of a 11:49 specific topic. That also goes through, like, a peer review process. But in that instance, what you're trying to do is bring everybody up to speed on a specific topic.

BY MR. COSTELLO: 11:50

Q. You mentioned statistician. It may be that a statistician reviewer is required to verify the data, true?

A. It really depends on the journal. I know some journals, that is very much a requirement 11:50 and every paper goes through an independent statistical review by a statistician, but I don't believe that is something that is required for all journals.

Q. Okay. Would you agree that your report and conclusion that chemical hair relaxers cause uterine or ovarian cancers would not survive this type of peer review?

MS. O'CONNOR: Objection. Objection. 11:50

THE WITNESS: I don't -- I don't know if I understand the question very well. But it's also, as you see here -- so my report as it currently stands, which is almost -- I think of it almost as a legal document, the way that it was written, 11:51 would not even fit the criteria for any of this because, you know, you look at the manuscript length for the research paper which are -- and the systematic reviews, which are probably the longest papers, that's 4,000 or 5,500 words. So usually 11:51 that's -- I don't know -- nine, ten pages.

So the -- and, again, the way my report, I consider to be more review, like a narrative review of the literature with my interpretations of the findings based on my 11:51 analysis and research. So I don't even know if this is -- yeah, this is not a journal that, even if I wanted to, I would be able to submit my report. I think it's well organized. I think I

reviewed the relevant literature. I interpreted it, and I give an opinion that is based on my own review of the available literature.

BY MR. COSTELLO:

Q. So am I correct then, based upon your answer, that you would not submit this analysis and your conclusion that chemical hair relaxers cause uterine and ovarian cancer for consideration for publication as a peer-reviewed article? 11:51

MS. O'CONNOR: Objection. To this journal or any journal? 11:52

MR. COSTELLO: To this journal or any of the journals that you currently serve either as an editor or on the board for.

MS. O'CONNOR: Okay. So to correct the record, he's not a section editor for Gynecologic Oncology. You established that earlier. 11:52

MR. COSTELLO: I'm just asking for the ones he's associated with.

MS. O'CONNOR: So all of your questions -- oh, associated with. So the question has changed. 11:52

THE WITNESS: Right. So let me -- that's the reason I wanted to correct initially. Because you mentioned gynecologic oncology on my CV on page 5.

That gynecologic oncology has nothing to do with this journal. Are we clear on that?

BY MR. COSTELLO:

Q. Okay. So you're not associated with the gynecologic oncology board? 11:52

A. What does that mean?

Q. I guess I'm just -- I'm asking a very simple question. You said that -- just so that we're clear, as far as the specific that we went through, I don't have -- 11:53

A. Let's go back to page 5 because I think -- yeah, I think there's a lot of assumptions you're making there that aren't correct.

Q. It just says "editorial boards service, section editor, gynecologic oncology, 2024 to 11:53 present." You're not affiliated with that board? You don't serve on that board? I guess I'm just --

A. You're talking about two different journals. The one -- and the one that says section editor for gynecologic oncology is not this. That 11:53 has nothing do with that. That -- and that's where I specified on the record. The journal or the publication is Advances in Oncology, Volume 5, not this. This is Gynecologic Oncology, the journal,

from the Society of Gynecologic Oncology. So I just want to make sure we're talking about the same thing.

Q. Okay. Do you know if the same criteria apply for peer-reviewed submissions, that it be independently reviewed by somebody else in the field? 11:54

MS. O'CONNOR: Objection to form.

THE WITNESS: I'm really not following. You know, I'm trying, but I'm really not following the question. 11:54

BY MR. COSTELLO:

Q. Sure. You're saying that this doesn't apply to the role that you have. This is an example of -- from the Gynecologic Oncology, a guide for authors of peer-reviewed whether it be a research paper, systematic review, letters to the editor, clinical commentary. Do you agree with that, what we've gone through in Exhibit 5? 11:54

A. Right. But what I want to make sure that we clarify, because I think we're talking a little bit about different issues here, the section editor for gynecologic oncology is for the topic of gynecologic oncology, so two or three articles, for 11:54

this Advances in Oncology compendium. It's almost like a small book. That's not a journal.

This Gynecologic Oncology document that you provided, this is for the journal called Gynecologic Oncology. I am not a section editor 11:55 for this journal.

Q. Okay.

A. So I just want to make sure that we are clear.

Q. Okay. It looks like, as far as 11:55 editorial board service, there's also an ad hoc reviewer from 2021 to present, and it's the Gynecologic Oncology. Is that the publication, the same publication?

A. Right. So that one is this journal, as 11:55 an ad hoc reviewer.

Q. Okay. And so as an ad hoc reviewer, you would be one of the persons who might review it -- be an independent reviewer of somebody else's publication; is that right? 11:56

A. Correct.

Q. Okay. And would you follow the guidelines, then, as an independent reviewer that are set out in Exhibit 5?

A. So usually by the time -- as an independent reviewer, as a peer reviewer for the journal -- because I'm not, you know, a section editor, I'm not the deputy editor. So by the time the paper gets to me as an independent reviewer, 11:56 that process already happened. So my responsibility at that point is to primarily focus on the research, the work that was done, the methodology, and make sure that it makes sense. And I'm the one -- one of the people -- there's 11:56 usually three or four -- that says, yes, this makes sense, or this research does not really support the conclusions; reject, accept, major revisions. But I am not -- by the point the article gets to me, I am not really dealing with some of the decisions 11:57 about the article types.

Q. Okay. Do you have any criticisms of the guidelines in Exhibit 5?

MS. O'CONNOR: Objection.

You can answer. 11:57

THE WITNESS: I mean, I think this is the guidelines that this journal wants to follow. These are the types of papers they want to follow. If you look here, one of the type of papers they

don't accept is case controls -- I mean, not case controls; my apologies -- case series or specific, you know, case reports, which are, you know, smaller types of papers. So I think for the purpose of this journal which serves the 11:57 gynecologic oncologic community, these papers are very appropriate for that purpose.

BY MR. COSTELLO:

Q. Okay. And you don't have any quarrel with the fact that peer review is independent and 11:57 requires scientific validity, true?

MS. O'CONNOR: Objection; form.

You can answer.

THE WITNESS: Yeah, I think it's very important for the peer review process to occur to 11:58 make sure that, you know, people submitting the work don't miss major issues that can make the research, you know, inaccurate or the conclusions inaccurate.

BY MR. COSTELLO: 11:58

Q. Okay. So I think we might have gotten sidetracked, and you educated me as far as your role as an ad hoc reviewer for the Gynecologic Oncology versus being on the board. So just to

revisit the question, because I think we went backwards, would you be comfortable submitting your analysis and conclusions in this case to the Gynecologic Oncology for their independent assessment as a peer-reviewed paper? 11:58

MS. O'CONNOR: Objection. It's been asked and answered.

You can answer.

THE WITNESS: It's the wrong type of paper.

BY MR. COSTELLO: 11:58

Q. Okay. So you wouldn't submit it?

A. Why would I submit it when it meets -- you know, like, I know for a fact that, you know, just the number of words by themselves and the types of articles that they accept, this type of 11:59 report, this type of opinion is none of those articles. So why would I submit it there?

Q. I guess what I'm asking is -- forget the length for a second, but just the conclusions that you draw in your paper regarding causation, would 11:59 this be something that you would be comfortable submitting to this particular journal?

MS. O'CONNOR: Objection.

THE WITNESS: I mean, my -- to be honest, my

only hesitation would be from the purpose of the legal issues about it. I mean, obviously, this is an active litigation. So it's not something that I would do primarily because of that. But I think from the perspective of the type of analysis that I carried out, the way that I conducted my research, and putting together this report, if I wanted to have a review about, you know, the effects of chemical hair relaxers or the association between chemical hair relaxers and uterine and endometrial cancer, I would feel comfortable putting that together and, you know, discussing my methodology, the studies that I reviewed. 11:59 12:00

Very similar to what I've done. The former would be different because, again, this is more of a legal type of document rather than something that I would submit for peer review. But, yeah, beyond the concern for, you know, the legal implications, it's something that I would feel comfortable writing and submitting, yeah. 12:00 12:00

BY MR. COSTELLO:

Q. If we look at I believe it's page 5 of this document there's a section on ethics. Do you see that, ethics in publishing?

A. Yep.
Q. And it says "Authors must follow ethical guidelines stated in Elsevier's publishing ethics policy."
Do you see that? 12:01
A. Mm-hmm.
Q. There's a hypertext link?
A. Mm-hmm.
Q. That's a yes?
A. Yes. Sorry. 12:01
Q. That's okay.
And you agree that a submission to the Gynecologic Oncology, that you have to follow the ethics policy as far as submitting a written paper, true? 12:01
A. Yeah. There's usually like a form with checkmarks and things like that that you have to fill out.
(Roque Deposition Exhibit 6 was marked for identification.) 12:01
BY MR. COSTELLO:
Q. Give me one second. I'm going to show you what's been marked as Exhibit 6. Did we give you that? You can hand it over. We can share this

one.

We've been talking a bit about what is peer reviewed. And you would agree, at least from the title that this appears to be what was just referenced, the Elsevier's guidelines as far as publishing? 12:02

A. Yeah. That's a description about -- this is about peer review from Elsevier.

Q. Okay. I just want to ask you some questions about it. Okay? 12:03

A. Okay.

Q. It says "Reviewers play a pivotal role in scholarly publishing. The peer review system exists to validate academic work, helps to improve the quality of published research, and increases 12:03 networking possibilities within the research communities. Despite some limitation, peer review is still the only widely accepted method for research validation."

Do you see that? 12:03

A. Yes.

Q. Do you agree with that statement?

A. Yeah. I have no reason to disagree with that statement.

Q. It says "Although" -- if we go down just a bit, it says -- I'm still on page 1, but I think it's maybe the fourth paragraph -- "Although peer review has some limitations, the majority of the research community still believes peer review is the best form of scientific evaluation. This opinion was endorsed by a 2015 survey by the Publishing Research Consortium in which 82 percent of researchers agreed that without peer review there is no control in scientific communication." 12:03 12:04

Do you see that?

A. Yes.

Q. Do you agree with that statement?

A. Yeah. I think peer review is a very critical part of kind of like what we do, how we -- you know, the literature that gets published. Absolutely. 12:04

Q. Would you agree with me that there is no peer-reviewed publication that has offered the opinion that a causal link exists between the use of chemical hair relaxers and uterine and ovarian cancers? 12:04

MS. O'CONNOR: Objection.

THE WITNESS: I mean, I think there's -- in

order to establish the causal link from my perspective is you look at the totality of the evidence. I think we all know that cigarette smoking causes lung cancer. I think that was something that took years and years and years to occur and the -- I mean, decades, in a way, despite the fact that there were multiple peer-reviewed publications that were showing the association between cigarette smoking and lung cancer. 12:05

So I think we have evidence right now that we'll conduct the studies that were done in this subject matter that show an association. And then when you start to look out and find the link between chemical hair relaxers and the EDCs within chemical hair relaxers and how they can be a causative factor for uterine and endometrial cancer, I believe that that totality of the evidence is enough for us to make that assessment even though the authors from, you know, the epidemiologic research may have not necessarily said that in their paper. But I think the -- when you look at the totality of the evidence, there's enough there using well-recognized and accepted frameworks of causality to establish that 12:05 12:05 12:05

causation.
BY MR. COSTELLO:
Q. Okay. And my question was just a very simple one. Are you aware of any peer-reviewed publication that has offered the opinion that a causal link exists between the use of chemical hair relaxers and uterine and ovarian cancers? 12:06
A. I don't -- I haven't read a specific publication that says this is the cause for endometrial or ovarian cancer. What I will say is definitely publications that have looked at the causation between estrogen exposure and unopposed estrogen and endometrial and ovarian cancer, and I believe there is a very -- there is definitely a parallel between the way that estrogen exposure and excess estrogen causes these cancers and the way EDCs in these chemical hair relaxers can cause endometrial or ovarian cancer. 12:06 12:06
Q. You'd agree that there's a difference between association and causation, true? 12:06
A. Yeah. I mean, in order to get from an association to a causation, you need to have -- you have to do a causal analysis. So just an association does not always necessarily lead to

causation.
Q. Okay. In the studies that you rely upon -- Chang, White, Bertrand, as referenced in your report -- all state that more study is required, true? 12:07
MS. O'CONNOR: Objection. Is it true that it says that, or does he believe that?
BY MR. COSTELLO:
Q. The studies that you rely on, Chang, White, and Bertrand, all those studies state 12:07 that -- all of them state that more study is required?
MS. O'CONNOR: You can answer.
THE WITNESS: I mean, I think they talk about how, from their framework, they have this 12:07 association that is very concerning. I don't think they -- any of them say, inappropriately so, I don't think any of them say this is a cause. And I think it's a good thing they're saying more studies are needed or more -- you know -- more data is 12:08 needed. And we do have some data to help get to the causation when you look at the data outside of the epidemiological studies.

BY MR. COSTELLO:
Q. But you agree all of them say that more study is required, true?
MS. O'CONNOR: Objection. Do you want to --
THE WITNESS: Yeah. I think -- you know, like, I would have to look at them specifically. Like, I don't know if that's the term that every single one of them use. I think they talk about, you know, saying that their evidence does not amount to -- but I have to look at the individual studies. I don't know if they're all using the same language. 12:08 12:08
BY MR. COSTELLO:
Q. Okay. Just before we move on, I want to make sure that I have a clear question and answer. You agree that there is no peer-reviewed publication that you're aware that has offered the opinion that a causal link exists between the use of chemical hair relaxers and uterine and ovarian cancer, true? 12:08 12:08
MS. O'CONNOR: Objection; asked and answered.
THE WITNESS: So all of those publications are talking about an association. And because of that association, they should be --

BY MR. COSTELLO:
Q. Just a second. I'm talking about causal link, not association. You're not aware of any peer-reviewed publication that has offered the opinion that a causal link exists between the use 12:09 of chemical hair relaxers and uterine and ovarian cancers?
I'm not asking you about association. Are you aware of any peer-reviewed publication that has offered the opinion that a causal link exists 12:09 between the use of chemical hair relaxers and uterine and ovarian cancer?
MS. O'CONNOR: Objection.
BY MR. COSTELLO:
Q. Yes or no? 12:09
MS. O'CONNOR: Over my objection, you can answer.
THE WITNESS: Again, it's not a yes or no because they're saying association, which I hear you. I agree that "association" and "causation" 12:09 might not necessarily be correlated, right? But going back to cigarette smoking, like, it's an association that is very much causal. And I think that what the articles are saying is this is --

based on the data, based on the hospitalizations that we're seeing, based on the strong association in a well-conducted study, that association can very much amount to causation.

BY MR. COSTELLO: 12:10

Q. Okay. And I didn't ask you about smoking. I'm asking you about the opinions in your report. You don't cite to in your report or any of the references to your report any peer-reviewed publication that has offered an opinion that a 12:10 causal link, not association, but a causal link exists between the use of chemical hair relaxers and uterine and ovarian cancers, true?

MS. O'CONNOR: Objection; asked and answered.

You can answer it again. 12:10

THE WITNESS: So, again, on my report I cite the epidemiological evidence. I take -- I use my methodological approach to determine in my opinion there whether or not there is a causal analysis. I think in the papers that have been published they 12:10 establish a very strong association which the authors agree that could amount to a causation if you conduct a -- you know, like, a causal analysis.

BY MR. COSTELLO:

Q. Okay. Can you point me to one specific peer-reviewed publication that has offered the opinion a causal link, not association, but a causal link exists between the use of chemical hair relaxers and uterine and ovarian cancer? I haven't gotten an answer to that. 12:11

MS. O'CONNOR: Objection.

THE WITNESS: So can you repeat the question.

MR. COSTELLO: Can you read it back, please. 12:11

(Record read as requested.)

THE WITNESS: There's not going to be -- causation is a very complex -- is a very complex, you know, analysis that has to be done. So in terms of like a peer-reviewed publication you have to look at all of the evidence that is there in order to say that. Like, I don't think any of these epidemiological studies are going to say this is the cause for XYZ; especially when it comes to these kinds of cancers, there can be other risk factors. So it's very difficult for any of these publications or any publication to say this is the cause for endometrial or ovarian cancer. 12:11 12:11

BY MR. COSTELLO:
Q. Okay. So as you sit here today in your deposition, you're not aware of any, true?
MS. O'CONNOR: Objection. Objection.
THE WITNESS: I have not read a specific publication that says definitively this is the cause for endometrial or uterine cancer. I have not seen that kind of analysis. 12:12
MR. COSTELLO: Okay. Thank you.
MS. O'CONNOR: By the way, just for the record anything that you do submit under CMO 19 should have a URL listed. I'm not finding it here. Not a big deal, but -- 12:12
MR. COSTELLO: We'll get you a list of all the URLs. It's just that we printed them up. Otherwise, I would have pulled it up live, which is what I typically do, but we're using paper here. We will get you a link to every URL. 12:12
MS. O'CONNOR: Thank you.
(Roque Deposition Exhibit 7 was marked for identification.) 12:12
BY MR. COSTELLO:
Q. Okay. Let's see. So this is 7. Okay. This is the Elsevier -- Exhibit No. 7 is the

Elsevier policies, and the section that we're looking at here is on publishing ethics.
Do you see that?
A. Yes.
Q. In fairness, if we look at the website, there's different headings. And I think this is just specific to one of, it looks like, four that are across the top here. One of them is publishing ethics and then duties of publishers and duties of editors and duties of reviewers. 12:13 12:14
Do you see that?
A. Yes.
Q. Okay. Give me one second. If we go to I believe it's page 8 on this document, Exhibit No. 7. 12:14
A. So there's no page numbers. So you may need to --
Q. Yeah. I'll make sure you and I are going from the same heading once you get there.
A. Yeah. Great. 12:14
Q. It's the section that talks about duties of authors. I believe it's page 8 of 15. It's at the very bottom there.
A. Yep.

Q. So if we go to page 8 of Exhibit 7, it says "Authors of reports of original research should present an accurate amount of work performed" -- strike that. Let me start over. I don't know if I said it wrong. 12:14
"Authors of reports of original research should present an accurate account of the work performed as well as an objective discussion of its significance. Underlying data should be represented accurately in the paper. A paper 12:15 should contain sufficient detail and references to permit others to replicate the work."
Do you see that?
A. Yes.
Q. Okay. You would agree with that? 12:15
MS. O'CONNOR: Objection.
THE WITNESS: So, yeah, I mean, that's pretty broad. But the idea is, like, the methods should be clear so that the research could be repeated. Is that your question? 12:15
BY MR. COSTELLO:
Q. Sure. You would agree when authoring a publication outside of litigation you have an obligation to follow this criteria?

MS. O'CONNOR: Objection.
BY MR. COSTELLO:
Q. True?
A. Well, it depends on the type of paper because if you're submitting a -- like, an original research, then absolutely. Like, the methodology should be able to be replicated with the idea of getting either similar results or close enough results that would show a similar type of result. But if you're submitting, you know, like a review paper, that's not something that's necessarily a methodology. Like systematic reviews, you do want to submit the types of methods that you use to find the terms. But in general, the idea is to try to replicate the experiment or the research as close as possible. 12:15 12:16 12:16
Q. Okay. So, for instance, if you were the author who published a paper that for the first time had a chemical -- or had a causal link between chemical hair relaxers and uterine and ovarian cancer, that would be different than somebody who is just reviewing that paper, true? You would be the author of that? 12:16
MS. O'CONNOR: Object to the form.

THE WITNESS: I don't -- can you repeat the question.

BY MR. COSTELLO:

Q. Sure. So just so that I'm clear, if you're authoring a publication, for instance, if 12:16 you authored a publication here on causation between chemical hair relaxers and uterine and ovarian cancer, you would have an obligation to follow the criteria specifically that the underlying data should be represented accurately in 12:17 the paper, true?

A. Yeah. For the purpose of submitting for publication, correct.

Q. And the paper should contain sufficient detail and references to permit others to replicate 12:17 the work, true?

MS. O'CONNOR: Objection.

THE WITNESS: So it depends a lot on the work because some -- you know, if you're doing -- I don't know -- like, an experiment in a lab, for 12:17 example, you're only talking about the methodology for, you know, the cell lines that you're using or the drugs you're using, the doses, the types of analysis that you're conducting. But for when

you're looking at epidemiological studies or observational studies, a lot of those studies are done using databases that are not necessarily going to be available to the readers. And the only way that reader can replicate the study is if they actually have access to the database in question. So I want to make sure because they can say the methodology, but just having the methodology itself without actual access to the data, you're not going to be able to replicate the studies even if you wanted to. 12:18 12:18

BY MR. COSTELLO:

Q. You would agree that you're required to ethically represent the data accurately in a report even if it's prepared for litigation? 12:18

A. Yeah.

Q. And if we look at page 10 of this document -- I'll get you the heading in just a second here. It's under "Citations."

A. Mm-hmm. 12:18

Q. Is that a yes? Do you see it?

A. Yes, yes. My apologies.

Q. No problem.

Under -- on page 10 under

"Citations," it says "Ensure that statements in their article which rely on external sources are cited accurately."
Do you see that?
A. Yes. 12:19
Q. And you would agree with that?
A. Yeah.
Q. And you have an obligation to accurately cite external sources even in your report prepared for this litigation, true? 12:19
A. Yeah. To the best of my ability, yeah. I tried to make sure that I was accurate.
Q. And the obligation to accurately represent citations from external sources, you would agree that that would apply to textbook 12:19 chapters, true?
A. Yeah. You try to make sure that the citation is very accurate. I mean, sometimes you're using citations -- so, like, sometimes errors happen, but as the author, you try to make 12:19 sure that's as accurate as possible.
Q. And if you're an invited lecturer or speaker, the same, you would have an obligation to make sure that the statements in an article or the

external data are cited accurately, true?
A. Yeah. If you're using some sort of reference, making sure that you try to reference to the best of your ability, yes.
Q. And in your report you would agree that you would have an obligation to conduct a careful evaluation and consideration of the epidemiological data, true? 12:20
A. Yes.
MS. O'CONNOR: Are we talking about journal article submissions or reports here? Is it clear? Objection to all these questions on the basis of this document, Exhibit 7. It doesn't contain a URL, by the way. 12:20
MR. COSTELLO: I do need to take a break. I don't know if lunch is ready. If you want to take a break now or -- 12:20
MS. O'CONNOR: I don't know. I prefer to wait until lunch because then lunch will be another natural break. Let me ask outside. 12:20
MR. COSTELLO: Sure. Okay.
MS. O'CONNOR: Let's go off the record for the moment.
THE VIDEOGRAPHER: Off the record at 12:21.

(Lunch recess taken from
12:21 p.m. to 1:06 p.m.)

A F T E R N O O N S E S S I O N

THE VIDEOGRAPHER: Back on the record at 1:06.

EXAMINATION (resumed)

BY MR. COSTELLO:

Q. Dr. Roque, we're going to go back to your report now -- 01:06

A. Okay.

Q. -- which is Exhibit 4. If you look at page 5 of your report, I believe it's the second full paragraph. I wanted to ask you some questions in that section. I believe the second full paragraph begins, under the "Methodological Approach of an Expert," "Careful evaluation and consideration of epidemiological data and results obtained therefrom is of paramount importance within my practice, as medicine, and in particular the field of gynecologic oncology, is not static but rather is constantly changing and advancing." 01:06 01:07

Do you see that in your report?

A. Yes. 01:07

Q. You would agree that you have an obligation to carefully consider the epidemiological data, true?

A. As part of the -- yeah, the science

that's out there that I definitely considered and I use to counsel patients, yeah.

Q. And that's why you put it in your report?

A. Well, yeah, it's part of my practice. 01:07 Not only for the purpose of this report, but I also use a lot of epidemiological data to care for patients.

Q. And you would agree that you have an ethical obligation to admit when insufficient 01:08 epidemiological data exists?

MS. O'CONNOR: Objection.

THE WITNESS: So, yeah, in the context of just one epidemiological study, even if it raises a red flag and I have no other context, I look at that 01:08 evidence and I'm like, you know, there might be something there, and -- but I don't ignore it. I think it's something that I do keep in the back of my mind. And certainly, if other either epidemiological data arises, more research arises 01:08 on the same topic, then I think we become more and more aware. But that's true just in what I do. In like the way we treat for patients with drugs, there were drugs that were not available that were

being studied 20, 30 years ago that were not being used in clinical practice. Science evolves.

BY MR. COSTELLO:

Q. Yes or no; there are many instances where epidemiological data suggests a potential association between cancer -- between something and a type of cancer, but sufficient data has not been identified to reach a conclusion that a causal relationship exists. Do you agree with that statement; yes or no? 01:08 01:09

MS. O'CONNOR: Objection.

THE WITNESS: Respectfully, that's a very broad statement. If you want to be more specific, I'm happy to try to answer the question. But that's very broad statement. 01:09

BY MR. COSTELLO:

Q. Yes or no, let me know if you agree: Sometimes despite early studies showing a potential link, no data is ever identified to support the existence of a causal relationship; yes or no? 01:09

MS. O'CONNOR: Objection.

THE WITNESS: Do you have any specific -- I'm not trying to answer in the form of a question, but I think I need more background in order to answer

that one way or the other.
BY MR. COSTELLO:
Q. You can't answer it one way or the other as posed?
A. That's very broad. 01:09
Q. Yes or no; in some cases epidemiological data initially suggests a permanent link between something and a cancer and is later determined that there is no link. An example would be coffee and pancreatic cancer. Do you agree with that? 01:09
MS. O'CONNOR: Objection.
THE WITNESS: Well, I think when that kind of data is presented, the authors, for example, can say, you know, there is an association here. And either through the peer review process or as 01:10 clinicians, epidemiologists review the data and say, well, you know, the peer review process missed this important confounder as part of the analysis. So to the extent that that example that you just posed is not real, I think a lot of that had to do 01:10 with, you know, I would say and I would argue somewhat a failure in the peer review process.
BY MR. COSTELLO:
Q. Okay. You would agree there's no causal

link between coffee and pancreatic cancer, true?

MS. O'CONNOR: Objection.

THE WITNESS: You know, I'm not a GI oncologist, as far as I'm aware. But I can't really answer that question because I actually 01:10 don't know the data on pancreatic cancer and the risk factors. I'm not a GI medical oncologist.

BY MR. COSTELLO:

Q. And you would need the data, the epidemiological data in order to determine that, 01:10 true?

MS. O'CONNOR: Objection.

THE WITNESS: So, again I'm not a GI oncologist, right? So for me to even start to look at that data and say, yeah, this is definitely a 01:11 causal relationship there, I would have to look at the data. But I don't know if I have the skill or the training. And in the absence of all the research to help me come up to that conclusion, I don't know if I could come to that conclusion. 01:11 It's just not my area of expertise.

BY MR. COSTELLO:

Q. In the statement that I just read from your report, you indicated that the field of

gynecologic oncology is not static but is constantly changing and advancing, correct? That's what it says in your report?

A. That's correct.

Q. Okay. And the fact that it's constantly changing, you're still not aware of any data other than the Sister Study and the Black Women's Health Study, Chang, White, and Bertrand that has data relevant to this litigation, true? 01:11

MS. O'CONNOR: Objection. 01:12

THE WITNESS: I mean, there's other studies that are relevant to the litigation. If you're asking whether there's other significant or meaningful epidemiological, is that the question? I'm just trying to understand. 01:12

BY MR. COSTELLO:

Q. I mean, that's what is cited in your report, the Sister Study, the Black Women's Health Study, Chang, White, and Bertrand. Those are studies for which you've based your opinion is based on those studies and the data contained therein? 01:12

MS. O'CONNOR: Objection.

THE WITNESS: So those studies are only part

of the totality of the evidence that I analyzed. Those are the epidemiological studies that I consider, but I consider a lot of other types of studies and types of research to form my opinion.
BY MR. COSTELLO: 01:12
Q. Okay. As far as the data as opposed to anything else that you've identified, is there any other data that you relied upon in formulating your opinions other than the ones I just listed and that are outlined in your report, the data specifically? 01:13
MS. O'CONNOR: Objection.
THE WITNESS: So I don't -- I might not be understanding the question. I don't have access to the data -- to the database from the Sister Study. I have the report through which the investigators 01:13 on all of the studies used the data to produce their research. So, yes, I'm using the peer-reviewed publication. I'm also using my ability to interpret that peer-reviewed publication to develop my report. But that's only -- again, 01:13 that's the epidemiological component of my report.
BY MR. COSTELLO:
Q. In the next sentence in that same paragraph, it says "Proper identification and

distinction of these entities, therefore, requires careful consideration and correlation with clinical, epidemiological, pathological, and biological, plausible pathways to arrive at the correct diagnosis so the patient can be managed appropriately." 01:14

Do you see that?

A. Yes.

Q. You haven't diagnosed any specific patient in this litigation, have you? 01:14

A. Well, I'm not sure -- as far as I'm aware, there's no patients that I've treated that are in the litigation. But I actually don't know the answer to that.

Q. Have you given a diagnosis to any particular individual that's involved in this litigation? 01:14

A. So just of like a diagnosis of endometrial cancer to any person or --

Q. Yes, involved in this litigation. Any of the bellwether plaintiffs? 01:14

A. Not that I'm aware, no.

Q. In your practice you've never considered chemical hair relaxer use by your patients as to a

specific type of cancer, true?

MS. O'CONNOR: Objection.

THE WITNESS: I mean, I think this is related to something we discuss later. I consider it, at the very least, a risk factor without doing an 01:15 individual causal analysis for each individual patient. I think we talked about this earlier. And certainly in the instances where it has come up, patient asking me about the possibility of risk factors, exposures, I do discuss this with my 01:15 patients.

BY MR. COSTELLO:

Q. I want to get to page 5, paragraph 3. I think it's maybe about halfway through that paragraph. It says "I also methodically and 01:15 systematically searched and reviewed the medical and scientific literature related to additional carcinogens identified in the literature identified in hair relaxers."

Do you see that? 01:15

A. Yes. There's maybe a typo there, but yes.

Q. We'll get to that in a minute. You believe that you identified additional carcinogens

identified in the literature regarding hair relaxers. What are you referring to there?

A. So I think during my, you know, analysis and my review of the literature, there were several papers that discuss some of the chemicals in hair relaxers. Some of those are considered to be EDCs. Some of them are considered to be more carcinogenic. I think formaldehyde would fall within that criteria. I saw a paper that they discuss a metal called cadmium. So, yeah, there's definitely literature out there identifying other types of chemicals. They may or may not be also an EDC but are considered carcinogens. 01:16 01:16

Q. I want to ask you specifically about EDCs or endocrine-disruptor chemicals. The methodological search for the studies related to EDC and carcinogenesis in hair relaxers, there's really three: Chang, White, and Bertrand, true? 01:17

A. Sorry. Can you repeat the question because you started with EDCs and then went to -- 01:17

Q. Sure. The studies related to EDC and carcinogenesis in hair relaxers, there's really three that are cited throughout your report; and that's Chang, White, and Bertrand, true?

MS. O'CONNOR: Objection.
THE WITNESS: If you're asking -- I mean, there's other papers that I reference that are discussing EDCs in hair relaxers that were written by other investigators. Some of them looking at 01:17 the association with breast cancer. I talked about earlier about the more recent paper looking at thyroid and pancreatic cancer. In my report I also reference the association that has been established between EDCs and fibroids. So I don't -- in my 01:18 report I'm not only discussing endometrial and uterine cancer. That's definitely the main goal, but I'm using the rest of the information with all of those other research papers addressing EDCs.
BY MR. COSTELLO: 01:18
Q. Sorry. You're not giving an opinion that breast cancer or pancreatic cancer or the other cancers that you just talked about are related to chemical hair relaxers, are you?
A. I'm not giving an opinion to that 01:18 effect. I'm using the association that was found in those papers as part of the totality of the evidence that I consider for the purpose of giving my opinion as it relates to uterine and ovarian

cancer.

Q. Yes or no; Chang, White, and Bertrand all specifically say that more study is required before there is a causal link between ovarian and endometrial cancer and chemical hair relaxers? 01:19

MS. O'CONNOR: Objection; asked and answered.

You can ask and answer again.

THE WITNESS: So, yeah, we keep coming back to this, I think. I'm happy if you want to show me the papers and the specific part because you're -- 01:19 that is not what I would say, like, every single one of these studies says. Their conclusions, they stated them very clearly, and I'm happy to discuss each of them individually. But I think that's a very broad assertion. 01:19

BY MR. COSTELLO:

Q. So you can't answer yes or no whether or not all three have found that there is no causal link between chemical hair relaxers and ovarian and uterine cancer? 01:19

MS. O'CONNOR: Objection.

THE WITNESS: As I mentioned earlier, so they all discuss that there is an association and they even went as far as to say it is an important

association that should be taken seriously. It is significant enough that it's something that we need to take seriously because we're talking about cancer here. So these are patients that are being exposed to chemicals that are causing, you know, 01:20 this condition that is quite, quite significant and serious. So I don't think these authors and their reports, I don't think they're just minimizing the significance of their findings.

BY MR. COSTELLO: 01:20

Q. Specifically as it relates to cancer development and estrogen-dependent neoplasia, including initiation and promotion of endometrial and ovarian cancers, you're not aware of any study that has found a causal link, not association, 01:20 between use of chemical hair relaxers and uterine and ovarian cancer specific to development in estrogen-dependent neoplasia?

MS. O'CONNOR: Objection to form.

Go ahead. 01:20

THE WITNESS: Yeah, I need you to make that question a little more clear because that was very long. And I think you used different terms there that are not accurate. So if you can clarify, that

would be great.
BY MR. COSTELLO:
Q. I guess I'm just trying to close out so I can move on. You keep saying "association." And I guess the question I'm asking is there's no study 01:21
that's found a causal link, not association, between the use of chemical hair relaxers and uterine or ovarian cancer?
MS. O'CONNOR: Objection.
THE WITNESS: So the studies that we have that 01:21
establish that association, they are not --
BY MR. COSTELLO:
Q. My question is not association. It's causal link. That's the problem.
MS. O'CONNOR: Don't cut off the witness. 01:21
Don't cut off the witness. He's answering your question.
MR. COSTELLO: I don't think he has.
MS. O'CONNOR: Well, don't cut him off. You have your remedies. Do not cut off the witness. 01:21
BY MR. COSTELLO:
Q. Let me ask you just so that we can move on. Yes or no; you -- yes or no; you can't cite to a single study that found a causal link, not an

association, between the use of chemical hair relaxers and uterine or ovarian cancer? Yes or no?

MS. O'CONNOR: Objection, again.

THE WITNESS: So if you want to show me each individual paper and the part that you're 01:22
referencing to when you're saying that the authors are saying there's not a causal link, we're happy -- I'm happy to review and tell you why I'm having a hard time answering that question with a yes-or-no answer. All of the authors are saying 01:22
there is an association and they -- in each of these papers there are statements that, to my interpretation, especially when I look at the totality of the evidence, they are very concerned that there is a causal association based on the 01:22
statements that they're making in the paper.

BY MR. COSTELLO:

Q. So let's be specific. There is one study, White, that has examined whether there is a link between chemical hair relaxers and ovarian 01:22
cancer, true?

A. Yes.

Q. And there's two studies that have examined a link between chemical hair relaxers and

uterine cancer, correct?
A. Yes.
Q. And you agree that -- no other studies that you're aware of that examine the link between chemical hair relaxers and uterine or ovarian cancer other than what we just talked about? 01:23
MS. O'CONNOR: Objection.
But you can answer.
THE WITNESS: Yeah. For uterine or ovarian cancer and the association with EDCs, those are the three main studies in the literature. 01:23
BY MR. COSTELLO:
Q. Okay. Those are the only studies, not the main studies, true?
A. So those are the studies that looked at uterine and ovarian cancer. In the context of my analysis, there's many other studies, epidemiological studies, that looked at EDCs in chemical hair relaxers and how they can associated with other types of cancer. And that's not evidence that I can ignore even though they're not talking about, you know, gynecological cancers. That to me is -- the fact that there's multiple, multiple studies looking at the same products 01:23 01:24

acting as carcinogens in addition to all the other evidence I have available to me, I am not thinking of them, like, individually. I'm thinking of them as these are chemical hair relaxers in -- I'm sorry -- EDCs in chemical hair relaxers causing gynecological cancers, both of which are kind of like -- have similar mechanisms of development or similar mechanisms of evolving into cancer from the source. 01:24

Q. Let's move off this for a minute. You would agree that there are publications out there that may be non-peer-reviewed, true? 01:24

A. Publications or articles or --

Q. Yeah. It could be newspapers, magazines, public documents, books, blogs. Those could all be things that could be potentially non-peer-reviewed, true? 01:25

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: Yes. There's a lot of stuff out there. 01:25

BY MR. COSTELLO:

Q. Right. There could be blogs out there that anyone can give their opinion on any range of

topics, true?
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: It's a free country.
BY MR. COSTELLO: 01:25
Q. That's right. And there are -- there's quite a bit of information out there that might be disinformation as far as the blogs that are out there or articles that haven't been subjected to scientific scrutiny, true? 01:25
MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: Yeah, I can see there's definitely people that go online and give their opinion. Whether accurate or not accurate, I don't 01:25 know because you have to give me specific examples. But I can agree with the notion of there's a lot of inaccurate information in the -- you know, in the web and non-peer-reviewed publications.
BY MR. COSTELLO: 01:25
Q. Right. And non-peer-reviewed materials lacks the level of quality control found in peer-reviewed publications; you'd agree with that?
MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: I mean, I think you're grouping a lot of non-peer-reviewed publications in the same bucket. I would consider non-peer-reviewed position statements from, you know, regulatory agencies or medical societies a little bit more important than, like, a blog, as you were saying. Similarly, I would probably rely on a reputable non-peer-reviewed newspaper that has editorial -- like, good editorial practice instead of a blog. It's the same thing for, just in general, news. So I think there's different qualities of the non-peer-reviewed evidence out of there. 01:26 01:26

BY MR. COSTELLO:

Q. You agree that anyone with a computer can create a non-peer-reviewed publication, right? 01:26

A. Yes, I think that's accurate.

Q. If you go to the fourth paragraph, I think it's on page 6, I believe. It goes into page 6. "I have also considered alternative and/or opposing perspectives when assessing the entire body of scientific medical literature and evaluating whether chemical hair relaxers can cause or contribute to the development of uterine and 01:27

ovarian cancers in rendering my opinion here."
Do you see that?
A. Yes.
Q. What alternative or opposing viewpoints did you consider? 01:27
A. So I reference those in my report. I mean, I'm not -- so I obviously didn't -- for obvious reasons, I'm not going to rely -- and I'm not sure if there's any websites, blogs, or literature out there that is discussing about 01:27 chemical hair relaxers not being associated with uterine and ovarian cancer. So I relied on peer-reviewed, you know, letters, review papers.
I've referenced the ones that I identified through my search and my analysis in my 01:28 report. I discuss their findings and my concerns, you know. The paper by Farooq was one of them. The paper by Hernandez was one of them. There was also an opinion piece that I also considered. I saw a paper looking at -- specifically at EDC and 01:28 absorption that I also looked at.
So I tried to identify papers and literature that oppose my view. And I also, you know, looked at the papers that are actually saying

that there might be an association to identify gaps in their methodology and ways to potentially explain, like, a faulty association. So that's what I meant by "alternate opposing perspectives."

Q. And the authors of three studies -- Chang, White, and Bertrand -- actually oppose your conclusion that a causal link, not association, between chemical hair relaxers and uterine and ovarian cancers have been established, true? 01:29

MS. O'CONNOR: Objection to form, foundation. 01:29

You can answer.

THE WITNESS: So the authors, that is an original -- all of those three were original research papers. They use large databases to ask a research question. They, in my opinion, did a very 01:29 good job with their methodology the way that they reported their findings, the way they analyzed their findings. Epidemiological studies are going to say, you know, this is an association that could potentially be causative. I don't think those 01:29 authors, a lot of them reference a lot of the mechanisms through which that association can occur. They didn't do a full causal analysis.

So I disagree with the idea that they

would disagree with my conclusion if they were to do the same kind of analysis that I did. So, like, their paper -- their point was not to find this causal -- this causation. They identified an association, and they were very cautious and said 01:30 so in their paper, the way that I interpret it, saying that this could be a very important cause and we should make sure that that's not the case. Because, you know, I believe one of the papers even said if we eliminate this exposure we can actually 01:30 see the rates of cancer, I believe it was uterine cancer, go down.

BY MR. COSTELLO:

Q. As you sit here today, you can't point to anywhere in Chang, White, or Bertrand where they 01:30 cite to the conclusion that there is a causal link, not an association, true?

MS. O'CONNOR: Can I hear that back.

(Record read as requested.)

MS. O'CONNOR: Objection to form. 01:31

You can answer.

THE WITNESS: So I can -- the way that I read those articles, they express -- all the authors expressed concern because of the association. And

the reason they're concerned is because that association that I identified, which was positive in every single one of those articles, could be causative.

BY MR. COSTELLO: 01:31

Q. Is there a reason why you can't answer the question as far as causation versus association? I feel like we keep going back and you keep answering with "association." Is there something missing that you can't say that there is 01:31 nothing in regard to causation?

MS. O'CONNOR: Objection to form. Please don't argue with the witness.

BY MR. COSTELLO:

Q. You would agree there's a difference 01:31 between association and causation?

A. Yes.

Q. Is there a reason that -- strike that.

Is there anywhere in Chang, White, or Bertrand that you can cite to me that says causal 01:32 link or causation between chemical hair relaxers and uterine and ovarian cancers as opposed to association? Can you point that to me anywhere in the documents?

MS. O'CONNOR: Objection.
THE WITNESS: The authors don't -- they don't use the word "causation" or "cause."
BY MR. COSTELLO:
Q. Thank you. 01:32
A. They use the word "association." And they have a few other things, which, again, I will have to look at papers -- I don't want to, you know, make up words -- that suggest that they are concerned about that association actually being 01:32 causal. And this is what my report and the work that I've done is exactly. So we did this causal analysis using those associations as a foundation of the research, the analysis, and weighing all of that totality of the evidence. So, yeah, they 01:32 didn't use the word "causation," if that's what you're asking.
Q. Okay. And you're not aware, as you sit here today, of any publication outside of this lawsuit that has reached the conclusion that you've 01:33 reached in this case, which is that chemical hair relaxers cause uterine and ovarian cancers, true?
MS. O'CONNOR: Objection. You have asked that question no less than ten times.

MR. COSTELLO: I feel like I'm not getting an answer.

MS. O'CONNOR: You keep asking and keep trying a few different words. You're asking the same thing. He's given you the answer. I'm at the point now I'm going to tell him not to answer because these questions are now designed at this point to harass, humiliate, and embarrass him at this deposition. All right. If you ask something 10 times or you ask something 20 times and you don't like the answer, then that's what you're doing. 01:33 01:33

MR. COSTELLO: But I think the answer is that he keeps going back to association. And my question is causation, which is the key question at issue in this case. 01:33

MS. O'CONNOR: That's his answer. That's his answer. That's his answer.

MS. DEBROSSE: I will say also just for the record many of your questions totally lack foundation. I think we've let a lot go. So I would work on the construction of your questions in that context. 01:33

MS. O'CONNOR: I'm not going to let him answer

it one more time. And I will direct him on the record not to answer it, and we'll take it up with the judge.

MR. COSTELLO: Okay.

BY MR. COSTELLO: 01:34

Q. Would you agree with the statement that the entire body of peer-reviewed literature relating to causal link between chemical hair relaxers and uterine and ovarian cancers is in opposition to the conclusions that you have in your 01:34 report?

MS. O'CONNOR: Objection.

You can answer that.

THE WITNESS: So that -- the way that I interpreted the totality of the evidence, including 01:34 the epidemiological studies and all of the literature -- is someone --

MS. O'CONNOR: Hold on.

Somebody needs to mute themselves that's on the Zoom. It's interfering with the 01:34 deposition. Please put yourself on mute.

Let's do this. Let's go back to the original question.

(Record read as requested.)

THE WITNESS: No. I think I looked at that -- all of the body of literature carefully, methodologically. I weighed all of the evidence that I identified that was related to the question, including the epidemiological evidence, the literature on EDCs, my own understanding and expertise in endometrial, uterine, and ovarian cancer. And when I looked at all of that evidence in its totality, my conclusion is that there is a causal relationship. So I'm not going to -- yeah, I'm not going to change that. This is very much my conclusion based on the totality of the evidence. 01:35 01:35

BY MR. COSTELLO:

Q. And at this point in time, you're not likely to change your opinion despite any contradictory evidence, true? 01:35

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: So if something else comes up, you know, like a new article comes up either, you know, epidemiological -- mostly probably epidemiological data is what we're looking for, I would be more than happy to look at my analysis and see if it's still accurate. But to your point, I have yet to see a well-designed epidemiological 01:36

study, an observational study that actually refutes any of the findings in the papers that we have currently available showing that association between uterine cancer and ovarian cancer and chemical hair relaxers. If you're aware of a well-designed study that shows the contrary, I'd be happy to look at it, I'd be happy to discuss it, and I'd be happy to, you know, adjust my conclusion based on that. 01:36

BY MR. COSTELLO: 01:36

Q. On page 5, the fifth paragraph, it says "I independently reviewed the literature." Do you see that?

A. Yes.

Q. You weren't independent in this case. You were hired and paid by the plaintiffs, true? 01:37

MS. O'CONNOR: Objection to form and foundation, argumentative.

THE WITNESS: Okay. "I independently reviewed the literature." How is that related to whether I was hired or not? 01:37

BY MR. COSTELLO:

Q. I guess the question is typically when we're talking about somebody who is an independent

reviewer, that's somebody outside of the author of the report, true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I think -- I mean, maybe -- I think we're talking semantics here. So what I mean by this is that I reviewed the literature available on the topic myself. Like, myself as a person. I didn't ask for help. I didn't ask for anybody else's opinion. I did that on my own. I identified the large majority of the literature that I reference, the plaintiffs' counsel certainly provided me with some references as well, many of which I identified on my own. But I didn't ask for any help or assistance in terms of reviewing the literature, interpreting the literature, weighing the evidence before me. So maybe it's just semantics, but you're talking about a peer review process, I believe. That is not what this is. 01:37 01:37 01:38

BY MR. COSTELLO:

Q. Right. What specific materials were you provided by the plaintiffs' attorneys? 01:38

A. I mean, I couldn't really mention. I think primarily some of the epidemiological studies that I was already aware of, which are some of --

they shared some of that evidence, but the majority of the evidence is evidence that I identify myself.

MR. COSTELLO: Okay. We can go to Exhibit No. 8.

(Roque Deposition Exhibit 8 was marked for identification.) 01:38

BY MR. COSTELLO:

Q. Did you get a copy of it?

A. Yes.

Q. Okay. So Exhibit No. 8, this is the framework for the Bradford Hill analysis. Have you seen this before? 01:39

A. Yes.

Q. And is this something that you reviewed in conjunction with your opinions in this case? 01:39

A. Yes. I reviewed it, and I see the framework based on which I arrive at my conclusion.

Q. Okay. Specifically in your clinical practice, have you ever utilized the Bradford Hill framework in your clinical practice? 01:39

A. No. And I think this is -- you know, this is related to what we were talking about earlier, doing a causal analysis for each individual patient to identify a specific cause of

their cancer. So that's not something that I've done. It's not what my role as a GYN oncologist is. But I have the expertise, the understanding, the ability to research the literature and interpret it in such a way that I would be able to 01:40 use this framework to arrive at a -- you know, develop and arrive at causation if needed.

Q. Have you ever utilized the Bradford Hill framework as an author for a published article?

A. I have not. 01:40

Q. Have you ever used the Bradford Hill framework as a peer reviewer?

A. Probably not. I haven't really reviewed any articles. I deal with, like, causation for the journals that I serve as an editor or reviewer for. 01:40 But so, no, that's not something I have used before for that purpose.

Q. Thank you. We can move on.

So getting back to your report, which is Exhibit 4, Section 5, I believe it's on page 11 01:41 of your report, there's a section here that's dealing with cancer, cell biology, and oncogenesis. Do you see that, Section 5 of your report?

A. Yes.

Q. And at the bottom there is a reference to "see Figure 1 from Weeden." Do you see that?
A. Yep.
Q. You have that in your report?
A. This part or -- 01:42
Q. Yeah.
A. Yeah, I see that.
Q. And then if we look below on page 12, I think it's the next page, it looks like there's a diagram that's in there; would you agree? 01:42
A. Yes.
Q. Okay. And as far as the report here, it says "It could be influenced by a combination of three main categories of risk factors."
Do you see that below the figure? 01:42
A. Yes.
Q. Okay. And the first one is exogenous risk factors?
A. Exogenous.
Q. Yes, exogenous. I'm sorry. 01:42
A. That's all right.
Q. Exogenous risk factors?
A. Yes.
Q. Okay. And examples include infections,

which are -- it says HPV, which is the human papilloma virus?

A. Correct.

Q. You would agree that the human papilloma virus, or HPV, has been directly linked to an increase in uterine cancer? 01:43

MS. O'CONNOR: Objection.

THE WITNESS: That is incorrect.

BY MR. COSTELLO:

Q. What is incorrect about it? 01:43

A. HPV has been associated with increased risk and very strong causation of cervical cancer.

Q. Okay. And so help me -- I'm not -- I just want to make sure that I'm not misunderstanding. Explain to me what the difference is then between uterine cancer and cervical cancer in regards to HPV. 01:43

A. So, I mean, how much time do we have?

Q. I mean, high level so that -- I mean, I'm going to ask you more questions, but you said it's incorrect. I guess I'm asking what is incorrect -- why is that an incorrect statement? 01:43

A. We're talking about two different kinds of cancer, like saying vulvar cancer and uterine

cancer or saying uterine cancer and ovarian cancer. So the cervix is -- I have anatomy pictures there, but the cervix is a portion of the uterus. But the cancers that develop on the cervix have nothing to do with -- are totally different disease than the 01:44 cancers that develop in the uterus.

So when we talk about uterine cancer, that has nothing to do with cervical cancer. Cervical cancer, it is the one cancer that is associated -- well, cervical cancer is associated 01:44 with HPV. Vaginal cancer, vulvar cancer, that can also be associated with HPV. But just because the cervix is part of the uterus, cervical cancer is not uterine cancer.

Q. So you just listed -- please correct me 01:44 if I'm wrong. I think you said cervical cancer, and then you said there were two other subtypes underneath that. What were they? You said, was it vulvar cancer and something else?

A. Yeah. There's other types of 01:44 HPV-associated gynecological cancers. That could be vaginal cancer, vulvar cancer. I mean, there's other HPV-related cancer, non-GYN. You know, throat cancer can be HPV-associated or caused by

HPV. But that's very different disease than what we're talking about. So cervical cancer is not, by any extent of the imagination, uterine cancer.

Q. Would you agree that HPV was not accounted for in the Sister Study or the Black Women's Health Study? 01:45

A. Why would they account for HPV?

Q. I'm asking.

A. You're asking? Okay. Sure. No, they did not account for HPV. 01:45

Q. Would you agree that would be an increased risk factor?

A. For uterine cancer or ovarian cancer?

Q. For any type of cancer.

A. Well, so I think we have to talk 01:45 about -- just clarify for me because we went from talking about uterine cancer to cervical cancer and now we're back talking to all kinds of cancer. So can we figure out what we're talking about here?

Q. I mean, I guess I'm asking you a broad 01:46 question. We can drill down further if we need to.

A. Sure.

Q. The fact that it's not accounted for in the Sister Study or Black Women's Health Study, you

would agree that that would be a risk factor for certain types of cancer, HPV?
A. But not for the cancers that they are looking at.
Q. Okay. As far as the section that we have here, it indicates upwards of 90 percent of cancers are influenced by non-extrinsic, non-genetic inheritance and modifiable risk factors. Do you see that? 01:46
A. Can you point me again to where you're seeing that? Sorry. Oh, in the bottom. 01:46
Q. Yes.
A. Yes, I see that.
(Roque Deposition Exhibit 9 was marked for identification.) 01:47
BY MR. COSTELLO:
Q. I've given you what has been marked as Exhibit No. 9 for the deposition here today. Do you have that in front of you?
A. Yes. 01:47
Q. Okay. And this looks like it's the Weeden article that we were just talking about?
A. Let me make sure. Yes.
Q. And if we go to page 3 of Weeden, it

looks like we can see that same chart that you had?
A. Page 1543, yep. Okay.
Q. Is that a yes?
A. Yes.
Q. Okay. And if we go to the next page, which at least on my copy and your copy would be page 4, there's a Box 1. Do you see that? 01:48
A. Yes.
Q. You would agree that inside Box 1 -- hold on one second. If we go down about -- I don't know -- three-quarters of the way, after Footnote 27, it starts with "recent studies." Do you see that? 01:48
A. Yep.
Q. It says "Recent studies suggest that 60 to 90 percent of all cancers are due to non-extrinsic risk, i.e., exogenic and cell extrinsic factors, and therefore could be modifiable." That's what it says in there? 01:48
A. You made a -- you might want to read it again. You did not read that correctly. 01:49
Q. Okay. "Recent studies suggest that 60 to 90 percent of all cancers are due to non-intrinsic risk, exogenous and cell extrinsic

risk factors, and therefore could be modifiable. This estimate varies by cancer type, with hematological cancer, such as acute myeloid leukemia and chronic lymphocytic leukemia, are less influenced by risk factors." Is that what it says? 01:49
A. Yes.
Q. Okay. You would agree that in your report you said "upwards of 90 percent," citing to the Weeden article, true?
A. Yes. 01:49
Q. But, in fact, the Weeden article specifically in Box 1 suggests 60 to 90 percent, true?
MS. O'CONNOR: Objection.
THE WITNESS: I mean, I think we're splitting 01:50 hairs here. But, yeah, upwards of 90 percent.
BY MR. COSTELLO:
Q. Okay. Isn't it misrepresenting Weeden to give a number of upwards of 90 percent where the range is actually 60 to 90 percent? Is that a 01:50 misrepresentation based upon the fact that there is a 30 percent difference between what you said in your report and what Weeden actually cites?
MS. O'CONNOR: Objection.

THE WITNESS: So I think -- I don't believe that was a misrepresentation. The statement is essentially saying that the majority of cancers or up to 90 percent of cancers are due to non-intrinsic risk factors or, you know -- yeah, risk factors. And I think the other part of the statement here, you know, they're talking about acute myeloid leukemia, chronic lymphocytic leukemia. So I think what we're losing here is the context and the discussion for why we're here. 01:50 01:51

If we're here to talk about every single possible kind of cancer that a human can develop, I don't have expertise on that. I have expertise in gynecologic oncology. Uterine/ovarian cancer will be -- will fall within that. I don't believe I misrepresented the statement. They said 60 to 90 percent. From my perspective and certainly in the GYN oncology, when it comes to uterine and ovarian cancer, the large majority are due to, like, spontaneous or somatic changes. It's not something that is -- not due to intrinsic factors or due to non-intrinsic or extrinsic. 01:51 01:51

BY MR. COSTELLO:

Q. Do you agree that it's misleading to

suggest that as few as 10 percent of cancers are non-hereditary and the result of somatic non-germline mutations when the number cited in Weeden is 60 to 90 percent?

MS. O'CONNOR: Objection; mischaracterizes the report. 01:52

But you go ahead and answer that.

THE WITNESS: Yeah. So I think that is not what I -- what the report is saying. All the report is saying is that the majority of cancers, 01:52 upwards of 90 percent, are influenced by non-intrinsic, meaning non-genetic inheritance, as I wrote here, modifiable risk factors. So I don't think that's a mischaracterization.

BY MR. COSTELLO: 01:52

Q. Would you agree that by leaving out the number 60, it does not provide the reader a full and fair disclosure of Weeden's full conclusions?

MS. O'CONNOR: Objection.

You can answer. 01:52

THE WITNESS: I don't agree that I mischaracterize what the authors are trying to say. Again, this is some background information that I use in my report to highlight the fact that the

majority of cancers are not due to intrinsic or hereditary syndromes.

BY MR. COSTELLO:

Q. Would you agree that it understates the percentage of cancers that are hereditary? 01:53

A. Not for -- it depends on the kind of cancer that we're talking about. So this is where, you know, context matters. For -- if we're talking about uterine cancer, the types of cancers that are hereditary, which more commonly are related to 01:53 Lynch syndrome, in women that have a diagnosis of uterine cancer, when we do genetic testing, only about 3 percent of those cancers are identified as having Lynch syndrome, which would be the genetic. So in that regard, this is an overestimation. If 01:53 we're talking about, you know, the BRCA mutation for ovarian cancer, it's like 15 percent of all cancers. So it depends on the context. So I think this is a broad background type of number to say the majority of cancers are not due to hereditary 01:54 conditions.

Q. By characterizing Weeden's conclusions as upwards of 90 percent and failing to state the full range of 60 to 90 percent, is that, at a

minimum, imprecise?

MS. O'CONNOR: Objection to form and foundation.

THE WITNESS: That is a -- like a summary statement of what Weeden is saying. And what I'm trying to say is the important point for the purpose of my report to make sure that I establish the fact that the majority of cancers are not caused by hereditary conditions. 01:54

BY MR. COSTELLO: 01:54

Q. Stating the conclusion as upwards of 90 percent slants -- strike that.

Stating the conclusion as upward of 90 percent slants the conclusions toward the outcome favored by the plaintiffs' attorneys who hired you in this case, doesn't it? 01:54

MS. O'CONNOR: Objection; form, foundation. Read the report.

THE WITNESS: It does not. And I think, you know, I do have to agree with Plaintiffs' counsel here. Like, if you read the report, this is a very, you know, broad statement or more generic statement of all kinds of cancers. So upwards of 90 percent are non-hereditary. And then further 01:54

down on the report I dive more specifically into the genetics of uterine and ovarian cancer, which is the types of cancers that I have expertise on. So I don't believe this is something that is influencing the conclusion. 01:55

BY MR. COSTELLO:

Q. Stating the conclusion simply as upwards of 90 percent fails to convey to the reader that as few as 60 percent of cancers are non-hereditary and are the result of somatic, not germline, mutations, 01:55 true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: So, again, for the purpose of the report, this statement is to highlight the fact that the majority of cancers, certainly the 01:55 majority of gynecological cancers, are not hereditary. And then as the reader goes on and reads my report, I talk about the genetics of gynecological cancers, specifically the genetics of uterine and ovarian cancer, and I give more precise 01:56 numbers that are reported in the literature. But I don't think this statement is in any way, you know, trying to push the evidence in one way or the other.

And also, by the way, the reference is there. So if someone wants to dive deeper into the point that Weeden is trying to make, you know, you can, just like you did, grab the paper, read it, and then see what they were talking about. But the point of that statement is more for me to say the majority of cancers are not hereditary. 01:56

BY MR. COSTELLO:

Q. You could have said in your report that the majority of cancers were caused, but you chose to use the term "90 percent" and "upward," true? 01:56

A. Yeah, that's what I said.

Q. At minimum, it's less than full disclosure by you of the available data, true?

MS. O'CONNOR: Objection; form, foundation. 01:57

THE WITNESS: I think I would -- that would be the case if I didn't reference Weeden, but I put it on my references. Anybody can go and take a look at the paper, as you did. I don't think that's -- I don't think that's a misrepresentation of the data. I don't think this has any weight of the -- on my conclusion, on my opinion. So... 01:57

BY MR. COSTELLO:

Q. Okay. You would not permit an author

who submitted a paper to you for peer review as an independent reviewer to be this imprecise when representing the data in their submission, true?

MS. O'CONNOR: Objection to form, foundation.

THE WITNESS: I have a really hard time saying 01:57
that this would be a reason I would reject a paper if I'm doing the peer review.

BY MR. COSTELLO:

Q. Does the fact that the actual article says "60 to 90 percent of all cancers are due to 01:57
non-intrinsic risk factors" and that you represented as "upwards of 90 percent" violate the Elsevier ethical guidelines?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I think if I was just coming up 01:58
with that number without any reference and I was not providing a reference, maybe you can make that argument, like, if I'm just throwing numbers out there. That number is in the paper. It's not something that is being used to misguide the 01:58
reader. It really does not have, like, a huge impact on my opinion, my conclusion. I put the reference in there. So I think that was very much -- I can guarantee that, as an editor in a

major journal, this is not something that I would, you know, reject a paper for.

BY MR. COSTELLO:

Q. How would the reader know that it was 60 to 90 percent and not upward of 90 percent without going and reading the reference article for themselves? 01:58

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: That's -- I mean, I think it's all about context, right? So this is background information. The reader -- what we're trying to establish is the genetics of uterine and ovarian cancer, which is the main topic of -- in terms of cancer -- types of cancer of the report. The reader will be able to read further on and see when I talk about the genetics of uterine and ovarian cancer. I don't think this is the kind of data point that anybody would focus on and be like, oh, this is an incorrect report or trying to misguide the reader. 01:59 01:59 01:59

(Roque Deposition Exhibit 10 was marked for identification.)

BY MR. COSTELLO:
Q. Before we get to 10, I just want to close out this last couple questions. Is it appropriate to misrepresent data in the body of a report as long as you cite to a source where the information came from? 02:00
A. I don't believe I'm misrepresenting data.
Q. Is it acceptable to misrepresent sources you're citing to so long as they're in the background section? 02:00
MS. O'CONNOR: Objection.
THE WITNESS: I don't believe I misrepresented the data. The upper limit of that range was 90 percent. For the context of the report and the purpose of this report, I don't believe that doing, you know, saying 60 to 90 percent was important. 02:00
BY MR. COSTELLO:
Q. I know that you answered as far as what you think. I guess I'm asking a hypothetical question. Is it appropriate to misrepresent data in the body of a report so long as you cite to where the reader can find the complete information regarding the data? 02:00

MS. O'CONNOR: Objection; form, foundation. It's been asked and answered many times.
THE WITNESS: I was not misrepresenting the data. I cited the report. So you're asking a hypothetical that is just not -- doesn't make a lot 02:01 of --
BY MR. COSTELLO:
Q. You can't answer the hypothetical whether it would be appropriate to misrepresent data in the body of a report so long as you cite to 02:01 where they can find the complete data?
MS. O'CONNOR: Objection; argumentative, form, and foundation.
You can answer.
THE WITNESS: So, yeah. My issue with 02:01 answering that question is your hypothetical is being formed on the basis that you're saying that I misclassified the report. So I'm not going to answer a question where the foundation is that I am misclassifying the report -- or misclassifying the 02:01 finding.
BY MR. COSTELLO:
Q. I'm not asking you. I'm asking a hypothetical. Is it acceptable to misrepresent

sources so long as the author uses it in the background section of the report?

MS. O'CONNOR: Objection; form, foundation, argumentative. That's maybe the fifth time you asked that. 02:02

MR. TURIELLO: He didn't answer the same question.

MS. O'CONNOR: Hold on. Hold on. Maybe we need to go to the judge.

MS. DEBROSSE: There's a lot of laughing, a 02:02 lot of comments. He's answering the comments. I would suggest the questions be a little cleaner. And I'd ask for respect towards the witness. There's a lot of laughing --

MR. TURIELLO: There's not a lot of laughing. 02:02

MS. DEBROSSE: -- under your breath, "he's not answering questions," counsel. Come on.

MR. TURIELLO: Counsel, you know what the witness is doing.

MS. DEBROSSE: He's answering your questions. 02:02 If your questions aren't clear --

MS. O'CONNOR: You don't like the answers, but he's answering the questions.

MS. DEBROSSE: He is a celebrated gyne

oncologist. Your questions have been extraordinarily imprecise and reflect the misunderstanding of some foundational materials. I'm not going to sit here and allow you to insult the witness, to imply that he's not responding to the question. He's been here all day answering your questions respectfully. He's entitled to and deserves the respect of counsel. 02:02

MR. COSTELLO: I don't think I've laughed at a single question. 02:02

MS. DEBROSSE: Your colleague did. Your colleague did.

MR. TURIELLO: I'm hearing a lot of chatter and laughing over there, too, as well. And we're having multiple people talk here. Just reframing the question to defend his report when that's not the question and not actually answering the question that's asked isn't answering the questions. 02:03

MS. O'CONNOR: It's on the heels of attacking his credibility. 02:03

MS. DEBROSSE: That's why we have a judge. If you feel that strongly, we can take the transcript in.

MR. TURIELLO: Or we can just keep going.
MS. DEBROSSE: Okay.
MR. COSTELLO: I don't remember the last question and answer, whether there was an answer or not. 02:03
MS. O'CONNOR: There was no answer.
MR. COSTELLO: Okay.
MS. O'CONNOR: Hold on. Let's listen to the question.
(Record read as requested.) 02:03
MS. O'CONNOR: My same objections stand.
You can answer it again.
THE WITNESS: Yeah. So as I mentioned, my issue with that question is that you are using what you believe is me misrepresenting that statement as 02:04 the foundation for that question. So I have an issue with it. I do not believe I misrepresented the Weeden paper when I said "upwards of 90 percent" for the purpose of what I'm trying to achieve in my report. So, you know, I'm not 02:04 saying -- like, I'm not saying, you know, 100 percent. I'm not saying, like, 10 percent. I'm saying upwards of 90 percent, which is very much within what that table -- that box shows in

Weeden. And I reference it. That's my answer.
BY MR. COSTELLO:
Q. But you also didn't cite to 60 percent in your report, did you?
A. I said "upwards of 90 percent." 02:04
Q. You have in front of you Exhibit No. 10. I believe this is the Tan study. Do you see that?
A. Mm-hmm.
Q. Is that a yes?
A. Yes. Sorry. 02:04
Q. That's okay.
And I believe -- please correct me if I'm wrong -- it's reference 22 from Section 4 that's on page 15 and 16 of your report. Just let me know when you get there. 02:05
A. Page 15, you said?
Q. I think it starts on -- it's under Section 4. I believe it might be page 15 of your report.
MS. O'CONNOR: It's page 15, bottom of page 15. 02:05
BY MR. COSTELLO:
Q. Yeah. It goes into 16.
A. Okay. Okay.

Q. I just want to ask you about a specific section here. It says "A study by Tan, et al., demonstrated that exposure of human cell lines to aldehydes like formaldehyde or acetaldehyde render the" -- I'm just going to refer to it as "the BRCA2 protein inactive. Based upon their findings, the authors postulated that the risk of carcinogenesis among the BRCA2 mutation carriers may depend not only on the nature of their germline BRCA2 and its susceptibility to aldehyde-induced haploinsufficiency but also upon other genetic and environmental factors that determine exposure to aldehydes. Their findings strongly suggest that cancer evolution among carriers of BRCA2 mutations may be driven by a gene environment interaction in which certain exposures trigger carcinogenesis." 02:05 02:06 02:06

Do you see that?

A. Yes.

Q. And if we go back to Exhibit 10, which I think you have in front of you -- 02:06

A. Yes.

Q. -- just give me one more second because I know we're going between both of these. I believe it's at the bottom of the page. I think

it's 1015.
A. Well, these pages start on 1105, 1105.
Q. I'm sorry. Yes. If I said the wrong one, please correct me. But I think it's 1115.
A. Okay. 02:07
Q. Okay. "We report here that naturally occurring concentrations of formaldehyde, a product of cellular metabolism" --
A. I'm sorry. Can you tell me where you're starting because I'm on that page -- 02:07
MS. O'CONNOR: I think it's the discussion.
THE WITNESS: Under "Discussion"?
BY MR. COSTELLO:
Q. I believe so.
A. Okay. 02:07
Q. Let me know when you're --
A. Yeah, go ahead. Sorry.
Q. That's okay. I know we're moving through this. Sorry. I have my notes. I just want to make sure. I'll start over. 02:08
"We report that naturally occurring concentrations of formaldehyde, a product of cellular metabolism and a ubiquitous environmental toxin, provoke replication fork instability and

structural chromosomal aberrations in cells heterozygous for multiple, pathogenic truncating mutations affecting the BRCA2 tumor suppressor."

Do you see that?

A. Yes. 02:08

Q. What does the term mean, "naturally occurring," when referring to concentrations of formaldehyde?

A. I -- you know, I think what the authors are doing -- I didn't write this paper. I think 02:08 you get -- assume they will reference concentrations that they may have found in the literature to see what are, like, naturally occurring concentrations of formaldehyde either, you know, in chemicals or in general. But, like, I 02:09 don't know. That's something that the authors talked about in the paper. It's like saying, you know, in a concentration of formaldehyde that we often find naturally occurring. I mean, some of these chemicals are very frequently seen in the 02:09 environment. But -- so I think they're using that data to say these are what the natural concentrations are.

Q. Okay. Do you know if our bodies

naturally produce formaldehyde?

A. There is some levels of formaldehyde. I mean, that, I will have to go and do some research. There is some maybe natural levels of formaldehyde, but I can't tell you what the levels are. 02:09

Q. Okay. Do you know if formaldehyde exists in the environment outside of chemical concentrations that are in products, it's found ubiquitously in the environment?

A. It is a chemical that, yeah, can be 02:10 found in -- it's certainly in many environmental chemicals, but it's pretty ubiquitous, yes.

Q. Under that same area, "Exposure to aldehydes like formaldehyde or acetaldehyde, which are both widespread in our environment and also 02:10 accumulate endogenously in certain tissues, could potentially spontaneous" -- "could potentiate spontaneous mutagenesis in the cells of mutation carriers, predisposing them to cancer."

Do you know what percentage of 02:10 plaintiffs involved in this case carry mutated BRCA2 genes?

A. You mean within the case specifically?

Q. Yes.

A. No, I do not know that.
Q. What about in regard to the bellwether cases?
A. I thought that's what you were asking.
Q. Sure. Maybe -- just so that we're -- 02:11 this will be two questions. We'll get through it.
A. Sure.
Q. So in this case you don't know in regard to the bellwether plaintiffs what percentage involved carry the mutated BRCA genes, true? 02:11
MS. O'CONNOR: Objection.
THE WITNESS: I do not know.
MS. O'CONNOR: Beyond the scope.
You can answer.
THE WITNESS: Yeah, I don't know that. 02:11
BY MR. COSTELLO:
Q. Okay. On page 1115, it also says "Because BRCA2 mutation carriers typically develop cancers" --
A. You've got it -- can you tell me where 02:11 because we're moving a lot with the page.
Q. I'm sorry. It's under "Implications for Carcinogenesis and Public Health."
A. Okay. Yeah.

Q. And I believe it's maybe the fifth sentence down. "Because BRCA2 mutation carriers typically develop..." Do you see that? It's on the right-hand side of the page.
A. Yep. 02:11
Q. It says "Because BRCA2 mutation carriers typically develop cancers in certain epithelial tissues, including the breast, ovary, pancreas, or prostate, we speculate that organ-specific differences in endogenous aldehyde accumulation and 02:12 extrinsic exposure may account, in part, for the observed tissue selectivity."
Do you see that?
A. Yes.
Q. What does it mean to speculate? 02:12
A. Well, they're creating almost, like, a hypothesis for -- based on the background information that they have, which is -- you know, which is accurate. So one thing that they're saying is we wonder if exposure to this chemical in 02:12 these tissues is causing that second mutation in the normal gene that these patients have or these cells have that is actually what's leading to carcinogenesis. So they're -- it's

hypothesis-generating in a way I would say would be the other way --
Q. Right. And maybe anticipating my next question. It's just a hypothesis, true?
MS. O'CONNOR: Objection. 02:13
THE WITNESS: Well, I mean, this is a study that is being done in cell lines. So I don't think this is something that's being done in, like, in an actual human. But it is a well-developed and well-thought-out hypothesis based on the evidence 02:13 that we know to be true.
BY MR. COSTELLO:
Q. Researchers with significant evidence don't need to speculate, true?
MS. O'CONNOR: Objection. 02:13
You can answer.
THE WITNESS: Sorry. Is that something you're reading, or is that a question?
BY MR. COSTELLO:
Q. It's a question. 02:13
A. Sorry. Can you repeat it.
Q. Sure. Researchers with significant evidence don't need to speculate, true?
MS. O'CONNOR: Objection.

THE WITNESS: Well, I mean, I think it depends on the research that's being done. I mean, I think in the context of this, what they're saying is, like, we know that carriers of BRCA mutations have increased risk of ovarian cancer. And what they're saying is they're identifying one way through which the second BRCA gene in that tissue in those cells can be mutated which can trigger that evolution into the cancer. 02:13

So it is a well-thought-out hypothesis. I mean, I think the other thing to take into consideration is cancer is multifactorial. This is one way through which these cancers can develop. So they're saying we think there is evidence there, and this is a well-thought-out hypothesis that this is one of the ways through which these cancers can actually develop if the cells are being exposed to aldehydes, formaldehyde, et cetera. 02:14 02:14

BY MR. COSTELLO: 02:14

Q. You would agree that researchers need significant evidence for there to be a strong suggestion of conclusion, true?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Yeah. You look at multiple lines of evidence to come up to -- it depends on the conclusion you're trying to arrive at. I don't think these authors, you know, they look -- they're doing a cell study -- I don't think they're saying 02:14 this is definitively the way that ovarian cancer and BRCA2 mutations develop. They're saying this is a very logical possibility given the ubiquitous formaldehyde in the environment and the fact that it seems to be causing that mutation in these 02:15 genes, which we do know increases the risk for ovarian cancer.

BY MR. COSTELLO:

Q. Okay. If we look at the next paragraph below it where it starts off "even in wild-type 02:15 cells." Do you see that?

A. Yes.

Q. Am I correct the term "wild-type cells," that they're normal, non-mutated cells?

A. They're non-mutated for -- in this case, 02:15 for the BRCA gene.

Q. Right.

A. For the BRCA2 gene.

Q. We're talking about the same thing, that

they're non-mutated for the purposes of the BRCA2 gene that the article is talking about?
A. Correct.
Q. And it goes on: "Prolonged or high-dose formaldehyde exposure can deplete BRCA2 protein to levels low enough to induce replication stress." 02:16
Do you see that?
A. Yes.
Q. Do you know what amounts to prolonged or high-dose formaldehyde exposure? 02:16
A. You know, I would have to go back and look at the whole methodology. I'm sure they talked about it at some point here when I read the article. But I'm -- I don't know if we have the time, but -- 02:16
Q. Yeah, I can -- maybe my next question will help out. Do you know whether or not Tan indicated that the prolonged or high-dose formaldehyde exposure for human cells was two hours? Do you know if that's the number that's referenced in this article? 02:16
A. I would have to go back and look at the whole methodology section. I don't want to speculate or guess right now.

MS. O'CONNOR: Why don't you do that. Don't guess. Read.

THE WITNESS: Yes. It might take a while.

BY MR. COSTELLO:

Q. I can reference -- maybe this would make it easier for you. If you go to page -- I'm sorry. It is in Figure 1. It's on page 1106. It's in the top right-hand corner under Figure 1. 02:17

A. Okay.

Q. It says "Immunofluorescent images of HeLa Kyoto cells labeled with EdU, one hour, after two-hour formaldehyde treatment." 02:18

Do you see that?

A. After two-hour formaldehyde, yep.

Q. So I was asking you the question whether -- was it your understanding that, in regard to formaldehyde, it was two hours. Does this help refresh your memory now by looking at this in paper? 02:18

A. Yes. For the purpose of this experiment, it looks like it was two hours. Yep. 02:18

Q. I wasn't -- I just wanted to make sure to get to the section.

A. Yeah. I didn't want to give you the

wrong information.

Q. Okay. Do you know -- specific to this case, do you know how long a hair relaxer product, if used according to the instructions, stays on the hair? 02:18

A. Well, I mean, I think there's some data that there's absorption occurring and it's not -- the issue is not whether it stays on the hair. The issue is that it's being absorbed through the skin. And my understanding is that there's also -- the 02:19 chemical is deposited in some of the hair follicles. So it's actually staying in the tissue of the skin. So how long it stays on the hair, I'm not sure. But it's not -- the issue is not that it stays on the hair. The issue is that these 02:19 products are highly alkaline with very, very high pH, are sometimes causing burns. And at the very least, they're causing inflammation and making skin of the scalp very porous.

So whether the manufacturer says, you 02:19 know, it only needs to stay for -- I actually don't know the answer to that -- like, one hour, 30 minutes, I don't know, the concern is that there is evidence to suggest that these products are being

absorbed through the skin of the scalp. And even after washing them out, there is product that can still -- the residue of it can stay on the pores of the hair follicles.

Q. Do you reference "introduction in the scalp" anywhere in your report? 02:20

A. No. It's something that I'm aware of, again, because I -- just in my practice and my general understanding of the skin. You were talking about earlier about whether I have 02:20 experience with endocrine. I know that the skin is highly absorptive organ. I personally prescribe, you know, patches -- estrogen patches for patients to treat menopausal symptoms.

So I know that the skin, just in the 02:20 nature of my profession and my expertise, I know that the skin is a highly absorbent -- it can absorb chemicals. And I think it's only logical to me that if you're actually causing inflammation and making the skin more porous that the amount of 02:20 absorption would be significantly higher.

Q. You don't cite that anywhere in your report, true?

A. I don't think I discuss a lot of the

absorption on the scalp because, again, it would probably be beyond my level of expertise. But I know the plaintiffs' counsel have retained a dermatologist, I believe.

Q. And you're not a dermatologist who would opine on that, true? 02:21

MS. O'CONNOR: Objection. I think we've been down that road before.

MR. COSTELLO: Specific to the opinion he just gave. 02:21

THE WITNESS: I'm not -- I think -- I use that -- from the perspective of me analyzing the evidence, I use my degree in medicine. And the fact that I did rotations and understand the skin as an organ, as an organ that can absorb chemicals, 02:21 for the purpose of the discussion of, well, how are these chemicals getting to the ovaries, to the uterus, it's very clear to me and there's evidence that these chemicals are being absorbed through the skin. But, no, I'm not a dermatologist. But I 02:21 don't need to be a dermatologist to know that the skin absorbs chemicals.

BY MR. COSTELLO:

Q. You would defer to a dermatologist as

far as the rate of absorption into the skin, true?
A. Yeah. The rate of absorption, I mean, I think, is something that can vary from chemical to chemical. I would say that whenever you have a burn or a disruption in the skin, I don't need to be a dermatologist to know that that's going to increase the amount of absorption. The same way that, you know, if you cut your skin, if you burn your skin, there is a breakage in that barrier so it's going to make that tissue much more absorbable to exogenous chemicals.
Q. And you didn't cite rate of absorption anywhere in your report, true?
A. I don't believe I discuss rate of absorption. I mean, I think something that the -- I believe it was Pierce -- I don't want to guess, but I know I talked about that earlier because they had some model where they model the absorption of phthalates and parabens. I believe it was like a computer model. So I talked about it as part of my, you know, like, analysis, but, you know, I did not myself quote rate of absorption.
Q. On page 1111, if we look in the bottom of the left-hand corner, it says "In multiple

experiments using different cell types, replication stress is not detected when cells wild-type for BRCA2 are exposed to 80 to 100" -- I don't know if that's uM or -- I think it's micrometer -- "formaldehyde for three to five hours, although it is evident in similarly treated BRCA2 heterozygous cells." 02:23

Do you see that?

A. I do. But I have to correct it here because you're using a metric -- like, meters, that's for length. That's for distance. We don't use meters for biological, you know, chemicals. So I think what that's saying is micromolar would be my guess. That is a chemical unit of measurement. So if you want to correct the record, but meters is a unit of length. 02:23 02:24

Q. Okay. So you said it's micromolar?

A. That's the way I would interpret that, yes.

Q. Okay. I'm not a scientist. I'm a lawyer. That's why I'm asking. 02:24

So is it your understanding that that symbol, 80 to 100, is representative of micromolars of formaldehyde?

A. That is the concentration of formaldehyde that they're utilizing for the experiment.
Q. Okay. And it says three to five hours, true? 02:24
A. That's what it says.
Q. Do you know what the concentration 80 to 100 micromolars would represent to the cells themselves? Is that a significant amount?
MS. O'CONNOR: Objection. Objection to the form. 02:24
THE WITNESS: I mean, I don't know. I think in the context of the litigation and the report, the conclusions, we are simply -- we're oversimplifying the issue at hand here. We're 02:25 talking about this experiment where they use this concentration of formaldehyde. From the perspective of my report, thinking about it as all of the chemicals, not only formaldehyde, all of the chemicals that are in chemical hair relaxers and 02:25 how they can act in synergy in the cells in the uterus and the ovaries to actually be carcinogenic.
So whether it's 80 micromolar formaldehyde, I'm not sure. But that is not --

it's a different system. We're talking about cells versus the human body. We're talking about repeated exposures to the same chemical over time. And these women that are using hair relaxers are not using it once. They're doing it repeatedly. 02:26 So I think it's -- we're not really talking about the issue at hand here.

BY MR. COSTELLO:

Q. So all these next questions are if you know. If you don't know, you can tell me you don't 02:26 know. Do you know how many micromolars of formaldehyde are in a single use of hair relaxer that someone would be exposed to?

A. I don't know that information off the top of my head. I don't think it's relevant. 02:26

Q. Do you know how many times someone would need to use a hair relaxer to have prolonged or high-dose formaldehyde exposure?

MS. O'CONNOR: Objection.

You can answer. 02:26

THE WITNESS: So, I mean, I think the -- every time they are getting the treatment they will be getting themselves exposed to formaldehyde if that is, in fact, in the hair relaxer, which, as far as

I can tell, there are many studies that have shown that formaldehyde releasers are present in these products. Whether, you know, it's a one-time thing or, like, multiple times a year, as it is the case for many of these women, it's kind of hard to know 02:27 how much -- what is the concentration that is being accumulated in this tissue. But, again, formaldehyde is a carcinogenic chemical. And it's not only the formaldehyde. It's formaldehyde plus all of the EDCs, all the carcinogens that are 02:27 acting in conjunction rather than this isolytic chemical that we're trying to talk about.

BY MR. COSTELLO:

Q. Okay. So just to follow up on it, you don't know the dose amount that would be required 02:27 to have high-dose formaldehyde exposure, true?

MS. O'CONNOR: Object to the form.

THE WITNESS: Yeah, I don't know what the dose would be.

MR. COSTELLO: Thank you. 02:27

MS. O'CONNOR: When you get to a natural breaking point, I think we've been on the record for more than an hour.

MR. COSTELLO: We can take a break now if you

need to.

THE VIDEOGRAPHER: Off the record at 2:27.

(Short recess.)

THE VIDEOGRAPHER: Back on the record at 2:45.

BY MR. COSTELLO: 02:45

Q. Dr. Roque, I want to refer you specifically to page 16 of your report, which is Exhibit No. 4. So we're going back to your report now. You can put that off to the side for now. If we look at I believe it's Section 7, the pathology 02:45 of uterine cancer, do you see that?

A. Yes.

Q. I just want to ask you a couple questions about this section. It says "There are two types of uterine cancer: endometrial cancer 02:46 and uterine sarcoma. Endometrial cancer, which develops in the lining of the uterus, endometrium, is the most common form, accounting for about 95 percent of uterine cancer cases. Uterine sarcoma is rare and originates in the muscle wall 02:46 of the uterus."

"This section of the report" -- if we skip down to the bottom, it says "This section of the report primarily focuses on endometrial cancer

unless otherwise specified."
Do you see that?
A. Yes.
Q. Okay. And that's because of the rarity of uterine sarcoma? 02:46
A. Partly because of the rarity, partly because it's a different type of cancer. So, you know, different mechanism, more rare. Same way that we were talking earlier about cervical versus uterine cancer. The endometrial cancer starts more 02:47 in the lining of the uterus, so what's called endometrial cancer, where sarcoma tends to start more in the muscle.
The one thing I do want to clarify because it can be confusing, there is a type of 02:47 endometrial cancer, it's called carcinosarcoma, which, you know, historically, that was considered a sarcoma, but we do consider carcinosarcomas to be a type of endometrial -- cancer of the lining of the uterus, not a type of sarcoma. So it can get a 02:47 little confusing, but...
Q. Okay. Let me just ask you some follow-up questions --
A. Sure.

Q. -- and you can tell me if I'm reviewing your report correctly. You would agree that uterine sarcoma is not estrogen- or hormone-driven, true?

A. That's not totally correct because sarcomas themselves, there's different types. So the most common type are the type that are called leiomyosarcoma, which they may have some hormone receptors, but we don't necessarily think of them as being hormone-driven. But then you have endometrial stromal sarcomas, which there's low grade, high grade. And adenosarcoma is another type of sarcoma, again, really not that common. But those types of sarcomas are very much types of cancer that we believe can be estrogen-driven. In fact, when we treat them, we use anti-estrogen therapies to manage them. So it gets a little confusing, and I apologize. But there are some types of sarcomas that are considered to be estrogen-driven. 02:47 02:48 02:48 02:48

Q. And in your report you discuss hormone-driven endometrial cancer on page 18; is that right? We'll get to it in just a second, but I think you do address that in your report, as

well, true?
A. Yeah. And I think this is -- when I'm talking about this, I'm primarily talking about endometrial cancer. I'm not talking a lot about those sarcomas. 02:48
Q. Okay. And, again, I'm not a physician so I'm just trying to understand the report and what you've outlined here. You would agree that estrogen- or hormone-driven does not apply to uterine serous carcinoma, true? 02:49
A. It's a little bit of a different mechanism. And, generally, uterine serous carcinomas, you know, in a lot of the epidemiological data, they're considered the Type 2 which tend to be less estrogen-responsive. But I 02:49 cannot say that, you know, that they cannot be estrogen-driven because they can have estrogen receptors, as well. But generally speaking, we think of those as being less estrogen-driven.
Q. Okay. And, additionally, uterine 02:49 sarcoma is not estrogen- or hormone-driven, true?
A. That's a little bit of a generalization. Again, there's some types of uterine sarcoma, as I mentioned, the endometrial stromal sarcoma, that

can be estrogen-driven.
Q. Okay. Maybe for purposes of expediting my next questions, you can tell me which types of uterine cancer are not considered estrogen- or hormone-driven. 02:50
A. I mean, it's really hard because that's a very general statement. I would say maybe leiomyosarcomas, we don't think of them as estrogen being, like, a driving force. But certainly for any cancer of the lining of the uterus or any sort 02:50 of endometrial cancer, I would consider estrogen to be potential risk factor, certainly for the Type 1s, that's a very much predominant and causative risk.
Q. As far as just the biology of this, 02:50 uterine serous carcinoma and uterine sarcoma, those originate in the muscle walls of the uterus, not the lining, true?
A. That's not accurate. Uterine serous carcinomas are still -- they're a type of 02:51 endometrial cancer. So as such, those do originate in the lining of the uterus. Uterine sarcomas originate more in the muscle. The exception can be confusing, the reason I wanted to make that

clarification, there is carcinosarcomas that they do arise in the lining that are considered a type of epithelial -- or a type of endometrial cancer, not a type of sarcoma.

Q. In this case you are not offering an opinion as to the causation regarding uterine sarcoma, are you? 02:51

A. I'm not. In terms of my report, it doesn't address uterine sarcomas. But I do think that there's -- the mechanism of action as it applies to hormone and specifically estrogen-driven cancers of the uterus, a lot of the same principles will apply. 02:51

Q. Okay. I just want to eliminate how much time I need to spend. You're not -- you haven't given an opinion in your report regarding the causation of uterine sarcoma in relation to the chemical hair relaxers, true? 02:52

A. I did not talk much about uterine sarcoma; that's correct. 02:52

Q. Okay. You do not have an opinion outlined in your report as regards to causation for uterine sarcoma, true?

A. In my report I don't talk a lot about

it. But, again, if we were going to break it down to whether or not they were estrogen-driven, some sarcomas tend to have estrogen receptors.

Q. Can we go to page 21 of your report. Are you there? 02:52

A. Yes.

Q. Okay. On page 21, there is a table; is that true?

A. Are you referring to Table 3? I see a table. I mean, I see a figure and a table, yes. 02:53

Q. Yeah. Let me just make sure I'm on the right page. Okay. So the table, I believe it is Table 3, and we have categories here that are listed as A, B, C, and D, true?

A. So that's a figure. That's not the 02:53 table. So can you help me.

Q. Sure. I guess I'm just trying to make sure we're on the same page. I guess it's the figure. So the figure has A, B, C, and D labeled across the top, and it's got the histological type 02:53 underneath it. Do you see that?

A. Yes.

Q. Okay. I guess that's Figure 8, just to make sure we're on the same page; is that right?

A. Yes.
Q. And serous and clear cell carcinomas are C and D, true?
A. Yes.
Q. Would you agree that C and D are not estrogen-driven? 02:54
A. Well, as you see here, it depends on whether or not there is expression of the estrogen receptors. So as you see, in general, clear cell, you can see how the -- on the bottom row, when you look at molecular markers, so a lot of times clear cells don't have estrogen receptor. And if there's no estrogen receptor, you know, potentially may not be estrogen-driven. But that is -- that's not always the case. There's certainly some clear cell cancer that may have estrogen receptors in them. 02:54 02:54
And then for the serous one, you can see how, for the ER/PR expression at the bottom for the serous, there's minus/plus because in cases where there are estrogen receptors on the tumors, there is the high likelihood that estrogen may have -- play a role and could potentially be involved in carcinogenesis, metastatic disease, et cetera. 02:55

Q. Okay. And so there was a lot in there. You said there are certain types. But the types that we're talking about here, generally speaking, C and D are not considered estrogen-driven, true?
MS. O'CONNOR: I'll object to that, but -- 02:55
THE WITNESS: Yeah, I mean, I think it's just a very broad overcharacterization. Historically, when we think about Type 1 versus Type 2, which is the way that a lot of times we still discuss these tumors, certainly in the epi studies serous and 02:55 clear cell will fall within that Type 2 category that, generally speaking, we think of them as being less estrogen-responsive. But to sit and say no estrogen influence at all, like, I don't think that would be completely accurate. 02:56
BY MR. COSTELLO:
Q. All right. If we look at Exhibit 4 on pages -- I think it goes into page 22, there's a -- I believe it's Figure 9. It's like a series of pie charts -- 02:56
A. Yes.
Q. -- from my uneducated eye. I have some questions about that. Your report addresses Type 1 endometrial cancer, true?

A. I try to frame it as Type 1, Type 2, because of the way that the epi studies were written.

Q. I just want to make sure that you and I are using the same terminology. 02:56

A. Yes. For that purpose, I'm fine with that.

Q. And that's how you had it in your report, Type 1 versus Type 2?

MS. O'CONNOR: Object to the form. 02:56

THE WITNESS: Well, yes. But I do -- I want to make sure that, for the record, you know, this table here is looking at a more updated and probably more accurate molecular classification of endometrial cancer that is kind of what we take 02:57 into consideration currently. It's still all endometrial cancers. But, you know, very briefly, what I can show you here, if you look at the low-grade endometrioid, so the top left pie chart there, so those are the ones that generally will be 02:57 considered Type 1 histological subtypes where once you look at, you know, the high-grade endometrioid, carcinosarcomas, serous, clear cell, so those will be the ones that will be classified within the

Type 2.
So what this newer classification does, it just breaks it down a little bit further based on the molecular groups, which they're listed there on the bottom right little square. So -- 02:57
but, yeah, it's a different framework, but it's still talking about, you know, same endometrial cancers.
BY MR. COSTELLO:
Q. All right. And Type 2 would include 02:57
serous and clear cell, true?
A. It would also include the carcinosarcomas. It would also include, from my perspective, the high-grade endometrioid, tumors that tend to be more aggressive, which is the 02:58
reason I don't want to completely exclude that estrogen function because, you know, high-grade endometrioid is very different than low-grade. And endometrioid high grades, they do have more estrogen, you know, receptors in them. 02:58
Q. And the -- again, just as far as being Type 2, the serous and clear cell, those are not hormone or estrogen-driven, generally, true?
MS. O'CONNOR: I'll object to the form.

Go ahead.

THE WITNESS: Again, you know, I think I cannot sit here and be like, no, absolutely no estrogen. I mean, I think in general, yes, Type 2s, which include the serous, the clear cell, 02:58 carcinosarcomas, sometimes estrogen might not be -- the estrogen receptor might not be as highly expressed, but it doesn't mean that it isn't. For the high-grade endometrioid, estrogen receptor can very much be expressed. 02:59

And to give you an idea, I mean, we use -- when we do molecular testing, we're looking for estrogen and progesterone receptors. And if any of these tumors have it, then that means they can be responsive to estrogen. In those cases and 02:59 in some instances we use that as a way to determine therapy in patients that have run out of chemotherapy options. It's something that we consider. So I cannot rule out the possibility that these tumors would respond or be caused by 02:59 estrogen.

BY MR. COSTELLO:

Q. Okay. And, again, back to your report. It just says this section of your report dealing

with the pathology of uterine cancer focuses on endometrial cancer unless otherwise specified, true?

A. That's true.

Q. Okay. If we look at the third paragraph, I think it's under this section -- 02:59

MS. DEBROSSE: What page are you on, Counsel?

MR. COSTELLO: Same page that we've been working from, which is page 16 of his report.

THE WITNESS: And the one thing I will say -- 03:00

BY MR. COSTELLO:

Q. There is no question pending.

A. Oh. Sorry.

Q. Getting to the third paragraph on page 16, it says "Historically, Black women have 03:00 had lower incidences of endometrial cancer than white women."

Do you see that? That's in your report?

A. Yes. 03:00

Q. And then if we skip ahead just a bit, it says "US data from the Surveillance, Epidemiological [sic], and End Results (SEER) Program report a 10.2 per 100,000 EC mortality rate

in Black women which is more than double the mortality rate in white women, 5.0 per 100,000." And then there's a 27 there, which I think is a citation outside of your report; is that true? It's a footnote? 03:01

A. Yeah. It's a citation to -- citation No. 27.

Q. Right. And then it says "Meaning, compared with white women, this is approximately a 21 percent lower five-year survival in Black 03:01 women." And then there's additional footnotes there, 26 and 27.

Do you see that?

A. Yes.

Q. "The disparity in EC mortality is 03:01 perhaps one of the worst racial disparities seen amongst all cancers. Several decades of research has shown that Black women are more likely to be diagnosed with high-risk EC histotypes. Importantly, even though the incidence of these 03:01 more aggressive EC types is higher for more women, the incidence in Black women has become twice as high."

Do you see that?

A. Yes.
Q. Again, you stated that, unless otherwise noted, your report focuses on endometrial cancer which develops in the lining of the uterus as opposed to uterine sarcoma, which does not, true? 03:02
MS. O'CONNOR: Object to the form.
THE WITNESS: I'm not sure. And this, you know -- let me just clarify because I think we're -- there might be a bit of confusion or maybe lack of understanding. So endometrial cancer 03:02 refers to cancers that start in the lining of the uterus. All of those subtypes that we have been talking about, low-grade endometrioid, high-grade endometrioid, carcinosarcoma, serous, and clear cell, those are all considered endometrial cancers. 03:02 Every single one of those subtypes starts in the lining of the uterus. None of these types of cancers are sarcomas. Okay?
So are we talking about the same thing? Because the question makes me think that 03:02 we're not.
BY MR. COSTELLO:
Q. I guess what I was asking you is just back to the questions that I asked you before as

far as when you're referring in your report to the cancers, essentially, for lack of a better term, Type 1 versus Type 2, unless otherwise noted, that's what you're referring to as far as the opinions you're giving, true? 03:03

A. Type 1 and Type 2 are types of endometrial cancers. So, yes, that's true.

Q. And you're specifically opining on Type 1 in the body of your report?

A. No. There's nothing about that 03:03 statement that says I'm only opining about Type 1. I'm saying that I'm not opining about sarcomas, but that endometrial cancers include both Type 1 and Type 2s.

(Roque Deposition Exhibit 11 was 03:03 marked for identification.)

BY MR. COSTELLO:

Q. All right. I'm going to show you what has been marked for the deposition as Exhibit No. 11. And I believe when we were just looking at 03:04 your report, one of the references was to Reference 26, which was Illah, which is the "Racioethnic Disparities in Endometrial Cancer Outcomes." Do you have that as Reference 26 in

front of you?
A. I'm looking. Just one second.
MS. O'CONNOR: Here's 26.
THE WITNESS: Yeah. Yes.
BY MR. COSTELLO: 03:04
Q. Okay. If we go down onto the second page from this -- I'm sorry. It would be -- yeah, it's the second page. And it's under Figure 1 after -- there's a reference to 9 and 10. There's, like, links there. It says starts with "several 03:05 decades of research."
Have you found it yet?
A. Sorry. So Figure 1.
Q. Underneath that, it's the first full paragraph that starts with "this disparity." 03:05
A. "This disparity." Okay.
Q. And then the section that I wanted to refer you to is about halfway through. It says "several" -- it starts with the sentence "several decades of research." 03:05
Do you see that?
A. Yes.
Q. Okay. "Several decades of research predominantly from the US has shown that Black

women are more likely to be diagnosed with high-risk EC histotypes. The incidence of these more aggressive EC subtypes has risen for all women, but the increase in Black women has been twice as high. Black women are more likely to be diagnosed with EC in an advanced stage compared to with white women." 03:06

Do you see that?

A. Yes.

Q. Then I wanted to refer you specifically, I believe it's on -- sorry. I thought it was page 4. It's Figure 4. I believe it's Figure 4, page 8 of the article. Are you there? 03:06

A. Yes.

Q. Again, I'm a lawyer. I'm doing my best to understand the chart that's here. But, essentially, in Figure 4 of the article there's a figure identifying the four molecular subtypes of endometrial cancer, correct? 03:07

A. Yes. 03:07

Q. And the first subtype there is actually a reduced prevalence in Black women, true?

A. Yeah. That's what the figure states, yes.

Q. Okay. If we look at it specifically, it says -- there's an arrow down, and it specifically says "reduced prevalence in Black women," true?
A. Yes.
Q. The second one on -- the second subtype here, it says the racioethnic differences are unknown, true, if we just look across? 03:07
A. Mm-hmm.
Q. Yes?
A. Yes. 03:08
Q. And then the third type, the same thing. It says racioethnic differences are unknown. Do you see that at the bottom?
A. Yes.
Q. And then if we look at the fourth subtype, which is copy-number high P53 mutation which is associated with the worst clinical outcome, there's an increased prevalence in Black women, true? 03:08
A. Yes. 03:08
Q. And this subtype would be the rarer uterine sarcoma that originates in the wall of the lining and not -- or wall of the uterus and not the lining?

A. That's totally not correct.
Q. Okay. This is -- as we talked about before, this is the rarer uterine sarcoma that we talked about, true?
A. I never said that. This is not uterine sarcoma. This is endometrial cancer. 03:08
Q. Okay. Is this p53abn, is this something that's identified in your report?
A. I believe I talk about it, and I think -- let me look here. Where is that pie chart? Yeah. So if you look at page 21 and then page 22, so on page 21, that's Figure 8 where it's only looking at the histological subtypes. If you look at the bottom row, it says "abberant P53." You can see where, like, in the serous subtype, that's positive. It can be positive in some of the endometrioid, especially the high-grade endometrioid histologies. It also can be positive in the clear cell. 03:09 03:09
And then if you go back to that pie chart, which essentially is very similar -- different way of showing the same information here, but that Figure 9 that has all of those pie charts, you can see how the red at the bottom says P53 03:10

abnormal. So that's what constitutes -- you know, you can see it's the same category. And you can see how serous -- in serous cancers that is very, very common, almost -- and this is only one snapshot of a group of patients, right? But in 03:10
this group of patients, all of the patients that had serous subtype had a P53-abnormal mutation. And then you can see how that's not a very common mutation in low-grade, little more common in high-grade endometrioid, 75 percent of the patients 03:10
in the carcinosarcoma will be within the molecular subtype.

Q. And is that the type of uterine cancer that you stated would not be addressed in your report unless otherwise noted? 03:11

A. No, sir. So I keep saying the -- on the report, what I said, that I would not be talking about uterine sarcoma. I say it again. Given the rarity of uterine sarcomas, the term "uterine cancer" is often used to refer to endometrial 03:11
cancers. This section of the report primarily focuses on endometrial cancers unless specifically otherwise specified. So this whole table here, Figure 8 -- let me go back here again to make sure

that I'm not -- Figure 8 in my report, that figure there, the Figure 9 with all the pie charts, that is all talking about endometrial cancers. There is nothing there about sarcomas.

Q. Is it misleading for you to suggest in your report that the review article, Reference 26, on racioethnic disparities in endometrial cancer outcomes, that the disparity in uterine sarcoma is also found in endometrial cancer, which is the most common uterine cancer, which is 95 percent? 03:11 03:12

A. Can you repeat the question. I don't think I'm following you.

MR. COSTELLO: Can you read it back.

THE COURT REPORTER: Not really.

BY MR. COSTELLO: 03:12

Q. Is it misleading for you to suggest in your report that the review article that we're looking at here, Reference 26, regarding racioethnic disparities in endometrial cancer outcomes, that the disparity in uterine sarcoma is also found in endometrial cancer, which is the most common uterine cancer? 03:12

A. You know, respectfully, Counselor, I think that question really doesn't make any sense.

You're talking about uterine cancer, you're talking about endometrial cancer, and sarcomas. This article here in my report, this article here is talking about endometrial cancer outcomes. The Figure 4 that we're talking about, every single one 03:12
of those subtypes is endometrial cancer, as highlighted on the top left under that box. It says "endometrial cancer."

There's nothing about this article, you know -- and I will have to read the whole thing 03:13
to make -- but there is nothing about this figure here, Figure 4 in this article by Illah that I reference, Reference No. 26 in my report, there is nothing about this figure that is talking about uterine sarcomas. 03:13

Q. If you look at page 7 and just before that Figure 26, it says "Histological differences are a dominant contributor to the racioethnic disparity in EC mortality" --

MS. O'CONNOR: Wait, wait, wait. Let's get 03:13
there. Slow down.

THE WITNESS: What page? Page 7?

MR. COSTELLO: Yes, at the very bottom.

MS. O'CONNOR: Okay. Bottom, under the

heading "Histological and Molecular Differences." Okay.

BY MR. COSTELLO:

Q. And then it continues "Black women are more likely to be diagnosed with higher-risk non-endometrioid EC subtypes. Non-endometrioid subtypes are present in 28 percent of Black women with EC compared with 10 percent in women of other ethnic groups. One study analyzed the samples of 248 EC samples from Black and white women. The results showed a higher prevalence of serous EC (58 versus 36 percent) and carcinosarcoma (25 versus 16 percent) and a lower prevalence of endometrioid EC (17 versus 48 percent) in Black women."

Does that suggest that the article showed an increase in all types of uterine cancers, Types 1 and 2, in Black women over white women, that that's misleading to state that?

Let me ask the question again. Suggesting that this article represented an increase in all types of uterine cancers, Type 1 and Type 2, in Black women over white women, after reading that, is that a misleading statement in your report?

03:14 03:14 03:14 03:15

MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: I mean, I think -- let me see. So -- give me one second. Are you talking about the mortality or the prevalence? What are we talking about? 03:15
BY MR. COSTELLO:
Q. I'm just talking about the fact that it appears from your report that you're citing to this article to show an increase in all types of uterine cancers, Type 1 and 2, in Black women over white women, doesn't the data contradict that from Reference 26? 03:15
A. From Reference 26, no, because I think what I'm saying is, like, the rates of endometrial -- I'm not talking about the specific number of endometrial cancer. So when you look at the whole population, the percentage of the population that is being diagnosed with the disease is going up. And that -- I think I talked about the -- you know, the SEER database here. What this article is saying is that the rates of the Type 2, the serous, the more aggressive subtypes, they tend to occur more frequently in Black women than white 03:16 03:16

women, which it might explain some of the increased mortality. I mean, there's many other reasons why there's higher rates of mortality in Black women, including the fact that, you know, they're misdiagnosed, undiagnosed for longer periods of time, they tend to present with more advanced stage disease. But there's nothing about this article that I would say is misrepresented in my report. 03:17

Q. Does the section that we just read, it specifically states "and a lower prevalence of endometrioid EC (17 percent versus 48 percent) in Black women," meaning 17 percent in Black women versus non-Black women, that would be a lower prevalence as stated in the article, true? 03:17

A. But you're talking about the specific subtypes. You're breaking that apart. I think in my report -- let me see if I can go back to -- yeah. So initially that paragraph -- so the third paragraph on page 16, Section 7, I said "Historically, Black women have had lower incidences of endometrial cancer than white women." So that is all endometrial cancers, not Type 1 versus Type 2. It's all-comers. I think maybe the confusion is we were throwing sarcomas in there 03:17 03:18

initially.
But endometrial cancer, that accounts for all Type 1 and Type 2. So that incidence of endometrial cancer has reversed over the last decade. Probably I think like around the mid-2015, 2017, I believe. I talk about the increase in mortality. And then, yeah, like, I think what they're saying is that there are higher rates of the Type 2 histological subtype instead -- you know, over the Type 1. But that doesn't take away the fact that the overall rate, so all Type 1s and Type 2s, the incidence in Black women has increased. 03:18 03:18

Q. You don't have any reason to dispute the data that's in the report that you reference in your -- strike that. 03:19
You don't have any reason to dispute the data that is part of Reference 26 that you incorporate in your report, do you?

A. No. I mean, I think we're saying the same thing. I just don't know if the way you're asking the questions, I don't know if that's the way that the article is discussing or the way that I'm discussing it. Because, you know, we were 03:19

talking about endometrial, and we were including sarcomas in that, and then we were saying the Type 2 includes sarcomas. So I think for the purpose of the record, like, I'm having a hard time following the line of questions. 03:19

Q. Can we go to -- maybe this will help. Can we go to page 13, which is Table 2.

A. Of my report or the article?

Q. Of Reference 26, the same document. Okay. Are you there? 03:20

A. Yes.

Q. If we look in the "Histological and Molecular Differences," do you see that section?

A. Yes.

Q. Second one. It says "Black women are 03:20 more likely to be diagnosed with more aggressive EC due to the following: An increased incidence of non-endometrial [sic] histological EC types, a higher prevalence of molecular alterations." And it says "Histological and molecular differences are 03:21 biological and nonmodifiable."

Do you see that? It's off to the right.

A. Yep. Yes.

Q. "More scientific research into non-endometrioid EC may generate more effective treatment options."

Do you see that, as well?

A. Yes. 03:21

Q. If we go to page 14, there's a conclusions section. And it says under "Conclusions," "Racioethnic disparities in EC outcomes are significant, with Black women having considerably higher mortality from EC compared with 03:21 white women. These disparities have been reported for several decades in the US literature and are supported by recently published UK data."

And then if we move on, "In examining the reasons behind these disparities, multiple 03:22 contributing factors have been highlighted. Black women are more likely to be diagnosed in an advanced-stage of EC due to a combination of social and biological factors. Low symptom awareness and societal [sic] cultural beliefs that hinder 03:22 health-seeking delays" -- "health-seeking can cause delays in clinical presentation. Care provider biases are assumed to cause further delays in diagnosis, and current EC diagnostic methods may

miss EC diagnoses more frequently in Black women."

It also says "Black women are also more likely to be diagnosed with aggressive EC histotypes and molecular tumor alterations associated with worse clinical outcomes. Finally, Black women are less likely to receive guideline-concordant treatment for EC. With the exception of histological and molecular differences in EC in Black women, the remaining factors responsible for disparity are modifiable with appropriate interventions." 03:22 03:23

Do you see that?

A. Yep.

Q. This does not suggest that the differences are exogenous, does it, the conclusions in this Figure 26 report? 03:23

MS. O'CONNOR: Objection.

THE WITNESS: I'm not -- I mean, there's a lot of exogenous differences here. When we talk about a lot of the social factors that they're talking about, the lack of access to care, those are all exogenous. We're not talking about biological exogenous factors. But if a woman is not being diagnosed with cancer because, you know, the 03:23

physician doesn't know what they're doing, they're not doing the right diagnostic test, that is an exogenous factor, in my opinion. And it's been well documented that one of the driving forces for the disparity in survival for Black women is the fact that many times they're not receiving guideline-concordant care. And I think -- so in my opinion, that is very much like an exogenous factor. So I'm not sure if I understand your question. 03:24 03:24

BY MR. COSTELLO:

Q. What does it mean in the article when we look at where it says -- I think we looked at it before, and it said, under the figure, "histological and molecular differences are biological and nonmodifiable"? What does that mean to you? 03:24

A. Those are the specific changes that these tumors have. Some of them can have this P53 abnormality. Some of them are going to be mismatch-repair-deficient. So those are biological differences in the tumor, but that is not in any way, shape, or form saying that those molecular changes may not have occurred as a result of 03:24

exogenous factors.

Q. Just yes or no. Do you believe that the data regarding differences as it relates to uterine sarcoma is not endocrine-driven based upon the data? Let me -- I misspoke. Let me restart over. 03:25

Do you agree, yes or no, that the data regarding differences as it relates to uterine sarcoma shows that it is not endocrine-driven? Do you agree with that; yes or no?

MS. O'CONNOR: Objection. 03:25

THE WITNESS: So, Counsel --

BY MR. COSTELLO:

Q. It's just a yes or no.

A. Well, I'm having a hard time answering the yes-or-no question because I think over the 03:25 last 30 minutes we've been talking about this topic, and you keep going from uterine cancer to endometrial cancer and Type 1, Type 2, and then keep throwing sarcoma in there. So when you say uterine sarcoma, to be honest, I'm not sure what 03:25 you're talking about. So I feel like we're talking about apples and oranges and you incorrectly keep putting uterine sarcoma in the endometrial cancer category. What I would say --

Q. I'm just trying to exclude it.
A. Well, I don't know. I don't know if that's what you're trying to do. But what I can tell you is, as I mentioned earlier, there are some uterine sarcomas. And, again, uterine sarcomas are 03:26 not endometrial cancers. There are some uterine sarcomas that have estrogen receptors and, as such, are responsive to endocrine hormones like estrogen. In fact, many of those -- for a decent size -- a decent number of those sarcomas, again, endometrial 03:26 stromal sarcoma, given the fact that they're endocrine-driven by estrogen, we treat those tumors with anti-estrogen treatment, with hormonal treatment, which is very much an endocrine -- again, an endocrine treatment. So I have a hard 03:26 time saying there's no hormonal driving force for --
Q. So just as far as the answer to the question then, you can't tell me yes or no whether you believe the data regarding differences as it 03:27 relates to uterine sarcoma is endocrine-driven or not, true?
MS. O'CONNOR: Objection.
You can answer.

THE WITNESS: I think -- I'm not going to answer that question as a yes or no because I honestly -- I don't know if you're using the term correctly. And as I mentioned earlier, there are some uterine sarcomas that do have estrogen receptors. 03:27

BY MR. COSTELLO:

Q. Just as posed, can you answer the question yes or no?

A. Yes as what? 03:27

Q. Yes or no; do you agree that the data regarding differences as it relates to uterine sarcoma is not endocrine-driven?

MS. O'CONNOR: Objection.

THE WITNESS: I don't agree with that statement. 03:27

MR. COSTELLO: Okay.

(Roque Deposition Exhibit 12 was marked for identification.)

BY MR. COSTELLO: 03:28

Q. Okay. I've put in front of you what I've marked as Exhibit 12, which is Reference 28, "Health Disparities in Uterine Cancer."

Do you see that?

A. Yes.
Q. One second. Actually, let's go back to your report for a minute, which is Exhibit No. 4, on page 22.
A. Okay. 03:29
Q. There's a section here labeled "Uterine Cancer Risk Factors." Do you see that?
A. Yes.
Q. And it starts off "Endometrial cancer occurs predominantly in postmenopausal women with 03:30 an average age of diagnosis of 60 years."
Do you see that?
A. Yes.
Q. And then from your report, you said "Thus, risk factors include endometrial 03:30 hyperplasia, reproductive factors that increase lifetime estrogen exposure (i.e., nulliparity, early menarche, and late menopause), polycystic ovary syndrome (PCOS), postmenopausal estrogen therapy, obesity, and tamoxifen use." 03:30
Do you see that?
A. Yeah. But I'd like to add that the sentence prior to that statement said "Estrogen, both endogenous and exogenous, is associated with

endometrial proliferation, hyperplasia, and cancer."

Q. The indication here in Table -- you have Table 4 lists the magnitude of the increased risk with some of the risk factors. You would agree that's in your report? 03:31

A. Yes.

Q. One of the things that you include here is tamoxifen use; is that right?

A. Are we talking about Table 4 now? 03:31

Q. It's in your report.

A. Yes, yes.

Q. I believe it's Table 4. Do you see where I'm talking about?

A. Yeah. I just want to make sure because I said tamoxifen here on page 22 but then also on the table. So I just want to make sure that we're looking at the same thing. 03:31

Q. We've moved to Table 4.

A. Okay. 03:31

Q. And it says "Tamoxifen use. Women taking tamoxifen for more than two years have a 2.3-fold to 7.5-fold relative risk for endometrial cancer, including an increased risk of uterine

serous carcinoma and carcinosarcoma."
My question is, as far as the risks that you've outlined in here, would you consider that a significant risk?
A. Yeah. It is one of the risk factors that we know is present. And certainly in patients that are taking tamoxifen, usually it's patients with the diagnosis of breast cancer. It's something that if they're complaining of abnormal bleeding or there's an abnormal ultrasound, we evaluate them. But, yeah, it's, again, all estrogen exposure. 03:31 03:32
Q. Do you know what percentage of the bellwether plaintiffs have used tamoxifen for over two years? 03:32
MS. O'CONNOR: Objection; beyond the scope.
THE WITNESS: I'm not familiar with any of the information of the bellwether cases right now.
BY MR. COSTELLO:
Q. Just help me to understand. One of the things in your risk factors, you have obesity listed there? 03:32
A. Yes.
Q. Okay. And it says the risk of

endometrial cancer increases 1.5-fold per 5 kilograms M-squared --

A. Mm-hmm.

Q. -- change in body mass. Do you see that? 03:33

A. Yep.

Q. Is it to say, then -- is there like a multiplier effect then based upon how obese you are as far as the increased risk?

A. Yes. There's certainly a spectrum, 03:33 right? So someone that has a BMI of 30, which is the obesity cutoff, that patient will have less of a risk of developing endometrial cancer than someone who has a BMI of 50, for example. And the reason is all, again, this is all about estrogen, 03:33 estrogen, estrogen.

So the way obesity causes endometrial cancer is through many different mechanisms, but one of them is the adipose tissues or the fat cells in the body can make estrogen. And especially once 03:33 a woman goes through menopause, that estrogen is not unopposed because the ovaries are no longer producing progesterone, which is the hormone that counteracts the action of estrogen in the

endometrium. So what occurs is there is this proliferation of the endometrial lining, which occurs naturally as a result of estrogen, but there's no opposing effects. So in women who are obese, certainly the amount of obesity, the BMI, 03:34 can certainly be correlated with higher risk. The higher the BMI, probably the higher the risk.

Q. Do you know what percentage of those in the bellwether class are obese or have a BMI over 50? 03:34

MS. O'CONNOR: Objection; beyond the scope.

You can answer.

THE WITNESS: I don't. But what I will tell you is, in a way, it's irrelevant primarily because this is just one of the risk factors. We don't 03:34 think about risk factors and endometrial cancer in a vacuum. So a woman may be obese, but that woman may also have PCOS or they may have been also exposed to unopposed estrogen or they may be on tamoxifen. So that effect of that unopposed 03:35 estrogen is very much additive, the same way that it is additive because of obesity.

So, again, BMI of 30, probably less risk than a BMI of 50. But if you have a BMI of 30

and then on top of that you add tamoxifen, on top of that you add, you know, chemical hair relaxers and the estrogenic effects of those chemicals in that patient, then you are going to have all of these factors that are essentially increasing the 03:35 amount of unopposed estrogen in the body. You don't have the anti-progesterone in someone who is postmenopausal. So you're essentially creating this environment where you're just increasing the risk of endometrial cancer developing, which is a 03:35 very, very well-known mechanism through which endometrial cancer develops. Look at all the risk factors. It's all about estrogen, estrogen, estrogen. If you have unopposed estrogen, you are at high risk, and that could be a causative factor 03:35 for endometrial cancer.

BY MR. COSTELLO:

Q. Okay. And I just want to make sure that I have your testimony clear. Is it your opinion that it doesn't matter whether or not the 03:35 bellwether plaintiffs in this particular case have a BMI over 50 as far as whether or not they're more -- they have a higher risk for developing these types of cancers?

MS. O'CONNOR: Object to the form and foundation, beyond the scope. As you know -- let me finish. As you know, he is here today to answer general questions on his general opinion report. You are delving into case specifics. It's beyond 03:36 the scope of his report. He's told you numerous times that he is unaware -- all right -- unaware of the demographics.

MR. COSTELLO: He can answer.

MS. O'CONNOR: No, no, no, no. It is beyond 03:36 the scope of his report. He is not going to give case-specific opinions disguised as general questions. All right? I know exactly what you're doing. I know exactly what you're being asked to do -- 03:36

MR. COSTELLO: Being asked to do?

MS. O'CONNOR: -- by your -- by, you know, your brethren. He is not going to answer questions in a vacuum on case specifics.

MR. COSTELLO: All right. You've made your 03:36 objection. Now we're going to move ahead.

Can you answer the question.

THE WITNESS: Can you repeat it, please.

(Record read as requested.)

MS. O'CONNOR: Objection, the same grounds. And if you continue along this vein to ask case-specific questions in cases that he has not seen, clearly, it's beyond the scope of the report. And we may just seek a ruling on that. It's very 03:37 clear, under CMO 15, all right, and maybe you are not familiar with them, that this is general opinions only. If you're going to tie it into the bellwethers, it isn't going to happen.

MR. COSTELLO: Go ahead. 03:37

MS. O'CONNOR: No. Do not answer that question.

BY MR. COSTELLO:

Q. Is it your testimony here today that having a BMI over 50 does not increase the risk of 03:38 these types of cancer?

MS. O'CONNOR: Different question. You may answer that question.

THE WITNESS: So, no, that is not --

BY MR. COSTELLO: 03:38

Q. Okay. You've answered the question. We can move on.

Let's move on to -- at the bottom of page 22 of your report, you have Footnote 55. Do

you see that?
A. Yes.
Q. I believe that Footnote 55 on the bottom of that refers to the National Cancer Institute endometrial cancer prevention, as cited in your report? 03:38
A. Yes.
Q. Okay. And it is cited in each category in Table 4 other than for chemical hair relaxers, true? 03:39
A. I'm sorry.
Q. What we just went through.
A. Can you repeat the question. I'm sorry. I got distracted.
Q. Sure. The National Cancer Institute, 03:39 Footnote 55, does not list chemical hair relaxers as a risk factor?
A. You know, when I looked at it, I don't remember. But if you have -- I will have to look at a more recent version of it and see if that has 03:39 changed. It was not listed the last time I looked at it.
Q. Okay. It was not listed?
A. I did not see it when I referenced --

when I used it, but I can't -- I don't know if it's there now or not.

MR. COSTELLO: Okay. We can put up Exhibit 13.

MS. O'CONNOR: Can you go back. I want to hear that last question. I want to make sure I understand which institute we're talking about. Was it National Cancer Institute? 03:40

THE COURT REPORTER: National Cancer Institute. 03:40

MS. O'CONNOR: Not the American Cancer Society. Okay.

THE COURT REPORTER: Right.

MS. O'CONNOR: Thank you.

(Roque Deposition Exhibit 13 was marked for identification.) 03:40

BY MR. COSTELLO:

Q. Okay. You have in front of you what's been marked as Deposition Exhibit 13; is that true?

A. Endometrial Cancer Prevention PDQ, yes. 03:40

Q. This is from the National Cancer Institute, true?

A. That's what it says, yes.

MS. O'CONNOR: Once again, we'll get a URL for

this --

MR. COSTELLO: You will.

MS. O'CONNOR: -- before the witness is answering questions?

MR. COSTELLO: I've given you the specific citation. I don't have it open in front of me because these are all printed out. You will have all the citations. I think we've already given you the other citations that have been referenced throughout the deposition. 03:40 03:41

MS. O'CONNOR: Objection to any question on this -- allow him to answer, but objection to questioning on this document.

BY MR. COSTELLO:

Q. Okay. If we go to the bottom of page 6, there's a section that's titled "Hair products, including dyes, bleach, highlights, straighteners, and permanents." Do you see that? 03:41

A. Yes.

Q. Okay. You would agree with me that this encompasses things other than chemical hair straighteners, true, including dyes, bleach, highlights, permanents? 03:41

A. Yes, there's more than chemical hair

relaxers here.

Q. In here it indicates "There is insufficient evidence of an association between hair products and endometrial cancer. Our respective analysis of the Sister Study addresses a possible association between these hair products and uterine cancers, including endometrial cancers." 03:42

That's what it says?

MS. O'CONNOR: Objection. It's read incorrectly. 03:42

THE WITNESS: Yeah. Can you repeat that. Can you read it again, please.

BY MR. COSTELLO:

Q. Sure. It says "There is insufficient evidence of an association between hair products and endometrial cancer. One retrospective analysis of the Sister Study addresses a possible association between these hair products and uterine cancers, including endometrial cancers." 03:42 03:42

That's what it says?

A. That's what it says.

Q. Okay. And underneath that, it says "Study design: Cohort"?

A. Yes.
MS. O'CONNOR: Okay. I'm going to object again. All right. Hold on. I'd like to see where Footnote 36 is.
MR. COSTELLO: We'll get there. 03:43
MS. O'CONNOR: I'd like to see it in this document.
MR. COSTELLO: I'll tell you what it is.
MS. O'CONNOR: Go ahead.
MR. COSTELLO: It's Chang and O'Brien and the 03:43 use of hair straighteners and other products. But my job is not to give you every question in advance. My job is to ask the question.
BY MR. COSTELLO:
Q. So let me follow up. So the Endometrial 03:43 Cancer Prevention PDQ, which you cite to regarding risk factors for endometrial cancer, says there is insufficient evidence of an association between hair products and endometrial cancer, true? That's what it says? 03:43
A. That's what they're stating, yes.
Q. Okay. It states "One retrospective analysis of the Sister Study addresses a possible association with these hair products and uterine

cancers, including endometrial cancer." And there's a Footnote 36. And if we look at that, it is citing Footnote 36. It is Chang-O'Brien, use of hair straighteners and other hair products, correct? 03:44

A. Yes.

Q. It describes Chang as a cohort study. Would you agree with that?

A. Well, it also describes it as a retrospective analysis. So I think there's some 03:44 mischaracterization here. So, yeah, it does say -- it does describe it as a cohort study.

Q. The National Cancer Institute publication states that the internal validity of the Chang study is poor, true? 03:44

A. That's what it says.

Q. Internal validity is how well a study's results reflect a target population; in this case, members of the Sister Study cohort, correct?

A. Sorry. Were you reading, or is there a 03:44 question?

Q. Yeah. The question is do you agree that internal validity is how well a study's results reflect a target population, which in this case

would be members of the Sister Study cohort, true?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yeah, I don't -- I'm not sure I'm understanding the question. I think, to me, validity is whether or not the findings are 03:45 pertinent to the patient population. So to me, the validity is more in the general public that is using chemical hair relaxers. That's what the purpose of the Sister Study was. I don't know what the internal validity with the overall cohort of 03:45 the Sister Study will be. And also, they're only referencing Chang here. But sure.
BY MR. COSTELLO:
Q. Poor internal validity -- strike that.
The NCI, the National Cancer 03:45 Institute, says there's poor internal validity which occurs when there are errors like selection bias, information bias, or confounding; you would agree?
A. I'm not sure what criteria they're using 03:45 to say the internal validity is poor. I mean, I've got -- that's their opinion.
Q. Okay. Does poor internal validity also mean that the results that are generated can't

apply to the sample population which they
represent?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yeah, so here's the issue. I
think when you go to the next page, it says 03:46
"Consistency: No other studies at this time." So
I'm not sure if they're basing this assessment of
the internal validity based on the fact that they
only had access to the Chang study. I mean, to me,
like, that's -- I would question everything about 03:46
that assessment because there's other studies that
have been published. They're not taking them into
consideration. So perhaps they haven't, you know,
analyzed that data yet. So I cannot opine about
what kind of criteria they're using for this 03:46
internal validity.
I can see how, if that was the only
study that was available, how they can say we don't
have a lot of validity right now, which I think
would be a fair statement. But I think once you 03:47
take into consideration the other epidemiological
studies that have been published, the Bertrand
study, the White study, I think that validity might
change.

BY MR. COSTELLO:

Q. I'm just asking you about the Sister Study right now. That's what the National Cancer Institute says about this specific study, true?

MS. O'CONNOR: Objection; form, foundation. 03:47

You can answer.

THE WITNESS: Right. But you're asking me to talk about only as if they're only talking about the Sister Study. Where like if you look at some of the other categories, when you look at study 03:47 design internal validity, they're saying good, but they're also saying, you know, there's prospective cohort and case control studies. So I don't think they are judging -- I'm not interpreting this as saying the Sister Study or the Chang study was 03:47 poor. I'm just saying at that point when they're reviewing this data they did not have a lot of epidemiological data to make that assessment. So I'm having a hard time agreeing with the premise of your question. 03:48

BY MR. COSTELLO:

Q. Would you agree that systematic bias tends to be worse because they impact the internal or external validity?

MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: You have to give me more context. Systematic bias, what kind of bias --
BY MR. COSTELLO:
Q. Nonsystematic bias is when differences that -- vary across populations equally and don't impact associations as much, true? 03:48
MS. O'CONNOR: Objection.
THE WITNESS: You have to give me some context here. Like, I think you're just asking bias question without referring to specific types of bias. 03:48
BY MR. COSTELLO:
Q. I'm just asking you generally if you agree with the statement. 03:48
A. I cannot agree to something without the context. Because, you know, you're asking questions, as far as I can tell, based on this source. And I think there's just a lot of inconsist -- like, you're asking about validity -- 03:48
Q. I'm just asking you generally.
A. Well, I think you have to give me more context.
Q. Do you agree with the statement that

systematic bias, especially selection bias, drives the estimate toward the null or can cause an overestimation? Do you agree with that; yes or no?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I'm not going to answer that in, 03:49
again, a general statement. I'm happy to -- if you have specific studies that we want to talk about, like if you want to talk about the Chang study, we can sit here and discuss whether or not there's selection bias or not. But I'm not going to answer 03:49
a general statement without --

BY MR. COSTELLO:

Q. So you can't answer that question yes or no?

A. I'm not going to answer that question 03:49
without a frame of reference.

Q. For consistency, as we have here in Exhibit No. 13, it says "No other studies at this time," and it states external validity is poor. Do you see that? 03:49

A. Yes.

Q. External validity means that the data can't be extrapolated from one study and applied to everyone outside the study population, true?

MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Again, I'm not sure the kind of criteria that they're using to make the determinations. For some of these other factors that they talk about, you know, for example, for 03:50 the fruits, vegetables, and vitamins, they're using case control studies and cohort studies and they're saying good internal validity, good external validity. Case control studies, in my understanding of epidemiology, are not as high 03:50 quality as a prospective cohort study.
So I'm just not sure how they are making that determination. And, again, this is somewhat outdated because of the fact that they are not considering the Bertrand study, the White 03:50 study. So whether or not -- if they had considered that, whether that would have changed their validity, I can't tell. But that's, like, their opinion.
BY MR. COSTELLO: 03:50
Q. What I'm asking you about in 13 all applies to the Chang study, true?
MS. O'CONNOR: Objection.
THE WITNESS: In this document, when they're

talking about this category, they're talking about the Chang study. That's what they're referencing.
BY MR. COSTELLO:
Q. And I know you mentioned just a moment ago there -- if we scrolled up on the same page, 03:51
there's intervention -- I'm sorry -- there's a fruits, vegetables, and vitamins, I think, that you just referenced. Do you see that?
A. Yes.
Q. And I think you mentioned in there they 03:51
have the study design cohort and case controls, and they have the validity is good, the consistency is good, and the validity is good, true?
A. Yes.
Q. And so they're rating another study 03:51
based upon internal validity and external validity inconsistency, correct?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Those are multiple studies. So this is not just one study that they're talking 03:51
about. So that reference, there's five studies, I believe, that they're referencing, 31 to 35. I don't know what those studies are. I would have to read it to see if I would agree with their

assessment of the internal and external validity. That's what is stated here. This in no way, shape, or form would influence my opinions.

BY MR. COSTELLO:

Q. Do you know if this summary was an update in April of 2025? 03:52

MS. O'CONNOR: I can't tell.

THE WITNESS: Yeah, I'm not even sure when this page was printed. I'm not sure. I mean, obviously, whenever it was updated, they were not 03:52 including more recent -- like, the Bertrand paper, for example, which very much should be included in the hair products, dyes, bleach, highlights, straighteners, and permanents. So I'm not sure.

BY MR. COSTELLO: 03:52

Q. If we go to page 25 --

MS. O'CONNOR: Of the report or of the exhibit?

MR. COSTELLO: Same exhibit.

THE WITNESS: This doesn't have page numbers. 03:53 Sorry. Not to --

BY MR. COSTELLO:

Q. There's a section that says "Latest Updates to This Summary." I think the document, in

total, is maybe 28 pages. So it's near the end.
A. Okay.
Q. Okay. It says "Latest Updates to This Summary (4/20/2025)." Do you see that?
A. I see that. 03:54
Q. Does it surprise you this was updated as of 2025, April 2025?
A. No. Good. I'm glad they did.
Q. Okay. All right. We can move on. If we go to page 26 of the same document -- 03:54
A. Oh, sorry.
Q. -- it says the "Purpose of This Summary." "This PDQ cancer information summary for health professionals provides comprehensive, peer-reviewed, evidence-based information about 03:54 endometrial cancer prevention. It is intended as a resource to inform and assist clinicians in the care of their patients. It does not provide formal guidelines or recommendations for making health care decisions." 03:55
Do you see that?
A. That's after "Purpose", right? Yeah.
Q. Okay. Based upon your opinions in this case, have you submitted any comments to the board

telling them why you believe that their stance on the lack of a causative relationship is wrong?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: What board?
BY MR. COSTELLO: 03:55
Q. Submitting any comments to the society here, the American Cancer Society.
MS. O'CONNOR: Objection.
BY MR. COSTELLO:
Q. I'm sorry. The endometrial cancer 03:55 prevention -- let me -- I'll get it right here. The National Cancer Institute, have you submitted anything to them letting them know why you disagree with their conclusion?
MS. O'CONNOR: Objection; mischaracterizes the 03:56 document.
You can answer.
THE WITNESS: Have I submitted my opinion as to why I think this is wrong or -- no. To be honest, I don't even know -- I guess there's a link 03:56 down there that you can e-mail them.
BY MR. COSTELLO:
Q. But at this time, you haven't done so, true?

A. Well, I don't even know if that is something that you do. I mean, usually what these organizations do, they have a meeting with some experts that I -- I mean, they're not listed here. I assume they have different experts in epidemiology, cancer prevention, and they discuss the evidence and whether or not they feel the evidence amounts to a level that they should be reporting it. 03:56

The other thing, again, you know, they're talking about information about endometrial cancer prevention, which, as I mentioned earlier, I'm not -- for the purpose of this document and my analysis, my opinion, I talk about the mechanism or causation between chemical hair relaxers and uterine and endometrial cancer. But in my practice, I'm not dealing a lot with the cancer prevention part. So -- 03:56 03:57

Q. So that's not something that you would do as part of your clinical practice, true? 03:57

A. No. I mean, I think I discuss -- I certainly have discussion with some -- in the right context and in the right patients. So I do see a lot of patients with Lynch syndrome or with BRCA

mutation that are at increased risk. In that way, like, I'm thinking of myself as preventing, so I'm counseling. So I still do cancer prevention.

Q. Right. And I guess I'm asking in regards to your clinical practice, this is not something that you would do, which would be to go and submit comments to the website indicating why you think they were wrong, true? 03:57

A. I don't think this is something that I, yeah, have done or that I would do as part of my clinical practice. 03:57

Q. We can go back to your report now, which is Exhibit No. 4. I want to turn your attention to page 32 of your report. I believe -- I'll give you a chance to catch up. I believe it's titled "Ovarian Cancer Staging." 03:58

A. Yeah.

Q. So that's the heading. I wanted to --

MS. O'CONNOR: We're going to get on to ovarian cancer now? Natural breaking point? 03:58

MR. COSTELLO: Sure.

MS. O'CONNOR: Okay.

THE VIDEOGRAPHER: Off the record at 3:58.

(Short recess.)

THE VIDEOGRAPHER: Back on the record at 4:17.
BY MR. COSTELLO:
Q. Okay. Doctor, before we went off the record I was referring you back to Exhibit 4, which is your report. And I think it begins on 04:17 Section 7, which is page 32, which starts the section about ovarian cancer risk. Do you see that in your report?
A. Yes.
Q. Okay. I want to just skip ahead just a 04:17 bit under that section to page 33, which is at the very bottom. You reference at the very bottom, "In addition, a study by White, et al., in 2021 (discussed further below) found the frequent use of hair straighteners/relaxers or pressing products 04:18 (defined as less than four times a year) was significantly associated with increased risk of ovarian cancer (HR 2.19)."
That's the health risk?
A. That's hazard ratio. 04:18
Q. I'm sorry. Hazard ratio. 95 percent CI, that's the confidence interval?
A. Correct.
Q. 1.12 to 4.27. "This association was

particularly strong for nonserous ovarian cancer where frequent usage was linked to a substantially higher risk." And then you have HR 4.35, 95 percent for the confidence interval, and 1.10 to 17.2 listed in that section. And then you have a Footnote 75. 04:19

Do you see that?

A. Yes.

MS. O'CONNOR: Dan, I'm sorry. I just have to point out a misstatement. When you talked about the frequency of use in the first sentence, you said "less than." It's actually greater than four times of year. 04:19

MR. COSTELLO: All right. It's always the wrong side of the alligator. 04:19

BY MR. COSTELLO:

Q. Greater than four times a year?

A. Yes. Sorry, I missed that.

MR. COSTELLO: I want to show you Exhibit 14 now. Give me one second to pull it up. 04:19

(Roque Deposition Exhibit 14 was marked for identification.)

BY MR. COSTELLO:

Q. Exhibit 14 is the White original article

in regards to the use of hair products in relation to ovarian cancer risk; would you agree?
A. Yes.
Q. And you relied upon the Sister Study in formulating your opinions? 04:20
A. Yes, which is the study based on which this paper was -- where this paper was -- the data came from.
Q. If we go to page 2 at the bottom of the White paper, there's a results section on the 04:21
bottom right-hand corner. Do you see that?
A. Yep.
Q. There's a long section here on the results. It says "With an average of ten years of follow-up, 241 women were diagnosed with ovarian 04:21
cancer. On average, at baseline, women went on to develop" -- "women who went on to develop ovarian cancer were older, more likely to be non-Hispanic white, have lower education attainment, and have a higher BMI than women in the full cohort." 04:21
Do you see that?
A. Yes.
Q. And there's a table associated with that?

A. Mm-hmm, yes.
Q. Okay. It says "In addition, women with ovarian cancer were more likely to be postmenopausal, have common hormone therapy, and to have undergone a hysterectomy (with retention of one or both ovaries) compared to the full cohort." 04:22
Do you see that?
A. Yes.
Q. And then it says "Overall, we observed little to no increase in risk of ovarian cancer associated with ever use in the past 12 months of most hair products." And it continues on the bottom of page 4. 04:22
Do you see that?
A. I see that. 04:22
Q. And the frequency of use data was for one 12-month period, true?
MS. O'CONNOR: Objection.
THE WITNESS: I'm sorry. What's the question?
BY MR. COSTELLO: 04:23
Q. Sure. If we look at this, it specifically said that -- if we look at the bottom of page 3 and I think it was on the left-hand side and page 2, that this was a frequency of use of

permanent over the -- strike that -- this was a frequency of use over a period of the previous 12 months, true?

A. It said with ever use in the past 12 months, which is essentially when the data was collected. So the questionnaire was asking about previous 12 months. So there's no -- I mean, just say whether they used a product or not. But I'm not sure I understand your question. 04:23

Q. Based upon the study itself, can you tell the frequency of use over the course of an individual's entire lifetime? 04:23

MS. O'CONNOR: Object to the form.

THE WITNESS: Well, I think the entire lifetime is difficult because they were not asking, you know, these women to say how frequently they were using it when they were 15 or 12. But in general, the reason this is such a well-designed study is because they're actually asking within the last 12 months, which is a very short period of time. So that is a very good proxy. I mean, it's not perfect, but it is a very good proxy for lifetime use. So I think that's appropriate. 04:24 04:24

BY MR. COSTELLO:
Q. Okay. You would agree with me that use could change over somebody's lifetime? They could use it not at all in 12 months and then resume it later on or vice versa. They could use it for a 12-month period and never again in their lifetime? 04:24
A. It's always possible that some people may decide to discontinue using the product, but it's also very possible that some people may start using the product. And I think that touches on what we have talked about and I address in my report, this idea of misclassification bias. But, sure, it's very possible that because of the way that the questionnaire was administered and when the data was collected that some of the people that were on the exposed group could have been nonexposed if the questionnaire was done a year earlier, for example; and some of the people in the nonexposed group would have been exposed the same way, like, if they were using hair products ten years ago but were not using it now. 04:25 04:25 04:25
So that's just an issue of misclassification, but the authors try their best to deal with that. And the 12-month period, just

asking over the last 12 months, I think that's a very good way to minimize some of the bias of recalling, and I think, in general, it's a very good proxy for lifetime use.

Q. So just for the purposes of my question, 04:25
I'm only asking you in regards to Exhibit 14. So in regards to Exhibit 14, which is the White paper, you are not able to tell the dose exposure based upon the information contained in the paper, true?

MS. O'CONNOR: Object to the form. 04:26

THE WITNESS: I mean, they were not measuring doe exposure. They were measuring frequency of -- they were asking about frequency of use. So I don't believe -- as far as I'm aware, I don't believe this study was looking at all at dose or 04:26
measuring that in any way, shape, or form.

BY MR. COSTELLO:

Q. Right. And so there's no way to tell what the dose exposure was based upon the paper itself, Exhibit 14, true? 04:26

MS. O'CONNOR: Objection.

THE WITNESS: I mean, I think the way that they were getting around that is an epidemiological study. So in the design itself, they were going

through the database. And the way that they deal with the dose is by asking -- dividing it by less than four times a year, more than four times a year. And certainly they went back -- so they're using that data as a measure of exposure. So 04:26 certainly people that are using it more than four times a year, just because of the nature of these products, as we discussed earlier, that they can be absorbed, it is a very reasonable way to determine that dose exposure. So in my mind, yes, that is a 04:27 way to -- that is a proxy for dose exposure.

BY MR. COSTELLO:

Q. Dose exposure is differently defined than just frequency of use, true?

MS. O'CONNOR: Objection. 04:27

THE WITNESS: Yes. That exposure by the mere nature of these products that are being absorbed through the skin of the scalp, the more you're exposed, there is data to show that these chemicals are being absorbed in the body. And certainly the 04:27 more you're using it, it's very -- it comes to reason and I think it's very -- I would expect that there's higher doses of the products being absorbed over time in someone that's only using it once a

year versus someone that's using it four, certainly someone that's using it six times a year.

BY MR. COSTELLO:

Q. Specifically, what is the dose exposure data that you were able to extract from the White paper, specific amounts? 04:28

MS. O'CONNOR: Objection.

THE WITNESS: Again, I did not measure any specific amounts. They just did that assessment based on the frequency of use in the 12 months prior to baseline, which is what they collected on the questionnaire. So they divided it between never users, they also had women that used it less than four times a year, and women that used it more than four times a year. And greater than four times a year, I mean, like some people may have been using it eight times. So -- 04:28 04:28

BY MR. COSTELLO:

Q. So you're referring to the frequency of use, true? 04:28

A. As a proxy for, yeah, the dose exposure.

Q. Is it fair to say that, based upon the White study, that the positive association was also limited to nonserous?

MS. O'CONNOR: Objection.
THE WITNESS: I don't think that's fair. I mean, I think the main finding of the study when it comes to all-comers or all the endometrial -- sorry -- all the ovarian cancers, you know, here the article said "We did observe" -- and this is page 1191, that paragraph we were talking about just below Table 2 -- the author said "We did observe an imprecise but positive association between ever use of straighteners and incident ovarian cancer." 04:29 04:29
So what they're saying is there was an association between ever exposure and then an incidence of ovarian cancer. So certainly they did this subanalysis, which I think from my perspective as a GYN oncologist and based on my knowledge of the different subtypes of ovarian cancer, I find that finding of a significant -- or, like, a hazard ratio of 4.2, I believe it is, the nonserous -- I find that very compelling because, in my experience, those are tumors that are usually endometrioid clear cell which tend to arise in endometriosis. Endometriosis is very similar and often we consider almost endometrial tissue, so the 04:29 04:30

tissue from inside the uterus that is growing outside of the uterus.

So I find that very compelling. Granted, that is a very small of patients in the White study, so it is somewhat imprecise because of that. Like, you know, the confidence intervals are very wide. But the fact that that is a four-times-higher hazard ratio, I think that's very compelling. 04:30

BY MR. COSTELLO: 04:30

Q. And the fact that there's a large confidence interval may question the power of the study itself, true?

MS. O'CONNOR: Objection.

THE WITNESS: So you're talking now about -- are you talking about all the ovarian cancer patients or the nonserous -- 04:30

BY MR. COSTELLO:

Q. I'm just following up on the last answer that you gave. 04:31

A. Well, the wide confidence intervals, in that scenario, in that case I was referring to the nonserous histological subtype. So the reason those confidence intervals are wide is because

there was a very small number of patients that met that criteria for nonserous histological subtypes.

Q. Just yes or no on this. Would you agree that you're unable to state an opinion to a reasonable degree of medical certainty as to the causal link, not association, but the causal link between chemical hair relaxers and serous forms of ovarian cancer? 04:31

MS. O'CONNOR: Object to the form and foundation. 04:31

BY MR. COSTELLO:

Q. Just yes or no.

MS. O'CONNOR: Objection.

THE WITNESS: Yeah, like, I'm not -- my analysis, my conclusion, it's not purely based on just the White paper or the paper by White. This very much forms the foundation of my opinion, but I relied upon a lot of other evidence that I weighed very heavily, I analyzed before I came to that conclusion. So for me to answer that question, you know, looking at Exhibit No. 14, I think that is just not the type of process that I followed to arrive at my conclusion that there is a causal association between exposure to chemical hair 04:31 04:32

relaxers and ovarian cancer.
BY MR. COSTELLO:
Q. You would agree that causation and association are separate and distinct concepts under the science, true? 04:32
MS. O'CONNOR: Objection; asked and answered.
You can answer again.
THE WITNESS: So --
BY MR. COSTELLO:
Q. Yes or no? 04:32
A. Well, I'm not --
MS. O'CONNOR: Objection.
THE WITNESS: You know, it's all about the context in the previous question. So I already answered that question. You're asking me 04:32 specifically as we're discussing this paper. So I do have to say that for me to go from association to causation, that was just not purely based on the White paper. I relied on the weight of the evidence, the totality of the evidence, my 04:33 understanding of the chemicals in chemical hair relaxers, how those chemicals act on the human body, and how they can be -- how they can lead to cancer; in this case, ovarian cancer. And not only

ovarian cancer. Gynecologic cancers in general. We do have two other papers that were also part of my analysis that relate to uterine cancer.

BY MR. COSTELLO:

Q. I'm just asking you a specific question, and it feels like you're filibustering me. Can you answer the question yes or no? 04:33

A. What was the question?

(Record read as requested.)

THE WITNESS: As terms in talking outside of the context of this, association does not always equal causation. That is a whole process that we have to undertake in order to arrive at that conclusion. 04:33

BY MR. COSTELLO: 04:34

Q. If we look at Table 5 from the White study -- or the White paper -- I'm sorry -- I think it's your report that references "The associations estimated for ever or frequent use of hair products tended to be higher for African-American/Black women than for non-Hispanic white women." And then we look at the table here. Table 5, specifically among African-American women, HR were elevated for frequent use of semi-permanent hair dye, e.g., 04:34

frequent versus never semi-permanent hair dye. And we have HR of 3.06, and we have a confidence interval of 1.08 to 8.63.

You would agree that semi-permanent hair dye does not fall into the category of hair straighteners, true? 04:35

A. Yeah, that's correct. Those are not hair straighteners.

Q. And yet we see an increase in the health risk based upon the White study, true -- or the White paper, true? Semi-permanent hair dye in Table 5. 04:35

A. There's an increased hazard ratio. Okay.

Q. If we look at the ever use of straighteners from the table, the hazard ratio is 1.28, correct? 04:35

A. For -- can you be a little more precise.

Q. Sure. Straighteners/relaxers.

A. Yep. 04:36

Q. African-Americans.

A. Ever versus --

Q. Ever versus non-ever use. Do you see what I'm talking about?

A. Yep.
Q. That's a lower hazard ratio than for semi-permanent hair dye itself, true?
A. Yes.
Q. And if we look at hair permanents and body under the same table for White and we go to African-Americans, we have -- this is under hair permanents or body -- you'd agree hair permanents are not what we're talking about here as far as chemical hair straighteners, true? 04:36 04:36
MS. O'CONNOR: Well, objection. Objection to form and foundation.
THE WITNESS: I mean, to be honest, it's obviously classified differently. I'm not really that familiar with hair permanents. So -- but, yeah, they're classified under a different category as the straighteners/relaxers. 04:36
BY MR. COSTELLO:
Q. You anticipated my next question. They're separated out from hair straighteners and relaxers, true? 04:37
A. Yes.
Q. Okay. And if we look at that, the hazard ratio is 1.8, 95 percent confidence

interval, and it looks like it's between -- it looks like we have between .74 and 4.36. Do you see that?
A. Yep.
Q. Okay. That would also be higher for African-Americans or Blacks in this table than for straighteners and relaxers, true? 04:37
MS. O'CONNOR: Objection; form, foundation, relevance.
THE WITNESS: Yeah, it's higher. 04:37
BY MR. COSTELLO:
Q. Okay. Sorry. I'm just -- there's just one specific quote, my notes don't match up. I'm just trying to make sure I find it here so I can refer you to it. 04:38
A. Take your time.
Q. Okay. I found it. It's on page 4. It's the, I guess, first full paragraph underneath that large table. And there's a bunch of footnotes there; 9, 10, 19, 20. It's the sentence following that. 04:39
A. Sorry. Page 4, but this -- is it page 1192?
Q. Give me one second.

A. I want to make sure since there's no "4" there.
Q. Yes, it's 1192.
A. Okay.
Q. So it's the last full sentence of that second paragraph where it begins "To the best of our knowledge, there have been no previous studies considering how hair straighteners are associated with the incidence of ovarian cancer or any other cancer types, aside from breast cancer." 04:39 04:39
Do you see that?
A. I see that sentence.
Q. Okay. You would agree that there's been no study since the time the White paper was written, true? 04:39
A. About --
MS. O'CONNOR: Objection; form.
THE WITNESS: Yeah. About ovarian cancer? What's -- can you clarify the question.
BY MR. COSTELLO: 04:40
Q. Sure. Specifically, since the time that this White paper was written, you're not aware of any other studies considering hair straighteners and their association with the incidence of ovarian

cancer or any other cancer types outside of breast cancer, true?

MS. O'CONNOR: Objection; form.

THE WITNESS: I don't agree with that statement. I mean, I think I -- 04:40

BY MR. COSTELLO:

Q. Tell me what studies you're aware of.

A. I mean, we talked about -- what was it, Bailey? -- the one for thyroid cancer and pancreatic cancer. 04:40

Q. I just want your testimony, not the attorney's.

A. No, I have it here. I was just trying to make it quicker to find it. But I --

MS. O'CONNOR: Take your time. Find it. 04:40

THE WITNESS: Yeah. Yeah, so Bailey. So it's Reference 105 --

BY MR. COSTELLO:

Q. What's the date of that?

A. In my report. So that is 04:40 September 30th, 2025. Published online September 30th, 2025.

Q. And do they include data as part of a study that would be -- that you would be able to

reference?

MS. O'CONNOR: Objection.

THE WITNESS: So I believe this is also data from the Sister Study.

BY MR. COSTELLO: 04:41

Q. Right. And so that is relying upon the Sister Study data itself, true?

A. That's my understanding.

Q. Are you aware that the Sister Study included other straighteners other than chemical 04:41 hair relaxers, including hot irons, hot combs, Brazilian Blowouts, and not just chemical hair straighteners?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Yeah. I mean, I'm aware that is 04:41 one of the criticisms because they included those participants or may have included those participants. I don't think there's any way to know for sure.

BY MR. COSTELLO: 04:41

Q. And you can't tell from the study if the women only used a chemical hair straightener versus any other form of straightener in that 12-month period, true?

MS. O'CONNOR: Objection.
You can answer.
THE WITNESS: That's accurate. But, you know, we were talking about it earlier, this idea of misclassification bias. And that would be 04:42
considered like a nondifferential misclassification, which, in general, as far as I'm aware within the world of epidemiology, that type of misclassification tends to bias the result towards null. 04:42
BY MR. COSTELLO:
Q. I want to refer you -- we're still on page -- I'm sorry. We're still on Exhibit 14, which is the White paper, page 4. If you look in the top right-hand corner of page 4, right after 04:42
Footnote 39 [sic], it starts with "future research."
Do you see that?
A. Sorry. So you said page 4 again, but it's 1192. So is that the same page we're -- 04:43
Q. It's the same page that we were on.
A. And then under Footnote 29, "future," yes. Okay.
Q. Actually, I'm going to go up just a

little bit. It says -- if we look at the bottom, I guess it's after Footnote 26 through 28, it says "In our study, the estimated associations between frequent straightener/relaxer use and ovarian cancer risk did not appear to substantially differ by race or ethnicity. However, because ovarian cancer is rare, we had very limited power to detect any differences. Although the observed associations did not significantly vary by race or ethnicity, given the higher" -- "the much higher prevalence of the use of these products, the impact of these results is more relevant for the African-American woman." 04:43 04:44

And then it goes on: "Future research is needed in larger and more diverse populations with greater representation of racial and ethnic minorities to evaluate how hair straighteners or other products can be used by particular racial or ethnic groups might contribute to ovarian cancer risk and survival." 04:44 04:44

Do you see that?

A. Yes.

Q. Okay. You would agree that the Sister Study itself was predominantly white women,

approximately 83 percent of the Sister Study was women who were white non-Hispanic?

A. You said 83 percent, so I just want to make sure. So non-Hispanic white, at least on this Table 1, it says 84 percent. 04:45

Q. Okay. I think I rounded down, but it's 83.8 percent?

A. I'd have to go back. I mean, on the table it says 84 percent. So...

Q. Got it. And so earlier when I asked you 04:45 about White, you would agree with me that as it appears on page 1192, which is Exhibit 14, the author has indicated that future research is needed in larger and more diverse populations with greater representation of racial and ethnic minorities to 04:45 evaluate how hair straighteners or other products used by particular racial or ethnic groups might contribute to ovarian cancer and survival, true?

A. That's the author's statement there. Are you asking me a question or... 04:45

Q. That's what the authors say there, true?

A. Yes.

Q. If we go to 1195 on the same document, which is page 7, left column, first full paragraph,

"In this large US prospective cohort, we provide the first evidence of a possible relationship between frequent adult use of straightener/relaxers or pressing products and ovarian cancer risk. In addition, we observed that permanent hair dye use 04:46 may be associated with ovarian cancer risk differentially by histological type. Given the novelty of these findings, more research is needed to confirm our results and identify constituents of these products that may be driving risk. It is 04:46 particularly important for future studies to be conducted in racially/ethnically diverse populations and inclusive of a wider variety of hair care products to help us better understand the role in determining ovarian cancer risk among 04:47 women."

Do you see that?

A. Yes.

Q. Yes or no; have you ever authored -- strike that. 04:47

Yes or no; have you ever offered an opinion that a causal link exists when the authors of the finding you rely upon, in part, describe the findings as novel?

MS. O'CONNOR: Objection to form.
THE WITNESS: I mean, I -- other than this opinion and this litigation, I have not offered any other causal opinions in any other settings.
BY MR. COSTELLO: 04:47
Q. You would agree that, based upon Exhibit No. 14, that those authors, based upon what we just read, the novelty, that they did not opine that a causal link exists between chemical hair relaxers and ovarian cancers based upon the White study, 04:48 true?
A. I mean, I think they're raising a huge -- it's a big red flag. And I think -- I'm all for more research. I mean, this is how the science evolves. But that doesn't mean that we 04:48 need to ignore the data that we have currently available, especially for something like this. I take care of these women. This is the deadliest cancer -- gynecologic cancer that we see. It's not that common, but the majority of these women are 04:48 going to die.
So if this is one of the risk factors and after all of the analysis that I've done, I believe that this is very much a causal risk for

many of these women with ovarian cancer, I'm not going to wait 10, 20 years like they did with cigarette smoking to say, well, you know, now we figure out that this is actually a cause. So, yes, I think they're performing more research, which I think is great, I think it's important, but I'm not going to ignore the current evidence that we have today. 04:49

Q. Right. Didn't answer my question at all. You would agree that the authors of this study, White, I just read you their specific findings, that they did not opine that there's a causal link that exists between chemical hair relaxers and ovarian cancers based upon the White study, true? 04:49 04:49

MS. O'CONNOR: Objection to the form and the colloquy preceding the question.

You can answer.

THE WITNESS: Same answer that I gave. I don't think these authors were going necessarily after causality. This is an epidemiological study. I think they identified a very, very significant risk that, based on my research, my analysis, analyzing the totality of the evidence, it's very 04:49

much a causal risk factor.
BY MR. COSTELLO:
Q. They didn't use the word "causal" in the White study, true?
A. I mean, I'll have to look -- - read the whole thing. I don't know if they used the word anywhere, but I don't see it on the paragraph. 04:49
Q. Right. And we didn't go -- when we read through the findings, we didn't hear the word "causal" either, did we? 04:50
MS. O'CONNOR: Objection. Didn't read the whole study. Objection; form, foundation.
THE WITNESS: Yeah, we didn't go through the whole study to see if that word was used.
BY MR. COSTELLO: 04:50
Q. Let's go back to your report, Exhibit 4, page 34. If we look under I believe it's Section 9, there's a paragraph that starts "Other chemicals reported to be present in hair straightening products include formaldehyde" -- I think it's "cyclosiloxanes, parabens, sodium hydroxide, diethanolamine, phthalates, and benzophenone." I know I probably mispronounced some of those. But that is cited specifically in 04:50

your report, that paragraph?
A. That's a question?
Q. Yes.
A. Yes.
Q. And then you reference they tested for 66 chemicals belonging to ten chemical classes, i.e., ultraviolet, UV, filters. And then you list a whole host of things here, including the cyclosiloxanes that I keep mispronouncing, glycol ethers, fragrances, alkylphenols, ethanolamines, antimicrobials, bisphenol A, phthalates, and parabens. 04:51 04:51
Do you see that?
A. Yes.
MR. COSTELLO: Okay. 04:52
(Roque Deposition Exhibit 15 was marked for identification.)
BY MR. COSTELLO:
Q. So I want to refer you because I believe you're referencing at the end of that paragraph Footnote 78. Do you see that? 04:52
A. Yep.
Q. Okay. So if we go -- Exhibit 15 is the article that you reference, true?

MS. O'CONNOR: Objection.
THE WITNESS: Let me see.
BY MR. COSTELLO:
Q. The "Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black men [sic]." 04:53
Do you see that?
A. Do you want to rephrase the question? You said "Black men."
Q. I'm sorry. Black women. 04:53
A. Yes.
Q. This was Footnote 78 to your report, true?
A. That's accurate, yeah.
Q. You would agree with me that this article deals with not just EDCs but also asthma-associated chemicals, true? 04:53
MS. O'CONNOR: Okay. I'm just going to, for the record -- is this the published version?
MS. CASTRONUOVA: This is not published. 04:53
MS. O'CONNOR: Not published?
MS. CASTRONUOVA: No.
MS. O'CONNOR: Just for the record, the version of the Helm 2018, which is listed as 78,

the version you've given us is an article in press. It doesn't have the final publication date on it. I just -- over my objection -- and I'm only assuming that it's fairly close, but you really should be presenting the witness with the final published version, as it is referenced in his report. 04:54

MR. COSTELLO: And I thought that we were. So...

MS. O'CONNOR: Just carefully review it. Okay. Take each question as it comes. 04:54

BY MR. COSTELLO:

Q. Do you know if there's anything different from this version versus the published version? I'm just asking a threshold question. 04:54

A. I mean, it's possible. There's -- sometimes articles change from the in press to the final version. I mean, I would have to look at the final version to know. But --

Q. If we look at the bottom -- and maybe this is -- I'm not going to want to get into the weeds over this, but it does say "Accepted 18th of March 2018." Do you know if that's different from what you relied on? 04:54

A. Well, but, again, accepted -- we have to understand the peer review and publication process. Because "accepted" just means that the work was accepted, but then it goes through a lot of editorial, you know, formatting; like, tables may change. Just the fact that it was accepted doesn't mean that the article in press, it's going to be the same as the final article. So it probably is very similar if not identical, but I don't know. 04:55
Q. And if we look at page 2 where it goes through the methods, there's a product selection there. Do you see that? 04:55
A. Yes.
Q. And it says "We tested 18 products in six hair product categories: hot oil treatment, anti-frizz/polish, leave-in conditioner, root stimulator, hair lotion, and relaxer." 04:55
Do you see that?
A. Yes.
Q. And then if we go down, it says -- the sentence begins "These product types are most often used one to seven times per week, while hair relaxers are used several times a year to permanently straighten hair." 04:56

Do you see that?

A. Yes.

Q. I want to refer you to page 4 of this document. I think we are on page 2 right now. Okay. At the top of page 4 it says "Most of the products comprised one material; however, hair relaxer kits comprised several component materials to be used in sequence. We tested kit components from three hair relaxer kits (1, 2, and 3). Kits 1 and 2 were" -- I'm sorry -- "Kits 1 and 3 were no-lye formations [sic] marketed to children. Each hair relaxer kit contained relaxer cream, activation [sic], shampoo, and conditioner. Relaxer Kit No. 1 also contained a protective gel, pre-relaxer treatment, and hair lotion. Relaxer No. 3 contained a second conditioning product." 04:57 04:57 04:57

That's what it says?

A. Yes. I will clarify. You said "formations" instead of "formulations." But otherwise, yes. 04:58

Q. Okay. If we go to Figure 2, which is on page 6, I believe, you're able to review that, page 6?

A. Yep. Yes.

Q. So there's a total of only three kits that were tested, true?

MS. O'CONNOR: Objection; form.

THE WITNESS: Well, three hair relaxer products. Is that what you're saying, three -- 04:59

BY MR. COSTELLO:

Q. It says Kits 1, 2, and 3, true?

A. It says Relaxer No. 1, No. 2, and No. 3.

Q. Do you know if Pro-Line and Colomer are defendants in this case? 04:59

A. I wouldn't be able to tell you off the top of my head.

Q. Okay. Do you know if Luster is a defendant in this case?

A. You know, I don't know, like, all 04:59 defendants off the top of my head. I know that there's a large list.

Q. If we look at the -- see supplemental material on page 2, it indicates that Relaxer No. 3 is Luster. Do you have any reason to disagree with 05:00 that?

A. So you want me to look at supplemental number 3? Is that what you're saying?

Q. Supplemental material.

A. Well, you didn't provide any supplemental material. So I'm not sure.

MR. COSTELLO: It's the next exhibit?

MR. TURIELLO: Yeah.

(Roque Deposition Exhibit 16 was marked for identification.) 05:00

BY MR. COSTELLO:

Q. Sorry. I thought it was in that one. I believe it's Exhibit 16, which you've been handed. Okay. If we go to page 2, I'm at the bottom of 05:00 page 2, it says Hair Relaxer No. 3, Luster Products.

Do you see that?

A. Yes.

Q. Okay. You don't have any reason to 05:01 disagree that Luster is the product that's at issue here in Hair Relaxer No. 3, do you?

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I mean, that's what is listed here as the hair relaxer brand, yes. 05:01

BY MR. COSTELLO:

Q. You would agree that the Luster product that's Kit No. 3, the relaxer and activator actually contain no EDCs, true?

MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I have to refer to, you know, this other figure that we were talking about earlier. Which portion of that product are we talking about? 05:02
BY MR. COSTELLO:
Q. The relaxer and the activator actually contain no EDCs?
MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: I don't -- are there specific 05:02 EDCs you're referring to, like, any -- I mean, there's many EDCs. So is there --
BY MR. COSTELLO:
Q. Can you name any EDCs that are contained in the relaxer or activator? 05:03
A. What are the EDCs? You know, which ones are we talking about, EDCs? I want to make sure we're, like, on the same page. So are there specific ones that you want me to discuss whether they were present or not? I'm happy to do that. 05:03
Q. Let me be specific. If we go back to the -- I don't know which document you're on. You're on this one?
A. Yep.

Q. Okay. So if we go down to the bottom --
MS. DEBROSSE: You may want to indicate which one you're talking about for the record.
MR. COSTELLO: I will. Don't worry.
MS. O'CONNOR: There's more than one table. 05:03
MR. COSTELLO: I'm getting there.
BY MR. COSTELLO:
Q. Exhibit 15, that's the one you're looking at, page 6?
A. Yes. 05:03
Q. And we're looking at Figure No. 2?
A. Okay.
Q. Is that right? That's what you're looking at?
A. That's where I am right now. 05:03
Q. Okay. If we look at the bottom three, for Relaxer No. 3, bisphenol A does not show the presence of that in Relaxer No. 3, true?
A. I don't see --
Q. In the relaxer or activator, if you look 05:04 at the chart.
A. Yeah, I don't see that listed here.
Q. Phthalates are not in the relaxer, cream, or activator for Relaxer No. 3, true?

A. They are not in the relaxing cream or activator.

Q. Parabens are not in the relaxing cream or activator for Relaxer No. 3, which is Luster, true? 05:04

MS. O'CONNOR: Objection.

THE WITNESS: Parabens. Let me see here. Yeah, I don't see it on the cream or the activator.

BY MR. COSTELLO:

Q. Okay. So this study tells you nothing about the chemical makeup of the hair relaxers other than the three that were bought in Boston in 2008, correct? 05:04

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: Can you repeat the question. 05:04

BY MR. COSTELLO:

Q. Sure. We're talking about three kits here, right?

A. Yes.

Q. So this study doesn't tell you anything about the chemical makeup of hair relaxers systemwide other than the three that were tested in Boston in 2008 that's the basis of this paper, true? 05:04

MS. O'CONNOR: Objection; form, foundation.
THE WITNESS: Yeah. This paper, it only talks -- they only measures chemicals in these hair relaxers. I don't have reason to believe that a lot of these chemicals aren't present in other brands. I mean, all of these products work the same way. They're, like, alkaline, high pH. They break disulfide bonds. So in order to do that, I think they have to have very similar chemicals present. 05:05 05:05
BY MR. COSTELLO:
Q. But you haven't done your own analysis of specific products to find out what EDCs are there, true?
MS. O'CONNOR: Objection; form, foundation. 05:05
THE WITNESS: I mean, I have not done my --
MS. O'CONNOR: What do you mean by "your own analysis." Objection. Stop. What do you mean by his own analysis?
BY MR. COSTELLO: 05:05
Q. You did not conduct -- you did not go out and purchase products, test them to find out if there were EDCs that were present similar to Exhibit 15, true?

MS. O'CONNOR: Thank you for the clarification.
You can answer.
THE WITNESS: Sorry. No, I did not do that kind of analysis. 05:05
BY MR. COSTELLO:
Q. Okay. And so you wouldn't have independent data to contradict what's shown in Figure 2 of Exhibit 15, true?
MS. O'CONNOR: Objection. 05:06
BY MR. COSTELLO:
Q. As to specific products and the concentrations of bisphenol A, phthalates, or parabens, true?
A. I don't have any data other than this for that purpose. 05:06
Q. And this Exhibit 15, the measurement of endocrine-disrupting and asthma-associated chemicals in hair products used by Black women, it doesn't tell you anything about the chemical composition historically, whether it's changed from the 1960s to present or not, true? 05:06
MS. O'CONNOR: Objection.
You can answer.

THE WITNESS: I mean, it doesn't tell me that. I think it just -- what is very consistent is there are some chemical classes that are consistently used within the kit. So, I mean, if you want to separate the different components of the kit, that's fine. But all of these kits contain chemicals or concern, namely, these EDCs. Based on the way that these products work, I don't see a reason why the formulation would have changed since, you know, they have to have these chemicals in order for them to do their intended -- what they're supposed to be doing. 05:06 05:07

BY MR. COSTELLO:

Q. Right. You did not conduct any research by purchasing the products, collecting data on your own so that you would be able to give us specific data as to the chemical composition of all chemical hair relaxers, true? 05:07

MS. O'CONNOR: Objection; form.

You can answer. 05:07

THE WITNESS: No, I didn't buy any of these products myself.

BY MR. COSTELLO:

Q. And you don't have sufficient data to

suggest that entire category of products has a causal link with uterine and ovarian cancer because you did not go out and purchase all of the products and test them, true?

MS. O'CONNOR: Objection; form, foundation, argumentative. 05:07

You can answer over my objection.

THE WITNESS: So as I mentioned before, there's no reason for me to believe that a lot of these chemicals, whether -- you know, there might be a difference of a couple here and there. But in terms of a lot of these chemicals, I have no reason to believe that the formulations of these products, given how they're used and what they are intended to accomplish, would be any different. 05:08 05:08

And, in fact, I mean, the manufacturer is -- one thing that I got from these papers, like, either the manufacturers either don't know what's in the products or it's not disclosed in there. Because there's a lot of chemicals that were identified here that the manufacturers who were actually making these products and making the ingredients and the labels are not disclosing. 05:08

BY MR. COSTELLO:
Q. You're just speculating on the fact that the products have remained the same and have the same chemical composition because you didn't conduct your own independent research on that as far as testing the products, true? 05:08
MS. O'CONNOR: Objection; form.
THE WITNESS: I'm not -- I'm going based on the fact that all these chemicals consistently, they have high pH, they are intended to work by breaking the disulfide bonds in the hair. Those disulfide bonds then get formed again after the hair gets straightened. And given these findings, I have no reason to believe that there are significant differences in the composition of these chemicals -- of these products. And I have no reason to believe that, as a group, hair relaxers don't contain EDCs. 05:09 05:09
BY MR. COSTELLO:
Q. Right. But you don't have a specific basis as far as the data sheets or chemical composition from the individual companies to be able to point to that you can show me the data where they're all the same, true? 05:09

MS. O'CONNOR: Objection; form, foundation, asked and answered.

THE WITNESS: So the issue here is, like, even if I had access to that I don't know if I would believe it. Because, you know, what this paper said and what it showed is many of the chemicals that are reported by the manufacturer and the label, in fact, is not even disclosed. So I'd love to look at the labels and, you know, the manufacturer list of ingredients, but I will be very skeptical about the accuracy of it because, as this paper showed, there was a lot of chemicals that were not, you know, disclosed or mentioned in the product label. 05:09 05:10

BY MR. COSTELLO: 05:10

Q. Do you think that the testing of three kits from 2008 is a sufficient basis to give a causal link to chemical hair straighteners and cancers?

MS. O'CONNOR: Objection. 05:10

BY MR. COSTELLO:

Q. Do you think that's a sufficient pool of data?

MS. O'CONNOR: Objection; mischaracterizes the

witness's opinions, his entire report. Objection.
Over my objection, you can answer.
THE WITNESS: So, again, you're trying to keep asking me about this basing my opinion on just one paper, one study. This was one paper that I used 05:10
in the context of the totality of the evidence that I analyzed. This paper is very concerning to me because of the fact that, as a group of products, there are many EDCs, carcinogens, in these products. Granted, you know, different 05:11
compositions, different concentrations, but consistently there were EDCs, consistently there were carcinogens. Because of the way that they're supposed to work, I see no reason why any other products on the market that are marketed with the 05:11
same goal would have any difference in the chemical composition.
So looking at that and looking at the totality of the evidence -- looking at the epidemiological data, how these EDCs impact the 05:11
endocrine system, how they can have an effect on the ovary, the uterus, when I looked at that, the totality --

BY MR. COSTELLO:
Q. Let me follow up because I think you're --
MS. O'CONNOR: Don't interrupt the witness.
MR. COSTELLO: He's not being responsive now. 05:11
MS. O'CONNOR: That's your opinion. Don't interrupt the witness.
MR. COSTELLO: He's covering ground that he went through --
MS. O'CONNOR: You have your remedies. You 05:11 have your remedies.
BY MR. COSTELLO:
Q. Okay. Are you finished?
MS. O'CONNOR: No, he wasn't finished.
THE WITNESS: I mean, I just wanted to make 05:12 sure that your characterization is that I'm using individual papers and findings to arrive at my conclusion, and there is nothing further from the truth. We have been talking about this since 9:00 a.m. this morning that my whole opinion and 05:12 conclusion is based on the totality of evidence, not only from the epi, but these cancer studies, as well.
MS. O'CONNOR: We're going to take a break.

MR. COSTELLO: Okay.
THE VIDEOGRAPHER: Off the record at 5:12.
(Short recess.)
THE VIDEOGRAPHER: Back on the record at 5:31.
BY MR. COSTELLO: 05:31
Q. Okay. I want to shift gears a little bit and just go through some questions for you. If you can do your best to just keep your answers brief.
When else have you done Bradford Hill 05:31 criteria analysis before, other than this case?
MS. O'CONNOR: Object to foundation and form.
THE WITNESS: So this is the first time that I've done that kind of analysis for the purpose of causality. 05:32
BY MR. COSTELLO:
Q. Okay. And how did you determine which of these factors were the important factors?
A. So I looked at the totality of the evidence, what was available to me. I think -- 05:32 and, you know, I want to make sure that I'm reading my report here. But I thought the strength of the evidence and the consistency of the association in terms of those two factors, I think it's very, very

important. And we -- from the epi evidence, I think we have strong and consistent association. So I weighted those guidelines or that frame -- you know, those two factors very heavily on my report.

The specificity, as I mention in my report, I didn't really put a lot of weight into that because of the fact that, as I mentioned previously, ovarian cancer, uterine cancer can be multifactorial. So that's not something that I put a lot of weight. 05:32 05:33

In terms of the temporal relationship of the association, I think it's very clear -- very clear from the epi studies that all of these women that were exposed prior to the diagnosis of uterine cancer and ovarian cancer. So I weigh that very heavily. 05:33

Q. Let me stop you there. As far as the Bradford Hill analysis itself, you would agree with me that before you conduct a Bradford Hill analysis you have to have a positive or a strength of association before you even get to that, true? 05:33

A. Yes, which I alluded to earlier. That was one of the factors that I considered quite heavily in my analysis.

Q. And in this case you would have had to apply the fact that there might have been inconsistencies among the Chang study and the Bertrand study as far as the strength of association? They were different in those two studies, true? 05:34

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: So there were -- I mean, where you're saying the difference in terms of the amount of the point estimate, I don't expect those studies 05:34 to be, necessarily, well aligned. To me, what's more significant is the fact that they both show a positive association, so, you know, a positive hazard ratio. So that, you know, it aligns with the rest of the evidence that I reviewed because of 05:34 the mechanism. But I think there is a strong association there. And the fact that there's two studies looking at uterine cancer in different patient populations and they both found that strong association, I think that's very meaningful. 05:35

BY MR. COSTELLO:

Q. As far as the Bertrand study, if it indicated that Black women who had use of over 20 years had a lower HR than those who used it less

frequency, would that be a cause for concern for you as far as the Bradford Hill analysis?

MS. O'CONNOR: Objection.

THE WITNESS: So it would be helpful to look at that. I know there's a table there. But, no, that would not be a cause for concern because the association, the positive association -- and I don't want to speculate here on the record. I want to look at the table -- but the association is positive for many of the different durations. And certainly it can be a little bit imprecise because some of those numbers are smaller for the number of women that were using it for less, you know, like one to four years versus 20 years. 05:35 05:35

But to me, the fact that use over 20 years had a very strong, you know -- like a strong association, like a positive hazard ratio, to me that's very significant. So I would not discount the fact that the women that were using it for less time -- there might be some, you know, inconsistencies there, but I don't think that's something that would influence my analysis. 05:36 05:36

BY MR. COSTELLO:

Q. Do you agree that there's a difference

between a risk factor and causal connection, true?

MS. O'CONNOR: Objection.

THE WITNESS: So we talked about this, I think, a little bit. Certainly, risk factors can be causal. But in order to arrive at that 05:36 causality for individual patients, I would need to look at the full history, the whole context, for me to make that distinction. For the purposes of my report, my conclusion, I looked at the totality of the evidence that is, you know, referenced in my 05:36 report in order to arrive at that causal association.

BY MR. COSTELLO:

Q. So you'd agree there is a difference between a risk factor and a causal connection, 05:37 true?

MS. O'CONNOR: Objection; form.

THE WITNESS: I mean, risk factors can be causal. That's --

BY MR. COSTELLO: 05:37

Q. So you don't see any distinction, then?

MS. O'CONNOR: Objection.

THE WITNESS: No, that's not what I'm saying. There's certain risk factors that are not

necessarily causal. For example, you know, a patient may have a genetic predisposition to ovarian cancer or uterine cancer, but many of those patients that have genetic predisposition never develop those cancers during their lifetime. 05:37

BY MR. COSTELLO:

Q. So there's a risk factor, but there isn't a causal connection because they don't necessarily develop cancer over their lifetime, true? 05:37

A. For that specific factor --

Q. Yes, for that specific example.

A. -- yeah.

Q. Okay. Have you done any research into the latency of uterine or ovarian cancer and how 05:37 long it takes to develop; yes or no?

MS. O'CONNOR: Objection.

MR. COSTELLO: I'll follow up if he says yes, but I just need a yes or no.

BY MR. COSTELLO: 05:38

Q. Have you done any research into the latency of uterine or ovarian cancer and how long it takes to develop?

A. No. But I know -- you know, I do a lot

of risk-reducing surgeries for women that are at increased risk. And I know there are, you know, some people say, well, these cancers take 20, 15 years to develop. And even in women who are at increased risk because of their genetic mutations, 05:38 it's fairly rare that we end up finding either precancer or cancer when we're doing the prophylactic risk-reducing surgeries.

BY MR. COSTELLO:

Q. Okay. So you haven't done any research 05:38 into that, then, true?

A. It's not something that I have done research, no.

Q. You didn't do any analysis on exposure necessity, true? 05:38

A. I'm sorry. Can you repeat that? Exposure...

Q. You didn't do any research -- you didn't do any analysis on exposure necessity, true?

MS. O'CONNOR: Objection; form, foundation. 05:38

THE WITNESS: I'm not familiar with that term. So I will say no.

BY MR. COSTELLO:

Q. Okay. Fair enough. Do you know how

many times you have to use the product in order for it to become a risk factor, chemical hair straighteners specifically?

MS. O'CONNOR: Objection. Let me hear the question. 05:39

BY MR. COSTELLO:

Q. Sure. How many times do you need to have used chemical hair straightener products in order for it to become a risk factor? Do you know how many times? 05:39

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I mean, it doesn't really -- certainly it's increased use, but it's the same question we were talking about earlier: you know, how obese do you have to be to develop endometrial 05:39 cancer or ovarian cancer? Lower BMI in the obese category you might develop endometrial cancer, but it's probably a little less likely than if your BMI was 50. But even in women who have a BMI of 50, many of them do not develop endometrial cancer. 05:39

So I don't think of this as any different. You know, some women may only use it twice a year, but it is the accumulation over time of being exposed to those chemicals. In some

instances, maybe, like, being exposed two, three, four times, maybe that's enough. But what we do know is these women are using it for years, many times since they're in their teens. And it is something that is, like, a factor that they're repeatedly being exposed to. 05:40

BY MR. COSTELLO:

Q. Okay. So you gave me a long answer there. Do you know a specific number, whether it be one time or a hundred times, that would be required for it to be a risk factor? 05:40

MS. O'CONNOR: Objection; form, foundation.

THE WITNESS: I mean, it's unlikely to be like one time, but I can see how depending on the amount that gets absorbed, maybe that's enough. Certainly the more you're exposed to it the more the risk increases. Again, we know of many chemical mixtures where that is the case. Again, I'll go back to cigarette smoking. One cigarette your whole life, probably not going to lead to cancer, versus if you're smoking 20-pack years, yeah, you're probably at higher risk. 05:40 05:40

BY MR. COSTELLO:

Q. Right. And we're not talking about

cigarettes in this case, true?
A. Well, that's accurate, but it's similar concept with the mixtures.
(Roque Deposition Exhibit 21 was marked for identification.) 05:41
BY MR. COSTELLO:
Q. I want to show you Exhibit No. 21. Do you have that in front of you?
A. Yes.
Q. Okay. Exhibit No. 21 is the Reference 05:41 57 from your report, true? If you need to check, you can. But --
A. Yeah, I need -- yeah, I just want to make sure. Yes.
Q. Okay. And this is -- Kimberly Bertrand 05:41 is the lead author for "Hair relaxer use and risk of uterine cancer in the Black Women's Health Study," true?
A. Yes.
Q. If we look at the bottom of Exhibit 05:41 No. 21, there is an abstract and a background and it says "chemical hair relaxers" --
MS. O'CONNOR: I'm going to put an objection on the record. This is not his citation.

MR. COSTELLO: Okay.

MS. O'CONNOR: Okay. This is not the published study in its final form, and it's just the abstract with snippets. And I don't know where you got this from. This is not the article, the complete article that he cites in his report, the published article. 05:42

MR. COSTELLO: Okay. Objection is noted.

BY MR. COSTELLO:

Q. Would you agree that the Bertrand study concluded that whether hair relaxer use increases the risk of uterine cancer is unknown? 05:42

MS. O'CONNOR: Objection; form. Why don't you point him to that language, then.

BY MR. COSTELLO: 05:42

Q. I'm just --

MS. O'CONNOR: And you can't because you don't have the study.

BY MR. COSTELLO:

Q. It's on the bottom of Exhibit 21. But, look, you cited to this in your report, Exhibit 21, which is reference -- I'm sorry -- Reference 57 is the Bertrand study. So would you agree that the conclusion reached by the Bertrand study is that 05:42

whether hair relaxer use increases the risk of uterine cancer is unknown? Would you agree with that; yes or no?

A. I have to look at the wording. I mean, I think if you can give me the full article, I just 05:43 want to make sure that I see -- I can read the actual statements that they make.

Q. So you don't know as you sit here today one way or the other whether that was the finding, that the use of hair relaxer increases the risk of 05:43 uterine cancer and whether the study concluded that that's unknown?

MS. O'CONNOR: Objection. Objection.

THE WITNESS: That's not what I'm saying. You presented me with an exhibit that is, allegedly, 05:43 the full study, which it isn't. So I think your question was supposed to be about the conclusions in the paper, and I don't have that paper in front of me to answer that question accurately.

BY MR. COSTELLO: 05:43

Q. As you sit here today, can you recall reviewing the Bertrand article in its entirety where it indicates that whether hair relaxer use increases the risk of uterine cancer is unknown;

yes or no?
MS. O'CONNOR: Objection.
THE WITNESS: I've reviewed the article in its entirety, but I want to make sure that the wording and the phrasing that you're using is what is actually reported in the Bertrand study. I'm not going to take your word without looking at it. 05:44
BY MR. COSTELLO:
Q. Okay. So without looking at it, you can't tell me if it says it's unknown or not, true? 05:44
A. I want to look at the wording and phrasing that they used to make sure that I know exactly what they're talking about. And I think that was your intention. You just gave me a study that is not the reference and it does not have the conclusion in this exhibit that you provided. 05:44
Q. You cite to Bertrand in your report, true?
A. Yes.
Q. And you reference 57 in your report. Was that the entirety of the article? I'm just asking a foundational question. You cited to it. It was the entire exhibit? 05:45
A. Yes.

Q. And if we -- whatever that article says, you use as the basis for your opinions, true?

MS. O'CONNOR: Objection.

THE WITNESS: No. I used the data that was presented in the article. I interpreted the data 05:45 presented in that article in the context of all the other evidence that was available to me. So I did not use what Bertrand said or their conclusion in my opinion. I weighted their report in the context of all of the other evidence that I had available 05:46 to me.

BY MR. COSTELLO:

Q. In your report, which is Exhibit No. 4, on page 40 you acknowledge that the study -- the Bertrand study had some limitations which were 05:46 worth discussing, true?

A. So page 40. Where are we looking at?

Q. Bottom paragraph where it begins "This study has certain limitations worth discussing."

A. Yes. 05:46

Q. You acknowledge that -- the researchers acknowledged not being able to account for changes in product formulations or usage patterns, true?

A. That's something that the researchers

discuss, yes.
Q. Yeah. Second, there was an absence of specific product ingredient data since the study lacked information on particular brands or chemical formulations, true? 05:47
A. They acknowledged that, correct.
Q. This prevented the researchers from identifying if any observed associations were driven by products -- by specific products or particular classes of chemicals within the relaxers, true? 05:47
A. That's what they stated, yes.
Q. And finally, a limitation stemmed from the definition of the reference category. Due to the high prevalence of chemical hair relaxer use among participants in the BWHS, which is the Black Women's Health Study, the researchers combined never users and infrequent users into a single reference group, true? 05:47
A. Yes. That was the way that they described their methods. 05:47
Q. You agree that not knowing changes in formulation or usage patterns makes it uncertain whether the findings can be generalized to current

hair relaxers or contemporary usage behaviors, true?

A. I don't agree with that statement, again, because -- that's certainly one of the limitations of the study. But as I was mentioning earlier, these products work in a specific way. They have very similar chemical properties. They have very similar ingredients that are designed to break the disulfide bonds in the hair. So I have no reason to, you know, suspect that these products are any different as a class of products. So in my opinion, yes, I think it's good that they acknowledge that, but I don't think it would have influenced the results in any way, shape, or form. And it certainly did not influence my opinion. 05:48 05:48 05:48

Q. And you reference that there are limitations worth discussing in your report, true, the ones that we just went through?

A. Yes, because, you know, we talked about earlier how I need to consider all the positives and negatives. This is the way we analyze the evidence. We didn't just, you know, pick and choose the things that are convenient for us. We look at the study. They brought up -- to their 05:49

credit, they brought up these limitations, which I think are valid and important to mention. But when we take a step back, are these limitations something we need to totally throw out the study and not believe the conclusions? No. 05:49

Q. You're not aware of any other studies that have come out since Bertrand which have reconciled the issues raised that we just enumerated regarding the ability to generalize the results? 05:49

MS. O'CONNOR: Objection; form and foundation.

THE WITNESS: I'm not sure I understand your question.

BY MR. COSTELLO:

Q. You're not aware of any other studies 05:49 that have come out since Bertrand, which we just went through, that specifically address the changes in formulations in the usage -- the usage patterns making it uncertain as to findings, the absence of product-specific ingredients, and finally, the 05:50 limitation of the definition of the reference category? You're not aware of any study since Bertrand that has specifically addressed those deficiencies, true?

MS. O'CONNOR: Objection; form, foundation, mischaracterizes the evidence.
You can answer over my objection.
THE WITNESS: So I believe these were somewhat the issues that were brought up on the Hernandez paper, which I reference in my report. So I believe they, you know, commented on some of those issues. The issue that we don't know what's the product, what's in the products, et cetera. I think there was an opinion piece by a dermatologist that may have also discussed that. So I also considered that in my report. You know, I have a recollection of both of these studies raising the question of not knowing what's in the products. 05:50 05:50
BY MR. COSTELLO: 05:51
Q. Okay. You did not conduct a study of your own to address the limitations that are cited in the Bertrand study, true?
MS. O'CONNOR: Objection.
THE WITNESS: Yeah. Beyond my analysis of the evidence and the literature that's available, I did not do my own studies of these products. 05:51
BY MR. COSTELLO:
Q. Thank you. The -- if we look at

Exhibit 4, page 42, the first full paragraph, just getting back to this, you reference again that the study has certain limitations that warrant consideration. You'd agree that another limitation of the studies were that Black women were underrepresented, true, and specifically in regards to the Chang study in 2022? 05:52

A. That's the first full paragraph.

Q. Sure. This is dealing with, I believe, the Chang study. You would agree that the Chang study referenced in 2022 one of the limitations is that Black women were completely underrepresented as a -- 05:52

MS. O'CONNOR: Objection; form, foundation, mischaracterizes. 05:52

THE WITNESS: So, I mean, this is in the section for the White study. I just want to make that clear. So I think the reason I reference the Chang study here is because both the Chang 2022 study and the White study use the Sister Study database. So because of that, you know, we're dealing with the similar discussion that we had earlier about the makeup of the different ethnic and racial groups in the Sister Study. 05:53

BY MR. COSTELLO:
Q. Additionally, the White and Chang also had limitations in that they lumped all hair straighteners together, including mechanical hair straightening, Brazilian Blowouts, and chemical hair relaxers, true? 05:53
MS. O'CONNOR: Objection to form, foundation, asked and answered.
You can answer again.
THE WITNESS: Yeah, I mean, that's one -- again, one of the criticisms, but it's not -- it's really not -- it's well recognized by the investigators. If anything, it may have biased the results towards the null. So that's okay. 05:53
BY MR. COSTELLO: 05:54
Q. But we don't know because of the fact that it wasn't separated out. They were all put together. And any woman could have used chemical hair straighteners or not but could have answered the same question as to yes whether they were using them or not? 05:54
A. Right.
MS. O'CONNOR: Please read that back.
(Record read as requested.)

MS. O'CONNOR: Objection; form, foundation, mischaracterization of the evidence.
THE WITNESS: Right. So this is something that we discussed earlier. So it's this idea of misclassification bias. So the same way that the 05:54
women in the exposure group may have said that they used chemical hair relaxers when, in fact, they were referring to Brazilian Blowouts or the other term they used, I think, is hot -- heated --
BY MR. COSTELLO: 05:55
Q. Heated combs --
A. Right. So that is also true in the nonexposed group of women that they may have said the last 12 months I may not -- I have not used a chemical hair relaxer. So that is something that's 05:55
called misclassification bias. And as far as I'm aware, in the epidemiology world, whenever you have the kind of misclassification bias that occurred in the study, nondirectional, that tends to bias the results toward the null. 05:55
BY MR. COSTELLO:
Q. Let me ask you this. In the Sister Study, I know we quibbled a little bit about the percentages, whether it's 84 percent or

83.7 percent, the majority of women in the study were white non-Hispanic, true?

A. Non-Hispanic --

MS. O'CONNOR: Object to the form.

BY MR. COSTELLO: 05:56

Q. Non-Hispanic white.

A. Sorry. But -- yes, it was -- yes, it was 84 percent non-Hispanic white.

Q. You would agree that that is not the typical population that uses chemical hair 05:56 straighteners, true?

MS. O'CONNOR: Object to the form.

THE WITNESS: That's irrelevant for the purpose of the study. They asked women whether they used chemical hair relaxers or not, and they 05:56 looked at how many of them developed uterine cancer and compared them to the nonexposed group. So whether white women for whatever reason or Hispanic women decided to use chemical hair relaxers, sure, they're not Black women, but they're still using 05:56 chemical hair relaxers. So the exposure here is not race. What we are looking at is did you use chemical hair relaxers and did you develop uterine cancer. At the end of the day, that's what that

study was doing. So the discussion about race is really not relevant.
BY MR. COSTELLO:
Q. But that particular study, the Sister Study, was not designed specifically for whether or not chemical hair relaxers caused cancer. It was designed for a different purpose, true? 05:56
MS. O'CONNOR: Object to the form.
THE WITNESS: So, yeah, I mean, I think --
MS. O'CONNOR: What study? Are we talking about Chang? Are we talking about White? Are we talking about both of them? 05:57
MR. COSTELLO: I asked specifically the Sister Study.
MS. O'CONNOR: The Sister Study is both Chang and White, okay. 05:57
BY MR. COSTELLO:
Q. I talked about the design. We don't have a lot of time left. But the Sister Study was not designed -- 05:57
MS. O'CONNOR: Listen carefully.
BY MR. COSTELLO:
Q. -- to draw a conclusion between the use of chemical hair relaxers and cancer. It was

designed for a different purpose, true?

MS. O'CONNOR: Object to the form, foundation.

THE WITNESS: Yeah, I don't think that's an accurate statement because -- so the study was -- the whole purpose, they collected data from all of 05:57 these women that had a sister with a diagnosis of breast cancer. And they collected a lot of data, a lot of data, including whether or not -- you know, the use of hair products. So if you're saying the original Sister Study publication by Sandler, if 05:58 they were looking at whether chemical hair relaxers caused uterine cancer, that's not what the Sandler study was doing. But that database they created, the whole purpose, it is well described and mentioned in their website, they have produced 05:58 thousands -- I mean hundreds -- I'm not going to say thousands, but definitely hundreds of research papers that are using that database to answer precisely these kinds of questions.

BY MR. COSTELLO: 05:58

Q. But those questions were maybe a byproduct of the Sister Study. I don't want to spend too much time on this. But if we look at the questionnaire that was used in the Sister Study, I

believe it was Question 103, it conflates multiple things, not just hair relaxers in themselves; and we talked about that at length, true?

MS. O'CONNOR: Objection; form, foundation, asked and answered. 05:58

THE WITNESS: Yeah.

BY MR. COSTELLO:

Q. It's a yes or no. I'm almost done.

A. I need to see the question. I mean, I know there was a questionnaire about the types of 05:58 products, and I know there's some conflagration there as what we're talking about. But I don't know if that was a specific question or how it was asked.

Q. Right. And we just talked about this. 05:59 Whether it was Brazilian Blowouts, whether it was heat related, whether it was mechanical straightening or hair straighteners, those are all different processes, true?

MS. O'CONNOR: Objection; form, foundation, 05:59 asked and answered.

You can answer again.

THE WITNESS: Again, that deals with the misclassification. And certainly some of the

products or some of those techniques may not have used the chemical hair relaxers. But it's very possible that, for example, the Brazilian Blowouts, those patients -- or those participants may have been exposed to formaldehyde. At the same time 05:59 there were people -- there were participants in the nonexposure that may have been exposed to any of those products, and that was not -- they were not assigned to the exposed category.

So at the end of the day when we look 05:59 at epidemiology study design, that nondirectional misclassification, it's very much well described as driving the findings towards the null. So in a way, the findings that they have may actually be underestimating the actual association of the 06:00 chemical hair relaxers and uterine cancer.

BY MR. COSTELLO:

Q. And you can't say what that number would be because you haven't conducted your own analysis as to how far toward the null it would drive those 06:00 results, true?

MS. O'CONNOR: Objection to form, foundation, beyond the scope.

THE WITNESS: Right. You would need to know

how many women were actually -- which women were supposed to be in which arm. But there's calculations that can be made. I mean, I'm sure --

BY MR. COSTELLO:

Q. But you haven't done them in this case? 06:00

MS. O'CONNOR: Objection.

You can answer.

THE WITNESS: You know, I was not -- I examined the epidemiology data. But, yeah, it's not the type of calculation that I made as part of 06:00 my report.

MR. COSTELLO: Okay. That's all the questions I have.

MS. O'CONNOR: Okay. I have some questions. You pass the witness? 06:01

MR. COSTELLO: Sure.

EXAMINATION

BY MS. O'CONNOR:

Q. Okay. Let's work a little bit backwards. You were presented with Exhibit 21, if 06:01 you remember. Is that the full Bertrand study? Is it even the publication itself?

A. No.

Q. So that is not what you referenced in

your expert opinion report?
A. That's correct.
MS. O'CONNOR: Okay. All right. This is 17.
(Roque Deposition Exhibit 17 was marked for identification.) 06:02
BY MS. O'CONNOR:
Q. Until we get copies for counsel, I'll not ask any specific questions about the document. But generally speaking, you talked a bit about biasing results towards the null. Can you explain 06:02 what you mean by that. What is biasing towards the null, and how does it, if at all, affect the outcome of an epidemiologic study?
A. So, yeah, the null is what we usually think as no difference, that there is no difference 06:02 between the exposed and unexposed and the outcome of, in this case, uterine cancer. So if the results are being biased towards the null as a result of this misclassification bias, what it shows is that the hazard ratio that was determined 06:02 based on the statistical model is likely being underestimated, so meaning --
Q. Meaning that the hazard ratio was lower than it ordinarily might be?

A. Correct.
MR. COSTELLO: Object to form, foundation.
BY MS. O'CONNOR:
Q. Okay. So with regard to the Bertrand study, in terms of the exposure groups, was there 06:03 anything about the exposure groups themselves, the never, the light, the moderate, the heavy, that in any way could bias those results towards the null?
MR. COSTELLO: Object to form, foundation.
THE WITNESS: Yes. Because in the Bertrand 06:03 study there was never -- there's not a group of women that were never exposed. So their lowest exposure category included both women that were not exposed as well as those that they classified as, you know, light. So never/light was the category, 06:03 and then the other categories were moderate and heavy. So the fact that they included some light users in that never use, it's going to bias the results toward null because it's saying that we have this risk factor that we believe may lead to 06:04 uterine cancer, but we do have people that are being exposed to it on the nonexposed group.
So that is very much a misclassification bias that can bias the result

towards the null. And I understand why they did it. In the study it was African-American women, and 95 percent of the women were using hair products. It was very hard to find women that were never users. 06:04

BY MS. O'CONNOR:

Q. You mentioned Black women. Obviously, there is a large preponderance of Black women in the Black Women's Health Study, correct?

A. Correct. 06:04

Q. Okay. With regard to the Chang study, you were asked questions, I think, the percentages of 84 percent non-Hispanic white versus -- if my math is correct -- 16 percent Black females. Do you remember that? 06:05

A. Yes.

Q. Were there Black females studied in the Chang study for uterine cancer?

A. Yes, there were.

Q. Were there Black females studied in the White study for ovarian cancer? 06:05

A. Yes, there were.

Q. Do you have an opinion one way or the other whether or not there was adequate

representation through the Sister Study database of Black females for the purpose of both of those studies?

MR. COSTELLO: Object to form, foundation, qualifications. 06:05

THE WITNESS: Yeah, I think it's -- it's always harder to recruit, you know, Black women in general to any study and research. But I do think for the purposes of that study, these women were highly motivated because, you know, they had 06:05 sisters that had breast cancer. So they were very motivated to be part of the study, answer the questions. And I do think there was decent -- like, a significant percentage of the study population that was African-American. So I don't 06:05 think that was a limitation of the study.

BY MS. O'CONNOR:

Q. Okay. And, in fact, did the authors in Chang and White do any testing or subanalysis or subgroup analysis to determine whether there was a 06:06 difference between white and Black women when it came to uterine cancer in the Chang study and ovarian cancer in the White study?

A. Yes. They both -- in the White study

and the Chang study, they actually looked at heterogeneity. They divided the patients into subgroup analysis, looking at whether or not a patient's race impacted the results. And they did not find that race made a difference. 06:06

Q. So in other words, the fact there were more white -- non-Hispanic white women in the Sister Study which forms the database or the data, if you will, the data set for both the Chang and White study, does not -- is not affected by the fact that there were predominantly more non-Hispanic white than Black women? 06:07

MR. COSTELLO: Object to form, foundation, qualifications.

THE WITNESS: Correct. 06:07

BY MS. O'CONNOR:

Q. I want to go back to Exhibit 15. For the record, that is the Helm 2018 study. Again, not the final published version, but we'll use this for the purposes of this exam. Do you have that in front of you, Dr. Roque? 06:07

A. Yes.

Q. And do you recall being asked questions by counsel about the absence or presence of EDCs in

the three hair relaxer kits that were the subject of this -- that were partially the subject of this study?
A. Yes.
Q. Okay. And counsel pointed you to certain parts or aspects of the kits -- of each of the three kits, correct? 06:07
A. Correct.
Q. Okay. Have you examined Table -- excuse me -- Figure 2 at page 6 and determined for yourself one way or the other whether there are EDCs present in the kits themselves? 06:08
A. Yes. There were EDCs present in all of the kits.
Q. Okay. Can you give us some examples. Let's say starting from the top with the cyclosiloxanes. Is there evidence of the presence of cyclosiloxane in the kits in this -- that are depicted in Figure 2? 06:08
A. Yeah, there were cyclosiloxanes in all three of the kits. 06:08
Q. Okay. How about -- let's go down a little bit further. Are there any phthalates -- I hate that word -- are there any phthalates in the

three kits that were examined -- or studied in the Helm 2018 article?
A. Yes, there were phthalates in all three of the kits.
Q. Okay. And with regard to parabens, I see a notation at the bottom under the heading "Parabens," methylparaben. Do you see that there? 06:09
A. Yes.
Q. All right. Were methylparabens present in any one of the three kits that were the subject of the Helm 2018 study? 06:09
A. Methylparaben was present in all three kits.
Q. And was Helm 2018 the only article or publication that you relied upon for your opinions about, generally speaking, what are contained in these products known as chemical hair relaxers? 06:09
A. No. That was one of the articles I relied on, but I also quoted an article by Schildroth, which I believe is Reference 79 on my report. And in that report they looked at, you know, concentrations of EDCs in the urine in women that are using these products. I also looked at a study, I believe, out of Kenya where they looked at 06:09

what they referred to as chemicals of concerns in the labels of these products. And there's also I reference a study, I believe, out of Nigeria, and I can try to find it. But they identified formaldehyde and cadmium, which is a metal that is 06:10
recognized as an EDC, in the products they analyzed.

Q. So just to be clear, when you approached the subject of the causal relationship between uterine and ovarian cancer, did you consider only 06:10
one article or three articles, or what did you consider in terms of the total evidence in order to form your opinions?

MR. COSTELLO: Object to form, foundation, asked and answered. 06:10

THE WITNESS: So as written in my report, I reference all of the articles that I identify where they discuss the makeup or the chemicals that were contained in these products. So, you know, I used multiple articles for that purpose. We talked 06:11
about the Helm study, the Schildroth study. I'm trying to look for -- just one second.

BY MS. O'CONNOR:

Q. Take your time.

A. Yeah. So Irungo, which is Reference No. 81. So that was looking at chemicals of concern in select packaged hair relaxers available in the Kenyan market, an examination of ingredient labels and measurement of PH. So they look at many products that they describe as products of concern. 06:11

There was another reference. Let's see here. Yeah. So Reference No. 121, so that is an article by -- I'm going to spell it because it's complicated -- it's I-w-e-g-b-u-e, and the title of that is "Evaluation of human exposure to metals from some commonly used hair care products in Nigeria." So this is why -- you know, even though the Helm article only is talking about three kits, there's a lot of evidence out there looking at other products and documenting the presence of EDCs in chemical hair relaxers. 06:12 06:12

Q. And going back to Helm 2018, the fact that two of the kits, according to counsel, were manufactured by companies that are not defendants in this particular case, does that affect your opinion in any way as to your approach to these products as a class of products? 06:12

A. No.

Q. Dr. Roque, do you have handy Exhibit 13? It looks like this.

A. Yep.

Q. Do you recall that you were asked questions by counsel pertaining to Exhibit 13 and the representation that this is a National Cancer Institute missive or publication? 06:13

A. Yes.

Q. All right. There are no page numbers here. But if you look towards the end, counsel directed your attention to a heading, "Latest Updates to This Summary" dated -- it says 4/10/2025. Do you see that there? 06:14

A. Yes.

Q. All right. You mentioned during your testimony that this particular missive did not include the results or at least even reference the Bertrand 2023 study. Do you recall that? 06:14

A. Yeah. My brief review, I did not see that reference in this document. 06:14

Q. So do you have any reason to believe that the authors, whoever they may be, of this particular Exhibit 13 considered in any way the Bertrand 2023 study when they made statements about

the relationship between chemical hair relaxers and uterine cancer?

A. It's not in the references. So based on that, I would say that they did not consider it.

Q. Do you have any idea of who the authors are of this particular Exhibit 15 -- Exhibit 13? 06:15

A. Yeah, no idea.

Q. If you stay on that last page -- not last page -- third to the last page, "Latest Updates to this Summary" dated 4/10/2025. 06:15

A. Okay.

Q. All right. Do you see in the last paragraph there that was not read to you the statement that "This summary is written and maintained by the PDQ Screening and Prevention Editorial Board"? Do you know who they are? 06:15

A. No.

Q. It goes on to say "which is editorially independent of NCI," meaning the National Cancer Institute. Do you see that there, as well? 06:15

A. Yes.

Q. And do you see also that it states "The summary reflects an independent review of the literature and does not represent a policy

statement of NCI, National Cancer Institute, or NIH"? Do you understand NIH to be the National Institutes of Health?

A. Yes.

Q. All right. If you turn to the next page where it states "About this PDQ summary," counsel read to you the purpose, or portions of the purpose. All right. Do you see that underneath it says "Reviewers and Updates"? 06:16

A. Yes. 06:16

Q. Okay. Where it indicates "The summary is reviewed regularly and updated as necessary by the PDQ Screening and Prevention Editorial Board." Do you see that there?

A. Yes. 06:16

Q. Do you know who any of these editors are?

A. I do not.

Q. Do you know if they've published on any of the subjects at issue in this litigation, that being ovarian and uterine cancer and its connection to chemical hair relaxers? 06:16

A. I do not.

Q. You don't know one way or the other?

A. I don't know one way or the other, correct.

Q. It goes on to say that "The PDQ Screening and Prevention Editorial Board, which is editorially independent of the National Cancer Institute, NCI, the summary reflects an independent review of the literature and does not represent a policy statement of NCI or the National Institutes of Health, NIH." 06:17

Do you see that there? 06:17

A. Yes.

Q. By the way, with regard to the Chang and White studies, who were the sponsors or who was the sponsor of those two large prospective cohort studies? 06:17

A. The NIH.

Q. If we can turn back to Exhibit 4, which, for the record, is Dr. Roque's expert opinion report submitted in this litigation, and I'd like to draw your attention -- and by the way, page 55, 06:18 you were asked about your sources of data for what's in these chemical hair relaxers. Do you remember those questions?

MR. COSTELLO: Object to form. I don't think

there's anything from page 55 I asked about.
BY MS. O'CONNOR:
Q. Okay. Do you recall being asked about the basis of your opinions as to what is present or contained within chemical hair relaxers? 06:18
A. Yeah. That discussion came primarily through the Helm article, but yes.
Q. If we turn to page 55 of your report, under the heading "Regulatory Agencies," I'm not going to go into great detail, but did you also 06:18 cite in your expert opinion report to the California Department of Toxic Substances Control, Chemicals in Hair Straightening Products Background Document dated 2021?
A. Yes, I did. 06:18
Q. And did you among other sources consider this regulatory agency's paper on the subject of chemical hair relaxers?
A. Yes.
Q. And did -- to your recollection, the 06:19 California Department of Toxic Substance Control addressing chemical and hair straightening products, did the -- to the best of your recollection, did this document describe the

contents of chemical hair relaxers?
A. Yes.
Q. And did it include, among other things, EDCs as part of that description?
A. Yes, it did. 06:19
Q. I want to turn to page 57 of Exhibit 4, your expert opinion report. And do you recall being asked questions about your causal analysis towards the end of your deposition?
A. Yes. 06:19
Q. Okay. And I believe that you spoke to counsel about your analysis of the strength of the observed association and consistency of the observed association?
A. Yes. 06:20
Q. How did you weight those guidelines from the Hill framework of causality?
MR. COSTELLO: Objection; asked and answered.
THE WITNESS: I weighed those very heavily in my analysis. 06:20
BY MS. O'CONNOR:
Q. And in addition to those two factors in temporality, did you also consider biological gradient, also known as exposure-response

relationship, in your analysis of the causal connection between chemical hair relaxers and uterine and ovarian cancer?

A. Yes, I did.

Q. Did you also consider biologic plausibility in your analysis of the causal connection between chemical hair relaxers and uterine and ovarian cancer? 06:20

A. Yes, I did.

Q. Did you also consider coherence, one of the nine factors enunciated by Sir Bradford Hill, did you consider that as well? 06:20

A. Yes, I did.

Q. Did you consider the presence or absence of experimental evidence in this case with regard to the subjects at hand? 06:21

A. I did not because we don't have, you know, natural experiments. That would be unethical, probably illegal, to do a randomized controlled trial where we randomize women to chemical hair relaxers or not. So I don't think that applies here. There's no best way to measure that exposure and outcome other than through the way that it has been done by White, Chang, and 06:21

Bertrand, through very high quality observational studies.

Q. Meaning large prospective studies following patients to determine whether an exposure and an outcome are related? 06:21

A. That's correct.

Q. And, finally, with regard to the ninth Hill factor or guideline -- framework of causality, did you consider analogy in your analysis of the issues at hand in this case? 06:22

A. I did.

Q. And in terms of analogy, can you just give us a sense of what you considered by way of analogy in reaching your opinions in this case?

A. Yes. So mainly looking at the totality 06:22 of the epidemiological evidence and seeing how EDCs which are in chemical hair relaxers can cause cancer. So the papers by White, Chang, and Bertrand, they show the association with gynecological cancers. But on top of that, there's 06:22 also evidence demonstrating the association with breast cancer, which is also hormonally responsive, just like uterine and ovarian cancer. And then more recently, the paper that I mentioned by

Bailey, I believe, that looked at the increased risk for pancreatic cancer and thyroid cancer, both of which are endocrine organs.

So when we take all of that in conjunction, there's a lot of cancers that we're 06:23 seeing in these women that have been exposed to chemical hair relaxers by ways of, you know, the EDCs that are contained within these products.

Q. And what is it about -- understanding that neither thyroid cancer nor pancreatic cancer 06:23 are gynecological cancers, what is it about the relationship between chemical hair relaxers and those cancers, as established in Bailey 2025, that further informs your opinions in this case?

MR. COSTELLO: Object to form, foundation. 06:23

THE WITNESS: So the main thing is, you know, both thyroid and the pancreas are endocrine organs. So EDCs is in the name, endocrine-disrupting chemicals. So the fact that there is an association in these two other endocrine organs, I 06:24 think there is, you know, strong analogy there because I also consider the ovary as part of the endocrine system and the uterus as an organ that responds to the effects of the endocrine system.

MS. O'CONNOR: Okay. I have nothing further.

FURTHER EXAMINATION

BY MR. COSTELLO:

Q. Just a follow up on Exhibit 17 because I don't want the record to be confused. You were 06:24 shown Exhibit No. 17, which is the --

A. Yep.

Q. -- "Hair relaxer use and risk of uterine cancer in Black women." If we look at the background here, the very last sentence, it says 06:24 "Whether hair relaxer use increases the risk of uterine question is unknown." That's what it says?

A. That's in the background, not the conclusions.

Q. Okay. That was the same as what we 06:24 reviewed from the abstract, true?

A. Right. But your question that you were asking, it was whether that was the conclusion. And that's background. That's not conclusion.

Q. If we look at page 5 of Exhibit 17, it 06:25 says in the -- I guess it's the second to last full paragraph, "An important limitation of the present study is that we did not update exposure information over time. Therefore, it is not known

whether these results are generalizable to chemical hair relaxers on the market today or to contemporary patterns of use."

Do you see that?

A. Yes. 06:25

Q. And that was something that you reviewed in conjunction with formulating your opinions, true?

A. I've reviewed that. And then it says "That said, contemporary studies have documented 06:25 the presence of parabens and phthalates as well as formaldehyde, a known carcinogen, in modern-day formulations of many hair products, including chemical relaxers."

Q. All right. And then it goes on to say 06:25 "We lacked information regarding brand or product ingredients and, therefore, unable to identify whether observed associations may be driven by a specific product or chemical class," true?

A. It says that. And, again, this is where 06:26 my ability to analyze the rest of the evidence allows me to formulate an opinion.

Q. Okay. And then if we look at -- on page 5, on the right-hand side there's a sentence

that starts "Our findings highlight the importance of continued research regarding potential adverse health effects" --

A. Sorry. Where are we?

Q. I'm sorry. It's just a little bit further. It's -- 06:26

A. I mean, I'm on that page, but...

Q. Sure. I think it starts off "our findings highlight."

A. Yeah. Okay. 06:26

Q. You're on the same page with me now?

A. Yep.

Q. "Our findings highlight the importance of continued research regarding potentially adverse health effects of exposure to chemical hair relaxers and their constituents. Uterine cancer mortality rates are substantially higher for Black women compared to non-Hispanic Black women." 06:27

Do you see that?

MS. O'CONNOR: White women. 06:27

BY MR. COSTELLO:

Q. I'm sorry. Non-Hispanic white women. It's getting long.

MS. O'CONNOR: It is.

THE WITNESS: I see that.
BY MR. COSTELLO:
Q. Okay. And that reflects your review of this particular study, that the highlights -- that the findings highlight the need for the importance of continued research, true? 06:27
MS. O'CONNOR: Objection to the form.
Can you read that question back.
(Record read as requested.)
BY MR. COSTELLO: 06:27
Q. Let me reask that question. You would agree with me that the authors here specifically indicate that the findings highlight the importance of continued research regarding potentially adverse health effects of exposure to chemical hair relaxers and their constituents, true? 06:28
A. That's what the authors state.
Q. Okay.
A. But, again, they're raising a huge red flag. The following sentence talks about how efforts to reduce exposure to these potentially harmful products, such as by identifying safer alternatives to straightening hair, stricter regulation of cosmetic products, and policies 06:28

prohibiting discrimination against natural hair, could represent important steps towards reducing racial disparities in this cancer type.

Q. I promise I'm done very soon here. Exhibit 13, that was Reference 55 that you cited in your report; is that true? 06:28

A. What number? 55?

Q. Yes, I believe it's Reference 55.

A. Yes.

Q. Okay. And that's something that -- 06:29

MS. O'CONNOR: I'll object because, once again, I don't think we have the URL. I don't know what it is that he looked at. I don't know if it was different. I'm going to object to your whole line of questioning about that. 06:29

MR. TURIELLO: It's listed in his report.

MS. O'CONNOR: Listed in his report, that's right. This is a URL. I don't know if this is the exact version, et cetera, et cetera.

BY MR. COSTELLO: 06:29

Q. Did you produce the URL to us as part of your report?

A. The -- so it's 55, right? Sorry. I was just looking at it.

Q. Yeah.
A. So the URL is in there, but I also -- it also has the date that I accessed it as September 1st, 2025.
Q. Okay. And if we accessed the same link from what you cite in your report, that would be what Reference 55 is, true? 06:29
A. I would assume so.
Q. Okay.
A. But, again, you know, I would have to look at the website. But, yeah, I would assume so. 06:30
MR. COSTELLO: That's all the questions I have.
MS. O'CONNOR: I have nothing further. Thank you very much. 06:30
THE VIDEOGRAPHER: Off the record at 6:30.
FURTHER DEPONENT SAITH NAUGHT
(Proceedings concluded at 6:30 p.m.)

STATE OF ILLINOIS )
                  ) SS:
COUNTY OF COOK    )

I, Valerie M. Calabria, CSR, RPR, do hereby certify that DARIO ROQUE, MD, was duly sworn by me to testify the whole truth, and that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was not waived, and that the deposition was submitted to Ms. Stephanie O'Connor, Plaintiffs' counsel, for signature. Pursuant to Rule 30(e) of the Federal Rules of Procedure, if deponent does not appear or read and sign the deposition within 30 days, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of February, A.D. 2026.

Valerie M. Calabria, CSR, RPR
Illinois CSR License 084-003928

MS. STEPHANIE O'CONNOR
soconnor@douglasandlondon.com

February 2nd, 2026

RE: All MDL Hair Relaxer Cases v. Hair Relaxer
1/28/2026, Dario Rafael Roque, MD (#7852368)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (division email).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Priority-One/Veritext Legal Solutions
p1hairdepos@veritext.com

All MDL Hair Relaxer Cases v. Hair Relaxer

Dario Rafael Roque, MD (#7852368)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE______ LINE______ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

_______________________________________ __________________

Dario Rafael Roque, MD Date

All MDL Hair Relaxer Cases v. Hair Relaxer

Dario Rafael Roque, MD (#7852368)

ACKNOWLEDGEMENT OF DEPONENT

I, Dario Rafael Roque, MD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Dario Rafael Roque, MD Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:2,14,18 3:12,17 4:2,7 4:12,17 5:2,13 9:6,8,12,14,16 9:22,24 10:3,7 10:12

**0**

**00818** 1:5
**084-003928** 5:24 396:23

**1**

**1** 4:3 6:10,20 8:8 14:12,15 15:4,7 16:22 17:5 102:1 112:1 152:2 200:2 205:7,9 206:12 231:7,8 248:8,23 249:1 249:9,21 255:3 255:6,9,11,13 256:8,13 263:17,21 264:11 265:22 266:3,10 271:18 322:5 331:9,9,10,14 332:7,8
**1.08** 314:3
**1.10** 301:4
**1.12** 300:24
**1.28** 314:17
**1.5** 277:1
**1.8** 315:24
**1/28/2026** 397:5
**10** 1:13 7:3 8:14 67:22 102:10 112:10 165:17,24 193:10 208:1 214:22 215:2 219:22 220:6 221:19 256:9 263:8 316:20 325:2
**10.2** 252:24
**100** 219:22 236:3,23 237:8
**100,000** 252:24 253:2
**10016** 4:13
**10020** 4:3
**10038** 2:5
**1015** 222:1
**103** 369:1
**105** 318:17
**10th** 4:13
**11** 6:4 7:6 101:12 102:1 102:11 112:11 199:20 255:15 255:20
**1105** 222:2,2
**1106** 231:7
**1111** 235:23
**1115** 222:4 225:17
**114** 49:1
**1191** 309:7
**1192** 316:23 317:3 320:20 322:12
**1195** 322:23
**12** 7:8 102:12 112:12 200:8 273:18,22 303:11,17 304:3,5,7,17,20 305:4,6,24 306:1 308:10 319:23 365:14
**121** 380:8
**12:21** 167:24 168:2
**13** 7:10 102:13 112:13 267:7 283:4,15,19 292:18 293:21 381:1,5,23 382:6 394:5
**135** 6:16
**14** 6:10 7:11 102:14 112:14 268:6 301:19 301:21,24 306:6,7,20 311:21 320:13 322:12 324:7
**1400** 2:20
**15** 7:13 89:4 102:15 112:15 161:22 209:17 220:14,16,18 220:20,21 281:6 304:17 327:16,23 335:8 337:24 338:9,17 351:4 376:17 382:6
**150** 2:20 6:18
**1500** 2:10
**1505** 3:13
**1543** 205:2
**16** 6:11 7:16 102:16 112:16 220:14,23 240:7 252:9,15 263:13 265:19 333:5,9 374:14
**160** 6:19
**17** 7:19 102:17 112:17 263:14 265:11,12 372:3,4 390:4 390:6,20
**17.2** 301:5
**18** 102:18 112:18 242:22 330:14

**1825** 2:15
**18th** 329:22
**19** 102:19 112:19 160:11 316:20
**1900** 4:8
**191** 5:3
**1960s** 338:22
**198** 6:20
**1:06** 168:2 169:2
**1:23** 1:5
**1s** 244:13 266:11
**1st** 18:5 30:8 395:4

**2**

**2** 6:11 16:10,14 28:19,20 29:12 29:14 34:21 56:13 102:2 112:2 243:14 248:8,11 249:1 249:9 250:1,10 250:22 255:3,6 263:17,22 264:11,22 265:23 266:3,9 267:3,7 271:18 302:9 303:24 309:8 330:10 331:4,9,10,21 332:7,8,19 333:10,11 335:11 338:9 377:10,19
**2.19** 300:18
**2.3** 275:23
**20** 67:22 102:20 112:20 171:1 193:10 316:20 325:2 347:24 348:14 348:16 351:3 353:21 399:15
**200** 4:18
**20006** 2:15
**2005** 47:12 111:13
**2008** 336:13,23 342:17
**2015** 152:7 266:5
**2017** 133:14 266:6
**2018** 328:24 329:23 376:18 378:2,11,14 380:18
**202.783.6400** 2:16
**2021** 43:10 145:12 300:13 385:14
**2022** 363:7,11 363:19
**2023** 133:15,15 381:18,24
**2024** 132:11 143:15
**2025** 18:6 30:8 42:4 43:1,8,23 44:12 45:1,18 46:9 47:8,17 49:1 51:8 52:24 53:18 55:7,11 61:19 62:16,24 63:4 63:13 64:7 74:18 85:9,24 110:4,18 113:7 113:20,23 114:1 295:6 296:7,7 318:21 318:22 389:13 395:4
**2026** 1:14 8:2 396:17 397:3
**204** 6:22
**209** 3:18
**20th** 2:10
**21** 7:22,24 102:1,21 112:21 246:4,7 253:10 259:11 259:12 354:4,7 354:10,21 355:20,21 371:20
**212.566.7500** 2:5
**212.989.8844** 4:4
**214** 7:3
**22** 102:22 112:22 220:13 248:18 259:12 274:4 275:16 281:24
**225** 5:9
**23** 7:3 102:23 112:23
**233** 5:14
**24** 102:24 112:24
**2401** 4:18
**241** 302:15
**248** 263:10
**25** 47:14 111:16 263:12 295:16
**2500** 42:4
**255** 7:6
**26** 7:6 49:1 51:7 52:24 253:12 255:22 255:24 256:3 261:6,18 262:13,17 264:13,14 266:18 267:9 269:16 296:10 321:2

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 403 of 515 PageID #:76261




**26th** 47:12,17
**27** 205:12 253:3,7,12
**273** 7:8
**275** 4:13
**28** 1:14 7:8 73:16 263:7 273:22 296:1 321:2
**2801** 4:3
**283** 7:10
**28th** 8:2
**29** 320:22
**2950** 5:3
**29898** 396:21
**2:27** 240:2
**2:45** 240:4
**2nd** 53:18 55:7 55:11 396:17 397:3
**2s** 251:5 255:14 266:12

**3**

**3** 6:14 46:15,19 52:22 61:17 102:3 112:3 137:10,12,22 177:13 204:24 209:13 246:9 246:13 303:23 331:9,10,16 332:7,8,19,23 333:11,17,23 335:17,18,24 336:4
**3.06** 314:2
**30** 68:5 73:16 89:3 171:1 206:22 232:22 271:16 277:11 278:23,24 396:9,10 397:16
**300** 3:3
**301** 7:11
**303** 3:3
**30th** 54:8 318:21,22
**31** 294:22
**312.214.7900** 2:11
**312.645.7800** 5:15
**312.762.9450** 3:19
**312.767.1314** 5:4
**312.781.6677** 3:4
**312.849.8100** 3:9
**312.850.2651** 2:21
**312.855.1010** 5:10
**312.855.1105** 4:9
**32** 299:14 300:6
**327** 7:13
**33** 300:11
**33131** 4:18
**333** 7:16
**34** 326:17
**35** 294:22
**35203** 2:11
**354** 7:22
**36** 263:12 286:4 287:2,3
**371** 6:5
**372** 7:19
**39** 320:16
**390** 6:6
**3:58** 299:23

**4**

**4** 6:15 15:1,2,7 29:10 35:12,17 60:1,11,12,17 60:17 64:9,10 87:13 102:4 111:24 112:4 169:8 199:20 205:7 220:13 220:18 240:8 248:17 257:12 257:12,12,17 262:5,12 274:3 275:4,10,13,19 282:9 299:13 300:4 303:13 316:17,22 317:1 320:14 320:15,19 326:16 331:3,5 358:13 363:1 384:17 386:6
**4,000** 141:15
**4.2** 309:19
**4.27.** 300:24
**4.35** 301:3
**4.36.** 316:2
**4/10/2025** 381:13 382:10
**4/20/2025** 296:4
**40** 358:14,17
**4100** 3:8
**42** 363:1
**45** 54:15
**46** 6:14
**48** 263:14 265:11
**4:17** 300:1

**5**

**5** 6:16 15:2,7 17:2,3 40:7 49:24 87:8,13 87:22 102:5 111:24 112:5 132:5,17,22 135:22 136:2 142:24 143:11 143:23 144:19

145:24 146:18 149:22 169:9 177:13 196:11 199:20,23 277:2 313:16 313:22 314:12 390:20 391:24
**5,500** 141:15
**5.0** 253:2
**50** 277:14 278:10,24 279:22 281:15 352:19,19
**500** 54:23
**505** 2:10
**54** 53:21,24
**55** 7:10 281:24 282:3,16 384:20 385:1,8 394:5,7,8,23 395:7
**5500** 5:14
**57** 7:19,22 354:11 355:22 357:20 386:6
**58** 263:11
**59** 2:4
**5:12** 345:2
**5:31** 345:4

**6**

**6** 6:18 29:18,20 40:23 99:24 100:13 102:6 112:6 150:19 150:23 187:19 187:20 284:15 331:22,23 335:9 377:10
**60** 6:15 49:7,10 68:5 205:15,22 206:12,20 207:17 208:4 208:17 209:24 211:9 213:10 214:4 215:17 220:3 274:11
**6060** 5:15
**60601** 3:8
**60604** 3:18
**60606** 2:20 3:3 4:8 5:4,10
**63101** 3:13
**646.513.2133** 4:14
**66** 327:6
**68** 134:3
**6:30** 395:16,19
**6th** 1:13 2:4

**7**

**7** 6:19 40:7 41:12 46:8 102:7 112:7 160:20,23,24 161:15 162:1 167:13 240:10 262:16,22 265:19 300:6 322:24
**7.5** 275:23
**70** 134:3
**70/30** 69:19
**700** 2:15 5:9
**701** 3:13
**74** 316:2
**75** 7:11 86:3 88:13,15 260:10 301:6
**77** 3:8
**78** 7:13,16 327:21 328:12 328:24
**7852368** 1:23 397:5 398:2 399:2
**786.957.1157** 4:19
**79** 378:20
**7th** 3:18 42:4 43:1,23 44:12 45:1,18 47:8

**8**

**8** 6:20,22 41:13 56:14,15,16 86:11 100:14 102:8 112:8 161:14,22 162:1 198:4,5 198:10 246:23 257:13 259:12 260:24 261:1
**8.63.** 314:3
**80** 64:13 67:21 236:3,23 237:7 237:23
**80/20** 69:19
**81** 99:21 380:2
**815.963.4454** 3:14
**82** 152:8
**83** 86:13,15 322:1,3
**83.7** 366:1
**83.8** 322:7
**84** 322:5,9 365:24 366:8 374:13

**9**

**9** 6:22 15:8 58:12 101:12 102:9 112:9 204:14,18 248:19 256:9 259:23 261:2 316:20 326:18
**90** 204:6 205:16,23 206:8,12,16,19 206:20 207:4 207:17 208:4 208:11 209:23 209:24 210:12 210:14,24

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 405 of 515 PageID #:76263




211:8 212:11 213:10,12 214:5,5 215:15 215:17 219:19 219:23 220:5
**95** 240:19 261:10 300:21 301:4 315:24 374:3
**9:00** 344:20
**9:04** 1:15 8:2

**a**

**a.d.** 396:17
**a.m.** 1:15 8:2 112:17,20 344:20
**abberant** 259:14
**abbreviation** 16:18
**aberrations** 223:1
**ability** 108:10 166:11 167:4 175:19 199:4 361:9 391:21
**able** 23:10 25:17 26:6 51:17 72:4,9 87:11 121:7 125:10 141:23 163:7 165:10 199:5 214:16 306:8 308:5 318:24 331:22 332:11 339:16 341:23 358:22
**abnormal** 260:1,7 276:9 276:10
**abnormality** 270:20
**above** 28:21 29:2 397:6 399:7
**absence** 128:1 173:18 359:2 361:19 376:24 387:14
**absolutely** 116:24 121:22 133:21 152:17 163:6 251:3
**absorb** 233:18 234:15
**absorbable** 235:10
**absorbed** 232:9 233:1 234:19 307:9,17,20,23 353:15
**absorbent** 233:17
**absorbs** 234:22
**absorption** 188:21 232:7 233:21 234:1 235:1,2,7,12,15 235:18,22
**absorptive** 233:12
**abstract** 63:20 354:21 355:4 390:16
**abstracts** 56:21 63:22
**academic** 39:19 43:22 44:10 84:12 117:8,13 118:1 119:4 121:2 124:7,23 126:24 128:6 131:13 151:14
**accept** 134:20 134:23 137:2,3 137:5 139:6 146:13 147:1 148:15
**acceptable** 215:9 216:24
**accepted** 151:18 153:23 329:22 330:1,3 330:4,6
**access** 15:24 16:1,8 34:14 37:14,21 39:3 71:6,13,21,24 85:13 93:15 165:6,9 175:13 269:21 289:9 342:4
**accessed** 21:15 395:3,5
**accomplish** 340:15
**account** 162:7 203:7,10 226:11 358:22
**accounted** 203:5,23
**accounting** 240:18
**accounts** 266:2
**accumulate** 224:16
**accumulated** 239:7
**accumulation** 226:10 352:23
**accuracy** 342:11 397:9
**accurate** 30:11 30:15,16 35:11 54:12 57:7,8 61:21 65:13 86:1 101:20 162:3,7 166:12 166:18,21 181:24 186:15 186:15 187:17 195:23 226:19 244:19 248:15 249:14 320:3 328:14 354:2

368:4
**accurately** 162:10 164:10 165:14 166:3,8 166:13 167:1 356:19
**acetaldehyde** 221:4 224:14
**achieve** 64:22 73:7 219:20
**acknowledge** 358:14,21 360:13
**acknowledged** 358:22 359:6
**acknowledge...** 399:3
**acknowledg...** 397:12
**act** 62:10 139:9 237:21 312:22
**acting** 185:1 239:11
**action** 8:19 127:16 245:10 277:24 396:15
**activation** 331:13
**activator** 333:23 334:7 334:15 335:20 335:24 336:2,4 336:8
**active** 149:3
**actively** 113:14 113:18 115:4,6
**actual** 62:11 66:2 114:11 165:9 213:9 227:9 356:7 370:15
**actually** 16:23 42:11 51:8 66:24 98:22 104:12,15 165:6 173:5 176:13 188:24 189:6 190:10 192:10 196:1 206:20,23 218:17 226:23 228:17 232:12 232:21 233:19 237:22 257:21 274:2 301:12 304:19 320:24 325:4 333:24 334:7 340:22 357:6 370:14 371:1 376:1
**acute** 206:3 207:8
**ad** 145:11,16 145:17 147:23
**adams** 2:10 9:20,20
**add** 48:21 274:22 279:1,2
**added** 53:15,15
**addend** 39:7
**addition** 185:1 300:13 303:2 323:5 386:22
**additional** 177:17,24 253:11
**additionally** 13:3 243:20 364:2
**additions** 399:6
**additive** 278:21 278:22
**address** 18:24 27:6 98:24 242:24 245:9 305:11 361:17 362:17
**addressed** 63:14 91:8 260:14 361:23
**addresses** 27:1 248:23 285:5 285:18 286:23
**addressing** 40:3 53:5 96:4 179:14 385:22
**adenosarcoma** 242:12
**adequate** 374:24
**adipose** 277:19
**adjust** 90:21 109:3,3 196:8
**administered** 305:14
**administering** 64:19
**admit** 170:10
**adult** 323:3
**advance** 58:18 286:13
**advanced** 3:16 9:13 257:6 265:6 268:18
**advances** 132:16,21 143:23 145:1
**advancing** 169:18 174:2
**adverse** 392:2 392:14 393:14
**advice** 85:2
**advise** 78:11 83:17 84:16 85:4 110:19 111:12 116:13 118:1 120:6 123:6,11
**advised** 73:8 74:17 75:10,18
**advising** 79:9
**affect** 97:24 372:12 380:21

**affected** 376:10
**affecting** 223:3
**affiliated** 143:16
**affiliations** 8:24
**affirmative** 21:1
**african** 73:21 313:20,23 314:21 315:7 316:6 321:13 374:2 375:15
**age** 274:11
**agencies** 23:22 187:6 385:9
**agency** 23:23
**agency's** 385:17
**agents** 108:24
**aggressive** 250:15 253:21 257:3 264:23 267:16 269:3
**ago** 12:2 61:16 119:17 171:1 294:5 305:21
**agree** 8:7 28:2 29:22 32:4 36:9 47:2 52:7 95:21 119:3 120:10 126:2 127:24 129:5 133:18 135:2 140:2 141:1 144:18 150:12 151:3,22 152:13,18 154:19 156:2 156:16 157:20 158:22 162:15 162:22 165:13 166:6,15 167:5 169:21 170:9 171:9,17 172:10,24 184:3 185:11 186:17,23 187:15 191:15 194:6 200:10 201:4 203:4,11 204:1 205:9 206:7 207:24 208:16,21 209:4 210:20 228:21 242:2 243:8 247:5 271:6,9 273:11 273:15 275:5 284:20 287:8 287:22 288:19 290:22 291:15 291:16,24 292:3 294:24 302:2 305:2 311:3 312:3 314:4 315:8 317:13 318:4 321:23 322:11 324:6 325:10 328:15 333:22 346:18 348:24 349:14 355:10 355:23 356:2 359:22 360:3 363:4,10 366:9 393:12
**agreed** 75:17 152:9
**agreeing** 290:19
**ahead** 10:10 14:11 60:16 86:11 125:7 181:20 208:7 222:17 251:1 252:21 280:21 281:10 286:9 300:10
**al** 221:2 300:13
**alabama** 2:11
**aldehyde** 221:10 226:10
**aldehydes** 221:4,13 224:14 228:19
**alexius** 2:9 9:18
**aligned** 347:11
**aligns** 347:14
**alkaline** 232:16 337:7
**alkylphenols** 327:10
**allegedly** 356:15
**allen** 3:12 9:13
**alligator** 301:15
**allotted** 397:19
**allow** 218:4 284:12
**allows** 391:22
**alluded** 346:22
**alterations** 267:19 269:4
**alternate** 189:4
**alternative** 187:20 188:4
**alternatives** 393:23
**american** 73:21 283:11 297:7 313:20,23 321:13 374:2 375:15
**americans** 314:21 315:7 316:6
**amiller** 2:12
**amount** 41:17 55:21 68:7 92:17 94:9,20 98:15 123:17 156:10 158:4 158:22 162:3

233:20 235:7 237:9 239:15 278:5 279:6 347:9 353:14
**amounts** 127:23 230:9 298:8 308:6,9
**amricordati** 4:9
**analogy** 123:10 388:9,12,14 389:21
**analysis** 19:8 24:7 37:24 42:22 43:21 44:3,3,4,8,17 44:24 45:7,16 46:3,9 51:2,17 74:6 77:20 78:16 111:3 116:9 120:16 125:22 127:21 130:1,4 134:5 134:18 138:1 141:21 142:6 148:3 149:5 154:23 158:19 158:23 159:14 160:8 164:24 172:18 177:6 178:3 184:17 188:15 189:23 190:2 192:13 192:14 195:22 198:11,23 235:21 285:5 285:17 286:23 287:10 298:14 311:15 313:3 324:23 325:23 337:12,18,19 338:5 345:11 345:14 346:18 346:19,24 348:2,22 351:14,19 362:20 370:19 375:20 376:3 386:8,12,20 387:1,6 388:9
**analyze** 95:16 360:21 391:21
**analyzed** 130:2 175:1 189:17 263:9 289:14 311:19 343:7 379:7
**analyzing** 125:2 126:9 234:12 325:24
**anatomy** 92:5 202:2
**anderson** 5:2
**androgen** 87:9
**anna** 4:7 10:4
**answer** 13:12 16:6 20:18 23:16 24:15 26:12 27:18 31:11 32:20 33:12 34:8,19 35:22 36:8 37:19 39:23 44:1,3,9,14,24 45:16,20 46:13 50:24 57:21 58:7 62:5,18 63:6 67:11 68:3 69:13 70:14 75:4 78:8 83:12 84:19 89:5,24 91:12 94:15,17 97:15,17 103:20 104:8 109:11 110:22 110:24 113:9 115:16 121:7 124:4 126:17 126:17,21 128:15,16 129:16 131:10 142:6 146:20 147:13 148:8 155:13 156:15 157:17 158:15 159:7 171:14 171:23,24 172:3 173:5 176:14 180:7 180:17 183:10 184:8 185:19 186:3,12 187:1 189:11 190:21 191:6 193:2,5 193:6,11,13,17 193:18,18,24 194:2,13 208:7 208:20 214:9 216:8,14,19 217:6 219:4,4 219:6,12 220:1 225:14 227:16 232:22 238:20 264:2 272:18 272:24 273:2,8 278:12 280:3,9 280:18,22 281:11,18 284:12 290:6 292:5,10,13,15 297:17 310:19 311:20 312:7 313:7 320:2 325:9,18,19 338:3,24 339:20 340:7 343:2 353:8 356:19 362:3 364:9 368:18 369:22 371:7 375:12
**answered** 21:12 24:14 66:10 110:21 128:17 131:9

148:7 156:21 158:14 180:6 215:19 216:2 281:21 312:6 312:15 342:2 364:8,19 369:5 369:21 379:15 386:18
**answering** 20:24 28:22 35:23 182:16 183:9 191:9 216:16 217:11 217:17,20,23 218:6,17,18 271:14 284:4
**answers** 123:2 217:22 345:8
**anti** 242:16 272:13 279:7 330:16
**anticipate** 13:5
**anticipated** 46:7 113:17 315:19
**anticipating** 227:3
**antimicrobials** 327:11
**anybody** 197:8 212:18 214:19
**anyplace** 23:4
**apart** 265:16
**apologies** 147:2 165:22
**apologize** 47:16 58:18 242:18
**appear** 321:5 396:10,12
**appearance** 8:23
**appearances** 2:1 3:1 4:1 5:1 8:24
**appeared** 2:17 2:23 3:5,10,15 3:20 4:5,10,15 4:20 5:6,12,17
**appears** 151:4 264:9 322:12
**appended** 399:7
**apples** 271:22
**applicable** 397:8
**applied** 292:23
**applies** 245:11 293:22 387:22
**apply** 106:12 136:21 144:5 144:14 166:15 243:9 245:13 289:1 347:2
**approach** 112:2,11 158:18 169:13 380:22
**approached** 379:8
**appropriate** 147:7 215:4,21 216:9 269:11 304:23
**appropriately** 176:6
**approximately** 253:9 322:1
**april** 295:6 296:7
**area** 92:14 173:21 224:13
**areas** 74:21 97:16 104:6
**arguable** 131:17
**argue** 123:24 172:21 191:13
**argument** 130:3 213:18
**argumentative** 196:18 216:12 217:4 340:6
**arguments** 121:17
**arises** 170:20 170:20
**arm** 371:2
**arrive** 112:7 176:4 198:17 199:6,7 229:3 311:23 313:13 344:17 349:5 349:11
**arrow** 258:2
**article** 18:20 84:8 137:11,15 138:10 142:9 146:14,16 166:2,24 167:11 195:19 199:9 204:22 206:9,11 213:9 214:6 230:2,14 230:21 257:13 257:17 261:6 261:17 262:3,3 262:9,12 263:15,20 264:10,22 265:7,14 266:23 267:8 270:12 301:24 309:6 327:24 328:16 329:1 330:7,8 355:5 355:6,7 356:5 356:22 357:3 357:21 358:1,5 358:6 378:2,14 378:19 379:11 380:9,14 385:7
**articles** 26:15 45:22 46:1,3 61:23 62:1 89:4,4,4 90:4,9

95:6 117:9 131:21 132:19 133:20 137:3 138:2,11 144:24 148:15 148:17 157:24 185:13 186:9 190:23 191:3 199:14 329:17 378:18 379:11 379:17,20

**ashcraft** 2:14 9:14

**ashcraftlaw.c...** 2:16

**aside** 317:10

**asked** 16:2 22:11 37:12 60:19 61:9 62:15 63:1 75:22 102:23 103:7 108:21 110:11,21 111:8 113:2,5 113:23 120:6 129:18 130:19 131:9 148:6 156:21 158:14 180:6 192:23 216:2 217:5 218:18 254:24 280:14,16 312:6 322:10 342:2 364:8 366:14 367:13 369:5,14,21 374:12 376:23 379:15 381:4 384:21 385:1,3 386:8,18

**asking** 20:19 22:12 23:18 25:14 26:4 37:13 43:4 45:4 75:1 76:1 104:21 109:9 109:12 111:10 111:11 113:15 113:18 115:1,5 115:6 120:22 126:15,16 142:18 143:7 148:18 157:8 158:7 174:13 177:9 179:2 182:5 192:17 193:3,4 201:21 203:8,9,20 215:20 216:4 216:23,23 225:4 231:15 236:21 254:23 266:22 290:2,7 291:10,14,17 291:20,21 293:21 299:4 304:6,15,19 306:1,6,13 307:2 312:15 313:5 322:20 329:15 343:4 357:22 390:18

**asks** 34:22 41:13 56:19

**aspect** 90:16,16 90:24

**aspects** 99:6 377:6

**assertion** 180:15

**assess** 77:8

**assessing** 187:21

**assessment** 148:5 153:18 289:7,11 290:18 295:1 308:9

**assign** 115:24

**assigned** 370:9

**assist** 296:17

**assistance** 197:14

**associated** 7:14 7:17 87:5,24 88:4 130:11 139:17 142:19 142:21 143:4 184:19 188:11 201:11 202:10 202:10,12,21 202:24 258:17 269:5 274:24 300:17 302:23 303:11 317:8 323:6 328:5,17 338:18

**association** 6:21 28:3,11 45:23 53:6 118:20 122:2 123:16 129:22 149:9 153:8,12 154:20,22,24 155:16 156:23 156:24 157:3,8 157:19,20,23 158:2,3,11,21 159:4 171:6 172:14 179:6,9 179:21 180:23 181:1,15 182:4 182:6,11,13 183:1,11,15 184:10 189:1,3 189:7,19,22 190:5,17,24 191:2,8,9,16,23 192:6,10 193:14 196:3 285:3,6,16,19 286:18,24 300:24 308:23 309:9,13 311:6 311:24 312:4 312:17 313:11

317:24 345:23 346:2,12,21 347:5,13,17,20 348:7,7,9,17 349:12 370:15 386:13,14 388:19,21 389:20
**associations** 192:13 291:7 313:18 321:3,9 359:8 391:18
**assume** 69:4 104:14 127:24 223:11 298:5 395:8,11
**assumed** 268:23
**assuming** 329:4
**assumptions** 143:12
**asthma** 7:14,17 328:5,17 338:18
**attach** 72:7
**attached** 18:4 397:11
**attachments** 28:24 30:7,13 31:8,22 36:1,9 36:13,16,19 38:8,19 40:13 57:11 60:12
**attacking** 218:20
**attainment** 302:19
**attention** 115:8 299:13 381:11 384:20
**attorney** 9:1,9 396:14,14 397:13
**attorney's** 318:12
**attorneys** 34:23 39:21 54:1,5 197:21 210:15
**audio** 8:5
**author** 28:15 126:11 163:18 163:23 166:20 197:1 199:9 212:24 217:1 309:8 322:13 354:16
**author's** 125:12,15,24 322:19
**authored** 164:6 323:19
**authoring** 162:22 164:5
**authority** 23:9 25:7,10 26:3,5 27:10
**authors** 6:17 56:20 57:10,15 57:23 58:9 125:2,16,18 126:3,9 136:19 144:16 150:2 153:19 158:22 161:22 162:2,6 172:13 181:7 183:6,10 189:5 189:12,21 190:23 192:2 208:22 221:7 223:9,16 229:4 305:23 322:21 323:22 324:7 325:10,20 375:18 381:22 382:5 393:12 393:17
**autoimmune** 93:23,24
**available** 80:2 84:5 116:8 122:13 124:20 125:10 127:14 129:6,8 135:14 142:3 165:4 170:24 185:2 196:3 197:6 212:14 289:18 324:17 345:20 358:7,10 362:21 380:3 397:6
**avenue** 4:13
**average** 274:11 302:14,16
**avlon** 4:11 10:6
**avoid** 83:18,21 84:16
**awards** 100:13 100:16 101:4
**aware** 19:6 21:7 22:7,14 27:11,12,14 38:3,5,16 39:11,15 43:6 43:11 53:10 55:19 111:1,4 111:19 154:4 156:17 157:3,9 160:3 170:22 173:4 174:6 176:12,22 181:14 184:4 192:18 196:5 197:24 233:7 306:14 317:22 318:7 319:9,15 320:8 361:6,15 361:22 365:17
**awareness** 85:14,16 268:19

**b**

**b** 93:20,20 246:14,19 380:10
**back** 23:2 28:19 56:6,12 56:13 75:6 88:13 102:17 110:2 111:23 112:19 117:5 127:11 132:7 143:11 157:22 159:10 169:2,5 170:18 180:8 190:18 191:8 193:14 194:22 199:19 203:18 221:19 230:11 230:22 240:4,8 251:23 254:24 259:20 260:24 261:13 265:17 274:2 283:5 299:12 300:1,4 307:4 322:8 326:16 334:21 345:4 353:19 361:3 363:2 364:23 376:17 380:18 384:17 393:8
**background** 19:2 22:4,5 50:7 51:16 89:19 171:24 208:23 209:19 214:11 215:11 217:2 226:17 354:21 385:13 390:10,13,19
**backwards** 148:2 371:20
**bacon** 4:2 10:7
**bailey** 318:9,16 389:1,13
**barrier** 235:9
**based** 28:8 46:3 66:18 78:21 84:21 90:22 93:5 116:8,21 129:5 139:6 141:20 142:2,5 158:1,1,2 174:20,21 183:15 195:12 196:9 198:17 206:21 221:6 226:17 227:10 250:4 271:4 277:8 289:8 291:18 294:16 296:15,23 302:6 304:10 306:8,19 308:10,22 309:16 311:15 312:18 314:10 324:6,7,10 325:14,23 339:7 341:8 344:21 372:21 382:3
**baseline** 302:16 308:11
**bases** 19:22 60:13
**basic** 83:5
**basically** 87:16 89:3,13
**basing** 289:7 343:4
**basis** 24:8 25:9 25:19 26:2,16 32:5,16 39:1 103:19 167:12 216:17 336:23 341:21 342:17 358:2 385:4
**bates** 17:13
**bathroom** 102:11
**beauty** 2:23 3:16 9:3,13
**began** 52:4
**beginning** 9:1
**begins** 169:12 300:5 317:6 330:21 358:18
**begun** 39:16
**behalf** 2:17,23 3:5,10,15,20 4:5,10,15,20 5:6,12,17 9:3,5 9:7 10:13,16 10:18,19,22,24 11:2
**behaviors** 360:1
**beliefs** 268:20
**believe** 12:5 14:21 15:13 22:19 28:14 32:6 41:13,22 54:18 60:17 64:12 70:7,8 75:14,17 85:18 86:3,12 87:17 112:1 113:4,21 120:16 122:6 122:17 125:13 132:4 140:23 149:22 153:17 154:14 155:7 161:14,22 169:9,11 177:24 187:19 190:9,11 197:18 199:20 207:1,16 211:4 215:7,13,16 219:15,17 220:7,12,18 221:24 222:14 226:1 234:4 235:14,16,19

240:10 242:15 246:12 248:19 255:20 257:11 257:12 259:9 266:6 271:2 272:20 275:13 282:3 294:22 297:1 299:14 299:15 306:14 306:15 309:19 319:3 324:24 326:17 327:19 331:22 333:9 337:4 340:9,13 341:14,17 342:5 361:5 362:4,7 363:9 369:1 373:20 378:20,24 379:3 381:21 386:11 389:1 394:8
**believes** 152:5
**bell** 2:24 9:3
**bellwether** 176:21 225:2,9 276:14,18 278:9 279:21
**bellwethers** 281:9
**belonging** 327:6
**benefit** 76:20
**benzophenone** 326:23
**benzophenones** 41:6 56:23
**bertrand** 155:3 155:10 174:8 174:19 178:18 178:24 180:2 189:6 190:15 191:20 289:22 293:15 295:11 347:4,22 354:15 355:10 355:23,24 356:22 357:6 357:17 358:8 358:15 361:7 361:16,23 362:18 371:21 373:4,10 381:18,24 388:1,19
**best** 13:2,19 48:16 49:9 124:4 152:6 166:11 167:4 257:15 305:23 317:6 345:8 385:23 387:22
**better** 21:3,15 51:16 65:4 255:2 323:14
**beyond** 44:15 149:18 225:13
234:2 276:16 278:11 280:2,5 280:10 281:4 362:20 370:23
**bias** 288:18,18 290:22 291:3,3 291:5,10,12 292:1,1,10 305:12 306:2 320:5,9 365:5 365:16,18,19 372:19 373:8 373:18,24,24
**biased** 364:13 372:18
**biases** 268:23
**biasing** 372:10 372:11
**big** 96:5,7 160:13 324:13
**bill** 42:1
**billed** 48:24 50:15
**billing** 41:15,15 61:18
**biologic** 387:5
**biological** 127:17 130:15 176:4 236:12 267:21 268:19 269:22 270:16 270:21 386:23
**biology** 199:22 244:15
**biopsies** 66:13
**biopsy** 66:13 66:20,21,23 68:13
**biostatistician** 90:7
**biostatistics** 89:21,23,24 90:2,5 95:2 98:19 99:1,8 102:24
**birmingham** 2:11
**biscayne** 4:18
**bisphenol** 327:11 335:17 338:13
**bit** 12:13 29:10 43:20 45:21 61:16 62:8 69:24 71:2 75:16 82:6 118:8 144:22 151:2 152:2 186:7 187:6 243:11,22 250:3 252:21 254:9 300:11 321:1 345:7 348:11 349:4 365:23 371:19 372:9 377:23 392:5

**black** 7:15,18 7:20,23 174:7 174:18 203:5 203:24 252:15 253:1,10,18,22 256:24 257:4,5 257:22 258:3 258:18 263:4,7 263:10,14,17 263:22 264:11 264:24 265:3 265:12,12,13 265:20 266:12 267:15 268:9 268:16 269:1,2 269:6,9 270:5 313:20 328:6,9 328:10 338:19 347:23 354:17 359:16 363:5 363:12 366:20 374:7,8,9,14,17 374:20 375:2,7 375:21 376:12 390:9 392:17 392:18
**blacks** 316:6
**blame** 115:24
**bleach** 284:17 284:22 295:13
**bleeding** 68:18 276:10
**blog** 187:7,10
**blogs** 185:15,23 186:8 188:9
**blowouts** 319:12 364:5 365:8 369:16 370:3
**blue** 119:22 123:20
**blurry** 104:10
**bmi** 277:11,14 278:5,7,9,23,24 278:24 279:22 281:15 302:20 352:16,18,19
**board** 88:21,22 89:10 94:18 95:12 104:2,3 104:14 105:4,6 105:9,10,11,14 105:16,20,22 106:6,10,13,14 106:17,19,22 107:6,9,12,14 107:17,21,22 107:24 108:8 108:15,19,22 133:6,13,15 142:14 143:5 143:16,17 145:11 147:24 296:24 297:4 382:16 383:13 384:4
**boards** 106:8 143:14
**bodies** 223:24
**body** 97:24 98:2,5 109:1 130:13 187:22 194:7 195:2 215:4,22 216:10 238:2 255:9 277:4,20 279:6 307:20 312:23 315:6,8
**bonds** 337:8 341:11,12 360:9
**book** 145:2
**books** 185:15
**boston** 336:12 336:23
**bottom** 161:23 200:1 204:11 220:20 221:24 235:23 240:23 247:10,18 250:5 258:13 259:14,24 262:23,24 281:23 282:3 284:15 300:12 300:12 302:9 302:11 303:13 303:22 321:1 329:20 333:10 335:1,16 354:20 355:20 358:18 378:6
**bought** 336:12
**boulevard** 4:18
**box** 205:7,9 206:12 219:24 262:7
**bradford** 122:11 198:11 198:19 199:8 199:11 345:10 346:18,19 348:2 387:11
**bradley** 5:2
**brand** 333:20 391:16
**brands** 337:6 359:4
**brazilian** 319:12 364:5 365:8 369:16 370:3
**brca** 209:16 225:10 228:4,7 229:21 298:24
**brca2** 7:4 221:5 221:8,9,14 223:3 224:22 225:18 226:2,6 229:7,23 230:1 230:5 236:3,6
**break** 50:10 59:19 102:11 102:20 167:15

167:17,20 239:24 246:1 337:8 344:24 360:9
**breakage** 235:9
**breakdown** 49:19 52:13 69:20
**breaking** 239:22 265:16 299:20 341:11
**breaks** 250:3
**breast** 179:6,17 226:8 276:8 317:10 318:1 368:7 375:11 388:22
**breath** 217:16
**brethren** 280:18
**brief** 112:22 345:9 381:19
**briefly** 249:17
**bring** 74:8 140:13
**bringing** 87:16
**broad** 19:11 20:20 23:18 62:8 67:14 81:7 83:13 105:17 107:8 117:20 162:18 171:13,15 172:5 180:15 203:20 209:19 210:22 248:7
**broadly** 70:9 100:22
**brochures** 35:1 79:7,15,16
**brought** 74:7 80:7 84:22 104:13 115:8 360:24 361:1 362:5
**brown** 58:15
**bucket** 187:4
**bulk** 49:6 52:18 53:2 54:15 79:3 82:12
**bunch** 316:19
**burn** 235:5,8
**burns** 232:17
**busy** 50:18
**buy** 339:21
**bwhs** 359:16
**bypasses** 68:19
**byproduct** 368:22

**c**

**c** 11:1 246:14 246:19 247:3,5 248:4
**cadmium** 178:10 379:5
**calabria** 1:12 5:24 8:17 396:3,22
**calculation** 371:10
**calculations** 371:3
**california** 385:12,21
**called** 1:9 11:5 96:7 132:16 145:4 178:10 241:11,16 242:7 365:16
**cancer** 6:23 7:7 7:9,10,12,20,23 12:6 23:13 25:12 26:8 32:8 37:4,16 38:6,18 39:13 41:4,5 42:24 44:11 45:7,18 45:24,24 46:11 53:7,7 56:22 56:22 58:21,21 60:22,22 61:12 61:12 62:3,20 63:11,15 64:6 64:16 65:2,11 65:15,23 66:2 66:8,17 67:20 68:11,11,23 69:11 73:14 74:11 75:14 76:15 77:9,22 78:11,17 79:9 79:22 80:14 84:1,3,3,9 85:19 87:19 88:11 92:4,7,8 92:12 93:10,11 93:22 96:21,24 97:8 98:4 100:17,24 103:6 104:18 104:18 110:12 110:15,20 111:13 114:16 115:3,23 116:1 116:20,24 117:16 118:4 118:13,20 119:12 120:8 121:1 123:8 124:10 125:1 125:18 126:8 127:3,6 128:11 129:14,24 130:14 131:8 142:8 149:11 153:4,9,17 154:10,13,18 156:20 157:12 159:6,23 160:7 163:21 164:8 171:6,7 172:8 172:10 173:1,6 176:19 177:1 179:6,8,12,17 179:17 180:1,5

180:20 181:4
181:11,17
182:8 183:2,21
184:1,6,10,16
184:20 185:8
188:12 190:11
190:12 195:8
196:4,4 199:1
199:22 201:6
201:12,16,17
201:24,24
202:1,1,1,7,8,9
202:9,10,11,11
202:13,14,16
202:19,22,22
202:23,24
203:2,3,13,13
203:14,17,17
203:18 204:2
206:2,3 207:12
207:15,19
209:7,9,12,17
211:2,20
214:14,15,15
214:18 221:14
224:19 228:5,9
228:12 229:6
229:12 240:11
240:15,15,16
240:19,24
241:7,10,10,12
241:16,19
242:15,22
243:4 244:4,10
244:11,21
245:3 247:16
248:24 249:15
252:1,2,16
254:3,10
255:23 257:19
259:6 260:13
260:20 261:7,9
261:10,19,21
261:22 262:1,2
262:4,6,8
264:17 265:21
266:2,4 269:24
271:17,18,23
273:23 274:7,9
275:2,24 276:8
277:1,13,18
278:16 279:10
279:12,16
281:16 282:4,5
282:15 283:8,9
283:11,20,21
285:4,17
286:16,17,19
287:1,13
288:15 290:3
296:13,16
297:7,10,12
298:6,12,16,17
299:3,16,20
300:7,18 301:1
302:2,16,18
303:3,10
309:11,14,17
310:16 311:8
312:1,24,24
313:1,3 317:9
317:10,10,18
318:1,1,2,9,10
321:5,7,20
322:18 323:4,6
323:15 324:19
324:19 325:1
340:2 344:22
346:8,8,15,15
347:18 350:3,3
350:9,15,22
351:7 352:16
352:16,17,20
353:20 354:17
355:12 356:2
356:11,24
366:16,24
367:6,24 368:7
368:12 370:16
372:17 373:21
374:18,21
375:11,22,23
379:10 381:6
382:2,19 383:1
383:21 384:5
387:3,8 388:18
388:22,23
389:2,2,10,10
390:9 392:16
394:3
**cancers** 39:19
64:15 69:1
78:4,4 82:1
88:1 92:3 93:4
95:8 99:17
100:6 101:18
102:3 105:19
112:9 117:8
119:20 120:3
141:3 152:22
154:7,16 157:7
158:13 159:20
179:18 181:14
184:22 185:6
188:1 189:9
191:22 192:22
194:9 202:4,6
202:21 204:3,7
205:16,23
207:3,4 208:1
208:10 209:1,5
209:9,13,18,20
210:8,23 211:3
211:9,15,16,19
212:7,10
213:10 225:19
226:7 228:14
228:17 245:12
249:17 250:8
253:17 254:11
254:15,18
255:2,7,13
260:3,21,22
261:3 263:16
263:21 264:11
265:22 272:6

279:24 285:7,8 285:20,20 287:1 309:5 313:1 324:10 325:14 342:19 350:5 351:3 388:20 389:5 389:11,13
**captured** 13:1
**capturing** 45:13
**carcinogen** 391:12
**carcinogenesis** 178:17,22 221:7,16 225:23 226:24 247:23
**carcinogenic** 118:16 178:8 237:22 239:8
**carcinogens** 177:18,24 178:13 185:1 239:10 343:9 343:13
**carcinoma** 243:10 244:16 276:1
**carcinomas** 243:13 244:20 247:2
**carcinosarco...** 241:16 254:14 260:11 263:12 276:1
**carcinosarco...** 241:18 245:1 249:23 250:13 251:6
**card** 90:7 95:10
**care** 64:14,22 65:7,9 67:6,6 68:24 69:4,5 72:13 73:4,6,7 73:8 74:10 75:21 78:19 79:9,14 91:2 95:17 170:7 268:22 269:21 270:7 296:18 296:20 323:14 324:18 380:12
**careful** 167:6 169:13 176:2
**carefully** 169:22 195:2 329:10 367:21
**caring** 76:6 82:16
**carried** 149:6
**carriers** 221:8 221:14 224:19 225:18 226:2,6 228:4
**carry** 224:21 225:10
**carrying** 66:7 90:7 95:10
**case** 1:4 12:3,9 13:16 15:17 17:7,12 19:8 21:9,13,23 26:21 29:7 30:2,19 32:2 33:3,23 34:3,6 34:12,15 35:21 42:18 43:18 46:24 51:9 55:11 61:20 77:1,3 78:3 85:9 87:2 99:9 108:24 118:17 129:6 130:2 133:23 137:4,4 147:1,1,2,3 148:3 190:8 192:21 193:16 196:15 198:15 210:16 212:17 224:21,23 225:8 229:20 232:3 239:4 245:5 247:15 279:21 280:5 280:12,19 281:3 287:18 287:24 290:13 293:7,9 294:11 296:24 310:22 312:24 332:10 332:14 345:11 347:1 353:18 354:1 371:5 372:17 380:21 387:15 388:10 388:14 389:14
**cases** 11:18 65:14 67:21 72:6 172:6 225:3 240:19 247:19 251:15 276:18 281:3 397:4 398:1 399:1
**castronuova** 2:3 9:8,8 328:20,22
**catch** 299:15
**categories** 15:10 138:13 200:14 246:13 290:10 330:15 373:16
**category** 248:11 260:2 271:24 282:8 294:1 314:5 315:16 340:1 352:17 359:14 361:22 370:9 373:13,15
**causal** 28:3,10 42:23 44:17 46:2,9 51:17

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 418 of 515 PageID #:76276



57:18 58:5 62:15,19 63:10 64:5 74:6 76:24 77:20 78:16 79:21 80:13 112:8 114:16 116:8,9 117:15 118:2 119:5 120:7,16 120:24 123:7 123:12 124:9 124:18,24 125:4 126:7,12 127:1 128:9 129:12 130:3 131:6 152:20 153:1 154:6,23 156:18 157:2,5 157:10,23 158:11,11,19 158:23 159:4,5 163:19 171:8 171:20 172:24 173:16 177:6 180:4,18 181:15 182:6 182:14,24 183:7,15 189:7 189:23 190:4 190:16 191:20 192:11,12 194:8 195:10 198:23 311:6,6 311:23 323:22 324:4,9,24 325:13 326:1,3 326:10 340:2 342:18 349:1,5 349:11,15,19 350:1,8 379:9 386:8 387:1,6

**causality** 122:6 122:12 123:18 124:3,21 127:6 127:23 153:24 325:21 345:15 349:6 386:17 388:8

**causally** 77:9

**causation** 6:21 14:3 19:8 88:10 96:20 99:16 100:5,9 100:16 101:5 101:17 102:2,7 121:13 123:21 148:20 154:1 154:12,20,22 155:1,22 157:20 158:4 158:22 159:13 164:6 190:4 191:7,11,16,21 192:3,16 193:15 199:7 199:14 201:12 245:6,17,22 298:15 312:3 312:18 313:12

**causative** 87:18 88:1 153:16 189:20 191:4 244:14 279:15 297:2

**cause** 44:11 46:10 60:21 61:11 73:24 77:21 93:23 110:20 111:12 119:12 121:3 141:2 142:7 154:9,17 155:18 159:19 159:23 160:7 187:23 190:7 192:3,22 198:24 268:21 268:23 292:2 325:4 348:1,6 388:17

**caused** 45:17 57:17 73:14,20 74:15 75:13 76:18 78:10,17 114:16 202:24 210:9 212:10 251:20 367:6 368:12

**causes** 123:8 153:4 154:16 277:17

**causing** 32:7 85:19 181:5 185:5 226:21 229:10 232:17 232:18 233:19

**cautioned** 115:13

**cautious** 116:7 116:13 190:5

**cavo** 3:2 10:22

**cease** 73:9 74:17

**celebrated** 217:24

**cell** 164:22 199:22 205:17 205:24 221:3 227:7 229:5 236:1 247:2,9 247:15 248:11 249:23 250:11 250:22 251:5 254:15 259:19 309:22

**cells** 93:22 223:1 224:18 226:23 228:7 228:18 229:16 229:18,19 230:19 231:11 236:2,7 237:8 237:21 238:1 247:12 277:19

**cellular** 222:8 222:23
**center** 131:14
**certain** 122:8 204:2 221:16 224:16 226:7 248:2 349:24 358:19 363:3 377:6
**certainly** 28:6 39:4 76:20 77:18 84:4 110:13 116:3 116:17 118:10 127:7 134:18 135:17 170:19 177:8 197:11 207:18 211:15 224:11 244:9 244:12 247:15 248:10 276:6 277:10 278:5,6 298:22 307:4,6 307:20 308:1 309:14 348:11 349:4 352:13 353:15 360:4 360:15 369:24
**certainty** 13:23 14:6 60:20 61:10 126:23 311:5
**certificate** 396:11
**certification** 89:6,12 95:13 105:16 106:6 106:13,18 107:14 108:9
**certifications** 88:20 89:1
**certified** 88:21 88:22 94:19 104:2,3,14 105:4,7,10,14 105:20,22 106:10,14,19 106:22 107:6,9 107:12,17,21 107:22,24 108:16,20,22
**certify** 89:14 396:3,7,13
**cervical** 65:16 66:16,19 201:12,17 202:8,9,10,13 202:16 203:2 203:17 241:9
**cervix** 202:2,3 202:4,13
**cetera** 44:19 64:21 69:6 77:5 84:3 119:19 228:19 247:24 362:9 394:19,19
**cgw** 2:21,22
**chance** 136:3 299:15
**chang** 58:16 155:3,9 174:8 174:19 178:18 178:24 180:2 189:6 190:15 191:19 286:10 287:3,7,15 288:12 289:9 290:15 292:8 293:22 294:2 347:3 363:7,10 363:10,19,19 364:2 367:11 367:15 374:11 374:18 375:19 375:22 376:1,9 384:12 387:24 388:18
**change** 27:6 39:6 195:11,15 277:4 289:24 305:3 329:17 330:6 398:4,7 398:10,13,16 398:19
**changed** 71:2 75:16 142:21 282:21 293:17 338:21 339:9
**changes** 139:7 207:20 270:18 270:24 358:22 359:22 361:17 397:10 399:6
**changing** 27:3 169:18 174:2,6
**chapters** 117:10 166:16
**characterizati...** 344:16
**characterizing** 209:22
**charge** 55:2
**charging** 54:21 55:4
**chart** 205:1 249:19 257:16 259:11,21 335:21
**charts** 248:20 259:23 261:2
**chatter** 218:13
**cheatham** 2:23 3:11 9:3 10:24
**check** 354:11
**checkmarks** 150:17
**chemical** 21:13 23:12,24 25:11 26:7 32:20 33:1,9 37:3,15 38:5,17 39:12 39:18 41:4 42:23 44:10 45:17 46:10

53:6 56:21 58:20 60:21 61:11 62:2,19 63:9,14 64:5 73:9,22 74:18 75:11,18,22 77:9 79:10,21 80:13 83:18,22 84:8,16 87:5 87:17,20,24 88:5,9 90:12 90:18 91:4,9 91:13,17 96:20 96:23 98:1 99:16 100:6,9 100:16,23 101:5,17,22 102:2,8 103:1 103:1 110:20 111:12 112:8 113:2 115:13 116:5,22 117:16,21 118:17 119:6 120:7 121:11 123:7 128:10 129:13,23 130:9 131:7 141:2 142:7 149:9,10 152:21 153:14 153:15 154:6 154:17 156:19 157:6,11 158:12 159:5 163:19,20 164:7 176:24 179:19 180:5 180:19 181:16 182:7 183:1,20 183:24 184:5 184:19 185:4,5 187:23 188:11 189:8 191:21 192:21 194:8 196:5 224:7,10 226:20 232:11 235:3,4 236:14 237:20 238:3 239:8,12 245:18 279:2 282:9,16 284:21,24 288:8 298:15 311:7,24 312:21 315:10 319:10,12,22 324:9 325:13 327:6 336:11 336:21 338:20 339:3,17,17 341:4,21 342:18 343:16 352:2,8 353:17 354:22 359:4 359:15 360:7 364:5,18 365:7 365:15 366:10 366:15,19,21 366:23 367:6 367:24 368:11 370:2,16 378:17 380:17 382:1 383:22 384:22 385:5 385:18,22 386:1 387:2,7 387:21 388:17 389:7,12 391:1 391:14,19 392:15 393:15

**chemicals** 7:14 7:17 22:20 24:2 32:7,9,12 32:15 41:7 56:24 85:19 90:19 101:10 127:19 130:9 130:11,12 178:5,12,15 181:5 223:15 223:20 224:12 233:18 234:15 234:17,19,22 235:11 236:12 237:19,20 279:3 307:19 312:21,22 326:19 327:6 328:5,17 337:3 337:5,9 338:19 339:7,10 340:10,12,20 341:9,16 342:6 342:12 352:24 359:10 379:1 379:18 380:2 385:13 389:19

**chemotherapi...** 93:17

**chemotherapy** 64:20 69:6 70:21 72:16 73:1 76:10,10 78:24 90:17 91:14,16 97:23 108:24 251:18

**cherin** 4:12 10:3

**cherry** 28:9

**chicago** 1:14 2:20 3:3,8,18 4:8 5:4,10,15 8:14

**children** 331:11

**choose** 360:23

**chose** 212:10

**chromosomal** 223:1

**chronic** 206:4 207:8

**ci** 300:22

**cigarette** 153:3 153:9 157:22 325:3 353:19

353:19
**cigarettes** 354:1
**circle** 110:2
**citation** 166:18 253:4,6,6 284:6 354:24
**citations** 165:19 166:1 166:14,19 284:8,9
**cite** 158:8,16 166:9 182:23 190:16 191:20 215:5,22 216:10 220:3 233:22 235:12 286:16 357:17 385:11 395:6
**cited** 166:3 167:1 174:17 178:23 208:3 216:4 282:5,8 326:24 355:21 357:22 362:17 394:5
**cites** 206:23 355:6
**citing** 206:8 215:10 264:9 287:3
**civil** 1:10
**clarence** 58:15
**clarification** 40:22 245:1 338:2
**clarify** 37:8 70:18 81:7 132:13 144:21 181:24 203:16 241:14 254:8 317:19 331:18
**class** 7:3 278:9 360:11 380:23 391:19
**classes** 327:6 339:3 359:10
**classification** 249:14 250:2
**classified** 249:24 315:14 315:16 373:14
**clausen** 5:8 10:17
**clausen.com** 5:11
**clean** 13:10 55:4
**cleaner** 217:12
**clear** 18:10 25:20 28:5 102:22 103:8 103:11 105:3 107:20 128:7 143:2,9 145:9 156:15 162:19 164:4 167:11 181:22 217:21 234:18 247:2,9 247:11,15 248:11 249:23 250:11,22 251:5 254:14 259:19 279:19 281:6 309:22 346:12,13 363:18 379:8
**clearly** 13:1 45:13 110:4 180:13 281:4
**clinic** 73:15 82:17 83:9 84:24
**clinical** 64:14 64:16 65:5 66:14,18 81:17 83:7 86:16,24 87:4,13 90:14 90:23,24 98:9 112:13 113:1 113:19 114:3 114:14 115:12 117:7 138:6 144:18 171:2 176:3 198:18 198:20 258:17 268:22 269:5 298:20 299:5 299:11
**clinician** 95:19 110:6
**clinicians** 172:16 296:17
**clinics** 72:5
**close** 38:15 56:14 101:3 163:8,15 182:3 215:3 329:4
**cmo** 160:11 281:6
**coffee** 172:9 173:1
**coherence** 387:10
**cohort** 285:24 287:7,12,19 288:1,10 290:13 293:7 293:11 294:11 302:20 303:6 323:1 384:14
**collaboration** 16:9
**collaborators** 138:14
**colleague** 218:11,12
**collected** 61:24 304:6 305:15 308:11 368:5,7
**collecting** 100:21 339:15
**collection** 37:24

**colloquy** 325:17
**colomer** 332:9
**column** 322:24
**combination** 78:24 87:10 200:13 268:18
**combined** 359:17
**combs** 319:11 365:11
**come** 65:14,19 66:1,7,11,15,18 66:22 67:1,17 68:5,7 69:2,19 73:10,12,19 75:12 80:1,5,8 84:1 85:2,22 108:11 110:10 114:5,8 115:20 116:4 117:3 118:21,24 128:18,20,22 131:18 173:19 173:20 177:8 217:17 229:2 361:7,16
**comers** 265:23 309:4
**comes** 20:2 27:1,4 67:23 76:21 84:20 96:4 104:24 105:19 106:15 114:22 115:4 115:19 119:18 159:19 195:18 195:19 207:18 307:21 309:4 329:11
**comfortable** 20:24 23:3 94:3 109:17 129:24 131:1 134:7,17 148:2 148:21 149:11 149:20
**coming** 30:18 31:7,20 114:13 180:8 213:15
**commenced** 42:18
**commentary** 138:6 144:18
**commented** 27:23 362:7
**comments** 217:11,11 296:24 297:6 299:7
**committee** 16:17
**committee's** 6:11
**common** 70:24 93:24 240:18 242:7,13 260:4 260:8,9 261:10 261:22 303:4 324:20
**commonly** 209:10 380:12
**communication** 152:10
**communicati...** 56:19 57:3 58:14,23 59:6 59:11
**communities** 151:17
**community** 147:6 152:5
**companies** 33:8 341:22 380:20
**company** 32:21 32:23 33:4
**compared** 253:9 257:6 263:8 268:10 303:6 366:17 392:18
**compelling** 130:3 309:20 310:3,9
**compendium** 132:15 145:1
**compensation** 6:14 41:17 47:1 61:18
**complained** 68:17
**complaining** 65:21 276:9
**complete** 17:6 17:24 18:12 87:7 215:23 216:11 355:6 399:8
**completed** 397:16
**completely** 248:15 250:16 363:12
**completion** 25:22
**complex** 20:8 76:8,13 78:5 97:15 126:15 159:13,13
**complicated** 380:10
**component** 91:1,3 175:21 331:7
**components** 331:8 339:5
**composition** 338:21 339:17 341:4,15,22 343:17
**compositions** 343:11
**comprehensive** 296:14

**comprised** 331:6,7
**computer** 47:22 187:15 235:20
**computerized** 396:5
**concentration** 223:18 237:1,7 237:17 239:6
**concentrations** 222:7,22 223:7 223:12,14,23 224:8 338:13 343:11 378:22
**concept** 354:3
**concepts** 312:4
**concern** 149:18 190:24 232:23 339:7 348:1,6 380:2,6
**concerned** 116:19,23 183:14 191:1 192:10
**concerning** 84:2 114:15 155:16 343:7
**concerns** 58:9 74:22,22 188:16 379:1
**conclude** 125:4 126:11
**concluded** 125:3 126:10 355:11 356:11 395:18
**conclusion** 28:2 28:7 117:18 118:5 119:8 120:10,24 124:11 141:2 142:7 171:8 173:19,20 189:7 190:1,16 192:20 195:9 195:12 196:8 198:17 210:11 210:13 211:5,7 212:22 213:22 228:23 229:3 297:14 311:15 311:20,23 313:14 344:18 344:21 349:9 355:24 357:16 358:8 367:23 390:18,19
**conclusions** 126:1 146:13 147:18 148:3 148:19 180:12 194:10 208:18 209:22 210:14 237:14 268:7,8 269:15 356:17 361:5 390:14
**concordant** 269:7 270:7
**condition** 92:10 92:12,14,16 127:20 181:6
**conditioner** 330:16 331:13
**conditioning** 331:16
**conditions** 107:15 130:10 209:21 210:9
**conduct** 96:8 153:11 158:23 167:6 337:21 339:14 341:5 346:19 362:16
**conducted** 24:7 96:13 149:6 158:3 323:12 370:19
**conducting** 164:24
**conferences** 117:12
**confidence** 300:22 301:4 310:6,12,21,24 314:2 315:24
**confirm** 323:9
**confirmed** 130:16
**conflagration** 369:11
**conflates** 369:1
**confounder** 172:18
**confounding** 288:18
**confused** 390:5
**confusing** 132:14 241:15 241:21 242:18 244:24
**confusion** 254:9 265:24
**conjunction** 198:15 239:11 389:5 391:7
**connection** 349:1,15 350:8 383:21 387:2,7
**consider** 19:7 23:19 28:12,12 30:18 31:24 33:23 36:22 96:15 107:9 113:12 129:1 131:16 140:8 141:18 169:22 175:3,3 177:4 179:23 187:4 188:5 241:18 244:11 251:19 276:3 309:24 360:20 379:10 379:12 382:4 385:16 386:23

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 424 of 515 PageID #:76282



387:5,10,12,14 388:9 389:22
**considerably** 268:10
**consideration** 24:8 142:8 167:7 169:14 176:2 228:12 249:16 289:13 289:21 363:4
**considered** 18:4,11,22 19:4,9,13,14 20:16 21:2,10 21:17,24 22:7 22:17 23:7,14 24:10,22 25:8 26:10,15 27:15 28:16 29:5 30:1,13 31:6 31:20 92:11 104:23 118:12 135:15 170:1 176:23 178:6,7 178:13 187:20 188:19 241:17 242:19 243:14 244:4 245:2 248:4 249:21 254:15 293:16 320:6 346:23 362:12 381:23 388:13
**considering** 293:15 317:8 317:23
**consistency** 289:6 292:17 294:12 345:23 386:13
**consistent** 339:2 346:2
**consistently** 110:9,16 113:5 339:3 341:9 343:12,12
**consortium** 152:8
**constantly** 80:17 91:13 98:11 108:5 119:15,19 169:18 174:2,5
**constituents** 323:9 392:16 393:16
**constitutes** 91:4 260:1 396:5
**constituting** 40:9
**construction** 193:22
**consulted** 68:22,23
**contacted** 42:5 42:9,14 61:18
**contain** 162:11 164:14 167:13 333:24 334:8 339:6 341:18
**contained** 7:24 26:9,22 32:9 32:12 40:16 174:21 306:9 331:12,14,16 334:14 378:16 379:19 385:5 389:8
**contemporary** 360:1 391:3,10
**contents** 16:3 22:24 386:1
**context** 11:17 73:10 84:5,7 117:4 126:18 128:18 170:13 170:15 184:16 193:23 207:10 209:8,18 214:11 215:15 228:3 237:13 291:3,9,17,23 298:23 312:14 313:11 343:6 349:7 358:6,9
**continue** 8:6 281:2
**continued** 3:1 4:1 5:1 392:2 392:14 393:6 393:14
**continues** 263:4 303:12
**continuing** 89:13
**contradict** 264:12 338:8
**contradictory** 195:16
**contrary** 196:6
**contribute** 28:10 78:4 187:24 321:19 322:18
**contributing** 268:16
**contributor** 262:18
**control** 99:9 152:10 186:22 290:13 293:7,9 385:12,21
**controlled** 387:20
**controls** 147:1 147:2 294:11
**convenient** 360:23
**conversation** 12:22 63:24 80:6 110:10
**conversations** 8:4

**convey** 211:8
**cook** 396:2
**copies** 17:12 372:7 397:14
**copy** 14:16 17:6,24 70:23 71:16 198:8 205:6,6 258:16
**corner** 231:8 235:24 302:11 320:15
**corners** 31:8,14 31:21
**corporation** 3:21 10:1
**correct** 14:7 16:1 30:21 31:5,23 33:21 34:1,4,17 37:1 38:2 39:24 40:17 41:11 46:14 53:16 59:3,5,15 60:8 62:21 64:8 72:18 73:2 86:21 87:3 88:3,6,12,24 89:16 96:22 99:18 101:7,23 102:5,9 104:2 105:8 130:21 133:7 139:13 142:5,15,23 143:13 145:21 164:13 174:2,4 176:5 184:1 201:3 202:15 220:12 222:4 229:18 230:3 236:9,15 242:5 245:20 257:19 259:1 287:5,19 294:17 300:23 314:7,17 336:13 359:6 372:2 373:1 374:9,10,14 376:15 377:7,8 384:2 388:6 399:8
**corrections** 399:6
**correctly** 205:21 242:2 273:4
**correlated** 157:21 278:6
**correlation** 176:2
**correspondem...** 59:16
**cosmetic** 91:21 91:21 103:1,2 393:24
**costello** 2:18,19 6:4,6 9:2,2 11:8 14:8,14 16:12 21:6 24:13 25:23 26:18 27:8 28:18 31:15 32:18 33:17 34:10,20 37:10 37:22 38:13 39:9 40:5 43:19 44:6,22 45:11 46:6,17 47:15 48:23 49:14 51:6 52:1,20 53:12 58:2,10 59:18 59:23 60:3 61:3,5,7 62:13 62:22 63:12 64:2 67:3,15 69:7,16 70:17 75:1,6,20 76:2 78:6 79:5 80:9 81:1 84:13 85:5,23 94:22 97:11 102:10 102:13,19 105:1 108:18 110:1,21 111:9 111:15,22 112:14,21 113:16 116:11 117:23 119:2 120:4,21 122:5 124:6 126:4,19 128:14 130:17 131:19 134:9 135:1,9 136:1 140:15 142:4 142:12,18 143:3 144:12 147:8,20 148:10 149:21 150:21 154:2 155:8 156:1,13 157:1,14 158:5 159:1,10 160:1 160:9,14,22 162:21 163:2 164:3 165:12 167:15,21 169:4 171:3,16 172:2,23 173:8 173:22 174:16 175:5,22 177:12 179:15 180:16 181:10 182:2,12,18,21 183:17 184:12 185:22 186:5 186:20 187:14 190:13 191:5 191:14 192:4 193:1,13 194:4 194:5 195:13 196:10,22 197:19 198:3,7 201:9 204:16 206:17 207:23 208:15 209:3 210:10 211:6

212:8,23 213:8 214:3 215:1,18 216:7,22 218:9 219:3,7 220:2 220:22 222:13 225:16 227:12 227:19 228:20 229:13 231:4 234:9,23 238:8 239:13,20,24 240:5 248:16 250:9 251:22 252:8,11 254:22 255:17 256:5 261:13 261:15 262:23 263:3 264:7 270:11 271:12 273:7,17,20 276:19 279:17 280:9,16,20 281:10,13,20 283:3,17 284:2 284:5,14 285:14 286:5,8 286:10,14 288:13 290:1 290:21 291:4 291:13 292:12 293:20 294:3 295:4,15,19,22 297:5,9,22 299:21 300:2 301:14,16,19 301:23 303:20 305:1 306:17 307:12 308:3 308:18 310:10 310:18 311:11 312:2,9 313:4 313:15 315:18 316:11 317:20 318:6,18 319:5 319:20 320:11 324:5 326:2,15 327:15,18 328:3 329:8,12 332:6 333:3,7 333:21 334:6 334:13 335:4,6 335:7 336:9,16 337:11,20 338:6,11 339:13,23 341:1,19 342:15,21 344:1,5,8,12 345:1,5,16 347:21 348:23 349:13,20 350:6,18,20 351:9,23 352:6 353:7,23 354:6 355:1,8,9,15,19 356:20 357:8 358:12 361:14 362:15,23 364:1,15 365:10,21 366:5 367:3,13 367:17,22 368:20 369:7 370:17 371:4 371:12,16 373:2,9 375:4 376:13 379:14 384:24 386:18 389:15 390:3 392:21 393:2 393:10 394:20 395:12

**cote** 58:16

**counsel** 8:23 15:14 16:9 18:5 19:18 29:1 30:8 36:1 42:14 51:3 105:18 130:24 130:24 170:2 197:11 210:20 217:17,18 218:8 234:3 252:7 271:11 372:7 376:24 377:5 380:19 381:5,10 383:6 386:12 396:9 396:14,15 397:14

**counseling** 104:19 299:3

**counselor** 261:23

**counteracts** 277:24

**country** 83:3 186:4

**county** 396:2

**couple** 36:7 62:14 66:4 79:6 80:8 91:8 102:22 215:3 240:13 340:11

**course** 64:18 90:2 95:4 304:11

**courses** 98:23

**court** 1:1 8:16 13:1 55:16 261:14 283:9 283:13

**courts** 1:11

**covered** 99:13

**covering** 344:8

**cream** 331:12 335:24 336:1,3 336:8

**create** 41:8 134:4,6 187:16

**created** 41:2 368:13

**creating** 226:16 279:8

**credibility** 218:21

**credit** 361:1
**criteria** 133:19 141:11 144:4 162:24 164:9 178:9 288:20 289:15 293:3 311:2 345:11
**critical** 95:16 152:15
**criticisms** 70:11 146:17 319:16 364:11
**criticize** 70:15 134:19
**cross** 18:20 21:14
**crowley** 58:17
**csr** 1:13 5:24 396:3,22,23
**cultural** 268:20
**cure** 64:23 125:18
**current** 64:13 74:4 90:14 115:9 268:24 325:7 359:24
**currently** 117:6 133:10 141:8 142:13 196:3 249:16 324:16
**curriculum** 106:5
**custom** 110:5,8 110:19 111:11
**cut** 182:15,16 182:19,20 235:8
**cutoff** 277:12
**cv** 1:5 86:2,12 88:14 89:20 99:20,24 102:1 131:20 132:5 142:24
**cyclosiloxane** 377:18
**cyclosiloxanes** 326:21 327:9 377:17,20

**d**

**d** 5:9 94:2 246:14,19 247:3,5 248:4
**daily** 48:13 103:19
**damage** 76:14
**dan** 2:19 9:2 301:9
**dario** 1:8 6:3 6:13 8:9 11:4 11:11 60:11 396:3 397:5 398:2,24 399:2 399:4,12
**darolutamide** 87:10
**data** 17:10 29:5 29:24 30:12,18 30:22 31:2,6 31:16,20 35:18 35:19 37:2,7,7 37:8,13,14,20 37:21,24 38:5 38:17,22,24 39:2,3,6,11,14 43:9,18 57:12 61:24 95:16 100:21 109:23 110:13,13 117:17 118:4 119:7,10 120:9 120:13,15,19 120:23 121:10 121:11,18,22 122:1,4,18,18 122:20 123:3,9 123:19,20,22 124:1,2,16,17 124:17,17 125:2,9,11,13 126:10 128:1,2 128:4 129:8 140:18 155:20 155:21,22 158:1 162:9 164:10 165:9 165:14 167:1,8 169:14,23 170:7,11,20 171:5,7,19 172:7,13,16 173:6,9,10,15 173:17 174:6,8 174:21 175:6,8 175:10,14,16 195:21 212:14 212:21 213:3 214:18 215:4,8 215:14,21,24 216:4,10,11 223:22 232:6 243:14 252:22 264:12 266:15 266:18 268:13 271:3,5,7 272:20 273:11 289:14 290:17 290:18 292:22 302:7 303:16 304:5 305:15 307:5,19 308:5 318:23 319:3,7 324:16 338:8 338:15 339:15 339:17,24 341:21,23 342:23 343:20 358:4,5 359:3 368:5,7,8 371:9 376:8,9 384:21
**database** 96:8 96:11 165:6 175:14 264:21 307:1 363:21 368:13,18

375:1 376:8
**databases** 96:5 96:5,12 165:3 189:14
**date** 47:8,12 50:11,21 51:7 53:17,19 118:23 135:19 318:19 329:2 395:3 398:24 399:12
**dated** 381:12 382:10 385:14
**dates** 38:7,11 38:12 47:5
**day** 13:9 27:3 40:20 41:10 42:8 47:24 48:11 50:13 51:4 55:13 59:2,4,8,12 68:24 130:8 218:6 366:24 370:10 391:12 396:17 399:15
**days** 50:20 73:15 108:4 396:10 397:16
**dc** 2:15
**dcostello** 2:21
**deadliest** 324:18
**deal** 87:15,23 91:15 92:19,21 95:4 97:22 98:15 99:5,10 103:18 108:3 108:23 160:13 199:14 305:24 307:1
**dealing** 91:13 103:23 114:12 146:15 199:22 251:24 298:17 363:9,22
**deals** 107:12 137:15 328:16 369:23
**dealt** 99:15
**dearborn** 1:13 8:14
**debrosse** 2:9 9:4,4,10 193:19 217:10 217:16,20,24 218:11,22 219:2 252:7 335:2
**decade** 266:5
**decades** 153:6 253:17 256:11 256:20,23 268:12
**december** 12:2 18:5 30:8 50:17 53:18 55:7,9,11
**decent** 55:21 92:17 94:9,20 272:9,10 375:13
**decide** 305:8
**decided** 366:19
**decisions** 108:7 108:11 146:15 296:20
**deck** 4:12 10:2 10:2
**declare** 399:4
**dedicate** 114:17
**dedicated** 54:16
**dedicating** 48:4
**deemed** 399:6
**deep** 44:17 111:3 114:23
**deeper** 85:20 212:2
**defend** 218:16
**defendant** 1:9 2:23 3:5,10,15 3:20 4:5,10,15 4:20 5:6,12,17 10:3,6 33:2 332:14
**defendant's** 17:1
**defendants** 6:12 18:1,5 25:18 32:2 121:15 332:10 332:16 380:20
**defense** 29:1 30:8 33:19 36:1
**defer** 234:24
**deficiencies** 361:24
**deficient** 270:21
**defined** 300:16 307:13
**definitely** 32:14 39:7 54:6 56:9 78:17 128:22 154:11,14 170:1 173:15 178:11 179:12 186:14 368:17
**definition** 359:14 361:21
**definitive** 109:16
**definitively** 160:6 229:6
**degree** 13:23 14:6 60:20 61:10 89:23 90:11,14 91:9 91:20 93:1 94:18,23 95:13 96:1 97:13,21 98:15 99:12 103:8,12,20

104:11,22 105:12 109:7 109:12,22 234:13 311:5
**degrees** 97:3
**delays** 268:21 268:22,23
**delivering** 64:14
**delving** 280:5
**demographics** 280:8
**demonstrated** 221:3
**demonstrates** 118:19
**demonstrating** 388:21
**demonstratives** 40:19
**department** 385:12,21
**depend** 221:8
**dependent** 181:12,18
**depending** 92:16 122:3 138:20 140:6 353:14
**depends** 68:8 127:4 140:19 163:4 164:18 209:6,18 228:1 229:2 247:7
**depicted** 377:19
**deplete** 230:5
**deponent** 395:17 396:10 397:13 399:3
**deponent's** 35:19
**deposing** 397:13
**deposited** 232:11
**deposition** 1:8 6:10,13 8:9,13 11:13,24 12:7 12:12 14:12,16 14:17 15:11 16:10,19 25:1 33:23 36:14 46:15 55:19 60:1,10 135:22 150:19 160:3 160:20 193:9 194:21 198:5 204:14,18 214:22 255:15 255:19 273:18 283:15,19 284:10 301:21 327:16 333:5 354:4 372:4 386:9 396:4,5 396:8,8,10,10
**depositions** 1:12 17:9 34:3 55:1,3
**deputy** 133:11 133:16 138:17 146:4
**dermatological** 92:19,22
**dermatologist** 92:3,18 234:4 234:5,20,21,24 235:6 362:10
**dermatologists** 92:9 107:13
**dermatology** 92:1,18 103:3 103:17 104:4 105:4 107:11
**describe** 48:9 287:12 323:23 380:6 385:24
**described** 112:11 359:21 368:14 370:12
**describes** 287:7 287:9
**description** 6:9 7:2 151:7 386:4
**deserves** 218:8
**design** 285:24 290:11 294:11 306:24 367:18 370:11
**designed** 193:7 195:24 196:6 304:18 360:8 367:5,7,20 368:1
**despite** 151:17 153:6 171:18 195:15
**detail** 162:11 164:15 385:10
**details** 50:7 52:10
**detect** 321:7
**detected** 236:2
**determination** 293:13
**determinations** 293:4
**determine** 158:18 173:10 221:12 251:16 307:9 345:17 375:20 388:4
**determined** 172:8 372:20 377:10
**determining** 323:15
**develop** 94:6 100:24 116:20 175:20 199:7 202:4,6 207:13 225:18 226:3,7 228:14,18

229:7 302:17 302:17 350:5,9 350:16,23 351:4 352:15 352:17,20 366:23
**developed** 116:1 227:9 366:16
**developing** 116:23 277:13 279:10,23
**development** 181:12,17 185:7 187:24
**develops** 240:17 254:4 279:12
**diabetes** 94:7,8
**diagnosed** 65:16 69:2 84:1 114:14 176:9 253:19 257:1,6 263:5 264:19 267:16 268:17 269:3 269:24 302:15
**diagnoses** 269:1
**diagnosis** 45:8 65:11,11,15,19 65:24 66:2,8 66:12,14,16,24 67:2 68:6,8,11 69:3,9,11,19 72:1 76:16 94:4 114:9,11 114:12 117:3 176:5,15,18 209:11 268:24 274:11 276:8 346:14 368:6
**diagnostic** 268:24 270:2
**diagram** 200:10
**diandra** 2:9 9:4
**dicello** 2:8 8:13 9:19,20
**dicellolevitt.c...** 2:12,12,13
**die** 324:21
**diethanolamine** 326:22
**differ** 321:5
**difference** 154:19 191:15 201:16 206:22 340:11 343:16 347:9 348:24 349:14 372:15 372:15 375:21 376:5
**differences** 226:10 258:6 258:12 262:17 263:1 267:13 267:20 269:8 269:15,19 270:15,22 271:3,7 272:20 273:12 291:5 321:8 341:15
**different** 12:12 12:13 18:20 19:16 20:9 24:24 33:19 43:20 45:4 54:24 55:2 71:9 78:14 99:6 102:23 109:10 118:9 119:16 125:17 131:22 132:17 133:3,4 137:1 137:2,2 143:18 144:22 149:15 161:6 163:21 181:23 187:12 193:4 201:23 202:5 203:1 236:1 238:1 241:7,8 242:6 243:11 250:6 250:18 259:22 277:18 281:17 298:5 309:17 315:16 329:14 329:23 339:5 340:15 343:10 343:11 347:5 347:18 348:10 352:22 360:11 363:23 367:7 368:1 369:19 394:14
**differential** 45:8
**differentially** 323:7
**differently** 120:18 121:16 121:19 122:15 122:22 307:13 315:14
**difficult** 159:21 304:15
**digging** 114:23
**dinsmore** 4:17 10:12
**dinsmore.com** 4:19
**dipak** 58:18
**direct** 194:1
**directed** 381:11
**direction** 74:24 396:5
**directly** 114:5 201:5 396:15
**disagree** 27:20 28:3 125:23,24 151:23 189:24 190:1 297:13 332:20 333:16
**disagreed** 28:16

**disagreement** 27:16
**disciplines** 102:23 103:9 104:1
**disclosed** 19:18 20:1 21:23 340:19 342:8 342:13
**disclosing** 340:23
**disclosure** 208:18 212:14
**discontinue** 305:8
**discount** 348:19
**discrimination** 394:1
**discuss** 28:17 57:11,14,22 58:1,8 76:22 80:20 114:22 115:4,7 120:2 130:23 177:4 177:10 178:5 178:10 180:13 180:23 188:16 196:7 233:24 235:14 242:21 248:9 292:9 298:6,21 334:19 359:1 379:18
**discussed** 84:7 111:20 131:12 300:14 307:8 362:11 365:4
**discusses** 32:11 32:15
**discussing** 21:17 24:2 58:3 87:21 110:16 116:2 119:13 149:12 179:4,11 188:10 266:23 266:24 312:16 358:16,19 360:17
**discussion** 42:15 63:23 75:12,15 76:21 79:3,24 83:21 84:21 111:18 112:18 113:11 113:13 115:21 127:21 128:23 131:14 140:10 162:8 207:10 222:11,12 234:16 298:22 363:22 367:1 385:6
**discussions** 84:10 118:10 118:22 119:16 119:17
**disease** 6:21 64:18 76:9 78:5 202:5 203:1 247:23 264:19 265:7
**diseases** 107:10 107:11 130:10
**disguised** 280:12
**disinformation** 186:8
**disparities** 7:6 7:8 253:16 255:23 261:7 261:19 268:8 268:11,15 273:23 394:3
**disparity** 253:15 256:15 256:16 261:8 261:20 262:19 269:10 270:5
**dispute** 266:14 266:17
**disrupting** 7:14 7:17 41:6 56:24 328:4 338:18 389:18
**disruption** 235:5
**disruptor** 101:9 178:15
**distance** 236:11
**distinct** 312:4
**distinction** 176:1 349:8,21
**distracted** 282:14
**district** 1:1,1 1:11
**disulfide** 337:8 341:11,12 360:9
**dive** 64:11 211:1 212:2
**diverse** 321:15 322:14 323:12
**divided** 308:12 376:2
**dividing** 307:2
**division** 1:2 397:15
**divito** 3:17 9:24
**doctor** 68:19 102:20 112:22 116:16 300:3
**doctors** 81:14
**document** 14:17 15:1 16:16,23 18:18 18:23,24 20:1 34:21 40:15 47:6 48:6,7,8 52:2 56:19 58:12 60:5 86:12 125:20 141:10 145:3

149:16,23 161:14 165:18 167:13 267:9 284:13 286:7 293:24 295:24 296:10 297:16 298:13 322:23 331:4 334:22 372:8 381:20 385:14,24
**documentation** 20:13
**documented** 270:4 391:10
**documenting** 380:16
**documents** 15:11,12 17:8 17:13,15 18:1 18:11,12 21:21 29:3 30:12 33:18 34:22 35:6,18 40:8 40:24 41:14 185:15 191:24
**doe** 306:12
**doing** 50:5 52:4 56:11 74:14 80:22 81:17 83:4,6 95:22 96:14,16 97:18 116:19 129:24 140:1 164:19 177:5 193:12 198:23 213:7 215:16 217:19 223:10 229:5 238:5 257:15 270:1,2 280:14 339:12 351:7 367:1 368:13
**dominant** 262:18
**dose** 90:21 98:12 230:4,10 230:18 238:18 239:15,16,18 306:8,15,19 307:2,10,11,13 308:4,21
**doses** 98:7 164:23 307:23
**double** 253:1
**douglas** 2:2,3 9:6,8,16,16,16 9:22
**douglasandlo...** 2:6,6,7,7 397:2
**dr** 8:9 11:12 17:6,11,16,24 18:2 28:24 29:6 30:1,7 34:22 35:5,20 35:24 40:11 41:2,18,19 56:20 57:2 58:15,22 60:11 69:21 70:20 71:20 72:10 74:22 104:13 169:5 240:6 376:21 381:1 384:18
**drafting** 54:2,4
**draw** 117:17 118:4 119:7 120:9,24 123:10 148:20 367:23 384:20
**drill** 203:21
**drive** 2:20 3:8 5:3,9,14 370:20
**driven** 93:14 221:15 242:3 242:10,15,20 242:22 243:9 243:17,19,21 244:1,5 245:11 246:2 247:6,14 248:4 250:23 271:4,8 272:12 272:21 273:13 359:9 391:18
**drives** 292:1
**driving** 244:9 270:4 272:16 323:10 370:13
**drugs** 76:10 87:14 88:7 93:19,21 97:23 98:4 164:23 170:23,24
**due** 205:16,23 207:4,20,21,22 209:1,20 213:10 267:17 268:18 359:14
**dug** 44:17
**duly** 11:3,5 396:3
**durations** 348:10
**duties** 161:9,9 161:10,21
**dye** 313:24 314:1,5,11 315:3 323:5
**dyes** 284:17,22 295:13


**e**


**e** 3:17 11:1 93:20 169:1,1 297:21 380:10 380:10 396:9 398:3,3,3
**e.g.** 313:24
**earlier** 43:10 52:3 83:20 90:15 98:10 104:13 105:24 108:22 118:22 135:14 142:17 177:7 179:7 180:22 198:23

233:10 235:17 241:9 272:4 273:4 298:12 305:18 307:8 320:4 322:10 334:4 346:22 352:14 360:6 360:20 363:23 365:4
**early** 6:23 171:18 274:18
**easier** 13:7 20:5 36:14 46:18 231:6
**eastern** 1:2
**easy** 71:18
**ec** 252:24 253:15,19,21 257:2,3,6 262:19 263:6,8 263:10,11,14 265:11 267:16 267:18 268:2,8 268:10,18,24 269:1,3,7,9
**eckert** 4:12 10:2
**eckertseaman...** 4:14
**edc** 101:8 178:13,17,21 188:20 379:6
**edcs** 88:5 100:10 101:6 101:22 102:8 130:7 153:14 154:17 178:6 178:15,20 179:4,10,14 184:10,18 185:5 195:6 239:10 328:16 333:24 334:8 334:11,12,14 334:16,17 337:13,23 339:7 341:18 343:9,12,20 376:24 377:12 377:13 378:22 380:16 386:4 388:16 389:8 389:18
**editor** 132:1,11 132:20 138:4 142:14,16 143:15,20 144:18,23 145:5 146:4,4 199:15 213:24
**editorial** 133:5 133:13,15 138:17 143:14 145:11 187:9 187:10 330:5 382:16 383:13 384:4
**editorially** 382:18 384:5
**editors** 133:11 133:17 138:18 138:18 161:10 383:16
**edu** 231:11
**educated** 147:22
**education** 81:24 89:14 302:19
**educator** 131:13
**effect** 91:3 179:21 277:8 278:20 343:21
**effective** 268:2
**effects** 98:13 108:23 149:8 278:4 279:3 389:24 392:3 392:15 393:15
**efficacy** 90:24
**effort** 135:21
**efforts** 393:21
**eight** 308:17
**either** 13:19 21:2 24:23 39:6 65:15,17 66:12,16 69:3 80:6 83:4,24 110:10 127:19 142:13 163:8 170:19 172:15 195:19 223:14 326:10 340:18 340:18 351:6
**electronic** 14:10 15:16,18 15:23 71:3,11
**elevated** 313:23
**elevates** 121:12
**eliminate** 190:10 245:14
**else's** 145:19 197:9
**elsevier** 6:18,19 151:8 160:24 161:1 213:13
**elsevier's** 150:3 151:5
**email** 397:15
**embarrass** 193:8
**employee** 41:15 396:14,14
**encompasses** 284:21
**encompassing** 36:23
**endeavors** 117:8,13 126:24 128:6
**endocrine** 7:14 7:17 41:6 44:19 56:24 87:15,21 93:8

93:9,15 94:10 94:21 101:9 178:15 233:11 271:4,8 272:8 272:12,14,15 272:21 273:13 328:4 338:18 343:21 389:3 389:17,18,20 389:23,24
**endocrinolog...** 93:4 94:13
**endocrinology** 93:2,6 94:18 94:19 97:6 103:3 105:7,21 105:23 106:4 106:11,13,15
**endogenous** 7:4 226:10 274:24
**endogenously** 224:16
**endometrial** 7:6,10 32:8 45:7 64:16 68:11,18 93:10 96:21 129:23 130:14 149:10 153:16 154:10 154:13,18 159:23 160:7 176:19 179:11 180:5 181:13 195:7 240:15 240:16,24 241:10,12,16 241:19 242:11 242:22 243:4 243:24 244:11 244:21 245:3 248:24 249:15 249:17 250:7 252:2,16 254:3 254:10,15 255:7,13,23 257:19 259:6 260:20,22 261:3,7,9,19,21 262:2,4,6,8 264:16,17 265:21,22 266:2,4 267:1 267:18 271:18 271:23 272:6 272:10 274:9 274:15 275:1 275:23 277:1 277:13,17 278:2,16 279:10,12,16 282:5 283:20 285:4,7,17,20 286:15,17,19 287:1 296:16 297:10 298:11 298:16 309:4 309:24 352:15 352:17,20
**endometrioid** 249:19,22 250:14,18,19 251:9 254:13 254:14 259:17 259:18 260:10 263:6,6,13 265:11 268:2 309:22
**endometriosis** 309:23,23
**endometrium** 240:17 278:1
**endorsed** 152:7
**ensure** 166:1
**entails** 79:4
**entire** 187:21 194:7 304:12 304:14 340:1 343:1 357:23
**entirety** 356:22 357:4,21
**entities** 176:1
**entitled** 19:21 101:13 218:7
**enumerated** 361:9
**enunciated** 387:11
**environment** 6:21 221:15 223:21 224:7,9 224:15 229:9 279:9
**environmental** 7:3 97:5 103:4 115:2 118:11 221:12 222:23 224:11
**epi** 248:10 249:2 344:22 346:1,13
**epic** 71:11,14
**epidemiologic** 153:20 372:13
**epidemiologi...** 27:24 43:9 95:15,19,23 96:9,16 99:3 109:20 111:2,5 118:18 127:8,9 128:20 130:16 155:23 158:17 159:18 165:1 167:7 169:14 169:23 170:7 170:11,14,20 171:5 172:6 173:10 174:14 175:2,21 176:3 184:18 189:18 194:16 195:5 195:20,21,24 197:23 243:14 252:23 289:21 290:18 306:23 325:21 343:20 388:16

**epidemiologist** 95:11
**epidemiologi...** 172:16
**epidemiology** 90:3,5 94:24 95:2,4,5,9,13 95:15 96:17 98:19 99:8 103:3 105:10 105:12 293:10 298:6 320:8 365:17 370:11 371:9
**epithelial** 226:7 245:3
**equal** 313:12
**equally** 291:6
**er** 65:18,20 68:21,22 247:18
**errata** 397:11 397:13,16
**errors** 166:20 288:17
**especially** 71:2 71:5 76:8 80:3 98:10 103:16 108:3 159:19 183:13 259:17 277:20 292:1 324:17
**essentially** 96:14 138:16 207:3 255:2 257:17 259:21 279:5,8 304:5
**establish** 76:24 117:24 120:16 122:11 124:3 124:18,21 153:1,24 158:21 182:11 210:7 214:13
**established** 65:15,24 66:12 67:1 68:6,8 69:3 128:9 142:17 179:9 189:9 389:13
**establishes** 39:11,15
**estimate** 11:16 49:9 55:22,24 69:15,17 72:14 206:2 292:2 347:10
**estimated** 313:19 321:3
**estrogen** 93:11 118:14,15 154:12,13,15 154:16 181:12 181:18 233:13 242:3,15,16,20 243:9,15,17,17 243:19,21 244:1,4,8,11 245:11 246:2,3 247:6,8,12,13 247:14,16,20 247:21 248:4 248:13,14 250:17,20,23 251:4,6,7,9,13 251:15,21 272:7,8,12,13 273:5 274:17 274:19,23 276:12 277:15 277:16,16,20 277:21,24 278:3,19,21 279:6,13,13,14 279:14
**estrogenic** 279:3
**et** 44:19 64:21 69:6 77:5 84:3 119:19 221:2 228:19 247:24 300:13 362:9 394:19,19
**ethanolamines** 327:10
**ethers** 327:10
**ethical** 150:2 170:10 213:13
**ethically** 165:14
**ethics** 6:19 149:23,24 150:3,14 161:2 161:9
**ethnic** 263:9 321:17,19 322:15,17 363:23
**ethnically** 323:12
**ethnicity** 321:6 321:10
**european** 23:22
**evaluate** 276:11 321:17 322:16
**evaluated** 25:4
**evaluating** 187:23
**evaluation** 152:6 167:7 169:13 380:11
**evenings** 48:3
**everybody** 91:17 140:13
**everyday** 12:22
**evidence** 27:3 27:24 28:8 43:15,15 46:5 116:7 118:19 119:14 122:12 125:3,20 126:10 127:7 130:1 153:3,10 153:18,22 156:9 158:17

159:16 170:16 175:1 179:23 183:14 184:21 185:2 187:13 192:15 194:15 195:3,5,8,12,16 197:16 198:1,2 198:2 211:23 227:10,13,23 228:15,22 229:2 232:24 234:13,18 285:3,16 286:18 296:15 298:7,8 311:18 312:20,20 323:2 325:7,24 343:6,19 344:21 345:20 345:23 346:1 347:15 349:10 358:7,10 360:22 362:2 362:21 365:2 377:17 379:12 380:15 387:15 388:16,21 391:21 396:11
**evident** 236:6
**evolution** 6:23 221:14 228:8
**evolved** 76:11
**evolves** 130:14 171:2 324:15
**evolving** 119:15 185:8
**exact** 394:19
**exactly** 192:12 280:13,14 357:13
**exam** 376:20
**examination** 1:9 6:2 11:7 169:3 371:17 380:4 390:2
**examine** 184:4
**examined** 11:6 129:9,9 183:19 183:24 371:9 377:9 378:1
**examining** 268:14
**example** 23:21 65:20 73:21 93:19 96:5 118:14 134:21 140:6 144:15 164:21 172:9 172:13,19 277:14 293:5 295:12 305:18 350:1,12 370:3
**examples** 186:16 200:24 377:15
**excel** 48:6
**except** 41:2
**exception** 59:2 59:4 67:23 244:23 269:8
**excess** 154:16
**exclude** 250:16 272:1
**excluding** 40:20
**exclusion** 41:10
**excuse** 377:9
**executive** 133:11,16
**exhibit** 6:10,11 6:14,15,16,18 6:19,20,22 7:3 7:6,8,10,11,13 7:16,19,22,24 14:12,15 16:10 16:14 28:19 29:12 34:21 46:15,19 52:22 56:13 60:1,11 60:12 61:17 64:10 86:3,9 88:14 99:21 111:24 135:22 136:2 144:19 145:24 146:18 150:19,23 160:20,24 161:14 162:1 167:13 169:8 198:3,5,10 199:20 204:14 204:18 214:22 220:6 221:19 240:8 248:17 255:15,19 273:18,22 274:3 283:4,15 283:19 292:18 295:18,19 299:13 300:4 301:19,21,24 306:6,7,20 311:21 320:13 322:12 324:6 326:16 327:16 327:23 333:3,5 333:9 335:8 337:24 338:9 338:17 354:4,7 354:10,20 355:20,21 356:15 357:16 357:23 358:13 363:1 371:20 372:4 376:17 381:1,5,23 382:6,6 384:17 386:6 390:4,6 390:20 394:5
**exhibits** 6:8 7:1 14:9 40:10,16 40:18
**exist** 59:14
**existed** 117:15 118:3 119:6

120:7 124:9,10 124:24 125:4 126:7,12
**existence** 171:20
**exists** 127:2 128:1 129:12 151:14 152:20 154:6 156:18 157:5,10 158:12 159:5 170:11 171:9 224:7 323:22 324:9 325:13
**exogenic** 205:17
**exogenous** 200:17,19,20 200:22 205:24 235:11 269:15 269:19,22,23 270:3,8 271:1 274:24
**expect** 307:22 347:10
**expediting** 244:2
**experience** 91:18,22,24 92:2,17 94:20 97:3,17 99:11 99:12 103:15 103:22 104:23 105:13 108:9 109:19 233:11 309:21
**experiment** 163:15 164:20 231:21 237:3 237:16
**experimental** 387:15
**experiments** 62:11 236:1 387:18
**expert** 6:15 17:9,16 18:3 28:23 30:5,6 35:24 36:12,15 36:22 60:10 104:24 112:2 123:23 169:13 372:1 384:18 385:11 386:7
**expertise** 97:16 107:15 108:10 138:19 139:9 173:21 195:7 199:3 207:13 207:14 211:3 233:16 234:2
**experts** 25:18 59:8 92:11 120:17 121:14 124:2 298:4,5
**explain** 189:3 201:15 265:1 372:10
**explanation** 130:15
**exposed** 91:15 92:10 181:5 228:18 236:3 238:13,23 278:19 305:16 305:19 307:19 346:14 352:24 353:1,6,16 370:5,7,9 372:16 373:12 373:14,22 389:6
**exposure** 90:12 91:5,9,10,13,17 93:12 94:10 98:8 103:1 121:23 123:16 154:12,15 190:10 221:3 221:12 224:13 226:11,20 230:5,10,19 238:18 239:16 274:17 276:12 306:8,12,19 307:5,10,11,13 307:16 308:4 308:21 309:13 311:24 351:14 351:17,19 365:6 366:21 373:5,6,13 380:11 386:24 387:23 388:4 390:23 392:15 393:15,21
**exposures** 41:7 57:1 75:13 77:4 90:19 93:8 97:5 103:4 118:11 127:15,19 177:10 221:16 238:3
**express** 190:23
**expressed** 190:24 251:8 251:10
**expression** 247:8,18
**extensive** 121:12 127:21 135:12
**extent** 44:20 87:20 172:19 203:3
**external** 108:24 118:15 166:2,9 166:14 167:1 290:24 292:19 292:22 293:8 294:16 295:1
**extract** 308:5
**extraordinarily** 218:2

**extrapolated** 292:23
**extrinsic** 204:7 205:17,18,24 207:22 226:11
**eye** 248:22

**f**

**f** 169:1
**facility** 71:6
**fact** 58:4 61:23 92:8 106:11 147:10 148:13 153:7 174:5 184:23 203:23 206:11,21 208:24 210:8 211:14 213:9 229:9 234:14 238:24 242:16 264:8 265:4 266:11 270:6 272:9,11 289:8 293:14 310:7 310:11 330:6 340:16 341:2,9 342:8 343:8 346:7 347:2,12 347:17 348:15 348:19 364:16 365:7 373:17 375:18 376:6 376:11 380:18 389:19
**factor** 73:24 74:8,9 85:1,8 115:21 119:22 153:16 177:5 203:12 204:1 244:12 270:3,9 279:15 282:17 326:1 349:1,15 350:7,11 352:2 352:9 353:5,11 373:20 388:8
**factors** 6:23 74:3 75:13 78:3,9,12,15 79:17 95:7 105:18 110:12 110:14 111:8 115:2 118:13 119:18,20 159:21 173:7 177:10 200:14 200:18,22 204:9 205:18 206:1,5 207:5 207:6,22 208:13 213:11 221:12 268:16 268:19 269:9 269:20,23 271:1 274:7,15 274:16 275:5 276:5,21 278:15,16 279:5,13 286:17 293:4 324:22 345:18 345:18,24 346:4,23 349:4 349:18,24 386:22 387:11
**fail** 89:11
**failing** 209:23
**fails** 211:8 397:18
**failure** 172:22 396:11
**fair** 36:14,18 40:14 72:17 78:12 98:15 100:4,7,8,11 103:24 131:3 208:18 289:20 308:22 309:2 351:24
**fairly** 44:5 92:7 329:4 351:6
**fairness** 161:5
**fall** 178:8 207:15 248:11 314:5
**falls** 108:2 109:4
**familiar** 13:22 21:3 43:11 60:4 136:12 276:17 281:7 315:15 351:21
**family** 74:12 110:11 111:7 111:21 116:4,5 116:15
**far** 12:13 18:10 19:13 20:12 25:9 34:12 47:19 58:5 72:13 79:14 88:5,20 89:18 95:18 99:14 100:12 101:3 108:19 113:18 128:5 131:20 135:3,12 143:9 145:10 147:22 150:14 151:5 173:4 175:6 176:11 180:24 186:8 191:7 200:12 204:5 215:19 235:1 238:24 244:15 250:21 255:1,4 272:18 276:2 277:9 279:22 291:18 306:14 315:9 320:7 341:6,21 346:17 347:4 347:22 348:2 365:16 370:20
**farooq** 27:22 28:13 188:17

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 439 of 515 PageID #:76297



**fat** 277:19
**faulty** 189:3
**favored** 210:15
**february** 42:4 43:1,23 44:12 45:1,18 46:8 47:8 50:16 51:13 61:19 62:16,24 63:4 63:13 64:6 74:18 85:9,24 110:4,18 111:13 113:7 113:20,23 114:1 396:17 397:3
**federal** 1:10 55:16 396:9
**federer** 5:2 10:18,18
**feel** 20:23 21:11 21:11 23:3 94:3 115:17 118:8 120:17 121:15,18 122:14 129:24 131:1 134:7,16 149:11,20 191:8 193:1 218:23 271:21 298:7
**feels** 313:6
**fellow** 80:4 117:15 124:8 124:23 126:7 127:1 128:8
**fellows** 79:19 80:19 81:3 82:23,24 83:2 118:2 119:5 121:3 123:6 128:24 129:11 131:6,15
**fellowship** 83:3 98:24
**females** 374:14 374:17,20 375:2
**fibroids** 179:10
**field** 91:19 98:21 106:6 107:2 121:15 144:7 169:17 173:24
**fields** 103:16 103:23 104:24
**fifth** 196:11 217:4 226:1
**figure** 49:18 67:5,20 200:2 200:15 203:19 231:7,8 246:10 246:15,19,19 246:23 248:19 256:8,13 257:12,12,17 257:18,23 259:12,23 260:24 261:1,1 261:2 262:5,11 262:12,14,17 269:16 270:14 325:4 331:21 334:3 335:11 338:9 377:10 377:19
**file** 15:17,23 16:3,7 17:6,24
**filibustering** 313:6
**fill** 150:18
**filters** 327:7
**final** 54:10,14 329:2,5,18,19 330:8 355:3 376:19
**finally** 269:5 359:13 361:20 388:7
**financially** 8:19 396:15
**find** 153:13 163:13 190:3 215:23 216:11 223:19 309:17 309:20 310:3 316:14 318:14 318:15 337:13 337:22 374:4 376:5 379:4
**finding** 160:12 216:21 309:3 309:18 323:23 351:6 356:9
**findings** 57:11 65:22 66:19 111:7 134:6 141:20 181:9 188:16 189:17 189:18 196:2 221:6,13 288:5 323:8,24 325:12 326:9 341:13 344:17 359:24 361:19 370:13,14 392:1,9,13 393:5,13
**fine** 36:21 59:22 249:6 339:6
**finish** 280:3
**finished** 344:13 344:14
**firm** 8:17
**first** 11:5 14:22 56:10,11 74:16 81:16 88:14,16 112:1 163:18 200:17 256:14 257:21 301:11 316:18 322:24 323:2 345:13 363:1,8
**fit** 141:11

**five** 11:16 47:8 54:5 102:10 119:17 236:5 237:4 253:10 294:21
**flag** 170:15 324:13 393:20
**flags** 120:1
**flip** 15:2
**flipped** 56:18
**floor** 1:14 2:4 3:18 4:13 82:21
**florida** 4:18
**focus** 76:6 81:24 114:9,20 146:7 214:19
**focused** 78:19 81:3,24 82:6 82:19 83:1,10
**focuses** 240:24 252:1 254:3 260:22
**fold** 275:23,23 277:1
**follicles** 232:12 233:4
**follow** 32:19 38:15 62:14 64:21 65:6 66:3 71:16 73:6,8 74:16 75:21 79:6,9 83:14 105:2 122:9 133:19 137:9 145:22 146:22,23 150:2,13 162:24 164:9 239:14 241:23 286:15 302:15 344:2 350:18 390:4
**followed** 112:6 122:10 311:22
**following** 144:9 144:10 261:12 267:5,17 310:19 316:20 388:4 393:20
**follows** 11:6
**footnote** 205:12 253:5 281:24 282:3,16 286:4 287:2,3 301:6 320:16,22 321:2 327:21 328:12
**footnotes** 253:11 316:19
**force** 244:9 272:16
**forces** 270:4
**foregoing** 28:23 396:4 399:5
**forget** 148:18
**forgive** 52:21
**fork** 222:24
**form** 14:10 23:15 24:8 25:19 26:15 28:10 31:10 37:17 39:1,22 43:24 44:13 45:2,19 46:5 47:22 61:1 66:8 74:19 75:8 77:11 78:13 79:23 83:19 117:19 118:6 124:10 125:1,6 126:8 127:2 134:1 144:8 147:12 150:16 152:6 163:24 171:23 175:4 181:19 189:10 190:20 191:12 195:17 196:17 197:3 210:2,17 211:12 212:15 213:4,14 216:1 216:12 217:3 228:24 237:11 239:17 240:18 249:10 250:24 254:6 270:23 280:1 288:2 289:3 290:5 291:1 292:4 293:1 294:18 295:3 297:3 304:13 306:10 306:16 311:9 315:12 316:8 317:17 318:3 319:14,23 324:1 325:16 326:12 332:3 333:18 334:1,9 336:14 337:1 337:15 339:19 340:5 341:7 342:1 345:12 347:7 349:17 351:20 352:11 353:12 355:3 355:13 360:14 361:11 362:1 363:14 364:7 365:1 366:4,12 367:8 368:2 369:4,20 370:22 373:2,9 375:4 376:13 379:13,14 384:24 389:15 393:7
**formal** 131:16 296:18
**formaldehyde** 41:5 56:23 178:8 221:4

222:7,22 223:8 223:14,18 224:1,2,4,6,14 228:19 229:9 230:5,10,19 231:12,14,17 236:5,24 237:2 237:17,19,24 238:12,18,23 239:2,8,9,9,16 326:20 370:5 379:5 391:12
**format** 48:7 137:8
**formations** 331:11,19
**formatting** 330:5
**formed** 85:21 216:17 341:12
**former** 149:15
**forms** 311:7,17 376:8
**formulate** 96:11 391:22
**formulated** 24:5
**formulating** 17:11 175:8 302:5 391:7
**formulation** 32:1,11 33:15 339:9 359:23
**formulations** 32:20 33:2,9 33:14 331:19 340:13 358:23 359:5 361:18 391:13
**forth** 29:3,4 40:9
**found** 23:11 26:7 28:11 66:19 86:8 125:18 179:21 180:18 181:15 182:6,24 186:22 223:12 224:8,11 256:12 261:9 261:21 300:14 316:17 347:19
**foundation** 125:6 189:10 192:13 193:21 195:17 196:18 197:3 210:3,17 211:12 212:15 213:4,14 216:1 216:13,19 217:3 219:16 228:24 280:2 288:2 289:3 290:5 291:1 292:4 293:1 294:18 297:3 311:10,17 315:12 316:8 319:14 326:12 333:18 334:1,9 336:14 337:1 337:15 340:5 342:1 345:12 347:7 351:20 352:11 353:12 361:11 362:1 363:14 364:7 365:1 368:2 369:4,20 370:22 373:2,9 375:4 376:13 379:14 389:15
**foundational** 218:3 357:22
**four** 31:8,13,21 81:21 138:20 146:11 161:7 257:18 300:16 301:12,17 307:3,3,6 308:1,14,15,15 310:8 348:14 353:2
**fourth** 152:3 187:18 258:15
**fragrances** 327:10
**frame** 249:1 292:16 346:3
**framework** 122:9,11,14 124:19,20 155:15 198:11 198:17,20 199:6,9,12 250:6 386:17 388:8
**frameworks** 153:24
**franklin** 4:8
**free** 186:4
**frequency** 85:12 301:11 303:16,24 304:2,11 306:12,13 307:14 308:10 308:19 348:1
**frequent** 300:14 301:2 313:19,24 314:1 321:4 323:3
**frequently** 44:5 85:22 125:24 223:20 264:24 269:1 304:16
**frizz** 330:16
**front** 16:13 28:19 46:19 47:6 50:12 84:23 89:20 100:2 114:24 132:8 136:4 204:19 220:6

221:20 256:1 273:21 283:18 284:6 354:8 356:18 376:21
**fruits** 293:6 294:7
**fu** 2:9,12
**full** 73:3 169:10 169:11 189:23 208:17,18 209:24 212:13 256:14 302:20 303:6 316:18 317:5 322:24 349:7 356:5,16 363:1,8 371:21 390:21
**fully** 396:11
**function** 250:17
**further** 6:6 28:22 35:23 55:8 203:21 210:24 214:16 250:3 268:23 300:14 344:18 377:23 389:14 390:1,2 392:6 395:14,17 396:7,13
**future** 39:5 83:17,18 84:15 84:16 99:5 320:16,22
321:14 322:13 323:11

**g**

**g** 380:10
**gaps** 189:1
**gary** 2:3 9:16
**gdouglas** 2:7
**gears** 345:6
**gel** 331:14
**gene** 221:15 226:22 228:7 229:21,23 230:2
**general** 16:24 17:22 19:8 28:21 44:4 65:18 70:7,10 75:1 81:4,13 83:23 95:5 99:7 106:7 108:3 125:9 137:6 138:22 163:14 187:11 223:15 233:9 244:7 247:9 251:4 280:4,4 280:12 281:7 288:7 292:6,11 304:18 306:3 313:1 320:7 375:8
**generalizable** 391:1
**generalization** 243:22
**generalize** 361:9
**generalized** 359:24
**generally** 65:10 66:4,6 76:5 243:12,18 248:3,12 249:20 250:23 291:14,21 372:9 378:16
**generate** 268:2
**generated** 288:24
**generating** 227:1
**generic** 210:22
**genes** 224:22 225:10 229:11
**genetic** 78:1 104:17 105:18 204:8 208:12 209:12,14 221:11 350:2,4 351:5
**geneticist** 104:14 105:15
**genetics** 70:8 97:5 103:4,17 104:4,11 106:12,14,15 106:16 211:2
211:18,19 214:13,17
**genome** 7:5
**gerel** 2:14 9:15
**germline** 208:3 211:10 221:9
**getting** 77:19 111:23 163:8 193:1 199:19 234:17 238:22 238:23 252:14 306:23 335:6 363:2 392:23
**gi** 173:3,7,13
**gildner** 5:9 10:16,16
**ginex** 2:18
**give** 14:4 17:1 55:20,23 56:12 78:10 86:13 88:18 94:16 101:16 109:10 109:16 126:16 126:20,21 129:18,21 130:19 132:4,7 142:2 150:22 150:23 161:13 185:24 186:14 186:16 206:19 211:20 221:22 231:24 251:11 264:4 280:11 286:12 291:2,9

291:22 299:14 301:20 316:24 339:16 342:17 356:5 377:15 388:13
**given** 11:12,17 11:18,20 12:11 63:7,8,18 116:7 176:15 193:5 204:17 229:8 245:16 260:18 272:11 284:5,8 321:10 323:7 329:1 340:14 341:13 396:6 399:9
**giving** 12:7 14:5 18:14 19:23 34:13 179:16,20,23 255:5
**glad** 296:8
**glycol** 327:9
**go** 8:7 10:10 12:14 13:5 14:11 17:2 23:2 40:6 56:13 58:12 74:6 78:9 79:12 82:2,18 88:13,15 92:4 99:19 101:12 101:24 102:13 111:24 112:14 125:7 127:11 131:23 137:10 143:11 152:1 161:13 162:1 167:22 169:5 181:20 186:14 187:18 190:12 193:21 194:22 198:3 204:24 205:5,10 208:7 212:18 217:9 221:19 222:17 224:3 230:11 230:22 231:6 246:4 251:1 256:6 259:20 260:24 265:17 267:6,7 268:6 274:2 281:10 283:5 284:15 286:9 289:5 295:16 296:10 299:6,12 302:9 312:17 315:6 320:24 322:8 322:23 326:8 326:13,16 327:23 330:20 331:21 333:10 334:21 335:1 337:21 340:3 345:7 353:18 376:17 377:22 385:10
**goal** 74:10 100:18 179:12 343:16
**god** 49:3
**goes** 36:4 140:11,21 187:19 211:17 220:23 230:4 248:18 277:21 321:14 330:4 330:10 382:18 384:3 391:15
**going** 8:1 13:5 20:23 28:9 46:2 54:10 56:6 58:17 59:18,21 60:14 74:24 78:16 81:6,13 83:9 87:11 91:6,7 94:16 97:2 109:10 112:23 119:13,21 121:22,24 126:21 128:13 131:1 136:2 137:18,19 150:22 157:22 159:12,18 161:19 165:3,9 169:5 188:8 189:18 191:8 193:6,14,24 195:10,11 201:20 214:6 216:18 218:4 219:1 221:5,23 235:6,10 240:8 246:1 255:18 264:20 270:20 271:17 273:1 279:4 280:11 280:18,21 281:8,9 286:2 292:5,10,15 299:19 306:24 320:24 324:21 325:2,7,20 328:18 329:21 330:7 341:8 344:24 353:20 354:23 357:7 368:16 373:18 380:9,18 385:10 394:14
**golkow** 3:6 10:22
**good** 8:1 12:17 155:19 187:10 189:16 290:11 293:8,8 294:12 294:13,13 296:8 304:21 304:22 306:2,4 360:12
**gotten** 147:21 159:7

**grab** 212:4
**grade** 242:12 242:12 249:19 249:22 250:14 250:17,18 251:9 254:13 254:13 259:17 260:9,10
**grades** 250:19
**gradient** 386:24
**grand** 129:19
**grant** 99:22 100:5,8
**granted** 310:4 343:10
**grants** 100:12 100:15,19 101:4
**great** 161:20 182:1 325:6 385:10
**greater** 301:12 301:17 308:15 321:16 322:14
**ground** 12:15 344:8
**grounds** 281:1
**group** 22:21 95:23 96:2 260:5,6 305:16 305:19 341:17 343:8 359:19 365:6,13 366:17 373:11 373:22
**grouping** 187:2
**groups** 250:4 263:9 321:19 322:17 363:24 373:5,6
**growing** 310:1
**guarantee** 213:24
**guess** 31:19 44:7 46:18 49:18 50:6 59:9 67:4 111:10 117:24 123:2 126:5 143:7,17 148:18 182:3,5 196:23 201:21 203:20 215:20 230:24 231:2 235:16 236:14 246:17,18,23 254:23 297:20 299:4 316:18 321:2 390:21
**guessing** 69:15
**guide** 6:16 95:17 136:19 144:16
**guideline** 269:7 270:7 388:8
**guidelines** 145:23 146:18 146:22 150:3 151:5 213:13 296:19 346:3 386:16
**guo** 4:2 10:7,7
**gyn** 65:17 68:10,15,20 70:7,10 82:7 82:11,14 83:10 83:23 92:8 106:5,7,14,16 106:18 108:2 132:20 199:2 202:23 207:18 309:16
**gyne** 217:24
**gynecologic** 6:16 64:15 65:2,7 66:8 81:3,20 82:4 82:20,24 83:2 88:22 132:1,11 132:14 134:11 136:6,18,24 138:21 142:16 142:24 143:1,5 143:15,20,24 144:1,15,23,24 145:3,5,13 147:6,23 148:4 150:13 169:17 174:1 207:14 313:1 324:19
**gynecological** 65:8 67:6 69:1 82:1 105:19 117:8 120:3 184:22 185:6 202:21 211:16 211:19 388:20 389:11
**gynecology** 88:21 97:6 103:4 132:24 133:9,12 134:12,22
**gyns** 81:4 82:3 83:17 84:15

**h**

**h** 94:2,2 398:3
**hair** 1:4 7:11 7:15,18,19,22 8:10 21:13 23:12 25:11 26:7 37:3,15 38:6,17 39:12 39:18 41:4 42:23 44:10 45:6,17 46:10 53:6 56:22 58:20 60:21 61:11 62:2,20 63:9,14 64:5 73:9,22 74:18 75:11,18,22 77:9 79:10,22

80:13 83:18,22 84:8,16 87:5 87:17,20,24 88:5,10 96:20 96:23 99:16 100:6,9,16,24 101:5,18,22 102:2,8 110:5 110:20 111:12 112:8 113:2 115:14 116:5 116:22 118:18 121:11 128:10 129:13,23 130:9 131:7 141:2 142:7 149:9,10 152:21 153:14 153:15 154:6 154:17 156:19 157:6,11 158:12 159:5 163:20 164:7 176:24 177:19 178:1,5,17,22 179:4,19 180:5 180:19 181:16 182:7 183:1,20 183:24 184:5 184:19 185:4,5 187:23 188:11 189:8 191:21 192:21 194:8 196:5 232:3,5 232:8,11,13,15 233:4 237:20 238:4,12,17,24 245:18 279:2 282:9,16 284:16,21,24 285:4,6,16,19 286:11,19,24 287:4,4 288:8 295:13 298:15 300:15 302:1 303:12 305:20 311:7,24 312:21 313:19 313:24 314:1,5 314:5,8,11 315:3,5,7,8,10 315:15,20 317:8,23 319:11,12,22 321:17 322:16 323:5,14 324:9 325:13 326:19 328:5 330:15 330:17,22,24 331:6,9,12,15 332:4 333:11 333:17,20 336:11,21 337:3 338:19 339:18 341:11 341:13,17 342:18 352:2,8 354:16,22 355:11 356:1 356:10,23 359:15 360:1,9 364:3,4,6,19 365:7,15 366:10,15,19 366:21,23 367:6,24 368:9 368:11 369:2 369:18 370:2 370:16 374:3 377:1 378:17 380:3,12,17 382:1 383:22 384:22 385:5 385:13,18,22 386:1 387:2,7 387:21 388:17 389:7,12 390:8 390:11 391:2 391:13 392:15 393:15,23 394:1 397:4,4 398:1,1 399:1 399:1

**hairs** 206:16

**halfway** 177:14 256:18

**hand** 27:5 77:18 150:24 226:4 231:8 235:24 237:15 238:7 302:11 303:23 320:15 387:16 388:10 391:24 396:17

**handed** 333:9

**handful** 19:20

**handouts** 35:1

**handy** 381:1

**haploinsuffic...** 7:4 221:11

**happen** 166:20 281:9

**happened** 146:6

**happening** 127:11,13,17

**happens** 50:4 94:3 125:23

**happier** 13:8

**happy** 76:22 97:17 171:14 180:9,13 183:8 183:8 195:22 196:7,7,8 292:6 334:20

**harass** 193:8

**hard** 50:2,9 183:9 213:5 239:5 244:6 267:4 271:14 272:15 290:19 374:4

**harder** 375:7

**hardy** 4:2 10:7

**harm** 32:7

**harmful** 393:22
**hate** 69:15 377:24
**hazard** 90:18 91:5 300:20,21 309:18 310:8 314:13,16 315:2,24 347:14 348:17 372:20,23
**hazards** 90:12 103:1
**head** 11:22 12:10 63:19 106:3 238:15 332:12,16
**heading** 161:19 165:18 263:1 299:18 378:6 381:11 385:9
**headings** 161:6
**health** 7:8,21 7:23 97:8 98:16,17,18,20 99:1,6,6,11 103:6 109:8,13 174:7,18 203:6 203:24 225:23 268:21,21 273:23 296:14 296:19 300:19 314:9 354:17 359:17 374:9 383:3 384:9 392:3,15 393:15
**hear** 157:19 190:18 283:6 326:9 352:4
**heard** 45:14
**hearing** 218:13
**heat** 369:17
**heated** 365:9 365:11
**heavily** 311:19 346:4,16,24 386:19
**heavy** 373:7,17
**heels** 218:20
**hela** 231:11
**held** 8:13
**helm** 328:24 376:18 378:2 378:11,14 379:21 380:14 380:18 385:7
**help** 74:11 95:17 96:2 108:11 155:21 173:19 197:8 197:14 201:13 230:17 231:18 246:16 267:6 276:20 323:14
**helpful** 348:4
**helping** 76:6 93:21
**helps** 151:14
**hematological** 206:3
**hereditary** 208:2 209:2,5 209:10,20 210:9,24 211:9 211:17 212:7
**hereto** 399:7
**hereunto** 396:16
**hernandez** 27:22 28:13 188:18 362:5
**hesitation** 149:1
**heterogeneity** 376:2
**heterozygous** 223:2 236:6
**heyl** 3:12 9:12
**heylroyster.c...** 3:14
**high** 201:19 230:4,10,18 232:16 238:18 239:16 242:12 247:21 249:22 250:14,17,19 251:9 253:19 253:23 254:13 257:2,5 258:16 259:17 260:10 279:15 293:10 337:7 341:10 359:15 388:1
**higher** 73:22 233:21 253:21 263:5,11 265:3 266:8 267:19 268:10 278:6,7 278:7 279:23 301:3 302:20 307:23 310:8 313:20 316:5 316:10 321:10 321:10 353:22 392:17
**highlight** 208:24 211:14 392:1,9,13 393:5,13
**highlighted** 262:7 268:16
**highlights** 284:17,23 295:13 393:4
**highly** 65:23 84:2 114:15 120:2 232:16 233:12,17 251:7 375:10
**hill** 122:11 198:11,19 199:8,11 345:10 346:18 346:19 348:2 386:17 387:11

388:8
**hinder** 268:20
**hipaa** 74:20
**hired** 39:20 43:23 113:7 196:16,21 210:16
**hispanic** 302:18 313:21 322:2,4 366:2 366:3,6,8,18 374:13 376:7 376:12 392:18 392:22
**histological** 246:20 249:21 259:13 262:17 263:1 266:9 267:12,18,20 269:8 270:15 310:23 311:2 323:7
**histologies** 259:18
**historically** 241:17 248:7 252:15 265:20 338:21
**history** 74:3 76:5 77:4 113:3,5,12 114:5,10 349:7
**histotypes** 253:19 257:2 269:4
**hmm** 17:19 22:13 35:13 58:13 86:23 150:6,8 165:20 220:8 258:8 277:3 303:1
**hoc** 145:11,16 145:17 147:23
**hold** 94:12 97:12 99:23 104:5 105:3,6 105:9 107:3 194:18 205:10 217:8,8 219:8 286:3
**honest** 78:18 148:24 271:20 297:20 315:13
**honestly** 273:3
**hope** 74:24
**hormonal** 272:13,16
**hormonally** 388:22
**hormone** 242:3 242:8,10,22 243:9,21 244:5 245:11 250:23 277:23 303:4
**hormones** 93:9 93:13,13 272:8
**hospitalizatio...** 158:1
**host** 327:8
**hot** 319:11,11 330:15 365:9
**hour** 42:1 54:23 59:19,20 129:3 231:11 231:12,14 232:22 239:23
**hourly** 54:20 55:5
**hours** 47:8,23 49:1 50:14,15 50:21 53:21,24 54:6,15 55:24 230:20 231:17 231:21 236:5 237:4
**house** 2:23 3:11 9:3 10:24
**hpv** 201:1,5,11 201:17 202:11 202:12,21,23 202:24 203:1,4 203:7,10 204:2
**hr** 300:18 301:3 313:23 314:2 347:24
**huge** 96:16 213:21 324:13 393:19
**huh** 12:21
**human** 98:5 109:1 201:1,4 207:12 221:3 227:9 230:19 238:2 312:22 380:11
**humiliate** 193:8
**hundred** 353:10
**hundreds** 51:19,19 123:22,24 368:16,17
**hydroxide** 326:22
**hyperplasia** 274:16 275:1
**hypertext** 150:7
**hypothalamic** 93:15
**hypothesis** 226:17 227:1,4 227:10 228:11 228:16
**hypothetical** 120:5 123:5 125:19 215:20 216:5,8,16,24
**hypothyroidi...** 94:1
**hysterectomy** 303:5

**i**

**i.e.** 64:19 205:17 274:17 327:7
**idea** 84:24 139:2 162:18 163:7,14 189:24 251:11 305:12 320:4 365:4 382:5,7
**identical** 330:9
**identification** 14:13 16:11 46:16 60:2 135:23 150:20 160:21 175:24 198:6 204:15 214:23 255:16 273:19 283:16 301:22 327:17 333:6 354:5 372:5
**identified** 18:2 31:7,21 53:6 54:18 57:18 171:8,19 175:7 177:18,18,24 178:1 188:15 190:4 191:2 195:4 197:10 197:13 209:13 259:8 325:22 340:21 379:4
**identify** 9:10 23:10 26:6 188:22 189:1 198:2,24 323:9 379:17 391:17
**identifying** 178:11 228:6 257:18 359:8 393:22
**ignore** 170:17 184:21 324:16 325:7
**ii** 87:9
**illah** 255:22 262:12
**illegal** 387:19
**illinois** 1:1,14 2:20 3:3,8,18 4:8 5:4,10,15 8:14 396:1,23
**illustrations** 20:7,13
**images** 231:10
**imagination** 203:3
**imaging** 65:21 65:22 66:14 67:18
**immediately** 51:14
**immune** 93:22
**immunofluor...** 231:10
**immunothera...** 64:20 70:22 72:17 73:2 93:18 94:1
**impact** 6:22 98:5 213:22 290:23 291:7 321:11 343:20
**impacted** 376:4
**implications** 149:19 225:22
**imply** 218:5
**importance** 169:15 392:1 392:13 393:5 393:13
**important** 126:18 147:15 172:18 180:24 187:7 190:7 210:6 215:17 323:11 325:6 345:18 346:1 361:2 390:22 394:2
**importantly** 253:20
**imprecise** 210:1 213:2 218:2 309:9 310:5 348:11
**improper** 119:4 120:6,10,23 121:2 123:5,11
**improve** 151:14
**inaccurate** 147:18,19 186:18
**inactive** 221:6
**inappropriately** 155:17
**incidence** 253:20,22 257:2 266:3,12 267:17 309:14 317:9,24
**incidences** 252:16 265:21
**incident** 309:10
**include** 18:17 33:9 200:24 250:10,12,13 251:5 255:13 274:15 275:8 318:23 326:20 381:17 386:3
**included** 19:14 38:24 135:13 295:12 319:10 319:16,17 373:13,17
**includes** 18:16 27:20 36:16 40:24 267:3
**including** 17:7 34:24 35:18 41:1,14,18

58:3 64:15,18 72:1 74:22 109:20 117:9 129:7 181:13 194:15 195:5 226:8 265:4 267:1 275:24 284:17,22 285:7,20 287:1 295:11 319:11 327:8 364:4 368:8 391:13
**inclusive** 323:13
**inconsist** 291:20
**inconsistencies** 347:3 348:21
**inconsistency** 294:17
**incorporate** 266:19
**incorporates** 17:22 28:20
**incorrect** 201:8 201:10,21,22 201:22 214:20
**incorrectly** 271:22 285:11
**increase** 104:17 115:3 118:12 201:6 235:7 257:4 263:16 263:21 264:10 266:6 274:16 281:15 303:10 314:9
**increased** 201:11 203:12 228:5 258:18 265:1 266:13 267:17 275:4 275:24 277:9 299:1 300:17 314:13 351:2,5 352:13 389:1
**increases** 151:15 229:11 277:1 353:17 355:11 356:1 356:10,24 390:11
**increasing** 279:5,9
**independent** 39:16 139:12 139:14 140:21 145:19,23 146:2,5 147:10 148:4 196:15 196:24 213:2 338:8 341:5 382:19,23 384:5,6
**independently** 144:6 196:12 196:19
**index** 6:1
**indicate** 67:19 335:2 393:13
**indicated** 173:24 230:18 322:13 347:23
**indicates** 204:6 285:2 332:19 356:23 383:11
**indicating** 299:7
**indication** 275:3
**indirectly** 396:15
**individual** 33:2 33:4,14 74:1,7 77:6,8,19 78:2 156:10 176:16 177:6,6 183:5 198:24 341:22 344:17 349:6
**individual's** 304:12
**individually** 97:18 180:14 185:3
**individuals** 59:12
**induce** 230:6
**induced** 94:1 221:10
**induces** 7:4
**infections** 200:24
**inflammation** 232:18 233:19
**influence** 248:14 295:3 348:22 360:15
**influenced** 200:13 204:7 206:5 208:11 360:14
**influencing** 211:5
**inform** 296:17
**information** 18:19 19:2 21:8 22:8,15 26:13 29:5,24 30:12 36:17 42:13 51:16 129:6 179:13 186:7,18 208:23 214:12 215:6,23 226:18 232:1 238:14 259:22 276:18 288:18 296:13,15 298:11 306:9 359:4 390:24 391:16
**informs** 389:14
**infrequent** 359:18

**ingredient** 359:3 380:4
**ingredients** 340:23 342:10 360:8 361:20 391:17
**inheritance** 204:8 208:12
**inhibition** 87:9
**initial** 50:5 65:11 73:13 118:9
**initially** 142:23 172:7 265:18 266:1
**initiating** 113:13
**initiation** 181:13
**inpatient** 82:16 83:8
**inquire** 114:4
**inside** 205:9 310:1
**insofar** 17:14
**instability** 7:5 222:24
**instance** 50:11 140:12 163:17 164:5
**instances** 65:19 66:1,17,23 67:17 73:19 127:18 171:4 177:8 251:16 353:1
**institute** 282:4 282:15 283:7,8 283:10,22 287:13 288:16 290:4 297:12 381:7 382:20 383:1 384:6
**institutes** 383:3 384:8
**institutional** 86:19
**institutions** 72:5
**instruct** 81:5 83:16 84:15
**instructed** 79:20 117:14 124:7,22 126:6
**instructing** 126:24
**instruction** 80:11
**instructions** 232:4
**insufficient** 117:17 118:4 119:7 120:9,13 120:23 121:8 121:21 122:17 123:3,4,9,19 124:3,14,16 125:3 126:10 125:10 175:19 190:6 199:5 236:18
**insult** 218:4
**intend** 26:20
**intended** 296:16 339:11 340:14 341:10
**intention** 357:14
**intentional** 71:14
**intentionally** 19:17
**interaction** 81:15 221:15
**interactions** 81:18
**interested** 8:19 129:21 396:15
**interestingly** 42:9
**interfering** 194:20
**internal** 68:14 68:19 287:14 287:17,23 288:10,14,16 288:21,23 289:8,16 290:11,23 293:8 294:16 295:1
**interpret** 109:20,23 170:10 285:3 285:15 286:18
**interpretation** 183:13
**interpretations** 141:20
**interpreted** 142:1 194:15 358:5
**interpreting** 122:4,22 197:15 290:14
**interrupt** 344:4 344:7
**interruption** 112:22
**interval** 300:22 301:4 310:12 314:3 316:1
**intervals** 310:6 310:21,24
**intervention** 294:6
**interventions** 269:11
**intrinsic** 205:24 207:5 207:21,22 208:12 209:1 213:11
**introduction** 60:18,19 233:5

**invasive** 132:24 133:8,12 134:12,22
**investigate** 62:15 63:1
**investigated** 119:23
**investigation** 125:22
**investigator** 86:20
**investigators** 175:15 179:5 364:13
**invited** 101:13 101:21 117:11 129:19 137:5 166:22
**invoice** 42:3 50:22 55:6
**invoices** 41:16 41:24 55:8
**involved** 37:23 63:23 65:6,8 65:10 96:23 98:11 99:2,3,4 99:14 176:16 176:20 224:21 225:10 247:23
**involvement** 79:18
**irons** 319:11
**irrelevant** 278:14 366:13
**irungo** 380:1
**isolytic** 239:11
**issue** 21:8,22 22:9,16 27:5 42:11 63:14 77:17 121:5,8 122:23 123:21 129:9,10 134:16 193:16 216:15 219:14 219:17 232:8,9 232:14,15 237:15 238:7 289:4 305:22 333:16 342:3 362:8 383:20
**issues** 28:9 92:19,22 144:22 147:17 149:2 361:8 362:5,8 388:10

**j**

**j** 2:3,4 4:12
**james** 5:9 10:16
**january** 1:14 8:2
**jeffrey** 58:16
**jgildner** 5:11
**jmig** 133:11
**job** 1:23 13:7 47:24 189:16 286:12,13
**joe** 10:21
**john** 5:12 10:17
**joseph** 3:2
**journal** 26:14 90:4 131:21 132:15,23 133:8,12,14,17 133:23,24 134:3,8,11,21 134:21 135:20 136:16,17 138:15,16 140:19 141:22 142:10,11,12 143:2,22,24 145:2,4,6,15 146:3,22 147:5 148:22 167:10 214:1
**journals** 117:9 128:22 137:2,3 137:4 138:24 140:20,24 142:13 143:19 199:15
**judge** 194:3 217:9 218:22
**judging** 290:14
**jump** 110:2
**junction** 76:20

**k**

**k** 2:14,15
**kdeck** 4:14
**keep** 25:3 43:14 47:19,20,21 48:3,15,20 55:4 59:18,21 72:18 170:18 180:8 182:4 191:8,9 193:3 193:3 219:1 260:16 271:17 271:19,22 327:9 343:3 345:8
**keeps** 193:14
**kelbey** 4:12 10:2
**kenya** 378:24
**kenyan** 380:4
**kept** 23:5 24:23 53:10
**key** 193:15
**keytruda** 93:19
**kilograms** 277:2
**kimberly** 354:15
**kind** 48:15 50:6 50:9 54:9 134:23 137:8 152:15 160:8 172:12 185:6 190:2 207:12 209:6 214:18 239:5 249:15

289:15 291:3 293:2 338:5 345:14 365:18
**kinds** 84:10 159:20 201:23 203:18 210:23 368:19
**kit** 331:8,12,14 333:23 339:4,5
**kits** 331:7,9,9 331:10 332:1,7 336:17 339:6 342:17 377:1,6 377:7,12,14,18 377:21 378:1,4 378:10,13 380:14,19
**know** 12:9,11 13:19 14:2 19:17,21 20:3 20:7 22:19 23:2,17 24:20 25:3 26:14 27:21 28:6 31:13 32:4,7 32:13,16 33:14 38:22 39:5,6,7 40:2 42:9,10 42:21 43:3,4,7 44:16,18 47:5 47:21,23 48:14 49:7 50:15,16 50:19 51:14 52:8,14 53:5,9 54:12 55:12,12 55:15 56:3,7 62:12 63:20 66:12,19 67:13 68:9,24 69:5 69:21,23 71:1 71:15,16,20 72:2,7,14 73:11,12,14,20 73:21 74:9,12 74:13 75:15 76:4,14,18,24 77:3,13,13,20 77:24 78:16,19 78:22 79:1,12 80:3,17,22 81:16 83:5,12 84:7 85:14 89:11,17 90:4 90:7,8,13,18 91:1,2,4,16 93:6,10 95:1 95:12 96:6 98:4 100:23 101:8 103:10 104:17 105:13 105:24 109:1 109:22,22,23 110:13,23 113:4,10 114:10,13,20 114:23 115:2 115:17,24 116:18 118:7 118:10,13,17 119:11 121:10 121:14,24 122:15,16 123:14 124:19 125:21 127:14 127:20 129:20 130:5,22,24 133:16 134:5 134:19 135:6 135:18 136:3 137:1,3 138:10 138:21 139:8 140:5,20 141:6 141:12,16,21 144:4,10 146:3 147:3,3,16,18 148:13,13,13 149:8,12,18 152:16 153:3 153:19 155:20 156:5,7,9,11 158:23 159:14 162:5 163:10 164:19,20,22 167:16,18 170:16 171:17 172:14,17,21 173:3,6,17,20 176:13 178:3 181:5 184:22 186:16,18 187:5 188:13 188:17,24 189:19 190:9 192:9 195:19 195:20 196:8 198:21 199:6 202:23 205:11 207:5,7 209:8 209:16 210:20 210:22 211:22 212:3 214:2,4 215:17,19 217:18 219:20 219:21 220:15 221:23 222:16 222:18 223:9 223:15,16,18 223:24 224:6 224:20 225:1,8 225:12,15 226:18 227:11 228:4 229:4,11 230:9,11,14,17 230:20 232:2,3 232:21,22,23 233:11,13,15 233:16 234:3 234:21 235:6,8 235:17,21,21 236:3,12 237:7 237:12 238:10 238:10,11,11 238:14,16 239:3,5,15,18 241:8,17 243:13,16

247:13 249:12 249:17,22 250:7,17,20 251:2 254:8 260:1 261:23 262:10 264:21 265:4 266:10 266:21,22,24 269:24 270:1 272:2,2 273:3 276:6,13 278:8 279:2 280:2,3 280:13,14,17 282:18 283:1 288:9 289:13 290:12 291:17 293:5 294:4,23 295:5 297:13 297:20 298:1 298:10 304:16 309:5 310:6 311:21 312:13 319:19 320:3 325:3 326:6,23 329:13,19,23 330:5,9 332:9 332:13,15,15 332:16 334:2 334:16,22 339:10 340:10 340:19 342:4,5 342:9,13 343:10 345:21 346:4 347:13 347:14 348:5 348:13,16,20 349:10 350:1 350:24,24 351:2,2,24 352:9,14,22 353:3,9,17 355:4 356:8 357:12 360:10 360:19,22 362:7,8,12 363:21 364:16 365:23 368:8 369:10,11,13 370:24 371:8 373:15 375:7 375:10 378:22 379:19 380:13 382:16 383:16 383:19,24 384:1 387:18 389:7,16,21 394:12,13,18 395:10

**knowing** 62:10 129:21 359:22 362:14

**knowledge** 77:17 103:16 116:8 309:16 317:7

**known** 84:24 118:15 279:11 378:17 386:24 390:24 391:12

**kyoto** 231:11

**l**

**l** 2:10 93:20

**lab** 83:5,5 164:20

**label** 342:8,14

**labeled** 231:11 246:19 274:6

**labels** 340:23 342:9 379:2 380:4

**labor** 82:21

**laboratories** 10:13

**laboratory** 4:21

**lack** 193:20 254:10 255:2 269:21 297:2

**lacked** 359:4 391:16

**lacks** 186:22

**lane** 2:4

**language** 156:12 355:14

**lara** 2:4 9:22

**large** 95:22 96:7 189:14 197:10 207:19 310:11 316:19 323:1 332:17 374:8 384:14 388:3

**larger** 321:15 322:14

**lasalle** 3:18

**laser** 92:15

**late** 274:18

**latency** 350:15 350:22

**latest** 295:23 296:3 381:11 382:9

**laughed** 218:9

**laughing** 217:10,14,15 218:14

**lawsuit** 39:20 192:20

**lawyer** 236:21 257:15

**lay** 20:6 91:14

**layperson** 20:14

**lead** 9:4 127:19 154:24 312:23 353:20 354:16 373:20

**leading** 54:9 226:23

**learn** 19:2

**learning** 119:19

**leave** 46:2 330:16

**leaving** 208:16
**lecture** 63:8,18 80:11,16 81:15 129:4,19,19
**lecturer** 117:11 166:22
**lectures** 98:22 98:23
**led** 73:14
**left** 235:24 249:19 262:7 303:23 322:24 367:19
**legal** 141:10 149:2,16,19 397:23
**legal.com** 2:21 2:22
**leiomyosarco...** 242:8
**leiomyosarco...** 244:8
**length** 12:13 141:13 148:19 236:11,16 369:3
**lens** 125:17
**lesions** 92:13
**leslie** 5:2 10:18
**letter** 72:8
**letters** 138:4 144:17 188:13
**letting** 297:13
**leukemia** 206:4 206:4 207:8,9
**leupro** 87:10
**level** 121:13 123:18 126:23 127:23 186:22 201:19 234:2 298:8
**levels** 224:2,4,5 230:6
**levitt** 2:8 8:14 9:19,20
**lfederer** 5:5
**liability** 1:5 8:12
**license** 5:24 396:23
**life** 39:19 43:22 44:10 353:20
**lifetime** 274:17 304:12,15,23 305:3,6 306:4 350:5,9
**light** 373:7,15 373:15,17
**likelihood** 247:21
**likely** 14:2 120:2 127:23 195:15 253:18 257:1,5 263:5 267:16 268:17 269:3,6 302:18 303:3 352:18 372:21
**limit** 215:14
**limitation** 151:17 359:13 361:21 363:4 375:16 390:22
**limitations** 152:4 358:15 358:19 360:5 360:17 361:1,3 362:17 363:3 363:11 364:3
**limited** 34:24 35:19 41:14 73:17 308:24 321:7
**line** 104:10 267:5 332:9 394:15 398:4,7 398:10,13,16 398:19
**lines** 164:22 221:3 227:7 229:2
**lining** 66:21 240:17 241:11 241:19 244:10 244:18,22 245:2 254:4,11 254:17 258:23 258:24 278:2
**link** 23:11 25:10 26:7 37:3,14 38:5 38:17 39:12,15 39:17 42:23 43:21 44:8 62:16,19 63:1 79:21 80:13 112:8 117:15 118:2 119:5 120:7,24 123:7 123:12 124:9 124:24 125:4 126:7,12 127:2 128:1,9 129:12 131:7 150:7 152:20 153:1 153:13 154:6 156:18 157:3,5 157:10 158:11 158:11 159:4,5 160:18 163:19 171:19 172:7,9 173:1 180:4,19 181:15 182:6 182:14,24 183:7,20,24 184:4 189:7 190:16 191:21 194:8 297:20 311:6,6 323:22 324:9 325:13 340:2 342:18 395:5
**linked** 19:16 23:24 77:9 201:5 301:2

**links** 256:10
**list** 14:8 17:16 18:2,3,4,12,12 18:22 19:4,10 19:14 20:16 21:10,24 22:7 22:18 23:7,14 24:10,22 25:9 26:10,17 32:13 32:24 38:24 87:14 91:6 97:2 102:24 135:15,15 160:14 282:16 327:7 332:17 342:10
**listed** 18:21 19:3,9 20:16 21:9 22:17 25:8 30:23 31:3 52:18 53:21 54:22 57:10,15 71:19 86:16 97:13 103:9 137:21 138:12 160:12 175:9 202:15 246:14 250:4 276:22 282:21 282:23 298:4 301:5 328:24 333:19 335:22 394:16,17
**listen** 219:8 367:21
**lists** 132:10 137:22 275:4
**litchfield** 3:2 10:21
**litchfieldcav...** 3:4
**literature** 17:8 17:13 18:13 19:7 21:22 23:9 24:6 25:7 25:9 26:3,5,14 27:4,10 32:10 32:14 33:16 41:3 44:5,19 44:19,23 45:8 45:15,21 48:5 51:12 53:11 56:9 62:10 77:16 79:8 84:5,22 85:15 111:19 119:24 124:12,15 127:15 128:19 129:7 130:6,16 135:14,18 141:19 142:1,3 152:16 177:17 177:18 178:1,4 178:11 184:11 187:22 188:10 188:23 194:7 194:17 195:2,6 196:12,20 197:6,10,15,15 199:4 211:21 223:13 268:12 362:21 382:24 384:7
**litigating** 120:14
**litigation** 1:5 8:12 12:7 17:14 38:1 40:1 41:3 42:6 44:21 54:21 56:21 58:20 99:15 113:7 116:10 130:18 131:2 149:3 162:23 165:15 166:10 174:9 174:12 176:10 176:13,17,20 237:13 324:3 383:20 384:19
**little** 12:13 19:11 29:10 37:6 43:20 45:21 55:17 61:16 62:8 69:24 71:2 75:16 82:6 85:20 118:8 132:14 144:22 181:22 187:6 217:12 241:21 242:17 243:11 243:22 250:3,5 260:9 303:10 314:18 321:1 345:6 348:11 349:4 352:18 365:23 371:19 377:23 392:5
**live** 160:16
**llc** 2:8,23 3:11 3:17 4:12 5:2 5:17 10:24 11:2
**llp** 3:2 4:2,17
**location** 8:12
**logical** 229:8 233:18
**london** 2:2 9:7 9:9,17,22
**long** 42:5 52:15 83:12 94:17 136:23 181:23 215:5,10,22 216:10 217:1 232:3,13 302:13 350:16 350:22 353:8 392:23
**longer** 265:5 277:22
**longest** 141:14
**look** 15:1,6,8 16:22 17:1 18:19 19:3

20:4 28:9 29:2 29:20 35:12,22 40:23 41:12 52:15 53:17 56:14 60:16,17 64:9 71:22 74:2,3 86:15 117:5 125:12 127:14 139:1 141:12 146:24 149:22 153:2 153:13,22 155:22 156:6 156:10 159:16 161:5 165:17 169:8 170:15 173:14,16 183:13 192:8 195:22 196:7 200:8 212:18 229:1,4,14 230:12,22 235:23 240:10 247:11 248:17 249:18,22 252:5 258:1,7 258:15 259:10 259:11,14 262:16 264:17 267:12 270:13 279:12 282:19 287:2 290:9,10 303:21,22 313:16,22 314:15 315:5 315:23 320:14 321:1 326:5,17 329:18,20 330:10 332:18 332:22 335:16 335:20 342:9 348:4,9 349:7 354:20 355:21 356:4 357:11 360:24 362:24 368:23 370:10 379:22 380:5 381:10 390:9 390:20 391:23 395:11

**looked** 20:8,22 21:19 22:3 23:20 24:1,12 24:17,18,19 25:4,16 27:23 28:12 53:8 61:17 122:21 154:11 184:15 184:18 188:21 188:24 195:1,8 270:13 282:18 282:21 343:22 345:19 349:9 366:16 376:1 378:21,23,24 389:1 394:13

**looking** 20:4,12 24:15 43:17 50:12 52:8 59:10 77:14,15 86:13 87:19 90:5 108:6 122:21 125:17 126:5 127:5 136:15 140:4 161:2 165:1 179:5,7 184:24 188:20 195:21 204:4 231:18 249:13 251:12 255:20 256:2 259:13 261:18 275:18 306:15 311:21 335:9 335:11,14 343:18,18,19 347:18 357:7,9 358:17 366:22 368:11 376:3 380:2,15 388:15 394:24

**looks** 42:2 47:1 47:7 136:18 137:13 145:10 161:7 200:9 204:21 205:1 231:21 316:1,2 381:2

**loop** 38:16

**losing** 207:9

**lost** 29:10

**lot** 40:1 48:2 49:8,12,17,23 51:1,12 52:15 52:16 54:6,10 55:12,13,20 60:7 68:8 70:1 71:3 73:12,18 76:17,20 77:5 77:5,16,17 82:15 85:3 89:4 92:2 93:4 93:12 96:4 104:20 110:9 114:21 123:22 130:6,10 135:21 137:5 143:12 164:18 165:2 170:7 172:20 175:3 185:20 186:17 187:3 189:21 189:21 193:21 216:5 217:10 217:11,14,15 218:13 225:21 233:24 243:4 243:13 245:12 245:24 247:11 248:1,9 269:18 269:20 289:19 290:17 291:19 298:17,24 311:18 330:4 337:5 340:9,12

340:20 342:12 346:6,10 350:24 367:19 368:7,8 380:15 389:5
**lotion** 330:17 331:15
**louis** 3:13
**love** 342:8
**low** 230:6 242:11 249:19 250:18 254:13 260:9 268:19
**lower** 252:16 253:10 263:13 265:10,13,20 302:19 315:2 347:24 352:16 372:23
**lowest** 373:12
**lsay** 2:7
**lumped** 364:3
**lunch** 167:16 167:19,19 168:1
**lung** 153:4,9
**luster** 5:7 10:14 332:13,20 333:11,16,22 336:4
**lye** 331:11
**lymphocytic** 206:4 207:8
**lynch** 209:11 209:14 298:24
**lynn** 58:16
**lyons** 2:14 9:14 9:14

**m**

**m** 4:7 5:24 11:1 93:20,20 94:2 277:2 396:3,22
**made** 72:1 93:13 121:17 129:3 205:20 280:20 371:3 371:10 376:5 381:24 399:5
**madison** 3:3 4:13
**magazines** 185:15
**magnitude** 275:4
**mahoney** 5:13
**maiden** 2:4
**mail** 297:21
**main** 74:10 100:18,19 122:23 136:17 179:12 184:11 184:14 200:14 214:14 309:3 389:16
**maintain** 15:16
**maintained** 15:23 382:15
**maintenance** 89:6,11
**major** 71:11 146:13 147:17 214:1
**majority** 54:3 65:13 67:21 69:18 78:18 152:4 197:10 198:1 207:3,19 208:10 209:1 209:20 210:8 211:15,16 212:7,10 324:20 366:1
**make** 12:15,20 12:24 13:7 15:14 18:9 25:6,20 28:5 45:3,5,9,12 46:18 51:17,20 54:13 55:17 59:6 62:6 66:13 72:21 89:19 97:15 102:22 103:10 103:21 108:7 110:3 123:20 127:9 128:7 130:2 135:18 136:16 137:19 139:4,24 140:2 144:2,20 145:8 146:9 147:16 147:17 153:18 156:15 161:18 165:7 166:12 166:17,20,24 181:21 190:8 192:9 201:14 204:23 210:7 212:3 213:17 216:5 222:20 231:5,22 235:10 244:24 246:11,17,24 249:4,12 260:24 261:24 262:11 275:15 275:17 277:20 279:18 283:6 290:18 293:3 316:14 317:1 318:14 322:4 334:17 344:15 345:21 349:8 354:14 356:6,7 357:4,12 363:17
**makes** 13:10 146:9,11 254:20 359:23
**makeup** 336:11 336:21 363:23 379:18

**making** 30:10 36:13 40:21 54:11 55:14 56:7,8 66:24 96:2 139:2,4 143:13 167:3 183:16 232:18 233:20 293:13 296:19 340:22 340:22 361:19
**mal** 11:18
**manage** 64:17 69:5 107:10,15 242:17
**managed** 176:5
**management** 91:10 104:19
**managing** 94:8
**manner** 95:16
**manufactured** 380:20
**manufacturer** 32:13 232:20 340:17 342:7 342:10
**manufacturers** 22:8,12,16 340:18,21
**manufacturing** 22:21,24
**manuscript** 141:12
**marcadis** 4:17 10:9,9,11,12
**march** 51:14 329:23
**marked** 14:13 14:15 16:11 46:16 60:2,9 135:23 150:20 150:23 160:21 198:6 204:15 204:17 214:23 255:16,19 273:19,22 283:16,19 301:22 327:17 333:6 354:5 372:5
**markers** 247:11
**market** 3:13 343:15 380:4 391:2
**marketed** 331:11 343:15
**marketing** 1:4 8:11
**maron** 5:2 10:14,19,19
**maronmarvel...** 5:5,5
**marvel** 5:2 10:14,19
**mass** 65:22 66:19,22 67:17 67:24 277:4
**match** 316:13
**material** 7:16 17:10 19:22 21:16 26:20 53:3 331:6 332:19,24 333:2
**materials** 18:1 18:4,11,13,21 19:4,9,14 20:16 21:10,17 21:23 22:6,17 23:7,14 24:10 24:22 25:8 26:10,17 27:14 35:2 38:24 41:2,9 52:23 135:15 186:21 197:20 218:3 331:7
**math** 374:14
**matter** 8:10 51:13,20 138:20 139:10 153:12 279:20
**matters** 209:8
**mcauliffe** 4:7 10:5
**mcbride** 4:21 10:13
**mccambridge** 5:13
**mcguirewoods** 3:7 10:23
**mcguirewoo...** 3:9
**md** 1:8 6:3,13 11:4 60:11 396:3 397:5 398:2,24 399:2 399:4,12
**mdl** 9:4 397:4 398:1 399:1
**mean** 14:1 19:11 22:19 23:18 26:24 27:9 39:24 48:20 49:7,8 49:12,22 50:18 51:1,11 52:12 55:24 57:23 63:19 68:4 69:14,23 79:11 79:24 85:3 89:22 93:13 95:22 98:18 101:1 115:9 116:3 119:10 120:14 125:8 125:11 127:4 129:2,17 134:16 135:11 136:20 143:6 146:21 147:1 148:24 149:2 152:24 153:6 154:21 155:14 162:17 166:18

174:11,17 177:3 179:2 187:2 188:7 197:4,5,22 201:18,19,19 202:22 203:20 206:15 214:10 223:6,19 224:3 224:23 226:15 227:6 228:1,2 228:11 232:6 235:2,15 237:12 238:21 244:6 246:10 248:6 251:4,8 251:11 264:3 265:2 266:20 269:18 270:12 270:16 288:21 288:24 289:9 295:9 298:2,4 298:21 304:7 304:21 306:11 306:22 308:16 309:3 315:13 318:5,8 319:15 322:8 324:2,12 324:14,15 326:5 329:16 329:18 330:7 333:19 334:11 337:6,16,17,18 339:1,4 340:16 344:15 347:8 349:18 352:12 353:13 356:4 363:16 364:10 367:9 368:16 369:9 371:3 372:11 392:7
**meaning** 208:12 253:8 265:12 372:22 372:23 382:19 388:3
**meaningful** 174:14 347:20
**means** 14:2 251:14 292:22 330:3
**meant** 189:4
**measure** 307:5 308:8 387:22
**measurement** 7:13,16 236:14 328:4 338:17 380:5
**measures** 337:3
**measuring** 306:11,12,16
**mechanical** 364:4 369:17
**mechanism** 127:13,16 241:8 243:12 245:10 279:11 298:14 347:16
**mechanisms** 32:6 85:18 87:17 185:7,8 189:22 277:18
**med** 11:18
**media** 8:8
**medical** 13:23 14:6 17:9 20:7 20:12,13 60:20 61:10 71:3,11 74:3,23 77:3 79:19 80:3,6 80:12,18 81:11 81:13,18 82:8 84:12 90:1 95:3 98:22,23 117:14 118:1 119:4 123:6 124:8,22 126:6 127:1 128:8,23 129:11 131:5 131:13,15 173:7 177:16 187:6,22 311:5
**medications** 76:12 92:15
**medicine** 68:15 68:19 97:7 103:5 106:23 107:1,2,4 125:9 169:16 234:13
**meeting** 54:1,5 63:20 298:3
**meetings** 34:23 49:21,24 50:2 63:22 117:12
**meets** 139:2 148:12
**megan** 3:17 9:24
**mellott** 4:12 10:3
**member** 63:24 110:11 111:7 116:4,5,16
**members** 287:19 288:1
**memorize** 47:5
**memory** 231:18
**men** 328:6,9
**menarche** 274:18
**menopausal** 233:14
**menopause** 274:18 277:21
**mention** 73:23 197:22 346:5 361:2
**mentioned** 21:14 71:20 80:7 83:20 98:21 99:2 103:18 111:6 118:22 135:14 140:16 142:24 180:22 219:13

243:24 272:4 273:4 294:4,10 298:12 340:8 342:13 346:7 368:15 374:7 381:15 388:24
**mentioning** 360:5
**mere** 307:16
**mess** 58:17
**met** 51:2 59:7 311:1
**meta** 138:1
**metabolism** 222:8,23
**metal** 178:10 379:5
**metals** 380:11
**metastatic** 76:8 247:23
**meters** 236:10 236:12,15
**method** 151:18
**methodically** 177:15
**methodologi...** 112:2,11 158:18 169:12 178:16
**methodologi...** 195:3
**methodology** 112:6 117:6 134:17 139:3 140:3,4 146:9 149:12 163:6 163:12 164:21 165:8,8 189:2 189:16 230:12 230:23
**methods** 134:5 162:18 163:13 268:24 330:11 359:21
**methylparaben** 378:7,12
**methylparabe...** 378:9
**metric** 236:10
**miami** 4:18
**michael** 2:19 58:16
**michele** 58:16
**micrometer** 236:4
**micromolar** 236:13,17 237:23
**micromolars** 236:23 237:8 238:11
**microphones** 8:3
**mid** 51:13 266:5
**middle** 130:22 131:2
**mike** 9:2
**miller** 2:9 5:8 9:18,18 10:17
**mind** 20:2,10 91:3 93:7 96:17 107:19 109:4 123:19 131:24 170:19 307:10
**mine** 12:5 69:24 99:20
**minimally** 132:24 133:8 133:12 134:11 134:22
**minimize** 306:2
**minimizing** 181:8
**minimum** 210:1 212:13
**minorities** 321:17 322:15
**minority** 19:19
**minus** 247:19
**minute** 38:14 51:21,23 56:13 102:10 177:23 185:10 274:3
**minutes** 232:23 271:16
**mischaracteri...** 208:14 287:11 365:2
**mischaracteri...** 208:22
**mischaracteri...** 37:18 208:5 297:15 342:24 362:2 363:15
**misclassificat...** 305:12,23 320:5,7,9 365:5,16,18 369:24 370:12 372:19 373:24
**misclassified** 216:18
**misclassifying** 216:20,20
**misdiagnosed** 265:5
**misguide** 213:20 214:20
**misleading** 207:24 261:5 261:16 263:18 263:23
**mismatch** 270:21
**mispronounced** 326:23
**mispronounc...** 327:9
**misrepresent** 215:4,9,21 216:9,24

**misrepresent...** 103:22 206:21 207:2 212:20
**misrepresented** 109:18 207:16 215:13 219:17 265:8
**misrepresenti...** 206:18 215:7 216:3 219:15
**missed** 172:17 301:18
**missing** 191:10
**missive** 381:7 381:16
**missouri** 3:13
**misspoke** 47:16 271:5
**misstatement** 301:10
**mistaken** 54:8
**misunderstan...** 201:15 218:3
**mitch** 11:1
**mitchell** 5:12 5:14 10:17
**mixtures** 353:18 354:3
**mm** 17:19 22:13 35:13 58:13 86:23 150:6,8 165:20 220:8 258:8 277:3 303:1
**mmorinec** 5:16
**model** 235:18 235:18,20 372:21
**moderate** 373:7 373:16
**modern** 391:12
**modifiable** 204:8 205:19 206:1 208:13 269:10
**molecular** 247:11 249:14 250:4 251:12 257:18 260:11 263:1 267:13 267:19,20 269:4,8 270:15 270:23
**moment** 167:23 294:4
**monitoring** 98:12
**month** 12:1 42:7,15 48:22 50:18 82:15,19 303:17 305:6 305:24 319:23
**months** 50:20 303:11 304:3,5 304:7,20 305:4 306:1 308:10 365:14
**moon** 119:11 122:1 123:2,9
**morinec** 5:14 11:1,1
**morning** 8:1 344:20
**morrison** 10:4 10:5
**mortality** 252:24 253:2 253:15 262:19 264:5 265:2,3 266:7 268:10 392:17
**motion** 108:17
**motivated** 375:10,12
**move** 102:21 108:14 156:14 182:4,22 185:10 199:18 268:14 280:21 281:22,23 296:9
**moved** 275:19
**moving** 54:12 222:18 225:21
**mph** 96:1
**mryan** 3:19
**mturiello** 2:22
**multifactorial** 228:13 346:9
**multiple** 97:16 153:7 184:23 184:24 218:15 223:2 229:1 235:24 239:4 268:15 294:19 369:1 379:20
**multiplier** 277:8
**murray's** 5:7 10:20
**muscle** 240:20 241:13 244:17 244:23
**mutagenesis** 224:18
**mutated** 224:21 225:10 228:8 229:19 229:20 230:1
**mutation** 209:16 221:8 224:18 225:18 226:2,6,21 229:10 258:16 260:7,9 299:1
**mutations** 104:17 208:3 211:10 221:14 223:3 228:4 229:7 351:5
**mute** 8:5 194:19,21
**mychart** 71:8,9
**myeloid** 206:3 207:8

**n**

**n** 11:1 96:6 169:1,1,1
**name** 8:15 11:9 11:11 12:9 28:15 58:17 334:14 389:18
**narrative** 140:10 141:19
**narrower** 85:20
**national** 96:7 282:4,15 283:8 283:9,21 287:13 288:15 290:3 297:12 381:6 382:19 383:1,2 384:5 384:8
**natural** 98:1,6 167:20 223:22 224:4 239:21 299:20 387:18 394:1
**naturally** 222:6 222:21 223:6 223:13,19 224:1 278:3
**nature** 4:6 10:8 12:3 84:12 221:9 233:16 307:7,17
**naught** 395:17
**nci** 288:15 382:19 383:1 384:6,8
**ndma** 41:6 56:24
**near** 296:1
**necessarily** 18:22 19:17 21:3 46:4 63:23 65:24 74:13 92:2 95:21 106:10 113:14 114:19 115:19 125:15 131:1 140:9 153:20 154:24 157:21 163:11 165:3 242:9 325:20 347:11 350:1,9
**necessary** 52:23 72:16 73:1 383:12 399:6
**necessity** 351:15,19
**need** 12:20 15:2 17:18 77:7 78:19 79:2 81:6 98:2,6 126:24 127:4 137:9 154:22 161:17 167:15 171:24 173:9 181:2,21 203:21 217:9 227:14,23 228:21 234:21 235:5 238:17 240:1 245:15 324:16 349:6 350:19 352:7 354:11,13 360:20 361:4 369:9 370:24 393:5
**needed** 39:8 57:17 125:5 126:12 155:20 155:21 199:7 321:15 322:13 323:8
**needs** 194:19 232:21
**negatives** 360:21
**neither** 389:10
**neoplasia** 181:12,18
**networking** 151:16
**neuroendocri...** 97:7 103:5 106:20
**neurologist** 82:3
**never** 34:2,5 55:16 62:15 63:2,7,14 176:23 259:5 305:6 308:13 314:1 350:4 359:18 373:7 373:11,12,15 373:18 374:5
**new** 2:5,5 4:3,3 4:13,13 27:10 71:15 76:10 195:19
**newer** 56:9 110:13 250:2
**news** 187:11
**newspaper** 187:9
**newspapers** 185:14
**nick** 5:19 8:15
**nigeria** 379:3 380:13
**nights** 51:4
**nih** 383:2,2 384:9,16
**nine** 15:10 141:16 387:11
**ninth** 388:7
**non** 185:12,17 186:19,21 187:3,4,9,13,16 202:23 204:7,8 205:17,24

207:5,22 208:2 208:3,12,12 210:24 211:9 213:11 229:19 229:20 230:1 263:6,6 265:13 267:18 268:2 302:18 313:21 314:23 322:2,4 366:2,3,6,8 374:13 376:7 376:12 392:18 392:22
**nondifferential** 320:6
**nondirectional** 365:19 370:11
**nonexposed** 305:17,19 365:13 366:17 373:22
**nonexposure** 370:7
**nonmodifiable** 267:21 270:16
**nonsensical** 139:8
**nonserous** 301:1 308:24 309:19 310:17 310:23 311:2
**nonsystematic** 291:5
**normal** 226:22 229:19
**north** 1:13 2:10 2:20 4:8 5:3 8:14
**northern** 1:1
**northwestern** 69:22 71:13 72:3,3,6,10 74:23
**notary** 399:13 399:19
**notation** 378:6
**note** 8:3 71:17 72:7,8 397:10
**noted** 254:3 255:3 260:15 355:8 399:7
**notes** 17:8 71:17,21 72:1 72:4 74:23 222:19 316:13
**notice** 6:10,12 14:16 17:1 47:11
**noticed** 131:20
**noticing** 9:1
**notion** 186:17
**novel** 323:24
**novelty** 323:8 324:8
**november** 50:18 54:8
**nsqip** 96:6
**null** 292:2 320:10 364:14 365:20 370:13 370:20 372:10 372:12,14,18 373:8,19 374:1
**nulliparity** 274:17
**number** 6:9 7:2 15:4 16:22 17:5 28:20 29:10,14 35:12 35:17 40:7,23 41:12 50:21 55:21 56:14 58:12 76:10 87:8,13,13,22 102:23 148:14 206:19 208:3 208:17 209:19 213:16,19 230:20 258:16 264:17 272:10 311:1 332:23 348:12 353:9 370:18 394:7
**numbered** 17:13
**numbers** 161:16 211:21 213:18 295:20 348:12 381:9
**numerous** 280:6
**nw** 2:15

**o**

**o** 11:1 93:20 94:2,2 169:1,1 169:1
**o'brien** 286:10 287:3
**o'connor** 2:2 6:5 9:6,6 16:5 20:17 23:15 25:13 26:11,23 27:17 31:10 32:3 33:11 34:7,18 37:5 37:17 38:9,21 39:22 43:2,24 44:13 45:2,19 46:12 47:14 48:18 49:11 50:23 51:10 52:11 53:1 57:20 58:6 59:20,24 61:1 61:4 62:4,17 63:5,17 66:9 67:10 68:2 69:12 70:13 74:19 75:2,8 75:24 77:11 78:13 79:23 80:15 83:19

84:18 85:10 94:14 97:10 102:12 104:7 108:17 109:14 111:14,17 113:8 115:15 117:19 118:6 119:9 120:11 121:4 123:13 125:6 126:14 128:12 129:15 131:9 134:1,14 135:5 139:23 141:5 142:10 142:15,20 144:8 146:19 147:12 148:6 148:23 152:23 155:6,13 156:4 156:21 157:13 157:16 158:14 159:8 160:4,10 160:19 162:16 163:1,24 164:17 167:10 167:18,22 170:12 171:11 171:21 172:11 173:2,12 174:10,23 175:11 177:2 179:1 180:6,21 181:19 182:9 182:15,19 183:3 184:7 185:18 186:2 186:11,24 189:10 190:18 190:20 191:12 192:1,23 193:3 193:17,24 194:12,18 195:17 196:17 197:3 201:7 206:14,24 208:5,19 210:2 210:17 211:12 212:15 213:4 213:14 214:8 215:12 216:1 216:12 217:3,8 217:22 218:20 219:6,8,11 220:20 222:11 225:11,13 227:5,15,24 228:24 231:1 234:7 237:10 238:19 239:17 239:21 248:5 249:10 250:24 254:6 256:3 262:20,24 264:1 269:17 271:10 272:23 273:14 276:16 278:11 280:1 280:10,17 281:1,11,17 283:5,11,14,24 284:3,11 285:10 286:2,6 286:9 288:2 289:3 290:5 291:1,8 292:4 293:1,23 294:18 295:7 295:17 297:3,8 297:15 299:19 299:22 301:9 303:18 304:13 306:10,21 307:15 308:7 309:1 310:14 311:9,13 312:6 312:12 315:11 316:8 317:17 318:3,15 319:2 319:14 320:1 324:1 325:16 326:11 328:1 328:18,21,23 329:10 332:3 333:18 334:1,9 335:5 336:6,14 337:1,15,17 338:1,10,23 339:19 340:5 341:7 342:1,20 342:24 344:4,6 344:10,14,24 345:12 347:7 348:3 349:2,17 349:22 350:17 351:20 352:4 352:11 353:12 354:23 355:2 355:13,17 356:13 357:2 358:3 361:11 362:1,19 363:14 364:7 364:23 365:1 366:4,12 367:8 367:10,15,21 368:2 369:4,20 370:22 371:6 371:14,18 372:3,6 373:3 374:6 375:17 376:16 379:23 385:2 386:21 390:1 392:20 392:24 393:7 394:11,17 395:14 396:9 397:1

**oadams** 2:13

**ob** 65:17 68:10 68:20 70:7,10 81:4 82:3,7,11 83:17,23 84:15 106:5,7,14,18 108:2

**obese** 115:1 277:8 278:5,9

278:17 352:15 352:16
**obesity** 74:8 78:1,9 274:20 276:21 277:12 277:17 278:5 278:22
**object** 23:15 31:10 37:17 44:13 45:2,19 61:1 74:19 75:8 77:11 78:13 79:23 83:19 117:19 118:6 163:24 239:17 248:5 249:10 250:24 254:6 280:1 286:2 304:13 306:10 311:9 345:12 366:4 366:12 367:8 368:2 373:2,9 375:4 376:13 379:14 384:24 389:15 394:11 394:14
**objection** 16:5 20:17 25:13 26:11,23 27:17 28:23 32:3 33:11 34:7,18 35:23 37:5 38:9,21 39:22 43:2,24 46:12 47:14 48:18 49:11 50:23 51:10 52:11 53:1 57:20 58:6 62:4,17 63:5,17 66:9 67:10 68:2 69:12 70:13 75:3,24 80:15 84:18 85:10 94:14 97:10 104:7 109:14 110:21 111:14 111:17 113:8 115:15 119:9 120:11 121:4 123:13 125:6 126:14 128:12 129:15 131:9 134:1,14 135:5 139:23 141:5,5 142:10 144:8 146:19 147:12 148:6,23 152:23 155:6 156:4,21 157:13,16 158:14 159:8 160:4,4 162:16 163:1 164:17 167:12 170:12 171:11,21 172:11 173:2 173:12 174:10 174:23 175:11 177:2 179:1 180:6,21 181:19 182:9 183:3 184:7 185:18 186:2 186:11,24 189:10 190:20 191:12 192:1 192:23 194:12 195:17 196:17 197:3 201:7 206:14,24 208:5,19 210:2 210:17 211:12 212:15 213:4 213:14 214:8 215:12 216:1 216:12 217:3 225:11 227:5 227:15,24 228:24 234:7 237:10,10 238:19 264:1 269:17 271:10 272:23 273:14 276:16 278:11 280:21 281:1 284:11,12 285:10 288:2 289:3 290:5 291:1,8 292:4 293:1,23 294:18 297:3,8 297:15 303:18 306:21 307:15 308:7 309:1 310:14 311:13 312:6,12 315:11,11 316:8 317:17 318:3 319:2,14 320:1 324:1 325:16 326:11 326:12 328:1 329:3 332:3 333:18 334:1,9 336:6,14 337:1 337:15,18 338:10,23 339:19 340:5,7 341:7 342:1,20 342:24 343:1,2 347:7 348:3 349:2,17,22 350:17 351:20 352:4,11 353:12 354:23 355:8,13 356:13,13 357:2 358:3 361:11 362:1,3 362:19 363:14 364:7 365:1 369:4,20 370:22 371:6 386:18 393:7

**objections** 6:12 8:21 16:19,24 17:22 28:21 219:11
**objective** 100:18,20 101:1 162:8
**obligation** 162:24 164:8 166:8,13,23 167:6 169:22 170:10
**observational** 44:16 45:23 80:1 85:17 99:9 109:21 165:2 196:1 388:1
**observe** 309:6,9
**observed** 226:12 303:9 321:8 323:5 359:8 386:13 386:14 391:18
**obstetrics** 88:21
**obtained** 169:15 396:12
**obvious** 188:8
**obviously** 12:18 27:2,6 28:3 39:2 47:23 59:7 89:20 121:13 130:23 139:12 149:2 188:7 295:10 315:14 374:7
**occasions** 11:15 12:12
**occupational** 41:7 57:1 97:7 103:5 106:23 107:2,4
**occur** 147:15 153:6 189:23 264:24
**occurred** 85:12 129:1 270:24 365:18
**occurring** 98:1 222:7,21 223:7 223:14,19 232:7
**occurs** 274:10 278:1,3 288:17
**october** 47:12 47:17 49:1 50:16,17,17 51:7 52:24 53:9
**offer** 60:19 61:9
**offered** 17:12 35:21 152:19 154:5 156:17 157:4,10 158:10 159:3 323:21 324:3
**offering** 87:1 245:5
**office** 69:23 138:17
**offices** 8:13
**oh** 49:3 84:8 86:8 142:20 204:11 214:19 252:13 296:11
**oil** 330:15
**okay** 11:12,20 11:23 12:9,11 12:16 13:1,10 13:11,13,20 14:4,8,22 15:16 16:2,13 16:16,22 17:2 17:20 18:9 19:5 20:11 21:20 24:14 25:5 27:9 31:24 32:19,24 35:5 36:11 37:2,23 39:10 40:6 41:12 42:2,17 43:20 45:12 46:7,18 46:19,22 47:4 47:11,19 49:9 50:11,19 51:7 52:21 53:17,21 54:20 55:6 56:17 58:3,11 59:17 60:4,9 61:5 63:13 64:3,9 65:4 66:3 67:4 69:21 70:2 71:23 72:21 75:2 78:7 84:14 86:2,24 89:8,13,18 90:11 91:6,24 92:21 94:12 95:18 96:19 97:4 99:13 100:4 101:3,12 101:16 103:13 105:2 107:3,17 109:6 111:23 112:5,23,24 113:6,17 116:12 120:5 120:22 126:23 130:18 131:3 132:6,8 133:18 134:10 136:2,5 136:21 137:10 137:14,15,20 139:11 141:1 142:15 143:4 144:4 145:7,10 145:17,22 146:17 147:9 147:21 148:11 150:11 151:9 151:10,11

154:3 155:2 156:14 158:6 159:2 160:2,9 160:23,23 161:13 162:15 163:17 167:21 169:7 172:24 174:5 175:6 184:13 192:18 194:4 196:19 198:3,10,18 200:12,17,24 201:13 203:9 204:5,21 205:2 205:5,22 206:7 206:18 212:24 219:2,7 220:11 220:24,24 222:5,6,15,18 223:24 224:6 225:17,24 229:14 231:9 232:2 236:17 236:20 237:4 239:14 241:4 241:22 243:6 243:20 244:2 245:14,21 246:7,12,23 248:1 251:23 252:5 254:18 256:6,16,23 258:1 259:2,7 262:24 263:2 267:10 273:17 273:21 274:5 275:20 276:24 279:18 281:21 282:8,23 283:3 283:12,18 284:15,20 285:23 286:2 286:22 288:23 296:2,3,9,23 299:22 300:3 300:10 303:2 305:2 314:14 315:23 316:5 316:12,17 317:4,13 320:23 321:23 322:6 327:15 327:23 328:18 329:11 331:5 331:21 332:13 333:10,15 335:1,12,16 336:10 338:7 344:13 345:1,6 345:17 350:14 351:10,24 353:8 354:10 354:15 355:1,2 355:8 357:9 362:16 364:14 367:16 371:12 371:14,19 372:3 373:4 374:11 375:18 377:5,9,15,22 378:5 382:11 383:11 385:3 386:11 390:1 390:15 391:23 392:10 393:3 393:18 394:10 395:5,9

**older** 302:18

**omega** 2:10 9:20

**once** 51:15 69:2 161:19 238:5 249:21 277:20 283:24 289:20 307:24 394:11

**oncodermato...** 107:7,21,23

**oncogenesis** 199:22

**oncologic** 147:6

**oncologist** 88:22 173:4,7 173:14 199:2 218:1 309:16

**oncologists** 82:4

**oncology** 6:16 73:4 81:3,20 82:8,14,20,24 83:2,11 132:2 132:11,15,16 132:17,21,21 134:11 136:6 136:18,24 138:22 142:17 142:24 143:1,5 143:15,20,23 143:24 144:1 144:15,23,24 145:1,3,5,13 147:24 148:4 150:13 169:17 174:1 207:14 207:18

**ones** 81:4 137:21 138:12 142:18 175:9 188:14 249:20 249:24 334:16 334:19 360:18

**ongoing** 135:16

**online** 9:11 79:12 186:14 318:21

**open** 284:6

**operating** 82:18

**operations** 5:17 11:2

**operative** 71:17

**opine** 234:6 289:14 324:8 325:12

**opining** 255:8 255:11,12

**opinion** 18:3 24:5,9 25:19 26:2,16 27:20 28:7,14,16,24 30:6 32:17 35:24 36:12,15 39:7 46:5 60:10,19 61:9 99:11 111:4 112:7 123:18 142:2 148:16 152:7,20 154:5 156:18 157:5 157:10 158:10 158:18 159:4 174:20 175:4 179:16,20,24 185:24 186:15 188:1,19 189:15 195:15 197:9 212:22 213:22 234:9 245:6,16,21 270:3,8 279:19 280:4 288:22 293:19 297:18 298:14 311:4 311:17 323:22 324:3 343:4 344:6,20 358:9 360:12,15 362:10 372:1 374:23 380:22 384:18 385:11 386:7 391:22
**opinions** 14:5 17:12 18:14,16 19:23 26:21 27:16 29:6 30:2,10,18,24 31:4,7,21 34:13 35:21 40:11 52:24 60:13 85:21 87:1 111:23 158:7 175:9 198:15 255:5 280:12 281:8 295:3 296:23 302:5 324:4 343:1 358:2 378:15 379:13 385:4 388:14 389:14 391:7
**opportunity** 82:10
**oppose** 108:17 188:23 189:6
**opposed** 175:6 191:22 254:5
**opposing** 187:21 188:4 189:4 278:4
**opposition** 194:10
**options** 251:18 268:3
**oral** 114:4
**oranges** 271:22
**order** 51:17 76:24 77:7 153:1 154:21 159:17 171:24 173:10 313:13 337:8 339:11 349:5,11 352:1 352:9 379:12
**ordinarily** 372:24
**organ** 92:6 93:8 226:9 233:12 234:15 234:15 389:23
**organizations** 298:3
**organized** 141:24
**organs** 92:8 93:16 389:3,17 389:20
**original** 162:2 162:6 163:5 189:13,13 194:23 301:24 368:10
**originate** 244:17,21,23
**originates** 240:20 258:22
**outcome** 8:20 14:3 210:15 258:18 372:13 372:16 387:23 388:5
**outcomes** 7:7 255:24 261:8 261:20 262:4 268:9 269:5
**outdated** 293:14
**outlined** 101:19 102:3 112:6 175:10 243:8 245:22 276:3
**outside** 24:16 37:24 38:6,18 39:20 40:19 59:12 72:5 121:24 130:18 134:23 155:22 162:23 167:20 192:19 197:1 224:7 253:4 292:24 310:2 313:10 318:1
**ovarian** 7:12 12:6 23:12 25:11 26:8 32:8 37:4,16 38:6,18 39:13 39:18 41:5 42:24 44:11 45:17,24 46:10 56:22 58:21 60:22 61:12

62:3,20 63:10 63:15 64:6,16 65:16,23 66:17 79:22 80:14 84:3 85:19 87:18 88:10 93:11 96:21,24 99:17 100:17 100:24 104:18 110:15 116:20 116:24 118:13 118:20 119:12 128:10 129:13 131:8 141:3 142:8 152:21 154:7,10,13,18 156:19 157:6 157:12 158:13 159:6,23 163:20 164:8 179:24 180:4 180:19 181:14 181:17 182:8 183:2,20 184:5 184:9,16 188:1 188:12 189:9 191:22 192:22 194:9 195:7 196:4 202:1 203:13 207:14 207:19 209:17 211:2,20 214:13,17 228:5 229:6,12 299:16,20 300:7,18 301:1 302:2,15,17 303:3,10 309:5 309:11,14,17 310:16 311:8 312:1,24 313:1 317:9,18,24 321:4,6,20 322:18 323:4,6 323:15 324:10 325:1,14 340:2 346:8,15 350:3 350:15,22 352:16 374:21 375:23 379:10 383:21 387:3,8 388:23

**ovaries** 93:7,7 93:14 234:17 237:22 277:22 303:6

**ovary** 226:8 274:19 343:22 389:22

**overall** 266:11 288:10 303:9

**overcharacter...** 248:7

**overestimate** 50:1

**overestimation** 209:15 292:3

**oversimplifyi...** 237:15

**own** 35:19 37:8 37:20 39:3 79:11 125:11 125:21,22,22 142:2 195:6 197:9,13 337:12,17,19 339:16 341:5 362:17,22 370:19

**p**

**p** 2:19 3:2 5:14 93:20 94:2 96:6

**p.c.** 2:2 5:8

**p.m.** 168:2,2 395:19

**p1hairdepos** 397:24

**p53** 258:16 259:14,24 260:7 270:19

**p53abn** 259:7

**pa** 80:19

**pack** 353:21

**packaged** 380:3

**page** 5:19 6:9 7:2 8:15 12:16 15:2,7,7 17:2,3 25:6 29:15,16 29:18,20 36:4 40:7 41:13 56:15,16 60:17 60:17 64:9 86:3,7,11,13,15 87:23 88:13,14 88:16 99:19,20 99:21,23,24 100:13 101:12 111:24 132:3,5 134:3 137:10 137:12,21,22 142:24 143:11 149:22 152:2 161:14,16,22 162:1 165:17 165:24 169:9 177:13 187:19 187:20 196:11 199:20 200:8,9 204:24 205:2,5 205:7 220:14 220:16,18,20 220:21 221:24 222:10 225:17 225:21 226:4 231:6,7 235:23 240:7 242:22 246:4,7,12,18 246:24 248:18 252:7,8,9,15 256:7,8 257:12 257:13 259:11 259:12,12

262:16,22,22 265:19 267:7 268:6 274:4 275:16 281:24 284:15 289:5 294:5 295:9,16 295:20 296:10 299:14 300:6 300:11 302:9 303:13,23,24 309:7 316:17 316:22,23 320:13,14,15 320:19,20,21 322:12,24 326:17 330:10 331:3,4,5,22,23 332:19 333:10 333:11 334:18 335:9 358:14 358:17 363:1 377:10 381:9 382:8,9,9 383:5 384:20 385:1,8 386:6 390:20 391:24 392:7,11 398:4 398:7,10,13,16 398:19

**pages** 15:1 102:1 141:16 222:2 248:18 296:1

**paid** 41:19 196:16

**pain** 65:21

**pamphlets** 79:7

**pancreas** 226:8 389:17

**pancreatic** 53:7 172:10 173:1,6 179:8,17 318:10 389:2 389:10

**panigrahy** 58:18

**paper** 14:9 15:17 27:1,21 27:22 28:1 53:3 54:18 63:9 80:7 123:15,19 137:7 138:23 139:1,2,6,8 140:2,6,7,9,21 141:13 144:17 146:5 148:5,9 148:20 150:15 153:21 160:17 162:10,10 163:4,11,18,22 164:11,14 178:9 179:7 183:5,16 188:17,18,20 190:3,6 212:4 212:19 213:1,6 213:19 214:2 219:18 223:10 223:17 231:19 295:11 302:7,7 302:10 306:7,9 306:19 308:6 311:16,16 312:16,19 313:17 314:11 317:14,22 320:14 336:23 337:2 342:5,12 343:5,5,7 356:18,18 362:6 385:17 388:24

**papers** 27:20 43:7,9,12 50:6 51:19 56:6 57:24 80:5 90:9 136:20,22 137:1,16,22 141:15 146:23 146:24 147:4,6 158:20 178:5 179:3,14,22 180:10 183:12 188:13,22,24 189:14 190:9 192:8 196:2 313:2 340:18 344:17 368:18 388:18

**papilloma** 201:2,4

**parabens** 41:5 56:23 235:19 326:21 327:12 336:3,7 338:14 378:5,7 391:11

**paragraph** 64:12 112:1 152:3 169:10 169:12 175:24 177:13,15 187:18 196:11 229:14 252:6 252:14 256:15 265:18,19 309:7 316:18 317:6 322:24 326:7,18 327:1 327:20 358:18 363:1,8 382:13 390:22

**parallel** 154:15

**paramount** 169:15

**part** 19:12 24:15 27:19 29:4,24 31:13 32:16 36:15 40:10 64:4 65:1 84:14 86:2 92:6 96:12 103:19 106:4,17 113:2

113:12,19,24 126:1 133:5 139:11 152:15 169:24 170:5 172:18 174:24 179:22 180:10 183:5 200:5 202:13 207:6 226:11 235:20 266:18 298:18 298:20 299:10 313:2 318:23 323:23 371:10 375:12 386:4 389:22 394:21
**partially** 377:2
**participants** 319:17,18 359:16 370:4,6
**particular** 15:17 117:16 118:3 120:8 121:1 124:10 125:1 126:8 148:22 169:16 176:16 279:21 321:19 322:17 359:4,10 367:4 380:21 381:16 381:23 382:6 393:4
**particularly** 301:1 323:11
**parties** 8:7,18 396:14
**partly** 241:6,6
**partners** 95:24
**parts** 377:6
**party** 33:23 34:3
**pass** 371:15
**passed** 12:6
**past** 99:4 303:11 304:4
**patches** 233:13 233:13
**path** 81:4
**pathogenesis** 93:10
**pathogenic** 223:2
**pathological** 108:6 176:3
**pathology** 77:4 78:21,22 97:8 97:8 103:6,6 103:17 108:1,3 108:5,7,10,16 240:10 252:1
**pathways** 176:4
**patient** 12:5 66:6 68:9,17 70:19 71:15 73:8 74:1,7,17 75:10,22 76:6 77:6,19,23 78:2,8 110:11 111:7,21 113:13,19,22 113:24 114:6 115:8,13 116:16 176:5 176:10 177:7,9 198:24 277:12 279:4 288:6 347:19 350:2
**patient's** 376:4
**patients** 44:4 64:15,17,22 65:7,9,14 66:1 66:11,15,18,22 67:1,7 68:5,7 68:16,22 69:1 69:18 70:3 71:10,13,21 73:6,12,16,17 73:18 74:5,10 75:18 76:13 79:3,8,12,14 82:16,17 83:9 83:18,21,23,24 84:16,23 90:17 90:20 94:4,6 95:17 98:8,12 100:21 104:16 104:20 105:18 107:13 108:8 108:12 109:1 110:19 111:12 114:8,13,19,24 115:19,22 116:2,4,18 117:2,7 170:2 170:8,23 176:12,24 177:11 181:4 226:22 233:13 251:17 260:5,6 260:6,10 276:6 276:7 296:18 298:23,24 310:4,17 311:1 349:6 350:4 370:4 376:2 388:4
**patrick** 2:14 9:14
**patterns** 358:23 359:23 361:18 391:3
**paul** 5:12 10:17
**payment** 42:18
**pc** 2:18
**pcos** 274:19 278:18
**pcp** 65:18
**pdf** 86:7
**pdq** 7:10 283:20 286:16 296:13 382:15 383:6,13 384:3
**peal** 3:12 9:12 9:12

**peer** 6:18 124:11,12,15 126:1 133:20 133:23 134:2,8 134:12 135:4 135:20 137:7 138:8 139:11 140:12 141:4 142:9 144:5,16 146:2 147:10 147:15 148:5 149:17 151:3,8 151:13,17 152:3,5,9,14,19 153:7 154:4 156:16 157:4,9 158:9 159:3,15 172:15,17,22 175:18,19 185:12,17 186:19,21,23 187:3,4,9,13,16 188:13 194:7 197:17 199:12 213:1,7 296:15 330:2
**peers** 134:10 139:9
**peiyuan** 4:2 10:7
**pelvic** 65:22 66:22 67:17,23
**pembrolizum...** 93:19
**pending** 252:12
**people** 67:17 73:20 79:1 91:1 121:9,14 122:13,21 134:19 137:8 138:17 146:10 147:16 186:14 218:15 305:7,9 305:15,18 307:6 308:16 351:3 370:6 373:21
**percent** 49:7,10 49:24 64:13 67:21,22 152:8 204:6 205:16 205:23 206:8 206:12,16,19 206:20,22 207:4,17 208:1 208:4,11 209:13,17,23 209:24 210:12 210:14,24 211:8,9 212:11 213:10,12 214:5,5 215:15 215:17 219:19 219:22,22,23 220:3,5 240:19 253:10 260:10 261:10 263:7,8 263:12,13,14 265:11,11,12 300:21 301:4 315:24 322:1,3 322:5,7,9 365:24 366:1,8 374:3,13,14
**percentage** 67:5 69:9,10 209:5 224:20 225:9 264:18 276:13 278:8 375:14
**percentages** 365:24 374:12
**perfect** 304:22
**perform** 69:10 70:20
**performed** 42:22 43:5 162:4,8
**performing** 64:18 67:7 325:5
**period** 303:17 304:2,20 305:6 305:24 319:24
**periods** 265:5
**permanent** 172:7 304:1 313:24 314:1,4 314:11 315:3 323:5
**permanently** 330:24
**permanents** 284:18,23 295:14 315:5,8 315:8,15
**permit** 162:12 164:15 212:24
**person** 138:23 176:19 197:7
**personally** 58:1 233:12
**persons** 145:18
**perspective** 62:9 97:23 122:19 125:12 125:15 149:5 153:2 207:17 234:12 237:18 250:14 309:15
**perspectives** 187:21 189:4
**pertaining** 1:11 381:5
**pertinent** 288:6
**petti** 5:3 10:10 10:10,14,14
**pguo** 4:4
**ph** 232:17 337:7 341:10 380:5
**ph.d.** 4:2 58:19
**phase** 87:9 98:10
**phones** 8:5

**phrasing** 357:5 357:12
**phthalates** 41:5 56:23 235:19 326:22 327:11 335:23 338:13 377:23,24 378:3 391:11
**physical** 106:24
**physician** 11:19,21 12:4 12:8 34:12,15 68:15 70:6,12 70:16,20,22 71:5,19,24 72:3 104:6 107:4 243:6 270:1
**physicians** 34:5 71:12 79:20 80:12
**pi** 86:22
**pick** 8:4 28:9 360:22
**picks** 36:5
**pictures** 20:4,5 202:2
**pie** 248:19 249:19 259:10 259:20,23 261:2
**piece** 28:14 188:19 362:10
**pierce** 235:16
**pituitary** 93:15
**pivotal** 151:12
**place** 8:6 23:5
**placed** 16:13
**places** 25:3
**plaintiff** 9:17 9:18 34:24
**plaintiff's** 6:11
**plaintiffs** 2:17 9:5,7,9,15,21 9:23 15:13 16:9,17 19:18 25:18 39:21 42:13 130:24 176:21 196:16 197:11,21 210:15,20 224:21 225:9 234:3 276:14 279:21 396:9
**plan** 76:7 78:19 114:21
**plausibility** 127:17 387:6
**plausible** 130:15 176:4
**play** 151:12 247:22
**plaza** 4:3
**pleadings** 17:9
**please** 8:3,5,22 8:24 9:11 11:9 13:18 100:14 132:3 159:10 191:12 194:21 202:15 220:12 222:4 280:23 285:13 364:23
**plus** 239:9 247:19
**plyons** 2:16
**point** 13:17 67:24 76:14 118:23 122:10 132:3 146:7,14 159:2 190:3,14 191:23 193:6,8 195:14,23 204:10 210:6 212:3,6 214:19 230:13 239:22 290:16 299:20 301:10 341:23 347:10 355:14
**pointed** 377:5
**policies** 161:1 393:24
**policy** 150:4,14 382:24 384:8
**polish** 330:16
**polycystic** 274:18
**pool** 342:22
**poor** 71:23 287:15 288:14 288:16,21,23 290:16 292:19
**population** 264:18,19 287:18,24 288:6 289:1 292:24 366:10 375:15
**populations** 291:6 321:16 322:14 323:13 347:19
**pores** 233:3
**porous** 232:19 233:20
**portion** 202:3 334:4
**portions** 383:7
**posed** 172:4,20 273:8
**position** 187:5
**positive** 191:2 259:16,16,18 308:23 309:9 346:20 347:13 347:13 348:7 348:10,17
**positives** 360:20
**possession** 15:15,20 35:6 57:2 58:22
**possibilities** 151:16
**possibility** 116:23 177:9

229:8 251:19
**possible** 20:8 77:21 110:12 111:1,6 113:11 120:1 163:16 166:21 207:12 285:6,18 286:23 305:7,9 305:13 323:2 329:16 370:3
**posters** 63:22
**postmenopau...** 68:17 274:10 274:19 279:8 303:4
**postulated** 221:7
**potential** 39:17 42:23 43:21 44:8 73:24 75:13 77:21 171:5,18 244:12 392:2
**potentially** 20:12 67:19 185:16 189:2 189:20 224:17 247:13,22 392:14 393:14 393:21
**potentiate** 224:17
**power** 310:12 321:7
**powerpoint** 80:23 129:3
**powerpoints** 131:12
**pr** 247:18
**practice** 27:2 28:6 43:16 64:17 65:5 74:4 83:23 84:12,15 90:15 92:20 95:5,18 103:19 110:5,8 110:19 111:11 112:13 113:1 113:20 115:9 115:12 117:7 169:16 170:5 171:2 176:23 187:10 198:19 198:20 233:8 298:17,20 299:5,11
**practices** 1:4 8:11 104:6
**pre** 331:15
**precancer** 351:7
**preceding** 325:17
**precise** 211:20 314:18
**precisely** 368:19
**predisposing** 224:19
**predisposition** 350:2,4
**predominant** 244:13
**predominantly** 256:24 274:10 321:24 376:11
**prefer** 167:18
**premalignant** 92:13
**premise** 75:17 290:19
**prep** 14:22
**preparation** 55:14
**prepare** 29:6 30:1 40:18
**prepared** 34:22 40:12 55:15,18 165:15 166:9
**preponderance** 374:8
**prescribe** 233:12
**presence** 335:18 376:24 377:17 380:16 387:14 391:11
**present** 5:18 8:23 132:12 143:16 145:12 162:3,7 239:2 263:7 265:6 276:6 326:19 334:20 337:5 337:10,23 338:22 377:12 377:13 378:9 378:12 385:4 390:22
**presentation** 63:2,8 80:22 130:20 131:5 268:22
**presentations** 35:1 41:1 131:11
**presented** 64:4 172:13 356:15 358:5,6 371:20
**presenting** 117:10 130:1 329:5
**press** 329:1,17 330:7
**pressing** 300:15 323:4
**presume** 13:13
**pretty** 115:18 162:17 224:12
**prevalence** 257:22 258:3 258:18 263:11 263:13 264:5 265:10,14 267:19 321:11

359:15
**prevented** 359:7
**preventing** 299:2
**prevention** 7:10 282:5 283:20 286:16 296:16 297:11 298:6,12,18 299:3 382:15 383:13 384:4
**previous** 122:15 304:2,7 312:14 317:7
**previously** 111:5 346:8
**primarily** 107:10 146:7 149:4 197:23 240:24 243:3 260:21 278:14 385:6
**primary** 76:5 101:1 114:9
**principal** 86:19
**principles** 99:7 245:12
**printed** 160:15 284:7 295:9
**prior** 42:5 43:18 44:11 45:1,18 46:8 51:7 62:16,24 63:3,7,13 64:6 99:15 109:6 110:4,16,18 111:13 113:20 133:13 274:23 308:11 346:14
**priority** 397:23
**private** 8:4
**pro** 332:9
**probably** 47:5 48:8,12,21 50:1 52:6 85:11 92:11 99:4 111:20 117:1 118:24 119:13 134:22 141:14 187:8 195:20 199:13 234:2 249:14 266:5 278:7,23 326:23 330:8 352:18 353:20 353:22 387:19
**problem** 120:12,18 165:23 182:14
**procedure** 1:10 396:10
**procedures** 68:16
**proceedings** 8:22 395:18
**process** 22:21 55:16 89:12 98:7 126:2 135:16 138:9 139:4,12 140:12 146:6 147:15 172:15 172:17,22 197:18 311:22 313:12 330:2
**processes** 369:19
**produce** 16:2 25:2 41:23 175:16 224:1 394:21
**produced** 17:14,18 33:19 39:4 46:22 93:9 368:15
**producing** 277:23
**product** 8:11 22:9 54:14 91:21 103:2 222:7,22 232:3 233:2 304:8 305:8,10 330:11,15,21 331:16 333:16 333:22 334:4 342:14 352:1 358:23 359:3 361:20 362:9 391:16,19
**production** 17:6 29:14,21 40:7
**products** 1:4 5:7 7:12,15,18 8:11 10:15 21:8,22 22:11 22:16,22 32:1 32:10,12,15,21 33:20 60:23 61:13 91:21 103:2 116:14 184:24 224:8 232:16,24 239:3 284:16 285:4,6,16,19 286:11,19,24 287:4 295:13 300:15 302:1 303:12 305:20 307:8,17,23 313:19 321:11 321:18 322:16 323:4,10,14 326:20 328:5 330:14 331:6 332:5 333:12 337:6,13,22 338:12,19 339:8,15,22 340:1,3,13,19 340:22 341:3,6 341:16 343:8 343:10,15

352:8 359:9,9 360:6,10,11 362:9,14,22 368:9 369:11 370:1,8 374:4 378:17,23 379:2,6,19 380:6,6,12,16 380:23,23 385:13,23 389:8 391:13 393:22,24
**profession** 233:16
**professional** 39:19 43:22 44:9 63:3,16 64:14 117:11
**professionals** 296:14
**progesterone** 93:12 251:13 277:23 279:7
**program** 252:24
**prohibiting** 394:1
**projects** 40:3 96:13 99:5
**proliferation** 275:1 278:2
**prolonged** 230:4,9,18 238:17
**promise** 394:4
**promotion** 181:13
**proper** 175:24
**properly** 64:24
**properties** 360:7
**prophylactic** 351:8
**proposals** 99:22 100:5,9
**prospective** 290:12 293:11 323:1 384:14 388:3
**prostate** 226:9
**protective** 331:14
**protein** 221:6 230:5
**provide** 15:14 35:20 72:14,15 72:24 73:5 79:8,13,16 95:17 208:17 296:18 323:1 333:1
**provided** 34:16 48:19 79:15 145:4 197:12 197:21 357:16
**provider** 65:17 68:10,14 69:4 268:22
**providers** 68:12
**provides** 296:14
**providing** 64:21 65:7,8 73:7 75:21 90:17 213:17
**provoke** 222:24
**proxy** 304:21 304:22 306:4 307:11 308:21
**psc** 16:18 17:21 17:24 28:20
**public** 20:6 35:2 91:15 97:8 98:16,17 98:18,20,24 99:5,6,10 103:6 109:7,13 185:15 225:23 288:7 399:19
**publication** 18:24 133:3,4 133:24 135:4 142:9 143:23 145:13,14,20 152:19 154:5,9 156:17 157:4,9 158:10 159:3 159:15,22 160:6 162:23 164:5,6,13 175:18,19 187:16 192:19 287:14 329:2 330:2 368:10 371:22 378:15 381:7
**publications** 102:6 131:22 153:8 154:11 156:22 159:22 185:11,13 186:19,23 187:3
**publicly** 80:2
**publish** 134:3
**published** 17:7 17:13 37:12 38:23 41:3 43:7,10 53:4 62:1 64:3 80:2 128:21 151:15 152:16 158:20 163:18 199:9 268:13 289:12 289:22 318:21 328:19,20,21 329:6,14 355:3 355:7 376:19 383:19
**publishers** 161:9
**publishing** 6:19 117:9 131:21 149:24 150:3 151:6,13 152:8

161:2,8
**pugliese** 58:19
**pull** 88:18 301:20
**pulled** 160:16
**purchase** 337:22 340:3
**purchasing** 339:15
**purely** 311:15 312:18
**purpose** 22:22 24:4 25:15 40:1 43:6 44:20 45:6 55:3 95:7 98:3 103:11 104:19 147:5,7 149:1 164:12 170:6 179:23 199:17 210:7 211:13 215:16 219:19 231:20 234:16 249:6 267:4 288:9 296:12 296:22 298:13 338:16 345:14 366:14 367:7 368:1,5,14 375:2 379:20 383:7,8
**purposes** 22:3 60:10 111:4 230:1 244:2
306:5 349:8 375:9 376:20
**pursuant** 1:10 396:9
**push** 211:23
**put** 46:19 98:2 136:3 170:3 194:21 212:17 213:22 240:9 273:21 283:3 346:6,9 354:23 364:17
**putting** 149:7 149:11 271:23

**q**

**qualifications** 375:5 376:14
**qualified** 105:17
**qualities** 187:12
**quality** 151:15 186:22 293:11 388:1
**quarrel** 147:9
**quarters** 205:11
**question** 12:20 13:5,12,14,18 20:20,24 21:12 22:10 31:1,19 32:5 33:5 34:9 34:22 37:9,11 38:11 40:4 43:5,16,20 44:3,7,9 45:1,5 45:16 46:8 52:22 67:13 71:23 72:23 75:3,5,15,16 81:8 83:13 89:22 90:6 94:17 95:2 96:3 97:15 104:21 107:19 108:21 109:10 109:16 110:24 112:23 113:18 116:18,21 117:20 118:9 120:5,13,19,22 121:6,8,20 122:16,23 123:3 124:5 126:16,18,22 129:2,21 135:7 137:17 139:15 141:7 142:21 143:8 144:11 148:1 154:3 156:15 159:9 162:20 164:2 165:6 171:14 171:23 173:5 174:14 175:13 178:19 181:22 182:5,13,17 183:9 189:15 191:7 192:24 193:15,15 194:23 195:4 196:23 203:21 215:21 216:16 216:19 217:7 218:6,10,16,17 218:18 219:4,9 219:14,16 227:4,18,20 230:16 231:15 252:12 254:20 261:11,24 263:19 270:10 271:15 272:19 273:2,9 276:2 280:22 281:12 281:17,18,21 282:13 283:6 284:11 286:12 286:13 287:21 287:22 288:4 289:10 290:20 291:11 292:13 292:15 303:19 304:9 306:5 310:12 311:20 312:14,15 313:5,7,8 315:19 317:19 322:20 325:9 325:17 327:2 328:8 329:11

329:15 336:15 352:5,14 356:17,19 357:22 361:13 362:14 364:20 369:1,9,13 390:12,17 393:8,11
**questioning** 284:13 394:15
**questionnaire** 113:19,22,24 304:6 305:14 305:17 308:12 368:24 369:10
**questionnaires** 96:15
**questions** 23:18 36:7 45:4 65:6 75:1 89:5 96:10 128:6 142:20 151:10 167:12 169:10 193:7,20,22 201:20 215:3 217:12,17,20 217:21,23 218:1,7,19 225:6 238:9 240:14 241:23 244:3 248:23 254:24 266:22 267:5 280:4,13 280:18 281:3 284:4 291:18 345:7 368:19 368:21 371:12 371:14 372:8 374:12 375:13 376:23 381:5 384:23 386:8 395:12
**quibbled** 365:23
**quicker** 318:14
**quite** 22:24 50:18 100:14 111:1,6 120:1 135:12 181:6,6 186:7 346:23
**quote** 235:22 316:13
**quoted** 378:19

**r**

**r** 4:17 11:1 58:16 93:20 94:2 169:1 398:3,3
**race** 321:6,9 366:22 367:1 376:4,5
**racial** 253:16 321:16,19 322:15,17 363:24 394:3
**racially** 323:12
**racioethnic** 7:6 255:23 258:6 258:12 261:7 261:19 262:18 268:8
**radiation** 78:24
**radiologist** 82:2
**rafael** 6:13 397:5 398:2,24 399:2,4,12
**raise** 74:21
**raised** 361:8
**raises** 120:1 170:14
**raising** 324:12 362:13 393:19
**randolph** 5:9
**random** 121:23
**randomize** 387:20
**randomized** 99:9 387:19
**range** 185:24 206:20 209:24 215:14
**rare** 240:20 241:8 321:7 351:6
**rarer** 258:21 259:3
**rarity** 241:4,6 260:19
**rate** 54:20 55:2 55:5 235:1,2 235:12,14,22 252:24 253:2 266:11
**rates** 73:22 190:11 264:15 264:22 265:3 266:8 392:17
**rather** 78:11 149:16 169:18 239:11
**rating** 294:15
**ratio** 300:20,21 309:19 310:8 314:13,16 315:2,24 347:14 348:17 372:20,23
**ravika** 4:17 10:9,10,12
**ravika.rames...** 4:19
**reach** 52:24 57:9 171:8
**reached** 192:20 192:21 355:24
**reaching** 124:11 388:14
**reaction** 93:23
**reactions** 93:24
**read** 25:4,17,21 28:1 29:22 45:22 51:15

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 479 of 515 PageID #:76337



75:6,7 80:7 89:3 109:19 154:8 159:10 159:11 160:5 173:23 190:19 190:22 194:24 205:20,21 210:18,21 212:4 214:16 219:10 230:13 231:2 261:13 262:10 265:9 280:24 285:10 285:13 294:24 313:9 324:8 325:11 326:5,8 326:11 356:6 364:23,24 382:13 383:7 393:8,9 396:10 397:9 399:5
**reader** 165:5 208:17 211:8 211:17 213:21 214:4,12,16,21 215:23
**readers** 165:4
**reading** 23:22 23:23 44:15,23 50:5,9 62:10 85:16 90:9 109:22 122:3 214:6 227:18 263:23 287:20 345:21 396:7
**reads** 211:18
**ready** 167:16
**real** 125:14 172:20
**realized** 51:18
**really** 20:2 42:8 44:16,17 73:16 74:4 76:19 110:23,24 114:9 117:3 137:5 140:19 144:9,10 146:12,15 173:5 178:18 178:22 197:22 199:13 213:5 213:21 238:6 242:13 244:6 261:14,24 315:14 329:4 346:6 352:12 364:12 367:2
**reask** 393:11
**reason** 13:18 50:2 70:15 76:19 115:24 122:23 124:21 142:23 151:23 191:1,6,18 213:6 244:24 250:16 266:14 266:17 277:15 304:18 307:22 310:23 332:20 333:15 337:4 339:9 340:9,12 341:14,17 343:14 360:10 363:18 366:18 381:21 396:12 397:11 398:6,9 398:12,15,18 398:21
**reasonable** 13:15,23 14:6 60:20 61:10 307:9 311:5
**reasons** 188:8 265:2 268:15
**recall** 20:10,22 24:3 42:4,16 53:4 54:7 63:21 80:16 356:21 376:23 381:4,18 385:3 386:7
**recalling** 306:3
**receipt** 397:17
**receive** 269:6
**received** 30:11 41:17,22 42:3 42:17 105:23 138:16
**receiving** 270:6
**recent** 179:7 205:12,15,22 282:20 295:11
**recently** 14:21 93:18 268:13 388:24
**receptor** 87:9 247:12,13 251:7,9
**receptors** 242:9 243:18 246:3 247:9,16,20 250:20 251:13 272:7 273:6
**recess** 102:16 168:1 240:3 299:24 345:3
**recognize** 93:22
**recognized** 153:23 364:12 379:6
**recollect** 19:13
**recollection** 48:16 362:13 385:20,24
**recommend** 78:24 139:7
**recommendat...** 78:23 108:12 108:13 296:19
**reconciled** 361:8
**record** 8:2,7 9:1 11:10 13:10 23:8 29:22 48:10

71:12 74:2 75:7 102:14,15 102:17 103:11 112:14,16,18 112:19 136:16 137:19 142:16 143:22 159:11 160:10 167:22 167:24 169:2 190:19 193:20 194:2,24 219:10 236:15 239:22 240:2,4 249:12 267:4 280:24 299:23 300:1,4 313:9 328:19,23 335:3 345:2,4 348:8 354:24 364:24 376:18 384:18 390:5 393:9 395:16 396:6
**recorded** 8:9 12:18 396:4
**recording** 8:6
**records** 17:9 41:15,16 70:23 71:3,7 74:23
**recruit** 375:7
**red** 120:1 170:14 259:24 324:13 393:19
**reduce** 98:7 393:21
**reduced** 257:22 258:3 396:5
**reducing** 351:1 351:8 394:2
**refer** 68:13 94:9 107:13 221:5 240:6 256:18 257:10 260:20 316:15 320:12 327:19 331:3 334:2
**reference** 6:20 6:22 7:3,6,8,10 7:11,13,16,19 7:22 17:16,22 18:2,3 21:2,16 24:9 26:16 27:21 28:21 38:23 40:12 167:3,3 179:3 179:9 188:6 189:21 197:11 200:1 212:1,17 213:16,17,23 214:6 220:1,13 223:11 231:5 233:5 255:22 255:24 256:9 261:6,18 262:13,13 264:13,14 266:15,18 267:9 273:22 292:16 294:21 300:12 318:17 319:1 327:5,24 354:10 355:22 355:22 357:15 357:20 359:14 359:19 360:16 361:21 362:6 363:2,18 378:20 379:3 379:17 380:1,7 380:8 381:17 381:20 394:5,8 395:7
**referenced** 17:15 18:23 20:12 21:14 22:5 30:19 52:2 53:13 123:2 151:5 155:3 188:14 230:21 282:24 284:9 294:8 329:6 349:10 363:11 371:24 397:6
**references** 18:17,17 24:18 24:19,19 52:16 54:11 57:15 123:24 134:18 135:15 158:9 162:11 164:15 197:12 212:18 255:21 313:18 382:3
**referencing** 18:20 47:9 50:8 183:6 288:12 294:2 294:22 327:20
**referrals** 72:5 92:9 104:12,16
**referred** 67:9 67:24 68:16 69:9 379:1
**referring** 29:4 38:12 40:9 62:11 65:17 68:9,10,14 69:4 70:19,22 71:19,24 178:2 223:7 246:9 255:1,4 291:11 300:4 308:19 310:22 334:11 365:8
**refers** 17:24 36:8 70:2 71:22 254:11 282:4
**reflect** 41:16 52:3 218:2 287:18,24
**reflecting** 35:18

**reflects** 382:23 384:6 393:3
**reframing** 218:15
**refresh** 231:18
**refutes** 196:1
**regard** 17:23 191:11 209:15 225:2,8 231:17 373:4 374:11 378:5 384:12 387:15 388:7
**regarding** 21:13 33:19 38:5,17 39:17 41:4,9 42:5 57:1 79:21 80:13 131:6 148:20 178:1 215:24 245:6 245:16 261:18 271:3,7 272:20 273:12 286:16 361:9 391:16 392:2,14 393:14
**regards** 8:10 61:19 201:17 245:22 299:5 302:1 306:6,7 363:6
**regional** 137:7 138:11 140:8
**regular** 128:19
**regularly** 383:12
**regulation** 91:21,23 103:2 393:24
**regulatory** 23:20,23 187:5 385:9,17
**rehabilitation** 107:1
**reject** 139:7 146:13 213:6 214:2
**relate** 41:3 87:1 87:4 88:4 96:23 100:5,9 100:16 101:5 101:21 102:2,7 313:3
**related** 8:18 21:8,22 22:8 22:15 45:6 58:20 79:10 87:24 93:11 177:3,17 178:16,21 179:19 195:4 196:20 198:22 202:23 209:10 369:17 388:5
**relates** 96:19 101:17 120:3 179:24 181:11 271:3,7 272:21 273:12
**relating** 37:3 37:14 42:22 56:21 89:5,21 194:8
**relation** 7:12 245:17 302:1
**relationship** 57:18 58:5 62:2 63:10 64:5 77:1 116:17 124:19 127:10,12 129:22 171:9 171:20 173:16 195:10 297:2 323:2 346:11 379:9 382:1 387:1 389:12
**relative** 275:23 396:13,14
**relaxer** 1:4 7:19,22 60:21 61:11 100:24 116:6,22 176:24 232:3 238:12,17,24 321:4 330:17 331:7,9,12,12 331:14,15,15 332:4,8,19 333:11,17,20 333:23 334:7 334:15 335:17 335:18,20,23 335:24 336:4 354:16 355:11 356:1,10,23 359:15 365:15 377:1 390:8,11 397:4,4 398:1 398:1 399:1,1
**relaxers** 8:10 21:13 23:12 25:11 26:8 37:3,15 38:6 38:18 39:12,18 41:4 42:24 44:10 45:6,17 46:10 53:6 56:22 58:20 62:2,20 63:9 63:15 64:5 73:9,23 74:18 75:11,19,23 77:10 79:10,22 80:14 83:18,22 84:9,17 87:5 87:18,20 88:1 88:5,10 96:20 96:24 99:16 100:6,10,17 101:5,18,22 102:2,8 110:6 110:20 111:12 112:9 113:2 115:14 118:18

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 482 of 515 PageID #:76340



121:11 128:10 129:13,23 130:9 131:7 141:2 142:7 149:9,10 152:21 153:14 153:15 154:7 154:17 156:19 157:6,11 158:12 159:6 163:20 164:7 177:19 178:2,6 178:17,22 179:4,19 180:5 180:19 181:16 182:7 183:2,20 183:24 184:5 184:19 185:4,5 187:23 188:11 189:8 191:21 192:22 194:9 196:5 237:20 238:4 245:18 279:2 282:9,16 285:1 288:8 298:15 300:15 311:7 312:1,22 314:19 315:17 315:21 316:7 319:11 323:3 324:9 325:14 330:23 336:11 336:21 337:4 339:18 341:17 354:22 359:11 360:1 364:6 365:7 366:15 366:19,21,23 367:6,24 368:11 369:2 370:2,16 378:17 380:3 380:17 382:1 383:22 384:22 385:5,18 386:1 387:2,7,21 388:17 389:7 389:12 391:2 391:14 392:16 393:16

**relaxing** 336:1 336:3

**releasers** 239:2

**relevance** 316:9

**relevant** 27:5 43:15 51:19 142:1 174:9,12 238:15 321:12 367:2

**relied** 17:11 18:13,18 19:22 26:14 27:15 29:5 30:1 34:11 35:20 39:1 175:8 188:12 302:4 311:18 312:19 329:24 378:15 378:19

**rely** 26:20 30:17 33:22 66:13,14 95:6 108:6 127:6,8 155:2,9 166:2 187:8 188:8 323:23

**relying** 29:3 108:5 319:6

**remained** 341:3

**remaining** 269:9

**remedies** 182:20 344:10 344:11

**remember** 28:15 106:2 118:24 219:3 282:19 371:21 374:15 384:23

**remind** 56:7

**remission** 64:23 73:7

**render** 221:4

**rendering** 188:1

**renew** 89:2

**repair** 270:21

**repeat** 13:16,20 22:10 31:1,12 34:9 75:5 159:9 164:1 178:19 227:21 261:11 280:23 282:13 285:12 336:15 351:16

**repeated** 162:19 238:3

**repeatedly** 238:5 353:6

**repeating** 107:19

**rephrase** 13:16 13:19 121:6 328:8

**replacement** 94:5

**replicate** 162:12 163:15 164:15 165:5 165:10

**replicated** 163:7

**replication** 222:24 230:6 236:1

**report** 6:15 17:16 18:3,4 18:15,16 23:7 23:13,22 24:17 24:18,20,21 25:8,15,16,16 26:9,22 27:7 27:10,19 28:7 28:11,17,24 30:6,13,20,23

31:3,8,22 32:6
33:1,10 35:24
36:12,16,22
38:7,19,23
39:1,8 40:13
40:16,19 43:6
43:17 48:5
49:4,16 50:7
51:2,18 52:15
52:15,17,18
53:14,16 54:2
54:4,7,10,16,22
55:14 56:2,4,5
56:10,11 57:10
57:16,24 59:23
60:11 64:10,11
77:4,15 78:21
78:22 86:2,4
100:22,23
101:19 102:3
102:21 108:7
110:3 112:1,7
112:12 117:5
123:22 133:22
134:3,12,23
135:4 136:20
141:1,8,18,24
148:16 149:7
155:4 158:8,8
158:9,16
165:14 166:9
167:5 169:6,9
169:19 170:4,6
173:24 174:3
174:18 175:10
175:15,20,21
178:23 179:8
179:11 188:6
188:16 192:11
194:11 197:2
199:19,21,23
200:4,12 206:8
206:23 208:6,9
208:10,24
210:7,18,21
211:1,14,18
212:9 214:15
214:20 215:5
215:15,16,22
216:4,10,18,20
217:2 218:16
219:20 220:4
220:14,19
222:6,21 233:6
233:23 235:13
237:13,18
240:7,8,22,24
242:2,21,24
243:7 245:8,16
245:22,24
246:4 248:23
249:9 251:23
251:24 252:9
252:19,24
253:4 254:3
255:1,9,21
259:8 260:15
260:17,21
261:1,6,17
262:3,13
263:24 264:9
265:8,17
266:15,19
267:8 269:16
274:3,14 275:6
275:11 280:4,6
280:11 281:4
281:24 282:6
295:17 299:12
299:14 300:5,8
305:12 313:18
318:20 326:16
327:1 328:12
329:7 343:1
345:22 346:4,6
349:9,11
354:11 355:6
355:21 357:17
357:20 358:9
358:13 360:17
362:6,12
371:11 372:1
378:21,21
379:16 384:19
385:8,11 386:7
394:6,16,17,22
395:6

**reported** 5:24
33:15 119:24
189:17 211:21
268:11 326:19
342:7 357:6

**reporter** 8:17
13:1 261:14
283:9,13

**reporting**
298:9

**reports** 17:10
36:8 108:10
123:23 137:4
147:3 162:2,6
167:11 181:8

**represent**
165:14 166:14
237:8 289:2
382:24 384:7
394:2

**representation**
321:16 322:15
375:1 381:6

**representative**
103:14 236:23

**represented**
162:10 164:10
213:12 263:20

**representing**
8:15 34:23
213:3

**reproductive**
97:6 105:21,22
106:4,10,13,15
106:16 274:16

**reputable**
128:22 187:8

**request** 17:5
29:2,10,14,21

35:7 37:18 40:6 41:12,13 46:23 57:4 58:24
**requested** 15:11 37:12 41:19 75:7 159:11 190:19 194:24 219:10 280:24 313:9 364:24 393:9
**requesting** 29:23
**requests** 15:3,6 40:24
**require** 76:9 138:24
**required** 139:21 140:4 140:17,23 155:5,12 156:3 165:13 180:3 239:15 353:11 399:13
**requirement** 89:14 140:20
**requires** 147:11 176:1
**research** 10:13 24:17 39:17 40:1,2 49:2,3,4 49:5,6 50:3,5 51:2,15 52:4,9 52:18 54:17 56:11 61:24 62:7,9,12 63:24 83:4,6 96:1,3,4,10,17 99:8 101:2 125:23 135:3,7 135:11,16,21 136:21 137:1,7 137:16,22 138:11 139:10 139:18 140:8,9 141:13,21 144:17 146:8 146:12 147:18 149:6 151:15 151:16,19 152:5,8 153:20 162:2,7,19 163:6,15 170:20 173:19 175:4,17 179:14 189:14 189:15 192:14 199:4 224:3 228:2 253:17 256:11,20,23 268:1 320:17 321:15 322:13 323:8 324:14 325:5,23 339:14 341:5 350:14,21 351:10,13,18 368:17 375:8 392:2,14 393:6 393:14
**researchers** 152:9 227:13 227:22 228:21 358:21,24 359:7,17
**researching** 49:20
**reservations** 57:16 58:4
**residency** 90:3 98:24 106:1,1
**resident** 80:4 117:14 124:8 124:23 126:7 127:1 128:8
**residents** 79:19 80:19 81:2 82:5,7,8,8,11 82:12 83:16,17 96:14 99:7 118:2 119:5 121:2 123:6 128:24 129:11 131:5,6,15
**residue** 233:3
**resource** 296:17
**respect** 125:11 217:13 218:8
**respectfully** 21:11 171:12 218:7 261:23
**respective** 285:5
**respond** 251:20
**responding** 98:13 218:5
**responds** 93:8 389:24
**response** 6:11 12:21 16:18 17:21 28:20 29:21 30:6,11 30:16 35:5 46:23,23 386:24
**responses** 16:23,24
**responsibility** 146:7
**responsible** 269:10
**responsive** 35:6 57:3 58:23 243:15 248:13 251:15 272:8 344:5 388:22
**rest** 69:5 179:13 347:15 391:21
**restart** 271:5
**result** 94:7 163:9 208:2 211:10 270:24 278:3 320:9 372:19 373:24

**results** 67:19 111:2 139:4 163:8,9 169:14 252:23 263:11 287:18,23 288:24 302:10 302:14 321:12 323:9 360:14 361:10 364:14 365:20 370:21 372:10,18 373:8,19 376:4 381:17 391:1
**resume** 305:4
**resumed** 169:3
**retained** 234:3
**retainer** 41:18 42:3,17 47:7 50:15
**retainment** 43:18
**retention** 85:8 303:5
**retrospective** 285:17 286:22 287:10
**return** 397:13 397:16
**reversed** 266:4
**review** 6:18 30:17 31:24 32:20,22 33:9 33:13,18,22 34:2 44:5 45:21 46:3 77:2,3 78:21 90:23 126:1 129:7 134:4,6 134:13 135:18 138:1,11,12,14 139:6,10,11,12 139:14 140:7 140:10,12,22 141:4,18,19 142:3 144:17 145:18 147:10 147:15 149:8 149:17 151:8 151:13,17 152:4,5,9,14 163:10 172:15 172:16,17,22 178:4 183:8 188:13 197:17 213:1,7 261:6 261:17 329:10 330:2 331:22 381:19 382:23 384:7 393:3 397:7
**reviewed** 17:10 22:15 23:6,10 26:6 27:15 32:10 33:1,14 34:5,11 35:20 46:1 52:23 53:2 61:23 90:4 124:11,12 124:15 130:2 133:20,23 134:2,8 135:4 135:20 137:7 138:8 142:1,9 144:5,6,16 148:5 149:13 151:3 152:19 153:7 154:4 156:16 157:4,9 158:9 159:3,15 175:18,19 177:16 185:12 185:17 186:19 186:21,23 187:3,4,9,13,16 188:13 194:7 196:12,19 197:6 198:14 198:16 199:13 296:15 347:15 357:3 383:12 390:16 391:6,9
**reviewer** 131:21 139:1 140:17 145:12 145:16,17,19 145:23 146:2,2 146:5 147:23 197:1 199:12 199:15 213:2
**reviewers** 138:19 139:5 139:15,17 140:1 151:12 161:10 383:9
**reviewing** 28:8 44:18 45:15 48:5 55:14 56:5,6 138:23 139:18 140:2 163:22 197:14 242:1 290:17 356:22
**reviews** 45:8 137:5 141:14 163:12
**revisions** 146:13
**revisit** 148:1
**revlon** 4:16 10:3
**ricordati** 4:7 10:4,5
**right** 15:21,24 20:22 21:18 24:3 26:4 27:3 30:14,15 46:14 49:22 50:4 56:5 77:16 80:18 84:6,22 88:23 96:3 101:9 104:3 106:1 112:9 118:5 119:15 120:14 122:20 124:13 128:3 130:21 132:12

138:6 142:22 144:20 145:15 145:20 153:10 157:21 173:14 185:23 186:6 186:21 187:16 193:9 197:20 200:21 214:11 226:4 227:3 229:22 230:24 231:8 242:23 246:12,24 248:17 250:5 250:10 253:8 255:18 260:5 267:23 270:2 275:9 276:18 277:11 280:7 280:13,20 281:6 283:13 286:3 289:19 290:3,7 296:9 296:22 297:11 298:22,23 299:4 301:14 302:11 306:18 319:6 320:15 320:15 325:9 326:8 331:4 335:13,15 336:18 339:14 341:20 353:24 364:22 365:3 365:12 369:15 370:24 372:3 378:9 381:9,15 382:12 383:5,8 390:17 391:15 391:24 394:18 394:23

**risen** 257:3

**risk** 6:23 7:12 7:20,22 73:23 74:3,8,9 75:12 78:11,14 79:9 79:17 85:1,8 88:4 95:7 104:18 105:18 110:12,14 111:8 115:2,21 118:12,12 119:18,20,22 159:20 173:7 177:5,9 200:14 200:18,22 201:12 203:12 204:1,8 205:17 205:24 206:1,5 207:5,6 208:13 213:11 221:7 228:5 229:11 244:12,14 253:19 257:2 263:5 274:7,15 275:4,5,23,24 276:4,5,21,24 277:9,13 278:6 278:7,15,16,24 279:10,12,15 279:23 281:15 282:17 286:17 299:1 300:7,17 300:19 301:3 302:2 303:10 314:10 321:5 321:20 323:4,6 323:10,15 324:22,24 325:23 326:1 349:1,4,15,18 349:24 350:7 351:1,2,5,8 352:2,9 353:11 353:16,22 354:16 355:12 356:1,10,24 373:20 389:2 390:8,11

**risks** 87:5,24 115:3 276:2

**rna** 3:21 10:1

**road** 234:8

**robert** 5:3 10:10,11,14

**rockefeller** 4:3

**rocks** 119:12 122:1 123:2,9

**role** 64:13 74:15 144:14 147:23 151:12 199:2 247:22 323:15

**room** 82:18

**root** 330:16

**roque** 1:8 6:3 6:13,15 8:9 11:4,11,12 14:12 16:10 17:11 28:24 29:6 30:1,7 34:22 35:5,20 35:24 40:11 41:2,19 46:15 56:20 57:2 58:15,22 60:1 60:11 135:22 150:19 160:20 169:5 198:5 204:14 214:22 240:6 255:15 273:18 283:15 301:21 327:16 333:5 354:4 372:4 376:21 381:1 396:3 397:5 398:2,24 399:2,4,12

**roque's** 17:6,16 17:24 18:2 41:18 384:18

**rotate** 82:20

**rotation** 81:19

**rotations** 82:13 82:22 106:2,3 234:14

**rothstein** 3:17 10:1
**rounded** 322:6
**rounds** 84:7 128:19 129:19
**row** 247:10 259:14
**royster** 3:12 9:12
**rpetti** 5:5
**rpr** 1:13 5:24 396:3,22
**rude** 12:23 35:14
**rule** 251:19 396:9
**rules** 1:10 12:15 396:9
**ruling** 281:5
**run** 91:6 97:2 251:17
**running** 83:8
**ryan** 3:17 9:24 9:24

**s**

**s** 94:2 96:6 169:1,1,1 398:3
**safer** 393:22
**safety** 90:12,18 91:3,5
**saith** 395:17
**sales** 1:4 8:11
**sameer** 58:19
**sample** 289:1
**samples** 263:9 263:10
**sandler** 368:10 368:12
**sara** 2:3 3:12 9:8,12
**sarcoma** 240:16,20 241:5,12,18,20 242:3,13 243:21,23,24 244:16 245:4,7 245:17,20,23 254:5 258:22 259:3,6 260:18 261:8,20 271:4 271:8,19,20,23 272:11,21 273:13
**sarcomas** 242:6 242:11,14,19 243:5 244:22 245:9 246:3 254:18 255:12 260:19 261:4 262:2,15 265:24 267:2,3 272:5,5,7,10 273:5
**satisfied** 54:14
**saw** 14:23 57:23 59:7 84:8 178:9 188:20
**saying** 50:3 72:8,19 74:13 77:20 81:10 116:21 121:21 130:6 144:13 155:19 156:9 157:19,24 182:4 183:6,7 183:10 187:7 188:24 190:7 201:24 202:1 207:3 208:9,10 210:5 213:5 215:17 216:17 219:21,21,22 219:23 223:17 226:20 228:3,6 228:14 229:5,7 236:13 255:12 260:16 264:15 264:22 266:8 266:20 267:2 270:23 272:16 290:11,12,15 290:16 293:8 309:12 332:5 332:23 347:9 349:23 356:14 368:9 373:19
**says** 17:5,17,23 28:20 30:5,6 35:17,22 40:8 57:2 58:14,22 60:19 64:11,12 86:16 87:8 112:5 123:15 132:23 136:9 143:14,19 146:11 150:2 151:12 152:1,2 154:9 155:7 160:6 162:2 166:1 174:3 175:24 177:15 180:12 191:20 196:11 200:13 201:1 205:15 205:19 206:5 213:10 221:2 225:17 226:6 231:10 232:20 235:24 237:4,6 240:14,23 251:24 252:15 252:22 253:8 255:11 256:10 256:18 258:2,3 258:6,12 259:14,24 262:8,17 267:15,20 268:7 269:2 270:13 275:21

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 488 of 515 PageID #:76346



276:24 283:23 285:9,15,21,22 285:23 286:17 286:20 287:16 288:16 289:5 290:4 292:18 295:23 296:3 296:12 302:14 303:2,9 321:1 321:2 322:5,9 330:14,20 331:5,17 332:7 332:8 333:11 350:18 354:22 357:10 358:1 381:12 383:9 390:10,12,21 391:9,20
**scalp** 92:22,24 232:19 233:1,6 234:1 307:18
**scastronuova** 2:6
**scenario** 124:1 310:22
**schildroth** 378:20 379:21
**scholarly** 101:24 102:7 151:13
**school** 90:1 95:3 98:22,23
**science** 40:20 41:10 55:13 59:2,4,8,12 83:5 119:14 122:7 125:9 169:24 171:2 312:5 324:15
**sciencedirect** 136:9
**scientific** 139:3 139:20 147:11 152:6,10 177:17 186:10 187:22 268:1
**scientist** 236:20
**scope** 134:21 134:24 136:24 225:13 276:16 278:11 280:2,6 280:11 281:4 370:23
**screening** 382:15 383:13 384:4
**scrolled** 294:5
**scrutiny** 186:10
**se** 80:17
**seamans** 4:12 10:2
**search** 15:12 24:6 178:16 188:15
**searched** 177:16
**second** 17:2 23:2 56:12 64:11 81:16 86:13 88:18 101:16 112:15 132:4,7 148:19 150:22 157:2 161:13 165:19 169:9,11 205:10 221:22 226:21 228:7 242:23 256:2,6 256:8 258:5,5 264:4 267:15 274:2 301:20 316:24 317:6 331:16 359:2 379:22 390:21
**section** 24:9 86:16 99:21 101:13 132:1 132:10,20,21 142:16 143:15 143:19 144:22 145:5 146:3 149:23 161:1 161:21 169:11 199:20,21,23 204:5 215:11 217:2 220:13 220:18 221:2 230:23 231:23 240:10,14,22 240:23 251:24 252:6 256:17 260:21 265:9 265:19 267:13 268:7 274:6 284:16 295:23 300:6,7,11 301:5 302:10 302:13 326:18 363:17
**sections** 54:13
**see** 14:20 15:3 15:8 16:14,19 17:17,17 18:7 24:16 28:23 29:8,17 30:3,5 30:6 32:13 35:3,8,24 36:2 41:20,21 44:4 46:20 47:7,12 47:18 50:21 56:8 57:5 59:1 60:12,24 61:14 67:21,22 70:1 71:13 72:4,9 73:15 76:20 77:23 79:12 82:17 83:8 86:17,20 99:22 101:14 112:3 114:24 116:2,6 125:11,20 132:24 133:10 136:7,10 141:8 149:24 150:5 151:20 152:11 160:23 161:3

161:11 162:13 165:21 166:4 169:19 176:7 177:20 186:13 188:2 190:11 195:23,24 196:13 198:16 199:23 200:2,2 200:7,15 204:9 204:13 205:1,7 205:13 212:5 214:16 220:7 221:17 223:4 223:13 226:3 226:13 229:16 230:7 231:13 236:8 240:11 241:2 246:9,10 246:21 247:7,9 247:10,18 252:18 253:13 253:24 256:21 257:8 258:13 259:15,24 260:2,3,8 264:3 265:17 267:13,22 268:4 269:12 273:24 274:7 274:12,21 275:13 277:4 282:1,20,24 284:18 286:3,6 289:17 292:20 294:8,24 296:4 296:5,21 298:23 300:7 301:7 302:11 302:21 303:7 303:14,15 314:9,23 316:3 317:11,12 320:18 321:21 323:17 324:19 326:7,14 327:13,21 328:2,7 330:12 330:18 331:1 332:18 333:13 335:19,22 336:7,8 339:8 343:14 349:21 353:14 356:6 369:9 378:6,7 380:8 381:13 381:19 382:12 382:20,22 383:8,14 384:10 391:4 392:19 393:1

**seeing** 71:15 73:16 74:5,10 83:22,24 84:23 158:2 204:11 388:16 389:6

**seek** 281:5

**seeking** 268:21 268:21

**seem** 122:14

**seems** 229:10

**seen** 14:17 19:15 63:21 160:8 198:12 223:20 253:16 281:4

**seer** 252:23 264:21

**segal** 5:13

**select** 380:3

**selection** 288:17 292:1 292:10 330:11

**selectivity** 226:12

**semantics** 197:5,17

**semi** 313:24 314:1,4,11 315:3

**seminars** 35:2

**send** 71:16,17 72:8 135:19 137:6 138:15 138:18

**sends** 70:19

**sense** 65:4 91:12 127:9 139:4 146:9,12 261:24 388:13

**sensitive** 8:3

**sent** 55:7 397:14

**sentence** 175:23 226:2 256:19 274:23 301:11 316:20 317:5,12 330:21 390:10 391:24 393:20

**sentences** 54:12

**separate** 139:14 312:4 339:5

**separated** 315:20 364:17

**september** 318:21,22 395:4

**sequence** 331:8

**series** 137:4 147:2 248:19

**serious** 181:7

**seriously** 181:1 181:3

**serous** 243:10 243:12 244:16 244:19 247:2 247:17,19 248:10 249:23 250:11,22 251:5 254:14 259:15 260:3,3 260:7 263:11 264:23 276:1 311:7

**serve** 22:22 142:13 143:17 199:15
**served** 18:5 28:24 30:7 36:1
**serves** 147:5
**service** 81:19 81:20 82:13,14 82:17,19 83:8 143:14 145:11
**set** 38:7,19 68:12 95:14 145:24 376:9 396:16
**sets** 16:24
**setting** 29:3,4 40:9 63:3,16 114:4 118:1 119:4 121:2 124:8,24
**settings** 324:4
**seven** 330:22
**several** 82:13 106:2 178:4 253:17 256:10 256:19,19,23 268:12 330:23 331:7
**shampoo** 331:13
**shape** 270:23 295:2 306:16 360:14
**share** 150:24
**shared** 198:1
**sharma** 58:19
**shb.com** 4:4
**she'll** 13:7
**sheet** 397:11
**sheets** 41:16 47:20 341:21
**shift** 345:6
**shohl** 4:17 10:12
**shook** 4:2 10:7
**short** 102:16 240:3 299:24 304:20 345:3
**shortly** 42:14 55:18 61:19
**show** 45:23 115:22 127:9 136:2 150:22 153:12 163:9 180:9 183:4 249:18 255:18 264:10 301:19 307:19 335:17 341:23 347:12 354:7 388:19
**showed** 65:22 66:20 263:11 263:16 342:6 342:12
**showing** 43:9 153:8 171:18 196:3 259:22
**shown** 118:11 130:9 239:1 253:18 256:24 338:8 390:6
**shows** 196:6 219:24 271:8 372:20
**shulman** 69:21 70:20 71:20 72:10 74:22 104:13
**sic** 93:20 252:23 267:18 268:20 320:16 328:6 331:11 331:13
**side** 25:18,19 42:10 91:3 98:13 120:17 121:15 226:4 240:9 301:15 303:23 391:24
**sidetracked** 147:22
**sign** 396:10 397:12
**signature** 396:9 396:12,21
**signed** 54:7 396:11 397:19
**significance** 162:9 181:9
**significant** 98:5 174:13 181:2,6 227:13,22 228:22 237:9 268:9 276:4 309:18 325:22 341:15 347:12 348:18 375:14
**significantly** 233:21 300:17 321:9
**signing** 396:8
**signs** 84:2 114:14
**silvina** 58:18
**similar** 22:22 23:1 95:1 127:18,19 128:5 149:14 163:8,9 185:7 185:8 259:21 309:23 330:9 337:9,23 354:2 360:7,8 363:22
**similarly** 40:23 187:8 236:6
**simple** 143:8 154:4
**simply** 211:7 237:14
**singer** 5:13
**single** 97:18 156:8 180:11 182:24 191:3 207:12 218:10 238:12 254:16

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 491 of 515 PageID #:76349



262:5 359:18
**sir** 260:16 387:11
**sister** 174:7,18 175:14 203:5 203:24 285:5 285:18 286:23 287:19 288:1,9 288:11 290:2,9 290:15 302:4 319:4,7,9 321:23 322:1 363:20,24 365:22 367:4 367:13,15,19 368:6,10,22,24 375:1 376:8
**sisters** 375:11
**sit** 19:24 20:15 21:18,20 22:14 25:1 26:19 39:10 55:23 69:8 73:17 80:10 131:3 160:2 190:14 192:18 218:4 248:13 251:3 292:9 356:8,21
**sitting** 78:15
**situation** 116:6 123:5,11
**situations** 19:19 114:18
**six** 11:16 308:2 330:15
**sixth** 99:20
**size** 272:9
**skeptical** 342:11
**skill** 68:12 95:14 173:17
**skin** 92:6,6,8,12 92:14 107:11 107:15 232:9 232:13,18 233:1,9,11,15 233:17,20 234:14,20,22 235:1,5,8,9 307:18
**skip** 17:23 60:16 86:11 240:23 252:21 300:10
**skyrocketed** 76:12
**slants** 210:12 210:14
**slide** 41:1
**slides** 35:1 41:8 108:6
**slow** 262:21
**small** 68:7 96:13 145:2 310:4 311:1
**smaller** 147:4 348:12
**smith** 3:7 10:23 10:23
**smoking** 153:4 153:9 157:22 158:7 325:3 353:19,21
**smsm.com** 5:16
**snapshot** 260:5
**snippets** 355:4
**social** 113:3,5 113:12 268:18 269:20
**societal** 268:20
**societies** 187:6
**society** 136:17 144:1 283:12 297:6,7
**soconnor** 2:6 397:2
**sodium** 326:21
**sole** 25:9 26:2
**solutions** 397:23
**somatic** 207:20 208:2 211:10
**somebody** 67:23 70:2,19 144:6 145:19 163:21 194:19 196:24 197:1
**somebody's** 305:3
**someone's** 98:2
**somewhat** 172:22 293:14 310:5 362:4
**soon** 394:4
**sorry** 10:19 17:19 29:10 35:17 56:18 61:3 67:18 72:20 86:5,6 87:12,12,12,13 88:14,18 93:20 111:16 133:10 137:17 150:10 178:19 179:16 185:5 200:20 204:11 220:10 222:3,9,17,19 225:22 227:17 227:21 231:6 252:13 256:7 256:13 257:11 282:11,13 287:20 294:6 295:21 296:11 297:10 300:21 301:9,18 303:19 309:5 313:17 316:12 316:22 320:13 320:19 328:10 331:10 333:8 338:4 351:16 355:22 366:7 392:4,5,22

394:23
**sort** 128:23 131:14 134:6 167:2 244:10
**sounds** 12:17 28:2 75:16
**source** 20:15 185:9 215:5 291:19
**sources** 18:19 18:21 20:21 21:1,4 22:2 166:2,9,14 215:9 217:1 384:21 385:16
**south** 3:18 4:18 5:14
**speak** 66:5 138:21
**speaker** 117:11 166:23
**speaking** 70:10 243:18 248:3 248:12 372:9 378:16
**speal** 3:14
**specialized** 82:9,24
**specialties** 132:18
**specialty** 70:8
**specific** 14:3 21:21 22:20 23:23 25:5 42:8 50:13,20 51:4 52:12 77:1 78:10 80:11 83:15 87:19 88:9 117:21 118:23 127:15 128:4 131:23 138:15 138:19 140:11 140:14 143:9 147:2 154:8 159:2 160:5 161:7 171:13 171:22 176:9 177:1 180:10 181:17 183:18 186:16 197:20 198:24 221:1 226:9 232:2 234:9 264:16 265:15 270:18 280:12 281:3 284:5 290:4 291:11 292:7 308:6,9 313:5 316:13 325:11 334:10,19,21 337:13 338:12 339:16 341:20 350:11,12 353:9 359:3,9 360:6 361:20 369:13 372:8 391:19
**specifically** 18:24 29:23 37:12 83:16 156:6 164:9 175:10 178:14 180:3 181:11 188:20 198:18 206:12 211:1 211:19 224:23 240:7 245:11 255:8 257:10 258:1,2 260:22 265:10 303:22 308:4 312:16 313:22 317:21 326:24 352:3 361:17,23 363:6 367:5,13 393:12
**specificity** 346:5
**specifics** 280:5 280:19
**specified** 143:22 241:1 252:2 260:23
**spectrum** 64:17 73:3 277:10
**speculate** 226:9 226:15 227:14 227:23 230:24 348:8
**speculating** 341:2
**speeches** 35:2
**speed** 97:1 140:13
**spell** 380:9
**spend** 64:13 73:18 76:22 83:4 245:15 368:23
**spending** 56:5 76:17 82:15
**spent** 41:17 47:23 49:15,19 49:20,21,23 52:9 54:1,6,24 55:10 56:2,10 60:7 77:15
**spill** 91:16
**splitting** 206:15
**spoke** 64:4 386:11
**spoken** 63:2 85:6,7
**sponsor** 384:14
**sponsored** 100:13,15 101:4
**sponsors** 384:13
**spontaneous** 207:20 224:17 224:18
**square** 250:5
**squared** 277:2

**ss** 396:1
**st** 3:13
**stage** 257:6 265:6 268:18
**staging** 299:16
**stance** 297:1
**stand** 219:11
**standards** 139:3
**stands** 141:9
**start** 13:6 14:11 50:7 94:4 112:23 153:13 162:4 173:14 222:2 222:20 241:12 254:11 305:9
**started** 40:3 43:17 51:15 52:9 73:23 114:11 178:20
**starting** 15:2,4 18:10 74:20 222:10 377:16
**starts** 15:7 205:12 220:17 229:15 241:10 254:16 256:10 256:15,19 274:9 300:6 320:16 326:18 392:1,8
**state** 8:22,24 11:9 155:4,10 155:11 209:23 263:18 311:4 393:17 396:1
**stated** 28:21 150:3 180:13 254:2 260:14 265:14 295:2 359:12
**statement** 6:14 41:24 47:1 100:7,11 107:8 151:22,24 152:13 171:10 171:13,15 173:23 194:6 201:22 207:2,7 207:16 210:5 210:22,23 211:14,22 212:6 219:15 244:7 255:11 263:23 273:16 274:23 289:20 291:15,24 292:6,11 318:5 322:19 360:3 368:4 382:14 383:1 384:8
**statements** 41:15 166:1,24 183:12,16 187:5 356:7 381:24
**states** 1:1,11 257:23 265:10 286:22 287:14 292:19 382:22 383:6
**static** 169:17 174:1
**stating** 210:11 210:13 211:7 286:21
**statistical** 139:1 140:22 372:21
**statistician** 140:16,17,22
**statisticians** 140:3
**stay** 232:21 233:3 382:8
**staying** 232:12
**stays** 232:4,8 232:13,15
**steering** 6:11 16:17
**stemmed** 359:13
**stenographic...** 396:4
**step** 361:3
**stephanie** 2:2 9:6 396:8 397:1
**steps** 394:2
**steroids** 92:16
**stimulator** 330:17
**stop** 75:10,18 115:13,20 116:13,19 117:1 337:18 346:17
**straighten** 330:24
**straightened** 341:13
**straightener** 319:22,23 321:4 323:3 352:8
**straighteners** 284:17,22 286:11 287:4 295:14 300:15 309:10 314:6,8 314:16,19 315:10,17,20 316:7 317:8,23 319:10,13 321:18 322:16 342:18 352:3 364:4,19 366:11 369:18
**straightening** 326:20 364:5 369:18 385:13 385:22 393:23

**street** 1:13 2:10 2:15 3:3,13,18 4:8
**strength** 4:6 10:8 345:22 346:20 347:4 386:12
**stress** 230:6 236:2
**stricter** 393:23
**strike** 26:1,3 38:3 59:17 66:5 108:14 109:6 162:4 191:18 210:12 266:16 288:14 304:1 323:20
**stripe** 68:18
**stromal** 242:11 243:24 272:11
**strong** 118:19 158:2,21 201:12 228:22 301:1 346:2 347:16,19 348:16,17 389:21
**strongly** 218:23 221:13
**structural** 223:1
**struggling** 104:20
**student** 80:3,6 117:14 124:8 124:23 126:6 127:1 128:8
**students** 79:19 79:20 80:12,18 80:20 81:2,10 81:11,13,18 82:1 118:2 119:5 123:6 128:24 129:11 131:6,15
**studied** 171:1 374:17,20 378:1
**studies** 44:16 45:23 56:20 57:1 62:12 80:2 85:17 88:8 95:16,19 95:23 96:9,13 96:22 99:3,14 109:20,21 111:5 123:23 124:11 125:2 126:9 127:8,9 127:10 128:20 129:8,9 149:13 153:11 155:2,9 155:10,19,23 156:11 159:18 165:1,2,2,10 171:18 174:11 174:20,21,24 175:2,4,16 178:16,21 180:12 182:10 183:23 184:3 184:11,13,14 184:15,17,18 184:24 189:5 189:18 194:16 197:23 205:12 205:15,22 239:1 248:10 249:2 289:6,11 289:22 290:13 292:7,18 293:7 293:7,9 294:19 294:21,23 317:7,23 318:7 323:11 344:22 346:13 347:6 347:10,18 361:6,15 362:13,22 363:5 375:3 384:13,15 388:2,3 391:10
**study** 7:21,23 28:13,13 57:17 87:9 96:16 111:2 125:5 126:12 155:4 155:11 156:3 158:3 165:5 170:14 174:7,8 174:18,19 175:14 180:3 181:14 182:5 182:24 183:19 196:1,1,6 203:5,6,24,24 220:7 221:2 227:6 229:5 263:9 285:5,18 285:24 286:23 287:7,12,15,19 288:1,9,11 289:9,18,23,23 290:3,4,9,10,15 290:15 292:8 292:23,24 293:11,15,16 293:22 294:2 294:11,15,20 300:13 302:4,6 304:10,19 306:15,24 308:23 309:3 310:5,13 313:17 314:10 317:14 318:24 319:4,7,9,21 321:3,24 322:1 324:10 325:11 325:15,21 326:4,12,14 336:10,20 343:5 347:3,4 347:22 354:18 355:3,10,18,23

355:24 356:11 356:16 357:6 357:14 358:14 358:15,19 359:3,17 360:5 360:24 361:4 361:22 362:16 362:18 363:3,7 363:10,11,17 363:19,20,20 363:20,24 365:19,23 366:1,14 367:1 367:4,5,10,14 367:15,19 368:4,10,13,22 368:24 370:11 371:21 372:13 373:5,11 374:2 374:9,11,18,21 375:1,8,9,12,14 375:16,22,23 375:24 376:1,8 376:10,18 377:3 378:11 378:24 379:3 379:21,21 381:18,24 390:23 393:4
**study's** 287:17 287:23
**stuff** 185:20
**subanalysis** 309:15 375:19
**subgroup** 375:20 376:3
**subject** 27:2 28:22 51:12,20 134:12 138:20 139:10 153:12 377:1,2 378:10 379:9 385:17
**subjected** 186:9
**subjective** 120:13,20 121:9 122:7,20
**subjectively** 124:15
**subjectivity** 122:24
**subjects** 383:20 387:16
**submission** 133:19 150:12 213:3
**submissions** 144:5 167:11
**submit** 133:22 138:10 141:23 142:6 148:11 148:12,17 149:17 160:11 163:13 299:7
**submitted** 99:22 213:1 296:24 297:12 297:18 384:19 396:8
**submitting** 134:8 135:3 136:19 140:7 147:16 148:2 148:22 149:20 150:14 163:5 163:10 164:12 297:6
**subscribed** 399:14
**subspecialty** 83:1 132:19
**substance** 30:9 117:16 118:3 118:15 119:6 120:8 121:1 123:8 385:21
**substances** 385:12
**substantially** 301:2 321:5 392:17
**substantive** 51:8
**subtype** 257:21 258:5,16,21 259:15 260:7 260:12 266:9 310:23
**subtypes** 202:17 249:21 254:12,16 257:3,18 259:13 262:6 263:6,7 264:23 265:16 309:17 311:2
**sudden** 123:15
**sufficient** 120:15,19 121:12,18 122:3,16,17,18 124:1,14,18 129:10 162:11 164:14 171:7 339:24 342:17 342:22
**suggest** 25:10 139:5 192:9 205:15,22 208:1 217:12 221:13 232:24 261:5,16 263:15 269:14 340:1
**suggesting** 263:20
**suggestion** 228:23
**suggests** 23:11 26:6 171:5 172:7 206:12
**suite** 2:10,15,20 3:3,8,13 4:3,8 4:18 5:3,9,14
**sullivan** 3:2 10:21,21

**sullivanj** 3:4
**summary** 40:10 48:17,21 210:4 295:5,24 296:4 296:13,13 381:12 382:10 382:14,23 383:6,11 384:6
**supplemental** 7:16 332:18,22 332:24 333:2
**support** 26:21 30:23 40:11 74:11,12 129:10 146:12 171:19
**supported** 36:23 268:13
**supporting** 36:16
**supports** 31:3
**supposed** 339:12 343:14 356:17 371:2
**suppressor** 223:3
**sure** 12:15,24 15:14 18:9 22:11 25:6,20 29:12 30:10 31:2,16 34:11 37:11 38:10,11 38:14 42:11 44:7 45:5,9,12 51:20 52:6 54:11,13 55:15 55:17 56:7,8 59:6 60:4 62:7 67:16 71:4 72:21 81:9 83:14 89:19 96:2 102:22 103:10,21 104:15 105:11 107:1 110:3 115:18 118:24 122:10 128:7 129:1 135:18 136:16 139:2,4 139:24 140:2 144:2,13,20 145:8 146:9 147:16 156:15 161:18 162:22 164:4 165:7 166:12,17,21 166:24 167:3 167:21 176:11 178:21 188:9 190:8 201:14 203:9,22 204:23 210:7 222:20 225:5,7 227:22 230:12 231:22 232:14 237:24 241:24 246:11,17,18 246:24 249:4 249:12 254:7 260:24 270:9 271:20 275:15 275:17 279:18 282:15 283:6 285:15 288:3 288:12,20 289:7 293:2,12 295:8,9,14 299:21 303:21 304:9 305:13 314:19 316:14 317:1,21 319:19 322:4 333:2 334:17 336:17 344:16 345:21 352:7 354:14 356:6 357:4,12 361:12 363:9 366:19 371:3 371:16 392:8
**surgeries** 67:7 108:4 351:1,8
**surgery** 64:19 69:6 70:21 72:15,24 76:9 78:20,20,21
**surgical** 90:16 96:5
**surprise** 296:6
**surveillance** 79:2 252:22
**survey** 96:14 96:17 152:7
**survival** 253:10 270:5 321:20 322:18
**survive** 141:3
**survivorship** 64:22 73:6,11
**susceptibility** 221:10
**suspect** 360:10
**suspicion** 66:15
**suspicious** 65:23
**sworn** 11:3,6 396:3 399:14
**symbol** 236:23
**symptom** 268:19
**symptoms** 84:2 114:10,11,15 233:14
**syndrome** 209:11,14 274:19 298:24
**syndromes** 78:1 209:2
**synergy** 237:21
**system** 71:14 72:11 87:15 93:9,22 94:10 94:21 151:13 238:1 343:21 389:23,24

**systematic** 64:19 65:3 72:16,19 138:1 138:11 141:14 144:17 163:12 290:22 291:3 292:1
**systematically** 177:16
**systemic** 65:2 72:19 73:1
**systems** 5:12 10:17 71:12 87:21
**systemwide** 336:22

**t**

**t** 94:2 169:1 398:3,3
**tabet** 3:17 9:24
**table** 219:24 246:7,9,10,10 246:12,13,16 249:13 260:23 267:7 275:3,4 275:10,13,17 275:19 282:9 302:23 309:8 313:16,22,22 314:12,16 315:6 316:6,19 322:5,9 335:5 348:5,9 377:9
**tables** 125:13 330:5
**take** 8:6 59:19 76:5 77:5,22 85:2 86:6 89:10 95:4 102:10 125:15 158:17 167:15 167:16 181:3 194:2 212:18 218:23 228:12 231:3 239:24 249:15 266:10 289:21 316:16 318:15 324:18 329:11 344:24 351:3 357:7 361:3 379:24 389:4
**taken** 1:9,13 8:9 12:19 17:8 55:20 98:21 168:1 181:1
**takes** 114:21 135:20 350:16 350:23
**talc** 12:7
**talk** 13:6 24:6 67:16 71:10 78:8,14 90:18 119:22 155:14 156:8 202:7 203:15 207:11 211:18 214:17 218:15 239:12 245:19,24 259:9 266:6 269:19 290:8 292:7,8 293:5 298:14
**talked** 52:5 60:13 61:22 69:24 90:15 98:19 102:24 105:24 115:18 177:7 179:6,18 184:6 223:17 230:13 235:17 235:20 259:2,4 264:20 301:10 305:11 318:8 349:3 360:19 367:18 369:3 369:15 372:9 379:20
**talking** 13:8 19:5 21:12 25:22 29:9 31:16 36:11 43:8 44:2 45:10 62:21 72:22 75:12 76:17 77:14 78:20 80:21 81:11 82:5 83:15 90:10 101:9 103:17 103:20 117:22 119:11 121:23 123:4 124:13 130:7,8 143:18 144:2,21 151:2 156:23 157:2 164:21 167:10 181:3 184:22 196:24 197:5 197:17 198:22 201:23 203:2 203:17,18,19 204:22 207:7 209:7,8,16 212:5 229:24 230:2 233:10 237:16 238:1,2 238:6 241:9 243:3,3,4 248:3 250:7 254:13,19 260:17 261:3 262:1,1,4,5,14 264:4,6,8,16 265:15 267:1 269:20,22 271:16,21,21 275:10,14 283:7 290:8 294:1,1,20 298:11 309:7 310:15,16 313:10 314:24 315:9 320:4 334:3,5,17

335:3 336:17 344:19 352:14 353:24 357:13 367:10,11,12 369:12 380:14
**talks** 101:13,21 117:6 137:10 161:21 337:3 393:20
**tamoxifen** 274:20 275:9 275:16,21,22 276:7,14 278:20 279:1
**tan** 220:7 221:2 230:17
**tardy** 5:2
**target** 287:18 287:24
**targeted** 64:20 70:21 72:17 73:2
**taught** 128:8
**tdrlaw.com** 3:19
**teach** 129:11
**teaching** 80:18 80:21,21 117:9 128:5,19 129:2 131:16
**team** 64:1,4
**techniques** 370:1
**teens** 353:4
**tell** 19:24 21:18 24:22 42:8 49:22 50:13 51:4,11 52:13 52:17,22 67:5 68:4 69:8 76:23 85:3 97:3,12 98:16 100:14 119:4 121:2 135:13 183:8 193:6 222:9 224:5 225:20 238:10 239:1 242:1 244:3 272:4,19 278:13 286:8 291:18 293:18 295:7 304:11 306:8,18 318:7 319:21 332:11 336:20 338:20 339:1 357:10
**telling** 52:14 115:19 297:1
**tells** 336:10
**temporal** 346:11
**temporality** 386:23
**ten** 89:1 141:16 192:24 302:14 305:20 327:6
**tend** 22:24 243:15 246:3 250:15 264:23 265:6 309:22
**tended** 313:20
**tends** 241:12 290:23 320:9 365:19
**term** 13:22 19:3 21:3 62:7 101:8 156:7 212:11 223:6 229:18 255:2 260:19 273:3 351:21 365:9
**terminology** 121:9 249:5
**terms** 50:2 131:12 159:15 163:14 181:23 197:14 214:14 245:8 313:10 340:12 345:24 346:11 347:9 373:5 379:12 388:12
**test** 89:10 270:2 337:22 340:4
**tested** 106:7 327:5 330:14 331:8 332:2 336:22
**testified** 11:6 55:16 61:16 111:5
**testify** 396:4
**testifying** 60:14
**testimony** 12:19 13:4 14:4 34:6,15 45:13 108:15 110:4 279:19 281:14 318:11 381:16 396:6 397:9,17 399:8
**testing** 209:12 251:12 341:6 342:16 375:19
**textbook** 166:15
**textbooks** 117:10
**thank** 10:11 26:19 40:21 102:13,20 103:24 160:9 160:19 192:5 199:18 239:20 283:14 338:1 362:24 395:14
**therapies** 67:8 242:17
**therapy** 64:19 64:20 65:2,3 72:16,17 73:1 73:2 94:5

251:17 274:20 303:4
**therefrom** 169:15
**thereto** 30:7 36:1,13,20
**thickened** 66:21 68:18
**thing** 19:6 36:12 38:16 45:10 68:21 71:8 72:22 82:5 83:15 90:13 92:5 93:3 115:23 128:13 144:3 155:19 187:11 193:5 226:19 228:11 229:24 239:3 241:14 252:10 254:20 258:11 262:10 266:21 275:18 298:10 326:6 340:17 389:16
**things** 18:1 23:4,6 24:11 28:5 62:14 66:4 67:8 71:18 79:6,12 84:11 85:3 99:10 102:22 150:17 185:16 192:7 275:8 276:21 284:21 327:8 360:23 369:2 386:3
**think** 16:17 19:11,12 20:14 20:19 21:21 22:1,21,23 23:17 24:14,24 27:19,22,24 36:18 37:6 45:3 46:7 49:22 51:12 53:3,8 54:4 56:16 59:21 62:8 69:18,24 71:1,2 74:15 75:9 77:12 78:2 79:24 80:10,17,20 81:7 84:4,9,20 85:15,17,21 86:1,3 88:13 88:15 89:22,24 91:7,7,11,14 95:22 96:6 98:18 99:13,19 100:13,22 103:7 104:15 108:21 109:9 115:10 116:17 119:14 120:15 121:5,16 122:8 122:9,19,24 123:1,14,23 125:8 126:18 127:4,5 128:17 129:17 130:14 134:2,15,16 135:11,13,16 141:9,24,24 143:12,12 144:21 146:21 147:4,14,21 148:1 149:4 152:2,14,24 153:3,4,10,21 155:14,16,18 155:19 156:5,8 157:23 158:20 159:17 161:6 170:18,21 171:24 172:12 172:20 177:3,7 177:14 178:3,8 180:9,14 181:7 181:8,23 182:18 187:2 187:12,17,19 189:20 193:13 193:21 195:1 197:4,5,23 198:21 200:9 202:16 203:15 206:15 207:1,6 207:9 208:8,14 209:18 210:19 211:22 212:16 212:19,20,21 213:15,23 214:10,18 215:20 218:9 220:17 221:20 221:24 222:4 222:11 223:9 223:10,21 227:7 228:1,2 228:11,15 229:4,5 232:6 233:18,24 234:7,11 235:3 235:15 236:4 236:13 237:12 238:6,15,21 239:22 242:9 242:24 243:2 243:19 244:8 245:9 248:6,8 248:12,14,18 251:2,4 252:6 253:3 254:8,20 259:10 261:12 261:24 264:3 264:14,20 265:16,23 266:5,7,20 267:3 270:7,13 271:15 273:1 278:16 284:8 287:10 288:4 289:5,19,20,23 290:13 291:10 291:19,22

294:7,10 295:24 297:19 298:21 299:8,9 300:5 303:23 304:14,23 305:10 306:1,3 306:22 307:22 309:2,3,15 310:8 311:21 313:17 318:5 319:18 322:6 324:12,13 325:5,6,6,20,22 326:21 331:4 337:9 339:2 342:16,22 344:2 345:20 345:24 346:2 346:12 347:16 347:20 348:21 349:4 352:21 356:5,16 357:13 360:12 360:13 361:2 362:10 363:18 365:9 367:9 368:3 372:15 374:12 375:6,8 375:13,16 384:24 387:21 389:21 392:8 394:12

**thinking** 185:2 185:3 237:18 299:2

**third** 34:3 53:18 64:12 252:5,14 258:11 265:18 382:9

**thomas** 58:19

**thought** 45:14 225:4 227:10 228:10,16 257:11 329:8 333:8 345:22

**thousands** 368:16,17

**three** 83:3 108:4 132:18 138:20 144:24 146:11 178:18 178:23 180:18 184:11 189:5 189:13 200:14 205:11 236:5 237:4 331:9 332:1,4,5 335:16 336:12 336:17,22 342:16 353:1 377:1,7,21 378:1,3,10,12 379:11 380:14

**threshold** 329:15

**throat** 202:24

**throw** 361:4

**throwing** 213:18 265:24 271:19

**thyroid** 53:7 94:5 179:8 318:9 389:2,10 389:17

**tie** 281:8

**time** 8:5,22 11:23 14:23 19:15,15 27:9 36:20 41:16,17 42:13 45:9 47:20,20 48:4 48:15,24 49:2 49:12,15,17,19 49:20,21,23 50:1,3,4,10 51:3,3 52:8,16 53:4 54:1,3,6 54:19,24 55:10 55:20,21 56:1 56:4,10 60:7 64:14 68:1 73:16,18 74:4 74:16 76:17,22 77:6,14,14,22 78:18 79:3 81:23 82:15,16 83:7 86:6 104:12,16 113:20 114:7 114:12,17,21 115:7,21 118:23 135:21 146:1,4 163:19 183:9 194:1 195:14 201:18 213:5 217:4 230:15 238:3 238:22 239:3 245:15 265:6 267:4 271:14 272:16 282:21 289:6 290:19 292:19 297:23 304:21 307:24 316:16 317:14 317:21 318:15 345:13 348:20 352:23 353:10 353:14 367:19 368:23 370:5 379:24 390:24 397:18

**timeframe** 397:8

**times** 13:4 19:20 73:11,13 80:8 110:9 128:12 138:24 192:24 193:10 193:10 216:2 238:16 239:4 247:11 248:9 270:6 280:7 300:16 301:13

301:17 307:3,3 307:7 308:2,14 308:15,16,17 310:8 330:22 330:23 352:1,7 352:10 353:2,4 353:10
**tissue** 226:12 228:7 232:12 235:10 239:7 309:24 310:1
**tissues** 224:16 226:8,21 277:19
**title** 16:19 151:4 380:10
**titled** 99:21 284:16 299:15
**today** 12:14 14:5,17 19:24 20:15 21:20 22:14 24:23 25:1 26:19,24 27:1,12 39:10 60:14 69:8 72:9 80:10 119:16 131:4 135:13 160:2 190:14 192:19 204:18 280:3 281:14 325:8 356:8,21 391:2
**together** 149:7 149:12 364:4
364:18
**told** 83:21 280:6
**took** 24:8 52:16 55:13 102:20 153:5
**top** 11:22 12:10 20:10 29:20 63:19 80:4 106:3 136:9 161:8 231:8 238:15 246:20 249:19 262:7 279:1,1 320:15 331:5 332:12 332:16 377:16 388:20
**topic** 85:15 121:10 127:15 140:11,14 144:23 170:21 197:7 214:14 271:17
**topics** 91:19 117:10 186:1
**total** 41:23 296:1 332:1 379:12
**totality** 122:12 127:7 153:2,17 153:22 175:1 179:22 183:14 192:15 194:15 195:9,12
312:20 325:24 343:6,19,23 344:21 345:19 349:9 388:15
**totally** 139:8 193:20 202:5 242:5 259:1 361:4
**touches** 305:10
**toward** 210:14 292:2 365:20 370:20 373:19
**towards** 217:13 320:10 364:14 370:13 372:10 372:11,18 373:8 374:1 381:10 386:9 394:2
**toxic** 90:19 98:1 385:12,21
**toxicities** 109:4
**toxicity** 90:21 90:22 109:2
**toxicology** 44:18 90:14 97:9,20,22,22 103:7 108:19 108:20,23 109:5
**toxin** 222:24
**toxins** 7:4
**track** 23:5 24:23 25:3
47:20,21 48:4 48:15,20 53:10 106:16
**train** 82:12
**training** 79:18 79:21 80:12 81:14,17,23 83:1,7 89:21 90:8,11 91:9 91:12,18,20,22 91:24 92:19 93:1 94:23 95:3 97:3,20 98:17 103:7 105:23 106:1 173:18
**transcript** 218:23 396:5 397:6,19 399:5 399:8
**treat** 90:20 92:4,7,9,13,15 93:4 95:8 170:23 233:14 242:16 272:12
**treated** 176:12 236:6
**treating** 11:19 11:21 12:4,8 34:5,12,15 74:5 90:17 94:3 98:4 116:15 117:7

**treatment** 66:7 67:6 70:23 72:15,24 76:7 78:22 79:14 88:8 108:7,11 108:12 109:3 114:20 119:18 231:12 238:22 268:3 269:7 272:13,14,15 330:15 331:15
**treatments** 78:23 87:14 93:5
**trial** 55:1 87:19 87:23 387:20
**trials** 55:3 86:16,24 87:4 87:14 90:23,24 98:9,10 99:9
**tried** 166:12 188:22
**trigger** 221:16 228:8
**true** 16:4 18:14 19:10 21:10 22:9,18 23:14 25:12 26:10,22 27:11 30:20,24 31:4,9 32:2,21 33:3,10,20,24 34:3,6,13,16 35:10 36:24 37:4 38:1,8,20 39:13 40:16,20 40:22 41:10 42:19 43:1,23 45:1,18 46:11 47:9 50:13,22 52:10 53:14,22 53:23 57:12,13 57:19 58:5 59:14 60:14 61:20 62:3,16 63:4,16 64:7 65:7,12 66:6 72:1,11 79:10 79:14 80:14 87:2,6 88:2,5 88:11 92:22 95:20 96:21 99:17 100:17 101:6,19,22 102:4,8 103:9 104:6 105:4,7 105:15 107:7 107:18,21 108:20 109:8 110:20 112:7 116:14 119:8 121:3 128:1 130:20 131:8 131:22 133:20 135:4 136:22 137:16,23 138:2 140:18 147:11 150:15 154:20 155:5,6 156:3,20 158:13 160:3 163:3,22 164:11,16 166:10,16 167:1,8 169:23 170:22 173:1 173:11 174:9 177:1 178:18 178:24 183:21 184:14 185:12 185:17 186:1 186:10 189:9 190:17 192:22 195:16 196:16 197:2 206:9,13 211:11 212:11 212:14 213:3 225:10 227:4 227:11,14,23 228:23 233:23 234:6 235:1,13 237:5 239:16 242:4 243:1,10 243:21 244:18 245:18,23 246:8,14 247:3 248:4,24 250:11,23 252:3,4 253:4 254:5 255:5,7 257:22 258:3,7 258:19 259:4 265:14 272:22 282:10 283:19 283:22 284:22 286:19 287:15 288:1 290:4 291:7 292:24 293:22 294:13 297:24 298:20 299:8 303:17 304:3 306:9,20 307:14 308:20 310:13 312:5 314:6,10,11 315:3,10,21 316:7 317:15 318:2 319:7,24 322:18,21 324:11 325:15 326:4 327:24 328:13,17 332:2,7 333:24 335:18,24 336:5,24 337:14,24 338:9,14,22 339:18 340:4 341:6,24 346:21 347:6 349:1,16 350:10 351:11 351:15,19 354:1,11,18 357:10,18 358:2,16,23 359:5,11,19

360:2,17 361:24 362:18 363:6 364:6 365:12 366:2 366:11 367:7 368:1 369:3,19 370:21 390:16 391:8,19 393:6 393:16 394:6 395:7 396:6 399:8
**truncating** 223:2
**truth** 344:19 396:4
**try** 13:2 71:14 72:6 163:14 166:17,20 167:3 171:14 249:1 305:23 379:4
**trying** 12:23,24 20:4 49:18 67:4,20 97:14 100:22 114:15 117:24 140:13 144:10 171:23 174:15 182:3 193:3 208:22 210:6 211:23 212:3 214:12 214:20 219:19 229:3 239:12 243:7 246:17 272:1,3 316:14 318:13 343:3 379:22
**tumor** 223:3 269:4 270:22
**tumors** 247:20 248:10 250:14 251:14,20 270:19 272:12 309:21
**turiello** 2:19 9:2 217:6,15 217:18 218:13 219:1 333:4 394:16
**turn** 299:13 383:5 384:17 385:8 386:6
**twice** 253:22 257:5 352:23
**two** 11:22 16:24 45:4 47:23 81:21 83:6 108:4 132:18,20 143:18 144:24 183:23 201:23 202:17 225:6 230:19 231:12 231:14,17,21 240:15 275:22 276:15 313:2 345:24 346:4 347:5,17 353:1 380:19 384:14 386:22 389:20
**type** 70:6,21 71:8 83:6,23 93:23 98:10,17 102:3 112:9 125:21,22 126:17 130:19 131:4 137:7 140:6 141:4 146:24 148:9 148:15,16 149:5,16 163:4 163:9 171:7 177:1 203:14 206:2 209:19 229:15,18 236:2 241:7,15 241:19,20 242:7,7,13 243:14 244:13 244:20 245:2,3 245:4 246:20 248:8,8,11,23 249:1,1,9,9,21 250:1,10,22 251:5 255:3,3 255:6,6,9,11,13 255:14 258:11 260:13 263:21 263:22 264:11 264:22 265:22 265:23 266:3,3 266:9,10,11,12 267:3 271:18 271:18 311:22 320:8 323:7 371:10 394:3
**types** 67:8 80:5 88:1 93:24 99:8 101:18 137:1,2,11,15 146:16,23 147:4 148:15 163:13 164:23 175:3,4 178:12 184:20 202:20 204:2 209:9 211:3 214:15 236:1 240:15 242:6,14,14,19 243:23 244:3 248:2,2 253:21 254:17 255:6 263:16,17,21 264:10 267:18 279:24 281:16 291:11 317:10 318:1 330:21 369:10
**typical** 366:10
**typically** 72:13 72:15 160:17 196:23 225:18 226:3,7
**typo** 177:21

**u**

**u** 93:20 380:10
**ubiquitous** 222:23 224:12 229:8
**ubiquitously** 224:9
**uh** 12:21
**uhn** 12:10,10 12:21,21
**uk** 268:13
**ultrasound** 66:20 276:10
**ultrasounds** 70:9
**ultraviolet** 327:7
**um** 236:4
**unable** 311:4 391:17
**unannotated** 17:15
**unaware** 30:22 31:2 280:7,7
**uncertain** 359:23 361:19
**under** 15:6 112:2 160:11 165:19,24,24 169:12 217:16 220:17 222:12 224:13 225:22 231:8 252:6 256:8 262:7,24 268:7 270:14 281:6 300:11 312:5 315:6,7 315:16 320:22 326:17 378:6 385:9 396:5
**underestimated** 372:22
**underestimati...** 370:15
**undergone** 303:5
**underlying** 162:9 164:10
**underneath** 202:18 246:21 256:14 285:23 316:18 383:8
**underrepresе...** 363:6,12
**understand** 13:18 20:6 21:2 31:13 38:10 67:13 76:7,13 78:7 90:6,8,21 95:15 98:3,6 99:7 109:15 135:6 141:7 174:15 234:14 243:7 257:16 270:9 276:20 283:7 304:9 323:14 330:2 361:12 374:1 383:2
**understanding** 21:16 24:10 51:16 70:5 76:23 77:17 84:21 85:17,21 94:10,21 95:7 97:23 103:15 105:17 109:2 109:19 130:12 130:13 175:13 195:6 199:3 231:16 232:10 233:9 236:22 254:10 288:4 293:10 312:21 319:8 389:9
**understates** 209:4
**understood** 13:13 48:1 59:9 81:12
**undertake** 313:13
**undiagnosed** 69:2 265:5
**uneducated** 248:22
**unethical** 387:19
**unexposed** 372:16
**unique** 82:9
**unit** 8:8 236:14 236:16
**united** 1:1,11
**universe** 31:6 31:20
**unknown** 258:7 258:12 355:12 356:2,12,24 357:10 390:12
**unopposed** 154:12 277:22 278:19,20 279:6,14
**unpublished** 17:8 35:18 37:2,13,14,21 39:2,11,14
**update** 295:6 390:23
**updated** 249:13 295:10 296:6 383:12
**updates** 295:24 296:3 381:12 382:10 383:9
**upper** 215:14
**upward** 210:13 212:11 214:5
**upwards** 204:6 206:8,16,19 208:11 209:23 210:11,23 211:7 213:12

219:18,23
220:5
**urine** 378:22
**url** 160:12,18
167:14 283:24
394:12,18,21
395:2
**urls** 160:15
**urogynecology**
82:21
**urology** 82:7
**usage** 301:2
358:23 359:23
360:1 361:18
361:18
**use** 7:11,20,22
18:18 23:11
25:10 26:7
34:23 39:5
60:21,22 61:11
61:12 71:10
89:24 91:11
92:16 93:5,18
96:11 100:24
101:8 108:10
117:6 129:12
131:7 134:6,17
134:18 152:20
154:6 156:8,18
157:5,11
158:12,17
159:5 163:13
170:2,7 176:24
181:16 182:7
183:1 189:14
192:3,6,16
199:6 208:24
212:11 234:11
234:13 236:12
237:16 238:12
238:17 242:16
251:12,16
274:20 275:9
275:21 286:11
287:3 300:14
301:11 302:1
303:11,16,24
304:2,4,11,23
305:2,4,5
306:4,13
307:14 308:10
308:20 309:10
313:19,24
314:15,23
321:4,11 323:3
323:5 326:3
347:23 348:15
352:1,13,22
354:16 355:11
356:1,10,23
358:2,8 359:15
363:20 366:19
366:22 367:23
368:9 373:18
376:19 390:8
390:11 391:3
**used** 7:15,18
18:19 19:2
21:5 22:4
32:16 35:2
40:10 75:22
88:8 96:8
112:10 171:2
175:16 181:23
199:11,16
213:20 232:4
260:20 276:14
283:1 304:8
308:13,14
319:22 321:18
322:17 326:6
326:14 328:6
330:22,23
331:8 338:19
339:4 340:14
343:5 347:24
352:8 357:12
358:4 364:18
365:7,9,14
366:15 368:24
370:2 379:19
380:12 396:11
397:19
**users** 308:13
359:18,18
373:18 374:5
**uses** 217:1
366:10
**using** 62:7 73:9
74:17 75:10,18
90:20 98:3
115:13 116:5
116:14,22
117:1 121:21
122:12,14
124:19 134:4
153:23 156:11
160:17 164:22
164:23 165:3
166:19 167:2
175:17,18
179:13,21
192:13 219:14
223:21 236:1
236:10 238:4,5
249:5 273:3
288:8,20
289:15 293:3,6
304:17 305:8
305:10,20,21
307:5,6,21,24
308:1,2,17
344:16 348:13
348:19 353:3
357:5 364:20
366:20 368:18
374:3 378:23
**usually** 11:18
42:1 55:2
66:13 71:9,17
73:13 81:10,21
82:14 83:2
132:18 139:5
139:18 141:15
146:1,11
150:16 276:7

298:2 309:21 372:14
**uterine** 7:8,20 7:22 23:12 25:11 26:8 32:8 37:4,15 38:6,18 39:12 39:18 41:4 42:24 44:11 45:7,18,24 46:11 56:22 58:21 60:21 61:11 62:3,20 63:10,15 64:6 65:15 66:16,21 68:11 73:3 79:22 80:14 84:3,9 85:19 87:18 88:10 96:24 99:17 100:17 104:18 110:14 116:20 116:24 118:13 118:20 119:12 128:10 129:13 129:23 131:8 141:3 142:8 149:10 152:21 153:16 154:7 156:19 157:6 157:12 158:13 159:6 160:7 163:20 164:7 179:12,24 180:20 181:16 182:8 183:2 184:1,5,9,16 187:24 188:12 189:8 190:11 191:22 192:22 194:9 195:7 196:4 201:6,16 201:24 202:1,7 202:14 203:3 203:13,17 207:14,19 209:9,12 211:2 211:20 214:13 214:17 240:11 240:15,16,19 240:19 241:5 241:10 242:3 243:10,12,20 243:23 244:4 244:16,16,19 244:22 245:6,9 245:17,19,23 252:1 254:5 258:22 259:3,5 260:13,18,19 260:19 261:8 261:10,20,22 262:1,15 263:16,21 264:10 271:3,7 271:17,20,23 272:5,5,6,21 273:5,12,23 274:6 275:24 285:7,19 286:24 298:16 313:3 340:2 346:8,14 347:18 350:3 350:15,22 354:17 355:12 356:2,11,24 366:16,23 368:12 370:16 372:17 373:21 374:18 375:22 379:10 382:2 383:21 387:3,8 388:23 390:8 390:12 392:16
**uterus** 93:6,8 202:3,6,13 234:18 237:22 240:17,21 241:11,20 244:10,17,22 245:12 254:4 254:12,17 258:23 310:1,2 343:22 389:23
**utilization** 73:22
**utilized** 198:19 199:8
**utilizing** 237:2
**uv** 327:7

**v**

**v** 397:4 398:1 399:1
**vacuum** 278:17 280:19
**vaginal** 202:11 202:22
**vague** 37:6 45:22
**vaguely** 63:21
**valerie** 1:12 5:24 8:17 396:3,22
**valid** 361:2
**validate** 151:14
**validation** 151:19
**validity** 139:20 147:11 287:14 287:17,23 288:5,7,10,14 288:16,21,23 289:8,16,19,23 290:11,24 291:20 292:19 292:22 293:8,9 293:18 294:12 294:13,16,16 295:1
**varies** 71:1 137:5 206:2
**variety** 323:13

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 507 of 515 PageID #:76365



**vary** 235:3 291:6 321:9
**vegetables** 293:6 294:7
**vein** 281:2
**verbal** 12:21
**verify** 140:17 397:9
**veritext** 8:16,18 397:14,23
**veritext.com** 397:24
**versa** 305:5
**version** 282:20 328:19,24 329:1,6,14,15 329:18,19 376:19 394:19
**versus** 50:3 54:1 67:7,22 68:5,14 69:10 124:14 147:24 191:7 238:2 241:9 248:8 249:9 255:3 263:12,12,14 265:11,13,23 308:1 314:1,22 314:23 319:22 329:14 348:14 353:21 374:13
**vice** 305:5
**video** 1:8 8:6,9
**videoconfere...** 2:3,4,9,10,14 3:2,7,12,17 4:2 4:7,12 5:2,3,9 5:14
**videographer** 5:19 8:1,16 102:15,17 112:16,19 167:24 169:2 240:2,4 299:23 300:1 345:2,4 395:16
**videotaped** 6:12
**view** 188:23
**viewpoints** 188:4
**violate** 213:12
**virus** 201:2,5
**visit** 71:17 73:13 77:13
**vitamins** 293:6 294:7
**voelker** 3:12 9:12
**volume** 132:17 132:22 143:23
**vulva** 92:4,5 107:16
**vulvar** 92:4,7 92:11,14 107:10 201:24 202:11,19,22

**w**

**w** 5:3 380:10
**wacker** 2:20 3:8 5:3,14
**wait** 13:7 51:21 167:18 262:20 262:20,20 325:2
**waiting** 51:22
**waived** 396:8
**waiver** 28:23
**waiving** 35:23
**walking** 104:10
**wall** 240:20 258:22,23
**walls** 244:17
**want** 12:1,14 14:9 18:9 24:20 25:20 26:4 45:5,9 47:4 51:4 52:12 59:6,18 59:21 61:6 62:6 64:10 69:14 72:18,21 74:21 76:22 89:19 91:2 102:21 103:8 103:10,14,21 107:20 109:16 109:18 110:3 114:17,20,20 115:23 118:22 121:7 123:10 128:7 131:23 134:10 135:17 136:15 137:6 139:24 144:2 144:20 145:8 146:23 151:9 156:4,14 163:12 165:7 167:16 171:13 177:13 178:14 180:9 183:4 192:8 201:14 205:20 215:2 221:1 222:20 230:23 231:24 235:16 236:15 240:6,13 241:14 245:14 249:4,11 250:16 275:15 275:17 279:18 283:5,6 292:7 292:8 299:13 300:10 301:19 317:1 318:11 320:12 322:3 327:19 328:8 329:21 331:3 332:22 334:17 334:19 335:2 339:4 345:6,21 348:8,8 354:7 354:13 356:6

357:4,11 363:17 368:22 376:17 386:6 390:5
**wanted** 45:12 51:20 55:17 71:22 141:23 142:23 149:7 165:11 169:10 231:22 244:24 256:17 257:10 299:18 344:15
**wants** 146:22 212:2
**warrant** 363:3
**washing** 233:2
**washington** 2:15
**way** 24:5,24 27:2 28:1 43:4 43:13 46:1 48:13 72:7 74:8 77:2 93:21 104:21 106:9 109:10 109:15,19 115:20 124:4 125:17 130:12 141:10,17 149:6 153:6 154:15,16 160:10 165:4 167:14 170:23 172:1,3 189:16 189:17 190:6 190:22 194:14 199:5 205:11 211:22,23 212:1 227:1,2 228:6,13 229:6 235:7 236:18 241:8 248:9 249:2 251:16 259:22 266:21 266:23,23 270:23 277:17 278:14,21 295:2 299:1 305:13,20 306:2,16,18,22 307:1,9,11 319:18 337:7 339:8 343:13 356:9 359:20 360:6,14,21 365:5 370:14 373:8 374:23 377:11 380:22 381:23 383:24 384:1,12,20 387:22,24 388:13
**ways** 104:23 189:2 228:17 389:7
**we've** 14:15 24:17,17,18 60:9 69:24 84:21 144:19 151:2 193:21 234:7 239:22 252:8 271:16 275:19 284:8
**web** 186:19
**website** 19:15 19:16,24 21:21 23:24 161:5 299:7 368:15 395:11
**websites** 20:9 20:21 21:15 23:6,19,20,21 26:15 188:9
**weeden** 200:2 204:22,24 206:9,11,18,23 208:4 210:5 212:3,17 219:18 220:1
**weeden's** 208:18 209:22
**weeds** 329:22
**week** 27:1 48:14 108:4 330:22
**weekends** 48:3 51:5
**weekly** 48:13 48:17,21
**weeks** 54:9 81:22
**weigh** 346:15
**weighed** 195:3 311:18 386:19
**weighing** 192:14 197:15
**weight** 212:21 312:19 346:6 346:10 386:16
**weighted** 346:3 358:9
**wella** 5:17 11:2
**went** 53:24 104:1 143:9 148:1 178:20 180:24 203:16 282:12 300:3 302:16,17 307:4 344:9 360:18 361:17
**west** 3:3,8 5:9
**whatsoever** 103:23
**whereof** 396:16
**whispering** 8:4
**white** 155:3,10 174:8,19 178:18,24 180:2 183:19 189:6 190:15 191:19 252:17 253:2,9 257:7 263:10,17,22 264:11,24 265:21 268:11

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 509 of 515 PageID #:76367



289:23 293:15 300:13 301:24 302:10,19 306:7 308:5,23 310:5 311:16 311:16 312:19 313:16,17,21 314:10,11 315:6 317:14 317:22 320:14 321:24 322:2,4 322:11 324:10 325:11,14 326:4 363:17 363:20 364:2 366:2,6,8,18 367:11,16 374:13,21 375:19,21,23 375:24 376:7,7 376:10,12 384:13 387:24 388:18 392:20 392:22
**wide** 310:7,21 310:24
**wideikis** 2:18
**widely** 151:18
**wider** 323:13
**widespread** 224:15
**wiedner** 4:7 10:5
**wild** 229:15,18 236:2
**william** 58:15
**witness** 6:2 11:3,5 16:7 20:19 23:17 25:14 26:13,24 27:19 31:12 32:4 33:13 34:9 37:6,20 38:10,22 39:24 43:3 44:2,15 45:3,20 46:14 48:19 49:12 51:1,11 52:12 53:2 57:22 58:8 59:22 61:6 62:6,19 63:7,18 66:10 67:12 68:4 69:14 70:15 75:5,9 76:1 77:12 78:14 79:24 80:16 83:20 84:20 85:11 94:16 104:9 109:15 110:23 111:18 113:10 115:17 117:20 118:7 119:10 120:12 121:5 123:14 125:8 126:15 129:17 131:11 134:2,15 135:6 139:24 141:6 142:22 144:9 146:21 147:14 148:9,24 152:24 155:14 156:5,22 157:18 158:16 159:9,12 160:5 162:17 164:1 164:18 170:13 171:12,22 172:12 173:3 173:13 174:11 174:24 175:12 177:3 179:2 180:8,22 181:21 182:10 182:15,16,20 183:4 184:9 185:20 186:4 186:13 187:2 189:12 190:22 191:13 192:2 194:14 195:1 195:18 196:19 197:4 201:8 206:15 207:1 208:8,21 210:4 210:19 211:13 212:16 213:5 213:15 214:10 215:13 216:3 216:15 217:13 217:19 218:5 219:13 222:12 225:12,15 227:6,17 228:1 229:1 231:3 234:11 237:12 238:21 239:18 248:6 249:11 251:2 252:10 254:7 256:4 262:22 264:3 269:18 271:11 273:1,15 276:17 278:13 280:23 281:19 284:3 285:12 288:3 289:4 290:7 291:2,9 292:5 293:2,24 294:19 295:8 295:20 297:4 297:18 303:19 304:14 306:11 306:22 307:16 308:8 309:2 310:15 311:14 312:8,13 313:10 315:13 316:10 317:18 318:4,16 319:3 319:15 320:3 324:2 325:19 326:13 328:2 329:5 332:4

Case: 1:23-cv-00818 Document #: 1828-18 Filed: 05/05/26 Page 510 of 515 PageID #:76368



333:19 334:2 334:10 336:7 336:15 337:2 337:16 338:4 339:1,21 340:8 341:8 342:3 343:3 344:4,7 344:15 345:13 347:8 348:4 349:3,18,23 351:21 352:12 353:13 356:14 357:3 358:4 361:12 362:4 362:20 363:16 364:10 365:3 366:13 367:9 368:3 369:6,23 370:24 371:8 371:15 373:10 375:6 376:15 379:16 386:19 389:16 393:1 396:6,16 397:8 397:10,12,18
**witness's** 343:1
**wmlaw.com** 4:9
**woman** 269:23 277:21 278:17 278:17 321:13 364:18
**women** 7:15,18 60:22 61:12 73:21 76:8 209:11 238:4 239:5 252:15 252:17 253:1,2 253:9,11,18,21 253:22 257:1,4 257:4,5,7,22 258:3,19 263:4 263:7,8,10,14 263:17,17,22 263:22 264:11 264:12,24 265:1,3,12,12 265:13,20,21 266:12 267:15 268:9,11,17 269:1,2,6,9 270:5 274:10 275:21 278:4 302:15,16,17 302:20 303:2 304:16 308:13 308:14 313:21 313:21,23 319:22 321:24 322:2 323:16 324:18,20 325:1 328:10 338:19 346:13 347:23 348:13 348:19 351:1,4 352:19,22 353:3 363:5,12 365:6,13 366:1 366:14,18,19 366:20 368:6 371:1,1 373:12 373:13 374:2,3 374:4,7,8 375:7,9,21 376:7,12 378:22 387:20 389:6 390:9 392:18,18,20 392:22
**women's** 7:20 7:23 174:7,18 203:6,24 354:17 359:17 374:9
**wonder** 226:20
**word** 48:6,8 52:2 192:3,6 192:16 326:3,6 326:9,14 357:7 377:24
**wording** 356:4 357:4,11
**words** 141:15 148:14 192:9 193:4 376:6
**work** 41:18,23 41:24 42:18,22 43:5,14 46:24 48:2,10 51:8 52:4 53:24 68:13 71:12 93:21 97:24 128:3 130:12 139:10,19 146:8 147:17 151:14 162:3,8 162:12 164:16 164:18 192:11 193:22 330:3 337:6 339:8 341:10 343:14 360:6 371:19
**worked** 15:13 16:8 52:3
**working** 55:10 252:9
**works** 94:11 98:7 101:24 102:7 109:3
**world** 320:8 365:17
**worldwide** 5:7 10:20
**worried** 116:22
**worry** 335:4
**worse** 269:5 290:23
**worst** 253:16 258:17
**worth** 358:16 358:19 360:17
**write** 223:10
**writing** 25:15 28:7 43:6,17 48:5 49:4,15 49:20 50:3,7,8

52:17 54:16 56:2,10 77:15 80:22 126:3 149:20
**written** 18:15 41:2,9 56:4 59:10 63:9 138:13 141:10 150:14 179:4 249:3 317:15 317:22 379:16 382:14
**wrong** 56:18 99:23 100:15 148:9 162:5 202:16 220:13 222:3 232:1 297:2,19 299:8 301:15
**wrote** 27:9 51:2 56:8 57:23 208:13

**x**

**x** 123:16
**xyz** 159:19

**y**

**y** 94:2,2
**yeah** 21:18 22:19 26:13 31:16,18,18 34:14 37:20 40:21,22 44:15 47:22 48:3,13 48:20 49:8,13 50:14 52:13 53:15 54:14 55:20 59:5,24 62:24 63:7 65:1 66:23,24 68:5 69:14 72:12,23 75:9 78:15 79:12 82:11 85:1,11 86:1,6,9,10 87:7,13 99:10 100:18 101:1 102:12 104:4,9 110:15,16,24 115:10,17 117:1 118:7 119:12,21 124:3,16,20 127:22 128:2 128:17 131:24 132:6,13 134:7 135:19,21 136:23 137:18 138:9 139:17 141:22 143:12 147:14 149:18 149:20 150:16 151:7,23 152:14 154:21 156:5 161:18 161:20 162:17 164:12 165:16 166:7,11,11,17 167:2 169:24 170:2,5,13 173:15 178:10 180:8 181:21 184:9 185:14 186:13 192:15 195:10 200:6,7 202:20 206:16 207:5 208:8 212:12 216:15 219:13 220:23 222:17 224:10 225:15,24 229:1 230:16 231:24 235:2 239:18 243:2 246:11 248:6 250:6 253:6 256:4,7 257:23 259:11 265:18 266:7 274:22 275:15 276:5 276:11 285:12 287:11,22 288:3 289:4 295:8 296:22 299:10,17 308:21 311:14 314:7 315:16 316:10 317:18 318:16,16 319:15 326:13 328:14 333:4 335:22 336:8 337:2 350:13 353:21 354:13 354:13 359:2 362:20 364:10 367:9 368:3 369:6 371:9 372:14 375:6 377:20 380:1,8 381:19 382:7 385:6 392:10 395:1,11
**year** 27:4 81:16 83:3,4 85:13 89:1,2,9,15 110:17 132:19 239:4 253:10 300:16 301:13 301:17 305:17 307:3,4,7 308:1,2,14,15 308:16 330:23 352:23
**years** 43:10 76:11 83:7 119:17 132:20 153:5,5,5 171:1 274:11 275:22 276:15 302:14 305:21 325:2 347:24 348:14,14,16 351:4 353:3,21
**yep** 29:13,17,19 36:6 88:17

100:1 136:11
136:13 137:14
150:1 161:24
200:3 205:2,14
226:5 231:14
231:21 267:24
269:13 277:6
302:12 314:20
315:1 316:4
327:22 331:24
334:24 381:3
390:7 392:12
**yesterday** 14:21,23
**york** 2:5,5 4:3,3
4:13,13

**z**

**z** 93:20
**zoe** 3:7 10:23
**zoeller** 58:19
**zoom** 194:20
**zsmith** 3:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.