# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*********************************
IN RE: HAIR RELAXER MARKETING
SALES PRACTICES AND PRODUCTS CASE NO.
LIABILITY LITIGATION 1:23-CV-00818
*********************************

VIDEOTAPED DEPOSITION OF:
R. THOMAS ZOELLER, Ph.D.

DOUGLAS & LONDON LLP
One State street
New York, New York
February 24, 2026 8:08 a.m.

Job No. 7928358

DANIELLE GRANT, REALTIME REPORTER

APPEARANCES:

Representing the Plaintiffs:

DOUGLAS & LONDON, P.C.
One State Street
35th Floor
New York, NY 10004
BY: STEPHANIE O'CONNOR, ESQUIRE
212.566.7500
soconnor@douglasandlondon.com
LARA J. SAY, ESQUIRE (Via zoom)
lsay@douglasandlondon.com
KRISTIN PADDEN, ESQUIRE (Via zoom)
-and-
DICELLO LEVITT LLP
506 20th Street North
Financial Center
Birmingham, AL 35203
BY: DIANDRA "FU" DEBROSSE, ESQUIRE
fu@dicellolevitt.com

(Continued on next page)

APPEARANCES (Continued):

ELLIS GEORGE LLP
152 West 57th Street
Suite 28 S
New York, New York 10019
BY: JAMES R. BLISS. DILLON, ESQUIRE
jbliss@ellisgeorge.com

Representing the Defendant Avon Industries:

WIEDNER MCAULIFFE, LLP
One North Franklin
19th Floor
Chicago, Illinois 60606
BY: KRISTEN A. SCHANK, ESQUIRE
kaschank@wmlaw.com

Representing the Defendant McBride Research Laboratories, Inc.: (Via Zoom)

DINSMORE
200 South Biscayne Boulevard
Suite 2401
Miami, Florida 31311
BY: RAVIKA MARCADIS, ESQUIRE
ravika.rameshwar@dinsmore.com

(Continued on next page)

APPEARANCES (Continued):

Representing the Defendant Beauty Bell:

COSTELLO GINEX & WIDEIKIS, PC
150 North Wacker Drive
Suite 1400
Chicago, Illinois 60601
BY: SHIPRA MEHTH, ESQUIRE (Via Zoom)
smehta@cgw-legal.com

-and-

LITCHFIELD CAVO LLP
303 West Madison
Suite 300
Chicago, IL 60606
BY: KEVIN A. TITUS, ESQUIRE
titus@litchfieldcavo.com

Representing the Defendant
Advanced Beauty, Inc.:

HEYL, ROSTER, VOELKER & ALLEN, P.C.
701 Market Street
Peabody Plaza
Suite 1505
St. Louis, Missouri 63101
BY: SARA J. PEAL, ESQUIRE (Via zoom)
speal@helroyster.c

(Continued on next page)

APPEARANCES (Continued):

Representing the Defendant House of Cheatham:

MCGUIREWOODS LLP
1075 Peachtree Street, NE
35th Floor
Atlanta, Georgia 303039
BY: CHRISTIAN E. HENNEKE, ESQUIRE (Via Zoom)
chenneke@mcguirewoods.com

Representing the Defendant John Paul Mitchell Systems:

CLAUSEN MILLER P.C.
225 West Randolph Street
Suite 700
Chicago, Illinois 60606
BY: JAMES D. GILDNER, ESQUIRE (Via Zoom)
jgildner@clausen.com

Representing the Defendant:

SHOOK, HARDY & BACON LLP
1 Rockefeller Plaza
Suite 2801
New York, New York 10020
BY: PEIYUAN GUO, ESQUIRE (Via Zoom)
pguo@shb.com

(Continued on next page)

APPEARANCES (Continued):

Representing the Defendant Murray's Worldwide:

MARON MARVEL BRADLEY ANDERSON & TARDY LLC
191 North Wacker Drive
Suite 2950
Chicago, Illinois 60606
BY: SYDNEY D. WISNIEWSKI, ESQUIRE (Via Zoom)
lfederer@maronmarvrel.com

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
BY: SABRINA PALACIOS, ESQUIRE (Via Zoom)
sabrina.palacios@sidley.com

Representing the Defendant
AFAM Concept, Inc. d/b/a JF Labs:
(Via Zoom)

GOLDBERG SEGALLA
2600 Michelson Drive
Suite 900
Irvine, California 92612
BY: HARDIP B. PASSANANTI, ESQUIRE
hpassananti@goldbergsegalla.com

(Continued on next page)

APPEARANCES (Continued):

Representing the Defendant Revlon, Inc.:

ECKERT SEAMANS CHERIN & MELLOTT, LLC
275 Mdison Avenue
10th Floor
New York, New York 10016
BY: KELBEY J. DECK, ESQUIRE
kdeck@eckertseamans.com

Representing the Defendant PSC:

SHIPMAN WRIGHT & MOORE, LLP
575 Military Cutoff Road
Suite 106
Wilmington, North Carolina 28405
BY: GARY K. SHIPMAN, ESQUIRE
gshipman@shipmanlaw.com

ALSO PRESENT:

PAUL BAKER, VIDEOGRAPHER

Dr. Zoeller

VIDEOGRAPHER: Good morning. We're going on the record at 8:08 a.m. eastern standard time, on Tuesday, February 24, 2026.

This is Media Unit 1 of the video-recorded deposition of Robert Thomas Zoeller, Ph.D., in the matter of In Re Hair Relaxer Marketing Sales Practice and Products Liability Litigation filed in the United States District Court for the Northern District of Illinois. This deposition is being held at Douglas & London, PC, located at 1 State Street, New York, New York.

My name is Paul Baker and I'm the videographer. The court reporter is Danielle Grant, and we are both from Veritext Legal Solutions. Appearances will be noted on the stenographic record.

Will the court reporter please swear in the witness?

R O B E R T  T H O M A S  Z O E L L E R,

Dr. Zoeller
called as a witness, having been first duly sworn by Danielle Grant, a Notary Public within and for the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. BLISS:

Q Good morning, Dr. Zoeller.
A Good morning.
Q Have you been deposed before?
A A long time ago, so probably --
Q About how long ago?
A -- twenty years ago or so. Yeah.
Q Is that the only time?
A That was the only period. I think I had probably four depositions in between 2002 and 2006 or '7, something like that.
Q In what matters?
A So one matter had to do with PCBs in Lexington, Massachusetts. The other was medical malpractice that had to do with a woman who was -- who was inappropriately treated with propylthiouracil, which is a

thyroid antagonist. So that was kind of my specialty.

Q So you were an expert witness in those matters?

A Yes.

Q Were there any other matters in which you were deposed?

A No.

Q You met with counsel to prepare for your testimony today?

A Yes.

Q You understand that, if your counsel objects to a question, you still have to answer unless specifically instructed otherwise?

A Yes.

Q You understand that you should ask for clarification if you're ever not clear on what I'm asking and that, if you answer a question, I'll assume you understood it?

A Yes.

Q You understand that you are obligated to answer my questions truthfully

Dr. Zoeller

and completely to the best of your ability?

A Yes.

Q Is there any reason, Dr. Zoeller, that you can can't testify to the best of your ability today?

A No. The only thing is that I was in a -- in a artillery unit a long time ago, and so I can't always hear some things although your voice is pretty understandable. But some -- there is times when I might have to get clarification.

Q No problem. If, as I said, anytime you're not clear on what I'm asking, just say so --

A Okay.

Q -- and I will clarify the question.

A Yeah.

Q Let's mark as Exhibit 1 the amended notice of video-taped deposition, Robert Zoeller, Ph.D.

(Whereupon, the Amended Notice of R. Thomas Zoeller, Ph.D. was marked as Zoeller Exhibit No. 1 for

identification, as of this date.)

Q Dr. Zoeller, do you recognize this document?

A Yes.

Q Have you seen it before?

A Or something like it.

Q This is the --

A Yeah.

Q -- joint defense group's notice of your deposition, and you'll see that it requests some documents?

A Yes.

Q Did you bring any documents with you?

A I did not.

Q Did you search for documents in response to this notice?

A No.

Q You were not asked to search for any documents?

A No.

MS. DEBROSSE: Object to form.

Go ahead. Give me a chance to object and then --

Dr. Zoeller

THE WITNESS: Yeah. Okay.
MR. BLISS: -- you can answer, Tom. Okay?
Thank you.
Q Dr. Zoeller, when did you first turn your attention to chemical hair relaxers as a potential source of toxic chemical exposure?
MS. DEBROSSE: Object to form.
A So a couple of years ago. So I was asked, in fact, by Fu to consider this. And it took me a while to, you know, do the research to at least kind of familiarize myself with what the issue is.
Q Had you been formally engaged at that point?
MS. DEBROSSE: Object to form.
You can answer.
A To tell you the truth, I don't remember.
Q Were you formally engaged at some point?
A Yes.
Q So this was a couple of years

ago, so 2023?
A I think so.
Q Can you be any more specific?
A No, I don't think so. Maybe the fall of 2023.
Q And that's when you first started doing work on the issue of hair relaxers?
A Yes.
Q Which plaintiffs' counsel have you been working with other than Fu?
A I guess Stephanie.
Q Anyone else?
A I've met a lot of people. I'm not sure that constitutes working with.
Q I -- now just who you have been actively working with on the engagement?
A Yeah. Just these two.
Q About how much time have you spent on the engagement to this point?
A So it's all kind of in my invoices. So I, you know, write things out, and it's kind of -- it's interesting because the topics overlap with a lot of the other work that I'm -- that I do, so

it's hard to know where the -- where the boundary is.

Q Dr. Zoeller, what are your current sources of income?

A I have retirement pension from UMass, and that's it.

Q So, at this point, other than your UMass pension, your income is from work as an expert witness in this case?

A It has been.

Q And that's been the case for the last couple of years?

A Yeah.

Q I know it was 20 years ago, but was any of your testimony limited or excluded in those matters you described?

A I have no idea.

MS. DEBROSSE: Object to form.

Just give me a moment to object.

THE WITNESS: Sure. Okay. I'll delay.

A I have no idea. I never heard. You know, in the one case -- in medical malpractice case, the guy bringing the case

had to file for bankruptcy and so the case was terminated.

Q So I take it you did not testify at trial in either of those cases?

A No.

MR. BLISS: Let's mark please, as a second exhibit, Dr. Zoeller's report in this litigation.

(Whereupon, the Expert Report of R. Thomas Zoeller, Ph.D. was marked as Zoeller Exhibit No. 2 for identification, as of this date.)

A So one -- kind of one clarification is that I -- is that I did testify at trial in a separate case, but I don't remember writing a report or being deposed in that. That was probably in 2002. It was a perchlorate case in kind of central valley of California, and yeah, I just don't remember.

Q So is that the only other time you've testified either at deposition or trial as an expert --

A Yeah.

Dr. Zoeller

Q -- other than those cases from 20 years ago?

A It is, and that was the only trial.

Q I see.

What was the nature of your testimony in that case?

A It had to do with perchlorate, which is a thyroid inhibitor. The central valley had been contaminated largely from weapons. You know, perchlorate is used as an -- as an oxidant. It doesn't degrade in the environment, and so my testimony was really about what is the thyroid, what does it do, what does hormone do, how does thyroid -- how does perchlorate, you know, affect that.

Q And did the court limit or exclude any of your proposed testimony?

MS. DEBROSSE: Object to form.

THE WITNESS: I don't think so.

I keep forgetting.

MS. DEBROSSE: That's okay.

Q So, Dr. Zoeller, you have in

front of your report in this litigation?
A It looks like it.
Q Is that your signature on page 43?
A Yes.
Q Did you write the report yourself?
A Yes.
Q Did anyone, other than counsel, work with you on your report?
MS. DEBROSSE: And, counsel, I'm just going to object to the extent that we're going into any draft issues as protected by the rule.
You may answer.
A No.
Q Does your report contain all the conclusions and opinions you intend to offer in this litigation?
A Well, within the context of the specific kind of charge, it does. Of course, I mean, I have 40 years of experience in this whole field that kind of impacts on that and that I draw on.

Dr. Zoeller

Q My question is: Whether your report -- I appreciate that.

My question is whether your report contains all the conclusions and opinions you intend to offer in this litigation?

A As it relates to the charge, yes.

Q And understanding what you just said a second ago, does your report contain all the bases for your conclusions and opinions?

MS. DEBROSSE: Object to form.

A I think so. It was my goal to be clear.

Q And complete?

A Yes.

Q Are you aware of any errors, inaccuracies, or deficiencies in your report or the appendices or exhibits?

MS. DEBROSSE: Object to form.

A I am not aware of one. I hope not.

Q On pages 44 through 55 of your report, you list something like 120 studies

Dr. Zoeller

and other materials?

A Okay. Yeah.

Q Do you see that?

A Uh-huh.

Q Are those all the materials you specifically considered or relied on in preparing your report and forming your conclusions and opinions?

A I think so. There have been some papers that have come out since then, but they don't material affect my opinion.

Q Which papers are those?

A I'd have -- I'd have to look them up.

Q But nothing that materially affects --

A Right.

Q -- what's in your report?

A Right.

Q Dr. Zoeller, before signing the final version of the report, did you see a draft or a final version or any part of a draft or final version of any other experts' report?

Dr. Zoeller

A No.

Q Did you communicate with any of the Plaintiffs' other experts before signing the final version of your report?

A Yeah, I had a short conversation with one of the other experts.

Q Who was that?

A Michael Crowley.

Q What did you and Mr. Crowley talk about?

A He is an organic chemist, and he talked to me about some of the -- because I, you know -- well, it turns out that the chemicals that I'm looking at here were published. So it's part of the public record. He was looking at a database that -- that essentially didn't really affect what I was -- because I don't reference any of that.

Q So any discussions you had with -- I think I said Mr. Crowley -- I think it's Dr. Crowley --

A Yes.

Q -- did not make it into your

report --

A It didn't.

Q -- or did not impact your report?

A No, it didn't.

Q What did you do to prepare for your testimony today?

A Well, tried to remember what I wrote.

Q Always good.

A Yeah. Also look at some of the foundational papers that I use here. There is also -- kind of a good example is there is a new paper that's come out of -- that is a theoretical paper about thresholds and what that means. And that actually bears on this even though I don't have it in here. It just came out a week ago, I think. So I've looked through that kind of material.

Q I thought you said that the new papers that came out didn't bear on the topics in your report?

A It doesn't.

MS. DEBROSSE: Object to form.

Dr. Zoeller

A No, it doesn't.

MS. DEBROSSE: Give me a chance.

A It doesn't -- it doesn't change my opinion. It's a theoretical kind of construct that helps, for me at least, kind of informs me about arguments of threshold, et cetera.

Q Do you remember the name of that paper?

A Well, it was written by Fred vom Saal and Wade Welshons.

Q Can you spell those names?

A Small V, O-M S-A-A-L. Wade Welshons is W-E-L-S-H-O-N-S.

Q Do you happen to remember the title?

A It had thresholds in it.

Q So if I understand correctly, that paper would not change any of your conclusions or opinions but it does bear on the topic?

A Well, it bears on kind of the way I think about the -- the evidence and the -- kind of this, you know, the issue of

Dr. Zoeller

thresholds is theoretical as well as practical. We think about thresholds as being, you know, if it doesn't kill you, it makes you stronger kind of thing, but that's not -- that's not scientifically valid. So this -- this is a kind of mathematical treatment of thresholds and what it means and how we can think about them.

Q Well, let me ask it this way: How did it inform your thinking on the issue of thresholds?

A So it didn't -- it didn't inform my thinking for this paper, for this report. What it does do is provide a structure that I hadn't quite thought of in the same way. I thought about thresholds a lot. I've published papers on thresholds. So it's an area that I'm familiar with. It's just kind of a new context.

Q Did you meet with counsel to prepare for today?

A Briefly, although it was more like coffee.

Dr. Zoeller

Q Okay. When did you meet with counsel for coffee?

A 7:00 this morning.

Q Just this morning?

A Well, we met over the last couple of days. We were here yesterday kind of in preparation. Yeah, that's true. Okay. Sorry.

Q That's what I'm asking.

Yeah, so how many times did you meet with counsel to prepare to testify today?

A So we met briefly on Saturday, also on Sunday, and then of course, Monday.

Q How long did you meet with counsel on Saturday?

A Maybe a couple hours.

Q Sunday?

A A few more hours. It was kind of -- started at 11:00, got out at 2:00 or 3:00.

Q And yesterday.

A Yes, I -- it's -- it's some number of hours.

Dr. Zoeller

Q Some number.
Can you give me an estimate?
A Four.
Q Did you review all the references in your report?
A No.
Q Have you looked at any of the other experts' reports in this litigation?
A Not fully. I have one from Hoyt. I just read maybe a couple pages.
Q And you've not seen any others?
A No.
Q Dr. Zoeller, is the CV attached as Exhibit A to your report complete, accurate, and up to date?
A CV?
Q The CV.
A I think so.
Q Have you had any formal education or training in epidemiology?
A So, I mean, I have collaborated with epidemiologists. I have -- I review a lot of manuscripts that are epidemiology. I have -- you know, I use it a lot. So

that's -- it is kind of formal.
Q Okay. So the most formal -- well, let's go back to my question.
A Okay.
Q And if you can just please listen carefully to my question, and then you can explain as you wish.
A Okay.
Q Have you had any formal education or training in epidemiology?
A I haven't had a class, but I have, you know, 40 years of experience.
Q In epidemiology?
A Well, using epidemiology. So I had -- I mean, I was funded by the NIH for almost 30 years. You can't -- you can't get those grants if it's not human relevant, and you can't really, you know, demonstrate human relevance unless you're using epidemiological studies.
Q Have you ever held any certifications or professional credentials in epidemiology?
A No.

Dr. Zoeller

Q Have you ever held yourself out professionally as an epidemiologist or an expert in epidemiology?

A No.

Q Have you authored any papers or book chapters in the field of epidemiology?

A Yes.

Q Which ones?

A I have them listed, you know, so I have published with Joe Braun, for example, at Brown University. I also published a couple of papers with -- with Dr. Till at York University in Canada. I can't think of anymore.

Q And these are epidemiology papers?

A Yes.

Q Have you ever taught any courses or presented any lectures on epidemiology?

A Yes.

Q When was that?

A So at UMass, I taught human physiology and endocrinology. Both of those required kind of an understanding of

Dr. Zoeller

epidemiology. My goal in all those cases was to help students have kind of the ability to critical think about new studies that come out in the newspaper, you know, just to help them kind of guide and not fall into traps of, you know, misinformation.

Q Anything beyond that?

A So I'm one of the lead authors right now for a project to revise the 2012 State of the Science document for the World Health Organization. As part of that, one of the first chapters is the epidemiology of environmental contaminants and human health effects. So, you know, I'm -- I'm kind of dead center in that.

Q You're a co-author of that chapter or that part of the report?

A Well, yeah, we're -- it's a single set of authors that is responsible for the whole document. There are probably four, you know, foundational chapters, one on epidemiology, one on testing and assessment, one on exposure globally, one

on economic costs.

Q And are you actively involved in the epidemiology chapter?

A Yes.

Q Have you had any formal education or training in toxicology?

A It's kind of the same story where I have not had a toxicology course, but my experience with the U.S. EPA in the '90s for a year and a half on a kind of high-level committee, at one point I served as one of the scientists on the Science Advisory Board for EPA. I reviewed FDA food safety. There -- all of this is related to toxicology.

I've given lectures. I had a course on toxicology at UMass. I've published a lot of papers on kind of endocrine toxicology. So my field -- my formal field is endocrinology and neuroendocrinology. And the toxicity of chemicals within that domain is very different from -- mainly because it's receptor based. I can get into that later,

but I have testified before Congress. I have just a lot of experience in that.

Q But you don't hold any formal credentials in toxicology?

MS. DEBROSSE: Object to form.

A No.

MS. DEBROSSE: You've got to slow down, please.

Q Have you or scientists working under your direction or supervision performed any research on EDCs -- and for the record, I think we all know endocrine-disrupting chemicals in relation to estrogen?

MS. DEBROSSE: Object to form. You may answer.

A That's a good question. I'm not sure. My field was -- had more to do with thyroid hormone. The hormone systems work the same mechanistically. I would -- I would have to look back and see.

Q But nothing comes to mind?

A No. It certainly wasn't a primary.

Dr. Zoeller

Q Have you or scientists working under your direction or supervision performed any research on EDCs in relation to uterine cancer?

A No.

Q What about ovarian cancer?

A No.

Q Breast cancer?

A No.

Q What about EDCs and mixture effects?

A No.

Q Do you have any experience Dr. Zoeller performing chemical hazard assessments?

A Yes.

Q What is your experience in that area?

Actually, you know what, let's define some terms --

A Sure.

Q -- just so we don't get confused.

A "hazard" is something that has the potential to cause harm, while "risk"

is the likelihood of a hazard causing harm --

MS. DEBROSSE: Object to form.

A So.

Q -- is that correct --

A -- so I would say that a hazard is an intrinsic property of a chemical. So the risk is whether or not that can affect -- have an adverse effect. So hazard assessment -- for example, I was on an IARC Monograph [sic] committee where that's their goal, that's what they do is to identify the hazard of carcinogenicity.

And I forget exactly when that was, but it's, you know, ten days of eight- to ten-hour days debating these kind of issues. I -- also, when I was on the Science Advisory Board, one of the things that we did as a group was to undergo quality reviews for the hazard and risk assessments that the IRIS program was doing in the EPA. Plus, most recently, the IRIS program did a set of five hazard and risk assessments on various PFAS, and I was one of the reviewers for that.

Dr. Zoeller

Q So just to define our terms, there is a difference, as I understand, between a hazard assessment and a risk assessment?

A Yeah.

MS. DEBROSSE: Object to form.

A That's true.

MS. DEBROSSE: Tom, you're going to have to let me get my objection --

THE WITNESS: Okay.

MS. DEBROSSE: -- in on the record. Okay?

THE WITNESS: Okay.

MS. DEBROSSE: Thank you.

THE WITNESS: Yeah, yeah.

Q And the basic difference is that a hazard describes what potential adverse effects a chemical can cause under any circumstance, while risk considers hazard and exposure under real world conditions?

MS. DEBROSSE: Object to form. Compound.

A So -- so the kind of Toxicology 101 definition of a hazard is

that it's an intrinsic property. So, for example, the analogy I give is of a staircase. A staircase is a hazard. It's always a hazard. If nobody is home, it's a hazard. If somebody is walking up and down the stairs, it's a risk. It's a minimal risk if somebody is confident. It's a big risk if you have got a toddler standing on the top. So that's kind of -- that's the way, I think, that we really need to think about it. There's hazard identification and hazard assessment. And those two things are different. Hazard assessment is dose response. Hazard identification is strictly the intrinsic property. This is a chemical that impacts the estrogen receptor, or it impacts an enzyme, et cetera.

Q But isn't that the difference between a hazard assessment and a risk assessment?

MS. DEBROSSE: Object to form.

A Well, they are different for sure. That's -- that's true. And hazard

Dr. Zoeller

is independent of risk. That's true.

Q So I think you've just described to me your experience with hazard assessment?

A No. I've done risk assessments also.

Q Okay. Well, can you tell me about that?

A Sure. Well, the -- when I was on the SAB, those were all risk assessment. You don't really go into risk assessment without a hazard assessment. So those two things are linked. Same with the PFAS that I have reviewed for the IRIS program. It's first a hazard assessment and then risk. So those two -- like IARC only looks at hazard. They don't even do assessment. It's hazard identification. That's -- that's a separate thing.

Q Right. Right.

So there is hazard identification, and then there's risk assessment, and the risk assessment is where you get into things like dose and

exposure?

MS. DEBROSSE: Object to form.

A True.

Q Dr. Zoeller, as an academic, as you were saying before, your main research interest was thyroid hormone action on brain development and environmental disruption of thyroid hormone action; is that right?

MS. DEBROSSE: Object to -- object to form.

A Yes.

Q What is the strongest claim or conclusion as to causation that you ever expressed in writing on the question of whether interference with thyroid action by EDCs is causally related to adverse effects on brain development?

MS. DEBROSSE: Object to form.

A It's a good question. In terms of the phraseology -- so I don't know. I'd -- I'd really have to look at some of the things we've published.

Q What I'm getting at is: Did you

Dr. Zoeller

ever express in writing the conclusion that exposure to EDCs that you were looking at caused impairment to brain development?

A So --

Q In other words, do you ever come down firmly on that question and, if so, where did you express that --

MS. DEBROSSE: Object to form.

Q -- view?

A So I think that the work that we did on that was -- was -- I don't want to say theoretical as if it's not relevant to human exposures. But what we showed unequivocally is that the effect of chemicals, the chemicals that we were looking at, on the thyroid hormone system would -- could have an effect on the endpoints that FDA and OECD, EPA -- it's globally look at to determine hazard, and it was incorrect.

So even in a human study that we looked at, the goal was to understand the mechanism by which chemicals can interfere with thyroid hormone action in the absence of

giving signals that the regulatory system look at. So we didn't -- we were not looking at a human population for the purpose of identifying hazard or identifying, you know, adverse effects to be causally related. That wasn't the goal of that.

In fact, the work that we did, the publications that we did really changed the course of the way OECD is developing test methods. OECD is a -- is a multi-national program. I think over a hundred countries are involved in OECD work. So the effect of what we had done has really had a global effect, but it was -- it wasn't this kind of focused on a specific causal relationship.

Q In one of your papers, you wrote -- and I'm going to skip trying to pronounce some of these names: Certain chemicals including PCBs, BPA, have been shown to bind thyroid receptors and perhaps have selective effects on thyroid functions. A number of common chemicals, including PBBs and phthalates may also exert such effects. Considering the

Dr. Zoeller

importance of thyroid, hormone, and brain development, it will be important to pursue the possibilities that these chemicals or interactions among these chemicals are affecting children's health by influencing thyroid hormone signaling in the developing brain.

MS. DEBROSSE: Object to form.
Counsel, do you have the paper?
MR. BLISS: I don't have that particular one.
A I don't remember that specific comment but --
Q I'm not asking about, like, the specific words but that was the gist of your --
A Yes.
Q -- your main --
MS. DEBROSSE: And I'm just -- I'm just going to object --
Q -- project?
MS. DEBROSSE: -- to form, Counsel. He's doesn't have the paper in front --

Dr. Zoeller

MR. BLISS: I -- I --

MS. DEBROSSE: -- of him, and he's published many, many papers in his career.

Tom?

A So, yeah, I mean that's the goal of what we were doing.

Q Right. And so just to get back to my original question -- and I appreciate your explanation.

But if you could just --

A Sure.

Q -- try to listen carefully to my question?

Do you remember whether you ever expressed an opinion on whether the chemicals that you were studying are causally related to adverse effects in children's brain development?

MS. DEBROSSE: Object to form.

A So I can't think of a specific paper where I had said something like that. If -- I mean, there were -- there was a couple of papers that came out in 2003 that

Dr. Zoeller

was the epidemiology of PCBs. So they -- what this group had done is to combine all the data globally from a number of cohort studies on PCBs and IQ. The work that we did on PCBs made it clear that PCBs interfere with thyroid hormone during development and, in effect, you know, we were looking in animal studies and kind of functional and structural effects on brain development.

The combination of those two things made it clear to me that PCBs are causally related to IQ deficits in children. I don't know that I published that statement per se, but that would be where I would have made that kind of statement.

Q In other words, you would have made that statement in one of your publications?

A Yeah.

Q And so am I right that, even though you knew that thyroid hormone is important in brain development and that the chemicals you were concerned about bind the

Dr. Zoeller

thyroid receptor have selective effects on thyroid function, that wasn't enough in and of itself to conclude that those chemicals affect children's brain development?

MS. DEBROSSE: Object to form. Mischaracterize the witness' testimony.

You may answer.

Q In other words --

A So --

Q -- that's the basis for your hypothesis that you then pursued in your research; is that right?

MS. DEBROSSE: Object to form.

A I'm -- I don't understand that. So what do you mean by -- so the hypothesis that we started with was if PCBs caused a reduction in thyroid hormone levels during development, we should see effects on the brain that mimic that. Because we knew what the brain looks like when it's deprived of thyroid hormone. That's not what we saw.

What we saw is that PCBs produced

Dr. Zoeller

an effect that was more consistent with elevated thyroid hormone, despite the fact that thyroid hormone levels in the blood were diminished.

So I think your question is: Based on all the work we did in animals, could I say that -- that PCBs are causative in the absence of -- in the absence of human epidemiology?

And I'd have to say yes. There is just -- the two systems -- the endocrine systems in animals is identical. Thyroid hormone is chemically identical. Estrogen is chemically identical. The endocrine system is -- you know, there are features of the endocrine systems that are similar for all hormones. So yeah, I mean, I don't think -- I wouldn't have said that because we had the epidemiology.

Q I'm sorry.

Wouldn't have said what?

A I wouldn't have said on the basis of animals alone that it would be causative because the epidemiology was there. You

know, the bad part about it is you get an NIH grant because you can see something in the human population, which means that the regulatory system has to fail to such an extent that humans are affected for somebody like me to be able to study it. That's the sad part.

Q I just want to go back to my earlier question just to make sure I understand.

You knew that certain chemicals affected thyroid function and you knew that thyroid function affected brain development and that's why it was important for you to pursue the possibility that there was a causal relationship there?

MS. DEBROSSE: Object to form.

A So --

Q Just --

A -- so the -- yeah.

Q -- if you could -- and I know you -- and I just want to say we're going to get into --

A Sure.

Dr. Zoeller

Q -- all the issues you want to talk about --

A Okay.

Q -- later. So you could just --

A So the words that would function --

(Whereupon, the court reporter requested clarification.)

MS. DEBROSSE: Objection.

THE WITNESS: Okay.

(Whereupon, the court reporter requested clarification.)

THE WITNESS: Okay.

(Whereupon, the court reporter requested clarification.)

Q Yeah. The court reporter will hate us if we keep --

A Okay.

Q And, again, all I'm trying to do, Dr. Zoeller, is just sort of focus you on the question and we're going to get into --

A Okay.

Q -- all of the issues about --

A Yeah.

Q -- endocrine function and all of that later.
A Okay.
MS. DEBROSSE: And just for --
Q So...
MS. DEBROSSE: -- just for the record, give me the opportunity to object. Okay?
And I think Tom is doing his best to just answer the questions.
He just has a whole lot in his head, but we're going to try to slow it down. Okay?
So thank you.
A I think so. I'm -- now I can't remember what you asked. I was objecting to the word "function." That's such a -- that's a huge trigger.
Q But that's not really the --
A That's not your question.
Q -- the essence of the question.
A At all.
Q It's not -- it's not about the details.

Dr. Zoeller

It's you knew that certain chemicals were doing something.
A Yes.
Q They were affecting thyroid action --
A Yeah.
Q -- interfering with thyroid action.
A Right. Right.
MS. DEBROSSE: Sorry, counsel. Object to form.
Tom, give me the opportunity to get an objection on the record.
THE WITNESS: I'm sorry.
MS. DEBROSSE: That's okay.
A Okay.
Q And you knew that thyroid hormone affects brain development --
MS. DEBROSSE: Object to form.
Q -- correct?
A Yes.
Q And that led to the hypothesis, from what I've read in your work, that exposure to those chemicals could possibly

Dr. Zoeller

affect brain development in children, correct?

MS. DEBROSSE: Object to form.

A Yes.

Q And that hypothesis had to be pursued and was pursued in further research, as you have described?

A Yes.

Q Dr. Zoeller, I'm going to make a series of statements and the question is just going to be: Do you agree or not agree?

A Okay.

Q Uterine and ovarian cancer don't require exposure to an exogenous carcinogen?

Let me rephrase it. You look puzzled, so let me -- maybe I'll -- can ask it a better way.

Uterine and ovarian cancer can develop without exposure to an exogenous carcinogen?

MS. DEBROSSE: Object to form. Compound.

Dr. Zoeller
A I think it's theoretically possible. I don't know how likely that is.
Q So I'll come back to my first formulation.
Uterine and -- there has been an objection for compound. That's saying you're putting two things together. I'm doing that in the interest of efficiency but I'll break it up.
Uterine cancer -- let me start again.
The development of uterine cancer doesn't require exposure to an exogenous carcinogen?
A I don't know that that's true.
Q And do you not know whether that's true for ovarian cancer as well?
A True.
Q True that you don't know?
MS. O'CONNOR: Okay.
A Correct. I don't know.
Q No human carcinogen causes all human cancers?
A So that's a -- that's a

Dr. Zoeller

complicated question.

Q I didn't --

A So --

Q -- think so.

A -- well --

MS. DEBROSSE: Object to form.

A So --

Q Okay. Let me --

A -- so I'm thinking --

Q I --

A -- of all the cancers that I can --

MS. DEBROSSE: Wait. Wait.

A -- think of and --

MS. DEBROSSE: Tom.

Q Okay.

MS. O'CONNOR: You want to withdraw the question?

MR. BLISS: No. No. I -- I --

MS. O'CONNOR: Okay.

Q Are you aware, Dr. Zoeller, of a carcinogen that causes all known human cancers?

A No.

Dr. Zoeller

Q And so I think a logical entailment of that last answer is that all human carcinogens cause some cancer or cancers but not others?

MS. DEBROSSE: Object to form.

A The problem I'm having with that is that -- is that carcinogenesis isn't simply, you know, one chemical and one target. Carcinogens -- and a good example is, when I was on this IARC committee, there were -- there were cases. And, in fact, IARC, in their preamble, talks about the ten key characteristics. And one of the reasons that that came up is that chemicals can have a specific effect under one set of conditions, but have a different effect, that is a different target, under different circumstances.

So that combination of what the -- you know, what the characteristics are can change that. A good example is cigarettes that can produce lung cancer but also other cancers.

Q But not all cancers?

Dr. Zoeller

A Not all cancers.

Q Right.

So my question -- and maybe I can phrase it a little differently: All known human carcinogens are associated with some cancer or cancers but not others?

A Yeah. Truth.

Q Hormones affects different organs and tissues differently?

A True.

Q Hormones can affect the same tissue or organ differently at different times or under different conditions?

A Yes.

Q And both of those statements are true for estrogen?

A Yes.

Q Hormones have very complex actions simultaneously in different tissues?

MS. DEBROSSE: Object --

A Yes.

MS. DEBROSSE: -- to form.

Q Chemicals can influence hormone

Dr. Zoeller

metabolism in a tissue-specific manner that can directly interfere with normal hormone actions only in some tissues?

MS. DEBROSSE: Object to form.

A So it can only interfere with the hormone action in tissues where that hormone is acting.

Q Let me read it again. By the way, these are, as best as I tried, quotes from one your papers so -- but I thought this was all basic stuff, but you can tell me whether you agree or not.

Chemicals can influence hormone metabolism in a tissue-specific manner that can directly interfere with normal hormone actions only in some tissues?

A So only in those tissues where it's affecting metabolism.

Q I see. So let me ask the next one. This might be what you're getting at.

A chemical may be metabolized in a tissue-specific manner, and the metabolites may directly interfere with hormone action only in the tissues where

they're generated?

A Yes.

MS. DEBROSSE: And, counsel, whenever you have a breaking point?

We've been going almost an hour, so let us know.

MR. BLISS: Sure. Let me get through this --

MS. DEBROSSE: Okay.

MR. BLISS: -- list of do you agree or not agree, but that's okay.

MS. DEBROSSE: That's okay with you, Tom?

THE WITNESS: Yes.

MS. DEBROSSE: All right.

MR. BLISS: You doing okay Dr. Zoeller?

THE WITNESS: Yeah.

Q Chemicals or their metabolites may interact with hormone receptors in a tissue-specific manner either because some tissues exhibit greater receptor density or because different receptor isoforms are expressed in different tissues?

Dr. Zoeller

A Yeah. I'm -- so the issue of metabolites don't -- doesn't seem to fit with the rest of that, so I'm not --

Q Let me amend that?

A -- sure how to --

Q Chemicals may interact with hormone receptors in a tissue-specific manner, either because some tissues exhibit greater receptor density or because different receptor isoforms are expressed in different tissues?

A Yeah.

Q Tissue-specific cofactors are important determinants of how endogenous estrogen and estrogenic EDCs act in specific tissues or organs?

A Yes.

Q A hormone's effects in one tissue or organ can't just be inferred or extrapolated from its effects in another tissue or organ --

MS. DEBROSSE: Object to form.

Q -- for all the reasons we've just talked about?

Dr. Zoeller

A Yeah.

Q A particular chemical or chemical mixture could be carcinogenic in animals but not in humans?

A I am trying to think of the case where that's true. So for --

Q I'm not asking for specific examples right now, but are you aware that that is true, that there are chemicals that can be carcinogenic --

A I'm.

Q -- in laboratory animals but not in humans?

MS. DEBROSSE: Object to form.

A I'm not aware of that.

Q A particular chemical or chemical mixture could interfere with hormone action but not be carcinogenic?

A True.

Q A particular chemical or chemical mixture that binds estrogen receptor-alpha could act as a receptor agonist or a receptor antagonist?

A Possible.

Dr. Zoeller

Q Or both?

A At different doses.

Q I just want to make sure the record is clear.

The answer is yes as to receptor agonist or antagonist and possibly both but at different doses?

A Yes.

Q A particular chemical or chemical mixture could be carcinogenic under some use or exposure conditions but not others?

MS. DEBROSSE: Object to form.

A Again, I'm trying to think of specific examples and, you know, certainly, I can answer, yeah -- yes.

Q A particular chemical or chemical mixture could have a certain molecular cellular or biochemical effect in vitro but not in vivo?

A So no, I don't think so. That's -- that gets tricky. So a chemical -- let's say a chemical that binds to the estrogen receptor in vitro, if that chemical is -- is, you know, exposed to the

Dr. Zoeller

estrogen receptor, it's going to bind to it. It's going to have the same effect. In fact, I would say that binding to the estrogen receptor is a hazardous property of that chemical.

Q My question was a little broader than that, though. It wasn't specifically about --

A Estrogen.

Q -- estrogen receptor binding. So let's just go back to the broader question.

A particular chemical or chemical mixture could have certain molecular, cellular, or biochemical effects in vitro but not in living organisms?

MS. DEBROSSE: Object to form.

A So the in vitro assay is going to test one thing. Once you put a chemical in vivo, it can have multiple effects. So like that's kind of what I'm thinking about that. It will still have the effect that you saw in vitro.

Q Always?

MS. DEBROSSE: Object to form.

Dr. Zoeller

A I'm trying to think of a case where it's not. I mean...

Q Let me ask my next question.

A particular chemical or chemical mixture could have a certain molecular or cellular or biochemical or biological effect in laboratory animals but not in humans?

MS. DEBROSSE: Object to form.

Q That could happen?

A Possible.

Q I should have asked this question earlier, probably.

By your preferred definition, as I understand it, endocrine-disrupting chemical or EDC is an exogenous chemical or chemical mixture that can interfere with any aspect of hormone action?

A That's a definition. True.

Q And do I understand correctly that that's your preferred definition?

MS. DEBROSSE: Object to form.

A So there are different definitions depending on the context. So

the UNEP/WHO definition is a definition for regulatory purposes. So the definition that we published from the Endocrine Society is a definition that is -- that is not for regulatory purposes but demonstrates clearly what endocrine disruptors do.

Q I see.

MS. DEBROSSE: Counsel, can we take that break.

MR. BLISS: Yeah, sure.

VIDEOGRAPHER: Stand by. The time is 9:05 a.m. We're off the record.

(Whereupon, at 9:05 a.m., a recess was taken to 9:15 a.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 9:15 a.m. We are back on the record.

Q Dr. Zoeller, before we went on our break, we were talking about endocrine-disrupting chemicals, you were saying that different definitions are for

different purposes. I asked you first about the definition proposed by the Endocrine Society?

A Uh-huh.

Q And then you were telling me about a different definition adopted by, I think, the World Health Organization?

A Uh-huh.

Q What is the difference between those two definitions?

A So the --

Q Actually, let me -- let me just tell you my understanding, just maybe cut this short.

My understanding is that the World Health Organization definition includes an aspect of adverse health effects?

MS. DEBROSSE: Object to form.

Q Is that it?

A Yes, it does.

Q And so now going back to what I will call "the Endocrine Society definition" of an exogenous chemical or

chemical mixture that can interfere with any aspect of hormone action, that definition, as I understand, doesn't imply that all chemicals that interfere with any aspect of hormone action are a significant risk to human health because risk, as we talked about before, will depend on the exposure and the potency of the chemical or mixture?

MS. DEBROSSE: Object to form.

A So exposure and potency is wrong, I think. I don't think that's in any of the definitions of risk.

Q Oh, let me -- okay. Let me read the statement again. And this relates to the Endocrine Society definition --

A Yes.

Q -- of EDCs.

This definition doesn't imply that all chemicals that interfere with any aspect of hormone action are a significant risk to human health?

MS. DEBROSSE: Object to form.

A So when we debated this --

Dr. Zoeller

Q Well, hold on.
Do you have an answer to my question?
A Yes, it does --
MS. DEBROSSE: Object to form.
A -- imply that.
Q It does imply that?
A Yes. It's -- the debate that we had is can anyone -- endocrinologists -- there were both clinical and experimental endocrinologists on the committee. Can anybody think of a way that you could interfere with any aspect, which is complicated and we're trying to cut through the chase -- is there any way that could not have adverse effects? Yeah. I can't think of one.
Q Okay. So just to make sure I understand your testimony.
That definition does imply that all EDCs so defined are a significant risk to human health?
A Yes.
MS. DEBROSSE: Object to form.

Dr. Zoeller

And, Counsel, just for my clarify, what definition are you referring to?

MR. BLISS: What we're calling "the Endocrine Society definition."

MS. DEBROSSE: Okay.

MR. BLISS: Which, to be clear, is that an EDC is an exogenous chemical or chemical mixture that can interfere with any aspect of hormone action.

I apologize. I'm flying solo today, as you can see. So I'm --

MS. DEBROSSE: That's fine.

MR. BLISS: -- here fumbling with exhibits.

MS. O'CONNOR: No one wanted to come to the Big Apple. Go figure.

MR. BLISS: You're fine.

Q All right. We'll come back to that at the next break.

Potency is one of the most important aspects of hormone action?

MS. DEBROSSE: Object to form.

Dr. Zoeller

A It's an important aspect.

Q Not all EDCs or mixtures of EDCs cause cancer?

MS. DEBROSSE: Object to form.

A True.

Q A particular EDC or mixture of EDCs could bind estrogen receptor-alpha but not activate proliferative signaling in a certain tissue or organ?

MS. DEBROSSE: Object to form. Foundation. You may answer.

A It would -- I mean, I can think -- I can think of cases -- I can think of the situation where that could be true, but it would be very specific. I can even give a good example of that.

Q If you make it quick, I'll let you give me one.

A So tamoxifen is an anti-estrogen in breast tissue, but it activates ER-alpha in the uterus, and that's because of the cofactors that are different in those two tissues.

Q A particular EDC or mixture of

Dr. Zoeller

EDCs could bind estrogen receptor-alpha and activate proliferative signaling in a certain tissue or organ but not be carcinogenic in that tissue or organ?

MS. DEBROSSE: Object to form.

A The bad part about it is that the estrogen receptor is kind of known. It's -- it's a hormone, but it's also -- I mean, estrogen itself is a carcinogen. There are people who would make that argument.

Q Let me change the wording slightly.

And then the question is just do you agree with it or do you not agree with it.

A particular EDC or mixture of EDCs could bind estrogen receptor-alpha and activate proliferative signaling in a certain tissue or organ but not cause cancer in that tissue or organ?

A I think -- so I don't think that it could not contribute, increase the likelihood or the risk of cancer.

Dr. Zoeller

Q So your understanding is that a particular EDC or mixture of EDCs that binds ER-alpha and activates proliferative signaling in a certain tissue or organ will invariably contribute causally to the risk of cancer?

A Yes.

Q So I'll ask a more general question.

A particular EDC or mixture of EDCs could bind estrogen receptor-alpha in a particular tissue or organ but not cause cancer in that particular organ or tissue?

MS. DEBROSSE: Object to form.

A In a single case, yeah.

Q What do you mean "in a single case"?

A So, like, in an individual person, it could not contribute. I think that on a population level, that would not be true.

Q So it's your understanding that a particular EDC or mixtures of EDCs that binds estrogen receptor-alpha in a

Dr. Zoeller

particular tissue or organ will at a population level be carcinogenic?

A And it causes proliferation, yes.

Q A particular estrogenic EDC -- let me start again because there was some noise with the blinds being brought down.

A particular estrogenic EDC or mixture of estrogenic EDCs could be carcinogenic in some tissues or organs but not in others. Maybe tamoxifen is the example.

MS. DEBROSSE: Object to form.

A Uh-huh. It actually -- well --

Q Well, let me go back to my question so the record is clear, and you just tell me whether you agree or disagree.

A particular estrogenic EDC or mixture of estrogenic EDCs could be carcinogenic in some tissues or organs but not in others?

A Well, so I think that that's true but for tissues that don't have the estrogen receptor. I think that -- I think that tissues that do have the estrogen

Dr. Zoeller

receptor, I think, are going to be vulnerable to that.

Q Just, if you could, listen carefully to my question.

A particular estrogenic EDC or mixture of estrogenic EDCs could be carcinogenic in some tissues or organs with estrogen receptors but not in others?

MS. DEBROSSE: Object to form.

Asked and answered.

A So part of this is kind of hanging up on "carcinogenic." Can it increase the likelihood or the risk of cancer, you know, I don't think that you can say proliferation all by itself is carcinogenesis. There is a couple of things that have to go together there. But if you increase proliferation, you're going to increase the likelihood or increase the risk of cancer.

Q Well, tamoxifen is an estrogenic EDC?

MS. DEBROSSE: Object to form.

A Tamoxifen is a drug that is best

Dr. Zoeller

known as an antagonist, an estrogen receptor antagonist.

Q But it binds ER-alpha?

A It does bind ER-alpha.

Q It binds ER-alpha, but it doesn't cause cancer or increase the risk of cancer in breast tissue?

MS. DEBROSSE: Object to form, foundation.

Go ahead.

A I don't think that it affects breast tissue. In fact, they give it to breast cancer patients.

Q A particular estrogenic EDC or mixture of estrogenic EDCs could cause some reproductive cancers but not uterine or ovarian cancer?

MS. DEBROSSE: Object to form.

A In principle, I can't think of -- I mean, basically breast cancer but not uterine or ovarian. It's possible.

Q DES?

MS. DEBROSSE: Object to form.

A It's a good question. I don't --

Dr. Zoeller

I don't know the DES literature.

Q A particular estrogenic EDC or mixture of estrogenic EDCs could protect women from a certain estrogen-sensitive cancer?

MS. DEBROSSE: Object to form.

A No. I just don't think that's true. Especially mixtures.

Q What about genistein, if I'm pronouncing that correctly?

A Genistein. What about it?

Q I believe it's known to be protective against endometrial cancer?

MS. DEBROSSE: Object to form.

A Yeah, I don't know that literature. My guess would be genistein as a single chemical, I would be surprised at that. Certainly, people that eat soy also don't eat other things. That's a more complicated issue.

Q I just want to go back to a couple of the questions I asked before and change the wording a little bit and see if that makes it easier.

A particular chemical or chemical mixture could cause cancer under some use or exposure conditions but not others?

MS. DEBROSSE: Object to form.

A In principle.

Q And in reality, right?

MS. DEBROSSE: Object to form.

A I don't know of a case like that, I mean, when I'm thinking of the literature.

Q You can't think of any example where use or exposure conditions don't matter for whether a chemical or chemical mixture could cause cancer?

A Yeah, I didn't interpret it that way.

MS. DEBROSSE: Object to form.

Let me get in there.

A So exposure in -- in an exposure scenario where somebody is not exposed, I can see -- I mean, that's one side of it. I think, yeah, that gets really complicated.

Q Just so the record is clear, you

Dr. Zoeller

don't agree that a particular chemical or chemical mixture could cause cancer under some use or exposure conditions but not others?

MS. DEBROSSE: Object to form. Foundation. Hypothetical.

Go ahead, Tom.

A So that's a theoretical that I can imagine scenarios where it doesn't cause cancer. For example, there is no exposure. I mean, that's -- that's basically what European Commission has said with their legislation on pesticides and, you know, that category. If there is no exposure, than there is -- you can get a license.

Q Well, obviously, nothing can cause cancer if you're not exposed to it.

A Yes.

Q I think we can agree on that.

MS. DEBROSSE: Object to form.

Q So is it your opinion, just so I understand, that aside from a no-exposure scenario, a particular chemical or chemical

mixture will cause cancer -- or if it causes cancer, will cause cancer under any and all use or exposure conditions?

MS. DEBROSSE: Object to form. Foundation. Hypothetical. Mischaracterizes the witness's testimony.

You may answer, Tom.

A It's so theoretical that I can -- I can imagine scenarios where it doesn't.

Q Well, there is a difference, for example, between having one cigarette when you're a teenager and smoking a pack a day for 30 years?

MS. DEBROSSE: Object to form.

A Yeah.

Q I think you've already answered this, but I don't remember so I'm going to go back.

A particular estrogenic EDC or mixture of EDCs -- let me start again.

A particular estrogenic EDC or mixture of estrogenic EDCs could cause some reproductive cancers but not uterine or

Dr. Zoeller

ovarian cancer?

MS. DEBROSSE: Object to form. Compound. Asked and answered.

You may answer, Tom.

A Yeah.

Q Well, it's either that, or you're saying that a particular EDC or mixture that could cause any reproductive cancer will cause all reproductive cancers. It's one or the other.

A Right.

MS. DEBROSSE: Object to form.

A So what I'm thinking of is in a -- in a large population, you're probably going to see a lot of different categories of reproductive cancers that estrogenic EDCs are going to increase the risk of reproductive -- not just reproductive cancer but thyroid cancer, for example, that also is also estrogen related. And so --

Q But you're --

A In an --

MS. DEBROSSE: Let --

Dr. Zoeller

A -- individual, that's true. And, on a population level, I'm less confident that that's true.

Q Okay. So, on a population level, your understanding is that if a particular estrogenic EDC or mixture of EDCs can cause any reproductive cancer, it will cause all reproductive cancers, including uterine and ovarian cancer?

A But it --

MS. DEBROSSE: Object to form. Mischaracterizes the witness's testimony.

Go ahead, Tom.

A That it increases the risk, yes.

Q Of all?

A Of all estrogen-related cancers.

Q And when you say "increases the risk," you mean in a causal sense?

A Yes.

Q The replication of experimental results is fundamental to the scientific method?

MS. DEBROSSE: Object to form.

Dr. Zoeller

A Yes.

Q So, Dr. Zoeller, as recited in your report, the purpose of your testimony is to answer the question, quote, is it biologically plausible that chemical hair relaxers caused uterine or ovarian cancer?

If so, what are the possible biological mechanisms by which chemical hair relaxers could cause uterine or ovarian cancer?

A Yes.

Q Are you opining, Dr. Zoeller, just on whether it's biologically plausible that chemical hair relaxers cause uterine and ovarian cancer or are you going farther in opining on whether they do, in fact, cause those cancers?

A So -- so, at this stage of the game, there's -- we're looking at the literature the way it exists right now. And so it's biologically plausible. And I think I say in here that it's likely.

Q Well, I -- my question doesn't really have to do with the state of the

literature; it has to do with the opinions you're offering. And I'm trying to understand --

A Right.

Q -- which I think is fair, the opinions you're offering. And I'll just say it's not entirely clear to me what you're saying so let me just go back to my question.

If you could just focus on my question?

Are you --

MS. DEBROSSE: Object -- object to form.

Go ahead, counsel.

Q -- are you opining just on this question of biological plausibility, whether it's biologically plausible that chemical hair relaxers cause uterine and ovarian cancer, or are you going farther and offering the opinion -- or offering an opinion of whether they, in fact, do cause these cancers?

A So the opinion in here -- first

Dr. Zoeller

of all, I kind of go through the relationship between cause and increase risk so I kind of talk about that. But I also make the kind of conclusion that it's plausible and more than that, likely. I mean, my opinion in here is that, if you were going to make a product that could cause uterine and ovarian cancer, this would be it because it's a perfect combination of estrogenic chemicals that are not low dose and carcinogens that all increase the risk.

Q This is the perfect storm you talked about?

A Yes.

Q Okay. I'm still not sure I -- well, let's keep going. Maybe we can clarify it when we look at some other parts of your report.

But as you use the term, what does "biologically plausible" mean?

A It means there is a well-recognized pathway from exposure to cancer.

Dr. Zoeller

Q In your methodology section, which is Section 3.0, you state that: In preparing your report, you used the same general methods you apply in your academic and advisory work.

A Yes.

Q Do you feel that you did that?

A Yes.

Q You then describe how you conducted your literature search.

You started by searching PubMed with: Constructed sequential search strategies combining terms for, one, uterine and ovarian cancer carcinogenesis, et cetera.

Do you recall that?

A Yes.

Q Could you just open your report to page 7 so you can see this language?

And you see that, in your initial search of PubMed, you constructed these sequential search strategies and combined terms for four different categories or topics?

(Whereupon, the court reporter requested clarification.)

THE WITNESS: I'm sorry.

A Yes.

Q Dr. Zoeller, if there were animal carcinogenicity studies or epidemiology studies of, say, phthalate exposure with no findings relating to uterine or ovarian cancer, how would those studies get picked up in your initial PubMed search --

MS. DEBROSSE: Object --

Q -- under which topic?

MS. DEBROSSE: I apologize.
Object to form. Compound.

A So I -- so, first of all, what I did to kind of clarify this, these one, two, three, four are kind of domains. So a PubMed search allows you to search for key words, and those key words can have attributes like title, abstract or mesh terms or et cetera. So what I would do is put in key words, for example, uterine cancer or hair relaxers or whatever.

You do that -- you perform that

Dr. Zoeller

search. You get a lot of -- you get a lot of hits, then you do another search that would be -- that would then interact with the first search. So that's the way I did that, and then I would go through. In terms of looking at whether or not estrogenic chemicals causes cancer in animals I don't think was relevant to my opinion, so I didn't look at those. There were animal studies that demonstrated the estrogenicity of these chemicals, and those I would pick up.

So I would -- I would -- I would get all those papers. But as I would go through, I would search for -- for papers that would inform me about the pathway.

Q Sorry. I'm just looking through your answer to make sure I got it. I was going to talk about your next step in the process, which is where were you winnowing down the studies that were collected through your initial search to some manageable number and then screen them for relevance to five different domains or topics.

A Uh-huh.

MS. DEBROSSE: Object to form.

You can answer.

Q But if I understand your --

MR. BLISS: It's okay.

Q -- your prior answer -- I think I know your answer, and so I can maybe cut this short.

You did not consider animal studies looking at whether or not estrogenic chemicals cause cancer?

You did not consider relevant to your work in this case whether -- let me start again.

You did not consider it relevant to your work in this case to look at whether or not estrogenic chemicals cause cancers?

A The --

MS. DEBROSSE: Object to form.

Mischaracterizes the witness's testimony.

Q And, Dr. Zoeller, to be clear, I am never trying to mischaracterize your testimony. I'm just trying to understand

it. I asked you, you know, where in your search domains would that kind of study get picked up.

And, as I understand your answer -- and I'm looking at it, you know, right here -- you did not consider those sorts of studies, animal carcinogenicity studies of the chemicals that you're focused on, to be relevant to your analysis?

A Correct.

Q Maybe this is related, but is that why you didn't consider parabens, phthalates, benzophenones, and siloxanes to be carcinogens for purposes of your topic of analysis carcinogens in hair relaxers?

A Yes.

MS. DEBROSSE: Object to form.

MR. BLISS: Did you get it?

Q And I take it that's also why you don't have as a topic of analysis carcinogenicity of parabens, phthalates, benzophenones, and siloxanes but have only a topic of analysis estrogenicity of

Dr. Zoeller

parabens, phthalates, benzophenones, and siloxanes?

MS. DEBROSSE: Object to form.

A Yes.

Q You say, on page 40 of your report, in the last paragraph: In any analysis of this kind --

MS. DEBROSSE: I'm sorry, counsel.

Can we get to it?

MR. BLISS: Oh --

MS. DEBROSSE: I'm sorry.

MR. BLISS: -- I'm sorry.

MS. O'CONNOR: Page 40?

MS. DEBROSSE: Yeah.

MR. BLISS: Page 40, the last paragraph.

MS. DEBROSSE: Okay.

MR. BLISS: Get a sip of water while you guys are finding it.

Q Dr. Zoeller, are you there?

A Yes.

Q You write: In any analysis of this kind, it is important to articulate

Dr. Zoeller

the areas of uncertainty.

Do you see that?

A Yes.

Q And then skipping down a little bit: The method of quote/unquote read-across is accepted and widely used in the scientific community to address data gaps such as these. The principle of the read-across technique is that end point or test information for one chemical is used to predict the same end point or test for another chemical which is considered to be similar by scientific justification. It is for this reason that I assume, in general, that the kinds of phthalates, parabens, or other chemicals found in products are similar to the specific chemicals for which there is experimental evidence of estrogenicity.

Do you see that?

A Yes.

Q As you say, the read-across method can't be employed without scientific justification, but you seem to have just

Dr. Zoeller

assumed that it could apply without providing any justification --

MS. DEBROSSE: Object to form.

Q -- is that right?

A So --

MS. DEBROSSE: Miss -- object to form. Mischaracterizes the text.

But go ahead.

Q Again, I don't want to mischaracterize anything, so let me ask you another question.

I did not see in your report -- but please point me to it if it's there -- where you provide scientific justification for employing the read-across method as opposed to simply assuming that it can apply as you say in this paragraph?

MS. DEBROSSE: Object to form.

You can answer.

A So the word "assume" there isn't being applied like that.

What I am assuming is that there's -- the data gap is: What are all the chemicals in these products?

Dr. Zoeller

So there is limited information about that, and I have to go with what is available. The assumption is that the kinds of -- you know, the chemistry of hair is the same. That doesn't change. So the product has to be -- has to be, you know, constructed in a way that performs the function to which it's, you know, being applied. That's the assumption. The assumption isn't read-across; the assumption is that, based on what we know, I can make an opinion.

Q I'm not sure I follow that.

You say: The principle of read-across technique is that end point or test information for one chemical is used to predict the same end point or test for another chemical which is considered to be similar by scientific justification.

A Right.

Q So scientific justification is necessary, as you say here, for application of read-across?

A Right.

Q You can't do it willy-nilly?

Dr. Zoeller

MS. DEBROSSE: Object to form.

A I'm not.

Q All right. Okay. Well -- and I want to understand how.

And -- and -- but then you say: It is for this reason.

The reason being that read-across technique can be used when there is similarity by scientific justification, that you assume, in general, that the kinds of chemicals in the products are similar to the kinds of chemicals for which there is experimental evidence.

That's what you say?

A Right.

Q And I'm simply asking: Where do you provide, in your report, the scientific justification which would require, as you know, an analysis of chemical structure, molecular structure, and so on, to use the read-across technique in this manner?

A So -- so, again, the assumption is that the kinds of chemicals -- phthalates, parabens, et cetera -- that are

known to be there must also be in other products. We don't have any way of knowing that because we don't have a list of those ingredients.

Q Dr. Zoeller, are you aware that the Defendants in this litigation have produced to the Plaintiffs lists of their product formulations?

A I haven't seen those.

Q And, again, just so I'm sure I haven't missed anything: There is nowhere in your report where you are providing a scientific justification for being able to read across from one particular phthalate to another?

MS. DEBROSSE: Object to form. Asked and answered repeatedly.

Tom, you may answer.

A That's not what "assume" means there. I was talking about read across as a principle, not as this chemical read across to that chemical. So the -- the assumption is that the -- well, I have to go on what I've -- what scientific evidence

is available.

Q Well, let me -- let me put it this way. Let's say the data you have for -- I'm just using this as a hypothetical. The class of chemical we call phthalates is a particular phthalate?

A Right.

Q But none of the hair relaxer products in the case contain that particular phthalate. Assume that.

A Okay.

Q In order for your opinion to be valid with respect to that product, you would have to be able to read across the data that you have presented on the particular phthalate to the different phthalate that's in the product?

MS. DEBROSSE: Object to form. Hypothetical.

You may answer.

Compound.

A In principle, that's true.

Q I mean, it's true in practice, right?

Dr. Zoeller

MS. DEBROSSE: Object to form.

A Since we don't know everything that is in there, it's hard to practice that. So what you have to do and what I've done here is to -- is to look at the evidence. So there is two -- there is kind of two -- two areas: What phthalates have been evaluated, what parabens, et cetera; and then which ones, in the limited amount of information that we've got, is there. So --

Q I understand that. I understand that you were dealing with limited information.

I'm just saying that, in order for your opinions and conclusions to translate from the evidence you present in your report to a particular product that has, say, a different phthalate than the one you analyzed, that would depend on the validity of this read-across technique?

MS. DEBROSSE: Object to form. Compound. Hypothetical. Asked and answered multiple times.

Dr. Zoeller

A Well, in principle.

Q Oh, yeah, I understand you didn't have access to the information to do better with that, but --

MS. DEBROSSE: Object to --

Q -- in principle --

MS. DEBROSSE: I'm sorry. Go ahead. Go ahead, Counsel.

MR. BLISS: Yeah, I think I have the answer. It's okay.

MS. DEBROSSE: Yeah. Object to form.

Q And, Dr. Zoeller, when we talk about areas of uncertainty for your analysis, another area of uncertainty would be -- we kind of touched on this before -- but what happens in vitro might not happen in a living organism?

MS. DEBROSSE: Object to form. Foundation.

A I mean, that's a theoretical. I think that what happens in vitro is an intrinsic property of those chemicals.

Q Right. But that might not lead

to a particular effect in animals, which is why we do animal studies.

A Well, there are ways --

MS. DEBROSSE: Object to form.

A There are ways in which that can occur, but it's pretty specific.

Q Well, we can look at this in more detail later, but many of the studies you cite say, you know, this is an interesting result, but we need to see if this is going to obtain in animals.

MS. DEBROSSE: Object to form.

Q I just want to make sure you're understanding --

A Yeah.

Q -- the point I'm getting. It's -- it's a limitation or an area of uncertainty -- I'm sorry -- of your analysis that, insofar as you're citing in vitro data, that might not translate to the in vivo environment?

MS. DEBROSSE: Object to form. Lacks foundation.

Q You can say that's a -- that is a

Dr. Zoeller

limitation or you don't regard that as any kind of limitation?

You can tell me whatever your opinion is.

MS. DEBROSSE: Same objection.

A It's a theoretical, and it's always possible. And certainly papers that do that kind of work will always couch what they're saying in those kind of terms.

Q And, you know, to your point about it's always important to articulate areas of uncertainty, that's true not just in expert reports, but that's true in scientific literature?

A Yes.

Q And so that's what they're doing.

Would you agree with that, that's --

MS. DEBROSSE: Object to form.

Q -- part of the ethos of scientists?

A Yes.

Q And is it another area of uncertainty that what happens in a

mechanistic study might not lead to an adverse effect at higher levels of cellular complexity or in living organisms?

MS. DEBROSSE: Object to form. Lacks foundation. Compound question.

You may respond.

A So, look, it's very --

Q Again, I don't want to --

A -- very broad.

Q -- look -- no, I -- I don't want to cut you off.

MS. DEBROSSE: I'm sorry.

Q I would -- I just want to focus you on my question.

A Yes.

Q And you can -- you can say to me: No, I don't think that's a limitation.

It's either you say yep, that's a limitation of my analysis -- or I'm sorry. I keep saying limitation -- area of uncertainty.

A Yeah.

Q I want to use your words. Either you regard it as an area of uncertainty or

Dr. Zoeller

you don't. And you don't have -- and so that's my question. I'm asking you to just listen to my question. So --

MS. DEBROSSE: Well, let me get my objection to that on the record.

MR. BLISS: Yeah.

MS. DEBROSSE: Dr. Zoeller is responding to your question. He's not bound to specifically respond to your question in the manner in which you direct him. He has been very forthcoming and he's responding to your questions in the best of his ability. They have been quite broad as well.

So, Dr. Zoeller, to the best of your ability, please answer Counsel's question.

Q Yeah, Dr. Zoeller, do you regard it, yes or no, as an area of uncertainty for your analysis that what happens in a mechanistic study might not lead to an adverse effect at higher levels of biological complexity?

Dr. Zoeller

MS. DEBROSSE: Object to form and same prior objections.

You may answer.

A So in terms of my analysis here, I think -- I guess the way I would phrase it is that there is less uncertainty -- first of all, when you package uncertainty, you have to think also about what you know and what you don't know. There are things we don't know for sure. There are also things that we know and the -- you know, the opinion is based on, certainly, mechanistic evidence that is not uncertain. These are estrogenic chemicals.

Now, from a -- from a plausible point of view, the opinion is based on that. So -- so it's not so theoretical. The uncertainties that I have are less than the certainties that I have. I'll put it that way.

Q Okay. So I did listen very carefully to your answer.

But I understand you to be saying that you do not regard this as an important

Dr. Zoeller

area of uncertainty, given what you just said?

MS. DEBROSSE: Object to form.

A It's not a primary area of -- it's an uncertainty that is not greater than the certainty that I have. The kind of metaphor that I use here is that, you know, a guy drinks a pint of hard liquor and then gets in his car and goes home and later says, you know, I didn't know that pedestrian was going to be standing there.

Well, that's true. He didn't. That's the area of uncertainty. But there's areas of certainty here that, I think, are more important.

Q So your certainty as to this overrides any uncertainty there might be as to whether what happens in a mechanistic study would lead to adverse effects?

A It's more important, yes.

MS. DEBROSSE: Object to form.

That -- that's okay.

Q Is it -- or do you regard it as an area of uncertainty for your analysis

Dr. Zoeller

that what happens in laboratory animals might not happen in humans?

MS. DEBROSSE: Object to form.

A Well, there is actual -- there are -- there are data in humans as well. I didn't really talk about that. The animal studies are -- that I talk about here in terms of estrogenicity are kind of classic test systems.

Q So you don't regard that as an important area of uncertainty.

A It's less important than the areas of --

COURT REPORTER: Excuse me.

Q So if I understand, it isn't --

MS. DEBROSSE: One moment, please.

COURT REPORTER: I sneezed.

MS. DEBROSSE: I have to get the opportunity to get my objection on the record. If you could put my objection --

(Whereupon, the court reporter requested clarification.)

Dr. Zoeller

MS. DEBROSSE: And that's all in the record. So let's try to clean that up.

MR. BLISS: Over a superseding sneeze.

Q So as I understand your testimony, you're telling me that this is an area of uncertainty, but it's outweighed by what you are certain about with respect to the estrogenicity of the chemicals you analyze?

MS. DEBROSSE: Object to form.

You may respond.

A Yes.

MS. DEBROSSE: Counsel, are you at a breaking point?

MR. BLISS: How long have we been going?

MS. DEBROSSE: An hour. I do have to make a call.

MR. BLISS: Okay. No problem.

VIDEOGRAPHER: Stand by. The time is 10:03 a.m. We're off the record.

Dr. Zoeller

(Whereupon, at 10:03 a.m., a recess was taken to 10:09 a.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 10:09 a.m. We're back on the record.

Q Dr. Zoeller, I believe I understand what you have been saying about uncertainties.

But is it fair to say that when you cite, for example, mechanistic data, you are -- in support of your theory, you are extrapolating from that mechanistic data to what happens in humans?

MS. DEBROSSE: Object to form.

You may answer.

A So it's not so much extrapolation as defining the estrogenicity of these chemicals. So the -- I mean, that's -- the goal here is to determine whether or not, you know, my charge was to make an opinion about plausibility and risk. And so I applied what is the information that is available, which is considerable.

Dr. Zoeller

Q And again, as I understand, you're using this available mechanistic and other data to draw conclusions about biological plausibility in humans?

A Yes.

Q Dr. Zoeller, there is -- kind of this point, there is more to the relationship between chemical interference with estrogen action and estrogen-sensitive cancers than just ER-alpha binding?

MS. DEBROSSE: Object to form. Compound.

A Yes.

Q And there is more to the relationship between chemical interference with estrogen action and estrogen-sensitive cancers than stimulation of ER-alpha proliferative signaling?

MS. DEBROSSE: Same objection.

A Yes.

Q I want to go back to one of my questions earlier. Remember the list of do you agree or not agree?

A Uh-huh.

Q I was hunting for an article. I finally found it.

MR. BLISS: So if we could please mark this as the next exhibit in order, Exhibit 3.

MS. DEBROSSE: Thank you.

MS. O'CONNOR: If you have an extra, I'll take that. Thank you.

MR. BLISS: Actually, now, I don't have one.

MS. DEBROSSE: Oh, yeah.

MR. BLISS: Sorry.

MS. DEBROSSE: Fair. We'll share.

MR. BLISS: If you guys share, I would appreciate it.

(Whereupon, an Article from Endocrinology from September 2021 written by Dr. Zoeller was marked as Zoeller Exhibit No. 3 for identification, as of this date.)

Q Dr. Zoeller, you are familiar, I assume, with Exhibit 3?

A Yes.

Dr. Zoeller

Q Because you are the lead author?
A Yes.
Q Remember I asked you whether the Endocrine Society definition of an EDC implied or didn't apply that all chemicals that interfere with any aspect of hormone action are a significant risk to human health?
MS. DEBROSSE: Object to form.
A Yes.
Q And you remember -- I thought you said that they -- that the definition does imply that they are significant risk to human health?
A Yes.
Q And so if you could, please, look at the last sentence -- well, the last two sentences on page -- if you look at the upper right -- 4099.
A Uh-huh.
Q It's the third page of the document.
Do you see it says: An ED, which is an endocrine disruptor --

MS. DEBROSSE: I'm sorry, Counsel, where are you?

MR. BLISS: I'm right here.

MS. DEBROSSE: Okay. Thank you.

MR. BLISS: Right at the bottom of -- I should have said the left column on page 4099.

Q It says: An ED is an exogenous chemical or mixture of chemicals that interferes with any aspect of hormone action.

Do you see that?

And that's what we have been calling the Endocrine Society definition.

A Uh-huh.

Q You see it says --

MS. O'CONNOR: You have to say a word.

A I'm sorry.

(Whereupon, the court reporter requested clarification.)

MR. BLISS: Madam Court Reporter, did you get that?

(Whereupon, the court reporter

Dr. Zoeller
requested clarification.)
A Yes, I'm sorry.
Q Right after that, Dr. Zoeller, it says: It is important to recognize that this definition does not imply that all chemicals that interfere with any aspect of hormone action are a significant risk?
A Yes, I see that.
Q Okay. That seems to me --
A It could mean --
Q -- to be the exact opposite of what you said about half an hour ago. And so I just would like to know what your opinion is.
Is it what you testified to here, or is it what you wrote in this paper on endocrine-disrupting chemicals and public health protection?
MS. DEBROSSE: Object to form.
A So this is a 2012 paper, and between then and now, I would say that my opinion of this is not as it was written here.
Q Okay. So, fair enough.

Dr. Zoeller

So when you wrote this -- in other words, that was not a typo --

A No, no.

Q -- the "not" was meant to be there?

A Yes.

Q But in the intervening years, you have changed your view and now believe that this definition does imply that all chemicals that interfere with any aspect of hormone action are a significant risk to human health?

A So -- so instead of believe, I think the evidence shows that if a chemical interferes with endocrine action, as it's stated here, it's a significant risk.

Q Any level of interference at all?

A Yeah.

Q And is that regardless of exposure or potency?

A Well, interference means that --

Q Actually, let me -- let me tell you why I'm asking it that way. Because this --

Dr. Zoeller

MS. DEBROSSE: And, Counsel, I'm sorry. Can we just let the doctor finish his response but...

MR. BLISS: Well, I'm going to --

MS. O'CONNOR: You have to withdraw the question.

MR. BLISS: -- I'll withdraw the question.

MS. DEBROSSE: Okay. Thank you.

MR. BLISS: I'll withdraw --

MS. O'CONNOR: This should help.

MR. BLISS: -- the question --

MS. DEBROSSE: Thank you, counsel.

MR. BLISS: -- because I think it will be clear.

Q We just read here in the 2012 paper where you say: It's important to recognize that this definition does not imply that all chemicals that interfere with any aspect of hormone action are a significant risk.

And it goes on to say: Risk will

depend on the exposure and the potency of the chemical.

So my question is: Given your now different opinion on this, would you now say that exposure and potency are not relevant?

MS. DEBROSSE: Object to form.

A So the statement starts with: Or mixture of chemicals that interfere with any aspect of hormone action. Well, it can't interfere with hormone action if these other things aren't true.

So if you have a chemical that interferes with, you know, hormone action really at any level because it's -- it's continuous -- that interference is continuous -- you can't have continuous interference with hormone signaling and imagine that it's not going to produce adverse effects.

Q I'm not sure I follow that. Why would you assume --

A It's not an assumption.

Q -- that the interference -- why

would you believe that the interference would be continuous?

I'm not sure I understand that.

MS. DEBROSSE: Object to form.

Q Just for example, if I'm exposed right now to an endocrine-disrupting chemical, why would the interference be continuous and for how long would it continue?

A Yeah --

MS. DEBROSSE: Object to form. Compound.

You may answer.

A -- so chances are good that your blood is, you know, has well over a hundred industrial chemicals. Many -- many of those will be endocrine active, and it's going to be chronic. And that's going to increase the risk for a number of health effects.

Q Right. But this definition is speaking of particular chemicals or mixtures.

A Yeah.

Dr. Zoeller

Q And as I -- I mean, just as I read it, it's saying that just because something interferes -- a particular chemical or chemical mixture, just because it interferes with hormone action doesn't mean that it's necessarily a significant risk to human health?

A Right. And that's what we wrote -- what? -- 14 years or so ago.

Q But I just -- I want to clarify --

A Yeah.

Q -- why I'm asking my question this way.

Because your last answer, you kind of shifted from particular chemicals to just sort of ongoing environmental exposure. And so I want to make sure I understand.

With respect to any particular EDC or mixture of EDCs, is it your opinion today that any interference with hormone action poses a significant risk to human health?

Dr. Zoeller

A Yes.

MS. DEBROSSE: Object to form.

THE WITNESS: Sorry.

MS. DEBROSSE: Was this marked as exhibit?

COURT REPORTER: Three.

MR. BLISS: Yes, three.

I should note that on my copy in case we get back to this.

Q Dr. Zoeller, would you agree that there are enormous discrepancies between the high concentrations of estrogenic EDCs often required to produce effects in laboratory assays and their low levels in human tissues and the environment?

MS. DEBROSSE: Object to form. Compound. Lacks foundation.

You may answer.

A From -- so to clarify, you mean, in kind of testing studies in animals, that the amount of chemicals they use, the dose, is greater than what humans are supposed to?

And that is by design.

Dr. Zoeller

Q Well, I just -- again, listen carefully to my question. And I'm -- you know, this is in some of the -- we -- I'm just trying to -- never mind. Let me start again. Just listen very carefully to my question and just answer it as you see fit.

There are enormous discrepancies between the high concentrations of estrogenic EDCs often required to produce effects in laboratory assays and their low levels in human tissues and the environment?

MS. DEBROSSE: Same objection.

A No.

Can I follow up on that?

That's a very complicated issue. Regulatory agencies require high levels of exposure in their testing. It's called the -- you begin with the maximum tolerated dose. So that's the dose at which --

Q It won't kill the --

A -- the --

Q -- animal?

A -- it won't -- basically -- well,

Dr. Zoeller

they're a little better than that. They -- it's -- won't reduce body weight. And then they have two doses between zero and that maximum tolerated dose. That's mandated. If you think about the CLARITY-BPA study that was a combination of regulators and academic scientists, what we showed was that the level of BPA -- just as an example, not making a thing out of BPA.

But the dose at which BPA caused effects on mammary gland development and brain development were below what people are exposed to. So this concept that, first of all, toxicological studies require a certain amount to look at the insensitive end points, I might add. Uterine weight is not a sensitive end point for estrogenicity, and then the fact that the law requires them to use high doses not doses that humans are exposed to.

Q I understand that, but I don't think you're listening carefully enough to my question.

A Okay.

Dr. Zoeller

Q Because the question talks about doses that are required to produce effects in the assays, whether there's a low dose, a higher, a higher, a higher, a higher, and then only at a certain point do you see the effect.

MS. DEBROSSE: Object to form.

Q So --

A Still the --

Q -- that --

A -- answer is still --

Q But --

A -- no.

Q Okay. Okay. Would you agree that -- well, actually I want to make sure about that.

So you would disagree that there are enormous discrepancies between the high concentrations of estrogenic EDCs often required to produce effects in laboratory assays and their low levels in human tissues in the environment?

MS. DEBROSSE: Object to form. Asked and answered.

Dr. Zoeller

Q It's okay if you disagree. I just want --

A Yeah.

Q -- to make sure.

A I get where the question is coming from. I disagree with the premise.

Q We'll get to it later. I -- this is a statement straight out of the one of the studies you cite, and I'm just trying to see if you share the authors' views. And it sounds like you don't is what I'm getting.

Would you agree that it remains to be seen whether a mixture of estrogenic EDCs could act together impact the actions of endogenous estrogens in a way that is physiologically relevant?

A Yes.

MS. DEBROSSE: Object to form. Compound.

MR. BLISS: Okay. Did you get that?

It was objection, then a yes?

MS. DEBROSSE: Compound. Yes.

Dr. Zoeller

MR. BLISS: Are we good?

COURT REPORTER: Yeah.

MR. BLISS: How do I get this to the -- well --

MS. O'CONNOR: Yeah. I'm having the same problem.

MS. DEBROSSE: You have to pull up --

MS. O'CONNOR: Okay. I'm just --

COURT REPORTER: Go off.

MS. O'CONNOR: So that.

MS. DEBROSSE: Yeah.

MS. O'CONNOR: -- pause it and it goes to the bottom.

COURT REPORTER: If the red play button -- you have to hit it so it's not on play. You keep touching it so it will keep doing it. It will go to the bottom.

MR. BLISS: Where do I find, say, the last question and answer?

COURT REPORTER: Just it's right there. Push it.

MR. BLISS: I see. Okay. I guess it's because it's rough the words are not --

Q Would you agree, Dr. Zoeller, that whether mixture effects will actually occurs in humans is difficult to anticipate without comprehensive information about the levels and the identity of EDCs in the environment and in human tissues?

MS. DEBROSSE: Object to form. Compound. Lacks foundation.

You may answer.

A So I think the question -- well, I'm not sure of the question.

Can you --

Q Yeah. Kortenkamp --

A Yes.

Q -- et al., in their 2007 paper that you cite, state that: Whether mixture effects will actually occur in humans is difficult to anticipate without comprehensive information about the levels and the identity of EDCs in the environment and in human tissues.

Dr. Zoeller

And I just want to know whether you agree with it?

MS. DEBROSSE: And let me get an objection on the record that we don't have the paper in front of us, we don't have the statement in front of us, we don't have the context in front of us.

But you may respond, Tom.

A So what he's saying there is that we're not going to be able to see it scientifically unless we have that. One of -- one of the things that's important here -- and Kortenkamp has published a number of papers in humans now that are important. But the point of that is these mixtures are having an effect, how -- and it's complicated.

So how are we able to see it scientifically?

That is what his statement is. It's we -- it's not that -- it's not that it's not happening. It's that, for us to be able to show it scientifically, we're going

to have to have a certain amount of information first so that we can make predictions and determine whether those predictions are true. But when they show that it is true, it means that it was happening all along.

MR. BLISS: I'll mark the study as an exhibit so we can look at it -- not the study. The paper.

THE WITNESS: Yeah.

(Whereupon, a Andreas Kortenkamp article from December 2007 was marked as Zoeller Exhibit No. 4 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you a paper by -- actually, it's just Kortenkamp, it looks like, published in 2007 titled "Ten Years of Mixing Cocktails; a Review of Combination Effects of Endocrine-disrupting Chemicals"?

A Yes.

Q And this is one of the studies you rely on in your report?

A That I cite, yes.

Dr. Zoeller

Q If you look at page 102?

The third column -- well, the right-hand column toward the top of the page says: Combination effects may result from cumulative exposure to EDs if they are present in sufficiently large numbers at levels equivalent to fractions of their individual NOELs -- which is not observable effect levels. However, whether mixture effects will indeed occur is difficult to anticipate without comprehensive information about the levels and the identity of EDs in the environment and in human tissues.

Do you agree with that statement?

A So --

Q They're talking about what actually occurs.

A I -- I get it.

MS. DEBROSSE: Object to form.

A So the second part of that sentence is -- so this "anticipation of" -- yeah. So, in principle, as a theoretical, that's true. I mean, on the other hand,

Dr. Zoeller

his whole kind of body of work in this area was to try to do two things. One is to show that mixture effects are real but also how to show it. So Andreas is probably one of the key figures who developed this whole field.

So -- so, in his writing, there is always two elements; what's happening -- you know, what's real in the real world, how do we see it, and how do we go about showing it even statistically?

So the methodology -- there was no methodology before he started in the '90s.

Q I understand, but the statement that I'm asking you about talks about whether mixture effects will occur -- whether they will, indeed, occur in humans. And he's saying that that's difficult to determine for all the reasons he talks about.

Do you agree with that statement is --

A Right.

Q -- all I'm asking?

Dr. Zoeller

A Yes.

MS. DEBROSSE: Object to form.

You have got to let me get in there.

MR. BLISS: Okay. You got the objection --

MS. DEBROSSE: Let's --

MR. BLISS: -- and the yes --

THE WITNESS: Boy, it's hard.

MS. DEBROSSE: -- let's -- let's just -- let's just take a beat.

MS. O'CONNOR: You just have to slow down.

MS. DEBROSSE: Just -- yeah. Just let him ask --

MS. O'CONNOR: Just wait.

MS. DEBROSSE: -- the question.

THE WITNESS: I'm holding my watch to try to remind myself.

MS. DEBROSSE: Give me a chance to get in there --

THE WITNESS: Yes.

MS. DEBROSSE: -- okay?

Q Would you agree, Dr. Zoeller,

that, if a chemical or chemical mixture does not cause cancer in humans, it doesn't matter, from a risk assessment perspective, how many potential pathway mechanisms it induces?

MS. DEBROSSE: Object to form. Compound. Lack of foundation.

A That's a -- I'm not sure about that. That's kind of a -- I haven't really thought about it like that.

If it doesn't cause cancer, then what doesn't matter?

Q So a chemical -- a particular chemical or chemical mixture might induce certain molecular events that could potentially be one event along an adverse outcome pathway. But that pathway might not lead all the way to cancer.

And so I'm asking: In that scenario, if the chemical or chemical mixture doesn't actually cause cancer in humans, the fact that it might cause some mechanistic event or some number of them ultimately doesn't matter from a human

health risk assessment standpoint?

MS. DEBROSSE: Object to form. Hypothetical -- incomplete hypothetical. Lacks foundation.

Just go ahead, Tom.

Q Just so you are aware, you're an expert. So I can ask you hypotheticals. It's one of the most fun things about expert depositions. We can talk about hypotheticals.

So do you have the question in mind?

A Yes.

MS. DEBROSSE: Okay.

Q Okay. And what's your answer?

A So a chemical that causes brain damage but not cancer, that fits into your scenario, doesn't it.

Q Yes, it does. I think -- I think so. Thank you for pointing that out. So I'm just, from a -- from a carcinogenicity standpoint, let me ask it that way.

If the question on the table is, does this chemical or mixture cause cancer,

Dr. Zoeller

if it, in fact, doesn't, then from a human health risk assessment standpoint, it ultimately doesn't matter whether it causes or induces certain biochemical or cellular or molecular mechanisms?

MS. DEBROSSE: Same objection.

A So -- so I can't exclude the possibility that it's still having human health effects. It may not cause cancer but it can cause, you know, diabetes or --

Q I'm limiting my question to carcinogenicity.

A Okay. So as long --

MS. DEBROSSE: Same objection?

A -- as it's safe.

MS. DEBROSSE: You have got to let me get in there, Tom.

Same -- just standing objection to the line of questioning.

You can go ahead.

This is a rough one. All right. You have got to give me a second. Go ahead.

A So, if it's safe other than

carcinogenicity but it doesn't cause carcinogenicity, then from a theoretical point of view, it's safe.

Q Well, also from a practical point of view?

A Well, but I can't think --

MS. DEBROSSE: Object to form.

A -- of --

Q It's a -- it's -- I'm asking a abstract question, which I can do, and so -- and I -- and I thank you for pointing out that limitation in my question. So if we confined it to -- well, I could -- yes. Let's stick with my carcinogenicity question.

A Yeah.

Q If a chemical or a mixture does not cause cancer, it just doesn't, then from a human health risk assessment standpoint, it doesn't matter that it causes or induces certain mechanisms --

MS. DEBROSSE: Same objection.

Q -- that might theoretically --

A Cause brain damage.

Dr. Zoeller

Q -- to be -- no, no. I'm just -- don't fight the hypothetical. I'm on carcinogenicity here.

MS. DEBROSSE: And I just have a standing objection --

MR. BLISS: Yeah. I understand.

MS. DEBROSSE: -- to that question.

But go ahead.

A So if it doesn't cause cancer, then it doesn't cause cancer. That's --

Q Fair enough. Well, I guess I could ask that the question is to just adverse health effects in general.

If a -- if a chemical or chemical mixture doesn't cause adverse health effects of any sort in humans, then from a risk assessment standpoint, it doesn't matter that it might induce certain molecular, cellular, or biochemical mechanisms that could --

A If --

Q -- be, theoretically --

MS. DEBROSSE: Object to form.

Dr. Zoeller

Q -- the events on a adverse outcome pathway?

A So I -- I'm still -- I get tangled up in, if it -- if it doesn't cause cancer and it doesn't cause other health effects, then it's okay. Then to superimpose on that the idea that it's affecting molecular-initiating events within the context of an AOP, for example let's say neurotoxicity. From a risk assessment point of view -- and that's a very practical and kind of formulaic thing -- there are people who would ignore that.

I don't think everybody would. I don't think all risk assessment agencies -- I don't think ECHO would necessarily ignore that. So...

Q I don't think my question really gets into whether anything would be ignored, but let's keep going.

A Okay.

Q Let's talk about your overall conclusion.

Dr. Zoeller

On paragraph -- excuse me -- page 4 of your report -- and you were alluding to this earlier -- you write --

MS. DEBROSSE: One moment, counsel. We just have got to get back to that exhibit.

MR. BLISS: Yeah. No problem.

MS. DEBROSSE: One second.

Q Page 4, second paragraph.

Are you with me?

A Yes.

Q You write: My -- I'm going to change the wording a little bit so that it is grammatical in the context of my question.

My conclusion is that it is not only plausible but likely that chemical hair relaxer use is causally associated with uterine and ovarian cancer in the human population.

Do you see that?

A Yes.

Q So are you offering an opinion on general causation as opposed to just

biological plausibility?

A Yes.

Q On page 5 of your report, the last sentence you write: Taken as a whole, it is my opinion, to a reasonable degree of scientific certainty, that the weight of evidence supports the conclusion that hair relaxer use is causally associated with uterine and ovarian cancer in the human population.

Do you see that?

A Yeah.

Q So, again, at least -- it sounds to me like you're going beyond just the question that was presented to you about biological plausibility and are going farther to issue a -- or to offer an opinion on general causation.

A Is that not the same.

Q I don't think so.

A No.

Q But you can tell me if you disagree.

A So --

Dr. Zoeller

Q So it would be one thing to opine that assuming a true association between the use of these products and uterine and ovarian cancer, there are biologically plausible mechanisms by which that association could be causal. That could be one scope of opinion just on biological plausibility.

It's one part of the Bradford Hill criteria, right?

MS. DEBROSSE: Object to form.

Go ahead.

A Yes.

Q It would be a broader opinion to opine that exposure to hair relaxer products causes these cancers.

A So, in the first part of that, the context was, you know, if the human evidence is not firm.

So, basically, what I'm proposing here is that, given strong signals in epidemiological studies, given the well-known and accepted method or mechanism of pathogenesis of uterine and ovarian cancer,

Dr. Zoeller

is it plausible that the combination of chemicals in hair relaxers increases the risk?

And my conclusion is that that is not only plausible, but likely.

Q So, again, just to be clear, you are opining that it is not only plausible but likely that use of chemical hair relaxer products is causally associated with uterine and ovarian cancer?

A Yes.

Q On page 43, the last page you write: The weight of evidence reviewed in this report supports my opinion to a reasonable degree of scientific certainty that multiple biologically plausible mechanisms exist to explain the elevated risks of uterine and ovarian cancer with exposure to chemical hair relaxers as reported in the three large prospective studies I have discussed above.

Do you see that?

A Yes.

Q What do you mean by "the weight

of evidence?"
I'm not asking you to go through the weight of evidence but just what you mean by the concept of "weight of evidence" as you use it in your report.
A So the evidence is broad, and there is kind of multiple streams of evidence. And you weigh the -- those elements where you, you know -- where you focus on what you know, consider what you don't know. I mean, that's kind of a broad -- I am sure there is a definition in -- the EPA has for a weight of evidence analysis.
Q Right. And I was going to ask: Do you believe that you had performed what other scientists or the EPA would recognize as a proper weight of evidence analysis?
A I haven't articulated in that context or in that formulaic approach, but it could be done.
Q I understand, but you have not done that in your report?
A I haven't kept frack of the

Dr. Zoeller

different categories.

Q When you say that the weight of evidence, as you see it, supports your overall opinion, what do you mean by "supports"?

A So -- so, in fact, in the -- in the Chang paper -- Chan paper.

Q Chang.

A Chang. They articulate how they think or what the evidence is that can lead from exposures to these cancers. When I've -- when I looked at the literature for that, there was a lot of confirmation that is generally accepted that excess estrogen plays a role in the development of uterine and ovarian cancer.

So when I'm talking about support, the evidence that -- that I came across in a -- in a broad way because I, you know, this was, you know, I haven't worked on these cancers, but I have decades of experience with endocrine mechanisms. All of those data supported that pathway.

Q Right. You identify four streams

Dr. Zoeller

of evidence that you see as supporting your conclusion. The first stream, you say, is the relevant hair relaxer epidemiology literature?

A Yes.

Q The second stream is mechanistic evidence of uterine and ovarian cancer pathogenesis?

A Yes.

Q The third stream is chemical analysis of hair relaxers that identify chemical constituents?

A Yes.

Q And the fourth is mixture toxicology studies?

A Yes.

Q Is it your understanding, Dr. Zoeller, that epidemiology studies are evidence of biological plausibility?

A There -- so epidemiology is just an observation. So it is not just an observation. This was, you know, these are 11-year-and-more studies. So they're not just, you know, a one-off experiment. What

Dr. Zoeller

they're -- what they're looking for is a signal.

Q Yeah, Dr. Zoeller, I don't -- I don't mean to interrupt, but it's just -- my question -- if you listen, please, carefully to my question.

You are opining on biological plausibility?

A Yes.

Q And I'm asking whether it's your understanding that epidemiology studies serve as evidence of biological plausibility?

A Yeah, I wouldn't put it that way.

Q How would you put it?

A I would -- I would say that it's looking for an association. So there -- there are mechanistic epidemiological studies, GWAS, for example, that can -- that can look at mechanisms and plausible mechanisms and identify new pathways, but that's not what this was. This was: Is there an association between chemical hair relaxer use and outcome of interest?

Dr. Zoeller

Q So if I understand, epidemiology data are not evidence of biological plausibility. Rather, evidence of biological plausibility is what scientists look for as part of a causation analysis when epidemiology data has observed an association?

MS. DEBROSSE: Object to form. Mischaracterizes the witness's testimony.

You may respond.

A Yeah.

Q You say on page 11 of your report -- it's the sentence in bold.

MS. O'CONNOR: I'm sorry. Where are we?

MR. BLISS: Page 11.

MS. O'CONNOR: Okay.

MR. BLISS: There is a sentence in bold.

Q Are you there Dr. Zoeller --

A Yes.

Q -- Zoeller? I'm sorry.

A Yes.

Dr. Zoeller

MS. DEBROSSE: Uh-huh.

Q It says: The fact is that chemical hair relaxers, slash -- let me start again.

The fact is that chemical hair straighteners, slash, relaxers are toxic combinations of estrogenic, endocrine-disrupting chemicals and carcinogens.

Do you see that?

A Yes.

Q By "toxic" in that sentence, you mean that chemical hair straighteners, slash, relaxers cause uterine and ovarian cancer?

A Well, I mean just what it says. First of all, they're incredibly caustic. You wouldn't want to drink it. So it's toxic. It's a combination of estrogenic chemicals. And the Helm report identified using sophisticated techniques a large number of estrogenic chemicals as well as carcinogens. So -- so the statement kind of stands on its own.

Dr. Zoeller

Q Well, I think it needs to be clarified, at least from my perspective. So if you could please just listen carefully to my question.

By "toxic" in that statement, do you mean, among other things, that chemical hair straighteners, slash, relaxers cause uterine and ovarian cancer?

MS. DEBROSSE: Object to form. Asked and answered.

A So this was a conclusion based on the paragraphs before interpreting these core studies. So it's an empirical statement. It wasn't intended -- that statement alone wasn't intended to imply anything. It was -- it just -- it...

Q Let me ask it a different. Maybe this will help. Because you say the fact is dot dot dot.

Do you regard as scientifically established fact that chemical hair straighteners, slash, relaxers cause uterine and ovarian cancer?

MS. DEBROSSE: Object to form.

Dr. Zoeller

A So I think the fact is it's a toxic product. You wouldn't drink it.

Q So by --

A In that, it has a combine of estrogenic chemicals and carcinogens. That statement --

Q So just to be clear, you're not -- when you say "the fact is," you're not opining that it's a scientifically established fact that chemical hair straighteners, slash, relaxers cause uterine and ovarian cancer?

A That state --

MS. DEBROSSE: One moment. Object to form. Asked and answered.

And, Counsel, if you could just let Dr. Zoeller just complete his responses.

You may answer, Tom.

A That statement isn't saying that.

Q But would you make the same statement -- I take it you would -- about any consumer product that contained any amount of EDCs and carcinogens?

MS. DEBROSSE: Object to form.

A Well, I would have to look at those.

Q But if I understand your statement correctly, you're saying that chemical hair straighteners, slash, relaxers are toxic because they contain estrogenic endocrine-disrupting chemicals and carcinogens. It seems to follow from that statement that you would say the same about any shampoo or conditioner or food product or anything that contain some amount of estrogenic EDCs and carcinogens?

MS. DEBROSSE: Object to form. Mischaracterizes his prior testimony. Mischaracterize the report.

You may respond, Tom.

A So chemical relaxers are, first of all, toxic. They have a pH of 11 to 13 or 14. And it's not just the pH. It's the ionic strength. They're caustic. They cause burn. That's different from a shampoo that's buffered, et cetera, et cetera. And I would have to look at

other products kind of in its totality. The point here is to make a state -- to make just an empirical statement about -- that follows from the discussion above.

Q But do I understand your view correctly that any consumer product, personal care product, or otherwise that exposes the user to any level of EDCs and carcinogens is toxic?

MS. DEBROSSE: Object to form. Mischaracterizes Dr. Zoeller's prior testimony. Mischaracterizes his opinions and the report.

You may answer, Tom.

A So I wouldn't put it that way. So I would say that -- that any consumer products that carry these chemicals will cause a risk, maybe not of uterine cancer, but of many other things. So estrogenic chemicals, there are chemicals that affect the androgen system. There are chemicals that affect, you know, metabolism. So any of these consumer products will elevate the risk.

Dr. Zoeller

But it's very different to talk about a product that has the kind of chemical characteristics that have to be exigent to straighten hair.

Q I just want to make sure you understand something, and you may. So don't -- I don't want you to take offense --

A It's all right.

Q -- to me asking the question.

Do you understand that the chemicals that you're concerned about in your report are not, at least by and large, in the component of the hair relaxer product that straightens the hair; that it's in the shampoos and conditioners --

MS. DEBROSSE: Objection --

Q -- and other components of the kit? Are you aware of that?

MS. DEBROSSE: Object to form. Foundation.

A So if people use it as instructed, it's the whole thing. I mean, it's a -- you have to think about the kit,

not just one component.

Q I understand. I was just asking whether if you understand that the chemicals that you talk about in your report aren't in the relaxer cream?

A They're all in the kit.

MS. DEBROSSE: Tom, please.

Q Okay.

MS. DEBROSSE: Object to form. Asked and answered.

Q So was that such a funny question?

I don't know.

A No. I just --

Q We're talking about the --

A -- I'm just so reflexive.

MS. DEBROSSE: Yeah. I think that's why we're having issues with the timing. So that's all.

MR. BLISS: Yeah, okay. Let's see if we can do better.

Q You saw on page 11 of your report, I think first sentence of the last paragraph, under Section 4.3, that after

reviewing the relevant -- after reviewing the relevant epidemiology literature --

MS. DEBROSSE: Counsel, and I'm sorry to disturb you. But where are you? And my apologies.

MR. BLISS: No problem. I'm sorry. Just press ahead. Page 11 --

MS. DEBROSSE: Uh-huh.

MR. BLISS: -- if my notes are correct, first sentence of the last paragraph under Section 4.3.

MS. DEBROSSE: Okay.

Q And that comes after your review of the epidemiology literature.

And so after reviewing the relevant epidemiology literature, you write that, quote, There are several periods of research that are important in understanding how these products cause cancer.

Do you see that?

A Yes.

Q Are you assuming that the epidemiology literature establishes that

Dr. Zoeller

these products cause cancer?

MS. DEBROSSE: Object to form.

A I'm not assuming that.

Q Are you opining in this litigation that the epidemiology papers you review in your report establish a causal association between chemical hair relaxer use and uterine and ovarian cancer?

MS. DEBROSSE: Object to form.

A My opinion is that those epidemiological studies demonstrate association.

Q Not in the causal sense but in the statistical sense?

MS. DEBROSSE: Object to form.

A Well, so in the sense that epidemiology can inform us about relationships between exposure and outcome.

Q That's what I mean by a "statistical association." I'm just trying to understand whether you are taking the position that the epidemiology papers, Chang, Bertrand, and White establish a causal association between hair relaxer use

and ovarian and uterine cancer?

A I'm not saying that.

Q Are you saying that those papers establish a true statistical association not resulting from chance, bias, or confounding?

A Yes.

Q At this point, there are two relevant epidemiology papers relating to uterine cancer, Chang et al., 2022, and Bertrand et al., 2024; is that right?

MS. DEBROSSE: Object to form.

A Yes.

MR. BLISS: If we can please mark this as next in order.

(Whereupon, a Che-Jung Chang article from August 2022 was marked as Zoeller Exhibit No. 5 for identification, as of this date.)

Q Dr. Zoeller, do you recognize Exhibit 4 [sic] as the Chang paper?

A Yes.

Q The Chang paper that you discuss in your report?

Dr. Zoeller

A Yes.

Q When did you first read this paper?

Let me just ask: After you were contacted by Fu?

A Yes.

Q Is it your understanding, Dr. Zoeller, that a single epidemiology paper is generally sufficient to establish a true association between an exposure and an adverse health effect?

A It can.

Q When has it, in your view?

MS. DEBROSSE: Object to form.

A Well, I think -- so an epidemiology study that is ecological would not -- would not fit that category for cohort studies. You know, the C8 studies on PFAS, for example, I think are a good example of how, in fact, it's still today the only cohort study. So a cohort study like this that was 10 or 11 years long is significantly different from a case control or ecological study.

Dr. Zoeller

Q Okay. So let me restate my question: Is it your understanding that a single perspective cohort study is generally sufficient to establish a true association between an exposure and an adverse health effect?

A It can.

MS. DEBROSSE: Object to form.

Q You don't think consistent results across a number of studies are required.

MS. DEBROSSE: Object -- pardon. Object to form.

A So when you have a cohort study that goes for 11 years, they're enormously expensive. You are not going to get that. You would have to wait for, I mean, decades.

Q Okay. No, I understand the practicalities. But I'm just asking, and I think you've answered, but you can clarify.

You do not think that consistent results across a number of studies are required to establish a true association

Dr. Zoeller

from an epidemiological standpoint?

MS. DEBROSSE: Object to form.

Asked and answered multiple times.

Tom, you may respond.

A It's kind of a different question.

Q Okay. How would you answer that question?

A I think that, if there were ten studies on this that took, you know~-- what?~-- 50 years, sure, that would be more significant. I think that, when you have a ten-year study like this, a cohort study well designed well performed funded at levels that we are not seeing today, I think that it's sufficient.

Q Are you aware, Dr. Zoeller, that the Sister Study cohort was not designed to investigate whether chemical hair relaxers caused uterine or ovarian cancer?

MS. DEBROSSE: Object to form.

Go ahead.

A Yes.

Q And you are aware that the

Dr. Zoeller

exposure assessment was not chemical hair relaxers but relaxers, straighteners, and pressing products?
A Yes.
Q Would you agree that it's important, when evaluating epidemiology data, to consider any significant limitations or weaknesses in the study's design or methodology?
A Yes.
Q Is it your view, Dr. Zoeller, that the Chang paper alone established a true association -- not causal, but just a statistical -- a true statistical association between chemical hair relaxer use and uterine cancer?
A It's not -- it's not the only paper I looked at.
Q Yeah. I understand. We had Bertrand, which came a couple of years later.
I'm just asking: Is it your view that Chang was enough to answer this question about whether there is a true

Dr. Zoeller

statistical association?

Had Chang study kind of settled that one?

A I -- and that's --

MS. DEBROSSE: Object to form.

You can answer.

A -- that's not what I was -- that's not what I -- that's not the evidence that I used to come to that conclusion.

So it's hard for me to say, if there was nothing else in the literature, would that have been sufficient?

Q That's what I'm asking.

If we didn't have Bertrand, we only had Chang, would you say that was enough?

A Or White or Bailey.

Q But right now, I'm just talking about uterine cancer, so let's --

A Right.

Q -- stick with that.

A But we're talking --

MS. DEBROSSE: Object to form.

Dr. Zoeller

Give me a change to get in there.

THE WITNESS: Okay.

MS. DEBROSSE: Did --

Q So --

MR. BLISS: Yes.

Q -- so just focusing on uterine cancer, if all we had was Chang, would that have been enough?

A I -- it's a theoretical question that I don't think I can answer. I really -- I wasn't --

Q Well --

A -- exposed to that.

Q -- but reading the literature now, would you say that the Chang study alone was sufficient to establish true statistical association --

MS. DEBROSSE: Object --

Q -- of uterine cancer?

MS. DEBROSSE: -- object to form. Asked and answered.

A That's -- but the way I'm hearing that is: Knowing what I know today, would

Dr. Zoeller

it have been sufficient for me to pay attention to the first epidemiological study that showed a link between cigarettes and cancer?

You know, sure, but that's a theoretical construct.

Q I'm asking whether you -- of course you're going to pay attention to it. I'm just asking -- and maybe you can't answer, which is fine.

But in your view, did the Chang study in and of itself answer the question of whether there is a true statistical association between straightener, relaxer, and pressing product use and uterine cancer?

MS. DEBROSSE: Object to form. Asked and answered many times.

A I'd have to think about that.

Q By the way, have you had any direct or indirect communication with any of the authors of the Chang paper or the Bertrand paper?

A No.

Dr. Zoeller

Q Chang, et al., don't characterize their findings -- well, let me ask another question.

As between you and the epidemiologists who authored the Chang and Bertrand papers, who do you think is more qualified to interpret their findings?

A Sure. Let's say they are -- let's stick with Chang right now -- findings as strong evidence of an association between relaxer, straightener, and pressing product use in uterine cancer. They say -- or they characterize their findings as "novel."

Do you recall that?

MS. DEBROSSE: Object to form.

Q Do you recall that Chang, et al., characterized their findings as "novel" and the "first epidemiological evidence of its kind"?

MS. DEBROSSE: Object to form.

A Where is that?

I don't remember that word but...

Q Take a look at the abstract, the

conclusion towards the bottom of the abstract.

These findings are the first epidemiologic evidence of an association between using straightening products and uterine cancer.

A Okay.

Q Do you see that?

A Yes.

Q And, if you look at the conclusion?

Where is it?

Do you see, in the second sentence, they refer to their findings as "novel"?

A Right here?

Q If you look on page 1642?

The last paragraph on that page reads: In this large perspective cohort study, we observe that straightening product use was positively associated with uterine cancer. More research is warranted to confirm our novel findings in different populations, particularly in African

Dr. Zoeller

American and/or Black women because of the high prevalence of straightener use?

A Yes.

MS. DEBROSSE: Well -- and let me get in there. Object to form.

Counsel, I believe it is in the discussion section, not the conclusion section.

You may respond.

Q Oh, you know what, I don't think there is actually a section entitled "conclusion." It's right at the end of the discussion section. It's what I'm calling their conclusion. But I think we're in the same place right now.

MS. DEBROSSE: Object to form.

Q So just sticking with that -- well, let's finish reading to the end of the paper, and then I will have some questions.

They go on to say -- well -- More research is warranted to confirm our novel findings in different populations, particularly in African American and/or

Dr. Zoeller

Black women, because of the high prevalence of straightener use and to evaluate the potential contribution of hair products to health disparities in uterine dancer. Future efforts are also needed to identify the chemical ingredients which might result in the elevated rates. Given the widespread use of hair products and the rising incidence of uterine cancer, our findings, which identify hair straightener use as a potential target for intervention, are particularly relevant for public health approaches to reduce uterine cancer incidence.

Do you see that?

A Yeah.

Q So the authors say that they're findings need to be confirmed, true?

A They say confirmed in other populations.

Q Particularly Black and African American women?

A That's what they say.

Q And they say that because

Dr. Zoeller

chemical hair relaxers of the type that we're talking about in this case, hydroxide-based relaxers, are used predominantly by Black and African American women.

You are --

A Yeah.

Q -- aware of that?

A Yes.

Q And they say that their products -- I'm sorry.

They say that: Hair products quote/unquote potentially contribute to health disparities in uterine cancer.

Do you see that?

A Yes.

Q And they talk about needing to identify chemical ingredients that quote/unquote might result in elevated uterine cancer rates.

Do you see that?

A Yes.

Q And you saw that when you read this study in preparing your report?

Dr. Zoeller

A Yes.

Q And the authors make no claims of causation?

MS. DEBROSSE: Object to form.

A They don't and they wouldn't.

Q Well, let's see what the Bertrand authors had to say, so let me find that one.

MS. DEBROSSE: Danielle, what exhibit is this one?

I just want to keep track.

COURT REPORTER: Which one? This one?

MS. DEBROSSE: The Chang one.

COURT REPORTER: Five.

MS. DEBROSSE: Okay. Thank you.

(Whereupon, the Kimberly A. Bertrand article from September 2023 was marked as Zoeller Exhibit No. 6 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you the Bertrand study that you talk about in your report?

A Yes.

Dr. Zoeller

Q In the abstract, Bertrand, et al., write: Chemical hair relaxers, use of which is highly prevalent among Black women in the U.S., have been inconsistently linked to risk of estrogen-dependent cancers such as breast cancer and other reproductive health conditions. Whether hair relaxer use increases risk of uterine cancer is unknown.

Do you see that?

A Yes.

Q Do you --

A I do.

Q -- agree with the Bertrand authors, who share their view that, as of the time they were writing their paper -- or publishing their paper in 2024, that whether hair relaxer use increases risk of uterine cancer is unknown?

MS. DEBROSSE: Object to form. Mischaracterizes the document.

You may answer.

A So, as long as they didn't have Chang, that would be true and I would agree

Dr. Zoeller

with it because there was no evidence.

Q Well, Bertrand was published after Chang.

A Yeah. Well, there is a year, so it probably took~-- what?~-- six months or more for this paper to be published?

Q Well, they talk all about Chang. So let's --

A Oh, okay.

Q -- let's look at that.

A And --

Q Bertrand, et al., then point out that all participants in the Sister Study -- we're talking now about Chang -- had a family history of breast cancer, thus they represent a high-risk population for breast cancer and possibly other hormonally-related cancers as well.

And the point there is that a Sister Study results, as reported by Chang, et al., may not be generalizable to women not in that possibly high-risk population.

Do you agree with that?

MS. DEBROSSE: Object to form.

Dr. Zoeller

A It -- theoretical meaning --

MS. DEBROSSE: I'm on -- where is --

A -- it may be -- there's no -- I don't think there is any evidence between the -- you know, the participants of the Sister Study and uterine cancer. So that's a -- that's speculation.

Q Well, all I'm asking you about right now is whether --

MS. DEBROSSE: No. Wait a minute.

Counsel, where were you reading from?

MR. BLISS: Page 5.

MS. DEBROSSE: What paragraph?

MR. BLISS: Starting with the third paragraph -- second full paragraph on the page.

MS. DEBROSSE: Okay. Can you begin that -- I'm on page 5. Let's see.

What are the beginning two words?

MR. BLISS: Yeah. Let me see where my quote picks up. We can just start from the -- the top of that paragraph, so you have the full context.

Q They write: To our knowledge, the NIEHS Sister Study is the only study to have published on hair relaxer use and uterine cancer risk. Consistent with our findings, Chang, et al., reported positive associations with frequent use of hair relaxers in relation to uterine cancer among post-menopausal women. There are, however, some important differences between the two studies. First, all participants in the Sister Study had a family history of breast cancer, thus they represent a high-risk population for breast cancer and possibly other hormonally-related cancers as well. This was not the case, obviously, in the Black women's health study.

Do you see that?

A Yes.

Q And all I'm asking you is whether

Dr. Zoeller

you agree that Bertrand, et al., are pointing to this as a limitation of the Chang paper?

MS. DEBROSSE: Object to form.

A It's a possible limitation.

Q A possible limitation on the generalized ability of the findings reported by Chang?

A Possible.

Q They also point out: They -- being Bertrand, et al. -- that the Sister Study queried use of hair products in the year prior to study enrollment whereas the Black women's health study queried lifetime use of hair relaxers as of 1997.

Do you see that?

A Yes.

Q And that's also a limitation of the Chang study.

Would you agree with that?

MS. DEBROSSE: Object to form.

Q You would agree that's why Bertrand, et al., are pointing this out?

A Sure.

MS. DEBROSSE: Object to form.

A So the -- yeah. So they point it out.

Q They also point out -- This is in the same paragraph, if you look toward the end here, this sentence beginning "finally," Fu?

MS. O'CONNOR: Okay. Finally.

MS. DEBROSSE: Yes. Thank you.

MR. BLISS: Okay.

MS. O'CONNOR: Tom?

MS. DEBROSSE: Are you there, Tom?

THE WITNESS: Yeah.

Q Finally, while the Sister Study reported a significant positive association for frequent use of hair relaxers and uterine cancers overall, the association was most apparent for non-Hispanic white women. The estimate for the small number of Black women, N equal 17 exposed cases pre- and post-menopausal women combined, was elevated but not statistical significantly.

Dr. Zoeller

Do you see that?
A Yes.
Q So Bertrand, et al., are pointing out that, in Chang, there is no statistically significant association --
MS. DEBROSSE: Object to form.
A To Black women.
MS. DEBROSSE: Object to form --
MS. O'CONNOR: That's why you have to wait.
MS. DEBROSSE: -- of --
MS. O'CONNOR: That's why you have to wait.
MS. DEBROSSE: -- misrepresentation of the document. Misrepresentation of the study.
You may respond.
A So I don't think that's what they were saying, and I don't think that's what Chang, et al., found. One of the --
Q Well, let's break it down.
MS. DEBROSSE: Counsel, please, please let him complete his response.
A Well --

Dr. Zoeller

Q Go ahead, Dr. Zoeller.

A So, in both of these cases, they're large studies. There's going to be a lot of signals, and they run through their analysis kind of like a program to say that -- that somehow -- you know, they -- in Chang, they divide it among different ethnicities, and as a result of that, they get fewer and fewer participants whenever you start to kind of separate things. So the fact that you lose power necessarily will show that you have, you know, less statistical ability to seize statistical significance.

The idea that a positive HR that crosses 1 is not interpretable within the context of the whole study, I think, is wrong. So -- so there is -- there is a -- first of all, epidemiologic -- epidemiologists almost always will go through, as a -- as a formula, what the strengths and weaknesses are. And they will pick out weaknesses because the biggest insult that somebody could make is that

they're over-interpreting their data.

So those are standard statements. The fact is that what -- well, there's two things. What Chang showed was a significant positive signal, and they -- they don't -- they don't -- Chang doesn't project the concept that this could be erroneous. And what Bertrand is doing is also showing a significant positive signal, but it's complicated as in people are complicated.

Q Well, can you agree with me, Dr. Zoeller, that Bertrand, et al., are pointing this out as a potential methodological limitation or weakness of the Chang paper?

MS. DEBROSSE: Object to form.

A No.

Q But you do agree, or as you explained a second ago, there were a small number of Black women among the exposed cases pre- and post-menopausal?

A 4,000 or so.

Q I think it says 17?

A Oh, cases.

Q Cases --

A That's true.

Q -- exposed cases.

A Right. But the participants were obviously...

Q Understood.

MS. O'CONNOR: Mine keeps stopping.

COURT REPORTER: You have -- you have to hit the -- is the red -- is play highlighted red?

MS. O'CONNOR: Okay.

COURT REPORTER: You have to hit --

Q So am I right --

MR. BLISS: Oh, sorry.

COURT REPORTER: You have to hit it, and then it will scroll.

MS. O'CONNOR: Okay.

Q So Bertrand, et al., reported a statistically significant finding only for heavy use by post-menopausal women?

A Correct.

Q And the confidence interval was

1.01 to 2.64?

A Where is this?

Q If you look at the abstract, I think it reports that.

It does. You can take my word for it. Lower down, 1.01.

MS. DEBROSSE: Object to form.

MS. O'CONNOR: Come on.

MS. DEBROSSE: Please, give the witness a moment to look at the study.

MS. O'CONNOR: Don't do that.

MS. DEBROSSE: It's not a memory test.

A Okay. Yes.

Q And am I right that if the lower bound of the confidence interval was just 0.01 lower, the results even for post-menopausal women would not have been statistically significant?

MS. DEBROSSE: Object to form.

A At a 0.05, yes, but I have to say, this kind of focus on statistical significance in the context of a number of

Dr. Zoeller

these hazard ratios that -- that are all positive, I mean epidemiologists will say that we shouldn't just look at statistical significance as a binary thing.

Certainly, the fact that it's not statistically significant doesn't mean that there is a lack of evidence or evidence for the lack of effect.

Q Well, let's look at how Bertrand, et al. characterized their findings. If you look at the concluding paragraph, which is on pages 5 and 6.

They write: Results of these analyses suggest that moderate and heavy use of chemical hair relaxers may increase risk of uterine cancer among post-menopausal Black women.

These products are widely marketed to and commonly used by Black women. Our findings highlight the importance of continued research regarding potential adverse health effects of exposure to chemical hair relaxers and their constituents. Uterine cancer

mortality rates are substantially higher for Black women compared to non-Hispanic white women, and there are few established modifiable risk factors for uterine cancer.

If the present results are confirmed, efforts to reduce exposure to these potentially harmful products such as by identifying safer alternatives to straightening hair, stricter regulation of cosmetic protects, and policies prohibiting discrimination against natural hair, e.g., the CROWN Act, could represent important steps toward reducing racial disparities in this cancer type.

Do you see that?

A Yes.

Q So Bertrand, et al., seem to be interpreting their findings quite cautiously using words like "suggest," "may," "if," "could," only if confirmed, and only with respect to postmenopausal Black women.

MS. DEBROSSE: Object to --

Q Would you agree with that?

MS. DEBROSSE: -- object to form.

A They are being cautious.

Q And is it fair to say that you're interpreting their findings and the findings of Chang much more broadly and aggressively than the authors?

MS. DEBROSSE: Object to form.

Q So let me -- let me actually ask a narrower question.

MS. O'CONNOR: Are you withdrawing that last question?

MR. BLISS: Yes. Withdrawing the question.

MS. O'CONNOR: Good.

Q Your opinion regarding these epidemiology papers doesn't, as far as I can see, distinguish between postmenopausal women and premenopausal women?

A Well, premenopausal women --

MS. O'CONNOR: It's not a question.

MS. DEBROSSE: Yeah, just let me get in there. Okay. Object to form.

You may respond.

A Premenopausal women will become postmenopausal if they're lucky. So this concept that we have to discriminate, that we have to kind of view this population study like it's a static thing, I think, is incorrect.

Q Fair enough.

But I think as we've just seen, Bertrand, et al. are only talking about what might be the case, what's suggested, so forth and so on, with respect to postmenopausal women.

MS. DEBROSSE: Object.

Q They're not really making anything of their finding with respect to premenopausal women.

MS. DEBROSSE: Objection --

Q And so I'm asking whether, in your opinion, about the strength of this evidence that you're saying it's for both premenopausal and postmenopausal women from your standpoint?

MS. DEBROSSE: Object to form.

Dr. Zoeller

A Well, yeah, so it's a continuum. They didn't take, you know, it's like cigarette smoke. If you, you know, people that smoke cigarettes and get cancer are mostly older. It took a while to get there. I don't -- I think what they're doing in the way I interpreted this was that they're sticking with their data. They have done the kind of formal analysis. They've done their subdivisions, secondary analyses, and that's what they're talking about. I also -- I mean, their language of uncertainty, I think, is uncalled for, in my opinion.

Q Fair enough.

A And they certainly don't claim to have settled the question of whether hair relaxer use is associated causally or otherwise with uterine cancer --

MS. DEBROSSE: Object to --

Q -- even with respect to postmenopausal?

MS. DEBROSSE: Object to form.

A They don't say that.

Dr. Zoeller

MR. BLISS: Let's mark this as the next exhibit. Seven?

MS. O'CONNOR: Yes, thank you.

MS. DEBROSSE: And just a heads-up, lunch will be here in 15 minutes.

MR. BLISS: Okay. Let's see if we can get through this epideiology section.

I'm sorry. What exhibit are we on? Seven?

(Whereupon, a Alexandra J. White article from June 2021 was marked as Zoeller Exhibit No. 7 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you the paper by White, et al.?

A Yes.

Q And sort of like Chang if -- well, let's look at the concluding paragraph on page 1195, starting with: In this large U.S. prospective cohort.

It says in this large U.S. prospective cohort --

MR. BLISS: I'm sorry. Fu, you there?

MS. DEBROSSE: Yes, we are.

MR. BLISS: Okay.

MS. DEBROSSE: Are you there, Tom?

THE WITNESS: Yes.

MS. DEBROSSE: Okay.

Q In this large U.S. prospective cohort, we provide the first evidence of a possible relationship between frequent adult use of straighteners, slash, relaxers or pressing products and ovarian cancer risk.

In addition, we observe that permanent hair dye use may be associated with ovarian cancer risk differentially by histological type.

Given the novelty of these findings, more research is needed to confirm our results and identify constituents of these products that may be driving risk. Also, it is particularly important for future studies to be

Dr. Zoeller

conducted in racially, slash, ethnically diverse populations and inclusive of a wider variety of hair care products to help us better understand their role in determining ovarian cancer risk among U.S. women.

Do you see that?

A Yes.

Q So as with Chang, et al. and Bertrand, et al., White, et al., don't claim to have settled the question of whether relaxers, straighteners, and pressing products are truly associated with ovarian cancer?

MS. DEBROSSE: Object to form.

A They don't say that.

Q And they certainly don't claim to establish a causal relationship between the use of relaxers, straighteners, and pressing products in ovarian cancer risk?

MS. DEBROSSE: Object to form.

You may answer.

A They don't say that.

Q They say, much like Chang, et

al., that their results are the first evidence of a possible relationship that needs to be confirmed in other studies?

MS. DEBROSSE: Object to form.

A They say that, but I have to say that the people that I have worked, I have tried to argue against this kind of -- this language of uncertainty that's ambiguous. What they found, they can stand on, and they can make a very confident statement about the relationships that they identified. When they say "possible" or whatever, they're talking about a more theoretical issue.

Q Aren't they talking about the limitations of their methodology?

A No.

MS. DEBROSSE: Object to form. Misrepresents the documents.

A Yeah, they're -- what -- when they use the word "possible relationship," they're not talking about their data. And that's one of the things that I've argued on the papers that I have been on is you

need to be clear about what you know and what you don't know. And in this case, they're using a term that is ambiguous.

Q But what they're doing in this concluding paragraph, which is part of the discussion section, is that they're discussing and interpreting their findings. That's the purpose of that discussion.

MS. DEBROSSE: Object to form.

A So they're -- when they use the word "possible relationship," they're not talking about their data. If they had just focused on their data, they would say that, We have identified, you know, a significant relationship between exposure and outcome.

Q And they --

A That's what they would have said.

Q -- they do report the statistics, but then they go on to interpret their findings, their statistical findings.

Remember you told me that when you teach students about epidemiology, you teach them to be careful not to overread epidemiology studies, not to make too much

Dr. Zoeller

of what they might read in the press? Remember that?

MS. DEBROSSE: Object to form.

A Yeah. But that's not what this is.

MR. BLISS: Let's mark this as Exhibit 8.

MS. O'CONNOR: Oh, good. Thank you. You have one for yourself?

MR. BLISS: I think I do. I do.

MS. O'CONNOR: I can share.

(Whereupon, a Patricia F. Coogan article dated May 2021 was marked as Zoeller Exhibit No. 8 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you as Exhibit 8 the study you cite in your report by Coogan, et al., investigating the possibility of association between hair relaxer -- well, relaxers, straight hair and pressing product use, and breast cancer?

A Yes.

Q Do you recall discussing this

Dr. Zoeller

paper in your report?

A Vaguely.

MS. DEBROSSE: Let me -- let's go back one moment.

MR. BLISS: Sure.

MS. DEBROSSE: I'm going to -- I'm going to object to the title of the study. But you can continue.

Q Okay. The title of the study for the record is "Hair Product Use and Breast Cancer Incidence in the Black Women's Health Study."

Did I say "Sister Study"? Maybe I messed that up. Anyway, the title is now clearly on the record.

Well, let's look at what you say in your report.

If you look on page 11, Section 4.3 of your report, Dr. Zoeller.

A Yes.

Q Second sentence there, Section 4.3.

A Yes.

Q You write: The predominant

medical view of the pathogenesis of uterine and ovarian cancer is that estrogens in ovarian cancer pathogenesis includes excess estrogen as a chronic proliferative signal. Thus, the relationship between chemical hair relaxers and breast cancer is an important observation since estrogens play a role in breast cancer also.

Do you see that?

A Yes.

Q Do you still believe that?

MS. DEBROSSE: Object to form.

Q That it's an important observation, what's been seen with respect to breast cancer and hair relaxer use?

A Yeah.

Q And am I right that on your theory of biological plausibility, hair relaxer products should cause breast cancer by the same mechanism of ER-alpha activation and stimulation of cell proliferation?

MS. DEBROSSE: Object to form.

A It would elevate the risk.

Dr. Zoeller

Q In a causal way?

MS. DEBROSSE: Object to form.

A Yes.

Q So looking at the abstract, Coogan, et al -- and I'll try to avoid reading the whole thing. But starting with the first sentence, they write: Hair relaxers and leave-in conditioners and oils commonly used by Black, slash, African American women may contain estrogens or estrogen-disrupting compounds. Thus, their use may contribute to breast cancer risk. Results of the few previous studies on this topic are inconsistent.

Do you see that?

A Yes.

Q Were you aware when you were writing your report that the epidemiology data on hair relaxer use and breast cancer had been inconsistent?

MS. DEBROSSE: Object to form.

A Yes.

Q Skipping down the last couple sentences of the abstract, they say:

Dr. Zoeller

Results of this study were largely null. But there was some evidence that heavy use of lye-containing hair relaxers may be associated with increased risk of ER-positive breast cancer. Consistent results from several studies are needed before it can be concluded that use of certain hair relaxers impacts breast cancer development.

Do you see that?

A Yes.

Q Do you agree with Coogan, et al., that consistent results from several studies are needed before it can be concluded that use of chemical hair relaxers impacts breast cancer development?

A So there were a number of studies that had been done. I also think that when you think about these kind of studies, they're -- they are oftentimes biased toward the null. So to have inconsistency you don't want to -- you don't want to just count the number of positives and the number of negatives. But you really have

Dr. Zoeller

to look at those studies that are less likely to be conflicted or biased toward the null. But these are -- I mean, humans are variable, and it's the human variability that makes it problematic.

Q I appreciate all that.

But I am just asking whether you agree with Coogan, et al., that until we see consistent results from several studies we can't conclude that use of hair relaxers impacts breast cancer development?

MS. DEBROSSE: Object to form.

A Within the context of their study, yes.

Q I'm not sure what you mean by that qualification, like "within the context of their study."

A So they're talking about --

MS. DEBROSSE: Object to form.

Q Okay. Let me -- let me back up. Coogan, et al., have written a paper about a potential association between hair relaxer use and breast cancer. And they're saying others have written papers on this

Dr. Zoeller

and the results have been inconsistent.

A Right.

Q And they're saying, Until we see consistent results across a number of studies, we can't conclude that hair relaxer use impacts breast cancer development.

Do you agree with that, their assessment of the state of the epidemiology?

MS. DEBROSSE: Object to form.

A I didn't, and the reason is they didn't really do an analysis of all these other studies to help explain where this variability comes from.

Q Okay. Fair enough. You disagree with their assessment.

Now, it's true, Dr. Zoeller, that for uterine and ovarian cancer, we don't know whether results from several studies would be consistent or inconsistent, because there are only -- well, there's only one ovarian cancer study and that's White?

Dr. Zoeller

MS. DEBROSSE: Object to form.

A True. As a ten-year study, it would be hard to replicate that.

Q And the same would be true for uterine cancer --

MS. DEBROSSE: Object to form.

Q -- that -- well, let me ask it separately.

I think --

MR. BLISS: Did I just ask about ovarian?

MS. DEBROSSE: You did.

MS. O'CONNOR: You did.

Q So, for uterine cancer, we also don't know whether results from several studies would be consistent because there are only two uterine cancer studies to date being Chang and Bertrand?

MS. DEBROSSE: Object to form.

A There are only two studies, again, decades.

Q Chang and Bertrand -- well, do you agree that Chang and Bertrand are consistent in that they reported a

Dr. Zoeller

statistically significant association with frequent or heavy use for postmenopausal but not premenopausal?

MS. DEBROSSE: Object to form. Foundation.

You may answer.

A I think they were consistent with their findings, and the implications are consistent.

Q All right. Dr. Zoeller, please just listen carefully to my question. I'm asking now about the findings with respect to postmenopausal and premenopausal women, because both studies stratify by menopausal status --

A Right.

Q -- correct?

A Right.

MS. DEBROSSE: Object to form.

Q And am I correct that -- or do you agree that Chang and Bertrand are consistent in that they reported a statistically significant association with frequent or heavy use for postmenopausal

Dr. Zoeller

but not premenopausal?

MS. DEBROSSE: Object to form.
Compound. Foundation.

A So, from my point of view looking at the totality of both studies, they're consistent. They reinforce each other. Now --

Q Can --

A -- this whole issue between stratification and looking at one stratification as somehow a binary issue that can be interpreted without the rest of the data, that's where I'm -- I have a problem with that. So that's -- I think those two studies reinforce each other, and they're also decades long. I mean, these are not trivial studies.

Q But they are epidemiology studies and all that goes along with it in terms of the possibility for residual confounding --

MS. DEBROSSE: Object to --

Q -- true?

MS. DEBROSSE: -- form. Object to form.

Dr. Zoeller

A They are epidemiology studies. There is no evidence that confounding has somehow blurred the picture.

Q Did you consider the possibility of residual confounding?

MS. DEBROSSE: Object to form.

A What I did was to read their methods, and they do -- you know, as one guy likes to say: It's only confounding if it is confounding.

To try to imagine that there are confounders that we know about that would change the outcome, that's a different story.

Q Would you agree, though, that, if all possible confounders aren't adequately controlled for, it's possible that any reported associations are partly or entirely the results of residual confounding?

MS. DEBROSSE: Object to form.

And --

MS. O'CONNOR: When?

MS. DEBROSSE: -- counsel, which study are we referring to?

Dr. Zoeller

MS. O'CONNOR: You're talking --

MS. DEBROSSE: I'm very sorry.

MS. O'CONNOR: -- about residual --

MR. BLISS: I'm not talking about a particular study.

MS. O'CONNOR: -- confounding and at other times confounding. Which is it?

MR. BLISS: No, I'm talk -- I'm asking an abstract question right now. It doesn't relate to either of the studies in particular. I'm talking about methodology --

MS. O'CONNOR: Okay.

MR. BLISS: -- in epidemiology.

MS. O'CONNOR: And you assert different words in different parts of the sentence.

Are you talking residual confounding or known confounders?

It's not clear.

MR. BLISS: Let me just ask the --

MS. O'CONNOR: Do you.

MR. BLISS: -- question --

MS. O'CONNOR: -- want -- if you --

MS. DEBROSSE: Can we just --

MS. O'CONNOR: -- change your --

MS. DEBROSSE: -- state the question again?

MR. BLISS: I'll ask it again.

Q If all possible confounders aren't adequately controlled for, it's possible that any reported associations are partly or entirely the result of non-controlled-for confounding --

MS. DEBROSSE: Same --

Q -- a.k.a. residual confounding?

MS. DEBROSSE: Same objections.

Q Would you agree with that?

A It's a completely theoretical issue. It's true that, if there is confounding, then there is confounding whether it's residual or not.

Q And would you agree that, in epidemiology, it's important to adequately

Dr. Zoeller

control for as many potentially significant confounders as possible?

A Yes.

Q Chang and Bertrand are inconsistent in that Chang reported statistically significant associations for the full cohort, which consisted of 87 percent plus non-Hispanic white women, while Bertrand reported a null result for the full cohort, which consisted of 100 percent Black women.

MS. DEBROSSE: Object to form. Compound. Foundation.

You may answer.

A So this is in Table 2.

Q You know what, we can -- we can go on.

MR. BLISS: When is lunch going to be ready?

MS. O'CONNOR: It was supposed to be here. It's a good question.

MR. BLISS: Still not here?

MS. O'CONNOR: It was going to be momentarily.

Dr. Zoeller

MS. DEBROSSE: I think it's on the way in a few minutes.

MS. O'CONNOR: Let me see.

COURT REPORTER: We've been going almost two hours.

Can we take a break?

MS. O'CONNOR: You know, then why don't we take --

MR. BLISS: Yeah. Yeah.

MS. O'CONNOR: -- a break?

MR. BLISS: I mean, I was going to say I'm about. I'm getting a light-headed myself so --

MS. O'CONNOR: Okay.

MR. BLISS: -- I wouldn't mind a little food.

MS. O'CONNOR: Would you let -- and this is --

MS. DEBROSSE: Okay.

MS. O'CONNOR: -- at a good point. I agree.

VIDEOGRAPHER: I'll take us off the record. Stand by.

MS. DEBROSSE: All right. Thank

you.

VIDEOGRAPHER: The time is 11:47 a.m. We're off the record.

(Whereupon, at 11:47 a.m., a recess was taken to 12:32 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 12:32 p.m. We're back on the record.

BY MR. BLISS

Q Good afternoon, Dr. Zoeller.

A Good afternoon.

Q We're going to leave epidemiology, and we're going to talk about your theory of biological plausibility.

And, as I understand it from reading your report, your theory is that chemical hair relaxer products contain what you call today and call in your report: a perfect storm of carcinogens and potent EDCs wherein the carcinogens create a carcinogenic environment in which the EDCs bind and estrogen receptor-alpha and, based on the principle of mixture additivity,

combine to create a proliferative signal in the endometrium and the ovaries that amplifies the proliferative signal created by the body's own estrogen, thereby contributing to excess estrogen which plays a major role in uterine and ovarian carcinogenesis.

A It sounds right.

Q Yeah. I was pretty careful about it, so I think -- I think that is a fair summary of your biological plausibility theory in a nutshell, but you can tell me if it's -- if it's not.

MS. DEBROSSE: And I'll just -- you know, my object to form. Compound. That was a long one.

But go ahead, Tom.

Q I can read it again.

MS. DEBROSSE: Why don't we have it --

A No.

MS. DEBROSSE: -- read back? It was a long one.

MR. BLISS: Yeah. Yeah. No. I

understand. I went -- and I went slow.

MS. O'CONNOR: Okay.

MR. BLISS: But I think if Dr. Zoeller tracks with me, he'll see --

Q I just want to make sure we're on the same page in terms of what it is you are --

A Yeah.

Q -- opining on here.

So your theory, as I understand it, of biological plausibility is that hair relaxer products contain a perfect storm of carcinogens and potent EDCs.

We'll just stop there.

So far so good?

A Yes.

Q That -- wherein, I should say, the carcinogens create what you call a "carcinogenic environment," right?

A Yes.

Q In which the potent EDCs bind estrogen receptor-alpha and, based on the

Dr. Zoeller

principles of mixture additivity, combine to create a proliferative signal in the endometrium and the ovaries?

A Yes.

Q That amplifies, as you say, the proliferative signal created by the body's own estrogen thereby contributing to excess estrogen, which plays a major role in uterine and ovarian carcinogenesis.

MS. DEBROSSE: Same objection.

A So --

Q Is that a fair summary?

A -- it's -- it's -- it is what I wrote. The context of it, though --

Q I considered that.

A -- well, the context is -- this concept -- the concept of excess estrogen really comes from somewhere else. This is what the medical community generally concludes about the pathogenesis of these cancers.

Q But excess estrogen as a concept is part of your --

A Yes.

Dr. Zoeller

Q -- biological plausibility theory?

A Right. Taken from that generally accepted.

Q Okay. So, with that clarification, did I correctly summarize your -- encapsulate your theory?

A Yeah. I think you read what I wrote.

Q Pretty much. I tried to, you know, shorten it a little bit.

And so, as you emphasize in your report -- I think it's literally emphasized with italics: It is the entire mixture -- the combination of potent EDCs and other carcinogens that creates the highly plausible biological basis for the increased risk of uterine and ovarian cancer in observed in epidemiological studies of chemical hair relaxers.

MS. DEBROSSE: And, counsel, what page are you on?

MR. BLISS: I don't have in my notes a citation to that. Oh, let me

see if I can find it quickly.

MS. DEBROSSE: Thank you.

MR. BLISS: Let's see, you know what, I know a quicker way to do it. Okay. So it's on page 42, the last sentence before Section 12.3.

MS. DEBROSSE: Thank you.

Q Do you see that, Dr. Zoeller?

You say: Therefore -- you kind of summarize your theory the way I did -- or, as I said, I tried to, you know, smooth it out a little bit just for efficiency.

But you say: Therefore, it is the entire mixture, the combination of potent EDCs and other carcinogens, that creates the highly plausible biological basis for the increased risk of uterine and ovarian cancer observed in epidemiological studies of chemical hair relaxers.

Do you see that?

A Yes.

Q And, for the EDC part of what you call "the perfect storm," you focus on four classes of chemicals; UV fillers,

Dr. Zoeller

benzophenones, phthalates, siloxane, and parabens.

Yes?

A Yes.

Q And, for the carcinogen part of what you call "the perfect storm," you focus on four chemicals or chemical classes; N-nitrosamine, formaldehyde, and ethylene oxide, 1,4-dioxane?

A Yes.

Q So it is this, as you say, entire mixture of the four classes of EDCs and the four carcinogens that makes it biologically plausible, in your opinion, that chemical hair relaxers cause uterine and ovarian cancer?

A Yes.

Q Does your theory, Dr. Zoeller, apply to type II endometrial cancer?

It seems that it doesn't.

MS. DEBROSSE: Object to form.

A So --

MS. DEBROSSE: You may answer.

A -- it depends on the relationship

Dr. Zoeller

between those two. It would have to be estrogen-dependent.

Q Well, if you look at page 13 of your report, Figure 2?

A Yeah.

Q You say: Thus --

MS. DEBROSSE: Hold on, counsel. I think he's still getting there.

MR. BLISS: Okay.

Q Just let me know when you're there.

A Yeah.

Q You say: Thus estrogens acting through ER-alpha play a central role in the development of the vast majority of uterine cancers.

And when you say "the vast majority of uterine cancers," I take it you mean type I endometrial cancer?

A So the vast majority are type I.

Q Well, if you look at your figure, when it talks about type I?

A Uh-huh.

Q It says "excess estrogen" in that

progression of events.

A Yes.

Q And then there is no excess estrogen in type II.

MS. DEBROSSE: Object to form.

A Right.

Q And so just -- it seems to me that your biological plausibility theory applies to type I endometrial cancers, which are the vast majority, but not type II.

Am I correct about that?

A If it's not -- I think some type II do have estrogen receptors, so anything that would be sensitive to estrogen -- I got bronchitis on the way back from Geneva so...

Q Is it -- is it your understanding that your theory applies to both type I endometrial cancer and type II endometrial cancer?

MS. DEBROSSE: Object to form.

You can answer.

A So it applies to any

Dr. Zoeller

estrogen-sensitive uterine cancer.

Q Is type II endometrial cancer an endo -- estrogen-sensitive cancer?

A Some are. That was my understanding. There are -- there are some ER-alpha positive. I don't know the statistics of them, to be honest, because type I is so much more prevalent and, when it comes to epidemiology, it's a numbers game. That's what -- that's what statistical analysis is all about. I focused mainly on type I, but type II can be estrogen sensitive from my understanding.

Q On page 11 of your report, first sentence of the second full paragraph, you write: The predominant medical view of the pathogenesis of uterine and ovarian cancer is that estrogens have a strong role in the development of these cancers. It's important that both uterine and ovarian cancer pathogenesis includes excess estrogen as a chronic proliferative signal.

Do you see that?

Dr. Zoeller

A Yes.

Q You have no citation there.

A There are --

MS. DEBROSSE: Object to form.

A -- cite -- there are --

Q And I'm asking because --

A -- citations.

Q -- as I look at your citations -- so, for example, you cite, in this part of your report -- or maybe it's later. If you look at --

MS. O'CONNOR: Can we --

Q Let me -- let me --

MS. DEBROSSE: One moment.

What page?

Q Okay. Let's stick on page 11.

MS. DEBROSSE: We were on 13.

Q We've already read the sentence where you talk about the predominant medical view of the pathogenesis of uterine and ovarian cancers, that estrogens have a strong role.

Then you write, in the last full sentence on that page: Research into the

Dr. Zoeller

causal mechanisms of uterine and ovarian cancer indicates that a major and well accepted element is what has been called "excess estrogen."

And once, again, I don't see a citation for that.

MS. DEBROSSE: Object to form.

Is there a question?

You may answer.

A So I developed that with references below.

Q Right. So let's look at page 15 of your report second paragraph. This is the section entitled "Role of Estrogens in Uterine and Ovarian Cancer."

And you write: Estrogen also plays an important role in the development of ovarian cancer, citing Hu, et al., 2016 and Koziel and Pias- -- I don't know how to pronounce that.

You see what I am referring to?

A Yes.

Q Hu -- the Hu paper doesn't say anything about estrogen. The Koziel paper

Dr. Zoeller

talks about how it is postulated that many factors may contribute to the development of ovarian cancer, including hormonal imbalance.

Estrogens are a group of hormones that have an important role in both physiological and pathological processes, and that, in ovarian cancer, they may regulate proliferation, invasiveness, and epithelial to mesenchymal transition.

That doesn't seem to establish that it's the predominant medical view that estrogen -- or excess estrogen plays a major role in ovarian cancer -- focusing on ovarian cancer pathogenesis?

MS. DEBROSSE: Object to.

Q What --

MS. DEBROSSE: Oh, go ahead.

Q The question is: So what evidence or other evidence do you have, Dr. Zoeller, that it's the predominant medical view that estrogen plays a major role in the development of ovarian cancer or that excess estrogen is a well-accepted

causal mechanism for ovarian cancer?

MS. DEBROSSE: Object to form. So compound. Foundation. I think there's summary of who has not been presented to the witness. A summary of Koziel not presented to the witness.

To the extent that you could answer that question, you may respond.

A I would have to look at those again. I don't remember exactly what those -- what those papers showed. The --

Q Is it still your understanding, sitting here today, that it's the predominant medical view that estrogen plays a major role in the development of ovarian cancer?

A Yeah.

MS. DEBROSSE: Object to form.

You may respond.

MR. BLISS: I have to unhook for a second.

Actually, I'm not going to do

Dr. Zoeller

that right now.

Q Dr. Zoeller, are you aware that recent research has shown that most, if not all, high-grade serious -- serous ovarian cancers originate in the fallopian tubes?

A No.

Q You say on page 13 of your report, last sentence of the first full paragraph: ER-alpha is highly expressed in normal endometrium and in the major pathway in the production of uterine and ovarian cancer.

Do you see that, that statement, the last sentence of the first full paragraph on page 13?

A That ends in Figure 213?

Q Starts just above that figure, oh, no, hold on.

It's on page -- yes -- 13, top of the page, first full sentence: ER-alpha is highly expressed in normal endometrium and in the major pathway in the production of uterine and ovarian cancer.

Do you see that?

A Yes.
Q The fallopian tubes are not made of or lined with endometrial cells?
MS. DEBROSSE: Objection to form. Is there a question?
Q Are you aware of that?
A Yes.
Q So if ovarian cancer originates in the fallopian tubes and if the fallopian tubes aren't made of or lined with endometrial cells, ER-alpha expression in the endometrium can't be playing a causal role in the pathogenesis of ovarian cancer.
Do you agree with that?
MS. DEBROSSE: Object to form. Object to form.
A So my understanding is, for example, uterine tissue can be kind of expelled through the fallopian tube, which is, you know, a major risk for a variety of problems including ovarian cancer but -- I mean, that's -- that's my understanding, but I'm not sure exactly the way you phrased the question.

Dr. Zoeller

Q Well, you say that ER-alpha is highly expressed in normal endometrium --

A Yeah.

Q -- and is a major pathway in the production of uterine and ovarian cancer. I follow you as to the endometrial cancer. But as to ovarian cancer, I'm not sure how that would be the case if recent research has shown that ovarian cancer originates in the fallopian tubes, and the fallopian tubes are not made of or lined with endometrial cells.

MS. DEBROSSE: Object to form. Foundation. Compound. Discussing research not presented.

You may answer to the extent you understand the question.

A So it's not my understanding that -- that the majority of uterine -- of ovarian cancer comes from the fallopian tubes.

MR. BLISS: Would you please mark this as the next exhibit.

MS. DEBROSSE: Thank you.

MR. BLISS: Stephanie, I have one copy. Sorry to do that.

That's okay.

(Whereupon, a Memorial Sloan Kettering Cancer Center Article was marked as Zoeller Exhibit No. 9 for identification, as of this date.)

Q So, Dr. Zoeller, you've probably not seen this document before. It's not something you cite in your report. But it's something that I found. It's from Memorial Sloan Kettering Cancer Center. It's entitled "Can We Prevent Ovarian Cancer." And the first sentence reads: Recent research has shown that most, if not all, high-grade serous ovarian cancers originate in the fallopian tubes.

MS. DEBROSSE: Object to form.

Q Do you see that?

A I do see it.

Q And I -- if I understand your testimony, you were not aware of that?

A I wasn't. I had never read that.

Q And your report doesn't mention

Dr. Zoeller

anything about fallopian tubes.

MS. DEBROSSE: Object to form.

A So the -- the question I had with that statement --

MS. O'CONNOR: Let him ask a question. Let him ask a question.

A The question I have with that statement is that uterine tissue itself can be a product of the -- of the fallopian tubes just through this kind of regurgitation. So the question is whether this is the epithelium of the fallopian tubes or something else.

So the fact that it comes from, you know, the ovary is sitting kind of nested where the fallopian tube is. Because if you don't have that connection, you won't get fertility. So my, you know, it's not clear to me what that says. I would have to kind of read up on that.

Q But you do agree with me that the fallopian tubes are not made of or lined with endometrial cells?

A They're not made of --

Dr. Zoeller

MS. DEBROSSE: Object to form.
Go ahead.
A They're not made of endometrial tissue, true. They're a transport system for endometrial tissue.
Q And you're saying that those transport systems play a role in carcinogenesis?
A Yes, there is evidence of that in the ovary.
Q Dr. Zoeller, how many exogenous chemicals would you say are known endocrine disruptors?
A Well, it depends on the definition that you use, depends upon what organization lines them up, lists them. There is -- you can certainly make the argument for about a thousand.
Q Actually, you know what, I'm going to -- we're going to come back to that topic.
A Okay.
Q I'm going to go to another one. I changed my mind.

Let's talk about non-monotonic dose responses and adverse effects thresholds. On page 22 of your report, fifth sentence of Section 7.5, you write: Because hormones themselves can produce a non-monotonic dose response, it's reasonable to expect that EDCs will also exhibit such responses.

Do you see that?

A Yes.

Q So first of all, what is a non-monotonic dose response?

A It's a dose response that has both a positive and a negative slope over the course of that dose response.

Q So a sigmoidal dose response curve would be monotonic?

A Yes.

Q How does your opinion that EDCs exhibit non-monotonic dose responses fit into your biological plausibility theory?

A I don't think it really does.

Q Then why do you discuss it in your report?

Dr. Zoeller
A The goal is to try to --
Q Well, let me -- let me withdraw the question --
MS. DEBROSSE: Okay.
Q -- ask another question because if your testimony, which is fine, is that, I talk about it, but it doesn't fit into my biological plausibility theory, then --
A Why do it.
Q -- we don't have to spend so much time talking about it today.
But that's if you're able to confirm that this is not playing a role in your theory, albeit you discuss it?
A It doesn't, other than to say that receptor-mediated toxicity is a different beast from the way we think about toxicity traditionally.
Q Does your theory depend on EDCs and hair relaxer products exhibiting non-monotonic dose responses?
A No.
Q You also say that: The concept of thresholds doesn't work for EDCs, and

therefore, we cannot assume that there is a threshold below which adverse effects will not occur.

Do you remember writing that?

A Yes.

Q What role does that statement play in your theory?

A Well, it goes to the way we think about the dose that people are getting when they applied this product. And that's -- there is -- there is sufficient evidence, I think, that there is -- there is, you know, absorption -- when you think about how much is there, the Helm study gives kind of quantitative estimates of different chemicals, and those quantitative estimates, some people would look at and say, Okay, micrograms per gram of material.

That's actually a lot for a small molecular weight molecules.

Q Well, Dr. Zoeller, it's one thing to say that we can't assume the existence of an adverse effect threshold, but it's another thing to make the broader claim

Dr. Zoeller

that the entire concept of thresholds just doesn't work for EDCs.

What exactly are you claiming?

MS. DEBROSSE: Object to form.

A I don't see that they're different.

Q So the concept of threshold has this paradox. Every scientist will agree that any measurement effect -- any measurement tool will have a low dose, you know, a limit of detection. And so to discriminate between a real threshold and a technical threshold is not possible.

And as a result, we have to have faith that there is a threshold that -- and in this Figure 4 here demonstrates just incredibly clearly that just because something is below the limit of detection, and in this case a very sensitive assay, doesn't mean it's not doing anything because you won't have effect or dose addition if you don't have some effect of the chemical doses below which you can measure it. This has been repeated in many

in vitro systems, in vivo, in humans.

Q We're going to talk about mixtures a little later.

A Yeah.

Q But for now sticking with --

A But it does inform threshold.

Q Fair enough.

A Okay.

Q But are you claiming that EDCs --

MS. DEBROSSE: Object to -- well --

MS. O'CONNOR: I think there is an error in the transcript.

MS. DEBROSSE: What does it read?

MS. O'CONNOR: It says: No, it doesn't inform threshold.

COURT REPORTER: It does inform threshold?

MR. BLISS: It does.

MS. O'CONNOR: It does.

MS. DEBROSSE: And he said it does.

COURT REPORTER: It does.

Dr. Zoeller

MS. O'CONNOR: It does.

MS. DEBROSSE: Yeah, it think that's line 12 --

COURT REPORTER: I got it.

MS. O'CONNOR: Okay. Thank you.

Q Just to be clear, are you saying, Dr. Zoeller, that EDCs do not have adverse effect thresholds?

A Yeah, I am. Of course, it always depends on the situation. But, you know, so dose and duration are both important timing of exposure, all those kind of things.

What I'm saying is we can't assume that just because we don't see something in a specific assay doesn't mean that there isn't an effect. And whenever we talk about adverse effects, we're talking about a very specific situation. You know, in a rodent model, in humans, which is even more difficult, yeah.

Q But if I understand what you're saying, in your opinion, it's not just that we can't assume that there are adverse

Dr. Zoeller

effect thresholds for EDCs, you're saying we can assume that there are not because there are not such thresholds for EDCs.

MS. DEBROSSE: Object to form.

Q Is that what your testimony is?

A So we can state that just because we don't see an effect in a limited assay doesn't mean that there is not an effect.

Q I understand that, but that's a different proposition from saying EDCs categorically do not have adverse effect thresholds?

A There is no evidence for that.

Q For what?

A No-effect thresholds.

Q There is no evidence that EDCs do not have adverse effect thresholds?

MS. DEBROSSE: Object to form.

Q There is a double negative in there.

A Yeah.

MS. DEBROSSE: Yeah.

Q Yeah, yeah.

A So there is -- I don't think

there is any evidence that EDCs -- of course, that is a broad category. There are many different kinds of EDCs, let's just say estrogenic EDCs -- that they don't -- that they have adverse effect threshold. And the CLARITY study, I would go back to to say might see -- you might see a no effect in the uterus, but you see an effect in mammary tissue and in the brain at doses below what you saw in the uterus.

So -- so to me, that's -- that's one kind of evidence that shows that we don't have evidence for no adverse effect threshold estrogenic chemicals.

I think I was thrown off by the double negatives, again.

Is it your understanding, Dr. Zoeller, that the concept of adverse effect thresholds do not apply or does not apply categorically to estrogenic EDCs?

MS. DEBROSSE: Object to form.

Asked and answered multiple times.

You may answer.

Dr. Zoeller

A So I can think of a lot of different categories. What I'm saying is there is no evidence for -- for a threshold of adversity for estrogenic chemicals. Now, you can -- the complicated part of it is different tissues have different sensitivities. And so there are tissues that are far more sensitive than what is normally used in regulatory settings and in safety settings that that FDA food safety would have.

And so -- so you have to be very specific. I could say there is -- that there is a threshold of adversity for -- for, you know, uterine weight in a rat. Okay. That doesn't inform us for the things that are more sensitive. And so you can't say on the whole-body setting that there is a threshold of adversity that has been identified.

Q I'm not talking about, then, the whole body, but with respect to a particular adverse effect, are you saying that there are no thresholds for EDCs?

MS. DEBROSSE: Object to form.

Dr. Zoeller

Asked and answered multiple times.

A So I think what -- as I've kind of gone down that tube, that there are adverse effects that we don't have evidence for a threshold.

Q But there are adverse effects for which we do have evidence for a threshold, correct?

MS. DEBROSSE: Object to form.

A So there are under very limited conditions. Uterotrophic assay is probably the most performed assay for estrogenicity, but it has a 28-day exposure period. Yeah, within that context, there is a threshold of adverse effect. It's almost meaningless.

Q Why?

A Because we know too much by now. Regulatory agencies should have stopped using that long ago because it's insensitive. In fact, Andreas Kortenkamp wrote a thing for the European Commission that made that very clear, the state-of-the-art of endocrine disruptors,

Dr. Zoeller

which profoundly affected the Commission because they didn't, for example, realize that chemicals could affect brain development.

Q So if I understand what you are telling me, at least for certain adverse effects, there can be adverse effect thresholds for EDCs?

A Yes.

MS. DEBROSSE: Object to form.

A Then they're technical.

Q Sorry.

MR. BLISS: Got an objection to form and a yes?

COURT REPORTER: And object.

MS. DEBROSSE: Slow down.

THE WITNESS: Yeah.

Q The assumption of a monotonic, if not linear, relationship between dose and response has been the foundation of modern risk assessments.

Is that your position?

A Yes.

Q Is that still the foundation of

Dr. Zoeller

modern risk assessments?

A I think it depends on who is doing the risk assessment.

MS. O'CONNOR: Counsel, where are you reading from?

MR. BLISS: I'm just reading a statement.

MS. O'CONNOR: Okay. Sometimes it's hard to tell. Okay.

MR. BLISS: Okay.

MS. DEBROSSE: And I'm sorry.

MR. BLISS: Well, I'm reading it from my notes.

MS. DEBROSSE: I know.

MR. BLISS: I did -- I did, you know --

MS. DEBROSSE: It's -- it comes --

MR. BLISS: -- take it from one of Dr. Zoeller's -- but it's a very straightforward assertion, and I think I have an answer.

Q So the question, just to be clear, is that modern risk assessments have

Dr. Zoeller

assumed, in your view, a monotonic if not linear relationship between dose and response?

MS. DEBROSSE: Object to form.

A It's not just my -- I mean, it's in their guidelines.

Q Am I right, Dr. Zoeller, that since at least 2012, there has been an intense debate about the reality of NMDRs, non-monotonic dose responses, and their importance for risk assessments?

MS. DEBROSSE: Object to form. Foundation. Compound.

A There has -- there has been a debate, but it seems fallacious to me. There is no doubt that there are non-monotonic dose responses.

Q I understand that there is no doubt in your mind, but --

A No. There's no doubt in the literature. There is no doubt in medicine. There are --

Q Well, Dr. Zoeller --

A -- there are drugs that act by a

Dr. Zoeller

non-monotonic dose response. You give a woman a low dose of GnRH analog called Lupron, and it stimulates the hypothalamic-gonadal axis. You give a high dose, same drug, to a guy with prostate cancer, and it blocks the system. That's a non-monotonic dose response. Julie Axelrod, the guy that I did a post-doc with, got a Nobel Prize for the identification of non-monotonic dose responses -- essentially. He didn't call it that. But yeah, this is not knew.

Q I understand you have your views about the literature.

But isn't it the case that, since at least 2012, there has been an intense debate among scientists about the reality of non-monotonic dose responses and their importance for risk assessments?

MS. DEBROSSE: Object to form. Asked and answered. Lacks foundation. Compound question.

A So I think the debate is how -- informs risk assessment, not whether or not

Dr. Zoeller

they exist. The problem -- the problem is that risk assessment depends on animal studies, not epidemiology. When the guideline from OECD, EPA, FDA --

Q I'm listening. Go ahead.

A -- the guidance is for three doses. That's not sufficient statistically to demonstrate a non-monotonic dose response, which creates a lot of fodder for people to say that they don't exist. But it's -- there is no evidence for that.

Q Really, I'm just asking whether there has been an intense debate about that.

MS. DEBROSSE: Object to --

Q -- do -- you do acknowledge that there has been an intense debate about that?

MS. DEBROSSE: Object to form. Asked and answered. Foundation.

A So I wrote a paper with a bunch of other people called "The Way Forward" to address that debate, because the debate is fictitious. It's -- it's a debate for

Dr. Zoeller

people kind of, in my opinion, purposefully kind of misusing even the definition of an endocrine disruptor that WHO proposed. And what we tried to do in that paper was to lay some ground rules. In fact, there was a -- we had a meeting in Berlin of people that were part of that debate. And we came away with a consensus statement, so I think the debate really isn't a genuine debate.

Q Well, if I'm hearing you correctly, there has been an intense debate that you regard as not genuine?

MS. DEBROSSE: Okay. Object to form. Asked and answered multiple times. Foundation.

Q Dr. Zoeller, are you familiar with the systematic review of the issue of non-monotonic dose responses by the U.S. EPA in 2013?

A Yes.

Q And the European Food Safety Authority O'Soleil (ph), et al., 2016?

A I'm not sure about that one.

Q Gray and Foster 2014?

Dr. Zoeller

A I'm not sure about that.

Q Parrot, et al., 2017?

(Whereupon, the court reporter requested clarification.)

THE WITNESS: Sorry.

Q Coady, et al.?

(Whereupon, the court reporter requested clarification.)

A Yes.

MS. DEBROSSE: You need to --

Q Coady, C-O-A-D-Y, et al., 2016; are you familiar with that paper?

A I might be. I don't know.

Q So you don't know whether those papers failed to find a significant body of evidence consistent with NMDRs for the estrogen or androgen pathways leading to toxicity?

MS. DEBROSSE: Object to form.

A So the one that I know about is the EPA, the National Academy.

They took that paper to the National Academy, who basically said: Go back to the drawing board because you don't

have the evidence.

So -- and -- yeah.

Q We're going to mark an exhibit and have you look at this.

MR. BLISS: I seemed to have lost my pen.

MS. DEBROSSE: Is there a copy for us?

MR. BLISS: Yes.

MS. O'CONNOR: You can hold it for him.

(Whereupon, a Susy Brescia article from March 2020 was marked as Zoeller Exhibit No. 10 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you a paper by Susy Brescia, B-R-E-S-C-I-A, entitled "Thresholds of Adversity and Their Applicability to Endocrine-disrupting Chemicals."

Have you seen this paper before?

A Yes.

Q Where did you see it?

A When it came out.

Dr. Zoeller

Q On page 216, the paper states:
It is also -- if you look to the --
MS. DEBROSSE: Counsel, one moment.
Where are you?
MR. BLISS: Sure. Sure.
Q It states on page 216 -- I had a highlighted version of this which would be helpful if I could find --
MS. O'CONNOR: Can you give us the first three --
Q Yes.
MS. O'CONNOR: -- words?
Q There we are.
MR. BLISS: Yes. It is: Also often argued.
MS. O'CONNOR: Okay. Got it.
Q It is right here.
MS. O'CONNOR: Tom, you have got it, too?
THE WITNESS: Okay.
MS. DEBROSSE: You're on page 216?
MR. BLISS: 216 --

Dr. Zoeller

THE WITNESS: Yeah. I got it.

MR. BLISS: -- paragraph before the title "Non-threshold Approach to Genotoxicity."

Q Brescia writes: Is it also often argued that, since EDs displaying low dose effects and non-monotonic dose responses, the threshold level, apparent NOAEL, identified by conventional toxicity testing is incorrect.

Do you see that?

A Yes.

Q And that's essentially what you're arguing here?

MS. DEBROSSE: Object to form.

A Yes.

Q Brescia goes on to write: There is no consensus in the scientific community on the existence of these phenomena and their relevance to toxicology.

Do you see that?

A Yes.

Q Do you -- and I understand you're not going to agree with her ultimate

Dr. Zoeller

position, but do you agree that there is, at this point, no consensus, in the scientific community, on the existence of these phenomena and the relevance to toxicology?

A So there is no consensus, but my -- as I was thinking about this, the way I see it -- because we published a rebuttal to this paper that really goes into detail about where she's making a mistake. But my concept of the debate is this: If I say your hair is red and you say it's not, we've got a debate. And that's the kind of debate that we've got here. That's what she's talking about, the debate that people level on low dose.

Now, first of all, what does that mean?

When -- when toxicology studies use very high doses and they assume that that -- there is a linear relationship between those doses and zero, that's untested.

In fact, Earl Gray, who was one of the people that you had cited about

systematic reviews, when we made that point to him, his argument was: We don't have to do that because we know that there is no affect at the low level because they're -- whatever they saw up above, there is no evidence for that.

That's not a scientific statement. Our paper kind of goes into detail about the -- first of all, this is not a scientist. This is a politician. That's the first thing. So the arguments that she puts forward here are just part of the same -- are basically non-scientific.

Q Take a look at the conclusion paragraph, Dr. Zoeller.

She writes: For the purpose of chemicals regulation, it is important that the approaches used are compatible with the consensus position of mainstream toxicology or, if there is dispute, the majority view. There are clearly two dominant opposing theories regarding the existence of thresholds for the adverse effects of chemicals that act via an endocrine mode of

action. The evidence presented above provides a compelling case for the superiority of one theory over the other. Overall, it is concluded that there is nothing special or unique about endocrine disruption or greater uncertainties in its assessment compared to other non-genotoxic forms of toxicity to justify adopting a non-threshold approach by default. Biology predicts that thresholds of adversity exists and are the rule for all end points, including those arising from endocrine disruption. Indeed, there is even growing -- a growing amount of evidence for the existence of thresholds of adversity even for directly acting genotoxic agents.

Do you see that?

A Yes.

Q Again, I'm not expecting that you'll agree with this author's assessment of the evidence.

But do you agree that there are clearly two dominant opposing theories regarding the existence of thresholds for

Dr. Zoeller

the adverse effects of chemicals act via an endocrine mode of action?

MS. DEBROSSE: Object to form.

A So, again, it's the same kind of debate about your hair being red. There is a lot of people who -- who oppose the use of what we know about receptor-based toxicity and say that that's false. I don't -- I -- first of all, I think that it's diminishing, that debate, the strength of it, the number of people that -- that ascribe to this kind of dose makes the poison thresholds of adversity is changing.

Q Well, Dr. Zoeller, am I right that no -- as of this point, no regulatory agency has adopted the view that dose and exposure are irrelevant on the theory that there are no thresholds for EDCs?

MS. DEBROSSE: Object to form. Foundation.

A I --

MS. DEBROSSE: Compound.

A So the European legislations on biocides and plant protection products both

state that, if a chemical has an -- is classified as a EDC because thresholds are -- and they talk about thresholds, those products are not licensed. There is an exclusion for endocrine disruptors without a risk assessment.

Q In those particular cases?

A Yes.

Q But otherwise, my initial statement is true?

MS. DEBROSSE: Object to form.

A I think your initial statement was: There are no cases where that's true.

Q That's right.

And you give me -- those are the cases that you are aware of?

A Yeah. Those are big cases.

MS. DEBROSSE: Object -- object to form.

Go ahead. Just give me a minute to get in there.

THE WITNESS: Yeah.

MS. DEBROSSE: All right.

MS. O'CONNOR: We're going to

put an electric shock collar --

MS. DEBROSSE: An electric shock over there on your chair.

MR. BLISS: An electric shock collar on your expert?

I'm not sure you want to do that.

MS. O'CONNOR: One on you, too.

MR. BLISS: On me?

MS. O'CONNOR: Long day.

MS. DEBROSSE: Okay. Get to it.

Q Dr. Zoeller, would you agree that, if a non-monotonic dose response were to be observed for a molecular event or early or intermediate event along a biological pathway, that doesn't mean a non-monotonic dose response would be observed in a downstream apical event?

MS. DEBROSSE: Object to form.

A In principle, that's true.

Q What about empirically?

MS. DEBROSSE: Object to form.

A If you give me an empirical example, I can answer that.

Dr. Zoeller

Q You're not aware of any examples?

MS. DEBROSSE: Object to form.

A Not right off.

Q Are you familiar with the European Food Safety Authority's 2021 opinion on the impact of non-monotonic dose responses on EFSA's human health risk assessments?

A No. I don't think so.

Q They say: If an NMDR is observed for a molecular-initiating even or an early intermediate event, the potential for propagating towards an apical effect needs to be investigated and checked for its biological relevance.

MS. DEBROSSE: Object to form.

Q Would you agree with that?

MS. DEBROSSE: Object to form. The document has not been presented to the witness.

A You.

MS. DEBROSSE: And we're not sure what is being read into the record.

Dr. Zoeller

If you can, you may respond.

A If that's what they say, but I haven't --

Q Well, I'm asking --

A -- seen that.

Q -- you know, it -- I understand I don't -- haven't put the document in front of you.

But just would you agree with that statement, that if you -- if a non-monotonic dose responses is observed at the molecular level, that you would then need to perform further investigation to see if that non-monotonicity would propagate towards an apical effect?

MS. DEBROSSE: Object to form. Compound. Foundation.

A Empirically with experiments. Sure.

Q You're familiar with a Lagarde (ph) decision tree?

You wrote about that?

A Yes.

Q And you didn't follow the Lagarde

Dr. Zoeller

decision tree or any variation of that in analyzing the four ECs that you focus on in your report?

MS. DEBROSSE: Object to form.

A No. That's because non-monotonic dose responses issues weren't -- weren't critical.

Q Are you aware of any empirical evidence of non-monotonic dose responses for any of the four EDCs you focus on?

A Not that I can put my fingers on.

Q An NMDR, if I'm understanding correctly, is still a dose response, meaning that there is a dose or doses at which something happens and other doses at which it doesn't happen?

MS. DEBROSSE: Object to form.
Compound.

A Yes.

Q And so, without knowing what the effective dose or doses are, whatever the dose response curve looks like, it's impossible to know whether the response will occur with respect to a particular

dose?

MS. DEBROSSE: Object to form. Compound.

A I'm not sure I understand that.

Q Okay. A dose response curve could be monotonic, it could be non-monotonic, it could be sigmoidal, it could have various slopes and shapes.

Unless we know what the dose response curve is, what the effective dose or doses are, we can't know whether a particular exposure will elicit the response?

MS. DEBROSSE: Object to form.

A So what I'm -- what I'm hearing is if the -- if you don't know what the dose response is, you can't make a prediction a priori. I think that's true.

Q You write on page 23 of your report, second paragraph, that: The presence, slash, absence of a threshold cannot be proved with data because there is always a non-zero measurement threshold.

Do you see that?

Dr. Zoeller

A Yes.

Q I think that's what you were explaining before?

However, from a practical point of view, the number of molecules of estrogenic chemicals found in hair relaxers is high given that even a nanomole of a chemical, ten to the negative nine mole is over 600 billion molecules.

Do you see that?

A I do.

Q So when you say it's high, high relative to what?

A 600 billion seems like a lot. That's -- that's what I mean.

Q It does mean -- yeah, it would be a lot of money if I were to win it, for example, but what -- what does that -- I -- why is that a high number of molecules?

MS. DEBROSSE: Object to form.

Q You say that in the statement I just read from your report that the number of molecules of estrogenic chemicals found in hair relaxers is high given that it's

Dr. Zoeller

billions -- hundreds of billions of molecules but high relative to what? Like, what is the meaning of that?

A Relative to zero. I mean, it's -- to me, it's important to kind of dispel this idea that a microgram doesn't mean anything. There are regulatory agencies that use this concept. In fact, FDA food and safety views this concept of the threshold of toxicity.

If you have no data, then 50 -- I forget if it's micrograms or milligrams -- is kind of a cutoff. Anything below that, you don't have to worry about. And that's just absurd. These are small molecular weight molecules. And so the number of molecules within a microgram is a lot.

MS. DEBROSSE: Counsel, if it --

Q But it --

MS. DEBROSSE: I'm sorry. Go ahead.

Q But it may not be enough to cause an effect?

A But it may be.

Dr. Zoeller

Q Depends on the dose-response curve --

MS. DEBROSSE: Object to form.

Q -- correct?

A Yes.

Q Are you aware, Dr. Zoeller, of any toxicology risk assessment framework or protocol or guidelines that considers or measures exposure in terms of number of molecules?

A No.

Q And you didn't assess how many molecules of any chemical and hair relaxers would be dermally absorbed and present in the uterus or the ovaries from hair relaxer use?

A I didn't assess that.

MR. BLISS: How long have we been going since lunch?

COURT REPORTER: Just an hour.

MR. BLISS: Why don't we take a quick break.

MS. DEBROSSE: Sure.

VIDEOGRAPHER: Stand by. The

time is 1:31 p.m. We're off the record.

(Whereupon, at 1:31 p.m., a recess was taken to 1:47 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 1:47 p.m. We are back on the record.

Q Dr. Zoeller, people are sequentially and simultaneously exposed to complex mixtures of chemicals present in water, air, and soil; in food; and in consumer products --

MS. DEBROSSE: Object to --

Q -- true?

MS. DEBROSSE: Object to form. Compound.

A Yes.

Q Martin, in his 2023 paper, states: Over 350,000 anthropogenic chemicals and mixtures of chemicals have been registered for production and use and the myriad of by-products, metabolites, and abiotically-formed transformation products

Dr. Zoeller

are not included in this figure.

Do you agree with that?

MS. DEBROSSE: Object to form.

The paper hasn't been presented to the witness. We don't know what's being read from.

You may answer to the extent you can.

A Yeah, I don't know the figure or the --

Q Just order of magnitude, does that sound right to you --

MS. DEBROSSE: Object to form.

Q -- 350,000 chemicals --

MS. DEBROSSE: Object to form.

Q -- have been registered for use or production?

A It could be.

Q I see from some of your presentations and public lectures that you're fond of the quote: We live in a toxic soup?

MS. DEBROSSE: Object to form.

A It wasn't my quote.

Dr. Zoeller

Q No, I understand, but your -- you seem to like the quote; am I right?

A It is.

MS. DEBROSSE: Object to form.

Go ahead.

MR. BLISS: I think he already answered.

Q And that quote, if I understand, is getting at the fact that a multitude of chemicals, including like the ones you focused on in your report, are ubiquitous in the environment?

MS. DEBROSSE: Object to form.

A So that was first coined by Linda Birnbaum, who was the director of NIEHS at the time, and it was certainly her opinion that we are -- we are in this -- we're all exposed.

Q Do you share that opinion?

A Yeah.

Q Is it possible, Dr. Zoeller, in ordinary life, at least in the U.S., to completely avoid exposure to phthalates?

A I don't know of any experiments

Dr. Zoeller

for that. You can certainly limit it.
Q What about parabens?
A I think the same for all.
Q Can exposure to those compounds be completely avoided realistically?
A Not normally.
Q And because we all live in a -- what we call a -- or what -- I forget the person's name -- we call it the toxic stew.
Any user of hair relaxer products will already have been exposed and will have continued to be exposed to the chemicals and chemical classes you focused on in your report from a host of other sources?
MS. DEBROSSE: Object to form.
A There is evidence for that.
Q Now, an essential part of your biological plausibility theory is that hair relaxer products contain multiple potent estrogenic EDCs that combine based on the principle of additivity to produce an effect that would not be seen with any of those EDCs individually, correct?

Dr. Zoeller

MS. DEBROSSE: Object to form.

A Yeah, that's -- that's not what I said. But what I'm saying is that the combination is worse than -- is more productive than any single one by itself. Now, the evidence for thresholds was a specific in vitro experiment that was -- that was for the purpose of understanding.

Q But is this principle of additivity essential to your theory?

A Yes.

Q You're not opining that the chemicals in hair relaxer products act synergically, correct?

MS. DEBROSSE: Object to form. Mischaracterizes the report and response.

A True.

Q And you're not ruling out that chemicals in hair relaxer products could act antagonistically with respect to ER-alpha binding or activation in uterine or ovarian tissues, true?

A So I think I have ruled that out

that --

Q Ruled out antagonism?

A So I think I have ruled out that the mixture has an agonistic effect.

Q How did you rule that out?

A They're all -- they're all estrogenic. Now, some have anti-estrogenic properties, but by and large, the overall effect is ER-alpha activational.

Q Individual phthalates have been found, as the studies you cite show, to act as ER-alpha agonists, antagonists, or both at different doses, true?

A Yeah.

Q And by the way, that's the same with estrogen receptor-beta?

MS. DEBROSSE: Object to form.

Is there a question?

You may answer.

A There is -- there is true in that, but the beta receptor is really not the focus of this.

Q Doesn't the beta receptor have something to do with ovarian cancer

Dr. Zoeller

pathogenesis?

A I am not aware of that.

Q In any event, you did not analyze in your report the affinity of any chemicals that you talk about with estrogen receptor-beta?

A I didn't.

Q According to Kortenkamp, et al., 2007 which has already been marked as an exhibit -- so you should have it there -- additivity occurs when combinations --

MS. DEBROSSE: I'm sorry, Counsel, can we get there.

MR. BLISS: Yeah.

MS. O'CONNOR: All right.

MS. DEBROSSE: Yes, there we go.

A What page?

Q 102.

MS. DEBROSSE: 102.

MS. O'CONNOR: It's Exhibit 7 -- It's Exhibit 4.

MS. DEBROSSE: Kortenkamp.

MR. BLISS: It's four?

MS. O'CONNOR: Yes.

Dr. Zoeller

Q Kortenkamp, et al., say these -- I'm reading the middle column, toward the bottom: The examples clearly demonstrate the combinations of EDs with similar effects are able --

MS. DEBROSSE: Counsel, I'm sorry. We're trying to follow you. Where are you?

MR. BLISS: Okay. Yeah. Middle column.

MS. DEBROSSE: Yeah.

MR. BLISS: Very last paragraph right at the bottom: These examples clearly.

MS. O'CONNOR: The middle column? Oh, wait. You're on another page.

MR. BLISS: 102. What did I say? Did I not say 102?

MS. O'CONNOR: I don't think you did. So it was page --

MR. BLISS: All right. Court reporter said I did.

MS. O'CONNOR: All right. Fine.

Dr. Zoeller

MR. BLISS: So I'm not losing my marbles completely.

Q All right. Anyway, this is -- I don't want to get too hung up on this. I think this is a very basic point. They say that combinations of EDs with similar effects are able to act together at doses that when used alone do not lead to observable effects.

Do you see that?

A Yes.

Q And you agree with that, I assume?

A Yes.

Q From the standpoint, Dr. Zoeller, of your biological plausibility theory, am I right that there is no difference in terms of ER-alpha binding and activation between exposure to a certain concentration of a single EDC and exposure to an equally effective concentration of a mixture of EDCs?

MS. DEBROSSE: Object to form.

A So the reason I'm thinking about

that is that there is -- there is certainly the case that a single EDC could have the same effect as the mixture, very different doses, if that's the question then.

Q That's the question. I'm -- I'm just trying to confirm my understanding, which is that from the standpoint of your biological plausibility theory, there is no difference in terms of ER-alpha binding or activation between exposure to a single EDC and exposure to an equi-effective concentration of a mixture of EDCs?

A Sure. By definition.

And by definition, the same would be true for ER-alpha proliferative signaling.

A Yes.

Q You didn't perform -- I think we already went over this, but you did not perform any exposure assessment for the chemicals you focus on in your report?

MS. DEBROSSE: Object to form. Asked and answered.

A No.

Q So you don't know what the level

Dr. Zoeller

of exposure in uterine or ovarian tissues would be, if anything, from the use of hair relaxers?

MS. DEBROSSE: Object to form.

A No.

Q And you didn't perform any mixtures risk assessment of chemicals in hair relaxer products?

MS. DEBROSSE: Object to form. Asked and answered.

A No.

Q Would you say, Dr. Zoeller, that from your perspective the relevant mixture for human health risk assessment is not just the chemicals in hair relaxer products but the broader mixture of EDCs and carcinogens to which women who use hair relaxer products are continuously exposed from all sources?

MS. DEBROSSE: Object to form. Foundation. Hypothetical. Compound.

A It is hypothetical. So the -- from -- from the --

Q Let me withdraw the question.

I'll ask another one.

I see in some of the papers that you have cited they talk about it's important to know what's out there in the environment. You don't necessarily know what the environmental exposures are, the levels of these chemicals and tissues.

So I'm just asking you whether, from your way of looking at things, the relevant mixture isn't just what's in chemical hair relaxer products but all of the sources of exposure to EDCs and carcinogens?

MS. DEBROSSE: Object to form. Foundation. Summary of document that have not been placed before the witness.

Answer the question if you can, Dr. Zoeller.

A So for the purpose of this opinion, what I recognize is that there are signals in epidemiology for the relationship between these products and cancer. And I don't see signals in

Dr. Zoeller

these -- this other domain of background exposure.

Q Are you familiar, Dr. Zoeller, with existing frameworks for mixture risk assessment?

MS. DEBROSSE: Object to form.

A Somewhat. And in Kortenkamp was instrumental in developing those.

Q You say you're "somewhat."

How familiar? Would you be able to explain them in any detail?

A Yes.

Q How would you summarize the steps involved in a mixture risk assessment?

A So for mixture risk assessment, the first thing you have to do is evaluate the chemicals of the interest and pin them to some equivalency. And it could be estrogenicity. So to what extent are each one of these chemicals -- what is their, you know, potency relevant to estrogen, how does that summate, and then to do that analysis after that kind of conversion, and they showed that in a couple of papers.

Dr. Zoeller

Q And a mixture assessment has to account for potential additivity synergy and antagonism?

A They do.

Q And I think you just answered this, but to determine if the chemicals in a mixture are acting additively, synergistically, or antagonistically there needs to be a common apical end point against which these potential effects can be measured?

MS. DEBROSSE: Object to form.

A So -- so I think that's incorrect. The normalizing features would be, like for estrogenicity, so it's an estrogen equivalent. The apical end point is what you're doing the risk assessment on. It would be circular arguments to try to, you know, normalize the data with respect to the apical end point.

Q But don't you need a common apical end point to measure the effects of the chemicals in the mixture?

A Sure. Well, right. You need

that but you wouldn't use that to normalize.

MR. BLISS: Please mark this as the next exhibit.

(Whereupon, a Modica article from December 2022 was marked as Zoeller Exhibit No. 11 for identification, as of this date.)

MS. DEBROSSE: Is this 10?

COURT REPORTER: Eleven.

MS. DEBROSSE: Do you have a copy for us, counsel?

MR. BLISS: Yes, I do. Sorry. I've got two.

MS. O'CONNOR: Oh, all right. He just wants to give away his paper.

MS. DEBROSSE: Is this Exhibit 11?

COURT REPORTER: Yes.

MS. DEBROSSE: Okay. Thank you.

Q Dr. Zoeller, you have in front of you as Exhibit 11 a paper Modica, et al., entitled "Endocrine-disrupting Chemicals, EDCs, and Cancer; New Perspectives on an

Dr. Zoeller

Old Relationship."
Do you recognize this as one of the papers you rely on in your report?
A Vaguely.
Q On page 24 of your report --
MS. DEBROSSE: I'm sorry, counsel. I think Dr. Zoeller is looking at his report to confirm.
MR. BLISS: Yep. Yep. I'm pointing him to where it is.
Q So, if you look on page 24, the first sentence of Section 8.4, you say: Different estrogenic EDCs can interact among themselves as well as with other environmental factors, including known carcinogens to increase cancer risk.
Then you cite Modica, et al., 2023; Rachón -- Rachón -- I'm not sure how to pronounce it 2015; Sharma, et al., 2024.
Do you see that?
A Yes.
Q Modica, et al., 2023 is a literature review, correct?
MS. DEBROSSE: Object to form.

Dr. Zoeller

I believe the Modica paper you've marked as Exhibit 11 is September of 2022.

MR. BLISS: Oh, maybe --

MS. DEBROSSE: Or it's received.

MR. BLISS: -- just --

MS. DEBROSSE: Yeah. I'm sorry, counsel. Go ahead. It's 2023.

MS. O'CONNOR: Okay.

MR. BLISS: Yes. I think it was maybe --

MS. DEBROSSE: Yeah.

MR. BLISS: -- the initial --

MS. DEBROSSE: Accepted.

MR. BLISS: Yeah. Yeah.

MS. DEBROSSE: Accepted.

MR. BLISS: Exactly. Exactly.

Q So this, Dr. Zoeller, is what we call "literature review"?

MS. DEBROSSE: Object to form.

A Yes.

Q If you look at page 672, there is a section entitled "Ovarian Cancer."

If you could please read that?

Dr. Zoeller

A The whole section?
Q Yeah. Just those four paragraphs.
A My voice is going to give out.
Q Okay. Yeah. Yeah. No. I don't mean out loud. You know what, let me read it.
A Okay.
Q How about this?
A I'll read it.
Q I just meant to yourself.
A Okay.
Q Worldwide, ovarian cancer is the seventh most common type of malignant neoplasm in women and the eighth cause of mortality in them. The global incidence of ovarian cancer has been stable during in the last decades without any screening program. The majority ovarian tumors over-express estrogen receptor-alpha, and this facilitates tumor growth through estrogen signaling.

There is no established EDCs clearly carcinogenic for ovary, but some

Dr. Zoeller

evidence suggests that there could be a higher risk to develop disease in people exposed to dioxin and to chloro-triazine herbicides. Herein, a study conducted in rats demonstrated that chronic exposure to TCDD promotes the development of ovarian tumors in female. On the other hand, in a case control study, women previously exposed to these EDCs showed a significant 2.7-fold increase risk of ovarian neoplasms.

A similar result was obtained by the agricultural health study conducted in North Carolina regarding EDCs assumed through food ingestion and meta-analysis of 62 observational studies; 49 studies for consumption of nitrates and 51 studies for nitrates -- natrates --

MS. DEBROSSE: Nitrites --

MS. O'CONNOR: Trites.

Q -- nitrites.

MR. BLISS: I don't know how to pronounce the difference.

Q Just three have studied ovarian

Dr. Zoeller

cancer, finding no statistically significant correlation. Further investigations are needed about relationship between female reproductive cancer in EDCs, like DES, BPA, or phthalates. TD -- TCDD and chloro-triazine herbicides seem to be carcinogenic for ovary.

Do you see that?

A Yes.

Q Do you agree with the authors of this study you cite that there are no established EDCs clearly carcinogenic for the ovary?

A I didn't know that literature like that. I mean, they're talking about EDCs broadly so...

Q So you don't know whether --

MS. DEBROSSE: Object to form.

Q -- you could agree with that or not?

MS. DEBROSSE: Object to form.

A I may have to work on that.

Q And, just to be clear, dioxin, as

Dr. Zoeller

I understand, has nothing to do with 1,4-dioxane?

A True.

Q And I take it you don't have any reason to think that hair relaxer products might, at some point, have contained chlorotriazine herbicides or dioxin?

MS. DEBROSSE: Object to form.

A I didn't see that.

MR. BLISS: Did we already mark a study by Rachón, if that's how it's pronounced?

Q Dr. Zoeller, do you have that one?

MS. DEBROSSE: I don't --

MR. BLISS: I don't think so. Yeah. I have it. Here we go.

If we could mark this as the next exhibit?

Fu?

(Whereupon, a Dominik Rachon article from February 2016 was marked as Zoeller Exhibit No. 12 for identification, as of this date.)

Dr. Zoeller

Q Dr. Zoeller, do you remember citing this paper in your report?

A Yes.

Q Now, this paper, as far as I could see, even though it's cited for your statement about mixtures, doesn't say anything about mixtures. But it does have, on pages 361 to 362, a section on ovarian cancer EDCs.

So if you can please turn to that?

MS. DEBROSSE: Object to form.

A Yes.

Q It says: Although ovarian cancer is not an estrogen-dependent malignancy, there have been some studies conducted in vitro on the effects of selected EDC on the proliferation of ovarian cancer cells. Data from experience conducted in vitro showed that BPA, nonylphenol, octylphenol, metho -- methoxychlor, benzophenone-1 stimulate the proliferation of ER-positive BG1 ovarian cancer cells via estrogen-signaling pathway. Benzophenone-1

Dr. Zoeller

is a commonly used UV filter which has also been shown to possess immunomodulating properties which resemble those of E2. Data from the experiments conducted by Hall and Korach also pointed to the mitogenic potential of BPA, genistein, and 2,2-bisphydro -- phydroxyphenol 1-1,1,1-trichlorothane, HPTE, in ovarian cancer cells, which is regulated via ER mediation expression.

Blah, blah, blah. I'm just going to skip over some of this verbiage.

The results of these studies, however, do not point to the potential association between exposure to these substances and ovarian cancer risk. We might speculate on the potential role of the indirect actions of EDCs on ovarian cancer risks, especially those possessing anti-estrogenic effects in the hypothalamus leading to an increased production of gonadotropins, which directly stimulate the gonads and therefore may also impact the risk of ovarian cancer development.

Clinical data on the exposure to environmental EDCs and the risk of ovarian cancer is, however, still lacking.

Do you see all that?

A Yes.

Q Do you agree with the authors of this paper that you cite that there is a lack of clinical data on the risk of ovarian cancer and exposure to environmental EDCs?

MS. DEBROSSE: Object to form.

A So there is a couple of things here. When they say that the results of these studies, they've just kind of reviewed in vitro studies, don't point to the potential association. Of course, they couldn't. They were in vitro studies. So then, when they -- when they say "clinical data on exposure to environmental chemicals," it's not exactly what's clear to me what they mean by "clinical data." So, you know, these are -- so it's not clear what they're -- I think what they're saying is that the in vitro data that they

Dr. Zoeller

just reviewed stands as it is, and it doesn't -- in -- it doesn't -- it's not clinical data, and it's not, you know, a human study.

Q Do you agree with that first part of the statement -- the first part of that paragraph, that ovarian cancer is not an estrogen-dependent malignancy?

A I think it depends on what you mean by that, because the previous paper just said that it's got elevated expression of ER-alpha that contributes to a proliferative signal.

Q But just this statement that ovarian cancer is not an estrogen-dependent malignancy --

A That's not --

Q -- would --

A -- my understanding.

Q Yeah.

But you would agree with me that that would be contrary to your statements in your report that the predominant medical view is that ovarian cancer is an

estrogen-driven cancer?
MS. O'CONNOR: In 2015?
MS. DEBROSSE: Object to form.
A Yes. As well as the paper that we just looked at.
MR. BLISS: Can you please have this marked as the next exhibit?
Okay.
(Whereupon, a Paper from Elisabete Silve, et al. from 2002 was marked as Zoeller Exhibit No. 13 for identification, as of this date.)
Q Dr. Zoeller, you have in front of you as Exhibit --
MR. BLISS: Thirteen?
What are we up to?
Q -- the paper you cite from Silva, et al., 2002?
A Yes.
Q Do you remember this paper?
A Yes.
Q The Section 7.7 on page 23 of your report, you cite on this paper and write --

Dr. Zoeller

MS. DEBROSSE: Just give us one moment --

MR. BLISS: Yep.

MS. DEBROSSE: -- to get there.

MS. O'CONNOR: Sorry.

What -- page 23?

MS. DEBROSSE: Section -- yes.

What did you say, Section 7.7?

Q Do you see, Dr. Zoeller, where you cite this paper by Silva, et al.?

And you write: A key observation made in the early 2000s was that mixtures of different EDCs that activate the estrogenic receptor-alpha can summate. In particular, this group --

Referring, I think, to Silva, et al.

-- combined a mixture of eight estrogenic EDCs at a concentration where each had no effect on ER-alpha activation, but showing that the mixture activated ER-alpha in a predictable concentration additive way.

Then you say: The take-home

Dr. Zoeller

lesson here is that this mixture effect would not be observed if there was a threshold below which EDC was inactive.

Do you see that?

MS. O'CONNOR: Each EDC.

Q Which each EDC -- okay.

Let me start. The take-home lesson, you write, is that this mixture effect would not be observed if there was a threshold below which each EDC was inactive.

Did I read that correctly?

A Yes.

Q Was your sentence there about the take-home lesson written correctly, because it doesn't seem to me to follow from what came before?

MS. DEBROSSE: Object to form.

A It does seem like the conclusion.

Q Okay. So here is where I'm losing you.

Couldn't it be the case that the individual EDCs in a mixture on their own would be below the level where they would

have any effect. Forget about observability, just have no effect. And yet, when combined in a mixture, would produce an effect because of their combined potencies.

Couldn't that be?

A So you're saying that each one doesn't have an effect, but when you combine them all together, they do?

Q That's my understanding of what these papers are saying.

A I don't think that's what they're -- I don't think that's what Silva is saying. And, in fact --

Q So --

A Well --

Q Let me -- let me withdraw -- let me just ask you a question.

Is it -- is it your opinion that, in order for individual chemicals to combine and have an effect as a mixture, they each have to have an individual effect?

MS. DEBROSSE: Object to form.

A Yes.
Q On page 1756 of Silva, et al., they write -- let me see where it is.
You see there are some numbered paragraphs in the left column on page 1756, last page?
A Okay?
Q Numbered paragraph 3 says: In the present study, we have explored combination effects at the molecular level close to biological receptors. An important task will be to investigate whether our findings hold true for biological effects at higher levels of cellular organization, e.g., estrogen-mediated cell proliferation or at the organism level. A study of in vitro effects of mixtures of estrogen and chemicals has recently been published.
Do you see that?
A Yeah.
Q Do you know what that recently published study showed?
MS. O'CONNOR: I see --

Dr. Zoeller

MS. DEBROSSE: Object to form.
I believe this paper is a 2002 paper.
But you may respond if you can.
Q Recently as of the publication of this Silva paper.
A No.
MS. DEBROSSE: Object to form.
Q Are you aware, Dr. Zoeller, of any other studies that investigated whether Silva, et al.'s findings hold true for biological effects at higher levels of cellular organization, like estrogen-mediated cell proliferation or at the organism level?
MS. DEBROSSE: Object to form.
Compound.
A Yes.
Q Did you cite those papers in your report?
Are those the Rajapakse papers?
MS. DEBROSSE: Object to form.
I think he was about to respond and review.
A I think I referenced -- I can't

remember the --

MS. DEBROSSE: You could look at your report.

A Sprung on page 53.

Q Sprung?

Sprung, I don't believe, had anything to do with estrogens.

A It didn't.

MS. DEBROSSE: Object to form.

A So it has to do with additivity. So if I can kind of go back to clarify this issue of summation, if a chemical is truly not affecting the estrogen receptor, it means it's not bound. And if it's not bound, it's not going to summate either. So that's -- that's the -- that's kind of the underlying argument for why this has to mean that they were bound. And if it's bound, it's having an effect. We just can't measure it.

Q Silva, et al., also writes -- same page we were looking at before, numbered paragraph 4: Endogenous steroidal estrogens exert quite strong effects at the

levels normally found in body fluids and tissues. Therefore, it's crucial to explore whether relatively weak xenoestrogens are able to create an impact on the actions of endogenous estrogens when combined at low levels that individually produce undetectable effects. Studies addressing these points are underway in our laboratory.

Do you see that?

A Yes.

Q Are you aware of any studies exploring whether relatively weak xenoestrogens are able to create an impact on the actions of endogenous estrogens when combined at low levels that individually produce undetectable effects?

A So I don't know what they published on this later.

Q Well, are those the two Rajapakse, et al., studies you cite?

A It could be.

Q I have a question --

MS. DEBROSSE: Look at your

report.

Q Yeah, feel free to look at your report.

And what I'm trying to understand, Dr. Zoeller, is whether the two Rajapakse studies you cite fit that description, and also, are you aware of any other studies?

MS. DEBROSSE: And why don't you just take a moment to look at your report, please.

A So -- so I'm thinking of in vivo experiments that would -- that are similar to this other one on brain development. So Earl Gray actually published one -- so this is -- this is chemicals that affect the androgen system. It's still the same thing. It's receptor-based interaction. And he showed the same, you know, the same principle of additivity. So that's -- that's also an old paper.

These are -- these are not today abnormal observations. And in fact, the European Commission right now is revising

reach and considering human kind of mixture analysis for their studies.

Q But Silva studied with estrogenic EDCs, correct?

A True. But it's the same principle.

MR. BLISS: We can mark this next exhibit.

(Whereupon, a Nissanka Rajapakse et al. article from January 2001 was marked as Zoeller Exhibit No. 14 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you as Exhibit --

MR. BLISS: What did you just say?

COURT REPORTER: Fourteen.

MR. BLISS: Fourteen. Thank you

Q -- the paper by Rajapakse, et al., published 2001, which you cite in your report. This study tested whether combining bisphenol A -- or I don't know how to pronounce this -- o,p'-DDT with 17beta-estradiol would produce an additive

effect relative to estradiol alone in terms of ER-alpha binding; is that right?

A Expression, yeah.

Q And looking at the abstract, third sentence from the bottom, the authors write: On combining E2 --

MS. DEBROSSE: Are you there?

THE WITNESS: No.

Q Abstract, third sentence from the bottom.

A Okay.

Q On combining E2, which is 17beta-estradiol, with either BPA, or I'll just call it "the DDT," at approximately equi-effective concentrations corresponding to molar mixture ratios between one to 20,000 and 1 to 100,000 E2 to BPA or to DDT, substantial modulations of the effects of E2 became discernible.

Do you see that?

A Yes.

Q In other words, if I'm reading this correctly, based on the mixture ratios, for any additive effects to become

Dr. Zoeller

discernible, the mixture had to contain 25,000 to a hundred thousand times more of the EDC than of estradiol?

MS. DEBROSSE: Object to form.

A I kind of have to look at their --

Q Sure.

A Okay.

Q Okay. So am I reading this correctly that based on the mixture ratios for any additive effect to become discernible the mixture had to contain 25,000 to a hundred thousand times more than the EDC than of estradiol?

MS. DEBROSSE: Object to form.

A 20,000 --

Q 20,000 -- I'm sorry -- 20,000 to a hundred thousand --

A Yeah.

Q -- correct?

A That's what they're saying now, yeah.

Q And this is an example of a threshold effect?

A In --

MS. DEBROSSE: Object to form.

A So it's still -- it's still a measurement threshold, right?

Q Right. But if I understand this correctly, they weren't seeing an effect, they weren't able to measure an effect until the mixture ratios got to 25,000 to a hundred thousand times more of the EDC than estradiol?

A Yes.

Q And they also say that the ratios normally found in human tissues would be below one to 5,000?

MS. DEBROSSE: Where are you, Counsel?

Q That's also in the first paragraph, very first paragraph. It looks like it's the fourth sentence down: For molar mixture ratios proportional to the levels normally found in human tissues, i.e., below one to 5,000 E2 to BPA or DDT.

Do you see that?

A I don't see "tissues." Oh, human

tissue. So --

Q And also -- well, withdrawn. Whatever the question was.

Am I also correct that the study showed that for each EDC and for each EDCs mixture with estradiol there was a monotonic dose response?

MS. DEBROSSE: Object to form.

And what section are you referring to, Counsel?

MR. BLISS: I'm just referring to the paper generally.

MS. O'CONNOR: You can look at --

Q Yeah, you can look at the curves.

A Yeah, I don't see any non-monotonic.

Q On page 303, Dr. Zoeller, the third paragraph from the top, Rajapakse, et al., write: Our results offer guidance in defining conditions where estrogenic chemicals may be substantially -- may add substantially to estrogenic burdens over and above the already strong effects of

Dr. Zoeller

steroidal estrogens.

From data about the levels of bioavailable 17b-estradiol and this DDT in the serum of postmenopausal women, it can be estimated that the molar ratios of the two agents lie between one to 1,000 and one to 6,000, far below the ratio of a median -- of median affect concentrations observed in many bioassays. Our data suggests that the contribution of this DDT alone to combination effects with the hormone are negligible at physiological levels. Similar considerations apply to BPA, although data about human tissues levels are sparse.

Do you see that?

A I didn't see it, but I'll take your word for it.

MS. DEBROSSE: No, Tom, make sure you see it. Okay.

Q No, no, no, you've got to see -- just -- okay. Page 303.

A Yeah.

Q Third paragraph from the top.

Dr. Zoeller

A Okay.

Q Starting right there?

A Okay.

MS. DEBROSSE: And, Counsel, after this, we'll take a break.

MR. BLISS: Sure.

MS. DEBROSSE: Thank you.

Do you see the paragraph now?

THE WITNESS: Yes.

Q Do you agree, Dr. Zoeller, that their data suggests that the contribution of this DDT alone to combination effects with the hormone are negligible at physiological levels?

MS. DEBROSSE: Object to form.

A So that's what these data suggested. Physiological levels is kind of tough. With the physiological level of DDT, it kind of shouldn't be there. It's a -- it is an odd turn of phrase. I think what they mean is that in background levels they don't expect to see an effect.

Q You see where they write "In summary" right at the end there. If you

Dr. Zoeller

turn to the next page: In summary --

A Yes.

Q -- our study does not provide support for the assumption that weak xenoestrogens are generally unable to create an impact upon the already strong effects of endogenous steroidal estrogens. In line with pharmacological principles, they will modulate significantly the actions of steroidal estrogens at mixture ratio similar to the relative potency.

Do you see that?

A Yes.

Q So in layman's terms, this is saying that for estrogens -- for exogenous estrogens to have any physiologically significant effects beyond what the body's own estrogens are already doing, there would need to be enough of them and big enough amounts that their combined potency would be similar to the potency of the body's own estrogens?

MS. DEBROSSE: Object to form. Mischaracterizes the document.

Dr. Zoeller

A So what they say is the -- the -- their data don't provide support for the assumption that we get -- we get, xenoestrogens are generally unable to create an impact. So it doesn't support the concept that they're not creating some impact.

Q That was the first sentence.

A On estrogenic.

Q But look at the second sentence of the summary.

MS. DEBROSSE: Object to form.

Q Yeah. They will modulate significantly the actions of steroidal estrogens at mixture ratios similar to their relative potency.

MS. DEBROSSE: Object to form.

Q So is that saying that they will significantly modulate endogenous estrogens if their combined potency is similar to that of a body's own estrogens?

MS. DEBROSSE: Object to form.

A It wouldn't have to be similar to the body's own estrogen. It would have to

be potent enough -- so one of the things, I think --

Q Well, just let me rephrase my --

MS. DEBROSSE: Counsel, just please let the doctor finish his response.

MR. BLISS: Okay.

A So one of the misconceptions that I think what they're trying to address here is this concept of competition per se, of course, in a -- in a structured in vitro assay, you can compare the potency on the estrogen receptor in a yeast cell because you're comparing them both in the same assay.

When it comes to the human body, the concept of competition has to be modified. So of course they're saying here that -- I mean I think from -- to make it clear, if a chemical isn't estrogenic, it's not going to affect estrogen signaling, the endogenous estrogen signaling and the degree to which a chemical or mixtures will affect the endogenous estrogen is dependent upon its

ability to do that.

Now, the interesting part about it is that -- that some xenoestrogens might be weak in terms of this -- this assay system. It may appear weak, several orders of magnitude less potent, in quotes, on that end point than estradiol. But it can have a much greater effect on the effect of -- on estrogen signaling than estradiol itself. In fact, several hundred fold greater.

So even though the dose is -- so the molar dose of, in quotes, weak estrogen has to be greater than that of estradiol. It has -- it's able to activate the estrogen receptor to a much greater effect. Both of those things have to be taken into consideration here.

Q Let's just go back to what Rajapakse, et al., say. They say: In line with pharmacological principles, "they" --

Meaning weak xenoestrogens.

-- will modulate significantly the actions of steroidal estrogens at mixture ratios similar to their relative

potency.

Do you agree with that statement?

MS. DEBROSSE: Object to form. Asked and answered.

A Yeah, like I said earlier.

MS. DEBROSSE: And, Counsel, we're going to take a break, a ten-minute break.

MR. BLISS: Oh, okay.

MS. DEBROSSE: All right.

VIDEOGRAPHER: Stand by. The time is 2:38 p.m. We are off the record.

(Whereupon, at 2:38 p.m., a recess was taken to 2:53 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 2:53 p.m. We are back on the record.

Q Dr. Zoeller, can you point me to any evidence of EDCs acting additively in a mixture to cause a type of cancer that could not have been caused by individual EDCs in the mixture at any level of

exposure?

MS. DEBROSSE: Object to form.

A I didn't look at that for this report. I really focused on kind of the materials that were there and how they would be integrated.

Q Okay. I'm going to ask a few more quick questions to the same effect, and you can answer as you like.

Can you point me to any evidence of an association between an EDC mixture and a type of cancer that is not associated with individual EDCs in the mixture at any level of exposure?

MS. DEBROSSE: Object to form.

A Again, I didn't look at that for this report.

Q So I take it you can't point me to any evidence of an EDC mixture increasing the risk of a type of cancer that is not associated with an increased risk from any level of exposure to individual EDCs in the mixture?

MS. DEBROSSE: Object to form.

A So I didn't look at that literature.

Q Let me ask one more in this vein, a little more general.

Can you point me to any evidence of exposure to a chemical mixture increasing the risk of a type of cancer that is not associated with an increased risk from any level of exposure to individual chemicals in the mixture?

MS. DEBROSSE: Object to form.

A Again, I didn't cover that.

Q Dr. Zoeller, on page 24 of your report, last sentence, you write: One way to visualize how EDCs can interact with carcinogens is to consider the key characteristics of carcinogens and the key characteristics of EDCs side by side, and you have a table.

Do you see that?

A Yes.

Q To be clear, the key characteristics of carcinogens, which I'll call KCCs and the KCs of EDCs were not

Dr. Zoeller

designed to help people think about how EDCs and carcinogen can interact, true correct?

MS. DEBROSSE: Object to form.

A So they -- so in neither case were people thinking that, although when we -- when we did KCs of EDCs, we were thinking it could be useful for this purpose.

Q Well, the purpose -- according to the literature, the purpose for which the KCCs are used is to identify and categorize scientific findings relevant to cancer mechanisms when assessing whether an agent is a potential human carcinogen, true?

MS. DEBROSSE: Object to form.

A Yes.

Q And the 10 KCCs are not, as the literature emphasizes, in and of themselves mechanisms of carcinogenesis or adverse outcome pathways?

MS. DEBROSSE: Object to form. Foundation.

A So -- so what they -- what they

are is characteristics of chemicals that are known carcinogens. And so there are ten characteristics that are -- that are common among, you know, the kind of proband, the hundred chemicals that they looked at to come up with these ten key characteristics. So -- so I'm not sure that -- that -- the way you phrased it can be kind of ambiguous.

Q Well, maybe we'll come back to that. I just -- I believe there was a statement in the Smith paper just pointing out that the KCCs are not in and of themselves mechanisms of carcinogenesis or adverse outcome pathways.

MS. DEBROSSE: Object to form.

Q Would you agree with that?

MS. DEBROSSE: Object to form.

A Yeah. I would have to look at that.

Q And you would agree that the KCCs are not used as a checklist for determining whether a chemical is carcinogenic?

A Correct.

Dr. Zoeller

Q The evidence identified and categorized based on the KCCs would have to be evaluated?

A In combination --

MS. DEBROSSE: Object to form?

A -- with --

MS. DEBROSSE: Go ahead.

A -- in combination with the -- all of the evidence on that -- on that individual chemical.

Q A chemical can have some number of the 10 KCCs and not be carcinogenic?

MS. DEBROSSE: Object to form.

A It's possible, but when the KCs are used, there is other evidence that indicates carcinogenicity.

Q Oh, I understand.

I'm just saying that it's true that a given chemical can possess one or more of the KCCs and, upon evaluation, not be classified as a carcinogen?

MS. DEBROSSE: Object to form.

A I don't know of a case like that, but...

Dr. Zoeller

Q So just to make sure I -- your understanding is that every chemical that has one or more of the KCCs is carcinogenic?

A There's --

MS. DEBROSSE: Object to form.

Just give me a second.

A Is a candidate certainly.

Q But that's not my question. Just listen carefully to my question.

Is it your understanding that any chemical that possesses any number of the KCCs is carcinogenic?

MS. DEBROSSE: Object to form.

Asked and answered.

A Since it's not a checklist, I don't think that you can look at it like that.

Q And am I correct in understanding that the KCs of EDCs were inspired by the KCCs and, like the KCCs, were developed to be used as a universal framework for identifying, organizing, and utilizing mechanistic data when evaluating chemicals

for endocrine disruption?

A So the point was to -- to communicate what the -- you could almost call it "molecular initiating events," things that all -- it depends on what the -- what the KC is that -- that can effectively interfere with hormone action to inform people and to inform risk assessors.

(Whereupon, the court reporter requested clarification.)

Q Right.

But am I -- am I correct that the KCCs -- I'm sorry -- the KCs of EDCs were developed to be used like the KCCs as a framework for identifying, organizing, and utilizing mechanistic data when evaluating chemicals as EDCs?

A Yes.

Q And, likewise, they're not intended to be used as a kind of checklist?

A True.

Q In the section of your report after you put the KCCs and KCs of EDCs side

by side, you basically kind of checked the boxes and then conclude that the combination of EDCs and carcinogens in hair relaxer products, quote, greatly increases the risk of uterine and ovarian cancer.

MS. DEBROSSE: Object to form. Object to the characterization --

Q Do you see that?

MS. DEBROSSE: -- of "checking the boxes."

You may respond.

A I don't see exactly what you are pointing to.

Q Okay. If you look at your report?

What page are we on, 26?

So last sentence of 25 going on to 26, you write: The combination of the additive effect of estrogenic EDCs in hair relaxers producing an effect that would be seen with a single chemical and -- all caps -- the additive effect of carcinogenic chemicals greatly increases the risk of uterine and ovarian cancer.

Do you see that?
A Yes.
Q And the basis for that -- and there is no citation there, correct?
A Correct.
Q And the basis for that seems to be the suggestion that chemicals and hair relaxer products possess collectively these key characteristics of carcinogens and EDCs --
MS. DEBROSSE: Object to --
Q -- true?
MS. DEBROSSE: -- object to form.
A So the -- first of all, this is coming from -- this is fitting into this kind of recognized mechanism of pathogenesis. So that -- that -- what this is showing is that the combination of estrogenic chemicals and carcinogens within this single product are providing an environment that many people have talked about as being the cause of uterine and ovarian cancer. And this fits that.

Q Dr. Zoeller, I asked you earlier about how many exogenous chemicals would you say are known endocrine disruptors.

You said, as I recall: It depends on the definition but it's probably somewhere on the order of a thousand?

A People say that.

Q Do you know roughly how many of those chemicals have been classified by a regulatory agency as known or probable carcinogens?

Do you have a sense of that?

A Different regulatory agencies have different numbers. I'm trying to come up with a list. Actually, we're doing that on this WHO document. So we have staff who are trying to figure that out. It's not easy to find.

Q Do you have a ballpark sense of the percentage --

MS. DEBROSSE: Object to form.

Q -- of EDCs that have been classified as known or probable carcinogens?

Dr. Zoeller

A Oh, no, I don't.

Q Am I right that no regulatory agency considers endocrine activity alone as evidence for endocrine disruption or a downstream adverse effect?

MS. DEBROSSE: Object to form. Compound.

A Any regulatory. So -- so the European Commission in that the jurisdiction, so it depends on the jurisdiction. But in the context of biocides and plant protection products, they do. So it's the -- it's the -- you know, I don't want to say endocrine activity. A chemical that has been defined as an endocrine disruptor, even in the absence of human data, will not be licensed. So they do regulate on the basis of that.

Q Why did you focus on benzophenone, siloxanes, phthalates, and parabens?

A Those were the ones that were identified by Helm, et al.

Q If you were to order them in terms of the strength of evidence in favor of your theory as you see it, what would the order be?

MS. DEBROSSE: Object to form.

A I didn't -- I didn't order them, and to look at each one comprehensively like that to rank order them, I think it's hard to say at least right now. I think it's doable.

Q In support of your conclusions regarding benzophenones, you discuss seven studies, all of them mechanistic and all but one of them in vitro.

A All --

MS. DEBROSSE: Object to form.

A -- of them.

Q It's on pages --

A I didn't hear that last part.

Q -- 28 through 30 of your report.

Is that correct?

A Yes.

Q And just are -- am I correct that all of the studies you discuss for the four

Dr. Zoeller

chemical classes are mechanistic studies?

A Yes. The goal of that was just to characterize their estrogenicity, and that's actually what -- what Silva and others -- that was their whole point.

Q And am I correct that, in support of your conclusions regarding phthalates, all of the mechanistic studies you cite were in vitro?

A Yes.

Q And am I correct that, in support of your conclusions regarding siloxanes, you discuss five mechanistic studies, two of which are in vitro?

That's on pages 30 to 32.

A Yes.

Q When you prepared your report, were you aware that these four chemical classes have been studied for carcinogenicity in animals?

A I didn't look at that.

Q Did you look at whether these four chemical classes had been the subject of epidemiology studies -- cancer

Dr. Zoeller

epidemiology studies?

A So the point I was -- I mean, the path that I went down was excess estrogen is being contributed by these chemicals, so that's where the data were important and relevant to this opinion.

Q So you weren't -- because of that, you weren't looking for human carcinogenicity data with respect to these classes of chemicals or the four carcinogens?

MS. DEBROSSE: Object to form.

A Your -- well, everything up to your carcinogens, yes, I didn't look at these as carcinogens but as estrogenic chemicals.

Q Right.

And, because of that, you didn't look for human carcinogenicity data with respect to these four classes of chemicals?

MS. DEBROSSE: Object to form.

A Correct.

Q And you also did not look for human carcinogenicity data with respect to

Dr. Zoeller

the four -- what you call the four carcinogens -- formaldehyde, ethylene oxide, 1,4-dioxane, and N-nitrosamines --

MS. DEBROSSE: Object to form.

Q -- correct?

MS. DEBROSSE: Object to form. Compound.

A I kind of didn't have to largely because they're so well-known to be carcinogens.

Q But not for uterine or ovarian cancer, true?

MS. DEBROSSE: Object to form.

A So they are known to be carcinogens in terms of both producing tumors but also having key characteristics that are important for carcinogenicity.

Q But they're not known for producing uterine or ovarian tumors?

MS. DEBROSSE: Object to form. Asked and answered.

A It wasn't part of my -- it wasn't part of this opinion.

Q To look at that question?

Dr. Zoeller

A To look at that question in other studies, especially alone and kind of in isolation.

Q On page 28 of your report, you say -- actually, you know what, withdraw that.

I want to bounce around a little bit.

MS. DEBROSSE: Did you withdraw the question, counsel?

MR. BLISS: I did.

MS. DEBROSSE: Okay.

MR. BLISS: Yeah. So apologies for bouncing around a little bit, but I'm cognizant of the time.

Q Just to be clear, you're not claiming that any of the four chemicals that you refer to as carcinogens exhibit NMDR?

MS. DEBROSSE: Object to form.

A That wasn't part of the opinion.

Q And that's not something you're claiming?

You're not claiming that

Dr. Zoeller

formaldehyde exhibits non-monotonic dose response?

A I didn't. Yeah. That was --

Q And you're not --

A Yeah.

Q And you're not claiming that any of those four chemicals or chemical classes exhibit low dose effects?

A Well, I didn't -- yeah. I can't say that I'm not claiming that.

Q I didn't see --

A And it's having --

Q -- it in your report?

A Right. So it's -- so what I'm saying is that, in terms of the mechanism that explains the epidemiology, those chemicals have sufficient potency in abundance. Now, low dose -- in fact, Andreas was talking about the definition of "low dose." There is many definitions. In this case, I don't think that's a relevant concept.

Q That was my understanding from reading your report, that that is a concept

relevant to EDCs, not to these carcinogens.

MS. DEBROSSE: Object to form.

A I'm getting confused.

Q Okay. So, in your report, you talk about NMDR, low dose effects, thresholds when you're talking about EDCs. You don't connect those thoughts at all in your report, as far as I can see, with the four carcinogens --

MS. DEBROSSE: Object to form.

Q -- that you focus on.

MS. DEBROSSE: Object to form.

A So the point of that kind of analysis -- or the point of that review is that -- is that EDCs have properties that are different from traditional -- what we think of as traditional toxins that have -- that can have a linear dose response, et cetera. So that was -- that was a way of kind of demonstrating that we have to change the way we think about, essentially, receptor-based toxicity.

Q Right. But just my question is simpler than that.

It's just to clarify that your discussion of NMDR, low dose effects, and the inapplicability of exposure thresholds relate only to the EDCs you focus on and not to the carcinogens you focus on.

MS. DEBROSSE: Object to form. Asked and answered. Mischaracterizes the testimony.

You may answer if you understand the question.

A So it was focused on EDCs.

Q And you're not making those claims with respect to the carcinogens?

A I didn't make that.

Q Would you agree that none of the four carcinogens that you focus on have been classified by regulatory agencies based on evidence of carcinogenicity in ovarian tissue?

MS. DEBROSSE: Object to form. Compound.

A I don't know that.

MS. DEBROSSE: Lacks foundation.

Q You didn't look at the basis for

any regulatory classifications?

MS. DEBROSSE: Object to form. Compound. Lacks foundation.

MS. O'CONNOR: Exceeds the scope.

MS. DEBROSSE: Exceeds the scope of his opinion.

But answer the question if you can.

A So I read about it, but that's different from what your question is.

Q Let me ask a different question. I didn't see it, I don't think, in your reference materials.

But did you look at the regulatory classifications of the chemicals that you focus on in your report and review the bases for those classifications?

MS. DEBROSSE: Object to form. Compound. We have not presented Dr. Zoeller as a regulatory expert.

To the extent that you can answer Counsel's question, please do.

A So -- so the -- so the principle

Dr. Zoeller

here is that there is a mixture effect of estrogenic EDCs and carcinogens. Those carcinogens have key characteristics that produce a milieu of genomic instability. So just, you know, as you increase proliferation -- cell division increases with every division, you run the risk -- there is a risk -- that there is an effect that produces -- that leads to cancer. That's the -- that is the mechanism by which these cancers will occur.

So it doesn't really matter to me whether the -- whether the carcinogens that I talked about were identified or evaluated by IARC or whatever in terms of those particular cancers. And in fact, the key characteristics of carcinogens are not used like that. They're not used to say a cancer in this tissue is caused because of this key characteristic. Those key characteristics apply to all cancers.

And so it's the combination of the two different activities, if I can think of it more like activities. There is

estrogenicity, cell proliferation. There is the milieu that -- that increases the likelihood on many cell divisions -- we are talking about many cell divisions over decades potentially that you have a single cell that goes down the path of carcinogenesis. And in fact, most of these tumors are monoclonal. So that supports this -- this concept.

Q I appreciate the explanation, Dr. Zoeller.

But is the answer to my question that in preparing your report -- and I understand you had reasons, but you did not consider it of any particular relevance to examine the bases on which any of these chemicals that you focus on were classified as known or probable carcinogens?

A Right. That's not true.

MS. DEBROSSE: Tom, same --

Q I'm sorry. What?

MS. DEBROSSE: Same objection as the prior objection. Object to form.

Q My statement is not correct?

MS. DEBROSSE: But let me just get the objection on the -- I need to get the objection on the record. My prior -- exceeds the scope. Compound. Object to form.

You may respond.

Do you need to hear the question again?

(The requested portion of the record was read back.)

A The original question was whether I looked at the regulatory agencies that evaluated carcinogenicity for these cancers. And I didn't -- I -- that's not what I was worried about.

Q I'm sorry. For these cancers or for these chemicals?

A What I was worried about --

Q Did you mean to say for these --

A For the -- for these particular cancers, uterine and ovarian. That's the way I understood your original question. Now, I looked at those data to understand the key characteristics, the kinds of

Dr. Zoeller

effects, the activities that these chemicals have that would support an opinion about whether they can, in one way of thinking about it, collaborate, producing an environment that increases the risk of cancer.

Q Are you aware, Dr. Zoeller, that the four carcinogens you focus on have been studied for carcinogenicity in animals?

MS. DEBROSSE: Object to form. Compound.

You may respond.

A Yes.

Q Or you didn't consider that relevant, as I understand?

MS. DEBROSSE: Object to form.

A I didn't put it in here. It was more important to me to make the case for the production of a tumorigenic environment.

Q Dr. Zoeller, how would you know that the incremental exposure from hair relaxer use, to say exogenous formaldehyde, would be enough to move the needle in terms

of a milieu, as you call it?
MS. DEBROSSE: Object to form.
A So the way I put it here is that, first of all, when you think about whether it's likely -- is it plausible? Is it likely? It's -- but what I had to think about is what's the likelihood that it's not. These are -- the concentration that Helm produces is significant for these estrogenic chemicals. The -- I can't think of a way to propose that it's not having an effect on cell proliferation. It's probably significant.
Q But is there a level of exposure below which these four carcinogens would not materially change the environment?
MS. DEBROSSE: Object to form.
A I don't -- I mean, that's a theoretical question that I don't think is relevant to the opinion because the amount of chemicals that are -- that are in there is significant.
Q But how do you know it's significant in the sense that it would

change the environment materially?

MS. DEBROSSE: Object to form. Asked and answered.

A So I would have to propose that it doesn't, and I think that that's not likely.

Q Well, let's take an example.

The maximum concentration in any component of a certain defendant's hair relaxer products was 0.00000001.

A Well, I don't know where that's coming from.

Q No, no, I'm telling you.

A Okay.

Q I'm just -- I'm giving this to you as a fact.

A Okay.

MS. DEBROSSE: Counsel. Object to form. If there is a document you would like to show the witness.

Q Okay. Just I'll make it a hypothetical.

Assume hypothetically, that the maximum -- the maximum concentration of

Dr. Zoeller

N-nitrosamine In any hair relaxer product at issue in this litigation was 0.0000001?

A One what?

Q That's the concentration.

A Grams?

MS. DEBROSSE: Object to form.

Give me a moment.

Q Yeah, it's whatever the unit of measure is for the -- for the component.

MS. DEBROSSE: Object to form. Foundation. Hypothetical.

Q Micrograms again?

Yeah, again, I can -- I can ask you hypotheticals.

But let's assume it's a teeny, teeny, tiny concentration like that. That's the concentration of the kit component like the shampoo, right? I don't know how -- I don't know. It could be one trillionth of a percent of the concentration?

MS. DEBROSSE: Objection to form. Objection to "tiny concentration" and just the inability

Dr. Zoeller

to even give the -- what is the measurement of, I think, is what Tom has been asking.

But Doctor, if you can answer --

MR. BLISS: Okay. I could -- I could -- I could --

MS. DEBROSSE: Okay.

MR. BLISS: -- clarify that on a break.

Q But let's say it's one molecule. We'll use your -- you like molecules. One molecule.

A So that's --

MS. DEBROSSE: Object to form.

You can answer.

Q No, no. Seriously, I mean, well, it's hypothetical. We'll take it to an extreme. Let's say it's a molecule.

A That question --

Q Do you think that that would materially impact the milieu?

MS. DEBROSSE: Object to form.

A So that question came up with the JRC a number of years ago when I was on

Dr. Zoeller

that debate. The answer that most people agreed with was yes, though it's unlikely. Okay. So when you talk about -- and this is -- so you're at zero zero point whatever. If you think about a mole of chemicals, all chemicals, a mole is 6.023 times 10 to the 23rd, 23 zeros. You can go 0.00001. You've still got billions or quadrillions of chemicals.

Q Of molecules?

A Of molecules, yes.

Q Well, let's talk about formaldehyde.

Formaldehyde is produced endogenously?

MS. DEBROSSE: Object to form.

A Yes.

Q If I remember correctly, our bodies produce something like one and half to two, maybe two and half ounces of formaldehyde a day?

MS. DEBROSSE: Object to form?

Is there a question?

A I would be really surprised at

that.

Q In any event, wouldn't endogenous formaldehyde already be in uterine and ovarian issues?

MS. DEBROSSE: Object to form.

A So there are a number of enzymes that break down formaldehyde. Once those are saturated, you have got a problem. So -- and by "problem," I mean, you now have free formaldehyde. The whole issue with the carcinogenicity of formaldehyde is that those enzyme systems get saturated and, in different tissues, saturated more quickly. In fact, I think it's alcohol dehydrogenase that breaks down formaldehyde that's high in the liver, but it's not high in other tissues.

Q Let me ask a general question: Is your theory of biological plausibility indifferent to exposure and dose?

MS. DEBROSSE: Object to form.

A No. And that's -- that's really why I talk about molecules. Because when we talk about micrograms, it's not really a

relevant metric. It's what people use. I do, you know, HPLC or mass spec, and I come up with an estimate of the mass, so micrograms per gram, in the case of Helm.

But to translate that into something that's meaningful, you really need to think about what that means for the chemical. These chemicals have low molecular weight, which mean that the number of molecules is going to be huge.

Q Okay. Let's keep in it terms of number of molecules. You agree that what we care about is the number of molecules that -- from exposure to hair relaxers products that reach ovarian and uterine tissues?

A Yeah. What we care about is cell proliferation. That's really the -- that's the index that's the kind of --

Q But am I right that for your theory to hold, these chemicals have to reach the uterus and the ovaries?

MS. DEBROSSE: Object to form.

A They would have to be there,

yeah.

Q So let's just say use of chemical hair relaxer products, most of which obviously go on the hair?

MS. DEBROSSE: Object to form.

MS. O'CONNOR: Object to form.

Q Not everything that's in the bottle would end up in the body; fair to say?

MS. DEBROSSE: Object to form. Foundation.

A Not everything.

Q And let's just say as a hypothetical that one molecule of each of these chemicals were to end up in uterine tissue.

Would your theory still hold?

MS. DEBROSSE: Object to form.

A So to be theoretical, then it would -- it would hold, but it would also be a matter of probability. The fact is that we're talking about -- we're talking about a -- a truly enormous number of molecules of these chemicals that are

getting into the body. It's -- it's not plausible to me that they won't have an effect on a tissue that is estrogen sensitive.

Q But do you agree with me that whether that's plausible and the extent to which it's plausible does depend on the exposure in uterine and ovarian tissues?

MS. DEBROSSE: Object to form. Asked and answered.

A So I think the evidence for that is really Chang. If people don't use it, they don't -- it's -- it's a lower --

Q I'm not talking about zero exposure. I'm talking about level of exposure.

MS. DEBROSSE: Object to form.

A So the increased level would increase risk.

Q And is there a level below which your theory would become implausible?

MS. DEBROSSE: Object to form.

A There is no evidence for that.

Q But would your theory become less

and less plausible as exposure --

A No, it would be less and less -- it's equally plausible. It's just less and less likely. So, you know, the -- to quantify the risk, which is what the epidemiology kind of does within their framework, that's, you know, the people in that population study are all different. So this idea that it's not plausible at one dose and it is plausible at another dose, I don't think that's -- that's too binary.

MR. BLISS: How long have we been going?

COURT REPORTER: Forty minutes --

MR. BLISS: Let's take a break.

VIDEOGRAPHER: Stand by. The time is 3:34 p.m. We're off the record.

(Whereupon, at 3:34 p.m., a recess was taken to 4:14 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 4:14

Dr. Zoeller

p.m. We're back on the record.

Q Dr. Zoeller, are you aware that in December of last year, 2025, the EPA and its Science Advisory Board released their final risk evaluation of phthalates under the Toxic Substances Control Act?

A I haven't read that, no.

Q Would it matter to your opinion?

A It's unlikely. First of all, the SAB doesn't -- doesn't do risk assessment. So I'm not sure what that would -- that would be.

MR. BLISS: If we can please mark this as the next exhibit.

(Whereupon, an EPA Phthalates Risk Evaluation document was marked as Zoeller Exhibit No. 15 for identification, as of this date.)

Q Dr. Zoeller, you have not seen this document?

A No.

MS. O'CONNOR: Can we establish what it is?

MS. DEBROSSE: Take your time to

review, please.

MR. BLISS: I'm trying to find my copy of it. Did I somehow give it away?

Hold on a second.

MS. O'CONNOR: Okay.

Q So this document is entitled "EPA Phthalates -- EPA Phthalates Risk Evaluations, Comprehensive Toxic Substances Control Act, Scientific Assessments, Protect American Families, Workers, and the Environment Through Gold Standard Science and Rigorous Peer Review."

Looking down under the heading "Protecting American Health," it says: EPA conducted the most comprehensive evaluation ever of five widely used phthalate chemicals using gold standard science and extensive public input. We examined these chemicals' potential for health effects.

Do you see that?

A Yes.

Q But you're not familiar with this review by the EPA?

Dr. Zoeller

MS. DEBROSSE: Object to form. Asked and answered.

A No. First of all, this is a press release, it looks like. Okay?

Q Would the EPA's risk assessment of phthalates influence your opinion at all?

A I would have to read it.

MS. DEBROSSE: Object to form. To the extent this is a representation that the -- this is the EPA's risk assessment of phthalates, and that has not been established.

But to the extent you can respond, you can respond.

MR. BLISS: I'll mark another document.

VIDEOGRAPHER: Can we go off the record for a second.

MR. BLISS: Yeah, sure.

VIDEOGRAPHER: The time is 4:19 p.m. We're off the record.

(Whereupon, at 4:19 p.m., a recess

was taken to 4:20 p.m.)
(The proceeding resumed with all parties present.)
(Whereupon, a EPA Risk Evaluation for Diethylhexyl Phthalate was marked as Zoeller Exhibit No. 16 for identification, as of this date.)

VIDEOGRAPHER: The time is 4:20 p.m. We're back on the record.
MR. BLISS: He has it?
MS. O'CONNOR: Extra.
MR. BLISS: Okay.
Q Dr. Zoeller, you have in front of you Exhibit whatever number it is --
COURT STENOGRAPHER: Sixteen.
Q -- sixteen, the EPA's non-technical summary of the TSCA Risk Evaluation for Di-ethylhexyl Phthalate, DEHP.
MS. DEBROSSE: Object to form.
Do we have that document?
MR. BLISS: Oh, I'm sorry.
Q And this is just what it's described as, a non-technical summary. And

Dr. Zoeller

you'll see, on the second page of this document, there is a heading, "What is EPA's Final Risk Determination for Di-ethylhexyl Phthalate under TSCA?"

Do you see that?

MS. DEBROSSE: And, counsel, object to form.

Let's give Dr. Zoeller a moment --

MS. O'CONNOR: Yeah.

MS. DEBROSSE: -- to review the document, please.

MR. BLISS: Sure.

A Well, there is a couple of things. One is --

MS. DEBROSSE: Let's review the document.

MS. O'CONNOR: You have to read the document.

THE WITNESS: It's not a whole document.

MS. O'CONNOR: All right.

THE WITNESS: It starts on page 144.

Dr. Zoeller

MS. O'CONNOR: I see.

Q I mean, the set of documents for these risk evaluations is absolutely massive.

A Yeah.

Q So let me just try to cut to the chase here.

The EPA, after finishing its risk evaluation, determined that the phthalates they evaluated -- DEHP, DBP, BBP, among others, were likely not carcinogenic to humans and were not a risk to the general population under any conditions of use. Just assume that.

MS. DEBROSSE: Let me get my objection --

Q Now --

MS. DEBROSSE: -- on the record on -- on multiple fronts. I object to the document not being submitted in some form its totality. It could have submitted electronically into the record. We have very limited pages from the record. We -- you're

also asking our expert to take your summary of a document that, if I understand correctly, is hundreds of pages long which he has never seen and has testified that he has not read and to simply accept your summary.

Counsel, that is not proper. I've gotten my objecting on the record.

MR. BLISS: That's fine.

Q So, Dr. Zoeller, I'm just trying to understand whether the EPA's risk evaluation of phthalates has any bearing on your opinions in this case?

MS. DEBROSSE: Same objection.

A So if I haven't, I can't answer that. I mean, I've read a number of EPA risk assessments. This is put out by the Office of Pesticides. I don't really know that's -- that's not entirely common. The IRIS program usually puts out major risk assessments, so I'm just not sure. I mean, I've seen risk assessments that EPA does

Dr. Zoeller

that are gold standard, and I have seen some that are not. So, in the absence of --

Q Okay. Fair enough.

(Whereupon, a Document, titled Estrogen agonistic/antagonistic activity of bromated parabens by Saski and Terasaki was marked as Zoeller Exhibit No. 17 for identification, as of this date.)

MR. BLISS: Okay. Mark this. Is it 14?

COURT STENOGRAPHER: Seventeen.

MR. BLISS: Seventeen. Gotcha. Can't keep them straight.

MS. DEBROSSE: And this is what exhibit number?

MR. BLISS: Seventeen.

MS. DEBROSSE: Okay.

Q Dr. Zoeller, looking at page 35 of your report, which is the section talking about parabens, the first study you cite is Sasake and Terasaki --

MS. DEBROSSE: Are you there?

Dr. Zoeller

Q -- 2018.

Do you recall citing this study in your report?

A Yes.

Q You wrote in your report: Sasake and Terasaki studied the ability of nine different parabens that were non-brominated, monobrominated, or dibrominated to interact with estrogen receptor-alpha in a yeast-based system. Seven of the nine non-brominated parabens significantly activated the estrogen receptor in this system. No brominated paraben activated the estrogen receptor. The effective concentration that significantly activated the estrogen receptor was in the 100 nm range.

MS. DEBROSSE: Object to form.

Q Do you see that in your report?

A Yes.

Q Now, the three parabens that Helm, et al., found in the three hair relaxer products they analyzed were ethylparaben, methylparaben, and

Dr. Zoeller

butylparaben.

Do you recall that?

MS. DEBROSSE: Object to form. Foundation.

You may answer.

A Yes.

Q And, in this study that you cite, two of those, ethylparaben and methylparaben, were both negative for ER agonistic and antagonist activity?

MS. DEBROSSE: Object to form.

A I don't see E antagonism.

Q Look at Table 3.

It says: Estrogen agonistic and antagonistic activity brominated parabens.

Maybe there is another table as well.

If you look at MP --

MS. DEBROSSE: I'm sorry. What page are you on, counsel?

MR. BLISS: 21263.

Q Am I correct, Dr. Zoeller, that in this study, ethylparaben and methylparaben were both negative or, as it

says here "not active as agonists or antagonists"?

MS. DEBROSSE: Object to form. Compound.

A So, in that table, they show not active.

Q And am I correct that butylparaben was found to have both agonistic and antagonistic ER activity?

A Yes.

Q And so am I correct in understanding that this study cuts against your theory?

MS. DEBROSSE: Object to form.

A So I don't think so. There are other studies that show -- one thing about this assay is -- yeah. So it's a -- it's a colorimetric yeast-based assay. There are other -- there are others that don't -- there are other papers that show the estrogenicity of these compounds. There's -- there's reasons that it would be positive in one study and not positive in another.

Dr. Zoeller

The main reason I used this was because of the figure that looks at -- especially "A" in Figure 3 that shows kind of a graphical activation of the receptor.

Q Right.

But am I correct that your theory posits that the chemicals in hair relaxer products are estrogen receptor-alpha agonists?

A That the overall effect of the mixture is ER-alpha activational, yes.

Q But at least according to this study in this particular assay of the three chemicals, the three parabens that Helm found in hair relaxer products, two of them were found not to be agonists --

MS. DEBROSSE: Object --

Q -- and one of them was found to be both an agonist and antagonist?

MS. DEBROSSE: -- object to form. Compound.

A So two things. The --

Q Well, is that what the study shows?

Dr. Zoeller

A The study shows that. The reason -- the reason it doesn't refute my opinion is that, first of all, the antagonist was far less than the agonism, if that's a word. Secondly, we're not looking at just one phthalate or paraben. We're looking at the entire mixture. The entire mixture is on balance estrogenic.

Q Well, you haven't done any actual mixture analysis, so --

A I haven't done --

Q -- do you know that?

A -- a formal --

MS. DEBROSSE: Object to form. Asked and answered repeatedly during the deposition.

You may respond if you understand the question.

A So I haven't -- you know, I haven't published a formal ER activation study on the chemicals that have been demonstrated to be in there.

MR. BLISS: I seem to be missing a folder. No. Here it is.

All right. Please mark this as Exhibit 18.

Q Dr. Zoeller, you have in front of as Exhibit 18 the study by Ziv-Gal, et al., published in 2020 entitled "Paraben Exposure Alters Cell Cycle Progression and Survival of Spontaneously Immortalized Secretory Murine Oviductal Epithelial Cells."

MS. DEBROSSE: I am sorry, counsel. I don't believe we're looking at the same document that you have marked?

MR. BLISS: Oh, really?

Oh, we're not. Shoot. Okay. Hold on. Give me that back.

MS. O'CONNOR: Do you want to de-mark it?

MR. BLISS: Yeah. Let's de-mark it. I don't know. It was in the wrong folder. Okay. Let's try this again.

Q Dr. Zoeller, do we --

MR. BLISS: Okay. We got it.

Dr. Zoeller

(Whereupon, a Document, titled Paraben Exposure Alters Cell Cycle Progression and Survival was marked as Zoeller Exhibit No. 18 for identification, as of this date.)

MR. BLISS: Okay. Take two.

MS. DEBROSSE: Thank you.

Q Okay. Dr. Zoeller, I believe you will now have in front of you the study by Ziv-Gal, et al., 2020.

MS. DEBROSSE: And this is replacing Defendant's 18, correct?

MR. BLISS: Yes.

MS. DEBROSSE: Okay.

MR. BLISS: So to be clear for the record, Defendant's 18 is the study entitled "Paraben Exposure Alters Cell Cycle Progression and Survival," et cetera, et cetera.

Q Do you recall citing this article --

MS. DEBROSSE: Object to form.

Q -- or this paper, Dr. Zoeller?

A Vaguely. I would have to look

Dr. Zoeller

through it.

Q Well, on page 35 of your report, you describe this as a study that used murine oviductal epithelial cell line -- used a murine oviductal epithelial cell line to study cell proliferation induced by parabens and identify the intracellular pathways being regulated by these chemicals.

Of the three parabens Helm, et al., found in hair relaxer products, only methylparaben was tested in this study; is that right?

MS. DEBROSSE: Object to form.

A There is propylparaben also.

Q I don't think that was identified in the Helm study.

But this study, in any event, looks at --

A Okay.

Q -- methylparaben and propylparaben?

A Okay. Yes.

Q And, as you acknowledge in your

Dr. Zoeller

report, the results of this study indicate that methylparaben significantly inhibited MOE cell proliferation, true?

A I'm not seeing that.

Q You're not seeing that in the study or --

A Well --

MS. DEBROSSE: Object to form.

Were you asking about his report or the study?

MR. BLISS: I was asking about the report. That's the way he describes it in his report, but ultimately, it's what's in the study that counts.

MS. DEBROSSE: Object to form.

Q Let me see if I can find the statement from you in the report.

So, on page 35, Dr. Zoeller, of your report, second paragraph under Section 10.5, looks like the third sentence.

They report that both PB and MB could significantly inhibit cell

proliferation.

A So the focus of this paper is to look at kind of cell cycle genes. It does -- they do show an inhibition of proliferation, but they're also looking at -- and one of the things that that means is that now you're in a more differentiative [sic] state. So part of the issue here is that -- is that it -- these are oviductal cells, so it's -- you know, it's relevant from that point of view.

Q Well, am I correct in understanding that the inhibition of cell proliferation is the opposite of what you propose in your theory?

MS. DEBROSSE: Object to form.

A So still, I'll go back to the mixture itself, at least as -- has been published and otherwise made available for the number of chemicals in there. The overall thing is still ER activation, and so what this is talking about is cell cycle control genes.

Dr. Zoeller

Q How do you know that the overall thing is ER-alpha activation and cell proliferation?

MS. DEBROSSE: Object to form. Asked and answered throughout the course of this deposition.

You may respond.

A So looking at those chemicals in total and looking at the data that supports the idea that they're estrogenic, I mean, they're -- there is a way to analyze that global estrogenicity. And this is kind of what Kortenkamp pioneered. There are certainly ways of doing that. I didn't perform that kind of analysis specifically, but that was my opinion.

(Whereupon, a Publication by Handule Lee titled, Effects of consumer products chemicals ingredients and their mixtures on the estrogen receptor/androgen receptor transcriptional activation was marked as Zoeller Exhibit No. 19 for identification, as of this date.)

MR. BLISS: Let's mark this next document as 19.

Q Dr. Zoeller, you have in front of you as Exhibit 19 the paper you cite in your paraben discussion by Lee, et al., 2022.

Do you recognize this paper?

A Yes.

Q On page 36 of your report, you describe this study as looking at the ability of a number of parabens, bisphenols -- paren, bisphenols and UV filters, close paren, to activate the estrogen receptor in -- I don't know how to pronounce this -- HeLa 9903 cells?

A Yes.

Q And am I correct that those are human cervical cancer cells?

A Yes.

Q You write that: They found that these parabens could strongly activate the ER in HeLa cells. The maximum response was between 60 percent 270 percent of the response to 1 nm estradiol, with the lowest

Dr. Zoeller

dose affecting ER activity and a ten to the negative seven -- the ten to the negative six M range.

You say "these parabens," but you don't mention the finding that methylparaben, which, again, is one of the parabens identified by Helm, as well as the five phthalates that were also tested were negative for ER activation?

MS. DEBROSSE: Object to form. Compound. Foundation.

A Well -- so the -- I keep going back to the combination of chemicals are -- that were -- have been reported, and I will continue to argue that, overall, it's estrogenic. This is also a good example, when it says "270," that's a maximum response that's -- that's 2.7 fold higher than E2.

Q I'm sorry.

Say that part again, Dr. Zoeller?

A The -- so this is a good example of how a chemical can produce a greater response than estrogen itself.

Dr. Zoeller

Q And where are you seeing that in the study?

A On the graph. So if you look at...

MS. DEBROSSE: While he looks for that, can you give us a time check, please?

VIDEOGRAPHER: Six hours 24 minutes.

MS. DEBROSSE: Thank you.

A So it's Figure 2B -- 2A and 2B. In fact, three of those parabens have a greater effect than estrogen itself.

MS. DEBROSSE: What page?

THE WITNESS: It's page 6, Figure 2A and B.

Q All right. Well, I'm not going to spend time now staring at those graphs. But I have your testimony.

But I am correct that methylparaben was negative for ER activation as were the five phthalates that were tested?

MS. DEBROSSE: Object to form.

Compound. Foundation.
A I'm trying to find methyl.
Q Look at Table 1.
A Okay.
Q That's okay. We can both read the study --
A So --
Q -- later. I'm going to withdraw the question and just ask you another question that is not in this line of questioning. So it's going to seem a little out of left field, but it's a question that is on my mind.
The carcinogenic environment that you say is created by exposure to the carcinogens and chemical hair relaxer products, where does that environment exist? Is it all throughout the body?
A So it will have the -- so if you look at the key characteristics of carcinogenesis -- of carcinogens, those -- a chemical that produces, you know, this effect would -- would be systematic inasmuch as it's located. I mean, there

Dr. Zoeller

are -- there are chemicals that are transported, which allows tissues to be very differentially exposed.

Q But the premise of your theory is that the four carcinogens that you focus on are -- there is exposure to those four carcinogens in the uterus and the ovaries?

A Yes.

MS. DEBROSSE: Object to form.

I'm sorry.

Q And so that is where, for purposes of your theory, these carcinogens are creating the carcinogenic environment as you call it?

A Yes.

Q And I'm asking you whether exposure to those chemicals would be creating a carcinogenic environment elsewhere in the body or just in those two organs?

A It would be wherever there is exposure.

Q If that's the case that exposure to these carcinogens creates a carcinogenic

Dr. Zoeller

environment wherever those chemicals reach in the body, wouldn't the epidemiology studies of formaldehyde exposure show an increase in multiple cancer types?

MS. DEBROSSE: Object to form. Foundation. Hypothetical. Scope.

A So the focus here is that it's the combination of proliferative driver and the carcinogenic signals or really this milieu that increases the risk of cancer. It's that combination that is what produces.

Q I understand what your theory is.

But I'm just asking: If formaldehyde is creating this milieu, as you put it, not just in the ovaries and the uterus but throughout the body, wouldn't we expect to see in epidemiology studies of formaldehyde exposure increased risks of cancer throughout the body?

MS. DEBROSSE: Object to form. Compound. Hypothetical. Scope.

A We -- it depends on what the -- what the type of cancer is and what the

Dr. Zoeller

other contributing factors are. It would be the same as in the uterus and ovary, that is -- it's -- it's a combination of proliferative drive and this milieu that increases the likelihood of a single cell going down the -- a carcinogenic pathway.

Q Right. But leaving aside the EDC part of your theory, if the carcinogens like formaldehyde, as an example, were creating a carcinogenic environment, making cancer more likely, wouldn't that show up in epidemiology studies of formaldehyde exposure?

MS. DEBROSSE: Object to form.

Q In terms of cancers throughout the body?

MS. DEBROSSE: Object to form.

A Under the conditions where you have this -- that are similar. I can't really speak to other cancer types and formaldehyde, or it's a -- it's -- so to break the mixture down into individual units and, you know, try to explain it away, each one, is -- is not the way I

approached it. So I didn't look to see whether this chemical produced that cancer. It's the combination of the effect of proliferation and milieu that increases that likelihood.

MR. BLISS: Can we go off the record.

MS. O'CONNOR: No.

MR. BLISS: Okay.

MS. O'CONNOR: No.

MR. BLISS: Where is this one? Got it?

Please have this marked as the next exhibit.

(Whereupon, a Paper by Nissanka Rajapakse was marked as Zoeller Exhibit No. 20 for identification, as of this date.)

Q Dr. Zoeller, you have in front of you the study -- or the paper by Rajapaske et al., 2002.

A Yes.

Q Do you recall citing this paper in your report?

Dr. Zoeller

A Yes.

Q And this is the second of the two Rajapaske papers you cite.

MS. DEBROSSE: Object to form.

Q And this study, 11 estrogenic EDCs were combined in a mixture and then combined with estradiol to see if there would be an additive effect on ER-alpha binding relative to estradiol alone; is that correct?

A Yes.

Q They say we created a pool of 11 weak xenoestrogens with a mixture ratio in proportion --

MS. DEBROSSE: I'm sorry, Counsel, but where are you? I don't see where you are.

MR. BLISS: It's on page 917.

MS. DEBROSSE: Okay.

MR. BLISS: Probably in the abstract. No, actually. Page 917, rightmost column, paragraph beginning: The clarification of the above issues.

Dr. Zoeller

MS. DEBROSSE: Okay.

MR. BLISS: Do you see that?

MS. DEBROSSE: Yeah.

MR. BLISS: Second sentence.

Q We created the pool of 11 weak xenoestrogens with a mixture ratio and proportion to the EC01 concentration producing 1 percent of the maximally inducible effect in the YES assay of all individual components. This ensured that no single xenoestrogen contributed disproportionately to the overall mixture effect. The 11 xenoestrogens were in turn mixed with 17b-estradiol at defined mixture ratios ranging from one to 25,000 to one to a hundred thousand, 17b-estradiol to the pool of xenoestrogens.

Do you see that?

A Yes.

Q So if I understand correctly, the overall mixture, xenoestrogens and estradiol consisted of 25,000 times to 100,000 times more EDCs than estradiol.

Am I reading that correctly?

Dr. Zoeller

A So, no. So in a concentration thing, it was an estradiol effect thing. So they purposefully calibrated the xenoestrogens to have 1 percent of the maximum inducible. So they're using a concentration that is low and has a low effect.

So, and they do that on purpose because they're showing that -- that xenoestrogens at a low effective dose -- and they, you know, the doses are actually going to be different for each one because they have different potency with respect to this yeast assay. So then, they use one to 25,000 to one to a hundred thousand. But it's already at 1 percent.

Q Right. But am I correct in understanding that the overall mixture would consist of the pool of xenoestrogens and estradiol consisted of 25,000 to a hundred thousand times more of the xenoestrogen mixture than the estradiol.

A Because they designed it that way, yes.

Dr. Zoeller

Q Is that correct, is what I'm saying? I'm understanding that correctly?

A They designed it to be that each one is equivalent to 1 percent of estrogen. Now, they could have designed this differently where they looked at 25 percent. There is some chemicals that even produce a greater effect on estrogen than estrogen itself. That would have been -- then they would have had to use a different ratio.

Q Well, am I correct that looking at Figures 1, 2, and 3, the study showed that for each individual EDC, the pool of EDCs and the combined mixture with estradiol, the dose response curves were all monotonic?

MS. DEBROSSE: Object to form. Compound.

A They're all sigmoidal, yes.

Q And sigmoidal is a type of monotonic dose response?

A You would always see that in this kind of assay. So to be clear, this is a

Dr. Zoeller

yeast assay. So they have engineered yeast cells to have an estrogen receptor. One of the ways in which non-monotonicity can occur on the estrogen receptor that occurs even under clinical settings is that the ligand, estradiol, can down-regulate the expression of the estrogen receptor. As a result, you get a big increase and then a decrease. And that's, you know, well recognized. In a yeast assay, that's not going to happen because it's been engineered to be stable.

Q And that's an example of what I was talking about before where what happens in an in vitro assay might not translate to in vivo environment?

A All the elements --

MS. DEBROSSE: Object to form.

A So all the elements won't be the same because it's constructed to show a certain thing. But you can't say that that the fact that it hits the estrogen receptor in this yeast assay doesn't mean that it's going to hit the assay in a human or the

Dr. Zoeller

estrogen receptor in the human. It's the same receptor.

Q Right. But in a living organism, there might be competition with other chemicals to bind to the receptor, true?

MS. DEBROSSE: Object to form.

A It's actually more -- competition is more relevant in this yeast assay then in a human. Because in a human, especially in a situation that has elevated estrogen receptors, competition is less. It doesn't have to be competitive.

Q Dr. Zoeller, is it fair to say that throughout your career you have been an outspoken advocate on issues relating to EDCs?

MS. DEBROSSE: Object to form.

A Well, I have been -- I have -- I have articulated why the endocrine system has to be viewed from a point of view in toxicity differently because receptor-based toxicity has a -- has a very different phenotype. And that -- that actually, you know, this whole -- this whole concept

Dr. Zoeller

really got going in the 1990s.

And when I was on the EPA's screening and testing advisory committee, there was really a lot of clash between the two endocrinologists on the committee and mostly industry toxicologists. The outcome of, you know, that very brief period motivated the, first of all, Congress to mandate that EPA has an endocrine-disruptor screening program. It motivated Japan to inaugurate an equivalent of NIEHS. It motivated the European Union to set off on, you know, a decades-long program, same with OECD.

These are all well recognized. They're not, you know, they're not trivial concepts. And the role that I have tried to play with the Endocrine Society and others is to bring the science of endocrinology to the field of regulatory toxicology.

Q And do you feel you have been successful in that endeavor? Is the field where you would want it to be?

A No. It's not where I would want

Dr. Zoeller

it to be because I don't think -- I think -- a good example is we went to the European Parliament a number of times and talked to various, you know, MEPs. And you know, the next time you go, they're all different. So it's hard to continue to educate people that are -- that are, I think, being vulnerable to arguments that are just not -- they're -- it's -- it's basically manufacturing doubt.

Q Do you believe, Dr. Zoeller, that current standard approaches to risk assessment are inadequate?

A I think that's changing. Perfect example is that -- is that EFSA reduced this kind of safe dose, the TDI of bisphenol A by 250,000 fold. That represented a clear departure in standard toxicology. You know, note that FDA wrote an argument against that because they didn't -- they weren't going to go there. It will change because the science is there.

Q But if you please listen

Dr. Zoeller

carefully to my question, do you believe that the current standard approaches to risk assessment are inadequate?

MS. DEBROSSE: Object to form. Asked and answered.

A Some are. Some aren't. That's kind of -- that was how I tried to answer that. EFSA and their analysis of BPA was really the first kind of recognition of -- of looking at an endocrine disruptor, BPA, and its risk to human health. Other regulatory agencies didn't do that.

So -- so the ones that didn't do that made arguments that are -- that are kind of standard arguments against recognizing the science as it exists.

Q I know you have your view, Dr. Zoeller.

But isn't it true that the arguments these others are making are arguments of a scientific nature?

MS. DEBROSSE: Object to form.

A Most of them aren't. So most of them are technical. So, for example, FDA

said: Wait, you can't look at data that hasn't been produced by industry or by GLP, which is something that industry uses. Academics -- most academics don't.

So it was a, you know, it's kind of like saying, you know Al Capone got busted for tax evasion, not for murder. It's a technical argument. It's not a scientific argument. BFR did the same thing. The European Medicine Agency [sic] did the same thing. It was all a technical argument about the way the risk assessment was performed, not the science.

MR. BLISS: How much time do we have left?

VIDEOGRAPHER: You're at six hours and 50 minutes.

Q Dr. Zoeller, in your report, you characterized the EDCs in hair relaxer products as potent.

Do you recall that?

A Yes.

Q I believe every study you cite, for example, in your discussion of

Dr. Zoeller

siloxanes, characterizes the estrogenic EDCs being tested as weak, I think, without exception.

MS. DEBROSSE: Object to form.

Q Why do you characterize these EDCs as potent when all of the literature you cite characterizes them as weak?

MS. DEBROSSE: Object to form.

A So I'm really looking at the combination, and all of the other studies are talking about individual chemicals.

Q So when you speak of potency, you're speaking of the entire mixture, EDCs, carcinogens, not individual EDCs?

A Not individual chemicals, right.

Q So just to make sure I'm clear, your theory is that although the individual EDCs might be weakly estrogenic, when combined in the mixture, they become potent?

A That it is a potent mixture. And I wasn't --

Q But you don't have any empirical or quantitative evidence for that?

Dr. Zoeller

A I didn't quantitate, but -- and if -- and if -- you know, you look at my kind of analysis of individual chemicals, I'm not making up, you know, data. I'm showing that they are -- I don't like to use the word "weak" because I think that is kind of misleading.

But in these test systems, they -- it -- within the context of the test system, they are not as potent as estrogen for sure, ten to the third to ten to the sixth less potent now.

Q By the way, when it says ten to the, say, the negative sixth --

A Yeah.

Q -- what does that mean to normal people?

A So ten to the third is a thousand. Ten to the sixth is a million.

Q So ten to the negative sixth would be the chemical is a million times less potent than, say, estradiol?

A On that -- in that -- within the context of that assay. Yes.

Dr. Zoeller

Q You may have answered this already, but to your knowledge, has any regulatory agency ever classified a chemical as a carcinogen based solely on in vitro studies?

MS. DEBROSSE: Object to form. Asked and answered.

A So they have -- they have done it in the absence of human epidemiology. Yes. When I was at the IARC, there was a case like that.

Q Just in vitro though or in vitro plus animal studies?

A There was an animal study.

Q You say on page 22 of your report: Any change in the level of hormone action will throw off its balance affecting downstream events.

Do you recall writing that?

A Yes.

Q Do you really mean "any change in level"?

A That's how hormones work.

Q But when you say "throw off its

Dr. Zoeller

balance," it sounds kind of dramatic. And so we're all exposed, as we've talked about, to EDCs on a daily basis.

Does that mean that all of our endocrine systems are being constantly thrown off balance?

MS. DEBROSSE: Object to form.

A That's a -- I mean, there's -- there's two kind of uncertainties there in trying to answer that.

Q Well, let me ask this: By "downstream event," that doesn't necessarily mean an adverse event, correct?

A So --

MS. DEBROSSE: Object to form.

You may answer.

A -- so adverse -- so it depends on what you mean by "adverse." A good example is, let's say, diabetes. Let's say you throw off insulin action just a little bit in a chronic way that will lead to adverse effects. And what we're talking about here is adverse effects that just don't pop up the first time you use hair relaxer. It

takes -- you know, these people have been exposed for a long time. That constant and chronic disruptive tone is what leads to adverse effects.

Q But you understand that hair relaxers are not every day use products?

A True.

Q They're used six to eight times a year.

A Yeah.

Q And, again, I understand that you're saying the throwing off of hormonal balance could affect or produce adverse effects, but it doesn't necessarily do that, right?

Downstream events that you're talking about here could not be adverse --

MS. DEBROSSE: Object to form.

Q -- true?

A There are situations where that wouldn't lead to adverse effects, but it's not the kind of situation that we're looking at here.

MR. BLISS: How much time, Paul?

Dr. Zoeller

VIDEOGRAPHER: Forty-five seconds.

Q I think I asked this before, but just for clarity, is your theory indifferent to dose and exposure in the uterus and the ovaries?

MS. DEBROSSE: Object to form. Asked and answered multiple times during this deposition.

A Yeah. I have kind of answered that multiple ways.

Q Can you answer it again?

A So --

Q Well, my understanding is that your -- is testimony is that it is not -- that your theory is not --

MS. DEBROSSE: I'm sorry, counsel. We're out of time. The seven hours is up.

MR. BLISS: Are we done, Paul?

VIDEOGRAPHER: Yes.

MR. BLISS: All right.

MS. DEBROSSE: Okay. Can we take two minutes?

Dr. Zoeller

MR. BLISS: Sure.

VIDEOGRAPHER: All right. Stand by. The time is 5:17 p.m. We're off the record.

(Whereupon, at 5:17 p.m., a recess was taken to 5:36 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: The time is 5:36 p.m. We're back on the record.

BY MS. O'CONNOR:

Q Good after -- or good evening, Dr. Zoeller.

As you know, my name is Stephanie O'Connor. I'm with the law firm of Douglas & London, and I have a few follow-up questions based on questions that were posed to you by counsel earlier, including several articles or exhibits that were shown to you. Would like to talk with you a little bit about your opinions on ovarian cancer and the estrogen sensitivity of that organ; in other words, the sensitivity of ovary -- of the ovaries to

estrogen.

You were showed a number of articles by counsel, including --

MS. O'CONNOR: If we could start with Exhibit 11 for the record?

Q This is an article that you cited in your report by Modica and others entitled "Endocrine-disrupting Chemicals, EDCs, and Cancer: New Perspectives of an Old Relationship."

Do you have that in front of you?

A Yes.

Q All right. If you turn, Dr. Zoeller, to page -- this would be page 672 of Exhibit 11, there is a section on ovarian cancer.

Do you see that there?

A Yes.

Q All right. There is a statement, the third sentence down from the new paragraph: The majority of ovarian tumors over-express estrogen receptor-alpha and this facilitates tumor growth through estrogen signaling.

Dr. Zoeller

Do you see that there?
A Yes.
Q All right. Is that consistent with your opinions about the receptivity of the ovaries to estrogen signaling?
A Yes.
Q Okay. Then there is another statement: There is no established -- what is the importance or the significance of the statement that "the majority of ovarian tumors over-express ER-alpha, and this facilitates tumor growth through estrogen signaling"?
What is the significance of that to your opinions about chemical hair relaxers and ovarian cancer?
A So this concept of estrogen -- excess estrogen stimulating, you know, this -- this proliferative drive that's part of the hallmark of cancer fits the same profile that -- that uterine cancer does.
Q Okay. If we take a look at Exhibit 12?

Dr. Zoeller

MS. O'CONNOR: Which for the record is an article by Rachón entitled "Endocrine-disrupting Chemicals, EDCs, and Female Cancer: Informing the Patients."

Do you have that in front of you?

A Yes.

Q Yeah. And this is an article from 2015 that you cited in your own report, correct?

A Yes.

Q All right. If we take your -- take you to page 361 of this article?

And counsel read to you -- under the heading, 1.5 Ovarian Cancer and EDCs, he read to you: Although ovarian cancer is not an estrogen-dependent malignancy, there have been some studies conducted in vitro on the effects of selected EDC on the proliferation of ovarian cancer cells.

Do you see that there?

A Yes.

Q All right. And then it goes on to say: Data from experiments conducted in

Dr. Zoeller

vitro show that BPA, nonylphenol, octylphenol, methoxychlor, benzophenol-1 stimulated the proliferation of ER-positive BG1 ovarian cancer cells via estrogen signaling pathway.

With some references there.

Do you see that?

A Yes.

Q All right. Is this statement about the in vitro experiments that have shown estrogen signaling pathways positive -- ER positive in ovarian cancer cells -- how does that inform your opinion or opinions, I should say, about the relationship between chemical hair relaxers, exposure to chemical hair relaxers, and ovarian cancer?

A So it fit -- this observation fits in this theory of excess estrogen producing a proliferative drive in combination with other chemicals in the product. So it seems to me to be a parallel situation to uterine cancer.

Q And did you consider this

Dr. Zoeller
evidence in terms of arriving at your overall opinions about the causal connection between of chemical hair relaxers and ovarian cancer?
A Yes.
MR. BLISS: Objection. Lacks foundation.
Q All right. Let's take a look at Exhibit 9.
Do you recall, Dr. Zoeller, being presented with this -- well, first of all, what is this to your understanding, this Exhibit 9?
A So it looks like the transcript of a podcast.
Q So a podcast.
And, in other words, this is not a peer-reviewed journal article, is it?
A No.
Q Okay. Is it a text book?
A No.
Q Does it give any citations to whoever the authors are who are claiming that recent research has shown that most,

Dr. Zoeller

if not all, high-grade serous ovarian cancers originate in the fallopian tubes?

A No, not that I can see.

Q Okay. Now the fact -- putting that aside.

The fact -- assuming that this is even true, that recent research has shown that not all high-grade serous ovarian cancers originate in the fallopian tubes, does that matter to you in terms of your own opinions?

A No.

MR. BLISS: Objection. I think you misread.

MS. O'CONNOR: What have I misread?

You know what, I'll withdraw the question.

MR. BLISS: No. No. Hold on. You may have read it correctly. Just give me a second. I withdraw my objection.

MS. O'CONNOR: Thank you, counsel.

Dr. Zoeller

Q And, in fact, one of the studies that was presented to you that we'll talk about in a few moments, the White 2021 study, that actually looked at both serous and non-serous ovarian cancers, correct?

A Yes.

Q All right. Does this blog -- or this podcast that we've looked at today make any comment about non-serous cancer -- ovarian cancer and where it originates?

A It doesn't appear to. I haven't read the entire podcast.

Q Okay. Can you take just a look through it and see if you see any statement about non-serous; in other words, the other type of ovarian cancer that has been implicated in this litigation?

A I don't see that. They're focused on the other.

Q The high-grade non -- the high-grade serous?

A Yes.

Q Okay.

A And it looks like it's a case

report.

Q Okay. So what is a case report, let's say, in contrast to an epidemiologic study?

A It's one person.

Q Okay.

A Could be more than that, but usually not. In this case, it looks like one person.

Q Does this Exhibit 9 in any way inform your opinions about the relationship between chemical hair relaxers and ovarian cancer?

A No.

Q Okay. Let's take a look at Exhibit 4.

MS. O'CONNOR: And, for the record, Exhibit 4 is Kortenkamp. Title of the article is "Ten Years of Mixing Cocktails: A Review of Combination Effects of Endocrine-disrupting Chemicals."

Q Have I read that correctly?

A Yes.

Dr. Zoeller

Q And you mentioned Andreas, so I take it you know Dr. Kortenkamp?

A Yes.

Q That you've published with him in the past?

A Yes.

Q All right. Do you consider Dr. Kortenkamp to be an expert in the field of, let's say, mixing of chemicals and the production of adverse events or effects?

MR. BLISS: Objection.

A A pioneer.

Q Okay. Did you mention that he received a Nobel Prize or did I misunderstand that?

A No.

Q Okay. I may have heard you say it about someone else. Counsel read to you a portion of this article at page 102, but I would like to read to you another of import -- portion of this. And it begins --

MS. O'CONNOR: Now it's my turn, James.

Dr. Zoeller

Q -- middle column -- middle column, the very last full paragraph that begins with: These examples.

MR. BLISS: Well, that's what I read.

Q Are you with me?

These examples clearly demonstrate that combinations of EDs --

That means endocrine disruptors, correct?

A Yes.

Q All right.

-- with similar effects are able to act together at doses that, when used alone, do not lead to observable effects. The experimental evidence is in line with the assumptions of dose addition.

That -- those few sentences that I read, do they reflect your own opinions about mixtures versus individual chemicals and the potential harm that they can exert?

A Yes.

MR. BLISS: Objection.

Q And then, if we go down a little

bit further, under "Implications for Regulatory Strategies," it sate -- states: It is evident that the traditional chemical-by-chemical approach to risk assessment is inadequate when dealing with EDs, in paren, and chemicals with other toxic profiles, end paren. The biological reality of combination effects from exposure to multiple agents at low doses highlights the potential for underestimating risks when mixture effects are not taken into account.

Have I read that correctly?

A Yes.

Q All right. What impact, if any, do statements like this from researchers like Dr. Kortenkamp have on your opinions about low dose when it comes to the chemicals that are alleged to be harmful in this case?

A It's perfectly --

MR. BLISS: Objection. Vague.

A -- in --

MR. BLISS: Lacks foundation.

Dr. Zoeller

A -- perfectly in alignment.

Q And are you and Dr. Kortenkamp the only researchers, academics in the field that believe in the low dose mixture theory?

A No.

MR. BLISS: Objection.

Q Let's switch gears for a little bit.

MS. O'CONNOR: I would like to actually go to Dr. Zoeller's report, which I believe is Exhibit 2.

MR. BLISS: Yes.

MS. O'CONNOR: Okay. I figured everybody has that handy.

Q Okay. So, Dr. Zoeller, when you researched the issues that you were asked to research -- and as I understand it, chemical hair relaxers' biologically plausible mechanisms -- did you also, during your research and review and report writing, conduct or perform a causal analysis of the issues that you were asked to review?

Dr. Zoeller

A My -- yes, I did.

Q In other words, you did not limit your opinions only to biologically plausible mechanisms that could explain the elevated risk that have been seen that you testified to in the epidemiologic studies?

A So --

MR. BLISS: Objection. Lacks foundation.

A -- that was the -- that was the data that I used to essentially view in terms of kind of a structured analysis.

Q Now, you were asked, I believe, by counsel about Bradford Hill.

In terms of your causal analysis, did you apply the factors or guidelines articulated by Sir Austin Bradford Hill in arriving at your conclusion in this matter?

A Yes.

Q Okay. If we turn to page 4 of your report, we can see here -- it will be the second full paragraph where you say there are several streams of evidence that you identify.

Dr. Zoeller

Do you see that there?
A Yes.
Q Okay. Can you tell us what the streams of evidence were that you evaluated in your overall causal analysis in this case?
A So the streams of evidence were the -- the -- and I have kind of written somewhere else, but it's the epidemiology, the kind of pathogenesis -- what -- what is the, you know, kind of recognized pathway for pathogenesis of uterine cancer and ovarian cancer.
Q If I might interrupt you, would that be on page 4 of your report. The second stream is mechanistic evidence that describes how uterine and ovarian cancer develops, i.e., the pathogenesis in which factors increase risk in humans.
Is that what you are referring to?
A Yes.
Q All right. And then you'll see that after that, you have a third stream of

Dr. Zoeller

evidence.

Can you tell us what that third stream of evidence that you have reviewed in reaching your conclusions in this case?

A Chemical analyses of hair relaxers that identify chemical constituents.

Q And in approaching that stream of evidence or reviewing that stream of evidence, did you rely on the published peer-reviewed literature that actually discusses what is present in chemical hair relaxers.

A Yes.

MR. BLISS: Objection. Mischaracterizes.

Q Did that include Helm 2018?

A Yes.

Q Did that include Irungu (ph) 2025?

A Yes.

Q Were there other articles and papers that you looked at that identified and described chemicals that at least,

Dr. Zoeller

according to those articles, are present in chemical hair relaxers?

A There are, but I can't remember the authors right off.

Q But you reviewed articles, correct?

A Yes.

Q And then, finally, wrapping over to page 5, it indicates the fourth stream.

Can you tell us what you meant by the fourth stream: Mixture toxicology studies?

A So this is essentially what the Kortenkamp lab has done, although a number of other people have -- have produced data that support that theory both in humans and in vitro.

Q And did you incorporate that knowledge, that research in reaching your own opinions in this case?

A Yes.

Q All right. I asked you earlier whether or not you had done a Bradford Hill or a causal analysis in this case, if I can

Dr. Zoeller

turn you to -- have you turn your attention to page 5 of your report -- actually, I'm sorry, page 8 -- excuse me -- page 8 of your report.

And if you see Dr. Zoeller, right above the heading, "Epidemiology of Hair Straighteners and Relaxers," there is a sentence there that says: These topics --

Referring earlier to your methodology.

-- then integrated to evaluate the consistency, coherence, and biologic plausibility of an association between chemical hair relaxer -- excuse me -- chemical hair straightener use and uterine and ovarian cancer?

A Yes.

Q All right. Did you consider, among other things, consistency, coherence, and biologic plausibility in reaching your opinions in this case?

A Yes.

Q If we can go to page 11 of your report, if we look at -- and by the way,

Dr. Zoeller

this Section 4.3 at page 11, Interpretation of these Core Studies, are you referring to the epidemiologic studies that were under discussion earlier today?

A Yes.

Q Okay. And you indicate that these studies provide reliable evidence for a strong association between chemical hair straighteners, slash, relaxers and uterine and ovarian cancer. The study design is prospective cohort design, which is the strongest design capable of revealing causative relationships.

Have I read that correctly?

A Yes.

Q Is this the type of strength of evidence that you considered in your overall causal analysis of the relationship between chemical hair relaxers and both uterine and ovarian cancer?

A Yes.

Q If we go down a little bit further where it begins "There," you can see that: There is a very clear

Dr. Zoeller

mechanistic pathway by which chemical hair straighteners, slash, relaxers can cause uterine and ovarian cancer. This pathway includes a chronic proliferative signal in the presence of carcinogenic signals that can act on dividing cells in the uterus and ovary to generate cancer cells.

Have I read that correctly?

A Yes.

Q All right. Is this a sum-up, if you will, of what you considered in terms of a mechanistic pathway when you -- when you conducted a causal analysis in this case?

A Yes.

Q And then if we look at -- give me one second. It is the final sentence right before Section 5.0, Uterine and Ovarian Cancer Pathogenesis. You state: Finally, I will review the concept of risk and causal inference as well as the evidence that chemical constituents of these products are estrogenic and carcinogenic.

Did you include that

Dr. Zoeller

consideration in your overall causal analysis in this case?

A Yes.

Q If we can turn to page 20 -- we'll just move on. Can we turn to page 26 of your report. And if we look under the Section Heading 9: The Biology of Risk, Contribution and Cause.

Do you see that there?

A Yes.

Q All right. That was a title that you ascribed to this particular section of your own report, correct?

A Yes. Yes.

Q All right. And under Section 9.1 there is a question: Is an increase in risk a cause?

And you indicated that the answer is yes.

Have I read that correctly?

A Yes.

Q All right. And then you do go on to talk. You do mention Bradford Hill and the relationship between smoking cigarettes

Dr. Zoeller

and lung cancer, which was a focus of the Bradford Hill article, correct?

A It was his focus, yes.

Q All right. And, Doctor, just to be clear, have you actually read the 1965 article by Sir Austin Bradford Hill?

A Yes.

Q Okay. And have you over the years, of your -- of all of your work and experience, have you applied causal analyses at different points in time with regard to different chemicals, agents, things of that nature that you are considering in terms of the safety profile and human health?

A Yes.

Q Doctor, have you formed an opinion with reasonable, scientific certainty as to whether the relationship, whether the exposure, I should say, between chemical hair relaxers is causal when it comes to uterine cancer?

A Yes.

Q And what is that opinion?

Dr. Zoeller

A Well, that is, within the context of this, it is highly plausible and likely to cause uterine and ovarian cancer.

Q And that was going to be my question with regard to ovarian cancer.

Same answer?

A Yes.

Q All right. Doctor, as you sit here today with regard to all of your opinions, including those on biological plausibility and mechanism, which has comprised a large part of today's testimony, are your opinions stated with a reasonable degree of scientific certainty?

A Yes.

MS. DEBROSSE: Okay. I'll pass the witness subject to any further examination.

MR. BLISS: Let's take a quick break and see if I have anything.

VIDEOGRAPHER: Stand by. The time is 5:59 p.m. We're off the record.

(Whereupon, at 5:59 p.m., a recess

was taken to 6:07 p.m.)
(The proceeding resumed with all parties present.)
VIDEOGRAPHER: The time is 6:07 p.m. We are back on the record.
BY MR. BLISS:
Q Dr. Zoeller, are you saying that you performed a full Bradford Hill analysis?
A Yeah, pretty much.
Q Is that the same or different, in your mind, from a weight of evidence analysis?
A Well, they both interact. Both of those concepts interact. I mean, Bradford Hill -- first of all, I have written about Bradford Hill. I even helped to organize a meeting about Bradford Hill 10 years ago with a 50th anniversary at the -- at the place where he gave his, you know, presidential address at the Royal Academy of Medicine.
So I kind of -- I know how the structure works. The structure -- the way he

Dr. Zoeller

put it together is incredibly valuable. It's used a lot. The issue of receptor-based toxicity means that you have to -- you have to interpret some of his views a little more specifically. But that's -- I mean, I think in those terms. So...

Q But I'm just trying to understand.

In your mind, is a weight of evidence analysis the same as a Bradford Hill analysis?

A No --

MS. DEBROSSE: Object to form.

A -- they interact.

MS. DEBROSSE: Asked and answered.

A They inform each other. They interact.

Q And you're saying you did both in your report?

A Yes.

Q You were asked about the four streams of evidence.

Do you remember that?

Dr. Zoeller

A Yes.

Q How much weight did each of the four streams of evidence contribute to the overall weight of the evidence as you see it?

A They're -- they're all important. I think in terms of, you know, you can't have one without the other. The -- for example, the evidence on pathogenesis is critical. And it leads -- I mean, the mechanism that I'm proposing, I don't even think it's a mechanism I'm proposing. The mechanism that is well accepted fits into the constituents of hair relaxers.

Q So if I understand correctly, your opinion -- your theory of biological plausibility and your opinion on causation requires support from all four of these streams?

MS. DEBROSSE: Object to form.

A Well, the support was present in all four of those streams. I would have to look at it differently if one of those streams were not -- didn't have evidence,

Dr. Zoeller

if that makes sense.

Q Yeah, that might change your opinion.

A It's theoretically possible, but I have the data that I have.

Q But just to be clear, it was the data and the evidence from all four streams that allowed you to form your opinions in this case?

MS. DEBROSSE: Object to form. Asked and answered.

A Yeah.

Q You were also asked about a section in your report that discusses risk and cause.

Do you recall that?

A Yes.

Q You were asked: Is an increase in risk a cause?

And you say the answer is yes.

A I did say that.

Q This one confused me. So I'm glad I'm having the opportunity to ask you about it.

Dr. Zoeller

Age is a risk factor for most cancers, true?

A Yeah.

Q But age doesn't cause cancer?

A So, in part, it does.

Q How so?

A So, I mean, first of all, to try to separate age from, for example, cumulative exposure to whatever things is difficult to separate. But age itself has, you know, the increased incidence of genomic instability at cell division is an age-related issue. So, yeah.

Q Okay. Age is associated with increased risk in that sense --

MS. DEBROSSE: Object to form.

Q -- but it's not causal, right?

MS. DEBROSSE: Object to form. Asked and answered.

Q So the mechanism that -- so aging increases the risk of genomic changes, somatic changes that occur at cell division, so in that case, it's a cause. It's a contributing factor. It increases

Dr. Zoeller

risk independent of the chemical exposures that you may have for smoking or drinking or whatever the other risk factors are for some cancer.

A Right. But something can be associated with a cancer and therefore be a risk factor but not be causal?

MS. DEBROSSE: Object to form.

A In principle, but that wouldn't be the case with aging.

Q You use the example of smoking and you make the point that not everyone who smokes will get cancer -- will get lung cancer.

But you say that smoking nevertheless contributes to the overall risk of getting lung cancer, true?

A Yes.

Q But in that context, when you say that smoking contributes to the overall risk of lung cancer, you mean that it contributes causally; that there is a causal relationship, not just a statistical association?

A Yeah. The -- what I'm trying to do there is kind of dispel this myth that if cancer -- if cigarettes -- in the case of cigarettes, if there are people who smoke but don't get cigarettes [sic], how many people have said, you know, my grandma smoked until she was whatever and didn't get cancer, that doesn't mean that cigarettes don't cause cancer. That was the point --

Q I understand --

A -- of that.

Q -- that, but that seems to me to be a different proposition than to say that anything that is a risk factor is causal.

MS. DEBROSSE: Object to form.

Q Are those two the same thing in your mind?

A I -- mostly the -- it's the same thing. Something that increases the likelihood of cancer, and you can -- you know, you can eliminate reverse causation or whatever the, you know, statistical situation is. Biological risk factors

Dr. Zoeller

are -- contribute to the cancer of whatever.

Q Well, gray hair is associated with cancer incidents, true?

A I don't --

MS. DEBROSSE: Object to form.

A -- know that. I'm hoping it isn't. But I color mine so...

Q Okay. So, again, I just want to make sure I understand what you're saying.

Am I correct in understanding that, in your view, anything that is associated with increased incidents of a cancer is a cause of that cancer?

MS. DEBROSSE: Object to form. Mischaracterized the witness's testimony.

You may answer.

A So I wouldn't frame it like that. When I talk about a risk factor, I'm talking about a biological risk factor, not, you know, a red herring.

Q So -- just, again, so I understand, you're talking about the thing

Dr. Zoeller

has to be directly exerting some physical influence on the system that is causing or contributing to the cause of cancer?

MS. DEBROSSE: Object to form.

A In some way, yeah.

Q Well, as you use the word "cause" in your report, what do you mean?

MS. DEBROSSE: Object to form. Asked and answered.

A So, in this case, the focus was: Is there a plausible mechanism?

And my conclusion was that it's not just plausible, but likely. Now, to me, a plausible -- in the context of this -- of the data that we have and the data that I reviewed, not only is it a plausible mechanism, is it plausible that hair relaxers cause uterine and ovarian cancer; but it's likely to be causal.

Q I appreciate that but I'm asking when you use the words "cause" and "causal" as you just did, what do you mean?

MS. DEBROSSE: Same objection.

A I -- it's seemed -- I don't know

how to say it differently, I guess. I've written it. I've kind of -- I've tried to explain that. I'm not sure how I can do it differently.

MR. BLISS: No further questions.

MS. O'CONNOR: Thank you.

Thank you, Danielle.

MS. DEBROSSE: Thank you.

MS. O'CONNOR: Thank you, everyone.

VIDEOGRAPHER: Stand by. This concludes today's testimony. The time is 6:18 p.m. We are off the record.

(Time noted: 6:18 p.m.)

Dr. Zoeller

--------------------INDEX------------------------

WITNESS: ROBERT THOMAS ZOELLER, Ph.D.


| EXAMINATION BY | PAGE |
| --- | --- |
| MR. BLISS | 8, 399 |
| MS. O'CONNOR | 376 |


-------------------EXHIBITS---------------------


| FOR IDENTIFICATION | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit No. 1 | Amended Notice of R. Thomas Zoeller, Ph.D. | 12 |
| Exhibit No. 2 | Expert Report of R. Thomas Zoeller, Ph.D. | 16 |
| Exhibit No. 3 | Article from Endocrinology from September 2021 written by Dr. Zoeller | 105 |
| Exhibit No. 4 | Andreas Kortenkamp article from December 2007 | 122 |
| Exhibit No. 5 | Che-Jung Chang article from August 2022 | 150 |
| Exhibit No. 6 | Kimberly A. Bertrand article from September 2023 | 163 |
| Exhibit No. 7 | Alexandra J. White article from June 2021 | 180 |
| Exhibit No. 8 | Patricia F. Coogan article dated May 2021 | 185 |
| Exhibit No. 9 | Memorial Sloan Kettering Cancer Center Article | 217 |
| Exhibit No. 10 | Susy Brescia article from March 2020 | 237 |

Dr. Zoeller

------------------EXHIBITS---------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 11 | Modica article from December 2022 | 267 |
| Exhibit No. 12 | Dominik Rachon article from February 2016 | 274 |
| Exhibit No. 13 | Paper from Elisabete Silve, et al. from 2002 | 278 |
| Exhibit No. 14 | Nissanka Rajapakse et al. article from January 2001 | 287 |
| Exhibit No. 15 | EPA Phthalates Risk Evaluation document | 333 |
| Exhibit No. 16 | EPA Risk Evaluation for Diethylhexyl Phthalate | 336 |
| Exhibit No. 17 | Document, titled Estrogen agonistic/antagonistic activity of bromated parabens by Saski and Terasaki | 340 |
| Exhibit No. 18 | Document, titled Paraben Exposure Alters Cell Cycle Progression and Survival | 347 |
| Exhibit No. 19 | Publication by Handule Lee titled, Effects of consumer products chemicals ingredients and their mixtures on the estrogen receptor/androgen receptor transcriptional activation | 352 |

Dr. Zoeller

------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit No. 20 | Paper by Nissanka Rajapakse | 359 |

---- ***** ----

Dr. Zoeller

CERTIFICATE

STATE OF NEW YORK )
)ss:
COUNTY OF RICHMOND)

I, DANIELLE GRANT, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That ROBERT THOMAS ZOELLER, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 25th day of February, 2026.

Danielle Grant

DANIELLE GRANT

STEPHANIE O'CONNOR, ESQUIRE
soconnor@douglasandlondon.com

March 3rd, 2026

RE: All MDL Hair Relaxer Cases v. Hair Relaxer

2/24/2026, R. Thomas Zoeller , Ph.D. (#7928358)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at p1hairdepos@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

All MDL Hair Relaxer Cases v. Hair Relaxer

R. Thomas Zoeller , Ph.D. (#7928358)

E R R A T A  S H E E T

PAGE______ LINE______ CHANGE____________________________

________________________________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE____________________________

________________________________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE____________________________

________________________________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE____________________________

________________________________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE____________________________

________________________________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE____________________________

________________________________________________________

REASON__________________________________________________

____________________________________ _________________

R. Thomas Zoeller , Ph.D. Date

All MDL Hair Relaxer Cases v. Hair Relaxer

R. Thomas Zoeller , Ph.D. (#7928358)

ACKNOWLEDGEMENT OF DEPONENT

I, R. Thomas Zoeller , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

R. Thomas Zoeller , Ph.D. Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 1:17 2:5 4:4 4:18 5:20 6:4 7:4,11 8:15 376:17

**0**

**0.00000001.** 324:11
**0.0000001** 325:3
**0.00001.** 327:9
**0.01** 174:19
**0.05** 174:23
**00818** 1:9

**1**

**1** 5:21 8:6,16 11:20,25 171:17 274:22 274:25 288:18 352:25 355:4 361:9 362:5,17 363:5,14 380:3 409:8
**1,000** 292:7
**1,4** 206:10 273:3 313:4
**1-1,1,1** 275:9
**1.01** 174:2
**1.01.** 174:7
**1.5** 379:16
**10** 151:23 237:15 267:10 301:19 303:13 327:8 399:20 409:24
**10.5** 349:22
**100** 198:12 341:18
**100,000** 288:18 361:24
**10004** 2:8
**10016** 7:7
**10019** 3:6 6:13
**10020** 5:23
**101** 34:25
**102** 123:2 259:19,20 260:19,20 385:20
**105** 409:11
**106** 7:13
**1075** 5:5
**10:03** 102:24 103:2
**10th** 7:6
**11** 138:24 140:14,18 144:20 147:23 148:8 151:23 152:16 186:19 209:16 210:17 267:8,19,23 269:3 360:6,13 361:6,14 377:6 377:16 393:24 394:2 410:4
**1195** 180:22
**11:00** 25:21
**11:47** 200:4,5
**12** 225:4 273:24 378:25 409:8 410:5
**12.3.** 205:7
**120** 19:25
**122** 409:14
**12:32** 200:6,10
**13** 144:20 207:4 210:18 214:8,16,20 278:12 410:7
**14** 113:10 144:21 287:12 340:13 410:9
**1400** 4:6
**144** 337:25
**15** 180:7 211:13 333:18 410:11
**150** 4:5 409:16
**1505** 4:21
**152** 3:4
**16** 336:7 409:10 410:12
**163** 409:17
**1642** 159:18
**17** 169:22 172:24 340:10 410:14
**1756** 282:3,6
**17b** 292:4 361:15,17
**17beta** 287:25 288:14
**18** 346:3,5 347:5,13,17 410:18
**180** 409:19
**185** 409:21
**19** 351:24 352:3,5 410:21
**191** 6:5
**1965** 397:6
**1990s** 366:2
**1997** 168:16
**19th** 3:12
**1:23** 1:9
**1:31** 253:2,4

**2**

**2** 16:12 198:16 207:5 363:14 388:13 409:10
**2,2** 275:8
**2.64** 174:2
**2.7** 271:11 353:19
**2/24/2026** 413:5
**20** 15:15 17:3 359:18 396:5 411:4 415:15
**20,000** 288:18 289:17,18,18

**200** 3:19
**2000s** 279:13
**2001** 287:11,21 410:10
**2002** 9:18 16:19 278:11 278:19 283:3 359:22 410:8
**2003** 41:25
**2006** 9:18
**2007** 120:19 122:13,19 259:10 409:15
**2012** 29:11 108:21 110:19 232:9 233:17
**2013** 235:20
**2014** 235:25
**2015** 268:20 278:3 379:10
**2016** 211:19 235:23 236:12 273:23 410:6
**2017** 236:3
**2018** 341:2 391:18
**2020** 237:14 346:6 347:11 409:25
**2021** 105:19 180:14 185:14 246:6 383:4 409:12,20,21
**2022** 150:11,18 267:7 269:4 352:7 409:16 410:4
**2023** 14:2,6 163:19 253:20 268:19,23 269:9 409:18
**2024** 150:12 164:18 268:20
**2025** 333:4 391:21
**2026** 1:20 8:5 412:19 413:3
**20th** 2:17
**212.566.7500** 2:10
**21263** 342:22
**213** 214:17
**216** 238:2,8,24 238:25
**217** 409:22
**22** 220:4 372:16
**225** 5:14
**23** 249:20 278:23 279:7 327:8
**237** 409:24
**23rd** 327:8
**24** 1:20 8:5 268:6,12 300:14 354:9
**2401** 3:20
**25** 306:18 363:8
**25,000** 289:3,14 290:9 361:16 361:23 362:15 362:21
**250,000** 367:18
**25th** 412:19
**26** 306:17,19 396:6
**2600** 6:20
**267** 410:4
**270** 352:24 353:18
**274** 410:5
**275** 7:5
**278** 410:7
**28** 3:5 229:14 310:21 314:5
**2801** 5:22
**28405** 7:14
**287** 410:9
**2950** 6:6
**2:00** 25:21
**2:38** 298:13,15
**2a** 354:12,17
**2b** 354:12,12

**3**

**3** 105:6,21,24 282:9 342:14 344:4 363:14 409:11
**3.0** 81:3
**30** 27:17 75:15 310:21 311:16 413:16
**300** 4:12
**303** 4:11 291:19 292:23
**303039** 5:7
**31311** 3:21
**32** 311:16
**333** 410:11
**336** 410:12
**340** 410:14
**347** 410:18
**35** 340:21 348:3 349:20
**350,000** 253:21 254:15
**352** 410:21
**35203** 2:19
**359** 411:4 412:23
**35th** 2:7 5:6
**36** 352:10
**361** 274:9 379:14
**362** 274:9
**376** 409:6
**399** 409:5
**3:00** 25:22
**3:34** 332:19,21
**3rd** 413:3

**4**

**4** 122:14 132:3 132:10 150:22 223:17 259:22 284:24 384:17 384:19 389:21 390:16 409:14
**4,000** 172:23
**4.3** 147:25 186:20 394:2
**4.3.** 148:12 186:23
**40** 18:23 27:13 86:6,15,17
**4099** 106:20 107:8
**42** 205:6
**43** 18:5 135:13
**44** 19:24
**49** 271:17
**4:20** 336:2,10

**5**

**5** 133:4 150:19 166:16,22 175:13 392:10 393:3 409:16
**5,000** 290:15,23
**5.0** 395:19
**50** 153:12 251:12 369:18
**506** 2:17
**50th** 399:20
**51** 271:18
**53** 284:5
**55** 19:24
**575** 7:12
**57th** 3:4
**5:17** 376:4,6
**5:36** 376:7,11
**5:59** 398:23,25

**6**

**6** 163:20 175:13 354:16 409:17
**6,000** 292:8
**6.023** 327:7
**60** 352:24
**600** 250:10,15
**60601** 4:7
**60606** 3:13 4:13 5:16 6:7
**62** 271:17
**63101** 4:22
**672** 269:23 377:16
**6:18** 408:15,17

**7**

**7** 9:18 81:20 180:15 259:21 409:19
**7.5** 220:5
**7.7** 278:23 279:9
**700** 5:15
**701** 4:19
**787** 6:12
**7928358** 1:23 413:5 414:2 415:2
**7:00** 25:4

**8**

**8** 185:8,15,18 393:4,4 409:5 409:21
**8.4** 268:13
**87** 198:9
**8:08** 1:20 8:4

**9**

**9** 217:7 381:10 381:14 384:11 396:8 409:22
**9.1** 396:16
**900** 6:21
**90s** 30:10 124:14
**917** 360:19,22
**92612** 6:22
**9903** 352:16
**9:05** 61:14,16

**a**

**a.k.a.** 197:17
**a.m.** 1:20 8:4 61:14,16,17,21 102:24 103:2,3 103:7 200:4,5
**ability** 11:2,6 29:4 98:15,18 168:8 171:14 297:2 341:7 352:12
**abiotically** 253:25
**able** 45:7 91:14 92:15 121:12 121:20,25 221:13 260:6 261:8 265:11 285:5,15 290:8 297:15 386:14
**abnormal** 286:24
**above** 135:22 145:5 214:18 241:6 242:2 291:25 360:25 393:7 413:6 415:7
**absence** 38:25 44:9,9 249:22 309:18 340:3 372:10
**absolutely** 338:4
**absorbed** 252:15
**absorption** 222:14
**abstract** 82:21 129:11 158:25

159:3 164:2 174:4 188:5,25 196:12 288:5 288:10 360:22
**absurd** 251:16
**abundance** 315:19
**academic** 37:5 81:5 116:8
**academics** 369:5,5 388:4
**academy** 236:22,24 399:23
**accept** 339:7
**accepted** 87:7 134:24 137:15 204:5 211:4 212:25 269:15 269:17 401:14
**access** 94:4
**account** 266:3 387:13
**accuracy** 413:9
**accurate** 26:16
**acknowledge** 234:17 348:25
**acknowledge...** 415:3
**acknowledg...** 413:12
**act** 56:16 57:23 118:16 176:13 232:25 241:25 243:2 257:14 257:22 258:12 261:8 333:7 334:11 386:15 395:7
**acting** 54:8 207:14 242:17 266:8 298:22
**action** 37:7,9 37:17 38:25 48:6,9 54:7,25 57:18 60:19 63:3,6,22 65:12,24 104:10,17 106:8 107:12 108:8 109:12 109:16 110:23 111:11,12,15 113:6,24 242:2 243:3 305:8 372:18 373:21 412:15
**actions** 53:20 54:4,17 118:16 275:19 285:6 285:16 294:11 295:15 297:24
**activate** 66:9 67:3,20 279:14 297:15 352:14 352:22
**activated** 279:22 341:13 341:15,17
**activates** 66:21 68:4
**activation** 187:22 257:23 261:19 262:11 279:21 344:5 345:21 350:23 351:3,23 353:10 354:23 410:25
**activational** 258:10 344:12
**active** 112:18 343:2,7
**actively** 14:17 30:3
**activities** 319:24,25 322:2
**activity** 309:4 309:16 340:8 342:11,16 343:10 353:2 410:16
**actual** 101:5 345:10
**actually** 22:16 32:20 62:13 69:14 105:10 109:23 117:16 120:6,21 122:17 123:19 126:22 160:12 177:10 213:25 219:20 222:20 286:16 308:16 311:5 314:6 360:22 362:12 365:8,24 383:5 388:12 391:12 393:3 397:6
**add** 116:17 291:23
**addition** 181:16 223:23 386:18
**additions** 415:6
**additive** 279:24 287:25 288:25 289:12 306:20 306:23 360:9
**additively** 266:8 298:22
**additivity** 200:25 203:2 256:23 257:11 259:12 266:3 284:11 286:21
**address** 87:8 234:24 296:10 399:22
**addressing** 285:9
**adequately** 195:16 197:12 197:25

**adopted** 62:7 243:17
**adopting** 242:9
**adult** 181:13
**advanced** 4:17
**adverse** 33:10 34:18 37:18 39:6 41:19 62:18 64:17 97:3 98:24 100:20 111:21 126:17 130:15 130:17 131:2 151:12 152:7 175:23 220:3 222:3,24 225:8 225:19,25 226:12,18 227:6,15,20 228:23 229:5,7 229:16 230:7,8 241:24 243:2 301:21 302:16 309:6 373:14 373:18,19,22 373:24 374:5 374:14,18,22 385:11
**adversity** 228:5 228:15,20 237:19 242:11 242:16 243:14
**advisory** 30:14 33:18 81:6 333:5 366:4
**advocate** 365:16
**afam** 6:17
**affect** 17:18 20:12 21:19 33:10 43:5 49:2 53:12 145:21,23 230:4 241:5 286:17 292:9 296:22,24 374:14
**affected** 45:6 45:13,14 230:2
**affecting** 40:6 48:5 54:19 131:9 284:14 353:2 372:18
**affects** 20:17 48:19 53:9 71:12
**affinity** 259:5
**african** 159:25 160:25 161:22 162:5 188:10
**afternoon** 200:12,13
**age** 403:2,5,9 403:11,14,15
**agencies** 115:18 131:17 229:20 251:9 308:14 317:18 321:13 368:13
**agency** 243:17 308:11 309:4 369:11 372:4
**agent** 301:15
**agents** 242:17 292:7 387:10 397:13
**aggressively** 177:8
**aging** 403:21 404:11
**ago** 9:12,13,14 11:9 13:11 14:2 15:15 17:3 19:10 22:18 108:13 113:10 172:20 229:21 326:25 399:20
**agonism** 345:5
**agonist** 57:23 58:7 344:20
**agonistic** 258:5 340:7 342:11 342:15 343:10 410:15
**agonists** 258:13 343:2 344:10 344:17
**agree** 49:12,13 54:13 55:12,12 67:16,16 69:17 74:2,21 96:18 104:24,24 114:11 117:15 118:14 120:5 121:3 123:16 124:22 125:25 154:6 164:15 164:25 165:24 168:2,21,23 172:12,19 176:25 189:13 190:9 191:9 192:24 193:22 195:15 197:19 197:24 199:22 215:15 218:22 223:9 239:25 240:2 242:21 242:23 245:13 246:18 247:10 254:3 261:13 272:12,21 276:7 277:6,22 293:11 298:3 302:18,22 317:16 329:13 331:6
**agreed** 327:3
**agricultural** 271:14
**ahead** 12:24 71:11 74:8 77:15 79:16 88:9 94:9,9 127:6 128:21

128:24 130:10 134:13 148:8 153:23 171:2 201:18 212:19 219:3 234:6 244:21 251:22 255:6 269:9 303:8
**air** 253:13
**al** 2:19 120:19 150:11,12 158:2,18 164:3 165:13,22 167:11 168:2 168:12,24 170:4,21 172:13 173:21 175:11 176:18 178:11 180:18 182:10,11,11 183:2 185:19 188:6 189:13 190:9,22 211:19 235:23 236:3,7,12 259:9 260:2 267:23 268:18 268:20,23 278:11,19 279:11,18 282:3 284:22 285:22 287:11 287:21 291:21 297:20 309:25 341:23 346:5 347:11 348:12 352:6 359:22 369:7 410:7,9
**al.'s** 283:11
**albeit** 221:15
**alcohol** 328:15
**alexandra** 180:13 409:19
**alignment** 388:2
**alleged** 387:20
**allen** 4:18
**allotted** 413:19
**allowed** 402:9
**allows** 82:19 356:3
**alluding** 132:4
**alpha** 57:22 66:8,21 67:2 67:19 68:4,12 68:25 71:4,5,6 104:11,18 187:21 200:24 202:25 207:15 209:7 214:10 214:21 215:12 216:2 257:23 258:10,13 261:19 262:10 262:16 270:21 277:13 279:15 279:21,23 288:3 341:11 344:9,12 351:3 360:9 377:23 378:12
**alternatives** 176:9
**alters** 346:7 347:3,19 410:19
**ambiguous** 183:9 184:4 302:10
**amend** 56:5
**amended** 11:21 11:23 409:8
**american** 160:2 160:25 161:23 162:5 188:11 334:12,16
**amount** 93:10 114:22 116:16 122:2 143:25 144:14 242:15 323:21
**amounts** 294:21
**amplifies** 201:4 203:6
**analog** 233:3
**analogy** 35:3
**analyses** 175:15 179:12 391:6 397:12
**analysis** 85:11 85:17,22,25 86:8,24 90:20 94:16 95:20 97:20 98:22 99:5 100:25 136:15,19 138:12 140:6 171:6 179:10 191:14 209:12 265:24 271:16 287:3 316:15 345:11 351:16 368:9 371:4 388:24 389:13 389:16 390:6 392:25 394:19 395:14 396:3 399:10,14 400:11,12
**analyze** 102:12 259:4 351:12
**analyzed** 93:21 341:24
**analyzing** 248:3
**anderson** 6:4
**andreas** 122:12 124:5 229:22 315:20 385:2 409:14
**androgen** 145:22 236:18 286:18 351:22 410:24

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 423 of 518 PageID #:77196



**animal** 42:9 82:6 83:10 84:10 85:8 95:3 101:7 115:24 234:3 372:14,15
**animals** 44:7 44:13,24 57:4 57:13 60:8 83:8 95:2,12 101:2 114:21 311:21 322:10
**anniversary** 399:20
**answer** 10:15 10:21,25 13:3 13:19 18:16 31:17 43:9 47:11 52:3 58:6,16 64:3 66:12 75:9 76:5 78:5 83:18 84:4,7,8 85:6 88:20 91:19 92:21 94:11 98:18 99:4,23 103:17 112:14 113:16 114:19 115:7 117:12 119:23 120:13 127:16 143:20 145:15 153:8 154:24 155:7 156:12 157:11,13 164:23 182:23 193:7 198:15 206:24 208:24 211:10 213:10 216:17 227:25 231:23 245:25 254:8 258:20 264:19 299:10 317:10 318:9 318:24 320:13 326:5,16 327:2 339:18 342:6 368:8 373:11 373:17 375:13 396:19 398:7 402:21 406:19
**answered** 70:11 75:18 76:4 91:18 93:25 117:25 142:11 143:16 147:11 152:22 153:4 156:23 157:19 227:24 229:2 233:22 234:21 235:15 255:8 262:23 263:11 266:6 298:5 304:16 313:22 317:8 324:4 331:11 335:3 345:16 351:6 368:6 372:2,8 375:9 375:11 400:17 402:12 403:20 407:10
**antagonism** 258:3 266:4 342:13
**antagonist** 10:2 57:24 58:7 71:2,3 342:11 344:20 345:5
**antagonistic** 340:7 342:16 343:10 410:15
**antagonistica...** 257:22 266:9
**antagonists** 258:13 343:3
**anthropogenic** 253:21
**anti** 66:20 258:8 275:21
**anticipate** 120:7,22 123:12
**anticipation** 123:23
**anybody** 64:13
**anymore** 28:15
**anytime** 11:14
**anyway** 186:15 261:4
**aop** 131:10
**apical** 245:19 246:14 247:16 266:10,17,21 266:23
**apologies** 148:6 314:14
**apologize** 65:13 82:14
**apparent** 169:20 239:9
**appear** 297:6 383:12
**appearances** 2:2 3:2 4:2 5:2 6:2 7:2 8:21
**appended** 415:7
**appendices** 19:20
**apple** 65:19
**applicability** 237:20
**applicable** 413:8
**application** 89:22
**applied** 88:22 89:9 103:24 222:11 397:11
**applies** 208:10 208:20,25
**apply** 81:5 88:2 88:18 106:6 206:20 227:21

227:22 292:14 319:22 389:17
**appreciate** 19:3 41:10 105:17 190:7 320:11 407:21
**approach** 136:21 239:4 242:10 387:5
**approached** 359:2
**approaches** 161:14 241:19 367:13 368:3
**approaching** 391:9
**approximately** 288:15
**area** 24:20 32:19 94:16 95:18 96:24 97:21,25 98:21 100:2,5,14,25 101:12 102:9 124:2
**areas** 87:2 93:8 94:15 96:13 100:15 101:14
**argue** 183:8 353:16
**argued** 183:24 238:17 239:7
**arguing** 239:15
**argument** 67:12 219:19 241:3 284:18 367:21 369:9 369:10,12
**arguments** 23:7 241:12 266:19 367:9 368:15,16,21 368:22
**arising** 242:13
**arriving** 381:2 389:19
**art** 229:25
**article** 105:2,18 122:13 150:17 163:19 180:14 185:14 217:6 237:13 267:6 273:22 287:11 347:22 377:7 379:3,9,14 381:19 384:20 385:20 397:3,7 409:11,14,16 409:18,20,21 409:23,24 410:4,5,9
**articles** 376:20 377:4 391:23 392:2,6
**articulate** 86:25 96:12 137:10
**articulated** 136:20 365:20 389:18
**artillery** 11:8
**ascribe** 243:13
**ascribed** 396:13
**aside** 74:24 358:8 382:6
**asked** 12:20 13:12 47:17 60:13 62:2 70:11 72:23 76:4 85:2 91:18 93:24 106:4 117:25 142:11 143:16 147:11 153:4 156:23 157:19 227:24 229:2 233:22 234:21 235:15 262:23 263:11 298:5 304:16 308:2 313:22 317:8 324:4 331:11 335:3 345:16 351:6 368:6 372:8 375:4,9 388:18,24 389:14 392:23 400:16,23 402:12,14,19 403:20 407:10
**asking** 10:20 11:15 25:10 40:15 57:8 90:17 98:3 109:24 113:14 124:16,25 126:20 129:10 136:3 139:11 146:11 147:3 152:21 154:23 155:15 157:8 157:10 166:10 167:25 178:20 190:8 193:13 196:12 210:7 234:13 247:5 264:9 326:4 339:2 349:10 349:12 356:17 357:15 407:21
**aspect** 60:19 62:18 63:3,6 63:22 64:14 65:11 66:2 106:7 107:11 108:7 109:11 110:23 111:11
**aspects** 65:24
**assay** 59:18 223:20 225:17 226:8 229:12 229:13 296:13 296:16 297:5 343:18,19

344:14 361:10 362:15 363:25 364:2,11,16,24 364:25 365:9 371:25
**assays** 114:15 115:11 117:4 117:22
**assert** 196:18
**assertion** 231:22
**assess** 252:13 252:18
**assessing** 301:15
**assessment** 29:25 33:11 34:4,5 35:13 35:14,21,22 36:5,11,12,13 36:16,18,24,24 126:4 127:2 128:3 129:20 130:19 131:12 131:17 154:2 191:10,18 231:4 233:25 234:3 242:8,21 244:7 252:8 262:20 263:8 263:15 265:6 265:15,16 266:2,18 333:11 335:6 335:13 367:14 368:4 369:13 387:6
**assessments** 32:16 33:21,24 36:6 230:22 231:2,25 232:12 233:20 246:9 334:11 339:20,24,25
**assessors** 305:10
**associated** 53:6 132:19 133:9 135:10 159:22 179:19 181:17 182:14 189:5 299:13,22 300:9 403:15 404:7 406:4,14
**association** 134:3,7 139:18 139:24 140:8 149:8,13,21,25 150:5 151:11 152:6,25 154:14,16 155:2 156:19 157:15 158:12 159:5 169:17 169:19 170:6 185:20 190:23 193:2,24 275:16 276:17 299:12 393:14 394:9 404:25
**associations** 167:12 195:18 197:13 198:7
**assume** 10:21 87:15 88:21 90:11 91:20 92:11 105:24 111:23 222:2 222:23 225:15 225:25 226:3 240:21 261:14 324:24 325:16 338:15
**assumed** 88:2 232:2 271:15
**assuming** 88:17 88:23 134:3 148:24 149:4 382:7
**assumption** 89:4,10,10,11 90:23 91:24 111:24 230:19 294:5 295:4
**assumptions** 386:18
**atlanta** 5:7
**attached** 26:14 413:11
**attention** 13:7 157:3,9 393:2
**attorney** 413:13
**attributes** 82:21
**august** 150:18 409:16
**austin** 6:11 389:18 397:7
**author** 29:18 106:2
**author's** 242:21
**authored** 28:6 158:6
**authority** 235:23
**authority's** 246:6
**authors** 29:10 29:21 118:11 157:23 161:18 163:3,8 164:16 177:8 272:12 276:7 288:6 381:24 392:5
**available** 89:4 92:2 103:25 104:3 350:21 413:6
**avenue** 6:12 7:5
**avoid** 188:6 255:24
**avoided** 256:6

**avon** 3:9
**aware** 19:18,22 51:22 57:9,16 91:6 127:7 146:20 153:18 153:25 162:9 188:18 214:3 215:7 217:23 244:17 246:2 248:9 252:7 259:3 283:9 285:13 286:8 311:19 322:8 333:3
**axelrod** 233:9
**axis** 233:5

**b**

**b** 6:17,23 8:25 237:18 354:17
**back** 27:4 31:22 41:9 45:9 50:4 59:12 61:21 62:23 65:21 69:15 72:22 75:20 79:9 103:7 104:22 114:10 132:7 186:5 190:21 200:10 201:23 208:18 219:21 227:8 236:25 253:9 284:12 297:19 298:20 302:11 321:11 333:2 336:10 346:17 350:19 353:14 376:11 399:6
**background** 265:2 293:22
**bacon** 5:20
**bad** 45:2 67:7
**bailey** 155:19
**baker** 7:24 8:17
**balance** 345:9 372:18 373:2,7 374:14
**ballpark** 308:20
**bankruptcy** 16:2
**based** 30:25 44:6 89:11 99:13,17 142:12 162:4 200:24 202:25 243:8 256:22 286:19 288:24 289:11 303:3 316:23 317:19 341:11 343:19 365:22 372:5 376:18 400:3
**bases** 19:11 318:19 320:17
**basic** 34:17 54:12 261:6
**basically** 71:21 74:13 115:25 134:21 236:24 241:14 306:2 367:11
**basis** 43:12 44:23 204:18 205:18 307:4,7 309:19 317:25 373:4
**bbp** 338:11
**bear** 22:22 23:21
**bearing** 339:15
**bears** 22:16 23:23
**beast** 221:18
**beat** 125:12
**beauty** 4:3,17
**beginning** 166:24 169:7 360:24
**begins** 385:23 386:4 394:24
**believe** 72:13 103:8 109:9,14 112:2 136:17 160:7 187:12 269:2 283:3 284:7 302:12 346:12 347:9 367:12 368:2 369:24 388:5 388:13 389:14
**bell** 4:3
**benzophenol** 380:3
**benzophenone** 274:22,25 309:22
**benzophenones** 85:15,24 86:2 206:2 310:13
**berlin** 235:7
**bertrand** 149:24 150:12 154:21 155:16 157:24 158:7 163:7,18,23 164:2,15 165:3 165:13 168:2 168:12,24 170:4 172:9,13 173:21 175:10 176:18 178:11 182:11 192:19 192:23,24 193:22 198:5 198:10 409:17
**best** 11:2,5 47:11 54:10 70:25 98:14,17
**beta** 258:17,22 258:24 259:7
**better** 49:20 94:4 116:2

147:22 182:5
**beyond** 29:9 133:15 294:18
**bfr** 369:10
**bg1** 274:24 380:5
**bias** 150:6
**biased** 189:21 190:3
**big** 35:8 65:19 244:18 294:20 364:9
**biggest** 171:24
**billion** 250:10 250:15
**billions** 251:2,2 327:9
**binary** 175:5 194:12 332:12
**bind** 39:21 42:25 59:2 66:8 67:2,19 68:12 71:5 200:24 202:24 365:6
**binding** 59:4 59:11 104:11 257:23 261:19 262:10 288:3 360:10
**binds** 57:22 58:23 68:4,25 71:4,6
**bioassays** 292:10
**bioavailable** 292:4
**biochemical** 58:19 59:15 60:7 128:5 130:21
**biocides** 243:25 309:13
**biologic** 393:13 393:21
**biological** 60:7 78:9 79:18 98:25 104:5 133:2,17 134:8 138:20 139:8 139:13 140:3,5 187:19 200:16 201:12 202:14 204:2,18 205:17 208:9 220:22 221:9 245:17 246:16 256:20 261:17 262:9 282:12 282:15 283:12 328:20 387:8 398:11 401:17 405:25 406:22
**biologically** 78:6,14,22 79:19 80:22 134:5 135:17
206:14 388:20 389:4
**biology** 242:10 396:8
**birmingham** 2:19
**birnbaum** 255:16
**biscayne** 3:19
**bisphenol** 287:23 367:18
**bisphenols** 352:13,13
**bisphydro** 275:8
**bit** 72:24 87:6 132:14 204:12 205:13 314:9 314:15 373:21 376:22 387:2 388:10 394:23
**black** 160:2 161:2,22 162:5 164:4 167:22 168:15 169:22 170:8 172:21 175:18,20 176:3,23 186:12 188:10 198:12
**blah** 275:12,12 275:12
**blinds** 69:7
**bliss** 3:7 9:8 13:3 16:7 40:11 41:2 51:20 55:8,11 55:17 61:12 65:5,8,16,20 84:6 85:20 86:12,14,17,20 94:10 98:7 102:5,18,22 105:4,10,13,16 107:4,6,23 110:5,9,12,14 110:17 114:8 118:22 119:2,4 119:22 120:2 122:8 125:6,9 130:7 132:8 140:18,20 147:21 148:7 148:10 150:15 156:7 166:16 166:18 167:2 169:11 173:17 177:14 180:2,8 181:2,5 185:7 185:11 186:6 192:11 196:6 196:11,17,24 197:3,10 198:19,23 199:10,12,16 200:11 201:25 202:5 204:24

205:4 207:10 213:23 216:23 217:2 224:21 230:14 231:7 231:11,13,16 231:20 237:6 237:10 238:7 238:16,25 239:3 245:5,10 252:19,22 255:7 259:15 259:24 260:10 260:13,19,23 261:2 267:4,14 268:10 269:5,7 269:11,14,16 269:18 271:23 273:11,17 278:7,16 279:4 287:8,16,19 291:12 293:7 296:8 298:10 314:12,14 326:6,9 332:13 332:17 333:14 334:3 335:18 335:22 336:11 336:13,23 337:14 339:12 340:12,15,19 342:22 345:24 346:15,20,25 347:7,14,16 349:12 352:2 359:7,10,12 360:19,21 361:3,5 369:15 374:25 375:21 375:23 376:2 381:7 382:14 382:20 385:12 386:5,24 387:23,25 388:8,14 389:9 391:16 398:20 399:7 408:6 409:5

**blocks** 233:7

**blog** 383:8

**blood** 44:4 112:16 412:15

**blurred** 195:4

**board** 30:14 33:19 236:25 333:5

**bodies** 327:20

**body** 116:3 124:2 228:19 228:22 236:16 285:2 296:17 330:9 331:2 355:19 356:20 357:3,18,21 358:17

**body's** 201:5 203:7 294:18 294:23 295:22 295:25

**bold** 140:15,21

**book** 28:7 381:21

**bottle** 330:9

**bottom** 107:6 119:16,21 159:2 260:4,14 288:6,11

**boulevard** 3:19

**bounce** 314:8

**bouncing** 314:15

**bound** 98:10 174:18 284:15 284:16,19,20

**boundary** 15:3

**boxes** 306:3,11

**boy** 125:10

**bpa** 39:20 116:6,9,10,11 272:6 274:21 275:7 288:14 288:18 290:23 292:15 368:9 368:11 380:2

**bradford** 134:10 389:15 389:18 392:24 396:24 397:3,7 399:9,17,18,19 400:11

**bradley** 6:4

**brain** 37:8,19 38:4 40:2,8 41:20 42:10,24 43:5,21,22 45:14 48:19 49:2 116:13 127:17 129:25 227:11 230:4 286:15

**braun** 28:11

**break** 50:10 61:11,23 65:22 170:22 199:7 199:11 252:23 293:6 298:8,9 326:10 328:8 332:17 358:23 398:21

**breaking** 55:5 102:17

**breaks** 328:16

**breast** 32:9 66:21 71:8,13 71:14,21 164:7 165:16,18 167:18,19 185:22 186:11 187:7,9,16,20 188:13,20 189:6,9,17 190:12,24 191:7

**brescia** 237:13 237:18 239:6 239:18 409:24

**brief** 366:8
**briefly** 24:24 25:14
**bring** 12:14 366:20
**bringing** 15:25
**broad** 97:10 98:15 136:7,13 137:20 227:3
**broader** 59:7 59:12 134:15 222:25 263:17
**broadly** 177:7 272:18
**bromated** 340:8 410:16
**brominated** 341:9,12,14 342:16
**bronchitis** 208:17
**brought** 69:7
**brown** 28:12
**buffered** 144:24
**bunch** 234:22
**burdens** 291:24
**burn** 144:23
**busted** 369:7
**button** 119:18
**butylparaben** 342:2 343:9

**c**

**c** 236:12 237:18
**c8** 151:19
**calibrated** 362:4
**california** 6:22 16:20
**call** 62:24 92:7 102:21 200:20 200:20 202:21 205:24 206:7 233:12 256:9 256:10 269:20 288:15 300:25 305:5 313:2 323:2 356:15
**called** 9:2 115:19 211:4 233:3 234:23
**calling** 65:5 107:15 160:14
**canada** 28:14
**cancer** 32:5,7,9 49:15,21 50:11 50:13,18 52:4 52:23 53:7 66:4 67:22,25 68:7,14 70:15 70:21 71:7,7 71:14,18,21 72:6,14 73:3 73:15 74:3,11 74:19 75:2,3,3 76:2,9,20,20 77:8,10 78:7 78:11,16 79:21 80:9,25 81:15 82:10,24 83:8 84:12 126:3,12 126:19,22 127:18,25 128:10 129:19 130:11,12 131:6 132:20 133:10 134:5 134:25 135:11 135:19 137:17 138:8 141:16 142:9,24 143:13 145:19 148:21 149:2,9 150:2,11 153:21 154:17 155:21 156:9 156:21 157:5 157:17 158:13 159:7,23 161:10,14 162:15,21 164:7,10,20 165:16,18 166:8 167:10 167:13,18,19 175:17,25 176:5,15 179:5 179:20 181:14 181:18 182:6 182:15,21 185:23 186:12 187:3,4,7,9,16 187:20 188:13 188:20 189:6,9 189:17 190:12 190:24 191:7 191:20,24 192:6,15,18 204:20 205:19 206:17,20 207:20 208:21 208:22 209:2,3 209:4,19,23 211:3,16,19 212:4,9,15,16 212:24 213:2 213:19 214:13 214:24 215:9 215:14,22 216:6,7,8,10,21 217:6,13,15 233:7 258:25 264:25 267:25 268:17 269:24 270:14,18 272:2,6 274:10 274:15,19,24 275:10,17,20 275:25 276:4 276:10 277:8 277:16,25 278:2 298:23 299:13,21

300:8 301:14 306:6,25 307:25 311:25 313:13 319:10 319:19 322:7 352:19 357:5 357:11,21,25 358:12,21 359:3 376:23 377:10,17 378:17,21,22 379:5,16,17,21 380:5,13,18,24 381:5 383:10 383:11,17 384:14 390:13 390:14,18 393:17 394:11 394:21 395:4,8 395:20 397:2 397:23 398:4,6 403:5 404:5,7 404:14,15,18 404:22 405:4,9 405:10,22 406:2,5,15,15 407:4,19 409:23

**cancers** 50:24 51:12,24 52:5 52:24,25 53:2 53:7 71:17 75:25 76:10,17 77:9,18 78:18 79:24 84:18 104:11,18 134:17 137:12 137:22 164:7 165:19 167:20 169:19 203:22 207:17,19 208:10 209:21 210:22 214:6 217:17 319:12 319:17,22 321:15,17,22 358:16 382:3 382:10 383:6 403:3

**candidate** 304:9

**capable** 394:13

**capone** 369:7

**caps** 306:23

**car** 100:10

**carcinogen** 49:17,23 50:15 50:23 51:23 67:10 206:6 301:3,16 303:22 372:5

**carcinogenesis** 52:8 70:17 81:15 201:8 203:10 219:9 301:21 302:15 320:8 355:22

**carcinogenic** 57:4,11,19 58:11 67:5 69:3,10,20 70:8,13 200:23 202:22 270:25 272:8,14 302:24 303:13 304:5,14 306:23 338:12 355:15 356:14 356:19,25 357:10 358:7 358:11 395:6 395:24

**carcinogenicity** 33:14 82:7 85:8,23 127:22 128:13 129:2,3 129:15 130:4 303:17 311:21 312:10,20,25 313:18 317:19 321:14 322:10 328:12

**carcinogens** 52:4,10 53:6 80:12 85:16,17 141:10,24 143:6,25 144:10,14 145:10 200:21 200:22 202:16 202:21 204:17 205:16 206:14 263:18 264:14 268:17 300:17 300:18,24 302:3 306:4 307:10,21 308:12,25 312:12,15,16 313:3,11,16 314:19 316:2 316:10 317:6 317:14,17 319:3,4,14,18 320:19 322:9 323:16 355:17 355:22 356:6,8 356:13,25 358:9 370:15

**care** 145:8 182:4 329:14 329:18

**career** 41:5 365:15

**careful** 184:24 201:10

**carefully** 27:7 41:14 70:5 99:23 115:3,6 116:23 139:7 142:5 193:12 304:11 368:2

**carolina** 7:14 271:15

**carry** 145:18
**case** 1:8 15:10 15:12,24,25,25 16:2,16,19 17:8 57:6 60:2 68:16,18 73:9 84:14,17 92:10 114:10 151:24 162:3 167:21 178:12 184:3 216:9 223:20 233:16 242:3 262:3 271:9 280:23 301:6 303:24 315:22 322:19 329:5 339:16 356:24 372:11 383:25 384:3,9 387:21 390:7 391:5 392:21,25 393:22 395:15 396:3 402:10 403:24 404:11 405:4 407:11
**cases** 16:5 17:2 29:2 52:12 66:14 169:22 171:3 172:22 172:25 173:2,4 244:8,14,17,18 413:4 414:1 415:1
**categorically** 226:12 227:22
**categories** 76:16 81:24 137:2 228:3
**categorize** 301:13
**categorized** 303:3
**category** 74:15 151:18 227:3
**causal** 39:16 45:17 77:20 134:7 149:7,14 149:25 154:14 182:19 188:2 211:2 213:2 215:13 381:3 388:23 389:16 390:6 392:25 394:19 395:14 395:22 396:2 397:11,22 403:18 404:8 404:24 405:16 407:20,22
**causally** 37:18 39:6 41:19 42:13 68:6 132:19 133:9 135:10 179:19 404:23
**causation** 37:15 132:25 133:19 140:6 163:4 401:18 405:23
**causative** 44:8 44:24 394:14
**cause** 32:25 34:19 52:4 66:4 67:21 68:13 71:7,16 73:3,15 74:3 74:11,19 75:2 75:3,24 76:9 76:10 77:7,8 78:10,15,18 79:20,23 80:3 80:9 84:12,18 126:3,12,22,23 127:25 128:10 128:11 129:2 129:19,25 130:11,12,17 131:5,6 141:15 142:8,23 143:12 144:23 145:19 148:20 149:2 187:20 206:16 251:23 270:16 298:23 307:24 395:3 396:9,18 398:4 402:16,20 403:5,24 405:10 406:15 407:4,7,19,22
**caused** 38:4 43:18 78:7 116:11 153:21 298:24 319:20
**causes** 50:23 51:23 69:4 75:3 83:7 127:17 128:4 129:22 134:17
**causing** 33:2 407:3
**caustic** 141:18 144:22
**cautious** 177:4
**cautiously** 176:20
**cavo** 4:10
**cell** 187:22 282:17 283:14 296:14 319:7 320:2,4,5,7 323:13 329:18 346:7 347:3,19 348:5,6,7 349:4,25 350:4 350:15,24 351:3 358:6 403:13,23 410:19
**cells** 215:4,12 216:13 218:24 274:19,24 275:10 346:10 350:11 352:16

352:19,23 364:3 379:21 380:5,14 395:7 395:8
**cellular** 58:19 59:15 60:7 97:3 128:5 130:21 282:16 283:13
**center** 2:18 29:17 217:6,13 409:23
**central** 16:20 17:10 207:15
**certain** 39:19 45:12 48:2 58:18 59:14 60:6 66:10 67:4,21 68:5 72:5 102:10 116:15 117:6 122:2 126:16 128:5 129:22 130:20 189:9 230:7 261:20 324:10 364:22
**certainly** 31:24 58:15 72:19 96:8 99:13 175:6 179:17 182:18 219:18 255:17 256:2 262:2 304:9 351:15
**certainties** 99:20
**certainty** 100:7 100:15,17 133:7 135:16 397:20 398:15
**certificate** 412:2
**certifications** 27:23
**certified** 412:6
**certify** 412:8,14
**cervical** 352:19
**cetera** 23:8 35:19 81:16 82:22 90:25 93:9 144:24,25 316:20 347:20 347:20
**cgw** 4:8
**chair** 245:4
**chan** 137:8
**chance** 12:24 23:3 125:21 150:6
**chances** 112:15
**chang** 137:8,9 137:10 149:24 150:11,17,22 150:24 154:13 154:24 155:3 155:17 156:9 156:17 157:12 157:23 158:2,6 158:10,18 163:15 164:25 165:4,8,15,21 167:11 168:4,9 168:20 170:5 170:21 171:8 172:5,7,16 177:7 180:20 182:10,25 192:19,23,24 193:22 198:5,6 331:13 409:16
**change** 23:4,20 52:22 67:13 72:24 89:6 132:14 156:2 195:14 197:7 316:22 323:17 324:2 367:23 372:17,22 402:3 414:4,7 414:10,13,16 414:19
**changed** 39:9 109:9 219:25
**changes** 403:22 403:23 413:10 415:6
**changing** 243:14 367:15
**chapter** 29:19 30:4
**chapters** 28:7 29:14,23
**characteristic** 319:21
**characteristics** 52:14,21 146:4 300:18,19,24 302:2,4,8 307:10 313:17 319:4,18,21 321:25 355:21
**characterizati...** 306:8
**characterize** 158:2,14 311:4 370:6
**characterized** 158:19 175:11 369:20
**characterizes** 370:2,8
**charge** 18:22 19:8 103:22
**chase** 64:16 338:8
**che** 150:17 409:16
**cheatham** 5:3
**check** 354:8
**checked** 246:15 306:2
**checking** 306:10
**checklist** 302:23 304:17 305:22

**chemical** 13:7,9 32:15 33:8 34:19 35:17 52:9 54:22 57:3,3,17,17,21 57:21 58:10,10 58:17,17,23,23 58:25 59:6,13 59:13,19 60:5 60:5,17,17,18 62:25 63:2,9 65:10,10 72:18 73:2,2,14,14 74:2,3,25,25 78:6,9,15 79:20 87:11,13 89:16,18 90:20 91:22,23 92:6 104:9,16 107:10 109:15 111:3,14 112:8 113:5,5 126:2 126:2,14,15,15 126:21,21 127:17,25 129:18 130:16 130:16 132:18 135:9,20 138:11,13 139:24 141:4,6 141:14 142:7 142:22 143:11 144:7,19 146:3 149:8 153:20 154:2,16 161:7 162:2,19 164:3 175:16,24 187:6 189:16 200:19 204:21 205:20 206:8 206:15 223:24 244:2 250:9 252:14 256:14 264:12 284:13 296:21,24 300:7 302:24 303:11,12,20 304:3,13 306:22 309:16 311:2,19,24 315:8 329:9 330:3 353:24 355:17,23 359:3 371:22 372:5 378:16 380:16,17 381:4 384:13 387:5,5 388:20 391:6,7,13 392:3 393:15 393:16 394:9 394:20 395:2 395:23 397:22 404:2

**chemically** 44:14,15

**chemicals** 21:15 30:23 31:14 38:16,16 38:24 39:20,23 40:4,5 41:18 42:25 43:4 45:12 48:3,25 52:16 53:25 54:14 55:20 56:7 57:10 61:24 63:5,21 80:11 83:7,11 84:12,18 85:9 87:17,18 88:25 90:12,13,24 94:24 99:15 102:11 103:20 106:6 107:10 108:7,18 109:11 110:22 111:10 112:17 112:23 113:17 114:22 122:21 135:3 141:9,21 141:23 143:6 144:9 145:18 145:21,21,22 146:13 147:5 205:25 206:8 219:13 222:17 227:16 228:5 230:4 237:21 241:18,25 243:2 250:7,24 253:12,22,22 254:15 255:11 256:14 257:14 257:21 259:6 262:21 263:8 263:16 264:8 265:18,21 266:7,24 267:24 276:21 281:21 282:20 286:17 291:23 300:11 302:2,6 304:25 305:19 306:24 307:8 307:21 308:3 308:10 312:5 312:11,17,21 314:18 315:8 315:18 318:17 320:18 321:18 322:3 323:11 323:22 327:7,7 327:10 329:9 329:22 330:16 330:25 334:19 334:21 344:8 344:15 345:22 348:10 350:22 351:9,20 353:14 356:2 356:18 357:2 363:8 365:6 370:12,16 371:4 377:9 379:5 380:22 384:23 385:10

386:21 387:7 387:20 391:25 397:13 410:22
**chemist** 21:12
**chemistry** 89:5
**chenneke** 5:9
**cherin** 7:4
**chicago** 3:13 4:7,13 5:16 6:7
**children** 42:14 49:2
**children's** 40:6 41:20 43:5
**chloro** 271:4 272:7
**chlorotriazine** 273:8
**christian** 5:8
**chronic** 112:19 187:5 209:24 271:6 373:22 374:4 395:5
**cigarette** 75:13 179:4
**cigarettes** 52:22 157:4 179:5 396:25 405:4,5,6,10
**circular** 266:19
**circumstance** 34:20
**circumstances** 52:19
**citation** 204:25 210:3 211:7 307:5
**citations** 210:8 210:9 381:23
**cite** 95:10 103:12 118:10 120:20 122:25 185:18 210:6 210:10 217:11 258:12 268:18 272:13 276:8 278:18,24 279:11 283:19 285:22 286:7 287:21 311:9 340:24 342:8 352:5 360:4 369:24 370:8
**cited** 240:25 264:4 274:6 377:7 379:10
**citing** 95:20 211:19 274:3 341:3 347:21 359:24
**claim** 37:14 179:17 182:12 182:18 222:25
**claiming** 223:4 224:10 314:18 314:24,25 315:7,11 381:24
**claims** 163:3 317:14
**clarification** 10:19 11:12 16:15 46:9,13 46:16 82:3 101:25 107:22 108:2 204:7 236:5,9 305:12 360:24
**clarified** 142:3
**clarify** 11:17 65:3 80:19 82:17 113:12 114:20 152:22 284:12 317:2 326:9
**clarity** 116:6 227:7 375:5
**clash** 366:5
**class** 27:12 92:6
**classes** 205:25 206:9,13 256:14 311:2 311:20,24 312:11,21 315:8
**classic** 101:9
**classifications** 318:2,17,19
**classified** 244:3 303:22 308:10 308:24 317:18
320:18 372:4
**clausen** 5:13
**clausen.com** 5:18
**clean** 102:3
**clear** 10:20 11:14 19:15 42:6,13 58:5 65:8 69:16 73:25 79:8 84:23 110:18 135:7 143:8 184:2 196:23 218:19 225:7 229:24 231:25 272:25 276:21 276:24 296:21 300:23 314:17 347:16 363:25 367:19 370:17 394:25 397:6 402:7
**clearly** 61:7 186:16 223:18 241:22 242:24 260:4,15 270:25 272:14 386:8
**clinical** 64:11 276:2,9,19,22 277:4 364:6
**close** 282:12 352:14

**coady** 236:7,12
**cocktails** 122:19 384:21
**cofactors** 56:14 66:23
**coffee** 24:25 25:3
**cognizant** 314:16
**coherence** 393:13,20
**cohort** 42:4 151:19,22,22 152:4,15 153:14,19 159:20 180:23 180:25 181:11 198:8,11 394:12
**coined** 255:15
**collaborate** 322:5
**collaborated** 26:22
**collar** 245:2,6
**collected** 83:21
**collectively** 307:9
**color** 406:9
**colorimetric** 343:19
**column** 107:8 123:3,4 260:3 260:11,17 282:6 360:23 386:2,3
**combination** 42:12 52:20 80:11 116:7 122:20 123:5 135:2 141:20 204:16 205:15 257:5 282:11 292:12 293:13 303:5,9 306:4 306:19 307:20 319:23 353:14 357:9,12 358:4 359:4 370:11 380:22 384:22 387:9
**combinations** 141:8 259:12 260:5 261:7 386:9
**combine** 42:3 143:5 201:2 203:2 256:22 281:10,22
**combined** 81:23 169:23 279:19 281:4,5 285:7,17 294:21 295:21 360:7,8 363:16 370:20
**combining** 81:14 287:23 288:7,13
**come** 20:11 22:14 29:5 38:6 50:4 65:19,21 155:10 174:9 219:21 302:7 302:11 308:15 329:3
**comes** 31:23 148:14 191:16 203:19 209:10 216:21 218:15 231:19 296:17 387:19 397:23
**coming** 118:7 307:17 324:13
**comment** 40:14 383:10
**commission** 74:13 229:23 230:2 286:25 309:10
**committee** 30:12 33:12 52:11 64:12 366:4,6
**common** 39:23 266:10,22 270:15 302:5 339:22
**commonly** 175:20 188:10 275:2
**communicate** 21:3 305:4
**communication** 157:22
**community** 87:8 203:20 239:19 240:4
**compare** 296:13
**compared** 176:3 242:8
**comparing** 296:15
**compatible** 241:19
**compelling** 242:3
**competition** 296:11,18 365:5,8,12
**competitive** 365:13
**complete** 19:16 26:15 143:18 170:24 415:8
**completed** 413:16
**completely** 11:2 197:20 255:24 256:6 261:3
**complex** 53:19 253:12

**complexity** 97:4 98:25
**complicated** 51:2 64:15 72:21 73:24 115:17 121:19 172:11,11 228:6
**component** 146:15 147:2 324:10 325:10 325:19
**components** 146:19 361:11
**compound** 34:23 49:25 50:7 76:4 82:15 92:22 93:24 97:6 104:13 112:13 114:18 118:21 118:25 120:12 126:8 194:4 198:14 201:17 213:4 216:15 232:14 233:23 243:23 247:18 248:19 249:4 253:18 263:22 283:17 309:8 313:8 317:22 318:4,21 321:6 322:12 343:5 344:22 353:12 355:2 357:23 363:20
**compounds** 188:12 256:5 343:22
**comprehensive** 120:8,23 123:12 334:10 334:17
**comprehensi...** 310:8
**comprised** 398:13
**concentration** 261:20,22 262:13 279:20 279:23 323:9 324:9,25 325:5 325:17,18,22 325:25 341:16 361:8 362:2,7
**concentrations** 114:13 115:9 117:20 288:16 292:9
**concept** 6:17 116:14 136:5 172:8 178:5 203:18,18,23 221:24 223:2,8 227:20 240:12 251:9,10 295:7 296:11,18 315:23,25 320:10 365:25 378:18 395:21
**concepts** 366:18 399:16
**concerned** 42:25 146:13
**conclude** 43:4 190:11 191:6 306:3
**concluded** 189:8,16 242:5
**concludes** 203:21 408:14
**concluding** 175:12 180:21 184:6
**conclusion** 37:15 38:2 80:5 131:25 132:17 133:8 135:5 138:3 142:12 155:11 159:2,12 160:9 160:13,15 241:15 280:20 389:19 407:13
**conclusions** 18:19 19:5,11 20:9 23:21 93:17 104:4 310:12 311:8 311:13 391:5
**conditioner** 144:12
**conditioners** 146:17 188:9
**conditions** 34:21 52:17 53:14 58:12 73:4,13 74:4 75:4 164:8 229:12 291:22 338:14 358:19
**conduct** 388:23
**conducted** 81:11 182:2 271:5,14 274:17,20 275:5 334:17 379:19,25 395:14
**confidence** 173:25 174:18
**confident** 35:8 77:3 183:11
**confined** 129:14
**confirm** 159:24 160:23 181:22 221:14 262:7 268:9
**confirmation** 137:14
**confirmed** 161:19,20 176:7,21 183:4
**conflicted** 190:3

**confounders** 195:13,16 196:22 197:11 198:3
**confounding** 150:7 194:21 195:3,6,10,11 195:20 196:8,9 196:22 197:15 197:17,22,22
**confused** 32:23 316:4 402:23
**congress** 31:2 366:9
**connect** 316:8
**connection** 218:18 381:4
**consensus** 235:9 239:19 240:3,7 241:20
**consider** 13:12 84:10,13,16 85:7,14 136:11 154:8 195:5 300:17 320:16 322:15 380:25 385:8 393:19
**considerable** 103:25
**consideration** 297:18 396:2
**considerations** 292:14
**considered** 20:7 87:13 89:18 203:16 394:18 395:12
**considering** 39:25 287:2 397:15
**considers** 34:20 252:9 309:4
**consist** 362:20
**consisted** 198:8 198:11 361:23 362:21
**consistency** 393:13,20
**consistent** 44:2 152:10,23 167:10 189:6 189:14 190:10 191:5,22 192:17,25 193:8,10,23 194:7 236:17 378:4
**constant** 374:3
**constantly** 373:6
**constituents** 138:13 175:25 181:23 391:8 395:23 401:15
**constitutes** 14:15
**construct** 23:6 157:7
**constructed** 81:13,22 89:7 364:21
**consumer** 143:24 145:7 145:17,24 253:14 351:19 410:22
**consumption** 271:18
**contacted** 151:6
**contain** 18:18 19:10 92:10 144:8,13 188:11 200:19 202:15 256:21 289:2,13
**contained** 143:24 273:7
**containing** 189:4
**contains** 19:5
**contaminants** 29:15
**contaminated** 17:11
**context** 18:21 24:21 60:25 121:8 131:10 132:15 134:19 136:21 167:6 171:18 174:25 190:14,18 203:15,17 229:15 309:12 371:10,25 398:2 404:20 407:15
**continue** 112:10 186:9 353:16 367:7
**continued** 2:25 3:2,23 4:2,25 5:2,25 6:2,25 7:2 175:22 256:13
**continuous** 111:17,18,18 112:3,9
**continuously** 263:19
**continuum** 179:2
**contrary** 277:23
**contrast** 384:4
**contribute** 67:24 68:6,20 162:14 188:13 212:3 401:4 406:2
**contributed** 312:5 361:12
**contributes** 277:13 404:17

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 438 of 518 PageID #:77211



404:21,23
**contributing** 201:6 203:8 358:2 403:25 407:4
**contribution** 161:4 292:11 293:12 396:9
**control** 151:24 198:2 271:9 333:7 334:11 350:25
**controlled** 195:17 197:12 197:15
**conventional** 239:10
**conversation** 21:6
**conversion** 265:24
**coogan** 185:13 185:19 188:6 189:13 190:9 190:22 409:21
**copies** 413:14
**copy** 114:9 217:3 237:8 267:13 334:4
**core** 142:14 394:3
**correct** 33:6 48:21 49:3 50:22 85:12 148:11 173:24 193:18,21 208:13 229:9 252:5 256:25 257:15 268:24 287:5 289:21 291:5 301:4 302:25 304:20 305:14 307:5,6 310:22,24 311:7,12 312:23 313:6 320:25 342:23 343:8,12 344:7 347:13 350:14 352:18 354:21 360:11 362:18 363:2,13 373:14 379:11 383:6 386:11 392:7 396:14 397:3 406:12 415:8
**corrections** 415:6
**correctly** 23:19 60:21 72:11 144:6 145:7 204:7 235:12 248:14 280:13 280:16 288:24 289:11 290:7 327:19 339:4 361:21,25 363:3 382:21 384:24 387:14 394:15 395:9 396:21 401:16
**correlation** 272:3
**corresponding** 288:16
**cosmetic** 176:11
**costello** 4:4
**costs** 30:2
**couch** 96:9
**counsel** 10:10 10:14 14:10 18:10,12 24:22 25:3,12,17 40:10,24 48:11 55:4 61:10 65:2 79:16 86:10 94:9 102:16 107:3 110:2,16 132:6 143:17 148:4 160:7 166:14 170:23 195:24 204:22 207:8 231:5 238:4 251:19 259:14 260:7 267:13 268:8 269:9 290:17 291:11 293:5 296:5 298:7 314:11 324:19 337:7 339:9 342:21 346:12 360:17 375:19 376:19 377:4 379:15 382:25 385:19 389:15 413:14
**counsel's** 98:18 318:24
**count** 189:24
**countries** 39:12
**counts** 349:16
**county** 412:5
**couple** 13:11,25 15:13 25:6,18 26:11 28:13 41:25 70:17 72:23 154:21 188:24 265:25 276:13 337:15
**course** 18:23 25:15 30:9,18 39:10 157:9 220:16 225:10 227:3 276:17 296:12,19 351:7
**courses** 28:19
**court** 1:2 8:12 8:18,23 17:19 46:8,12,15,17 82:2 101:15,19 101:24 107:21 107:23,25

114:7 119:3,12 119:17,24 163:13,16 173:10,14,18 199:5 224:19 224:25 225:5 230:16 236:4,8 252:21 260:23 267:11,20 287:18 305:11 332:15 336:16 340:14
**cover** 300:13
**cream** 147:6
**create** 200:22 201:2 202:21 203:3 285:5,15 294:7 295:6
**created** 201:4 203:7 355:16 360:13 361:6
**creates** 204:17 205:17 234:10 356:25
**creating** 295:7 356:14,19 357:16 358:11
**credentials** 27:23 31:5
**criteria** 134:11
**critical** 29:4 248:8 401:11
**crosses** 171:17
**crowley** 21:9 21:10,22,23
**crown** 176:13
**crucial** 285:3
**cumulative** 123:6 403:10
**current** 15:5 367:13 368:3
**curve** 220:18 248:23 249:6 249:11 252:3
**curves** 291:16 363:17
**cut** 62:14 64:15 84:8 97:12 338:7
**cutoff** 7:12 251:14
**cuts** 343:13
**cv** 1:9 26:14,17 26:18
**cycle** 346:7 347:3,19 350:4 350:24 410:19

**d**

**d** 5:17 6:8,17 236:12
**daily** 373:4
**damage** 127:18 129:25
**dancer** 161:5
**danielle** 1:25 8:19 9:3
163:10 408:9 412:6,24
**data** 42:4 87:8 88:24 92:4,16 95:21 101:6 103:12,15 104:4 137:23 140:3,7 154:8 172:2 179:9 183:23 184:13 184:14 188:20 194:14 249:23 251:12 266:20 274:20 275:5 276:2,9,20,22 276:25 277:4 292:3,10,15 293:12,17 295:3 304:25 305:18 309:18 312:6,10,20,25 321:24 351:10 369:2 371:5 379:25 389:12 392:16 402:6,8 407:16,16
**database** 21:17
**date** 12:2 16:13 26:16 105:22 122:15 150:20 163:21 180:16 185:16 192:18 217:8 237:16 267:9 273:25
278:13 287:13 333:19 336:8 340:11 347:6 351:25 359:19 414:24 415:12
**dated** 185:14 409:21
**day** 75:14 229:14 245:11 327:22 374:7 412:19 415:15
**days** 25:7 33:16 33:17 413:16
**dbp** 338:11
**ddt** 287:24 288:15,19 290:23 292:4 292:11 293:13 293:20
**de** 346:19,20
**dead** 29:17
**dealing** 93:14 387:6
**debate** 64:9 232:10,16 233:18,24 234:14,18,24 234:24,25 235:8,10,10,12 240:12,14,15 240:16 243:6 243:11 327:2
**debated** 63:25

**debating** 33:17
**debrosse** 2:20 12:23 13:10,18 15:19 17:21,24 18:12 19:13,21 22:25 23:3 31:6,8,16 33:4 34:7,9,12,15,22 35:23 37:3,11 37:20 38:9 40:9,20,23 41:3,21 43:6 43:15 45:18 46:10 47:5,7 48:11,16,20 49:4,24 51:7 51:14,16 52:6 53:22,24 54:5 55:4,10,13,16 56:23 57:15 58:13 59:17,25 60:10,23 61:10 62:20 63:11,24 64:6,25 65:7 65:15,25 66:5 66:11 67:6 68:15 69:13 70:10,24 71:9 71:19,24 72:7 72:15 73:5,8 73:18 74:6,22 75:5,16 76:3 76:13,25 77:12 77:25 79:14 82:12,14 84:3 84:20 85:19 86:4,9,13,16,19 88:4,7,19 90:2 91:17 92:19 93:2,23 94:6,8 94:12,20 95:5 95:13,23 96:6 96:20 97:5,13 98:5,8 99:2 100:4,22 101:4 101:17,20 102:2,13,16,20 103:16 104:12 104:20 105:7 105:12,14 106:10 107:2,5 108:20 110:2 110:11,15 111:8 112:5,12 114:3,5,17 115:14 117:8 117:24 118:20 118:25 119:8 119:14 120:11 121:4 123:21 125:3,8,11,15 125:18,21,24 126:7 127:3,15 128:7,15,17 129:8,23 130:5 130:8,25 132:5 132:9 134:12 140:9 141:2 142:10,25 143:15 144:2 144:15 145:11 146:18,21 147:8,10,18 148:4,9,13 149:3,10,16 150:13 151:15 152:9,13 153:3 153:22 155:6 155:25 156:5 156:20,22 157:18 158:17 158:22 160:5 160:17 163:5 163:10,15,17 164:21 165:25 166:3,12,17,21 168:5,22 169:2 169:10,13 170:7,9,12,15 170:23 172:17 174:8,10,14,22 176:24 177:2,9 177:24 178:15 178:19,25 179:21,24 180:5 181:4,6 181:9 182:16 182:22 183:5 183:19 184:10 185:4 186:4,7 187:13,24 188:3,22 190:13,20 191:12 192:2,7 192:13,20 193:5,20 194:3 194:22,24 195:7,21,24 196:3 197:6,8 197:16,18 198:13 199:2 199:20,25 201:15,20,23 203:11 204:22 205:3,8 206:22 206:24 207:8 208:6,23 210:5 210:15,18 211:8 212:17 212:19 213:3 213:21 215:5 215:16 216:14 216:25 217:19 218:3 219:2 221:5 223:5 224:11,15,23 225:3 226:5,19 226:23 227:23 228:25 229:10 230:11,17 231:12,15,18 232:5,13 233:21 234:16 234:20 235:14 236:11,20 237:8 238:4,23

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 441 of 518 PageID #:77214



239:16 243:4 243:20,23 244:12,19,24 245:3,12,20,23 246:3,17,19,23 247:17 248:5 248:18 249:3 249:15 250:21 251:19,21 252:4,24 253:15,17 254:4,14,16,24 255:5,14 256:17 257:2 257:16 258:18 259:13,17,20 259:23 260:7 260:12 261:24 262:22 263:5 263:10,21 264:15 265:7 266:13 267:10 267:12,18,21 268:7,25 269:6 269:8,13,15,17 269:21 271:20 272:20,23 273:9,16 274:13 276:12 278:4 279:2,5 279:8 280:19 281:25 283:2,8 283:16,22 284:3,10 285:25 286:10 288:8 289:5,16 290:3,16 291:9 292:20 293:5,8 293:16 294:24 295:13,18,23 296:5 298:4,7 298:11 299:3 299:16,25 300:12 301:5 301:17,23 302:17,19 303:6,8,14,23 304:7,15 306:7 306:10 307:12 307:14 308:22 309:7 310:6,17 312:13,22 313:5,7,14,21 314:10,13,21 316:3,11,13 317:7,21,24 318:3,7,20 320:21,23 321:2 322:11 322:17 323:3 323:18 324:3 324:19 325:7 325:11,23 326:8,15,23 327:17,23 328:6,22 329:24 330:6 330:11,19 331:10,18,23 333:25 335:2 335:10 336:21 337:7,12,17 338:16,19 339:17 340:17 340:20,25 341:19 342:4 342:12,20 343:4,15 344:18,21 345:15 346:11 347:8,12,15,23 348:15 349:9 349:17 350:18 351:5 353:11 354:6,11,15,25 356:10 357:6 357:22 358:15 358:18 360:5 360:16,20 361:2,4 363:19 364:19 365:7 365:18 368:5 368:23 370:5,9 372:7 373:8,16 374:19 375:8 375:18,24 398:17 400:14 400:16 401:21 402:11 403:17 403:19 404:9 405:17 406:7 406:16 407:5,9 407:24 408:10

**decades** 137:22 152:19 192:22 194:17 270:19 320:6 366:14

**december** 122:13 267:7 333:4 409:14 410:4

**decision** 247:22 248:2

**deck** 7:8

**declare** 415:4

**decrease** 364:10

**deemed** 415:6

**default** 242:10

**defendant** 3:9 3:16 4:3,16 5:3 5:11,19 6:3,16 7:3,10

**defendant's** 324:10 347:13 347:17

**defendants** 91:7

**defense** 12:10

**deficiencies** 19:19

**deficits** 42:14

**define** 32:21 34:2

**defined** 64:22 309:16 361:15

**defining** 103:19 291:22
**definition** 34:25 60:15,20 60:22 61:2,2,3 61:5 62:3,7,17 62:25 63:4,17 63:20 64:21 65:3,6 106:5 106:13 107:15 108:6 109:10 110:21 112:22 136:13 219:16 235:3 262:14 262:15 308:6 315:20
**definitions** 60:25 61:25 62:11 63:14 315:21
**degrade** 17:13
**degree** 133:6 135:16 296:23 398:15
**dehp** 336:20 338:11
**dehydrogenase** 328:16
**delay** 15:22
**demonstrate** 27:20 149:12 234:9 260:4 386:9
**demonstrated** 83:10 271:6 345:23
**demonstrates** 61:7 223:17
**demonstrating** 316:21
**density** 55:23 56:10
**departure** 367:19
**depend** 63:8 93:21 111:2 221:20 331:8
**dependent** 164:6 207:3 274:16 277:9 277:16 296:25 379:18
**depending** 60:25
**depends** 206:25 219:15,16 225:11 231:3 234:3 252:2 277:10 305:6 308:6 309:11 357:24 373:18
**deponent** 413:13 415:3
**deposed** 9:11 10:8 16:18
**deposing** 413:13
**deposition** 1:14 8:7,14 11:21 12:11 16:23 345:17 351:7 375:10 412:10 412:12
**depositions** 9:17 127:10
**deprived** 43:23
**dermally** 252:15
**des** 71:23 72:2 272:6
**describe** 81:10 348:4 352:11
**described** 15:17 36:3 49:8 336:25 391:25
**describes** 34:18 349:14 390:18
**description** 286:8 409:8 410:3 411:3
**design** 114:25 154:10 394:11 394:12,13
**designed** 153:15,19 301:2 362:24 363:4,6
**despite** 44:3
**detail** 95:9 240:10 241:9 265:12
**details** 47:25
**detection** 223:12,19
**determinants** 56:15
**determination** 337:4
**determine** 38:20 103:21 122:4 124:20 266:7
**determined** 338:10
**determining** 182:6 302:23
**develop** 49:22 271:3
**developed** 124:6 211:11 304:22 305:16
**developing** 39:10 40:7 265:9
**development** 37:8,19 38:4 40:3 41:20 42:8,11,24 43:5,20 45:14 48:19 49:2 50:13 116:12 116:13 137:16 189:10,17 190:12 191:8

207:16 209:21 211:18 212:3 212:24 213:18 230:5 271:7 275:25 286:15
**develops** 390:19
**di** 336:19 337:5
**diabetes** 128:11 373:20
**diandra** 2:20
**dibrominated** 341:10
**dicello** 2:16
**dicellolevitt.c...** 2:21
**diethylhexyl** 336:6 410:13
**difference** 34:3 34:17 35:20 62:10 75:12 261:18 262:10 271:24
**differences** 167:15
**different** 30:24 35:14,24 52:17 52:18,19 53:9 53:13,14,20 55:24,25 56:11 56:12 58:3,8 60:24 61:25 62:2,7 66:23 76:16 81:24 83:24 92:17 93:20 111:5 137:2 142:18 144:23 146:2 151:24 153:6 159:24 160:24 171:9 195:14 196:19,19 221:18 222:16 223:7 226:11 227:4 228:3,7 228:7 258:14 262:4 268:14 279:14 308:14 308:15 316:17 318:12,13 319:24 328:14 332:9 341:8 362:13,14 363:12 365:23 367:7 397:12 397:13 399:12 405:15
**differentially** 181:18 356:4
**differentiative** 350:9
**differently** 53:5 53:10,13 363:7 365:22 401:24 408:2,5
**difficult** 120:7 120:22 123:11 124:19 225:22 403:11
**dillon** 3:7
**diminished** 44:5
**diminishing** 243:11
**dinsmore** 3:18
**dinsmore.com** 3:22
**dioxane** 206:10 273:3 313:4
**dioxin** 271:4 272:25 273:8
**direct** 98:12 157:22
**direction** 31:11 32:3
**directly** 54:3,16 54:24 242:17 275:23 407:2
**director** 255:16
**disagree** 69:17 117:18 118:2,7 133:24 191:17
**discernible** 288:20 289:2 289:13
**discrepancies** 114:12 115:8 117:19
**discriminate** 178:5 223:13
**discrimination** 176:12
**discuss** 150:24 220:24 221:15 310:13,25 311:14
**discussed** 135:22
**discusses** 391:13 402:15
**discussing** 184:8 185:25 216:15
**discussion** 145:5 160:8,14 184:7,9 317:3 352:6 369:25 394:5
**discussions** 21:21
**disease** 271:3
**disparities** 161:5 162:15 176:14
**dispel** 251:7 405:3
**displaying** 239:7
**disproportion...** 361:13
**dispute** 241:21
**disrupting** 31:14 60:16 61:24 108:18 112:7 122:21 141:9 144:9

188:12 237:20 267:24 377:9 379:4 384:23
**disruption** 37:9 242:7,14 305:2 309:5
**disruptive** 374:4
**disruptor** 106:25 235:4 309:17 366:10 368:11
**disruptors** 61:8 219:14 229:25 244:6 308:4 386:10
**distinguish** 177:19
**district** 1:2,3 8:12,13
**disturb** 148:5
**diverse** 182:3
**divide** 171:8
**dividing** 395:7
**division** 1:4 319:7,8 403:13 403:24
**divisions** 320:4 320:5
**doable** 310:11
**doc** 233:9
**doctor** 110:3 296:6 326:5 397:5,18 398:9
**document** 12:4 29:12,22 106:23 164:22 170:16 217:10 246:20 247:8 264:16 294:25 308:17 324:20 333:17,21 334:8 335:19 336:22 337:3 337:13,18,20 337:22 338:21 339:3 340:6 346:13 347:2 352:3 410:11 410:14,18
**documents** 12:12,14,17,21 183:20 338:3
**doing** 14:8 33:22 41:8 47:10 48:3 50:9 55:17 96:17 119:20 172:9 179:8 184:5 223:21 231:4 266:18 294:19 308:16 351:15
**domain** 30:23 265:2
**domains** 82:18 83:24 85:3
**dominant** 241:22 242:24
**dominik** 273:22 410:5
**dose** 35:15 36:25 80:12 114:22 115:21 115:21 116:5 116:11 117:4 220:3,7,13,14 220:16,17,21 221:22 222:10 223:11,22 225:12 230:20 232:3,11,18 233:2,3,6,8,11 233:19 234:9 235:19 239:7,8 240:17 243:13 243:17 245:14 245:18 246:7 247:12 248:7 248:10,14,15 248:22,23 249:2,6,10,11 249:18 252:2 291:8 297:12 297:13 315:2,9 315:19,21 316:6,19 317:3 328:21 332:11 332:11 353:2 362:11 363:17 363:23 367:17 375:6 386:18 387:19 388:5
**doses** 58:3,8 116:4,20,20 117:3 223:24 227:11 234:8 240:21,23 248:15,16,22 249:12 258:14 261:8 262:5 362:12 386:15 387:10
**dot** 142:20,20 142:20
**double** 226:20 227:18
**doubt** 232:17 232:20,21,22 367:11
**douglas** 1:17 2:5 8:15 376:17
**douglasandlo...** 2:11,13 413:2
**downstream** 245:19 309:6 372:19 373:13 374:17
**dr** 8:1 9:1,9 10:1 11:1,4 12:1,3 13:1,6 14:1 15:1,4 16:1,8 17:1,25 18:1 19:1 20:1

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 445 of 518 PageID #:77218



20:21 21:1,23 22:1 23:1 24:1 25:1 26:1,14 27:1 28:1,14 29:1 30:1 31:1 32:1,15 33:1 34:1 35:1 36:1 37:1,5 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,21 47:1 48:1 49:1 49:10 50:1 51:1,22 52:1 53:1 54:1 55:1 55:18 56:1 57:1 58:1 59:1 60:1 61:1,22 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1,3,13 79:1 80:1 81:1 82:1,6 83:1 84:1,23 85:1 86:1,22 87:1 88:1 89:1 90:1 91:1,6 92:1 93:1 94:1,14 95:1 96:1 97:1 98:1,8,17,20 99:1 100:1 101:1 102:1 103:1,8 104:1 104:7 105:1,20 105:23 106:1 107:1 108:1,4 109:1 110:1 111:1 112:1 113:1 114:1,11 115:1 116:1 117:1 118:1 119:1 120:1,5 121:1 122:1,16 123:1 124:1 125:1,25 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1,19 139:1,4 140:1 140:22 141:1 142:1 143:1,18 144:1 145:1,12 146:1 147:1 148:1 149:1 150:1,21 151:1 151:9 152:1 153:1,18 154:1 154:12 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,22 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1,2 172:1,13 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1,17 181:1 182:1 183:1 184:1 185:1,17 186:1,20 187:1 188:1 189:1 190:1 191:1,19 192:1 193:1,11 194:1 195:1 196:1 197:1 198:1 199:1 200:1,12 201:1 202:1,6 203:1 204:1 205:1,9 206:1,19 207:1 208:1 209:1 210:1 211:1 212:1,22 213:1 214:1,3 215:1 216:1 217:1,9 218:1 219:1,12 220:1 221:1 222:1,22 223:1 224:1 225:1,8 226:1 227:1,20 228:1 229:1 230:1 231:1,21 232:1,8,24 233:1 234:1 235:1,17 236:1 237:1,17 238:1 239:1 240:1 241:1,16 242:1 243:1,15 244:1 245:1,13 246:1 247:1 248:1 249:1 250:1 251:1 252:1,7 253:1,10 254:1 255:1,22 256:1 257:1 258:1 259:1 260:1 261:1,16 262:1 263:1,13 264:1 264:20 265:1,4 266:1 267:1,22 268:1,8 269:1 269:19 270:1 271:1 272:1 273:1,14 274:1 274:2 275:1 276:1 277:1 278:1,14 279:1 279:10 280:1 281:1 282:1 283:1,9 284:1 285:1 286:1,6 287:1,14 288:1 289:1 290:1 291:1,19 292:1 293:1,11 294:1

295:1 296:1 297:1 298:1,21 299:1 300:1,14 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1,2 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,22 319:1 320:1,12 321:1 322:1,8 322:22 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1,3 333:20 334:1 335:1 336:1,14 337:1,9 338:1 339:1,13 340:1 340:21 341:1 342:1,23 343:1 344:1 345:1 346:1,4,24 347:1,9,24 348:1 349:1,20 350:1 351:1 352:1,4 353:1 353:22 354:1 355:1 356:1 357:1 358:1 359:1,20 360:1 361:1 362:1 363:1 364:1 365:1,14 366:1 367:1,12 368:1 368:19 369:1 369:19 370:1 371:1 372:1 373:1 374:1 375:1 376:1,14 377:1,15 378:1 379:1 380:1 381:1,11 382:1 383:1 384:1 385:1,3,9 386:1 387:1,18 388:1,3,12,17 389:1 390:1 391:1 392:1 393:1,6 394:1 395:1 396:1 397:1 398:1 399:1,8 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1 408:1 409:1,13 410:1 411:1 412:1

**draft** 18:14 20:23,24
**dramatic** 373:2
**draw** 18:25 104:4
**drawing** 236:25
**drink** 141:19 143:3
**drinking** 404:3
**drinks** 100:9
**drive** 4:5 6:5,20 358:5 378:20 380:21
**driven** 278:2
**driver** 357:9
**driving** 181:24
**drug** 70:25 233:6
**drugs** 232:25
**duly** 9:3 412:11
**duration** 225:12
**dye** 181:17

**e**

**e** 5:8 8:25,25,25 23:15 237:18 342:13 414:3,3 414:3
**e.g.** 176:12 282:16
**e2** 275:4 288:7 288:13,18,20 290:23 353:20
**earl** 240:24 286:16
**earlier** 45:10 60:14 104:23 132:4 298:6 308:2 376:19 392:23 393:10 394:5
**early** 245:16 246:12 279:13
**easier** 72:25
**eastern** 1:4 8:4
**easy** 308:19
**eat** 72:19,20
**ec01** 361:8
**echo** 131:18
**eckert** 7:4
**eckertseaman...** 7:8
**ecological** 151:17,25
**economic** 30:2
**ecs** 248:3
**ed** 106:24 107:9
**edc** 60:17 65:9 66:7,25 67:18 68:3,11,24 69:5,8,18 70:6 70:23 71:15 72:3 75:21,23 76:8 77:7 106:5 113:22 205:23 244:3 261:21 262:3 262:11 274:18

280:4,6,7,11 289:4,15 290:10 291:6 299:12,20 358:8 363:15 379:20
**edcs** 31:12 32:4 32:11 37:18 38:3 56:16 63:19 64:22 66:3,3,8 67:2 67:19 68:3,12 68:24 69:9,19 70:7 71:16 72:4 75:22,24 76:18 77:7 113:22 114:13 115:10 117:20 118:16 120:9 120:24 143:25 144:14 145:9 200:22,23 202:16,24 204:16 205:16 206:13 220:8 220:20 221:20 221:25 223:3 224:10 225:8 226:2,4,11,17 227:2,4,5,22 228:24 230:9 243:19 248:11 256:22,25 261:23 262:13 263:17 264:13 267:25 268:14 270:24 271:10 271:15 272:6 272:14,18 274:10 275:19 276:3,11 279:14,20 280:24 287:5 291:6 298:22 298:25 299:14 299:24 300:16 300:19,25 301:3,8 304:21 305:15,19,25 306:4,20 307:11 308:23 316:2,7,16 317:5,12 319:3 360:7 361:24 363:16 365:17 369:20 370:3,7 370:15,15,19 373:4 377:10 379:5,16
**eds** 123:6,14 239:7 260:5 261:7 386:9 387:7
**educate** 367:8
**education** 26:20 27:10 30:6
**effect** 33:10 38:15,18 39:13 39:15 42:8 44:2 52:16,18 58:19 59:3,22 60:8 95:2 97:3 98:24 117:7 121:18 123:10 151:12 152:7 175:9 222:24 223:10,22,23 225:9,18 226:2 226:8,9,12,16 226:18 227:6,9 227:10,15,21 228:23 229:16 230:8 246:14 247:16 251:24 256:24 258:5 258:10 262:4 279:21 280:2 280:10 281:2,3 281:5,9,22,24 284:20 288:2 289:12,25 290:7,8 293:23 297:9,9,16 299:9 306:20 306:21,23 309:6 319:2,9 323:13 331:4 344:11 354:14 355:24 359:4 360:9 361:10 361:14 362:3,8 363:9
**effective** 248:22 249:11 261:22 262:12 288:16 341:16 362:11
**effectively** 305:8
**effects** 29:16 32:12 34:19 37:18 39:6,22 39:25 41:19 42:10 43:2,20 56:19,21 59:15 59:20 62:19 64:17 100:20 111:21 112:21 114:14 115:11 116:12 117:3 117:21 120:6 120:21 122:20 123:5,11 124:4 124:17 128:10 130:15,18 131:7 175:23 220:3 222:3 225:19 229:5,7 230:8 239:8 241:24 243:2 260:6 261:8,10 266:11,23 274:18 275:21 282:11,15,19

283:12 284:25 285:8,18 288:19,25 291:25 292:12 293:13 294:8 294:18 315:9 316:6 317:3 322:2 334:21 351:19 373:23 373:24 374:5 374:15,22 379:20 384:22 385:11 386:14 386:16 387:9 387:12 410:21
**efficiency** 50:9 205:13
**efforts** 161:6 176:7
**efsa** 367:16 368:9
**efsa's** 246:8
**eight** 33:16 279:19 374:9
**eighth** 270:16
**either** 16:5,23 55:22 56:9 76:7 97:19,24 196:13 284:16 288:14
**electric** 245:2,3 245:5
**electronically** 338:23
**element** 211:4
**elements** 124:9 136:10 364:18 364:20
**elevate** 145:24 187:25
**elevated** 44:3 135:18 161:8 162:20 169:24 277:12 365:11 389:6
**eleven** 267:11
**elicit** 249:13
**eliminate** 405:23
**elisabete** 278:10 410:7
**ellis** 3:3
**ellisgeorge.c...** 3:7
**emphasize** 204:13
**emphasized** 204:14
**emphasizes** 301:20
**empirical** 142:14 145:4 245:24 248:9 370:24
**empirically** 245:22 247:19
**employed** 87:24
**employing** 88:16
**encapsulate** 204:8
**endeavor** 366:23
**endo** 209:4
**endocrine** 30:20 31:14 44:12,15,17 47:2 60:16 61:4,7,24 62:4 62:24 63:17 65:6 106:5,25 107:15 108:18 109:16 112:7 112:18 122:21 137:23 141:9 144:9 219:13 229:25 235:4 237:20 241:25 242:6,13 243:3 244:6 267:24 305:2 308:4 309:4,5,15,17 365:20 366:10 366:19 368:11 373:6 377:9 379:4 384:23 386:10
**endocrinolog...** 64:10,12 366:6
**endocrinology** 28:24 30:21 105:19 366:20 409:12
**endogenous** 56:15 118:17 284:24 285:6 285:16 294:8 295:20 296:23 296:25 328:3
**endogenously** 327:16
**endometrial** 72:14 206:20 207:20 208:10 208:21,21 209:3 215:4,12 216:7,13 218:24 219:4,6
**endometrium** 201:3 203:4 214:11,22 215:13 216:3
**endpoints** 38:19
**ends** 214:17
**engaged** 13:16 13:22
**engagement** 14:17,20
**engineered** 364:2,13
**enormous** 114:12 115:8 117:19 330:24

**enormously** 152:16
**enrollment** 168:14
**ensured** 361:11
**entailment** 52:3
**entire** 204:15 205:15 206:12 223:2 345:8,9 370:14 383:13
**entirely** 79:8 195:19 197:14 339:22
**entitled** 160:12 211:15 217:14 237:19 267:24 269:24 334:8 346:6 347:18 377:9 379:4
**environment** 17:14 95:22 114:16 115:13 117:23 120:10 120:24 123:14 200:23 202:22 255:13 264:6 307:23 322:6 322:21 323:17 324:2 334:13 355:15,18 356:14,19 357:2 358:11 364:17
**environmental** 29:15 37:8 113:18 264:7 268:16 276:3 276:11,20
**enzyme** 35:18 328:13
**enzymes** 328:7
**epa** 30:10,14 33:22 38:19 136:14,18 234:5 235:20 236:22 333:4 333:16 334:8,9 334:16,25 336:5 338:9 339:19,25 366:10 410:11 410:12
**epa's** 335:6,13 336:17 337:4 339:14 366:3
**epideiology** 180:9
**epidemiologic** 159:5 171:20 384:4 389:7 394:4
**epidemiologi...** 27:21 134:23 139:19 149:12 153:2 157:3 158:20 204:20 205:19
**epidemiologist** 28:3
**epidemiologi...** 26:23 158:6 171:21 175:3
**epidemiology** 26:21,24 27:11 27:14,15,24 28:4,7,16,20 29:2,14,24 30:4 42:2 44:10,20,25 82:7 138:4,19 138:21 139:12 140:2,7 148:3 148:15,17,25 149:6,18,23 150:10 151:9 151:17 154:7 177:18 184:23 184:25 188:19 191:11 194:19 195:2 196:17 197:25 200:15 209:10 234:4 264:23 311:25 312:2 315:17 332:7 357:3,19 358:13 372:10 390:10 393:7
**epithelial** 212:11 346:9 348:5,6
**epithelium** 218:13
**equal** 169:22
**equally** 261:21 332:4
**equi** 262:12 288:16
**equivalency** 265:19
**equivalent** 123:8 266:17 363:5 366:12
**er** 66:21 68:4 71:4,5,6 104:11,18 187:21 189:6 207:15 209:7 214:10,21 215:12 216:2 257:23 258:10 258:13 261:19 262:10,16 274:23 275:10 277:13 279:21 279:23 288:3 342:10 343:10 344:12 345:21 350:23 351:3 352:23 353:2 353:10 354:22 360:9 378:12 380:4,13
**errata** 413:11 413:13,16

**erroneous** 172:8
**error** 224:14
**errors** 19:18
**especially** 72:9 275:20 314:3 344:4 365:10
**esquire** 2:9,12 2:14,20 3:7,14 3:22 4:8,14,23 5:8,17,24 6:8 6:14,23 7:8,15 413:1
**essence** 47:22
**essential** 256:19 257:11
**essentially** 21:18 233:12 239:14 316:22 389:12 392:14
**establish** 149:7 149:24 150:5 151:10 152:5 152:25 156:18 182:19 212:12 333:23
**established** 142:22 143:11 154:13 176:4 270:24 272:14 335:15 378:9
**establishes** 148:25
**estimate** 26:3 169:21 329:4
**estimated** 292:6
**estimates** 222:16,18
**estradiol** 287:25 288:2 288:14 289:4 289:15 290:11 291:7 292:4 297:8,10,14 352:25 360:8 360:10 361:15 361:17,23,24 362:3,21,23 363:17 364:7 371:23
**estrogen** 31:15 35:17 44:14 53:17 56:16 57:22 58:24 59:2,5,10,11 66:8,20 67:2,8 67:10,19 68:12 68:25 69:24,25 70:9 71:2 72:5 76:21 77:18 104:10,10,17 104:17 137:15 164:6 187:5 188:12 200:24 201:5,6 202:25 203:8,9,18,23 207:3,25 208:5 208:15,17 209:2,4,14,24 211:5,17,25 212:14,14,23 212:25 213:17 236:18 258:17 259:6 265:22 266:17 270:21 270:23 274:16 274:25 277:9 277:16 278:2 282:17,19 283:14 284:14 295:25 296:14 296:22,23,25 297:10,13,15 312:4 331:4 340:7 341:10 341:13,15,17 342:15 344:9 351:21 352:15 353:25 354:14 363:5,9,10 364:3,5,8,23 365:2,11 371:11 376:23 377:2,23,25 378:6,13,18,19 379:18 380:5 380:12,20 410:15,23
**estrogenic** 56:16 69:5,8,9 69:18,19 70:6 70:7,22 71:15 71:16 72:3,4 75:21,23,24 76:17 77:7 80:11 83:7 84:12,18 99:15 114:13 115:10 117:20 118:15 141:8,20,23 143:6 144:9,14 145:20 227:5 227:16,22 228:5 250:7,24 256:22 258:8,8 268:14 275:21 279:15,20 287:4 291:22 291:24 295:10 296:21 306:20 307:21 312:16 319:3 323:11 345:9 351:11 353:17 360:6 370:2,19 395:24
**estrogenicity** 83:11 85:25 87:20 101:9 102:11 103:19 116:18 229:13 265:20 266:16 311:4 320:2 343:22 351:13

**estrogens** 118:17 187:3,8 188:11 207:14 209:20 210:22 211:15 212:6 284:8,25 285:6 285:16 292:2 294:8,11,16,17 294:19,23 295:16,20,22 297:24
**et** 23:8 35:19 81:16 82:22 90:25 93:9 120:19 144:24 144:25 150:11 150:12 158:2 158:18 164:2 165:13,22 167:11 168:2 168:12,24 170:4,21 172:13 173:21 175:11 176:18 178:11 180:18 182:10,11,11 182:25 185:19 188:6 189:13 190:9,22 211:19 235:23 236:3,7,12 259:9 260:2 267:23 268:18 268:20,23 278:11,19 279:11,17 282:3 283:11 284:22 285:22 287:10,20 291:20 297:20 309:25 316:20 341:23 346:5 347:11,20,20 348:11 352:6 359:22 410:7,9
**ethnically** 182:2
**ethnicities** 171:9
**ethos** 96:21
**ethylene** 206:10 313:3
**ethylhexyl** 336:19 337:5
**ethylparaben** 341:25 342:9 342:24
**european** 74:13 229:23 235:22 243:24 246:6 286:25 309:10 366:13 367:4 369:11
**evaluate** 161:3 265:17 393:12
**evaluated** 93:9 303:4 319:15 321:14 338:11 390:5
**evaluating** 154:7 304:25 305:18
**evaluation** 303:21 333:6 333:17 334:17 336:5,19 338:10 339:15 410:11,12
**evaluations** 334:10 338:4
**evasion** 369:8
**evening** 376:13
**event** 126:17,24 245:15,16,19 246:13 259:4 328:3 348:19 373:13,14
**events** 126:16 131:2,9 208:2 305:5 372:19 374:17 385:11
**everybody** 131:16 388:16
**evidence** 23:24 87:19 90:14 91:25 93:7,18 99:14 109:15 133:8 134:20 135:14 136:2,4 136:5,7,9,14,19 137:4,11,19 138:2,8,20 139:13 140:3,4 155:10 158:11 158:20 159:5 165:2 166:6 175:8,8 178:22 181:11 183:3 189:3 195:3 212:21,21 219:10 222:12 226:14,17 227:2,14,15 228:4 229:5,8 234:12 236:17 237:2 241:7 242:2,15,22 248:10 256:18 257:7 271:2 298:22 299:11 299:20 300:6 303:2,10,16 309:5 310:3 317:19 331:12 331:24 370:25 381:2 386:17 389:24 390:5,8 390:17 391:2,4 391:10,11 394:8,18 395:22 399:13 400:11,24 401:4,5,10,25 402:8
**evident** 387:4

**exact** 108:12
**exactly** 33:15 213:13 215:24 223:4 269:18 269:18 276:21 306:13
**examination** 9:7 398:19 409:4
**examine** 320:17
**examined** 9:5 334:20
**example** 22:13 28:12 33:11 35:3 52:10,22 66:17 69:12 73:12 74:11 75:13 76:20 82:23 103:12 112:6 116:10 131:10 139:20 151:20,21 210:10 215:19 230:3 245:25 250:19 289:24 324:8 353:17 353:23 358:10 364:14 367:3 367:16 368:25 369:25 373:19 401:10 403:9 404:12
**examples** 57:9 58:15 246:2 260:4,14 386:4 386:8
**exceeds** 318:5,7 321:5
**exception** 370:4
**excess** 137:15 187:4 201:6 203:8,18,23 207:25 208:4 209:23 211:5 212:14,25 312:4 378:19 380:20
**exclude** 17:20 128:8
**excluded** 15:17
**exclusion** 244:6
**excuse** 101:15 132:2 393:4,15
**exert** 39:25 284:25 386:22
**exerting** 407:2
**exhibit** 11:20 11:25 16:8,12 26:15 55:23 56:9 105:5,6 105:21,24 114:6 122:9,14 132:7 150:19 150:22 163:11 163:20 180:3 180:11,15 185:8,15,18 216:24 217:7 220:9,21 237:4 237:15 259:11 259:21,22 267:5,8,19,23 269:3 273:20 273:24 278:8 278:12,15 287:9,12,15 314:19 315:9 333:15,18 336:7,15 340:10,18 346:3,5 347:5 351:24 352:5 359:15,18 377:6,16 378:25 381:10 381:14 384:11 384:17,19 388:13 409:8 409:10,11,14 409:16,17,19 409:21,22,24 410:4,5,7,9,11 410:12,14,18 410:21 411:4
**exhibiting** 221:21
**exhibits** 19:20 65:17 315:2 376:20 409:7 410:2 411:2
**exigent** 146:4
**exist** 135:18 234:2,11 355:19
**existence** 222:23 239:20 240:4 241:23 242:16,25
**existing** 265:5
**exists** 78:21 242:12 368:17
**exogenous** 49:16,22 50:14 60:17 62:25 65:9 107:9 219:12 294:16 308:3 322:24
**expect** 220:8 293:23 357:19
**expecting** 242:20
**expelled** 215:20
**expensive** 152:17
**experience** 18:24 27:13 30:10 31:3 32:14,18 36:4 137:22 274:20 397:11
**experiment** 138:25 257:8

**experimental** 64:11 77:22 87:19 90:14 386:17
**experiments** 247:19 255:25 275:5 286:14 379:25 380:11
**expert** 10:4 15:10 16:10,24 28:4 96:14 127:8,10 245:6 318:22 339:2 385:9 409:10
**experts** 20:25 21:4,7 26:9
**explain** 27:8 135:18 191:15 265:12 358:24 389:5 408:4
**explained** 172:20
**explaining** 250:4
**explains** 315:17
**explanation** 41:11 320:11
**explore** 285:4
**explored** 282:10
**exploring** 285:14
**exposed** 58:25 73:21 74:19 112:6 116:14 116:21 156:15 169:22 172:21 173:4 253:11 255:19 256:12 256:13 263:19 271:4,10 356:4 373:3 374:3
**exposes** 145:9
**exposure** 13:9 29:25 34:21 37:2 38:3 48:25 49:16,22 50:14 58:12 63:9,12 73:4 73:13,20,20 74:4,12,16,24 75:4 80:24 82:8 109:21 111:2,6 113:19 115:19 123:6 134:16 135:20 149:19 151:11 152:6 154:2 175:24 176:7 184:16 225:13 229:14 243:18 249:13 252:10 255:24 256:5 261:20,21 262:11,12,20 263:2 264:13 265:3 271:6 275:16 276:2 276:10,20 299:2,15,23 300:7,10 317:4 322:23 323:15 328:21 329:15 331:9,16,17 332:2 346:7 347:3,18 355:16 356:7 356:18,23,24 357:4,20 358:14 375:6 380:17 387:10 397:21 403:10 410:18
**exposures** 38:14 137:12 264:7 404:2
**express** 38:2,8 270:21 377:23 378:12
**expressed** 37:16 41:17 55:25 56:11 214:10,22 216:3
**expression** 215:12 275:11 277:12 288:4 364:8
**extensive** 334:20
**extent** 18:13 45:6 213:9 216:17 254:8 265:20 318:23 331:7 335:11 335:16
**extra** 105:9 336:12
**extrapolated** 56:21
**extrapolating** 103:14
**extrapolation** 103:18
**extreme** 326:19

**f**

**f** 185:13 409:21
**facilitates** 270:22 377:24 378:13
**fact** 13:12 39:8 44:3 52:13 59:4 71:13 78:17 79:23 116:19 126:23 128:2 137:7 141:3,6 142:19 142:22 143:2,9 143:11 151:21 171:12 172:4 175:6 218:15 229:22 235:6 240:24 251:9 255:10 281:15 286:24 297:11

315:19 319:17 320:8 324:17 328:15 330:22 354:13 364:23 382:5,7 383:2
**factor** 403:2,25 404:8 405:16 406:21,22
**factors** 176:5 212:3 268:16 358:2 389:17 390:20 404:4 405:25
**fail** 45:5
**failed** 236:16
**fails** 413:18
**fair** 79:6 103:11 105:14 108:25 130:13 177:5 178:9 179:16 191:17 201:11 203:13 224:8 330:9 340:5 365:14
**faith** 223:16
**fall** 14:6 29:7
**fallacious** 232:16
**fallopian** 214:6 215:3,10,10,20 216:11,11,21 217:18 218:2 218:10,13,17 218:23 382:3
382:10
**false** 243:9
**familiar** 24:20 105:23 235:17 236:13 246:5 247:21 265:4 265:11 334:24
**familiarize** 13:14
**families** 334:12
**family** 165:16 167:17
**far** 177:18 202:18 228:9 274:5 292:8 316:9 345:5
**farther** 78:16 79:21 133:18
**favor** 310:3
**fda** 30:14 38:19 228:11 234:5 251:10 367:20 368:25
**features** 44:16 266:15
**february** 1:20 8:5 273:23 410:6 412:19
**feel** 81:8 286:3 366:22
**female** 271:8 272:5 379:5
**fertility** 218:19
**fewer** 171:10 171:10
**fictitious** 234:25
**field** 18:24 28:7 30:20,21 31:19 124:7 355:13 366:21,23 385:9 388:5
**fifth** 220:5
**fight** 130:3
**figure** 65:19 207:5,22 214:17,18 223:17 254:2 254:10 308:18 344:3,4 354:12 354:17
**figured** 388:15
**figures** 124:6 363:14
**file** 16:2
**filed** 8:11
**fillers** 205:25
**filter** 275:2
**filters** 352:14
**final** 20:22,23 20:24 21:5 333:6 337:4 395:18
**finally** 105:3 169:8,9,16 392:9 395:20
**financial** 2:18
**find** 119:22 163:8 205:2 236:16 238:10 308:19 334:3 349:18 355:3
**finding** 86:21 173:22 178:17 272:2 353:6
**findings** 82:9 158:3,8,11,15 158:19 159:4 159:15,24 160:24 161:11 161:19 167:11 168:8 175:11 175:21 176:19 177:6,7 181:21 184:8,21,21 193:9,13 282:14 283:11 301:14
**fine** 65:15,20 157:11 221:7 260:25 339:12
**fingers** 248:12
**finish** 110:4 160:19 296:6
**finishing** 338:9
**firm** 134:20 376:16
**firmly** 38:7
**first** 9:2 13:6 14:7 29:14

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 455 of 518 PageID #:77228



36:16 50:4 62:2 79:25 82:16 83:4 99:8 116:14 122:3 134:18 138:3 141:18 144:19 147:24 148:11 151:3 157:3 158:20 159:4 167:16 171:20 181:11 183:2 188:8 209:16 214:9 214:15,21 217:15 220:12 238:12 240:18 241:10,11 243:10 255:15 265:17 268:13 277:6,7 290:18 290:19 295:9 307:16 323:5 333:10 335:4 340:23 345:4 366:9 368:10 373:25 381:12 399:17 403:8
**fit** 56:3 115:7 151:18 220:21 221:8 286:7 380:19
**fits** 127:18 307:25 378:21 380:20 401:14
**fitting** 307:17
**five** 33:23 83:24 163:16 311:14 334:18 353:9 354:23 375:2
**floor** 2:7 3:12 5:6 7:6
**florida** 3:21
**fluids** 285:2
**flying** 65:13
**focus** 46:21 79:11 97:14 136:11 174:24 205:24 206:8 248:3,11 258:23 262:21 309:21 316:12 317:5,6,17 318:18 320:18 322:9 350:3 356:6 357:8 397:2,4 407:11
**focused** 39:16 85:10 184:14 209:13 255:12 256:14 299:5 317:12 383:20
**focusing** 156:8 212:15
**fodder** 234:10
**fold** 271:11 297:11 353:19 367:18
**folder** 345:25 346:22
**follow** 89:13 111:22 115:16 144:10 216:7 247:25 260:8 280:17 376:18
**follows** 9:6 145:5
**fond** 254:22
**food** 30:15 144:12 199:17 228:11 235:22 246:6 251:10 253:13 271:16
**foregoing** 415:5
**forget** 33:15 251:13 256:9 281:2
**forgetting** 17:23
**form** 12:23 13:10,18 15:19 17:21 19:13,21 22:25 31:6,16 33:4 34:7,22 35:23 37:3,12 37:20 38:9 40:9,23 41:21 43:6,15 45:18 48:12,20 49:4 49:24 51:7 52:6 53:24 54:5 56:23 57:15 58:13 59:17,25 60:10 60:23 62:20 63:11,24 64:6 64:25 65:25 66:5,11 67:6 68:15 69:13 70:10,24 71:9 71:19,24 72:7 72:15 73:5,8 73:18 74:6,22 75:5,16 76:3 76:13 77:12,25 79:15 82:15 84:3,20 85:19 86:4 88:4,8,19 90:2 91:17 92:19 93:2,23 94:13,20 95:5 95:13,23 96:20 97:5 99:2 100:4,22 101:4 102:13 103:16 104:12 106:10 108:20 111:8 112:5,12 114:3 114:17 117:8 117:24 118:20 120:11 123:21 125:3 126:7 127:3 129:8 130:25 134:12 140:9 142:10

142:25 143:16 144:2,15 145:11 146:21 147:10 149:3 149:10,16 150:13 151:15 152:9,14 153:3 153:22 155:6 155:25 156:23 157:18 158:17 158:22 160:6 160:17 163:5 164:21 165:25 168:5,22 169:2 170:7,9 172:17 174:8,22 177:3 177:9,25 178:25 179:24 182:16,22 183:5,19 184:10 185:4 187:13,24 188:3,22 190:13,20 191:12 192:2,7 192:20 193:5 193:20 194:3 194:24,25 195:7,21 198:13 201:16 206:22 208:6 208:23 210:5 211:8 213:3,21 215:6,16,17 216:14 217:19 218:3 219:2 223:5 226:5,19 227:23 228:25 229:10 230:11 230:15 232:5 232:13 233:21 234:20 235:15 236:20 239:16 243:4,20 244:12,20 245:20,23 246:3,17,19 247:17 248:5 248:18 249:3 249:15 250:21 252:4 253:17 254:4,14,16,24 255:5,14 256:17 257:2 257:16 258:18 261:24 262:22 263:5,10,21 264:15 265:7 266:13 268:25 269:21 272:20 272:23 273:9 274:13 276:12 278:4 280:19 281:25 283:2,8 283:16,22 284:10 289:5 289:16 290:3 291:9 293:16 294:24 295:13 295:18,23 298:4 299:3,16 299:25 300:12 301:5,17,23 302:17,19 303:6,14,23 304:7,15 306:7 307:15 308:22 309:7 310:6,17 312:13,22 313:5,7,14,21 314:21 316:3 316:11,13 317:7,21 318:3 318:20 320:24 321:6 322:11 322:17 323:3 323:18 324:3 324:20 325:7 325:11,24 326:15,23 327:17,23 328:6,22 329:24 330:6,7 330:11,19 331:10,18,23 335:2,10 336:21 337:8 338:22 341:19 342:4,12 343:4 343:15 344:22 345:15 347:23 348:15 349:9 349:17 350:18 351:5 353:11 354:25 356:10 357:6,22 358:15,18 360:5 363:19 364:19 365:7 365:18 368:5 368:23 370:5,9 372:7 373:8,16 374:19 375:8 400:14 401:21 402:9,11 403:17,19 404:9 405:17 406:7,16 407:5 407:9

**formal** 26:20 27:2,3,10 30:6 30:21 31:4 179:10 345:14 345:21

**formaldehyde** 206:9 313:3 315:2 322:24 327:14,15,22 328:4,8,11,12 328:16 357:4 357:16,20 358:10,13,22

**formally** 13:16 13:22

**formed** 253:25 397:18

**forming** 20:8
**forms** 242:9
**formula** 171:22
**formulaic** 131:13 136:21
**formulation** 50:5
**formulations** 91:9
**forth** 178:13 412:11
**forthcoming** 98:13
**forty** 332:15 375:2
**forward** 234:23 241:13
**foster** 235:25
**found** 87:17 105:3 170:21 183:10 217:12 250:7,24 258:12 285:2 290:14,22 341:23 343:9 344:16,17,19 348:12 352:21
**foundation** 66:12 71:10 74:7 75:6 94:21 95:24 97:6 114:18 120:12 126:8 127:5 146:22 193:6 194:4 198:14 213:4 216:15 230:21 230:25 232:14 233:23 234:21 235:16 243:21 247:18 263:22 264:16 301:24 317:24 318:4 325:12 330:12 342:5 353:12 355:2 357:7 381:8 387:25 389:10
**foundational** 22:12 29:23
**four** 9:17 26:4 29:23 81:24 82:18 137:25 205:24 206:8 206:13,14 248:3,11 259:24 270:3 310:25 311:19 311:24 312:11 312:21 313:2,2 314:18 315:8 316:10 317:17 322:9 323:16 356:6,7 400:23 401:4,19,23 402:8
**fourteen** 287:18,19
**fourth** 138:15 290:20 392:10 392:12
**frack** 136:25
**fractions** 123:8
**frame** 406:20
**framework** 252:8 304:23 305:17 332:8
**frameworks** 265:5
**franklin** 3:11
**fred** 23:11
**free** 286:3 328:11
**frequent** 167:12 169:18 181:12 193:3 193:25
**front** 18:2 40:25 121:6,7 121:9 122:16 163:22 180:17 185:17 237:17 247:8 267:22 278:14 287:14 336:14 346:4 347:10 352:4 359:20 377:12 379:7
**fronts** 338:20
**fu** 2:20,21 13:12 14:11 151:6 169:8 181:2 273:21
**full** 166:19 167:5 198:8,11 209:17 210:24 214:9,15,21 386:3 389:23 399:9
**fully** 26:10
**fumbling** 65:16
**fun** 127:9
**function** 43:3 45:13,14 46:7 47:2,18 89:8
**functional** 42:10
**functions** 39:23
**fundamental** 77:23
**funded** 27:16 153:15
**funny** 147:12
**further** 49:7 247:14 272:3 387:2 394:24 398:18 408:6 412:14
**future** 161:6 181:25

**g**

**gal** 346:5 347:11
**game** 78:20 209:11

**gap** 88:24
**gaps** 87:9
**gary** 7:15
**gears** 388:9
**general** 68:9 81:5 87:15 90:11 130:15 132:25 133:19 300:5 328:19 338:13
**generalizable** 165:22
**generalized** 168:8
**generally** 137:15 151:10 152:5 203:20 204:4 291:13 294:6 295:5
**generate** 395:8
**generated** 55:2
**genes** 350:4,25
**geneva** 208:18
**genistein** 72:10 72:12,17 275:7
**genomic** 319:5 403:13,22
**genotoxic** 242:8,17
**genotoxicity** 239:5
**genuine** 235:10 235:13
**george** 3:3
**georgia** 5:7
**getting** 37:25 54:21 95:17 118:13 199:13 207:9 222:10 255:10 316:4 331:2 404:18
**gildner** 5:17
**ginex** 4:4
**gist** 40:16
**give** 12:24 15:20 23:3 26:3 35:3 47:8 48:13 66:17,19 71:13 125:21 128:23 156:2 174:10 233:2,5 238:11 244:16 244:21 245:24 267:17 270:5 279:2 304:8 325:8 326:2 334:4 337:9 346:17 354:7 381:23 382:22 395:17
**given** 30:17 100:2 111:4 134:22,23 161:8 181:20 250:8,25 303:20 412:13 415:9
**gives** 222:15
**giving** 39:2 324:16
**glad** 402:24
**gland** 116:12
**global** 39:14 270:17 351:13
**globally** 29:25 38:20 42:4
**glp** 369:3
**gnrh** 233:3
**go** 12:24 27:4 36:12 45:9 59:12 65:19 69:15 70:18 71:11 72:22 74:8 75:20 77:15 79:9,16 80:2 83:6,14 88:9 89:3 91:25 94:8,9 104:22 119:12 119:20 124:11 127:6 128:21 128:23 130:10 134:13 136:3 153:23 160:22 171:2,21 184:20 186:5 198:18 201:18 212:19 219:3 219:24 227:8 234:6 236:24 244:21 251:21 255:6 259:17 269:9 273:18 284:12 297:19 303:8 327:8 330:5 335:20 350:19 359:7 367:6,22 386:25 388:12 393:24 394:23 396:23
**goal** 19:14 29:2 33:13 38:23 39:7 41:7 103:21 221:2 311:3
**goes** 100:10 110:25 119:16 152:16 194:20 222:9 239:18 240:10 241:9 320:7 379:24
**going** 8:3 18:13 18:14 34:9 39:18 40:21 45:23 46:22 47:13 49:10,12 55:6 59:2,3,18 62:23 70:2,19 75:19 76:16,18 78:16 79:21 80:8,18 83:19 95:11 100:12 102:19 110:5 111:20 112:19

112:19 121:12 121:25 131:22 132:13 133:15 133:17 136:16 152:17 157:9 171:4 186:7,8 198:19,24 199:6,12 200:14,15 213:25 219:21 219:21,24 224:3 237:4 239:25 244:25 252:20 270:5 275:12 284:16 296:22 298:8 299:8 306:18 329:11 332:14 353:13 354:18 355:9,12 358:7 362:12 364:12 364:25 366:2 367:22 398:5
**gold** 334:13,19 340:2
**goldberg** 6:19
**goldbergsega...** 6:23
**gonadal** 233:5
**gonadotropins** 275:23
**gonads** 275:24
**good** 8:2 9:9,10 22:10,13 31:18 37:21 52:10,22 66:17 71:25 112:15 119:2 151:20 177:16 185:9 198:22 199:21 200:12 200:13 202:18 353:17,23 367:3 373:19 376:13,13
**gotcha** 340:15
**gotten** 339:10
**grade** 214:5 217:17 382:2,9 383:21,22
**gram** 222:19 329:5
**grammatical** 132:15
**grams** 325:6
**grandma** 405:7
**grant** 1:25 8:19 9:3 45:3 412:6 412:24
**grants** 27:18
**graph** 354:4
**graphical** 344:5
**graphs** 354:19
**gray** 235:25 240:24 286:16 406:4
**greater** 55:23 56:10 100:6 114:23 242:7 297:9,11,14,16 353:24 354:14 363:9
**greatly** 306:5 306:24
**ground** 235:6
**group** 33:20 42:3 212:6 279:16
**group's** 12:10
**growing** 242:15 242:15
**growth** 270:22 377:24 378:13
**gshipman** 7:16
**guess** 14:12 72:17 99:6 120:3 130:13 408:2
**guidance** 234:7 291:21
**guide** 29:6
**guideline** 234:5
**guidelines** 232:7 252:9 389:17
**guo** 5:24
**guy** 15:25 100:9 195:10 233:6,9
**guys** 86:21 105:16
**gwas** 139:20

**h**

**h** 8:25 23:15 414:3
**hair** 1:7 8:9 13:7 14:8 78:6 78:10,15 79:20 82:24 85:17 89:5 92:9 132:19 133:8 134:16 135:3,9 135:20 138:4 138:12 139:24 141:4,6,14 142:8,22 143:11 144:7 146:5,15,16 149:8,25 153:20 154:2 154:16 161:4,9 161:11 162:2 162:13 164:3,9 164:19 167:9 167:12 168:13 168:16 169:18 175:16,24 176:10,12 179:18 181:17 182:4 185:20 185:21 186:11 187:7,16,19 188:8,20 189:4 189:9,16

190:11,23 191:6 200:19 202:14 204:21 205:20 206:16 221:21 240:13 243:6 250:7,25 252:14,16 256:11,20 257:14,21 263:3,9,16,18 264:12 273:6 306:4,20 307:8 322:23 324:10 325:2 329:15 330:4,5 341:23 344:8,16 348:12 355:17 369:20 373:25 374:6 378:16 380:16,17 381:4 384:13 388:20 391:6 391:13 392:3 393:7,15,16 394:9,20 395:2 397:22 401:15 406:4 407:18 413:4,4 414:1 414:1 415:1,1

**half** 30:11 108:13 327:20 327:21

**hall** 275:5

**hallmark** 378:21

**hand** 123:4,25 271:8 412:19

**handule** 351:18 410:21

**handy** 388:16

**hanging** 70:13

**happen** 23:16 60:11 94:18 101:3 248:17 364:12

**happening** 121:24 122:7 124:9

**happens** 94:18 94:23 96:25 98:22 100:19 101:2 103:15 248:16 364:15

**hard** 15:2 93:4 100:9 125:10 155:12 192:4 231:10 310:10 367:7

**hardip** 6:23

**hardy** 5:20

**harm** 32:25 33:3 386:22

**harmful** 176:8 387:20

**hate** 46:18

**hazard** 32:15 32:24 33:2,7 33:11,14,21,24 34:4,18,20,25 35:4,5,6,12,13 35:14,15,21,25 36:4,13,16,18 36:19,22 38:20 39:5 175:2

**hazardous** 59:5

**he'll** 202:6

**head** 47:13

**headed** 199:14

**heading** 334:15 337:3 379:16 393:7 396:8

**heads** 180:6

**health** 29:13,16 40:6 62:8,17 62:18 63:7,23 64:23 106:9,15 108:19 109:13 112:20 113:8 113:25 127:2 128:3,10 129:20 130:15 130:17 131:6 151:12 152:7 161:5,13 162:15 164:8 167:22 168:15 175:23 186:13 246:8 263:15 271:14 334:16 334:21 368:12 397:16

**hear** 11:9 310:20 321:8

**heard** 15:23 385:18

**hearing** 156:24 235:11 249:16

**heavy** 173:23 175:15 189:3 193:3,25

**hela** 352:16,23

**held** 8:14 27:22 28:2

**helm** 141:21 222:15 309:25 323:10 329:5 341:23 344:15 348:11,18 353:8 391:18

**help** 29:3,6 110:13 142:19 182:4 191:15 301:2

**helped** 399:18

**helpful** 238:10

**helps** 23:6

**helroyster.c** 4:23

**henneke** 5:8

**herbicides** 271:5 272:8 273:8

**hereinbefore** 412:10

**hereto** 415:7
**hereunto** 412:18
**herring** 406:23
**heyl** 4:18
**high** 30:12 114:13 115:9 115:18 116:20 117:19 160:3 161:2 165:17 165:23 167:19 214:5 217:17 233:5 240:21 250:8,13,13,20 250:25 251:3 328:17,17 382:2,9 383:21 383:22
**higher** 97:3 98:24 117:5,5 117:5,5 176:2 271:3 282:15 283:12 353:19
**highlight** 175:21
**highlighted** 173:12 238:9
**highlights** 387:11
**highly** 164:4 204:17 205:17 214:10,22 216:3 398:3
**hill** 134:11 389:15,18 392:24 396:24 397:3,7 399:9 399:17,18,19 400:12
**hispanic** 169:20 176:3 198:9
**histological** 181:19
**history** 165:16 167:17
**hit** 119:18 173:11,15,18 364:25
**hits** 83:3 364:23
**hold** 31:4 64:2 207:8 214:19 237:11 282:14 283:11 329:22 330:18,21 334:6 346:17 382:20
**holding** 125:19
**home** 35:5 100:10 279:25 280:8,16
**honest** 209:8
**hope** 19:22
**hoping** 406:8
**hormonal** 212:4 374:13
**hormonally** 165:19 167:20
**hormone** 17:16 31:20,20 37:7 37:9 38:17,25 40:2,7 42:7,23 43:19,23 44:3 44:4,14 48:18 53:25 54:3,7,8 54:14,16,25 55:21 56:8 57:18 60:19 63:3,6,22 65:11,24 67:9 106:7 107:11 108:8 109:12 110:23 111:11 111:12,15,19 113:6,23 292:13 293:14 305:8 372:17
**hormone's** 56:19
**hormones** 44:18 53:9,12 53:19 212:6 220:6 372:24
**host** 256:15
**hour** 33:17 55:6 102:20 108:13 252:21
**hours** 25:18,20 25:25 199:6 354:9 369:18 375:20
**house** 5:3
**hoyt** 26:10
**hpassananti** 6:23
**hplc** 329:3
**hpte** 275:9
**hr** 171:16
**hu** 211:19,24 211:24
**huge** 47:19 329:11
**huh** 20:5 62:5,9 69:14 84:2 104:25 106:21 107:16 141:2 148:9 207:24
**human** 27:18 27:20 28:23 29:15 38:14,22 39:4 44:9 45:4 50:23,24 51:23 52:4 53:6 63:7 63:23 64:23 106:8,15 109:13 113:8 113:24 114:16 115:12 117:22 120:10,25 123:15 126:25 128:2,9 129:20 132:21 133:10 134:19 190:5 246:8 263:15

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 462 of 518 PageID #:77235



277:5 287:2 290:14,22,25 292:15 296:17 301:16 309:18 312:9,20,25 352:19 364:25 365:2,10,10 368:12 372:10 397:16
**humans** 45:6 57:5,14 60:9 101:3,6 103:15 104:5 114:23 116:20 120:7 120:21 121:16 124:18 126:3 126:23 130:18 190:4 224:2 225:21 338:13 390:20 392:17
**hundred** 39:12 112:16 289:3 289:14,19 290:10 297:11 302:6 361:17 362:16,22
**hundreds** 251:2 339:4
**hung** 261:5
**hunting** 105:2
**hydroxide** 162:4
**hypothalamic** 233:5
**hypothalamus** 275:21
**hypothesis** 43:13,17 48:23 49:6
**hypothetical** 74:7 75:6 92:6 92:20 93:24 127:4,5 130:3 263:22,23 324:23 325:12 326:18 330:15 357:7,23
**hypothetically** 324:24
**hypotheticals** 127:8,11 325:15

**i**

**i.e.** 290:23 390:19
**iarc** 33:12 36:17 52:11,13 319:16 372:11
**idea** 15:18,23 131:8 171:16 251:7 332:10 351:11
**identical** 44:13 44:14,15
**identification** 12:2 16:13 35:12,15 36:19 36:23 105:22 122:15 150:20 163:21 180:16 185:16 217:8 233:11 237:16 267:8 273:25 278:13 287:13 333:19 336:8 340:11 347:6 351:25 359:18 409:8 410:3 411:3
**identified** 141:21 183:13 184:15 228:20 239:10 303:2 309:25 319:15 348:17 353:8 391:24
**identify** 33:14 137:25 138:12 139:22 161:6 161:11 162:19 181:22 301:13 348:8 389:25 391:7
**identifying** 39:5,5 176:9 304:24 305:17
**identity** 120:9 120:24 123:14
**ignore** 131:14 131:18
**ignored** 131:22
**ii** 206:20 208:5 208:12,15,21 209:3,13
**il** 4:13
**illinois** 1:3 3:13 4:7 5:16 6:7 8:13
**imagine** 74:10 75:11 111:20 195:12
**imbalance** 212:5
**immortalized** 346:8
**immunomod...** 275:3
**impact** 22:4 118:16 246:7 275:24 285:5 285:15 294:7 295:6,8 326:22 387:16
**impacts** 18:25 35:17,18 189:9 189:17 190:12 191:7
**impairment** 38:4
**implausible** 331:22
**implicated** 383:18

**implications** 193:9 387:2
**implied** 106:6
**imply** 63:4,20 64:7,8,21 106:14 108:6 109:10 110:22 142:16
**import** 385:22
**importance** 40:2 175:22 232:12 233:20 378:10
**important** 40:3 42:24 45:15 56:15 65:24 66:2 86:25 96:12 99:25 100:16,21 101:12,13 108:5 110:20 121:14,17 148:19 154:7 167:15 176:13 181:25 187:8 187:14 197:25 209:22 211:18 212:7 225:12 241:18 251:6 264:5 282:13 312:6 313:18 322:19 401:7
**impossible** 248:24
**inability** 325:25
**inaccuracies** 19:19
**inactive** 280:4 280:12
**inadequate** 367:14 368:4 387:6
**inapplicability** 317:4
**inappropriately** 9:24
**inasmuch** 355:25
**inaugurate** 366:12
**incidence** 161:10,15 186:12 270:17 403:12
**incidents** 406:5 406:14
**include** 391:18 391:20 395:25
**included** 254:2
**includes** 62:18 187:4 209:23 395:5
**including** 39:20 39:24 77:9 212:4 215:22 242:13 255:11 268:16 376:20 377:4 398:11
**inclusive** 182:3
**income** 15:5,9
**incomplete** 127:4
**inconsistency** 189:22
**inconsistent** 188:15,21 191:2,22 198:6
**inconsistently** 164:5
**incorporate** 392:19
**incorrect** 38:21 178:8 239:11 266:15
**increase** 67:24 70:14,19,20,20 71:7 76:18 80:3,13 112:20 175:16 268:17 271:11 319:6 331:20 357:5 364:9 390:20 396:17 402:19
**increased** 189:5 204:19 205:18 275:22 299:22 300:9 331:19 357:20 403:12,16 406:14
**increases** 77:16 77:19 135:3 164:9,19 306:5 306:24 319:7 320:3 322:6 357:11 358:6 359:5 403:22 403:25 405:21
**increasing** 299:21 300:8
**incredibly** 141:18 223:18 400:2
**incremental** 322:23
**independent** 36:2 404:2
**index** 329:20 409:2
**indicate** 349:2 394:7
**indicated** 396:19
**indicates** 211:3 303:17 392:10
**indifferent** 328:21 375:6
**indirect** 157:22 275:19
**individual** 68:19 77:2 123:9 258:11 280:24 281:21 281:23 298:24

299:14,24 300:11 303:11 358:23 361:11 363:15 370:12 370:15,16,18 371:4 386:21
**individually** 256:25 285:7 285:17
**induce** 126:15 130:20
**induced** 348:7
**induces** 126:6 128:5 129:22
**inducible** 361:10 362:6
**industrial** 112:17
**industries** 3:9
**industry** 366:7 369:3,4
**inference** 395:22
**inferred** 56:20
**influence** 53:25 54:14 335:7 407:3
**influencing** 40:6
**inform** 24:12 24:14 83:16 149:18 224:7 224:18,19 228:17 305:9,9
380:14 384:12 400:18
**information** 87:11 89:2,16 93:11,15 94:4 103:24 120:8 120:23 122:3 123:13
**informing** 379:6
**informs** 23:7 233:25
**ingestion** 271:16
**ingredients** 91:5 161:7 162:19 351:20 410:22
**inhibit** 349:25
**inhibited** 349:3
**inhibition** 350:5,15
**inhibitor** 17:10
**initial** 81:21 82:11 83:22 244:10,13 269:14
**initiating** 131:9 246:12 305:5
**input** 334:20
**insensitive** 116:16 229:22
**insofar** 95:20
**inspired** 304:21
**instability** 319:5 403:13
**instructed** 10:16 146:24
**instrumental** 265:9
**insulin** 373:21
**insult** 171:25
**integrated** 299:7 393:12
**intend** 18:19 19:6
**intended** 142:15,16 305:22
**intense** 232:10 233:17 234:14 234:18 235:12
**interact** 55:21 56:7 83:4 268:14 300:16 301:3 341:10 399:15,16 400:15,19
**interaction** 286:19
**interactions** 40:5
**interest** 37:7 50:9 139:25 265:18
**interested** 412:16
**interesting** 14:23 95:10 297:3
**interfere** 38:24 42:7 54:3,6,16 54:24 57:18 60:18 63:2,5 63:21 64:14 65:11 106:7 108:7 109:11 110:22 111:10 111:12 305:8
**interference** 37:17 104:9,16 109:18,22 111:17,19,25 112:2,8 113:23
**interferes** 107:11 109:16 111:15 113:4,6
**interfering** 48:8
**intermediate** 245:16 246:13
**interpret** 73:16 158:8 184:20 400:5
**interpretable** 171:17
**interpretation** 394:2
**interpreted** 179:8 194:13

**interpreting** 142:13 172:2 176:19 177:6 184:8
**interrupt** 139:5 390:15
**interval** 173:25 174:18
**intervening** 109:8
**intervention** 161:12
**intracellular** 348:8
**intrinsic** 33:8 35:2,16 94:24
**invariably** 68:6
**invasiveness** 212:10
**investigate** 153:20 282:13
**investigated** 246:15 283:10
**investigating** 185:19
**investigation** 247:14
**investigations** 272:4
**invoices** 14:22
**involved** 30:3 39:13 265:15
**ionic** 144:22
**iq** 42:5,14
**iris** 33:21,23 36:15 339:23
**irrelevant** 243:18
**irungu** 391:20
**irvine** 6:22
**isoforms** 55:24 56:11
**isolation** 314:4
**issue** 13:15 14:8 23:25 24:13 56:2 72:21 115:17 133:18 183:15 194:10,12 197:21 235:18 284:13 325:3 328:11 350:10 400:3 403:14
**issues** 18:15 33:17 46:2,24 147:19 248:7 328:5 360:25 365:16 388:18 388:24
**italics** 204:15

**j**

**j** 2:12 4:23 7:8 180:13 409:19
**james** 3:7 5:17 385:25
**january** 287:11 410:10
**japan** 366:11
**jbliss** 3:7
**jf** 6:17
**jgildner** 5:18
**job** 1:23
**joe** 28:11
**john** 5:11
**joint** 12:10
**journal** 381:19
**jrc** 326:25
**julie** 233:8
**june** 180:14 409:20
**jung** 150:17 409:16
**jurisdiction** 309:11,12
**justification** 87:14,25 88:3 88:15 89:19,21 90:10,19 91:14
**justify** 242:9

**k**

**k** 7:15
**kaschank** 3:14
**kc** 305:7
**kccs** 300:25 301:13,19 302:14,22 303:3,13,21 304:4,14,22,22 305:15,16,25
**kcs** 300:25 301:8 303:15 304:21 305:15 305:25
**kdeck** 7:8
**keep** 17:23 46:18 80:18 97:21 119:19 119:20 131:22 163:12 329:12 340:16 353:13
**keeps** 173:8
**kelbey** 7:8
**kept** 136:25
**kettering** 217:6 217:13 409:23
**kevin** 4:14
**key** 52:14 82:19 82:20,23 124:6 279:12 300:17 300:18,23 302:7 307:10 313:17 319:4 319:17,20,21 321:25 355:21
**kill** 24:4 115:22
**kimberly** 163:18 409:17
**kind** 10:2 13:14 14:21,23 16:14 16:19 18:22,24 22:13,19 23:5 23:6,23,25

24:5,7,21 25:7 25:20 27:2 28:25 29:3,6 29:17 30:8,11 30:19 33:17 34:24 35:10 39:15 42:9,17 59:21 67:8 70:12 80:2,4,5 82:17,18 85:3 86:8,25 93:7 94:17 96:3,9 96:10 100:7 101:9 104:7 113:17 114:21 124:2 126:10 131:13 136:8 136:12 141:24 145:2 146:3 153:6 155:3 158:21 171:6 171:11 174:24 178:6 179:10 183:8 189:20 205:10 215:19 218:11,16,20 222:15 225:13 227:14 229:3 235:2,3 240:14 241:9 243:5,13 251:6,14 265:24 276:15 284:12,17 287:2 289:6 293:18,20 299:5 302:5,10 305:22 306:2 307:18 313:9 314:3 316:14 316:21 329:20 332:7 344:4 350:4 351:13 351:16 363:25 367:17 368:8 368:10,15 369:6 371:4,8 373:2,10 374:23 375:11 389:13 390:9 390:11,12 399:24 405:3 408:3

**kinds** 87:16 89:4 90:11,13 90:24 227:4 321:25

**kit** 146:20,25 147:7 325:18

**knew** 42:23 43:21 45:12,13 48:2,18 233:13

**know** 13:13 14:22 15:2,15 15:24 17:12,17 21:14 23:25 24:4 26:25 27:13,19 28:10 29:5,7,16,23 31:13 32:20 33:16 37:22 39:5 42:8,15 44:16 45:2,22 50:3,16,17,20 50:22 52:9,21 55:7 58:15,25 70:15 72:2,16 73:9 74:15 84:8 85:2,6 89:5,7,9,12 90:20 93:3 95:10 96:11 99:9,10,11,12 99:12 100:9,11 100:11 103:22 108:14 111:15 112:16 115:4 121:2 124:10 128:11 134:19 136:10,11,12 137:20,21 138:23,25 145:23 147:14 151:19 153:11 156:25 157:6 160:11 166:7 171:7,14 179:3 179:4 184:2,3 184:15 191:21 192:16 195:9 195:13 198:17 199:8 201:16 204:12 205:4,5 205:12 207:11 209:7 211:20 215:21 218:16 218:19 219:20 222:13 223:12 225:11,20 228:16 229:19 231:15,17 236:14,15,21 241:4 243:8 247:7 248:24 249:10,12,17 254:6,10 255:25 262:25 264:5,6 265:22 266:20 270:7 271:23 272:16 272:19 276:23 277:4 282:23 285:19 286:20 287:23 302:5 303:24 308:9 309:15 314:6 317:23 319:6 322:22 323:24 324:12 325:20 325:20 329:3 332:5,8 339:21 345:13,20 346:21 350:12 351:2 352:15 355:23 358:24 362:12 364:10 365:25 366:8

366:14,17 367:5,6,20 368:18 369:6,7 371:3,5 374:2 376:15 378:19 382:18 385:3 390:12 399:22 399:24 401:8 403:12 405:7 405:23,24 406:8,23 407:25
**knowing** 91:3 156:25 248:21
**knowledge** 167:7 372:3 392:20
**known** 51:23 53:5 67:8 71:2 72:13 91:2 134:23 196:22 219:13 268:16 302:3 308:4,11 308:24 313:10 313:15,19 320:19
**korach** 275:6
**kortenkamp** 120:17 121:15 122:12,18 229:22 259:9 259:23 260:2 265:8 351:14 384:19 385:3,9 387:18 388:3 392:15 409:14
**koziel** 211:20 211:25 213:7
**kristen** 3:14
**kristin** 2:14

**l**

**l** 8:25,25 23:14 23:15
**lab** 392:15
**laboratories** 3:17
**laboratory** 57:13 60:8 101:2 114:15 115:11 117:21 285:10
**labs** 6:17
**lack** 126:8 175:8,9 276:9
**lacking** 276:4
**lacks** 95:24 97:6 114:18 120:12 127:5 233:22 317:24 318:4 381:7 387:25 389:9
**lagarde** 247:21 247:25
**language** 81:20 179:13 183:9
**lara** 2:12
**large** 76:15 123:7 135:21 141:22 146:14 159:20 171:4 180:23,24 181:10 258:9 398:13
**largely** 17:11 189:2 313:9
**law** 116:19 376:16
**lay** 235:6
**layman's** 294:15
**lead** 29:10 94:25 97:2 98:23 100:20 106:2 126:19 137:11 261:9 373:22 374:22 386:16
**leading** 236:18 275:22
**leads** 319:10 374:4 401:11
**leave** 188:9 200:14
**leaving** 358:8
**lectures** 28:20 30:17 254:21
**led** 48:23
**lee** 351:19 352:6 410:21
**left** 107:7 282:6 355:13 369:16
**legal** 8:20 413:23
**legal.com** 4:8
**legislation** 74:14
**legislations** 243:24
**lesson** 280:2,9 280:16
**level** 30:12 68:21 69:3 77:3,5 109:18 111:16 116:9 145:9 239:9 240:17 241:5 247:13 262:25 280:25 282:11 282:18 283:15 293:19 298:25 299:15,23 300:10 323:15 331:16,19,21 372:17,23
**levels** 43:19 44:4 97:3 98:24 114:15 115:12,18 117:22 120:9 120:23 123:8 123:10,13 153:16 264:8 282:15 283:12

285:2,7,17 290:22 292:3 292:14,16 293:15,18,22
**levitt** 2:16
**lexington** 9:22
**lfederer** 6:9
**liability** 1:9 8:10
**license** 74:17
**licensed** 244:5 309:19
**lie** 292:7
**life** 255:23
**lifetime** 168:15
**ligand** 364:7
**light** 199:14
**likelihood** 33:2 67:25 70:14,20 320:4 323:8 358:6 359:6 405:22
**likely** 50:3 78:23 80:6 132:18 135:6,9 190:3 323:6,7 324:7 332:5 338:12 358:12 398:3 407:14 407:20
**likes** 195:10
**likewise** 305:21
**limit** 17:19 223:12,19 256:2 389:3
**limitation** 95:18 96:2,3 97:18,20,21 129:13 168:3,6 168:7,19 172:15
**limitations** 154:9 183:17
**limited** 15:16 89:2 93:10,14 226:8 229:11 338:24
**limiting** 128:12
**linda** 255:15
**line** 128:20 225:4 294:9 297:20 348:5,7 355:11 386:17 414:4,7,10,13 414:16,19
**linear** 230:20 232:3 240:22 316:19
**lined** 215:4,11 216:12 218:23
**lines** 219:17
**link** 157:4
**linked** 36:14 164:6
**liquor** 100:9
**list** 19:25 55:11 91:4 104:23 308:16
**listed** 28:10
**listen** 27:6 41:14 70:4 98:4 99:22 115:2,6 139:6 142:4 193:12 304:11 367:25
**listening** 116:23 234:6
**lists** 91:8 219:17
**litchfield** 4:10
**litchfieldcav...** 4:14
**literally** 204:14
**literature** 72:2 72:17 73:11 78:21 79:2 81:11 96:15 137:13 138:5 148:3,15,17,25 155:13 156:16 232:22 233:15 268:24 269:20 272:16 300:3 301:12,20 370:7 391:12
**litigation** 1:9 8:11 16:9 18:2 18:20 19:7 26:9 91:7 149:6 325:3 383:18
**little** 53:5 59:7 72:24 87:5 116:2 132:14 199:17 204:12 205:13 224:4 300:5 314:8,15 355:13 373:21 376:22 386:25 388:9 394:23 400:5
**live** 254:22 256:8
**liver** 328:17
**living** 59:16 94:19 97:4 365:4
**llc** 6:4 7:4
**llp** 1:17 2:16 3:3,10 4:10 5:4 5:20 6:11 7:11
**located** 8:15 355:25
**logical** 52:2
**london** 1:17 2:5 8:15 376:17
**long** 9:12,13 11:8 25:16 102:18 112:9 128:14 151:23 164:24 194:17 201:17,24 229:21 245:11 252:19 332:13 339:5 366:14

374:3
**look** 20:14 22:11 31:22 37:23 38:20 39:3 49:18 80:19 83:9 84:17 93:6 95:8 97:8,11 106:17,19 116:16 122:9 123:2 139:21 140:6 144:3,25 158:25 159:11 159:18 165:11 169:6 174:4,11 175:4,10,12 180:21 186:17 186:19 190:2 207:4,22 210:9 210:12 211:13 213:12 222:18 237:5 238:3 241:15 268:12 269:23 284:3 285:25 286:3 286:11 289:6 291:14,16 295:11 299:4 299:17 300:2 302:20 304:18 306:15 310:8 311:22,23 312:15,20,24 313:25 314:2 317:25 318:16 342:14,19 347:25 350:4 354:4 355:4,21 359:2 369:2 371:3 378:24 381:9 383:14 384:16 393:25 395:17 396:7 401:24
**looked** 22:19 26:8 38:23 137:13 154:19 278:6 302:7 321:13,24 363:7 383:5,9 391:24
**looking** 21:15 21:17 38:3,17 39:3 42:9 78:20 83:6,17 84:11 85:6 139:2,18 188:5 194:5,11 264:10 268:9 284:23 288:5 312:9 334:15 340:21 345:7,8 346:13 350:6 351:9,10 352:11 363:13 368:11 370:10 374:24
**looks** 18:3 36:17 43:22 122:18 248:23 290:19 335:5 344:3 348:20 349:22 354:6 381:15 383:25 384:9
**lose** 171:12
**losing** 261:2 280:22
**lost** 237:7
**lot** 14:14,24 24:19 26:24,25 30:19 31:3 47:12 76:16 83:2,2 137:14 171:5 222:20 228:2 234:10 243:7 250:15 250:18 251:18 366:5 400:3
**loud** 270:7
**louis** 4:22
**low** 80:12 114:15 115:11 117:4,22 223:11 233:3 239:7 240:17 241:5 285:7,17 315:9,19,21 316:6 317:3 329:9 362:7,7 362:11 387:10 387:19 388:5
**lower** 174:7,17 174:19 331:14
**lowest** 352:25
**lsay** 2:13
**lucky** 178:4
**lunch** 180:6 198:19 252:20
**lung** 52:23 397:2 404:14 404:18,22
**lupron** 233:4
**lye** 189:4

**m**

**m** 8:25 23:14 353:4
**madam** 107:23
**made** 42:6,13 42:16,19 215:3 215:11 216:12 218:23,25 219:4 229:24 241:2 279:13 350:21 368:15 415:5
**madison** 4:11
**magnitude** 254:12 297:7
**main** 37:6 40:19 344:2
**mainstream** 241:20

**major** 201:7 203:9 211:3 212:15,23 213:18 214:11 214:23 215:21 216:5 339:23
**majority** 207:16,19,21 208:11 216:20 241:21 270:20 377:22 378:11
**make** 21:25 45:10 49:10 58:4 64:19 66:18 67:11 80:5,8 83:18 89:12 95:14 102:21 103:22 113:19 117:16 118:5 122:3 143:22 145:3,4 146:6 163:3 171:25 183:11 184:25 202:8 219:18 222:25 249:18 292:20 296:20 304:2 317:15 322:19 324:22 370:17 383:10 404:13 406:11
**makes** 24:5 72:25 190:6 206:14 243:13 402:2
**making** 116:10 178:16 240:11 317:13 358:11 368:21 371:5
**malignancy** 274:16 277:9 277:17 379:18
**malignant** 270:15
**malpractice** 9:23 15:25
**mammary** 116:12 227:10
**manageable** 83:23
**mandate** 366:10
**mandated** 116:5
**manner** 54:2 54:15,23 55:22 56:9 90:22 98:11
**manufacturing** 367:11
**manuscripts** 26:24
**marbles** 261:3
**marcadis** 3:22
**march** 237:14 409:25 413:3
**mark** 11:20 16:7 105:5 122:8 150:16 180:2 185:7 216:24 237:4 267:4 273:11 273:19 287:8 333:15 335:18 340:12 346:2 346:19,20 352:2
**marked** 11:24 16:11 105:20 114:5 122:14 150:18 163:20 180:14 185:14 217:7 237:14 259:10 267:7 269:3 273:23 278:8,11 287:12 333:17 336:7 340:9 346:14 347:4 351:24 359:14 359:17
**market** 4:19
**marketed** 175:20
**marketing** 1:7 8:9
**maron** 6:4
**maronmarvre...** 6:9
**marriage** 412:16
**martin** 253:20
**marvel** 6:4
**mass** 329:3,4
**massachusetts** 9:22
**massive** 338:5
**material** 20:12 22:20 222:19
**materially** 20:16 323:17 324:2 326:22
**materials** 20:2 20:6 299:6 318:15
**mathematical** 24:8
**matter** 8:8 9:21 73:14 126:4,13 126:25 128:4 129:21 130:20 319:13 330:22 333:9 382:11 389:19 412:17
**matters** 9:20 10:5,7 15:17
**maximally** 361:9
**maximum** 115:20 116:5 324:9,25,25 352:23 353:18 362:6
**mb** 349:24

**mcauliffe** 3:10
**mcbride** 3:16
**mcguirewoods** 5:4
**mcguirewoo...** 5:9
**mdison** 7:5
**mdl** 413:4 414:1 415:1
**mean** 18:23 26:22 27:16 41:7,24 43:17 44:18 60:3 66:13 67:10 68:17 71:21 73:10,22 74:12 77:20 80:7,22 92:24 94:22 103:20 108:11 113:2,7 114:20 123:25 135:25 136:5,12 137:5 139:5 141:14 141:17 142:7 146:24 149:20 152:18 175:3,7 179:13 190:4 190:16 194:17 199:12 207:20 215:23 223:21 225:17 226:9 232:6 240:19 245:17 250:16 250:17 251:5,8 270:7 272:17 276:22 277:11 284:19 293:22 296:20 312:3 321:20 323:19 326:17 328:10 329:10 338:3 339:19,24 351:11 355:25 364:24 371:17 372:22 373:5,9 373:14,19 399:16 400:6 401:11 403:8 404:22 405:9 407:8,23
**meaning** 166:2 248:15 251:4 297:22
**meaningful** 329:7
**meaningless** 229:17
**means** 22:16 24:9 45:4 80:23 91:20 109:22 122:6 284:15 329:8 350:7 386:10 400:4
**meant** 109:5 270:12 392:11
**measure** 223:25 266:23 284:21 290:8 325:10
**measured** 266:12
**measurement** 223:10,11 249:24 290:5 326:3
**measures** 252:10
**mechanism** 38:24 134:24 187:21 213:2 307:18 315:16 319:11 398:12 401:12,13,14 403:21 407:12 407:18
**mechanisms** 78:9 126:5 128:6 129:22 130:22 134:6 135:18 137:23 139:21,22 211:2 301:15 301:21 302:15 388:21 389:5
**mechanistic** 97:2 98:23 99:14 100:19 103:12,14 104:3 126:24 138:7 139:19 304:25 305:18 310:14 311:2,9 311:14 390:17 395:2,13
**mechanistica...** 31:21
**media** 8:6
**median** 292:9,9
**mediated** 221:17 282:17 283:14
**mediation** 275:11
**medical** 9:23 15:24 187:2 203:20 209:18 210:21 212:13 212:23 213:17 277:24
**medicine** 232:22 369:11 399:23
**meet** 24:22 25:2,12,16
**meeting** 235:7 399:19
**mehth** 4:8
**mellott** 7:4
**memorial** 217:5,13 409:22
**memory** 174:14
**menopausal** 167:14 169:23 172:22 173:23

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 472 of 518 PageID #:77245



174:20 175:18 193:15
**mention** 217:25 353:6 385:14 396:24
**mentioned** 385:2
**meps** 367:5
**mesenchymal** 212:11
**mesh** 82:21
**messed** 186:15
**met** 10:10 14:14 25:6,14
**meta** 271:16
**metabolism** 54:2,15,19 145:23
**metabolites** 54:24 55:20 56:3 253:24
**metabolized** 54:22
**metaphor** 100:8
**metho** 274:22
**method** 77:24 87:6,24 88:16 134:24
**methodologi...** 172:15
**methodology** 81:2 124:13,14 154:10 183:17
196:15 393:11
**methods** 39:11 81:5 195:9
**methoxychlor** 274:22 380:3
**methyl** 355:3
**methylparaben** 341:25 342:10 342:25 348:13 348:22 349:3 353:7 354:22
**metric** 329:2
**miami** 3:21
**michael** 21:9
**michelson** 6:20
**microgram** 251:7,18
**micrograms** 222:19 251:13 325:13 328:25 329:5
**middle** 260:3 260:10,16 386:2,2
**milieu** 319:5 320:3 323:2 326:22 357:11 357:16 358:5 359:5
**military** 7:12
**miller** 5:13
**milligrams** 251:13
**million** 371:20 371:22
**mimic** 43:21
**mind** 31:23 115:5 127:13 199:16 219:25 232:20 355:14 399:13 400:10 405:19
**mine** 173:8 406:9
**minimal** 35:7
**minute** 166:13 244:21 298:9
**minutes** 180:7 199:3 332:16 354:10 369:18 375:25
**mischaracteri...** 43:7 84:24 88:11 144:17
**mischaracteri...** 406:17
**mischaracteri...** 75:7 77:13 84:21 88:8 140:10 144:16 145:12,13 164:22 257:17 294:25 317:8 391:17
**misconceptio...** 296:9
**misinformation** 29:8
**misleading** 371:8
**misread** 382:15 382:17
**misrepresent...** 170:16,17
**misrepresents** 183:20
**missed** 91:12
**missing** 345:24
**missouri** 4:22
**mistake** 240:11
**misunderstand** 385:16
**misusing** 235:3
**mitchell** 5:12
**mitogenic** 275:6
**mixed** 361:15
**mixing** 122:19 384:21 385:10
**mixture** 32:11 57:4,18,22 58:11,18 59:14 60:6,18 63:2 63:10 65:10 66:7,25 67:18 68:3,11 69:9 69:19 70:7 71:16 72:4 73:3,15 74:3 75:2,22,24

76:8 77:7 107:10 111:10 113:5,22 118:15 120:6 120:20 123:10 124:4,17 126:2 126:15,22 127:25 129:18 130:17 138:15 200:25 203:2 204:15 205:15 206:13 258:5 261:22 262:4 262:13 263:14 263:17 264:11 265:5,15,16 266:2,8,24 279:19,22 280:2,9,24 281:4,22 287:2 288:17,24 289:2,11,13 290:9,21 291:7 294:11 295:16 297:25 298:23 298:25 299:12 299:14,20,24 300:7,11 319:2 344:12 345:8,9 345:11 350:20 358:23 360:7 360:14 361:7 361:13,15,22 362:19,23 363:16 370:14 370:20,22 387:12 388:5 392:12

**mixtures** 66:3 68:24 72:9 112:24 121:18 224:4 253:12 253:22 263:8 274:7,8 279:13 282:19 296:24 351:21 386:21 410:23

**mode** 241:25 243:3

**model** 225:21

**moderate** 175:15

**modern** 230:21 231:2,25

**modica** 267:6 267:23 268:18 268:23 269:2 377:8 410:4

**modifiable** 176:5

**modified** 296:19

**modulate** 294:10 295:14 295:20 297:23

**modulations** 288:19

**moe** 349:4

**molar** 288:17 290:21 292:6 297:13

**mole** 250:9 327:6,7

**molecular** 58:18 59:14 60:6 90:21 126:16 128:6 130:21 131:9 222:21 245:15 246:12 247:13 251:16 282:11 305:5 329:9

**molecule** 326:11,13,19 330:15

**molecules** 222:21 250:6 250:10,20,24 251:3,17,17 252:11,14 326:12 327:11 327:12 328:24 329:11,13,14 330:25

**moment** 15:20 101:17 132:5 143:15 174:11 186:5 210:15 238:5 279:3 286:11 325:8 337:10

**momentarily** 198:25

**moments** 383:4

**monday** 25:15

**money** 250:18

**monobromin...** 341:9

**monoclonal** 320:9

**monograph** 33:12

**monotonic** 220:2,7,13,18 220:21 221:22 230:19 232:2 232:11,18 233:2,8,11,19 234:9 235:19 239:8 245:14 245:18 246:7 247:12 248:6 248:10 249:7,8 291:8,18 315:2 363:18,23

**monotonicity** 247:15 364:4

**months** 165:6

**moore** 7:11

**morning** 8:2 9:9,10 25:4,5

**mortality** 176:2 270:17

**motivated** 366:9,11,13

**move** 322:25 396:6
**mp** 342:19
**multi** 39:11
**multiple** 59:20 93:25 135:17 136:8 153:4 227:24 229:2 235:15 256:21 338:20 357:5 375:9,12 387:10
**multitude** 255:10
**murder** 369:8
**murine** 346:9 348:5,6
**murray's** 6:3
**myriad** 253:24
**myth** 405:3

**n**

**n** 23:15 169:22 206:9 313:4 325:2
**name** 8:17 23:9 256:10 376:15
**names** 23:13 39:19
**nanomole** 250:8
**narrower** 177:11
**national** 39:11 236:22,24
**natrates** 271:19
**natural** 176:12
**nature** 17:7 368:22 397:14
**ne** 5:5
**necessarily** 113:7 131:18 171:13 264:6 373:14 374:15
**necessary** 89:22 415:6
**need** 35:11 95:11 161:19 184:2 236:11 247:14 266:22 266:25 294:20 321:3,8 329:7
**needed** 161:6 181:21 189:7 189:15 272:4
**needing** 162:18
**needle** 322:25
**needs** 142:2 183:4 246:14 266:10
**negative** 220:15 226:20 250:9 342:10 342:25 353:3,3 353:10 354:22 371:15,21
**negatives** 189:25 227:18
**negligible** 292:13 293:14
**neither** 301:6
**neoplasm** 270:16
**neoplasms** 271:12
**nested** 218:16
**neuroendocri...** 30:22
**neurotoxicity** 131:11
**never** 15:23 84:24 115:5 217:24 339:5
**nevertheless** 404:17
**new** 1:19,19 2:8 3:6,6 5:23,23 6:13,13 7:7,7 8:16,16 9:4 22:14,21 24:21 29:4 139:22 267:25 377:10 377:21 412:3,8
**newspaper** 29:5
**niehs** 167:8 255:16 366:12
**nih** 27:16 45:3
**nilly** 89:25
**nine** 250:9 341:7,12
**nissanka** 287:10 359:16 410:9 411:4
**nitrates** 271:18 271:19
**nitrites** 271:20 271:22
**nitrosamine** 206:9 325:2
**nitrosamines** 313:4
**nm** 341:18 352:25
**nmdr** 246:11 248:13 314:20 316:6 317:3
**nmdrs** 232:10 236:17
**noael** 239:9
**nobel** 233:10 385:15
**noels** 123:9
**noise** 69:7
**non** 169:20 176:3 197:15 198:9 220:2,7 220:13,21 221:22 232:11 232:18 233:2,8 233:11,19 234:9 235:19 239:4,8 241:14

242:8,10 245:14,18 246:7 247:12 247:15 248:6 248:10 249:8 249:24 291:18 315:2 336:18 336:25 341:9 341:12 364:4 383:6,10,16,21
**nonylphenol** 274:21 380:2
**normal** 54:3,16 214:11,22 216:3 371:17
**normalize** 266:20 267:3
**normalizing** 266:15
**normally** 228:10 256:7 285:2 290:14 290:22
**north** 2:17 3:11 4:5 6:5 7:14 271:15
**northern** 1:3 8:12
**notary** 9:3 412:7 415:13 415:19
**note** 114:9 367:20 413:10
**noted** 8:21 408:17 415:7
**notes** 148:10 204:25 231:14
**notice** 11:21,23 12:10,18 409:8
**novel** 158:15 158:19 159:16 159:24 160:23
**novelty** 181:20
**null** 189:2,22 190:4 198:10
**number** 25:25 26:2 39:23 42:4 83:23 112:20 121:16 126:24 141:23 152:11,24 169:21 172:21 174:25 189:18 189:24,25 191:5 243:12 250:6,20,23 251:17 252:10 303:12 304:13 326:25 328:7 329:10,13,14 330:24 336:15 339:19 340:18 350:22 352:12 367:4 377:3 392:15
**numbered** 282:5,9 284:24
**numbers** 123:7 209:10 308:15
**nutshell** 201:13
**ny** 2:8

**o**

**o** 8:25,25,25 23:14,15 236:12 287:24
**o'connor** 2:9 50:21 51:18,21 65:18 86:15 105:8 107:18 110:7,13 119:6 119:10,13,15 125:13,17 140:16,19 169:9,12 170:10,13 173:8,13,20 174:9,13 177:12,16,22 180:4 185:9,12 192:14 195:23 196:2,4,8,16,18 197:2,4,7 198:21,24 199:4,8,11,15 199:18,21 202:4 210:13 218:6 224:13 224:17,22 225:2,6 231:5 231:9 237:11 238:11,14,18 238:20 244:25 245:9,11 259:16,21,25 260:16,21,25 267:16 269:10 271:21 278:3 279:6 280:6 282:25 291:14 318:5 330:7 333:23 334:7 336:12 337:11 337:19,23 338:2 346:18 359:9,11 376:12,16 377:5 379:2 382:16,24 384:18 385:24 388:11,15 408:8,11 409:6 413:1
**o'soleil** 235:23
**object** 12:23,25 13:10,18 15:19 15:20 17:21 18:13 19:13,21 22:25 31:6,16 33:4 34:7,22 35:23 37:3,11 37:12,20 38:9 40:9,21 41:21 43:6,15 45:18 47:9 48:12,20

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 476 of 518 PageID #:77249



49:4,24 51:7
52:6 53:22
54:5 56:23
57:15 58:13
59:17,25 60:10
60:23 62:20
63:11,24 64:6
64:25 65:25
66:5,11 67:6
68:15 69:13
70:10,24 71:9
71:19,24 72:7
72:15 73:5,8
73:18 74:6,22
75:5,16 76:3
76:13 77:12,25
79:14,14 82:12
82:15 84:3,20
85:19 86:4
88:4,7,19 90:2
91:17 92:19
93:2,23 94:6
94:12,20 95:5
95:13,23 96:20
97:5 99:2
100:4,22 101:4
102:13 103:16
104:12 106:10
108:20 111:8
112:5,12 114:3
114:17 117:8
117:24 118:20
120:11 123:21
125:3 126:7
127:3 129:8
130:25 134:12
140:9 142:10
142:25 143:16
144:2,15
145:11 146:21
147:10 149:3
149:10,16
150:13 151:15
152:9,13,14
153:3,22 155:6
155:25 156:20
156:22 157:18
158:17,22
160:6,17 163:5
164:21 165:25
168:5,22 169:2
170:7,9 172:17
174:8,22
176:24 177:2,9
177:25 178:15
178:25 179:21
179:24 182:16
182:22 183:5
183:19 184:10
185:4 186:8
187:13,24
188:3,22
190:13,20
191:12 192:2,7
192:20 193:5
193:20 194:3
194:22,24
195:7,21
198:13 201:16
206:22 208:6
208:23 210:5
211:8 212:17
213:3,21
215:16,17
216:14 217:19
218:3 219:2
223:5 224:11
226:5,19
227:23 228:25
229:10 230:11
230:16 232:5
232:13 233:21
234:16,20
235:14 236:20
239:16 243:4
243:20 244:12
244:19,19
245:20,23
246:3,17,19
247:17 248:5
248:18 249:3
249:15 250:21
252:4 253:15
253:17 254:4
254:14,16,24
255:5,14
256:17 257:2
257:16 258:18
261:24 262:22
263:5,10,21
264:15 265:7
266:13 268:25
269:21 272:20
272:23 273:9
274:13 276:12
278:4 280:19
281:25 283:2,8
283:16,22
284:10 289:5
289:16 290:3
291:9 293:16
294:24 295:13
295:18,23
298:4 299:3,16
299:25 300:12
301:5,17,23
302:17,19
303:6,14,23
304:7,15 306:7
306:8 307:12
307:14 308:22
309:7 310:6,17
312:13,22
313:5,7,14,21
314:21 316:3
316:11,13
317:7,21 318:3
318:20 320:24
321:6 322:11
322:17 323:3
323:18 324:3
324:19 325:7
325:11 326:15
326:23 327:17
327:23 328:6
328:22 329:24

330:6,7,11,19 331:10,18,23 335:2,10 336:21 337:8 338:20 341:19 342:4,12 343:4 343:15 344:18 344:21 345:15 347:23 348:15 349:9,17 350:18 351:5 353:11 354:25 356:10 357:6 357:22 358:15 358:18 360:5 363:19 364:19 365:7,18 368:5 368:23 370:5,9 372:7 373:8,16 374:19 375:8 400:14 401:21 402:11 403:17 403:19 404:9 405:17 406:7 406:16 407:5,9
**objecting** 47:17 339:10
**objection** 34:10 46:10 48:14 50:7 96:6 98:6 101:21,23 104:20 115:14 118:24 121:5 125:7 128:7,15 128:19 129:23 130:6 146:18 178:19 203:11 215:5 230:14 320:23,24 321:3,4 325:23 325:24 338:17 339:17 381:7 382:14,23 385:12 386:24 387:23 388:8 389:9 391:16 407:24
**objections** 99:3 197:18
**objects** 10:14
**obligated** 10:25
**observability** 281:3
**observable** 123:9 261:10 386:16
**observation** 138:22,23 187:8,15 279:12 380:19
**observational** 271:17
**observations** 286:24
**observe** 159:21 181:16
**observed** 140:7 204:20 205:19 245:15,19 246:11 247:12 280:3,10 292:10
**obtain** 95:12
**obtained** 271:13
**obviously** 74:18 167:21 173:6 330:5
**occur** 95:7 120:21 123:11 124:17,18 222:4 248:25 319:12 364:5 403:23
**occurs** 120:7 123:19 259:12 364:5
**octylphenol** 274:21 380:3
**odd** 293:21
**oecd** 38:19 39:10,11,13 234:5 366:15
**offense** 146:9
**offer** 18:20 19:6 133:18 291:21
**offering** 79:3,7 79:22,22 132:24
**office** 339:21
**oftentimes** 189:21
**oh** 63:15 86:12 94:3 105:12 160:11 165:10 172:25 173:17 185:9 204:25 212:19 214:19 260:17 267:16 269:5 290:25 298:10 303:18 309:2 336:23 346:15,16
**oils** 188:9
**okay** 11:16 13:2,4 15:21 17:24 20:3 25:2,8 27:3,5,9 34:11,13,14 36:8 46:4,11 46:14,19,23 47:4,9,14 48:16,17 49:14 50:21 51:9,17 51:21 55:10,12 55:13,17 63:15 64:19 65:7 77:5 80:17 84:6 86:19 90:4 92:12 94:11 99:22 100:23 102:22 107:5 108:10 108:25 110:11

116:25 117:15 117:15 118:2 118:22 119:10 120:2 125:6,24 127:15,16 128:14 131:7 131:23 140:19 147:9,21 148:13 152:2 152:20 153:8 156:4 159:8 163:17 165:10 166:21 169:9 169:11 173:13 173:20 174:16 177:25 180:8 181:5,9 186:10 190:21 191:17 196:16 199:15 199:20 202:4 204:6 205:6 207:10 210:17 217:4 219:23 221:5 222:19 224:9 225:6 228:16 231:9 231:10,11 235:14 238:18 238:22 245:12 249:6 260:10 267:21 269:10 270:6,9,13 278:9 280:7,21 282:8 288:12 289:9,10 292:21,23 293:2,4 296:8 298:10 299:8 306:15 314:13 316:5 324:15 324:18,22 326:6,8 327:4 329:12 334:7 335:5 336:13 340:5,12,20 346:16,22,25 347:7,9,15 348:21,24 355:5,6 359:10 360:20 361:2 375:24 378:8 378:24 381:21 382:5 383:14 383:24 384:3,7 384:16 385:14 385:18 388:15 388:17 389:21 390:4 394:7 397:9 398:17 403:15 406:10

**old** 268:2 286:22 377:11

**older** 179:6

**once** 59:19 211:6 328:8

**ones** 28:9 93:10 255:11 309:24 368:14

**ongoing** 113:18

**open** 81:19

**opine** 134:2,16

**opining** 78:13 78:17 79:17 135:8 139:8 143:10 149:5 202:12 257:13

**opinion** 20:12 23:5 41:17 74:23 79:22,23 79:25 80:7 83:9 89:12 92:13 96:5 99:13,17 103:22 108:15 108:23 111:5 113:22 132:24 133:6,19 134:8 134:15 135:15 137:5 149:11 177:17 178:21 179:15 206:15 220:20 225:24 235:2 246:7 255:17,20 264:22 281:20 312:7 313:24 314:22 318:8 322:4 323:21 333:9 335:7 345:4 351:17 380:14 397:19 397:25 401:17 401:18 402:4

**opinions** 18:19 19:6,12 20:9 23:21 79:2,7 93:17 145:14 339:16 376:22 378:5,16 380:15 381:3 382:12 384:12 386:20 387:18 389:4 392:21 393:22 398:11 398:14 402:9

**opportunity** 47:8 48:13 101:21 402:24

**oppose** 243:7

**opposed** 88:17 132:25

**opposing** 241:22 242:24

**opposite** 108:12 350:16

**order** 92:13 93:16 105:6 150:16 254:12 281:21 308:7 310:2,5,7,9

**orders** 297:6

**ordinary** 255:23

**organ** 53:13 56:20,22 66:10 67:4,5,21,22

68:5,13,14 69:2 376:24
**organic** 21:12
**organism** 94:19 282:18 283:15 365:4
**organisms** 59:16 97:4
**organization** 29:13 62:8,17 219:17 282:16 283:13
**organize** 399:19
**organizing** 304:24 305:17
**organs** 53:9 56:17 69:10,20 70:8 356:21
**original** 41:10 321:12,23
**originate** 214:6 217:18 382:3 382:10
**originates** 215:9 216:10 383:11
**ounces** 327:21
**outcome** 126:18 131:3 139:25 149:19 184:16 195:14 301:22 302:16 366:7 412:17
**outspoken** 365:16
**outweighed** 102:9
**ovarian** 32:7 49:15,21 50:18 71:18,22 76:2 77:10 78:7,11 78:16 79:21 80:9 81:15 82:9 132:20 133:10 134:5 134:25 135:11 135:19 137:17 138:8 141:15 142:9,24 143:13 149:9 150:2 153:21 181:14,18 182:6,15,21 187:3,4 191:20 191:24 192:12 201:7 203:10 204:19 205:19 206:16 209:19 209:22 210:22 211:2,16,19 212:4,9,15,16 212:24 213:2 213:19 214:5 214:12,24 215:9,14,22 216:6,8,10,21 217:14,17 257:24 258:25 263:2 269:24 270:14,18,20 271:7,11,25 274:9,15,19,24 275:9,17,19,25 276:3,10 277:8 277:16,25 306:6,25 307:25 313:12 313:20 317:20 321:22 328:5 329:16 331:9 376:23 377:17 377:22 378:11 378:17 379:16 379:17,21 380:5,13,18 381:5 382:2,9 383:6,11,17 384:13 390:14 390:18 393:17 394:11,21 395:4,19 398:4 398:6 407:19
**ovaries** 201:3 203:4 252:16 329:23 356:8 357:17 375:7 376:25 378:6
**ovary** 218:16 219:11 270:25 272:9,15 358:3 376:25 395:8
**overall** 131:24 137:5 169:19 242:5 258:9 344:11 350:23 351:2 353:16 361:13,22 362:19 381:3 390:6 394:19 396:2 401:5 404:17,21
**overlap** 14:24
**overread** 184:24
**overrides** 100:18
**oviductal** 346:9 348:5,6 350:11
**own** 141:25 201:5 203:8 280:24 294:19 294:23 295:22 295:25 379:10 382:12 386:20 392:21 396:14
**oxidant** 17:13
**oxide** 206:10 313:4

**p**

**p** 287:24
**p.c.** 2:5 4:18 5:13
**p.m.** 200:6,10 253:2,4,5,9

298:13,15,16 298:20 332:19 332:21,22 333:2 335:24 335:25 336:2 336:10 376:4,6 376:7,11 398:23,25 399:2,6 408:15 408:17
**p1hairdepos** 413:15
**pack** 75:14
**package** 99:8
**padden** 2:14
**page** 2:25 3:23 4:25 5:25 6:25 18:5 81:20 86:6,15,17 106:19,22 107:8 123:2,5 132:3,10 133:4 135:13,13 140:14,18 147:23 148:8 159:18,19 166:16,20,22 180:22 186:19 202:9 204:23 205:6 207:4 209:16 210:16 210:17,25 211:13 214:8 214:16,20,21 220:4 238:2,8 238:24 249:20 259:18 260:18 260:22 268:6 268:12 269:23 278:23 279:7 282:3,6,7 284:5,23 291:19 292:23 294:2 300:14 306:17 314:5 337:2,25 340:21 342:21 348:3 349:20 352:10 354:15 354:16 360:19 360:22 372:16 377:15,16 379:14 385:20 389:21 390:16 392:10 393:3,4 393:4,24 394:2 396:5,6 409:4 409:8 410:3 411:3 414:4,7 414:10,13,16 414:19
**pages** 19:24 26:11 175:13 274:9 310:19 311:16 338:25 339:5
**palacios** 6:14
**paper** 22:14,15 23:10,20 24:15 40:10,24 41:23 108:17,21 110:20 120:19 121:6 122:10 122:17 137:8,8 150:22,24 151:4,10 154:13,19 157:23,24 160:20 164:17 164:18 165:7 168:4 172:16 180:18 186:2 190:22 211:24 211:25 234:22 235:5 236:13 236:23 237:18 237:22 238:2 240:10 241:9 253:20 254:5 267:17,23 269:2 274:3,5 276:8 277:11 278:5,10,18,21 278:24 279:11 283:3,3,6 286:22 287:20 291:13 302:13 347:24 350:3 352:5,8 359:16 359:21,24 410:7 411:4
**papers** 20:11 20:13 22:12,22 24:19 28:6,13 28:17 30:19 39:17 41:4,25 54:11 83:14,15 96:8 121:16 149:6,23 150:4 150:10 158:7 177:18 183:25 190:25 213:14 236:16 264:3 265:25 268:4 281:12 283:19 283:21 343:21 360:4 391:24
**paraben** 341:15 345:7 346:6 347:3,18 352:6 410:18
**parabens** 85:14 85:23 86:2 87:16 90:25 93:9 206:3 256:3 309:23 340:8,23 341:8 341:12,22 342:16 344:15 348:8,11 352:12,22 353:5,8 354:13 410:16
**paradox** 223:9

**paragraph** 86:7,18 88:18 132:2,10 147:25 148:12 159:19 166:17 166:19,20 167:5 169:6 175:12 180:22 184:6 209:17 211:14 214:10 214:16 239:3 241:16 249:21 260:13 277:8 282:9 284:24 290:19,19 291:20 292:25 293:9 349:21 360:23 377:22 386:3 389:23
**paragraphs** 142:13 270:4 282:6
**parallel** 380:24
**pardon** 152:13
**paren** 352:13 352:14 387:7,8
**parliament** 367:4
**parrot** 236:3
**part** 20:23 21:16 29:13,19 45:2,8 67:7 70:12 96:21 123:22 134:10 134:18 140:6 184:6 203:24 205:23 206:6 210:10 228:6 235:8 241:13 256:19 277:6,7 297:3 310:20 313:23,24 314:22 350:9 353:22 358:9 378:21 398:13 403:6
**participants** 165:14 166:7 167:16 171:10 173:5
**particular** 40:12 57:3,17 57:21 58:10,17 59:13 60:5 66:7,25 67:18 68:3,11,13,14 68:24 69:2,5,8 69:18 70:6 71:15 72:3 73:2 74:2,25 75:21,23 76:8 77:6 91:15 92:7,11,17 93:19 95:2 112:23 113:4 113:17,21 126:14 196:7 196:14 228:23 244:8 248:25 249:13 279:16 319:16 320:16 321:21 344:14 396:13
**particularly** 159:25 160:25 161:13,22 181:24
**parties** 61:19 103:5 200:8 253:7 298:18 332:24 336:4 376:9 399:4 412:15
**partly** 195:18 197:14
**parts** 80:19 196:19
**pass** 398:17
**passananti** 6:23
**past** 385:6
**path** 312:4 320:7
**pathogenesis** 134:25 138:9 187:2,4 203:21 209:19,23 210:21 212:16 215:14 259:2 307:19 390:11 390:13,19 395:20 401:10
**pathological** 212:8
**pathway** 80:24 83:16 126:5,18 126:18 131:3 137:24 214:11 214:23 216:5 245:17 274:25 358:7 380:6 390:12 395:2,4 395:13
**pathways** 139:22 236:18 301:22 302:16 348:9 380:12
**patients** 71:14 379:6
**patricia** 185:13 409:21
**paul** 5:11 7:24 8:17 374:25 375:21
**pause** 119:15
**pay** 157:2,9
**pb** 349:24
**pbbs** 39:24
**pc** 4:4 8:15
**pcbs** 9:21 39:20 42:2,5,6,6,13 43:18,25 44:8
**peabody** 4:20
**peachtree** 5:5
**peal** 4:23

**pedestrian** 100:12
**peer** 334:14 381:19 391:12
**peiyuan** 5:24
**pen** 237:7
**pension** 15:6,9
**people** 14:14 67:11 72:19 116:13 131:14 146:23 172:11 179:4 183:7 222:10,18 234:11,23 235:2,7 240:16 240:25 243:7 243:12 253:10 271:3 301:2,7 305:9 307:23 308:8 327:2 329:2 331:13 332:8 367:8 371:18 374:2 392:16 405:5,7
**percent** 198:9 198:12 325:21 352:24,24 361:9 362:5,17 363:5,8
**percentage** 308:21
**perchlorate** 16:19 17:9,12 17:17
**perfect** 80:10 80:14 200:21 202:15 205:24 206:7 367:15
**perfectly** 387:22 388:2
**perform** 82:25 247:14 262:18 262:20 263:7 351:16 388:23
**performed** 31:12 32:4 136:17 153:15 229:13 369:13 399:9
**performing** 32:15
**performs** 89:8
**period** 9:16 229:14 366:8
**periods** 148:18
**permanent** 181:17
**person** 68:20 384:6,10
**person's** 256:10
**personal** 145:8
**perspective** 126:4 142:3 152:4 159:20 263:14
**perspectives** 267:25 377:10
**pesticides** 74:14 339:21
**pfas** 33:24 36:14 151:20
**pguo** 5:24
**ph** 144:20,21 235:23 247:22 391:20
**ph.d.** 1:15 8:8 11:22,24 16:11 409:3,9,10 412:9 413:5 414:2,24 415:2 415:4,12
**pharmacolog...** 294:9 297:21
**phenomena** 239:20 240:5
**phenotype** 365:24
**phrase** 53:5 99:6 293:21
**phrased** 215:25 302:9
**phraseology** 37:22
**phthalate** 82:8 91:15 92:7,11 92:17,18 93:20 334:18 336:6 336:19 337:5 345:7 410:13
**phthalates** 39:24 85:15,23 86:2 87:16 90:25 92:7 93:8 206:2 255:24 258:11 272:7 309:22 311:8 333:6,16 334:9,9 335:7 335:14 338:10 339:15 353:9 354:23 410:11
**phydroxyphe...** 275:8
**physical** 407:2
**physiological** 212:8 292:13 293:15,18,19
**physiologically** 118:18 294:17
**physiology** 28:24
**pias** 211:20
**pick** 83:12 171:24
**picked** 82:10 85:4
**picks** 167:3
**picture** 195:4
**pin** 265:18
**pint** 100:9
**pioneer** 385:13
**pioneered** 351:14
**place** 160:16 399:21

**placed** 264:17
**plaintiffs** 2:4 14:10 21:4 91:8
**plant** 243:25 309:13
**plausibility** 79:18 103:23 104:5 133:2,17 134:9 138:20 139:9,14 140:4 140:5 187:19 200:16 201:12 202:14 204:2 208:9 220:22 221:9 256:20 261:17 262:9 328:20 393:14 393:21 398:12 401:18
**plausible** 78:6 78:14,22 79:19 80:6,22 99:16 132:18 134:6 135:2,6,8,17 139:21 204:18 205:17 206:15 323:6 331:3,7 331:8 332:2,4 332:10,11 388:21 389:5 398:3 407:12 407:14,15,17 407:18
**play** 119:17,19 173:12 187:8 207:15 219:8 222:8 366:19
**playing** 215:13 221:14
**plays** 137:16 201:6 203:9 211:18 212:14 212:23 213:18
**plaza** 4:20 5:21
**please** 8:23 16:7 27:6 31:9 88:14 98:18 101:18 105:5 106:17 139:6 142:4 147:8 150:15 170:23 170:24 174:10 193:11 216:23 267:4 269:25 274:11 278:7 286:12 296:6 318:24 333:14 334:2 337:13 346:2 354:8 359:14 367:25
**plus** 33:22 198:9 372:14
**podcast** 381:16 381:17 383:9 383:13
**point** 13:17,23 14:20 15:8 30:12 55:5 87:10,12 88:14 89:15,17 95:17 96:11 99:17 102:17 104:8 116:18 117:6 121:17 129:4,5 131:12 145:3 150:9 165:13 165:20 168:11 169:3,5 194:5 199:22 240:3 241:2 243:16 250:5 261:6 266:10,17,21 266:23 273:7 275:15 276:16 297:8 298:21 299:11,19 300:6 305:3 311:6 312:3 316:14,15 327:5 350:12 365:21 404:13 405:11
**pointed** 275:6
**pointing** 127:21 129:12 168:3,24 170:4 172:14 268:11 302:13 306:14
**points** 116:16 242:12 285:9 397:12
**poison** 243:14
**policies** 176:11
**politician** 241:11
**pool** 360:13 361:6,18 362:20 363:15
**pop** 373:24
**population** 39:4 45:4 68:21 69:3 76:15 77:3,5 132:21 133:11 165:17,23 167:19 178:6 332:9 338:14
**populations** 159:25 160:24 161:21 182:3
**portion** 321:10 385:20,22
**posed** 376:19
**poses** 113:24
**position** 149:23 230:23 240:2 241:20
**positive** 167:11 169:17 171:16 172:6,10 175:3 189:6 209:7 220:15 274:23 343:24,24 380:4,13,13

**positively** 159:22
**positives** 189:24
**posits** 344:8
**possess** 275:3 303:20 307:9
**possesses** 304:13
**possessing** 275:20
**possibilities** 40:4
**possibility** 45:16 128:9 185:20 194:21 195:5
**possible** 50:3 57:25 60:12 71:22 78:8 96:8 168:6,7 168:10 181:12 183:3,13,22 184:12 195:16 195:17 197:11 197:13 198:3 223:14 255:22 303:15 402:5
**possibly** 48:25 58:7 165:18,23 167:20
**post** 167:14 169:23 172:22 173:23 174:20 175:18 233:9
**postmenopau...** 176:22 177:19 178:4,14,23 179:23 193:3 193:14,25 292:5
**postulated** 212:2
**potencies** 281:6
**potency** 63:9 63:12 65:23 109:21 111:2,6 265:22 294:12 294:21,22 295:17,21 296:13 298:2 315:18 362:14 370:13
**potent** 200:21 202:16,24 204:16 205:16 256:21 296:2 297:7 369:21 370:7,21,22 371:11,13,23
**potential** 13:8 32:25 34:18 126:5 161:4,12 172:14 175:23 190:23 246:13 266:3,11 275:7 275:15,18 276:17 301:16 334:21 386:22 387:11
**potentially** 126:17 162:14 176:8 198:2 320:6
**power** 171:12
**practical** 24:3 129:5 131:13 250:5
**practicalities** 152:21
**practice** 8:10 92:24 93:4
**practices** 1:8
**pre** 169:23 172:22
**preamble** 52:13
**predict** 87:12 89:17
**predictable** 279:23
**prediction** 249:19
**predictions** 122:4,5
**predicts** 242:11
**predominant** 186:25 209:18 210:20 212:13 212:22 213:17 277:24
**predominantly** 162:5
**preferred** 60:15,22
**premenopausal** 177:20,21 178:3,18,23 193:4,14 194:2
**premise** 118:7 356:5
**preparation** 25:8
**prepare** 10:10 22:6 24:23 25:12
**prepared** 311:18
**preparing** 20:8 81:4 162:25 320:14
**presence** 249:22 395:6
**present** 7:23 61:19 93:18 103:5 123:7 176:6 200:8 252:15 253:7 253:12 282:10 298:18 332:24 336:4 376:9 391:13 392:2 399:4 401:22
**presentations** 254:21
**presented** 28:20 92:16

133:16 213:6,7 216:16 242:2 246:20 254:5 318:21 381:12 383:3
**presidential** 399:22
**press** 148:8 185:2 335:5
**pressing** 154:4 157:16 158:13 181:14 182:14 182:21 185:22
**pretty** 11:10 95:7 201:10 204:11 399:11
**prevalence** 160:3 161:2
**prevalent** 164:4 209:9
**prevent** 217:14
**previous** 188:14 277:11
**previously** 271:9
**primary** 31:25 100:5
**principle** 71:20 73:6 87:9 89:14 91:22 92:23 94:2,7 123:24 200:25 245:21 256:23 257:10 286:21 287:7 318:25 404:10
**principles** 203:2 294:9 297:21
**prior** 84:7 99:3 144:16 145:12 168:14 320:24 321:5
**priori** 249:19
**prize** 233:10 385:15
**probability** 330:22
**probable** 308:11,24 320:19
**probably** 9:12 9:17 16:18 29:22 60:14 76:15 124:5 165:6 217:9 229:12 308:6 323:14 360:21
**proband** 302:6
**problem** 11:13 52:7 102:22 119:7 132:8 148:7 194:15 234:2,2 328:9 328:10
**problematic** 190:6
**problems** 215:22
**proceeding** 61:18 103:4 200:7 253:6 298:17 332:23 336:3 376:8 399:3
**process** 83:20
**processes** 212:8
**produce** 52:23 111:20 114:14 115:10 117:3 117:21 220:6 256:23 281:5 285:8,18 287:25 319:5 327:20 353:24 363:9 374:14
**produced** 43:25 91:8 327:15 359:3 369:3 392:16
**produces** 319:10 323:10 355:23 357:13
**producing** 306:21 313:16 313:20 322:6 361:9 380:21
**product** 80:8 89:6 91:9 92:14,18 93:19 143:3,24 144:13 145:7,8 146:3,16 157:16 158:13 159:22 185:22 186:11 218:10 222:11 307:22 325:2 380:23
**production** 214:12,23 216:6 253:23 254:18 275:22 322:20 385:11
**productive** 257:6
**products** 1:8 8:10 87:17 88:25 90:12 91:3 92:10 134:4,17 135:10 145:2 145:18,24 148:20 149:2 154:4 159:6 161:4,9 162:12 162:13 168:13 175:19 176:8 181:14,23 182:4,14,21 187:20 200:19 202:15 221:21 243:25 244:5 253:14,24,25 256:11,21 257:14,21

263:9,16,19 264:12,24 273:6 306:5 307:9 309:13 324:11 329:16 330:4 341:24 344:9,16 348:12 351:20 355:18 369:21 374:7 395:24 410:22
**professional** 27:23
**professionally** 28:3
**profile** 378:22 397:15
**profiles** 387:8
**profoundly** 230:2
**program** 33:22 33:23 36:15 39:12 171:6 270:20 339:23 366:11,14
**progression** 208:2 346:7 347:4,19 410:19
**prohibiting** 176:11
**project** 29:11 40:22 172:7
**proliferation** 69:4 70:16,19 187:23 212:10 274:19,23 282:17 283:14 319:7 320:2 323:13 329:19 348:7 349:4 350:2,6,16 351:4 359:5 379:21 380:4
**proliferative** 66:9 67:3,20 68:4 104:19 187:5 201:2,4 203:3,7 209:24 262:16 277:14 357:9 358:5 378:20 380:21 395:5
**promotes** 271:7
**pronounce** 39:19 211:21 268:20 271:24 287:24 352:16
**pronounced** 273:13
**pronouncing** 72:11
**propagate** 247:16
**propagating** 246:14
**proper** 136:19 339:9
**properties** 258:9 275:4 316:16
**property** 33:8 35:2,16 59:5 94:24
**proportion** 360:15 361:8
**proportional** 290:21
**propose** 323:12 324:5 350:17
**proposed** 17:20 62:3 235:4
**proposing** 134:21 401:12 401:13
**proposition** 226:11 405:15
**propylparaben** 348:16,23
**propylthioura...** 9:25
**prospective** 135:21 180:23 180:25 181:10 394:12
**prostate** 233:6
**protect** 72:4 334:12
**protected** 18:15
**protecting** 334:16
**protection** 108:19 243:25 309:13
**protective** 72:14
**protects** 176:11
**protocol** 252:9
**proved** 249:23
**provide** 24:16 88:15 90:18 181:11 294:4 295:3 394:8
**provides** 242:3
**providing** 88:3 91:13 307:22
**psc** 7:10
**public** 9:4 21:16 108:18 161:13 254:21 334:20 412:7 415:19
**publication** 283:5 351:18 410:21
**publications** 39:9 42:20
**published** 21:16 24:19 28:11,13 30:19 37:24 41:4 42:15 61:4 121:15 122:18

165:3,7 167:9 240:9 282:20 282:24 285:20 286:16 287:21 345:21 346:6 350:21 385:5 391:11
**publishing** 164:18
**pubmed** 81:12 81:22 82:11,19
**pull** 119:8
**purpose** 39:4 78:4 184:9 241:17 257:9 264:21 301:10 301:11,12 362:9
**purposefully** 235:2 362:4
**purposes** 61:3 61:6 62:2 85:16 356:13
**pursue** 40:3 45:16
**pursued** 43:13 49:7,7
**push** 119:25
**put** 59:19 82:23 92:3 99:20 101:22 139:15 139:16 145:16 245:2 247:8 248:12 305:25 322:18 323:4 339:20 357:17 400:2
**puts** 241:12 339:23
**putting** 50:8 382:5
**puzzled** 49:19

**q**

**quadrillions** 327:10
**qualification** 190:17
**qualified** 158:8
**quality** 33:20
**quantify** 332:6
**quantitate** 371:2
**quantitative** 222:16,17 370:25
**queried** 168:13 168:15
**question** 10:14 10:21 11:18 19:2,4 27:4,7 31:18 37:16,21 38:7 41:10,15 44:6 45:10 46:22 47:21,22 49:11 51:2,19 53:4 59:7,12 60:4,13 64:4 67:15 68:10 69:16 70:5 71:25 78:5,24 79:10,12,18 88:12 97:6,15 98:3,4,9,11,19 110:8,10,14 111:4 113:14 115:3,7 116:24 117:2 118:6 119:23 120:14 120:15 125:18 127:12,24 128:12 129:11 129:13,16 130:9,14 131:20 132:16 133:16 139:6,7 142:5 146:11 147:13 152:3 153:7,9 154:25 156:11 157:13 158:4 177:11 177:13,15,23 179:18 182:12 193:12 196:12 197:3,9 198:22 211:9 212:20 213:10 215:6 215:25 216:18 218:4,7,7,8,12 221:4,6 231:24 233:23 258:19 262:5,6 263:25 264:19 281:19 285:24 291:4 304:10,11 313:25 314:2 314:11 316:24 317:11 318:9 318:12,13,24 320:13 321:8 321:12,23 323:20 326:20 326:24 327:24 328:19 345:19 355:10,11,14 368:2 382:19 396:17 398:6
**questioning** 128:20 355:12
**questions** 10:25 47:11 72:23 98:14 104:23 160:21 299:9 376:18,18 408:7
**quick** 66:18 252:23 299:9 398:20
**quicker** 205:5
**quickly** 205:2 328:15
**quite** 24:17 98:15 176:19 284:25
**quote** 78:5 87:6 148:18 162:14

162:20 167:3 254:22,25 255:3,9 306:5
**quotes** 54:10 297:7,13

**r**

**r** 1:15 3:7 8:25 8:25,25 11:23 16:10 237:18 409:8,10 413:5 414:2,3,3,24 415:2,4,12
**rachon** 273:22 410:5
**rachón** 268:19 268:19 273:12 379:3
**racial** 176:14
**racially** 182:2
**rajapakse** 283:21 285:22 286:7 287:10 287:20 291:20 297:20 359:17 410:9 411:4
**rajapaske** 359:21 360:4
**randolph** 5:14
**range** 341:18 353:4
**ranging** 361:16
**rank** 310:9
**rat** 228:16
**rates** 161:8 162:21 176:2
**rather** 140:4
**ratio** 292:8 294:12 360:14 361:7 363:12
**ratios** 175:2 288:17,25 289:11 290:9 290:13,21 292:6 295:16 297:25 361:16
**rats** 271:6
**ravika** 3:22
**ravika.rames...** 3:22
**reach** 287:2 329:16,23 357:2
**reaching** 391:5 392:20 393:21
**read** 26:11 48:24 54:9 63:15 87:7,10 87:23 88:16 89:11,15,23 90:8,22 91:15 91:21,22 92:15 93:22 110:19 113:3 151:3 162:24 185:2 195:8 201:19 201:23 204:9 210:19 217:24 218:21 224:16 246:24 250:23 254:7 269:25 270:7,11 280:13 318:11 321:11 333:8 335:9 337:19 339:7,19 355:6 379:15,17 382:21 383:13 384:24 385:19 385:21 386:6 386:20 387:14 394:15 395:9 396:21 397:6 413:9 415:5
**reading** 156:16 160:19 166:14 188:7 200:18 231:6,7,13 260:3 288:23 289:10 315:25 361:25
**reads** 159:20 217:15
**ready** 198:20
**real** 34:21 124:4,10,10 223:13
**realistically** 256:6
**reality** 73:7 232:10 233:18 387:9
**realize** 230:3
**really** 17:15 21:18 27:19 35:11 36:12 37:23 39:9,14 47:20 73:23 78:25 101:7 111:16 126:10 131:20 156:13 178:16 189:25 191:14 203:19 220:23 234:13 235:10 240:10 258:22 299:5 319:13 327:25 328:23,25 329:7,19 331:13 339:21 346:15 357:10 358:21 366:2,5 368:10 370:10 372:22
**realtime** 1:25
**reason** 11:4 87:15 90:7,8 191:13 261:25 273:6 344:2 345:3,3 413:11 414:6,9,12,15 414:18,21
**reasonable** 133:6 135:16 220:8 397:19

398:15
**reasons** 52:15 56:24 124:20 320:15 343:23
**rebuttal** 240:9
**recall** 81:17 158:16,18 185:25 308:5 341:3 342:3 347:21 359:24 369:22 372:20 381:11 402:17
**receipt** 413:17
**received** 269:6 385:15
**recent** 214:4 216:9 217:16 381:25 382:8
**recently** 33:23 282:20,23 283:5
**receptivity** 378:5
**receptor** 30:25 35:18 43:2 55:23,24 56:10 56:11 57:22,23 57:24 58:6,24 59:2,5,11 66:8 67:2,8,19 68:12,25 69:24 70:2 71:3 200:24 202:25 221:17 243:8 258:17,22,24 259:7 270:21 279:15 284:14 286:19 296:14 297:16 316:23 341:11,14,15 341:18 344:5,9 351:22,22 352:15 364:3,5 364:8,23 365:2 365:3,6,22 377:23 400:3 410:24,24
**receptors** 39:21 55:21 56:8 70:9 208:15 282:12 365:12
**recess** 61:16 103:2 200:5 253:4 298:15 332:21 335:25 376:6 398:25
**recited** 78:3
**recognition** 368:10
**recognize** 12:3 108:5 110:21 136:18 150:21 264:22 268:3 352:8
**recognized** 80:24 307:18 364:11 366:16 390:12
**recognizing** 368:16
**record** 8:3,22 21:17 31:13 34:13 47:8 48:14 58:5 61:15,21 69:16 73:25 98:6 101:22 102:3 102:25 103:7 121:5 186:11 186:16 199:24 200:4,10 246:25 253:3,9 298:14,20 321:4,10 332:20 333:2 335:21,24 336:10 338:19 338:24,25 339:11 347:17 359:8 376:5,11 377:6 379:3 384:19 398:24 399:6 408:16 412:12
**recorded** 8:7
**red** 119:17 173:11,12 240:13 243:6 406:23
**reduce** 116:3 161:14 176:7
**reduced** 367:16
**reducing** 176:14
**reduction** 43:19
**refer** 159:15 314:19
**reference** 21:20 318:15
**referenced** 283:25 413:6
**references** 26:5 211:12 380:7
**referring** 65:4 195:25 211:22 279:17 291:11 291:12 390:21 393:10 394:3
**reflect** 386:20
**reflexive** 147:17
**refute** 345:3
**regard** 96:2 97:25 98:20 99:25 100:24 101:11 142:21 235:13 397:13 398:6,10
**regarding** 175:22 177:17 241:23 242:25 271:15 310:13 311:8,13

**regardless** 109:20
**registered** 253:23 254:17
**regulate** 212:10 309:19 364:7
**regulated** 275:10 348:9
**regulation** 176:10 241:18
**regulators** 116:7
**regulatory** 39:2 45:5 61:3,6 115:18 228:10 229:20 243:16 251:8 308:11 308:14 309:3,9 317:18 318:2 318:17,22 321:13 366:21 368:13 372:4 387:3
**regurgitation** 218:12
**reinforce** 194:7 194:16
**relate** 196:13 317:5
**related** 30:16 37:18 39:6 41:19 42:14 76:21 77:18 85:13 165:19 167:20 403:14 412:14
**relates** 19:8 63:16
**relating** 82:9 150:10 365:16
**relation** 31:14 32:4 167:13
**relationship** 39:16 45:17 80:3 104:9,16 181:12 182:19 183:3,22 184:12,16 187:6 206:25 230:20 232:3 240:22 264:24 268:2 272:5 377:11 380:16 384:12 394:19 396:25 397:20 404:24
**relationships** 149:19 183:12 394:14
**relative** 250:14 251:3,5 288:2 294:12 295:17 297:25 360:10
**relatively** 285:4 285:14
**relaxer** 1:7 8:9 92:9 132:19 133:9 134:16 135:10 138:4 139:25 146:15 147:6 149:8,25 154:16 157:15 158:12 164:9 164:19 167:9 179:19 185:21 187:16,20 188:20 190:24 191:7 200:19 202:15 221:21 252:16 256:11 256:21 257:14 257:21 263:9 263:16,19 264:12 273:6 306:5 307:9 322:24 324:11 325:2 330:4 341:24 344:8 344:16 348:12 355:17 369:20 373:25 393:15 413:4,4 414:1 414:1 415:1,1
**relaxers** 13:8 14:8 78:7,10 78:15 79:20 82:24 85:17 135:3,20 138:12 141:4,7 141:15 142:8 142:23 143:12 144:8,19 153:20 154:3,3 162:2,4 164:3 167:13 168:16 169:18 175:16 175:24 181:13 182:13,20 185:21 187:7 188:9 189:4,9 189:17 190:11 204:21 205:20 206:16 250:7 250:25 252:14 263:4 306:21 329:15 374:7 378:17 380:17 380:18 381:5 384:13 388:20 391:7,14 392:3 393:8 394:10 394:20 395:3 397:22 401:15 407:18
**release** 335:5
**released** 333:5
**relevance** 27:20 83:24 239:21 240:5 246:16 320:16
**relevant** 27:19 38:13 83:8 84:13,16 85:10 111:7 118:18 138:4 148:2,3 148:17 150:10

161:13 263:14 264:11 265:22 301:14 312:7 315:22 316:2 322:16 323:21 329:2 350:12 365:9
**reliable** 394:8
**relied** 20:7
**rely** 122:24 268:4 391:11
**remains** 118:14
**remember** 13:21 16:17,21 22:8 23:9,16 40:13 41:16 47:17 75:19 104:23 106:4 106:12 158:24 184:22 185:3 213:13 222:5 274:2 278:21 284:2 327:19 392:4 400:25
**remind** 125:20
**repeated** 223:25
**repeatedly** 91:18 345:16
**rephrase** 49:18 296:4
**replacing** 347:13
**replicate** 192:4
**replication** 77:22
**report** 16:9,10 16:17 18:2,7 18:11,18 19:3 19:5,10,20,25 20:8,19,22,25 21:5 22:2,4,23 24:16 26:6,15 29:19 78:4 80:20 81:4,19 86:7 88:13 90:18 91:13 93:19 122:24 132:3 133:4 135:15 136:6 136:24 140:15 141:21 144:17 145:14 146:14 147:6,24 149:7 150:25 162:25 163:24 184:19 185:19 186:2 186:18,20 188:19 200:18 200:20 204:14 207:5 209:16 210:11 211:14 214:9 217:11 217:25 220:4 220:25 248:4 249:21 250:23 255:12 256:15 257:17 259:5 262:21 268:4,6 268:9 274:3 277:24 278:24 283:20 284:4 286:2,4,12 287:22 299:5 299:18 300:15 305:24 306:16 310:21 311:18 314:5 315:14 315:25 316:5,9 318:18 320:14 340:22 341:4,6 341:20 348:3 349:2,10,13,14 349:19,21,24 352:10 359:25 369:19 372:17 377:8 379:11 384:2,3 388:12 388:22 389:22 390:16 393:3,5 393:25 396:7 396:14 400:21 402:15 407:8 409:10
**reported** 135:21 165:21 167:11 168:9 169:17 173:21 192:25 193:23 195:18 197:13 198:6,10 353:15
**reporter** 1:25 8:18,23 46:8 46:12,15,17 82:2 101:15,19 101:24 107:21 107:24,25 114:7 119:3,12 119:17,24 163:13,16 173:10,14,18 199:5 224:19 224:25 225:5 230:16 236:4,8 252:21 260:24 267:11,20 287:18 305:11 332:15 412:7
**reports** 26:9 96:14 174:5
**represent** 165:17 167:18 176:13
**representation** 335:12
**represented** 367:19
**representing** 2:4 3:9,16 4:3 4:16 5:3,11,19 6:3,16 7:3,10
**reproductive** 71:17 75:25 76:9,10,17,19

76:19 77:8,9 164:8 272:5
**requested** 46:9 46:13,16 82:3 101:25 107:22 108:2 236:5,9 305:12 321:10
**requests** 12:12
**require** 49:16 50:14 90:19 115:18 116:15
**required** 28:25 114:14 115:10 117:3,21 152:12,25 415:13
**requires** 116:19 401:19
**research** 3:16 13:14 31:12 32:4 37:6 43:14 49:8 148:19 159:23 160:23 175:22 181:21 210:25 214:4 216:9,16 217:16 381:25 382:8 388:19 388:22 392:20
**researched** 388:18
**researchers** 387:17 388:4
**resemble** 275:4
**residual** 194:21 195:6,19 196:5 196:21 197:17 197:23
**respect** 92:14 102:10 113:21 176:22 178:13 178:17 179:22 187:15 193:13 228:22 248:25 257:22 266:21 312:10,21,25 317:14 362:14
**respond** 97:7 98:10 102:14 121:10 140:12 144:18 153:5 160:10 170:18 178:2 213:11 213:22 247:2 283:4,23 306:12 321:7 322:13 335:17 335:17 345:18 351:8
**responding** 98:9,13
**response** 12:18 35:15 110:4 170:24 220:7 220:13,14,16 220:17 230:21 232:4 233:2,8 234:10 245:14 245:18 248:14 248:23,24 249:6,11,14,18 252:2 257:18 291:8 296:7 315:3 316:19 352:23,25 353:19,25 363:17,23
**responses** 143:19 220:3,9 220:21 221:22 232:11,18 233:12,19 235:19 239:8 246:8 247:12 248:7,10
**responsible** 29:21
**rest** 56:4 194:13
**restate** 152:2
**result** 95:11 123:5 161:7 162:20 171:9 197:14 198:10 223:15 271:13 364:9
**resulting** 150:6
**results** 77:23 152:11,24 165:21 174:19 175:14 176:6 181:22 183:2 188:14 189:2,7 189:14 190:10 191:2,5,21 192:16 195:19 275:14 276:14 291:21 349:2
**resumed** 61:18 103:4 200:7 253:6 298:17 332:23 336:3 376:8 399:3
**retirement** 15:6
**return** 413:13 413:16
**revealing** 394:13
**reverse** 405:23
**review** 26:5,23 122:20 148:14 149:7 235:18 268:24 269:20 283:24 316:15 318:18 334:2 334:14,25 337:12,17 384:21 388:22 388:25 395:21 413:7
**reviewed** 30:14 36:15 135:14 276:16 277:2 381:19 391:4 391:12 392:6

407:17
**reviewers** 33:25
**reviewing** 148:2,2,16 391:10
**reviews** 33:20 241:2
**revise** 29:11
**revising** 286:25
**revlon** 7:3
**richmond** 412:5
**right** 20:18,20 29:11 36:21,21 37:10 41:9 42:22 43:14 48:10,10 53:3 55:16 57:9 65:21 73:7 76:12 78:21 79:5 85:7 88:5 89:20,24 90:4 90:16 92:8,25 94:25 106:20 107:4,6 108:4 112:7,22 113:9 119:24 123:4 124:24 128:22 134:11 136:16 137:25 146:10 150:12 155:20 155:22 158:10 159:17 160:13 160:16 166:11 173:5,16 174:17 187:18 191:3 193:11 193:17,19 196:12 199:25 201:9 202:22 204:4 208:7 211:13 214:2 232:8 238:19 243:15 244:15 244:24 246:4 254:13 255:3 259:16 260:14 260:23,25 261:4,18 266:25 267:16 286:25 288:3 290:5,6 293:3 293:25 298:11 305:13 309:3 310:10 312:18 315:15 316:24 320:20 325:19 329:21 337:23 344:6 346:2 348:14 354:18 358:8 362:18 365:4 370:16 374:16 375:23 376:3 377:14 377:20 378:4 379:13,24 380:10 381:9 383:8 385:8 386:13 387:16 390:24 392:5 392:23 393:6 393:19 395:11 395:18 396:12 396:16,23 397:5 398:9 403:18 404:6
**rightmost** 360:23
**rigorous** 334:14
**rising** 161:10
**risk** 32:25 33:9 33:21,24 34:4 34:20 35:7,8,9 35:21 36:2,6 36:11,12,16,23 36:24 63:7,7 63:14,23 64:22 67:25 68:6 70:14,21 71:7 76:18 77:16,20 80:4,13 103:23 106:8,14 108:8 109:12,17 110:24,25 112:20 113:8 113:24 126:4 127:2 128:3 129:20 130:19 131:11,17 135:4 145:19 145:25 164:6,9 164:19 165:17 165:23 167:10 167:19 175:17 176:5 181:15 181:18,24 182:6,21 187:25 188:13 189:5 204:19 205:18 215:21 230:22 231:2,4 231:25 232:12 233:20,25 234:3 244:7 246:8 252:8 263:8,15 265:5 265:15,16 266:18 268:17 271:3,11 275:17,25 276:3,9 299:21 299:23 300:8 300:10 305:9 306:6,24 319:8 319:9 322:7 331:20 332:6 333:6,11,16 334:9 335:6,13 336:5,18 337:4 338:4,9,13 339:14,20,23 339:25 357:11 367:13 368:4 368:12 369:13

387:5 389:6 390:20 395:21 396:8,18 402:15,20 403:2,16,22 404:2,4,8,18,22 405:16,25 406:21,22 410:11,12
**risks** 135:19 275:20 357:20 387:12
**road** 7:12
**robert** 8:7 11:22 409:3 412:9
**rockefeller** 5:21
**rodent** 225:20
**role** 137:16 182:5 187:9 201:7 203:9 207:15 209:20 210:23 211:15 211:18 212:7 212:15,24 213:18 215:14 219:8 221:14 222:7 275:18 366:18
**roster** 4:18
**rough** 120:3 128:22
**roughly** 308:9
**royal** 399:22
**rule** 18:15 242:12 258:6
**ruled** 257:25 258:3,4
**rules** 235:6
**ruling** 257:20
**run** 171:5 319:8

**s**

**s** 3:5 8:25 23:14 23:15,15 237:18 414:3
**saal** 23:12
**sab** 36:11 333:11
**sabrina** 6:14
**sabrina.palac...** 6:14
**sad** 45:8
**safe** 128:16,25 129:4 367:17
**safer** 176:9
**safety** 30:15 228:11,11 235:22 246:6 251:10 397:15
**sales** 1:8 8:9
**sara** 4:23
**sasake** 340:24 341:6
**saski** 340:9 410:16
**sate** 387:3
**saturated** 328:9,13,14
**saturday** 25:14 25:17
**saw** 43:24,25 59:23 147:23 162:24 227:11 241:6
**saying** 37:6 50:7 61:25 76:8 79:9 93:16 96:10 97:21 99:24 103:9 113:3 121:11 124:19 143:21 144:6 150:3,4 170:20 178:22 190:25 191:4 219:7 225:7,15,24 226:2,11 228:3 228:23 257:4 276:25 281:8 281:12,15 289:22 294:16 295:19 296:19 303:19 315:16 363:3 369:7 374:13 399:8 400:20 406:11
**says** 100:11 106:24 107:9 107:17 108:5 123:5 141:3,17 172:24 180:24 207:25 218:20 224:17 274:15 282:9 334:16 342:15 343:2 353:18 371:14 393:9
**scenario** 73:21 74:25 126:21 127:19
**scenarios** 74:10 75:11
**schank** 3:14
**science** 29:12 30:13 33:18 333:5 334:13 334:19 366:20 367:23 368:17 369:14
**scientific** 77:23 87:8,14,24 88:15 89:19,21 90:10,18 91:14 91:25 96:15 133:7 135:16 239:19 240:4 241:8,14 301:14 334:11 368:22 369:9 397:19 398:15

**scientifically** 24:6 121:13,21 121:25 142:21 143:10
**scientist** 223:9 241:10
**scientists** 30:13 31:10 32:2 96:22 116:8 136:18 140:5 233:18
**scope** 134:8 318:6,7 321:5 357:7,23
**screen** 83:23
**screening** 270:19 366:4 366:11
**scroll** 173:19
**se** 42:15 296:11
**seamans** 7:4
**search** 12:17,20 81:11,13,22,23 82:11,19,19 83:2,3,5,15,22 85:3
**searching** 81:12
**second** 16:8 19:10 123:22 128:23 132:9 132:10 138:7 159:14 166:19 172:20 186:22 209:17 211:14 213:24 249:21 295:11 304:8 334:6 335:21 337:2 349:21 360:3 361:5 382:22 389:23 390:17 395:18
**secondary** 179:11
**secondly** 345:6
**seconds** 375:3
**secretory** 346:9
**section** 81:2,3 147:25 148:12 160:8,9,12,14 180:10 184:7 186:20,23 205:7 211:15 220:5 268:13 269:24 270:2 274:9 278:23 279:8,9 291:10 305:24 340:22 349:22 377:16 394:2 395:19 396:8,13,16 402:15
**see** 12:11 17:6 20:4,22 31:22 43:20 45:3 54:20 61:9 65:14 72:24 73:22 76:16 81:20,21 87:3 87:21 88:13 95:11 106:24 107:13,17 108:9 115:7 117:6 118:11 120:2 121:12 121:20 124:11 132:22 133:12 135:23 137:4 138:2 141:11 147:22 148:22 159:9,14 161:16 162:16 162:22 163:7 164:11 166:23 167:2,23 168:17 170:2 176:16 177:19 180:8 182:8 187:10 188:16 189:11 190:10 191:4 199:4 202:7 205:2,4 205:9,21 209:25 211:6 211:22 214:14 214:25 217:20 217:21 220:10 223:6 225:16 226:8 227:8,9 227:9 237:24 239:12,22 240:9 242:18 247:15 249:25 250:11 254:20 261:11 264:3 264:25 268:21 272:10 273:10 274:6 276:5 279:10 280:5 282:4,5,21,25 285:11 288:21 290:24,25 291:17 292:17 292:18,21,22 293:9,23,24 294:13 300:21 306:9,13 307:2 310:4 315:12 316:9 318:14 334:22 337:2,6 338:2 341:20 342:13 349:18 357:19 359:2 360:8,18 361:3 361:19 363:24 377:18 378:2 379:22 380:8 382:4 383:15 383:15,19 389:22 390:2 390:24 393:6 394:25 396:10 398:21 401:5
**seeing** 153:16 290:7 349:5,6 354:2

**seem** 56:3 87:25 176:18 212:12 255:3 272:8 280:17 280:20 345:24 355:12
**seemed** 237:6 407:25
**seems** 108:10 144:10 206:21 208:8 232:16 250:15 307:7 380:23 405:14
**seen** 12:6 26:12 91:10 118:15 178:10 187:15 217:10 237:22 247:6 256:24 306:22 333:20 339:5,25 340:2 389:6
**segalla** 6:19
**seize** 171:14
**selected** 274:18 379:20
**selective** 39:22 43:2
**sense** 77:20 149:14,15,17 308:13,20 323:25 402:2 403:16
**sensitive** 72:5 104:10,17 116:18 208:16 209:2,4,14 223:20 228:9 228:18 331:5
**sensitivities** 228:8
**sensitivity** 376:23,25
**sent** 413:14
**sentence** 106:18 123:23 133:5 140:15 140:20 141:13 147:24 148:11 159:15 169:7 186:22 188:8 196:20 205:7 209:17 210:19 210:25 214:9 214:15,21 217:15 220:5 268:13 280:15 288:6,10 290:20 295:9 295:11 300:15 306:18 349:23 361:5 377:21 393:9 395:18
**sentences** 106:19 188:25 386:19
**separate** 16:16 36:20 171:11 403:9,11
**separately** 192:9
**september** 105:19 163:19 269:3 409:12 409:18
**sequential** 81:13,23
**sequentially** 253:11
**series** 49:11
**serious** 214:5
**seriously** 326:17
**serous** 214:5 217:17 382:2,9 383:5,6,10,16 383:22
**serum** 292:5
**serve** 139:13
**served** 30:12
**set** 29:21 33:23 52:17 338:3 366:13 412:10 412:18
**setting** 228:19
**settings** 228:10 228:11 364:6
**settled** 155:3 179:18 182:12
**seven** 180:3,12 310:13 341:12 353:3 375:20
**seventeen** 340:14,15,19
**seventh** 6:12 270:15
**several** 148:18 189:7,14 190:10 191:21 192:16 297:6 297:11 376:20 389:24
**shampoo** 144:12,24 325:19
**shampoos** 146:17
**shapes** 249:9
**share** 105:15 105:16 118:11 164:16 185:12 255:20
**sharma** 268:20
**shb.com** 5:24
**sheet** 413:11
**shifted** 113:17
**shipman** 7:11 7:15
**shipmanlaw....** 7:16
**shipra** 4:8
**shock** 245:2,3,5
**shook** 5:20
**shoot** 346:16
**short** 21:6 62:15 84:9

**shorten** 204:12
**shorthand** 412:6
**show** 121:25 122:5 124:4,5 171:13 258:12 324:21 343:6 343:17,21 350:5 357:4 358:12 364:21 380:2
**showed** 38:14 116:8 157:4 172:5 213:14 265:25 271:10 274:21 282:24 286:20 291:6 363:14 377:3
**showing** 124:11 172:9 279:22 307:20 362:10 371:6
**shown** 39:21 214:4 216:10 217:16 275:3 376:21 380:12 381:25 382:8
**shows** 109:15 227:14 344:4 344:25 345:2
**sic** 33:12 150:22 350:9 369:11 405:6
**side** 73:22 300:19,19 305:25 306:2
**sidley** 6:11
**sidley.com** 6:14
**sigmoidal** 220:17 249:8 363:21,22
**sign** 413:12
**signal** 139:3 172:6,10 187:5 201:2,4 203:3 203:7 209:24 277:14 395:5
**signaling** 40:7 66:9 67:3,20 68:5 104:19 111:19 262:16 270:23 274:25 296:22,23 297:10 377:25 378:6,14 380:6 380:12
**signals** 39:2 134:22 171:5 264:23,25 357:10 395:6
**signature** 18:4 412:23
**signed** 413:19
**significance** 171:15 174:25 175:5 378:10 378:15
**significant** 63:6 63:22 64:22 106:8,14 108:8 109:12,17 110:24 113:7 113:24 153:13 154:8 169:17 170:6 172:5,10 173:22 174:21 175:7 184:15 193:2,24 198:2 198:7 236:16 271:10 272:3 294:18 323:10 323:14,23,25
**significantly** 151:24 169:25 294:10 295:15 295:20 297:23 341:13,17 349:3,25
**signing** 20:21 21:5
**siloxane** 206:2
**siloxanes** 85:15 85:24 86:3 309:22 311:13 370:2
**silva** 278:18 279:11,17 281:14 282:3 283:6,11 284:22 287:4 311:5
**silve** 278:11 410:7
**similar** 44:17 87:14,18 89:19 90:12 260:5 261:7 271:13 286:14 292:14 294:12,22 295:16,21,24 297:25 358:20 386:14
**similarity** 90:10
**simpler** 316:25
**simply** 52:9 88:17 90:17 339:7
**simultaneously** 53:20 253:11
**single** 29:21 68:16,17 72:18 151:9 152:4 257:6 261:21 262:3,11 306:22 307:22 320:6 358:6 361:12
**sip** 86:20
**sir** 389:18 397:7
**sister** 153:19 165:14,21 166:8 167:8,17 168:12 169:16

186:14
**sit** 398:9
**sitting** 213:16 218:16
**situation** 66:15 225:11,20 365:11 374:23 380:24 405:25
**situations** 374:21
**six** 165:6 353:4 354:9 369:17 374:9
**sixteen** 336:16 336:17
**sixth** 371:12,15 371:20,21
**skip** 39:18 275:13
**skipping** 87:5 188:24
**slash** 141:4,7 141:15 142:8 142:23 143:12 144:7 181:13 182:2 188:10 249:22 394:10 395:3
**slightly** 67:14
**sloan** 217:5,13 409:22
**slope** 220:15
**slopes** 249:9
**slow** 31:9 47:13 125:14 202:3 230:17
**small** 23:14 169:21 172:20 222:20 251:16
**smehta** 4:8
**smith** 302:13
**smoke** 179:4,5 405:6
**smoked** 405:8
**smokes** 404:14
**smoking** 75:14 396:25 404:3 404:12,16,21
**smooth** 205:12
**sneeze** 102:6
**sneezed** 101:19
**society** 61:5 62:4,24 63:17 65:6 106:5 107:15 366:19
**soconnor** 2:11 413:2
**soil** 253:13
**solely** 372:5
**solo** 65:13
**solutions** 8:20 413:23
**somatic** 403:23
**somebody** 35:6 35:8 45:7 73:21 171:25
**somewhat** 265:8,10
**sophisticated** 141:22
**sorry** 25:9 44:21 48:11,15 82:4 83:17 86:9,13,14 94:8 95:19 97:13,20 105:13 107:2 107:20 108:3 110:3 114:4 140:16,24 148:5,8 162:12 173:17 180:11 181:2 196:3 217:3 230:13 231:12 236:6 251:21 259:13 260:8 267:14 268:7 269:8 279:6 289:18 305:15 320:22 321:17 336:23 342:20 346:11 353:21 356:11 360:16 375:18 393:4
**sort** 46:21 113:18 130:18 180:20
**sorts** 85:8
**sound** 254:13
**sounds** 118:12 133:14 201:9 373:2
**soup** 254:23
**source** 13:8
**sources** 15:5 256:16 263:20 264:13
**south** 3:19
**soy** 72:19
**sparse** 292:16
**speak** 358:21 370:13
**speaking** 112:23 370:14
**speal** 4:23
**spec** 329:3
**special** 242:6
**specialty** 10:3
**specific** 14:4 18:22 39:16 40:13,16 41:22 52:16 54:2,15 54:23 55:22 56:8,14,17 57:8 58:15 66:16 87:18 95:7 225:17,20 228:14 257:8
**specifically** 10:15 20:7 59:8 98:10 351:16 400:6

**speculate** 275:18
**speculation** 166:9
**spell** 23:13
**spend** 221:11 354:19
**spent** 14:20
**spontaneously** 346:8
**sprung** 284:5,6 284:7
**ss** 412:4
**st** 4:22
**stable** 270:18 364:13
**staff** 308:17
**stage** 78:19
**staircase** 35:4,4
**stairs** 35:7
**stand** 61:13 102:23 183:10 199:24 252:25 298:12 332:18 376:3 398:22 408:13
**standard** 8:4 172:3 334:13 334:19 340:2 367:13,19 368:3,16
**standing** 35:9 100:12 128:19 130:6
**standpoint** 127:2,23 128:3 129:21 130:19 153:2 178:24 261:16 262:8
**stands** 141:25 277:2
**staring** 354:19
**start** 50:11 69:6 75:22 84:15 115:5 141:5 167:4 171:11 280:8 377:5
**started** 14:7 25:21 43:18 81:12 124:14
**starting** 166:18 180:22 188:7 293:3
**starts** 111:9 214:18 337:24
**state** 1:18 2:6 8:16 9:4 29:12 78:25 81:3 120:20 143:14 145:3 191:10 197:8 226:7 229:25 244:2 350:9 395:20 412:3,8
**stated** 109:17 398:14
**statement** 42:15,17,19 63:16 111:9 118:9 121:7,22 123:16 124:15 124:22 141:24 142:6,15,16 143:7,21,23 144:6,11 145:4 183:11 214:14 218:5,9 222:7 231:8 235:9 241:8 244:11 244:13 247:11 250:22 274:7 277:7,15 298:3 302:13 320:25 349:19 377:20 378:9,11 380:10 383:15
**statements** 49:11 53:16 172:3 277:23 387:17
**states** 1:2 8:11 238:2,8 253:21 387:3
**static** 178:7
**statistical** 149:15,21 150:5 154:15 154:15 155:2 156:19 157:14 169:24 171:14 171:15 174:24 175:4 184:21 209:12 404:24 405:24
**statistically** 124:12 170:6 173:22 174:21 175:7 193:2,24 198:7 234:8 272:2
**statistics** 184:19 209:8
**status** 193:16
**stenographer** 336:16 340:14
**stenographic** 8:22
**step** 83:19
**stephanie** 2:9 14:12 217:2 376:15 413:1
**steps** 176:14 265:14
**steroidal** 284:24 292:2 294:8,11 295:15 297:24
**stew** 256:10
**stick** 129:15 155:23 158:10 210:17
**sticking** 160:18 179:9 224:6

**stimulate** 274:23 275:23
**stimulated** 380:4
**stimulates** 233:4
**stimulating** 378:19
**stimulation** 104:18 187:22
**stop** 202:17
**stopped** 229:20
**stopping** 173:9
**storm** 80:14 200:21 202:15 205:24 206:7
**story** 30:8 195:14
**straight** 118:9 185:21 340:16
**straighten** 146:5
**straightener** 157:15 158:12 160:3 161:3,11 393:16
**straighteners** 141:7,14 142:8 142:23 143:12 144:7 154:3 181:13 182:13 182:20 393:8 394:10 395:3
**straightening** 159:6,21 176:10
**straightens** 146:16
**straightforward** 231:22
**strategies** 81:14,23 387:3
**stratification** 194:11,12
**stratify** 193:15
**stream** 138:3,7 138:11 390:17 390:25 391:4,9 391:10 392:10 392:12
**streams** 136:8 137:25 389:24 390:5,8 400:24 401:4,20,23,25 402:8
**street** 1:18 2:6 2:17 3:4 4:19 5:5,14 8:16
**strength** 144:22 178:21 243:11 310:3 394:17
**strengths** 171:23
**stricter** 176:10
**strictly** 35:16
**strong** 134:22 158:11 209:20 210:23 284:25 291:25 294:7 394:9
**stronger** 24:5
**strongest** 37:14 394:13
**strongly** 352:22
**structural** 42:10
**structure** 24:17 90:20,21 399:25,25
**structured** 296:12 389:13
**students** 29:3 184:23
**studied** 271:25 287:4 311:20 322:10 341:7
**studies** 19:25 27:21 29:4 42:5,9 82:7,8 82:10 83:10,21 84:11 85:8,9 95:3,9 101:8 114:21 116:15 118:10 122:23 134:23 135:22 138:16,19,24 139:12,20 142:14 149:12 151:19,19 152:11,24 153:11 167:16 171:4 181:25 183:4 184:25 188:14 189:7 189:15,18,20 190:2,10 191:6 191:15,21 192:17,18,21 193:15 194:6 194:16,18,19 195:2 196:14 204:21 205:20 234:4 240:20 258:12 271:17 271:17,18 274:17 275:14 276:15,16,18 283:10 285:8 285:13,22 286:7,9 287:3 310:14,25 311:2,9,14,25 312:2 314:3 343:17 357:4 357:19 358:13 370:11 372:6 372:14 379:19 383:2 389:7 392:13 394:3,4 394:8
**study** 38:22 45:7 85:3 97:2 98:23 100:20

116:6 122:8,10 151:17,22,22 151:25 152:4 152:15 153:14 153:14,19 155:3 156:17 157:4,13 159:21 162:25 163:23 165:15 165:21 166:8 167:8,8,17,22 168:13,14,15 168:20 169:16 170:17 171:18 174:12 178:7 185:18 186:9 186:10,13,14 189:2 190:15 190:18 191:24 192:3 195:25 196:7 222:15 227:7 271:5,9 271:14 272:13 273:12 277:5 282:10,18,24 287:22 291:5 294:4 332:9 340:23 341:3 342:8,24 343:13,24 344:14,24 345:2,22 346:5 347:10,18 348:4,7,13,18 348:19 349:2,7 349:11,15 352:11 354:3 355:7 359:21 360:6 363:14 369:24 372:15 383:5 384:5 394:11

**study's** 154:9

**studying** 41:18

**stuff** 54:12

**subdivisions** 179:11

**subject** 311:24 398:18

**submitted** 338:21,23

**subscribed** 415:14

**substances** 275:17 333:7 334:10

**substantial** 288:19

**substantially** 176:2 291:23 291:24

**successful** 366:23

**sufficient** 151:10 152:5 153:17 155:14 156:18 157:2 222:12 234:8 315:18

**sufficiently** 123:7

**suggest** 175:15 176:20

**suggested** 178:12 293:18

**suggestion** 307:8

**suggests** 271:2 292:11 293:12

**suite** 3:5,20 4:6 4:12,21 5:15 5:22 6:6,21 7:13

**sum** 395:11

**summarize** 204:7 205:11 265:14

**summary** 201:12 203:13 213:5,6 264:16 293:25 294:2 295:12 336:18 336:25 339:3,8

**summate** 265:23 279:15 284:16

**summation** 284:13

**sunday** 25:15 25:19

**superimpose** 131:8

**superiority** 242:4

**superseding** 102:5

**supervision** 31:11 32:3

**support** 103:13 137:18 294:5 295:3,6 310:12 311:7,12 322:3 392:17 401:19 401:22

**supported** 137:24

**supporting** 138:2

**supports** 133:8 135:15 137:4,6 320:9 351:10

**supposed** 114:23 198:21

**sure** 14:15 15:21 31:19 32:22 35:25 36:10 41:13 45:10,25 55:8 56:6 58:4 61:12 64:19 80:17 83:18 89:13 91:11 95:14 99:11 111:22 112:4 113:19 117:16 118:5 120:15

126:9 136:13 146:6 153:12 157:6 158:9 168:25 186:6 190:16 202:8 215:24 216:8 235:24 236:2 238:7,7 245:7 246:24 247:20 249:5 252:24 262:14 266:25 268:19 289:8 292:21 293:7 302:8 304:2 333:12 335:22 337:14 339:24 370:17 371:11 376:2 406:11 408:4
**surprised** 72:18 327:25
**survival** 346:8 347:4,20 410:20
**susy** 237:13,18 409:24
**swear** 8:24
**switch** 388:9
**sworn** 9:3 412:11 415:14
**sydney** 6:8
**synergically** 257:15
**synergistically** 266:9
**synergy** 266:3
**system** 38:17 39:2 44:15 45:5 145:22 219:5 233:7 286:18 297:5 341:11,14 365:20 371:10 407:3
**systematic** 235:18 241:2 355:24
**systems** 5:12 31:20 44:12,13 44:17 101:10 219:8 224:2 328:13 371:9 373:6

**t**

**t** 8:25,25 414:3 414:3
**table** 127:24 198:16 300:20 342:14,17 343:6 355:4
**take** 16:4 61:11 85:21 105:9 125:12 143:23 146:8 158:25 174:6 179:3 199:7,9,23 207:19 231:20 241:15 252:22 273:5 279:25 280:8,16 286:11 292:18 293:6 298:8 299:19 324:8 326:18 332:17 333:25 339:2 347:7 375:25 378:24 379:13 379:14 381:9 383:14 384:16 385:3 398:20
**taken** 61:17 103:3 133:5 200:6 204:4 253:5 297:17 298:16 332:22 336:2 376:7 387:13 399:2
**takes** 374:2
**talk** 21:10 46:3 80:4 83:19 94:14 101:7,8 127:10 131:24 146:2 147:5 162:18 163:23 165:8 196:11 200:15 210:20 220:2 221:8 224:3 225:18 244:4 259:6 264:4 316:6 327:4,13 328:24,25 376:21 383:3 396:24 406:21
**talked** 21:13 56:25 63:8 80:15 307:23 319:15 367:5 373:3
**talking** 61:23 91:21 123:18 137:18 147:16 155:20,24 162:3 165:15 178:11 179:12 183:14,16,23 184:13 190:19 196:2,6,15,21 221:12 225:19 228:21 240:16 272:17 315:20 316:7 320:5 330:23,23 331:15,16 340:23 350:24 364:15 370:12 373:23 374:18 406:22,25
**talks** 52:13 117:2 124:16 124:20 207:23 212:2
**tamoxifen** 66:20 69:11

Case: 1:23-cv-00818 Document #: 1828-20 Filed: 05/05/26 Page 503 of 518 PageID #:77276



70:22,25
**tangled** 131:5
**taped** 11:21
**tardy** 6:4
**target** 52:10,18 161:12
**task** 282:13
**taught** 28:19 28:23
**tax** 369:8
**tcdd** 271:7 272:7
**td** 272:7
**tdi** 367:17
**teach** 184:23,24
**technical** 223:14 230:12 336:18,25 368:25 369:9 369:12
**technique** 87:10 89:15 90:9,22 93:22
**techniques** 141:22
**teenager** 75:14
**teeny** 325:16,17
**tell** 13:20 36:8 54:12 62:14 69:17 96:4 109:23 133:23 201:13 231:10 390:4 391:3 392:11
**telling** 62:6 102:8 230:7 324:14
**ten** 33:16,17 52:14 122:19 153:10,14 192:3 250:9 298:9 302:4,7 353:2,3 371:12 371:12,14,19 371:20,21 384:20
**terasaki** 340:9 340:24 341:7 410:17
**term** 80:21 184:4
**terminated** 16:3
**terms** 32:21 34:2 37:21 81:14,24 82:22 83:6 96:10 99:5 101:9 194:20 202:9 252:10 261:19 262:10 288:2 294:15 297:5 310:3 313:16 315:16 319:16 322:25 329:12 358:16 381:2 382:11 389:13 389:16 395:12
397:15 400:7 401:8
**test** 39:10 59:19 87:11,12 89:16,17 101:10 174:15 371:9,10
**tested** 287:22 348:13 353:9 354:24 370:3
**testified** 9:5 16:23 31:2 108:16 339:6 389:7
**testify** 11:5 16:4,16 25:12
**testimony** 10:11 15:16 17:8,14,20 22:7 43:8 64:20 75:8 77:14 78:4 84:22,25 102:8 140:11 144:16 145:13 217:23 221:7 226:6 317:9 354:20 375:16 398:14 406:18 408:14 412:12 413:9 413:17 415:8
**testing** 29:24 114:21 115:19 239:10 366:4
**text** 88:8 381:21
**thank** 13:5 34:15 47:15 105:7,9 107:5 110:11,15 127:21 129:12 163:17 169:10 180:4 185:9 199:25 205:3,8 216:25 225:6 267:21 287:19 293:8 347:8 354:11 382:24 408:8,9,10,11
**theoretical** 22:15 23:5 24:2 38:13 74:9 75:10 94:22 96:7 99:18 123:24 129:3 156:11 157:7 166:2 183:15 197:20 323:20 330:20
**theoretically** 50:2 129:24 130:24 402:5
**theories** 241:23 242:24
**theory** 103:13 187:19 200:16 200:18 201:13 202:13 204:3,8

205:11 206:19 208:9,20 220:22 221:9 221:15,20 222:8 242:4 243:18 256:20 257:11 261:17 262:9 310:4 328:20 329:22 330:18 331:22 331:25 343:14 344:7 350:17 356:5,13 357:14 358:9 370:18 375:5 375:17 380:20 388:6 392:17 401:17

**thing** 11:7 24:5 36:20 59:19 116:10 131:14 134:2 146:24 175:5 178:7 188:7 222:22 222:25 229:23 241:12 265:17 286:19 343:17 350:23 351:3 362:3,3 364:22 369:10,12 405:18,21 406:25

**things** 11:9 14:22 33:19 35:14 36:14,25 37:24 42:12 50:8 70:18 72:20 99:10,12 111:13 121:14 124:3 127:9 142:7 145:20 171:12 172:5 183:24 225:14 228:17 264:10 276:13 296:2 297:17 305:6 337:16 344:23 350:7 393:20 397:14 403:10

**think** 9:17 14:3 14:5 17:22 19:14 20:10 21:22,23 22:19 23:24 24:3,9 26:19 28:15 29:4 31:13 35:11,11 36:3 38:11 39:12 41:22 44:6,18 47:10,16 50:2 51:5,15 52:2 57:6 58:14,21 60:2 62:8 63:13,13 64:13 64:18 66:14,14 66:15 67:23,23 68:20 69:22,24 69:24 70:2,15 71:12,20 72:8 73:12,23 74:21 75:18 78:23 79:6 83:8 84:7 94:10,23 97:18 99:6,9 100:15 109:15 110:17 116:6,23 120:14 127:20 127:20 129:7 131:16,17,18 131:20 133:21 137:11 142:2 143:2 146:25 147:18,24 151:16,20 152:10,22,23 153:10,13,17 156:12 157:20 158:7 160:11 160:15 166:6 170:19,20 171:18 172:24 174:5 178:7,10 179:7,14 185:11 189:19 189:20 192:10 193:8 194:15 199:2 201:11 201:11 202:5 204:9,14 207:9 208:14 213:4 220:23 221:18 222:9,13,14 224:13 225:3 226:25 227:17 228:2 229:3 231:3,23 233:24 235:9 243:10 244:13 246:10 249:19 250:3 255:7 256:4 257:25 258:4 260:21 261:6 262:18 266:6,14 268:8 269:11 273:6 273:17 276:24 277:10 279:17 281:13,14 283:23,25 293:21 296:3 296:10,20 301:2 304:18 310:9,10 315:22 316:18 316:22 318:14 319:24 323:5,7 323:11,20 324:6 326:3,21 327:6 328:15 329:8 331:12 332:12 343:16 348:17 367:2,3 367:9,15 370:3 371:7 375:4 382:14 400:6 401:8,13

**thinking** 24:12 24:15 51:10 59:21 73:10 76:14 240:8 261:25 286:13 301:7,9 322:5
**third** 106:22 123:3 138:11 166:19 288:6 288:10 291:20 292:25 349:22 371:12,19 377:21 390:25 391:3
**thirteen** 278:16
**thomas** 1:15 8:8 11:24 16:11 409:3,9 409:10 412:9 413:5 414:2,24 415:2,4,12
**thought** 22:21 24:17,18 54:11 106:12 126:11
**thoughts** 316:8
**thousand** 219:19 289:3 289:14,19 290:10 308:7 361:17 362:16 362:22 371:20
**three** 82:18 114:7,8 135:21 234:7 238:12 271:25 341:22 341:23 344:14 344:15 348:11 354:13
**threshold** 23:7 222:3,24 223:8 223:13,14,16 224:7,18,20 227:7,15 228:4 228:15,19 229:6,8,15 239:4,9 242:10 249:22,24 251:11 280:4 280:11 289:25 290:5
**thresholds** 22:15 23:18 24:2,3,8,13,18 24:19 220:4 221:25 223:2 225:9 226:2,4 226:13,16,18 227:21 228:24 230:9 237:19 241:24 242:11 242:16,25 243:14,19 244:3,4 257:7 316:7 317:4
**throw** 372:18 372:25 373:21
**throwing** 374:13
**thrown** 227:17 373:7
**thyroid** 10:2 17:10,15,17 31:20 37:7,9 37:17 38:17,25 39:21,22 40:2 40:7 42:7,23 43:2,3,19,23 44:3,4,13 45:13,14 48:5 48:8,18 76:20
**till** 28:14
**time** 8:4 9:12 9:15 11:8 14:19 16:22 61:14,20 102:24 103:6 164:17 200:3,9 221:12 253:2,8 255:17 298:13 298:19 314:16 332:19,25 333:25 335:23 336:9 354:7,19 367:6 369:15 373:25 374:3 374:25 375:19 376:4,10 397:12 398:23 399:5 408:15 408:17 413:18
**timeframe** 413:8
**times** 11:11 25:11 53:14 93:25 153:4 157:19 196:9 227:24 229:2 235:16 289:3 289:14 290:10 327:8 361:23 361:24 362:22 367:4 371:22 374:9 375:9
**timing** 147:20 225:13
**tiny** 325:17,24
**tissue** 53:13 54:2,15,23 55:22 56:8,14 56:19,22 66:10 66:21 67:4,5 67:21,22 68:5 68:13,14 69:2 71:8,13 215:19 218:9 219:5,6 227:10 291:2 317:20 319:20 330:17 331:4
**tissues** 53:10 53:21 54:4,7 54:17,18,25 55:23,25 56:9 56:12,17 66:24 69:10,20,23,25 70:8 114:16 115:12 117:23

120:10,25 123:15 228:7,8 257:24 263:2 264:8 285:3 290:14,22,25 292:15 328:14 328:18 329:17 331:9 356:3
**title** 23:17 82:21 186:8,10 186:15 239:4 384:20 396:12
**titled** 122:19 340:6 347:2 351:19 410:14 410:18,21
**titus** 4:14,14
**today** 10:11 11:6 22:7 24:23 25:13 65:14 113:23 151:21 153:16 156:25 200:20 213:16 221:12 286:23 383:9 394:5 398:10
**today's** 398:13 408:14
**toddler** 35:9
**together** 50:8 70:18 118:16 261:8 281:10 386:15 400:2
**told** 184:22
**tolerated** 115:20 116:5
**tom** 13:4 34:9 41:6 47:10 48:13 51:16 55:14 74:8 75:9 76:5 77:15 91:19 121:10 127:6 128:18 143:20 144:18 145:15 147:8 153:5 169:12,14 181:7 201:18 238:20 292:20 320:21 326:3
**tone** 374:4
**took** 13:13 153:11 165:6 179:6 236:23
**tool** 223:11
**top** 35:10 123:4 167:4 214:20 291:20 292:25
**topic** 23:22 82:13 85:16,22 85:25 188:15 219:22
**topics** 14:24 22:23 81:25 83:25 393:9
**total** 351:10
**totality** 145:2 194:6 338:22
**touched** 94:17
**touching** 119:19
**tough** 293:19
**toward** 123:4 169:6 176:14 189:22 190:3 260:3
**towards** 159:2 246:14 247:16
**toxic** 13:8 141:7,13,20 142:6 143:3 144:8,20 145:10 254:23 256:10 333:7 334:10 387:8
**toxicity** 30:22 221:17,19 236:19 239:10 242:9 243:9 251:11 316:23 365:22,23 400:4
**toxicological** 116:15
**toxicologists** 366:7
**toxicology** 30:7 30:9,16,18,20 31:5 34:25 138:16 239:21 240:6,20 241:20 252:8 366:21 367:20 392:12
**toxins** 316:18
**track** 163:12
**tracks** 202:6
**traditional** 316:17,18 387:4
**traditionally** 221:19
**training** 26:21 27:11 30:7
**transcript** 224:14 381:15 413:6,19 415:5 415:8
**transcriptional** 351:23 410:25
**transformation** 253:25
**transition** 212:11
**translate** 93:18 95:21 329:6 364:16
**transport** 219:5,8
**transported** 356:3
**traps** 29:7
**treated** 9:25

**treatment** 24:8
**tree** 247:22 248:2
**trial** 16:5,16,24 17:5
**triazine** 271:4 272:7
**trichlorothane** 275:9
**tricky** 58:22
**tried** 22:8 54:10 183:8 204:11 205:12 235:5 366:18 368:8 408:3
**trigger** 47:19
**trillionth** 325:21
**trites** 271:21
**trivial** 194:18 366:17
**true** 25:8 34:8 35:25 36:2 37:4 50:16,18 50:19,20 53:11 53:17 57:7,10 57:20 60:20 66:6,16 68:22 69:22 72:9 77:2,4 92:23 92:24 96:13,14 100:13 111:13 122:5,6 123:25 134:3 150:5 151:11 152:5 152:25 154:14 154:15,25 156:18 157:14 161:19 164:25 173:3 191:19 192:3,5 194:23 197:21 219:5 244:11,14 245:21 249:19 253:16 257:19 257:24 258:14 258:21 262:16 273:4 282:14 283:11 287:6 301:3,16 303:19 305:23 307:13 313:13 320:20 349:4 365:6 368:20 374:8,20 382:8 403:3 404:18 406:5 412:12 415:8
**truly** 182:14 284:13 330:24
**truth** 13:20 53:8
**truthfully** 10:25
**try** 41:14 47:13 102:3 124:3 125:20 188:6 195:12 221:2 266:19 338:7 346:22 358:24 403:8
**trying** 39:18 46:20 57:6 58:14 60:2 64:15 79:3 84:24,25 115:5 118:10 149:21 260:8 262:7 286:5 296:10 308:15,18 334:3 339:13 355:3 373:11 400:8 405:2
**tsca** 336:18 337:5
**tube** 215:20 218:17 229:4
**tubes** 214:6 215:3,10,11 216:11,12,22 217:18 218:2 218:11,14,23 382:3,10
**tuesday** 8:5
**tumor** 270:22 377:24 378:13
**tumorigenic** 322:20
**tumors** 270:20 271:8 313:17 313:20 320:9 377:22 378:12
**turn** 13:7 274:11 293:21 294:2 361:14 377:14 385:24 389:21 393:2,2 396:5,6
**turns** 21:14
**twenty** 9:14
**two** 14:18 35:13 36:13,17 42:12 44:12 50:8 62:11 66:23 82:18 93:7,8,8 106:18 116:4 124:3,9 150:9 166:24 167:16 172:4 192:18 192:21 194:16 199:6 207:2 241:22 242:24 267:15 285:21 286:6 292:7 311:14 319:24 327:21,21 342:9 344:16 344:23 347:7 356:20 360:3 366:6 373:10 375:25 405:18
**type** 162:2 176:15 181:19 206:20 207:20 207:21,23

208:5,10,12,15 208:20,21 209:3,9,13,13 270:15 298:23 299:13,21 300:8 357:25 363:22 383:17 394:17
**types** 357:5 358:21
**typo** 109:3

**u**

**u.s.** 30:10 164:5 180:23,24 181:10 182:6 235:20 255:23
**ubiquitous** 255:12
**uh** 20:5 62:5,9 69:14 84:2 104:25 106:21 107:16 141:2 148:9 207:24
**ultimate** 239:25
**ultimately** 126:25 128:4 349:15
**umass** 15:7,9 28:23 30:18
**unable** 294:6 295:5
**uncalled** 179:14
**uncertain** 99:14
**uncertainties** 99:19 103:10 242:7 373:10
**uncertainty** 87:2 94:15,16 95:19 96:13,25 97:22,25 98:21 99:7,8 100:2,6 100:14,18,25 101:12 102:9 179:14 183:9
**under** 31:11 32:3 34:19,21 52:16,18 53:14 58:11 73:3 74:3 75:3 82:13 147:25 148:12 229:11 333:6 334:15 337:5 338:14 349:21 358:19 364:6 379:15 387:2 394:4 396:7,16
**underestimati...** 387:12
**undergo** 33:20
**underlying** 284:18
**understand** 10:13,18,24 23:19 34:3 38:23 43:16 45:11 60:16,21 63:4 64:20 74:24 79:4 84:5,25 85:5 90:5 93:13,13 94:3 99:24 101:16 102:7 103:9 104:2 112:4 113:20 116:22 124:15 130:7 136:23 140:2 144:5 145:6 146:7,12 147:3,4 149:22 152:20 154:20 182:5 200:17 202:2,13 216:18 217:22 225:23 226:10 230:6 232:19 233:14 239:24 247:7 249:5 255:2,9 273:2 286:6 290:6 303:18 317:10 320:15 321:24 322:16 339:4 339:14 345:19 357:14 361:21 374:6,12 388:19 400:9 401:16 405:12 406:11,25
**understandable** 11:11
**understanding** 19:9 28:25 62:14,16 68:2 68:23 77:6 95:15 138:18 139:12 148:20 151:8 152:3 208:19 209:6 209:15 213:15 215:18,23 216:19 227:19 248:13 257:9 262:7 277:20 281:11 304:3 304:12,20 315:24 343:13 350:15 362:19 363:3 375:15 381:13 406:12
**understood** 10:22 173:7 321:23
**underway** 285:9
**undetectable** 285:8,18
**unep** 61:2
**unequivocally** 38:15

**unhook** 213:23
**union** 366:13
**unique** 242:6
**unit** 8:6 11:8 325:9
**united** 1:2 8:11
**units** 358:24
**universal** 304:23
**university** 28:12,14
**unknown** 164:10,20
**unquote** 87:6 162:14,20
**untested** 240:23
**upper** 106:20
**use** 22:12 26:25 58:12 73:3,13 74:4 75:4 80:21 90:21 97:24 100:8 114:22 116:20 132:19 133:9 134:4 135:9 136:6 139:25 146:23 149:9 149:25 154:17 157:16 158:13 159:22 160:3 161:3,9,12 164:3,9,19 167:9,12 168:13,16 169:18 173:23 175:16 179:19 181:13,17 182:20 183:22 184:11 185:22 186:11 187:16 188:13,20 189:3,8,16 190:11,24 191:7 193:3,25 219:16 240:20 243:7 251:9 252:17 253:23 254:17 263:3 263:18 267:2 322:24 326:12 329:2 330:3 331:13 338:14 362:15 363:11 371:7 373:25 374:7 393:16 404:12 407:7 407:22
**used** 17:12 81:4 87:7,11 89:16 90:9 155:10 162:4 175:20 188:10 228:10 241:19 261:9 275:2 301:13 302:23 303:16 304:23 305:16 305:22 319:18 319:19 334:18 344:2 348:4,6 374:9 386:15 389:12 400:3 413:19
**useful** 301:9
**user** 145:9 256:11
**uses** 369:4
**using** 27:15,21 92:5 104:3 141:22 159:6 176:20 184:4 229:21 334:19 362:6
**usually** 339:23 384:9
**uterine** 32:5 49:15,21 50:6 50:11,13 71:17 71:22 75:25 77:9 78:7,10 78:15 79:20 80:9 81:15 82:9,23 116:17 132:20 133:10 134:4,25 135:11,19 137:16 138:8 141:15 142:9 142:24 143:13 145:19 149:9 150:2,11 153:21 154:17 155:21 156:8 156:21 157:16 158:13 159:7 159:23 161:5 161:10,14 162:15,21 164:9,20 166:8 167:10,13 169:19 175:17 175:25 176:5 179:20 187:2 191:20 192:6 192:15,18 201:7 203:10 204:19 205:18 206:16 207:16 207:19 209:2 209:19,22 210:21 211:2 211:16 214:12 214:24 215:19 216:6,20 218:9 228:16 257:23 263:2 306:6,25 307:24 313:12 313:20 321:22 328:4 329:16 330:16 331:9 378:22 380:24 390:13,18 393:16 394:10 394:21 395:4 395:19 397:23 398:4 407:19

**uterotrophic** 229:12
**uterus** 66:22 227:9,12 252:16 329:23 356:8 357:18 358:3 375:7 395:7
**utilizing** 304:24 305:18
**uv** 205:25 275:2 352:13

**v**

**v** 23:14 413:4 414:1 415:1
**vague** 387:23
**vaguely** 186:3 268:5 347:25
**valid** 24:7 92:14
**validity** 93:22
**valley** 16:20 17:11
**valuable** 400:2
**variability** 190:6 191:16
**variable** 190:5
**variation** 248:2
**variety** 182:4 215:21
**various** 33:24 249:9 367:5
**vast** 207:16,18 207:21 208:11
**vein** 300:4
**verbiage** 275:13
**verify** 413:9
**veritext** 8:20 413:14,23
**veritext.com.** 413:15
**version** 20:22 20:23,24 21:5 238:9
**versus** 386:21
**video** 8:7 11:21
**videographer** 7:24 8:2,18 61:13,20 102:23 103:6 199:23 200:3,9 252:25 253:8 298:12,19 332:18,25 335:20,23 336:9 354:9 369:17 375:2 375:22 376:3 376:10 398:22 399:5 408:13
**videotaped** 1:14
**view** 38:10 99:17 109:9 129:4,6 131:12 145:6 151:14 154:12,23 157:12 164:16 178:6 187:2 194:5 209:18 210:21 212:13 212:23 213:17 232:2 241:21 243:17 250:6 277:25 350:13 365:21 368:18 389:12 406:13
**viewed** 365:21
**views** 118:11 233:14 251:10 400:5
**visualize** 300:16
**vitro** 58:19,24 59:15,18,23 94:18,23 95:21 224:2 257:8 274:18,20 276:16,18,25 282:18 296:12 310:15 311:10 311:15 364:16 372:6,13,13 379:19 380:2 380:11 392:18
**vivo** 58:20 59:20 95:22 224:2 286:13 364:17
**voelker** 4:18
**voice** 11:10 270:5
**vom** 23:11
**vulnerable** 70:3 367:9

**w**

**w** 23:15
**wacker** 4:5 6:5
**wade** 23:12,14
**wait** 51:14,14 125:17 152:18 166:12 170:11 170:14 260:17 369:2
**walking** 35:6
**want** 38:12 45:9,23 46:2 51:18 58:4 72:22 88:10 90:5 95:14 97:9,11,14,24 104:22 113:11 113:19 117:16 118:3 121:2 141:19 146:6,8 163:12 189:23 189:23 197:4 202:8 245:7 261:5 309:15 314:8 346:18 366:24,25 406:10

**wanted** 65:18
**wants** 267:17
**warranted** 159:23 160:23
**watch** 125:20
**water** 86:20 253:13
**way** 23:23 24:11,18 35:11 39:10 49:20 54:10 64:13,16 73:17 78:21 83:5 89:8 91:3 92:4 99:6,21 109:24 113:15 118:17 126:19 127:23 137:20 139:15 145:16 156:24 157:21 179:8 188:2 199:3 205:5,11 208:17 215:24 221:18 222:9 234:23 240:8 258:16 264:10 279:24 300:15 302:9 316:20 316:22 321:23 322:4 323:4,12 349:13 351:12 358:25 362:25 369:13 371:14 373:22 384:11 393:25 399:25 407:6 412:16
**ways** 95:4,6 351:15 364:4 375:12
**we've** 37:24 55:6 56:24 93:11 178:10 199:5 210:19 240:14,15 373:3 383:9
**weak** 285:4,14 294:5 297:5,6 297:13,22 360:14 361:6 370:3,8 371:7
**weakly** 370:19
**weakness** 172:15
**weaknesses** 154:9 171:23 171:24
**weapons** 17:12
**week** 22:18
**weigh** 136:9
**weight** 116:3 116:17 133:7 135:14,25 136:4,5,14,19 137:3 222:21 228:16 251:16 329:10 399:13 400:10 401:3,5
**welshons** 23:12 23:15
**went** 61:22 202:2,2 262:19 312:4 367:3
**west** 3:4 4:11 5:14
**whereof** 412:18
**white** 149:24 155:19 169:20 176:4 180:13 180:18 182:11 191:25 198:9 383:4 409:19
**wideikis** 4:4
**widely** 87:7 175:19 334:18
**wider** 182:4
**widespread** 161:9
**wiedner** 3:10
**willy** 89:25
**wilmington** 7:14
**win** 250:18
**winnowing** 83:20
**wish** 27:8
**wisniewski** 6:8
**withdraw** 51:19 110:8,9 110:12 221:3 263:25 281:18 314:6,10 355:9 382:18,22
**withdrawing** 177:13,14
**withdrawn** 291:3
**witness** 8:24 9:2 10:4 13:2 15:10,21 17:22 34:11,14,16 43:7 46:11,14 48:15 55:15,19 82:4 114:4 122:11 125:10 125:19,23 156:4 169:15 174:11 181:8 213:6,8 230:18 236:6 238:22 239:2 244:23 246:21 254:6 264:18 288:9 293:10 324:21 337:21,24 354:16 398:18 409:3 412:10 412:13,18 413:8,10,12,18
**witness's** 75:7 77:13 84:21 140:10 406:17
**wmlaw.com** 3:14
**woman** 9:24 233:3

**women** 72:5 160:2 161:2,23 162:6 164:4 165:22 167:14 169:21,22,23 170:8 172:21 173:23 174:20 175:18,21 176:3,4,23 177:20,20,21 178:3,14,18,23 182:7 188:11 193:14 198:9 198:12 263:18 270:16 271:9 292:5
**women's** 167:22 168:15 186:12
**word** 47:18 88:21 107:19 158:24 174:6 183:22 184:12 292:19 345:6 371:7 407:7
**wording** 67:13 72:24 132:14
**words** 38:6 40:16 42:18 43:10 46:6 82:20,20,23 97:24 109:3 120:4 166:25 176:20 196:19 238:14 288:23 376:24 381:18 383:16 389:3 407:22
**work** 14:8,25 15:10 18:11 31:20 38:11 39:8,13 42:5 44:7 48:24 81:6 84:14,17 96:9 124:2 221:25 223:3 272:24 372:24 397:10
**worked** 137:21 183:7
**workers** 334:12
**working** 14:11 14:15,17 31:10 32:2
**works** 399:25
**world** 29:12 34:21 62:8,17 124:10
**worldwide** 6:3 270:14
**worried** 321:16 321:19
**worry** 251:15
**worse** 257:5
**wrapping** 392:9
**wright** 7:11
**write** 14:22 18:7 86:24 132:4,13 133:5 135:14 148:17 164:3 167:7 175:14 186:25 188:8 209:18 210:24 211:17 220:5 239:18 249:20 278:25 279:12 280:9 282:4 288:7 291:21 293:24 300:15 306:19 352:21
**writes** 239:6 241:17 284:22
**writing** 16:17 37:16 38:2 124:8 164:17 188:19 222:5 372:20 388:23
**written** 23:11 105:20 108:23 190:22,25 280:16 390:9 399:18 408:3 409:12
**wrong** 63:12 171:19 346:22
**wrote** 22:9 39:18 108:17 109:2 113:10 203:15 204:10 229:23 234:22 247:23 341:6 367:20

**x**

**xenoestrogen** 361:12 362:23
**xenoestrogens** 285:5,15 294:6 295:5 297:4,22 360:14 361:7 361:14,18,22 362:5,11,20

**y**

**y** 236:12
**yeah** 9:14 11:19 12:9 13:2 14:18 15:14 16:20,25 20:3 21:6 22:11 25:8,11 29:20 34:6,16 34:16 41:7 42:21 44:18 45:21 46:17,25 48:7 53:8 55:19 56:2,13 57:2 58:16 61:12 64:17 68:16 72:16 73:16,23 75:17 76:6 86:16 94:3,10,12 95:16 97:23

98:7,20 105:12 109:19 112:11 112:25 113:13 118:4 119:3,6 119:14 120:17 122:11 123:24 125:15 129:17 130:7 132:8 133:13 139:4 139:15 140:13 147:18,21 154:20 161:17 162:8 165:5 167:2 169:3,15 177:24 179:2 183:21 185:5 187:17 199:10 199:10 201:10 201:25,25 202:11 204:9 207:6,13 213:20 216:4 224:5 225:3,10 225:22 226:22 226:23,24,24 229:14 230:18 233:13 237:3 239:2 244:18 244:23 250:17 254:10 255:21 257:3 258:15 259:15 260:10 260:12 269:8 269:13,16,16 270:3,6,6 273:18 277:21 282:22 286:3 288:4 289:20 289:23 291:16 291:17 292:24 295:14 298:6 302:20 314:14 315:4,6,10 325:9,14 329:18 330:2 335:22 337:11 338:6 343:18 346:20 361:4 371:16 374:11 375:11 379:9 399:11 402:3 402:13 403:4 403:14 405:2 407:6

**year** 30:11 138:24 153:14 165:5 168:14 192:3 333:4 374:10

**years** 9:14 13:11,25 15:13 15:15 17:3 18:23 27:13,17 75:15 109:8 113:10 122:19 151:23 152:16 153:12 154:21 326:25 384:20 397:10 399:20

**yeast** 296:14 341:11 343:19 362:15 364:2,2 364:11,24 365:9

**yep** 97:19 268:10,10 279:4

**yesterday** 25:7 25:23

**york** 1:19,19 2:8 3:6,6 5:23 5:23 6:13,13 7:7,7 8:16,16 9:5 28:14 412:3,8

**z**

**z** 8:25

**zero** 116:4 240:23 249:24 251:5 327:5,5 331:15

**zeros** 327:8

**ziv** 346:5 347:11

**zoeller** 1:15 8:1 8:8 9:1,9 10:1 11:1,4,22,24,25 12:1,3 13:1,6 14:1 15:1,4 16:1,11,12 17:1,25 18:1 19:1 20:1,21 21:1 22:1 23:1 24:1 25:1 26:1 26:14 27:1 28:1 29:1 30:1 31:1 32:1,15 33:1 34:1 35:1 36:1 37:1,5 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 46:21 47:1 48:1 49:1,10 50:1 51:1,22 52:1 53:1 54:1 55:1,18 56:1 57:1 58:1 59:1 60:1 61:1,22 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1,3,13 79:1 80:1 81:1 82:1,6 83:1 84:1,23 85:1 86:1,22 87:1 88:1 89:1 90:1 91:1,6 92:1 93:1 94:1,14 95:1 96:1 97:1 98:1,8,17,20 99:1 100:1

| | | | |
|---|---|---|---|
| 101:1 102:1 103:1,8 104:1 104:7 105:1,20 105:21,23 106:1 107:1 108:1,4 109:1 110:1 111:1 112:1 113:1 114:1,11 115:1 116:1 117:1 118:1 119:1 120:1,5 121:1 122:1,14,16 123:1 124:1 125:1,25 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1,19 139:1,4 140:1 140:22,24 141:1 142:1 143:1,18 144:1 145:1 146:1 147:1 148:1 149:1 150:1,19 150:21 151:1,9 152:1 153:1,18 154:1,12 155:1 156:1 157:1 158:1 159:1 160:1 161:1 | 162:1 163:1,20 163:22 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1,2 172:1 172:13 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1,15,17 181:1 182:1 183:1 184:1 185:1,15,17 186:1,20 187:1 188:1 189:1 190:1 191:1,19 192:1 193:1,11 194:1 195:1 196:1 197:1 198:1 199:1 200:1,12 201:1 202:1,6 203:1 204:1 205:1,9 206:1,19 207:1 208:1 209:1 210:1 211:1 212:1,22 213:1 214:1,3 215:1 216:1 217:1,7 217:9 218:1 219:1,12 220:1 221:1 222:1,22 223:1 224:1 | 225:1,8 226:1 227:1,20 228:1 229:1 230:1 231:1 232:1,8 232:24 233:1 234:1 235:1,17 236:1 237:1,15 237:17 238:1 239:1 240:1 241:1,16 242:1 243:1,15 244:1 245:1,13 246:1 247:1 248:1 249:1 250:1 251:1 252:1,7 253:1,10 254:1 255:1,22 256:1 257:1 258:1 259:1 260:1 261:1,16 262:1 263:1,13 264:1 264:20 265:1,4 266:1 267:1,7 267:22 268:1,8 269:1,19 270:1 271:1 272:1 273:1,14,24 274:1,2 275:1 276:1 277:1 278:1,12,14 279:1,10 280:1 281:1 282:1 283:1,9 284:1 285:1 286:1,6 | 287:1,12,14 288:1 289:1 290:1 291:1,19 292:1 293:1,11 294:1 295:1 296:1 297:1 298:1,21 299:1 300:1,14 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1,2 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,22 319:1 320:1,12 321:1 322:1,8,22 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1,3,18,20 334:1 335:1 336:1,7,14 337:1,9 338:1 339:1,13 340:1 340:10,21 341:1 342:1,23 343:1 344:1 345:1 346:1,4 346:24 347:1,5 |

347:9,24 348:1
349:1,20 350:1
351:1,24 352:1
352:4 353:1,22
354:1 355:1
356:1 357:1
358:1 359:1,17
359:20 360:1
361:1 362:1
363:1 364:1
365:1,14 366:1
367:1,12 368:1
368:19 369:1
369:19 370:1
371:1 372:1
373:1 374:1
375:1 376:1,14
377:1,15 378:1
379:1 380:1
381:1,11 382:1
383:1 384:1
385:1 386:1
387:1 388:1,17
389:1 390:1
391:1 392:1
393:1,6 394:1
395:1 396:1
397:1 398:1
399:1,8 400:1
401:1 402:1
403:1 404:1
405:1 406:1
407:1 408:1
409:1,3,9,10,13
410:1 411:1
412:1,9 413:5
414:2,24 415:2
415:4,12

**zoeller's** 16:8
145:12 231:21
388:12

**zoom** 2:12,14
3:17 4:8,23 5:8
5:17,24 6:8,14
6:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.