# Exhibit 29

EXHIBIT
4 ADAMS-CAMPBELL 3/25/26 dv
exhibitsticker.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: HAIR RELAXER MARKETING SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | **MDL No. 3060**<br><br>Case No. 1:23-cv-00818<br><br>Honorable Mary M. Rowland<br><br>**This document relates to: All Cases** |

**EXPERT REPORT OF LUCILE L. ADAMS-CAMPBELL, PH.D.**

I. Background and Qualifications ..... 1
II. Summary of My Opinions ..... 2
III. What are Chemical Hair Relaxers? ..... 3
IV. Cancer Background ..... 3
A. What is Cancer? ..... 3
B. Ovarian Cancer ..... 4
C. Risk Factors for Ovarian Cancer ..... 5
i. Age ..... 6
ii. Obesity ..... 6
iii. Hormone Replacement Therapy ..... 6
iv. Family History of Cancer ..... 6
v. Personal History of Breast Cancer ..... 7
vi. Endometriosis ..... 7
vii. Other Suggested Risk Factors ..... 7
viii. Protective Factors ..... 7
D. Uterine Cancer ..... 7
E. Risk Factors for Uterine Cancer ..... 8
i. Age ..... 8
ii. Early Menarche ..... 8
iii. Hormone Replacement Therapy (HRT) ..... 9
iv. Nulliparity ..... 9
v. Obesity ..... 9
vi. Metabolic Syndrome ..... 9
vii. Pelvic Radiation ..... 9
viii. Genetic Conditions ..... 9
V. Methodological Approach to Causation ..... 10
A. Cohort Studies ..... 10
B. Case-Control Studies ..... 11
C. Interpretation of Epidemiological Studies ..... 11
D. Evaluation of Chance (Statistical Significance) ..... 11
E. Confounding ..... 13
F. Bias ..... 13
i. Selection Bias ..... 14
ii. Information Bias (Misclassification Bias) ..... 14
iii. Additional Forms of Bias ..... 14

iv. Mitigating Bias ..... 15

G. Causation Methodology ..... 15

H. Bradford-Hill Criteria ..... 16

VI. Hair Relaxers and Cancer ..... 18

A. Ovarian Cancer and Chemical Hair Relaxers ..... 19

i. White et al., 2021 ..... 19

B. Uterine Cancer and Chemical Hair Relaxers ..... 22

i. Chang et al., 2022 ..... 22

ii. Bertrand et al., 2023 ..... 24

C. Concluding Remarks ..... 28

VII. Hypothesized Carcinogenic Mechanisms of Hair Relaxers ..... 29

VIII. Analysis of Bradford Hill Criteria ..... 30

A. Ovarian Cancer ..... 30

i. Strength: ..... 30

ii. Consistency: ..... 31

iii. Temporality: ..... 31

iv. Biological gradient: ..... 31

v. Specificity: ..... 31

vi. Plausibility: ..... 31

vii. Coherence: ..... 32

viii. Experiment: ..... 32

ix. Analogy: ..... 32

B. Uterine Cancer ..... 32

i. Strength: ..... 32

ii. Consistency: ..... 33

iii. Temporality: ..... 33

iv. Biological Gradient: ..... 33

v. Specificity: ..... 34

vi. Plausibility: ..... 34

vii. Coherence: ..... 34

viii. Experiment: ..... 34

ix. Analogy: ..... 34

IX. Conclusions ..... 34

X. Rebuttal to Reports by Drs. Gerstman and Cote ..... 35

XI. Appendices ..... a

A. Table - Uterine Cancer and Chemical Hair Relaxers ..................................................... a
B. Table - Ovarian Cancer and Chemical Hair Relaxers ..................................................... f
XII. References ..................................................................................................................... h

## I. Background and Qualifications

As my Curriculum Vitae will provide in more detail, I am currently a Distinguished University Professor of Oncology and tenured Professor at Lombardi Comprehensive Cancer Center, Georgetown University Medical Center. I am also the Associate Director of Health Disparities Research and Senior Associate Dean, Community Outreach and Engagement at Georgetown University Medical Center. Prior to joining Georgetown University, I served in roles that included being a Senior Research Scientist at New England Research Institute and Director of the Public Health Careers Opportunity Program at the University of Pittsburgh. For 18 years I worked at Howard University, and for 13 of which I served as the Director of Howard University Cancer Center. Other leadership positions that I have held at Howard University include the following: Associate Director of Epidemiology and Biostatistics; Associate Director, Epidemiology and Cancer Control; and Associate Director, Preventive Cardiology Programs, and Associate Director, Health Disparities Research and Cardiovascular Epidemiology. Over more than 40 years, my research has focused primarily on addressing minority health and health disparities, with particular emphasis on women's health. I have been responsible for directing interdisciplinary and transdisciplinary research programs that focus on identifying the environmental and genetic causes of cancer using epidemiology and biomarkers. Through all these activities, I am responsible for mentoring many junior and senior faculty, postdoctoral fellows, PhD candidates, medical students, interns, residents, graduate students, and undergraduate students. My teaching responsibilities include, or have included, leading the academic mission of the Graduate School of Arts and Sciences at Georgetown University, providing lectures, and serving as the inaugural program director for the Master of Science program in Epidemiology.

My Curriculum Vitae shows that I have published more than 260 papers in scientific peer-reviewed journals, many in high-impact journals. As evidence of respect from my peers, I have been elected as a member of the National Academy of Medicine (formerly the Institute of Medicine). As evidence of recognition as an epidemiologist from my peers, I was awarded the Joseph F. Fraumeni, Jr. Distinguished Achievement Award from the American Society of Preventive Oncology. Over the years, I have been the Program Chair or member of numerous program committees for national and international scientific meetings. I am a regularly invited speaker at national and international meetings, and at universities around the world. I also sit on various committees and panels with such groups as the American Association for Cancer Research, National Cancer Institute, American Cancer Society, and others that provide research opinions, identify funding priorities, or review other investigators' research proposals about the causes of cancer.

Throughout my career, I have conducted research into cancer disparities in relationship to prevention and control with particular interest in large epidemiological cohorts, clinical trials, and behavioral interventions. I served as the Co-Primary Investigator (PI) of the Women's Health Initiative (WHI), the largest study of women (postmenopausal) in the United States for over two decades. The WHI was a long-term national health study funded by the National Heart, Lung, and Blood Institute (NHLBI). The original WHI study began in the early 1990s and concluded in 2005 and included 161,808 women across forty centers in the United States. Since 2005, the WHI has continued with Extension and Ancillary studies, which are annual collections of health updates and outcomes in active participants. The main areas of research for the WHI include cardiovascular diseases, cancers, and osteoporotic fractures. WHI continues to focus on strategies to prevent the major causes of death, disability, and frailty in older women. The WHI cohort has considerable breadth and depth and thus enables the exploration and investigation of many more research questions on women's health and aging. I was integrally involved in the clinical trial and study design for the WHI, including measurements, surveys, clinical outcomes,

and case adjudication. I continue to serve as a consultant for the WHI Northeast Regional Center.

I also served as the Co-PI of the Black Women's Health Study (BWHS), which is the largest cohort of Black Women in the United States and which was funded by the National Institutes of Health (NIH) in 1995, comprising 59,000 Black women. This study population was younger than other similar cohorts by including women 18 years of age or older at study start. I was involved from the inception of the BWHS cohort to evaluate the higher rates of many illnesses, such as hypertension, breast cancer at young ages, diabetes, stroke, lupus, and environmental exposures. I was responsible for measures and outcomes related primarily to the various cancers.

Relevant to the case addressed here, I am an expert in women's health involving research assessing cancer risk factors such as environmental, obesity, behavioral and lifestyles, as well as exogenous hormones as it is related to gynecological and breast cancers. I have published widely in these areas and have served on numerous committees that have considered this particular area of science. As an example, I served on the Committee on Breast Cancer and the Environment: The Scientific Evidence, Research Methodology and Future Directions for the Institute of Medicine. Thus, my publications, which include those domains that relate directly to some of the chemicals at issue here, have appeared in peer-reviewed journals.

There are different ways that the impact of a public health expert and researcher, such as myself, are measured. My research is directed towards identifying risk factors associated with specified cancer and disease outcomes. The results often lead to cancer prevention and risk reduction interventions, which are very important from a public health perspective. It is also essential that health-related findings are disseminated via professional communicators, as evident by peer-reviewed funding of the science and securing external funding to continue the scientific endeavors. While my number of publications is high, the number alone does not reflect the value other researchers place in them or cite them in their publications. One way to measure the value of a researcher's scientific publications is by the H-index, which is the outcome of a formula based on the number of publications for which an author has been cited by other authors. H-indexes can be found on Web of Science or Google Scholar. My H-index is generally 67 for Google Scholar, which is considered remarkable. To date I have more than 20,230 citations for Google Scholar with 90 publications cited more than 90 times.

Another way to assess the quality and impact of research is by being awarded federal funding through peer-review process evaluating the quality of your science and your future directions. Of note, I have been continuously federally funded since 1984. As of 2021, I have received approximately $52 million in federal funding. This includes both primary research and training grants so that I can mentor the next generation of researchers. Also, I have extensively published about risk assessment and risk assessment methods. For example, during the course of my research career, I have contributed as a thought leader for behavioral interventions among minority and underserved populations, for example participating in 2015 Dietary Guidelines Advisory Committee for the US Department of Health and Human Services (DHHS) and the Department of Agriculture (USDA).

My billable rate is $500 per hour and I have not provided any expert testimony in the past four years.

## II. Summary of My Opinions

I have been asked to provide my opinions regarding whether there is reliable scientific evidence that use of chemical hair relaxers causes uterine cancer and/or ovarian cancer. In forming my opinions, I have relied on my training, expertise, and experience, as well as my

review and consideration of the scientific and medical literature and other documents listed in Exhibit B. A summary of my opinions is provided below and described in the body of this report. My opinions are held to a reasonable degree of scientific certainty.

- The available scientific evidence does not demonstrate that use of chemical hair relaxers causes uterine cancer or any specific subtype of uterine cancer, including endometrial cancer.
- The available scientific evidence does not demonstrate that use of chemical hair relaxers causes ovarian cancer or any specific subtype of ovarian cancer.
- Use of chemical hair relaxers is not an established or generally recognized cause of either uterine or ovarian cancers. As of the date of writing this report, I am not aware of any medical or scientific organization who has concluded that use of chemical hair relaxers causes or substantially increases the risk of contracting either one of these cancers.
- To my knowledge, chemical hair relaxers have not been declared carcinogenic by any cancer organization.

## III. What are Chemical Hair Relaxers?

Women today have several methods to alter the shape and texture of their hair that fall into three general categories.

Temporary physical straightening or curling can be performed using heat as a means of physically shaping the hair. These methods are often called “pressing” methods, as they often utilize a flat iron, although other devices such as a blow dryer or hot comb may be used as well (Dias et al., 2007). These methods may or may not be used in conjunction with various hair care products to enhance the effects and/or protect the hair from excessive heat damage.

A longer lasting, yet still temporary, method of changing the texture of hair are the so-called “smoothing” methods, also known as Brazilian straightening or Brazilian blowouts. These methods generally use acidic (low pH) chemical compounds, such as glyoxylic acid, formaldehyde, and formaldehyde-releasing compounds, as active ingredients (Hatsbach et al., 2022). Heat and physical straightening are important components to the process, as heat is needed to achieve sufficient degradation of formaldehyde-releasing compounds to free formaldehyde, which is needed to reach the desired effect. These products are applied to damp hair in small sections using a brush and generally have a short processing period of around 20 minutes. The hair is then blow-dried with a round brush. Small sections of hair are repeatedly flat-ironed until the desired effect is achieved (Pierce et al., 2011)

Finally, products generally called “hair relaxers” or “chemical hair relaxers” are used to achieve a permanent change to the protein structure of the hair. These products use highly basic or high-pH compounds, such as metal hydroxides to open the hair cuticle and break the sulfide bonds in the hair shaft. While this creates a permanent change, it is a surface effect only, and the relaxing process must be applied to new growth as the hair grows out of the scalp, usually at an 6 to 8 week interval. Throughout this report, I used “hair relaxers” and “chemical hair relaxers” interchangeably.

## IV. Cancer Background

### A. What is Cancer?

At its most basic, “cancer” is a group of diseases characterized by the uncontrolled growth and spread of abnormal cells. Uncontrolled cell growth can develop into malignant

tumors that start in one area/organ of the body, and can spread (metastasize) to other parts of the body (Brown et al., 2023) There are many different types of cancer, arising from different cell types, with different growth patterns as well as different risk factors and causes (National Cancer Institute, 2025a). For example, carcinomas start in the skin or lining of organs, while sarcomas start in the bone, muscle, or connective tissue. Broadly speaking, there are two main categories of cancer: blood cancers (e.g., leukemias or lymphomas); and solid tumor cancers (e.g., breast cancer, colorectal cancers, and ovarian and uterine cancers). Understanding the specific type of cancer is critical not only for medical reasons such as treatment and prognosis, but also from an epidemiological perspective to study and understand the etiology (i.e., cause) of the cancer, as different cancer types, even within the same organ system may have different risk factors, different latency periods, different levels of aggressive malignancy, and different genetic signatures, among other factors (Wentzensen et al., 2016; Yang et al., 2007).

In general, cancer risk increases with age, and cancer is thought of as a disease of aging (Mandelblatt et al., 2021). Every day, our organs replace billions of cells. Each time a cell is replaced, there is a possibility that a mutation (i.e., change in genetic material) occurs. Each time a mutation occurs, there is a possibility that the mutation could be deleterious. Generally, if there is a “mistake” in cell replication, the human body is efficient at repairing such mistakes, or the cell will not survive, and the mistake will not be replicated (Tomasetti and Vogelstein, 2015). As we age, however, cell division becomes more error-prone, and protective pathways that surveil mistakes of differentiation slow with age (Mandelblatt et al., 2021). In other words, simply by getting older, the likelihood of a potentially cancerous mutation that is not repaired or destroyed increases. As the most recent data from the National Cancer Institute’s SEER Program shows, the vast majority of cancers are diagnosed after age 45, with a median age of 67 at diagnosis(National Cancer Institute, 2025b). More specifically, cancers develop in tissues as stem cell reserves in tissues divide and develop mutations that change the functions of proteins that normally either limit growth or act as checkpoints to prevent excessive growth and tumor formation. These variations can be inherited mutations in germ cells. They also occur spontaneously through errors in replication and chromosomal alignment during cell division, and they can occur through exogenous factors that alter the physical structure of the genetic materials of the cells(Tomasetti and Vogelstein, 2015). Mutations that confer a selective advantage to cells in the microenvironment (e.g., escape cell death/apoptosis) can lead to tumor growth in the affected organ and metastatic spread throughout the body (Brown et al., 2023). Cancer leads to tissue death and organ failure as the normal tissue is replaced or deprived of nutrients by the cancer cells (National Cancer Institute, 2025a).

### B. <u>Ovarian Cancer</u>

Ovarian cancer is a malignant tumor or tumors arising from the tissues of the ovaries, which are the female reproductive organs that house and release female reproductive cells (i.e., oocytes) (Siegel et al., 2022)). Ovarian cancer is the 18th most prevalent cancer with an estimated 20,890 cases diagnosed in the United States in 2025 (National Cancer Institute, 2025c). A women’s lifetime risk of developing ovarian cancer is about 1 in 85, and the chance of dying from ovarian cancer is about 1 in 119 (American Cancer Society, 2022). Ovarian cancer is more common in White women than Black women, with the annual incidence rate 27% higher among non-Hispanic White women (Torre et al., 2018). In the United States, the median age at diagnosis of ovarian cancer is 63, with nearly half of women diagnosed with ovarian cancer between the ages of 55 to 74(National Cancer Institute, 2025c).

*Figure 1 - Female Reproductive System*




There are five distinct histotypes of ovarian cancer: (1) high-grade serous; (2) low-grade serous; (3) endometrioid; (4) clear cell; and (5) mucinous. High-grade serous, endometrioid, and clear cell are the most prevalent ovarian cancers histotypes (Torre et al., 2018). Each of these histotypes of ovarian cancer are associated with varying risk factors that differ by race/ethnicity (Phung et al., 2022a). In 2022, Phung et al. analyzed cancer registry data collected by the U.S. Centers for Disease Control (CDC) from 1992-2019 and calculated age-standardized incidence rates (ASIRs) for the three most prevalent histotypes by race (Phung et al., 2022b). Black women had the lowest ASIRs for all three histotypes during this period. White women had the highest ASIRs across histotypes. Among the histotypes, only clear cell ovarian cancer incident rates are increasing among all racial/ethnic groups.

Five-year survival for ovarian cancer is worse for non-Hispanic Black women across all histotypes and among all racial/ethnic groups. This is largely due to lack of access to care for Black women compared to other racial/ethnic groups, but Black women also face higher co-morbidities when given the same level of care (Stenzel et al., 2019).

### C. Risk Factors for Ovarian Cancer

There are numerous established risk factors for ovarian cancer including: (1) getting older, >40 year of age; (2) elevated body mass index (BMI); (3) having children later in life or never having a full-term pregnancy; (4) taking hormone therapy after menopause using estrogens alone; (5) having a family history of ovarian, breast or colorectal cancer; (6) having family cancer syndromes; (7) having had a personal history of breast cancer; (8) diabetes mellitus; and (9) endometriosis(Moorman et al., 2016; Palmer et al., 2009). Hereditary conditions include Hereditary Breast and Ovarian Cancer Syndrome (HBOC), Lynch Syndrome, and MUTYH-associated polyposis (Caruso et al., 2025). Ovarian cancer is hormonally modulated with estrogen-associated factors increasing ovarian cancer risk and progesterone-associated factors decreasing risk. Factors associated with a decreased risk of ovarian cancer include the following: (1) surgical removal of the uterus and/or ovaries; (2) tubal ligation; (3) use of oral contraceptives or intrauterine devices for birth control; (4) breast feeding; and (5) pregnancy (Moorman et al., 2016).

Umbrella reviews are systematic reviews where the study authors perform broad, scoping reviews of the scientific literature for systematic reviews and meta-analyses on specific

topics, then add another level of their own analysis to the aggregated literature (Belbasis et al., 2022). Also called a "review of reviews," umbrella reviews are useful studies to determine the strength of an association and heterogeneity in the body of scientific evidence on reported associations. Whelan et al. published an umbrella review on risk factors associated with ovarian cancer risk in 2022 (Whelan et al., 2022). From their systematic review, the authors identified 174 meta-analyses of cohort studies analyzing 44 identified risk factors, of which six risk factors were classified as "strong evidence" based on their grading scale, which included: summary random-effects p-value; p-value of largest study in meta-analysis; number of cases; between-study heterogeneity; 95% prediction interval; small study effects; and excess significance bias. These six risk factors rated as "strong evidence" were greater height (RR by 4 inches = 1.16; 95% CI: 1.11-1.20), obesity (as measured by BMI ≥ 30 kg/m$^2$) (RR = 1.27; 95% CI: 1.17-1.38), and hormone replacement therapy by "ever use," "current/recent" use, and "ever use" with measures of duration and time since last use included. Prior history of endometriosis was graded as "highly suggestive" (RR = 2.34; 95% CI: 1.76-3.10), while oral contraceptives showed "strong" protective effects (RR = 0.74; 95% CI:0.67-0.82).

**i. Age**

Ovarian cancer incidence increases with age, with less than 10% of cases diagnosed before age 35(National Cancer Institute, 2025c). Nearly half of ovarian cancers are diagnosed between the ages of 55 and 74. Incidence rates increase with increasing age for all racial groups, with higher incidence rates for White women compared with Black or Hispanic women but a younger median age at diagnosis for Black women compared with White women (National Cancer Institute, 2025d; Phung et al., 2022b) .

**ii. Obesity**

Obesity, defined as having a BMI over 30 kg/m$^2$, has a consistent association with ovarian cancer. Whelen et al. found that, across 13 studies, obese women had a 27% increase in ovarian cancer risk compared with normal women (BMI < 25 kg/m$^2$) with little heterogeneity among studies (Whelan et al., 2022). The risk was also significant among pre-menopausal women, but inconsistent with high heterogeneity among post-menopausal women (Whelan et al., 2022). Obesity increases the risk of poorer outcomes, including low-grade serous, invasive mucinous, and clear cell subtypes. The risk is stronger in premenopausal than in postmenopausal women. Obese women diagnosed with ovarian cancer have slightly worse overall and progression-free survival rates compared to non-obese (Cancer et al., 2012; Diaz et al., 2013; Olsen et al., 2013; Ptak et al., 2013)

**iii. Hormone Replacement Therapy**

Use of menopausal hormone therapy, especially estrogen-only regimens, is associated with an increased risk of ovarian cancer (Bethea et al., 2017). A long duration, large (n = 16,608) randomized trial as part of the Women's Health Initiative showed a significant increased risk for ovarian cancer in women randomized to conjugated equine estrogen only compared to placebo (HR = 2.04; 95% CI:1.14-3.65;(Chlebowski et al., 2024) There was no elevated risk for women randomized to combined estrogen and progesterone treatment. Additionally, cohort studies demonstrate a dose- and duration-dependent effect, with risk rising after ≥5 years of use. The association is considered convincing and consistent across multiple analyses (Cancer et al., 2015; Whelan et al., 2022).

**iv. Family History of Cancer**

A family history of ovarian or breast cancer strongly predicts ovarian cancer risk, largely due to inherited mutations such as BRCA1/2 (Kuchenbaecker et al., 2017; Zheng et al., 2018). Relative risks often exceed 2.0, and the association is highly consistent across studies. Other

familial genetic mutations like MUTYH-associated polyposis are associated with ovarian cancer risk, but as the risk is only elevated with biallelic carriers of MUTYH mutations, overall risk for ovarian cancer in patients with this syndrome is low (Win et al., 2011). The evidence is convincing that a family history of breast, ovarian, and colorectal cancers is associated with an increased risk of ovarian cancer.

#### v. Personal History of Breast Cancer

Women with prior breast cancer have an elevated risk of ovarian cancer, reflecting shared genetic and hormonal pathways (Parhizgar et al., 2023). While the magnitude of the association varies by population, the association is across studies and supports a positive association.

#### vi. Endometriosis

Endometriosis is associated with endometrioid and clear-cell ovarian carcinomas (Pearce et al., 2012). Meta-analyses show two- to three-fold increased risks for these subtypes, with consistent findings across case-control and cohort studies (Tanha et al., 2021; Whelan et al., 2022). The evidence is convincing for subtype-specific risk.

#### vii. Other Suggested Risk Factors

Diabetes shows an association with ovarian cancer risk, but with considerable heterogeneity among studies and other factors like obesity confounding results. Whelan et al. found a risk ratio of 1.32 (95% CI: 1.14-1.52) in their random effects model, but with high heterogeneity in the pooled studies ($I^2$ = 80) (Whelan et al., 2022). Ever use of metformin was associated with a decreased risk of ovarian cancer. Evidence is suggestive, but not fully supportive, of an association.

Therapeutic pelvic radiation can increase second-primary cancer risk, but evidence for de novo ovarian cancer in general populations is weak (IARC, 2012; Leung et al., 2023). Most studies show no clear association outside high-dose treatment contexts. Evidence remains limited/inconclusive.

#### viii. Protective Factors

Full-term pregnancy and oral contraceptive (OC) use are among the most robust protective factors for ovarian cancer. Large, pooled analyses and cohort studies demonstrate a strong inverse association, with risk reductions of up to 50% for long-term users (>10 years) (Tanha et al., 2021; Whelan et al., 2022). The protective effect persists for decades after cessation. The evidence is consistent and convincing.

Breastfeeding is consistently associated with a reduced risk of ovarian cancer (Bethea et al., 2017). Meta-analyses show a dose-response relationship, with longer cumulative duration conferring greater protection (Tanha et al., 2021; Whelan et al., 2022). The pooled risk reduction is typically in the range of 20–30% for women with extended breastfeeding history.

Physical activity is associated with modest reductions in ovarian cancer risk in several cohort studies, likely mediated by hormonal and metabolic pathways; however, effect sizes are small (typically a 10–20% risk reduction), and heterogeneity exists by intensity and timing of activity (Tanha et al., 2021).

### D. Uterine Cancer

Although “endometrial” and “uterine” often are used interchangeably, they are not exactly the same. Uterine cancer is the broader term that includes all cancers that develop in

the uterus, including endometrial cancer and less common types, such as uterine sarcoma (Koskas et al., 2021). Endometrial cancer accounts for the vast majority of cases and is the most common type of uterine cancer. Endometrial cancer is the ninth most common cancer for women in the United States (National Cancer Institute, 2025d)

In the United States, it is estimated for 2025 that 69,120 new cases of cancer of the uterus will be diagnosed and that 13,860 women will die from cancers of the uterus (National Cancer Institute, 2025d). Uterine cancer affects mainly post-menopausal women. The median age of women diagnosed with uterine cancer is 64. Uterine cancer is uncommon in women under the age of 45, with less than 10% of cases diagnosed in younger women (National Cancer Institute, 2025d). Uterine cancer is more common in Black and American Indian women than in White women. Black women are also more likely to be diagnosed with more aggressive subtypes (type 1; non-endometrioid) of endometrial cancer with worse prognoses (Feinberg et al., 2019). The incidence has increased by more than 1% per year since the mid-2000s; over the past decade (2012-2021), the rate increased by 0.6% per year in White women and 2% to 3% per year in women of all other racial and ethnic groups (Wright et al., 2025). Endometrial cancer is one of the few cancers with increasing mortality; from 2013 to 2022, the death rate rose by 1.5% per year.

Studies have shown racial and socioeconomic inequities in endometrial cancer outcomes that remain among the widest of all cancer types, with an approximate 20% difference in 5-year survival (Clarke et al., 2019). Racial disparities persist even when controlling for advanced stage at presentation and more aggressive tumor subtypes and treatment (Bregar et al., 2017). The reasons for these disparities have been attributed to Black women having more advanced stage at diagnosis, having more aggressive histologic subtypes, undergoing hysterectomy less frequently, and/or less often receiving adjuvant chemotherapy or radiation for high-risk disease. However, when controlling for age, time period of diagnosis, region of the country, urban or rural setting, treating facility type, socioeconomic status, education, insurance, comorbidity index, pathologic stage, histology, lymphadenectomy and adjuvant treatment, African American women still had lower overall survival than white women (HR 1.21; 95%CI: 1.16-1.26) (Bregar et al., 2017).

### E. <u>Risk Factors for Uterine Cancer</u>

There are numerous established risk factors for uterine cancer, including the following: (1) estrogen-only hormone replacement therapy; (2) menstruation beginning at a young age; (3) nulliparous; (4) obesity; (5) metabolic syndrome; (6) age; (7) radiation therapy for treatment of prior cancers; (8) genetic conditions; and (9) race (American Cancer Society, 2025; Makker et al., 2021; Raglan et al., 2019).  (American Cancer Society, 2025) Additionally, risk factors also vary by cancer sub-type with type 2 non-endometrioid cancers, as this sub-type shows weaker associations with hormone-associated risk factors than type 1 endometrioid sub-type endometrial cancers (Feinberg et al., 2019; Setiawan et al., 2013).

#### i. Age

Advancing age is a major non-modifiable risk factor, with incidence peaking after menopause (ages 55 to 64) (National Cancer Institute, 2025d). Risk escalation reflects cumulative hormonal exposure and genomic instability attributable to ageing cells. (Makker et al., 2021)

#### ii. Early Menarche

Early onset of menstruation extends lifetime estrogen exposure, increasing endometrial cancer risk (Sponholtz et al., 2017). Black women with an age at menarche of 11 years or

younger showed an increased risk of uterine cancer in a large, pooled case-control analysis (Sponholtz et al., 2023). Mechanistic evidence shows that women with more menstrual cycles are at a higher risk for uterine cancer, including those with early menarche and those with later menopause due to longer estrogen exposure (Chou et al., 2024) .

### iii. Hormone Replacement Therapy (HRT)

Unopposed estrogen therapy is associated with increased endometrial cancer risk, but this risk is significantly modified by obesity and menopausal status (Chlebowski et al., 2024; Hutt et al., 2021; Sponholtz et al., 2023). Adding progestin mitigates but does not fully eliminate this risk (Sponholtz et al., 2018).

### iv. Nulliparity

Nulliparous women exhibit higher endometrial cancer risk than parous women, largely due to uninterrupted estrogen exposure and absence of progesterone surges during pregnancy (Key and Pike, 1988). In their pooled analysis of seven studies, Hutt et al. found an association between nulliparity (i.e., lack of pregnancies) and endometrial cancer risk (RR = 1.43; 95% CI: 1.35-1.52) (Hutt et al., 2021). The relationship between parity and endometrial cancer, however, is less clear among participants in the BWHS, as Sponholtz et al. did not find an association between nulliparous women and endometrial cancer (Sponholtz et al., 2017).

### v. Obesity

Obesity is an important modifiable risk factor for uterine cancer. In their umbrella review, Kalliala et al. found an increased risk for both BMI over 30 (RR = 1.27; 95% CI: 1.17-1.38) and a dose-response relationship per 5 $kg/m^2$ increase, both with low heterogeneity across studies (Kalliala et al., 2017). Obesity is also the most significant risk factor for Black women, with women whose BMI is over 40 $kg/m^2$ having nearly a four-fold risk of uterine cancer compared to those within normal range (Sponholtz et al., 2023).

### vi. Metabolic Syndrome

Metabolic syndrome is a cluster of conditions that includes obesity, high blood pressure, high blood glucose, high triglycerides, and low HDL cholesterol, all of which have shown associations with an increased risk of endometrial cancer (Sponholtz et al., 2016). Metabolic syndrome is associated with obesity and the presence of other metabolic abnormalities like diabetes and hypertension, which is often called the "triple syndrome" of endometrial cancer. In a large, case-control study of the Centers for Disease Control's SEER database, Trabert et al. found a statistically significant association between metabolic syndrome and endometrial cancer (OR = 1.39; 95% CI: 1.32–1.47), as well as all of its components (Trabert et al., 2015). Obesity has the most established association with endometrial cancer, with diabetes and elevated cholesterol showing less consistent associations (Sponholtz et al., 2023, 2016).

### vii. Pelvic Radiation

Pelvic radiation for previous malignancies modestly increases uterine cancer risk, likely via DNA damage and mutagenesis (Utada et al., 2019). Evidence is limited to observational studies with small numbers, and the effect size is modest.

### viii. Genetic Conditions

Hereditary syndromes, particularly Lynch syndrome (mismatch repair [MMR] gene mutations), confer a markedly elevated lifetime risk (up to 40–60%) (Møller et al., 2018).

## V. Methodological Approach to Causation

Epidemiology is the science of population health and the underlying factors that affect health outcomes. In particular, epidemiology is used to assess whether certain exposures (e.g., use of hair relaxers) are associated with a specific outcome (e.g., ovarian cancer).

There are various types of study designs that can help to inform a causation analysis. The highest level of epidemiological study is a randomized, controlled trial (RCT) (Murad et al., 2016). RCTs involve a study population that is divided into one or more groups (or "arms" of the study), who are then randomly selected to either receive or not receive an intervention or therapy (Stanley, 2007). The groups are prospectively followed to assess the impact of the therapy on an outcome. Such trials typically are double-blinded, meaning neither the investigators nor the participants know whether they received the therapy/intervention. The purpose of randomization and blinding is to reduce/eliminate the effects of confounding and bias, which will be discussed more fully below in the section on observational epidemiologic studies (Stanley, 2007). A properly designed and conducted RCT provides a solid foundation from which to determine whether an exposure has a beneficial (or detrimental) effect on a disease outcome. Because RCTs are "interventional," meaning investigators randomize participants and control the exposure under investigation, RCTs typically are not designed to assess whether an exposure increases the risk of an outcome like cancer (Hernán and Robins, 2006; Osterholm and Hedberg, 2015). Usually, RCTs are designed to assess whether there is a beneficial effect (i.e., decreased risk) on disease outcomes for a proposed therapy.

Information on risk factors (those factors that are known to increase the risk of disease) generally comes from observational epidemiologic studies (Fedak et al., 2015). Observational epidemiological studies "observe" the use of a medication or product (or other exposure) in real-world settings. Unlike RCTs, observational studies are inherently subject to bias and confounding (explained further below). Observational studies may be prospective or retrospective (Szklo, 1998). In retrospective studies, investigators are looking back in time, typically evaluating a database to assess information on the exposure of interest and the outcome of interest. In prospective studies, investigators typically follow participants forward in time to assess exposure and outcome. The different types of observational epidemiologic studies generally fall into two categories: cohort studies and case-control studies (Celentano et al., 2019; Szklo, 1998). In both designs, there is always a control group (either a group without the exposure, or a group without the outcome) with which to assess whether the outcome and the exposure are related (i.e., associated) with one another, and the nature of such association if it exists (e.g., increased or decreased risk) (Osterholm and Hedberg, 2015).

### A. Cohort Studies

A cohort study is an observational research method that follows a group of people with a common characteristic over a specific period to examine how certain exposures or factors affect health outcomes (Samet and Muñoz, 1998; Szklo, 1998). Cohort studies can be either prospective or retrospective, meaning the cohorts can be defined at study start and followed over time or the cohorts can be determined at the time of analysis (Osterholm and Hedberg, 2015). Prospective cohort studies, like the Black Women's Health Study and the Sister Study, take years and decades and are very costly but have fewer sources of possible bias than retrospective studies (Murad et al., 2016; Rosenberg et al., 1995).

### B. Case-Control Studies

A case-control study is a retrospective observational study that compares two groups: one who have the disease or outcome of interest (cases) and a similar group of people who do not have the disease (controls) (Osterholm and Hedberg, 2015; Szklo, 1998). Researchers are able to look back, retrospectively, and compare the frequencies of exposures of interest in both groups and assess associations. However, there is an increased likelihood of recall bias in this design. Retrospective studies are often less expensive than prospective studies as they are most frequently secondary analyses of data collected for other reasons, such as insurance databases (Rosenberg et al., 1995). As these studies are retrospective in nature, however, data collection on the exposure of interest may be subject to recall bias if it is a secondary analysis of data collected for another purpose at study start (Hernán et al., 2004).

### C. Interpretation of Epidemiological Studies

As mentioned above, the purpose of an observational epidemiologic study is to evaluate "associations," i.e., whether two variables (exposure and outcome) are related. It is well understood in the field of epidemiology that "association does not equal causation" (Hernán and Robins, 2006). There are two fundamental reasons why associations found in an observational epidemiologic study do not alone represent a causal relationship: (1) observed associations may result from chance, bias or confounding (concepts described below), and (2) any valid association (an observed association sufficiently evaluated for chance, bias, and confounding) must be further evaluated using additional heuristic methods (described further below) to determine whether any association that exists is causative (Cox and Ricci, 2005). Chance, bias, and confounding are all threats to whether an observed association should be considered a valid association (NASEM, 2017).

### D. Evaluation of Chance (Statistical Significance)

Virtually all epidemiologic studies have as their starting point the "null hypothesis" (Celentano et al., 2019). The null hypothesis is the starting assumption that the two variables an investigator is interested in (for example, chemical hair relaxer use and ovarian cancer) are not related and the probabilities that the outcome (i.e., ovarian cancer) will occur between the two groups are equal (NTP, 2015; Osterholm and Hedberg, 2015). Investigators then design a study to evaluate the exposure of interest (use of chemical hair relaxers) and the outcome of interest (ovarian cancer) to determine whether there is reliable evidence that would "disprove the null" (NTP, 2015). One of the tools used to assess the results of an epidemiologic study is statistical testing.

Results from epidemiological studies are typically reported as "risk estimates," which are reported numerically in the form of risk ratios, hazard ratios, relative risks, or odds ratios (Osterholm and Hedberg, 2015). Although there are some statistical and technical differences between the different reporting measures, for purposes of this discussion they can be interpreted as providing information about whether the exposure of interest (chemical hair relaxer use) is associated with the outcome of interest (ovarian cancer). For example, an odds ratio of 1.0 means there is no difference in the occurrence of ovarian cancer in women who used chemical hair relaxer products compared to women who did not use or minimally used chemical hair relaxer products. An odds ratio above 1.0 is in the direction of increased risk, while an odds ratio below 1.0 is in the direction of decreased risk.

Reported risks (whether odds ratios, hazard ratios, etc.) are assessed statistically to determine whether they are statistically different from the null hypothesis. For example, even

assuming there is no relationship between an exposure and an outcome, an observational study is unlikely to report a "risk" estimate that falls exactly on 1.0 (Hernán and Robins, 2006; Osterholm and Hedberg, 2015). This is because random error (i.e., randomness or chance) is an inherent component of every epidemiologic study. As an example, consider a probabilistic event like coin tossing. Assuming a fair coin, there is a 50/50 chance of getting heads or tails. If you toss this coin 10 times or even 50 times, you may not get 5 heads and 5 tails, or 25 heads and 25 tails. If you toss this coin 10 times and get 6 heads and 4 tails, that does not mean you are 50% more likely to get heads than tails when tossing this coin or any other coin. There will always be random variation in the results, which can be assessed using statistical techniques. This fact is illustrated in many studies in which multiple comparisons are made—the more that data from a study are sliced into subgroups and many different comparisons are made, the more likely that "associations" will be produced purely by chance (NASEM, 2017).

In epidemiology studies, investigators evaluate the random variation of the observed risk ratios using p-values and confidence intervals, which inform whether the results are statistically significant (Celentano et al., 2019; Osterholm and Hedberg, 2015). These measures help us to understand whether the observed risks are statistically different from the null hypothesis. The conventional threshold for statistical significance in epidemiology is alpha = 0.05 or 5%. Thus, a p-value less than 0.05 ($p < 0.05$) means the result is statistically significant which (along with other considerations described below) can provide evidence that the observed risk is different from the null hypothesis (whether in an increased or decreased risk direction). A p-value greater than or equal to 0.05 ($p \geq 0.05$) is considered not statistically significant and indicates that any observed difference in risk is not statistically different from the null hypothesis and may be the result of random error.

P-values are statistically related to confidence intervals. For example, a p-value of 5% corresponds to a confidence interval of 95% (Celentano et al., 2019). The confidence interval provides a range of values around the reported risk estimate that are consistent with the data. For example, an odds ratio of 0.8 may have a 95% confidence interval ranging from 0.4 -1.6, which would typically be reported as OR = 0.8 (95% CI: 0.4-1.6). Note that if the confidence interval includes the number 1.0, this means the result is not statistically significant, and thus the null hypothesis of no effect has not been rejected. (Celentano et al., 2019). A confidence interval that excludes the null value of 1.0 is considered statistically significant (e.g., OR = 1.5; 95% CI: 1.2-1.8), meaning the result is unlikely to represent random error.

Beyond whether an individual reported result is statistically significant (either by p-value or by confidence interval), as noted above one must also consider how many comparisons in a study were performed, and whether reported results that may be statistically significant on their face may nonetheless represent chance findings because there was no correction for multiple testing (Celentano et al., 2019; NASEM, 2017). Because the conventional significance level is 5% (used by virtually all medical scientific journals and employed in the relevant studies of hair relaxer use and cancer), as a practical matter this means that for every 20 comparisons performed, one would expect one statistically significant result just by chance alone. There are a number of statistical methods to correct for multiple comparisons. Bonferroni adjustment is the most common method to adjust for multiple comparisons, with other methods like Benjamini-Hochberg adjustment and Holm adjustment used less frequently (Chen et al., 2017). Such adjustment techniques are often used in epidemiologic studies of genetic relationships with disease that are evaluating hundreds or thousands of genes but are used less often in epidemiologic studies of environmental exposures.

## E. Confounding

"Confounding" is a critical concept in the interpretation of any epidemiological study. Every observational epidemiological study is drawn from a non-randomized population, which necessarily means that the groups being studied and compared may have differences in health characteristics or health behaviors that are not equally balanced between groups (Osterholm and Hedberg, 2015). A confounder is a variable that may alter the relationship between the exposure of interest and the outcome of interest, such that the observed effect is either an under or overestimation of the true relationship (Hernán and Robins, 2006). In essence, every epidemiological study seeks to compare "apples to apples," to isolate as much as possible the exposure of interest.

A simple example commonly used in epidemiology is alcohol and lung cancer. If you were to study the effect of alcohol on lung cancer, you would need to design this study in such a manner as to balance the confounding effect of smoking between the control group and the exposed group (Blot and Tarone, 2015; Doll and Peto, 1981). This is due to the fact that alcohol drinkers tend to have higher smoking rates, and smoking is the primary cause of lung cancer. If you were not to account for smoking among alcohol users, you may incorrectly conclude that alcohol consumption increases the risk of lung cancer due to the over-representation of smokers in your exposed population.

The concept of confounding is why study investigators "control" or "adjust" for various potential confounding factors. A well-designed and conducted study will adjust for factors such as the following, if possible: age; sex; disease states (e.g. diabetes); health characteristics such as obesity; health behaviors such as smoking and alcohol use; and many other factors that may be disease specific (Hernán and Robins, 2006). It is not always possible, however, to adjust for every potential confounder. For example, a retrospective study using patient information from a healthcare database may not utilize adequate information on smoking history to appropriately control for this confounder. As a general matter, we simply do not know all the factors that may influence disease and so cannot control for every potential confounder.

Each study needs to be evaluated to determine what confounding factors were adjusted for and how such adjustment was performed. This includes assessing study methods to determine if the study design included obtaining detailed, quantitative information on the potential confounder (Greenland and Robins, 1986). Other study design elements to assess include matching or stratification performed or statistical adjustment in a regression model for key confounding factors (Hernán et al., 2004). One must also consider that even the best-performed epidemiological studies cannot control for all known (and unknown) potential confounders, and therefore it is nearly impossible to rule out residual confounding. This is why consistency, both internal consistency within a single study and external consistency between different studies, is a critical component of establishing a reliable association for purposes of determining causation (Cole and Frangakis, 2009).

## F. Bias

Bias in epidemiology refers to systematic errors that can distort the estimation of relationships between exposures and outcomes, resulting in findings that deviate from the true values (Celentano et al., 2019). Unlike random error, which is unpredictable and can be quantified using statistical methods, bias leads to consistent errors in one direction and cannot be evaluated simply by increasing the sample size to obtain a more precise statistical estimate (Rothman and Greenland, 2018). The likelihood and magnitude of bias depend on both the study design and contextual factors, influencing the validity and interpretation of study results.

When evaluating associations between an exposure and a disease, several key sources of bias must be considered, including selection bias, information bias (also known as misclassification bias), recall bias, and other relevant types of bias.

#### i. Selection Bias

Selection bias arises when the study sample is not representative of the target population, leading to an over- or underestimation of the true association (Hernán et al., 2004). This type of bias can occur at various stages, such as during the recruitment of participants, allocation into exposure groups, or loss to follow-up. For example, in case-control studies, cases and controls should ideally be drawn from the same population base. Historically, cases for case-control studies were selected from the same hospital population, which might have a higher risk of the studied outcome compared to the general population. This can make the results less generalizable (Osterholm and Hedberg, 2015). The Sister Study, for instance, demonstrates selection bias concerning ovarian and uterine cancer, as women with heritable breast cancer mutations are already predisposed to other hormonally-linked cancers, meaning the sample is not representative of the broader population (D. P. Sandler et al., 2017).

Other forms of selection bias include volunteer bias (where individuals who choose to participate differ systematically from those who do not), healthy worker effect (where employed populations tend to be healthier than the general population), and loss to follow-up bias in cohort studies. Each can affect the interpretation of study findings and must be considered when designing studies and analyzing results.

#### ii. Information Bias (Misclassification Bias)

Information bias occurs when there are systematic errors in the measurement of exposure, outcome, or other study variables (Celentano et al., 2019). This can happen due to inaccuracies in data collection, recording, or recall. Information bias is often referred to as misclassification bias, which can be either differential or non-differential. Differential misclassification occurs when the rate of misclassification differs between study groups, potentially leading to an over- or underestimation of the association. Non-differential misclassification, on the other hand, affects both groups equally and generally biases the results toward the null hypothesis.

A common subtype is recall bias, which is particularly relevant in retrospective studies (Drews and Greenland, 1990). Recall bias arises when individuals with a disease outcome are more likely to recall and report past exposures differently compared to those without the disease. This can lead to systematic differences in reporting and, consequently, misclassification. For instance, patients diagnosed with cancer may be more likely to remember and report their use of certain products or exposures, whereas healthy participants may not recall or may underreport such exposures (Osterholm and Hedberg, 2015).

Misclassification can result in participants being incorrectly categorized (e.g., classified as exposed when they are not, or vice versa). The impact of misclassification on study results depends on degree and distribution. If misclassification is random, it may dilute the observed association, making it harder to detect a true relationship. If it is systematic, it can either exaggerate or obscure the association, depending on the direction of the bias.

#### iii. Additional Forms of Bias

Other biases relevant in epidemiological studies include:

- Observer bias: Occurs when investigators' knowledge of exposure status influences their assessment of outcomes.

- Reporting bias: Results from selective revealing or suppression of information by participants or researchers, often shaped by social desirability or perceived stigma.
- Surveillance bias (Detection bias): Arises when one group receives more intensive monitoring, resulting in higher detection of outcomes.
- Publication bias: Occurs when studies with statistically significant or positive findings are more likely to be published than those with null or negative results, potentially distorting the overall evidence base.

#### iv. Mitigating Bias

Careful study design, data collection, and analytic methods are essential for minimizing bias. Mitigation strategies include randomization, blinding, standardized data collection procedures, appropriate selection of controls, and statistical adjustments for confounding factors (Hernán et al., 2004; Hernán and Robins, 2006). Transparent reporting of study methods and potential limitations also helps to critically assess the risk of bias and the reliability of findings.

In summary, understanding and addressing bias is crucial for ensuring the validity of epidemiological research and for drawing accurate conclusions about causal relationships between exposures and health outcomes.

### G. Causation Methodology

When evaluating the potential causal relationship between an exposure and a specific cancer, it is important to consider widely accepted causal approaches. One such approach is the methodology developed by the International Agency for Research on Cancer (IARC) under the World Health Organization (WHO). IARC assembles expert panels to rigorously evaluate evidence on the carcinogenicity of various agents, including single chemicals, complex mixtures, occupational exposures, physical agents, biological organisms, pharmaceuticals, and other exposures. Their evaluation is based on the methodology published in its preamble (IARC, 2019) .

IARC's evaluation process begins with comprehensive literature searches to identify studies relevant to assessing whether an agent causes cancer in humans (epidemiological studies) or in animals (carcinogenicity studies) or exhibits key characteristics of known human carcinogens (mechanistic studies). For epidemiological evidence, IARC restricts its reviews to "studies in humans of exposure to the agent of interest with cancer as an outcome" (IARC, 2019). In this case, such studies would be studies of chemical hair relaxer use and uterine or ovarian cancer as the outcome. However, as I describe below, there is only one epidemiologic study that specifically evaluates chemical hair relaxers and uterine cancer, which is the Black Women's Health Study. The other relevant study, the Sister Study, did not specifically evaluate chemical hair relaxer use and, therefore, cannot reliably demonstrate an association between chemical hair relaxer use and either ovarian or uterine cancer. Additionally, studies focusing on individual chemicals allegedly present in hair relaxers are not studies in humans of exposure to hair relaxer use, and cannot substitute for such studies to draw causal conclusions about chemical hair relaxers.

The next step involves evaluating the quality of the selected studies based on design, methodology, and reporting. Exposure characterization is a critical component of this step. IARC noted: "Regardless all exposures have two principal dimensions: intensity (sometimes defined as concentration or dose) and time. Time considerations include duration (time from first to last exposure), pattern or frequency (whether continuous or intermittent), and windows of susceptibility" (IARC, 2019). In this case, hair relaxer epidemiological studies measure the

effects of whatever chemicals and their amounts were in hair relaxer products, and if designed properly, can also account for the intensity, frequency and duration of the exposures to these chemicals through hair relaxer use. If these studies fail to provide sufficient information to reliably assess the cancer risk from exposures to the chemicals allegedly present in hair relaxers, then the evidence would be inadequate to support a causal link. This does not permit reliance on studies that do not measure the effects of exposures to these chemicals through hair relaxer use. For example, an epidemiologic study of formaldehyde clearly is not an epidemiologic study of the use of hair relaxers. Reliance on a study of formaldehyde to draw conclusions about the use of hair relaxers would require speculative leaps to extrapolate from one exposure scenario to another, a methodology not endorsed by IARC. The disease outcome in humans also must be specific (i.e., one would not draw conclusions about uterine cancer based on findings for breast cancer). For example, IARC classified processed meats as carcinogenic to humans (Group 1) based on studies of processed meats and colorectal cancer. IARC did not reach its conclusion based on evidence from exposures to individual constituents outside processed meat consumption or extrapolate its finding to other cancer types or other foodstuffs containing overlapping constituents (IARC, 2018).

Another critical component of quality assessment is the evaluation of statistical methods, chance, bias, and confounding (Guyatt et al., 2017, 2011). As discussed above, epidemiologists use p-values and confidence intervals to assess chance. A point estimate above or below 1 that is not statistically significant indicates insufficient evidence to reject the null hypothesis of no difference. A wide interval often reflects small sample sizes and low power (Rothman and Greenland, 2018). Bias and confounding are best minimized through careful study design and comprehensive data collection.

The final step involves the evaluation of the overall strength and limitations of human, animal, and mechanistic evidence. For epidemiological studies, IARC emphasizes that there is no fixed number of human studies required to infer causality, though more than one study in a single population is virtually always necessary. Similarly, when evaluating cancer risk from diet, nutrition, and physical activity, the World Cancer Research Fund (WCRF) requires, among other things, evidence from more than one study type and evidence from at least two independent cohort studies to demonstrate a convincing causal relationship and evidence from at least two independent cohort studies or at least five case-control studies to demonstrate a probable causal relationship (WCRF/AICR, 2018) .

When an association is deemed unlikely due to chance, bias, or confounding, criteria such as Bradford Hill's guidelines are applied to assess causality. These criteria are widely adopted by scientific organizations such as IARC and WCRF (IARC, 2019; WCRF/AICR, 2018). These criteria are discussed below.

After reviewing all data, IARC classifies an agent into one of the four categories: Group 1 (carcinogenic to humans), Group 2A (probably carcinogenic to humans), Group 2B (possibly carcinogenic to humans), and Group 3 (not classifiable as to its carcinogenicity to humans). Group 1 requires sufficient evidence in humans. In other words, an agent such as hair relaxer use cannot be classified as carcinogenic to humans if there is insufficient evidence of carcinogenicity in humans.

### H. Bradford-Hill Criteria

While we remain true in many ways to the original writings of Sir Austin Bradford-Hill, there is a better understanding of how to apply the criteria after 50 years of research, and the following discussion includes several important concepts. As Sir Bradford-Hill wrote, not all criteria are required, but today, we understand that when there are data available for any

criteria, then that data cannot be ignored and some criteria are required to be fulfilled when data exists; there are some criteria that if violated would exclude the likelihood of causation, while fulfilling some may not lead to a definitive conclusion of causation without considering other criteria (Hill, 1965). The following are the elements of the Bradford-Hill criteria:

- Consistency among epidemiology studies (i.e., How many good quality studies say the same thing?): When multiple epidemiological studies are available, especially when the same research questions are asked in different populations and with different methodologies, and with statistical significance, this criterion is given the greatest weight. A lack of consistency, with considerations of statistical significance, argues strongly against causality.
- Dose-response (does more exposure cause more disease?): This is a fundamental principle of toxicology. While not universally true, in general, the greater the dose, the greater the effect. There are no known exposures that I am aware of that are associated with cancer at low level exposure but not at higher levels of exposure.
- Timing of exposure or temporality (does the cancer come after the exposure and a believable period of time?): In the context of epidemiologic studies, it is difficult to know when a cancer started given the long latency between cancer initiation and diagnosis. Among case-control and some cohort study designs, the timing of exposure and effect may be unclear (e.g., brief latency periods). Temporality is strongest when the studied exposure is measured prior to study start and frequently measured during the duration of the study.
- Strength of association (is the risk estimate clinically meaningful and plausible?): The original consideration was that greater effects were more likely to be causal, but the effect size is not the only information when considering if this criteria is satisfied. While larger estimates of risk are less likely to be due to some unknown confounder, statistically significant associations can still be subject to chance and bias. It is also relevant if the magnitude of effect is reasonable and consistent with current expectations and incidence of disease. For example, an elevated risk reported in studies might be observed, but inconsistent with population level incidence rates or known exposure levels across groups.
- Specificity (is the disease unique?): Following the model of causation for infectious disease, this criterion assesses if the outcome of interest is uniquely related to a specific causal agent, and if so, this is strong evidence of causality. Specificity also relates to the exposure of interest and the outcome of interest outside the infectious disease model. The exposure of interest (e.g., chemical hair relaxers) and the outcome of interest (e.g., ovarian cancer) should be evaluated specifically.
- Biologically plausible (does it make sense?): This criterion is the most loosely applied in a weight of evidence causation analysis, although there are more transparent methods that are now available (cited above and discussed below). Simply having data to support a biological hypothesis is not sufficient, and there must be consistent epidemiological evidence and specificity relating laboratory findings to human disease pathways (e.g., simply because a chemical causes DNA damage or affects the immune system in a lab setting is not sufficient evidence of biological plausibility for cancer causation).
- Coherence (is it contradictory to laboratory data?): The causal conclusion must not run counter to available experimental data, usually in two different types:

- Human interventions (are there reliable clinical studies to consider?): This criterion can provide strong evidence for causation when a human trial or experiment can show reduction or reversal of a causation outcome.
- Analogous similarities to other toxins.

These viewpoints or criteria form the framework for making causal determinations as an epidemiologist. Many scientific and medical organizations have adjusted, refined, and clarified these criteria to suit their specific missions, but the criteria are still valid and widely used in epidemiology today (Fedak et al., 2015; Shimonovich et al., 2021).

## VI. Hair Relaxers and Cancer

To my knowledge, there is one article analyzing the sole cohort study that has evaluated whether use of chemical hair relaxers is associated with uterine cancer, which is the BWHS. There is another cohort that evaluated use of hair straighteners or hair relaxers or pressing products and uterine or ovarian cancer, the Sisters Study. Based on my critical analysis of these studies, individually and together, the data does not support a consistent reliable association between use of chemical hair relaxers and either uterine or ovarian cancers. Without such an association, causation cannot be established, and in my opinion is not established.

Epidemiologic studies, when designed well and executed, are essential to answer questions as a first step in determining whether exposure to a substance causes a disease in humans. While some exposures have been shown in clinical trials to increase the risk of cancer, most exposures that are known to cause cancer in humans are based on evidence from epidemiologic studies, supported by evidence derived from non-human studies (e.g., animal studies, in vitro studies). For example, large, reliable epidemiologic studies are necessary to establish whether an exposure leads to an increased cancer risk or protects against cancer in humans. Epidemiology studies assessing female reproductive cancers like uterine cancer must be highly structured and large enough to overcome bias of confounding factors like obesity and polycystic ovarian syndrome with sufficient statistical power (Hutt et al., 2021). Additionally, to specifically address causal effects, prospective cohort study designs must be employed. Some have hypothesized that there are certain chemicals in hair relaxer products that may interfere with the endocrine system by means of inhalation and dermal uptake through the scalp (Coogan et al., 2021).

As of the date of this report, there are no scientific bodies who have determined that use of chemical hair relaxers causes any cancer, including ovarian and uterine cancers. For example, the American Cancer Society indicates that using chemical hair relaxers often and for many years "might" increase the risk of endometrial cancer, a certain type of uterine cancer (American Cancer Society, 2025). Only two cohort studies, the Sister Study and the Black Women's Health Study, have surveyed women to analyze associations, if any, between hair straightening or hair relaxing or pressing products (including chemical hair relaxers) and uterine cancer or ovarian cancer. Three publications relating to hair straightening or hair relaxing products have come out of these two studies. Of the two scientific articles analyzing hair straightening or relaxing product use and uterine cancer, Chang et al. reported (in their primary analysis) a statistically significant association between use of hair straighteners, relaxers or pressing products in the 12 months prior to enrollment in the study and diagnosis of uterine cancer, while Bertrand et al. did not (Bertrand et al., 2023; Chang et al., 2022). Only one article, by White et al., has assessed hair straightener or hair relaxer use and ovarian cancer, and the authors found no association in their primary analysis between ever use and ovarian cancer (White et al., 2021). These articles also reported on various subgroup analyses (described below), but these subgroup analyses failed to yield consistent relationships across studies. As I

describe with additional detail below, these three articles of two cohort studies are not sufficient to establish that consumer use of chemical hair relaxers is associated with, or causes, uterine cancer, or ovarian cancer. As I described above, association and causation are distinct, but a valid association is the first step in assessing causation. Nevertheless, I apply the Bradford-Hill criteria for causation, which I discuss in full in Section VIII. It is my opinion that the Bradford-Hill causation criteria are not satisfied.

### A. Ovarian Cancer and Chemical Hair Relaxers

The Sister Study enrolled women between 35 and 74 years old living in the United States (including Puerto Rico) from 2003 to 2009. The women were eligible if they had no history of breast cancer but had at least one sister who had been diagnosed with breast cancer (D. Sandler et al., 2017). Women were recruited through a marketing campaign with an emphasis to enroll a diverse group of women to study environmental and genetic risk factors for breast cancer and other diseases, including gynecologic cancer, cardiovascular disease, osteoporosis, and autoimmune diseases. While the investigators attempted to enroll a larger proportion of women who were ethnic minorities, only 9% of participants identified as non-Hispanic Black/African American (D. Sandler et al., 2017). Baseline data was collected via telephone interview and included demographic information, residential information, medical history, including medication use, reproductive history, breast surgeries and conditions, occupational history, physical activity, and personal care product use including use of hair straighteners or hair relaxers or pressing products, as well as other measures of lifestyle and environmental exposures. Women enrolled in the cohort were followed through brief annual updates and biannual/triannual more comprehensive questionnaires with encouragement to self-report significant medical diagnoses. The data from this cohort were used by White et al. and Chang et al. to evaluate possible association between hair product use and gynecological cancers.

#### i. White et al., 2021

In the study by White et al., ovarian cancer cases were defined as self-reported or next-of-kin-reported diagnosis of incident ovarian, fallopian tube, or peritoneal cancer (White et al., 2021). Exclusion criteria included pre-existing ovarian cancer or uncertain timing of diagnosis of ovarian cancer, surgical history of bilateral oophorectomy, lack of follow-up, missing data on hair product use, and study withdrawal, leaving 40,559 women in the eligible cohort. Hair product use was grouped into the following categories: permanent hair dye, semi-permanent hair dye, hair straighteners/relaxers or pressing products, and hair permanents/body waves. Product use was assessed only at study baseline by asking participants their prior 12-month use of each product, with responses for hair straightener/relaxer or pressing product use collapsed into three categories: never, 4 or fewer times per year, and more than 4 times per year. White et al. used a Cox proportional hazard modeling in their analysis, accounting for race/ethnicity, education, BMI, age at menarche, menopausal status, number of pregnancies, oral contraceptive use, hormone therapy use, hysterectomy status, tubal ligation status, smoking status, and alcohol use as potential confounders. White et al. used a time-scale model with age, and participants were followed until ovarian cancer diagnosis or censored at the time of bilateral oophorectomy, loss of follow-up, or study end. Additionally, White et al. assessed interactions with frequency-of-use variables using a chi-square test for significance of potential trend interactions. Sub-group analyses included Wald tests by race and by hair type, and sensitivity analyses included restricting the analysis to medically-confirmed ovarian cancers and assessing potential misclassification among perm users and straightener/relaxer users.

Among study participants, White et al. found no significant association with "ever use" versus "never use" of hair relaxer/straighteners or pressing products and ovarian cancer (multivariate HR = 1.29; 95% CI: 0.70-2.38) but reported a statistically significant association between "frequent use" (>4 times/year) and ovarian cancer (HR = 2.19; 95% CI: 1.12-4.27). They observed 241 incident cases of ovarian cancer over a 10-year period, but only 22 cases among Black participants, which is consistent with the rarity of ovarian cancer among Black women. In a sub-group analysis, White et al. found no statistically significant associations among either non-Hispanic White women with "ever use" of hair straighteners/relaxers or pressing products (HR = 0.89; 95% CI = 0.33, 2.40) or "frequent use" (HR = 1.55; 95% CI: 0.49, 4.86) or Black women with "ever use" (HR = 1.28; 95% CI = 0.46, 3.52) or "frequent use" (HR = 1.82; 95% CI = 0.64, 5.18) compared to "never use" of straighteners/relaxers or pressing products (White et al., 2021). The authors did find an association between frequent hair relaxer/straightener or pressing product use (but not "ever use") for non-serous ovarian cancer (HR = 4.35; 95% CI: 1.10, 17.2). The association was dependent on very few cases of non-serous ovarian cancer among frequent users (n=4). As White et al. noted in their paper, "[b]ecause the nonserous group includes clear cell, endometrioid, and mucinous carcinomas, as well as several other histologic types with potentially divergent etiologies, the subtype-stratified analyses are difficult to interpret." (White et al., 2021).

First, this is a hypothesis-generating study, the findings of which require replication in hypothesis-driven research to confirm validity. Hypothesis-generating studies are exploratory by design and lack predefined hypotheses. They often involve multiple comparisons, increasing the risk of false-positive findings due to chance. The study's exploratory nature and lack of a predefined hypothesis are indicated by the authors' stated aim to "evaluate the association between use of specific hair products during adulthood in relation to incident ovarian cancer in a large prospective cohort of US women." Separate analyses were conducted on seven groups of hair products: permanent dyes, semi-permanent dyes; temporary dyes; bleach; highlights; straighteners, relaxers, or pressing products, and hair permanents or body waves. Multiple subgroup analyses were conducted for each grouping of hair products, further increasing the likelihood of false-positive findings.

Second, White et al. did not specifically examine ovarian cancer risk from hair relaxer use. The participants were asked at baseline "In the past 12 months, how frequently have you or someone else straightened or relaxed your hair, or used hair pressing products?" and "In the past 12 months, how frequently have you straightened or relaxed someone else's hair, or used hair pressing products on someone else? Please do not include times you did this as part of a job." [Sister Cohort questionnaire]. In other words, White et al. examined ovarian cancer risk from all of the three main types of hair straightening methods: pressing products, smoothing products (e.g., Brazilian blowouts), and hair relaxers. We do not know whether any of the participants in Sister Study who developed ovarian cancer actually used chemical hair relaxers. We cannot attribute any reported finding from the Sister Study on ovarian cancer risk to chemical hair relaxers.

Third, the categorization of "never users," "ever users" and "frequent users" was based on the assumption that product use in the 12 months prior to enrollment accurately reflects lifetime usage patterns, but this assumption was not validated. In fact, it is likely that many of the "never users" had used hair relaxers outside this 12-month period. For example, in this study, 74% of Black women in the non-case group, which comprised the majority of participants, were classified as "ever users." By contrast, in the Women's Circle of Health Study (WCHS) cohort, approximately 88% Black women reported using hair relaxers and straighteners for at least one year (Llanos et al., 2017). Similarly, 95% of Black women reported past use of chemical hair straighteners in the BWHS cohort, and 89% of Black women reported past use of hair relaxers

and straighteners in the Study of Environment, Lifestyle, and Fibroids (SELF) cohort (Bertrand et al., 2023; Gaston et al., 2020). Because the details of misclassifying ever/frequent users as "never uses," such as whether the misclassification disproportionately affected specific subgroups or interacted with confounders, are unknown, the direction of bias cannot be determined with certainty. Moreover, because the analysis of "frequent users" relied on the unvalidated assumption that product use in the 12 months prior to enrollment accurately reflects lifetime usage patterns, a dose-response gradient could not be reliably estimated.

Fourth, the Sister Study cohort did not collect information on specific product formulations, brands, or ingredients. Consequently, the findings reported in White et al. may not be extrapolatable to a particular formulation. The lack of product information also prevents the study from formulating hypotheses regarding the effects of individual chemical constituents. Without clear hypotheses, it is scientifically unwarranted to extrapolate from studies focusing on chemicals allegedly present in hair relaxers to assess cancer risk from hair relaxer use.

Fifth, the sample size was small. There were only 24 ovarian cancer cases among "ever users," including 4 in White women and 17 in Black women. The sample size was even smaller in subgroup analyses by frequency and medically confirmed cases. Small samples reduce statistical power, making estimates more variable and increasing the likelihood that significant findings reflect random noise rather than true effects. This instability, combined with practices such as multiple comparisons, can lead to a higher proportion of false positives.

Sixth, it appears that the statistically significant increase among frequent users of hair straighteners or hair relaxers was largely driven by the four medically confirmed ovarian cancer cases. As discussed above, this small sample size increases the likelihood of false positives. In addition, non-serous subtypes exhibit heterogeneous molecular features and divergent etiologies, making it inappropriate to infer uniform increased risk of this group of ovarian cancers. As the study authors acknowledged: "Because the non-serous group includes clear cell, endometrioid, and mucinous carcinomas, as well as several other histologic types with potentially divergent etiologies, the subtype-stratified analyses are difficult to interpret." Moreover, White et al. also reported statistically significant increases in non-serous ovarian cancer among ever and frequent users of permanent hair dyes. If the use of hair relaxers, straighteners or pressing products were correlated with the use of permanent hair dyes, the finding for hair relaxers, straighteners or pressing products could be confounded by the use of permanent hair dyes.

Seventh, the chemicals allegedly present in hair relaxers such as parabens, phthalates, and formaldehyde are ubiquitous in foodstuffs, personal care products, and many other sources, resulting in diverse exposure pathways for individuals. If these chemicals were indeed associated with increased ovarian cancer risk, the failure to adjust for these factors in White et al. would introduce a substantial risk of confounding. Without controlling for these factors, it also becomes difficult to isolate the effect of hair relaxers from the broader background of ubiquitous exposures to these chemicals. Furthermore, I am not aware of any chemical allegedly present in chemical hair relaxers that has been identified as a cause of ovarian cancer in humans.

Eighth, cancer diagnoses in the Sister Study cohort were largely based on self-reports, suggesting a potential for misclassification between cancer and non-cancer participants. Medical or death certificate confirmation was obtained only for 77% (185) of the 241 self-reported ovarian cancer cases. The agreement between self-reports and medical records was 80%. The potential for misclassification is consistent with the observation that the statistically significant increase among frequent users disappeared when the analysis was restricted to medically confirmed cases.

Ninth, because the participants in the Sister Study cohort were eligible only if they had at least one sister diagnosed with breast cancer, this cohort was at increased risk of ovarian cancer. This introduces potential selection bias and limits generalizability to the general population of hair relaxer users.

## B. Uterine Cancer and Chemical Hair Relaxers

### i. Chang et al., 2022

In a similar analysis of the Sister Study cohort, Chang et al. examined hair care product use and uterine cancer incidence (Chang et al., 2022). Uterine cancer cases were defined as women who self-reported a diagnosis of endometrial cancer, uterine sarcoma, or other types of cancer in the uterus and was confirmed by medical records when possible. Exclusion criteria included prior surgical history of hysterectomy, prior history of uterine cancer, unclear timing of diagnosis relative to enrollment, lack of hair product use information, and other issues. The investigators studied the associations between the use of seven hair products, including straighteners, relaxers, or pressing products and incident uterine cancer (i.e., uterine sarcoma and endometrial cancer). Like White et al., hair product use was assessed by self-report based on the prior 12 months at study start. The study population was comprised of 7.4% Black, 4.4% Hispanic and 85.6% non-Hispanic White women. Also, like White et al., Chang et al. used Cox proportional hazard modeling with age as the timescale in their analysis, although with slightly different confounders, including race/ethnicity, education, BMI, physical activity, menopausal status at enrollment, parity, smoking status, alcohol consumption, oral contraceptive use duration, hormone replacement therapy, and age at menarche. Trend interactions were also assessed via Wald tests of covariate-by-attained-age interaction terms.

30,329 (90.9%) participants reported not using a hair straightener, relaxer, or pressing product in the 12 months prior to enrollment (classified as “never users”), whereas 3,306 (9.1%) participants reported past 12-month use of hair straighteners, relaxers, or pressing products (“ever users”). Chang et al. found a statistically significant association between ever use of straighteners, relaxers or pressing products and uterine cancer compared with never use (multivariate HR = 1.80; 95% CI: 1.12-2.88) and also showed a statistically significant associations between frequent users and uterine cancer (multivariate HR = 2.55; 95% CI: 1.46-4.45). Additionally, infrequent use (≤4 times/year) was not associated with uterine cancer (multivariate HR 1.20; 95% CI: 0.63–2.29), and frequent use (>4 times/year) associated with a statistically significant association (multivariate HR 2.55; 95% CI, 1.46–4.45), although this three-tiered usage classification scheme is insufficient to determine if a dose-response relationship was present.

Stratified analyses revealed that the association persisted among postmenopausal women (HR 1.90; 95% CI: 1.16–3.13) but was not statistically significant among premenopausal women (HR 1.56; 95% CI: 0.26–9.29). Subgroup analyses by race/ethnicity indicated that the reported association was statistically significant among non-Hispanic White women but not among Black women for “ever users” (HR = 1.66; 95% CI: 0.67-4.09) or for “frequent users” (HR = 2.12; 95% CI: 0.83-5.39). Elevated risks were observed in both obese and non-obese women. Notably, Chang et al., identified an effect modification by physical activity with significant associations restricted to women reporting low levels of physical activity.

First, this is a hypothesis-generating study, the findings of which require replication in hypothesis-driven research to confirm validity. Hypothesis-generating studies are exploratory by design and lack predefined hypotheses. They often involve multiple comparisons, increasing the risk of false-positive findings due to chance. Chang et al. is exploratory in nature and lacks a predefined hypothesis, as indicated by the authors’ stated aim “to examine associations

between hair product use and the age-specific hazard of uterine cancer in a large, racially and ethnically diverse cohort in the United States." Separate analyses were conducted on seven groups of hair products: permanent dyes; semi-permanent dyes; temporary dyes; bleach; highlights; straighteners, relaxers, or pressing products, and hair permanents or body waves. Multiple subgroup analyses were conducted for each type of hair product, further increasing the likelihood of false-positive findings.

Second, Chang et al. did not specifically examine uterine cancer risk from chemical hair relaxer use. The participants were asked at baseline "In the past 12 months, how frequently have you or someone else straightened or relaxed your hair, or used hair pressing products?" and "In the past 12 months, how frequently have you straightened or relaxed someone else's hair, or used hair pressing products on someone else? Please do not include times you did this as part of a job." [Sister Study Cohort questionnaire]. In other words, Chang et al. examined uterine cancer risk from all of the three main types of hair straightening methods: pressing products, smoothing products (e.g., Brazilian blowouts), and chemical hair relaxers. We do not know whether any of the participants in Sister Study who developed uterine cancer actually used chemical hair relaxers. We cannot attribute any reported finding from Chang et al. on uterine cancer risk to the use of chemical hair relaxers. In fact, it cannot be ruled out that the statistically significant findings for all races combined were driven by use of non-relaxer hair straightening methods. In their subgroup analyses, Chang et al. reported a statistically significant increase in uterine cancer risk among White women, whereas no such finding was reported among Black women. Although the Sister Study cohort was not designed to evaluate racial differences in the relative use of hair relaxers, hair straighteners, and pressing products, other cohorts suggest that while Black women typically use hair relaxers to straighten their hair, White women typically use non-relaxer hair straightening methods. For example, the Women's Circle of Health Study (WCHS) cohort had a similar enrollment period (2002-2104) and age at enrollment (20-74 with a mean age around 50) as the Sister Study cohort (Llanos et al., 2017). In this cohort, among Black women in both the case and control groups (2,798 in total), 2,435 reported using hair relaxers and straighteners for at least one year, and 2,295 of them reported that they typically used hair relaxers; among White women in both the case and control groups (1,487 in total), 90 reported using hair relaxers and straighteners for at least one year, and only 33 of them reported that they typically used hair relaxers.

Third, the categorization of "never users," "ever users" and "frequent users" was based on the assumption that product use in the 12 months prior to enrollment accurately reflects lifetime usage patterns, but this assumption was not validated. In fact, it is likely that many of the "never users" had used hair relaxers outside this 12-month period. For example, in this study, 653 of the Black women were categorized as "never users," and 1,852 were categorized as "ever users," resulting in 74% Black women categorized as "ever users." By contrast, in the Women's Circle of Health Study (WCHS) cohort, approximately 88% of Black women reported using hair relaxers and straighteners for at least one year (Llanos et al., 2017) Similarly, 95% of Black women reported past use of chemical hair straighteners in the BWHS cohort, and 89% Black women reported past use of hair relaxers and straighteners in the Study of Environment, Lifestyle, and Fibroids (SELF) cohort [Bertrand 2023; Gaston 2020]. Because the details of misclassifying ever/frequent users as "never uses," such as whether the misclassification disproportionately affected specific subgroups or interacted with confounders, are unknown, the direction of bias cannot be determined with certainty. Moreover, because the analysis of "frequent users" relied on the unvalidated assumption that product use in the 12 months prior to enrollment accurately reflects lifetime usage patterns, a dose-response gradient could not be reliably estimated.

Fourth, the Sister Study cohort did not collect information on specific product formulations, brands, or ingredients. Consequently, the findings reported in Chang et al. may not be extrapolatable to a particular formulation. The lack of product information also prevents the study from formulating hypotheses regarding the effects of individual chemical constituents. Without clear hypotheses, it is scientifically unwarranted to extrapolate from studies focusing on chemicals allegedly present in hair relaxers to assess cancer risk from chemical hair relaxer use.

Fifth, the sample size was small. There were only 38 uterine cancer cases among "ever users," including 12 in White women and 23 in Black women. The sample size was even smaller in subgroup analyses by frequency, menopausal status, BMI, physical activity, and medically confirmed cases. Small samples reduce statistical power, making estimates more variable and increasing the likelihood that significant findings reflect random noise rather than true effects. This instability, combined with practices such as multiple comparisons, can lead to a higher proportion of false positives.

Sixth, the chemicals allegedly present in hair relaxers such as parabens, phthalates, and formaldehyde are ubiquitous in foodstuffs, personal care products, and many other sources, resulting in diverse exposure pathways for individuals. If these chemicals were indeed associated with increased uterine cancer risk, the failure to adjust for these factors in Chang et al. would introduce a substantial risk of confounding. Without controlling for these factors, it also becomes difficult to isolate the effect of chemical hair relaxers from the broader background of ubiquitous exposures to these chemicals. Furthermore, I am not aware of any chemical allegedly present in chemical hair relaxers that has been identified as a cause of uterine cancer in humans.

Seventh, there are notable differences in baseline characteristics between "ever users" and "never users." As indicated by the study authors, "ever users" were younger with a higher BMI and lower physical activity than "never users." Although these factors were adjusted in the statistical analyses, substantial imbalances in risk factor distribution can limit the effectiveness of statistical adjustment, resulting in residual confounding. Of note, BMI was adjusted only at baseline and not updated throughout the follow-up period, which may also lead to residual confounding.

Eighth, cancer diagnoses in the Sister Study cohort were largely based on self-reports, suggesting a potential for misclassification between cancer and non-cancer participants. Medical or death certificate confirmation was obtained only for 69.3% (262) of the 378 self-reported uterine cancer cases.

Ninth, because the participants in the Sister Study cohort were eligible only if they had at least one sister diagnosed with breast cancer, this cohort had increased risk of uterine cancer. This introduces potential selection bias and limits generalizability to the general hair relaxer users.

#### ii. Bertrand et al., 2023

In 1995, the BWHS, a prospective cohort study among 59,000 women who self-identified as Black, was established and included participants between 21 and 69 years of age (Rosenberg et al., 1995). Prior to the 1990s, Black women were deemed too few to count in epidemiological studies, which contributed to limited findings available on factors that contributed to disease outcomes among Black women. Therefore, the findings from prior epidemiology studies were not generalizable to Black women. The BWHS was established to identify factors such as diet, exercise, menstrual and reproductive history, stress, and other exposures and assess whether these factors affected health outcomes, including cancer

outcomes. As one of the founding members of the BWHS, my co-investigators and I identified specific exposure-disease associations among Black women, like breast cancer and alcohol, where the prior studies showed weak associations that could be due to uncontrolled confounding, as fewer Black women drink than White women, and constructed the questionnaires with the intent to inform physicians and other medical providers on preventive and interventional public health efforts to improve the lives of Black women.

Participants were recruited for this prospective cohort study through postal questionnaires to Black women identified with the assistance of the National Education Association, Essence Magazine, and the publishers' clearing house. Respondents who completed the questionnaire were enrolled in the study. The initial questionnaire in 1995 included questions regarding occupation, education, menstrual and reproductive history (including birth control use), medication history (including HRT), smoking history, family medical history, alcohol use, physical activity, height and weight, diet, and family and community measures. In 1997, my co-investigators and I added additional questions on chemical hair relaxer use, including questions regarding age at first use, frequency of use, duration of use, and lye versus no-lye products as shown below:

**27. Have you *ever* used a chemical hair straightener?**

- Yes
- No → *Go to question 28.*

**a. At what age did you *first* use chemical hair straighteners?**

- Less than 10 years old
- 10–19 years old
- 20–29 years old
- 30 or more years old

**b. How often do you (or did you) use chemical hair straighteners?**

- About 1 time per year
- About 2 times per year
- About 3–4 times per year
- About 5–6 times per year
- 7 or more times per year

**c. In total, *how many years* have you used hair straighteners?**

- Less than 1 year
- 1–4 years
- 5–9 years
- 10–14 years
- 15–19 years
- 20 or more years

**d. How many times have you experienced burns (a break in the skin, not just tingling) during the application of chemical straighteners?**

- Never
- 1–2 times
- 3–4 times
- 5–9 times
- 10 or more times

**e. Which of the following chemical hair straighteners have you used *most often*?**

- Lye
- No-lye
- Don't know

Study investigators contact participants in this cohort of Black women biennially to collect additional data with the study currently funded through 2027. Study staff work to identify participants who may have moved between questionnaires and obtain updated addresses to minimize study attrition. When possible, disease outcomes are informed via self-report and confirmed with medical records if consented by the participant. Deaths are informed from close contacts of the participant, the postal service, or the National Death Index.

Bertrand et al. investigated the possible association between chemical hair relaxer use and the risk of uterine cancer among participants in the BWHS (Bertrand et al., 2023). Eligibility included women with an intact uterus who were followed from 1997 until 2019 via biennial questionnaires. Uterine incident cases were obtained through self-report on follow-up

questionnaires, as well as linkage to state cancer registries and the National Death Index. Follow-up of the BWHS was complete for more than 80% of participants. Medical records were also used to confirm uterine cancer diagnoses, coupled with cancer registry data with diagnoses that included endometrial cancer and uterine sarcoma (Bertrand et al., 2023). Notably, chemical hair relaxer use was only assessed on the 1997 questionnaire, possibly contributing to classification bias at the time of diagnosis. Women who did not complete the 1997 questionnaire or the hair relaxer portion of the 1997 questionnaire were excluded. Additional exclusion criteria included those with a history of hysterectomy or those with cancer (excluding non-melanoma skin cancer) prior to completion of the 1997 questionnaire.

As shown above, chemical hair relaxer use was assessed, as well as age at first use, frequency of use, duration of use, type of chemical hair relaxer use (i.e., lye versus non-lye), and frequency of scalp burns during use. As product use was only assessed on the 1997 questionnaire, Bertrand et al. used responses to this questionnaire to approximate lifetime use of chemical hair relaxers. As noted in prior analyses, only 5% of participants responded "no" to Question 27 and another 5% had used hair relaxers 2 or fewer times a year and for 1 to 4 years. These respondents were grouped as "never/light users" (10%, n = 4,535) (Coogan et al., 2021). "Heavy" users were classified as using hair relaxers for 15 years or more and 5 or more times per year (37%, n = 16,535). The remaining respondents were grouped as "moderate" users (i.e., more than 2 but less than 4 times per year and more than 4 but less than 15 years of use) (53%, n = 23,728). Bertrand et al. included the following potential confounders in their Cox proportional hazard model of analysis, stratified by age and follow-up time: age at menarche, oral contraceptive use, parity, menopausal status, post-menopausal hormone use, BMI, smoking history, alcohol consumption, physical activity, residential region, and moderate users (multivariate HR = 1.23; 95% CI: 0.8-1.76) and educational attainment.

Overall, compared to never/light users, neither heavy users (multivariate HR = 1.18; 95% CI: 0.81-1.71) nor moderate users (multivariate HR = 1.23; 95% CI: 0.8-1.76) showed a statistically significant association with uterine cancer. There were no statistically significant associations found between uterine cancer and hair relaxer use by duration of use, frequency of use, age at first use, or number of burns within the main analyses. Furthermore, when stratified by the use of lye or no-lye formulations, neither heavy use (multivariate HR = 1.04; 95% CI: 0.85-1.87) nor moderate use (multivariate HR = 1.49; 95% CI: 0.87-2.54) of lye-based hair relaxers or heavy use (multivariate HR = 1.24; 95% CI: 0.83-1.84) or moderate use of no-lye relaxers (multivariate HR = 1.22; 95% CI: 0.84-1.77) showed any statistically significant association with uterine cancer. As with the full analysis, the stratified analysis of lye versus no-lye hair relaxers showed no statistically significant associations with duration of use, frequency of use, or number of burns.

Stratifying by menopausal status, among the pre-menopausal women, there were no statistically significant associations. Among post-menopausal women, however, there were statistically significant associations reported, although the dose-response findings were inconsistent, with no trend analysis to support a dose-response effect. Among pre-menopausal women, Bertrand et al. did not find a statistically significant association among either moderate (multivariate HR = 0.84; 95% CI: 0.45-1.58) or heavy use groups (multivariate HR = 0.63; 95% CI: 0.32-1.24). Among post-menopausal women, Bertrand et al. identified a statistically significant increase among both moderate (multivariate HR = 1.60; 95% CI: 1.01-2.53) and heavy use groups (multivariate HR = 1.64; 95% CI: 1.01-2.64). Bertrand et al. also performed a dose-response analysis for both frequency and duration of use. For frequency of use, there was only a statistically significant association for use of 5 to 6 times per year (multivariate HR = 1.85; 95% CI: 1.13-3.03), but not for 1 to 2 times per year (multivariate HR = 1.59; 95% CI:0.87-2.91), 3 to 4 times per year (multivariate HR = 1.56; 95% CI:0.96-2.53), or 7 or more times per year

(multivariate HR = 1.47; 95% CI: 0.88-2.46). For duration of use, there was no consistent dose-response effect observed, with statistically significant associations only for those who reported 10 to 14 years of relaxer use (multivariate HR = 2.21; 95% CI: 1.30-3.75) and those who used hair relaxers for 20 years or more (multivariate HR = 1.71; 95% CI: 1.08-2.72). A statistically significant increased risk of uterine cancer was not observed among post-menopausal women who reported 15 to 19 years of relaxer use (multivariate HR = 1.49; 95% CI:0.85-2.59).

In a secondary sensitivity analysis, when stratified by lye or no-lye relaxers among postmenopausal women only, Bertrand et al. reported a statistically significant association with moderate use of lye relaxers (multivariate HR = 2.59; 95% CI: 1.30-5.13) but not among heavy users of lye relaxers (multivariate HR = 1.45; 95% CI: 0.67-3.17). Among users of no-lye hair relaxers, they reported a statistically significant association among heavy users (multivariate HR = 1.85; 95% CI: 1.12-3.05) but not among moderate users (multivariate HR = 1.56; 95% CI: 0.96: 2.53). Further analysis by frequency of use showed a statistically significant association among those who most commonly used lye hair relaxers one to four times per year (HR = 2.52; 95% CI: 1.17-5.43) but not more frequently (e.g., 5 to 6 or 7 or more times per year). Similarly, among postmenopausal women who most commonly used no-lye hair relaxers, Bertrand et al. reported a statistically significant association with uterine cancer among those who used hair relaxers 5 to 6 times per year (multivariate HR = 1.96; 95% CI: 1.16-3.31) but not 7 or more times per year. Among postmenopausal women who most commonly used lye hair relaxers, a statistically significant risk was only reported in moderate users (multivariate HR = 2.59; 95% CI:1.30-5.13) but not in heavy users (multivariate HR = 1.45; 95% CI: 0.67-3.17). There were no statistically significant associations between frequency of burns and uterine cancer observed among postmenopausal women.

Bertrand et al. is a hypothesis-generating study exploring possible associations between chemical hair relaxer use and uterine cancer risk. The study authors acknowledged in their Introduction section, "Whether hair relaxer use increases risk of uterine cancer is unknown." This underscores that Bertrand et al. explored a poorly understood area rather than testing a well-established hypothesis. Bertrand et al. took an exploratory approach, stratifying the cohort by menopausal status and use of lye/no-lye hair relaxers and conducting multiple analyses on frequency, duration, type, age at first use, number of burns for the overall cohort and the sub-cohorts, rather than testing pre-defined hypotheses. Such broad, multiple comparisons, which are typical of hypothesis-generating studies, increase the likelihood of false-positive findings. The authors concluded: "Our findings highlight the importance of continued research regarding potential adverse health effects of exposure to chemical hair relaxers and their constituents," suggesting that the results in Bertrand et al. are intended to generate new hypotheses for future, more targeted studies.

Second, this study may be subject to recall bias, particularly regarding self-reported chemical hair relaxer use over long durations. Participants were asked to recall details about their past use of chemical hair relaxers, including frequency, duration, type, age at first use, and number of burns (the mean age when the participants filled out the questionnaire was 43.4, 39.8 and 39.1 for never/light, moderate and heavy users, respectively). Such long-term recall can be inaccurate, as individuals may forget, misestimate, or misclassify their past behaviors. This potential for recall bias is especially relevant for exposure characterization involving extended use, which could affect the reliability of the associations reported between hair relaxer use and uterine cancer risk.

Third, the categorization of "never/light users," "moderate users" and "heavy users" was based on the usage pattern assessed in the 1997 questionnaire. Exposure information was not updated during the follow-up period of up to 22 years. This increases the potential for exposure misclassification not only among "never/light users," "moderate users" and "heavy users," but

also in sub-group analyses based on duration and frequency of use. Because the details of the misclassification, such as whether it disproportionately affected specific subgroups or interacted with confounders, are unknown, the direction of bias cannot be determined with certainty.

Fourth, the BWHS cohort did not collect information on specific product formulations, brands, or ingredients. The lack of this information can lead to misclassification of the chemical hair relaxer product (e.g., lye versus no-lye). Consequently, the findings reported by Bertrand et al. may not be extrapolatable to a particular formulation or "generalizable to chemical hair relaxers on the market today or to contemporary patterns of use," as the study authors noted. The lack of product information also prevents the study from formulating hypotheses regarding the effects of individual chemical constituents. Without clear hypotheses, it is scientifically unwarranted to extrapolate from studies focusing on chemicals allegedly present in hair relaxers to assess cancer risk from hair relaxer use.

Fifth, the chemicals allegedly present in hair relaxers such as parabens, phthalates, and formaldehyde are ubiquitous in foodstuffs, personal care products, and many other sources, resulting in diverse exposure pathways for individuals. If these chemicals were indeed associated with increased uterine cancer risk, the failure to adjust for these factors in Bertrand et al. would introduce a substantial risk of confounding. Without adequately accounting for these factors in non-exposed patients, it also becomes difficult to isolate the effect of chemical hair relaxers from the broader background of ubiquitous exposures to these chemicals. As stated before, I am not aware of any chemical allegedly present in chemical hair relaxers that has been identified as a cause of uterine cancer in humans.

Sixth, there are notable differences in baseline characteristics among never/light, moderate, and heavy users. As indicated by the study authors, moderate and heavy users were younger, had a higher BMI, and were more likely to have used oral contraceptives than never/light users. Although these factors were adjusted in the statistical analyses, substantial imbalances in risk factor distribution can limit the effectiveness of statistical adjustment, resulting in residual confounding. Of note, BMI was adjusted only at baseline and not updated throughout the follow-up period, which may also lead to residual confounding.

### C. Concluding Remarks

There are no randomized clinical trials assessing chemical hair relaxer use and ovarian or uterine cancer risk. Among the epidemiology cohort studies presented, overall exposure misclassification is thematic across all studies. In fact, one of the two cohorts touted by plaintiffs as showing an association between chemical hair relaxer use and ovarian and uterine cancer did not directly assess chemical hair relaxer use. The Sister Study divided hair product use into seven specific groups of products: permanent hair dye, semi-permanent hair dye, temporary hair dye, bleach, highlights, straighteners/relaxers or pressing products, and hair permanents/body waves. As a result of defining use to include chemical hair relaxers as well as straightening and pressing products, it is improper to use this study to draw any conclusion regarding causation of ovarian or uterine cancer from the use of chemical hair relaxers. It is unclear whether the women in the Sister Study, as analyzed by White et al. and Chang et al., who were grouped by using straightening/relaxing or pressing products used chemical hair relaxers, professional straightening kits like Brazilian blowouts, or mechanical pressing agents like heated combs or flat irons. While it is unclear whether this methodology would bias the analysis towards or away from the null hypothesis, it is improper and scientifically unreliable to use this study to make a causal determination between ovarian cancer and chemical hair relaxers. As White et al. is the only epidemiological article to assess any relationship between hair straightener/relaxer use and ovarian cancer, I can state, even if a true association existed

and without even applying the Bradford Hill Criteria, that there is insufficient evidence to suggest that chemical hair relaxers cause ovarian cancer.

Among the population of Black women investigated in each study, there were no statistically significant increases in gynecological cancers (i.e., uterine cancer or ovarian cancer). Subgroup analyses showed inconsistent results.

The Sister Study cohort was already poised to overestimate any associations identified just due to the high-risk population of the study cohort. The fact that neither Chang et al. nor White et al. found statistically significant increased risk due to hair straightener/relaxer or pressing product use among Black women in a potentially high-risk population provides more evidence that the use of hair relaxers is not a risk factor for these cancers.

For all the cohorts presented, it is clear that there is a lack of quantitative estimates of the chemical components of hair relaxer products, which makes it difficult at best to assess relevant exposures of hair relaxers used by the general population.

## VII. Hypothesized Carcinogenic Mechanisms of Hair Relaxers

Chemical hair relaxers are chemical mixtures that, in addition to the active agents that relax hair, contain additives to improve product performance and shelf stability (Dias et al., 2007). Plaintiffs' experts hypothesized that because some additives are potentially carcinogens or endocrine-disrupting chemicals, it is biologically plausible that chemical hair relaxer use can cause uterine and ovarian cancers in humans. Such broad generalizations are based on speculative leaps rather than scientific evidence. To evaluate whether hair relaxer use can cause uterine or ovarian cancer because it contains a specific chemical, it is necessary to understand the exposure to that chemical through hair relaxer use. None of the three hair straightener/relaxer epidemiological studies assessed product formulations or measured biomarkers of hair relaxer ingredients.

Further, endocrine-disrupting chemicals are not synonymous with carcinogens. Many chemicals, both man-made and naturally occurring, have the potential to interact with the endocrine hormone pathways in humans (Damstra et al., 2002). These chemicals are very broadly categorized as endocrine-disrupting chemicals (EDCs) due to their potential nature to disrupt these pathways. Some of these chemicals, like phytoestrogens, naturally occur in plants, while others, like BPA, were once used to make plastics and other consumer goods. The classifier EDC is very broad and generally refers to any disruption of endocrine activity in animal studies and in vitro, even at high levels. It is paramount to look at data in humans exposed to EDCs to determine if there is any increased risk for a specific disease endpoint with significant exposure. Very few chemicals identified as EDCs have significant human activity and even fewer have carcinogenic activity in humans, and there is almost no information about associations between EDC exposure and endometrial or ovarian cancer (World Health Organization, 2013). To my knowledge, no chemical detected in hair relaxer products and characterized by Plaintiffs' experts as an EDC has been classified by scientific organizations or regulatory agencies as human carcinogens (Helm et al., 2018; World Health Organization, 2013).

Moreover, it is inappropriate to conclude that a chemical can cause uterine or ovarian cancer because it is classified as a human carcinogen. Different cancers have different risk factors and causes (National Cancer Institute, 2025a). For example, Tamoxifen, a partial estrogen agonist that inhibits the actions of estrogen receptors, is associated with secondary endometrial cancers in the treatment of women with breast cancer (Osborne, 1998). In fact, IARC requires identification of a specific target organ or tissue when classifying an agent as carcinogenic to humans (Group 1) (IARC, 2019). To my knowledge, no chemical detected in

hair relaxer products (Helm et al., 2018; World Health Organization, 2013) has been determined by scientific organizations or regulatory agencies as carcinogenic to humans for uterine or ovarian cancer

Finally, the chemicals characterized by Plaintiffs' experts are ubiquitous and detectable in most of the general population (Helm et al., 2018; World Health Organization, 2013). For example, parabens and phthalates are present in a variety of personal care products including shampoos, soaps, lotions, antiperspirants, cosmetics, toothpaste, etc. (World Health Organization, 2013). These chemicals are also detectable in the biological samples of most of the general population (National Center for Environmental Health, 2024). The mere presence of a chemical in a product does not establish its potential health effects without considering dose, exposure route, frequency, and context.

## VIII. Analysis of Bradford Hill Criteria

Before discussing my application of the Bradford Hill criteria, I find a lack of convincing evidence upon which any epidemiologist can make a determination on the relationships between chemical hair relaxer use and either ovarian cancer or uterine cancer broadly, or endometrial cancer specifically. Additionally, while the BWHS included questions regarding chemical hair relaxer use, limiting these questions to self-reported lifetime use on only one questionnaire introduces another set of confounders that limits the ability of epidemiologists to use the findings of the BWHS in determining causal relationships between chemical hair relaxer use and uterine or ovarian cancer.

As plaintiffs' experts are making arguments regarding additional studies between White et al.'s analysis of chemical hair relaxer use and ovarian cancer, I will provide additional information regarding my application of the Bradford Hill criteria below.

### A. Ovarian Cancer

#### i. Strength:

The Sister Study questionnaire was not prepared with the intention of assessing chemical hair relaxer use. White et al., therefore, does not assess whether there is an association between chemical hair relaxer use and ovarian cancer. White et al., did not find an association between ever use of straighteners/relaxers and ovarian cancer, but did report an association between use of straighteners/relaxers and ovarian cancer among those who reported use more than 4 times per year in the year prior to baseline with a borderline statistical significance for trend with use ($p = 0.03$). This finding, while statistically significant, was made despite few cases (20) among frequent users of straighteners/relaxers, who were only a small percentage of the entire cohort (5%). Findings among subgroups are difficult to extrapolate to the entire cohort due to small sample sizes and p-value instability (Rothman and Greenland, 2018). When White et al. limited their analysis to only medically confirmed ovarian cancer cases, the association was only significant for non-serous ovarian cancer (4 cases) and not significant for serous ovarian cancer (4 cases). Additionally, among the 14 Black respondents (who are more likely to use chemical hair relaxers) who were frequent users of straighteners/relaxers, there was no significant association with ovarian cancer. One study is insufficient to assess the strength of an association between hair straighteners/relaxers and ovarian cancer, and White et al. did not demonstrate an association between ovarian cancer and straightener/relaxer products among the subgroup most likely to use chemical hair relaxers.

**ii. Consistency:**

Naturally, one study cannot be used to determine if a causal relationship is consistent. Additionally, White et al. did not determine if any of the Sister Study participants who developed ovarian cancer used chemical hair relaxers as opposed to other straightening or pressing products. It is clear, however, that White et al. did not find a consistent relationship even between frequent straightener/relaxer products across subtypes of ovarian cancer or across racial subgroups.

**iii. Temporality:**

White et al. reported an association between use of straightening/pressing/relaxing products in the year prior to baseline and ovarian cancer only among individuals who report use of those products more than four times per year. While the Sister Study was designed to assess hair product use via self-report for the year prior to study start, this is insufficient to determine if a temporal relationship between chemical hair relaxer use and ovarian cancer exists. Latency (i.e., the duration between initiation of an exposure and diagnosis of a disease) is an important concept in epidemiology and must be accounted for in study design. As an example, epidemiology studies for cancers in survivors of the nuclear detonations at Hiroshima and Nagasaki, Japan, showed a significant delay from the atomic bomb blast to onset of ionizing radiation-related cancers like thyroid cancer. Likewise, as cancer is a disease that takes years from the initiating event to diagnosis, it is unlikely that this study captured enough events to accurately determine the risk of ovarian cancer from exposure to chemical hair relaxers. Additionally, while the authors did exclude women who had uncertain timing of diagnosis relative to baseline, the authors did not exclude individuals whose use of chemical hair relaxers was of too short duration or too close to baseline to plausibly cause their ovarian cancer. As such, the evidence from this study is inconclusive on whether a temporal association exists.

**iv. Biological gradient:**

One study is insufficient to support a biological gradient between either frequency or duration of use and ovarian cancer. White et al. divided the women who reported use of straightening/pressing/relaxing products into three groups by frequency of use in the year prior to baseline: never, four or fewer times per year, or more than four times per year. While their analysis of users of these products did show a significant p value for the trend ($p = 0.03$), there were few cases among infrequent (4) and frequent (20) users. The Sister Study questionnaire was also not designed to assess duration of use and frequency alone is insufficient to make a dose-response analysis.

**v. Specificity:**

Again, as the Sister Study did not specifically assess chemical hair relaxer and determined chemical hair relaxer use in the same aggregated category with other hair straightening and pressing products, there is no specificity between the findings of White et al. and plaintiffs' allegation that chemical hair relaxer use causes ovarian cancer.

**vi. Plausibility:**

Biological plausibility is a concept to provide additional framework on potential mechanisms by which an exposure can lead to a disease endpoint. No organization has determined that chemical hair relaxers cause any cancer, especially ovarian cancer, in humans. It is not plausible that chemical hair relaxers cause ovarian cancer under typical use scenarios.

**vii. Coherence:**

Coherence, as prescribed by the Bradford Hill criteria, is the general fit between the cause-and-effect analysis within the understood natural history and biology of the disease. Due to the lack of population effects with no clear incidence trends among Black women with the most use of chemical hair relaxers, this criterion is unsatisfied by the current scientific evidence.

**viii. Experiment:**

This criterion is specific to experimental evidence that may support a causal relationship if other criteria are unmet. Examples of experimental studies in humans include randomized clinical trials or naturalistic observational studies among exposed versus unexposed groups. No randomized clinical trials on chemical hair relaxers and ovarian cancers have been conducted and observational studies are prone to bias and confounding among groups, as evidenced by the Sister Study. There is no evidence to support this criterion.

**ix. Analogy:**

Analogy can be useful in determining whether known human carcinogen can cause a specific disease endpoint. HPV can cause cervical cancer in humans and may also cause other female reproductive cancers. Chemical hair relaxers are not associated with other female reproductive cancers, like breast cancer. There are no useful analogies to support this criterion.

**B. Uterine Cancer**

There is one publication available that has assessed a possible relationship between chemical hair relaxer use and uterine cancer (Bertrand et al., 2023). There is another study available that has assessed a possible relationship between use of hair straighteners/relaxers/pressing products and uterine cancer (Chang et al., 2022) . Two epidemiologic studies looking at the same exposure are rarely, if ever, sufficient to determine if a cause-and-effect relationship exists between an exposure and a disease. Here we have two epidemiologic studies of uterine cancer that evaluate different exposures. Thus, the body of epidemiologic evidence is insufficient to support a valid association, let alone a causal association between the use of chemical hair relaxers and the development of uterine cancer. Moreover, initial findings may no longer be statistically significant with additional information including longer study duration or additional exposure classification (O'Brien et al., 2024). Furthermore, chemical hair relaxers are complex products who have changed over time for both better performance. And lastly, uterine cancer is a broad classification that includes type I and type II endometrial cancer and uterine sarcoma with differing risk factors and etiologies among these three cancer types (Feinberg et al., 2019; Felix et al., 2013).

As plaintiffs are making additional arguments regarding chemical hair relaxers and uterine cancer other than the two epidemiology studies by Chang et al., and Bertrand et al., I will provide additional information regarding my application of the Bradford Hill criteria below.

**i. Strength:**

Chang et al. reported a statistically significant association between ever use of straighteners, relaxers, or pressing products and uterine cancer (multivariate HR = 1.80; 95% CI = 1.12-2.88). Chang et al. also found a statistically significant association between frequent use (>4 times/year) and never use (multivariate HR = 2.55; 95% CI = 1.46-4.45). As noted above, it is scientifically unreliable to draw any conclusions from Chang et al. about whether use of chemical hair relaxers is associated with the development of uterine cancer. Thus, the results from Chang et al. cannot be used to support strength of association between chemical hair

relaxers and uterine cancer. Bertrand et al. did not find an association between chemical hair relaxer use and uterine cancer when comparing light or never use to either moderate (multivariate HR = 1.23; 95% CI = 0.86-1.76) or heavy use (multivariate HR = 1.18; 0.81-1.71). Bertrand et al. also did not find an association with increasing frequency of use, decreasing age at first use, or with number of burns. Bertrand et al. did report an association between moderate use (multivariate HR = 1.60; 95% CI = 1.01-2.53) and also heavy use (multivariate HR = 1.64; 95% CI = 1.01-2.64) in a subgroup analysis of post-menopausal women; a few positive associations, however, in a few subgroups can occur completely due to chance with multiple comparisons, so the null hypothesis cannot be ruled out. This hypothesis, raised in a sub-group analysis of a single study of chemical hair relaxer use, is not sufficient to support strength of association.

**ii. Consistency:**

Given the differences between exposure assessment between Chang et al. and Bertrand et al., these two studies are too different to determine if the associations between chemical hair relaxer use and uterine cancer are a causal relationship as the exposed group in Chang et al. includes participants who used other straightening and pressing products. Chang et al. found associations between ever use and frequent (>4 times/year) use of straighteners/relaxers and uterine cancer but did not find an association between Black women who had ever used straighteners/relaxers or were frequent users and uterine cancer. It is unclear whether this lack of an association is a type II error (i.e., false negative) or a true finding of a lack of an association, but it is telling that Chang et al. did find a weak association among non-Hispanic White women who were ever (multivariate HR = 1.94; 95% CI = 1.09-3.47) or frequent users (multivariate HR = 2.66; 95% CI = 1.25-5.67) even with fewer cases of uterine cancer in this subgroup. White women are less likely to use chemical hair relaxers, so it is unlikely that the findings of Chang et al. are relevant to chemical hair relaxer used by Black women. There is no consistent relationship between chemical hair relaxer use and uterine cancer.

**iii. Temporality:**

Chang et al. found an association between use of straightening/pressing/relaxing products in the year prior to baseline and uterine cancer. Just like White et al., the Sister Study was designed to assess hair product use via self-report for the year prior to study start, this is insufficient to determine if a temporal relationship between chemical hair relaxer use and ovarian cancer exists. Latency between chemical hair relaxer use and uterine cancer is also a factor in the analysis by Chang et al. Bertrand et al. had the benefit of the BWHS assessing of self-reported lifetime chemical hair relaxer use prior to baseline but did not find a consistent association between chemical hair relaxer use and uterine cancer. Also, follow-up questions in later study questionnaires could better assess whether participants changed hairstyles and changed from the exposed to the unexposed groups. In short, these two studies are insufficient to show temporality between chemical hair relaxer use and uterine cancer.

**iv. Biological Gradient:**

The evidence is insufficient to support a biological gradient between chemical hair relaxer use and uterine cancer. Chang et al. found that both ever and frequent users of straighteners/relaxers in the Sister Study were more likely to develop uterine cancer than never users. Bertrand et al., however, did not find a dose-response relationship with frequency of use of chemical hair relaxers or with duration of use even in sub-groups of lye versus no-lye chemical hair relaxers or menopausal status. Additionally, as the BWHS inquired specifically regarding chemical hair relaxer use versus the Sister Study aggregating chemical hair relaxer use with other straightening and pressing products, the findings by Bertrand et al. are specific to chemical hair

relaxers and the lack of trend with duration or frequency more informative than the findings of Chang et al. The evidence does not demonstrate a dose-response effect between chemical hair relaxer use and uterine cancer.

#### v. Specificity:

There is no specificity with any association between chemical hair relaxers and uterine cancer. Chang et al. reported an association between use of straightening/pressing/relaxing products and uterine cancer, but subgroup analyses only showed a significant association among White women and not Black women. Chang et al. does not report any data specific to the use of chemical hair relaxers. Bertrand et al. did not find an association between chemical hair relaxers and uterine cancer in their primary analysis. This criterion was not met.

#### vi. Plausibility:

No organization has determined that chemical hair relaxers cause any cancer, especially uterine cancer, in humans. To my knowledge, none of the components of chemical hair relaxers are known as human carcinogens for uterine cancer.

#### vii. Coherence:

As discussed in the last section, coherence in this context is the general fit between the cause-and-effect analysis within the understood natural history and biology of the disease. Due to the infrequent or intermittent use of chemical hair relaxers, unclear or even deficient evidence on the potential of the components of these products to cause ovarian cancer, and lack of a clear mechanism, this criterion is unsatisfied by the current scientific evidence.

#### viii. Experiment:

Again, this criterion is specific to experimental evidence that may support a causal relationship if other criteria are unmet. No randomized clinical trials on chemical hair relaxers and uterine cancer have been conducted and observational studies are prone to bias and confounding among groups, as evidenced by the Sister Study. Animal studies are of limited utility in determining cancer causation in humans, and even so, no animal studies have shown tumor development in animals exposed to chemical hair relaxers. There is no evidence to support this criterion.

#### ix. Analogy:

Analogy, as described by Sir Bradford Hill, can be useful in determining whether known human carcinogen can cause a specific disease endpoint. Chemical hair relaxers are not associated with other female reproductive cancers, like breast cancer. There are no useful analogies to support this criterion.

## IX. Conclusions

Based on a comprehensive review of the available scientific and medical literature, as well as the application of established epidemiological and causation methodologies, the evidence does not support a causal relationship between the use of chemical hair relaxers and the development of uterine cancer or ovarian cancer. The available evidence does not consistently demonstrate statistically significant associations between chemical hair relaxer use and increased risk of uterine or ovarian cancer. Where associations have been observed, they are limited to specific subgroups, lack consistent dose-response relationships, and are subject

to methodological limitations such as exposure misclassification, confounding, and bias. As shown with my application of the Bradford Hill criteria, there is insufficient evidence for strength of association, consistency, temporality, biological gradient, specificity, plausibility, coherence, experimental support, or analogy to establish chemical hair relaxers as a cause of uterine or ovarian cancer.

Among Black women, who represent a significant proportion of chemical hair relaxer users, the studies do not identify statistically significant increases in gynecological cancers attributable to hair relaxer use. Even in sub-groups like post-menopausal women with some positive associations, the associations between hair relaxer use and uterine and ovarian cancer are inconsistent and do not show any dose-response correlations.

No medical or scientific organization has concluded that chemical hair relaxers cause uterine or ovarian cancer. The evidence to date is insufficient to warrant changes in public health recommendations or clinical practice regarding hair relaxer use. While some ingredients in hair relaxers are hypothesized to act as endocrine-disrupting chemicals, current human and animal data do not provide convincing evidence that these chemicals, as used in hair relaxers, increase the risk of uterine or ovarian cancer. The ubiquity of certain chemicals (e.g., phthalates, parabens) in consumer products further complicates attribution of risk to hair relaxers alone.

In summary, the current body of scientific evidence does not support a causal association between chemical hair relaxer use and uterine or ovarian cancer. These conclusions are stated to a reasonable degree of scientific certainty and may be supplemented should new information become available.

## X. <u>Rebuttal to Reports by Drs. Gerstman and Cote</u>

I have reviewed the expert reports submitted by counsel for plaintiffs, focusing on the epidemiology reports by Dr. B. Burt Gerstman and Dr. Michele Cote. I respectfully disagree with both experts on numerous statements in their reports and I will rebut several of those statements here.

First, in their expert reports, Dr. Cote and Dr. Gerstman each perform a causation analysis using the Bradford Hill criteria to determine if chemical hair relaxers cause uterine and ovarian cancer combined. This analysis is inappropriate as it combines two distinct diseases into one category. As I discussed in my report above, it is inappropriate to use the Bradford Hill criteria on more than one exposure-disease association and it is also inappropriate to use the Bradford Hill criteria on one epidemiologic study. Here, we have one publication on chemical hair relaxer use, BWHS, which evaluated a possible association with uterine cancer. There are two publications that included exposure data that was not specific to chemical hair relaxer use. More studies are needed before a causation analysis is possible, both for ovarian and uterine cancer and chemical hair relaxers.

Second, the association between chemical hair relaxer use and uterine cancer in post-menopausal women, which show an inconsistent relationship in the analysis by Bertrand et al., is a new hypothesis derived from this analysis of the BWHS. This new hypothesis requires additional study among cohorts of post-menopausal women who have used chemical hair relaxers.

Further, a key part of the Sister Study is the possibility of misclassification bias as a result of the questions on chemical hair relaxer use in the questionnaire. As the questions both aggregate straightening and relaxing products into one category and limit product use to the prior twelve months at baseline, it is impossible to determine whether this exposure assessment

biases the study results “towards the null” hypothesis as Dr. Cote and Dr. Gerstman postulate. It is unclear what proportion of Sister Study participants had long term use of chemical hair relaxers or other hair straighteners but had not used chemical hair relaxers or other straighteners in the prior 12 months to study start and were counted as unexposed participants. The converse is also true, that it is unclear what proportion of Sister Study participants did not have long-term chemical hair relaxers or other hair straighteners, but were new users in the prior 12 months to study start. These questions on exposure, independent of any additional analysis, sufficiently limit one’s ability to make a causal analysis from these findings. A recent systematic review by Hernandez et al. on chemical hair relaxers and female productive outcomes noted the abundance of exposure misclassification across these studies and were unable to conduct a meta-analysis due to the differing methods of exposure classification (Hernandez et al., 2025) .

Overall, the population level data does not show elevated incidence trends for either uterine or ovarian cancer in Black women compared with White women (Clarke et al., 2019; Phung et al., 2022b). Incidence trends for ovarian cancer in the CDC’s SEER database show stable rates since 1975 for Black women with a recent non-significant increase since 2019:




SEER data shows similar results for uterine cancer with similar slight upward trends among both White and Black women:




As Dr. Gerstman noted in his expert report, most Black women have used chemical hair relaxers (89%), with participants in the BWHS reporting higher rates of ever use (95%) while participants in the Sister Study reporting lower rates of ever use of chemical hair relaxers, straighteners, or pressing products (74%) (Bertrand et al., 2023; Chang et al., 2022). If chemical hair relaxers were strongly associated with uterine cancer or ovarian cancer, such high use rates among this population would lead to higher rates of these cancers in this population both in national data sets like the CDC's SEER data and in cohort studies like the BWHS and the Sister Study. Notably, the BWHS, which is a longer duration study of only women who identify as Black, shows a *weaker* association among women who use chemical hair relaxers compared to the Sister Study. If what Dr. Gerstman and Dr. Cote are stating is correct, you would expect to find a *stronger* association between chemical hair relaxers and uterine cancer in the BWHS compared to the Sister Study, even when comparing never/light users to heavy users. While I disagree with Dr. Gerstman on whether his WinPEPI analysis uses the appropriate methodology for a sensitivity analysis of pooled moderate and heavy users in the BWHS, his pooled analysis still shows a weaker association among Black women than Chang et al. found in their analysis.

Also notable in his report, Dr. Gerstman discusses the British Doctors Study by Sir Richard Doll and Sir Richard Peto as an example of a key cohort study on smoking and health. What is notable about Dr. Gerstman's description of the British Doctor's Study was the omission that this was the first cohort study to assess the relationship between smoking and lung cancer, but it was not until a decade later, after many other cohort and other studies, that the U.S. Surgeon General published the first report establishing smoking as a cause of lung cancer using Dr. Bradford Hill's criteria of medical causation. As illustrated below, it was not until many studies, including seven large, prospective cohort studies, showed a statistically significant association between cigarette smoking and lung cancer when the U.K. Royal College of

Physicians and the U.S. Surgeon General published their causation findings regarding smoking and lung cancer in the early 1960s (Schumacher et al., 2014).




As the forest plot from Schumacher et al. above shows, the association between cigarette smoking and death from lung cancer was strong and statistically significant across every prospective cohort study with the most weight for the incidence rate ratio from the very large U.S. Veteran's Study (n = 249,000).

Lastly, Dr. Gerstman used two statistical tools, confidence curves and E-values, to infer more certainty in the findings of the three epidemiological studies on chemical hair relaxers and uterine and ovarian cancer, but he is overstating both the importance and the utility of these tools in his reports. Confidence curves are merely graphical representations of the confidence intervals plotted by varying the alpha value in the function to determine the confidence interval. Graphing confidence curves only shows the range of the probability of the true measurement within a sample population but does not address the sources of bias present in either the BWHS or the Sister Study that limit one's ability to determine if there's a causal relationship based on the results of those studies.

E-values are another statistical tool to address potential confounding bias in an epidemiological study but does not address other forms of bias. This tool, while useful in cohort studies where unknown confounding may be significant, is not useful in addressing systematic bias such as measurement bias as the result of an over-inclusive description of product use like the questions in the Sister Study questionnaire (Ioannidis et al., 2019). A specific example of an unknown confounder is air pollution. An analysis of the Sister Study, conducted by many of the same authors as Chang 2022, on air pollution and uterine cancer, was published in the Journal of the National Cancer Institute in 2024 (Brown et al., 2024) Brown et al. found an association between exposure to nitrogen dioxide and uterine cancer (HR = 1.23; 95% CI: 1.04-1.46). This is exact sort of unknown confounder for which the E-value statistic is useful, but Dr. Gerstman failed to include this confounder in his analysis.

All of my opinions above are stated to a reasonable degree of scientific certainty. I reserve the right to supplement these opinions if additional information becomes available.

Signed:



Lucile L. Adams-Campbell, Ph.D.
January 6, 2026

# XI. Appendices

## A. Table - Uterine Cancer and Chemical Hair Relaxers

| Publication | Description | Findings | Comments |
|---|---|---|---|
| **Bertrand KA, et al.** ***Environ Res*** **(2023) pre-pub** | • Black Women's Health Study, 1997-2019<br>• Included 44,798 women<br>• 347 uterine cancers diagnosed<br>• Product use assessed in 1997; no follow-up<br>• Three groups of exposure:<br>○ Never/Light (<4 years use and ≤2 times per year)<br>○ Moderate (> Light users but < Heavy users)<br>○ Heavy (≥15 years of use and ≥5 times per year)<br>• Exclusion Criteria:<br>○ Did not complete 1997 questionnaire (n=5,923)<br>○ Prior hysterectomy (n=6,164)<br>○ Prior history of cancer (n=1,342)<br>○ No response to hair relaxer questions (n=773) | • **Hair Relaxer Use: Multivariable HR (95% CI)**<br>○ Never/Light: 1.00 (ref)<br>○ Moderate: 1.23 (0.86, 1.76)<br>○ Heavy: 1.18 (0.81, 1.71)<br>• Duration of Use<br>○ Never/Light: 1.00 (ref)<br>○ 1-4 years: 1.00 (0.55, 1.83)<br>○ 5-9 years: 1.00 (0.61, 1.64)<br>○ 10-14 years: 1.35 (0.88, 2.06)<br>○ 15-19 years: 1.06 (0.69, 1.63)<br>○ ≥20 years: 1.28 (0.89, 1.84)<br>• Frequency of Use<br>○ Never/Light: 1.00 (ref)<br>○ 1-2 times/year: 1.22 (0.75, 2.00)<br>○ 3-4 times/year: 1.25 (0.86, 1.83)<br>○ 5-6 times/year: 1.23 (0.83, 1.81)<br>○ ≥7 times/year: 1.08 (0.72, 1.61)<br>• Age at First Use<br>○ <10 years: 1.19 (0.56, 2.54)<br>○ 10-19 years: 1.13 (0.72, 1.78)<br>○ 20-29 years: 1.42 (0.93, 2.15)<br>○ ≥20 years: 1.00 (ref)<br>• Number of Burns<br>○ Never burned: 1.00 (ref)<br>○ 1-2 times: 1.32 (0.94, 1.86)<br>○ 3-4 times: 0.97 (0.66, 1.43)<br>○ 5-9 times: 1.29 (0.85, 1.96)<br>○ ≥10 times: 1.08 (0.73, 1.61)<br>• **Most Commonly Used - Lye** | • No association between hair relaxer use and uterine cancer in main study group<br>• Limited but statistically significant risk in some subgroups of postmenopausal women with frequent use<br>• No clear dose-response effect in any subgroup<br>• Long study duration with assessment of product use at multiple time-points<br>• Lack of statistical test between exposure groups; noticeable difference in duration of oral contraceptive use between exposure groups |

| Publication | Description | Findings | Comments |
|---|---|---|---|
| | | ○ Never/Light: 1.00 (ref)<br>○ Moderate: 1.49 (0.87, 2.54)<br>○ Heavy: 1.04 (0.58, 187)<br>• Duration of Use<br>○ Never/light: 1.00 (ref)<br>○ 1-9 years: 0.55 (0.17, 1.80)<br>○ 10-19 years: 1.59 (0.88, 2.88)<br>○ ≥20 years: 1.28 (0.73, 2.25)<br>• Frequency of Use<br>○ Never/light: 1.00 (ref)<br>○ 1-4 times/year: 1.40 (0.75, 2.58)<br>○ 5-6 times/year: 1.21 (0.62, 2.35)<br>○ ≥7 timers/year: 1.15 (0.61, 2.18)<br>• **Most Commonly Used – No-lye**<br>○ Never/light: 1.00 (ref)<br>○ Moderate: 1.22 (0.84, 1.77)<br>○ Heavy: 1.24 (0.83, 1.84)<br>• Duration of Use<br>○ Never/light: 1.00 (ref)<br>○ 1-9 years: 1.12 (0.69, 1.82)<br>○ 10-19 years: 1.15 (0.76, 1.73)<br>○ ≥20 years: 1.31 (0.90, 1.93)<br>• Frequency of Use<br>○ Never/light: 1.00 (ref)<br>○ 1-4 times/year: 1.26 (0.86, 1.86)<br>○ 5-6 times/year: 1.24 (0.82, 1.89)<br>○ ≥7 times/year: 1.13 (0.73, 1.74)<br>• Number of Burns<br>○ Never burned: 1.00 (ref)<br>○ 1-9 times: 1.16 (0.8, 1.67)<br>○ ≥10 times: 1.12 (0.7, 1.79)<br>• **Premenopausal**<br>○ Never/light: 1.00 (ref)<br>○ Moderate: 0.84 (0.45, 1.58) | |

| Publication | Description | Findings | Comments |
|---|---|---|---|
| | | ○ Heavy: 0.63 (0.32, 1.24)<br>• Duration of Use<br>○ Never/light: 1.00 (ref)<br>○ 1.4 years: 1.36 (0.55, 3.38)<br>○ 5-9 years: 0.90 (0.40, 2.02)<br>○ 10-14 years: 0.66 (0.31, 1.41)<br>○ 15-19 years: 0.65 (0.31, 1.34)<br>○ ≥20 years: 0.74 (0.38, 1.47)<br>• Frequency of Use:<br>○ Never/light: 1.00 (ref)<br>○ 1-2 times/year: 0.83 (0.32, 2.13)<br>○ 3-4 times/year: 1.00 (0.51, 1.94)<br>○ 5-6 times/year: 0.55 (0.27, 1.14)<br>○ ≥7 times/year: 0.65 (0.32, 1.31)<br>• **Postmenopausal**<br>○ Never/light: 1.00 (ref)<br>○ Moderate: **1.60 (1.01, 2.53)**<br>○ Heavy: **1.64 (1.01, 2.64)**<br>• Duration of Use<br>○ Never/light: 1.00 (ref)<br>○ 1-4 years: 0.87 (0.37, 2.95)<br>○ 5-9 years: 1.09 (0.57, 2.12)<br>○ 10-14 years: **2.21 (1.30, 3.75)**<br>○ 15-19 years: 1.49 (0.85, 2.59)<br>○ ≥20 years: **1.71 (1.08, 2.72)**<br>• Frequency of Use:<br>○ Never/light: 1.00 (ref)<br>○ 1-2 times/year: 1.59 (0.87, 2.91)<br>○ 3-4 times/year: 1.56 (0.96, 2.53)<br>○ 5-6 times/year: **1.85 (1.13, 3.03)**<br>• ≥7 times/year: 1.47 (0.88, 2.46) | |

| Publication | Description | Findings | Comments |
|---|---|---|---|
| **Chang CJ, et al. *JNCI* 114, 1636–1645 (2022).** | • Sister Study<br>○ 50,884 women enrolled from 2003-2009<br>○ Breast cancer-free, aged 35-74 yrs. With at least 1 sister w/ breast cancer<br>○ Follow- up annually<br>○ Data through Sept. 2019 (Data Release 9.1)<br>• Exclusion Criteria<br>○ Withdrawal (n=3)<br>○ Self-report uterine cancer before enrollment (n=380)<br>○ Uncertain uterine cancer history (n=10)<br>○ Unclear timing of diagnosis relative to enrollment (n=59)<br>○ Prior hysterectomy to enrollment (n=15,585)<br>○ Did not answer any hair product use questions (n=736)<br>○ Did not contribute follow-up time (n-164)<br>• Total participants = 33,947<br>• Asked Personal Hair Product Use in <u>12 months prior to baseline</u> for 7 types of hair products<br>○ Did not use<br>○ 1-2 times per year<br>○ Every 3-4 months<br>○ Every 5-8 weeks<br>○ Once per month | • **Straighteners, Relaxers or Pressing Products Use, Fully Adjusted HR (95% CI)**<br>○ Never = 1.00 (ref)<br>○ Ever = **1.80 (1.12, 2.88)**<br>○ Never to others = 1.00 (ref)<br>○ Ever to others = 1.42 (0.72, 2.79)<br>• Frequency of Use at baseline<br>○ Never = 1.00 (ref)<br>○ ≤4 times = 1.20 (0.63, 2.29)<br>○ >4 times = **2.55 (1.46, 4.45)**<br>○ $P_{trend}$ = **0.002**<br>• Premenopausal Cases<br>○ Ever Use = 1.56 (0.26, 9.29)<br>○ Frequent Use = 1.56 (0.26, 9.29)<br>○ $P_{trend}$ = N/A<br>• Postmenopausal Cases<br>○ Ever Use = **1.90 (1.16, 3.13)**<br>○ Frequent Use = **2.52 (1.39, 4.55)**<br>○ $P_{trend}$ = **0.003**<br>• Medically Confirmed Cases<br>○ All Uterine Cancer<br>• Ever Use = **1.94 (1.10, 3.42)**<br>• Frequent Use = **2.78 (1.39, 5.55)**<br>• $P_{trend}$ = **0.005**<br>○ Endometrial Cancer<br>• Ever Use = **1.89 (1.04, 3.43)**<br>• Frequent Use = **2.68 (1.30, 5.53)**<br>• $P_{trend}$ = **0.005**<br>○ Type I Endometrial Cancer<br>• Ever Use = **1.89 (1.01, 3.54)**<br>• Frequent Use = **2.94 (1.42, 6.08)**<br>• $P_{trend}$ = **0.009**<br>○ Type II Endometrial Cancer<br>• Ever Use = 2 cases | • Product use reporting issues; Only obtained prior year product use at baseline with no follow-up.<br>• Very limited differentiation between levels of product use (Never vs. Ever vs. Frequent at baseline)<br>• Very few cases in exposed sub-group<br>• Possibility of underlying bias due to genetic risk in cohort as recruitment for the study was based on sibling with breast cancer at baseline<br>• No screening for genetic risk factors at baseline (BRCA + vs. BRCA -; HR+ vs. HR -)<br>• Few cases in medically confirmed endometrial cancers in ever vs. frequent use<br>• Inadequate data on cofounders including exposures to other endocrine disrupters<br>• Over-enrichment of African American women in exposed versus overall cohort. |

| Publication | Description | Findings | Comments |
|---|---|---|---|
| | ○ More than once per month<br>• Grouped to ≤2 or >2 times per year for perms; ≤4 or >4 times per year for other products<br>• Uterine cancer cases defined as either/or endometrial, uterine sarcoma, or other types after enrollment (n=378)<br>○ 247 cases confirmed via medical records<br>○ 15 via death certificate<br>○ 109 via self-report<br>○ 7 via next of kin<br>○ 248 of medically-confirmed cases were endometrial cancer | • Frequent Use = 2 cases<br>• no HR<br>○ African American/Black<br>• Ever Use = 1.66 (0.67, 4.09)<br>• Frequent Use = 2.12 (0.83, 5.39)<br>• $P_{trend}$ = 0.09<br>○ Non-Hispanic White<br>• Ever Use = 1.94 (1.09, 3.47)<br>• Frequent Use = **2.66 (1.25, 5.67)**<br>• $P_{trend}$ = **0.011**<br>○ Nonobese (<30kg/m$^2$)<br>• Ever Use = **1.81 (1.04, 3.17)**<br>• Frequent Use = **2.48 (1.22, 5.03)**<br>• $P_{trend}$ = **0.010**<br>○ Obese (≥30 kg/m$^2$)<br>• Ever Use = 1.68 (0.90, 3.14)<br>• Frequent Use = **2.40 (1.19, 4.85)**<br>• $P_{trend}$ = **0.022**<br>○ Physical Activity – Low<br>• Ever Use = **2.59 (1.46, 4.61)**<br>• Frequent Use = **3.72 (1.91, 7.25)**<br>• $P_{trend}$ = **<0.001**<br>○ Physical Activity – High<br>• Ever Use = 1.30 (0.71, 2.38)<br>• Frequent Use = 1.86 (0.89, 3.87)<br>• $P_{trend}$ = 0.16 | |

## B. Table - Ovarian Cancer and Chemical Hair Relaxers

| Publication | Description | Findings | Comments |
|---|---|---|---|
| **White, et al., *Carcinogenesis* (2021), 42.9:1189-1195** | • Sister Study<br>○ 50,884 women enrolled from 2003-2009<br>○ Breast cancer-free, aged 35-74 yrs. With at least 1 sister w/ breast cancer<br>○ Follow- up annually<br>○ Data through Sept. 2019 (Data Release 9.1)<br>• Exclusion Criteria<br>○ Withdrawal (n=3)<br>○ Self-report ovarian cancer before enrollment (n=201)<br>○ Unclear timing of diagnosis relative to enrollment (n=39)<br>○ Missing data for all questions about hair product use (n=977)<br>○ History of bilateral oophorectomy (w/ or w/o hysterectomy) (n = 8909)<br>○ Did not contribute any follow-up time (n=196)<br>• Total participants = 40,559<br>• Asked Personal Hair Product Use in <u>12 months prior to baseline</u> for 7 types of hair products<br>○ Did not use<br>○ 1-2 times per year<br>○ Every 3-4 months | • **Hair Relaxer Use: Age-Adjusted HR (95% CI)**<br>○ Never: 1.00<br>○ Ever: 1.37 (0.89, 2.10)<br>• **Hair Relaxer Use: Age and Race/Ethnicity-Adjusted HR (95% CI)**<br>○ Never: 1.00<br>○ Ever: 1.26 (0.69, 2.30)<br>• **Hair Relaxer Use: Multivariable-Adjusted HR (95% CI)**<br>○ Never: 1.00<br>○ Ever: 1.29 (0.70, 2.38)<br>• **Frequency of Use in Past 12 Months at Baseline**<br>○ Never: 1.00<br>○ ≤4 times/year: 0.50 (0.17, 1.44)<br>○ **>4 times/year: 2.19 (1.12, 4.27)**<br>○ ***p* value for trend: 0.03**<br>• **Ovarian Cancer Sub-type, Medically Confirmed Cases**<br>○ Ever vs. never<br>• Serous ovarian: 1.33 (0.68, 2.62)<br>• Non-serous ovarian: 1.49 (0.42, 5.33)<br>• *p* for trend: 0.89<br>○ Frequent vs. never<br>• Serous ovarian: 1.13 (0.49, 2.57)<br>• **Non-serous ovarian: 4.35 (1.10, 17.2);**<br>• *p*-value for trend: 0.12<br>• **Race/Ethnicity**<br>○ Non-Hispanic White<br>• Never vs. Ever: 0.89 (0.33, 2.40)<br>• Never vs. Frequent: 1.55 (0.49, 4.86)<br>• *p* for trend: 0.81 | • Sisters Study enrolled sisters of breast cancer patients, so genetic risk for breast cancer among participants<br>• Product use assessed based on 1 year of recall at baseline<br>• Small number of cases who were ever users (24) or frequent uses (8).<br>• Only 4 frequent users diagnosed with non-serous ovarian cancer, same N as serous ovarian cancer<br>• No statistically significant association by race |

| Publication | Description | Findings | Comments |
|---|---|---|---|
| | ○ Every 5-8 weeks<br>○ Once per month<br>○ More than once per month<br>• Grouped to ≤4 or >4 times per year for most products (permanent or semi-permanent dyes, straighteners, perms); duration for dyes collapsed to non-use, <10 years, 10+ years.<br>• Covariates considered:<br>○ Self-identified race and ethnicity<br>○ Educational attainment<br>○ Smoking History<br>○ Alcohol Consumption<br>○ Reproductive History<br>▪ Age at menarche<br>▪ Parity<br>▪ Oral contraceptive use<br>▪ Hormone therapy use<br>▪ Menopausal status<br>○ History of Medical Procedures<br>▪ Hysterectomy<br>▪ Oophorectomy<br>▪ Tubal ligation<br>○ Body Mass Index (BMI) | ○ African-American/Black<br>• Never vs. Ever: 1.28 (0.46, 3.52)<br>• Never vs. Frequent: 1.82 (0.64, 5.18)<br>• *p* for trend: 0.15 | |

## XII. References

American Cancer Society, 2022. Lifetime Probability of Developing and Dying from Cancer, 2016-2018 [WWW Document]. URL https://www.cancer.org/research/cancer-facts-statistics/all-cancer-facts-figures/cancer-facts-figures-2022.html (accessed 8.29.25).

American Cancer Society, 2025. Endometrial Cancer Risk Factors [WWW Document]. URL https://www.cancer.org/cancer/types/endometrial-cancer/causes-risks-prevention/risk-factors.html (accessed 9.2.25).

Belbasis, L., Bellou, V., Ioannidis, J.P.A., 2022. Conducting umbrella reviews. BMJ Med. 1, e000071.

Bertrand, K.A., Delp, L., Coogan, P.F., Cozier, Y.C., Lenzy, Y.M., Rosenberg, L., Palmer, J.R., 2023. Hair relaxer use and risk of uterine cancer in the Black Women's Health Study. Environ. Res. 239, 117228.

Bethea, T.N., Palmer, J.R., Adams-Campbell, L.L., Rosenberg, L., 2017. A prospective study of reproductive factors and exogenous hormone use in relation to ovarian cancer risk among Black women. Cancer Causes Control 28, 385–391.

Blot, W.J., Tarone, R.E., 2015. Doll and Peto's Quantitative Estimates of Cancer Risks: Holding Generally True for 35 Years. J. Natl. Cancer Inst. 107, djv044.

Bregar, A.J., Rauh-Hain, J.A., Spencer, R., Clemmer, J.T., Schorge, J.O., Rice, L.W., Carmen, M.G. del, 2017. Disparities in receipt of care for high-grade endometrial cancer: A National Cancer Data Base analysis. Gynecol. Oncol. 145, 114–121.

Brown, J.A., Ish, J.L., Chang, C.-J., Bookwalter, D.B., O'Brien, K.M., Jones, R.R., Kaufman, J.D., Sandler, D.P., White, A.J., 2024. Outdoor air pollution exposure and uterine cancer incidence in the sister study. JNCI: J. Natl. Cancer Inst. djae031.

Brown, J.S., Amend, S.R., Austin, R.H., Gatenby, R.A., Hammarlund, E.U., Pienta, K.J., 2023. Updating the definition of cancer. Mol. Cancer Res. 21, 1142–1147.

Cancer, C.G. on E.S. of O., Beral, V., Gaitskell, K., Hermon, C., Moser, K., Reeves, G., Peto, R., 2012. Ovarian cancer and smoking: individual participant meta-analysis including 28 114 women with ovarian cancer from 51 epidemiological studies. Lancet Oncol. 13, 946–956.

Cancer, C.G.O.E.S.O.O., Beral, V., Gaitskell, K., Hermon, C., Moser, K., Reeves, G., Peto, R., 2015. Menopausal hormone use and ovarian cancer risk: individual participant meta-analysis of 52 epidemiological studies. Lancet 385, 1835–1842.

Caruso, G., Weroha, S.J., Cliby, W., 2025. Ovarian Cancer. JAMA 334, 1278–1291.

Celentano, D.D., Szklo, M., Gordis, L., 2019. Gordis epidemiology, 6th edition. ed. Elsevier, Philadelphia, PA.

Chang, C.-J., O'Brien, K.M., Keil, A.P., Gaston, S.A., Jackson, C.L., Sandler, D.P., White, A.J., 2022. Use of Straighteners and Other Hair Products and Incident Uterine Cancer. JNCI: J. Natl. Cancer Inst. 114, 1636–1645.

Chen, S.-Y., Feng, Z., Yi, X., 2017. A general introduction to adjustment for multiple comparisons. J. Thorac. Dis. 9, 1725–1729.

Chlebowski, R.T., Aragaki, A.K., Pan, K., Haque, R., Rohan, T.E., Song, M., Wactawski-Wende, J., Lane, D., Harris, H., Strickler, H.D., Kaunitz, A., Runowicz, C.D., 2024. Menopausal hormone therapy and ovarian and endometrial cancers: Long-term follow-up of the Women's Health Initiative randomized trials. J. Clin. Oncol. 42, 10506–10506.

Chou, A.-J., Bing, R.-S., Ding, D.-C., 2024. Endometrial Atypical Hyperplasia and Risk of Endometrial Cancer. Diagnostics 14, 2471.

Clarke, M.A., Devesa, S.S., Harvey, S.V., Wentzensen, N., 2019. Hysterectomy-Corrected Uterine Corpus Cancer Incidence Trends and Differences in Relative Survival Reveal Racial Disparities and Rising Rates of Nonendometrioid Cancers. J. Clin. Oncol. 37, 1895–1908.

Cole, S.R., Frangakis, C.E., 2009. The Consistency Statement in Causal Inference. Epidemiology 20, 3–5.

Coogan, P.F., Rosenberg, L., Palmer, J.R., Cozier, Y.C., Lenzy, Y.M., Bertrand, K.A., 2021. Hair product use and breast cancer incidence in the Black Women's Health Study. Carcinogenesis 42, 924–930.

Cox, L.A., Ricci, P.F., 2005. Causation in risk assessment and management: models, inference, biases, and a microbial risk–benefit case study. Environ. Int. 31, 377–397.

Damstra, T., Barlow, S., Bergman, A., Kavlock, R., Treball, O.I. del, Químicas, P.I. de S. de las S., Medi, P. de les N.U. per a la D. del, Salut, O.M. de la, 2002. Global assessment of the state-of-the-science of endocrine disruptor. World Health Organization, [Geneva?].

Dias, T.C.D.S., Baby, A.R., Kaneko, T.M., Velasco, M.V.R., 2007. Relaxing/straightening of Afro-ethnic hair: historical overview. J. Cosmet. Dermatol. 6, 2–5.

Diaz, E.S., Karlan, B.Y., Li, A.J., 2013. Obesity-associated adipokines correlate with survival in epithelial ovarian cancer. Gynecol. Oncol. 129, 353–357.

Doll, R., Peto, R., 1981. The Causes of Cancer: Quantitative Estimates of Avoidable Risks of Cancer in the United States Today. JNCI 66, 1192–1308.

Drews, C.D., Greenland, S., 1990. The Impact of Differential Recall on the Results of Case-Control Studies. Int. J. Epidemiology 19, 1107–1112.

Fedak, K.M., Bernal, A., Capshaw, Z.A., Gross, S., 2015. Applying the Bradford Hill criteria in the 21st century: how data integration has changed causal inference in molecular epidemiology. Emerg. Themes Epidemiology 12, 14.

Feinberg, J., Albright, B., Black, J., Lu, L., Passarelli, R., Gysler, S., Whicker, M., Altwerger, G., Menderes, G., Hui, P., Santin, A.D., Azodi, M., Silasi, D.-A., Ratner, E.S., Litkouhi, B., Schwartz, P.E., 2019. Ten-Year Comparison Study of Type 1 and 2 Endometrial Cancers: Risk Factors and Outcomes. Gynecol. Obstet. Investig. 84, 290–297.

Felix, A.S., Cook, L.S., Gaudet, M.M., Rohan, T.E., Schouten, L.J., Setiawan, V.W., Wise, L.A., Anderson, K.E., Bernstein, L., Vivo, I.D., Friedenreich, C.M., Gapstur, S.M., Goldbohm, R.A., Henderson, B., Horn-Ross, P.L., Kolonel, L., Lacey, J.V., Liang, X., Lissowska, J., Magliocco, A., McCullough, M.L., Miller, A.B., Olson, S.H., Palmer, J.R., Park, Y., Patel, A.V., Prescott, J., Rastogi, R., Robien, K., Rosenberg, L., Schairer, C., Shu, X.O., Brandt, P.A. van den, Virkus, R.A., Wentzensen, N., Xiang, Y.-B., Xu, W.-H., Yang, H.P., Brinton, L.A., 2013. The etiology of uterine sarcomas: a pooled analysis of the epidemiology of endometrial cancer consortium. Br. J. Cancer 108, 727–734.

Gaston, S.A., James-Todd, T., Harmon, Q., Taylor, K.W., Baird, D., Jackson, C.L., 2020. Chemical/straightening and other hair product usage during childhood, adolescence, and adulthood among African-American women: potential implications for health. J. Expo. Sci. Environ. Epidemiology 30, 86–96.

Greenland, S., Robins, J.M., 1986. Identifiability, Exchangeability, and Epidemiological Confounding. Int. J. Epidemiology 15, 413–419.

Guyatt, G.H., Ebrahim, S., Alonso-Coello, P., Johnston, B.C., Mathioudakis, A.G., Briel, M., Mustafa, R.A., Sun, X., Walter, S.D., Heels-Ansdell, D., Neumann, I., Kahale, L.A., Iorio, A., Meerpohl, J., Schünemann, H.J., Akl, E.A., 2017. GRADE guidelines 17: assessing the risk of bias associated with missing participant outcome data in a body of evidence. J. Clin. Epidemiology 87, 14–22.

Guyatt, G.H., Oxman, A.D., Vist, G., Kunz, R., Brozek, J., Alonso-Coello, P., Montori, V., Akl, E.A., Djulbegovic, B., Falck-Ytter, Y., Norris, S.L., Williams, J.W., Atkins, D., Meerpohl, J., Schünemann, H.J., 2011. GRADE guidelines: 4. Rating the quality of evidence—study limitations (risk of bias). J. Clin. Epidemiology 64, 407–415.

Hatsbach, J.N., Basílio, F.M.A., Mulinari-Brenner, F.A., 2022. Effects of chemical straighteners on the hair shaft and scalp. An. Bras. Dermatol. 97, 193–203.

Helm, J.S., Nishioka, M., Brody, J.G., Rudel, R.A., Dodson, R.E., 2018. Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women. Environ. Res. 165, 448–458.

Hernán, M.A., Hernández-Díaz, S., Robins, J.M., 2004. A Structural Approach to Selection Bias. Epidemiology 15, 615–625.

Hernán, M.A., Robins, J.M., 2006. Estimating causal effects from epidemiological data. J. Epidemiology Community Heal. 60, 578.

Hernandez, A.M., Smith, S.J., Vahora, M.S., Campbell, D., Krevanko, C.F., Lewis, R.C., Pierce, J.S., 2025. Systematic Review of the Epidemiology of Hair Relaxer Use and Hormone-Sensitive Reproductive Outcomes Among Black Adult Women in the United States. J. Appl. Toxicol. 45, 1394–1416.

Hill, A.B., 1965. The Environment and Disease: Association or Causation? J. R. Soc. Med. 58, 295–300.

Hutt, S., Mihaies, D., Karteris, E., Michael, A., Payne, A.M., Chatterjee, J., 2021. Statistical Meta-Analysis of Risk Factors for Endometrial Cancer and Development of a Risk Prediction Model Using an Artificial Neural Network Algorithm. Cancers 13, 3689.

IARC, 2012. Volume 100D: Radiation, A Review of Human Carcinogens.

IARC, 2018. Volume 114: Red Meat and Processed Meat, IARC monographs on the evaluation of carcinogenic risks to humans. IARC Press, Lyon.

IARC, 2019. Preamble: IARC Monographs on the Identification of Carcinogenic Hazards to Humans.

Ioannidis, J.P.A., Tan, Y.J., Blum, M.R., 2019. Limitations and Misinterpretations of E-Values for Sensitivity Analyses of Observational Studies. Ann. Intern. Med. 170, 108–111.

Kalliala, I., Markozannes, G., Gunter, M.J., Paraskevaidis, E., Gabra, H., Mitra, A., Terzidou, V., Bennett, P., Martin-Hirsch, P., Tsilidis, K.K., Kyrgiou, M., 2017. Obesity and gynaecological and obstetric conditions: umbrella review of the literature. BMJ 359, j4511.

Key, T., Pike, M., 1988. The dose-effect relationship between “unopposed” oestrogens and endometrial mitotic rate: its central role in explaining and predicting endometrial cancer risk. Br. J. Cancer 57, 205–212.

Koskas, M., Amant, F., Mirza, M.R., Creutzberg, C.L., 2021. Cancer of the corpus uteri: 2021 update. Int. J. Gynecol. Obstet. 155, 45–60.

Kuchenbaecker, K.B., Hopper, J.L., Barnes, D.R., Phillips, K.-A., Mooij, T.M., Roos-Blom, M.-J., Jervis, S., Leeuwen, F.E. van, Milne, R.L., Andrieu, N., Goldgar, D.E., Terry, M.B., Rookus, M.A., Easton, D.F., Antoniou, A.C., Consortium, B. and B.C., McGuffog, L., Evans, D.G., Barrowdale, D., Frost, D., Adlard, J., Ong, K.-R., Izatt, L., Tischkowitz, M., Eeles, R., Davidson, R., Hodgson, S., Ellis, S., Nogues, C., Lasset, C., Stoppa-Lyonnet, D., Fricker, J.-P., Faivre, L., Berthet, P., Hooning, M.J., Kolk, L.E. van der, Kets, C.M., Adank, M.A., John, E.M., Chung, W.K., Andrulis, I.L., Southey, M., Daly, M.B., Buys, S.S., Osorio, A., Engel, C., Kast, K., Schmutzler, R.K., Caldes, T., Jakubowska, A., Simard, J., Friedlander, M.L., McLachlan, S.-A., Machackova, E., Foretova, L., Tan, Y.Y., Singer, C.F., Olah, E., Gerdes, A.-M., Arver, B., Olsson, H., 2017. Risks of Breast, Ovarian, and Contralateral Breast Cancer for BRCA1 and BRCA2 Mutation Carriers. JAMA 317, 2402–2416.

Leung, L., Lavoué, J., Siemiatycki, J., Guénel, P., Koushik, A., 2023. Occupational environment and ovarian cancer risk. Occup. Environ. Med. 80, 489–497.

Llanos, A.A., Rabkin, A., Bandera, E.V., Zirpoli, G., Gonzalez, B.D., Xing, C.Y., Qin, B., Lin, Y., Hong, C.-C., Demissie, K., Ambrosone, C.B., 2017. Hair product use and breast cancer risk among African American and White women. Carcinogenesis 38, 883–892.

Makker, V., MacKay, H., Ray-Coquard, I., Levine, D.A., Westin, S.N., Aoki, D., Oaknin, A., 2021. Endometrial cancer. Nat. Rev. Dis. Prim. 7, 88.

Mandelblatt, J.S., Ahles, T.A., Lippman, M.E., Isaacs, C., Adams-Campbell, L., Saykin, A.J., Cohen, H.J., Carroll, J., 2021. Applying a Life Course Biological Age Framework to Improving the Care of Individuals With Adult Cancers. JAMA Oncol. 7, 1692–1699.

Møller, P., Seppälä, T.T., Bernstein, I., Holinski-Feder, E., Sala, P., Evans, D.G., Lindblom, A., Macrae, F., Blanco, I., Sijmons, R.H., Jeffries, J., Vasen, H.F.A., Burn, J., Nakken, S., Hovig, E., Rødland, E.A., Tharmaratnam, K., Cappel, W.H. de V.T.N., Hill, J., Wijnen, J.T., Jenkins, M.A., Green, K., Lalloo, F., Sunde, L., Mints, M., Bertario, L., Pineda, M., Navarro, M., Morak, M., Renkonen-Sinisalo, L., Valentin, M.D., Frayling, I.M., Plazzer, J.-P., Pylvanainen, K., Genuardi, M., Mecklin, J.-P., Moeslein, G., Sampson, J.R., Capella, G., Group, M., 2018. Cancer risk and survival in path_MMR carriers by gene and gender up to 75 years of age: a report from the Prospective Lynch Syndrome Database. Gut 67, 1306–1316.

Moorman, P.G., Alberg, A.J., Bandera, E.V., Barnholtz-Sloan, J., Bondy, M., Cote, M.L., Funkhouser, E., Peters, E.S., Schwartz, A.G., Terry, P., Crankshaw, S., Wang, F., Schildkraut, J.M., 2016. Reproductive factors and ovarian cancer risk in African-American women. Ann. Epidemiology 26, 654–662.

Murad, M.H., Asi, N., Alsawas, M., Alahdab, F., 2016. New evidence pyramid. Évid. Based Med. 21, 125.

NASEM, 2017. Using 21st Century Science to Improve Risk-Related Evaluations.

National Cancer Institute, 2025a. What Is Cancer? - NCI [WWW Document]. URL https://www.cancer.gov/about-cancer/understanding/what-is-cancer (accessed 8.28.25).

National Cancer Institute, 2025b. NCI SEER -- Cancer of Any Site — Cancer Stat Facts [WWW Document]. URL https://seer.cancer.gov/statfacts/html/all.html (accessed 10.23.25).

National Cancer Institute, 2025c. Ovarian Cancer — Cancer Stat Facts [WWW Document]. URL https://seer.cancer.gov/statfacts/html/ovary.html (accessed 9.26.25).

National Cancer Institute, 2025d. SEER Cancer Stat Facts: Uterine Cancer [WWW Document]. URL https://seer.cancer.gov/statfacts/html/corp.html (accessed 8.29.25).

National Center for Environmental Health, 2024. National Exposure Report Home Page | National Exposure Report | CDC [WWW Document]. URL https://www.cdc.gov/environmental-exposure-report/index.html (accessed 12.29.25).

NTP, 2015. Handbook for Preparing Report on Carcinogens Monographs.

O'Brien, K.M., Wentzensen, N., Ogunsina, K., Weinberg, C.R., D'Aloisio, A.A., Edwards, J.K., Sandler, D.P., 2024. Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis. J. Clin. Oncol. 42, 2645–2659.

Olsen, C.M., Nagle, C.M., Whiteman, D.C., Ness, R., Pearce, C.L., Pike, M.C., Rossing, M.A., Terry, K.L., Wu, A.H., Cancer), A.C.S. (Ovarian, Group, A.O.C.S., Risch, H.A., Yu, H., Doherty, J.A., Chang-Claude, J., Hein, R., Nickels, S., Wang-Gohrke, S., Goodman, M.T., Carney, M.E., Matsuno, R.K., Lurie, G., Moysich, K., Kjaer, S.K., Jensen, A., Hogdall, E., Goode, E.L., Fridley, B.L., Vierkant, R.A., Larson, M.C., Schildkraut, J., Hoyo, C., Moorman, P., Weber, R.P., Cramer, D.W., Vitonis, A.F., Bandera, E.V., Olson, S.H., Rodriguez-Rodriguez, L., King, M., Brinton, L.A., Yang, H., Garcia-Closas, M., Lissowska, J., Anton-Culver, H., Ziogas, A., Gayther, S.A., Ramus, S.J., Menon, U., Gentry-Maharaj, A., Webb, P.M., Consortium, O.C.A., 2013. Obesity and risk of ovarian cancer subtypes: evidence from the Ovarian Cancer Association Consortium. Endocr.-Relat. Cancer 20, 251–262.

Osborne, C.K., 1998. Tamoxifen in the Treatment of Breast Cancer. N. Engl. J. Med. 339, 1609–1618.

Osterholm, M.T., Hedberg, C.W., 2015. Mandell, Douglas, and Bennett's Principles and Practice of Infectious Diseases. Mand., Douglas, Bennett's Princ. Pr. Infect. Dis. 146-157.e2.

Palmer, J.R., Boggs, D.A., Adams-Campbell, L.L., Rosenberg, L., 2009. Family history of cancer and risk of breast cancer in the Black Women's Health Study. Cancer Causes Control 20, 1733–1737.

Parhizgar, P., Monfared, A.B., Mohseny, M., Keramatinia, A., Nazari, S.S.H., Rahman, S.A., Marzouqi, A.A., Al-Yateem, N., Jarrahi, A.M., 2023. Risk of second primary cancer among breast cancer patients: A systematic review and meta-analysis. Front. Oncol. 12, 1094136.

Pearce, C.L., Templeman, C., Rossing, M.A., Lee, A., Near, A.M., Webb, P.M., Nagle, C.M., Doherty, J.A., Cushing-Haugen, K.L., Wicklund, K.G., Chang-Claude, J., Hein, R., Lurie, G., Wilkens, L.R., Carney, M.E., Goodman, M.T., Moysich, K., Kjaer, S.K., Hogdall, E., Jensen, A., Goode, E.L., Fridley, B.L., Larson, M.C., Schildkraut, J.M., Palmieri, R.T., Cramer, D.W., Terry, K.L., Vitonis, A.F., Titus, L.J., Ziogas, A., Brewster, W., Anton-Culver, H., Gentry-Maharaj, A., Ramus, S.J., Anderson, A.R., Brueggmann, D., Fasching, P.A., Gayther, S.A., Huntsman, D.G., Menon, U., Ness, R.B., Pike, M.C., Risch, H., Wu, A.H.,

Berchuck, A., Consortium, on behalf of the O.C.A., 2012. Association between endometriosis and risk of histological subtypes of ovarian cancer: a pooled analysis of case–control studies. Lancet Oncol. 13, 385–394.

Phung, M.T., Muthukumar, A., Trabert, B., Webb, P.M., Jordan, S.J., Terry, K.L., Cramer, D.W., Titus, L.J., Risch, H.A., Doherty, J.A., Harris, H.R., Goodman, M.T., Modugno, F., Moysich, K.B., Jensen, A., Kjaer, S.K., Anton-Culver, H., Ziogas, A., Berchuck, A., Khoja, L., Wu, A.H., Pike, M.C., Pearce, C.L., Lee, A.W., 2022a. Effects of risk factors for ovarian cancer in women with and without endometriosis. Fertil. Steril. 118, 960–969.

Phung, M.T., Pearce, C.L., Meza, R., Jeon, J., 2022b. Trends of ovarian cancer incidence by histotype and race/ethnicity in the United States 1992-2019. Cancer Res. Commun. 3, 1–8.

Pierce, J.S., Abelmann, A., Spicer, L.J., Adams, R.E., Glynn, M.E., Neier, K., Finley, B.L., Gaffney, S.H., 2011. Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products. J. Occup. Environ. Hyg. 8, 686–699.

Ptak, A., Kolaczkowska, E., Gregoraszczuk, E.L., 2013. Leptin stimulation of cell cycle and inhibition of apoptosis gene and protein expression in OVCAR-3 ovarian cancer cells. Endocrine 43, 394–403.

Raglan, O., Kalliala, I., Markozannes, G., Cividini, S., Gunter, M.J., Nautiyal, J., Gabra, H., Paraskevaidis, E., Martin-Hirsch, P., Tsilidis, K.K., Kyrgiou, M., 2019. Risk factors for endometrial cancer: An umbrella review of the literature. Int. J. Cancer 145, 1719–1730.

Rosenberg, L., Adams-Campbell, L., Palmer, J.R., 1995. The Black Women's Health Study: a follow-up study for causes and preventions of illness. J. Am. Méd. Women's Assoc. (1972) 50, 56–8.

Rothman, K.J., Greenland, S., 2018. Planning Study Size Based on Precision Rather Than Power. Epidemiology 29, 599–603.

Samet, J.M., Muñoz, A., 1998. Evolution of the Cohort Study. Epidemiologic Rev. 20, 1–14.

Sandler, D., Hodgson, M.E., Deming-Halverson, S.L., Juras, P.S., D'Aloisio, A.A., Suarez, L.M., Kleeberger, C.A., Shore, D.L., DeRoo, L.A., Taylor, J.A., Weinberg, C.R., Team, S.S.R., 2017. The Sister Study Cohort: Baseline Methods and Participant Characteristics. Environ. Heal. Perspect. 125, 127003.

Sandler, D.P., Weinberg, C.R., Taylor, J.A., White, A.J., Jackson, C.L., O'Brien, K.M., 2017. The Sister Study [Methodology].

Schumacher, M., Gerta, R., Schwarzer, G., 2014. Meta-Analysis and the Surgeon General's Report on Smoking and Health. N. Engl. J. Med. 370, 186–188.

Setiawan, V.W., Yang, H.P., Pike, M.C., McCann, S.E., Yu, H., Xiang, Y.-B., Wolk, A., Wentzensen, N., Weiss, N.S., Webb, P.M., Brandt, P.A. van den, Vijver, K. van de, Thompson, P.J., Group, T.A.N.E.C.S., Strom, B.L., Spurdle, A.B., Soslow, R.A., Shu, X., Schairer, C., Sacerdote, C., Rohan, T.E., Robien, K., Risch, H.A., Ricceri, F., Rebbeck, T.R., Rastogi, R., Prescott, J., Polidoro, S., Park, Y., Olson, S.H., Moysich, K.B., Miller, A.B., McCullough, M.L., Matsuno, R.K., Magliocco, A.M., Lurie, G., Lu, L., Lissowska, J., Liang, X., Jr, J.V.L., Kolonel, L.N., Henderson, B.E., Hankinson, S.E., Håkansson, N., Goodman, M.T., Gaudet, M.M., Garcia-Closas, M., Friedenreich, C.M., Freudenheim, J.L., Doherty, J., Vivo, I.D., Courneya, K.S., Cook, L.S., Chen, C., Cerhan, J.R., Cai, H., Brinton, L.A., Bernstein, L., Anderson, K.E., Anton-Culver, H., Schouten, L.J., Horn-Ross, P.L., 2013. Type I and II Endometrial Cancers: Have They Different Risk Factors? J. Clin. Oncol. 31, 2607–2618.

Shimonovich, M., Pearce, A., Thomson, H., Keyes, K., Katikireddi, S.V., 2021. Assessing causality in epidemiology: revisiting Bradford Hill to incorporate developments in causal thinking. Eur. J. Epidemiology 36, 873–887.

Siegel, R.L., Miller, K.D., Fuchs, H.E., Jemal, A., 2022. Cancer statistics, 2022. CA: A Cancer J. Clin. 72, 7–33.

Sponholtz, T.R., Palmer, J.R., Rosenberg, L., Chen, C., Chen, Y., Clarke, M.A., Clendenen, T., Du, M., Johnson, L., Liao, L.M., Michels, K.A., O'Connell, K., Olson, S.H., Petruzella, S., Rebbeck, T.R., Setiawan, V.W., Trabert, B., Weiss, N.S., Wentzensen, N., Wilkens, L., Wise, L.A., 2023. Risk factors for endometrial cancer in Black women. Cancer Causes Control 34, 421–430.

Sponholtz, T.R., Palmer, J.R., Rosenberg, L., Hatch, E.E., Adams-Campbell, L.L., Wise, L.A., 2016. Body Size, Metabolic Factors, and Risk of Endometrial Cancer in Black Women. Am. J. Epidemiology 183, 259–268.

Sponholtz, T.R., Palmer, J.R., Rosenberg, L., Hatch, E.E., Adams-Campbell, L.L., Wise, L.A., 2017. Reproductive factors and incidence of endometrial cancer in U.S. black women. Cancer Causes Control 28, 579–588.

Sponholtz, T.R., Palmer, J.R., Rosenberg, L.A., Hatch, E.E., Lucile, A.-C., Wise, L.A., 2018. Exogenous Hormone Use and Endometrial Cancer in U.S. Black Women. Cancer Epidemiology Prev. Biomark. 27, cebp.0722.2017.

Stanley, K., 2007. Design of Randomized Controlled Trials. Circulation 115, 1164–1169.

Stenzel, A.E., Buas, M.F., Moysich, K.B., 2019. Survival disparities among racial/ethnic groups of women with ovarian cancer: An update on data from the Surveillance, Epidemiology and End Results (SEER) registry. Cancer Epidemiology 62, 101580.

Szklo, M., 1998. Population-based Cohort Studies. Epidemiologic Rev. 20, 81–90.

Tanha, K., Mottaghi, A., Nojomi, M., Moradi, M., Rajabzadeh, R., Lotfi, S., Janani, L., 2021. Investigation on factors associated with ovarian cancer: an umbrella review of systematic review and meta-analyses. J. Ovarian Res. 14, 153.

Tomasetti, C., Vogelstein, B., 2015. Variation in cancer risk among tissues can be explained by the number of stem cell divisions. Science 347, 78–81.

Torre, L.A., Trabert, B., DeSantis, C.E., Miller, K.D., Samimi, G., Runowicz, C.D., Gaudet, M.M., Jemal, A., Siegel, R.L., 2018. Ovarian cancer statistics, 2018. CA: A Cancer J. Clin. 68, 284–296.

Trabert, B., Wentzensen, N., Felix, A.S., Yang, H.P., Sherman, M.E., Brinton, L.A., 2015. Metabolic Syndrome and Risk of Endometrial Cancer in the United States: A Study in the SEER–Medicare Linked Database. Cancer Epidemiology Prev. Biomark. 24, 261–267.

Utada, M., Brenner, A.V., Preston, D.L., Cologne, J.B., Sakata, R., Sugiyama, H., Sadakane, A., Grant, E.J., Cahoon, E.K., Ozasa, K., Mabuchi, K., 2019. Radiation Risks of Uterine Cancer in Atomic Bomb Survivors: 1958–2009. JNCI Cancer Spectr. 2, pky081.

WCRF/AICR, 2018. Judging the evidence. In: ContinuousUpdate Project Expert Report 2018.

Wentzensen, N., Poole, E.M., Trabert, B., White, E., Arslan, A.A., Patel, A.V., Setiawan, V.W., Visvanathan, K., Weiderpass, E., Adami, H.-O., Black, A., Bernstein, L., Brinton, L.A., Buring, J., Butler, L.M., Chamosa, S., Clendenen, T.V., Dossus, L., Fortner, R., Gapstur, S.M., Gaudet, M.M., Gram, I.T., Hartge, P., Hoffman-Bolton, J., Idahl, A., Jones, M., Kaaks, R., Kirsh, V., Koh, W.-P., Jr, J.V.L., Lee, I.-M., Lundin, E., Merritt, M.A., Onland-Moret, N.C., Peters, U., Poynter, J.N., Rinaldi, S., Robien, K., Rohan, T., Sandler, D.P., Schairer, C., Schouten, L.J., Sjöholm, L.K., Sieri, S., Swerdlow, A., Tjonneland, A., Travis, R., Trichopoulou, A., Brandt, P.A. van den, Wilkens, L., Wolk, A., Yang, H.P., Zeleniuch-Jacquotte, A., Tworoger, S.S., 2016. Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis From the Ovarian Cancer Cohort Consortium. J. Clin. Oncol. 34, 2888–2898.

Whelan, E., Kalliala, I., Semertzidou, A., Raglan, O., Bowden, S., Kechagias, K., Markozannes, G., Cividini, S., McNeish, I., Marchesi, J., MacIntyre, D., Bennett, P., Tsilidis, K., Kyrgiou, M., 2022. Risk Factors for Ovarian Cancer: An Umbrella Review of the Literature. Cancers 14, 2708.

White, A.J., Sandler, D.P., Gaston, S.A., Jackson, C.L., O'Brien, K.M., 2021. Use of hair products in relation to ovarian cancer risk. Carcinogenesis 42, 1189–1195.

Win, A.K., Cleary, S.P., Dowty, J.G., Baron, J.A., Young, J.P., Buchanan, D.D., Southey, M.C., Burnett, T., Parfrey, P.S., Green, R.C., Marchand, L.L., Newcomb, P.A., Haile, R.W., Lindor, N.M., Hopper, J.L., Gallinger, S., Jenkins, M.A., 2011. Cancer risks for monoallelic MUTYH mutation carriers with a family history of colorectal cancer. Int. J. Cancer 129, 2256–2262.

World Health Organization, 2013. State of the Science of Endocrine Disrupting Chemicals - 2012. UNEP/WHO, Geneva, CH.

Wright, J.D., Prest, M.T., Ferris, J.S., Chen, L., Xu, X., Rouse, K.J., Melamed, A., Hur, C., Heckman-Stoddard, B.M., Samimi, G., Bickell, N.A., Layne, T.M., Myers, E.R., Havrilesky, L.J., Blank, S.V., Stout, N.K., Hazelton, W.D., Kong, C.Y., Elkin, E.B., 2025. Projected Trends in the Incidence and Mortality of Uterine Cancer in the United States. Cancer Epidemiology, Biomark. Prev. 34, 1156–1166.

Yang, X.R., Sherman, M.E., Rimm, D.L., Lissowska, J., Brinton, L.A., Peplonska, B., Hewitt, S.M., Anderson, W.F., Szeszenia-Dąbrowska, N., Bardin-Mikolajczak, A., Zatonski, W., Cartun, R., Mandich, D., Rymkiewicz, G., Ligaj, M., Lukaszek, S., Kordek, R., García-Closas, M., 2007. Differences in Risk Factors for Breast Cancer Molecular Subtypes in a Population-Based Study. Cancer Epidemiology, Biomark. Prev. 16, 439–443.

Zheng, G., Yu, H., Kanerva, A., Försti, A., Sundquist, K., Hemminki, K., 2018. Familial risks of ovarian cancer by age at diagnosis, proband type and histology. PLoS ONE 13, e0205000.