# Exhibit 32

**Expert Report of Douglas L. Weed, M.D., M.P.H., Ph.D.**

**In Re: Hair Relaxer Marketing Sales Practices and Products Liability Litigation**
**United Sates District Court, Northern District of Illinois, Eastern Division**
**MDL No. 3060**



EXHIBIT 3
WIT: Weed
DATE: 4-8-26
Barbara Perkovich, CSR

TABLE OF CONTENTS

PART ONE INTRODUCTION

Section 1.1 Qualifications
Section 1.2 Purpose of My Expert Report
Section 1.3 A Caveat Concerning the Purpose of this Report
Section 1.4 Summary of Major Conclusions (Opinions)
Section 1.5 Executive Summary: Failure of the Plaintiffs' Causation Case

PART TWO BACKGROUND ON UTERINE CANCER, OVARIAN CANCER, CHEMICAL HAIR RELAXER PRODUCTS, PARABENS, PHTHALATES, AND FORMALDEHYDE

Section 2.1 Uterine Cancer
Section 2.2 Ovarian Cancer
Section 2.3 Chemical Hair Relaxer Products
Section 2.4 Parabens
Section 2.5 Phthalates
Section 2.6 Formaldehyde

PART THREE GENERAL CAUSATION

Section 3.1 Methods of General Causation

Background on Making Scientific Claims of General Causation
Methods of Causal Inference
Bodies of Scientific Evidence
Scientific Judgment
Methods of Causal Inference: General Scientific Method
Epidemiology and the Scientific Method
Statistical Hypothesis Testing and the Scientific Method

Methods of Causal Inference: Epidemiological Methods

The Fundamental Problem of Causal Inference

Methods of Causal Inference: Research Synthesis Methods
Systematic Narrative Review or "Evidence-based Review"
Meta-Analysis
Criteria-based Methods
Use and Uses of the Causal Criteria
Causal Criteria and the Scientific Method

Section 3.2 Assessment of General Causation: Chemical Hair Relaxer Products and Cancer (Uterine and Ovarian)
Section 3.2.1 Literature Search and Included/Excluded Published Papers
Section 3.2.2 Epidemiologic Studies of Chemical Hair Relaxer Products and Uterine Cancer

| | |
|---|---|
| Section 3.2.3 | Summary Evaluation of the Potential Relationship Between Chemical Hair Relaxer Products and Uterine Cancer |
| Section 3.2.4 | Epidemiologic Studies of Chemical Hair Relaxer Products and Ovarian Cancer |
| Section 3.2.5 | Summary Evaluation of the Potential Relationship Between Chemical Hair Relaxer Products and Ovarian Cancer |
| Section 3.2.6 | Systematic and Narrative Reviews of Chemical Hair Relaxer Products and Cancers in Women (Uterine and Ovarian Cancer) |
| Section 3.2.7 | Organizational Statements Regarding Chemical Hair Relaxer Products, Uterine Cancer and Ovarian Cancer |
| Section 3.3 | Assessment of General Causation: Parabens, Ovarian Cancer and Uterine Cancer |
| Section 3.3.1 | Literature Search and Included/Excluded Published Papers |
| Section 3.3.2 | Epidemiologic Studies of Parabens and Uterine Cancer |
| Section 3.3.3 | Systematic Reviews, Meta-Analyses, and Narrative Reviews of Parabens and Uterine or Ovarian Cancer |
| Section 3.4 | Assessment of General Causation: Phthalates and Uterine Cancer as Well as Phthalates and Ovarian Cancer |
| Section 3.4.1 | Literature Search and Included/Excluded Published Papers |
| Section 3.4.2 | Epidemiologic Studies of Phthalate Exposure and Uterine Cancer |
| Section 3.4.3 | Other Studies of Phthalates and Female Reproductive Cancers |
| Section 3.4.4 | An Epidemiologic Study of Personal Care Product Mixtures: Ovarian and Uterine Cancer |
| Section 3.5 | An Epidemiologic Study of Occupational Titles and Ovarian Cancer |
| PART FOUR | ASSESSMENT OF THE PLAINTIFFS' EXPERTS' OPINIONS |
| Section 4.1 | General Approach to the Evaluation of the Opinions of the Plaintiffs' Experts |
| Section 4.1.1 | Considerations in the Evaluation of the Opinions of the Plaintiffs' Experts |
| Section 4.1.2 | Additional Considerations in Peer Review |
| Section 4.2 | Assessment of Dr. Michele Cote's Expert Report and Opinions |
| Section 4.2.1 | Dr. Cote's Purpose and Claims regarding General Causation |
| Section 4.2.2 | Serious Problems with Dr. Cote's Causation Claims |
| Section 4.2.3 | Dr. Cote's Methodology for Determining Causation |
| Section 4.2.4 | Overall Assessment of Dr. Cote's Hill Criteria Analysis |
| Section 4.2.5 | Additional Errors in Dr. Cote's Description of Epidemiologic Methodology |
| Section 4.3 | Assessment of Dr. B. Burt Gerstman's Expert Report and Opinions |
| Section 4.3.1 | Dr. Gerstman's Purpose and Claims regarding General Causation |
| Section 4.3.2 | Serious Problems with Dr. Gerstman's Causation Claims |
| Section 4.3.3 | Dr. Gerstman and the Hill Criteria |
| Section 4.3.4 | Summary of Dr. Gerstman's Hill "Viewpoints" Discussion |
| Section 4.4 | Additional Assessments of Plaintiffs' Experts: Mr. Atwood, Dr. Chang, Dr. Panigrahy, Dr. Pugliese, Dr. Roque, Dr. Sharma, and Dr. Zoeller |
| Section 4.4.1 | An Assessment of the Methodological and Causal Claims of Mr. Stanley Atwood |
| Section 4.4.2 | Mr. Atwood's Methodologically Incorrect Views on the Nature and Assessment of the Hill Consideration of Biological Plausibility |

| | |
|---|---|
| Section 4.4.3 | Mr. Atwood's Incorrect Methodologic Definition and Application of Hill's Consistency Consideration |
| Section 4.4.4 | Mr. Atwood's Lack of Understanding of Basic Cancer Classifications |
| Section 4.4.5 | Mr. Atwood's Fatal Error in the Interpretation of Hill's Consistency Consideration |
| Section 4.4.6 | Mr. Atwood's Failure to Apply the Hill Criteria |
| Section 4.4.7 | Mr. Atwood and His Use of the Phrases "Weight of the Evidence" and "Strength of the Evidence" |
| Section 4.4.8 | Summary of Mr. Atwood's Methodological Failings |
| Section 4.4.9 | An Assessment of the Methodology Claimed by Dr. Jeffery Chang in his Causal Assessment |
| Section 4.4.10 | An Assessment of the Methodology Claimed by Dr. Dipak Panigrahy. |
| Section 4.4.11 | Summary of Dr. Panigrahy's Methodological Failures |
| Section 4.4.12 | An Assessment of the Methodology of Dr. Silvina Pugliese. |
| Section 4.4.13 | Summary of Dr. Pugliese's Claim |
| Section 4.4.14 | An Assessment of the Methodology of Dr. Dario Roque. |
| Section 4.4.15 | Dr. Roque and Strength of Association |
| Section 4.4.16 | Dr. Roque and Consistency of Association |
| Section 4.4.17 | An Assessment of the Methodology of Dr. Shameer Sharma |
| Section 4.4.18 | Dr. Sharma's General Approach to Causal Inference |
| Section 4.4.19 | Dr. Sharma's Failure to Assess Hill's Initial Condition |
| Section 4.4.20 | Dr. Sharma's Failure to Appropriately Assess Strength of Association |
| Section 4.4.21 | Dr. Sharma's Critical Error regarding Consistency of Association |
| Section 4.4.22 | Dr. Sharma's Failure to Describe the Lack of Dose-Response in Bertrand et al. (2023) |
| Section 4.4.23 | Summary of Dr. Sharma's Causal Claims |
| Section 4.4.24 | An Assessment of the Methodology of Dr. R. Thomas Zoeller |
| Section 4.4.25 | Dr. Zoeller and His Use of "Weight of the Evidence" |
| Section 4.4.26 | Summary of Dr. Zoeller's Causal Claims |
| Section 4.5 | Two Related Errors Shared by Drs. Cote, Gerstman, Chang, and Zoeller: The Design of the Sister Study and the Role of Misclassification Bias in Assessing its Results |
| Section 4.6 | An Overall Assessment of the Lack of Scientific Reliability and Validity Found in the Plaintiffs' Experts' Reports |
| | |
| PART FIVE | OPINIONS |
| | |
| PART SIX | REFERENCES |
| | |
| Section 6.1 | Methodological References |
| Section 6.2 | Additional References |
| Section 6.3 | Other Documents |
| Section 6.4 | Websites |
| | |
| PART SEVEN | APPENDICES |
| | |
| Appendix A | Scientific Reliability and Validity |
| Appendix B | A Method for Individual Causation |
| Appendix C | Curriculum Vitae of Douglas L. Weed, M.D., M.P.H., Ph.D. |
| Appendix D | Testimony (Past 4 Years) of Douglas L. Weed, M.D., M.P.H., Ph.D.A |

# PART ONE: INTRODUCTION

## Section 1.1 Qualifications

My name is Douglas L. Weed. I am the founder and managing member of DLW Consulting Services LLC, a scientific consulting firm specializing in epidemiology with a focus on disease causation. I am a physician-epidemiologist with over 42 years of experience in epidemiology, epidemiological methods, and the methods of causal inference.

### Education

I received a Bachelor of Science (B.Sc.) degree in Engineering, *summa cum laude*, in 1974 from The Ohio State University. In 1977, I received the Doctor of Medicine (M.D.) degree from The Ohio State University. In 1980, I received the Master of Public Health (M.P.H.) degree from the University of North Carolina and the Doctor of Philosophy (Ph.D.) degree in Epidemiology from the University of North Carolina in 1982.

### Work Experience

In 1982, I was hired by the National Cancer Institute (NCI) as a Senior Staff Fellow, a research position. I was progressively promoted to the position of Chief, Office of Preventive Oncology, a post which I held until 2007. During the years 1990 through 2007, I directed the Cancer Prevention Fellowship Program, a postdoctoral training program at the National Cancer Institute in the Division of Cancer Prevention. Note that one of the key concerns of cancer prevention is the identification of causes of cancer. I also created and directed the Summer Curriculum in Cancer Prevention and Control, a multidisciplinary educational program. Both programs provide state-of-the-art postdoctoral training in cancer etiology, prevention, and control. Since retiring from the NCI, I have been engaged in the professional consulting practice of epidemiology, the scientific study of the causes and distributions of human disease and health conditions and the application of that knowledge to improve the public's health.

### Professional Experience

Until recently, I was an adjunct full professor at the University of Utah's School of Medicine in the Department of Family and Preventive Medicine, Division of Public Health. Previously, I held academic positions at the Johns Hopkins University, Georgetown University, the Uniformed Services University of the Health Sciences and the University of New Mexico as well as visiting professorships at the National School of Public Health in Madrid, Spain and at McGill University in Montreal. In addition, I was a Visiting Scholar at the Federal Judicial Center in Washington D.C. and co-chaired a National Academy of Sciences (NAS) committee examining the *Daubert* decision on its 10th anniversary.

I am the author of over 142 published scientific papers. I have edited and contributed to two books, one on cancer prevention and control published in 1996 and another on ethics and epidemiology published in 2009.

I am a Fellow of the American College of Epidemiology (ACE) and formerly, Chair of the Ethics and Standards of Practice Committee of the College. As a member of that committee, I co-wrote the American College of Epidemiology's Ethics Guidelines (2000). I have held leadership positions in the

field of epidemiology, as a member of the Executive Committee of the Society for Epidemiologic Research and as a member of the Board of Directors of the American College of Epidemiology.

**Research Interests and Experience**

My primary research focus is the science and practice of disease causation. Over the course of the past 42 years, I have published peer-reviewed papers on the methods used to assess causation, the practice of causal inference, theories of causation, the logic of causal inference, and the philosophies of science applicable to this central problem of medicine, public health, and the law. For examples of papers on causality in the peer reviewed literature, see the following: Weed (1986), Koopman and Weed (1990), Weed (1995), Weed and Gorelic (1996), Weed and Hursting (1998), Weed (2000a), Weed (2002), Weed (2005), Parascandola and Weed (2006), Weed (2016), Weed (2018), Weed (2021), Weed and Alexander (2022), Weed (2022), and Weed (2024).

I have also published peer-reviewed papers on the methods and practice of meta-analysis as applied to epidemiological studies. See, for example: Weed (2000b), Weed (2010), Alexander et al. (2011), and Althuis et al. (2014). I have also published peer-reviewed papers on the methods and practice of systematic reviews. See, for example, Breslow et al. (1998), Weed et al. (2011), Alexander et al. (2012), Weed (2013), Alexander et al. (2013), Alexander and Weed (2016) and Weed (2018). Finally, I have published analyses of mortality in occupational populations; see for example, Weed et al. (1987) and Weed (2010).

I have lectured on disease causation and epidemiological methods at the National Cancer Institute, the Institute of Medicine, the United States Environmental Protection Agency, the National Academies of Science, Harvard University, Yale University, University of California (Berkeley), Imperial College (London), the University of Michigan, the University of North Carolina, Sloan Kettering Cancer Center, MD Anderson Cancer Center, the University of New Mexico, the University of Utah, and at The Ohio State University as well as at academic and research institutions around the world (e.g. China, Japan, Germany, Ireland, Northern Ireland, Norway, and Turkey) and at many scientific conferences. Most recently, for example, I presented at the International Society of Environmental Epidemiology meeting in Rome, Italy, September, 2016, at the American Association for Cancer Research meeting in Washington DC, April, 2017, at the International Epidemiological Association meeting in Japan, September, 2017, at the Society of Toxicology meeting in San Antonio, Texas, March, 2018, at Queens University, Belfast, Northern Ireland, September, 2018, at the National Cancer Institute in Rockville, Maryland, November, 2018, at George Washington University in Washington D.C., March, 2019, and at the University of Indiana, July, 2019 and September, 2021. In March of 2022, I presented recent research findings and methodologies at the Society of Toxicology conference in San Diego, California; in September, 2022, I presented at the annual meeting of the American College of Epidemiology in Scottsdale, Arizona; and in June, 2023, I lectured at the University of Indiana. In June, 2024 I presented three research projects at the Society for Epidemiologic Research meeting in Austin, Texas, in July, 2024 I lectured on causation at the University of Arkansas, Little Rock, Arkansas, and in September, 2024 I presented three projects at the American College of Epidemiology meeting in Columbus, Ohio. Also in September, 2024, I presented three projects at the World Congress of Epidemiology in Cape Town, South Africa and a talk at the American College of Epidemiology meeting in Pasadena, California, September, 2025.

I have trained and taught hundreds of physicians, nurses, public health scientists, and biomedical scientists in the principles and practice of disease causation. In addition, I have designed

epidemiological studies, meta-analyses, and systematic reviews, analyzed the results, and published my findings in peer-reviewed journals.

I have also written extensively and lectured on bioethics, with special interest in the application of bioethical principles and methods to biomedical research, epidemiology, preventive medicine, and public health (Weed and McKeown, 2001). Topics of special interest have been scientific misconduct (Weed, 1998), the ethics of cancer screening (Weed, 1999), conflicts of interest (Weed, 2009), and more recently on the ethics of causal inference (Salerno et al. 2024).

Finally, I have extensive experience in the peer review of manuscripts submitted for publication. I have been (and continue to be) asked to review manuscripts for at least 35 different scientific journals. Examples include: the Journal of the American Medical Association (JAMA), Cancer, Critical Reviews in Toxicology, the American Journal of Public Health (AJPH), the American Journal of Epidemiology (AJE), the American Journal of Preventive Medicine, Nutrition and Cancer, and the Journal of the National Cancer Institute (JNCI). In addition, I served on the editorial board of the JNCI for over 25 years where I managed this same peer review process.

I am being compensated at the rate of $700 per hour. My curriculum vitae can be found in Appendix C. Cases for which I have testified in the past four years can be found in Appendix D.

My opinions are expressed to a reasonable degree of medical and scientific certainty.

**Section 1.2 Purpose of My Expert Report**

The plaintiffs in this matter have presented with a claim involving chemical hair relaxer products and uterine cancer as well as ovarian cancer.

I have been asked to provide an opinion to a reasonable degree of medical and scientific certainty on the following questions:

> Does exposure to chemical hair relaxer products cause uterine cancer?
> Does exposure to chemical hair relaxer products cause ovarian cancer?

I have also been asked to critique[1] the opinions of plaintiffs' experts, Drs Cote and Gerstman, who are the primary general causation experts in this matter as well as Mr. Atwood, and Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller.

I do not address here the question of whether populations (or, for that matter, individuals) should avoid exposure to chemical hair relaxer products, parabens, phthalates or formaldehyde whether by personal choice or governmental regulations. There is a critically important distinction to be made between scientific claims of causation and medical practice (including public health and preventive) recommendations and actions. As Sir Austin Bradford Hill, perhaps the best-known scientist (ever) who has proposed a method for determining general causation, has written (Hill, 1965, p. 300):

[1] By "critique" I mean to examine the plaintiffs' experts' reports and opinions using the well-established scientific approach of peer review .

> "Finally, in passing from association to causation, I believe in 'real life' we shall have to consider what flows from that decision. **On scientific grounds we should do no such thing.** The evidence is there to be judged on its merits and the judgment (in that sense) should be utterly independent of what hangs upon it—or who hangs because of it." (emphasis added)

Simply put, causation questions can be (and will be here) kept separate from medical, public health, and regulatory decision-making. I will not discuss this issue in detail. What is important to keep in mind is that there is a sharp distinction between scientific questions such as "does exposure to chemical hair relaxer products cause ovarian cancer?" and the regulatory (or medical practice question): "should exposure to chemical hair relaxer products (at some specific amount and duration) be avoided?"[2]

The focus of PART TWO of this report is the nature of chemical hair relaxer products, parabens, phthalates, and formaldehyde[3] as well as basic descriptive information about uterine cancer and ovarian cancer. PART THREE of this report focuses solely on the scientific question of general causation. There I provide a brief description of the methods currently used by the scientific community to assess general causation as well as the application of those methods to the issues of chemical hair relaxer products and uterine cancer as well as the issue of chemical hair relaxer products and ovarian cancer. Similar considerations are given to parabens, phthalates and formaldehyde as exposures potentially related to uterine and ovarian cancer. PART FOUR is a critical assessment of the reliability and validity of the opinions of the plaintiffs' experts. PART FIVE contains my opinions. PART SIX contains reference lists. PART SEVEN contains appendices.

### Section 1.4 Summary of Major Conclusions (Opinions)

Based on the available scientific evidence and the application of well-accepted methods of causal inference to that evidence, it has not been established that exposure to chemical hair relaxer products causes uterine cancer. Similarly, it has not been established that exposure to chemical hair relaxer products causes ovarian cancer.

The opinions of Drs. Cote and Dr. Gerstman on causality are unreliable and invalid. Similarly, I find the general causation claims of Mr. Atwood, Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller unreliable and invalid.

My opinions are made to a reasonable degree of medical and scientific certainty.

### Section 1.5 Executive Summary: Failure of the Plaintiffs' Causation Case

The plaintiffs' causation experts, Drs. Cote and Gerstman, have failed to establish that chemical hair relaxer products cause uterine cancer or ovarian cancer. Both experts attempt to employ the Bradford Hill criteria (or viewpoints or aspects) as described in his classic 1965 publication. Both Dr. Cote and Dr.

---

[2] The other exposures (phthalates, parabens and formaldehyde) as well as uterine cancer could be inserted in this section.

[3] This matter is primarily about the potential relationship between exposure to chemical hair relaxer products and uterine cancer as well as between exposure to chemical hair relaxer products and ovarian cancer. However, the plaintiffs' experts have argued that there are specific chemicals within chemical hair relaxer products that could be responsible for what they consider to be causal effects. Of these, parabens, phthalates, and formaldehyde are prominent but not the only examples. I have, therefore, examined these three chemical groups (in the case of parabens and phthalates) and the specific chemical formaldehyde in more detail in terms of what is known about their potential relationship(s) with chemical hair relaxer products.

Gerstman fail to address key aspects of the method and either misrepresent or ignore several of the criteria without providing any justification for these significant changes. Examples abound. Neither expert can articulate how the effects of chance can be excluded, a key initial condition of the Hill approach. Dr. Cote simply ignores it. Dr. Gerstman goes to great lengths to discuss why this issue is not an issue (anymore) because it implies the need for "statistical significance" and for the use of p-values but then agrees that p-values are acceptable for determining if chance can explain the existence of a dose-response relationship. This sort of methodologic or theoretical inconsistency lessens Dr. Gerstman's scientific credibility.

Both experts fail to appreciate the fact that making a causal claim from a single epidemiologic study with a null result for the "ever/never" comparison—i.e., the White et al. (2021) study of relaxers, straighteners, and pressing products and ovarian cancer—is contrary to not only good epidemiologic practice but to the integrity of the scientific process itself requiring replication.

Both experts fail to appreciate the fact that the Sister Study, from which the Chang et al. (2022) and the White et al. (2021) studies emerged, does not study the specific hypothesis of chemical hair relaxer products and uterine cancer and ovarian cancer, respectively. Rather, the Sister Study examined these potential relationships for a combined category of "relaxers, straighteners, and pressing products."

Neither expert can cite a single systematic review or statement by organizations such as the American Cancer Society, the National Cancer Institute, the International Agency for Research on Cancer, the National Toxicology Program, or the Agency for Toxic Substances and Disease Registry, that chemical hair relaxer products, based on the available evidence cause ovarian cancer or uterine cancer in, as Dr. Gerstman claims "all racial and ethnic groups."[4] Nor can they cite a single systematic review or organization that goes on to state that this effect is both established and is primarily found in postmenopausal women but not in premenopausal women. The lack of a consensus in the scientific community on these key issues speaks volumes and cannot be ignored. Organizations, such as the American Cancer Society and others, are acutely aware of the evidence and have chosen not to state that the use of chemical hair relaxer products cause either uterine cancer or ovarian cancer.

Neither expert recognizes that the introduction of the results of the Sister Study and of the Black Women's Health Study regarding postmenopausal women is a new hypothesis—a third hypothesis—to be added to the more general causal hypotheses[5] and must, therefore, be treated separately in causal terms. Simply put, this third hypothesis requires a Hill analysis that must include why, in biological and epidemiologic terms, the observed results in these studies appears to be limited to postmenopausal women given that the plaintiffs claim that these effects are due to chemicals—the "endocrine disrupting chemicals" or "EDCs"—that interfere with the mix of female hormones. It is not very difficult to wonder, given this premise, why the EDCs do not appear to cause cancer in women with more "female hormones" on board both in terms of type and concentration. Neither expert recognizes this obvious scientific issue. They simply ignore it. By doing so, their scientific arguments are weakened.

---

[4] Dr. Gerstman's overreaching claim here requires comment. The studies involved looked at non-Hispanic white women and/or African American women. The studies tell us nothing about Asian Islanders, Native Americans, the Inuit, Ashkenazy Jewish women, or many other ethnic groups. There was a small percentage of Hispanic women in the Chang et al. (2022) study but the authors provided no information on risk.

[5] By "more general" I mean both premenopausal and postmenopausal women.

Both experts argue that two of the EDCs involved in the occurrence of uterine cancer and ovarian cancer are parabens and phthalates and, as noted above, both experts are convinced that the causal effect is particularly prominent in postmenopausal women. Neither expert, however, includes the evidence from an epidemiologic case-control study of the potential effects of parabens, phthalates and uterine cancer by Sarink et al. (2021) although they are both aware of this study and cite it for other reasons. The Sarink et al. (2021) study, however, clearly shows that there are basically no "statistically significant" results—i.e., no confidence intervals that exclude 1.0—for postmenopausal women. In addition, there are many—as many as 50% of the observed odds ratios—that are less than 1.0. To ignore this evidence makes the claims of both experts suspect, meaning they chose not to mention much less discuss this evidence because it is contrary to their personal views on the matter of causation.

Both experts, at various places in their reports, treat "EDCs" to be a single known entity rather than a collection of many different chemical compounds each with their unique chemical structures and effects. Both experts mention parabens and phthalates but then ignore the fact that there are many subtypes within these broad categories.[6]

Both experts, at various places in their reports, write that chemical hair relaxer products contain parabens and phthalates although these same experts cannot provide any insight into the specific parabens and specific phthalates that were in the products used by the women in the Sister Study and the Black Women's Health Study. A bigger problem for the plaintiffs' experts is the following: dyes, semi-permanent dyes, permanents, and other hair products also contain measurable concentrations of parabens and phthalates. However, the results of the Sister Study revealed no non-weak "statistically significant" associations including many below 1.0 for uterine cancer and products other than relaxers, straighteners, and pressing products. The plaintiffs' experts ignored this information that contradicts their hypothesis. After all, if the parabens and phthalates are responsible for the carcinogenic effects, then why was there no evidence of this effect in hair products other than relaxers, straighteners, and pressing products?

Both experts appear to be ignorant of the history of and precedents set in the study of human carcinogens since the late 1950's when a serious discussion in the epidemiologic community began about the causes of so-called "chronic diseases" as distinct from infectious diseases (Weed, 1996). Both experts argue that because they believe that chemical hair relaxer products contain formaldehyde that that fact is sufficient for a claim of biological plausibility.[7] However, they can provide no evidence—no epidemiologic study much less a series of consistent studies—that shows that women exposed to formaldehyde have higher incidence rates of uterine cancer or ovarian cancer.[8] The impression that these experts want to give is that there is (presumably) a carcinogen hiding in all chemical hair relaxer products and therefore, because it is a carcinogen, it can explain the occurrence of the cancers. But formaldehyde has been extensively studied in occupational populations and in those highly exposed formaldehyde does not cause many cancers. True, it is known to cause nasopharyngeal cancer, and three forms of leukemia, but it does not cause any gastrointestinal cancer, any neurological cancer, bone cancer, any hormone-related cancer, sarcomas and other soft tissue cancers, multiple myeloma, as

[6] The Sarink et al. (2021) study analyzes the data by subtype of parabens and phthalates.

[7] I recognize that these experts include other arguments in their discussion of biological plausibility but a "carcinogen" is one of the words that, for the lay person, evokes the idea that it causes any and all cancers.

[8] Furthermore, they cannot state which hair relaxers have measurable amounts of formaldehyde and to what extent any hair relaxer used by the women in any of the three cohort studies (White et al. 2021; Chang et al. 2022; Bertrand et al. 2023) had formaldehyde as an ingredient.

well as many others. It follows—although the plaintiffs' causation experts are apparently unaware of the fact—that the presence of a carcinogen (which they do not demonstrate) does not, therefore provide an explanation for the occurrence of a cancer beyond a hypothesis. There were no measurements of formaldehyde exposure in the Sister Study or the Black Women's Health Study just as there were no measurements of parabens, phthalates, or any other EDC. The plaintiffs' causation experts are, in the spirit of Cervantes, tilting at windmills.

Both experts misrepresent the Hill "viewpoints." As just one example, both Dr. Cote and Dr. Gerstman use the coherence criterion as if it were the biologic plausibility criterion, repeating their arguments for the latter. A strict interpretation of this criterion would require the experts to include the Sarink et al. (2021) contradictory evidence that revealed no consistent evidence of any increased risk of uterine cancer in postmenopausal women. Both experts, as mentioned above, chose to ignore this contradictory evidence even though they were aware of it. As discussed above, they also ignored contradictory evidence in which uterine cancer risk was not increased when women in the Sister Study used other hair products known or likely to contain parabens and phthalates.

Both experts downplayed or ignored the Bertrand et al. (2023) study results showing no clear evidence of dose-response for the hypothesized relationship between exposure to chemical hair relaxer products and uterine cancer.

Once these experts finished their description and discussion of the Hill viewpoints (including the ones they misinterpreted or misrepresented), neither provided a cogent explanation for why, given these descriptions and discussions, a causal claim could be generated. Dr. Gerstman's explanation here was the most telling. All that he wrote was that he "carefully considered" everything. As mentioned in more detail in Section 4 of this report, this comment provides no information at all about why causality should be invoked. The upshot of his approach is that Dr. Gerstman's causal claims are largely personal, i.e., subjective, as if this most important decision that any epidemiologist can make is, in the end, unique to that individual and that individual's personal interpretation of the evidence and thus devoid of objectivity. Subjective decisions are not valid bases for conclusions about causality.

Dr. Cote, on the other hand, provides a hint—but just a hint—of why she claimed causation. In a nutshell, she put a big emphasis on biologic plausibility even though at no point could she say precisely what chemical compounds were in the chemical hair relaxer products or how these specific compounds lead not just to "cancer" in general, but rather to uterine cancer and to ovarian cancer.[9] She claims that the consistency criterion is met but does so by mixing the chemical hair relaxer products-uterine cancer results with the chemical hair relaxer products-ovarian cancer results (that together there is consistency) even though that approach is scientifically incorrect and has no basis in the methodology of causation. These are, as I pointed out, separate and distinct hypotheses that must be treated that way. Finally, she claims that "it is (her) opinion that chemical hair relaxers can more likely than not cause uterine and ovarian cancers." The use of a legal standard is inconsistent with scientific practice. One interpretation of the "more likely than not" phrase is that Dr. Cote has divined that the likelihood of causation is greater than 50%. She has provided no basis for this belief, no scientific methodology for determining the quantitative likelihood of a causal hypothesis or claim. Another interpretation of the phrase "more likely than not" is that it simply represents Dr. Cote's personal subjective belief. Either

[9] Nor did she even attempt to explain why these same compounds—found in dyes and other hair products—didn't increase uterine cancer risk in the Sister Study.

way, there is no way to assess how Dr. Cote came to this quantitative conclusion and thus it has no validity in scientific terms.

Neither expert provides any explanation for why there are so many null or near null results, especially in the large Bertrand et al. (2023) study. Both experts are guilty of "cherry-picking" what they consider to be "positive" results and ignore, for all practical purposes, the large number of negative results. Such an approach calls into question their objectivity.[10]

These experts have failed to provide evidence-based scientifically rigorous arguments establishing that exposure to chemical hair relaxer products cause uterine cancer or ovarian cancer, whether in postmenopausal women, premenopausal women, or as Dr. Gerstman would have it all women regardless of race or ethnicity.

I find Dr. Cote's and Dr. Gerstman's opinions in this case to be scientifically unreliable and invalid.

The other experts who have made causal claims in this case[11] fare no better than Dr. Cote and Gerstman. From a rigorous scientific perspective, these plaintiffs' experts—like Drs. Cote and Gerstman—who were asked to consider making claims of general causation for the two distinct hypotheses: chemical hair relaxer products and uterine cancer as well as the chemical hair relaxer products and ovarian cancer, have committed a series of scientific errors that make their causal claims invalid and unreliable. These errors run the gamut from a failure to use any causal inference method at all,[12] misrepresenting and misapplying existing methods, and ignoring basic scientific principles. One example of this is the key scientific requirement of replication of findings. The best example of the lack of replication is the fact that the hypothesis tested in the study by White et al. (2021) of relaxers, straighteners, and pressing products and ovarian cancer have not been examined elsewhere. The unremarkable and prominently negative findings found in that study makes a causal claim scientifically inappropriate without any methodologic support. And yet that is precisely what the plaintiffs' experts have done. Add to these errors the plaintiffs' experts' willingness to ignore contrary evidence as if it did not exist. The best example of this phenomenon is their failure to discuss the failure of the Bertrand et al. (2023) study of chemical hair relaxer products and uterine cancer to find a dose-response relationship. Lack of dose-response is a hallmark of relationships that are not causal and cannot be simply ignored or wished away. These are only two of the many errors committed by these experts,

---

[10] One final point. Both experts have, apparently, "discovered" causal relationships. It would be interesting to know if, given the opportunity, Dr. Cote or Dr. Gerstman would stand up in front of an audience of epidemiologists with this evidence in hand and argue that they had "found" for the first time causal relationships between chemical hair relaxer products and these two cancers. Indeed, if the authors of the White et al. (2021) study (as one example) were in the audience I would expect them to point out in the question and answer session their conclusion as it appears in the paper (White et al. 2021, p. 1195):

> "Given the novelty of these findings, more research is needed."

These experts as professional epidemiologists have an ethical responsibility to tell the public health community that causation has been discovered. They say nothing about this in their reports.

[11] Mr. Atwood, Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller.

[12] I am referring here to Dr. Pugliese and Dr. Chang primarily, who simply state that they are going to "weigh the evidence" and make causal claims. This is not an example of the use of scientific methodology, but rather an example of personal subjective opinion masking as science, pseudoscience or "junk science."

many of whom have no formal training in epidemiology or causal inference methodology and have never published on these subjects in the peer-reviewed literature.[13]

It is as if the plaintiffs' experts have dispensed with key scientific concepts, i.e. objectivity and skepticism. The objectivity of science does not come from the individual scientist but from the methods used by the scientists (Weed, 2022). Skepticism, in turn, is an attitude that includes being willing to give up on an idea—a hypothesis—when the evidence is against that hypothesis and to be patient until more evidence is available in order to make a better decision. A decision about the causation of disease is one of the most important in all of biomedical science and should not be rushed or made using altered methods or, in the worst case, no method at all.

I do not mean to imply that causal claims should not or cannot be made. There are many examples where the objective application of scientific method has resulted in valid and reliable causal claims about the relationship between a specific chemical (e.g. arsenic or benzene to name a few) or a mix of chemicals (tobacco smoke) and specific cancers.[14] The available evidence on the potential relationships between exposure to chemical hair relaxer products and uterine cancer as well as that between exposure to chemical hair relaxer products and ovarian cancer have not achieved that level because the fair and impartial application of those objective methods failed to produce such claims.

[13] Another good example of a key error was committed by all the experts who claim to be using Hill's (1965) method. They ignored Hill's initial condition: that the observed association be "perfectly clear-cut" and that chance can be excluded. The plaintiffs' experts' failure to do so means that either they were ignorant of this aspect of the method (Hill, 1965, p. 295) or they chose to ignore it. Either way, it is a serious scientific error.

[14] Complete and contemporary lists can be found at the website of the International Agency on Cancer, the American Cancer Society, and the National Toxicology Program.

# PART TWO

## BACKGROUND ON UTERINE CANCER, OVARIAN CANCER, CHEMICAL HAIR RELAXER PRODUCTS, PARABENS, PHTHALATES, AND FORMALDEHYDE[15]

### Section 2.1 Uterine Cancer

The purpose of this section is to briefly describe the basic epidemiology of uterine cancer, i.e., incidence, prevalence, and mortality statistics as well as what are currently considered risk factors for the disease.

Uterine cancer is a malignant growth in the uterus, a female reproductive organ (see the first illustration below). Uterine cancer starts in the cells of the inner lining of the uterus—the endometrium—and is the most common type of cancer in the uterus. The most common histologic type of uterine cancer is adenocarcinoma. There are other less common types including clear-cell carcinoma, mucinous adenocarcinoma, undifferentiated carcinoma, and serous adenocarcinoma. Adenocarcinomas of the uterus are often referred to as endometrioid cancers. These cancers begin in the glandular cells of the endometrium. Endometrioid cancers are graded based on the percentage of cells in the tumor that form glands. Grade 1 tumors have 95% or more of the cancer forming glands, Grade 2 tumors have 50% to 94% cells forming glands, and Grade 3 tumors have less than 50% cell- forming glands. Grade 1 and Grade 2 endometrioid tumors are referred to as Type 1 uterine cancers. Type 2 endometrioid cancers are relatively uncommon. An illustration of uterine cancer is shown below in the second illustration.






15 In this legal matter, the plaintiffs' experts have mentioned several different and sometimes related chemicals that may be found in chemical hair relaxer products. At least three examples are prominently mentioned: parabens, phthalates (as examples of classes of endocrine disrupting chemicals) as well as formaldehyde.

Uterine sarcomas are another type of cancer affecting the uterus; these cancers arise from the myometrium—the muscle layer—of the uterus.

According to the American Cancer Society (@www.cancer.org), the causes and risk factors for uterine cancer are:

- Age
- Type 2 diabetes
- Overweight and obesity (considered a strong risk factor)
- Family history (having close relatives with uterine or colorectal cancer [HNPCC Syndrome])
- Having had breast or ovarian cancer in the past
- Having had uterine hyperplasia in the past
- Treatment with radiation therapy to the pelvis (e.g., radiotherapy)
- Postmenopausal estrogen therapy in women with an intact uterus*
- The total number of menstrual cycles during a woman's lifetime
- Never having been pregnant
- Taking tamoxifen (a drug used to help prevent and treat breast cancer)*
- Having been diagnosed with a granulosa cell tumor of the ovaries
- Having been diagnosed with polycystic ovarian syndrome
- High-fat diet

*See also (www.iarc.org).

**Uterine Cancer Risk Factors: Published Systematic Review and Meta-Analysis Literature**

Additional sources for research on uterine cancer risk factors are published systematic reviews (some with meta-analysis) found in the peer-reviewed literature. The following factors (with references)—whether positive (+), negative i.e. protective (-), or null (ɸ) can be found in the list below:

| | | |
|---|---|---|
| Hypertension (+) | Drab et al. 2025 | Meta-Analysis |
| Oral Contraceptives (-) | Harajka et al. 2024 | Systematic Review |
| Non-Sugar Sweetened Beverages (ɸ) | Beigrezaei et al. 2025 | Umbrella Review |

The American Cancer Society estimates that there will be 69,120 new cases of uterine cancer diagnosed in 2025. Estimated deaths in 2025 are 13,860.

Uterine cancer is the 4th most common cancer among women (Cronin et al., 2022; ACS, 2025). The 5-year relative survival rate for uterine cancer is 81.3% based on data from 2012-2018 (@seer.cancer.gov/statfacts/html/corp.html).

The uterine cancer incidence rate based on data from 2014-2018 was 27.7 per 100,000 (95% confidence interval [27.6-27.8]). For non-Hispanic white women the incidence rate was 28.1 per 100,000 (95% CI [28.0-28.3]) with a non-significant 0.4 AAPC[16]. For non-Hispanic black women, the incidence rate was 28.5 per 100,000 (95% CI [28.1-28.8]) with a statistically significant 2.4 APPC. See Cronin et al. (2022, Table 1, p. 4256).

[16] AAPC = Average Annual Percentage Change

Uterine cancer incidence rates have increased by approximately 1% per year since the mid-2000's. During the years 2012-2021, incidence rates in white women increased by approximately 0.6% and by 2-3% in Black women and other minorities (ACS, 2025).

## Section 2.2 Ovarian Cancer

The purpose of this section is to briefly describe the basic epidemiology of ovarian cancer, i.e., incidence, prevalence, and mortality statistics as well as what are currently considered risk factors for the disease. For some prominent risk factors, estimates of their prevalence in the general population are described. The information providing support for the information described here came from published papers and websites. See the additional references list for details.

### Basic Epidemiology of Ovarian Cancer

Ovaries are the reproductive glands in women. They produce eggs (ova) for reproduction and provide most of the hormones, estrogen and progesterone. Ovaries are located on each side of the uterus as shown in the following illustration:




Three basic types of ovarian cancer are recognized: malignant epithelial ovarian tumors (carcinomas), ovarian germ cell tumors, and stromal tumors. The ovarian carcinomas (epithelial tumors) are the most common form of ovarian cancer representing approximately 85% to 90% of all ovarian malignancies. There are 4 types of epithelial carcinomas: serous carcinoma (the most common form), clear cell, mucinous, and endometroid. An additional 2% to 3% of ovarian cancers are germ cell tumors arising from malignant transformation of the ova. These include teratomas, dysgerminomas, endodermal sinus tumors, and choriocarcinoma. Choriocarcinomas can also arise from the placenta. The least common forms of ovarian cancer are stromal tumors arising within the structural tissue cells that hold the ovaries together. See the illustration below:

Three Types of Ovarian Cancer



**Epithelial ovarian cancer** is a tumor that starts on the outside of the ovary. The majority of cancer-causing ovarian tumors are epithelial.

**Stromal cancer** starts from ovarian cells that make hormones. Doctors can typically diagnose these early. They make up about 1 percent of ovarian cancer.

**Germ cell cancer** starts in the egg cells. These tumors are very rare, making up less than 2 percent of ovarian cancers. They occur in younger women and girls.

Ovarian cancer is the 11th most common malignancy among women. Its incidence has been falling with an average annual percentage change (AAPC) of 2.5% over the years 2014 through 2018 (Cronin et al. 2022, Fig. 3, p. 4264). Incidence rates vary across broad ethnic groups as shown in the following table, adapted from Cronin et al. (2022, Table 1, p. 4257):

| Ethnic Group | Incidence Rate Per 100,000 |
|---|---|
| **All** | 10.9 |
| **Non-Hispanic White** | 11.3 |
| **Non-Hispanic Black** | 9.0 |
| **Non-Hispanic Asian Pacific Islander** | 9.4 |
| **Hispanic** | 10 |

There are approximately 20,890 new cases of ovarian cancer in the U.S. in 2025 and 12,730 deaths (ACS, 2025).

**Ovarian Cancer Risk Factors: American Cancer Society [ACS] (www.cancer.org)**

- Age
- Overweight/Obesity
- Late 1st Pregnancy (> 35 years)
- Estrogen or Estrogen/Progesterone Postmenopausal Hormone Therapy
- Family History: Breast Cancer, Ovarian Cancer, Colorectal Cancer
- Family Cancer Syndromes
  - Hereditary Breast and Ovarian Cancer Syndromes (HBOC): BRCA1/BRCA2
    - [With BRCA1 the lifetime risk of ovarian cancer is 35-70%]
    - [With BRCA2 the lifetime risk of ovarian cancer is 10-30%]
  - Hereditary Nonpolyposis Colon Cancer (HNPCC) or Lynch Syndrome [lifetime risk 10%]
  - Peutz-Jehgers Syndrome [rare]
  - MUTYH-associated Polyposis
- IVF
- Past History of Breast Cancer
- Smoking

**Unclear Ovarian Cancer Risk Factors: ACS (www.cancer.org)**

- Androgens
- Talc
- Diet (in terms of a negative (protective) risk factor

**Factors that Lower Risk of Ovarian Cancer: ACS (www.cancer.org)**

- Pregnancy (carried to term in women <26 years of age)
- Breast Feeding
- Oral Contraceptives (OCs)
- Tubal Ligation
- Use of IUDs
- Hysterectomy

**Chemicals and Ovarian Cancer Risk (ACS)**

ACS does not independently assess whether chemicals increase the risk of any cancer. Rather, the ACS relies upon the International Agency for Research on Cancer (IARC), the National Toxicology Program (NTP), the Food and Drug Administration (FDA), and the U.S. Environmental Protection Agency (USEPA) for their assessments.[17]

**Ovarian Cancer Risk Factors: The International Agency for Research Cancer (IARC)[18]**

The International Agency for Research on Cancer makes decisions about the carcinogenicity of chemicals, some physical factors (e.g. radiation), and occupations. It does not examine or make decisions about other categories of risk factors, e.g. age, reproductive history (e.g. age at pregnancy), family history, or genetic factors. The following factors are considered by IARC to be known causal risk factors for ovarian cancer:

- Overweight/Obesity
- Asbestos
- Postmenopausal Hormone Therapy
- Tobacco Smoking

IARC also lists factors that have limited evidence of carcinogenicity (regarding ovarian cancer):

- Talc
- X + Gamma Radiation

**Ovarian Cancer Risk Factors: The National Cancer Institute's Patient Data Query System (NCI-PDQ)**

---

[17] Depending upon the type of chemical, the ACS refers to one or more of these various organizations. For example, the assessment of asbestos would be handled by IARC, NTP, and sometimes the USEPA, while the assessment of cosmetics would be handled by the FDA.
[18] https://monographs.iarc.who.int/wp-content/uploads/2019/07/classifications_by_cancer_site.pdf

The National Cancer Institute's PDQ System also regularly posts lists of established risk factors, protective factors, and unclear risk factors for cancers, including but not limited to ovarian cancer.

**Known Risk Factors (NCI-PDQ)**

- Family History: Ovarian Cancer, Fallopian Tube Cancer, Primary Peritoneal Cancers
- Inherited Risk
- Hormone Replacement Therapy
- Weight and Height
- Endometriosis

**Known Protective Factors (NCI-PDQ)**

- Oral Contraceptives
- Tubal Ligation
- Giving Birth
- Salpingectomy
- Breast Feeding

**Unclear Risk Factors (NCI-PDQ)**

- Diet
- Alcohol Drinking
- Aspirin/NSAIDS
- Talc
- Infertility Treatments

**Ovarian Cancer Risk Factors: Published Systematic Review and Meta-Analysis Literature**

Additional sources for research on ovarian cancer risk factors are published systematic reviews (some with meta-analysis) found in the peer-reviewed literature. The following factors (with references)—whether positive (+), negative i.e. protective (-), or null (ϕ) can be found in the list below:

| | |
|---|---|
| Polycystic Ovary Syndrome (+) | Barry et al. 2014. Systematic Review and Meta-Analysis |
| Sedentary Behavior (+) | Biller et al. 2021. Systematic Review and Meta-Analysis |
| Diet (fat, nitrates) (+) | Crane et al. 2014. Systematic Review |
| Obesity (+) | Ding et al. 2022. Systematic Review and Meta-Analysis |
| C-Reactive Protein (+) | Li et al. 2017. Systematic Review and Meta-Analysis |
| Talc (+) | Penninkilanpi et al. 2018. Systematic Review and Meta-Analysis |
| Diabetes Mellitus (+) | Wang et al. 2020. Systematic Review and Meta-Analysis |

| | | |
|---|---|---|
| Aspirin/NSAIDS (-) | Baandrup et al. 2012. | Systematic Review and Meta-Analysis |
| Statins (-) | Irvin et al. 2020. | Systematic Review and Meta-Analysis |
| Breast Feeding (-) | Li et al. 2014. | Systematic Review and Meta-Analysis |
| Oral Contraceptives (-) | Moorman et al. 2013. | Systematic Review and Meta-Analysis |

| | | |
|---|---|---|
| Vitamin E (ϕ) | Leng et al. 2019 | Meta-Analysis |
| Vitamin C (ϕ) | Long et al. 2020 | Meta-Analysis |
| Coffee (ϕ) | Salari-M et al. 2019 | Meta-Analysis |
| Folates (ϕ) | Wang et al. 2021 | Meta-Analysis |

**Section 2.3 Chemical Hair Relaxer Products**

Chemical hair relaxer products are consumer products designed to straighten hair by breaking down hair protein. Once that effect occurs, the hair strands become malleable and permanently straightened (Pierce et al. 2024). New hair growth requires reapplication of the specific chemical hair relaxer product if straightening is desired. Chemical hair relaxer products are made and marketed by many companies and have different formulations; some contain sodium hydroxide (lye-based formulations), others contain calcium hydroxide and/or guanidine (non-lye formulations). Chemical hair relaxer products are often but not always sold as kits comprised of pre-treatment, relaxer, shampoo, and conditioner (Pierce et al. 2024).

Sa Dias et al. (2007, p. 2) write that the "habit of straightening Afro-ethnic hair probably started during the slavery period. Later, in 1900, an African American woman created an oil-based hair treatment that "revolutionized the styling of Afro-ethnic hair" (Sa Dias et al. 2007, p. 2) that incorporated the use of a hot metal comb to achieve straightening of the hair. Straightening chemicals were developed in the 1940's and 1950's. Home-based kits for hair straightening were sold in the mid-1960's and hair relaxing creams were introduced in the late 1970's. As Sa Dias (2007, p. 3) write: "today, there are several options of products directed to straightening of Afro-ethnic hair."

Chemical hair relaxer products are used by women of different ages, ethnicities, and social status. African-American (Black) women are prominent users. Some recent studies examined the possible relationship between exposure to chemical hair relaxer products and cancer, including breast and uterine cancer (Coogan et al. 2021; Bertrand et al. 2023; Wise et al. 2023). For example, in the study by Bertrand et al. (2023), the authors revealed that over 90% of participants in the Black Women's Health Study had used chemical hair relaxer products at some point in their lives. When asked for the information, the women reported that 53% were moderate users; 37% were heavy users and 10% were either non-users or light users.

Parabens and phthalates are often added to consumer beauty products including hair products (Pierce et al. 2024). In Pierce et al. (2024) the authors searched for studies that measured paraben and phthalate concentrations in chemical hair relaxer product kits. The authors estimated the total potential absorbed exposure of parabens and phthalates by assuming that the user used all components of the chemical hair relaxer product kits. Using information from Helm et al. (2018), the authors concluded that the "modeled absorbed doses for each chemical were below estimated internal daily doses associated" with what the authors called "the most relevant health-based guidance values" (Pierce et al. 2024, p. 14).

**Section 2.4 Parabens**

Parabens are used as preservatives—especially to prevent growth of microorganisms—in cosmetics and consumer personal care products, including underarm deodorants, anti-perspirants, skin moisturizers, body creams, body sprays, sun-care products, and hair products (e.g., chemical hair relaxer products, hair lotions, leave-in conditions, and root stimulators) as well as pharmaceuticals, textiles, clothes, and

foods (Darbre and Harvey, 2008; Hager et al., 2022). If personal care products (PCPs) that contain parabens are left on the skin for extended periods of time, continuous dermal exposure permits the absorption and accumulation in underlying tissues of parabens (Harvey and Darbre, 2004; Darbre 2006a; Johnson et al. 2022). As Hager et al. (2022, p. 2) note, "humans have continuous and repetitive exposure to parabens." Indeed, Ye et al. (2006) tested for the presence of parabens in a group of demographically diverse adults and found that 99% of the group had detectable methyl paraben, 96% had detectable *n*-propyl paraben, 69% had detectable butyl paraben and 39% had detectable benzyl paraben in their urine. Calafat et al. (2010) tested 2548 urine samples for parabens using data collected in the NHANES (National Health and Nutrition Examination Survey) study. Methyl paraben and propyl paraben were found in 99.1% and 92.7% of the samples.[19] Parabens can also be absorbed through the gastrointestinal system (Hager et al., 2022; Wu et al. 2021). Parabens have been found in blood, breast milk, placental tissue, and urine. Castelain and Castelain (2012, p. 723) write that "studies have shown that they (i.e., parabens) are degraded once applied on the skin." Although blood levels of parabens can be used in studies, Wu et al. (2021, p. 1426) write that "urine is considered the optimal matrix to measure these non-persistent chemicals with short half-lives."

Parabens are the alkyl esters of *p*-hydroxybenzoic acid. Commonly used parabens are methylparaben, ethyl paraben, *n*-propylparaben, *n*-butylparaben, and isobutyl paraben (Darbre and Harvey, 2008). Chemical formulas for these and other parabens are shown below in Fig. 1:



Figure 1. The chemical structures of seven alkyl esters of *p*-hydroxybenzoic acid (parabens) which are commonly used in consumer products. Hydrolysis of the ester linkage (arrow) gives the common paraben metabolite *p*-hydroxybenzoic acid

Parabens appear to be ubiquitous in cosmetics and frequently found in other personal care products. In 1984, for example, parabens were used in an estimated 13,200 different cosmetic formulations. In 1995, a study of a survey sample of 215 cosmetic products revealed that 99% of leave-on products and 77% of rinse-off products contained parabens (Darbre and Harvey, 2008, p. 562).

## Section 2.5 Phthalates

Phthalates are man-made chemicals with a wide range of industrial applications. High molecular-weight phthalates (e.g. di(2-ethylhexyl)phthalate or "DEHP") are used as plasticizers in flexible vinyl as well as in

[19] The authors note that, regarding epidemiological studies, their findings "raise concern about potential confounding from co-occurring chemicals and misclassification due to variability in product composition" (Dodson et al. 2012, p. 935).

flooring, food contact applications, foods, and in medical devices (Varshavsky et al. 2018). Phthalates are also found in some medications (Hernandez-Diaz et al. 2009; Kelley et al. 2012). Phthalates improve flexibility and durability of plastics and are the most important and widely used plasticizers (Chang et al. 2021). Low molecular-weight phthalates [e.g., dimethylphthalate (DMP), diethylphthalate (DEP), or di-isobutylphthalate (DiBP)] are used in personal care products, solvents and in lacquers and varnish as well as time-release pharmaceuticals (Hauser and Calafat, 2005; Chang et al. 2021). Exposure to phthalates can occur thru ingestion, inhalation, dermal contact (cosmetics and personal care products), and parenteral. Breast milk is another possible source of exposure to phthalates (Hauser and Calafat, 2005). The main source of exposure to phthalates is diet, mainly from the consumption of foods wrapped in plastic (Zuccarello et al. 2018). Phthalates are not chemically bound to plastics and therefore can leak into the environment (Gore et al. 2015). After exposure, phthalates are rapidly metabolized and excreted in urine and feces. Urinary excretion of phthalates is a biomarker for exposure (Chang et al. 2021). According to Fu et al. (2017), DEHP is metabolized to mono-(2-ethylhexyl phthalate) or (MEHP) which, in turn, is modified to become mono-(2-ethyl-5-hydroxyhexyl) phthalate (MEHHP), mono-(2-ethyl-5-oxohyexyl) phthalate (MEOHP), mono-(2-(carboxymethyl)hexyl) phthalate (MCMHP) and mono-(2-ethyl-5-carboxypentyl) phthalate or MECCP. The half-life of DEHP is approximately 2-4 hours (ATSDR, 2022). Average human exposure to phthalates in German and U.S. populations based on urinary output has been measured for diethylphthalate (DEP), dibutylphthalate (DBP), di-isobutylphthalate (DiBP), and DEHP as shown in the following table, adapted from Kay et al. (2013):

| Phthalate | Average Exposure Level |
|---|---|
| DEP | 2.32-12 μg/kg/d |
| DBP | 0.26-0.88 μg/kg/d |
| DiBP | 0.12-1.4 μg/kg/d |
| DEHP | 0.71-4.6 μg/kg/d |

Exposure (excretion) may be much higher in individuals who take slow-release pharmaceuticals (Kay et al. 2013), as much as two orders of magnitude higher (i.e., 100X).

Chemically, phthalates are the diesters of 1,2-benzenedicarboxylic acid (phthalic acid).

**A Note About Evaluating Exposure to Phthalates and Parabens and other Nonpersistent Chemicals**

As noted above, blood levels of parabens (and phthalates and other nonpersistent chemicals) can be used in studies, but "urine is considered the optimal matrix to measure these non-persistent chemicals with short half-lives" (Wu et al. 2021, p. 1426). By "optimal," it is meant that there are reasons for why urinary measures of nonpersistent chemicals (e.g., phthalates, parabens, etc.) are superior scientifically to blood/serum measures. As Calafat et al. (2015) note, urinary concentrations of metabolites of nonpersistent chemicals are 30-100 times greater than concentrations in blood. This difference is important because it facilitates quantification and reduces the impact of external contamination. Contamination, according to Calafat, is ubiquitous and it affects both urine and blood measurements.

Another issue with attempting to measure phthalates and other nonpersistent chemicals is that—however they are measured, i.e., whether in blood or urine—those measurements may reflect a person's usual exposure over months to years or they may reflect recent use of medical equipment, medical treatment, or the use of any number of consumer products near the time of biospecimen

collection. The problem is that nonpersistent chemicals—like phthalates and parabens—have very short-half lives. As noted above, the half-life of DEHP is 2-4 hours. The issue emerges because any single measure of a nonpersistent chemical (e.g., in urine or, for that matter, in blood) is affected by intraindividual variability, i.e., is the measure representative of continuous exposure or simply a measure of that chemical when it was measured. According to Calafat et al. (2015, p. A166), "reasonable reproducibility over months to years has found for urinary biomarker concentrations of nonpersistent chemicals." That claim is based on the following published literature: Baird et al. (2010), Engel et al. (2014), Hauser et al. (2004), Marcus et al. (2010), Meeker et al. (2013), and Townsend et al. (2013).

**Dodson et al. (2012)** selected 213 commercial products (including diapers, various cleaning products, detergents, bleach, stain removers, soaps, lotions and sunscreens, shampoos and conditioners, toothpaste, cosmetics (various), hair gel, hair spray, and lip balm among others but not hair straighteners or relaxers) and tested them for the presence of parabens as well as phthalates, bisphenol A (BPA), triclosan, and cyclosiloxanes among others. The authors further categorized the tested products as "conventional" or "alternative," where "alternative" meant that the label did not contain these words: parabens, ethanolamines, nonionic surfactants (suggesting the presence of alkylphenols), fragrances, triclosan, antibacterial (suggesting the presence of triclosan), stain-resistant, vinyl (assumed to contain phthalates), or petroleum-based. Most "alternative" products were obtained at a "natural products" store. Many alternative products were labeled as "green." For each category of product (e.g., nail polish, lipstick, body lotion, etc.), the authors combined the products. For example, there were 4 different nail polish products combined, 4 lipsticks combined, and 5 body lotions combined). The authors note that mixing similar products could mask the existence of chemicals of interest but could also "provide more generalizable exposure information" (Dodson et al. 2012, p. 936). Results revealed parabens in 11 of 42 product mixtures (26%) as follows: hand soap, body lotion, shampoo, conditioner, face lotion, facial cleanser, foundation, lipstick, mascara, hair spray or mousse, and sunscreen. Phthalates were found in pillow protectors, diapers, hand sanitizer, shaving cream, deodorant, foundation, lipstick, shower curtain, car interior cleanser, car air freshener, dryer sheet, polish/wax, fragrance, body wash, and sunscreen but not hair products. Bisphenol A (BPA) was found in pillow protectors, dishwasher detergents, laundry detergents, bar soaps, body lotions, shampoos, conditioners, shaving creams, face lotions, face cleansers, shower curtains, toilet bowel cleaners, body wash, nail polish, and sunscreen.

A more recent study (Johnson et al. 2022) reported the occurrence of parabens In hair products, skin products, and makeup products based primarily on labels of 546 different products.[20] The table below shows the occurrence of parabens (# and percentage) as listed on labels, adapted from Johnson et al. (2022, Table 2, p. 868):

| Chemical Name | # of Products | % |
|---|---|---|
| **Methylparaben** | 74 | 13.6 |
| **Propylparaben** | 49 | 9.0 |
| **Ethylparaben** | 16 | 2.9 |
| **Butylparaben** | 3 | 0.5 |

[20] Included were the results of laboratory analysis of 31 products.

The authors also examined the occurrence of parabens (# and percentage) as well as cyclosiloxanes in hair products and in skin products, stratified by race/ethnicity and focusing on Blacks, Latina, and Vietnamese, as shown in the following table, adapted from Johnson et al. (2022, Table 3, p. 869-70):

| Chemical | Black | Latina | Vietnamese | Total |
|---|---|---|---|---|
| **# Hair Products** | **112** | **46** | **45** | **203** |
| **Parabens** | 19 (17%) | 4 (6.5%) | 3 (6.7%) | 26 (12.8%) |
| **Cyclosiloxanes** | 14 (12.5%) | 5 (10.9%) | 3 (6.7%) | 22 (10.8%) |
| **# Skin Products** | **36** | **93** | **109** | **238** |
| **Parabens** | 13 (36.1%) | 18 (19.4%) | 12 (11.0%) | 43 (18.1%) |
| **Cyclosiloxanes** | 3 (8.3%) | 4 (4.3%) | 5 (4.6%) | 12 (5.0%) |

**Helm et al. (2018)** is the report of a study of constituents of hair products the authors report are used by Black women. The authors collected 18 hair products in 6 general categories reportedly used by a higher percentage of Black women than White or Hispanic women, based on the results of James-Todd (2008). The 6 general categories (with numbers of products) are hot oil treatments (n = 1), anti-frizz/polish (n = 3), leave-in conditioner (n = 1), root stimulator (n = 4), hair lotion (n = 6), and relaxer (n = 3). Of particular interest here are the following constituents: bisphenol A (BPA), cyclosiloxanes, phthalates,[21] and parabens.[22] The authors tested for 66 target chemicals. Results for BPA and for the parabens listed in the footnote below are shown in the following table, adapted from Helm et al. (2018, Fig. 1, p. 450):

| Hair Product | BPA | Butyl Paraben | Ethyl Paraben | Methyl Paraben |
|---|---|---|---|---|
| **Hot Oil Treatment** | | | | ●●[23] |
| **Anti-Frizz #1** | | | | |
| **Anti-Frizz #2** | | | | |
| **Anti-Frizz #3** | | | | |
| **Conditioner** | ●[24] | | | ●● |
| **Stimulator #1** | | ● | ● | ●● |
| **Stimulator #2** | | | | ●● |
| **Stimulator #3** | | | | ●● |
| **Stimulator #4** | | | | ●● |
| **Lotion #1** | | | | ●●●[25] |
| **Lotion #2** | | | | ●● |
| **Lotion #3** | | | | ●●● |
| **Lotion #4** | ● | ● | ● | |
| **Lotion #5** | | | | ●●● |
| **Lotion #6** | | | | |
| **Relaxer #1** | ● | ● | ● | ●● |
| **Relaxer #2** | | | | ●● |
| **Relaxer #3** | | | ● | ●● |

[21] The phthalates tested included diethyl, di-*n*-propyl, di-*n*-octyl, di-*n*-hexyl, di-*n*-butyl, di-isononyl, di-isobutyl, di-cyclohexyl, benzyl, and bis(2-ethylhexyl).
[22] The parabens tested included butyl, ethyl, and methyl.
[23] ●● = > 100-1000 μ/g
[24] ● = 1-100 μg/g
[25] ●●● = > 1000 μg/g

Positive results for some phthalates are shown in the following table, adapted from Helm et al. (2018, Fig. 1, p. 450). Note that there were no positive results for di-*n*-hexyl phthalate, di-*n*-butyl phthalate, di-isononyl phthalate, di-isobutyl phthalate or di-cyclohexyl phthalate.

| Hair Product | Diethyl Phthalate | Di-*n*-Propyl Phthalate | Benzyl Butyl Phthalate | Bis(2-ethylhexyl) Phthalate |
|---|---|---|---|---|
| Hot Oil Treatment | • | | | |
| Anti-Frizz #1 | | | | |
| Anti-Frizz #2 | | • | • | • |
| Anti-Frizz #3 | | | | |
| Conditioner | | | | |
| Stimulator #1 | • | | | |
| Stimulator #2 | •• | | | |
| Stimulator #3 | • | | | • |
| Stimulator #4 | •• | | | |
| Lotion #1 | •• | | | |
| Lotion #2 | • | | | |
| Lotion #3 | • | | | |
| Lotion #4 | • | | | |
| Lotion #5 | ••• | | | |
| Lotion #6 | •• | | | • |
| Relaxer #1 | • | | | |
| Relaxer #2 | •• | | | |
| Relaxer #3 | • | | | |

Results for cyclosiloxanes in the hair products are shown in the following table, adapted from Helm et al. (2018, Fig. 1, p. 450):

| Hair Product | Siloxane #1[26] | Siloxane #2[27] | Siloxane #3[28] |
|---|---|---|---|
| Hot Oil Treatment | | | • |
| Anti-Frizz #1 | ••• | ••• | ••• |
| Anti-Frizz #2 | ••• | ••• | ••• |
| Anti-Frizz #3 | •• | ••• | •• |
| Conditioner | •• | •• | •• |
| Stimulator #1 | • | • | • |
| Stimulator #2 | | • | |
| Stimulator #3 | • | | • |
| Stimulator #4 | | •• | • |
| Lotion #1 | | | |
| Lotion #2 | | | |
| Lotion #3 | | | |
| Lotion #4 | | | |
| Lotion #5 | | | |
| Lotion #6 | | | |
| Relaxer #1 | • | • | • |
| Relaxer #2 | •• | ••• | •• |

[26] Siloxane #1 = dodecamethylcyclohexylsiloxane
[27] Siloxane #2 = decamethylcyclopentasiloxane
[28] Siloxane #3 = octamethylcyclotetrasiloxane

| | | | |
|---|---|---|---|
| **Relaxer #3** | • | • | • |

What is clear from just this study is that different hair products, including relaxers, may contain different subtypes of parabens or phthalates.

### Section 2.6 Formaldehyde

Formaldehyde ($CH_2O$)—see the structural image immediately below—is a colorless gas with a pungent odor.



Formaldehyde is primarily used in the production of resins which, in turn, are used as adhesives and binders in wood-production, the pulp-and-paper industry, plastics, coatings, and in textile finishing. Formaldehyde is also used in aqueous solution (formalin) as a disinfectant and preservative agent. Formaldehyde is a natural product, formed endogenously in mammals and humans. It also occurs naturally in fruit (e.g. mandarin oranges) and other foods such as cauliflower, fish, mushrooms, and beetroot. Formaldehyde is produced in the combustion process; cigarette smoke is a common source of formaldehyde as is automobile exhaust. Some cosmetics and fabrics treated with formaldehyde-releasing resins can provide dermal exposure to formaldehyde (IARC, 2012). Inhalation exposure is the most common route of exposure to formaldehyde especially in the occupational setting. Prime examples are the wood furniture manufacture (varnish) and in the medical, dental, and veterinary environments where formalin is commonly used.

At present, IARC lists the following cancers as having sufficient to be considered caused by exposure to formaldehyde: pharyngeal/nasopharyngeal, acute myeloid leukemia (adults), other acute non-lymphocytic leukemia, and chronic myeloid leukemia. IARC had determined (as of 2009) that there is limited evidence for a causal relationship between exposure to formaldehyde and cancers of the nasal cavity and paranasal sinuses. In other words, **IARC makes no claim of causation (sufficient or limited evidence) for the following cancers:** oral cavity, salivary gland, lung, bone, skin, soft tissue, breast, vulvar, vaginal, cervix, **endometrium, ovary,** testis, prostate, kidney, renal pelvis, bladder, eye, brain and CNS, childhood leukemia, acute lymphocytic leukemia, chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin lymphoma, or multiple myeloma. (emphasis added)

## PART THREE: GENERAL CAUSATION

### Section 3.1 Methods of General Causation

**Background on Making Scientific Claims of General Causation**

Claims regarding general causation rely primarily on scientific method. Indeed, causal claims rely upon a family of interconnected scientific methods. Although professional expertise, assertions about one's "life experience as a scientist," and judgment are not entirely irrelevant, they are no substitute for method in science. Simply put, scientific methods and their application to the available scientific evidence are by far the most important components of establishing causal inference.

Of particular importance are methods used to synthesize scientific evidence, i.e., methods used to collect, summarize, and interpret the results of many different studies, often from different scientific sub-disciplines. These methods, which are sometimes called "research synthesis methods" or labeled "weight of evidence" methods (Weed, 2005; Krimsky, 2005), will be discussed below.

Any scientific expert's opinion on what causes a disease (or disorder or condition) in any particular instance—for example, whether exposure to chemical hair relaxer products, parabens, phthalates, or formaldehyde—that is made without a careful description of the methods used to support such an opinion, and without a description of the evidence to which those methods have been applied, an appreciation of the quality of that evidence as well as its capacity to test causal hypotheses, should be regarded as insufficient and of questionable reliability and validity. For definitions of reliability and validity see Appendix A.

**Methods of Causal Inference**

In current practice, claims about disease causation emerge from the application of causal inference methods to bodies of scientific evidence. These methods include: (1) the general scientific method, (2) epidemiological methods, commonly described in terms of study design types such as cohort studies, case-control studies, and ecologic studies, to name some examples, and (3) methods of research synthesis.

**Bodies of Scientific Evidence**

By "bodies of scientific evidence" I am referring to systematic collections of scientific studies, found in searches of scientific databases (e.g., PubMed) and by reviewing the reference lists of published articles. Typically, a body of evidence is comprised of studies published in peer-reviewed scientific journals. There are occasions, however, when additional sources of information are important, such as unpublished studies, abstracts of scientific work, textbooks, and the reports of public health agencies involved in scientific research; these are sometimes referred to as examples of the "grey literature." In this case, for example, reports (including websites) of the Agency for Toxic Substances and Disease Registry (ATSDR) and the International Agency for Research on Cancer (IARC), may be discussed and cited.

Scientific studies are often described in terms of their design, with a broad categorization involving either: descriptive studies (such as prevalence surveys, case reports, case series, and reports of clusters), analytical studies (such as epidemiologic cohort studies and case-control studies), and experimental studies (such as randomized clinical trials). In addition, any scientific study can be examined in terms of its quality and validity. Quality concerns typically include: the extent to which measurements of

exposure and disease outcome were made accurately and reliably, the appropriateness of the quantitative methods used to analyze the data, and the extent to which those quantitative methods were used appropriately. Validity concerns typically include: the extent to which the results of the study are biased, whether by random error (assessed using tests of statistical significance and/or confidence intervals) or by systematic error. Systematic error (bias) has many different types, including but not limited to confounding, information bias, and selection bias.[29] Definitions of these biases—all challenges to the internal validity of a study—can be found in textbooks of epidemiology, for example, Aschengrau and Seage (2003a).

Published reviews of the scientific evidence are important sources of information in causal assessments. Not all reviews, however, provide causal conclusions; some, for example, provide recommendations for further research. The quality of any review of the literature—like the quality of an individual scientific study—may affect the validity and reliability of the conclusions and the inferences that should be drawn from that review. The quality of a review is determined, in part, by the extent to which it is systematic, as discussed in more detail below.

**Scientific Judgment**

Scientific judgment is an important part of the process of causal inference (Weed, 2007). When collecting, summarizing, and interpreting scientific evidence, judgment is applied at many steps. Judgment incorporates scientific reasoning. Judgment is not, therefore, a purely subjective process, although it has a clear and significant subjective component. Judgment is important in causal inference, but it is not, by itself, sufficient for making causal claims. Methods of causal inference and a systematically collected body of evidence are the necessary components of any causal analysis. These methods take precedence over judgment in any causal assessment. Put another way, a judgment about causation in the absence of evidence is best considered a hypothesis that requires testing.

**Methods of Causal Inference: General Scientific Method**

The general scientific method is the over-arching methodology that must be used in making causal claims about human health and disease. The aim of science (and so its methodology) is explanation, typically causal explanation. Reliable and valid claims regarding causal explanations emerge from the application of methods, including the general scientific method as well as the many more specific methods that have been developed by biomedical scientists over the past half century. Scientific methods provide the objectivity so critical to the validity and reliability of scientific claims about disease causation.

The basic structure of the scientific method includes: a causal hypothesis, observable predictions of that hypothesis, the observations themselves, alternative hypotheses, and tests to distinguish between the causal hypothesis of interest and its alternatives. The process of making causal claims using this basic (although over-simplified) scientific method proceeds as follows: a causal hypothesis is proposed (often, by observing a phenomenon that requires explanation, such as the occurrence of a condition or disease in a single individual (a patient), a series of patients, or a population group). Predictions that can be observed in studies are then made. For example, one such prediction is that in a population of similar individuals, some of whom are exposed to a substance or product (e.g., chemical hair relaxer product(s) and others who are not, the incidence of the condition (e.g., ovarian cancer) should be greater in those

[29] These are general categories of biases, each with many specific types within those categories. For example, response bias and misclassification bias are forms of information bias.

exposed than in those unexposed with due consideration for alternative explanations (e.g., chance, confounding, and bias).

**Epidemiology Studies and the Scientific Method**

Comparisons of the type mentioned immediately above are the key contrast found in well-designed analytical epidemiologic studies. Indeed, epidemiology can be described as the basic science of the public's health. Whether designed as prospective or retrospective cohort studies or as case-control studies, epidemiologic studies compare the incidence rate (i.e., occurrence) of a disease (e.g., uterine cancer) in those exposed to a hypothetical causal factor (e.g., chemical hair relaxer products) to the incidence rate of the same disease in those not so exposed. In cohort studies, the numerical measure of this hypothetical relationship is called the "relative risk," often abbreviated as "RR." This measure of association is calculated for internal analyses, i.e., analyses comparing the rate of disease in one group in the cohort (e.g., exposed) relative to that of a reference group (i.e., unexposed) from the same cohort. RRs—sometimes reported as hazard ratios (HRs)—are used to examine whether exposure-response relationships exist between exposure to chemical hair relaxer products and outcomes such as uterine cancer. Case-control studies [the structure of which can be found in textbooks by Bhopal (2002) and Checkoway et al. (2004)] also involve calculations of a numerical measure that estimates this same relative risk. In those studies, this measure is called the "odds ratio" or "OR."

In contrast, when mortality rates (i.e., death rates) are used in the study rather than the incidence of disease, and when the comparison group is an external "standard" population, the numerical measure of this hypothetical relationship is called the "standardized mortality ratio" or "SMR" (Checkoway et al., 2004). SMRs summarize the observed number of deaths in the cohort relative to that which would be expected in a representative general population, such as the US population.

Confidence intervals (95% CI) and p-values can be calculated for both SMRs, RRs and HRs; more on these statistical tests will be described below as needed.

Alternative hypotheses are also important in the general scientific method and can affect any study, including but not limited to epidemiology studies. These alternatives include but are not limited to chance, other factors that may also cause the same outcome (confounders), and bias. Finally, tests are proposed and undertaken to attempt to distinguish the causal hypothesis of interest from its alternatives.

**Statistical Hypothesis Testing and the Scientific Method**

For example, tests of statistical significance and confidence intervals provide the scientific investigator with information that may allow him to exclude chance as an alternative explanation. If a 95% confidence interval includes the value of 1.0 (for a relative risk estimate), then chance cannot be excluded as an explanation for the results. Similarly, if a test of statistical significance fails to achieve some pre-specified level of significance, such as $p < 0.05$, then chance cannot be excluded as an explanation for the results. Failure to achieve statistical significance introduces uncertainty because an important alternative explanation for the results cannot be dismissed (or excluded). Besides chance, there are many competing explanations for any scientific observation, such as bias and confounding (discussed in more detail in this report). The goal of the scientific method is to discern which explanation is the best (i.e., the most valid and reliable) explanation.

The general scientific method is applied every time a scientific study is undertaken. It is not always the case that investigators explicitly describe each of its steps, although each step is a critical part of the

method. It is especially important to recognize the importance of alternative hypotheses when general causation is the issue. For example, if an outcome is observed in a population of individuals who have been exposed to a substance, it is reasonable (and important) from a scientific perspective to ask: what are all the possible causes of this outcome and to what extent have these alternative hypotheses been excluded? If the outcome occurs in individuals who have never been exposed, then the exposure may not be the cause of the condition in this group (population) of individuals. Only carefully performed scientific studies with control groups can begin to sort out whether the exposure of interest or some other factor causes the outcome in any population. Studies themselves are not sufficient, however. To these studies, collected into a body of evidence, are applied the methods of causal inference and scientific judgment.

Finally, the extent to which an outcome in a single individual was caused by the exposure is not the problem of general causation. That is a very different problem—individual (or specific) causation—the methodology for which can be found in Appendix B.

**Methods of Causal Inference: Epidemiological Methods**

Epidemiological methods involving human subjects (i.e., study participants) are the most important means for identifying and testing hypotheses involving human disease causation. These studies are prioritized as follows from strongest to weakest (USPSTF, 2008):[30]

- Randomized Controlled Trials, Well-conducted Systematic Reviews or Meta- Analyses of Homogeneous RCTs
- Well-designed Controlled Trials without Randomization
- Well-designed Cohort Studies
- Well-designed Case-Control Studies
- Ecologic Studies and Multiple Time Series Studies
- Case Series (i.e., a collection of individual case reports)
- Expert Opinion

By "strongest," I mean the strongest test of a causal hypothesis, i.e., the study design that best distinguishes between the hypothesis of interest and alternative hypotheses. A randomized controlled trial (RCT) is generally considered to be the strongest test of a causal hypothesis in a single study. By "strongest," I do not necessarily mean the study from which the strongest recommendations for some action—e.g., a recommendation to control or regulate exposure to a chemical—should be taken, even though that may, in some specific circumstances, be the case. Any action taken on the basis of scientific evidence is a complex matter, involving issues well beyond the results of scientific studies and their interpretation. Discussions of specific regulations regarding exposure to chemical hair relaxer products and related public health recommendations are not a part of this report unless relevant to the causal question.

By "weakest study" I mean the weakest test of a causal hypothesis. Expert opinion in the absence of evidence and a methodology is an extraordinarily unreliable way to make causal claims. Expert opinion in the absence of evidence and methodology is no test of a causal hypothesis. In this regard, it is also important to point out that case series (and single case studies) are only marginally better than expert

[30] It is important to recognize that "clusters" are not included here. Cluster studies are not considered analytical epidemiological studies. Put another way, cluster studies do not test causal hypotheses but rather are useful for identifying hypotheses.

opinion. Although they involve actual observations, case series (and single case reports) provide no test of a causal hypothesis (Holland, 1986) and are, therefore, a logical problem to be discussed in more detail below. There are no established methodologies in the published scientific literature on the topic of causal inference that rely upon collections of case reports. There are, however, publications on the role of case reports in causation analyses, primarily in the literature on pharmacovigilance, i.e., the occurrence of adverse drug reactions in the practice of medicine. It is generally held that, even in that situation, making reliable causal claims is severely hampered and not recommended when case reports and case series are used as the primary evidentiary source (Jick, 1977; Venning, 1983). At best, case reports and case series generate (rather than test) causal hypotheses about the relationship between medications and adverse reactions (Sachs and Bortnichak, 1986; Goldman, 1998). In sum, case reports only provide clues to etiology (Vandenbroucke, 1999). The reason case reports cannot test causal hypotheses will be discussed in the next section.

**The Fundamental Problem of Causal Inference**

We cannot observe on the same individual both the effect of a cause (e.g., a disease outcome) and what would have occurred had the cause not acted to produce its effect (Holland, 1986). This constraint is sometimes called the "counterfactual" condition. If, for example, an individual is exposed to a chemical and is later diagnosed with an illness or condition, we cannot know whether that same person would have contracted that illness or condition without being exposed.

This fundamental problem of causal inference is the primary reason why randomized clinical trials are considered the gold standard of scientific research in therapeutic and (etiologic) preventive clinical research; randomized trials provide the best approximation to solving this problem by assuming that the individuals who do not receive the intervention—e.g. the placebo controls or controls given some other intervention—are as similar as possible to the individuals who do receive the intervention. Certainly, the control group is not exactly the same as the treated group; but randomization assures that the differences between the two groups are distributed evenly among them.

The use of the randomized clinical trial to "solve" the fundamental problem of causal inference also explains why control groups in any study of human health effects are so important. Epidemiological studies, such as the prospective cohort study and the case-control study, do not have randomly identified controls, but controls in those studies are carefully selected nevertheless, for precisely the same reason they are used in randomized trials: providing an approximate solution to this fundamental problem. Claims about disease causation from studies that lack control groups are of questionable validity and reliability. Note that simply selecting similar controls is insufficient; potential confounders must be controlled for in the data analysis.

Ecologic studies also do not test causal hypotheses relating to the individuals in a population. Making general causation claims from ecologic study results is inappropriate and has been dubbed the "ecologic fallacy." (McLaren and Hawe, 2005; Porta, 2008, p. 75)

A complete account of the design and analysis of epidemiological studies is beyond the scope of this report. Epidemiology is a mature scientific discipline with graduate degree programs and textbooks describing in detail the methodologies and other issues involved in undertaking an epidemiological study (See, as representative examples, Aschengrau and Seage, 2003a,b, or Bhopal, 2002). The emphasis in this report is on the interpretation of epidemiological evidence for the purpose of making claims about general causation. Given the purposes of this report, I may consider to a limited extent the biological plausibility of the general causal hypothesis at issue in this litigation, e.g., whether a

mechanism has been demonstrated that can explain at the biological (cellular) level why exposure to chemical hair relaxer products affect the occurrence of gynecological cancers (specifically, uterine and/or ovarian cancer). Specific methodological issues pertaining to the design and analysis of individual epidemiological studies and toxicological studies (e.g., animal bioassays and studies involving cell cultures) will be discussed in this report as needed.

**Methods of Causal Inference: Research Synthesis Methods.**

Claims of general causation are made using a body of evidence, that is, a collection of studies. To this body of evidence, the methods of causal inference are applied. Several such methods are generally recognized. These are sometimes referred to as research synthesis methods (Weed, 2000a):

1. The systematic narrative review
2. Meta-analysis, including pooled analyses
3. Criteria-based methods of causal inference

These methods are important in a discussion of any hypothetical causal relationship, although there are situations in which meta-analysis should not be performed.

**Systematic Narrative Review, or "Evidence-based" Review**

The systematic narrative review (sometimes called an "evidence-based" review) is a critically important methodology in the practice of causal inference (Weed, 1997; Weed, 2000a, Weed, 2018). Here, the relevant scientific evidence is systematically collected, summarized, and interpreted. Typically, medical library databases are searched with a description of the search techniques made sufficiently transparent that the search could be repeated by others with similar if not the same results. In addition, it is common for authors of systematic reviews to supplement the searches with additional studies found in the reference lists of published papers or textbook chapters on the topic, government reports, and possibly, unpublished studies. The purpose of the review, the conditions (or criteria) for including and excluding the studies to be summarized and interpreted, and the criteria (or other methods) to be used in making causal claims are important—indeed, essential—components of a systematic narrative review. The word "narrative" is often used to describe this methodology, because it is common for authors to describe each study before the results are summarized and finally interpreted in terms of causation.

The quality of review papers published in the scientific literature is an issue of considerable importance, given that it is within these publications that general causation claims most often appear. Put another way, it is inappropriate for general causation claims to appear based on the results of single studies. Assessments of general causation always involve the collection, description, summarization, and interpretation of bodies of scientific evidence comprised of many studies, often from many different disciplines. It follows that the quality of review papers is key. Indeed, a poor-quality review cannot be considered "systematic," and its conclusions should be regarded as having questionable validity and reliability.

The discussion in the scientific community on the need for a systematic approach to reviewing the scientific and medical literature began in the mid-1980's and has continued unabated, with application to epidemiology as early as the mid-1990's (Milne and Chambers, 1993). For detailed discussions of the method and examples of its application, see: (Breslow et al., 1998; Crowther et al., 2007; Greenhalgh, 1997; Hutchison, 1993; Lichtenstein et al., 2008; Moher et al., 2008; Moher et al., 2009; Montori et al., 2003; Mulrow, 1987; Mulrow, 1994; Oxman et al., 1988; Oxman, 1994; Oxman et al., 2006; Rochon et

al., 2002; Shea et al., 2007; Shea et al., 2009; Weed, 1997; Weed et al., 2011, Alexander and Weed, 2016, and Weed, 2018).

A good example of the minimum requirements for a scientifically rigorous systematic review can be found in Shea et al., (2007a):

1. a clear description of the purpose of the review,
2. explicit search terms and databases,
3. explicit inclusion and exclusion criteria (for the studies to be reviewed),
4. duplicate data abstraction and a process for resolving disputes between abstractors,
5. explicit consideration of the so-called "grey" literature, i.e. unpublished reports, etc.
6. detailed descriptions (e.g. a table) of the characteristics of the included studies,
7. formal quality assessments of the included studies,
8. appropriate incorporation of the quality assessments in combining results,
9. appropriate methods for combining results of the studies,
10. explicit assessment of publication bias (e.g. in meta-analyses), and
11. an explicit discussion of potential conflicts of interest (e.g. funding sources).

Failure to include all or most of these items in a published review should be interpreted to mean that the review is not systematic. Indeed, these 11 questions form the basis for a valid and reliable tool for evaluating the quality of a review (Shea et al. 2007b; Shea et al. 2009); that tool is called "AMSTAR" and has been extensively used in the scientific literature, including publications involving oncology, the study of cancer (Duncan et al. 2017; Hasan et al. 2017; Kung et al. 2010; Li et al. 2012).

**Meta-Analysis**

Meta-analysis is a method for combining results across scientific studies. For a discussion of the quality of (and therefore a list of the essential components of) meta-analyses, see Stroup et al., 2000. Under certain conditions, it is possible to average results from several different studies or, alternatively, to pool the data (i.e., using the original individual study participant information from several studies). Pooling creates a single study from the data collected from many studies. Only very similar studies—i.e., non-heterogeneous studies by design or by assessing heterogeneity using statistical tests—can be combined using meta-analytical techniques. The value of meta-analysis is that it increases the statistical power of the effort to identify and quantify statistical associations. As a result, the pooled results (or meta-analyzed results) may be able to detect statistically significant (and typically more precise estimates of) associations that could not be detected in smaller studies. Meta-analysis can also provide an assessment of the consistency of evidence, as described in more detail in the next section (Weed, 2000b; Weed, 2010). Finally, published meta-analyses typically (and appropriately) provide an assessment of publication bias.

**Criteria-based Methods**

The criteria of causation, often referred to as "Hill's criteria," are traditionally the most important step in causal inference involving both studies of human populations and laboratory-based studies of biological mechanisms (Weed and Gorelic, 1996; Weed, 1997). These criteria are only applied to a body of evidence once a statistical association has been established, i.e. once several epidemiological studies have revealed increased risks of a disease (or condition) that could be called "statistically significant," most often at the level of ($p < 0.05$), whether evaluated using p-values or confidence intervals. Under these conditions, it is reasonable to conclude that the observed association is not due to chance (Hill,

1965; Hill, 1971; Susser, 1986). These risks are described in terms of incidence rates or mortality rates with corresponding relative risk estimates. Hill (1965) also noted that the user of this approach should be confident that a statistically significant association exists; he used the phrase "clear-cut."

It will be helpful and important to describe these so-called criteria, their characteristics, and some of their strengths and limitations, because they have appeared in the scientific literature on causation (more generally) and figure prominently in assessments of general causation in practice.

I use the word "so-called" to describe these criteria (or, alternatively, "factors" or "guidelines") because so many commentators have emphasized the fact that these are not criteria in the classic sense of the word, with one exception: temporality. Note that in this report I will use the term "criteria" to describe these considerations (or factors) in keeping with common usage.

Temporality—the concept that a causal factor must precede its effect—is a true criterion (Susser, 1986; Aschengrau and Seage, 2003c; Beaglehole et al., 1993; Gordis, 2000; Goodman and Samet, 2006). In the absence of temporality, i.e., if the presumed effect precedes its hypothetical cause in time, then causation can, for practical purposes, be ruled out. But the existence of the appropriate temporal order—a hypothetical cause followed by its presumed effect—does not establish causation, because many alternative explanations remain to be considered and because causation is not established because one event follows another. Some commentators include the concept of latency under the rubric of temporality. Latency refers to the length of time between the onset of a hypothetical causal exposure and a disease. In short, temporality may support causation when it exists, but there are at least eight other so-called criteria to be considered. The remaining eight are presented in the same order that Austin Bradford Hill, the scientist whose 1965 paper on this topic remains a classic source, discussed them.

Strength of Association: refers to the magnitude of the relative risk estimates observed in the epidemiology studies. Typically, the larger the relative risk (RR), the more likely the observed association is causal (Susser, 1986; Aschengrau and Seage, 2003c; Beaglehole et al., 1993; Gordis, 2000; Goodman and Samet, 2006). Relative risk estimates can be obtained from well-designed cohort and case-control studies comparing the incidence of a condition in those exposed to the hypothetical cause to the incidence of the same condition in those unexposed. Small magnitudes of association (sometimes called "weak" or "modest" associations), e.g., relative risks (RRs) of 2.0 or less, are less likely to represent causal associations. Bias (due especially to uncontrolled and residual confounding) can explain the presence of weak associations. Even large in magnitude relative risks can be subject to unknown confounding.

Consistency of Association[31]: refers to the extent to which scientific results are similar (e.g., in direction and statistical significance) across the entire body of epidemiological evidence. Typically, the more consistent are the results, the more likely the observed association is causal (Susser, 1986; Aschengrau and Seage, 2003c; Beaglehole et al, 1993; Gordis, 2000; Goodman and Samet, 2006). One of the additional values of meta-analysis is that it provides a quantitative assessment of consistency (Weed,

[31] It is important to point out that the Reference Manual on Scientific Evidence (2000) uses the term "replication" rather than the term "consistency" to refer to the need for more than one epidemiologic study showing an association between an exposure and a disease. Hill (1965) referred to this concept as "consistency." The Reference Manual uses the term "consistency" for what Hill (1965) described as "coherence," referring to the need to link epidemiologic studies with other sources of knowledge. Simply put, it would be an error to conclude that the use of the causal criterion of "consistency" does not refer to the need for more than one epidemiological study showing an association as long as the source of that definition is made clear. That definition is precisely how Hill (1965) and many later authors interpret the concept of "consistency."

2000b) through tests of heterogeneity; studies homogeneous enough to be combined are, by definition, consistent. Note, however, that these tests do not provide an assessment of design heterogeneity, i.e. differences in study design prominent enough to preclude combining the results in a meta-analysis. Consistency cannot be assessed from a single study by definition. Furthermore, the results of a single study must be re-examined in additional studies in order to satisfy a basic scientific requirement: replication.

Biologic Gradient (Exposure-Response): refers to the extent to which the relative risk estimates increase in magnitude as the measure of the exposure increases in the epidemiology studies. Typically, a regularly increasing relationship between exposure and risk estimate is more likely to represent a causal relationship than other patterns (Aschengrau and Seage, 2003c; Beaglehole et al., 1993; Gordis, 2000; Goodman and Samet, 2006). Note that a statistically significant exposure-response relationship may still not represent a valid relationship. All that statistical significance does is allow the investigator to exclude chance as an explanation.

Biologic Plausibility: refers to the extent to which a mechanism of action has been proposed, studied, and demonstrated, typically in toxicological and other types of laboratory-based studies. It is generally accepted that as the evidence explaining the mechanism of action for a disease increases, the more likely the association is causal (Weed and Hursting, 1998). A disease mechanism has many features, including but not limited to the many intracellular and extracellular changes that occur from the initiating causal event (e.g., an exposure or some unknown "idiopathic" event) to the subsequent disease event. Indeed, latency (discussed briefly above) can be considered one of many features of a disease mechanism. Assessing biological plausibility also involves distinguishing between what happens in humans and what happens in animals. Although animal testing (also called animal bioassay testing) has been used for many years as a component of assessing biological plausibility, its relevance to human health is under intense scrutiny in the scientific community. The primary concern has always been the extent to which the results of animal testing can be extrapolated to humans. Animal testing typically involves exposing rodents (rats, mice, and hamsters) to excessive doses of the chemical of interest to observe whether these same animals subsequently develop disease (e.g. cancer). The evidentiary concerns about animal testing, however, include the following: (1) that animals are exposed to doses (and durations) that far exceed human exposure conditions, (2) the mechanisms of action in animals are not those found in humans, and (3) the physiology of rodents (and their metabolic pathways) may be different than those in humans. A recent report by the National Research Council (NRC) of the National Academy of Sciences (NAS) calls for a dramatic reduction in the use of animal models to assess human health concerns. The NRC report concludes that animal testing lacks relevance, is cumbersome, and is less accurate than methods based on tests using human cells and cell components (NRC, 2007). In light of this fundamental shift in scientific thinking on the role and relevance of animal testing, any and all results from animal bioassays must be considered relatively unreliable. At best, animal bioassay test results should be considered sources of hypotheses to be tested in studies involving human cells, human cell components, or whole individuals (e.g., in epidemiological studies), where mechanisms and modes of action better represent human (rather than rodent) health.

Specificity: refers to two related ideas. First, it refers to the precision with which the exposure and the outcome can be defined and characterized. For example, studies of parabens and uterine cancer have more specific measures of exposures and outcomes than, say, studies of endocrine-disrupting chemicals and female gynecological cancers. As Hill noted, the more specific the exposure and disease involved, the stronger the argument in favor of causation. Secondly (and traditionally), specificity also refers to the extent that the disease (outcome) has one or more causes (Gordis, 2000; Aschengrau and Seage, 2003c). Cancers, including ovarian and uterine cancer, are generally regarded as diseases with multiple

causes. Not all causes of these cancers have been identified; put another way, there are unknown (often called "idiopathic") causes of these cancers.

Coherence: refers to the extent to which the evidence and hypotheses for the results fit together into a reasonable and well-tested explanation (Susser, 1986). In the classic description of this so-called criterion, coherence was defined as the extent to which the causal hypothesis does not conflict with the available evidence. Coherence can be assessed in terms of the extent to which other causal criteria (or "guidelines") have been met. The more criteria that are satisfied, the more coherent the causal explanation.

Experimentation: refers to the extent to which a randomized clinical trial (e.g., a prevention trial) or an observational intervention study has been undertaken (Goodman and Samet, 2006). This is an uncommon condition to be satisfied using randomized trials in the study of chronic diseases. Note that this criterion does not refer to animal experimentation.

Analogy: the extent to which the purported exposure-disease relationship under consideration is similar (in types and characteristics of evidence) to other relationships, known to be causal or not (Weed, 2018). As discussed in that publication, many investigators have mistakenly construed the nature of this causal consideration. Briefly, analogy is not assessed with simple comparisons such as "exposure A causes disease B" and because exposure A' is similar to exposure A, then exposure A' also causes disease B. The correct assessment involves comparing the body of evidence of the A-B known causal relationship with the body of evidence available for the A'-B hypothetical relationship.

**Use and Uses of the Causal Criteria**

These are criteria widely used with scientific justification; the method has been used for at least fifty years in hundreds, if not thousands, of applications involving many different exposures and many different diseases and conditions. Furthermore, many causes of diseases have been identified using this methodology. Research institutions and governmental regulatory agencies regularly use these criteria. Some examples include: the International Agency for Research on Cancer and the U.S. Environmental Protection Agency (Cogliano et al., 2004; USEPA, 2005; Cogliano et al., 2008).

For the past 60 years, epidemiology textbooks have recommended and discussed the use of these criteria for causal inference. See, for example: MacMahon and Pugh, 1970; Mausner and Bahn, 1974; Kleinbaum et al., 1982; Rothman, 1986; Beaglehole et al., 1993; Weed, 1995; Kelsey et al., 1998; Rothman and Greenland, 1998; Gordis, 2000; Rothman, 2002; Aschengrau and Seage, 2003c; Bhopal, 2002; Goodman and Samet, 2006.

Several issues should be understood when these criteria are invoked. In cancer epidemiology, commonly used criteria are strength, consistency, biological plausibility, and dose-response (Weed and Gorelic, 1996). Other criteria are also used, however, but in a less regular way. Nevertheless, all of Hill's original criteria are relevant to making causal claims, as Hill and many later commentators have recognized. Indeed, an extensive literature on the use of these criteria exists.

If users of this methodology select some of the criteria but not others, they must provide an explanation and justification for their choices. These explanations and justifications are subject to critical appraisal. It is important that users of this criteria-based methodology explain in detail what evidence is needed to satisfy each of the criteria they select. For example, if "consistency" is important to their use of the method, they should specify how much, what kinds, and what characteristics of the evidence satisfy that criterion. Without an explanation and justification for their individual choices in the use of the criteria-

based method, the causal claims of users are suspect. Furthermore, it is important to examine whether users of the criteria appropriately define the criteria and their accompanying rules of inference, whereby "appropriate" I mean the extent to which the user's definitions conform to accepted definitions in the published scientific literature.

**Causal Criteria and the Scientific Method**

Finally, it is important to point out that these criteria reflect the application of the general scientific method. In other words, the criteria represent key concerns of the general scientific method and not a substitute for it. Examples abound. The criterion of consistency, for example, reflects the basic scientific principles of replicability and testability. The criterion of strength (of association) reflects the basic scientific concept of critically testing alternative explanations. Experimentation, likewise, reflects the need to test and control for alternative hypotheses. Temporality is a key feature of any causal hypothesis. Specificity reflects the need to test the hypothesis of interest and not some different hypothesis. Biological plausibility incorporates biological explanations (at the cellular level) with those explanations at the level of human populations by examining the extent to which the basic causal hypothesis has been tested in cellular systems. And finally, exposure (sometimes referred to as "dose") response reflects a basic toxicological principle: the greater the dose (or exposure) to a causal agent, the greater the effect. In sum, the criteria and the general scientific method are not only compatible but inseparable.

## Section 3.2 Assessment of General Causation: Chemical Hair Relaxer Products and Cancer (Uterine and Ovarian)

### Section 3.2.1 Literature Search and Included/Excluded Published Papers

A systematic search of the medical literature was performed for publications examining the hypothetical relationship between exposure to chemical hair relaxer products and cancers of the female reproductive system, specifically uterine cancer and ovarian cancer. The purpose of this search was to identify all English-language epidemiological studies and meta-analyses of epidemiological studies that have examined these hypothetical relationships, with special attention to those that separate chemical hair relaxer products (or straighteners) from the broader category of hair products. In addition, relevant reviews, reports, and commentaries were identified. Excluded were case reports and case series addressing aspects of these hypothetical relationships.

Medline (PubMed) was searched for English-language publications as follows:

PubMed (May 17, 2023): search terms: "hair" + "cancer" (n = 262)

EMBASE (May 18, 2023): search terms: "hair relaxer" or "hair straightener" or "hair product" (n = 114)

After removal of duplicates (n = 16), a total of three hundred sixty (360) potentially relevant publications were available for review.

After examining the titles and abstracts, a total of five (5) publications were identified for full text review. These include: Chang et al. (2022), Llanos et al. (2022), White et al. (2021), Helm et al. (2018), Llanos et al. (2017), and Wise et al. (2012).

Excluded publications from this search are available upon request.

In addition, I have examined websites and reports of several relevant organizations including the International Agency for Research on Cancer, the National Toxicology Program, the American Cancer Society, and the National Cancer Institute. Reports of this type are sometimes referred to as the "grey literature."

Examining the reference lists of the potentially relevant publications identified in the searches described above, an additional two (2) publications were identified for full text review: Calafat et al. (2010), Romero-Franco et al. (2011)

On August 4, 2023, an additional search was undertaken for English-language publications in PubMed using search terms "hair" and "cancer." There were 126 publications identified. One publication was identified as relevant: Okeke and Burgess (2023). More recent searches identified the following publications: Bertrand et al. (2023), Chang et al. (2024a,b), Farooq et al. (2024), Taylor et al. (2024), Needle et al. (2024), and Hernandez et al. (2025).[32]

Taylor et al. (2024) was excluded because chemical hair relaxer products were not examined.

**Section 3.2.2 Epidemiologic Studies of Chemical Hair Relaxer Products and Uterine Cancer**

**Bertrand et al. (2023)** is the report of a cohort study of chemical hair relaxer products and the incidence of uterine cancer. This study used data from the Black Women's Health Study (BWHS) that includes 59,000 women who identify as Black and were between the ages of 21 and 69 at enrollment in 1995. Of these, 44,798 women were included in the analyses after exclusions for women who failed to fill out the 1997 self-administered questionnaire where questions regarding chemical hair relaxer products use were included. Questions about chemical hair relaxer product use were not included in the original 1995 questionnaire or in the questionnaires provided to the participants every 2 years since 1997. Also excluded were women who had had a hysterectomy and those with a history of cancer prior to 1997. The 1997 questionnaire included questions about the frequency of use, duration of use, age at first use, type most used, and number of burns (on scalp). Because 95% of the cohort reported using chemical hair relaxer products, the authors created the reference category of "never/light use" where "light use" was defined as using chemical hair relaxer products for less than 4 years or using them ≤2 times/year. Women who had used chemical hair relaxer products ≥15 years or ≥5 times/year were classified as "heavy users." A third category, "moderate users" was comprised of women who did not fit into one of the other 2 categories.

Incident cases of uterine cancer were self-reported and then confirmed by medical record and cancer registry record review; deaths due to uterine cancer were identified from state cancer registries and the National Death Index. 347 incident cancers[33] were recorded through 2019 with 862,507 person-years of follow-up. Person-time was calculated from 1997 to diagnosis of cancer, hysterectomy, death, or the

[32] A search on 11.24.2025 with search terms "hair" and "cancer" (2024-2025) produced no new relevant publications.
[33] There were 285 cases of known histology with 93% Uterine cancer and 7% (n =21) uterine sarcomas.

end of follow-up, whichever came first. Cox proportional hazards ratio models were stratified by age and follow-up period and were used to estimate hazard ratios (HRs) and 95% confidence intervals (95% CI). Covariates (potential confounders) of interest included current weight, parity, oral contraceptive use, alcohol consumption, physical activity, postmenopausal hormone therapy, smoking history, age at menarche, residence (by geographic region in 1997), height, and educational attainment, as of 1995. Age-adjusted and multivariable hazard ratio results are shown in the following table, adapted from Bertrand et al. (2023, Table 2, p. 3):

**Chemical Hair Relaxer Product Use and Uterine Cancer (Black Women's Health Study)**
**Bertrand et al. (2023)**

| Category | N cases | HR (95% CI) Age-adjusted | HR (95% CI) Multivariable |
|---|---|---|---|
| **Hair Relaxer Use** | | | |
| **Never/Light** | 38 | 1.00 | 1.00 |
| **Moderate** | 187 | 1.18 (0.83-1.68) | 1.23 (0.86-1.76) |
| **Heavy** | 122 | 1.02 (0.71-1.48) | 1.18 (0.81-1.71) |
| **Duration of Use** | | | |
| **Never/Light** | 38 | 1.00 | 1.00 |
| **1-4 Years** | 15 | 1.03 (0.56-1.87) | 1.00 (0.55-1.83) |
| **5-9 Years** | 29 | 1.01 (0.62-1.64) | 1.00 (0.61-1.64) |
| **10-14 Years** | 58 | 1.24 (0.82-1.88) | 1.35 (0.88-2.06) |
| **15-19 Years** | 54 | 0.98 (0.64-1.49) | 1.06 (0.69-1.63) |
| **≥20 Years** | 153 | 1.16 (0.81-1.65) | 1.28 (0.89-1.84) |
| **Frequency of Use** | | | |
| **Never/Light** | 38 | 1.00 | 1.00 |
| **1-2 times/Year** | 29 | 1.19 (0.74-1.94) | 1.22 (0.75-2.00) |
| **3-4 times/Year** | 110 | 1.23 (0.85-1.78) | 1.25 (0.86-1.83) |
| **5-6 times/Year** | 89 | 1.09 (0.74-1.59) | 1.23 (0.83-1.81) |
| **≥7 times/Year** | 77 | 0.96 (0.64-1.42) | 1.08 (0.72-1.61) |
| **Number of Burns** | | | |
| **Never** | 51 | 1.00 | 1.00 |
| **1-2 times** | 101 | 1.33 (0.95-1.86) | 1.32 (0.94-1.86) |
| **3-4 times** | 56 | 0.98 (0.67-1.44) | 0.97 (0.66-1.43) |
| **5-9 times** | 42 | 1.25 (0.83-1.89) | 1.29 (0.85-1.96) |
| **≥10 times** | 54 | 1.10 (0.74-1.62) | 1.08 (0.73-1.61) |

Results revealed no statistically significant increases in risk for chemical hair relaxer product use, duration of use, frequency of use, and number of burns.[34] Furthermore, there were no clear dose-response relationships for any of the analyses.

The authors also examined the data according to the use of lye-based vs. non-lye-based hair relaxers. There were no statistically significant increases in risk for hair relaxer use, duration of use, frequency of use, and number of burns, echoing the results shown above.[35]

The data from this study was also analyzed by menopausal status. Results are shown in the following table, adapted from Bertrand et al. (2023, Table 4, p. 4):

**Chemical Hair Relaxer Product Use and Uterine Cancer (Black Women's Health Study)**

[34] Age at first use also revealed no statistically significant increases in risk (not shown in the table above).
[35] For confirmation of the results by lye-based vs. non-lye-based relaxers, see Bertrand et al. (2023, Table 3, p. 4).

**Bertrand et al. (2023)**
**Premenopausal and Postmenopausal Women**

| Category | N cases Premenopausal | HR (95% CI) Multivariable Premenopausal | N Cases Postmenopausal | HR (95% CI) Multivariable Postmenopausal |
|---|---|---|---|---|
| **Hair Relaxer Use** | | | | |
| **Never/Light** | 12 | 1.00 | 23 | 1.00 |
| **Moderate** | 58 | 0.84 (0.45-1.58) | 123 | 1.60 (1.01-2.53) |
| **Heavy** | 31 | 0.63 (0.32-1.24) | 85 | 1.64 (1.01-2.64) |
| **Duration of Use** | | | | |
| **Never/Light** | 12 | 1.00 | 23 | 1.00 |
| **1-4 Years** | 8 | 1.36 (0.55-3.38) | 7 | 0.87 (0.37-2.05) |
| **5-9 Years** | 12 | 0.90 (0.40-2.02) | 15 | 1.09 (0.57-2.12) |
| **10-14 Years** | 18 | 0.66 (0.31-1.41) | 39 | 2.21 (1.30-3.75) |
| **15-19 Years** | 20 | 0.65 (0.31-1.34) | 31 | 1.49 (0.85-2.59) |
| **≥20 Years** | 31 | 0.74 (0.38-1.47) | 116 | 1.71 (1.08-2.72) |
| **Frequency of Use** | | | | |
| **Never/Light** | 12 | 1.00 | 23 | 1.00 |
| **1-2 times/Year** | 7 | 0.83 (0.32-2.13) | 21 | 1.59 (0.87-2.91) |
| **3-4 times/Year** | 35 | 1.00 (0.51-1.94) | 72 | 1.56 (0.96-2.53) |
| **5-6 times/Year** | 20 | 0.55 (0.27-1.14) | 65 | 1.85 (1.13-3.00) |
| **≥7 times/Year** | 25 | 0.65 (0.32-1.31) | 48 | 1.47 (0.88-2.46) |

These results reveal some indication of an association between use of chemical hair relaxer products and incident uterine cancer that is limited to those postmenopausal women who had used these products between 10 to 14 years or greater than 20 years (but not 1-9 years or 15-19 years) and those postmenopausal women who used the products 5-6 times per year but not 1-4 times per year or greater than 7 times per year. There was no evidence of a dose-response relationship; the hazard ratio for postmenopausal women who were moderate users was identical to that of heavy users.

The authors note that, although the earlier Chang et al. (2022) study revealed an increased risk of uterine cancer in postmenopausal women, that result was limited to non-Hispanic white women and not African American postmenopausal women.

The authors conclude that their results "suggest that moderate and heavy use of hair relaxers may increase risk of uterine cancer among postmenopausal women" (Bertrand et al. 2023, p. 5).

**Chang et al. (2022)** is the report of a cohort study of the use of relaxers, pressing products and straighteners, and incident uterine cancer.[36] Data for the analyses came from the "Sister Study," a prospective cohort study of breast cancer-free American-born women aged 35-74 years who had at least 1 sister diagnosed with breast cancer. The study enrolled participants during the years 2003-2009. An in-person interview was conducted at baseline at which participants answered questions about hair product use in the past 12 months.[37] Weight and height were measured at baseline by trained interviewers. Periodic reassessment of cancer diagnoses and other health-related changes were undertaken, typically every 2 to 3 years. From the original cohort, exclusions were made including women with an existing uterine cancer history, had a hysterectomy prior to enrollment, women who did

[36] In the next section of this report, see the editorial by Llanos et al. (2022) that accompanied this publication by Chang et al. (2022).
[37]The Chang et al. (2022) study involved both an in-person interview and a self-administered questionnaire.

not answer hair product questions, as well as some additional issues. The final size of the analytic cohort for this study was 33,947 women. Information on exposure to hair products—in the 12 months prior to study enrollment—was organized as follows: frequency of application (by the individual or by someone to that same individual): "did not use," "1-2 times per year," "every 3-4 months," "every 5-8 weeks," "once per month," or "more than once per month." These categories were collapsed by the investigators as follows: "no more than 2" and "more than 2 times per year" for hair permanents and "no more than 4" and "more than 4 times per year" for other hair products, including relaxers. In addition, the investigators created a "never" versus "ever" use category. For hair dyes, the investigators created a lifetime duration of use variable, i.e., "did not use," "less than 5 years," "5-9 years," and "10 or more years." Uterine cancer diagnoses were first identified by self-report and then confirmed (when possible) using medical records. According to the authors, 69.3% of the self-reported uterine cancers were confirmed.

Cox proportional hazards models were used to evaluate the possible associations between hair product use and ovarian cancer incidence, using hazard ratios (HRs) and 95% confidence intervals (95% CI). Adjustments in the analysis were made for race and ethnicity, education, BMI, physical activity, menopausal status at enrollment, parity, smoking, alcohol consumption, oral contraceptive use, hormone replacement therapy, and age at menarche.

The study population was comprised of 85.6% non-Hispanic white women, 7.4% Black/African American, 4.4% Hispanic/Latina and 2.5% other. Results for never/ever use (permanent dyes, semipermanent dyes, temporary dyes, straighteners (and relaxers or pressing products), and hair permanents are shown in the following table, adapted from Chang et al. (2022, Table 2, p. 5):

**Hair Product Use and Uterine Cancer**
**Chang et al. (2022)**

| Hair Product Use | Cases | HR (95% CI)[1] |
|---|---|---|
| **Permanent Dyes** | | |
| **Never** | 184 | Referent |
| **Ever** | 185 | 0.90 (0.74-1.11) |
| **Never to Others** | 352 | Referent |
| **Ever to Others** | 17 | 0.69 (0.42-1.14) |
| **Semipermanent Dyes** | | |
| **Never** | 307 | Referent |
| **Ever** | 64 | 0.94 (0.72-1.24) |
| **Never to Others** | 362 | Referent |
| **Ever to Others** | 9 | 0.78 (0.4-1.51) |
| **Temporary Dyes** | | |
| **Never** | 333 | Referent |
| **Ever** | 36 | 1.25 (0.88-1.78) |
| **Straighteners (etc.)[2]** | | |
| **Never** | 332 | Referent |
| **Ever** | 38 | 1.80 (1.12-2.88) |
| **Never to Others** | 358 | Referent |
| **Ever to Others** | 11 | 1.42 (0.72-2.79) |
| **Hair Permanents** | | |
| **Never** | 316 | Referent |
| **Ever** | 53 | 1.01 (0.75-1.37) |

[1]fully adjusted (see list above)
[2]Includes relaxers and/or pressing products

Results of analyses by frequency of use are shown in the following table, adapted from Chang et al. (2022, Table 3, p. 6):

**Frequency of Hair Product Use and Uterine Cancer**
**Chang et al. (2022)**

| Hair Product Use | Cases | HR (95% CI) | *p*-trend |
|---|---|---|---|
| **Permanent Dyes** | | | |
| **Never** | 184 | Referent | |
| **≤4 times** | 64 | 0.79 (0.59-1.05) | |
| **>4 times** | 121 | 0.98 (0.78-1.24) | |
| **<5 years** | 48 | 0.75 (0.54-1.04) | |
| **5-10 years** | 50 | 0.84 (0.61-1.15) | |
| **≥10 years** | 112 | 0.82 (0.64-1.05) | |
| **Semipermanent Dyes** | | | |
| **Never** | 307 | Referent | |
| **≤4 times** | 35 | 0.91 (0.63-1.29) | |
| **>4 times** | 29 | 0.98 (0.67-1.44) | |
| **<5 years** | 49 | 0.93 (0.69-1.27) | |
| **5-10 years** | 28 | 1.15 (0.78-1.70) | |
| **≥10 years** | 26 | 0.90 (0.60-1.35) | |
| **Straighteners (etc.)** | | | |
| **Never** | 332 | Referent | |
| **≤4 times** | 12 | 1.20 (0.63-2.29) | |
| **>4 times** | 26 | 2.55 (1.46-4.45) | |
| **Hair Permanents** | | | |
| **Never** | 316 | Referent | |
| **≤2 times** | 23 | 0.92 (0.60-1.41) | |
| **>2 times** | 30 | 1.11 (0.75-1.63) | |

Some additional results are presented here, focusing only on the straighteners (etc.) category, specifically, uterine cancer by subtype and uterine cancer by race, BMI, and physical activity, adapted from Chang et al. (2022, Table 4, p. 7 and Table 5, p. 8):

| Straightener (etc.) | Ever Cases | Ever HR (95% CI) | Frequent Cases | Frequent HR (95% CI) |
|---|---|---|---|---|
| **Premenopausal** | 5 | 1.56 (0.26-9.29) | 5 | 1.56 (0.26-9.29) |
| **Postmenopausal** | 33 | 1.90 (1.16-3.13) | 21 | 2.52 (1.39-4.55) |
| **Medically Confirmed Cases** | | | | |
| **All Uterine Cancer** | 21 | 1.94 (1.10-3.42) | 14 | 2.78 (1.39-5.55) |
| **Type I Uterine Cancer** | 13 | 1.89 (1.04-3.43) | 9 | 2.94 (1.42-6.08) |
| **Type II Uterine Cancer** | 2 | | 2 | |
| **Race and Ethnicity** | | | | |
| **African American/Black** | 23 | 1.66 (0.67-4.09) | 17 | 2.12 (0.83-5.39) |
| **Non-Hispanic White** | 12 | 1.94 (1.09-3.47) | 7 | 2.66 (1.25-5.67) |
| **BMI** | | | | |
| **Non-Obese (<30 kg/m³)** | 16 | 1.81 (1.04-3.17) | 10 | 2.48 (1.22-5.03) |
| **Obese (≥30 kg/m³)** | 22 | 1.68 (0.90-3.14) | 16 | 2.40 (1.19-4.85) |
| **Physical Activity** | | | | |
| **Low** | 22 | 2.59 (12.46-4.61) | 15 | 3.72 (1.91-7.25) |
| **High** | 16 | 1.30 (0.71-2.38) | 11 | 1.86 (0.89-3.87) |

According to the American Cancer Society (@www.cancer.org), the causes and risk factors for uterine cancer are:

- Age
- Type 2 diabetes

- Overweight and obesity (considered a strong risk factor)
- Family history (having close relatives with uterine or colorectal cancer [HNPCC Syndrome])
- Having had breast or ovarian cancer in the past
- Having had uterine hyperplasia in the past
- Treatment with radiation therapy to the pelvis (e.g., radiotherapy)
- Postmenopausal estrogen therapy in women with an intact uterus*
- The total number of menstrual cycles during a woman's lifetime
- Never having been pregnant
- Taking tamoxifen (a drug used to help prevent and treat breast cancer)*
- Having been diagnosed with a granulosa cell tumor of the ovaries
- Having been diagnosed with polycystic ovarian syndrome

High-fat diet

According to the authors, the risk factors for uterine cancer are:

- Race and ethnicity
- Education
- BMI
- Physical activity
- Menopausal status at enrollment
- Parity
- Smoking
- Alcohol consumption
- Oral contraceptive use
- Hormone replacement therapy
- Age at menarche

The authors did not adjust for several well-established risk factors of uterine cancer, including Type 2 diabetes, radiotherapy to the pelvis, taking tamoxifen, polycystic ovarian syndrome, and high-fat diet.

Chang et al. (2022, p. 1) conclude the following:

> "These findings are the first epidemiologic evidence of association between use of straightening products and uterine cancer. More research is warranted to replicate our findings in other settings and to identify specific chemicals driving this observed association."

The authors also conclude (2022, p. 7-8):

> "More research is warranted to confirm our novel findings in different populations, particularly in African American and/or Black women because of the high prevalence of straightener use, and to evaluate the potential contribution of hair products to health disparities in uterine cancer. Future efforts are also needed to identify the chemical ingredients, which might result in the elevated rates. Given the widespread use of hair products and the rising incidence of uterine cancer (2) our findings which identify hair straightener use as a potential target for intervention are particularly relevant for public health approaches to reduce uterine cancer incidence."

It will prove important when examining the claims of the plaintiffs' experts in this matter to keep in mind that the use of other hair products by women in this study was not associated with an increased risk of uterine cancer; see the Tables above adapted from Chang et al. (2022). These experts will argue that the chemicals found in the hair relaxers, specifically EDCs such as parabens and phthalates, are responsible for the hypothesized carcinogenic effects. It follows that those same carcinogenic effects should have been observed from the use of dyes, semi-permanent dyes, and permanents, which also have been shown to contain parabens and phthalates (Schildroth et al. 2024).

It is also important to keep in mind that the Chang et al. (2022) study did not look at chemical hair relaxer products solely, but rather a combination category of "relaxers, straighteners, and pressing products." The extent to which the relaxers (i.e., the chemical hair relaxer products) were potentially responsible for any of the results in this study is unknown.

**Chang et al. (2024)** is the report of a study examining the extent to which the results of the Chang et al. (2022) study, which showed potential associations between relaxers, straighteners, and pressing product use and uterine cancer in the Sister Study, could be explained by epigenetic age. Note that "epigenetic age" is an expression used to broadly describe the biological pathways associated with advancing age. The more specific markers used in this study to measure epigenetic age were related to DNA-methylation. Very basically, DNA-methylation is the physiological process of turning genes off. As noted by the authors, they found "little evidence of an association" (Chang et al. 2024, p. 1).

In sum, this study does not provide evidence satisfying the condition (or criterion) of biological plausibility.

### Section 3.2.3 Causal Evaluation of the Relationship Between Chemical Hair Relaxer Products and Uterine Cancer

The body of evidence to be examined here consists of two epidemiologic studies, both of which have examined the potential relationship between relaxers, straighteners, and pressing products and uterine cancer (Bertand et al. 2023; Chang et al. 2022).[38] The methodologic approach taken here is to examine this body of evidence using the approach described in 1965 by Hill and discussed extensively in the literature since that time.[39]

In the first of these, published in 2022, the authors reported a modestly elevated risk—statistically significant[40]—for uterine cancer having ever used hair relaxers, hair straighteners and pressing products.[41] This "ever/never" use comparison resulted in a hazard ratio (HR) of 1.80 (95% CI: 1.12-2.88). The 2023 study by Bertrand et al. (2023) did not report an "ever/never" result but rather used the "never and light" category as the referent group compared to moderate users and heavy users. As shown in the table above, the observed results revealed weak HRs between 1.20 (95% CI: 0.83-1.74) for moderate users and 1.16 (95% CI: 0.79-1.71) representing uterine cancers minus the relatively

---

[38] As mentioned earlier in this report, the Chang et al. (2022) study did not separate "relaxers" or "chemical hair relaxer products" from straighteners and pressing products adding to the uncertainty of the significance (i.e. causal relevance) of the results of that study.

[39] See Section 3.1 above.

[40] Alternatively, "with confidence intervals that do not include 1.0."

[41] The "ever/never" use comparison.

uncommon serous type.[42] These results are "not statistically significant" or, alternatively, chance cannot be excluded as an explanation for the results.

**Hill's First Consideration: Can Chance be Excluded?**

As described elsewhere in this report, the first consideration in the approach championed by Hill (1965) is to determine whether chance as an explanation for the results can be excluded considering the body of evidence as a whole. This has traditionally been accomplished using the p-value (or confidence interval). From the results of these two studies, chance cannot be excluded. Although the Chang et al. (2022) study reports a HR with confidence interval that does not include 1.0,[43] which in effect, permits the exclusion of chance, the results from the Bertrand et al. (2023) study clearly reveal a different result which does not permit the exclusion of chance. Together, these results make it unclear whether chance can be excluded. Recall that the Hill (1965) paper clearly states that the application of his "aspects"[44] takes place after "beyond what we would care to attribute to chance" (Hill 1965, p. 295) with more than one study. It follows not only that application of the Hill "aspects" is inappropriate, but also that under these circumstances a claim of causation is unwarranted. After all, the purpose of this exercise, applying the general scientific method, is to work towards excluding alternative explanations. If chance cannot be excluded then causation or some other explanation cannot be considered the "best explanation" of these results.

Nevertheless, for the sake of completeness, I will continue with the remaining Hill "aspects" or "criteria."

**Strength of Association**

This consideration examines the relevance to causation of the magnitude of the hazard ratio (i.e., the relative risk). Three basic ratios are available: the 1.80 from Chang et al. (2022) and two ratios from the Bertrand et al. (2023) study of 1.20 and 1.16 or, alternatively 1.23 and 1.18 when the serous cancers are included. These are all less than 2.0 which can be considered weak associations.[45] The two Bertrand et al. (2023) ratios remain weak associations while the Chang et al. (2022) results should—in these times—be considered a moderate estimate. Together, however, these mixed results cannot satisfy the strength consideration for the body of evidence. It is also important to point out that the Bertrand et al. (2023) study is a much larger study than the Chang et al. (2022) study and therefore had the capacity to test several secondary hypotheses involving the relationships between uterine cancer incidence and duration of use of chemical hair relaxer products, frequency of use of those products, and by "frequency of burns." The results reveal prominent extraordinarily weak associations (many indistinguishable from no increase in risk). For example, 13 of these comparisons showed HR estimates below 1.10. Results such as these cannot be considered anything other than null findings. The remainder are between 1.10 and 1.35. Precisely the same situation occurs when serous cancers are removed from the analysis. See Supplemental Table 1 of the Bertrand et al. (2023) publication.

**Consistency of Association**

---

[42] See Bertrand et al. (2023, Supplemental Table S1). Serous uterine cancers are not thought to be hormonally related.

[43] Which is described as "statistically significant" in the frequentist approach to statistical inference.

[44] Or "considerations" or "criteria"

[45] See Hill (1965, p. 296)

Given that there is only one hazard ratio reported with confidence interval that excludes 1.0 (from the Chang et al. (2022) study) and a lack of association on statistical grounds in the study by Bertrand et al. (2023) the consistency criterion cannot be satisfied. Simply put, this evidence does not permit the investigator to state that the association (for which chance has been excluded) has (in Hill's words, 1965, p. 296) "has been repeatedly observed by different persons in different places, circumstances, and times?" Clearly not.

**Specificity**

Given that uterine cancer is considered a disease with multiple determinants (causes and risk factors) then this consideration could be considered irrelevant. However, specificity (as discussed earlier in this report) can also refer to the extent to which either the exposure or the disease is clearly defined, i.e., "specified." That is not an issue for the disease of uterine cancer, although the Bertrand et al. (2023) study did make the effort to separate the less common form of serous out of the analyses. The exposure, however, in these studies is another story. "Hair relaxers," or in the case of the Sister Study, relaxers, straighteners, and pressing products, as discussed elsewhere in this report,[46] are varied in their chemical composition and there are many different formulations, hence I describe them as "chemical hair relaxer products." In addition, the basic presumption of the causal analysis is that there are one or more chemical entities within these products that could potentially affect uterine cancer occurrence. Those entities, however, are unknown.[47] With this information in mind, the specificity consideration becomes relevant to the causal analysis and to both the Chang et al. (2022) and the Bertrand et al. (2023) studies. It follows that the specificity consideration counts against causality.

**Dose Response**

Dose response (biologic gradient) is a key consideration in a causal analysis. The Bertrand et al. (2023) study reveals no indication of a dose-response with the basic contrasts comparing never/light users to moderate users and to heavy users. The hazard ratios observed for these two groups are statistically indistinguishable and, in fact, the heavy user value is a bit smaller than the moderate user value.[48] The Bertrand et al. (2023) study examines this issue more carefully in their duration of use analysis, which revealed no evidence of a positive dose-response relationship. Similarly, the frequency of use analysis in Bertrand et al. (2023) likewise reveals no dose-response relationship[49] with the observed HR value for use 1-2 times per year higher than the value for ≥7 times per year and no difference across three categories. The Chang et al. (2022) study, in contrast, provides the reader with only two results, contrasting never users with those using chemical hair relaxer products for ≤4 times per year and >4 times per year. In their analysis there is a trend revealed as shown elsewhere in this report. The Chang et al. (2022) study was too small to provide any information on the better measures of dose, i.e., duration of use and frequency of use.

From these results, it cannot be concluded that a dose-response relationship has been established for the relationship between the use of chemical hair relaxer products and uterine cancer. The larger

---

[46] See Section 2.3 above.

[47] The plaintiffs' experts insist that they know that various EDCs and formaldehyde are in "hair relaxers" but cannot state in which product or to what extent those compounds exist there.

[48] This is true whether the analysis includes or excludes the serous cases.

[49] See Bertrand et al. (2023, Table 2, p. 3).

Bertrand et al. (2023) study provided a more extensive and thus more compelling analysis of this issue and found no evidence of dose-response.

**Temporality**

Cohort studies provide a reasonably good assessment of temporality and thus this consideration (or "criterion") is satisfied.

**Biological Plausibility**

Biological plausibility in the matter of chemical hair relaxer products and uterine cancer is unclear and cannot be said to be satisfied. As noted above, the specific chemicals that might be involved in physiological (biological) systems that explain the occurrence of uterine cancer are not known. There have been discussions of the possibility that endocrine disruptors, such as parabens and phthalates, may be involved and there is some evidence that in some chemical hair relaxer products these compounds can sometimes be found (as they are found in many consumer products). But how these compounds relate to the occurrence of uterine cancer is unknown. In addition, there is the issue of formaldehyde which may or may not be present in any specific chemical hair relaxer product. As discussed earlier in this report, there is no evidence that formaldehyde (from other sources of exposure) has a causal relationship with uterine cancer. The fact that formaldehyde is a carcinogen cannot be used as support for the hypothesis that formaldehyde causes uterine cancer; rather it provides only the hypothesis (untested) itself. Formaldehyde has been extensively studied in occupational populations and, while it has been established that it causes nasopharyngeal cancer, acute myeloid leukemia, and chronic myeloid leukemia, it has not been established that exposure to formaldehyde causes any other cancers and these others have been studied extensively (IARC, 100F, 2012 and IARC, 2025).

It follows that biologic plausibility has not been established. The issue remains, at best, an untested hypothesis.

One more issue requires comment. Hill (1965) noted that biologic plausibility was not required, due largely because he argued that that condition is dependent upon the knowledge of the day. Put another way, Hill (1965) was primarily interested in and dependent upon the epidemiologic evidence. This makes sense with current thinking in cancer science and cancer epidemiology. Even when a chemical is determined to be a carcinogen, that fact does not permit the inference—the conclusion—that the specific human cancer that chemical may cause is known. The current epidemiologic evidence (as discussed in terms of strength, consistency, dose-response, and specificity above) does not permit a causal conclusion.

**Coherence**

As discussed elsewhere in this report, the coherence consideration can be interpreted as the extent to which the other criteria have been satisfied. Using Hill's original definition does not change this conclusion. There is sufficient information to assert that the results of these studies conflict with what is known about the epidemiology and biology of uterine cancer. Of particular interest here is the Sarink et al. (2021) study examined in more detail in this report. This case-control study of postmenopausal women with uterine cancer revealed no "statistically significant" associations and no evidence of dose response for bisphenol A, triclosan, several parabens and several phthalates and the risk of uterine cancer. A clearer example of incoherence would be hard to imagine.

**Experimentation**

A practical application of this causal consideration—the strongest of all—has not been attempted thus cannot be said to be satisfied or not satisfied. It is simply unknown.

**Analogy**

This commonly misinterpreted consideration[50] is an important one for this causal analysis. As discussed elsewhere, the analogy consideration is not determined by the simple concept of whether a "similar" disease and a "similar" exposure have been studied and shown to be causal (or not). Such a simplistic interpretation is unhelpful and is the source of the misinterpretations. Rather, this criterion implies a different, much more complex comparison, namely, whether a body of evidence (i.e. the one regarding chemical hair relaxer products and uterine cancer described above) is similar enough to other known bodies of evidence for which causation has been established, or is it in fact similar to other bodies of evidence for which causation has not been established? As Hill (1965) wrote, analogy is about "similar evidence" and thus bodies of evidence.

Answering the analogy question requires a look at the historical record. Consider, for example, the situation with tobacco smoking and lung cancer, a known causal relationship. In 1964, when the Surgeon General's Committee determined that a causal relationship had been established, there had been published 29 case-control studies and 7 large prospective studies with consistent relative risk ratios between 4.0 and 20.0, clear and consistent dose-response relationships, and evidence of known carcinogenic compounds in the tobacco smoke. This situation is a far cry from the available evidence on chemical hair relaxer products and the two cancers at issue here. More recent examples of established causal relationships in cancer have somewhat less impressive characteristics, but it would be difficult to find any such causal relationship in which there were only two studies, with many weak and inconsistent associations, inconsistent and primarily null dose-response relationships, and a rudimentary discussion of biological plausibility (not much beyond a hypothesis) and an exposure—a consumer product—with varying (non-specific) chemical ingredients. It follows that the analogy criterion has not been established. As discussed elsewhere, the analogy criterion (or consideration) as initially defined by Hill is considerably more important than what could be found in the methodological literature prior to 2018 (Weed, 2018).

**Conclusion**

It has not been established that the use of chemical hair relaxer products causes uterine cancer, a conclusion in agreement with that found in a recent systematic review (Hernandez et al. 2025) discussed later in this report.

**Section 3.2.4 Causal Evaluation of the Relationship Between Chemical Hair Relaxer Products and Uterine Cancer in Postmenopausal Women**

As above, the body of evidence to be examined here consists of two epidemiologic studies, both of which have examined the potential relationship between relaxers, straightener and pressing products and uterine cancer stratifying by premenopausal and postmenopausal status (Bertand et al. 2023; Chang

[50] See Weed (2018).

et al. 2022). The methodologic approach taken here is to examine this body of evidence using the approach described in 1965 by Hill and discussed extensively in the literature since that time.[51]

In the first of these, published in 2022, the authors reported that for postmenopausal women, there was a modestly elevated risk—statistically significant[52]—for uterine cancer having ever used relaxers, straighteners or pressing products.[53] This "ever/never" use comparison resulted in a hazard ratio (HR) of 2.52 (95% CI: 1.39-4.55). The 2023 study by Bertrand et al. (2023) did not report an "ever/never" result for postmenopausal women rather they used the "never and light" category as the referent group compared to moderate users and heavy users. As shown in the table above, the observed results revealed weak HRs between 1.60 (95% CI: 1.01-2.53) for moderate users and 1.64 (95% CI: 1.01-2.64) representing heavy users. These results are "statistically significant" or, alternatively, chance can reasonably be excluded as an explanation for the results.

**Hill's First Consideration: Can Chance be Excluded?**

As described elsewhere in this report, the first consideration in the approach championed by Hill (1965) is to determine whether chance as an explanation for the results can be excluded considering the body of evidence as a whole. This has traditionally been accomplished using the p-value (or confidence interval). From the results of these two studies for postmenopausal women, chance can be excluded.

I will continue with the remaining Hill "aspects" or "criteria."

**Strength of Association**

This consideration examines the relevance to causation of the magnitude of the hazard ratio (i.e., the relative risk). Three basic ratios are available: the 2.52 from Chang et al. (2022) and two ratios from the Bertrand et al. (2023) study of 1.60 and 1.64. The Bertrand et al. (2023) values are less than 2.0 which are weak associations.[54] The Chang et al. (2022) result should—in these times—be considered a moderate estimate of a potential relationship between exposure to hair relaxers, straighteners and pressing products. Together, however, these mixed results can be considered to reasonably satisfy the strength consideration for the body of evidence. It is important to point out that the results from the Bertrand et al. (2023) study are more modest (regarding the magnitude of association). This situation is not uncommon in cancer epidemiology wherein an initial study reveals an elevated risk followed by larger studies that reveal relatively smaller relative risk values. If this trend continues, then the chemical hair relaxer product-uterine cancer relationship will be considered a "false positive" (Boffetta et al. 2008).

**Consistency of Association**

Given that there are two elevated hazard ratios reported with confidence intervals that exclude 1.0 (from the Chang et al. (2022) study and from the Bertrand et al. (2023) study) the consistency criterion may be partially satisfied although, as Hill (1965) noted he believed this aspect would be best evaluated

---

[51] See Section 3.1 above.

[52] Alternatively, "with confidence intervals that do not include 1.0."

[53] The "ever/never" use comparison.

[54] For confirmation of this idea—that a relative risk of 2.0 is the level at which he was concerned about unknown confounders--see Hill's strength of association discussion.

with both prospective (cohort) and retrospective (case-control) studies. There are no case-control studies examining the hypotheses of concern. Also, these studies have other differences that count against consistency in terms of differences in information gathered.

**Specificity**

Given that uterine cancer is considered a disease with multiple determinants (causes and risk factors) then this consideration could be considered irrelevant. However, specificity (as discussed earlier in this report) can also refer to the extent to which either the exposure or the disease is clearly defined, i.e., "specified." That is not an issue for the disease of uterine cancer, although the Bertrand et al. (2023) study did make the effort to separate the less common form of serous cancer out of the analyses. The exposure, however, in these studies is another story. "Chemical hair relaxer products," as discussed elsewhere in this report,[55] are varied in their chemical composition and there are many different formulations. Indeed, in the Sister Study, these products were studied as the combination of relaxers, straighteners, and pressing products. In addition, the basic presumption of the causal analysis is that there is one or more chemical entities within these products that could potentially affect uterine cancer occurrence. Those entities, however, are unknown. With this information in mind, the specificity consideration becomes relevant to the causal analysis and to both the Chang et al. (2022) and the Bertrand et al. (2023) studies. It follows that the specificity consideration counts against causality.

**Dose Response**

Dose response (biologic gradient) is a key consideration in a causal analysis. The Bertrand et al. (2023) study reveals no indication of a dose-response with the basic contrasts comparing never/light users to moderate users and to heavy users. The hazard ratios observed for these two groups are statistically indistinguishable. The Bertrand et al. (2023) study examines this issue more carefully in their duration of use analysis, which revealed no evidence of a positive dose-response relationship. Similarly, the frequency of use analysis in Bertrand et al. (2023) likewise reveals no dose-response relationship[56] with the observed HR value for use 1-2 times per year higher than the value for ≥7 times per year and no difference across three categories. The Chang et al. (2022) study, in contrast, provides no information on dose-response for postmenopausal women.

From these results, it cannot be concluded that a dose-response relationship has been established for the relationship between the use of chemical hair relaxer products and uterine cancer in postmenopausal women. The larger Bertrand et al. (2023) study provided a more extensive and thus more compelling analysis of this issue and found no evidence of dose-response.

**Temporality**

Cohort studies provide a reasonably good assessment of temporality and thus this consideration (or "criterion") is satisfied.

**Biological Plausibility**

---

[55] See Section 2.3 above where I discuss the fact that the Sister Study examined a combination category of relaxers, straightening products, and pressing products.

[56] See Bertrand et al. (2023, Table 2, p. 3).

As discussed in Section 3.2.3 above, biologic plausibility in the matter of chemical hair relaxer products and uterine cancer is unclear and cannot be said to be satisfied. Biologic plausibility has not been established. The issue remains, at best, an untested hypothesis. Indeed, no explanation has been provided for why chemical hair relaxer products—i.e., the chemicals presumably responsible for the carcinogenic effects—only affected postmenopausal women and not premenopausal women. Premenopausal women are rich in the hormones that the plaintiffs' experts believe were affected by the presence of endocrine disruptors and Dr. Gerstman argues that these chemicals can act "quickly." This lack of biological plausibility adds considerable uncertainty to the causal analysis.

**Coherence**

As discussed elsewhere in this report, the coherence consideration can be interpreted as the extent to which the other criteria have been satisfied. Using Hill's original definition does not change this conclusion. There is sufficient information to assert that the results of these studies conflict with what is known about the epidemiology and biology of uterine cancer. See also my discussion of Sarink et al. (2021) elsewhere in this report that demonstrates that neither parabens nor phthalates are associated with the occurrence of uterine cancer in postmenopausal women. This evidence represents a critically important refutation of the hypothesis that use of chemical hair relaxer products causes uterine cancer in postmenopausal women.

**Experimentation**

A practical application of this causal consideration—the strongest of all—has not been attempted thus cannot be said to be satisfied or not satisfied. It is simply unknown.

**Analogy**

The situation for the results for postmenopausal women is similar to the situation with the entire study populations in these studies. Here, while strength and consistency can be said to be satisfied, dose-response and biologic plausibility cannot. In addition, the studies were not designed specifically to test the premenopausal/postmenopausal distinction. It follows that the analogy criterion has not been established.

**Conclusion**

It has not been established that the use of chemical hair relaxer products causes uterine cancer in postmenopausal women.

**Section 3.2.4 Epidemiologic Studies of Chemical Hair Relaxer Products and Ovarian Cancer**

**White et al. (2021)** is the report of an analysis from the same "Sister Study" described above. In this analysis, the authors examined the potential relationships between hair product use and ovarian cancer. The final size of the analytic cohort for this study was 40,559 women.

**Hair Product Use and Ovarian Cancer**
**White et al. (2021)**

| Hair Product Use | Cases | HR (95% CI)[1] |
|---|---|---|
| **Permanent Dyes** | | |

| | | |
|---|---|---|
| Never | 108 | Referent |
| Ever | 129 | 1.07 (0.82-1.39) |
| **Semipermanent Dyes** | | |
| Never | 185 | Referent |
| Ever | 50 | 1.17 (0.85-1.60) |
| **Temporary Dyes** | | |
| Never | 219 | Referent |
| Ever | 16 | 0.75 (0.45-1.26) |
| **Straighteners (etc.)[2]** | | |
| Never | 213 | Referent |
| Ever | 24 | 1.29 (0.70-2.38) |
| Never to Others | 358 | Referent |
| Ever to Others | 11 | 1.42 (0.72-2.79) |
| **Hair Permanents** | | |
| Never | 200 | Referent |
| Ever | 38 | 1.06 (0.74-1.52) |

[1]fully adjusted (see list above)

[2]Includes relaxers

Results reported for the possible relationships between frequency of hair product use and ovarian cancer are shown in the following table, adapted from White et al. (2021, Table 3, p. 1193):

**Frequency of Hair Product Use and Ovarian Cancer**
**White et al. (2021)**

| Hair Product Use | Cases | HR (95% CI) | *p*-trend |
|---|---|---|---|
| **Permanent Dyes** | | | |
| Never | 108 | Referent | |
| ≤4 times | 53 | 1.06 (0.76-1.48) | |
| >4 times | 7 | 1.07 (0.79-1.45) | |
| <10 years | 60 | 0.80 (0.58-1.12) | |
| ≥10 years | 84 | 1.06 (0.78-1.43) | |
| **Semipermanent Dyes** | | | |
| Never | 185 | Referent | |
| ≤4 times | 26 | 1.05 (0.69-1.59) | |
| >4 times | 24 | 1.33 (0.87-2.04) | |
| <10 years | 53 | 0.79 (0.56-1.12) | |
| ≥10 years | 76 | 1.17 (0.76-1.82) | |
| **Straighteners (etc.)** | | | |
| Never | 213 | Referent | |
| ≤4 times | 4 | 0.50 (0.17-1.44) | |
| >4 times | 20 | 2.19 (1.12-4.27) | |
| **Hair Permanents** | | | |
| Never | 200 | Referent | |
| ≤2 times | 32 | 0.98 (0.67-1.44) | |
| >2 times | 6 | 1.77 (0.75-4.19) | |

Results reported for the possible relationships between frequency of hair product use and ovarian cancer tumor types are shown in the following table, adapted from White et al. (2021 Table 4, p. 1194):

**Frequency of Hair Product Use and Ovarian Cancer Tumor Types**
**White et al. (2021)**

| Hair Product Use | Cases | Ever vs Never HR (95% CI) | Frequent vs Never HR (95% CI) | *p*-trend |
|---|---|---|---|---|
| **Permanent Dyes** | | | | |

| | | | | |
|---|---|---|---|---|
| Serous Ovarian | 95 | 0.65 (0.43-0.99) | 0.56 (0.33-0.94) | 0.02 |
| Non-serous Ovarian | 59 | 1.94 (1.12-3.37) | 1.90 (1.03-3.51) | 0.002 |
| *p*-heterogeneity | | 0.007 | | |
| **Semipermanent Dyes** | | | | |
| Serous Ovarian | 95 | 1.49 (0.94-2.38) | 1.47 (0.76-2.84) | 0.12 |
| Non-serous Ovarian | 57 | 0.83 (0.41-1.68) | 1.32 (0.57-3.06) | 0.30 |
| *p*-heterogeneity | | 0.18 | 0.29 | |
| **Straighteners (etc.)** | | | | |
| Serous Ovarian | 95 | 1.33 (0.68-2.62) | 1.13 (0.49-2.57) | 0.89 |
| Non-serous Ovarian | 58 | 1.49 (0.42-5.33) | 4.35 (1.10-17.2) | 0.12 |
| *p*-heterogeneity | | 0.87 | 0.25 | |
| **Hair Permanents** | | | | |
| Serous Ovarian | 95 | 1.18 (0.66-2.09) | 1.91 (0.49-7.39) | 0.49 |
| Non-serous Ovarian | 59 | 0.50 (0.19-1.31) | .... | |
| *p*-heterogeneity | | 0.13 | .... | |

Results reported for the possible relationships between hair product use and ovarian cancer by race and ethnicity are shown in the following table, adapted from White et al. (2021, Table 5, p. 1194):

| Hair Product Use | Ever vs Never Cases/Controls | Ever vs Never HR (95% CI) | Frequent vs Never Cases/Controls | Frequent vs Never HR (95% CI) | *p*-trend |
|---|---|---|---|---|---|
| **Permanent Dyes** | | | | | |
| Non-Hispanic White | 116/18545 | 1.14 (0.86-1.52) | 70/11003 | 1.14 (0.83-1.57) | 0.39 |
| African American | 7/1382 | 0.63 (0.25-1.55) | 4/462 | 0.92 (0.30-2.85) | 0.57 |
| *p*-heterogeneity | | 0.22 | | | |
| **Semipermanent Dyes** | | | | | |
| Non-Hispanic White | 35/5728 | 1.02 (0.71-1.47) | 16/2298 | 1.10 (0.66-1.83) | 0.81 |
| African American | 11/1178 | 2.05 (0.86-4.88) | 6/413 | 3.06 (1.08-8.63) | 0.04 |
| *p*-heterogeneity | | 0.15 | | 0.29 | |
| **Straighteners (etc.)** | | | | | |
| Non-Hispanic White | 4/1004 | 0.89 (0.33-2.40) | 3/416 | 1.55 (0.49-4.86) | 0.86 |
| African American | 17/2417 | 1.28 (0.46-3.52) | 14/1454 | 1.82 (0.64-5.18) | 0.15 |
| *p*-heterogeneity | | 0.59 | | 0.25 | |
| **Hair Permanents** | | | | | |
| Non-Hispanic White | 30/3830 | 0.98 (0.65-1.47) | 0/128 | .... | |
| African American | 8/706 | 1.80 (0.74-4.36) | 6/333 | 2.97 (1.12-7.88) | 0.06 |
| *p*-heterogeneity | | 0.21 | | .... | |

White et al. (2021, p. 1195) conclude the following:

> "Given the novelty of these findings, more research is needed to confirm our results and identify constituents of these products that may be driving risk. It is particularly important for future studies to be conducted in racially/ethnically diverse populations and inclusive of a wider variety of hair care products to help us better understand their role in determining ovarian cancer risk in US women."

### Section 3.2.5 A Bradford Hill Evaluation of the Potential Relationship Between Chemical Hair Relaxer Products and Ovarian Cancer

As discussed elsewhere in this report, the assessment of causation is undertaken when the epidemiologic evidence reveals, in A.B. Hill's words, "an association between two variables, perfectly

clear-cut and beyond what one would care to attribute to the play of chance" (Hill, 1965, p. 295). In this situation, there is a single study that has examined the hypothesis that relaxers, straighteners, and pressing products may have a relationship with the occurrence of ovarian cancer. Simply put, the results of this study have not been replicated.

Repetition of the study—in terms of the (same) exposure and the same disease—is the appropriate approach to undertake to examine the issue of replication[57], whereby "repetition" here means that other study populations and other study designs are employed. The purpose here is to examine whether the association can be replicated, a key scientific consideration in the general scientific method. Hill pointed out in his example of this approach that when the U.S. Surgeon General determined that smoking caused lung cancer, there had been 29 retrospective (typically, case-control) and 7 prospective (cohort) studies published on the topic.

To apply Hill's approach, indeed the approach of any reliable and valid scientific method, to the situation of relaxers, straighteners, and pressing products and ovarian cancer makes clear that a causal claim is inappropriate if for no other reason than there is a single study and the basic contrast between "ever" users and "never" users is a weak HR with confidence interval including 1.0.[58] The existence of an association is in question here and it is also clear that chance cannot be excluded as an explanation.

Applying the Hill criteria in this situation is inappropriate for reasons grounded in the general scientific method—lack of replicability—as well as the historical practice of causal inference in epidemiology.

There are at least two findings that will require examination in additional studies with different populations. The first is a simple comparison of those who used chemical hair relaxer products 4 times or fewer in the past 12 months and those who used chemical hair relaxer products more than 4 times in 12 months; this is a rudimentary examination of a dose-response relationship. It will also be important to confine the definition of exposure to hair relaxers (chemical hair relaxer products) rather than the broader category of relaxers, straighteners, and pressing products. The second comparison of interest (i.e. a "positive" finding) is that for non-serous ovarian cancers. These comparisons will require further study before any claim about causation; indeed the application of the Hill criteria can be entertained.

It has not been established that use of chemical hair relaxer products causes ovarian cancer. This conclusion is consistent with the views of the American Cancer Society, the National Cancer Institute, the Mayo Clinic, and a recent systematic review (Hernandez et al. 2025) as described and discussed in the next section.

Nevertheless, if one were to apply the Hill criteria here, it would be reasonable to assert that, like in the case of chemical hair relaxer products[59] and uterine cancer, biological plausibility has not been achieved beyond an untested hypothesis. Strength of association is both present and not present depending upon the contrast which does not permit a decision of "satisfied." Consistency is impossible. Dose response has not been examined with the appropriate information. Temporality has been met. Coherence has not. Specificity has not. Experimentation is irrelevant. The final consideration, analogy,

---

[57] As discussed in the methods section of this report, "replicability" and "consistency" are two sides of the same coin, both referring to observing similar results in many different studies.

[58] This statement is also true for the HR calculated for serous ovarian and non-serous ovarian cancers, for non-Hispanic white women and for African American women.

[59] Or, in the case of the Sister Study, "relaxers, straighteners, and pressing products."

has definitely not been satisfied given that there is little if any precedent for making a causal claim from a single epidemiologic study with a null finding for the "ever"/"never" contrast.

The following table provides another way to display the situation with the evidence regarding exposure to chemical hair relaxer products and ovarian cancer.[60]

**Hill's Criteria**
**Relaxers, Straighteners, and Pressing Products and Ovarian Cancer**

| Causal Criterion | Satisfied? |
|---|---|
| Strength | No |
| Consistency | No |
| Dose Response | No |
| Temporality | Yes |
| Biologic Plausibility | No |
| Coherence | No |
| Specificity | No |
| Experimentation | No |
| Analogy | No |

The argument sometimes made about Hill's criteria is that there are no "hard and fast rules" for using these criteria, meaning fixed requirements for determining causation.[61] On the other hand, if the evidence lacks strength, consistency, dose-response, biologic plausibility, and analogy then a causal claim is based solely on speculation or wishful thinking.

It has not been established that exposure to chemical hair relaxer products causes ovarian cancer.

### Section 3.2.6 Systematic and Narrative Reviews of Studies of Chemical Hair Relaxer Products and Cancers in Women (Uterine and Ovarian Cancer)

**Hernandez et al. (2025)** is the report of a systematic review of studies examining the potential relationships between the use of chemical hair relaxer products (or "straighteners") in black women and the following outcomes: breast cancer, uterine (including endometrial)[62] cancer, ovarian cancer, and uterine fibroids. The authors followed the well-accepted PRISMA guidelines for reporting systematic reviews, systematically searching the literature, evaluating the quality of the identified epidemiological studies with a validated scale, i.e., the Newcastle-Ottawa Scale (NOS), and examining the strengths and limitations of their review. For uterine cancer, the authors identified two epidemiologic studies: Chang et al. (2022) and Bertrand et al. (2023).

[60] Again, the complaints made in the methodological literature that the Hill criteria should not be treated as a list are weak. If a body of evidence lacks dose-response then that consideration can be "checked off" the list and/or it can be said that that fact counts against causality because dose-response (in some form or another) as measured in epidemiological studies is something required for causes. There is nothing inherently wrong with the concept of list. Consider, for example, that a systematic review of the literature needs to have certain characteristics. A list is one way to portray those requirements. It is simply contrary to common "good" sense to argue that a list of causal considerations shouldn't be considered a list or that "checking off" these items is somehow inconsistent with good scientific practice.

[61] This is something Hill wrote (1965, p. 299).

[62] The authors defined uterine cancers as those including sarcoma of the uterus, whereas Uterine cancers excluded sarcomas of the uterus.

The authors do not conclude that exposure to chemical hair relaxer products cause uterine cancer, breast cancer, or ovarian cancer in black women.[63] They conclude that "**the overall findings of our current review suggest that Black women likely do not experience increased risk of breast cancer, ovarian cancer, or uterine cancer due to hair relaxer use"** (Hernandez et al. 2025, p. 21 of 23).

**Farooq et al. (2024)** is the report of a systematic review and meta-analysis of studies examining the potential relationships between use of hair products (i.e., hair dyes, relaxers) and several gynecological cancers.[64] For the purposes of this report, I will focus primarily on the review by Farooq et al. (2024) on studies of chemical hair relaxer products. After a systematic search of library databases, the authors identified a total of 17 studies, of which 8 studies involved breast cancer outcomes, 1 study that examined chemical hair relaxer products and uterine cancer (Chang et al. 2022)[65] as well as at least two studies of hair dye use and uterine cancer (Stavraky et al. 1981) and (Chang et al. 2022). For ovarian cancer outcomes, the authors identified studies by Stavraky et al. (1981), Tzonou et al. (1993) and White et al. (2021). Of these, only White et al. (2021) examined chemical hair relaxer product use and ovarian cancer. Studies involving chemical hair relaxer product use and uterine cancer, ovarian cancer, and uterine fibroids are described in detail elsewhere in this report.

The authors do not conclude that exposure to chemical hair relaxer products cause ovarian cancer, uterine cancer, or uterine fibroids. Indeed, they conclude that "**the available evidence regarding personal hair product use and gynecological conditions is insufficient to conclude whether a positive association exists**" (Farooq et al. 2024, p. 167). (emphasis added)

**Needle et al. (2024)** is a narrative review discussing the potential relationships between exposure to chemical hair relaxer products and several outcomes including local cutaneous reactions of the scalp, asthma and respiratory disease, kidney injury, breast cancer, ovarian cancer, uterine cancer, and reproductive outcomes (specifically, premature puberty and fertility). I will limit remarks to the authors' approach and to their discussions of ovarian and uterine cancer.

The authors provide little if any information on the design, methodology, results, and conclusions of the studies included in their review. For example, the authors' only comment about the Sister Study by Chang et al. (2022) is that it "found that the use of hair straightening products was associated with higher incident uterine cancer rates and a stronger association was observed when comparing frequent use to never use" (Needle et al. 2024, p. 54).

Similarly, the authors write that in the Black Women's Health Study (Bertrand et al. 2023), "hair relaxer use was associated with uterine cancer among postmenopausal women but not among premenopausal women" (Needle et al. 2024, p. 54). The authors, however, fail to point out that Chang et al. (2022) also found no association among premenopausal women (Chang et al., 2022, Table 4, p. 7).

Furthermore, the authors note that African American women are relatively frequent users of hair straighteners but failed to point out that Chang et al. (2022) found no association for uterine cancer in this subgroup.

---

[63] They do not make any causal claims for these same exposure-disease relationships in white, Hispanic, or Asian populations.

[64] Conditioning creams and hair oils were also examined although not discussed in this report. In addition, the authors [i.e., Farooq et al. (2024)] distinguished between permanent and semi-permanent hair dyes.

[65] The authors also described the study by Wise et al. (2021) that examined the potential relationship between hair relaxer use and uterine fibroids.

In sum, this review barely describes a few positive results and ignores negative results, thus biasing their reporting. The bias here is most likely an information bias based, at least in part, on an underlying "white hat bias."

In the end, the authors note that the evidence, overall, is limited making no causal claims.

**Okeke and Burgess (2023)** briefly reviewed the published epidemiological studies on the use of chemical hair relaxer products and uterine cancer.

The authors conclude that "larger studies are warranted to identify specific chemicals, products, and uterine cancer risk factors to confirm the association between relaxers and uterine cancer" (Okeke and Burgess, 2023, p. 876).

**Llanos et al. (2022)** is an editorial accompanying the publication of the Chang et al. (2022) Sister Study. In it the authors briefly describe the results of this study. While not making a causal claim about chemical hair relaxer products and any specific cancer, the authors "invoke the precautionary principle to call for action" (Llanos et al. 2022, p. 1568) meaning that the authors want "policy changes" and "evidence-based interventions" to reduce exposure to potentially hazardous hair products (Llanos et al. 2022, p. 1568). Making policy changes on the basis of weak evidence having not established causation seems, in fact, incautious in that there is no discussion of the potential harms—economic and social—that could occur if chemical hair relaxer products were no longer available. The authors are arguing that women could no longer be able to choose whether they wanted to use chemical hair relaxer products, removing "choice" in favor of "precaution." Furthermore, any proposed intervention must be able to test the causal hypothesis. The authors provide no proposal of the types of interventions that would be suitable.

### Section 3.2.7 Organizational Statements Regarding Chemical Hair Relaxer Products, Uterine Cancer, and Ovarian Cancer

The **American Cancer Society (ACS, 2025)** discusses the possibility that chemical hair relaxer products may be a risk factor for uterine cancer but does not mention chemical hair relaxer products in their discussion of risk factors for ovarian cancer (ACS, 2025). They write:

> "Some studies have found that using chemical hair straighteners (relaxers) might increase the risk of uterine cancer. However, scientists aren't sure which chemical in the straighteners might be causing this risk. Further studies have shown that the increased risk for uterine cancer was particularly high for Black women who are post-menopausal."

The **National Cancer Institute** (NCI, 2022) noted:

> "Recently, a large cohort study found that women who had used any straightening products in the previous 12 months had 1.8 times the risk of developing uterine cancer as those who had never used such a product" citing Chang et al. (2022).
>
> "Because hair straighteners and relaxers contain varying compositions of chemicals, future studies will try to narrow down which chemicals have specific health impacts."

In a more recent post, the **National Cancer Institute (NCI, April, 2025)** noted that hair products (including straighteners) had inadequate evidence for increased risk of uterine cancer:

> "One retrospective analysis of the Sister Study addressed a possible association between these hair products and uterine cancers, including uterine cancers. A limitation to this study was a lack of properly adjusted analysis for multiple comparisons, thus making the significance of the findings hard to interpret."

www.mayoclinic.org/diseases-conditions/uterine-cancer/symptoms-causes/syc-20352461

The **Mayo Clinic** website (2025) does not list chemical hair relaxer products, hair straighteners, or any other hair product as risk factors for (much less causes of) uterine cancer.

### Section 3.3 Assessment of General Causation: Parabens, Ovarian Cancer, and Uterine Cancer

The purpose of this section is to examine two general causation questions: does exposure to parabens cause ovarian cancer, and does exposure to parabens cause uterine (uterine) cancer?

### Section 3.3.1 Literature Search and Included/Excluded Published Papers

A systematic search of the medical literature was performed for publications examining the hypothetical relationship between exposure to parabens and cancers of the female reproductive system, namely uterine cancer and ovarian cancer. The purpose of this search was to identify all English-language epidemiological studies and meta-analyses of epidemiological studies that have examined these hypothetical relationships, with special attention to those that separate parabens from the broader category of endocrine disrupting chemicals. In addition, relevant reviews, reports, and commentaries were identified. Excluded were case reports and case series addressing aspects of these hypothetical relationships.

> Medline (PubMed) was searched for English-language publications as follows:
>
> PubMed (November 11, 2025): search terms: "parabens" + "cancer" (n = 277)
>
> PubMed (November 7, 2025): search terms: "parabens" + " ovarian cancer" (n = 7)
>
> PubMed (November 7, 2025): search terms: "parabens" + "uterine cancer" (n = 14)

After removal of duplicates (n = 21), a total of two hundred seventy-seven (277) potentially relevant publications were available for review.

After examining the titles and abstracts, a total of twenty-two (22) publications were identified for full text review. These include: Alblooshi (2025), Pierce et al. (2025), Ozga and Jurewicz (2025), Peebles and Mahalingaiah (2024), Chatterjee et al. (2024), Schildroth et al. (2024a), Schildroth et al. (2024b), Cathey et al. (2023), Balwierz et al. (2023), Johnson et al. (2022), Al-Halaseh et al. (2022), Sarink et al. (2021), Dogan et al. (2019), Jacob et al. (2018), Sasseville et al. (2015), Bledzka et al. (2014), Castelain and Castelain (2012), Witorsch and Thomas (2010), Crinnion (2010), and Golden et al. (2005).

Excluded publications from this search are available upon request.

In addition, I have examined websites and reports of several relevant organizations including the International Agency for Research on Cancer, the National Toxicology Program, the American Cancer Society, and the National Cancer Institute. Reports of this type are sometimes referred to as the "grey literature."

Examining the reference lists of the potentially relevant publications identified in the searches described above, an additional one publication was identified for full text review: Calafat et al. (2010).

**Section 3.3.2 Epidemiological Studies of Parabens and Uterine Cancer**

**Sarink et al. (2021)** is the report of a case-control analysis nested within the Multiethnic Cohort Study (MEC). The MEC is a study from Hawaii and California in which participants were recruited during the years 1993-1996; of particular interest for this analysis were postmenopausal women from five main racial/ethnic groups who provided single urine samples in 2001-2006 and had no previous diagnoses of uterine or breast cancer. Urinary concentrations of metabolites of several endocrine disrupting chemicals (EDC)—bisphenol A [BPA], triclosan, parabens, and phthalates—were measured in nanograms per milliliter. Urinary creatinine levels were also measured to adjust for kidney function in the study participants' EDC metabolite levels. Cases of incident invasive uterine cancer were obtained from linkages to the Surveillance, Epidemiology and End Results cancer registries in Hawaii and California. Controls (matched 1:1 on race/ethnicity and birth year, urine type, time of day, year, fasting hours, and current postmenopausal hormone use) were selected from participants who were alive and uterine/breast cancer free at the time of diagnosis of their index case. There were 139 matched case-control pairs in the analysis. Odds ratios (ORs) and 95% confidence intervals (95% CI) were calculated using conditional logistic regression models adjusting for BMI, diabetes, and Mediterranean Diet Score. Results for the potential associations between exposure to BPA, triclosan, and metabolites of parabens, i.e., selected EDCs (as measured by creatinine-adjusted urinary excretion of metabolites and stratified by tertiles) and uterine cancer are shown in the following table, adapted from Sarink et al. (2021, Table 2, p. 3):[66]

| EDC Metabolite | Tertile 1 | Tertile 2 | Tertile 3 | *p*-trend |
|---|---|---|---|---|
| **BPA** | 44/47<br>Ref | 45/46<br>0.86 (0.44-1.67) | 50/46<br>1.21 (0.60-2.44) | 0.50 |
| **Triclosan** | 49/47<br>Ref | 45/46<br>1.09 (0.53-2.25) | 45/46<br>0.97 (0.47-2.01) | 0.80 |
| **Methyl Paraben** | 50/47<br>Ref | 46/46<br>1.36 (0.68-2.73) | 43/46<br>1.17 (0.60-2.28) | 0.83 |
| **Ethyl Paraben** | 62/47<br>Ref | 36/46<br>0.65 (0.33-1.28) | 41/46<br>0.95 (0.48-1.89) | 0.85 |
| **Propyl Paraben** | 54/47<br>Ref | 55/46<br>1.35 (0.70-2.61) | 30/46<br>0.80 (0.39-1.65) | 0.25 |
| **Butyl Paraben** | 55/47<br>Ref | 43/46<br>0.80 (0.40-1.61) | 41/46<br>0.78 (0.38-1.63) | 0.67 |
| **Total Parabens** | 51/47<br>Ref | 48/46<br>1.36 (0.71-2.60) | 40/46<br>1.03 (0.52-2.02) | 0.81 |

No associations were observed between paraben metabolites and uterine cancer in this study.

[66] Results for phthalates and Uterine cancer from this study are found in a separate section.

### Section 3.3.3 Reviews of the Potential Relationship Between Exposure to Parabens and Uterine or Ovarian Cancer

**Chatterjee et al. (2024)** is a narrative review of the potential health effects of parabens but there is no mention of ovarian cancer or uterine cancer. Some attention is paid to the possible relationship of paraben exposure to breast cancer. The authors write "multiple investigations have revealed that paraben have estrogenic activity and can potentially cause cancer" (Chatterjee et al. 2024, p. 2) but the citations provided do not relate to ovarian or uterine cancer.

**Crinnion (2010)** is a narrative review of the potential effects of parabens on human health. The author mentions that parabens "are a cause for concern regarding breast cancer" (Crinnion, p. 190) and that their "exact health effects are unknown" (Crinnion, 2010, p. 195). This paper provides no information on the possible relationship between exposure to parabens and either uterine or ovarian cancer in human populations.

### Section 3.4 Assessment of General Causation: Phthalates and Uterine Cancer as well as Phthalates and Ovarian Cancer

### Section 3.4.1 Literature Search and Included/Excluded Published Papers

A systematic search of the medical literature was performed for publications examining the hypothetical relationship between exposure to phthalates and cancers of the female reproductive system, including uterine cancer and ovarian cancer. The purpose of this search was to identify all English-language epidemiological studies and meta-analyses of epidemiological studies that have examined these hypothetical relationships, with special attention to those that separate phthalates from the broader category of endocrine disrupting chemicals. In addition, relevant reviews, reports, and commentaries were identified. Excluded were case reports and case series addressing aspects of these hypothetical relationships.

PubMed was searched for English-language publications as follows:

> PubMed (November 7, 2025): search terms: "phthalates" + "uterine cancer" (n = 46)
>
> PubMed (November 7, 2025): search terms: "phthalates" + "ovarian cancer" (n = 76)
>
> PubMed (November 11, 2025): search terms: "phthalates" + "cancer" (n = 288)

After removal of duplicates (n = 10), a total of three hundred twenty-four (324) potentially relevant publications were available for review.

After examining the titles and abstracts, a total of seventeen (17) publications were identified for full text review. These include: Lin et al. (2025), Liu et al. (2025), Belmaker et al. (2024), Symeonides et al. (2024), Chitakwa et al. (2024), Di et al. (2023), Fan et al. (2023), Macedo et al. (2023), Peng et al. (2023), Eales et al. (2022), Sarink et al. (2021), Kahn et al. (2020), Gore et al. (2015), Romero-Franco et al. (2011), Witorsch and Thomas (2010), Crinnion (2010), and Ross (2006).

Excluded publications from this search are available upon request. These include: Chitakwa et al. (2024) that did not report any results for the phthalate-uterine cancer relationship, Di et al. (2024) examined phthalates and other endocrine disrupting chemicals measured in the NHANES study with all cancer mortality but did not examine ovarian or uterine cancer, Fan et al. (2023) examined the relationships between endocrine-disrupting chemicals (including but not limited to phthalates) and overall cancer mortality but did not examine specific cancer outcomes. Belmaker et al. (2024) was excluded because it is a policy paper on the potential adverse health effects of exposure to plastics. The paper makes no mention of ovarian or uterine cancer.

In addition, I have examined websites and reports of several relevant organizations including the International Agency for Research on Cancer, the National Toxicology Program, the American Cancer Society, and the National Cancer Institute. Reports of this type are sometimes referred to as the "grey literature."

Examining the reference lists of the potentially relevant publications identified in the searches described above, an additional two (2) publications were identified for full text review: Meng et al. (2024), Yang et al. (2024).

From these publications, the following publications were excluded: Meng et al. (2024), a systematic review and meta-analysis that combined results from a single study of phthalates and uterine cancer with studies of phthalates and breast cancer and at least one study of phthalates and thyroid cancer. No inference about the uterine cancer-phthalate relationship can be gleaned from this study.

**Trasande and Sargis (2023)** is a narrative review of endocrine-disrupting chemicals and general health effects. The authors mention phthalates and cancer, stating that the "evidence for phthalates is limited."

**Section 3.4.2 Studies of Phthalate Exposure and Uterine Cancer**

**Sarink et al. (2021)** is the report of a case-control analysis nested within the Multiethnic Cohort Study (MEC). The MEC is a study from Hawaii and California in which participants were recruited during the years 1993-1996; of particular interest for this analysis were postmenopausal women from five main racial/ethnic groups who provided single urine samples in 2001-2006 and had no previous diagnoses of uterine or breast cancer. Urinary concentrations of metabolites of several endocrine disrupting chemicals (EDC)—bisphenol A [BPA], triclosan, parabens, and phthalates—were measured in nanograms per milliliter. Urinary creatinine levels were also measured to adjust for kidney function in the study participants' EDC metabolite levels. Cases of incident invasive uterine cancer were obtained from linkages to the Surveillance, Epidemiology and End Results cancer registries in Hawaii and California. Controls (matched 1:1 on race/ethnicity and birth year, urine type, time of day, year, fasting hours, and current postmenopausal hormone use) were selected from participants who were alive and uterine/breast cancer free at the time of diagnosis of their index case. There were 139 matched case-control pairs in the analysis. Odds ratios (ORs) and 95% confidence intervals (95% CI) were calculated using conditional logistic regression models adjusting for BMI, diabetes, and Mediterranean Diet Score. Results for the potential associations between exposure to metabolites of phthalates, i.e., selected EDCs (as measured by creatinine-adjusted urinary excretion of metabolites and stratified by tertiles) and uterine cancer are shown in the following table, adapted from Sarink et al. (2021, Table 2, p. 3):[67]

[67] Results for phthalates and Uterine cancer from this study are found in a separate section.

| EDC Metabolite | Tertile 1 | Tertile 2 Cases/Controls OR (95% CI)[1] | Tertile 3 Cases/Controls OR (95% CI) | *p*-trend |
|---|---|---|---|---|
| **MzBP** | 43/47<br>Ref | 51/46<br>1.20 (0.62-2.33) | 45/46<br>1.07 (0.55-2.11) | 0.97 |
| **MECPP** | 45/47<br>Ref | 46/46<br>1.24 (0.64-2.41) | 48/46<br>1.52 (0.74-3.13) | 0.28 |
| **MEHHP** | 50/47<br>Ref | 42/46<br>1.14 (0.62-2.10) | 47/46<br>0.95 (0.48-1.87) | 0.78 |
| **MEHP** | 46/47<br>Ref | 44/46<br>1.27 (0.64-2.52) | 49/46<br>1.43 (0.75-2.75) | 0.30 |
| **MEOHP** | 55/47<br>Ref | 33/46<br>0.68 (0.35-1.35) | 51/46<br>1.17 (0.57-2.42) | 0.42 |
| **MEP** | 47/47<br>Ref | 49/46<br>0.85 (0.43-1.68) | 43/46<br>0.93 (0.43-2.00) | 0.92 |
| **MiBP** | 36/47<br>Ref | 49/46<br>1.51 (0.75-3.01) | 54/46<br>1.85 (0.90-3.82) | 0.13 |
| **MMP** | 54/47<br>Ref | 46/46<br>0.77 (0.38-1.55) | 39/46<br>0.59 (0.27-1.31) | 0.21 |
| **MnBP** | 32/47<br>Ref | 63/46<br>2.35 (1.19-4.65) | 44/46<br>1.82 (0.81-4.10) | 0.44 |
| **PA (Phthalic Acid)** | 47/47<br>Ref | 50/46<br>1.39 (0.72-2.67) | 42/46<br>1.00 (0.45-2.22) | 0.84 |
| **DBP[2]** | 33/47<br>Ref | 63/46<br>2.09 (1.05-4.16) | 43/46<br>1.77 (0.75-4.17) | 0.54 |
| **DEHP[3]** | 52/47<br>Ref | 39/46<br>0.99 (0.51-1.89) | 48/46<br>1.15 (0.56-2.36) | 0.65 |
| **Total Phthalates** | 47/47<br>Ref | 46/46<br>1.09 (0.59-1.99) | 46/46<br>1.22 (0.61-2.43) | 0.58 |

[1]Adjusted for BMI, diabetes, and energy-adjusted Mediterranean Diet Score.
[2]Sum of MiBP and MnBP excretion
[3]Sum of MECPP, MEHHP, MEHP and MEOHP excretion

A single association was observed between phthalate metabolites (MiBP + MnBP) and uterine cancer in this study. No association was observed between uterine cancer and MBzP, MECPP, MEHHP, MEHP, MEP, MiBP, MMP, MnBP, PA, DEHP, or total phthalates.

Nevertheless, the authors conclude that "in this case-control study nested in the MEC, prediagnostic urinary DBP metabolite excretion was positively associated with uterine cancer risk" (Sarink et al. 2021, p. 1). Note however that this represents a single finding in Tertile 2 but not Tertile 3 (see the table above).

The strengths of this study include the fact that the case-control study was nested in an established cohort. Therefore, exposure measurements occurred prior to the onset of illness. Some adjustment for confounders occurred. The limitations of this study include the misleading interpretation by the authors and the modest sample size.

### Section 3.4.3 Other Studies of Phthalates and Female Reproductive Cancers

**Yang et al. (2024)** is the report of a cross-sectional study using data from the 2011-2018 National Health and Nutrition Examination Survey (NHANES), examining potential relationships between self-reported female reproductive cancers and measured urinary phthalate metabolites (MEHP, MEHHP, MEOHP, and

MECPP) as surrogates for DEHP exposure (described in the study as ΣDEHP). The authors did not provide information on the relative proportion of female reproductive cancers in the study population. The authors categorized exposure into quartiles with Quartile 1 (Q1) representing exposure levels <5.1 ng/mg crt. Odds ratios (ORs) and 95% confidence intervals (95% CI) were calculated using regression techniques. Results are shown in the following table, adapted from Yang et al. (2024, Fig. 5, p. 9 of 12):

**Urinary Phthalates and Female Reproductive Cancers**
**Cross-Sectional Analysis**

| ΣDEHP | OR | 95% CI |
|---|---|---|
| **Q1 <5.1 ng/mg crt** | reference | |
| **Q2 5.1-5.6 ng/mg crt** | 1.59 | (1.31-1.93) |
| **Q3 5.7-6.1 ng/mg crt** | 1.18 | (0.97-1.43) |
| **Q4 >6.1 ng/mg crt** | 1.55 | (1.29-1.87) |

The results reveal a potential association between 4 urinary phthalate metabolites and female reproductive cancers. As such no causal relationship can be inferred along with the fact that the data is cross-sectional thus providing no information on causality due to a lack of temporality. Furthermore, the cancer diagnoses were self-reported making information bias likely.

In sum, this study provides little if any information on the potential relationship between DEHP and any specific female cancer including uterine and ovarian cancer.

**Reviews of Phthalates and Uterine or Ovarian Cancer**

**Crinnion et al. (2010)** is a brief narrative review examining the potential health effects of phthalates. There is no mention of uterine cancer or ovarian cancer.

**Section 3.4.4 An Epidemiologic Study of Personal Care Product Mixtures and Ovarian and Uterine Cancer.**

**Chang et al. (2024b)** is a study identified in the various searches described above. It examines the potential relationships between exposure to personal care product (PCP) mixtures and incident ovarian and uterine cancer. Given that it has been established that many personal care products used as beauty products, hair products (excluding in this analysis chemical hair relaxer products) and hygiene products contain parabens or phthalates (or both), then it is reasonable to examine whether these products increase the risk of the two cancers of concern in this matter, i.e., ovarian cancer and uterine cancer. Three general categories of PCPs were recognized in the study: (1) beauty products included blush, eyeliners, eye shadow, foundation, lipstick, mascara perfume, make-up removers, and items used in nail care, (2) hair products included conditioners, hair food, hair spray, gel/mousse, Minoxidil, pomade and shampoo, and (3) hygiene products included bath gel, deodorant, body lotion, and various products used on faces.

This study was undertaken using data from the Sister Study, described in more detail elsewhere in this report. The authors note that "seven less frequently used hair products including permanent, semi-permanent, and temporary dyes, bleach, highlights, straighteners/relaxers or pressing products, and hair permanents/body waves were not considered, as use of these products is more episodic and thus would not regularly co-occur with the everyday PCPs" (Chang et al. 2024b, p. 2). Exposure to the PCPs by study participants was collected using a questionnaire at baseline about the use of PCPs in the previous 12

months. Exposure categories were <1 use/month, 1-3 times/month, 1-5 times/month, and >5 times/month. Cancer cases were confirmed by medical records or death certificates. Covariates included in the analysis were age, race, ethnicity, education, reproductive history, use of oral contraceptives, use of hormone replacement therapy, smoking and alcohol use, physical activity, and BMI among others.

In 11.6 years of follow-up, there were 277 ovarian cancer cases and 403 uterine cancer cases diagnosed in women 20-79 years of age. The study population was comprised of 8% Black, 84% Non-Hispanic White, and 8% other. Results from the Cox proportional hazard analyses for ovarian cancer and for uterine cancer in all women and stratified by premenopausal and postmenopausal cancers are shown in the following tables, adapted from Chang et al. 2024b, Table 2, p. 8):

**Personal Care Product (PCP) Use and Ovarian Cancer**
**All Participants**
**Chang et al. (2024b)**

| Type of PCP | Cases/Controls | Age Adjusted HR (95% CI) | Fully Adjusted HR (95% CI) |
|---|---|---|---|
| **Beauty** | 264/38403 | 1.09 (0.86-1.37) | 1.08 (0.85-1.37) |
| **Hygiene** | 267/39092 | 1.49 (1.12-1.99) | 1.35 (1.00-1.83) |
| **Skincare** | 267/38727 | 0.86 (0.59-1.26) | 0.84 (0.57-1.25) |

There are no statistically significant associations in the fully adjusted model results. These results do not support an association between exposure to beauty products, hygiene products, or skincare products and the occurrence of ovarian cancer.

**Personal Care Product (PCP) Use and Ovarian Cancer**
**Premenopausal Participants**
**Chang et al. (2024b)**

| Type of PCP | Cases/Controls | Age Adjusted HR (95% CI) | Fully Adjusted HR (95% CI) |
|---|---|---|---|
| **Beauty** | 20/15896 | 0.87 (0.32-2.41) | 1.04 (0.36-3.00) |
| **Hygiene** | 21/16038 | 1.77 (0.75-4.20) | 1.54 (0.61-3.91) |
| **Skincare** | 20/15960 | 1.39 (0.49-3.96) | 1.54 (0.52-4.58) |

There are no statistically significant associations in the fully adjusted model results. These results do not support an association between exposure to beauty products, hygiene products, or skincare products and the occurrence of ovarian cancer in premenopausal women participants.

**Personal Care Product (PCP) Use and Ovarian Cancer**
**Postmenopausal Participants**
**Chang et al. (2024b)**

| Type of PCP | Cases/Controls | Age Adjusted HR (95% CI) | Fully Adjusted HR (95% CI) |
|---|---|---|---|
| **Beauty** | 231/34695 | 1.08 (0.84-1.39) | 1.05 (0.81-1.37) |
| **Hygiene** | 233/35360 | 1.49 (1.07-2.06) | 1.35 (0.97-1.89) |
| **Skincare** | 234/35011 | 0.82 (0.53-1.28) | 0.80 (0.51-1.27) |

There are no statistically significant associations in the fully adjusted model results. These results do not support an association between exposure to beauty products, hygiene products, or skincare products and the occurrence of ovarian cancer in postmenopausal women participants.

This study provides no support for an association much less a causal association between exposure to paraben and phthalate containing beauty, hygiene, and skincare products and ovarian or uterine cancer.

**Section 3.5 An Epidemiologic Study of Occupational Titles and Ovarian Cancer**

Le et al. (2014) is an exploratory[68] case-control study of occupational titles and ovarian cancer. Included were the following relevant occupational titles: hairdresser (this category also included barbers and other related occupations) as well as a broader category of "industrial groups" within which was the category of barber and beauty shops.[69] In all, there were 105 different (and sometimes related) occupational titles as well as approximately 115 industrial groups. Importantly, the authors note that some earlier studies have found "excess (ovarian cancer) mortality risk for hairdressers and beauticians suggesting that hair dyes or other agents commonly used in the occupation may have an etiologic role" (Le et al. 2014, p. 830). However, these same authors also note that many of these studies lack important information on potential confounders, a weakness that the Le et al. (2014) study overcame by collecting information on those potential confounders from each study participant. Cancer cases in women 20 to 79 years of age and diagnosed between 2001 and 2007 were identified from the British Columbia Cancer Registry. Documentation of cancer histology was performed in over 95% of the cases. Controls were selected from the residents of British Columbia. Study participants were asked to complete a self-administered questionnaire to general information on occupation, reproduction, medical information, history of cancer, and demographics.

Unconditional logistic regression was used to generate odds ratios (ORs) and 95% confidence intervals (95% CI). Results, stratified by "ever occupied" and "usual occupation" for relevant occupational titles and industrial groups are shown in the tables below, adapted from Le et al. (2014, Table 3, p. 835-7 and Table 4, p. 837-9):

**Barbers, Hairdressers, and Related Occupational Titles**
**Risk of Ovarian Cancer**

| "Ever" Cases/Controls | "Ever" OR (95% CI) | "Usual" Cases/Controls | "Usual" OR (95% CI) |
|---|---|---|---|
| 16/11 | 0.79 (0.34-1.86) | 12/6 | 1.18 (0.43-3.57) |
| | | | |

**Barber and Beauty Shops**
**Risk of Ovarian Cancer**

| "Ever" Cases/Controls | "Ever" OR (95% CI) | "Usual" Cases/Controls | "Usual" OR (95% CI) |
|---|---|---|---|
| 15/9 | 0.95 (0.39-2.41) | 10/5 | 1.09 (0.36-3.68) |
| | | | |

---

68 By "exploratory" I mean that the authors examined many occupational titles and industries rather than focusing on a particular occupation due to some specific hypothesis although they did single out hairdressers as potentially relevant.

69 This study is included here because hairdressers in particular and other individuals working in similar industries and jobs will have potential exposure to hair relaxers as well as to hair products containing parabens or phthalates or both.

**Beauty Shops**
**Risk of Ovarian Cancer**

| "Ever" Cases/Controls | "Ever" OR (95% CI) | "Usual" Cases/Controls | "Usual" OR (95% CI) |
|---|---|---|---|
| 13/9 | 0.83 (0.33-2.16) | 9/5 | 1.00 (0.32-3.43) |
| | | | |

The results provide no support for a relationship between exposure to hair care (and perhaps other beauty products) and ovarian cancer in these occupational titles and industry groups.

## PART FOUR: ASSESSMENT OF THE PLAINTIFFS' EXPERTS' OPINIONS

### Section 4.1 General Approach to the Evaluation of the Opinions of the Plaintiffs' Experts

By an "evaluation" of the opinion of the plaintiffs' experts, Dr. Cote and Dr. Gerstman,[70] in this matter, I mean an assessment of the extent to which their opinions are scientifically valid and reliable as well as ethically appropriate, given the arguments they make in their reports and testimony, the scientific evidence they use as support for their claims, and the methods (if any) they use to summarize and interpret that evidence.

The approach I take here is directly analogous to the process of peer review in scientific practice. There, a scientist's claims (and the evidence and methods used to make and support those claims) are subject to review and critique. The peer review process, as such, is familiar to and accepted by practicing scientists. It is an essential part of the practice of science. This process serves to increase the validity and reliability of the content—the results and interpretation of results—found in the scientific literature. A scientist's data, methods, and interpretations (e.g., causal claims or claims about the effects of random processes) are subject to scrutiny by one's peers. Rejection of an author's claims (indeed, rejection of the manuscript as a whole) is not uncommon and occurs for many reasons, including when the methods are faulty or nonexistent and when the claims made are unjustified.

### Section 4.1.1 Considerations in the Evaluation of the Opinions of the Plaintiffs' Experts

My assessment of the opinions of Drs. Cote and Gerstman and seven other plaintiffs' experts is based on the principles and practice of peer review in the scientific community with special attention to current scientific thought on making causal claims and other general methodological considerations as discussed in the peer-reviewed scientific literature (Weed, 2016; Weed, 2018):

1. Whether the expert relies primarily upon method or primarily upon their subjective judgment in making claims about causation.
2. Whether a method for determining causation is described.
3. Whether the method described is one generally recognized in the scientific community and referenced there.
4. Whether the expert's description of that method is accurate (i.e. whether it reasonably conforms to the descriptions of that method in the published literature or misrepresents—i.e. deviates prominently from—those same descriptions).
5. Whether that method is appropriate for the scientific question at hand.
6. Whether the method selected by the expert was used appropriately to analyze data or to interpret results.

Failure to meet any of these concerns would be grounds for determining that the expert's opinions are invalid and unreliable. For example, failure to describe and use an established methodology (see #1, #2 and #3 above) or misrepresenting/misapplying a methodology (see #4, #5 and #6) are particularly important considerations, calling into question the validity and reliability of the expert's claims. It follows that each of plaintiffs' experts should provide an adequate (i.e., comprehensive and accurate) description of and justification for the methods they use to make claims about causation. Furthermore, the expert should show how the actual use of those methods in this matter justifies the claims made.

[70] My evaluation of Mr. Atwood and Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller follow these same steps.

### Section 4.1.2 Additional Considerations in Peer Review

There are many other concerns in peer review, such as:

1. the extent to which the logic of an expert's argument is valid,
2. whether the expert has comprehensively searched for and cited the appropriate scientific literature, providing explicit criteria for including or excluding studies to be relied upon,
3. whether the expert has provided an objective process for evaluating the quality of studies,
4. whether the expert has considered and accounted for the many forms of bias that can affect the valid interpretation of scientific evidence,
5. whether the expert provides an approach for interpreting the evidence
6. whether the expert has considered the scientific and ethical issues associated with his claims, and
7. whether there is evidence of confirmation bias or "white hat" bias on the part of the expert[71]

In this report, I will show how Dr. Cote's and Dr. Gerstman's descriptions and applications of a key method—Hill's criteria—in making causal claims is fatally flawed, resulting in unreliable and invalid causal claims. To be sure, there are other serious methodological and substantive problems with their opinions but an inaccurate application of a causal inference methodology to the relevant studies—i.e., to the available evidence—is a fatal error.

The same problem exists with the causal claims and methodological efforts of Mr. Atwood and Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller. Each of these plaintiffs' experts has committed serious methodological and inferential errors rendering their opinions on causality invalid and unreliable. Details to follow immediately below.

### Section 4.2 Assessment of Dr. Michele Cote's Expert Report and Opinions

Dr. Cote has submitted a 42-page report dated December 1, 2025.

### Section 4.2.1 Dr. Cote's Purpose and Claims regarding General Causation

In this section, I will describe Dr. Cote's stated purpose for participation in this litigation and the claims she makes regarding that purpose.

In her December 1, 2025 report (p. 1), Dr. Cote states that she was asked "to perform a methodological review and to render my professional opinion regarding two questions: Can the use of chemical hair relaxers cause uterine cancer? Can the use of chemical hair relaxers cause ovarian cancer?"

Regarding these questions, Dr. Cote concludes the following:

> "I considered the totality of the evidence and highlight below the points that support my opinion that the association between chemical hair relaxer use, uterine and ovarian (cancer) is more likely than not a causal relationship" (Report, p. 27).

---

In addition, Dr. Cote states (Report, p. 27):

> "...it is my opinion to a reasonable degree of scientific certainty that the use of chemical hair relaxers can cause uterine and ovarian cancers."

**Section 4.2.2 Serious Problems with Dr. Cote's Causation Claims**

Problem #1: Dr. Cote appears to believe that there is a single hypothesis that encompasses both uterine cancer and ovarian cancer in relationship to the use of chemical hair relaxer products. This approach is inconsistent with good scientific practice. There are, in fact, two distinct and separate hypotheses, one involving chemical hair relaxer products and uterine cancer, the other involving chemical hair relaxer products and ovarian cancer. They are not to be combined into one assessment. The scientific assessment of causation has, for decades, focused on individual cancers and their potential relationship to a defined exposure. There is no precedent for examining uterine cancer and ovarian cancer as a single defined entity, despite the fact that they are both uniquely female cancers, respond to hormonal regulation, and are relatively close to each other anatomically. They are, however, different organs with vastly different physiological functions.

Furthermore, the current state of knowledge about these two cancers reveal different known chemical causes. Ovarian cancer, for example, is known to be caused by asbestos by IARC and postmenopausal estrogen therapy whereas uterine cancer is known to be caused by tamoxifen, combined estrogen and progesterone postmenopausal therapy and, like ovarian cancer, postmenopausal estrogen therapy (IARC, 2025). Furthermore, the known risk factors of these two cancers varies remarkably as discussed in PART TWO of this report.

Problem #2: Dr. Cote uses an expression used primarily if not exclusively in the legal community, namely, that an association—or what should be considered two separate associations—(see Problem #1) is "more likely than not" a causal association (Report, p. 27). The problem here is that there is no well-recognized translation of this legal phrase into scientific language for general causation.[72] Perhaps Dr. Cote means that the likelihood of a causal relationship (once again, see Problem #1) is greater than 50%. If so, Dr. Cote should (but did not) provide a quantitative basis for such a claim. As it stands, Dr. Cote's "more likely than not" claim is nothing more than her subjective judgment and is, therefore, without objective scientific reliability or validity. Her use of the phrase "totality of the evidence" (Report, p. 27) does nothing to improve the situation.[73]

Problem #3: Dr. Cote's causal claim does not conform to current scientific practice when she writes that "the use of hair relaxers **can** cause uterine and ovarian cancers" (emphasis added to a statement on p. 27 of Cote's report). The word "can" here implies the "possibility of" or the "potential for" causation rather than the fact of causation. Perhaps, once again, Dr. Cote is using an expression from the legal community rather than from the scientific community.

These three problems make Dr. Cote's causal claims suspect on their face. As described in more detail in my Curriculum Vitae (see Appendix C), I have a long history of providing and managing peer review. Had a manuscript with these problems been submitted for review, e.g. at the Journal of the National Cancer

[72] There is, however, a well-recognized translation of the "more likely than not" condition in the methodology of individual causation.

[73] And is contradicted by the fact that Dr. Cote does not mention much less address contradictory evidence.

Institute or at the American Journal of Epidemiology, it would have been rejected outright for failure to use accepted scientific terminology for the critically important issue of cancer causation.

**Section 4.2.3 Dr. Cote's Methodology for Determining Causation**

Dr. Cote's primary—cited—methodology for assessing causation is the Hill (1965) paper described in detail elsewhere in this report. Dr. Cote's description and application of the method is flawed. As noted above, peer review of methodology includes (but is not limited to) two conditions: that the methodology is described accurately and that it is applied appropriately. I will show in this section Dr. Cote's errors in the description and application of Hill's criteria.

<u>Error #1: Failure to Consider Hill's Initial Condition: Excluding Chance as an Explanation</u>

As described elsewhere, Hill wrote that the application of his criteria (or, "aspects") takes place once there is clear evidence of an association in more than one study and that chance can be excluded as an explanation for the results. Dr. Cote ignored Hill's initial condition. This is an important omission because the Bertrand et al. (2023) study reported results for moderate and for heavy users where chance could not be excluded. Similarly, for the hypothesis regarding relaxers, straighteners, and pressing products and ovarian cancer, White et al.'s (2021) "ever/never" comparison likewise does not allow chance to be excluded.

<u>Error #2: Failure to Separate the Two Hypotheses Regarding Uterine Cancer and Ovarian Cancer</u>

In Dr. Cote's presentation of the Hill methodology, she combines these two considerations. This is contrary to good scientific practice. As discussed elsewhere in this report, strength of association concerns the magnitude of the association and the relationship of that magnitude to the possibility of effects by unknown confounders and biases.

Dr. Cote claims that because "those who were frequent or heavy users of chemical hair relaxers were at increased risk of uterine and ovarian cancers" that, therefore, consistency has been satisfied. This is an error in causal thinking. Consistency cannot be established for the ovarian cancer hypothesis because there is only one study reported. The evidence for uterine cancer has no bearing on the consistency consideration for ovarian cancer. Dr. Cote is wrong.

Dr. Cote writes that "strength of association" refers to "how large the measure of association is" and then notes that for the uterine cancer studies a hazard ratio of 1.8 (from the Sister Study) "suggest(s) strength of association." She then describes results from the Black Women's Health Study with hazard ratios of 1.23 (95% CI: 0.86-1.76) and 1.18 (95% CI: 0.81-1.71). These are weak associations that count strongly against a causal claim. Dr. Cote makes no mention of the fact in her discussion of strength of association that in the Bertrand et al. (2023) study, the duration of use analysis produced hazard ratios between 1.00 and 1.35 all of which had confidence intervals that included 1.0. Similarly, Dr. Cote made no mention of the fact that for the frequency of use analysis (again, Bertrand et al. 2023) the results revealed hazard ratios of 1.22, 1.23, 1.25, and 1.08, with confidence intervals including 1.0. These are all weak associations.

For the ovarian cancer study (White et al. 2021), Dr. Cote does not mention the weak association for "ever/never" comparison of 1.29 (95% CI: 0.70-2.38) focusing solely on the value for >4 times per year.

For Dr. Cote to then claim that she gives this evidence "moderate to strong weight" is not only a stretch, but in addition, Dr. Cote provides no guidance on how she came to this conclusion. It appears that it is a purely subjective judgment and thus outside the realm of rigorous science. Furthermore, Dr. Cote clearly "cherry picks" results that conform to her views rather than to provide a discussion of all the magnitudes—the ones closer to one—found in the results.

Error #3: Dr. Cote's Failure to Consider that the Exposure in these Causal Analyses is Non-Specific

While the specificity consideration can be limited to the issue of the extent to which a cancer is multifactorial, there is also the issue of the specificity of the exposure and disease. In this case, the exposure is clearly non-specific, comprised of consumer products from many different sources with different formulations none of which have been identified in the studies.

Error #4: Dr. Cote's Failure to Consider the Full Range of Evidence on Dose-Response

Dr. Cote has a penchant for ignoring (not mentioning) evidence that is contrary to her view on causality. Consider, for example, the fact that she makes no mention of the fact that the large Bertrand et al. (2023) study examined the dose-response relationship in terms of moderate vs. light, duration of use, and frequency of use and found no evidence of a dose-response relationship. These analyses are far superior to a single value from the Chang et al. (2022) study examining use ≤4 times and >4 times in the past year. Dr. Cote's claim that there is "moderate" evidence of a dose-response relationship for the chemical hair relaxer products-uterine cancer relationship is incorrect.[74]

Dr. Cote also attempts to buttress her arguments about dose-response with a discussion of endocrine-disruptors (EDCs). As noted elsewhere, the phrase "endocrine disruptors" represents a broad category of many different chemicals, each with their own peculiarities with regard to any potential dose-response relationship with uterine cancer or ovarian cancer. Exactly the same argument can be made in the case of the Chang et al. (2022) and White et al. (2021) studies, the combination category of "relaxers, straighteners, and pressing products." Whatever Dr. Cote believes about a hypothetical dose-response relationship between a large category of EDCs and either uterine cancer or ovarian cancer is irrelevant.

Error #5: Dr. Cote's Mistaken Claim that Biologic Plausibility is "Strongly Established"

Dr. Cote claims (Report, p. 25) that "biologic plausibility" is strongly established. Support for her claim (Report, p. 25) is limited to one sentence, that "classes of chemicals, such as endocrine disrupting chemicals (EDCs) **may** drive carcinogenesis, as well as single chemicals including heavy metals and formaldehyde that are classified as carcinogenic."

There is at least one other place in her report where this issue is discussed (Report, p. 13). But first, it is important to point out that Dr. Cote's inclusion of "heavy metals" here is totally without support. This is the only place in her report where she mentions "heavy metals." I could find no mention of specific metals anywhere in her report. Inclusion of "heavy metals" here is inappropriate since it appears to be used as a way to convince the reader that some or all relaxers, straighteners, and pressing products have heavy metal carcinogens. She provides no evidence.

---

[74] Whatever "moderate" means to Dr. Cote who provides no guidance on this issue.

Dr. Cote's effort to discuss biologic plausibility can be found in her Report (p. 13) in two paragraphs. At best, Dr. Cote's description of the potential effect of EDC's is that they "may impact uterine or ovarian cancer development..when...acting as obesogens." The citation for this statement is a publication by Heindel et al. (2024) that makes no mention of chemical hair relaxer products or their constituents. The paper does mention that parabens and phthalates are considered obesogens along with a large variety of other compounds. The publication, however, is not an assessment of the paraben-obesity or phthalate-obesity relationships. Furthermore the purpose of this publication was to propose a hypothetical model to test a "global theory of obesity" a far cry from describing or defining the potential biological mechanism between exposure to chemical hair relaxer products and either ovarian or uterine cancer.

What is even more troubling about Dr. Cote's claim that biologic plausibility has been "strongly established" is that she cannot define any specific endocrine disruptor found in any chemical hair relaxer product. She cannot provide any evidence from scientific studies on biological systems that chemical hair relaxer products have any effect on carcinogenic processes in ovarian or uterine cells. Dr. Cote provides no evidence that formaldehyde exists in any chemical hair relaxer product. Dr. Cote provides no evidence that formaldehyde exposure increases the risk of ovarian cancer or uterine cancer in any epidemiologic study. Furthermore, Dr. Cote discusses "endocrine disruptor compounds" as if they are a single entity. That is far from the truth. Endocrine disruptors include parabens, phthalates (of which there are many subtypes and at least 8 common subtypes [BBP, BDP, DEHP, DEP, DiDP, DiNP, DnHP, and DnOP]), bisphenol A, triclosan, lead, and cadmium, to name many but not all. Yet Dr. Cote provides no evidence that any of these compounds exist in the chemical hair relaxer products studied in Chang et al. (2022), White et al. (2021) or Bertrand et al. (2023).

One final point: in cancer epidemiology and the assessment of human carcinogens, it is not appropriate to simply mention a known carcinogen and then claim that, therefore, it was responsible for (i.e., caused) two cancers for which no human evidence exists. Formaldehyde has been studied extensively in epidemiology. It is known to cause nasopharyngeal cancer, acute myeloid leukemia, chronic myeloid leukemia, and non-lymphocytic leukemia. It is not known to cause any other cancer, including but not limited to ovarian cancer and uterine cancer (IARC, 2025). Dr. Cote's implication that formaldehyde in chemical hair relaxer products causes (or contributes to the cause) of these cancers is pure speculation.

Her claim that biological plausibility is "strongly established" is totally without empirical support. At best, there are any number of untested hypotheses about individual (or mixtures) of EDCs, heavy metals, and formaldehyde and the occurrence of these two cancers.

<u>Error #6: Dr. Cote's Coherence Evaluation</u>

Here, Dr. Cote repeats her error from the biologic plausibility discussion for both EDCs and for formaldehyde. For example, she writes "by definition, a chemical that is labeled as a carcinogen could support coherence." Alternatively, it won't support coherence once evidence is available. To put it another way, in scientific inquiry, hypotheses must be tested. Simply stating a hypothesis does not make it verified.

Hill's definition of the coherence consideration follows (1965, p. 298):

> "...the cause-and-effect interpretation of our data should not seriously conflict with the generally known facts of the natural history and biology of the disease..."

A good example of conflict that affects the causal interpretation of the chemical hair relaxer products-uterine cancer hypothesis concerns a study by Sarink et al. (2021) described in more detail elsewhere in this report. This case-control study of postmenopausal women with uterine cancer examined the relationships between phthalates and uterine cancer as well as between parabens and uterine cancer. Other endocrine disruptors were also studied, including bisphenol A (BPA) and triclosan. The results are shown below (Table 2, p.3) :

| EDC Metabolite | Tertile 1 | Tertile 2 | Tertile 3 | *p*-trend |
|---|---|---|---|---|
| **BPA** | 44/47<br>Ref | 45/46<br>0.86 (0.44-1.67) | 50/46<br>1.21 (0.60-2.44) | 0.50 |
| **Triclosan** | 49/47<br>Ref | 45/46<br>1.09 (0.53-2.25) | 45/46<br>0.97 (0.47-2.01) | 0.80 |
| **Methyl Paraben** | 50/47<br>Ref | 46/46<br>1.36 (0.68-2.73) | 43/46<br>1.17 (0.60-2.28) | 0.83 |
| **Ethyl Paraben** | 62/47<br>Ref | 36/46<br>0.65 (0.33-1.28) | 41/46<br>0.95 (0.48-1.89) | 0.85 |
| **Propyl Paraben** | 54/47<br>Ref | 55/46<br>1.35 (0.70-2.61) | 30/46<br>0.80 (0.39-1.65) | 0.25 |
| **Butyl Paraben** | 55/47<br>Ref | 43/46<br>0.80 (0.40-1.61) | 41/46<br>0.78 (0.38-1.63) | 0.67 |
| **Total Parabens** | 51/47<br>Ref | 48/46<br>1.36 (0.71-2.60) | 40/46<br>1.03 (0.52-2.02) | 0.81 |

There is a complete lack of dose-response and odds ratios (ORs) 50% of which are below 1.0 and the other 50% hover just above 1.0 with the largest 1.36. None are "statistically significant" or, to put it another way, none have confidence intervals that exclude 1.0. This is quite clearly a null (or, negative) study that casts serious doubt on the idea, promoted by the plaintiffs' experts (including Dr. Cote) that EDCs in general or the parabens in particular are responsible for the elevated risk of uterine cancer in postmenopausal women.

What is most disturbing about the Sarink et al. (2021) study is that Dr. Cote cites the study in her report but fails to point out this obvious refutation of the coherence consideration. She makes no mention of this evidence. That fact alone calls into question Dr. Cote's scientific integrity. Put another way, it is difficult to see how her exclusion of this critically important evidence contradicting her causal claims was not intentional.

The same problem exists for Dr. Cote and the Sarink et al. (2021) data on the potential relationship between phthalates and uterine cancer in postmenopausal women. The relevant table (Table 2, p.3) is shown below:

| EDC Metabolite | Tertile 1 | Tertile 2<br>Cases/Controls<br>OR (95% CI)[1] | Tertile 3<br>Cases/Controls<br>OR (95% CI) | *p*-trend |
|---|---|---|---|---|
| **MzBP** | 43/47<br>Ref | 51/46<br>1.20 (0.62-2.33) | 45/46<br>1.07 (0.55-2.11) | 0.97 |
| **MECPP** | 45/47<br>Ref | 46/46<br>1.24 (0.64-2.41) | 48/46<br>1.52 (0.74-3.13) | 0.28 |
| **MEHHP** | 50/47<br>Ref | 42/46<br>1.14 (0.62-2.10) | 47/46<br>0.95 (0.48-1.87) | 0.78 |

| | | | | |
|---|---|---|---|---|
| **MEHP** | 46/47<br>Ref | 44/46<br>1.27 (0.64-2.52) | 49/46<br>1.43 (0.75-2.75) | 0.30 |
| **MEOHP** | 55/47<br>Ref | 33/46<br>0.68 (0.35-1.35) | 51/46<br>1.17 (0.57-2.42) | 0.42 |
| **MEP** | 47/47<br>Ref | 49/46<br>0.85 (0.43-1.68) | 43/46<br>0.93 (0.43-2.00) | 0.92 |
| **MiBP** | 36/47<br>Ref | 49/46<br>1.51 (0.75-3.01) | 54/46<br>1.85 (0.90-3.82) | 0.13 |
| **MMP** | 54/47<br>Ref | 46/46<br>0.77 (0.38-1.55) | 39/46<br>0.59 (0.27-1.31) | 0.21 |
| **MnBP** | 32/47<br>Ref | 63/46<br>2.35 (1.19-4.65) | 44/46<br>1.82 (0.81-4.10) | 0.44 |
| **PA (Phthalic Acid)** | 47/47<br>Ref | 50/46<br>1.39 (0.72-2.67) | 42/46<br>1.00 (0.45-2.22) | 0.84 |
| **DBP[2]** | 33/47<br>Ref | 63/46<br>2.09 (1.05-4.16) | 43/46<br>1.77 (0.75-4.17) | 0.54 |
| **DEHP[3]** | 52/47<br>Ref | 39/46<br>0.99 (0.51-1.89) | 48/46<br>1.15 (0.56-2.36) | 0.65 |
| **Total Phthalates** | 47/47<br>Ref | 46/46<br>1.09 (0.59-1.99) | 46/46<br>1.22 (0.61-2.43) | 0.58 |

[1]Adjusted for BMI, diabetes, and energy-adjusted Mediterranean Diet Score.

There are no significant dose-response relationships. Of the 26 contrasts, only 2 revealed odds ratios with confidence intervals that exclude 1.0 and both are in single tertiles with (as noted above) no evidence of a dose-response relationship. 8 of 16 calculated odds ratios are at 1.00 or below.

This evidence clearly refutes the claim by Dr. Cote that phthalates are responsible for the elevated risk of uterine cancer in the postmenopausal women. Again, Dr. Cote's failure to describe and discuss this evidence—evidence that clearly contradicts her arguments and claims—speaks volumes about the unscientific approach she has taken.

Error #7: Dr. Cote's Mistaken Views on the Analogy Criterion (Consideration)

Here, Dr. Cote argues that the evidence on chemical hair relaxer products and uterine and ovarian cancers is "in line with other similar exposure-disease associations" and the association she uses is smoking and lung cancer. Dr. Cote's claim here is refuted by well-established facts. At the time the Surgeon General's Committee determined that smoking caused lung cancer, there were approximately 29 case-control studies and 7 cohort studies showing strong (statistically significant) relative risk values and clear and convincing dose-response relationships and carcinogens documented to be in tobacco smoke (Surgeon General, 1964). The smoking-lung cancer body of evidence bears little similarity to that of the chemical hair relaxer products and uterine cancer as well as that of the chemical hair relaxer products and ovarian cancer, as described above. Dr. Cote's views here are mistaken.

Error #8: Dr. Cote's Failure to Separately Address the Hypothesis that Chemical Hair Relaxer Products may Be Associated with (or Causes of) Uterine Cancer in Postmenopausal Women

The presence of a possible causal relationship between exposure to chemical hair relaxer products and uterine cancer in postmenopausal women requires a separate and distinct causal analysis using Hill's criteria. The presence or absence of Hill's criteria in other situations, e.g. chemical hair relaxer products and uterine cancer or chemical hair relaxer products in ovarian cancer bears little if any relationship to this situation, i.e., this hypothesis other than a vague and insufficient view on analogy. Indeed, the

biologic plausibility becomes even more complex since Dr. Cote must now provide an explanation based on evidence of a biologic mechanism that explains why chemical hair relaxer products "cause" uterine cancer in postmenopausal women but not in premenopausal women.

### Section 4.2.4 Overall Assessment of Dr. Cote's Hill Criteria Analysis

For all the reasons provided above, Dr. Cote's Analysis is fatally flawed. Her errors are not trivial. Dr. Cote has described and applied the Hill criteria incorrectly. Her causal claims are without scientific merit and are, therefore, unreliable and invalid.

### Section 4.2.5 Additional Errors in Dr. Cote's Description of Epidemiologic Methodology

In her report, Dr. Cote makes some statements that are simply incorrect. Examples follow.

Error #1: "I would not describe one study design as better than another because all have strengths and weaknesses" (Report, p. 2).

Dr. Cote includes here the following study designs: case reports and case series, ecologic studies, cross-sectional studies, cohort studies, case-control studies, and randomized clinical trials (RCTs).

Dr. Cote's claim that these study designs are equally "better" is simply inconsistent with what has been known about study methodology ever since the first randomized clinical trial was undertaken the mid-1940's. Case reports, by their very nature, cannot test causal hypotheses as explained earlier in this report. Randomized clinical trials can test causal hypotheses. It follows that RCTs are better than case reports for testing causality. The same is true for cohort studies and case-control studies. These designs can also test causal hypotheses.

Dr. Cote is wrong.

Error #2: Dr. Cote describes the results from the two uterine/chemical hair relaxer products studies with this statement: "they both noted a strong association in postmenopausal women which is expected due to the higher incidence" (Report, p.5). Dr. Cote is incorrect in arguing that the magnitude of an association is determined by the magnitude of the incidence rate, as if the magnitude of an association will necessarily increase as the incidence rate (of exposed and unexposed) increases. This is simply untrue. Large magnitudes regularly appear in situations with very rare diseases (very low incidence rates). A good example involves the causal relationships between exposure to vinyl chloride and two malignant outcomes: angiosarcoma of the liver (a very rare disease) and hepatic (liver) carcinoma (a relatively common cancer).[75] And very small magnitudes of association regularly appear in situations with very common diseases (with relatively high incidence rates). Furthermore, as the incidence increases, the magnitude of association may increase, decrease, or stay the same depending on the effect of the exposure and the effects of biases and confounders.

Dr. Cote is wrong.

### Section 4.3 Assessment of Dr. B. Burt Gerstman's Expert Report and Opinions

[75] Evidence from epidemiologic studies is available upon request. The relative risk for vinyl chloride-angiosarcoma of the liver is extraordinarily high while the relative risk for vinyl chloride-hepatic carcinoma is relatively modest.

Dr. Gertsman has submitted a 107-page report dated November 26, 2025.

**Section 4.3.1 Dr. Gerstman's Purpose and Claims regarding General Causation**

In this section, I will describe Dr. Gerstman's stated purpose for participation in this litigation and the claims he makes regarding that purpose.

In his report (p. 8), Dr. Gerstman states that he was asked "to evaluate the epidemiologic evidence as to whether hair relaxers can cause these cancers," meaning uterine cancer and ovarian cancer.

Regarding these questions, Dr. Gerstman concludes the following:

> "Based on careful considerations of all the evidence as discussed in this full report, I find that the evidence supports a causal connection between chemical hair relaxer use and the development of uterine cancer and ovarian cancer. I conclude that chemical hair relaxers can cause these outcomes in all racial/ethnic groups, while acknowledging that the evidence is strongest for postmenopausal uterine cancer..." (Report, p. 85-6).

**Section 4.3.2 Serious Problems with Dr. Gerstman's Causation Claims**

Error #1: Dr. Gerstman's causal claim (in a manner like that of Dr. Cote) does not conform to current scientific practice when he writes that "the use of hair relaxers **can** cause these outcomes meaning the two cancers" (emphasis added to a statement on p. 86 of Dr. Gertsman's report). The word "can" here implies the "possibility of" or the "potential for" causation rather than the fact of causation. Importantly, when Dr. Gerstman attempts to provide a more scientifically acceptable statement, he writes only that the evidence "supports" a causal connection. The word "supports" is ambiguous. For example, in the IARC process of determining human carcinogenicity of chemicals, there is the designation of "sufficient" evidence of carcinogenicity in human populations and "limited" evidence of carcinogenicity in human populations (IARC, 2019). The word "support" could easily be used for both categories, but the categories imply quite different things. "Sufficient" evidence means that the chemical does cause the cancer involved. "Limited" evidence means something less than "does cause." The distinction is crucial in cancer epidemiology, between "sufficient" and "limited" evidence. Dr. Gerstman's causal claims, therefore, are vague. Either Dr. Gerstman believes chemical hair relaxer products are sufficient causal agents or he doesn't.[76] It certainly appears to this reader—familiar with the history of causal inference and with claims made by plaintiffs' experts in scores of legal cases—that he is not really convinced that causation has been achieved and thus describes his conclusions in imprecise and uninterpretable terms. He is, in effect, "hedging his bets."

Error #2: Given the evidence and Dr. Gerstman's efforts to interpret it, the statement "does exposure to hair relaxers cause uterine or ovarian cancer in premenopausal women" is a separate and distinct scientific question requiring a separate causal analysis. Dr. Gerstman has not provided that analysis.[77] Note that there is nothing in Dr. Gerstman's description of biologic plausibility that can explain why premenopausal women are not affected by the effects of chemical hair relaxer products (assuming there

[76] See Dr. Gerstman's discussion of specificity (Report, p. 80-81) where sufficiency of causation is discussed.

[77] I will return to Dr. Gerstman's attempt to explain why results less than 1.0 and those greater than 1.0 are "still somewhat compatible." "Somewhat" is hardly a rigorous scientific concept.

is an effect) while postmenopausal women are affected. Whatever explanation might be provided must be evidence-based.

Similarly, Dr. Gerstman, like Dr. Cote, would prefer to combine the two hypotheses, one involving uterine cancer and the other ovarian cancer as if that is the norm in causal inference practice. This is simply not the case. Each disease must be considered separately even if there are similarities among the diseases of interest. These diseases have some overlap in their known causes and risk factors but, on the other hand, they have many risk factors unique to each cancer and some different causes.

Error #3: Dr. Gerstman's most prominent problem—i.e. his most prominent error in causal thinking— is his inability to articulate how he came to his personal causal conclusions. As I will show below, Dr. Gerstman goes through the Hill criteria (considerations or aspects) and then simply pronounces that he has "carefully" considered everything and has decided the evidence "supports" causation. The problem here is that Dr. Gerstman's conclusion is subjective.[78] He either could not or chose not to provide any discussion of why his discussion and description of the Hill criteria would lead another investigator to the same conclusion. The reader cannot discern how his "thinking" took place. His decision—his claims—therefore are not objective because his "careful consideration" is opaque to the reader; it cannot be defined much less used by anyone else. We are, apparently, supposed to take his word for it.

**Section 4.3.3 Dr. Gerstman and the Hill Criteria**

Issue #1: The Exclusion of Chance as an Explanation for the Observed Results

As described elsewhere in this report, Hill wrote that the application of his criteria (or, "aspects") takes place once there is clear evidence of an association and that chance can be excluded as an explanation for the results. Dr. Gerstman, like Dr. Cote, ignored Hill's initial condition. This is an important omission because the Bertrand et al. (2023) study reported results for moderate and for heavy users where chance could not be excluded. Similarly, for the hypothesis regarding relaxers, straighteners, and pressing products and ovarian cancer, White et al.'s (2021) "ever/never" comparison likewise does not allow chance to be excluded.

Dr. Gerstman's view on the role of chance as an explanation for results can only be found in one place in his report (Report, p. 16) where he writes the following:

> "The p-value does not quantify the extent to which the results are due to chance."

But this sentence does not provide an answer to the question that Hill poses. If the p-value doesn't provide "quantitative" information about the role of chance as an explanation, then what does? But Dr. Gerstman's use of the word "quantitative" here speaks volumes. It is not necessary to quantify this decision. The decision—regarding the role of chance as an explanation—only requires a "yes" or "no" answer, as do all explanations. The same goes for Dr. Gerstman's decision about causation. Note that he provides no "quantitative" information about whether the results are due to causation. It makes no scientific or methodologic sense that the exclusion of chance as an explanation requires quantitation but the causation explanation does not.

[78] Of course, Dr. Gerstman's approach was "careful" otherwise it would have been "careless" or "sloppy." All the experts in this matter will—could—say the same. Everyone has been "careful" but that provides no insight into how the causal claims were made.

Perhaps Dr. Gerstman is simply denying that chance can be an explanation for the results, regardless of the issue of quantification. To put this issue in perspective, the goal here is that of basic scientific explanation. That is, we have observed a "finding," a "result," and we need to sort through the possible explanations for that result. Chance is a legitimate explanation for results[79] and Dr. Gerstman does not deny this. Therefore, the goal of scientific explanation is to find a way to exclude that explanation from all the others that remain. The p-value (or confidence intervals) provided a way to do that which has now been rejected by Dr. Gerstman. But he provides no alternative for achieving what is at the heart of the scientific method, the exclusion of the alternative explanation of chance.

Issue #2: Dr. Gerstman's Long Discussion on Strength of Association and "E-values"

Dr. Gerstman spends considerable time and energy on calculations of the "E-value" which provides an estimate of the magnitude of the relative risk of a confounder (and an outcome such as uterine or ovarian cancer) that would be required to "push" the observed HR value for chemical hair relaxer products down to 1.0 thus eliminating the apparent risk. These calculations are a quantitative version of what has been known qualitatively since the late 1950's, and thus by Hill (1965, see p. 296). What Dr. Gerstman mentions but does not elaborate upon is that these E-values "do not indicate the presence of confounding but merely indicate that it might be conceivable to construct a scenario in which confounding bias prevails" (Report, p. 77). In other, more succinct language, these calculations are about matters unknown (i.e., what cannot be known) inasmuch as their identification can only occur in the future. Whatever the "E-value" is, we cannot know whether an unknown confounder exists or not. Hence, these calculations are not very helpful. Dr. Gerstman is no better at divining what cannot be seen than I. And unknown confounders are exactly that. They are not controlled for in an epidemiologic analysis as, for example, in randomized clinical trials which do a much better job dealing with the unknown (due to the randomization). What Dr. Gerstman would like the reader to believe is that because these unknown factors in the ether are, in his words, "formidable," (Report, p. 79) they are less likely to exist. He has no evidence that that is the case. Put simply, his efforts to sway the reader are purely speculative designed primarily (in my view) to sway the reader's opinions in favor of his opinions rather than to provide an objective appraisal of the *available* evidence.

Issue #3: Dr. Gerstman's Misrepresentation of Hill's Discussion of the Consistency Consideration

Putting aside for now what Dr. Gerstman calls the "broadly consistent" results of the Chang et al. (2022) and Bertrand et al. (2023) results, which he confines to the results of the postmenopausal women, I turn first to the results of these studies for premenopausal women regarding uterine cancer.

Note that Dr. Gerstman provides only two confidence intervals, (0.29, 9.29) from the Chang et al. (2022) paper and (0.45, 1.58) from the Bertrand et al. (2023) paper. Why did he not provide the values of the HRs? One reason is that the values do not provide an elevated risk of disease. The magnitude of the HR from the Bertrand et al. (2023) paper for premenopausal women is 0.84, and for the Chang et al. (2022) paper the HR value is 1.56. These are, as Dr. Gerstman points out, on both sides of 1.0. What Dr. Gerstman chose not to say was that the combination of these two values would almost certainly be very close to 1.0. A simple average would yield 1.2, whereas a weighted average, given that the Bertrand et

[79] Recall also that Dr. Gerstman claims to be following Hill's (1965) framework about which he writes that it is the "most accepted and time-tested framework for this type of discussion" (Report, p. 75). It follows that either Dr. Gerstman will stick with Hill's approach or, as it appears here, he will alter aspects of the approach to suit his personal views.

al. (2023) study had 89 cases of uterine cancer in the premenopausal women and the Chang et al. (2022) study had only 5 cases, would bring the "average" value even closer to one, perhaps even below 1.0, indicating that there is no risk observed for premenopausal women. This means that the results for premenopausal women are consistently negative (or "null"), rather than simply "consistent in support of causation" as Dr. Gerstman says. This calls into question his objectivity, methodology, and opinions.

Dr. Gerstman's discussion of the consistency consideration (or "aspect") for the chemical hair relaxer products-ovarian cancer issue is equally if not more troubling. Because there is only one study with results on this topic, the most obvious problem for Dr. Gerstman is that "consistency" is all about finding similar results in different studies.[80] That has always been the case with the consistency consideration.

According to Dr. Gerstman, the Hill quote that provides support is the following:

> "We have (or certainly had) to make up our minds on a unique event; and there is no difficulty in doing so" (Hill, 1965, p. 297).

Dr. Gerstman would have the reader believe that Hill here was providing an "out" in the case of "unique" events which translates, according to Dr. Gerstman as a single study of an exposure-disease relationship, like chemical hair relaxer products and ovarian cancer.

But a single study is not what Hill was referring to.[81] Rather, Hill used that quote at the end of an example that does not bear much relationship at all to the "one study" scenario. That example is described below.

Hill sets the stage with this statement:

> "...there will be occasions when repetition is absent or impossible and yet we should not hesitate to draw conclusions" (Hill, 1965, p. 297).

The example, however, involves two studies (of the same population) and a preventive intervention in that same population in between the two studies. The population involved is nickel refiners in South Wales. As Hill points out, during the years 1929 through 1938 there was good evidence of extremely high relative risks of lung cancer and nasal cancer among the workers in the chemical processes part of the refinery. In 1923, however, there were changes made to the refinery and as Hill puts it, "no case of cancer of the nose has been observed in any man who first entered the works after that year, and in those men there has been no excess of cancer of the lung" (Hill, 1965, p. 297). Nevertheless, in a second study (undertaken by the legendary Dr. Richard Doll), during the years 1948 through 1956, high relative risks remained but only in those men who were employed in the refinery prior to 1923. "In other words, (Hill intones, p. 297) the excess in both sites is uniquely a feature in men who entered the refinery in, roughly, the first 23 years of the present century."

---

[80] There is no other way to interpret Hill's original consideration or the many discussions of the importance of consistency in the epidemiologic literature. It is about observing the same finding (or something similar) in different studies, in different populations, and by different investigators.

[81] As noted elsewhere in my discussion and critique of Dr. Gerstman's claims, there is more than one example of him using only a small part of Hill's arguments and then deviating from it to fit his (Dr. Gerstman's) arguments.

It follows that Dr. Gerstman's effort to label the premenopausal findings as "consistent" using Hill's paper is a misrepresentation of the facts. Hill did not argue (by example) that a single study can be considered "consistent" in the absence of other evidence. In his example, there were two studies (in the same population) and a preventive intervention in that same population, which Hill described as the "strongest support for the causation hypothesis" (Hill, 1965, p. 299).[82]

<u>Issue #4: Dr. Gerstman and the Temporality Criterion</u>

Dr. Gerstman provides to the reader an interesting exercise in contradictory arguments. On the one hand, Dr. Gerstman quotes Hill (1965, p. 299) who wrote that none (of his "viewpoints") can be required and then writes that, in fact, temporality "in Hill's framework requires that exposure precedes disease" (Report, p. 81).

<u>Issue #5: Dr. Gerstman and Specificity</u>

Here, Dr. Gerstman gives the reader a brief theoretical discussion of the nature of the sufficient-component cause model about which he quotes Hill who wrote that it should not be over-emphasized. Dr. Gerstman provides no discussion of the fact that, throughout his arguments—like Dr. Cote—he often refers to endocrine disrupting chemicals (EDCs) and heavy metals as if this lack of specificity can be translated into valid scientific terms.

<u>Issue #6: Dr. Gerstman's Views on Dose-Response</u>

Dr. Gerstman's discussion of dose-response is remarkably brief. He provides p-values[83] for trend for the minimalist dose-response analyses done by Chang et al. (2022) and by White et al. (2021) but provides no quantitative information for the more robust Bertrand et al. (2023) study. He simply states that the "BWHS did not find a monotonic dose response" (Report, p. 81). What Dr. Gerstman does not mention is that the Bertrand et al. (2023) study examined dose-response in four different analyses for all study participants and three different analyses for postmenopausal and premenopausal women (each). Put another way, Dr. Gerstman could have written the "BWHS did not find a monotonic dose response in at least 10 separate analyses of this concept, by 'moderate vs. heavy use,' 'duration of use,' 'frequency of use,' and by 'number of burns," for the entire cohort and for the premenopausal and postmenopausal sub-cohorts." This type of information counts strongly against causation. The Bertrand et al. (2023) study is a larger study and is not populated by a special population, i.e., women whose sisters have been diagnosed with breast cancer. But Dr. Gerstman did not emphasize these contrary facts, choosing instead to base his opinion primarily on the sparse findings from the Sister Study.

One more issue requires attention. Dr. Gerstman claims that Hill (1965) "makes clear that demonstrating a monotonic gradient is not always necessary, noting that it is sometimes necessary "to envisage some much more complex relationship to satisfy the cause-and-effect hypothesis" (Report, p. 81, quoting Hill (1965, p. 298). What Dr. Gerstman excluded from his description was the scenario—the

---

[82] Dr. Gerstman's description of the experimentation consideration is inconsistent with the Hill (1965) paper. More on this later.

[83] Apparently, Dr. Gerstman's long discussion of the problems with the p-value just doesn't apply when it comes to dose-response relationships although the purpose of the p-value remains the same, i.e., to determine if chance can explain the observed results. All he writes is that epidemiologists still use p-values for this purpose (as they have done for estimating effects).

situation—about which Hill made his remarks. Hill pointed out that if the evidence revealed a higher rate (of death) in the lowest exposure group (here, light smokers) and a lower rate in heavier smokers, then he would "need to envisage some much more complex relationship....etc."

There is no reason to include Hill's discussion of this condition in this analysis. The evidence from the Bertrand et al. (2023) study, for example, clearly shows no trend in any direction. There is simply no evidence of dose-response, period. Dr. Gerstman appears to be suggesting that because the Bertrand et al. (2023) did not show a "monotonic" dose-response relationship, we (the reader) should think there could be a "more complex relationship" that just has not been explicated. This is a good example of an unscientific—misleading—argument.

What Dr. Gerstman should have written is simple: Bertand et al. (2023) did not find any evidence of a dose-response relationship looking at the data in several different ways and this fact counts strongly against dose-response and thus against causality.

<u>Issue #7: Dr. Gerstman and Biological Plausibility</u>

As is the case with Dr. Cote, Dr. Gerstman appears to pay considerable attention on the biological plausibility consideration. His arguments, however, lack epistemological strength and therefore fall short. For example, Dr. Gerstman writes that "chemical hair relaxers and straighteners contain endocrine disrupting chemicals (EDCs)" but the only compounds he names specifically are phthalates and parabens. He also writes that there are "other EDCs as well." It follows that the only EDCs the reader can examine with any clarity are phthalates and parabens. Note that in this report, I showed that a case-control study (Sarink et al. 2021) examined the potential relationship between parabens and phthalates (and bisphenol A and triclosan) and found no increase in risk for uterine cancer in postmenopausal women. Dr. Gerstman—who cited this paper for other reasons—neglected to mention much less describe the key negative epidemiologic results of this study. Once again, he has failed to be objective in his presentation.

Note also that Dr. Gerstman writes that exposure to phthalates and parabens "may have estrogenic, antiandrogenic, and other effects that mimic or alter the metabolism or transportation of natural hormones" which, even if accurate[84], does not imply much less demonstrate that, therefore, the biological mechanism involving parabens, phthalates, and either uterine or ovarian cancer has been established (Report, p. 83).

Dr. Gerstman then notes that chemical hair relaxer products contain "harmful carcinogenic chemicals such as formaldehyde, heavy metals, and diethanolamine" and notes that "mutagens and carcinogens such as formaldehyde and heavy metals can cause DNA damage" (Report, p. 82). DNA damage, by itself, does not imply much less guarantee carcinogenicity. Furthermore, the presence of a carcinogen does not therefore mean that the biological mechanism for a specific cancer has been established. Consider, for example, the fact that bananas, grapes, pineapples, oranges, and mandarin oranges all contain formaldehyde (Nowshad et al. 2018) but there is no established relationship much less a causal relationship between these fruits and cancer, i.e., any cancer. Furthermore, if Dr. Gerstman believed formaldehyde to be a causal risk factor for these cancers, he should have discussed why the effects of

---

[84] By "accurate" I mean just as nonspecific as Dr. Gerstman asserts here. "Altering or mimicking the metabolism or transportation of natural hormones" provides no inkling of how that might affect the process of carcinogenesis and, as such, appears to be an attempt by Dr. Gerstman to pad his argument with irrelevant conjecture.

formaldehyde did not come from the study participants' diets or from any other natural or consumer-based source of formaldehyde. The presence of a carcinogen does not provide a sufficient explanation for a biological mechanism. Formaldehyde, as discussed earlier in this report, causes nasopharyngeal cancer and three types of leukemia but those are the only cancers known to be caused by the chemical based on extensive epidemiologic research in occupational populations.

Dr. Gerstman's inclusion of "heavy metals" in his biological plausibility argument requires careful consideration. Two well-known "heavy metals" are lead and mercury; gold is another example. None of these are known to cause any cancer (IARC, 2025). Importantly, Dr. Gerstman fails to define which "heavy metals" he is referring to. His arguments are, at best, hypotheses with no epistemological strength and no relevance to this matter other than to give a false impression of a hazard.

Dr. Gerstman's biological plausibility arguments are weak and fall into the category of "makes sense to me"[85] rather than a scientifically valid evidence-driven description of the mechanism by which parabens, phthalates, formaldehyde or chemical hair relaxer products cause uterine or ovarian cancer.

Issue #8: Dr. Gerstman's Failure to Include Key Evidence Contradicting his Claim About Coherence

Dr. Gerstman quotes Hill's description of the coherence consideration about "serious conflict" with what is known about the disease (Report, p. 84). What follows, however, does not include the conflicting evidence from the Sarink et al. (2021) case-control study of postmenopausal women diagnosed with uterine cancer and endocrine disruptors, including BPA, triclosan, parabens, and phthalates.[86]

As in the case of Dr. Cote, Dr. Gerstman cites the Sarink et al. (2021) study but does not mention the contradictory evidence. In my view, this is a breach of scientific integrity.

The remainder of his coherence argument is basically a rehash of things he mentioned in other sections of his report. General statements about "causal relations between exogenous hormones and hormone sensitive cancers" which, although true, is vague and, in the absence of any other information, largely peripheral to the central causal questions. I assume (but can only assume) that Dr. Gerstman wants the reader to think that because these two cancers are hormone dependent and because EDCs can alter hormone balance, that the EDC's have something to do with cancer occurrence. If true, this type of argument is not a valid scientific argument.

In the end, Dr. Gerstman's effort to use the coherence consideration in support of his causal claims (especially regarding hair relaxers and uterine cancer in postmenopausal women) is deeply flawed.

Issue #9: Dr. Gerstman's Faulty Interpretation of Hill's "Experimentation" Consideration

Dr. Gerstman's description of Hill's (1965) experimentation consideration is flawed. He begins with Hill's own words about "appealing to experimental or semi-experimental evidence" but then ignores Hill's explanation. This consideration is all about preventive interventions, either in randomized (prevention) trials or in non-randomized studies in which the exposure is removed and study populations are followed subsequently for cancer incidence. This consideration is not about past epidemics or that

---

[85] See Weed and Hursting (1998) for a discussion of this weak category of "biologic plausibility."

[86] The evidence from Sarink et al. (2021) was described more fully elsewhere in this report including in my discussion of the Cote expert report.

"EDCs have carcinogenic and mutagenic properties in in vivo and in vitro systems" that Dr. Gerstman claims. Dr. Gerstman claims to be using Hill's approach but is deviating from it to attempt to bolster his opinion.

Put another way, Dr. Gerstman appears to have misinterpreted Hill's consideration of experimentation to boost his causal arguments. This is inconsistent with good scientific practice. Hill's experimentation criterion is limited to studies (randomized or not) of preventive interventions.

Issue #10: Dr. Gerstman's Overly-Simplistic View on Hill's Analogy Consideration (or Criterion)

Dr. Gerstman's view on the analogy consideration ignores Hill's actual language and misinterprets the meaning of this causal consideration. As discussed elsewhere in this report and in the published peer-reviewed literature (Weed, 2018), the analogy consideration involves "bodies of evidence," i.e., comparing the extent to which the body of evidence on hair relaxers and either cancer (at issue here) bears any resemblance to other bodies of evidence for which causation has been established. The evidentiary situation with the single study of relaxers, straighteners, and pressing products and ovarian cancer is a good if extreme example. The idea—promoted but never stated explicitly by Dr. Gerstman (and Dr. Cote)—that a single study with a null or weak[87] result for the "ever/never" contrast could represent a well-established causal relationship is not consistent with the analogy criterion as Hill described it. The situation with hair relaxers and uterine cancer is only marginally different. There we have two studies with a variety of conflicting results (e.g. dose-response) and bare-bones biological plausibility arguments look remarkably different from the bodies of evidence for any number of well-established causal relationships.

**Section 4.3.4 Summary of Dr. Gerstman's Hill "Viewpoints" Discussion**

As discussed above, Dr. Gerstman walks through the Hill considerations (or aspects) and then simply pronounces that he "carefully" considered things and decided that the evidence supports causation for three separate exposure-disease relationships. He makes no effort to explain which of these considerations (if any) "tipped the balance" of his opinions for which of the three relationships. He makes no effort to explain to the reader how the various "lines of evidence" i.e. the nine Hill viewpoints together produced these causal claims. We are, apparently, supposed to trust his judgment or his experience or some other intangible including his "careful consideration." At best, that is an appeal to his scientific authority rather than to the scientific method in all its various forms. Appeals to authority are seriously problematic. As Guzelian and Guzelian (2004) noted, there is a dramatic and critical difference between authority-based conclusions arising from such intangibles as opinion, experience, intuition, and judgment, and evidence-based conclusions derived from an objective, unbiased, and systematic analyses. The latter are preferred; the former have no objective basis.

Objectivity is the essence of science and it does not originate in a vague appeal to "careful considerations" but rather in methodology. It follows that Dr. Gerstman failed to explain why the nine Hill criteria (as he interprets their importance and relevance[88]) leads one necessarily to a conclusion of "support" for causation (with all the imprecision that the words "support" and "can cause" entails).

---

[87] Recall that the basic contrast revealed a HR of 1.29 (95% CI: 0.70-2.38) from White et al. (2021).

[88] Assuming that his description, interpretation, and application of the criteria are consistent with Hill's description, interpretation, and application. In another section, I will describe how Dr. Gerstman attempted (unsuccessfully) to argue that

To be more pointed in my critique, consider the following:

- Dr. Gerstman does not follow Hill's framework for the "exclusion of chance" requirement.
- Dr. Gerstman's strength of association argument fails to point out that his E-values are about things (unknown confounders) that, because their existence relies upon events in the future, cannot be known. His argument, therefore, is speculative.
- Dr. Gerstman's consistency argument misrepresents Hill's discussion of this consideration.
- Dr. Gerstman's temporality argument contradicts itself.
- Dr. Gerstman's specificity argument is, at best, a theoretical discussion of component causes without any reference to the specifics of the evidence in this matter.
- Dr. Gerstman's biologic gradient (dose-response) argument ignores the overwhelming negative evidence of the Bertrand et al. (2023) study.
- Dr. Gerstman's biologic plausibility argument is weak.
- Dr. Gerstman's coherence argument fails to follow Hill's approach. Instead, Dr. Gerstman rehashes ideas from his biologic plausibility argument.
- Dr. Gerstman's discussion of experimentation is simply wrong.
- Dr. Gerstman's analogy argument reveals a lack of understanding of what Hill wrote.

For all these reasons, I find that Dr. Gerstman's use of the Hill approach to causation analysis is lacking in objectivity and scientific rigor and is therefore unreliable and invalid.

### Section 4.4 Additional Assessments of Plaintiffs' Experts: Mr. Atwood, Dr. Chang, Dr. Panigrahy, Dr. Pugliese, Dr. Roque, Dr. Sharma, and Dr. Zoeller

I have also been asked to evaluate the methodological approaches to causation mentioned, described, and/or applied by the following plaintiffs' experts: Stanley Atwood, M.S., Dr. Jeffrey Chang, Dr. Dipak Panigrahy, Dr. Silvina Pugliese, Dr. Dario Roque, and Dr. R. Thomas Zoeller.

### Section 4.4.1 An Assessment of the Methodological and Causal Claims of Mr. Stanley Atwood

Mr. Atwood's expert report, dated December 1, 2025, refers to several methodologic approaches and concepts that require critical comment. These are "biological plausibility," the Bradford Hill viewpoints (or criteria), and the phrases "weight of evidence" and "strength of evidence."

---

consistency is not needed for the ovarian and hair relaxer hypothesis because Hill's words allow that to occur. What Dr. Gerstman failed to point out was that Hill's explanation of his statement which he provided by example, if applied to the ovarian-hair relaxer evidence—would not have permitted a conclusion of consistency.

### Section 4.4.2 Mr. Atwood's Methodologically Incorrect Views on the Nature and Assessment of the Hill Consideration of Biological Plausibility

It is important to point out that for this legal case Mr. Atwood was asked to answer the following question: "Are there biologically plausible mechanisms that link the use of (hair relaxers) with ovarian and uterine cancer?" (Report, p. 1).

He answers this question as follows (Report, p. 4):

> "In my opinion, as a toxicologist with 37 years of experience in evaluating hazards from environmental exposures to chemicals, stated to a reasonable degree of scientific certainty, integration of epidemiological, toxicological, and mechanistic studies strongly support a biologically plausible causal relationship between exposure to hair relaxers and ovarian and uterine cancers reported in several recent epidemiological studies."

Mr. Atwood's inclusion of epidemiological studies "strongly supporting" his opinion on biological plausibility is contrary to the definition of this concept in the Bradford Hill (1965) publication that Mr. Atwood cites.

The biological plausibility criterion has, for decades, been defined in terms of mechanistic and animal studies, i.e., studies commonly performed and interpreted by toxicologists (Weed and Hursting, 1998; Gordis, 2000; Bhopal, 2002; Goodman and Samet, 2006, and many others). It is not, unless studies of molecular epidemiology are involved, about epidemiological studies of exposures and disease occurrence.[89] Biological plausibility is therefore closely aligned but not identical with another Hill consideration, coherence, inasmuch as Hill specifically included animal experimentation in that category.

It follows that for Mr. Atwood to include epidemiological studies as support for biological plausibility is inconsistent with the method he claims to be using, i.e., Hill's 1965 method. The reason Mr. Atwood appears to do so is because he writes that the epidemiological evidence is "direct" evidence of causation whilst the toxicological evidence is "indirect" evidence of causation.[90] In other words, the biological evidence for an established mechanism is weak. Mr. Atwood admits this weakness when he writes that he "cannot determine which of the specific chemicals are most responsible for the biological effects associated with hair relaxer use" nevertheless he continues, "it is plausible and likely that the combination of biological activities of these chemicals over time creates an elevated risk for endocrine-related cancers" (Report, p. 4). In other words, he is confident that one or another of these chemicals (he is not able to name one) is causing an effect or maybe (he says likely) it is the combination of some of these chemicals (but he is not able to name them).

In addition to Mr. Atwood answering a different (much broader) question than the one he was asked to address, he also is incorrect in his understanding of the Hill criterion (or consideration) of biological plausibility. He writes that the introduction of biological plausibility by Bradford Hill "marked the initial

---

[89] The epidemiological studies of hair relaxers, straighteners and pressing products and uterine cancer and the single study of relaxers, straighteners, and pressing products and ovarian cancer are not molecular epidemiology studies.

[90] Specifically, Mr. Atwood writes (Report, p. 4) that his opinion is "based on overall consistency and coherence of direct evidence reported in epidemiology studies of hair relaxer use and indirect evidence reported in mechanistic and other studies..."

formalization of the concept of biological plausibility within the epidemiological and biomedical literature" (Report, p. 68). Mr. Atwood is wrong. The idea that it is important to consider the biological mechanisms that may be responsible for a hypothesized causal effect in human populations can be easily traced to at least three publications published 5 to 6 years prior to Hill (1965): Yerushalmy and Palmer (1959), Lilienfeld (1960), and Sartwell (1960).[91] The Reference Manual on Scientific Evidence (3rd ed. p. 600) recognizes that Hill did not "invent" the concept of biological plausibility. That well-recognized source notes: "these guidelines (i.e., the ones mentioned in a list there including biologic plausibility) reflect criteria proposed by the U.S. Surgeon General in 1964 in assessing the relationship between smoking and lung cancer and expanded upon by Sir Austin Bradford Hill in 1965 and are often referred to as the Hill criteria or Hill factors."

These facts represent Mr. Atwood's lack of knowledge of the historical record regarding the introduction of the concept of biological mechanism—the central concept of biological plausibility.

Mr. Atwood also mischaracterizes the Hill criteria and either fails to apply them or applies them incorrectly. Examples follow:

### Section 4.4.3 Mr. Atwood's Incorrect Methodologic Definition and Application of Hill's Consistency Consideration

Mr. Atwood includes in his definition of Hill's consistency criterion as follows (Report, p. 68): "Has the effect been reported in studies from other investigators, in different places, times, and circumstances? This does not mean that conclusions should not or cannot be drawn (about consistency) in cases where a study has not been replicated." Anyone familiar with the Hill (1965) paper will recognize that the first sentence here is faithful to Hill's definition, which clearly implies that there are several studies available for the causal analysis. Hill writes that he "would put a great deal of weight upon similar results reached in quite different ways, e.g. prospectively and retrospectively" (Hill, 1965, p. 197). Hill did not write the second sentence that Mr. Atwood provides nor did Hill argue in its favor. Rather, as I have discussed in more detail in my critique of Dr. Gerstman's views on this topic, Hill did not state nor provide an example of claiming consistency from a single study. Rather, he provided an example of a single occupational facility for which two epidemiological studies and one intervention occurred removing the alleged causal agent (Hill, 1965, p. 8-9). In that situation Hill (1965) would argue for consistency. Furthermore, Mr. Atwood appears to be rather cavalier in his willingness to forgo a key scientific principle, i.e., a principle that is recognized across most if not all sciences and certainly within the biomedical sciences, namely, the need for replication.

### Section 4.4.4 Mr. Atwood's Lack of Understanding of Basic Cancer Classifications

[91] Yerushalmy J, Palmer CE. On the methodology of investigations of etiologic factors in chronic diseases. J Chron Dis 1959;10:41-6.

Lilienfeld AM. "On the methodology of investigations of etiologic factors in chronic diseases"—some comments. J Chron Dis 1959;10:41-6.

Sartwell PE. "On the methodology of investigations of etiologic factors in chronic diseases"—further comments. J Chron Dis 1960;11:61-3.

See Mr. Atwood's report, p. 70. Here, Mr. Atwood claims that two studies (Kithikii, 2025) and (Ogunsina, 2025) examine the use of hair relaxers and uterine cancer. They do not. Both studies examine the potential relationships between use of hair relaxers and uterine fibroids. Uterine fibroids are benign growths that are not risk factors for uterine cancer (ACS, 2025). To use these two studies of a noncancer by calling them studies of cancer is unscientific and calls into question either his deep lack of understanding of the nature of cancer or his scientific integrity or both.

**Section 4.4.5 Mr. Atwood's Fatal Error in the Interpretation of Hill's Consistency Consideration**

Mr. Atwood attempts to use 10 studies of hair relaxers and different outcomes (uterine cancer, ovarian cancer, breast cancer, thyroid cancer, and uterine fibroids) to make a claim that the evidence on hair relaxers and uterine cancer as well as the evidence on hair relaxers and ovarian cancer satisfy the consistency consideration. This is a misapplication of the Hill consideration contrary to good methodologic practice. These are separate hypotheses (one involving uterine cancer, another ovarian cancer, etc.) and the consistency consideration (or criterion) must be applied to each one separately. That was the intent by Hill and, without question, the way that consideration has been applied in practice for decades.[92] Either Mr. Atwood is unaware of the long history of the use of the consistency consideration or he has decided that he can use it in any way that suits his purpose. Either way, he is wrong.

**Section 4.4.6 Mr. Atwood's Failure to Apply the Hill Criteria**

Mr. Atwood (Report, p. 70) writes that the epidemiologic studies "address several of the Hill principles including strength, consistency, coherence, temporality, specificity, and biologic gradient." That statement provides no information on the extent to which the three studies of interest (i.e. involving uterine cancer and ovarian cancer) satisfied or did not satisfy any of the Hill considerations. As such, Mr. Atwood's claims about the strength of the epidemiologic evidence are pure speculation, without methodologic support. These criteria (or considerations) must be examined individually. It is scientifically inappropriate to simply state that the Hill "principles" were "addressed." The reader cannot possible discern what this means regarding the evidence. As such, Mr. Atwood's claim here is speculative and outside the realm of scientific practice.

**Section 4.4.7 Mr. Atwood and His Use of the Phrases "Weight of the Evidence" and "Strength of the Evidence"**

See page 2 of Mr. Atwood's report where he states:

"I conducted literature searches, reviewed toxicology and mechanistic studies for various substances, agents, or exposure conditions and prepared reports that summarized the findings and presented conclusions based on the overall weight or strength of evidence."

As discussed elsewhere in this report, there is no established method of "weight of the evidence" that allows the user to make causal claims. As such, it is simply a marker for some other established method. Similarly, "strength of evidence" is not a recognized methodology in making causal claims. Neither phrase is defined by Mr. Atwood. Both phrases, at best, are rhetorical flourishes without epistemological (methodological) validity or reliability.

[92] See, for example, Weed and Gorelic (1996) for an example of the use of consistency in practice.

**Section 4.4.8 Summary of Mr. Atwood's Methodological Failings**

Mr. Atwood's understanding of the Hill considerations and the practice of causal inference—i.e., the application of these considerations to both epidemiological and biologic evidence--is seriously flawed.[93] His claim that the evidence on hair relaxers and uterine cancer as well as that regarding hair relaxers and ovarian cancer "is" a "biologically plausible causal relationship" is scientifically invalid and unreliable.[94] Finally, his assertion that he is using a "weight of the evidence" or "strength of the evidence" approach provides no clue as to the methodology he may have used. In fact, he used a seriously flawed approach inconsistent with valid and reliable scientific practice.

**Section 4.4.9 An Assessment of the Methodology Claimed by Dr. Jeffery Chang in his Causal Assessment**

Dr. Jeffery Chang has submitted an expert report dated December 1, 2025. He writes the following about his methodology as follows (Report, p. 3):

> "The methods I employed in addressing the role of chemical hair relaxers and their relationship to uterine and ovarian cancer based on a weight-of-the-evidence approach."

This so-called "method" is never defined in terms of any recognized methodology for assessing causality. As such, it is nothing more than a metaphor for some approach unknown to anyone but Dr. Chang (Weed, 2005). The author of a critical discussion of the "weight of evidence" concept notes that when it is applied without mentioning or pointing to a legitimate well-established method that is equivalent to a "seat of the pants review" (Krimsky, 2005). Nevertheless, Dr. Chang claims (Report, p. 5) that "evidence derived from original research in peer reviewed epidemiologic studies demonstrates that exposure to chemical hair relaxers can cause uterine and ovarian cancer." Dr. Chang has no scientific basis—no methodologic basis—to justify this claim. It is, in the end, his subjective personal opinion devoid of reliability and validity.

**Section 4.4.10 An Assessment of the Methodology Claimed by Dr. Dipak Panigrahy.**

Dr. Panigrahy has submitted an expert report dated November 30, 2025. In it he writes the following regarding the methodology he claims to have used (Report, p. 10):

> "I use a similar methodology (to that of the International Agency for Research on Cancer) in determining cancer causation using principles of scientific rigor, impartial evaluation (free of financial conflict of interest), transparency, and consistency."

Dr. Panigrahy does not cite much less discuss the Preamble (2019) of that international organization (i.e. IARC) where this methodology is described. Rather, Dr. Panigrahy cites a commentary on the Preamble (Samet et al. 2020) where this methodology is not fully described but rather provides some insight into

---

[93] In the published toxicological literature, there are recent papers on applying Hill-like criteria to the biological (toxicological) evidence (and only that evidence) to examine the question of biological plausibility. Mr. Atwood is either unaware of those publications or chose to ignore them.

[94] Note too that he describes these two relationships as one. This is inconsistent with good scientific practice. He is wrong.

how the 2019 version of the IARC Preamble differs from that of an earlier version. The Samet et al. (2019) publication did not discuss in any detail how epidemiologic evidence is to be evaluated. Nevertheless, the IARC Preamble (2019) notes that the Bradford Hill (1965) publication is to be used. On the other hand, the IARC process is not a single individual (someone like Dr. Panigrahy) but rather at least three large committees reviewing the evidence collected and collated by IARC staff. The final decision on causation comes after the committee decides by voting. Dr. Panigrahy did not actually follow the IARC methodology. With these facts in hand, it is important to assess how Dr. Panigrahy attempted to apply these considerations. See his Report, p. 102.

There, Dr. Panigrahy writes that "Epidemiological evidence indicates that frequent users of chemical hair relaxers have significantly increased risks of uterine and ovarian cancer, with most studies reporting these risks are more than doubled. These associations are both strong and consistent across studies, thereby meeting several guidelines of a Bradford Hill Causal Analysis (#1 Strength of Association; #2 Consistency Across Studies)."

He does not describe these studies. He does not separate the chemical hair relaxer product and uterine cancer issue from the chemical hair relaxer product and ovarian cancer issue. This is a serious scientific error.

He provides no indication as to where the "more than doubled" results were observed. He provides no discussion of why there are many more estimates of relative risk in these studies that show no increase in risk and are not statistically significant. He provides no indication at all of why consistency is satisfied. As I have discussed in this report, consistency of the hair relaxer product and ovarian cancer relationship cannot be considered "consistent" given Hill's definition and application of this concept. Dr. Panigrahy is wrong about strength and consistency. Furthermore, there is a lack of consistency across the premenopausal and postmenopausal results in the Chang et al. (2022) and Bertrand et al. (2023) studies yet Dr. Panigrahy ignores this obvious refutation of his claim of consistency.

On that same page in his report, Dr. Panigrahy claims that "compellingly, statistically significant dose-response effects were observed in several studies. These are relatively rare and important findings in environmental exposure studies and fulfill another Bradford Hill guideline (#5 Biological Gradient)." He provides no support for the concept that dose-response findings are "relatively rare...in environmental exposure studies." This is a false claim for which he provides no evidence. Finally, Dr. Panigrahy ignores the overwhelmingly negative evidence of dose-response in the Bertrand et al. (2023) study that refutes such a confident claim that there is "compelling" evidence. Dr. Panigrahy is wrong.

Dr. Panigrahy continues his mistaken and unsupported claims about the Hill considerations when he writes that the coherence consideration is satisfied because "chemicals can trigger mechanisms (i.e. key characteristics of carcinogens)" as if this nonspecific statement applies to the chemicals in chemical hair relaxer products. Dr. Panigrahy ignores the fact that many chemicals do not trigger such mechanisms and without stating which specific chemicals and what specific mechanisms supported by systematically collected toxicologic evidence his statement is scientifically unhelpful.

Dr. Panigrahy mistakenly argues that Hill's experimentation consideration involves animal experiments and epidemiological studies. This is simply untrue, inconsistent with Hill's 1965 paper. Hill's (1965) publication makes clear that the experimentation consideration is about preventive interventions in human populations as discussed elsewhere in this report.

**Section 4.4.11 Summary of Dr. Panigrahy's Methodological Failures**

Dr. Panigrahy has not done what he promised he would do. He wrote that he follows a "rigorous," "transparent" and "consistent" approach. However, he was not rigorous or transparent in his use of the Hill considerations. He failed to provide the reader with the epidemiologic evidence or how he applied the considerations to that evidence. His account of Hill's considerations are inconsistent with Hill's (1965) account and with the IARC (2019) account of cancer causation methodology. It follows that his views on causation are invalid and unreliable on methodological grounds.

**Section 4.4.12 An Assessment of the Methodology of Dr. Silvina Pugliese.**

Dr. Silvina Pugliese submitted a report in this matter, dated December 1, 2025. She was asked to address the following: "whether it is biologically plausible that the use of chemical hair relaxer products can contribute to the development of uterine and ovarian cancers in product users" (Report, p. 3).

She claims to have used the following approach: "In reaching my opinions, I have used the same methods that I would use in my academic and professional work. I began by defining the scope of my mandate and performing a comprehensive literature search. After reviewing the pertinent literature, I undertook a weight of evidence analysis, summarized my findings, and formulated my conclusions" (Report, p. 3-4).

Dr. Pugliese does not define this "weight of evidence" approach. She cites no publications on methodology. A reader cannot possibly discern how she came to her conclusion of "biologically plausible" on methodologic grounds.[95]

**Section 4.4.13 Summary of Dr. Pugliese's Claim**

Dr. Pugliese's claim of biological plausibility is not based on any recognized scientific methodology. As such it is not a scientific one and is, therefore, invalid and unreliable.

**Section 4.4.14 An Assessment of the Methodology of Dr. Dario Roque.**

Dr. Dario Roque has submitted a report in this matter, dated November 30, 2025. According to Dr. Roque he used the following methodology (Report, p. 6):

> "I then utilized the well-accepted framework for causality as enunciated by Sir Austin Bradford Hill that include consideration of the strength of the evidence, consistency of the evidence, specificity, biologic plausibility, biologic gradient, temporality, analogy, coherence and experimental evidence, in order to allow me to provide an opinion in this report with a reasonable degree of medical and scientific certainty."

On page 57 of his report, Dr. Roque restates his intention to use the Bradford Hill criteria and then adds that he will refer also to the U.S. Environmental Protection Agency's (U.S. EPA) Guidelines published in 2005. Dr. Roque cites no other references on Hill's criteria. He does not compare and contrast these

[95] I have provided more extensive discussions of the "weight of the evidence" phrase elsewhere in this is report.

two accounts of the causal criteria but rather borrows from each according to his unstated needs and purpose.

I consider each of Dr. Roque's description and application of these criteria. First, however, it is important to point out that Dr. Roque does not provide the reader with a complete description of the epidemiological evidence. He "cherry picks" results he sees supporting his opinions, ignoring those results which conflict with, even refute, those opinions. This is an unscientific approach inconsistent with a systematic examination and thus inconsistent with an unbiased, transparent, approach, thus putting at risk the reliability and validity of his opinions.

**Section 4.4.15 Dr. Roque and Strength of Association**

For strength of association, Dr. Roque limits his description to the U.S. EPA guidelines as follows:

> "The finding of large, precise risks increases confidence that the association is not likely due to chance, bias, or other factors. A modest risk, however, does not preclude a causal association and may reflect a lower level of exposure, an agent of lower potency, or a common disease with a high background level."

Dr. Roque does not provide Hill's discussion that relative risks of 2 and under are particularly susceptible to the unknown or unmeasured confounder, putting many of the relative risk estimates found in Chang et al. (2022), Bertrand et al. (2023) and White et al. (2021) contrary to a causal claim.

**Section 4.4.16 Dr. Roque and Consistency of Association**

Here, Dr. Roque writes that "In weighing the evidence, I find that consistency of the observed association is strong and that this particular guideline of the Hill framework is present" (Report, p. 58). However, Dr. Roque does not cite Hill (1965) but rather a part of the U.S. EPA statement which states ""An inference of causality is strengthened when a pattern of elevated risks is observed across several independent studies. The reproducibility of findings constitutes one of the strongest, but not the only, arguments for causality. However, discordant results seen in investigations may be due to such things as differences in exposure, confounding factors, and/or the power of the study are considered."

What Dr. Roque never provides to the reader is his arguments for why there are many discordant results in the three epidemiologic studies he discusses. Part of the problem, of course, is that he fails to describe those discordant results, providing only those results that he believes support his views.

Dr. Roque does not include these statements by Hill (1965) and by the US EPA (2005) as follows:

> "Consideration of the consistency of the effects associations involves looking across the results of studies conducted by different investigators in different places and times. Particular weight may be given, consistent with Hill's views, to the presence of "similar results reached in quite different ways, e.g., prospectively and retrospectively" (Hill, 1965).

This basic definition for consistency—included in both sources Dr. Roque says he relies upon—cannot provide a justification for claiming that there is consistency in the ovarian cancer and chemical hair relaxer product evidence. Similarly, given that there is no retrospective evidence, this definition makes

consistency uncertain for the chemical hair relaxer product and uterine cancer issue. Finally, this definition also makes it clear that there is consistent negative evidence (across two prospective studies) of a relationship between chemical hair products and uterine cancer in premenopausal women. Dr. Roque provides no discussion much less an explanation for these findings contrary to his claim of "strong" consistency. Rather he punts to another source of Hill's criteria written primarily about evidence concerning causation when molecular epidemiology studies are involved and the so-called "integration" approach. He does not define what he means by an "integration approach."

For all these reasons, Dr. Roque's causal claims are invalid and unreliable.

**Section 4.4.17 An Assessment of the Methodology of Dr. Shameer Sharma**

Dr. Sharma has submitted a report in this matter, dated November 29, 2025.

**Section 4.4.18 Dr. Sharma's General Approach to Causal Inference**

Dr. Sharma claims that he "utilized the totality of the data to formulate a causation analysis in addition to the application of an established framework of causality referred to as the Bradford-Hill guidelines" (Report p. 6). In addition, Dr. Sharma writes that he "considered contrary evidence in the published literature as well as possible alternative explanations for the positive associations observed in the available published literature" (Report, p. 6). In performing this analysis, Dr. Sharma also writes that he "attributed relative weights to the various factors insofar as they informed my opinions on causality" (Report, p. 40).

**Section 4.4.19 Dr. Sharma's Failure to Assess Hill's Initial Condition**

At no point in Dr. Sharma's discussion of the Hill aspects does he address the initial condition posed by Hill (1965) that before applying the "criteria" the user must be confident that chance can be excluded as an explanation for the observed association(s) and that the observed association is "perfectly clear-cut" (Hill, 1965, p. 295). As is the case with all the other experts, Dr. Sharma simply ignores this issue and proceeds without comment despite the fact that the Bertrand et al. (2023) study, for example, found no statistically significant increase in uterine cancer risk for moderate or heavy users and the White et al. (2021) study is basically a null study for exposure to relaxers, straighteners, and pressing products and ovarian cancer. See Section 3.2 for confirmation. Even considering that the Chang et al. (2022) did find a statistically significant increase for the "ever users" (but not for those who used the products on others) it cannot be said that the association is "perfectly clear-cut" and that chance has been excluded. Far from it. Dr. Sharma has ignored a key part of the methodology he claims to be using.

**Section 4.4.20 Dr. Sharma's Failure to Appropriately Assess Strength of Association**

Dr. Sharma cites exactly four hazard ratios (i.e., estimates of strength of association) in this section. Put another way, he ignores 80% of the hazard ratios reported by White et al. (2021) and 75% of the hazard ratios reported by Chang et al. (2022) and all (100%) of the hazard ratios reported by Bertrand et al. (2023). The fact that the Bertrand et al. (2023) study failed to find a large number of statistically significant associations and many null associations about which Dr. Sharma made no mention means that he cannot have "considered contrary evidence" or the "totality of the evidence" as he claimed. This is a serious scientific error by Dr. Sharma calling into question not only his objectivity but also his scientific integrity.

In addition, Dr. Sharma provides no definition of or description of this Hill criterion. He apparently assumes the reader will understand his interpretation of this key consideration. That is not the way good science proceeds.

**Section 4.4.21 Dr. Sharma's Critical Error regarding Consistency of Association**

For the consistency criterion, Dr. Sharma commits a methodologic error committed by all other plaintiffs' experts in this matter. He uses evidence from one separate and distinct causal hypothesis (chemical hair relaxer products and uterine cancer) to justify a claim of consistency for another separate and distinct causal hypothesis (chemical hair relaxer products and ovarian cancer). There is no precedent for this in the methodologic literature on causal inference and it is not something Hill (1965) advocated.[96] Dr. Sharma is wrong.

**Section 4.4.22 Dr. Sharma's Failure to Describe the Lack of Dose-Response in Bertrand et al. (2023)**

The Bertrand et al. (2023) study is a critically important one for the assessment of dose response for the hypothesis of chemical hair relaxer products and uterine cancer. To refresh the reader's recollection, consider the following table shown earlier in this report:

**Hair Relaxer Use and Uterine Cancer (Black Women's Health Study)**

| Category | N cases | HR (95% CI) Age-adjusted | HR (95% CI) Multivariable |
|---|---|---|---|
| **Hair Relaxer Use** | | | |
| **Never/Light** | 38 | 1.00 | 1.00 |
| **Moderate** | 187 | 1.18 (0.83-1.68) | 1.23 (0.86-1.76) |
| **Heavy** | 122 | 1.02 (0.71-1.48) | 1.18 (0.81-1.71) |
| **Duration of Use** | | | |
| **Never/Light** | 38 | 1.00 | 1.00 |
| **1-4 Years** | 15 | 1.03 (0.56-1.87) | 1.00 (0.55-1.83) |
| **5-9 Years** | 29 | 1.01 (0.62-1.64) | 1.00 (0.61-1.64) |
| **10-14 Years** | 58 | 1.24 (0.82-1.88) | 1.35 (0.88-2.06) |
| **15-19 Years** | 54 | 0.98 (0.64-1.49) | 1.06 (0.69-1.63) |
| **≥20 Years** | 153 | 1.16 (0.81-1.65) | 1.28 (0.89-1.84) |
| **Frequency of Use** | | | |
| **Never/Light** | 38 | 1.00 | 1.00 |
| **1-2 times/Year** | 29 | 1.19 (0.74-1.94) | 1.22 (0.75-2.00) |
| **3-4 times/Year** | 110 | 1.23 (0.85-1.78) | 1.25 (0.86-1.83) |
| **5-6 times/Year** | 89 | 1.09 (0.74-1.59) | 1.23 (0.83-1.81) |
| **≥7 times/Year** | 77 | 0.96 (0.64-1.42) | 1.08 (0.72-1.61) |
| **Number of Burns** | | | |
| **Never** | 51 | 1.00 | 1.00 |
| **1-2 times** | 101 | 1.33 (0.95-1.86) | 1.32 (0.94-1.86) |
| **3-4 times** | 56 | 0.98 (0.67-1.44) | 0.97 (0.66-1.43) |
| **5-9 times** | 42 | 1.25 (0.83-1.89) | 1.29 (0.85-1.96) |
| **≥10 times** | 54 | 1.10 (0.74-1.62) | 1.08 (0.73-1.61) |

---

[96] In my 42 years of studying the practice and methodology of causal inference, I have not ever seen this practice in any peer-reviewed publication or epidemiology textbook where the consistency criterion is discussed. Dr. Sharma is "making this up" in order to find a way to justify the "consistency" criterion given that there is only one study of chemical hair products and ovarian cancer.

These results are about as negative for dose-response as could be imagined. There is no evidence here of dose response, whether by the basic categories of moderate vs. heavy use, duration of use, frequency of use, or by number of burns.

Dr. Sharma ignores this evidence in his discussion of dose-response. This is another example of how his claims that he considered the "totality of the evidence" and that he considered "contrary evidence" are false.

The only supposed evidence of dose-response that Dr. Sharma cites is the following:

> "Additionally, Bertrand et al noted that postmenopausal women who reported 20 years or more of use compared to never/light users had a higher risk of uterine cancer (HR = 1.71), with similar findings reported in those postmenopausal women with a history of 10-14 years of use for the chemical hair relaxers (HR = 2.21) thus suggesting a dose-response relationship for duration of use. (Bertrand et al. 2023)" (Sharma Report, p. 42).

To be clear, here is the evidence from Bertrand et al. (2023) regarding premenopausal and postmenopausal women:

**Hair Relaxer Use and Uterine Cancer (Black Women's Health Study)**
**Premenopausal and Postmenopausal Women**

| Category | N cases Premenopausal | HR (95% CI) Multivariable Premenopausal | N Cases Postmenopausal | HR (95% CI) Multivariable Postmenopausal |
|---|---|---|---|---|
| **Hair Relaxer Use** | | | | |
| **Never/Light** | 12 | 1.00 | 23 | 1.00 |
| **Moderate** | 58 | 0.84 (0.45-1.58) | 123 | 1.60 (1.01-2.53) |
| **Heavy** | 31 | 0.63 (0.32-1.24) | 85 | 1.64 (1.01-2.64) |
| **Duration of Use** | | | | |
| **Never/Light** | 12 | 1.00 | 23 | 1.00 |
| **1-4 Years** | 8 | 1.36 (0.55-3.38) | 7 | 0.87 (0.37-2.05) |
| **5-9 Years** | 12 | 0.90 (0.40-2.02) | 15 | 1.09 (0.57-2.12) |
| **10-14 Years** | 18 | 0.66 (0.31-1.41) | 39 | 2.21 (1.30-3.75) |
| **15-19 Years** | 20 | 0.65 (0.31-1.34) | 31 | 1.49 (0.85-2.59) |
| **≥20 Years** | 31 | 0.74 (0.38-1.47) | 116 | 1.71 (1.08-2.72) |
| **Frequency of Use** | | | | |
| **Never/Light** | 12 | 1.00 | 23 | 1.00 |
| **1-2 times/Year** | 7 | 0.83 (0.32-2.13) | 21 | 1.59 (0.87-2.91) |
| **3-4 times/Year** | 35 | 1.00 (0.51-1.94) | 72 | 1.56 (0.96-2.53) |
| **5-6 times/Year** | 20 | 0.55 (0.27-1.14) | 65 | 1.85 (1.13-3.00) |
| **≥7 times/Year** | 25 | 0.65 (0.32-1.31) | 48 | 1.47 (0.88-2.46) |

Dr. Sharma cherry-picks exactly two values from this table (representing just under 10% of the available evidence) neither of which can be said to provide evidence of dose-response or "suggestive" evidence given that none of the six analyses shown in the table show a pattern of increasing hazard ratio with increasing use, duration of use, or frequency of use whether in the premenopausal women or the postmenopausal women.

Dr. Sharma is wrong. Once again, Dr. Sharma's claim that he considered the "totality of the evidence" and "contrary evidence" is refuted when the facts are known.

Actions such as these—repeated in his strength of association discussion—are undeniably unscientific. The fact that Dr. Sharma claims to do one thing but then does something exactly opposite cannot be considered good, ethically appropriate scientific practice.

**Section 4.4.23 Summary of Dr. Sharma's Causal Claims**

Dr. Sharma "heavily weighed" the Hill criteria of strength, consistency, and dose-response, but his unscientific actions with regard to these three key criteria are so egregious and nonsensical from a scientific perspective, I find his opinions to be invalid and unreliable.

**Section 4.4.24 An Assessment of the Methodology of Dr. R. Thomas Zoeller**

Dr. Zoeller has submitted a report in this matter, dated November 30, 2025.

**Section 4.4.25 Dr. Zoeller and His Use of "Weight of the Evidence"**

> "Taken as a whole, it is my opinion to a reasonable degree of scientific certainty that the weight of evidence supports the conclusion that hair relaxer use is causally associated with uterine and ovarian cancer in the human populations."

Dr. Zoeller, like other experts in this matter, uses the phrase "weight of evidence" as if it has some epistemological and methodological relevance. It does not as I have discussed elsewhere in this report.

Without any description or explanation, Dr. Zoeller concludes:

> "The weight of evidence reviewed in this report supports my opinion to a reasonable degree of scientific certainty that multiple, biologically plausible mechanisms exist to explain the elevated risks of uterine and ovarian cancer with exposure to chemical hair relaxers as reported in three large, prospective studies that I have discussed above. (Chang et al. 2022, Bertrand et al. 2023 and White et al. 2021)."

**Section 4.4.26 Summary of Dr. Zoeller's Causal Claim**

Dr. Zoeller's causal claim lacks scientific credibility inasmuch as it is not methodologically based but rather a subjective, personal view on the matter.

**Section 4.5 Two Related Errors Shared by Drs. Cote, Gerstman, Chang, and Zoeller: The Design of the Sister Study and the Role of Misclassification Bias in Assessing its Results.**

Drs. Cote, Gerstman, Chang and Zoeller are unanimous in their belief that the Sister Study is a well-designed study. Dr. Cote writes that "the epidemiologic studies (referring to both the Sister Study and the Black Women's Health Study) are well-designed, have excellent follow up, and cover a wide range of potential exposures (Cote Report, p. 49). Dr. Gerstman writes a similar accolade, "both the Sister Study and BWHS are well designed..." (Gerstman Report, p. 49). Dr. Chang calls the studies

"rigorously conducted" (Chang Report, p. 29). Dr. Zoeller's views (Report, p. 8) are a bit more circumspect but still he maintains that "some of these (studies) focus specifically on the association between the use of these products (meaning chemical hair straightener/relaxer use) and uterine or ovarian cancer" citing Bertrand et al. (2023), Chang et al. (2022), and White et al. (2021).

The impression that these four plaintiffs' experts leave with the reader is that the Sister Study, in particular, was designed specifically with the purpose of studying hair relaxer products and both uterine cancer and ovarian cancer. This is simply not true. According to Sandler et al. (2017, p.1), the senior author on the publication in which the Sister Study was introduced to the scientific community, states that "the study was not designed around one particular a priori hypothesis." The current website of the Sister Study says the following:

> " The Sister Study is conducted by the National Institute of Environmental Health Sciences, one of the National Institutes of Health, of the US Department of Health and Human Services. From 2003 to 2009, more than 50,000 women across the US and Puerto Rico, who were between ages 35–74 and whose sister had breast cancer, joined this landmark research effort to find causes of breast cancer" (sisterstudy.niehs.nih.gov accessed January 6, 2026).

Simply put, the Sister Study was designed to study breast cancer. Furthermore it was not designed to test the hypothesis that hair relaxers specifically or the combination of hair relaxers, straighteners, and pressing products cause ovarian cancer or uterine cancer. These items were included along with a host of other factors that could be related to the occurrence of breast cancer.

Despite the fact that these experts state that the Sister Study was well-designed seemingly for the purpose of examining the hair relaxer-uterine cancer and hair relaxer-ovarian cancer hypotheses, they are also unanimous in their belief that there was a design flaw in the study. They also believe that there is sufficient misclassification bias acting to hide the causal effect that they believe exists.

They argue that some of the study participants who said they were unexposed to these products might have used the products and likewise, other participants who said they used any of these hair products may not have used them or used them less frequently than they had stated in the study questionnaires. These same experts then argue that, as a result of this design flaw[97] in this otherwise "well-designed" study, the observed hazard ratios (HRs) would be biased towards the null due to misclassification bias. The end result would be higher HRs than were observed in the study (See Cote Report, p. 27, Gerstman Report, p. 17 and p. 38, Chang Report, p. 29, and Zoeller Report, p. 8).

But in this situation, the plaintiffs' claim of misclassification bias assumes the causal relationship between "hair relaxers, straighteners, and pressing products" is known, i.e. has been established. But it has not been established. To put it another way, the purpose of the plaintiffs' experts was to determine

[97] Obviously, the plaintiffs' experts did not call this a flaw. Either they failed to recognize or chose to ignore this discrepancy between their claim that the study is "well-designed" but not so for the issue of misclassification. Nevertheless, they rely heavily on the possibility of misclassification so that all the results, in their view, could be—should be—larger than those observed.

if a claim causation was evident. It is unreasonable and unscientific, therefore, to attempt to provide an argument for causation by assuming it exists.[98]

Put another way, the plaintiffs' experts do not entertain the possibility that the combination of these three hair products have no causal effect and therefore there would be no misclassification bias regardless of the reliability and validity of the information about hair product use obtained from the study questionnaires. The point here is that the plaintiffs' experts claim of bias is speculative and rests upon knowledge they do not have. They do not know if there is a causal effect and they do not know if misclassification took place and to what extent it occurred if at all and whether it biased results towards or away from the null.[99]

**Section 4.6 An Overall Assessment of the Lack of Scientific Reliability and Validity Found in the Claims of the Plaintiffs' Experts' Reports by Mr. Atwood, and Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller.**

From a rigorous scientific perspective, these experts (Mr. Atwood, Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller) have committed a series of scientific errors that make their causal claims invalid and unreliable. These errors run the gamut from a failure to use any causal inference method at all, misrepresenting and misapplying existing methods, and ignoring basic scientific principles, one example of this is the key scientific requirement of replication of findings. The best example of the lack of replication is the fact that the hypothesis tested in the study by White et al. (2021) of relaxers, straighteners, and pressing products and ovarian cancer have not been examined elsewhere. The unremarkable and prominently negative findings found in that study makes a causal claim scientifically absurd, even irresponsible. And yet that is precisely what the plaintiffs' experts have done. Add to these errors the plaintiffs' experts' willingness to ignore contrary evidence as if it did not exist. The best example of this phenomenon is the failure of the Bertrand et al. (2023) study of hair relaxer products and uterine cancer to find a dose-response relationship. Dr. Sharma's assertion that he considered all contrary evidence but fails to mention the lack of dose-response in Bertrand et al. (2023) represents one of the best examples (but not the only one) of an individual's unscientific practice. Lack of dose-response is a hallmark of relationships that are not causal and cannot be simply ignored or wished away. These are only two of the many errors committed by these experts, many of whom have no or minimal formal training in epidemiology or causal inference methodology and have never published on these subjects in the peer-reviewed literature. Finally, as is the case with Drs. Cote and Gerstman, these experts fail to appreciate that the Sister Study did not study hair relaxers but rather a combination category of relaxers, straighteners, and pressing products.

In sum, a critical examination of the methods and claims of these experts provides compelling evidence of serious errors in reasoning and methodologic practice. Their causal claims are invalid and unreliable on methodologic grounds.

---

[98] They are, in a sense, putting a somewhat different cart before a somewhat different horse, to use Hill's (1965) colorful analogy. Here, the cart is "an established causal relationship" and the horse is "the effect of misclassification bias because cause has been established."

[99] I recognize that the same concern could be raised about the Bertrand et al. (2023) study. However, as documented in its data collection processes, analyses, and results, it was better designed to examine the hair relaxer product—specifically, hair relaxer products--and uterine cancer hypothesis as documented by its extensive ability to carefully examine dose-response. Nevertheless, if the experts claim that the BWHS had extensive misclassification bias, they are falling into the same inferential trap. Causation has not been established.

## PART FIVE: OPINIONS

Based on the available scientific evidence and the application of well-accepted methods of causal inference to that evidence, it has not been established that exposure to chemical hair relaxer products causes uterine cancer. Similarly, it has not been established that exposure to chemical hair relaxer products causes ovarian cancer.

The opinions of Drs. Cote and Dr. Gerstman on causality are unreliable and invalid. Similarly, I find the general causation claims of Mr. Atwood, Drs. Chang, Panigrahy, Pugliese, Roque, Sharma, and Zoeller unreliable and invalid.

My opinions are made to a reasonable degree of medical and scientific certainty.

January 6, 2026

Douglas L. Weed, M.D., M.P.H., Ph.D.

# PART SIX REFERENCES

## Section 6.1 Methodological References

Alexander DD, Weed DL, Cushing CA, Lowe KA. Meta-analysis of prospective studies of red meat consumption and colorectal cancer. Eur J Cancer Prevention 2011;20:293-307.

Alexander DD, Weed DL, Mink PJ, et al. A weight-of-evidence review of epidemiologic studies of colorectal cancer in pesticide applicators. Int Arch Occup Environ Health 2012;85:715-45.

Alexander DD, Weed DL, Chang ET, et al. A systematic review of multivitamin-multimineral use and cardiovascular disease and cancer incidence and total mortality. J Amer Coll Nutr 2013;32:339-54.

Alexander DD, Weed DL. On the need for improved methodological quality of published reviews. Am J Clin Nutr 2016;103:683-4.

Althuis MD, Weed DL, Frankenfeld CL. Evidence-based mapping of design heterogeneity prior to meta-analysis: a systematic review and evidence synthesis. Systematic Reviews 2014;3:80.

American College of Epidemiology Ethics Guidelines. Ann Epidemiol 2000;10:487-97.

Aschengrau A, Seage GR. The Approach and Evolution of Epidemiology. Chapter 1 in: Essentials of Epidemiology in Public Health. Sudbury, MA:Jones and Bartlett, 2003;1-32.

Aschengrau A, Seage GR. Cohort Studies. Chapter 8 in: Essentials of Epidemiology in Public Health. Sudbury, MA:Jones and Bartlett, 2003;193-220.

Aschengrau A, Seage GR. The Epidemiologic Approach to Causation. Chapter 15 in: Essentials of Epidemiology in Public Health. Sudbury, MA:Jones and Bartlett, 2003;375-401.

Aschengrau A, Seage GR. Case-Control Studies. Chapter 9 in: Essentials of Epidemiology in Public Health. Sudbury, MA:Jones and Bartlett, 2003;221-298.

Aschengrau A, Seage GR. Bias. Chapter 10 in: Essentials of Epidemiology in Public Health. Sudbury, MA:Jones and Bartlett, 2003;251-79.

Beaglehole R, Bonita R, Kjellstrom T. Causation in Epidemiology. Chapter 5 in: Basic Epidemiology. Geneva:World Health Organization, 1993;71-81.

Bhopal R. What is epidemiology? Chapter 1 in: Concepts of Epidemiology. New York:Oxford University Press, 2002;1-16.

Bhopal R. Cause and effect: The epidemiological approach. Chapter 5 in: Concepts of Epidemiology. New York:Oxford University Press, 2002;98-132.

Boffetta P, McLaughlin JK, La Vecchia C, et al. False-positive results in cancer epidemiology: a plea for epistemological modesty. J Natl Cancer Inst 2008;100:988-95.

Breslow RA, Ross SA, Weed DL. Quality of reviews in epidemiology. Am J Pub Health 1998;88(3):475-7.

Checkoway H, Pearce N, Kriebel D. Research Methods in Occupational Epidemiology. Oxford: University Press, 2004.

Cogliano VJ, Baan RA, Straif K, et al. The science and practice of carcinogen identification and evaluation. Environ Health Perspect 2004;112:1269-74.

Cogliano VJ, Baan RA, Straif K, et al. Use of mechanistic data in IARC evaluations. Environ Molec Mutag 2008;49:100-9.

Cole P. Causality in epidemiology, health policy, and law. Environmental Law Reporter 1997;27:10279-85.

Crowther MA, Cook DJ. Trials and tribulations of systematic reviews and meta-analyses. Hematology 2007;493-7.

Duncan M, Moschopoulou E, Herrington E, et al. Review of systematic reviews of non-pharmacological interventions to improve quality of life in cancer survivors. BMJ Open 2017;Nov 28;7(11):e015860.

Goldman SA. Limitations and strengths of spontaneous reports data. Clin Therapeut 1998;20(Suppl C):C40-C44.

Goodman SN, Samet JM. Causation and Causal Inference. Chapter 1 in: Schottenfeld D, Fraumeni Jr, JF. Cancer Epidemiology and Prevention, 3rd ed. New York:Oxford, 2006;3-9.

Gordis L. From Association to Causation: Deriving Inferences from Epidemiologic Studies. Chapter 13 in: Epidemiology, 2nd ed. Philadelphia:W.B. Saunders, 2000;184-203.

Greenhalgh T. How to read a paper: Papers that summarise other papers (systematic reviews and meta-analyses). BMJ 1997;315:672-5.

Guzelian PS, Guzelian CP. Authority based explanation. Science 2004;303:1468-9.

Hasan H, Muhammed T, Yu J, et al. Assessing the methodological quality of systematic reviews in radiation oncology: a systematic review. Ca Epidemiol 2017;50:141-9.

Hill AB. The Environment and Disease: Association or Causation? Proc Roy Soc Med 1965;58:295-300.

Hill AB. Statistical evidence and inference. Chapter 24 in: A Short Textbook of Medical Statistics. London:Hodder and Stoughton 1971:283-96.

Holland PW. Statistics and causal inference. J Am Stat Assoc 1986;81:945-60.

Hutchison BG. Critical appraisal of review articles. Can Fam Physician 1993;39:1097-102.

International Agency for Research on Cancer (IARC). IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. Preamble. (2006).

Jick H. The discovery of drug-induced illness. NEJM 1977;296:481-5.

Kelsey JL, Pettiti DB, King AC. Key Methodologic Concepts and Issues. Chapter 2 in: Brownson RR, Pettiti DB. Applied Epidemiology: Theory to Practice. New York:Oxford University Press, 1998;35-69.

Kleinbaum DG, Kupper LL, Morgenstern H. Fundamentals of Epidemiologic Research. Chapter 2 in: Epidemiologic Research. Belmont, CA:Lifetime Learning. 1982;19-39.

Koopman JS, Weed DL. Epigenesis theory: A mathematical model relating causal concepts of pathogenesis in individuals to disease patterns in populations. Am J Epidemiol. 1990;132:366-90.

Krimsky S. The Weight of Evidence in Policy and Law. Am J Pub Health 2005;95(Suppl 1):S129-S136.

Kung J, Chiappelli F, Cajulis OO, et al. From systematic reviews to clinical recommendations for evidence-based health care: validation of revised assessment of multiple systematic reviews (R-AMSTAR) for grading of clinical relevance. Open Dent J 2010;4:84-91.

Li L, Ying XJ, Sun TT, et al. Overview of methodological quality of systematic reviews about gastric cancer risk and protective factors. Asian Pac J Cancer Prev 2012;13:20169-79.

Lichtenstein AH, Yetley EA, Lau J. Application of systematic review methodology to the field of nutrition. J Nutrition 2008;138:2297-306.

MacMahon B, Pugh TF. Concepts of Cause. Chapter 2 in: Epidemiology: Principles and Methods. Boston:Little, Brown, 1970.

Mausner JD, Bahn AK. The Search for Causal Relations: Observational Studies. Chapter 5 in: Epidemiology: An Introductory Text. Philadelphia:W.B. Saunders. 1974;91-111.

McLaren L, Hawe P. Ecological perspectives in health research. J Epidemiol Commun Health 2005;59:6-14.

Milne R, Chambers L. Assessing the scientific quality of review articles. J Epidemiol Community Health 1993;47(3):169-70.

Moher D, Tsertsvadze A, Tricco AC, et al. When and how to update systematic reviews. Cochrane Database Syst Rev 2008;23(1):MR000023.

Moher D, Tetzlaff J, Tricco AC, et al. Epidemiology and reporting characteristics of systematic reviews. PLoS Med 2007;4(3): e78. doi:10.1371/journal.pmed.0040078.

Moher D, Liberati A, Tetzlaff J, et al. Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. PLoS Medicine 2009;6:e1000097.

Montori VM, Swiontkowski MF, Cook DJ, et al. Methodologic issues in systematic reviews and meta-analyses. Clin Orthop Rel Rsch 2003;413:43-54.

Mulrow CD. The medical review article: state of the science. Ann Intern Med 1987;106:485-8.

Mulrow CD. Rationale for systematic reviews. BMJ 1994;309:597-9.

National Research Council (NRC). Toxicity Testing in the 21st Century: A Vision and a Strategy. Committee on Toxicity Testing and Assessment of Environmental Agents, National Research Council. Washington DC,National Academies Press, 2007.

Oxman AD, Guyatt GH. Guidelines for reading literature reviews. Can Med Assoc J 1988;138:697-703.

Oxman DA. Checklists for review articles. Brit Med J 1994;309:648-51.

Oxman AD, Schunemann HJ, Fretheim A. Improving the use of research evidence in guideline development: 8. Synthesis and presentation of evidence. Health Research Policy and Systems 2006, 4:20. doi:10.1186/1478-4505-4-20.

Parascandola M, Weed DL. Causation in epidemiology. J Epidemiol Commun Health 2001;55:905-12.

Porta M. Dictionary of Epidemiology. 5th ed. New York:Oxford University Press, 2008.

Reference Manual on Scientific Evidence. 2nd ed. Federal Judicial Center. 2000.

Reference Manual on Scientific Evidence. 3rd ed. Federal Judicial Center and the National Research Council of the National Academies of Science. National Academies Press, Washington DC. 2011.

Rochon PA, Bero LA, Bay AM, et al. Comparison of review articles published in peer-reviewed and throwaway journals. JAMA 2002;287:2853-6.

Rothman KJ. Causal Inference in Epidemiology. Chapter 2 in: Modern Epidemiology. Boston: Little, Brown. 1986;7-21.

Rothman KJ. What is Causation? Chapter 2 in: Epidemiology: an Introduction. New York:Oxford University Press, 2002;8-23.

Rothman KJ and Greenland S. Causation and Causal Inference. Chapter 2 in: Modern Epidemiology, 2nd ed. Philadelphia:Lippincott, Raven. 1998.

Sachs RM, Bornichak EA. An evaluation of spontaneous adverse drug reaction monitoring systems. Am J Med 1986;81:49-55.

Salerno J, Weed DL, Pandey CM, et al. Global matters of epidemiology and the ethical challenges of addressing the health of populations. Ann Epidemiol 2024;91:8-11.

Shea BJ, Bouter LM, Peterson J, et al. External validation of a measurement tool to assess systematic reviews (AMSTAR). PLoS One 2007;2(12):e1350.

Shea BJ, Grimshaw JM, Wells GA, et al. Development of AMSTAR: a measurement tool to assess the methodological quality of systematic reviews. BMC Med Research Methodology 2007, 7:10. doi:10.1186/1471-2288-7-10.

Shea BJ, Hamel C, Wells GA, et al. AMSTAR is a reliable and valid measurement tool to assess the methodological quality of systematic reviews. J Clin Epidemiol 2009;62:1013-20.

Stroup DF, Berlin JA, Morton SC. Meta-analysis of observational studies in epidemiology: a proposal for reporting. J Am Med Assoc 2000;283:2008-12

Susser M. Rules of inference in epidemiology. Reg Tox Pharm 1986;6:116-28.

United States Environmental Protection Agency (EPA). Guidelines for Carcinogen Risk Assessment. Risk Assessment Forum U.S. Environmental Protection Agency, Washington, DC. EPA/630/P-03/001F March, 2005.

United States Preventive Services Task Force (USPSTF). Procedure Manual. Section 4: Evidence Report Development. AHRQ Publication #08-05118-EF, July, 2008.

Vandenbroucke JP. Case reports in an evidence-based world. J Roy Soc Med 1999;92:159-63.

Venning GR. Identification of adverse reactions to new drugs. III. Alerting processes and early warning systems. BMJ 1983;286:458-60.

Weed DL. On the logic of causal inference. Am J Epidemiol 1986;123:965-79.

Weed DL, Tyroler, HA, Shy CM. The healthy worker effect in actively-working communications workers. J Occup Med 1987;29:335-9.

Weed DL. Causal and Preventive Inference. Chapter 17 in: Greenwald P, Kramer BS, Weed DL. Cancer Prevention and Control. New York:Marcel Dekker, 1995;285-302.

Weed DL, Gorelic LS. The practice of causal inference in cancer epidemiology. Cancer Epidemiol Biomark Prev 1996;5:303-11.

Weed DL. Methodological guidelines for review papers. J Natl Cancer Inst 1997;89:6-7.

Weed DL. Preventing scientific misconduct. Am J Public Health 1998;88:125-9.

Weed DL, Hursting SD. Biologic plausibility in causal inference: current method and practice. Am J Epidemiol 1998;147:415-25.

Weed DL. Epidemiological evidence and causal inference. Hemat/Oncol Clin N Amer 2000;14:797-807.

Weed DL. Interpreting epidemiological evidence: how meta-analysis and causal inference methods are related. Int J Epidemiol 2000;29:387-90.

Weed DL. Methods in epidemiology and public health: does practice match theory? J Epidemiol Commun Health 2001;55:104-10.

Weed DL, McKeown RE. Ethics in epidemiology and public health. I. Technical terms. J Epidemiol Community Health 2001;55:855-7.

Weed DL. Environmental epidemiology: basics and proof of cause-effect. Toxicology 2002; 181-182:399-403.

Weed DL. Weight of evidence: review of concept and methods. Risk Anal 2005;25:1545-57.

Weed DL. Evidence synthesis and general causation: key methods and an assessment of reliability. Drake Law Review 2006;54:639-650.

Weed DL. The nature and necessity of scientific judgment. J Law Policy 2007;15:135-64.

Weed DL. Conflicts of interest. J Epidemiol Commun Health 2009;63:601-2.

Weed DL. Meta-analysis and causal inference: a case study of benzene and non-Hodgkin's lymphoma. Ann Epidemiol 2010;20:347-55.

Weed DL, Althuis MA, Mink PJ. Quality of reviews on sugar-sweetened beverages and health outcomes. Am J Clin Nutr 2011;94:1340-7.

Weed DL. The quality of nutrition and cancer reviews: a systematic assessment. Crit Rev Food Sci Nutrition 2013;53:276-86.

Weed DL. Causal inference in epidemiology: potential outcomes, pluralism, and peer review. Int J Epidemiol 2016;45:1838-40.

Weed DL. Analogy in causal inference: rethinking Austin Bradford Hill's neglected consideration. Ann Epidemiol 2018;28:343-346.

Weed DL. The need for systematic reviews in oncology. JNCI J Natl Cancer Inst 2018;110(8): djy050.

Weed DL. Does paraquat cause Parkinson's disease? A review of reviews. Neurotoxicology 2021;86:180-184.

Weed DL. Do cell phones cause brain tumor? Another piece of the puzzle. JNCI J Natl Cancer Inst. 2022;114:643-644.

Weed DL. Commentary: On the reliability of causal claims. Global Epidemiol 2022; https://doi.org/10.1017/j.gloepi.2022.100087.

Weed DL, Alexander DD. The erosion of causal inference in systematic reviews in epidemiology. Med Res Arch 2022; https://doi.org/10.18103/mra.v10i10.3252.

Weed DL. Paraquat and Parkinson's disease: A systematic assessment of recent epidemiologic evidence. Med Res Arch 2024;12(9)doi.1018103/mva.v12i9.5767.

**Section 6.2 Additional References**

Alipour S. Comments on: Hair dye and chemical straightener use and breast cancer risk in a large US population of black and white women. Int J Cancer 2020;146:2651.

Agency for Toxic Substances and Disease Registry (ATSDR). FILL IN

Baandrup L, Faber MT, Christensen J. Nonsteroidal anti-inflammatory drugs and risk of ovarian cancer: systematic review and meta-analysis of observational studies. Acta Obstet Gynecol Scand 2013;92:245–55.

Baird DD, Saldanab TM, Neponmaschyc PA, et al. Within-person variability in urinary phthalate metabolite concentrations: Measurements from specimens after long-term frozen storage. Expo Sci Environ Epidemiol 2010;20: 169–75.

Barry JA, Azizia MM, Hardiman PJ. Risk of uterine, ovarian and breast cancer in women with polycystic ovary syndrome: a systematic review and meta-analysis. Hum Reprod Update 2014;20:748-58.

Beigrezaei S, Hamidreza Raeisi-Dehkordi H, Vargas JAH, et al. Non–sugar-sweetened beverages and risk of chronic diseases: An umbrella review of meta-analyses of prospective cohort studies. Nutr Rev 2025;83:663-74.

Belmaker I, Anca ED, Rubin LP, et al. Adverse health effects of exposure to plastic, microplastics and their additives: environmental legal and policy implications for Israel. Isr J Health Policy Res 2024;13:44.

Benjamin S, Masai E, Kamimura N, et al. Phthalates impact human health: Epidemiological evidences and plausible mechanism of action. J Hazard Mater 2017;340:360-83.

Bertrand KA, Delp L, Coogan PF, et al. Hair relaxer use and risk of uterine cancer in the Black Women's Health Study. Environ Res 2023;239:117228.

Biller VS, Leitzmann MF, Sedlmeier AM. Sedentary behaviour in relation to ovarian cancer risk: a systematic review and meta-analysis. Eur J Epidemiol 2021;36:769–80.

Brinton LA, Figueroa JD, Ansong D, et al. Skin lighteners and hair relaxers as risk factors for breast cancer: results from the Ghana breast health study. Carcinogenesis 2018;39:571-9.

Calafat AM, Ye X, Wong LY, et al. Urinary concentrations of four parabens in the U.S. population: NHANES 2005-2006. Environ Health Perspect 2010;118:679-85.

Calafat AM, Longnecker MP, Koch HM, et al. Optimal exposure biomarkers for nonpersistent chemicals in environmental epidemiology. Environ Health Perspect 2015;123:A166-8.

Castelain F, Castelain M. Parabens: a real hazard or a scare story? Eur J Dermatol 2012;22:723-7.

Chang WH, Herianto S, Lee CC, et al. The effects of phthalate ester exposure on human health: A review. Sci Tot Environ 2021;786:147371.

Chang CJ, O'Brien KM, Keil AP, et al. Use of straighteners and other hair products and incident uterine cancer. J Natl Cancer Inst 2022;114:1636-45.

Chang CJ, O'Brien KM, Kresovich JK, et al. Associations between use of chemical hair products and epigenetic age: Findings from the Sister Study. Environ Epidemiol 2024;8:e311.

Chang CJ, O'Brien KM, Keil AP, et al. Use of personal care product mixtures and incident hormone-sensitive cancers in the Sister Study: A U.S.-wide prospective cohort. Environ Int 2024;183:108298.

Chatterjee S, Adhikary S, Bhattacharya S, et al. Parabens as a double-edged sword: Understanding the benefits and potential health risks. Sci Tot Environ 2024;954:176547.

Chitakwa N, Alqudaimi M, Sultan M, et al. Plastic-related endocrine disrupting chemicals significantly related to the increased risk of estrogen-dependent diseases in women. Environ Res 2024;252:118966.

Coogan PF, Rosenberg L, Palmer JR, et al. Hair product use and breast cancer incidence in the Black Women's Health Study. Carcinogenesis 2021;42:924-30.

Crinnion WJ. Toxic effects of the easily avoidable phthalates and parabens. Altern Med Rev 2010;15:190-6.

Cronin KA, Scott S, Firth AU, et al. Annual Report to the Nation on the Status of Cancer: Part I, Annual Cancer Statistics. Cancer 2022;128:4251-84.

Darbre PD. Environmental oestrogens, cosmetics and breast cancer. Best Pract Research Clin Endocrinol Metab 2006;20:121–43.

Darbre PD, Harvey PW. Paraben esters: review of recent studies of endocrine toxicity, absorption, esterase and human exposure, an discussion of potential human health risks. J Appl Toxicol 2008;28: 561–78.

De Coster S, van Larebeke N. Endocrine-disrupting chemicals: associated disorders and mechanisms of action. J Environ Public Health 2012;713696.

Di D, Zhang R, Zhou H, et al. Exposure to phenols, chlorophenol pesticides, phthalate and PAHs and mortality risk: A prospective study based on 6 rounds of NHANES. Chemosphere 2023;329:138650.

Dodson RE, Nishioka M, Standley LJ, et al. Endocrine disruptors and asthma-associated chemicals in consumer products. Environ Health Perspect 2012;120:935–43.

Dogan S, Simsek T. Possible relationship between endocrine disrupting chemicals and hormone dependent gynecologic cancers. Med Hypotheses 2016;92:84-7.

Drab A, Kanadys W, Malin M, et al. Association of uterine cancer with hypertension—an updated meta-analysis of observational studies. Sci Rpt 2024;14:24884.

Eales J, Bethel A, Galloway T, et al. Human health impacts of exposure to phthalate plasticizers: An overview of reviews. Environ Int 2022;158:106903.

Eberle CE, Sandler DP, Taylor KW, et al. Hair dye and chemical straightener use and breast cancer risk in a large US population of black and white women. Int J Cancer 2020;147:383-91.

Encarnacao T, Pais AA, Campos MG, et al. Endocrine disrupting chemicals: Impact on human health, wildlife and the environment. Sci Prog 2019;102:3-42.EN

Engel LS, Buckley JP, Yang G, et al. Predictors and variability of repeat measurements of urinary phenols and parabens in a cohort of Shanghai women and men. . Environ Health Perspect 2014;122:733–40.

Fan Y, Tao C, Li Z, et al. Association of endocrine-disrupting chemicals with all-cause and cause-specific mortality in the U.S.: A prospective cohort study. Environ Sci Technol 2023;57:2877-86. **NEED**

Farooq H, Mhatre P, Aggarwal R, et al. A systematic review association between use of hair products and benign and malignant gynecological conditions. Eur J Ob Gyn 2024;295;160-71.

Fu Z, Zhao F, Chen K, et al. Association between urinary phthalate metabolites and risk of breast cancer and uterine leiomyoma. Reprod Toxicol 2017;74:134-42.

Gore AC, Chappell VA, Fenton SE, et al. Executive Summary to EDC-2: The Endocrine Society's Second Scientific Statement on Endocrine-Disrupting Chemicals. Endocr Rev 2015;36:593-602.

Hager E, Chen J, Zhao L. Minireview: Parabens exposure and breast cancer. Int J Environ Res Public Health 2022;19(3):1873.

Harajka A, Hercsik T, VIrgens IPA, et al. Association of oral contraceptives and risk of uterine cancer: A systematic review and meta-analysis. Acta Obstet Gynecol Scand 2025;104:591-603.

Hauser R, Calafat AM. Phthalates and human health. Occup Environ Med 2005;62:806-18.

Hauser R, Meeker JD, Park S, et al. Temporal variability of urinary phthalate metabolite levels in men of reproductive age. . Environ Health Perspect 2004;112:1734–40.

Helm JS, Nishioka M, Brody JG, et al. Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women. Environ Res 2018;165:448-58.

Hernandez AM, Smith SJ, Vahora MS, et al. Systematic review of the epidemiology of hair relaxer use and hormone-sensitive reproductive outcomes among black adult women in the United States. J Appl Toxicol 2025;0:1-23.

Hernandez-Diaz S, Mitchell AA, Kelley KE, et al. Medications as potential sources of exposure to phthalates in the U.S. population. Environ Health Perspect 2009;117:185-9.

Jacob SL, Cornell E, Kwa M, et al. Cosmetics and cancer: Adverse event reports submitted to the Food and Drug Administration. JNCI Cancer Spectrum 2018;2(2):pky012.

Jagne J, White D, Jefferson F. Endocrine-disrupting chemicals: Adverse effects of bisphenol A and parabens to women's health. Water Air Soil Pollut 2016;227:Article 182.

Johnson PI, Favela K, Jarin J, et al. Chemicals of concern in personal care products used by women of color in three communities of California. J Expo Sci Environ Epidemiol 2022;32:864-76.

Kahn LG, Philippat C, Nakayama SF, et al. Endocrine-disrupting chemicals: implications for human health. Lancet Diabetes Endocrinol 2020;8:703-18.

Karthikeyan LV, Wilson JV, Parida SK, et al. Risk of parabens in human use. Int J Pharma Res 2021;13:4100-13.

Kay VR, Chambers C, Foster WG. Reproductive and developmental effects of phthalate diesters in females, Crit RevToxicol 2013;43: 200-19. DOI: 10.3109/10408444.2013.766149

Kazemi Z, Aboutaleb E, Shahsavani A, et al. Evaluation of pollutants in perfumes, colognes and health effects on the consumer: a systematic review. J Environ Health Sci Eng 2022;20:589-98.

Kelley KE, Hernandez-Diaz, Chaplin EL, et al. Identification of phthalates in medications and dietary supplement formulations in the United States and Canada. Environ Health Perspect 2012;120:379-84.

Le ND, Leung A, Brooks-Wilson A, et al. Occupational exposure and ovarian cancer risk. Cancer Causes Control 2014;25:829-41.

Lin H, Lee WC, Chen YY, et al. Elevated urinary phthalate levels in uterine cancer patients: Evidence from a comparative study. Ecotoxicol Environ Saf 2025;203:109741.

Liu X, Wang L, Liu X, et al. Microplastics, plastics, and their products exposures and cancer: a pooled analysis. Int J Surg 2025;111:5593-605.

Llanos AAM, Rabkin A, Bandera EV, et al. Hair product use and breast cancer risk among African American and White women. Carcinogenesis 2017;38:883-92.

Llanos AAM, McDonald JA, Teteh DK, et al. Chemical relaxers and hair-straightening products: Potential targets for hormone-related cancer prevention and control. J Natl Cancer Inst 2022;114:1567-9.

Macedo S, Teixeira E, Gaspar TB, et al. Endocrine-disrupting chemicals and endocrine neoplasia: A forty-year systematic review. Environ Res 2023;218:114869.

Marcus M, Christensen KY, Manatunga A, et al. Variability of phthalate monoester levels in daily first-morning urine from adult women: A pilot study. Rev Environ Health 2010;25:359–68.

Meeker JD, Calafat AM, Hauser R. Urinary phthalate metabolites and their biotransformation products: predictors and temporal variability among men and women. J Expo Sci Environ Epidemiol 2012;22: 376–85.

Meng M, Yang Y, Song L, et al. Association between urinary phthalates and phthalate metabolites and cancer risk: A systematic review and meta-analysis. Heliyon 2024:e29684.

Needle CD, Kearney CA, Brinks AL, et al. Safety of chemical hair relaxers: A review article. JAAD Rev 2024;2:50-6.

Nguyen VK, Kahana A, Heidt J, et al. A comprehensive analysis of racial disparities in chemical biomarker concentrations in United States women, 1999-2014. Environ Int 2020;137:105496.

Nohynek GJ, Borgert CJ, Dietrich D, et al. Endocrine disruption: fact or urban legend? Toxicol Let 2013;223(3):205-305.

Nowshad F, Islam N, Khan MS. Concentration and formation behavior of naturally occurring formaldehyde in foods. Agri Food Saf 2018;7:17.

Okeke CAV, Burgess CM. Dispelling myths of chemical hair relaxers causing uterine cancer. J Am Acad Dermatol 2023;published online July 15, 2023.

Peng S, Dong S, Gong C, et al. Evidence-based identification of breast cancer and association ovarian and uterus cancer risk components in source waters from high incidence area in the Pearl River Basin, China. Sci Total Environ 2023;903:166060.

Pierce JS, Cheatham D, Campbell DA, et al. Evaluation of dermal exposure to phthalates and parabens resulting from the use of hair relaxers. Int j Environ Health Res 2024;doi:10.1080/09603123.2024.2402836.

Rao R, McDonald JA, Barrett ES, et al. Association of hair dye and relaxer use with breast tumor clinicopathologic features: Findings from the Women's Circle of Heath Study. Environ Res 2022:203:111863.

Roig B, Mnif W, Hadj Hassine AI, et al. Endocrine disrupting chemicals and human health risk assessment: A critical review. Crit Rev Environ Sci Technol 2013;43:2297-351.

Romero-Franco M, Hernández-Ramírez RU, Calafat AM, et al. Personal care product use and urinary levels of phthalate metabolites in Mexican women. Environ Int 2011;37:867-71.

Ross G. A perspective on the safety of cosmetic products: a position paper of the American Council on Science and Health. Int J Toxicol 2006;25:269-77. **NEED**

Sá Dias TC, Baby, AR, Kaneko TM. Relaxing/straightening of Afro-ethnic hair: historical overview. J Cosmetic Dermatol 2007; 6:2–5.

Sandler DP, Hodgson ME, Denny-Halverson SL, et al. The Sister Study Cohort: Baseline methods and participant characteristics. Environ Health Perspect 2017;125(12):127003.

Sarink D, Franke AA, White KK, et al. BPA, parabens, and phthalates in relation to uterine cancer risk: A case-control study nested in the Multiethnic cohort. Environ Health Perspect 2021;129(5):57702.

Schildroth S, Geller RJ, Wesselink AK, et al. Hair product use and urinary biomarker concentrations of non-persistent endocrine disrupting chemicals among reproductive-aged Black women. Chemosphere 2024;361:142442.

Siegel RL, Miller KD, Fuchs HE, et al. Cancer statistics, 2022. CA Cancer J Clin 2022;72:7-33.

Stiel L, Adkins-Jackson PB, Clark P, et al. A review of hair product use on breast cancer risk in African American women. Cancer Med 2016;5:597-604.

Symeonides C, Aromataris E, Mulders Y, et al. An umbrella review of meta-analyses evaluating associations between human health and exposure to major classes of plastic-associated chemicals. Ann Glob Health 2024;90(1):52.

Taylor KW, Co CA, Gaston SA, et al. Frequency of personal care product use among reproductive-aged Black individuals and associations with socio-demographic characteristics. J Exposure Sci Environ Epidemiol 2024;doi:10:1038.

Townsend MK, Franke AA, Li X, et al. Within-person reproducibility of urinary bisphenol A and phthalate metabolites over a 1 to 3 year period among women in the Nurses' Health Studies: a prospective cohort study. Environ Health 2013;12:80.

Trasande L, Liu B, Bao W. Phthates and attributable mortality: A population-based longitudinal cohort study and cost analysis. Environ Pollut 2022;292(Pt A):118021.

Trasande L, Sargis RM. Endocrine-disrupting chemicals: Mainstream recognition of health effects and implications for the practicing internist. J Int Med 2023;295:259-74.

Varshavsky JR, Morello-Frosch R, Woodruff TJ, et al. Dietary sources of cumulative phthalates exposure among the U.S. general population in NHANES 2005-2014. Environ Int 2018;115:417-29.

Velotto S, Squillante J, Nolasco A, et al. Occurrence of phthalate esters in coffee and risk assessment. Foods 2023;12(5):1106.

Wesselink AK, Weuve J, Fruh V, et al. Urinary concentrations of phenols, parabens, and triclocarban in relation to uterine leiomyomata incidence and growth. Fertil Steril 2021;116:1590-1600.

White AJ, Gregoire AM, Taylor KW, et al. Adolescent use of hair dyes, straighteners and perms in relation to breast cancer risk. Int J Cancer 2021;148:2255-63.

White AJ, Sandler DP, Gaston SA, et al. Use of hair products in relation to ovarian cancer risk. Carcinogenesis 2021;42:1189-95.

Willhite CC. Weight-of-evidence versus strength-of-evidence in toxicologic hazard identification: Di(2-ethylhexyl)phthalate (DEHP). Toxicology 2001;160:219-26.

Wise LA, Palmer JR, Reich D, et al. Hair relaxer use and risk of uterine leiomyomata in African-American women. Am J Epidemiol 2012;175:432-40.

Wise LA, Wang TR, Ncube CN, et al. Use of Chemical Hair Straighteners and Fecundability in a North American Preconception Cohort. Am J Epidemiol 2023;192:1066–80.

Witorsch RJ, Thomas JA. Personal care products and endocrine disruption: A critical review of the literature. Crit Rev Toxicol 2010;40 Suppl 3:1-30.

Wu AH, Franke AA, Wilkens LR, et al. Risk of breast cancer and pre-diagnostic urinary excretion of bisphenol A, triclosan and parabens: The Multiethnic Cohort Study. Int J Cancer 2021;149:1426-34.

Xu S, Wang H, Liu Y, et al. Hair chemicals may increase breast cancer risk: A meta-analysis of 210319 subjects from 14 studies. PLoS One 2021;16:e0243792.

Yan S, Hu C, Wang Y, et al. Association of phthalate exposure with all-cause and cause-specific mortality among people with hypertension: The U.S. National Health and Nutrition Examination Survey, 2003-2014.

Yang L, Liu X, Peng Z, et al. Exposure to di-2-ethylhexyl-phthalate (DEHP) increases the risk of cancer. BMC Public Health 2024;24:430.

Ye X, Bishop AM, Reidy JA, et al. Parabens as urinary biomarkers of exposure in humans. Environ Health Perspect 2006;114:1843–6.

**Section 6.3 Other Documents**

Expert Report of Mr. Stanley Atwood, M.S.
Expert Report of Dr. Jeffery Chang
Expert Report of Dr. Michele Corte
Expert Report of Dr. B. Burt Gerstman
Expert Report of Dr. Dipak Panigrahy
Expert Report of Dr. Silvina Pugliese
Expert Report of Dr. Dario Roque
Expert Report of Dr. Sameer Sharma
Expert Report of Dr. R. Thomas Zoeller

**Section 6.4 Websites**

www.cancer.org/cancer/types/ovarian-cancer (accessed 11.24.2025)
www.cancer.org/cancer/types/uterine (accessed 11.24.2025)
www.cancer.gov/types/uterine/hp/uterine-prevention-pdq (accessed 11.24.2025)
www.mayoclinic.org/diseases-conditions/uterine-cancer/symptoms-causes/ 1 (accessed 11.24.2025)
seer.cancer.gov/statfacts/html/corp.html (accessed 11.25.2025)

# PART SEVEN APPENDICES

## Appendix A Scientific Reliability and Validity

Inasmuch as I have been asked to examine the reliability and validity of the plaintiffs' experts' opinions in this matter, I provide a description of two fundamental methodological concerns in the practice of science, with additional comments on bias, the most important challenge to the internal validity of scientific evidence.

### Scientific Reliability

In science generally, and in the specific biomedical and public health sciences (e.g. epidemiology, toxicology, and biostatistics), reliability is defined as the extent to which a measurement technique or the results of a methodology can be replicated (Porta, 2008, p. 214). For example, a reliable method is one in which different individuals using the same method (under the same or similar conditions) report the same (or similar) results. Examples include blood tests, X-rays, exposure assessments, and the results of studies (e.g. the results of clinical trials or epidemiological studies). The results of meta-analyses and the results of other methods of research synthesis (e.g. the systematic narrative review) also fall under this definition of reliability (Weed, 2006).

Reliability, as defined here, tracks well with the definition of scientific objectivity, which emerges from (or can be traced to) the scientist's reliance upon methodology rather than upon subjective judgment. One of the best examples of the relative superiority of objective methodology over subjective judgment (or opinion) is the well-known hierarchy of scientific study designs utilized by the United States Preventive Services Task Force (USPSTF, 2008, p. 36) which puts randomized clinical trials and systematic reviews at the top of the hierarchy and expert opinion at the bottom (at or below the level of case reports) to mean that the objective methodologies that test causal hypotheses (and objectively assess bodies of evidence) trump the use of opinion and personal experience. The USPSTF hierarchy is as follows:

- Randomized Controlled Trials, well-conducted Systematic Reviews or Meta-Analyses of Homogeneous RCTs
- Well-designed Controlled Trials without Randomization
- Well-designed Cohort Studies
- Well-designed Case-Control Studies
- Multiple Time Series (a Type of Ecologic Study)
- Case Reports and Case Series, and
- Opinions of Respected Authorities (Experts) based upon "Experience."

Note that case reports, case series, and the opinions of respected authorities based upon "experience" are not tests of hypotheses. Indeed, a case series cannot test causal hypotheses for reasons discussed in earlier sections of this report.

### Scientific Validity

In science generally, and in the specific biomedical sciences such as epidemiology, toxicology, and biostatistics, validity means the extent to which a measurement (e.g. a blood test, the diagnosis of

disease, or the results of a study) measures what it purports to measure (Porta, 2008, p. 251-2). The main challenges to validity are systematic and random errors.

Validity, therefore, can refer to the extent to which a study (e.g. an epidemiologic study) is free from bias (also known as systematic error) and is free from random error (i.e. chance). Put another way, an internally valid study measures the risk of disease attributable to (i.e. caused by) the exposure, conditional on the absence of unknown confounding and other forms of bias. This version of validity—often called "internal validity"—is an assessment of the extent to which the reported results are free from errors (Aschengrau and Seage, 2003d).

Confounding is another source of systematic error that must be accounted for in an epidemiological analysis in order for the results of an analysis to be considered internally valid. Confounding can be due to unmeasured factors (associated with both exposure and outcome) or it can be due to incomplete measurement of factors, called "residual" confounding (Aschengrau and Seage, 2003e, p. 295).

Validity can also be used in a broader sense in science to describe the extent to which the results of a study—or more broadly, a body of evidence comprised of several studies from one or more disciplines—are generalizable. For a study or a body of evidence to be "externally valid" means that the results can be applied to populations other than the populations actually involved in the studies (Porta, 2008, p. 252; Aschengrau and Seage, 2003e). External validity, broadly conceived, is similar to the process of establishing general causation because a claim of general causation is equivalent to saying that the relationship at issue holds, with some obvious caveats (e.g. gender-specific illnesses such as cervical cancer), for any and all populations.

## Appendix B A Method for Individual Causation

In this appendix I describe a method for making claims about specific causation. These claims or expert opinions rely on much more than professional expertise and assertions about reasonable degrees of scientific certainty. Rather, it is essential that claims regarding specific causation be made using a method regarded as reliable by the scientific and medical research communities.
Methods for making claims about specific causation are documented in the literature (Cole, 1997) and involve several key considerations. The following five conditions are required: (1) a general causation claim established using the methods—discussed earlier in this report—regarding the specific disease and specific exposure (the putative causal factor) at issue, (2) demonstration that the individual has been diagnosed with the specific disease, (3) identification and exclusion of alternative causes, (4) demonstration that the individual was exposed to the putative causal factor, and (5) scientific justification for the claim that the individual's (i.e. the plaintiff's) disease was caused "more likely than not" by the amount (or extent) of exposure, sometimes referred to as the "probability of causation" condition. All five considerations—or conditions—are required in this method.

Condition I: General Causation

No claim of specific causation can be considered (much less justified) unless general causation has been established.

Condition II: Documentation of Disease

The plaintiff's disease must be the same disease that has been demonstrated to have been caused (in general) by the exposure.

Condition III: Documentation of Exposure

In the generally accepted method for making claims about specific causation, it is also important to document the specific nature of an individual's alleged exposures to the putative cause. Only then will it be possible to compare the plaintiff's risk of developing disease as a result of exposure to the risk of developing the same disease in well-designed epidemiology studies.

Condition IV: Exclusion of Alternative Causes

If the disease of interest has more than one known cause, then one component of a reliable method for assessing specific causation requires that alternative causes be identified and then ruled out or excluded. It is important to note that the careful and rigorous investigation of all possible exposures to known alternative causes in an individual is an essential part of the methodology. Failure to identify and reliably exclude alternative causes, including how those exclusions were accomplished, is scientifically inappropriate and calls into question the scientific validity and reliability of any causal claim made.

Condition V: The "More Likely Than Not" Standard

Methods of specific causation also involve a scientific justification for the claim that the plaintiff's disease was caused "more likely than not" by the exposure. Precise quantitative techniques are a recognized approach to this widely-recognized methodological condition. "More likely than not" corresponds to the situation wherein greater than 50% of the cases of the diseases are caused by (attributed to) the exposure of interest. Briefly, scientists may demonstrate that greater than 50% of the cases of disease are caused by a specific exposure (type and amount of the exposure of interest) by estimating the relative risk (RR) of disease in a group exposed to that same type and amount of the

putative cause in well-designed epidemiology studies. This RR estimate is found by estimating the overall RR across as many studies as were included in the systematic review of the literature from which the general causation claim emerged regarding the exposure and the disease of interest. If the RR exceeds 2.0 (with a number of additional assumptions regarding the extent to which alternative causes and confounding factors have been controlled, the extent of bias, the appropriate level of statistical precision, and the biological mechanism of action in the individual plaintiff), then it can be shown mathematically that the substance causes greater than 50% of the cases in those cases exposed. Then, and only then, can a claim of "more likely than not" be scientifically justified. This "more likely than not" calculation, however, requires that a general causation claim be established. It makes no logical sense to attribute a percentage of the cases to an exposure (using an estimate of the overall RR) if that same exposure does not cause the disease in question.

<u>Specific Causation in Science and Diagnosing Disease in Medical Practice</u>
Finally, a distinction should be made between a scientifically reliable claim of specific causation made using a scientifically reliable method documented in the published scientific literature and a physician's personal judgment regarding why a patient's illness may have occurred. At issue is not what a physician might provide to a patient (or their family) as a helpful explanation for what may have contributed to the patient's illness. Physicians often discuss such matters as part of their practices, offering their view of why an illness may have occurred. At issue in this case, on the other hand, is what a scientific expert provides as a scientifically reliable claim regarding specific causation. Such a claim arises from the application of established methods of causal inference which require, at minimum, the establishment of general causation, an assessment—and exclusion—of alternative causes, documentation of specific exposures and disease, and a quantitative assessment of the likelihood (or probability) of causation (as discussed in more detail above).

**Additional Discussion of the Method for Assessing Individual Causation**
As described above, there are five conditions—each required—for making a claim of individual (specific) causation. These same conditions can also be found in the 2nd and 3rd editions of the Reference Manual on Scientific Evidence (2000; 2011) as described in the next section.

**Support for a 5 step Method for Determining Individual Causation from the Reference Manual on Scientific Evidence (2000; 2011)**

The second edition of the Reference Manual discusses the types of information needed to determine individual causation—or what the authors refer to as "external causation"—in the chapters on "Epidemiology" and "Medical Testimony." Included in that discussion are the following steps once the diagnosis of the condition has been established: firstly, characterization of exposure at the individual level (p. 472), secondly, determination if the medical and research literature supports a determination of environmental (i.e., general) causation that includes the requirement that the "physician should be guided by the methods set forth in the Reference Guides on Epidemiology and Toxicology in evaluating this literature and its relevance to the patients' exposure and condition" (p. 474), thirdly, the requirement of integrating the information about the patient's exposure to the causal factor, i.e., the "dose" of exposure and the nature of the dose-response relationship, fourthly, the "possibility of multiple causes of a clinical condition is a critical concern," and "alternative causes of disease must be ruled out" (p. 476) If a general causation claim is invalid (and unreliable), then an individual causation claim regarding the same exposure factor and disease cannot be established (Reference Manual, 3rd ed., p. 609)[1].

Although the 3rd edition of the Reference Manual notes that treating physicians may opine on specific causation, they also caution that "they may not routinely review specialized aspects of such data, for example, toxicology, industrial hygiene, environment, and some aspects of epidemiology. Additional experts may assist in distinguishing general from specific causation by using their specialized knowledge to weigh the relative contribution of each putative causative factor to determine "reasonable medical certainty" or "reasonable medical probability." (p. 716 3rd ed) A discussion of the role of general causation and the "more likely than not" condition can also be found in the "Reference Guide on Epidemiology" chapters in both the 2nd and 3rd editions.

For example, the 3rd edition (p. 609), states that "if a general causation claim is invalid (and unreliable), then an individual causation claim regarding the same exposure factor and disease cannot be established".

Regarding the "more likely than not" condition, the authors of the 2nd and 3rd edition chapters on epidemiology write that "the threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0" (Reference Manual, 2nd ed., p. 384 and similarly, 3rd ed., p. 612 and p. 659)

The Reference Manual also supports the idea that "an epidemiologist may be helpful to the fact finder in answering this question (i.e., the question of individual causation)" (Reference Manual, 2nd ed., p. 382, footnote 131). That said, the Reference Manual also states that "epidemiology is concerned with the incidence of disease in populations and does not address the question of the cause of an individual's disease. This question, sometimes referred to as specific causation, is beyond the domain of the science of epidemiology" (Reference Manual, 2nd ed., p. 381).

It might appear that an inconsistency exists in the Manual. That would be an erroneous inference. The obvious confusion can be ameliorated by looking more deeply at the issues involved.

While it is true that an epidemiologic study provides an estimate of the risk of an outcome (given an exposure) for a population, it is also true that in the method of individual causation described above, an epidemiological study can be used to determine the (relative) risk of an outcome in an individual if they had been a participant in that same study. The logic is straightforward. If the individual (plaintiff) had been a participant in that study, then their risk of the outcome (given the exposure) is best estimated as the population's risk of that outcome.

As noted above, the method's fifth condition, is the "more likely than not" condition. As the Reference Manual states, the threshold for concluding that an agent was more likely than not the cause of an individual's disease is a relative risk greater than 2.0. That assessment involves using an epidemiological study or, if possible, a meta-analysis of epidemiological studies that has examined the relationship—presumably causal because condition #1 requires general causation—between the exposure of concern and the illness or condition diagnosed in the individual.

There is no contradiction in the Reference Manual on this issue. An epidemiological study provides an estimate of the risk (relative risk) of an outcome given exposure in a population and that same study can provide an estimate of the risk (relative risk) in an individual if one assumes that that same individual had been a participant in that study. There is no other scientific way to determine the risk in that individual other than to rely upon epidemiology.

Finally, the Reference Manual on Scientific Evidence (in the 2nd and 3rd edition iterations) is completely consistent with the method for individual causation published by Cole (1997).

**A Similar Method for Individual Causation by Guzelian et al. (2005)**

Guzelian et al. (2005, p. 190) provide the following 5-step methodology for evaluating individual causation in a publication primarily designed for use by toxicologists:

**General causation.** The chemical in question is known to be capable of producing the alleged effect in humans under toxicologically relevant conditions delimited to address specifically formulated causation question(s). In some instances, animal data or other information might be applied to the analysis and the biologic plausibility (pathophysiology) of such an extrapolation must be evaluated in this assessment. [This is essentially the result of the general causation analysis.]

**Dose-response.** From the case-specific dataset it is established that the individual had contact with the chemical (exposure), and the amount of chemical absorbed into the body (dose) was of sufficient magnitude and duration to be capable of producing the alleged effect (dose-response).

**Temporality**. The onset and cessation of the chemical exposure must be related to the time course of the individual's clinical condition, e.g., the effect did not precede the alleged exposure. This time course is evaluated toxicokinetically with the use of some parameter of dose but may also consider latency intervals if the specific toxicity endpoint is a disease such as cancer.

**Elimination of Alternative Causes**. Other significant causes (including exposure to other substances, lifestyle, workplace, and inheritable factors, or spontaneous causes) of the disease for the individual do not explain the disease. In some instances, this step may involve an evidence-based analysis of a competing cause.

**Coherence.** All of the evidence including mechanism of action is consistent with the conclusion of causation.

Except for step 5, the Guzelian et al. (2005) method is almost identical to that found in Cole (1997) and in the Reference Manuals (2000, 2011). Step 5, on the other hand, is relatively weak given that there is no way to objectively assess it. Note that the definition of "coherence" is dependent upon the definition of "consistent" and there is no guide to assessing how "consistency" is to be evaluated. Note too that the coherence step appears to be focused exclusively on "all of the evidence" without describing how that evidence is to be collected, identified, and interpreted. One way to interpret coherence is to define it as the extent to which the other 4 steps (or criteria) have been met. However, if the first 4 criteria (or steps) must be met to establish individual causation, step 5 is unnecessary.

**References**

Cole P. Causality in epidemiology, health policy, and law. Environmental Law Reporter 1997;27:10279-85.

Guzelian PS, Victoroff MS, Halmes NC, et al. Evidence-based toxicology: a comprehensive framework for causation. Hum Experiment Toxicol 2005;24:161-201.

Reference Manual on Scientific Evidence. 2nd ed. Federal Judicial Center. 2000.

Reference Manual on Scientific Evidence. 3rd ed. Federal Judicial Center and the National Research Council of the National Academies of Science. National Academies Press, Washington DC. 2011.

**Appendix C**

# CURRICULUM VITAE

Douglas L. Weed, M.D., M.P.H., Ph.D.
616 Inverary Way
Wilmington, NC 28405

Phone: 301.980.0197
Email: douglaslweed@aol.com

**Education**:

1982 – Ph.D., Epidemiology, University of North Carolina

1980 – M.P.H., Epidemiology, University of North Carolina

1977 – M.D., The Ohio State University

1974 – B.Sc., Engineering, *summa cum laude*, The Ohio State University

**Experience:**

Dr. Weed is an independent scientific consultant. He is a physician-epidemiologist with over 40 years of experience in epidemiological research and research training. Dr. Weed is an internationally recognized scholar and educator in causation, causal inference, and the ethics of epidemiology. He has extensive experience in the methods of general causation, cancer causation, systematic reviews, and weight-of-evidence methods. He co-chaired the National Academy of Sciences Committee on the 10th anniversary of the U.S. Supreme Court's *Daubert* decision and was a Visiting Scholar at the Federal Judicial Center (Washington, DC). He maintains an active research program in scientific methods, nutritional epidemiology, occupational epidemiology, and the ethics of research. Recent invited lectures include: American Association for the Advancement of Science, at the World Congress of Epidemiology, and at the National Cancer Institute. Dr. Weed the Reviews Editor for the Journal of the National Cancer Institute and formerly an Associate Editor at the American Journal of Epidemiology.

Dr. Weed is the founder of DLW Consulting Services, LLC. This scientific consulting company provides expertise in disease causation, the methods of causal inference, weight of evidence methods, epidemiological and clinical research methods, and the ethics of epidemiology and public health. DLW Consulting Services, LLC specializes in providing expert advice and guidance on problems at the interface of science, law, commerce, and public policy. Typical

projects include expert testimony and consultation in toxic tort litigation, assessments of health risks from exposure to chemicals, metals, infectious agents, pharmaceuticals, and medical devices, as well as assessments of key methodological and ethical problems facing stakeholders. Examples of such problems include: scientific uncertainty, conflicts of interest, and methods used in legal and regulatory contexts to determine general and specific causation.

**Employment**:

| | |
|---|---|
| 2008- present | Managing Member, DLW Consulting Services, LLC. |
| 2007-2008 | Vice President for Epidemiology and Biostatistics, The Weinberg Group, Washington DC |
| 1990-2007 | Chief, Office of Preventive Oncology, National Cancer Institute<br>Director, Cancer Prevention Fellowship Program, Bethesda MD |
| 1982-1989 | Senior Staff Fellow, Biometry Branch, National Cancer Institute |
| 1978-1982 | Public Health Service Trainee, Department of Epidemiology, University of North Carolina, Chapel Hill, NC. |
| 1978 | Research Associate, Environmental Protection Agency, Chapel Hill, NC. |
| 1977 | Medical Intern, N. Carolina Memorial Hospital, Chapel Hill, NC. |

**Professional and Scientific Organizations**:

American College of Epidemiology (Fellow)
Society of Toxicology (Past Member)
International Epidemiological Association (Member)
Kennedy Institute of Ethics (Member)

**Elected Positions:**

Board of Directors, American College of Epidemiology, 1998-2001
Executive Committee, Society for Epidemiologic Research, 1996-1999

**Editorial Positions:**

Associate Editor, Journal of the National Cancer Institute, 1994-2013
Reviews Editor, Journal of the National Cancer Institute, 1995-2024
Associate Editor, American Journal of Epidemiology, 1997-2013
Editor-in-Chief, NCI Division of Cancer Prevention Newsletter, 1999-2002

**Peer Reviewer**:

American Family Physician
American Journal of Clinical Nutrition
American Journal of Epidemiology
American Journal of Industrial Medicine
American Journal of Preventive Medicine
American Journal of Public Health
Annals of Epidemiology
Cancer
Cancer Epidemiology
Clinical Trials
Critical Reviews in Toxicology
Diabetes Research and Clinical Practice
Emerging Themes in Epidemiology
Environmental Health Perspectives
Epidemiologic Reviews
Epidemiology
Evidence Based Journal
Food and Chemical Toxicology
Global Epidemiology
International Journal of Epidemiology
International Journal of Health Policy and Management
Journal of the American Medical Association
Journal of Clinical Epidemiology
Journal of Epidemiology and Community Health
Journal of Medical Decision-Making
Journal of the National Cancer Institute
Journal of Toxicology and Environmental Health
Kennedy Institute of Ethics Journal
Nutrition and Cancer
Philosophy and Theory in Biology
Preventive Medicine
Regulatory Toxicology and Pharmacology
Social Science and Medicine
Statistics in Medicine
Theoretical Medicine and Bioethics
Toxicology
Toxicology and Industrial Health

**Faculty Appointments**:

Adjunct Professor, 2014-2024
Department of Family and Preventive Medicine
Division of Public Health
School of Medicine

University of Utah
Salt Lake City, UT

Adjunct Professor, 2010 - 2018
Department of Internal Medicine
Division of Epidemiology and Biostatistics
School of Medicine
University of New Mexico
Albuquerque, NM

Visiting Scholar, 2006
Federal Judicial Center
Washington, D.C.

Visiting Fellow, 2001
National Cancer Center
Tokyo, Japan

Visiting Professor (Oncology), 1999
McGill University and University of Montreal
Montreal, Quebec, Canada

Visiting Professor (Epidemiology), 1998
National School of Public Health
Madrid, Spain

Faculty Affiliate, 2001- 2010
Senior Research Fellow, 1995 – 2001
Visiting Fellow, 1994-5
Kennedy Institute of Ethics
Georgetown University, Washington, D.C.

Faculty member, 1994
Society for Epidemiologic Research
Student Workshop on Epidemiologic Methods, Miami, FL

Adjunct Associate Professor, 1994 - 2010
Department of Preventive Medicine and Biometrics
F. Edward Hebert School of Medicine
Uniformed Services University of the Health Sciences
Bethesda, MD

Associate Faculty, 1989 - 2010
Department of Epidemiology
School of Hygiene and Public Health
Johns Hopkins University, Baltimore, MD

Teaching Assistant and Lecturer (Epidemiology), 1979-80
University of North Carolina, Chapel Hill, NC

**Honors and Awards:**

Engineering Honor Scholar 1971-1974 (each year)
Phi Eta Sigma (freshman academic honorary) 1971
Alpha Epsilon Delta (pre-med academic honorary) 1973
Tau Beta Pi (engineering academic honorary) 1974
Phi Kappa Phi (general academic honorary) 1974
Alpha Omega Alpha (medicine academic honorary) 1977
Honors in Medicine (clinical) 1977
Honors in Obstetrics and Gynecology (clinical) 1977
On-the-Spot Cash Award (NCI): 1999, 2000
Sustained Superior Performance Cash Award (NCI): 1990-1999 (each year)
Distinguished Alumnus: Ohio State Univ. Preventive Medicine 1994
NIH Merit Award 1995
Commencement Speaker: USUHS M.P.H. Graduation 1996
Quality Step Increase (NCI) 1997, 2000
Keynote Speaker: III Congress of Chilean Society of Epidemiology 1997
Keynote Speaker: Spanish Epidemiologic Society 1998
Advances in Oncology Lecture: McGill University Cancer Center 1999
Samuel C. Harvey Lecture: American Association for Cancer Education 1999
Keynote Speaker: Korean Society for Preventive Medicine 1999
Grand Rounds: Ohio State University Cancer Center 1999
Keynote Speaker: Ethics and Research Integrity Day, University of Alberta, 2000
Keynote Speaker: EPA Conference on Environmental Statistics, 2001
J. Walter Juckett Memorial Lecture, Vermont Cancer Center, 2002
Distinguished Leadership Award, NCI Division of Cancer Prevention, 2002
NIH Merit Award, 2004
Keynote Speaker: Great Lakes Cancer Institute Symposium, 2005
Keynote Speaker: Turkish Society of Internal Medicine, 2005

**Board and Committee Memberships**

Member, University of North Carolina Nutrition Research Institute Advisory Board 2022-2024.

Member, Selection Committee (for Medical School Applicants), University of Utah School of Medicine, 2015 - 2021

Member, Ethics Committee, American College of Epidemiology, 2014 – 2020

Member, Admissions Committee, University of Utah School of Medicine, 2014 - 2015

Member, Ohio State University College of Public Health Advisory Board
Columbus, Ohio, 2005 – 2013

Member, Commission on Forensic Science and Public Policy, American Judicature Society, 2005 -- 2007

Co-Chair, National Academy of Sciences Committee, 2005 - 2006
"Alternative Models to the *Daubert* Criteria"
Science, Technology, and Law Program, NAS

Chair, Prevention Working Group, 2001-2007
All-Ireland NCI Cancer Consortium
National Cancer Institute (NCI)

Chair, Scientific Education Committee, 1989- 2007
Division of Cancer Prevention, NCI

Chair, Ethics and Standards of Practice Committee, American College of Epidemiology, 1998-2001.

Member, NIH Committee on Continuing Medical Education (CME), 2000-2005

Cancer Advisory Panel, National Center for Alternative and Complementary Medicine, NIH, 1998-2002

World Health Organization Working Group on the Acceptability of Epidemiologic Evidence for Health Impact Assessment, 1999.

National Cancer Institute Cancer Training Advisory Committee, 1997-9.

Member, Advisory Committee for the National Center for Training in Cancer Prevention and Control, Centers for Disease Control and Prevention, 1995-7.

NIH Epidemiology and Clinical Trials Interest Group, 1985-2000.

NIH Committee on Generic Postdoctoral Research Training, 1994.

NCI Committee on Employee Mentoring, 1994.

Program Planning Committee, American Society of Preventive Oncology, 1991-1993.

American Cancer Society Task Force on Preventive Medicine Training, 1993.

NIH Planning Committee for the Alternative Medicine Technology Assessment Meetings, 1993.

ICCCR International Conference on Cancer Prevention. Bethesda, Maryland, February, 1991. See also: Monographs of the Journal of the National Cancer Institute. NIH Publication 91-3227, p.167, 1992.

American Society of Preventive Oncology Annual Meeting Symposium on Quality of Prevention Research. 1991.

Leader, Roundtable Discussion on Causal Inference. Society for Epidemiologic Research Annual Meeting, 1994.

Panel on Philosophy of Science in Epidemiology. Third Brazilian Congress of Epidemiology, Salvador, Bahia, Brazil, 1995.

Leader, Roundtable Discussion on Methods and Morals in Epidemiology. Society for Epidemiologic Research Annual Meeting, 1995.

NCI Roundtable Discussion on Clinical Trials Auditing, 1995.

Leader, Roundtable Discussion on Preventing Scientific Misconduct. Society for Epidemiologic Research Annual Meeting, 1996.

Education Review Committee, U.T. M.D. Anderson Cancer Center, Cancer Prevention and Education Program, 1996-1998.

Member, Ethics and Standards of Practice Committee, American College of Epidemiology, 1996-1998.

**Research Interests**:

Disease causation, cancer epidemiology, prevention and control, causal and preventive inference, research synthesis methods (evidentiary methods, meta-analysis, systematic reviews, inferential methods, ethical decision-making methods), philosophy of public health, ethics of biomedical research, professional ethics, medical humanities, research training, science and the law.

**Recent Lectures and Invited Seminars**

"The Reliability of Causal Claims." University of North Carolina at Wilmington. September, 2022.

"Causality, Epidemiology, and Ethics." American College of Epidemiology Annual Meeting. September, 2022.

"Best Practices: Causal Inference." University of Indiana School of Public Health, (by Zoom). September, 2021.

"Causality and Epidemiology." DRI Seminar on Toxic Torts and Environmental Law, Phoenix, AZ, February, 2020.

"Best Practices: Causal Inference." University of Indiana School of Public Health, Bloomington, IN, July 2019.

"Case-Based Causality: Application of Artificial Intelligence to Epidemiology and Public Health." George Washington University, Washington, DC. March 5, 2019.

"Narrative and Systematic Reviews: Basics, Quality, and an Innovation." National Cancer Institute, November 14, 2018.

"Case-Based Causality." Queens University, Belfast, Northern Ireland, September 26, 2018.

"Science, Ethics, and Policy: Causation and Conflict." National Cancer Institute, September 6, 2018.

"After the NCI: Methods, Mountains, and Mischief." National Cancer Institute, June 7, 2016.

"Risk of Bias and Causality Assessments." United States Environmental Protection Agency, Crystal City, VA, December 16, 2015.

"Best Practices: Interpreting Observational Studies." University of Alabama, Birmingham. July 20, 2015 and July 25, 2016.

"But are you a good epidemiologist?" Society for Epidemiologic Research Graduate Student Workshop. Denver, CO. June 16, 2015.

"Systematic review and meta-analysis of sugar-sweetened beverages and type 2 diabetes." 33rd International Symposium on Diabetes and Nutrition. Toronto, Canada. June 11, 2015.

"Comments on Scientific Question #1 on Butyl Benzyl Phthalate (BBP) and USEPA IRIS Preliminary Materials." United States Environmental Protection Agency (USEPA). Integrated Risk Information System (IRIS) Bimonthly Public Science Meeting. Crystal City, VA. February 26, 2015.

"Meta-Analyses of Observational Studies." International Life Sciences (ILSI) Annual Conference. Phoenix, AZ, January 19, 2015.

"Causality in Public Health and Preventive Medicine." Department of Family and Preventive Medicine, University of Utah, Salt Lake City, UT, April 18, 2014.

"On the Utility of Criteria-Based Methods of Causal Inference." Society for Risk Analysis. Baltimore, MD, December 9, 2013.

"What Causes Cancer?" Huntsman Cancer Institute. Salt Lake City, UT, November 13, 2013.

"Does Red Meat Cause Colon Cancer?" Center for Advanced Study at the Norwegian Academy of Science and Letters. Oslo, Norway, November 6, 2013.

"Interpreting Scientific Evidence for Cancer Prevention." National Cancer Institute Summer Curriculum on Cancer Prevention and Control. Rockville, MD, July 10, 2014; July 8, 2015; July 8, 2016.

"Conflicts of Interest." University of California, Berkeley. Epidemiology Doctoral Seminar. Berkeley, CA, April 10, 2013.

"On the Utility of Criteria-Based Methods of Causal Inference." International Society for Environmental Epidemiology. Columbia, SC, August 30, 2012.

"How do we make causal conclusions from the 'totality of the evidence' objective and observable?" Conference on "Scientific Approaches to Strengthening Research Integrity in Nutrition and Energetics" sponsored by the University of Alabama, Birmingham. New Paltz, NY, August 2012.

"Standards of Reporting Dietary Supplements Research Studies." National Institutes of Health Office of Dietary Supplements Research Practicum. Bethesda, MD, June 2012.

"Quality of peer-reviewed published reviews: a case study of sugar-sweetened beverages and health outcomes." Institute of Medicine Food Forum. Washington, DC, September 2011.

"Registration of Epidemiological Studies" Pre-Conference Course on Epidemiological Methods, International Epidemiological Association World Congress of Epidemiology. Edinburgh, Scotland, August 2011.

"Comments on Weight of Evidence" AAAS Conference, Washington DC, February 2011.

"The Professional Responsibilities of Epidemiologists." University of California, Berkeley. March, 2010.

"Causal Inference in Cancer Epidemiology." University of California, Berkeley. March, 2010.

"Uncertainty and Weight of Evidence in Risk Assessment." ICNIRP Workshop: Evaluation and Communication of Scientific Evidence and Uncertainty - Towards a Consistent Terminology in Non-ionizing Radiation. Salzburg, Austria, November, 2009.

"Meta-analysis and causal inference: a case study of benzene and non-Hodgkin's lymphoma." Benzene09, Munich, Germany, September, 2009.

"Biological Mechanism and Causal Inference." Institute of Medicine, Washington DC, June 2009.

"A Method for Individual Causation." University of North Carolina, Chapel Hill, NC, May 2008, the American Association of Law Schools Conference on Evidence, Cleveland, Ohio, June 2008, and at Michigan State University, East Lansing, MI, October, 2009.

"Weight of Evidence and Uncertainty Assessments" DIA/FDA Workshop on Risks and Benefits, Bethesda, MD, November 2009 and ICNIRP/WHO Workshop on Risk Assessment and Terminology, Salzburg, Austria, November 2009.

"Cases and Causes" AstraZeneca Wilmington DE, November 2007, and Amgen Inc. Thousand Oaks, CA, March 2008.

"Why should epidemiology bridge the science/law "cultural chasm"? North American Epidemiology Congress plenary session, Seattle, Washington, June 2006.

"Rethinking Epidemiology" Imperial College (London), Division of Epidemiology, London, England, May 2006.

"Weight of Evidence and General Causation" Science for Judges Program, Brooklyn Law School, Brooklyn, NY, March 2006.

"Weight of Evidence: a Review of Concept and Methods." Society for Risk Analysis, Orlando, Florida, December 2005.

"The Future of Cancer Prevention" Keynote Address. Symposium, San Antonio Cancer Institute, San Antonio, Texas, November 2004; and Special Lecture at the 250th Anniversary of the Meath Hospital, Dublin, Ireland, October 2003.

"The End of Epidemiology" Columbia University, Department of Epidemiology, May 2004, University of New Mexico, May 2005 and 2010, Imperial College (London) Department of Epidemiology and Public Health, December 2005.

"Cancer Prevention in the USA" Xi'an Cancer Hospital, Xi'an, China; CICAMS Cancer Hospital, Beijing, China, October 2004.

"Biologic plausibility and other challenges to the primary prevention of cancer." American College of Preventive Medicine, Washington DC, February 2005.

"The Future of Cancer Epidemiology." Michigan State University Department of Epidemiology, East Lansing, MI, April 2005, and the University of New Mexico, Department of Family and Community Medicine, Albuquerque, NM, May 2005.

**Advisory Positions**

American Health Foundation, 1998-1999.
Australian Cancer Society, 1999.
Health and Environmental Sciences Institute, 2004 – 2005.
International Life Sciences Institute, 2000 – 2003.
World Health Organization, 1999, 2001.
Mead Johnson Nutrition Safety Advisory Panel, 2012 – 2015.
National Science Teachers Association, 2002-2017, 2019-2021.
Brooklyn Law School, 2003, 2006.

**Dissertation and Thesis Committees**

Vrije University, Brussels, Belgium (Guido Goelen, M.D., Ph.D), 1999-2001

**Community Service**

Board Member, Local Homeowner's Association, 2017-2022
Volunteer, Best Friends Utah, 2018-2022

# BIBLIOGRAPHY

## PUBLICATIONS

Weed DL. 2024. Paraquat and Parkinson's Disease: A systematic assessment of recent epidemiologic evidence. Med Res Arch 12:9.

Salerno J, Weed DL, Pandey CM, et al. 2024. Global matters of epidemiology and the ethical challenges of addressing the health of populations. Ann Epidemiol 91:8-11.

Weed DL. 2022. Commentary: On the reliability of causal claims. Global Epidemiol https://doi.org/10.1017/j.gloepi.2022.100087.

Weed DL, Alexander DD. 2022. The erosion of causal inference in systematic reviews in epidemiology. Med Res Arch https://doi.org/10.18103/mra.v10i10.3252.

Weed DL. 2022. Do cell phones cause brain tumor? Another piece of the puzzle. JNCI J Natl Cancer Inst. 114:643-644.

Weed DL. 2021. Does paraquat cause Parkinson's disease? A review of reviews. Neurotoxicology 86:180-184.

Weed DL. 2021. A metaphor for epidemiology: The sea of person time. Global Epidemiol 3:100053.

Weed DL. 2018. Analogy in causal inference: rethinking Austin Bradford Hill's neglected consideration. Ann Epidemiol 28:343-346.

Weed DL. 2018. The need for systematic reviews in oncology. JNCI J Natl Cancer Inst 110:812-814.

Weed DL. 2016. Causal inference in epidemiology: potential outcomes, pluralism, and peer review. Int J Epidemiol 45:1838-1840.

Alexander DD, Miller PE, Vargas AJ, Weed DL. 2016. Meta-analysis of egg consumption and risk of coronary heart disease and stroke. J Am Coll Nutr 35:204-16.

Acquavella J, Garabrant D, Marsh G, Sorahan T, Weed DL. 2016. Glyphosate epidemiology expert panel review evaluating the relationship between glyphosate exposure and non-Hodgkins lymphoma or multiple myeloma. Crit Rev Toxicol 46(Suppl 1):28-43.

Williams G, Aardema M, Acquavella J, Berry C, Brusick D, Burns M, Camargo J, Garabrant D, Greim H, Kier L, Kirkland D, Marsh G, Solomon K, Sorahan T, Roberts A, Weed DL. 2016. A review of the carcinogenic potential of glyphosate by four independent panels and comparison to the IARC assessment. Crit Rev Toxicol 46(Suppl 1):3-20.

Alexander DD, Weed DL. 2016. On the need for improved methodological quality of published reviews. Am J Clin Nutr 103:683-4.

Alexander DD, Weed DL, Miller P, Mohamed M. 2015. Red meat and colorectal cancer: a quantitative update on the state of the epidemiologic science. J Am Coll Nutr 34:521-43.

Alexander DD, Bassett JK, Weed DL, Barrett EC, Watson H, Harris W. 2015. Meta-analysis of long-chain omega-3 polyunsaturated fatty acids (LCω-3PUFA) and prostate cancer. Nutrition and Cancer March 31:1-12 [epub ahead of print].

Althuis MD, Weed DL, Frankenfeld CL. 2014. Evidence-based mapping of design heterogeneity prior to meta-analysis: a systematic review and evidence synthesis. Systematic Reviews 3:80.

Miller PE, Alexander DD, Weed DL. 2014. Uncertainty of results in nutritional epidemiology. Nutrition Today 49:147-5.

Oostindjer M, Alexander J, Amdam GV, Andersen G, Bryan NS, Chen D, Corpet DE, De Smet S, Dragsted LO, Haug A, Karlsson AH, Kleter G, de Kok TM, Kulseng B, Milkowski AL, Martin RJ, Pajari A-M, Paulsen JE, Pickova J, Rudi K, Sødring M, Weed DL, Egelandsdal B. 2014. The role of red and processed meat in colorectal cancer development: a perspective. Meat Science 97:583-96.

Alexander DD, Weed DL, Chang ET, et al. 2013. A systematic review of multivitamin-multimineral use and cardiovascular disease and cancer incidence and total mortality. J Amer Coll Nutr 32:339-54.

Althuis MD, Weed DL. 2013. Evidence mapping: Methodological foundations and application to intervention and observational research on sugar sweetened beverages and health outcomes. Am J Clin Nutr . doi: 10.3945/ajcn.113.058917.

Weed DL. 2013. The quality of nutrition and cancer reviews: a systematic assessment. Crit Rev Food Sci Nutrition 53:276-86.

Alexander DD, Weed DL, Mink PJ, et al. 2012. A weight-of-evidence review of epidemiologic studies of colorectal cancer in pesticide applicators. Int Arch Occup Environ Health 85:715-45.

Weed DL, Althuis MD, Mink PJ. 2011. Quality of reviews on sugar-sweetened beverages and health outcomes. Am J Clin Nutr 94:1340-7.

Alexander DD, Weed DL, Cushing CA, Lowe KA. 2011. Meta-analysis of prospective studies of red meat consumption and colorectal cancer. Eur J Cancer Prevention 20:293-307.

Navia JL, Byers T, Djordjevic D, Hentges E, King J, Klurfeld D, Llewellyn C, Milner J, Skrypec D, Weed DL. 2010. Integrating the totality of food and nutrition evidence for public health decision making and communication. Crit Rev Food Sci Nutrition 50:1-8.

Schreider J, Barrow C, Birchfield N, Dearfield K, Devlin D, Henry S, Kramer M, Schappelle S, Solomon K, Weed DL, Embry MR. 2010. Enhancing the credibility of decisions based on scientific conclusions: transparency is imperative. Tox Sci doi: 10.1093/toxsci/kfq102.

Weed DL. 2010. Meta-analysis and causal inference: a case study of benzene and non-Hodgkin's lymphoma. Ann Epidemiol 20:347-355.

Weed DL. 2009. Conflicts of Interest. J Epidemiol Commun Health 63:601-602.

Weed DL. 2008. Truth, Epidemiology, and General Causation. Brooklyn Law Review 73:651-665.

Griego FY, Bogen KT, Price PS, Weed DL. 2008. Exposure, epidemiology and human cancer incidence of naphthalene. Reg Tox Pharmacol 51:22-6.

Weed DL. 2007. The nature and necessity of scientific judgment. J Law Policy 15:135-164.

Collins JJ, Bukowski JA, Weed DL, Brent RL, Klein P, Boerstoel-Steefland M, Sprafka JM, Williams AL, Holsapple MP. 2007. Evaluating emerging issues in epidemiology. Regul Toxicol Pharmacol 48(3):296-307.

Dores G, Chang S, Berger VW, Perkins S, Hursting SD, and Weed DL. 2006. Evaluating research training outcomes: experience from the Cancer Prevention Fellowship Program at the National Cancer Institute. Acad Med. 81(6):535-541.

Weed DL. 2006. Commentary: Rethinking epidemiology. Int J Epidemiol. 35(3):583-586.

Parascandola M, Weed DL, and Dasgupta A. 2006. The Surgeon General's Reports on Smoking and Cancer: a historical investigation of the practice of causal inference. Emerg Themes Epidemiol. 3:1-11.

Weed DL. 2006. Evidence synthesis and general causation: key methods and an assessment of reliability. Drake Law Review 54:639-650.

Weed DL. 2006. Vision, values, and verisimilitude: a response. Risk Anal. 26:577.

Weed DL. 2005. Hail the heroes who brave front line. The Times Higher Education Supplement (London) No. 1722:14.

Weed DL. 2005. Weight of evidence: a review of concepts and methods. Risk Anal. 25:1545-1557.

Chang, S., Hursting, S., Perkins, S., Dores, G., and Weed, D.L. 2005. Adapting postdoctoral training to interdisciplinary science in the 21st century: the Cancer Prevention Fellowship Program at the National Cancer Institute. Acad Med. 80(3):261-265.

Resnik, D.B., Kopelman, L.M., and Weed, D.L. 2004. What is the role of the precautionary principle in bioethics and the philosophy of medicine? J Med Philos. 29(3):255-258.

McKeown, R.E. and Weed, D.L. 2004. Ethical choices in survey research. Soz Praventivmed. 49:67-68.

Weed, D.L. and Dores, G. 2004. Physicians as citizens (letter). JAMA 291:2076.

Kopelman, L.M., Resnick, D., and Weed, D.L. 2004. What is the role of the precautionary principle in the philosophy of medicine and bioethics? J Med Philos. 29:255-258.

Weed, D.L. 2004. Precaution, prevention, and public health ethics. J Med Philos. 29:313-332.

Weed, D.L. and McKeown, R.E. 2003. Science and social responsibility in public health. Environ Health Perspect. 111:1804-1808.

Weed, D.L. 2003. Methodologic implications of the precautionary principle: causal criteria. Eur J Oncology. 2:103-108.

Weed, D.L. 2003. Causation: an epidemiological perspective. J Law Policy 43:43-53.

Weed, D.L. and McKeown, R.E. 2003. Science, ethics and professional public health practice. J Epidemiol Commun. Health 57:4-5.

McKeown, R.E., Weed, D.L., Kahn, J., and Stoto, M. 2003. American College of Epidemiology Ethics Guidelines: Foundations and Dissemination. Sci Eng. Ethics 9(2):207-214.

Weed, D.L and Mink, P. 2002. Roles and responsibilities of epidemiologists. Ann Epidemiol. 12:67-72.

Weed, D.L. 2002. Environmental epidemiology: basics and proof of cause-effect. Toxicology 181-182:399-403.

McKeown, R.E. and Weed, D.L. 2002. Glossary of ethics in epidemiology and public health: II. Applied terms. J Epidemiol Commun. Health 56:739-741.

Weed, D.L. 2002. Cancer prevention and the All-Ireland NCI Cancer Consortium. Promoting Health-The Journal of Health Promotion for Northern Ireland 18:26-27.

Weed, D.L. 2001. Methods in epidemiology and public health: does practice match theory? J Epidemiol Commun. Health 55:104-110.

Piniewski-Bond, J.F., Buck, G.M., Horowitz, R.S., Schuster, J.H.R., Weed, D.L., and Weiner, J.M. 2001. Comparison of information processing technologies. J Am Med Informatics Assoc. 8:174-184.

Weed, D.L. 2001. A radical future for public health. Int J Epidemiol. 30:440-441.

Merrill, R.M. and Weed, D.L. 2001. Measuring public health burden of cancer through lifetime and age-conditional risk estimates. Ann Epidemiol. 11:547-553.

Burke, W., Coughlin, S.S., Lee, N.C., Weed, D.L., and Khoury, M. 2001. Application of population screening principles to genetic screening for adult-onset conditions. Genet Test. 5:201-211.

Parascandola, M. and Weed, D.L. 2001. Causation in epidemiology. J Epidemiol Commun. Health 55:905-912.

Weed, D.L. and McKeown, R.E. 2001. Glossary of ethics in epidemiology and public health: I. Technical terms. J Epidemiol Commun. Health 55:855-857.

Weed, D.L. 2001. Theory and practice in epidemiology. Ann NY Acad Sci. 954:52-62.

Stoto, M.A., Hermalin, A.I., Li, R., Martin, L., Wallace, R.B., and Weed, D.L. 2001. Advocacy in epidemiology and demography. Ann NY Acad Sci. 954:76-87.

Weed, D.L. 2000. History of Cancer Prevention: Pioneers of progress: Major Greenwood, Austin Bradford Hill, and the development of the randomized clinical trial (1900-1950). PreventionPost 2:2-3.

Weed, D.L. 2000. The rise and fall of the clinical trial paradigm. PreventionPost 2:1:16.

Weed, D.L. 2000. Interpreting epidemiologic evidence: how meta-analysis and causal inference methods are related. Int J Epidemiol. 29:387-390.

Connor, R.J., Boer, R., Prorok, P.C., and Weed, D.L. 2000. An investigation of design and bias issues in case-control studies of cancer screening using microsimulation. Am J Epidemiol. 151:991-998.

Weed, D.L. 2000. Epidemiologic evidence and causal inference. Hematology/Oncology Clin N America 14:797-807.

Weed, D.L. 2000. History of Cancer Prevention: Joseph Cullen: Champion of Cancer Prevention and Control. PreventionPost 2:2:10.

Weed, D.L. 2000. Heroes and champions. PreventionPost 2:2:12.

Weed, D.L. 1999. Towards a philosophy of public health. J Epidemiol Commun. Health 53:99-104.

Potischman, N. and Weed, D.L. 1999. Causal criteria in nutritional epidemiology. Am J Clin. Nutrition 69(Suppl):1309S-1314S.

Weed, D.L. and Coughlin, S.S. 1999. New ethics guidelines for epidemiology: background and rationale. Ann Epidemiol. 9:277-280.

Weed, D.L. 1999. Book review of: *Philosophy in Epidemiology and Public Health*. Epidemiol. Monitor.

Ratnasinghe, D.D., Weed, D.L., and Shankar, S. 1999. Cancer knowledge and misconceptions among Hispanic El Salvadorian men in the Washington DC area. J Immigrant Health 1:207-213.

Weed, D.L. and Hursting, S.D. 1999. The authors reply (letter). Am J Epidemiol. 150:218-219.

Weed, D.L. 1999. History of Cancer Prevention: Cancer prevention in the "Roaring Twenties." PreventionPost 1:6.

Weed, D.L. 1999. The DCP Newsletter team (editorial). PreventionPost 1:12.

Weed, D.L. 1999. Higher standards for epidemiologic studies-replication prior to publication? (letter). JAMA 282:937.

Weed, D.L. 1998. Preventing scientific misconduct. Am J Public Health 88:125-129.

Weed, D.L. 1998. Beyond black box epidemiology. Am J Public Health 88:12-14.

Breslow, R.A. and Weed, D.L. 1998. Review of epidemiologic studies of alcohol and prostate cancer: 1971-1996. Nutrition and Cancer 30:1-13.

Breslow, R.A. and Ross, S.A., and Weed, D.L. 1998. Quality of reviews in epidemiology. Am J Public Health 88:475-477.

Weed, D.L. and Hursting, S.D. 1998. Biologic plausibility in causal inference: current method and practice. Am J Epidemiol 147:415-425.

Cronin, K.A., Weed, D.L., Prorok, P.C., and Connor, R.J. 1998. Case-control studies of screening: theory and practice. J National Cancer Inst. 90:498-504.

Weed, D.L. and McKeown, R.E. 1998. Epidemiology and virtue ethics. Int J Epidemiol. 27:343-348.

McKeown, R.E. and Weed, D.L. 1998. Authors' response to comment on "Epidemiology and virtue ethics." Int J Epidemiol. 27:348-349.

Huerta, E.E. and Weed, D.L. 1998. "Cuidando su Salud" (Spanish language radio in preventive medicine and public health). Cancer (Suppl) 83:1805-1808.

Weed, D.L. 1997. Methodologic guidelines for review papers. J Nat Cancer Inst. 89:6-7.

Weed, D.L. and Kramer, B.S. 1997. Response to Brind et al. (letter). J Nat Cancer Inst. 89:588.

Bulterys, M., Morgenstern, H., and Weed. D.L. 1997. Quantifying the expected versus potential impact of a risk-factor intervention program. Am J Public Health 87:867-868.

Weed, D.L. 1997. Underdetermination and incommensurability in contemporary epidemiology. Kennedy Institute of Ethics J. 7:107-127.

Weed, D.L. 1997. Meta-analysis under the microscope. J Nat Cancer Inst. 89:904-905.

Weed, D.L. 1997. The behavior-biology interface in cancer prevention and control. Prev Med. 26:S37-S41.

Merrill, R.M., Weed, D.L., and Feuer, E.J. 1997. The lifetime risk of developing prostate cancer in white and black men. Cancer Epidemiol Biom Prev, 6:763-768.

Weed, D.L. 1997. On the use of causal criteria. Int J Epidemiol. 26:1137-1141.

Gerlach, K.K., Marino, C., Weed, D.L., and Hoffman-Goetz, L. 1997. Lack of colon cancer coverage in seven women's magazines. Women & Health 26:57-68.

Weed, D.L. 1996. The sea of person time. Int J Epidemiol 25:1-4.

Weed, D.L. 1996. Book Review of: *The Fight for Public Health: Principles and Practice of Media Advocacy*. Prev Med, 25:86.

Weed, D.L. and Gorelic, L.S. 1996. The practice of causal inference in cancer epidemiology. Cancer Epidemiol Biomark Prev. 5:303-311.

Weed, D.L. 1996. Weed Responds to: The future of epidemiology: a humanist response. Am J Pub Health 86:1029-1030.

Weed, D.L. 1996. Book review of: Changing the Odds: Cancer Prevention through Personal Choice and Public Policy. Oncology 10:1432.

Weed, D.L. and Kramer, B.S. 1996. Induced abortion, bias and breast cancer: why epidemiology hasn't reached its limit. J Nat Cancer Inst. 88:1698-1700.

Weed, D.L. 1995. Epidemiology, the humanities, and public health. Am J Pub Health 85:914-918.

Houn, F., Bober, M.A., Huerta, E.A., Hursting, S., Lemon, S., and Weed, D.L. 1995. The association between alcohol and breast cancer: popular press coverage of research. Am J Pub Health 85:1082-1086.

Weed, D.L. 1994. Science, ethics guidelines, and advocacy in epidemiology. Ann Epidemiol. 4:166-171.

Reprinted by permission in: Coughlin SS (ed.). 1995. Ethics in Epidemiology and Clinical Research. Chestnut Hill, MA: ERI. Pp. 267-272.

Weed, D.L. 1994. Book Review of: Apricots and Oncogenes: On Vegetables and Cancer Prevention. Am J Epidemiol. 139:743-744.

Weed, D.L. 1994. Between science and technology: the case of antihistamines and cancer. J Nat Cancer Inst. 86: 740-741.

Coughlin, S.S., Benichou, J. and Weed, D.L. 1994. Attributable risk estimation in case control studies. Epidemiol Rev. 16:51-64.

Weed, D.L. 1994. Alcohol, breast cancer, and causal inference: where ethics meets epidemiology. Contemporary Drug Problems 21:185-204.

Greenwald, P.G., Kramer, B.K., and Weed, D.L. 1993. Expanding horizons in breast and prostate cancer prevention and early detection. J Cancer Education 8:91-107.

Husten, C., Weed, D.L, and Kaluzny, A.R. 1993. Training researchers in cancer prevention and control: a description and evaluation of NCI's Cancer Prevention Fellowship Program. J Cancer Education 8:281-290.

Pommerenke, F. and Weed, D.L. 1991. Physician compliance: Improving skills in preventive medicine practices. Am Fam Physician 43:560-568.

Weed, D.L. 1991. The merger of bioethics and epidemiology. J Clin Epidemiol. 44:15S-22S.

Cairoli, V.J. and Weed, D.L. 1991. NCI Report on the Cancer Education Program. J Cancer Education 6:65-66.

Connor, R.J., Prorok, P.C., and Weed, D.L. 1991. The case-control design and the assessment of the efficacy of cancer screening. J Clin Epidemiol. 44:1215-1221.

Clark, L.C., Patterson, B.H., Weed, D.L., and Turnbull, B.W. 1991. Design issues in cancer chemoprevention trials using micronutrients: application to skin cancer. Cancer Bulletin 43:519-524.

Koopman, J.S. and Weed, D.L. 1990. Epigenesis theory: A mathematical model relating causal concepts of pathogenesis in individuals to disease patterns in populations. Am J Epidemiol. 132:366-390.

Greenwald, P., Cullen, J.W., and Weed, D.L. 1990. Introduction: cancer prevention and control. Semin Oncol. 17:383-390.

Weed, D.L., Greenwald, P., and Cullen, J.W. 1990. The future of cancer prevention and control. Semin Oncol. 17:504-509.

Weed, D.L., Selmon, M., and Sinks, T. 1988. Links between categories of interaction. Am J Epidemiol. 127:17-27.

Weed, D.L. and Trock, B. 1988. Interactions and public health decisions. J Clin Epidemiol. 41:207-209.

Weed, D.L. 1987. The author replies. (Re: "On the logic of causal inference"). Am J Epidemiol. 126:157-158.

Weed, D.L. 1987. Epidemiology's triple crown. J Chronic Dis. 40:905-906.

Weed, D.L. 1987. The author replies. (Re: "On the logic of causal inference"). Am J Epidemiol. 126:557.

Weed, D.L., Tyroler, H.A., and Shy, C.M. 1987. The healthy worker effect in actively-working communications workers. J Occup Med. 29:335-339.

Weed, D.L. 1986. Historical roots of the healthy worker effect. J Occup Med. 28:343-347.

Weed, D.L. 1986. Lament for an epidemiologist. Pharos 49:43.

Weed, D.L. 1986. On the logic of causal inference. Am J Epidemiol. 123:965-979.

Weed, D.L. and Trock, B.J. 1986. Criticism and the growth of epidemiologic knowledge. (Re: "Popperian refutation in epidemiology"). Am J Epidemiol. 123:1119-1120.

Weed, D.L. 1985. An epidemiological application of Popper's method. J Epidemiol Commun. Health 39:277-285.

Weed, D.L. 1983. Ethics and chemoprevention research. Semin Oncol. 10:355-359.

**BOOKS, BOOK CHAPTERS, EDITED JOURNAL ISSUES, DISSERTATION, AND TECHNICAL REPORTS**

Weed, D.L. 2009. Towards a Philosophy of Epidemiology. In: Coughlin, S.S., Beauchamp, T.L., and Weed, D.L. (eds). Ethics and Epidemiology. New York:Oxford University Press.

Rockhill, B. and Weed, D.L. 2006. Increasing the contribution of epidemiology to the primary prevention of cancer. In Schottenfeld, D.A. and Fraumeni, J.F. Jr. (eds). Cancer Epidemiology and Prevention. Pp. 1292-1302.

Weed, D.L. 2004. Ethics and philosophy of public health. In Khushf. G. Handbook of Bioethics: A Philosophical Overview. Pp.525-547.

Weed, D.L. 2002. Philosophical basis for public health. In Breslow, L. et al. (ed). Encyclopedia of Public Health. Farmington Hill, Michigan: Macmillan Reference. Pp. 914-917.

Weed, D.L. 2002/2003. Is the Precautionary Principle a principle? IEEE Technology and Society Magazine 21:45-48.

[No authors listed]. American College of Epidemiology Ethics Guidelines. 2000. Ann Epidemiol 10(8):487-497.

WHO Working Group. 2000. Evaluation and use of epidemiological evidence for environmental health risk assessment: guideline document. World Health Organization, EUR/00/5020369, E68940. See also: Environmental Health Perspectives 108:997-1002, 2000.

Weed, D.L. 1999. Ethics and consent. In Kramer, B.S., Gohagan, J., and Prorok, P.C. (eds). Cancer Screening: Theory and Practice. New York: Marcel Dekker. Pp. 89-140.

Douglas Weed and B.S. Kramer, "Breast cancer studies aren't political," Wall Street Journal, Wednesday, 26 Mar 1997, sec. A19.

Weed, D.L. 1996. Epistemology and ethics in epidemiology. In Coughlin, S.S. and Beauchamp, T.L. Ethics and Epidemiology. New York: Oxford. Pp. 76-94.

Weed, D.L. 1995. Causal and preventive inference. In Greenwald, P., Kramer, B., and Weed, D.L. (eds.). Cancer Prevention and Control. New York: Marcel Dekker. Pp. 285-302.

Weed, D.L. and Coughlin, S.S. 1995. Ethics in cancer prevention and control. In Greenwald, P., Kramer, B., and Weed, D.L. (eds). Cancer Prevention and Control. New York: Marcel Dekker. Pp. 497-507.

Weed, D.L. and Husten, C. 1995. Training in cancer prevention and control. In Greenwald, P., Kramer, B., and Weed, D.L. (eds). Cancer Prevention and Control. New York: Marcel Dekker. Pp. 707-717.

Greenwald, P.G., Kramer, B.K., and Weed, D.L. 1995. Cancer Prevention and Control. New York: Marcel Dekker.

Greenwald, P.G., Cullen, J.W., and Weed, D.L. (eds.). Cancer prevention and Control. Seminars in Oncology 17:1990.

Weed, D.L. 1988. Causal criteria and Popperian refutation. In Rothman, K.J. (ed.). Causal Inference. Chestnut Hill: Epidemiology Resources, Inc. Pp. 15-32.

Weed, D.L. 1988. Criticism and its constraints: A self-appraisal and rejoinder. In Rothman, K.J. (ed.). Causal Inference. Chestnut Hill: Epidemiology Resources, Inc. Pp. 201-207.

Weed, D.L. 1982. An investigation of the healthy worker effect. Ph.D. dissertation, University of North Carolina, Chapel Hill, North Carolina.

**ABSTRACTS**

Weed, D.L. Case-based causality: an application of artificial intelligence to toxicology. 61st Conference of the Society of Toxicology and ToxExpo. San Diego, CA March, 2022.

Alexander, D.D., Riordan, A.S., Rygiel, C.A., Weed, D.L. Secondary acute myeloid leukemia/myelodysplastic syndrome (AML/MDS) following radiotherapy treatment for primary tissue cancer. 61st Conference of the Society of Toxicology and ToxExpo. San Diego, CA March, 2022.

Weed, D.L. Case-based causality: an application of artificial intelligence to environmental carcinogenesis. AACR Special Conference on Environmental Carcinogenesis: Potential Pathway to Prevention. Charlotte, NC, June, 2019.

Weed, D.L. Cancer causation: rethinking the role of analogy. Society of Toxicology. San Antonio, Texas, March, 2018 and Ca Rsch 2017;77(Suppl):5301.

Weed, D.L., Alexander, D.D. A Systematic Review of the Use of the Bradford-Hill Criteria. Society of Toxicology. San Antonio, Texas, March, 2018.

Weed, D.L. Rethinking the role of analogy in causal inference. International Society of Environmental Epidemiology. Rome, Italy, September, 2016.

Kelsh, M.A., Yao, B., Arrindell, D.A., Alexander, D., Acquavella, J., Weed, DL. Evaluation of adverse events of pharmaceutical agents—the impact of effect measure selection on meta-analysis findings. International Society of Pharmacoepidemiology. October, 2014. Taipei, Taiwan.

Weed, D.L., Althuis, M.A. Evaluating Confounding Bias when Designing Meta-analyses of Dietary Risk Factors with Weak Associations: a Systematic Review of Risk Factors for Type 2 Diabetes. International Epidemiology Association World Congress. August, 2014. Anchorage, Alaska.

Weed, D.L. 2012. On the utility of criteria-based methods of causal inference. International Society for Environmental Epidemiology: Conference. August, 2012.

Weed, D.L. 2009. Meta-analysis and causal inference: a case study of benzene and non-Hodgkin's lymphoma. Benzene 2009: Health Effects and Mechanisms of Bone Marrow Toxicity, Implications for t-AML and the Mode of Action Framework. Munich, Germany.

Weed, D.L. 2008. A method for individual causation. Am. J. Epidemiol. 167:S115.

Weed, D.L. 2001. Ethics of precautionary preventive interventions. Am. J. Epidemiol. 153:S7.

Weed, D.L. 2001. Environmental epidemiology: basics and proof of cause-effect. Toxicology 164:29.

Weed, D.L. 2000. Epidemiology, beneficence, and the Precautionary Principle. Am J. Epidemiol. 151: S90.

Marcus, P.M. and Weed, D.L. 1999. Did the chronic disease era of cancer epidemiology start before we think it did? Ann. Epidemiol.

Weed, D.L. 1997. Underdetermination and incommensurability in epidemiology. Am. J. Epidemiol. 145(Suppl):S73.

Weed, D.L. 1993. Bioethical methods in epidemiology. Am. J. Epidemiol. 138:671.

Weed, D.L. 1992. Epidemiology and the humanities: an illustrated example. Am. J. Epidemiol. 136:1006-1007.

Gorelic, L.S., Weed, D.L., Dresser, C., Graubard, B., and Ruiz, E. 1991. Cervical cancer screening practices by Hispanic women. Prev. Med.

Weed, D.L. 1991. Causal inference: A matter of principle. Am. J. Epidemiol. 134:779-780.

Patterson, B.H., Clark, L.C., and Weed, D.L. 1991. Cancer prevention trials using micronutrients: design issues. Cont. Clin. Trials.

Weed, D.L. and Gorelic, L. 1989. Weak associations, bias, and causal inference. Am. J. Epidemiol. 130:819.

Mayer, W.J., Weed, D.L., and Trock, B.J. 1989. Criteria for preventive inference. Am. J. Epidemiol. 130:854.

Chu, K.C. and Weed, D.L. 1989. Validating screening case-control study results with randomized controlled trials for screening. Am. J. Epidemiol. 130:826-827.

Weed, D.L. 1988. Analyzing conflicts of interest in epidemiologic research. Am. J. Epidemiol. 128:943.

Weed, D., Connor, R., and Prorok, P. 1986. Case-control studies of screening: A methodological test. Am. J. Epidemiol. 124:527.

Weed, D. and Trock, B. 1985. Preventive interactions. Am. J. Epidemiol. 122:509-510.

Weed, D. 1985. Causal criteria and Popperian refutation. Am. J. Epidemiol. 122:550.

Trock, B and Weed, D. 1985. Predicting the effects of retinoid chemoprevention. Am. J. Epidemiol. 122:521-522.

Weed, D.L., Selmon, M., and Sinks, T. 1984. Predicting interactions. Am. J. Epidemiol. 120: 464-465.

Weed, D.L. 1983. An epidemiologic application of Popper's method. Am. J. Epidemiol. 118:432.

Weed, D.L. 1982. Age and the healthy worker effect: New findings with old measures. Am. J. Epidemiol. 116:574-575.

**PRESENTATIONS:**

A Mortality Study in Communications Workers. Society for Epidemiologic Research Student Workshop on Methods, Minneapolis, Minnesota, June, 1980.

Age and the healthy worker effect: new findings with old measures. 15th Meeting of the Society for Epidemiologic Research, Cincinnati, Ohio, June, 1982.

Absolute and relative measures of effect. National Cancer Institute, Division of Cancer Prevention and Control, Bethesda, Maryland, November, 1982.

An epidemiologic application of Popper's method. National Cancer Institute, Division of Cancer Prevention and Control, Bethesda, Maryland, May, 1983.

An epidemiologic application of Popper's method. 16th Meeting of the Society for Epidemiologic Research, Winnipeg, Manitoba, Canada, June, 1983.

Ethics and chemoprevention. National Cancer Institute, Division of Cancer Prevention and Control, Bethesda, Maryland, July, 1983.

Epidemiology and the engineer. 36th Annual Conference on Engineering in Medicine and Biology, Columbus, Ohio, September, 1983.

Disease models and inference in epidemiology. National Meeting of the Operations Research Society of America, Orlando, Florida, November, 1983.

Disease models and epidemiologic inference. Department of Preventive Medicine, Cornell University, Ithaca, New York, November, 1983.

Popper and epidemiology. Division of Preventive Medicine, Walter Reed Army Institute of Research, Washington, D.C., April, 1984.

Some issues in predicting interactions. National Cancer Institute, Division of Cancer Prevention and Control, Bethesda, Maryland, May, 1984.

Predicting interactions. 17th Meeting of the Society for Epidemiologic Research, Houston, Texas, June, 1984.

Cancer control epidemiology. Ohio State Comprehensive Cancer Center, Columbus, Ohio, August, 1984.

Modelling disease interactions. 37th Annual Conference on Engineering in Medicine and Biology, Los Angeles, California, September, 1984.

Causal Criteria and Popperian Refutation. 18th Annual Meeting of the Society for Epidemiologic Research, Chapel Hill, North Carolina, June, 1985.

Preventive Interactions. 18th Annual Meeting of the Society for Epidemiologic Research, Chapel Hill, North Carolina, June, 1985.

Case-control studies of screening: A methodologic test. 19th Annual Meeting of the Society for Epidemiologic Research, Pittsburgh, Pennsylvania, June, 1986.

Speaking in Tongues: A Mega-analysis of a debate. National Cancer Institute, Division of Cancer Prevention and Control, Bethesda, Maryland, July, 1987.

The Analysis of Debates and Other Forms of Epidemiologic Reasoning. University of Pennsylvania School of Medicine, Clinical Epidemiology Unit, Philadelphia, Pennsylvania, January, 1988.

The Analysis of Medical Reasoning. Southern Illinois University School of Medicine, Springfield, Illinois, February, 1988.

Interaction. Uniformed Services University of the Health Sciences, Division of Preventive Medicine and Biometrics, Bethesda, Maryland, May, 1988.

Modelling Interactions in Epidemiologic Research. University of Michigan, School of Public Health, Department of Epidemiology, Ann Arbor, Michigan, May, 1988.

Analyzing Conflicts of Interest in Epidemiologic Research. 21st Annual Meeting of the Society for Epidemiologic Research, Vancouver, British Columbia, Canada, June, 1988.

Analyzing Conflicts of Interest. Office of Protection from Research Risks, Office of the Director, NIH, Bethesda, Maryland, July, 1988.

Epidemiology and the Ethics of Prevention. The Johns Hopkins University, School of Hygiene and Public Health, Department of Epidemiology, Baltimore, Maryland, November, 1988.

Ethical Problems in Cancer Prevention. The Johns Hopkins University, School of Hygiene and Public Health, Department of Epidemiology, Baltimore, Maryland, January, 1989 and June, 1989.

The Future of Cancer Prevention and Control. The University of North Carolina, Lineberger Cancer Center, Chapel Hill, North Carolina, March, 1989.

On the Merger of Bioethics and Epidemiology. IEF Conference on Ethics in Epidemiology, Birmingham, Alabama, June, 1989.

Weak Associations, Bias, and Causal Inference. 22nd Annual Meeting of the Society for Epidemiologic (SER), Birmingham, Alabama, June, 1989.

Criteria for Preventive Inference. Centers for Disease Control, Atlanta, Georgia, September, 1989.

Causal Inference. University of Virginia, College of Medicine, Charlottesville, Virginia, October, 1989.

Uniformed Services University of the Health Sciences, Bethesda, Maryland, May, 1991, May, 1992, April 1993, April 1994.

Ethics in Epidemiology. University of Maryland at Baltimore, College of Medicine, Baltimore, Maryland, December, 1989.

Science, Ethics and the Prevention of Cancer. Fox Chase Cancer Center, Philadelphia, Pennsylvania, December 1989.

Ethics and Cancer Prevention. National Cancer Institute, Bethesda, Maryland, December, 1989.

Common Sense in Epidemiology. The Johns Hopkins University, School of Hygiene and Public Health, Department of Epidemiology, Baltimore, Maryland, January, 1990.

Centers for Disease Control, National Institute of Occupational Safety and Health, Robert A. Taft Laboratories, Cincinnati, Ohio, February, 1990.

Yale University School of Medicine, Department of Epidemiology and Public Health, New Haven, Connecticut, April, 1990.

University of Virginia, College of Medicine, Division of Epidemiology and Virology, Charlottesville, Virginia, October, 1990.

University of North Carolina, School of Public Health, Department of Epidemiology, Chapel Hill, North Carolina, November, 1991.

Harvard University, School of Public Health, Department of Epidemiology, Boston, Massachusetts, December, 1991.

Case Studies in Epidemiological Ethics. Yale University School of Medicine, Department of Epidemiology and Public Health, New Haven, Connecticut, April, 1990.

Inferential Issues in the Study of Alcohol and Breast Cancer. AMC Cancer Research Center, Denver, Colorado, December, 1990.

Epidemiology and the Humanities. Society for Health and Human Values, St. Louis, Missouri, October, 1991.

Bringing Ethics into Causal Inference in Epidemiology. University of Virginia, College of Medicine, Division of Epidemiology and Virology, Charlottesville, Virginia, April, 1992.

Training Programs for Cancer Prevention and Control Researchers. NCI Cancer Center Directors' Workshop, Buffalo, New York, June 1992.

Science, Ethics, and Public Policy: The Case of Alcoholic Beverages and Breast Cancer. American College of Epidemiology, Bethesda, Maryland, September 1992.

Cancer Prevention Training in the Preventive Oncology Branch. American Cancer Society Board of Directors Meeting, Atlanta, Georgia, November 1992.

Ethical Issues in Prophylactic Mastectomy. American Society of Preventive Oncology, Tucson, Arizona, March 1993.

Ethical Considerations in Moderate Alcohol Drinking. Addiction Research Foundation International Symposium, Toronto, Ontario, May 1993.

Ethics in Epidemiology. PHS Epidemiology Training Program Seminar, Bethesda, Maryland, August 1993, and Uniformed Services University of the Health Sciences, Basic Epidemiology I, Bethesda, Maryland, November 1993, November 1994, November 1995.

Alcohol and Breast Cancer. University of Hawaii Cancer Center, Honolulu, Hawaii, September 1993.

Public Health Posters from the National Library of Medicine. Society for Health and Human Values, Rosslyn, Virginia, November 1993.

Untangling Decisions in Health Matters: The Case of Cancer Prevention. Baltimore Ethical Society, Baltimore, Maryland, April 1994.

Evidence-based Cancer Prevention: How Do We Know What to Do? Ohio State University Preventive Medicine Alumni Conference, Columbus, Ohio, September 1994.

Preventive Medicine and the Press: A Case Study. Ohio State University Preventive Medicine Alumni Conference, Columbus, Ohio, September 1994.

Causal Inference in Cancer Epidemiology: A Methodologic Review. Department of Epidemiology, Harvard School of Public Health, Boston, Massachusetts, September 1994.

Division of Cancer Prevention and Control, NCI, Bethesda, Maryland, September 1994.

Department of Epidemiology, University of Washington School of Public Health and Community Medicine, Seattle, Washington, September 1995.

Epidemiology, Humanities, and Public Health. Department of Epidemiology and Preventive Medicine, University of Maryland, Baltimore, Maryland, September 1994.

Should Epidemiologists be Advocates? Centers for Disease Control and Prevention Course on Government Employees and Public Policy, Atlanta, Georgia, January 1995.

A New Ethic for Epidemiology? Third Brazilian Congress of Epidemiology, Salvador, Bahia, Brazil, April 1995.

Causality, Data and Inference. George Washington University School of Medicine, Washington D.C., May 1995.

The Future of Epidemiology. Uniformed Services University of the Health Sciences, Bethesda, MD, August 1995, August 1996, August 1997.

Beyond Black Box Epidemiology: Behavior and Biology. American College of Epidemiology Annual Meeting, St. Louis, MO, September 1995.

Causal Conclusions, Public Health Recommendations and Methods of Ethical Reasoning: A Practical Approach. American Public Health Association Annual Meeting, San Diego, CA, October 1995.

Biologic Evidence and Human Cancer Causation. Department of Epidemiology, MD Anderson Cancer Center, Houston, TX, March 1996.

Epidemiology Branch, National Institute for Environmental Health Sciences, Research Triangle Park, NC, July 1996.

American Health Foundation, Valhalla, NY, January 1998. Department of Oncology, McGill University, Montreal, QC, Canada, February 1999.

Preventing Scientific Misconduct. Department of Epidemiology and Biostatistics, Tulane University School of Public Health and Tropical Medicine, New Orleans, LA, March 1996.

Preventive Medicine Residency Program, Centers for Disease Control and Prevention, Atlanta, GA, March 1996.

Department of Chemistry, University of Maryland, College Park, MD, April 1996.

University of Hawai'i at Manoa, Honolulu, HI, August 1996.

Department of Biometrics and Preventive Medicine, Uniformed Services University of the Health Sciences, Bethesda, MD, November 1996 and November 1997.

MD Anderson Cancer Center, Houston, TX, July 1998.

Department of Oncology, Royal Victoria Hospital, McGill University, Montreal, QC, Canada, February 1999.

Office of Research Integrity, U.S. Public Health Service, Rockville, Maryland, September 2000.

Epidemiology and Virtue Ethics. XIVth Congress of the International Epidemiological Association, Nagoya, Japan, August 1996.

Association or Causation: Myths and Legends. NIH Research Festival Workshop, Bethesda, MD, September 1996.

On the Need for Ethics in the Community of University Scholars. University of South Carolina, Columbia, SC, March 1997.

Communicating Cancer Information: an American Perspective. German Cancer Research Center, Heidelberg, Germany, April 1997.

Annual Meeting of the European Association for Cancer Education, Brussels, Belgium, April 1997.

Women's Health and the Media: The Role of the Medical Journal. Healthy Women 2000 Conference, Washington DC, June 1997.

Principles and Practice of Cancer Prevention and Control. NCI Medical Oncology Lecture Series, Bethesda, MD, August 1997.

Ethics and Cancer Screening. Cancer Conference: Integrating Public Health Programs for Cancer Control, Atlanta, GA, September 1997.

NIH Research Festival. Bethesda, MD, October 1997.

University of Puerto Rico, San Juan, Puerto Rico, February 1998.

Pavilion du Chum, University of Montreal, Montreal, QC, Canada, February 1999.

Publishing and Authorship. Cancer Prevention Fellows Data Club Meeting, Bethesda, MD, September 1997.

Towards a Philosophy of Epidemiology. Department of Social and Preventive Medicine, SUNY-Buffalo, Buffalo, NY, September 1997.

Causal Criteria in Nutritional Epidemiology. ILSI Conference on the Role of Epidemiology in making Nutritional Recommendations. Washington, D.C., October 1997.

Philosophical Foundations for the Practice of Epidemiology. III Congress of the Chilean Society of Epidemiology. Vina del Mar, Chile, October 1997.

16th Meeting of the Spanish Society of Epidemiology. Sevilla, Spain, October 1998.

Determining Causality from Epidemiological Studies.

III Congress of the Chilean Society of Epidemiology. Vina del Mar, Chile, October 1997.

Department of Epidemiology and Biostatistics, Boston University School of Public Health, Boston, MA, December 1997.

University of Puerto Rico, San Juan, Puerto Rico February 1998.

Department of Epidemiology and Biostatistics, McGill University, Montreal, QC, Canada, February 1999.

End of the Era of Weak Associations? An Historical Study of Epidemiologic Discovery. NIH Historical Office Symposium on Evidence and Action: How epidemiologists make decisions about science and the public's health. NIH Clinical Center, Bethesda, MD, March 1998.

Department of Epidemiology. School of Public Health. University of North Carolina, Chapel Hill, NC, April 1998.

Center for Clinical Epidemiology and Biostatistics. University of Pennsylvania Medical Center, Philadelphia, PA, May 1998.

MD Anderson Cancer Center. Houston, TX, July 1998.

Department of Epidemiology and Biostatistics, Yale University, New Haven, CT, November 1998.

Department of Epidemiology, University of California, Berkeley, Berkeley, CA, March 1999.

Channing Lab, Harvard University, May 1999.
Department of Health Evaluation Sciences, University of Virginia, Charlottesville, VA, January 2000.

Department of Epidemiology, Michigan State University, East Lansing, MI, February 2000.

Department of Epidemiology, Tulane University School of Public Health and Tropical Medicine, New Orleans, LA, April 2000.

Epidemiology at a Crossroads. Seminar for the Cosmetics, Fragrance, and Toiletries Association. Morristown, NJ, April 1998.

Epidemiologists and Risk: Theory, Method, and Practice. Workshop on Epidemiology and Toxicology. Washington, DC, May 1998.

The Interpretation of Meta-Analyses with reference to Causal Inference and Public Health Decisionmaking. Society for Epidemiologic Research Symposium on the Methods and Applications of Meta-Analysis. Chicago, IL, June 1998.

Roles and Responsibilities of Epidemiologists. Department of Epidemiology, University of North Carolina, Chapel Hill, NC, March 1999.

Causation and Biology. Society for Epidemiologic Research Symposium on the Future of Causes in Epidemiology. Baltimore, MD, June 1999.

Epidemiologic Evidence and the Precautionary Principle. International Society for Environmental Epidemiology. Athens, Greece, September 1999.

Improving Cancer Screening: An American Perspective. Symposium on Cancer Screening. Catholic University of Korea Cancer Center. Seoul, Korea, October 1999.

Causality and Inference in Cancer Epidemiology: We've Got Some Problems.

Ohio State University James Cancer Hospital. Columbus, OH, October 1999.

Department of Food Science and Human Nutrition. Michigan State University, East Lansing, MI, February 2000.

Department of Epidemiology. Tulane University School of Public Health and Tropical Medicine, New Orleans, LA, April 2000.

Our future is not epidemiology.calm. American Public Health Association Special 70th Anniversary for the Epidemiology Section. Chicago, IL, November 1999.

American College of Epidemiology Ethics Guidelines: Foundations and Dissemination. AAAS Conference on Research Integrity, Washington, DC, April 2000.

Teaching Ethics and Public Health: Curriculum Content. ASPH/HRSA Workshop on Ethics and Public Health, Washington, DC, May 2000.

Science, Ethics and the Future of Preventive Oncology. Seminars in Clinical and Molecular Oncology, National Cancer Institute, Bethesda, MD, July 2000.

Precautionary Principle and the Philosophy of Public Health. WHO Workshop on the Precautionary Principle, Rome, Italy, May 2001.

Science, Ethics and the Future of Epidemiology.

International Epidemiological Association Regional Asia Meeting, Kitakyushu, Japan, September 2001.

Kyoto University School of Public Health, Kyoto, Japan, September 2001.

National Cancer Center, Tokyo, Japan, September 2001.

Cancer Prevention in the 21st Century Istituto Superiore di Sanita, Rome, Italy, May 2002.

Roles and Responsibilities of Epidemiologists Istituto Superiore di Sanita, Rome, Italy, May 2002.

Promoting Research Integrity Cleveland Clinic Foundation, Cleveland, Ohio, May 2002.

Scope and Importance of Public Health World Bank/WHO Conference on Public Health Challenges in the Middle East and North Africa, Beirut, Lebanon, June 2002.

The Precautionary Principle and the Philosophy of Public Health International Society of Environmental Epidemiology, Vancouver, BC, August 2002.

**Prior Testimony: Douglas L. Weed, M.D., M.P.H., Ph.D.**
**Past 4 Years**

Deborah Monnahan, William Gray et al., Plaintiffs, vs. Modine Manufacturing Company and Hamilton Sundstrand Corporation, et al. Defendants. In the Circuit Court of Camden County, Missouri Case No.: 18CM-CC00218. Deposition: January 17, 2023, Washington, D.C. Attorney: James Ray, Robinson & Cole, Hartford, CT.

Millard Clark, Plaintiff, versus Dixie Carriers, Inc. et al., Defendants. In the Civil District Court for the Parish of Orleans, State of Louisiana, Docket No.: 2020-03891. Section 12. Deposition: March 17, 2023, Salt Lake City, UT. Attorney: Dan Collarini, Eckart & Tarleton, Metairie, LA.

Judy Cundy, and individual, Plaintiff, vs. BNSF Railway Company, et al., Defendant. In: Superior Court of the State of Washington in and for Spokane County. Case No. 21-2-03718-32. Deposition, September 28, 2023, Salt Lake City, UT. Attorneys: Adam Duerk and Seamus Molly, KnightNiCastro, Billings, MT.

Suzanne Kruse and Christopher Zimms, et al. Plaintiffs, v. Town & Country of Lexington, et al., Defendants. In: Court of Common Pleas, 11th Judicial Circuit, State of South Carolina, County of Lexington, Case No. 18-CP-32-01951. Deposition, May 12-13, 2025, New York City, NY. Attorney: Joseph Ortego, Nixon Peabody, New York City, NY.

Ford Oxaal, et al. Plaintiffs, v. Norlite LLC, et al. Defendants. In: United States District Court, Northern District of New York, New York. November 4, 2025, Wilmington, NC. Attorneys: James Ray and Megan Baroni, Robinson & Cole, Hartford, CT.