# Exhibit 33

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

----------------------------------

| | |
|---|---|
| | ) Case No. 23 C 818 |
| IN RE: HAIR RELAXER MARKETING | ) |
| SALES PRACTICES AND PRODUCTS | ) MDL No. 3060 |
| LIABILITY LITIGATION | ) |
| | ) Judge Mary M. Rowland |

---------------------------------

The VIDEOTAPED DEPOSITION of DOUGLAS WEED, M.D, M.P.H., Ph.D., called for examination pursuant to notice and pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Barbara Perkovich, CSR, Certified Shorthand Reporter, at One South Dearborn Street, 38th Floor, Chicago, Illinois on the 8th day of April, 2026 at 9:30 a.m.

APPEARING FOR PLAINTIFFS:
DOUGLAS & LONDON, PC
BY: MR. GARY DOUGLAS
MS. LARA SAY
MS. REBECCA NEWMAN
MS. SARA CASTRONUOVA
MS. KRISTEN PADDEN (VIA ZOOM)
One State Street
35th Floor New
York, New York 10004
(646) 693-9067
gdouglas@douglasandlondon.com
lsay@douglasandlondon.com
rnewman@douglasandlondon.com
scastronuova@douglasandlondon.com

PARKER WAICHMAN, LLP
BY: MS. LAILA A. RAZZAGHI (VIA ZOOM)
6 Harbor Park Drive
Port Washington, New York 11050
(516) 723-4626
lrazzaghi@yourlawyer.com

APPEARING FOR HOUSE OF CHEATHAM, LLC:
McGUIREWOODS, LLP
BY: MR. BRANDEN P. MOORE (VIA ZOOM)
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, Pennsylvania 15222
(412) 667-7908
bmoore@mcguirewoods.com

APPEARING FOR AVLON:

WIEDNER MCAULIFFE
BY: MS. ANNA MORRISON-RICORDATI (VIA ZOOM)
One North Franklin Street
Suite 1900
Chicago, Illinois 60606
(312) 596-4984
amricordati@wmlaw.com

APPEARANCES (Cont'd):

APPEARING FOR NAMASTÉ LABORATORIES, LLC:

SIDLEY AUSTIN
BY: MR. DANIEL A. SPIRA
MR. MICHAEL LISAK
MS. JULIA STEINER (VIA ZOOM)
One South Dearborn Street
38th Floor
Chicago, Illinois 60603
(312) 853-7000
dspira@sidley.com
mlisak@sidley.com

APPEARING FOR JOHN PAUL MITCHELL SYSTEMS:

CLAUSEN MILLER, PC
BY: MR. MITCHEL TORRENCE (VIA ZOOM)
225 West Randolph Street
Suite 700
Chicago, Illinois 60606
(312) 606-7757
MTorrence@clausen.com

APPEARING FOR RNA CORPORATION:

TABET DIVITO & ROTHSTEIN
BY: MS. MEGAN RYAN (VIA ZOOM)
209 South LaSalle Street
Suite 700
Chicago, Illinois 60604
(312) 762-9459
MRyan@tdrlaw.com

APPEARING FOR AFAM CONCEPTS LAB:

GOLDBERG SEGALLA (VIA ZOOM)
BY: MS. HARDIP PASSANANTI
2600 Michelson Drive
Suite 900
Irvine, California 92612
(949) 271-3399
hpassananti@goldbersegalla.com

APPEARANCES (Cont'd):

APPEARING FOR BEAUTY BELL ENTERPRISES, LLC:
COSTELLO GINEX & WIDEIKIS, PC
BY: MS. SHIPRA MEHTA (VIA ZOOM)
150 North Wacker Drive
Suite 1400
Chicago, Illinois 60606
(312) 850-2651
smehta@cgw-legal.com
and
LITCHFIELD CAVO, LLP
BY: MR. KEVIN TITUS (VIA ZOOM)
303 West Madison Street
Suite 300
Chicago, Illinois 60606
(312) 781-6677
titus@LitchfieldCavo.com

APPEARING FOR MCBRIDE RESEARCH LABORATORIES, INC.:
DINSMORE & SHOHL, LLP
BY: MS. AUDRIANA RODRIGUEZ (VIA ZOOM)
200 South Biscayne Boulevard
Suite 2401
Miami, Florida 33131
(786) 957-1157
Audriana.Rodriguez@dinsmore.com

APPEARING FOR LUSTER PRODUCTS, INC.:
MARON MARVEL BRADLEY ANDERSON & TARDY, LLC
BY: MS. MELISSA FALLAH (VIA ZOOM)
MR. ROBERT PETTI (VIA ZOOM)
191 North Wacker Drive
Suite 2950
Chicago, Illinois 60606
(312) 767-1314
mfallah@maronmarvel.com

APPEARANCES (Cont'd):
APPEARING FOR REVLON CONSUMER PRODUCTS CORPORATION, REVLON GROUP HOLDINGS LLC, REVLON INC., and ROUX LABORATORIES, INC.:
ECKERT SEAMANS CHERIN & MELLOTT, LLC
BY: MS. JUSTINA NZEGWU (VIA ZOOM)
275 Madison Avenue
10th Floor
New York, New York 10016
(646) 513-2347
kdeck@eckertseamans.com
ndannunzio@eckertseamans.com

ALSO PRESENT: Darnell Brown, Videographer
Tejash Patel, Tech

* * *

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DOUGLAS WEED, M.D., M.P.H., Ph.D. | |
| Examination By Mr. Douglas | 9 |
| Examination By Mr. Spira | 253 |
| Further Examination By Mr. Douglas | 261 |
| Further Examination By Mr. Spira | 265 |


E X H I B I T S


| WEED DEPOSITION EXHIBIT | | MARKED FOR ID |
|---|---|---|
| Exhibit No. 1 | Dr. Weed Testimony Excerpts Abilify Case June 16th, 2017 | 32 |
| Exhibit No. 2 | Notice of Deposition | 55 |
| Exhibit No. 3 | Dr. Weed Expert Report | 58 |
| Exhibit No. 4 | Statement of Compensation | 80 |
| Exhibit No. 5 | Dr. Weed Testimony DuPont Case March 27, 2015 | 88 |
| Exhibit No. 6 | American Cancer Society Endometrial Cancer Risk Factors | 93 |
| Exhibit No. 7 | Product Testimony List | 135 |
| Exhibit No. 8 | List of States | 139 |
| Exhibit No. 9 | Website Print Out | 155 |
| Exhibit No. 10 | Doubt is Their Product Book Excerpts | 165 |
| Exhibit No. 11 | Uncovering the Weinberg Group Vanity Fair Article | 171 |
| Exhibit No. 12 | Red Meat and Colorectal Cancer: A Quantitative Update on the State of the Epidemiologic Science | 180 |

| | | |
|---|---|---|
| Exhibit No. 13 | A Systemic Review of Multivitamin Multimineral Use and Cardiovascular Disease and Cancer Incidence and Total Mortality | 184 |
| Exhibit No. 14 | CRN The Science Behind the Supplement | 186 |
| Exhibit No. 15 | A weight-of-evidence review of colorectal cancer in pesticide applicators; the agricultural health study and other epidemiologic studies | 188 |
| Exhibit No. 16 | A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment | 192 |
| Exhibit No. 17 | Exposure, epidemiology and human cancer incidence of naphthalene | 212 |
| Exhibit No. 18 | Glyphosate epidemiology expert panel review; a weight of evidence systematic review of the relationship between glyphosate exposure and non-Hodgkin's lymphoma or multiple myeloma | 217 |
| Exhibit No. 19 | Meta-analysis of Egg Consumption and Risk of Coronary Heart Disease and Stroke | 223 |
| Exhibit No. 20 | Meta-Analysis of Long-Chain Omega-3 Polyunsaturated Fatty Acids and Prostate Cancer | 227 |

| | | |
|---|---|---|
| Exhibit No. 21 | Does paraquat cause Parkinson's disease? A review of reviews - Neurotoxicology | 230 |
| Exhibit No. 22 | Paraquat and Parkinson's Disease: A Systematic Assessment of Recent Epidemiologic Evidence | 235 |
| Exhibit No. 23 | Revealed: The secret push to bury a weedkiller's link to Parkinson's disease | 243 |
| Exhibit No. 24 | Meta-analysis of prospective studies of red meat consumption and colorectal cancer | 246 |
| Exhibit No. 25 | Industry Sponsorship bias | 250 |

THE VIDEOGRAPHER: Good morning. We are now on the record. My name is Darnell Brown, I'm the videographer with Golkow. Today's date is April 8th, 2026, and the time is now 9:35 a.m.

This video deposition is being held in Chicago, Illinois, in the matter of Hair Relaxer Marketing Sales Practices and Products Liability Litigation for the United States District Court for the Northern District of Illinois.

The deponent is Dr. Douglas Weed. Counsel will be noted on the stenographic record. The court reporter is Barbara Perkovich, who will now swear in the witness.

(Witness sworn.)

DOUGLAS L. WEED, M.D., M.P.H., Ph.D., having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DOUGLAS:

Q. Good morning, Dr. Weed. How are you today?

A. I'm excellent.

Q. Very good.

Dr. Weed, I'd go over all the boring ground rules for this deposition with you, but I know you've been through this process before, so I think we can skip most of them.

In fact, I think I went over them personally with you, back -- way back, about a decade ago in the C8 litigation.

But if you have any questions during this process, please do not hesitate to interrupt me, ask me to explain a question, repeat something. Sound fair?

A. Sounds good.

Q. Now, I -- I know a bit about your background, but I would like Judge Rowland, our judge in this case, to get to know a little bit about what you do for a living now.

And is it fair to say that the main thing that you do and the main source of your income, since 2008, is your consultancy company, DLW; is that right?

A. Well, it's actually called DLW Consulting --

Q. Yes.

A. -- Services, LLC, which is important because if you just call it DLW you get something else.
Q. Yeah, I noticed that when I Googled it.
A. In fact, if you get DLW Consulting you get something else, which is why I had to add the services part.
Q. So DLW Consulting Services is -- has been the main source of your income since approximately 2008. Is that fair to say?
A. That is correct.
Q. Okay. And the main thing you do -- and the main thing -- let me rephrase that.
And most of that consulting work is litigation-related matters; is that fair to say?
A. These days?
Q. I would say -- let's take it over the last 18 years, since you started the company.
Would you say that most of the work that your consultancy company has done is litigation related?
A. Well, it has changed over time. I would have to say early on I spent a fair amount of time in nonlitigation consulting, and

litigation.

Q. Okay.

A. And now, and in the past several years -- I'm not sure exactly when because I'm kind of slowing down --

Q. Good for you.

A. -- it's all -- it's been litigation.

Q. Okay. And we can -- you know, we could go back to some of the transcripts and, in fact, the transcript of the C8 deposition that I took of you, but would it be fair to say that as of the mid-2000s -- as of around 2014 or '15, about 90 percent of the work that your consultancy did was litigation related?

A. I don't know if about 90 is true. I know it's been the primary source since '14, for sure.

Q. Okay. Well, we'll get into it a little deeper. In case you don't remember what you previously testified to, I have the transcripts and we can get to that in a bit.

But do you have any reason, as you sit here today, as you sit here right now, to dispute that you've testified in the past that your

consultancy did about 90 percent litigation-related work in the past?
A. Well, yeah. I would say that's exactly where we are right now.
Q. Okay. And that's exactly where you were when I took your deposition in 2015 -- was it 2015 -- in 2015, right?
A. Well, that's what -- that's what you say. I would obviously -- we would have to look at it to be sure that you're --
Q. Oh, we will.
A. That's fine.
Q. Okay. And -- and so you -- how many times have you testified at a deposition like this, a litigation-related matter?
A. I don't know the exact number, but I believe it's somewhere around 40.
Q. Okay.
A. For -- I'm sorry. For deposition?
Q. For deposition, yeah.
A. Yeah, I would say it's somewhere between 35 and 40, somewhere, I think.
Q. Okay. And how many times would you say you've testified at a trial, you know, where there

is a jury seated and listening to your testimony and weighing your opinions?
A. I believe it's five or six.
Q. When was the last time?
A. Gosh. It's been a while, so I don't really remember. It may have been a couple trials I did here in Chicago, but I don't actually remember.
Q. You're not from Chicago, are you?
A. Oh, no.
Q. You are from Salt Lake City. Am I right?
A. No.
Q. No.
Where are you from?
A. I was born in Columbus, Ohio.
Q. That's right.
And where do you currently reside?
A. Wilmington, North Carolina.
Q. Okay. Okay. Well, we'll straighten that all out at the end.
And -- and so I asked you about how many depositions, I asked about how many trials.
How many litigation-related reports,

like the kind of report you generated for this case, would you estimate you've generated over the last 18 years?

A. I don't know the answer to that. It's obviously more than 40 because I generate reports that then don't end up being used or the case stops or whatever. So I don't really know the answer to your question, but for me to be able to say it's greater than 40.

Q. Okay. And you have also testified in what we call a Daubert hearing?

A. Several Daubert or Daubert-like hearings. There are Frye hearings, as well.

Q. Okay. And do you know what the difference is between a Daubert hearing and a Frye hearing?

A. A little bit.

Q. You have no formal legal training; is that correct?

A. I have no formal legal training.

Q. Your -- your interaction and understanding of the legal process comes from your experience working on -- and I think this is how you phrased it in your report -- scores of legal

cases over the years?
A. Well, that's --
MR. SPIRA: Objection.
THE WITNESS: I'm sorry.
That's not quite true. It's more than that.
So when I was at the National Cancer Institute, I spent a year spending time at the Federal Judicial Center in Washington, DC, which is the -- as you probably know -- the Supreme Court's research and education facility. It's down near Union Station.
And I spent some time there because I thought it was likely I would be moving into this world of litigation.
BY MR. DOUGLAS:
Q. What made you think you were likely move into this -- well, let me stop there.
So you're in -- are you currently in this world of litigation --
A. Well --
MR. SPIRA: Objection.

BY MR. DOUGLAS:
Q. -- to use your phrase?
A. I do this part -- as part of my consulting, whatever you want to call it. Call it the world, you can call it different cultures than the scientific culture.
I spent some time working with attorneys and talking to attorneys.
Q. And -- and so you went to -- you spent this year at the Federal Judicial Center in Washington, DC, because, if I understand correctly, you anticipated going into this world of litigation.
Were there any other purposes for -- for spending that one year?
A. Well, I mean I just wanted to get my head around a little bit some of the language so I could understand. That is primarily why I was doing it.
Q. Did you receive a certificate, a diploma, or a degree at -- at the end of your one year?
A. I had some sort of a title, but I don't remember what it was. I didn't get a certificate.

They -- they gave me some sort of a title when I was there.

Q. What did you do while you were there?

A. Basically just thought about, read things about the Daubert decision, Frye decision. Talked with some of the folks that worked there.

Q. And so you fancy yourself an expert in the area of litigation and legal-related matters?

A. I wouldn't say that. I'd say I'm a scientist that wanted to know a little bit more about some of the issues I was likely to face when I was in litigation.

Q. Okay. So you went into your consultancy business -- withdrawn.

So I am just trying to wrap my head around why -- why a scientist would want to learn about legal standards and legal terminology.

And if I understand you correctly, it's because you knew that you intended to do litigation-related work; is that right?

A. Well, if -- if you would like me to tell you the longer story, I'm happy to do that --

Q. No, I wouldn't.

A. -- of why I was there.

Q. I just want to ask a simple question.
A. Okay. So ask me again, please. Or repeat it, whatever.
Q. If I understand you correctly, you spent that one year at the Federal Judicial Center because you intended to go into the litigation world and you wanted to familiarize yourself with some of the legal standards and terminology, right?
A. Yeah, I had -- I had thought that that would be a likely thing to happen. I wasn't -- I hadn't done it yet, so I wasn't sure that that's what was actually going to happen. But I had been introduced to these ideas before.
And so I'm a sort of student of things, so I wanted to learn more about it.
Q. Okay. But you -- you -- you had preplanned to do litigation work before you left the NCI?
A. Well, not quite. I had -- I had said to myself, I would like to -- to move on in my career. Consulting was the opportunity I thought was probably best for me and that would be potentially involved in litigation.

I hadn't actually get [sic] involved, so I wasn't sure that this would actually be something that I would do, or --
Q. Okay.
A. So I wanted to learn a little more about it.
Q. Understandable.
So you are the one that sought out work in the litigation field, as opposed to, say, you were just a scientist doing your work and folks reached out to you because you were an expert in epidemiology?
MR. SPIRA: Objection.
BY MR. DOUGLAS:
Q. You -- you sought out litigation work; is that right?
MR. SPIRA: Objection, mischaracterizes.
THE WITNESS: No, that's not what I said.
BY MR. DOUGLAS:
Q. Then why did you go to the Federal Judicial Center for a year?
A. Excellent. Let me tell you that story.

So the year is 2000, and I'm at the Memorial Sloan Kettering Cancer Center giving a talk to --

Q. You said 2000?

A. Around 2000.

Q. Twenty-six years ago?

A. Yes.

And I was giving a talk about some aspect of causation that I happened to be working on at the time, which was sort of typical for me to do. I had given talks at a lot of cancer centers around the country, universities.

Q. Right.

A. And there happened to be in the audience a law professor, Margaret Berger of the Brooklyn Law School.

She came up to me after my talk and said, "Would you be interested in coming to the Brooklyn Law School and give this talk or talks like this to some judges?"

She says, "I have a program funded by the National Academy of Sciences, called Science for Judges."

And this -- and I said, "Sure." And so

I was invited to give a talk. I was not the only person there from a scientific discipline, there were lots of different disciplines represented, and there was an audience full of state and federal judges --

Q. Right.

A. -- who were, as I understood it, about three or four years past the Daubert decision and were trying to get their own handle on some scientific issues because they, as you know, were going to be considered gatekeepers in some decisions.

Q. What is a "gatekeeper"?

A. They were going to have to be able to make decisions about the -- I would -- in my language, I would say reliability and validity of the scientific methodology from an expert.

Q. Do you understand what the term gatekeeper means in the legal community?

A. I understand as I just discussed it.

Anyway, so I was invited back to do that. I know I was there a couple times.

And then in 2006, I believe, I was invited again by Margaret Berger to cochair a -- I

believe it was the National Academy of Sciences Committee on the 10th anniversary of the Daubert decision. And so there were a bunch of discussions about that and it was -- you know, it was sort of an exchange between scientists and -- and lawyers and legal scholars about sort of the way these two cultures were moving together after the Daubert decision.

So that's how I got interested in the subject.

Q. Okay. And so when you lectured that audience of judges, state and federal judges, back in 2000, 26 years ago, did you discuss Daubert?

A. No.

Q. Did you discuss Frye?

A. No.

Q. Did you discuss any legal concepts?

A. No. It was just purely for me to describe to them the processes of making the methodology -- the scientific methodology for causation claims, and that's --

Q. Okay. From a purely scientific perspective?

A. That's -- that's exactly correct.

Q. So you don't intend to opine in this case, or lecture our judge in this case, about the legal standard for general causation, correct?

A. Oh, I -- I have -- my primary focus here is on the science.

Q. Okay. But I would like an answer to the question: Do you intend to lecture our judge, in this case Judge Rowland, about the legal standards for general causation?

MR. SPIRA: Objection, asked and answered.

BY MR. DOUGLAS:

Q. Yes or no.

A. If the judge asks me a question about legal standards, I will say -- if I don't have any knowledge of it and they ask me about it, I will do my best. But I'm not a legal scholar.

Q. Okay.

A. I'm not an attorney and so -- but I understand the process having thought about it and been involved in this culture -- the two cultures for 18 years.

Q. Okay. And by two cultures, you mean the legal culture and the scientific culture?

A. Yes.
Q. Okay. So you have not been purely -- solely involved in just the scientific culture for the last 18 years, it's a combination of both legal and scientific?
MR. SPIRA: Object to form.
THE WITNESS: Well, let's be clear about this because --
BY MR. DOUGLAS:
Q. Please?
A. I am scientist and I've spent some time with attorneys and in courtrooms. So my focus is on the science.
Q. Okay. But you just said -- testified that you had been involved in the legal culture, as well as the scientific culture.
A. That's exactly what I just said.
Q. Yeah.
A. I said I've been involved. I'm here, this is the legal culture.
Q. Right.
A. A deposition is the legal culture, so I'm --
Q. And it --

A. -- I'm here.
Q. And it's something that you sought out after you were contacted by that professor at Brooklyn?
A. No, that --
MR. SPIRA: Objection.
THE WITNESS: That is not --
BY MR. DOUGLAS:
Q. I'll withdraw the question.
You intended to -- to do litigation-related work after you left NCI.
That was your intention, part of why you created your consultancy, right?
A. No, that's -- that's -- you're -- you're missing some things.
No, so that's --
Q. I'm not missing anything.
MR. SPIRA: Well, let him -- let him finish -- let him finish his answer.
THE WITNESS: Please.
BY MR. DOUGLAS:
Q. I think you are not explaining yourself well.
MR. SPIRA: Let him finish his answer.

THE WITNESS: Well, then let me explain it.

BY MR. DOUGLAS:

Q. Just answer the question.

A. I am going to answer the question.

Q. And the question is: You intended to go into litigation work when you established your consultancy.

It was one of the purposes you created that consultancy; isn't that true?

A. When -- by the time I started the company, but I had a year in a consulting business prior to that. And so in that year, I learned about how to run a consultancy, the business side of consultancy, and the various aspects of what a consultant could do with my sort of background, one of which was litigation.

So when it came time for me to set up my own company, then litigation was going to be one of the foci of the business.

Q. Okay. And when you say that you were -- having spent a year in a consulting business prior to your own, you are talking about the Weinberg Group?

A. That is correct.
Q. So was that the time they were under Congressional investigation?
A. There was a Congressional investigation that I had nothing to do with that had --
Q. I didn't ask you whether you had anything to do with it. I asked you whether you were there at the time that the --
MR. SPIRA: Counsel, let him --
BY MR. DOUGLAS:
Q. -- Congressional investigation --
MR. SPIRA: -- you have to let him finish his answer before you ask your next question.
THE WITNESS: Okay. Let me finish my answer.
BY MR. DOUGLAS:
Q. But please answer my question.
A. Okay.
Q. Go ahead.
A. I don't know the answer to your question because I didn't have any part of it. I knew there was a discussion about it, that there had been a discussion about it. I don't know the

dates, I don't know if that's what was going on at the time or not.

It wasn't part of what I ever was involved in or knew very much about, other than this sort of coffee room discussions I heard people talking about it. So I don't know what was going on with that.

Q. But you heard people talking about it around the water cooler?

A. Or whatever. I remember hearing something about it, but I don't really know any of the details.

Q. And you weren't curious to know why the United States Congress would be investigating the company that's signing your paycheck?

A. Well, I didn't know anything about it, and I really didn't -- I -- I wasn't really interested in it so much as I was interested in learning the consulting business, and I had a mentor there who was helping me.

And like I said, I don't know if the investigation was going on at the time or not.

Q. Okay. So -- well, again, I'm going to go through some depositions with you, but do you

have any reason to dispute that you previously testified in the Abilify litigation that you were there and you were aware while you were there that there was a Congressional investigation going on?

A. I don't know if I said "going on." Maybe I did. I know there was a Congressional investigation. I know it was being talked about. I haven't thought about this for 25 years. I can't remember at this point whether it was actually happening at the time or not.

Q. And do you know what Weinberg was being investigated for?

A. I don't recall.

Q. Well, we're going to get into that a little bit later. But that's where you learned to be -- the Weinberg Group is -- is -- is the organization where you learned to be a good consultant --

MR. SPIRA: Object to form.

BY MR. DOUGLAS:

Q. -- is that fair to say?

A. No, I wouldn't say that. I would say I learned in the Weinberg Group some of the things that you need to think about when you're setting

up a consulting business, how the business operates.

As far as being a good consultant, a good consultant in a scientific sense was doing exactly what I had been thinking about for the 25 or 27 years prior to that, meaning the causation problem. And that's -- from my consideration as being a good consultant, it was being a good scientific consultant.

Q. So it is where you learned to be a good consultant, Weinberg?

A. No.

MR. SPIRA: Object to the form, mischaracterizes testimony.

THE WITNESS: No, no. I said -- and we can read it back because I'm going to say the same thing.

A good consultant as a good scientific epidemiologic consultant is someone who applies the methodologies appropriately, and that's what -- that's what a good consultant does.

What I learned was something about the business aspect of it.

BY MR. DOUGLAS:
Q. Okay. And I appreciate you making that distinction now in 2026, but let me show you what you said in 2017 in the -- I think this is the Abilify.
MR. DOUGLAS: Let's pull up DL 16, please.
(Discussion off the record.)
(Weed Deposition Exhibit No. 1 was marked for identification.)
BY MR. DOUGLAS:
Q. And I have some excerpts from the deposition that you gave in the Abilify case on June 16th, 2017. And if you turn to what is Page 53.
MR. SPIRA: And I'll just object to this exhibit, to the extent this is -- appears to be select pages pulled out of a larger document.
MR. DOUGLAS: Yeah. Well, we can provide you the full transcript.
And if we could highlight from question -- Line 13 through Line 20.
BY MR. DOUGLAS:

Q. And my question is going to be really simple. First let me read to you -- the section I'm going to question you about. Question -- this is a question to you, Dr. Weed.

"So what were the starting and ending dates of your time at Weinberg?

"ANSWER: Pretty close to April the 1st, 2007, to April the 1st, 2008.

"QUESTION: And why did you leave?

"ANSWER: I had learned enough about how to be a good consultant."

Did you give those answers to those questions back in 2017, yes or no? It's a yes-or-no question.

A. I know you'd like me to give you the answers -- you ask the questions, and then I'll give you an answer.

Q. Just no -- no soapbox, no speeches. Just answer my question.

MR. SPIRA: Counsel, he has to be able to answer the question the way he needs --

MR. DOUGLAS: Well, he -- he --

THE WITNESS: I can answer the question, and I'll be happy to answer the

question.
BY MR. DOUGLAS:
Q. But you can't give speeches. It's a very simple question, and if we're going to have trouble with a question as simple as, Did you give those answers to those questions, then we're going to have a lot of trouble today.
MR. SPIRA: Counsel, he hasn't even started to answer the question.
BY MR. DOUGLAS:
Q. So -- so -- so let's -- so let's repeat -- I'm going to repeat the question: Did you give those answers to those questions in 2017, yes or no? And if you can't answer it with a yes or no, please tell me.
A. Well, the way you asked that question ignores what it means -- what the definition of a good consultant is. And so -- which I just clarified for you that there's two aspects to it, which is the business side and the scientific side.
And so I interpreted this to mean that this was when I was talking about how to be a consultant, a good business oriented consultant

that understands the business.
Q. Okay. So could you now answer the question: Did you give those answers to those questions in 2017?
A. I just answered your question, sir.
Q. No, you didn't. I heard your spin, your soapbox speech, because you're obviously -- you're keen to the fact that we know what Weinberg Group is, and we're going to get into that, and you wanted to give the impression that you were just being a good scientist and avoid the appearance that you were learning how to be, you know, a shill for industry.
So my question is simply whether you gave those answers to the questions.
MR. SPIRA: I will object to the entire lead-up to the actual question.
MR. DOUGLAS: That's fine. That's never going to be read to a jury anyway. Just the question and answer.
THE WITNESS: So --
BY MR. DOUGLAS:
Q. I mean --
A. No, it's fine. I mean --

Q. -- did you give those answers to those questions?

A. I gave -- I said -- these are the answers that appear on this deposition that I said at that time, with all the caveats that I just mentioned.

Q. Well, you didn't give the caveats at the time of the deposition, so...

A. So they still apply.

Q. I didn't ask whether they apply.

A. Well, I did.

Q. I'm asking you whether or not you gave those answers to those questions.

A. Just --

Q. And I think we agree that you did, right?

MR. SPIRA: Objection, asked and answered.

THE WITNESS: I've asked -- I've answered your question. Let's just move on.

BY MR. DOUGLAS:

Q. It's my deposition. We'll move on when I'm ready.

A. That's fine.

Q. Okay.
A. It's my deposition too. I'll answer it the way I'll answer it.
Q. You seem -- you seem way too comfortable sitting there at a deposition. You've done this many times before, right?
MR. SPIRA: Object --
THE WITNESS: I'm sorry?
MR. SPIRA: Object to the characterization.
THE WITNESS: Because I don't -- I don't -- what question did you just ask me? Can you repeat that question, please, because you asked that question. You said "right" --
BY MR. DOUGLAS:
Q. You're not the judge.
A. No, no.
Q. I withdraw the question. That's how the process works.
A. That's different. Okay. That's fine.
Q. Okay. It's okay with you?
A. To withdraw it, that's fine, sure.
Q. Okay. And so I'm clear, you had, at the time, no idea why Weinberg was being

investigated by Congress?
A. I don't recall the details.
Q. Okay. They were Congressional hearings, some of which were televised, and you're telling us you had no idea what it was about?
A. That's correct.
Q. And I do understand you have been involved, since 2008 in scores of cases like this, right?
MR. SPIRA: Object to form. Asked and answered.
THE WITNESS: Well, we did go over that. I have been involved in a number of litigation cases, yeah.
BY MR. DOUGLAS:
Q. Okay. And you've characterized it as scores of cases.
A. Scores would be fair.
Q. Okay. And most of that work -- we've been talking about the depositions, the reports, the trial testimony, the Daubert hearings that you've been involved in over the last 18 years.
Most if not all of that work has been for defendants in a litigation like you are doing

now in this case, right?
A. Most.
Q. Okay. Would you say it's been about -- have you previously testified that it's about 90 percent?
A. Yes.
Q. When you decided to get into the -- the legal world, do you remember the very first case that you had -- that you worked on as a -- as a consultant in litigation?
A. I'm not sure if it was the first. I remember one of -- one of the early ones.
Q. Which one was that?
A. It was peanut butter litigation.
Q. And who were you hired by?
A. I don't know the company involved. I remember the law firm was out of Richmond, Virginia. And there was a gentleman there, an attorney by the name of McMenamin, Joe McMenamin, and that is what I remember about the origins of it.
Q. And you were -- you were working for the -- the manufacturer of peanut butter or the company that sold peanut butter?

A. I believe it was -- it had to do with at least -- it had to do with a facility that was making peanut butter. I remember that part.
Q. Okay. They were the defendant in that -- in that case?
A. That is correct.
Q. And had you ever published -- were there some claims about peanut butter causing human health effects?
A. Yes.
Q. And you testified that the evidence was that the scientific evidence was insufficient to establish -- or your opinion in that case was that the evidence was insufficient to establish the causation between peanut butter consumption and human health effects; would that be fair to say?
A. No, I'm not sure that -- I'm not sure that was correct about it. I'd have to go back and look because this was an infectious disease case.
Q. Okay.
A. So it's a very different -- I don't exactly remember very much about it.

Q. Okay. But whatever the infectious disease that was alleged, was it your ultimate conclusion in that case that the scientific literature was insufficient to establish general causation?
A. No.
Q. You established --
A. Yes.
Q. -- you opined that it caused it?
A. Yeah. I mean, it was -- it was an infectious agent that causes an infectious disease --
Q. Did you --
A. -- so causation was established.
Q. Did you -- did you -- did you -- okay. Did you testify to that? Did you do a deposition?
A. Maybe, I don't remember.
Q. Did you issue a report?
A. Yes.
Q. Okay. And over the years, how many different defense lawyers -- since you said that most of your litigation work is for the defense side. How many different lawyers, like counsel that is sitting to your right right now, have you

worked with over the last 18 years?

A. I have no way to estimate that. I don't know the answer to that.

Q. Well, let's see if we can ballpark it. Is it -- is it more than five?

A. Well, look, we already talked about the fact that I wrote 40 reports -- I'm sorry, that's incorrect. I was deposed around 40 times.

Q. I know it's hard to keep track, but go ahead. Are you done with your answer?

A. No.

MR. SPIRA: Object to the --

THE WITNESS: No, I'm just -- I'm just surprised that you would say that. It seemed kind of quite rude quite frankly, but nevertheless let me keep -- let me -- let me finish my answer.

BY MR. DOUGLAS:

Q. Well, no. You seem confused. I want to make sure you're not confused.

A. I'm not confused. I'm trying to help you with an --

Q. I don't need help. Just answer the question.

MR. SPIRA: He's trying to answer your question, Counsel.
THE WITNESS: I'm trying to answer the question.
BY MR. DOUGLAS:
Q. But saying I need help is not answering the question.
A. But by interrupting it just --
Q. Answer the question.
A. So -- and I've been retained by many different lawyers from different firms. I don't keep track of the numbers.
Q. Okay.
A. So I think the number is -- could be 40, it could be more than 40, because it's often the case, like here, where there's more than one individual involved. So I don't know the answer to your question.
Q. Okay. But it could be more than 40?
A. I think it's likely to be more than 40.
Q. Yeah, okay. And you mentioned peanut butter. But you've also been involved in working on the defense side for other manufacturers of other products. Fair to say?

A. Yes.
Q. Products in the chemical industry, right?
A. Yes.
Q. Like, for example, when we previously met, PFOA and DuPont, right?
A. That's correct.
Q. Okay. Do you still do any of that C8 work or PFOA work?
A. I have done some since then, but I am not currently doing work on it right now.
Q. Okay. When was the last time you did work on it?
A. It's been a few years. I don't -- I can't tell you.
Q. You've worked on -- you've worked -- done work for the pharmaceutical industry in litigation-related matters?
A. I have, yes.
Q. How many different compounds or pharmaceutical products would you estimate you've been -- you've worked on in litigation?
A. Not many. I don't know the number, but I guess -- my guess, it would be less than 10.

Q. Okay. And you've done work on behalf of the meat and dairy industries in litigation-related matters?
A. No, not in litigation matters.
Q. You've published.
A. That's different. I have done some work, consulting -- non-litigation consulting work for the dairy industry and the meat industry, yes.
Q. And you've published -- and I'm going to go through some of your publications a little later, but just for now, you have published on like red meat and its potential association with certain human health outcomes?
A. Yes.
Q. And some of that work was funded by the meat industry?
A. Yes.
Q. So let me -- let me sort of tie this all together before we move on to something else.
Is it fair to say that in the last 18 years of your professional life, since you left public service, your consultancy business has been the primary source of your income, and about 80 to 90 percent of that consultancy work is litigation

related?
A. It -- it has changed over time.
Q. Yeah.
A. At the present time that's where you -- you would say it is.
Q. And it -- it has been over the years as well, hasn't it?
A. There have been times when I had -- that's true over time, various years, yes.
Q. Okay. And -- and in doing this work, litigation-related work, mostly for defendants in lawsuits, you have earned multimillions in dollars; fair to say?
A. Yes.
Q. How many millions would you say?
A. Well, I think somebody asked me that before, I had some sort of an estimate. I've done it for about 18 years. I don't have a precise answer for you. But I know it's less than 18.
Q. Okay. But there are many times where you've made over a million in any -- in one particular year?
A. I wouldn't say many times. I would say it has happened.

Q. Okay. And what was your salary as of the date you left NCI?
A. If I remember correctly, it was $180,000 a year.
Q. Not including benefits?
A. That's correct.
Q. Okay. So that's quite a life-changing difference in what you made working at NCI, and I understand you did good work while you were there, to the income you earned once you started your consultancy?
A. Well, that's not quite true, because the first year when I worked for the consulting business, the Weinberg Group I made $280,000 a year.
Q. Leaving that first year aside where you learned how to be a consultant, you went from $180,000 a year to earning millions of dollars a year at your consultancy; is that fair to say?
MR. SPIRA: Object to form.
THE WITNESS: No, I made increasingly -- I made more money as a consultant than I did at the NCI and as we talked about --

BY MR. DOUGLAS:
Q. But --
A. As we talked about, occasionally, very occasionally I made more than a million dollars a year and there were many years I didn't.
Q. And most of that was from defense firms, right?
MR. SPIRA: Object to form, asked and answered.
THE WITNESS: I would say yes.
BY MR. DOUGLAS:
Q. Doctor, we -- forgive me for asking, but how old are you now?
A. I am 73.
Q. Okay. Well, you look great for your age.
A. Well, I appreciate that.
Q. And -- but are you feeling okay to keep going right now? All good?
A. Oh, yeah. Well, the last one -- I do apologize for the last deposition, I was really sick.
Q. Oh, yeah.
A. I was really sick. It took me 10 days

to get over that. So I had never -- I have to say, I have never canceled a deposition in my entire career until that time.

Q. Okay. But you are fully recovered?

A. I'm doing fine today, thank you.

Q. Okay. That is why I'm asking and I hope you are feeling well. And I'm glad to see that you feel great.

Now, we are in Chicago right now so -- and I -- and I asked you before, were -- and you indicated you are from Columbus, Ohio, right?

A. That's where I was born.

Q. Okay. And then when you started your consultancy, where did you live?

A. When I started the business, we lived in Kensington, Maryland.

Q. And I don't know what -- did you, at some point, live in Utah?

A. Oh, yeah.

Q. Okay. When was that?

A. So we moved to Utah -- let me think about it -- somewhere around 2010 or 2011.

Q. Okay. And when did you move to North Carolina?

A. Well, we -- we moved full-time to North Carolina two years ago.
Q. 2024?
A. Yeah, we -- we had bought the house prior to that, but -- so we bought the house in 2022, but we didn't actually move in permanently until 2024.
Q. Okay. And is that where you keep your office, at home?
A. Yes.
Q. And was that the case while you resided in Utah?
A. Yes.
Q. Your office was at home.
Okay. How did you get here to Chicago for this deposition?
A. I flew on an airplane. Two airplanes.
Q. No direct flight?
A. Not out of Wilmington.
Q. I'm sorry to hear that.
A. Although, quite frankly, they are going to -- in May -- I fly United because, you know, I've done it forever.
In May, they will have a direct flight

to Chicago. They have it over the summer for some reason.

Q. Yeah. It's funny how those things work.

Anyway, and where have you been staying?

A. The JW Marriott on Adams Street.

Q. Okay. I assume a regular room or a suite?

A. Oh. It's got two -- two queen beds, one of those.

Q. Okay. And who has paid for all of that?

A. Well, pretty sure Namasté is going to pay for it.

Q. I'm sorry.

A. I'm pretty sure Namasté, the -- the company that is --

Q. Okay.

A. -- behind this is going to pay for my travel.

Q. Okay. Did you lay out the expense up front?

A. No.

Q. And are they paying for your meals while you're here?
A. I hope so.
Q. Okay.
A. I think so. I think so.
Q. Okay. So is that like an expense you'll put in --
A. Yes.
Q. -- to be reimbursed?
A. Exactly.
Q. Okay. And how long have you been in Chicago, since you got here for the purpose of this deposition?
A. I came on Monday.
Q. Okay. And did you spend time between Monday and today meeting with the lawyers?
A. Yes.
Q. How much time would you say you spent?
A. We had a meeting yesterday that lasted four hours.
Q. That would be Tuesday, correct?
A. Yes.
Q. Just so it's clear for the record.
And today is Wednesday.

A. That's correct.
Q. Okay. What about Monday, did you meet with the lawyers on Monday?
A. No.
Q. And as you mentioned, we had the deposition previously scheduled for two weeks ago before you took ill.
Did you spend time preparing for your deposition prior to the original deposition date?
A. Yes, we had a -- we did have a meeting -- I stayed very far away from these guys -- the day before the deposition, at which I was feeling sort of okay. I thought maybe I could keep going. And then I got home that night and it wasn't going to happen.
So, yes, I did have a meeting.
Q. Okay. And it was just the one meeting?
A. As I recall, that's correct.
Q. And same questions -- and that was in New York, right?
A. That is correct.
Q. Same questions, you -- you flew to New York from North Carolina?
A. That's correct.

Q. Direct flight, I hope.
A. That is a direct flight.
Q. Excellent.
And what hotel were you put up at?
A. I stayed at Le Meridian, I think. Yes, Le Meridian.
Q. And, again, that was all paid for?
A. Well, I've submitted it to them. I haven't got the money yet.
Q. Okay. Well, I hope -- I hope you get that soon.
Now, today you are here to testify on behalf of a particular defendant or more than one defendant?
A. I believe there is more than one, but the primary one is Namasté.
Q. Okay. Did -- did you meet with lawyers from anyone other than for Namasté in preparation for your deposition, either in person, or on Zoom, or telephone call?
A. Well, there is this other attorney that was on the Zoom call yesterday, and I think he may be representing a different company, but I don't know which one.

Q. And what is the name of that attorney?
A. Joseph Welter.
Q. Now, do you know what the caption of the case is?
A. I'm not sure what that means.
MR. DOUGLAS: Okay. Let's put up DL-1, please, and we'll mark that as whatever exhibit we're up to.
(Weed Deposition Exhibit No. 2 was marked for identification.)
BY MR. DOUGLAS:
Q. So I've handed you and what we have on the screen is Exhibit 2, which is the notice -- what we call the Notice of Deposition for your deposition.
Have you seen it before?
A. Yes.
Q. Okay. And do you see at the top it says, "In the United States District Court for the Northern District of Illinois, Eastern Division"?
Do you see that at the top?
A. Yes.
Q. And then to -- just below that, there is a box and the title of the case, which is "In

Re: Hair Relaxer Marketing Sales Practices and Products Liability Litigation."
Do you see that?
A. Yes.
Q. Okay. That's what we call the title of the case.
Do you understand?
A. Oh, I don't know. You call it a caption. Is that the caption you were talking about?
Q. That's -- it's in the caption, so that's --
A. Oh. Okay. There you go.
Q. Us -- us -- us lawyers, we call that the caption.
A. Got it. Now I know -- I just learned something. Thank you.
Q. Okay. Good. I'm glad I was able to teach you something.
And so you'll see the word -- you'll see the words in the caption, "hair relaxer"?
A. Um-hmm.
Q. Okay. And so you can see that this case -- and I think you knew this even without

seeing the caption -- but this case pertains to, amongst other things, hair relaxer -- hair relaxer products, right?

A. Yes.

Q. Okay. And do you see in the caption any individual chemical components identified in the caption?

And by that I mean chemical components of the hair relaxer product as a whole.

A. No.

Q. So is it your understanding -- this is an easy one -- that this case is about the finished product known as hair -- hair relaxers?

A. Well, I wouldn't say it quite that simply because even your own experts have said it's not just about hair relaxers, it's also about the potential chemicals within the hair relaxers because they talked about that.

So I understand that that's what the case says, but from a scientific perspective it is about hair relaxers and it's also about the potential for compounds -- chemical compounds within those products.

Q. Right. But the -- the title of the

case refers to the finished product, agree?
A. That is true.
Q. Okay. And -- and we'll take a look at your summary opinions in a minute, but in your summary opinions you refer only to hair product -- hair relaxers, the finished product, and not the specific chemical constituents?
MR. SPIRA: Object to form.
BY MR. DOUGLAS:
Q. We can wait to take a look at it if you would prefer to do that, rather than guess.
A. Oh, well, this -- it will just take a second.
MR. DOUGLAS: Yeah. So -- so let's mark the report.
(Weed Deposition Exhibit No. 3 was marked for identification.)
BY MR. DOUGLAS:
Q. I think you'll find your summary opinions at Page 8 in regard to ovarian cancer, Section 1.4.
Do you have it in front of you?
A. Yes.
Q. You have your own copy; is that right?

A. Yeah.
Q. Okay. And you'll see where it says summary of major conclusions, parentheses, opinions, close parentheses, right?
A. That's right.
Q. And you go on to say, "Based on the available scientific evidence and the application of well-accepted methods of causal inference to that evidence, it has not been established that exposure to chemical hair relaxer products causes uterine cancer."
Did I read that correctly, first of all?
A. Yes.
Q. Okay. So you don't identify in your summary of major conclusions anything about the chemical constituents referring to the hair -- to the chemical hair relaxers as -- as the whole product, right?
A. That is correct.
Q. Okay. And then you say -- and that -- and then you say -- and that's with respect to uterine cancer.
And then in the very next sentence you

say, "Similarly, it has not been established that exposure to chemical hair relaxer products causes ovarian cancer, period."

Did I read that correctly?

A. Yes.

Q. And once again, you are referring to hair relaxer products as a whole, you don't mention in this summary conclusion anything about the individual products -- individual chemical constituents, right?

A. That is correct.

Q. So let me -- let me ask you some really basic questions. Have -- I suspect I know the answer to this question, but: Have you ever personally used hair relaxer products?

A. No.

Q. Has any member of your family used any?

A. I don't actually know the answer to that question.

Q. Okay. How about your wife?

A. Pretty sure not.

Q. Okay. Do you know any friends or colleagues that have used hair relaxer products?

A. I'm not aware of any, but I've never

asked them.

Q. Okay. Have you ever personally observed someone in your presence apply a hair relaxer product?

A. No.

Q. Can you identify for me the brand names of the products that are at issue in this hair relaxer litigation?

A. No.

Q. Are you familiar, generally, with the instructions on how to safely apply hair relaxer products?

A. I did not look at that.

Q. Independent of any instructions that might come with the products that you purchased over the counter in a pharmacy or beauty aid store or used in a salon, do you have your own understanding of how hair relaxer products are to be safely applied?

A. I -- I didn't look into it, so I don't -- I don't know the answer to that question.

Q. Okay. Do you know if there are differences in the way each individual may apply hair relaxer products to themselves?

A. I wouldn't be surprised, in the same way that different people brush their teeth differently. So I would imagine, potentially, but I don't know the answer to your question.
Q. Okay. Have you looked at the question as to whether or not some folks absorb more of the chemicals in the hair products because of the way they use it than others?
A. Well, that's not really a question that the direct -- is a component of the general causation issue, per se.
But I wouldn't be surprised if it were true, only because there are variations in how people use it and variations in the products themselves and the chemical components in those products.
And by "absorb" --
Q. Um-hmm.
A. -- you mean the chemicals that are within a hair relaxer?
You don't mean the hair relaxer itself, you mean the chemicals within the hair relaxer are actually absorbed?
Q. Absorbed through the skin is what I'm

talking about.
A. I would think -- well, that's -- that's different. But, yeah, through the skin. Sure.
Q. Okay. But you are not going to opine on that subject, the differences and how they may or may not affect health outcomes?
The differences in the absorption between different users.
A. That's not a part of the general causation problem, per se, although it exists there with -- deep inside, but there is no information in the studies about that -- about that.
Q. Okay. So if I were to ask you to walk us though how hair relaxer products, in general, are to be safely applied, you wouldn't be able to answer that question or able to walk us through the process with confidence?
A. I -- I don't know the answer to that question.
Q. Okay. Do you know if there are different types of hair relaxers?
MR. SPIRA: Objection.
THE WITNESS: Well, I know there are a

lot of --

BY MR. DOUGLAS:

Q. Chemical hair relaxers.

A. There are -- there are many different products by many different companies.

Q. Right.

A. And they have different constituents and different amounts of constituents in them.

Q. Have you ever seen the product that was manufactured -- the chemical hair relaxer product that was manufactured by Namasté?

Have you seen -- ever seen the packaging?

A. No.

Q. Do you know if it comes in a box?

A. I know they come as kits, typically. I don't know if Namasté's does, but I wouldn't be surprised if it comes as a kit. And my guess if it comes as a kit, it's probably in a box.

Q. Right.

Do you know what is in the box?

A. I've never seen -- I don't know what's in the box.

Q. Do you -- so do you know how many

different components there are to a kit?
A. From Namasté?
Q. From Namasté.
A. No.
Q. I take it you've never seen hair relaxer -- chemical hair relaxer being applied in a salon?
A. No.
Q. Okay. Do you know if it's different in the way they use it -- a consumer might use it at home than the way it would be applied at a salon?
A. I don't know the answer to that question.
Q. Okay. If I were to look through all of your publications, would I find a single one that dealt with the use of hair relaxers as a product?
A. No.
Q. You are aware, however, that there are researchers who have published on the subject of hair relaxers and the potential for human health effects, right?
A. Yes.
Q. Okay. But you are not one of those?
A. That is correct.

Q. Okay. So speaking of the specific chemical constituents, what are some of the chemical constituents that you are aware of that are in hair product -- chemical hair relaxers generally?

A. Well, I focused on -- and I talked about this at some length in my report. I'm going to turn to page -- it really starts on Page 20 and goes through Page 25.

There have been some studies done of the various chemical components of some hair relaxers, and other -- many other products as well.

Q. Yeah. So --

A. The primary two that have been a focus primarily from the interests of your Plaintiffs' experts themselves have been the parabens and the phthalates, and those -- I discuss that in some detail, that different hair relaxers and different hair products have many different phthalates and parabens --

THE WITNESS: You know, to spell phthalates it's -- oh, you know how to spell phthalates. Okay. Good.

-- have point different constituents, and those are the two that have been sort of the focus of this litigation.

There has also been mention of formaldehyde.

BY MR. DOUGLAS:

Q. I'm sorry.

A. And there has also been some discussion about the potential for there to be formaldehyde in these products.

Q. Are you aware of any other chemical constituents in hair relaxer products?

A. Oh, I'm sure there are more constituents than that. I don't know -- I don't know what they are. I mean --

Q. Okay.

A. -- there are --

Q. What about nitrosamines, are you aware of that?

A. It did not come up as an issue in this litigation, to my knowledge.

Q. Okay. Are nitrosamines considered carcinogenic to humans?

A. I would have to go back and look. I

haven't looked at that for a while. So right off the top of my head I would want to go back and check that out before I answered that question.

Q. Okay. So sitting here right now you don't know?

A. Well, I -- I want to be -- I'm a scientist guy. I want to be precise about it. I know there's been -- I know there's literature about this. I know there has been discussions about it, but I'm not able today to tell you these are -- if there are causal effects of nitrosamines, these are what they are.

Q. I know that you fancy yourself a scientist guy, but do you also fancy yourself a litigation guy?

MR. SPIRA: Objection, asked and answered.

THE WITNESS: Well, I -- I focus my work on the science. And we've talked about this before. I've spent time in the litigation world, so I primarily focus on the science. So I don't know what you mean -- you know, when I say that --

BY MR. DOUGLAS:
Q. I get that you focus on the science, but it's always -- it's almost always in the context of litigation now, at least for the last 18 years, right?
MR. SPIRA: Objection, mischaracterization.
THE WITNESS: That's not quite true, because I still publish in the scientific literature. I still go to scientific meetings and so from a -- in the consulting world, it's primarily litigation.
But my last 44 years has been thinking about and writing about the science of disease causation as an epidemiologist.
BY MR. DOUGLAS:
Q. Right. And not to be redundant, but most of that work -- most of your consultancy work though is in the litigation context?
MR. SPIRA: Objection, asked and answered.
THE WITNESS: Well, it is -- it is now, yeah.

BY MR. DOUGLAS:

Q. Yeah, okay.

And -- and prior to this litigation, had you ever published in the peer-reviewed literature on parabens or phthalates?

A. No.

Q. What -- who was it that first contacted you in regard to this case?

A. An attorney by the name of Barry Thompson.

Q. And what firm?

A. You know, he changed firms, so I'm not sure if it was the firm that he was in or the firm he changed to, but it was Baker something or other.

Q. Okay. And have you worked with Barry Thompson since -- since he first contacted you?

A. I worked with Barry Thompson for a while, yes.

Q. In this litigation?

A. In this litigation.

Q. Okay. And prior to the time when Barry Thompson contacted you for this litigation, had you worked with him before?

A. Yes.
Q. When was the first time you worked with Barry Thompson?
A. Oh, it was a long time ago. I don't remember the date.
Q. But was it sometime after you started your consultancy in 2008?
A. Pretty sure the answer to that is yes.
Q. And how many different litigations have you worked on with Barry Thompson?
A. I can recall two.
Q. And both of those were for the defense side, correct?
A. That's correct.
Q. And when you say "two," that's two in -- in addition to this current litigation, right?
A. No.
Q. It's including this?
A. As far as I remember.
Q. Okay. Now, have you ever worked for Sidley Austin before?
A. I know I had talked to some Sidley folks, but I don't know if I ever actually worked

for them. And this is back when I was working for the consulting firm. And they were involved in some of the litigation that -- not just Weinberg Group did, but Exponent was working on at the time. And I'm pretty sure Sidley was somehow involved.

But since then, I don't believe that -- I do not recall having worked with Sidley before this litigation in terms of actually being contacted by Sidley and working with them directly.

Q. Okay. So -- and who -- who from Sidley have you worked with?

A. I don't remember. Other than -- you mean now?

Q. Other than who is seated here with us now.

A. Oh, well, there is a woman out of Los Angeles. I'm blanking on her name, I'm sorry.

Q. That's okay.

A. I don't remember.

Q. At least one other person?

A. At least one other person.

Q. Okay. And in the other case -- so in

the other case that you worked with -- for Barry Thompson, I think I asked you this, it was for the defense side; is that right?

A. Yes, you did ask me, and that is correct.

Q. Do you remember the nature of the case?

A. I think it was the pramipexole litigation.

Q. And what is that?

A. It was about whether or not pramipexole, which is a drug given as I recall to Parkinson's disease patients --

Q. Um-hmm.

A. -- had a side effect of increasing obsessive compulsive behaviors, as I recall.

Q. Okay. And -- and was it your opinion in that case that the evidence was insufficient to establish that that drug caused those side effects?

A. I don't recall where -- what happened in that litigation. I'd have to go back and look to be clear. I suspect -- I'm pretty confident that I was probably asked to evaluate general causation.

Q. Right.
A. But sometimes these cases fall apart, and I -- I can't answer. It's been a long time. This is --
Q. You don't remember?
A. I don't remember, no.
MR. SPIRA: Counsel, whenever you're at a good breaking point, we've been going a little more than an hour.
MR. DOUGLAS: Really? It seems like I just started. Yeah, give me a few more minutes.
MR. SPIRA: Sure.
BY MR. DOUGLAS:
Q. Have you ever published an article in the peer-reviewed literature where you concluded that a product or compound or drug was, in fact, a cause of harmful human health effects, in other words, established general causation?
A. I'm not sure I was ever involved in a matter like that in my publication record. It's the topic, you know, and how the publication process worked, I don't think that came up as something I had published on --

Q. Okay.
A. -- although I could have, but I don't think I did.
Q. Okay. In any event, when you were first contacted for this case -- let's get back to this case -- I imagine you were given a general idea of what the case was about initially?
MR. SPIRA: Objection.
MR. DOUGLAS: I can rephrase it.
MR. SPIRA: Yeah, okay.
BY MR. DOUGLAS:
Q. Before you wrote your report, before you had an opportunity to look at the plaintiffs' experts' reports, did you have a general idea what the allegations in this case were?
A. When -- when are we talking about?
Q. Prior to the time you actually wrote your report, you did your research, and certainly before you read the plaintiffs' experts' reports, did you have a general idea of what the allegations were about in this case?
A. Well, it has changed over time. So the general allegations were that hair relaxer product use may be associated with and may be causally

associated with some female cancers.

Q. And -- and were you provided with like the complaint or any other pleadings, documentation for your review before you began your own research and certainly before you started your report?

A. Well, yeah, that's pretty typical. Yeah, sure.

Q. Yeah.

A. Yes.

Q. So you had an understanding that the plaintiffs were making certain claims, and the company that hired you, the defendant in this case, were disputing those claims before you even started your research.

Would that be fair to say?

A. Well, I'm not sure I -- about the "disputing" part. Maybe I could have assumed that, but I didn't know that. I knew that I was being asked to evaluate the evidence.

Q. And evaluate what evidence?

A. The evidence that needed to be evaluated to answer a general causation question.

Q. And the general causation in terms of

whether hair relaxer products caused certain female cancers?

A. That is correct.

Q. And you understood that the company that hired you was -- was of the position that those hair relaxer products did not cause those cancers at that time?

A. I don't think that was ever made clear to me exactly what their position was. What I was asked to do was to evaluate the evidence and then inform them what my opinion would be once I completed that process.

Q. Okay. But you've done this before for defendant companies, so surely you must have suspected at least that it was their position that these cancer- -- that these products did not cause cancers.

MR. SPIRA: Object to form.

BY MR. DOUGLAS:

Q. Right?

A. I may have suspected it. I did not know that.

Q. Okay. So did you suspect that they were of the position that they do cause these

cancers?

A. I just said I suspect- -- you could have -- you're talking about what did I assume.

Q. I want to -- if I may --

A. Yeah, I -- okay.

Q. If I may, I just want to understand if you had any concept of what the defendant who hired you in this case -- what their position was with respect to whether or not hair relaxer products caused uterine or ovarian cancer.

A. No, I didn't know that. I suspected that they knew that the litigation existed, and they needed a scientific evaluation of the evidence to inform them about what was going on.

Q. Did you know that before you were hired they had already denied the plaintiffs' allegations that hair relaxer could cause uterine or ovarian cancer?

MR. SPIRA: Object to form.

THE WITNESS: I -- I was -- I was not aware of that, no.

BY MR. DOUGLAS:

Q. And given your extensive involvement in litigation work, you didn't assume that or presume

that?
A. No.
Q. And were you given a payment or down payment, if you will, so to speak, before you began your work?
A. No.
Q. Was there an understanding as to how much you would be paid for your work?
A. My process is to tell them my hourly rate.
Q. Okay. Which as of now is what?
A. $700 an hour.
Q. And is that whether it's doing research, work on your report, or does that change or increase for time you spend in a deposition or trial or hearings?
A. It has -- does not change.
MR. DOUGLAS: Okay. I'm going to mark the statement of compensation, and then we can take a break.
MR. SPIRA: Sure.
MR. DOUGLAS: Go through that real quick. That's DL 43.

(Weed Deposition Exhibit No. 4 was
marked for identification.)
BY MR. DOUGLAS:
Q. Okay. So I'm showing you what your counsel has produced as a summary of what you've charged and invoiced in this case.
And if you'll see, it says "Statement of Compensation, Douglas L. Weed M.D., MPH, Ph.D.," and then there is a column on the left that has invoice date.
Do you see that?
A. Yes.
Q. So you first invoiced or billed for that case in May of 2023?
A. Correct.
Q. So that's almost three years ago now?
A. Yes.
Q. I'm not going to go through all of them, but you've been billing from May of 2023, at least according to this statement, through March of 2026, right?
A. Yes.
Q. And the total you've billed to this point is about 300- -- is $348,950. Does that

sound right?
A. That's correct.
Q. Okay. So that's about -- a little more than a hundred thousand dollars a year, fair to say, on average?
A. That is correct.
Q. Okay. And you will be invoicing for your work preparing for and attending this deposition in the future?
A. Yes.
Q. And any other work that you might do, obviously?
A. Yes.
Q. You were not at the Daubert hearing; is that correct?
A. Yes.
Q. Were you asked to be at the Daubert hearing?
MR. SPIRA: Objection to the extent you are asking for the content of an attorney/client conversation.
BY MR. DOUGLAS:
Q. I'll rephrase it. Did you have plans to be at the Daubert hearing at any point?

MR. SPIRA: I'll still -- I'll just caution the witness, you can answer if you can do so without revealing the contents of any conversations with the attorneys.
THE WITNESS: Did I have plans to?
BY MR. DOUGLAS:
Q. Yes.
A. No.
Q. I mean, sometimes experts are told you need to attend a Daubert, and they call it off.
MR. SPIRA: And I'll -- yeah, I don't think there is a question pending.
MR. DOUGLAS: Okay. So if would you like a break. Is that good for you, Doctor?
THE WITNESS: Sure.
THE VIDEOGRAPHER: The time is now 10:52. Going off the record.
(Break taken.)
THE VIDEOGRAPHER: Time is now 11:12. Back on the record.
MR. DOUGLAS: Just for the record, I think I mentioned a Daubert hearing. My bad. I know there was no Daubert hearing in this case.

BY MR. DOUGLAS:
Q. So obviously you wouldn't know about a Daubert hearing, Doctor, so my apologies for that.
Let me ask you this -- let me ask you this.
MR. SPIRA: I thought I missed something.
MR. DOUGLAS: Yeah, no this is what happens when you go back and forth from litigation to litigation.
MR. SPIRA: I share your pain.
MR. DOUGLAS: Yeah, yeah. That's life.
BY MR. DOUGLAS:
Q. All right. So -- so I think from what you've already testified to, Dr. Weed, we can agree that your only connection to this case or with hair relaxers generally is that you were hired by the defendant in this litigation, right?
A. I was hired by the defendant, yes.
Q. And that's your only connection to this case?
MR. SPIRA: Object to form.
THE WITNESS: Well, I believe so, yes.

BY MR. DOUGLAS:

Q. Yeah, okay. And just to sum up, and I have a question about it. You had done no research on hair relaxers or the chemical constituents in them before this case. You had no personal experience, as we discussed, using hair relaxers. You've never published on hair relaxers, never purchased any, and you are unfamiliar with how the product is even safely applied.

Do I have all of that right?

MR. SPIRA: Object to form. Asked and answered. Compound.

THE WITNESS: Yeah, that -- we already talked about that, yes.

BY MR. DOUGLAS:

Q. Yeah, okay. So my question about that is: Yet of all the epidemiologists in the world, some of whom have -- who have done -- who have done such work, the defense lawyers dialed you up when they needed a defense expert, right?

MR. SPIRA: Object to form.

BY MR. DOUGLAS:

Q. They called you?

A. Somebody called me, yeah, right.
Q. Yeah, okay. And do you know if any other epidemiologists have been hired by the defense -- any one of the defendants in this case, besides you?
A. Yes.
Q. Okay. Who?
A. A woman with the last name of Adams-Campbell.
Q. Okay. And have you interacted, spoken with her?
A. No.
Q. Okay. Read any written materials she's prepared?
A. No.
Q. And how was it that you came to know about this other person, other than through counsel?
A. That she was involved?
Q. Yeah.
A. I didn't know.
Q. Okay. Let me ask you this: Do you think that you were chosen -- you were hired, I'll use that word -- that you were hired by the

defense in this case because they knew how many times -- the many times in which you've testified regarding substances and that your opinions were that the evidence was insufficient to conclude that they caused human health effects?

MR. SPIRA: Object to form.

BY MR. DOUGLAS:

Q. Do you think that's one of the reasons that of all the epidemiologists in the world they dialed you up?

MR. SPIRA: Object to form.

THE WITNESS: I don't know why.

BY MR. DOUGLAS:

Q. Okay. I just want to go over with you a few basic terms of epidemiology, real simple stuff, but I think it will be helpful for our court and jury. And we've talked about this at our previous meetings in the C8 litigation.

And you are familiar with the terms risk factor -- with the term "risk factor"?

A. Yes.

Q. And in the context of epidemiology?

A. Yes.

Q. And "causal association," is that

another term you're familiar with in the context of epidemiology?

A. Yes.

Q. And I want to talk about what they mean and what the differences are.

Is it fair to say that a risk factor is something that has a statistically significant association with an outcome, but hasn't yet met the condition of causality?

A. No, that's not quite true, not quite correct, in this sense: I mean, a causal factor is also a risk factor. So -- it can -- so a causal -- known causal factors are also risk factors.

So if you use the term "risk factor" by itself, you're including those factors which, like you've said, have not been established as causal. But it would also include those that have --

Q. Not all risk factors are considered causal, correct?

A. That is correct.

Q. Okay. That's -- that's the point I wanted to make. I understand what you're saying.

And I just want to be crystal clear, if

we could pull up DL 2 --

(Weed Deposition Exhibit No. 5 was marked for identification.)

BY MR. DOUGLAS:

Q. -- which is the testimony that you gave in the C8 litigation when I asked you that identical or similar question.

Okay. So if you'll see, I asked you at Page 20 -- if you don't mind turning to Page 20, Line 3. And you were asked: What is an associate- -- "Okay. What is an association?" At Line 3.

And you answered: "An association in the epidemiologic context --

"QUESTION: Right.

"ANSWER: -- is the demonstration typically in more than one epidemiological studies of an increase in risk that is statistically significance, and there has been adequate control for what we'll call the alternative explanations which would be confounding factors and bias."

Did I read that correctly?

A. Yes.

Q. And that's the answer you gave at the time, right?
A. Yes.
Q. Okay. And then I -- then if you go down to the next question, 14 -- Line 14:
"QUESTION: Okay. And how is that different, how is association different from causal association?"
And you answered: "Probably the best representation of an answer to that question is the application of what we call the causal criteria, or causal considerations, that were described and discussed in the literature, from somewhere around the late 1950s to the present, and the premise of that approach is that a certain association of the sort you just talked about.
And then you --
"QUESTION: A statistical association?
"ANSWER: A statistical association as I described it.
"QUESTION: Yes.
Then you consider a variety of factors?"
You answered, "These are the factors

that sometimes are referred to as the Hill criteria, or the causal criteria, or the causal considerations?"

Did I read all that correctly?

A. Yes.

Q. And that's all essentially what you are saying today. That's all true?

A. Well, yeah. I would probably add something to the question that you asked about association different from a causal association. I would probably add some additional considerations there.

But -- so, I would add some things there.

Q. Okay. But that's the gist of the distinction?

A. The gist, yeah. It's the gist.

Q. Okay. That's all I want is the gist.

But the point is that not all risk factors are considered causal associations?

A. Not all risk factors are considered causal factors.

Q. So on that subject, I want to turn to your report, which is Exhibit 3. And I believe

you have your own copy.
And at the top of Page 15, you talk -- you talk about the risk factors for uterine cancer?
A. Right.
Q. And you cite to the American Cancer Society. According to the American Cancer Society, and then you give the site -- the website, "The causes and risk factors for uterine cancer are," and then you have a bullet point list.
That's Page 15?
A. Right. I'm there.
Q. Okay. And one of the risk factors that you include, citing to the American Cancer Society, is overweight and obesity, and then in parentheses you add "considered a strong risk factor."
Do you see that?
A. Yes.
Q. Okay. So you did not say it is a causal association or a causal factor. There is nowhere in that sentence that says causal factor, right?

A. That's right.
Well, not in that sentence. But according to the American Society, the causes and risk factors are. So I didn't say it was causal, I -- not in that bullet, no.
Q. Okay. So well, let me be clear: Are you going to testify at trial, should you testify at trial, that obesity causes uterine cancer?
A. It wasn't what I was asked to assess.
Q. Okay. So you have no opinion as of right now?
A. I don't have an opinion as -- based on all of the application of the methods that I would have to do in order to make that claim or look it up.
Q. Okay. So you didn't do that work to determine whether or not obesity -- applying all the -- the criteria for causal association, was, in fact, established in the scientific literature as a causal factor, as opposed to just a risk factor?
A. That's correct.
Q. And so I want to now take a look at the website you cited to from the American Cancer

Society, which is DL-5, and we'll mark it as exhibit -- Exhibit 6.

This is a printed out -- this is a printout of the website to which you cited.

A. Right.

(Weed Deposition Exhibit No. 6 was marked for identification.)

BY MR. DOUGLAS:

Q. And before we get into that, just for clarification, endometrial cancer is a type of uterine cancer; is that right?

A. Yes.

Q. Okay. And the American Cancer Society in its website refers to endometrial cancer specifically, not uterine cancer?

A. Correct.

Q. Okay. So -- so what you have in front of you is the -- as -- as of March 12th, 2026, what the American Cancer Society has on its website, those risk factors it considers with respect to endometrial cancer.

Do you see that?

A. Yes.

Q. Okay. And the first sentence is, "A

risk factor is any" -- the first sentence of the page -- the first paragraph is, "A risk factor is anything that raises your chance of getting a disease such as cancer."

Do you see that?

A. Um-hmm.

Q. And then the next paragraph says, "Although certain factors can increase the risk for developing endometrial cancer, they don't always cause the disease."

Do you agree with that sentence?

A. Yes.

Q. Okay. And below that there is a major heading at the bottom of the page, "Factors that increase the risk for endometrial cancer."

Do you see that?

A. That's correct.

Q. It doesn't -- that's not -- that doesn't say causal factors for endometrial cancer, right?

A. That is correct.

Q. Okay. And below that it starts -- it lists, if you go through it, a number of risk factors.

A. Right.
Q. Starting with, "Estrogen-only hormone replacement therapy."
Do you see that?
A. Um-hmm.
Q. Tamoxifen?
A. Yes.
Q. Then followed by, "Number of menstrual periods in a lifetime."
Do you see that?
A. Yes.
Q. "No pregnancies," right?
A. Right.
Q. "Certain medical conditions," right?
A. Yes.
Q. Obesity is listed as a risk factor, right?
A. Yes.
Q. Okay. And then it has a paragraph underneath obesity that talks about a potential mechanism, but there is nothing in that paragraph that starts with the ovaries produce the most estrogen about causal association or causal factor, right?

A. That's correct.
Q. Okay. And there is nothing, in fact, about -- in there from the American Cancer Society that says is a strong association?
A. Not in this section, no.
Q. Okay. And then continuing with a list of risk factors, according to ACS, is metabolic syndrome, right?
A. Yes.
Q. Diet?
A. Yes.
Q. Endometrial hyperplasia?
A. Yes.
Q. Age?
A. Yes.
Q. Genetic conditions?
A. Yes.
Q. It's a long list, so forgive me, but we'll get through it.
First-degree relative is a risk factor?
A. Yes.
Q. Race?
A. Yes.
Q. Chemical exposure, do you see that?

A. Yes.
Q. And in parentheses, hair relaxers.
Do you see that?
A. Right.
Q. And radiation therapy, finally, is the last factor listed -- listed by the -- by the ACS, correct?
A. Yes.
Q. Okay. Well, I noticed something about your reference to risk factors for endometrial cancer.
If we can go back to Page 15 of your report, where you list and cite to the American Cancer Society the risk factors.
A. Right.
Q. Can you --
MR. DOUGLAS: Yeah. Thank you.
BY MR. DOUGLAS:
Q. Can you identify for me where on -- where on this list you included, as per the American Cancer Society's list of risk factors, chemical exposure hair relaxers?
A. It's not on that list. It's on Page 57.

Q. Okay. So you are probably old enough, and so am I, to remember the show Dragnet.
Remember that show, Jack Webb?
A. Oh, yeah. I remember Dragnet.
Q. Yeah.
A. Yeah. That was -- you remember Sergeant Friday used to say, "Just the facts."
Q. Do you remember, that was sort of -- when he would have a witness that would babble on about extraneous things, he would say, "Just the facts, ma'am?"
Do you remember that?
A. Yes.
Q. Okay. I kind of want you to do the same thing.
My question is simply: Did you list on Page 15, or did you omit, hair relaxers as one of the risk factors?
MR. SPIRA: Object to form. Asked and answered.
THE WITNESS: It's not on Page 15. It's on Page 57.
BY MR. DOUGLAS:
Q. Okay. Is there a reason why you

omitted it from -- from the list on Page 15?
A. Yes.
Q. What is that?
A. There are two really good reasons.
Q. I didn't ask you if they were really good, but --
A. Well, they are.
Q. -- give me the reasons.
A. They are.
Q. I'm thinking.
A. So one is if you notice about the way they've written the descriptions of their risk factors, all but hair relaxers are listed -- described as these are risk factors.
Chemical exposure hair relaxers is different. They don't say that, not really. What they say is some studies have found that using chemical hair relaxers might increase the risk of endometrial cancer, so that's -- so that's different than every other one that they've listed under risk factor.
But here is the even more important, is that the National Cancer Institute, where I worked for 25 years, also describes hair relaxers, and

this -- this is on Page 58, they -- they don't list it as a -- as a -- as a risk factor at all.

Q. Okay.

A. So it's different.

Q. Okay.

A. So it's different. So I did include it. I didn't put it on that list because they -- they made this different. I could have, but I would have had to explain it there and I didn't -- so I explained it here.

Q. Well, it sounds like you've got a lot of explanation, but did -- the fact is that the American Cancer Society lists it under the very heading of risk factors for endometrial cancer, lists hear relaxer chemical exposure. That's a fact.

MR. SPIRA: Object to form. Asked and answered.

THE WITNESS: And it is a fact that they say maybe.

BY MR. DOUGLAS:

Q. Okay. But it's listed under the heading of risk factors for endometrial cancer. That's either -- it either is or it isn't.

MR. SPIRA: Object to form. Asked and answered.

THE WITNESS: I've answer -- I've answered. It's -- it's in that list and it says maybe.

BY MR. DOUGLAS:

Q. I didn't ask you --

A. So that -- I know. I know what you are going to say, but that sets it apart from every other factor on that list.

Q. In your opinion?

A. No. I'm sorry, it's not my opinion. Just read -- this is the facts, sir. Just read every one of these.

Q. Well, you can interpret anything you want in any --

A. No, no, no. No.

Q. I'm speaking, please don't interrupt.

MR. SPIRA: And he can finish his answer.

MR. DOUGLAS: I'm speaking.

MR. SPIRA: He wasn't done with his answer.

MR. DOUGLAS: I'm sorry. I'm sorry.

Do you know how this works?

MR. SPIRA: I do know how this works.

MR. DOUGLAS: I have to finish my -- I have to complete my question.

MR. SPIRA: And he has to complete his answer.

MR. DOUGLAS: And then he gets to speak.

MR. SPIRA: Yes.

MR. DOUGLAS: And you don't get to interrupt me and he doesn't get to interrupt me.

MR. SPIRA: And you don't get to interrupt him.

MR. DOUGLAS: That's correct.

MR. SPIRA: Okay. So --

MR. DOUGLAS: So let's see if we can all get on -- get restarted here.

THE WITNESS: I was in the middle of an answer. I was in the middle of an answer.

BY MR. DOUGLAS:

Q. Well, the record will reflect, but I will give you the benefit of the doubt.

Get on your soapbox, give me your

speech.
MR. SPIRA: Object to form.
THE WITNESS: Oh.
BY MR. DOUGLAS:
Q. Oh, what?
A. I mean, I'm not on a soapbox. I'm -- you said to me --
Q. I beg to differ.
A. No. You said to me -- you brought up the Dragnet example. The Dragnet example says the facts.
Q. Yeah.
A. The fact --
Q. So just give me the facts.
A. The fact --
MR. SPIRA: Counsel, let him finish.
THE WITNESS: I am giving you the facts.
The facts says that chemical hair relaxers might increase the risk. That is different than saying they do increase the risk. And every one of these other ones on this list say they do.
So this is different and I tried

to explain that and I explained that somewhere else, so that -- that -- I covered this topic completely.

BY MR. DOUGLAS:

Q. Okay. I get -- I hear you.

A. Thank you.

Q. But the question is simpler than that. Is -- the fact is that hair relaxers, chemical exposure, listed under the -- under the heading in the section of risk factors for endometrial cancer. It either is or it isn't, with or without your explanation as to whatever it is you want to offer.

It is, in fact, listed under the heading of risk factors. Yes or no?

MR. SPIRA: Object to form. Asked and answered.

BY MR. DOUGLAS:

Q. Can you --

A. I've already answered that.

Q. I mean, it's obvious that it is. So I don't know why you are fighting with me on this.

A. I'm not fighting with you, I'm trying to explain why --

Q. You are doing a lot of explaining. I didn't ask for an explanation.

MR. SPIRA: Counsel. Counsel, he's -- he's trying to answer your question. He's already answered it multiple times.

MR. DOUGLAS: I beg to differ. He's not answering the question. I think that's pretty -- that's pretty blatant.

MR. SPIRA: He answered your question and he gave an explanation for his answer.

BY MR. DOUGLAS:

Q. It's either under there or it isn't.

And you know what, I don't really need his answer, it is there.

But go ahead and be evasive, that will be noted for the record.

MR. SPIRA: I object to the form and the characterization and the badgering of the witness.

MR. DOUGLAS: It's not badgering.

MR. SPIRA: Is there a question pending?

MR. DOUGLAS: Oh, I have more questions.

MR. SPIRA: I understand you have more questions, but I want to know if there is currently a question pending?
MR. DOUGLAS: What do you think?
MR. SPIRA: I don't know.
MR. DOUGLAS: Well, I wouldn't admit that on the record, but feel free.
BY MR. DOUGLAS:
Q. So I want to go back to your summary opinions, okay, because I want to understand what it is you are saying and what you're not saying.
So if we go to page -- where are the summary opinions? Page 8 of your report. Okay?
A. Yeah. I'm there.
Q. All right. We went through a little bit of this before. Okay?
And so if we could just, for context, read --
MR. DOUGLAS: Blow up that section, please.
BY MR. DOUGLAS:
Q. "Summary of major conclusions. Based on the available scientific evidence and the application of well-accepted methods of causal

inference to the evidence, it has not been established that exposure to chemical hair relaxer products causes uterine cancer."

Okay. We read that before. And did I read it again correctly?

A. Yes.

Q. Okay. And so my question is -- and, again, I want to understand what you are saying and what you are not saying, or what you will say at trial or will not say at trial.

There is nothing in your summary opinion on this page in that sentence about, first of all, any of the individual components?

A. That is correct.

Q. Okay. And you are not saying -- this is going to be a double negative, so bear with me. If you don't understand it, just feel free to say so.

You are not saying in this summary opinion you have highlighted on the screen, you are not saying that the evidence is sufficient to establish that hair relaxers do not cause ovarian -- uterine cancer, right?

MR. SPIRA: Object to form.

THE WITNESS: Those -- you are asking me are those words on that summary?
BY MR. DOUGLAS:
Q. Yeah. Are -- are you --
A. They're not up there.
Q. Yeah. So my -- my further question then is: Will you be testifying at trial that the evidence is sufficient to establish that hair relaxers do not cause uterine cancer?
MR. SPIRA: Object to form.
THE WITNESS: I will be -- I will be opining exactly what it says there.
BY MR. DOUGLAS:
Q. And you're not -- I'm sorry.
MR. SPIRA: Let him finish.
THE WITNESS: And it has not been established that that is causal.
BY MR. DOUGLAS:
Q. Okay. I -- I understand that, but I also want to know what you're not going to say.
And you're not saying that the scientific evidence established that it doesn't cause ovarian cancer --
MR. SPIRA: Object to form.

BY MR. DOUGLAS:
Q. -- correct?
A. Well, it doesn't -- it doesn't really come up as an issue in the scientific community, so it's --
Q. That's not what I asked.
MR. SPIRA: Let him finish his answer.
THE WITNESS: No -- yeah, please.
So this is the correct scientific statement for the -- for the literature and evidence as it exists today.
BY MR. DOUGLAS:
Q. So --
A. So that's -- that's as best as I can say. That's what I'm going to say.
Q. Okay.
A. As far as the relationship between hair relaxers and this, it has not been established. And that's -- that is the way it works in science.
Q. Right. I understand that. So, therefore, you will not be testifying at trial that the evidence establishes that hair relaxers do not cause -- definitively establishes that hair relaxers do not cause uterine cancer?

A. You just changed the question.
Q. That's my question right now. That's the one before you --
A. Okay. So you're talking about the --
Q. I'm not done talking. That's the one I would like you to answer.
A. Okay.
MR. SPIRA: Object to form.
THE WITNESS: You have -- you have now a different question.
BY MR. DOUGLAS:
Q. Yes.
A. The first question was you're not -- you're not going to testify that they did not --
Q. I didn't ask you what the first question was.
A. I'm -- I'm trying to explain to you --
Q. I would like you to answer the one that's pending.
A. I'm trying to make sure everyone understands the situation here. So you've changed the question --
Q. I think we do.
MR. SPIRA: Counsel, let him answer the

question.

THE WITNESS: You changed the situation now to the word "definitely," so it's definitely do not cause.

What this says, right now, is that -- that it's not been established that it causes it, which is the same thing as saying as of today, it does not cause it because it hasn't been established that it causes it.

You cannot say definitely about what might happen in the future, which is what you're asking me.

BY MR. DOUGLAS:

Q. No, I'm not asking you about the future.

A. The word "definitely" definitely -- definitely implies --

Q. I think it's pretty clear what I'm asking, and I'm going to ask it again because I didn't get an answer, and maybe you're not understanding.

A. Maybe not.

Q. Is it Dr. Weed's opinion that the

scientific evidence definitively establishes that hair relaxers do not cause uterine cancer?

MR. SPIRA: Object to form.

BY MR. DOUGLAS:

Q. Yes, no, or you don't know?

MR. SPIRA: Object to form. Asked and answered.

THE WITNESS: No one could possibly answer that question.

BY MR. DOUGLAS:

Q. Including you?

A. Including me, because it's just not a question that can be answered at -- by anybody.

MR. DOUGLAS: Okay. I didn't ask because, so I'll move to strike the "because" part.

BY MR. DOUGLAS:

Q. I've looked through your report from front to back, top to bottom, and I do not see anywhere in there, and correct me if I'm wrong, or a statement that the -- that the scientific evidence establishes that hair relaxers do not cause uterine cancer.

Is that true, there is no such

statement in there?

MR. SPIRA: Object to form.

THE WITNESS: Because --

BY MR. DOUGLAS:

Q. I didn't ask because.

A. I'm going to tell you because you -- you're going to ask --

Q. You have to answer my question.

A. I am going to answer your question, but you kept interrupting me, which is --

Q. Okay. Well, you keep changing the subject.

MR. SPIRA: Counsel --

THE WITNESS: No, no.

MR. SPIRA: Counsel, you have to let him answer the question.

BY MR. DOUGLAS:

Q. You're not making a great record for yourself.

MR. SPIRA: Counsel, you have to let him answer the question.

BY MR. DOUGLAS:

Q. You're being evasive. Please do not evade my question and answer my question.

MR. SPIRA: Counsel --
BY MR. DOUGLAS:
Q. Is there a sentence in the report that says the scientific evidence establishes that -- that hair relaxers do not cause uterine cancer, yes or no?
MR. SPIRA: Counsel -- counsel, you do not get to force him into a yes or no. You cannot object to the first word that comes out of his mouth --
BY MR. DOUGLAS:
Q. That's why I say if you can't answer it --
MR. SPIRA: You have to answer it --
BY MR. DOUGLAS:
Q. -- yes or no, say you can't answer it yes or no.
MR. SPIRA: You have to let him answer the question.
MR. DOUGLAS: He has to answer the question.
MR. SPIRA: He has to answer the question, but he doesn't have to limit it to a single word that you --

MR. DOUGLAS: It has to be responsive. That's a fundamental --
MR. LISAK: If you cut him off before he finishes his answer, how do you know if it's responsive?
MR. DOUGLAS: Because he started with something that had nothing to do with the question.
MR. LISAK: Everyone is interrupting everyone.
MR. DOUGLAS: So let's --
MR. SPIRA: Let's take a deep breath and not interrupt people.
BY MR. DOUGLAS:
Q. So let's -- let's restate the question and see if you can answer. If you can't, just tell me you can't, okay? Sound fair?
A. Sure.
Q. Is there a sentence anywhere in your report to the effect that scientific evidence establishes that hair relaxer products do not cause uterine cancer?
A. Yes.
Q. Where?

A. There. You said in effect.
Q. In effect.
A. You said in effect. That's exactly what that says.
Q. So you are going to affirmatively opine at trial that the scientific evidence establishes that hair relaxers do not cause as opposed to the evidence is insufficient to establish that hair relaxers cause uterine cancer.
MR. SPIRA: Object to form. Asked and answered.
THE WITNESS: That's exactly the same statement.
BY MR. DOUGLAS:
Q. It's exactly the same statement?
A. It's exactly the same statement. From a scientific perspective -- let me finish. From a scientific perspective, the evidence to date doesn't establish causation. Therefore -- --
Q. I get it.
A. -- as of today, it does not cause it. No one else believes that it causes it except for your plaintiffs' experts, but it does not cause it as of today. What will happen in the future is

what will happen in the future.
Q. Okay. But there's a distinction, and you're a sophisticated epidemiologist. There's a distinction between saying it doesn't cause it and saying the evidence establishes that it doesn't -- that hair relaxers do not cause uterine cancer.
Do you understand the distinction there?
MR. SPIRA: Object to form.
THE WITNESS: No.
BY MR. DOUGLAS:
Q. Okay. Fair enough. I'll take that as an answer.
You alluded to this plaintiffs' experts have expressed opinions that the evidence -- the scientific literature establishes that hair relaxers are capable of causing ovarian and uterine cancer.
You're aware of that, disagree as you may.
A. Yes, that is correct.
Q. Okay. And you did your own systematic review of the literature and determined that the evidence was insufficient to establish that they

didn't, right?
A. That is correct.
Q. Okay. So on the one hand, we have your opinion, right, based on a review of the literature, right?
A. Yes.
Q. And on the other hand, we have the plaintiffs' experts who have a different opinion, right; agree or disagree?
A. That's correct.
Q. Okay. And being a person who has been involved in litigation matters, I assume you're savvy enough to understand that it is the judge and our jury who will ultimately decide whose opinion to accept or reject and/or how much weight to give each opinion, right?
MR. SPIRA: Object to form.
THE WITNESS: I think that is how the process works.
BY MR. DOUGLAS:
Q. Yeah.
A. Well, let me put it this way, they'll either agree with the defense or they'll agree with the plaintiffs.

Q. Right. And -- and, for example, in the C8 litigation, you opined that PFOA was not capable of causing kidney cancer. Do you remember that generally?
A. I don't know if I used -- I would be very surprised if I used the term "capable."
Q. Yeah. But words to that effect?
A. I would have to look, but I -- I suspect that's true, but I don't know for sure.
Q. Okay. But you -- you definitively opined in a written report that PFOA exposure did not cause the plaintiff's kidney cancer?
A. At the individual causation level?
Q. Yeah.
A. I don't recall. Maybe I did.
Q. Okay. Will you take my word for it? I tried three of those cases.
A. I --
MR. SPIRA: Object to form.
THE WITNESS: If that's what actually happened, then, I will accept it, if that is exactly what happened.
BY MR. DOUGLAS:
Q. Okay. And, in fact, do you recall in

that case that you pointed to the plaintiff's obesity as a potential explanation, just like you are doing here for their -- the plaintiff's kidney cancer in that case?

MR. SPIRA: Object to form. Mischaracterizes evidence.

THE WITNESS: Oh, I -- I didn't point to obesity as the potential reason for this. Where is that in my report?

BY MR. DOUGLAS:

Q. I'm saying that you pointed to obesity as a potential explanation in the C8 case?

A. Oh, on the --

MR. LISAK: You said also as he's doing in this case in your question.

A. You said in this case. You included that.

BY MR. DOUGLAS:

Q. Okay. So you're not -- okay. Great, so you're not saying obesity is a potential explanation for -- for any of the plaintiffs' cancers in this case?

MR. SPIRA: Object to form. Mischaracterizes evidence.

BY MR. DOUGLAS:
Q. You haven't said that?
A. Well, I wasn't -- I wasn't asked to evaluate individual causation, so I didn't get to that issue.
Q. Okay. You haven't been asked as of yet?
A. Well, I may be asked or I may not be asked. I don't know.
Q. Okay. All right. And so my point is -- I mean, no one is perfect, right?
A. Well, I don't think so.
Q. Okay. I marvel at the fact that you had to struggle to answer that question.
MR. SPIRA: Object to the mischaracterization.
BY MR. DOUGLAS:
Q. And you've been wrong in the past, haven't you?
A. About what?
Q. Anything.
A. I've been wrong about something in my life? I suppose everyone in this room could probably say yeah.

Q. That's my point.
A. Okay. All right.
Q. And in fact, getting back to this question of this role of the judge and the jury to weigh your opinions, there have been times like in the C8 case where a jury has rejected your opinion and accepted the plaintiffs' opinion and found in favor of the plaintiffs, right?
MR. SPIRA: Object to form.
THE WITNESS: Oh, I didn't know that.
BY MR. DOUGLAS:
Q. Well, they made a major motion picture about it. You didn't know that?
A. I didn't -- I didn't see the picture.
Q. Okay. They made two documentaries, you didn't see that?
A. No.
Q. You had no interest even though you were involved as an expert in that case to see those documentaries?
A. I didn't know they existed.
Q. Okay. So, in fact, ultimately, if you recall, you were excluded by Judge Sargus, federal judge in Columbus, Ohio, your hometown, from

testifying as to general causation; isn't that true?

A. Oh, I don't recall. Well, as I recall in the C8 litigation, the deal that the company had made with the lawyers was that general causation had already been established, and so that wasn't an issue that I could opine about. That's what I understood was the case.

It was -- it was a done deal that general causation -- so of course I couldn't be -- I couldn't talk about general causation because the company had allowed that to go through.

Q. But you did opine about general causation despite that agreement, and that's why you were excluded from testifying as to general causation?

A. I don't -- I don't know why I was excluded. I -- if I did it, then that's because the attorneys said, Well, why don't you go ahead and do it.

Q. Okay. And I'm just exploring the possibility that maybe you're wrong in this case too. And so my question is -- and you mentioned that you have done some work since then, since the

C8 cases on PFOA.
Have -- have you changed your view on whether or not PFOA, just to cite as an example, is considered a carcin- -- a human carcinogen in drinking water?
A. Oh, well, I don't think I've ever addressed that question specifically. I would never be asked that question, Is it -- is it a carcinogen. That's a different question than does it cause a specific cancer.
So I'm sure I was never asked that question, never been asked that question.
Q. So let me use -- let me follow up based on what you just said.
So it was at one time your opinion that PFOA was not established in the scientific literature to -- to cause kidney cancer? That's the cancer at issue specifically.
A. You mean in terms of -- in terms of testimony?
Q. And your report.
A. Oh, I'd have to look at the report. I think that may be true, but I -- I don't actually remember.

Q. Okay. And so my point is that since the time you testified and wrote the report and you testified at deposition, as I mentioned, are you aware that the EPA and other regulatory agencies have classified PFOA as a likely carcinogen?
A. They may have, which is different than saying it is a carcinogen, but they may have.
Q. Okay.
A. I also know something else about it is that it does not exist at the IARC, the International Agency For Research on Cancer.
Q. Well, actually IARC has classified PFOA as a Group 1 carcinogen. You didn't know that?
A. I would -- associated with which cancer?
Q. Including kidney cancer.
A. Okay. So maybe -- then things have changed.
Q. Here's -- here's my point. You once held the view that PFOA was not capable of causing kidney cancer?
A. I did not. No, I did not say that --
Q. You don't like the word "capable"?

A. No, no, no. I did not say that. I said exactly what I said here --
Q. I know.
A. -- it has not been established, and then more research was done, and then it became established. That's different.
Q. All right.
A. That's different.
Q. But you'll acknowledge, therefore, that sometimes you turn out to be wrong?
A. I wasn't wrong. Why was I wrong? I wasn't wrong.
Q. I ask the questions.
A. At the time -- no. At the time the evidence wasn't sufficient. Then more evidence shows up. It can change, and that's exactly what happened.
Q. But it was already an agreement, as you said, that -- to general causation at that time.
A. That's what the company agreed to. That's not because that's what was true.
Q. Okay. All right. In any event, the point of this is not to get into PFOA.
The point is that sometimes it turns

out -- maybe that's a better way to put it. It turns out that -- later on that the compound of interest does in fact -- of which you were asked to opine about, does, in fact, cause a human outcome like a cancer.

A. Or it doesn't.

Q. Or it doesn't.

A. Right, because we don't know the future.

Q. Okay. Do you think that more research should be done with respect to chemical hair relaxers and its potential to cause uterine cancer?

A. Yes.

Q. Why is that?

A. Because there's very little information about it right now.

Q. Okay. But do you think there's some public health interest as to why we should continue to study the question of hair relaxers and its potential to cause uterine cancer?

A. Well, there is a public health interest in this sense, that it is a consumer product, and therefore if it were to turn out to be causal,

which we don't know and we can't know, then it would have potentially sufficient -- some public health interest, of course. So that's why more research is needed.

Q. Okay. In your opinion?

A. Well, not just my opinion. It's what every author of these papers -- the three major studies have said.

Q. Including your opinion?

A. Yeah, more research is needed, for sure.

Q. All right. And you understand the plaintiffs' experts in looking at not just the epidemiology -- because you mentioned the papers that have been written on epidemiology, when looking at multiple avenues of evidence, like animal studies, toxicology, causability, they have -- plaintiffs' experts have determined that there is sufficient evidence to draw a conclusion as to causation, disagree or not?

A. Well, I -- they -- they have. They're wrong, but they have.

Q. You say they're wrong, they say they're right. Jury gets to decide, right?

MR. SPIRA: Object to form.
Mischaracterizes the legal process.
THE WITNESS: The -- they are wrong.
BY MR. DOUGLAS:
Q. In your opinion?
A. It's not an opinion.
Q. It's a fact?
A. It's because of the fact that they did not use the correct methodology, and that's what science is all about.
Q. I understand, and -- and you use some wild language in describing some of these experts. I was kind of surprised about that, as opposed to being strictly scientific.
But you have -- at the end of the day you have a difference of opinion between you and the plaintiffs' experts?
MR. SPIRA: Object to the form, asked and answered.
THE WITNESS: Well, at the end of the day, I would pose it a slightly different way because you're correct in a sense, but I also -- but they are also different from every other institution known outside of this

litigation. There's nobody else that says it's causal. The EPA doesn't say it, IARC doesn't say it, National Toxicology Program doesn't say it, ATSTR doesn't say it.
So it's not me against them. It's them against the scientific community.
BY MR. DOUGLAS:
Q. I know, but sometimes it's you against the scientific community and, we can get into some examples where the scientific community and regulatory agencies have discovered a compound, has a human carcinogen and you said it's not?
A. No.
Q. Okay.
A. That is an inexact description of what I have ever said.
Q. Well, have I three or four examples we are going to get to.
A. I will guarantee you that it has something to do with a specific cancer, because you can have -- you can have something called a carcinogen, great example is in this litigation, formaldehyde. It is a human carcinogen. And it doesn't cause uterine cancer or ovarian cancer.

So it can be called a carcinogen, but you have to get down to which cancer we're talking about.

MR. DOUGLAS: All right. Move to strike as unresponsive.

BY MR. DOUGLAS:

Q. I am going to give you some examples of specific cancers where regulatory agencies have weighed in and said a particular compound causes specific cancers, but you disagreed. We are going to get to that in a few minutes.

So I want to revisit in greater specificity the question of how much money you've made from the defense bar over the years, so our judge can get an idea as to where you've earned your living over the last 18 years. Okay?

A. Sure.

Q. Okay. When I took your deposition back in 2015, in the C8 litigation, you testified from the time you started your consultancy in 2007 to 2015, you had already made, by that time in 2015, 5 or 6 million dollars.

Do you dispute that?

And we can show you the transcript.

A. No. No.

Q. Okay. How many more millions have you made since then?

A. I don't really know the precise answer to that, more than 5 or 6. I don't know the answer to be precise.

Q. Okay. And you told me back then -- and, again, we can go to the transcript, it's just going to slow us down -- that 80 percent was litigation related?

A. That could have been, probably true at the time.

Q. Okay. And it's true now. I think you mentioned earlier that it's about 90 percent now?

A. That's correct.

Q. Okay. And in 2016 alone, you testified in the Abilify case that you earned 1.2 million.

Any reason to disagree with that number?

A. Yes. Not the number but the way you characterized it.

Q. Okay.

A. I'm reasonably confident -- I work on more than one project at a time, so maybe I made 1.2 million from the Abilify or maybe I made

1.2 million that year and Abilify was one of the projects I was working on.

Q. I didn't ask you whether that was Abilify alone, but I understand that important distinction.

But it was all defense work?

A. Well, I've worked for the plaintiffs; that was probably before that.

So I think it was all for the defense. Yes, most likely.

Q. So -- and over these 18 years, there is a number of different products, chemicals, compounds, and pharmaceutical drugs where you've been retained as a consultant on behalf of a defendant?

A. Yes.

Q. Okay. Abilify is one?

A. Yes.

Q. The talc case, talcum powder?

A. Yes.

Q. For the defense?

A. Yes.

Q. Mirapex?

A. Yes.

Q. The weed killer, Roundup?
A. Yeah. That one didn't really go anywhere, so I don't actually recall. But maybe I did.
Q. Okay. Well, we'll look at it. I have a list we're going to mark in a second.
Dentu-Creme, were you hired by the defense?
A. Oh, yeah. I did Dentu-Creme. I remember that.
Q. And how many different states -- this is -- this case is pending in federal court in Illinois.
How many different states, whether state or federal, have you served as an expert in?
A. I don't know.
Q. If I told you it's at least 19, almost half the number of states in the country, would that sound about right?
A. I don't know.
Q. Okay. Well, we'll go through that. I have another list.
So let's start with DL-19.
And is this a list we compiled from the

public records of the different cases and products that you have been retained as an expert on behalf of defendants in with examples of some of the specific cases --

(Weed Deposition Exhibit No. 7 was marked for identification.)

BY MR. DOUGLAS:

Q. -- which, according to the public records, you were an expert.

With that preface, let's just go through it and you tell me if it's true or not.

We talked about Abilify, right?

A. Yes.

Q. The talc baby powder case, right?

A. Yes.

Q. Mirapex and Dentu-Creme, right?

A. Yes.

Q. Roundup, you see that, in the Jennifer Leeman v. Monsanto Company?

A. Right.

Q. You've been hired by Monsanto, they've paid you, right?

A. Yes.

Q. Peter Pan, I guess that's the peanut

butter case?
A. It was Peter Pan, yeah.
Q. For the defense?
A. Right.
Q. Okay. Nature Made vitamins?
A. Yes.
Q. That was about vitamins and their potential for human health effects?
A. It had something to do with -- it had something to do with that. It was a rather different case because it had something to do with labeling.
Q. But it was for the defendant?
A. Yes.
Q. Okay. And hair relaxers, which is this case, right?
A. Yes.
Q. PFOA?
A. Yes.
Q. That is also known as the "forever chemical"?
A. I can --
MR. SPIRA: Object to form.
THE WITNESS: I've heard that

expression.
BY MR. DOUGLAS:
Q. Okay. Vinyl chloride, another product you've opined on?
A. Yes.
Q. For the defense?
A. Yes.
Q. Trichloromethylene [sic], TCE, is that another product you've testified on behalf of the defense?
A. It's actually trichloroethylene, not methylene. But, yes.
Q. Benzene containing ink products?
A. Yes.
Q. You have been retained by the defense in that case?
A. Um-hmm.
Q. Mold and dust mite infestation.
Have you been retained as an expert in such a case?
A. Yes.
Q. For the defense?
A. Yes.
Q. Toxic dust is another such case you

were retained in to opine on by the defendants?

A. I don't remember that. I suspect there was more to it than toxic dust. I'm not sure what the actual exposure was.

Q. Whatever the actual exposure was --

A. Yeah.

Q. -- it was for the defense.

A. Yes.

Q. And lead exposure cases?

A. Just one. But, yes.

Q. Okay. And then workplace exposures, like to benzene, diesel solvents, solvents in asbestos, causing multiple types of cancer.

You've been retained as an expert on behalf of defendants in such cases, including the once we have listed in the right-hand column?

A. Well, you -- you -- I was retained to look at all of these subjects, yes.

Q. Okay. And would it be fair to say, generally speaking, that in each and every one of those cases you opined that the particular product, substance, or chemical, with respect to those products, chemicals and compounds, that the evidence was insufficient to establish general

causation?
A. No.
Q. Which ones -- tell me which one on this list.
A. I can tell you at least two.
Q. Which ones?
A. Vinyl chloride and benzene.
Q. You've testified for the defendant that their product caused human health effects?
A. Yes.
Q. Well, we'll check that.
And so I'm going to give you the next exhibit, which is DL Exhibit 18.
(Weed Deposition Exhibit No. 8 was marked for identification.)
BY MR. DOUGLAS:
Q. Which we'll hand you in a second.
But to keep things moving, you'll see it's -- it's a list we compiled from the public records of all the different cases and states in which you have traveled to provide consultancy work for defendants?
MR. SPIRA: Object to form.

BY MR. DOUGLAS:
Q. Take a -- just take a quick perusal through it.
A. Is that a question?
Q. The question -- it's a direction to take a look at the document first.
A. Okay.
Q. And then I'll have a question for you.
A. Yeah.
Q. Just say when you're ready.
A. I'm ready.
Q. Okay. And it's -- it's true, you've testified -- and we can make it simple. If you look in the right-hand column, it's a list of -- we have the name of the cases on the left side, according to public records in which you've testified or been retained as an expert. And on the right side, the various states in which those cases were pending.
So my question, sir, is: Are all of these states in the right-hand column on Page 1 -- and I think it's a total of three pages -- the various states in which the cases were pending where you were retained as an expert?

A. If you say so. I don't really pay attention to it.
Q. Okay. You have no reason to dispute it?
A. I have no reason to accept it or dispute it.
Q. Okay. So you'll see it includes Arizona, California, Florida, Georgia, Illinois, Massachusetts, Minnesota -- Missouri, Minnesota --
MR. SPIRA: I don't think it has Missouri.
MR. DOUGLAS: It has an MI. Michigan.
MR. SPIRA: Isn't MI Michigan?
(Crosstalk.)
MR. DOUGLAS: In my defense, at my age, I need my reading glasses to read this, so... It's a little blurry.
BY MR. DOUGLAS:
Q. Minnesota, Missouri, New Jersey, New York, Ohio -- Ohio, Pennsylvania, Texas, Utah, Virginia, Washington.
Any reason to dispute that those are all of the states which you have been retained as a consultant for defendants?

MR. SPIRA: Object to form.
THE WITNESS: Well, I have been retained by law firms for a particular case or set of cases that happen to be associated with these states.
BY MR. DOUGLAS:
Q. Okay.
A. This is the first time I've ever seen such a list because I don't keep track of it.
Q. Okay. Well, I'm just trying to figure out if there is a -- there's a laundry list of different products, compounds, and you know the -- let me ask you this.
You know the saying "jack of all trades, master of none"?
Are you familiar with that phrase --
A. I am.
Q. -- and what it means?
Yeah?
A. Yeah.
Q. Okay. And you've had no background specifically, for example, in -- in hair relaxer before you were retained in this case, right?
A. That's correct.

Q. And there is a myriad of compounds, pharmaceutical products, and chemicals that you have testified or been retained as an expert to offer an opinion on behalf of defendants, as we just saw?

A. Well, that's not exactly correct. And you've left out exactly what I was asked to do, which was to assess general causation or sometimes specific causation in every one of these cases.

And so when you are asking -- the implication that you are making is -- you just said it yourself, you -- I am not a master of anything. It's all about causation.

Q. Yeah. Okay.

A. Every one of these.

And so that's why I'm retained, because I apply the causal -- the causal inference methodologies and they apply in all of these situations. There is no special methodology for, say, vinyl chloride that isn't also used for trichloroethylene.

Q. Yeah. But you also said that in every one of those cases, except for two, that your ultimate conclusion was essentially that the

scientific literature was insufficient to establish general causation, right?
A. No, I didn't say that.
Q. I thought you did.
A. No. What I said was --
Q. I stand corrected.
A. What you asked --
Q. Let the record speak for itself.
A. What you asked me was which of these have I opined that -- well, maybe I don't remember the question.
But there -- there are times when I have opined general causation and there are times when I haven't because of the application of these methods.
Q. Yeah. And I get it.
But have -- there isn't a compound, or a chemical, or a pharmaceutical drug, or a weedkiller where you have felt unqualified to render an opinion as to general causation?
A. Well, my qualifications have to do with general causation, not -- not about the subject --
Q. I get the distinction.
A. Okay.

Q. I think we all get the distinction.
A. Well, let me finish my sentence -- my answer, then.
It's not a distinction, it's an important point, is that I am asked to do this because the question --
Q. Totally get it.
A. -- at hand is general causation --
Q. Okay. But --
A. -- and that is what I do.
Q. But my point is, you had no specific knowledge of -- in a -- for example, in this case, of hair relaxers before you were asked to apply your -- your principles of general causation, right?
A. Well, you have the question -- it's actually not a very good question, but let me explain why.
Q. Thank you.
A. Let me explain why.
Q. I think you have been giving not great answers.
A. It's -- it's about methodology, and so it's the application of the methodology.

It's not my methodology, it is the methodology of the scientific community.

Q. Yeah. We heard you 15 times already, but my -- please answer my question, this will go a lot easier.

You had no particular expertise in hair relaxer before you were retained as an expert in this case. Fact?

A. You asked me that question --

MR. SPIRA: Objection.

THE WITNESS: I'm trying to explain because you don't need to in order to -- in order to answer the question --

BY MR. DOUGLAS:

Q. Why is there a long explanation in the answer?

A. Because I --

Q. What are you so defensive about?

A. I'm not being defensive.

Q. I think you are.

A. No. For me -- please let me finish.

Because --

Q. I would like an answer to my question.

MR. SPIRA: Counsel. Counsel, he is

trying to answer your question.

MR. DOUGLAS: He is not answering the question and you know it.

THE WITNESS: Because you have always said --

MR. DOUGLAS: And you have a duty to make sure he answers the question. So I --

MR. SPIRA: Counsel, you have a duty to let him answer before you interject.

MR. DOUGLAS: He has a duty to answer and you have a duty to make sure he does and doesn't get on a soapbox and reiterate whatever it is you spent three days prepping him to say, which is obvious to us all. Okay?

MR. SPIRA: Counsel. Counsel, he --

MR. DOUGLAS: The question is simple, Counsel.

MR. SPIRA: Counsel, please don't interrupt.

MR. DOUGLAS: The question is simple, he had no experience in hair relaxer prior to being retained in this matter.

Is that too complicated for you?

MR. SPIRA: Counsel --

MR. DOUGLAS: Is that too complicated for you?

MR. SPIRA: Counsel, I -- Counsel, calm down, first of all.

Second of all, you've asked him the question. I understand it, he understands it. He has tried to answer your question, he is trying to answer it again.

MR. DOUGLAS: He is speaking but he's not answering --

MR. SPIRA: You keep interrupting him. You keep interrupting me.

MR. DOUGLAS: And vice versa.

MR. SPIRA: Let him answer the question.

MR. DOUGLAS: I would like him to answer the question.

BY MR. DOUGLAS:

Q. The question is: You had no expertise, particularly, in hair relaxer before you were retained as an expert in this case.

MR. SPIRA: Objection --

BY MR. DOUGLAS:
Q. True or not true?
MR. SPIRA: Objection, asked and answered.
BY MR. DOUGLAS:
Q. Then answer it again.
A. Let me try to answer it. You would like me to say yes or no. We've already -- you've already -- you've already asked me this question, so I've already answered this question. And you've already set this up as explaining something to the judge and the jury.
And I'm trying to then help the judge and the jury to understand the context of this and what you're trying to sort of -- how you're trying to point me.
Q. I'm just asking questions.
A. No, I understand that, and I've already answered that question.
Q. So --
A. And I'm trying to give you -- the context to the judge and jury, which you've made a point about bringing --
Q. I haven't asked for context.

A. Yeah, but --
Q. I've asked for just the facts, man.
A. But you have set that -- you have set that up as the reason you're asking these questions. I've answered that --
Q. This is --
A. I've answered --
MR. SPIRA: Counsel, you have to stop interrupting.
THE WITNESS: I've answered that question --
MR. DOUGLAS: Even you have to say he's not answering the question.
MR. SPIRA: You got to let him --
MR. DOUGLAS: Let him speak?
MR. SPIRA: -- let him speak, and then if you have a follow-up, you ask your follow-up.
MR. DOUGLAS: And then you'll say asked and answered. So I get the game, but I'd like an answer to the question.
MR. SPIRA: I'm not preventing him from -- if I object to asked and answered, as you well know, it's for the record --

MR. DOUGLAS: I didn't know we were making records. Okay.
THE WITNESS: I already answered that question.
BY MR. DOUGLAS:
Q. And what was your answer?
A. And my previous answer was I did not have specific information about hair relaxers, I did have the notion that this is the exposure. And the exposure is what matters in a causal claim --
Q. I -- I get it.
A. -- process.
Q. See how easy that was?
A. Is that a question you actually want me to answer?
Q. And that is -- and that is true --
A. Sorry --
Q. No, I'll withdraw that question.
MR. SPIRA: Counsel, whenever you're at a breaking point, no rush.
BY MR. DOUGLAS:
Q. That is true for any of those products listed on Exhibit -- what exhibit was that, 18 or

19? 19.
And you had no particular expertise in the area of any of those products before you were retained?
A. I'm not sure what you're asking me.
Q. I don't know how I can be any clearer.
A. You said "particular expertise." What does that mean?
Q. What does your answer mean? What is the meaning of life? I mean, what do you -- what do you want -- that's a pretty straightforward question.
A. Well, let me put it this way. I worked at National Cancer Institute --
Q. I know you like to say that, and you did great work there.
MR. SPIRA: Counsel.
BY MR. DOUGLAS:
Q. Go ahead.
MR. SPIRA: Let him answer.
THE WITNESS: 25 years.
BY MR. DOUGLAS:
Q. 26 years ago.
A. 20- --

MR. SPIRA: Counsel, let him answer the question, and then you can follow-up.
THE WITNESS: And within that time period, I was exposed to and discussed and listened to talks and seminars about many of these -- many of these chemicals, so I know about many of these chemicals. I know about vinyl chloride. I know about trichloroethylene.
BY MR. DOUGLAS:
Q. Okay.
A. I know about benzene. I know what these things are, and if that's what you mean by expertise, I know what they are, I know what benzene is. I know what Dentu-Creme is.
Q. I think we all do.
MR. SPIRA: Counsel.
THE WITNESS: There you go. So this whole --
BY MR. DOUGLAS:
Q. But I wouldn't consider myself --
MR. SPIRA: Counsel --
THE WITNESS: Whoa, whoa, whoa, I'm not done. So your question, do you have

expertise -- you just said, Yeah, you've got expertise too.

BY MR. DOUGLAS:

Q. No, I didn't.

A. No, you said we've got -- I know what Dentu-Creme is, so do I.

Q. But I'm not an expert.

A. Yeah, but I know what Dentu-Creme is. I know what vinyl chloride is.

Q. I do -- I do too.

A. I know what mold and dust mites are. I know what led is. I know all about led exposure. So -- so I -- I -- I --

Q. That's fantastic. The question though is not whether you know about it, but did you consider yourself an expert in those with respect to your knowledge of those products before you were retained as an expert?

A. No one -- who would ever say that? Yeah, I don't understand that.

Q. Thank you. You've answered my question.

A. I don't --

Q. You've answered my question as --

A. Yeah, I don't --
Q. -- incredulous as you would like it to appear, that's a good answer. Thank you. I'll take it.
MR. SPIRA: Whenever you're at a transition, we can do a lunch break, but happy to let you go a few more minutes if you want.
MR. DOUGLAS: One more document that will be quick.
MR. SPIRA: Sure.
MR. DOUGLAS: Let's go to your website, DL 21.
(Weed Deposition Exhibit No. 9 was marked for identification.)
BY MR. DOUGLAS:
Q. Do you recognize Exhibit 9?
A. I almost don't recognize myself and -- you know, I haven't looked at this -- I've got to change this. I haven't -- I haven't revised this for a while.
Q. Okay. This is a perfect example of you're not answering my question. I asked you if you recognize it.

A. Yes.
Q. Okay. And as you indicated, the picture of you is from some years ago?
A. Yes.
Q. And that's okay. The picture of me on my firm's website is from some years ago. It hurts to have to change it, honestly.
But if you go -- and this is a website for your consultancy company, right?
A. Yes.
Q. And I think you mentioned, if you go on the web and you just type in "DLW Consulting," you may not come up with your website, right?
A. You may not.
Q. Okay. And it goes on to say, first paragraph, Douglas L. Weed, a physician epidemiologist, is the founder and managing member of DLW Consulting Services LLC."
Do you see where I'm reading from?
A. Yes.
Q. Okay. And are you currently the managing member?
A. Yes.
Q. How many members are there?

A. Two.
Q. You and who else?
A. My wife.
Q. What does she do?
A. She handles the business side of like QuickBooks and things like that.
Q. Like the billing?
A. Well, we do it together, but she's -- she's responsible for the management part of it.
Q. Okay. So it's not like you're managing a group of scientists that support your work, like they had at Weinberg?
A. No, it's just me and her.
Q. Just you and her. And the office has always been at your home, right?
A. That is correct.
Q. Okay. So you didn't intend to give the impression to anyone who would read this website that this is a large company and -- that requires a managing member to manage all the members. It's just you and your wife, right?
A. Well, managing member is the -- is the language of LLCs as I understand it.
Q. Okay. But my --

A. So it would be -- it would be -- that's the appropriate word.
Q. Okay. I get that, but you didn't -- so you didn't mean to give the impression to anyone who would come upon your website that this is a large company, and there are many members that you needed to manage. Fair to say?
A. Fair, yes.
Q. And you, in the very first paragraph, indicate consulting service -- Dr. Weed's company specializes in -- "Dr. Weed's company," which is basically you and your wife, "specializes in providing expert advice and guidance on problems at the interface of science and law, commerce and public policy."
Right?
A. Yes.
Q. Okay. It doesn't say anywhere that -- that -- in this sentence anyway, guidance on the question of general causation. I don't see the words "general causation" in that sentence, do you?
A. Not in that sentence no. That's later.
Q. That's fine. That's why I said not in

this sentence.
The next sentence, you go on to say Dr. Weed has -- "Dr. Weed has 25 years of experience in epidemiological research."
And you're referring to your time with National Cancer Institute there; is that right?
A. That's correct.
Q. Okay. "And training at the National Cancer Institute. He is the former chief of preventive oncology, the director of the Cancer Prevention Fellowship Program and the director of the Summer Curriculum in Cancer Prevention."
Who wrote this?
A. Oh, I did.
Q. Do you often refer to yourself in the third person like that? You're referring to yourself as "he is."
A. I think I read some other websites where this is exactly the way -- I think it's exactly the way people write these things, so I did it sort of as a model. I wouldn't think I would --
Q. Okay. I just want to be clear, you're referring to yourself in the third person, right?

A. Yes.
Q. Okay.
MR. DOUGLAS: Just one other thing I want to do quickly, because it's relating to this.
BY MR. DOUGLAS:
Q. In your report, you have your CV; is that correct?
A. Yes.
Q. And I have some questions about your CV, but just one particular question we -- I have for you now, and then we can take a break. It's Appendix C of your report --
A. Right.
Q. -- which is -- and on the very first page of your CV, in the first paragraph, you write, "Dr. Weed is an independent scientific consultant."
Right? See where I am?
A. Yes.
Q. Okay. "He is a physician-epidemiologist with four years' experience in epidemiological research and research training."

And then you go on to say "Dr. Weed is an internationally recognized scholar and" educated in -- "educator in causation, causal inference, and the ethics of epidemiology."

Do you see that?

A. Yes.

Q. You wrote that about yourself?

A. Yes.

Q. Okay. Did -- is there anything you can cite to where you have been characterized by other authors as internationally -- as an internationally recognized scholar?

A. I don't think anybody could possibly do that. I'm simply pointing out that I give talks around the world, and I've given talks around the world at lots of international -- and give talks at international meetings and so --

Q. But you're suggesting that the scientific community, others, recognize you as an international scholar. I'm just curious as to whether that's your own -- if you do say so yourself kind of thing --

A. I have --

Q. -- or others have said that about

you --

MR. SPIRA: Object to form.

BY MR. DOUGLAS:

Q. -- and you published that?

A. Well, it's not about publishing that, but if you were to ask them, they would probably say "yeah."

Q. Okay. And I don't doubt at the time that you were at NCI that folks might say that, but would it surprise you to learn that a lot of your colleagues today -- I don't want to use the word "sell out," that's -- that's offensive, but that you have sought to monetize your 25 years of public service by working for defendants in litigation-related matters?

MR. SPIRA: Object to form and foundation.

BY MR. DOUGLAS:

Q. Would it surprise you to know that is what your colleagues think of you now?

MR. SPIRA: Same objection.

THE WITNESS: My colleagues, some of them -- some people in the discipline might say that. They might.

MR. DOUGLAS: Okay. Thank you. All right. Let's take a break.
THE VIDEOGRAPHER: Okay. The time is now 12:25. Going off the record.
(Break taken.)
THE VIDEOGRAPHER: Time is now 12:43. Back on the record.
BY MR. DOUGLAS:
Q. Okay. So you left NCI in 2007 to go work for Weinberg as we discussed, right?
A. That's correct.
Q. Okay. And I think you've testified previously that it was about a month between when you left NCI and when you began at Weinberg?
A. Something like that.
Q. Okay. And -- and -- and how is it that you came to be employed by Weinberg?
A. Well, as I recall, I interviewed at several firms like Weinberg and chose Weinberg.
Q. Okay. So you must have done some research into them and all the other companies in helping make your decision?
A. Not -- not probably as -- not probably very much. I wasn't really -- I was very

brand-new to this whole issue, so I probably didn't do very much research into them. I sort of went with what people said, Well, here are these various companies around, why don't you go look at those. So...

Q. What other companies did you look at, if you -- if you can recall?

A. Exponent was one. Sorry. I think I interviewed maybe at something called The Sapphire Group, and I'm not sure if that still exists. Those are the three that I can remember.

I may have -- I may have re-interviewed at ChemRisk, but I don't remember if I did. Maybe.

Q. Okay. And -- and I think we established this, that when you did go work for Weinberg, you were unaware that Representative John Dingell of Michigan, the chairman of the House Energy and Commerce Committee, was leading a Congressional investigation examining the role of the Weinberg Group in using scientists, including epidemiologists, as hired guns to defend products from legal and regulatory action.

You said you're not aware of that?

A. Well, I'm not aware of what was going on, however you want to characterize it.

Q. Well, it's how the representative characterized it, but I'm not going to quibble with you on that.

There's -- there is a book about Weinberg and some of these others entities like Exponent and ChemRisk called "Doubt is Their Product."

Are you familiar with that book?

A. Yes.

Q. Have you read it?

A. I leafed through it.

Q. Okay. Did you leaf through the parts that talk about Weinberg?

A. Not that I recall.

Q. Okay. Well, I want to show you some of those parts. I have the whole book. It's my only copy, but in case you need context, it's here for your use, if you would like it. But I've taken some excerpts and marked them as a -- as a specific exhibit.

(Weed Deposition Exhibit No. 10 was marked for identification.)

BY MR. DOUGLAS:
Q. And I'm going to read some portions of it and have some follow-up questions. And I want to start with -- first of all, the title of the book is "Doubt is Their Product: How Industry's Assault on Science Threatens Your Health."
Do you see that?
A. Yes.
Q. Okay. And I want to go first to Page 46 of 372. And there's a paragraph on the left side, "as the product defense work." Just let me know when you're --
A. Yeah, I got -- I'm sorry. Yeah, I'm there.
Q. Great. It says, "As the product defense work has gotten more and more specialized, the makeup of the business has changed; generic public relations operations like Hill & Knowlton -- have you heard of Hill & Knowlton? Do you know who they are?
A. No.
Q. Okay. "...have been eclipsed by product defense firms, specialty boutiques run by scientists. Having cut their teeth manufacturing

uncertainty for big tobacco, scientists at ChemRisk, the Weinberg Group, Exponent..." those are the three firms that you looked into, right?
A. Yes.
Q. "...and other consulting firms now" battle for the -- "they're battling regulatory agencies on behalf of the manufacturers of benzene, beryllium, chromium, MTBE, perchlorates, phthalates and virtually every other toxic chemical in the news today."
Do you see where I'm reading from?
A. Yes.
Q. Are you -- when you skimmed through this book, did you read that particular -- do you recall reading that particular portion?
A. I don't know when I skimmed through the book. No, I don't know.
Q. You don't recall seeing that part?
A. No.
Q. Okay. Whenever it was.
It goes on, the next page at the top, the sentence begins "they."
A. Yes.
Q. Yeah. "They and the larger, wealthier

industries for which they work go through the motions we expect of the scientific enterprise, salting the literature with their questionable reports and studies. Nevertheless, it is all a charade. The work has one overriding motivation: Advocacy for the sponsor's position in civil court, the court of public opinion, and the regulatory arena."

Do you see where I'm reading from?

A. Yes.

Q. Is it -- is that the first time you're seeing that?

A. Yes.

Q. Okay. And there's a couple more, and I'll have some questions about these.

Page 156, there's a sentence that begins -- it begins on the second half, second side, about three lines down, "instead, they turned."

"Instead they turned to the Weinberg Group, specialists in product defense."

Did you know that the Weinberg Group is considered by some as a -- as a specialist in product defense?

A. Well, they -- they were apparently, according to David Michaels in his non-peer-reviewed book, that they were known for that. I actually heard some rumors later that they were now involved in plaintiff work, so -- which I don't know if it's true or not, but that's what I heard.

MR. DOUGLAS: All right. I'll move to strike the nonresponsive portion, everything about plaintiffs' work, speculation.

BY MR. DOUGLAS:

Q. Veterans -- and then the sentence goes on, "Veterans of the tobacco wars."

Did you know that the Weinberg Group had been hired by the tobacco industry to defend against litigation claims brought by individual smokers?

A. Well, yeah, I knew that. And I specifically told them I -- I -- I wouldn't work for tobacco.

Q. So -- because I thought you said you didn't do much research but you knew they had done work in the tobacco area?

A. Well, once I got there, I found out

that was true, and I said, Well, I won't do that.
Q. Are there any other companies, products, industries that you refused to do work for, other than tobacco?
A. That's the one that I remember. I don't remember doing it for others. I may have, but I don't -- I just know I wouldn't do it for tobacco.
Q. Do you remember what particular cases, for lack of a better word, you worked on while you were at Weinberg?
A. Just cases in general?
Q. Yeah.
A. I know the peanut butter case was out of Weinberg.
Q. Anything else?
A. There was some work in PCBs, I think.
Q. And that was on behalf of defendants, right?
A. Yes.
Q. And the sentence goes on, "Veterans of the tobacco wars with a proven willingness to defend virtually any product under siege."
Do you see where I'm reading from?

A. Yes.
Q. And that's what you did with respect to the two that you do remember, the peanut butter and -- what was the other one -- PCBs, you worked for the defense, defending the product?
A. No.
Q. You didn't defend the product?
A. I worked for the defense to assess the evidence to see whether or not in the case of peanut butter, whether or not this was an individual causation issue, not general causation --
Q. Got you.
A. -- for peanut butter.
And for PCBs, the question was: Is the evidence -- like we've talked about before -- sufficient to make claims of causation about PCBs? That's what I was asked to do.
Q. Okay. On behalf of the defendants?
A. Yes.
Q. Now, I want to turn to another source, DL-24, which we will mark as 11.
(Weed Deposition Exhibit No. 11 was marked for identification.)

BY MR. DOUGLAS:
Q. And this is an article from Vanity Fair, in 2008, which is -- I think you -- you were there in 2008.
You were at Weinberg in 2008?
A. I was.
Q. Through April?
A. Through April. So it would be, yeah, three months.
Q. Okay. And this article happened to be published in -- on April 28th, 2008.
Do you see that?
A. I was gone.
Q. Okay. By a couple of weeks?
A. Yeah, but I was gone.
Q. Okay. And the article is called, "Uncovering the Weinberg Group."
Do you see that?
A. Yes.
Q. Okay. And I want to read you some excerpts from it. It starts, "Back in" -- on the first page of the article itself.
"Back in February 2006, journalist Paul Thacker wrote a story called, 'The Weinberg

proposal.' It appeared in Environmental Science & Technology, a journal published by the American Chemical Society."

Do you see that?

A. Yes.

Q. And you're familiar with the publication Environmental Science & Technology?

A. Barely.

Q. Okay. But you are certainly familiar with the American Chemical Society?

A. Yes.

Q. And you haven't done any work for the American Chemical Society, directly?

A. I've given a talk or two there. I'm not sure I've ever been employed in a contractual consulting, that I can recall.

Q. And what is the American Chemical Society?

A. My understanding is that it's a -- well, it's in Washington, DC, and it functions primarily as a lobbying organization for the chemical manufacturers of the United States.

Q. Okay. The article goes on to say, "The piece was about the Weinberg Group, a scientific

consulting firm in DC. It works for chemical companies to manufacture uncertainty about the health and environmental effects of chemicals with the aim of fighting off regulatory and legal challenges."

Do you see that?

A. Yes.

Q. It goes on to say, "Lest you think that description melodramatic, it's worth reading the letter Weinberg sent DuPont on that company's battle over Teflon. It describes how Weinberg would 'harness, focus and involve the scientific and intellectual capital of our company with one goal in mind - creating the outcome our client desires.'"

Do you see that?

A. Yes.

Q. If that's true that is not consistent with what you have been saying, which is that you just -- you apply established principles of epidemiology and general causation, no matter what the compound chemical or pharmaceutical drug is at issue, right?

A. That's not what I did at Weinberg.

Q. That not -- you're saying that's what you did. I get that.
A. That's not what I did, I did exactly --
Q. But that -- you -- you certainly would think that that is not an appropriate thing to do, which is to use the -- the company to create the outcome that the client desires, as opposed to applying objective scientific principles of, say, general causation, right?
A. That's not what I do.
Q. But that is the what the author of this article is saying in citing to a letter from Weinberg to DuPont as to what Weinberg was doing?
A. Yeah, it's a --
Q. Agree or not?
A. Well, it's a magazine article.
Q. And on Page 4 of 8, at the top, it says, "As part of his investigation, Representative John Dingell (Democrat - Michigan), chairman of the House Energy and Commerce Committee, wants to exam the role played by the Weinberg Group, a Washington firm that employees scientists, lawyers and public relations specialists to defend products from legal and

regulatory action."
Am I correct -- did I read that correctly, first of all?
A. Yes.
Q. All right. So my question is -- so if I understand what you've said before, you were unaware that the -- that Representative Dingell was examining the role the Weinberg played in using scientists and lawyers to defend products from legal and regulatory liability?
A. I didn't know what Representative Dingell had intention. No, this is the first time I have ever read this.
I knew that there was some -- something going on between Dingell and the Weinberg Group, that's all I knew.
Q. Okay. So you were there for a year and you had no idea what exactly it was that was going on --
A. That's correct.
Q. -- between Dingell and the Weinberg Group?
Okay. Except for some chatter around the water cooler?

A. That is correct.
Q. And so, you -- you -- I don't want to say you were oblivious, but you are completely -- you are saying you are completely unaware of all of these allegations that were being made about the Weinberg Group while you were there?
A. I had no idea what the specific allegations were.
Q. Okay. And did you have any curiosity as to why the United States Congress would be looking into the company that was employing you?
A. No, actually I felt like it was probably a good time for me to go because I didn't have anything to do with it.
And this is -- as you pointed out, the Vanity Fair article came out after I left. And this was -- and as the writer has written here, "wants to examine."
So, actually, it looks to me like it hadn't really happened yet. So based on this, if this is -- so --
Q. If --
A. I knew that something was going on --
Q. Okay.

A. -- and I thought, well, of all the things -- all the reasons it would be good to leave, it would be good to leave because I didn't want to have anything to do with it, I had nothing to do with it, and I felt like it was a good time to set up my own company.

Q. Okay. And in any event, you have described your reasons for leaving Weinberg, as we looked at before, from your Abilify deposition, as, "I had learned" -- quote/unquote, I had learned enough about how to be a good consultant.

MR. SPIRA: Object to form. Asked and answered.

THE WITNESS: We -- that's a question and I -- and we talked about what that meant.

BY MR. DOUGLAS:

Q. Right.

A. And I wanted to be independent of the Weinberg Group and every other consulting company.

Q. And then you went on to start your own consultancy, right?

A. That's correct.

Q. Which also happened to be doing work primarily for manufacturers and defendants in

litigation?
A. Well, that's the way --
Q. Is that -- is that the business --
A. Well, that's the way it -- I'm sorry. Are you not done?
Q. Let me finish.
A. I'm sorry.
Q. It might have seemed like I was done.
Is that the business model that you had learned from in -- in creating your own consultancy, the Weinberg Group?
A. No.
Q. Okay. But you did do work almost, if not entirely, exclusively for defendants and manufacturers?
MR. SPIRA: Object to form.
THE WITNESS: Well, that's the way it turned out.
BY MR. DOUGLAS:
Q. Okay. Now, I'm going to switch gears.
And, again, I just want the Court to know something about -- you know, from whence you came and what your experience was and what you've been doing for the last 18 years. I want some

context and color on that.

So I want to look in that vein at some of the publications and the peer review that you have authored.

And I want to start with DL-25 --

(Weed Deposition Exhibit No. 12 was marked for identification.)

BY MR. DOUGLAS:

Q. -- which will be Exhibit 12.

I have a bunch these, I think we can go through them quickly, hopefully.

I have -- you have before you Exhibit 12, which is an article entitled, "Red meat and colorectal cancer: A quantitative update on the state of epidemiological science."

Do you see that?

A. Yes.

Q. Okay. And it's co-authored by Dominik Alexander and yourself, and two other people, right?

A. That's correct.

Q. Okay. You have published with Dr. Alexander in the past?

A. That's correct.

Q. Okay. Do you know each other personally?
A. Yes.
Q. Okay. He -- he was also an expert in the C8 litigation, if you recall.
A. He may be, I don't recall.
Q. Okay. And let's just go to the abstract on the -- on the next page. And you brought -- and let's just look at the conclusion. Let's get to the heart of it first.
MR. DOUGLAS: In the conclusion at the bottom of that first paragraph. Keep going -- no, above that. The top paragraph. And you'll see, "In conclusion."
BY MR. DOUGLAS:
Q. And it says, "In conclusion, the state of the epidemiologic science on red meat consumption and CRC" -- which is short for colorectal cancer, right?
A. Correct.
Q. So you are looking at the association between red meat consumption and colorectal cancer in this article?
A. That is correct.

Q. And you write that -- that is best -- "The association is best described in terms of weak associations, heterogenicity, an inability to disentangle effects from other dietary and lifestyle factors, a risk [sic] of clear dose-response effect, and weakening evidence over time."
Did I read that correctly?
A. No.
Q. What did I miss?
A. Lack of dose-response effect, not risk of.
Q. Again, I probably should be wearing my glasses, but thank you for that correction.
With that correction, did I read everything else correctly?
A. Yes.
Q. And then if we go to Page 541 of the article, there is this bold heading of called funding. And it goes on to say that, "This manuscript was partially" -- meaning this manuscript that you co-authored -- "This manuscript was partially funded by meat and livestock Australia, MLA" -- that is short for

Meat and Livestock Australia -- "did not contribute to the writing, analysis, or interpretation of study findings."

Did I read that correctly?

A. Yes.

Q. But it was funded by industry, right?

A. Yes, partially funded.

Q. Partially.

Okay. It doesn't say it was funded by consumer advocacy groups, right?

A. No, it does not say that.

Q. Okay. Let's go to the next -- DL-26, which will be Exhibit 13.

(Weed Deposition Exhibit No. 13 was marked for identification.)

BY MR. DOUGLAS:

Q. And it is an article entitled, "A Systemic Review of Multivitamin -- Multivitamin-Multimineral Use and Cardiovascular Disease and Cancer Incidence and Total Mortality."

Did I read that correctly?

A. Yes.

Q. Okay. And, again, this one is co-authored between yourself and Dominik

Alexander?
A. I'm sorry?
Q. And you co-authored this with Dr. Alexander?
A. Yes.
Q. Okay. And then, again, let's just look at the abstract below that, it's the setoff paragraph, and the last sentence in that setoff paragraph. It starts, "Based upon the available scientific evidence to date, supplementation with MVMs" -- that stands for multivitamin-multimineral, right?
A. Yes.
Q. Okay. "-- does not appear to increase all-cause mortality, cancer incidence or mortality, or CVD" -- cardiovascular disease -- "incidence or mortality and may provide a modest protective benefit."
That what your conclusion was in that case --
A. That's correct.
Q. -- in that article, right?
A. Right. Yes.
Q. And, again, if we go to

acknowledgments.
MR. DOUGLAS: It's on the next page -- no. It's not, it's on Page 352.
Acknowledgements, if you could blow that up.
BY MR. DOUGLAS:
Q. Again, it appears that you have been -- partially funded by industry, right?
A. I actually don't know what the Council For Responsible Nutrition is, Dominik arranged for that.
Q. Okay. I'm glad you asked that because I do.
MR. DOUGLAS: Can we go to DL-27?
BY MR. DOUGLAS:
Q. And before we do, I want to put that in the record. It says, "This research was partially supported by the Council of Responsible Nutrition.
Is that what it says?
A. That's the first sentence of the paragraph.
Q. Yeah. And then it goes on to say that they had done nothing to do with your writing?
A. That's -- that's the important part of

the paragraph.

Q. Well, you know --

A. As important.

Q. Yeah, okay.

You have heard of something called funding bias, right?

A. Yes, I have heard of funding bias.

Q. I am going to ask you about that in a minute, if you wouldn't mind holding on.

(Weed Deposition Exhibit No. 14 was marked for identification.)

BY MR. DOUGLAS:

Q. So I do know what this -- the Council for Responsible Nutrition is, and so I'm showing you Exhibit 14. And this is from their website, as of March 14th, 2026. And you'll see it says, "CRN, The Science Behind the Supplements. Responsible. It's our middle name. Our member companies, brands, and board of directors" -- and it says, "The Council for Responsible Nutrition member companies include ingredient suppliers and manufacturers in dietary supplement and functional food industry, as well as companies providing services to those suppliers and manufacturers."

Does that help refresh your recollection that CRN is, in fact, an industry sponsored group?
A. It is not about recollection, I don't think I ever knew.
Q. Okay. Well --
A. But now I know.
Q. But now you know. And the article -- getting back to the article that you wrote up with Dr. Alexander on multivitamins -- does not acknowledge -- does not have an acknowledgment indicating that a consumer advocacy group partially sponsored the work?
A. That's not what it says, no.
Q. No, it says that CRN was partially responsible?
A. Right.
Q. Okay. And that means -- does that mean that you received money, you personally received money as compensation for your work?
A. Yes.
Q. From that group?
A. I don't -- I think it might have been from Dominik's company.

Q. And he also has a defense-oriented consultancy company, true?
A. I don't --
MR. SPIRA: Object to form.
THE WITNESS: I don't know if you could call it that or not. I haven't talked to him for a long time.
He has a consulting company.
MR. DOUGLAS: Okay. And let's go to the next one, Exhibit 15.
(Weed Deposition Exhibit No. 15 was marked for identification.)
BY MR. DOUGLAS:
Q. And it's entitled, "A weight-of-evidence review of colorectal cancer in pesticides applicators." This time it's pesticides applicators.
Do you see that?
A. Yes.
Q. "The agricultural health study and other epidemiologic studies," again, co-authored by yourself and Dr. Alexander, right?
A. That is correct.
Q. And the abstract -- and this is 2011,

right?
It says revised in 2011.
A. It's published in 2012.
Q. Okay. And that is when you had your consultancy business already for a few years?
A. That is correct.
Q. Okay. And the abstract begins, "Objective: To systematically evaluate epidemiologic studies on pesticides and colon cancer and rectal cancer in agricultural pesticides applicator populations using a transparent 'weight-of-evidence' methodology -- methodological approach."
Do you see that?
A. Yes.
Q. And that is what you did for this particular piece, right?
A. Yeah. It's a summary of what we did, yes.
Q. Okay. And you concluded, not surprisingly, "The available epidemiological evidence" -- where have I heard that before -- "does not support a causal relationship between occupation as a pesticides application --

applicator or specific pesticides exposures and colon or rectal cancer," right?

A. Is that whole thing that you just said part of the question or was the first -- the first part just comment? The surprising part.

Q. I added some comment, you're right.

A. Okay.

Q. Do you want me to read it again without the comment?

A. Yeah.

Q. The available -- we have a saying -- I'll just save that for summation, should we get to trial and make my comment then.

My question is, "The available epidemiological evidence does not support a causal relationship between occupation as a pesticide applicator or specific pesticide exposures and colon or rectal cancer."

Did I read that correctly?

A. Yes.

Q. So you concluded there was no general causation?

A. For --

Q. Evidence of general causation.

A. For colorectal cancer with the specific exposures that we're talking about.
Q. Okay. And if we turn to the last page, there's a paragraph "Conflict of Interest." And it says, "The work was partially supported by Crop Life America, CLA did not contribute to the design, analysis, or interpretation of the content of this review."
Did I read all of that correctly?
A. Well, you added the usual. This is actually a really important sentence.
It says, just like Sidley, go ahead and do the analysis, tell us what you find.
MR. DOUGLAS: Okay. I move to strike as nonresponsive.
BY MR. DOUGLAS:
Q. I just asked if I read it correctly.
A. Well, not quite. But if you are going to ask that question, yes.
Q. Apart from the little comment I threw in there, right?
A. Yes. You did read it correctly.
Q. I mean, it says what it says. We can't argue over that.

And my question is: Crop Life America is an industry organization; isn't it?
A. Yes.
Q. And you received funding from that industry as well, right?
A. That is correct.
Q. And you did not receive any industry -- any compensation from a consumer advocacy group in order to do your study in this case, right?
A. That's correct.
MR. DOUGLAS: Let's go to the next, which will be Exhibit 16 now.
(Weed Deposition Exhibit No. 16 was marked for identification.)
BY MR. DOUGLAS:
Q. We can skip this, sorry. I think you've acknowledged it's an industry group.
Let's go to the next article which is DL 30.
MR. DOUGLAS: You want to take back 16 and remove it?
MR. LISAK: You had no questions about it.
MR. DOUGLAS: We can remove it. Strike

all that about 16.
BY MR. DOUGLAS:
Q. And it's entitled "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment."
Do you see that?
A. That's correct.
Q. We mentioned IARC before, but I think it's important for the record to tell us what IARC is, please.
A. It's -- the abbreviation stands for International Agency on Research on Cancer. It is the World Health Organization's cancer research agency in Lyon, France.
Q. Okay, I didn't hear what you said. You trailed off at the end.
And it's considered one of the world's authority on the -- on the subject. Would you agree that?
A. It is an agency that regularly summarizes and determines causation of chemicals in cancers, specific cancers.
Q. Okay. Do many physicians and

epidemiologists, scientists rely on IARC?
A. Yes.
Q. Including yourself at times?
A. Yes.
Q. Let's start with the abstract. It says the international agency -- before we get to that. And you're listed as one of the authors of this article, right?
A. Yes.
Q. And it goes on to say, "The International Agency For Research on Cancer, IARC, published a monograph in 2015 concluding that glyphosate is probably carcinogenic to humans, Group 2A, based on limited evidence in humans and sufficient evidence in experimental animals."
Do you see that?
A. Yes.
Q. And when IARC makes an assessment on carcinogenicity with respect to humans, it doesn't just rely on one stream of evidence like epidemiology; it will consider various streams of evidence, including animal data, toxicology, and other streams, correct?
A. Yes.

Q. Sometimes the epidemiological data or signal is strong, whereas the animal data is weak, and sometimes the other way around, and they weigh all of these things to make a final determination, fair to say?
A. They make a final determination based on the entire body of evidence.
Q. Right. And is that -- is that what you attempted to do in this case?
A. Yes, and to this extent: I'm not a toxicologist, but I have written about what it takes to -- to make a claim of biologic plausibility. I've written about this subject.
And quite frankly in this particular case, as I've written out in my report, the epidemiology is so weak that it just- -- does not justify a causal relationship. Plus, I could find no published mechanism for how hair relaxers could potentially cause -- by mechanism, I mean in the same way that IARC would look at it, which is actually defining the mechanism.
So that's what I did.
Q. Okay. I have a couple of follow-up questions based on that, one of which is: Did you

do a systematic review of the toxicology literature regarding hair relaxers and either uterine or ovarian cancer?
A. No, I relied on what your plaintiffs' experts said about it.
Q. So is it fair to say, then, that you didn't reach a final conclusion until after you read the expert -- plaintiffs' experts' reports?
A. No, that's -- that's not true.
Q. Okay.
A. -- because there's a fair amount of information about biologic plausibility mechanism in the discussion sections of the epidemiology papers themselves.
Q. So let me see if I can summarize. You did not do your own -- let me just use your words, systematic review of the toxicology literature; you relied on the plaintiffs' reports in which they described their review of the toxicology?
A. Oh, no. They didn't describe --
Q. Do you wish to --
A. They didn't describe a review of their toxicology. They -- they didn't do this either, and -- not the ones that I've been asked to look

at that were some systematic assessment of toxicology.

And as I said before, the epidemiology is so weak, that it's too weak to make a claim.

MR. DOUGLAS: Okay. Move to strike.

BY MR. DOUGLAS:

Q. I didn't ask but the epidemiology. I'm going to get into it, though.

Let's be clear: You did not do your own systematic review of the toxicology literature regarding hair relaxer and health outcomes like uterine or ovarian cancer, true?

MR. SPIRA: Objection. Objection, asked and answered.

THE WITNESS: I did not because --

BY MR. DOUGLAS:

Q. I didn't ask because.

A. Well, I'm going to tell you why.

Q. And I'm going to move to strike, but go ahead.

A. I'm -- I'm just going to answer your question.

Q. That's not the question.

A. I saw -- I saw no evidence that anyone

had ever done this review that would then allow me to say, Well, here's -- here's what's available, and so there's just -- it doesn't exist.

Q. Okay. But you didn't do the systematic review?

A. I didn't review the toxicological mechanism.

Q. Okay. Great. And as far as the epidemiology is concerned, there are many instances with the human data, epidemiology, is weak, but nonetheless IARC will conclude that a particular substance is probably carcinogenic, right? There are many examples of that.

A. Well --

MR. SPIRA: Object to form.

THE WITNESS: But that is different than what is going on in this case.

BY MR. DOUGLAS:

Q. I didn't ask this case.

A. Well, yeah. Well -- but I'm going to relate it to this case because that's what --

Q. I didn't ask you --

A. -- the judge and jury --

Q. -- to relate it to the case.

MR. SPIRA: Let him -- let him answer the question.
THE WITNESS: Yeah, please let me answer the question.
BY MR. DOUGLAS:
Q. Answer the --
A. I'm answering -- I'm trying to answer --
Q. You're not answering the question. You're offering information that is beyond the question, but I can't stop you from talking and filibustering.
A. Thank you.
You -- you may be right that IARC has come out with probably. That is not a Group 1 carcinogen description. So are there instances in which there is weak epidemiology and somewhat stronger biological mechanism and they say probably?
You know what that means is that means we don't think it's causal. That's what IARC says.
Q. What does the word "probably" mean?
A. Let's -- let's look at what IARC says

it means. It has no relationship.
Q. I'm asking you --
A. I'm -- I'm -- I'm not done.
Q. No, I'm asking you --
A. I'm not done.
Q. -- what does the word "probably" mean?
MR. SPIRA: He's in the middle of an answer.
THE WITNESS: I'm not done -- I'm not -- I wasn't finished answering the question, and then you interrupted --
BY MR. DOUGLAS:
Q. You haven't started answering the question.
A. No, no, no.
MR. SPIRA: Because you keep interrupting him.
THE WITNESS: No.
BY MR. DOUGLAS:
Q. You haven't starting answering the question.
A. Yes, I --
Q. Please answer the question. This is not complicated.

MR. LISAK: Stop talking, and he'll answer it.
BY MR. DOUGLAS:
Q. I'm asking you what the word "probably" means to you.
A. I answered in the prior question --
MR. SPIRA: Counsel -- Counsel, he was in the middle of an answer.
MR. DOUGLAS: He is speaking, but he's not answering. See, that's where we disagree.
MR. SPIRA: Now you're interrupting me.
MR. DOUGLAS: I shouldn't interrupt an answer, but he's not answering the question, so let's make that clear.
MR. LISAK: He's not answering it how you want it answered.
MR. DOUGLAS: No, he's answering it the way he wants to -- he's saying what he wants to say, but he's not answering the question.
BY MR. DOUGLAS:
Q. So let me make it really simple for you, Dr. Weed, okay? Do you know the definition of the word "probably"?

MR. SPIRA: And I'm going to object that you cut off his prior answer so he can't --

MR. DOUGLAS: I withdraw the prior question. I have a new question.

MR. SPIRA: Counsel --

MR. DOUGLAS: Do you have a --

MR. SPIRA: Can I please say my objection before you interrupt me?

MR. DOUGLAS: I withdrew the question.

MR. SPIRA: I understand, but he was already in the middle of answering your question when you interrupted him with your new question.

So I'm going to object to the whole line of questioning.

MR. DOUGLAS: Yeah, okay. I don't even know what that means, but I have a question now.

BY MR. DOUGLAS:

Q. And that question is: What is your understanding of the definition of the word "probably"? And keep in mind, we all understand the definition of that word. But go ahead.

A. Okay. So I think it's important to make a distinction here between "probably" as it's used in common language and probably as it's used in the scientific community when they're talking about carcinogenesis. These are not identical. They are not even -- they're not identical.

So when you ask me about probably -- the word "probably," it means whatever it means in the English language, and you can look it up in the dictionary, and that's what it means.

But if we're talking about what probably means in IARC, which is where you started this, probably carcinogenic, that has a specific definition that IARC has made.

Q. And what's that definition?

A. And that is it's not known to be causal. It means the evidence and they say this specifically. It means that the evidence is below that, which would allow them to say it's carcinogenic.

Q. Okay. But it is -- there are many levels below -- what is it, Group 2, right?

A. There are --

Q. What are the levels below Group 2?

A. Well, there's possibly.
Q. "Possibly" is not as strong as "probably," right, meaning the evidence is not as strong?
A. The evidence isn't as strong.
Q. And what's below "possible"?
A. There's -- there's at least one more that says -- I know there's one that says the evidence is insufficient to make any assessment.
Q. Okay, good. So -- and then there's only one level higher than Group 2, right?
A. Yeah, the one you just didn't get to exactly.
Q. Right. Okay. Would you expose yourself to a compound or chemical that the -- that IARC has determined is probably carcinogenic?
MR. SPIRA: Object to form --
THE WITNESS: I made it pretty clear in my report --
MR. DOUGLAS: Did we get that on the record, comment -- counsel provided an answer for the witness.
MR. LISAK: No, I was talking to myself, sorry.

THE WITNESS: I -- I -- I made it pretty clear in my report that I was not going to address questions of personal choice, what someone would do at a personal level, and so that would include me.

So I -- I -- this is not something that I would answer today.

BY MR. DOUGLAS:

Q. Okay. I'll take that -- that's like a first cousin of a yes, you would expose yourself. That's your choice.

Anyway, so -- but what they say here -- what is said here in the article that -- that the panels concluded the data -- I'm sorry, wrong spot.

Back to that first sentence, "The International Agency for Research on Cancer, IARC, published a monograph in 2015 concluding that glyphosate is probably carcinogenic to humans, Group 2A."

Do you know the group, the difference?

MR. SPIRA: I think he's looking for the exhibit.

MR. DOUGLAS: Oh, okay.

THE WITNESS: Oh, wait, wait, it's you.
Sorry. Sorry, I got it.
BY MR. DOUGLAS:
Q. And it says Group 2 A, right?
A. That's right.
Q. Is there a Group 2 B?
A. Yes.
Q. What's the difference?
A. Well, I want to be precise about it. I'd have to go look at exactly what they say so I don't misrepresent, but it's just a different -- it's a different -- it's a slightly different level of evidence.
Q. A slightly higher level of evidence, right?
A. Of 2 B?
Q. Of a 2 A over a 2 B.
A. Yes.
Q. Okay. And it says "based on limited evidence in humans," right? Did I read that correctly?
A. Yes.
Q. And so there are instances where IARC will classify a compound as a 2 A, probably

carcinogenic, even where the -- there is limited evidence in humans, right? That happens all the time?
A. Yeah, it happens.
Q. Okay. And -- and basing that decision based on experiment -- experimental animal data, the 2 A classification?
A. Well, it's probably more than that.
Q. More than that, in part?
A. But, yeah, that can happen.
Q. Okay. Let's see. You then write in the abstract "the overall" -- it's about halfway down, and it starts on the right side, "The overall weight of evidence from the genetic toxicology data supports a conclusion that glyphosate, including GBFs and AMPA, does not pose a genotoxic hazard, and therefore should not be considered support for the classification of glyphosate as a genotoxic carcinogen."
That's - so we're clear, that's what your -- part of what your conclusion is in this paper?
A. No, that's not quite the way it works. This group was set up exactly like IARC in which

there were at least three different committees.
Q. Right.
A. There was the epidemiology committee. There was the toxicology committee, and there was the -- I believe an exposure focused committee. So this is the conclusion --
Q. Of these committees?
A. -- of the -- of the toxicology committee.
Q. Okay. Were you part of that toxicology committee?
A. No.
Q. And in -- in essence, they're disagreeing with IARC --
A. I'm not --
Q. -- is that right?
A. I don't know the answer to that. I would have to see exactly what IARC said.
Q. Okay. But it goes on to say, "As a result, following the review, the totality of the evidence, the panels concluded that the data do not support IARC's conclusion that glyphosate is a probable human carcinogen."
Did I read that correctly?

A. Well, you left out the part about epidemiology, but yeah, you jumped over that. You said "after that." Well, yeah, it is after that, but you left out the other part, but, yeah, that's what it says.

Q. My point is this -- this panel had a different conclusion than IARC, correct?

A. Yes.

Q. One with which you agree in this paper, right?

A. Yes.

Q. So to my point earlier about there are times when IARC reaches a certain conclusion about the carcinogen- -- carcinogenicity of a compound, product or whatever the case might be, and you disagree with it?

A. I have never disagreed with IARC's categorization of Group 1 carcinogens.

Q. I didn't ask about Group 1 carcinogens. I asked more broadly about any of their conclusions. It might include Group 2, Group 2 A, B, C?

A. I believe this is the only example that you could possibly come up with that has anything

to do with the comparison of IARC. I think this is the only time I did this, and --
Q. Okay.
A. That's the only time I ever did this.
Q. Gotcha. Let's -- let's go to the final page of this article. And it says, in the upper right-hand corner, second paragraph, "in summary."
"In summary, the totality of the evidence, especially in light of the extensive testing that glyphosate has received as judged by the expert panels, does not support the conclusion that glyphosate is a probable human carcinogen, and consistent with previous regulatory assessments, the expert panels conclude that glyphosate is unlikely to pose a carcinogenic risk to humans."
Right?
A. Yes.
Q. And you agree with this panel, as opposed to IARC, in this article?
A. Yes.
Q. Okay.
A. With just one caveat.
Q. Okay.

A. As of 2016.
Q. Have you changed your view on the subject?
A. I haven't looked at it.
Q. Okay. And under declaration of interest, again, here we see -- let me phrase it this way. It says, "Funding" -- in the second paragraph, "Funding for this evaluation was provided to Intertek by the Monsanto Company, which is a primary producer of glyphosate and products containing this active ingredient."
Did I read that correctly?
A. Yes.
Q. Okay. Did you receive funding from Monsanto for this article, for your work on this article?
A. I received funding from Intertek.
Q. And what is Intertek?
A. Intertek was the consultancy firm that put this group together.
Q. And Intertek, in return, received its funding from Monsanto, the industry -- the manufacturer of glyphosate?
A. That's what it says here, yes.

Q. Okay. A few more. Let's go to DL-31, which will be Exhibit 17.

(Weed Deposition Exhibit No. 17 was marked for identification.)

BY MR. DOUGLAS:

Q. It's entitled, "Exposure, epidemiology and human cancer incidence of naphthalene, right?

A. Yes.

Q. Okay. And you are a coauthor on this?

A. That is correct.

Q. And this was -- was available online 23 February, 2008.

Do you see that?

A. That's right.

Q. And, again, just go to the abstract.

And -- and take a look through it, but in this the bottom line conclusion is that -- was that the evidence does not establish that -- that naphthalene causes cancer in humans.

A. Where are you reading?

Q. I'm not.

A. Because it's not there.

Q. I'm trying to get --

A. What this paper was, if you read --

actually read the abstract, is to derive consensus of human exposure, cancer incidence plausibly associated with these exposures, and identify quintessential research that could significantly reduce or eliminate material uncertainties to inform human cancer risk assessment.

So this was a paper about what is the current evidence and what new evidence is needed.

Q. Okay. And you found that based on the current evidence, that evidence did not establish that naphthalene caused cancer in humans and that more research was needed?

A. That is not what the paper says. There is nothing about causation in this paper.

I'm trying to find out where does it say that.

Q. Well, so if you go to page -- is it S-25. It's the second page.

And is -- there is a column -- there is a paragraph entitled, "3.2, Human carcinogenicity data."

A. Yes.

Q. Okay. And it says, "The limited epidemiological data pertinent to assessing

naphthalene carcinogenicity have been reviewed by EPA and by IARC. These data are generally viewed as inadequate for determining human carcinogenicity of naphthalene."
Did I read that correctly?
A. Yes.
Q. And that's -- those are the words in the article you co-authored, right?
A. Yeah. And there -- yeah. And you were looking at this to show me where it says that this paper says something that it doesn't cause it. There is nothing in here about that.
Q. I'm sorry. Are you speculating as to the operation of my mind?
A. Yes.
Q. As to why I am asking a question?
A. Because you asked it before.
It says --
Q. I would just like you to answer the question.
A. It says --
Q. Did I read it correctly?
A. It says, "The limited epidemiological data pertinent to assessing naphthalene

carcinogenicity has been reviewed by EPA and reviewed -- you didn't use that word -- by IARC, and they are generally viewed by those two agencies as inadequate for determining human carcinogenicity of naphthalene."

So --

Q. And you concurred with that statement?

A. Yeah. Well...

Q. Okay. And so -- and there has been additional research on naphthalene since then, right?

A. Probably, but I don't know that.

Q. Okay. And let's go to the acknowledgments.

And if you go to the second paragraph under acknowledgment. It says, "Additional grant support was provided by the Electric Power Research Institute, the American Petrolatum Institute, the Naphthalene Council Incorporated, the Association of Railroads, the American Coke and Coal Chemical Institute, the Asphalt Institute, and the National Petrochemical Refiners Association.

Those are all industry groups, right?

A. Yes.
Q. And while the -- the paragraph goes on to say that they had nothing to do with your final conclusions, the fact is you received compensation in one form or another, from one or more of those industry groups for your work in generating this published article, right?
A. I don't -- I don't know that. I got money from -- if I remember right, from the regulatory checkbook. If I got any money from it. I don't even know if I ever did, quite frankly. I don't recall if I ever was paid by the regulatory checkbook. I may not have been.
Q. Okay. I'll take a --
A. I don't know the answer to that.
Q. I'll take a don't recall.
But I did read that paragraph correctly, as to what the funding source was?
A. Yes. Well, it's additional grant support.
Yes, you read it correctly.
Q. Additional, okay.
Let's do DL-32, which is Exhibit 18.

(Weed Deposition Exhibit No. 18 was marked for identification.)

Q. Again, an article on glyphosate entitled, "Glyphosate epidemiology expert panel review: A weight of evidence systematic review of the relationship between glyphosate exposure and non-Hodgkin's lymphoma or multiple myeloma.

Right, is that the title?

A. Yes.

Q. And you are a co-author on this?

A. Yes.

Q. Okay. And just go to the abstract and get to the bottom line. It says, "We conducted a systematic review" -- and "we," it means the authors, correct?

A. That's correct.

Q. "We conducted a systematic review of the epidemiologic literature for glyphosate focusing on non-Hodgkin's lymphoma and multiple myeloma, two cancers that were the focus of a recent review by the -- by IARC, a cancer-working group."

Do you see where I'm reading from?

A. Yes.

Q. Okay. And let's just skip to your overall conclusion at the bottom of the abstract, where it stated, "Overall, our review did not find support in the epidemiological literature for causal association between glyphosate and NHL and MM, right?
A. Or MM. But, yes.
Q. I said "or." Did you say "for"?
A. You said "and."
Q. So that was your conclusion?
A. That's correct.
Q. And, again -- so just to put it in simple lay terms, you found no evidence of general causation between glyphosate and these two -- and multiple myeloma and non-Hodgkin's lymphoma?
A. Well, the way you put that is not what we said here. We didn't -- we didn't find evidence that would support a general causal association.
Q. Okay.
A. That doesn't mean -- and what that means in scientific terms, which is what is important, is that, again, the methodology, which is very complex and has lots of pieces, when you

applied it, you don't get to carcinogen. You don't get to these -- that these -- that this compound causes either one of these two cancers.

Q. I get it. But bottom line is you concluded there was no evidence of general causation?

A. No evidence of the Group 1 carcinogenicity, that's correct.

Q. And we've seen several so far, and there is more, where you reached similar conclusions about other compounds and human carcinogenicity, correct?

MR. SPIRA: Object to form.

THE WITNESS: For specific cancers in specific situations. Again, because of the methodology.

BY MR. DOUGLAS:

Q. Whatever the methodology, the point is you found no evidence of general causation for a Group 1 carcinogen for this particular compound and the two cancer -- the two health points at issues?

A. Right.

Q. Okay.

A. As of the date of this --
Q. Of this --
A. -- paper, 2016.
Q. Yeah, okay.
A. It was probably actually 2015. It came out later.
Q. And so in the declaration of interest, again, it says -- while it says that -- in that first paragraph, "Each individual participated in their review process and preparation of this paper as an independent professional and not as a representative of their employer."
Do you see that?
A. Um-hmm. Yes.
Q. While it says that, it goes on at the very bottom of this paragraph to say, D.W. -- it's the last sentence in the paragraph. "D.W.," that would be you, Douglas Weed?
A. Yes.
Q. -- "has consulted on litigation matters concerning Monsanto that did not involve glyphosate," right?
A. That's correct.
Q. But you -- so you did receive -- you

did understand that glyphosate was manufactured by Monsanto?

A. Yes.

Q. And you have received substantial compensation from Monsanto for litigation-related matters in the past, true?

A. Well, not about glyphosate, but I have worked for -- I have received financial compensation from Monsanto, yes.

Q. That's my question.

How much would you estimate?

A. I don't know.

Q. Is it in the hundreds of thousands?

A. I don't know.

Q. It would seem to me if it was in the hundreds of thousands, you know, just regular folks would remember that, but you don't.

MR. SPIRA: Objection, form.

THE WITNESS: I just want to be precise, I don't know the answer to that. It could be or not.

BY MR. DOUGLAS:

Q. Okay.

A. I don't -- I don't have the information

handy to be as precise as I need to be.

Q. I'll take a could be.

Now, are you aware that just last month there was a symposium in which some of the leading experts and scientists in the world familiar with glyphosate gathered to discuss and reach conclusions about glyphosate and its potential for causing human harm in Seattle, Washington?

A. No.

Q. So you would not be aware -- you are not aware that they concluded that, "The evidence that glyphosate and GBHs harm human health at levels of current use is now so strong that no additional delays in regulation of glyphosate can be justified."

MR. SPIRA: Objection to form. Foundation.

BY MR. DOUGLAS:

Q. So you are not aware of that conclusion by this symposium in Seattle just last month?

A. No.

Q. Let go to the next, DL-33.

MR. SPIRA: Counsel, just -- I don't want to interrupt, but just checking on --

we've been going, I think, a little more than another hour. If you want to take a break.

MR. DOUGLAS: I have five more articles and one very brief subject. If we're all willing to plow through it, we could end this.

THE WITNESS: I'm okay.

(Weed Deposition Exhibit No. 19 was marked for identification.)

BY MR. DOUGLAS:

Q. I'm showing you now what is Exhibit 19, which is an article entitled, "Meta-analysis of Egg Consumption and Risk of Coronary Heart Disease and Stroke."

Again, co-authored by yourself and Douglas -- and Dominik Alexander, right?

A. That's correct.

Q. What is the year on this one -- 2016.

Do you see that?

A. Yes.

Q. On the first page it repeats the title and then it has the abstract.

Do you see where I'm referring to?

A. Yes.

Q. And it says, "The possible relationship between dietary cholesterol and cardiac outcomes has been scrutinized for decades. However, recent reviews of the literature has suggested that dietary cholesterol is not a nutrient of concern. Thus, we conducted a meta-analysis" -- and by the way, a meta-analysis, we've talked about -- used that term several times, is just a review of other studies. It's not -- it's not actually a study in and of itself, it's a review of existing studies?

MR. SPIRA: Object to form.

THE WITNESS: That would be incorrect.

BY MR. DOUGLAS:

Q. What is it, then? You tell me.

A. It is -- it is a study. It is a study in which the quantitative evidence from a variety of studies are quantitatively analyzed.

Q. All together?

A. All together, yes. It's a very well-accepted approach.

Q. It's a study of studies, would that be a fair way to say it?

A. No. It's more than a study of studies because it's trying to assess, quite frankly, the

extent to which there is consistency across the data.

Q. Right.

A. And that's -- so that's --

Q. Well, that's what I mean by study, to look for certain consistencies, inconsistencies, to get the big picture, right?

A. No.

Q. Not the big picture. You get the little picture?

A. You get the picture -- you get an assessment of one of Hill's criteria, which is consistency.

Q. Or lack thereof?

A. That is what meta-analysis provides.

Q. Or lack thereof?

A. Or lack thereof.

Q. Okay. That's all I'm saying.

A. Well, that's not what you were saying, but that's what I am saying.

Q. I did say it, but you just seem to be so contrarian that no matter what I say you like to get in that -- you like to say that that's not correct.

MR. SPIRA: Objection to the mischaracterization.

BY MR. DOUGLAS:

Q. I don't know if that is part of your prep or whatever, but I think it's pretty obvious.

MR. SPIRA: Objection, mischaracterizes testimony.

MR. DOUGLAS: Yeah. Okay. You can laugh all you want, but I think we all see through it.

We know who he is.

BY MR. DOUGLAS:

Q. So anyway, we got sidetracked there with the meta-analysis thing.

The point is, you conclude that, "Based on the results of this meta-analysis, consumption of up to one egg daily may contribute to a decreased risk of total stroke and daily egg intake does not appear to be associated with a risk of CHD" -- CHD, coronary heart disease, right?

A. Correct.

Q. Okay. And, again, that conclusion that you reached in this study -- in this article --

the work that you did in reaching that conclusion was partially supported by the Egg Nutrition Center, if you look at Page 715 under funding. Right?
A. Correct.
Q. It's not some consumer advocacy group who was interested in this and hired you to look at the question, it was an industry group?
A. That's correct.
Q. Next, DL-34.
(Weed Deposition Exhibit No. 20 was marked for identification.)
BY MR. DOUGLAS:
Q. Here is another article, co-authored by yourself and Dominik Alexander.
How many articles would you say you've co-authored with Mr. Alexander? Dr. Alexander, I should say.
A. I think you probably covered almost all of them whenever I did work with him on specific papers. Just a handful, fewer than a dozen.
Q. Okay. And anyway, this -- the year is 2015; is that right?
A. It was -- yes, it was published in

2015.

Q. Okay. And it says: Meta-analysis of Long-Chain Omega-3 Polyunsaturated Fatty Acids and Prostate Cancer this time.

Do you see that?

A. Yes.

Q. And, again, if we go to the first paragraph, it says, "We conducted a systematic review and meta-analysis to estimate the potential associations between LC -- could you -- I don't want to butcher that. What does it that stand for?

A. It's the abbreviation for all those words that came before.

Q. Okay. And prostate cancer, right?

A. That's correct.

Q. And you conclude in the next paragraph: "The results from this meta-analysis do not support an association between -- all of those words and compounds -- and PC, prostate cancer, right?

A. That's correct.

Q. Okay. And in reaching such a conclusion, you did -- this article was supported

by funding, though, I did not receive personally any funding from the Global Organization for EPA -- that doesn't mean Environmental Protection Agency, it's a different EPA, right?
A. I think so.
Q. And DHA Omega-3s, GOED.
Do you see where I'm reading from?
A. Yes.
Q. And then it that you -- it doesn't say, Drs. Harris, Weed, Bassett, Barret did not receive funds from GOED. It doesn't say anything about the Global Organization for EPA, though, right?
A. That's right.
Q. Okay. So did you receive funding from the Global Organization for EPA?
A. I don't know. I probably got funding from Dominik's company, and he may have received money from them. I don't really know the answer to that question.
Q. Well, how does it work when you work with Dominik?
He has this consultancy, as you mentioned.
A. Yes.

Q. He gets funding from -- from some industrial or manufacturing source, and then hires you to work with him or something else?

A. Something like that, yes.

Q. Okay. Let's do some Garrett articles. Let's go to DL-35. It should be Exhibit 21.

(Weed Deposition Exhibit No. 21 was marked for identification.)

BY MR. DOUGLAS:

Q. And this is in the publication NeuroToxicology. You are the sole author. It's entitled, "Does paraquat cause Parkinson's disease? A review of reviews."

Do you see that?

A. Yes.

Q. Okay. What does that mean to say, what is a review of reviews?

A. It's probably best if you just look at Table 3 on Page 183 because that's what this study -- or what this paper is about.

It is to examine the conclusions made by organizations and authors -- primarily authors who have examined the question of paraquat and Parkinson's disease to see what their conclusion

was.

Q. My question was: What do you mean by a review of reviews?

A. I'm telling --

Q. Is that what you mean?

A. That's what I mean that's exactly what it is.

Q. You reviewed those -- those publications, those studies?

A. Those reviews that have examined this evidence to see whether there is a consensus in the scientific community about this scientific -- this relationship.

Q. So you did no original research yourself?

A. This is original research.

Q. Well, you didn't conduct your own studies?

A. Neither did these guys. I mean --

Q. I -- I mean, I didn't ask about these guys. I asked about you. Did you do original research or just review other people's research?

A. Well, the answer to that question is not exactly, because -- well, I'll tell you what.

Why don't you define for me what you mean by "original research." Something that no one has ever done before? Is that original research?

Q. Well, I'm not here to answer your questions. You probably know that.

A. Okay. Well, I'm trying to -- I'm trying to --

Q. So let me -- but that's a good question. I'm going to take your advice and ask you.

What is your understanding of what "original research" is?

A. It is research that no one's done before.

Q. And so that's my question. You -- this is not an article of original research.

A. Yes, it is.

Q. Oh, in the sense that nobody has reviewed the reviews.

A. This is a legitimate publication.

Q. By your definition anything --

A. No, no, no, no, wait.

MR. SPIRA: Counsel, let him finish his answer.

THE WITNESS: This is a legitimate use of -- a legitimate publication in the scientific community, which is why it got published in NeuroToxicology. I'm not done.

It is something that, in fact, your own plaintiffs' experts did when they looked at the conclusions of agencies about the relationship between hair relaxers and cancers and, they said, We looked at those too.

This is -- no one has ever done this. It's original research by my definition.

BY MR. DOUGLAS:

Q. I understand. I understand. No one ever wrote this particular article. But when -- I noticed something interesting. You said this is -- this is -- this is a legitimate use.

Did you hear me say it wasn't a legitimate use of research? Why are you so defensive?

MR. SPIRA: Object to form.

THE WITNESS: I'm trying to be more -- I'm trying to be more precise.

BY MR. DOUGLAS:
Q. Who said it wasn't legitimate?
A. I'm --
Q. What, what, what?
A. I didn't say you said it -- it wasn't legitimate. I was trying to understand what you mean by "original research," because the implication that you were giving is this isn't original research. That was the implication.
Q. And so --
A. And I'm not done.
And so we had to define "original research." We defined it, and that's what this is.
Q. I get it. Any article that anybody publishes in the peer review is technically original as long as you didn't plagiarize anybody, but my question --
A. Well --
Q. I'm not done with my question.
My question is: You didn't conduct a study in the sense that you enrolled subjects or participants and followed -- who were exposed to the subject -- were exposed to paraquat in this

case and followed them to see health outcomes and compare them to unexposed people. That's not what this article is, right?

A. No, there's no way I could possibly do that.

Q. I didn't ask possible.

A. Well --

Q. Okay? And there is no well. The question and answer is over.

And I noticed -- if you go to declaration of competing interests, and you're the sole author on this. You declare that you have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper, right?

A. That's right.

Q. Okay. Hold that thought. And let's go to DL 36.

(Weed Deposition Exhibit No. 22 was marked for identification.)

BY MR. DOUGLAS:

Q. I just want to go back to Exhibit 21, the first paragraph -- article we just talked about.

A. Right.
Q. Of which you are the sole author.
A. Right.
Q. Did you leave your house in order to do this original research?
A. I don't think so.
Q. No, I didn't think so either. Did your wife help -- help you write it?
A. No.
Q. Now, let's go to next one, which is entitled "Paraquat and Parkinson's disease: A Systematic Assessment of Recent Epidemiologic Evidence."
Did you have to leave your house to write this article?
A. No.
Q. So to generate this article, you reviewed other people's work; is that fair to say?
A. Yeah, yeah, right, exactly, in the same way your plaintiffs' experts did and I did for this case.
Q. I didn't ask what my plaintiffs' did. I don't know why you have to --
A. I'm just trying --

Q. I'm not finished speaking.
A. I'm sorry.
Q. I don't know why you always feel like you have to gratuitously throw that in. I'll let the Court decide for itself or a jury decide for itself why you feel it necessary to offer extraneous comments.
MR. SPIRA: Object. Object to the characterization.
BY MR. DOUGLAS:
Q. And I hope you don't continue to do that.
MR. LISAK: That's both sides of table, though, right?
MR. DOUGLAS: Yeah, okay. I'm not the witness though. I'm not the one under oath.
MR. LISAK: You're not here to make speeches. You're here to ask questions.
MR. DOUGLAS: Yeah, and give instructions. If the witness doesn't follow the rules of how a deposition is conducted, I have a right to say something, and I think you have an obligation to counsel your -- your witness.

I think you're not exactly following that, but that's not what we're here to fight about. Let's just finish this deposition.

MR. LISAK: Let's get back to it.

BY MR. DOUGLAS:

Q. So this one is also about paraquat, and you wrote it from your home, and from your home, you concluded "There is no scientific justification for causal claims."

That's the very last sentence, right? Is that what you wrote?

A. That's right.

Q. Okay. Do you know who makes paraquat?

A. I can't tell you offhand who -- if one company or more than one company makes it. I don't know.

Q. Okay. And in the very end the funding, you claim or allege that you received no funding from any individual, private or public organization.

Do you see that?

A. That's right.

Q. And again, you concluded there is no

scientific justification for a causal claim, right?
A. Yes.
Q. And this was published in 2024?
A. That's right.
Q. Okay. Do you know that there is currently pending before the Illinois legislature a bill to ban paraquat?
A. No.
Q. And it's been pending for some time. So when you wrote this article, you weren't aware of that?
MR. SPIRA: Object to form foundation.
THE WITNESS: I -- I wasn't writing this article to discuss or examine regulatory issues, so that wasn't important to what I was doing.
BY MR. DOUGLAS:
Q. Okay. Well, banning -- they obviously must think it's harmful to humans, right?
MR. SPIRA: Object to form, foundation.
THE WITNESS: I'm not going -- I'm not going to say what's obvious.

BY MR. DOUGLAS:
Q. I just want to point out --
A. No --
(Crosstalk.)
MR. SPIRA: Let him finish his answer.
THE WITNESS: I'm not done. I'm not done. It's a political decision by a legislature, so that's not -- that is way out of my wheelhouse.
BY MR. DOUGLAS:
Q. How do you know it's a political decision as opposed to a decision that was based on a consensus in the scientific community?
A. Well, it's -- because it came from the legislature.
Q. What do you think the legislature does?
A. I don't know. About this particular issue? I don't have any information. I don't know the answer to that.
Q. So -- so would you oppose enacting -- you just did this in 2024, not too long ago. Would you oppose the passage of this bill banning paraquat in the state of Illinois?
MR. SPIRA: Object to form.

BY MR. DOUGLAS:
Q. Based on what you know about the science, where you concluded there's no support for general causation?
MR. SPIRA: I object to form, lack of foundation.
THE WITNESS: I wouldn't have any -- I wouldn't be involved in that at all.
BY MR. DOUGLAS:
Q. Okay. Okay. Now -- and did you know that Syngenta, that's the company that makes it -- did you know that they just announced that they are ceasing production of paraquat?
A. No.
Q. And do you know why?
MR. SPIRA: Object to form, foundation.
BY MR. DOUGLAS:
Q. So you -- so you don't know why --
A. No.
Q. -- they discontinued?
A. No.
Q. There you are -- I'm just trying to get the answer in your home in your home office, reviewing other people's work, reaching the

conclusion that there is no support for general causation.

Yet we have a bill in the -- in this state's legislature banning it, and Syngenta themselves have decided to discontinue its production.

And you're unaware of both of those last two facts, right?

MR. SPIRA: Object -- object to form, foundation, and asked and answered.

THE WITNESS: Yes.

BY MR. DOUGLAS:

Q. Okay. I have to ask you and not to get into -- into the paraquat litigation, there has been allegations -- and let me start again.

In -- in the two paraquat papers we looked at, you declared that you received no compensation.

A. That's correct.

Q. Okay. Are you aware that there are documents in the paraquat litigation that disclosed that there are scientists who published on paraquat that were compensated by Syngenta but who did not reveal that fact in their published --

in their published works?
A. Well, it --
MR. SPIRA: Object to form, foundation.
THE WITNESS: It wasn't me.
BY MR. DOUGLAS:
Q. Okay. Well, that's what I'm asking. So I want to look at this article, Exhibit 23.
(Weed Deposition Exhibit No. 23 was marked for identification.)
BY MR. DOUGLAS:
Q. Now, we've gone through article after article after article and this is just a small percentage of your publications, where you've been partially funded by industry, right?
MR. SPIRA: Object to form.
THE WITNESS: Scientific articles, yes.
BY MR. DOUGLAS:
Q. And you denied partially funded or funded at all in any way, shape or form by Syngenta with respect to the two paraquat articles that we just looked at?
A. That is correct.
Q. Okay. I want to take a look at this article, "Revealed: The Secret Push to Bury a

Weedkiller's Link to Parkinson's Disease."
Do you see the title?
A. Yes.
Q. And it says "Internal documents from chemical giant Syngenta reveals tactics to sponsor sympathetic scientific papers that mislead regulators about unfavorable research."
Do you see that?
A. What page are we on?
Q. The cover page.
A. Okay. Right.
Q. The next page there's a paragraph "but the scientific record."
But the scientific record -- "But the scientific record they point to as proof of paraquat's safety is the same one that Syngenta official scientists and lawyers in the US and UK have worked over decades to create and at times covertly manipulate, according to the trove of internal Syngenta files reviewed by the guardian and the new lead."
Do you see where I'm reading from?
A. Yes.
Q. It goes on to say "The files reveal an

array of tactics including enlisting a prominent UK scientists and other outside researchers who authored scientific literature that do not disclose any involvement with Syngenta."
Do you see where I'm reading from?
A. Yes.
Q. First of all, you did not disclose in any of those -- either of those two Syngenta articles any involvement with Syngenta, right? You did not disclose that?
A. Because it didn't happen.
Q. Okay. I appreciate what you're saying, what your position is.
But there is no such disclosure, because you say -- you deny that there was, right?
A. Exactly.
Q. Okay. So my question to you, are -- so my question to you: Are you one of those outside researchers who did, in fact, receive compensation from Syngenta but failed conveniently to disclose it?
A. No.
Q. So we have all of these articles that we just spent like an hour or however long going

through where you are receiving compensation from industry and manufacturers -- here we have internal documents from Syngenta that discloses they are secretly paying researchers, and suddenly you're saying you didn't receive any.

Is this just coincidence?

MR. SPIRA: Object to form.

THE WITNESS: Well, it's not a coincidence. It's -- as you pointed out with Dragnet, just the facts, it's the truth.

BY MR. DOUGLAS:

Q. Okay. I feel like having one of those Seinfeld moments with the Larry David stare, but we'll skip that. You're sure?

A. Absolutely sure.

MR. SPIRA: Objection to form, asked and answered.

BY MR. DOUGLAS:

Q. Last one.

(Weed Deposition Exhibit No. 24 was marked for identification.)

BY MR. DOUGLAS:

Q. Back to red meat. This is an article coauthored by you and Dominik Alexander again,

"Metaanalysis of protective studies of red meat consumption and colorectal cancer."

Do you see that -- the title there?

A. Yes.

Q. What year are we talking about? 2011 I believe is the copyright.

A. That is correct.

Q. Let's just get to the heart of it, at the end of the abstract bottom of the first -- on the left side, it says, "The available epidemiologic data are not sufficient to support an independent and unequivocal causative association between red meat intake and colorectal cancer."

Did I read that correctly?

A. Correct.

Q. Okay. And under "acknowledgments," it says the study was partially -- the study -- "This study was partially funded by the beef checkoff through the National Cattlemen's Beef Association and the National Park Board," and then it has the usually how they didn't contribute to the writing of the" --

MR. LISAK: That was the Kosher reading

of that sentence.
MR. DOUGLAS: What did I say?
THE WITNESS: You said park.
MR. LISAK: You said park instead of pork.
MR. DOUGLAS: That's because I'm Jewish.
MR. LISAK: It is a trade reading.
BY MR. DOUGLAS:
Q. That's fine. However -- however, it says that none of those manufacturer organizations, industry organizations helped you with the writing or involved in it, right, in a nutshell?
A. Writing, analysis, or interpretation, that's right.
Q. But you did receive money from those or indirectly from them through Dominik's consultancy business from those industry folks?
A. I believe so, yes.
Q. Yes, okay. I think this is going to be the last subject.
We have looked at a number of those articles in which you were partially funded by

industry. And I had asked you before about this indu- -- this concept of industry sponsorship bias. Do you remember we talked about that briefly?

A. Right.

Q. And I said I would get into it a little bit later?

A. Right.

Q. Are you familiar with the Center For Evidence-Based Medicine?

A. I'm only vaguely familiar. I don't think I've looked into it very carefully.

Q. It's part of -- you've probably heard of the Oxford University. You've heard of the Oxford University?

A. Oh, yeah, of course.

Q. And did you know that the Oxford University, through the Center For Evidence-Based Medicine, publishes what is called a Catalog of Bias with respect to various biases in the field of epidemiology? Were you aware of that, the Catalog of Bias?

A. No, I've never seen that.

Q. Okay. But one step back. The term

"bias" in epidemiology has a very specific meaning, right?

A. Yes.

Q. Okay. What does that mean?

A. It means that there was -- if you are looking for an explanation, a causal relationship, for example, that there may be factors that have altered your ability to assess the causal relationship, if there is one.

Q. Right. Okay. And you have to account for potential biases when you -- when you design an epidemiological study, fair to say?

A. That is true.

Q. So I want to show you from the Catalog of Bias, one of the biases listed in the catalog currently on the Oxford website. And that will be Exhibit --

THE REPORTER: 25.

(Weed Deposition Exhibit No. 25 was marked for identification.)

BY MR. DOUGLAS:

Q. And this was on the website as of a couple weeks ago, March 27, 2026, I believe it says, and it talks about industry sponsorship

bias. Do you see where I'm reading from?
A. Yes.
Q. Okay. And we've seen a number of articles that you have authored -- we looked at over the last hour or so, where your work was sponsored by industry, right?
A. In part, yes.
Q. Yeah, okay. So this from the Catalog of Bias from the Oxford University, the Center For Evidence-Based Medicine, goes on to say that "Industry sponsorship bias: A tendency for the authors and results of a study to support the interest of the funding organization."
Do you see that?
A. That's correct. Yeah, I see that.
Q. Okay. In fact, it goes on in the background section, last paragraph to say "Industry-sponsored bias refers to the tendency of the scientific study to support the interest of the study's financial sponsor. This bias is also referred to as funding bias, sponsorship bias, funding outcome bias, funding publication bias, and funding effect."
And it cites Holman 2018. Do you see

where I'm reading from?
A. Yes.
Q. Okay. And just to be clear, the last page, this is -- you'll see the very last sentence it says -- it's copyrighted by the 2717 Centre For Evidence-Based Medicine.
Do you see that?
A. Yes.
Q. Okay. And you take an evidence-based approach to your work, right?
A. Yes.
Q. Okay. I've read some of the things that you've published on conflict of interest. You published on conflict of interest, yes?
A. One paper, I believe.
Q. One paper. You don't think that industry-sponsored bias as it's defined here is a thing, right?
MR. SPIRA: Object to form.
THE WITNESS: I wouldn't say that. Of course it's a thing.
BY MR. DOUGLAS:
Q. Okay. I'll take that.
MR. DOUGLAS: Let's take 5 minutes.

THE VIDEOGRAPHER: Off the record at 2:18.

(Break taken.)

THE VIDEOGRAPHER: Time is now 2:43. Back on the record.

MR. DOUGLAS: I pass the witness.

EXAMINATION

BY MR. SPIRA:

Q. Dr. Weed, I just have a few follow up questions. I want to talk a little bit about your background. Can you tell me about your educational background?

A. Sure. So I have received four degrees. I started in engineering at the Ohio State University, this is back in 1970, graduated from there and then went to medical school again at the Ohio State University.

Subsequently, I received a master of public health and a Ph.D. in epidemiology from the University of North Carolina, Chapel Hill.

Q. And I'm looking at your CV which is attached to Exhibit 3, which was introduced earlier today. And I think you mentioned earlier today that you spent about 25 years at the

National Cancer -- Cancer Institute after graduating from medical school and getting your master's and MPH; is that right?

A. And Ph.D., yeah, it was in 1982. I finished my Ph.D. in 1992, and I went, within a month or two I think, to the National Cancer Institute.

Q. Okay. And how long were you at the National Cancer Institute?

A. 25 years.

Q. And it looks like from your CV that in the last 17 years of that, you were the chief of the Office of Preventive Oncology; is that right?

A. That is correct.

Q. What -- what is the Office of Preventive Oncology at the National Cancer Institute?

A. Well, who knows what it is today, because, you know, they change these things, but when I was there, our role was to develop and build an in-house postdoctoral fellowship program, training the leaders in cancer prevention for the future.

And I was the director of that program,

built the program from maybe four or five fellows and two staff to 60 fellows and 10 staff.

Q. Now, I want to follow-up on some questions that counsel asked you. You mentioned that you've -- you've served as a consultant in a variety of litigation before; is that right?

A. Yes.

Q. Regardless of whether you were -- regardless of whether you were hired as a consultant by a defendant or a plaintiff in a given litigation, do you utilize the same methodology?

A. Yes.

Q. Does the party that hires you dictate the methodology you use?

A. No.

Q. Does the party that hires you dictate the outcome of your analysis?

A. No.

Q. What dic- -- what dictates the outcome of your analysis?

A. The results of the methodology.

Q. Counsel asked about several publications that you issued related to exposures

and outcomes other than those at issue in this litigation. Do you remember that?
A. Yes.
MR. DOUGLAS: Object to form.
BY MR. SPIRA:
Q. Did counsel ask you about the bases for any of your conclusions in any of those publications?
A. No.
Q. In any of those instances, did the direct or indirect funding source or lack thereof dictate the outcome of your analyses?
A. No.
Q. Since leaving NCI, have most of your publications been funded by industry?
A. No.
Q. Have any publications you've authored in the last five years been funded by what counsel characterized as industry?
A. No.
Q. You've also written a variety of books and book chapters on epidemiology; is that right?
A. That's correct.
Q. Were any of those funded by industry?

A. No.
Q. In your report you were asked of whether your summary of your opinions refers to hair relaxers, the finished product. Do you recall that question?
A. Yes.
Q. Does your report also address specific chemicals alleged by plaintiffs' experts to be included in at least some hair relaxers?
A. Yes.
Q. You were asked some questions about whether you've published on hair relaxer products. Do you recall that?
A. That is correct.
Q. Have you published on the assessment of causation?
A. Yes.
Q. Have you published on the application of the Bradford Hill methodology and other causal methodologies?
A. Yes.
Q. Is that -- would you say you've published a couple of articles on that or is it more extensive?

A. Oh, it's much more extensive. I think I've probably published 20 or 30 articles about the methodologies used to assess causation, and Hill's criteria is obviously one of them, published quite a bit.

Q. You were asked whether physicians and epidemiologists and other scientists rely on IARC classification. Do you recall that?

A. Yes.

Q. You were also asked a lot of questions about IARC classifications of possible or probably carcinogens. Do you recall that?

A. Yes.

Q. Has IARC concluded that hair relaxer products cause uterine cancer?

A. No.

Q. Has IARC concluded that hair relaxer products cause ovarian cancer?

A. No.

Q. Counsel referred to situations where IARC might conclude, despite limited epidemiological evidence, that there is a possible or probable causal relationship between an exposure and an outcome.

Do you recall that question?
A. Yes.
Q. Is this a situation where plaintiffs' experts' reports that you have reviewed pointed to strong evidence beyond epidemiological studies that show hair relaxers cause uterine or ovarian cancer?
A. No.
Q. Are you aware of any peer-reviewed publications that conclude that a causal relationship has been established between an exposure and an outcome, based on the level of available evidence we have here pertaining to a potential relationship between chemical hair relaxers and ovarian cancer?
A. No.
Q. Is that -- is the same true for uterine cancer?
A. Yes.
Q. Are you aware of any governmental agency concluding that a causal relationship has been established between an exposure and an outcome based on the level of evidence that exists here pertaining to a potential relationship

between chemical hair relaxers and ovarian cancer?
A. I'm not aware of any, no.
Q. Is the same true for uterine cancer?
A. That is correct.
Q. Has IARC or the National Toxicology Program ever concluded that a causal relationship has been established between an exposure and an outcome based on the level of evidence that exists here pertaining to -- to a potential relationship between chemical hair relaxers and ovarian cancer?
A. Of the causal associations that I have looked at -- and I've looked at many, I've been thinking about this problem for 40 years -- I've never seen them make a causal claim from the minimal amount of evidence that is in this particular litigation.
Q. Has -- and is the same true with regard to the evidence here pertaining to uterine cancer?
A. Yes.
Q. And you -- you anticipated my -- my next question, but how long have you been looking at and analyzing causal relationship between exposures and outcomes?
A. I started thinking about causation in

1980. So it's been 46 years.

MR. SPIRA: I have no more questions.

FURTHER EXAMINATION

BY MR. DOUGLAS:

Q. I have just a couple. So first of all, when I began the deposition, I -- I asked you, Dr. Weed, if you'd indulge me in giving Judge Rowland an idea of what it is you do now for a living.

And so what you do now for a living is your consultancy work, right?

A. Yes.

Q. And you've done that for the last 18 -- almost two decades now, 18 years?

A. That's correct.

Q. Okay. And when is the last time you designed or conducted an epidemiological study?

A. I designed one of the largest epidemiology studies available at the time when I did my Ph.D. dissertation.

Q. What -- what decade was that?

A. That would be around 1980.

Q. Okay. So would it be fair to say that the majority of your work as a consultant is you

sitting at your desk in your home office reviewing other people's work?

MR. SPIRA: Object to form.

THE WITNESS: Well, I wouldn't put it that way, no, any more then I would say that a principal investigator of one of those studies basically sits around at their desk all day and reviews reports coming in about their study. That's exactly what they do, and I have a lot of friends who do that. We all sit at our desks all day.

I don't design epidemiology studies. I design systemic reviews.

BY MR. DOUGLAS:

Q. But I'm not interested in what other people do. As I said I want Judge Rowland to know what you do. So the work that you do now does not require you to leave your home office, fair to say?

A. Well, unless you guys make me come to Chicago, no.

Q. For a deposition, for which you are being compensated by the defendants, right?

A. Right, exactly.

Q. Isn't it often true that agencies like the EPA or agencies like the IARC are -- are -- I'll use the phrase "behind the science"? In other words, there's a lag between when IARC takes action or issues a decision from the time that the science is published. It takes them time to digest the science and reach the conclusion. There is a lag so to speak.
Does that make sense?
A. Well, yes, but it's so imprecise the way you said it.
Q. Thank you for the compliment.
A. No, because it's not like you want to give anyone, the judge and the jury, which you mentioned, the impression that if an epidemiology study comes out, a single one, we'll take the white paper, that, therefore, IARC would then take a look at it. That would be absurd --
Q. Right.
A. -- because it's insufficient, that's why. And so they wait until there is a body of evidence, and they make those decisions, and it's an in-house kind of decision process for when they do that.

Q. Okay. And very often, after that period of time, as the evidence is coming in, there is a lag between the time the evidence is in and when IARC or EPA weighs in on the subject?
A. Well, the way it works for IARC -- and we're talking about IARC now.
Q. Okay.
A. -- is that when they decide they're going to take on a subject, whatever that happens to be, they will then form these committees, as I mentioned the three big committees, and then they will look at everything that has been published up until -- in peer-reviewed journals up to a certain point in time. And that is what they'll review.
Q. Okay. And do you know if IARC, while we're talking about IARC, has formed such a committee to look at hair relaxers and their outcome?
A. I haven't looked at -- I haven't looked at it. There is a way to do that by looking on their website. They may tell you, These are the meetings we're planning. Typically they do that into the future.
Q. Okay. So you're not saying that IARC

has looked at the literature and concluded that hair relaxers do not cause uterine or ovarian cancer. You're not saying that?

A. That is correct. I'm not saying that.

MR. DOUGLAS: Thank you, Dr. Weed.

FURTHER EXAMINATION

BY MR. SPIRA:

Q. I've got maybe two questions to follow up.

Dr. Weed, you were asked a moment ago about -- about having designed epidemiological studies. Do you recall that?

A. Yes.

Q. Have you -- looking at your CV, this is Page 121 onto 122 of your CV, which is attachment to Exhibit 3 to the deposition, have you served in editorial positions on various journals more recently than you've designed an epidemiological study?

A. Oh, yes, I was review -- reviews editor for the Journal of National Cancer Institute from 1995 to 2024. I was also -- actually I didn't write this in here, but when the editor and chief went somewhere like to a meeting, I was often

asked to come in and become editor in chief for a day or two.

Q. And if you look on the next page, you -- you list journals that you've been a peer reviewer for; is that right?

A. That's correct.

Q. And I quickly counted these, but it looks like you've been a peer reviewer for more than 35 professional journals; is that right?

A. That is correct.

Q. Does your -- has your work as a peer reviewer involved evaluating publications on epidemiological studies?

A. Yes.

MR. SPIRA: That's all I have.

MR. DOUGLAS: I guess we're done.

THE VIDEOGRAPHER: Okay. Time is now 2:57. This concludes the deposition.

Going off the record.

MR. SPIRA: I think we'll want a rough and a final normal -- what is normal delivery?

THE REPORTER: 10 business days.

MR. SPIRA: I think if we have a rough

that should be fine.

(Timed noted 2:57 p.m.)

REPORTER'S CERTIFICATE

I, BARBARA PERKOVICH, CSR No. 84-004070, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth. At which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Illinois that the foregoing is true and correct.

Dated this ___8th____ day of __April____, 2026.

<%7976,Signature%>

_____________________________________

BARBARA PERKOVICH, C.S.R. No. 84-004070

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein

EXECUTED this _____ day of _______________, ________, at _____________________, ________________.

(City) (State)

________________________________
DOUGLAS WEED, M.D., M.P.H., Ph.D.

Subscribed and sworn to before me this _____ day of ___________, ________.

Notary Public in and for said
County and State

**&**

**&** 2:2 3:14 4:3 4:12,17 5:4 166:18,19 173:1,7

**1**

**1** 6:10 32:9 55:6 125:14 140:21 199:15 209:18 209:19 219:7 219:20
**1.2** 132:16,24 133:1
**1.4.** 58:21
**10** 6:18 44:24 48:24 165:23 255:2 266:23
**10004** 2:6
**10016** 5:6
**10:52** 82:17
**10th** 5:5 23:2
**11** 6:19 171:22 171:23
**11050** 2:11
**11:12** 82:19
**12** 6:21 180:6,9 180:13
**121** 265:15
**122** 265:15
**12:25** 163:4
**12:43** 163:6
**12th** 93:18
**13** 7:1 32:23 183:13,14
**135** 6:17
**139** 6:17
**14** 7:4 12:16 89:5,5 186:10 186:15
**1400** 4:4
**14th** 186:16
**15** 7:5 12:12 91:2,12 97:12 98:17,21 99:1 146:3 188:10 188:11
**150** 4:4
**15222** 2:16
**155** 6:18
**156** 168:16
**16** 7:8 32:6 192:12,13,20 193:1
**165** 6:18
**16th** 6:11 32:14
**17** 7:11 212:2,3 254:12
**171** 6:19
**18** 7:13 11:18 15:3 24:22 25:4 38:22 42:1 45:21 46:18,19 69:5 131:15 133:11 139:13 151:24 179:24 216:23 217:1 261:13,14
**180** 6:21
**180,000** 47:4,18
**1800** 2:16
**183** 230:19
**184** 7:1
**186** 7:4
**188** 7:5
**19** 7:18 134:17 134:23 152:1,1 223:8,11
**1900** 2:21
**191** 4:18
**192** 7:8
**1950s** 89:14
**1970** 253:15
**1980** 261:1,22
**1982** 254:4
**1992** 254:5
**1995** 265:22
**1st** 33:8,8

**2**

**2** 6:12 55:9,13 88:1 203:22,24 204:11 206:4,6 206:16,17,17 206:24 207:7 209:21,21
**20** 7:20 32:23 66:8 88:9,9 152:24 227:11 258:2
**200** 4:13
**2000** 21:1,4,5 23:13
**2000s** 12:12
**2006** 22:23 172:23
**2007** 33:8 131:19 163:9
**2008** 10:20 11:10 33:8 38:8 71:7 172:3,4,5 172:11 212:12
**2010** 49:22
**2011** 49:22 188:24 189:2 247:5
**2012** 189:3
**2014** 12:12
**2015** 6:15 13:6 13:7,7 131:18 131:20,20 194:12 205:18 220:5 227:23 228:1
**2016** 132:15 211:1 220:3 223:18
**2017** 6:11 32:4 32:14 33:13 34:13 35:4
**2018** 251:24
**2022** 50:6
**2023** 80:14,19
**2024** 50:3,7 239:4 240:21

265:22
**2026** 1:16 9:4 32:3 80:21 93:18 186:16 250:23 268:22
**209** 3:15
**21** 8:1 155:13 230:6,7 235:22
**212** 7:11
**217** 7:13
**22** 8:3 235:19
**223** 7:18
**225** 3:10
**227** 7:20
**23** 1:3 8:5 212:11 243:7,8
**230** 8:1
**235** 8:3
**24** 8:7 171:22 246:20
**2401** 4:13
**243** 8:5
**246** 8:7
**25** 8:9 30:8 31:5 66:9 99:24 152:21 159:3 162:13 180:5 213:18 250:18 250:19 253:24 254:10
**250** 8:9
**253** 6:5
**26** 23:13 152:23 183:12
**260** 2:15
**2600** 3:20
**261** 6:5
**265** 6:6
**27** 6:14 31:6 185:14 250:23
**271-3399** 3:22
**2717** 252:5
**275** 5:5
**280,000** 47:14
**28th** 172:11
**2950** 4:19
**2:18** 253:2
**2:43** 253:4
**2:57** 266:18 267:2
**2a** 194:14 205:20

**3**

**3** 6:12 7:21 58:16 88:10,12 90:24 228:3 230:19 253:22 265:16
**3.2** 213:20
**30** 192:19 258:2
**300** 4:8 80:24
**303** 4:8
**3060** 1:5
**31** 212:1
**312** 2:22 3:6,12 3:17 4:5,9,20
**32** 6:10 216:23
**33** 222:22
**33131** 4:14
**34** 227:10
**348,950** 80:24
**35** 13:22 230:6 266:9
**352** 185:3
**35th** 2:5
**36** 235:18
**372** 166:10
**38th** 1:15 3:5
**3s** 229:6

**4**

**4** 6:13 80:1 175:17
**40** 13:17,22 15:5,9 42:7,8 43:15,15,19,20 260:13
**412** 2:17
**43** 79:23
**44** 69:13
**46** 166:10 261:1

**5**

**5** 6:14 88:2 93:1 131:21 132:4 252:24
**513-2347** 5:6
**516** 2:11
**53** 32:15
**541** 182:18
**55** 6:12
**57** 97:24 98:22
**58** 6:12 100:1
**596-4984** 2:22

**6**

**6** 2:10 6:15 93:2 93:6 131:21 132:4
**60** 255:2
**606-7757** 3:12
**60603** 3:6
**60604** 3:16
**60606** 2:21 3:11 4:5,9,19
**646** 2:6 5:6
**667-7908** 2:17
**693-9067** 2:6

**7**

**7** 6:17 135:5
**700** 3:11,16 79:12
**715** 227:3
**723-4626** 2:11
**73** 48:14
**762-9459** 3:17
**767-1314** 4:20
**781-6677** 4:9
**786** 4:14
**7976** 268:22

**8**

**8** 6:17 58:20 106:13 139:14 175:17

**80** 6:13 45:23 132:8
**818** 1:3
**84-004070** 268:2,24
**850-2651** 4:5
**853-7000** 3:6
**88** 6:14
**8th** 1:16 9:4 268:22

**9**

**9** 6:4,18 155:14 155:17
**90** 12:13,15 13:1 39:5 45:24 132:13
**900** 3:21
**92612** 3:21
**93** 6:15
**949** 3:22
**957-1157** 4:14
**9:30** 1:16
**9:35** 9:5

**a**

**a.m.** 1:16 9:5
**abbreviation** 193:12 228:13
**abilify** 6:11 30:2 32:5,13 132:16,24 133:1,4,17 135:12 178:9
**ability** 250:8
**able** 15:8 22:14 33:20 56:18 63:16,17 68:10
**above** 181:13
**absolutely** 246:15
**absorb** 62:6,17
**absorbed** 62:23 62:24
**absorption** 63:7
**abstract** 181:8 184:7 188:24 189:7 194:5 207:12 212:15 213:1 217:12 218:2 223:22 247:9
**absurd** 263:18
**academy** 21:22 23:1
**accept** 118:15 119:21 141:5
**accepted** 59:8 106:24 122:7 224:20
**account** 250:10
**acids** 7:22 228:3
**acknowledge** 126:9 187:11
**acknowledged** 192:17
**acknowledge...** 185:4
**acknowledg...** 187:11 215:16
**acknowledg...** 185:1 215:14 247:17
**acs** 96:7 97:6
**action** 164:23 176:1 263:5 268:18
**active** 211:11
**actual** 35:17 138:4,5
**actually** 10:22 14:7 19:13 20:1 20:2 30:10 50:6 60:18 62:23 71:24 72:9 75:17 119:20 124:23 125:13 134:3 137:11 145:17 151:15 169:4 177:12 177:19 185:9 191:11 195:21 213:1 220:5 224:9 265:22
**adams** 51:7 85:9
**add** 11:6 90:8 90:11,13 91:17
**added** 190:6 191:10
**addition** 71:16
**additional** 90:11 215:10 215:16 216:19 216:22 222:14
**additions** 269:6
**address** 205:3 257:7
**addressed** 124:7
**adequate** 88:20
**admit** 106:6
**advice** 158:13 232:9
**advocacy** 168:6 183:10 187:12 192:8 227:6
**afam** 3:18
**affect** 63:6
**affirmatively** 116:5
**age** 48:16 96:14 141:15
**agencies** 125:5 130:11 131:7 167:7 215:4 233:7 263:1,2
**agency** 125:12 193:13,15,21 194:6,11 205:17 229:4 259:21
**agent** 41:11

**ago** 10:8 21:6 23:13 50:2 53:6 71:4 80:16 152:23 156:3,6 240:21 250:23 265:10
**agree** 36:15 58:1 83:16 94:11 118:9,23 118:23 175:15 193:20 209:9 210:19
**agreed** 126:20
**agreement** 123:14 126:18
**agricultural** 7:7 188:20 189:10
**ahead** 28:20 42:10 105:15 123:19 152:19 191:12 197:20 202:24
**aid** 61:16
**aim** 174:4
**airplane** 50:17
**airplanes** 50:17
**alexander** 180:19,23 184:1,4 187:10 188:22 223:16 227:15,17,17 246:24
**allegations** 75:15,21,23 78:17 177:5,8 242:15
**allege** 238:19
**alleged** 41:2 257:8
**allow** 198:1 203:19
**allowed** 123:12
**alluded** 117:14
**altered** 250:8
**alternative** 88:21
**america** 191:6 192:1
**american** 6:15 91:6,7,15 92:3 92:24 93:13,19 96:3 97:13,21 100:13 173:2 173:10,13,17 215:18,20
**amount** 11:23 196:11 260:15
**amounts** 64:8
**ampa** 207:16
**amricordati** 2:22
**analyses** 256:12
**analysis** 7:18 7:20 8:7 183:2 191:7,13 223:12 224:6,7 225:15 226:14 226:16 228:2,9 228:18 248:15 255:18,21
**analyzed** 224:17
**analyzing** 260:22
**anderson** 4:17
**angeles** 72:19
**animal** 128:17 194:22 195:2 207:6
**animals** 194:15
**anna** 2:20
**anniversary** 23:2
**announced** 241:12
**answer** 15:4,8 24:6 26:19,24 27:4,5 28:13,16 28:18,21 33:7 33:10,17,19,21 33:23,24 34:9 34:14 35:2,20 37:2,3 42:3,10 42:17,23 43:1,3 43:9,17 46:19 60:14,18 61:21 62:4 63:17,19 65:12 71:8 74:3 76:23 82:2 88:16 89:1,10 89:19 101:3,20 101:23 102:6 102:20,20 105:4,10,14 109:7 110:6,18 110:24 111:21 112:9 113:8,9 113:16,21,24 114:12,14,16 114:18,20,22 115:4,16 117:13 121:14 132:3,5 145:3 146:4,13,16,23 147:1,9,10 148:8,9,15,18 149:6,7 150:21 151:6,7,16 152:9,20 153:1 155:3 197:21 199:1,4,6,8 200:8,23 201:2 201:8,14 202:2 204:21 205:7 208:17 214:19 216:15 221:20 229:18 231:23 232:4,24 235:9 240:5,19 241:23
**answered** 24:11 35:5 36:18,20 38:11 48:9 68:3 68:17 69:21

84:13 88:13 89:9,24 98:20 100:18 101:2,4 104:17,20 105:5,9 112:7 112:13 116:11 129:19 149:4 149:10,19 150:5,7,10,20 150:23 151:3 154:21,24 178:13 197:14 201:6,17 242:10 246:17
**answering** 43:6 105:7 147:2 148:11 150:13 155:23 199:7,9 200:10,13,20 201:10,14,16 201:18,20 202:12
**answers** 33:12 33:16 34:6,13 35:3,15 36:1,4 36:13 145:22 147:7
**anticipated** 17:12 260:20
**anybody** 112:13 161:13 234:15,17
**anyway** 22:21 35:19 51:5
158:19 205:12 226:13 227:22
**apart** 74:2 101:9 191:20
**apologies** 83:3
**apologize** 48:21
**apparently** 169:1
**appear** 36:4 155:3 184:14 226:19
**appearance** 35:12
**appearances** 3:1 4:1 5:1
**appeared** 173:1 235:14
**appearing** 2:1 2:13,18 3:2,8 3:13,18 4:2,11 4:16 5:2
**appears** 32:18 185:7
**appendix** 160:13
**application** 59:7 89:11 92:13 106:24 144:14 145:24 189:24 257:18
**applicator** 189:11 190:1 190:17
**applicators** 7:6 188:16,17
**applied** 61:19 63:16 65:6,11 84:10 219:1
**applies** 31:20
**apply** 36:9,10 61:3,11,23 143:17,18 145:13 174:20
**applying** 92:17 175:8
**appreciate** 32:2 48:17 245:12
**approach** 89:15 189:13 224:20 252:10
**appropriate** 158:2 175:5
**appropriately** 31:21
**approximately** 11:10
**april** 1:16 9:4 33:7,8 172:7,8 172:11 268:22
**area** 18:8 152:3 169:23
**arena** 168:8
**argue** 191:24
**arizona** 141:8
**arranged** 185:10
**array** 245:1
**article** 6:20 74:15 172:2,10 172:16,22 173:23 175:12 175:16 177:16 180:13 181:23 182:19 183:17 184:22 187:8,9 192:18 194:8 205:13 210:6 210:20 211:15 211:16 214:8 216:7 217:3 223:12 226:24 227:14 228:24 232:16 233:16 234:15 235:3 235:23 236:15 236:17 239:11 239:15 243:7 243:11,12,12 243:24 246:23
**articles** 223:3 227:16 230:5 243:16,20 245:9,23 248:24 251:4 257:23 258:2
**asbestos** 138:13
**aside** 47:16
**asked** 14:22,23 24:10 28:7 34:16 36:17,19

37:14 38:10 46:16 48:8 49:10 61:1 68:16 69:20 73:2,23 76:20 77:10 81:17 84:12 88:6,8,10 90:9 92:9 98:19 100:17 101:1 104:16 109:6 112:6 116:10 121:3,6,8,9 124:8,11,12 127:3 129:18 143:7 144:7,9 145:5,13 146:9 148:6 149:3,9 149:24 150:2 150:19,23 155:23 171:18 178:12 185:12 191:17 196:24 197:14 209:20 214:17 231:21 242:10 246:16 249:1 255:4,23 257:2,11 258:6 258:10 261:6 265:10 266:1
**asking** 36:12 48:12 49:6 81:20 108:1 111:13,15,20 143:10 149:17 150:4 152:5 200:2,4 201:4 214:16 243:6
**asks** 24:14
**aspect** 21:9 31:24
**aspects** 27:15 34:20
**asphalt** 215:21
**assault** 166:6
**assess** 92:9 143:8 171:8 224:24 250:8 258:3
**assessing** 213:24 214:24
**assessment** 7:11 8:4 193:6 194:18 197:1 204:9 213:6 225:12 236:12 257:15
**assessments** 210:14
**associate** 88:11
**associated** 75:24 76:1 125:15 142:4 213:3 226:19
**association** 45:12 86:24 87:8 88:11,13 89:7,8,16,18,19 90:10,10 91:22 92:18 95:23 96:4 181:21 182:2 215:20 215:23 218:5 218:19 228:19 247:13,20
**associations** 90:20 182:3 228:10 260:11
**assume** 51:8 78:3,24 118:12
**assumed** 76:18
**atstr** 130:4
**attached** 253:22
**attachment** 265:15
**attempted** 195:9
**attend** 82:10
**attending** 81:8
**attention** 141:2
**attorney** 24:19 39:19 54:21 55:1 70:9 81:21 268:16
**attorneys** 17:8 17:8 25:12 82:4 123:19
**audience** 21:15 22:4 23:12
**audriana** 4:12
**audriana.rodr...** 4:15
**austin** 3:3 71:22
**australia** 182:24 183:1
**author** 128:7 175:11 217:10 230:11 235:12 236:2
**authored** 180:4 180:18 182:22 183:24 184:3 188:21 214:8 223:15 227:14 227:17 245:3 251:4 256:17
**authority** 193:19
**authors** 161:11 194:7 217:15 230:22,22 251:12
**available** 59:7 106:23 184:9 189:21 190:11 190:14 198:2 212:11 247:10 259:13 261:19
**avenue** 2:15 5:5
**avenues** 128:16
**average** 81:5
**avlon** 2:18
**avoid** 35:11
**aware** 30:3 60:24 65:18

66:3 67:11,18 78:21 117:19 125:4 164:24 165:1 222:3,10 222:11,19 239:11 242:20 249:21 259:9 259:20 260:2

**b**

**b** 6:8 206:6,16 206:17 209:22
**babble** 98:9
**baby** 135:14
**back** 10:7,7 12:9 22:21 23:12 31:16 33:13 40:19 67:24 68:2 72:1 73:21 75:5 82:20 83:9 97:12 106:9 112:19 122:3 131:17 132:6 163:7 172:21 172:23 187:9 192:20 205:16 235:22 238:5 246:23 249:24 253:5,15
**background** 10:15 27:16 142:21 251:17 253:11,12
**bad** 82:22
**badgering** 105:18,20
**baker** 70:14
**ballpark** 42:4
**ban** 239:8
**banning** 239:19 240:22 242:4
**bar** 131:13
**barbara** 1:14 9:14 268:2,24
**barely** 173:8
**barret** 229:10
**barry** 70:9,16 70:18,22 71:3 71:10 73:1
**based** 59:6 92:12 106:22 118:4 124:13 177:20 184:9 194:14 195:6 195:24 206:19 207:6 213:9 226:15 240:12 241:2 249:10 249:18 251:10 252:6,9 259:12 259:23 260:8
**bases** 256:6
**basic** 60:13 86:15
**basically** 18:4 158:12 262:7
**basing** 207:5
**bassett** 229:10
**battle** 167:6 174:11
**battling** 167:6
**bear** 107:16
**beauty** 4:2 61:16
**beds** 51:10
**beef** 247:19,20
**beg** 103:8 105:6
**began** 76:4 79:5 163:14 261:6
**begins** 167:22 168:17,17 189:7
**behalf** 45:1 54:13 133:14 135:2 137:9 138:15 143:4 167:7 170:18 171:19
**behaviors** 73:15
**believe** 13:17 14:3 22:23 23:1 40:1 54:15 72:7 83:23 90:24 208:5 209:23 247:6 248:20 250:23 252:15
**believes** 116:22
**bell** 4:2
**benefit** 102:23 184:18
**benefits** 47:5
**benzene** 137:13 138:12 139:7 153:12,15 167:8
**berger** 21:15 22:24
**beryllium** 167:8
**best** 19:23 24:17 89:9 109:14 182:1,2 230:18
**better** 127:1 170:10
**beyond** 199:10 259:5
**bias** 8:10 88:22 186:6,7 249:3 249:20,22 250:1,15 251:1 251:9,11,18,20 251:21,21,22 251:22 252:17
**biases** 249:20 250:11,15
**big** 167:1 225:7 225:9 264:11
**bill** 239:8 240:22 242:3
**billed** 80:13,23

**billing** 80:19 157:7
**biologic** 195:12 196:12
**biological** 199:18
**biscayne** 4:13
**bit** 10:14,16 12:21 15:17 17:17 18:10 30:15 106:16 249:7 253:10 258:5
**blanking** 72:19
**blatant** 105:8
**blow** 106:19 185:5
**blurry** 141:17
**bmoore** 2:17
**board** 186:19 247:21
**body** 195:7 263:21
**bold** 182:19
**book** 6:19 165:6 165:10,18 166:5 167:14 167:17 169:3 256:22
**books** 256:21
**boring** 10:2
**born** 14:16 49:12
**bottom** 94:14 112:19 181:12 212:17 217:13 218:2 219:4 220:16 247:9
**bought** 50:4,5
**boulevard** 4:13
**boutiques** 166:23
**box** 55:24 64:15 64:19,21,23
**bradford** 257:19
**bradley** 4:17
**brand** 61:6 164:1
**branden** 2:14
**brands** 186:19
**break** 79:20 82:14,18 155:6 160:12 163:2,5 223:2 253:3
**breaking** 74:8 151:21
**breath** 115:12
**brief** 223:4
**briefly** 249:4
**bringing** 149:23
**broadly** 209:20
**brooklyn** 21:16 21:19 26:4
**brought** 103:9 169:16 181:9
**brown** 5:9 9:3
**brush** 62:2
**build** 254:21
**built** 255:1
**bullet** 91:10 92:5
**bunch** 23:3 180:10
**bury** 8:6 243:24
**business** 18:14 27:12,14,20,23 29:19 31:1,1,24 34:20,24 35:1 45:22 47:14 49:15 157:5 166:17 179:3,9 189:5 248:19 266:23
**butcher** 228:11
**butter** 39:14,23 39:24 40:3,8,15 43:22 136:1 170:14 171:3 171:10,14

**c**

**c** 1:3 160:13 209:22
**c.s.r.** 268:24
**c8** 10:8 12:10 44:8 86:18 88:6 119:2 120:12 122:6 123:4 124:1 131:18 181:5
**california** 3:21 141:8
**call** 11:2 15:11 17:4,4,5 54:20 54:22 55:14 56:5,8,14 82:10 88:20 89:11 188:6
**called** 1:10 10:22 21:22 84:24 85:1 130:21 131:1 164:9 165:8 172:16,24 182:19 186:5 249:19
**calm** 148:4
**campbell** 85:9
**canceled** 49:2
**cancer** 6:15,16 6:21 7:3,6,12 7:22 8:9 16:8 21:2,11 58:20 59:11,23 60:3 77:16 78:10,18 91:4,6,7,10,15 92:8,24 93:10 93:11,13,14,15 93:19,21 94:4,9 94:15,19 96:3 97:11,14,21 99:19,23 100:13,14,23 104:11 107:3

107:23 108:9 108:23 109:24 112:2,23 114:5 115:22 116:9 117:6,18 119:3 119:12 120:4 124:10,17,18 125:12,16,17 125:22 127:5 127:13,21 130:20,24,24 131:2 138:13 152:14 159:6,9 159:10,12 180:14 181:19 181:22 183:20 184:15 188:15 189:10,10 190:2,18 191:1 193:13,14 194:11 196:3 197:12 205:17 212:7,19 213:2 213:6,11 217:21 219:21 228:4,15,20 247:2,14 254:1 254:1,6,9,16,22 258:15,18 259:7,15,18 260:1,3,10,18 265:3,21

**cancers** 76:1 77:2,7,17 78:1 120:22 131:7,9 193:23,23 217:20 219:3 219:14 233:9

**capable** 117:17 119:3,6 125:21 125:24

**capital** 174:13

**caption** 55:3 56:9,9,11,15,21 57:1,5,7

**carcin** 124:4

**carcinogen** 124:4,9 125:6,8 125:14 130:12 130:22,23 131:1 199:16 207:19 208:23 209:14 210:12 219:1,20

**carcinogenesis** 203:5

**carcinogenic** 7:9 67:23 193:4 194:13 198:12 203:13,20 204:16 205:19 207:1 210:15

**carcinogenicity** 194:19 209:14 213:20 214:1,4 215:1,5 219:8 219:12

**carcinogens** 209:18,19 258:12

**cardiac** 224:2

**cardiovascular** 7:2 183:19 184:16

**career** 19:22 49:3

**carefully** 249:12

**carolina** 14:19 49:24 50:2 53:23 253:20

**case** 1:3 6:11,14 10:16 12:19 15:2,6 24:2,2,8 32:13 39:1,8 40:5,13,21 41:3 43:16 50:11 55:4,24 56:6,24 57:1,12,20 58:1 70:8 72:24 73:1 73:6,17 75:5,6 75:7,15,21 76:14 78:8 80:6 80:14 82:24 83:16,21 84:5 85:4 86:1 120:1 120:4,12,15,16 120:22 122:6 122:19 123:8 123:22 132:16 133:19 134:12 135:14 136:1 136:11,16 137:16,20,24 142:3,23 145:12 146:8 148:22 165:19 170:14 171:9 184:20 192:9 195:9,15 198:17,19,21 198:24 209:15 235:1 236:21

**cases** 16:1 38:8 38:14,17 74:2 119:17 124:1 135:1,4 138:9 138:15,21 139:20 140:15 140:19,23 142:4 143:9,23 170:9,12

**castronuova** 2:4

**catalog** 249:19 249:22 250:14 250:15 251:8

**categorization** 209:18

**cattlemen's** 247:20

**causability** 128:17

**causal** 59:8 68:11 86:24

87:11,13,13,17 87:20 89:8,11 89:12 90:2,2,10 90:20,22 91:22 91:22,23 92:4 92:18,20 94:19 95:23,23 106:24 108:17 127:24 130:2 143:17,17 151:10 161:3 189:23 190:15 195:17 199:21 203:17 218:5 218:18 238:10 239:1 250:6,8 257:19 258:23 259:10,21 260:6,11,14,22
**causality** 87:9
**causally** 75:24
**causation** 21:9 23:21 24:3,9 31:6 40:15 41:5 41:14 62:11 63:10 69:15 73:24 74:19 76:23,24 116:19 119:13 121:4 123:1,6 123:10,11,14 123:16 126:19 128:20 139:1 143:8,9,13 144:2,13,20,22 145:8,14 158:20,21 161:3 171:11 171:12,17 174:21 175:9 190:22,24 193:22 213:14 218:14 219:6 219:19 241:4 242:2 257:16 258:3 260:24
**causative** 247:12
**cause** 8:1 74:18 77:6,16,24 78:17 94:10 107:22 108:9 108:23 109:23 109:24 111:4,8 112:2,23 114:5 115:22 116:7,9 116:21,23 117:4,6 119:12 124:10,17 127:4,12,21 130:24 184:15 195:19 214:11 230:12 258:15 258:18 259:6 265:2
**caused** 41:9 73:18 77:1 78:10 86:5 139:9 213:11
**causes** 41:11 59:10 60:2 91:9 92:3,8 107:3 111:7,10 116:22 131:8 212:19 219:3
**causing** 40:8 117:17 119:3 125:21 138:13 222:8
**caution** 82:2
**caveat** 210:23
**caveats** 36:5,7
**cavo** 4:7
**ceasing** 241:13
**center** 16:9 17:10 19:5 20:23 21:2 227:3 249:9,18 251:9
**centers** 21:12
**centre** 252:5
**certain** 45:13 76:12 77:1 89:15 94:8 95:14 209:13 225:6 264:13
**certainly** 75:18 76:5 173:9 175:4
**certificate** 17:20,24 268:1
**certified** 1:14 268:3
**certify** 268:3,15
**cgw** 4:6
**chain** 7:21 228:3
**chairman** 164:18 175:20
**challenges** 174:5
**chance** 94:3
**change** 79:14 79:17 126:16 155:20 156:7 254:19
**changed** 11:22 46:2 70:12,14 75:22 110:1,21 111:2 124:2 125:19 166:17 211:2
**changing** 47:7 113:11
**chapel** 253:20
**chapters** 256:22
**characterizati...** 37:10 105:18 237:9
**characterize** 165:2
**characterized** 38:16 132:20 161:10 165:4

256:19
**charade** 168:5
**charged** 80:6
**chatter** 176:23
**chd** 226:20,20
**cheatham** 2:13
**check** 68:3 139:11
**checkbook** 216:10,13
**checking** 222:24
**checkoff** 247:19
**chemical** 44:2 57:6,8,22 58:7 59:10,17,18 60:2,9 62:15 64:3,10 65:6 66:2,3,4,11 67:11 84:4 96:24 97:22 99:15,18 100:15 103:19 104:8 107:2 127:11 136:21 138:22 144:18 167:10 173:3 173:10,13,17 173:22 174:1 174:22 204:15 215:21 244:5 259:14 260:1 260:10
**chemicals** 57:17 62:7,19 62:22 133:12 138:23 143:2 153:6,7 174:3 193:22 257:8
**chemrisk** 164:13 165:8 167:2
**cherin** 5:4
**chicago** 1:15 2:21 3:6,11,16 4:5,9,19 9:7 14:7,9 49:9 50:15 51:1 52:12 262:21
**chief** 159:9 254:12 265:23 266:1
**chloride** 137:3 139:7 143:20 153:8 154:9
**choice** 205:4,11
**cholesterol** 224:2,5
**chose** 163:19
**chosen** 85:23
**chromium** 167:8
**cite** 91:6 97:13 124:3 161:10
**cited** 92:24 93:4
**cites** 251:24
**citing** 91:15 175:12
**city** 14:11 269:12
**civil** 1:11 168:6
**cla** 191:6
**claim** 92:14 151:11 195:12 197:4 238:19 239:1 260:14
**claims** 23:21 40:8 76:12,14 169:16 171:17 238:10
**clarification** 93:10
**clarified** 34:19
**classification** 207:7,18 258:8
**classifications** 258:11
**classified** 125:5 125:13
**classify** 206:24
**clausen** 3:9
**clausen.com** 3:12
**clear** 25:7 37:23 52:23 73:22 77:8 87:24 92:6 111:19 159:23 182:5 197:9 201:15 204:18 205:2 207:20 252:3
**clearer** 152:6
**client** 81:21 174:14 175:7
**close** 33:7 59:4
**coal** 215:21
**coauthor** 212:9
**coauthored** 246:24
**cochair** 22:24
**coffee** 29:5
**coincidence** 246:6,9
**coke** 215:20
**colleagues** 60:23 162:11 162:20,22
**colon** 189:9 190:2,18
**color** 180:1
**colorectal** 6:21 7:5 8:9 180:14 181:19,22 188:15 191:1 247:2,13
**columbus** 14:16 49:11 122:24
**column** 80:9 138:16 140:14 140:21 213:19
**combination** 25:4

**come** 61:15 64:16 67:20 109:4 156:13 158:5 199:15 209:24 262:20 266:1
**comes** 15:22 64:15,18,19 114:9 263:16
**comfortable** 37:5
**coming** 21:18 262:8 264:2
**comment** 190:5 190:6,9,13 191:20 204:21
**comments** 237:7
**commerce** 158:14 164:19 175:20
**committee** 23:2 164:19 175:21 208:3,4,6,9,11 264:17
**committees** 208:1,7 264:10 264:11
**common** 203:3
**community** 22:19 109:4 130:6,9,10 146:2 161:19 203:4 231:12 233:3 240:13
**companies** 64:5 77:14 163:21 164:4,6 170:2 174:2 186:19 186:21,23
**company** 10:20 11:18,20 27:12 27:19 29:15 39:16,24 51:18 54:23 76:13 77:4 123:4,12 126:20 135:19 156:9 157:19 158:6,10,11 174:13 175:6 177:11 178:6 178:19 187:24 188:2,8 211:9 229:17 238:16 238:16 241:11
**company's** 174:10
**compare** 235:2
**comparison** 7:10 193:5 210:1
**compensated** 242:23 262:23
**compensation** 6:13 79:19 80:8 187:20 192:8 216:4 221:5,9 242:18 245:19 246:1
**competing** 235:11,13
**compiled** 134:24 139:19
**complaint** 76:3
**complete** 102:4 102:5
**completed** 77:12
**completely** 104:3 177:3,4
**complex** 218:24
**complicated** 147:24 148:2 200:24
**compliment** 263:12
**component** 62:10
**components** 57:6,8 62:15 65:1 66:11 107:13
**compound** 74:17 84:13 127:2 130:11 131:8 144:17 174:22 204:15 206:24 209:14 219:3,20
**compounds** 44:20 57:22,22 133:13 138:23 142:12 143:1 219:11 228:20
**compulsive** 73:15
**concept** 78:7 249:2
**concepts** 3:18 23:17
**concern** 224:5
**concerned** 198:9
**concerning** 220:21
**conclude** 86:4 198:11 210:14 226:15 228:17 258:21 259:10
**concluded** 74:16 189:20 190:21 205:14 208:21 219:5 222:11 238:9 238:24 241:3 258:14,17 260:6 265:1
**concludes** 266:18
**concluding** 194:12 205:18 259:21
**conclusion** 41:3 60:8 128:19 143:24 181:9 181:11,14,16

184:19 196:7 207:15,21 208:6,22 209:7 209:13 210:11 212:17 218:2 218:10 222:19 226:23 227:1 228:24 230:24 242:1 263:7
**conclusions** 59:3,16 106:22 209:21 216:4 219:11 222:7 230:21 233:7 256:7
**concurred** 215:7
**condition** 87:9
**conditions** 95:14 96:16
**conduct** 231:17 234:21
**conducted** 217:13,17 224:6 228:8 237:21 261:17
**confidence** 63:18
**confident** 73:22 132:22
**conflict** 191:4 252:13,14
**confounding** 88:22
**confused** 42:19 42:20,21
**congress** 29:14 38:1 177:10
**congressional** 28:3,4,11 30:4 30:6 38:3 164:20
**connection** 83:16,20
**consensus** 213:1 231:11 240:13
**consider** 89:22 153:21 154:16 194:21
**consideration** 31:7
**considerations** 89:12 90:3,12
**considered** 22:11 67:22 87:19 90:20,21 91:17 124:4 168:23 193:18 207:18
**considers** 93:20
**consistencies** 225:6
**consistency** 225:1,13
**consistent** 174:18 210:13
**constituents** 58:7 59:17 60:10 64:7,8 66:2,3 67:2,12 67:14 84:5
**consultancy** 10:20 11:20 12:13 13:1 18:14 26:13 27:8,10,14,15 45:22,24 47:11 47:19 49:14 69:18 71:7 131:19 139:21 156:9 178:21 179:11 188:2 189:5 211:19 229:22 248:18 261:11
**consultant** 27:16 30:18 31:3,4,8,9,11 31:18,19,22 33:11 34:18,24 34:24 39:10 47:17,23 133:14 141:24 160:18 178:11 255:5,10 261:24
**consulted** 220:20
**consulting** 10:23 11:5,8,14 11:24 17:4 19:22 27:12,22 29:19 31:1 45:7 45:7 47:13 69:11 72:2 156:12,18 158:10 167:5 173:16 174:1 178:19 188:8
**consumer** 5:2 65:10 127:23 183:10 187:12 192:8 227:6
**consumption** 7:19 8:8 40:15 181:18,22 223:13 226:16 247:2
**cont'd** 3:1 4:1 5:1
**contacted** 26:3 70:7,17,23 72:10 75:5
**contained** 269:8
**containing** 137:13 211:11
**content** 81:20 191:7
**contents** 82:3
**context** 69:4,19 86:22 87:1 88:14 106:17 149:14,22,24

165:19 180:1
**continue** 127:20 237:11
**continuing** 96:6
**contractual** 173:15
**contrarian** 225:22
**contribute** 183:2 191:6 226:17 247:22
**control** 88:20
**conveniently** 245:20
**conversation** 81:21
**conversations** 82:4
**cooler** 29:9 176:24
**copy** 58:24 91:1 165:19
**copyright** 247:6
**copyrighted** 252:5
**corner** 210:7
**coronary** 7:19 223:13 226:20
**corporation** 3:13 5:2
**correct** 11:11 15:19 23:24 24:3 28:1 38:6 40:6,19 44:7 47:6 52:21 53:1 53:18,21,24 59:20 60:11 65:24 71:13,14 73:5 77:3 80:15 81:2,6,15 87:11 87:20,21 92:22 93:16 94:17,21 96:1 97:7 102:15 107:14 109:2,9 112:20 117:21 118:2 118:10 129:9 129:22 132:14 142:24 143:6 157:16 159:7 160:8 163:11 176:2,20 177:1 178:22 180:21 180:24 181:20 181:24 184:21 188:23 189:6 192:6,10 193:8 194:23 209:7 212:10 217:15 217:16 218:11 219:8,12 220:23 223:17 225:24 226:22 227:5,9 228:16 228:22 242:19 243:22 247:7 247:16 251:15 254:14 256:23 257:14 260:4 261:15 265:4 266:6,10 268:13,21 269:7
**corrected** 144:6
**correction** 182:14,15
**corrections** 269:5
**correctly** 17:12 18:18 19:4 47:3 59:12 60:4 88:23 90:4 107:5 176:3 182:8,16 183:4 183:21 190:19 191:9,17,22 206:21 208:24 211:12 214:5 214:22 216:18 216:21 247:15
**costello** 4:3
**council** 185:9 185:18 186:13 186:20 215:19
**counsel** 9:13 28:9 33:20 34:8 41:23 43:2 74:7 80:5 85:18 103:16 105:3,3 110:24 113:13 113:15,20 114:1,7,7 146:24,24 147:8,16,16,18 147:19 148:1,4 148:4 150:8 151:20 152:17 153:1,17,22 201:7,7 202:6 204:21 222:23 232:23 237:23 255:4,23 256:6 256:18 258:20
**counted** 266:7
**counter** 61:16
**country** 21:12 134:18
**county** 269:23
**couple** 14:6 22:22 168:14 172:14 195:23 250:23 257:23 261:5
**course** 123:10 128:3 249:16 252:21
**court** 1:1 9:10 9:14 55:19 86:17 134:12 168:7,7 179:21 237:5 269:1
**court's** 16:11
**courtrooms** 25:12

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 285 of 335 PageID #:79093



**courts** 1:12
**cousin** 205:10
**cover** 244:10
**covered** 104:2 227:19
**covertly** 244:19
**crc** 181:18
**create** 175:6 244:18
**created** 26:13 27:9
**creating** 174:14 179:10
**creme** 134:7,9 135:16 153:15 154:6,8
**criteria** 89:12 90:2,2 92:18 225:12 258:4
**crn** 7:4 186:17 187:2,15
**crop** 191:5 192:1
**crosstalk** 141:14 240:4
**crystal** 87:24
**csr** 1:14 268:2
**culture** 17:6 24:21,24,24 25:3,15,16,20 25:22
**cultures** 17:5 23:7 24:21,23
**curiosity** 177:9
**curious** 29:13 161:20
**current** 71:16 213:8,10 222:13
**currently** 14:18 16:20 44:11 106:3 156:21 239:7 250:16
**curriculum** 159:12
**cut** 115:3 166:24 202:2
**cv** 160:7,11,16 253:21 254:11 265:14,15
**cvd** 184:16

**d**

**d** 6:1
**d.w.** 220:16,17
**daily** 226:17,18
**dairy** 45:2,8
**daniel** 3:3
**darnell** 5:9 9:2
**data** 194:22 195:1,2 198:10 205:14 207:6 207:15 208:21 213:21,24 214:2,24 225:2 247:11
**date** 9:4 47:2 53:9 71:5 80:10 116:18 184:10 220:1
**dated** 268:22
**dates** 29:1 33:6
**daubert** 15:11 15:12,12,15 18:5 22:8 23:2 23:8,13 38:21 81:14,17,24 82:10,22,23 83:3
**david** 169:2 246:13
**day** 1:16 53:12 129:15,21 262:8,11 266:2 268:22 269:9 269:18
**days** 11:16 48:24 147:13 266:23
**dc** 16:10 17:11 173:20 174:1
**deal** 123:4,9
**dealt** 65:16
**dearborn** 1:15 3:5
**decade** 10:8 261:21
**decades** 224:3 244:18 261:14
**decide** 118:14 128:24 237:5,5 264:8
**decided** 39:7 242:5
**decision** 18:5,5 22:8 23:3,8 163:22 207:5 240:7,12,12 263:5,23
**decisions** 22:12 22:15 263:22
**declaration** 211:5 220:7 235:11
**declare** 235:12 268:19 269:3
**declared** 242:17
**decreased** 226:18
**deep** 63:11 115:12
**deeper** 12:19
**defend** 164:22 169:15 170:23 171:7 175:24 176:9
**defendant** 40:4 54:13,14 76:13 77:14 78:7 83:18,19 133:15 136:13 139:8 255:10
**defendants** 38:24 46:11 85:4 135:3

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 286 of 335 PageID #:79094



138:1,15 139:22 141:24 143:4 162:14 170:18 171:19 178:24 179:14 262:23
**defending** 171:5
**defense** 41:21 41:22 43:23 48:6 71:12 73:3 84:20,21 85:4 86:1 118:23 131:13 133:6,9 133:21 134:8 136:3 137:6,10 137:15,22 138:7 141:15 166:11,16,23 168:21,24 171:5,8 188:1
**defensive** 146:18,19 233:21
**define** 232:1 234:12
**defined** 234:13 252:17
**defining** 195:21
**definitely** 111:3 111:4,11,17,17 111:18
**definition** 34:18 201:23 202:22,24 203:14,15 232:21 233:13
**definitively** 109:23 112:1 119:10
**degree** 17:21 96:20
**degrees** 253:13
**delays** 222:14
**deletions** 269:6
**delivery** 266:22
**democrat** 175:19
**demonstration** 88:16
**denied** 78:16 243:18
**dentu** 134:7,9 135:16 153:15 154:6,8
**deny** 245:15
**deponent** 9:12
**deposed** 42:8
**deposition** 1:9 6:9,12 9:6 10:3 12:10 13:6,14 13:19,20 25:22 32:9,13 36:4,8 36:22 37:2,5 41:16 48:21 49:2 50:16 52:13 53:6,9,9 53:12 54:19 55:9,14,15 58:16 79:15 80:1 81:9 88:2 93:6 125:3 131:17 135:5 139:14 155:14 165:23 171:23 178:9 180:6 183:14 186:10 188:11 192:13 212:3 217:1 223:8 227:11 230:7 235:19 237:21 238:4 243:8 246:20 250:19 261:6 262:22 265:16 266:18
**depositions** 1:13 14:23 29:24 38:20
**derive** 213:1
**describe** 23:19 196:20,22
**described** 89:13 89:20 99:14 178:8 182:2 196:19
**describes** 99:24 174:11
**describing** 129:12
**description** 130:15 174:9 199:16
**descriptions** 99:12
**design** 191:7 250:11 262:12 262:13
**designed** 261:17,18 265:11,18
**desires** 174:15 175:7
**desirous** 269:6
**desk** 262:1,7
**desks** 262:11
**despite** 123:14 258:21
**detail** 66:19
**details** 29:12 38:2
**determination** 195:4,6
**determine** 92:17
**determined** 117:23 128:18 204:16
**determines** 193:22
**determining** 214:3 215:4
**develop** 254:20
**developing** 94:9
**dha** 229:6

**dialed** 84:20 86:10
**dic** 255:20
**dictate** 255:14 255:17 256:12
**dictates** 255:20
**dictionary** 203:10
**diesel** 138:12
**diet** 96:10
**dietary** 182:4 186:22 224:2,5
**differ** 103:8 105:6
**difference** 15:15 47:8 129:16 205:21 206:8
**differences** 61:23 63:5,7 87:5
**different** 17:5 22:3 37:20 40:23 41:21,23 43:11,11 44:20 45:6 54:23 62:2 63:3,8,22 64:4 64:5,7,8 65:1,9 66:19,19,20 67:1 71:9 89:7 89:7 90:10 99:16,20 100:4 100:6,8 103:21 103:24 110:10 118:8 124:9 125:7 126:6,8 129:21,23 133:12 134:11 134:14 135:1 136:11 139:20 142:12 198:16 206:11,12,12 208:1 209:7 229:4
**differently** 62:3
**digest** 263:7
**dingell** 164:18 175:19 176:7 176:12,15,21
**dinsmore** 4:12
**dinsmore.com** 4:15
**diploma** 17:21
**direct** 50:18,24 54:1,2 62:10 256:11
**direction** 140:5
**directly** 72:11 173:13
**director** 159:10 159:11 254:24
**directors** 186:19
**disagree** 117:19 118:9 128:20 132:17 201:11 209:16
**disagreed** 131:9 209:17
**disagreeing** 208:14
**discipline** 22:2 162:23
**disciplines** 22:3
**disclose** 245:4,7 245:10,20
**disclosed** 242:22
**discloses** 246:3
**disclosure** 245:14
**discontinue** 242:5
**discontinued** 241:20
**discovered** 130:11
**discuss** 23:13 23:15,17 66:18 222:6 239:15
**discussed** 22:20 84:6 89:13 153:4 163:10
**discussion** 28:23,24 32:8 67:8 196:13
**discussions** 23:4 29:5 68:9
**disease** 7:2,20 8:1,3,7 40:20 41:2,12 69:15 73:12 94:4,10 183:20 184:16 223:13 226:20 230:13,24 236:11 244:1
**disentangle** 182:4
**dispute** 12:23 30:1 131:22 141:3,6,22
**disputing** 76:14 76:18
**dissertation** 261:20
**distinction** 32:3 90:16 117:2,4,7 133:5 144:23 145:1,4 203:2
**district** 1:1,1,12 9:10,11 55:19 55:20 269:1,1
**division** 1:2 55:20 269:2
**divito** 3:14
**dl** 32:6 55:6 79:23 88:1 93:1 134:23 139:13 155:13 171:22 180:5 183:12 185:14 192:19 212:1 216:23 222:22 227:10 230:6 235:18

**dlw** 10:21,23 11:2,5,8 156:12 156:18
**doctor** 48:12 82:14 83:3
**document** 32:19 140:6 155:9
**documentaries** 122:15,20
**documentation** 76:4
**documents** 242:21 244:4 246:3
**doing** 17:19 20:10 31:4 38:24 44:11 46:10 49:5 79:13 105:1 120:3,14 170:6 175:13 178:23 179:24 239:17
**dollars** 46:13 47:18 48:4 81:4 131:21
**dominik** 180:18 183:24 185:10 223:16 227:15 229:21 246:24
**dominik's** 187:24 229:17 248:18
**dose** 182:6,11
**double** 107:16
**doubt** 6:18 102:23 162:8 165:8 166:5
**douglas** 1:9 2:2 2:2 6:3,4,5 9:12 9:17,21 16:17 17:1 20:14,21 24:12 25:9 26:8 26:21 27:3 28:10,17 30:20 32:1,6,11,20,24 33:22 34:2,10 35:18,22 36:21 37:15 38:15 42:18 43:5 48:1 48:11 55:6,11 58:9,14,18 64:2 67:6 69:1,16 70:1 74:10,14 75:9,11 77:19 78:22 79:18,22 80:3,8 81:22 82:6,13,21 83:1 83:8,12,13 84:1 84:16,23 86:7 86:13 88:4 93:8 97:17,18 98:23 100:21 101:6 101:21,24 102:3,7,10,15 102:17,21 103:4 104:4,18 105:6,11,20,23 106:4,6,8,19,21 108:3,13,18 109:1,12 110:11 111:14 112:4,10,14,17 113:4,17,22 114:2,11,15,20 115:1,6,11,14 116:14 117:11 118:20 119:23 120:10,18 121:1,17 122:11 129:4 130:7 131:3,5 135:7 137:2 139:16 140:1 141:12,15,18 142:6 146:14 147:2,6,10,17 147:21 148:2 148:10,14,17 148:19 149:1,5 150:12,15,19 151:1,5,22 152:18,22 153:10,20 154:3 155:9,12 155:16 156:16 160:3,6 162:3 162:18 163:1,8 166:1 169:8,11 172:1 178:16 179:19 180:8 181:11,15 183:16 185:2,6 185:14,15 186:12 188:9 188:13 191:14 191:16 192:11 192:15,20,24 193:2 197:5,6 197:16 198:18 199:5 200:12 200:19 201:3,9 201:13,18,21 202:4,7,10,17 202:20 204:20 205:8,24 206:3 212:5 219:17 220:18 221:22 222:18 223:3 223:10,16 224:13 226:3,8 226:12 227:13 230:9 233:14 234:1 235:21 237:10,15,19 238:6 239:18 240:1,10 241:1 241:9,17 242:12 243:5 243:10,17 246:11,18,22 248:2,6,9 250:21 252:22 252:24 253:6 256:4 261:4

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 289 of 335 PageID #:79097



262:14 265:5 266:16 269:16
**douglasandlo...** 2:7,7,8,8
**dozen** 227:21
**dr** 6:10,12,14 9:12,22 10:2 33:4 83:15 111:24 158:10 158:11 159:3,3 160:17 161:1 180:23 184:4 187:10 188:22 201:23 227:17 253:9 261:7 265:5,10
**dragnet** 98:2,4 103:10,10 246:10
**draw** 128:19
**drinking** 124:5
**drive** 2:10 3:20 4:4,18
**drs** 229:10
**drug** 73:11,18 74:17 144:18 174:22
**drugs** 133:13
**dspira** 3:7
**duly** 9:18
**dupont** 6:14 44:6 174:10 175:13
**dust** 137:18,24 138:3 154:11
**duty** 147:6,8,10 147:11

**e**

**e** 6:1,8
**earlier** 132:13 209:12 253:23 253:23
**early** 11:23 39:12
**earned** 46:12 47:10 131:14 132:16
**earning** 47:18
**easier** 146:5
**eastern** 1:2 55:20 269:2
**easy** 57:12 151:14
**eckert** 5:4
**eckertseaman...** 5:7,7
**eclipsed** 166:22
**editor** 265:20 265:23 266:1
**editorial** 265:17
**educated** 161:3
**education** 16:12
**educational** 253:12
**educator** 161:3
**effect** 73:14 115:20 116:1,2 116:3 119:7 182:6,11 251:23
**effects** 40:9,16 65:21 68:11 73:19 74:18 86:5 136:8 139:9 174:3 182:4
**egg** 7:18 223:13 226:17,18 227:2
**either** 54:19 100:24,24 104:11 105:12 118:23 196:2 196:23 219:3 236:7 245:8
**electric** 215:17
**eliminate** 213:5
**employed** 163:17 173:15
**employee** 268:16
**employees** 175:22
**employer** 220:12
**employing** 177:11
**enacting** 240:20
**endometrial** 6:16 93:10,14 93:21 94:9,15 94:19 96:12 97:10 99:19 100:14,23 104:10
**energy** 164:19 175:20
**engineering** 253:14
**english** 203:9
**enlisting** 245:1
**enrolled** 234:22
**enterprise** 168:2
**enterprises** 4:2
**entire** 35:16 49:3 195:7
**entirely** 179:14
**entities** 165:7
**entitled** 180:13 183:17 188:14 193:3 212:6 213:20 217:4 223:12 230:12 236:11
**environmental** 173:1,7 174:3 229:3
**epa** 125:4 130:2 214:2 215:1 229:3,4,12,15 263:2 264:4

**epidemiologic** 6:23 7:8 8:5 31:19 88:14 181:17 188:21 189:9 217:18 236:12 247:11 250:1 253:19 256:22 261:19 262:12 263:15
**epidemiologi...** 88:17 159:4 160:23 180:15 189:21 190:15 195:1 213:24 214:23 218:4 250:12 258:22 259:5 261:17 265:11,18 266:13
**epidemiologist** 69:15 117:3 156:17 160:22
**epidemiologi...** 84:18 85:3 86:9 164:22 194:1 258:7
**epidemiology** 7:11,14 20:12 86:15,22 87:2 128:14,15 161:4 174:21 194:21 195:16 196:13 197:3,7 198:9,10 199:17 208:3 209:2 212:6 217:4 249:21
**especially** 210:9
**essence** 208:13
**essentially** 90:6 143:24
**establish** 40:13 40:14 41:4 73:18 107:22 108:8 116:8,19 117:24 138:24 144:2 212:18 213:10
**established** 27:7 41:7,14 59:9 60:1 74:19 87:17 92:19 107:2 108:17 108:22 109:18 111:6,9 123:6 124:16 126:4,6 164:16 174:20 259:11,22 260:7
**establishes** 109:22,23 112:1,22 114:4 115:21 116:6 117:5,16
**estimate** 15:2 42:2 44:21 46:17 221:11 228:9
**estrogen** 95:2 95:23
**ethics** 161:4
**evade** 113:24
**evaluate** 73:23 76:20,21 77:10 121:4 189:8
**evaluated** 76:23
**evaluating** 266:12
**evaluation** 78:13 211:8
**evasive** 105:15 113:23
**event** 75:4 126:22 178:7
**evidence** 7:5,15 8:5 40:11,12,14 59:7,9 73:17 76:20,21,22 77:10 78:14 86:4 106:23 107:1,21 108:8 108:22 109:11 109:22 112:1 112:22 114:4 115:20 116:6,8 116:18 117:5 117:15,24 120:6,24 126:15,15 128:16,19 138:24 171:9 171:16 182:6 184:10 188:15 189:12,22 190:15,24 194:14,15,20 194:22 195:7 197:24 203:17 203:18 204:3,5 204:9 206:13 206:14,20 207:2,14 208:21 210:9 212:18 213:8,8 213:10,10 217:5 218:13 218:18 219:5,7 219:19 222:11 224:16 231:11 236:13 249:10 249:18 251:10 252:6,9 258:22 259:5,13,23 260:8,15,18 263:22 264:2,3
**exact** 13:16
**exactly** 12:4 13:3,5 23:24 25:17 31:5 40:24 52:10 77:9 108:12 116:3,12,15,16 119:22 126:2 126:16 143:6,7

159:19,20 175:3 176:18 204:13 206:10 207:24 208:18 231:6,24 236:19 238:1 245:16 262:9 262:24
**exam** 175:21
**examination** 1:10 6:2,4,5,5,6 9:20 253:7 261:3 265:6 268:11
**examine** 177:18 230:21 239:15
**examined** 9:18 230:23 231:10
**examining** 164:20 176:8
**example** 44:5 103:10,10 119:1 124:3 130:22 142:22 145:12 155:22 209:23 250:7
**examples** 130:10,17 131:6 135:3 198:13
**excellent** 9:24 20:24 54:3
**except** 116:22 143:23 176:23
**excerpts** 6:11 6:19 32:12 165:21 172:21
**exchange** 23:5
**excluded** 122:23 123:15 123:18
**exclusively** 179:14
**executed** 269:9
**exhibit** 6:9,10 6:12,12,13,14 6:15,17,17,18 6:18,19,21 7:1 7:4,5,8,11,13 7:18,20 8:1,3,5 8:7,9 32:9,17 55:8,9,13 58:16 80:1 88:2 90:24 93:2,2,6 135:5 139:13,13,14 151:24,24 155:14,17 165:22,23 171:23 180:6,9 180:13 183:13 183:14 186:10 186:15 188:10 188:11 192:12 192:13 205:23 212:2,3 216:23 217:1 223:8,11 227:11 230:6,7 235:19,22
243:7,8 246:20 250:17,19 253:22 265:16
**exist** 125:11 198:3
**existed** 78:12 122:21
**existing** 224:10
**exists** 63:10 109:11 164:10 259:23 260:8
**expect** 168:2
**expense** 51:22 52:6
**experience** 15:23 84:6 147:22 159:4 160:23 179:23
**experiment** 207:6
**experimental** 194:15 207:6
**expert** 6:12 7:10,14 18:7 20:11 22:17 84:21 122:19 134:15 135:2,9 137:19 138:14 140:17,24 143:3 146:7 148:22 154:7 154:16,18 158:13 181:4 193:5 196:8
210:11,14 217:4
**expertise** 146:6 148:20 152:2,7 153:14 154:1,2
**experts** 57:15 66:17 75:14,19 82:9 116:23 117:14 118:8 128:13,18 129:12,17 196:5,8 222:5 233:6 236:20 257:8 259:4
**explain** 10:11 27:1 100:9 104:1,24 110:17 145:18 145:20 146:11
**explained** 100:10 104:1
**explaining** 26:22 105:1 149:11
**explanation** 100:12 104:12 105:2,10 120:2 120:12,21 146:15 250:6
**explanations** 88:21
**exploring** 123:21

**exponent** 72:4 164:8 165:8 167:2
**expose** 204:14 205:10
**exposed** 153:4 234:23,24
**exposure** 7:11 7:16 59:10 60:2 96:24 97:22 99:15 100:15 104:9 107:2 119:11 138:4,5 138:9 151:9,10 154:12 208:5 212:6 213:2 217:6 258:24 259:12,22 260:7
**exposures** 138:11 190:1 190:17 191:2 213:3 255:24 260:23
**expressed** 117:15
**expression** 137:1
**extensive** 78:23 210:9 257:24 258:1
**extent** 32:17 81:19 195:10 225:1
**extraneous** 98:10 237:7

**f**

**face** 18:11
**facility** 16:12 40:2
**fact** 10:6 11:5 12:9 35:8 42:7 74:17 92:19 96:2 100:12,16 100:19 103:13 103:15 104:8 104:14 119:24 121:13 122:3 122:22 127:3,4 129:7,8 146:8 187:2 216:4 233:5 242:24 245:19 251:16
**factor** 86:20,20 87:6,11,12,15 91:18,22,23 92:20,21 94:1,2 95:16,24 96:20 97:6 99:21 100:2 101:10
**factors** 6:16 87:13,14,16,19 88:22 89:23,24 90:20,21,22 91:3,9,14 92:4 93:20 94:8,14 94:19,24 96:7 97:10,14,21 98:18 99:13,14 100:14,23 104:10,15 182:5 250:7
**facts** 98:7,11 101:13 103:11 103:14,18,19 150:2 242:8 246:10
**failed** 245:20
**fair** 6:20 10:12 10:18 11:10,15 11:23 12:11 30:21 38:18 40:16 43:24 45:20 46:13 47:19 76:16 81:4 87:6 115:17 117:12 138:19 158:7,8 172:3 177:16 195:5 196:6,11 224:22 236:18 250:12 261:23 262:18
**fall** 74:2
**fallah** 4:17
**familiar** 61:10 86:19 87:1 142:16 165:10 173:6,9 222:5 249:9,11
**familiarize** 19:7
**family** 60:17
**fancy** 18:7 68:13,14
**fantastic** 154:14
**far** 31:3 53:11 71:20 109:17 198:8 219:9
**fatty** 7:21 228:3
**favor** 122:8
**february** 172:23 212:12
**federal** 16:9 17:10 19:5 20:22 22:5 23:12 122:23 134:12,15
**feel** 49:8 106:7 107:17 237:3,6 246:12
**feeling** 48:18 49:7 53:13
**fellows** 255:1,2
**fellowship** 159:11 254:21
**felt** 144:19 177:12 178:5
**female** 76:1 77:2
**fewer** 227:21
**field** 20:9 249:20
**fight** 238:3

**fighting** 104:22 104:23 174:4
**figure** 142:10
**files** 244:20,24
**filibustering** 199:12
**final** 195:4,6 196:7 210:5 216:3 266:21
**finally** 97:5
**financial** 221:8 235:13 251:20
**financially** 268:17
**find** 58:19 65:15 191:13 195:17 213:15 218:3,17
**findings** 183:3
**fine** 13:12 35:18,24 36:24 37:20,22 49:5 158:24 248:10 267:1
**finish** 26:19,19 26:24 28:13,15 42:17 101:19 102:3 103:16 108:15 109:7 116:17 145:2 146:21 179:6 232:23 238:3 240:5
**finished** 57:13 58:1,6 200:10 237:1 254:5 257:4
**finishes** 115:4
**firm** 39:17 70:11,13,13 72:2 174:1 175:22 211:19
**firm's** 156:6
**firms** 43:11 48:7 70:12 142:3 163:19 166:23 167:3,5
**first** 9:18 33:2 39:8,11 47:13 47:16 59:12 70:7,17 71:2 75:5 80:13 93:24 94:1,2 96:20 107:12 110:13,15 114:9 140:6 142:8 148:5 156:15 158:9 160:15,16 166:4,9 168:11 172:22 176:3 176:13 181:10 181:12 185:20 190:4,4 205:10 205:16 220:9 223:21 228:7 235:23 245:7 247:9 261:5
**five** 14:3 42:5 223:3 255:1 256:18
**flew** 50:17 53:22
**flight** 50:18,24 54:1,2
**floor** 1:15 2:5 3:5 5:5
**florida** 4:14 141:8
**fly** 50:22
**foci** 27:20
**focus** 24:4 25:12 66:15 67:3 68:18,21 69:2 174:12 217:20
**focused** 66:6 208:5
**focusing** 217:19
**folks** 18:6 20:10 62:6 71:24 162:9 221:17 248:19
**follow** 124:13 150:17,18 153:2 166:3 195:23 237:20 253:9 255:3 265:8
**followed** 95:8 234:23 235:1
**following** 208:20 238:2
**follows** 9:19
**food** 186:23
**forbes** 2:15
**force** 114:8
**foregoing** 268:4 268:13,20 269:4,7
**forever** 50:23 136:20
**forgive** 48:12 96:18
**form** 25:6 30:19 31:13 38:10 47:20 48:8 58:8 77:18 78:19 83:22 84:12,22 86:6 86:11 98:19 100:17 101:1 103:2 104:16 105:17 107:24 108:10,24 110:8 112:3,6 113:2 116:10 117:9 118:17 119:19 120:5 120:23 122:9 129:1,18 136:23 139:23 142:1 162:2,16 178:12 179:16 188:4 198:15

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 294 of 335 PageID #:79102



204:17 216:5 219:13 221:18 222:16 224:11 233:22 239:13 239:21 240:24 241:5,16 242:9 243:3,15,19 246:7,16 252:19 256:4 262:3 264:10
**formal** 15:18 15:20
**formaldehyde** 67:5,9 130:23
**formed** 264:16
**former** 159:9
**forth** 83:9 268:6
**found** 99:17 122:7 169:24 213:9 218:13 219:19
**foundation** 162:17 222:17 239:13,21 241:6,16 242:10 243:3
**founder** 156:17
**four** 7:9 22:8 52:20 130:17 160:22 193:4 253:13 255:1
**france** 193:15
**franklin** 2:20
**frankly** 42:15 50:21 195:14 216:11 224:24
**free** 106:7 107:17
**friday** 98:7
**friends** 60:22 262:10
**front** 51:23 58:22 93:17 112:19
**frye** 15:13,15 18:5 23:15
**full** 22:4 32:21 50:1
**fully** 49:4
**functional** 186:22
**functions** 173:20
**fundamental** 115:2
**funded** 21:21 45:15 182:23 183:6,7,9 185:8 243:14,18,19 247:19 248:24 256:15,18,24
**funding** 182:20 186:6,7 192:4 211:7,8,14,17 211:22 216:18 227:3 229:1,2 229:14,16 230:1 238:18 238:19 251:13 251:21,22,22 251:23 256:11
**funds** 229:11
**funny** 51:3
**further** 6:5,6 108:6 261:3 265:6 268:15
**future** 81:9 111:12,16 116:24 117:1 127:9 254:23 264:23

**g**

**game** 150:20
**garrett** 230:5
**gary** 2:2
**gatekeeper** 22:13,19
**gatekeepers** 22:11
**gathered** 222:6
**gbfs** 207:16
**gbhs** 222:12
**gdouglas** 2:7
**gears** 179:20
**general** 24:3,9 41:4 62:10 63:9 63:15 73:23 74:19 75:6,14 75:20,23 76:23 76:24 123:1,5 123:10,11,13 123:15 126:19 138:24 143:8 144:2,13,20,22 145:8,14 158:20,21 170:12 171:11 174:21 175:9 190:21,24 218:13,18 219:5,19 241:4 242:1
**generally** 61:10 66:5 83:17 119:4 138:20 214:2 215:3
**generate** 15:5 236:17
**generated** 15:1 15:2
**generating** 216:6
**generic** 166:17
**genetic** 96:16 207:14
**genotoxic** 207:17,19
**gentleman** 39:18
**georgia** 141:8
**getting** 94:3 122:3 187:9 254:2

**giant** 244:5
**ginex** 4:3
**gist** 90:15,17,17 90:18
**give** 21:19 22:1 33:12,15,17 34:3,5,13 35:3 35:10 36:1,7 74:11 91:8 99:8 102:23,24 103:14 118:16 131:6 139:12 149:21 157:17 158:4 161:14 161:16 237:19 263:14
**given** 21:11 73:11 75:6 78:23 79:3 161:15 173:14 255:11
**giving** 21:2,8 103:17 145:21 234:8 261:7
**glad** 49:7 56:18 185:12
**glasses** 141:16 182:14
**global** 229:2,12 229:15
**glyphosate** 7:9 7:13,16 193:4 194:13 205:19 207:16,19 208:22 210:10 210:12,15 211:10,23 217:3,4,6,18 218:5,14 220:22 221:1,7 222:6,7,12,14
**go** 10:2 12:9 19:6 20:22 27:7 28:20 29:24 38:12 40:19 42:9 45:10 56:13 59:6 67:24 68:2 69:10 73:21 79:22 80:18 83:9 86:14 89:4 94:23 97:12 105:15 106:9 106:12 123:12 123:19 132:7 134:2,21 135:10 146:4 152:19 153:18 155:7,12 156:8 156:11 159:2 161:1 163:9 164:4,16 166:9 168:1 177:13 180:10 181:7 182:18 183:12 184:24 185:14 188:9 191:12 192:11,18 197:19 202:24 206:10 210:5 212:1,15 213:17 215:13 215:15 217:12 222:22 228:7 230:6 235:10 235:17,22 236:10
**goal** 174:14
**goed** 229:6,11
**goes** 66:9 156:15 167:21 169:12 170:21 173:23 174:8 182:20 185:22 194:10 208:19 216:2 220:15 244:24 251:10 251:16
**going** 17:12 19:13 22:11,14 27:5,19 29:1,7 29:22,23 30:4,5 30:14 31:16 33:1,3 34:4,6 34:12 35:9,19 45:9 48:19 50:21 51:14,20 53:14,15 63:4 66:7 74:8 78:14 79:18 80:18 82:17 92:7 101:9 107:16 108:20 109:15 110:14 111:20 113:6,7,9 116:5 130:18 131:6,9 132:8 134:6 139:12 163:4 165:1,4 166:2 176:15,18 177:23 179:20 181:13 186:8 191:18 197:8 197:18,19,21 198:17,20 202:1,15 205:3 223:1 232:9 239:22,23 245:24 248:21 264:9 266:19
**goldberg** 3:19
**goldbersegall...** 3:22
**golkow** 9:3
**good** 9:1,22 10:1,13 12:6 30:17 31:3,4,8 31:8,10,18,18 31:22 33:11 34:18,24 35:11 47:9 48:19 56:18 66:24 74:8 82:14 99:4 99:6 145:17 155:3 177:13 178:2,3,5,11

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 296 of 335 PageID #:79104




204:10 232:8
**googled** 11:4
**gosh** 14:5
**gotcha** 210:5
**gotten** 166:16
**governmental** 259:20
**graduated** 253:15
**graduating** 254:2
**grant** 215:16 216:19
**gratuitously** 237:4
**great** 48:15 49:8 113:18 120:19 130:22 145:21 152:16 166:15 198:8
**greater** 15:9 131:11
**ground** 10:3
**group** 5:2 6:20 27:24 30:16,23 35:9 47:14 72:4 125:14 157:11 164:10,21 167:2 168:21 168:22 169:14 172:17 173:24 175:22 176:15 176:22 177:6 178:19 179:11 187:3,12,22 192:8,17 194:14 199:15 203:22,24 204:11 205:20 205:21 206:4,6 207:24 209:18 209:19,21,21 211:20 217:22 219:7,20 227:6 227:8
**groups** 183:10 215:24 216:6
**guarantee** 130:19
**guardian** 244:20
**guess** 44:24,24 58:11 64:18 135:24 266:16
**guidance** 158:13,19
**guns** 164:22
**guy** 68:7,14,15
**guys** 53:12 231:19,21 262:20

**h**

**h** 6:8
**hair** 1:4 9:8 56:1,21 57:2,2 57:9,13,13,16 57:17,21 58:5,6 59:10,17,18 60:2,7,15,23 61:3,7,11,18,24 62:7,20,21,22 63:15,22 64:3 64:10 65:5,6,16 65:20 66:4,4,11 66:19,20 67:12 75:23 77:1,6 78:9,17 83:17 84:4,6,7 97:2 97:22 98:17 99:13,15,18,24 103:19 104:8 107:2,22 108:8 109:17,22,23 112:2,22 114:5 115:21 116:7,8 117:6,16 127:11,20 136:15 142:22 145:13 146:6 147:22 148:21 151:8 195:18 196:2 197:11 233:8 257:4,9 257:12 258:14 258:17 259:6 259:14 260:1 260:10 264:17 265:2
**half** 134:18 168:17
**halfway** 207:12
**hand** 118:3,7 138:16 139:17 140:14,21 145:8 210:7
**handed** 55:12
**handful** 227:21
**handle** 22:9
**handles** 157:5
**handy** 222:1
**happen** 19:11 19:13 53:15 111:12 116:24 117:1 142:4 207:10 245:11
**happened** 21:9 21:14 46:24 73:20 119:21 119:22 126:17 172:10 177:20 178:23
**happening** 30:10
**happens** 83:9 207:2,4 264:9
**happy** 18:22 33:24 155:7
**harbor** 2:10
**hard** 42:9
**hardip** 3:20
**harm** 222:8,12
**harmful** 74:18 239:20
**harness** 174:12

**harris** 229:10
**hazard** 207:17
**he'll** 201:1
**head** 17:17 18:15 68:2
**heading** 94:14 100:14,23 104:9,15 182:19
**health** 7:7 40:9 40:16 45:13 63:6 65:20 74:18 86:5 127:19,22 128:3 136:8 139:9 166:6 174:3 188:20 193:14 197:11 219:21 222:12 235:1 253:19
**hear** 50:20 100:15 104:5 193:16 233:19
**heard** 29:5,8 35:6 136:24 146:3 166:19 169:4,7 186:5,7 189:22 249:13 249:14
**hearing** 15:11 15:15,16 29:10 81:14,18,24 82:22,23 83:3
**hearings** 15:13 15:13 38:4,21 79:16
**heart** 7:19 181:10 223:13 226:20 247:8
**held** 9:7 125:21
**help** 42:21,23 43:6 149:13 187:1 236:8,8
**helped** 248:12
**helpful** 86:16
**helping** 29:20 163:22
**hesitate** 10:10
**heterogenicity** 182:3
**higher** 204:11 206:14
**highlight** 32:22
**highlighted** 107:20
**hill** 90:1 166:18 166:19 253:20 257:19
**hill's** 225:12 258:4
**hired** 39:15 76:13 77:5 78:8 78:15 83:18,19 85:3,23,24 134:7 135:21 164:22 169:15 227:7 255:9
**hires** 230:2 255:14,17
**hmm** 56:22 62:18 73:13 94:6 95:5 137:17 220:14
**hodgkin's** 7:17 217:7,19 218:15
**hold** 235:17
**holding** 186:9
**holdings** 5:2
**holman** 251:24
**home** 50:9,14 53:14 65:11 157:15 238:8,8 241:23,23 262:1,18
**hometown** 122:24
**honestly** 156:7
**hope** 49:7 52:3 54:1,10,10 237:11
**hopefully** 180:11
**hormone** 95:2
**hotel** 54:4
**hour** 74:9 79:12 223:2 245:24 251:5
**hourly** 79:9
**hours** 52:20
**house** 2:13 50:4 50:5 164:19 175:20 236:4 236:14 254:21 263:23
**hpassananti** 3:22
**human** 7:12 40:9,16 45:13 65:20 74:18 86:5 124:4 127:4 130:12 130:23 136:8 139:9 198:10 208:23 210:12 212:7 213:2,6 213:20 214:3 215:4 219:11 222:8,12
**humans** 67:23 194:13,14,19 205:19 206:20 207:2 210:16 212:19 213:11 239:20
**hundred** 81:4
**hundreds** 221:13,16
**hurts** 156:7
**hyperplasia** 96:12

**i**

**iarc** 7:11 125:11,13 130:2 193:6,9 193:10 194:1 194:11,18 195:20 198:11 199:14,21,24 203:12,14 204:16 205:17 206:23 207:24 208:14,18 209:7,13 210:1 210:20 214:2 215:2 217:21 258:7,11,14,17 258:21 260:5 263:2,4,17 264:4,5,6,15,16 264:24
**iarc's** 208:22 209:17
**idea** 37:24 38:5 75:7,14,20 131:14 176:18 177:7 261:8
**ideas** 19:14
**identical** 88:7 203:5,6
**identification** 32:10 55:10 58:17 80:2 88:3 93:7 135:6 139:15 155:15 165:24 171:24 180:7 183:15 186:11 188:12 192:14 212:4 217:2 223:9 227:12 230:8 235:20 243:9 246:21 250:20
**identified** 57:6
**identify** 59:15 61:6 97:19 213:3
**ignores** 34:17
**illinois** 1:1,16 2:21 3:6,11,16 4:5,9,19 9:7,11 55:20 134:13 141:8 239:7 240:23 268:20 269:1
**imagine** 62:3 75:6
**implication** 143:11 234:8,9
**implies** 111:18
**important** 11:1 99:22 133:4 145:5 185:24 186:3 191:11 193:10 203:1 218:23 239:16
**imprecise** 263:10
**impression** 35:10 157:18 158:4 263:15
**inability** 182:3
**inadequate** 214:3 215:4
**incidence** 7:3 7:12 183:20 184:15,17 212:7 213:2
**include** 87:18 91:15 100:6 186:21 205:5 209:21
**included** 97:20 120:16 257:9
**includes** 141:7
**including** 47:5 71:19 87:16 112:11,12 125:17 128:9 138:15 164:21 194:3,22 207:16 245:1
**income** 10:20 11:9 45:23 47:10
**inconsistencies** 225:6
**incorporated** 215:19
**incorrect** 42:8 224:12
**increase** 79:15 88:18 94:8,15 99:18 103:20 103:21 184:14
**increasing** 73:14
**increasingly** 47:22
**incredulous** 155:2
**independent** 7:10 61:14 160:17 178:18 193:5 220:11 247:12
**indicate** 158:10
**indicated** 49:11 156:2
**indicating** 187:12
**indirect** 256:11
**indirectly** 248:18
**individual** 43:17 57:6 60:9 60:9 61:23 107:13 119:13 121:4 169:16 171:11 220:9 238:20
**indu** 249:2
**indulge** 261:7
**industrial** 230:2

**industries** 45:2 168:1 170:3
**industry** 8:9 35:13 44:2,17 45:8,8,16 169:15 183:6 185:8 186:23 187:2 192:2,5,7 192:17 211:22 215:24 216:6 227:8 243:14 246:2 248:12 248:19 249:1,2 250:24 251:6 251:11,18 252:17 256:15 256:19,24
**industry's** 166:5
**inexact** 130:15
**infectious** 40:20 41:1,11 41:11
**inference** 59:8 107:1 143:17 161:4
**infestation** 137:18
**influence** 235:15
**inform** 77:11 78:14 213:6
**information** 63:12 127:16 151:8 196:12 199:10 221:24 240:18
**ingredient** 186:21 211:11
**initially** 75:7
**ink** 137:13
**inside** 63:11
**instances** 198:10 199:16 206:23 256:10
**institute** 16:8 99:23 152:14 159:6,9 215:18 215:19,21,22 254:1,7,9,17 265:21
**institution** 129:24
**instructions** 61:11,14 237:20
**insufficient** 40:12,14 41:4 73:17 86:4 116:8 117:24 138:24 144:1 204:9 263:20
**intake** 226:19 247:13
**intellectual** 174:13
**intend** 24:1,7 157:17
**intended** 18:19 19:6 26:10 27:6
**intention** 26:12 176:12
**interacted** 85:10
**interaction** 15:21
**interest** 122:18 127:3,19,22 128:3 191:4 211:6 220:7 251:13,19 252:13,14
**interested** 21:18 23:9 29:18,18 227:7 262:15 268:17
**interesting** 233:17
**interests** 66:16 235:11,13
**interface** 158:14
**interject** 147:9
**internal** 244:4 244:20 246:3
**international** 125:12 161:16 161:17,20 193:13 194:6 194:11 205:17
**internationally** 161:2,11,12
**interpret** 101:15
**interpretation** 183:3 191:7 248:15
**interpreted** 34:22
**interrupt** 10:10 101:18 102:11 102:11,14 115:13 147:20 201:13 202:9 222:24
**interrupted** 200:11 202:13
**interrupting** 43:8 113:10 115:9 148:12 148:13 150:9 200:17 201:12
**intertek** 211:9 211:17,18,19 211:21
**interviewed** 163:18 164:9 164:12
**introduced** 19:14 253:22
**investigated** 30:12 38:1
**investigating** 29:14
**investigation** 28:3,4,11 29:22

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 300 of 335 PageID #:79108



30:4,7 164:20 175:18
**investigator** 262:6
**invited** 22:1,21 22:24
**invoice** 80:10
**invoiced** 80:6 80:13
**invoicing** 81:7
**involve** 174:12 220:21
**involved** 19:24 20:1 24:21 25:3 25:15,19 29:4 38:8,13,22 39:16 43:17,22 72:2,6 74:20 85:19 118:12 122:19 169:5 241:8 248:13 266:12
**involvement** 78:23 245:4,9
**irvine** 3:21
**issue** 41:18 61:7 62:11 67:20 109:4 121:5 123:7 124:18 164:1 171:11 174:23 240:18 256:1
**issued** 255:24
**issues** 18:11 22:10 219:22 239:16 263:5

**j**

**jack** 98:3 142:14
**jennifer** 135:18
**jersey** 141:19
**jewish** 248:7
**joe** 39:19
**john** 3:8 164:18 175:19
**joseph** 55:2
**journal** 173:2 265:21
**journalist** 172:23
**journals** 264:13 265:17 266:4,9
**judge** 1:7 10:15 10:16 24:2,7,8 24:14 37:16 118:13 122:4 122:23,24 131:14 149:12 149:13,22 198:23 261:7 262:16 263:14
**judged** 210:10
**judges** 21:20,23 22:5 23:12,12
**judicial** 16:9 17:10 19:5 20:23
**julia** 3:4
**jumped** 209:2
**june** 6:11 32:14
**jury** 14:1 35:19 86:17 118:14 122:4,6 128:24 149:12,14,22 198:23 237:5 263:14
**justification** 238:10 239:1
**justified** 222:15
**justify** 195:17
**justina** 5:4
**jw** 51:7

**k**

**kdeck** 5:7
**keen** 35:8
**keep** 42:9,16 43:12 48:18 50:8 53:14 113:11 139:18 142:9 148:12 148:13 181:12 200:16 202:23
**kensington** 49:16
**kept** 113:10
**kettering** 21:2
**kevin** 4:7
**kidney** 119:3 119:12 120:3 124:17 125:17 125:22
**killer** 134:1
**kind** 12:5 15:1 42:15 98:14 129:13 161:22 263:23
**kit** 64:18,19 65:1
**kits** 64:16
**knew** 18:19 28:23 29:4 56:24 76:19 78:12 86:1 169:18,22 176:14,16 177:23 187:5
**know** 10:4,14 10:16 12:8,15 12:16 13:16,24 15:4,7,14 16:11 18:10 22:10,22 23:4 28:21,24 29:1,6,11,13,16 29:21 30:5,6,7 30:11 33:15 35:8,13 39:16 42:3,9 43:17 44:23 46:19 49:17 50:22 54:24 55:3 56:8 56:16 60:13,18 60:22 61:21,22 62:4 63:19,21 63:24 64:15,16 64:17,21,22,24

65:9,12 66:22 66:23 67:14,15 68:5,8,8,9,13 68:22,23 70:12 71:23,24 74:22 76:19 77:22 78:11,15 82:23 83:2 85:2,16,21 86:12 101:8,8 102:1,2 104:22 105:13 106:2,5 108:20 112:5 115:4 119:5,9 121:9 122:10 122:13,21 123:17 125:10 125:14 126:3 127:8 128:1,1 130:8 132:3,4 134:16,20 142:12,14 147:3 150:24 151:1 152:6,15 153:6,7,8,12,12 153:14,14,15 154:5,8,9,11,12 154:12,15 155:19 162:19 166:12,20 167:16,17 168:22 169:6 169:14 170:7 170:14 176:11 179:22,22 181:1 185:9 186:2,13 187:7 187:8 188:5 199:20 201:23 202:18 204:8 205:21 208:17 215:12 216:8 216:11,15 221:12,14,16 221:20 226:4 226:11 229:16 229:18 232:5 236:23 237:3 238:14,17 239:6 240:11 240:17,19 241:2,10,12,15 241:18 249:17 254:19 262:16 264:15

**knowledge** 24:16 67:21 145:12 154:17

**knowlton** 166:19,19

**known** 57:13 87:13 129:24 136:20 169:3 203:16 235:13

**knows** 254:18

**kosher** 247:24

**kristen** 2:4

**l**

**l** 9:17 80:8 156:16

**lab** 3:18

**labeling** 136:12

**laboratories** 3:2 4:11 5:3

**lack** 170:10 182:11 225:14 225:16,17 241:5 256:11

**lag** 263:4,8 264:3

**laila** 2:10

**lake** 14:11

**language** 17:17 22:16 129:12 157:23 203:3,9

**lara** 2:3

**large** 157:19 158:6

**larger** 32:19 167:24

**largest** 261:18

**larry** 246:13

**lasalle** 3:15

**lasted** 52:19

**late** 89:14

**laugh** 226:9

**laundry** 142:11

**law** 21:15,16,19 39:17 142:3 158:14

**laws** 268:20

**lawsuits** 46:12

**lawyers** 23:6 41:21,23 43:11 52:16 53:3 54:17 56:14 84:20 123:5 175:23 176:9 244:17

**lay** 51:22 218:13

**lc** 228:10

**le** 54:5,6

**lead** 35:17 138:9 244:21

**leaders** 254:22

**leading** 164:19 222:4

**leaf** 165:14

**leafed** 165:13

**learn** 18:16 19:16 20:5 162:10

**learned** 27:13 30:15,17,23 31:10,23 33:10 47:17 56:16 178:10,11 179:10

**learning** 29:19 35:12

**leave** 33:9 178:3,3 236:4 236:14 262:18

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 302 of 335 PageID #:79110



**leaving** 47:16 178:8 256:14
**lecture** 24:2,7
**lectured** 23:11
**led** 154:12,12
**leeman** 135:19
**left** 19:18 26:11 45:21 47:2 80:9 140:15 143:7 163:9,14 166:11 177:16 209:1,4 247:10
**legal** 15:18,20 15:22,24 18:8 18:17,17 19:8 22:19 23:6,17 24:3,8,15,17,24 25:5,15,20,22 39:8 129:2 164:23 174:4 175:24 176:10
**legal.com** 4:6
**legislature** 239:7 240:8,15 240:16 242:4
**legitimate** 232:20 233:1,2 233:18,20 234:2,6
**length** 66:7
**lest** 174:8
**letter** 174:10 175:12
**level** 119:13 204:11 205:5 206:13,14 259:12,23 260:8
**levels** 203:22,24 222:13
**liability** 1:6 9:9 56:2 176:10
**life** 45:21 47:7 83:12 121:23 152:10 191:6 192:1
**lifestyle** 182:5
**lifetime** 95:9
**light** 210:9
**likely** 16:15,18 18:11 19:11 43:20 125:5 133:10
**limit** 114:23
**limited** 194:14 206:19 207:1 213:23 214:23 258:21
**line** 32:23,23 88:10,12 89:5 202:16 212:17 217:13 219:4
**lines** 168:18
**link** 8:6 244:1
**lisak** 3:4 115:3 115:9 120:14 192:22 201:1 201:16 204:23 237:13,17 238:5 247:24 248:4,8
**list** 6:17,17 91:11 96:6,18 97:13,20,21,23 98:16 99:1 100:2,7 101:4 101:10 103:23 134:6,22,24 139:4,19 140:14 142:9 142:11 266:4
**listed** 95:16 97:6,6 99:13,20 100:22 104:9 104:14 138:16 151:24 194:7 250:15
**listened** 153:5
**listening** 14:1
**lists** 94:23 100:13,15
**litchfield** 4:7
**litchfieldcavo...** 4:10
**literature** 41:4 68:8 69:10 70:5 74:16 89:13 92:19 109:10 117:16,23 118:5 124:17 144:1 168:3 196:2,17 197:10 217:18 218:4 224:4 245:3 265:1
**litigation** 1:6 9:9 10:8 11:15 11:21 12:1,7,14 13:2,15 14:24 16:16,21 17:13 18:8,12,20 19:6 19:18,24 20:9 20:15 26:11 27:7,17,19 30:2 38:14,24 39:10 39:14 41:22 44:18,22 45:3,4 45:7,24 46:11 56:2 61:8 67:3 67:21 68:15,21 69:4,12,19 70:3 70:20,21,23 71:16 72:3,9 73:8,21 78:12 78:24 83:10,10 83:18 86:18 88:6 118:12 119:2 123:4 130:1,22 131:18 132:9 162:15 169:16 179:1 181:5 220:20 221:5 242:14,21 255:6,11 256:2

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 303 of 335 PageID #:79111



260:16
**litigations** 71:9
**little** 10:16 12:18 15:17 17:17 18:10 20:5 30:15 45:10 74:9 81:3 106:15 127:16 141:17 191:20 223:1 225:10 249:6 253:10
**live** 49:14,18
**lived** 49:15
**livestock** 182:24 183:1
**living** 10:17 131:15 261:9 261:10
**llc** 2:13 3:2 4:2 4:17 5:2,4 11:1 156:18
**llcs** 157:23
**llp** 2:9,14 4:7 4:12
**lobbying** 173:21
**london** 2:2
**long** 7:21 52:11 71:4 74:3 96:18 146:15 188:7 228:3 234:17 240:21 245:24 254:8 260:21
**longer** 18:22
**look** 13:9 40:20 42:6 48:15 58:3 58:10 61:13,20 65:14 67:24 73:21 75:13 92:14,23 119:8 124:22 134:5 138:18 140:6 140:14 164:4,6 180:2 181:9 184:6 195:20 196:24 199:24 203:9 206:10 212:16 225:6 227:3,7 230:18 243:7,23 263:18 264:12 264:17 266:3
**looked** 62:5 68:1 112:18 155:19 167:3 178:9 211:4 233:7,9 242:17 243:21 248:23 249:12 251:4 260:12,12 264:19,19 265:1
**looking** 128:13 128:16 177:11 181:21 205:22 214:10 250:6 253:21 260:21 264:20 265:14
**looks** 177:19 254:11 266:8
**los** 72:19
**lot** 21:11 34:7 64:1 100:11 105:1 146:5 162:10 258:10 262:10
**lots** 22:3 161:16 218:24
**lrazzaghi** 2:12
**lsay** 2:7
**lunch** 155:6
**luster** 4:16
**lymphoma** 7:17 217:7,19 218:15
**lyon** 193:15

**m**

**m** 1:7
**m.d** 1:10
**m.d.** 6:3 9:17 80:8 269:16
**m.p.h.** 1:10 6:3 9:17 269:16
**ma'am** 98:11
**made** 16:18 46:21 47:8,14 47:21,22 48:4 77:8 100:8 122:12,15 123:5 131:13 131:20 132:2 132:23,24 136:5 149:22 177:5 203:14 204:18 205:1 230:21 268:10 269:5
**madison** 4:8 5:5
**magazine** 175:16
**main** 10:18,19 11:9,12,13
**major** 59:3,16 94:13 106:22 122:12 128:7
**majority** 261:24
**make** 22:15 42:20 87:23 92:14 110:20 140:13 147:7 147:11 163:22 171:17 190:13 195:4,6,12 197:4 201:15 201:22 203:2 204:9 237:17 260:14 262:20 263:9,22
**makes** 194:18 238:14,16 241:11
**makeup** 166:17

**making** 23:19 32:2 40:3 76:12 113:18 143:11 151:2 269:7
**man** 150:2
**manage** 157:20 158:7
**management** 157:9
**managing** 156:17,22 157:10,20,22
**manipulate** 244:19
**manufacture** 174:2
**manufactured** 64:10,11 221:1
**manufacturer** 39:23 211:23 248:11
**manufacturers** 43:23 167:7 173:22 178:24 179:15 186:22 186:24 246:2
**manufacturing** 166:24 230:2
**manuscript** 182:21,22,23
**march** 6:14 80:20 93:18 186:16 250:23
**margaret** 21:15 22:24
**mark** 55:7 58:15 79:18 93:1 134:6 171:22
**marked** 6:9 32:10 55:10 58:17 80:2 88:3 93:7 135:6 139:15 155:15 165:21,24 171:24 180:7 183:15 186:11 188:12 192:14 212:4 217:2 223:9 227:12 230:8 235:20 243:9 246:21 250:20
**marketing** 1:4 9:8 56:1
**maron** 4:17
**maronmarvel...** 4:20
**marriott** 51:7
**marvel** 4:17 121:13
**mary** 1:7
**maryland** 49:16
**massachusetts** 141:9
**master** 142:15 143:12 253:18
**master's** 254:3
**material** 213:5
**materials** 85:13
**matter** 9:7 13:15 74:21 147:23 174:21 225:22
**matters** 11:15 18:8 44:18 45:3 45:4 118:12 151:10 162:15 220:20 221:6
**mcauliffe** 2:19
**mcbride** 4:11
**mcguirewoods** 2:14
**mcguirewood...** 2:17
**mcmenamin** 39:19,19
**mdl** 1:5
**meals** 52:1
**mean** 17:16 24:23 34:22 35:23,24 41:10 57:8 62:19,21 62:22 67:15 68:22 72:15 82:9 87:4,11 103:6 104:21 121:11 124:19 152:8,9,10 153:13 158:4 187:18 191:23 195:19 199:23 200:6 218:21 225:5 229:3 230:16 231:2,5 231:6,19,20 232:1 234:7 250:4
**meaning** 31:6 152:10 182:21 204:3 250:2
**means** 22:19 34:17 55:5 142:18 187:18 199:20,20 200:1 201:5 202:18 203:8,8 203:10,12,17 203:18 217:14 218:22 250:5
**meant** 178:15
**meat** 6:21 8:8 45:2,8,12,16 180:14 181:17 181:22 182:23 183:1 246:23 247:1,13
**mechanism** 95:21 195:18 195:19,21 196:12 198:7 199:18

**medical** 95:14 253:16 254:2
**medicine** 249:10,19 251:10 252:6
**meet** 53:2 54:17
**meeting** 52:16 52:19 53:11,16 53:17 265:24
**meetings** 69:11 86:18 161:17 264:22
**megan** 3:15
**mehta** 4:3
**melissa** 4:17
**mellott** 5:4
**melodramatic** 174:9
**member** 60:17 156:17,22 157:20,22 186:18,21
**members** 156:24 157:20 158:6
**memorial** 21:2
**menstrual** 95:8
**mention** 60:8 67:4
**mentioned** 36:6 43:21 53:5 82:22 123:23 125:3 128:14 132:13 156:11 193:9 229:23 253:23 255:4 263:15 264:11
**mentor** 29:20
**meridian** 54:5 54:6
**met** 44:6 87:8
**meta** 7:18,20 8:7 223:12 224:6,7 225:15 226:14,16 228:2,9,18
**metaanalysis** 247:1
**metabolic** 96:7
**methodological** 189:13
**methodologies** 31:20 143:18 257:20 258:3
**methodology** 22:17 23:20,20 129:9 143:19 145:23,24 146:1,2 189:12 218:23 219:16 219:18 255:12 255:15,22 257:19
**methods** 59:8 92:13 106:24 144:15
**methylene** 137:12
**mfallah** 4:20
**mi** 141:12,13
**miami** 4:14
**michael** 3:4
**michaels** 169:2
**michelson** 3:20
**michigan** 141:12,13 164:18 175:19
**mid** 12:12
**middle** 102:19 102:20 186:18 200:7 201:8 202:12
**miller** 3:9
**million** 46:21 48:4 131:21 132:16,24 133:1
**millions** 46:15 47:18 132:1
**mind** 88:9 174:14 186:9 202:23 214:14
**minimal** 260:15
**minnesota** 141:9,9,19
**minute** 58:4 186:9
**minutes** 74:12 131:10 155:7 252:24
**mirapex** 133:23 135:16
**mischaracteri...** 69:7 121:16 226:2
**mischaracteri...** 20:18 31:14 120:6,24 129:2 226:6
**mislead** 244:6
**misrepresent** 206:11
**missed** 83:6
**missing** 26:15 26:17
**missouri** 141:9 141:11,19
**mitchel** 3:10
**mitchell** 3:8
**mite** 137:18
**mites** 154:11
**mla** 182:24
**mlisak** 3:7
**mm** 218:6,7
**model** 159:21 179:9
**modest** 184:17
**mold** 137:18 154:11
**moment** 265:10
**moments** 246:13
**monday** 52:14 52:16 53:2,3

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 306 of 335 PageID #:79114



**monetize** 162:13
**money** 47:22 54:9 131:12 187:19,20 216:9,10 229:18 248:17
**monograph** 194:12 205:18
**monsanto** 135:19,21 211:9,15,22 220:21 221:2,5 221:9
**month** 163:13 222:3,20 254:6
**months** 172:9
**moore** 2:14
**morning** 9:1,22
**morrison** 2:20
**mortality** 7:3 183:20 184:15 184:16,17
**motion** 122:12
**motions** 168:2
**motivation** 168:5
**mouth** 114:10
**move** 16:19 19:21 36:20,22 45:19 49:23 50:6 112:15 131:3 169:8 191:14 197:5 197:19
**moved** 49:21 50:1
**moving** 16:16 23:7 139:18
**mph** 80:8 254:3
**mryan** 3:17
**mtbe** 167:8
**mtorrence** 3:12
**multimillions** 46:12
**multimineral** 7:2 183:19 184:12
**multiple** 7:17 105:5 128:16 138:13 217:7 217:19 218:15
**multivitamin** 7:1 183:18,19 184:12
**multivitamins** 187:10
**mvms** 184:11
**myeloma** 7:18 217:7,20 218:15
**myriad** 143:1

**n**

**n** 6:1
**namasté** 3:2 51:14,17 54:16 54:18 64:11 65:2,3
**namasté's** 64:17
**name** 9:2 39:19 55:1 70:9 72:19 85:8 140:15 186:18
**names** 61:6
**naphthalene** 7:13 212:7,19 213:11 214:1,4 214:24 215:5 215:10,19
**national** 16:7 21:22 23:1 99:23 130:3 152:14 159:6,8 215:22 247:20 247:21 254:1,6 254:9,16 260:5 265:21
**nature** 73:6 136:5
**nci** 19:19 26:11 47:2,8,23 162:9 163:9,14 256:14
**ndannunzio** 5:7
**near** 16:12
**necessary** 237:6
**need** 30:24 42:23 43:6 82:10 105:13 141:16 146:12 165:19 222:1
**needed** 76:22 78:13 84:21 128:4,10 158:7 213:8,12
**needs** 33:21
**negative** 107:16
**neither** 231:19
**neurotoxicol...** 8:2 230:11 233:4
**never** 35:19 49:1,2 60:24 64:22 65:5 84:7 84:8 124:8,11 124:12 209:17 249:23 260:14
**nevertheless** 42:16 168:4
**new** 2:5,6,11 5:6,6 53:20,23 141:19,20 164:1 202:5,14 213:8 244:21
**newman** 2:3
**news** 167:10
**nhl** 218:5
**night** 53:14
**nitrosamines** 67:18,22 68:12
**non** 7:17 45:7 169:3 217:7,19 218:15

**nonlitigation** 11:24
**nonresponsive** 169:9 191:15
**normal** 266:21 266:21
**north** 2:20 4:4 4:18 14:19 49:24 50:2 53:23 253:20
**northern** 1:1 9:10 55:20 269:1
**notary** 269:22
**noted** 9:13 105:16 267:2
**notes** 268:14
**notice** 1:11 6:12 55:13,14 99:11
**noticed** 11:4 97:9 233:17 235:10
**notion** 151:9
**number** 13:16 38:13 43:14 44:23 94:23 95:8 132:18,19 133:12 134:18 248:23 251:3
**numbers** 43:12
**nutrient** 224:5
**nutrition** 185:10,18 186:14,20 227:2
**nutshell** 248:14
**nzegwu** 5:4

**o**

**oath** 237:16 268:7
**obesity** 91:16 92:8,17 95:16 95:20 120:2,8 120:11,20
**object** 25:6 30:19 31:13 32:16 35:16 37:7,9 38:10 42:12 47:20 48:8 58:8 77:18 78:19 83:22 84:12,22 86:6 86:11 98:19 100:17 101:1 103:2 104:16 105:17 107:24 108:10,24 110:8 112:3,6 113:2 114:9 116:10 117:9 118:17 119:19 120:5,23 121:15 122:9 129:1,18 136:23 139:23 142:1 150:23 162:2,16 178:12 179:16 188:4 198:15 202:1,15 204:17 219:13 224:11 233:22 237:8,8 239:13 239:21 240:24 241:5,16 242:9 242:9 243:3,15 246:7 252:19 256:4 262:3
**objection** 16:3 16:23 20:13,17 24:10 26:6 36:17 63:23 68:16 69:6,20 75:8 81:19 146:10 148:23 149:3 162:21 197:13,13 202:9 221:18 222:16 226:1,6 246:16
**objections** 268:9
**objective** 175:8 189:8
**obligation** 237:23
**oblivious** 177:3
**observed** 61:3
**obsessive** 73:15
**obvious** 104:21 147:14 226:5 239:23
**obviously** 13:9 15:5 35:7 81:12 83:2 239:19 258:4
**occasionally** 48:3,4
**occupation** 189:24 190:16
**offensive** 162:12
**offer** 104:13 143:4 237:6
**offering** 199:10
**offhand** 238:15
**office** 50:9,14 157:14 241:23 254:13,15 262:1,18
**official** 244:17
**oh** 13:11 14:10 24:4 48:20,23 49:19 51:10 56:8,13 58:12 66:23 67:13 71:4 72:18 98:4 103:3,5 105:23 120:7,13 122:10 123:3 124:6,22 134:9 159:14 196:20 205:24 206:1 232:18 249:16 258:1 265:20

**ohio** 14:16 49:11 122:24 141:20,20 253:14,17

**okay** 11:12 12:2 12:8,18 13:5,13 13:18,23 14:20 14:20 15:10,14 18:13 19:2,17 20:4 23:11,22 24:6,18,23 25:2 25:14 27:21 28:15,19 29:23 32:2 35:2 37:1 37:20,21,21,23 38:3,16,19 39:3 40:4,22 41:1,15 41:20 43:13,19 43:21 44:8,12 45:1 46:10,20 47:1,7 48:15,18 49:4,6,13,20,23 50:8,15 51:8,12 51:19,22 52:4,6 52:11,15 53:2 53:13,17 54:10 54:17 55:6,18 56:5,13,18,23 57:5 58:3 59:2 59:15,21 60:20 60:22 61:2,22 62:5 63:4,14,21 65:9,14,23 66:1 66:24 67:16,22 68:4 70:2,16,22 71:21 72:12,20 72:24 73:16 75:1,4,10 77:13 77:23 78:5 79:11,18 80:4 81:3,7 82:13 84:2,17 85:2,7 85:10,13,22 86:14 87:22 88:8,11 89:4,6 90:15,18 91:14 91:21 92:6,10 92:16 93:13,17 93:24 94:13,22 95:19 96:2,6 97:9 98:1,14,24 100:3,5,22 102:16 104:5 106:10,13,16 107:4,7,15 108:19 109:16 110:4,7 112:14 113:11 115:17 117:2,12,22 118:3,11 119:10,16,24 120:19,19 121:6,10,13 122:2,15,22 123:21 125:1,9 125:18 126:22 127:10,18 128:5 130:14 131:15,17 132:1,6,12,15 132:21 133:17 134:5,21 136:5 136:15 137:3 138:11,19 140:7,12 141:3 141:7 142:7,10 142:21 143:14 144:24 145:9 147:15 151:2 153:11 155:22 156:2,5,15,21 157:10,17,24 158:3,18 159:8 159:23 160:2 160:21 161:9 162:8 163:1,3,9 163:12,16,20 164:15 165:14 165:17 166:9 166:22 167:20 168:14 171:19 172:10,14,16 172:20 173:9 173:23 176:17 176:23 177:9 177:24 178:7 179:13,20 180:18,22 181:1,4,7 183:9 183:12,23 184:6,14 185:12 186:4 187:6,18 188:9 189:4,7,20 190:7 191:3,14 193:16,24 195:23 196:10 197:5 198:4,8 201:23 202:17 203:1,21 204:10,14 205:9,24 206:19 207:5 207:11 208:10 208:19 210:3 210:22,24 211:5,14 212:1 212:9 213:9,23 215:9,13 216:14,22 217:12 218:1 218:20 219:24 220:4 221:23 223:7 225:18 226:8,23 227:22 228:2 228:15,23 229:14 230:5 230:16 232:6 235:8,17 237:15 238:14 238:18 239:6 239:19 241:10 241:10 242:13 242:20 243:6 243:23 244:11

245:12,17 246:12 247:17 248:21 249:24 250:4,10 251:3 251:8,16 252:3 252:9,12,23 254:8 261:16 261:23 264:1,7 264:15,24 266:17
**old** 48:13 98:1
**omega** 7:21 228:3 229:6
**omit** 98:17
**omitted** 99:1
**once** 47:10 60:6 77:11 125:20 138:16 169:24
**oncology** 159:10 254:13 254:16
**one's** 232:13
**ones** 39:12 103:22 139:3,6 196:24
**online** 212:11
**operates** 31:2
**operation** 214:14
**operations** 166:18
**opine** 24:1 63:4 116:5 123:7,13 127:4 138:1
**opined** 41:9 119:2,11 137:4 138:21 144:10 144:13
**opining** 108:12
**opinion** 40:13 73:16 77:11 92:10,12 101:11,12 107:12,20 111:24 118:4,8 118:15,16 122:6,7 124:15 128:5,6,9 129:5 129:6,16 143:4 144:20 168:7
**opinions** 14:2 58:4,5,20 59:4 86:3 106:10,13 117:15 122:5 257:3
**opportunity** 19:22 75:13
**oppose** 240:20 240:22
**opposed** 20:9 92:20 116:7 129:13 175:7 210:20 240:12
**order** 92:14 146:12,13 192:9 236:4
**organization** 30:17 173:21 192:2 229:2,12 229:15 238:21 251:13
**organization's** 193:14
**organizations** 230:22 248:12 248:12
**oriented** 34:24 188:1
**original** 53:9 231:14,16,21 232:2,3,12,16 233:12 234:7,9 234:12,17 236:5
**origins** 39:20
**outcome** 87:8 127:5 174:14 175:7 251:22 255:18,20 256:12 258:24 259:12,23 260:8 264:18
**outcomes** 45:13 63:6 197:11 224:2 235:1 256:1 260:23
**outside** 129:24 245:2,18
**ovarian** 58:20 60:3 78:10,18 107:23 108:23 117:17 130:24 196:3 197:12 258:18 259:6 259:15 260:1 260:10 265:2
**ovaries** 95:22
**overall** 207:12 207:14 218:2,3
**overriding** 168:5
**overweight** 91:16
**own** 22:9 27:19 27:23 57:15 58:24 61:17 76:5 91:1 117:22 161:21 178:6,20 179:10 196:16 197:10 231:17 233:6
**oxford** 249:14 249:15,17 250:16 251:9

**p**

**p** 2:14
**p.m.** 267:2
**packaging** 64:13
**padden** 2:4
**page** 32:15 58:20 66:8,8,9 88:9,9 91:2,12 94:2,14 97:12 97:24 98:17,21

98:22 99:1 100:1 106:12 106:13 107:12 140:21 160:16 166:10 167:21 168:16 172:22 175:17 181:8 182:18 185:2,3 191:3 210:6 213:17,18 223:21 227:3 230:19 244:9 244:10,12 252:4 265:15 266:3
**pages** 32:18 140:22
**paid** 51:12 54:7 79:8 135:22 216:12
**pain** 83:11
**pan** 135:24 136:2
**panel** 7:14 209:6 210:19 217:4
**panels** 7:10 193:5 205:14 208:21 210:11 210:14
**paper** 207:22 209:9 212:24 213:7,13,14 214:11 220:3 220:10 230:20 235:15 252:15 252:16 263:17
**papers** 128:7 128:14 196:14 227:21 242:16 244:6
**parabens** 66:17 66:21 70:5
**paragraph** 94:2 94:7 95:19,21 156:16 158:9 160:16 166:10 181:12,13 184:8,9 185:21 186:1 191:4 210:7 211:8 213:20 215:15 216:2,17 220:9 220:16,17 228:8,17 235:23 244:12 251:17
**paraquat** 8:1,3 230:12,23 234:24 236:11 238:7,14 239:8 240:23 241:13 242:14,16,21 242:23 243:20
**paraquat's** 244:16
**parentheses** 59:3,4 91:17 97:2
**park** 2:10 247:21 248:3,4
**parker** 2:9
**parkinson's** 8:1 8:3,7 73:12 230:12,24 236:11 244:1
**part** 11:7 17:3 17:3 26:12 28:22 29:3 40:3 63:9 76:18 112:16 157:9 167:18 175:18 185:24 190:4,5 190:5 207:9,21 208:10 209:1,4 226:4 249:13 251:7
**partially** 182:21,23 183:7,8 185:8 185:17 187:13 187:15 191:5 227:2 243:14 243:18 247:18 247:19 248:24
**participants** 234:23
**participated** 220:9
**particular** 46:22 54:13 131:8 138:21 142:3 146:6 152:2,7 160:11 167:14,15 170:9 189:17 195:14 198:12 219:20 233:16 240:17 260:16
**particularly** 148:21
**parties** 268:17
**parts** 165:14,18
**party** 255:14,17
**pass** 253:6
**passage** 240:22
**passananti** 3:20
**past** 12:3,24 13:2 22:8 121:18 180:23 221:6
**patel** 5:9
**patients** 73:12
**paul** 3:8 172:23
**pay** 51:15,20 141:1
**paycheck** 29:15
**paying** 52:1 246:4
**payment** 79:3,4
**pc** 2:2 3:9 4:3 228:20
**pcbs** 170:17 171:4,15,17
**peanut** 39:14 39:23,24 40:3,8

40:15 43:21 135:24 170:14 171:3,10,14
**peer** 70:4 74:16 169:3 180:3 234:16 259:9 264:13 266:4,8 266:11
**penalty** 268:19 269:4
**pending** 82:12 105:22 106:3 110:19 134:12 140:19,23 239:7,10
**pennsylvania** 2:16 141:20
**people** 29:6,8 62:2,14 115:13 159:20 162:23 164:3 180:19 235:2 262:16
**people's** 231:22 236:18 241:24 262:2
**percent** 12:13 13:1 39:5 45:24 132:8,13
**percentage** 243:13
**perchlorates** 167:8
**perfect** 121:11 155:22
**period** 60:3 153:4 264:2
**periods** 95:9
**perjury** 268:19 269:4
**perkovich** 1:14 9:15 268:2,24
**permanently** 50:6
**person** 22:2 54:19 72:22,23 85:17 118:11 159:16,24
**personal** 84:6 205:3,4 235:13
**personally** 10:7 60:15 61:2 181:2 187:19 229:1
**perspective** 23:23 57:20 116:17,18
**pertaining** 1:13 259:13,24 260:9,18
**pertains** 57:1
**pertinent** 213:24 214:24
**perusal** 140:2
**pesticide** 7:6 190:16,17
**pesticides** 188:16,17 189:9,11,24
190:1
**peter** 135:24 136:2
**petrochemical** 215:22
**petrolatum** 215:18
**petti** 4:18
**pfoa** 44:6,9 119:2,11 124:1 124:3,16 125:5 125:13,21 126:23 136:18
**ph.d.** 1:10 6:3 9:17 80:9 253:19 254:4,5 261:20 269:16
**pharmaceutical** 44:17,21 133:13 143:2 144:18 174:22
**pharmacy** 61:16
**phrase** 17:2 142:16 211:6 263:3
**phrased** 15:24
**phthalates** 66:18,20,23,24 70:5 167:9
**physician** 156:16 160:22
**physicians** 193:24 258:6
**picture** 122:12 122:14 156:3,5 225:7,9,10,11
**piece** 173:24 189:17
**pieces** 218:24
**pittsburgh** 2:16
**place** 268:5
**plagiarize** 234:17
**plaintiff** 169:5 255:10
**plaintiff's** 119:12 120:1,3
**plaintiffs** 2:1 66:16 75:13,19 76:12 78:16 116:23 117:14 118:8,24 120:21 122:7,8 128:13,18 129:17 133:7 169:10 196:4,8 196:18 233:6 236:20,22 257:8 259:3
**planning** 264:22
**plans** 81:23 82:5
**plausibility** 195:13 196:12
**plausibly** 213:2

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 312 of 335 PageID #:79120



**played** 175:21 176:8
**pleadings** 76:3
**please** 10:10 19:2 25:10 26:20 28:18 32:7 34:15 37:13 55:7 101:18 106:20 109:8 113:23 146:4,21 147:19 193:11 199:3 200:23 202:8
**plow** 223:5
**plus** 195:17
**point** 30:9 49:18 67:1 74:8 80:24 81:24 87:22 90:19 91:10 120:7 121:10 122:1 125:1,20 126:23,24 145:5,11 149:16,23 151:21 209:6 209:12 219:18 226:15 240:2 244:15 264:14
**pointed** 120:1 120:11 177:15 246:9 259:4
**pointing** 161:14
**points** 219:21
**policy** 158:15
**political** 240:7 240:11
**polyunsaturat...** 7:21 228:3
**populations** 189:11
**pork** 248:5
**port** 2:11
**portion** 167:15 169:9
**portions** 166:2
**pose** 129:21 207:16 210:15
**position** 77:5,9 77:15,24 78:8 168:6 245:13
**positions** 265:17
**possibility** 123:22
**possible** 204:6 224:1 235:6 258:11,22
**possibly** 112:8 161:13 204:1,2 209:24 235:4
**postdoctoral** 254:21
**potential** 7:9 45:12 57:17,22 65:20 67:9 95:20 120:2,8 120:12,20 127:12,21 136:8 193:4 222:7 228:9 250:11 259:14 259:24 260:9
**potentially** 19:24 62:3 128:2 195:19
**powder** 133:19 135:14
**power** 215:17
**practices** 1:5 9:8 56:1
**pramipexole** 73:7,11
**precise** 46:18 68:7 132:3,5 206:9 221:20 222:1 233:24
**preface** 135:10
**prefer** 58:11
**pregnancies** 95:12
**premise** 89:15
**prep** 226:5
**preparation** 54:18 220:10
**prepared** 85:14
**preparing** 53:8 81:8
**preplanned** 19:18
**prepping** 147:13
**presence** 61:3
**present** 5:9 46:4 89:14
**presume** 78:24
**pretty** 33:7 51:14,17 60:21 71:8 72:5 73:22 76:7 105:8,8 111:19 152:11 204:18 205:2 226:5
**preventing** 150:22
**prevention** 159:11,12 254:22
**preventive** 159:10 254:13 254:16
**previous** 86:18 151:7 210:13
**previously** 12:20 30:1 39:4 44:5 53:6 163:13
**primarily** 17:18 66:16 68:21 69:12 173:21 178:24 230:22
**primary** 12:16 24:4 45:23

54:16 66:15 211:10
**principal** 262:6
**principles** 145:14 174:20 175:8
**print** 6:18
**printed** 93:3
**printout** 93:4
**prior** 27:13,23 31:6 50:5 53:9 70:3,22 75:17 147:22 201:6 202:2,4
**private** 238:20
**probable** 208:23 210:12 258:23
**probably** 16:11 19:23 64:19 73:23 89:9 90:8 90:11 98:1 121:24 132:10 133:8 162:6 163:23,23 164:1 177:13 182:13 194:13 198:12 199:15 199:19,23 200:6 201:4,24 202:23 203:2,3 203:7,8,12,13 204:3,16 205:19 206:24 207:8 215:12 220:5 227:19 229:16 230:18 232:5 249:13 258:2,11
**problem** 31:7 63:10 260:13
**problems** 158:13
**procedure** 1:12
**proceedings** 268:4
**process** 10:4,10 15:22 24:20 37:19 63:18 74:23 77:12 79:9 118:19 129:2 151:13 220:10 263:23
**processes** 23:19
**produce** 95:22
**produced** 80:5
**producer** 211:10
**product** 6:17 6:18 57:9,13 58:1,5,6 59:19 61:4 64:9,10 65:16 66:4 74:17 75:23 84:9 127:23 137:3,9 138:22 139:9 165:9 166:5,11,15,23 168:21,24 170:23 171:5,7 209:15 257:4
**production** 241:13 242:6
**products** 1:5 4:16 5:2 9:9 43:24 44:2,21 56:2 57:3,23 59:10 60:2,7,9 60:15,23 61:7 61:12,15,18,24 62:7,14,16 63:15 64:5 66:12,20 67:10 67:12 77:1,6,16 78:10 107:3 115:21 133:12 135:1 137:13 138:23 142:12 143:2 151:23 152:3 154:17 164:22 170:3 175:24 176:9 211:11 257:12 258:15,18
**professional** 45:21 220:11 266:9
**professor** 21:15 26:3
**program** 21:21 130:3 159:11 254:21,24 255:1 260:6
**project** 132:23
**projects** 133:2
**prominent** 245:1
**proof** 244:15
**proposal** 173:1
**propounded** 268:9
**prospective** 8:8
**prostate** 7:22 228:4,15,20
**protection** 229:3
**protective** 184:18 247:1
**proven** 170:22
**provide** 32:21 139:21 184:17
**provided** 76:2 204:21 211:9 215:17
**provides** 225:15
**providing** 158:13 186:23
**public** 45:22 127:19,22 128:2 135:1,8 139:19 140:16 158:15 162:14 166:18 168:7 175:23 238:20 253:19 269:22

**publication** 74:21,23 173:7 230:10 232:20 233:2 251:22
**publications** 45:10 65:15 180:3 231:9 243:13 255:24 256:8,15,17 259:10 266:12
**publish** 69:9
**published** 40:7 45:5,9,11 65:19 70:4 74:15,24 84:7 162:4 172:11 173:2 180:22 189:3 194:12 195:18 205:18 216:7 227:24 233:4 239:4 242:22 242:24 243:1 252:13,14 257:12,15,18 257:23 258:2,5 263:6 264:12
**publishes** 234:16 249:19
**publishing** 162:5
**pull** 32:6 88:1
**pulled** 32:18
**purchased** 61:15 84:8
**purely** 23:18,22 25:2
**purpose** 52:12
**purposes** 17:14 27:9
**pursuant** 1:10 1:11
**push** 8:6 243:24
**put** 52:7 54:4 55:6 100:7 118:22 127:1 152:13 185:16 211:20 218:12 218:16 262:4 268:6

**q**

**qualifications** 144:21
**quantitative** 6:22 180:14 224:16
**quantitatively** 224:17
**queen** 51:10
**question** 10:11 15:8 19:1 24:7 24:14 26:9 27:4 27:5,6 28:14,18 28:22 32:23 33:1,3,3,4,9,14 33:19,21,24 34:1,4,5,9,12 34:17 35:3,5,14 35:17,20 36:20 37:12,13,14,18 42:24 43:2,4,7 43:9,18 60:14 60:19 61:21 62:4,5,9 63:17 63:20 65:13 68:3 76:23 82:12 84:3,17 88:7,15 89:5,6 89:10,18,21 90:9 98:16 102:4 104:7 105:4,7,9,21 106:3 107:7 108:6 110:1,2 110:10,13,16 110:22 111:1 112:9,13 113:8 113:9,16,21,24 113:24 114:19 114:21,23 115:8,15 120:15 121:14 122:4 123:23 124:7,8,9,12,12 127:20 131:12 140:4,5,8,20 144:11 145:6 145:16,17 146:4,9,13,23 147:1,3,7,17,21 148:7,9,16,18 148:20 149:9 149:10,19 150:11,13,21 151:4,15,19 152:12 153:2 153:24 154:14 154:22,24 155:23 158:20 160:11 171:15 176:5 178:14 190:4,14 191:19 192:1 197:22,23 199:2,4,9,11 200:11,14,21 200:23 201:6 201:14,20 202:5,5,10,13 202:14,18,21 214:16,20 221:10 227:8 229:19 230:23 231:2,23 232:9 232:15 234:18 234:20,21 235:9 245:17 245:18 257:5 259:1 260:21
**questionable** 168:3
**questioning** 202:16
**questions** 10:9 33:13,16 34:6 34:13 35:4,15 36:2,13 53:19

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 315 of 335 PageID #:79123



53:22 60:13 105:24 106:2 126:13 149:17 150:5 160:10 166:3 168:15 192:22 195:24 205:3 232:5 237:18 253:10 255:4 257:11 258:10 261:2 265:8 268:9
**quibble** 165:4
**quick** 79:23 140:2 155:10
**quickbooks** 157:6
**quickly** 160:4 180:11 266:7
**quintessential** 213:4
**quite** 16:5 19:20 42:15,15 47:7,12 50:21 57:14 69:8 87:10,10 191:18 195:14 207:23 216:11 224:24 258:5
**quote** 178:10

**r**

**race** 96:22
**radiation** 97:5
**railroads** 215:20
**raises** 94:3
**randolph** 3:10
**rate** 79:10
**rather** 58:11 136:10
**razzaghi** 2:10
**reach** 196:7 222:6 263:7
**reached** 20:11 219:10 226:24
**reaches** 209:13
**reaching** 227:1 228:23 241:24
**read** 18:4 31:16 33:2 35:19 59:12 60:4 75:19 85:13 88:23 90:4 101:13,13 106:18 107:4,5 141:16 157:18 159:18 165:12 166:2 167:14 172:20 176:2 176:13 182:8 182:15 183:4 183:21 190:8 190:19 191:9 191:17,22 196:8 206:20 208:24 211:12 212:24 213:1 214:5,22 216:17,21 247:15 252:12 269:4
**reading** 141:16 156:19 167:11 167:15 168:9 170:24 174:9 212:20 217:23 229:7 244:22 245:5 247:24 248:8 251:1 252:1
**ready** 36:23 140:10,11
**real** 79:22 86:15
**really** 14:6 15:7 29:11,17,17 33:1 48:21,24 60:12 62:9 66:8 74:10 99:4,5,16 105:13 109:3 132:3 134:2 141:1 163:24 177:20 191:11 201:22 229:18
**reason** 12:22 30:1 51:2 98:24 120:8 132:17 141:3,5,22 150:4
**reasonably** 132:22
**reasons** 86:8 99:4,8 178:2,8
**rebecca** 2:3
**recall** 30:13 38:2 53:18 71:11 72:8 73:11,15,20 119:15,24 122:23 123:3,3 134:3 163:18 164:7 165:16 167:15,18 173:16 181:5,6 216:12,16 257:5,13 258:8 258:12 259:1 265:12
**receive** 17:20 192:7 211:14 220:24 229:1 229:10,14 245:19 246:5 248:17
**received** 187:19 187:19 192:4 210:10 211:17 211:21 216:4 221:4,8 229:17 238:19 242:17 253:13,18
**receiving** 246:1
**recent** 8:4 217:21 224:3 236:12
**recently** 265:18

**recognize** 155:17,18,24 161:19
**recognized** 161:2,12
**recollection** 187:2,4
**record** 9:2,14 32:8 52:23 74:21 82:17,20 82:21 102:22 105:16 106:7 113:18 144:8 150:24 163:4,7 185:17 193:10 204:21 244:13 244:14,15 253:1,5 266:19
**recorded** 268:11
**records** 135:1,9 139:20 140:16 151:2
**recovered** 49:4
**rectal** 189:10 190:2,18
**red** 6:21 8:8 45:12 180:13 181:17,22 246:23 247:1 247:13
**reduce** 213:5
**redundant** 69:17
**refer** 58:5 159:15
**reference** 97:10
**referred** 90:1 251:21 258:20
**referring** 59:17 60:6 159:5,16 159:24 223:23
**refers** 58:1 93:14 251:18 257:3
**refiners** 215:22
**reflect** 102:22
**refresh** 187:1
**refused** 170:3
**regard** 58:20 70:8 260:17
**regarding** 86:3 196:2 197:11
**regardless** 255:8,9
**regular** 51:8 221:16
**regularly** 193:21
**regulation** 222:14
**regulators** 244:7
**regulatory** 125:4 130:11 131:7 164:23 167:6 168:8 174:4 176:1,10 210:13 216:10 216:12 239:15
**reimbursed** 52:9
**reiterate** 147:12
**reject** 118:15
**rejected** 122:6
**relate** 198:21 198:24
**related** 11:15 11:21 12:14 13:2,15 14:24 18:8,20 26:11 44:18 45:3 46:1 46:11 132:9 162:15 221:5 255:24
**relating** 160:4
**relations** 166:18 175:23
**relationship** 7:16 109:17 189:23 190:16 195:17 200:1 217:6 224:1 231:13 233:8 250:6,9 258:23 259:11,14,21 259:24 260:6,9 260:22
**relationships** 235:14
**relative** 96:20 268:16
**relaxer** 1:4 9:8 56:1,21 57:2,2 57:9 59:10 60:2 60:7,15,23 61:4 61:8,11,18,24 62:20,21,22 63:15 64:10 65:6,6 67:12 75:23 77:1,6 78:9,17 100:15 107:2 115:21 142:22 146:7 147:22 148:21 197:11 257:12 258:14,17
**relaxers** 57:13 57:16,17,21 58:6 59:18 63:22 64:3 65:16,20 66:4 66:12,19 83:17 84:4,7,8 97:2 97:22 98:17 99:13,15,18,24 103:20 104:8 107:22 108:9 109:18,22,24 112:2,22 114:5 116:7,9 117:6 117:17 127:12 127:20 136:15 145:13 151:8

195:18 196:2 233:8 257:4,9 259:6,15 260:1 260:10 264:17 265:2
**reliability** 22:16
**relied** 196:4,18
**rely** 194:1,20 258:7
**remember** 12:19 14:6,8 17:24 29:10 30:9 39:8,12,17 39:20 40:3,24 41:17 47:3 71:5 71:20 72:14,21 73:6 74:5,6 98:2,3,4,6,8,12 119:3 124:24 134:10 138:2 144:10 164:11 164:13 170:5,6 170:9 171:3 216:9 221:17 249:3 256:2
**remove** 192:21 192:24
**render** 144:20
**repeat** 10:11 19:3 34:12,12 37:13
**repeats** 223:21
**rephrase** 11:13 75:9 81:23
**replacement** 95:3
**report** 6:12 15:1,24 41:18 58:15 66:7 75:12,18 76:6 79:14 90:24 97:13 106:13 112:18 114:3 115:20 119:11 120:9 124:21 124:22 125:2 160:7,13 195:15 204:19 205:2 257:2,7
**reported** 235:15
**reporter** 1:14 9:14 250:18 266:23 268:3
**reporter's** 268:1
**reports** 14:24 15:5 38:20 42:7 75:14,19 168:4 196:8,18 259:4 262:8
**representation** 89:10
**representative** 164:17 165:3 175:19 176:7 176:12 220:12
**represented** 22:3
**representing** 54:23
**require** 262:18
**requires** 157:19
**research** 4:11 16:11 75:18 76:5,15 79:14 84:4 125:12 126:5 127:10 128:4,10 159:4 160:23,24 163:21 164:2 169:22 185:17 193:13,14 194:11 205:17 213:4,12 215:10,18 231:14,16,22 231:22 232:2,3 232:12,13,16 233:12,20 234:7,9,13 236:5 244:7
**researchers** 65:19 245:2,19 246:4
**reside** 14:18
**resided** 50:11
**respect** 59:22 78:9 93:21 127:11 138:22 154:16 171:2 194:19 243:20 249:20
**response** 182:6 182:11
**responsible** 157:9 185:10 185:18 186:14 186:18,20 187:16
**responsive** 115:1,5
**restarted** 102:18
**restate** 115:15
**result** 208:20
**results** 226:16 228:18 251:12 255:22
**retained** 43:10 133:14 135:2 137:15,19 138:1,14,17 140:17,24 141:23 142:3 142:23 143:3 143:16 146:7 147:23 148:22 152:4 154:18
**return** 211:21
**reveal** 242:24 244:24
**revealed** 8:5 243:24

**revealing** 82:3
**reveals** 244:5
**review** 7:1,5,8 7:14,15 8:2 76:4 117:23 118:4 180:3 183:18 188:15 191:8 193:3 196:1,17,19,22 197:10 198:1,5 198:6 208:20 217:5,5,14,17 217:21 218:3 220:10 224:8 224:10 228:9 230:13,17 231:3,22 234:16 264:14 265:20
**reviewed** 70:4 74:16 169:3 214:1 215:1,2 231:8 232:19 236:18 244:20 259:4,9 264:13
**reviewer** 266:5 266:8,12
**reviewing** 241:24 262:1
**reviews** 8:2 224:4 230:13 230:17 231:3 231:10 232:19 262:8,13 265:20
**revised** 155:20 189:2
**revisit** 131:11
**revlon** 5:2,2,2
**richmond** 39:17
**ricordati** 2:20
**right** 10:21 12:23 13:4,7 14:12,17 18:20 19:9 20:16 21:13 22:6 25:21 26:13 36:16 37:6,14 38:9 39:1 41:24 41:24 44:3,6,11 48:7,19 49:9,11 53:20 57:3,24 58:24 59:4,5,19 60:10 64:6,20 65:21 68:1,4 69:5,17 71:17 73:3 74:1 77:20 80:21 81:1 83:14,18 84:11 84:21 85:1 88:15 89:2 91:5 91:13,24 92:1 92:11 93:5,11 94:20 95:1,12 95:13,14,17,24 96:8 97:4,15 106:15 107:23 109:20 110:2 111:5 118:1,4,5 118:9,16 119:1 121:10,11 122:2,8 126:7 126:22 127:8 127:17 128:12 128:24,24 131:3 134:19 135:12,14,16 135:20,22 136:4,16 138:16 140:14 140:18,21 142:23 144:2 145:15 156:9 156:13 157:15 157:21 158:16 159:6,24 160:14,19 163:2,10 167:3 169:8 170:19 174:23 175:9 176:5 178:17 178:21 180:20 181:19 183:6 183:10 184:12 184:22,23 185:8 186:6 187:17 188:22 189:1,17 190:2 190:6 191:21 192:5,9 194:8 195:8 198:13 199:14 203:22 204:3,11,14 206:4,5,15,20 207:2,13 208:2 208:16 209:10 210:7,17 212:7 212:14 214:8 215:11,24 216:7,9 217:8 218:6 219:23 220:22 223:16 225:3,7 226:21 227:4,23 228:15,21 229:4,12,13 235:3,15,16 236:1,3,19 237:14,22 238:11,13,23 239:2,5,20 242:8 243:14 244:11 245:9 245:15 248:13 248:16 249:5,8 250:2,10 251:6 252:10,18 254:3,13 255:6 256:22 261:11 262:23,24 263:19 266:5,9
**risk** 6:16 7:19 86:20,20 87:6 87:12,13,15,19 88:18 90:19,21

91:3,9,14,17 92:4,20 93:20 94:1,2,8,15,23 95:16 96:7,20 97:10,14,21 98:18 99:12,14 99:18,21 100:2 100:14,23 103:20,22 104:10,15 182:5,11 210:15 213:6 223:13 226:18 226:20

**rna** 3:13

**rnewman** 2:8

**robert** 4:18

**rodriguez** 4:12

**role** 122:4 164:20 175:21 176:8 254:20

**room** 29:5 51:8 121:23

**rothstein** 3:14

**rough** 266:20 266:24

**roundup** 134:1 135:18

**roux** 5:3

**rowland** 1:7 10:15 24:8 261:8 262:16

**rude** 42:15

**rules** 1:11 10:3 237:21

**rumors** 169:4

**run** 27:14 166:23

**rush** 151:21

**ryan** 3:15

**s**

**s** 6:8 213:18

**safely** 61:11,19 63:16 84:9

**safety** 244:16

**salary** 47:1

**sales** 1:5 9:8 56:1

**salon** 61:17 65:7,11

**salt** 14:11

**salting** 168:3

**sapphire** 164:9

**sara** 2:4

**sargus** 122:23

**save** 190:12

**savvy** 118:13

**saw** 143:5 197:24,24

**saying** 43:6 87:23 90:7 103:21 106:11 106:11 107:8,9 107:15,19,21 108:21 111:8 117:4,5 120:11 120:20 125:8 142:14 174:19 175:1,12 177:4 190:11 201:19 225:18,19,20 245:12 246:5 264:24 265:3,4

**says** 21:21 55:19 57:20 59:2 80:7 91:23 94:7 96:4 101:5 103:10,19 108:12 111:5 114:4 116:4 130:1 166:15 175:18 181:16 185:17,19 186:16,20 187:14,15 189:2 191:5,12 191:23,23 194:5 199:22 199:24 204:8,8 206:4,19 209:5 210:6 211:7,24 213:13,23 214:10,11,18 214:21,23 215:16 217:13 220:8,8,15 224:1 228:2,8 244:4 247:10 247:18 248:11 250:24 252:5

**scastronuova** 2:8

**scheduled** 53:6

**scholar** 24:17 161:2,12,20

**scholars** 23:6

**school** 21:16,19 253:16 254:2

**science** 6:23 7:4 21:22 24:5 25:13 68:19,22 69:2,14 109:19 129:10 158:14 166:6 173:1,7 180:15 181:17 186:17 241:3 263:3,6,7

**sciences** 21:22 23:1

**scientific** 17:6 22:2,10,17 23:20,22 24:24 25:3,5,16 31:4 31:9,19 34:21 40:12 41:3 57:20 59:7 69:9 69:10 78:13 92:19 106:23 108:22 109:4,9 112:1,21 114:4 115:20 116:6 116:17,18 117:16 124:16 129:14 130:6,9

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 320 of 335 PageID #:79128



130:10 144:1 146:2 160:17 161:19 168:2 173:24 174:12 175:8 184:10 203:4 218:22 231:12,12 233:3 238:9 239:1 240:13 243:16 244:6 244:13,14,15 245:3 251:19
**scientist** 18:10 18:16 20:10 25:11 35:11 68:7,14
**scientists** 23:5 157:11 164:21 166:24 167:1 175:23 176:9 194:1 222:5 242:22 244:17 245:2 258:7
**scores** 15:24 38:8,17,18
**screen** 55:13 107:20
**scrutinized** 224:3
**se** 62:11 63:10
**seamans** 5:4
**seated** 14:1 72:16
**seattle** 222:8,20
**second** 58:13 134:6 139:17 148:6 168:17 168:17 210:7 211:7 213:18 215:15
**secret** 8:5 243:24
**secretly** 246:4
**section** 33:2 58:21 96:5 104:10 106:19 251:17
**sections** 196:13
**see** 42:4 49:7 55:18,21 56:3 56:20,21,23 57:5 59:2 80:7 80:11 88:8 91:19 93:22 94:5,16 95:4,10 96:24 97:3 102:17 112:19 115:16 122:14 122:16,19 135:18 139:18 141:7 151:14 156:19 158:20 160:19 161:5 166:7 167:11 168:9 170:24 171:9 172:12 172:18 173:4 174:6,16 180:16 181:14 186:16 188:18 189:14 193:7 194:16 196:15 201:10 207:11 208:18 211:6 212:13 217:23 220:13 223:19 223:23 226:9 228:5 229:7 230:14,24 231:11 235:1 238:22 244:2,8 244:22 245:5 247:3 251:1,14 251:15,24 252:4,7
**seeing** 57:1 167:18 168:12
**seem** 37:4,4 42:19 221:15 225:21
**seemed** 42:14 179:8
**seems** 74:10
**seen** 55:16 64:9 64:12,12,22 65:5 142:8 219:9 249:23 251:3 260:14
**segalla** 3:19
**seinfeld** 246:13
**select** 32:18
**sell** 162:12
**seminars** 153:5
**sense** 31:4 87:11 127:23 129:22 232:18 234:22 263:9
**sent** 174:10
**sentence** 59:24 91:23 92:2 93:24 94:1,11 107:12 114:3 115:19 145:2 158:19,21,23 159:1,2 167:22 168:16 169:12 170:21 184:8 185:20 191:11 205:16 220:17 238:11 248:1 252:4
**sergeant** 98:7
**served** 134:15 255:5 265:16
**service** 45:22 158:10 162:14
**services** 11:1,7 11:8 156:18 186:24
**set** 27:18 142:4 149:11 150:3,3 178:6 207:24 268:5

**setoff** 184:7,8
**sets** 101:9
**setting** 30:24
**several** 12:3 15:12 163:19 219:9 224:8 255:23
**shape** 243:19
**share** 83:11
**shill** 35:13
**shipra** 4:3
**shohl** 4:12
**short** 181:18 182:24
**shorthand** 1:14 268:3,14
**show** 32:3 98:2 98:3 131:23 165:17 214:10 250:14 259:6
**showing** 80:4 186:14 223:11
**shows** 126:16
**sic** 20:1 137:8 182:5
**sick** 48:22,24
**side** 27:14 34:20,21 41:23 43:23 71:13 73:3,14,18 140:15,18 157:5 166:11 168:18 207:13 247:10
**sides** 237:13
**sidetracked** 226:13
**sidley** 3:3 71:22 71:23 72:5,8,10 72:12 191:12
**sidley.com** 3:7 3:7
**siege** 170:23
**signal** 195:2
**signature** 268:22
**significance** 88:19
**significant** 87:7
**significantly** 213:4
**signing** 29:15
**similar** 88:7 219:10
**similarly** 60:1
**simple** 19:1 33:2 34:4,5 86:15 140:13 147:17,21 201:22 218:13
**simpler** 104:7
**simply** 35:14 57:15 98:16 161:14
**single** 65:15 114:24 263:16
**sir** 35:5 101:13 140:20
**sit** 12:22,23 262:11
**site** 91:8
**sits** 262:7
**sitting** 37:5 41:24 68:4 262:1
**situation** 110:21 111:2 259:3
**situations** 143:19 219:15 258:20
**six** 14:3 21:6
**sixty** 2:15
**skimmed** 167:13,16
**skin** 62:24 63:3
**skip** 10:5 192:16 218:1 246:14
**slightly** 129:21 206:12,14
**sloan** 21:2
**slow** 132:8
**slowing** 12:5
**small** 243:12
**smehta** 4:6
**smokers** 169:17
**soapbox** 33:18 35:7 102:24 103:6 147:12
**society** 6:16 91:7,8,16 92:3 93:1,13,19 96:3 97:14 100:13 173:3,10,13,18
**society's** 97:21
**sold** 39:24
**sole** 230:11 235:12 236:2
**solely** 25:3
**solvents** 138:12 138:12
**somebody** 46:16 85:1
**somewhat** 199:17
**soon** 54:11
**sophisticated** 117:3
**sorry** 13:19 16:4 37:8 42:7 50:20 51:16 67:7 72:19 101:12,24,24 108:14 151:18 164:8 166:13 179:4,7 184:2 192:16 204:24 205:14 206:2,2 214:13 237:2
**sort** 17:23 18:1 19:15 21:10 23:5,6 27:16 29:5 45:18 46:17 53:13 67:3 89:16 98:8

149:15 159:21 164:2
**sought** 20:8,15 26:2 162:13
**sound** 10:12 81:1 115:17 134:19
**sounds** 10:13 100:11
**source** 10:19 11:9 12:16 45:23 171:21 216:18 230:2 256:11
**south** 1:15 3:5 3:15 4:13
**speak** 79:4 102:8 144:8 150:15,16 263:8
**speaking** 66:1 101:18,21 138:20 148:10 201:9 237:1
**special** 143:19
**specialist** 168:23
**specialists** 168:21 175:24
**specialized** 166:16
**specializes** 158:11,12
**specialty** 166:23
**specific** 58:7 66:1 124:10 130:20 131:7,9 135:4 143:9 145:11 151:8 165:22 177:7 190:1,17 191:1 193:23 203:13 219:14,15 227:20 250:1 257:7
**specifically** 93:15 124:7,18 142:22 169:19 203:18
**specificity** 131:12
**speculating** 214:13
**speculation** 169:10
**speech** 35:7 103:1
**speeches** 33:18 34:3 237:18
**spell** 66:22,23
**spend** 52:15 53:8 79:15
**spending** 16:8 17:15
**spent** 11:23 16:8,14 17:7,9 19:5 25:11 27:22 52:18 68:20 147:13 245:24 253:24
**spin** 35:6
**spira** 3:3 6:5,6 16:3,23 20:13 20:17 24:10 25:6 26:6,18,24 28:9,12 30:19 31:13 32:16 33:20 34:8 35:16 36:17 37:7,9 38:10 42:12 43:1 47:20 48:8 58:8 63:23 68:16 69:6,20 74:7,13 75:8,10 77:18 78:19 79:21 81:19 82:1,11 83:6,11,22 84:12,22 86:6 86:11 98:19 100:17 101:1 101:19,22 102:2,5,9,13,16 103:2,16 104:16 105:3,9 105:17,21 106:1,5 107:24 108:10,15,24 109:7 110:8,24 112:3,6 113:2 113:13,15,20 114:1,7,14,18 114:22 115:12 116:10 117:9 118:17 119:19 120:5,23 121:15 122:9 129:1,18 136:23 139:23 141:10,13 142:1 146:10 146:24 147:8 147:16,19 148:1,4,12,15 148:23 149:3 150:8,14,16,22 151:20 152:17 152:20 153:1 153:17,22 155:5,11 162:2 162:16,21 178:12 179:16 188:4 197:13 198:15 199:1 200:7,16 201:7 201:12 202:1,6 202:8,11 204:17 205:22 219:13 221:18 222:16,23 224:11 226:1,6 232:23 233:22 237:8 239:13 239:21 240:5

240:24 241:5 241:16 242:9 243:3,15 246:7 246:16 252:19 253:8 256:5 261:2 262:3 265:7 266:15 266:20,24
**spoken** 85:10
**sponsor** 244:5 251:20
**sponsor's** 168:6
**sponsored** 187:3,13 251:6 251:18 252:17
**sponsorship** 8:9 249:2 250:24 251:11,21
**spot** 205:15
**staff** 255:2,2
**stand** 144:6 228:11
**standard** 24:3
**standards** 18:17 19:8 24:9 24:15
**stands** 184:11 193:12
**stare** 246:13
**start** 134:23 166:4 178:20 180:5 194:5 242:15
**started** 11:18 27:11 34:9 47:10 49:13,15 71:6 74:11 76:5 76:15 115:6 131:19 200:13 203:12 253:14 260:24
**starting** 33:5 95:2 200:20
**starts** 66:8 94:22 95:22 172:21 184:9 207:13
**state** 2:5 6:22 22:4 23:12 134:15 180:15 181:16 240:23 253:14,17 269:12,23
**state's** 242:4
**stated** 218:3
**statement** 6:13 79:19 80:7,20 109:10 112:21 113:1 116:13 116:15,16 215:7
**statements** 268:10
**states** 1:1,12 6:17 9:10 29:14 55:19 134:11 134:14,18 139:20 140:18 140:21,23 141:23 142:5 173:22 177:10 269:1
**station** 16:13
**statistical** 89:18 89:19
**statistically** 87:7 88:19
**stayed** 53:11 54:5
**staying** 51:6
**steiner** 3:4
**stenographic** 9:13
**stenographic...** 268:11
**step** 249:24
**stop** 16:19 150:8 199:11 201:1
**stops** 15:7
**store** 61:16
**story** 18:22 20:24 172:24
**straighten** 14:21
**straightforward** 152:11
**stream** 194:20
**streams** 194:21 194:23
**street** 1:15 2:5 2:20 3:5,10,15 4:8 51:7
**strictly** 129:14
**strike** 112:15 131:4 169:9 191:14 192:24 197:5,19
**stroke** 7:20 223:14 226:18
**strong** 91:17 96:4 195:2 204:2,4,5 222:13 259:5
**stronger** 199:18
**struggle** 121:14
**student** 19:15
**studies** 7:8 8:8 63:12 66:10 88:18 99:17 128:8,17 168:4 188:21 189:9 224:9,10,17,21 224:23 231:9 231:18 247:1 259:5 261:19 262:7,13 265:12 266:13
**study** 7:7 127:20 183:3 188:20 192:9 224:9,15,15,21 224:23 225:5

226:24 230:20 234:22 247:18 247:18,19 250:12 251:12 251:19 261:17 262:9 263:16 265:19
**study's** 251:20
**stuff** 86:16
**subject** 23:10 63:5 65:19 90:23 113:12 144:22 193:19 195:13 211:3 223:4 234:24 248:22 264:4,9
**subjects** 138:18 234:22
**submitted** 54:8
**subscribed** 269:18
**subsequently** 253:18
**substance** 138:22 198:12
**substances** 86:3
**substantial** 221:4
**suddenly** 246:4
**sufficient** 107:21 108:8 126:15 128:2 128:19 171:17 194:15 247:11
**suggested** 224:4
**suggesting** 161:18
**suite** 2:16,21 3:11,16,21 4:4 4:8,13,19 51:9
**sum** 84:2
**summarize** 196:15
**summarizes** 193:22
**summary** 58:4 58:5,19 59:3,16 60:8 80:5 106:9 106:13,22 107:11,19 108:2 189:18 210:7,8 257:3
**summation** 190:12
**summer** 51:1 159:12
**supplement** 7:4 186:22
**supplementat...** 184:10
**supplements** 186:17
**suppliers** 186:21,24
**support** 157:11 189:23 190:15 207:18 208:22 210:11 215:17 216:20 218:4 218:18 228:19 241:3 242:1 247:11 251:12 251:19
**supported** 185:18 191:5 227:2 228:24
**supports** 207:15
**suppose** 121:23
**supreme** 16:11
**sure** 12:4,17 13:10 19:12 20:2 21:24 37:22 39:11 40:18,18 42:20 51:14,17 55:5 60:21 63:3 67:13 70:13 71:8 72:5 74:13 74:20 76:8,17 79:21 82:15 110:20 115:18 119:9 124:11 128:11 131:16 138:3 147:7,11 152:5 155:11 164:10 173:15 246:14,15 253:13
**surely** 77:14
**surprise** 162:10 162:19
**surprised** 42:14 62:1,12 64:18 119:6 129:13
**surprising** 190:5
**surprisingly** 189:21
**suspect** 60:13 73:22 77:23 78:2 119:9 138:2
**suspected** 77:15,21 78:11
**swear** 9:15
**switch** 179:20
**sworn** 9:16,18 269:18
**sympathetic** 244:6
**symposium** 222:4,20
**syndrome** 96:8
**syngenta** 241:11 242:4 242:23 243:20 244:5,16,20 245:4,8,9,20 246:3
**systematic** 7:15 8:4 117:22 196:1,17 197:1 197:10 198:4

217:5,14,17 228:8 236:12
**systematically** 189:8
**systemic** 7:1 183:18 262:13
**systems** 3:8

**t**

**t** 6:8
**tabet** 3:14
**table** 230:19 237:13
**tactics** 244:5 245:1
**take** 11:17 58:3 58:10,12 65:5 79:20 92:23 115:12 117:12 119:16 140:2,2 140:6 155:4 160:12 163:2 192:20 205:9 212:16 216:14 216:16 222:2 223:2 232:9 243:23 252:9 252:23,24 263:16,17 264:9
**taken** 1:13 82:18 163:5 165:20 253:3 268:4,14
**takes** 195:12 263:4,6
**talc** 133:19 135:14
**talcum** 133:19
**talk** 21:3,8,17 21:19 22:1 87:4 91:2,3 123:11 165:15 173:14 253:10
**talked** 18:6 30:7 42:6 47:24 48:3 57:18 66:6 68:19 71:23 84:15 86:17 89:16 135:12 171:16 178:15 188:6 224:7 235:23 249:3
**talking** 17:8 27:23 29:6,8 34:23 38:20 56:9 63:1 75:16 78:3 110:4,5 131:2 191:2 199:11 201:1 203:4,11 204:23 247:5 264:6,16
**talks** 21:11,19 95:20 153:5 161:14,15,16 250:24
**tamoxifen** 95:6
**tardy** 4:17
**tce** 137:8
**tdrlaw.com** 3:17
**teach** 56:19
**tech** 5:9
**technically** 234:16
**technology** 173:2,7
**teeth** 62:2 166:24
**teflon** 174:11
**tejash** 5:9
**telephone** 54:20
**televised** 38:4
**tell** 18:22 20:24 34:15 44:15 68:10 79:9 113:6 115:17 135:11 139:3,5 191:13 193:10 197:18 224:14 231:24 238:15 253:11 264:21
**telling** 38:5 231:4
**tendency** 251:11,18
**term** 22:18 86:20 87:1,15 119:6 224:8 249:24
**terminology** 18:17 19:8
**terms** 72:9 76:24 86:15,19 124:19,19 182:2 218:13 218:22
**testified** 9:19 12:20,24 13:14 13:24 15:10 25:14 30:2 39:4 40:11 83:15 86:2 125:2,3 131:18 132:15 137:9 139:8 140:13,17 143:3 163:12
**testify** 41:16 54:12 92:7,7 110:14
**testifying** 108:7 109:21 123:1 123:15
**testimony** 6:10 6:14,17 14:1 31:14 38:21 88:5 124:20 226:7 268:8 269:8
**testing** 210:10
**texas** 141:20
**thacker** 172:24

**thank** 49:5 56:17 97:17 104:6 145:19 154:21 155:3 163:1 182:14 199:13 263:12 265:5
**therapy** 95:3 97:5
**thereof** 225:14 225:16,17 256:11
**thing** 10:19 11:12,13 19:11 31:17 98:15 111:7 160:3 161:22 175:5 190:3 226:14 252:18,21
**things** 18:5 19:15 26:15 30:23 51:3 57:2 90:13 98:10 125:18 139:18 153:13 157:6 159:20 178:2 195:4 252:12 254:19
**think** 10:5,6 13:22 15:23 16:18 26:22 30:24 32:4 36:15 43:14,20 46:16 49:21 52:5,5 54:5,22 56:24 58:19 63:2 73:2,7 74:23 75:3 77:8 82:12,22 83:14 85:23 86:8,16 105:7 106:4 110:23 111:19 118:18 121:12 124:6,23 127:10,18 132:12 133:9 140:22 141:10 145:1,21 146:20 153:16 156:11 159:18 159:19,21 161:13 162:20 163:12 164:8 164:15 170:17 172:3 174:8 175:5 180:10 187:5,23 192:16 193:9 199:21 203:1 205:22 210:1 223:1 226:5,9 227:19 229:5 236:6,7 237:22 238:1 239:20 240:16 248:21 249:12 252:16 253:23 254:6 258:1 266:20 266:24
**thinking** 31:5 69:14 99:10 260:13,24
**third** 159:16,24
**thompson** 70:10,17,18,23 71:3,10 73:2
**thought** 16:15 18:4 19:10,22 24:20 30:8 53:13 83:6 144:4 169:21 178:1 235:17
**thousand** 81:4
**thousands** 221:13,16
**threatens** 166:6
**three** 22:8 80:16 119:17 128:7 130:17 140:22 147:13 164:11 167:3 168:18 172:9 208:1 264:11
**threw** 191:20
**throw** 237:4
**tie** 45:18
**time** 9:4 11:22 11:24 14:4 16:9 16:14 17:7 21:10 25:11 27:11,18 28:2,8 29:2,22 30:10 33:6 36:5,8 37:24 44:12 46:2,4,9 49:3 50:1 52:15,18 53:8 68:20 70:22 71:2,4 72:5 74:3 75:17 75:22 77:7 79:15 82:16,19 89:2 124:15 125:2 126:14 126:14,19 131:19,20 132:11,23 142:8 153:3 159:5 162:8 163:3,6 168:11 176:13 177:13 178:5 182:7 188:7,16 207:3 210:2,4 228:4 239:10 253:4 261:16,19 263:5,6 264:2,3 264:14 266:17 268:5,6,10
**timed** 267:2
**times** 13:14,23 22:22 37:6 42:8 46:8,20,23 86:2 86:2 105:5 122:5 144:12 144:13 146:3 194:3 209:13

224:8 244:18
**title** 17:23 18:1 55:24 56:5 57:24 166:4 217:8 223:21 244:2 247:3
**titus** 4:7,10
**tobacco** 167:1 169:13,15,20 169:23 170:4,8 170:22
**today** 9:23 12:23 34:7 49:5 52:16,24 54:12 68:10 90:7 109:11 111:8 116:21,24 162:11 167:10 205:7 253:23 253:24 254:18
**today's** 9:4
**together** 23:7 45:19 157:8 211:20 224:18 224:19
**told** 82:9 132:6 134:17 169:19
**took** 12:10 13:6 48:24 53:7 131:17
**top** 55:18,21 68:2 91:2 112:19 167:21 175:17 181:13
**topic** 74:22 104:3
**torrence** 3:10
**total** 7:3 80:23 140:22 183:20 226:18
**totality** 208:20 210:8
**totally** 145:7
**tower** 2:15
**toxic** 137:24 138:3 167:9
**toxicological** 198:6
**toxicologist** 195:11
**toxicology** 128:17 130:3 194:22 196:1 196:17,19,23 197:2,10 207:15 208:4,8 208:10 260:5
**track** 42:9 43:12 142:9
**trade** 248:8
**trades** 142:15
**trailed** 193:17
**training** 15:18 15:20 159:8 160:24 254:22
**transcribed** 268:12
**transcript** 12:10 32:21 131:23 132:7 268:14 269:5,8
**transcripts** 12:9,20
**transition** 155:6
**transparent** 189:12
**travel** 51:21
**traveled** 139:21
**trial** 13:24 38:21 79:16 92:7,8 107:10 107:10 108:7 109:21 116:6 190:13
**trials** 14:6,23
**trichloroethyl...** 137:11 143:21 153:9
**trichlorometh...** 137:8
**tried** 103:24 119:17 148:8
**trouble** 34:5,7
**trove** 244:19
**true** 12:15 16:5 27:10 46:9 47:12 58:2 62:13 69:8 87:10 90:7 112:24 119:9 123:2 124:23 126:21 132:10 132:12 135:11 140:12 149:2,2 151:17,23 169:6 170:1 174:18 188:2 196:9 197:12 221:6 250:13 259:17 260:3 260:17 263:1 268:13,21 269:7
**truth** 246:10
**try** 149:7
**trying** 18:15 22:9 42:21 43:1 43:3 104:23 105:4 110:17 110:20 142:10 146:11 147:1 148:9 149:13 149:15,15,21 199:7 212:23 213:15 224:24 232:6,7 233:23 233:24 234:6 236:24 241:22
**tuesday** 52:21
**turn** 32:14 66:8 90:23 126:10 127:24 171:21 191:3

**turned** 168:19 168:20 179:18
**turning** 88:9
**turns** 126:24 127:2
**twenty** 21:6
**two** 2:15 23:7 24:21,23 34:19 50:2,17 51:10 51:10 53:6 66:15 67:2 71:11,15,15 99:4 122:15 139:5 143:23 157:1 171:3 173:14 180:19 215:3 217:20 218:14 219:3 219:21,21 242:8,16 243:20 245:8 254:6 255:2 261:14 265:8 266:2
**type** 93:10 156:12
**types** 63:22 138:13
**typical** 21:10 76:7
**typically** 64:16 88:17 264:22

**u**

**uk** 244:17 245:2
**ultimate** 41:2 143:24
**ultimately** 118:14 122:22
**um** 56:22 62:18 73:13 94:6 95:5 137:17 220:14
**unaware** 164:17 176:7 177:4 242:7
**uncertainties** 213:5
**uncertainty** 167:1 174:2
**uncovering** 6:19 172:17
**under** 28:2 99:21 100:13 100:22 104:9,9 104:14 105:12 170:23 211:5 215:16 227:3 237:16 247:17 268:7,19,19 269:3
**underneath** 95:20
**undersigned** 269:3
**understand** 17:11,18 18:18 19:4 22:18,20 24:20 38:7 47:9 56:7 57:19 78:6 87:23 106:1,10 107:8,17 108:19 109:20 117:7 118:13 128:12 129:11 133:4 148:7 149:14,18 154:20 157:23 176:6 202:11 202:23 221:1 233:15,15 234:6
**understandable** 20:7
**understanding** 15:22 57:11 61:18 76:11 79:7 111:22 173:19 202:22 232:11
**understands** 35:1 110:21 148:8
**understood** 22:7 77:4 123:8
**unequivocal** 247:12
**unexposed** 235:2
**unfamiliar** 84:9
**unfavorable** 244:7
**union** 16:13
**united** 1:1,12 9:10 29:14 50:22 55:19 173:22 177:10 269:1
**universities** 21:12
**university** 249:14,15,18 251:9 253:15 253:17,20
**unqualified** 144:19
**unquote** 178:10
**unresponsive** 131:4
**update** 6:22 180:14
**upper** 210:6
**use** 7:2 17:2 62:8,14 65:10 65:10,16 75:24 85:24 87:15 124:13 129:9 129:11 162:11 165:20 175:6 183:19 196:16 215:2 222:13 233:1,18,20 255:15 263:3

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 329 of 335 PageID #:79137



**used** 15:6 60:15 60:17,23 61:17 98:7 119:5,6 143:20 203:3,3 224:7 258:3
**users** 63:8
**using** 84:6 99:17 164:21 176:9 189:11
**usual** 191:10
**usually** 247:22
**utah** 49:18,21 50:12 141:20
**uterine** 59:11 59:23 78:10,17 91:3,9 92:8 93:11,15 107:3 107:23 108:9 109:24 112:2 112:23 114:5 115:22 116:9 117:6,18 127:12,21 130:24 196:3 197:12 258:15 259:6,17 260:3 260:18 265:2
**utilize** 255:11

**v**

**v** 135:19
**vaguely** 249:11
**validity** 22:16
**vanity** 6:20 172:2 177:16
**variations** 62:13,14
**variety** 89:22 224:16 255:6 256:21
**various** 27:15 46:9 66:11 140:18,23 164:4 194:21 249:20 265:17
**vein** 180:2
**versa** 148:14
**veterans** 169:12,13 170:21
**vice** 148:14
**video** 9:6
**videographer** 5:9 9:1,3 82:16 82:19 163:3,6 253:1,4 266:17
**videotaped** 1:9
**view** 124:2 125:21 211:2
**viewed** 214:2 215:3
**vinyl** 137:3 139:7 143:20 153:8 154:9
**virginia** 39:18 141:21
**virtually** 167:9 170:23
**vitamins** 136:5 136:7

**w**

**wacker** 4:4,18
**waichman** 2:9
**wait** 58:10 206:1,1 232:22 263:21
**walk** 63:14,17
**want** 17:4 18:16 19:1 42:19 68:2,6,7 78:4,6 86:14 87:4,24 90:18 90:23 92:23 98:14 101:16 104:12 106:2,9 106:10 107:8 108:20 131:11 151:15 152:11 155:8 159:23 160:4 162:11 165:2,17 166:3 166:9 171:21 172:20 177:2 178:4 179:21 179:24 180:2,5 185:16 190:8 192:20 201:17 206:9 221:19 222:24 223:2 226:9 228:11 235:22 240:2 243:7,23 250:14 253:10 255:3 262:16 263:13 266:20
**wanted** 17:16 18:10 19:7,16 20:5 35:10 87:23 178:18
**wants** 175:21 177:18 201:19 201:19
**wars** 169:13 170:22
**washington** 2:11 16:10 17:11 141:21 173:20 175:22 222:8
**water** 29:9 124:5 176:24
**way** 10:7 23:7 33:21 34:16 37:3,4 42:2 61:23 62:2,7 65:10,11 99:11 109:19 118:22 127:1 129:21 132:19 152:13 159:19,20 179:2,4,17 195:3,20 201:19 207:23 211:7 218:16 224:7,22 235:4 236:20 240:8

243:19 262:5 263:11 264:5 264:20
**we've** 38:19 68:19 74:8 86:17 149:8 154:5 171:16 219:9 223:1 224:7 243:11 251:3
**weak** 182:3 195:2,16 197:4 197:4 198:11 199:17
**weakening** 182:6
**wealthier** 167:24
**wearing** 182:13
**web** 156:12
**webb** 98:3
**website** 6:18 91:9 92:24 93:4 93:14,20 155:12 156:6,8 156:13 157:18 158:5 186:15 250:16,22 264:21
**websites** 159:18
**wednesday** 52:24
**weed** 1:9 6:3,9 6:10,12,14 9:12 9:17,22 10:2 32:9 33:4 55:9 58:16 80:1,8 83:15 88:2 93:6 134:1 135:5 139:14 155:14 156:16 159:3,3 160:17 161:1 165:23 171:23 180:6 183:14 186:10 188:11 192:13 201:23 212:3 217:1 220:18 223:8 227:11 229:10 230:7 235:19 243:8 246:20 250:19 253:9 261:7 265:5,10 269:16
**weed's** 111:24 158:10,11
**weedkiller** 144:19
**weedkiller's** 8:6 244:1
**weeks** 53:6 172:14 250:23
**weigh** 122:5 195:3
**weighed** 131:8
**weighing** 14:2
**weighs** 264:4
**weight** 7:5,14 118:15 188:15 189:12 207:14 217:5
**weinberg** 6:20 27:24 30:11,16 30:23 31:11 33:6 35:8 37:24 47:14 72:3 157:12 163:10 163:14,17,19 163:19 164:17 164:21 165:7 165:15 167:2 168:20,22 169:14 170:11 170:15 172:5 172:17,24 173:24 174:10 174:11,24 175:13,13,22 176:8,15,21 177:6 178:8,19 179:11
**welter** 55:2
**went** 10:6 17:9 18:13 47:17 106:15 164:3 178:20 253:16 254:5 265:24
**west** 3:10 4:8
**wheelhouse** 240:9
**white** 263:17
**whoa** 153:23,23 153:23
**wideikis** 4:3
**wiedner** 2:19
**wife** 60:20 157:3,21 158:12 236:8
**wild** 129:12
**willing** 223:5
**willingness** 170:22
**wilmington** 14:19 50:19
**wish** 196:21
**withdraw** 26:9 37:18,22 151:19 202:4
**withdrawn** 18:14
**withdrew** 202:10
**witness** 6:2 9:15,16 16:4 20:19 25:7 26:7 26:20 27:1 28:15 31:15 33:23 35:21 36:19 37:8,11 38:12 42:13 43:3 47:21 48:10 63:24 66:22 68:18 69:8,22 78:20

Case: 1:23-cv-00818 Document #: 1828-35 Filed: 05/05/26 Page 331 of 335 PageID #:79139



82:2,5,15 83:23 84:14 86:12 98:9,21 100:19 101:3 102:19 103:3,17 105:19 108:1 108:11,16 109:8 110:9 111:2 112:8 113:3,14 116:12 117:10 118:18 119:20 120:7 122:10 129:3,20 136:24 142:2 146:11 147:4 150:10 151:3 152:21 153:3 153:18,23 162:22 178:14 179:17 188:5 197:15 198:16 199:3 200:9,18 204:18,22 205:1 206:1 219:14 221:19 223:7 224:12 233:1,23 237:16,20,24 239:14,22 240:6 241:7 242:11 243:4 243:16 246:8 248:3 252:20 253:6 262:4 268:6,8

**wmlaw.com** 2:22

**woman** 72:18 85:8

**word** 56:20 85:24 111:3,17 114:9,24 119:16 125:24 158:2 162:12 170:10 199:23 200:6 201:4,24 202:22,24 203:8 215:2

**words** 56:21 74:19 108:2 119:7 158:21 196:16 214:7 228:14,20 263:4

**work** 11:14,19 12:13 13:2 18:20 19:18 20:8,10,15 26:11 27:7 38:19,23 41:22 44:9,9,11,13,17 45:1,7,7,15,24 46:10,11 47:9 51:4 68:19 69:18,18 78:24 79:5,8,14 81:8 81:11 84:20 92:16 123:24 132:22 133:6 139:22 152:16 157:11 163:10 164:16 166:11 166:16 168:1,5 169:5,10,19,23 170:3,17 173:12 178:23 179:13 187:13 187:20 191:5 211:15 216:6 227:1,20 229:20,20 230:3 235:15 236:18 241:24 251:5 252:10 261:11,24 262:2,17 266:11

**worked** 18:6 39:9 42:1 44:16 44:16,22 47:13 70:16,18,24 71:2,10,21,24 72:8,13 73:1 74:23 99:23 133:7 152:13 170:10 171:4,8 221:8 244:18

**working** 15:23 17:7 21:9 39:22 43:22 47:8 72:1 72:4,10 133:2 162:14 217:21

**workplace** 138:11

**works** 37:19 102:1,2 109:19 118:19 174:1 207:23 243:1 264:5

**world** 16:16,21 17:5,12 19:7 39:8 68:21 69:12 84:18 86:9 161:15,16 193:14 222:5

**world's** 193:18

**worth** 174:9

**wrap** 18:15

**write** 159:20 160:17 182:1 207:11 236:8 236:15 265:23

**writer** 177:17

**writing** 69:14 183:2 185:23 239:14 247:22 248:13,15

**written** 85:13 99:12 119:11 128:15 177:17 195:11,13,15 256:21

**wrong** 112:20 121:18,22 123:22 126:10

126:11,11,12 128:22,23 129:3 205:14
**wrote** 42:7 75:12,17 125:2 159:13 161:7 172:24 187:9 233:16 238:8 238:12 239:11

**x**

**x** 6:1,8

**y**

**yeah** 11:4 13:3 13:20,21 19:10 25:18 32:20 38:14 41:10 43:21 46:3 48:20,23 49:19 50:4 51:3 58:14 59:1 63:3 66:14 69:23 70:2 74:11 75:10 76:7,8,9 78:5 82:11 83:8,12 83:12 84:2,14 84:17 85:1,2,20 90:8,17 97:17 98:4,5,6 103:12 106:14 108:4,6 109:8 118:21 119:7,14 121:24 128:10 134:2,9 136:2 138:6 140:9 142:19,20 143:14,22 144:16 146:3 150:1 154:1,8 154:20 155:1 162:7 166:13 166:13 167:24 169:18 170:13 172:8,15 175:14 185:22 186:4 189:18 190:10 198:20 199:3 202:17 204:12 207:4 207:10 209:2,3 209:4 214:9,9 215:8 220:4 226:8 236:19 236:19 237:15 237:19 249:16 251:8,15 254:4
**year** 16:8 17:10 17:15,22 19:5 20:23 21:1 27:12,13,22 46:22 47:4,13 47:15,16,18,19 48:5 81:4 133:1 176:17 223:18 227:22 247:5
**years** 11:18 12:4 15:3 16:1 21:6 22:8 23:13 24:22 25:4 30:8 31:6 38:22 41:20 42:1 44:14 45:21 46:6,9,18 48:5 50:2 69:5,13 80:16 99:24 131:13,15 133:11 152:21 152:23 156:3,6 159:3 160:22 162:13 179:24 189:5 253:24 254:10,12 256:18 260:13 261:1,14
**yesterday** 52:19 54:22
**york** 2:6,6,11 5:6,6 53:20,23 141:20
**yourlawyer.c...** 2:12

**z**

**zoom** 2:4,10,14 2:20 3:4,10,15 3:19 4:3,7,12 4:17,18 5:4 54:19,22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.