**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: HAIR RELAXER MARKETING, SALES PRACTICES, AND PRODUCTS LIABLITY | Case No. 1:23-cv-00818<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Before the Court remains Defendants' motion to exclude Plaintiffs' general causation experts [1828]. The Court's previous order regarding Defendants' motion set out the relevant factual background and legal standards, resolving Defendants' generalized challenges against Plaintiffs' slate of ten experts. *See In Re Hair Relaxer Mkting., Sales Pracs., and Prods. Liab.*, 2026 WL 3168417 (N.D. Ill. Oct. 22, 2026). The Court assumes familiarity with its previous order and does not repeat those facts or legal reasoning here. For the reasons explained below, the Court grants Defendants' request to exclude Drs. Chang and Pugliese. The Court denies Defendants' motion to exclude as to Drs. Roque, Sharma, Panigrahy, and Brown.

## I. Discussion

### A. Dr. Chang is Not Qualified to Opine on General Causation of Cancer Conditions.

Dr. Chang is Professor Emeritus in the Department of Obstetrics, Gynecology, and Reproductive Sciences, with a long curriculum vitae and extensive academic and clinical practice in oncofertility and reproductive endocrinology. However, "nothing in [his] testimony nor his expert report and curriculum vitae" qualifies him to opine

as to ovarian and uterine cancers. *See Hall v. Flannery,* 840 F.3d 922, 930 (2016); *see also Koehler v. Infosys Techs. Ltd., Inc.*, 181 F.4th 769, 779 (7th Cir. 2026) (excluding expert who, even if potentially qualified to identify "western" names, was unqualified to identify "South Asian" names). As such, the Court agree with Defendants that Dr. Chang is unqualified to opine on general causation of these conditions. *See* Defs.' Mem. at 68-69[1]

Generally, "[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Judges "ask not whether an expert 'is qualified in general' but whether he is qualified 'to answer a specific question ....'" *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (quoting *Gayton*, 593 F.3d at 617); *see also Ollison v. Gossett*, 136 F.4th 729, 742 n.41 (7th Cir. 2025). An expert need not "be a specialist in a given field." *Hall v. Flannery*, 840 F.3d 922, 929-30 (7th Cir. 2016) (quoting *Gayton*, 593 F.3d at 618). For instance, clinical experience or practical expertise can qualify an expert even if they lack formal training. *See id.* at 928-29 (collecting cases). Ultimately, an expert must "possess[ ] ... specialized education, knowledge, experience, or skill" in the area in which he offers his opinions. *Id.* at 929-30.

---

[1] The Court's rulings as to Dr. Chang, as well as to the other experts whose qualifications and reliability have been challenged in Defendants' combined motion to exclude Plaintiffs' general causation experts, is limited to general causation of ovarian and uterine cancers. They do not extend to other conditions or issues that may be at issue in the MDL.

A factor critical to this inquiry is whether an expert's specialized education, knowledge, experience, or skill comprises the condition at issue. In *Hall v. Flannery*, the Seventh Circuit reviewed de novo whether plaintiff's expert, a pediatric neurosurgeon, was qualified to offer an opinion concerning whether the plaintiff's injury was attributable to a heart-related issue or a seizure. *See* 840 F.3d at 928-30. While the expert's extensive neurological experience qualified him to testify as to seizures, the Seventh Circuit found that nothing in his training or experience qualified him to opine as to chronic inflammation or cardiology. *See id.*; *see also Koehler*, 181 F.4th at 779 (upholding exclusion where expert admitted he lacked relevant experience and expertise).

Dr. Chang admits he lacks any training, expertise, or experience regarding ovarian and uterine cancers. He admits to not having been trained or having published in a variety of disciplines relevant to his opinion. *See* Chang Tr. at 71-79. While this specialization is not required, Dr. Chang also repeatedly testified that his experience and expertise is not in oncology (or any other medical discipline that diagnoses, treats, or otherwise concerns the causes of cancer), but is in reproductive endocrinology and oncofertility (fields focusing on fertility, including the effects of cancer on fertility). *See, e.g.*, Chang Tr. at 63 (agreeing that oncofertility "was not focused upon determining the cause -- the diagnosis, the cause, and treatment of the cancer itself, but fertility aspects related to the fact that a woman may have had cancer, to preserve her fertility"); *id.* at 64 (agreeing that his career "has not been on the diagnosis and causes of either ovarian or endometrial cancer."). Most tellingly, if

one of Dr. Chang's patients is diagnosed with cancer, he refers them to another doctor. *See* Chang Tr. at 61 ("I'm not an oncologist. I'm a reproductive endocrinologist. If I find these patients [with cancer], I refer them to oncology."); *id.* at 64 (agreeing that he does not diagnose or treat ovarian or uterine cancer patients). The Court cannot help but conclude that a doctor who is uncomfortable diagnosing and treating the cancers at issue is unqualified to testify as to the causation of those cancers.

Plaintiffs argue that Dr. Chang's specialization in endocrinology regarding reproductive systems should suffice to qualify him. *See* Pls.' Opp. at 76. As they see it, Dr. Chang offers an endocrinology-focused opinion founded in his familiarity with the endocrinological mechanisms that he opines underlie ovarian and uterine cancer causation. *See id.* While the Court agrees that Dr. Chang's endocrinology credentials are "superlative," *id.* at 74, Plaintiffs provide no evidence, nor does the Court see in Dr. Chang's report, curriculum vitae, or stated academic and clinical experience any support for the proposition that Dr. Chang's specialization and practice in endocrinology extends to the causation of cancer conditions, as opposed to fertility-related conditions. As Dr. Chang states, he has spent "an entire academic career," Chang Rep. at 4, studying one particular non-cancer condition: polycystic ovary syndrome, a disorder "characterized by irregular or absent menstrual cycles, excessive hair growth, and enlarged ovaries that contain multiple small cysts." Chang Rep. at 1-2. While this condition "can contribute to the development of endometrial and ovarian cancer," *id.*, Dr. Chang does not appear to deal with that aspect in his clinical or academic experience. Rather he specializes in the causes and fertility

implications of polycystic ovary syndrome. *See* Chang Rep. at 22-25 (describing these pathways); *see also generally id.* at Ex. 1 (curriculum vitae). If the condition he studies, treats, and diagnoses produces a cancer, he refers them to another doctor.

Nor does the fact that Dr. Chang possesses superlative experience in this particular condition qualify him to opine as to cancer causation. While he opines that both polycystic ovary syndrome and the cancers at issue are hormonally driven, *see* Chang Rep. at 24-25, he only has training, expertise, or experience regarding the former. As Defendants argue, Plaintiffs mention, and Dr. Chang describes, cancer is a multifarious and multifactorial disease. *See* Defs.' Mem. at 50; Pls.' Opp. at 48 n.29 (discussing deposition testimony of Dr. Roque); *see, e.g.*, Chang Rep. at 25-27 (describing the many classifications and risk factors for uterine cancer); *id.* at 33-37 (similar for ovarian cancer). Further, while Dr. Chang opines from his experience regarding PCOS' connection to ovarian and uterine cancers to CHRs connection to those cancers, *see* Chang Rep. at 22-25, 41 (describing how PCOS can increase the risk of cancer), he does not connect CHR use to PCOS or connect PCOS to the larger plaintiff population. *See generally id.*[2]

In sum, Plaintiffs fail to show how Dr. Chang's expertise in reproductive endocrinology qualifies him to testify as to cancer causation, a condition with a

[2] Even if Dr. Chang were qualified to offer a general causation opinion, the court is not convinced that he employed his weight-of-the-evidence methodology reliably. First, the gaps between PCOS and cancer in Dr. Chang's qualifications double as analytical gaps in his scientific reasoning. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Second, despite relying in large part on the three central epidemiological studies (*Chang*, *Bertrand*, and *White*) to connect CHR use with ovarian and uterine cancers, *see* Chang Rep. at 5-7, 40-41, 42, Dr. Chang does not reliably consider their limitations, nor their mixed results. As examples, he does not consider their varied statistical significance or the Sister Studies' overinclusive product categories.

different diagnostic profile. The Court therefore finds Dr. Chang unqualified to opine on the "specific question" asked—whether CHRs can cause ovarian and uterine cancer. *See Hall,* 840 F.3d at 926; *see also Truitt*, 938 F.3d at 889-90 (upholding ruling that experience with some group dynamics did not qualify expert to testify as to others); *Ollison*, 136 F.4th at 742-43 (expert on medical care was not qualified to offer opinion on nonmedical care).

**B. Plaintiffs' Gynecologic Oncology Experts, Drs. Roque and Sharma, are Both Qualified to Opine to Cancer Causation.**

Defendants contend that that Plaintiffs' gynecologic oncology experts, Drs. Roque and Sharma, are both unqualified to proffer general causation opinions and do so unreliably. At bottom, Defendants' arguments regarding these experts' qualifications rest on the facts that these experts do not specialize in epidemiology and have not previously performed a Bradford Hill analysis. The latter is "irrelevant" because "[b]y that logic, no witness could ever qualify as an expert for the first time." *Catapult Commc'ns Corp. v. Foster*, No. 06 C 6112, 2010 WL 659072, at *2 (N.D. Ill. Feb. 19, 2010). The former is equally irrelevant. *See Truitt*, 938 F.3d at 889 (expertise in a particular field is not required).

Rather, both experts are qualified to opine as to general causation of uterine and ovarian cancers given their experience or clinical expertise. *See Hall*, 840 F.3d at 928-29. Dr. Roque is a gynecologic oncologist board-certified in obstetrics and gynecology and gynecologic oncology. Roque Rep. at Ex. A (curriculum vitae). Dr. Sharma is a double-board certified gynecologic oncologist with board certifications in obstetrics and gynecology, and gynecologic oncology. Dr. Sharma Rep. at 5. Both are

medical doctors and academics who not only have specializations, but also clinical and academic experience, in diagnosing and treating the cancers at issue. *See* Pls.' Opp. at 67, 69-70. Moreover, Dr. Sharma agreed in his deposition testimony, and Defendants do not contest, that "the concepts behind the Bradford Hill analysis or the framework that [he] used [are] consistent with [his] everyday practice, clinical endeavors, things of that nature." Sharma Tr. at 288. So too with Dr. Roque, who stated that his clinical practice and academic endeavors qualify him to opine on the causes of ovarian and uterine cancer. *See* Roque Rep. at 5 ("Proper identification and distinction of these [cancers], therefore, requires careful consideration and correlation with clinical, epidemiological, pathological and biologically plausible pathways to arrive at the correct diagnosis so that the patient can be managed appropriately.").[3] So, while Drs. Roque and Sharma may lack practical experience with CHRs or EDCs, *see* Defs.' Mem. at 71 n.49, 73, their medical expertise and clinical experience qualify them to perform the general causation analysis on which they opine. *See Hall*, 840 F.3d at 928-29; *see also In re Johnson & Johnson*, 509 F. Supp. 3d 116, 159 (D.N.J. 2020) (qualifying gynecologic-oncologist performing Bradford-Hill analysis); *see generally In re Johnson & Johnson Talcum Powder Prods. Mktg.*, No. 3:16-MD-2738 (MAS) (RLS), 2026 WL 161184, at *1 (D.N.J. Jan. 20, 2026) (qualifying or noting past orders qualifying multiple gynecologic-oncologists).

---

[3] Dr. Roque testified that he does not have time to do a specific causal analysis "for each individual patient". Defs.' Mem. at 71 n.49. Dr. Roque's statement does not undermine his reliability to offer a general causation opinion given his oncological training and stated clinical experience. At most, then, this statement goes to weight, not admissibility. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

### C. Drs. Roque and Sharma Reliably Opine as to General Causation

Defendants levy only one specific challenge to the reliability of Drs. Roque and Sharma but also reference both in some of their generalized challenges. As the Court found previously, Defendants' generalized challenges do not serve as categorical bars to admissibility; rather they largely identify potential analytical gaps that Plaintiffs' experts must reliably bridged. *See In re Hair Relaxer*, 2026 WL 3168417, at *4-10. As the Court stated previously, it will not apply generalized challenges to experts employing a more specific or different method of reasoning than the broad-brush one Defendants challenge. *See id.*

Defendants specific challenge to both experts' reliability contends that neither employed defined or reproducible enough methodologies for their literature searches. *See* Defs.' Mem. at 72-75. To be certain, documentation and reproducibility are important when assessing reliability. *See United States v. Hebshie*, 754 F. Supp. 2d 89, 125 (D. Mass. 2010) ("Documentation is necessary to test a hypothesis; in fact, reproducibility is the sine qua non of science.") (cleaned up). But even Defendants' only cited authority indicates that failures of documentation are "not independently fatal to [reliability]." *In re Paraquat Prod. Liab.*, 730 F. Supp. 3d. 793, 831 (S.D. Ill. 2024). Rather, such failures supply reason for exclusion where they show a "systemic failure to adhere to the rules of [a] chosen methodology." *Id.* Defendants' critique is thus more aptly levied against experts who use certain defined methodologies for their literature search, such as a meta-analysis or "Systematic Literature Review." *Id.* at 830-31; *see also generally In re Abbott Lab'ys, et al., Preterm Infant Nutrition*

*Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 1283927 (N.D. Ill. May 2, 2025) (differently analyzing and admitting experts who performed a systematic literature review and weight-of-the-evidence analysis); *In re Abbott Laby's Preterm Infant Nutrition Prods. Liab. Litig.*, 2025 WL 2381699 (differently analyzing and admitting experts performing meta-analysis and literature review consistent with prior publications). Neither Dr. Roque nor Dr. Sharma performed such a methodology. Nor were they required to. *See Preterm Infant Nutrition Prods.*, 2025 WL 2381699 at *12 ("Neither *Daubert* nor Seventh Circuit precedent require that an expert name a 'specific standardized methodology' in reaching her conclusions; *Daubert* directs the district court to determine 'whether *the reasoning or* methodology underlying the testimony is scientifically valid.'") (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)). Instead, Drs. Roque and Sharma performed a Bradford Hill analysis, which this Court previously found generally reliable. *See In re Hair Relaxer*, 2026 WL 3168417, at *21 (citing *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 850 (7th Cir. 2025), *cert. denied sub nom. Andrews v. Lands' End, Inc.*, No. 26-3, 2026 WL 2976181 (U.S. Oct. 5, 2026)).[4]

Defendants have not shown that any asserted failures of documentation in either experts' literature review merits exclusion. According to Defendants, Dr. Roque is unreliable because he "could not testify as to the specific material he reviewed or considered in performing his analysis," and "could not define the scope of

[4] Importantly, Defendants do not contend that either Dr. Roque or Dr. Shama performed their Bradford-Hill analysis unreliably, only that they did not reliably document certain aspects of the literature review they used to support that methodology. The Court also notes that both experts provided weighting in their Bradford Hill analyses. *See* Roque Rep. at 57-61; Sharma Rep. at 40-43.

his literature review or even recall the universe of literature he reviewed in performing his causal assessment." Defs.' Mem. at 70-72. However, as Plaintiffs point out, Dr. Roque specified a search methodology, Roque Rep. at 5-6, and "provided a list of 137 references and dozens of additional materials he considered." Pls.' Opp. at 68 (citing Roque Rep. at 63-74 and *id.* at Exhibit B ("Materials Considered by Expert Dr. Dario Roque")); *see also, e.g.*, Roque Tr. at 177-78, 187-89. Likewise, Defendants criticize Dr. Sharma for not being able to specify a full set of search terms, inclusion criteria, or materials considered. Defs.' Mem. at 73 (citing Sharma Tr. at 55-56, 59-60, 62-63). But Dr. Sharma also supplied his methodology. *See* Sharma Rep. at 6. And, in response to Defendants' questioning, Dr. Sharma did in fact supply search terms. *See* Sharma Tr. at 59-63 (providing terms "to his best recollection"). He also provided an extensive list of references and additional materials considered. *See* Sharma Rep. at 45-52; *see also* Sharma Rep. at Ex. B. ("Materials Considered by Expert Dr. Sameer Sharma").

Further, both experts' testimony is far from *ipse dixit*. Nearly every factual or scientific assertion in both reports is followed by a citation to the scientific literature. Defendants do not dispute that these represent peer-reviewed or otherwise sound scientific bases for the opinions offered. Such citation practice and reasoning is clear indication of both reports' reliability. *See Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017) ("When determining the reliability of a qualified expert's testimony under *Daubert*, courts are to consider ... whether the theory has been subjected to peer review [and] whether the theory has been accepted in the relevant

scientific community."). This indication is especially compelling where Defendants do not accuse Drs. Roque or Sharma of cherry-picking, identify any studies that either should have considered but were not, or provide scientific or legal authority for their contention that literature reviews in support of a Bradford-Hill analysis must be more rigorously conducted or documented.

Regarding their generalized challenges, Defendants largely do not explain how these render unreliable Dr. Roque's or Dr. Sharm's actual reasoning employed. Defendants' only references to Dr. Roque in their generalized challenges are suggestions that Dr. Roque did not reliably connect the EDCs he analyzed to the CHRs at issue, *see* Defs.' Mem. at 21 n.20, and that he unreliably considered bias that could have resulted from the epidemiological studies' twelve-month exposure period. *Id.* at 51. The Court's analysis below finds that Dr. Roque reliably did both. Defendants' generalized challenges do not address at all Dr. Sharma, except to approvingly cite his consideration of statistical significance. *Id.* at 37 (citing Sharma Tr. at 303). Still, although perhaps supererogatory, the Court, in recognition of its role as gatekeeper of expert testimony, analyzed and found both Dr. Roque's and Dr. Sharma's reports reliable in spite of Defendants' generalized challenges.

Dr. Roque bridges the analytical gaps identified by Defendants' generalized challenges. He opines to general causation by relying on epidemiological studies connecting CHR use at the product-level to ovarian and uterine cancers as well as mechanistic evidence showing biological plausibility. *See* Roque Rep. at 37-52, 60. He reliably considers the three central epidemiological studies' results, statistically and

non-statistically significant, explaining that "statistical significance is lacking in a single study (or a sub-group analysis), does not obviate the presence of a meaningful exposure-response relationship, requiring examination of underlying methods and comparison to the weight of evidence." *See* Roque Rep. at 57; *see also id.* at 49, 59. Dr. Roque also accounts for the studies' limitations, including bias resulting from CHR usage in *Bertrand*'s never/light reference category, the studies' limitation of the exposure period to a twelve-month window prior to enrollment in the study, and the studies' treatment of race. *See id.* at 38-42; s*ee also* Pls.' Opp. at 21 n.13 (citing Roque Tr. at 374:20-376:15) ("[A] significant percentage of the study population was African American. So I don't think that [race] was a limitation of the study … [the study authors] did not find that race made a difference.").[5] Dr. Roque also evenhandedly discusses a number of other studies and published analyses, including those criticizing the three central epidemiological studies. *See* Roque Rep. at 47-54.

Furthermore, Dr. Roque scientifically justifies his treatment of EDCs as a class and connects their mechanistic effects to uterine and ovarian cancers. *See, e.g.*, Roque Rep. at 54-55, 60. He also connects the chemicals he analyzed to CHR mixtures. *See id.* at 53 ("[S]everal studies and regulatory agencies have shown that hair relaxers as a product category or class share similar ingredients, many of which are considered to be carcinogenic, including several EDCs."); *id.* at 34-37. Additionally, he reliably considered dose at human levels of exposure, *see id.* at 57-59. Moreover, Dr. Roque justifies transdiagnostic reasoning where such reasoning is employed, including by

[5] While the quote provided by Plaintiffs differs slightly from the one in Dr. Roque's deposition transcript, both are substantively identical.

describing how EDC's disruption of normal endocrine functions links these chemicals to breast cancer and uterine fibroids as well as to uterine and ovarian cancers. *See, e.g.*, *id.* at 45, 47, 53, 60-61.

Dr. Sharma bridges the same analytic gaps identified by Defendants in their generalized objections. He scientifically justifies his treatment of EDCs as a class and connects their mechanistic effects to uterine and ovarian cancers. *See, e.g.*, Sharma Rep. at 21-24, 42. He connects the chemicals he analyzed to CHR mixtures. *See id.* at 21-23. His general causation opinion relies on both epidemiological studies connecting CHR use at the product level to ovarian and uterine cancers, as well as mechanistic evidence showing biological plausibility. *See id.* at 11, 16-17, 40-42. In considering the three central epidemiological studies, Dr. Sharma evenhandedly discusses their limitations and what it means for them to have produced both statistically significant and non-statistically significant results. *See* Sharma Rep. at 25-32, 40-41; Sharma Tr. at 250-252, 274-276, 304-05.[6] Further, by centering his analysis around the three epidemiological studies, as well as studies showing absorption at human-use levels, he reliably opines to causation at human doses. *See generally*, Sharma Rep. Dr. Sharma also reliably discusses nonmonotonic dose response. *See* Sharma Tr. at 160-161.

[6] It is unsurprising that "Dr. Sharma acknowledged that the Sister Study and Black Women's Health Study cohorts were not designed specifically to investigate the relationship between chemical hair relaxers and uterine or ovarian cancer." Defs.' Mem. at 74. This is common in cohort studies, an established study design in epidemiology. *See* Nat'l Acads. Of Scis., Eng'g, & Med. & Fed. Jud. Ctr., Reference Manual on Scientific Evidence, at 908-09 (4th ed. 2025) ("In cohort studies, researchers define a study population without regard to the participants' disease status."). In this light, Defendants' contention that Dr. Sharma "chose to downplay" study design, Defs.' Mem. at 74 (*citing* Sharma Tr. at 57-58), is unpersuasive.

### D. Dr. Panigrahy's Biological Plausibility Opinion is Reliable.

Dr. Panigrahy offers an opinion on both biological plausibility and causation, the latter using a Bradford Hill analysis. *See* Pls.' Opp. at 87-91.[7] As the Court previously held, these are separate opinions that warrant separate assessments for reliability. *See In Re Hair Relaxer*, 2026 WL 3168417, at *15 (biological plausibility is neither necessary nor sufficient for a general causation opinion) (citing *Talcum Powder*, 2026 WL 161184, at *50-51, 55, 58); *see also Rutledge v. Walgreen Co.*, 182 F.4th 168, 189 (2d Cir. 2026). In particular, biological plausibility opinions need only provide reliable scientific support that a proposed mechanism is *plausible*. *See In Re Hair Relaxer*, 2026 WL 3168417, at *15.

Defendants largely challenge Dr. Panigrahy's opinions as a whole. As such, their challenges to the reliability of his opinions either fail to attend to the yardstick for a biological plausibility opinion or constitute generalized statements unattuned to Dr. Panigrahy's more specific scientific opinions.

#### 1) Defendants' Generalized Challenges Do Not Show Dr. Panigrahy to Be Unreliable.

First, Defendants extend their generalized objections to Dr. Panigrahy, arguing that he does not provide scientific justification for his causal analysis at the mixture or product level, *see* Defs.' Mem. at 21; does not adequately tie the chemicals he analyzed to CHR products, *id.* at 89; and unreliably considers dose, *id.* at 26 (asserting that Dr. Panigrahy stated that the chemicals he analyzed do have a

[7] Defendants do not challenge Dr. Panigrahy's qualifications.

threshold dose); *id.* at 90 ("Dr. Panigrahy's general causation opinion ultimately reduces to the uniformly rejected 'any exposure' theory.").

In failing to anchor their generalized objections in Dr. Panigrahy's actual methodologies, Defendants largely miss the mark. For instance, Dr. Panigrahy grounds his opinion in published science, including providing a number of citations and scientific justifications for analyzing the chemicals in his opinion at the mixture level, including shared pathways and the chemicals' additive or synergistic effects. *See, e.g.*, Panigrahy Rep. at 96-100 (discussing mixture effects of genotoxic and carcinogenic chemicals). Defendants do not contend with the scientific reasoning underlying Dr. Panigrahy's opinion. Specifically, Dr. Panigrahy states that:

> Exposure to a mixture of carcinogens can cause cancer to grow more aggressively than exposure to a single carcinogen. For example, formaldehyde can disrupt DNA repair. Thus, DNA damage caused by exposure to the other genotoxic carcinogens in hair relaxers can initiate and promote cancers in an additive or synergistic manner. Similarly, a chemical that exhibits immunosuppressive activity may not be carcinogenic as a single agent, but it may promote carcinogenesis in the presence of other chemicals. For example, formaldehyde can induce immunosuppression, which can help initiate or cause cancer via the other genotoxic and non-genotoxic carcinogens in the hair relaxers. *Id.* at 100.

Defendants only response to this scientific reasoning is to mischaracterize Dr. Panigrahy's deposition testimony and report. First, Defendants treat a statement by Dr. Panigrahy that he is not aware of a study that considered a mixture containing *all* of the chemicals he analyzed as an admission that he provides no support analyzing *any* chemicals as part of a mixture. *See* Defs.' Mem. at 30 (citing Panigrahy Tr. at 270). But Dr. Panigrahy's statement is not such an admission. Second, Defendants cite to a specific page of Dr. Panigrahy's deposition to declare that his

report "cites only to an article recognizing a 'hypothesis' that 'low-dose exposures to [mixtures of] disruptive chemicals that are not individually carcinogenic may be capable of instigating and/or enabling carcinogenesis.'" *Id.* at 30 (citing Panigrahy Tr. at 280). This is contradicted by the rest of Dr. Panigrahy's testimony and his actual report. Dr. Panigrahy testified that he doesn't "rely only on this paper," but "cite[s] other publications that actually tested different mixtures and especially of carcinogens." *See* Panigrahy Tr. 282-284. This is borne out by his report. *See* Panigrahy Rep. at 99-100 (citing Goodson et al*., Assessing the Carcinogenic Potential of Low-Dose Exposures to Chemical Mixtures in the Environment: The Challenge Ahead*, 36(1) Carcinogenesis 254 (2015); Goodson, et al., *Testing the Low Dose Mixtures Hypothesis from the Halifax Project*, 35 Rev. Env. Health 333 (2020); Rider et al., *Using the Key Characteristics of Carcinogens to Develop Research on Chemical Mixtures and Cancer*, 129 Env. Health Perspect. 35003 (2021).

Defendants' second generalized challenge, that he does not connect the chemicals he analyzed to CHRs, fares no different when Dr. Panigrahy's actual reasoning is considered. He in fact cites multiple studies bridging this analytic gap. *See, e.g.*, *id.* at 28-29 (citing Helm et al., *Measurement of Endocrine Disrupting and Asthma-Associated Chemicals in Hair Products Used by Black Women*, 165 Environ. Res. 448 (2018). As the Court previously found, this is sufficient to satisfy reliability under Rule 702. *See In Re Hair Relaxer*, 2026 WL 3168417, at *16.

Third, Dr. Panigrahy does not inappropriately employ "any exposure" logic by denying a threshold dose. *Contra* Defs.' Reply at 36-37. As the Court previously noted,

general causation experts are not required to identify a threshold dose. *See In Re Hair Relaxer*, 2026 WL 3168417, at *8-9 (collecting cases). Rather, to be reliable, Dr. Panigrahy must only show that the chemicals or mixtures he examines have the capacity to cause ovarian and uterine cancers at human-realistic doses. *See id.* Like Plaintiffs' other qualified general causation experts, he does. *See generally*, Panigrahy Rep. (opining based on epidemiological studies showing product-level association of CHRs with ovarian and uterine cancers, as well as studies showing biological plausibility).

**2) Defendants' Specific Challenges to Dr. Panigrahy's Biological Plausibility Opinion Do Not Render Him Unreliable.**

Defendants' specific challenges to Dr. Panigrahy's biological plausibility opinion include that his methodology is generally unsound, that he fails to bridge the gap between the carcinogenicity of the chemicals he analyses and ovarian and uterine cancers and that he does not provide sufficient human data regarding the chemicals and biological mechanisms he discusses. *See* Defs.' Mem. at 90-91.

First, Dr. Panigrahy uses the established Key Characteristics of Carcinogens framework as methodology for his biological plausibility opinion. *See* Reference Manual on Scientific Evidence at 1067-78 (discussing the use of such "formal processes to evaluate the weight of evidence that a chemical causes cancer" by the World Health Organization's IARC and the U.S. National Toxicology Program); *id.* at 1068 n.79 (noting these organizations are among those with "the lengthiest track record of responsibility for the hazard identification of carcinogens"); Panigrahy Rep. at 12-24 (describing this framework and their acceptance by public health bodies).

Other than broadly claiming that Dr. Panigrahy merely "aggregates general propositions about carcinogenesis," Defendants do not impugn these frameworks as unreliable or claim that Dr. Panigrahy applies them in an unreliable manner. *See* Defs.' Mem. at 90-91. Defendants also do not contest that Dr. Panigrahy uses these methodologies in his academic or clinical experience or claim that he applied them differently in litigation.

Second, the Court finds that Dr. Panigrahy's analysis, for the large part, is sufficiently connected to ovarian and uterine cancers. His report connects the chemicals and chemical mixtures to ovarian and uterine cancers, citing both human and animal data. *See* Panigrahy Rep. at 48 ("[E]vidence shows that formaldehyde induces chronic inflammation, which provides a pro-tumorigenic environment that can accelerate the survival, growth and development of uterine cancers and ovarian cancers."); *id.* at 49 (formaldehyde is immunosuppressive, even at low levels and for short-term exposures. This ... can promote the survival, growth and development of uterine cancers and ovarian cancers."); *id.* at 50-54 (discussing evidence that ethylene oxide "causes uterine, ovarian, and other cancer types in animals."); *id.* at 57-63 (discussing human and animal studies connecting acrylamide to endometrial, uterine, ovarian, and breast cancers); *id.* at 63-69 (discussing various mechanistic connections between parabens and hormone responsive cancers like breast, uterine and ovarian); *id.* at 69-75 (same for phthalates, including citing epidemiological associations between phthalates and hormone responsive cancers in humans); *id.* at 77-80 (discussing how Benzophenones, as EDCs, can mechanistically cause ovarian

and uterine cancers); *id.* at 79 (citing human and animal studies connecting Benzophenone-1 to ovarian cancer); *id.* at 80-85 (connecting n-Nitrosodimethylamine to mechanisms of ovarian and uterine cancers in humans and animals, including studies showing "NDMA causes cancer including ovarian cancer in studies of a wide variety of animal species"); *id.* at 90-96 (similar for arsenic).[8]

Third, the mere fact that Dr. Panigrahy relies on animal studies as well as human studies does not undermine his reliability. It is common for biological plausibility opinions to discuss animal studies as mechanistic evidence. *See, e.g.*, *Rutledge*, at *182 n.9 (recognizing that animal studies can reliably inform Bradford Hill and weight-of-the-evidence analyses); *id.* at 189, 189 n.19 (finding experts approach on biological plausibility found "support in the practices of other epidemiologists outside the courtroom") (citing study "concluding that biological plausibility is satisfied based on experimental animal evidence"); *Talcum Powder*, 2026 WL 161184, at *75 (expressly distinguishing using animal studies for biological plausibility from using them to establish general causation); *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1126-1128, 1137-38, 1144, 1146-47 (N.D. Cal. 2018), *aff'd sub nom. Hardeman v. Monsanto Co.*, 997 F.3d 941 (9th Cir. 2021)

[8] Dr. Panigrahy's biological plausibility opinion does not reliably connect 1,4-dioxane, "NDELA", or polyaromatic hydrocarbons to ovarian and uterine cancers. *See* Panigrahy Rep. at 54-57; 75-77, 85-89. He does not bridge the gap between the conclusion that these chemicals are generally carcinogenic and the initiation of ovarian and uterine cancers specifically. However, Dr. Panigrahy does reliably opine that these chemicals may be promoters of ovarian and uterine cancers as part of a mixture, such as through mechanisms like chronic inflammation and oxidative stress. As such, he may opine to them as part of his mixture-level opinion, including synergistic, additive, or other mixture-effects.

(finding animal evidence supported certain biological plausibility components of Bradford Hill analysis even though it did not, by itself, establish causation). And, for most of the chemicals he analyzed, Dr. Panigrahy cites both animal and human evidence. *See* Panigrahy Rep. at 48-96.

**E. Dr. Panigrahy Reliably Opines to General Causation.**

Defendants' specific challenges to Dr. Panigrahy's opinion on general causation (his Bradford Hill analysis) are that he cherry-picks statistically significant results in certain subgroups, "baselessly insisted the studies underestimated the risk of uterine or ovarian cancer by conflating hair relaxers with other products not at issue in this litigation", and concedes the absence of a biological gradient (*i.e.* dose-response) in *Bertrand*. *See* Defs.' Mem. at 91-92.

Like Plaintiffs' other general causation experts, Dr. Panigrahy does not simply ignore non-statistically significant results, but reports and accounts for them. *See* Panigrahy Rep. at 27; Panigrahy Tr. at 103-104. Further, it is hard to see how Dr. Panigrahy's direction of bias estimation is baseless given that the authors of the epidemiological studies he discusses provided the same direction of bias assessment in their peer-reviewed and published work. *See* Panigrahy Rep. at 27; *see In Re Hair Relaxers*, 2026 WL 3168417, at *13 n.19 (explaining why direction of bias issues are more appropriate for cross-examination). Finally, just as with Dr. Cote, although Dr. Panigrahy concedes the absence of a dose-response in *Bertrand*, he reports dose responses in *Chang*, as well as in another sister study testing CHR association with breast cancer. *See* Panigrahy Rep. at 27-28; *In Re Hair Relaxers*, 2026 WL 3168417,

at *27 (discussing Dr. Cote). He further justifies this transdiagnostic reasoning, *see, e.g.*, Panigrahy Rep. at 42, 64, and explains why his analysis considered this Bradford-Hill factor "fulfill[ed]." *Id.* at 102-03. As such, the Court finds Dr. Panigrahy's causation opinion as reliable as his opinion regarding biological plausibility.

**F. While Plaintiffs' Dermatological Experts, Drs. Brown and Pugliese, Are Both Qualified, Only Dr. Brown's Opinion is Reliable.**

Plaintiffs clarify in their opposition that Drs. Brown and Pugliese are biological plausibility experts with a specific "role": "to explain the dermatologic mechanisms by which repeated exposure to harsh chemicals can compromise scalp integrity and permit enhanced systemic absorption of the chemicals in chemical hair relaxer products."[9] *See* Pls.' Opp. at 63. Most of Defendants' challenges to both experts address analytical gaps outside of this limited form of general causation opinion. As such, arguments attacking their ostensible causation opinions, as opposed to the actual opinions these experts offer, are inapposite. *See, e.g.*, Defs.' Mem. at 61 (noting Dr. Brown said further investigation on causation is necessary); *id.* at 62 (claiming unreliability because Dr. Brown did not "determine whether his theory of absorption

[9] As the Court previously held, use of such "building block" experts is permissible where their opinions are relevant. *See In Re Hair Relaxers*, 2026 WL 3168417, at *3. Defendants for the first time on reply contest the relevance of this narrow formulation of these experts' opinions. *See* Defs.' Reply at 27-28. Given Plaintiffs' building block approach, the fact that Plaintiffs' dermatology experts do not establish the whole of the biological plausibility or general causation analysis does not make them irrelevant. Rather, their opinions that chemicals in CHRs can enter systemic circulation through dermal absorption, including through the scalp, is an opinion that would "assist the trier of fact." *See Daubert*, 509 U.S. at 591 (1993).

For the same reason, the Court is unpersuaded that the fact that Dr. Brown acknowledges that his opinion only concerns this aspect of biological plausibility render him unreliable. *Contra* Defs.' Mem. at 61. To the contrary—that an expert opines solely on the matters contained in their report is an indicium of reliability.

could lead to sufficient concentration in the uterus to produce biological meaningful effects.") (cleaned up).

Defendants challenge the reliability of both experts. *See id.* at 60-68. While Dr. Brown's report and methodology reliably bridge the requisite analytical gaps, Dr. Pugliese's report is unreliable as she fails to articulate any methodology at all.[10]

**1) Dr. Brown's Methodology is Reliable.**

Defendants contend that Dr. Brown is unreliable because he did no independent analysis apart from his literature review and because he failed to bridge various analytical gaps in his biological plausibility opinion.[11] Neither persuades the Court.

First, Rule 702 does not require an expert offering a biological plausibility opinion based on an otherwise reliable synthesis of published scientific literature to conduct independent testing. *See Rutledge*, 182 F.4th at 189 (biological plausibility

---

[10] Defendants also argue that Dr. Pugliese is unqualified to offer a causation opinion. *See* Defs.' Mem. at 65-66. However, as Plaintiffs state, Dr. Pugliese does not offer an opinion on causation, but one limited to biological plausibility. Dr. Pugliese explains that her expertise allows her to opine to "discuss the local effects of chemical hair relaxers, the mechanisms by which they can be absorbed." Pugliese Rep. at 3. Defendants do not challenge her qualifications to offer this more limited opinion and do not explain why Dr. Pugliese's practice as a board-certified dermatologist and oncodermatologist would not provide her expertise enough to opine on matters like "scalp anatomy, skin-barrier disruption, transdermal absorption, follicular penetration pathways, inflammation, and systemic uptake of chemicals in hair relaxer products through the skin." *See* Pls.' Opp. at 56. The Court finds Dr. Pugliese qualified. *See Hall*, 840 F.3d at 928-29 (specialty in every scientific discipline implicated in an opinion is not required).

[11] Defendants' initial brief also contended that Dr. Brown's decision to rely on one study instead of another is "fatal." *See* Defs.' Mem. at 62-63. Defendants appear to abandon this contention on reply. *See* Defs.' Reply at 26 ("Defendants do not fault Dr. Brown's decision to not rely on the *Pierce* study."). In any event, an expert's reasoned decision to credit one study over another is a matter for vigorous cross-examination, not exclusion. *See Africano v. Atrium Med. Corp.*, 561 F. Supp. 3d 772, 777-78 (N.D. Ill. 2021); *see also Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) ("Whether [Plaintiffs' expert] selected the best data set to use, however, is a question for the jury, not the judge.").

"'asks whether the hypothesized causal link is credible in light of what is known from science and medicine'" about the alleged toxin and its biological effects.') (citing *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 25 (1st Cir. 2011)); *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802, 815 (7th Cir. 2012) (finding methodologies other than testing can be reliable, especially where testing may not be "feasible or prudent").

As to the supposed analytical gaps in Dr. Brown's scientific reasoning, Defendants contend that he "identified no evidence" that reliably establishes hair relaxers can come in contact with the scalp; ingredients can penetrate the epidermal barrier or through the transappendageal process; and chemicals can enter the bloodstream and reach the uterine or ovarian tissue. Defs.' Reply at 25-26. However, Brown describes the hair relaxer application process, explains why petroleum-based protectants do not necessarily prevent contact with the scalp, and cites literature documenting effects on the scalp, such as burns. *See* Brown Rep. at 21-27 (citing many studies).[12] Similarly, Dr. Brown explains his opinion that relaxer ingredients can penetrate the epidermal barrier, including explaining how highly alkaline products compromise the stratum corneum and citing dermatological literature addressing the effect of pH and barrier integrity on percutaneous absorption. *Id.* at 14-17 (citing studies). Dr. Brown's report likewise grounds the absorption pathway he calls transappendageal in his deposition, Brown Tr. at 167, in studies examining

[12] Defendants' argument regarding hair relaxer instructions is irrelevant to Dr. Brown's reliability. *See* Defs.' Mem. at 63 n.47. Dr. Brown provides sufficient support for whether and how chemicals in CHRs can come into contact with the skin.

penetration through hair follicles, the contribution of follicular pathways to systemic uptake, and the capacity of follicles to retain substances after application. Brown Rep. at 15-19 (citing studies).[13] As to systemic circulation, Dr. Brown explains how chemicals reaching the scalp can enter systemic circulation. *Id.* at 9-12, 14-16 (explaining that the scalp's "rich vascular network permits the circulatory system to transport substances absorbed through the skin quickly throughout the body"; citing studies). He also identifies evidence bearing on whether chemicals in CHRs actually enter the body, including studies which measured urinary biomarkers of EDCs among CHR users. *Id.* at 21.

Defendants are correct that Dr. Brown does not establish dose or demonstrate that CHR constituents reach reproductive organs at biologically meaningful concentrations. *See* Defs.' Mem. at 32; Defs.' Reply at 25. Failure to reliably grapple with these issues could potentially be fatal to a causation opinion, but both lie beyond Dr. Brown's limited biological plausibility opinion. *See, e.g.*, Brown Tr. at 167-68 (testifying that whether chemicals in CHRs "must reach a sufficient concentration in the uterus to produce biological meaningful effects" … "wasn't part of the issue that [he] was tasked to answer."). Given Dr. Brown's extensive citations to published scientific literature regarding the biological pathways through which the chemicals in CHR could be absorbed, his opinion is not merely "hypothetical." *Contra* Defs.'

---

[13] Dr. Brown's report thus belies Defendants' assertion that he "cites no article examining dermal absorption of chemicals from hair relaxers." Defs.' Mem. at 62 (citing Brown Tr. at 191, 197). The Court also notes that Defendants' citation appears to be to their own question, not to Dr. Brown's response. *See* Tr. at 191-92 (to which Dr. Brown responded, "I'm not sure that's entirely true. If you apply a product or chemical to the skin and then measure its urinary excretion, how do you think it gets into the urine if it's not transposed -- or transported across the skin?").

Mem. at 31. Rather, Dr. Brown reliably enough substantiates the biological plausibility of mechanisms through which chemicals in CHRs "can be absorbed through the scalp," and "can enter the body's bloodstream," which support his conclusion that "the local and physiological effects caused by the application of chemical hair relaxers support the existence of biologically plausible mechanisms to explain the excess risk of uterine and ovarian cancers reported in the epidemiologic studies." *See* Brown Rep. at 27.

**2) Dr. Pugliese's Methodology Is Not Reliable.**

The Court agrees with Defendants that Dr. Pugliese's failure to specify what her weight-of-the-evidence methodology actually entailed is fatal to her admissibility. Defs.' Mem. at 66-68. To be sure, an expert need not use a "formalized weight-of-the-evidence analysis" to be reliable, including one that utilizes scoring criteria or other modes of quantification. *Contra id.* at 67; *see Milward*, 639 F.3d at 18 ("[T]he use of scientific judgment is necessary" in weight-of-the-evidence methodologies); *In re Social Media*, 2026 U.S. Dist. LEXIS, at *165-67 (N.D. Cal. March 17, 2026) (rejecting argument that "a lack of numerical weighting necessitates exclusion"); *see also Talcum Powder.*, 2026 WL 161184, at *67 (finding biological plausibility opinions reliable where they "synthesize[d] multiple lines of evidence"). And, as the Court noted above, failures in documentation, such as failing to provide a full list of search terms, tend to go to weight, not admissibility. Still, a Court in its role as gatekeeper must assess each experts' methodologies for reliability. *See In Re Hair Relaxers*, 2026 WL 3168417, at *1-2. The Court cannot do so where an expert specifies virtually no

methodology. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1253 (S.D. Fla. 2022) ("There must be a scientific method of weighting that is used and explained.") (citing *In re Zoloft*, 858 F.3d at 795).

Unlike Plaintiffs' other experts, Dr. Pugliese does not lay out her methodology with any specificity in her report (which lacks a methodology section), nor was she able to provide sufficient additional clarity in her deposition. *See generally* Pugliese Rep.; Pugliese Tr. at 98-100; 137-145. The only reference Dr. Pugliese makes to methodology in her report are the conclusory statements that she performed "a comprehensive literature search" and that she "used the same methods that [she] would use in my academic and professional work." Pugliese Rep. at 3-4. But Dr. Pugliese does not clarify what a comprehensive literature review entails or how she uses literature reviews in her academic or professional work. She states that she didn't "diagram anything out" to come up with her opinion and did not apply any "scoring methodologies" or "scoring criteria" in her evaluation. Pugliese Tr. at 137. Further, although Dr. Pugliese stated that she used PubMed for her literature search, she was unable to answer further questions about her methodology, including which search terms she used. *See* Pugliese Tr. at 98-100.[14] Nor can the Court infer just from Dr. Pugliese's list of references and materials alone that she applied whatever methodology she used reliably.

[14] While she offers to "review what… [the search terms she used] were", there is no evidence in the record before the Court, including Plaintiffs' opposition, that she ever produced them. *See* Pugliese Tr. at 99.

Plaintiffs' only argument on this point is that the literature review Dr. Pugliese employed was the same as what she uses in her practice. *See* Pls.' Opp. at 58 (citing Pugliese Rep. at 3-4; Pugliese Tr. at 22-24). The Court is not convinced. First, the portion of her deposition transcript that Plaintiffs cite do not discuss weight-of-the-evidence analyses or literature reviews. *See* Pugliese Tr. at 22-24. And Plaintiffs' citation to Dr. Pugliese's report merely reiterates the conclusory statements she provided about her methodology.

Dr. Pugliese's deposition further contradicts the idea that Dr. Pugliese's failure to specify a methodology can be saved by reference to her teaching, academic, or clinical experience. Dr. Pugliese's methodology was not consistent with what she teaches because she does "not have a specific weight-of-the-evidence analysis that [she] teach[es]." *See* Pugliese Tr. at 141-142. Similarly, in Dr. Pugliese's academic work, she explained, she "utilizes [scoring systems] when it's available", but that "it's not available in all reviews." *See id.* at 137-141. She does not say whether a scoring methodology was unavailable here or what kind of methodology she uses when such scoring systems are unavailable.[15] The deposition also gave the court little confidence that Dr. Pugliese employed a methodology consistent with her clinical work. For

[15] Plaintiffs do not identify any articles in which Dr. Pugliese conducts literature reviews in this manner. For her part, Dr. Pugliese mentions conducting a "comprehensive literature review" as part of an article on "a natural ingredient in cosmeceuticals." *See* Pugliese Tr. at 102-103. While unnamed by Dr. Pugliese or any party, the Court presumes this article is the only one it found fitting that description in her curriculum vitae: Bowe & Pugliese, *Cosmetic Benefits of Natural Ingredients*, 13(19) J. Drugs Dermatology 1021 (2014). However, Dr. Pugliese does not explain this article's methodology, did not say she used the same methodology in this litigation, and explained that the article's substance was different: regarding "localized toxicity," not absorption. *See* Pugliese Tr. at 102-103. The Court's independent review of that article also revealed that the article could not fill in this blank as it itself does not specify any methodology used.

instance, Dr. Pugliese supplied multiple reasons why her literature review process as part of this litigation was "a little different experience" from those she conducts when "working with cancer treatment." *See* Pugliese Tr. at 100-102.

Given the fact that Dr. Pugliese fails to disclose her methodology, Dr. Pugliese's failure to document her literature review goes more to admissibility than to weight. Whereas Dr. Sharma and Dr. Roque's reports contained methodology sections, with both experts able to elaborate on their methodologies in their depositions, Dr. Pugliese's methodology consists solely of her conclusory statements that she performed "a comprehensive literature search" and that she "used the same methods that [she] would use in my academic and professional work." Pugliese Rep. at 3-4. Without more, this is not a methodology that can be assessed for reliability. The Court cannot determine whether Dr. Pugliese's methodology was reliably applied merely from assurances that whatever methodology she used was consistent with her prior work. As such, her opinion is closer to the "standardless presentation of evidence" the court excluded in *Paraquat*, 730 F. Supp. F.3d at 831, 841, than the opinions the Court finds admissible above.

## II. CONCLUSION

For the reasons above, Defendants' Combined Motion to Exclude Plaintiffs' General Causation Experts is DENIED as to Dr. Sharma, Dr. Roque, Dr. Panigrahy, and Dr. Brown and GRANTED as to Dr. Chang and Dr. Pugliese.

E N T E R:

Dated: November 12, 2026

Mary M Rowland

MARY M. ROWLAND
United States District Judge